UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MELISSA KAYE,

PLAINTIFF,

-against-

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION; ELIZABETH FORD; PATRICIA YANG;
ABHISHEK JAIN;AND JONATHAN WANGEL (said
names being fictitious, the persons intended being those who
aided and abetted the unlawful conduct of the named
Defendants),

DEFENDANTS.

## FIRST AMENDED COMPLAINT
## JURY TRIAL REQUESTED

*Duly Submitted by:*                    Special Hagan, Esq.
                                        **LAW OFFICES OF SPECIAL HAGAN, ESQ.**
                                        196-04 Hollis Avenue
                                        Saint Albans, New York 11412
                                        (917) 337-2439 (Telephone)

1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
.................................................................................X
MELISSA KAYE,

                                PLAINTIFF,            **FIRST AMENDED**
                                               **COMPLAINT**

             -against-                                 **Civil Docket No.**

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION; ELIZABETH FORD; PATRICIA YANG;      **18-12137(JPO)**
ABHISHEK JAIN; and JONATHAN WANGEL (said names
being fictitious, the persons intended being those who aided and   **JURY TRIAL**
abetted the unlawful conduct of the named Defendants),           **REQUESTED**

                                  DEFENDANTS.
.................................................................................X

        PLAINTIFF, MELISSA KAYE ("KAYE" or "PLAINTIFF"), by and through her attorney,

SPECIAL HAGAN, ESQ., complains of Defendants:  NEW YORK CITY HEALTH AND

HOSPITALS CORPORATION ("HHC"); ELIZABETH FORD ("FORD"); PATRICIA YANG

("YANG"); ABHISHEK JAIN ("JAIN"); and JONATHAN WANGEL ("WANGEL"), in their

official and individual capacities and as aiders and abettors alleges as follows:

## I. **INTRODUCTORY STATEMENT**

     1.      This is an action for injunctive relief, declaratory judgment, equitable relief, money

damages and punitive damages, on behalf of PLAINTIFF, MELISSA KAYE.  KAYE contends that

she is experiencing discrimination based on sex.

     2.      PLAINTIFF alleges that she has been paid less than her male comparators despite having

more experience and certifications.  From 1999 to 2017, KAYE was paid up to $35K less than her

male comparators at the other borough forensic psychiatry court clinics. KAYE complained on numerous occasions about pay parity between 2012 and 2018 to no avail.

3.        KAYE contends that DEFENDANTS retaliated against her due to her protected activities. DEFENDANTS excluded her from meetings she once attended to perform her job functions, reduced her job title and changed her work schedule.  The latter change has had a devastating effect on PLAINTIFF and her family.  KAYE is a single working mother of nine year old twins.  PLAINTIFF has a child with a debilitating skin condition that requires on going care.  Accordingly, KAYE needed to work a prescribed work schedule.  DEFENDANTS changed Plaintiff's work schedule within 3 months of her complaint to the Equal Employment Opportunity Commission (EEOC).    When PLAINTIFF asked her union representative why she was being required to work a 9-hour day when none of the other directors were required to do so, KAYE was told that DEFENDANTS were *miffed* about her complaint to the EEOC.

4.        Due to DEFENDANTS' retaliatory change to her work schedule, PLAINTIFF was then compelled to take FMLA to care for her child since she was not allowed to work the same schedule she had prior to her complaint of discrimination.   KAYE repeatedly and frequently discussed her son's condition with DEFENDANTS, as such they were aware of PLAINTIFF's status as a care giver. Initially DEFENDANTS  approved KAYE's request for FMLA to care for her son, however in unprecedented fashion and despite medical documentation DEFENDANTS rescinded the approval of her request for FMLA.  PLAINTIFF and her family have experienced irreparable harm due to this shift change.  Specifically, PLAINTIFF's son's medical condition has been exacerbated.  He has experienced emotional distress, sleep deprivation, behavioral and performance problems in school

since PLAINTIFF's shift change in August 2018.  PLAINTIFF has also lost pay due to being forced to take leave without pay and FMLA to care for her family.

5.     KAYE also alleges that she experienced retaliation under the First Amendment of the U.S. Constitution when she voiced her concerns about the 730 Evaluation Process of inmates on Rikers Island; KAYE also expressed concerns about the operations and staff at the Forensic Psychiatry Evaluation Court Clinics ("FPECC").  KAYE complained both verbally and in writing about DEFENDANTS' malfeasance.  KAYE has experienced harassment and other adverse employment actions in the wake of her complaints.

6.     DEFENDANTS YANG and WANGEL specifically continue to retaliate against KAYE up until the filing of this Amended Complaint.  PLAINTIFF was given until April 12, 2019 to serve DEFENDANTS with her initial complaint.  On the same day, DEFENDANTS YANG and WANGEL arranged a meeting with PLAINTIFF and Corporate Compliance. YANG fabricated disciplinary charges as a precursory step to terminate KAYE's employment for filing the lawsuit herein.   Ignorant of the standards for forensic evaluations, DEFENDANTS were not aware that it was standard practice to record interviews.  As such, they attempted to cite PLAINTIFF's compliance with the standards of the profession as grounds for discipline and termination.  PLAINTIFF refuted those charges but has experienced emotional distress, anxiety and an exacerbation of her heart condition due to DEFENDANTS' harassment, discrimination and retaliation.

7.     PLAINTIFF alleges that the terms, conditions, and privileges of her employment relationship with Defendants have been adversely affected under: the 1st and 14th Amendments of the United States Constitution; the Equal Pay Act; Family Medical Leave Act ("FMLA"); Title VII of the

4

Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title VII"); 42 U.S.C. §§ 1983

and 1988; the New York Human Rights Law as contained in New York Executive Law §296 et. seq.

("NYHRL"); and New York City Human Rights Law as contained in the Administrative Code of the

City of New York, §8-107 et. seq. ("NYCHRL"); and New York Whistleblowing Law.

8.      Accordingly, this action is being brought to vindicate Plaintiff's human and civil rights

under the law.

## II. JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 to

secure protection of and to redress deprivation of rights secured by: 1st and 14th Amendments of the

United States Constitution; Fair Labor Standards Act ("FLSA"); Family Medical Leave Act

("FMLA"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title

VII"); 42 U.S.C. §§ 1983 and 1988; the Civil Rights Act of 1991; and 28 U.S.C. § 1658(a).

10.     This Court has supplemental and pendant jurisdiction pursuant to 28 U.S.C. § 1367(a) over

the PLAINTIFF's state and city law claims arising under the New York State Executive Law and the

New York City Administrative Code respectively, because the PLAINTIFF's federal, state and city

claims derive from a common nucleus of operative facts and form part of the same case or controversy.

11.     Venue is proper under 28 U.S.C. § 1391 in that the acts and transactions herein complained

of have taken place in the Southern District of New York, including the unlawful employment

practices about which PLAINTIFF complains.  The DEFENDANTS may be found in this district and

PLAINTIFF is employed with all of her employment records maintained in this district.

12.     PLAINTIFF's action for declaratory relief is authorized by 28 U.S.C. §§ 1343, 2201, and 2202.

### III.  PROCEDURAL REQUIREMENTS

13. All prerequisites to the institution of this action have been met. PLAINTIFF filed charges with the Equal Employment Opportunity Commission (EEOC) on May 22, 2018. Plaintiff received a right to sue letter from the EEOC on September 26, 2018 and this action was filed within 90 (ninety) days thereof.

14. Pursuant to § 8-502(c) of the Administrative Code of the City of New York, copies of this Complaint have been served upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York.

### IV. PARTIES

15. PLAINTIFF, MELISSA KAYE is a woman and was born in the United States of America.

16. KAYE is a resident of the State and City of New York.

17.  KAYE has continuously been employed by the New York City Health and Hospitals Corporation  (HHC) as an Attending Physician Level III since 2000.

18. KAYE was initially hired in 1999 and was promoted to Medical Director of the Bronx Forensic Psychiatry Court Clinic in 2004.

19. KAYE has worked in the same civil service title since 1999; she had the title of Medical Director from 2004 to 2018, until DEFENDANTS reduced it to Director in retaliation for her protected activities.

6

20.  KAYE worked at least 1,250 hours in 2016, 2017 and 2018 respectively.  As a result, at all relevant times herein, PLAINTIFF was an eligible employee under the FMLA.

21.  DEFENDANT, New York City Health and Hospitals Corporation ("HHC") is a statutorily created public benefit corporation which, in part, provides health and medical services directly to the public including by operating, managing and maintaining health facilities under its jurisdiction.

22. HHC is the largest public health care system in the nation; HHC serves more than a million New Yorkers annually in more than 70 patient care locations across the City's five boroughs.

23.  Correctional Health Services (CHS) is a part of HHC.  CHS operates one of the nation's largest correctional health care systems in the country.   CHS also provides medical and mental health care, substance use treatment, dental care, social work services, and discharge planning and re-entry services 24 hours a day, 7 days a week.  The FPECC are citywide court clinics located in each of the four boroughs; they fall under the purview of CHS.

24. HHC has a workforce of more than 42,000 employees throughout the five boroughs.

25.  At all times relevant, DEFENDANT PATRICIA (PATSY) YANG ("YANG") was employed by HHC.  For all times relevant to this cause of action YANG was PLAINTIFF's indirect supervisor. For all times relevant to this cause of action YANG was Senior Vice President for Correctional Health Services for HHC/Correctional Health Services.  YANG had substantial and final policy making authority, and had the ability to make personnel decisions.  In her capacity, YANG was also the final decision maker as it pertained to discrimination complaints, disciplinary actions and FMLA requests. YANG is sued here both in her individual and official capacities; YANG acted directly in the allegations herein, she is also being sued as an aider and abettor.

26. At all times relevant, DEFENDANT ELIZABETH FORD ("FORD") was employed by HHC. For all times relevant to this cause of action FORD was PLAINTIFF's indirect supervisor. For all times relevant to this cause of action FORD was Chief of Service of Psychiatry for HHC/Correctional Health Services. FORD had substantial and final policy making authority, and had the ability to make personnel decisions. In this capacity, FORD was also the final decision maker when it came to discrimination complaints and personnel matters. FORD acted directly in the allegations herein, FORD is sued here both in her individual and official capacities; she is also being sued as an aider and abettor.

27. At all times relevant, DEFENDANT ABHISHEK JAIN ("JAIN") was employed by HHC. For all times relevant to this cause of action JAIN was PLAINTIFF's direct supervisor. For all times relevant to this cause of action, JAIN was the Director of Forensic Psychiatry Evaluation Court Clinics for HHC/CHS. JAIN participated directly in the allegations herein. JAIN is sued here both in his individual and official capacities; he is also being sued as an aider and abettor.

28. At all times relevant, DEFENDANT JONATHAN WANGEL ("WANGEL") was employed by HHC. For all times relevant to this cause of action, WANGEL was Senior Director of Risk Mitigation and Management for HHC/CHS. WANGEL is responsible for health information, risk management, patient relations, litigation coordination, oversight compliance, employment matters, labor relations and disciplinary proceedings. WANGEL had substantial and final policy making authority, and had the ability to make final decisions in response to disciplinary proceedings, FMLA requests and personnel matters. WANGEL is sued here both in his individual and official capacities; WANGEL acted directly in the allegations herein, he is also being sued as an aider and abettor.

29.  At all times relevant, DEFENDANTS acted under color of the statutes, ordinances, regulations, customs and usages of the Constitution of the United States and New York.  Defendants also acted under the authority of their respective positions or offices.

## V.  FACTS

### Background Information

30.  KAYE has a Bachelor's Degree from the University of Colorado and a Medical Degree from the University of Pennsylvania.

31. KAYE has the following licensures and certifications:  Diplomate of the American Board of Psychiatry and Neurology; Diplomate of the American Board of Forensic Psychiatry; and Diplomate of American Board of Child and Adolescent Psychiatry.

32.  KAYE has almost 20 years of professional experience and has worked as an Attending Physician Level III since 1999.  She is more than qualified for her position.

33.  Due to her excellent performance, KAYE was promoted to the position of Medical Director of the Bronx Forensic Psychiatric Evaluation Center in 2004.

### Gender Discrimination: Kaye Makes Up to 35K Less than Comparators Despite Having More Experience and Superior Credentials

34.  Unbeknownst to KAYE, unlike her male counterparts at the other evaluation centers, she was hired in a lesser civil service title than her male counterparts.

35. KAYE was hired as an Attending Physician Level III while her male counterparts were hired as Physician Specialists.

36.  The Physician Specialist title has a larger salary range and reflects the sub-specialty training of physicians who have additional qualifications, such as formal training in forensic psychiatry or child and adolescent psychiatry. The Physician Specialist title is commensurate with KAYE's licensure, experience and training.  The Physician Specialist title is also more prestigious in terms of salary and professional opportunities.

37.  KAYE's male counterparts who acted as Medical Directors at the citywide court clinics have been paid more.

38.  All of the Medical Directors performed the same job functions; and all of the Medical Directors were employed by HHC.

39.  Yet KAYE was treated differently in terms of pay, title and staff.  KAYE was paid up to 35K less than her male comparators despite performing identical job functions.  Unlike her male comparators: KAYE did not have sufficient staff; conducted and drafted more evaluations; and engaged in out of title clerical work.

40.  KAYE remained in this lower civil service title and salary despite her complaints to FORD, YANG and WANGEL.

41.  Between 2012 and 2018 KAYE made multiple complaints about pay parity to FORD, YANG and WANGEL.

42.  When KAYE initially complained to FORD about the disparate pay, FORD replied in sum and substance that "getting anything done around here is like moving elephants."

43. Unfortunately, inertia was the least of the repercussions that KAYE would experience in the wake of her complaints of discrimination.  Under YANG, WANGEL and JAIN, KAYE would

experience harassment,  bullying, and other adverse employment actions in retaliation for her complaints about the discrimination she experienced. KAYE would experience increased cardiac symptoms in the wake of her complaints.  In addition her son's illness and academic performance would deteriorate, and KAYE would face termination based on DEFENDANTS' retaliatory animus.

### YANG, WANGEL and JAIN Work in Concert to Retaliate against KAYE and Push Her Out of HHC

44. In or around January 2018, KAYE had begun to speak to management about her working conditions.

45.  KAYE spoke to WANGEL about her compensation, work hours, pension and other job functions in the upcoming transition from the Court clinics being managed under Bellevue Hospital Center ("BHC") to the HHC.

46.  In or around April 2018, WANGEL and his staff assured KAYE that the terms of her employment would remain the same once the Court Clinics completed their transition to HHC management.

47. In or around May 3, 2018, KAYE complained to YANG about the disparities in pay and title she experienced.

48.   While YANG acknowledged her receipt of the complaint via email, she failed to take any steps to address the complaint.

49.  Since YANG, FORD and WANGEL failed to act, KAYE filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on or about May 22, 2018.

50.  In or around May 2018, a month after her complaint to the EEOC,  YANG, WANGEL and JAIN changed KAYE's title from Medical Director to Director.

51. YANG, WANGEL and JAIN changed KAYE's title in retaliation for her EEOC charge.

52. The title change was significant since the Medical Director title more accurately depicted KAYE's professional stature, credentials and licensure.

53. KAYE  is a trained Psychiatrist and has a medical license should be listed as a Doctor, as such the Medical Director title more accurately reflects her credentials and accomplishments.

54.  YANG, WANGEL and  JAIN's deletion of the word "Medical" from KAYE'S title diminished her credentials and reduced her professional standing.   By reducing KAYE to just a Director, YANG, WANGEL and JAIN demoted KAYE; KAYE's demotion was unwarranted and took place within days of her charge to the EEOC.

55. In or around July 2018, KAYE notified JAIN that she had filed a charge of discrimination against him at the EEOC.  JAIN in retaliation immediately reported KAYE to WANGEL who was the final authority in DEFENDANTS' disciplinary process.

56.  In or around August 16, 2018, KAYE's shift was changed from 9AM to 5:30PM to 8AM to 5PM.

57.  YANG, WANGEL and JAIN knowingly imposed this shift on KAYE in retaliation for KAYE's EEOC charge.  YANG, WANGEL and JAIN knew that this shift change would make it impossible for KAYE to care for her sick son.  Again, YANG, WANGEL and JAIN were on notice

about KAYE's son's illness and they were on notice that KAYE needed to work from 8AM to 5PM to care for him.

58.  In or around that time KAYE also discovered that her access to KRONOS, the time keeping system, had been revoked.

59. During that time JAIN repeatedly and inaccurately entered KAYE's hours into KRONOS.

60. When JAIN inaccurately entered KAYE's time into KRONOS, he intentionally insured that she was docked pay and leave.

61.  KAYE complained to her union representative about the shift change and the other harassment from JAIN to no avail.

62.  KAYE's union representative disclosed to her that WANGEL told him that WANGEL, JAIN and YANG were "miffed" about her EEOC charge; and that they changed her shift and docked her educational leave for taking an initial board certification examination in Child and Adolescent Psychiatry in retaliation for her EEOC charge.

63. At this juncture, it was clear that YANG, WANGEL and JAIN were seeking to force KAYE to resign; they were seeking to make her choose between her son's health and her job.

64. Upon information and belief, no other Medical Directors were required to work from 8AM to 5:30PM or to work 9-hour shifts.

65. JAIN, YANG and WANGEL insisted on this work schedule despite the fact that it was not necessary.

66.  KAYE works in the Bronx Courthouse in a non-clinical, non-patient care setting

67.  Furthermore, the Courts do not open until 9:30AM and inmates are produced from Riker's Island and other city jails between 10AM and 2PM each day.

68.  In or around September 2018, JAIN, WANGEL, FORD and YANG would work in concert to deny KAYE pay when she sat for her Child and Adolescent initial Board certification examination. DEFENDANTS' actions were unprecedented, upon information and belief DEFENDANTS have never denied any other physician at the Court Clinics pay when they sat for their Board certification examinations.

69.  KAYE had to advocate extensively to fight against being docked leave for taking the examination.  KAYE made multiple complaints to WANGEL, YANG, JAIN and FORD.

70.  Typically, HHC would compensate employees who sat for their exams, especially since these certifications were necessary for them to perform their job functions.

71.  Also in September 2018, DEFENDANTS would circulate an email which disclosed KAYE's personal and confidential medical information.  KAYE was mortified that this information was disclosed because it involved very graphic medical information.  KAYE notified JAIN who promised to address the disclosure of her information,  however JAIN failed to act.

72.  KAYE also complained to WANGEL about the circulation of her personal information on multiple occasions -to no avail.

73.  During this time JAIN also began  to exclude KAYE from meetings that were essential to her job functions.

74.  JAIN excluded KAYE from court clinic meetings with court clinic personnel and judges.

14

75.  DEFEDNDANTS continued to harass and retaliate against KAYE between August 2018 and April 12, 2019, when this Court prescribed a deadline for her to serve her complaint.

76.  KAYE filed the initial complaint in this matter in December  2018. On or about February 15, 2019, DEFENDANTS circulated another private/confidential email about KAYE to her colleagues.

77.  YANG, WANGEL and JAIN would work in concert to manufacture grounds to terminate KAYE, coincidentally their actions coincided  with the Court's prescribed deadline for KAYE to have served her initial Complaint.

78.  Ignorant about the standards for forensic evaluations, YANG, WANGEL and JAIN sought to discipline and terminate KAYE for recording an evaluation she conducted -especially when they thought she would not file her complaint in time.

79.  Unbeknownst to the aforementioned Defendants, recording evaluations was standard practice. Again KAYE had to vigorously defend and advocate for herself against baseless accusations and harassment by YANG, WANGEL and JAIN.

**KAYE Experiences Interference to take Leave under the FMLA and Based on Her Care Giver Status**

80.  KAYE initially disclosed her son's medical condition to FORD years ago

81.  Additionally, from time to time KAYE and FORD would discuss her son's condition and treatment.

82. Eventually when JAIN, WANGEL and YANG were amongst her direct and indirect supervisors, KAYE also disclosed to them that her son had a serious chronic skin condition that required her to go to his school to administer his treatment.

83. Due to the severity and the location of the skin lesions on her son's body, KAYE was required to go to the school herself to treat her son, since the school's medical staff refused to do so themselves.

84. JAIN, FORD, WANGEL and YANG were therefore aware that KAYE needed to work her prior 9AM to 5PM shift. JAIN, FORD, WANGEL and YANG repeatedly denied KAYE's requests for reasonable accommodations.

85. YANG, WANGEL FORD and JAIN initially allowed KAYE to work from 9AM to 5PM beginning July 1, 2018. However, within weeks of JAIN learning of her EEOC charge, JAIN, WANGEL, FORD and YANG insisted that KAYE work from 8AM to 5PM.

86. JAIN, YANG, FORD and WANGEL insisted on this work schedule fully cognizant of the impact it would have on KAYE's ability to care for her son's illness and her childcare responsibilities in general.

87. KAYE repeatedly implored JAIN, YANG, FORD and WANGEL to allow her to return to her 9AM to 5PM work schedule to no avail.

88. KAYE would eventually exhaust her leave balances and would have to pursue FMLA in order to work the same schedule she had previously worked without incident and while performing her job.

89.  Beyond DEFENDANTS' vindictive and retaliatory animus, there aren't any fiscal or operational justifications KAYE to be required to report to a courthouse at 8AM.

90. KAYE would have to advocate to work this same schedule, despite WANGEL's agreement back in April 2018 that KAYE's working conditions and title would not change.

91.  DEFENDANTS initially approved KAYE's request for FMLA on October 30, 2018, however WANGEL YANG and JAIN then revoked KAYE's ability to take leave under the FMLA on or about November 23, 2018.

92.  DEFENDANTS revoked KAYE's FMLA despite the fact that she had worked the requisite number of hours and provided them with the requested documentation.  Defendants revoked KAYE's FMLA within two months after she supplemented to her EEOC charge to include a retaliation claim; KAYE filed the supplement to her charge in September 2018.

93. DEFENDANTS also retaliated against KAYE in response to her request for FMLA the month before.

94.  DEFENDANTS continued to deny KAYE's request for reasonable accommodations despite her multiple entreaties about the devastating impact the shift change was having on her son's health, academic performance and her family.  KAYE also complained about the anxiety she had experienced, the aggravation to her digestive system and heart -again to no avail.

**First Amendment Retaliation:  Defendants Retaliate when KAYE Voices Concern about Ethical Violations, Malfeasance Surrounding the 730 Evaluation Process, Staff Conflict of Interest and HIPAA Violations**

95. Criminal Defendants have the potential to be evaluated under two separate and distinct articles of the Criminal Procedural Law (CPL):  Articles 390 and 730.

96.  CPL 390 is a pre-pleading, pre-sentencing mental health assessment; and Article 730 assesses a defendant's factual and rational understanding of their case, and their capacity to assist on his or her defense.

97.  Under the DeBlasio Mayoral Administration these examinations have become politicized. In an effort to reduce the population at Rikers Island by any means necessary.  The Administration has conflated forensic examinations with treatment and disposition from custodial care in an effort to get inmates off Rikers Island more quickly.

98.  Performing "730 Examinations" is part of KAYE's job functions.  As a qualified psychiatrist, based on a judge's order, KAYE examines criminal defendants to determine whether they are incapacitated or fit to stand trial.

99.  KAYE has expertly performed 730 Examinations since 1999.   Accordingly she has garnered the respect of stakeholders in the legal community throughout the city.  It is therefore without question that KAYE is committed to ensuring that the evaluation processes at the clinics are performed properly. For almost 20 years, KAYE has worked tirelessly to implement the process that the City recognizes today.

100. KAYE along with other psychiatrists or psychologists at the FPECC evaluate defendants and generate what is known as CPL Article 730 Examination Reports.

101. A judge based on the findings in the reports of either a qualified psychiatrist like KAYE or a certified psychologist will then determine whether: the defendant is fit to proceed with trial; they will be released; or whether they go to a hospital.

102. Examinations under CPL 390 do not meet statutory or forensic examination requirements to make a determination of fitness, and therefore should not be used in place of competency evaluations.

*103. The Queens and Brooklyn FPECCs have rendered opinions on fitness based on CPL 390 examinations. As a result, criminal defendants in these cases have been deprived due process protections under the law. Additionally, these cases where defendants have received fitness determinations based on CPL 390 examinations have the potential to be subject to conviction reversal and appeal.*

104. Between January 2018 and November 2018, KAYE made a number of complaints to YANG, JAIN, FORD and WANGEL to report compliance and malfeasance issues at CHS's FPECC and on Rikers Island.

105. KAYE along with a number of defense attorneys have reported concerns about the ongoing improper use of HIPAA consent release forms on Rikers Island.

106. KAYE along with other stakeholders have complained about the coercion of the mentally ill and "mentally retarded" vulnerable populations into signing HIPAA release waivers to use treatment records for forensic evaluation purposes without their capacity to understand and without the input of defense counsel.

106. KAYE along with other key stakeholders have expressed concern that inmates' medical records were released with incorrectly or incompletely filled out HIPAA forms or even prior to obtaining the

signed HIPAA consent form.  As a result, KAYE noted that inmates were potentially being released from jail in an expedited fashion and circumvention of the procedures and law.

107.  In or around January 2018, KAYE informed YANG about best practices regarding the use of HIPAA release forms forensic exams.  KAYE stated that staff should obtain and review unredacted medical records by way of court order, so that they can comply with the medicolegal standards in the field of forensic psychiatry.     YANG disregarded KAYE's suggestion and concerns; to date YANG and the CHS continue to commit HIPAA violations at FPECC and on Rikers Island.

108.  In or around April 2018, KAYE complained to FORD about JAIN's destruction of his handwritten notes taken when he conducted evaluations.

109.  Again based on KAYE's commitment to her profession, the legal community and the criminal defendants she serves, she reported her concerns to FORD.

110. KAYE informed FORD that all handwritten notes were work product and should be retained in their files.  KAYE told FORD that: JAIN's discarding of his notes was a destruction of work product; could potentially lead JAIN to perjure himself should he be called to testify; and destruction of work product is  a Class E felony.

111.  In response to KAYE's discussion with FORD, JAIN was not disciplined or referred to HHC's Corporate Compliance as KAYE was for practicing within the standards of her field.  Instead, JAIN re-created his  handwritten notes and upon information and belief perjured himself when he testified in court in Manhattan that he had forgotten his notes rather than the truth which was that he had actually destroyed them.

112.  KAYE told FORD that several lawyers had complained to her about JAIN.  FORD did not question KAYE about the source of the complaint nor did she investigate any further.

113.  KAYE also expressed concern about YANG's implementation of the "730 Mobile Team."  CPL § 730 requires that either psychiatrists or psychologists perform 730 examinations, however, the 730 Team now comprised primarily of social workers and mental health counselors.   To be clear, neither the social workers nor mental health counselors have the training or legal authority to render opinions on fitness. KAYE voiced her concerns to YANG, FORD and WANGEL and similar to the other instances where she complained, she experienced adverse employment actions.

## VI.  REQUEST FOR ATTORNEY AND EXPERT FEES AND COSTS

114.  If Plaintiff prevails, she is entitled to an award of attorney and expert fees and costs.

## VII.  DEMAND FOR TRIAL BY JURY

115. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, PLAINTIFF demands a trial by jury in this action.

## VIII.  CLAIMS FOR RELIEF

### FIRST CLAIM OF RELIEF
### SEX DISCRIMINATION

21

**VIOLATION OF TITLE VII, 1983, EQUAL PROTECTION CLAUSE, NYSHRL AND NYCHRL1**

116.   PLAINTIFF hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

117.   By the acts and practices above, the individually named DEFENDANTS and other HHC management have engaged in discriminatory and disparate treatment based on PLAINTIFF's sex in violation of: Title VII; 1983;  New York State Executive Law § 296; and New York City Administrative Code § 8-107.

118.   DEFENDANTS treated PLAINTIFF in a disparate fashion based on her sex despite her superior qualifications and experience.   DEFENDANTS paid male Medical Directors more than PLAINTIFF, placed them in a civil service title that was more prestigious and had a larger salary range, and provided PLAINTIFF's male comparators with staff.

119.   As a proximate result of Defendants' sex discrimination against PLAINTIFF, PLAINTIF has suffered and continues to suffer, substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

120.   As a further and proximate result of defendant's actions, plaintiff has suffered and continues to suffer impairment and damage to Plaintiff's good name and reputation.

121.   As a further proximate result of Defendants' actions taken because of Plaintiff's sex, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

---

1 Plaintiff's claims under Title VII are not against the individually named Defendants, just HHC.

122.  The conduct of Defendants was outrageous and malicious, and was intended to injure Plaintiff, and was done with reckless indifference to Plaintiff's protected civil rights, entitling Plaintiff to an award of punitive damages.

**SECOND CLAIM OF RELIEF**
**RETALIATION AND INTERFERENCE**
**VIOLATION OF THE FAMILY MEDICAL LEAVE ACT**

123.   PLAINTIFF hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

124.  Section 2613 (c) of the Family Medical Leave Act (FMLA) states that an employee who has worked over 1,250 hours in a year is entitled to a total of 12 work weeks of leave during any 12-month period in order to care for a spouse, son, daughter, parent  that has a serious health condition.

125. Section 2615 of the Family Medical Leave Act prohibits the interference of the exercise of rights under the FMLA.

126.  PLAINTIFF has worked over 1,250 hours in a work year and is eligible for FMLA.

127. PLAINTIFF sought to take leave under the FMLA to care for her child who has been diagnosed with severe  and superimposed allergic atopic and contact dermatitis.

128.  DEFENDANTS collectively and unlawfully interfered, restrained and denied PLAINTIFF'S right to exercise and attempt to exercise her rights under § 2615 and discriminated and retaliated against her for opposing Defendants' unlawful employment practice and attempting to exercise her rights.

129.  As a proximate result of DEFENDANTS' discrimination against Plaintiff on the basis of her exercise of rights under the FMLA, Plaintiff has suffered and continues to suffer, substantial losses, including the loss of past and future earnings, bonuses, deferred compensation, and other employment benefits.

130.  As a further proximate result of DEFENDANTS' actions, Plaintiff has suffered and continues to suffer impairment and damage to her good name and reputation by DEFENDANTS.

131.  As a further proximate result of DEFENDANTS' actions, Plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish.

**THIRD CLAIM OF RELIEF**
**RETALIATION**
**VIOLATION OF THE FIRST AMENDMENT FREEDOM OF SPEECH UNDER THE FEDERAL CONSTITTUTION**

132. PLAINTIFF hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

133.  PLAINTIFF engaged in protected activities when she complained of ethical and legal violations pertaining to the Centers' evaluation processes and Medical Directors.

134.  Between January 2018 and November 2018, PLAINTIFF complained to FORD, YANG, WANGEL and JAIN.

135. KAYE engaged in speech on a matter of public concern:  Ethical violations involving the 730 Evaluation Psychiatric Evaluation Process; Conflicts of Interest of Professional Staff Members performing evaluations;  and the destruction of Evidence to the detriment of criminal defendants.

136. Between January 2018 and November 2018, DEFENDANTS have taken a number of adverse employment actions against Plaintiff : docked her pay; denied her leave under the FMLA; reduced her title; and changed her work hours.

137.  PLAINTIFF is entitled to compensatory damages and to recover her attorney's fees and expenses incurred in this action.  In addition, because the DEFENDANTS' actions were performed with malice and without justification or excuse, PLAINTIFF is entitled to punitive damages.

138.  As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional opportunities, bonuses; has suffered mental anguish, emotional distress and loss of enjoyment of life; and has incurred damages thereby.

**FOURTH CLAIM OF RELIEF**
**RETALIATION**
**VIOLATION OF TITLE VII, NYSHRL AND NYCHRL**

139. PLAINTIFF hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

140.  Between 2012 and November 2018, PLAINTIFF made numerous internal complaints of discrimination to YANG, FORD, WANGEL and JAIN.

141.  On or about May 22, 2018 KAYE complained to the EEOC about discrimination.

142.  DEFENDANTS began to retaliate against KAYE in August 2018 when they changed her work shift.  DEFENDANTS also docked her pay, denied her leave to take care of her child with a known serious medical condition, and reduced her title within days of her EEOC charge.

143.  Within 3 months of filing the lawsuit herein Defendants sought to terminate Plaintiff by bringing her up on manufactured disciplinary charges.

144. As a proximate result of DEFENDANTS' retaliation against PLAINTIFF.  PLAINTFF has suffered and continues to suffer substantial losses including the loss of past and future earnings, bonuses, deferred compensation and other employment benefits.

145.  As a further proximate result of DEFENDANTS' actions, PLAINTIFF has suffered and continues to suffer impairment and damage to her good name, lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

146.  The conduct of DEFENDANTS was outrageous; was done in a deliberate, callous, malicious, fraudulent and oppressive manner, and was intended to injure PLAINTIFF. DEFENDANTS' acts were done with an improper and evil motive, amounting to malice and spite; and were done in conscious disregard of PLAINTIFF's rights.  PLAINTIFF is therefore also entitled to an award of punitive damages.


### FIFTH CLAIM OF RELIEF
### RETALIATORY WHISTLEBLOWING
### VIOLATION OF N.Y. LAB L. § 740


147. PLAINTIFF hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

148.  Plaintiff's complaints about the 730 process, the conflict of interest of the FPECC staff, the destruction of evaluators' notes, the introduction of bias and lowering of the quality of the forensic

psychiatric evaluation process so that inmates can be released from Rikers Island quickly regardless of the standards set forth in § 730.

149. The DEFENDANTS engaged in a campaign to force KAYE out of her job at HHC.  The DEFENDANTS  insisted that KAYE change her work hours knowing that she would not be able to care for her child and that it would lead her to make the inevitable choice between caring for her child and her job.   The DEFENDANTS excluded KAYE from meetings, locked her out of the timekeeping system,  and fraudulently manipulated her timesheets so that she would be docked pay.

150.  As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional opportunities, and bonuses; and has incurred damages.

## SIXTH CLAIM OF RELIEF
## VIOLATION OF EQUAL PAY ACT

151.  PLAINTIFF re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraph as if fully set forth herein.

152.  By the acts and practices described above, in violation of the Equal Pay Act, DEFENDANTS discriminated against Plaintiff by paying similarly situated male employees' higher wages than PLAINTIFF in the job of Center Medical Director which required equal skill, effort, and responsibility, and which was performed under similar working conditions.

153.  DEFENDANTS knew that their actions constituted unlawful discrimination and/or acted with malice or reckless disregard for PLAINTIFF's statutorily protected rights.

154. PLAINTIFF seeks damages in the amount of her respective unpaid compensation, liquidated (double) damages as provided in the NYLL, attorney's fees and costs, and such other relief as this Court deems just and proper.

## SEVENTH CLAIM OF RELIEF
## CAREGIVER DISCRIMINATION
## IN VIOLATION OF NYCHRL

155. PLAINTIFF hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

156. At all relevant times, PLAINTFF was an "employee "within the meaning of the NYCHRL.

157. At all relevant times, PLAINTIFF was a "caregiver" within the meaning of the NYCHRL.

158. By adversely affecting the terms, conditions, and privileges of PLAINTIFF's employment because of her caregiver status, DEFENDANTS have violated the New York City Human Rights Law.

159. DEFENDANTS were on notice of PLAINTIFF' status as a caregiver.

160. Upon information and belief, DEFENDANTS did not require employees without children to work 9-hour days.

161. Upon information and belief DEFENDANTS did not change employees without children's shifts involuntarily.

162. Upon information and belief, DEFENDANTS permitted other employees without children to take leave.

163. As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional opportunities, and bonuses; and has incurred damages.

## EIGHTH CLAIM OF RELIEF
## MONELL LIABILITY/1983

164.  PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth herein.

165.  HHC and the individually named DEFENDANTS failed to address PLAINTIFF's numerous complaints of discrimination and retaliation under the First Amendment.

166.  At all times relevant, YANG, FORD and WANGEL were final policy makers as it pertained to personnel decisions that could affect PLAINTIFF's employment conditions.

167.  At all times relevant, YANG, FORD, JAIN and WANGEL had the ability to hire, fire and demote PLAINTIFF.

168.  At all times relevant, YANG, FORD and WANGEL had the ability to stop the discriminatory and retaliatory behavior of JAIN and HHC management and failed to do so.

169.  The underlying violations of PLAINTIFF's civil rights have been established.  The Amended Complaint is rife with allegations where the individually named Defendants personally participated in the discriminatory and retaliatory conduct PLAINTIFF experienced.

170.  As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional and job opportunities and bonuses.  PLAINTIFF has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

## NINTH CLAIM OF RELIEF
## INDIVIDUAL LIABILITY UNDER § 1983

171.  PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

172.  The named DEFENDANTS directly participated in the constitutional violations described herein. They worked in concert to deny PLAINTIFF of job and promotional opportunities.

173.  The named DEFENDANTS worked in concert to ensure that PLAINTIFF worked in a work environment where she was discriminated against based on her sex: KAYE was paid less, had less staff, and had a less prestigious civil service title than her male comparators.

174.  As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional and job opportunities, and bonuses.  PLAINTIFF has also suffered mental anguish, emotional distress, loss of enjoyment of life, and has incurred damages.

## TENTH CLAIM OF RELIEF
## AIDING AND ABETTING
## NYSHRL & NYCHRL

175.  PLAINTIFF hereby re-alleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

176.  The underlying violations of PLAINTIFF"s civil rights have been fully established. The Amended Complaint is rife with allegations where the individually named DEFENDANTS participated directly and worked in concert to deprive PLAINTIFF of her rights under the law.

177.  As a result of the foregoing, PLAINTIFF has lost wages, benefits, promotional and job opportunities, and bonuses.  PLAINTIFF has also suffered mental anguish, emotional distress, loss of enjoyment of life and has incurred damages.

## IX. PRAYER FOR RELIEF

WHEREFORE PLAINTIFF prays that this Court grant her judgment containing the following relief;

a.   Impanel a jury to hear PLAINTIFF'S claims;

b.   Costs and disbursements of this action;

c.   An award of damages of $2 million dollars to compensate PLAINTIFF for her monetary losses and damages, including PLAINTIFF's loss of past and future earnings, bonuses, compensation and other employment benefits.

d.   An award of damages of $1 million dollars to compensate PLAINTIFF for the mental anguish, humiliation, embarrassment, treatment and emotional injury she endured for each cause of action;

e.   An award of damages in an amount to be determined upon the trial of this matter to compensate PLAINTIFF for violations of her rights under: the 1st and 14th Amendments of the US. Constitution; 42 U.S.C. §§ 1983 and 1988; the New York State Executive Law; and New York City Human Rights Law;

f.   An award of punitive damages to be determined at trial for each cause of action, by reason of the wanton, unrepentant, reckless and egregious conduct of the individually named DEFENDANTS herein;

g.   An order prohibiting DEFENDANTS from continuing or maintaining the policy, practice/and or custom of discrimination and retaliation based on gender and protected activities; and

h.   Such other and further relief as this Court may deem just and proper.


Dated: Queens, New York
       May 3, 2019

                              Respectfully Submitted,


                                     /S/

31

.......................................................................
SPECIAL HAGAN, ESQ.
LAW OFFICES OF SPECIAL HAGAN
196-04 Hollis Avenue
Saint Albans, New York 11412
(917) 337-2439
special@haganlawoffices.net

32