JC4TKAYC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    MELISSA KAYE,

4                    Plaintiff,

5            v.                              18 CV 12137 (JPO)(JLC)

6    NEW YORK CITY HEALTH AND
     HOSPITALS CORPORATION, et al.,
7
                   Defendants.
8
     ------------------------------x
9                                            New York, N.Y.
                                             December 4, 2019
10                                           11:20 a.m.

11   Before:

12                        HON. JAMES L. COTT,

13                                           Magistrate Judge

14                            APPEARANCES

15   THE LAW OFFICES OF SPECIAL HAGAN
          Attorneys for Plaintiff
16   BY:  SPECIAL HAGAN

17

18   NEW YORK CITY LAW DEPARTMENT
     OFFICE OF CORPORATION COUNSEL
          Attorneys for Defendants
19   BY:  DONNA CANFIELD
          ANTHONY DiSENSO
20

21

22

23

24

25
```

JC4TKAYC

1            (Case called)

2            THE COURT:  State your name for the record, please.

3            MS. HAGAN:  Special Hagan for plaintiff, Melissa Kaye.

4    My apologies, your Honor, for being late.

5            THE COURT:  How come you're 20 minutes late?

6            MS. HAGAN:  Traffic.

7            THE COURT:  You drove?

8            MS. HAGAN:  Yes.

9            THE COURT:  Don't drive to the courthouse.  I don't

10   know where you're driving from, but it's unwise to get here by

11   driving, it's better to take mass transit.

12           MS. CANFIELD:  Good morning, your Honor, Donna

13   Canfield from the New York City Law Department representing the

14   defendants.  With me from our office's e-discovery group is

15   Anthony DiSenso.

16           THE COURT:  Good morning to both of you.

17           This is our first conference in this case.  I have

18   done my best to try and get up to speed.  I know there are a

19   number of issues we need to address.

20           The first thing I wanted to address, Ms. Hagan, is at

21   the end of the first letter you sent, the one to Judge Oetken

22   on November 19, you indicated you wanted to amend your

23   complaint.  Is that something that you wanted to do?

24           MS. HAGAN:  We're contemplating amending the complaint

25   because there's been a few additional facts that have taken

JC4TKAYC

1   place.

2              THE COURT:  I don't know what "contemplating" means.

3   Either you will ask to amend or not.  It's December 4, and fact

4   discovery closes on February 15, so we can't kind of let it

5   float.  You mentioned it in a letter, so if you want to do it

6   then we have to figure out whether there's opposition.  If

7   there is, we have to litigate it, we need to set a timeframe

8   for all that.  This is what we have to do.

9              This case is, as you know --

10             MS. HAGAN:  Yes, we are going to amend it.

11             THE COURT:  Have you met and conferred about that?

12             MS. HAGAN:  Actually, no.

13             THE COURT:  Okay.  So it's premature for me to then

14  resolve it today.

15             Ms. Canfield, do you have any view whether you're

16  going to oppose this or not?

17             MS. CANFIELD:  I would like to see the proposed

18  amended complaint and then I would probably have an opinion on

19  it.

20             THE COURT:  I expect that you would.

21             Okay.  So we'll leave that to side for now, but just

22  be mindful that we have a February 15 discovery cutoff date,

23  and I'm just concerned that there's a lot of acrimony here but

24  not a lot of substance in what appears to be a relatively

25  straightforward case.  So we need to toe the line here and move

JC4TKAYC

1     it forward properly.

2               Before we get into the discovery issues, let me ask

3     about settlement, because it seems to me there's been a lot of

4     stopping and starting in that regard.  You never were able to

5     avail yourselves of a mediation program.  Where do you stand on

6     settlement and how to proceed with respect to settlement in

7     this case?

8               MS. HAGAN:  Judge Oetken asked, I guess the last time

9     we appeared before him, that I give defense counsel a demand

10    letter, and I did, and defense counsel never countered or spoke

11    or anything else.

12              THE COURT:  Is the city interested in trying to work

13    towards settlement in the case or not in this posture, or where

14    are we in that regard?

15              MS. CANFIELD:  The amount indicated in the demand

16    letter was far beyond what we would consider.

17              THE COURT:  That wouldn't be the first time that ever

18    happened.  That's quite normal.

19              MS. CANFIELD:  So at this juncture in the litigation,

20    we would like to engage in discovery, and then if circumstances

21    change, which we don't believe they will, we will entertain

22    settlement.  But because of acrimony in the beginning of just

23    getting dates with the mediator, having the ability to weigh in

24    on the appropriateness on the mediator, we thought at this

25    point why don't we litigate the case and revisit settlement

JC4TKAYC

1    when it seemed the parties were more cooperative in actually

2    reaching an agreement.

3            THE COURT:  Okay.  Well, keep in the back of your mind

4    we can discuss this, I suppose, down the road, that either

5    Judge Oetken or I can refer you back to a mediation program

6    and/or you can participate in a settlement conference with me,

7    if that would be more helpful, whatever you all think in that

8    regard.  But I'm happy to, again, defer that until the case is

9    developed a little bit further.  Sounds like that's what we

10   need to do.

11           MS. CANFIELD:  You're correct, your Honor.  I just

12   wanted to add one point.  It appears from the complaint and it

13   appears from my discussions with H plus H that plaintiff is not

14   happy with her position, so I would imagine that any settlement

15   would involve either plaintiff's reassignment or plaintiff's

16   resignation or retirement from H plus H.  I think that would be

17   the main sticking point for defendants in terms of settlement.

18           THE COURT:  You mean not financial?

19           MS. CANFIELD:  Well, the financial would certainly be

20   increased with those conditions that she retire or resign.

21           THE COURT:  Well, okay, I think these are the sorts of

22   things that counsel should talk to each other about first and

23   then we can obviously discuss if there's a role the Court can

24   play in helping to facilitate settlement discussions or,

25   alternatively, having that mediator assigned to the case,

JC4TKAYC

1    that's fine.

2              MS. HAGAN:  Your Honor, may I interject?  I'm not sure

3    if I'm projecting or not.

4              THE COURT:  Usually people stand when they speak.  If

5    you can't, that's fine, but usually lawyers speak in court by

6    standing.

7              MS. HAGAN:  Okay.  Well, I will project.

8              I think that there's been a mischaracterization of the

9    dynamic between counsel.  We are amenable -- plaintiff is

10   amenable to resolving this case.  I think that there could be

11   discussion of settlement, but again, there had been no counter

12   offer.  And as you basically pointed out, there usually is a

13   distance or a gap between the initial proposed amount and what

14   the parties actually come to some agreement on, and the

15   conditions.

16             So to some degree defendants are correct in that

17   plaintiff is not exactly happy in the current situation that

18   she's in.  She does like what she's doing, but the managerial

19   structure is of concern for her.

20             THE COURT:  Okay.  Well --

21             MS. HAGAN:  And that's changed some, from what I

22   understand, as recently as yesterday.

23             THE COURT:  Let's do this, let's deal with other

24   issues and then we'll excuse the court reporter and we can have

25   some offline discussions about this perhaps collectively and

JC4TKAYC

1    maybe each party as well.  I don't think we need to belabor the

2    record on this issue at this moment, but we can come back to it

3    before we conclude today.

4            All right.  So let's talk about discovery.  Now I

5    gather there are enough disputes you all are having about

6    timeframe and protocols and the like that to date the

7    defendants have literally not produced anything, is that

8    correct?

9            MS. CANFIELD:  That is correct.  We have not started

10   our collection because we have not agreed on the basic scope of

11   the collection with respect to the ESI.

12           THE COURT:  The request was made on October 22nd, so

13   you had 30 days.  So it was due on November 22nd, but you asked

14   for an extension on November 14, which Ms. Hagan didn't agree

15   to, but you nonetheless still haven't made a production, so

16   technically you're in default of the rule.

17           MS. CANFIELD:  That is correct, your Honor, I

18   requested from Ms. Hagan additional time when I did not hear

19   from her in terms of custodians.

20           THE COURT:  Right.  And that's because you only want

21   to go back to the beginning of 2018 and she wants to go back

22   further than that, at least with respect to some of the

23   custodians.  And you wanted to do this only once and not

24   multiple times, so you didn't want to collect from January 2018

25   to the present and then have to make a supplemental production.

JC4TKAYC

1          Am I right in assuming that, or incorrect?

2          MS. CANFIELD:  The timeframe said -- we based our

3    collection or proposal based on the allegations in the

4    complaint, there was nothing --

5          THE COURT:  That's not really my question to you

6    exactly.  My question is:  You don't want to do this more than

7    once.

8          MS. CANFIELD:  Absolutely not.

9          THE COURT:  You have an agreement that you should go

10   back to 2018.  So you could have, by November 22nd, gone back

11   to January 21st, 2018 with respect to these custodians and done

12   a search and produced it by November 22nd.  You could have done

13   that.  You chose not to do that because you hadn't had that

14   agreement about whether there would be any custodians for whom

15   you had to go back further than 2018 and you didn't want to

16   have to do it a second time.  So what I'm asking is:  Is that

17   why you produced nothing?

18         MS. CANFIELD:  You are correct that I did not produce

19   anything.  I would say, respectfully, that you're incorrect

20   that between the production or the request date of October and

21   November 22nd that I would have been able to contact H and H,

22   make an appointment with our e-discovery group, collect the

23   material and list a vendor, go through and search all the

24   documents with what we propose is Continuous Active Learning,

25   CAL, do all the quality assurance checks that we need to do,

JC4TKAYC

1   send it back to a vendor for production, that would not happen

2   in 30 days.

3           THE COURT:  Now it's December 4.  I'm just concerned

4   about the timeframe here.

5           MS. CANFIELD:  Well, at this point we don't want to do

6   it twice now because we know that there is an active dispute.

7   So rather than going and collecting and then having to do it

8   again, we were hoping for the Court's intervention.

9           THE COURT:  Well, I am intervening, and I will make

10  some rulings today, and that's why we have a court reporter,

11  because presumably you will get the transcript of this

12  proceeding and use it as a guide as to how to proceed.

13          So as a threshold issue we have to decide the time

14  frame, correct?

15          MS. CANFIELD:  Correct.

16          THE COURT:  And you want to go back to January 21st,

17  2018, but not earlier, because the allegations in the complaint

18  essentially arise from that time frame going forward.  Is that

19  a fair summary?

20          MS. CANFIELD:  Correct.  This seems -- the allegations

21  in the complaint seem to begin when the forensic evaluation

22  department was run by Corizon, and that contract with Corizon

23  HHC was terminated and that went under Correctional Health

24  Services.  So what I understand reading the complaint, the

25  allegations in terms of her work hours, the type of work she's

JC4TKAYC

doing, starts in 2018.  That being said, there are allegations
that she believes she has been unequivocally compensated, but
any compensation material would be in her hiring packet, that
would not involve ESI.  The rate she's hired in and the civil
service requirement she's hired in is something that's part of
the personnel file.

THE COURT:  Which hasn't been produced.

MS. CANFIELD:  It has not been produced.

THE COURT:  Why not?  It's called rolling production,
Ms. Canfield, right?  You could have produced it.  It's not a
good look for the city to come to the Court two weeks past due
and say we have done nothing when there are certain things
clearly you could have done, like that.

MS. CANFIELD:  Well, I can say we haven't done
nothing.  I have just about ready for production -- plaintiff
served me with 197 admissions, so I have been working on that.
I have not challenged those, even though case law is clear that
163 is considered excessive.  So some of the discovery requests
are out of bounds in terms of overburden and unduly burdensome
nature.

So you're correct, it doesn't look good we haven't
produced anything.  I do have documents, but I also am
struggling with I think unreasonable discovery requests.

THE COURT:  Well, I don't know anything about that
because that's not in the correspondence to me.  So this is the

JC4TKAYC

1    first time I'm hearing about that.

2              MS. CANFIELD:  You are correct.

3              THE COURT:  So all I'm interested in, as is true in

4    every case from a judge's perspective, is having a level

5    playing field and making sure everyone has the information they

6    need in order to move a case forward on the merits.  That's all

7    I'm interested in in ensuring for both sides.

8              MS. CANFIELD:  Well, I also want to add that it was

9    not until about 10 o'clock last night that we received any

10   documents from plaintiff.  So both sides were dilatory.

11             THE COURT:  This may be a good time for me to say what

12   I was going to again say toward the end, which is I'm not

13   appreciating the way the case is getting litigated.  The tone

14   in the letters, frankly, is not good.  I really didn't

15   appreciate the tone in the letters.  Our words matter, and you

16   have to be very careful when you say someone is obstructing,

17   Ms. Hagan; maybe you think that, or someone is not acting in

18   good faith, those are strong statements.

19             I'm not going to litigate that now and don't want to

20   hear from you now, I'm just going to say in any future

21   correspondence to the Court, be very, very careful about the

22   language you use about each other.  That's my point.  No ad

23   hominems, no careless use of adjectives or adverbs, stick to

24   the facts.  It's just as powerful to say the city has produced

25   not a single document and it's now ten days past due.  To say

JC4TKAYC

that speaks for itself.  You don't need to dress it up,

Ms. Hagan, with language like obstruction, obscuring, failing

to cooperate, does not seem that they wish to pursue this

process in good faith, et cetera.  Those are fighting words,

and I don't appreciate that unless they're fully justified.

Now you may think they're fully justified, but I think

you have to be very careful when you write to a court and use

phrases like that, especially in a very short, somewhat

abbreviated presentation.  I'm interested in the merits of the

case and the parties getting what they need in a fair,

efficient, proportional, expeditious way.  Rule 1 dictates that

to both of lawyers and the judge, speedy and inexpensive.

So we have to think about proportionality.  This case

is getting more complicated than it needs to be.  I frankly

don't understand, Ms. Hagan -- and I will give you an

opportunity to address this -- why, in the posture we're in,

we're talking about discovery on discovery when you don't even

have a piece of paper yet.  So you don't even know what

failures there have been by the city other than they have given

you nothing.

We need to set a date by which they're going to make

production to you.  You will get it, and then you will evaluate

it and then you will talk to Ms. Canfield and then she will

either say you're right, I will give you these things, or she

won't, or it will be something in between.  And then you will

JC4TKAYC

1    make a judgment as to whether you want to avail yourself of the

2    Court to try and resolve that next dispute.  That's how this

3    has to work.  It can't just work:  I want to have all of these

4    things when I don't even know what I'm getting or not getting

5    yet.

6            Go right ahead.

7            MS. HAGAN:  Well, I guess I would like to start

8    somewhat as far as the discovery demands and when Ms. Canfield

9    actually received them.  I emailed Ms. Canfield all of my

10   discovery demands back in July, July 23rd, to be exact.  I

11   didn't serve her with them until October, but she's had them

12   since July.  So that's to begin with.

13           As far as the -- it was not an issue of what actually

14   e-discovery platform that -- what actual methodology that

15   they're using.  What I have asked Ms. Canfield to do is to

16   engage in a transparent and cooperative process in actually

17   producing the ESI.  That's why I proposed an ESI protocol, so

18   that we would be accountable to each other and the Court.  It

19   wasn't an issue with exactly what platform they chose.  But

20   with CAL specifically -- and the case law supports this -- the

21   way it's set up --

22           THE COURT:  The case law supports what exactly?

23           MS. HAGAN:  The fact that the parties really need to

24   be cooperative and working together from the beginning.  You

25   are looking at the *Silvermore*, you're looking at the *Rio* case

JC4TKAYC

1    and also looking at least a handful of cases throughout the

2    country which contemplate that the parties cooperate with each

3    other from the beginning of the ESI collection process.

4          I think the first issue that Ms. Canfield and I

5    actually had a problem with was even disclosure of what vendor

6    they were using, what platform they were using, so that we

7    could use the same language to communicate with each other at

8    least so I could understand exactly what exactly the document

9    universe were.

10         THE COURT:  Why does it matter to you at this moment

11   in time who the vendor is?  I don't understand why that matters

12   at this moment.  It might matter, but I don't know why it

13   matters right this minute.

14         MS. HAGAN:  The reason why it matters is because when

15   we met in front of Judge Oetken, Ms. Canfield -- even though

16   she disputes this -- said that there was going to be a lot

17   emails and a lot of e-discovery in the case.  At that point --

18   I may have suggested at that point that we should develop ESI

19   protocol, and Judge Oetken at that point agreed.

20         So when we left, I was under the impression that the

21   parties were going to work together to develop an ESI protocol.

22   As such, I proceeded accordingly.  Then I proposed the ESI

23   protocol to Ms. Canfield and I received nothing more.  But some

24   of the basic questions of ESI protocol that you will see in

25   other cases is the parties know which vendors are being used,

JC4TKAYC

1    which platforms are being used.

2            THE COURT:  But that's discovery on discovery, right?

3            MS. HAGAN:  Not necessarily.

4            THE COURT:  Sure, it is, because a lot of times

5    e-discovery is produced and there's no back and forth about how

6    it was prepared because it's deemed to be adequate by the

7    recipient.  But your concern in advance -- you're worried in

8    advance you're not going to get what you think you should get.

9            MS. HAGAN:  Not exactly.

10           THE COURT:  There's an old saying that the judge I

11   clerked for many years ago used to say:  Don't trouble trouble

12   until trouble troubles you.  But I think you're troubled

13   already because you haven't gotten anything, but you want to

14   know eight different things about what they're doing and how

15   they're going to produce it.

16           MS. HAGAN:  Not exactly.  I know you're citing the

17   *Federal Review* case when you're saying discovery upon

18   discovery.

19           THE COURT:  I didn't make up the concept of that.

20           MS. HAGAN:  No, no, I know you're citing it.

21           THE COURT:  I'm not citing any particular case.

22           MS. HAGAN:  You're referencing it to some degree.  I

23   think that's where I got the phrase from.

24           But in that case it appeared that there were gaps in

25   discovery.  I'm not questioning that.  I'm not questioning

JC4TKAYC

1    whether or not there are gaps, I'm trying to understand from

2    the beginning when you're going to engage in the ESI process

3    that's transparent and cooperative that you know exactly how

4    many documents we're talking about.

5         I have asked Ms. Canfield have you done a basic

6    search, do you know how many documents, what the ballpark is we

7    are talking about.  Let's say you just did a basic run with my

8    client's name and the four defendants that are named, I have

9    gotten no numbers whatsoever.

10        So I said look, it makes sense for us to have an ESI

11   protocol from the beginning so we're all on the same page.  I'm

12   not disputing whether or not they should use CAL versus keyword

13   searches.  However, because of the nature of CAL and because of

14   how it's not as interactive as a keyword search, because

15   actually the courts have found the other way, that because of

16   the nature of it the parties have to cooperate more because you

17   have to negotiate from the beginning rather than perhaps --

18   there's I guess a negotiation between the keyword searches and

19   custodians.

20             THE COURT:  Those discussions you have had, correct?

21             MS. HAGAN:  Actually, no.  I have asked her, I have

22   proposed --

23             THE COURT:  I'm confused about that then.  I thought

24   there were eight custodians that were going to be searched.  Is

25   that what you decided unilaterally?

JC4TKAYC

1          MS. HAGAN:  No, we discussed the custodians.

2          THE COURT:  That's what I'm saying.  You had those

3    preliminary discussions and they're going to search those

4    custodians for your client's name.

5          MS. HAGAN:  Well, they didn't do that.

6          MS. CANFIELD:  If I may, your Honor, I want to clear

7    up -- there was no transcript at the Rule 16 conference before

8    Judge Oetken.  I ordered it, there's no transcript.  I was

9    hoping there was.

10          What happened at that conference, because I was made

11   aware that ESI -- she was interested in collecting ESI, that if

12   she wanted to provide any scope or timeframes for ESI she get

13   it to me as soon as possible because of how long it takes to

14   collect and go through the material.  I did not hear from

15   Ms. Hagan until I called her and left a message in November

16   around the time that this dispute started, and I said:  Do you

17   want to wait?  This is what I have.  This is what I'm going to

18   run.  And that is what started the conflict.

19          So looking back, perhaps I should have just --

20          THE COURT:  Could I beg of you both, could we just

21   move forward?

22          MS. CANFIELD:  Yes.

23          THE COURT:  Let's deal with the merits of all of this.

24   Let's get to the heart of this instead of just talking about

25   all the fights you all have been having.  It's disappointing

JC4TKAYC

1   and discouraging and probably demoralizing to my law clerk to

2   see two accomplished, articulate lawyers fighting about basic

3   and simple things here.

4             So let's talk about the time frame.  Ms. Hagan, why

5   should it go before January of 2018?

6             MS. HAGAN:  My client started complaining about pay

7   parity back in 2012.

8             THE COURT:  Pay parity, how would that be implicated

9   by e-discovery?

10            MS. HAGAN:  There were email exchanges between at

11   least my client and Elizabeth Ford that predate the 2018

12   cutoff.  Ms. Canfield also agreed to earlier cutoff dates for

13   Mr. MacDonald, Ms. Yang, and I believe Mr. Wangel.

14            THE COURT:  Earlier meaning what?

15            MS. HAGAN:  2015.

16            THE COURT:  Is that right, Ms. Canfield, you'll go

17   back to 2015 for those individuals?

18            MS. CANFIELD:  No, I agreed, because she previously

19   worked for Dr. Ford, and Dr. Ford is also employed by Bellevue,

20   as is plaintiff, that I would go back earlier; but not Wangel,

21   because Mr. Wangel did not start working until 2018, as did

22   Dr. Jain, not until 2018.  Then after I offered the concession

23   for this person we'll go back farther, and the next time we

24   spoke she added another custodian.

25            I'm trying to manage how much and the cost of

JC4TKAYC

1    collecting ESI --

2              THE COURT:  Maybe the most efficient thing to do is I

3    have the draft protocol that Ms. Hagan sent on page 14, there's

4    a list of nine custodians and then there are dates.  Is that an

5    accurate reflection of where things stand or is something

6    different?

7              MS. CANFIELD:  No, it's not.

8              THE COURT:  So can you then tell me what --

9              MS. CANFIELD:  What we had agreed --

10             THE COURT:  Let's take them one at a time.  Ms. Ford,

11   she wants to go back to 2011.  And what is your proposed time

12   period if it's not that?

13             MS. CANFIELD:  The farthest I would go back is 2015.

14             THE COURT:  2015.  And the reason for that is?

15             MS. CANFIELD:  It's three years back from when she

16   filed the complaint.  I don't think there's anything

17   responsive.  It's not material and relevant to any allegations

18   in the complaint.  But if she's concerned there might be some

19   correspondence regarding pay equity issues, I will go back to

20   2015.  2011 I think is way too far back.

21             THE COURT:  Why should we go back to 2011 with respect

22   to Ms. Ford?

23             MS. HAGAN:  My client started complaining to Ms. Ford

24   and to management back in 2012, and there are paragraphs in the

25   complaint, specifically paragraph 40, which goes into a

JC4TKAYC

discussion about how she started complaining to Ford and
management about pay parity.  So it's plaintiff's position that
the ESI should go back at least to that, at least to 2011,
because at least -- I would concede 2012, but 2011 would be
safe.

THE COURT:  Could you ask maybe your colleague,
Ms. Canfield, to address this, is there any -- if you're going
to be searching Ms. Ford's email going back to 2015 for the
plaintiff's name, how is it any more burdensome to go back
three more years in time, especially if it's going to be
discrete as to something like this and there may be little to
no other production related to it?

MS. CANFIELD:  I would just pose a question:  How many
emails do you get a day?  There could be plenty of emails that
we have to collect, and that has to be stored, and then we'll
go through them.  I don't see the cost that -- the
proportionality in terms of what the allegations are and what
the cost burden is going to be on us --

THE COURT:  That's what I'm asking, what is the cost
burden to go back beyond 2015?

MS. CANFIELD:  We don't know until we collect, but I
would say if it goes to EPA -- there's an EPA claim in 2015,
and 2011 is going to be the same, there's liability there.  And
if there's a retaliation claim because she complained about
this and we find something in 2015, it doesn't matter, she

JC4TKAYC

```
 1    still hasn't established her retaliation claim.  I just don't

 2    see the discovery going back is proportional to her making her

 3    prima facie case.

 4              THE COURT:  Is going beyond 2015 solely related to pay

 5    parity?

 6              MS. HAGAN:  Yes.

 7              THE COURT:  And the statute of limitations for that

 8    claim is what?

 9              MS. HAGAN:  Six years.

10              THE COURT:  But why is Ms. Canfield wrong in that?

11    I'm not sure it's six years.

12              MS. CANFIELD:  It's not six years, it's three years.

13              THE COURT:  I think it's three years, but I could be

14    wrong.

15              Why is Ms. Canfield wrong, Ms. Hagan, that if in fact

16    there is email in relation to the pay parity complaints your

17    client has made to Ms. Ford in 2015 that that isn't just as

18    actionable as any correspondence with her in 2013?

19              MS. HAGAN:  Well, there are specific statements that

20    Ms. Ford made in an email to my client about her civil service

21    title and the ability to address the pay parity issues, and it

22    started back then.  And we are arguing that that Ms. Ford took

23    that animus into the new administration of management.

24              So we're talking about Yang and other subsequent

25    managers that Ms. Ford and my client actually had.  And there
```

JC4TKAYC

```
1    are cases that examine timeframes before and after, like
2    windows, and I don't see -- I'm not really even sure what the
3    issue would be for defendants to go back an additional four
4    years with that specific keyword.
5             THE COURT:  Because Ms. Ford had a lot of interaction
6    with your client that will produce a lot of emails that have
7    absolutely nothing whatsoever to do with this case, which will
8    then make it burdensome for them to have to cull through them
9    to find the three emails out of 4,000 that have to do with pay
10   parity is, in a nutshell, I think the point.
11            MS. HAGAN:  But they haven't -- first off, I guess
12   what we're arguing is that earlier emails establish the animus,
13   the gender discrimination and pay parity issues.  We're saying
14   that the intention starts there, and that's why we're seeking
15   to get those emails at an earlier date.
16            THE COURT:  I don't see that in your complaint.
17            MS. HAGAN:  That's why we're proposing to amend it.
18            THE COURT:  You can't do that.  That's really not a
19   legitimate argument to make in an unamended complaint we are
20   nonetheless seeking to develop the scope beyond what is in the
21   current complaint.
22            MS. HAGAN:  There are allegations in the amended
23   complaint that my client complained to Ms. Ford and that -- I
24   should say Dr. Ford, and Dr. Ford said getting pay parity or
25   getting change around here is like getting elephants to move
```

1    and stuff, something to that nature, and the --

2           THE COURT:  Here's what we're going to do, because

3    we're not going to spend the entire day here.  And we started

4    20 minutes late so we're already past where I thought we would

5    be done.  It's already 10 of 12:00.

6           My order is that the city is directed to go back to

7    2015.  You will get the production.  You will see what it is.

8    I'm denying the application to go back before that without

9    prejudice.  If you could make a more substantive basis for why

10   you need information, once you have what you do have, for

11   information before that I will let you renew the application.

12   But it strikes me as disproportional, given what is in the

13   current pleading and given what I otherwise know.  So if the

14   complaint is amended and the production is inadequate, you

15   could revisit it, but on the framework for today it's 2015.

16          Now I hope we're not going to have to go through all

17   other eight for ten minutes each because this will take a long

18   time.

19          Is it Mr. Jain, J-A-I-N, and April 2018 to the

20   present, and do we both agree on that one?

21          MS. CANFIELD:  Defendants agree.

22          MS. HAGAN:  Yes.

23          THE COURT:  Okay.  Great.  So that's good.

24          Then it's Mr. MacDonald, plaintiff proposes the 2015

25   date and the defendant proposes 2017.  So what's the disparity

JC4TKAYC

1    there?

2           MS. CANFIELD:  We actually proposed that 2018 date.

3    I'm really confused, I don't see what relevancy Dr. MacDonald

4    has to this case, so --

5           THE COURT:  Well, you'll have to help me because you

6    know the players and I don't.  What is or was his relationship

7    to Dr. Kaye?

8           MS. CANFIELD:  I don't know.

9           MS. HAGAN:  He's her indirect supervisor.

10          THE COURT:  Indirect supervisor.  What does that mean?

11          MS. HAGAN:  She communicated with him at times as far

12   as the pay parity issue, and she also complained about

13   discrimination to Mr. MacDonald.

14          THE COURT:  Beginning -- when did the relationship

15   begin?

16          MS. HAGAN:  Well, he actually -- they have been

17   interacting with each since he got hired in 2015.

18          THE COURT:  Why are you going back to 2015?  Because

19   you're saying that she had interactions with him about

20   discrimination and pay parity for that period of time?

21          MS. HAGAN:  And malfeasance.  Yes, she has been

22   complaining for a long time.  It didn't just start.

23          THE COURT:  Can I ask, by the way, if you're going to

24   search the plaintiff's name you're going to get a lot more

25   production than if it is with other terms as well that could

JC4TKAYC

narrow this in some way.  Shouldn't this search be undertaken

simply not by the plaintiff's name but with other terms such as

discrimination, retaliation, pay, pay parity, something along

those lines?

MS. CANFIELD:  We're fine with search terms.  We

thought to expedite things we would collect from the time

period and use plaintiff's name because --

THE COURT:  That's up to you.  You know better than I

what is going to be more costly or burdensome to you.  I'm just

concerned that these people have lots of interactions, I

suspect, a few of which may be relevant to the lawsuit, many of

which will be entirely irrelevant to the lawsuit, but the

broader your search, the more work it's going to end up being

to have to cull through it.

MS. CANFIELD:  Correct.  We're just concerned about

getting this moving.  Negotiating search terms is just

something else that we have to do.  We're hoping today if we

could streamline the collection period and search her name.

THE COURT:  You're going to just search her name in

this collection period for these custodians?

MR. DiSENSO:  Your Honor, Anthony DiSenso for the City

of New York.

I think our theory was we're talking about just

collecting -- we're using the search term to collect the data,

so we're not running these terms in a database.  I'm not sure

JC4TKAYC

1   how complex the search terms can really be.  It depends on what

2   the compliance tool is that the specific agency in this case is

3   going to use to collect.

4           THE COURT:  Well, you have some sense of how you're

5   going to do this, do you not?

6           MR. DiSENSO:  We do, but I think as a general matter

7   when we collect we typically collect broader and then narrow

8   down in the database a couple of different ways; it could be

9   search terms, it could also be Continuous Active Learning or

10  another tool that we use in lieu of search terms.

11          THE COURT:  And to Ms. Hagan's point, that does need

12  to be done collaboratively.  You can't just do it on your own,

13  because if you do it on your own you will be in my courtroom

14  every week, and I don't have time for you to be in my courtroom

15  every week.

16          MS. CANFIELD:  That's why we're here.  We want to get

17  the scope, the custodians, and the time period, and we want to

18  do Continuous Active Learning and do everything with

19  plaintiff's name, and then from there the computer does its own

20  production.

21          THE COURT:  But you have to be talking to Ms. Hagan

22  about what it is you're going to ask your computer to do,

23  because it's otherwise having an ex parte conversation with

24  your computer.  And I want it not to be an ex parte

25  conversation, otherwise whatever you produce I'm going to guess

JC4TKAYC

1    that Ms. Hagan will somehow be unhappy about it and then you'll

2    be right back here and we'll have moved the boulder down the

3    hill about three inches, and I want the boulder to move

4    completely down the hill.

5            MS. HAGAN:  Your Honor, this is the precise reason why

6    I was saying we should work together.

7            THE COURT:  I'm your ally on that.

8            MS. HAGAN:  Thank you.

9            THE COURT:  I am all in favor of cooperation, and I

10   want to make sure that everybody knows that that has to happen.

11           If what you're telling me is you think the most

12   efficient way, however proportional you're willing to live with

13   it is, we're going to define for each custodian a timeframe,

14   you're going to search that custodian's email collection for

15   that time frame, then you're going to have the universe of

16   documents.  We'll say it's 10,000 documents.  Then once you

17   have that subset of documents you will talk to Ms. Hagan about

18   how you will search that subset of documents to make a sub

19   subset of them that are relevant to the lawsuit by having

20   search terms that hopefully you can agree on.  Because it's not

21   rocket science, in a case like this, as to what it should be.

22   That sounds fine to me as long as you're working together so

23   that she understands whether using CAL or some other TAR system

24   to drill down into that sub subset, that's all fine with me, as

25   long as there's communication in that regard.

JC4TKAYC

1          MR. DiSENSO:  Your Honor, if I could be heard, I want

2     to make sure I can clarify some of the points that were raised

3     in the letter, because I think there is some confusion about

4     the process that was contemplated initially in the discussion.

5          With the CAL approach, a lot of the issues that arise

6     that arose in the earlier cases with previous versions of TAR

7     are no longer at issue.  CAL is essentially just a

8     prioritization of the order in which you review the documents.

9     So there is no seed set training, there is no complicated

10    control set validation process, it's just you're going to start

11    reviewing the documents with the machine watching you and

12    learning what's relevant and it's reordering the order of

13    documents and bringing those responsive documents up to the

14    front of the queue.  And once you stop seeing responsive

15    documents, we take a sample to make sure that we're not leaving

16    anything behind, and then we complete the review, but there is

17    no seed set.

18         THE COURT:  Okay.  But with all due respect, I think

19    of some of what you're doing now is conducting a meet and

20    confer in the courtroom in my presence.  And a lot of these

21    conversations don't need to be in front of me or in the

22    courtroom but need to be behind closed doors in a conference

23    room or on the phone in which you all are explaining to

24    Ms. Hagan how your process is going to work, because I think

25    she doesn't know at least some of what you're telling me or

JC4TKAYC

 1    hasn't heard it from you until right now.

 2              Is this news to you, some of what you're hearing?

 3              MS. HAGAN:  To some extent.  I think Mr. DiSenso is

 4    leaving out to some degree that even as we spoke in court he

 5    went back and forth between what would be keyword search and

 6    what would be a CAL methodology.

 7              THE COURT:  I didn't hear that.

 8              MS. HAGAN:  At some point he was talking about whether

 9    or not they would use terms to narrow things down.  This is

10    before this last discussion.  At first he was talking about how

11    they were going to go through the universe of documents.  He

12    kind of vacillated between a keyword search and CAL.  I

13    understand -- it's my understanding before I came in here today

14    that we were just going to be dealing with CAL, but I wanted to

15    understand exactly what process they were going to go through

16    to get the universe of documents.  They still have to have a

17    base of documents, a program, the computer --

18              THE COURT:  That's what we're talking about.  That's

19    why we're setting a timeframe.  The documents for these nine

20    custodians requires us to set a time frame.

21              And you'll have a base of documents, is that right?

22              MS. CANFIELD:  Yes, timeframe, and collect with

23    plaintiff's name, so it will be a very, very broad collection.

24              THE COURT:  I understand that.  I think we said that.

25    We need to move in order --

JC4TKAYC

1          MS. HAGAN:  I just have -- not about the terms, I

2     don't understand why we can't have a protocol that I sign off

3     on, your Honor, because I think that would keep them honest and

4     on time.

5          THE COURT:  Because it's premature, that's why.

6     Because you need to receive production and then determine if

7     there's some deficiency in it that warrants some kind of -- you

8     could call it a protocol, to me it's just getting Court rulings

9     because there are disputes that need to be resolved between the

10    parties.

11         Not every case involving e-discovery has a protocol.

12    With due respect, Ms. Hagan, I have been here ten years, and I

13    think I have had less than five cases with protocols and I

14    think I had a hundred cases with e-discovery.  So you might

15    think it's the best way to proceed, and maybe in some other

16    cases it's been useful to you.  It's premature today for me to

17    review a 16-page document that you submitted that Ms. Canfield

18    hasn't even responded to yet, and there's been no production

19    yet for me to evaluate whether some protocol needs to be

20    imposed today.

21         Let's finish with these custodians so we can move

22    along here.  So for Mr. McDonald, when did he start working

23    with Dr. Kaye?  I'm not entirely clear on that.

24         MS. HAGAN:  August 2015.

25         THE COURT:  And we can't go back to 2015 because?

JC4TKAYC

1          MS. CANFIELD:  To expedite things, we'll go back to

2     2015.

3          THE COURT:  Okay.  What about Mr. Wangel?  There seems

4     to be agreement of January 2018, correct?

5          MS. CANFIELD:  Correct.

6          MS. HAGAN:  Yes.

7          THE COURT:  And for Ms. Yang, it's between January and

8     December of 2015.  Why is there that disparity?

9          MS. CANFIELD:  I could speak for defendants.  It's

10    three years back from the filing of the complaint.  We went

11    back three years, statute of limitations.

12         THE COURT:  Why does it need to go back beyond that?

13    I don't know what the relationship again between Kaye and Yang

14    is that determines any of this.  You all know these facts, I

15    don't.

16         MS. HAGAN:  Ms. Yang was my client's indirect

17    supervisor since she started.

18         THE COURT:  Let's say January 2015, since we're going

19    back to that for these others as well.

20         Now Mitchell Katz, there's an objection to this

21    custodian all together.  What's the nature of that objection?

22         MS. CANFIELD:  It's my recollection that this

23    individual, according to what I remember of the conversations

24    with plaintiff's counsel, is that this individual attended a

25    disciplinary conference, I believe, and that was the only

JC4TKAYC

1    purpose of the collection.  And I suggested to plaintiff's

2    counsel that if he was in any correspondence with plaintiff's

3    supervisors, like Dr. Jain or Dr. Ford, their emails would be

4    captured, would capture everything, and it would be unnecessary

5    to collect him if the collection was for that limited purpose.

6           THE COURT:  Is that the only interaction he had with

7    plaintiff?

8           MS. CANFIELD:  That's my recollection.

9           THE COURT:  Was there anything beyond this

10   disciplinary proceeding?

11          MS. HAGAN:  My client has been complaining about

12   discrimination.

13          THE COURT:  I know that, but what does Dr. Katz have

14   to do with anything related to those complaints other than

15   that?  Ms. Canfield says he was involved in a disciplinary

16   proceeding, which I gather Dr. Ford and Dr. Jain were also

17   involved in, from what she says, so why would there be uniquely

18   documents corresponding between your client and Mitchell Katz?

19   That's my question.

20          MS. HAGAN:  Well, Mitchell Katz is the CEO of H and H,

21   and my client is like I guess three steps removed, but not that

22   far away from him, I guess, as far as the hierarchical food

23   chain.

24          She actually complained to everyone in this managerial

25   structure, and Mr. Katz has an obligation, once he is

JC4TKAYC

1    brought -- once discrimination or retaliation has been brought

2    to his attention to actually act upon it.  And it's our

3    argument that he willfully did not do anything, and in fact

4    participated in retaliation against my client.

5           THE COURT:  What is his position?

6           MS. HAGAN:  He's the CEO of H and H.  But my client

7    was a very senior person in the organization.

8           THE COURT:  Well, what interaction does your client

9    have with Mr. Katz?

10          MS. HAGAN:  Well, she emailed him on -- she CC'd him

11   on emails, and actually --

12          THE COURT:  I haven't heard enough to convince me that

13   he should be involved in the collection, so denied without

14   prejudice.  If you can make some case that he has unique

15   information that hasn't otherwise been produced, you can renew

16   it, but not I'm requiring any search at this time.

17          Now the plaintiff herself.  That seems agreed, or no?

18          MS. CANFIELD:  We'll go back to 2015.

19          THE COURT:  This says 2011.

20          MS. CANFIELD:  I never agreed to 2011, I only agreed

21   to the statutory time period.  We agreed to 2015.

22          THE COURT:  January 2015.

23          MS. HAGAN:  Is there a possibility -- we're not

24   getting everything, could we get --

25          THE COURT:  You never get everything.  Let me tell you

JC4TKAYC

1    a little secret, which is if you wait until February 1st to

2    take depositions in this case because you don't have all the

3    documents, you're going to run out of time.

4              MS. HAGAN:  No.

5              THE COURT:  So I'm hard pressed to understand why the

6    statute of limitations that's implicated here isn't at least

7    guidance for purposes of how we should frame what could

8    potentially be fairly extensive discovery.  And until you know

9    what is produced, you are not going to be in as good a position

10   as you may be to tell me why you think that the production is

11   inadequate, because the critical documents are from 2013, which

12   you can't tell me, sitting here today, you're just sort of

13   making a broader argument that she's been complaining from time

14   immemorial.  But to complain from time immemorial doesn't give

15   you license to get documents from time immemorial because

16   that's not proportional.  And as a colleague of mine said not

17   that long ago, "Proportionality is the new black," so we have

18   to abide by that, because I do think it's important and in

19   everyone's interest.

20             You have an obligation and the Court has an obligation

21   under Rule 1 to ensure that discovery is inexpensive.  That's

22   why I keep asking questions about the burden, and some of this

23   they're willing to undertake, even though it seems to me the

24   way they're going to do it might be more burdensome than some

25   other way, but they have chosen do so and I'm not going to

1    second guess that.

2            We'll go back to January 2015 for Ms. Kaye, again

3    without prejudice, Ms. Hagan.  If there's some application you

4    want to make after production has been made that you think

5    justifies a further search, I'm happy to hear it, but that's

6    where I come out today.

7            And Andrea Swenson, January 2018, and that's agreed?

8            MS. CANFIELD:  I'm not quite sure what her role is in

9    the litigation.

10           THE COURT:  Who is she and what is her relationship to

11   the allegations in the complaint?

12           MS. HAGAN:  Andrea Swenson complained about my client

13   and participated in disciplinary charges against my client.

14           THE COURT:  Is she a supervisor of your client?

15           MS. HAGAN:  I'm not exactly sure.  She's not a

16   supervisor, but there was an incident that took place between

17   she and my client, allegedly, and my client was brought up on

18   quasi-disciplinary charges involving Ms. Swenson, and we're

19   arguing that --

20           THE COURT:  Your client was brought up on disciplinary

21   charges related Ms. Swenson, is that what you said?

22           MS. HAGAN:  Yes.  So we were seeking e-discovery for

23   her interaction with Ms. Swenson, and I guess what transpired

24   around --

25           THE COURT:  When was this incident that you are

JC4TKAYC

```
 1  talking about?

 2             MS. HAGAN:  I would say it would have been in the

 3  spring of this year.

 4             THE COURT:  Spring of 2019?

 5             MS. HAGAN:  Yes.

 6             THE COURT:  Why are we going back to January 2018 for

 7  her?

 8             MS. HAGAN:  I just wanted to make sure that we covered

 9  the entire timeframe period.

10             THE COURT:  I don't know what that means.  Why don't

11  we go back to January of 2019.

12             MS. HAGAN:  Okay.

13             MS. CANFIELD:  That's fine.

14             THE COURT:  January 2019, based on what I just heard.

15             MS. HAGAN:  And, if necessary, could I make an

16  application?

17             THE COURT:  Yes.  I mean, again, I have a finite

18  amount of information about all of these people.  I'm just

19  trying to do my best given what you all are telling me in terms

20  of who they are in relation to the plaintiff and the

21  allegations in the current pleading.  Any application that you

22  want to make with respect to these custodians going forward

23  beyond the timeframe you can make, I'm not denying that, with

24  prejudice, but you will have to have a pretty compelling

25  argument to convince me because we need to move the case
```

JC4TKAYC

1    forward.  And I think once production is made you'll have a lot

2    of material to think through and work with and you'll have to

3    decide what is proportional for your purposes.

4             The last person on the list is Anansa Brayton.  Who is

5    this person and is there agreement or not agreement?

6             MS. CANFIELD:  I don't know who she is.

7             THE COURT:  Who is she?

8             MS. HAGAN:  She worked with my client.  She actually

9    just resigned like a few weeks ago, but they were in the clinic

10   together.

11            THE COURT:  What makes her someone whose email should

12   be searched?  Why will she be a relevant witness here?

13            MS. HAGAN:  There were issues involving my client

14   being excluded from meetings, being excluded from policy making

15   Ms. Brayton was actually involved in, and my client alleges

16   that she was part of the marginalization she experienced.

17            THE COURT:  I thought you said she was a peer.

18            MS. HAGAN:  She's a peer, but Ms. Brayton was actually

19   included while my client wasn't.  So we're trying to establish

20   the extent of which she was excluded from meetings.

21            THE COURT:  Why would any emails Ms. Brayton have

22   address that?

23            MS. HAGAN:  There are issues involving Ms. Brayton's

24   workload, Ms. Brayton's performance, Ms. Brayton's inclusion in

25   meetings with respect to my client during the relevant time

JC4TKAYC

1    period.

2              THE COURT:  This is a gender discrimination case,

3    right?

4              MS. HAGAN:  It's a gender discrimination case but also

5    my client alleges she that was retaliated against after she

6    engaged in protected activity, including filing claims of

7    discrimination as well as claims of malfeasance.

8              THE COURT:  What would Ms. Brayton have to do with any

9    of that?

10             MS. HAGAN:  Well, she alleges that Ms. Brayton was

11   treated favorably because she didn't engage in those protected

12   activities.

13             THE COURT:  I'm not persuaded.  Sorry, I'm not going

14   to allow discovery of Ms. Brayton as a custodian at this time.

15   I think if what you say is true -- who was supervising Brayton

16   and Kaye at this time?

17             MS. CANFIELD:  Jain.

18             THE COURT:  Yeah, so you're going to see at least

19   preliminarily in that production relevant information related

20   to that, I suspect, if it does exist.

21             We have gone through the custodians' list, we have a

22   timeframe for all of them.  What else do we need to today as

23   far as production is concerned, other than set a schedule for

24   it?  Anything else?

25             Now you have your marching orders in terms of time

JC4TKAYC

| | |
|---|---|
| 1 | frames and custodians, and the search term is the name of the |
| 2 | plaintiff, correct? |
| 3 | MS. CANFIELD:  Correct. |
| 4 | THE COURT:  How long is it going to take? |
| 5 | MS. CANFIELD:  I was talking to Mr. DiSenso |
| 6 | beforehand, and it will depend on the universe of documents we |
| 7 | have once we gather them based on the timeframe. |
| 8 | THE COURT:  Tell me what that means. |
| 9 | MS. CANFIELD:  That means that once we have the |
| 10 | universe of documents we need to review, then we might have a |
| 11 | better idea as to how long it will take. |
| 12 | Am I correct in that assessment? |
| 13 | MR. DiSENSO:  That is correct.  Basically the reason |
| 14 | we can't give a timeframe for completing production -- |
| 15 | THE COURT:  Well, I will give you a timeframe if you |
| 16 | don't propose one, so propose one. |
| 17 | MS. CANFIELD:  Well, I was going to propose just an |
| 18 | outside, with an extension of discovery that we work within |
| 19 | to -- |
| 20 | THE COURT:  We're already in December seeking an |
| 21 | extension of discovery? |
| 22 | MS. CANFIELD:  Because -- |
| 23 | THE COURT:  Did you have these requests in July, as |
| 24 | Ms. Hagan said? |
| 25 | MS. CANFIELD:  We rejected them as improper.  It was |

JC4TKAYC

1    prior to the Rule 16 conference.  We rejected them.

2         THE COURT:  So you stood on ceremony and she was

3    trying to expedite matters by giving you a heads up as to what

4    she was looking for, and you're penalizing her for doing that,

5    which I think is really not a good way to set the tone in a

6    lawsuit.  Is that how they educate -- you're a very experienced

7    lawyer, Ms. Canfield, you've been before me many times.  The

8    training of corp. counsel is informal discovery served in

9    advance of Rule 16 you can just ignore?

10        I'm not saying that because it was sent to you

11   informally in July that you had to respond in August, but it's

12   now December.  You had a conference with Judge Oetken in which

13   he set a schedule of fact discovery deadline in February and

14   you have still done nothing, and now you're sitting here on

15   December 4th and asking for a discovery extension because you

16   don't want to produce anything until January.  And why

17   shouldn't I hold your feet to the fire since you had this since

18   July?

19        It's just a question of priority, and if I said get

20   this done in one week you would figure out to how to get it

21   done in one week.  I'm not saying it's going to be a week, but

22   you're saying Judge, let's have until April for fact discovery

23   and we'll produce this in January.  And why should you be

24   rewarded for that?  I don't know.  Tell me why.

25        MS. CANFIELD:  I certainly wouldn't characterize any

JC4TKAYC

1    of this as a reward.

2              THE COURT:  I'm being a little loose with my language

3    in that regard, but I mean effectively the city abrogated to

4    itself an order not to have to produce anything until things

5    were worked out in court, and this has now taken until December

6    4th.  Judge Oetken just referred this to me last week, so you

7    didn't know you were stuck with me until last week, but I'm

8    just eager to move cases along.  That's my job as a magistrate

9    judge supervising discovery.

10             So I understand you have technological issues in

11   making this happen, but what's the realistic timeframe?  I

12   can't allow you to not propose a timeframe.  I need to know

13   what you think you need and then I will evaluate and hear from

14   Ms. Hagan about how realistic that is.

15             MS. CANFIELD:  First thing, I never thought that we

16   were stuck with you, Magistrate Judge Cott.

17             THE COURT:  Thank you in that regard.

18             MS. CANFIELD:  I know you have some wisdom regarding

19   these issues, ESI, so I was actually happy that Judge Oetken

20   referred the case to you.  Considering the holidays, I would

21   say at the beginning of January, the second week of January

22   full production.

23             THE COURT:  But just if you don't mind, work me

24   through -- take me through logistically how this is going to

25   play out after you leave the courtroom today.  What's going to

JC4TKAYC

1  happen?  You're going to be in touch with a vendor and schedule

2  what, and how would that work?

3          MS. CANFIELD:  It sounds like the vendor we'll use for

4  CAL we already have a contract with, so --

5          MR. DiSENSO:  That's not -- maybe I could speak to

6  this.  We'll start, your Honor, by requesting the data from--

7  because this is an outside entity from us, we don't --

8          THE COURT:  HHC?

9          MR. DiSENSO:  Yes.

10         THE COURT:  So you need to access through their IT

11  department the mailboxes for the custodians we've identified.

12         MR. DiSENSO:  Correct.

13         THE COURT:  How long would that take?

14         MR. DiSENSO:  Could take up to two weeks.

15         THE COURT:  Why so long?

16         MR. DiSENSO:  These IT departments do not have a lot

17  of staff that handle ESI requests for lawsuits.  Typically we

18  have to get the data by sending the hard drive out and then

19  back, so that adds a little bit of time depending on, again,

20  the size of the data that we collect.

21         THE COURT:  Send it out to whom?

22         MR. DiSENSO:  To HHC to where the IT department sits I

23  think in the Bronx.

24         THE COURT:  But if you call an IT person at HHC this

25  afternoon and said we're before a federal judge who said you

JC4TKAYC

1    have one week to get this back to us, won't they get it back to

2    you in one week?

3              MR. DiSENSO:  I certainly hope so.

4              THE COURT:  I hope so, too.  So let's assume it's a

5    week, not two weeks.  So now we're at December 11, then you

6    have the mailboxes you need.  What happens next?

7              MR. DiSENSO:  So then we process the data in order to

8    index it, essentially be able search across it.

9              THE COURT:  Is that something that the law department

10   has capabilities of doing or somebody else?

11             MR. DiSENSO:  Our vendor will do it for us.

12             THE COURT:  You have a vendor under contract at the

13   ready for this?

14             MR. DiSENSO:  Yes.

15             THE COURT:  Why can't that happen toward the end of

16   next week into the week of the 16th?

17             MR. DiSENSO:  As long as we have the data by then we

18   should be able to process.

19             THE COURT:  If I tell you that you have to get it from

20   HHC by the 11th, then you're turning it around the week of the

21   16th, and how long does that process take?

22             MR. DiSENSO:  It can take two to three days, I would

23   say, and it should be completed.

24             THE COURT:  Okay.  And once that process that you've

25   just described is completed, is it ready to be produced or

JC4TKAYC

1    what?

2            MR. DiSENSO:  No, at that point we would make a

3    decision about how best to narrow the universe for a review.

4            THE COURT:  So that's then when you would engage

5    Ms. Hagan in conversation, because then you could tell her we

6    have 9,412 documents for these seven custodians and let's talk

7    about how we should search them, correct?

8            MR. DiSENSO:  Potentially, your Honor.  I am not sure

9    if --

10           THE COURT:  Because this is where the rubber meets the

11   road and this is why Ms. Hagan I think wants a protocol and all

12   of that, which is once we reach this point in the process you

13   need to engage with her, because otherwise you're just laying

14   the foundation for more disputes.  And I want you not to have

15   disputes, I want you to work together, and she's an experienced

16   lawyer who wants to work with you.

17           Now that doesn't mean reasonable people can't

18   disagree.  I understand that, and I know you all do, too, and

19   I'm not deluding myself into thinking that I'm not going to see

20   you again in this case.  I'm highly confident I will see you

21   again in this case, but in a way where you will be very laser

22   beam focused.  Today has been very scattershot, the next time

23   will be laser beam focused.

24           So what I would suggest is once you've run this to the

25   point that you have said, before you undertake how you're going

JC4TKAYC

1    to cull and narrow the collection, you need to have a meet and

2    confer with Ms. Hagan.  That's Judge Cott's informal protocol,

3    if you will, at that moment in time so that you will, before

4    Christmas, have those conversations.

5         Then I would say realistically, once you've had those

6    conversations, again you run into the holidays.  And I am not

7    someone who wants people's holidays ruined by litigation,

8    because life is too short and people have families and other

9    commitments and I don't want lawsuits to have people working on

10   Christmas Eve at 5 o'clock or whatever other holidays people

11   may be celebrating.  So we have to be mindful of that, and I'm

12   very mindful of that, but we need to make this move

13   accordingly.

14        MS. CANFIELD:  I was going to add, again on page 6 of

15   document 51, that's the protocol proposed by plaintiff, I am in

16   agreement that the issues she has listed here -- and I think I

17   had proposed those in an email to Ms. Hagan back in November,

18   we are happy to have that be the scope of how we cull the

19   initial set of documents, those broad subject matter areas, if

20   that's something that --

21        MR. DiSENSO:  Well, I think -- and this is the point I

22   was going to make, your Honor, is once we have the data

23   processed and we're going to make a decision about how best to

24   proceed with review, it may be that we don't apply search

25   terms, we just review the document.  It's hard to say without

JC4TKAYC

1    knowing how many we have.  Of course, if we were going to -- if

2    we thought the search terms were the best way to cull down the

3    data set we would reach out to Ms. Hagan about that, but --

4         THE COURT:  What I don't want to have happen is

5    another conference where Ms. Hagan comes and tells me she's

6    essentially been kept in the dark about how you went about

7    providing whatever documents you do end up producing.  That's

8    what I want to avoid, and the record will be clear so the

9    transcript will tell us what I just said.

10        Okay?  That's what I want to avoid.

11        MS. CANFIELD:  I do want to add one other point.

12   Regardless if we have search terms, if using that platform or

13   using CAL, Continuous Active Learning, I'm going to be the one

14   reviewing the documents.  This is not going to be sent out to a

15   managed review team.  I will be sitting at my desk, and I can

16   average 700 to a thousand documents a day if I'm on a tight

17   schedule and I put everything else aside.

18        It was my experience in the last case I had before

19   Judge Koeltl in using CAL that it really is a better way of

20   gathering documents because I could look at the document and

21   that goes directly to FMLA, that goes directly to equal pay

22   issues.  So I think it's a more efficient way because you're

23   training the machine as you're reviewing the documents and

24   whole volumes -- say there's a media, she's getting newspaper

25   articles every day, and "retaliation" is in that newspaper

JC4TKAYC

1    article, the search terms, that same newspaper article or same

2    newspaper that she has delivered to her mailbox every day will

3    show up in search terms.  But I have CAL, CAL will know that

4    retaliation term, that's unrelated to the type of retaliation

5    in this context, and it will exclude all of those documents.

6            THE COURT:  Well, let me be clear, in the posture

7    we're in right now, I'm not here to micromanage what you should

8    do.  I want you to do what you think.  I just want you to talk

9    to Ms. Hagan about it so she understands at least at a macro

10   level what you're doing so that she could provide her thoughts

11   and input.  And you will either accept them or not, and you

12   will make your production.  And she may be totally satisfied

13   with the production.  I don't want to predict she won't be.

14   But the more information you provide to her and the more input

15   she can give you about what she thinks she may want to get, the

16   less likely it is that we're going to be back here having

17   disputes about things.  That's all.

18           I'm not trying to micromanage anything.  You should do

19   your review.  If you're sitting at your desk and looking at a

20   thousand documents, God bless you.  I leave that up to you, and

21   you will be in the best position to know what to do.  I think

22   it's unwise for judges to try to micromanage these types of

23   things, especially in this posture.  Down the road we have to

24   see what happens and where that takes you all.

25           But realistically, let me ask another question, just

JC4TKAYC

1    trying to perempt some things:  Are there going to be experts

2    in this case?

3          MS. HAGAN:  I'm still conferring with my client about

4    that.

5          THE COURT:  If there were to be an expert or experts,

6    what kind of expert are we talking about?

7          MS. HAGAN:  Probably talking about the psych -- she's

8    a psychiatrist herself, but probably looking at someone who is

9    going to look at her mental health.

10          THE COURT:  So for emotional distress-type purposes?

11          MS. HAGAN:  Yes.

12          THE COURT:  But you haven't decided that is what

13    you're saying.

14          MS. HAGAN:  Right.

15          THE COURT:  I don't want to speak for you, but I

16    assume not unless she does, then you might, but otherwise no?

17          MS. CANFIELD:  Otherwise no.

18          MS. HAGAN:  An actuary probably.

19          THE COURT:  An actuary?

20          MS. HAGAN:  Yeah.

21          THE COURT:  Okay.  Well, the reason I'm asking that is

22    because the way I would think about this is abiding by what

23    Judge Oetken set in the schedule, you have an expert deadline

24    in April, and as far as I'm concerned, what we can agree to

25    today is the April date will be all discovery, fact and expert,

JC4TKAYC

so that you don't get stuck having to take depositions back to

back to back the last week of the fact discovery deadline in

February.  It seems to me, given the timeline now with this

electronic discovery, and realistically having an early January

production, an early January production is fine as long as we

extend the fact discovery deadline until April.

I'm going to be disinclined to want to extend it

beyond that, however, especially because to some of the points

Ms. Hagan has been making.  We're talking about a longstanding

employee whose issues have gone on a long time, and the longer

the case goes on, memories fade, et cetera.  So it's in

everyone's interest that I hold your collective feet to the

fire.

And I'm not going to be inclined to extend discovery

past the April date, but we have an April 9 expert discovery

deadline, and I'm prepared today to say that we can consider

that a deadline for all discovery purposes, especially when

there may or may not be experts.  And if there are, they will

be pretty discrete in this case, and we can obviously deal with

that in due course.

If there are going to be experts, though, Ms. Hagan, I

think you can't decide that in April, you obviously need to

decide that by -- was there a timeline set for that?  I can't

remember.

In any event, I would say by February you should

JC4TKAYC

1    decide and disclose so that there is time, if there's going to

2    be expert discovery taken, that can happen in the February to

3    April window.  But we'll have the fact discovery window close

4    in April as well, so that gives you a little bit of time.

5            So in that end could we say realistically that the

6    production to Ms. Hagan can occur no later than the week of

7    January 6, and as early in that week as possible, can I say

8    like January 7, which is roughly a month from today, accounting

9    for the holidays of Christmas and New Year's where there are

10   multiple days where most offices are closed.

11           MS. CANFIELD:  Is it possible to do the bulk of the

12   production say versus if there's something that is privileged

13   or confidential that needs to be processed through a privilege

14   log, that the bulk of the production that doesn't need

15   redactions that could be produced by that date, but if we could

16   have an additional week if we need to.

17           THE COURT:  Maybe this is a good case for a 502(d)

18   order.

19           MS. CANFIELD:  That was going to be my next issue,

20   confidentiality agreement and also a 502(d).

21           THE COURT:  But if that was in place, why should we

22   delay production further?

23           MS. CANFIELD:  Well, I doubt there will be

24   attorney-client material.

25           THE COURT:  None of these people are lawyers.

JC4TKAYC

1        MS. CANFIELD:  Like I said, I doubt there will be --

2   if anything, there would be -- because she does -- she's a

3   psychiatrist who conducts forensic examinations, so there may

4   be inmate information that we would need to redact.  So any

5   redactions might need to come out.

6        THE COURT:  If you have a 502(d) order and there's

7   some inadvertent production of some prisoner, you can deal with

8   it in due course if you discover it after the fact.

9        MS. CANFIELD:  I would like to talk to my client about

10  that.  They have certain obligations that they need to follow.

11  They have other laws that I'm not familiar with.  I don't know

12  if a confidentiality order would -- a 502(d) only covers

13  attorney-client and not the personal information, and --

14       THE COURT:  I think that's correct.

15       MS. CANFIELD:  So we're saying the bulk of production.

16  If we could have another week for those --

17       THE COURT:  What I would say is you will make your

18  production by January 7.  If there's something that you're not

19  producing on January 7 because of information that needs to be

20  logged, you can have until the 14th to do that.  But I'm

21  deeming the 7th to be the date by which you're making your

22  production.

23       Frankly, if there's any way to make any sort of a

24  rolling production, I would encourage you to do that.  If there

25  are certain documents you have looked at on December 20 and you

JC4TKAYC

know they will be produced, let's say they're related to

Dr. Kaye and you know because you can see they're all

responsive to the issues that you just listed, there's no

reason in my mind that you should just hold off on that.  I

think rolling productions can be very helpful.  I suspect some

things that you have Ms. Hagan may already have, but that's

okay, that's confirmatory, I suppose, in some respects.

            So I would encourage rolling production.  I will set

January 7 as the date by which the production needs to be made

consistent with the time frame on the custodians we've set, and

any redaction/privilege type issue that warrants withholding

certain documents you would otherwise produce has to be

identified in a log or otherwise to Ms. Hagan no later than the

14th.

            Okay?

            MS. HAGAN:  One thing, there are the outstanding

discovery demands, the requests for admissions, the

production -- I mean I have given defendants interrogatories,

requests for admissions and productions since July, and I don't

have anything from them.

            THE COURT:  Okay.  Well, before we get there, I want

to close out the e-discovery production for our purposes today,

then we can go to non-e-discovery related discovery in the

remaining time.

            Is there anything else e-discovery related that we

JC4TKAYC

```
 1   need to address today now that I set timeframes for custodians
 2   and timeframes for production or rules of the road?
 3            MS. CANFIELD:  I would say yes, overall, but if
 4   plaintiff is planning on amending the complaint, I would
 5   suggest that we know what the additional allegations are going
 6   to be before I start reviewing documents.
 7            THE COURT:  We'll set a date for that and other
 8   related things, but okay, other than that we're good to pass on
 9   to other subjects, yes?
10            MS. CANFIELD:  Yes.  It's going to be difficult for us
11   to make that deadline.  We'll do our best.
12            THE COURT:  It's a Court order.  You said January, I'm
13   giving you January.  I could have said December.
14            MR. DiSENSO:  Your Honor, I think the concern that I
15   have is not knowing how many documents that I have to review.
16   It's hard to know.
17            THE COURT:  Do your best.  I made my rulings.  We'll
18   see where it takes us.
19            Now you'll amend your complaint by what date?
20            MS. HAGAN:  January 6.
21            THE COURT:  No, because it affects the production you
22   will get.  Can't we do it a week from today?
23            MS. HAGAN:  It's a pretty long complaint.
24            THE COURT:  It's a 30-page complaint.  But what are
25   you adding to it?  Not 30 more pages.
```

JC4TKAYC

1          MS. HAGAN:  My client and I have been going back and

2     forth for the last few months.

3          THE COURT:  Today is the 4th.

4          MS. HAGAN:  So I guess I could get it back by the

5     18th.

6          THE COURT:  Two weeks from today.

7          MS. HAGAN:  Yes.

8          THE COURT:  What you're doing then is you're making it

9     very difficult for the production that you want to be

10    meaningful if these allegations are going to in some way

11    materially change the legal terrain, so to speak.

12         MS. HAGAN:  So I guess we could do I guess the 11th.

13         THE COURT:  Okay.  I don't know what the scope of the

14    amendment is, so without knowing that and how extensive it is,

15    I don't know whether it will impact materially or not what it

16    is that Ms. Canfield needs to undertake.  So we'll say a week

17    from today.  And what you'll do is you are going to propose an

18    amended complaint, because you need leave of the Court unless

19    the parties agree.

20         So what I would suggest is this, we're talking about

21    the deadline for the amended complaint, so she's going to do it

22    by the 11th.  What I would suggest is she send it to you on the

23    11th, then you will let her and the Court know whether you will

24    object to it.  If you are going to object to it then we'll have

25    to have motion practice related to that, and I would say the

JC4TKAYC

following, which is:  We're still pretty early in this case,

given no discovery has been produced, so I will be hard pressed

to deny a motion to amend unless there's really good reason.

The only good reason I could think of is if you basically

change the case.  If you turn it into some other case or

something rather than sort of work on the edges of the margins

of the case, then I might have a different view.

        But leave to amend is freely granted in a posture like

this, so I would think the city is going to have some pretty

compelling arguments to convince me why the motion should be

denied if we're putting her through the burden of making a

motion.  Having said that, I don't know what the amendment is,

so I'm not making any advisory ruling here.

        You will have until the 11th and you will have until

the 18th to let the Court know whether the amended complaint is

one that you're agreeable to filing.  Obviously, all you're

doing is agreeing to it to being amended, not to any of the

allegations.  And if there's a stipulation to that effect, you

could submit a stipulation and then I will grant permission to

Ms. Hagan to file the amended complaint.

        And by the 18th, I think that should still give you

enough time to the extent it might impact your production.

Given what you have been telling me about your timeline, you

will have only gotten the mailboxes from HHC the previous week

and you will still be in process with your vendor then.  So

JC4TKAYC

1    that should be fine.  So 11th for the amended complaint, the

2    18th you need to let the Court know either by stipulation or in

3    letter opposing and the basis for why, and depending on what

4    you say then, I will set some schedule for motion practice if

5    it comes to that.

6            Now requests for admission, interrogatories, et

7    cetera, what's the timeline for that?

8            MS. CANFIELD:  I can produce the interrogatories, our

9    responses and our objections, by next week.  I do have a

10   concern about the admissions because --

11           THE COURT:  We'll take them one at a time.  So the

12   interrogatories a week from today?

13           MS. CANFIELD:  Yes.

14           THE COURT:  The 11th.

15           MS. CANFIELD:  Yes.

16           THE COURT:  Interrogatory responses will be provided

17   by the 11th.

18           Now the RFAs, how many did you say there were, 193?

19           MS. CANFIELD:  197.

20           THE COURT:  Okay.  I'm all ears.  It's not in the

21   letters.  I generally don't like having things in front of me

22   that the parties haven't identified to me before we get here,

23   but in order to avoid having more conferences, you'll answer

24   some of them, all of them, none of them?  What's the concern?

25   And there's no blanket rule that says you can't have 197 RFAs,

JC4TKAYC

1     it's just are they appropriate or not appropriate.  I haven't

2     seen them so there's no way I can opine on that.  You have to

3     tell me.

4              MS. CANFIELD:  I have responded to them up to 172.

5              THE COURT:  You drafted responses?

6              MS. CANFIELD:  I drafted responses.

7              THE COURT:  You only have 25 more to go.

8              MS. CANFIELD:  I do have 25 more to go but I do have

9     to follow up with my client on some of these.  My biggest

10    concern is because they were so voluminous it was almost

11    impossible to respond to them within the 30 days as required

12    under the federal rules.

13             THE COURT:  Can you respond by the 18th of December,

14    two weeks from today?

15             MS. CANFIELD:  Since I'm already at 172, I believe I

16    can.

17             MS. HAGAN:  Your Honor, may I interject, she's had --

18             THE COURT:  You just got me to have her agree to

19    December 18 for responses, so what more is there to discuss?

20             MS. HAGAN:  She's had them since July.

21             THE COURT:  There are 197, and it's at the outset of

22    discovery, which is not usually when RFAs are usually served.

23    So I don't know exactly what admissions you're looking for, and

24    a lot of admissions aren't that useful unless there are things

25    like authenticating documents, none of which have been produced

JC4TKAYC

1    yet.  And if you're using it as sort of a shortcut to getting

2    answers in depositions and the like, you're not going to

3    succeed in that regard.

4            So I think RFAs can be very useful, but they have to

5    be used carefully is all I'll say.  Again I'm speaking

6    generically.  I don't know what these entail.  But in any

7    event, you will get responses by the 18th of December, and I'm

8    totally happy with that timeframe.

9            And by the way, I'm not issuing some order with all

10   these dates and stuff.  You all order the transcript, so you

11   will have it all in there.

12           What other loose ends, if anything, do we have, other

13   than we'll go off the record and excuse the court reporter and

14   talk a little more offline about settlement.  Anything else we

15   need to discuss on the record?

16           MS. HAGAN:  Yes, the 502(d) order, when would your

17   Honor like for the parties to submit that?

18           THE COURT:  I would think any protective order and/or

19   502(d) order you should submit let's say by the 18th, before

20   the holidays.  Those are pretty straightforward.  I don't see

21   why a case like this would create any particular issues.

22           MS. CANFIELD:  And we have our standard that we'll

23   send over to Ms. Hagan.

24           THE COURT:  Yeah, the standard orders that I have seen

25   from your office I don't have any problem with.  I don't know

JC4TKAYC

1    if you have particular bells and whistles, Ms. Hagan, that you

2    want to include, but talk to Ms. Canfield about it.  Lawyers

3    should be able to work out protective orders in relatively

4    straightforward employment discrimination cases, as this is.

5    So let's have that submitted to the Court by the 18th as well.

6            Anything else that we need the court reporter for?

7            Okay.  So thank you very much.  You'll order the

8    transcript from him and we'll talk among ourselves a little

9    more and maybe go in the jury room.

10           (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25