F719ELLC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    TRACY CATAPANO-FOX,

4                   Plaintiff,

5              v.                          14 Civ. 8036 (KPF)

6    THE CITY OF NEW YORK, et al.,
                                           Telephone Conference
7                   Defendants.

8    ------------------------------x

9                                          New York, N.Y.
                                           July 1, 2015
10                                         12:00 p.m.

11   Before:

12             HON. KATHERINE POLK FAILLA

13                                         District Judge

14

15

16        APPEARANCES

17

18   WIGDOR LLP
          Attorneys for Plaintiff
19   BY:  MICHAEL J. WILLEMIN

20

21   ZACHARY W. CARTER
          Corporation Counsel for the City of New York
          Attorney for Defendants
22   DONNA A. CANFIELD
          Assistant Corporation Counsel

23

24

25

F719ELLC

1          (In chambers)

2          (Case called)

3          MR. WILLEMIN:  This is Michael Willemin of Wigdor LLP

4     for plaintiff Tracy Catapano-Fox.

5          MS. CANFIELD:  Donna Canfield for the New York City

6     Law Department, for all defendants.

7          THE COURT:  Good afternoon to both of you.  This is

8     Judge Failla.  I have a court reporter taking down these

9     proceedings and I will ask you to get a transcript at some

10    point after this conversation ends.

11          We're here today because of a series of letters that I

12    have received.  And the ones that I have, I have a letter from

13    the Wigdor Firm that is dated June 17.  Then I have a response

14    of June 23 from Ms. Canfield.  And there are some exhibits to

15    the Wigdor letter that I have looked at as well.

16          Let me just begin with an overview.  I'm sad but not

17    surprised to see that we have a discovery dispute here.  I

18    actually did think that the amount of time that I specified in

19    my opinion was enough to get things done.  So it's

20    disappointing on some level to realize that it hasn't been

21    done.

22          Lest I be accused of unnecessarily criticizing people

23    are piling on, I just want to raise two issues.

24          Mr. Willemin, I do understand -- and I appreciate that

25    you want to get to me in a very timely fashion -- any disputes

F719ELLC

1   that you see or think are about to happen in this case.  But I

2   do think, sir, that upon learning that defense counsel was

3   going to be out of the office for two days you probably could

4   have extended her the courtesy of waiting those two days and

5   letting this response come in on the 22nd or 23rd.  I don't

6   think that would have been fatal.  And you could have told me

7   that you were extending a courtesy.

8           The bigger issue I have, candidly, is with

9   Ms. Canfield.

10          Ms. Canfield, I'm telling myself that you're not doing

11  this deliberately.  But I do feel that the tenor of your letter

12  is an effort to try and force me into an extension that I don't

13  want to give.  And so I can only just describe it in that way.

14  I have no idea what other cases you have and what other work

15  that you've been doing.  But I have to tell you that there are

16  several points in your letter of the 23rd that -- and obviously

17  the last part of it where I just feel that you're trying to

18  force me into something that I don't want to do.  And I just

19  want to communicate to you for future letters and for future

20  conduct in this case and for future cases that you may have

21  before me I bristle at the notion of people just willfully or

22  even recklessly refusing to abide by my discovery deadlines.  I

23  actually try and put some thought into them.  So it is

24  frustrating when the parties are not complying with it.

25          So I'm just asking the parties to keep both of these

F719ELLC

1   thoughts in mind.  I don't actually need a response from either

2   of you as to either of those points.

3          Let me begin then with the things -- the non-overview

4   items on my list.  Let me begin with the privilege log.

5          Mr. Willemin, I understand from Ms. Canfield that

6   she's leaving open the possibility that one day she may need a

7   privilege log but as of this moment she does not.  I

8   understood, sir, that you're doing the same thing.  So is there

9   an issue with respect to the privilege log?

10          MR. WILLEMIN:  Only that in the letter there were --

11   even in the letter that Ms. Canfield submitted to the Court

12   there are numerous privilege objections that have been renewed.

13          If there is no privilege documents being withheld,

14   then that's fine.  That's done.  We don't need to deal with it.

15          I inquired, and that's the answer, then we don't need

16   to deal with it.  But I'm just suspecting that there may be

17   because there continues to be a renewal of privilege

18   objections.  That was my only concern.

19          THE COURT:  Sure.  I understood, Mr. Willemin, that

20   those objections were more on the order, if you'll excuse the

21   term, boilerplate.

22          But Ms. Canfield are there in fact any documents being

23   withheld on the grounds of privilege?

24          MS. CANFIELD:  At the time of the letter, no, there

25   was not.  But subsequent to the submission of the letter I

F719ELLC

1    notified Mr. Willemin, I believe yesterday, that -- an e-mail

2    we are going to deem privileged.  And in my ESI review I do see

3    documents that we are potentially withholding on privilege

4    grounds.

5              The documents I do have now, for production, or I have

6    Bates stamped, I can produce the privilege log for that one

7    document.  Or I can wait and produce the privilege log once the

8    entirety -- of the entire production.  Either way I have no

9    problem producing privilege logs for documents we are deeming

10   privileged.

11             THE COURT:  Mr. Willemin, I have no preference either.

12   You can express yours.

13             MR. WILLEMIN:  I guess my preference would be to get

14   them as they come along on the privilege log only because, God

15   forbid, there are issues that need to be addressed in terms of

16   the assertion of privilege, I'd rather have that be able to be

17   addressed sooner rather than later, but I'm not going to

18   zealously advocate for that position.  That's my preference.

19             MS. CANFIELD:  That's fine.

20             THE COURT:  You're not going to the mat on it.  I

21   understand.

22             Can we then switch please to interrogatories.

23             Mr. Willemin, I understand your complaint to be that

24   there has only been a response to 2 of the 21.

25             Is that correct, sir?

F719ELLC

1          MR. WILLEMIN:  Yes.  That's correct.

2          THE COURT:  And Ms. Canfield, do I understand your

3     response to be that you find that some of these interrogatories

4     are either inappropriate under the local rules or drafted in

5     such an imprecise manner that you're not actually sure what

6     he's seeking?

7          MS. CANFIELD:  Yes.  Let me just speak to that point.

8          I thought long and hard on how I would respond to

9     these interrogatories.  And oftentimes I do construe the

10    requests to what I believe the request is.  But I just --

11    rather than doing that, I objected.  And the primary reason is

12    because I didn't want to guess what exactly plaintiff was

13    looking for.  Secondly, I did not want to put the witness who

14    would be verifying interrogatories in a position of possible

15    impeachment.

16         So, I'm happy to answer the interrogatories.  I would

17    just like some clarity.  If they could be specific in some of

18    the -- any and all city employees, that's pretty broad.  If it

19    could be narrow to any and all board members or executive

20    staff, if it could be limited in a way that I feel comfortable

21    and my witness feels comfortable verifying them.  I'm happy to

22    respond to those.

23         I was not being cute.  I spent a lot of time thinking

24    about it.  I consulted with my colleagues here and that's

25    ultimately what I decided to do.

F719ELLC

| | |
|---|---|
| 1 | THE COURT:  Let me understand, please, the scope of |
| 2 | individuals for whom you feel comfortable responding on their |
| 3 | behalf. |
| 4 | Clearly it would include the CCRB, the board members |
| 5 | themselves. |
| 6 | Do you consider the executive folks to be something |
| 7 | other than that?  Or do you consider that to be a subset of the |
| 8 | CCRB? |
| 9 | MS. CANFIELD:  Subset would be the deputy executive |
| 10 | director.  There are several -- one's in charge of |
| 11 | investigations.  One's in charge of prosecutions.  One's in |
| 12 | charge of operations.  That's what I'm speaking of when I refer |
| 13 | to executive staff. |
| 14 | THE COURT:  Would you be able to make the |
| 15 | representation with respect to any member of -- anyone employed |
| 16 | at or a member of the CCRB?  Basically handling the admin |
| 17 | people as well as the board members? |
| 18 | MS. CANFIELD:  Not the entire staff of the CCRB.  I |
| 19 | would not feel comfortable soliciting responses to |
| 20 | interrogatories, who knew and who did not know. |
| 21 | Some of the information has been in the newspaper.  So |
| 22 | conceivably everyone in the city has potential to know some |
| 23 | information about the litigation. |
| 24 | As I said, there's some way that some of the responses |
| 25 | can be narrowed I'm happy to respond to them -- I'm sorry, the |

F719ELLC

```
1    interrogatories can be narrowed.

2              THE COURT:  Mr. Willemin, let me talk to you about

3    that, sir.

4              I found it a little bit all-encompassing when you said

5    "all city employees or agents."  I think that's a very

6    broadbrush with which to paint the potential folks who may

7    know.  And while I suppose there is a -- there are people

8    within the city who might know these things and for whom this

9    is relevant to your case, I'm not sure that every single person

10   involved in any capacity with city government needs to be

11   questioned about this.

12             So, is there a way in which you can limit the scope of

13   the people to whom this inquiry should be made?

14             MR. WILLEMIN:  Sure.  Just to be clear from our

15   perspective.  I understand that that appears broad.  But I

16   believe that the information that's being sought is sort of

17   self-limiting.

18             So there is no reason to ask a teacher with the DOE

19   whether she knew that Ms. Catapano-Fox was going to be

20   appointed executive director.  Now, that said, I understand

21   that concern.

22             What I'm really concerned about is the CCRB's board

23   members executive level as well as the mayor's office and the

24   police department.  And it's really important those two

25   entities, because they are two entities that were involved,
```

F719ELLC

1    first of all, in many of the allegations, in terms of the

2    police department, in terms of impropriety with the CCRB, but

3    also they were involved in removing Ms. Catapano-Fox as

4    executive director by reshaping the board in the month before

5    she was voted out.

6              So to the extent -- my intent was to basically seek

7    information concerning the knowledge of the people in the

8    mayor's office and the NYPD and the CCRB.

9              THE COURT:  Let me stop you there, sir.

10             Because NYPD, you have to know, this is a very, very

11   large organization.  And it's certainly -- I don't think it

12   matters that some beat cop in Queens was aware of a New York

13   Post article about what happened.  I don't think you're going

14   to that level of granularity, are you?

15             MR. WILLEMIN:  No.  I agree with that.  I agree with

16   that.

17             Again, in terms of the NYPD it would be more -- the

18   problem is I'm a little bit hamstrung because I don't know who

19   Emery speaks to there.  I assume he speaks with

20   administrative-level employees or the top X percent of the

21   administration there.  So I mean that's what I'm looking for.

22             I'm looking for whether anyone from Bratton or his

23   close administration was involved in these decisions.

24             And I know that at least Bratton was involved in some

25   of the decisions in this case.  So that's where my focus is, on

F719ELLC

1    the top level.  I'm not looking for the beat cop.  That's

2    correct.

3          Same thing with the mayor's office.  It's hard for me

4    to pinpoint particular individuals because I don't have the --

5    the org charts there.

6          THE COURT:  Nor do I.

7          Ms. Canfield, can you help us.  We're trying to arrive

8    at a smaller universe of people to whom this inquiry can be

9    directed.  Can you help us in that regard.

10         MS. CANFIELD:  With respect to the mayor's office I

11   would suggest the Office of Appointments, because the Office of

12   Appointments, as I understand it, is responsible for assisting

13   and appointing the chairperson, Mr. Emery's position, and also

14   in appointing the new executive director, which is the same

15   across the city, all city agencies, so it's a function of that

16   office, after the mayor was elected, to vet candidates to

17   replace the current administration's appointees as

18   commissioner.  I would say that would include Chloe Drew,

19   Kathleen Rubenstein and perhaps to a certain extent Maya Wiley

20   who is the mayor's counsel and perhaps some of their

21   assistants.

22         In terms of the police department.  From what I can

23   tell, the great majority of the ESI that I have reviewed,

24   e-mails sent by the plaintiff, a lot of her correspondence

25   mirrored the Office of Appointment's and the deputy mayor's --

F719ELLC

1    I can't recall her name -- but anyway with respect to the

2    police department, the Department Advocate's Office, who is

3    responsible for bringing charges.

4            THE COURT:  Mr. Willemin, in the first instance, can

5    we limit the requests to the Office of Appointments and the

6    Department Advocate's Office with the understanding that if

7    there is some incredibly illuminating e-mail that comes out in

8    the ESI discovery that names somebody else in either of those

9    two organizations we can talk about reopening discovery as to

10   them?

11           MR. WILLEMIN:  Yes.  So I'm fine with the Office of

12   Appointments.  Although I would just say that to the extent you

13   ask Kathleen Rubenstein who was involved in the decision-making

14   process of the board members and she names some people outside

15   of that office, then obviously we need to follow those trails.

16           With regard to the DOA, I'm fine with that.  But I

17   guess my -- I want to also be asking the people in the police

18   department who are responsible for appointing board members.

19   Because the police department gets its own board member.  And

20   it was a board member that was swapped out.  And so to the

21   extent that there are individuals responsible for that, I'd

22   like to know who they are.

23           But then I'm okay otherwise with the limitations,

24   again, assuming that we follow the trail once we ask people.

25           THE COURT:  Ms. Canfield, does that work for you as

F719ELLC

1    well?

2              MS. CANFIELD:  Sure.  I'm not familiar with the

3    structure of the police department in terms of board

4    appointments but I can follow up with those.

5              THE COURT:  Let's do that then.

6              Mr. Willemin, let me tell you the other concern I have

7    about your interrogatories.  I don't think that they are in

8    violation of the local rules because I do think they are

9    seeking the identities of individuals.  But I am having some

10   difficulty myself understanding the concept of the words "aware

11   of."  So I don't know if there's a way that you can clarify or

12   perhaps put some limitations on what you're really seeking.

13             MR. WILLEMIN:  I think -- so where I did that was

14   Interrogatory 5, Interrogatory 6, a few of them.  That's

15   correct.

16             The issue is I'm trying to find out how far up the

17   chain these decisions go.  So I can figure out -- I mean I've

18   already noticed a number of depositions, obviously.  But my

19   main issue is to figure out how far up the chain they go.  So

20   that if -- I don't want to get hyper-technical.  If they say

21   who was involved in let's say appointing this particular board

22   member and they say well this person was the one who originally

23   made the recommendation, whatever it may be, but that needs a

24   rubber stamp or that needs some sort of level of approval or at

25   least needs to be run past some high-level individual, I just

F719ELLC

```
1    want to know who that line of individuals is.  That's what I
2    intended by it, the term.
3            I can certainly try to -- if this explanation itself
4    isn't sufficient certainly try to make that more clear.
5            THE COURT:  Ms. Canfield, do you think that you could
6    work with Mr. Willemin at trying to arrive at an understanding
7    between the two of you that you may or may not share with me as
8    to what "aware of" pertains to?
9            MS. CANFIELD:  Sure.  And I think I have a better idea
10   who it might be in that universe as I go through the ESI.
11           THE COURT:  Perhaps instead of "aware of" you might
12   like something like "participated in the decision."  It may
13   have been "involved in the decision."
14           But I think -- I take Mr. Willemin's point which is he
15   doesn't want anybody to get too cute or too clever about who
16   was involved.  So I think you have that in mind.
17           Mr. Willemin, I think that's the last of my concerns
18   about the interrogatories.  Is there anything else I should be
19   raising on that issue?
20           MR. WILLEMIN:  No.  I think that that covers
21   everything.  Thank you, your Honor.
22           THE COURT:  Let's please then proceed to the document
23   requests.
24           I am looking at two things right now, a June 16 letter
25   that I believe is -- has been identified for me as a deficiency
```

F719ELLC

1     letter and was attached as Exhibit C to a June 17 letter that I

2     received from Mr. Willemin.

3          Counsel, I do want to understand what is and is not

4     resolved because the parties may be of the mind that something

5     is resolved and it may not, in fact, be.  So you'll excuse me

6     if we're going through these individually.

7          Mr. Willemin, Request No. 4.  Is that resolved?

8          MR. WILLEMIN:  Almost.  In Ms. Canfield's letter to

9     the Court she agreed to produce responsive ESI to the extent

10    that it exists.  But I would just say that the defendants are

11    obligated to produce all documents, whether ESI or hard copies.

12    So I don't know whether that was intentional or not.

13         And that's case with six of the requests that are

14    almost resolved for the same reason.

15         THE COURT:  What you're saying, sir, is you're worried

16    that in committing to produce the ESI they may be omitting or

17    overlooking hard copies of these materials?

18         MR. WILLEMIN:  Yes.  Obviously not duplicates of

19    what's in the ESI but to the extent some of these documents are

20    found only in hardcopy that's all I'm referring to like

21    handwritten notes or text messages or, I don't know -- well I

22    guess text messages would be ESI -- handwritten notes or other

23    hardcopy documents.

24         THE COURT:  Ms. Canfield have you also been looking

25    for hardcopies of things like notes?

F719ELLC

1          MS. CANFIELD:  I have directed the agency to pull

2     board materials that they provide board members during these

3     meetings.  I don't know yet if any of those materials have been

4     recycled.  So it's back to a certain date.  I'm waiting to hear

5     back from them.  But certainly there's a lot of information and

6     ESI.

7          THE COURT:  Let me ask the question more pointedly.

8          Can I understand, please, that while you're looking

9     for ESI that is responsive, and while that may be the bulk of

10    what you produce, you have not forgotten about the fact that

11    some things may exist only in hardcopy and you have looked for

12    that as well?

13         MS. CANFIELD:  I have asked the agency to look for

14    hardcopies.

15         As I said, it's my understanding from some of the

16    witnesses that the board is presented with an agenda in a

17    packet that they use during the board meetings, and that those

18    packets are collected at the end of the board meeting.  I've

19    asked the agency to retrieve those for me.  I don't know what

20    exists yet though.

21         THE COURT:  I understand that.  Mr. Willemin I'm

22    satisfied with that.

23         Let's move please to what is in your deficiency letter

24    as B, and it's several requests, 25, 30, 36, 42, 44, 46, 48,

25    and 50.

F719ELLC

| 1 | Not resolved, correct?

| 2 | MR. WILLEMIN:  Correct.

| 3 | THE COURT:  Let me -- Ms. Canfield, I have the

| 4 | notation to myself here and I will simply -- because I don't

| 5 | want to have extensive discussion on this -- in the description

| 6 | in the deficiency letter of the plaintiff's position and in the

| 7 | description in your letter of the 23rd, of your response, I'm

| 8 | siding with plaintiff here.

| 9 | So I don't know that I need to go into extensive

| 10 | detail.  I certainly don't need to have argument on it.  But I

| 11 | agree with what plaintiff is seeking.  So I just want to make

| 12 | you aware of that.

| 13 | MS. CANFIELD:  I did have one very important

| 14 | objection.  It's a violation of any law, rule, or regulation or

| 15 | policy.  I think that is incredibly broad.  There could be like

| 16 | a dress code violation.  That would encompass that.  So that's

| 17 | why I limited it.

| 18 | If he wants comparators, I think that comparators are

| 19 | those that have complained of race discrimination, sexual

| 20 | harassment and retaliation.  I mean that's really the universe

| 21 | of what's relevant here.  Not if someone complained about some

| 22 | other type of violation or -- I just think that has to be

| 23 | narrowed.  Otherwise -- I mean I know this agency, there's a

| 24 | lot of complaints.  So I just think -- I guess this would be a

| 25 | wild goose chase for us.

F719ELLC

1          THE COURT:  I don't see that in your letter to me of

2     the 23rd, the limitation you're now proposing.

3          MS. CANFIELD:  Well, it's in the -- my objections to

4     response.  I renewed the objections.  I construed it as seeking

5     formal internal and external complaints of race discrimination

6     sexual harassment and/or retaliation made by current and/or

7     former employees of CCRB.  That would be easily retrievable if

8     there was a formal complaint.  Informal complaints, I don't

9     know how I would hunt those down.

10          THE COURT:  Mr. Willemin, let me hear from you.

11          MR. WILLEMIN:  I would just say quite simply that the

12     scope of the allegations of the complaint go well beyond

13     complaints of sexual harassment, gender discrimination or race

14     discrimination. I mean a big bulk of the complaint concern

15     protected activity under section 75-b which protects

16     individuals who complain about any violation of law, rule, or

17     regulation.  There are -- I mean, many, many cases in the

18     context of employment disputes like this that say that other

19     complaints of similar ilk and the reaction to those complaints

20     are relevant in determining that defendants' motive vis-a-vis

21     their conduct towards the plaintiff.

22          So, in this case there are a lot of complaints that

23     Ms. Catapano-Fox made regarding violations of the way in which

24     the CCRB is supposed to conduct its business under the charter,

25     under the CCRB's rules and regulations and then, obviously,

F719ELLC

with regard to all the collusion with the police.  For

instance, statistics that are being put in the report as being

false.  So I mean none of this stuff falls under sexual

harassment, race or gender discrimination but it's all critical

to the complaint.

        So, if you want to propose a limitation, of course I

don't -- if there's a dress code violation complaint, I don't

know whether that actually exists or whether that was just kind

of a hypothetical.

        THE COURT:  No.  No.  No.  I think that's real.

That's the problem I'm having.

        You yourself agree that the comparators have to be of

a similar ilk and the dress code violation is not.

        So why don't you -- at least Ms. Canfield has proposed

a limit.  I need a counterproposal from you.  And just saying

anything that might be subject to 75-b that's not at all

sufficient.

        MS. CANFIELD:  May I, your Honor?  And Mr. Willemin?

        I did include retaliation.  And I am including, in my

review of ESI, there are employees who have written letters to

the board complaining on certain investigative techniques,

they're complaining about how cases are truncated.  We have

other lawsuits that this department is handling brought by

employees of CCRB who have complained about some of the things

that Mr. Willemin is referring to, for instance how CCRB

F719ELLC

investigators are treated or how investigations are

substantiated but then the board unsubstantiates them.  I am

including all of that correspondence in my production.

            THE COURT:  To my mind that is enough.

            Let's move on to the next one, please.

            This is Category C, Requests 41, 43, 45, 47, 49, and

52.

            I think is also not resolved, correct?

            MR. WILLEMIN:  Yeah.  Largely the same issues as the

last bunch though.  In the sense that the defendants responded

in the same manner.  So to the extent that the documents

that -- and this is more narrow because it's communications

specifically involving plaintiff and various individuals

concerning -- and in this case what was excluded was the

violation or potential violation of any law, regulation, rule

or policy.

            In this case, given that the communications involve

ones that are made by plaintiff, I don't see how -- all of that

would be protected under 75-b and it is what plaintiff is

saying.  So I think in this case I'm not -- I don't know that

there is a need to carve out a limitation on what we requested.

            And then just very quickly, this is an issue with the

other one too.  I think that you've sided with plaintiff but I

just want to confirm.  It's not just the copies of the

communications themselves that are the issue.  It's also

F719ELLC

1   documents -- what the CCRB's response to those complaints were.

2   So investigations of those complaints, etc.  And so that goes

3   for both batches of documents we're talking about now.

4       THE COURT:  Well to your last point, that is my

5   understanding as well.

6       To your first point, Ms. Canfield are you not just

7   producing all documents that you can find that Ms. Catapano-Fox

8   is on, anything she has either sent or received?

9       MS. CANFIELD:  Everything?  No.  No.

10      To this subject matter, yes.

11      But to any document that she sent or received?  No.  I

12  can but that's a lot of e-mails.  A lot of nonresponsive

13  irrelevant e-mails.

14      Let me just make one point.  They want communications

15  between plaintiff and the EEO office.  The EEO office would not

16  handle any type of whistleblower-type complaints.  They would

17  strictly handle any retaliation for engaging in protected

18  activity and then of course any discrimination claims.  So

19  that's why I limited it to what I did.  Just race

20  discrimination and sexual harassment.

21      But back to what I said earlier.  Any time I am

22  running across e-mails that are from plaintiff or CCRB

23  employees complaining about operations of CCRB or any type of

24  harassment conduct, anything like that, I am producing it.

25      THE COURT:  Again, I'm going to agree with that.

F719ELLC

1          Category D requests numbers 53 and 54.  Mr. Willemin,

2     is it resolved?

3          MR. WILLEMIN:  I believe this is in the almost

4     resolved category.  That's correct.  This is in the almost

5     resolved category.  So I think it's now resolved.  If it is the

6     case that, again, that all hardcopy documents are going to be

7     searched for and produced in addition to all ESI.

8          MS. CANFIELD:  Yes.  And there is ESI too, additional

9     ESI that I will be producing.  I have come across some e-mails

10    related to the alleged harassment.

11         THE COURT:  Category E.  Requests 55 and 56.  Also

12    almost resolved?

13         MR. WILLEMIN:  That's correct, your Honor.

14         THE COURT:  I'm grateful for that.

15         Category F.  Requests 61 and 62.

16         I thought we had an agreement that it included

17    October 2014.

18         Mr. Willemin, what is left to be resolved?

19         MR. WILLEMIN:  What's left to be resolved is the

20    limitation that there -- the production is going to contain

21    only communications between Emery, Taylor, Fisher, Soler --

22    specific individuals that were identified by defendants in the

23    response.  And that we'd be entitled, to the extent that there

24    are individuals in the mayor's office who are not Drew, Wiley

25    or Rubenstein that were involved in the process of selecting

F719ELLC

1     new board members or who communicated about the allegations in

2     this lawsuit, etc.  Again, I'm at a disadvantage to know who

3     those individuals are.  But my assumption is that someone has

4     to approve, let's say, when a new board member is appointed.

5     So any communications of that individual -- and this is not

6     just with regard to 61.  This is a couple of different areas

7     here.  Communications of those individuals should be produced.

8     So that was my concern there.

9             Same thing, again, the NYPD.  Now I'm not saying that

10    they were.  But let's say de Blasio and Bratton were e-mailing

11    back and forth about this case with each other.  That would be

12    something we would need to see and that would not be included

13    in defendants' response.

14            THE COURT:  Ms. Canfield.

15            MS. CANFIELD:  As far as de Blasio and Bratton I

16    highly doubt that they were e-mailing about this case.  But I

17    can tell you that we have collected ESI from three individuals

18    working in the mayor's office at that time:  Chloe Drew, Maya

19    Wiley and Kathleen Rubenstein.  So any communications that they

20    would have sent would be captured with respect to any

21    discussions regarding the board and the lawsuit.

22            THE COURT:  Are you suggest that if anyone in the

23    mayor's office were involved in discussions about this subject

24    matter that one of those three individuals would be on the

25    e-mail at some point?

F719ELLC

1          MS. CANFIELD:  Yes.  Chloe Drew is the director of the

2     Office of Appointments.  She is the main person who would have

3     worked to replace plaintiff in her role as executive director.

4     That was her sole function.  The Office of Appointments sole

5     function was to vet candidates to replace the current

6     commissioners and the current executive staff of the various

7     city agencies.

8          THE COURT:  I'm sorry.  Ms. Canfield, let me be more

9     precise.  I think Mr. Willemin was expressing a concern that

10    there may be ESI out there from other individuals in the

11    mayor's office who would be having relevant communications,

12    communications about information relevant to this lawsuit or

13    relevant to these document requests, that might not be caught

14    up in a review of the folders of the three individuals who you

15    have mentioned.  So that's why I was asking you whether you are

16    confident that any conversation about Ms. Catapano-Fox at the

17    mayor's office would have been copied to one of these three

18    people.

19         MS. CANFIELD:  Based on my investigations, speaking

20    with the three individuals from the mayor's office, I am led to

21    believe that all the conversations were within those three

22    individuals and perhaps their assistants.  I do not know of

23    anyone else in the mayor's office who would have been privy to

24    the conversations with respect to plaintiff.

25         Now, with respect to Bishop Taylor there may have been

F719ELLC

 1    conversations with city counsel.  But I will know better once I

 2    see the e-mails from Chloe Drew.

 3         Bishop Taylor is a city council appointee, not the

 4    mayor's office.

 5         THE COURT:  I just want to understand what you think

 6    you might find as you go through those e-mails.

 7         MS. CANFIELD:  I will find who they communicated with

 8    and then certainly plaintiff is welcome to follow up if there

 9    is someone additional that they either want to depose or they

10    want them to search their e-mail boxes for responsive

11    communications.  At this time I don't know of anyone else who

12    would have responsive information.

13         THE COURT:  What about at the NYPD level?

14         MS. CANFIELD:  I don't know anyone at the NYPD.  As

15    far as my knowledge, no one at the NYPD was involved with this.

16         THE COURT:  I'm sorry.  The entity that you mentioned

17    sometime ago, the Department Advocate's Office, there is no one

18    there who would have been involved with this?

19         MS. CANFIELD:  The former director of the Department

20    of Advocate's Office –– and, I'm sorry, I know her first name

21    is Julie and I can't remember her last name –– she is no longer

22    employed there.  And the communications that I see are

23    predominantly whether or not the Department Advocate's Office

24    is going to go forward with the prosecution.

25         The police department was not involved at all in the

F719ELLC

```
 1    appointment of either Richard Emery or the replacement of

 2    plaintiff.

 3              THE COURT:  Yes, Mr. Willemin.

 4              MR. WILLEMIN:  If I may.

 5              The NYPD was responsible for the replacement of at

 6    least one of the board members.  And I'll confirm this, but

 7    this is -- my recollection is that they were responsible for

 8    the replacement of one of the board members as, again, the

 9    board was being revamped to get rid of plaintiff.

10              That's correct.  So two of them actually were

11    designated by the NYPD commissioner.

12              So, obviously there are communications in the NYPD

13    about the designation of these individuals and the removal of

14    the previous ones which are relevant -- given that -- I mean

15    the documents are pretty clear that the board was revamped, at

16    least largely in part to get rid of Ms. Catapano-Fox.  And so

17    the reasons for those appointments, the process, etc., etc.,

18    are relevant and that would have occurred within the NYPD

19    almost certainly.  They are their appointments.

20              Secondly, the communication between the CCRB and NYPD

21    is also, you know with regard to many of the underlying

22    allegations in the complaint, the failure of the NYPD to follow

23    up on substantiated complaints.  Again, the alleged collusion

24    between the CCRB and the NYPD and the way they handled these

25    investigations.
```

F719ELLC

1          So, again, that may be the DOA.  Maybe we'll have that

2     covered.  But that's just something to throw out there.  And

3     most importantly these board member were -- again, they were

4     designated by the NYPD.

5          MS. CANFIELD:  Let me just -- I know your theory of

6     the case is that they were replaced just to guilty rid of your

7     client but they were actually replaced because their terms had

8     expired and there was a new administration in the mayor's

9     office and there was also a new police commissioner and it was

10    their right to put in the people that they want to work for

11    them, so.

12         THE COURT:  But Ms. Canfield --

13         MS. CANFIELD:  So these to answer the question, I do

14    not know who would have been involved with the police

15    department appointment.

16         I can tell you that any communications with respect to

17    the allegations towards Richard Emery that he colluded with the

18    police or failed to prosecute, all of that would be contained

19    in the ESI.

20         THE COURT:  Although, Ms. Canfield, to be clear.  I'm

21    not necessarily seconding the recitation of events as described

22    by Mr. Willemin.  But to the extent that there were

23    replacements of board members for whatever reason, either

24    because there was some decision to pack the board to get rid of

25    Ms. Catapano-Fox or because their terms had come to an end, I

F719ELLC

1    do believe the plaintiff is entitled to ESI or to documents

2    relating to those decisions.  So to the extent you have to go

3    inquire within the NYPD as to who was involved in that I am

4    asking you to so do.

5              MS. CANFIELD:  I will do so.

6              THE COURT:  Thank you.

7              The next one is request 66.  Mr. Willemin, resolved,

8    not resolved?

9              MR. WILLEMIN:  This is not resolved.  And this is I

10   think pretty straightforward.  The allegation is that defendant

11   Emery came in, told Ms. Catapano-Fox right off the bat that the

12   mayor's office wanted to get rid of her as soon as possible and

13   requests all documents concerning that which would of course

14   include documents within the mayor's office or between the

15   mayor's office and Mr. Emery about getting rid of Ms. Fox,

16   perhaps the reasons therefor.  And so that's what we requested.

17   And the limitations imposed by defendants was just the

18   communications between plaintiff and defendant Emery which

19   doesn't -- I know those.  Defendant Emery walked into the room

20   and told plaintiff X, Y, Z.  That's not what we're looking for

21   here.  We're looking for documents to substantiate the

22   allegations.

23             THE COURT:  But is there any limitation from where

24   these documents are being sought?

25             MR. WILLEMIN:  I guess I would just say again that the

F719ELLC

1    limitation is in the subject matter.  I mean I can't imagine --

2    and I wouldn't ask defendants to ask a low-level employee of

3    the mayor's office about wanting to get rid of

4    Ms. Catapano-Fox.  But defendant Emery presumably knows who he

5    spoke with at the mayor's office about getting rid of

6    Ms. Catapano-Fox.

7             So I guess all I'm asking is for Ms. Canfield to say

8    who did you speak with about this and then get the

9    communications if they exist.

10            THE COURT:  But Mr. Willemin let me be clear.  It is,

11   if you will, not helpful to say I have a very broad request but

12   the subject matter defines it or limits it.  That's not helpful

13   to me.  You're still asking Ms. Canfield to basically go all

14   over the place to get an answer to this.

15            I'm not convinced, or at least I don't share your

16   confidence that the topic matter of the request gives you a

17   very clear understanding of its limitations.  So let's figure

18   out who she's going to talk to about this.

19            Obviously defendant Emery.  Who else?

20            MR. WILLEMIN:  Sure.  So if defendant Emery said they

21   spoke about this with X, Y, Z at the mayor's office, then we'll

22   speak with X, Y, Z and that should illuminate -- if X, Y, Z

23   says it was just me or if X, Y, Z says it was A, B, C who was

24   involved also, either way, that will illuminate the people who

25   are involved in these discussions to the extent that there were

F719ELLC

1   any and then we'll just ask if they have documents.

2              MS. CANFIELD:  Can I interject, your Honor, please,

3   one second.

4              THE COURT:  Yes.

5              MS. CANFIELD:  Again, going back to the Office of

6   Appointments, the three that have been identified -- actually

7   two primary, Chloe Drew and Kathleen Rubenstein were

8   responsible for replacing plaintiff as executive director.  And

9   communications by and between them and also Mr. Emery will shed

10  light on who else may have been involved.

11             That's one of the problems with responding to some of

12  these document requests.

13             And again, you asked me was it necessary to address

14  this issue, and I know you're loathe to grant extensions, but

15  there's just a volume of material that we're going through and

16  it just takes time.  And I'm sure that once the material is

17  fully reviewed and produced that a lot, if not all, of these

18  documents requests will be satisfied.

19             THE COURT:  Mr. Willemin, what I'm going to do is I'm

20  assuming that Ms. Canfield is looking -- is speaking with

21  defendant Emery and speaking as well with the relevant people

22  at the mayor's office and if it turns out that there is

23  additional information out there then we will know that in the

24  course of the depositions but I'm not going to have her ask

25  every single person in New York city government whether they

F719ELLC

 1   have materials responsive to this.  I'm going to move on.

 2          I am told, but perhaps I'm being overly optimistic,

 3   that the document requests listed in categories H, I, J, and K

 4   are resolved with the possibility of a lingering privilege

 5   issue.

 6          Mr. Willemin, may I hear from you on that?

 7          MR. WILLEMIN:  H being Request 103.  That is correct.

 8   So they have agreed now to produce communications from Emery or

 9   Taylor to the media.  I would only ask that to the extent

10   Emery or Taylor instructed the press secretary at the CCRB say

11   X, Y, Z to the media, that that would be included.  So that's

12   the only additional piece that I would say in response to their

13   response.

14          THE COURT:  You're saying if there's ESI that includes

15   a request by defendant Emery that a person in the press office

16   do something you would want that as well?

17          MR. WILLEMIN:  To the extent it's related to this

18   case, yes.

19          THE COURT:  Although I assume that that's going to get

20   produced to you because it's got defendant Emery's involvement

21   in it.

22          MR. WILLEMIN:  I would hope so.  It's just that the

23   way the response was provided it said that they wouldn't

24   produce it so that's why I'm just making sure.

25          THE COURT:  Ms. Canfield, any problems with that?

F719ELLC

1              MS. CANFIELD:  The extent of my objection, there is no

2      timeframe here.  And I know that we collected -- plaintiff

3      served a second set of interrogatory document requests on us

4      subsequent to an article that was published the weekend before

5      Memorial Day involving his client.  And I know that we ran a

6      collection of the communications director at that time.  But I

7      don't believe we ran a collection prior to that period.  So if

8      it gets limited to -- we have the collections from the two

9      named defendants, the CCRB board members' e-mails although, as

10     I said in my letter, we don't have their business or their

11     personal e-mails collected yet.

12             So I guess if I could have a limiting scope, if there

13     are certain communications, there are certain reports in those

14     newspapers that are responsive, then I would have an easier

15     time searching.

16             THE COURT:  Mr. Willemin, can't we give a date

17     restriction of a particular year?

18             MR. WILLEMIN:  Yes.

19             THE COURT:  What is the year?

20             MR. WILLEMIN:  Well I would just ask for August of

21     2014 to the end of May 2015.  So just a little less than a

22     year.  Because that's the point in time -- I can restrict it

23     more than that.  There are about three or four articles that

24     came out that are particularly important.  So I can work with

25     defense counsel to provide let's say two-week windows or

F719ELLC

1    three-week windows around the articles that I'm concerned

2    about.  And then, again, assuming that we're searching Emery

3    and Taylor as well as the press secretary or whoever, you know,

4    they would have instructed to do X, Y, Z then that's fine.  I

5    can limit it in that way.

6          THE COURT:  Ms. Canfield, does that work?

7          MS. CANFIELD:  That's fine.  I can also let you know,

8    Mr. Willemin, after interviewing the communications director,

9    it sounds like most of her communications were by telephone.

10   But I will produce what I have.

11         MR. WILLEMIN:  That's fine.  We'll maybe we'll depose

12   her.

13         Okay.

14         THE COURT:  Request 106, Mr. Willemin?

15         MR. WILLEMIN:  Request 106 is resolved based on

16   defendants' response to the letter.  That's correct.

17         THE COURT:  Requests 110 and 111?

18         MR. WILLEMIN:  The issue with this is that we would be

19   seeking -- and maybe this is what we're getting -- so we're

20   seeking documents concerning the decision to retain counsel.

21   And we sent -- our firm sent a letter on September 26, 2014.  A

22   week and change later plaintiff was formally terminated.  So we

23   want, obviously, documents concerning the decision to retain

24   counsel and send that letter.  And the defendants have agreed

25   to produce documents between Emery, the mayor's office and

F719ELLC

1    corp. counsel.  But I would just say that Emery's -- first of

2    all -- one of the major issues -- one of the allegations in the

3    complaint is that one of the board members specifically

4    identified that the allegations in the letter that we sent were

5    all true.  So that's something that we'd want if it exists.

6    And that wouldn't be, you know, Emery or mayor's office or

7    corp. counsel.  That may be a separate issue because we're

8    going to talk about board member ESI.  But that's of particular

9    importance.

10            Secondly, Emery's communications to anyone are

11   relevant.  I mean if Emery communicated -- again, this may be

12   caught in his ESI -- but if Emery communicated to the NYPD, for

13   instance, or if Emery communicated to anyone, really, and said,

14   hey, this is true or this is not true or, you know, this makes

15   me mad, I'm going to fire her or whatever, you know, those

16   communications need to be produced.

17            THE COURT:  All right.  Although, again, you haven't

18   suggested to me that there are things that aren't going to be

19   captured by a search of Emery's ESI.

20            MR. WILLEMIN:  That is -- well to the extent that

21   there are -- that we're searching all of Emery's personal,

22   business, etc., ESI and, you know, if there's text messages or

23   whatever, then that's correct.

24            That's correct.

25            THE COURT:  All right.  And I will talk in a few

F719ELLC

1   moments about the ability to obtain personal or

2   non-city-related business e-mail accounts.  We'll talk about

3   that in a moment.  I don't want to speak for the city on that

4   because I want to understand it more.

5              Request No. 115.  Is that resolved?

6              MR. WILLEMIN:  I think so.  Is it my understanding --

7   it was unclear to me, but my understanding is that they've

8   agreed now to produce all responsive documents.  Obviously not

9   privileged, you know, responsive documents.  If that's true,

10  it's resolved.  Not just the transcripts but all responsive

11  documents.

12             THE COURT:  Ms. Canfield.

13             MS. CANFIELD:  Sure.  As I said earlier, to the extent

14  they exist we will produce them.  It's my understanding that

15  there was a packet that was sent out for each board meeting.

16  If they have those and didn't shred them, I will produce them.

17             MR. WILLEMIN:  Again, handwritten notes.  That's

18  important also.  Just to say.

19             MS. CANFIELD:  I will ask, but that will be really

20  difficult because that's not going to be housed with the CCRB.

21  That will be with individual board members most likely.

22             THE COURT:  Let me move on then to the next topic of

23  discussion which is the ESI search terms and custodians and

24  things of that nature.

25             I guess I need to understand, Ms. Canfield, why the

F719ELLC

1   hesitancy or the reluctance to review Mr. Soler's ESI?

2          MS. CANFIELD:  The only reluctance is the volume, your

3   Honor.  If we can narrow the search terms so the volume is not

4   so high I have no problem reviewing his ESI.  With the

5   deadlines that we're under now, this will just be impossible.

6          THE COURT:  I'll talk about the deadline momentarily

7   and, again, you know how much I appreciate you trying to push

8   that.

9          MS. CANFIELD:  I truly apologize, your Honor.  If

10  there was some way that we could get through this material by

11  the end of the month -- I have other cases that I'm neglecting

12  because of this case -- I would be happy to do so.  But it's

13  just -- we have over ten thousand with the plaintiff and the

14  two named defendants and the two nonparty witnesses.

15         Last evening we were able to load the city hall

16  custodians into -- we conducted a DT search, which is basically

17  looking -- indexing and looking at the plaintiff's search terms

18  and we got twelve thousand documents.

19         So we're looking at over 20,000 documents to review in

20  such a short period of time.  And many of the documents need to

21  be coded for privilege or for law enforcement purposes.  So

22  it's -- as I said I -- no disrespect to your Honor, but it

23  is -- it's almost an impossible task.

24         As I explained to plaintiff's counsel prior to this

25  phone conference even if we were to enlist first years or say

F719ELLC

1    contract attorneys, the industry standard is only one hundred

2    documents a day with redactions and two hundred without

3    redactions and it's just -- I just don't -- it's impossible.

4    And I can speak more pointedly to specific questions regarding

5    ESI.  Happy to do so.

6            I also have a representative from our litigation

7    support unit.  She's offsite but she can dial in if you want,

8    if you have some questions for her to explain some of the

9    difficulties in getting not only reviewed but processed and

10   produced.

11           THE COURT:  Well let's go to the issue that I actually

12   wanted to talk about.

13           Mr. Willemin, if I were to extend discovery for some

14   reasonable period of time, which may be less than defense

15   counsel is seeking, can I understand that you will work with

16   her to come up with a set of search terms as to Mr. Soler so

17   that his ESI can be reviewed?

18           MR. WILLEMIN:  Here is my issue.  I don't -- I'm not

19   opposed to compromising at all.  The issue that I'm having is

20   twofold.  One is that we have compromised.  We actually ended

21   up using what defense counsel had proposed as search terms and

22   then, even after that, we crossed a number of search terms out

23   to narrow it even more.  And we're left now with a set of

24   search terms that to me I don't see any false -- you know, any

25   likelihood of a tremendous number of false positives.  And I

F719ELLC

1    haven't had a proposal by defense counsel other than what we've

2    already accepted to narrow these terms.

3          The second problem that I'm faced with at this point

4    is that I don't believe that 2,000 documents in a case like

5    this or even -- I understand the total number may be more than

6    20,000 -- to review, that's simply not exorbitant.  This is a

7    case involving a lot of issues and we have -- we have cases

8    here that involve tens and tens of thousands of documents that

9    are produced.

10         So I understand and I'm sympathetic to defense

11   counsel's position.  But I don't believe that -- I don't

12   believe that we've in any way sort of slacked on our duty to

13   compromise.  And I'm not sure where to go from here other than

14   to just -- I would do my best if defense counsel makes

15   proposals but I don't think we're in an unreasonable position

16   right now.

17         THE COURT:  That actually was kind of not responsive

18   to my question.  And I really -- you can get off the soapbox

19   now.  Thank you.

20         What I really want is for you to work with

21   Ms. Canfield and if it ends up being that you are using the

22   same collection of search terms that you've used for the others

23   for Mr. Soler, that's fine.  If you can agree to more, that's

24   fine.  If you need to come to me to get some resolution on the

25   divergence of proposals that are made, you'll do it promptly.

F719ELLC

1   Really what I want to know is can you actually work with her

2   professionally in trying to come up with a list for Mr. Soler?

3          MR. WILLEMIN:  I can continue to do that.

4          THE COURT:  Then you shall do that.

5          Ms. Canfield, I need to understand what you perceive

6   your responsibilities to be with respect to the personal and

7   non-city business e-mail accounts of the board members.

8          MS. CANFIELD:  Let me begin by backing up.  We

9   collected the e-mail boxes, the business e-mail boxes of the

10  two named defendants.  And we collected those -- I just learned

11  this week -- using the names Tracy, Tracy Catapano, Fox,

12  variation stem searches of those names.  Now that we've

13  negotiated search terms we have to go back and run those search

14  terms on these business e-mail boxes and then do a second

15  collection.

16         A lot of time and effort to reach out to the IT

17  people, these respective -- I mean Mr. Emery -- and even the

18  problem with running a search term, say, for instance, like

19  "retaliation" in his e-mail box, he's a partner of a civil

20  rights law firm, quite frankly, who often sues the city.  And

21  I'm getting pushback from his firm in applying some of these

22  search terms.  And I would imagine that someone might say that

23  Alphonzo Grant, who is an employee of Morgan Stanley, Morgan

24  Stanley is going to give us a great amount of pushback in

25  collecting materials from his e-mail box or applying search

F719ELLC

1   terms to those e-mail boxes.

2          Logistically it's a problem for us.  What I suggested

3   to plaintiff's counsel is we'll go ahead and do the

4   recollection from Emery and Taylor, and we'll review the

5   material that we have from them, as well plaintiff, and these

6   two nonparty witnesses, as well as the city hall people.  And

7   then if there's something out there after we produce -- I'm

8   happy to do a rolling production -- after we produce, if

9   there's some e-mail out there that they think exists, if they

10  can be more pointed in the search, we will go and try to

11  retrieve that information from the board members.

12          I have instructed the current board members, any

13  correspondence, they must use their CCRB e-mail account.  But

14  prior to this -- my instruction, it appears that they were not

15  utilizing their CCRB e-mail.  So we have a big problem with

16  retrieving those board members' e-mails.

17          THE COURT:  That's exactly my point.  I think the

18  rolling production is a good idea, rather than deluging

19  plaintiff's counsel all at once.  That said, your having told

20  me that folks typically frequently used personal e-mail

21  accounts or their business -- their non-CCRB business e-mail

22  accounts, I don't know how you can say that they don't get

23  searched because that may be where everything is.

24          MS. CANFIELD:  Let me tell you that by searching -- to

25  the extent there are conversations between plaintiff and board

F719ELLC

| 1 | members and the board members used their business accounts,
| 2 | those communications will be captured in plaintiff's e-mail
| 3 | collection.  To the extent that defendants Emery and Taylor, or
| 4 | nonparty witnesses Soler, George and Fenimore Fisher
| 5 | communicated with board members, those would be captured in
| 6 | their e-mail accounts.  The only thing we're not getting is if
| 7 | there were communications between board members.
| 8 |         THE COURT:  And that's of concern to me.  So let me
| 9 | hear from -- I need to hear from you a little bit more about
| 10 | this.  I don't know why I can't have that.
| 11 |         MS. CANFIELD:  Then we would definitely need a lot
| 12 | more time, a lot more time.
| 13 |         THE COURT:  Why?  Can't they be limited temporally?
| 14 | The events of the lawsuit didn't take place over an especially
| 15 | long period of time.
| 16 |         MS. CANFIELD:  I'm not even talking about the review,
| 17 | your Honor.  I'm talking about the simple collection.  Everyone
| 18 | is aware that ESI was to be preserved.  Litigation holds were
| 19 | put out as soon as we received a letter from plaintiff's
| 20 | counsel.  But the problem is, is our IT people going out and
| 21 | conducting searches of business e-mail boxes.  And I know we're
| 22 | going to get a lot of pushback from various law firms and
| 23 | businesses, as I said, and I don't know how long that is going
| 24 | to take.  We're talking about fifteen plus individuals.
| 25 |         THE COURT:  Mr. Willemin, may I hear from you?

F719ELLC

| | |
|---|---|
| 1 | MR. WILLEMIN:  I think -- this was actually -- I had |
| 2 | always assumed that Taylor and Emery, that their personal |
| 3 | business accounts were being searched and that the only issue |
| 4 | was the other board members.  But I will speak to everyone |
| 5 | because I understand this to be the issue now. |
| 6 | They used their business and personal e-mails |
| 7 | routinely.  We know that from the documents we already have. |
| 8 | That's not an issue here. |
| 9 | I understand if a law firm has an issue -- I'm not |
| 10 | sure if they have standing to assert that issue in the context |
| 11 | of the discovery obligation.  I mean this is -- these are |
| 12 | e-mails that need to be produced. |
| 13 | I would say though that potentially we don't use an |
| 14 | ESI protocol for these documents.  The ESI protocol is used, |
| 15 | generally speaking, to make things easier for defendants and to |
| 16 | make sure nothing is missed.  But in this case perhaps just an |
| 17 | instruction to all of the board members to go through all of |
| 18 | their business and personal e-mails for documents relating to |
| 19 | Ms. Catapano-Fox, this case, whatever the list may be, and just |
| 20 | turn them over to corporation counsel.  That should eliminate |
| 21 | the issue of pushback from the companies and obviously |
| 22 | that's -- provides us with a little less certainty, I guess, |
| 23 | that everything is going to be produced but, again, I'm |
| 24 | certainly trying to work in that regard if that's something |
| 25 | that can help. |

F719ELLC

1          THE COURT:  Ms. Canfield, what I was going to suggest

2     before Mr. Willemin spoke was that the search be limited to --

3     for each board member's business e-mail address, a search for

4     any instances or any e-mails in which the recipient or the

5     senders were other board members for a particular time period.

6     That's all I was thinking about.  As opposed to, for example,

7     the very long list of ESI terms.

8          Now Mr. Willemin has done me one better and limited it

9     to Ms. Catapano-Fox or this litigation, which I think is an

10    even smaller subset.  I believe that can be done.  Can you tell

11    me why that can't be done?

12         MS. CANFIELD:  For the reasons I already articulated,

13    your Honor.  We have not approached each business to ask them

14    to search respective e-mail boxes.  I don't know what their

15    retention cycle is.  They should have preserved everything.  We

16    sent the litigation holds out.

17         I just don't have an answer for you.  We've not

18    started the process.

19         I do want to add -- make one point; that is, that we

20    would argue -- our answer is due today, and we are going to be

21    including in that an affirmative defense of after-acquired

22    evidence based on the article that was in the paper that

23    Ms. Catapano-Fox released information in violation of Civil

24    Service Law 58.  And we would argue that discovery requests are

25    not proportional to the damages in this case.

F719ELLC

1          Even if we did not assert that affirmative defense,

2     Ms. Catapano-Fox is currently employed.  And she's making a

3     little less than what she was making at the CCRB.  Just put out

4     there that the time and effort we're spending on this

5     litigation far outweighs the value of her potential damages.

6          THE COURT:  I think I do disagree with you on that

7     point.  You're allowed to have that view.  I disagree with you

8     that we've gotten to the point of it outweighing any possible

9     damages she could have because there are some pretty serious

10    allegations there and a jury may see fit to award very severe

11    compensatory damages.

12         I think you have to reach out to the board members.  I

13    do not feel comfortable -- I'm limiting it, as Mr. Willemin

14    suggested, to simply communications about Ms. Catapano-Fox or

15    her litigation, the one that's now before me.  And I really

16    think that very much limits -- we can even limit the timeframe

17    to -- actually, I'll use the same limit.  What was it, August

18    of 2014 to May of 2015.

19         But I do want that information.  And so I think you'll

20    need to reach out to these individuals.

21         Since there has been a litigation hold, it's my belief

22    that things will not have been deleted.  It's my hope that

23    things will not have been deleted.  And to the extent that

24    there is pushback from the individual employers I'm very happy

25    to issue an order requiring it if that makes the process any

F719ELLC

1    easier.

2          MS. CANFIELD:  That would probably make the process

3    much easier.  I would want to clarify the timeframe.

4    August 2014 to May 2015.  I don't think that's the responsive

5    time period.  Mr. Willemin, can you --

6          MR. WILLEMIN:  I agree.  That was in particular

7    because of the article in the Post that -- I would say that

8    we're looking at March 2014, which is when Ms. Catapano-Fox

9    first began making her complaints, through the end of

10   January 2015, which is a ten-month period, which is when the

11   new executive director was appointed to the CCRB.  And so

12   that's the timeframe that we would like to look at.  It's the

13   same number of months but just a different window.

14         THE COURT:  I agree with that.  I misspoke on the

15   dates I was giving.

16         MS. CANFIELD:  Then in terms of, we do need search

17   terms.  If we use --

18         THE COURT:  Why?  The search terms would be Tracy,

19   Tracy Catapano-Fox, things of that -- variations of her name.

20   And I suppose if there's -- the recipients and the senders

21   would both have to be board members.

22         MS. CANFIELD:  We can't do a search -- we can do a

23   search on terms but I can't do it on recipients.  Once I get

24   the data back I can do another search.

25         THE COURT:  The problem is lawsuit or litigation, I

F719ELLC

1   don't know how many e-mails -- how many hits that's going to

2   generate.

3           MS. CANFIELD:  I agree.

4           MR. WILLEMIN:  We can work to try to narrow the terms.

5   I would agree.  I think that there may be some -- I think there

6   are probably some additional terms, other than just her name,

7   that could be narrow enough to try to get -- target the issues

8   in the litigation.  But I would agree that it doesn't make

9   sense to search an attorney's inbox for lawsuit or litigation.

10  Although I will say if we put her name in there -- we can

11  confer on that further.

12          I would agree that we need a much more narrow set of

13  search terms.  But it would certainly include her name and then

14  potentially some additional ones.

15          THE COURT:  All right.  Ms. Canfield, again, let me be

16  as candid as I'm capable of being.  I am fully aware that you

17  have other cases and obviously I do as well.  But at the moment

18  at least I do need this one to be your priority.  I am asking

19  you to be reasonable in telling me how much time you will need

20  to get this done.

21          MS. CANFIELD:  I have to consult with our litigation

22  support division, your Honor.  They handle all the outreach and

23  do the collection.

24          I can speak to how much time it will take me to go

25  through the material.  I can average between 300 and 400

F719ELLC

1   documents a day.  And so -- we'd have to do the math and see

2   how long that would take me.  I would not be able to look at

3   the material every single day.

4          I don't have an answer, I'm sorry, at this point how

5   much it would take.  My estimation of 90 days, I'm told by

6   litigation support, is not enough time to collect from all of

7   the individual board members.

8          What I suggest is perhaps I submit a follow-up letter

9   to the court after I'm able to consult with litigation support,

10  after they have been able to conduct an initial outreach to all

11  the board members and their IT folks to see how long it will

12  take for them to do the collection.

13         THE COURT:  May I have that letter by the end of next

14  week.

15         MS. CANFIELD:  Yes.  My only hesitancy is because of

16  the July 4 holiday.  I don't know if people are taking

17  vacations.  I will try to have that by the end of next week.

18         THE COURT:  I sort of built into that the vacations

19  but, of course, someone could be out the entirety of next week.

20         MS. CANFIELD:  As a compromise, your Honor, I'm sorry

21  to interrupt.  I am reviewing the e-mail boxes.  I've started

22  with plaintiff and the two named defendants.  And as soon as

23  those are reviewed and QT'd I will produce those to plaintiff.

24  And as I go through the mail boxes, I will produce the

25  material.  It's just, as I said, there's over 2,000 that

F719ELLC

1   plaintiff -- e-mails that plaintiff sent.  And I have been

2   reviewing them since last week.  And I've gotten through about

3   1500.  It takes time.  Our review platform had some problems.

4   I had to switch servers.  As a backup I have asked litigation

5   support to see if they can take the material and field it out

6   to a vendor.  They're putting together a budget now as to how

7   much that would cost.  We are making every effort that we have

8   available to us to have a review platform that's fully

9   functional and that it has enough server space so others can

10   join in this project if need be, if I need to enlist contract

11   attorneys or preferably less senior attorneys to do the review.

12            THE COURT:  Well I'm going to withhold judgment on

13   that part of the matter.

14            I do think that what was productive about today's call

15   at least I think we -- the three of us have a better sense of

16   how to define and delimit the plaintiff's requests.  And what I

17   need now is just a realistic and fair approximation of how much

18   time you believe it will take.

19            MS. CANFIELD:  Correct.

20            THE COURT:  Okay.  With that, I'm going let you both

21   go because I've had you on the phone enough.

22            Please collectively obtain a transcript of this

23   because I'm sure we'll need it at some point.

24            And if we can refrain from having more of these that

25   would be better but I understand it may not be avoidable.

F719ELLC

1              MS. CANFIELD:  Your Honor, there is one more issue.

2              THE COURT:  Yes.

3              MS. CANFIELD:  We have scheduled a number of

4    depositions this month.  And I know that plaintiff would

5    appreciate having the documents prior to deposing some of our

6    witnesses.  So can we put -- tentative, maybe a 30-day

7    extension on discovery right now, just so plaintiff is not

8    placed in the position of having to take the deposition of

9    say -- I think Bishop Taylor's deposition is scheduled for next

10   week.  So we're able to make a production.

11             THE COURT:  I'm not sure that Mr. Willemin needs you

12   to be carrying his water.  But Mr. Willemin, would you prefer

13   to take the depositions after having the ESI?

14             MR. WILLEMIN:  I would.  And obviously it hasn't been

15   granted yet but assuming that there's going to be some

16   extension I'm happy to move the depositions accordingly.

17   That's correct.

18             I think it's part of the scheduling order, although I

19   understand that obviously the original scheduling order hasn't

20   been followed completely.  But I think the intent is to get the

21   documents before the depositions.

22             THE COURT:  That is the intent.  I think despite my

23   extreme reluctance to do so, I will have to grant an extension.

24   I just really want the parties to be reasonable in what they're

25   seeking.  So you can suspend the depositions that are currently

F719ELLC

1    scheduled.  I think they are all going to have to be adjourned.

2    And I will hear from Ms. Canfield next week as to her best

3    understanding of the amount of time this will take.

4              MS. CANFIELD:  Okay.  Thank you, your Honor.  Thank

5    you so much.

6              THE COURT:  Thank you both.

7              MR. WILLEMIN:  Thank you, your Honor.

8              (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25