UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

________________________________

MELISSA KAYE,

Plaintiff,

v. Case No. 1:18-cv-12137-JPC-JLC

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION; ELIZABETH FORD; PATRICIA YANG; ABHISHEK JAIN; AND JONATHAN WANGEL (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the named Defendants),

Defendants.

________________________________

VIDEOCONFERENCE DEPOSITION OF MELISSA KAYE

DATE: Monday, November 15, 2021

TIME: 10:03 a.m.

LOCATION: Remote Proceeding
Albuquerque, New Mexico

REPORTED BY: Emmanuel Sabatino, Notary Public

JOB No.: 4897710

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF, MELISSA KAYE:

SPECIAL HAGAN, ESQUIRE (by videoconference)
Law Offices of Special Hagan
196-04 Hollis Avenue
Saint Albans, New York 11412
special@haganlawoffices.net
(917) 337-2439

ON BEHALF OF DEFENDANTS, NEW YORK CITY HEALTH AND HOSPITALS CORPORATION; ELIZABETH FORD; PATRICIA YANG; ABHISHEK JAIN; AND JONATHAN WANGEL:

DONNA CANFIELD, ESQUIRE (by videoconference)
New York City Law Department
100 Church Street
New York, New York 10007
dcanfiel@law.nyc.gov
(212) 356-2461

File #: 2019-032851

Control #: 21-2743

INDEX

| EXAMINATION: | PAGE |
|---|---|
| By Ms. Canfield | 6 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Email, 1/22/2018 | 108 |
| Exhibit B | Amended Complaint | 192 |
| Exhibit C | BHS to CHS Line Change | 219 |
| Exhibit D | Letter, 6/4/2021 | 325 |

(*Exhibits attached.)

QUESTIONS INSTRUCTED NOT TO ANSWER

| PAGE | LINE |
|---|---|
| 69 | 9 |
| 156 | 9 |
| 336 | 23 |

DOCUMENTS REQUESTED

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Paystubs for 2021 | 136 |
| 2 | Gracie Square Income, 2015-2021 | 137 |
| 3 | AABR Income, 2015-2021 | 141 |

P R O C E E D I N G S

THE REPORTER: Good morning. My name is Emmanuel Sabatino; I am the reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 10:03 a.m.

This is the deposition of Dr. Melissa Kaye taken in the matter of Melissa Kaye, Plaintiff against New York City Health and Hospitals Corporation; Elizabeth Ford; Patricia Yang; Abhishek Jain; and Jonathan Wangle (said names being fictitious, the persons intended being those who aided and abetted the unlawful conduct of the name Defendants), Defendants, on November 15, 2021, via Zoom.

I am a Notary authorized to take acknowledgements and administer oaths in New York. Parties agree that I will swear-in the witness remotely outside of her presence.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording virtually of this proceeding:

- is intended for all uses permitted under applicable procedural and

evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and

- shall constitute written stipulation of such.

At this time will everyone in attendance please identify yourself for the record.

MS. CANFIELD: Donna Canfield, counsel for the defendants. I consent to the foregoing stipulations.

MS. HAGAN: Special Hagan, counsel for Plaintiff. I also consent to the foregoing stipulation. Counsel for Dr. Kaye.

MS. KAYE: Yes. Melissa Kaye, Plaintiff, and I stipulate to the conditions.

THE REPORTER: Thank you.

Hearing no objection, I will now swear-in the witness.

WHEREUPON,

MELISSA KAYE,

called as a witness, and having been first duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

//

//

EXAMINATION

BY MS. CANFIELD:

Q Good morning, Dr. Kaye. How are you?

A Good.

Q Can I ask where you're located this morning? Are you in New York or are you in another state?

A I'm in another --

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q You can answer.

A I'm in another state.

Q And what state are you located in now?

A New Mexico.

Q Okay. And what city in New Mexico?

A Albuquerque.

Q Thank you. Never been there. I hear it's beautiful.

I wanted to know before we get started this morning, do you have a cell phone or another electronic device in front of you? I just want to make sure that while we're in the deposition today, that I have your undivided attention and that you're not going to be tempted to receive, like, any text messages.

I do understand that you have two children

and if, you know -- if there was an emergency, that you would have something for them to contact you, but if you could put that aside just for purposes of the deposition.

Now, do you have a cell phone in front of you?

A I have my cell phone in my house.

Q Okay. It's not in front of you then?

MS. HAGAN: Objection.

MS. CANFIELD: Do you have -- I'm sorry.

MS. HAGAN: She's going to have to have her cell phone because her children are --

MS. CANFIELD: I understand that. And I agree. I agree. I just -- if it's just not right in front of her, that'd be great.

MS. HAGAN: We haven't made those kind of stipulations with your witness. I suggest, you know, you afford my client the same courtesy.

MS. CANFIELD: I only do so because during the other depositions, Dr. Kaye has, like -- I can see her communicating and typing on the computer.

I just want to make sure that while she's answering questions, that she's not communicating with anyone else.

MS. HAGAN: If she can answer your questions and if she knows she has a problem where she needs to ask you to re-ask the question, she will do so.

MS. CANFIELD: Okay. All right.

BY MS. CANFIELD:

Q Do you have any other devices other than your cell phone with you, Dr. Kaye?

MS. HAGAN: She would have to use her laptop in order to engage you. That's what we're all doing.

MS. CANFIELD: Okay.

BY MS. CANFIELD:

Q Other than your laptop?

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Dr. Kaye, you have to respond to my question.

A Yes. Yes, I have my laptop.

Q Okay. Anything else other than your laptop and your cell phone?

A I have a printer in the house.

Q Okay. All right. All right. Thank you. All right. As you know, my name is Donna Canfield. I'm an assistant corporation counsel with the New York

City Law Department. I represent the defendants, New York City Health and Hospitals Corporation, Elizabeth Ford, Patricia Yang, Abhishek Jain, Jonathan Wangel in the case called Kaye vs. Health and Hospitals Corporation, et al. And that's pending in the Southern District of New York.

I'm going to ask you a couple questions today and I ask that you answer them truthfully, okay?

A Yes.

Q Okay. You understand that you're under oath now, correct?

A Yes.

Q Okay. The court reporter, Mr. Sabatino, will take down what you say and what I say, and what Ms. Hagan says. If the court reporter asks you to speak up or to slow down, will you please do that?

A Yes.

Q Okay. Please tell me if you cannot hear my questions or if there's a break in the internet connection. Will you do that, please?

A Yes.

Q Okay. And please tell me if you don't understand my question, okay?

A Yes.

Q Okay. If I ask you a question and you

answer it, I will understand that you heard and understood my question, okay?

A Yes.

Q Okay. And if you give me an answer -- oh, and it's important that you don't start answering your question until I have finished my question, okay?

A Yes.

Q If you give me an answer at one time today and later on you want to add to it or change something, please let me know, okay?

A Yes.

Q Please let me know if you want to take a break to use the restroom or get something to drink. That is fine. These days can be long and you're going to be talking, so I would understand if you would need a short break. The only thing I ask is that you finish answering my question before we take the break. Is that fair?

A Yes.

Q Okay. Now it's difficult for the court reporter to take down an uh-huh or a nod of the head or -- because it's not verbal. Because -- and we can't read it either on the transcript. So please use yes or no instead of uh-huh or mm-hmm, okay?

A Yes.

Q And then finally, when a question is pending, you cannot speak to your lawyer except to determine if a privilege applies. Do you understand that?

A Yes.

Q Okay. Now do you have any medical condition or illness that affects your ability to hear me now?

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q You can answer.

A No.

Q But --

THE WITNESS: I would like to take a moment to turn the heat on. It's very cold in here and I need to -- I need to do that, if I may.

MS. CANFIELD: Yes, you may.

THE WITNESS: Thank you.

MS. CANFIELD: Now I seem to be able to hear the heater.

Mr. Sabatino, is that going to be interfering with your ability to hear the witness?

THE REPORTER: If I can't hear something, I will speak up, but I did just hear that come on, yes.

MS. CANFIELD: Okay. Okay.

THE WITNESS: Yes. That is why I had turned off the heat, but it's freezing in here.

MS. CANFIELD: Okay. Well, as Mr. Sabatino said, if there's something that he doesn't hear, he will just ask you to repeat it, and same with me. Okay.

BY MS. CANFIELD:

Q Do you have any condition that affects your ability to answer my questions?

MS. HAGAN: Objection.

THE WITNESS: No.

BY MS. CANFIELD:

Q Have you taken any medication or substances that would impair your ability to hear me?

A No.

Q Have you taken any medication or substances that would impair your ability to understand me?

A No.

Q What about to answer my questions?

A No.

Q Okay. Are you currently under a doctor's care?

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q You can answer.

A Yes.

MS. HAGAN: To the extent that you understand.

BY MS. CANFIELD:

Q And what doctor are you seeing?

THE REPORTER: I'm sorry.

Ms. Hagan, what did you just say?

MS. HAGAN: I said to the -- answer to the extent that you understand her question.

THE REPORTER: Okay.

I'm sorry. Could you give that question again also, Ms. Canfield?

MS. CANFIELD: I said, "Are you currently under a doctor's care?"

THE WITNESS: Yes.

MS. CANFIELD: Okay.

BY MS. CANFIELD:

Q And what doctor?

MS. HAGAN: Objection to form.

BY MS. CANFIELD:

Q What is the name of the doctor that you're seeing?

A Dr. Al Rashida.

Q Can you spell that please, for the record?

A It's A-L R -- R-A-I-S-H-I-D or A-D, I

believe.

Q Mr. Al Raishid [sic]?

A She -- she's a woman.

Q Okay. Dr. Al Rashida. And what do you see Dr. Al Rashida for?

A Elevated cholesterol.

Q And when did you first start seeing this doctor?

A Last April. April 2020.

Q And is Dr. Al Rashida located in New Mexico?

A Yes.

Q Are you currently under any other doctors' care?

A Yes.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q I'm sorry. I didn't hear your response?

A Yes.

Q Okay. What is the name of the other doctor that you're seeing?

A Dr. Gregory De Felice.

Q Can you spell Dr. De Felice's last name for the record, please?

A D-I-F-I-L-I-C-E [sic] possibly.

Q Okay. And for what reason do you see Dr. De

Felice?

MS. HAGAN: Objection as to form.

THE WITNESS: For surgical follow-up.

BY MS. CANFIELD:

Q And what type of surgery did you have?

MS. HAGAN: Objection, form.

THE WITNESS: I had a shoulder surgery.

BY MS. CANFIELD:

Q For what reason?

MS. HAGAN: Objection.

THE WITNESS: I had calcified crystals in the joint and a rotator cuff tear.

BY MS. CANFIELD:

Q Okay. And how long ago did you have the surgery?

MS. HAGAN: Objection.

THE WITNESS: July.

BY MS. CANFIELD:

Q July?

A July of this year.

Q And did you have any physical therapy associated with your surgery?

MS. HAGAN: Objection.

THE WITNESS: Yes.

//

BY MS. CANFIELD:

Q Okay. And are you still attending physical therapy for your surgery?

A Yes.

Q Okay. Any other doctors that you're currently seeing?

MS. HAGAN: Objection as to form.

BY MS. CANFIELD:

Q You can answer.

A No.

Q What other doctors, if any, have you seen in the past five years?

MS. HAGAN: Objection, form. Could you be more specific?

BY MS. CANFIELD:

Q I'm asking, what other doctors have you seen, if any, in the last five years --

MS. HAGAN: Answer --

BY MS. CANFIELD:

Q -- for specific medical care?

MS. HAGAN: Answer if you're able.

THE WITNESS: I've seen Dr. Peter Kim.

BY MS. CANFIELD:

Q And for what reason did you see Dr. Peter Kim?

MS. HAGAN: Objection.

THE WITNESS: For GI problems.

BY MS. CANFIELD:

Q And when did you first start seeing Dr. Kim?

A He was my internist in the early to mid-2000s. And then he gave up his primary care practice and became a gastroenterologist, and I continued seeing him for my GI problems.

Q Okay. When did you start seeing him for your GI problems?

A It's hard for me to pinpoint the date.

THE REPORTER: Please repeat the answer.

THE WITNESS: It's hard for me to pinpoint the date.

BY MS. CANFIELD:

Q Was it before or after 2015?

A Before.

Q Was it before or after 2012?

A I don't know.

Q So is it fair to say you started seeing him sometime between 2012 and 2015?

A I started seeing him as a primary care doctor probably before that.

Q Okay.

A He changed his practice to specializing in GI medicine only.

Q Okay.

A And at that point, I only saw him for GI issues.

Q Okay. And that's what I'm interested in knowing.

When did you first start seeing him for GI issues?

MS. HAGAN: Objection. Asked and answered. She said she didn't know. Next question, please.

MS. CANFIELD: No, you can answer.

MS. HAGAN: Asked and answered.

THE WITNESS: I'm trying to give you a --

MS. HAGAN: She said she didn't know. She can't answer the question. She said she doesn't know.

MS. CANFIELD: Excuse me.

Dr. Kaye, please.

MS. HAGAN: Again, she said she doesn't know. I'm going to instruct my client not to continue unless she's going to give the same answer -- she doesn't know. You're asking her to give you an answer

that she doesn't know the answer to.

MS. CANFIELD: That's not clear on the record yet.

BY MS. CANFIELD:

Q Dr. Kaye, when did you first start seeing Dr. Kim for your GI problems?

A I -- I can't pinpoint the time that his practice changed from primary care to GI, so I -- it's hard for me to -- to say when he became a GI practitioner.

Q Okay.

A And --

Q Go ahead. I'm sorry.

A No, that's okay. I had seen him as my primary care physician and then I received notification that he was closing his primary care practice and specializing in GI medicine and -- and taking -- taking his patients -- accepting patients that he was following as a primary care doctor as -- into his GI practice. If --

Q Okay.

A -- if need be.

Q Okay.

A And that's what my situation was. So I don't recall exactly when that switchover happened,

but I believe it was sometime in the early 2000s.

Q Okay.

A Maybe around, you know, some --

MS. HAGAN: Dr. Kaye, don't guess. If you don't remember, you don't know.

THE WITNESS: It just -- I don't remember when that transition in his practice occurred, but I do think it was sometime in the early 2000s.

BY MS. CANFIELD:

Q Okay. Let me ask it another way. When did you begin to have issues with your GI requiring you to see a specialist?

MS. HAGAN: Objection.

You can answer.

THE WITNESS: I -- I was diagnosed with irritable bowel syndrome and when I was under stress, I would have flares. And --

BY MS. CANFIELD:

Q And when were you first diagnosed with irritable bowel syndrome?

A I know I -- I know I had it in medical school. I don't know if I was diagnosed prior to that.

Q Okay. So it's something that you've had for

quite some time; is that fair to say?

A Well, yeah. It's a chronic illness that flares with stress.

Q Okay. And are you still seeing someone for your irritable bowel syndrome?

A Well, I would consider Dr. Kim my GI doctor.

Q Okay. So do you not still see him or do you see someone locally?

A No, I consider Dr. Kim my GI doctor.

Q Okay. All right. Fair enough. All right. Any other doctor that you saw for a medical condition within the last five years, other than the three doctors that you've testified to so far?

MS. HAGAN: Objection as to form. Compound question.

THE WITNESS: I've seen a cardiologist.

BY MS. CANFIELD:

Q What is the name of the cardiologist you've seen?

A Dr. Margaret Sullivan.

Q And when did you first see Dr. Sullivan?

A I have trouble pinning down the date.

Q Let me ask you this then. Maybe this will help you.

For what issue related to your heart led you

to see a cardiologist?

MS. HAGAN: Objection as to form.

BY MS. CANFIELD:

Q You can answer.

A I have -- I -- I have a genetic condition.

Q Okay. And when did you learn of this genetic condition?

A In the early 1990s.

Q Have you been seeing Dr. Sullivan since the early 1990s?

A No.

Q Do you recall the last time you saw Dr. Sullivan?

MS. HAGAN: Objection.

You can answer.

THE WITNESS: I don't recall the exact date, but I know it was before the pandemic.

BY MS. CANFIELD:

Q What about Dr. Kim? When was the last time you saw Dr. Kim?

A I had a colonoscopy right before the pandemic. I believe it was in January 2020.

Q Any other doctors, other than the four doctors that you've testified to so far, that you have seen for any type of treatment within the past five

years?

A I saw a social worker.

Q What's the name of the social worker?

A Her name was Alessio -- last name's Alessio.

Q Can you spell that, please, for the record?

A I don't want to spell it incorrectly. I think it is something like A-L-I-E-S-S-O [sic].

Q Okay. And is the social worker a male or a female?

A Female.

Q Okay. And what's the social worker's first name?

A I think it's Paulina [sic] or -- I believe it's Paola or Paulina.

Q Okay. Do you know how to spell her first name?

A I'm sorry.

Q Okay. That's fine.

A She's Italian and I am not all that familiar with --

Q Okay.

MS. HAGAN: You have the HIPAA release for this doctor, Dr. Canfield.

MS. CANFIELD: Okay.

//

BY MS. CANFIELD:

Q And when did you start first seeing Ms. Alessio?

A I think I had -- I had reached out to her in November or December -- early December of '18 I believe. I don't know when we were able to find the schedule --

THE REPORTER: I'm sorry. Repeat what you just said.

THE WITNESS: I -- I reached out to her in November, early December of 2018, but I don't recall when we were able to schedule our first appointment.

BY MS. CANFIELD:

Q Okay. How long did you see Ms. Alessio? Let me ask another way.

Are you still seeing Ms. Alessio?

A No.

Q Okay. When did you last see Ms. Alessio?

A I don't recall.

Q Okay. Was it before or after the pandemic?

A Before.

May I clarify something about her --

Q Yes.

A -- please? She's a psychologist by training

in Italy, but she's not a licensed psychologist in the United States. So --

Q Okay.

A -- she's a social worker by licensure in the United States, but she is a psychologist. And so she uses the title "doctor" for that reason.

Q She does? Okay.

And for what reason did you reach out to start seeing I guess Dr. Alessio?

A I was stressed out about my work situation.

Q Can you be more specific?

A Well, I was being treated very poorly at work and it was causing me a lot of strain and it was affecting me and -- and my kids and I was really upset about it. It was causing me physical and emotional distress.

And Dr. Alessio is a therapist who does what's called "body work," so I thought -- and she was recommended, and I thought she could help me cope with my stress.

Q Okay. Now, Dr. --

THE REPORTER: Okay. Just a sec.

Dr. Kaye, I'm going to ask you to please keep your voice up because I was having trouble hearing you there. So please keep your voice up a

little louder, okay?

THE WITNESS: Yes. Yes, I will. Can you please tell me what you need me to repeat?

THE REPORTER: Nothing there. Just in general in the future.

THE WITNESS: Yes, I will. Thank you.

MS. CANFIELD: Yes. Thank you. You are very softspoken and it is difficult to hear.

THE WITNESS: Yes. I -- I'm sorry I had to turn on the heat. Hopefully it'll warm up in a little bit and I can turn it off.

MS. CANFIELD: Yeah. The heat doesn't seem to be the problem. I don't hear that humming in the background anymore, but just keep your voice up.

THE WITNESS: I will. Thank you.

BY MS. CANFIELD:

Q So a couple follow-up questions. You said that you were being treated very poorly at work. By whom were you being treated poorly?

A Management, staff.

Q Can you identify any particular individuals?

A Elizabeth Ford, Andrea Swenson, Jonathan Wangel, Ross Macdonald, Patricia Yang, Abhishek Jain, some support staff. It became more extensive over time.

Q Okay.

A And more individuals were participating in activities that were hurtful and -- to me -- and stressful.

Q Okay. And when did this -- when did you first start feeling stressed out by your work situation?

MS. HAGAN: Objection as to form.

You can answer if you understand.

THE WITNESS: I think that it started in late -- I mean, it -- it -- it was a crescendo that started when CHS decided to get involved with the city-wide court clinics.

THE REPORTER: What kind of clinics?

THE WITNESS: They're city-wide court clinics.

THE REPORTER: Thank you.

THE WITNESS: You're welcome.

BY MS. CANFIELD:

Q All right. Well, I'll definitely have some follow-up questions with that, but I want to close the loop on medical professionals.

Any other doctors that you've seen for any type of medical care other than the five I guess you've named so far in your testimony that you have

seen in the last five years?

A So you're -- you're asking me that I've seen since 2016?

Q Correct. 2015, 2016, yes.

A Does that include nurse practitioners?

Q Sure.

A I saw a nurse practitioner for a routine GYN exam. And that was also around the time I saw Dr. Al Rashida. I would say April 2020. I do not remember her name.

Q Okay.

A And does that include physical therapists?

Q You had talked about receiving physical therapy. Is that different than your physical therapy for your shoulder surgery?

A No. It's been ongoing since the surgery.

Q Okay. Okay. Now you've mentioned the physical therapy. Okay.

A Yeah. And I saw two doctors -- I don't recall their names -- in July of 2021. An anesthesiologist and an internist. I saw them at HSS.

Q Is this related to your shoulder surgery?

A Yeah.

Q Okay.

A It was the pre-op --

Q Right.

A -- clinical clearance screening.

Q Okay. Okay. I'm going to go back to the social worker that you saw. Are you currently under any type of treatment from a mental health professional, whether it be a social worker, psychologist or psychiatrist?

A No.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Okay. Are you currently taking any medication for your elevated cholesterol?

A Yes, sir.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q And what is that?

A Lipitor.

Q Okay. Anything else?

A Well, it's not really medication, but I -- I take Q -- Coenzyme Q which is something that you're supposed to take with Lipitor to combat the side effects.

THE REPORTER: Could you say that word again?

THE WITNESS: Q -- Coenzyme Q. It's a

-- it's a supplement that helps prevent side effects from Lipitor.

BY MS. CANFIELD:

Q And how long have you been taking Lipitor?

A I believe Dr. Sullivan started me on that because of my genetic condition.

Q I'm sorry. Repeat that?

A Dr. Sullivan started me on the Lipitor because of my genetic condition.

Q The question was when did you start it -- taking it?

A I don't know. I don't know.

Q Before or after the pandemic?

A Before.

Q Were you still employed at CHS when you started taking it?

A I was -- it was probably pre-CHS. It probably was when I was employed for -- at Bellevue.

Q And what are the side effects of Lipitor for you?

MS. HAGAN: Objection.

THE WITNESS: I don't have any -- I don't have any side effects, but it can deplete enzymes in your system. So it's just recommended for safety purposes to replace those.

BY MS. CANFIELD:

Q Okay. Is that why you take the Q Coenzyme?

A Yeah.

Q Okay. So you've had no side effects from the Lipitor; is that correct?

A No.

Q Okay.

A That's correct, yes.

Q Okay. And for the GI issues that you were seeing Dr. Kim for, were you taking any medications or are you currently taking any medications for the GI issues you experience?

A No.

Q Okay. Have you taken medication in the past?

MS. HAGAN: Objection. Form.

Answer if you can.

Could you be more specific?

MS. CANFIELD: Yes, I can.

BY MS. CANFIELD:

Q Within the past five years, or from 2015 to the present, have you taken medication for your GI issues?

A Yes.

Q And what have you taken?

A They're called proton-pump inhibitors. I don't remember which ones I was prescribed. Dexilant I think was the one I was taking. Called Dexilant.

Q Can you spell that, please?

You didn't know you were going to be participating in a spelling bee today, did you?

A Yeah. I think it's D-E-X-A-L-A-N-T [sic].

Q Okay.

A -- know.

Q Okay.

A It's a proton-pump inhibitor.

THE REPORTER: I'm sorry. Could you repeat what you said after you spelled it?

THE WITNESS: I'm not certain if that's the spelling of it, but I do know it's a -- it's -- it's for one of my GI problems.

BY MS. CANFIELD:

Q Okay. But you no longer take it?

A I'm not taking it now, no.

Q Okay. And how long were you taking it when you were taking Dexilant?

A I would take it on and off over the years.

Q And are there any side effects that you experienced from taking the Dexilant?

A No.

Q What about for the cardiologist that you were seeing? Were you taking any medication to address the genetic condition that you have?

A Yes.

Q And what were you taking?

A Lipitor.

Q Lipitor. Okay. And who prescribed the Lipitor for your genetic condition related to your heart? Dr. Sullivan or Dr. Rashida?

A Al Rashida? I -- I -- it's not just Lipitor that I've taken. I've taken other statins. I don't remember the names, but they've both prescribed statins for me.

Q Okay.

A I was seeing Dr. Sullivan for the cholesterol and for cardiac irregularities -- palpitations.

Q And when you were seeing Dr. Alessio, I understand that she's a psychologist by trade, but did she recommend that you take any medication?

A No.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Did she recommend that you see a psychiatrist about medication?

MS. HAGAN: Objection.

THE WITNESS: She did not. She -- she -- she did not recommend that.

BY MS. CANFIELD:

Q Okay. Did you believe that you could benefit from a medication?

MS. HAGAN: Objection. She's not treating herself.

MS. CANFIELD: It's just a question.

BY MS. CANFIELD:

Q You can answer.

A I believe medications can be helpful, yes.

Q Okay. Did you take any medications that were helpful? I know that you are a psychiatrist.

A No.

Q Other than what you testified to this morning, any other doctors or health professionals have you seen for a health condition from 2015 to the present?

A Hello?

Q Yes.

A I -- I don't know the exact cutoff of -- of 2015 as to if I -- I may have seen a Dr. Rho, R-H-O.

Q For what purpose?

A He's a physical medicine and rehab doctor.

It -- it would have been for my shoulder.

Q Okay. And how did you injure your shoulder?

A It's unclear when -- it's unclear when the -- well, I can explain what was told to me.

Q Okay.

A I have risk factors for calcified crystals. It's called -- I think it's called calcified tendonitis. There's a -- there's an acronym for it. I don't remember what it is, but it's when calcium crystals develop in the joint. And I -- I had the risk factors. And the risk factors are being female, being over 40 and having previous trauma to the shoulder. So I have all of those risk factors.

Q Okay. All right. And you had prior trauma to the shoulder?

A Yes.

Q Okay. And how long ago did that occur?

A Well, that's the -- that's the unclear part because there'd been multiple traumas to the shoulder over many, many years.

MS. HAGAN: Can I stop you for a second?

Ms. Canfield, I don't have any of your exhibits for Dr. Kaye.

MS. CANFIELD: I'm going to email them

to you as I use them.

MS. HAGAN: I was supposed to be getting them in advance of the deposition, not as you use them, as per the Court's order. So if you can send me the -- if you can send me all of the exhibits that you may use today before we proceed, I'd like that.

MS. CANFIELD: I'm going to share them with you contemporaneous as we would if we were in a conference room together.

MS. HAGAN: I don't know how that would work, Ms. Canfield.

MS. CANFIELD: I'm going to email them to you and I will email them to you prior to showing the exhibit. That's what I'm going to do.

MS. HAGAN: That's not as per the Court's order.

MS. CANFIELD: Okay.

MS. HAGAN: The Court -- you got the exhibits before the deposition with all of the depositions. I'm expecting that same courtesy, Ms. Canfield.

MS. CANFIELD: I will send them to you as I use them.

MS. HAGAN: We're going to have to call

the Court.

MS. CANFIELD: That's fine.

MS. HAGAN: Because I had to -- we're going to have to call the Court because I should have them.

MS. CANFIELD: That's fine. You can call the Court if you want.

Can we go off the record, please?

THE REPORTER: The time is 10:46 a.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 10:52 a.m. We're back on the record.

MS. CANFIELD: Okay.

BY MS. CANFIELD:

Q Dr. Kaye, what did you do, if anything, to prepare for your deposition today?

MS. HAGAN: Objection.

THE WITNESS: I talked to my attorney.

BY MS. CANFIELD:

Q Did you review any documents?

MS. HAGAN: Objection as to form.

You can answer.

THE WITNESS: I -- I'm sorry. I didn't hear the question.

BY MS. CANFIELD:

Q I said did you review any documents to prepare for this deposition?

A I looked at some of the discovery emails.

Q When you say "discovery emails," what do you mean by that?

MS. HAGAN: Objection.

To the extent that you can understand the question.

THE WITNESS: I -- the emails that we obtained in discovery.

BY MS. CANFIELD:

Q Okay. The emails that I produced to your attorney as part of discovery? Is that what you're referring to?

A Yes.

Q Okay. And do you remember in particular what you reviewed?

MS. HAGAN: Objection as to form.

THE WITNESS: I don't. I just skimmed through some of them. I -- I didn't get through all of them.

BY MS. CANFIELD:

Q Okay. Do you recall the subject matter of the emails that you were able to get through?

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q You can answer.

A Well, I remember looking at the one where Elizabeth Ford said that they were going to manage me out.

I recall the exchanges between me and Dr. Jain about my shift change.

I recall one where Dr. Ford told Dr. Jain to ignore my email about my brother's death and my request to have my shift restored to what it had been prior.

I remember emails that categorized me as the reason and the problem for CHS getting itself into trouble with the Court by defying court orders. That's -- that's pretty much what I recall.

Q Okay. Thanks. Now I want to take these one at a time.

The email that you first mentioned was the email where Dr. Ford, you said, had the words "manage me out." Do you recall the date of that email?

A I think it was in early February. I think it was early February 2018.

Q Okay.

MS. CANFIELD: Do you need to take a

message?

THE WITNESS: No. I just got a -- can I -- can I -- this is about someone picking up my kids.

MS. CANFIELD: Yeah. You can --

THE WITNESS: Can I take a break for a second? I'm sorry.

MS. CANFIELD: Yes.

THE WITNESS: For this?

MS. CANFIELD: Yes, of course.

THE REPORTER: The time is 10:57 a.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 10:59 a.m. We're back on the record.

MS. CANFIELD: All right. Thank you.

BY MS. CANFIELD:

Q The email you believe was February 2018; is that correct?

A I'm not certain. I -- I -- that's -- that's just my recollection.

Q Okay. Well, the document will speak for itself.

Do you know when you read that email or that time period, had you transitioned to CHS or were you

still an employee of Bellevue?

MS. HAGAN: Objection.

If you recall, you can answer.

THE WITNESS: I know that CHS contacted Bellevue for -- yeah. I was contacted by Bellevue in December 2017 and told that CHS was taking over management of the court clinics.

THE REPORTER: Taking over management of what?

THE WITNESS: The court clinics. I was told by Bellevue -- my chain of command at Bellevue in December 2017 that CHS was taking over management of the court clinics.

BY MS. CANFIELD:

Q Okay. And do you recall exactly when you transitioned under CHS and left the employment at Bellevue?

MS. HAGAN: Objection.

MS. CANFIELD: You can answer.

MS. HAGAN: To the extent that she can answer the question.

THE WITNESS: That is -- the answer to that question would depend on how you would define the transition.

//

BY MS. CANFIELD:

Q Okay. Let me ask you this. In February 2018, who did you report to?

A I reported to Jeremy Colley, M.D.

Q So you did not report to Dr. Ford at that time?

MS. HAGAN: Objection.

THE WITNESS: No. Not yet.

BY MS. CANFIELD:

Q Okay. Why do you believe Dr. Ford --

MS. CANFIELD: Do you need to look at those messages?

THE WITNESS: No.

MS. CANFIELD: Okay. Is there any way you can put that on vibrate -- your phone?

THE WITNESS: I -- I can try. I'm not really that -- I'm not really that tech -- tech savvy, but I can try. I don't know.

MS. CANFIELD: Are you receiving emails or is that your phone that's making a noise?

MS. HAGAN: Objection.

THE WITNESS: Pictures. Someone's sending me pictures. Sorry. I only have one phone, so I'm not really sure what to do.

MS. CANFIELD: My question was the

dinging, is that coming from your computer or your phone?

THE WITNESS: I don't know. I don't know.

MS. CANFIELD: Did you receive a message on your computer or did you receive a message on your phone?

MS. HAGAN: She said she didn't know. Let's move on.

MS. CANFIELD: That's a different question. Please.

THE WITNESS: I -- when I get a -- my computer and my phone are linked. So when I get a message on one, it comes on the other also.

MS. CANFIELD: Okay. Okay. It's just very disruptive of the deposition. If you can somehow turn it off or turn down the volume?

THE WITNESS: Yeah. When we take a break, I'll call -- I'll call the school and see if I can let them know that I am not available or something. I -- I don't know. I'll figure out something. I'll figure out something. I'll call the kids' school and I'll let -- I'll call the nurse's office and let them know that I'm unavailable.

MS. CANFIELD: Okay. If you feel

comfortable doing that. Just if there's some way --

THE WITNESS: I mean, I don't know what else to do because I -- you know, they do call me from the school here and again, so I don't know what to say.

MS. CANFIELD: Okay. Okay.

BY MS. CANFIELD:

Q The email that you reviewed from Dr. Ford where she used the phrase "manage me out," do you believe that that phrase was motivated by discrimination?

A Yes.

Q Okay. What type of discrimination?

MS. HAGAN: Objection as to form. It calls for a legal conclusion.

Answer if you can.

THE WITNESS: I believe it was sex discrimination.

BY MS. CANFIELD:

Q Why do you believe Dr. Ford, as a woman, was discriminating against you based on your sex?

A Well, she was treating me differently than my male colleagues.

Q How did she treat you differently?

A She -- she retaliated against me over an

issue that I shared. My -- my male colleagues agreed with me and were involved in the issue as much or more than I was, and I got scapegoated for the issue.

They were taken seriously and respected for their opinion about the issue and I was deemed a problem and a cyclone and I was targeted.

Q What is "the issue" that you're referring to?

A The issue is using redacted versus unredacted records in conducting forensic assessments of criminal defendants.

Q Prior to that issue, do you believe that Dr. Ford discriminated against you based on your gender?

A Yes.

Q Okay. And why do you believe that?

A I discovered when -- I reported to Dr. Kaye -- I mean, I'm sorry. I don't report to myself.

I reported to Dr. Ford when I worked at Bellevue. She was the director of the Division of Forensic Psychiatry.

Q Mm-hmm.

A And she was my direct report-to. I discovered in -- around 2013 or 2014, I discovered that I was on a lower title and getting paid less than my male comparator.

Q And who was that -- your male comparator?
A That was Steven Ciric, M.D.
Q And how did you learn that you were being paid less?
A I -- someone made a mistake and disseminated an email with all of the doctors working at Bellevue -- their -- all their information, including their -- their titles and their salaries.
And I looked at that email. I didn't know it was by mistake. It was only later expunged from the system or everyone was later denied access to that email, but it had gone out. And I saw the email and I was, you know, taken aback, and I contacted my union.
Q Okay. And who at your union did you contact in particular?
A I believe at the time, the union representative was Lori Davidson I think was her name.
Q Do you recall the year that you contacted her?
A It was around 2014.
Q Okay. All right. And what did you say to Lori Davidson when you contacted her?
A I told her the situation.
Q And what exactly did you tell her?
A I said, you know, "I'm getting paid less

than my male comparator. He's on -- he's on a physician specialist line and he's getting paid significantly more than I am, and I'm only on an attending three line. And I'm actually more of a physician specialist than he is. I have more fellowships under my belt than he does." And she just responded by shrugging it off and she said, "Oh, yeah. Well, be glad you're not in surgery. Be glad you're in psychiatry because the psychiatrists only get paid $40,000 a year less than -- less than -- the female surgeons get paid $60,000 less. So just be glad you're a psychiatrist and not a surgeon or it'd be worse." She said something like that to me.

And I was taken aback and I asked her, you know, if they could help me and she said no. That that's not -- they don't get into that with -- that's not part of the collective bargaining, pay -- pay issues.

Q Did you confirm that by looking at the Collective Bargaining Agreement?

MS. HAGAN: Objection.

THE WITNESS: I -- she told me that it's not something the union could help me with, so I just accepted that was -- I figured if they could help me, they -- they would have I -- I thought. And she

-- she said it's just pervasive. This paying female physicians less than male physicians is just the pervasive practice of HHC, which stands for Health and Hospitals Corporation. She told me that was just the pervasive culture there and kind of basically said suck it up.

So I -- at the time, Elizabeth Ford was my report-to. And it was -- I think it was in 2014 -- early 2014 and I had -- I went to her and I -- I told her about it and I asked her for my line to be changed from attending three to physician specialist and be paid equal to or more than Steve Ciric, because I was more qualified and I had more seniority than him. And she kind of gave -- well, she totally gave me the runaround and she kept saying that she would look into it and that she would talk to Dr. Mary Anne Badaracco who was -- I think still is the chief of psychiatry at Bellevue, and that she'd get back to me. And I -- you know, she'd always kind of put me off.

And I would, you know, periodically follow-up with her and she would send me the emails. And I remember one of the emails said, "Oh, you know, getting anything done around here is like moving elephants." And she just basically never did anything about it. And, you know, she just had this kind of

queen bee mentality where, you know, she was very hard on women. And, you know, it wasn't -- it was obvious. It was obvious to me and it was obvious to other people who -- who, you know, had to work under her -- other women.

BY MS. CANFIELD:

Q How was she hard on other women?

A Just not as -- not as supportive. Not professionally supportive. Quick -- you know, quick on the draw, you know? Shoot first, ask questions later-kind of style. And, you know, like failing to consider my pay parity concerns seriously.

Q Let me ask you a question. Who are the other women that she was not as supportive of?

A Well, I know that Melanie Farkas and I -- please, I'm not sure -- don't ask me how to spell it. I -- I'm not sure. I think it's F-A-R-K-U-S [sic]. I'm not sure.

Q Okay.

A You know --

Q What was her title?

A She was a psychologist on the inpatient unit at Bellevue.

Q Was she doing forensic psychology or was she doing -- seeing patients and --

A The inpatient forensic unit was a treatment unit. I did not work in treatment capacity during my time at HHC. I worked as a forensic evaluator at the Bronx Court Clinic. But Bellevue did oversee the Bronx and Manhattan Court Clinics which were forensic --

THE REPORTER: Bronx and what?

THE WITNESS: The -- the Bellevue Hospital oversaw the Manhattan and Bronx Court Clinics, which were forensic evaluation centers in the --

BY MS. CANFIELD:

Q Okay.

A -- in the courthouses.

Q How is it that you know that Melanie Farkas was treated differently or poorly by Dr. Ford?

A She -- she told me.

Q Okay. But you didn't work with her, did you?

MS. HAGAN: Objection.

THE WITNESS: I had -- there were overlaps in our professional activities.

BY MS. CANFIELD:

Q Where was your office during the time that you -- during the time that you're describing now with

Dr. Ford and learning that you were paid less than Dr. Ciric?

A My office is in the Bronx courthouse.

Q Okay. And where was Melania Farkas' office, if at all?

A At Bellevue.

Q Okay.

A The 19th floor.

Q Okay. So you would not see her on a regular basis; is that fair to say?

A I would be down at Bellevue not infrequently back in those days. I would go down to Bellevue and do forensic assessments for inmates that were admitted either to the medical prison unit. It really wasn't a prison, it was a jail, but it was the -- if they were too medically ill or compromised or undergoing some kind of treatment, acute treatment, they would not be at Rikers. They would be at Bellevue on the medical service. And if there was a 730 ordered, I -- you know, I would sometimes go down there and do the exam down there just to move the case forward.

Similarly with the inpatient psychiatric unit, I would see defendants -- they were defendants to me, they were patients for them. But I would see the incarcerated individual at Bellevue.

There were staffing issues in the Bronx, so sometimes I would meet another evaluator from the Manhattan Court Clinic or someone else to do the exam at Bellevue.

Q Okay. So there were some staffing issues in the Bronx as early as 2014?

A No, I wouldn't say it was that early. Well, I'd have to -- let me think. When did -- there were periodic staffing issues. There were staffing issues between 2005 and 2008. And then definitely that -- then.

The other reason I would see cases at Bellevue or my other overlap --

Q Hold on a second. I want to know if there were staffing issues in 2014.

MS. HAGAN: Objection.

THE WITNESS: No, I don't think there were.

BY MS. CANFIELD:

Q Okay. All right. I'm going to move on because we're going to talk about this, but I don't want to get too far off the path.

Anyone other than Melanie Farkas that you believe was another female that Dr. Ford treated less favorably as compared to the male doctors?

A Yes.
Q Who else?
A Dr. Erica Weissman. She was a JD PsyD.
Q And how did Dr. Ford treat her less favorably?
A She was just very -- Dr. Ford was very hard on Dr. Weissman. Very critical of her -- of her and she had told me when -- when she got hired, Dr. Ford had told me that she was going to manage her out, and she did.
Q Dr. Ford told you that she was going to manage Dr. Weissman out?
A Yes.
Q When did she say that, if you can recall?
A It was around -- I do recall and I recall specifically because it was in the context of me -- Dr. Ford had just been hired to be the director of the forensic psychiatry unit at Bellevue. It was around 2009 -- early 2009. And I had wanted to meet with Dr. Ford and I sent her an email. I wanted to tell her that I was pregnant with twins. I wanted to tell her that just to give her the heads up, you know? That this was going to -- this was going to be, you know, the situation. And I also wanted to clarify some business matters about the -- the court clinic.

And what Dr. Weissman's role was going to be because it had shifted during the period of time Dr. Weissman was at Bellevue and I just wanted some clarification of, you know, like this -- what -- specifically, if I were to want to refer a defendant for longitudinal observation to help complete his 730 exam, there were some unclear kind of administrative algorithms about how that was done.

Q Let me interrupt you right here. Dr. Weissman -- was Dr. Weissman also part of the inpatient treatment -- treating staff?

A Yes. Her -- well, yes. Yes and --

Q Okay.

A -- and additionally, she was administration and treatment. She was -- her title was clinical director.

Q Okay. But she was not conducting forensic examinations, correct?

MS. HAGAN: Objection.

THE WITNESS: I cannot say that she did not hear and again conduct a 730 exam. I don't know about --

BY MS. CANFIELD:

Q Okay.

A But that was not the primary job.

Q Okay. So tell me -- I want to know specifically how Dr. Ford treated her less favorably. That was the question.

A When I communicated with Dr. Ford about this, she was just very -- spoke very unfavorably about Dr. Weissman and was kind of dismissive of what I was asking. And she just told me that, "Well, we're going to manage her out. We're going to manage her out."

She clearly didn't like Dr. Weissman and she said, "We're going to manage her out."

Q Okay. Now did Dr. Weissman tell you that she believed that Dr. Ford was treating her poorly?

MS. HAGAN: Objection.

THE WITNESS: I didn't have that discussion with Dr. Weissman.

BY MS. CANFIELD:

Q Okay. How about Dr. Farkas? Did she tell you that she believed that Dr. Ford was treating her less favorably?

MS. HAGAN: Objection.

THE WITNESS: She felt she -- yeah, she had some unfavorable comments about Dr. Ford and -- and her treatment of -- the way that she was treated, yes.

BY MS. CANFIELD:

Q Okay.

A She said some unfavorable things to me.

Q And what did she say?

A Well, the one thing that I remember, she -- she thought Dr. Ford was a sociopath.

Q Okay.

A And that, you know, she didn't support the staff. And there was a lot of complaints about Dr. Ford's schedule. Dr. Ford had worked out this -- you know, mind you, Dr. Ford was in charge of an inpatient treatment unit, okay? This was clinical work. And she had worked out some schedule where she would come in -- ostensibly come in at some very early hour, like 6:30. She ostensibly worked 6:30 in the morning till 2:30 in the afternoon, four days a week, and then had Thursdays off is what I recall.

And so, you know, on an inpatient unit where you have all the clinical activity happening during business hours, you know, there's no social workers and activity therapists at the hospital at 6:30 in the morning. And 2:30 in the afternoon is pretty early to -- to be leaving work when you're in charge of an inpatient unit, so she was very much resented about that.

There was this --

Q Oh, excuse me. Hold on. Who was very much resented? Dr. Ford?

A All the -- the treatment staff that -- that were working under her at the time.

Q Okay. So not just Dr. Farkas, but all the treatment staff were resentful of her schedule?

A There was rumbling and chattering about it, yeah.

Q Okay. Okay. And how else did -- what else did Dr. Farkas tell you about why she was treated less favorably?

A She just felt that she wasn't supported. Her professional development wasn't supported. She wasn't respected as a psychologist. She just felt devalued.

Q Okay. And did she --

A I'm not going to say those were the exact words, but that was the feeling I -- that was the impression that I had leaving the conversation.

Q Okay.

THE REPORTER: I'm sorry. "Leaving the conversation"? Did you say anything after that?

THE WITNESS: That was my takeaway impression of the -- of her complaint and I do

remember her saying that she thought Ford was a sociopath.

BY MS. CANFIELD:

Q Okay. Other than Dr. Farkas and Dr. Weissman, any other females who felt that they were treated less favorably by Dr. Ford because of their sex?

MS. HAGAN: Objection.

To the extent you can answer.

THE WITNESS: I don't recall any other --

MS. CANFIELD: Okay. Okay. That's fine.

THE REPORTER: I'm sorry. Please repeat the answer.

THE WITNESS: I don't recall any other specific incidents.

THE REPORTER: Thank you.

BY MS. CANFIELD:

Q Okay. Now after learning that you were paid less than Dr. Ciric, other than raising the issue with your union and raising the issue with Dr. Ford, did you raise the issue with anyone else?

A Yes.

Q Who?

A Dr. Jeremy Colley.

Q And what did you say to Dr. Colley?

A Well, Dr. Ford left to go work for CHS at DOH MH in -- I don't know -- 2014 or '15. I think '15. And Dr. Jeremy Colley took over that role as the director of forensic -- the director of the Division of Forensic Psychiatry at Bellevue.

Q Okay. So what did you say to him about the pay equity issue?

A He came up to the Bronx to just -- right after he got hired, he came up to the Bronx to meet with me and Dr. Barry Winkler. And he just wanted to check in and ask questions and ask about any problems. And during that meeting, I told him about the pay parity issue.

Q What exactly did you say?

A I said I'm getting paid less than my male colleagues and Ford said she would look into it and take care of it, and nothing ever happened.

Q Okay. So you said "male colleagues." Did you believe that you were being paid less than more than one male colleague?

A I know that it was -- that Steve Ciric was on the physician specialist line and that is a higher paying line. And then there was another -- I believe

there was another male -- I considered Steve Ciric my comparator because we were both medical directors of our respective court clinics. But there was another male psychiatrist, I don't even remember the name, who was part-time at the Manhattan Court Clinic who also had a physician specialist line.

Q Okay. And how was it that you know that this psychiatrist who worked part-time was paid more than you?

A Because I saw the spreadsheet.

Q It was a spreadsheet, and that was the email that you testified to earlier that was inadvertently sent around?

A Yes.

Q Okay.

A It was erroneously sent out to everyone.

Q Okay. And what did Dr. Colley say, if anything, in response?

A Well, he seemed to take my complaint seriously and said he would talk to Dr. Mary Anne Badaracco who was the chief of psychiatry for Bellevue.

Q Okay. Do you know if he spoke with Dr. Badaracco?

A He did.

Q Okay. And how do you know that?

A Because she called me into her office shortly thereafter.

Q Okay. And for what reason did she call you into her office?

A She was concerned about my complaint regarding pay parity.

Q And how do you know that?

A Because she told me.

Q What did she say?

A She said, "Oh, yeah. Well, this is -- you know, this is something we need to address. This is an EEOC issue."

It was clear to me from my interaction with her that Ford had never talked to her. That this was the first time she was hearing about it.

Q Okay. And how is it that you were led to believe that Dr. Ford had not met with Dr. Badaracco about the pay issue?

A Because she was interacting with me as if this was the first she was hearing about it from Jeremy Colley.

Q Okay. And other than saying "this is an EEOC issue," what else did she say, if anything?

A She said she would look into it.

Q Okay. Did she tell you specifically what she would do when she said she would look into it?

MS. HAGAN: Objection. Form.

THE WITNESS: I don't know if she told me specifically at that time, but I did learn over the course of addressing this with Dr. Colley and Dr. Badaracco that she was interacting with central office -- HHC central office.

BY MS. CANFIELD:

Q And I'm sorry, how do you know that she was interacting with HHC central office?

A I don't know if Jeremy -- Dr. Colley or Dr. Badaracco told me that they were talking to central office or just over the course of a couple months when this was being dealt with -- being attempted to deal with it, I just know I got the information that central office was involved. I don't know if it was from Dr. Colley or Dr. Badaracco or both of them.

Q Okay. Other than learning that central office was involved, did you learn anything else about what was being done to address your complaints that you were being paid less?

A I was told that it was -- it was being looked into.

Q Anything else?

A Well, yes. About -- and I don't know the exact timeframe, but it seemed like maybe two or three months, I don't know, or longer. Maybe it was longer? Maybe six -- six months? It was more -- a while later, and I'm sorry I can't specify the time, but there are emails about this in GroupWise if -- if we want to ever look at those. They're old.

But basically at one point I was told that -- and I think I met with Dr. Badaracco again and maybe Dr. Colley, too. And I was told that basically "you die in your line." And that my line could not be changed -- could not, would not, I don't remember the exact wording, but my line was not going to be changed from attending three to physician specialist.

Q Did they say why it would not be changed from physician three -- or attending physician three to physician specialist?

THE REPORTER: Please repeat the question.

BY MS. CANFIELD:

Q Did they say why your line would not be changed from attending physician to physician specialist?

A They told me that you could not change your line. That a line could not be changed. That's what

they told me.

Q Okay. And who told you that?

A Dr. Badaracco and -- and Jeremy Colley.

Q Okay. And how did they tell you that? In person or in writing?

A I don't -- I know I had a meeting with them and I don't know if they told me at the meeting? And I got emails about it because it continued on, so they said, but -- your line can't be changed, but each corporate pay title has a -- there's different tiers. There's a gradation of pay and there's a range of pay, right? So they said, "We can -- or central office can push you to the top pay range for attending three. We can do that for you."

Q And did that happen?

A Yes, it did happen.

Q Okay.

A But it did not come near to closing the pay gap between me and Steve Ciric. It amounted to about a $2,000 a year increase in my salary and it didn't -- and I think he was getting paid about $38,000 a year more than me. So it brought -- maybe it brought the pay difference down to 35 or 36,000, but it didn't correct the problem.

Q Okay. And after you met with Dr. Badaracco

and Dr. Colley, did you ever go back to your union about the issue?

A No.

MS. HAGAN: Objection.

THE WITNESS: No. I -- my union had told me they can't help or get involved in an issue like that.

BY MS. CANFIELD:

Q Let me back up because I know we're going down to some of the substance of your complaint, but I want to go make sure I cover everything that I wanted to cover beforehand.

Other than reviewing the documents -- the emails that you testified to earlier -- and speaking with your attorney, did you do anything else to prepare for today's deposition?

MS. HAGAN: Objection.

You can answer.

THE WITNESS: I mean, it depends on when you -- I want to answer that accurately. I mean, I've done things regarding my lawsuit over a period of time, whether it's for direct preparation for this deposition, I -- I guess that's up -- that's up for, you know, debate.

I mean, it -- I've -- I've looked at --

I looked at some of the deposition transcripts from a while back -- a while back I looked at them. So I guess you could consider -- I guess you could consider that preparation. I don't know.

BY MS. CANFIELD:

Q Okay. Whose deposition transcripts did you review?

A I looked at -- this was quite some time ago. I think it was maybe a year or more -- more than a year ago. Feels like two years ago. I don't know. But I looked at Dr. Yang's deposition transcript, and more recently but also a while ago, I looked at Ms. Patsos' deposition transcript.

THE REPORTER: Could you please spell that?

THE WITNESS: P-A-T-S-O-S.

BY MS. CANFIELD:

Q Anyone else?

MS. HAGAN: Objection.

THE WITNESS: I skimmed -- I skimmed through Dr. Ford's, but I didn't -- I skimmed through Dr. Ford's.

BY MS. CANFIELD:

Q Is that it of the deposition transcripts?

A Yeah.

Q Is that a yes? Yes?
A I think. Yeah, yeah. I think that's it.
Q Okay. When you spoke with your attorney, did you do so by telephone or in person?
MS. HAGAN: Objection.
THE WITNESS: On the phone.
BY MS. CANFIELD:
Q Okay. Was anyone else present during the meeting?
MS. HAGAN: Objection.
You can't --
She's not going to answer that. It's attorney-client privilege.
MS. CANFIELD: If someone was there, then there is no privilege.
BY MS. CANFIELD:
Q Was anyone in attendance at the time you spoke with your attorney by telephone?
A No.
Q Other than your attorney, did you speak with anyone else about your deposition today?
MS. HAGAN: Objection.
THE WITNESS: Well, I -- I told people it was happening.
//

BY MS. CANFIELD:

Q Who did you tell?

A The people that I asked to help me with my kids.

Q Okay. Were these family members or babysitters?

A Family member and parents of -- of students that go to school with my -- my children.

Q Besides the current action, have you ever been a plaintiff or defendant in any other lawsuit?

A I've not been a defendant and I don't know how to answer the question about being a plaintiff.

Q Have you ever sued anyone before prior to this litigation?

A Yes.

Q Who have you sued?

MS. HAGAN: Objection.

You can answer.

THE WITNESS: New York City Department of Education.

BY MS. CANFIELD:

Q And for what reason did you sue the New York City Department of Education?

A It was on the behalf of my minor child -- my son.

Q Was this in relation to an individualized education plan?

A Yes.

Q And what was the result of that litigation?

A It was granted. Modifying -- I'm sorry. May I correct that? It was modified as requested and granted. The IEP was modified as requested.

Q Okay. And what was the IEP for your son?

MS. HAGAN: Objection. That's not relevant. We're not going to actually -- she's not going to answer that question.

MS. CANFIELD: I can ask it a different way later. That's fine.

BY MS. CANFIELD:

Q Have you ever given a deposition or did you give a deposition in relation to the lawsuit you filed against the Department of Education?

MS. HAGAN: Objection as to form.

You can "ask" if you understand.

THE WITNESS: I was not deposed in the Department of Education matters.

BY MS. CANFIELD:

Q Were you represented by counsel in that matter?

A Yes.

Q And who represented you?

A It was Nicole Saldana [ph] and she had temporarily a partner, but they split up and I stayed with Nicole. I don't remember the partner's name.

Q Do you remember the name of the firm?

MS. HAGAN: Objection.

THE WITNESS: I don't know if it was a firm. They were just two women working together.

BY MS. CANFIELD:

Q Okay. In what year did you sue the DOE?

A It was two years in a row. One year was 2016. And I don't remember if the first year was 2015 or if the -- so I don't remember if it was 2015-2016, or 2016-2017.

Q Okay. And have you ever signed an affidavit or a declaration in connection with the litigation against the DOE?

MS. HAGAN: Objection to form.

THE WITNESS: I think I did sign something. I don't remember what it was, but I remember when the case -- the DOE case was resolving and they were going to modify his IEP, that I did have to sign a lot of papers. And I don't know if it was called a declaration, but I signed a lot of papers.

//

BY MS. CANFIELD:

Q Okay. Any other -- go ahead. I'm sorry.

THE WITNESS: I'm getting, like, texts about my -- something about my kids' stuff and I was wondering if there was any way we could take a break soon? Just a short break?

MS. CANFIELD: Yes. Let's take a five-minute break now.

THE WITNESS: I can -- okay. All right. Thank you.

THE REPORTER: The time is 11:42 a.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 11:49 a.m. We're back on the record.

MS. HAGAN: I'm ready to proceed.

MS. CANFIELD: Thank you.

BY MS. CANFIELD:

Q Dr. Kaye, you're represented here by Special Hagan; is that correct?

A Yes.

Q When did you first contact Special Hagan regarding the issues in this litigation?

MS. HAGAN: Objection. She's not going to answer that.

MS. CANFIELD: That's not privileged when she first contacted you. I'm not going to ask her what she said, I just want to know when she first contacted you.

THE WITNESS: I want to give -- I can give you a timespan, but I can't give you a date.

BY MS. CANFIELD:

Q Okay. Whatever you can provide.

A I would -- I would say September/October 2018.

Q Okay. And what led you to contact Special Hagan regarding the litigation?

MS. HAGAN: Objection.

THE WITNESS: I needed to find a new lawyer.

BY MS. CANFIELD:

Q And had you contacted other attorneys or law firms prior to contacting Special Hagan?

A I was represented by another law firm.

Q Okay. And what was the name of that law firm?

MS. HAGAN: Objection.

THE WITNESS: I think it was Bentley & Levy.

//

BY MS. CANFIELD:

Q Did you have a retainer agreement with that firm?

A Yes.

Q And do you recall when you entered into a retainment agreement with Bentley & Levy?

MS. HAGAN: Can I correct it? It was Bantle & Levy. So it was B-A-N-T-L-E.

MS. CANFIELD: Okay. Thank you.

THE REPORTER: And can you spell Levy?

MS. HAGAN: L-E-V-Y.

THE WITNESS: I don't recall when -- when I entered into the -- when I signed the retainer.

BY MS. CANFIELD:

Q Do you recall when you first contacted them about the issues in this litigation?

A I don't.

Q Do you know if it was in 2018?

A Yes. Yes, it was in 2018.

Q Okay. Was it while you were working at Bellevue?

MS. HAGAN: Objection.

THE WITNESS: Am I supposed to answer?

MS. HAGAN: Yes.

MS. CANFIELD: Yes.

THE WITNESS: Yes.

BY MS. CANFIELD:

Q Okay. So is it your best recollection that it was early in 2018 when you contacted or reached out to Bantle & Levy?

A Yes.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Okay. In 2013 and 2014, when you learned that you were being paid less than Dr. Steven Ciric, did you reach out to any attorneys at that time?

MS. HAGAN: Objection.

THE WITNESS: I don't recall.

BY MS. CANFIELD:

Q Okay. When you learned that you were being paid less than Dr. Steven Ciric, did you file any type of administrative complaint? Meaning did you file a complaint with the EEOC or the State Division of Human Rights or the City Commission of Human Rights?

MS. HAGAN: Objection.

You can answer.

THE WITNESS: No.

MS. CANFIELD: Okay.

THE REPORTER: Was the answer no?

THE WITNESS: The answer is no.

BY MS. CANFIELD:

Q When you learned that you were being paid less than Dr. Steven Ciric, did you file an internal complaint with Bellevue?

MS. HAGAN: Objection.

THE WITNESS: I complained to Dr. Ford and later I complained to Dr. Colley.

BY MS. CANFIELD:

Q Okay. But did you file a complaint with the EEO office of Bellevue?

A No.

Q Do you know if they filed a complaint with the EEO office of Bellevue?

A I don't know.

Q Why did you not contact legal counsel in 2014, 2015 when you learned that you were being paid less than Dr. Steven Ciric?

MS. HAGAN: Objection.

You can answer.

THE WITNESS: My supervisor was Dr. Ford and then Dr. Colley were telling me it was going to be addressed.

BY MS. CANFIELD:

Q Okay. What led to you reaching out to Bantle & Levy in early 2018?

MS. HAGAN: Objection.

You can answer.

THE WITNESS: When CHS decided to take over the court clinics and started -- they started unofficially doing that in early 2018. And I learned that the psychologists working at the court clinics were getting their line -- their lines changed from psychology two to psychology three so that they would get a raise.

And so I was also aware that CHS was set up to be part of HHC, but also as separate from HHC, and that different rules applied to CHS. And so I thought, well, maybe at HHC proper, you have to die in your line and they couldn't change my line from attending three to physician specialist, but clearly, that's not true at CHS.

So I then decided that I was going to pursue that change in my corporate title to bring my pay -- make my pay comparable to Dr. Ciric and other physician specialists at the court clinics.

BY MS. CANFIELD:

Q Okay. So I'm not quite clear. The question was what led you to reach out to attorneys -- Bantle & Levy -- in early 2018. And the response was because you learned these three things?

A I learned that the lines could in fact be changed, which I was told they couldn't. I asked -- I reached out to Dr. Yang and I asked for the change in title, and I explained the whole situation to her. She passed me off. It was in May, even though I was -- I was slated to switchover, you know, in a month or so -- a month and a half. And they had already taken over the Brooklyn and Queens clinic and the psychologist lines were changed to increase their salaries.

I reached out to Dr. Yang early on when I found out about this and she kind of passed -- passed me off to Bill Hicks at Bellevue. And it was like the runaround and they said they would get back to me and they never did. So that's when I decided to file an EEOC complaint.

THE REPORTER: Did you say Bill Hicks?

THE WITNESS: Yes.

THE REPORTER: Thank you.

BY MS. CANFIELD:

Q Okay. So let's back up a little bit. You said that you learned that there were some psychologists whose lines were -- their levels were being increased from a level two to a level three; is that what your testimony was?

A My testimony is that there's corporate titles -- I believe they're called corporate titles, which are titles that are linked to those pay ranges I talked about before.

And the pay range for a psychologist two is less than the pay range for a psychologist three. So the psychologists that were being brought on board from the court clinics that were all -- all four court clinics were being merged under CHS. The psychologists who were working at the court clinics were getting their titles changed from a psychology two to psychology three so they could get paid more. So they were -- so they were getting an increase in their salary with this bump-up in their corporate title from psychology two to psychology three.

Q Okay. So their lines weren't being changed. They were just moving up a level in their line? Similar to how you were -- you probably held a position attending physician two before you held the position attending physician three; is that correct?

A No.

MS. HAGAN: Objection as to form.

THE WITNESS: That's not correct because a line is a line. So if you're in a line -- a psychology two line, that's your line. If you're in a

psychology three line, that's your line. If you're an attending three or attending -- or a physician specialist, that's your line. And I was told none of those lines could be changed.

So not --

BY MS. CANFIELD:

Q Okay. Who told you that a psychology two is a line different from psychology three, rather than just an internal bump-up within that line or within that scale? Who told you that?

A It's in the Collective Bargaining Agreement. If you look at the -- the designated city lines, they're discrete and -- and separate. They're not -- it's not a part of the same -- the definition of the work isn't exactly the same.

I think -- I know for an attending three line, I can speak to -- that is -- includes some administrative responsibilities and that was my line.

I don't know the details about the definition of these lines, but the lines are discrete and separate. It's not like the -- the bumping up in -- in the range of a specific line with your pay is different than actually changing the corporate title.

Q Okay.

A And if the title changes from -- from

psychology two to psychology three, or -- or attending three to physician specialist, it's a -- it's a change in the corporate title. So I -- I was told that you cannot have a change in your line, a change in your corporate title at HHC. And that's why I couldn't have that equal pay to my male colleague. That's why I couldn't be a physician specialist. But then I learned otherwise that those same rules, if they are in fact true -- and I don't know, but that's what I was told and I believed at the time -- that I -- I just accepted that at the time, but then when I learned that at CHS that that rule doesn't apply, I wanted to correct this longstanding pay discrepancy. And I sought to -- to do that.

Q Okay. I'm going to stop you there. Who are the psychologists that you saw getting their line changed?

MS. HAGAN: Wait, wait, wait. She needs to finish her -- stop, stop.

THE REPORTER: I'm sorry. Please speak one at a time.

MS. HAGAN: Wait a second.

Dr. Kaye, did you finish your answer from the previous question?

THE WITNESS: Well, I -- I mean, I was

just talking about, you know, whatever I was -- I was just --

MS. HAGAN: Ms. Canfield, I'm going to just ask that you allow Dr. Kaye to finish her answers before you start with the next question.

MS. CANFIELD: I will do my best. I'm just trying to move the deposition along and just trying to get answers to the questions.

I apologize if I interrupted you, Dr. Kaye.

THE WITNESS: I'm sorry. I'll try to be more succinct. I'm -- I --

MS. CANFIELD: Thank you. Thank you.

BY MS. CANFIELD:

Q What are the names of the psychologists that you said moved from psych two to psych three -- psychology three?

A I don't know their exact names for sure, but I was told that all the psychologists in Queens and Brooklyn, or many of them, got a bump-up in their corporate title from psychology two to psychology three so they could get a raise.

Q Okay. Who told you that?

A Dr. Barry Winkler.

Q Dr. Winkler said that? Okay. Did Dr.

Winkler say that he was given a raise?

A He did not say. He -- well, he -- he was -- he took a different job.

Q Okay. And what job did he take?

A And yes, I -- I'm sorry, Ms. Canfield. And yes, he did -- he did get a raise with his -- his new position.

Q Okay. And what was his new position that he took?

A He left the Bronx Court Clinic in April 2018 to become the director of the Brooklyn Court Clinic.

Q Okay. And do you know at the time when he was -- prior to him becoming the director of the Brooklyn Court Clinic, do you know what title he held?

A Well, his -- I think -- and I believe it's called "functional title" if I'm not mistaken, which just means it's not linked to the corporate pay title. But he was deputy director of the Bronx Court Clinic. That was what he was, but that was -- yeah. That was --

Q What was his civil service title?

A He was not in civil service. He switched out of civil service.

Q Okay. And when did he do that?

MS. HAGAN: Objection.

If you know the answer.

THE WITNESS: I would say it was in the first three or so years that he was working at the Bronx Court Clinic.

BY MS. CANFIELD:

Q Okay.

A And he started working there in 2008, so maybe 2011 around, plus or minus.

Q Do you know if Dr. Winkler, when he was working at the Bronx Court Clinic, was a member of the union?

MS. HAGAN: Objection.

THE WITNESS: When -- when he was in the civil service title, he was. I -- yes.

BY MS. CANFIELD:

Q Okay. So is it your belief that prior to -- immediately prior to going to Brooklyn, he was not in -- represented by a Collective Bargaining Unit when he was working in Bronx?

MS. HAGAN: Objection.

THE WITNESS: That's my understanding.

BY MS. CANFIELD:

Q Okay. And the psychologist that you were told received the change from psychologist two to psychologist three, do you know if they were members

of a Collective Bargaining Unit?

A Yes.

Q Okay. And how do you know that?

A Because the psychologists at the court clinics are -- they were all part of the Collective Bargaining Unit.

Q Okay. Do you know what Collective Bargaining Unit they were a part of?

A Is it DC 37?

MS. HAGAN: Objection.

Don't guess if you don't know.

THE WITNESS: Whatever the largest Collective Bargaining Unit is in -- in -- for healthcare workers. I think it's called DC 37.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Okay.

A I'm not a hundred percent sure about that --

Q Okay.

A -- but I believe it's DC 37.

Q And during the time that you were employed at Bellevue and at CHS, were you a member of a Collective Bargaining Unit?

A Yes.

Q And what was the name?

A Doctors Council.

Q Okay. And so is it your testimony that Doctors Council does not represent psychologists?

MS. HAGAN: Objection.

If you know the answer to that question.

THE WITNESS: Correct. They do not.

BY MS. CANFIELD:

Q Okay. Now who did you speak to at CHS about getting your line changed? You said you spoke to Dr. Yang?

A And Dr. Ford, and Dr. --

THE REPORTER: And who was the third name?

THE WITNESS: Dr. Jain. That's J-A-I-N.

BY MS. CANFIELD:

Q And what did you say to Dr. Yang?

A I wrote her -- well, I first talked to Dr. Ford and Dr. Jain in April because, I mean, CHS had unofficially taken over the court clinics by then. I mean, they were involved way back since 2015, but they then became very actively involved in 2018.

And we were having meetings downtown with CHS and there was a lot of -- they had pretty much

taken over the management of the clinics by -- by April.

Q I'm sorry to interrupt, Dr. Kaye. My question was is what did you say to Dr. Yang?

A So we --

MS. HAGAN: Can you please let her finish her answer?

THE WITNESS: I'm sorry, Ms. Canfield. I'm going to try to be tight because I -- I did speak to Dr. Jain and Dr. Ford at a CHS court clinic-related matter down on Water Street in April of 2018 about the pay parity issues. I was ushered off to speak to Mr. Wangel and Jessica Laboy about -- about that and my -- and the conditions of my work should I accept -- formally accept the transfer that was scheduled for July.

And so I -- I verbally complained to them and then I asked Dr. Ford -- especially given my history with her, knowing that she never did anything about it at Bellevue, I didn't -- and then she was trying to push me to -- saying the only way I could have a pay raise is if I left the union and I didn't think that was reasonable. You know, Steve Ciric was in the union as a physician specialist, so I didn't feel like, you know -- if my male comparator who was

getting paid more than me was allowed to me in the union, I didn't feel I should have to be pushed out of the union just to get equal pay and -- and -- and then lose everything -- you know, give something up for that.

So she sent me an email I think that said -- was vague and cryptic. And I asked her about, you know, giving up the union benefits if I wanted to be considered for equal pay.

And so I asked her if I could reach out to Dr. Yang. And so she said yes. And I wrote Dr. Yang a long, detailed description of my -- my pay parity issues at HHC. And that was in -- I don't know. Probably right after that meeting. Maybe beginning of May or something, around there. End of April, beginning of May of 2018. And she passed me off -- bumped me back to Bellevue -- to Bill Hicks at Bellevue and they were kind of giving me a lot of lip service, but they never followed up with them.

They said they would follow-up with me, but neither one of them ever followed up with me.

BY MS. CANFIELD:

Q Okay. Let me ask you a question. When you spoke to Dr. Ford and she said that you would have to give up your union, explain to me what she explained

to you.

A Well, we didn't speak. She just --

MS. HAGAN: Objection as to form.

You can answer.

THE WITNESS: We didn't -- she -- Dr. Ford kept me at an arm's length. I only met -- once Bellevue -- I only met face to face with Dr. Ford once during my employment at -- well, twice actually. I'm going to correct that.

She only -- she kept me at an arm's length. I met with her once at a meeting that I insisted upon having. She tried to get out of it, but I insisted upon having a meeting. November 30th was the meeting of 2018. And so she didn't call or meet with me, so she would just, you know -- she would send these kind of -- these emails. And the email was, "Well, yeah." I don't remember exactly what the email said, but it basically was, "Yeah, well, I could support, you know, pay parity and things being fair, but I you want pay parity, you'd have to give up your union and other benefits."

And I was like, this is -- you know, this is ridiculous. This isn't -- you know, pay parity doesn't mean that you have to be punished for being -- or lose something for getting paid the same

as your male colleagues. So I was -- I rejected that.

BY MS. CANFIELD:

Q Let me ask you, so --

MS. HAGAN: You need to let her finish her answer.

Are you finished with your answer, Dr. Kaye?

THE WITNESS: I just rejected the concept that correcting my pay parity with Steve Ciric, who was in the -- who was a union member.

BY MS. CANFIELD:

Q Did Steve Ciric come over with the CHS oversight of the court clinics?

A No. Steve Ciric -- I'm trying to think. I believe Steve Ciric resigned -- I'm trying to remember. I think it was -- it was before the official takeover. I -- I think it was --

MS. HAGAN: If you're not sure, just say so.

THE WITNESS: I think it was around the end of 2017, beginning of 2018 that Dr. Ciric resigned.

BY MS. CANFIELD:

Q Okay. Do you know why he resigned?

MS. HAGAN: Objection.

THE WITNESS: He moved to Buffalo to be near his wife's family.

BY MS. CANFIELD:

Q Okay. And do you know who stepped in his position to oversee the Manhattan Court Clinic?

A There was no one formally in the position. Dr. Jeremy Colley who was, on paper you know anyway, still in charge of the Bronx and Manhattan Court Clinics until July 1, 2018. He was acting as the interim director of the Manhattan Court Clinic in his capacity as the director of the Division of Forensic Psychology at Bellevue.

Q Okay. Who eventually took over Dr. Ciric's position as the head of the Manhattan Court Clinic?

A CHS hired a new director, Daniel S. Mundy, M.D. M-U-N-D-Y is the spelling I believe.

Q And do you -- was Dr. Mundy a psychiatrist or a psychologist?

A Psychiatrist.

Q Psychiatrist? Okay. And do you know if Dr. Mundy was a member of a Collective Bargaining Unit when he was hired?

A He was part-time psychiatrist evaluator at the Manhattan Court Clinic under Bellevue. And at that time, he was a member of the Collective

Bargaining Unit.

I know that he was made -- he was -- there were numerous stipulations that were given to him about taking -- being offered and taking the job as the director, and one of those was that he would have to leave the Collective Bargaining Unit.

Q Okay. And how do you know this?

A He told me.

Q Okay. One of the stipulations was leaving the Collective Bargaining Unit?

A Right.

Q Okay. Did he indicate that was something he did not want to do?

A He -- he had concerns about it. He wasn't -- it was an uneasy decision for him. He talked to me a lot about it.

Q What did he say?

A He didn't want to -- he didn't want to have to leave -- he didn't want to have to give up being a member of the union. He was concerned.

Q What were his concerns?

MS. HAGAN: Objection.

THE WITNESS: Loss of benefits. Loss of protection.

//

BY MS. CANFIELD:

Q But he eventually agreed to leave the Collective Bargaining Unit and become what's called a managerial employee; is that your understanding?

MS. HAGAN: Objection.

THE WITNESS: I don't know what it's called, but I know that he agreed to take the job without being a member of the union.

BY MS. CANFIELD:

Q Okay. And you as head of the Bronx Court Clinic, you were able to take the job without giving up your union benefits; is that correct?

MS. HAGAN: Objection.

THE WITNESS: Well, what happened was that when -- when CHS announced the takeover in early 2018, the unions got involved. And my union, Doctors Council, had multiple meetings with CHS leadership, including Jonathan Wangel, Elizabeth Ford, Patsy Yang. And basically said that the doctors from Bellevue -- and I believe this was done in conjunction with I think it's DC 37 -- that the -- whether they were M.D. physician doctors or whether they were PhD, PsyD, psychology doctors, they were going to be rolled over as-is. Or I know that Dr. Yang decided to give the psychologists a raise, but that their working

conditions weren't going to change. Everything would stay exactly the same. And that was reiterated again and again in this agreement and there were certain other agreements related to a pending retention bonus that was going to be given to all the physician M.D. evaluators, which would have been me and I think three or four part-time male psychiatry physician examiners at the Manhattan Court Clinic.

So there was all this detail worked out about that, but specifically was that everyone that was in the Collective Bargaining Unit that was rolling over in their same positions would stay in the Collective Bargaining Unit. So that included me.

BY MS. CANFIELD:

Q Okay. So you were able to stay in the Collective Bargaining Unit?

A Correct.

Q Okay. And what are the benefits that you had in the Collective Bargaining Unit as compared to someone who's a managerial employee?

MS. HAGAN: Objection.

To the extent that you know the answer to that question.

BY MS. CANFIELD:

Q I would think that you would know because

you did not want to give them up. So what were those benefits?

A Well, the benefits that -- I think the benefit is that, you know, I think in general, employees, you know, in unions have a -- have a voice that is speaking for the collective. And whether that be negotiating cost of living pay raises or, you know, trying to buffer or mitigate any kind of managerial abuse or the ability to have some checks and balances as far as any kind of changes in -- or disciplinary actions or any kind of bad behavior on the part of management, if you have a union, you're possibly in a better situation than being in a -- in a job that is at-will and you can be fired without cause. That type of thing.

So given the hostility that was clearly directed to me, before even the official takeover of CHS -- of the court clinics -- I was -- I felt that the offer to ostensibly get a pay raise if I gave up my union was a ploy to fire me. And I wasn't going to fall for that.

Q Why did you -- let me ask you a question. Why did you think that the request to -- if this is a way that we could raise your pay, why did you see that as really something disguised as an attempt to fire

you?

MS. HAGAN: Objection as to form of the question.

You can answer.

THE WITNESS: Dr. Ford had shown, you know, to be -- herself to be unsupportive and less than honest with me in the past. And there was an incident where, you know, I had complained or I had been involved in numerous -- with numerous clinicians -- physicians and psychologists -- and Dr. Winkler is a psychologist and an attorney. Dr. Ciric, Dr. Colley.

There was this issue about using redacted records versus unredacted records in conducting a forensic exam. And it really wasn't my issues. It was, you know, a professional discussion amongst the senior evaluators and --

BY MS. CANFIELD:

Q Right.

A -- that just -- the people I just named. And, you know, the judges -- some very senior judges in the Bronx -- Judge John S. Moore, he's a -- he was a bureau chief under Robert Morgenthau. Then he became a -- a Criminal Court judge in the Bronx, and then a Supreme Court judge. And he was an institution

-- like, he -- he ran the sex offender and the youth part of the courts in the Bronx. And he then transitioned into being involved in Mental Health Court.

I mean, this was a seasoned, knowledgeable, experienced judge in the matters of mental health and criminal law, and the intersection between those two bodies of knowledge and professional activity. And he -- you know, he had issued -- and it wasn't just him. It was Judge Lieb -- Judith Lieb and -- and --

Q Dr. Kaye?

A Yeah.

Q Dr. Kaye, I'm just trying to -- I'm trying to -- we need to stay on track or we're never going to get --

A I'm sorry.

Q -- we're never going to finish.

A So --

MS. CANFIELD: Can you read the question back again just --

MS. HAGAN: No, no. She needs to finish her answer.

Did you finish your train of thought, Dr. Kaye?

MS. CANFIELD: We're going to have to

come back if --

THE WITNESS: I'm sorry.

MS. HAGAN: What is your answer?

You can't cut her off. You cannot cut her off, Ms. Canfield.

THE WITNESS: I'm sorry. What is the -- if you read back the question, I'm sorry, Ms. Canfield. I'm going to be succinct, but I feel like there's a lot of -- there was --

Please read back the question if -- if --

THE REPORTER: Just a second.

(The reporter played the record as requested.)

THE WITNESS: Thank you.

So the issue of using redacted records or not using redacted records was a legitimate professional issue amongst informed professionals -- legal professionals, forensic evaluators who were professionals in their own rights. And it wasn't a personal issue of mine, Dr. Ford --

THE REPORTER: It wasn't a what, ma'am?

THE WITNESS: It wasn't a personal -- personal issue of mine. I mean, certainly I wanted to do quality work and -- and provide neutral, objective,

thorough exams and -- and -- and make diagnoses with -- with professional responsibility, but the courts were ordering -- you know, it -- it --

The courts were ordering unredacted records. And they -- this was in conjunction -- the Chief Administrative Judge Torres ended up getting involved because CHS was defying these court orders for unredacted medical records. They were just snubbing the Court and they would just provide redacted medical records and just make the -- you know, decide that they would have -- that they didn't have to answer to the Court. And it was --

MS. CANFIELD: Dr. Kaye?

MS. HAGAN: Oh, you have to let her finish.

MS. CANFIELD: No, no.

BY MS. CANFIELD:

Q Dr. Kaye, why -- how did you tie the issue of your challenge to the redacted records -- how is it that that led you to believe that you were at risk of losing your job or that's the motivation behind wanting to make you a managerial employee?

MS. HAGAN: First and foremost --

MS. CANFIELD: That's the question.

MS. HAGAN: No. You have to let her

finish the answer that she was in the -- of giving.

THE WITNESS: You know, so it was that issue and it was the issue of just gratuitously having all criminal -- it was a constitutional issue for the rights of defendants. And it was -- and, you know, Patsy Yang and a bunch of very high-ranking people, including Dr. Ford, basically stormed my office in January 2018 and were making all of these -- proposing all of these changes that had constitution -- in my opinion as a non-lawyer. I mean, this was just my opinion as a non-lawyer had constitutional issues regarding the rights of criminal defendants and I was concerned.

I mentioned it at the meeting that there was a -- you know, my concerns about using -- gratuitously using -- having criminal defendants signing HIPAA releases pro forma at arraignment was problematic on many levels. And at that point, I was threatened. I was openly threatened, and there were many people in the room.

Patsy Yang said to me, "If you don't like the way we do things, there's the door." And she gestured to the door. And she said, "We got all the money. We can hire whoever we want." Just because I was trying to voice my concerns about the

constitutional rights of criminal defendants.

And then similarly, with the redacted record issue, Ford basically felt that I was -- that was problematic that I had a concern about it, but she wasn't concerned that Barry Winkler or Steve Ciric or Jeremy Colley had a concern about it. Just me.

BY MS. CANFIELD:

Q How do you know that?

A Because it was discussed. It -- we were interacting with her. She worked for CHS at that point and we were -- we were interacting with CHS about these medical records via emails, via phone calls.

Q How do you know -- how do you know -- because you said in the deposition of Dr. Winkler, Dr. Winkler also testified that he objected to the use of redacted records.

How do you know that you are the target when you say that everyone had the same objections?

A Because --

Q What leads you to the conclusion that you alone were singled out?

A Because after this meeting when it came up, it was me who was getting retaliated against.

Q Okay. And how were you retaliated against?

A Dr. Winkler got a promotion and I got -- I started getting excluded and marginalized. I --

Q Okay. Hold on. Hold on. Let's start with -- Dr. Winkler got a promotion. Okay.

You told me that Dr. Winkler, he was hired into the Brooklyn medical director, or Brooklyn director position, right?

A He was hired as --

Q Is that the promotion you're talking about?

MS. HAGAN: Objection. You got to let her answer the question. You're --

MS. CANFIELD: I'm just trying to move things along.

MS. HAGAN: Well, she has to answer the question. You're asking these questions, so let her answer the question, please.

THE WITNESS: Dr. Winkler was promoted from deputy director at the Bronx Court Clinic to director of the Brooklyn Court Clinic. And he got -- that was a promotion.

BY MS. CANFIELD:

Q Okay. That is a promotion. Okay. So because he got a promotion, you believe that -- what?

A Well, I'm just saying I was treated very differently because then after that meeting when they

stormed my office and I was threatened, I -- there was this -- CHS under Dr. Ford in particular had put together this so called 730 workgroup where they wanted to talk about ways to improve the 730 evaluation process and, you know, what the problems are, how they could be addressed. And I was very into that. I really wanted to be part of the -- the modern -- the court clinics and making things better. And I -- I was all in for that. And --

Q And you were invited to participate in that workgroup, weren't you not?

A I was --

MS. HAGAN: Objection.

THE WITNESS: I was not. I was not. I specifically -- after that meeting when they -- it was Bill Hicks, Sarah Gillian [ph], Beth Ward [ph], Jeremy Colley, LaKeisha Prasad [ph] -- who was our administrator up there -- Dr. Yang, Dr. Winkler. I -- I don't remember who else was in that meeting. Bill Hicks. And they were all in that meeting when they stormed our office. And after that meeting, people were -- we kind of left my office. We were waiting for Department of Corrections -- DOC -- to come up and open our bullpen because they wanted to see where we did these evaluations. Where we did these forensic

evaluations.

And I asked Dr. Ford -- she was leaning against the wall and I said, "I really want to be part of the 730 workgroup." And so she just like -- she looks down at the ground -- she shuffles her feet, looks down at the ground, turns her back on me and starts trying to get someone else walking passed her in the hall to talk to her. Just like --

BY MS. CANFIELD:

Q Weren't you invited to the workgroup? Didn't Mr. Bloom testify that you were in fact invited to the workgroup, but that your email address was wrong and that --

A No, that's --

MS. HAGAN: Objection. Assumes that she knows what Mr. Winkler said. And --

MS. CANFIELD: I'm talking about Mr. Bloom, and she attended Mr. Bloom's deposition.

MS. HAGAN: Objection.

Go ahead.

THE WITNESS: May I talk?

MS. HAGAN: Yes.

THE WITNESS: So those are totally separate 730 workgroups. Mr. Bloom was talking about the MOCJ workgroups, which were run and managed by

City Hall, which was completely different than this internal CHS 730 taskforce brainstorming group. I mean, I don't know if it was -- workgroup my -- you know, it was this 730, you know, improvement, strategic taskforce. That's not the official name, but it was under Dr. Ford and it was only relevant and focused on CHS. And the only people invited were people that either worked for CHS or were going to work for CHS. And Dr. Winkler was invited and attended, and I was excluded.

BY MS. CANFIELD:

Q Okay. So it's your testimony that you never received an invitation either from Dr. Ford or Dr. Colley to join a 730 workgroup?

MS. HAGAN: Objection. She didn't say she didn't receive an invitation from Dr. Colley or Dr. Ford. She said she didn't receive an invitation from Dr. Ford's strategic taskforce.

THE WITNESS: I -- I -- I don't know if the name of it was strategic taskforce. She had this -- this internal CHS workgroup which was separate and distinct from the MOCJ ongoing workgroup that had been going on and on -- on and on, off and on for years -- years. But that was a separate -- that was a separate agenda, separate issues and it was initiated by a

separate agency.

I am testifying that I specifically asked to join that group and I was -- I was shunned. I mean, she literally refused to answer me and turned her back on me.

So, you know, and it -- and it was -- you know, and I had -- had the history where I knew she had lied to me about trying to do something about my pay disparity when she was -- when I reported directly to her at Bellevue. I knew how she was. I knew she was -- she had queen bee tendencies and I knew she was, you know, not including me in this workgroup even though I was the most senior and experienced forensic evaluator in New York City, and I wanted to participate.

BY MS. CANFIELD:

Q All right. Let me show you this document.

MS. CANFIELD: And, Ms. Hagan, I am going to email it to you right now.

MS. HAGAN: I'm going to need an opportunity to look at the document.

THE REPORTER: Please repeat what you said, Ms. Hagan.

MS. HAGAN: I said I'm going to need an opportunity to look at the document before Dr. Kaye

has an opportunity to respond.

Thank you. I'm sorry.

MS. CANFIELD: That's fine. Whatever you need to do.

MS. HAGAN: Mm-hmm.

THE REPORTER: And if you could please email it to me as well.

MS. CANFIELD: I will.

MS. HAGAN: I guess we'll need a break so we can read it.

MS. CANFIELD: No, no. We don't need a break.

MS. HAGAN: Mm-hmm. Because I still haven't had it -- I still don't have it.

MS. CANFIELD: You will have it. You don't need a break though.

MS. HAGAN: Mm-hmm.

BY MS. CANFIELD:

Q All right, Dr. Kaye. I'm going to show you this email.

MS. HAGAN: Wait a second. I'd like to look at it first.

MS. CANFIELD: We can look at it at the same time. That's what we did when I was -- when I was defending depositions.

MS. HAGAN: -- exact document that you just emailed me --

THE REPORTER: I'm sorry.

MS. CANFIELD: This is the exact --

THE REPORTER: Repeat what you said, Ms. Hagan. And try not to talk at the same time. I'm sorry.

MS. HAGAN: I'm trying to -- first off, I'm not even sure how this happened. I'm trying to look at the email that Ms. Canfield sent. Then now it seems like my entire screen has been taken over by this Zoom thing. I don't know.

MS. CANFIELD: It's the same document and I was able to navigate between my hardcopies that were sent to me and the Zoom, so you should be able to do that, too.

MS. HAGAN: I'm looking --

MS. CANFIELD: Maybe just minimize the Zoom?

MS. HAGAN: I'm trying to do that.

MS. CANFIELD: All right.

BY MS. CANFIELD:

Q Dr. Kaye, if you could just take a look at this. This document identified by the Bates stamp numbers NYC_000053.

MS. HAGAN: And what exhibit is this, Ms. Canfield? Because you sent an Exhibit A, which was the Amended Complaint. Is this Exhibit A or Exhibit B?

MS. CANFIELD: This will be Exhibit A.

(Exhibit A was marked for identification.)

MS. HAGAN: And Exhibit A, for purposes of the record, is NYC 53? And was this produced when?

MS. CANFIELD: This was produced a year ago.

For purposes of the record, beginning at the very beginning of the thread, it's an email from Elizabeth Ford to Jeremy Colley asking evaluators from the Bronx clinic and one to two psychiatrists from the Manhattan clinic who will be able to -- able willing to participate in a workgroup to think about a standardized clinical approach to the exams. That's dated January 18, 2018.

BY MS. CANFIELD:

Q Do you see that, Dr. Kaye?

A I do.

Q Okay. And do you see where Dr. Colley forwards this email to Dr. Harper, Dr. Solanki, Dr. Mundy, Dr. Weiss, yourself and Dr. Winkler?

A Yes.

Q It says, "See below - let me know if you're interested"?

A Yes.

Q Dr. Mundy responds and says, "Certainly interested. Please keep me in the loop." Then you also respond and say, "Let me know dates and I'll try to work it in."

A Mm-hmm.

Q Do you recall receiving and sending this email?

A I don't recall.

Q Okay. So it does appear that you were in fact invited to participate in the workgroup.

MS. HAGAN: And for purposes of the record, I'd like to note that there are question marks before the text in at least two of the emails. The email from Dr. Mundy, there's a question mark that says "?Certainly interested, please keep me in the loop." And then from Dr. Kaye's alleged response, there's a question mark, "?Let me know dates, and I'll try to work it in." Just for purposes of the record.

MS. CANFIELD: That's fine. I can see that those question marks are there. I don't know why they are, but they appear in a number of emails. It's

the way that the emails were collected. And if there are quotations there, that's -- I don't know.

MS. HAGAN: Mm-hmm.

MS. CANFIELD: Okay.

BY MS. CANFIELD:

Q Okay. So the fact that you were not -- you didn't believe that you were invited to the workgroup caused you to believe that you were on the chopping block, I guess so to speak, when you were offered a managerial title. But as I just showed you, you were in fact invited to the workgroup.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q What other reasons do you believe that you were --

MS. HAGAN: Objection.

MS. CANFIELD: You can object. I can still ask her my question.

MS. HAGAN: And then you're inserting facts that are not -- that she didn't testify to in your question.

MS. CANFIELD: She just testified that she saw that email. The document speaks for itself.

MS. HAGAN: She said she wasn't sure if she saw it.

MS. CANFIELD: Okay. You can make your argument in opposition to our motion for summary judgment.

MS. HAGAN: Mm-hmm.

BY MS. CANFIELD:

Q What other reasons --

A Well --

Q -- do you believe that you were being targeted for termination by the fact that you were being offered a managerial title?

A Okay.

MS. HAGAN: Objection.

THE WITNESS: So Dr. Ford did not send me that email. Dr. Colley sent me that email.

BY MS. CANFIELD:

Q As well as the other --

A Yes.

Q -- psychologists and psychiatrists, correct?

A Dr. Colley forwarded that email that was sent to him. So I -- that email came from not Dr. Ford. Dr. -- Dr. Colley. And I then shortly thereafter specifically asked her when they came up to the Bronx to inform us they were taking us over. And I asked her specifically to be part of the group and she shunned me. And that was on the heels of Dr. Yang

threatening to fire me. So --

Q Okay.

A -- that was -- I'm sorry.

Q Did you ever follow-up in writing to Dr. Ford about participating -- or Dr. Colley about participating in the 730 workgroup --

A I don't --

Q -- after receiving this email?

A I -- I don't recall. I don't even -- I mean, I wrote what is said there, but I don't recall every email I sent in 2018.

If you could refresh my memory, I would be able to know that.

Q Okay. Okay. With respect to the pay equity issue, is it your belief that after the transition to CHS, that you remained to be paid less than your male comparators?

A My male comparator was Steve Ciric. That's who was my male comparator when I discovered the pay discrepancy. That's who was the male comparator when I asked for it to be corrected, both informally or -- you know, internally I should say, at Bellevue when I asked Dr. Ford and -- and -- and Dr. Colley to address it. And then again, when I went to Dr. Yang and it was sent to Dr. Hicks. And then when I filed an EEOC

complaint, it -- it was about my lack of pay parity with Steve Ciric.

Now when my salary is assessed, it's -- it can -- you can -- it can be misrepresented unless one considers that because of my longevity pay, because I was hired by HHC in 1999 and I had a significant amount of longevity pay, that could be construed as part of my base salary, which it is not. And I was talking about a pay discrepancy and title discrepancy relative to my base salary, not having my longevity -- my earned longevity pay because I had been a longstanding public servant to be folded into my base salary and then have that number being used to compare me to other people. That wasn't fair because that was not -- that was not the issue.

The issue was my base salary was lower and my title was lower. And if I did happen to be at Health and Hospitals for 20 years and I had longevity pay, I don't feel like the longevity pay, which was earned separate from -- it would have been the same if I was a physician specialist or anything else. My longevity pay should not have been folded in to be considered as part of my base salary, to then deny me equal pay or to say that I was already getting equal pay, because with my longevity pay, that brought me up

to a more comparable pay equity.

Q Okay. So let's go through this. You already testified that Dr. Mundy was hired to oversee the Manhattan Court Clinics, correct?

A Correct.

Q Okay. And we already established that Dr. Winkler -- are you taking notes, Dr. Kaye?

A No, I'm not.

Q That Dr. Winkler was hired to oversee the Brooklyn Court Clinic, correct?

A Correct.

Q You were overseeing the Bronx Court Clinic, correct?

A Correct.

Q Okay. And who was overseeing the Queens Court Clinic?

THE WITNESS: Ow. Sorry. That's what I'm doing. I'm dealing with this cat.

A It was Elizabeth Owen.

Q Okay. Okay. And then Dr. Winkler also oversaw the Staten Island court clinics; is that correct?

A Staten Island Court Clinic was under -- well, there was no -- no, that's not correct. No. There was no -- there is no Staten Island Court

Clinic.

Q Okay. Okay. Now do you believe that -- and Dr. Mundy is a psychologist or a psychiatrist?

A Psychiatrist.

Q And do you believe that he was compensated more than you at the time that you were head of the Bronx Court Clinic?

A I believe that -- yes, I believe that my longevity pay and my retention bonus were included in my base salary to compare me to Dr. Mundy to make it look like we had comparable salaries when we did not.

Q Okay. And when you were offered a managerial position, were you told how much you would be compensated?

A No details were offered. It was a nebulous email I got from Dr. Ford.

Q Okay.

A Basically telling me she would consider -- she would consider, you know, looking into pay parity if I got out of the union -- union and gave up benefits.

Q Okay. Did anyone else suggest that you take on a managerial title in relation to the pay parity issue of which you were complaining?

A No. That was the only communication I had

at all about the situation.

Q Okay.

A -- talked to me about it.

Q Okay.

THE REPORTER: I'm sorry. Repeat what you said after "situation."

THE WITNESS: No one else talked to me about it.

THE REPORTER: Thank you.

BY MS. CANFIELD:

Q When you spoke or emailed Dr. Yang, did you raise the issue of becoming a managerial employee with her?

THE WITNESS: Sorry, I have to -- this cat is chewing a wire. Sorry.

MS. HAGAN: I'm sorry.

THE WITNESS: I apologize.

MS. CANFIELD: Do you mind reading back the question, please?

THE REPORTER: Just a moment.

(The reporter read the record as requested.)

THE WITNESS: No.

BY MS. CANFIELD:

Q Why not?

MS. HAGAN: Objection.

THE WITNESS: For the reasons I've discussed previously.

BY MS. CANFIELD:

Q That you were interested in becoming a managerial employee?

A No, that I was not. I wanted to be comparable to my male comparator, which was Steve Ciric, and I wanted to continue to be in the Collective Bargaining Agreement.

Q Okay. If a managerial position had been offered to you, would you have taken it?

MS. HAGAN: Objection. It's a hypothetical. It wasn't offered to her.

THE REPORTER: Please repeat what you said, Ms. Hagan.

MS. HAGAN: I said objection. It's a hypothetical. It was not offered to her.

MS. CANFIELD: You're testifying.

THE WITNESS: I was not talked to about any negotiations. This issue was never followed up with anybody other than that one vague email from Dr. Ford.

I can't say what I would have agreed to or not agreed to, but Dr. Yang didn't speak to me.

Mr. Hicks didn't speak to me. I got that nebulous email from Dr. Ford that said there would have to be a quid pro quo and I would have to give up something to get pay parity -- i.e. give up my union in order to have comparable pay. And no --

BY MS. CANFIELD:

Q So Dr. Yang did follow-up with you and said that -- did have a conversation with you about becoming a managerial employee?

A No.

MS. HAGAN: Objection. Testifying. That's not what she said.

THE WITNESS: That's false. Dr. Yang never spoke to me about it. Never. No one ever spoke to me in person or on the phone about it, ever.

And Dr. Yang told me that she was going to forward my concerns to Bill Hicks at -- she didn't tell me because I never spoke to her, but she sent me an email that said she was going to forward my concerns to Bill Hicks at Bellevue and that he would get back to me. And he did send a -- an email to me that he would look into it and get back to me and never did.

And that is why --

MS. CANFIELD: Okay.

MS. HAGAN: Would you let her finish?

THE WITNESS: That is why I chose to go to the EEOC because I could tell very clearly that it wasn't being taken seriously and I was getting the runaround.

BY MS. CANFIELD:

Q Okay. But the complaint about Steve Ciric, there was something about pay in the past. That was backpay issue. I'm talking about going forward from the time that you transitioned over to CHS. When Dr. Mundy, Dr. Winkler, Dr. Kaye and Dr. Owen were ahead of the court clinics.

MS. HAGAN: Objection as to the form. And it's --

MS. CANFIELD: I haven't even finished my question.

MS. HAGAN: Oh.

BY MS. CANFIELD:

Q I'm talking about the time after the transition over to CHS.

MS. HAGAN: If you understand the question.

THE WITNESS: I need -- I need you to re-ask the question, please.

//

BY MS. CANFIELD:

Q The complaint that you made to Dr. Yang, that concerned your pay as compared to Steve Ciric, correct?

A It concerned a pay parity issue that I had at HHC that had never been satisfactory -- it had never been resolved in a satisfactory manner.

Q Right. And you testified earlier that the comparator was Dr. Ciric; is that correct?

A Yes.

Q Okay. But you also testified that Dr. Ciric resigned. So he was no longer being paid more than you going forward from the date that he resigned; isn't that correct?

MS. HAGAN: Objection.

THE WITNESS: My complaint was that throughout my 20 years at HHC, I was paid less than my male comparator, that -- that affects my pension. That affected my day-to-day life as far as, you know, what my income was, and that my understanding -- and I'm not a lawyer, so I'm not speaking about this as a lawyer -- but my understanding is that, you know, if someone is paid less for the same job based on sex, which I was, that that needs to be corrected by the institution. And HHC needed to correct that and the

correction is retroactive. It's a six-year retroactive correction with triple damages. So that's my understanding when I read on Google what -- what it was. It wasn't about, oh, if you make a pay complaint, that that means you're going to be -- that means that whatever happened in the past doesn't matter anymore. It matters the most because that's what the pay complaint was based on. It wasn't based on the future or the present, it was based on what had happened to me and what I'd been complaining about since 2014.

MS. CANFIELD: Okay. All right. We're going to shift off this topic for a while. We're going to get through some other topics just briefly and then we'll take a lunch break, if that's okay with everyone.

That works? Okay.

THE WITNESS: Yeah. I would like to request, if it's okay, that maybe just 30 minutes so we can try not to go overtime.

MS. CANFIELD: That's fine. That's fine. And if we -- I will do my best to ask all of the questions that I have. If for some reason we need to go beyond 6:00, we'll just have to schedule another time to bring you back.

THE WITNESS: I can go beyond 6:00, but I will need a break to arrange for childcare --

MS. CANFIELD: Okay.

THE WITNESS: -- pick-up kind of situation.

THE REPORTER: Repeat what you said after "pick-up."

THE WITNESS: I will need to arrange for a childcare pick-up-kind of situation if we go beyond 6:00. And I'll need a little break to do that if it looks like we're --

And some lead time would be better.

MS. CANFIELD: Okay. That's fine.

MS. HAGAN: Can we figure out how much time we've consumed so far? Just for the record.

MS. CANFIELD: Why don't we do that during our break instead of now, because we've only been going since 10:00 and we took two -- three five-minute breaks, so --

MS. HAGAN: So that would be two hours and thirty minutes.

MS. CANFIELD: Yeah.

MS. HAGAN: Two hours and thirty-three minutes then.

MS. CANFIELD: Let's just -- if you

could calculate the time during lunch, that'd be great.

All right. Let's just move forward so that we do get through all this today.

MS. HAGAN: Mm-hmm.

BY MS. CANFIELD:

Q Dr. Kaye, are you currently employed?

A No.

Q Have you been employed at any point during this year? And I'm talking about 2021.

A Yes.

Q And where were you working?

A I was doing per diem work at Gracie Square Hospital in New York City.

Q And when did you stop doing that work?

A First -- I think the first or second week of August.

Q And how long had you been employed at Gracie Square?

A I had -- I've had admitting privileges at Gracie Square on and off since 1996. And I worked there in different capacities.

Q Okay. Let's go through those capacities.

When you started in 1996, what was your capacity at Gracie Square?

A I was a voluntary attending and I did attending coverage.

Q Okay. And how long did you do that?

A I did that on and off until around 2004.

Q Okay. And did your role change at Gracie Square in 2004?

A My role didn't change. I just stopped wanting to work on the weekends and stopped -- and so I -- I stopped doing the voluntary attending coverage for a while. So I just -- it was per diem work. I just decided that -- I just stopped doing it for a while.

Q Okay. And did you resume that work at any point?

A In 2010, I went back. It was around 2010 I think, I went back and I started doing some overnight moonlighting shifts. And I also then at some point started doing the weekend attending coverage sometimes. Periodically.

Q What were your job responsibilities as a voluntary attending?

A A voluntary attending?

Q Yeah, attending.

A I would go see the patient and talk to the staff and review the chart, and address any medical

issues pertaining to the psychiatric treatment and write a note.

Q Okay.

THE REPORTER: Did you say "write a note"?

THE WITNESS: Write a note in the chart.

BY MS. CANFIELD:

Q Was that consistent between 1996 and 2004 when you were performing that work as a voluntary attending?

A I was a volunteer attending, and that just meant that they didn't pay me. I didn't get a salary, but I had admitting privileges and my privilege is at the hospital to work there, to going there and see patients and treat patients. That's all that meant. And I was unpaid, but I was the medical staff.

And yeah, the coverage for -- the coverage for these patients was always the same thing. I would see the -- round on the patient, address the issues, write a note.

Q And what was the advantage of performing that work when you weren't being paid?

MS. HAGAN: Objection as to form.

THE WITNESS: I -- I was covering for

other attendings, and so I would get paid for the services that I rendered for those patients.

BY MS. CANFIELD:

Q Okay. So you were getting paid? It was not a total -- it was --

A I was not getting paid by Gracie Square Hospital.

Q So who was paying you?

A Whatever insurance the patients had.

Q Okay. And when you went back in 2010 --

A Well, let me just clarify. I was getting paid -- I -- in order to be the volunteer attending, I would -- I -- I was -- a billing service was doing the billing through the primary volunteer attending's practice. So I wasn't really involved in that. And then I would get paid based on what they collected from insurance, from the billing. But I wasn't -- I was not directly billing the insurance company. I was involved in like a -- as part of -- like, I would work for the PC -- the professional corporation of the attendings who wanted coverage.

Q Okay. What was the name of that professional corporation? Do you remember?

A There's been many over the years.

MS. HAGAN: If you don't know, then --

THE WITNESS: Yeah. I don't know. I think it was called Yorkville PC or something. And then there was one that was Medical Healthcare. I mean, I don't remember --

BY MS. CANFIELD:

Q Okay.

A -- what they called their PCs. I just --

Q Okay. And then when you went back in 2010, you said that you were moonlighting overnight shifts as a weekend attending. Were your job responsibilities the same?

A It wasn't quite the same as being --

MS. HAGAN: Objection. It assumes facts that she didn't testify to. She didn't say that she was moonlighting overnight shifts. She didn't testify to any of that.

MS. CANFIELD: She did, but go ahead.

THE WITNESS: I -- when I did -- it was like I was the house doctor. So I would do admissions. I would take care of all the psychiatric emergencies that would come up throughout the -- the shift. And I would renew medications, review charts to, you know, see if medications were expiring and if they should be renewed or changed. I would deal with issues that would come up in the units with patients

or, you know, questions with staff. I would, of course, document everything in the chart. And sometimes when patients had to be sent out, I would, like, have to talk to doctors or nurses in emergency rooms where the patients were about what happened or what was going to happen.

And, you know, so it was -- it was -- Gracie Square was across the street from where I lived, so sometimes they would, you know -- I would just go over there and help out when they needed me, if I could. And it might not have been a specific moonlighting shift. Like, if they had 23 admissions or something like that, sometimes they would ask me if I could come help.

BY MS. CANFIELD:

Q Okay. Approximately how many hours -- if you could estimate, how many hours would you work there per week?

A Wow, that's very variable. Are you saying during the attending coverage or during the house doctor overnight shifts, or some kind of combination thereof?

Q A combination.

A It was very variable and it was contingent on childcare and other issues if -- going on. But I

don't know. Maybe it could be 12 hours or, you know, if I -- if I happen to do a 24-hour shift of being a house doctor, I mean, it could be 24 hours, but I was allowed to work, you know -- stay at home because I lived across the street and even the call room wasn't in the hospital. It was down the street.

So I don't know. There were times where I took 24-hour shifts on -- on Saturday or Sunday.

Q Okay. And when did you stop -- you said that you stopped the second week -- the first or second week of August working at Gracie Square. I'm assuming you mean this year, 2021?

A Yeah. I stopped doing the overnight shifts I think in 2014 or so. And I then did the per diem. I was a per diem -- so the other thing that I started -- they started hiring me in a bit of a different capacity. Instead of just doing attending coverage and rounding on patients -- private patients, they had transitioned their care model in I think it was 2014. And private attending psychiatrists who were admitting patients to Gracie were no longer -- like, they weren't doing that model where private attending psychiatrists would have their own patients and follow their own patients. They -- they got more closely affiliated with NYP and they started having full-time,

salaried attendings. And then --

Q I'm sorry. Did you say NYPD?

A NYP Hospital.

Q Oh, NYP? Okay.

A New York Presbyterian Hospital.

Q Okay. Right.

A And so they no longer had that attending where the attendings would come in and round on their patients and then, you know, go to their private offices.

They -- they never had, like, salaried attendings there with a patient load. And they switched to that model.

I never worked as a salaried employee, but I did work this summer in that model as a per diem attending. So I was a per diem attending at Gracie -- at Gracie Square.

Q Okay. Beginning in 2014?

A Yeah. Maybe off and on as I -- I don't know when they -- there was a phaseout with the private attendings. And as they pulled in more salaried doctors and phased out the private attendings, I'm not so sure -- I think that took a couple years. So I don't know that it was, like, 2014 that the private attending coverage in the previous incarnation had

been phased out. I don't think it was. It took -- it took a while.

But to the point of your question, this summer I was doing attending coverage. I had a caseload and I took care of that caseload. And I -- I worked along with the other clinical staff in -- in caring for the patients.

Q And approximately how many hours were you working over the summer in 2021?

A Well, I was getting paid for a full day of work. I did have reasonable accommodations. I stopped working in the middle of the summer after my surgery. And then I came back with reasonable accommodations.

So I was getting paid for a full day, but I wasn't carrying a full -- I couldn't carry a full caseload because of the surgery. I couldn't -- I couldn't type and use my right arm, so I was, you know, typing with my left pointer finger and everything is electronic. The medical record and every -- sending emails and everything. So I was very, very slow in being able to get the -- the charting and other stuff done. So they cut my hours in half.

Q So approximately how many hours did you have

this summer? You said you were working pretty much full-time until your surgery?

A I mean, I wouldn't -- they didn't cut my hours in half. They cut my patient load in half and they just -- they were letting -- they said I could work from home. I just went over and I saw the patients and I would go over. And if there was a family meeting or a Zoom meeting out -- outside the agency, you know, an outpatient clinic or something, or an -- team or something like that, I would go over, but I wasn't carrying a full load after my surgery.

Q Okay. What about in 2020, were you working at Gracie Mansion? I mean Gracie Square. Sorry. Gracie Square.

A Yeah. No.

Q Gracie Square. Sorry.

A That's okay. I think I might have done a little coverage at times. I -- I don't know.

Q Okay. What about 2019?

A Wait, 20 -- okay. Hold on. I'm sorry. Let me just get -- let me -- I have to orient myself, so please, let me just -- okay. 2020, pandemic. So, pre-pandemic, after I felt I had to resign from my job, which I didn't really want to do, but I resigned in January 2020. And then I worked a little bit at

Gracie -- Gracie Square Hospital. And then -- in 2020. And then the pandemic hit and they had to -- NYP -- New York Presbyterian Hospital has a bunch of -- had other psychiatric hospitals like Brookdale and I think Methodist and maybe -- I don't know. They had some -- they converted all their outer borough psychiatric facilities to medical facilities because of the pandemic. And all of those salaried doctors came over to Gracie -- were sent over to Gracie, and Gracie decreased their census from about 150 to about 60 because of the need for social distancing.

So they had a surplus of doctors and a -- and a paucity of patients and they didn't need me. So that was --

Q Okay.

A And I no longer had per diem options there, so I just -- I think I worked there in 2020 -- in February and the beginning of March before everything happened.

Q Okay. What about 2019? Were you at Gracie Square in 2019?

THE REPORTER: Please ask the question again. Sorry.

BY MS. CANFIELD:

Q Were you working in any capacity at Gracie

Square in 2019?

A Yes.

MS. HAGAN: Objection to form.

BY MS. CANFIELD:

Q Okay. And approximately how many hours were you working at Gracie Square in 2019?

MS. HAGAN: Objection.

THE WITNESS: I -- I can't recall. I --I don't know.

BY MS. CANFIELD:

Q But you were performing some work there?

A I was working there on and off, yeah.

Q Okay. What about 2018? Were you also performing work at Gracie Square Hospital?

A On and off, yes.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Okay. And what about 2017? Were you performing work at Gracie Square Hospital in 2017?

A Yes.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Okay. And how about 2016 -- were you performing work at Gracie Hospital?

MS. HAGAN: Objection as to form.

THE WITNESS: I'm -- I'm guessing that I -- since 2010, I would have these gaps of time where I wouldn't work there, and then I would work there.

So since I went back and renewed my medical admitting privileges in 2010, I worked there on and off.

BY MS. CANFIELD:

Q Okay. And you said that you were paid by a professional corporation and you gave two names, and you said sometimes the names change. Did that continue from 2014 up to 2021, that you were paid through insurance billing?

A No.

MS. HAGAN: Objection as to form.

You can answer if you understand the question.

THE WITNESS: No.

BY MS. CANFIELD:

Q Okay. So who paid you in 2021?

MS. HAGAN: Objection.

THE WITNESS: So as I said, that private practice model was phased out over a couple of years. And then during that same time, they were kind of phasing in the same model, but it was through NYP.

So NYP -- well, it was really Gracie

Square, but the parent company is NYP -- started paying me in a comparable-kind of way, similarly to the way I was getting paid by those PCs.

BY MS. CANFIELD:

Q Okay.

A That Gracie -- instead of the private attending calling me up and saying, "Hey, can you cover my patients this weekend?" The chief medical officer of Gracie, or her, you know -- or her chief administrative assistant would call me up or text me or whatever -- contact me and say, "Can you cover?" And that kind of shifted over.

So I started -- instead of covering for the private attendings, I started covering for NYP, but it was comparable work. And the pay was coming then from NYP.

Well, when I say NYP, it's just because that's who kind of owns and runs Gracie. But I think that the pay came from Gracie, but it was processed through NYP.

Q Okay. All right. I'm going to call for the production of your paycheck slips or however way you were paid in 2021. I know that you haven't received a 1099 or any type of tax document yet, but whatever you have, I call for that production.

And in 20 --

MS. HAGAN: I will take that under advisement and in writing, Counselor.

BY MS. CANFIELD:

Q What about in 2020? Did you receive a 1099 for your work at Gracie Square in 2020?

MS. HAGAN: Objection.

THE WITNESS: Yeah. I worked there before the pandemic, so yeah.

BY MS. CANFIELD:

Q Okay. So I would like a copy of any 1099 that you received from Gracie Square in 2020.

MS. HAGAN: We'll take that under advisement. Please put that in writing.

MS. CANFIELD: I've already requested it as part of discovery, but I will follow-up in writing.

MS. HAGAN: Mm-hmm.

BY MS. CANFIELD:

Q And then for years 2019, 2018, 2017 and 2016, did you receive 1099s for your work at Gracie Square?

MS. HAGAN: Objection. Take --

THE REPORTER: What did you say, Ms. Hagan?

MS. HAGAN: Strike the latter part. Objection.

MS. CANFIELD: You can't strike my question.

MS. HAGAN: No. I said strike the latter part of my --

MS. CANFIELD: Oh, of your objection. Okay. Okay.

THE WITNESS: I'm sorry. Can you repeat your question?

BY MS. CANFIELD:

Q I wanted to know for the years 2019 back to 2016, if you received a 1099 from Gracie Square or from these billing corporations?

A I -- I likely did and I also would like to clarify that when I was a moonlighter, what I call the house doctor and did those overnight shifts, even if they were just a 12-hour dayshift on the weekend or whatever. When I did those house doctor shifts, that was paid on a W-2.

Q Okay. All right. Thank you for that clarification. So I am calling for the production of all evidence of compensation that you received through your work at Gracie Square. Whether that's a 1099 or a W-2 for the years 2015 to 2021.

MS. HAGAN: Objection. I mean, not objection. I'm sorry. We'll take that under advisement. Please be sure to follow-up in writing.

BY MS. CANFIELD:

Q Other than employment at Gracie Square Hospital, were you employed any place else this year back to 2015, other than CHS and Bellevue?

MS. HAGAN: Objection as to form.

You can answer if you understand.

THE WITNESS: Yes.

BY MS. CANFIELD:

Q Where else were you employed?

A An agency called AABR. And that's an acronym for Association of the Advancement of the Blind and Retarded. It's AABR Inc.

Q Thank you. And when did you start working for that organization?

A 1999 I think.

Q Did that continue for a number of years?

A Yes.

Q How many years?

A Until this September.

Q September 2021?

A Yes.

Q And what did you do for AABR?

A I was the -- I was a psychopharmacologist consultant. So I was the consulting pscyhopharmacologist for some of their patients.

They -- they call them "consumers," but to me, they were patients.

Q Okay. And approximately how many hours per week were you working as a psychopharmacologist consultant?

A I didn't work there every week.

Q Okay. Starting with this past year, 2021, how often were you working for AABR, approximately?

A Once a month.

Q What about in 2020?

MS. HAGAN: Objection as to form.

THE WITNESS: About the same.

BY MS. CANFIELD:

Q 2019?

MS. HAGAN: Objection.

THE WITNESS: It averaged about once a month.

BY MS. CANFIELD:

Q 2018?

A The same.

Q 2017?

A About a month -- about once a month.

Q 2016?

A The same.

Q 2015?

A Yes, once a month.

Q Okay. How were you paid by AABR?

A I billed for my services and they paid me directly.

Q How often would you bill for your services?

A Once a month.

Q Did you receive a tax document from AABR each of the years that you worked for them, or performed work for them?

MS. HAGAN: Objection as to form.

You can answer.

THE WITNESS: Yes.

BY MS. CANFIELD:

Q What did you receive?

A 1099.

Q All right. I'm going to call for the production of the 1099s that you received from AABR for the years 2015 through 2021. And I will put it in writing.

MS. HAGAN: We'll take it under advisement.

//

BY MS. CANFIELD:

Q Any other employment that you've held?

A I had these on and off, like, short little consulting requests where I would be asked to do capacity evaluations and/or a psychopharmacologic consultation. A consultation for psychopharmacology and/or a consultation for capacity evaluation. And I was asked to do that by some of these same doctors who had PCs that were asking me to cover their patients at Gracie.

Q Okay. And have you done those evaluations or consultations fairly consistently between the years 2015 to 2021?

A No.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Okay. How many have you done?

MS. HAGAN: Objection.

THE WITNESS: It's difficult for me to quantify because it was a while ago, but I would be asked to go into the facility, assess the patient, determine his or her capacity to participate in treatment planning and discharge planning. And then sometimes I would be asked to look at the medications -- the medical and psychiatric medications, if there

were any, and -- in relation to whatever the consultation question was about behavior, thought, psychosis, depression -- whatever it was -- and make a recommendation about the medications and then render an opinion on the capacity and put that --

BY MS. CANFIELD:

Q Okay. And you said that -- I believe you testified that this work came to you through your work at Gracie Mansion -- or Gracie Square?

MS. HAGAN: Objection as to form. And assumes facts --

THE WITNESS: Yeah. Some of the doctors at -- I think. Yeah. I think one of the doctors that I had met at Gracie -- one of the private attendings, I think I might have met him maybe when I was moonlighting or something. I don't know. But he asked me if I would do that.

And then another doctor I had met through outside sources. So --

BY MS. CANFIELD:

Q Okay. Were you ever asked to engage in consulting work through any of the attorneys that you've met through your work at CHS or at Bellevue?

MS. HAGAN: Objection as to form. Can you specify a time period?

MS. CANFIELD: I did. While working at CHS and at Bellevue.

THE WITNESS: Yeah. I was -- I was contacted by legal aid. It was after my forced resignation and I was contacted about several cases and asked to -- they wanted to discuss them and they asked me to evaluate the -- their client. And --

BY MS. CANFIELD:

Q How many clients did you evaluate?

A Two.

Q Two? And how were you compensated? Actually, let me withdraw that.

Who compensated you? Legal aid?

MS. HAGAN: Objection.

THE WITNESS: Well, that's who's supposed to compensate me. I haven't been paid yet, but yeah.

BY MS. CANFIELD:

Q Okay. When did you conduct these two evaluations?

A I've been paid for one of the evaluations. Not the other one.

THE REPORTER: Please repeat the answer.

THE WITNESS: I've been paid for one of

the evaluations. Not the other.

I think that it was in maybe January.

BY MS. CANFIELD:

Q 2021?

A Yeah.

Q Okay. And when was the other evaluation?

A Well, the other evaluation was ongoing. There was a lot of collateral information I had to collect. But are you asking -- when you say "evaluation," are you asking when I wrote the report? When I interviewed the -- the --

Q When you completed the work on the evaluation.

A September of this year.

Q Okay. Thank you. And did you perform any consultancy work in 2020?

MS. HAGAN: Objection.

THE WITNESS: Yes.

THE REPORTER: Ms. Hagan, did you say something?

MS. HAGAN: Yes. Objection.

BY MS. CANFIELD:

Q Okay. And --

A Do you mean consulting or do you mean per diem?

Q The consulting work that you were talking about just now, you said that you were doing consulting whether that's competency or psychopharmaceutical?

A Psychopharmacology. Yeah. I'm sorry. I misunderstood the question.

No. I -- I did work per diem at Gracie Square in 2020, but I was per diem. I -- so I guess it's -- I'm calling that something different than consulting.

Q Right. But you had already testified to the fact that you were doing per diem work at Gracie Square, correct?

A Right.

Q Okay. I'm mostly interested in the consulting work that you were doing that you were billing yourself --

A Okay.

Q -- to perform.

Did you do any of that work in 2020?

MS. HAGAN: Objection as to form.

THE WITNESS: That one case that was very long and complicated, it's possible that the lawyers may have reached out to me in 2020, but it was the same case I talked about for 2021.

BY MS. CANFIELD:

Q Okay. How about for 2019?

A No.

Q No work?

A When you're saying "consulting," can you just define specifically what you mean? Like, which -- you're not talking about Gracie Square and you're not talking about AABR?

Q Correct.

A Okay.

Q Did you perform any consultancy work in 2019?

A No.

Q 2018?

A No.

Q 2017?

A I might have done some of those. I mean, yeah. I don't know if I did any -- I might have done some of those nursing home capacity evaluations in '17. I'm not sure. And --

Q I'm sorry?

A Yeah. I might have done some of those nursing home pharmacology capacity consults. I don't remember the -- the date span of when I did those. It was kind of a infrequent situation and it didn't --

and I didn't do it for a long period of time.

Q Okay. What about in 2016?

MS. HAGAN: Objection to form.

THE WITNESS: Again, the same thing with those nursing home and care facility consultations.

BY MS. CANFIELD:

Q Okay. And then 2015?

A Again, I -- I -- there was a span of time where I was doing that -- that type of work where I was being asked to go do those capacity evaluations and make pharmacologic --

Q Okay.

A -- psychopharmacologic recommendations. So yeah, that could have been happening then. I don't have the dates on the top of my head.

Q Okay. Do you recall why you stopped doing the nursing home consultations?

A Yes.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Why is that?

A Because of it taking up too much time outside of my primary job. I -- going to the nursing homes on the weekends or in the evenings would require

childcare issues. I would be away from my kids. It wasn't -- I wasn't making that much money and, you know, by the time I calculated in the problems with getting childcare and that was challenging for, you know, later in the evening and being away from my kids and paying for childcare, and how much money I was making. And after taxes, it was just completely -- it made no sense.

Q Okay.

A And --

THE REPORTER: I'm sorry. Repeat what you said after "no sense."

THE WITNESS: It made no sense for me financially or personally.

BY MS. CANFIELD:

Q Okay. And what about your work at AABR and at Gracie Square? Were you working -- performing work at those two facilities more regularly in 2015, 2016 and 2017 would you say?

MS. HAGAN: Objection as to form.

THE WITNESS: I would say it was always -- it was per diem, which means as-needed. So it was in chunks of time and then in not, and then on and off. I mean, not with Gracie.

With AABR, it was pretty consistently,

you know -- I would consult with them on a regular basis -- monthly.

BY MS. CANFIELD:

Q With AABR?

A AABR, yeah.

MS. HAGAN: Wait a second. Can we take a break? A bathroom break?

MS. CANFIELD: Just let me finish this line of questioning then we're done.

MS. HAGAN: I really need to go to the bathroom. Excuse me. Hold on for a second. I need --

THE REPORTER: The time is 1:33 p.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 1:40 p.m. We're back on the record.

BY MS. CANFIELD:

Q Okay. So you testified that your time at AABR was fairly consistent, and it looks that way based on your testimony. You were consistently providing consultancy work there once a month.

My question is with respect to Gracie Square, were you doing more work there in 2016, 2017 and 2015 as compared to 2017 -- I'm sorry. As

compared to 2018 to the present?

MS. HAGAN: Objection as to form.

BY MS. CANFIELD:

Q Or at least when you stopped working there?

MS. HAGAN: Objection as to form.

THE WITNESS: I don't know if I can answer that because, again, I worked in chunks of time. I worked at -- I worked at that chunk of time after I was forced out of CHS, and I worked until the pandemic caused them to drop their census and have too many doctors. I worked a chunk of time this summer.

So it goes and -- and, you know, it has -- it's been in chunks of time. So I guess it's hard to say what years I had more work than others. Like, it's hard for me to answer that if I am going to be accurate, because I really don't know.

BY MS. CANFIELD:

Q Okay. Your work at Gracie Square, was it primarily on the weekends? Did you do -- perform any work during the week?

A Sometimes during the week and sometimes during the weekend.

Q Okay. What about at AABR? Did you perform that work on the weekend or during the week?

MS. HAGAN: Objection. Form.

THE WITNESS: It varied. Sometimes the week, sometimes the weekend.

BY MS. CANFIELD:

Q Okay. And the consultancy that you did, the competency exams and the nursing home consulting, did you do that primarily on the weekends or during the week sometimes?

A I didn't do competency exams. It was -- these weren't criminal defendants. These were -- it was capacity evaluations.

Q Oh, apologies.

A But yeah, I -- it was -- it was both, but you know, it did -- there were mornings that I would go there early Saturday morning and, you know, I would come home and the kids would be awake and I -- and I -- I just decided that this is, you know, not -- not a good thing for -- for me, for a lot of reasons.

Q Okay. Did the oversight that CHS, when it took over the clinics, and the strict hours that you were required to work, did you find that interfered with some of the consultancy work that you were doing?

MS. HAGAN: Objection as to form.

THE WITNESS: The -- the problem with the hours at CHS was the -- I was promised very specifically by my union who had negotiated with the

transfer and that I would be grandfathered in, and my working conditions wouldn't change in any way.

And then in April, when I was down on Water Street and brought the -- my concerns to the attention of Dr. Ford and Dr. Jain about pay parity and about my working -- how my -- all my union benefits and all my working -- my title, my shift, everything was going to stay the same. My location. I didn't -- I didn't want to go to Rikers. And Dr. Ford brought me over to speak with Jessica Laboy and Mr. Wangel and I was assured that nothing was going to change. Everything would stay the same. So I was fine with that, you know? A 9:00 to 5:30, you know? That was fine.

The problem happened after I filed my EEOC complaint and I told Dr. Jain about my EEOC complaint. They changed my shift. And that was just brutal for me. Brutal. They said I had to be at work at 8:00 in the morning. They increased my unpaid work -- my unpaid lunch hour from 30 minutes to an hour, which extended my work day to nine hours. And it just -- it -- it -- you know, when you're a single mom with two kids, ten minutes makes all the difference in the world, you know? Much less an hour. And it just threw our lives into chaos. And it was super

stressful. And the reason for doing it kept shifting.

First, they were telling me it was because the system couldn't handle a 30-minute lunch, but I've had a 30-minute lunch per negotiations with the union and Bellevue and the rest of the enterprise, and other non-CHS agencies, for almost 13 years. And that had been negotiated when the doctors went from a 37.5 to a 40-hour work week. They decreased the unpaid lunch hour from an hour unpaid in the middle of the day to 30 minutes unpaid in the middle of the day. Or even if you want to take it at the end of the day, some of the managers allowed that.

So that was -- that -- that was devastating. And I would say that impacted my life the most.

BY MS. CANFIELD:

Q Okay. So I hear you saying that the shift change affected your personal life the most. My question is did it affect your ability to continue with your work at Gracie Square, with AABR, and with some of the other consultancy work that you were doing and privately billing?

A No.

MS. HAGAN: Objection as to form.

//

BY MS. CANFIELD:

Q I'm sorry?

A No.

Q Okay.

MS. HAGAN: And just to note, I objected to the question prior to Dr. Kaye's response.

MS. CANFIELD: Okay.

BY MS. CANFIELD:

Q One last question. Have we exhausted all other outside employment?

A I don't know. There's nothing that comes to mind. I mean, if -- I mean, the names of those nursing homes were very varied. I know there was -- do you want me to try to name those nursing homes where they had me doing the consulting?

Q No. No thank you, but I have requested your tax records and paystubs from that time period, so those documents will tell me where they were, okay?

MS. HAGAN: We'll take it under advisement.

BY MS. CANFIELD:

Q So there's no reason to rack your brain.

MS. HAGAN: Again, we'll take it under advisement.

//

BY MS. CANFIELD:

Q And I have a question. Why did you need to find new attorneys?

MS. HAGAN: Objection.

THE WITNESS: Because when I --

MS. HAGAN: Wait, wait, wait. Objection. This goes into attorney-client privilege.

MS. CANFIELD: It actually doesn't.

MS. HAGAN: She's not going to answer that question.

MS. CANFIELD: But it's not your privilege. It's her privilege to assert, and I'm talking about the --

MS. HAGAN: And I'm asserting it for her. This is something that she's made a decision as far as -- concerned.

MS. CANFIELD: It's not privileged.

BY MS. CANFIELD:

Q Why did you --

MS. HAGAN: She's not going to answer that question. You need to move on.

MS. CANFIELD: I've asked the question.

MS. HAGAN: Well, you're going to have to -- going to put a blank in the record.

THE REPORTER: I'm sorry. Please speak

one at a time.

MS. HAGAN: I'm saying that my client is not going to answer that question. She's not. It's not relevant and it touches on attorney-client privilege.

MS. CANFIELD: It does not, but can you please mark that for the record and we'll -- I'll follow-up with the Court later.

MS. HAGAN: Mm-hmm.

MS. CANFIELD: All right. Just the last set of questions and then we can take a break.

BY MS. CANFIELD:

Q Dr. Kaye, your name is Dr. Melissa Kaye? Do you have a middle name?

A Tosyl.

THE REPORTER: Please repeat that.

THE WITNESS: Tosyl, T-O-S-Y-L.

BY MS. CANFIELD:

Q Okay. And have you been known by any other name other than Dr. Melissa Kaye Tosyl, or Tosyl Kaye?

A Yeah. My -- my name is Melissa Tosyl Kaye and I was at one point known as Melissa Kaye Gavend.

Q Okay.

A G-A-V-E-N-D.

Q And did you change your name?

A I did.

Q And for what reason?

A My given name is Melissa Kaye and I was in college and there was a group of us girls who decided that we would change our names for various reasons, and that's what we did.

Q Okay.

A One of the girls name -- changed her name to Diana after a goddess, and I forget what the other ones did. And we went down to the Boulder County Clerk and changed our names.

We were in the women's studies program and we just kind of felt that was asserting our personhood.

Q I understand. I have a women's studies graduate degree.

So your name -- your surname was -- last name was Kaye?

A No. My -- my middle name is Kaye. My given name -- well, when I say "given," I mean my parents named me Melissa Kaye and my middle name was Kaye, and my last name was Gavend, G-A-V-E-N-D.

Q Okay. Okay. I'm sorry. Okay.

A My name that I was given at birth. And I -- and then my nickname. And I just took my -- and

that's how I -- I got my name. I changed my name because I was --

Q Okay.

A -- Melissa Kaye as my middle -- as my first and middle name. I changed Kaye to be my last name and took my nickname as my middle name.

Q So Tosyl was your nickname?

A Tosyl.

Q Tosyl.

A Yeah, it was a nickname.

Q Thank you. And are you married?

A No.

Q Okay. Have you been married?

A No.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q And you have children, correct?

A Yes.

Q How many?

A Two.

Q Okay. And what are their names and ages?

A B -- and J -- and --

Q How old are they?

A They're 12.

Q Are they twins?

A Yes.

Q Are they paternal or fraternal?

A They're boy/girl, so --

Q Oh, yeah. Okay. Sorry. That was obvious.

A It's a common question, so -- yeah.

Q Yeah, yeah, yeah.

A I -- yeah, they're fraternal.

Q And I'm assuming your children live with you?

A Correct.

Q Okay. And you stated earlier today that you're living in New Mexico. How long have you lived in New Mexico?

A I gave up my apartment in New York in August.

Q Did you rent or did you own?

A I rented.

Q Okay. And since August, you've been living in New Mexico. Do you rent or do you own?

A I rent.

Q And anyone else other than you and your children live with you?

A No.

Q Do you own or rent any other property?

MS. HAGAN: Objection.

THE WITNESS: Well, I was renting my apartment in New York, but now just my apartment in Albuquerque.

MS. CANFIELD: Okay. I guess why don't we take a break now.

THE WITNESS: Okay.

MS. CANFIELD: I think it's a good time.

MS. HAGAN: We can do 30 minutes?

MS. CANFIELD: Let's do 40.

THE REPORTER: Okay. The time is 1:53 p.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 2:37 p.m. We're back on the record.

BY MS. CANFIELD:

Q Welcome back, Dr. Kaye.

A Thank you.

Q As I said before, I will try to finish us today by 6:00. I'll do my best.

I just want to talk to you a little bit about the transition from Bellevue to CHS. I believe this morning you said that you learned about the transition about December of 2017. Am I correct of that recollection?

A Yes.

Q Okay. And how is it again that you learned of the transition?

A Dr. Jeremy Colley reached out to me and Dr. Winkler.

Q I'm sorry. Can you speak up, please?

A Yes. Dr. Jeremy Colley reached out to me and Dr. Winkler, and he informed us about this.

Q Okay. And did he reach out to you in person? Did he telephone you? Did he send you an email? What form of communication did he use to notify you?

MS. HAGAN: Objection as to form.

You can answer.

THE WITNESS: If I recall correctly, it was a text message. It could have been an email --

BY MS. CANFIELD:

Q Okay.

A -- but I think it was a text.

Q Okay. And what exactly did Dr. Colley say when he notified you?

A He said that he was notified that, you know -- well, the plan had been always with the -- all four clinics were going to consolidate under Bellevue. And that steps were -- had been taken for that to happen,

and he was involved in that. And he was the director of the Division of Forensic Psychiatry at Bellevue. That was the -- the position Dr. Ford had before she went to CHS.

And so there was discussions about that. And Elizabeth Owen had been in charge of the Brooklyn and Queens centers. And I remember emails -- I don't know if we ever met in person, but I remember emails and phone conversations. And then suddenly, there was this just change in the plan and he wanted, you know -- he was concerned and kind of ambushed. I think he was a little rattled and he wanted to talk to Barry and I -- Dr. Winkler and I and -- and find out why, you know, this was happening and if, you know -- that's what I remember.

And so we had some conversations with him. I don't remember if they were in person.

Q Okay. So if I'm understanding your testimony, you said that the original plan was for all the court clinics to be organized under Bellevue, and that there was a change where instead of the clinics having oversight by Bellevue, that they were going to be transitioned to CHS. Was that the change that Dr. Colley was speaking to you about?

A Dr. Colley -- yes. We were -- there was

rumbling or discussions or meetings about the consolidation of the four clinics under Bellevue. And that abruptly changed course and Dr. Colley informed me and Dr. Winkler about that.

Q Okay. When was it that there were discussions to organize the clinics under Bellevue? Do you recall when that first occurred?

A It was in 2017.

Q Okay.

A -- but I -- I know it was in 2017 because it was an active plan or thought or -- it was being explored actively when suddenly there was this big shift and CHS was going to basically -- even Dr. Mary Anne Badaracco was just kind of ambushed. Everyone was just like, "Whoa, what's going on? This is a big switch." And no one was informed about it and there was no discussion. And we had been previously on this trajectory to consolidate under Bellevue. And now, we're told this.

And it was -- it happened without any kind of forewarning or open dialogue with people involved.

Q Okay. Now when Bellevue was going to exercise oversight of the clinics, were there discussions about your role and whether or not your role would change with that type of transition?

A No.

Q Were there no discussions or were there discussions that your role wouldn't change?

A There was no -- there was no indication that my role was going to change.

Q Okay. And was Dr. Colley going to have oversight of all the clinics through Bellevue?

A Yes.

Q Okay.

A Well, as -- yes. It would be Dr. Colley or if -- whoever was in the director position of the Division of Forensic Psychiatry at Bellevue. And at the time, it was Dr. Colley.

Q Okay.

THE WITNESS: I'm going to turn off the heater because it's going to get noisy again.

MS. CANFIELD: Okay.

THE WITNESS: Okay. Here we go. It'll take a minute for the fan to turn off.

But yeah, so it was under Bellevue regardless of who was in that leader -- leadership position at the time.

At the time, it was Dr. Colley.

BY MS. CANFIELD:

Q Okay. And were you in agreement with

Bellevue taking over oversight of all the clinics?

MS. HAGAN: Objection as to form.

THE WITNESS: I thought it was a good idea. There was a lot of concern in the forensic community about Elizabeth Owen and some tactics that she employed. So people, you know, kind of felt that that -- those services in Brooklyn and Queens needed to be cleaned up. So I thought it was a good idea.

BY MS. CANFIELD:

Q Okay. Now once you learned that Bellevue would not be exercising oversight, but in fact, all the clinics would be transitioning over CHS or Correctional Health Services oversight, how did you feel about that?

MS. HAGAN: Objection as to form.

THE WITNESS: Well, I had concerns because it was done in such a surreptitious manner. It was kind of done as an ambush instead of open discussions with people about what was happening. So that naturally would -- would raise red flags.

But I -- my concern was that -- that CHS operated as a political wing of -- of the mayor's office, and I had concerns about politicizing the 730 competency exams and how that would impact defendants' constitutional rights.

I mean, I had concerns about things that were outside of my -- my job. And then I had concerns about things that pertain to my -- my employment.

And primarily, you know, was I going to have to go to Rikers? Was I going to have to go off-site? Was I going -- you know, what -- what -- who was I going to report to? Were the people going to maintain the integrity of -- of the process? And I was -- I was quite focused and concerned about making sure that, you know, I -- I had been a public servant for I think almost 20 years at the time and I was planning to stay in that job another 10 or 15 years. And I wanted to make sure, you know, what was happening. I wanted to know. And my union had ongoing meetings with CHS and it wasn't just because of me. There were I think five part-time -- four or five part-time male psychiatrists working at the Manhattan Court Clinic and it wasn't clear that -- that, you know -- whether or not they were going to fill Dr. Ciric's role, you know, as it was, which was a physician specialist unionized line, so that could have made it six doctors.

So the union was trying to verify that, you know, what's going to change, what's going to stay

the same. And they repeatedly promised again and again, everything's going to stay the same. Nothing's going to change. No change in working conditions. And the union tried to get an MOA to that effect, and then CHS -- Wangel and Ford for certain were there, I was told -- got real kind of slippery and said, "No. We're not going to give you an MOA. We will -- we'll make a FAQ website." It was --

So they put up this website. It's long-gone now. I didn't -- I don't have it, but with these very, very general questions that didn't address any of the concerns that Doctors Council had or that I had.

And so I wanted, you know, to make sure that, you know, I knew what I was getting to. And so in April when I was down at --

BY MS. CANFIELD:

Q Let me -- I'm going to ask you some questions about that. So --

MS. HAGAN: You have to let her -- you got to let her finish her answer though.

MS. CANFIELD: I'm going to ask her questions about the April meeting --

MS. HAGAN: Can you please let her finish her answers?

MS. CANFIELD: -- with Dr. --

MS. HAGAN: Dr. Kaye, are you finished with your answer?

THE WITNESS: Well, I just -- I'm sorry to speak, but --

MS. CANFIELD: We're not going to finish within the seven hours and I'll have to write to the Court. I'm just trying to move this along. And I'm going to ask follow-up questions --

MS. HAGAN: -- she's asking her questions -- she's answering the questions.

THE WITNESS: So --

THE REPORTER: I'm sorry, Ms. Hagan. Please repeat everything you just said.

MS. HAGAN: I said, you know, she's -- Dr. Kaye is trying to answer Ms. Canfield's questions to the best of her ability. I'm sorry that she doesn't like the way that Dr. Kaye is answering those questions, but she's trying to provide a complete answer to the questions that she's posed. And I think that Counsel has to afford Dr. Kaye the opportunity to express her answers in a way that she believes is suitable. This is her deposition. You called it and she's trying to answer your questions.

Please let her finish.

MS. CANFIELD: This is the deposition that I'm taking. I'm just trying to expedite.

Dr. Kaye, as I said, we're going to talk about the conversation that you had with Mr. Wangel and Ms. Laboy. That's where you were going. We're going to talk about that.

I just want to go back --

MS. HAGAN: For --

MS. CANFIELD: Ms. Hagan, please. I just want to go back and follow-up with some things that you said. When I asked you how you felt about --

MS. HAGAN: Let her finish her answer --

MS. CANFIELD: Stop talking, please.

THE REPORTER: I'm sorry. I'm sorry. I can't take you both at the same time.

Ms. Hagan, what --

MS. HAGAN: Please let her finish. Let her finish her train of thought and then you can go on with your questions.

MS. CANFIELD: No. I'm -- we're done. We're done. I'm going to ask another question. Thank you.

I'm asking another question.

MS. HAGAN: Could you please put a note

-- a blank in the transcript for this portion because Dr. Kaye was not able to finish her answer.

MS. CANFIELD: I will question her. She'll have plenty of time. I just want to make sure I get everything that I need to ask her. I need to follow-up.

BY MS. CANFIELD:

Q Dr. Kaye, one question is Dr. Ciric. Is your recollection that Dr. Ciric resigned before or after it was announced that CHS was going to take over the court clinics?

MS. HAGAN: Objection. Asked and answered.

And you can answer --

MS. CANFIELD: It was not.

You can answer.

MS. HAGAN: Asked and answered.

THE WITNESS: I have no recollection.

BY MS. CANFIELD:

Q Okay. You also testified that you believed that when I asked you how you felt about the transition to CHS, you described it as surreptitious. It was a surreptitious manner in which CHS was taking over the court clinics. What did you mean by that?

MS. HAGAN: Objection as to form.

Mischaracterizes the testimony.

THE REPORTER: Please repeat what you just said, Ms. Hagan.

MS. HAGAN: Objection as to form. Mischaracterizes Dr. Kaye's testimony.

BY MS. CANFIELD:

Q You can answer, Dr. Kaye.

A I meant it was done secretively and non-transparently. It wasn't vetted with anybody involved directly or indirectly. It was a surprise and a shock to Dr. Colley, Dr. Mary Anne Badaracco. It was just kind of an order from "on high" which really didn't include any discussion or -- you know, it was kind of a continuation of this -- these -- this kind of surreptitious would be the word that would come to mind. But this non-transparent infiltration of the court clinics by CHS. It was kind of just more of the same, this is not -- this wasn't something new, but it was the most bold and extreme action that we had experienced so far.

Q What do you mean when you say this "bold" like intrusion? I can't recall the word that you used, into the court clinics by CHS? What was happening that had you concerned?

A Well, when CHS was created by the -- by the

DiBlasio administration, it was created, you know, with a political agenda and for political optics. And that was the priority. And so in 2015, CHS and CHS operatives started interfering with the administration of the 730 exams. And MOCJ, which is the Mayors Office of Criminal Justice who was aligned with CHS started calling, emailing and getting in -- to engage the Court and attorneys in the 730 competency evaluation process. And it was just an interference of what was meant to be a non-political objective endeavor. So --

Q Let me ask you a question. Was it interference or was there just more interest in what was happening with the court clinics?

MS. HAGAN: Objection as to form and -- and a suggestive answer, but you can answer.

THE WITNESS: It was -- there was an interference with the examination -- logistics of the examination. There was --

BY MS. CANFIELD:

Q Can you give me an example of that, please?

MS. HAGAN: Let her finish.

THE WITNESS: Yeah. There was pressure to find people, fit or unfit. And there was an involvement of the mayor's office and CHS in minutia

and micromanagement of -- of the evaluators' activities in doing this neutral, objective work ordered by the court -- the state court.

BY MS. CANFIELD:

Q And you did not like that micromanagement, did you?

A It wasn't that I -- it was -- my concern was the defendants' due process rights and the integrity of the -- the legal system because there was pressure to influence the way the exams were done.

Q And who did that, please? Who influenced the examinations?

A It -- it -- the -- it was micromanagement in the sense of, like, hyper focused on -- on the process with investment in the outcome of the case. So I considered that inappropriate intrusion into what was supposed to be a neutral evaluation that was to serve the constitution of the United States. It wasn't supposed to be used for political purposes.

Q Again, I'm asking you who interfered -- who specifically interfered with the outcome of an examination? Who controlled the outcome of an examination?

A The -- we were getting -- in 2015, there was a case -- Miguel Figueroa -- where the defendant was

disruptive at Rikers and Patsy Yang didn't like that. So she was pressuring Jeremy Colley and -- I don't know what her interactions were with Dr. Badaracco, but she was pressuring Bellevue to "expedite" that exam in a manner that wasn't in service of the -- the fair, legal treatment of Miguel Figueroa.

They were pressuring us to order a force order, just gratuitously, and he hadn't even refused. I was -- I was one of the evaluators. Dr. Winkler was the other and it was over the Christmas break. He wasn't around. She wanted -- she was pressuring to have the exam moved to be done in Manhattan. He -- he -- his lawyer was I think not even available and it was a legal aid case. And the pressure to get this exam done was so intense, he -- he wasn't even given, you know -- his -- his constitutional rights were not even being considered. It was all about --

Q Did he eventually have an exam?

A He eventually had an exam.

Q Without a force order?

MS. HAGAN: Objection as to the form of the question.

You can answer.

THE WITNESS: I -- I think he may have refused once or -- I don't -- you know, typically,

before a judge is going to consider writing the order -- writing an order for a force order, you know, we need to document three refusals. I think he may have had one, but that was maybe even after they wanted a force order, before he had refused at all.

So eventually, he was examined. They had called the district attorney's office in the Bronx and -- trying to get them to accept an unfit finding without an exam. And all of this was very, you know -- I felt was corrupting the legal system.

I mean, I can't say that as part of my job because I'm not a lawyer. I'm not an office of the Court, but I found it very concerning and it raised red flags.

BY MS. CANFIELD:

Q And you said this happened in 2015?

A Yes.

Q Okay.

A And --

Q Didn't you tell me that you didn't learn that CHS was taking over the clinics until 2017?

A They didn't announce -- they didn't announce that they were taking over the clinics till -- formally until 2017, but they had been interfering inappropriately all the way back to 2015.

Q Okay. So when you say "they," you're talking about CHS or are you talking about particular individuals?

A I'm talking about CHS, Patsy Yang. I'm talking about John Volpe at the time. I'm talking about --

THE REPORTER: I'm sorry. John who?

THE WITNESS: Volpe, V-O-L-P-E I think.

And there were various operatives -- political operatives at MOCJ. Tasha Lloyd [ph] was a consistent player. There were some women -- Uma [ph]. I don't know if that was her first name or last name. There was a woman -- Steven Reagan [ph] who was emailing. She eventually got arrested for a weapons charge.

There were all kinds of these just random people who really had no business, you know, trying to interfere with a court-ordered competency exam when these people had legal representation. They weren't even going to their attorneys.

BY MS. CANFIELD:

Q So this was occurring in 2015. So it sounds like in 2017, when you learned that CHS was taking over the court clinics, that you had already formed an opinion about CHS; isn't that true?

MS. HAGAN: Objection as to form. Assumes facts that haven't been, I guess -- assumes -- there's no foundation for the question.

MS. CANFIELD: Right. And so she can answer with either a yes or a no.

BY MS. CANFIELD:

Q Isn't it true that you had already had bad feeling about CHS based on your experiences in 2015?

MS. HAGAN: Objection.

THE WITNESS: Based on my experience, I had concerns.

BY MS. CANFIELD:

Q Okay. And did you communicate those concerns to anyone?

MS. HAGAN: Objection. Form.

THE WITNESS: The concerns were shared by others. Legal stakeholders in the community had concerns. Judges --

BY MS. CANFIELD:

Q No. My question is who did you share your concerns with?

MS. HAGAN: Objection. You have to let her finish.

What were you saying, Dr. Kaye?

MS. CANFIELD: She was not answering

the question.

BY MS. CANFIELD:

Q Did you share your concerns about the transition to CHS with anyone?

MS. HAGAN: Continue your answer and then answer her subsequently.

MS. CANFIELD: No. I'm going to have to call the witness back.

MS. HAGAN: Mm-hmm.

MS. CANFIELD: She's not answering questions.

MS. HAGAN: Mm-hmm.

THE WITNESS: So I -- I can't tell you the exact timeframe, but I know the DA's office and -- and the -- the defense community had concerns about the Miguel Figueroa situation, which I discussed with --

BY MS. CANFIELD:

Q Okay. But my -- excuse me. Dr. Kaye, sorry. It's my deposition.

I want to know -- you said you had concerns. I want to know who -- if you shared your concerns with anyone?

A I --

MS. HAGAN: Please answer the question

that you were finishing and then go --

MS. CANFIELD: No, no.

MS. HAGAN: -- question.

MS. CANFIELD: No, no. Then we're going to call the witness back. That's not my question.

BY MS. CANFIELD:

Q My question is you had concerns. Did you share them with anyone?

MS. HAGAN: She has to answer the question. She's trying --

THE REPORTER: I'm sorry. Please. One at a time.

MS. HAGAN: You don't like how Dr. Kaye's answering your question.

MS. CANFIELD: It's -- no. It's not that I don't like it. She's not answering my question.

MS. HAGAN: She is.

MS. CANFIELD: And you have --

MS. HAGAN: She's not --

MS. CANFIELD: And you have a responsibility as her counsel to direct her to answer my questions. She's not answering my questions. I didn't ask her about who else had concerns. I wanted

to know if she shared her concerns with anyone.

MS. HAGAN: Clearly if she's expressing that these other people had concerns, she's talking to them. How else would she know?

Could you please finish?

MS. CANFIELD: No.

BY MS. CANFIELD:

Q I want to know if you expressed your concerns to anyone?

A Yes.

Q Who?

A I spoke with individuals at the Bronx district attorney's office.

Q Okay.

A Ginger James.

Q What about --

THE REPORTER: I'm sorry. I'm sorry. Repeat the name?

THE WITNESS: Ginger James and another ADA, Kelly Van Jeckel [ph] or something like that. Kelly Van Derken [ph]? Something like that.

I spoke to judges. I spoke to Judge Lieb, Judge Lieb's law secretary. Judith Lieb. I spoke to Judge Moore. I spoke to Judge Torres, the chief administrative judge. I spoke to legal aid

people. I think Claudia Montoya, Lorraine McKelvey, Jeff Bloom.

BY MS. CANFIELD:

Q Did you speak to anyone inside Bellevue? Any of your supervisors?

A I spoke extensively with Jeremy Colley. I spoke with Dr. Badaracco -- Mary Anne Badaracco. I spoke with Dr. Barry Winkler. I spoke with Dr. Ciric. I'm trying to think who else.

There was a male ADA at the Bronx district attorney's office that we spoke to about the Miguel Figueroa -- I don't know his -- I can't remember his name.

I spoke to Judge Torres' law secretary, Lonnie Gilbert [ph]. Judge Torres --

Q Let me interrupt a second. Now when you said you spoke to all these people, you spoke to them about Miguel Figueroa?

A No. You -- I thought the question was -- concern -- there were concerns about CHS? I thought that was --

Q Concerns about the transition. You spoke to all those people about your concerns regarding the transition?

A No. That was --

MS. HAGAN: No.

MS. CANFIELD: That was my question.

MS. HAGAN: You're mischaracterizing her testimony.

MS. CANFIELD: That was my question. That's my point.

BY MS. CANFIELD:

Q My point was who did you speak to about your concerns regarding the transition to CHS, not Miguel Figueroa.

A Because that was -- the names were people I spoke to since 2015.

Q That was not my question either.

A I apologize. I apologize.

Q Yeah.

A So specifically about the transition?

Q You testified that you had concerns about the transition.

A Yeah.

Q What I want to know, did you express any of those concerns to your superiors? What did you say, when, if you did.

MS. HAGAN: Objection. Form of question.

THE WITNESS: I -- I spoke to Jeremy

Colley.

BY MS. CANFIELD:

Q And what did you say to Dr. Colley?

A I'm not going to be able to recall the exact -- you know, the exact verbiage, but I -- we were concerned that, you know, as Dr. Colley characterized and I shared, you know, with CHS hijacking the mental health aspects of the criminal procedure law, and using it to manipulate the legal system. We had concerns about that.

Q Okay. Were you considering -- you testified earlier that you spoke to I think Dr. Ford and Dr. Jain about whether or not you had formally accepted position or accepted transfer to CHS.

A Yes.

Q During the time period before you had formally accepted the transfer, were you seeking other employment?

A I was in discussion with Dr. Mary Anne Badaracco and Jeremy Colley about possibly getting a position at Bellevue.

Q Okay. And what position were you discussing with them at Bellevue?

A Well, that was part of the issue is that they didn't really have -- I wanted to stay in my

Doctors Council HHC line and those lines had been phased out over the last 20 years and converted to private lines, like NYU lines at Bellevue instead of city lines.

And so the positions that were available were NYU lines. And I was kind of waiting and hoping to find a city line to -- to -- to stay in at Bellevue. That's a lot of around what the discussion was.

There was a discussion about if I would -- if they might be able to get an NYU line converted to a city line, and that I would work on the inpatient forensic unit at Bellevue, which was a treatment unit for people that were too acutely psychiatrically ill to be on Rikers. And --

Q Were you offered an NYU line?

MS. HAGAN: Objection.

THE WITNESS: I don't -- I don't remember if I was offered an NYU line. I specifically asked --

BY MS. CANFIELD:

Q If you were offered an NYU line, would you have taken it?

MS. HAGAN: Objection.

THE WITNESS: I don't think I would

have taken a job and given up -- I -- my goal was to stay in my union line and I don't -- I don't think I would have taken it, no.

BY MS. CANFIELD:

Q Did you believe that you were being told that they didn't have a city line because they wanted you to go into an NYU line where you would not be part of the union?

A I think -- I think that doctors have some kind of affiliation with the union. The -- the -- I don't know that they're not part of the union. I remember seeing emails that they -- they did afform some affiliation for those doctors, so I don't know that they weren't part of the union. But I was more interested in the benefits of the union.

I was kind of locked onto the -- the dental benefits and covering orthodontic treatment. And I was pretty locked onto that and I really wanted to keep that benefit.

I also felt like I -- you know, I had basically been told, "You die in your line," and that's why I wasn't given a raise. So I wasn't going to then just say, "Okay." But if it's convenient, you know, for us, we're just going to switch you over and you're going to lose all your union benefits. And,

you know, and still work here. It didn't seem reasonable to me.

I had been in that line and I asked specifically if I could be changed to a physician specialist line. I wanted that. Again, I asked again. At this transition point, I was asking Dr. Badaracco because I think that when Steve Ciric worked at the inpatient unit, which is where I was looking for a job, before he was hired by Dr. Ford to go be the director of the Manhattan Court Clinic, he had gotten -- he was an attending three, and then when he went to the court clinic, he became a physician specialist. So he got to change his line when he changed kind of roles. So I was hoping that I could do the same. So I was kind of looking for that and Dr. Badaracco was receptive to exploring it, but she voiced concerns to me that, you know, I appreciated her sharing. And she said that, you know, since CHS has took over Rikers, they were not referring people timely for psychiatric care -- for acute psychiatric care. They were holding onto them too long and they were coming to the hospital way more psychotic and way more violent. And at the rate of attacks on staff at Bellevue inpatient unit were -- were -- were up, high.

Q Okay. Let's -- we're getting off topic now.

Let me ask you a question.

The fact that Dr. Badaracco did not -- was unable to give you either a physician specialist or a city line, did you take that as -- that decision being in any way discriminatory or in retaliation for your previous complaints about pay equity?

MS. HAGAN: Objection. That mischaracterizes the testimony, but you can answer.

THE WITNESS: Well, I mean, there's two parts to that.

One, Dr. Badaracco never told me that they couldn't. She said she would explore it. And then she also gave me warnings about if I were to take that job, she said, "I know you're a mother and you have young kids." And that people, you know -- "Staff are getting hurt here and you need to consider that. I'm telling you that not only as someone who would be your supervisor, but you know, someone who cares. And I'm telling you that the unit is more violent now."

And --

BY MS. CANFIELD:

Q Okay. But my question is -- my question is -- you testified this morning that you believe the fact that you were not given a physician specialist line and they wanted to make you managerial was

discriminatory and then retaliation for your complaints.

What I want to know is why don't you believe the fact that Dr. Badaracco also was aware of your complaints. Why don't you characterize her inability to give you a city line as discriminatory and retaliatory as well?

MS. HAGAN: Objection. Objection. It mischaracterizes the testimony. She never said that Dr. Badaracco was unable to give her a physician specialist line.

BY MS. CANFIELD:

Q She didn't give you one, did she?

A Well --

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Did she ever get back to you and say -- she never followed up, did she? I mean, you didn't get the physician specialist line.

A She did follow-up and I believe that Dr. Badaracco --

First of all, Dr. Badaracco doesn't have near the power and authority that Dr. Yang has. Dr. Badaracco works within the hierarchal bureaucratic structure of HHC. Dr. Yang is in a -- is in an agency

that has a dot-dot-dot line connection to HHC. And she has a lot more autonomy and power and -- and control over her funding than Dr. Badaracco.

And I believe Dr. Badaracco, when she reacted to -- when Dr. Colley told her that -- about my pay parity, and she called me in, she did so out of concern. I believe that she did what she could to get my pay parity rectified. And I believe that she hit a wall with central office.

I don't -- I don't know that that's true, but I believe that she tried as best as she could and she got me that $2,000 pay raise by pushing my attending three salary to the top range.

So I believe Dr. Badaracco, in good faith, discharged her duty and did what she could for me. And I also believe that she was trying to look into options about what could be done for me to come to Bellevue on a city line. And she was --

Q But didn't you express those concerns to Dr. Ford who communicated your concern to Dr. Badaracco?

I guess what I'm trying to understand is why Dr. Badaracco did the right thing, but you believe that Dr. Ford did not do the right thing when she advocated for you to get that $2,000 increase?

MS. HAGAN: Objection. It

mischaracterizes the testimony.

First off, she didn't testify --

MS. CANFIELD: It actually doesn't.

MS. HAGAN: No. She didn't testify that Dr. Ford went to Dr. Badaracco at all. She said that she didn't go to Dr. Badaracco.

And secondly, she didn't say that Dr. Ford actually -- advocated for anything. You're mischaracterizing her testimony.

Could you please rephrase the question?

MS. CANFIELD: Yeah. I'm going to move on.

BY MS. CANFIELD:

Q So how many different times were you seeking positions at Bellevue?

A I don't know that I can quantify it, but I know that after I made a decision to stay at CHS, because 730 examinations and forensic work was my career and that was my first choice and my first love, and I was promised by Wangel and Laboy that nothing would change -- and I'm reassured by my union that would be true. I did take them, you know, at their word and thought they were acting in good faith, and I decided to stay.

Then as soon as I made my EEOC complaints

and asked for pay parity, I started -- I -- I was subjected to this constant harassment and retaliation, pay cuts, surreptitious changes to my pay, my timesheets, denial of access to the computer's electronic timekeeping system. You know, just being excluded from meetings and -- and -- and being mocked and ridiculed and having my computer not work. And having them shredding all my timesheets from Bellevue -- all the copies of my timesheets from Bellevue. And claiming --

Q All right. Let's show the complaint. Let's go over -- because these are some of the allegations in your complaint.

MS. CANFIELD: So, Ms. Hagan, you have the complaint. It was something that you authored.

MS. HAGAN: Is this Exhibit -- it is something that I authored? What are you insinuating?

MS. CANFIELD: It's Exhibit B. You have it.

(Exhibit B was marked for identification.)

MS. HAGAN: It's Plaintiff's Complaint. What do you want me to say?

MS. CANFIELD: Yes. I'm saying it's Exhibit B.

MS. HAGAN: Yes, please.

THE WITNESS: So during the course of all of that --

MS. CANFIELD: Hold on. Hold on, Dr. Kaye. I don't have a question for you. I said we're going to move on. You --

MS. HAGAN: -- finish her last answer before you cut her off.

MS. CANFIELD: No. We were finished. We were moving on.

MS. HAGAN: No, not "we" were finished. You were finished. She hadn't finished answering your question. Would you let her finish answering your question, please?

MS. CANFIELD: Does Dr. Kaye remember my question?

THE WITNESS: Well, you asked me if I applied to or sought employment at Bellevue multiple times. And when things started becoming very stressful and painful from this harassment and bullying by CHS -- one incident after another -- I did reach out to Bellevue again trying to get back there and trying to get out of this -- away from these mean people.

//

BY MS. CANFIELD:

Q Okay. All right. So I was transitioning to the complaint because these are some of the things that you allege in the complaint.

So I wasn't trying to cut you off. I was just trying to take these allegations in a systematic way so we get through them all today, okay?

A Thank you.

Q All right. All right. I'm going to share what's been marked as Defendants' Exhibit B. It's the Amended Complaint. Or actually, it's the First Amended Complaint in this action.

MS. HAGAN: So that might not be the --

THE WITNESS: It's very, very small on the screen. I can't -- I --

MS. CANFIELD: Okay.

MS. HAGAN: Can't see that. Is there a way that you can --

THE WITNESS: That's better.

MS. HAGAN: I don't know if you could full-screen? Let's see. I'm going to -- I made mine full-screen, Dr. Kaye. Maybe that'll help.

THE WITNESS: How do I do that?

MS. HAGAN: It should be like a -- an icon in the upper right-hand corner. If you click on

view, it'll give you the option. Not the top. There's one on the upper right-hand corner on your -- I think on my screen, but it should be on your screen as well.

MS. CANFIELD: There's an X and then a restore up, restore down and then a minimize. If you go restore up.

THE WITNESS: Well, I don't know. That might be for a PC, but this is a Mac. I -- I --

MS. HAGAN: I have a Mac, too. Yeah. I'm not sure what happened there.

MS. CANFIELD: Okay.

BY MS. CANFIELD:

Q I just want to know -- this is the First Amended Complaint. I want to know if prior to this being filed with the Court, if you had an opportunity to review it?

A I -- I don't know if I had an opportunity. I have reviewed it. I have reviewed it.

Q Okay. You have reviewed it. Okay.

A I -- after it was filed, I did -- I did take a look at it.

Q Okay. Are the allegations in the complaint correct and accurate?

A I don't even -- I would need to go through

them one by one because I -- I can't -- I know there were some things in there that, you know, I -- I would -- I would -- maybe some typos or something. So I -- I don't know. I --

In general, I can say that it's hard to -- this is a document that I haven't gone through closely.

Q Okay. So why don't we go through some of the allegations together.

A Is there any way that you could make it a little bit bigger, please? Okay. Thank you.

Q Okay. Now the first set of allegations -- and I'm going to scroll down -- concern --

MS. HAGAN: Is it possible you could go to the last page so she can see this is the most -- the one that we actually filed with the Court? Because it'll have the date.

MS. CANFIELD: Yeah. I don't even -- this one's not even --

MS. HAGAN: It should have the date at the end.

MS. CANFIELD: Yeah, I know. But I was going to say this one's not even Bates stamped. I don't know why. I mean, not Bates stamped, but ECF.

MS. HAGAN: Yeah. That's why I was

thinking if you had the ECF version of it, then that would be helpful. April 30th. I'm not sure if that's the most -- actually, I'm not sure if that's the most recent one, but let's see.

THE WITNESS: I think there was one in May, wasn't there?

MS. HAGAN: I believe so.

MS. CANFIELD: Let me make sure that I have the operative complaint.

This is the complaint I have. It's dated May 30th. I mean, it's dated April 30th, but it was filed on May 2, 2019. And the copy that I have -- the hardcopy at my desk is dated April 30th.

MS. HAGAN: Well, actually, the one that was filed -- one of the versions that was filed with the Court was filed on April 30, 2019. And it had ECF Docket No. 22.

MS. CANFIELD: The one I'm working from is Docket No. 25-1.

MS. HAGAN: Okay. Let's see what this one is. Because there should be another one that was actually filed on May 3rd. There should be one that's dated May 3rd. That's not the one that you're showing.

MS. CANFIELD: Okay.

MS. HAGAN: Mm-hmm.

MS. CANFIELD: We were not served with one dated May 3rd.

MS. HAGAN: Well, the May 3rd one --

THE REPORTER: I'm sorry. Could you please repeat that, Ms. Canfield?

MS. CANFIELD: I said -- we're going to have to pull it off the docket because I do not have one that's May 3rd. Are those two -- are those copies exactly the same?

MS. HAGAN: No. The May 3rd and the April 30th versions are not the same, Ms. Canfield.

MS. CANFIELD: Terrific.

MS. HAGAN: The May 3rd version is 32 pages versus the April 30th being 29 pages.

MS. CANFIELD: All right. Let's take a five-minute.

MS. HAGAN: Mm-hmm.

THE REPORTER: The time is 3:22 p.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 3:29 p.m. We're back on the record.

MS. CANFIELD: Thank you. And apologies to everyone for sharing the wrong complaint

that appears to be the -- I don't know if that was a proposed First Amended Complaint, but it's not the one that was eventually filed on the docket.

I do have the proper document now. It's ECF No. 29. It was filed on May 3, 2019.

BY MS. CANFIELD:

Q So, Dr. Kaye, the question I had for you earlier was whether or not you had an opportunity to review this before it was filed. You said no, but that you have subsequently had an opportunity to review all the allegations in the complaint.

And my question is other than typos, are the allegations factually correct, if you can recall?

A Yes. There's typos in there though, but yes. And regarding the shift change, you know, there's typos. But the shift change increased my hours to nine hours a day, and it made my start time at 8:00 a.m.

Q Right.

A So that was very hurtful.

Q Okay.

THE REPORTER: That was what, ma'am?

THE WITNESS: That was very hurtful.

THE REPORTER: Thank you.

//

BY MS. CANFIELD:

Q So I am going to scroll through some of the -- I don't want to say boilerplate, but it's just setting forth facts that are set forth in every complaint concerning venue and jurisdiction. And I want to go to --

A Concerning what? I'm sorry. Concerning what? I didn't --

Q Concerning venue and jurisdiction, just setting out and then hear who the parties are.

I'm going to get to sort of the meat of the complaint here, okay?

Now the first section -- the factual section is your background information. I'm assuming that the allegations here are correct?

A No.

Q That you have a bachelor's degree from the University of Colorado, and a medical degree from the University of Pennsylvania?

A No, that's not correct.

Q Okay. What is incorrect?

A I have a medical degree from the Medical College of Pennsylvania, and I did my residency at the University of Pennsylvania.

Q Okay. Thank you. The next paragraph says

you have "the following licensures and certifications: Diplomate of the American Board of Psychiatry and Neurology; Diplomate of the American Board of Forensic Psychiatry; and Diplomate of American Board of Child and Adolescent Psychiatry." Is that correct?

A What was the date that this was filed?

Q May 3, 2019.

A That's correct, but incomplete.

Q What would you add to that paragraph?

A Well, it lists my board certifications, but my -- that's different than my licensing. And my licensure is a -- a license to practice medicine in the State of New York, and a license to practice medicine in the State of Pennsylvania which I put in inactive status.

Q Okay. Thank you. And this factual -- that you worked as attending level three since 1999; is that correct?

THE REPORTER: Could you please repeat that? I'm so sorry.

MS. CANFIELD: Sure.

BY MS. CANFIELD:

Q The paragraph that alleges that you worked as an attending physician level three since 1999; is that correct?

A At HNH.

Q At HNH. Okay. When you applied to HNH for a position, were you applying to the position of attending physician?

A I didn't know anything about the -- the lines or anything. I applied to work at the court clinic part-time. I was applying for a part-time job as a forensic evaluator at the court clinic.

Q Okay. And when you were first hired, did -- were you working as a part-time psychiatrist at the court clinics?

A Yes.

Q Okay. And how long were you part-time?

A I was hired part-time in August 1999. And I worked part-time until May 2000.

Q Okay. And after May 2000, did you then go full-time?

A Correct. Yes.

Q And who did you report to working as a forensic psychiatrist?

A I reported to the director of the Division of Forensic Psychiatry who at the time was Robert Berger, M.D.

Q Okay. And --

A Rob Berger.

Q Rob Berger? Dr. Berger?

A Dr. Berger, yes.

Q Okay. And you were working at the Bronx Criminal Court building; is that correct?

A Correct.

Q Okay. And do you -- and what specifically were you doing at the Bronx Court Clinic in terms of your work? And when you went full-time in 2000.

A I was doing court-ordered forensic exams for CPL 730 -- Criminal Procedure Law 730. Orders for competency to stand trial, and I was doing CPL 390 exams, which are pre-pleading exams -- presentence.

Q Any other type of exams?

A Those are the only two exams the court clinic was performing.

Q Okay. Any other type of work outside of examinations that the court clinic was performing?

A Was I doing other work through the court clinic besides 730 and --

Q And 390, yes. Correct.

A No.

Q Okay. Thank you.

A Well, I mean, I -- there were other tasks associated with my work.

Q Okay.

A Like --

THE REPORTER: I'm sorry. "Other tasks" --

THE WITNESS: Associated with my work doing these 390 and 730 exams, like testifying.

BY MS. CANFIELD:

Q Okay. And at any point did that change the type of work you were doing in the court clinics from 2000 forward?

A In 2004, I was promoted to medical director, so I then had the same forensic evaluation job duties and additional administrative work.

Q Okay. At any point after 2004, following your promotion, did the type of work you were doing at the Bronx Court Clinic change?

A It was always court-ordered 390 and 730 exams.

Q Okay. And did you ever do any work related to probation violations, or were those violations similar to the 390s?

A No, I did not. There was -- in I think it was 2016 maybe, there was an administrative -- in Albany -- in Albany, there was an administrative amendment or change to the CPL 730 statute that said that designated parolees eligible for a CPL 730

competency exam.

So then at that time, there was no specifics about who was going to do it, where, or how it was going to be funded but it turned out that the way the amendment to the statute was interpreted was that it was to be done by the county in which the parolee was being held.

So they were 730 exams, but now they -- it was a different -- an expanded population. It was now parolees in addition to charged defendants -- criminally-charged defendants.

So parolees were eligible for 730s, and because Rikers -- even though the bridge to Rikers is in Queens, the -- the island is in the water that is Bronx County. So any incident that happens at Rikers is a Bronx case.

So all of those parolees -- those 730 exams for parolees fell on the Bronx. And so we had to absorb -- absorb that.

Q How did that change the -- or did it change -- withdrawn.

How many additional 730s were you required to do on a monthly basis following the amendment to the 730 statute regarding parolees?

A Initially, it was about a 25 percent

increase in our volume of cases. As time went on and we cleared out the backlog, it -- it -- it ended up being maybe I would say three or four parole cases a month. But I --

Q When did it become approximately three to four parole cases a month? When did you clear up the backlog?

THE REPORTER: Please repeat the question. Sorry.

MS. CANFIELD: Sorry. I said -- why don't I just withdraw the question.

BY MS. CANFIELD:

Q When did you clear the backlog so as you only had about three or four parolee 730s --

A Well, you know, that's -- that's part of the retaliation that I experienced from CHS because they wiped out all our data. We had ten years of data on our computer with this very specific information in the computer, and the hard drive was wiped out. So they're trying to present it like the Bronx Court Clinic wasn't busy and we didn't see cases, which is absolutely not true. That data was in -- in our computer -- in LaKeisha Prasad's computer.

But I would say that, you know, I don't know how long it took to clear out that backlog. It was

months. Months and months.

Q Okay.

A And I didn't get any additional staff or additional funding, so it -- it fell on -- on me and Dr. Winkler alone to -- to -- to clean up those parole cases.

Q Okay. In 2015, who was -- who did you have on staff at the Bronx Court Clinic?

A Myself, LaKeisha Prasad, who is the ACM which stands for I think assistant -- assistant coordinating manager. And Dr. Barry Winkler, PsyD JD who was functioning as -- he had the title deputy director.

Q Okay. Was that the same in 2016?

A Dr. Winkler worked -- yes. Dr. Winkler worked for the clinic from 2008 until Elizabeth Ford pulled him in April 2018.

Q Okay. So from 2015 to 2018, up to April 2018, he was in the clinic. And the clinic in the Bronx was staffed by yourself, LaKeisha Prasad and Dr. Winkler.

Do you know who staffed the Manhattan clinic in 2015?

MS. HAGAN: Objection.

You can answer.

BY MS. CANFIELD:

Q If you know. That's fine. If you don't know, that's fine, too.

A I believe Dr. Ford gave -- because when -- when Steve Ciric moved from being an inpatient attending in the forensic unit at Bellevue, he was given that court clinic medical director job, that was under Dr. Ford. She was -- she was the director and she -- she gave him that position, and she gave him the physician specialist title. And --

Q Who else worked there with him?

A He worked there as the director. They had a lot of turnover with their part-time staff. And they had a kind of funky system where doctors worked part-time and they didn't really -- and they would come and go. You know, come and go. I mean, they would get hired, then they would quit, and they'd hire -- so there was so much turnover in staff in Manhattan, it was hard to keep up with -- but I know Myles Schneider was a psychiatrist that worked there for many years. I think --

Q I'm sorry. What was the name again?

A Myles Schneider.

Q Myles? Okay.

A Yeah. I think he was there for many years.

I think that they had some psychologists. I don't really know the names of -- they had some older part-time psychiatrists that quit and then they would hire people out of training, and then they would keep the job for a year or two and quit. So I don't remember the names, but I --

Q Okay.

A Yeah.

Q How would you say the volume of work compared between the Bronx Court Clinic and the Manhattan Court Clinic?

A I think, you know, there has been a lot of discussion about this. And the Manhattan Court Clinic had a higher volume. It covered the Port Authority and Penn Station and there was, you know, a lot of arrests on -- on that property. So they -- they definitely had a higher volume of cases and they definitely had more staff.

Q Okay. In terms of the Bronx Court Clinic, would you say that between 2004 -- well, withdrawn.

Would you say from after you cleared out the backlog of the parolee cases, was the volume at the Bronx Court Clinic pretty consistent from, say, 2014 to 2018?

MS. HAGAN: Objection --

BY MS. CANFIELD:

Q Or were there fluctuations in the amount of 730s and 390s that you were doing?

MS. HAGAN: Objection. It mischaracterizes her testimony. She said from 2016 there was an amendment to the 730 statute -- the parolees. So that -- it's not 2014.

MS. CANFIELD: Okay.

THE WITNESS: Well, I would like to just clarify that I'm not positive that amendment happened in 2016. It happened around 2016, I think.

BY MS. CANFIELD:

Q Okay. Subsequent to the amendment and subsequent to you clearing out the backlog, in your estimation, were the number of 730 and 390 examinations pretty consistent in terms of numbers from the time you cleared all those out to 2018?

A There was always a waxing and waning flow of work, and it corresponded with what was going on in the courts. Around the holidays, things would slow down. In August, usually things would slow down, but not always. But there would always be -- there was always busy -- busier periods and less busy periods. And there was some predictability to that, but not always.

Q Okay.

A There were months in August where we were really busy and yet the courts were half closed. So --

Q Okay. Okay.

A May I say something else or --

Q Yes, you may.

A I -- I do feel that I was miscategorized as -- as not working because for what -- you know, to try to -- I don't know. To defend this lawsuit or part of the retaliation. That's completely false.

And I wanted to say for the 20 years that I worked there, I never had sufficient staff. I never had enough staff to not be there. So if myself or Dr. Winkler took vacation, and we did, we would have to work double time to -- before and after our vacations to stay on top of the workload. Because when we were on vacation, no one else was doing the cases. And I had to -- I was the only director in the city who had to do half of every 730 exam because there has to be two evaluators. Every other director had enough staff that he -- that he could go to meetings -- or he or she could go to meetings and his staff could continue working and his service could continue operating. I was never afforded that. And it got worse after CHS

took over.

Once CHS took over in April 2008, when they -- when Dr. Ford pulled Dr. Winkler from my service, I did not have a full-time staff person up there again until December 2018. They had a part-time per diem person, Louise Mullan, she was only there a half a day a week, three days a week. So I had her in the mornings on Monday, Tuesday, and Thursdays. And she had to be out of there by 1:00 or whatever it was. And it -- it was just crippling to the service. And Dr. Ford had promised me -- and legal aid -- she would not pull Winkler out of the service until she had a replacement, and that's exactly the opposite of what she did. And she crippled the service. And the judges were upset and so was the -- so were the lawyers and the DAs.

Q Well, let me ask you, from the time that you went over to the court clinics and then they hired someone full-time, they had Dr. Mullan and they eventually hired Dr. Brayton [ph], were you not interviewing other psychologists or psychiatrists for that position?

MS. HAGAN: Objection as to form.

You can answer if you understand the question.

BY MS. CANFIELD:

Q I guess what I'm asking is isn't it true that you were interviewing? You were actively interviewing candidates, but that you were not happy with the candidates that presented?

MS. HAGAN: Objection. Assumes facts not in evidence.

THE WITNESS: Initially, Dr. Winkler and Dr. Jain would come up to the Bronx and we would interview prospective candidates. I know we interviewed one -- one person in particular who had no forensic training or experience, and we all three agreed that it would be problematic for him to try to do the work. And he was deemed not appropriate for the position.

And then we interviewed someone else. I can't remember who it was. Oh, yeah. And there was someone else who -- who didn't demonstrate any real understanding of the work and had no experience. And -- but the -- I know that they had a plethora of extra staff in Queens and they were just sitting around doing nothing. And they didn't send any doctors up from Queens. And Dr. Jain was supposed to be helping out as part of his role.

And after I had a serious discussion

with him in April, he refused to speak to me since April -- I mean, not April. It was October 2018. He wouldn't do cases with me. He wouldn't talk to me. He wouldn't help out in -- in the court clinic when I was out. I had to take leave for various reasons, also related to the shift change and the hardship it was causing.

He didn't even come up to the service to make sure things were running okay. He just, like, let it die on the vine.

And so --

BY MS. CANFIELD:

Q -- from October 2018?

A Yeah. I'm saying that he neglected the Bronx Court Clinic because he -- and he -- even after -- when there was, like, a dire staffing need, he wasn't coming up and doing cases. He wasn't letting me -- I offered to go down into other boroughs and do cases with people in other borough. I offered to do half of the 730 exams in the Bronx and they could send the defendant someplace else for the second half.

I -- I did -- I made so many efforts to be a team player, to try to get the work done, and I was just left in my office for six weeks. I think I only saw, like, three exams and one of them -- or two of

them was because a judge got so angry that it wasn't done that he started making phone calls, so they sent Dr. Winkler up there.

Q Okay. Well, let's try to say kind of with some timeframes. Because you said a lot right there and I think you were talking originally regarding October 2018. Then I think what you were just testifying to was some events that you're claiming happened right before you resigned. Am I correct?

A I --

Q So we need to put them in a little bit more of an order. And so they're -- they -- so we can pin down what you're referring to and what timeframe.

So it seems though to me --

MS. HAGAN: Objection -- the record.

THE REPORTER: I'm sorry, Ms. Hagan. Please repeat what you said.

MS. HAGAN: Objection. Ms. Canfield is trying to characterize Dr. Kaye's testimony and she's testifying onto the record.

So if you want to ask questions to ensure that's what Dr. Kaye was saying, then that would be permissible rather than you trying to interpret what she said.

MS. CANFIELD: That's fine.

MS. HAGAN: -- please.

BY MS. CANFIELD:

Q Dr. Kaye, are you saying that Dr. Jain did not email or assist you at all at the Bronx Court Clinic from October 2018 until the time you resigned?

A No. I'm not saying -- I'm not speaking in absolutes. I'm saying that after I told Dr. Jain about my EEO complaint and after I had told Dr. Jain and I spoke up at a division -- a director meeting for the FPECC -- that's Forensic Psychiatry Evaluation Court Clinics -- there was a directorship meeting in -- I don't even -- it might have even been before I worked formally for CHS. Because like I said, they had pretty much absorbed us by April, even though the formal switch didn't happen until July.

But I -- I complained about the ethical violations I -- of the private practice policy. I was concerned about how it was perpetuating fraud on the Court. And I expressed that and I -- and I complained directly at the meeting. And I complained to Dr. Jain afterwards. And it's right around that time I told them about my EEOC complaint. And the next day, he called me up and he was very stern and he said, "I am going to report you -- I am going to have to report you to Jonathan Wangel."

And then after that, he started picking on me. I mean, I had been denied access to any Chronos [ph] up there. They took over -- we were doing --

Q Okay. Okay. I'm going to stop you because we're going to go through the complaint. We're going to go through the complaint so we can speak to these one by one, okay? Because you're on a roll.

All right. So the first part of the complaint, beginning at paragraph 34, talks about the allegations concerning pay equity. That you believe you were paid up to $35,000 less than your male comparators, despite having more experience and credentials.

I'm going to skip that because we -- I think we exhausted that topic. Your counsel's free to cross you on that after we're finished, but I believe that we're finished with this portion.

But I do want to talk to you about -- you testified earlier about having a meeting with Mr. Wangle and Ms. Laboy about your compensation. And you also testified this morning that you were not offered a managerial position -- that it was never offered to you. And I just want to show you that email that you sent --

A And I didn't say it wasn't offered. I said

Dr. Ford sent me this email saying I would have to give up my union benefits if I were to get -- if I wanted pay parity -- what had been going on for the last six years and longer at Bellevue.

Q So you would have to go into a managerial title, which would -- okay.

A Which wouldn't have been pay parity because Steve Ciric --

THE REPORTER: I'm sorry. Repeat what you just said, Ms. Kaye.

THE WITNESS: Yes. I -- I was told I would have to give up my union benefits if I wanted "pay parity." But it wouldn't have been pay parity to my comparator, which was Steve Ciric, because he was in the union and he didn't have to give up the union to be in a physician specialist line. That's what I was asking for, to be the same as him.

BY MS. CANFIELD:

Q Right, right. But he never made it over the transition from Bellevue to CHS; isn't that correct?

A Right. But this is all --

Q So at that time, he would not have been a proper comparator because he was not coming over; is that correct?

A No, I disagree because it was all HHC and I

began complaining about this when I was still working at Bellevue. And I had brought it to Bellevue's attention and I was told that I couldn't change my line, but that information was incorrect, at least at CHS where people's lines were getting changed and also -- I understand Steve Ciric's line was changed from attending three to physician specialist when he transitioned out of his treatment in a chief role at Bellevue to director of the Manhattan Court Clinic.

Q All right. I have emails a series of emails -- this document was produced by the plaintiff. There's Bates stamp numbers K000035, 36 to 37. And this appeared --

(Exhibit C was marked for identification.)

MS. HAGAN: -- please, since we haven't had an opportunity to look at it beforehand.

THE REPORTER: I'm sorry, Ms. Hagan. Please repeat what you said.

MS. HAGAN: I'd like to look at Exhibit C. Is this Exhibit C as in Cat, Ms. Canfield?

MS. CANFIELD: Yes, ma'am. Yes, ma'am.

MS. HAGAN: I'd like to look at it. Could you please scroll down?

MS. CANFIELD: Yes.

MS. HAGAN: I'd like to have Dr. Kaye to have an opportunity to look at the document. So I'd like to look at it from the beginning of the thread, which is probably at the end of the document.

MS. CANFIELD: This is the end. This is the end of the document. It's an email dated April 30th from Dr. Kaye to Jessica Laboy and Jonathan Wangel. The subject is "Melissa Kaye BHC to CHS line change."

MS. HAGAN: Okay.

BY MS. CANFIELD:

Q It says, "Hello Mr. Wangel and Ms. Laboy. Thank you for taking the time to talk with me about the pending change of my line on July 1, 2018. I understand from our conversation that everything will stay the same and nothing will change when my line is transferred from Bellevue to CHS. My current benefits and job duties are:" --

MS. HAGAN: Okay. Keep going.

BY MS. CANFIELD:

Q I just want to direct your attention to number two where it says, "I will not be taken out of Doctors Council and put on a non-unionized managerial title [sic]."

MS. HAGAN: Could you please tell her

to continue to read the document, Ms. Canfield? The entire document.

MS. CANFIELD: That's fine, but I'm going to go back to paragraph number two.

MS. HAGAN: I'd still like to read the entire document, please. Thank you.

MS. CANFIELD: I sent it to you.

MS. HAGAN: Well, when?

MS. CANFIELD: I just sent it to you.

MS. HAGAN: We're trying to look at the document. Dr. Kaye doesn't have it.

BY MS. CANFIELD:

Q Let me know, Dr. Kaye, when you want me to scroll down further.

A Okay. It sounds like I'm listing some of the benefits of my -- my employment and unionized line that corresponds to being told I would be grandfathered in and nothing would change. I don't think I hit every single point, but it's a partial list.

Q Okay. So again, directing your attention to paragraph number two in which you write, "I will not be taken out of Doctors Council to be put on a non-unionized managerial line."

This suggests to me that you had a

discussion with Ms. Laboy and Mr. Wangel about possibly going into a managerial line.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Is that correct?

A That's false.

Q That is correct?

MS. HAGAN: No, she --

MS. CANFIELD: I'm sorry.

THE WITNESS: It's false. I did not have a discussion about that specifically, but I did have a discussion about that with Dan Mundy who was squirming a lot about making that decision, because he was forced to.

See, he was not the director of the Manhattan Court Clinic. Had he been the director of the Manhattan Court Clinic at the time of the rollover, he would have been in a unionized line and he would have been in the same position that I was in. He would have rolled over as a unionized manager, "managerial line." But he did not have that choice because when he was working at the Manhattan Court Clinic, he was a part-time forensic evaluator. Steve Ciric was the director in a unionized line. And so when Steve Ciric left and that position opened up, it

became -- they just -- they closed out the -- the unionized director line and turned it into a managerial line, and then --

BY MS. CANFIELD:

Q And I'm sorry, how do you know this?

A Because it's -- it's what happened.

Q No. I'm saying how do you know this happened?

A Because Steve -- it's just -- Steve Ciric was in a unionized --

Q No, no, no. I need to know who told you that's what happened? That sounds like something that's administrative. I want to know how you learned that and who told you -- who knows -- who would have personal knowledge that that is exactly what happened?

A As I said --

Q Versus scuttlebutt, hearsay, rumor.

MS. HAGAN: Objection. Mischaracterizes -- argumentative.

THE WITNESS: I --

THE REPORTER: I'm sorry. You're all talking over each other.

Ms. Hagan, can you please repeat what you just said?

MS. HAGAN: First off, it's

argumentative. I also want Dr. Kaye to have the opportunity to read the rest of the email because there's more to this email. Could you please scroll up further, Ms. Canfield, before she finishes her question -- or answer?

MS. CANFIELD: The other email is completely unrelated.

MS. HAGAN: Ms. Canfield, you showed this as Exhibit C and Dr. Kaye --

MS. CANFIELD: Ms. Hagan, you have a copy. I'm not going up. You just -- you're being argumentative for the sake of being argumentative.

MS. HAGAN: Well -- because --

THE REPORTER: I'm sorry. I missed everything you just said, Ms. Canfield.

MS. HAGAN: First off --

MS. CANFIELD: I said I'm not scrolling up. This is my deposition. Ms. Hagan, you have a copy of the document. I do not need to -- the witness if it's unrelated.

MS. HAGAN: -- Dr. Kaye has an opportunity to read the rest of the exhibit.

THE REPORTER: Ms. Hagan, please start over what you just said.

MS. HAGAN: I said we're just going to

have to wait until Dr. Kaye has an opportunity to read the rest of the exhibit, and I can forward that to her now.

Now the judge said that they're supposed to be contemporaneously provided, which means --

MS. CANFIELD: It is provided.

MS. HAGAN: -- had the opportunity -- she should have it too then. She should have it too and she does not.

MS. CANFIELD: I will scroll up. This is a completely separate email that you sent -- two months later. And I'm not going to question you on this right now.

MS. HAGAN: It's in the exhibit and she's talking about --

MS. CANFIELD: Ms. Hagan, please stop. Please stop. We're going to be here until 8:00 if you don't stop interrupting.

MS. HAGAN: All right.

BY MS. CANFIELD:

Q Dr. Kaye, you say here in the second sentence of this email: "I understand from our conversation that everything will stay the same." Are you telling me that you did not talk about not

being taken out of Doctors Council, but you put it in the email anyway?

I do not --

A I -- I -- I can tell you that I knew from talking with Dan Mundy --

Q I don't want to hear about that. I want to hear about what did you talk about with Mr. Wangle and Ms. Laboy?

You're telling me on the record under oath that you did not discuss remaining in the union and not going into a managerial title?

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q You did not discuss Dr. Mundy's situation? Is that what you're telling me?

A Well, I'm saying --

MS. HAGAN: -- email above as to why she talked about --

THE REPORTER: Ms. Hagan, please repeat what you just said.

MS. HAGAN: Why Dr. Kaye mentioned the managerial discussion in this email is in the email above --

MS. CANFIELD: It's not. She just forwards it to someone else. This happened two months

before, Ms. Hagan. You're testifying. I want the witness to answer my question.

THE REPORTER: I'm sorry. I'm sorry. You're both talking. I need you both to talk one at a time. I'm sorry. The record is not going to be good if you don't speak one at a time.

MS. HAGAN: It happened a month later. And again, it explains the rationale as to why Dr. Kaye had mentioned the discussion of managerial -- the managerial -- the transition from managerial line. The --

MS. CANFIELD: Ms. Hagan, you're testifying now. Please.

BY MS. CANFIELD:

Q Dr. Kaye, I wanted to know --

MS. HAGAN: You need to let --

MS. CANFIELD: Ms. Hagan, please. Ms. Hagan.

MS. HAGAN: You need to let her read the exhibit the way you insisted that --

THE REPORTER: I'm sorry. Ms. Hagan, I didn't hear what you said.

MS. HAGAN: Ms. Canfield insisted during my depositions that all of her witnesses got a chance to read the entire exhibits that she provided

-- that I provided. Dr. Kaye should have that same luxury. I don't have that luxury. She --

MS. CANFIELD: Is this a childish tit for tat at this point? If so, I will assuage your concerns.

MS. HAGAN: Yes, please.

MS. CANFIELD: Okay? This --

MS. HAGAN: From the beginning.

MS. CANFIELD: This is completely unrelated.

MS. HAGAN: Number two -- let's please -- no, it's not.

MS. CANFIELD: This actually buttresses my argument. So read it.

MS. HAGAN: Keep going. Yes. And then keep going.

MS. CANFIELD: I will when Dr. Kaye tells me that she has read the email.

THE WITNESS: Okay. Okay.

MS. CANFIELD: Okay.

MS. HAGAN: Could you scroll up first? Further up to the end of the email.

MS. CANFIELD: This is it.

MS. HAGAN: Okay.

//

BY MS. CANFIELD:

Q So my question is to you, again, you testified that you did not talk to Mr. Wangel and Ms. Laboy about the fact that you're going to stay in your unionized title and not move to a managerial line. This email suggests otherwise.

A No. That's not -- that's not accurate because I talked to them about being in Doctors Council union and all the associated benefits with Doctors Council union. So by definition, that means I'm not being moved out of Doctors Council union into a managerial line.

Did they say to me, "Oh, we want you to move into a managerial line so you can have pay parity"? No, they did not.

Did they --

Q Did they say you're welcome to move into it or did you ask and say, "May I move into a managerial line so I can have pay parity"? Did you ask to be moved into that line?

MS. HAGAN: Objection. You need to let her finish her answer. Please let her finish her answer.

THE WITNESS: I think I made it clear when I got that email from Dr. Ford with this nebulous

enticement into taking a managerial line and giving up benefits in the union. I thought shew as trying to lure me into a position where they could fire me at-will because I had picked up hostility and -- and -- and she had been marginalizing me. And she had not treated me fairly since I worked for her. So I was -- I was leery of that and it was something I was not interested in. So I did possibly emphasize to Laboy and Wangel that, you know, I wanted -- that, you know, I -- Doctors Council union said I was being grandfathered in as-is, and nothing's going to change. And Wangel kept saying, "Everything's going to stay exactly the same. Exactly the same. Exactly the same." The only difference is is that the monies used to pay you are going to flow through CHS rather than Bellevue.

I never asked or made any indication that I wanted to change to a managerial line. And it was actually the opposite for all the reasons that I've previously discussed.

BY MS. CANFIELD:

Q Right.

A I wanted to stay in Doctors Council union. I wanted to stay in my unionized leadership role -- semi-leadership role. And I had had conversations --

multiple conversations with Dan Mundy and he was getting pressured to take that job as director in a managerial line. And he -- he --

Q We can get an affidavit from Dr. Mundy on what he did or did not say or how he felt. Let me ask you this question.

MS. HAGAN: Objection.

MS. CANFIELD: Aren't you the -- hold on.

BY MS. CANFIELD:

Q Isn't it true that you were the only director at the court clinic who did not take a managerial line?

MS. HAGAN: Objection as to form.

THE WITNESS: I was the only director who rolled over in a managerial line. Dr. Mundy was newly hired as a new director under CHS. Dr. Winkler was newly hired as a director under CHS. And Elizabeth Owen had been in a managerial line at Kings County.

So I was the only director who rolled over in a non-managerial line -- in a unionized line -- and I was told, and my union was told, that I would be allowed to stay in that -- in a unionized line. And so that's one of the promises that was made to me.

BY MS. CANFIELD:

Q Okay.

A And then -- I'm sorry, but then to -- you know, because I was trying to fix a longstanding pay parity issue, it was presented to me that that wouldn't be something that could be fixed unless I was -- there was a coercive attempt to make me get out of the unionized line just to fix a longstanding pay parity issue with my comparator, who was in a unionized line.

So it seemed -- it didn't -- I mean, it's like apples and oranges. They're -- they're two different --

Q Right. But we've already established --

THE REPORTER: I'm sorry. "Apples and oranges." Two different what?

THE WITNESS: Issues.

THE REPORTER: Thank you.

BY MS. CANFIELD:

Q But we've already established that Dr. Ciric did not make the transition to CHS.

MS. HAGAN: Objection.

THE WITNESS: Please. I was told that if I transitioned to CHS, that I would -- nothing would change. Nothing with my job and my working

conditions would change, and that I would be permitted to stay in my unionized line. I was told that.

MS. CANFIELD: Right. Right. I understand. I understand.

BY MS. CANFIELD:

Q Okay. So you allege in the complaint that after making the transition to CHS and remaining in your unionized line, you made the complaint that you still were not being paid as well as the other directors. Meaning Dr. Mundy, Dr. Winkler and Dr. Owen; is that correct?

A My -- my direct comparators, you know, it's -- the way the lines work and the way pay structures work at HHC, you know, whether you're an M.D. or a psychologist, has -- has bearing on -- generally on your -- on your pay. And what I was asking and -- and M.D.'s are typically paid more. And all I was asking -- and it was an easy fix. And if -- and it was just out of retaliation and spite and trying to get rid of me because I was speaking up for defendants' due process rights and constitutional rights, that all they needed to do was change my line to physician specialist and give me a comparable pay to what Steve Ciric was making. And without the longevity pay, without the retention bonus included as my base

salary. And it was an easy fix because that's what -- they were changing lines. It was something that could be done and I had been misled, for whatever reason, and I don't know if that was intentional on Dr. Badaracco's part or not. I'd like to think not, but I was told my line couldn't be changed to address this problem.

Then at CHS, lines are getting changed for unionized employees and I requested for my line to be changed to physician specialist with the commensurate pay increase, and it was an easy fix. I didn't need to be coerced or forced out of the union because, you know, my entire career at HHC to date of my EEOC complaint was -- my male comparator was a unionized employee.

So that's what the basis of my complaint was. A male comparator who was in the union, was in a higher title -- a higher paying title -- and I just wanted the same as him. That's all.

Q Okay.

A I wasn't asking for something unusual.

Q Okay. So you sent Dr. Yang an email. You complained about pay parity. Your attorneys at the time thereafter -- Bantle & Levy -- and I cannot show all the exhibits because I think we can agree your

attorneys at the time sent a letter about pay parity; is that correct?

A Yes. I believe they were speaking with Blanche Greenfield.

Q Right. Then thereafter, you filed a complaint with the EEOC, correct?

A Correct.

Q Okay. And as you testified earlier, you said that you revealed to Dr. Jain that you had filed a complaint with the EEOC.

So my question is why did you disclose that to Dr. Jain? What did you hope to accomplish?

MS. HAGAN: Objection as to form and argumentative.

You can answer.

THE WITNESS: I wanted to be open and transparent. And I -- it was -- he was new in the position and I was trying to help and support him. And I didn't want him to get blindsided by someone else. And I thought it was respectful and professional for me to inform him myself so that he wouldn't be caught flatfooted as my direct report. And I told him about it.

One, I thought that it was the respectful thing to do for -- to inform my supervisor

because supervisors generally want to know what's going on before they hear about it from somebody else.

And two, I had hoped that he would help me just fix this problem. It wasn't, to me, a hard fix. It wasn't something that was complicated.

Unfortunately, after I told him, he -- he started retaliating against me. He called me the next day. He was very stern. He said he reported me to Jonathan Wangel and --

BY MS. CANFIELD:

Q Let me stop you right there. When you say "reported you," what did he report you -- you make it sound like it's punitive. What do you mean he reported you? Did you do something?

MS. HAGAN: Objection as to form. Argumentative.

THE WITNESS: His tone was stern and punitive. He acted like I had done something wrong. He had -- he treated it and he made it sound like I was being reported, and he used it in a stern, punitive tone. And yeah, to him, I guess -- I guess it was punitive.

BY MS. CANFIELD:

Q Okay.

A And then this was -- and this was right

around the transition -- the official transition. Not the unofficial transition, which started happening much earlier, as I said. You know, in April, if not before.

And the official switchover for my time being -- was -- last day on the payroll at Bellevue was June 30th. First day on the payroll at CHS was July 1st.

Q Right.

A And --

Q Can I ask a question? Before you revealed to Dr. Jain that you had filed an EEOC charge, had you been speaking with him about pay parity and asking him to assist you?

A I spoke to -- there was an April meeting in -- at Water Street -- 55 Water Street in April. And there was a lot of different people -- court clinic people. And I don't -- maybe Elizabeth Ford was there and -- and then after that meeting, I -- I approached Dr. Ford and Dr. Jain and I told them about the pay parity issues and my concerns --

Q Right.

A -- about pay parity. So then Dr. Ford, you know, escorted me over to talk to Jessica Laboy and Jonathan Wangel.

And so I had told him about -- I had brought it up verbally to both of them in April.

Q Okay. And that's around the time that you met with Jessica Laboy and Jonathan Wangel as reflected in the email that we just reviewed. The email dated April 30th; is that correct?

A It was --

Q Yes. Okay. Okay. When you met with Jonathan --

THE REPORTER: I'm sorry. Please repeat the answer.

THE WITNESS: It was the same day.

BY MS. CANFIELD:

Q Okay. When you met with Mr. Wangel and Ms. Laboy, was your union present?

A No.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Okay. Did you have subsequent meetings with Mr. Wangel and Ms. Laboy where your union was present concerning the terms and conditions of your employment?

A Yes.

Q Okay. Now in your complaint, you allege that you believe that your title, which was proposed

to be changed from medical director to director, was retaliatory for filing your EEOC charge; is that correct?

A It was one of many things that was retaliatory.

Q Okay. My question is why do you believe that the decision to change not just your title, but to make everyone's title director was retaliatory for filing your EEOC charge?

MS. HAGAN: Objection as to the form. It assumes facts that were not put into evidence. There's no foundation. Counsel's testifying.

MS. CANFIELD: You can answer.

MS. HAGAN: Plaintiff doesn't necessarily agree if everyone's title was changed.

MS. CANFIELD: Okay. So she can testify.

MS. HAGAN: Mm-hmm.

THE WITNESS: So again, I was promised by Jessica Laboy and Jonathan Wangel in April, that day that I spoke to them -- Jonathan Wangel was like a mantra. He kept saying, "Everything's going to be exactly the same. Nothing will change." Like, no matter what I would bring up to me, he'd say, "Nothing's changing. Everything's going to be" -- and

I went through a litany of things, verbally, and then I recaptured some of them in that email. Maybe not all of them. And he just would always say the same thing. And he assured me that nothing would change.

And, you know, be -- so I made a decision based on his what I considered a verbal agreement -- contract -- a verbal agreement with me and my union that I was going to be grandfathered in -- unionized with my benefits. And my longevity pay and my -- my corporate title, my functional title.

And so then suddenly, like, I mean I don't -- I -- it was like right after, like, I -- I complained about pay parity, all the sudden I'm, like, getting this change in my title which, you know, was problematic and reflected a demotion. To me, it was a demotion.

For my work and what I do, and in the eyes of people that I work with, it reflected a demotion.

BY MS. CANFIELD:

Q How did you first learn that there was a talk of changing the title from medical director to director?

A I -- I'm trying to think. I think I got an email from Andrea Swenson telling me that my title had

been changed.

Q Okay. And what was the email in relation to other than the fact that your title had been changed?

Actually, let me ask you this. Was it in relation to business cards that you learned that there had been a decision to change all the directors of -- change all of the heads of the court clinics to a director title?

A Well --

MS. HAGAN: Objection.

THE WITNESS: -- I mean, I don't know that that characterizes it correctly because changing titles --

BY MS. CANFIELD:

Q The question is is that how you learned of the change? Through the email from Andrea Swenson concerning business cards.

A Some people were new to the position, so whatever title they -- didn't have a previously title. And --

Q Now my question is was it in connection with business cards?

A It was -- it was like three days --

MS. HAGAN: Objection.

THE WITNESS: -- it was three days

after I filed my EEOC complaint. The next thing I know is I'm being told that I'm no longer medical director.

The reason I found that -- I found it retaliatory and I also found it a demotion because that --

BY MS. CANFIELD:

Q That's not my question. My question is isn't it true you first heard about the decision to have everyone referred to as directors was when Andrea Swenson sent out an email about business cards?

MS. HAGAN: Objection.

THE WITNESS: She wanted to put me --

MS. HAGAN: Objection.

THE WITNESS: She wanted me -- she put me on those business cards as my title. She did not put me down as medical director. She put me down as director.

So yes, it was -- she was going to implement that demotion on my business card.

BY MS. CANFIELD:

Q Okay. Let me ask you this. Were the business cards ever printed?

MS. HAGAN: Objection.

THE WITNESS: I got a box of them, yes.

MS. CANFIELD: Okay. And --

THE REPORTER: Please repeat the answer.

THE WITNESS: I got -- I was given a box of the business cards, yes.

BY MS. CANFIELD:

Q Okay. And what was your title on the business card?

A Director.

Q Okay. And do you know -- have you ever seen Dr. Winkler's business card as head of Brooklyn Court Clinic?

A I don't know if I -- I don't know. Dr. Winkler's not a physician, so the medical director issue wouldn't pertain to him.

Q Okay. But my question was have you seen his business card?

A I don't -- I -- she sent copies of people's business cards. I don't know -- I don't know if everybody's was included, so I -- I don't remember.

Q Okay. Did you see -- ever see a copy of Dr. Owen's business card?

A I believe that -- like I said, I believe that in that email, she sent copies. I'm trying to think if --

Q I want to know -- after you received your box of cards, I want to know if, after you received your box of cards, if you saw a business card from Dr. Winkler or Dr. Owen? An actual business card, not what was in the email, but the actual business card. Did you see --

A At the -- at a division meeting -- a forensic -- an FPECC -- FPECC stands for Forensic Psychiatry Evaluation Court Clinics. And -- division director meeting with Jain -- it would be Dr. Jain, Dr. Mundy, Dr. Owen and Dr. Winkler.

Q Okay. And you saw Dr. Owen and Dr. Winkler's business card?

A Dr. Jain handed out everybody boxes of -- their box of their business cards.

Q Okay.

A Now did I -- at other people's business cards? I really don't know.

Q Okay. Did you see what Dr. Mundy's business card said on his box of business cards?

A I -- I don't know. I mean, Dr. Mundy was a new director. He wasn't getting a change in title. This was his given title that he was hired into.

Q Okay. Okay. But he's a medical doctor, correct?

A Correct.

Q Okay. Now are you aware that there's been evidence in the record -- and I'm sure that your attorney's going to object to this, but that some people at CHS thought you had quit your position in the beginning of June 2018?

MS. HAGAN: Objection.

THE WITNESS: I'm sorry. I'm getting this bizarre phone call. I don't know if it relates to my children. I'm asking permission from Counsel to take this call?

MS. CANFIELD: Yes. Take five.

THE REPORTER: The time is 4:25 p.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 4:34 p.m. We're back on the record.

BY MS. CANFIELD:

Q You can answer.

A Okay.

MS. HAGAN: Objection on the record.

MS. CANFIELD: Okay.

THE WITNESS: Yes. I -- the amount of unsubstantiated rumor and falsehoods that would swarm around with CHS and Patsy Yang and all of her

employees was astounding. There were constant rumors and it was like a big game of Red Robin. And the amount of falsities that were in these emails, and mistruths and distortions is mind boggling. So I am not surprised to learn that there was that false rumor.

BY MS. CANFIELD:

Q Okay. So prior to the transition, there was at no point immediately beforehand that you were wavering as to whether or not you wanted to go to CHS or you were just going to retire or resign?

A Well -- well, first of all --

MS. HAGAN: Objection.

THE WITNESS: -- I had never wanted to retire early. I -- I took a huge hit to my pension. I would still be in that job if -- if I had my druthers.

So no, I did not want to retire or resign. And yes, as I said before, I was exploring the option with Dr. Badaracco and Jeremy -- Dr. Jeremy Colley about the possibility of staying at Bellevue.

And I was also exploring with my union and CHS leadership and management what kind of protection or guarantees I was going to have, or agreements, verbal contracts, whatever you want to

call it that I was going to have if I rolled over with the transition and how, if at all, it'd affect my working conditions.

So yes, I was exploring that situation and it was not just a one-shot deal. It happened over an extended period of time. How that turned into a false rumor that I was quitting or resigning or retiring, that I can't, you know -- that would be -- you'd have to speak to the people who were spreading the rumors.

BY MS. CANFIELD:

Q Okay. Fair enough. All right. So you allege in the complaint that somewhere after filing your EEOC complaint, that your shift was changed. And you believe that that was retaliatory. Why do you believe that?

A I told Dr. Jain -- it was a one, two punch. Because right around the end of June to the beginning of July is when I informed Dr. Jain about my EEOC complaint. And that's when I was told in a stern and punitive manner that I was being reported to Jonathan Wangel.

Simultaneously or contemporaneously, there was a meeting with the FPECC directors. And at that meeting, Dr. Jain distributed the CHS private practice

policy, which had been authored by Dr. Ross Macdonald. That was either at the end of June of beginning of July.

At that meeting, I -- none of the directors seem to have seen this policy or known about it. We had been told previously by Elizabeth Ford, since April, that CHS Legal was working with the Conflict of Interest Board and looking into it and they were going to come out with a formal policy. And people were wondering and waiting for that.

I certainly was never given an opportunity to voice an opinion or -- and put suggestions into an edited draft. And I don't believe -- other doctors were. I'm sorry.

Q That was going to be my question. Were any of the other doctors given the opportunity?

A I don't believe they were. And the reason I say that is because at this directors meeting, Dr. Jain distributed the final draft. It was -- I mean, the final copy. The final version. And I know I had never seen it before. And I know Dr. Winkler had never seen it before. And I got the very strong impression, especially given Dr. Elizabeth Owen's reaction to it, that she had never seen it before because she got quite upset and started complaining

that she felt infantilized and she -- she kind of went off. And Dr. Mundy also had a bunch of questions and concerns. And so I got the strong impression that none of these directors had been involved in drafting that.

So at the meeting, that became the topic of discussion. And, you know, I expressed concerns about it. And, you know, I almost -- I basically felt it was -- you know, it was setting up a situation where there was going to be fraud on the Court. Misrepresentation to the Court.

Q Can you explain what you meant by that?

A Yeah. Because basically the stakeholders involved in hiring these doctors for private work are the same stakeholders for which they provide a city-salaried service to. So the lawyers, the prosecutors, the judges, all these same pool of individuals -- and the same defendant pool, actually -- is -- that the -- the FPECC doctors are paid by the city to do neutral, objective court clinic evaluations for competency and for 390 exams, which are really -- they have a label pre-pleading, presentence exams, but they're kind of like mental health --

THE REPORTER: They've been labeled what?

THE WITNESS: Pre -- pre-pleading, presentence exams, but they're very much more -- in practical terms, they're used -- in practical terms, they're used more as like a mental health screening. A mental health evaluation. And they can be ordered at any time during proceeding. They're sometimes even ordered at arraignment, even though they're technically presentence.

BY MS. CANFIELD:

Q I don't understand quite how there'd be a fraud on the Court. Are you saying that --

A Yeah. I'm sorry. Go ahead.

MS. HAGAN: Please explain.

THE WITNESS: So basically --

THE REPORTER: I'm sorry, Ms. Hagan. Please repeat what you just said.

MS. HAGAN: I said she needs to finish her answer. She needs to explain.

MS. CANFIELD: I'm just trying to move it along. Again, I want to finish tonight.

THE WITNESS: You know, I -- these are -- these are very complex and layered issues.

And so some of the doctors were kind of developing overly friendly relationships with lawyers and being influenced in how in the findings of their

730 exams in order to establish a business relationship that would get them private referrals.

BY MS. CANFIELD:

Q Okay.

A And so I found that problematic. And the other thing that was problematic that was going on, particularly under Dr. Owen in Brooklyn and Queens is the -- the -- the -- the doctors were being paid to do neutral competency exams, and they weren't supposed to be getting influenced by -- whether or not that lawyer could refer them a private case and had a certain agenda with the finding of fit or unfit, which is exactly what was happening.

The other problem was with the private practice policy, it was saying that the doctors could do "mitigation reports," which is basically what a lot of the times the Court is ordering a 390 for.

So they were farming out all of the court-ordered 390s that would have been done on their city-salaried time to themselves as private referrals.

Q Okay.

A So they were doing city work as private referrals. And the third reason I had a problem with it is because the defendant pool -- it was kind of artificially trying to isolate the ethical and legal

parameters by borough, which was ridiculous because many defendants had cases in multiple boroughs, either simultaneously or -- or consecutively, right? So that made no sense.

And so what was happening is these doctors were ending up conflicting themselves out of city-salaried job duties because they had already -- because they were doing private work on these cases. And, you know --

Q Okay.

A -- so it just seemed like -- and no one would give me a straight answer if this had ever even been formally vetted by the COB.

And so --

Q All right. Hold on. I just want to back up. I have a question about that.

When you said nobody -- you said it was vetted, who are you talking about? Dr. Macdonald or Dr. Jain?

A When I say nobody, Dr. Ford had actually said it was being vetted by the COB. But when I then went back and asked specifically, Dr. Jain said it was -- well, let me just finish.

So after the meeting, I -- I came out against it. So I became a permanent target for Dr.

Owen and Dr. Mundy. They were -- that was, like -- that was it. I was, like -- I was persona non grata. I -- I was public enemy number one. And they started -- suddenly I became the problem child in the Bronx and I was bonkers. And they wouldn't answer my emails and on and on. So that precipitated them coming after me.

And then after that meeting, that's when they really started disliking me and -- and not -- and -- and defaming me. And then after that meeting, I met one-on-one with Dr. Jain and I was very clear that I didn't think there should be any private practice policy because Dr. Winkler was already telling me about the abuses that were going on with some of doctor -- some of the psychologists that had worked under Dr. Owen, and some of the abuses that Owen had -- herself had been involved with. Like socializing and partying and -- with -- with defense attorneys and prosecutors to private practice.

So all these, like, very questionable boundary violations as far as, like, whether, you know, this is -- these are business relationships -- private business relationships or are these relationships that city employees have with city employees.

Q Okay. I'm going to stop you now just so I can ask you follow-up questions. Because I'm going to forget my follow-up questions if you continue, but I'll let you talk after.

First question is this.

MS. CANFIELD: Please, Ms. Hagan. Please, Ms. Hagan.

Q Your position was that you believe there should be no private practice policy. Does that mean there should be no policy or no one should engage in private practice?

MS. HAGAN: Objection. Objection.

THE WITNESS: I -- thank you for asking that. I -- I never really -- I always felt it was a little funky and I never even knew about the Conflict of Interest Board until they started talking about it.

But as I started -- as I was -- when that was brought to my attention and then I started thinking about it more, then I went online and I looked at it and I read --

BY MS. CANFIELD:

Q Okay. But my question is -- I know you want to tell me how you got there, but my question is did you have a problem with doctors engaging in private practice or did you have a problem with there being a

memorialized policy at CHS?

A I --

MS. HAGAN: Objection as to form.

THE WITNESS: I -- once I realized the issues and once I looked at a previous finding of the COB, I did not think that they should be doing private practice within the City of New York.

BY MS. CANFIELD:

Q Okay. Okay. Thank you. Thank you. But weren't you as well engaging in private practice with your consultancy and doing your -- evaluations?

A -- I'm talking about --

MS. HAGAN: Objection.

THE WITNESS: Yes. Thank you for clarifying that. I'm talking about specifically doing forensic psychiatric legal exams for the same stakeholders doing the same work --

BY MS. CANFIELD:

Q Okay.

A -- for the same legal stakeholders in the same court setting. I thought that was -- it was -- with -- with potentials to bias and alter CPL 730 results and exams to "woo" private practice. It was fraught with the outsourcing of 390 exams as --

Q Okay. Okay. I understand now. I

understand.

A -- treatment. I didn't say, "Oh, you can't have a -- you can't have a private" -- I wasn't saying --

Q Right.

A -- all moonlighting. I was just saying specific psychiatric legal exams for the same stakeholders that they were providing city services for --

Q Okay.

A -- for the same population of defendants --

Q All right. So in the beginning --

THE REPORTER: I'm sorry. What did you say after "defendants"?

THE WITNESS: And the same courts and the same attorneys.

BY MS. CANFIELD:

Q Okay. You stated that once this private practice policy was unveiled, you said that all the directors were unhappy and that Dr. Ford said that she felt "infantisized"?

A No. I didn't say that. I'm sorry. Let me clarify, if I did. I said Dr. Elizabeth Owen, the director of the Queens Court Clinic, felt infantilized.

Q Okay.
A And I think that's I-N-F-A-N-T-A-L-I-Z-E-D. It means, like, made to feel or treat --
Q I know what it means. I just wanted to make sure that --
MS. HAGAN: -- for the record.
BY MS. CANFIELD:
Q -- I thought you said Dr. Ford testified to that.
A I may have mistakenly said that.
Q Okay.
A Dr. Ford was not at that meeting. Dr. Owen said that and Dr. -- I -- I know that they were very unhappy that I voiced concerns about defendants' legal rights being violated and there being possible deceptive practice in -- in the 730 practice that could affect the Court's ability to rule neutrally on capacity. They did not like that.
Q Was there anyone -- what was Dr. Winkler's position on the policy, if you know?
MS. HAGAN: Would you allow her to finish what she was saying --
MS. CANFIELD: No. I need to move forward. I need to --
MS. HAGAN: She needs to be able to say

because this is -- this goes to the core of her claims and the constitutional --

MS. CANFIELD: I know. And there's something that --

MS. HAGAN: -- be able to articulate that. So you won't say that she didn't. So what --

MS. CANFIELD: No. I'm saying she can --

MS. HAGAN: -- complain about exactly at the meeting.

THE REPORTER: Please repeat what you just said, Ms. Hagan.

MS. HAGAN: Dr. Kaye needs to finish saying what she was complaining about as far as why the policy was problematic, and what it implicated, before Ms. Canfield cut her off.

Dr. Kaye was explaining the legal and the constitutional implications that were invoked by this problematic policy.

Could you finish testifying, Dr. Kaye?

MS. CANFIELD: Actually, Dr. Kaye explained it and I said I understood it. And I would say it's probably ethical considerations rather than constitutional considerations.

MS. HAGAN: That's not what she said.

MS. CANFIELD: But we're both testifying right now --

MS. HAGAN: Yes.

MS. CANFIELD: -- so let me follow-up with my question to Dr. Kaye.

MS. HAGAN: Well, let her finish what she was saying.

MS. CANFIELD: No. We're moving on.

MS. HAGAN: You cut her off.

MS. CANFIELD: She already finished it.

MS. HAGAN: No. You can't cut her off like that. That's not right.

MS. CANFIELD: Ms. Hagan, you have an opportunity when we're finished to question the witness.

MS. HAGAN: You can't cut off the deponent.

MS. CANFIELD: I can.

MS. HAGAN: No, you cannot.

MS. CANFIELD: I can. It's my deposition. Dr. Kaye --

MS. HAGAN: No, you can't. No, you can't.

THE REPORTER: Please speak one at a time. I'm sorry, ladies.

BY MS. CANFIELD:

Q Dr. Kaye, what was Dr. Winkler's position on the private practice policy?

A He was --

MS. HAGAN: If you know.

THE WITNESS: -- he was fairly quiet at the meeting relative to Dr. Owen and Dr. Mundy. Afterwards, he said, yeah, you know, he agreed with all my concerns and that, you know, it led to -- possibly led to biased reports being submitted to the Court. But he said to me -- well, do you want exact quote or do you want a paraphrase?

BY MS. CANFIELD:

Q Whatever you feel comfortable sharing.

A He said, "Well, screw it. They said I could do it, so" -- he said, "I don't care. Screw it. They said I could do it. It's their problem."

Q Okay. Now so other than --

A He really didn't say "screw it." He said, "Fuck it."

Q I figured that. Other than expressing your concerns to Dr. Jain at that meeting and after the meeting, did you express your concerns to anyone else about the private practice policy? And when I say "anyone else," I'm talking about anyone that you

reported to.

A I -- you mean in my chain of command --

Q Right.

A -- above Dr. Jain?

Q Correct.

A That would be Dr. Ford. I complained to her about numerous things in a meeting I had with her on November 30th.

Q I want to know specifically about the private practice policy. Did you specifically complain to her about that?

A No. She cut that meeting short. I don't think I had time to. It was on my list, but she --

Q Okay. Okay.

A -- about that.

Q Now we got on this topic on the private practice policy when I asked you why do you believe your shift change was retaliatory. Are there any other reasons other than your complaints regarding the private practice policy that you believe led to the fact that your shift was changed?

A I believe it -- that my complaint at that meeting in January 2018 about misuse of HIPAA releases for -- for criminal defendants because I felt coercing possibly incapacitated individuals into signing a

HIPAA release without legal representation was a violation of their constitutional rights. I complained about that in January. And I believe that my complaint about the private practice policy and my complaint about pay parity caused me to be targeted. And the shift change was just the beginning of an absolute hellish campaign of terror to make me quit.

Q Okay. Is it your belief that you were the only unionized employee that had their shift changed?

MS. HAGAN: Objection. As to unionized, she didn't say that.

MS. CANFIELD: I know she didn't. I'm asking the question.

BY MS. CANFIELD:

Q Is it your belief that you're the only unionized employee that had their shift changed?

A I believe that Patsy Yang is a cunning and ruthless individual and the way that her and Jonathan Wangel did this was to cover their tracks. Ostensibly, "everybody" had to be the same. Suddenly -- suddenly, the system couldn't handle a 30-minute lunch, although my time had been put in on a 30-minute lunch prior for years and it was the same Axial [ph] system at central office that -- they all use the same system. So that was a rouse.

And the other rouse was, oh, the doctors in Manhattan -- the three psychiatrists or four psychiatrists -- the four male part-time psychiatrists are getting their shift changed, too. They have to have an hour unpaid lunch. Well, you know, it turns out that some of them didn't take a lunch because they were part-time and they didn't work long enough to have a lunch.

Others, you know, they didn't -- they might not have had a full eight-hour day or they might have had the luxury of having a nice long lunch in Chinatown down at Center City -- in Center City by -- you know, on Center Street -- I'm sorry. By where the -- the courthouse was in Manhattan. And it didn't affect them and impact them and upend their life or their children's lives.

So it was very convenient to have that as a rouse that it was affecting them, but it wasn't affecting them the same as it was affecting me. I was the only full-time employee that it caused hardship for and there was no need for it. I mean, it was very -- it was very crafty to use 30 minutes of unpaid time to force -- to force me out so I would have to torture my children in the morning to come to work every day because suddenly, not only did they change -- add the

30 minutes of time to my workday, they moved my start time to 8:00 in the morning. And the courthouse didn't even open and get going till 9:30 or 10:00. I would have been fine if they had let me work -- I was already working -- I was already on-site an extra half hour, and that wasn't enough. They -- they had to just go in for the kill and make -- and make it nine hours.

So everybody else was on-site for eight hours, but they made it so I had to be on-site for nine hours. And --

Q When you say "everyone else," are you talking about the other directors who were managerial?

A I'm talking about all the FPECC --

MS. HAGAN: Objection. Objection.

THE WITNESS: -- employees.

THE REPORTER: I'm sorry. Please start your answer over.

MS. HAGAN: I'm saying objection because Counsel continues to try to testify with her questions. She did not say anything about the other directors being managerial and non-managerial. Dr. Kaye doesn't know what their status was.

MS. CANFIELD: I think there's testimony that the other three are managerial. So

that's been established.

BY MS. CANFIELD:

Q My question is when you say "everybody," I want to know who everybody is. Are you talking about your comparative directors?

A I'm talking about other CHS FPECC employees. I'm not aware that anyone had an adverse --

MS. HAGAN: Can you hold on for a second, please? Hold on for a second, please. Hold on.

I'm sorry. I had to stop the vacuuming in the background. I'm sorry.

MS. CANFIELD: Okay. Well, at least you have a clean house.

MS. HAGAN: We try, in some parts.

Okay. Yes. Keep going.

THE WITNESS: So I'm not aware that any other FPECC director or FPECC employee had the system manipulated to the point where they had to be working a nine-hour day. There was no reason for it. There was no functional, operational reason for it. It was sadistic and it was retaliatory, and I know that and they know it. And I had conversations with Dr. Jain about it and he was fully aware of how difficult it was for me. And -- and Dr. Ford was fully aware of

how difficult it was for me. And that's why they dug their heels in about it because they knew ultimately it was going to break me.

BY MS. CANFIELD:

Q So tell me, why was it difficult for you? What changed and made it difficult?

A Being at work at 8:00 in the morning instead of 9:00 in the morning when I'm trying to get two kids to school and one of my kids has problems and issues that contribute to chronic sleep deprivation. And then to have to drag him out of bed an hour early so -- you know, so that I -- I could accommodate an unnecessary shift change that -- that violated the agreement that my union and I had with CHS about when I rolled over. I was told nothing would change and everything would stay the same.

They had a duty and a right to inform me that this was going to happen, because had I been told that, I would not have been -- I would have not rolled over. I would -- I don't know what I would have done. I would have looked for a unionized line at Bellevue. I would have done whatever I needed to do, but there would be no way I would have ever agreed to that. They -- it was a bait and switch and it was retaliatory. And it was done to drive me out of my

job, and it worked.

Q So --

A They had to do a lot of other terrible things to me before I just couldn't take it anymore. And they also used the criminal defendants and the legal system as pawns in this -- in this attempt to get me to quit. I mean, they wouldn't staff my -- my clinic.

Q Okay. I'm going to get there. I just want to talk a little bit more about the shift change.

You said that prior to the shift change, you were going in at 9:00 a.m. And then with the shift change, you were going in at 8:00 a.m.; is that correct?

A They told me I had to come in at 8:00.

Q Okay. And what time did your son and daughter need to be at school?

A Well, school -- what do you mean "need to be at school"? What time did school start?

Q Yes.

A I think school started -- gosh, I don't even know. I should remember. I think it was like maybe -- I think they had to be there at 8:25 if I'm not mistaken.

Q Okay.

A I could be wrong about that. It might be 8:00.

Q Okay.

A It was something. It was some weird, like, time almost not on the hour, at a half hour. I think 8:25.

Q And how far from your apartment did you need to travel to bring your children to school?

A Three blocks.

Q Okay. And when you were required to go in at 8:00 a.m., would you have another caretaker take your children to school?

A No. I -- I -- I -- the school was not open as early as I needed to have them dropped off to -- to get there by 8:00, but they did open, like, 15 minutes after the time I -- I needed to drop them off. And I spoke with the person who did coverage for the early morning and I told them what was going on. And as a favor to me, he was coming in 15 minutes early so I could drop them off early.

Q When you say the person that does coverage for you, are you talking about someone that helps you take the kids to school in the morning or someone at the school?

A One of the teachers at school that did

coverage for the early -- the early morning period at the school. There was an early morning drop-off period at the school and they would have different teachers cover that -- to come in and cover that. And one of the teachers that did it most frequently, I talked to him and he said he would come in a little bit early so I could drop them off earlier than they normally would be dropped -- allowing people to drop off kids.

Q Okay. And so what time would you be able to do drop-off? The earliest you could drop off?

A I think it was -- I think he had the school ready and open for me -- he had to come in and get everything open and ready before he could bring kids in the school. I don't know if he would get there at 7:00 or 7:15 to do that. I don't know exactly what that entailed, lifting up the gate and doing all this other stuff.

Q What time were your children allowed or able to go to the school? 7:15 or 7:30?

A I don't remember, but I know that there was -- there were times -- it was a conflict for me to -- I wasn't able to definitely get them there every day at the time -- and get to work unless I had him agree to come in early for me.

Q Okay. So sometime between 7:15 and 7:30, you would be able to drop off your children in order to get to work by 8:00?

A Yeah.

Q Okay. And how long is the train ride? You were living on the upper east side? How long was the train ride to the Bronx courts? Twenty minutes?

A Well, you know, it's variable with the trains, but it was -- it was a walk -- you know, the train -- it's a walk to the train. It's a schlep to the train from -- you have to go to 86th and Lexington.

Q For the Express, yes.

A Well, it had to be the four, right? The six -- I mean, you know, you could take the six from 77th and Lex, but you had to get on the four.

Q Okay.

A And, you know, I mean you have -- it was -- it could be door to door 40 minutes if you want to -- if you want to calculate in possible delays and problems.

Q Okay. Forty minutes from the time that you left your house, dropped off the kids and then were able to make it to the Bronx courthouse?

A Yeah. Once you got to the Bronx, it was the

Yankee Stadium stop.

Q Right.

A -- a bit of a walk up the hill, over the Grand Concourse, down the hill and then into the building.

Q Okay. So when you were required to come in at 9:00, you would just drop off your children at 8:25. There was no sort of like an early morning drop-off; is that correct?

A No. I would drop them off before 8:25 because -- maybe 8:10 or something.

Q Okay.

A But the school was fully open by then. It wasn't, like, an issue that the other -- you know, and then they -- yeah. Yeah.

Q Okay. All right. I'm trying to get an idea about how the shift changed affected your morning commute and your morning.

So essentially --

A It --

Q -- it caused the need to get the children up an hour or so earlier.

A Yeah. My son would cry that, you know, "Mommy, Mommy, I'm so tired." You know, it was awful. Like, I was like torturing my children and I was going

to work knowing I'm torturing my children to satisfy sadistic retaliatory shift change.

It was -- it created a really negative to -- to do that to me. It was very hostile, and then it was cruel and so unnecessary.

And then I -- I -- I tried every which way to get it restored to what they had promised me it would be, and they would say -- and -- and Jain would say, "Well, you can come in at 9:00, but then you have to stay till 6:00." I'm like, "The courts close at 4:00. It's pitch black up here and my kids' school closes at 6:00." Like, that's not helping me. Why did you change my shift? It was wrong. It was -- it was wrong and I -- when I had a big -- in October, I told him -- I said, you know, I was so upset because it was just killing us. And then there were a lot of other things, too. This wasn't the only thing.

It was all these other -- I know you don't want me to get into that --

Q We're going to get into them. I just want to close off each thing we're talking about. And I do have another follow-up with the shift change. I'm going to share my screen again and show you paragraph 57 of the complaint.

And you say here that "Yang, Wangel and Jain

knew the shift change would make it impossible for Kaye to care for her sick son." And I guess what I want to know is that other than the disruption in having to get up an hour earlier, what type of illness does your son suffer from that made it impossible for you to care for him having to be at work an hour earlier?

A Because he has -- he has a -- I guess it stems from an immune problem, but he has this -- he had an excoriating rash all over his body that was disfiguring and disabling and they couldn't figure out what it was. It was -- you know, of course it was severe eczema, but you know, they thought he had all these immunologic problems driving it and he got all this work up and he had patch testing and all of this. And he ended up, you know, as we honed in on the diagnosis, they were able to hone in on the treatment. He has allergic contact dermatitis where common chemicals in the environment cause just this horrible kind of blistering, excoriating rash. Fragrance is one of them. Lanolin, neomycin, this thing called thiourea which is a component of rubber. I mean, all of these things. And as we started trying to identify -- we identified those and started trying to eliminate his contact with them, it wasn't completely possible.

But, you know, he wasn't using fragranced soap. That was -- you know, that kind of stuff.

And he had been put on these steroids and he was growing black hair on his body. I mean, it was awful. And he was having behavior and emotional problems from the high-potency steroids. It was -- and simultaneously, he was -- he had some life-threatening anaphylactic -- anaphylaxis to cashews. And ended up, you know, having to carry EpiPen. And so he had these type four just delayed hypersensitivity allergies, then he had these acute mediated food allergies. So he had all this -- and plus, he had all these developmental delays. That's why I had -- needed services from the DOE.

And it was just really frustrating dealing with the allopathic medical approach to his illness and the steroids and I -- an allergist referred me to a doctor who specialized in -- she's an M.D. pediatrician, but she's from China and she has a specialty in traditional Chinese medicine treating children with asthma, eczema, food allergies, these -- these kind of allergic diseases. These immunologic, allergic diseases with Chinese medicine protocols that she studied scientifically at the Jaffe Food Center.

And when I started -- and I found her on --

I'm thinking it was like May of 2018. And she had a protocol that he was supposed to be on and I had to apply all of these potions like they were these things that I would -- she would -- I would buy from her and it was actually her husband's business who I would -- he had the business of selling the things that she prescribed.

It wasn't prescribed in a medical sense. It was like alternative medicine.

But I had to put it all over his skin and I was supposed to do it in the morning. And I was like, well, this kid is completely sleep deprived already because of the shift change, so you know, am I going to inflict more sleep deprivation on him to put his medicine on him? To put the Chinese -- the TCM -- standing for traditional Chinese medicine ointments and creams on him? Or, you know -- and so it kind of -- I was like he had already suffered with this sleep deprivation from the rash itself. The pain, the itching. And then the steroids were, like, psychostimulant and he was all revved up from those. So he had these chronic sleep issues and deprivation because of the illness. And then, you know, this unnecessary shift change was like a nail on the coffin. It was awful.

And so sometimes I'm like, okay. This -- and so it made it very difficult for me to comply with this Chinese medicine protocol for him with this -- and be at the Bronx in the morning.

It would have been --

Q So --

A -- if I had been able to -- to be there --

THE REPORTER: I'm sorry. Repeat everything you said after 8:00 in the morning.

THE WITNESS: it would have been doable if I was allowed to go there at 9:00, like they had promised me when I rolled over. My shift would have been 9:00 to 5:30.

BY MS. CANFIELD:

Q Okay. Does your son still apply the -- what you call the Chinese medicine or potions, or have they got the eczema under control?

A He had a very intense -- you know, there were herbal pills -- capsules he had to take twice a day. The -- the treatment creams on the skin. And then these therapeutic baths that he -- and he does take this therapeutic bath still.

I'm waiting to get more of the creams because he's having problems still with his hands because all this washing with the pandemic and him not

-- him -- if he doesn't use fragrance-free soap, and they make -- whatever. His hands -- but there's -- you know, there's been a supply chain issue, so -- yes. I have the herbal bath treatments that he still takes a bath in those. We've run out right now of the -- of the capsules and some of the creams we've run out of. And so I'm just waiting till that, you know --

Q Okay.

A -- the supply chain -- the supply chain issue around that is resolved.

Q Okay. All right. I'm going to move beyond the shift change unless there's something -- I think you've told me how it's affected your family's life and why you believe it was retaliatory.

Any other reasons why you believe it was retaliatory besides the equal pay complaint, the HIPAA release complaint and the complaint about the private practice policy?

MS. HAGAN: Excuse me. Could you clarify the question? Retaliatory? You talking about the shift change being retaliatory or if she explained --

MS. CANFIELD: Yes.

MS. HAGAN: -- other forms of

retaliation?

MS. CANFIELD: No, no. The reasons that she believes the shift change was retaliatory.

BY MS. CANFIELD:

Q I believe you testified because your complaints of pay equity, your complaints about the private practice policy and your complaints about the HIPAA release. Is there anything else that you believe or things that you did that caused retaliation with respect to the shift change?

A I believe I was targeted for retaliation because somehow -- and it seems very sexist and -- to me. Somehow I was scapegoated for the redacted issue -- redacted records issue that CHS got itself into by defying a court order.

Q Is this the redacted issue that we talked about earlier today -- this morning?

A It was an ongoing issue. It probably started -- you know, it periodically rears its head.

Q Okay.

A It started I would say for -- for the -- for the incident where I was scapegoated for that, I would say it started maybe in, like, mid-2017 where CHS was very much involved in it because they were custodians of the records at the time. Even though they hadn't

come -- you know, it'd be another year or so before they took over the court clinics, they were getting court orders from judges in the Bronx. Senior, experienced judges in the Bronx, multiple court orders from different judges for different defendants.

Q Right. Right.

A And it was -- defying them and handing out redacted records. And defense counsel was up in arms. They went to Judge Torres, the chief administrative judge, and complained to him.

Q Okay. I know, I'm going to stop you. Other than the redacted records, too. I'm familiar with the redacted records. I think that --

A Yes.

Q -- we talked about it this morning. Anything else that you believe you did that --

A I believe that because I was not willing to roll over to the unsound decisions of CHS and its legal advisors, and the Court threatened to hold HHC in contempt, somehow that was turned around to be my fault as if I created that problem. I -- I kept trying to step back and let it be between the courts who were writing these orders that CHS was defying, and letting them deal with it. And of course, I'm going to get a little bit caught in the crossfires. I

was the medical director. I had -- I was -- I was an intermediary, but it wasn't my fault and I wasn't doing anything wrong.

But I --

Q But isn't that issue --

THE REPORTER: I'm sorry. Repeat what you said after, "I wasn't doing anything wrong."

THE WITNESS: I became "the troublemaker."

BY MS. CANFIELD:

Q But isn't that issue still related to the redacted records? The contempt issue?

A Well, CHS got itself into that situation because they were not complying with judicial orders in the Bronx.

Q Concerning unredacted records, correct?

A Unredacted records.

Q Okay. All right.

A And then I had mentioned to Jain -- Dr. Jain, I told him -- it was all around the same time because I had found out about -- I had found Dr. Lee. I had gotten my kid to see her and I had been told about this protocol that he was going to go on. And this was May-ish of 2018. So I mentioned it to Jain -- Dr. Jain, that I may look into FMLA to -- to deal

with it because I wanted to make sure I complied fully with the protocol.

And so that was another thing I felt like -- then they started messing around with me about and denying it, then retroactively denying it. And then --

Q All right. Let's talk about that then. Okay. You brought up your FMLA leave.

You believe that your FMLA leave was denied or not granted as a result of retaliatory animus, meaning that this was deliberately done to you in retaliation for your complaints?

A I believe that I started having a lot of repeated difficulties with routine matters. When I rolled over from Bellevue, I was on a 40 hour a week pay with a 30-minute half hour lunch. I was denied access to Chronos, the electronic timekeeping system. They didn't install it in the Bronx, so I was dependent on Dr. Jain to enter in my time. And I told him at the beginning of July that I work a -- you know, that I work an eight-hour day with a 30-minute unpaid lunch, and he lurched at me. He was, like, sitting in his chair and he got this aggressive posture with his body and he said, "No, you don't. That's not true." And he leaned forward and he, like

-- and it was like he was attacking me, you know? And accusing me of lying about that.

And I said, "It is true." I said, "Let me get my" -- I had paper copies of all my timesheets I had turned into Bellevue for the last ten years, as did LaKeisha. They were in her office. I went and I got a timesheet from Bellevue, a copy, and I said, "Look here." And I would show him. And I showed him what -- what it was. And he proceeded to ignore me. And then I never had access to Chronos until the middle of August. And when I looked in there, he had been putting my time in wrong. He had been putting me in for seven hours of work and one hour of unpaid lunch. So I was getting docked an hour of pay every day for six weeks. And that's --

Q Do you believe that he was doing that intentionally, or was it as a result of the decision by Jonathan Wangel to retroactively make you work the nine-hour day that we were just talking about consistent with the work rules at CHS?

MS. HAGAN: Objection as to form, and assumes facts and --

MS. CANFIELD: That evidence will bear it out.

//

BY MS. CANFIELD:

Q Do you think that Dr. Jain was deliberately entering in your time?

A I believe he was deliberately entering it in wrong because he knew I was working a 40-hour work week. He knew I was -- had a 30-minute lunch. And it was before Wangel did -- in August, he did retroactively alter my timesheets. He and Dr. Jain and Patsy Yang. But at this time, they didn't go back that -- I wish I had -- they kicked me out of my office, so I don't have all these copies of the stuff that I normally would have had if they hadn't kicked me out of my office.

But they're -- these -- we had to meet my union representative, Nate Santamaria [ph], we met with Jonathan Wangel in September -- September 7th. And I remember that day because --

Q What year? 2018 or 2019?

A '18. '18. I was double booked -- intentionally double booked for a meeting in the Bronx when I told Dr. Jain and Andrea Swenson that I wasn't -- be down on Water Street.

But -- so those hours were -- he -- so I was getting docked an hour of pay a week for six weeks, and then --

Q And were you ever reimbursed that money or was it hours that you weren't working because you were not working the number of hours that you should have been working?

A No. I was working the -- the normal hours I always worked. I was working eight hours a day with my 30-minute lunch. There was nothing that I was doing differently, I just was no longer allowed to fill out my timesheets because they denied me access to the electronic timekeeping system. And --

Q Okay. My question is were you not paid? Okay. Two things. One, you said that you were denied access to electronic timekeeping system. Was it even installed then when you say that you were denied access?

A No. They didn't bother installing it --

Q Okay. So you believe -- you believe --

THE REPORTER: I'm sorry. What did you say after "installing it"?

THE WITNESS: No. They did not install it. They delayed installing it. They knew they were taking over the clinics in January, but in July, they hadn't even started to consider doing whatever it is they needed to do to install the electronic timekeeping system.

BY MS. CANFIELD:

Q Okay. And you believe the fact that they didn't install it until late in the game, that that was deliberately an act of retaliation against you?

A I believe there was deliberate retaliatory sabotage directed against the Bronx Court Clinic --

Q Okay.

A -- in order to make me look bad and to force me to quit.

Q Okay. And when you say that you were docked pay, were you -- did you have to take annual leave to cover those hours or you just did not receive that pay in your check? Or was it corrected eventually by payroll and timekeeping?

A Well, that's a lot of questions and I want to be succinct.

MS. HAGAN: Objection to the form. It is a compound question.

MS. CANFIELD: It is. Well, let's take them one at a time.

THE WITNESS: Thank you.

BY MS. CANFIELD:

Q When you say "docked pay," were you not paid your full paycheck or were you required to take annual leave to cover your full paycheck?

A Okay. To clarify, annual leave is paid because when you separate from service, you can convert annual leave into a cash value.

Q Correct. I'm talking about when you were docked though. I'm not talking about when you left.

A So when -- so I was unfairly and illegitimately being docked annual leave that I shouldn’t have been.

Q Okay.

A And I have never to this day had all of the surreptitious alterations in my pay and my timesheets which have subsequently affected my pension addressed. They have, to this date, not -- to this day, have not been addressed.

We went down -- and when I say "we," I'm talking about Nate Santamaria and myself went down to meet with Mr. Wangel the beginning of September because of this.

I was -- we were told -- Mr. Wangel admitted to me and my union member that Patsy Yang was behind the shift change. That she was behind this retaliatory shift change. He admitted that to us in the meeting and he promised that he brought out some sheets that he had and my union was --

And some of this was beyond my

sophistication and skillset. Like, it was a lot of stuff my -- you know, I wasn't used to scrutinizing this kind of computerized paperwork for -- I'd never had this problem at Bellevue. So it was --

So all this stuff, and my union -- he went through some of it with my union. My union had a lot of concerns and questions. Mr. Wangel had promised us at that meeting on September 7, 2018, that he was going to get documentation from the Axial system, or something like that. Which was the -- like, the motherboard or the -- the primary central timekeeping system through central office for HHC. And that my union had wanted this kind of documentation to prove that I wasn't being unfairly docked pay.

Q And did your union ever receive that information?

Okay. Was your union --

THE REPORTER: Please repeat your answer.

THE WITNESS: No.

BY MS. CANFIELD:

Q Did your union ever -- or was it expressed to you by your union that the issue had been resolved with timekeeping and payroll subsequent to meeting with Mr. Wangel?

A No.

Q Okay. Did your union then file a grievance on your behalf?

MS. HAGAN: Okay. Okay. I'm going to stop you for a second because there's an hour left to this deposition. I just want to make sure. Can you please check your time --

MS. CANFIELD: I'm going to need more time than an hour.

MS. HAGAN: Well, it's an hour. You have seven hours a day.

MS. CANFIELD: I know. I'm going to need more time.

BY MS. CANFIELD:

Q Dr. Kaye, did your union file --

MS. HAGAN: How much time do we have left?

MS. CANFIELD: Excuse me. You're wasting time.

MS. HAGAN: Wait, wait, wait, wait. I'm going to ask him --

BY MS. CANFIELD:

Q Dr. Kaye, did you --

MS. HAGAN: No. I'm asking the reporter a question.

MS. CANFIELD: Excuse me, Ms. Hagan.

MS. HAGAN: I have a right to ask a question as far as time management is concerned.

MS. CANFIELD: Not when I'm still trying to get through the deposition.

MS. HAGAN: You're cutting me off. I'm trying --

MS. CANFIELD: Off the record, please. Off the record.

THE REPORTER: The time is 5:29 p.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 5:30 p.m. We're back on the record.

MS. HAGAN: And there are 54 minutes left. Thank you.

BY MS. CANFIELD:

Q Dr. Kaye, did your union file a grievance on your behalf regarding your pay and the docking of your pay?

A I have --

Q That's a yes or no question, please. I'm sorry. I'm trying to get through this. Yes or no?

A No. I can't -- it's not a yes or no question because I have been after my union from when

I found out about this in August 2018 to February of this year to address all of the payroll and pension irregularities that I have suffered for retaliation by CHS. And they have chosen to, you know, conspire with Mr. Wangel and politics and they assigned me a union rep who kept going in and out and in and out from a medical problem. So I'd go -- they'd tell me he was going to help me and then he'd be out for three months with a medical problem. They didn't give me any replacement.

And I have sent email after email to my union and they have not responsibly followed up with the grievances that should have been filed over -- and this isn't just the first instance of -- of being docked pay. They reduced my salary. I --

Q Okay. The --

A Well, no. I'm sorry, Ms. Canfield, but I got W-2s that showed that my salary had been reduced. I don't know how they did it, if they cut my longevity pay or if they changed me to an attending two, but I was -- I got, like, $28,000 pay cuts from CHS and I got docked for taking off the Jewish holidays after the system told me that I had time, and timekeeping told me that I had time. And I got emails from Labor Relations that told me I had time. And they would

send me these drop-and-run Friday afternoon emails that I was getting docked pay. And they did it two pay periods in a row. And the --

THE REPORTER: Please speak slower.

THE WITNESS: -- surreptitiously denied my educational leave and changed it -- docked me annual leave without telling me. And this was just an ongoing assault with --

BY MS. CANFIELD:

Q I'm going to stop you right now, please.

Okay. Did you file a complaint against your union for breach of duty of their representation?

A I --

MS. HAGAN: Objection.

THE WITNESS: I contacted the NLRB.

BY MS. CANFIELD:

Q Okay. And did you file a grievance or bring an improper practice claim against your union?

A I explained the situation --

MS. HAGAN: Objection.

THE WITNESS: -- to them and they told me to contact the -- the Manhattan DA's office.

BY MS. CANFIELD:

Q Okay. And have you contacted the Manhattan DA's office concerning the conduct of Doctors Council?

A Not yet.

MS. HAGAN: Objection.

BY MS. CANFIELD:

Q Okay. You mentioned your board examination being docked pay. Were you eventually paid for the time that you spent taking the -- your board examination?

MS. HAGAN: Objection.

THE WITNESS: I endured a lot of --

BY MS. CANFIELD:

Q The question is were you eventually paid for that time? Yes or no?

A I had -- I had --

Q Yes or no please.

A I didn't --

Q I'm going to have to call you back, Dr. Kaye, if you do not just answer my questions.

Were you eventually paid for that time?

MS. HAGAN: Objection.

Continue. Answer the question as you see fit.

MS. CANFIELD: No. That's my time -- that's my question.

BY MS. CANFIELD:

Q Were you eventually paid for that time --

MS. HAGAN: -- how she answers your question.

MS. CANFIELD: Excuse me, Ms. Hagan.

BY MS. CANFIELD:

Q Were you eventually paid the time?

MS. HAGAN: Do not harass --

THE REPORTER: I'm sorry. I didn't get anything that either of you two just said.

MS. HAGAN: Ms. Canfield is harassing the witness. She's cutting -- bullying.

MS. CANFIELD: I am not. You keep continuous -- you interrupt me.

BY MS. CANFIELD:

Q Dr. Kaye, were you eventually paid the time that you spent taking your board examination?

A I was denied the time. I was harassed and humiliated, and I had to fight and complain and threaten to go to central office and contact Bellevue before I was eventually given part of the time for an all-day board exam. And I continued to push the issue. They claimed that my board exam in child and adolescent psychiatry was irrelevant to my job, when in fact we have 16, 17-year-olds rotating through the court clinic who've been waived into Adult Court for violent felonies. It was not irrelevant to my job.

Q Okay. Let me ask you a question. Isn't it true that as a result of the fact that you petitioned to have your board examination paid for, that CHS and HHC changed their policies and now everyone can have their board exams paid for? Isn't that true?

A I have no idea what their policies are.

Q All right. I'm going to talk to you now about taking FMLA leave. Did you ever, during the time that you were employed by CHS, ever have your FMLA leave denied?

A Yes.

Q Okay. When?

A I don't remember the timeline. Initially, I filled out the paperwork -- well, Dr. Lee filled out the paperwork and I submitted it. And there was -- because of the nature of his illness, she had put in dates where we knew he would be out of school and I was going to be taking time off and doing his creams at a more frequent interval. And then if he had periodic flares, that was unpredictable.

So she had written something in there. I don't remember that there was these set days, and then there were these unknown days.

And I took some FMLA, and then it was retroactively denied because Dr. Lee didn't define the

-- the days where he was possibly going to have a flare, which is ridiculous. She --

Q Let's be careful here. Was it retroactively denied or did they just simply ask for more information?

A No. They --

MS. HAGAN: Objection -- testifying.

THE REPORTER: I'm sorry. What did you say, Ms. Hagan?

MS. HAGAN: I said objection. Counsel's testifying. Form of question. Objection to form.

BY MS. CANFIELD:

Q Go ahead, Dr. Kaye.

A If I recall, I got an email that said -- because I had put in for it I think and it said that -- I think it was denied and it had to be resubmitted.

Q Okay.

A I believe that it was retroactively denied is the way I read -- recall reading that email. And --

Q Okay. Did you eventually -- were you eventually granted FMLA time once you resubmitted the paperwork with more specific dates?

MS. HAGAN: Objection. You're

testifying.

MS. CANFIELD: No. It's a question. I said "were you."

THE WITNESS: Well, I'm sorry. I can't really answer that yes or no because what happened is that they were then charging me my -- you know, I had eight hours of -- of time a day for FMLA and they were telling me to put in this one code for FMLA and this other code for annual leave. Because I had annual leave, so it wasn't unpaid time. And then they were charging me 18 hours a day instead of 9.

BY MS. CANFIELD:

Q Was that eventually corrected?

A I have no idea because all these concerns that I brought to everyone's attention were considered me -- you know, I was labeled as being petty and having a litany of complaints and not being a team player, and resistant and overly concerned about benefits. None of it was taken seriously. I -- and the payroll --

Q Was that the same with your union, too? Did you complain to your union about the FMLA leave?

A I complained to my union about the reduction in pay as demonstrated by my W-2s in '18 -- I guess it would be '18 and '19. I complained -- I was supposed

to get the doctors in Doctors Council union after ratification of the contract were supposed to get backpay, which periodically happened over the, you know, 20 years. You would get some amount of money. And I never got any information about how much I was supposed to get, and if I got it all. CHS wouldn't give me any information. My union -- I have slews of emails -- I guess we'll go to the Manhattan DA's office at some point --

Q Did you turn over those emails to your attorney so they could be turned over to me about your complaints about CHS?

MS. HAGAN: Objection.

THE WITNESS: No because we're not suing my union at this point, so I didn't.

BY MS. CANFIELD:

Q But aren't they complaints to your union about CHS?

MS. HAGAN: Objection.

THE WITNESS: They're complaints about discrepancies in my pay and wanting to clarify -- I -- Jonathan Wangel fiddled around with my full-time status so I would only get two-thirds of my bonus retention. I was even told that when I called central office. It was Matthew Camponese's [ph] secretary.

She's like, "Oh, no. Jonathan Wangel confirmed that you're only part-time." So --

BY MS. CANFIELD:

Q So let me ask you a question. Right now, I'm going to call for the production of the emails between you and your union about pay discrepancies.

MS. HAGAN: Objection. And I'll take it under advisement.

MS. CANFIELD: You can take it under advisement.

BY MS. CANFIELD:

Q You can continue.

A Yeah. So then I guess, you know, the FMLA -- you know, I don't know if I got double charged. I don't -- I -- there was just so much monkey business going -- going on with my time and leave that it was just one thing after another. The retroactive -- my union said that it was unheard of. And I spoke to people at Bellevue -- just like gratuitously docking employees' pay. And this happened two -- two pay periods in a row, docking me for the Jewish holidays, taking off the Jewish holidays with this dump-and-run email Friday afternoon when I'm supposed to get paid and my paycheck is --

And I asked if I could, you know -- well,

this was not an error of mine. Chronos said I had time. I called payroll, they said I had time. Labor Relations sent me an email and said I had time. It wasn't my error. So if it is an error, I can -- why can't I have code 45 which is advanced annual leave? And --

Q Did you request advanced annual leave?

A Yes, I did. And I --

Q Okay. And was it granted? When you had exhausted all your annual leave, was it granted?

A I was marginalized and ignored. No one responded to my email.

Q Okay. All right. The record will reflect what happened because I know there's plenty of emails on that topic.

Why did you request FMLA leave?

MS. HAGAN: -- so --

MS. CANFIELD: Excuse me. Why --

THE REPORTER: I'm sorry, Ms. Hagan. If you can start over, whatever you just said.

MS. HAGAN: First and foremost, how can she say she knows there's so many emails on this topic and didn't produce them? What are you talking about?

BY MS. CANFIELD:

Q Dr. Kaye, for what reason did you take FMLA

leave?

A To provide the -- Dr. Lee TCM protocol for my son.

Q Okay. Is that the only reason that you took FMLA, or did you take it at any other time for another reason?

A I think I had taken some annual leave for -- for a death in the family, which was the normal thing that always would -- how it was done at Bellevue. And if they wanted to do it differently, that was fine. But I came back and there was this big bruhaha that I should have taken FMLA for that.

Q Were you taking care of your children during that time or was it bereavement leave?

A Well, it was -- it was partially bereavement leave, but it was also ended up being over what would have been, like, the winter break for -- for the holiday season. And that was something that I -- that Dr. Lee had put down as a schedule time that I would take off to do the treatments more intensely -- more frequently.

Q Okay. Okay.

A So it was -- so I think I took the four days of bereavement leave and then I think -- I'm -- I'm not really sure, but I remember that they were trying

to act like I had -- was trying to pull a fast one or something because I didn't put in for FMLA because I had a death in my family. And they started --

Q Okay. All right. Any other time that you took FMLA leave other than the time that you described to take care of your son's medical condition?

A Well, no. I had asked for the -- the tabulation that they're supposed to keep for my FMLA. I wanted those documents. I had asked for those and I was never able to get them.

Q Okay. What about --

THE WITNESS: So I'm getting a text about --

MS. CANFIELD: Yeah. Let's take a five-minute break. I'm getting a call from a client.

THE WITNESS: Okay. Thank you.

THE REPORTER: The time is 5:44 p.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 5:51 p.m. We're back on the record.

MS. CANFIELD: Okay.

BY MS. CANFIELD:

Q Dr. Kaye, we were talking about your FMLA usage and I had asked you what purposes you had taken

FMLA. If it was for your son's medical condition.

Have you ever taken FMLA -- requested FMLA for your own medical condition while working for CHS?

A I -- I know I requested reasonable accommodations for my medical condition.

Q Okay.

A But I can't recall -- I don't -- I don't recall -- I mean, I went out on FMLA at HHC with the pregnancy stuff, but --

Q Okay.

A -- I don't think I -- I don't think I did.

Q Okay.

A I know I did request reasonable accommodations for myself.

Q Okay. And were those reasonable accommodation requests granted?

A No.

Q No? Okay. What was your request?

A To be returned to my previous shift that had been my shift at Bellevue when I was grandfathered in and that I was promised I would be able to keep.

Q Okay.

A And also possibly a split shift and some partial remote work.

Q Okay. And is it your testimony that your

reasonable accommodation request was flatly denied, or was there some modification given to you for your medical condition?

MS. HAGAN: Objection to form.

THE WITNESS: All I recall is that I think they said that -- I think the split shift -- they didn't really -- it wasn't like I got to talk to anybody. I was kind of -- I was called on the phone. I didn’t get to have a discussion. This person -- I'm trying to think of his name. I think it was Kevin Marazzo [ph] and there was this other person -- Gardner [ph] or -- with an R. Robert or Randy, Ronald. Somebody Gardner. These were the two people I had interacted with over email mostly. Maybe one or two phone calls.

BY MS. CANFIELD:

Q Okay. And what did they tell you in relation to your accommodation request?

A Well, I didn't really get to interact with management. They would just give me these, like -- these vague kind of -- well, you know -- like, Jain never talked to me about it. Ford never talked to me about it. Yang never talked to me. Wangel never talked to me. Macdonald never talked to me. No one ever talked to me. They avoided me like I was

radioactive because I had dared to ask for equal pay.

So it -- he just would -- he called me up. He sounded like an old man. He sounded a little -- I don't know. Just old.

Q Who is "he"? The EEO person?

A Yeah. Marazzo I think.

Q Okay.

A And he -- he said --

Q What did he say?

A That my -- my request for a split shift was denied. My request for a return to my previous shift, which was, you know, eight and a half hours. Everybody else was working eight hours. How can you say that I needed to be there nine hours? That's crazy.

Q Okay. So what did he tell you about that -- returning to your prior shift?

A And he said something like -- that because I -- that he was told that because I had an EEOC complaint, they were told to do nothing and that they weren't going to allow me to do anything because something like -- he said something like it was because of my EEOC complaint, that they weren't going to give me my shift back. And by the way, my -- my union was told the same thing by Wangel, about the

harassment around the educational leave and the shift change. He told my union member that it was because they were -- about my EEOC complaint and that my union member --

Q So it's your testimony that your reasonable accommodation was never granted?

A I never got my shift returned to what it was supposed to be before the retaliatory, harmful shift change.

Q Did you get any adjustment to your shift as a result of your reasonable accommodation request?

A Nothing that was reasonable. They -- they said that I could come in at 9:00 and leave at 6:00, or come in even sometimes at 10:00 and leave at 7:00. That's not reasonable. That was not -- that doesn't -- that didn't help me because either I had problems on the front end or problems on the back end. And all they needed to do -- it wasn't going to cost them a dime. It wasn't going to impact the service in one iota of a way, is to give me back the shift that they promised I was going to have when I rolled over, but they knew that if they kept torturing me with this shift change, that it would force me out the door. And the goal was to force me out the door, and I know that because Dr. Jain in a meeting that I had with him

in October 2018, he didn't want to meet with me. He would avoid me like the plague. I kind of got him to come into my office that day. I wrangled him into my office. He reluctant -- he kept saying he had to go to Brooklyn, he had to do this, he had to do that. But I got him into my office and I complained about the shift change and he said something to me that was causing this -- it was like killing me. And he said something like, you know -- I talked about the hardship of my kids and stuff like that, and he said that childcare issues aren't a concern for CHS. Something like that.

And I did get upset. I started to cry. I was like, "I'm going to have to quit. This is going to -- you know, force me to resign." And he became, like, so excited when I said that. He's like, "Well, what's your resignation date? When are you going to resign?" I'm going -- I'm going to AAPL, which is the American Academy of Psychiatry and the Law. And there's job postings there and I -- I can fill your position. I need to know what -- and he kept pressuring me, like, when I was leaving. And -- and to give him a resignation date.

And then the other thing that they kept doing to humiliate me was to put me into People Soft

and make Dan Mundy the -- the -- my direct report-to. So he kept getting emails coming --

Q Okay. Why do you think that -- okay. So you're saying that the People Soft and sharing your personal information, I think that's how you characterized it in the complaint, was in retaliation for your complaint?

A It was just very suspicious. It kept happening over and over again.

Q Okay. And so what reason would they do that? You had given some things that you believe why they had changed your shift and you said the HIPAA --

A I --

Q Hold on. You said the HIPAA changes, your pay equity -- complaints, pay equity complaints and private practice complaints.

What I want to know is are there any other complaints that you made that you believe caused retaliation, whether denying reasonable accommodation, denying FMLA, any problems with People Soft, any problems with timekeeping in Chronos? What else did you complain about that you believe caused retaliation?

A I complained about the private practice to either IG or DOI. I complained --

Q When did you do that?

A It was -- it came out in July-ish. I think I did that in September. Early -- early September, late August. I don't know.

Q Of 2018?

A September -- yeah.

Q And how did you complain to DOI?

A I called them from my office.

Q You called them from your office? Did you ever follow-up with --

A Actually -- was --

THE REPORTER: I'm sorry. What was the question?

THE WITNESS: -- from her office, yeah.

MS. CANFIELD: I asked her how she complained to DOI about the private practice policy.

BY MS. CANFIELD:

Q And you just testified you called them from your phone in your office?

A I think it might have been in LaKeisha's office that I called them from. It might have -- my office of LaKeisha's office.

Q And did --

A I'm not 100 percent it was DOI. It was some kind of number, like, report -- you know, concern kind

of public fraud number. And I believe it was -- I don't know if it was like some number that HHC had on its website to report fraud. I'm -- I'm -- I'm -- I don't know if it --

Q Did you actually speak to a person or did you have to leave a message?

A No. I spoke to a person several times.

Q And what was that person's name?

A I didn't -- I don't know.

Q Did you ever have follow-up email conversations with this person?

A He told me to call back in a month, and I did. And he told me it was still being investigated.

Q And you talked to him several times, but you don't know his name?

A Uh-uh.

THE REPORTER: Please verbalize your answer.

THE WITNESS: No, I don't.

BY MS. CANFIELD:

Q Did he ever send you an email?

A No.

Q Did he request information from you byway of email?

A No.

Q Did you ever email him information?
A No.
Q Okay. Did you go and sit for an interview with DOI?
A No.
Q Okay. Any other complaints besides the private practice complaint you made to Dr. Jain, DOI, the HIPAA release complaints and the pay equity complaints?
A I complained to COB.
Q COIB?
A Yeah, COIB.
Q About the private practice policy?
A Yes.
Q Okay. And when did you do that?
A I did it twice. The first time I did it not -- not too long. After I realized that they weren't going to take me seriously and that I was getting information that Dr. Mundy was rigging exams. Elizabeth Owen was rigging exams, in cahoots with attorneys. I --
Q Did you complain to anyone that they were rigging exams? That Dr. Owen and Dr. Ford were rigging exams?
A Yeah. No, Dr. Mundy.

Q Who'd you complain to?

A Dr. Ford wasn't doing exams. It wasn't Dr. Ford.

Q Who did you complain to about Dr. Owen rigging exams?

A In that meeting in -- with Dr. Jain, in October of '18, I -- he -- I was complaining that Mundy was being -- that I was being put under Mundy's supervision. And I think it happened -- I know it happened, like, three or four times over the course of the CHS when I was under the auspice of CHS.

Q Okay. Are you talking about the emails that he -- on which he was copied? Where you claim that your personal information was being shared?

A Yeah. He got a copy of the FMLA. And he -- so I -- and I had gotten upset about that, so I was being reprimanded for getting upset about that by Dr. Jain in that meeting.

Q Okay.

A And I said, "I do not want" -- you know, "I am not comfortable with Dr. Mundy's behavior and what he does and how he was hired." And I explained how when I was talking to Dr. Mundy when he was thinking about getting the job for directorship, and Elizabeth Owen had been elevated to this kind of administrative

role in CHS by -- by Patsy Yang. And she was interviewing people. I know she interviewed Dr. Jain. She interviewed Dr. Mundy. She interviewed Dr. Barry. Anybody who she was interviewing -- she was like part of the leadership administrative team.

And Mundy told me -- he's like, "Well, you know, I got interviewed and I had to agree that, you know, if" -- you have to remember, Elizabeth Owen was in charge of that pilot -- the Queens pilot project and they were obsessed with cutting -- cutting the turnaround time and the numbers down and getting, like, manufacturing the statistics about how successful it was. So any delay in a case was going to mess up their optics.

So he said that he -- Elizabeth Owen said, you know -- that he agreed as part of being hired that he would "cut corners and do a less thorough job" on -- on exams and find people unfit, especially misdemeanors, to get them off the island. That's what he told --

Q Who said that?

A Mundy told me that. And so --

Q So he would find people unfit to get them off the island. And why is that?

A He -- he told me that part of being hired

was to agree to do a less thorough job to find people unfit and get them off the island because of the loophole in New York City -- well, it's New York State. If you're found unfit on a misdemeanor, your case is dismissed and --

Q Okay. Wait. Stop there. So who -- who --

MS. HAGAN: No, she has to finish. She has --

BY MS. CANFIELD:

Q No. I want to know who told Dr. Mundy --

MS. HAGAN: No because this goes to her --

THE REPORTER: I'm sorry. Please speak one at a time.

MS. HAGAN: I'm saying she goes to her constitutional claims and you keep interrupting her every time she talks about her first amendment retaliation claims.

MS. CANFIELD: I'm just trying to figure out the veracity of her testimony.

BY MS. CANFIELD:

Q Who did Dr. Mundy say to him -- that told him that he had to find people fit to get them off Rikers in order to get the director position?

A No, that's not what I said.

Q Okay.

A He interviewed with Elizabeth Owen for the position as director, and told me that he was informed and had to agree to do a less thorough job and cut corners to find people unfit, not fit. Unfit. Especially on misdemeanors. So they're -- to get them off the island.

Q Okay. So you're saying that Elizabeth Owen interviewed Dr. Mundy for the Manhattan director position and that he told you that Dr. Owen said, "As a condition of your hiring, you have to find them unfit"?

A That's not quite what I'm saying, but he was told to do a less thorough job and cut corners to find people unfit to get them off the island.

Q Okay. And you're saying --

A That's almost verbatim quote. He said, "On misdemeanors." And the -- the -- the CPL 730 law in New York State has a provision that if an inmate -- if a defendant is found unfit on a misdemeanor, his charges are dropped, his case is dismissed and he's released from custody. So --

Q I understand that. I understand. I'm not interested in the law. What I'm more interested in is this conversation between Dr. Mundy and Dr. Owen.

This was during his job interview?

MS. HAGAN: But the law impacts -- it's a matter --

MS. CANFIELD: I understand the law. I want to know about the complaint.

MS. HAGAN: Well, it's a matter of public concern and that's part of her first amendment --

MS. CANFIELD: I understand, Ms. Hagan. I want to know who said what when.

THE REPORTER: I missed what you said, Ms. Hagan. I'm sorry.

MS. HAGAN: I said this is part of her first amendment retaliation complaint -- claim and that this is a matter of public concern. And I asked Counsel to stop interrupting her because she's making the record to substantiate her claim. That's what I said.

BY MS. CANFIELD:

Q I just want to know who said what to whom because as I see it, it's all hearsay.

So who said -- you said Dr. Mundy told you that Dr. Owen told him that he had to do a less thorough job in order to find them unfit to get them off Rikers?

MS. HAGAN: How is -- had the conversation with Dr. Kaye? Stop testifying.

THE REPORTER: Please repeat what you said, Ms. Hagan.

MS. HAGAN: I said how is it hearsay if Dr. Kaye --

MS. CANFIELD: It doesn't matter. It doesn't matter. This is evidence --

MS. HAGAN: -- with Dr. Kaye.

THE REPORTER: I missed what you said again, Ms. Hagan. I'm sorry.

MS. HAGAN: How is it hearsay if Dr. Mundy had the conversation with Dr. Kaye? This is something that she had a conversation with Dr. Mundy about, that he had a conversation --

MS. CANFIELD: I'm not going to go into you about the rules of federal evidence.

MS. HAGAN: Yes.

BY MS. CANFIELD:

Q Dr. Kaye, after Dr. Mundy told you this, did you in turn tell someone else about it?

A I told Dr. Winkler and --

Q Okay.

A -- he said, "That didn't happen during my interview." And I told -- I told Jeff Bloom. And I

told --

Q Okay.

A -- and I told Dr. Jain. And when I told Dr. Jain that I -- you know, about my concerns about Dr. Mundy in general and that it was particularly offensive and concerning to be put as his subordinate --

Q Okay.

A -- and then I told him about this what I call rigging exams. He told -- he responded to me -- he got this very, like -- starting pursing his lips and furrowing his brow. And he said to me, "We have to make CHS look good. We have to make CHS look good." And then he, you know, kept reverting back to, "When are you going to quit? When are you going to resign?"

And then he was very dismissive and callous about my childcare issues, and he had been bragging to me ever since I met him that his wife was a child psychiatrist. So I -- I asked -- I told him. I said, "Well, if this is not an issue that, you know, fits into your life experience, why don't you talk to your wife about how difficult it is for a single mother to have her shift changed unnecessarily?" And then he got very angry with me and he said, "Don't -- don't

bring my wife into this. That -- you're being abusive." And I said, "No. You know, changing my shift is abusive. That's what's abusive."

And so that was the last time I met with him and I do not believe he followed up on any of my concerns about Dr. Mundy. And I think I continue to get put under him as his subordinate.

Q Okay. All right. I'm going to move on now because we're running out of time.

MS. CANFIELD: Ms. Hagan, I did send you a document. I sent the court reporter -- unfortunately, my comments are on the document, but I don't think it matters much because I'm -- these are comments that I want to ask -- I want to talk to the witness about.

MS. HAGAN: Let her -- I'd like to look at the document first, too.

MS. CANFIELD: Okay. I'm going to share it. You can look at it at the same time. These are the medical records that we received from Dr. Paola Alessio.

MS. HAGAN: Paola.

MS. CANFIELD: Paola Alessio.

THE WITNESS: Paola. Paola. It's -- I think it's for Paula in Italian.

MS. HAGAN: Yeah.

MS. CANFIELD: So this is a 67-page document.

MS. HAGAN: Mm-hmm.

MS. CANFIELD: It's bearing Bates stamps number D001588 to D001654. The front page is a cover letter from Dr. Alessio indicating that the --

MS. HAGAN: And I'd like to point out that Counsel was supposed to produce all -- all documents that she subpoenaed and got responses to her subpoenas, and she never produced this document.

MS. CANFIELD: I'm producing them right now.

MS. HAGAN: -- before the deposition. I didn't --

MS. CANFIELD: And --

MS. HAGAN: -- before the deposition.

MS. CANFIELD: You can make the record, but the same thing happened during your depositions of the defendants. So --

MS. HAGAN: Not true.

MS. CANFIELD: Okay. You can take it up with the Court. These are the medical records that were provided by Dr. Alessio --

THE REPORTER: I'm sorry. I can't take

the record with you both speaking at the same time.

MS. HAGAN: There's a combination of documents here because you have I guess some kind of medical record production email, but then on top of that, you have the Amended Complaint in here as well. The First Amended Complaint. Are you trying to introduce both into evidence here?

MS. CANFIELD: No. What I have here -- it's a 67-page document. The first page is a cover letter from Dr. Alessio indicating that they received a request for authorizations and that this is the material that's being disclosed. And close record contains 63 pages. And there's the -- a note that says 75 cents per page at 42.25.

The next document is a cover letter from my office requesting the information from Dr. Alessio. And after that is the HIPAA release that Dr. Kaye signed and filled out for the release of the records.

And here's the invoice that Dr. Alessio charged the Law Department for the records.

MS. HAGAN: Mm-hmm.

MS. CANFIELD: The records begin on Bates stamped page D001592.

//

BY MS. CANFIELD:

Q Now, Dr. Kaye, if you look at this document, it's dated what appears to be a email to Dr. Alessio from Psychology Today dated January 19, 2019, where you say, "Hi, Dr. Paola Alessio. This email comes to you via your profile at Psychology Today." From Melissa, email melissakayemd@gmail.com, and your phone number. The subject is "Possible session."

"Hi, I got your name from Marina R. I'm going through a lot and looking for therapy. Thanks, Melissa."

Dr. Kaye, do you recognize this email?

A I don't, but I sent out of requests beginning in December because I was looking for a therapist since the beginning of -- of December. So --

Q Okay.

A -- I'm not surprised to -- to see this because it was --

Q Okay.

A -- I was looking for someone to talk to.

Q Okay. And then there's some correspondence between you and Dr. Alessio about scheduling an appointment.

You described her earlier as a bio-energetic

therapist. What exactly does that mean?

MS. HAGAN: No, she didn't. You're mischaracterizing her testimony.

MS. CANFIELD: Then I'll withdraw the question.

BY MS. CANFIELD:

Q It looks here that there's a handwritten note that's dated January 28th, it looks like 2019, where there's some notes perhaps reflecting a conversation that you had with Dr. Alessio about the death of your brother. And you have two children. You have a boy with health problems and that you're suing your employer. Does that -- are those three things that you may have shared with Dr. Alessio?

A Yeah. I was going through a lot of stress. Like I said -- I mean, before my brother died. And then of course during and after. So those were stressors in my life, yes.

Q Okay. I'm going to just turn you to Bates stamped page number D001598. And it's an email from you to Dr. Alessio dated March 11, 2019, in which you're asking for additional times for therapy because you're meeting with your union.

You say, "The reason is that I have time today. And Thursday, my union is having a seminar

about the retirement process, which I will be doing in five months. So I wanted to attend, if possible."

MS. HAGAN: Objection.

THE WITNESS: Yeah.

BY MS. CANFIELD:

Q Were you, in March, planning on retiring in five months, which would have been August 2019?

A If things didn't get better at work and I had to, I was going to look in -- I wanted to look into it because it was pretty unbearable. And this was March 19th. I had -- I had been going through -- it was one thing after another. The shift change, the -- the mucking around with my time, the non-transparency with my timesheets, the -- being excluded. I was being harassed and -- and teased by administrative staff. Andrea Swenson was basically ridiculing me and mocking me and turning her report-tos against me, including LaKeisha. I mean, people -- I'd have a nice conversation with them and then two weeks later, they'd come up to cover in Bronx Court Clinic -- this woman, Anansa Gail [ph] from the -- from the Manhattan Court Clinic would come up to cover for -- for LaKeisha. And she would, like, glare at me and wouldn't even, like, talk to me. And it was insane.

And I'd ask for help with the Chronos timekeeping program and -- and I would get made fun of. I would ask that people --

Q Sorry to interrupt. Did you share any of this with Dr. Alessio?

A Well, she basically said, "It sounds like it's a snake pit. You know, you should get out of there." That was always her -- her position on what was happening to me at work. That these people sound like --

Q Okay.

A -- horrible and you should -- it's a snake pit and you should get out of there. I mean, she -- she was of the opinion that the work environment was very harmful and negative for me, and I should -- I should get out.

Q Okay.

A -- talked about --

THE REPORTER: What did you say after "I should get out"?

THE WITNESS: We talked about that in my sessions.

MS. CANFIELD: Okay.

MS. HAGAN: And for purposes of the record, this is Exhibit D and it bears the Bates stamp

D1588 to I think it's D1654.

(Exhibit D was marked for identification.)

MS. CANFIELD: Yes. Thank you, Ms. Hagan.

BY MS. CANFIELD:

Q I'm going to direct you to another email. It's Bates stamped D001604. And it looks like on April 30th of 2019, you informed your therapist that you officially sued --

A Mm-hmm.

Q -- HHC?

A Mm-hmm.

Q Okay.

THE REPORTER: Please verbalize your answer.

THE WITNESS: Yes.

BY MS. CANFIELD:

Q Okay. Then -- I'm sorry?

A Yes. Your -- yes. Go ahead.

THE REPORTER: Ms. Hagan, did you say something?

MS. HAGAN: I asked if there was a question that Ms. Canfield had.

MS. CANFIELD: I haven't asked it yet.

BY MS. CANFIELD:

Q In the email -- document Bates stamped number D001606, you again -- you say that you didn't have a chance to review the complaint that was filed, but it looks pretty good. And that you also send your therapist a copy of the complaint.

For what reason did you send your therapist a copy of the complaint?

A Because suing my employer, especially when my employer is New York City, was incredibly stressful and I needed support around it.

Q Okay. Now you also discuss that you learned on May 6th of 2019 -- and this document's Bates stamped D001608 -- that you learn some information about your family related -- and you -- and related to wishing that your brother was there to process it with you.

When did your brother die?

A December 15th or 16th of 2018.

Q Okay. And was part of the reason that you were seeking therapy was to process the death of your brother?

A It added to my problems. I started looking for therapy before my brother died, but I started sending out and requesting to find a therapist in

December before my brother died. And then after my brother died, it was -- I -- you know, there was as much or more of a need. I needed support around my being what I felt was being bullied and harassed and pushed out of my job, and then the death of my brother unexpectedly. And so I was looking for a therapist to talk to.

Q Okay. And then it appears, too, that you share with your therapist that you -- someone had notified you that you had a half-brother; is that true?

A Yeah.

MS. HAGAN: Objection.

THE WITNESS: Well, I had gotten an email from this woman, Gaye [ph], who is a third cousin. You can read the email. And apparently, you know, shortly after my brother died -- my brother died in December. This is May. She told me that through some kind of ancestry.com or 123 DNA or whatever those sites are, that she had gotten this close match with -- with this person. And it turned out that the person was my father's son, who my father never knew. We didn't know that he had fathered this person, Jonathan, before he left Brooklyn, before he left New York, before he met my mom, before he married her,

before I was born.

He was -- I guess Jonathan was -- I don't remember. I think it turned out that he was maybe five years older than me. And so it was pretty shocking and, you know, it would -- he would have also been -- my brother who died, he would have also been -- Jonathan would have been my brother's half-brother, too.

So it was shocking news, and then my brother was gone so I didn't really -- the one person that, you know, it would have impacted the most was my -- my brother who had died.

And so I had to -- so I started communicating with this person, Jonathan, who is my unknown half-brother through my father.

BY MS. CANFIELD:

Q And do you have a relationship with this individual now?

A I was in touch with him. I met him. He had -- ironically, he had ties to Manhattan and the Pentagon, just like my brother who passed away did.

And I did meet Jonathan and I was scheduled to meet him and his daughter, Rebecca, who would be my niece. And then Jonathan had some kind of incident where he fell and had hurt his -- got a head injury

and he was going to reschedule, and then the pandemic hit. And I don't know, I just -- I never heard from him after the pandemic. And I've thought about reaching out to him, but my life has been -- like everybody's -- you know, turned upside down. And the lawsuit continues to drag on and I'm having employment issues because of the retaliatory disciplinary actions.

So I have a very full plate and I did not reach out to him since the pandemic hit, and he did not reach out to me. So --

Q Okay.

A -- I would say prior to the pandemic, yes, we were in touch and we were communicating, and we had met on one occasion.

Q Okay. I also want to point you to an email Bates stamped D001621. Which you -- before you sent a picture of Dr. Ford in what looks like an article concerning a book that Dr. Ford has written?

A Mm-hmm.

Q And you refer to her as -- you state as the subject matter of the email, "She's as much politician as a doctor. Very power-hungry."

It sounds like that you dislike Dr. Ford very strongly; is that fair to say?

MS. HAGAN: Objection.

THE WITNESS: I wouldn't categorize that. I -- I don't respect Dr. Ford. She engages in a lot of forensic and clinical practice violations that are harmful to the courts, that are harmful to patients. She behaves inappropriately with patients. She puts herself -- she says that she's in love with her patients and allow -- allows them to use her as a masturbatory tool. She doesn't believe in record review, that's why Nicolas Feliciano is braindead. She tried to ruin my career because I wanted to use unredacted records. She lied and said that's the standard, and it's not the standard.

So I don't respect her. I don't think she's a nice person. She didn't give -- when my -- in 2012 and I sent her an email that my father had died and I was going back to Colorado for the funeral, she never even responded to the email. And I just thought that was pretty telling and pretty cold.

And then similarly, when my brother died in 2018, she was -- she never offered any condolences and she never acknowledged it. And -- went through the -- I mean, sorry. Dr. Jain went through the motions and sent me an email asking if there was anything he could do. It was kind of

proforma. And then when I actually asked him -- I said, "Yes. There's something you can do. You can restore my shift to what it was before," because things were bad and really hard for my kids and -- and me before my brother died. And they're even worse now.

I have two grieving children. I have a grieving mother. I'm grieving. Please give me my shift back. And then he forwarded that to Dr. Ford who writes back, "Ignore this." I mean, who acts like that? And then she puts -- and then she puts herself out as being concerned about her staff and staff trauma, and being transparent and being supportive and -- and talking to people and talking things out. She never spoke to me. She -- she had one meeting with me that I forced her to have in November 2018. And she cut the meeting short.

So I don't -- I don't appreciate the hypocrisy. I don't appreciate the boundary violations. I don't appreciate the -- being sloppy in the way she practices medicine and then putting herself out there as some kind of -- some kind of social justice reformer when it's all about selling her books and -- and -- and giving talking points.

//

BY MS. CANFIELD:

Q Okay.

A And she discriminated against me and she didn't -- she's married to a very wealthy man who comes from old money in Texas, hobnobbing with the Bush family. I mean, she doesn't have to worry about supporting her kids, and yet she couldn't -- she could care less about me getting paid less than my male colleagues, and she didn't -- and then she retaliates against me and tells me, you know, she doesn't let me come to the work group. She tries to whip up a storm against me because I want to use unredacted records, and the Court's in agreement, and Winkler's in agreement, and Jain's in agreement. I mean not Jain, and Colley's in agreement, and Ciric's in agreement. And then she turns everybody against me? I mean, it's mean. She's mean.

Q Can I ask you a question? Was the issue with the redacted medical records in 2015, was it so much the redacted records or the fact that was upsetting, or the fact that you refused to conduct the evaluation at all?

MS. HAGAN: Objection. Objection. Mischaracterizes the -- that actually does -- it mischaracterizes Dr. Kaye's testimony, assumes facts

that were not discussed.

MS. CANFIELD: It's just a question. She can deny it. Just a question.

MS. HAGAN: The best she understands the question.

BY MS. CANFIELD:

Q Did you refuse to conduct the competency examination without the unredacted records?

A Dr. Winkler and I both informed the courts, and Dr. Ciric and Dr. Colley were in agreement, that we cannot discharge our duty and do a full competency exam with redacted medical records. And that using redacted medical records does not inform -- properly inform the Court about some -- we are unable to inform the Court about someone's capacity with -- for me, with a reasonable degree of medical certainty. And --

Q So now when Judge Torres was going to hold HHC in contempt, was that because we would not turn over the redacted records -- unredacted records or is that because we weren't conducting the competency exam?

A Well, that's a misstatement and that speaks to all the rumor mill that these people base their hatred and retaliation on. And it's all rumors.

Judge Torres was never going to hold HHC or

CHS in contempt. That is misinformation and if anybody had spoken to me and asked me about the situation in a professional and appropriate manner, they would know the facts and not be basing the decision to manage me out on rumor.

No. Judge Torres was the chief administrative judge in the Bronx. He was not going to hold CHS in contempt. It was Judge John S. Moore who had ordered records, who was in Treatment Court, in Youth Court, in Sex Offender Court, and had previously been a bureau chief under Morgenthau. He was a very seasoned and experienced judge who understood criminal mental -- criminal law and mental health issues. And he ordered records for a certain case because obviously, if there's HIV-related information, that is -- you know, psychiatry is a medical subspecialty. People get cognitive -- the cognitive difficulties. They can become psychotic. They can develop mood symptoms. They can have all kinds of problems related to HIV that directly have a bearing on their capacity. And similarly with substance abuse. So --

Q Okay. And --

A -- I refuse -- no, I need to finish because I did not refuse to do anything other than I told the

courts I could not render an opinion with a reasonable degree of medical certainty because it -- and Dr. Winkler supported this opinion.

The argument was I couldn't know what was redacted and say that it didn't matter. She wants -- Ford wanted us to do this illogical thing where you say, oh, you tell the courts that this is our opinion and what -- you know, and so -- and we are going to say this opinion because -- and we don't know what's redacted, but because we're going to mention that it doesn't affect the opinion. Well, how can you say it doesn't affect the opinion if you don't know what's redacted? It's an illogical argument. And I opposed violating a defendant's constitutional right to a fair trial and due process by rigging these competency exams because CHS chose to not address their concerns with the Court directly.

If Judge Moore ordered unredacted records, it was the obligation of HHC/CHS to challenge that in court. And that's what Judge Moore pushed them to do.

He said, "You do not defy it." It is unheard of for an agency to receive a judicial subpoena for unredacted records and to turn over redacted records. It's unheard of. And he wanted Deandra Newton [ph], who was HHC counsel involved in

this -- and it was also Lucy Calterjeroni [ph] or something. She was involved in this -- an HHC lawyer. She wanted them -- he wanted them in their court room. And legal aid was up in arms because this was happening -- this had happened on six cases. And under no circumstance were they going to allow this to happen.

And Judge -- and they went to Judge Torres to tell him this was happening in multiple court rooms. It was Judge Moore, Judge Lieb. And I -- yes. I'm not going to violate a defendant's constitutional rights because CHS thinks that they can just "wantingly" be in contempt of court. No.

Q Okay. Okay. Okay. I'm going to stop you there. Thank you very much. Let's go back to this document because I want to get through it.

So on August 14th -- and the document's Bates stamped number D001627 -- you notified Dr. Alessio that you have to cancel your appointment because you need to get your son into therapy.

What type of therapy did you need to get your son into?

MS. HAGAN: Objection. Relevance. And we're not going to -- she's not going to answer that question.

BY MS. CANFIELD:

Q Let me ask you this. Do you believe your son needed to get into therapy because of the -- your work situation?

A It was stressing both of my children out excessively, that's for sure.

Q Okay. Then it's relevant to litigation.

So what type of therapy were you --

A May I read this? Because I --

Q Yes.

A -- I'm not sure. I'm not sure. This is August 2019.

MS. HAGAN: Can you enlarge this so that I can see this?

THE WITNESS: Yeah. I'm literally squinting here. Oh, I'm sorry. Now it's like I can't see it. Can you -- please, Counselor, can -- oh, I can't see it.

MS. CANFIELD: Is that too big? It's off my screen.

THE WITNESS: Yeah. It -- that's -- yeah, just let me try to read it. If we could just -- I -- I'm trying to think. I had -- it's just I'm trying to think back to August. It's hard because my son had services and I guess I was getting him --

I mean, the stress of all this was -- was not nothing. So yeah, I was -- I had my kids in therapy. So, yeah. I mean, I'm remembering I had my kids in therapy.

I was hoping that, you know --

BY MS. CANFIELD:

Q What type of therapy were your children involved in?

MS. HAGAN: Objection.

THE WITNESS: I -- whatever -- just the -- it was not a specialized therapy. It was just typical, supportive psychotherapy for -- for them. It wasn't -- are you asking was it -- what type of modality of therapy was being used for -- for the treatment?

BY MS. CANFIELD:

Q I guess what I'm asking is are you seeking damages related to what you claim is harm against your children as a result of the actions of HNH and the individually named defendants? Are you claiming that your children were harmed as a result?

A Well, absolutely unequivocally my children were harmed, and they're still being harmed.

Q Okay.

A But, you know, the damages as they're stated

in the complaint written in 2019 are -- are very different than -- and less than the damages now. I mean, I -- I'm -- I suffered retaliatory disciplinary actions that have seriously impacted my professional career and my ability to be gainfully employed.

So, yeah. My children were hurt and they -- they've suffered and there's no question about that. So -- yeah.

Q Okay. So let me ask you, how have -- how has your son been impacted by your employment situation with CHS?

MS. HAGAN: I'm going to object. I mean, are you asking if Dr. Kaye is seeking monetary damages for the impact of these -- of her employment on her children?

MS. CANFIELD: Yes.

MS. HAGAN: Because --

MS. CANFIELD: She just said yes.

MS. HAGAN: No, she didn't say that she's seeking monetary damages for that.

Did you testify to that, Dr. Kaye?

THE WITNESS: I was asked if my children have been harmed by the -- all the retaliation that I suffered. The -- the lawsuit, the stress, the --

I mean, this is -- I have to turn this -- now I'm getting calls about them. I'm getting calls about the children.

Now let me just state --

MS. HAGAN: I think we've reached seven hours at this point.

THE WITNESS: What I said was that the stress of -- of the viciousness and targeting of me because I was unwilling to stand by and allow the criminal justice system to be corrupted and perverted by CHS so they could manufacture optics and statistics that they're reforming in court. You know, justice -- criminal justice reformers.

You know, I mean I think that I was targeted and pushed out of my job. Now I'm unemployed and I'm having trouble, and I will continue to have trouble for the rest of my career because of the -- being falsely accused of violating HIPAA in the course of practicing forensic psychiatry, which makes no sense.

BY MS. CANFIELD:

Q But, Dr. Kaye, you're going off the topic. I'm going to ask you about that. What I want to know is you said that your children have been affected -- negatively affected by your employment situation at

CHS. What I want to know is are you seeking compensatory damages on behalf of your children because they suffered?

A I -- I mean, I don't know how my compensatory damages would be calculated and what goes into it. I know that they've been harmed. I know that they continue to be harmed. I know that my career has been ended.

Q Okay. Hold on about your career. I just want to know about your children. If that's what you're claiming, then I'm going to call for HIPAA releases so I can get the therapy records of your son and your daughter --

MS. HAGAN: She's not claiming --

BY MS. CANFIELD:

Q -- because we are -- Magistrate Judge Codd [ph] said that this is something I could pursue if that was in fact --

MS. HAGAN: She didn't say she was. She didn't say she was seeking --

MS. CANFIELD: She just did say that. So unless -- so, Ms. Hagan, we can take this off the record.

Unless there's a stipulation that she's not seeking damages related to their harm, then I'm

entitled to those records.

MS. HAGAN: Uh-huh. Well, we'll have --

MS. CANFIELD: Maybe this is something that I can -- we can write to the Court and I can call the witness back. And I can ask her about her son and daughter's therapy. I mean, she clearly says that her daughter's in therapy, and her son, she's trying to get him into therapy. So why don't we put that -- we'll mark this for --

MS. HAGAN: -- medical license --

MS. CANFIELD: Excuse me. We'll mark this --

THE REPORTER: I'm sorry, Ms. Hagan. I'm missing almost everything --

MS. CANFIELD: Ms. Hagan, let me make the record please. You can make it after I've finished.

MS. HAGAN: -- asked her about the harm to her medical license and her ability to practice --

MS. CANFIELD: I haven't gotten there yet. Please, stop.

THE REPORTER: I'm sorry. I'm sorry. I'm sorry.

Ms. Hagan, please, what did you just

say?

MS. HAGAN: I said Ms. Canfield needs to ask her about the -- about the harm to Dr. Kaye's medical license and her ability to pursue a medical license in New Mexico. Because those are the things that she has been complaining about, and Ms. Canfield has known about those things as recently as when we -- the parties met for the settlement conference.

So I don't believe that Ms. Canfield's asking these questions in good faith. In fact, I believe that she's trying to intimidate and harass Dr. Kaye because Dr. -- we are at the seven-hour mark. And Ms. Canfield has not in good faith asked questions about the damages that Dr. Kaye has sustained. Instead, she's trying to harass Dr. Kaye instead of using the time wisely and judiciously.

MS. CANFIELD: Are you finished, Ms. Hagan?

MS. HAGAN: Yes, ma'am.

MS. CANFIELD: I am not. I am just trying to clarify because if you are seeking damages on behalf of the harm that you claim your children have suffered, then we are entitled to see what that alleged harm is.

MS. HAGAN: And she's never said she

has.

MS. CANFIELD: She --

MS. HAGAN: -- had this discussion on multiple --

MS. CANFIELD: Okay. So we're going to mark this and we're going to write to the Court about it.

MS. HAGAN: Yes.

MS. CANFIELD: We will write to the Court.

MS. HAGAN: Yes.

BY MS. CANFIELD:

Q All right. So you also, Dr. Kaye, in the second paragraph say that, you know, the City answered the complaint instead of trying to get it dismissed. Special says this is a good sign. We are waiting for an assigned mediator. And then you say here in the fifth sentence, "Against my lawyer's advice, I am going to resign soon."

A Mm-hmm.

Q Okay?

A Mm-hmm.

Q So had you decided at that point that you were going to resign from your position at CHS?

A Well, I --

MS. HAGAN: Objection.

THE WITNESS: -- I had decided that it was such a hostile and abusive work environment, and I was having cardiac palpitations. I was having my IBS -- my irritable bowel syndrome. All of these stress-related symptoms were going through the roof. I was just -- I was -- I was under attack. Every day it was something. Every day I would -- I would ask the clerical staff and Ms. Swenson not to -- to run the -- the coffee maker and the microwave at the same time because it caused the circuits to blow and I'd be -- my -- my lights would go out. My computer would go out. And I just made that simple request and they were mocking me and -- and acting like it was just this most ridiculous thing. And then they would go deliberately do it to make my -- so I couldn’t work. I mean, it was just sabotage. It was awful.

And I loved my job. I was very good at my job. I had strong relationships with -- professional relationships with all the stakeholders. The judges, the -- the defense, prosecution. I was -- I was -- I was trusted and I was respected and I took my work very seriously. And I -- I believed that my work was important.

And I stepped outside of my job because

I saw how CHS was intentionally cutting corners and altering the results of the exams in conjunction with MOCJ, so -- so they could empty Rikers through the back door. This was all pre-bail reform.

And -- and Ford was abusive and Jain -- Dr. Jain had stopped speaking to me. He would come up to the Bronx and he wouldn't even knock on my door and tell me he was there. And he would --

BY MS. CANFIELD:

Q Okay. Okay. I'm going to stop you right there. You already testified to that, so I'm going to move on, okay?

I'm going to share the screen again. This next email to Dr. Alessio, it's Bates stamped D001635. And you say, "Sorry. Now they're coming up to monitor me. I may have to take 4:00 p.m. on Thursday if it's still available."

Who is "they" and why did you believe that they were monitoring you? This is dated September 10, 2019.

A September 10th --

MS. HAGAN: And objection to form. It's a compound question.

THE WITNESS: 2019. Well, they were definitely tracking me. They had --

BY MS. CANFIELD:

Q Who's "they"?

A Well, CHS leadership. Yang, Wangel, Jain, Ford. They had this -- this psychologist that they had hired tracking me. They -- I'd hear them talking about me. "Is she here? What is she doing?"

They -- they -- the office that I had --

Q Well, excuse me. Let me stop you. You said they hired a psychologist to track you?

A No, I didn't say that. I said they had a psychologist up there and I caught her -- she had -- she got off at 5:00.

Q What was her name?

A Anansa Brayton. And I also had in my office as I said, the circuits kept blowing and it was dark and I couldn't use my computer and there was a bad cell phone reception there to start with. So we had an -- defendant office down the hall and across the little -- like, down the hall and around the corner. And I would go in there to work and Anansa Brayton would come in and she -- to see if I was there, and then she would make up this excuse. "Oh. Oh, I'm here looking for my shredder." Just these completely implausible excuses.

One time when I had taken the shift from

9:00 to 6:00 --

Q Let me ask you. You said --

A But I want to finish --

Q But I'm confused. You said that Dr. Brayton came into your office to see if you were there, to spy on you? But you're saying -- sorry. Now they are coming up to monitor me Wasn't Dr. Brayton assigned to the Bronx Court Clinic?

A Right, right. But I'm just saying that -- then I --

THE REPORTER: Assigned to the Bronx what?

MS. CANFIELD: Court clinic.

THE WITNESS: So I -- I would get -- and this one day I was getting off at 6:00, she got off at 5:00. And I had been in the out-defendant office and I -- I was coming back to my other -- my main office. It was like ten of 6:00 -- quarter of 6:00. And she was there walking around looking for me. And she got caught red-handed. And I asked her point blank if she was spying on me and she was -- she was hemming and hawing and she got very nervous and started making excuses that didn't make any sense about why she was there at almost 6:00, an hour after she was --

BY MS. CANFIELD:

Q But why would she want to spy on you?

A She was being asked to track me.

Q By whom?

A Jain, Ford.

Q Okay. Do you have any evidence of that other than your own speculations?

A I know I was under surveillance on my emails --

THE REPORTER: I'm sorry. Please repeat the question.

MS. CANFIELD: I said do you have any evidence of that other than your own speculation.

MS. HAGAN: Objection. Argumentative.

THE WITNESS: I -- I'm a forensic psychiatrist and I can connect the dots. It was very obvious that they were doing -- that Anansa was making notes. And when I would -- she would be in my office and I would just be talking normal, she'd be writing everything down. And when she -- when I -- I asked her if she was spying on me, she couldn't give me a straight answer. And she didn't say no and she made excuses about -- brought up Dr. Jain and was kind of rambling about --

//

BY MS. CANFIELD:

Q Okay. So other than Dr. Brayton, was anyone else monitoring you?

A I think they were all watching me and asking if I was in my office, and if I wasn't in my office. I felt like they were -- and I know they were monitoring my emails. And --

Q Okay. Okay. I'm going to move on because I want to make sure that we get through everything.

So --

MS. HAGAN: We're actually at the seven-hour mark. We're over seven hours, so I'm going to have to -- we're going to have to call this to a close.

MS. CANFIELD: I would like to finish this document and then I will petition the Court for an additional hour, hour and a half.

MS. HAGAN: Mm-hmm. Okay.

BY MS. CANFIELD:

Q So, Dr. Kaye, if you take a look at this document -- it's Bates stamped D001638. And the subject is "Fwd: case management plan." And it looks like for some reason, Jeff Bloom sends you the case management plan.

How is it that Mr. Bloom had a copy of the

case management plan?

A What is a case management plan?

Q That's what I want to know. Why would Mr. Bloom send you a case management plan that you in turn forwarded to your therapist?

MS. HAGAN: Objection. Could you scroll down further so she can see --

MS. CANFIELD: I can. And I can show you that the attachment is actually the civil case management plan and scheduling order in this case.

MS. HAGAN: Well, that's a public document. So --

MS. CANFIELD: I know. I just have a question.

BY MS. CANFIELD:

Q Why you sent it to Jeff Bloom?

MS. HAGAN: She didn't send it to Jeff Bloom. Jeff Bloom sent it to her.

MS. CANFIELD: Okay.

BY MS. CANFIELD:

Q Why did Jeff Bloom send this to you, if you know?

MS. HAGAN: She can't speak for Jeff Bloom.

MS. CANFIELD: But she can answer my

questions and not you. Thank you.

MS. HAGAN: She can't --

BY MS. CANFIELD:

Q Dr. Kaye, why did Jeff Bloom send you this case management plan?

A I don't know.

Q Is it because your attorney didn't send it to you?

A I -- I don't know.

MS. HAGAN: I sent her everything. What are you talking about?

THE REPORTER: I'm sorry, Ms. Hagan. Repeat what you said.

MS. HAGAN: First off, I sent Dr. Kaye everything. So I'm not sure what she's trying to -- record because Dr. Kaye --

THE REPORTER: I'm sorry, Ms. Hagan. You're breaking up. Please start over.

MS. HAGAN: First and foremost, I'm not sure if Ms. Canfield is on some kind of vendetta, but I talk to Dr. Kaye probably several times a week. And on top of that, the things that I submitted to the Court I always give to Dr. Kaye. So I'm not sure what this exercise is about.

I mean, you need to use this time

better. I mean, are you trying to harass --

MS. CANFIELD: Okay. So let's move on then. Dr. Kaye --

I'm going to move to another --

THE REPORTER: I'm sorry. You're both speaking at the same time.

MS. HAGAN: No, no. So this isn't going --

Dr. Kaye, do I or do I not share the documents that I submit to the Court --

MS. CANFIELD: Excuse me? You're burning into my time.

MS. HAGAN: No, no, no --

MS. CANFIELD: You have your own time, Ms. Hagan. Ms. Hagan, you have your own time.

MS. HAGAN: No, no, no.

MS. CANFIELD: This is improper.

THE REPORTER: Just a second. Just a second.

MS. HAGAN: Dr. Kaye, I have a question.

THE REPORTER: Just a second.

MS. CANFIELD: Please go off the record. Please go off the record.

MS. HAGAN: No, don't go off the

record.

THE REPORTER: Just a second.

The time is 6:55 p.m. We're off the record.

(Off the record.)

THE REPORTER: The time is 7:06 p.m. and we're back on the record.

MS. HAGAN: And we've used 7 hours and 24 minutes.

MS. CANFIELD: The stenographer has just notified the parties that this deposition of Dr. Kaye has lasted 7 hours and 24 minutes.

Counsel for the defendants does have some more questioning. I am requesting an additional hour, an additional hour and a half to get through some of the damages. There were a lot of allegations in this complaint. There was also a lot of very length responses from the witness.

It seems based on my conversations with Ms. Hagan that she will not consent to the additional time. That's fine. But I do plan on making an application to the Court requesting the additional time so that this case is decided on its merits and not on a technicality.

So we're going to close the deposition

now. Dr. Kaye, I apologize for not completing the deposition. I appreciate your time. I also appreciate the efforts that you have had to take for, you know, childcare. I understand the difficulties. But I am -- I haven't finished and I am going to write to the Court to request an additional hour and a half.

So thank you very much.

THE WITNESS: Thank you.

MS. HAGAN: Thank you.

MS. CANFIELD: All right. We're closed.

THE REPORTER: The time is 7:08 p.m. We're off the record.

(Signature Reserved.)

(Whereupon, at 7:08 p.m., the proceeding was concluded.)

CERTIFICATE OF NOTARY PUBLIC

I, EMMANUEL SABATINO, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Emmanuel Sabatino

EMMANUEL SABATINO
Notary Public in and for the
State of New York

[X] Review of the transcript was requested.

CERTIFICATE OF TRANSCRIBER

I, JACOBEY RADTKE, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

JACOBEY RADTKE

Kaye v. New York City Health And Hospitals Corporation

Melissa Kaye (#4897710)

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE________________________

______________________________________________________

REASON________________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________________

REASON________________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________________

REASON________________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________________

REASON________________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________________

REASON________________________________________________

PAGE_____ LINE_____ CHANGE________________________

______________________________________________________

REASON________________________________________________

________________________________ _______________

Melissa Kaye Date

Kaye v. New York City Health And Hospitals Corporation

Melissa Kaye (#4897710)

ACKNOWLEDGEMENT OF DEPONENT

I, Melissa Kaye, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Melissa Kaye Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 72:23 73:6,8 74:5 75:25 76:23 234:24

**0**

**000053** 107:25

**1**

**1** 3:22 90:9 220:14
**1/22/2018** 3:7
**10** 167:13 346:19
**100** 2:15 308:24
**10007** 2:16
**108** 3:7
**1099** 136:24 137:5 137:11 138:13,24 141:18
**1099s** 137:21 141:20
**10:00** 122:18 264:3 305:14
**10:03** 1:19 4:5
**10:46** 37:9
**10:52** 37:12
**10:57** 40:11
**10:59** 40:14
**10th** 346:21
**11** 322:21
**11412** 2:6
**11:42** 71:11
**11:49** 71:14
**12** 129:1 138:18 159:24
**12137** 1:7
**123** 327:19
**13** 154:6
**136** 3:22
**137** 3:23
**141** 3:24
**14th** 336:17
**15** 1:18 4:13 59:4 59:5 167:13 268:15,19
**150** 133:10
**156** 3:17
**15th** 326:19
**16** 293:23
**16th** 326:19
**17** 147:20 293:23
**18** 24:5 108:19 283:19,19 296:11 296:24,25 311:7
**19** 296:25 321:4
**192** 3:8
**196-04** 2:5
**1990s** 22:8,10
**1996** 123:21,24 125:9
**1999** 113:6 139:18 201:17,24 202:14
**19th** 51:8 323:11
**1:00** 212:9
**1:18** 1:7
**1:33** 150:13
**1:40** 150:16
**1st** 237:8

**2**

**2** 3:23 138:20,25 197:12
**2,000** 64:20 190:12 190:24
**20** 113:18 120:17 132:20 137:1 167:12 185:2 211:12 297:4 359:15
**2000** 202:15,16 203:8 204:9
**2000s** 17:6 20:1,9
**2004** 124:4,6 125:9 204:10,13 209:20
**2005** 52:10
**2008** 52:10 83:7 207:16 212:2
**2009** 53:19,19
**2010** 124:15,15 126:10 127:8 135:2,5
**2011** 83:8
**2012** 17:19,22 330:16
**2013** 45:23 74:9
**2014** 45:23 46:20 48:8,9 52:6,15 59:4 74:9 75:16 121:11 129:14,19 130:18,24 135:11 209:23 210:7
**2015** 17:17,22 28:4 31:21 34:18,23 70:12 75:16 85:22 138:25 139:7 141:3,21 142:13 148:8 149:18 150:25 173:3 174:24 176:16,25 177:22 178:8 183:12 207:7,18 207:23 332:19
**2015-2016** 70:13
**2015-2021** 3:23,24
**2016** 28:3,4 70:12 134:23 137:21 138:13 141:1 148:2 149:18 150:24 204:22 207:14 210:5,11 210:11
**2016-2017** 70:14
**2017** 41:6,12 89:21 134:18,19 137:20 140:24 147:16 149:19 150:24,25 161:24 164:8,10 176:21,24 177:23 278:23
**2018** 24:11 39:23 40:18 42:3 72:10 73:18,19 74:4 75:25 76:5,24 82:10 85:23 86:11 87:16 88:14 89:21 90:9 92:16 99:8 108:19 112:11 134:13 137:20 140:22 147:14 151:1 207:17,18 207:19 209:24 210:17 212:5 214:2,13 215:7 216:5 220:14 245:6 261:23 275:1 280:24 283:18 287:8 290:1 306:1 308:5 326:19 330:21 331:16
**2019** 132:19 133:20,21 134:1,6 137:20 138:12 140:17 147:2,12 197:12,16 199:5 201:7 283:18 321:4 322:8,21 323:7 325:9 326:13 337:12 339:1 346:20,24
**2019-032851** 2:19
**2020** 14:9 22:22 28:9 132:12,22,25 133:2,17 137:5,6 137:12 140:13 145:16 146:8,20

146:24
**2021**   1:18 3:22
   4:13 28:20 123:10
   129:12 131:9
   135:11,19 136:23
   138:25 139:23
   140:10 141:21
   142:13 145:4
   146:25
**21-2743**   2:20
**212**   2:18
**219**   3:9
**22**   197:17
**22220**   356:17
**23**   3:18 128:12
**24**   129:2,3,8 354:9
   354:12
**25**   205:25
**25-1**   197:19
**26323**   357:14
**28,000**   290:21
**28th**   322:8
**29**   198:15 199:5
**2:30**   56:16,22
**2:37**   161:14
**2s**   290:18 296:24

**3**

**3**   3:24 199:5 201:7
**30**   121:19 153:20
   154:3,4,10 161:9
   197:16 262:21,22
   263:22 264:1
   281:16,21 283:6
   284:7
**30th**   88:13 197:2
   197:11,11,13
   198:12,15 220:7
   237:7 238:6 261:8
   325:9
**32**   198:14

**325**   3:10
**336**   3:18
**337-2439**   2:8
**34**   217:9
**35**   64:23
**35,000**   217:11
**356-2461**   2:18
**36**   219:12
**36,000**   64:23
**37**   84:9,14,20
   92:21 219:12
**37.5**   154:8
**38,000**   64:21
**390**   203:11,20
   204:5,16 210:15
   249:21 251:17
   255:24
**390s**   204:20 210:3
   251:19
**3:22**   198:19
**3:29**   198:22
**3rd**   197:22,23
   198:3,4,9,11,14

**4**

**40**   35:12 154:8
   161:10 270:19
   281:15 283:5
**40,000**   47:10
**42.25.**   320:14
**45**   299:5
**4897710**   1:23
   358:2 359:2
**4:00**   272:11
   346:16
**4:25**   245:13
**4:34**   245:16

**5**

**53**   108:9
**54**   289:15

**55**   237:16
**57**   272:24
**5:00**   347:12
   348:16
**5:29**   289:10
**5:30**   153:13
   276:13 289:13
**5:44**   301:17
**5:51**   301:20

**6**

**6**   3:3
**6/4/2021**   3:10
**60**   133:11
**60,000**   47:11
**63**   320:13
**67**   319:2 320:9
**69**   3:16
**6:00**   121:24 122:1
   122:10 161:20
   272:10,12 305:13
   348:1,15,18,19,24
**6:30**   56:15,15,21
**6:55**   354:3
**6th**   326:13

**7**

**7**   287:8 354:8,12
**730**   51:19 54:6,21
   102:3,4 103:4,24
   104:2,4,14 112:6
   166:23 173:5,8
   191:18 203:10,10
   203:19 204:5,16
   204:24,25 205:8
   205:17,24 210:6
   210:15 211:20
   214:20 251:1
   255:22 257:16
   314:18
**730s**   205:12,22
   206:14 210:3

**75**   320:14
**77th**   270:15
**7:00**   269:16
   305:14
**7:06**   354:6
**7:08**   355:12,15
**7:15**   269:16,20
   270:1
**7:30**   269:20 270:1
**7th**   283:16

**8**

**86th**   270:11
**8:00**   153:19
   199:18 225:18
   264:2 266:7
   267:13,15 268:2
   268:11,15 270:3
   276:9
**8:10**   271:11

**9**

**9**   3:16,17 296:11
**917**   2:8
**9:00**   153:13 266:8
   267:12 271:7
   272:9 276:11,13
   305:13 348:1
**9:30**   264:3

**a**

**a.m.**   1:19 4:5 37:9
   37:12 40:11,14
   71:11,14 199:18
   267:12,13 268:11
**aabr**   3:24 139:13
   139:15,25 140:11
   141:5,10,20 147:8
   149:16,25 150:4,5
   150:20 151:23
   154:20
**aapl**   306:18

**aback** 46:13 47:14
**abetted** 1:12 4:12
**abhishek** 1:9 2:12 4:9 9:3 26:23
**ability** 11:7,21 12:9,14,17 94:9 154:19 169:17 257:17 339:5 342:20 343:4 356:10 357:7
**able** 11:18 16:21 24:6,12 38:25 92:11 93:15 107:14,15 108:16 108:16 112:13 131:22 171:2 184:4 185:11 257:25 258:5 269:10,19,23 270:2,24 273:17 276:7 301:10 302:21
**abruptly** 164:3
**absent** 4:19
**absolute** 262:7
**absolutely** 206:22 338:22
**absolutes** 216:7
**absorb** 205:19,19
**absorbed** 216:14
**abuse** 94:9 334:22
**abuses** 253:14,16
**abusive** 318:2,3,3 345:3 346:5
**academy** 306:19
**accept** 86:14,15 176:8
**accepted** 47:24 80:11 184:13,14 184:17
**accepting** 19:18
**access** 46:11 192:4 217:2 281:17 282:10 284:9,13 284:15
**accommodate** 266:12
**accommodation** 302:16 303:1,18 305:6,11 307:19
**accommodations** 131:11,14 302:5 302:14
**accomplish** 235:12
**accurate** 151:16 195:24 229:7 356:9 357:5
**accurately** 65:20
**accused** 340:18
**accusing** 282:2
**acknowledged** 330:22
**acknowledgement** 359:3
**acknowledgeme...** 4:16
**acm** 207:9
**acronym** 35:8 139:14
**act** 285:4 301:1
**acted** 236:18
**acting** 90:9 191:23 345:14
**action** 68:9 172:19 194:12 356:12,16 357:8,12
**actions** 94:11 329:8 338:19 339:4
**active** 164:11
**actively** 85:23 164:12 213:3
**activities** 27:3 50:22 174:2
**activity** 56:19,21 96:8
**acts** 331:10
**actual** 244:4,5
**acute** 51:17 187:20 274:11
**acutely** 185:14
**ada** 181:20 182:10
**add** 10:9 201:9 263:25
**added** 326:23
**addition** 205:10
**additional** 204:12 205:22 207:3,4 322:22 350:17 354:14,15,20,22 355:6
**additionally** 4:19 54:14
**additions** 359:6
**address** 33:3 61:12 62:21 103:12 112:23 124:25 125:20 168:11 234:6 290:2 335:16
**addressed** 75:22 102:6 286:12,14
**addressing** 62:6
**adjustment** 305:10
**administer** 4:16
**administration** 54:14 173:1,4
**administrative** 54:7 74:17 79:18 98:6 136:10 181:25 204:12,22 204:23 223:13 279:9 311:25 312:5 323:16 334:7
**administrator** 102:18
**admissions** 127:20 128:12
**admitted** 51:13 286:19,22
**admitting** 123:20 125:14 129:20 135:5
**adolescent** 201:5 293:22
**adult** 293:24
**advance** 36:3
**advanced** 299:5,7
**advancement** 139:14
**advantage** 125:22
**adverse** 265:7
**advice** 344:18
**advisement** 137:3 137:14 139:3 141:24 155:20,24 298:8,10
**advisors** 279:19
**advocated** 190:24 191:8
**affect** 154:19 247:2 257:17 263:15 335:11,12
**affidavit** 70:15 231:4
**affiliated** 129:25
**affiliation** 186:10 186:13
**afford** 7:19 169:21

**afforded** 211:25
**afform** 186:12
**afternoon** 56:16 56:22 291:1 298:23
**agencies** 154:6
**agency** 105:1 132:9 139:13 189:25 335:22
**agenda** 104:25 173:2 251:12
**ages** 159:21
**aggressive** 281:23
**ago** 15:14 35:17 66:8,10,10,12 108:11 142:20
**agree** 4:17,21 7:15 7:15 234:25 239:15 269:24 312:7 313:1 314:4
**agreed** 45:1 92:2,7 117:24,25 213:13 260:8 266:23 312:16
**agreement** 47:20 73:2,6 79:11 93:3 117:10 165:25 240:7,7 266:14 332:13,14,14,15 332:15 333:10
**agreements** 93:4 246:25
**ahead** 19:13 71:2 103:20 119:11 127:17 250:12 295:14 325:20
**aid** 144:4,13 175:14 181:25 212:11 336:4
**aided** 1:12 4:11
**al** 9:5 13:23 14:2,4 14:5,10 28:8 33:10
**albans** 2:6
**albany** 204:23,23
**albuquerque** 1:21 6:15 161:3
**alessio** 23:4,4 24:3 24:15,17,19 25:9 25:17 33:18 318:21,23 319:7 319:24 320:10,17 320:20 321:3,5,23 322:10,14,21 324:5 336:19 346:14
**algorithms** 54:8
**aligned** 173:6
**allegations** 192:12 194:6 195:23 196:9,12 199:11 199:13 200:15 217:10 354:16
**allege** 194:4 233:6 238:24 247:13
**alleged** 109:20 343:24
**alleges** 201:23
**allergic** 273:18 274:22,23
**allergies** 274:11 274:12,21
**allergist** 274:17
**allopathic** 274:16
**allow** 81:4 257:21 304:21 330:8 336:6 340:9
**allowed** 87:1 129:4 154:12 231:24 269:19 276:11 284:8
**allowing** 269:8
**allows** 330:8
**alter** 255:22 283:8
**alterations** 286:11
**altering** 346:2
**alternative** 275:9
**ambush** 166:18
**ambushed** 163:11 164:14
**amended** 3:8 108:3 194:11,12 195:15 199:2 320:5,6
**amendment** 204:24 205:5,23 210:6,10,13 313:17 315:7,14
**american** 201:2,3 201:4 306:19
**amount** 113:7 210:2 245:23 246:3 297:4
**amounted** 64:19
**anansa** 323:21 347:14,20 349:17
**anaphylactic** 274:8
**anaphylaxis** 274:8
**ancestry.com** 327:19
**andrea** 26:22 240:25 241:16 242:10 283:21 323:16
**anesthesiologist** 28:21
**angry** 215:1 317:25
**animus** 281:10
**anne** 48:16 60:20 164:14 172:11 182:7 184:19
**announce** 176:22 176:22
**announced** 92:15 171:10
**annual** 285:11,24 286:1,3,7 291:7 296:9,9 299:5,7,10 300:7
**answer** 3:14 6:10 8:1 9:8 10:1,4,8 11:10 12:9,19,25 13:8 16:9,18,21 17:13 18:13,18,24 18:25 19:1 20:15 22:4,15 27:9 31:17 34:11 37:23 39:3 41:3,19,21,22 44:16 58:9,15 65:18,20 67:12 68:12,18 69:11 71:25 73:23 74:21 74:24,25 75:19 76:2 80:23 83:1 85:5 86:7 88:4 89:5,6 93:22 95:4 96:22 97:3 98:12 99:1 101:11,14,16 105:4 135:15 139:9 141:14 144:24 151:7,15 156:9,20 157:3 162:14 168:21 169:3,16,20,24 170:12 171:2,14 171:16 172:7 173:16,16 175:23 178:5 179:5,6,25 180:10,23 188:8 193:7 207:25 212:24 224:5

227:2 229:22,23 235:15 238:11 239:13 243:3 245:19 250:18 252:12 253:5 264:18 287:19 292:17,20 296:5 309:18 325:16 336:24 349:22 351:25
**answered** 18:11 18:14 171:13,17 344:14
**answering** 7:24 10:5,17 169:11,18 178:25 179:10 180:15,17,24 193:12,13
**answers** 81:4,8 168:25 169:22 293:1
**anybody** 117:22 172:9 303:8 312:4 334:2
**anymore** 26:14 121:7 267:4
**anyway** 90:7 226:2
**apartment** 160:14 161:2,2 268:7
**apologies** 152:11 198:25
**apologize** 81:9 116:17 183:14,14 355:1
**apparently** 327:16
**appear** 109:13,25
**appeared** 219:13
**appears** 199:1 321:3 327:8
**appended** 359:7
**apples** 232:12,15
**applicable** 4:25
**application** 354:22
**applied** 76:12 193:18 202:2,6
**applies** 11:3
**apply** 80:12 275:3 276:15
**applying** 202:3,7
**appointment** 24:13 321:24 336:19
**appreciate** 331:18 331:19,20 355:2,3
**appreciated** 187:17
**approach** 108:18 274:16
**approached** 237:19
**appropriate** 213:14 334:3
**approximately** 128:16 131:8,25 134:5 140:6,11 206:5
**april** 14:9,9 28:9 82:10 85:20 86:2 86:11 87:16 153:3 168:16,23 197:2 197:11,13,16 198:12,15 207:17 207:18 212:2 214:1,2,2 216:14 220:6 237:3,15,16 238:2,6 239:20 248:7 325:9
**argument** 111:2 228:14 335:4,13
**argumentative** 223:19 224:1,12 224:12 235:14 236:16 349:14
**arm** 131:18
**arm's** 88:6,10
**arms** 279:8 336:4
**arraignment** 99:17 250:7
**arrange** 122:2,8
**arrested** 177:14
**arrests** 209:16
**article** 329:18
**articulate** 258:5
**artificially** 251:25
**aside** 7:3
**asked** 18:10,14 47:14 48:10 68:3 77:2,3 86:18 87:7 87:10 103:2 105:3 111:22,24 112:21 112:23 142:4,8,21 142:24 143:17,21 144:6,7 148:11 156:22 170:11 171:12,17,21 185:20 187:3,5 192:1 193:17 230:17 252:22 261:17 298:25 301:7,9,25 308:15 315:15 317:20 325:23,25 331:1 334:2 339:22 342:19 343:13 348:20 349:3,20
**asking** 16:16 18:25 28:2 55:7 101:15 108:14 142:9 145:9,10 169:10 170:24
174:20 187:6 213:2 218:17 233:16,17 234:21 237:13 245:10 254:13 262:13 288:24 322:22 330:24 338:13,17 339:13 343:10 350:4
**asks** 9:15
**aspects** 184:8
**assault** 291:8
**assert** 156:12
**asserting** 156:14 158:13
**assess** 142:21
**assessed** 113:3
**assessments** 45:10 51:13
**assigned** 4:3 290:5 344:17 348:7,11
**assist** 216:4 237:14
**assistant** 8:25 136:10 207:10,10
**associated** 15:22 203:24 204:4 229:9
**association** 139:14
**assuage** 228:4
**assumes** 103:15 127:13 143:11 178:2,2 213:6 239:11 282:22 332:25
**assuming** 129:12 160:8 200:14
**assured** 153:11 240:4
**asthma** 274:21

**astounding** 246:1
**attached** 3:12
**attachment** 351:9
**attack** 345:7
**attacking** 282:1
**attacks** 187:23
**attempt** 94:25 232:7 267:6
**attempted** 62:15
**attend** 323:2
**attendance** 5:7 67:17
**attended** 103:18 104:10
**attending** 16:2 47:4 48:11 63:14 63:16,22 64:13 76:15 78:19,20 79:2,2,16 80:1 124:1,2,9,18,21,22 124:23 125:11,12 126:12 127:10 128:20 129:17,20 129:22 130:7,16 130:16,25 131:4 136:7 187:11 190:13 201:17,24 202:4 208:6 219:7 290:20
**attending's** 126:14
**attendings** 126:1 126:21 130:1,8,12 130:21,22 136:14 143:15
**attention** 6:22 153:5 219:3 220:21 221:21 254:18 296:15
**attorney** 37:19 38:14 65:15 67:3 67:13,18,20 95:11 156:7 157:4 297:11 352:7 356:14 357:10
**attorney's** 176:7 181:13 182:11 245:4
**attorneys** 72:17 74:11 76:23 143:22 156:3 173:8 177:20 234:23 235:1 253:18 256:16 310:21
**audio** 356:8 357:3
**august** 123:17 129:11 160:15,18 202:14 210:21 211:2 282:11 283:7 290:1 308:4 323:7 336:17 337:12,24
**auspice** 311:11
**authored** 192:15 192:17 248:1
**authority** 189:23 209:14
**authorizations** 320:11
**authorized** 4:15
**autonomy** 190:2
**available** 43:20 175:13 185:5 346:17
**avenue** 2:5
**averaged** 140:19
**avoid** 306:2
**avoided** 303:25
**awake** 152:15
**aware** 76:10 189:4 245:2 265:7,17,24 265:25
**awful** 271:24 274:5 275:25 345:17
**axial** 262:23 287:9

**b**

**b** 3:5,8 73:8 108:4 159:22 192:18,20 192:25 194:10
**babysitters** 68:6
**bachelor's** 200:17
**back** 29:3 37:13 40:15 48:18 51:12 65:1,9 66:2,2 71:15 77:14,21 85:22 87:17 96:20 97:1,7,10 103:6 105:5 116:18 118:21,22 121:25 124:15,16 126:10 127:8 131:13 135:4 138:12 139:7 150:17 161:15,17 170:7 170:10 176:25 179:8 180:5 189:17 193:22 198:23 221:4 245:17 252:15,22 279:22 283:9 289:14 292:16 300:11 301:21 304:24 305:17,20 309:12 317:14 330:17 331:9,10 336:15 337:24 342:6 346:4 348:17 354:7
**background** 26:14 200:14 265:12 210:14
**backlog** 206:2,7 206:13,25 209:22
**backpay** 119:9 297:3
**bad** 94:11 178:7 285:8 331:4 347:16
**badaracco** 48:16 60:21,24 61:18 62:7,13,18 63:9 64:3,25 164:14 172:11 175:3 182:7,7 184:20 187:7,16 188:2,11 189:4,10,21,22,24 190:3,4,14,20,22 191:5,6 246:20
**badaracco's** 234:5
**bail** 346:4
**bait** 266:24
**balances** 94:9
**bantle** 73:8 74:5 75:25 76:23 234:24
**bargaining** 47:17 47:20 79:11 83:18 84:1,6,8,13,23 90:21 91:1,6,10 92:3 93:11,13,16 93:19 117:10
**barry** 59:12 81:24 100:5 163:12 182:8 207:11 312:3
**base** 113:8,10,12 113:16,23 115:10 233:25 333:23
**based** 44:21 45:13 120:23 121:8,8,9 126:16 150:21 178:8,10 240:6 354:19

**basically** 48:5,24 63:8,10 88:18 92:19 99:7 100:3 115:18 164:13 186:21 249:8,13 250:14 251:16 323:16 324:6
**basing** 334:4
**basis** 51:10 150:2 205:23 234:16
**bates** 107:24 196:23,24 219:12 319:5 320:24 322:19 324:25 325:8 326:2,13 329:17 336:18 346:14 350:21
**bath** 276:22 277:4 277:5
**bathroom** 150:7 150:11
**baths** 276:21
**bear** 282:23
**bearing** 233:15 319:5 334:21
**bears** 324:25
**beautiful** 6:17
**becoming** 82:13 116:12 117:5 118:9 193:19
**bed** 266:11
**bee** 32:6 49:1 105:11
**began** 219:1
**beginning** 87:15 87:16 89:21 108:12,13 130:18 133:18 217:9 220:3 228:8 245:6 247:18 248:2 256:12 262:6 281:20 286:17 321:14,15
**behalf** 2:2,10 68:24 288:3 289:19 341:2 343:22
**behaves** 330:6
**behavior** 94:11 143:2 274:5 311:21
**belief** 83:16 112:15 262:8,15
**believe** 14:1 20:1 22:22 23:13 24:6 30:5 34:5,12 40:18 42:10 44:10 44:17,20 45:12,15 46:16 52:24 59:21 59:25 61:18 78:2 82:15 84:20 89:15 90:16 92:20 98:20 101:23 110:7,8,14 111:8 115:2,5,8,8 143:7 161:22 186:5 188:23 189:3,20 190:4,7,8 190:11,14,16,22 197:7 208:4 217:10,16 235:3 238:25 239:6 243:23,23 247:15 247:16 248:13,17 254:8 261:17,20 261:22 262:3,17 277:15,16 278:5,9 278:11 279:16,17 281:9,13 282:16 283:4 284:17,17 285:2,5 295:19 307:11,18,22 309:1 318:5 330:9 337:2 343:9,11 346:18
**believed** 55:13,19 80:10 171:20 345:23
**believes** 169:22 278:3
**bellevue** 30:18 41:1,5,5,11,11,17 45:19 46:6 48:18 49:23 50:4,8 51:6 51:11,12,18,25 52:4,13 53:18 54:3 59:7 60:22 73:21 75:4,10,13 77:13 84:22 86:20 87:17,18 88:7 90:12,24 92:19 105:10 112:22 118:20 139:7 143:23 144:2 154:5 161:22 162:24 163:2,20 163:22 164:2,6,18 164:22 165:7,12 165:20 166:1,10 175:4 182:4 184:21,23 185:3,8 185:13 187:24 190:18 191:15 192:8,9 193:18,22 208:6 218:4,20 219:2,9 220:17 230:16 237:6 246:21 266:21 281:15 282:5,7 287:4 293:18 298:19 300:9 302:20
**bellevue's** 219:2
**belt** 47:6
**benefit** 34:6 94:4 186:19
**benefits** 87:8 88:21 91:23 92:12 93:18 94:2,3 115:21 153:7 186:15,17,25 218:2,12 220:17 221:16 229:9 230:2 240:9 296:19
**bentley** 72:23 73:6
**bereavement** 300:14,15,24
**berger** 202:23,25 203:1,1,2
**best** 74:3 81:6 121:22 161:20 169:17 190:11 333:4 356:10 357:6
**beth** 102:16
**better** 94:13 102:8 122:12 194:19 323:8 353:1
**beyond** 121:24 122:1,10 277:12 286:25
**bhc** 220:8
**bhs** 3:9
**bias** 255:22
**biased** 260:10
**big** 164:12,15 246:2 272:14 300:11 337:19
**bigger** 196:11
**bill** 77:13,17 87:17 102:16,19 118:17 118:20 141:8

**billed**  141:6
**billing**  126:13,14
   126:17,18 135:12
   138:14 146:17
   154:22
**bio**  321:25
**birth**  158:24
**bit**  26:11 77:21
   129:16 132:25
   161:21 196:11
   215:11 267:10
   269:7 271:3
   279:25
**bizarre**  245:9
**black**  272:11
   274:4
**blanche**  235:4
**blank**  156:24
   171:1 348:21
**blind**  139:15
**blindsided**  235:19
**blistering**  273:20
**block**  110:9
**blocks**  268:9
**bloom**  103:11,18
   103:24 182:2
   316:25 350:23,25
   351:4,16,18,18,21
   351:24 352:4
**bloom's**  103:18
**blow**  345:11
**blowing**  347:15
**board**  78:7 201:2
   201:3,4,10 248:8
   254:16 292:4,6
   293:15,20,21
   294:3,5
**bodies**  96:8
**body**  25:18 273:10
   274:4 281:24

**boggling**  246:4
**boilerplate**  200:3
**bold**  172:19,21
**bonkers**  253:5
**bonus**  93:4 115:9
   233:25 297:23
**book**  329:19
**booked**  283:19,20
**books**  331:24
**born**  328:1
**borough**  133:6
   214:19 252:1
**boroughs**  214:18
   252:2
**bother**  284:16
**boulder**  158:10
**boundary**  253:21
   331:19
**bowel**  20:17,21
   21:5 345:5
**box**  242:25 243:5
   244:2,3,15,20
**boxes**  244:14
**boy**  160:3 322:12
**bragging**  317:18
**brain**  155:22
**braindead**  330:10
**brainstorming**
   104:2
**brayton**  212:20
   347:14,20 348:4,7
   350:2
**breach**  291:12
**break**  9:19 10:13
   10:16,17 40:6
   43:19 71:5,6,8
   106:9,12,16
   121:15 122:2,10
   122:17 150:7,7
   157:11 161:5
   175:10 266:3

300:17 301:15
**breaking**  352:18
**breaks**  122:19
**bridge**  205:13
**briefly**  121:14
**bring**  76:18
   121:25 239:24
   268:8 269:14
   291:17 318:1
**bronx**  50:4,5,7,9
   51:3 52:1,6 59:10
   59:11 82:10,18
   83:4,10,19 90:8
   92:10 95:22,24
   96:2 101:18
   108:15 111:23
   114:12 115:7
   176:7 181:12
   182:10 203:3,7
   204:15 205:15,16
   205:18 206:20
   207:8,20 209:10
   209:19,23 213:9
   214:15,20 216:4
   253:4 270:7,24,25
   276:4 279:3,4
   280:15 281:18
   283:20 285:6
   323:20 334:7
   346:7 348:8,11
**brookdale**  133:4
**brooklyn**  77:8
   81:20 82:11,14
   83:17 101:6,6,19
   114:10 163:6
   166:7 243:11
   251:7 306:5
   327:24
**brother**  322:11,16
   326:16,18,22,24
   327:1,2,5,10,17,17

328:6,7,10,12,15
   328:21 330:20
   331:5
**brother's**  39:10
   328:7
**brought**  64:22,22
   78:7 113:25 153:4
   153:10 219:2
   238:1 254:18
   281:8 286:23
   296:15 349:23
**brow**  317:12
**bruhaha**  300:11
**brutal**  153:18,18
**buffalo**  90:1
**buffer**  94:8
**building**  203:4
   271:5
**bullied**  327:4
**bullpen**  102:24
**bullying**  193:21
   293:10
**bump**  78:14 79:9
   81:20
**bumped**  87:17
**bumping**  79:21
**bunch**  99:6 133:3
   249:2
**bureau**  95:23
   334:11
**bureaucratic**
   189:24
**burning**  353:12
**bush**  332:6
**busier**  210:23
**business**  53:25
   56:20 177:17
   241:5,17,22
   242:11,16,20,23
   243:5,8,11,17,19
   243:22 244:3,4,5

244:13,15,17,19 244:20 251:1 253:22,23 275:5,6 298:15
**busy** 206:21 210:23,23 211:3
**buttresses** 228:13
**buy** 275:4
**byway** 309:23

**c**

**c** 2:1 3:9,20 4:1 14:24 219:14,21 219:21 224:9
**cahoots** 310:20
**calcified** 15:11 35:6,7
**calcium** 35:9
**calculate** 123:1 270:20
**calculated** 149:3 341:5
**call** 36:25 37:4,7 43:19,19,22,23 44:3 61:4 88:14 129:5 136:10,21 136:25 138:16 140:4 141:19 179:8 180:5 245:9 245:11 247:1 276:16 292:16 298:5 301:15 309:12 317:10 341:11 342:5 350:13
**called** 5:21 9:4 25:18 32:1,3 35:7 35:7 61:2 70:24 78:2 82:16 84:14 92:3,7 102:3 127:2,7 139:13 169:23 176:7 190:6 216:23 236:7 273:21 297:24 299:2 303:8 304:2 308:8 308:9,18,21
**calling** 136:7 138:22 146:9 173:7
**callous** 317:17
**calls** 44:15 100:13 215:2 303:15 340:2,3
**calterjeroni** 336:1
**campaign** 262:7
**camponese's** 297:25
**cancel** 336:19
**candidates** 213:4 213:5,10
**canfield** 2:13 3:3 5:8,8 6:2,9 7:10 7:14,20 8:5,6,12 8:13,16,24 11:9,16 11:18,25 12:3,7,12 12:24 13:4,12,13 13:16,17,20 14:16 15:4,8,13,18 16:1 16:8,15,19,23 17:3 17:16 18:13,20 19:2,4 20:10,19 21:17 22:3,18 23:23,24 24:1,14 26:7,12,16 27:19 29:10,15 30:3 31:1,19,20 32:17 33:23 34:4,9,10 35:23,25 36:8,12 36:13,18,22,23 37:2,6,14,15,20 38:1,12,23 39:2,25 40:5,8,10,16,17 41:14,19 42:1,9,11 42:14,19,25 43:5 43:10,15,25 44:6,7 44:19 49:6 50:12 50:23 52:19 54:23 55:17 56:1 58:3 58:12,19 62:9 63:20 65:8 66:5 66:17,23 67:7,14 67:16 68:1,21 69:12,14,22 70:9 71:1,7,17,18 72:1 72:7,16 73:1,9,14 73:25 74:2,8,14,23 75:1,8,23 76:21 77:20 79:6 81:3,6 81:13,14 82:5 83:5,15,22 84:16 85:8,17 86:8 87:22 89:2,11,23 90:3 92:1,9 93:14 93:24 95:18 96:19 96:25 97:5,8 98:13,16,17,24 100:7 101:12,21 103:9,17 104:11 105:16,18 106:3,8 106:11,15,18,23 107:4,10,13,18,21 107:22 108:2,5,10 108:20 109:23 110:4,5,13,17,22 111:1,5,15 116:10 116:18,24 117:4 117:19 118:6,25 119:6,15,18 120:1 121:12,21 122:3 122:13,16,22,25 123:6 125:8 126:3 127:5,17 128:15 133:24 134:4,10 134:17,22 135:7 135:18 136:4 137:4,10,15,19 138:3,7,11 139:4 139:11 140:16,21 141:16 142:1,16 143:6,20 144:1,8 144:18 145:3,22 147:1 148:7,21 149:15 150:3,8,18 151:3,17 152:3 154:16 155:1,7,8 155:21 156:1,8,11 156:17,18,22 157:6,10,12,18 159:16 161:4,7,10 161:16 162:17 165:17,24 166:9 168:17,22 169:1,6 170:1,9,14,21 171:3,7,15,19 172:6 173:20 174:4 176:15 177:21 178:4,6,12 178:19,25 179:2,7 179:10,18 180:2,4 180:7,16,20,22 181:6,7 182:3 183:2,5,7 184:2 185:21 186:4 188:21 189:12,16 191:3,11,13 192:14,18,24 193:4,9,15 194:1 194:16 195:5,12 195:13 196:18,22 197:8,18,25 198:2 198:6,7,12,13,16 198:24 199:6 200:1 201:21,22 204:6 206:10,12

208:1 210:1,8,12
213:1 214:12
215:18,25 216:2
218:18 219:21,22
219:25 220:5,11
220:20 221:1,3,7,9
221:12 222:4,9
223:4 224:4,6,8,10
224:15,17 225:7
225:11,17,21
226:13,24 227:12
227:14,17,23
228:3,7,9,13,17,20
228:23 229:1
230:21 231:8,10
232:1,19 233:3,5
236:10,23 238:13
238:18 239:13,16
240:20 241:14
242:7,21 243:1,6
245:12,18,22
246:7 247:11
250:9,19 251:3
254:6,21 255:8,18
256:17 257:7,23
258:3,7,16,21
259:1,4,8,10,13,18
259:20 260:1,13
262:12,14 264:24
265:2,13 266:4
276:14 277:24
278:2,4 280:10
282:23 283:1
285:1,19,22
287:21 288:8,12
288:14,18,22
289:1,4,8,17
290:17 291:9,16
291:23 292:3,10
292:22,24 293:3,4
293:9,11,13

295:13 296:2,12
297:16 298:3,9,11
299:18,24 301:14
301:22,23 303:16
308:15,17 309:20
313:9,19,21 315:4
315:9,19 316:7,16
316:19 318:10,18
318:23 319:2,5,12
319:16,18,22
320:8,23 321:1
322:4,6 323:5
324:23 325:4,6,18
325:24,25 326:1
328:16 332:1
333:2,6 337:1,19
338:6,16 339:16
339:18 340:21
341:15,21 342:4
342:12,16,21
343:2,6,13,17,20
344:2,5,9,12 346:9
347:1 348:13
349:1,12 350:1,15
350:19 351:8,13
351:15,19,20,25
352:3,20 353:2,11
353:14,17,23
354:10 355:10
**canfield's**  169:16
343:9
**capacities**  123:22
123:23
**capacity**  50:2
90:11 123:25
129:17 133:25
142:5,7,22 143:5
147:19,23 148:11
152:10 257:18
333:15 334:21

**capsules**  276:19
277:6
**card**  242:20 243:8
243:11,17,22
244:3,4,5,13,20
**cardiac**  33:16
345:4
**cardiologist**  21:16
21:18 22:1 33:1
**cards**  241:5,17,22
242:11,16,23
243:5,19 244:2,3
244:15,18,20
**care**  12:22 13:14
14:13 16:20 17:6
17:23 19:8,15,16
19:19 27:24 59:19
127:20 129:19
131:5 148:5
187:20,21 260:16
273:2,6 300:13
301:6 332:8
**career**  191:19
234:13 330:11
339:5 340:17
341:8,9
**careful**  295:3
**cares**  188:18
**caretaker**  268:11
**caring**  131:7
**carry**  131:16
274:9
**carrying**  131:16
132:11
**case**  1:6 9:4 51:21
70:21,21 146:22
146:25 174:15,25
175:14 205:16
251:11 312:13
313:5 314:21
334:15 350:22,23

351:1,2,4,9,10
352:5 354:23
**caseload**  131:5,5
131:17
**cases**  52:12 144:5
206:1,3,6,21 207:6
209:17,22 211:18
214:3,17,19 252:2
252:8 336:5
**cash**  286:3
**cashews**  274:8
**cat**  114:18 116:15
219:21
**categorize**  330:2
**categorized**  39:13
**caught**  235:22
279:25 347:11
348:20
**cause**  94:14
273:19
**caused**  110:8
151:10 262:5
263:20 271:21
278:9 307:18,22
345:11
**causing**  25:13,15
214:7 306:8
**cell**  6:19 7:5,7,13
8:8,21 347:17
**census**  133:10
151:10
**center**  263:12,12
263:13 274:24
**centers**  50:10
163:7
**central**  62:7,8,11
62:13,17,19 64:12
190:9 262:24
287:11,12 293:18
297:24

**cents** 320:14
**certain** 32:14 40:20 93:3 168:5 251:11 334:14
**certainly** 97:24 109:5,19 248:11
**certainty** 333:16 335:2
**certificate** 356:1 357:1
**certifications** 201:1,10
**certified** 4:22
**certify** 356:4 357:2
**chain** 41:11 261:2 277:3,10,10
**chair** 281:23
**challenge** 98:19 335:19
**challenging** 149:4
**chance** 227:25 326:4
**change** 3:9 10:9 39:8 63:24 76:14 76:18 77:3 80:2,4 80:4 83:24 93:1 124:5,7 135:10 153:2,12 154:18 157:25 158:5 163:10,21,23 164:25 165:3,5 167:25 168:3,3 187:13 191:21 199:15,16 204:7 204:15,24 205:20 205:20 214:6 219:3 220:9,14,16 221:18 230:11,18 232:25 233:1,22 239:7,23 240:4,14 241:6,7,16 244:22 261:18 262:6 263:25 266:13,15 267:10,11,13 272:2,13,22 273:1 275:13,24 277:13 277:22 278:3,10 286:21,22 305:2,9 305:23 306:7 323:12 358:4,7,10 358:13,16,19
**changed** 18:1 19:8 48:10 63:12,13,15 63:22,25 64:9 76:7 77:2,9 78:11 78:16 79:4 80:17 85:10 127:24 153:17 158:8,11 159:1,5 164:3 187:4,14 219:5,6 234:6,8,10 239:1 239:15 241:1,3 247:14 261:21 262:9,16 263:4 266:6 271:17 290:20 291:6 294:4 307:12 317:24
**changes** 79:25 94:10 99:9 192:3 307:14 359:6
**changing** 79:23 234:2 239:25 240:22 241:12 318:2
**chaos** 153:25
**characterize** 189:5 215:19
**characterized** 184:6 307:6
**characterizes** 241:12
**charge** 56:11,23 90:8 163:6 177:15 237:12 239:2,9 312:9
**charged** 205:10,11 298:14 320:21
**charges** 314:21
**charging** 296:6,11
**chart** 124:25 125:7 128:2
**charting** 131:23
**charts** 127:22
**chattering** 57:8
**check** 59:13 285:13 288:7
**checks** 94:9
**chemicals** 273:19
**chewing** 116:15
**chief** 48:17 60:21 95:23 98:6 136:8 136:9 181:25 219:8 279:9 334:6 334:11
**child** 68:24 201:4 253:4 293:21 317:19
**childcare** 122:2,9 128:25 149:1,4,6 306:11 317:18 355:4
**childish** 228:3
**children** 6:25 7:13 68:8 159:17 160:8 160:22 245:10 263:24 268:8,12 269:19 270:2 271:7,21,25 272:1 274:21 300:13 322:11 331:7 337:5 338:7,19,21 338:22 339:6,15 339:23 340:3,24 341:2,10 343:22
**children's** 263:16
**china** 274:19
**chinatown** 263:12
**chinese** 274:20,23 275:15,16 276:3 276:16
**choice** 191:19 222:21
**cholesterol** 14:6 29:12 33:16
**chopping** 110:8
**chose** 119:2 335:16
**chosen** 290:4
**christmas** 175:10
**chronic** 21:2 266:10 275:22
**chronos** 217:2 281:17 282:10 299:1 307:21 324:1
**chs** 3:9 27:12 30:15,17 39:14 40:25 41:4,6,12,16 59:3 76:3,10,12,16 78:9 80:12 84:22 85:9,20,25 86:10 89:12 90:15 92:15 92:17 94:18 98:7 100:10,11 102:2 104:2,7,8,9,21 112:16 119:10,20 139:7 143:23 144:2 151:9 152:18,24 154:6 161:22 163:4,23 164:13 166:12,22

167:16 168:5 171:10,22,23 172:17,23,25 173:3,3,6,25 176:21 177:2,4,23 177:25 178:8 179:4 182:20 183:9 184:7,14 187:18 191:17 193:21 206:16 211:25 212:2 216:13 218:20 219:5 220:8,17 230:15 231:17,18 232:21,24 233:7 234:8 237:7 245:5 245:25 246:10,23 247:25 248:7 255:1 265:6 266:14 278:14,23 279:18,23 280:13 282:20 290:4,21 294:3,9 297:6,12 297:18 302:3 306:11 311:11,11 312:1 317:13,13 334:1,8 335:16,19 336:12 339:11 340:11 341:1 344:24 346:1 347:3

**chunk** 151:8,11

**chunks** 149:23 151:7,13

**church** 2:15

**circuits** 345:11 347:15

**circumstance** 336:6

**ciric** 46:2 48:12 51:2 58:21 59:23 60:1 64:19 74:10 74:16 75:3,17 76:19 86:23 89:10 89:12,14,15,21 95:11 100:5 112:18 113:2 117:9 119:7 120:3 120:9,11 171:8,9 182:8 187:7 208:5 218:8,14 222:24 222:25 223:9 232:20 233:24 333:10

**ciric's** 90:13 167:21 219:6 332:15

**city** 1:7 2:10,14 4:8 6:14 9:1,2 27:13,15 68:19,23 74:19 79:12 104:1 105:14 123:14 185:4,7,12 186:6 188:4 189:6 190:18 211:19 249:15,19 251:19 251:22 252:6 253:24,24 255:7 256:8 263:12,12 313:3 326:10 344:14 358:1 359:1

**civil** 82:21,22,23 83:14 351:9

**claim** 291:18 311:13 315:14,17 338:18 343:22

**claimed** 293:21

**claiming** 192:10 215:8 338:20 341:11,14

**claims** 258:1 313:16,18

**clarification** 54:4 138:22

**clarify** 24:23 53:24 126:11 138:16 210:10 256:23 277:21 286:1 297:21 343:21

**clarifying** 255:15

**claudia** 182:1

**clean** 207:5 265:14

**cleaned** 166:8

**clear** 19:2 61:14 76:22 167:19 206:6,13,25 229:24 253:11

**clearance** 29:2

**cleared** 206:2 209:21 210:17

**clearing** 210:14

**clearly** 55:10 76:15 94:16 119:3 181:2 342:7

**clerical** 345:9

**clerk** 158:11

**click** 194:25

**client** 7:19 18:23 67:13 144:7 156:7 157:2,4 301:15

**clients** 144:9

**clinic** 50:4 52:3 53:25 60:5 77:8 82:10,11,14,18 83:4,10 86:10 90:5,10,14,24 92:11 93:8 101:18 101:19 108:15,16 114:10,12,16,23 115:1,7 132:9 167:19 187:10,12 202:7,8 203:7,15 203:17,19 204:15 206:21 207:8,16 207:19,19,22 208:7 209:10,11 209:13,19,23 214:4,15 216:5 219:9 222:16,17 222:23 231:12 237:17 243:12 249:20 256:24 267:8 285:6 293:24 323:21,22 348:8,13

**clinical** 29:2 54:15 56:12,19 108:18 131:6 330:4

**clinicians** 95:9

**clinics** 27:13,14,16 41:7,10,13 50:5,10 60:3 76:4,6,20 78:8,9,10 84:5 85:21 86:1 89:13 90:9 94:18 102:8 114:4,21 119:12 152:19 162:24 163:20,21 164:2,6 164:23 165:7 166:1,12 171:11 171:24 172:17,23 173:14 176:21,23 177:24 202:11 204:8 212:18 216:11 241:7 244:9 279:2 284:22

**close** 27:21 272:10 272:21 320:12 327:20 350:14 354:25

**closed** 211:3 223:1 355:11
**closely** 129:24 196:7
**closes** 272:12
**closing** 19:16 64:18
**cob** 252:13,21 255:6 310:10
**codd** 341:16
**code** 296:8,9 299:5
**coenzyme** 29:20 29:25 31:2
**coerced** 234:12
**coercing** 261:24
**coercive** 232:7
**coffee** 345:10
**coffin** 275:25
**cognitive** 334:17 334:18
**coib** 310:11,12
**cold** 11:14 330:19
**collateral** 145:8
**colleague** 59:22 80:6
**colleagues** 44:23 45:1 59:18,20 89:1 332:9
**collect** 145:9
**collected** 110:1 126:16
**collective** 47:17,20 79:11 83:18 84:1 84:5,7,13,23 90:21 90:25 91:6,10 92:3 93:11,13,16 93:19 94:6 117:10
**college** 158:4 200:23
**colley** 42:4 59:1,2 59:5 60:17 61:22 62:6,12,18 63:10 64:3 65:1 75:7,21 90:7 95:12 100:6 102:17 104:14,16 108:14,23 111:14 111:19,21 112:5 112:23 162:4,7,20 163:24,25 164:3 165:6,10,13,23 172:11 175:2 182:6 184:1,3,6,20 190:5 246:21 333:10
**colley's** 332:15
**colonoscopy** 22:21
**colorado** 200:18 330:17
**combat** 29:21
**combination** 128:21,23 320:2
**come** 11:24 56:13 56:14 64:18 89:12 97:1 102:23 127:21,25 128:14 130:8 152:15 172:15 190:17 208:15,16 213:9 214:8 248:9 263:24 267:15 269:4,6,13,25 271:6 272:9 279:1 305:13,14 306:3 323:20,22 332:11 346:6 347:21
**comes** 43:14 155:11 321:5 332:5
**comfortable** 44:1 260:14 311:21
**coming** 43:1 136:15 187:22 214:17 218:23 253:6 268:19 307:2 346:15 348:7,17
**command** 41:11 261:2
**commensurate** 234:10
**comments** 55:23 318:12,14
**commission** 74:19
**common** 160:5 273:18
**communicate** 178:13
**communicated** 55:4 190:20
**communicating** 7:22,25 328:14 329:14
**communication** 115:25 162:11
**community** 166:5 178:17 179:15
**commute** 271:18
**company** 126:18 136:1
**comparable** 76:19 114:1 115:11 117:8 118:5 136:2 136:15 233:23
**comparative** 265:5
**comparator** 45:25 46:1 47:1 60:2 86:25 112:18,19 112:20 117:8 120:9,18 218:14 218:23 232:9 234:14,17
**comparators** 112:17 217:12 233:12
**compare** 113:13 115:10
**compared** 52:25 93:19 120:3 150:25 151:1 209:10
**compensate** 144:16
**compensated** 115:5,14 144:11 144:13
**compensation** 138:23 217:20
**compensatory** 341:2,5
**competency** 146:3 152:5,8 166:24 173:8 177:18 203:11 205:1 249:20 251:9 333:7,11,20 335:15
**complain** 258:9 261:11 293:17 296:22 307:22 308:7 310:22 311:1,4
**complained** 75:6,7 86:17 95:8 216:16 216:19,20 234:23 240:13 261:6 262:3 279:10 296:23,25 306:6 307:24,25 308:16 310:10
**complaining** 115:24 121:10 219:1 248:25

258:14 311:7 343:6
**complaint** 3:8 57:25 60:19 61:6 65:10 74:17,18 75:4,9,12 77:16 108:3 113:1 119:7 120:2,16 121:5,8 153:16,17 192:11 192:13,15,22 194:3,4,11,12 195:15,23 197:9 197:10 198:25 199:2,11 200:5,12 216:8,22 217:5,6,9 233:6,8 234:14,16 235:6,10 238:24 242:1 247:13,14 247:20 261:22 262:4,5 272:24 277:17,18,18 291:11 304:20,23 305:3 307:6,7 310:7 315:5,14 320:5,6 326:4,6,8 339:1 344:15 354:17
**complaints** 56:9 62:21 188:6 189:2 189:5 191:25 261:19 278:6,6,7 281:12 296:17 297:12,17,20 307:15,15,16,18 310:6,8,9
**complete** 54:6 169:19 359:8
**completed** 145:12
**completely** 104:1 149:7 211:11 224:7 225:12 228:9 273:25 275:12 347:23
**completing** 355:1
**complex** 250:22
**complicated** 146:23 236:5
**complied** 281:1
**comply** 276:2
**complying** 280:14
**component** 273:22
**compound** 21:15 285:18 346:23
**compromised** 51:16
**computer** 7:22 43:1,6,13 192:7 206:18,19,23,23 345:12 347:16
**computer's** 192:4
**computerized** 287:3
**concept** 89:9
**concern** 100:4,6 166:4,21 174:7 182:20 190:7,20 196:13 306:11 308:25 315:7,15
**concerned** 61:6 91:20 99:13 100:5 120:3,5 156:16 163:11 167:10 172:24 184:6 216:18 289:3 296:18 331:12
**concerning** 176:13 200:5,7,7,9 217:10 238:21 241:17 280:16 291:25 317:6 329:19
**concerns** 49:12 91:14,21 99:15,25 118:17,20 153:4 166:16,23 167:1,3 168:12 178:11,14 178:16,18,21 179:3,15,21,22 180:8,25 181:1,3,9 182:20,22,23 183:9,17,21 184:10 187:17 190:19 228:5 237:21 249:3,7 257:14 260:9,22 260:23 287:7 296:14 317:4 318:6 335:16
**concluded** 355:16
**conclusion** 44:15 100:21
**concourse** 271:4
**condition** 11:6 12:8 21:11 22:5,7 30:6,9 33:3,8 34:18 301:6 302:1 302:3,5 303:3 314:11
**conditions** 5:15 86:14 93:1 153:2 168:3 233:1 238:21 247:3
**condolences** 330:22
**conduct** 1:13 4:12 54:21 144:19 291:25 332:21 333:7
**conducting** 45:10 54:17 95:15 333:20
**conference** 36:10 343:8
**confirm** 47:19
**confirmed** 298:1
**conflict** 248:7 254:15 269:22
**conflicting** 252:6
**confused** 348:4
**conjunction** 92:20 98:5 346:2
**connect** 349:16
**connection** 9:20 70:16 190:1 241:21
**consecutively** 252:3
**consent** 5:9,12 354:20
**consider** 21:6,9 49:12 66:3,3 115:18,19 176:1 188:16 284:23
**considerations** 258:23,24
**considered** 60:1 87:9 113:23 174:16 175:17 240:6 296:15
**considering** 184:11
**considers** 113:5
**consistent** 125:9 150:20 177:11 209:23 210:16 282:20
**consistently** 142:12 149:25 150:21
**consolidate** 162:24 164:18
**consolidation** 164:2

**conspire** 290:4
**constant** 192:2 246:1
**constitute** 5:4
**constitution** 99:9 174:18
**constitutional** 99:4,11 100:1 166:25 175:16 233:21 258:2,18 258:24 262:2 313:16 335:14 336:11
**construed** 113:7
**consult** 150:1
**consultancy** 145:16 147:11 150:22 152:4,21 154:21 255:11
**consultant** 140:2,8
**consultation** 142:6 142:6,7 143:2
**consultations** 142:12 148:6,18
**consulting** 140:2 142:4 143:22 145:24 146:1,3,10 146:16 147:5 152:5 155:15
**consults** 147:23
**consumed** 122:15
**consumers** 140:4
**contact** 7:2 46:14 71:22 72:11 75:15 136:11 273:18,25 291:22 293:18
**contacted** 41:4,5 46:13,18,22 72:2,4 72:17 73:15 74:4 144:4,5 291:15,24
**contacting** 72:18
**contains** 320:13
**contemporaneous** 36:9
**contemporaneou...** 225:5 247:23
**contempt** 279:20 280:12 333:18 334:1,8 336:13
**context** 53:16
**contingent** 128:24
**continuation** 172:14
**continue** 18:23 117:9 135:11 139:19 154:19 179:5 211:23,24 221:1 254:3 292:20 298:12 318:6 340:16 341:7
**continued** 17:7 64:8 293:20
**continues** 264:20 329:6
**continuous** 293:12
**contract** 240:7 297:2
**contracts** 246:25
**contribute** 266:10
**control** 2:20 190:3 276:17
**controlled** 174:22
**convenient** 186:23 263:17
**conversation** 57:20,23 118:8 170:4 220:15 225:24 314:25 316:2,13,14,15 322:10 323:19
**conversations** 163:9,16 230:25 231:1 265:23 309:11 354:19
**convert** 286:3
**converted** 133:6 185:2,11
**coordinating** 207:11
**cope** 25:19
**copied** 311:13
**copies** 192:9 198:9 243:18,24 282:4 283:11
**copy** 137:11 197:12 224:11,19 243:21 248:20 282:7 311:15 326:6,8 350:25
**core** 258:1
**corner** 194:25 195:2 347:19
**corners** 312:17 314:5,14 346:1
**corporate** 64:10 76:18 78:1,2,14 79:23 80:3,5 81:21 82:17 240:10
**corporation** 1:8 2:11 4:9 8:25 9:2 9:5 48:4 126:20 126:23 135:9 358:1 359:1
**corporations** 138:14
**correct** 9:11 28:4 31:5,8 40:19 54:18 64:24 69:6 71:20 73:7 78:20 78:23 80:13 85:7 88:9 92:12 93:17 111:18 114:4,5,10 114:11,13,14,22 114:24 120:4,9,14 120:25 146:13 147:9 159:17 160:10 161:24 195:24 199:13 200:15,20 201:5,8 201:18,25 202:18 203:4,5,20 215:9 218:20,24 222:5,7 233:11 235:2,6,7 238:6 239:3 244:25 245:1 261:5 267:14 271:9 280:16 286:4 359:8
**corrected** 112:21 120:24 285:13 296:13
**correcting** 89:9
**correction** 121:1,2
**correctional** 166:13
**corrections** 102:23 359:6
**correctly** 162:15 241:12
**corresponded** 210:19
**correspondence** 321:22
**corresponds** 221:17
**corrupted** 340:10
**corrupting** 176:10
**cost** 94:7 305:18
**couldn't** 273:11 345:16

**council** 85:1,3 92:17 168:12 185:1 220:23 221:23 226:1 229:9,10,11 230:10,23 291:25 297:1
**counsel** 5:8,11,13 8:25 69:23 75:15 169:21 180:23 245:10 264:20 279:8 315:16 319:9 335:25 354:13 356:11,14 357:7,10
**counsel's** 217:15 239:12 295:11
**counselor** 137:3 337:17
**county** 158:10 205:6,15 231:20
**couple** 9:7 26:17 62:14 130:23 135:22
**course** 40:10 62:6 62:14 128:2 164:3 193:2 273:12 279:24 311:10 322:17 340:18
**court** 1:1 9:13,15 10:20 27:13,15 36:19 37:1,4,7 39:15,15 41:7,10 41:13 50:4,5,9 52:3 53:25 60:3,5 76:4,6,20 78:8,8 78:10 82:10,11,14 82:18 83:4,10 84:4 85:21 86:10 89:13 90:5,8,10,14 90:24 92:10 93:8 94:18 95:24,25 96:4 98:7,9,12 101:18,19 102:8 114:4,10,12,16,21 114:23,25 115:7 119:12 157:8 163:20 167:19 169:8 171:11,24 172:17,23 173:8 173:14 174:3,3 176:13 177:18,24 187:10,12 195:16 196:16 197:16 202:6,8,11 203:4,7 203:9,14,17,18 204:8,15,16 206:20 207:8 208:7 209:10,11 209:13,19,23 212:18 214:4,15 216:4,11,19 219:9 222:16,17,22 231:12 237:17 241:7 243:11 244:9 249:10,11 249:20 250:11 251:17,18 255:21 256:24 260:11 278:15 279:2,3,4 279:19 285:6 293:24,24 318:11 319:23 323:20,22 333:14,15 334:9 334:10,10 335:17 335:20 336:3,9,13 340:12 342:5 344:6,10 348:8,13 350:16 352:23 353:10 354:22 355:6
**court's** 36:4,17 257:17 332:13
**courtesy** 7:19 36:21
**courthouse** 51:3 263:14 264:2 270:24
**courthouses** 50:14
**courts** 96:2 98:2,4 210:20 211:3 256:15 270:7 272:10 279:22 330:5 333:9 335:1 335:7
**cousin** 327:16
**cover** 65:11,12 136:8,11 142:9 262:19 269:4,4 285:12,25 319:7 320:9,15 323:20 323:22
**coverage** 124:2,9 124:18 125:18,18 126:21 128:20 129:17 130:25 131:4 132:18 268:17,21 269:1
**covered** 209:14
**covering** 125:25 136:13,14 186:17
**cpl** 203:10,11 204:24,25 255:22 314:18
**crafty** 263:22
**crazy** 304:15
**creams** 275:17 276:20,23 277:6 294:18
**created** 172:25 173:1 272:3 279:21
**credentials** 217:13
**crescendo** 27:11
**criminal** 45:11 95:24 96:7 99:4 99:12,16 100:1 152:9 173:6 184:8 203:4,10 261:24 267:5 334:13,13 340:10,13
**criminally** 205:11
**crippled** 212:14
**crippling** 212:10
**critical** 53:7
**cross** 217:15
**crossfires** 279:25
**cruel** 272:5
**cry** 271:23 306:13
**cryptic** 87:7
**crystals** 15:11 35:6,10
**cuff** 15:12
**culture** 48:5
**cunning** 262:17
**current** 68:9 220:17
**currently** 12:21 13:14 14:12 16:6 29:4,11 31:11 123:7
**custodians** 278:24
**custody** 314:22
**cut** 97:4,4 131:23 132:3,4 193:8 194:5 258:16 259:9,11,16 261:12 290:19 312:17 314:4,14 331:17
**cutoff** 34:22
**cuts** 192:3 290:21

**cutting** 289:6 293:10 312:10,10 346:1
**cv** 1:7
**cyclone** 45:6

**d**

**d** 3:1,10,20,20 4:1 13:25,25 14:24 32:7 90:16 157:24 158:22 257:2 324:25 325:2
**d001588** 319:6
**d001592** 320:24
**d001598** 322:20
**d001604** 325:8
**d001606** 326:3
**d001608** 326:14
**d001621** 329:17
**d001627** 336:18
**d001635** 346:14
**d001638** 350:21
**d001654** 319:6
**d1588** 325:1
**d1654** 325:1
**da's** 179:14 291:22 291:25 297:8
**damages** 121:2 338:18,25 339:2 339:14,20 341:2,5 341:25 343:14,21 354:16
**dan** 222:12 226:5 231:1 307:1
**daniel** 90:15
**dared** 304:1
**dark** 347:15
**das** 212:16
**data** 206:17,17,22
**date** 1:18 17:11,15 21:22 22:17 39:21 72:6 120:13 147:24 196:17,20 201:6 234:13 286:13 306:17,23 358:24 359:12
**dated** 108:19 197:11,11,13,23 198:3 220:6 238:6 321:3,4 322:8,21 346:19
**dates** 109:7,21 148:16 294:17 295:24
**daughter** 267:17 328:23 341:13
**daughter's** 342:7 342:8
**davidson** 46:17,22
**day** 120:19,19 131:10,15 153:21 154:10,10,11 199:17 212:6 216:22 236:8 237:6,7 238:12 239:21 263:10,24 265:20 269:23 276:20 281:21 282:15,19 283:17 284:6 286:10,13 288:11 293:20 296:7,11 306:3 345:7,8 348:15 359:15
**days** 10:14 51:12 56:16 212:7 241:23,25 294:22 294:23 295:1 300:23
**dayshift** 138:18
**dc** 84:9,14,20 92:21
**dcanfiel** 2:17
**de** 14:21,22,25
**deal** 62:15 127:24 247:5 279:24 280:25
**dealing** 114:18 274:15
**dealt** 62:15
**deandra** 335:25
**death** 39:10 300:8 301:3 322:11 326:21 327:5
**debate** 65:24
**december** 24:5,5 24:11 41:6,12 161:24 212:5 321:14,15 326:19 327:1,18
**deceptive** 257:16
**decide** 98:11
**decided** 27:12 76:3,17 77:15 92:24 124:11 152:16 158:4 191:24 344:23 345:2 354:23
**decision** 91:15 156:15 188:4 191:17 222:13 239:7 240:6 241:6 242:9 282:17 334:5
**decisions** 279:18
**declaration** 70:16 70:24
**declare** 359:4
**decreased** 133:10 154:8
**deemed** 45:5 213:14 359:6
**defaming** 253:10
**defend** 211:10
**defendant** 54:5 68:10,11 174:25 214:21 249:18 251:24 314:20 347:18 348:16
**defendant's** 335:14 336:11
**defendants** 1:14 1:15 2:10 4:13,13 5:9 9:1 45:11 51:23,23 99:5,12 99:16 100:1 152:9 166:24 174:8 194:10 205:10,11 233:20 252:2 256:11,14 257:14 261:24 267:5 279:5 319:20 338:20 354:13
**defending** 106:25
**defense** 179:15 253:18 279:8 345:21
**define** 41:23 147:6 294:25
**definitely** 27:20 52:10 209:17,18 269:23 346:25
**definition** 79:14 79:20 229:10
**defy** 335:21
**defying** 39:15 98:7 278:15 279:7,23
**degree** 158:16 200:17,18,22 333:16 335:2
**delay** 312:13
**delayed** 274:10 284:21

**delays** 270:20 274:13
**deliberate** 285:5
**deliberately** 281:11 283:2,4 285:4 345:16
**demonstrate** 213:18
**demonstrated** 296:24
**demotion** 240:15 240:16,19 242:5 242:20
**denial** 192:4
**denied** 46:11 217:2 281:9,16 284:9,12,14 291:5 293:16 294:10,25 295:4,17,19 303:1 304:11
**dental** 186:16
**deny** 113:23 333:3
**denying** 281:5,5 307:19,20
**department** 2:14 9:1 68:19,23 69:17,21 102:23 320:21
**depend** 41:23
**dependent** 281:19
**depends** 65:19
**deplete** 30:23
**deponent** 259:17 359:3
**deposed** 69:20
**deposition** 1:17 4:6 5:2 6:21 7:4 36:3,20 37:17 38:3 43:16 65:16 65:23 66:1,6,11,13 66:24 67:21 69:15 69:16 81:7 100:15 103:18 169:23 170:1 179:20 224:18 259:21 288:6 289:5 319:14,17 354:11 354:25 355:2
**depositions** 7:21 36:21 106:25 227:24 319:19
**depression** 143:3
**deprivation** 266:10 275:14,19 275:22
**deprived** 275:12
**deputy** 82:18 101:18 207:12
**derken** 181:21
**dermatitis** 273:18
**described** 171:22 301:5 321:25
**describing** 50:25
**description** 3:6,21 87:12
**designated** 79:12 204:25
**desk** 197:13
**despite** 217:12
**detail** 93:9
**detailed** 87:12
**details** 79:19 115:15
**determine** 11:3 142:22
**devalued** 57:16
**devastating** 154:14
**develop** 35:10 334:19
**developing** 250:24
**development** 57:14
**developmental** 274:13
**device** 6:20
**devices** 8:7
**dexilant** 32:2,3,21 32:24
**diagnosed** 20:16 20:20,23
**diagnoses** 98:1
**diagnosis** 273:17
**dialogue** 164:21
**diana** 158:9
**diblasio** 173:1
**didn't** 303:9
**die** 63:11 76:13 186:21 214:10 326:18
**died** 322:16 326:24 327:1,2,17 327:17 328:6,12 330:16,21 331:5
**diem** 123:13 124:10 129:14,15 130:15,16 133:16 145:25 146:7,8,12 149:22 212:5
**difference** 64:23 153:23 230:14
**different** 28:14 43:10 64:10 69:12 76:12 79:8,23 82:3 104:1 123:22 129:16 146:9 191:14 201:11 205:9 232:13,16 237:17 269:3 279:5,5 339:2
**differently** 44:22 44:24 50:16
101:25 284:8 300:10
**difficult** 10:20 26:8 142:19 265:24 266:1,5,6 276:2 317:23
**difficulties** 281:14 334:18 355:4
**digital** 356:8 357:3
**dime** 305:19
**dinging** 43:1
**diplomate** 201:2,3 201:4
**dire** 214:16
**direct** 45:22 65:22 180:23 220:21 233:12 235:22 307:1 325:7
**directed** 94:17 285:6
**directing** 221:21
**directly** 105:10 126:18 141:7 172:10 216:20 334:20 335:17
**director** 45:19 53:17 54:16 59:6 59:6 82:11,13,18 90:10,11,15 91:5 101:6,7,18,19 163:1 165:11 187:10 202:21 204:10 207:13 208:7,8,12 211:19 211:21 216:9 219:9 222:15,16 222:24 223:2 231:2,12,15,17,18 231:21 239:1,1,8 240:22,23 241:8 242:3,17,18 243:9

243:14 244:10,22 256:24 265:18 280:1 313:24 314:3,9
**directors** 60:2 233:10 241:6 242:10 247:24 248:4,18 249:4 256:20 264:13,22 265:5
**directorship** 216:11 311:24
**disabling** 273:11
**disagree** 218:25
**discharge** 142:23 333:11
**discharged** 190:15
**disciplinary** 94:10 329:7 339:3
**disclose** 235:11
**disclosed** 320:12
**discovered** 45:16 45:23,23 112:19
**discovery** 38:4,5 38:11,14 137:16
**discrepancies** 297:21 298:6
**discrepancy** 80:13 112:20 113:9,9
**discrete** 79:13,20
**discriminated** 45:13 332:3
**discriminating** 44:21
**discrimination** 44:11,13,18
**discriminatory** 188:5 189:1,6
**discuss** 144:6 226:10,14 326:12
**discussed** 100:9 117:3 179:16 230:20 333:1
**discussing** 184:22
**discussion** 55:16 95:16 164:17 172:13 184:19 185:8,10 209:13 213:25 222:1,11 222:12 226:22 227:9 249:7 303:9 344:3
**discussions** 163:5 164:1,6,24 165:2,3 166:19
**diseases** 274:22,23
**disfiguring** 273:11
**disguised** 94:25
**dislike** 329:24
**disliking** 253:9
**dismissed** 313:5 314:21 344:15
**dismissive** 55:6 317:17
**disparity** 105:9
**disruption** 273:3
**disruptive** 43:16 175:1
**disseminated** 46:5
**distancing** 133:11
**distinct** 104:22
**distortions** 246:4
**distress** 25:16
**distributed** 247:25 248:19
**district** 1:1,2 9:6 176:7 181:13 182:10
**division** 45:19 59:6 74:18 90:11 163:2 165:12
202:21 216:9 244:7,9
**dna** 327:19
**doable** 276:10
**doc** 102:23
**docked** 282:14 283:24 285:10,23 286:5,7 287:14 290:15,22 291:2,6 292:5
**docket** 197:17,19 198:8 199:3
**docking** 289:19 298:19,21
**doctor** 13:5,18,21 14:8,19 17:24 19:19 21:6,9,11 23:23 25:6 34:25 127:19 128:21 129:3 138:17,19 143:18 244:24 253:15 274:18 329:23
**doctor's** 12:21 13:14
**doctors** 14:12 16:5 16:11,16 21:13 22:23,24 27:23 28:19 34:17 46:6 52:25 85:1,3 92:16,19,22,23 128:4 130:22 133:8,12 142:8 143:13,14 151:11 154:7 167:23 168:12 185:1 186:9,13 208:14 213:22 220:23 221:23 226:1 229:8,10,11 230:10,23 248:13
248:16 249:14,19 250:23 251:8,15 252:5 254:24 263:1 291:25 297:1,1
**document** 40:22 105:17,21,25 107:1,13,24 110:23 128:2 136:24 141:10 176:3 196:6 199:4 219:11 220:2,4,6 221:1,2,6,11 224:19 318:11,12 318:17 319:3,11 320:9,15 321:2 326:2 336:16 350:16,21 351:12
**document's** 326:13 336:17
**documentation** 287:9,13
**documents** 37:21 38:2 65:13 155:18 301:9 319:10 320:3 353:10
**doe** 70:10,17,21 274:14
**doh** 59:4
**doi** 307:25 308:7 308:16,24 310:4,7
**doing** 8:11 44:1 49:24,25 76:5 114:18 123:13,15 124:9,11,16,18 126:13 129:13,17 129:22 131:4 146:2,12,16 148:10,17 150:24 152:21 154:1,21 155:15 174:2

203:7,9,11,18 204:5,8,14 210:3 211:18 213:22 214:17 217:3 251:22 252:8 255:6,11,15,17 269:17 280:3,7 282:16 284:8,23 294:18 306:25 311:2 323:1 347:6 349:17
**donna** 2:13 5:8 8:24
**door** 99:22,23 270:19,19 305:23 305:24 346:4,7
**dot** 190:1,1,1
**dots** 349:16
**double** 211:16 283:19,20 298:14
**downtown** 85:24
**dr** 4:6 5:13 6:3 7:21 8:8,17 13:23 14:4,5,10,21,22,25 16:22,24 17:4 18:21 19:5,6 20:4 21:6,9,20,21 22:9 22:12,19,20 23:23 25:9,17,21,23 28:8 30:5,8 31:10 33:9 33:9,15,18 34:23 35:24 37:16 39:7 39:9,9,20 42:5,10 44:8,20 45:12,16 45:18 48:16 50:16 51:1,1 52:24 53:3 53:4,6,7,8,11,12 53:17,19 54:1,2,9 54:10 55:2,4,6,10 55:12,13,16,18,19 55:23 56:6,9,10,11 57:3,6,11 58:4,4,6 58:21,22 59:1,2,3 59:5,12 60:17,20 60:23 61:18,18 62:6,6,12,12,18,18 63:9,10 64:3,25 65:1 66:11,21,22 71:19 74:10,16 75:3,6,7,17,20,21 76:19 77:3,11 80:23 81:4,9,24,25 81:25 83:9 85:10 85:12,12,15,18,19 85:20 86:3,4,10,10 86:18 87:11,11,24 88:5,7 89:6,21 90:7,13,17,20 92:24 95:5,10,11 95:11 96:11,13,24 97:21 98:13,18 99:7 100:15,15 101:1,4,5,17 102:2 102:18,18 103:2 104:6,9,13,13,16 104:17,18 105:25 106:19 107:23 108:21,23,24,24 108:24,25,25 109:5,18,20 111:13,14,19,20 111:21,21,25 112:4,5,23,23,24 112:25 114:3,6,7,9 114:20 115:3,10 115:16 116:11 117:22,25 118:2,7 118:13,16 119:10 119:11,11,11 120:2,9,11 123:7 153:5,5,9,16 155:6 157:13,13,20 161:17 162:4,4,7,8 162:20 163:3,13 163:23,25 164:3,4 164:13 165:6,10 165:13,23 167:21 169:1,2,16,18,21 170:3 171:2,8,8,9 172:5,7,11,11 175:3,9 178:24 179:19 180:14 182:7,8,8 184:3,6 184:12,12,19 187:6,9,16 188:2 188:11 189:4,10 189:20,22,23,23 189:25 190:3,4,5 190:14,19,20,22 190:23 191:5,5,6,7 193:4,15 194:22 199:7 203:1,2 207:5,11,15,15,20 208:4,8 211:14 212:3,3,11,19,20 213:8,9,23 215:3 215:19,22 216:3,3 216:7,8,20 218:1 220:1,7 221:11,13 224:1,9,21 225:1 225:22 226:14,21 227:8,15 228:1,17 229:25 231:4,16 231:17 232:20 233:10,10,10 234:4,22 235:9,12 237:12,20,20,23 243:11,13,21 244:3,4,10,11,11 244:11,12,12,14 244:19,21 246:20 246:20 247:17,19 247:25 248:1,18 248:21,23 249:2 251:7 252:18,19 252:20,22,25 253:1,11,13,16 256:20,23 257:8 257:12,12,13,19 258:13,17,20,21 259:5,21 260:2,2,7 260:7,22 261:4,6 264:22 265:23,25 280:19,21,25 281:19 283:2,8,21 288:15,23 289:18 292:16 293:14 294:14,25 295:14 299:25 300:2,19 301:24 305:25 310:7,19,23,23,25 311:2,2,4,6,17,21 311:23 312:2,3,3 313:10,22 314:9 314:10,25,25 315:22,23 316:2,6 316:9,12,13,14,20 316:20,22 317:3,3 317:4 318:6,20 319:7,24 320:10 320:16,17,20 321:2,3,5,12,23 322:10,14,21 324:5 329:18,19 329:24 330:3,23 331:9 332:25 333:9,10,10 335:2 336:18 339:13,21 340:22 343:3,11 343:12,14,15 344:13 346:6,14 348:4,7 349:23 350:2,20 352:4,14 352:16,21,23

353:3,9,20 354:11 355:1
**draft** 248:13,19
**drafting** 249:4
**drag** 266:11 329:6
**draw** 49:10
**drink** 10:13
**drive** 206:19 266:25
**driving** 273:14
**drop** 151:10 268:16,20 269:2,7 269:8,11,11 270:2 271:7,9,10 291:1
**dropped** 268:14 269:8 270:23 314:21
**druthers** 246:17
**due** 174:8 233:20 335:15
**dug** 266:1
**duly** 5:21 356:5
**dump** 298:22
**duties** 204:11 220:18 252:7
**duty** 190:15 266:17 291:12 333:11

**e**

**e** 2:1,1 3:1,5,20,20 3:20,20 4:1,1 14:24 23:7 32:7 73:8,11 157:24 158:22 177:8 257:2 358:3,3,3
**earlier** 60:12 65:14 120:8 160:11 184:12 199:8 217:19 235:8 237:3 269:7 271:22 273:4,7 278:17 321:25
**earliest** 269:11
**early** 17:5 20:1,8 22:8,10 24:5,11 39:22,23 48:9 52:6,7 53:19 56:14,22 74:4 75:25 76:5,24 77:11 92:15 152:14 246:15 266:11 268:14,17 268:19,20 269:1,1 269:2,7,25 271:8 308:3,3
**earned** 113:11,20
**east** 270:6
**easy** 233:18 234:1 234:11
**ecf** 196:24 197:1 197:17 199:5
**eczema** 273:13 274:21 276:17
**edited** 248:13
**education** 68:20 68:23 69:2,17,21
**educational** 291:6 305:1
**eeo** 75:10,13 216:8 304:5
**eeoc** 61:13,24 74:18 77:16 112:25 119:3 153:16,16 191:25 216:22 234:13 235:6,10 237:12 239:2,9 242:1 247:14,19 304:19 304:23 305:3
**effect** 168:4
**effects** 29:22 30:1 30:19,23 31:4 32:23
**efforts** 214:22 355:3
**eight** 263:10 264:9 281:21 284:6 296:7 304:12,13
**either** 10:23 51:14 104:8,13 178:5 183:13 188:3 248:2 252:2 293:8 305:16 307:25
**electronic** 6:20 131:20 192:5 281:17 284:10,13 284:24
**elephants** 48:24
**elevated** 14:6 29:12 311:25
**eligible** 204:25 205:12
**eliminate** 273:24
**elizabeth** 1:8 2:11 4:9 9:2 26:22 39:5 48:7 92:18 108:14 114:19 163:6 166:5 207:16 231:19 237:18 248:6,23 256:23 310:20 311:24 312:8,15 314:2,8
**email** 3:7 35:25 36:13,14 39:10,19 39:20,21 40:18,24 44:8 46:6,9,12,12 53:20 60:11 87:6 88:16,17 103:12 105:19 106:7,20 107:10 108:13,24 109:11,18 110:23 111:14,14,19,20 112:8,11 115:16 117:22 118:2,19 118:21 162:11,16 216:4 217:23 218:1 220:6 224:2 224:3,6 225:12,23 226:2,17,22,22 228:18,22 229:6 229:25 234:22 238:5,6 240:2,25 241:2,16 242:11 243:24 244:5 290:11,11 295:15 295:20 298:23 299:3,12 303:14 309:10,21,24 310:1 320:4 321:3 321:5,7,12 322:20 325:7 326:2 327:15,16 329:16 329:22 330:16,18 330:24 346:14
**emailed** 107:2 116:11
**emailing** 173:7 177:14
**emails** 38:4,5,10 38:13,25 39:13 42:19 48:21,22 63:6 64:8 65:14 88:16 100:12 109:17,25 110:1 131:21 163:7,8 186:12 219:10,10 246:3 253:5 290:24 291:1 297:8,10 298:5 299:14,22 307:2 311:12 349:8 350:7
**emergencies** 127:21

**emergency** 7:1 128:4
**emmanuel** 1:22 4:3 356:2,19
**emotional** 25:15 274:5
**emphasize** 230:8
**employed** 30:15 30:18 84:21 123:7 123:9,18 139:6,12 166:6 294:9 339:5 356:11,14 357:8 357:11
**employee** 41:1 92:4 93:20 98:22 116:12 117:6 118:9 130:14 234:15 262:9,16 263:20 265:18 356:13 357:10
**employees** 94:5 234:9 246:1 253:24,25 264:16 265:6 298:20
**employer** 322:13 326:9,10
**employment** 41:16 88:8 139:5 142:2 155:10 167:4 184:18 193:18 221:16 238:22 329:6 339:10,14 340:25
**empty** 346:3
**endeavor** 173:11
**ended** 98:6 206:2 273:16 274:9 300:16 341:8
**endured** 292:9
**enemy** 253:3
**energetic** 321:25
**engage** 8:10 143:21 173:7 254:10
**engages** 330:3
**engaging** 254:24 255:10
**enlarge** 337:13
**ensure** 215:22
**entailed** 269:17
**enter** 281:19
**entered** 73:5,13
**entering** 283:3,4
**enterprise** 154:5
**enticement** 230:1
**entire** 107:11 221:2,6 227:25 234:13
**entitled** 342:1 343:23
**environment** 273:19 324:14 345:3
**enzymes** 30:24
**epipen** 274:9
**equal** 48:12 80:6 87:3,9 113:24,24 277:17 304:1
**equity** 59:9 112:14 114:1 188:6 217:10 278:6 307:15,15 310:8
**erica** 53:3
**erroneously** 60:16
**error** 299:1,4,4
**es** 356:4
**escorted** 237:24
**especially** 86:18 248:23 312:18 314:6 326:9
**esquire** 2:3,13
**essentially** 271:19
**establish** 251:1
**established** 114:6 232:14,20 265:1
**estimate** 128:17
**estimation** 210:15
**et** 9:5
**ethical** 216:16 251:25 258:23
**evaluate** 144:7,9
**evaluation** 50:10 102:5 142:7 145:6 145:7,10,13 173:9 174:17 204:11 216:10 244:9 250:5 332:22
**evaluations** 102:25 103:1 142:5,11 144:20 144:21 145:1 147:19 148:11 152:10 249:20 255:11
**evaluator** 50:3 52:2 90:23 105:14 202:8 222:23
**evaluators** 93:6 95:17 97:19 108:14 174:1 175:9 211:21
**evening** 149:5
**evenings** 148:25
**events** 215:8
**eventually** 90:13 92:2 175:18,19 176:6 177:14 199:3 212:20 285:13 292:5,11 292:18,25 293:5 293:14,19 295:22 295:23 296:13
**everybody** 244:14 262:20 264:9 265:3,4 304:13 332:16
**everybody's** 243:20 329:5
**everyone's** 239:8 239:15 296:15
**everything's** 168:2 230:12 239:22,25
**evidence** 138:23 213:7 239:11 245:3 282:23 316:8,17 320:7 349:6,13
**evidentiary** 5:1
**exact** 22:16 34:22 57:18 63:2,13 81:18 107:1,4 179:14 184:4,5 260:11
**exactly** 19:25 41:15 46:24 59:16 79:15 88:17 93:2 162:20 198:10 212:13 223:15 230:13,13,13 239:23 251:13 258:9 269:16 322:1
**exam** 28:8 51:20 52:3 54:7,21 95:15 175:5,12,15 175:18,19 176:9 177:19 205:1 211:20 293:20,21 333:12,21
**examination** 3:2 6:1 173:18,19 174:22,23 292:4,7

293:15 294:3 333:8
**examinations** 54:18 174:12 191:18 203:17 210:16
**examined** 5:23 176:6
**examiners** 93:7
**example** 173:21
**exams** 98:1 108:18 152:5,8 166:24 173:5 174:10 203:9,12,12,13,14 204:5,17 205:8,17 214:20,25 249:21 249:22 250:2 251:1,9 255:16,23 255:24 256:7 294:5 310:19,20 310:23,24 311:2,5 312:18 317:10 335:16 346:2
**excessively** 337:6
**exchanges** 39:7
**excited** 306:16
**excluded** 101:2 104:10 192:6 323:15
**excoriating** 273:10,20
**excuse** 18:20 57:2 150:11 179:19 277:20 288:18 289:1 293:3 299:18 342:12 347:8,22 353:11
**excuses** 347:24 348:23 349:23
**exercise** 164:23 352:24
**exercising** 166:11
**exhausted** 155:9 217:15 299:10
**exhibit** 3:7,8,9,10 36:15 108:1,2,3,4 108:5,6,8 192:16 192:18,20,25 194:10 219:14,20 219:21 224:9,22 225:2,15 227:20 324:25 325:2
**exhibits** 3:12 35:24 36:5,20 227:25 234:25
**expanded** 205:9
**expecting** 36:21
**expedite** 170:2 175:4
**experience** 31:12 178:10 213:12,19 217:12 317:22
**experienced** 32:24 96:6 105:14 172:20 206:16 279:4 334:12
**experiences** 178:8
**expiring** 127:23
**explain** 35:4 87:25 249:12 250:13,18
**explained** 77:4 87:25 258:22 277:22 291:19 311:22
**explaining** 258:17
**explains** 227:8
**explore** 188:12
**explored** 164:12
**exploring** 187:16 246:19,22 247:4
**express** 169:22 183:20 190:19 260:23 270:13
**expressed** 181:8 216:19 249:7 287:22
**expressing** 181:2 260:21
**expunged** 46:10
**extended** 153:21 247:6
**extensive** 26:24
**extensively** 182:6
**extent** 13:2,9 38:8 41:20 58:9 93:22
**extra** 213:20 264:5
**extreme** 172:19
**eyes** 240:18

**f**

**f** 14:24 49:17 257:2
**face** 88:7,7
**facilities** 133:7,7 149:18
**facility** 142:21 148:5
**fact** 77:1 80:9 103:11 109:14 110:6,11 111:9 146:12 166:11 188:2,24 189:4 229:4 241:3 261:21 285:2 293:23 294:2 332:20,21 341:18 343:10
**factors** 35:6,11,11 35:13
**facts** 110:20 127:14 143:11 178:2 200:4 213:6 239:11 282:22 332:25 334:4
**factual** 200:13 201:16
**factually** 199:13
**failing** 49:11
**fair** 10:18 17:21 21:1,10 51:10 88:19 113:14 175:6 247:12 329:25 335:14
**fairly** 142:12 150:20 230:6 260:6
**faith** 190:14 191:23 343:10,13
**fall** 94:21
**false** 118:13 211:11 222:6,10 246:5 247:7
**falsehoods** 245:24
**falsely** 340:18
**falsities** 246:3
**familiar** 23:19 279:12
**family** 68:5,7 90:2 132:8 300:8 301:3 326:15 332:6
**family's** 277:14
**fan** 165:19
**faq** 168:8
**far** 21:13 22:24 27:25 52:22 94:10 120:19 122:15 156:16 172:20 253:21 258:14 268:7 289:3
**farkas** 49:15 50:15 51:4 52:23 55:18 57:6,11 58:4
**farming** 251:18
**fast** 301:1

**father** 327:22 328:15 330:16
**father's** 327:22
**fathered** 327:23
**fault** 279:21 280:2
**favor** 268:19
**favorably** 52:25 53:5 55:2,20 57:12 58:6
**february** 39:22,23 40:18 42:2 133:18 290:1
**federal** 316:17
**feel** 43:25 86:25 87:2 97:8 113:19 166:14 211:8 257:3 260:14
**feeling** 27:6 57:19 178:8
**feels** 66:10
**feet** 103:5
**felice** 14:21 15:1
**felice's** 14:22
**feliciano** 330:10
**fell** 205:18 207:4 328:25
**fellowships** 47:6
**felonies** 293:25
**felt** 55:22 57:13,15 58:5 94:18 100:3 132:23 158:13 166:6 170:11 171:21 176:10 186:20 231:5 249:1,8 254:14 256:21,24 261:24 281:3 327:4 350:6
**female** 23:9,10 35:11 47:10 48:1 52:24
**females** 58:5
**fictitious** 1:11 4:11
**fiddled** 297:22
**fifth** 344:18
**fight** 293:17
**figueroa** 174:25 175:6 179:16 182:12,18 183:10
**figure** 43:21,22 122:14 273:11 313:20
**figured** 47:24 260:21
**file** 2:19 74:16,17 75:3,9 77:15 288:2,15 289:18 291:11,17
**filed** 69:16 75:12 112:25 153:15 195:16,21 196:16 197:12,15,15,16 197:22 199:3,5,9 201:6 235:5,9 237:12 242:1 290:13 326:4
**filing** 239:2,9 247:13
**fill** 167:21 284:9 306:20
**filled** 294:14,14 320:18
**final** 248:19,20,20
**finally** 11:1
**financially** 149:14 356:15 357:11
**find** 24:6 72:14 152:20 156:3 163:13 173:24 185:7 312:18,23 313:1,23 314:5,11 314:14 315:24
326:25
**finding** 176:8 251:12 255:5
**findings** 250:25
**fine** 10:14 23:18 37:2,6 58:13 69:13 106:3 109:23 121:21,22 122:13 153:13,14 208:2,3 215:25 221:3 264:4 300:10 354:21
**finger** 131:19
**finish** 10:17 80:19 80:23 81:4 86:7 89:4 96:17,22,23 98:15 99:1 119:1 150:8 161:19 168:21,25 169:7 169:25 170:12,18 170:19 171:2 173:22 178:23 181:5 193:7,13 229:22,22 250:17 250:20 252:23 257:22 258:13,20 259:6 313:7 334:24 348:3 350:15
**finished** 10:6 89:6 119:15 169:2 193:9,11,12,12 217:16,17 259:10 259:14 342:18 343:17 355:5
**finishes** 224:4
**finishing** 180:1
**fire** 94:20,25 112:1 230:3
**fired** 94:14
**firm** 70:5,8 72:19 72:21 73:3
**firms** 72:18
**first** 5:21 14:7 17:4 18:8 19:5 20:20 21:21 23:11 23:15 24:2,12 27:6 39:19 49:10 61:16,21 70:12 71:22 72:2,3 73:15 83:3 85:19 98:23 106:22 107:8 123:16,16 129:10 154:2 159:4 164:7 177:12 189:22 191:2,19,19 194:11 195:14 196:12 199:2 200:13 202:9 217:8 223:25 224:16 228:21 237:7 240:21 242:9 246:12 254:5 290:14 299:21 310:16 313:17 315:7,14 318:17 320:6,9 352:14,19
**fit** 173:24 251:12 292:21 313:23 314:5
**fits** 317:21
**five** 16:12,17 21:12 22:25 27:24 28:1 31:21 71:7 122:18 167:17,18 198:17 245:12 301:15 323:2,7 328:4

**fix** 232:4,8 233:18 234:1,11 236:4,5
**fixed** 232:6
**flags** 166:20 176:14
**flare** 295:2
**flares** 20:18 21:3 294:20
**flatfooted** 235:22
**flatly** 303:1
**floor** 51:8
**flow** 210:18 230:15
**fluctuations** 210:2
**fmla** 280:25 281:8 281:9 294:8,10,24 295:23 296:7,8,22 298:13 299:16,25 300:5,12 301:2,5,8 301:24 302:1,2,2,8 307:20 311:15
**focused** 104:7 167:10 174:14
**folded** 113:12,22
**follow** 15:3 26:17 27:21 48:21 87:20 112:4 118:7 129:23 137:16 139:3 157:8 169:9 170:10 171:6 189:20 254:2,3 259:4 272:22 308:10 309:10
**followed** 87:19,21 117:21 189:18 290:12 318:5
**following** 19:19 201:1 204:13 205:23
**follows** 5:23
**food** 274:12,21,24
**force** 175:7,20 176:2,5 263:23,23 285:8 305:23,24 306:15
**forced** 144:4 151:9 222:14 234:12 331:16
**ford** 1:8 2:11 4:9 9:3 26:22 39:5,9 39:20 42:5,10 44:8,20 45:13,18 48:7 50:16 51:1 52:24 53:4,6,8,11 53:17,20 55:2,4,13 55:19,23 56:6,10 56:11 57:3 58:1,6 58:22 59:3,18 61:15,18 75:6,21 85:12,20 86:10,18 87:24 88:6,7 92:18 95:5 97:21 99:7 100:3 102:2 103:2 104:6,13,17 108:14 111:13,21 112:5,23 115:16 117:23 118:2 153:5,10 163:3 168:5 184:12 187:9 190:20,23 191:5,8 207:16 208:4,8 212:3,11 218:1 229:25 237:18,20,23 248:6 252:20 256:20 257:8,12 261:6 265:25 303:22 310:23 311:2,3 329:18,19 329:24 330:3 331:9 335:6 346:5 347:4 349:5
**ford's** 56:10 66:21 66:22 104:18
**foregoing** 5:9,12 356:3,4 357:4 359:5
**foremost** 98:23 299:21 352:19
**forensic** 45:10,20 49:24 50:1,3,5,10 51:13 53:18 54:17 59:6,7 90:11 95:15 97:19 102:25 105:14 163:2 165:12 166:4 185:13 191:18 201:3 202:8,20,22 203:9 204:11 208:6 213:12 216:10 222:23 244:8,8 255:16 330:4 340:19 349:15
**forewarning** 164:21
**forget** 158:9 254:3
**form** 13:19 15:2,6 16:7,13 21:14 22:2 27:8 31:16 37:22 38:19 44:14 62:3 69:18 70:18 78:22 88:3 95:2 119:13 125:24 134:3,25 135:14 139:8 140:14 141:13 143:10,24 146:21 148:3 149:20 151:2,5,25 152:22 154:24 162:11,13 166:2 166:15 171:25 172:4 173:15 175:21 178:1,15 183:23 212:23 231:14 235:13 236:15 239:10 255:3 282:21 285:17 295:11,12 303:4 346:22
**forma** 99:17
**formal** 216:15 248:9
**formally** 86:15 90:6 176:24 184:13,17 216:13 252:13
**formed** 177:24
**forms** 277:25
**forth** 200:4,4
**forty** 270:22
**forward** 51:21 118:17,19 119:9 120:13 123:3 204:9 225:2 257:24 281:25
**forwarded** 111:19 331:9 351:5
**forwards** 108:24 226:25
**found** 77:12 176:13 242:4,4,5 251:5 274:25 280:21,21 290:1 313:4 314:20
**foundation** 178:3 239:12
**four** 22:23 56:16 78:8 93:7 162:23 164:2 167:17 206:3,6,14 263:2,3 270:14,16 274:10 300:23 311:10

**fpecc** 216:10 244:8 244:8 247:24 249:19 264:14 265:6,18,18
**fragrance** 273:20 277:1
**fragranced** 274:1
**fraternal** 160:2,7
**fraud** 216:18 249:10 250:11 309:1,3
**fraught** 255:24
**free** 217:15 277:1
**freezing** 12:2
**frequent** 294:19
**frequently** 269:5 300:21
**friday** 291:1 298:23
**friendly** 250:24
**front** 6:20 7:5,8,16 305:17 319:6
**frustrating** 274:15
**fuck** 260:20
**full** 129:25 131:10 131:15,16,16 132:2,11 194:21 194:22 202:17 203:8 212:4,19 263:10,20 285:24 285:25 297:22 329:9 333:11
**fully** 265:24,25 271:13 281:1
**fun** 324:2
**functional** 82:16 240:10 265:21
**functioning** 207:12
**funded** 205:4
**funding** 190:3 207:4
**funeral** 330:17
**funky** 208:14 254:15
**furrowing** 317:12
**further** 221:14 224:4 228:22 351:7 356:13 357:9
**future** 26:5 121:9
**fwd** 350:22

**g**

**g** 4:1 157:24 158:22
**gail** 323:21
**gainfully** 339:5
**game** 246:2 285:3
**gap** 64:19
**gaps** 135:2
**gardner** 303:12,13
**gastroenterologist** 17:7
**gate** 269:17
**gavend** 157:22 158:22
**gaye** 327:15
**gender** 45:13
**general** 26:5 94:4 168:11 196:5 317:5
**generally** 233:15 236:1
**genetic** 22:5,7 30:6 30:9 33:3,8
**gestured** 99:23
**getting** 36:3 39:14 45:24 46:25 47:2 48:23 59:17 64:21 71:3 76:7 78:11 78:13 80:16 85:10 87:1 88:25 98:6 100:24 101:2 113:24 119:4 126:4,6,11 131:10 131:15 136:3 149:4 168:15 173:7 174:24 184:20 187:25 188:16 219:5 231:2 234:8 240:14 244:22 245:8 251:10 263:4 279:2 282:14 283:24 291:2 301:12,15 307:2 310:18 311:17,24 312:11 332:8 337:25 340:2,2 348:15
**gi** 17:2,8,10 18:2,4 18:8 19:6,8,9,17 19:20 20:12 21:6 21:9 31:9,11,22 32:16
**gilbert** 182:15
**gillian** 102:16
**ginger** 181:15,19
**girl** 160:3
**girls** 158:4,8
**give** 10:4,8 13:11 18:15,24,25 53:22 69:16 72:5,6,6 87:4,25 88:20 91:19 92:24 94:1 118:3,4 168:7 173:21 188:3 189:6,10,13 195:1 218:2,12,15 233:23 252:12 290:9 297:7 303:20 304:24 305:20 306:23 330:15 331:8 349:21 352:23
**given** 69:15 82:1 86:18 91:3 93:5 94:16 158:3,19,20 158:24 175:15 186:1,22 188:24 208:7 243:4 244:23 248:11,16 248:23 293:19 303:2 307:11 359:9
**giving** 87:8,18 92:11 99:1 230:1 331:24
**glad** 47:8,8,11
**glare** 323:23
**gmail.com** 321:7
**go** 19:13 29:3 37:8 51:12,20 59:3 65:1,11 68:8 71:2 103:20 114:2 119:2 121:20,24 122:1,9 123:23 124:24 127:17 128:10 130:9 132:7,10 142:21 148:11 150:10 152:14 153:9 165:18 167:6,6 170:7,10,19 180:1 186:7 187:9 191:6 192:12 195:7,25 196:8,14 200:6 202:16 208:16,16 211:22,23 214:18 217:5,6 218:5 221:4 246:10 250:12 264:7 268:10 269:20

270:11 276:11
280:23 283:9
290:7 293:18
295:14 297:8
306:4 310:3
316:16 325:20
336:15 345:12,12
345:15 347:20
353:23,24,25
**goal** 186:1 305:24
**goddess** 158:9
**goes** 151:12 156:7
258:1 313:11,15
341:5
**going** 6:23 7:12
9:7 10:14 11:20
18:23,24 25:23
29:3 32:5 35:25
36:8,13,15,25 37:4
39:5 52:20,21
53:9,11,23,23 54:1
55:8,8,11 57:18
63:13 65:9 67:12
69:10,11 70:22
71:24 72:2 75:21
76:17 80:15 81:3
83:17 86:9 88:9
92:23 93:1,5
94:20 96:14,17,25
97:8 104:8,23
105:19,20,24
106:19 118:16,19
119:9 120:13
121:5,13,14
122:18 125:15
128:6,25 136:21
141:19 148:24
151:15 153:8,11
156:9,20,23,24
157:3 162:24
163:22 164:13,15

164:22 165:5,6,15
165:16 167:5,6,7,8
167:8,20,25,25
168:2,3,7,18,22
169:6,9 170:3,5,6
170:22 171:10
176:1 177:20
179:7 180:5 184:4
186:22,24,25
191:11 193:6
194:9,21 196:13
196:23 198:7
200:2,11 205:3,4
210:19 216:24,24
217:4,5,5,14 218:3
220:19 221:4
222:2 224:11,25
225:13,18 226:11
227:5 228:15,16
229:4 230:11,12
230:15 236:2
239:22,25 240:8
242:19 245:4
246:11,24 247:1
248:8,15 249:10
251:6 253:14
254:1,2 264:3
265:16 266:3,18
267:9,12,13
268:18 271:25
272:20,23 275:13
277:12 279:11,25
280:23 287:9
288:4,8,12,21
290:6,8 291:10
292:16 294:7,18
295:1 298:5,16,16
304:21,23 305:18
305:19,21 306:14
306:14,17,18,18
310:18 312:13

316:16 317:15,15
318:8,18 321:10
322:15,19 323:9
323:11 325:7
329:1 330:17
333:17,25 334:7
335:8,10 336:6,11
336:14,24,24
339:12 340:22,23
341:11 344:5,6,19
344:24 345:6
346:10,11,13
350:8,12,13 353:4
353:8 354:25
355:5
**good** 4:2 6:3,4
152:17 161:7
166:3,8 190:14
191:23 227:5
317:13,14 326:5
343:10,13 344:16
345:18
**google** 121:3
**gosh** 267:21
**gotten** 187:11
280:22 311:16
327:14,20 342:21
**gracie** 3:23 123:13
123:18,21,25
124:5 126:6 128:8
129:11,21 130:16
130:17 132:13,13
132:14,16 133:1,1
133:9,9,10,20,25
134:6,14,19,24
135:25 136:6,9,18
136:19 137:6,12
137:21 138:13,24
139:5 142:10
143:9,9,14 146:7
146:12 147:7

149:17,24 150:23
151:18 154:20
**gradation** 64:11
**graduate** 158:16
**grand** 271:4
**grandfathered**
153:1 221:18
230:11 240:8
302:20
**granted** 69:5,7
281:10 295:23
299:9,10 302:16
305:6
**grata** 253:2
**gratuitously** 99:3
99:16 175:8
298:19
**great** 7:16 123:2
**greenfield** 235:4
**gregory** 14:21
**grievance** 288:2
289:18 291:17
**grievances** 290:13
**grieving** 331:7,8,8
**ground** 103:5,6
**group** 104:2 105:3
111:24 158:4
332:11
**groupwise** 63:6
**growing** 274:4
**guarantees** 246:24
**guess** 20:4 25:9
27:24 65:23 66:3
66:3 84:11 106:9
110:9 146:8
151:13 161:4
178:2 190:21
213:2 236:21,21
273:2,8 296:24
297:8 298:13
320:3 328:2

337:25 338:17
**guessing** 135:1
**gyn** 28:7

**h**

**h** 3:5 13:25 34:23 358:3
**hagan** 2:3,4 5:11 5:11 6:8 7:9,12,17 8:1,9,15 9:15 11:8 12:10,23 13:2,7,8 13:19 14:15 15:2 15:6,10,16,23 16:7 16:13,18,21 17:1 18:10,14,17,22 20:4,14 21:14 22:2,14 23:22 27:8 29:9,14 30:21 31:16 33:22 34:1,7 35:21 36:2 36:11,16,19,25 37:3,18,22 38:7,19 39:1 41:2,18,20 42:7,21 43:8 44:14 47:21 50:20 52:16 54:19 55:14 55:21 58:8 62:3 65:4,17 66:19 67:5,10,22 68:17 69:9,18 70:6,18 71:16,20,22,24 72:12,13,18,22 73:7,11,22,24 74:7 74:12,20 75:5,18 76:1 78:22 80:18 80:22 81:3 82:25 83:12,20 84:10,15 85:4 86:6 88:3 89:4,18,25 91:22 92:5,13 93:21 95:2 96:21 97:3 98:14,23,25 101:10,14 102:13 103:15,19,22 104:15 105:18,20 105:23,24 106:5,9 106:13,17,21 107:1,6,8,17,20 108:1,8 109:15 110:3,12,16,19,24 111:4,12 116:16 117:1,13,16,17 118:11 119:1,13 119:17,21 120:15 122:14,20,23 123:5 125:24 126:25 127:13 134:3,7,16,21,25 135:14,20 137:2,7 137:13,18,23,25 138:1,5 139:1,8 140:14,18 141:13 141:23 142:15,18 143:10,24 144:14 145:17,19,21 146:21 148:3,20 149:20 150:6,10 151:2,5,25 152:22 154:24 155:5,19 155:23 156:4,6,9 156:14,20,23 157:2,9 159:15 160:25 161:9 162:13 166:2,15 168:20,24 169:2 169:10,13,15 170:8,9,12,17,18 170:25 171:12,17 171:25 172:3,4 173:15,22 175:21 178:1,9,15,22 179:5,9,12,25 180:3,10,14,19,21 181:2 183:1,3,23 185:17,24 188:7 189:8,15 190:25 191:4 192:14,16 192:22 193:1,7,11 194:13,17,20,24 195:10 196:14,20 196:25 197:7,14 197:20 198:1,4,11 198:14,18 207:24 209:25 210:4 212:23 213:6 215:15,16,18 216:1 219:16,18 219:20,23 220:1 220:10,19,25 221:5,8,10 222:3,8 223:18,23,25 224:8,10,13,16,18 224:21,23,25 225:8,15,17,20 226:12,17,19,21 227:1,7,12,16,17 227:18,19,21,23 228:6,8,11,15,21 228:24 229:21 231:7,14 232:22 235:13 236:15 238:17 239:10,14 239:18 241:10,24 242:12,14,24 245:7,21 246:13 250:13,15,17 254:6,7,12 255:3 255:13 257:6,21 257:25 258:5,9,12 258:13,25 259:3,6 259:9,11,13,16,19 259:22 260:5 262:10 264:15,19 265:8,15 277:20 277:25 282:21 285:17 288:4,10 288:16,20,24 289:1,2,6,15 291:14,20 292:2,8 292:19 293:1,3,6,9 295:7,9,10,25 297:13,19 298:7 299:17,19,21 303:4 313:7,11,15 315:2,6,10,12,13 316:1,4,5,9,11,12 316:18 318:10,16 318:22 319:1,4,8 319:14,17,21 320:2,22 322:2 323:3 324:24 325:5,21,23 327:13 330:1 332:23 333:4 336:23 337:13 338:9 339:12,17 339:19 340:5 341:14,19,22 342:2,11,14,16,19 342:25 343:2,18 343:19,25 344:3,8 344:11 345:1 346:22 349:14 350:11,18 351:6 351:11,17,23 352:2,10,12,14,17 352:19 353:7,13 353:15,15,16,20 353:25 354:8,20 355:9
**haganlawoffices...** 2:7
**hair** 274:4
**half** 77:7 131:24 132:4,4 211:3,20

212:6 214:20,21 264:5 268:5 281:16 304:12 327:10 328:7,15 350:17 354:15 355:6
**hall** 103:8 104:1 347:18,19
**hand** 194:25 195:2
**handed** 244:14 348:20
**handing** 279:7
**handle** 154:3 262:21
**hands** 276:24 277:2
**handwritten** 322:7
**happen** 64:15,16 113:17 128:6 129:2 162:25 216:15 266:18 316:24 336:7
**happened** 19:25 59:19 92:14 107:9 121:6,10 128:5 133:19 153:15 164:20 176:16 195:11 210:11,11 215:9 223:6,8,12 223:15 226:25 227:7 247:5 296:5 297:3 298:20 299:14 311:9,10 319:19 336:5
**happening** 56:19 67:24 148:15 163:14 166:19 167:15 172:24 173:14 237:2 251:13 252:5
307:9 324:9 336:5 336:9
**happens** 205:15
**happy** 213:4
**harass** 293:6 343:11,15 353:1
**harassed** 293:16 323:15 327:4
**harassing** 293:9
**harassment** 192:2 193:20 305:1
**hard** 17:11,14 19:9 49:1,7 53:6 151:13,15 196:5 206:19 208:19 236:4 331:4 337:24
**hardcopies** 107:14
**hardcopy** 197:13
**hardship** 214:6 263:20 306:10
**harm** 338:18 341:25 342:19 343:3,22,24
**harmed** 338:21,23 338:23 339:23 341:6,7
**harmful** 305:8 324:15 330:5,5
**harper** 108:24
**hatred** 333:24
**hawing** 348:22
**head** 10:21 90:14 92:10 115:6 148:16 243:11 278:19 328:25
**heads** 53:22 241:7
**health** 1:7 2:10 4:8 9:2,4 29:5 34:17 34:18 48:3 96:3,6 113:18 166:13
184:8 249:23 250:4,5 322:12 334:14 358:1 359:1
**healthcare** 84:14 127:3
**hear** 6:16 9:18 11:7,19,21,22,23 12:5,14 14:17 26:8,13 37:25 54:21 154:17 200:10 226:6,7 227:22 236:2 347:5
**heard** 10:1 242:9 329:2
**hearing** 5:17 25:25 61:16,21
**hearsay** 223:17 315:21 316:5,12
**heart** 21:25 33:9
**heat** 11:14 12:2 26:10,12
**heater** 11:19 165:16
**heels** 111:25 266:2
**held** 78:18,19 82:14 142:2 205:7
**hellish** 262:7
**hello** 34:20 220:12
**help** 21:24 25:19 47:15,23,24 54:6 65:6 68:3 128:10 128:14 194:22 214:4 235:18 236:3 290:8 305:16 324:1
**helpful** 34:12,14 197:2
**helping** 213:23 272:12
**helps** 30:1 268:22
**hemming** 348:22
**herbal** 276:19 277:4
**hereto** 356:15 357:11 359:7
**hey** 136:7
**hhc** 48:3 50:3 62:8 62:11 76:11,12,13 80:5 87:13 113:6 120:6,17,25 185:1 189:25 190:1 218:25 233:14 234:13 279:19 287:12 294:4 302:8 309:2 325:12 333:18,25 335:19,25 336:2
**hi** 321:5,9
**hicks** 77:13,17 87:17 102:16,20 112:25 118:1,17 118:20
**hierarchal** 189:24
**high** 99:6 172:12 187:24 274:6
**higher** 59:24 209:14,17 234:18 234:18
**hijacking** 184:7
**hill** 271:3,4
**hipaa** 23:22 99:17 261:23 262:1 277:17 278:8 307:12,14 310:8 320:17 340:18 341:11
**hire** 99:24 208:17 209:3
**hired** 53:8,17 59:11 90:15,22

101:5,8 113:6 114:3,9 187:9 202:9,14 208:17 212:18,20 231:17 231:18 244:23 311:22 312:16,25 347:5,9
**hiring** 129:16 249:14 314:11
**history** 86:19 105:7
**hit** 133:2 190:8 221:19 246:15 329:2,10
**hiv** 334:15,20
**hmm** 10:24 45:21 106:5,13,17 109:9 110:3 111:4 123:5 137:18 157:9 179:9,12 198:1,18 239:18 319:4 320:22 325:11,13 329:20 344:20,22 350:18
**hnh** 202:1,2,2 338:19
**hobnobbing** 332:5
**hold** 52:14 57:2 101:3,3 132:20 150:11 193:4,4 231:8 252:15 265:8,9,9 279:19 307:14 333:17,25 334:8 341:9
**holding** 187:21
**holiday** 300:18
**holidays** 210:20 290:22 298:21,22
**hollis** 2:5
**home** 129:4 132:6 147:19,23 148:5 148:18 152:5,15
**homes** 148:25 155:13,14
**hone** 273:17
**honed** 273:16
**honest** 95:7
**hope** 235:12
**hoped** 236:3
**hopefully** 26:10
**hoping** 185:6 187:14 338:5
**horrible** 273:19 324:12
**hospital** 50:9 56:21 123:14 125:15 126:7 129:6 130:3,5 133:1,3 134:14,19 134:24 139:6 187:22
**hospitals** 1:7 2:11 4:8 9:2,4 48:4 113:18 133:4 358:1 359:1
**hostile** 272:4 345:3
**hostility** 94:16 230:4
**hour** 56:14 129:2 129:8 138:18 153:20,20,24 154:8,9,9 263:5,10 264:6 265:20 266:11 268:5,5 271:22 273:4,6 281:15,16,21 282:13,14,19 283:5,24 288:5,9 288:10 343:12 348:24 350:12,17 350:17 354:15,15 355:6
**hours** 56:20 122:20,23 128:16 128:17 129:1,3 131:8,23,25 132:4 134:5 140:6 152:19,24 153:21 169:7 199:17,17 264:8,10,11 282:13 283:23 284:2,3,5,6 285:12 288:11 296:7,11 304:12,13,14 340:6 350:12 354:8,12
**house** 7:7 8:22 127:19 128:20 129:3 138:17,19 265:14 270:23
**hss** 28:21
**huge** 246:15
**huh** 10:21,24 342:2
**human** 74:18,19
**humiliate** 306:25
**humiliated** 293:17
**humming** 26:13
**hundred** 84:18
**hungry** 329:23
**hurt** 188:16 328:25 339:6
**hurtful** 27:3 199:20,23
**husband's** 275:5
**hyper** 174:14
**hypersensitivity** 274:11
**hypocrisy** 331:19
**hypothetical** 117:14,18

**i**

**i.e.** 118:4
**ibs** 345:4
**icon** 194:25
**idea** 166:4,8 271:16 294:6 296:14
**identification** 108:7 192:21 219:15 325:3
**identified** 107:24 273:24
**identify** 5:7 26:21 273:23
**iep** 69:7,8 70:22
**ig** 307:25
**ignore** 39:10 282:9 331:10
**ignored** 299:11
**illegitimately** 286:7
**illness** 11:7 21:2 273:4 274:16 275:23 294:16
**illogical** 335:6,13
**immediately** 83:17 246:9
**immune** 273:9
**immunologic** 273:14 274:22
**impact** 166:24 263:15 305:19 339:14
**impacted** 154:14 328:11 339:4,10
**impacts** 315:2
**impair** 12:14,17
**implausible** 347:24
**implement** 242:20

**implicated** 258:15
**implications** 258:18
**important** 10:5 345:24
**impossible** 273:1,5
**impression** 57:20 57:25 248:23 249:3
**improper** 291:18 353:17
**improve** 102:4
**improvement** 104:4
**inability** 189:5
**inactive** 201:15
**inadvertently** 60:12
**inappropriate** 174:16
**inappropriately** 176:25 330:6
**incapacitated** 261:25
**incarcerated** 51:25
**incarnation** 130:25
**incident** 95:8 193:21 205:15 278:22 328:24
**incidents** 58:17
**include** 28:5,12 172:13
**included** 93:13 115:9 233:25 243:20
**includes** 79:17
**including** 46:7 92:18 99:7 105:12 323:18
**income** 3:23,24 120:20
**incomplete** 201:8
**incorrect** 200:21 219:4
**incorrectly** 23:6
**increase** 64:20 77:9 78:13 190:24 206:1 234:11
**increased** 77:24 153:19 199:16
**incredibly** 326:10
**indicate** 91:12
**indicating** 319:7 320:10
**indication** 165:4 230:17
**indirectly** 172:10
**individual** 51:25 262:18 328:18
**individualized** 69:1
**individually** 338:20
**individuals** 26:21 27:2 177:3 181:12 249:17 261:25
**infantilized** 249:1 256:25
**infantisized** 256:21
**infiltration** 172:16
**inflict** 275:14
**influence** 174:10
**influenced** 174:11 250:25 251:10
**inform** 111:23 235:21,25 266:17 333:13,14,14
**informally** 112:21
**information** 46:7 62:16 145:8 200:14 206:18 219:4 287:16 295:5 297:5,7 307:5 309:23 310:1,19 311:14 320:16 326:14 334:16
**informed** 97:18 162:8 164:3,16 247:19 314:3 325:9 333:9
**infrequent** 147:25
**infrequently** 51:11
**inhibitor** 32:11
**inhibitors** 32:1
**initially** 205:25 213:8 294:13
**initiated** 104:25
**injure** 35:2
**injury** 328:25
**inmate** 314:19
**inmates** 51:13
**inpatient** 49:22 50:1 51:22 54:11 56:11,18,24 185:12 187:8,24 208:5
**insane** 323:25
**inserting** 110:19
**inside** 182:4
**insinuating** 192:17
**insisted** 88:12,13 227:20,23
**install** 281:18 284:20,24 285:3
**installed** 284:14
**installing** 284:16 284:19,21
**instance** 290:14
**institution** 95:25 120:25
**instruct** 18:23
**instructed** 3:14
**insurance** 126:9 126:17,18 135:12
**integrity** 167:9 174:8
**intended** 1:11 4:11 4:24
**intense** 175:15 276:18
**intensely** 300:20
**intentional** 234:4
**intentionally** 282:17 283:20 346:1
**interact** 303:19
**interacted** 303:14
**interacting** 61:20 62:7,11 100:10,11
**interaction** 61:14
**interactions** 175:3
**interest** 173:13 248:8 254:16
**interested** 18:6 109:3,6,19 117:5 146:15 186:15 230:8 314:24,24 356:15 357:12
**interfere** 177:18
**interfered** 152:20 174:20,21
**interference** 173:9 173:13,18
**interfering** 11:21 173:4 176:24
**interim** 90:10
**intermediary** 280:2

**internal** 75:3 79:9 104:2,21
**internally** 112:22
**internet** 9:19
**internist** 17:5 28:21
**interpret** 215:24
**interpreted** 205:5
**interrupt** 54:9 86:3 182:16 293:12 324:4
**interrupted** 81:9
**interrupting** 225:19 313:16 315:16
**intersection** 96:7
**interval** 294:19
**interview** 213:10 310:3 315:1 316:25
**interviewed** 145:11 213:11,16 312:2,3,3,7 314:2 314:9
**interviewing** 212:21 213:3,4 312:2,4
**intimidate** 343:11
**introduce** 320:7
**intrusion** 172:22 174:16
**investigated** 309:13
**investment** 174:15
**invitation** 104:13 104:16,17
**invited** 102:10 103:10,11 104:7,9 109:14 110:7,11
**invoice** 320:20
**invoked** 258:18
**involved** 27:12 45:2 62:17,20 65:6 85:22,23 92:16 95:9 96:3 98:7 126:15,19 163:1 164:21 172:9 249:4,14 253:17 278:24 335:25 336:2 338:8
**involvement** 173:25
**iota** 305:20
**ironically** 328:20
**irregularities** 33:16 290:3
**irrelevant** 293:22 293:25
**irritable** 20:17,21 21:5 345:5
**ish** 280:24 308:2
**island** 114:21,23 114:25 205:14 312:19,24 313:2 314:7,15
**isolate** 251:25
**issue** 21:25 45:1,2 45:3,5,7,9,12 58:21,22,23 59:9 59:15 61:13,19,24 65:2,6 95:13 97:16,18,21,24 98:18 99:3,3,4 100:3 112:15 113:15,16 115:24 116:12 117:21 119:9 120:5 184:24 232:5,9 243:15 271:14 277:3,11 278:13 278:14,16,18 280:5,11,12 287:23 293:21 317:21 332:18
**issued** 96:9
**issues** 18:5,9 20:12 31:9,12,23 47:18 52:1,5,9,9,15 71:23 73:16 86:12 87:13 95:16 99:11 104:25 125:1,20 127:25 128:25 149:1 232:17 237:21 250:22 255:5 266:9 275:22 306:11 317:18 329:7 334:14
**it'd** 47:12 247:2 279:1
**it'll** 26:10 165:18 195:1 196:17
**italian** 23:19 318:25
**italy** 25:1
**itching** 275:20

**j**

**j** 85:15 159:22
**jacobey** 357:2,15
**jaffe** 274:24
**jail** 51:15
**jain** 1:9 2:12 4:10 9:3 26:23 39:8,9 85:15,20 86:10 153:5,16 184:13 213:9,23 216:3,7,8 216:20 235:9,12 237:12,20 244:10 244:10,14 247:17 247:19,25 248:19 252:19,22 253:11 260:22 261:4 265:23 272:8,25 280:19,20,24,25 281:19 283:2,8,21 303:21 305:25 310:7 311:6,18 312:2 317:3,4 330:23 332:14 346:5,6 347:3 349:5,23
**jain's** 332:14
**james** 181:15,19
**january** 22:22 99:8 108:19 132:25 145:2 261:23 262:3 284:22 321:4 322:8
**jd** 53:3 207:11
**jeckel** 181:20
**jeff** 182:2 316:25 350:23 351:16,17 351:18,21,23 352:4
**jeremy** 42:4 59:1,5 61:22 62:12 64:3 90:7 100:6 102:16 108:14 162:4,7 175:2 182:6 183:25 184:20 246:20,20
**jessica** 86:13 153:10 220:7 237:24 238:4 239:20
**jewish** 290:22 298:21,22
**jlc** 1:8
**job** 1:23 54:25 82:3,4 91:4 92:7 92:11 94:13 98:21

120:23 124:20 127:10 132:24 148:24 167:2,13 176:12 186:1 187:9 188:14 202:7 204:11 208:7 209:5 220:18 231:2 232:25 246:16 252:7 267:1 293:22,25 306:20 311:24 312:17 313:1 314:4,14 315:1,24 327:5 340:15 345:18,19 345:25
**john** 95:22 177:5,7 334:8
**join** 104:14 105:3
**joint** 15:12 35:10
**jonathan** 1:10 2:12 4:10 9:3 26:22 92:18 216:25 220:7 236:9 237:25 238:4,9 239:20,21 247:21 262:18 282:18 283:16 297:22 298:1 327:24 328:2,7,14 328:22,24
**jpc** 1:8
**judge** 95:22,24,25 96:6,10 98:6 176:1 181:22,23 181:24,24,25 182:14,15 215:1 225:4 279:9,10 333:17,25 334:6,7 334:8,12 335:18 335:20 336:8,8,10 336:10 341:16
**judges** 95:21,21 178:18 181:22 212:15 249:17 279:3,4,5 345:21
**judgment** 111:3
**judicial** 280:14 335:22
**judiciously** 343:16
**judith** 96:10 181:23
**july** 15:17,19,20 28:20 86:16 90:9 216:15 220:14 237:8 247:19 248:3 281:20 284:22 308:2
**june** 237:7 245:6 247:18 248:2
**jurisdiction** 200:5 200:9
**justice** 173:6 331:23 340:10,12 340:13

**k**

**k** 49:17
**k000035** 219:12
**kaye** 1:4,17 2:2 4:7,7 5:13,14,14 5:20 6:3 7:21 8:8 8:17 9:4 18:21 19:5 20:4 25:23 35:24 37:16 45:16 71:19 80:23 81:4 81:10 86:3 89:7 96:11,13,24 98:13 98:18 105:25 106:19 107:23 108:21 114:7 119:11 123:7 157:13,13,20,20 157:21,22 158:3 158:18,19,21,21 159:4,5 161:17 169:2,16,18,21 170:3 171:2,8 172:7 178:24 179:19 193:5,15 194:22 199:7 215:22 216:3 218:10 220:1,7,8 221:11,13 224:1,9 224:21 225:1,22 226:21 227:9,15 228:1,17 258:13 258:17,20,21 259:5,21 260:2 264:23 273:2 288:15,23 289:18 292:17 293:14 295:14 299:25 301:24 316:2,6,9 316:13,20 320:18 321:2,12 339:13 339:21 340:22 343:12,14,15 344:13 350:20 352:4,14,16,21,23 353:3,9,20 354:12 355:1 358:1,2,24 359:1,2,4,12
**kaye's** 109:20 155:6 172:5 180:15 215:19 332:25 343:3
**keep** 25:24,25 26:14 109:6,19 186:19 208:19 209:4 220:19 228:15,16 265:16 293:11 301:8 302:21 313:16
**kelly** 181:20,21
**kept** 48:15 88:6,10 154:1 230:12 239:22 279:21 290:6 305:22 306:4,21,24 307:2 307:8 317:14 347:15
**kevin** 303:10
**kicked** 283:10,12
**kid** 275:12 280:22
**kids** 25:14 40:4 43:23 68:4 71:4 149:1,5 152:15 153:23 188:15 266:8,9 268:23 269:9,14 270:23 272:11 306:10 331:4 332:7 338:2 338:4
**kill** 264:7
**killing** 272:16 306:8
**kim** 16:22,25 17:4 19:6 21:6,9 22:19 22:20 31:10
**kind** 7:17 27:14 48:5,14,19,25 49:11 51:17 54:7 55:6 77:12 87:18 88:16 94:8,10,11 102:22 122:4,9 128:21 135:23 136:2,12,18 147:25 158:13 163:11 164:14,20 166:6,18 168:6 172:12,13,14,17 185:6 186:10,16 187:14,15 208:14 215:4 246:23

249:1,22 250:23 251:24 273:20 274:2,22 275:17 287:3,13 303:8,21 306:2 308:25,25 311:25 320:3 327:19 328:24 330:25 331:22,22 349:23 352:20
**kinds** 177:16 334:20
**kings** 231:19
**knew** 105:7,10,11 105:12 168:15 226:4 254:15 266:2 273:1 283:5 283:6 284:21 294:17 305:22 327:22
**knock** 346:7
**know** 6:18 7:1,19 8:24 10:10,12 17:20 18:11,17,19 18:23,25 19:1 20:3,5,22,22,23 22:17 23:15 24:6 30:12,12 32:5,9,15 34:14,22 36:11 40:24 41:4 42:18 43:3,4,8,20,21,24 44:2,3,4 46:9,13 46:25 47:15 48:19 48:20,22,25 49:1,2 49:4,9,10,11,15,20 50:15 51:20 52:14 53:22,23 54:4,21 55:1 56:8,11,18,20 59:4,23 60:7,23 61:1,8,12 62:4,10 62:12,16,17 63:1,3 64:6,7 65:9,24 66:4,10 68:11 70:7,23 72:3 73:18 75:12,14 77:6 79:16,19 80:9 81:1,18 82:12,14 83:1,9,25 84:3,7,11 85:5 86:23,25 87:4,8,14 88:15,19,22,23 89:24 90:4,7,20 91:2,7 92:6,7,24 93:22,25 94:4,5,7 95:6,8,16,21 96:9 98:3,11 99:2,5,15 100:8,14,14,18 102:5 104:3,4,4,19 105:6,7,12 107:12 109:2,7,21,24 110:2 112:13,22 115:19 120:19,22 126:25 127:1,23 128:1,7,9 129:1,1 129:4,7 130:9,19 130:24 131:19 132:9,18 133:5 134:9 136:9,23 138:12 143:16 147:18 149:3,5 150:1 151:6,12,16 152:13,14,16 153:13,13,22,24 155:11,13 162:22 163:8,10,14,14 164:10 166:6 167:5,7,11,14,15 167:20,21,25 168:14,15 169:15 172:13 173:1 175:3,16,25 176:2 176:9 177:12,17 179:14,21,22 181:1,4,8 182:12 183:20 184:5,6,7 186:11,13,20,24 187:1,17,18 188:14,15,18 189:3 190:10 191:16,17,22 192:5 194:20 195:8,14,15,18 196:1,2,4,22,24 199:1,15 202:5 206:15,24,24 207:22 208:2,3,16 208:19 209:2,12 209:15 211:9,10 213:10,20 221:13 223:5,7,11,13 227:15 230:9,9 232:4 233:12,14 234:4,13 236:1 237:3,24 240:5,14 241:11 242:2 243:10,13,13,19 243:19 244:1,2,18 244:21 245:9 247:8 248:20,21 249:7,8,9 250:21 252:9 253:22 254:22 257:4,13 257:20 258:3 260:5,8,9 261:9 262:12 263:5,9,13 264:23 265:4,22 265:23 266:12,20 267:22 269:15,16 269:21 270:8,9,15 270:18 271:14,23 271:24 272:15,18 273:3,12,13,16 274:1,2,9 275:13 275:17,23 276:18 277:3,7 278:19 279:1,11 281:21 282:1 287:2 288:12 290:4,19 296:6,16 297:4 298:13,14,14,25 299:14 302:4,13 303:21 304:4,12 305:24 306:9,15 306:21 307:17 308:4,25 309:2,4,9 309:15 311:9,20 312:2,7,8,16 313:10 315:5,10 315:20 317:4,14 317:21 318:2 324:7 327:2,17,23 328:5,11 329:2,5 332:10 334:4,16 335:4,8,9,12 338:5 338:25 340:12,14 340:23 341:1,4,6,6 341:7,10 344:14 349:8 350:6 351:3 351:13,22 352:6,9 355:4
**knowing** 18:7 86:19 272:1
**knowledge** 96:8 223:15 356:10 357:6
**knowledgeable** 96:5
**known** 157:19,22 248:5 343:7
**knows** 8:2 103:16 223:14 299:22

**l**

**l** 13:25 14:24 23:7 32:7 73:8,11 157:17 177:8

257:2
**label** 249:21
**labeled** 249:24 296:16
**labor** 290:24 299:2
**laboy** 86:13 153:10 170:5 191:20 217:20 220:7,12 222:1 226:8 229:4 230:8 237:24 238:4,15 238:20 239:20
**lack** 113:1
**ladies** 259:25
**lakeisha** 102:17 206:23 207:9,20 282:6 323:18,23
**lakeisha's** 308:20 308:22
**lanolin** 273:21
**laptop** 8:10,14,19 8:20
**largest** 84:12
**lasted** 354:12
**late** 27:11 285:3 308:4
**law** 2:4,14 9:1 72:17,19,20 96:7 181:23 182:14 184:8 203:10 306:19 314:18,24 315:2,4 320:21 334:13
**law.nyc.gov** 2:17
**laws** 5:1
**lawsuit** 65:21 68:10 69:16 211:10 329:6 339:24
**lawyer** 11:2 72:15 99:10,11 120:21 120:22 175:13 176:12 251:10 336:2
**lawyer's** 344:18
**lawyers** 146:24 212:16 249:16 250:24
**layered** 250:22
**lead** 122:12
**leader** 165:21
**leadership** 92:17 165:21 230:24,25 246:23 312:5 347:3
**leads** 100:21
**leaned** 281:25
**leaning** 103:2
**learn** 22:6 46:3 62:5,20 176:20 240:21 246:5 326:14
**learned** 74:9,15 75:2,16 76:5,25 77:1,22 80:8,12 161:23 162:2 166:10 177:23 223:13 241:5,15 326:12
**learning** 51:1 58:20 62:19
**leave** 91:6,19 92:2 214:5 281:8,9 285:11,25 286:1,3 286:7 291:6,7 294:8,10 296:9,10 296:22 298:16 299:5,7,10,16 300:1,7,14,16,24 301:5 305:1,13,14
309:6
**leaving** 56:23 57:20,22 91:9 306:22
**led** 21:25 61:17 72:11 75:24 76:23 98:20 260:9,10 261:20
**lee** 280:21 294:14 294:25 300:2,19
**leery** 230:7
**left** 41:16 59:3 82:10 86:22 102:22 131:19 214:24 222:25 270:23 286:5 288:5,17 289:16 327:24,24
**legal** 44:15 75:15 97:19 144:4,13 174:9 175:6,14 176:10 177:19 178:17 181:25 184:9 212:11 248:7 251:25 255:16,20 256:7 257:14 258:17 262:1 267:6 279:19 336:4
**legitimate** 97:17
**length** 88:6,11 354:18
**letter** 3:10 235:1 319:7 320:10,15
**letting** 132:5 214:17 279:24
**level** 77:24,24 78:17 201:17,24
**levels** 77:23 99:18
**levy** 72:24 73:6,8 73:10 74:5 75:25
76:24 234:24
**lex** 270:16
**lexington** 270:12
**license** 201:12,13 342:11,20 343:4,5
**licensed** 25:1
**licensing** 201:11
**licensure** 25:4 201:12
**licensures** 201:1
**lieb** 96:10,10 181:23,23 336:10
**lieb's** 181:23
**lied** 105:8 330:12
**life** 120:19 154:14 154:18 263:15 274:7 277:14 317:22 322:18 329:4
**lifting** 269:17
**lights** 345:12
**line** 3:9,15 47:2,4 48:10 59:24,25 60:6 63:11,11,13 63:21,25,25 64:9 76:7,14,14 78:17 78:24,24,24,25,25 79:1,1,3,8,9,17,18 79:22 80:4,16 85:10 150:9 167:22 185:1,7,11 185:12,16,19,22 186:2,6,7,21 187:3 187:5,13 188:4,25 189:6,11,19 190:1 190:18 218:16 219:4,6 220:8,14 220:16 221:16,24 222:2,18,21,24 223:2,3 227:10 229:5,12,14,19,20

230:1,18 231:3,13 231:16,19,22,22 231:24 232:8,10 233:2,8,22 234:6,9 266:21 358:4,7,10 358:13,16,19
**lines** 76:7 77:1,9 77:23 78:16 79:4 79:12,20,20 185:1 185:3,3,4,6 202:6 219:5 233:13 234:2,8
**linked** 43:13 78:3 82:17
**lip** 87:18
**lipitor** 29:17,21 30:2,4,8,19 31:5 33:6,7,8,10
**lips** 317:11
**list** 221:20 261:13
**listing** 221:15
**lists** 201:10
**litany** 240:1 296:17
**literally** 105:4 337:15
**litigation** 68:14 69:4 70:16 71:23 72:12 73:16 337:7
**little** 26:1,11 77:21 122:10 132:18,25 142:3 161:21 163:12 196:11 215:11 254:15 267:10 269:6 279:25 304:3 347:19
**live** 160:8,22
**lived** 128:9 129:5 160:12
**lives** 153:25 263:16
**living** 94:7 160:12 160:18 270:6
**lloyd** 177:10
**load** 130:12 132:4 132:11
**locally** 21:8
**located** 6:5,12 14:10
**location** 1:20 153:8
**locked** 186:16,18
**logistics** 173:18
**long** 10:14 15:14 24:15 30:4 32:20 35:17 87:12 123:18 124:3 146:23 148:1 160:12 168:10 187:21 202:13 206:25 263:7,11 270:5,6 310:17
**longer** 32:18 63:3 63:3 120:12 129:21 130:7 133:16 218:4 242:2 284:8
**longevity** 113:5,7 113:10,11,18,19 113:22,25 115:9 233:24 240:9 290:19
**longitudinal** 54:6
**longstanding** 80:13 113:12 232:4,8
**lonnie** 182:15
**look** 42:11 48:15 59:18 61:25 62:2 63:7 79:12 105:21 105:25 106:22,23 107:10,23 115:11 118:22 142:24 190:16 195:22 219:17,20,23 220:2,3 221:10 280:25 282:8 285:8 317:13,13 318:16,19 321:2 323:9,9 350:20
**looked** 38:4 46:9 62:24 65:25 66:1 66:2,8,11,12 254:20 255:5 266:21 282:11
**looking** 39:4 47:19 107:17 115:19 187:8,15 248:8 321:10,14,21 326:23 327:6 347:23 348:19
**looks** 103:5,6 122:11 150:20 322:7,8 325:8 326:5 329:18 350:22
**loop** 27:22 109:6 109:20
**loophole** 313:3
**lori** 46:17,22
**lorraine** 182:1
**lose** 87:4 88:25 186:25
**losing** 98:21
**loss** 91:23,23
**lot** 25:13 56:9 70:23,24 85:25 87:18 91:16 97:9 145:8 152:17 166:4 185:8 190:2 208:13 209:12,15 215:5 222:13 237:17 251:16 267:3 272:16 281:13 285:15 287:1,6 292:9 321:10 322:15 330:4 354:16,17
**louder** 26:1
**louise** 212:6
**love** 191:19 330:7
**loved** 345:18
**lower** 45:24 113:16,17
**lucy** 336:1
**lunch** 121:15 123:1 153:20 154:3,4,9 262:22 262:23 263:5,6,8 263:11 281:16,22 282:14 283:6 284:7
**lurched** 281:22
**lure** 230:3
**luxury** 228:2,2 263:11
**lying** 282:2

**m**

**m** 3:20 90:16
**m.d.** 42:4 46:2 90:16 92:21 93:5 202:23 233:14 274:18
**m.d.'s** 233:17
**ma'am** 97:22 199:22 219:22,22 343:19
**mac** 195:9,10
**macdonald** 26:23 248:1 252:18 303:24

**magistrate** 341:16
**main** 348:18
**maintain** 167:9
**maker** 345:10
**making** 42:20 99:8 102:8 149:2,7 167:10 215:2 222:13 233:7,24 315:16 348:23 349:17 354:21
**male** 23:8 44:23 45:1,25 46:1 47:1 48:2 52:25 59:17 59:20,22 60:1,4 80:6 86:25 89:1 93:7 112:16,18,19 112:20 117:8 120:18 167:18 182:10 217:11 234:14,17 263:3 332:8
**man** 304:3 332:4
**manage** 39:5,20 44:9 53:9,12 55:8 55:8,11 334:5
**managed** 103:25
**management** 26:20 41:7,8,12 86:1 94:12 246:23 289:3 303:20 350:22,24 351:1,2 351:4,10 352:5
**manager** 207:11 222:20
**managerial** 92:4 93:20 94:8 98:22 110:10 111:10 115:13,23 116:12 117:6,11 118:9 188:25 217:22 218:5 220:23 221:24 222:2,21 223:3 226:11,22 227:9,10,10 229:5 229:12,14,18 230:1,18 231:3,13 231:16,19,22 264:13,22,22,25
**managers** 154:12
**manhattan** 50:5,9 52:3 60:5 90:5,8 90:10,14,24 93:8 108:16 114:4 167:19 175:12 187:10 207:22 208:18 209:11,13 219:9 222:16,17 222:22 263:2,14 291:22,24 297:8 314:9 323:22 328:20
**manipulate** 184:9
**manipulated** 265:19
**manner** 5:2 120:7 166:17 171:23 175:5 247:21 334:3
**mansion** 132:13 143:9
**mantra** 239:22
**manufacture** 340:11
**manufacturing** 312:12
**marazzo** 303:11 304:6
**march** 133:18 322:21 323:6,11
**margaret** 21:20
**marginalized** 101:2 299:11
**marginalizing** 230:5
**marina** 321:9
**mark** 109:18,21 157:7 342:10,12 343:12 344:6 350:12
**marked** 108:6 192:20 194:10 219:14 325:2
**marks** 109:16,24
**married** 159:11,13 327:25 332:4
**mary** 48:16 60:20 164:13 172:11 182:7 184:19
**masturbatory** 330:9
**match** 327:20
**material** 320:12
**matter** 4:7 38:24 69:24 86:11 121:7 239:24 315:3,6,15 316:7,8 329:22 335:5
**matters** 53:25 69:21 96:6 121:7 281:14 318:13
**matthew** 297:25
**mayor's** 166:22 173:25
**mayors** 173:5
**mckelvey** 182:1
**mean** 27:11 38:6 44:2 45:17 65:19 65:20,25 80:25 85:20,22 88:24 96:5 97:24 99:10 104:3 105:4 112:10 127:4 129:3,12 132:3,13 139:1 145:24,24 147:6,17 149:24 155:12,12 158:20 167:1 171:24 172:21 176:11 188:9 189:18 193:23 196:24 197:11 203:23 208:16 214:2 217:2 232:11 236:13 240:11 241:11 244:21 248:19 254:9 261:2 263:21 267:7,18 270:15 270:18 273:22 274:4 302:8 322:1 322:16 323:18 324:13 330:23 331:10 332:6,14 332:16,17,17 338:1,3 339:3,13 340:1,14 341:4 342:7 345:17 352:25 353:1
**meaning** 74:17 233:10 281:11
**means** 5:3 82:17 121:5,6 149:22 225:5 229:10 257:3,4
**meant** 125:13,16 172:8 173:10 249:12
**meat** 200:11
**mediated** 274:12
**mediator** 344:17
**medical** 11:6 16:20 20:22 21:11 27:22,24 51:14,18 60:2 98:8,10

100:12 101:6 124:25 125:17 127:3 131:20 133:7 135:5 136:8 142:25 200:18,22 200:22 204:10 208:7 239:1 240:22 242:2,17 243:14 244:24 274:16 275:8 280:1 290:7,9 301:6 302:1,3,5 303:3 318:20 319:23 320:4 332:19 333:12,13 333:16 334:17 335:2 342:11,20 343:4,4
**medically** 51:16
**medication** 12:13 12:16 29:12,19 31:14,22 33:2,20 33:25 34:6
**medications** 31:10 31:11 34:12,13 127:22,23 142:24 142:25 143:4
**medicine** 18:2 19:17 34:25 201:12,14 274:20 274:23 275:9,15 275:16 276:3,16 331:21
**meet** 52:2 53:19 59:11 88:14 283:14 286:17 306:1 328:22,23
**meeting** 59:14 64:6,7 67:9 87:14 88:11,13,14 99:14 100:23 101:25 102:15,19,20,21 132:8,8 168:23 216:9,11,20 217:19 237:15,19 244:7,10 247:24 247:25 248:4,18 249:6 252:24 253:8,10 257:12 258:10 260:7,22 260:23 261:7,12 261:23 283:20 286:23 287:8,24 305:25 311:6,18 322:23 331:15,17
**meetings** 85:24 92:17 164:1 167:16 192:6 211:22,23 238:19
**melania** 51:4
**melanie** 49:15 50:15 52:23
**melissa** 1:4,17 2:2 4:6,7 5:14,20 157:13,20,21,22 158:3,21 159:4 220:8 321:7,11 358:2,24 359:2,4 359:12
**melissakayemd** 321:7
**member** 68:7 83:10 84:22 89:10 90:21,25 91:20 92:8 286:20 305:2 305:4
**members** 68:5 83:25
**memorialized** 255:1
**memory** 112:12
**mental** 29:5 96:3,6 184:7 249:23 250:4,5 334:13,13
**mentality** 49:1
**mention** 335:10
**mentioned** 28:17 39:19 99:14 226:21 227:9 280:19,24 292:4
**merged** 78:9
**merits** 354:23
**mess** 312:14
**message** 40:1 43:6 43:6,14 162:16 309:6
**messages** 6:24 42:12
**messing** 281:4
**met** 61:18 63:9 64:25 88:6,7,11 143:14,15,18,23 163:8 238:4,8,14 253:11 283:15 317:19 318:4 327:25 328:19 329:15 343:8
**methodist** 133:5
**mexico** 1:21 6:13 6:14 14:10 160:12 160:13,19 343:5
**mh** 59:4
**micromanagement** 174:1,5,13
**microwave** 345:10
**mid** 17:5 278:23
**middle** 131:12 154:9,10 157:14 158:19,21 159:4,5 159:6 282:11
**miguel** 174:25 175:6 179:16 182:11,18 183:9
**mill** 333:23
**mind** 56:11 116:18 155:12 172:16 246:4
**mine** 97:21,24 194:21 299:1
**minimize** 107:18 195:6
**minor** 68:24
**minus** 83:8
**minute** 71:8 122:19 154:3,4 165:19 198:17 262:21,22 281:16 281:21 283:6 284:7 301:15
**minutes** 121:19 122:21,24 153:20 153:23 154:10 161:9 263:22 264:1 268:15,19 270:7,19,22 289:15 354:9,12
**minutia** 173:25
**miscategorized** 211:8
**mischaracterizes** 172:1,5 188:8 189:9 191:1 210:5 223:19 332:24,25
**mischaracterizing** 183:3 191:9 322:3
**misdemeanor** 313:4 314:20
**misdemeanors** 312:19 314:6,18
**misinformation** 334:1
**misled** 234:3

**misrepresentation** 249:11
**misrepresented** 113:4
**missed** 224:14 315:11 316:10
**missing** 342:15
**misstatement** 333:22
**mistake** 46:5,10
**mistaken** 82:16 267:24
**mistakenly** 257:10
**mistruths** 246:4
**misunderstood** 146:6
**misuse** 261:23
**mitigate** 94:8
**mitigation** 251:16
**mm** 10:24 45:21 106:5,13,17 109:9 110:3 111:4 123:5 137:18 157:9 179:9,12 198:1,18 239:18 319:4 320:22 325:11,13 329:20 344:20,22 350:18
**moa** 168:4,7
**mocj** 103:25 104:22 173:5 177:10 346:3
**mocked** 192:6
**mocking** 323:17 345:14
**modality** 338:14
**model** 129:19,22 130:13,15 135:22 135:24
**modern** 102:7
**modification** 303:2
**modified** 69:6,7
**modify** 70:22
**modifying** 69:5
**mom** 153:22 327:25
**moment** 11:14 116:20
**mommy** 271:24,24
**monday** 1:18 212:8
**monetary** 339:13 339:20
**money** 99:24 149:2,6 284:1 297:4 332:5
**monies** 230:14
**monitor** 346:15 348:7
**monitoring** 346:19 350:3,7
**monkey** 298:15
**month** 77:6,7 140:12,20,25,25 141:4,9 150:22 206:4,6 227:7 309:12
**monthly** 150:2 205:23
**months** 62:14 63:3 63:4 207:1,1,1 211:2 225:13 226:25 290:8 323:2,7
**montoya** 182:1
**mood** 334:19
**moonlighter** 138:16
**moonlighting** 124:17 127:9,15 128:12 143:16 256:6
**moore** 95:22 181:24 334:8 335:18,20 336:10
**morgenthau** 95:23 334:11
**morning** 4:2 6:3,5 6:19 34:17 56:15 56:22 152:14 153:19 161:23 188:23 217:21 263:24 264:2 266:7,8 268:18,23 269:1,2 271:8,17 271:18 275:11 276:4,9 278:17 279:15
**mornings** 152:13 212:8
**mother** 188:14 317:23 331:8
**motherboard** 287:11
**motion** 111:2
**motions** 330:24
**motivated** 44:10
**motivation** 98:21
**move** 43:9 51:21 52:20 81:7 101:12 123:3 156:21 169:8 191:11 193:6 229:5,13,17 229:18 250:19 257:23 277:12 318:8 346:12 350:8 353:2,4
**moved** 81:16 90:1 175:12 208:5 229:11,20 264:1
**moving** 48:23 78:17 193:10 259:8
**mucking** 323:13
**mullan** 212:6,19
**multiple** 35:19 92:17 193:18 231:1 252:2 279:4 336:9 344:4
**mundy** 90:15,17 90:21 108:25 109:5,18 114:3 115:3,10 119:11 222:12 226:5 231:1,4,16 233:10 244:11,21 249:2 253:1 260:7 307:1 310:19,25 311:8 311:23 312:3,6,22 313:10,22 314:9 314:25 315:22 316:13,14,20 317:5 318:6
**mundy's** 226:14 244:19 311:8,21
**myles** 208:19,23 208:24

**n**

**n** 2:1 3:1,20 4:1 32:7 73:8 85:16 90:16 157:24 158:22 257:2,2
**nail** 275:24
**name** 4:2,12 8:24 13:21 14:19,22 21:18 23:3,4,12,16 28:10 46:17 60:4 70:4,5 72:20 84:25 85:14 104:5 104:20 126:22 155:14 157:13,14

157:20,21,25 158:3,8,8,17,18,19 158:20,21,22,24 159:1,1,5,5,6 177:12,12 181:18 182:13 208:22 303:10 309:8,15 321:9 347:13
**name's** 23:4
**named** 1:13 27:25 95:20 158:21 338:20
**names** 1:10 4:10 28:20 33:12 81:15 81:18 135:9,10 155:12 158:5,11 159:21 183:11 209:2,6
**nate** 283:15 286:16
**naturally** 166:20
**nature** 294:16
**navigate** 107:14
**near** 64:18 90:2 189:23
**nebulous** 115:15 118:1 229:25
**necessarily** 239:15
**necessary** 359:6
**need** 10:15 11:15 11:15 19:22 26:3 39:25 42:11 61:12 89:4 96:14 105:20 105:24 106:4,9,11 106:16 119:23,23 121:23 122:2,8,10 133:11,13 150:10 150:11 156:2,21 171:5,5 176:3 188:16 195:25 214:16 215:11 223:11 224:19 227:4,16,19 229:21 234:11 257:23,24 263:21 267:17,18 268:7 271:21 288:8,13 306:21 327:3 334:24 336:20,21 352:25
**needed** 72:14 120:25 128:10 149:22 166:7 233:22 266:22 268:14,16 274:14 284:24 304:14 305:18 326:11 327:3 337:3
**needs** 8:3 80:19 96:21 120:24 250:17,18 257:25 258:13 343:2
**negative** 272:3 324:15
**negatively** 340:25
**neglected** 214:14
**negotiated** 152:25 154:7
**negotiating** 94:7
**negotiations** 117:21 154:4
**neither** 87:21 356:11 357:7
**neomycin** 273:21
**nervous** 348:22
**neurology** 201:3
**neutral** 97:25 174:2,17 249:19 251:9
**neutrally** 257:17
**never** 6:16 48:24 61:15 77:15 86:19 87:19 96:14,17 104:12 117:21 118:14,14,18,23 120:6,7 130:11,14 188:11 189:9,18 211:13,13,25 217:22 218:19 230:17 246:14 248:11,21,22,24 254:14,15 282:10 286:10 287:3 297:5 301:10 303:22,22,23,23 303:24 305:6,7 319:11 327:22 329:2 330:18,21 330:22 331:15 333:25 343:25
**new** 1:2,7,21 2:6 2:10,14,16,16 4:8 4:16 6:6,13,14 8:25 9:1,6 14:10 68:19,22 72:14 82:6,8 90:15 105:14 123:14 130:5 133:3 156:3 160:12,13,14,19 161:2 172:18 201:13 231:17 235:17 241:18 244:22 255:7 313:3,3 314:19 326:10 327:24 343:5 356:21 358:1 359:1
**newly** 231:17,18
**news** 328:9
**newton** 335:25
**nice** 263:11 323:19 330:15
**nickname** 158:25 159:6,7,10
**nicolas** 330:10
**nicole** 70:2,4
**niece** 328:24
**nine** 153:21 199:17 264:7,11 265:20 282:19 304:14
**nlrb** 291:15
**nod** 10:21
**noise** 42:20
**noisy** 165:16
**non** 99:10,11 154:6 172:8,16 173:10 220:23 221:23 231:22 253:2 264:22 323:13
**normal** 284:5 300:8 349:19
**normally** 269:8 283:12
**notary** 1:22 4:15 356:1,20 359:13 359:19
**note** 109:16 125:2 125:5,6,21 155:5 170:25 320:13 322:8
**noted** 359:7
**notes** 114:7 322:9 349:18
**nothing's** 168:2 230:11 239:25
**notification** 19:16
**notified** 162:21,22 327:10 336:18 354:11
**notify** 162:12

**november** 1:18 4:13 24:5,11 88:13 261:8 331:16
**number** 109:25 113:13 139:19 210:15 220:22 221:4,22 228:11 253:3 284:3 308:25 309:1,2 319:6 321:8 322:20 326:3 336:18
**numbers** 107:25 210:16 219:12 312:11
**numerous** 91:3 95:9,9 261:7
**nurse** 28:5,7
**nurse's** 43:23
**nurses** 128:4
**nursing** 147:19,23 148:5,18,24 152:5 155:13,14
**nyc** 107:25 108:9
**nyp** 129:25 130:3 130:4 133:3 135:24,25 136:1 136:14,16,17,20
**nypd** 130:2
**nyu** 185:3,6,11,16 185:19,22 186:7

**o**

**o** 3:20 4:1 23:7 34:23 66:16 157:17 177:8
**oath** 9:10 226:9
**oaths** 4:16
**object** 110:17 245:4 339:12
**objected** 100:16 155:6
**objection** 4:19 5:17 6:8 7:9 8:15 11:8 12:10,23 13:19 14:15 15:2 15:6,10,16,23 16:7 16:13 17:1 18:10 20:14 21:14 22:2 22:14 27:8 29:9 29:14 30:21 31:16 33:22 34:1,7 37:18,22 38:7,19 39:1 41:2,18 42:7 42:21 44:14 47:21 50:20 52:16 54:19 55:14,21 58:8 62:3 65:4,17 66:19 67:5,10,22 68:17 69:9,18 70:6,18 71:24 72:13,22 73:22 74:7,12,20 75:5,18 76:1 78:22 82:25 83:12,20 84:10,15 85:4 88:3 89:25 91:22 92:5,13 93:21 95:2 101:10 102:13 103:15,19 104:15 110:12,16 111:12 117:1,13 117:17 118:11 119:13 120:15 125:24 127:13 134:3,7,16,21,25 135:14,20 137:7 137:23 138:2,7 139:1,2,8 140:14 140:18 141:13 142:15,18 143:10 143:24 144:14 145:17,21 146:21 148:3,20 149:20 151:2,5,25 152:22 154:24 156:4,7 159:15 160:25 162:13 166:2,15 171:12,25 172:4 173:15 175:21 178:1,9,15,22 183:23 185:17,24 188:7 189:8,8,15 190:25 207:24 209:25 210:4 212:23 213:6 215:15,18 222:3 223:18 226:12 229:21 231:7,14 232:22 235:13 236:15 238:17 239:10 241:10,24 242:12,14,24 245:7,21 246:13 254:12,12 255:3 255:13 262:10 264:15,15,19 282:21 285:17 291:14,20 292:2,8 292:19 295:7,10 295:11,25 297:13 297:19 298:7 303:4 323:3 327:13 330:1 332:23,23 336:23 338:9 345:1 346:22 349:14 351:6
**objections** 100:19
**objective** 97:25 173:10 174:2 249:20
**obligation** 335:19
**observation** 54:6
**obsessed** 312:10
**obtained** 38:11
**obvious** 49:2,3,3 160:4 349:17
**obviously** 334:15
**occasion** 329:15
**occur** 35:17
**occurred** 20:8 164:7
**occurring** 177:22
**october** 72:9 214:2 214:13 215:7 216:5 272:14 306:1 311:7
**offender** 96:1 334:10
**offensive** 317:6
**offer** 94:19
**offered** 91:4 110:9 111:10 115:12,15 117:12,14,18 185:16,19,22 214:18,19 217:21 217:22,25 330:21
**office** 43:24 50:24 51:3,4 61:2,5 62:7 62:8,11,14,17,20 64:12 75:10,13 99:7 102:1,21,22 166:23 173:6,25 176:7,12 179:14 181:13 182:11 190:9 214:24 262:24 282:6 283:11,13 287:12 291:22,25 293:18 297:9,25 306:3,4,6 308:8,9,14,19,21 308:22,22 320:16

347:7,14,18 348:5 348:17,18 349:18 350:5,5
**officer** 136:9 356:2
**offices** 2:4 130:10
**official** 89:17 94:17 104:5 237:1 237:5
**officially** 325:10
**oh** 10:4 47:7 48:22 57:2 61:11 98:14 119:17 121:4 130:4 138:7 152:11 160:4 213:17 229:13 256:2 263:1 298:1 335:7 337:16,17 347:22,22
**ointments** 275:16
**okay** 6:14 7:8 8:5 8:12,20,23 9:8,10 9:13,18,22,23,25 10:2,4,6,10,20,24 11:6,25,25 12:3,6 12:21 13:10,16 14:4,19,25 15:14 16:2,5 17:9,25 18:3,6 19:11,14,21 19:23 20:2,11,25 21:4,7,10 22:6 23:8,11,15,18,21 23:24 24:15,19,21 25:3,7,21,22 26:1 27:1,5 28:11,17,17 28:18,24 29:3,3,11 29:18 31:2,4,7,9 31:14 32:8,10,18 32:20 33:7,14 34:5,13 35:2,5,14 35:17 36:18 37:14 38:13,17,24 39:17 39:24 40:22 41:15 42:2,10,14 43:15 43:15,25 44:6,6,13 45:15 46:14,21 49:19 50:13,18 51:4,7,9 52:5,20 54:13,17,24 55:1 55:12,18 56:2,7,12 57:6,10,10,17,21 58:4,12,12,20 59:8 59:20 60:7,15,17 60:23 61:1,4,17,23 62:1,19 64:2,4,17 64:25 66:6 67:3,8 68:5 69:8 70:10 70:15 71:2,9 72:8 72:11,20 73:9,20 74:3,9,15,23 75:9 75:24 76:22 77:21 78:16 79:7,24 80:15 81:23,25 82:4,8,12,24 83:6 83:16,23 84:3,7,17 84:19 85:2,9 87:23 89:24 90:4 90:13,20 91:7,9,12 92:10 93:15,18 100:25 101:3,4,22 101:22 104:12 108:23 109:13 110:4,6 111:1,11 112:2,14,14 114:2 114:6,15,20,20 115:2,2,12,17,22 116:2,4 117:11 118:25 119:7 120:11 121:12,15 121:17,19 122:3 122:13 123:23 124:3,5,13 125:3 126:4,10,22 127:6 127:8 128:16 129:9 130:4,6,18 132:12,17,19,20 132:22 133:15,20 134:5,13,18,23 135:8,19 136:5,21 137:11 138:8,8,21 140:6,10 141:5 142:11,17 143:7 143:21 144:19 145:6,15,23 146:15,18 147:2 147:10 148:2,8,13 148:17 149:9,16 150:19 151:18,23 152:4,18 154:17 155:4,7,18 157:19 157:23 158:7,23 158:23,23 159:3 159:13,21 160:4 160:11,18 161:4,6 161:11 162:2,9,18 162:20 163:18 164:5,9,22 165:6,9 165:14,17,18,25 166:10 171:20 176:18 177:1 178:13 179:19 181:14 184:11,22 186:23 187:25 188:22 194:2,7,16 195:12,20,20,23 196:8,11,12 197:20,25 199:21 200:12,21,25 201:16 202:2,9,13 202:16,24 203:3,6 203:16,22,25 204:7,13,18 207:2 207:7,14,18 208:24 209:7,19 210:8,13 211:1,5,5 214:9 215:4 217:4 217:4,7 218:6 220:10,19 221:15 221:21 228:7,19 228:19,20,24 232:2 233:6 234:20,22 235:8 236:24 238:3,8,8 238:14,19,24 239:6,16 241:2 242:22 243:1,7,10 243:16,21 244:12 244:16,19,24,24 245:2,20,22 246:8 247:12 251:4,21 252:10 254:1,22 255:9,9,19,25,25 256:10,18 257:1 257:11 260:18 261:14,14 262:8 265:13,16 267:9 267:16,25 268:3 268:10 269:10 270:1,5,17,22 271:6,12,16 276:1 276:15 277:9,12 278:20 279:11 280:18 281:8 284:11,12,17 285:2,7,10 286:1,9 287:17 288:2,4,4 290:16 291:11,17 291:24 292:4 294:1,12 295:18 295:22 299:9,13 300:4,22,22 301:4 301:11,16,22 302:6,10,12,15,18 302:22,25 303:17

304:7,16 307:3,3 307:10 310:3,6,15 311:12,19 313:6 314:1,8,16 316:23 317:2,8 318:8,18 319:22 321:17,20 321:22 322:19 324:11,17,23 325:14,19 326:12 326:20 327:8 329:12,16 332:2 334:23 336:14,14 336:14 337:7 338:24 339:9 341:9 344:5,21 346:10,10,12 349:6 350:2,8,8,18 351:19 353:2
**old** 63:7 159:23 304:3,4 332:5
**older** 209:2 328:4
**olds** 293:23
**once** 88:6,7,11 140:12,19,25 141:4,9 150:22 166:10 175:25 212:2 255:4,5 256:18 270:25 295:23
**one's** 196:19,23
**ones** 32:2 158:10
**ongoing** 28:16 104:22 145:7 167:16 278:18 291:8
**online** 254:19
**op** 28:25
**open** 102:24 164:21 166:18 235:16 264:3 268:13,15 269:13 269:14 271:13
**opened** 222:25
**openly** 99:19
**operated** 166:22
**operating** 211:24
**operational** 265:21
**operative** 197:9
**operatives** 173:4 177:9,10
**opinion** 45:5 99:10 99:11 143:5 177:25 248:12 324:14 335:1,3,7,9 335:11,12
**opportunity** 105:21,25 106:1 169:21 195:16,18 199:8,10 219:17 220:2 224:2,22 225:1,8 248:11,16 259:14
**opposed** 335:13
**opposite** 212:13 230:19
**opposition** 111:2
**optics** 173:2 312:14 340:11
**option** 195:1 246:20
**options** 133:16 190:17
**oranges** 232:12,16
**order** 8:10 36:4,17 118:4 126:12 172:12 175:7,8,20 176:1,2,2,5 215:12 251:1 270:2 278:15 285:8 313:24 315:24 351:10
**ordered** 51:19 174:3 177:18 203:9 204:16 250:5,7 251:19 334:9,14 335:18
**ordering** 98:3,4 251:17
**orders** 39:15 98:7 203:10 279:3,4,23 280:14
**organization** 139:17
**organize** 164:6
**organized** 163:20
**orient** 132:21
**original** 163:19
**originally** 215:6
**orthodontic** 186:17
**ostensibly** 56:14 56:15 94:19 262:20
**outcome** 174:15 174:21,22 356:16 357:12
**outer** 133:6
**outpatient** 132:9
**outside** 4:18 132:8 143:19 148:24 155:10 167:2 203:16 345:25
**outsourcing** 255:24
**overlap** 52:13
**overlaps** 50:22
**overly** 250:24 296:18
**overnight** 124:16 127:9,15 128:21 129:13 138:17
**oversaw** 50:9 114:21
**oversee** 50:4 90:5 114:3,9
**overseeing** 114:12 114:15
**oversight** 89:13 152:18 163:22 164:23 165:7 166:1,11,13
**overtime** 121:20
**ow** 114:17
**owen** 114:19 119:11 163:6 166:5 231:19 233:11 244:4,11 244:12 251:7 253:1,16,16 256:23 257:12 260:7 310:20,23 311:4,25 312:8,15 314:2,8,10,25 315:23
**owen's** 243:22 248:23
**owns** 136:18

**p**

**p** 2:1,1 4:1 66:16 177:8
**p.m.** 150:13,16 161:12,14 198:19 198:22 245:13,16 289:10,13 301:17 301:20 346:16 354:3,6 355:12,15
**page** 3:2,6,15,21 196:15 319:2,6 320:9,9,14,24 322:20 358:4,7,10 358:13,16,19

**pages** 198:15,15 320:13
**paid** 45:24 46:4,25 47:2,9,11 48:12 51:1 58:20 59:17 59:21 60:8 62:22 64:21 74:10,16 75:2,16 78:12 87:1 88:25 112:16 120:12,17,23 125:23 126:1,4,6 126:12,16 131:10 131:15 135:8,11 135:19 136:3,23 138:20 141:5,6 144:16,21,25 217:11 233:9,17 249:19 251:8 284:11 285:23 286:1 292:5,11,18 292:25 293:5,14 294:3,5 298:23 332:8
**pain** 275:19
**painful** 193:20
**palpitations** 33:17 345:4
**pandemic** 22:17 22:22 24:21 30:13 132:22,23 133:2,8 137:9 151:10 276:25 329:1,3,10 329:13
**paola** 23:14 318:21,22,23,24 318:24 321:5
**paper** 90:7 282:4
**papers** 70:23,24
**paperwork** 287:3 294:14,15 295:24
**paragraph** 200:25 201:9,23 217:9 221:4,22 272:23 344:14
**parameters** 252:1
**paraphrase** 260:12
**parent** 136:1
**parents** 68:7 158:20
**parity** 49:12 59:15 61:7 86:12 87:13 88:19,20,24 89:9 113:1 115:19,23 118:4 120:5 153:5 190:6,8 192:1 218:3,7,13,13 229:14,19 232:5,9 234:23 235:1 237:13,21,23 240:13 262:5
**parole** 206:3,6 207:5
**parolee** 205:6 206:14 209:22
**parolees** 204:25 205:10,12,17,18 205:24 210:7
**part** 35:18 38:14 47:17 54:10 60:5 60:8 76:11 79:14 84:5,8 90:23 93:7 94:11 96:2 102:7 103:3 111:24 113:8,23 126:19 137:16 138:1,6 167:17,18 176:11 184:24 186:7,11 186:14 202:7,7,10 202:13,14,15 206:15 208:13,14 209:2 211:10 212:5 213:24 217:8 222:23 234:5 263:3,7 293:19 298:2 312:4,16,25 315:7 315:13 326:20
**partial** 221:19 302:24
**partially** 300:15
**participate** 102:10 105:15 108:17 109:14 142:22
**participating** 27:2 32:6 112:5,6
**particular** 26:21 38:17 46:15 102:2 177:2 213:11
**particularly** 251:7 317:5
**parties** 4:17,20 200:10 343:8 354:11 356:12,14 357:8,11
**partner** 70:3
**partner's** 70:4
**parts** 188:10 265:15
**partying** 253:18
**passed** 77:5,12,12 87:16 103:7 328:21
**patch** 273:15
**paternal** 160:2
**path** 52:22
**patient** 124:24 125:20 130:12 132:4 142:21
**patients** 19:18,18 49:25 51:24 125:16,16,19 126:2,9 127:25 128:3,5 129:18,18 129:21,23,24 130:9 131:7 132:7 133:13 136:8 140:3,5 142:9 330:6,6,8
**patricia** 1:9 2:11 4:9 9:3 26:23
**patsos** 66:13
**patsy** 92:18 99:6 99:21 175:1 177:4 245:25 262:17 283:9 286:20 312:1
**paucity** 133:13
**paula** 318:25
**paulina** 23:13,14
**pawns** 267:6
**pay** 47:17,17 49:12 59:9,14 61:7,19 64:10,11 64:11,13,18,23 76:19,19 78:3,5,6 79:22 80:6,13 82:17 86:12,22 87:3,9,12 88:19,20 88:23 89:9 94:7 94:19,24 105:9 112:14,19 113:1,5 113:7,9,11,19,19 113:22,24,25,25 114:1 115:9,19,23 118:4,5 119:8 120:3,5 121:4,8 125:13 136:15,19 153:5 188:6 190:6 190:8,12 192:1,3,3 217:10 218:3,7,13 218:13 229:14,19 230:15 232:4,8

233:13,16,23,24 234:11,23 235:1 237:13,20,23 240:9,13 262:5 277:17 278:6 281:16 282:14 283:24 285:11,12 285:23 286:11 287:14 289:19,20 290:15,20,21 291:2,3 292:5 296:24 297:21 298:6,20,20 304:1 307:15,15 310:8
**paycheck** 136:22 285:24,25 298:24
**paying** 48:1 59:25 126:8 136:2 149:6 234:18
**payroll** 237:6,7 285:14 287:24 290:2 296:20 299:2
**paystubs** 3:22 155:17
**pc** 126:20 127:2 195:9
**pcs** 127:7 136:3 142:9
**pediatrician** 274:19
**pending** 9:5 11:2 93:4 220:14
**penn** 209:15
**pennsylvania** 200:19,23,24 201:14
**pension** 120:18 246:15 286:12 290:2
**pentagon** 328:21
**people** 49:4 67:23 68:3 95:20 99:6 99:20 102:21 104:7,8 113:14 164:21 166:6,19 167:8 173:24 177:17,19 181:3 182:1,17,23 183:11 185:14 187:19 188:15 193:24 209:4 214:19 237:17,18 240:18 241:18 245:5 247:9 248:9 269:8 298:19 303:13 306:25 307:4,20 312:2,18 312:23 313:1,23 314:5,15 323:18 324:3,9 331:14 333:23 334:17
**people's** 219:5 243:18 244:17
**percent** 84:18 205:25 308:24
**perform** 145:15 146:19 147:11 151:19,23
**performed** 141:12
**performing** 125:10,22 134:11 134:14,19,24 149:17 203:15,17
**period** 40:25 54:2 65:21 143:25 148:1 155:17 184:16 247:6 269:1,3
**periodic** 52:9 294:20
**periodically** 48:20 124:19 278:19 297:3
**periods** 210:23,23 291:3 298:21
**permanent** 252:25
**permissible** 215:23
**permission** 245:10
**permitted** 4:24 233:1
**perpetuating** 216:18
**person** 64:5 67:4 118:15 162:10 163:8,17 212:4,6 213:11 268:17,21 303:9,11 304:5 309:5,7,11 327:21 327:22,23 328:10 328:14 330:15
**person's** 309:8
**persona** 253:2
**personal** 97:21,23 97:24 154:18 223:15 307:5 311:14
**personally** 149:14
**personhood** 158:14
**persons** 1:11 4:11
**pertain** 167:3 243:15
**pertaining** 125:1
**pervasive** 48:1,3,5
**perverted** 340:10
**peter** 16:22,24
**petition** 350:16
**petitioned** 294:2
**petty** 296:16
**ph** 70:2 102:16,16 102:17 177:10,11 177:13 181:20,21 182:15 212:20 217:3 262:23 283:15 297:25 303:11,12 323:21 327:15 335:25 336:1 341:17
**pharmacologic** 148:12
**pharmacology** 147:23
**phased** 130:22 131:1 135:22 185:2
**phaseout** 130:20
**phasing** 135:24
**phd** 92:22
**phone** 6:19 7:5,7 7:13 8:8,21 42:15 42:20,23 43:2,7,13 67:6 100:12 118:15 163:9 215:2 245:9 303:8 303:15 308:19 321:7 347:17
**phrase** 44:9,10
**physical** 15:21 16:2 25:15 28:12 28:13,14,18 34:25
**physician** 19:15 47:2,5 48:11 59:24 60:6 63:14 63:16,16,17,22,22 76:15,20 78:19,20 79:2 80:2,7 86:24 92:22 93:5,7 113:21 167:22 187:4,12 188:3,24 189:10,19 201:24

202:4 208:10 218:16 219:7 233:22 234:10 243:14
**physicians** 48:2,2 95:10
**pick** 122:4,7,9
**picked** 230:4
**picking** 40:3 217:1
**picture** 329:18
**pictures** 42:22,23
**pills** 276:19
**pilot** 312:9,9
**pin** 215:12
**pinning** 21:22
**pinpoint** 17:11,15 19:7
**pit** 324:7,13
**pitch** 272:11
**place** 139:6
**plague** 306:2
**plaintiff** 1:5 2:2 4:7 5:12,15 68:10 68:12 219:11 239:14
**plaintiff's** 192:22
**plan** 69:2 162:23 163:10,19 164:11 350:22,24 351:1,2 351:4,10 352:5 354:21
**planning** 142:23 142:23 167:13 323:6
**plate** 329:9
**played** 97:13
**player** 177:11 214:23 296:18
**pleading** 203:12 249:22 250:1
**please** 5:7 9:16,18 9:20,22 10:10,12 10:23 13:24 14:23 17:12 18:12,21 23:5 24:25 25:24 25:25 26:3 32:4 37:8 43:11 49:16 58:14 63:18 66:14 80:20 86:6 97:10 101:16 105:22 106:6 109:6,19 116:19 117:15 119:24 132:22 133:22 137:14 139:3 144:23 156:25 157:7,16 162:6 168:24 169:14,25 170:9 170:14,18,25 172:2 173:21 174:11 179:25 180:12 181:5 191:10 193:1,14 196:11 198:6 201:19 206:8 215:17 216:1 219:16,19,24 220:25 221:6 223:23 224:3,23 225:17,18 226:19 227:13,17 228:6 228:11 229:22 232:23 238:10 243:2 250:13,16 254:6,7 258:11 259:24 264:17 265:9,9 287:18 288:7 289:8,22 291:4,10 292:14 309:17 313:13 316:3 325:15
331:8 337:17 342:17,22,25 349:10 352:18 353:23,24
**plenty** 171:4 299:14
**plethora** 213:20
**ploy** 94:20
**plus** 83:8 274:13
**point** 18:4 63:8 99:18 100:11 123:9 124:14,17 131:3 157:22 183:6,8 187:6 204:7,13 221:19 228:4 246:9 265:19 297:9,15 319:8 329:16 340:6 344:23 348:21
**pointer** 131:19
**points** 331:24
**policies** 294:4,6
**policy** 216:17 248:1,5,9 251:15 253:13 254:9,10 255:1 256:19 257:20 258:15,19 260:3,24 261:10 261:17,20 262:4 277:19 278:7 308:16 310:13
**political** 166:22 173:2,2,10 174:19 177:10
**politician** 329:22
**politicizing** 166:23
**politics** 290:5
**pool** 249:17,18 251:24
**poorly** 25:12 26:18,19 50:16 55:13
**population** 205:9 256:11
**port** 209:14
**portion** 171:1 217:17
**posed** 169:20
**position** 78:19,20 82:7,8 90:5,6,14 101:7 115:13 117:11 163:3 165:11,22 184:14 184:21,22 202:3,3 208:9 212:22 213:15 217:22 222:19,25 230:3 235:18 241:18 245:5 254:8 257:20 260:2 306:21 313:24 314:3,10 324:8 344:24
**positions** 93:12 185:5 191:15
**positive** 210:10
**possibility** 246:21
**possible** 146:23 196:14 257:15 270:20 273:25 321:8 323:2
**possibly** 14:24 94:12 184:20 222:2 230:8 260:10 261:25 295:1 302:23
**postings** 306:20
**posture** 281:24
**potency** 274:6

**potentials** 255:22
**potions** 275:3 276:16
**power** 189:23 190:2 329:23
**practical** 250:3,3
**practice** 17:6 18:1 19:8,17,20 20:7 48:3 126:15 135:22 201:12,13 216:17 247:25 251:15 253:12,19 254:9,11,25 255:7 255:10,23 256:19 257:16,16 260:3 260:24 261:10,17 261:20 262:4 277:19 278:7 291:18 307:16,24 308:16 310:7,13 330:4 342:20
**practices** 331:21
**practicing** 340:19
**practitioner** 19:10 28:7
**practitioners** 28:5
**prasad** 102:17 207:9,20
**prasad's** 206:23
**pre** 28:25 30:17 132:23 203:12 249:22 250:1,1 346:4
**precipitated** 253:6
**predictability** 210:24
**pregnancy** 302:9
**pregnant** 53:21
**preparation** 65:22 66:4
**prepare** 37:17 38:3 65:16
**prepared** 357:3
**presbyterian** 130:5 133:3
**prescribed** 32:2 33:7,12 275:7,8
**presence** 4:18
**present** 31:22 34:19 67:8 121:9 151:1 206:20 238:15,20
**presented** 213:5 232:5
**presentence** 203:12 249:22 250:2,8
**pressure** 173:23 174:9 175:14
**pressured** 231:2
**pressuring** 175:2 175:4,7,11 306:22
**pretty** 39:16 56:22 85:25 132:1 149:25 186:18 209:23 210:16 216:14 323:10 326:5 328:4 330:19,19
**prevent** 30:1
**previous** 35:12 80:24 130:25 188:6 255:5 302:19 304:11
**previously** 117:3 164:17 230:20 241:19 248:6 334:11
**primarily** 151:19 152:6 167:5
**primary** 17:6,23 19:8,15,16,19 54:25 126:14 148:24 287:11
**printed** 242:23
**printer** 8:22
**prior** 20:23 35:14 36:14 39:12 45:12 68:13 72:18 82:13 83:16,17 155:6 195:15 246:8 262:23 267:11 304:17 329:13 356:5
**priority** 173:3
**prison** 51:14,15
**private** 129:18,20 129:22 130:9,20 130:22,24 135:22 136:6,14 143:14 185:3 216:17 247:25 249:14 251:2,11,14,20,22 252:8 253:12,19 253:23 254:9,11 254:24 255:6,10 255:23 256:3,18 260:3,24 261:10 261:16,20 262:4 277:18 278:7 307:16,24 308:16 310:7,13
**privately** 154:22
**privilege** 11:3 67:13,15 125:14 156:7,12,12 157:5
**privileged** 72:1 156:17
**privileges** 123:20 125:14 135:5
**pro** 99:17 118:3
**probably** 17:24 30:17,18 78:18 87:14 220:4 258:23 278:18 352:21
**probation** 204:19
**problem** 8:2 26:13 39:14 45:6 64:24 152:23 153:15 234:7 236:4 251:14,23 253:4 254:24,25 260:17 273:9 279:21 287:4 290:7,9
**problematic** 99:18 100:4 213:13 240:15 251:5,6 258:15,19
**problems** 17:2,8 17:10 19:6 32:16 59:13 102:5 149:3 266:9 270:21 273:14 274:6 276:24 305:16,17 307:20,21 322:12 326:23 334:20
**procedural** 4:25
**procedure** 184:8 203:10
**proceed** 36:6 71:16
**proceeded** 282:9
**proceeding** 1:20 4:4,23 250:6 355:16 357:4
**proceedings** 356:3 356:5,6,9 357:6
**process** 102:5 167:9 173:9 174:8 174:14 233:21

323:1 326:16,21 335:15
**processed** 136:19
**produce** 299:23 319:9
**produced** 4:22 38:13 108:9,10 219:11 319:11
**producing** 319:12
**production** 136:22 136:25 138:22 141:20 298:5 320:4
**professional** 29:6 50:22 57:14 95:16 96:8 97:18 98:2 126:20,23 135:9 235:21 334:3 339:4 345:20
**professionally** 49:9
**professionals** 27:22 34:17 97:18 97:19,20
**profile** 321:6
**proforma** 331:1
**program** 158:12 324:2
**project** 312:9
**promised** 152:24 168:1 191:20 212:11 239:19 272:7 276:12 286:23 287:7 302:21 305:21
**promises** 231:25
**promoted** 101:17 204:10
**promotion** 101:1,4 101:9,20,22,23 204:14
**proper** 76:13 199:4 218:23
**properly** 333:13
**property** 160:24 209:16
**proposed** 199:2 238:25
**proposing** 99:8
**prosecution** 345:21
**prosecutors** 249:16 253:19
**prospective** 213:10
**protection** 91:24 246:24
**protocol** 275:2 276:3 280:23 281:2 300:2
**protocols** 274:23
**proton** 32:1,11
**prove** 287:13
**provide** 72:8 97:25 98:9 169:19 249:15 300:2
**provided** 225:5,7 227:25 228:1 319:24
**providing** 150:22 256:8
**provision** 314:19
**pscyhopharmac...** 140:3
**psych** 81:16,16
**psychiatric** 51:22 125:1 127:20 133:4,7 142:25 187:20,20 255:16 256:7
**psychiatrically** 185:14
**psychiatrist** 29:7 33:25 34:14 47:12 60:4,8 90:17,19,20 90:23 115:3,4 202:10,20 208:20 317:20 349:16
**psychiatrists** 47:9 108:15 111:18 129:20,23 167:18 209:3 212:21 263:2,3,3
**psychiatry** 45:20 47:9 48:17 53:18 59:7 60:21 93:7 163:2 165:12 201:2,4,5 202:22 216:10 244:9 293:22 306:19 334:16 340:19
**psychologist** 24:25 25:1,5 29:7 33:19 49:22 57:15 77:9 78:5,6 83:23,24,25 90:18 95:11 115:3 233:15 347:4,9,11
**psychologists** 76:6 77:23 78:7,10 80:16 81:15,19 84:4 85:3 92:25 95:10 111:18 209:1 212:21 253:15
**psychology** 49:24 76:8,8 78:11,12,15 78:15,25 79:1,7,8 80:1,1 81:17,21,21 90:12 92:23 321:4 321:6
**psychopharmace...** 146:4
**psychopharmac...** 142:5 148:14
**psychopharmac...** 140:1,7
**psychopharmac...** 142:6 146:5
**psychosis** 143:3
**psychostimulant** 275:21
**psychotherapy** 338:12
**psychotic** 187:22 334:18
**psyd** 53:3 92:22 207:11
**public** 1:22 113:12 167:11 253:3 309:1 315:7,15 351:11 356:1,20 359:19
**pull** 198:8 212:12 301:1
**pulled** 130:21 207:17 212:3
**pump** 32:1,11
**punch** 247:17
**punished** 88:24
**punitive** 236:13,18 236:21,22 247:21
**purpose** 34:24
**purposes** 7:3 30:25 108:8,12 109:15,22 174:19 301:25 324:24
**pursing** 317:11
**pursue** 76:18 341:17 343:4
**push** 64:13 86:21 293:20
**pushed** 87:2 327:5 335:20 340:15

**pushing** 190:12
**put** 7:3 42:15 48:19 102:2 137:14 141:21 143:5 156:24 168:9 170:25 201:14 215:11 220:23 221:23 226:1 239:11 242:13,15,17,17 248:12 262:22 274:3 275:10,14 275:15 294:16 295:16 296:8 300:19 301:2 306:25 311:8 317:6 318:7 342:9
**puts** 330:7 331:11 331:11
**putting** 282:12,12 331:21

**q**

**qualified** 48:13 356:7
**quality** 97:25
**quantify** 142:20 191:16
**quarter** 348:18
**queen** 49:1 105:11
**queens** 77:8 81:19 114:15 163:7 166:7 205:14 213:21,23 251:7 256:24 312:9
**question** 8:3,18 9:23,25 10:2,6,6 10:17 11:1 13:9 13:12 18:11,18 21:15 30:10 34:9 37:25 38:9 41:21 41:23 42:25 43:11 49:13 55:3 63:19 68:12 69:11 76:22 80:24 81:5 85:6 86:4 87:23 93:23 94:22 95:3 96:20 97:7,10 98:24 101:11,15,16 109:16,18,21,24 110:18,21 116:19 119:16,22,24 131:3 133:22 135:16 138:4,10 143:2 146:6 150:23 154:19 155:6,9 156:2,10 156:21,22 157:3 160:5 170:22,24 171:3,8 173:12 175:22 178:3,20 179:1,25 180:3,6,8 180:11,15,18 182:19 183:2,5,13 183:24 188:1,22 188:22 191:10 193:5,13,14,16 199:7,12 206:9,11 212:25 224:5 225:13 227:2 229:2 231:6 235:11 237:11 239:6 241:15,21 242:8,8 243:16 248:15 252:16 254:5,22,23 259:5 259:14 262:13 265:3 277:21 284:11 285:18 288:25 289:3,22 289:25 292:11,20 292:23 293:2 294:1 295:11 296:2 298:4 308:13 322:5 325:24 332:18 333:2,3,5 336:25 339:7 346:23 349:11 351:14 353:21
**questionable** 253:20
**questioning** 150:9 354:14
**questions** 3:14 7:24 8:2 9:7,19 12:9,19 26:17 27:21 49:10 59:13 81:8 101:15 121:23 128:1 157:11 168:11,19 168:23 169:9,11 169:11,16,19,20 169:24 170:20 179:11 180:24,24 215:21 249:2 254:2,3 264:21 285:15 287:7 292:17 343:10,13 352:1
**quick** 49:9,9
**quid** 118:3
**quiet** 260:6
**quit** 208:17 209:3 209:5 245:5 262:7 267:7 285:9 306:14 317:15
**quite** 21:1 66:8 76:22 127:12 167:10 248:25 250:10 314:13
**quitting** 247:7
**quo** 118:3
**quotations** 110:2
**quote** 260:12 314:17

**r**

**r** 2:1 3:20 4:1 13:25,25 34:23 49:17 303:12 321:9 358:3,3
**rack** 155:22
**radioactive** 304:1
**radtke** 357:2,15
**raise** 58:23 76:9 81:22 82:1,6 86:22 92:25 94:19 94:24 116:12 166:20 186:22 190:12
**raised** 176:14
**raises** 94:7
**raishid** 14:2
**raising** 58:21,22
**rambling** 349:24
**ran** 96:1
**random** 177:17
**randy** 303:12
**range** 64:11,13 78:5,6 79:22 190:13
**ranges** 78:3
**ranking** 99:6
**rash** 273:10,20 275:19
**rashida** 13:23 14:4 14:5,10 28:9 33:9 33:10
**rate** 187:23
**ratification** 297:2
**rationale** 227:8
**rattled** 163:12
**reach** 25:8 74:11 76:23 87:10 162:9

Melissa Kaye

**[reach - redacted]**

Page 50

193:22 329:10,11
**reached** 24:4,10
74:4 77:3,11
146:24 162:4,7
340:5
**reaching** 75:24
329:4
**reacted** 190:5
**reaction** 248:24
**read** 10:23 40:24
96:19 97:7,10
106:10 116:21
121:3 221:1,5
224:2,22 225:1
227:19,25 228:14
228:18 254:20
295:20 327:16
337:9,22 359:5
**reading** 116:18
295:20
**ready** 71:16
269:13,14
**reagan** 177:13
**real** 168:6 213:18
**realized** 255:4
310:17
**really** 25:14 29:19
42:17,17,24 51:14
94:25 95:15 102:7
103:3 126:15
132:24 135:25
150:10 151:16
172:12 177:17
184:25 186:18
208:15 209:2
211:3 244:18
249:21 253:9
254:14 260:19
272:3 274:15
296:5 300:25
303:7,19 328:10

331:4
**rears** 278:19
**reason** 14:25 15:9
16:24 25:6,8
39:14 52:12 61:4
68:22 121:23
154:1 155:22
158:2 234:3 242:4
248:17 251:23
265:20,21 299:25
300:4,6 307:10
322:24 326:7,20
350:23 358:6,9,12
358:15,18,21
**reasonable** 86:23
131:11,13 187:2
302:4,13,15 303:1
305:5,11,12,15
307:19 333:16
335:1
**reasons** 110:14
111:6 117:2
152:17 158:5
214:5 230:19
261:19 277:16
278:2
**reassured** 191:21
**rebecca** 328:23
**recall** 19:25 22:12
22:16 24:12,20
28:20 38:24 39:7
39:9,16,21 41:3,15
46:18 53:14,15,15
56:17 58:10,16
73:5,12,15 74:13
109:10,12 112:9
112:10 134:8
148:17 162:15
164:7 172:22
184:4 199:13
295:15,20 302:7,8

303:5
**recaptured** 240:2
**receive** 6:23 43:5,6
104:16,17 137:5
137:21 141:10,17
285:12 287:15
335:22
**received** 19:15
83:24 104:13
136:23 137:12
138:13,23 141:20
244:1,2 318:20
320:10
**receiving** 28:13
42:19 109:10
112:8
**reception** 347:17
**receptive** 187:16
**recognize** 321:12
**recollection** 40:21
74:3 161:25 171:9
171:18
**recommend** 33:20
33:24 34:3
**recommendation**
143:4
**recommendations**
148:14
**recommended**
25:19 30:24
**record** 4:4,5,20
5:7 13:24 14:23
19:3 23:5 37:8,10
37:11,13 40:12,13
40:15 71:12,13,15
97:13 100:3 108:9
108:12 109:16,22
116:21 122:15
131:20 150:14,15
150:17 156:24
157:7 161:12,13

161:15 198:20,21
198:23 215:15,20
226:9 227:5 245:3
245:14,15,17,21
257:6 289:8,9,11
289:12,14 299:13
301:18,19,21
315:17 319:18
320:1,4,12 324:25
330:9 341:23
342:17 352:16
353:24,24 354:1,4
354:5,7 355:13
356:9 357:5
**recorded** 5:2
356:6
**recording** 4:22
356:8 357:4
**records** 45:10
95:14,14 97:16,17
98:5,8,10,19
100:12,17 155:17
278:14,25 279:8
279:12,13 280:12
280:16,17 318:20
319:23 320:19,21
320:23 330:12
332:12,19,20
333:8,12,13,19,19
334:9,14 335:18
335:23,24 341:12
342:1
**rectified** 190:8
**red** 166:20 176:14
246:2 348:20
**redacted** 45:9
95:14 97:16,17
98:10,19 100:2,17
278:13,14,16
279:8,12,13
280:12 332:19,20

333:12,13,19 335:5,10,13,24
**reduced** 290:15,18 356:7
**reduction** 296:23
**refer** 54:5 251:11 329:21
**referrals** 251:2,20 251:23
**referred** 242:10 274:17
**referring** 38:15 45:7 187:19 215:13
**reflect** 299:13
**reflected** 238:5 240:15,18
**reflecting** 322:9
**reform** 346:4
**reformer** 331:23
**reformers** 340:13
**reforming** 340:12
**refresh** 112:12
**refusals** 176:3
**refuse** 333:7 334:24,25
**refused** 105:4 175:8,25 176:5 214:1 332:21
**regarding** 61:7 65:21 71:23 72:12 99:12 182:23 183:9 199:15 205:24 215:6 261:19 289:19
**regardless** 165:21
**regular** 51:9 150:1
**regularly** 149:18
**rehab** 34:25
**reimbursed** 284:1
**reiterated** 93:2
**rejected** 89:1,8
**related** 21:25 28:22 33:8 86:10 93:4 204:18 214:6 280:11 326:15,15 334:15,20 338:18 341:25 345:6 356:11 357:7
**relates** 245:9
**relation** 69:1,16 115:23 143:1 241:2,5 303:18
**relations** 290:25 299:3
**relationship** 251:2 328:17
**relationships** 250:24 253:22,23 253:24 345:19,20
**relative** 113:10 260:7 356:13 357:10
**release** 23:22 262:1 277:18 278:8 310:8 320:17,18
**released** 314:22
**releases** 99:17 261:23 341:12
**relevance** 336:23
**relevant** 69:10 104:6 157:4 337:7
**reluctant** 306:4
**remained** 112:16
**remaining** 226:10 233:7
**remember** 20:5,7 28:9 32:2 33:12 35:9 38:17 39:4 39:13 48:22 56:5 58:1 60:4 63:12 70:4,5,12,13,20,21 88:17 89:16 102:19 126:23 127:4 147:24 163:7,8,15,17 182:12 185:19 186:12 193:15 209:5 213:17 243:20 267:22 269:21 283:17 294:13,22 300:25 312:8 328:3
**remembering** 338:3
**remote** 1:20 302:24
**remotely** 4:18
**render** 143:4 335:1
**rendered** 126:2
**renew** 127:22
**renewed** 127:24 135:4
**rent** 160:16,19,20 160:24
**rented** 160:17
**renting** 161:1
**rep** 290:6
**repeat** 12:5 17:12 24:8 26:3 30:7 32:13 58:15 63:18 105:22 107:5 116:5 117:15 122:6 138:10 144:23 149:11 157:16 169:14 172:2 181:18 198:6 201:19 206:8 215:17 218:9 219:19 223:23 226:19 238:11 243:2 250:16 258:11 276:8 280:6 287:18 316:3 349:11 352:13
**repeated** 281:14
**repeatedly** 168:1
**rephrase** 191:10
**replace** 30:25
**replacement** 212:13 290:10
**report** 42:3,5 45:17,22 48:8 145:10 167:8 202:19 216:24,24 235:22 236:12 307:1 308:25 309:3 323:17
**reported** 1:22 42:4 45:16,18 105:9 202:21 236:8,12 236:14,20 247:21 261:1
**reporter** 4:2,3 5:16 9:13,15 10:21 11:22 13:6 13:10 17:12 24:8 25:22 26:4 27:14 27:17 29:23 32:12 37:9,12 40:11,14 41:8 50:7 57:22 58:14,18 63:18 66:14 71:11,14 73:10 74:24 77:17 77:19 80:20 85:13 97:12,13,22 105:22 106:6 107:3,5 116:5,9,20 116:21 117:15 122:6 125:4

133:22 137:24 144:23 145:19 149:11 150:13,16 156:25 157:16 161:11,14 169:13 170:15 172:2 177:7 180:12 181:17 198:5,19 198:22 199:22,24 201:19 204:2 206:8 215:16 218:9 219:18 223:21 224:14,23 226:19 227:3,21 232:15,18 238:10 243:2 245:13,16 249:24 250:15 256:13 258:11 259:24 264:17 276:8 280:6 284:18 287:18 288:25 289:10,13 291:4 293:7 295:8 299:19 301:17,20 308:12 309:17 313:13 315:11 316:3,10 318:11 319:25 324:19 325:15,21 342:14 342:23 348:11 349:10 352:12,17 353:5,18,22 354:2 354:6 355:12
**reports** 251:16 260:10
**represent** 9:1 85:3
**representation** 177:19 262:1 291:12
**representative** 46:17 283:15
**represented** 69:23 70:1 71:19 72:19 83:18
**reprimanded** 311:17
**request** 39:11 94:23 121:19 299:7,16 302:13 302:18 303:1,18 304:10,11 305:11 309:23 320:11 345:13 355:6
**requested** 69:6,7 97:14 116:22 137:15 155:16 234:9 302:2,4 356:23
**requesting** 320:16 326:25 354:14,22
**requests** 142:4 302:16 321:13
**require** 148:25
**required** 152:20 205:22 268:10 271:6 285:24 359:13
**requiring** 20:12
**reschedule** 329:1
**resented** 56:24 57:3
**resentful** 57:7
**reserved** 355:14
**residency** 200:23
**resign** 132:23 246:11,19 306:15 306:18 317:16 344:19,24
**resignation** 144:5 306:17,23
**resigned** 89:15,22 89:24 120:12,13 132:24 171:9 215:9 216:5
**resigning** 247:7
**resistant** 296:18
**resolved** 120:7 277:11 287:23
**resolving** 70:21
**respect** 112:14 150:23 278:10 330:3,14
**respected** 45:4 57:15 345:22
**respectful** 235:20 235:25
**respective** 60:3
**respond** 8:17 106:1 109:7
**responded** 47:7 299:12 317:10 330:18
**responds** 109:5
**response** 14:17 60:18 76:24 109:20 155:6
**responses** 319:10 354:18
**responsibilities** 79:18 124:20 127:11
**responsibility** 98:2 180:23
**responsibly** 290:12
**rest** 154:5 224:2 224:22 225:2 340:17
**restore** 195:6,6,7 331:3
**restored** 39:11 272:7
**restroom** 10:13
**resubmitted** 295:17,23
**result** 69:4 281:10 282:17 294:2 305:11 338:19,21
**results** 255:23 346:2
**resume** 124:13
**retainer** 73:2,13
**retainment** 73:6
**retaliated** 44:25 100:24,25
**retaliates** 332:9
**retaliating** 236:7
**retaliation** 188:5 189:1 192:2 206:16 211:11 233:19 278:1,9,11 281:12 285:4 290:3 307:6,19,23 313:18 315:14 333:24 339:24
**retaliatory** 189:7 239:2,5,8 242:5 247:15 261:18 265:22 266:25 272:2 277:15,17 277:21,22 278:3 281:10 285:5 286:22 305:8 329:7 339:3
**retarded** 139:15
**retention** 93:4 115:9 233:25 297:24
**retire** 246:11,15 246:18
**retirement** 323:1
**retiring** 247:8 323:6

**retroactive** 121:1 121:2 298:17
**retroactively** 281:5 282:18 283:8 294:25 295:3,19
**return** 304:11
**returned** 302:19 305:7
**returning** 304:17
**revealed** 235:9 237:11
**reverting** 317:14
**review** 37:21 38:2 66:7 124:25 127:22 195:17 199:9,11 326:4 330:10 356:23
**reviewed** 38:18 44:8 195:19,19,20 238:5
**reviewing** 65:13
**revved** 275:21
**rho** 34:23
**rid** 233:19
**ride** 270:5,7
**ridiculed** 192:7
**ridiculing** 323:17
**ridiculous** 88:23 252:1 295:2 345:15
**rigging** 310:19,20 310:23,24 311:5 317:10 335:15
**right** 7:15 8:5,23 8:23,24 21:10,10 22:21 27:20 29:1 35:14 40:16 46:21 52:20 54:9 59:10 64:12 71:10 87:14 91:11 95:19 101:7 105:17,19 106:19 107:21 120:8 121:12 123:3 130:6 131:18 136:21 138:21 141:19 146:11,14 157:10 178:4 190:22,23 192:11 194:2,9,9,25 195:2 198:16 199:19 215:5,9 216:21 217:8 218:19,19 218:21 219:10 225:14,20 230:22 232:14 233:3,3 235:5 236:11,25 237:9,22 240:12 247:12,18 252:3 252:15 256:5,12 259:2,12 261:3 266:17 270:14 271:2,16 277:5,12 279:6,6 280:18 281:7 289:2 291:10 294:7 298:4 299:13 301:4 318:8 319:12 335:14 344:13 346:10 348:9,9 355:10 346:3
**rights** 74:19,19 97:20 99:5,12 100:1 166:25 174:8 175:16 233:21,21 257:15 262:2 336:12
**rikers** 51:18 153:9 167:6 175:1 185:15 187:19 205:13,13,15 313:24 315:25
**risk** 35:6,11,11,13 98:20
**rob** 202:25 203:1
**robert** 95:23 202:22 303:12
**robin** 246:2
**role** 54:1 59:5 124:5,7 164:24,25 165:3,5 167:21 213:24 219:8 230:24,25 312:1
**roles** 187:14
**roll** 217:7 279:18
**rolled** 92:23 222:20 231:16,21 247:1 266:15,19 276:12 281:15 305:21
**rolling** 93:11
**rollover** 222:18
**ronald** 303:13
**roof** 345:6
**room** 36:10 99:20 129:5 336:3
**rooms** 128:5 336:10
**ross** 26:23 248:1
**rotating** 293:23
**rotator** 15:12
**round** 125:20 130:8
**rounding** 129:18
**rouse** 262:25 263:1,18
**routine** 28:7 281:14
**row** 70:11 291:3 298:21
**rubber** 273:22
**ruin** 330:11
**rule** 80:12 257:17
**rules** 5:1 76:12 80:8 282:20 316:17
**rumbling** 57:8 164:1
**rumor** 223:17 245:24 246:6 247:7 333:23 334:5
**rumors** 246:1 247:10 333:24
**run** 103:25 277:5 277:6 291:1 298:22 345:9
**runaround** 48:15 77:14 119:5
**running** 214:9 318:9
**runs** 136:18
**ruthless** 262:18

**s**

**s** 2:1 3:5,20,20 4:1 13:25 23:7,7 49:17 66:16,16 90:15 95:22 157:17 334:8 358:3
**sabatino** 1:22 4:3 9:13 11:20 12:4 356:2,19
**sabotage** 285:6 345:17
**sadistic** 265:22 272:2
**safety** 30:25
**saint** 2:6
**sake** 224:12
**salaried** 130:1,11 130:14,21 133:8

249:16 251:20 252:7
**salaries** 46:8 77:10 115:11
**salary** 64:20 78:14 113:3,8,10,13,16 113:23 115:10 125:13 190:13 234:1 290:15,18
**saldana** 70:2
**santamaria** 283:15 286:16
**sarah** 102:16
**satisfactory** 120:6 120:7
**satisfy** 272:1
**saturday** 129:8 152:14
**savvy** 42:17
**saw** 18:4 21:11 22:12,20 23:2 28:7,8,19,21 29:4 46:12 60:10 80:16 110:23,25 132:6 214:25 244:3,12 346:1
**saying** 48:15 58:1 61:23 86:21 101:24 128:19 136:7 147:5 154:17 157:2 178:24 192:24 214:14 215:22 216:3,6,7 218:1 223:7 226:16 230:12 239:22 250:11 251:15 256:3,6 257:22 258:7,14 259:7 264:19 306:4 307:4 313:15 314:8,13,16 348:6 348:9
**says** 9:15 109:2,5 109:19 200:25 220:12,22 320:14 330:7 342:7 344:16
**scale** 79:10
**scapegoated** 45:3 278:13,22
**schedule** 24:7,12 56:10,13 57:7 121:24 300:19
**scheduled** 86:15 328:22
**scheduling** 321:23 351:10
**schlep** 270:10
**schneider** 208:19 208:23
**school** 20:23 43:19 43:23 44:4 68:8 266:9 267:17,18 267:19,19,21 268:8,12,13,23,24 268:25 269:2,3,12 269:15,20 271:13 272:11 294:17
**scientifically** 274:24
**screen** 107:11 194:15,21,22 195:3,3 272:23 337:20 346:13
**screening** 29:2 250:4
**screw** 260:15,16 260:19
**scroll** 196:13 200:2 219:24 221:14 224:3 225:11 228:21 351:7
**scrolling** 224:17
**scrutinizing** 287:2
**scuttlebutt** 223:17
**season** 300:18
**seasoned** 96:5 334:12
**sec** 25:22
**second** 35:22 40:7 52:14 80:22 97:12 106:21 123:16 129:10,11 150:6 150:11 182:16 214:21 225:22 265:9,9 288:5 344:14 353:18,19 353:22 354:2
**secondly** 191:7
**secretary** 181:23 182:14 297:25
**secretively** 172:8
**section** 200:13,13
**see** 7:22 14:4,25 16:24 20:13 21:7 21:8,21 22:1 24:15,19 33:24 43:19 51:9,23,24 52:12 94:24 102:24 108:21,23 109:2,23 124:24 125:15,20 127:23 194:17,21 196:15 197:4,20 206:21 222:15 243:21,21 244:6,19 280:22 292:21 315:21 321:18 337:14,17 337:18 343:23 347:21 348:5 351:7
**seeing** 13:5,22 14:7,20 16:6 17:4 17:8,9,21,23 18:8 19:5 21:4 22:9 24:2,17 25:9 31:10 33:2,15,18 49:25 186:12
**seeking** 184:17 191:14 326:21 338:17 339:13,20 341:1,20,25 343:21
**seen** 16:11,17,22 19:14 21:16,19 22:25 27:23 28:1 28:2 34:18,23 243:10,16 248:5 248:21,22,24
**selling** 275:6 331:23
**semi** 230:25
**seminar** 322:25
**send** 36:5,5,23 48:21 88:15 111:13 118:21 162:10 213:22 214:20 291:1 309:21 318:10 326:5,7 351:4,17 351:21 352:4,7
**sending** 42:23 109:10 131:21 326:25
**sends** 350:23
**senior** 95:17,21 105:13 279:3
**seniority** 48:13
**sense** 149:8,12,13 174:14 252:4 275:8 340:20 348:23

**sent** 53:20 60:13 60:16 87:6 107:10 107:15 108:2 111:14,20 112:11 112:25 118:18 128:3 133:9 215:2 217:24 218:1 221:7,9 225:12 234:22 235:1 242:11 243:18,24 290:11 299:3 318:11 321:13 329:17 330:16,24 351:16,18 352:10 352:14
**sentence** 225:23 344:18
**separate** 76:11 79:13,21 103:24 104:21,24,24,25 105:1 113:20 225:12 286:2
**september** 72:9 139:22,23 145:14 283:16,16 286:17 287:8 308:3,3,6 346:19,21
**series** 219:10
**serious** 213:25
**seriously** 45:4 49:12 60:20 119:4 296:19 310:18 339:4 345:23
**servant** 113:12 167:11
**serve** 174:17
**served** 198:2
**service** 51:19 82:21,22,23 83:14 87:19 126:13 175:5 211:24 212:3,10,12,14 214:8 249:16 286:2 305:19
**services** 126:2 141:6,8 166:7,13 256:8 274:14 337:25
**session** 321:8
**sessions** 324:22
**set** 76:11 157:11 196:12 200:4 294:22
**setting** 200:4,10 249:9 255:21
**settlement** 343:8
**seven** 169:7 282:13 288:11 340:5 343:12 350:12,12
**severe** 273:13
**sex** 44:17,21 58:7 96:1 120:23 334:10
**sexist** 278:12
**share** 36:8 178:20 179:3 180:9 194:9 272:23 318:19 324:4 327:9 346:13 353:9
**shared** 45:1 178:16 179:22 181:1 184:7 311:14 322:14
**sharing** 187:18 198:25 260:14 307:4
**she'd** 48:18,19 349:19
**she'll** 171:4
**sheets** 286:24
**shew** 230:2
**shift** 39:8,11 121:13 127:22 128:12 129:2 153:7,17 154:17 164:13 199:15,16 214:6 247:14 261:18,21 262:6,9 262:16 263:4 266:13 267:10,11 267:12 271:17 272:2,13,22 273:1 275:13,24 276:12 277:13,22 278:3 278:10 286:21,22 302:19,20,23 303:6 304:10,11 304:17,24 305:1,7 305:8,10,20,23 306:7 307:12 317:24 318:3 323:12 331:3,9 347:25
**shifted** 54:2 136:12
**shifting** 154:1
**shifts** 124:17 127:9,15 128:21 129:8,13 138:17 138:19
**shock** 172:10
**shocking** 328:5,9
**shoot** 49:10
**short** 10:16 71:6 142:3 261:12 331:17
**shortly** 61:3 111:21 327:17
**shot** 247:5
**shoulder** 15:7 28:15,22 35:1,2,13 35:15,19
**shouldn't** 286:8
**show** 105:17 106:19 192:11 217:23 234:24 272:23 282:8 351:8
**showed** 110:10 224:8 282:8 290:18
**showing** 36:14 197:24
**shown** 95:5
**shredder** 347:23
**shredding** 192:8
**shrugging** 47:7
**shuffles** 103:5
**shunned** 105:3 111:25
**sic** 14:2,24 23:7,13 32:7 49:17 220:24
**sick** 273:2
**side** 29:21 30:1,19 30:23 31:4 32:23 270:6
**sign** 70:19,23 344:16
**signature** 355:14 356:17 357:14
**signed** 70:15,24 73:13 320:18
**significant** 113:6
**significantly** 47:3
**signing** 99:17 261:25
**similar** 78:18 204:20
**similarly** 51:22 100:2 136:2 330:20 334:21

**simple** 345:13
**simply** 295:4
**simultaneously** 247:23 252:3 274:7
**single** 153:22 221:19 317:23
**singled** 100:22
**sir** 29:13
**sit** 310:3
**site** 167:7 264:5,9 264:10
**sites** 327:20
**sitting** 213:21 281:23
**situation** 19:24 25:10 27:7 46:23 53:24 77:4 94:13 116:1,6 122:5,9 147:25 179:16 226:14 247:4 249:9 280:13 291:19 334:3 337:4 339:11 340:25
**six** 63:4,4 121:1 167:23 214:24 218:4 270:14,15 282:15 283:24 336:5
**skills** 356:10 357:6
**skillset** 287:1
**skimmed** 38:20 66:20,20,21
**skin** 275:10 276:20
**skip** 217:14
**slated** 77:6
**sleep** 266:10 275:12,14,18,22
**slews** 297:7
**slippery** 168:6
**slips** 136:22
**sloppy** 331:20
**slow** 9:16 131:22 210:20,21
**slower** 291:4
**small** 194:14
**snake** 324:7,12
**snubbing** 98:9
**soap** 274:1 277:1
**social** 23:2,3,8,11 25:4 29:4,6 56:20 133:11 331:23
**socializing** 253:17
**sociopath** 56:6 58:2
**soft** 306:25 307:4 307:20
**softspoken** 26:8
**solanki** 108:24
**somebody** 236:2 303:13
**someone's** 42:22 333:15
**someplace** 214:21
**son** 68:25 69:8 267:16 271:23 273:2,5 276:15 300:3 327:22 336:20,22 337:3 337:25 339:10 341:12 342:6,8
**son's** 301:6 302:1
**soon** 71:6 191:25 344:19
**sophistication** 287:1
**sorry** 7:11 13:6,11 14:17 19:13 23:17 24:8 26:9 30:7 32:12 37:24 40:7 42:23 45:17 57:22 58:14 62:10 63:5 69:5 71:2 80:20 81:11 82:5 86:3,8 96:16 97:2,6,7 106:2 107:3,7 112:3 114:17 116:5,14,15,16 130:2 132:13,16 132:20 133:23 138:9 139:2 146:5 147:21 149:11 150:25 155:2 156:25 158:23 160:4 162:6 169:4 169:13,17 170:15 170:15 177:7 179:20 180:12 181:17,17 198:5 200:7 201:20 204:2 206:9,10 208:22 215:16 218:9 219:18 222:9 223:5,21 224:14 227:3,3,5 227:21 232:3,15 238:10 245:8 248:14 250:12,15 256:13,22 259:25 263:13 264:17 265:11,12 276:8 280:6 284:18 289:23 290:17 293:7 295:8 296:4 299:19 308:12 313:13 315:12 316:11 319:25 324:4 325:19 330:23 337:16 342:14,23,23,24 346:15 348:6 349:10 352:12,17 353:5
**sort** 200:11 271:8
**sought** 80:14 193:18
**sound** 236:13,19 324:9
**sounded** 304:3,3
**sounds** 177:22 221:15 223:12 324:6 329:24
**sources** 143:19
**southern** 1:2 9:6
**span** 147:24 148:9
**speak** 9:16 11:2,23 40:22 67:20 79:17 80:20 85:9 86:9 86:12 88:2 110:9 117:25 118:1 153:10 156:25 162:6 169:5 182:4 183:8 214:1 217:6 227:6 247:9 259:24 291:4 309:5 313:13 351:23
**speaking** 65:14 94:6 120:21 163:24 216:6 233:20 235:3 237:13 320:1 346:6 353:6
**speaks** 110:23 333:22
**special** 2:3,4,7 5:11 71:19,22 72:11,18 344:16
**specialist** 20:13 47:2,5 48:11 59:24 60:6 63:14

63:17,23 76:15 79:3 80:2,7 86:24 113:21 167:22 187:5,13 188:3,24 189:11,19 208:10 218:16 219:7 233:23 234:10
**specialists** 76:20
**specialized** 274:18 338:11
**specializing** 18:1 19:17
**specialty** 274:20
**specific** 16:14,20 25:11 31:18 58:17 79:22 128:11 206:18 256:7 295:24
**specifically** 53:16 54:5 55:2 62:1,5 93:10 102:15 105:2 111:22,24 147:6 152:25 174:21 183:16 185:19 187:4 203:6 222:11 252:22 255:15 261:9,10
**specifics** 205:2
**specify** 63:5 143:25
**speculation** 349:13
**speculations** 349:7
**spell** 13:24 14:22 23:5,6,15 32:4 49:16 66:14 73:10
**spelled** 32:13
**spelling** 32:6,15 90:16
**spent** 292:6 293:15
**spite** 233:19
**split** 70:3 302:23 303:6 304:10
**spoke** 55:5 60:23 67:3,18 85:10 87:24 116:11 118:14,14,18 181:12,22,22,24 181:24,25 182:6,7 182:8,8,11,14,17 182:17,22 183:12 183:25 184:12 216:9 237:15 239:21 268:17 298:18 309:7 331:15
**spoken** 334:2
**spreading** 247:9
**spreadsheet** 60:10 60:11
**spy** 348:5 349:2
**spying** 348:21 349:21
**square** 3:23 123:13,19,21,25 124:6 126:6 128:8 129:11 130:17 132:13,14,16 133:1,21 134:1,6 134:14,19 136:1 137:6,12,22 138:13,24 139:5 143:9 146:8,13 147:7 149:17 150:24 151:18 154:20
**squinting** 337:16
**squirming** 222:13
**stadium** 271:1
**staff** 26:20,24 54:11 56:9 57:4,7 124:25 125:17 128:1 131:6 187:23 188:15 207:3,8 208:13,18 209:18 211:13,14 211:21,23 212:4 213:21 267:7 323:16 331:12,12 345:9
**staffed** 207:20,22
**staffing** 52:1,5,9,9 52:15 214:16
**stakeholders** 178:17 249:13,15 255:17,20 256:8 345:20
**stamp** 107:24 219:12 324:25
**stamped** 196:23 196:24 320:24 322:20 325:8 326:2,14 329:17 336:18 346:14 350:21
**stamps** 319:6
**stand** 203:11 340:9
**standard** 330:13 330:13
**standardized** 108:18
**standing** 275:16
**stands** 48:3 207:10 244:8
**start** 10:5 14:7 17:4,9 18:8 19:5 24:2 25:9 27:6 30:10 81:5 101:3 139:16 199:17 224:23 264:1,17 267:19 299:20 347:17 352:18
**started** 6:18 17:21 17:23 27:10,12 30:5,8,16 76:4,4 83:7 101:2 123:24 124:16,18 129:15 129:16,25 136:1 136:13,14 173:4,7 192:1 193:19 215:2 217:1 236:7 237:2 248:25 253:3,9 254:16,17 254:18 267:21 273:23,24 274:25 278:19,21,23 281:4,13 284:23 301:3 306:13 326:23,24 328:13 348:23
**starting** 140:10 317:11
**starts** 103:7
**state** 6:6,11,12 74:18 174:3 201:13,14 313:4 314:19 329:21 340:4 356:21
**stated** 160:11 256:18 338:25
**staten** 114:21,23 114:25
**states** 1:1 25:2,5 174:18
**statins** 33:11,13
**station** 209:15
**statistics** 312:12 340:11

**status** 201:15 264:23 297:23
**statute** 204:24 205:5,24 210:6
**stay** 93:2,12,15 96:14 129:4 153:8 153:12 167:13,25 168:2 184:25 185:7 186:2 191:17,24 211:17 220:16 225:24 229:4 230:12,23 230:24 231:24 233:2 266:16 272:10
**stayed** 70:3
**staying** 246:21
**stems** 273:9
**stenographer** 354:10
**stenographic** 5:3
**step** 279:22
**stepped** 90:4 345:25
**steps** 162:25
**stern** 216:23 236:8 236:17,20 247:20
**steroids** 274:3,6 274:17 275:20
**steve** 48:12 59:23 60:1 64:19 86:23 89:9,12,14,15 100:5 112:18 113:2 117:8 119:7 120:3 187:7 208:5 218:8,14 219:6 222:23,25 223:9,9 233:23
**steven** 46:2 74:10 74:16 75:3,17 177:13
**stipulate** 5:15
**stipulation** 5:4,13 341:24
**stipulations** 5:10 7:18 91:3,9
**stop** 35:21 80:15 80:19,19 123:15 129:9 170:14 217:4 225:17,18 225:19 236:11 254:1 265:11 271:1 279:11 288:5 291:10 313:6 315:16 316:2 336:14 342:22 346:10 347:8
**stopped** 124:7,8,9 124:11 129:10,13 131:12 148:17 151:4 346:6
**storm** 332:11
**stormed** 99:7 102:1,21
**straight** 252:12 349:22
**strain** 25:13
**strategic** 104:5,18 104:20
**street** 2:15 86:11 128:8 129:5,6 153:4 237:16,16 263:13 283:22
**stress** 20:17 21:3 25:20 322:15 338:1 339:25 340:8 345:5
**stressed** 25:10 27:6
**stressful** 27:4 154:1 193:20
326:10
**stressing** 337:5
**stressors** 322:18
**strict** 152:19
**strike** 138:1,3,5
**strong** 248:22 249:3 345:19
**strongly** 329:25
**structure** 189:25
**structures** 233:13
**students** 68:7
**studied** 274:24
**studies** 158:12,15
**stuff** 71:4 131:23 269:18 274:2 283:11 287:2,5 302:9 306:10
**style** 49:11
**subject** 38:24 220:8 321:8 329:22 350:22
**subjected** 192:2
**submit** 353:10
**submitted** 260:10 294:15 352:22
**subordinate** 317:6 318:7
**subpoena** 335:23
**subpoenaed** 319:10
**subpoenas** 319:11
**subscribed** 359:14
**subsequent** 210:13 210:14 238:19 287:24
**subsequently** 179:6 199:10 286:12
**subspecialty** 334:17
**substance** 65:10 334:22
**substances** 12:13 12:16
**substantiate** 315:17
**successful** 312:13
**succinct** 81:12 97:8 285:16
**suck** 48:6
**sudden** 240:13
**suddenly** 163:9 164:12 240:11 253:4 262:20,21 263:25
**sue** 68:22 70:10
**sued** 68:13,16 325:10
**suffer** 273:5
**suffered** 275:18 290:3 339:3,7,24 341:3 343:23
**sufficient** 211:13
**suggest** 7:18 115:22
**suggestions** 248:12
**suggestive** 173:16
**suggests** 221:25 229:6
**suing** 297:15 322:13 326:9
**suitable** 169:23
**sullivan** 21:20,21 22:9,13 30:5,8 33:9,15
**summary** 111:2
**summer** 130:15 131:4,9,12 132:1 151:11

**sunday** 129:8
**super** 153:25
**superiors** 183:21
**supervision** 311:9
**supervisor** 75:20 188:18 235:25
**supervisors** 182:5 236:1
**supplement** 30:1
**supply** 277:3,10 277:10
**support** 26:24 56:8 88:19 235:18 326:11 327:3
**supported** 57:13 57:14 335:3
**supporting** 332:7
**supportive** 49:8,9 49:14 331:13 338:12
**supposed** 29:21 36:2 73:23 144:16 174:17,19 213:23 225:5 251:9 275:2 275:11 296:25 297:2,6 298:23 301:8 305:8 319:9
**supreme** 95:25
**sure** 6:21 7:23 28:6 42:24 49:16 49:17,18 65:11 81:18 84:18 89:18 107:9 110:24 130:23 139:3 147:20 167:11,14 168:14 171:4 195:11 197:2,3,8 201:21 214:9 245:3 257:5 281:1 288:6 300:25 337:6,11,11 350:9 352:15,20,23
**surgeon** 47:12
**surgeons** 47:11
**surgery** 15:5,7,15 15:22 16:3 28:15 28:16,22 47:8 131:13,17 132:2 132:11
**surgical** 15:3
**surname** 158:17
**surplus** 133:12
**surprise** 172:10
**surprised** 246:5 321:18
**surreptitious** 166:17 171:22,23 172:15 192:3 286:11
**surreptitiously** 291:5
**surveillance** 349:8
**suspicious** 307:8
**sustained** 343:14
**swarm** 245:24
**swear** 4:17 5:17
**swenson** 26:22 240:25 241:16 242:11 283:21 323:16 345:9
**switch** 164:16 186:24 216:15 266:24
**switched** 82:22 130:13
**switchover** 19:25 77:6 237:5
**sworn** 4:20 5:21 356:5 359:14
**symptoms** 334:19 345:6
**syndrome** 20:17 20:21 21:5 345:5
**system** 30:24 46:11 154:3 174:9 176:10 184:9 192:5 208:14 262:21,24,25 265:18 267:6 281:17 284:10,13 284:25 287:9,12 290:23 340:10
**systematic** 194:6

**t**

**t** 3:5,20,20 32:7 66:16 73:8 157:17 257:2 358:3,3
**tabulation** 301:8
**tactics** 166:5
**take** 4:4,15 9:14 10:12,17,21 11:13 29:20,21 31:2 32:18,22 33:20 34:13 39:17,25 40:6 43:18 59:19 60:19 71:5,7 76:3 82:4 92:7,11 107:23 115:22 121:15 127:20 137:2,13,23 139:2 141:23 150:6 154:11 155:19,23 157:11 161:5 165:19 170:16 171:10 188:4,13 191:22 194:6 195:21 198:16 214:5 231:2,12 245:11,12 263:6 267:4 268:11,23 270:15 276:19,22 285:11,19,24 298:7,9 299:25 300:5,20 301:6,14 310:18 319:22,25 341:22 346:16 350:20 355:3
**takeaway** 57:24
**taken** 4:7 12:13,16 31:14,22,25 33:11 33:11 45:4 46:13 47:14 77:7 85:21 86:1 107:11 117:12 119:4 162:25 185:23 186:1,3 220:22 221:23 226:1 296:19 300:7,12 301:25 302:2 347:25 356:3,12 357:9
**takeover** 89:17 92:15 94:17
**takes** 277:5
**talk** 48:16 52:21 60:20 102:4 103:8 103:21 107:6 124:24 128:4 161:21 163:12 170:4,6 214:3 217:18 220:13 225:25 226:7 227:4 229:3 237:24 240:22 254:4 267:10 281:7 294:7 303:7 317:22 318:14 321:21 323:24 327:7 352:21
**talked** 28:13 37:19 61:15 78:4 85:19 91:15 116:3,7 117:20 146:25

226:18 229:8 269:6 278:16 279:15 303:22,22 303:23,24,24,25 306:9 309:14 324:18,21
**talking** 10:15 62:13 81:1 101:9 103:17,24 113:9 119:9,19 123:10 146:1 147:7,8 156:13 170:14 177:2,2,4,5,5 181:3 215:6 223:22 225:16 226:5 227:4 252:18 254:16 255:12,15 260:25 264:13,14 265:4,6 268:22 272:21 277:21 282:19 286:4,5,16 299:23 301:24 311:12,23 331:14,14,24 347:5 349:19 352:11
**talks** 217:9 313:17
**target** 100:18 252:25
**targeted** 45:6 111:9 262:5 278:11 340:15
**targeting** 340:8
**tasha** 177:10
**taskforce** 104:2,5 104:18,20
**tasks** 203:23 204:3
**tat** 228:4
**tax** 136:24 141:10 155:17
**taxes** 149:7
**tcm** 275:15 300:2
**teachers** 268:25 269:4,5
**team** 132:10 214:23 296:17 312:5
**tear** 15:12
**teased** 323:15
**tech** 42:17,17
**technicality** 354:24
**technically** 250:8
**telephone** 67:4,18 162:10
**tell** 5:22 9:18,22 26:3 46:24 53:20 53:21 55:1,12,18 57:11 62:1 64:4 68:2 118:18 119:3 155:18 176:20 179:13 220:25 226:4 254:23 266:5 290:7 303:17 304:16 316:21 335:7 336:9 346:8
**telling** 75:21 115:18 154:2 188:17,19 225:25 226:9,15 240:25 253:13 291:7 296:8 330:19
**tells** 228:18 332:10
**temporarily** 70:3
**tempted** 6:23
**ten** 153:23 206:17 282:5 348:18
**tendencies** 105:11
**tendonitis** 35:8
**termination** 111:9
**terms** 203:7 209:19 210:16 238:21 250:3,3
**terrible** 267:3
**terrific** 198:13
**terror** 262:7
**testified** 5:23 21:13 22:24 34:16 60:12 65:14 100:16 110:22 114:3 120:8,11 143:8 146:11 150:19 171:20 183:17 184:11 188:23 217:19,21 229:3 235:8 257:8 278:5 308:18 346:11
**testify** 103:11 110:20 127:14,16 191:2,4 239:17 264:20 339:21
**testifying** 105:2 117:19 118:11 204:5 215:8,20 227:1,13 239:12 258:20 259:2 295:7,11 296:1 316:2 356:5
**testimony** 27:25 77:25 78:1 85:2 104:12 150:21 163:19 172:1,5 183:4 188:8 189:9 191:1,9 210:5 215:19 264:25 302:25 305:5 313:20 322:3 332:25 359:8
**testing** 273:15
**texas** 332:5
**text** 6:23 109:17 136:10 162:16,19 301:12
**texts** 71:3
**thank** 5:16 6:16 8:23 11:17 26:6,7 26:15 27:17 40:16 58:18 71:10,17 73:9 77:19 81:13 81:13 97:15 106:2 116:9 138:21 139:16 145:15 155:16 159:11 161:18 170:22 194:8 196:11 198:24 199:24 200:25 201:16 203:22 220:13 221:6 232:18 254:13 255:9,9,14 285:21 289:16 301:16 325:4 336:15 352:1 355:7,8,9
**thanks** 39:17 321:10
**that'd** 7:16 123:1
**therapeutic** 276:21,22
**therapist** 25:17 321:15 322:1 325:9 326:6,7,25 327:6,9 351:5
**therapists** 28:12 56:21
**therapy** 15:21 16:3 28:14,14,18 321:10 322:22 326:21,24 336:20

336:21 337:3,8 338:3,4,7,11,14 341:12 342:7,8,9
**thereof** 128:22
**thing** 10:16 56:5 94:15 107:12 125:19 129:15 148:4 152:17 190:22,23 235:25 240:4 242:1 251:6 272:17,21 273:21 281:3 298:17 300:8 304:25 306:24 319:19 323:12 335:6 345:15
**things** 56:3 65:21 76:25 88:19 99:22 101:13 102:8 167:1,3 170:10 193:19 194:3 196:2 210:20,21 214:9 239:4 240:1 261:7 267:4 272:17 273:23 275:3,6 278:9 284:12 307:11 322:14 323:8 331:4,14 343:5,7 352:22
**think** 20:8 23:7,13 24:4 27:10 32:3,7 35:7 39:22,22 46:17 48:8,17 49:17 52:8,17 59:4 63:9 64:21 66:9 67:2,2 70:19 72:23 79:16 82:15 84:14 86:23 87:6 89:14,16,17,20 92:21 93:6,25 94:3,4,23 108:17 123:16 124:16 127:2 129:14,19 130:23 131:1 132:17 133:5,17 136:18 139:18 143:13,13,15 145:2 161:7 162:19 163:11 167:12,17 169:20 175:13,24 176:3 177:8 182:1,9 184:12 185:25 186:2,9,9 187:7 195:3 197:5 204:21 207:10 208:21,25 209:1 209:12 210:11 214:24 215:6,7 217:14 221:19 229:24 234:5,25 240:24,24 243:25 253:12 255:6 257:2 261:13 264:24 267:21,22 267:23 268:5 269:12,12 277:13 279:13 283:2 295:16,17 300:7 300:23,24 302:11 302:11 303:6,6,10 303:10 304:6 307:3,5 308:2,20 311:9 318:6,13,25 325:1 328:3 330:14 337:23,24 340:5,14 350:4
**thinking** 197:1 254:19 275:1 311:23
**thinks** 336:12
**thiourea** 273:22
**third** 85:13 251:23 327:15
**thirds** 297:23
**thirty** 122:21,23
**thorough** 98:1 312:17 313:1 314:4,14 315:24
**thought** 25:18,19 47:25 56:6 58:1 76:13 96:23 143:2 164:11 166:3,8 170:19 182:19,20 191:23 230:2 235:20,24 245:5 255:21 257:8 273:13 329:3 330:18
**thread** 108:13 220:4
**threaten** 293:18
**threatened** 99:19 99:19 102:1 279:19
**threatening** 112:1 274:8
**three** 21:12 47:4 48:11 63:2,14,16 63:16 64:13 76:8 76:15,25 77:24 78:6,12,15,20 79:1 79:2,8,16 80:1,2 81:16,17,22 83:3 83:25 93:6 122:18 122:23 176:3 187:11 190:13 201:17,24 206:3,5 206:14 212:7 213:12 214:25 219:7 241:23,25 263:2 264:25 268:9 290:8 311:10 322:13
**threw** 153:25
**thursday** 322:25 346:16
**thursdays** 56:17 212:8
**tie** 98:18
**tiers** 64:10
**ties** 328:20
**tight** 86:9
**till** 56:15 176:23 264:3 272:10 277:7
**time** 1:19 5:6 10:8 19:7 21:1 22:12 22:19 26:25 28:8 37:9,12 39:18 40:11,14,25 42:6 46:16 48:7 50:3 50:24,25 54:2 57:5 60:5,8 61:16 62:5 63:5 65:22 66:8 67:17 71:11 71:14 74:11 80:10 80:11,21 82:12 84:21 90:23,25 93:7 106:24 107:6 115:6 119:10,19 121:25 122:12,15 123:1 129:25 132:2 135:2,23 143:25 148:1,9,23 149:3,23 150:13 150:16,19 151:8,8 151:11,13 155:17 157:1 161:8,11,14 165:13,22,23 167:12,17,18 170:16 171:4

177:5 180:13 184:16 198:19,22 199:17 202:7,7,10 202:13,14,15,17 202:22 203:8 205:2 206:1 208:13,15 209:3 210:17 211:16 212:4,5,17,19 216:5,21 218:22 220:13 222:17,23 227:5,6 234:24 235:1 237:5 238:3 245:13,16 247:6 250:6 251:20 259:25 261:13 262:22 263:3,7,20 263:22 264:1,2 267:16,19 268:5 268:16 269:10,19 269:24 270:22 278:25 280:20 281:19 282:12 283:3,9 285:20 288:7,9,13,16,19 289:3,10,13 290:23,24,25 292:6,12,18,22,25 293:5,14,16,19 294:9,18 295:23 296:7,10 297:22 298:2,16 299:2,2,3 300:5,14,19 301:4 301:5,17,20 310:16 312:11 313:14,17 318:4,9 318:19 320:1 322:24 323:13 343:16 345:10 347:25 352:25 353:6,12,14,15 354:3,6,21,23 355:2,12

**timeframe** 63:2 179:14 215:13

**timeframes** 215:5

**timekeeping** 192:5 281:17 284:10,13 284:25 285:14 287:11,24 290:23 307:21 324:2

**timeline** 294:13

**timely** 187:20

**times** 129:7 132:18 191:14 193:19 251:17 269:22 309:7,14 311:10 322:22 352:21

**timesheet** 282:7

**timesheets** 192:4,8 192:9 282:4 283:8 284:9 286:11 323:14

**timespan** 72:6

**tired** 271:24

**tit** 228:3

**title** 25:6 45:24 49:21 54:15 64:10 76:18 77:4 78:15 79:23,25 80:3,5 81:21 82:14,16,17 82:21 83:14 110:10 111:10 113:9,17 115:23 153:7 207:12 208:10 218:6 220:24 226:11 229:5 234:18,18 238:25 239:7,8,15 240:10,10,14,22 240:25 241:3,8,19 241:19 242:16 243:7 244:22,23

**titles** 46:8 78:2,2,3 78:11 241:13

**today** 6:21 9:8 10:8 32:6 36:6 37:17 67:21 123:4 160:11 161:20 194:7 278:17 321:4,6 322:25

**today's** 65:16

**told** 35:4 39:9 41:6 41:11 46:23 47:22 48:4,9 50:17 53:8 53:9,11 55:7 59:14 61:9 62:4 62:13,23 63:8,10 63:24 64:1,2,7 65:6 67:23 77:2 79:3,7,10 80:3,10 81:19,23 83:24 91:8 101:5 115:13 118:16 153:16 164:19 168:6 186:5,21 188:11 190:5 216:7,8,21 218:11 219:3 221:17 223:11,14 231:23,23 232:23 233:2 234:6 235:23 236:6 237:20 238:1 242:2 247:17,20 248:6 266:15,18 267:15 268:18 272:15 277:14 280:20,22 281:19 283:21 286:19 290:23,24,25 291:21 297:24 304:19,20,25 305:2 309:12,13 312:6,20,22,25 313:10,22 314:3 314:10,14 315:22 315:23 316:20,22 316:25,25 317:1,3 317:3,9,10,20 327:18 334:25

**tone** 236:17,21

**tonight** 250:20

**tool** 330:9

**top** 64:13 148:16 190:13 195:1 211:17 320:4 352:22

**topic** 121:13 187:25 217:15 249:6 261:16 299:15,22 340:22

**topics** 121:14

**torres** 98:6 181:24 182:14,15 279:9 333:17,25 334:6 336:8

**torture** 263:23

**torturing** 271:25 272:1 305:22

**tos** 323:18

**tosyl** 157:15,17,20 157:20,21 159:7,8 159:9

**total** 126:5

**totally** 48:14 103:23

**touch** 328:19 329:14

**touches** 157:4

**track** 96:14 347:9 349:3

**tracking** 346:25 347:5

**tracks** 262:19
**trade** 33:19
**traditional** 274:20 275:16
**train** 96:23 170:19 270:5,7,10,10,11
**training** 24:25 209:4 213:12
**trains** 270:9
**trajectory** 164:18
**transcriber** 357:1
**transcript** 4:22 10:23 66:11,13 171:1 356:23 357:3,5 359:5,8
**transcriptionist** 356:8
**transcripts** 66:1,6 66:24
**transfer** 86:15 153:1 184:14,17
**transferred** 220:17
**transition** 20:7 41:24 112:15 119:20 161:22,24 162:3 164:25 171:22 179:4 182:22,24 183:9 183:16,18 187:6 218:20 227:10 232:21 233:7 237:1,1,2 246:8 247:2
**transitioned** 40:25 41:16 96:3 119:10 129:19 163:23 219:8 232:24
**transitioning** 166:12 194:2
**transparency** 323:14
**transparent** 172:16 235:17 331:13
**transparently** 172:9
**trauma** 35:12,14 331:13
**traumas** 35:19
**travel** 268:8
**treat** 44:24 53:4 125:16 257:3
**treated** 25:12 26:18,19 50:16 52:24 55:2,24 57:11 58:6 101:24 230:6 236:19
**treating** 34:8 44:22 54:11 55:13 55:19 274:20
**treatment** 22:25 29:5 50:1,2 51:17 51:17 54:11,15 55:24 56:12 57:4 57:7 125:1 142:23 175:6 185:13 186:17 219:8 256:2 273:17 276:20 334:9 338:15
**treatments** 277:4 300:20
**trial** 203:11 335:15
**tried** 88:12 168:4 190:11 272:6 330:11
**tries** 332:11
**triple** 121:2
**trouble** 21:22 25:24 39:15 340:16,17
**troublemaker** 280:9
**true** 76:16 80:9 177:25 178:7 190:10 191:22 206:22 213:2 231:11 242:9 281:25 282:3 294:2,5 319:21 327:11 356:9 357:5 359:8
**trusted** 345:22
**truth** 5:22,22,23
**truthfully** 9:8
**try** 42:16,18 81:11 86:9 107:6 109:7 109:22 121:20 155:14 161:19 211:9 213:13 214:23 215:4 264:20 265:15 337:22
**trying** 18:15 81:7 81:8 86:21 89:14 89:15 94:8 96:13 96:13 99:25 101:12 103:7 105:8 107:8,9,20 167:24 169:8,16 169:19,24 170:2 176:8 177:18 180:11 182:9 190:16,21 193:22 193:23 194:5,6 206:20 215:19,23 221:10 230:2 232:4 233:19 235:18 240:24 243:24 250:19 251:25 266:8 271:16 273:23,24 279:22 289:5,7,23 300:25 301:1 303:10 313:19 320:6 337:23,24 342:8 343:11,15 343:21 344:15 352:15 353:1
**tuesday** 212:8
**turn** 11:14 26:10 26:11 43:17,17 165:15,19 297:10 316:21 322:19 333:18 335:23 340:1 351:4
**turnaround** 312:11
**turned** 12:2 105:4 205:4 223:2 247:6 279:20 282:5 297:11 327:21 328:3 329:5
**turning** 323:17
**turnover** 208:13 208:18
**turns** 103:6 263:5 332:16
**twenty** 270:7
**twice** 88:8 276:19 310:16
**twins** 53:21 159:25
**two** 6:25 28:19 63:2 66:10 70:8 70:11 76:8 77:24 78:5,12,15,19,25 79:7 80:1 81:16 81:21 83:24 96:7 108:15 109:17

122:18,20,23 135:9 144:10,11 144:19 149:18 153:23 159:20 188:9 198:9 203:14 209:5 211:21 214:25 220:22 221:4,22 225:12 226:25 228:11 232:12,16 236:3 247:17 266:8 284:12 290:20 291:2 293:8 297:23 298:20,20 303:13 303:15 322:11 323:19 331:7
**type** 15:5 22:25 27:24 29:5 44:13 74:16 94:14 131:18 136:24 148:10 164:25 203:13,16 204:8 204:14 273:4 274:10 336:21 337:8 338:7,13
**typewriting** 356:7
**typical** 338:12
**typically** 175:25 233:17
**typing** 7:22 131:19
**typos** 196:3 199:12,14,16

**u**

**u** 3:20,20 49:17 90:16
**uh** 10:21,24 309:16,16 342:2
**ultimately** 266:2
**uma** 177:11
**unable** 188:3 189:10 333:14
**unavailable** 43:24
**unbearable** 323:10
**unclear** 35:3,3,18 54:7
**undergoing** 51:16
**understand** 4:21 6:25 7:14 9:10,23 10:1,15 11:3 12:17 13:3,9 27:9 33:19 38:8 69:19 119:21 135:15 139:9 158:15 190:21 212:24 219:6 220:15 225:23 233:4,4 250:10 255:25 256:1 314:23,23 315:4,9 355:4
**understanding** 83:21 92:4 120:20 120:22 121:3 163:18 213:19
**understands** 333:4
**understood** 10:2 258:22 334:13
**undivided** 6:22
**uneasy** 91:15
**unemployed** 340:15
**unequivocally** 338:22
**unexpectedly** 327:6
**unfairly** 286:6 287:14
**unfavorable** 55:23 56:3
**unfavorably** 55:5
**unfit** 173:24 176:8 251:12 312:18,23 313:2,4 314:5,5,12 314:15,20 315:24
**unfortunately** 236:6 318:12
**unhappy** 256:20 257:14
**unheard** 298:18 335:22,24
**union** 46:13,14,16 47:23 58:22 65:1 65:5 83:11 86:22 86:24 87:2,3,8,25 88:21 89:10 91:20 92:8,12,16 94:12 94:20 115:20,20 118:4 152:25 153:6 154:5 167:15,24 168:4 186:2,8,10,11,14 186:15,25 191:21 218:2,12,15,15 226:10 229:9,10 229:11 230:2,10 230:23 231:23 234:12,17 238:15 238:20 240:8 246:22 266:14 283:15 286:20,24 287:5,6,6,13,15,17 287:22,23 288:2 288:15 289:18,25 290:5,12 291:12 291:18 296:21,22 296:23 297:1,7,15 297:17 298:6,18 304:25 305:2,3 322:23,25
**unionized** 167:22 220:23 221:16,24 222:18,20,24 223:2,10 229:5 230:24 231:22,24 232:8,10 233:2,8 234:9,14 240:9 262:9,11,16 266:21
**unions** 92:16 94:5
**unit** 49:22 50:1,2 51:14,23 53:18 56:12,18,24 83:18 84:1,6,8,13,23 90:21 91:1,6,10 92:3 93:11,13,16 93:19 185:13,13 187:8,24 188:19 208:6
**united** 1:1 25:2,5 174:18
**units** 127:25
**university** 200:18 200:19,24
**unknown** 294:23 328:15
**unlawful** 1:13 4:12
**unnecessarily** 317:24
**unnecessary** 266:13 272:5 275:24
**unofficial** 237:2
**unofficially** 76:5 85:21
**unpaid** 125:17 153:19,20 154:9,9 154:10 263:5,22 281:22 282:13 296:10

**unpredictable** 294:20
**unredacted** 45:10 95:14 98:4,8 280:16,17 330:12 332:12 333:8,19 335:18,23
**unrelated** 224:7 224:20 228:10
**unsound** 279:18
**unsubstantiated** 245:24
**unsupportive** 95:6
**unusual** 234:21
**unveiled** 256:19
**unwilling** 340:9
**upend** 263:15
**upper** 194:25 195:2 270:6
**upset** 25:14 212:15 248:25 272:15 306:13 311:16,17
**upsetting** 332:21
**upside** 329:5
**usage** 301:25
**use** 8:9 10:13,23 36:1,4,6,24 100:16 131:18 162:11 262:24 263:22 277:1 330:8,11 332:12 347:16 352:25
**uses** 4:24 25:6
**ushered** 86:12
**usually** 210:21

**v**

**v** 1:6 73:11 157:24 158:22 177:8 358:1 359:1
**vacation** 211:15 211:18
**vacations** 211:16
**vacuuming** 265:11
**vague** 87:7 117:22 303:21
**value** 286:3
**van** 181:20,21
**variable** 128:19,24 270:8
**varied** 152:1 155:13
**various** 158:5 177:9 214:5
**vendetta** 352:20
**venue** 200:5,9
**veracity** 313:20
**verbal** 10:22 240:6 240:7 246:25
**verbalize** 309:17 325:15
**verbally** 86:17 238:2 240:1
**verbatim** 314:17
**verbiage** 184:5
**verify** 167:24
**veritext** 4:4
**version** 197:1 198:14 248:20
**versions** 197:15 198:12
**versus** 45:9 95:14 198:15 223:17
**vetted** 172:9 252:13,18,21
**vibrate** 42:15
**viciousness** 340:8
**videoconference** 1:17 2:3,13
**view** 195:1
**vine** 214:10
**violate** 336:11
**violated** 257:15 266:13
**violating** 335:14 340:18
**violation** 262:2
**violations** 204:19 204:19 216:17 253:21 330:4 331:20
**violent** 187:23 188:19 293:25
**virtually** 4:23
**voice** 25:24,25 26:14 94:5 99:25 248:12
**voiced** 187:17 257:14
**volpe** 177:5,8
**volume** 43:17 206:1 209:9,14,17 209:22
**voluntary** 124:1,9 124:21,22 125:10
**volunteer** 125:12 126:12,14
**vs** 9:4

**w**

**w** 138:20,25 290:18 296:24
**wait** 80:18,18,18 80:22 106:21 132:20 150:6 156:6,6,6 225:1 288:20,20,20,20 313:6
**waiting** 102:22 185:6 248:10 276:23 277:7 344:16
**waived** 293:24
**walk** 270:9,10 271:3
**walking** 103:7 348:19
**wall** 103:3 190:9
**wangel** 1:10 2:12 9:3 26:23 86:13 92:18 153:11 168:5 170:5 191:20 216:25 220:8,12 222:1 229:3 230:9,12 236:9 237:25 238:4,14,20 239:20,21 247:22 262:19 272:25 282:18 283:7,16 286:17,19 287:7 287:25 290:5 297:22 298:1 303:23 304:25 347:3
**wangle** 4:10 217:20 226:7
**waning** 210:18
**want** 6:20 7:23 10:9,12 23:6 27:21 37:7 39:17 52:14,22 54:5 55:1 63:7 65:11 65:20 72:3,5 88:20 91:13,18,18 91:19 94:1 99:24 103:3 132:24 153:9 154:11 155:14 161:21 170:7,10 171:4 179:21,22 181:8 183:20 189:3 192:23 195:14,15

200:3,6 215:21
217:18,23 220:21
221:13 223:13
224:1 226:6,6
227:1 229:13
235:19 236:1
244:1,2 246:18,25
250:20 252:15
254:22 260:11,12
261:9 265:4 267:9
270:19,20 272:19
272:20 273:3
285:15 288:6
306:1 307:17
311:20 313:10
315:5,10,20
318:14,14 329:16
332:12 336:16
340:23 341:1,10
348:3 349:2 350:9
351:3
**wanted**  6:18 53:19
53:20,21,24 54:3
59:12 65:11 80:13
87:8 97:24 102:4
102:7,24 105:15
117:7,9 126:21
138:12 144:6
163:10,12 167:14
167:15 168:14
175:11 176:4
180:25 184:25
186:6,18 187:5
188:25 211:12
218:3,12 227:15
230:9,18,23,24
234:19 235:16
242:13,15 246:10
246:14 257:4
281:1 287:13
300:10 301:9

323:2,9 330:11
335:6,24 336:3,3
**wanting**  98:22
124:8 297:21
**wantingly**  336:13
**wants**  335:5
**ward**  102:16
**warm**  26:10
**warnings**  188:13
**washing**  276:25
**wasting**  288:19
**watching**  350:4
**water**  86:11 153:4
205:14 237:16,16
283:22
**wavering**  246:10
**waxing**  210:18
**way**  20:11 24:16
42:14 44:1 55:24
69:13 71:5 85:22
86:21 94:24 99:22
110:1 136:2,3,22
150:20 153:2
169:18,22 174:10
176:25 187:22,22
188:5 194:7,18
196:10 205:4
227:20 233:13,13
262:18 266:23
272:6 295:20
304:24 305:20
331:21
**ways**  102:4
**we've**  122:15,17
232:14,20 277:5,6
340:5 354:8
**wealthy**  332:4
**weapons**  177:14
**website**  168:8,9
309:3

**week**  56:16 123:16
128:18 129:10,11
140:7,9 151:20,21
151:24 152:2,7
154:8 212:7,7
281:15 283:6,24
352:21
**weekend**  124:18
127:10 136:8
138:18 151:22,24
152:2
**weekends**  124:8
148:25 151:19
152:6
**weeks**  214:24
282:15 283:24
323:20
**weird**  268:4
**weiss**  108:25
**weissman**  53:3,7
53:12 54:3,10,10
55:6,10,12,16 58:5
**weissman's**  54:1
**welcome**  27:18
161:17 229:17
**went**  48:9 112:24
124:15,16 126:10
127:8 132:6 135:4
154:7 158:10
163:4 187:12
191:5 203:8 206:1
212:18 240:1
249:1 252:22
254:19 279:9
282:6 286:15,16
287:5 302:8
330:23,23 336:8
**whip**  332:11
**who've**  293:24
**whoa**  164:15

**wide**  27:13,15
**wife**  317:19,23
318:1
**wife's**  90:2
**willing**  108:17
279:17
**wing**  166:22
**winkler**  59:12
81:24,25 82:1
83:9 95:10 100:5
100:15,16 101:1,4
101:5,17 102:18
103:16 104:9
108:25 114:7,9,20
119:11 162:5,8
163:13 164:4
175:9 182:8 207:5
207:11,15,15,21
211:15 212:3,12
213:8 215:3
231:17 233:10
244:4,11 248:21
253:13 316:22
333:9 335:3
**winkler's**  243:11
243:14 244:13
257:19 260:2
332:13
**winter**  300:17
**wiped**  206:17,19
**wire**  116:15
**wisely**  343:16
**wish**  283:10
**wishing**  326:16
**withdraw**  144:12
206:11 322:4
**withdrawn**  205:21
209:20
**witness**  4:17,20,21
5:18,21 7:18
11:13,17,21 12:1

12:11 13:15 15:3
15:7,11,17,24
16:22 17:2,14
18:15 20:6,16
21:16 22:16 24:10
26:2,6,9,15 27:10
27:15,18 29:25
30:22 32:14 34:2
37:19,24 38:10,20
40:2,6,9 41:4,10
41:22 42:8,13,16
42:22 43:3,12,18
44:2,17 47:22
50:8,21 52:17
54:20 55:15,22
57:24 58:10,16
62:4 65:5,19
66:16,20 67:6,23
68:19 69:20 70:7
70:19 71:3,9 72:5
72:14,23 73:12,23
74:1,13,22,25 75:6
75:20 76:3 77:18
78:23 80:25 81:11
83:2,13,21 84:12
85:7,15 86:8 88:5
89:8,20 90:1
91:23 92:6,14
95:5 97:2,6,15,23
99:2 101:17
102:14 103:21,23
104:19 111:13
114:17 116:7,14
116:17,23 117:2
117:20 118:13
119:2,23 120:16
121:18 122:1,4,8
125:6,25 127:1,18
134:8 135:1,17,21
137:8 138:9
139:10 140:15,19
141:15 142:19
143:12 144:3,15
144:25 145:18
146:22 148:4
149:13,21 151:6
152:1,23 156:5
157:17 161:1,6
162:15 165:15,18
166:3,16 169:4,12
171:18 173:17,23
175:24 177:8
178:10,16 179:8
179:13 180:5
181:19 183:25
185:18,25 188:9
193:2,17 194:14
194:19,23 195:8
197:5 199:23
204:4 210:9 213:8
218:11 222:10
223:20 224:19
227:2 228:19
229:24 231:15
232:17,23 235:16
236:17 238:12
239:19 241:11,25
242:13,15,25
243:4 245:8,23
246:14 250:1,14
250:21 254:13
255:4,14 256:15
259:15 260:6
264:16 265:17
276:10 280:8
284:20 285:21
287:20 291:5,15
291:21 292:9
293:10 296:4
297:14,20 301:12
301:16 303:5
308:14 309:19
318:15,24 323:4
324:21 325:17
327:14 330:2
337:15,21 338:10
339:22 340:7
342:6 345:2
346:24 348:14
349:15 354:18
355:8 356:4

**witnesses** 227:24

**woman** 14:3 44:20 177:13 323:21 327:15

**women** 49:2,5,7 49:14 70:8 177:11

**women's** 158:12 158:15

**wondering** 71:5 248:10

**woo** 255:23

**word** 29:23 172:15 172:22 191:23

**wording** 63:13

**words** 39:20 57:19

**work** 25:10,13,18 26:18 27:6 36:12 49:4 50:2,18 56:12,23 59:3 79:15 86:14 97:25 104:9 109:8,22 123:13,15 124:8 124:10,13 125:10 125:15,23 126:19 128:17 129:4 130:15 131:11 132:6 134:11,14 134:19,24 135:3,3 136:15 137:6,21 138:24 140:9 141:12 143:8,8,22 143:23 145:12,16 146:1,7,12,16,20 147:4,11 148:10 149:16,17 150:22 150:24 151:14,18 151:20,24 152:20 152:21 153:18,19 153:21 154:8,20 154:21 174:2 185:12 187:1 191:18 192:7 202:6 203:8,16,18 203:24 204:4,8,12 204:14,18 209:9 210:19 211:16 213:14,19 214:23 233:13,14 240:17 240:18 249:14 251:22 252:8 255:17 263:7,24 264:4 266:7 269:24 270:3 272:1 273:6,15 281:20,21 282:13 282:18,20 283:5 302:24 323:8 324:9,14 332:11 337:4 345:3,16,23 345:24 347:20

**workday** 264:1

**worked** 45:18 50:3 56:10,13,15 60:8 93:9 100:10 104:8 123:21 130:14 131:6 132:25 133:17 135:5 137:8 141:11 151:7,8,8,9,11 187:7 201:17,23 202:15 207:15,16 208:11,12,14,20 211:13 216:13

230:6 253:15 267:1 284:6
**worker** 23:2,3,8 25:4 29:4,6
**worker's** 23:11
**workers** 56:20 84:14
**workgroup** 102:3 102:11 103:4,10 103:12 104:3,14 104:21,22 105:13 108:17 109:14 110:7,11 112:6
**workgroups** 103:24,25
**working** 46:6 57:5 70:8 73:20 76:6 78:10 83:3,7,10,19 92:25 123:12 129:11 131:9,12 132:1,12 133:25 134:6,12 139:16 140:7,11 144:1 149:17 151:4 153:2,6,7 167:18 168:3 197:18 202:10,19 203:3 211:9,24 219:1 222:22 232:25 247:3 248:7 264:5 265:19 283:5 284:2,3,4,5,6 302:3 304:13
**workload** 211:17
**works** 121:17 189:24
**world** 153:24
**worry** 332:6
**worse** 47:13 211:25 331:5
**wouldn't** 218:13
**wow** 128:19
**wrangled** 306:3
**write** 125:2,4,6,21 169:7 221:22 342:5 344:6,9 355:5
**writes** 331:10
**writing** 64:5 112:4 137:3,14,17 139:3 141:22 176:1,2 279:23 349:19
**written** 5:4 294:21 329:19 339:1
**wrong** 103:13 198:25 236:18 268:1 272:13,14 280:3,7 282:12 283:5
**wrote** 85:19 87:11 112:10 145:10

**x**

**x** 3:1,5 32:7 195:5 356:23

**y**

**y** 73:11 90:16 157:17
**yang** 1:9 2:11 4:9 9:3 26:23 77:3,11 85:11,18 86:4 87:11,12 92:18,24 99:6,21 102:18 111:25 112:24 116:11 117:25 118:7,13,16 120:2 175:1 177:4 189:23,25 234:22 245:25 262:17 272:25 283:9 286:20 303:23 312:1 347:3
**yang's** 66:11
**yankee** 271:1
**yeah** 21:2 26:12 28:19,23 31:3 32:7 40:5 41:5 43:18 47:7 55:22 57:9 61:11 66:25 67:2,2 82:19 88:17,18 96:12 121:18 122:22 124:23 125:18 127:1 129:13 130:19 132:15 134:12 137:8,9 143:12,13 144:3 144:17 145:5 146:5 147:18,22 148:15 150:5 152:12 157:21 159:10 160:4,5,6,6 160:6,7 165:20 173:23 183:15,19 191:11 195:10 196:18,22,25 208:25 209:8 213:17 214:14 236:21 249:13 250:12 260:8 270:4,25 271:15 271:15,23 298:13 301:14 304:6 308:6,14 310:12 310:25 311:15 319:1 322:15 323:4 327:12 337:15,21,22 338:2,3 339:6,8
**year** 15:20 46:18 47:10 64:20,21 66:9,10 70:10,11 70:12 108:10 121:1 123:10 129:12 139:6 140:10 145:14 209:5 279:1 283:18 290:2 293:23
**years** 16:12,17 21:12 23:1 28:1 31:21 32:22 35:20 66:10 70:11 83:3 104:23,24 113:18 120:17 126:24 130:23 135:23 137:20 138:12,25 139:19,21 141:11 141:21 142:12 151:14 154:6 167:12,13 185:2 206:17 208:20,25 211:12 218:4 262:23 282:5 297:4 328:4
**york** 1:2,7 2:6,10 2:14,16,16 4:8,16 6:6 8:25 9:2,6 68:19,22 105:14 123:14 130:5 133:3 160:14 161:2 201:13 255:7 313:3,3 314:19 326:10 327:25 356:21 358:1 359:1
**yorkville** 127:2
**young** 188:15
**youth** 96:1 334:10

**z**

**z** 257:2
**zoom** 4:14 107:12 107:15,19 132:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.