Melissa Kaye

Page 1

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3    _____

4    MELISSA KAYE,

5              Plaintiff,

6         v.                              Case No.

7    NEW YORK CITY HEALTH AND HOSPITALS    1:18-cv-12137-

8    CORPORATION; ELIZABETH FORD;          JPC-JLC

9    PATRICIA YANG; ABHISHEK JAIN; AND

10   JONATHAN WANGEL (said names being

11   fictitious, the persons intended

12   being those who aided and abetted

13   the unlawful conduct of the named

14   Defendants),

15             Defendants.

16   _____

17       VIDEOCONFERENCE DEPOSITION OF MELISSA KAYE

18   DATE:          Monday, November 15, 2021

19   TIME:          10:03 a.m.

20   LOCATION:      Remote Proceeding

21                  Albuquerque, New Mexico

22   REPORTED BY:   Emmanuel Sabatino, Notary Public

23   JOB No.:       4897710

24

25

Melissa Kaye

Page 2

```
 1                  A P P E A R A N C E S

 2     ON BEHALF OF PLAINTIFF, MELISSA KAYE:

 3          SPECIAL HAGAN, ESQUIRE (by videoconference)

 4          Law Offices of Special Hagan

 5          196-04 Hollis Avenue

 6          Saint Albans, New York 11412

 7          special@haganlawoffices.net

 8          (917) 337-2439

 9

10     ON BEHALF OF DEFENDANTS, NEW YORK CITY HEALTH AND

11     HOSPITALS CORPORATION; ELIZABETH FORD; PATRICIA YANG;

12     ABHISHEK JAIN; AND JONATHAN WANGEL:

13          DONNA CANFIELD, ESQUIRE (by videoconference)

14          New York City Law Department

15          100 Church Street

16          New York, New York 10007

17          dcanfiel@law.nyc.gov

18          (212) 356-2461

19          File #:  2019-032851

20          Control #:  21-2743

21

22

23

24

25
```

Melissa Kaye

**Page 3**

```
 1                        I N D E X

 2   EXAMINATION:                                    PAGE

 3        By Ms. Canfield                            6

 4

 5                     E X H I B I T S

 6   NO.              DESCRIPTION                     PAGE

 7   Exhibit A      Email, 1/22/2018                 108

 8   Exhibit B      Amended Complaint                192

 9   Exhibit C      BHS to CHS Line Change           219

10   Exhibit D      Letter, 6/4/2021                 325

11

12                 (*Exhibits attached.)

13

14           QUESTIONS INSTRUCTED NOT TO ANSWER

15                 PAGE                  LINE

16                 69                      9

17                 156                     9

18                 336                     23

19

20          D O C U M E N T S   R E Q U E S T E D

21   NO.              DESCRIPTION                     PAGE

22   1            Paystubs for 2021                   136

23   2            Gracie Square Income, 2015-2021     137

24   3            AABR Income, 2015-2021              141

25
```

Melissa Kaye

```
                                          Page 4

 1                 P R O C E E D I N G S

 2                 THE REPORTER:  Good morning.  My name

 3      is Emmanuel Sabatino; I am the reporter assigned by

 4      Veritext to take the record of this proceeding.  We

 5      are now on the record at 10:03 a.m.

 6                 This is the deposition of Dr. Melissa

 7      Kaye taken in the matter of Melissa Kaye, Plaintiff

 8      against New York City Health and Hospitals

 9      Corporation; Elizabeth Ford; Patricia Yang; Abhishek

10      Jain; and Jonathan Wangle (said names being

11      fictitious, the persons intended being those who aided

12      and abetted the unlawful conduct of the name

13      Defendants), Defendants, on November 15, 2021, via

14      Zoom.

15                 I am a Notary authorized to take

16      acknowledgements and administer oaths in New York.

17      Parties agree that I will swear-in the witness

18      remotely outside of her presence.

19                 Additionally, absent an objection on

20      the record before the witness is sworn, all parties

21      and the witness understand and agree that any

22      certified transcript produced from the recording

23      virtually of this proceeding:

24                 - is intended for all uses permitted

25                 under applicable procedural and
```

Melissa Kaye

Page 5

1              evidentiary rules and laws in the same

2              manner as a deposition recorded by

3              stenographic means; and

4              - shall constitute written stipulation

5              of such.

6              At this time will everyone in

7      attendance please identify yourself for the record.

8              MS. CANFIELD:  Donna Canfield, counsel

9      for the defendants.  I consent to the foregoing

10     stipulations.

11             MS. HAGAN:  Special Hagan, counsel for

12     Plaintiff.  I also consent to the foregoing

13     stipulation.  Counsel for Dr. Kaye.

14             MS. KAYE:  Yes.  Melissa Kaye,

15     Plaintiff, and I stipulate to the conditions.

16             THE REPORTER:  Thank you.

17             Hearing no objection, I will now swear-

18     in the witness.

19     WHEREUPON,

20                  MELISSA KAYE,

21     called as a witness, and having been first duly sworn

22     to tell the truth, the whole truth and nothing but the

23     truth, was examined and testified as follows:

24     //

25     //

Melissa Kaye

Page 6

```
 1                        EXAMINATION

 2    BY MS. CANFIELD:

 3         Q    Good morning, Dr. Kaye.  How are you?

 4         A    Good.

 5         Q    Can I ask where you're located this morning?

 6    Are you in New York or are you in another state?

 7         A    I'm in another --

 8              MS. HAGAN:  Objection.

 9    BY MS. CANFIELD:

10         Q    You can answer.

11         A    I'm in another state.

12         Q    And what state are you located in now?

13         A    New Mexico.

14         Q    Okay.  And what city in New Mexico?

15         A    Albuquerque.

16         Q    Thank you.  Never been there.  I hear it's

17    beautiful.

18              I wanted to know before we get started this

19    morning, do you have a cell phone or another

20    electronic device in front of you?  I just want to

21    make sure that while we're in the deposition today,

22    that I have your undivided attention and that you're

23    not going to be tempted to receive, like, any text

24    messages.

25              I do understand that you have two children
```

Melissa Kaye

Page 7

1    and if, you know -- if there was an emergency, that
2    you would have something for them to contact you, but
3    if you could put that aside just for purposes of the
4    deposition.
5             Now, do you have a cell phone in front of
6    you?
7        A    I have my cell phone in my house.
8        Q    Okay.  It's not in front of you then?
9                 MS. HAGAN:  Objection.
10                MS. CANFIELD:  Do you have -- I'm
11   sorry.
12                MS. HAGAN:  She's going to have to have
13   her cell phone because her children are --
14                MS. CANFIELD:  I understand that.  And
15   I agree.  I agree.  I just -- if it's just not right
16   in front of her, that'd be great.
17                MS. HAGAN:  We haven't made those kind
18   of stipulations with your witness.  I suggest, you
19   know, you afford my client the same courtesy.
20                MS. CANFIELD:  I only do so because
21   during the other depositions, Dr. Kaye has, like -- I
22   can see her communicating and typing on the computer.
23                I just want to make sure that while
24   she's answering questions, that she's not
25   communicating with anyone else.

Melissa Kaye

Page 8

```
 1                    MS. HAGAN:  If she can answer your
 2    questions and if she knows she has a problem where she
 3    needs to ask you to re-ask the question, she will do
 4    so.
 5                    MS. CANFIELD:  Okay.  All right.
 6    BY MS. CANFIELD:
 7        Q    Do you have any other devices other than
 8    your cell phone with you, Dr. Kaye?
 9                    MS. HAGAN:  She would have to use her
10    laptop in order to engage you.  That's what we're all
11    doing.
12                    MS. CANFIELD:  Okay.
13    BY MS. CANFIELD:
14        Q    Other than your laptop?
15                    MS. HAGAN:  Objection.
16    BY MS. CANFIELD:
17        Q    Dr. Kaye, you have to respond to my
18    question.
19        A    Yes.  Yes, I have my laptop.
20        Q    Okay.  Anything else other than your laptop
21    and your cell phone?
22        A    I have a printer in the house.
23        Q    Okay.  All right.  All right.  Thank you.
24    All right.  As you know, my name is Donna Canfield.
25    I'm an assistant corporation counsel with the New York
```

Melissa Kaye

Page 9

1    City Law Department.  I represent the defendants, New

2    York City Health and Hospitals Corporation, Elizabeth

3    Ford, Patricia Yang, Abhishek Jain, Jonathan Wangel in

4    the case called Kaye vs. Health and Hospitals

5    Corporation, et al.  And that's pending in the

6    Southern District of New York.

7              I'm going to ask you a couple questions

8    today and I ask that you answer them truthfully, okay?

9        A    Yes.

10       Q    Okay.  You understand that you're under oath

11   now, correct?

12       A    Yes.

13       Q    Okay.  The court reporter, Mr. Sabatino,

14   will take down what you say and what I say, and what

15   Ms. Hagan says.  If the court reporter asks you to

16   speak up or to slow down, will you please do that?

17       A    Yes.

18       Q    Okay.  Please tell me if you cannot hear my

19   questions or if there's a break in the internet

20   connection.  Will you do that, please?

21       A    Yes.

22       Q    Okay.  And please tell me if you don't

23   understand my question, okay?

24       A    Yes.

25       Q    Okay.  If I ask you a question and you

Melissa Kaye

1    answer it, I will understand that you heard and

2    understood my question, okay?

3         A    Yes.

4         Q    Okay.  And if you give me an answer -- oh,

5    and it's important that you don't start answering your

6    question until I have finished my question, okay?

7         A    Yes.

8         Q    If you give me an answer at one time today

9    and later on you want to add to it or change

10   something, please let me know, okay?

11        A    Yes.

12        Q    Please let me know if you want to take a

13   break to use the restroom or get something to drink.

14   That is fine.  These days can be long and you're going

15   to be talking, so I would understand if you would need

16   a short break.  The only thing I ask is that you

17   finish answering my question before we take the break.

18   Is that fair?

19        A    Yes.

20        Q    Okay.  Now it's difficult for the court

21   reporter to take down an uh-huh or a nod of the head

22   or -- because it's not verbal.  Because -- and we

23   can't read it either on the transcript.  So please use

24   yes or no instead of uh-huh or mm-hmm, okay?

25        A    Yes.

Melissa Kaye

Page 11

1          Q    And then finally, when a question is

2     pending, you cannot speak to your lawyer except to

3     determine if a privilege applies.  Do you understand

4     that?

5          A    Yes.

6          Q    Okay.  Now do you have any medical condition

7     or illness that affects your ability to hear me now?

8                    MS. HAGAN:  Objection.

9     BY MS. CANFIELD:

10         Q    You can answer.

11         A    No.

12         Q    But --

13                   THE WITNESS:  I would like to take a

14    moment to turn the heat on.  It's very cold in here

15    and I need to -- I need to do that, if I may.

16                   MS. CANFIELD:  Yes, you may.

17                   THE WITNESS:  Thank you.

18                   MS. CANFIELD:  Now I seem to be able to

19    hear the heater.

20                   Mr. Sabatino, is that going to be

21    interfering with your ability to hear the witness?

22                   THE REPORTER:  If I can't hear

23    something, I will speak up, but I did just hear that

24    come on, yes.

25                   MS. CANFIELD:  Okay.  Okay.

Melissa Kaye

Page 12

```
 1                   THE WITNESS:  Yes.  That is why I had
 2     turned off the heat, but it's freezing in here.
 3                   MS. CANFIELD:  Okay.  Well, as Mr.
 4     Sabatino said, if there's something that he doesn't
 5     hear, he will just ask you to repeat it, and same with
 6     me.  Okay.
 7     BY MS. CANFIELD:
 8          Q    Do you have any condition that affects your
 9     ability to answer my questions?
10                   MS. HAGAN:  Objection.
11                   THE WITNESS:  No.
12     BY MS. CANFIELD:
13          Q    Have you taken any medication or substances
14     that would impair your ability to hear me?
15          A    No.
16          Q    Have you taken any medication or substances
17     that would impair your ability to understand me?
18          A    No.
19          Q    What about to answer my questions?
20          A    No.
21          Q    Okay.  Are you currently under a doctor's
22     care?
23                   MS. HAGAN:  Objection.
24     BY MS. CANFIELD:
25          Q    You can answer.
```

Melissa Kaye

Page 13

```
 1        A     Yes.

 2                    MS. HAGAN:  To the extent that you

 3   understand.

 4   BY MS. CANFIELD:

 5        Q     And what doctor are you seeing?

 6                    THE REPORTER:  I'm sorry.

 7                    Ms. Hagan, what did you just say?

 8                    MS. HAGAN:  I said to the -- answer to

 9   the extent that you understand her question.

10                    THE REPORTER:  Okay.

11                    I'm sorry.  Could you give that

12   question again also, Ms. Canfield?

13                    MS. CANFIELD:  I said, "Are you

14   currently under a doctor's care?"

15                    THE WITNESS:  Yes.

16                    MS. CANFIELD:  Okay.

17   BY MS. CANFIELD:

18        Q     And what doctor?

19                    MS. HAGAN:  Objection to form.

20   BY MS. CANFIELD:

21        Q     What is the name of the doctor that you're

22   seeing?

23        A     Dr. Al Rashida.

24        Q     Can you spell that please, for the record?

25        A     It's A-L R -- R-A-I-S-H-I-D or A-D, I
```

Melissa Kaye

Page 14

1    believe.

2         Q     Mr. Al Raishid [sic]?

3         A     She -- she's a woman.

4         Q     Okay.  Dr. Al Rashida.  And what do you see

5    Dr. Al Rashida for?

6         A     Elevated cholesterol.

7         Q     And when did you first start seeing this

8    doctor?

9         A     Last April.  April 2020.

10        Q     And is Dr. Al Rashida located in New Mexico?

11        A     Yes.

12        Q     Are you currently under any other doctors'

13   care?

14        A     Yes.

15             MS. HAGAN:  Objection.

16   BY MS. CANFIELD:

17        Q     I'm sorry.  I didn't hear your response?

18        A     Yes.

19        Q     Okay.  What is the name of the other doctor

20   that you're seeing?

21        A     Dr. Gregory De Felice.

22        Q     Can you spell Dr. De Felice's last name for

23   the record, please?

24        A     D-I-F-I-L-I-C-E [sic] possibly.

25        Q     Okay.  And for what reason do you see Dr. De

Melissa Kaye

                                                    Page 15

1    Felice?

2                   MS. HAGAN:  Objection as to form.

3                   THE WITNESS:  For surgical follow-up.

4    BY MS. CANFIELD:

5         Q    And what type of surgery did you have?

6                   MS. HAGAN:  Objection, form.

7                   THE WITNESS:  I had a shoulder surgery.

8    BY MS. CANFIELD:

9         Q    For what reason?

10                   MS. HAGAN:  Objection.

11                   THE WITNESS:  I had calcified crystals

12   in the joint and a rotator cuff tear.

13   BY MS. CANFIELD:

14        Q    Okay.  And how long ago did you have the

15   surgery?

16                   MS. HAGAN:  Objection.

17                   THE WITNESS:  July.

18   BY MS. CANFIELD:

19        Q    July?

20        A    July of this year.

21        Q    And did you have any physical therapy

22   associated with your surgery?

23                   MS. HAGAN:  Objection.

24                   THE WITNESS:  Yes.

25   //

Melissa Kaye

                                                    Page 16

 1    BY MS. CANFIELD:

 2         Q    Okay.  And are you still attending physical

 3    therapy for your surgery?

 4         A    Yes.

 5         Q    Okay.  Any other doctors that you're

 6    currently seeing?

 7                   MS. HAGAN:  Objection as to form.

 8    BY MS. CANFIELD:

 9         Q    You can answer.

10         A    No.

11         Q    What other doctors, if any, have you seen in

12    the past five years?

13                   MS. HAGAN:  Objection, form.  Could you

14    be more specific?

15    BY MS. CANFIELD:

16         Q    I'm asking, what other doctors have you

17    seen, if any, in the last five years --

18                   MS. HAGAN:  Answer --

19    BY MS. CANFIELD:

20         Q    -- for specific medical care?

21                   MS. HAGAN:  Answer if you're able.

22                   THE WITNESS:  I've seen Dr. Peter Kim.

23    BY MS. CANFIELD:

24         Q    And for what reason did you see Dr. Peter

25    Kim?

Melissa Kaye

Page 17

 1              MS. HAGAN:  Objection.

 2              THE WITNESS:  For GI problems.

 3     BY MS. CANFIELD:

 4         Q    And when did you first start seeing Dr. Kim?

 5         A    He was my internist in the early to mid-

 6     2000s.  And then he gave up his primary care practice

 7     and became a gastroenterologist, and I continued

 8     seeing him for my GI problems.

 9         Q    Okay.  When did you start seeing him for

10     your GI problems?

11         A    It's hard for me to pinpoint the date.

12              THE REPORTER:  Please repeat the

13     answer.

14              THE WITNESS:  It's hard for me to

15     pinpoint the date.

16     BY MS. CANFIELD:

17         Q    Was it before or after 2015?

18         A    Before.

19         Q    Was it before or after 2012?

20         A    I don't know.

21         Q    So is it fair to say you started seeing him

22     sometime between 2012 and 2015?

23         A    I started seeing him as a primary care

24     doctor probably before that.

25         Q    Okay.

Melissa Kaye

Page 18

```
 1        A    He changed his practice to specializing in
 2   GI medicine only.
 3        Q    Okay.
 4        A    And at that point, I only saw him for GI
 5   issues.
 6        Q    Okay.  And that's what I'm interested in
 7   knowing.
 8             When did you first start seeing him for GI
 9   issues?
10             MS. HAGAN:  Objection.  Asked and
11   answered.  She said she didn't know.  Next question,
12   please.
13             MS. CANFIELD:  No, you can answer.
14             MS. HAGAN:  Asked and answered.
15             THE WITNESS:  I'm trying to give you a
16   --
17             MS. HAGAN:  She said she didn't know.
18   She can't answer the question.  She said she doesn't
19   know.
20             MS. CANFIELD:  Excuse me.
21             Dr. Kaye, please.
22             MS. HAGAN:  Again, she said she doesn't
23   know.  I'm going to instruct my client not to continue
24   unless she's going to give the same answer -- she
25   doesn't know.  You're asking her to give you an answer
```

Melissa Kaye

Page 19

1     that she doesn't know the answer to.

2                    MS. CANFIELD:   That's not clear on the

3     record yet.

4     BY MS. CANFIELD:

5          Q    Dr. Kaye, when did you first start seeing

6     Dr. Kim for your GI problems?

7          A    I -- I can't pinpoint the time that his

8     practice changed from primary care to GI, so I -- it's

9     hard for me to -- to say when he became a GI

10    practitioner.

11         Q    Okay.

12         A    And --

13         Q    Go ahead.  I'm sorry.

14         A    No, that's okay.  I had seen him as my

15    primary care physician and then I received

16    notification that he was closing his primary care

17    practice and specializing in GI medicine and -- and

18    taking -- taking his patients -- accepting patients

19    that he was following as a primary care doctor as --

20    into his GI practice.  If --

21         Q    Okay.

22         A    -- if need be.

23         Q    Okay.

24         A    And that's what my situation was.  So I

25    don't recall exactly when that switchover happened,

Melissa Kaye

Page 20

1    but I believe it was sometime in the early 2000s.

2         Q    Okay.

3         A    Maybe around, you know, some --

4              MS. HAGAN:  Dr. Kaye, don't guess.  If

5    you don't remember, you don't know.

6              THE WITNESS:  It just -- I don't

7    remember when that transition in his practice

8    occurred, but I do think it was sometime in the early

9    2000s.

10   BY MS. CANFIELD:

11        Q    Okay.  Let me ask it another way.  When did

12   you begin to have issues with your GI requiring you to

13   see a specialist?

14             MS. HAGAN:  Objection.

15             You can answer.

16             THE WITNESS:  I -- I was diagnosed with

17   irritable bowel syndrome and when I was under stress,

18   I would have flares.  And --

19   BY MS. CANFIELD:

20        Q    And when were you first diagnosed with

21   irritable bowel syndrome?

22        A    I know I -- I know I had it in medical

23   school.  I don't know if I was diagnosed prior to

24   that.

25        Q    Okay.  So it's something that you've had for

Melissa Kaye

Page 21

```
 1    quite some time; is that fair to say?
 2        A    Well, yeah.  It's a chronic illness that
 3    flares with stress.
 4        Q    Okay.  And are you still seeing someone for
 5    your irritable bowel syndrome?
 6        A    Well, I would consider Dr. Kim my GI doctor.
 7        Q    Okay.  So do you not still see him or do you
 8    see someone locally?
 9        A    No, I consider Dr. Kim my GI doctor.
10        Q    Okay.  All right.  Fair enough.  All right.
11    Any other doctor that you saw for a medical condition
12    within the last five years, other than the three
13    doctors that you've testified to so far?
14              MS. HAGAN:  Objection as to form.
15    Compound question.
16              THE WITNESS:  I've seen a cardiologist.
17    BY MS. CANFIELD:
18        Q    What is the name of the cardiologist you've
19    seen?
20        A    Dr. Margaret Sullivan.
21        Q    And when did you first see Dr. Sullivan?
22        A    I have trouble pinning down the date.
23        Q    Let me ask you this then.  Maybe this will
24    help you.
25              For what issue related to your heart led you
```

Melissa Kaye

Page 22

```
 1    to see a cardiologist?
 2                 MS. HAGAN:  Objection as to form.
 3    BY MS. CANFIELD:
 4        Q    You can answer.
 5        A    I have -- I -- I have a genetic condition.
 6        Q    Okay.  And when did you learn of this
 7    genetic condition?
 8        A    In the early 1990s.
 9        Q    Have you been seeing Dr. Sullivan since the
10    early 1990s?
11        A    No.
12        Q    Do you recall the last time you saw Dr.
13    Sullivan?
14                 MS. HAGAN:  Objection.
15                 You can answer.
16                 THE WITNESS:  I don't recall the exact
17    date, but I know it was before the pandemic.
18    BY MS. CANFIELD:
19        Q    What about Dr. Kim?  When was the last time
20    you saw Dr. Kim?
21        A    I had a colonoscopy right before the
22    pandemic.  I believe it was in January 2020.
23        Q    Any other doctors, other than the four
24    doctors that you've testified to so far, that you have
25    seen for any type of treatment within the past five
```

Melissa Kaye

Page 23

 1   years?

 2        A    I saw a social worker.

 3        Q    What's the name of the social worker?

 4        A    Her name was Alessio -- last name's Alessio.

 5        Q    Can you spell that, please, for the record?

 6        A    I don't want to spell it incorrectly.  I

 7   think it is something like A-L-I-E-S-S-O [sic].

 8        Q    Okay.  And is the social worker a male or a

 9   female?

10        A    Female.

11        Q    Okay.  And what's the social worker's first

12   name?

13        A    I think it's Paulina [sic] or -- I believe

14   it's Paola or Paulina.

15        Q    Okay.  Do you know how to spell her first

16   name?

17        A    I'm sorry.

18        Q    Okay.  That's fine.

19        A    She's Italian and I am not all that familiar

20   with --

21        Q    Okay.

22               MS. HAGAN:  You have the HIPAA release

23   for this doctor, Dr. Canfield.

24               MS. CANFIELD:  Okay.

25   //

Melissa Kaye

Page 24

```
 1   BY MS. CANFIELD:
 2        Q    And when did you start first seeing Ms.
 3   Alessio?
 4        A    I think I had -- I had reached out to her in
 5   November or December -- early December of '18 I
 6   believe.  I don't know when we were able to find the
 7   schedule --
 8                  THE REPORTER:  I'm sorry.  Repeat what
 9   you just said.
10                  THE WITNESS:  I -- I reached out to her
11   in November, early December of 2018, but I don't
12   recall when we were able to schedule our first
13   appointment.
14   BY MS. CANFIELD:
15        Q    Okay.  How long did you see Ms. Alessio?
16   Let me ask another way.
17             Are you still seeing Ms. Alessio?
18        A    No.
19        Q    Okay.  When did you last see Ms. Alessio?
20        A    I don't recall.
21        Q    Okay.  Was it before or after the pandemic?
22        A    Before.
23             May I clarify something about her --
24        Q    Yes.
25        A    -- please?  She's a psychologist by training
```

Melissa Kaye

Page 25

1    in Italy, but she's not a licensed psychologist in the

2    United States.  So --

3         Q    Okay.

4         A    -- she's a social worker by licensure in the

5    United States, but she is a psychologist.  And so she

6    uses the title "doctor" for that reason.

7         Q    She does?  Okay.

8              And for what reason did you reach out to

9    start seeing I guess Dr. Alessio?

10        A    I was stressed out about my work situation.

11        Q    Can you be more specific?

12        A    Well, I was being treated very poorly at

13   work and it was causing me a lot of strain and it was

14   affecting me and -- and my kids and I was really upset

15   about it.  It was causing me physical and emotional

16   distress.

17             And Dr. Alessio is a therapist who does

18   what's called "body work," so I thought -- and she was

19   recommended, and I thought she could help me cope with

20   my stress.

21        Q    Okay.  Now, Dr. --

22             THE REPORTER:  Okay.  Just a sec.

23             Dr. Kaye, I'm going to ask you to

24   please keep your voice up because I was having trouble

25   hearing you there.  So please keep your voice up a

Melissa Kaye

Page 26

1    little louder, okay?

2                    THE WITNESS:  Yes.  Yes, I will.  Can

3    you please tell me what you need me to repeat?

4                    THE REPORTER:  Nothing there.  Just in

5    general in the future.

6                    THE WITNESS:  Yes, I will.  Thank you.

7                    MS. CANFIELD:  Yes.  Thank you.  You

8    are very softspoken and it is difficult to hear.

9                    THE WITNESS:  Yes.  I -- I'm sorry I

10   had to turn on the heat.  Hopefully it'll warm up in a

11   little bit and I can turn it off.

12                   MS. CANFIELD:  Yeah.  The heat doesn't

13   seem to be the problem.  I don't hear that humming in

14   the background anymore, but just keep your voice up.

15                   THE WITNESS:  I will.  Thank you.

16   BY MS. CANFIELD:

17       Q    So a couple follow-up questions.  You said

18   that you were being treated very poorly at work.  By

19   whom were you being treated poorly?

20       A    Management, staff.

21       Q    Can you identify any particular individuals?

22       A    Elizabeth Ford, Andrea Swenson, Jonathan

23   Wangel, Ross Macdonald, Patricia Yang, Abhishek Jain,

24   some support staff.  It became more extensive over

25   time.

Melissa Kaye

Page 27

```
 1        Q    Okay.

 2        A    And more individuals were participating in

 3   activities that were hurtful and -- to me -- and

 4   stressful.

 5        Q    Okay.  And when did this -- when did you

 6   first start feeling stressed out by your work

 7   situation?

 8                    MS. HAGAN:  Objection as to form.

 9                    You can answer if you understand.

10                    THE WITNESS:  I think that it started

11   in late -- I mean, it -- it -- it was a crescendo that

12   started when CHS decided to get involved with the

13   city-wide court clinics.

14                    THE REPORTER:  What kind of clinics?

15                    THE WITNESS:  They're city-wide court

16   clinics.

17                    THE REPORTER:  Thank you.

18                    THE WITNESS:  You're welcome.

19   BY MS. CANFIELD:

20        Q    All right.  Well, I'll definitely have some

21   follow-up questions with that, but I want to close the

22   loop on medical professionals.

23             Any other doctors that you've seen for any

24   type of medical care other than the five I guess

25   you've named so far in your testimony that you have
```

Melissa Kaye

1      seen in the last five years?

2           A    So you're -- you're asking me that I've seen

3      since 2016?

4           Q    Correct.  2015, 2016, yes.

5           A    Does that include nurse practitioners?

6           Q    Sure.

7           A    I saw a nurse practitioner for a routine GYN

8      exam.  And that was also around the time I saw Dr. Al

9      Rashida.  I would say April 2020.  I do not remember

10     her name.

11          Q    Okay.

12          A    And does that include physical therapists?

13          Q    You had talked about receiving physical

14     therapy.  Is that different than your physical therapy

15     for your shoulder surgery?

16          A    No.  It's been ongoing since the surgery.

17          Q    Okay.  Okay.  Now you've mentioned the

18     physical therapy.  Okay.

19          A    Yeah.  And I saw two doctors -- I don't

20     recall their names -- in July of 2021.  An

21     anesthesiologist and an internist.  I saw them at HSS.

22          Q    Is this related to your shoulder surgery?

23          A    Yeah.

24          Q    Okay.

25          A    It was the pre-op --

Melissa Kaye

Page 29

```
 1        Q    Right.

 2        A    -- clinical clearance screening.

 3        Q    Okay.  Okay.  I'm going to go back to the

 4   social worker that you saw.  Are you currently under

 5   any type of treatment from a mental health

 6   professional, whether it be a social worker,

 7   psychologist or psychiatrist?

 8        A    No.

 9             MS. HAGAN:  Objection.

10   BY MS. CANFIELD:

11        Q    Okay.  Are you currently taking any

12   medication for your elevated cholesterol?

13        A    Yes, sir.

14             MS. HAGAN:  Objection.

15   BY MS. CANFIELD:

16        Q    And what is that?

17        A    Lipitor.

18        Q    Okay.  Anything else?

19        A    Well, it's not really medication, but I -- I

20   take Q -- Coenzyme Q which is something that you're

21   supposed to take with Lipitor to combat the side

22   effects.

23             THE REPORTER:  Could you say that word

24   again?

25             THE WITNESS:  Q -- Coenzyme Q.  It's a
```

Melissa Kaye

Page 30

```
 1    -- it's a supplement that helps prevent side effects
 2    from Lipitor.
 3    BY MS. CANFIELD:
 4        Q    And how long have you been taking Lipitor?
 5        A    I believe Dr. Sullivan started me on that
 6    because of my genetic condition.
 7        Q    I'm sorry.  Repeat that?
 8        A    Dr. Sullivan started me on the Lipitor
 9    because of my genetic condition.
10        Q    The question was when did you start it --
11    taking it?
12        A    I don't know.  I don't know.
13        Q    Before or after the pandemic?
14        A    Before.
15        Q    Were you still employed at CHS when you
16    started taking it?
17        A    I was -- it was probably pre-CHS.  It
18    probably was when I was employed for -- at Bellevue.
19        Q    And what are the side effects of Lipitor for
20    you?
21                   MS. HAGAN:  Objection.
22                   THE WITNESS:  I don't have any -- I
23    don't have any side effects, but it can deplete
24    enzymes in your system.  So it's just recommended for
25    safety purposes to replace those.
```

Melissa Kaye

Page 31

```
 1    BY MS. CANFIELD:
 2         Q    Okay.  Is that why you take the Q Coenzyme?
 3         A    Yeah.
 4         Q    Okay.  So you've had no side effects from
 5    the Lipitor; is that correct?
 6         A    No.
 7         Q    Okay.
 8         A    That's correct, yes.
 9         Q    Okay.  And for the GI issues that you were
10    seeing Dr. Kim for, were you taking any medications or
11    are you currently taking any medications for the GI
12    issues you experience?
13         A    No.
14         Q    Okay.  Have you taken medication in the
15    past?
16                   MS. HAGAN:  Objection.  Form.
17                   Answer if you can.
18                   Could you be more specific?
19                   MS. CANFIELD:  Yes, I can.
20    BY MS. CANFIELD:
21         Q    Within the past five years, or from 2015 to
22    the present, have you taken medication for your GI
23    issues?
24         A    Yes.
25         Q    And what have you taken?
```

Melissa Kaye

Page 32

1        A    They're called proton-pump inhibitors.  I
2     don't remember which ones I was prescribed.  Dexilant
3     I think was the one I was taking.  Called Dexilant.
4        Q    Can you spell that, please?
5             You didn't know you were going to be
6     participating in a spelling bee today, did you?
7        A    Yeah.  I think it's D-E-X-A-L-A-N-T [sic].
8        Q    Okay.
9        A    -- know.
10       Q    Okay.
11       A    It's a proton-pump inhibitor.
12             THE REPORTER:  I'm sorry.  Could you
13     repeat what you said after you spelled it?
14             THE WITNESS:  I'm not certain if that's
15     the spelling of it, but I do know it's a -- it's --
16     it's for one of my GI problems.
17     BY MS. CANFIELD:
18       Q    Okay.  But you no longer take it?
19       A    I'm not taking it now, no.
20       Q    Okay.  And how long were you taking it when
21     you were taking Dexilant?
22       A    I would take it on and off over the years.
23       Q    And are there any side effects that you
24     experienced from taking the Dexilant?
25       A    No.

Melissa Kaye

Page 33

```
 1        Q    What about for the cardiologist that you
 2   were seeing?  Were you taking any medication to
 3   address the genetic condition that you have?
 4        A    Yes.
 5        Q    And what were you taking?
 6        A    Lipitor.
 7        Q    Lipitor.  Okay.  And who prescribed the
 8   Lipitor for your genetic condition related to your
 9   heart?  Dr. Sullivan or Dr. Rashida?
10        A    Al Rashida?  I -- I -- it's not just Lipitor
11   that I've taken.  I've taken other statins.  I don't
12   remember the names, but they've both prescribed
13   statins for me.
14        Q    Okay.
15        A    I was seeing Dr. Sullivan for the
16   cholesterol and for cardiac irregularities --
17   palpitations.
18        Q    And when you were seeing Dr. Alessio, I
19   understand that she's a psychologist by trade, but did
20   she recommend that you take any medication?
21        A    No.
22                  MS. HAGAN:  Objection.
23   BY MS. CANFIELD:
24        Q    Did she recommend that you see a
25   psychiatrist about medication?
```

Melissa Kaye

```
 1                MS. HAGAN:  Objection.
 2                THE WITNESS:  She did not.  She -- she
 3      -- she did not recommend that.
 4      BY MS. CANFIELD:
 5           Q    Okay.  Did you believe that you could
 6      benefit from a medication?
 7                MS. HAGAN:  Objection.  She's not
 8      treating herself.
 9                MS. CANFIELD:  It's just a question.
10      BY MS. CANFIELD:
11           Q    You can answer.
12           A    I believe medications can be helpful, yes.
13           Q    Okay.  Did you take any medications that
14      were helpful?  I know that you are a psychiatrist.
15           A    No.
16           Q    Other than what you testified to this
17      morning, any other doctors or health professionals
18      have you seen for a health condition from 2015 to the
19      present?
20           A    Hello?
21           Q    Yes.
22           A    I -- I don't know the exact cutoff of -- of
23      2015 as to if I -- I may have seen a Dr. Rho, R-H-O.
24           Q    For what purpose?
25           A    He's a physical medicine and rehab doctor.
```

Melissa Kaye

Page 35

1    It -- it would have been for my shoulder.

2         Q    Okay.  And how did you injure your shoulder?

3         A    It's unclear when -- it's unclear when the

4    -- well, I can explain what was told to me.

5         Q    Okay.

6         A    I have risk factors for calcified crystals.

7    It's called -- I think it's called calcified

8    tendonitis.  There's a -- there's an acronym for it.

9    I don't remember what it is, but it's when calcium

10   crystals develop in the joint.  And I -- I had the

11   risk factors.  And the risk factors are being female,

12   being over 40 and having previous trauma to the

13   shoulder.  So I have all of those risk factors.

14        Q    Okay.  All right.  And you had prior trauma

15   to the shoulder?

16        A    Yes.

17        Q    Okay.  And how long ago did that occur?

18        A    Well, that's the -- that's the unclear part

19   because there'd been multiple traumas to the shoulder

20   over many, many years.

21                  MS. HAGAN:  Can I stop you for a

22   second?

23                  Ms. Canfield, I don't have any of your

24   exhibits for Dr. Kaye.

25                  MS. CANFIELD:  I'm going to email them

Melissa Kaye

Page 36

1    to you as I use them.

2                    MS. HAGAN:  I was supposed to be

3    getting them in advance of the deposition, not as you

4    use them, as per the Court's order.  So if you can

5    send me the -- if you can send me all of the exhibits

6    that you may use today before we proceed, I'd like

7    that.

8                    MS. CANFIELD:  I'm going to share them

9    with you contemporaneous as we would if we were in a

10   conference room together.

11                   MS. HAGAN:  I don't know how that would

12   work, Ms. Canfield.

13                   MS. CANFIELD:  I'm going to email them

14   to you and I will email them to you prior to showing

15   the exhibit.  That's what I'm going to do.

16                   MS. HAGAN:  That's not as per the

17   Court's order.

18                   MS. CANFIELD:  Okay.

19                   MS. HAGAN:  The Court -- you got the

20   exhibits before the deposition with all of the

21   depositions.  I'm expecting that same courtesy, Ms.

22   Canfield.

23                   MS. CANFIELD:  I will send them to you

24   as I use them.

25                   MS. HAGAN:  We're going to have to call

Melissa Kaye

Page 37

```
 1    the Court.
 2                   MS. CANFIELD:  That's fine.
 3                   MS. HAGAN:  Because I had to -- we're
 4    going to have to call the Court because I should have
 5    them.
 6                   MS. CANFIELD:  That's fine.  You can
 7    call the Court if you want.
 8                   Can we go off the record, please?
 9                   THE REPORTER:  The time is 10:46 a.m.
10    We're off the record.
11                        (Off the record.)
12                   THE REPORTER:  The time is 10:52 a.m.
13    We're back on the record.
14                   MS. CANFIELD:  Okay.
15    BY MS. CANFIELD:
16        Q    Dr. Kaye, what did you do, if anything, to
17    prepare for your deposition today?
18                   MS. HAGAN:  Objection.
19                   THE WITNESS:  I talked to my attorney.
20    BY MS. CANFIELD:
21        Q    Did you review any documents?
22                   MS. HAGAN:  Objection as to form.
23                   You can answer.
24                   THE WITNESS:  I -- I'm sorry.  I didn't
25    hear the question.
```

Melissa Kaye

                                                    Page 38

 1    BY MS. CANFIELD:
 2         Q    I said did you review any documents to
 3    prepare for this deposition?
 4         A    I looked at some of the discovery emails.
 5         Q    When you say "discovery emails," what do you
 6    mean by that?
 7                    MS. HAGAN:  Objection.
 8                    To the extent that you can understand
 9    the question.
10                    THE WITNESS:  I -- the emails that we
11    obtained in discovery.
12    BY MS. CANFIELD:
13         Q    Okay.  The emails that I produced to your
14    attorney as part of discovery?  Is that what you're
15    referring to?
16         A    Yes.
17         Q    Okay.  And do you remember in particular
18    what you reviewed?
19                    MS. HAGAN:  Objection as to form.
20                    THE WITNESS:  I don't.  I just skimmed
21    through some of them.  I -- I didn't get through all
22    of them.
23    BY MS. CANFIELD:
24         Q    Okay.  Do you recall the subject matter of
25    the emails that you were able to get through?

Melissa Kaye

Page 39

```
 1              MS. HAGAN:  Objection.
 2     BY MS. CANFIELD:
 3         Q    You can answer.
 4         A    Well, I remember looking at the one where
 5     Elizabeth Ford said that they were going to manage me
 6     out.
 7              I recall the exchanges between me and Dr.
 8     Jain about my shift change.
 9              I recall one where Dr. Ford told Dr. Jain to
10     ignore my email about my brother's death and my
11     request to have my shift restored to what it had been
12     prior.
13              I remember emails that categorized me as the
14     reason and the problem for CHS getting itself into
15     trouble with the Court by defying court orders.
16     That's -- that's pretty much what I recall.
17         Q    Okay.  Thanks.  Now I want to take these one
18     at a time.
19              The email that you first mentioned was the
20     email where Dr. Ford, you said, had the words "manage
21     me out."  Do you recall the date of that email?
22         A    I think it was in early February.  I think
23     it was early February 2018.
24         Q    Okay.
25              MS. CANFIELD:  Do you need to take a
```

Melissa Kaye

                                        Page 40

1    message?

2                    THE WITNESS:  No.  I just got a -- can

3    I -- can I -- this is about someone picking up my

4    kids.

5                    MS. CANFIELD:  Yeah.  You can --

6                    THE WITNESS:  Can I take a break for a

7    second?  I'm sorry.

8                    MS. CANFIELD:  Yes.

9                    THE WITNESS:  For this?

10                    MS. CANFIELD:  Yes, of course.

11                    THE REPORTER:  The time is 10:57 a.m.

12   We're off the record.

13                         (Off the record.)

14                    THE REPORTER:  The time is 10:59 a.m.

15   We're back on the record.

16                    MS. CANFIELD:  All right.  Thank you.

17   BY MS. CANFIELD:

18        Q    The email you believe was February 2018; is

19   that correct?

20        A    I'm not certain.  I -- I -- that's -- that's

21   just my recollection.

22        Q    Okay.  Well, the document will speak for

23   itself.

24             Do you know when you read that email or that

25   time period, had you transitioned to CHS or were you

Melissa Kaye

Page 41

1     still an employee of Bellevue?

2                    MS. HAGAN:  Objection.

3                    If you recall, you can answer.

4                    THE WITNESS:  I know that CHS contacted

5     Bellevue for -- yeah.  I was contacted by Bellevue in

6     December 2017 and told that CHS was taking over

7     management of the court clinics.

8                    THE REPORTER:  Taking over management

9     of what?

10                   THE WITNESS:  The court clinics.  I was

11    told by Bellevue -- my chain of command at Bellevue in

12    December 2017 that CHS was taking over management of

13    the court clinics.

14    BY MS. CANFIELD:

15        Q    Okay.  And do you recall exactly when you

16    transitioned under CHS and left the employment at

17    Bellevue?

18                   MS. HAGAN:  Objection.

19                   MS. CANFIELD:  You can answer.

20                   MS. HAGAN:  To the extent that she can

21    answer the question.

22                   THE WITNESS:  That is -- the answer to

23    that question would depend on how you would define the

24    transition.

25    //

Melissa Kaye

Page 42

```
 1    BY MS. CANFIELD:
 2         Q    Okay.  Let me ask you this.  In February
 3    2018, who did you report to?
 4         A    I reported to Jeremy Colley, M.D.
 5         Q    So you did not report to Dr. Ford at that
 6    time?
 7                   MS. HAGAN:  Objection.
 8                   THE WITNESS:  No.  Not yet.
 9    BY MS. CANFIELD:
10         Q    Okay.  Why do you believe Dr. Ford --
11                   MS. CANFIELD:  Do you need to look at
12    those messages?
13                   THE WITNESS:  No.
14                   MS. CANFIELD:  Okay.  Is there any way
15    you can put that on vibrate -- your phone?
16                   THE WITNESS:  I -- I can try.  I'm not
17    really that -- I'm not really that tech -- tech savvy,
18    but I can try.  I don't know.
19                   MS. CANFIELD:  Are you receiving emails
20    or is that your phone that's making a noise?
21                   MS. HAGAN:  Objection.
22                   THE WITNESS:  Pictures.  Someone's
23    sending me pictures.  Sorry.  I only have one phone,
24    so I'm not really sure what to do.
25                   MS. CANFIELD:  My question was the
```

Melissa Kaye

Page 43

1   dinging, is that coming from your computer or your

2   phone?

3                   THE WITNESS:  I don't know.  I don't

4   know.

5                   MS. CANFIELD:  Did you receive a

6   message on your computer or did you receive a message

7   on your phone?

8                   MS. HAGAN:  She said she didn't know.

9   Let's move on.

10                  MS. CANFIELD:  That's a different

11  question.  Please.

12                  THE WITNESS:  I -- when I get a -- my

13  computer and my phone are linked.  So when I get a

14  message on one, it comes on the other also.

15                  MS. CANFIELD:  Okay.  Okay.  It's just

16  very disruptive of the deposition.  If you can somehow

17  turn it off or turn down the volume?

18                  THE WITNESS:  Yeah.  When we take a

19  break, I'll call -- I'll call the school and see if I

20  can let them know that I am not available or

21  something.  I -- I don't know.  I'll figure out

22  something.  I'll figure out something.  I'll call the

23  kids' school and I'll let -- I'll call the nurse's

24  office and let them know that I'm unavailable.

25                  MS. CANFIELD:  Okay.  If you feel

Melissa Kaye

                                                    Page 44

1     comfortable doing that.  Just if there's some way --

2                     THE WITNESS:  I mean, I don't know what

3     else to do because I -- you know, they do call me from

4     the school here and again, so I don't know what to

5     say.

6                     MS. CANFIELD:  Okay.  Okay.

7     BY MS. CANFIELD:

8         Q     The email that you reviewed from Dr. Ford

9     where she used the phrase "manage me out," do you

10    believe that that phrase was motivated by

11    discrimination?

12        A     Yes.

13        Q     Okay.  What type of discrimination?

14                    MS. HAGAN:  Objection as to form.  It

15    calls for a legal conclusion.

16                    Answer if you can.

17                    THE WITNESS:  I believe it was sex

18    discrimination.

19    BY MS. CANFIELD:

20        Q     Why do you believe Dr. Ford, as a woman, was

21    discriminating against you based on your sex?

22        A     Well, she was treating me differently than

23    my male colleagues.

24        Q     How did she treat you differently?

25        A     She -- she retaliated against me over an

Melissa Kaye

Page 45

1    issue that I shared.  My -- my male colleagues agreed

2    with me and were involved in the issue as much or more

3    than I was, and I got scapegoated for the issue.

4              They were taken seriously and respected for

5    their opinion about the issue and I was deemed a

6    problem and a cyclone and I was targeted.

7         Q    What is "the issue" that you're referring

8    to?

9         A    The issue is using redacted versus

10   unredacted records in conducting forensic assessments

11   of criminal defendants.

12        Q    Prior to that issue, do you believe that Dr.

13   Ford discriminated against you based on your gender?

14        A    Yes.

15        Q    Okay.  And why do you believe that?

16        A    I discovered when -- I reported to Dr. Kaye

17   -- I mean, I'm sorry.  I don't report to myself.

18              I reported to Dr. Ford when I worked at

19   Bellevue.  She was the director of the Division of

20   Forensic Psychiatry.

21        Q    Mm-hmm.

22        A    And she was my direct report-to.  I

23   discovered in -- around 2013 or 2014, I discovered

24   that I was on a lower title and getting paid less than

25   my male comparator.

Melissa Kaye

Page 46

1          Q      And who was that -- your male comparator?

2          A      That was Steven Ciric, M.D.

3          Q      And how did you learn that you were being

4     paid less?

5          A      I -- someone made a mistake and disseminated

6     an email with all of the doctors working at Bellevue

7     -- their -- all their information, including their --

8     their titles and their salaries.

9                 And I looked at that email.  I didn't know

10    it was by mistake.  It was only later expunged from

11    the system or everyone was later denied access to that

12    email, but it had gone out.  And I saw the email and I

13    was, you know, taken aback, and I contacted my union.

14         Q      Okay.  And who at your union did you contact

15    in particular?

16         A      I believe at the time, the union

17    representative was Lori Davidson I think was her name.

18         Q      Do you recall the year that you contacted

19    her?

20         A      It was around 2014.

21         Q      Okay.  All right.  And what did you say to

22    Lori Davidson when you contacted her?

23         A      I told her the situation.

24         Q      And what exactly did you tell her?

25         A      I said, you know, "I'm getting paid less

1    than my male comparator.  He's on -- he's on a

2    physician specialist line and he's getting paid

3    significantly more than I am, and I'm only on an

4    attending three line.  And I'm actually more of a

5    physician specialist than he is.  I have more

6    fellowships under my belt than he does."  And she just

7    responded by shrugging it off and she said, "Oh, yeah.

8    Well, be glad you're not in surgery.  Be glad you're

9    in psychiatry because the psychiatrists only get paid

10   $40,000 a year less than -- less than -- the female

11   surgeons get paid $60,000 less.  So just be glad

12   you're a psychiatrist and not a surgeon or it'd be

13   worse."  She said something like that to me.

14           And I was taken aback and I asked her, you

15   know, if they could help me and she said no.  That

16   that's not -- they don't get into that with -- that's

17   not part of the collective bargaining, pay -- pay

18   issues.

19      Q    Did you confirm that by looking at the

20   Collective Bargaining Agreement?

21               MS. HAGAN:  Objection.

22               THE WITNESS:  I -- she told me that

23   it's not something the union could help me with, so I

24   just accepted that was -- I figured if they could help

25   me, they -- they would have I -- I thought.  And she

Melissa Kaye

Page 48

1    -- she said it's just pervasive.  This paying female

2    physicians less than male physicians is just the

3    pervasive practice of HHC, which stands for Health and

4    Hospitals Corporation.  She told me that was just the

5    pervasive culture there and kind of basically said

6    suck it up.

7                    So I -- at the time, Elizabeth Ford was

8    my report-to.  And it was -- I think it was in 2014 --

9    early 2014 and I had -- I went to her and I -- I told

10   her about it and I asked her for my line to be changed

11   from attending three to physician specialist and be

12   paid equal to or more than Steve Ciric, because I was

13   more qualified and I had more seniority than him.  And

14   she kind of gave -- well, she totally gave me the

15   runaround and she kept saying that she would look into

16   it and that she would talk to Dr. Mary Anne Badaracco

17   who was -- I think still is the chief of psychiatry at

18   Bellevue, and that she'd get back to me.  And I -- you

19   know, she'd always kind of put me off.

20                   And I would, you know, periodically

21   follow-up with her and she would send me the emails.

22   And I remember one of the emails said, "Oh, you know,

23   getting anything done around here is like moving

24   elephants."  And she just basically never did anything

25   about it.  And, you know, she just had this kind of

Melissa Kaye

Page 49

1    queen bee mentality where, you know, she was very hard
2    on women.  And, you know, it wasn't -- it was obvious.
3    It was obvious to me and it was obvious to other
4    people who -- who, you know, had to work under her --
5    other women.
6    BY MS. CANFIELD:
7         Q    How was she hard on other women?
8         A    Just not as -- not as supportive.  Not
9    professionally supportive.  Quick -- you know, quick
10   on the draw, you know?  Shoot first, ask questions
11   later-kind of style.  And, you know, like failing to
12   consider my pay parity concerns seriously.
13        Q    Let me ask you a question.  Who are the
14   other women that she was not as supportive of?
15        A    Well, I know that Melanie Farkas and I --
16   please, I'm not sure -- don't ask me how to spell it.
17   I -- I'm not sure.  I think it's F-A-R-K-U-S [sic].
18   I'm not sure.
19        Q    Okay.
20        A    You know --
21        Q    What was her title?
22        A    She was a psychologist on the inpatient unit
23   at Bellevue.
24        Q    Was she doing forensic psychology or was she
25   doing -- seeing patients and --

Melissa Kaye

Page 50

```
 1        A     The inpatient forensic unit was a treatment
 2   unit.  I did not work in treatment capacity during my
 3   time at HHC.  I worked as a forensic evaluator at the
 4   Bronx Court Clinic.  But Bellevue did oversee the
 5   Bronx and Manhattan Court Clinics which were forensic
 6   --
 7                   THE REPORTER:  Bronx and what?
 8                   THE WITNESS:  The -- the Bellevue
 9   Hospital oversaw the Manhattan and Bronx Court
10   Clinics, which were forensic evaluation centers in the
11   --
12   BY MS. CANFIELD:
13        Q     Okay.
14        A     -- in the courthouses.
15        Q     How is it that you know that Melanie Farkas
16   was treated differently or poorly by Dr. Ford?
17        A     She -- she told me.
18        Q     Okay.  But you didn't work with her, did
19   you?
20                   MS. HAGAN:  Objection.
21                   THE WITNESS:  I had -- there were
22   overlaps in our professional activities.
23   BY MS. CANFIELD:
24        Q     Where was your office during the time that
25   you -- during the time that you're describing now with
```

Melissa Kaye

Page 51

1    Dr. Ford and learning that you were paid less than Dr.

2    Ciric?

3         A    My office is in the Bronx courthouse.

4         Q    Okay.  And where was Melania Farkas' office,

5    if at all?

6         A    At Bellevue.

7         Q    Okay.

8         A    The 19th floor.

9         Q    Okay.  So you would not see her on a regular

10   basis; is that fair to say?

11        A    I would be down at Bellevue not infrequently

12   back in those days.  I would go down to Bellevue and

13   do forensic assessments for inmates that were admitted

14   either to the medical prison unit.  It really wasn't a

15   prison, it was a jail, but it was the -- if they were

16   too medically ill or compromised or undergoing some

17   kind of treatment, acute treatment, they would not be

18   at Rikers.  They would be at Bellevue on the medical

19   service.  And if there was a 730 ordered, I -- you

20   know, I would sometimes go down there and do the exam

21   down there just to move the case forward.

22             Similarly with the inpatient psychiatric

23   unit, I would see defendants -- they were defendants

24   to me, they were patients for them.  But I would see

25   the incarcerated individual at Bellevue.

Melissa Kaye

Page 52

```
 1           There were staffing issues in the Bronx, so
 2    sometimes I would meet another evaluator from the
 3    Manhattan Court Clinic or someone else to do the exam
 4    at Bellevue.
 5        Q    Okay.  So there were some staffing issues in
 6    the Bronx as early as 2014?
 7        A    No, I wouldn't say it was that early.  Well,
 8    I'd have to -- let me think.  When did -- there were
 9    periodic staffing issues.  There were staffing issues
10    between 2005 and 2008.  And then definitely that --
11    then.
12           The other reason I would see cases at
13    Bellevue or my other overlap --
14        Q    Hold on a second.  I want to know if there
15    were staffing issues in 2014.
16               MS. HAGAN:  Objection.
17               THE WITNESS:  No, I don't think there
18    were.
19    BY MS. CANFIELD:
20        Q    Okay.  All right.  I'm going to move on
21    because we're going to talk about this, but I don't
22    want to get too far off the path.
23           Anyone other than Melanie Farkas that you
24    believe was another female that Dr. Ford treated less
25    favorably as compared to the male doctors?
```

Melissa Kaye

Page 53

1        A     Yes.

2        Q     Who else?

3        A     Dr. Erica Weissman.  She was a JD PsyD.

4        Q     And how did Dr. Ford treat her less

5   favorably?

6        A     She was just very -- Dr. Ford was very hard

7   on Dr. Weissman.  Very critical of her -- of her and

8   she had told me when -- when she got hired, Dr. Ford

9   had told me that she was going to manage her out, and

10  she did.

11       Q     Dr. Ford told you that she was going to

12  manage Dr. Weissman out?

13       A     Yes.

14       Q     When did she say that, if you can recall?

15       A     It was around -- I do recall and I recall

16  specifically because it was in the context of me --

17  Dr. Ford had just been hired to be the director of the

18  forensic psychiatry unit at Bellevue.  It was around

19  2009 -- early 2009.  And I had wanted to meet with Dr.

20  Ford and I sent her an email.  I wanted to tell her

21  that I was pregnant with twins.  I wanted to tell her

22  that just to give her the heads up, you know?  That

23  this was going to -- this was going to be, you know,

24  the situation.  And I also wanted to clarify some

25  business matters about the -- the court clinic.

```
                                        Page 54
```

 1         And what Dr. Weissman's role was going to be
 2    because it had shifted during the period of time Dr.
 3    Weissman was at Bellevue and I just wanted some
 4    clarification of, you know, like this -- what --
 5    specifically, if I were to want to refer a defendant
 6    for longitudinal observation to help complete his 730
 7    exam, there were some unclear kind of administrative
 8    algorithms about how that was done.
 9         Q    Let me interrupt you right here.  Dr.
10    Weissman -- was Dr. Weissman also part of the
11    inpatient treatment -- treating staff?
12         A    Yes.  Her -- well, yes.  Yes and --
13         Q    Okay.
14         A    -- and additionally, she was administration
15    and treatment.  She was -- her title was clinical
16    director.
17         Q    Okay.  But she was not conducting forensic
18    examinations, correct?
19                   MS. HAGAN:  Objection.
20                   THE WITNESS:  I cannot say that she did
21    not hear and again conduct a 730 exam.  I don't know
22    about --
23    BY MS. CANFIELD:
24         Q    Okay.
25         A    But that was not the primary job.

Melissa Kaye

1      Q    Okay.  So tell me -- I want to know

2   specifically how Dr. Ford treated her less favorably.

3   That was the question.

4      A    When I communicated with Dr. Ford about

5   this, she was just very -- spoke very unfavorably

6   about Dr. Weissman and was kind of dismissive of what

7   I was asking.  And she just told me that, "Well, we're

8   going to manage her out.  We're going to manage her

9   out."

10          She clearly didn't like Dr. Weissman and she

11   said, "We're going to manage her out."

12      Q    Okay.  Now did Dr. Weissman tell you that

13   she believed that Dr. Ford was treating her poorly?

14              MS. HAGAN:  Objection.

15              THE WITNESS:  I didn't have that

16   discussion with Dr. Weissman.

17   BY MS. CANFIELD:

18      Q    Okay.  How about Dr. Farkas?  Did she tell

19   you that she believed that Dr. Ford was treating her

20   less favorably?

21              MS. HAGAN:  Objection.

22              THE WITNESS:  She felt she -- yeah, she

23   had some unfavorable comments about Dr. Ford and --

24   and her treatment of -- the way that she was treated,

25   yes.

Melissa Kaye

Page 56

1   BY MS. CANFIELD:

2        Q    Okay.

3        A    She said some unfavorable things to me.

4        Q    And what did she say?

5        A    Well, the one thing that I remember, she --

6   she thought Dr. Ford was a sociopath.

7        Q    Okay.

8        A    And that, you know, she didn't support the

9   staff.  And there was a lot of complaints about Dr.

10  Ford's schedule.  Dr. Ford had worked out this -- you

11  know, mind you, Dr. Ford was in charge of an inpatient

12  treatment unit, okay?  This was clinical work.  And

13  she had worked out some schedule where she would come

14  in -- ostensibly come in at some very early hour, like

15  6:30.  She ostensibly worked 6:30 in the morning till

16  2:30 in the afternoon, four days a week, and then had

17  Thursdays off is what I recall.

18            And so, you know, on an inpatient unit where

19  you have all the clinical activity happening during

20  business hours, you know, there's no social workers

21  and activity therapists at the hospital at 6:30 in the

22  morning.  And 2:30 in the afternoon is pretty early to

23  -- to be leaving work when you're in charge of an

24  inpatient unit, so she was very much resented about

25  that.

Melissa Kaye

Page 57

1          There was this --

2      Q    Oh, excuse me.  Hold on.  Who was very much

3   resented?  Dr. Ford?

4      A    All the -- the treatment staff that -- that

5   were working under her at the time.

6      Q    Okay.  So not just Dr. Farkas, but all the

7   treatment staff were resentful of her schedule?

8      A    There was rumbling and chattering about it,

9   yeah.

10     Q    Okay.  Okay.  And how else did -- what else

11  did Dr. Farkas tell you about why she was treated less

12  favorably?

13     A    She just felt that she wasn't supported.

14  Her professional development wasn't supported.  She

15  wasn't respected as a psychologist.  She just felt

16  devalued.

17     Q    Okay.  And did she --

18     A    I'm not going to say those were the exact

19  words, but that was the feeling I -- that was the

20  impression that I had leaving the conversation.

21     Q    Okay.

22              THE REPORTER:  I'm sorry.  "Leaving the

23  conversation"?  Did you say anything after that?

24              THE WITNESS:  That was my takeaway

25  impression of the -- of her complaint and I do

Melissa Kaye

```
 1    remember her saying that she thought Ford was a
 2    sociopath.
 3    BY MS. CANFIELD:
 4        Q    Okay.  Other than Dr. Farkas and Dr.
 5    Weissman, any other females who felt that they were
 6    treated less favorably by Dr. Ford because of their
 7    sex?
 8                   MS. HAGAN:  Objection.
 9                   To the extent you can answer.
10                   THE WITNESS:  I don't recall any other
11    --
12                   MS. CANFIELD:  Okay.  Okay.  That's
13    fine.
14                   THE REPORTER:  I'm sorry.  Please
15    repeat the answer.
16                   THE WITNESS:  I don't recall any other
17    specific incidents.
18                   THE REPORTER:  Thank you.
19    BY MS. CANFIELD:
20        Q    Okay.  Now after learning that you were paid
21    less than Dr. Ciric, other than raising the issue with
22    your union and raising the issue with Dr. Ford, did
23    you raise the issue with anyone else?
24        A    Yes.
25        Q    Who?
```

Melissa Kaye

Page 59

```
1          A     Dr. Jeremy Colley.

2          Q     And what did you say to Dr. Colley?

3          A     Well, Dr. Ford left to go work for CHS at

4    DOH MH in -- I don't know -- 2014 or '15.  I think

5    '15.  And Dr. Jeremy Colley took over that role as the

6    director of forensic -- the director of the Division

7    of Forensic Psychiatry at Bellevue.

8          Q     Okay.  So what did you say to him about the

9    pay equity issue?

10         A     He came up to the Bronx to just -- right

11   after he got hired, he came up to the Bronx to meet

12   with me and Dr. Barry Winkler.  And he just wanted to

13   check in and ask questions and ask about any problems.

14   And during that meeting, I told him about the pay

15   parity issue.

16         Q     What exactly did you say?

17         A     I said I'm getting paid less than my male

18   colleagues and Ford said she would look into it and

19   take care of it, and nothing ever happened.

20         Q     Okay.  So you said "male colleagues."  Did

21   you believe that you were being paid less than more

22   than one male colleague?

23         A     I know that it was -- that Steve Ciric was

24   on the physician specialist line and that is a higher

25   paying line.  And then there was another -- I believe
```

Melissa Kaye

Page 60

1    there was another male -- I considered Steve Ciric my

2    comparator because we were both medical directors of

3    our respective court clinics.  But there was another

4    male psychiatrist, I don't even remember the name, who

5    was part-time at the Manhattan Court Clinic who also

6    had a physician specialist line.

7         Q    Okay.  And how was it that you know that

8    this psychiatrist who worked part-time was paid more

9    than you?

10        A    Because I saw the spreadsheet.

11        Q    It was a spreadsheet, and that was the email

12   that you testified to earlier that was inadvertently

13   sent around?

14        A    Yes.

15        Q    Okay.

16        A    It was erroneously sent out to everyone.

17        Q    Okay.  And what did Dr. Colley say, if

18   anything, in response?

19        A    Well, he seemed to take my complaint

20   seriously and said he would talk to Dr. Mary Anne

21   Badaracco who was the chief of psychiatry for

22   Bellevue.

23        Q    Okay.  Do you know if he spoke with Dr.

24   Badaracco?

25        A    He did.

Melissa Kaye

Page 61

1      Q    Okay.  And how do you know that?

2      A    Because she called me into her office

3   shortly thereafter.

4      Q    Okay.  And for what reason did she call you

5   into her office?

6      A    She was concerned about my complaint

7   regarding pay parity.

8      Q    And how do you know that?

9      A    Because she told me.

10     Q    What did she say?

11     A    She said, "Oh, yeah.  Well, this is -- you

12   know, this is something we need to address.  This is

13   an EEOC issue."

14          It was clear to me from my interaction with

15   her that Ford had never talked to her.  That this was

16   the first time she was hearing about it.

17     Q    Okay.  And how is it that you were led to

18   believe that Dr. Ford had not met with Dr. Badaracco

19   about the pay issue?

20     A    Because she was interacting with me as if

21   this was the first she was hearing about it from

22   Jeremy Colley.

23     Q    Okay.  And other than saying "this is an

24   EEOC issue," what else did she say, if anything?

25     A    She said she would look into it.

Melissa Kaye

Page 62

1       Q    Okay.  Did she tell you specifically what

2   she would do when she said she would look into it?

3                    MS. HAGAN:  Objection.  Form.

4                    THE WITNESS:  I don't know if she told

5   me specifically at that time, but I did learn over the

6   course of addressing this with Dr. Colley and Dr.

7   Badaracco that she was interacting with central office

8   -- HHC central office.

9   BY MS. CANFIELD:

10      Q    And I'm sorry, how do you know that she was

11  interacting with HHC central office?

12      A    I don't know if Jeremy -- Dr. Colley or Dr.

13  Badaracco told me that they were talking to central

14  office or just over the course of a couple months when

15  this was being dealt with -- being attempted to deal

16  with it, I just know I got the information that

17  central office was involved.  I don't know if it was

18  from Dr. Colley or Dr. Badaracco or both of them.

19      Q    Okay.  Other than learning that central

20  office was involved, did you learn anything else about

21  what was being done to address your complaints that

22  you were being paid less?

23      A    I was told that it was -- it was being

24  looked into.

25      Q    Anything else?

Melissa Kaye

Page 63

1      A     Well, yes.  About -- and I don't know the

2    exact timeframe, but it seemed like maybe two or three

3    months, I don't know, or longer.  Maybe it was longer?

4    Maybe six -- six months?  It was more -- a while

5    later, and I'm sorry I can't specify the time, but

6    there are emails about this in GroupWise if -- if we

7    want to ever look at those.  They're old.

8            But basically at one point I was told that

9    -- and I think I met with Dr. Badaracco again and

10   maybe Dr. Colley, too.  And I was told that basically

11   "you die in your line."  And that my line could not be

12   changed -- could not, would not, I don't remember the

13   exact wording, but my line was not going to be changed

14   from attending three to physician specialist.

15      Q     Did they say why it would not be changed

16   from physician three -- or attending physician three

17   to physician specialist?

18                THE REPORTER:  Please repeat the

19   question.

20   BY MS. CANFIELD:

21      Q     Did they say why your line would not be

22   changed from attending physician to physician

23   specialist?

24      A     They told me that you could not change your

25   line.  That a line could not be changed.  That's what

Melissa Kaye

Page 64

1    they told me.

2           Q     Okay.  And who told you that?

3           A     Dr. Badaracco and -- and Jeremy Colley.

4           Q     Okay.  And how did they tell you that?  In

5    person or in writing?

6           A     I don't -- I know I had a meeting with them

7    and I don't know if they told me at the meeting?  And

8    I got emails about it because it continued on, so they

9    said, but -- your line can't be changed, but each

10   corporate pay title has a -- there's different tiers.

11   There's a gradation of pay and there's a range of pay,

12   right?  So they said, "We can -- or central office can

13   push you to the top pay range for attending three.  We

14   can do that for you."

15          Q     And did that happen?

16          A     Yes, it did happen.

17          Q     Okay.

18          A     But it did not come near to closing the pay

19   gap between me and Steve Ciric.  It amounted to about

20   a $2,000 a year increase in my salary and it didn't --

21   and I think he was getting paid about $38,000 a year

22   more than me.  So it brought -- maybe it brought the

23   pay difference down to 35 or 36,000, but it didn't

24   correct the problem.

25          Q     Okay.  And after you met with Dr. Badaracco

Melissa Kaye

Page 65

```
 1      and Dr. Colley, did you ever go back to your union
 2      about the issue?
 3            A     No.
 4                       MS. HAGAN:  Objection.
 5                       THE WITNESS:  No.  I -- my union had
 6      told me they can't help or get involved in an issue
 7      like that.
 8      BY MS. CANFIELD:
 9            Q     Let me back up because I know we're going
10      down to some of the substance of your complaint, but I
11      want to go make sure I cover everything that I wanted
12      to cover beforehand.
13                       Other than reviewing the documents -- the
14      emails that you testified to earlier -- and speaking
15      with your attorney, did you do anything else to
16      prepare for today's deposition?
17                       MS. HAGAN:  Objection.
18                       You can answer.
19                       THE WITNESS:  I mean, it depends on
20      when you -- I want to answer that accurately.  I mean,
21      I've done things regarding my lawsuit over a period of
22      time, whether it's for direct preparation for this
23      deposition, I -- I guess that's up -- that's up for,
24      you know, debate.
25                       I mean, it -- I've -- I've looked at --
```

Melissa Kaye

Page 66

```
 1     I looked at some of the deposition transcripts from a
 2     while back -- a while back I looked at them.  So I
 3     guess you could consider -- I guess you could consider
 4     that preparation.  I don't know.
 5     BY MS. CANFIELD:
 6         Q    Okay.  Whose deposition transcripts did you
 7     review?
 8         A    I looked at -- this was quite some time ago.
 9     I think it was maybe a year or more -- more than a
10     year ago.  Feels like two years ago.  I don't know.
11     But I looked at Dr. Yang's deposition transcript, and
12     more recently but also a while ago, I looked at Ms.
13     Patsos' deposition transcript.
14                    THE REPORTER:  Could you please spell
15     that?
16                    THE WITNESS:  P-A-T-S-O-S.
17     BY MS. CANFIELD:
18         Q    Anyone else?
19                    MS. HAGAN:  Objection.
20                    THE WITNESS:  I skimmed -- I skimmed
21     through Dr. Ford's, but I didn't -- I skimmed through
22     Dr. Ford's.
23     BY MS. CANFIELD:
24         Q    Is that it of the deposition transcripts?
25         A    Yeah.
```

Melissa Kaye

                                              Page 67

 1          Q     Is that a yes?  Yes?

 2          A     I think.  Yeah, yeah.  I think that's it.

 3          Q     Okay.  When you spoke with your attorney,

 4    did you do so by telephone or in person?

 5                      MS. HAGAN:  Objection.

 6                      THE WITNESS:  On the phone.

 7    BY MS. CANFIELD:

 8          Q     Okay.  Was anyone else present during the

 9    meeting?

10                      MS. HAGAN:  Objection.

11                      You can't --

12                      She's not going to answer that.  It's

13    attorney-client privilege.

14                      MS. CANFIELD:  If someone was there,

15    then there is no privilege.

16    BY MS. CANFIELD:

17          Q     Was anyone in attendance at the time you

18    spoke with your attorney by telephone?

19          A     No.

20          Q     Other than your attorney, did you speak with

21    anyone else about your deposition today?

22                      MS. HAGAN:  Objection.

23                      THE WITNESS:  Well, I -- I told people

24    it was happening.

25    //

Melissa Kaye

Page 68

```
 1   BY MS. CANFIELD:
 2        Q    Who did you tell?
 3        A    The people that I asked to help me with my
 4   kids.
 5        Q    Okay.  Were these family members or
 6   babysitters?
 7        A    Family member and parents of -- of students
 8   that go to school with my -- my children.
 9        Q    Besides the current action, have you ever
10   been a plaintiff or defendant in any other lawsuit?
11        A    I've not been a defendant and I don't know
12   how to answer the question about being a plaintiff.
13        Q    Have you ever sued anyone before prior to
14   this litigation?
15        A    Yes.
16        Q    Who have you sued?
17                  MS. HAGAN:  Objection.
18                  You can answer.
19                  THE WITNESS:  New York City Department
20   of Education.
21   BY MS. CANFIELD:
22        Q    And for what reason did you sue the New York
23   City Department of Education?
24        A    It was on the behalf of my minor child -- my
25   son.
```

Melissa Kaye

Page 69

1          Q     Was this in relation to an individualized

2     education plan?

3          A     Yes.

4          Q     And what was the result of that litigation?

5          A     It was granted.  Modifying -- I'm sorry.

6     May I correct that?  It was modified as requested and

7     granted.  The IEP was modified as requested.

8          Q     Okay.  And what was the IEP for your son?

9                MS. HAGAN:  Objection.  That's not

10    relevant.  We're not going to actually -- she's not

11    going to answer that question.

12                MS. CANFIELD:  I can ask it a different

13    way later.  That's fine.

14    BY MS. CANFIELD:

15         Q     Have you ever given a deposition or did you

16    give a deposition in relation to the lawsuit you filed

17    against the Department of Education?

18                MS. HAGAN:  Objection as to form.

19                You can "ask" if you understand.

20                THE WITNESS:  I was not deposed in the

21    Department of Education matters.

22    BY MS. CANFIELD:

23         Q     Were you represented by counsel in that

24    matter?

25         A     Yes.

Melissa Kaye

Page 70

```
 1        Q     And who represented you?
 2        A     It was Nicole Saldana [ph] and she had
 3   temporarily a partner, but they split up and I stayed
 4   with Nicole.  I don't remember the partner's name.
 5        Q     Do you remember the name of the firm?
 6               MS. HAGAN:  Objection.
 7               THE WITNESS:  I don't know if it was a
 8   firm.  They were just two women working together.
 9   BY MS. CANFIELD:
10        Q     Okay.  In what year did you sue the DOE?
11        A     It was two years in a row.  One year was
12   2016.  And I don't remember if the first year was 2015
13   or if the -- so I don't remember if it was 2015-2016,
14   or 2016-2017.
15        Q     Okay.  And have you ever signed an affidavit
16   or a declaration in connection with the litigation
17   against the DOE?
18               MS. HAGAN:  Objection to form.
19               THE WITNESS:  I think I did sign
20   something.  I don't remember what it was, but I
21   remember when the case -- the DOE case was resolving
22   and they were going to modify his IEP, that I did have
23   to sign a lot of papers.  And I don't know if it was
24   called a declaration, but I signed a lot of papers.
25   //
```

Melissa Kaye

Page 71

```
 1   BY MS. CANFIELD:
 2        Q    Okay.  Any other -- go ahead.  I'm sorry.
 3                  THE WITNESS:  I'm getting, like, texts
 4   about my -- something about my kids' stuff and I was
 5   wondering if there was any way we could take a break
 6   soon?  Just a short break?
 7                  MS. CANFIELD:  Yes.  Let's take a five-
 8   minute break now.
 9                  THE WITNESS:  I can -- okay.  All
10   right.  Thank you.
11                  THE REPORTER:  The time is 11:42 a.m.
12   We're off the record.
13                       (Off the record.)
14                  THE REPORTER:  The time is 11:49 a.m.
15   We're back on the record.
16                  MS. HAGAN:  I'm ready to proceed.
17                  MS. CANFIELD:  Thank you.
18   BY MS. CANFIELD:
19        Q    Dr. Kaye, you're represented here by Special
20   Hagan; is that correct?
21        A    Yes.
22        Q    When did you first contact Special Hagan
23   regarding the issues in this litigation?
24                  MS. HAGAN:  Objection.  She's not going
25   to answer that.
```

Melissa Kaye

1           MS. CANFIELD:  That's not privileged

2    when she first contacted you.  I'm not going to ask

3    her what she said, I just want to know when she first

4    contacted you.

5           THE WITNESS:  I want to give -- I can

6    give you a timespan, but I can't give you a date.

7    BY MS. CANFIELD:

8       Q    Okay.  Whatever you can provide.

9       A    I would -- I would say September/October

10   2018.

11      Q    Okay.  And what led you to contact Special

12   Hagan regarding the litigation?

13           MS. HAGAN:  Objection.

14           THE WITNESS:  I needed to find a new

15   lawyer.

16   BY MS. CANFIELD:

17      Q    And had you contacted other attorneys or law

18   firms prior to contacting Special Hagan?

19      A    I was represented by another law firm.

20      Q    Okay.  And what was the name of that law

21   firm?

22           MS. HAGAN:  Objection.

23           THE WITNESS:  I think it was Bentley &

24   Levy.

25   //

Melissa Kaye

Page 73

```
 1   BY MS. CANFIELD:
 2        Q    Did you have a retainer agreement with that
 3   firm?
 4        A    Yes.
 5        Q    And do you recall when you entered into a
 6   retainment agreement with Bentley & Levy?
 7                  MS. HAGAN:  Can I correct it?  It was
 8   Bantle & Levy.  So it was B-A-N-T-L-E.
 9                  MS. CANFIELD:  Okay.  Thank you.
10                  THE REPORTER:  And can you spell Levy?
11                  MS. HAGAN:  L-E-V-Y.
12                  THE WITNESS:  I don't recall when --
13   when I entered into the -- when I signed the retainer.
14   BY MS. CANFIELD:
15        Q    Do you recall when you first contacted them
16   about the issues in this litigation?
17        A    I don't.
18        Q    Do you know if it was in 2018?
19        A    Yes.  Yes, it was in 2018.
20        Q    Okay.  Was it while you were working at
21   Bellevue?
22                  MS. HAGAN:  Objection.
23                  THE WITNESS:  Am I supposed to answer?
24                  MS. HAGAN:  Yes.
25                  MS. CANFIELD:  Yes.
```

Melissa Kaye

Page 74

```
 1                    THE WITNESS:  Yes.
 2      BY MS. CANFIELD:
 3          Q     Okay.  So is it your best recollection that
 4      it was early in 2018 when you contacted or reached out
 5      to Bantle & Levy?
 6          A     Yes.
 7                    MS. HAGAN:  Objection.
 8      BY MS. CANFIELD:
 9          Q     Okay.  In 2013 and 2014, when you learned
10      that you were being paid less than Dr. Steven Ciric,
11      did you reach out to any attorneys at that time?
12                    MS. HAGAN:  Objection.
13                    THE WITNESS:  I don't recall.
14      BY MS. CANFIELD:
15          Q     Okay.  When you learned that you were being
16      paid less than Dr. Steven Ciric, did you file any type
17      of administrative complaint?  Meaning did you file a
18      complaint with the EEOC or the State Division of Human
19      Rights or the City Commission of Human Rights?
20                    MS. HAGAN:  Objection.
21                    You can answer.
22                    THE WITNESS:  No.
23                    MS. CANFIELD:  Okay.
24                    THE REPORTER:  Was the answer no?
25                    THE WITNESS:  The answer is no.
```

Melissa Kaye

Page 75

```
 1   BY MS. CANFIELD:
 2        Q    When you learned that you were being paid
 3   less than Dr. Steven Ciric, did you file an internal
 4   complaint with Bellevue?
 5                  MS. HAGAN:  Objection.
 6                  THE WITNESS:  I complained to Dr. Ford
 7   and later I complained to Dr. Colley.
 8   BY MS. CANFIELD:
 9        Q    Okay.  But did you file a complaint with the
10   EEO office of Bellevue?
11        A    No.
12        Q    Do you know if they filed a complaint with
13   the EEO office of Bellevue?
14        A    I don't know.
15        Q    Why did you not contact legal counsel in
16   2014, 2015 when you learned that you were being paid
17   less than Dr. Steven Ciric?
18                  MS. HAGAN:  Objection.
19                  You can answer.
20                  THE WITNESS:  My supervisor was Dr.
21   Ford and then Dr. Colley were telling me it was going
22   to be addressed.
23   BY MS. CANFIELD:
24        Q    Okay.  What led to you reaching out to
25   Bantle & Levy in early 2018?
```

```
 1                    MS. HAGAN:  Objection.

 2                    You can answer.

 3                    THE WITNESS:  When CHS decided to take

 4    over the court clinics and started -- they started

 5    unofficially doing that in early 2018.  And I learned

 6    that the psychologists working at the court clinics

 7    were getting their line -- their lines changed from

 8    psychology two to psychology three so that they would

 9    get a raise.

10                    And so I was also aware that CHS was

11    set up to be part of HHC, but also as separate from

12    HHC, and that different rules applied to CHS.  And so

13    I thought, well, maybe at HHC proper, you have to die

14    in your line and they couldn't change my line from

15    attending three to physician specialist, but clearly,

16    that's not true at CHS.

17                    So I then decided that I was going to

18    pursue that change in my corporate title to bring my

19    pay -- make my pay comparable to Dr. Ciric and other

20    physician specialists at the court clinics.

21    BY MS. CANFIELD:

22       Q   Okay.  So I'm not quite clear.  The question

23    was what led you to reach out to attorneys -- Bantle &

24    Levy -- in early 2018.  And the response was because

25    you learned these three things?
```

Melissa Kaye

Page 77

1        A    I learned that the lines could in fact be

2    changed, which I was told they couldn't.  I asked -- I

3    reached out to Dr. Yang and I asked for the change in

4    title, and I explained the whole situation to her.

5    She passed me off.  It was in May, even though I was

6    -- I was slated to switchover, you know, in a month or

7    so -- a month and a half.  And they had already taken

8    over the Brooklyn and Queens clinic and the

9    psychologist lines were changed to increase their

10   salaries.

11               I reached out to Dr. Yang early on when I

12   found out about this and she kind of passed -- passed

13   me off to Bill Hicks at Bellevue.  And it was like the

14   runaround and they said they would get back to me and

15   they never did.  So that's when I decided to file an

16   EEOC complaint.

17                     THE REPORTER:  Did you say Bill Hicks?

18                     THE WITNESS:  Yes.

19                     THE REPORTER:  Thank you.

20   BY MS. CANFIELD:

21        Q    Okay.  So let's back up a little bit.  You

22   said that you learned that there were some

23   psychologists whose lines were -- their levels were

24   being increased from a level two to a level three; is

25   that what your testimony was?

Melissa Kaye

Page 78

1          A     My testimony is that there's corporate

2     titles -- I believe they're called corporate titles,

3     which are titles that are linked to those pay ranges I

4     talked about before.

5               And the pay range for a psychologist two is

6     less than the pay range for a psychologist three.  So

7     the psychologists that were being brought on board

8     from the court clinics that were all -- all four court

9     clinics were being merged under CHS.  The

10    psychologists who were working at the court clinics

11    were getting their titles changed from a psychology

12    two to psychology three so they could get paid more.

13    So they were -- so they were getting an increase in

14    their salary with this bump-up in their corporate

15    title from psychology two to psychology three.

16         Q    Okay.  So their lines weren't being changed.

17    They were just moving up a level in their line?

18    Similar to how you were -- you probably held a

19    position attending physician two before you held the

20    position attending physician three; is that correct?

21         A    No.

22               MS. HAGAN:  Objection as to form.

23               THE WITNESS:  That's not correct

24    because a line is a line.  So if you're in a line -- a

25    psychology two line, that's your line.  If you're in a

Melissa Kaye

1    psychology three line, that's your line.  If you're an

2    attending three or attending -- or a physician

3    specialist, that's your line.  And I was told none of

4    those lines could be changed.

5                   So not --

6    BY MS. CANFIELD:

7         Q    Okay.  Who told you that a psychology two is

8    a line different from psychology three, rather than

9    just an internal bump-up within that line or within

10   that scale?  Who told you that?

11        A    It's in the Collective Bargaining Agreement.

12   If you look at the -- the designated city lines,

13   they're discrete and -- and separate.  They're not --

14   it's not a part of the same -- the definition of the

15   work isn't exactly the same.

16             I think -- I know for an attending three

17   line, I can speak to -- that is -- includes some

18   administrative responsibilities and that was my line.

19             I don't know the details about the

20   definition of these lines, but the lines are discrete

21   and separate.  It's not like the -- the bumping up in

22   -- in the range of a specific line with your pay is

23   different than actually changing the corporate title.

24        Q    Okay.

25        A    And if the title changes from -- from

Melissa Kaye

Page 80

1    psychology two to psychology three, or -- or attending

2    three to physician specialist, it's a -- it's a change

3    in the corporate title.  So I -- I was told that you

4    cannot have a change in your line, a change in your

5    corporate title at HHC.  And that's why I couldn't

6    have that equal pay to my male colleague.  That's why

7    I couldn't be a physician specialist.  But then I

8    learned otherwise that those same rules, if they are

9    in fact true -- and I don't know, but that's what I

10   was told and I believed at the time -- that I -- I

11   just accepted that at the time, but then when I

12   learned that at CHS that that rule doesn't apply, I

13   wanted to correct this longstanding pay discrepancy.

14   And I sought to -- to do that.

15        Q    Okay.  I'm going to stop you there.  Who are

16   the psychologists that you saw getting their line

17   changed?

18                  MS. HAGAN:  Wait, wait, wait.  She

19   needs to finish her -- stop, stop.

20                  THE REPORTER:  I'm sorry.  Please speak

21   one at a time.

22                  MS. HAGAN:  Wait a second.

23                  Dr. Kaye, did you finish your answer

24   from the previous question?

25                  THE WITNESS:  Well, I -- I mean, I was

Melissa Kaye

1    just talking about, you know, whatever I was -- I was

2    just --

3                    MS. HAGAN:  Ms. Canfield, I'm going to

4    just ask that you allow Dr. Kaye to finish her answers

5    before you start with the next question.

6                    MS. CANFIELD:  I will do my best.  I'm

7    just trying to move the deposition along and just

8    trying to get answers to the questions.

9                    I apologize if I interrupted you, Dr.

10   Kaye.

11                   THE WITNESS:  I'm sorry.  I'll try to

12   be more succinct.  I'm -- I --

13                   MS. CANFIELD:  Thank you.  Thank you.

14   BY MS. CANFIELD:

15       Q    What are the names of the psychologists that

16   you said moved from psych two to psych three --

17   psychology three?

18       A    I don't know their exact names for sure, but

19   I was told that all the psychologists in Queens and

20   Brooklyn, or many of them, got a bump-up in their

21   corporate title from psychology two to psychology

22   three so they could get a raise.

23       Q    Okay.  Who told you that?

24       A    Dr. Barry Winkler.

25       Q    Dr. Winkler said that?  Okay.  Did Dr.

Melissa Kaye

Page 82

1    Winkler say that he was given a raise?

2         A    He did not say.  He -- well, he -- he was --

3    he took a different job.

4         Q    Okay.  And what job did he take?

5         A    And yes, I -- I'm sorry, Ms. Canfield.  And

6    yes, he did -- he did get a raise with his -- his new

7    position.

8         Q    Okay.  And what was his new position that he

9    took?

10        A    He left the Bronx Court Clinic in April 2018

11   to become the director of the Brooklyn Court Clinic.

12        Q    Okay.  And do you know at the time when he

13   was -- prior to him becoming the director of the

14   Brooklyn Court Clinic, do you know what title he held?

15        A    Well, his -- I think -- and I believe it's

16   called "functional title" if I'm not mistaken, which

17   just means it's not linked to the corporate pay title.

18   But he was deputy director of the Bronx Court Clinic.

19   That was what he was, but that was -- yeah.  That was

20   --

21        Q    What was his civil service title?

22        A    He was not in civil service.  He switched

23   out of civil service.

24        Q    Okay.  And when did he do that?

25                   MS. HAGAN:  Objection.

Melissa Kaye

Page 83

```
 1                    If you know the answer.
 2                    THE WITNESS:  I would say it was in the
 3     first three or so years that he was working at the
 4     Bronx Court Clinic.
 5     BY MS. CANFIELD:
 6          Q    Okay.
 7          A    And he started working there in 2008, so
 8     maybe 2011 around, plus or minus.
 9          Q    Do you know if Dr. Winkler, when he was
10     working at the Bronx Court Clinic, was a member of the
11     union?
12                    MS. HAGAN:  Objection.
13                    THE WITNESS:  When -- when he was in
14     the civil service title, he was.  I -- yes.
15     BY MS. CANFIELD:
16          Q    Okay.  So is it your belief that prior to --
17     immediately prior to going to Brooklyn, he was not in
18     -- represented by a Collective Bargaining Unit when he
19     was working in Bronx?
20                    MS. HAGAN:  Objection.
21                    THE WITNESS:  That's my understanding.
22     BY MS. CANFIELD:
23          Q    Okay.  And the psychologist that you were
24     told received the change from psychologist two to
25     psychologist three, do you know if they were members
```

Melissa Kaye

Page 84

1    of a Collective Bargaining Unit?

2         A    Yes.

3         Q    Okay.  And how do you know that?

4         A    Because the psychologists at the court

5    clinics are -- they were all part of the Collective

6    Bargaining Unit.

7         Q    Okay.  Do you know what Collective

8    Bargaining Unit they were a part of?

9         A    Is it DC 37?

10              MS. HAGAN:  Objection.

11              Don't guess if you don't know.

12              THE WITNESS:  Whatever the largest

13   Collective Bargaining Unit is in -- in -- for

14   healthcare workers.  I think it's called DC 37.

15              MS. HAGAN:  Objection.

16   BY MS. CANFIELD:

17        Q    Okay.

18        A    I'm not a hundred percent sure about that --

19        Q    Okay.

20        A    -- but I believe it's DC 37.

21        Q    And during the time that you were employed

22   at Bellevue and at CHS, were you a member of a

23   Collective Bargaining Unit?

24        A    Yes.

25        Q    And what was the name?

Melissa Kaye

Page 85

```
 1        A     Doctors Council.
 2        Q     Okay.  And so is it your testimony that
 3    Doctors Council does not represent psychologists?
 4                    MS. HAGAN:  Objection.
 5                    If you know the answer to that
 6    question.
 7                    THE WITNESS:  Correct.  They do not.
 8    BY MS. CANFIELD:
 9        Q     Okay.  Now who did you speak to at CHS about
10    getting your line changed?  You said you spoke to Dr.
11    Yang?
12        A     And Dr. Ford, and Dr. --
13                    THE REPORTER:  And who was the third
14    name?
15                    THE WITNESS:  Dr. Jain.  That's J-A-I-
16    N.
17    BY MS. CANFIELD:
18        Q     And what did you say to Dr. Yang?
19        A     I wrote her -- well, I first talked to Dr.
20    Ford and Dr. Jain in April because, I mean, CHS had
21    unofficially taken over the court clinics by then.  I
22    mean, they were involved way back since 2015, but they
23    then became very actively involved in 2018.
24                    And we were having meetings downtown with
25    CHS and there was a lot of -- they had pretty much
```

Melissa Kaye

Page 86

1    taken over the management of the clinics by -- by

2    April.

3         Q    I'm sorry to interrupt, Dr. Kaye.  My

4    question was is what did you say to Dr. Yang?

5         A    So we --

6              MS. HAGAN:  Can you please let her

7    finish her answer?

8              THE WITNESS:  I'm sorry, Ms. Canfield.

9    I'm going to try to be tight because I -- I did speak

10   to Dr. Jain and Dr. Ford at a CHS court clinic-related

11   matter down on Water Street in April of 2018 about the

12   pay parity issues.  I was ushered off to speak to Mr.

13   Wangel and Jessica Laboy about -- about that and my --

14   and the conditions of my work should I accept --

15   formally accept the transfer that was scheduled for

16   July.

17             And so I -- I verbally complained to

18   them and then I asked Dr. Ford -- especially given my

19   history with her, knowing that she never did anything

20   about it at Bellevue, I didn't -- and then she was

21   trying to push me to -- saying the only way I could

22   have a pay raise is if I left the union and I didn't

23   think that was reasonable.  You know, Steve Ciric was

24   in the union as a physician specialist, so I didn't

25   feel like, you know -- if my male comparator who was

Melissa Kaye

Page 87

1    getting paid more than me was allowed to me in the

2    union, I didn't feel I should have to be pushed out of

3    the union just to get equal pay and -- and -- and then

4    lose everything -- you know, give something up for

5    that.

6                    So she sent me an email I think that

7    said -- was vague and cryptic.  And I asked her about,

8    you know, giving up the union benefits if I wanted to

9    be considered for equal pay.

10                   And so I asked her if I could reach out

11   to Dr. Yang.  And so she said yes.  And I wrote Dr.

12   Yang a long, detailed description of my -- my pay

13   parity issues at HHC.  And that was in -- I don't

14   know.  Probably right after that meeting.  Maybe

15   beginning of May or something, around there.  End of

16   April, beginning of May of 2018.  And she passed me

17   off -- bumped me back to Bellevue -- to Bill Hicks at

18   Bellevue and they were kind of giving me a lot of lip

19   service, but they never followed up with them.

20                   They said they would follow-up with me,

21   but neither one of them ever followed up with me.

22   BY MS. CANFIELD:

23       Q    Okay.  Let me ask you a question.  When you

24   spoke to Dr. Ford and she said that you would have to

25   give up your union, explain to me what she explained

Melissa Kaye

Page 88

```
 1    to you.
 2         A    Well, we didn't speak.  She just --
 3                   MS. HAGAN:  Objection as to form.
 4                   You can answer.
 5                   THE WITNESS:  We didn't -- she -- Dr.
 6    Ford kept me at an arm's length.  I only met -- once
 7    Bellevue -- I only met face to face with Dr. Ford once
 8    during my employment at -- well, twice actually.  I'm
 9    going to correct that.
10                   She only -- she kept me at an arm's
11    length.  I met with her once at a meeting that I
12    insisted upon having.  She tried to get out of it, but
13    I insisted upon having a meeting.  November 30th was
14    the meeting of 2018.  And so she didn't call or meet
15    with me, so she would just, you know -- she would send
16    these kind of -- these emails.  And the email was,
17    "Well, yeah."  I don't remember exactly what the email
18    said, but it basically was, "Yeah, well, I could
19    support, you know, pay parity and things being fair,
20    but I you want pay parity, you'd have to give up your
21    union and other benefits."
22                   And I was like, this is -- you know,
23    this is ridiculous.  This isn't -- you know, pay
24    parity doesn't mean that you have to be punished for
25    being -- or lose something for getting paid the same
```

Melissa Kaye

Page 89

1    as your male colleagues.  So I was -- I rejected that.

2    BY MS. CANFIELD:

3         Q    Let me ask you, so --

4                   MS. HAGAN:  You need to let her finish

5    her answer.

6                   Are you finished with your answer, Dr.

7    Kaye?

8                   THE WITNESS:  I just rejected the

9    concept that correcting my pay parity with Steve

10   Ciric, who was in the -- who was a union member.

11   BY MS. CANFIELD:

12        Q    Did Steve Ciric come over with the CHS

13   oversight of the court clinics?

14        A    No.  Steve Ciric -- I'm trying to think.  I

15   believe Steve Ciric resigned -- I'm trying to

16   remember.  I think it was -- it was before the

17   official takeover.  I -- I think it was --

18                   MS. HAGAN:  If you're not sure, just

19   say so.

20                   THE WITNESS:  I think it was around the

21   end of 2017, beginning of 2018 that Dr. Ciric

22   resigned.

23   BY MS. CANFIELD:

24        Q    Okay.  Do you know why he resigned?

25                   MS. HAGAN:  Objection.

Melissa Kaye

Page 90

1                 THE WITNESS:  He moved to Buffalo to be
2      near his wife's family.
3      BY MS. CANFIELD:
4          Q    Okay.  And do you know who stepped in his
5      position to oversee the Manhattan Court Clinic?
6          A    There was no one formally in the position.
7      Dr. Jeremy Colley who was, on paper you know anyway,
8      still in charge of the Bronx and Manhattan Court
9      Clinics until July 1, 2018.  He was acting as the
10     interim director of the Manhattan Court Clinic in his
11     capacity as the director of the Division of Forensic
12     Psychology at Bellevue.
13         Q    Okay.  Who eventually took over Dr. Ciric's
14     position as the head of the Manhattan Court Clinic?
15         A    CHS hired a new director, Daniel S. Mundy,
16     M.D.  M-U-N-D-Y is the spelling I believe.
17         Q    And do you -- was Dr. Mundy a psychiatrist
18     or a psychologist?
19         A    Psychiatrist.
20         Q    Psychiatrist?  Okay.  And do you know if Dr.
21     Mundy was a member of a Collective Bargaining Unit
22     when he was hired?
23         A    He was part-time psychiatrist evaluator at
24     the Manhattan Court Clinic under Bellevue.  And at
25     that time, he was a member of the Collective

Melissa Kaye

Page 91

1    Bargaining Unit.

2            I know that he was made -- he was -- there

3    were numerous stipulations that were given to him

4    about taking -- being offered and taking the job as

5    the director, and one of those was that he would have

6    to leave the Collective Bargaining Unit.

7        Q    Okay.  And how do you know this?

8        A    He told me.

9        Q    Okay.  One of the stipulations was leaving

10   the Collective Bargaining Unit?

11       A    Right.

12       Q    Okay.  Did he indicate that was something he

13   did not want to do?

14       A    He -- he had concerns about it.  He wasn't

15   -- it was an uneasy decision for him.  He talked to me

16   a lot about it.

17       Q    What did he say?

18       A    He didn't want to -- he didn't want to have

19   to leave -- he didn't want to have to give up being a

20   member of the union.  He was concerned.

21       Q    What were his concerns?

22                MS. HAGAN:  Objection.

23                THE WITNESS:  Loss of benefits.  Loss

24   of protection.

25   //

Melissa Kaye

Page 92

1    BY MS. CANFIELD:

2         Q    But he eventually agreed to leave the

3    Collective Bargaining Unit and become what's called a

4    managerial employee; is that your understanding?

5                   MS. HAGAN:  Objection.

6                   THE WITNESS:  I don't know what it's

7    called, but I know that he agreed to take the job

8    without being a member of the union.

9    BY MS. CANFIELD:

10        Q    Okay.  And you as head of the Bronx Court

11   Clinic, you were able to take the job without giving

12   up your union benefits; is that correct?

13                  MS. HAGAN:  Objection.

14                  THE WITNESS:  Well, what happened was

15   that when -- when CHS announced the takeover in early

16   2018, the unions got involved.  And my union, Doctors

17   Council, had multiple meetings with CHS leadership,

18   including Jonathan Wangel, Elizabeth Ford, Patsy Yang.

19   And basically said that the doctors from Bellevue --

20   and I believe this was done in conjunction with I

21   think it's DC 37 -- that the -- whether they were M.D.

22   physician doctors or whether they were PhD, PsyD,

23   psychology doctors, they were going to be rolled over

24   as-is.  Or I know that Dr. Yang decided to give the

25   psychologists a raise, but that their working

Melissa Kaye

Page 93

1      conditions weren't going to change.  Everything would

2      stay exactly the same.  And that was reiterated again

3      and again in this agreement and there were certain

4      other agreements related to a pending retention bonus

5      that was going to be given to all the physician M.D.

6      evaluators, which would have been me and I think three

7      or four part-time male psychiatry physician examiners

8      at the Manhattan Court Clinic.

9                     So there was all this detail worked out

10     about that, but specifically was that everyone that

11     was in the Collective Bargaining Unit that was rolling

12     over in their same positions would stay in the

13     Collective Bargaining Unit.  So that included me.

14     BY MS. CANFIELD:

15          Q     Okay.  So you were able to stay in the

16     Collective Bargaining Unit?

17          A     Correct.

18          Q     Okay.  And what are the benefits that you

19     had in the Collective Bargaining Unit as compared to

20     someone who's a managerial employee?

21                     MS. HAGAN:  Objection.

22                     To the extent that you know the answer

23     to that question.

24     BY MS. CANFIELD:

25          Q     I would think that you would know because

Melissa Kaye

Page 94

1    you did not want to give them up.  So what were those

2    benefits?

3        A    Well, the benefits that -- I think the

4    benefit is that, you know, I think in general,

5    employees, you know, in unions have a -- have a voice

6    that is speaking for the collective.  And whether that

7    be negotiating cost of living pay raises or, you know,

8    trying to buffer or mitigate any kind of managerial

9    abuse or the ability to have some checks and balances

10   as far as any kind of changes in -- or disciplinary

11   actions or any kind of bad behavior on the part of

12   management, if you have a union, you're possibly in a

13   better situation than being in a -- in a job that is

14   at-will and you can be fired without cause.  That type

15   of thing.

16            So given the hostility that was clearly

17   directed to me, before even the official takeover of

18   CHS -- of the court clinics -- I was -- I felt that

19   the offer to ostensibly get a pay raise if I gave up

20   my union was a ploy to fire me.  And I wasn't going to

21   fall for that.

22       Q    Why did you -- let me ask you a question.

23   Why did you think that the request to -- if this is a

24   way that we could raise your pay, why did you see that

25   as really something disguised as an attempt to fire

Melissa Kaye

Page 95

1      you?

2                      MS. HAGAN:  Objection as to form of the

3      question.

4                      You can answer.

5                      THE WITNESS:  Dr. Ford had shown, you

6      know, to be -- herself to be unsupportive and less

7      than honest with me in the past.  And there was an

8      incident where, you know, I had complained or I had

9      been involved in numerous -- with numerous clinicians

10     -- physicians and psychologists -- and Dr. Winkler is

11     a psychologist and an attorney.  Dr. Ciric, Dr.

12     Colley.

13                     There was this issue about using

14     redacted records versus unredacted records in

15     conducting a forensic exam.  And it really wasn't my

16     issues.  It was, you know, a professional discussion

17     amongst the senior evaluators and --

18     BY MS. CANFIELD:

19          Q    Right.

20          A    -- that just -- the people I just named.

21     And, you know, the judges -- some very senior judges

22     in the Bronx -- Judge John S. Moore, he's a -- he was

23     a bureau chief under Robert Morgenthau.  Then he

24     became a -- a Criminal Court judge in the Bronx, and

25     then a Supreme Court judge.  And he was an institution

Melissa Kaye

```
 1   -- like, he -- he ran the sex offender and the youth

 2   part of the courts in the Bronx.  And he then

 3   transitioned into being involved in Mental Health

 4   Court.

 5           I mean, this was a seasoned, knowledgeable,

 6   experienced judge in the matters of mental health and

 7   criminal law, and the intersection between those two

 8   bodies of knowledge and professional activity.  And he

 9   -- you know, he had issued -- and it wasn't just him.

10   It was Judge Lieb -- Judith Lieb and -- and --

11       Q    Dr. Kaye?

12       A    Yeah.

13       Q    Dr. Kaye, I'm just trying to -- I'm trying

14   to -- we need to stay on track or we're never going to

15   get --

16       A    I'm sorry.

17       Q    -- we're never going to finish.

18       A    So --

19               MS. CANFIELD:  Can you read the

20   question back again just --

21               MS. HAGAN:  No, no.  She needs to

22   finish her answer.

23               Did you finish your train of thought,

24   Dr. Kaye?

25               MS. CANFIELD:  We're going to have to
```

Melissa Kaye

1    come back if --

2                    THE WITNESS:  I'm sorry.

3                    MS. HAGAN:  What is your answer?

4                    You can't cut her off.  You cannot cut

5    her off, Ms. Canfield.

6                    THE WITNESS:  I'm sorry.  What is the -

7    - if you read back the question, I'm sorry, Ms.

8    Canfield.  I'm going to be succinct, but I feel like

9    there's a lot of -- there was --

10                   Please read back the question if -- if

11   --

12                   THE REPORTER:  Just a second.

13                   (The reporter played the record as

14                   requested.)

15                   THE WITNESS:  Thank you.

16                   So the issue of using redacted records

17   or not using redacted records was a legitimate

18   professional issue amongst informed professionals --

19   legal professionals, forensic evaluators who were

20   professionals in their own rights.  And it wasn't a

21   personal issue of mine, Dr. Ford --

22                   THE REPORTER:  It wasn't a what, ma'am?

23                   THE WITNESS:  It wasn't a personal --

24   personal issue of mine.  I mean, certainly I wanted to

25   do quality work and -- and provide neutral, objective,

Melissa Kaye

Page 98

1      thorough exams and -- and -- and make diagnoses with

2      -- with professional responsibility, but the courts

3      were ordering -- you know, it -- it --

4                     The courts were ordering unredacted

5      records.  And they -- this was in conjunction -- the

6      Chief Administrative Judge Torres ended up getting

7      involved because CHS was defying these court orders

8      for unredacted medical records.  They were just

9      snubbing the Court and they would just provide

10     redacted medical records and just make the -- you

11     know, decide that they would have -- that they didn't

12     have to answer to the Court.  And it was --

13                     MS. CANFIELD:  Dr. Kaye?

14                     MS. HAGAN:  Oh, you have to let her

15     finish.

16                     MS. CANFIELD:  No, no.

17     BY MS. CANFIELD:

18         Q    Dr. Kaye, why -- how did you tie the issue

19     of your challenge to the redacted records -- how is it

20     that that led you to believe that you were at risk of

21     losing your job or that's the motivation behind

22     wanting to make you a managerial employee?

23                     MS. HAGAN:  First and foremost --

24                     MS. CANFIELD:  That's the question.

25                     MS. HAGAN:  No.  You have to let her

1    finish the answer that she was in the -- of giving.

2                    THE WITNESS:  You know, so it was that

3    issue and it was the issue of just gratuitously having

4    all criminal -- it was a constitutional issue for the

5    rights of defendants.  And it was -- and, you know,

6    Patsy Yang and a bunch of very high-ranking people,

7    including Dr. Ford, basically stormed my office in

8    January 2018 and were making all of these -- proposing

9    all of these changes that had constitution -- in my

10   opinion as a non-lawyer.  I mean, this was just my

11   opinion as a non-lawyer had constitutional issues

12   regarding the rights of criminal defendants and I was

13   concerned.

14                    I mentioned it at the meeting that

15   there was a -- you know, my concerns about using --

16   gratuitously using -- having criminal defendants

17   signing HIPAA releases pro forma at arraignment was

18   problematic on many levels.  And at that point, I was

19   threatened.  I was openly threatened, and there were

20   many people in the room.

21                    Patsy Yang said to me, "If you don't

22   like the way we do things, there's the door."  And she

23   gestured to the door.  And she said, "We got all the

24   money.  We can hire whoever we want."  Just because I

25   was trying to voice my concerns about the

Melissa Kaye

Page 100

1    constitutional rights of criminal defendants.

2              And then similarly, with the redacted

3    record issue, Ford basically felt that I was -- that

4    was problematic that I had a concern about it, but she

5    wasn't concerned that Barry Winkler or Steve Ciric or

6    Jeremy Colley had a concern about it.  Just me.

7    BY MS. CANFIELD:

8         Q    How do you know that?

9         A    Because it was discussed.  It -- we were

10   interacting with her.  She worked for CHS at that

11   point and we were -- we were interacting with CHS

12   about these medical records via emails, via phone

13   calls.

14        Q    How do you know -- how do you know --

15   because you said in the deposition of Dr. Winkler, Dr.

16   Winkler also testified that he objected to the use of

17   redacted records.

18             How do you know that you are the target when

19   you say that everyone had the same objections?

20        A    Because --

21        Q    What leads you to the conclusion that you

22   alone were singled out?

23        A    Because after this meeting when it came up,

24   it was me who was getting retaliated against.

25        Q    Okay.  And how were you retaliated against?

Melissa Kaye

Page 101

```
 1        A    Dr. Winkler got a promotion and I got -- I
 2   started getting excluded and marginalized.  I --
 3        Q    Okay.  Hold on.  Hold on.  Let's start with
 4   -- Dr. Winkler got a promotion.  Okay.
 5             You told me that Dr. Winkler, he was hired
 6   into the Brooklyn medical director, or Brooklyn
 7   director position, right?
 8        A    He was hired as --
 9        Q    Is that the promotion you're talking about?
10             MS. HAGAN:  Objection.  You got to let
11   her answer the question.  You're --
12             MS. CANFIELD:  I'm just trying to move
13   things along.
14             MS. HAGAN:  Well, she has to answer the
15   question.  You're asking these questions, so let her
16   answer the question, please.
17             THE WITNESS:  Dr. Winkler was promoted
18   from deputy director at the Bronx Court Clinic to
19   director of the Brooklyn Court Clinic.  And he got --
20   that was a promotion.
21   BY MS. CANFIELD:
22        Q    Okay.  That is a promotion.  Okay.  So
23   because he got a promotion, you believe that -- what?
24        A    Well, I'm just saying I was treated very
25   differently because then after that meeting when they
```

Melissa Kaye

Page 102

1   stormed my office and I was threatened, I -- there was

2   this -- CHS under Dr. Ford in particular had put

3   together this so called 730 workgroup where they

4   wanted to talk about ways to improve the 730

5   evaluation process and, you know, what the problems

6   are, how they could be addressed.  And I was very into

7   that.  I really wanted to be part of the -- the modern

8   -- the court clinics and making things better.  And I

9   -- I was all in for that.  And --

10       Q    And you were invited to participate in that

11  workgroup, weren't you not?

12       A    I was --

13            MS. HAGAN:  Objection.

14            THE WITNESS:  I was not.  I was not.  I

15  specifically -- after that meeting when they -- it was

16  Bill Hicks, Sarah Gillian [ph], Beth Ward [ph], Jeremy

17  Colley, LaKeisha Prasad [ph] -- who was our

18  administrator up there -- Dr. Yang, Dr. Winkler.  I --

19  I don't remember who else was in that meeting.  Bill

20  Hicks.  And they were all in that meeting when they

21  stormed our office.  And after that meeting, people

22  were -- we kind of left my office.  We were waiting

23  for Department of Corrections -- DOC -- to come up and

24  open our bullpen because they wanted to see where we

25  did these evaluations.  Where we did these forensic

Melissa Kaye

Page 103

1    evaluations.

2                    And I asked Dr. Ford -- she was leaning

3    against the wall and I said, "I really want to be part

4    of the 730 workgroup."  And so she just like -- she

5    looks down at the ground -- she shuffles her feet,

6    looks down at the ground, turns her back on me and

7    starts trying to get someone else walking passed her

8    in the hall to talk to her.  Just like --

9    BY MS. CANFIELD:

10        Q    Weren't you invited to the workgroup?

11   Didn't Mr. Bloom testify that you were in fact invited

12   to the workgroup, but that your email address was

13   wrong and that --

14        A    No, that's --

15                   MS. HAGAN:  Objection.  Assumes that

16   she knows what Mr. Winkler said.  And --

17                   MS. CANFIELD:  I'm talking about Mr.

18   Bloom, and she attended Mr. Bloom's deposition.

19                   MS. HAGAN:  Objection.

20                   Go ahead.

21                   THE WITNESS:  May I talk?

22                   MS. HAGAN:  Yes.

23                   THE WITNESS:  So those are totally

24   separate 730 workgroups.  Mr. Bloom was talking about

25   the MOCJ workgroups, which were run and managed by

Melissa Kaye

Page 104

1    City Hall, which was completely different than this

2    internal CHS 730 taskforce brainstorming group.  I

3    mean, I don't know if it was -- workgroup my -- you

4    know, it was this 730, you know, improvement,

5    strategic taskforce.  That's not the official name,

6    but it was under Dr. Ford and it was only relevant and

7    focused on CHS.  And the only people invited were

8    people that either worked for CHS or were going to

9    work for CHS.  And Dr. Winkler was invited and

10   attended, and I was excluded.

11   BY MS. CANFIELD:

12       Q    Okay.  So it's your testimony that you never

13   received an invitation either from Dr. Ford or Dr.

14   Colley to join a 730 workgroup?

15               MS. HAGAN:  Objection.  She didn't say

16   she didn't receive an invitation from Dr. Colley or

17   Dr. Ford.  She said she didn't receive an invitation

18   from Dr. Ford's strategic taskforce.

19               THE WITNESS:  I -- I -- I don't know if

20   the name of it was strategic taskforce.  She had this

21   -- this internal CHS workgroup which was separate and

22   distinct from the MOCJ ongoing workgroup that had been

23   going on and on -- on and on, off and on for years --

24   years.  But that was a separate -- that was a separate

25   agenda, separate issues and it was initiated by a

Melissa Kaye

Page 105

```
 1    separate agency.
 2                    I am testifying that I specifically
 3    asked to join that group and I was -- I was shunned.
 4    I mean, she literally refused to answer me and turned
 5    her back on me.
 6                    So, you know, and it -- and it was --
 7    you know, and I had -- had the history where I knew
 8    she had lied to me about trying to do something about
 9    my pay disparity when she was -- when I reported
10    directly to her at Bellevue.  I knew how she was.  I
11    knew she was -- she had queen bee tendencies and I
12    knew she was, you know, not including me in this
13    workgroup even though I was the most senior and
14    experienced forensic evaluator in New York City, and I
15    wanted to participate.
16    BY MS. CANFIELD:
17         Q    All right.  Let me show you this document.
18                    MS. CANFIELD:  And, Ms. Hagan, I am
19    going to email it to you right now.
20                    MS. HAGAN:  I'm going to need an
21    opportunity to look at the document.
22                    THE REPORTER:  Please repeat what you
23    said, Ms. Hagan.
24                    MS. HAGAN:  I said I'm going to need an
25    opportunity to look at the document before Dr. Kaye
```

Melissa Kaye

Page 106

1    has an opportunity to respond.

2                    Thank you.  I'm sorry.

3                    MS. CANFIELD:  That's fine.  Whatever

4    you need to do.

5                    MS. HAGAN:  Mm-hmm.

6                    THE REPORTER:  And if you could please

7    email it to me as well.

8                    MS. CANFIELD:  I will.

9                    MS. HAGAN:  I guess we'll need a break

10   so we can read it.

11                   MS. CANFIELD:  No, no.  We don't need a

12   break.

13                   MS. HAGAN:  Mm-hmm.  Because I still

14   haven't had it -- I still don't have it.

15                   MS. CANFIELD:  You will have it.  You

16   don't need a break though.

17                   MS. HAGAN:  Mm-hmm.

18   BY MS. CANFIELD:

19        Q    All right, Dr. Kaye.  I'm going to show you

20   this email.

21                   MS. HAGAN:  Wait a second.  I'd like to

22   look at it first.

23                   MS. CANFIELD:  We can look at it at the

24   same time.  That's what we did when I was -- when I

25   was defending depositions.

Melissa Kaye

Page 107

1                    MS. HAGAN:  -- exact document that you

2      just emailed me --

3                    THE REPORTER:  I'm sorry.

4                    MS. CANFIELD:  This is the exact --

5                    THE REPORTER:  Repeat what you said,

6      Ms. Hagan.  And try not to talk at the same time.  I'm

7      sorry.

8                    MS. HAGAN:  I'm trying to -- first off,

9      I'm not even sure how this happened.  I'm trying to

10     look at the email that Ms. Canfield sent.  Then now it

11     seems like my entire screen has been taken over by

12     this Zoom thing.  I don't know.

13                   MS. CANFIELD:  It's the same document

14     and I was able to navigate between my hardcopies that

15     were sent to me and the Zoom, so you should be able to

16     do that, too.

17                   MS. HAGAN:  I'm looking --

18                   MS. CANFIELD:  Maybe just minimize the

19     Zoom?

20                   MS. HAGAN:  I'm trying to do that.

21                   MS. CANFIELD:  All right.

22     BY MS. CANFIELD:

23          Q    Dr. Kaye, if you could just take a look at

24     this.  This document identified by the Bates stamp

25     numbers NYC_000053.

Melissa Kaye

Page 108

1              MS. HAGAN:  And what exhibit is this,

2      Ms. Canfield?  Because you sent an Exhibit A, which

3      was the Amended Complaint.  Is this Exhibit A or

4      Exhibit B?

5              MS. CANFIELD:  This will be Exhibit A.

6              (Exhibit A was marked for

7              identification.)

8              MS. HAGAN:  And Exhibit A, for purposes

9      of the record, is NYC 53?  And was this produced when?

10             MS. CANFIELD:  This was produced a year

11     ago.

12             For purposes of the record, beginning

13     at the very beginning of the thread, it's an email

14     from Elizabeth Ford to Jeremy Colley asking evaluators

15     from the Bronx clinic and one to two psychiatrists

16     from the Manhattan clinic who will be able to -- able

17     willing to participate in a workgroup to think about a

18     standardized clinical approach to the exams.  That's

19     dated January 18, 2018.

20     BY MS. CANFIELD:

21         Q    Do you see that, Dr. Kaye?

22         A    I do.

23         Q    Okay.  And do you see where Dr. Colley

24     forwards this email to Dr. Harper, Dr. Solanki, Dr.

25     Mundy, Dr. Weiss, yourself and Dr. Winkler?

Melissa Kaye

Page 109

1        A    Yes.

2        Q    It says, "See below - let me know if you're

3    interested"?

4        A    Yes.

5        Q    Dr. Mundy responds and says, "Certainly

6    interested.  Please keep me in the loop."  Then you

7    also respond and say, "Let me know dates and I'll try

8    to work it in."

9        A    Mm-hmm.

10       Q    Do you recall receiving and sending this

11   email?

12       A    I don't recall.

13       Q    Okay.  So it does appear that you were in

14   fact invited to participate in the workgroup.

15              MS. HAGAN:  And for purposes of the

16   record, I'd like to note that there are question marks

17   before the text in at least two of the emails.  The

18   email from Dr. Mundy, there's a question mark that

19   says "?Certainly interested, please keep me in the

20   loop."  And then from Dr. Kaye's alleged response,

21   there's a question mark, "?Let me know dates, and I'll

22   try to work it in."  Just for purposes of the record.

23              MS. CANFIELD:  That's fine.  I can see

24   that those question marks are there.  I don't know why

25   they are, but they appear in a number of emails.  It's

Melissa Kaye

Page 110

```
 1    the way that the emails were collected.  And if there
 2    are quotations there, that's -- I don't know.
 3                    MS. HAGAN:  Mm-hmm.
 4                    MS. CANFIELD:  Okay.
 5    BY MS. CANFIELD:
 6        Q    Okay.  So the fact that you were not -- you
 7    didn't believe that you were invited to the workgroup
 8    caused you to believe that you were on the chopping
 9    block, I guess so to speak, when you were offered a
10    managerial title.  But as I just showed you, you were
11    in fact invited to the workgroup.
12                    MS. HAGAN:  Objection.
13    BY MS. CANFIELD:
14        Q    What other reasons do you believe that you
15    were --
16                    MS. HAGAN:  Objection.
17                    MS. CANFIELD:  You can object.  I can
18    still ask her my question.
19                    MS. HAGAN:  And then you're inserting
20    facts that are not -- that she didn't testify to in
21    your question.
22                    MS. CANFIELD:  She just testified that
23    she saw that email.  The document speaks for itself.
24                    MS. HAGAN:  She said she wasn't sure if
25    she saw it.
```

Melissa Kaye

Page 111

1              MS. CANFIELD:  Okay.  You can make your

2    argument in opposition to our motion for summary

3    judgment.

4              MS. HAGAN:  Mm-hmm.

5    BY MS. CANFIELD:

6        Q    What other reasons --

7        A    Well --

8        Q    -- do you believe that you were being

9    targeted for termination by the fact that you were

10   being offered a managerial title?

11       A    Okay.

12             MS. HAGAN:  Objection.

13             THE WITNESS:  So Dr. Ford did not send

14   me that email.  Dr. Colley sent me that email.

15   BY MS. CANFIELD:

16       Q    As well as the other --

17       A    Yes.

18       Q    -- psychologists and psychiatrists, correct?

19       A    Dr. Colley forwarded that email that was

20   sent to him.  So I -- that email came from not Dr.

21   Ford.  Dr. -- Dr. Colley.  And I then shortly

22   thereafter specifically asked her when they came up to

23   the Bronx to inform us they were taking us over.  And

24   I asked her specifically to be part of the group and

25   she shunned me.  And that was on the heels of Dr. Yang

Melissa Kaye

Page 112

1      threatening to fire me.  So --

2           Q    Okay.

3           A    -- that was -- I'm sorry.

4           Q    Did you ever follow-up in writing to Dr.

5      Ford about participating -- or Dr. Colley about

6      participating in the 730 workgroup --

7           A    I don't --

8           Q    -- after receiving this email?

9           A    I -- I don't recall.  I don't even -- I

10     mean, I wrote what is said there, but I don't recall

11     every email I sent in 2018.

12               If you could refresh my memory, I would be

13     able to know that.

14          Q    Okay.  Okay.  With respect to the pay equity

15     issue, is it your belief that after the transition to

16     CHS, that you remained to be paid less than your male

17     comparators?

18          A    My male comparator was Steve Ciric.  That's

19     who was my male comparator when I discovered the pay

20     discrepancy.  That's who was the male comparator when

21     I asked for it to be corrected, both informally or --

22     you know, internally I should say, at Bellevue when I

23     asked Dr. Ford and -- and -- and Dr. Colley to address

24     it.  And then again, when I went to Dr. Yang and it

25     was sent to Dr. Hicks.  And then when I filed an EEOC

Melissa Kaye

Page 113

1    complaint, it -- it was about my lack of pay parity

2    with Steve Ciric.

3            Now when my salary is assessed, it's -- it

4    can -- you can -- it can be misrepresented unless one

5    considers that because of my longevity pay, because I

6    was hired by HHC in 1999 and I had a significant

7    amount of longevity pay, that could be construed as

8    part of my base salary, which it is not.  And I was

9    talking about a pay discrepancy and title discrepancy

10   relative to my base salary, not having my longevity --

11   my earned longevity pay because I had been a

12   longstanding public servant to be folded into my base

13   salary and then have that number being used to compare

14   me to other people.  That wasn't fair because that was

15   not -- that was not the issue.

16           The issue was my base salary was lower and

17   my title was lower.  And if I did happen to be at

18   Health and Hospitals for 20 years and I had longevity

19   pay, I don't feel like the longevity pay, which was

20   earned separate from -- it would have been the same if

21   I was a physician specialist or anything else.  My

22   longevity pay should not have been folded in to be

23   considered as part of my base salary, to then deny me

24   equal pay or to say that I was already getting equal

25   pay, because with my longevity pay, that brought me up

Melissa Kaye

Page 114

1    to a more comparable pay equity.

2        Q    Okay.  So let's go through this.  You

3    already testified that Dr. Mundy was hired to oversee

4    the Manhattan Court Clinics, correct?

5        A    Correct.

6        Q    Okay.  And we already established that Dr.

7    Winkler -- are you taking notes, Dr. Kaye?

8        A    No, I'm not.

9        Q    That Dr. Winkler was hired to oversee the

10   Brooklyn Court Clinic, correct?

11       A    Correct.

12       Q    You were overseeing the Bronx Court Clinic,

13   correct?

14       A    Correct.

15       Q    Okay.  And who was overseeing the Queens

16   Court Clinic?

17                 THE WITNESS:  Ow.  Sorry.  That's what

18   I'm doing.  I'm dealing with this cat.

19       A    It was Elizabeth Owen.

20       Q    Okay.  Okay.  And then Dr. Winkler also

21   oversaw the Staten Island court clinics; is that

22   correct?

23       A    Staten Island Court Clinic was under --

24   well, there was no -- no, that's not correct.  No.

25   There was no -- there is no Staten Island Court

Melissa Kaye

                                      Page 115

1    Clinic.

2         Q    Okay.  Okay.  Now do you believe that -- and

3    Dr. Mundy is a psychologist or a psychiatrist?

4         A    Psychiatrist.

5         Q    And do you believe that he was compensated

6    more than you at the time that you were head of the

7    Bronx Court Clinic?

8         A    I believe that -- yes, I believe that my

9    longevity pay and my retention bonus were included in

10   my base salary to compare me to Dr. Mundy to make it

11   look like we had comparable salaries when we did not.

12        Q    Okay.  And when you were offered a

13   managerial position, were you told how much you would

14   be compensated?

15        A    No details were offered.  It was a nebulous

16   email I got from Dr. Ford.

17        Q    Okay.

18        A    Basically telling me she would consider --

19   she would consider, you know, looking into pay parity

20   if I got out of the union -- union and gave up

21   benefits.

22        Q    Okay.  Did anyone else suggest that you take

23   on a managerial title in relation to the pay parity

24   issue of which you were complaining?

25        A    No.  That was the only communication I had

Melissa Kaye

Page 116

1    at all about the situation.

2         Q    Okay.

3         A    -- talked to me about it.

4         Q    Okay.

5                   THE REPORTER:  I'm sorry.  Repeat what

6    you said after "situation."

7                   THE WITNESS:  No one else talked to me

8    about it.

9                   THE REPORTER:  Thank you.

10   BY MS. CANFIELD:

11        Q    When you spoke or emailed Dr. Yang, did you

12   raise the issue of becoming a managerial employee with

13   her?

14                  THE WITNESS:  Sorry, I have to -- this

15   cat is chewing a wire.  Sorry.

16                  MS. HAGAN:  I'm sorry.

17                  THE WITNESS:  I apologize.

18                  MS. CANFIELD:  Do you mind reading back

19   the question, please?

20                  THE REPORTER:  Just a moment.

21                  (The reporter read the record as

22                  requested.)

23                  THE WITNESS:  No.

24   BY MS. CANFIELD:

25        Q    Why not?

Melissa Kaye

                                              Page 117

1                    MS. HAGAN:  Objection.

2                    THE WITNESS:  For the reasons I've

3     discussed previously.

4     BY MS. CANFIELD:

5          Q    That you were interested in becoming a

6     managerial employee?

7          A    No, that I was not.  I wanted to be

8     comparable to my male comparator, which was Steve

9     Ciric, and I wanted to continue to be in the

10    Collective Bargaining Agreement.

11         Q    Okay.  If a managerial position had been

12    offered to you, would you have taken it?

13                   MS. HAGAN:  Objection.  It's a

14    hypothetical.  It wasn't offered to her.

15                   THE REPORTER:  Please repeat what you

16    said, Ms. Hagan.

17                   MS. HAGAN:  I said objection.  It's a

18    hypothetical.  It was not offered to her.

19                   MS. CANFIELD:  You're testifying.

20                   THE WITNESS:  I was not talked to about

21    any negotiations.  This issue was never followed up

22    with anybody other than that one vague email from Dr.

23    Ford.

24                   I can't say what I would have agreed to

25    or not agreed to, but Dr. Yang didn't speak to me.

Melissa Kaye

Page 118

1    Mr. Hicks didn't speak to me.  I got that nebulous

2    email from Dr. Ford that said there would have to be a

3    quid pro quo and I would have to give up something to

4    get pay parity -- i.e. give up my union in order to

5    have comparable pay.  And no --

6    BY MS. CANFIELD:

7        Q    So Dr. Yang did follow-up with you and said

8    that -- did have a conversation with you about

9    becoming a managerial employee?

10       A    No.

11                  MS. HAGAN:  Objection.  Testifying.

12   That's not what she said.

13                  THE WITNESS:  That's false.  Dr. Yang

14   never spoke to me about it.  Never.  No one ever spoke

15   to me in person or on the phone about it, ever.

16                  And Dr. Yang told me that she was going

17   to forward my concerns to Bill Hicks at -- she didn't

18   tell me because I never spoke to her, but she sent me

19   an email that said she was going to forward my

20   concerns to Bill Hicks at Bellevue and that he would

21   get back to me.  And he did send a -- an email to me

22   that he would look into it and get back to me and

23   never did.

24                  And that is why --

25                  MS. CANFIELD:  Okay.

Melissa Kaye

Page 119

1              MS. HAGAN:  Would you let her finish?

2              THE WITNESS:  That is why I chose to go

3    to the EEOC because I could tell very clearly that it

4    wasn't being taken seriously and I was getting the

5    runaround.

6    BY MS. CANFIELD:

7         Q    Okay.  But the complaint about Steve Ciric,

8    there was something about pay in the past.  That was

9    backpay issue.  I'm talking about going forward from

10   the time that you transitioned over to CHS.  When Dr.

11   Mundy, Dr. Winkler, Dr. Kaye and Dr. Owen were ahead

12   of the court clinics.

13             MS. HAGAN:  Objection as to the form.

14   And it's --

15             MS. CANFIELD:  I haven't even finished

16   my question.

17             MS. HAGAN:  Oh.

18   BY MS. CANFIELD:

19        Q    I'm talking about the time after the

20   transition over to CHS.

21             MS. HAGAN:  If you understand the

22   question.

23             THE WITNESS:  I need -- I need you to

24   re-ask the question, please.

25   //

Melissa Kaye

Page 120

1      BY MS. CANFIELD:

2          Q     The complaint that you made to Dr. Yang,

3      that concerned your pay as compared to Steve Ciric,

4      correct?

5          A     It concerned a pay parity issue that I had

6      at HHC that had never been satisfactory -- it had

7      never been resolved in a satisfactory manner.

8          Q     Right.  And you testified earlier that the

9      comparator was Dr. Ciric; is that correct?

10         A     Yes.

11         Q     Okay.  But you also testified that Dr. Ciric

12     resigned.  So he was no longer being paid more than

13     you going forward from the date that he resigned;

14     isn't that correct?

15                    MS. HAGAN:  Objection.

16                    THE WITNESS:  My complaint was that

17     throughout my 20 years at HHC, I was paid less than my

18     male comparator, that -- that affects my pension.

19     That affected my day-to-day life as far as, you know,

20     what my income was, and that my understanding -- and

21     I'm not a lawyer, so I'm not speaking about this as a

22     lawyer -- but my understanding is that, you know, if

23     someone is paid less for the same job based on sex,

24     which I was, that that needs to be corrected by the

25     institution.  And HHC needed to correct that and the

Melissa Kaye

Page 121

1    correction is retroactive.  It's a six-year

2    retroactive correction with triple damages.  So that's

3    my understanding when I read on Google what -- what it

4    was.  It wasn't about, oh, if you make a pay

5    complaint, that that means you're going to be -- that

6    means that whatever happened in the past doesn't

7    matter anymore.  It matters the most because that's

8    what the pay complaint was based on.  It wasn't based

9    on the future or the present, it was based on what had

10   happened to me and what I'd been complaining about

11   since 2014.

12            MS. CANFIELD:  Okay.  All right.  We're

13   going to shift off this topic for a while.  We're

14   going to get through some other topics just briefly

15   and then we'll take a lunch break, if that's okay with

16   everyone.

17            That works?  Okay.

18            THE WITNESS:  Yeah.  I would like to

19   request, if it's okay, that maybe just 30 minutes so

20   we can try not to go overtime.

21            MS. CANFIELD:  That's fine.  That's

22   fine.  And if we -- I will do my best to ask all of

23   the questions that I have.  If for some reason we need

24   to go beyond 6:00, we'll just have to schedule another

25   time to bring you back.

Melissa Kaye

Page 122

1           THE WITNESS:  I can go beyond 6:00, but
2   I will need a break to arrange for childcare --
3           MS. CANFIELD:  Okay.
4           THE WITNESS:  -- pick-up kind of
5   situation.
6           THE REPORTER:  Repeat what you said
7   after "pick-up."
8           THE WITNESS:  I will need to arrange
9   for a childcare pick-up-kind of situation if we go
10  beyond 6:00.  And I'll need a little break to do that
11  if it looks like we're --
12           And some lead time would be better.
13           MS. CANFIELD:  Okay.  That's fine.
14           MS. HAGAN:  Can we figure out how much
15  time we've consumed so far?  Just for the record.
16           MS. CANFIELD:  Why don't we do that
17  during our break instead of now, because we've only
18  been going since 10:00 and we took two -- three five-
19  minute breaks, so --
20           MS. HAGAN:  So that would be two hours
21  and thirty minutes.
22           MS. CANFIELD:  Yeah.
23           MS. HAGAN:  Two hours and thirty-three
24  minutes then.
25           MS. CANFIELD:  Let's just -- if you

Melissa Kaye

Page 123

1    could calculate the time during lunch, that'd be

2    great.

3                    All right.  Let's just move forward so

4    that we do get through all this today.

5                    MS. HAGAN:  Mm-hmm.

6    BY MS. CANFIELD:

7        Q    Dr. Kaye, are you currently employed?

8        A    No.

9        Q    Have you been employed at any point during

10   this year?  And I'm talking about 2021.

11       A    Yes.

12       Q    And where were you working?

13       A    I was doing per diem work at Gracie Square

14   Hospital in New York City.

15       Q    And when did you stop doing that work?

16       A    First -- I think the first or second week of

17   August.

18       Q    And how long had you been employed at Gracie

19   Square?

20       A    I had -- I've had admitting privileges at

21   Gracie Square on and off since 1996.  And I worked

22   there in different capacities.

23       Q    Okay.  Let's go through those capacities.

24                When you started in 1996, what was your

25   capacity at Gracie Square?

Melissa Kaye

Page 124

1    A    I was a voluntary attending and I did

2    attending coverage.

3    Q    Okay.  And how long did you do that?

4    A    I did that on and off until around 2004.

5    Q    Okay.  And did your role change at Gracie

6    Square in 2004?

7    A    My role didn't change.  I just stopped

8    wanting to work on the weekends and stopped -- and so

9    I -- I stopped doing the voluntary attending coverage

10   for a while.  So I just -- it was per diem work.  I

11   just decided that -- I just stopped doing it for a

12   while.

13   Q    Okay.  And did you resume that work at any

14   point?

15   A    In 2010, I went back.  It was around 2010 I

16   think, I went back and I started doing some overnight

17   moonlighting shifts.  And I also then at some point

18   started doing the weekend attending coverage

19   sometimes.  Periodically.

20   Q    What were your job responsibilities as a

21   voluntary attending?

22   A    A voluntary attending?

23   Q    Yeah, attending.

24   A    I would go see the patient and talk to the

25   staff and review the chart, and address any medical

Melissa Kaye

Page 125

1    issues pertaining to the psychiatric treatment and

2    write a note.

3         Q    Okay.

4                   THE REPORTER:  Did you say "write a

5    note"?

6                   THE WITNESS:  Write a note in the

7    chart.

8    BY MS. CANFIELD:

9         Q    Was that consistent between 1996 and 2004

10   when you were performing that work as a voluntary

11   attending?

12        A    I was a volunteer attending, and that just

13   meant that they didn't pay me.  I didn't get a salary,

14   but I had admitting privileges and my privilege is at

15   the hospital to work there, to going there and see

16   patients and treat patients.  That's all that meant.

17   And I was unpaid, but I was the medical staff.

18                   And yeah, the coverage for -- the coverage

19   for these patients was always the same thing.  I would

20   see the -- round on the patient, address the issues,

21   write a note.

22        Q    And what was the advantage of performing

23   that work when you weren't being paid?

24                   MS. HAGAN:  Objection as to form.

25                   THE WITNESS:  I -- I was covering for

Melissa Kaye

1    other attendings, and so I would get paid for the

2    services that I rendered for those patients.

3    BY MS. CANFIELD:

4         Q    Okay.  So you were getting paid?  It was not

5    a total -- it was --

6         A    I was not getting paid by Gracie Square

7    Hospital.

8         Q    So who was paying you?

9         A    Whatever insurance the patients had.

10        Q    Okay.  And when you went back in 2010 --

11        A    Well, let me just clarify.  I was getting

12   paid -- I -- in order to be the volunteer attending, I

13   would -- I -- I was -- a billing service was doing the

14   billing through the primary volunteer attending's

15   practice.  So I wasn't really involved in that.  And

16   then I would get paid based on what they collected

17   from insurance, from the billing.  But I wasn't -- I

18   was not directly billing the insurance company.  I was

19   involved in like a -- as part of -- like, I would work

20   for the PC -- the professional corporation of the

21   attendings who wanted coverage.

22        Q    Okay.  What was the name of that

23   professional corporation?  Do you remember?

24        A    There's been many over the years.

25             MS. HAGAN:  If you don't know, then --

Melissa Kaye

Page 127

1              THE WITNESS:  Yeah.  I don't know.  I
2      think it was called Yorkville PC or something.  And
3      then there was one that was Medical Healthcare.  I
4      mean, I don't remember --
5      BY MS. CANFIELD:
6          Q    Okay.
7          A    -- what they called their PCs.  I just --
8          Q    Okay.  And then when you went back in 2010,
9      you said that you were moonlighting overnight shifts
10     as a weekend attending.  Were your job
11     responsibilities the same?
12         A    It wasn't quite the same as being --
13             MS. HAGAN:  Objection.  It assumes
14     facts that she didn't testify to.  She didn't say that
15     she was moonlighting overnight shifts.  She didn't
16     testify to any of that.
17             MS. CANFIELD:  She did, but go ahead.
18             THE WITNESS:  I -- when I did -- it was
19     like I was the house doctor.  So I would do
20     admissions.  I would take care of all the psychiatric
21     emergencies that would come up throughout the -- the
22     shift.  And I would renew medications, review charts
23     to, you know, see if medications were expiring and if
24     they should be renewed or changed.  I would deal with
25     issues that would come up in the units with patients

Melissa Kaye

Page 128

```
 1    or, you know, questions with staff.  I would, of
 2    course, document everything in the chart.  And
 3    sometimes when patients had to be sent out, I would,
 4    like, have to talk to doctors or nurses in emergency
 5    rooms where the patients were about what happened or
 6    what was going to happen.
 7                  And, you know, so it was -- it was --
 8    Gracie Square was across the street from where I
 9    lived, so sometimes they would, you know -- I would
10    just go over there and help out when they needed me,
11    if I could.  And it might not have been a specific
12    moonlighting shift.  Like, if they had 23 admissions
13    or something like that, sometimes they would ask me if
14    I could come help.
15    BY MS. CANFIELD:
16        Q    Okay.  Approximately how many hours -- if
17    you could estimate, how many hours would you work
18    there per week?
19        A    Wow, that's very variable.  Are you saying
20    during the attending coverage or during the house
21    doctor overnight shifts, or some kind of combination
22    thereof?
23        Q    A combination.
24        A    It was very variable and it was contingent
25    on childcare and other issues if -- going on.  But I
```

Melissa Kaye

Page 129

1       don't know.  Maybe it could be 12 hours or, you know,

2       if I -- if I happen to do a 24-hour shift of being a

3       house doctor, I mean, it could be 24 hours, but I was

4       allowed to work, you know -- stay at home because I

5       lived across the street and even the call room wasn't

6       in the hospital.  It was down the street.

7               So I don't know.  There were times where I

8       took 24-hour shifts on -- on Saturday or Sunday.

9          Q    Okay.  And when did you stop -- you said

10      that you stopped the second week -- the first or

11      second week of August working at Gracie Square.  I'm

12      assuming you mean this year, 2021?

13         A    Yeah.  I stopped doing the overnight shifts

14      I think in 2014 or so.  And I then did the per diem.

15      I was a per diem -- so the other thing that I started

16      -- they started hiring me in a bit of a different

17      capacity.  Instead of just doing attending coverage

18      and rounding on patients -- private patients, they had

19      transitioned their care model in I think it was 2014.

20      And private attending psychiatrists who were admitting

21      patients to Gracie were no longer -- like, they

22      weren't doing that model where private attending

23      psychiatrists would have their own patients and follow

24      their own patients.  They -- they got more closely

25      affiliated with NYP and they started having full-time,

Melissa Kaye

Page 130

1    salaried attendings.  And then --

2         Q    I'm sorry.  Did you say NYPD?

3         A    NYP Hospital.

4         Q    Oh, NYP?  Okay.

5         A    New York Presbyterian Hospital.

6         Q    Okay.  Right.

7         A    And so they no longer had that attending

8    where the attendings would come in and round on their

9    patients and then, you know, go to their private

10   offices.

11             They -- they never had, like, salaried

12   attendings there with a patient load.  And they

13   switched to that model.

14             I never worked as a salaried employee, but I

15   did work this summer in that model as a per diem

16   attending.  So I was a per diem attending at Gracie --

17   at Gracie Square.

18        Q    Okay.  Beginning in 2014?

19        A    Yeah.  Maybe off and on as I -- I don't know

20   when they -- there was a phaseout with the private

21   attendings.  And as they pulled in more salaried

22   doctors and phased out the private attendings, I'm not

23   so sure -- I think that took a couple years.  So I

24   don't know that it was, like, 2014 that the private

25   attending coverage in the previous incarnation had

Melissa Kaye

Page 131

1    been phased out.  I don't think it was.  It took -- it

2    took a while.

3              But to the point of your question, this

4    summer I was doing attending coverage.  I had a

5    caseload and I took care of that caseload.  And I -- I

6    worked along with the other clinical staff in -- in

7    caring for the patients.

8        Q    And approximately how many hours were you

9    working over the summer in 2021?

10       A    Well, I was getting paid for a full day of

11   work.  I did have reasonable accommodations.  I

12   stopped working in the middle of the summer after my

13   surgery.  And then I came back with reasonable

14   accommodations.

15             So I was getting paid for a full day, but I

16   wasn't carrying a full -- I couldn't carry a full

17   caseload because of the surgery.  I couldn't -- I

18   couldn't type and use my right arm, so I was, you

19   know, typing with my left pointer finger and

20   everything is electronic.  The medical record and

21   every -- sending emails and everything.  So I was

22   very, very slow in being able to get the -- the

23   charting and other stuff done.  So they cut my hours

24   in half.

25       Q    So approximately how many hours did you have

Melissa Kaye

Page 132

1    this summer?  You said you were working pretty much

2    full-time until your surgery?

3        A    I mean, I wouldn't -- they didn't cut my

4    hours in half.  They cut my patient load in half and

5    they just -- they were letting -- they said I could

6    work from home.  I just went over and I saw the

7    patients and I would go over.  And if there was a

8    family meeting or a Zoom meeting out -- outside the

9    agency, you know, an outpatient clinic or something,

10   or an -- team or something like that, I would go over,

11   but I wasn't carrying a full load after my surgery.

12       Q    Okay.  What about in 2020, were you working

13   at Gracie Mansion?  I mean Gracie Square.  Sorry.

14   Gracie Square.

15       A    Yeah.  No.

16       Q    Gracie Square.  Sorry.

17       A    That's okay.  I think I might have done a

18   little coverage at times.  I -- I don't know.

19       Q    Okay.  What about 2019?

20       A    Wait, 20 -- okay.  Hold on.  I'm sorry.  Let

21   me just get -- let me -- I have to orient myself, so

22   please, let me just -- okay.  2020, pandemic.  So,

23   pre-pandemic, after I felt I had to resign from my

24   job, which I didn't really want to do, but I resigned

25   in January 2020.  And then I worked a little bit at

Melissa Kaye

1    Gracie -- Gracie Square Hospital.  And then -- in

2    2020.  And then the pandemic hit and they had to --

3    NYP -- New York Presbyterian Hospital has a bunch of

4    -- had other psychiatric hospitals like Brookdale and

5    I think Methodist and maybe -- I don't know.  They had

6    some -- they converted all their outer borough

7    psychiatric facilities to medical facilities because

8    of the pandemic.  And all of those salaried doctors

9    came over to Gracie -- were sent over to Gracie, and

10   Gracie decreased their census from about 150 to about

11   60 because of the need for social distancing.

12          So they had a surplus of doctors and a --

13   and a paucity of patients and they didn't need me.  So

14   that was --

15        Q    Okay.

16        A    And I no longer had per diem options there,

17   so I just -- I think I worked there in 2020 -- in

18   February and the beginning of March before everything

19   happened.

20        Q    Okay.  What about 2019?  Were you at Gracie

21   Square in 2019?

22               THE REPORTER:  Please ask the question

23   again.  Sorry.

24   BY MS. CANFIELD:

25        Q    Were you working in any capacity at Gracie

Melissa Kaye

Page 134

1    Square in 2019?

2         A    Yes.

3                   MS. HAGAN:  Objection to form.

4    BY MS. CANFIELD:

5         Q    Okay.  And approximately how many hours were

6    you working at Gracie Square in 2019?

7                   MS. HAGAN:  Objection.

8                   THE WITNESS:  I -- I can't recall.  I

9    --I don't know.

10   BY MS. CANFIELD:

11        Q    But you were performing some work there?

12        A    I was working there on and off, yeah.

13        Q    Okay.  What about 2018?  Were you also

14   performing work at Gracie Square Hospital?

15        A    On and off, yes.

16                  MS. HAGAN:  Objection.

17   BY MS. CANFIELD:

18        Q    Okay.  And what about 2017?  Were you

19   performing work at Gracie Square Hospital in 2017?

20        A    Yes.

21                  MS. HAGAN:  Objection.

22   BY MS. CANFIELD:

23        Q    Okay.  And how about 2016 -- were you

24   performing work at Gracie Hospital?

25                  MS. HAGAN:  Objection as to form.

Melissa Kaye

Page 135

1              THE WITNESS:  I'm -- I'm guessing that

2    I -- since 2010, I would have these gaps of time where

3    I wouldn't work there, and then I would work there.

4              So since I went back and renewed my

5    medical admitting privileges in 2010, I worked there

6    on and off.

7    BY MS. CANFIELD:

8        Q    Okay.  And you said that you were paid by a

9    professional corporation and you gave two names, and

10   you said sometimes the names change.  Did that

11   continue from 2014 up to 2021, that you were paid

12   through insurance billing?

13       A    No.

14             MS. HAGAN:  Objection as to form.

15             You can answer if you understand the

16   question.

17             THE WITNESS:  No.

18   BY MS. CANFIELD:

19       Q    Okay.  So who paid you in 2021?

20             MS. HAGAN:  Objection.

21             THE WITNESS:  So as I said, that

22   private practice model was phased out over a couple of

23   years.  And then during that same time, they were kind

24   of phasing in the same model, but it was through NYP.

25             So NYP -- well, it was really Gracie

Page 136

1     Square, but the parent company is NYP -- started

2     paying me in a comparable-kind of way, similarly to

3     the way I was getting paid by those PCs.

4     BY MS. CANFIELD:

5          Q     Okay.

6          A     That Gracie -- instead of the private

7     attending calling me up and saying, "Hey, can you

8     cover my patients this weekend?"  The chief medical

9     officer of Gracie, or her, you know -- or her chief

10    administrative assistant would call me up or text me

11    or whatever -- contact me and say, "Can you cover?"

12    And that kind of shifted over.

13              So I started -- instead of covering for the

14    private attendings, I started covering for NYP, but it

15    was comparable work.  And the pay was coming then from

16    NYP.

17              Well, when I say NYP, it's just because

18    that's who kind of owns and runs Gracie.  But I think

19    that the pay came from Gracie, but it was processed

20    through NYP.

21          Q     Okay.  All right.  I'm going to call for the

22    production of your paycheck slips or however way you

23    were paid in 2021.  I know that you haven't received a

24    1099 or any type of tax document yet, but whatever you

25    have, I call for that production.

Melissa Kaye

Page 137

1              And in 20 --

2                    MS. HAGAN:  I will take that under

3      advisement and in writing, Counselor.

4      BY MS. CANFIELD:

5          Q    What about in 2020?  Did you receive a 1099

6      for your work at Gracie Square in 2020?

7                    MS. HAGAN:  Objection.

8                    THE WITNESS:  Yeah.  I worked there

9      before the pandemic, so yeah.

10     BY MS. CANFIELD:

11         Q    Okay.  So I would like a copy of any 1099

12     that you received from Gracie Square in 2020.

13                   MS. HAGAN:  We'll take that under

14     advisement.  Please put that in writing.

15                   MS. CANFIELD:  I've already requested

16     it as part of discovery, but I will follow-up in

17     writing.

18                   MS. HAGAN:  Mm-hmm.

19     BY MS. CANFIELD:

20         Q    And then for years 2019, 2018, 2017 and

21     2016, did you receive 1099s for your work at Gracie

22     Square?

23                   MS. HAGAN:  Objection.  Take --

24                   THE REPORTER:  What did you say, Ms.

25     Hagan?

Melissa Kaye

Page 138

```
 1                 MS. HAGAN:  Strike the latter part.
 2                 Objection.
 3                 MS. CANFIELD:  You can't strike my
 4       question.
 5                 MS. HAGAN:  No.  I said strike the
 6       latter part of my --
 7                 MS. CANFIELD:  Oh, of your objection.
 8       Okay.  Okay.
 9                 THE WITNESS:  I'm sorry.  Can you
10       repeat your question?
11       BY MS. CANFIELD:
12           Q    I wanted to know for the years 2019 back to
13       2016, if you received a 1099 from Gracie Square or
14       from these billing corporations?
15           A    I -- I likely did and I also would like to
16       clarify that when I was a moonlighter, what I call the
17       house doctor and did those overnight shifts, even if
18       they were just a 12-hour dayshift on the weekend or
19       whatever.  When I did those house doctor shifts, that
20       was paid on a W-2.
21           Q    Okay.  All right.  Thank you for that
22       clarification.  So I am calling for the production of
23       all evidence of compensation that you received through
24       your work at Gracie Square.  Whether that's a 1099 or
25       a W-2 for the years 2015 to 2021.
```

Melissa Kaye

Page 139

1              MS. HAGAN:  Objection.  I mean, not

2    objection.  I'm sorry.  We'll take that under

3    advisement.  Please be sure to follow-up in writing.

4    BY MS. CANFIELD:

5        Q    Other than employment at Gracie Square

6    Hospital, were you employed any place else this year

7    back to 2015, other than CHS and Bellevue?

8              MS. HAGAN:  Objection as to form.

9              You can answer if you understand.

10             THE WITNESS:  Yes.

11    BY MS. CANFIELD:

12       Q    Where else were you employed?

13       A    An agency called AABR.  And that's an

14    acronym for Association of the Advancement of the

15    Blind and Retarded.  It's AABR Inc.

16       Q    Thank you.  And when did you start working

17    for that organization?

18       A    1999 I think.

19       Q    Did that continue for a number of years?

20       A    Yes.

21       Q    How many years?

22       A    Until this September.

23       Q    September 2021?

24       A    Yes.

25       Q    And what did you do for AABR?

Melissa Kaye

Page 140

```
 1        A    I was the -- I was a psychopharmacologist
 2   consultant.  So I was the consulting
 3   pscyhopharmacologist for some of their patients.
 4            They -- they call them "consumers," but to
 5   me, they were patients.
 6        Q    Okay.  And approximately how many hours per
 7   week were you working as a psychopharmacologist
 8   consultant?
 9        A    I didn't work there every week.
10        Q    Okay.  Starting with this past year, 2021,
11   how often were you working for AABR, approximately?
12        A    Once a month.
13        Q    What about in 2020?
14            MS. HAGAN:  Objection as to form.
15            THE WITNESS:  About the same.
16   BY MS. CANFIELD:
17        Q    2019?
18            MS. HAGAN:  Objection.
19            THE WITNESS:  It averaged about once a
20   month.
21   BY MS. CANFIELD:
22        Q    2018?
23        A    The same.
24        Q    2017?
25        A    About a month -- about once a month.
```

Melissa Kaye

Page 141

1      Q     2016?

2      A     The same.

3      Q     2015?

4      A     Yes, once a month.

5      Q     Okay.  How were you paid by AABR?

6      A     I billed for my services and they paid me

7      directly.

8      Q     How often would you bill for your services?

9      A     Once a month.

10      Q     Did you receive a tax document from AABR

11      each of the years that you worked for them, or

12      performed work for them?

13              MS. HAGAN:  Objection as to form.

14              You can answer.

15              THE WITNESS:  Yes.

16      BY MS. CANFIELD:

17      Q     What did you receive?

18      A     1099.

19      Q     All right.  I'm going to call for the

20      production of the 1099s that you received from AABR

21      for the years 2015 through 2021.  And I will put it in

22      writing.

23              MS. HAGAN:  We'll take it under

24      advisement.

25      //

Melissa Kaye

Page 142

1    BY MS. CANFIELD:

2         Q    Any other employment that you've held?

3         A    I had these on and off, like, short little

4    consulting requests where I would be asked to do

5    capacity evaluations and/or a psychopharmacologic

6    consultation.  A consultation for psychopharmacology

7    and/or a consultation for capacity evaluation.  And I

8    was asked to do that by some of these same doctors who

9    had PCs that were asking me to cover their patients at

10   Gracie.

11        Q    Okay.  And have you done those evaluations

12   or consultations fairly consistently between the years

13   2015 to 2021?

14        A    No.

15             MS. HAGAN:  Objection.

16   BY MS. CANFIELD:

17        Q    Okay.  How many have you done?

18             MS. HAGAN:  Objection.

19             THE WITNESS:  It's difficult for me to

20   quantify because it was a while ago, but I would be

21   asked to go into the facility, assess the patient,

22   determine his or her capacity to participate in

23   treatment planning and discharge planning.  And then

24   sometimes I would be asked to look at the medications

25   -- the medical and psychiatric medications, if there

Melissa Kaye

Page 143

1   were any, and -- in relation to whatever the

2   consultation question was about behavior, thought,

3   psychosis, depression -- whatever it was -- and make a

4   recommendation about the medications and then render

5   an opinion on the capacity and put that --

6   BY MS. CANFIELD:

7       Q    Okay.  And you said that -- I believe you

8   testified that this work came to you through your work

9   at Gracie Mansion -- or Gracie Square?

10                  MS. HAGAN:  Objection as to form.  And

11  assumes facts --

12                  THE WITNESS:  Yeah.  Some of the

13  doctors at -- I think.  Yeah.  I think one of the

14  doctors that I had met at Gracie -- one of the private

15  attendings, I think I might have met him maybe when I

16  was moonlighting or something.  I don't know.  But he

17  asked me if I would do that.

18                  And then another doctor I had met

19  through outside sources.  So --

20  BY MS. CANFIELD:

21      Q    Okay.  Were you ever asked to engage in

22  consulting work through any of the attorneys that

23  you've met through your work at CHS or at Bellevue?

24                  MS. HAGAN:  Objection as to form.  Can

25  you specify a time period?

Melissa Kaye

Page 144

1                    MS. CANFIELD:  I did.  While working at
2      CHS and at Bellevue.
3                    THE WITNESS:  Yeah.  I was -- I was
4      contacted by legal aid.  It was after my forced
5      resignation and I was contacted about several cases
6      and asked to -- they wanted to discuss them and they
7      asked me to evaluate the -- their client.  And --
8      BY MS. CANFIELD:
9          Q    How many clients did you evaluate?
10         A    Two.
11         Q    Two?  And how were you compensated?
12     Actually, let me withdraw that.
13                   Who compensated you?  Legal aid?
14                   MS. HAGAN:  Objection.
15                   THE WITNESS:  Well, that's who's
16     supposed to compensate me.  I haven't been paid yet,
17     but yeah.
18     BY MS. CANFIELD:
19         Q    Okay.  When did you conduct these two
20     evaluations?
21         A    I've been paid for one of the evaluations.
22     Not the other one.
23                   THE REPORTER:  Please repeat the
24     answer.
25                   THE WITNESS:  I've been paid for one of

Melissa Kaye

Page 145

```
 1    the evaluations.  Not the other.
 2              I think that it was in maybe January.
 3    BY MS. CANFIELD:
 4        Q    2021?
 5        A    Yeah.
 6        Q    Okay.  And when was the other evaluation?
 7        A    Well, the other evaluation was ongoing.
 8    There was a lot of collateral information I had to
 9    collect.  But are you asking -- when you say
10    "evaluation," are you asking when I wrote the report?
11    When I interviewed the -- the --
12        Q    When you completed the work on the
13    evaluation.
14        A    September of this year.
15        Q    Okay.  Thank you.  And did you perform any
16    consultancy work in 2020?
17                  MS. HAGAN:  Objection.
18                  THE WITNESS:  Yes.
19                  THE REPORTER:  Ms. Hagan, did you say
20    something?
21                  MS. HAGAN:  Yes.  Objection.
22    BY MS. CANFIELD:
23        Q    Okay.  And --
24        A    Do you mean consulting or do you mean per
25    diem?
```

Melissa Kaye

Page 146

1        Q    The consulting work that you were talking
2    about just now, you said that you were doing
3    consulting whether that's competency or
4    psychopharmaceutical?
5        A    Psychopharmacology.  Yeah.  I'm sorry.  I
6    misunderstood the question.
7             No.  I -- I did work per diem at Gracie
8    Square in 2020, but I was per diem.  I -- so I guess
9    it's -- I'm calling that something different than
10   consulting.
11       Q    Right.  But you had already testified to the
12   fact that you were doing per diem work at Gracie
13   Square, correct?
14       A    Right.
15       Q    Okay.  I'm mostly interested in the
16   consulting work that you were doing that you were
17   billing yourself --
18       A    Okay.
19       Q    -- to perform.
20            Did you do any of that work in 2020?
21            MS. HAGAN:  Objection as to form.
22            THE WITNESS:  That one case that was
23   very long and complicated, it's possible that the
24   lawyers may have reached out to me in 2020, but it was
25   the same case I talked about for 2021.

Melissa Kaye

Page 147

1    BY MS. CANFIELD:

2        Q    Okay.  How about for 2019?

3        A    No.

4        Q    No work?

5        A    When you're saying "consulting," can you

6    just define specifically what you mean?  Like, which

7    -- you're not talking about Gracie Square and you're

8    not talking about AABR?

9        Q    Correct.

10       A    Okay.

11       Q    Did you perform any consultancy work in

12   2019?

13       A    No.

14       Q    2018?

15       A    No.

16       Q    2017?

17       A    I might have done some of those.  I mean,

18   yeah.  I don't know if I did any -- I might have done

19   some of those nursing home capacity evaluations in

20   '17.  I'm not sure.  And --

21       Q    I'm sorry?

22       A    Yeah.  I might have done some of those

23   nursing home pharmacology capacity consults.  I don't

24   remember the -- the date span of when I did those.  It

25   was kind of a infrequent situation and it didn't --

Melissa Kaye

Page 148

```
 1    and I didn't do it for a long period of time.
 2         Q    Okay.  What about in 2016?
 3              MS. HAGAN:  Objection to form.
 4              THE WITNESS:  Again, the same thing
 5    with those nursing home and care facility
 6    consultations.
 7    BY MS. CANFIELD:
 8         Q    Okay.  And then 2015?
 9         A    Again, I -- I -- there was a span of time
10    where I was doing that -- that type of work where I
11    was being asked to go do those capacity evaluations
12    and make pharmacologic --
13         Q    Okay.
14         A    -- psychopharmacologic recommendations.  So
15    yeah, that could have been happening then.  I don't
16    have the dates on the top of my head.
17         Q    Okay.  Do you recall why you stopped doing
18    the nursing home consultations?
19         A    Yes.
20              MS. HAGAN:  Objection.
21    BY MS. CANFIELD:
22         Q    Why is that?
23         A    Because of it taking up too much time
24    outside of my primary job.  I -- going to the nursing
25    homes on the weekends or in the evenings would require
```

Melissa Kaye

Page 149

1  childcare issues.  I would be away from my kids.  It

2  wasn't -- I wasn't making that much money and, you

3  know, by the time I calculated in the problems with

4  getting childcare and that was challenging for, you

5  know, later in the evening and being away from my kids

6  and paying for childcare, and how much money I was

7  making.  And after taxes, it was just completely -- it

8  made no sense.

9         Q    Okay.

10        A    And --

11                  THE REPORTER:  I'm sorry.  Repeat what

12  you said after "no sense."

13                  THE WITNESS:  It made no sense for me

14  financially or personally.

15  BY MS. CANFIELD:

16        Q    Okay.  And what about your work at AABR and

17  at Gracie Square?  Were you working -- performing work

18  at those two facilities more regularly in 2015, 2016

19  and 2017 would you say?

20                  MS. HAGAN:  Objection as to form.

21                  THE WITNESS:  I would say it was always

22  -- it was per diem, which means as-needed.  So it was

23  in chunks of time and then in not, and then on and

24  off.  I mean, not with Gracie.

25                  With AABR, it was pretty consistently,

Melissa Kaye

Page 150

1    you know -- I would consult with them on a regular

2    basis -- monthly.

3    BY MS. CANFIELD:

4        Q    With AABR?

5        A    AABR, yeah.

6            MS. HAGAN:  Wait a second.  Can we take

7    a break?  A bathroom break?

8            MS. CANFIELD:  Just let me finish this

9    line of questioning then we're done.

10           MS. HAGAN:  I really need to go to the

11   bathroom.  Excuse me.  Hold on for a second.  I need

12   --

13           THE REPORTER:  The time is 1:33 p.m.

14   We're off the record.

15               (Off the record.)

16           THE REPORTER:  The time is 1:40 p.m.

17   We're back on the record.

18   BY MS. CANFIELD:

19       Q    Okay.  So you testified that your time at

20   AABR was fairly consistent, and it looks that way

21   based on your testimony.  You were consistently

22   providing consultancy work there once a month.

23           My question is with respect to Gracie

24   Square, were you doing more work there in 2016, 2017

25   and 2015 as compared to 2017 -- I'm sorry.  As

Melissa Kaye

Page 151

1    compared to 2018 to the present?

2              MS. HAGAN:  Objection as to form.

3    BY MS. CANFIELD:

4       Q    Or at least when you stopped working there?

5              MS. HAGAN:  Objection as to form.

6              THE WITNESS:  I don't know if I can

7    answer that because, again, I worked in chunks of

8    time.  I worked at -- I worked at that chunk of time

9    after I was forced out of CHS, and I worked until the

10   pandemic caused them to drop their census and have too

11   many doctors.  I worked a chunk of time this summer.

12             So it goes and -- and, you know, it has

13   -- it's been in chunks of time.  So I guess it's hard

14   to say what years I had more work than others.  Like,

15   it's hard for me to answer that if I am going to be

16   accurate, because I really don't know.

17   BY MS. CANFIELD:

18      Q    Okay.  Your work at Gracie Square, was it

19   primarily on the weekends?  Did you do -- perform any

20   work during the week?

21      A    Sometimes during the week and sometimes

22   during the weekend.

23      Q    Okay.  What about at AABR?  Did you perform

24   that work on the weekend or during the week?

25             MS. HAGAN:  Objection.  Form.

Melissa Kaye

Page 152

```
 1                    THE WITNESS:  It varied.  Sometimes the
 2      week, sometimes the weekend.
 3      BY MS. CANFIELD:
 4          Q    Okay.  And the consultancy that you did, the
 5      competency exams and the nursing home consulting, did
 6      you do that primarily on the weekends or during the
 7      week sometimes?
 8          A    I didn't do competency exams.  It was --
 9      these weren't criminal defendants.  These were -- it
10      was capacity evaluations.
11          Q    Oh, apologies.
12          A    But yeah, I -- it was -- it was both, but
13      you know, it did -- there were mornings that I would
14      go there early Saturday morning and, you know, I would
15      come home and the kids would be awake and I -- and I
16      -- I just decided that this is, you know, not -- not a
17      good thing for -- for me, for a lot of reasons.
18          Q    Okay.  Did the oversight that CHS, when it
19      took over the clinics, and the strict hours that you
20      were required to work, did you find that interfered
21      with some of the consultancy work that you were doing?
22                    MS. HAGAN:  Objection as to form.
23                    THE WITNESS:  The -- the problem with
24      the hours at CHS was the -- I was promised very
25      specifically by my union who had negotiated with the
```

Melissa Kaye

Page 153

```
 1      transfer and that I would be grandfathered in, and my
 2      working conditions wouldn't change in any way.
 3                      And then in April, when I was down on
 4      Water Street and brought the -- my concerns to the
 5      attention of Dr. Ford and Dr. Jain about pay parity
 6      and about my working -- how my -- all my union
 7      benefits and all my working -- my title, my shift,
 8      everything was going to stay the same.  My location.
 9      I didn't -- I didn't want to go to Rikers.  And Dr.
10      Ford brought me over to speak with Jessica Laboy and
11      Mr. Wangel and I was assured that nothing was going to
12      change.  Everything would stay the same.  So I was
13      fine with that, you know?  A 9:00 to 5:30, you know?
14      That was fine.
15                      The problem happened after I filed my
16      EEOC complaint and I told Dr. Jain about my EEOC
17      complaint.  They changed my shift.  And that was just
18      brutal for me.  Brutal.  They said I had to be at work
19      at 8:00 in the morning.  They increased my unpaid work
20      -- my unpaid lunch hour from 30 minutes to an hour,
21      which extended my work day to nine hours.  And it just
22      -- it -- it -- you know, when you're a single mom with
23      two kids, ten minutes makes all the difference in the
24      world, you know?  Much less an hour.  And it just
25      threw our lives into chaos.  And it was super
```

Melissa Kaye

Page 154

1    stressful.  And the reason for doing it kept shifting.

2                    First, they were telling me it was

3    because the system couldn't handle a 30-minute lunch,

4    but I've had a 30-minute lunch per negotiations with

5    the union and Bellevue and the rest of the enterprise,

6    and other non-CHS agencies, for almost 13 years.  And

7    that had been negotiated when the doctors went from a

8    37.5 to a 40-hour work week.  They decreased the

9    unpaid lunch hour from an hour unpaid in the middle of

10   the day to 30 minutes unpaid in the middle of the day.

11   Or even if you want to take it at the end of the day,

12   some of the managers allowed that.

13                   So that was -- that -- that was

14   devastating.  And I would say that impacted my life

15   the most.

16   BY MS. CANFIELD:

17        Q    Okay.  So I hear you saying that the shift

18   change affected your personal life the most.  My

19   question is did it affect your ability to continue

20   with your work at Gracie Square, with AABR, and with

21   some of the other consultancy work that you were doing

22   and privately billing?

23        A    No.

24                   MS. HAGAN:  Objection as to form.

25   //

Melissa Kaye

Page 155

```
 1    BY MS. CANFIELD:
 2         Q    I'm sorry?
 3         A    No.
 4         Q    Okay.
 5                   MS. HAGAN:  And just to note, I
 6    objected to the question prior to Dr. Kaye's response.
 7                   MS. CANFIELD:  Okay.
 8    BY MS. CANFIELD:
 9         Q    One last question.  Have we exhausted all
10    other outside employment?
11         A    I don't know.  There's nothing that comes to
12    mind.  I mean, if -- I mean, the names of those
13    nursing homes were very varied.  I know there was --
14    do you want me to try to name those nursing homes
15    where they had me doing the consulting?
16         Q    No.  No thank you, but I have requested your
17    tax records and paystubs from that time period, so
18    those documents will tell me where they were, okay?
19                   MS. HAGAN:  We'll take it under
20    advisement.
21    BY MS. CANFIELD:
22         Q    So there's no reason to rack your brain.
23                   MS. HAGAN:  Again, we'll take it under
24    advisement.
25    //
```

Melissa Kaye

Page 156

```
 1    BY MS. CANFIELD:
 2         Q    And I have a question.  Why did you need to
 3    find new attorneys?
 4                   MS. HAGAN:  Objection.
 5                   THE WITNESS:  Because when I --
 6                   MS. HAGAN:  Wait, wait, wait.
 7    Objection.  This goes into attorney-client privilege.
 8                   MS. CANFIELD:  It actually doesn't.
 9                   MS. HAGAN:  She's not going to answer
10    that question.
11                   MS. CANFIELD:  But it's not your
12    privilege.  It's her privilege to assert, and I'm
13    talking about the --
14                   MS. HAGAN:  And I'm asserting it for
15    her.  This is something that she's made a decision as
16    far as -- concerned.
17                   MS. CANFIELD:  It's not privileged.
18    BY MS. CANFIELD:
19         Q    Why did you --
20                   MS. HAGAN:  She's not going to answer
21    that question.  You need to move on.
22                   MS. CANFIELD:  I've asked the question.
23                   MS. HAGAN:  Well, you're going to have
24    to -- going to put a blank in the record.
25                   THE REPORTER:  I'm sorry.  Please speak
```

Melissa Kaye

Page 157

```
 1    one at a time.
 2              MS. HAGAN:  I'm saying that my client
 3    is not going to answer that question.  She's not.
 4    It's not relevant and it touches on attorney-client
 5    privilege.
 6              MS. CANFIELD:  It does not, but can you
 7    please mark that for the record and we'll -- I'll
 8    follow-up with the Court later.
 9              MS. HAGAN:  Mm-hmm.
10              MS. CANFIELD:  All right.  Just the
11    last set of questions and then we can take a break.
12    BY MS. CANFIELD:
13         Q    Dr. Kaye, your name is Dr. Melissa Kaye?  Do
14    you have a middle name?
15         A    Tosyl.
16              THE REPORTER:  Please repeat that.
17              THE WITNESS:  Tosyl, T-O-S-Y-L.
18    BY MS. CANFIELD:
19         Q    Okay.  And have you been known by any other
20    name other than Dr. Melissa Kaye Tosyl, or Tosyl Kaye?
21         A    Yeah.  My -- my name is Melissa Tosyl Kaye
22    and I was at one point known as Melissa Kaye Gavend.
23         Q    Okay.
24         A    G-A-V-E-N-D.
25         Q    And did you change your name?
```

Melissa Kaye

Page 158

1      A     I did.

2      Q     And for what reason?

3      A     My given name is Melissa Kaye and I was in

4   college and there was a group of us girls who decided

5   that we would change our names for various reasons,

6   and that's what we did.

7      Q     Okay.

8      A     One of the girls name -- changed her name to

9   Diana after a goddess, and I forget what the other

10   ones did.  And we went down to the Boulder County

11   Clerk and changed our names.

12         We were in the women's studies program and

13   we just kind of felt that was asserting our

14   personhood.

15      Q     I understand.  I have a women's studies

16   graduate degree.

17         So your name -- your surname was -- last

18   name was Kaye?

19      A     No.  My -- my middle name is Kaye.  My given

20   name -- well, when I say "given," I mean my parents

21   named me Melissa Kaye and my middle name was Kaye, and

22   my last name was Gavend, G-A-V-E-N-D.

23      Q     Okay.  Okay.  I'm sorry.  Okay.

24      A     My name that I was given at birth.  And I --

25   and then my nickname.  And I just took my -- and

Melissa Kaye

Page 159

```
 1    that's how I -- I got my name.  I changed my name
 2    because I was --
 3         Q    Okay.
 4         A    -- Melissa Kaye as my middle -- as my first
 5    and middle name.  I changed Kaye to be my last name
 6    and took my nickname as my middle name.
 7         Q    So Tosyl was your nickname?
 8         A    Tosyl.
 9         Q    Tosyl.
10         A    Yeah, it was a nickname.
11         Q    Thank you.  And are you married?
12         A    No.
13         Q    Okay.  Have you been married?
14         A    No.
15              MS. HAGAN:  Objection.
16    BY MS. CANFIELD:
17         Q    And you have children, correct?
18         A    Yes.
19         Q    How many?
20         A    Two.
21         Q    Okay.  And what are their names and ages?
22         A    B -- and J -- and --
23         Q    How old are they?
24         A    They're 12.
25         Q    Are they twins?
```

Melissa Kaye

Page 160

```
 1        A     Yes.
 2        Q     Are they paternal or fraternal?
 3        A     They're boy/girl, so --
 4        Q     Oh, yeah.  Okay.  Sorry.  That was obvious.
 5        A     It's a common question, so -- yeah.
 6        Q     Yeah, yeah, yeah.
 7        A     I -- yeah, they're fraternal.
 8        Q     And I'm assuming your children live with
 9   you?
10        A     Correct.
11        Q     Okay.  And you stated earlier today that
12   you're living in New Mexico.  How long have you lived
13   in New Mexico?
14        A     I gave up my apartment in New York in
15   August.
16        Q     Did you rent or did you own?
17        A     I rented.
18        Q     Okay.  And since August, you've been living
19   in New Mexico.  Do you rent or do you own?
20        A     I rent.
21        Q     And anyone else other than you and your
22   children live with you?
23        A     No.
24        Q     Do you own or rent any other property?
25              MS. HAGAN:  Objection.
```

Melissa Kaye

Page 161

1                    THE WITNESS:  Well, I was renting my
2       apartment in New York, but now just my apartment in
3       Albuquerque.
4                    MS. CANFIELD:  Okay.  I guess why don't
5       we take a break now.
6                    THE WITNESS:  Okay.
7                    MS. CANFIELD:  I think it's a good
8       time.
9                    MS. HAGAN:  We can do 30 minutes?
10                   MS. CANFIELD:  Let's do 40.
11                   THE REPORTER:  Okay.  The time is 1:53
12      p.m.  We're off the record.
13                        (Off the record.)
14                   THE REPORTER:  The time is 2:37 p.m.
15      We're back on the record.
16      BY MS. CANFIELD:
17           Q    Welcome back, Dr. Kaye.
18           A    Thank you.
19           Q    As I said before, I will try to finish us
20      today by 6:00.  I'll do my best.
21                   I just want to talk to you a little bit
22      about the transition from Bellevue to CHS.  I believe
23      this morning you said that you learned about the
24      transition about December of 2017.  Am I correct of
25      that recollection?

Melissa Kaye

Page 162

1        A     Yes.

2        Q     Okay.  And how is it again that you learned

3     of the transition?

4        A     Dr. Jeremy Colley reached out to me and Dr.

5     Winkler.

6        Q     I'm sorry.  Can you speak up, please?

7        A     Yes.  Dr. Jeremy Colley reached out to me

8     and Dr. Winkler, and he informed us about this.

9        Q     Okay.  And did he reach out to you in

10    person?  Did he telephone you?  Did he send you an

11    email?  What form of communication did he use to

12    notify you?

13                   MS. HAGAN:  Objection as to form.

14                   You can answer.

15                   THE WITNESS:  If I recall correctly, it

16    was a text message.  It could have been an email --

17    BY MS. CANFIELD:

18       Q     Okay.

19       A     -- but I think it was a text.

20       Q     Okay.  And what exactly did Dr. Colley say

21    when he notified you?

22       A     He said that he was notified that, you know

23    -- well, the plan had been always with the -- all four

24    clinics were going to consolidate under Bellevue.  And

25    that steps were -- had been taken for that to happen,

Melissa Kaye

Page 163

1    and he was involved in that.  And he was the director

2    of the Division of Forensic Psychiatry at Bellevue.

3    That was the -- the position Dr. Ford had before she

4    went to CHS.

5              And so there was discussions about that.

6    And Elizabeth Owen had been in charge of the Brooklyn

7    and Queens centers.  And I remember emails -- I don't

8    know if we ever met in person, but I remember emails

9    and phone conversations.  And then suddenly, there was

10   this just change in the plan and he wanted, you know

11   -- he was concerned and kind of ambushed.  I think he

12   was a little rattled and he wanted to talk to Barry

13   and I -- Dr. Winkler and I and -- and find out why,

14   you know, this was happening and if, you know --

15   that's what I remember.

16             And so we had some conversations with him.

17   I don't remember if they were in person.

18        Q    Okay.  So if I'm understanding your

19   testimony, you said that the original plan was for all

20   the court clinics to be organized under Bellevue, and

21   that there was a change where instead of the clinics

22   having oversight by Bellevue, that they were going to

23   be transitioned to CHS.  Was that the change that Dr.

24   Colley was speaking to you about?

25        A    Dr. Colley -- yes.  We were -- there was

Melissa Kaye

Page 164

1    rumbling or discussions or meetings about the

2    consolidation of the four clinics under Bellevue.  And

3    that abruptly changed course and Dr. Colley informed

4    me and Dr. Winkler about that.

5         Q    Okay.  When was it that there were

6    discussions to organize the clinics under Bellevue?

7    Do you recall when that first occurred?

8         A    It was in 2017.

9         Q    Okay.

10        A    -- but I -- I know it was in 2017 because it

11   was an active plan or thought or -- it was being

12   explored actively when suddenly there was this big

13   shift and CHS was going to basically -- even Dr. Mary

14   Anne Badaracco was just kind of ambushed.  Everyone

15   was just like, "Whoa, what's going on?  This is a big

16   switch."  And no one was informed about it and there

17   was no discussion.  And we had been previously on this

18   trajectory to consolidate under Bellevue.  And now,

19   we're told this.

20             And it was -- it happened without any kind

21   of forewarning or open dialogue with people involved.

22        Q    Okay.  Now when Bellevue was going to

23   exercise oversight of the clinics, were there

24   discussions about your role and whether or not your

25   role would change with that type of transition?

Melissa Kaye

Page 165

1          A     No.

2          Q     Were there no discussions or were there

3     discussions that your role wouldn't change?

4          A     There was no -- there was no indication that

5     my role was going to change.

6          Q     Okay.  And was Dr. Colley going to have

7     oversight of all the clinics through Bellevue?

8          A     Yes.

9          Q     Okay.

10         A     Well, as -- yes.  It would be Dr. Colley or

11    if -- whoever was in the director position of the

12    Division of Forensic Psychiatry at Bellevue.  And at

13    the time, it was Dr. Colley.

14         Q     Okay.

15                THE WITNESS:  I'm going to turn off the

16    heater because it's going to get noisy again.

17                MS. CANFIELD:  Okay.

18                THE WITNESS:  Okay.  Here we go.  It'll

19    take a minute for the fan to turn off.

20                But yeah, so it was under Bellevue

21    regardless of who was in that leader -- leadership

22    position at the time.

23                At the time, it was Dr. Colley.

24    BY MS. CANFIELD:

25         Q     Okay.  And were you in agreement with

Melissa Kaye

Page 166

1      Bellevue taking over oversight of all the clinics?

2                  MS. HAGAN:  Objection as to form.

3                  THE WITNESS:  I thought it was a good

4      idea.  There was a lot of concern in the forensic

5      community about Elizabeth Owen and some tactics that

6      she employed.  So people, you know, kind of felt that

7      that -- those services in Brooklyn and Queens needed

8      to be cleaned up.  So I thought it was a good idea.

9      BY MS. CANFIELD:

10        Q    Okay.  Now once you learned that Bellevue

11     would not be exercising oversight, but in fact, all

12     the clinics would be transitioning over CHS or

13     Correctional Health Services oversight, how did you

14     feel about that?

15                 MS. HAGAN:  Objection as to form.

16                 THE WITNESS:  Well, I had concerns

17     because it was done in such a surreptitious manner.

18     It was kind of done as an ambush instead of open

19     discussions with people about what was happening.  So

20     that naturally would -- would raise red flags.

21                 But I -- my concern was that -- that

22     CHS operated as a political wing of -- of the mayor's

23     office, and I had concerns about politicizing the 730

24     competency exams and how that would impact defendants'

25     constitutional rights.

Melissa Kaye

Page 167

1              I mean, I had concerns about things
2      that were outside of my -- my job.  And then I had
3      concerns about things that pertain to my -- my
4      employment.
5              And primarily, you know, was I going to
6      have to go to Rikers?  Was I going to have to go off-
7      site?  Was I going -- you know, what -- what -- who
8      was I going to report to?  Were the people going to
9      maintain the integrity of -- of the process?  And I
10     was -- I was quite focused and concerned about making
11     sure that, you know, I -- I had been a public servant
12     for I think almost 20 years at the time and I was
13     planning to stay in that job another 10 or 15 years.
14     And I wanted to make sure, you know, what was
15     happening.  I wanted to know.  And my union had
16     ongoing meetings with CHS and it wasn't just because
17     of me.  There were I think five part-time -- four or
18     five part-time male psychiatrists working at the
19     Manhattan Court Clinic and it wasn't clear that --
20     that, you know -- whether or not they were going to
21     fill Dr. Ciric's role, you know, as it was, which was
22     a physician specialist unionized line, so that could
23     have made it six doctors.
24              So the union was trying to verify that,
25     you know, what's going to change, what's going to stay

Melissa Kaye

Page 168

1    the same.  And they repeatedly promised again and

2    again, everything's going to stay the same.  Nothing's

3    going to change.  No change in working conditions.

4    And the union tried to get an MOA to that effect, and

5    then CHS -- Wangel and Ford for certain were there, I

6    was told -- got real kind of slippery and said, "No.

7    We're not going to give you an MOA.  We will -- we'll

8    make a FAQ website."  It was --

9                  So they put up this website.  It's

10   long-gone now.  I didn't -- I don't have it, but with

11   these very, very general questions that didn't address

12   any of the concerns that Doctors Council had or that I

13   had.

14                  And so I wanted, you know, to make sure

15   that, you know, I knew what I was getting to.  And so

16   in April when I was down at --

17   BY MS. CANFIELD:

18       Q    Let me -- I'm going to ask you some

19   questions about that.  So --

20                  MS. HAGAN:  You have to let her -- you

21   got to let her finish her answer though.

22                  MS. CANFIELD:  I'm going to ask her

23   questions about the April meeting --

24                  MS. HAGAN:  Can you please let her

25   finish her answers?

Melissa Kaye

Page 169

1                    MS. CANFIELD:  -- with Dr. --

2                    MS. HAGAN:  Dr. Kaye, are you finished

3        with your answer?

4                    THE WITNESS:  Well, I just -- I'm sorry

5        to speak, but --

6                    MS. CANFIELD:  We're not going to

7        finish within the seven hours and I'll have to write

8        to the Court.  I'm just trying to move this along.

9        And I'm going to ask follow-up questions --

10                   MS. HAGAN:  -- she's asking her

11       questions -- she's answering the questions.

12                   THE WITNESS:  So --

13                   THE REPORTER:  I'm sorry, Ms. Hagan.

14       Please repeat everything you just said.

15                   MS. HAGAN:  I said, you know, she's --

16       Dr. Kaye is trying to answer Ms. Canfield's questions

17       to the best of her ability.  I'm sorry that she

18       doesn't like the way that Dr. Kaye is answering those

19       questions, but she's trying to provide a complete

20       answer to the questions that she's posed.  And I think

21       that Counsel has to afford Dr. Kaye the opportunity to

22       express her answers in a way that she believes is

23       suitable.  This is her deposition.  You called it and

24       she's trying to answer your questions.

25                        Please let her finish.

Melissa Kaye

Page 170

1                    MS. CANFIELD:  This is the deposition

2      that I'm taking.  I'm just trying to expedite.

3                    Dr. Kaye, as I said, we're going to

4      talk about the conversation that you had with Mr.

5      Wangel and Ms. Laboy.  That's where you were going.

6      We're going to talk about that.

7                    I just want to go back --

8                    MS. HAGAN:  For --

9                    MS. CANFIELD:  Ms. Hagan, please.  I

10     just want to go back and follow-up with some things

11     that you said.  When I asked you how you felt about --

12                    MS. HAGAN:  Let her finish her answer

13     --

14                    MS. CANFIELD:  Stop talking, please.

15                    THE REPORTER:  I'm sorry.  I'm sorry.

16     I can't take you both at the same time.

17                    Ms. Hagan, what --

18                    MS. HAGAN:  Please let her finish.  Let

19     her finish her train of thought and then you can go on

20     with your questions.

21                    MS. CANFIELD:  No.  I'm -- we're done.

22     We're done.  I'm going to ask another question.  Thank

23     you.

24                    I'm asking another question.

25                    MS. HAGAN:  Could you please put a note

Melissa Kaye

Page 171

1    -- a blank in the transcript for this portion because

2    Dr. Kaye was not able to finish her answer.

3              MS. CANFIELD:  I will question her.

4    She'll have plenty of time.  I just want to make sure

5    I get everything that I need to ask her.  I need to

6    follow-up.

7    BY MS. CANFIELD:

8         Q    Dr. Kaye, one question is Dr. Ciric.  Is

9    your recollection that Dr. Ciric resigned before or

10   after it was announced that CHS was going to take over

11   the court clinics?

12             MS. HAGAN:  Objection.  Asked and

13   answered.

14             And you can answer --

15             MS. CANFIELD:  It was not.

16             You can answer.

17             MS. HAGAN:  Asked and answered.

18             THE WITNESS:  I have no recollection.

19   BY MS. CANFIELD:

20        Q    Okay.  You also testified that you believed

21   that when I asked you how you felt about the

22   transition to CHS, you described it as surreptitious.

23   It was a surreptitious manner in which CHS was taking

24   over the court clinics.  What did you mean by that?

25             MS. HAGAN:  Objection as to form.

Melissa Kaye

Page 172

1    Mischaracterizes the testimony.

2              THE REPORTER:  Please repeat what you

3    just said, Ms. Hagan.

4              MS. HAGAN:  Objection as to form.

5    Mischaracterizes Dr. Kaye's testimony.

6    BY MS. CANFIELD:

7         Q    You can answer, Dr. Kaye.

8         A    I meant it was done secretively and non-

9    transparently.  It wasn't vetted with anybody involved

10   directly or indirectly.  It was a surprise and a shock

11   to Dr. Colley, Dr. Mary Anne Badaracco.  It was just

12   kind of an order from "on high" which really didn't

13   include any discussion or -- you know, it was kind of

14   a continuation of this -- these -- this kind of

15   surreptitious would be the word that would come to

16   mind.  But this non-transparent infiltration of the

17   court clinics by CHS.  It was kind of just more of the

18   same, this is not -- this wasn't something new, but it

19   was the most bold and extreme action that we had

20   experienced so far.

21        Q    What do you mean when you say this "bold"

22   like intrusion?  I can't recall the word that you

23   used, into the court clinics by CHS?  What was

24   happening that had you concerned?

25        A    Well, when CHS was created by the -- by the

Melissa Kaye

Page 173

1    DiBlasio administration, it was created, you know,

2    with a political agenda and for political optics.  And

3    that was the priority.  And so in 2015, CHS and CHS

4    operatives started interfering with the administration

5    of the 730 exams.  And MOCJ, which is the Mayors

6    Office of Criminal Justice who was aligned with CHS

7    started calling, emailing and getting in -- to engage

8    the Court and attorneys in the 730 competency

9    evaluation process.  And it was just an interference

10   of what was meant to be a non-political objective

11   endeavor.  So --

12        Q    Let me ask you a question.  Was it

13   interference or was there just more interest in what

14   was happening with the court clinics?

15              MS. HAGAN:  Objection as to form and --

16   and a suggestive answer, but you can answer.

17              THE WITNESS:  It was -- there was an

18   interference with the examination -- logistics of the

19   examination.  There was --

20   BY MS. CANFIELD:

21        Q    Can you give me an example of that, please?

22              MS. HAGAN:  Let her finish.

23              THE WITNESS:  Yeah.  There was pressure

24   to find people, fit or unfit.  And there was an

25   involvement of the mayor's office and CHS in minutia

Melissa Kaye

Page 174

1   and micromanagement of -- of the evaluators'
2   activities in doing this neutral, objective work
3   ordered by the court -- the state court.
4   BY MS. CANFIELD:
5       Q    And you did not like that micromanagement,
6   did you?
7       A    It wasn't that I -- it was -- my concern was
8   the defendants' due process rights and the integrity
9   of the -- the legal system because there was pressure
10  to influence the way the exams were done.
11      Q    And who did that, please?  Who influenced
12  the examinations?
13      A    It -- it -- the -- it was micromanagement in
14  the sense of, like, hyper focused on -- on the process
15  with investment in the outcome of the case.  So I
16  considered that inappropriate intrusion into what was
17  supposed to be a neutral evaluation that was to serve
18  the constitution of the United States.  It wasn't
19  supposed to be used for political purposes.
20      Q    Again, I'm asking you who interfered -- who
21  specifically interfered with the outcome of an
22  examination?  Who controlled the outcome of an
23  examination?
24      A    The -- we were getting -- in 2015, there was
25  a case -- Miguel Figueroa -- where the defendant was

Melissa Kaye

Page 175

1    disruptive at Rikers and Patsy Yang didn't like that.

2    So she was pressuring Jeremy Colley and -- I don't

3    know what her interactions were with Dr. Badaracco,

4    but she was pressuring Bellevue to "expedite" that

5    exam in a manner that wasn't in service of the -- the

6    fair, legal treatment of Miguel Figueroa.

7                    They were pressuring us to order a force

8    order, just gratuitously, and he hadn't even refused.

9    I was -- I was one of the evaluators.  Dr. Winkler was

10   the other and it was over the Christmas break.  He

11   wasn't around.  She wanted -- she was pressuring to

12   have the exam moved to be done in Manhattan.  He -- he

13   -- his lawyer was I think not even available and it

14   was a legal aid case.  And the pressure to get this

15   exam done was so intense, he -- he wasn't even given,

16   you know -- his -- his constitutional rights were not

17   even being considered.  It was all about --

18        Q    Did he eventually have an exam?

19        A    He eventually had an exam.

20        Q    Without a force order?

21                    MS. HAGAN:  Objection as to the form of

22   the question.

23                    You can answer.

24                    THE WITNESS:  I -- I think he may have

25   refused once or -- I don't -- you know, typically,

Melissa Kaye

Page 176

1    before a judge is going to consider writing the order

2    -- writing an order for a force order, you know, we

3    need to document three refusals.  I think he may have

4    had one, but that was maybe even after they wanted a

5    force order, before he had refused at all.

6                    So eventually, he was examined.  They

7    had called the district attorney's office in the Bronx

8    and -- trying to get them to accept an unfit finding

9    without an exam.  And all of this was very, you know

10   -- I felt was corrupting the legal system.

11                   I mean, I can't say that as part of my

12   job because I'm not a lawyer.  I'm not an office of

13   the Court, but I found it very concerning and it

14   raised red flags.

15   BY MS. CANFIELD:

16       Q    And you said this happened in 2015?

17       A    Yes.

18       Q    Okay.

19       A    And --

20       Q    Didn't you tell me that you didn't learn

21   that CHS was taking over the clinics until 2017?

22       A    They didn't announce -- they didn't announce

23   that they were taking over the clinics till --

24   formally until 2017, but they had been interfering

25   inappropriately all the way back to 2015.

Melissa Kaye

Page 177

1        Q    Okay.  So when you say "they," you're

2    talking about CHS or are you talking about particular

3    individuals?

4        A    I'm talking about CHS, Patsy Yang.  I'm

5    talking about John Volpe at the time.  I'm talking

6    about --

7                    THE REPORTER:  I'm sorry.  John who?

8                    THE WITNESS:  Volpe, V-O-L-P-E I think.

9                    And there were various operatives --

10   political operatives at MOCJ.  Tasha Lloyd [ph] was a

11   consistent player.  There were some women -- Uma [ph].

12   I don't know if that was her first name or last name.

13   There was a woman -- Steven Reagan [ph] who was

14   emailing.  She eventually got arrested for a weapons

15   charge.

16                    There were all kinds of these just

17   random people who really had no business, you know,

18   trying to interfere with a court-ordered competency

19   exam when these people had legal representation.  They

20   weren't even going to their attorneys.

21   BY MS. CANFIELD:

22       Q    So this was occurring in 2015.  So it sounds

23   like in 2017, when you learned that CHS was taking

24   over the court clinics, that you had already formed an

25   opinion about CHS; isn't that true?

Melissa Kaye

Page 178

```
 1                    MS. HAGAN:  Objection as to form.
 2       Assumes facts that haven't been, I guess -- assumes --
 3       there's no foundation for the question.
 4                    MS. CANFIELD:  Right.  And so she can
 5       answer with either a yes or a no.
 6       BY MS. CANFIELD:
 7            Q    Isn't it true that you had already had bad
 8       feeling about CHS based on your experiences in 2015?
 9                    MS. HAGAN:  Objection.
10                    THE WITNESS:  Based on my experience, I
11       had concerns.
12       BY MS. CANFIELD:
13            Q    Okay.  And did you communicate those
14       concerns to anyone?
15                    MS. HAGAN:  Objection.  Form.
16                    THE WITNESS:  The concerns were shared
17       by others.  Legal stakeholders in the community had
18       concerns.  Judges --
19       BY MS. CANFIELD:
20            Q    No.  My question is who did you share your
21       concerns with?
22                    MS. HAGAN:  Objection.  You have to let
23       her finish.
24                    What were you saying, Dr. Kaye?
25                    MS. CANFIELD:  She was not answering
```

Melissa Kaye

Page 179

1    the question.

2    BY MS. CANFIELD:

3        Q    Did you share your concerns about the

4    transition to CHS with anyone?

5                MS. HAGAN:  Continue your answer and

6    then answer her subsequently.

7                MS. CANFIELD:  No.  I'm going to have

8    to call the witness back.

9                MS. HAGAN:  Mm-hmm.

10               MS. CANFIELD:  She's not answering

11   questions.

12               MS. HAGAN:  Mm-hmm.

13               THE WITNESS:  So I -- I can't tell you

14   the exact timeframe, but I know the DA's office and --

15   and the -- the defense community had concerns about

16   the Miguel Figueroa situation, which I discussed with

17   --

18   BY MS. CANFIELD:

19       Q    Okay.  But my -- excuse me.  Dr. Kaye,

20   sorry.  It's my deposition.

21           I want to know -- you said you had concerns.

22   I want to know who -- if you shared your concerns with

23   anyone?

24       A    I --

25               MS. HAGAN:  Please answer the question

Melissa Kaye

Page 180

1    that you were finishing and then go --

2                    MS. CANFIELD:  No, no.

3                    MS. HAGAN:  -- question.

4                    MS. CANFIELD:  No, no.  Then we're

5    going to call the witness back.  That's not my

6    question.

7    BY MS. CANFIELD:

8        Q    My question is you had concerns.  Did you

9    share them with anyone?

10                   MS. HAGAN:  She has to answer the

11   question.  She's trying --

12                   THE REPORTER:  I'm sorry.  Please.  One

13   at a time.

14                   MS. HAGAN:  You don't like how Dr.

15   Kaye's answering your question.

16                   MS. CANFIELD:  It's -- no.  It's not

17   that I don't like it.  She's not answering my

18   question.

19                   MS. HAGAN:  She is.

20                   MS. CANFIELD:  And you have --

21                   MS. HAGAN:  She's not --

22                   MS. CANFIELD:  And you have a

23   responsibility as her counsel to direct her to answer

24   my questions.  She's not answering my questions.  I

25   didn't ask her about who else had concerns.  I wanted

Melissa Kaye

Page 181

1    to know if she shared her concerns with anyone.

2                    MS. HAGAN:  Clearly if she's expressing

3    that these other people had concerns, she's talking to

4    them.  How else would she know?

5                    Could you please finish?

6                    MS. CANFIELD:  No.

7    BY MS. CANFIELD:

8        Q    I want to know if you expressed your

9    concerns to anyone?

10       A    Yes.

11       Q    Who?

12       A    I spoke with individuals at the Bronx

13   district attorney's office.

14       Q    Okay.

15       A    Ginger James.

16       Q    What about --

17                   THE REPORTER:  I'm sorry.  I'm sorry.

18   Repeat the name?

19                   THE WITNESS:  Ginger James and another

20   ADA, Kelly Van Jeckel [ph] or something like that.

21   Kelly Van Derken [ph]?  Something like that.

22                   I spoke to judges.  I spoke to Judge

23   Lieb, Judge Lieb's law secretary.  Judith Lieb.  I

24   spoke to Judge Moore.  I spoke to Judge Torres, the

25   chief administrative judge.  I spoke to legal aid

Melissa Kaye

Page 182

1    people.  I think Claudia Montoya, Lorraine McKelvey,

2    Jeff Bloom.

3    BY MS. CANFIELD:

4        Q    Did you speak to anyone inside Bellevue?

5    Any of your supervisors?

6        A    I spoke extensively with Jeremy Colley.  I

7    spoke with Dr. Badaracco -- Mary Anne Badaracco.  I

8    spoke with Dr. Barry Winkler.  I spoke with Dr. Ciric.

9    I'm trying to think who else.

10            There was a male ADA at the Bronx district

11   attorney's office that we spoke to about the Miguel

12   Figueroa -- I don't know his -- I can't remember his

13   name.

14            I spoke to Judge Torres' law secretary,

15   Lonnie Gilbert [ph].  Judge Torres --

16       Q    Let me interrupt a second.  Now when you

17   said you spoke to all these people, you spoke to them

18   about Miguel Figueroa?

19       A    No.  You -- I thought the question was --

20   concern -- there were concerns about CHS?  I thought

21   that was --

22       Q    Concerns about the transition.  You spoke to

23   all those people about your concerns regarding the

24   transition?

25       A    No.  That was --

Melissa Kaye

Page 183

```
 1                    MS. HAGAN:  No.
 2                    MS. CANFIELD:  That was my question.
 3                    MS. HAGAN:  You're mischaracterizing
 4     her testimony.
 5                    MS. CANFIELD:  That was my question.
 6     That's my point.
 7     BY MS. CANFIELD:
 8          Q    My point was who did you speak to about your
 9     concerns regarding the transition to CHS, not Miguel
10     Figueroa.
11          A    Because that was -- the names were people I
12     spoke to since 2015.
13          Q    That was not my question either.
14          A    I apologize.  I apologize.
15          Q    Yeah.
16          A    So specifically about the transition?
17          Q    You testified that you had concerns about
18     the transition.
19          A    Yeah.
20          Q    What I want to know, did you express any of
21     those concerns to your superiors?  What did you say,
22     when, if you did.
23                    MS. HAGAN:  Objection.  Form of
24     question.
25                    THE WITNESS:  I -- I spoke to Jeremy
```

Melissa Kaye

Page 184

```
1     Colley.
2     BY MS. CANFIELD:
3          Q    And what did you say to Dr. Colley?
4          A    I'm not going to be able to recall the exact
5     -- you know, the exact verbiage, but I -- we were
6     concerned that, you know, as Dr. Colley characterized
7     and I shared, you know, with CHS hijacking the mental
8     health aspects of the criminal procedure law, and
9     using it to manipulate the legal system.  We had
10    concerns about that.
11         Q    Okay.  Were you considering -- you testified
12    earlier that you spoke to I think Dr. Ford and Dr.
13    Jain about whether or not you had formally accepted
14    position or accepted transfer to CHS.
15         A    Yes.
16         Q    During the time period before you had
17    formally accepted the transfer, were you seeking other
18    employment?
19         A    I was in discussion with Dr. Mary Anne
20    Badaracco and Jeremy Colley about possibly getting a
21    position at Bellevue.
22         Q    Okay.  And what position were you discussing
23    with them at Bellevue?
24         A    Well, that was part of the issue is that
25    they didn't really have -- I wanted to stay in my
```

Melissa Kaye

Page 185

1    Doctors Council HHC line and those lines had been

2    phased out over the last 20 years and converted to

3    private lines, like NYU lines at Bellevue instead of

4    city lines.

5              And so the positions that were available

6    were NYU lines.  And I was kind of waiting and hoping

7    to find a city line to -- to -- to stay in at

8    Bellevue.  That's a lot of around what the discussion

9    was.

10             There was a discussion about if I would --

11   if they might be able to get an NYU line converted to

12   a city line, and that I would work on the inpatient

13   forensic unit at Bellevue, which was a treatment unit

14   for people that were too acutely psychiatrically ill

15   to be on Rikers.  And --

16        Q    Were you offered an NYU line?

17                  MS. HAGAN:  Objection.

18                  THE WITNESS:  I don't -- I don't

19   remember if I was offered an NYU line.  I specifically

20   asked --

21   BY MS. CANFIELD:

22        Q    If you were offered an NYU line, would you

23   have taken it?

24                  MS. HAGAN:  Objection.

25                  THE WITNESS:  I don't think I would

Melissa Kaye

Page 186

1    have taken a job and given up -- I -- my goal was to
2    stay in my union line and I don't -- I don't think I
3    would have taken it, no.
4    BY MS. CANFIELD:
5        Q    Did you believe that you were being told
6    that they didn't have a city line because they wanted
7    you to go into an NYU line where you would not be part
8    of the union?
9        A    I think -- I think that doctors have some
10   kind of affiliation with the union.  The -- the -- I
11   don't know that they're not part of the union.  I
12   remember seeing emails that they -- they did afform
13   some affiliation for those doctors, so I don't know
14   that they weren't part of the union.  But I was more
15   interested in the benefits of the union.
16            I was kind of locked onto the -- the dental
17   benefits and covering orthodontic treatment.  And I
18   was pretty locked onto that and I really wanted to
19   keep that benefit.
20            I also felt like I -- you know, I had
21   basically been told, "You die in your line," and
22   that's why I wasn't given a raise.  So I wasn't going
23   to then just say, "Okay."  But if it's convenient, you
24   know, for us, we're just going to switch you over and
25   you're going to lose all your union benefits.  And,

Melissa Kaye

Page 187

1    you know, and still work here.  It didn't seem

2    reasonable to me.

3              I had been in that line and I asked

4    specifically if I could be changed to a physician

5    specialist line.  I wanted that.  Again, I asked

6    again.  At this transition point, I was asking Dr.

7    Badaracco because I think that when Steve Ciric worked

8    at the inpatient unit, which is where I was looking

9    for a job, before he was hired by Dr. Ford to go be

10   the director of the Manhattan Court Clinic, he had

11   gotten -- he was an attending three, and then when he

12   went to the court clinic, he became a physician

13   specialist.  So he got to change his line when he

14   changed kind of roles.  So I was hoping that I could

15   do the same.  So I was kind of looking for that and

16   Dr. Badaracco was receptive to exploring it, but she

17   voiced concerns to me that, you know, I appreciated

18   her sharing.  And she said that, you know, since CHS

19   has took over Rikers, they were not referring people

20   timely for psychiatric care -- for acute psychiatric

21   care.  They were holding onto them too long and they

22   were coming to the hospital way more psychotic and way

23   more violent.  And at the rate of attacks on staff at

24   Bellevue inpatient unit were -- were -- were up, high.

25        Q    Okay.  Let's -- we're getting off topic now.

Melissa Kaye

Page 188

```
 1    Let me ask you a question.
 2              The fact that Dr. Badaracco did not -- was
 3    unable to give you either a physician specialist or a
 4    city line, did you take that as -- that decision being
 5    in any way discriminatory or in retaliation for your
 6    previous complaints about pay equity?
 7              MS. HAGAN:  Objection.  That
 8    mischaracterizes the testimony, but you can answer.
 9              THE WITNESS:  Well, I mean, there's two
10    parts to that.
11              One, Dr. Badaracco never told me that
12    they couldn't.  She said she would explore it.  And
13    then she also gave me warnings about if I were to take
14    that job, she said, "I know you're a mother and you
15    have young kids."  And that people, you know -- "Staff
16    are getting hurt here and you need to consider that.
17    I'm telling you that not only as someone who would be
18    your supervisor, but you know, someone who cares.  And
19    I'm telling you that the unit is more violent now."
20              And --
21    BY MS. CANFIELD:
22         Q    Okay.  But my question is -- my question is
23    -- you testified this morning that you believe the
24    fact that you were not given a physician specialist
25    line and they wanted to make you managerial was
```

Melissa Kaye

Page 189

```
1    discriminatory and then retaliation for your
2    complaints.
3              What I want to know is why don't you believe
4    the fact that Dr. Badaracco also was aware of your
5    complaints.  Why don't you characterize her inability
6    to give you a city line as discriminatory and
7    retaliatory as well?
8                   MS. HAGAN:  Objection.  Objection.  It
9    mischaracterizes the testimony.  She never said that
10   Dr. Badaracco was unable to give her a physician
11   specialist line.
12   BY MS. CANFIELD:
13       Q    She didn't give you one, did she?
14       A    Well --
15                  MS. HAGAN:  Objection.
16   BY MS. CANFIELD:
17       Q    Did she ever get back to you and say -- she
18   never followed up, did she?  I mean, you didn't get
19   the physician specialist line.
20       A    She did follow-up and I believe that Dr.
21   Badaracco --
22              First of all, Dr. Badaracco doesn't have
23   near the power and authority that Dr. Yang has.  Dr.
24   Badaracco works within the hierarchal bureaucratic
25   structure of HHC.  Dr. Yang is in a -- is in an agency
```

Melissa Kaye

Page 190

1     that has a dot-dot-dot line connection to HHC.  And

2     she has a lot more autonomy and power and -- and

3     control over her funding than Dr. Badaracco.

4            And I believe Dr. Badaracco, when she

5     reacted to -- when Dr. Colley told her that -- about

6     my pay parity, and she called me in, she did so out of

7     concern.  I believe that she did what she could to get

8     my pay parity rectified.  And I believe that she hit a

9     wall with central office.

10           I don't -- I don't know that that's true,

11    but I believe that she tried as best as she could and

12    she got me that $2,000 pay raise by pushing my

13    attending three salary to the top range.

14           So I believe Dr. Badaracco, in good faith,

15    discharged her duty and did what she could for me.

16    And I also believe that she was trying to look into

17    options about what could be done for me to come to

18    Bellevue on a city line.  And she was --

19       Q    But didn't you express those concerns to Dr.

20    Ford who communicated your concern to Dr. Badaracco?

21           I guess what I'm trying to understand is why

22    Dr. Badaracco did the right thing, but you believe

23    that Dr. Ford did not do the right thing when she

24    advocated for you to get that $2,000 increase?

25                MS. HAGAN:  Objection.  It

Melissa Kaye

Page 191

1    mischaracterizes the testimony.

2                     First off, she didn't testify --

3                     MS. CANFIELD:  It actually doesn't.

4                     MS. HAGAN:  No.  She didn't testify

5    that Dr. Ford went to Dr. Badaracco at all.  She said

6    that she didn't go to Dr. Badaracco.

7                     And secondly, she didn't say that Dr.

8    Ford actually -- advocated for anything.  You're

9    mischaracterizing her testimony.

10                    Could you please rephrase the question?

11                    MS. CANFIELD:  Yeah.  I'm going to move

12   on.

13   BY MS. CANFIELD:

14       Q    So how many different times were you seeking

15   positions at Bellevue?

16       A    I don't know that I can quantify it, but I

17   know that after I made a decision to stay at CHS,

18   because 730 examinations and forensic work was my

19   career and that was my first choice and my first love,

20   and I was promised by Wangel and Laboy that nothing

21   would change -- and I'm reassured by my union that

22   would be true.  I did take them, you know, at their

23   word and thought they were acting in good faith, and I

24   decided to stay.

25                    Then as soon as I made my EEOC complaints

Melissa Kaye

Page 192

1   and asked for pay parity, I started -- I -- I was

2   subjected to this constant harassment and retaliation,

3   pay cuts, surreptitious changes to my pay, my

4   timesheets, denial of access to the computer's

5   electronic timekeeping system.  You know, just being

6   excluded from meetings and -- and -- and being mocked

7   and ridiculed and having my computer not work.  And

8   having them shredding all my timesheets from Bellevue

9   -- all the copies of my timesheets from Bellevue.  And

10   claiming --

11       Q    All right.  Let's show the complaint.  Let's

12   go over -- because these are some of the allegations

13   in your complaint.

14                MS. CANFIELD:  So, Ms. Hagan, you have

15   the complaint.  It was something that you authored.

16                MS. HAGAN:  Is this Exhibit -- it is

17   something that I authored?  What are you insinuating?

18                MS. CANFIELD:  It's Exhibit B.  You

19   have it.

20                (Exhibit B was marked for

21                identification.)

22                MS. HAGAN:  It's Plaintiff's Complaint.

23   What do you want me to say?

24                MS. CANFIELD:  Yes.  I'm saying it's

25   Exhibit B.

Melissa Kaye

Page 193

1              MS. HAGAN:  Yes, please.

2              THE WITNESS:  So during the course of

3     all of that --

4              MS. CANFIELD:  Hold on.  Hold on, Dr.

5     Kaye.  I don't have a question for you.  I said we're

6     going to move on.  You --

7              MS. HAGAN:  -- finish her last answer

8     before you cut her off.

9              MS. CANFIELD:  No.  We were finished.

10    We were moving on.

11             MS. HAGAN:  No, not "we" were finished.

12    You were finished.  She hadn't finished answering your

13    question.  Would you let her finish answering your

14    question, please?

15             MS. CANFIELD:  Does Dr. Kaye remember

16    my question?

17             THE WITNESS:  Well, you asked me if I

18    applied to or sought employment at Bellevue multiple

19    times.  And when things started becoming very

20    stressful and painful from this harassment and

21    bullying by CHS -- one incident after another -- I did

22    reach out to Bellevue again trying to get back there

23    and trying to get out of this -- away from these mean

24    people.

25    //

Melissa Kaye

Page 194

```
1    BY MS. CANFIELD:
2        Q    Okay.  All right.  So I was transitioning to
3    the complaint because these are some of the things
4    that you allege in the complaint.
5             So I wasn't trying to cut you off.  I was
6    just trying to take these allegations in a systematic
7    way so we get through them all today, okay?
8        A    Thank you.
9        Q    All right.  All right.  I'm going to share
10   what's been marked as Defendants' Exhibit B.  It's the
11   Amended Complaint.  Or actually, it's the First
12   Amended Complaint in this action.
13                  MS. HAGAN:  So that might not be the --
14                  THE WITNESS:  It's very, very small on
15   the screen.  I can't -- I --
16                  MS. CANFIELD:  Okay.
17                  MS. HAGAN:  Can't see that.  Is there a
18   way that you can --
19                  THE WITNESS:  That's better.
20                  MS. HAGAN:  I don't know if you could
21   full-screen?  Let's see.  I'm going to -- I made mine
22   full-screen, Dr. Kaye.  Maybe that'll help.
23                  THE WITNESS:  How do I do that?
24                  MS. HAGAN:  It should be like a -- an
25   icon in the upper right-hand corner.  If you click on
```

Melissa Kaye

Page 195

1    view, it'll give you the option.  Not the top.
2    There's one on the upper right-hand corner on your --
3    I think on my screen, but it should be on your screen
4    as well.
5                   MS. CANFIELD:  There's an X and then a
6    restore up, restore down and then a minimize.  If you
7    go restore up.
8                   THE WITNESS:  Well, I don't know.  That
9    might be for a PC, but this is a Mac.  I -- I --
10                  MS. HAGAN:  I have a Mac, too.  Yeah.
11   I'm not sure what happened there.
12                  MS. CANFIELD:  Okay.
13   BY MS. CANFIELD:
14       Q    I just want to know -- this is the First
15   Amended Complaint.  I want to know if prior to this
16   being filed with the Court, if you had an opportunity
17   to review it?
18       A    I -- I don't know if I had an opportunity.
19   I have reviewed it.  I have reviewed it.
20       Q    Okay.  You have reviewed it.  Okay.
21       A    I -- after it was filed, I did -- I did take
22   a look at it.
23       Q    Okay.  Are the allegations in the complaint
24   correct and accurate?
25       A    I don't even -- I would need to go through

Melissa Kaye

Page 196

1    them one by one because I -- I can't -- I know there
2    were some things in there that, you know, I -- I would
3    -- I would -- maybe some typos or something.  So I --
4    I don't know.  I --
5              In general, I can say that it's hard to --
6    this is a document that I haven't gone through
7    closely.
8         Q    Okay.  So why don't we go through some of
9    the allegations together.
10        A    Is there any way that you could make it a
11   little bit bigger, please?  Okay.  Thank you.
12        Q    Okay.  Now the first set of allegations --
13   and I'm going to scroll down -- concern --
14             MS. HAGAN:  Is it possible you could go
15   to the last page so she can see this is the most --
16   the one that we actually filed with the Court?
17   Because it'll have the date.
18             MS. CANFIELD:  Yeah.  I don't even --
19   this one's not even --
20             MS. HAGAN:  It should have the date at
21   the end.
22             MS. CANFIELD:  Yeah, I know.  But I was
23   going to say this one's not even Bates stamped.  I
24   don't know why.  I mean, not Bates stamped, but ECF.
25             MS. HAGAN:  Yeah.  That's why I was

Melissa Kaye

                                              Page 197

1    thinking if you had the ECF version of it, then that

2    would be helpful.  April 30th.  I'm not sure if that's

3    the most -- actually, I'm not sure if that's the most

4    recent one, but let's see.

5                    THE WITNESS:  I think there was one in

6    May, wasn't there?

7                    MS. HAGAN:  I believe so.

8                    MS. CANFIELD:  Let me make sure that I

9    have the operative complaint.

10                   This is the complaint I have.  It's

11   dated May 30th.  I mean, it's dated April 30th, but it

12   was filed on May 2, 2019.  And the copy that I have --

13   the hardcopy at my desk is dated April 30th.

14                   MS. HAGAN:  Well, actually, the one

15   that was filed -- one of the versions that was filed

16   with the Court was filed on April 30, 2019.  And it

17   had ECF Docket No. 22.

18                   MS. CANFIELD:  The one I'm working from

19   is Docket No. 25-1.

20                   MS. HAGAN:  Okay.  Let's see what this

21   one is.  Because there should be another one that was

22   actually filed on May 3rd.  There should be one that's

23   dated May 3rd.  That's not the one that you're

24   showing.

25                   MS. CANFIELD:  Okay.

Melissa Kaye

Page 198

1              MS. HAGAN:  Mm-hmm.

2              MS. CANFIELD:  We were not served with

3      one dated May 3rd.

4              MS. HAGAN:  Well, the May 3rd one --

5              THE REPORTER:  I'm sorry.  Could you

6      please repeat that, Ms. Canfield?

7              MS. CANFIELD:  I said -- we're going to

8      have to pull it off the docket because I do not have

9      one that's May 3rd.  Are those two -- are those copies

10     exactly the same?

11             MS. HAGAN:  No.  The May 3rd and the

12     April 30th versions are not the same, Ms. Canfield.

13             MS. CANFIELD:  Terrific.

14             MS. HAGAN:  The May 3rd version is 32

15     pages versus the April 30th being 29 pages.

16             MS. CANFIELD:  All right.  Let's take a

17     five-minute.

18             MS. HAGAN:  Mm-hmm.

19             THE REPORTER:  The time is 3:22 p.m.

20     We're off the record.

21                  (Off the record.)

22             THE REPORTER:  The time is 3:29 p.m.

23     We're back on the record.

24             MS. CANFIELD:  Thank you.  And

25     apologies to everyone for sharing the wrong complaint

Melissa Kaye

Page 199

1    that appears to be the -- I don't know if that was a

2    proposed First Amended Complaint, but it's not the one

3    that was eventually filed on the docket.

4              I do have the proper document now.

5    It's ECF No. 29.  It was filed on May 3, 2019.

6    BY MS. CANFIELD:

7        Q    So, Dr. Kaye, the question I had for you

8    earlier was whether or not you had an opportunity to

9    review this before it was filed.  You said no, but

10   that you have subsequently had an opportunity to

11   review all the allegations in the complaint.

12             And my question is other than typos, are the

13   allegations factually correct, if you can recall?

14       A    Yes.  There's typos in there though, but

15   yes.  And regarding the shift change, you know,

16   there's typos.  But the shift change increased my

17   hours to nine hours a day, and it made my start time

18   at 8:00 a.m.

19       Q    Right.

20       A    So that was very hurtful.

21       Q    Okay.

22             THE REPORTER:  That was what, ma'am?

23             THE WITNESS:  That was very hurtful.

24             THE REPORTER:  Thank you.

25   //

Melissa Kaye

Page 200

```
 1    BY MS. CANFIELD:
 2         Q    So I am going to scroll through some of the
 3    -- I don't want to say boilerplate, but it's just
 4    setting forth facts that are set forth in every
 5    complaint concerning venue and jurisdiction.  And I
 6    want to go to --
 7         A    Concerning what?  I'm sorry.  Concerning
 8    what?  I didn't --
 9         Q    Concerning venue and jurisdiction, just
10    setting out and then hear who the parties are.
11              I'm going to get to sort of the meat of the
12    complaint here, okay?
13              Now the first section -- the factual section
14    is your background information.  I'm assuming that the
15    allegations here are correct?
16         A    No.
17         Q    That you have a bachelor's degree from the
18    University of Colorado, and a medical degree from the
19    University of Pennsylvania?
20         A    No, that's not correct.
21         Q    Okay.  What is incorrect?
22         A    I have a medical degree from the Medical
23    College of Pennsylvania, and I did my residency at the
24    University of Pennsylvania.
25         Q    Okay.  Thank you.  The next paragraph says
```

Melissa Kaye

Page 201

1   you have "the following licensures and certifications:

2   Diplomate of the American Board of Psychiatry and

3   Neurology; Diplomate of the American Board of Forensic

4   Psychiatry; and Diplomate of American Board of Child

5   and Adolescent Psychiatry."  Is that correct?

6        A    What was the date that this was filed?

7        Q    May 3, 2019.

8        A    That's correct, but incomplete.

9        Q    What would you add to that paragraph?

10       A    Well, it lists my board certifications, but

11   my -- that's different than my licensing.  And my

12   licensure is a -- a license to practice medicine in

13   the State of New York, and a license to practice

14   medicine in the State of Pennsylvania which I put in

15   inactive status.

16       Q    Okay.  Thank you.  And this factual -- that

17   you worked as attending level three since 1999; is

18   that correct?

19                THE REPORTER:  Could you please repeat

20   that?  I'm so sorry.

21                MS. CANFIELD:  Sure.

22   BY MS. CANFIELD:

23       Q    The paragraph that alleges that you worked

24   as an attending physician level three since 1999; is

25   that correct?

Melissa Kaye

Page 202

```
 1        A    At HNH.
 2        Q    At HNH.  Okay.  When you applied to HNH for
 3    a position, were you applying to the position of
 4    attending physician?
 5        A    I didn't know anything about the -- the
 6    lines or anything.  I applied to work at the court
 7    clinic part-time.  I was applying for a part-time job
 8    as a forensic evaluator at the court clinic.
 9        Q    Okay.  And when you were first hired, did --
10    were you working as a part-time psychiatrist at the
11    court clinics?
12        A    Yes.
13        Q    Okay.  And how long were you part-time?
14        A    I was hired part-time in August 1999.  And I
15    worked part-time until May 2000.
16        Q    Okay.  And after May 2000, did you then go
17    full-time?
18        A    Correct.  Yes.
19        Q    And who did you report to working as a
20    forensic psychiatrist?
21        A    I reported to the director of the Division
22    of Forensic Psychiatry who at the time was Robert
23    Berger, M.D.
24        Q    Okay.  And --
25        A    Rob Berger.
```

Melissa Kaye

Page 203

```
 1        Q    Rob Berger?  Dr. Berger?
 2        A    Dr. Berger, yes.
 3        Q    Okay.  And you were working at the Bronx
 4   Criminal Court building; is that correct?
 5        A    Correct.
 6        Q    Okay.  And do you -- and what specifically
 7   were you doing at the Bronx Court Clinic in terms of
 8   your work?  And when you went full-time in 2000.
 9        A    I was doing court-ordered forensic exams for
10   CPL 730 -- Criminal Procedure Law 730.  Orders for
11   competency to stand trial, and I was doing CPL 390
12   exams, which are pre-pleading exams -- presentence.
13        Q    Any other type of exams?
14        A    Those are the only two exams the court
15   clinic was performing.
16        Q    Okay.  Any other type of work outside of
17   examinations that the court clinic was performing?
18        A    Was I doing other work through the court
19   clinic besides 730 and --
20        Q    And 390, yes.  Correct.
21        A    No.
22        Q    Okay.  Thank you.
23        A    Well, I mean, I -- there were other tasks
24   associated with my work.
25        Q    Okay.
```

Melissa Kaye

Page 204

1          A     Like --

2                    THE REPORTER:  I'm sorry.  "Other

3     tasks" --

4                    THE WITNESS:  Associated with my work

5     doing these 390 and 730 exams, like testifying.

6     BY MS. CANFIELD:

7          Q     Okay.  And at any point did that change the

8     type of work you were doing in the court clinics from

9     2000 forward?

10         A     In 2004, I was promoted to medical director,

11    so I then had the same forensic evaluation job duties

12    and additional administrative work.

13         Q     Okay.  At any point after 2004, following

14    your promotion, did the type of work you were doing at

15    the Bronx Court Clinic change?

16         A     It was always court-ordered 390 and 730

17    exams.

18         Q     Okay.  And did you ever do any work related

19    to probation violations, or were those violations

20    similar to the 390s?

21         A     No, I did not.  There was -- in I think it

22    was 2016 maybe, there was an administrative -- in

23    Albany -- in Albany, there was an administrative

24    amendment or change to the CPL 730 statute that said

25    that designated parolees eligible for a CPL 730

Melissa Kaye

Page 205

1      competency exam.

2              So then at that time, there was no specifics

3      about who was going to do it, where, or how it was

4      going to be funded but it turned out that the way the

5      amendment to the statute was interpreted was that it

6      was to be done by the county in which the parolee was

7      being held.

8              So they were 730 exams, but now they -- it

9      was a different -- an expanded population.  It was now

10     parolees in addition to charged defendants --

11     criminally-charged defendants.

12             So parolees were eligible for 730s, and

13     because Rikers -- even though the bridge to Rikers is

14     in Queens, the -- the island is in the water that is

15     Bronx County.  So any incident that happens at Rikers

16     is a Bronx case.

17             So all of those parolees -- those 730 exams

18     for parolees fell on the Bronx.  And so we had to

19     absorb -- absorb that.

20        Q   How did that change the -- or did it change

21     -- withdrawn.

22             How many additional 730s were you required

23     to do on a monthly basis following the amendment to

24     the 730 statute regarding parolees?

25        A   Initially, it was about a 25 percent

Melissa Kaye

Page 206

1    increase in our volume of cases.  As time went on and

2    we cleared out the backlog, it -- it -- it ended up

3    being maybe I would say three or four parole cases a

4    month.  But I --

5         Q    When did it become approximately three to

6    four parole cases a month?  When did you clear up the

7    backlog?

8              THE REPORTER:  Please repeat the

9    question.  Sorry.

10             MS. CANFIELD:  Sorry.  I said -- why

11   don't I just withdraw the question.

12   BY MS. CANFIELD:

13        Q    When did you clear the backlog so as you

14   only had about three or four parolee 730s --

15        A    Well, you know, that's -- that's part of the

16   retaliation that I experienced from CHS because they

17   wiped out all our data.  We had ten years of data on

18   our computer with this very specific information in

19   the computer, and the hard drive was wiped out.  So

20   they're trying to present it like the Bronx Court

21   Clinic wasn't busy and we didn't see cases, which is

22   absolutely not true.  That data was in -- in our

23   computer -- in LaKeisha Prasad's computer.

24             But I would say that, you know, I don't know

25   how long it took to clear out that backlog.  It was

Melissa Kaye

Page 207

1    months.  Months and months.

2        Q    Okay.

3        A    And I didn't get any additional staff or

4    additional funding, so it -- it fell on -- on me and

5    Dr. Winkler alone to -- to -- to clean up those parole

6    cases.

7        Q    Okay.  In 2015, who was -- who did you have

8    on staff at the Bronx Court Clinic?

9        A    Myself, LaKeisha Prasad, who is the ACM

10   which stands for I think assistant -- assistant

11   coordinating manager.  And Dr. Barry Winkler, PsyD JD

12   who was functioning as -- he had the title deputy

13   director.

14       Q    Okay.  Was that the same in 2016?

15       A    Dr. Winkler worked -- yes.  Dr. Winkler

16   worked for the clinic from 2008 until Elizabeth Ford

17   pulled him in April 2018.

18       Q    Okay.  So from 2015 to 2018, up to April

19   2018, he was in the clinic.  And the clinic in the

20   Bronx was staffed by yourself, LaKeisha Prasad and Dr.

21   Winkler.

22            Do you know who staffed the Manhattan clinic

23   in 2015?

24                 MS. HAGAN:  Objection.

25                 You can answer.

Melissa Kaye

Page 208

1    BY MS. CANFIELD:

2         Q    If you know.  That's fine.  If you don't

3    know, that's fine, too.

4         A    I believe Dr. Ford gave -- because when --

5    when Steve Ciric moved from being an inpatient

6    attending in the forensic unit at Bellevue, he was

7    given that court clinic medical director job, that was

8    under Dr. Ford.  She was -- she was the director and

9    she -- she gave him that position, and she gave him

10   the physician specialist title.  And --

11        Q    Who else worked there with him?

12        A    He worked there as the director.  They had a

13   lot of turnover with their part-time staff.  And they

14   had a kind of funky system where doctors worked part-

15   time and they didn't really -- and they would come and

16   go.  You know, come and go.  I mean, they would get

17   hired, then they would quit, and they'd hire -- so

18   there was so much turnover in staff in Manhattan, it

19   was hard to keep up with -- but I know Myles Schneider

20   was a psychiatrist that worked there for many years.

21   I think --

22        Q    I'm sorry.  What was the name again?

23        A    Myles Schneider.

24        Q    Myles?  Okay.

25        A    Yeah.  I think he was there for many years.

Melissa Kaye

Page 209

1    I think that they had some psychologists.  I don't

2    really know the names of -- they had some older part-

3    time psychiatrists that quit and then they would hire

4    people out of training, and then they would keep the

5    job for a year or two and quit.  So I don't remember

6    the names, but I --

7         Q    Okay.

8         A    Yeah.

9         Q    How would you say the volume of work

10   compared between the Bronx Court Clinic and the

11   Manhattan Court Clinic?

12        A    I think, you know, there has been a lot of

13   discussion about this.  And the Manhattan Court Clinic

14   had a higher volume.  It covered the Port Authority

15   and Penn Station and there was, you know, a lot of

16   arrests on -- on that property.  So they -- they

17   definitely had a higher volume of cases and they

18   definitely had more staff.

19        Q    Okay.  In terms of the Bronx Court Clinic,

20   would you say that between 2004 -- well, withdrawn.

21             Would you say from after you cleared out the

22   backlog of the parolee cases, was the volume at the

23   Bronx Court Clinic pretty consistent from, say, 2014

24   to 2018?

25                  MS. HAGAN:  Objection --

Melissa Kaye

Page 210

1   BY MS. CANFIELD:

2        Q    Or were there fluctuations in the amount of

3   730s and 390s that you were doing?

4                    MS. HAGAN:  Objection.  It

5   mischaracterizes her testimony.  She said from 2016

6   there was an amendment to the 730 statute -- the

7   parolees.  So that -- it's not 2014.

8                    MS. CANFIELD:  Okay.

9                    THE WITNESS:  Well, I would like to

10  just clarify that I'm not positive that amendment

11  happened in 2016.  It happened around 2016, I think.

12  BY MS. CANFIELD:

13       Q    Okay.  Subsequent to the amendment and

14  subsequent to you clearing out the backlog, in your

15  estimation, were the number of 730 and 390

16  examinations pretty consistent in terms of numbers

17  from the time you cleared all those out to 2018?

18       A    There was always a waxing and waning flow of

19  work, and it corresponded with what was going on in

20  the courts.  Around the holidays, things would slow

21  down.  In August, usually things would slow down, but

22  not always.  But there would always be -- there was

23  always busy -- busier periods and less busy periods.

24  And there was some predictability to that, but not

25  always.

Melissa Kaye

Page 211

1        Q      Okay.

2        A      There were months in August where we were

3    really busy and yet the courts were half closed.  So

4    --

5        Q      Okay.   Okay.

6        A      May I say something else or --

7        Q      Yes, you may.

8        A      I -- I do feel that I was miscategorized as

9    -- as not working because for what -- you know, to try

10   to -- I don't know.  To defend this lawsuit or part of

11   the retaliation.  That's completely false.

12            And I wanted to say for the 20 years that I

13   worked there, I never had sufficient staff.  I never

14   had enough staff to not be there.  So if myself or Dr.

15   Winkler took vacation, and we did, we would have to

16   work double time to -- before and after our vacations

17   to stay on top of the workload.  Because when we were

18   on vacation, no one else was doing the cases.  And I

19   had to -- I was the only director in the city who had

20   to do half of every 730 exam because there has to be

21   two evaluators.  Every other director had enough staff

22   that he -- that he could go to meetings -- or he or

23   she could go to meetings and his staff could continue

24   working and his service could continue operating.  I

25   was never afforded that.  And it got worse after CHS

Melissa Kaye

Page 212

```
 1    took over.

 2              Once CHS took over in April 2008, when they

 3    -- when Dr. Ford pulled Dr. Winkler from my service, I

 4    did not have a full-time staff person up there again

 5    until December 2018.  They had a part-time per diem

 6    person, Louise Mullan, she was only there a half a day

 7    a week, three days a week.  So I had her in the

 8    mornings on Monday, Tuesday, and Thursdays.  And she

 9    had to be out of there by 1:00 or whatever it was.

10    And it -- it was just crippling to the service.  And

11    Dr. Ford had promised me -- and legal aid -- she would

12    not pull Winkler out of the service until she had a

13    replacement, and that's exactly the opposite of what

14    she did.  And she crippled the service.  And the

15    judges were upset and so was the -- so were the

16    lawyers and the DAs.

17         Q    Well, let me ask you, from the time that you

18    went over to the court clinics and then they hired

19    someone full-time, they had Dr. Mullan and they

20    eventually hired Dr. Brayton [ph], were you not

21    interviewing other psychologists or psychiatrists for

22    that position?

23              MS. HAGAN:  Objection as to form.

24              You can answer if you understand the

25    question.
```

Melissa Kaye

Page 213

1    BY MS. CANFIELD:

2         Q    I guess what I'm asking is isn't it true

3    that you were interviewing?  You were actively

4    interviewing candidates, but that you were not happy

5    with the candidates that presented?

6              MS. HAGAN:  Objection.  Assumes facts

7    not in evidence.

8              THE WITNESS:  Initially, Dr. Winkler

9    and Dr. Jain would come up to the Bronx and we would

10   interview prospective candidates.  I know we

11   interviewed one -- one person in particular who had no

12   forensic training or experience, and we all three

13   agreed that it would be problematic for him to try to

14   do the work.  And he was deemed not appropriate for

15   the position.

16             And then we interviewed someone else.

17   I can't remember who it was.  Oh, yeah.  And there was

18   someone else who -- who didn't demonstrate any real

19   understanding of the work and had no experience.  And

20   -- but the -- I know that they had a plethora of extra

21   staff in Queens and they were just sitting around

22   doing nothing.  And they didn't send any doctors up

23   from Queens.  And Dr. Jain was supposed to be helping

24   out as part of his role.

25             And after I had a serious discussion

Melissa Kaye

Page 214

1    with him in April, he refused to speak to me since

2    April -- I mean, not April.  It was October 2018.  He

3    wouldn't do cases with me.  He wouldn't talk to me.

4    He wouldn't help out in -- in the court clinic when I

5    was out.  I had to take leave for various reasons,

6    also related to the shift change and the hardship it

7    was causing.

8              He didn't even come up to the service

9    to make sure things were running okay.  He just, like,

10   let it die on the vine.

11             And so --

12   BY MS. CANFIELD:

13        Q    -- from October 2018?

14        A    Yeah.  I'm saying that he neglected the

15   Bronx Court Clinic because he -- and he -- even after

16   -- when there was, like, a dire staffing need, he

17   wasn't coming up and doing cases.  He wasn't letting

18   me -- I offered to go down into other boroughs and do

19   cases with people in other borough.  I offered to do

20   half of the 730 exams in the Bronx and they could send

21   the defendant someplace else for the second half.

22             I -- I did -- I made so many efforts to be a

23   team player, to try to get the work done, and I was

24   just left in my office for six weeks.  I think I only

25   saw, like, three exams and one of them -- or two of

Melissa Kaye

Page 215

1     them was because a judge got so angry that it wasn't

2     done that he started making phone calls, so they sent

3     Dr. Winkler up there.

4          Q    Okay.  Well, let's try to say kind of with

5     some timeframes.  Because you said a lot right there

6     and I think you were talking originally regarding

7     October 2018.  Then I think what you were just

8     testifying to was some events that you're claiming

9     happened right before you resigned.  Am I correct?

10         A    I --

11         Q    So we need to put them in a little bit more

12    of an order.  And so they're -- they -- so we can pin

13    down what you're referring to and what timeframe.

14              So it seems though to me --

15              MS. HAGAN:  Objection -- the record.

16              THE REPORTER:  I'm sorry, Ms. Hagan.

17    Please repeat what you said.

18              MS. HAGAN:  Objection.  Ms. Canfield is

19    trying to characterize Dr. Kaye's testimony and she's

20    testifying onto the record.

21              So if you want to ask questions to

22    ensure that's what Dr. Kaye was saying, then that

23    would be permissible rather than you trying to

24    interpret what she said.

25              MS. CANFIELD:  That's fine.

Melissa Kaye

                                              Page 216

1              MS. HAGAN:  -- please.

2     BY MS. CANFIELD:

3         Q    Dr. Kaye, are you saying that Dr. Jain did

4     not email or assist you at all at the Bronx Court

5     Clinic from October 2018 until the time you resigned?

6         A    No.  I'm not saying -- I'm not speaking in

7     absolutes.  I'm saying that after I told Dr. Jain

8     about my EEO complaint and after I had told Dr. Jain

9     and I spoke up at a division -- a director meeting for

10    the FPECC -- that's Forensic Psychiatry Evaluation

11    Court Clinics -- there was a directorship meeting in

12    -- I don't even -- it might have even been before I

13    worked formally for CHS.  Because like I said, they

14    had pretty much absorbed us by April, even though the

15    formal switch didn't happen until July.

16              But I -- I complained about the ethical

17    violations I -- of the private practice policy.  I was

18    concerned about how it was perpetuating fraud on the

19    Court.  And I expressed that and I -- and I complained

20    directly at the meeting.  And I complained to Dr. Jain

21    afterwards.  And it's right around that time I told

22    them about my EEOC complaint.  And the next day, he

23    called me up and he was very stern and he said, "I am

24    going to report you -- I am going to have to report

25    you to Jonathan Wangel."

Melissa Kaye

Page 217

1          And then after that, he started picking on
2    me.  I mean, I had been denied access to any Chronos
3    [ph] up there.  They took over -- we were doing --
4          Q    Okay.  Okay.  I'm going to stop you because
5    we're going to go through the complaint.  We're going
6    to go through the complaint so we can speak to these
7    one by one, okay?  Because you're on a roll.
8               All right.  So the first part of the
9    complaint, beginning at paragraph 34, talks about the
10   allegations concerning pay equity.  That you believe
11   you were paid up to $35,000 less than your male
12   comparators, despite having more experience and
13   credentials.
14               I'm going to skip that because we -- I think
15   we exhausted that topic.  Your counsel's free to cross
16   you on that after we're finished, but I believe that
17   we're finished with this portion.
18               But I do want to talk to you about -- you
19   testified earlier about having a meeting with Mr.
20   Wangle and Ms. Laboy about your compensation.  And you
21   also testified this morning that you were not offered
22   a managerial position -- that it was never offered to
23   you.  And I just want to show you that email that you
24   sent --
25          A    And I didn't say it wasn't offered.  I said

Melissa Kaye

Page 218

1    Dr. Ford sent me this email saying I would have to

2    give up my union benefits if I were to get -- if I

3    wanted pay parity -- what had been going on for the

4    last six years and longer at Bellevue.

5         Q    So you would have to go into a managerial

6    title, which would -- okay.

7         A    Which wouldn't have been pay parity because

8    Steve Ciric --

9                   THE REPORTER:  I'm sorry.  Repeat what

10    you just said, Ms. Kaye.

11                   THE WITNESS:  Yes.  I -- I was told I

12    would have to give up my union benefits if I wanted

13    "pay parity."  But it wouldn't have been pay parity to

14    my comparator, which was Steve Ciric, because he was

15    in the union and he didn't have to give up the union

16    to be in a physician specialist line.  That's what I

17    was asking for, to be the same as him.

18    BY MS. CANFIELD:

19         Q    Right, right.  But he never made it over the

20    transition from Bellevue to CHS; isn't that correct?

21         A    Right.  But this is all --

22         Q    So at that time, he would not have been a

23    proper comparator because he was not coming over; is

24    that correct?

25         A    No, I disagree because it was all HHC and I

Melissa Kaye

Page 219

1    began complaining about this when I was still working

2    at Bellevue.  And I had brought it to Bellevue's

3    attention and I was told that I couldn't change my

4    line, but that information was incorrect, at least at

5    CHS where people's lines were getting changed and also

6    -- I understand Steve Ciric's line was changed from

7    attending three to physician specialist when he

8    transitioned out of his treatment in a chief role at

9    Bellevue to director of the Manhattan Court Clinic.

10       Q    All right.  I have emails a series of emails

11   -- this document was produced by the plaintiff.

12   There's Bates stamp numbers K000035, 36 to 37.  And

13   this appeared --

14              (Exhibit C was marked for

15              identification.)

16              MS. HAGAN:  -- please, since we haven't

17   had an opportunity to look at it beforehand.

18              THE REPORTER:  I'm sorry, Ms. Hagan.

19   Please repeat what you said.

20              MS. HAGAN:  I'd like to look at Exhibit

21   C.  Is this Exhibit C as in Cat, Ms. Canfield?

22              MS. CANFIELD:  Yes, ma'am.  Yes, ma'am.

23              MS. HAGAN:  I'd like to look at it.

24   Could you please scroll down?

25              MS. CANFIELD:  Yes.

Melissa Kaye

Page 220

1              MS. HAGAN:  I'd like to have Dr. Kaye

2     to have an opportunity to look at the document.  So

3     I'd like to look at it from the beginning of the

4     thread, which is probably at the end of the document.

5              MS. CANFIELD:  This is the end.  This

6     is the end of the document.  It's an email dated April

7     30th from Dr. Kaye to Jessica Laboy and Jonathan

8     Wangel.  The subject is "Melissa Kaye BHC to CHS line

9     change."

10              MS. HAGAN:  Okay.

11    BY MS. CANFIELD:

12       Q    It says, "Hello Mr. Wangel and Ms. Laboy.

13    Thank you for taking the time to talk with me about

14    the pending change of my line on July 1, 2018.  I

15    understand from our conversation that everything will

16    stay the same and nothing will change when my line is

17    transferred from Bellevue to CHS.  My current benefits

18    and job duties are:" --

19              MS. HAGAN:  Okay.  Keep going.

20    BY MS. CANFIELD:

21       Q    I just want to direct your attention to

22    number two where it says, "I will not be taken out of

23    Doctors Council and put on a non-unionized managerial

24    title [sic]."

25              MS. HAGAN:  Could you please tell her

Melissa Kaye

                                                    Page 221

1    to continue to read the document, Ms. Canfield?  The

2    entire document.

3                    MS. CANFIELD:  That's fine, but I'm

4    going to go back to paragraph number two.

5                    MS. HAGAN:  I'd still like to read the

6    entire document, please.  Thank you.

7                    MS. CANFIELD:  I sent it to you.

8                    MS. HAGAN:  Well, when?

9                    MS. CANFIELD:  I just sent it to you.

10                   MS. HAGAN:  We're trying to look at the

11   document.  Dr. Kaye doesn't have it.

12   BY MS. CANFIELD:

13       Q    Let me know, Dr. Kaye, when you want me to

14   scroll down further.

15       A    Okay.  It sounds like I'm listing some of

16   the benefits of my -- my employment and unionized line

17   that corresponds to being told I would be

18   grandfathered in and nothing would change.  I don't

19   think I hit every single point, but it's a partial

20   list.

21       Q    Okay.  So again, directing your attention to

22   paragraph number two in which you write, "I will not

23   be taken out of Doctors Council to be put on a non-

24   unionized managerial line."

25                   This suggests to me that you had a

Melissa Kaye

Page 222

1     discussion with Ms. Laboy and Mr. Wangel about

2     possibly going into a managerial line.

3                 MS. HAGAN:  Objection.

4     BY MS. CANFIELD:

5          Q     Is that correct?

6          A     That's false.

7          Q     That is correct?

8                 MS. HAGAN:  No, she --

9                 MS. CANFIELD:  I'm sorry.

10                THE WITNESS:  It's false.  I did not

11     have a discussion about that specifically, but I did

12     have a discussion about that with Dan Mundy who was

13     squirming a lot about making that decision, because he

14     was forced to.

15                See, he was not the director of the

16     Manhattan Court Clinic.  Had he been the director of

17     the Manhattan Court Clinic at the time of the

18     rollover, he would have been in a unionized line and

19     he would have been in the same position that I was in.

20     He would have rolled over as a unionized manager,

21     "managerial line."  But he did not have that choice

22     because when he was working at the Manhattan Court

23     Clinic, he was a part-time forensic evaluator.  Steve

24     Ciric was the director in a unionized line.  And so

25     when Steve Ciric left and that position opened up, it

Melissa Kaye

Page 223

1    became -- they just -- they closed out the -- the

2    unionized director line and turned it into a

3    managerial line, and then --

4    BY MS. CANFIELD:

5        Q    And I'm sorry, how do you know this?

6        A    Because it's -- it's what happened.

7        Q    No.  I'm saying how do you know this

8    happened?

9        A    Because Steve -- it's just -- Steve Ciric

10   was in a unionized --

11       Q    No, no, no.  I need to know who told you

12   that's what happened?  That sounds like something

13   that's administrative.  I want to know how you learned

14   that and who told you -- who knows -- who would have

15   personal knowledge that that is exactly what happened?

16       A    As I said --

17       Q    Versus scuttlebutt, hearsay, rumor.

18              MS. HAGAN:  Objection.

19   Mischaracterizes -- argumentative.

20              THE WITNESS:  I --

21              THE REPORTER:  I'm sorry.  You're all

22   talking over each other.

23              Ms. Hagan, can you please repeat what

24   you just said?

25              MS. HAGAN:  First off, it's

Melissa Kaye

Page 224

1    argumentative.  I also want Dr. Kaye to have the

2    opportunity to read the rest of the email because

3    there's more to this email.  Could you please scroll

4    up further, Ms. Canfield, before she finishes her

5    question -- or answer?

6                    MS. CANFIELD:  The other email is

7    completely unrelated.

8                    MS. HAGAN:  Ms. Canfield, you showed

9    this as Exhibit C and Dr. Kaye --

10                   MS. CANFIELD:  Ms. Hagan, you have a

11   copy.  I'm not going up.  You just -- you're being

12   argumentative for the sake of being argumentative.

13                   MS. HAGAN:  Well -- because --

14                   THE REPORTER:  I'm sorry.  I missed

15   everything you just said, Ms. Canfield.

16                   MS. HAGAN:  First off --

17                   MS. CANFIELD:  I said I'm not scrolling

18   up.  This is my deposition.  Ms. Hagan, you have a

19   copy of the document.  I do not need to -- the witness

20   if it's unrelated.

21                   MS. HAGAN:  -- Dr. Kaye has an

22   opportunity to read the rest of the exhibit.

23                   THE REPORTER:  Ms. Hagan, please start

24   over what you just said.

25                   MS. HAGAN:  I said we're just going to

Melissa Kaye

Page 225

1  have to wait until Dr. Kaye has an opportunity to read

2  the rest of the exhibit, and I can forward that to her

3  now.

4              Now the judge said that they're

5  supposed to be contemporaneously provided, which means

6  --

7              MS. CANFIELD:  It is provided.

8              MS. HAGAN:  -- had the opportunity --

9  she should have it too then.  She should have it too

10  and she does not.

11              MS. CANFIELD:  I will scroll up.  This

12  is a completely separate email that you sent -- two

13  months later.  And I'm not going to question you on

14  this right now.

15              MS. HAGAN:  It's in the exhibit and

16  she's talking about --

17              MS. CANFIELD:  Ms. Hagan, please stop.

18  Please stop.  We're going to be here until 8:00 if you

19  don't stop interrupting.

20              MS. HAGAN:  All right.

21  BY MS. CANFIELD:

22      Q    Dr. Kaye, you say here in the second

23  sentence of this email:  "I understand from our

24  conversation that everything will stay the same."

25  Are you telling me that you did not talk about not

Melissa Kaye

Page 226

```
 1     being taken out of Doctors Council, but you put it in
 2     the email anyway?
 3               I do not --
 4          A    I -- I -- I can tell you that I knew from
 5     talking with Dan Mundy --
 6          Q    I don't want to hear about that.  I want to
 7     hear about what did you talk about with Mr. Wangle and
 8     Ms. Laboy?
 9               You're telling me on the record under oath
10     that you did not discuss remaining in the union and
11     not going into a managerial title?
12                    MS. HAGAN:  Objection.
13     BY MS. CANFIELD:
14          Q    You did not discuss Dr. Mundy's situation?
15     Is that what you're telling me?
16          A    Well, I'm saying --
17                    MS. HAGAN:  -- email above as to why
18     she talked about --
19                    THE REPORTER:  Ms. Hagan, please repeat
20     what you just said.
21                    MS. HAGAN:  Why Dr. Kaye mentioned the
22     managerial discussion in this email is in the email
23     above --
24                    MS. CANFIELD:  It's not.  She just
25     forwards it to someone else.  This happened two months
```

Melissa Kaye

Page 227

1     before, Ms. Hagan.  You're testifying.  I want the
2     witness to answer my question.
3                    THE REPORTER:  I'm sorry.  I'm sorry.
4     You're both talking.  I need you both to talk one at a
5     time.  I'm sorry.  The record is not going to be good
6     if you don't speak one at a time.
7                    MS. HAGAN:  It happened a month later.
8     And again, it explains the rationale as to why Dr.
9     Kaye had mentioned the discussion of managerial -- the
10    managerial -- the transition from managerial line.
11    The --
12                   MS. CANFIELD:  Ms. Hagan, you're
13    testifying now.  Please.
14    BY MS. CANFIELD:
15        Q    Dr. Kaye, I wanted to know --
16                   MS. HAGAN:  You need to let --
17                   MS. CANFIELD:  Ms. Hagan, please.  Ms.
18    Hagan.
19                   MS. HAGAN:  You need to let her read
20    the exhibit the way you insisted that --
21                   THE REPORTER:  I'm sorry.  Ms. Hagan, I
22    didn't hear what you said.
23                   MS. HAGAN:  Ms. Canfield insisted
24    during my depositions that all of her witnesses got a
25    chance to read the entire exhibits that she provided

Melissa Kaye

Page 228

1    -- that I provided.  Dr. Kaye should have that same

2    luxury.  I don't have that luxury.  She --

3                    MS. CANFIELD:  Is this a childish tit

4    for tat at this point?  If so, I will assuage your

5    concerns.

6                    MS. HAGAN:  Yes, please.

7                    MS. CANFIELD:  Okay?  This --

8                    MS. HAGAN:  From the beginning.

9                    MS. CANFIELD:  This is completely

10   unrelated.

11                   MS. HAGAN:  Number two -- let's please

12   -- no, it's not.

13                   MS. CANFIELD:  This actually buttresses

14   my argument.  So read it.

15                   MS. HAGAN:  Keep going.  Yes.  And then

16   keep going.

17                   MS. CANFIELD:  I will when Dr. Kaye

18   tells me that she has read the email.

19                   THE WITNESS:  Okay.  Okay.

20                   MS. CANFIELD:  Okay.

21                   MS. HAGAN:  Could you scroll up first?

22   Further up to the end of the email.

23                   MS. CANFIELD:  This is it.

24                   MS. HAGAN:  Okay.

25   //

Melissa Kaye

Page 229

1    BY MS. CANFIELD:

2         Q    So my question is to you, again, you

3    testified that you did not talk to Mr. Wangel and Ms.

4    Laboy about the fact that you're going to stay in your

5    unionized title and not move to a managerial line.

6    This email suggests otherwise.

7         A    No.   That's not -- that's not accurate

8    because I talked to them about being in Doctors

9    Council union and all the associated benefits with

10   Doctors Council union.   So by definition, that means

11   I'm not being moved out of Doctors Council union into

12   a managerial line.

13            Did they say to me, "Oh, we want you to move

14   into a managerial line so you can have pay parity"?

15   No, they did not.

16            Did they --

17        Q    Did they say you're welcome to move into it

18   or did you ask and say, "May I move into a managerial

19   line so I can have pay parity"?   Did you ask to be

20   moved into that line?

21                  MS. HAGAN:   Objection.   You need to let

22   her finish her answer.   Please let her finish her

23   answer.

24                  THE WITNESS:   I think I made it clear

25   when I got that email from Dr. Ford with this nebulous

Melissa Kaye

Page 230

1   enticement into taking a managerial line and giving up

2   benefits in the union.  I thought shew as trying to

3   lure me into a position where they could fire me at-

4   will because I had picked up hostility and -- and --

5   and she had been marginalizing me.  And she had not

6   treated me fairly since I worked for her.  So I was --

7   I was leery of that and it was something I was not

8   interested in.  So I did possibly emphasize to Laboy

9   and Wangel that, you know, I wanted -- that, you know,

10  I -- Doctors Council union said I was being

11  grandfathered in as-is, and nothing's going to change.

12  And Wangel kept saying, "Everything's going to stay

13  exactly the same.  Exactly the same.  Exactly the

14  same."  The only difference is is that the monies used

15  to pay you are going to flow through CHS rather than

16  Bellevue.

17            I never asked or made any indication

18  that I wanted to change to a managerial line.  And it

19  was actually the opposite for all the reasons that

20  I've previously discussed.

21  BY MS. CANFIELD:

22       Q    Right.

23       A    I wanted to stay in Doctors Council union.

24  I wanted to stay in my unionized leadership role --

25  semi-leadership role.  And I had had conversations --

Melissa Kaye

Page 231

1    multiple conversations with Dan Mundy and he was

2    getting pressured to take that job as director in a

3    managerial line.  And he -- he --

4         Q    We can get an affidavit from Dr. Mundy on

5    what he did or did not say or how he felt.  Let me ask

6    you this question.

7                   MS. HAGAN:  Objection.

8                   MS. CANFIELD:  Aren't you the -- hold

9    on.

10   BY MS. CANFIELD:

11        Q    Isn't it true that you were the only

12   director at the court clinic who did not take a

13   managerial line?

14                  MS. HAGAN:  Objection as to form.

15                  THE WITNESS:  I was the only director

16   who rolled over in a managerial line.  Dr. Mundy was

17   newly hired as a new director under CHS.  Dr. Winkler

18   was newly hired as a director under CHS.  And

19   Elizabeth Owen had been in a managerial line at Kings

20   County.

21                  So I was the only director who rolled

22   over in a non-managerial line -- in a unionized line

23   -- and I was told, and my union was told, that I would

24   be allowed to stay in that -- in a unionized line.

25   And so that's one of the promises that was made to me.

Melissa Kaye

Page 232

1    BY MS. CANFIELD:

2         Q    Okay.

3         A    And then -- I'm sorry, but then to -- you

4    know, because I was trying to fix a longstanding pay

5    parity issue, it was presented to me that that

6    wouldn't be something that could be fixed unless I was

7    -- there was a coercive attempt to make me get out of

8    the unionized line just to fix a longstanding pay

9    parity issue with my comparator, who was in a

10   unionized line.

11            So it seemed -- it didn't -- I mean, it's

12   like apples and oranges.  They're -- they're two

13   different --

14        Q    Right.  But we've already established --

15            THE REPORTER:  I'm sorry.  "Apples and

16   oranges."  Two different what?

17            THE WITNESS:  Issues.

18            THE REPORTER:  Thank you.

19   BY MS. CANFIELD:

20        Q    But we've already established that Dr. Ciric

21   did not make the transition to CHS.

22            MS. HAGAN:  Objection.

23            THE WITNESS:  Please.  I was told that

24   if I transitioned to CHS, that I would -- nothing

25   would change.  Nothing with my job and my working

Melissa Kaye

Page 233

1    conditions would change, and that I would be permitted

2    to stay in my unionized line.  I was told that.

3                    MS. CANFIELD:  Right.  Right.  I

4    understand.  I understand.

5    BY MS. CANFIELD:

6        Q    Okay.  So you allege in the complaint that

7    after making the transition to CHS and remaining in

8    your unionized line, you made the complaint that you

9    still were not being paid as well as the other

10   directors.  Meaning Dr. Mundy, Dr. Winkler and Dr.

11   Owen; is that correct?

12       A    My -- my direct comparators, you know, it's

13   -- the way the lines work and the way pay structures

14   work at HHC, you know, whether you're an M.D. or a

15   psychologist, has -- has bearing on -- generally on

16   your -- on your pay.  And what I was asking and -- and

17   M.D.'s are typically paid more.  And all I was asking

18   -- and it was an easy fix.  And if -- and it was just

19   out of retaliation and spite and trying to get rid of

20   me because I was speaking up for defendants' due

21   process rights and constitutional rights, that all

22   they needed to do was change my line to physician

23   specialist and give me a comparable pay to what Steve

24   Ciric was making.  And without the longevity pay,

25   without the retention bonus included as my base

Melissa Kaye

Page 234

1    salary.  And it was an easy fix because that's what --

2    they were changing lines.  It was something that could

3    be done and I had been misled, for whatever reason,

4    and I don't know if that was intentional on Dr.

5    Badaracco's part or not.  I'd like to think not, but I

6    was told my line couldn't be changed to address this

7    problem.

8              Then at CHS, lines are getting changed for

9    unionized employees and I requested for my line to be

10   changed to physician specialist with the commensurate

11   pay increase, and it was an easy fix.  I didn't need

12   to be coerced or forced out of the union because, you

13   know, my entire career at HHC to date of my EEOC

14   complaint was -- my male comparator was a unionized

15   employee.

16             So that's what the basis of my complaint

17   was.  A male comparator who was in the union, was in a

18   higher title -- a higher paying title -- and I just

19   wanted the same as him.  That's all.

20        Q    Okay.

21        A    I wasn't asking for something unusual.

22        Q    Okay.  So you sent Dr. Yang an email.  You

23   complained about pay parity.  Your attorneys at the

24   time thereafter -- Bantle & Levy -- and I cannot show

25   all the exhibits because I think we can agree your

Melissa Kaye

Page 235

1    attorneys at the time sent a letter about pay parity;

2    is that correct?

3         A    Yes.  I believe they were speaking with

4    Blanche Greenfield.

5         Q    Right.  Then thereafter, you filed a

6    complaint with the EEOC, correct?

7         A    Correct.

8         Q    Okay.  And as you testified earlier, you

9    said that you revealed to Dr. Jain that you had filed

10   a complaint with the EEOC.

11           So my question is why did you disclose that

12   to Dr. Jain?  What did you hope to accomplish?

13           MS. HAGAN:  Objection as to form and

14   argumentative.

15           You can answer.

16           THE WITNESS:  I wanted to be open and

17   transparent.  And I -- it was -- he was new in the

18   position and I was trying to help and support him.

19   And I didn't want him to get blindsided by someone

20   else.  And I thought it was respectful and

21   professional for me to inform him myself so that he

22   wouldn't be caught flatfooted as my direct report.

23   And I told him about it.

24           One, I thought that it was the

25   respectful thing to do for -- to inform my supervisor

Melissa Kaye

Page 236

1    because supervisors generally want to know what's

2    going on before they hear about it from somebody else.

3                    And two, I had hoped that he would help

4    me just fix this problem.  It wasn't, to me, a hard

5    fix.  It wasn't something that was complicated.

6                    Unfortunately, after I told him, he --

7    he started retaliating against me.  He called me the

8    next day.  He was very stern.  He said he reported me

9    to Jonathan Wangel and --

10   BY MS. CANFIELD:

11      Q    Let me stop you right there.  When you say

12   "reported you," what did he report you -- you make it

13   sound like it's punitive.  What do you mean he

14   reported you?  Did you do something?

15                   MS. HAGAN:  Objection as to form.

16   Argumentative.

17                   THE WITNESS:  His tone was stern and

18   punitive.  He acted like I had done something wrong.

19   He had -- he treated it and he made it sound like I

20   was being reported, and he used it in a stern,

21   punitive tone.  And yeah, to him, I guess -- I guess

22   it was punitive.

23   BY MS. CANFIELD:

24      Q    Okay.

25      A    And then this was -- and this was right

Melissa Kaye

Page 237

1    around the transition -- the official transition.  Not

2    the unofficial transition, which started happening

3    much earlier, as I said.  You know, in April, if not

4    before.

5              And the official switchover for my time

6    being -- was -- last day on the payroll at Bellevue

7    was June 30th.  First day on the payroll at CHS was

8    July 1st.

9         Q    Right.

10        A    And --

11        Q    Can I ask a question?  Before you revealed

12   to Dr. Jain that you had filed an EEOC charge, had you

13   been speaking with him about pay parity and asking him

14   to assist you?

15        A    I spoke to -- there was an April meeting in

16   -- at Water Street -- 55 Water Street in April.  And

17   there was a lot of different people -- court clinic

18   people.  And I don't -- maybe Elizabeth Ford was there

19   and -- and then after that meeting, I -- I approached

20   Dr. Ford and Dr. Jain and I told them about the pay

21   parity issues and my concerns --

22        Q    Right.

23        A    -- about pay parity.  So then Dr. Ford, you

24   know, escorted me over to talk to Jessica Laboy and

25   Jonathan Wangel.

Melissa Kaye

Page 238

```
 1              And so I had told him about -- I had brought
 2      it up verbally to both of them in April.
 3          Q    Okay.  And that's around the time that you
 4      met with Jessica Laboy and Jonathan Wangel as
 5      reflected in the email that we just reviewed.  The
 6      email dated April 30th; is that correct?
 7          A    It was --
 8          Q    Yes.  Okay.  Okay.  When you met with
 9      Jonathan --
10                    THE REPORTER:  I'm sorry.  Please
11      repeat the answer.
12                    THE WITNESS:  It was the same day.
13      BY MS. CANFIELD:
14          Q    Okay.  When you met with Mr. Wangel and Ms.
15      Laboy, was your union present?
16          A    No.
17                    MS. HAGAN:  Objection.
18      BY MS. CANFIELD:
19          Q    Okay.  Did you have subsequent meetings with
20      Mr. Wangel and Ms. Laboy where your union was present
21      concerning the terms and conditions of your
22      employment?
23          A    Yes.
24          Q    Okay.  Now in your complaint, you allege
25      that you believe that your title, which was proposed
```

Melissa Kaye

Page 239

```
 1     to be changed from medical director to director, was
 2     retaliatory for filing your EEOC charge; is that
 3     correct?
 4          A    It was one of many things that was
 5     retaliatory.
 6          Q    Okay.  My question is why do you believe
 7     that the decision to change not just your title, but
 8     to make everyone's title director was retaliatory for
 9     filing your EEOC charge?
10                    MS. HAGAN:  Objection as to the form.
11     It assumes facts that were not put into evidence.
12     There's no foundation.  Counsel's testifying.
13                    MS. CANFIELD:  You can answer.
14                    MS. HAGAN:  Plaintiff doesn't
15     necessarily agree if everyone's title was changed.
16                    MS. CANFIELD:  Okay.  So she can
17     testify.
18                    MS. HAGAN:  Mm-hmm.
19                    THE WITNESS:  So again, I was promised
20     by Jessica Laboy and Jonathan Wangel in April, that
21     day that I spoke to them -- Jonathan Wangel was like a
22     mantra.  He kept saying, "Everything's going to be
23     exactly the same.  Nothing will change."  Like, no
24     matter what I would bring up to me, he'd say,
25     "Nothing's changing.  Everything's going to be" -- and
```

Melissa Kaye

Page 240

1    I went through a litany of things, verbally, and then

2    I recaptured some of them in that email.  Maybe not

3    all of them.  And he just would always say the same

4    thing.  And he assured me that nothing would change.

5                    And, you know, be -- so I made a

6    decision based on his what I considered a verbal

7    agreement -- contract -- a verbal agreement with me

8    and my union that I was going to be grandfathered in

9    -- unionized with my benefits.  And my longevity pay

10   and my -- my corporate title, my functional title.

11                   And so then suddenly, like, I mean I

12   don't -- I -- it was like right after, like, I -- I

13   complained about pay parity, all the sudden I'm, like,

14   getting this change in my title which, you know, was

15   problematic and reflected a demotion.  To me, it was a

16   demotion.

17                   For my work and what I do, and in the

18   eyes of people that I work with, it reflected a

19   demotion.

20   BY MS. CANFIELD:

21      Q    How did you first learn that there was a

22   talk of changing the title from medical director to

23   director?

24      A    I -- I'm trying to think.  I think I got an

25   email from Andrea Swenson telling me that my title had

Melissa Kaye

```
 1    been changed.
 2         Q    Okay.  And what was the email in relation to
 3    other than the fact that your title had been changed?
 4              Actually, let me ask you this.  Was it in
 5    relation to business cards that you learned that there
 6    had been a decision to change all the directors of --
 7    change all of the heads of the court clinics to a
 8    director title?
 9         A    Well --
10              MS. HAGAN:  Objection.
11              THE WITNESS:  -- I mean, I don't know
12    that that characterizes it correctly because changing
13    titles --
14    BY MS. CANFIELD:
15         Q    The question is is that how you learned of
16    the change?  Through the email from Andrea Swenson
17    concerning business cards.
18         A    Some people were new to the position, so
19    whatever title they -- didn't have a previously title.
20    And --
21         Q    Now my question is was it in connection with
22    business cards?
23         A    It was -- it was like three days --
24              MS. HAGAN:  Objection.
25              THE WITNESS:  -- it was three days
```

Melissa Kaye

Page 242

1    after I filed my EEOC complaint.  The next thing I

2    know is I'm being told that I'm no longer medical

3    director.

4                    The reason I found that -- I found it

5    retaliatory and I also found it a demotion because

6    that --

7    BY MS. CANFIELD:

8        Q    That's not my question.  My question is

9    isn't it true you first heard about the decision to

10   have everyone referred to as directors was when Andrea

11   Swenson sent out an email about business cards?

12                   MS. HAGAN:  Objection.

13                   THE WITNESS:  She wanted to put me --

14                   MS. HAGAN:  Objection.

15                   THE WITNESS:  She wanted me -- she put

16   me on those business cards as my title.  She did not

17   put me down as medical director.  She put me down as

18   director.

19                   So yes, it was -- she was going to

20   implement that demotion on my business card.

21   BY MS. CANFIELD:

22       Q    Okay.  Let me ask you this.  Were the

23   business cards ever printed?

24                   MS. HAGAN:  Objection.

25                   THE WITNESS:  I got a box of them, yes.

Melissa Kaye

Page 243

1              MS. CANFIELD:  Okay.  And --

2              THE REPORTER:  Please repeat the

3     answer.

4              THE WITNESS:  I got -- I was given a

5     box of the business cards, yes.

6     BY MS. CANFIELD:

7         Q    Okay.  And what was your title on the

8     business card?

9         A    Director.

10        Q    Okay.  And do you know -- have you ever seen

11    Dr. Winkler's business card as head of Brooklyn Court

12    Clinic?

13        A    I don't know if I -- I don't know.  Dr.

14    Winkler's not a physician, so the medical director

15    issue wouldn't pertain to him.

16        Q    Okay.  But my question was have you seen his

17    business card?

18        A    I don't -- I -- she sent copies of people's

19    business cards.  I don't know -- I don't know if

20    everybody's was included, so I -- I don't remember.

21        Q    Okay.  Did you see -- ever see a copy of Dr.

22    Owen's business card?

23        A    I believe that -- like I said, I believe

24    that in that email, she sent copies.  I'm trying to

25    think if --

Melissa Kaye

Page 244

1      Q    I want to know -- after you received your
2   box of cards, I want to know if, after you received
3   your box of cards, if you saw a business card from Dr.
4   Winkler or Dr. Owen?  An actual business card, not
5   what was in the email, but the actual business card.
6   Did you see --
7      A    At the -- at a division meeting -- a
8   forensic -- an FPECC -- FPECC stands for Forensic
9   Psychiatry Evaluation Court Clinics.  And -- division
10  director meeting with Jain -- it would be Dr. Jain,
11  Dr. Mundy, Dr. Owen and Dr. Winkler.
12     Q    Okay.  And you saw Dr. Owen and Dr.
13  Winkler's business card?
14     A    Dr. Jain handed out everybody boxes of --
15  their box of their business cards.
16     Q    Okay.
17     A    Now did I -- at other people's business
18  cards?  I really don't know.
19     Q    Okay.  Did you see what Dr. Mundy's business
20  card said on his box of business cards?
21     A    I -- I don't know.  I mean, Dr. Mundy was a
22  new director.  He wasn't getting a change in title.
23  This was his given title that he was hired into.
24     Q    Okay.  Okay.  But he's a medical doctor,
25  correct?

Melissa Kaye

Page 245

```
 1        A    Correct.
 2        Q    Okay.  Now are you aware that there's been
 3    evidence in the record -- and I'm sure that your
 4    attorney's going to object to this, but that some
 5    people at CHS thought you had quit your position in
 6    the beginning of June 2018?
 7                    MS. HAGAN:  Objection.
 8                    THE WITNESS:  I'm sorry.  I'm getting
 9    this bizarre phone call.  I don't know if it relates
10    to my children.  I'm asking permission from Counsel to
11    take this call?
12                    MS. CANFIELD:  Yes.  Take five.
13                    THE REPORTER:  The time is 4:25 p.m.
14    We're off the record.
15                        (Off the record.)
16                    THE REPORTER:  The time is 4:34 p.m.
17    We're back on the record.
18    BY MS. CANFIELD:
19        Q    You can answer.
20        A    Okay.
21                    MS. HAGAN:  Objection on the record.
22                    MS. CANFIELD:  Okay.
23                    THE WITNESS:  Yes.  I -- the amount of
24    unsubstantiated rumor and falsehoods that would swarm
25    around with CHS and Patsy Yang and all of her
```

Melissa Kaye

Page 246

1    employees was astounding.  There were constant rumors

2    and it was like a big game of Red Robin.  And the

3    amount of falsities that were in these emails, and

4    mistruths and distortions is mind boggling.  So I am

5    not surprised to learn that there was that false

6    rumor.

7    BY MS. CANFIELD:

8        Q    Okay.  So prior to the transition, there was

9    at no point immediately beforehand that you were

10   wavering as to whether or not you wanted to go to CHS

11   or you were just going to retire or resign?

12       A    Well -- well, first of all --

13               MS. HAGAN:  Objection.

14               THE WITNESS:  -- I had never wanted to

15   retire early.  I -- I took a huge hit to my pension.

16   I would still be in that job if -- if I had my

17   druthers.

18               So no, I did not want to retire or

19   resign.  And yes, as I said before, I was exploring

20   the option with Dr. Badaracco and Jeremy -- Dr. Jeremy

21   Colley about the possibility of staying at Bellevue.

22               And I was also exploring with my union

23   and CHS leadership and management what kind of

24   protection or guarantees I was going to have, or

25   agreements, verbal contracts, whatever you want to

Melissa Kaye

Page 247

1    call it that I was going to have if I rolled over with

2    the transition and how, if at all, it'd affect my

3    working conditions.

4                So yes, I was exploring that situation

5    and it was not just a one-shot deal.  It happened over

6    an extended period of time.  How that turned into a

7    false rumor that I was quitting or resigning or

8    retiring, that I can't, you know -- that would be --

9    you'd have to speak to the people who were spreading

10   the rumors.

11   BY MS. CANFIELD:

12        Q    Okay.  Fair enough.  All right.  So you

13   allege in the complaint that somewhere after filing

14   your EEOC complaint, that your shift was changed.  And

15   you believe that that was retaliatory.  Why do you

16   believe that?

17        A    I told Dr. Jain -- it was a one, two punch.

18   Because right around the end of June to the beginning

19   of July is when I informed Dr. Jain about my EEOC

20   complaint.  And that's when I was told in a stern and

21   punitive manner that I was being reported to Jonathan

22   Wangel.

23                Simultaneously or contemporaneously, there

24   was a meeting with the FPECC directors.  And at that

25   meeting, Dr. Jain distributed the CHS private practice

Melissa Kaye

1    policy, which had been authored by Dr. Ross Macdonald.

2    That was either at the end of June of beginning of

3    July.

4              At that meeting, I -- none of the directors

5    seem to have seen this policy or known about it.  We

6    had been told previously by Elizabeth Ford, since

7    April, that CHS Legal was working with the Conflict of

8    Interest Board and looking into it and they were going

9    to come out with a formal policy.  And people were

10   wondering and waiting for that.

11             I certainly was never given an opportunity

12   to voice an opinion or -- and put suggestions into an

13   edited draft.  And I don't believe -- other doctors

14   were.  I'm sorry.

15        Q    That was going to be my question.  Were any

16   of the other doctors given the opportunity?

17        A    I don't believe they were.  And the reason I

18   say that is because at this directors meeting, Dr.

19   Jain distributed the final draft.  It was -- I mean,

20   the final copy.  The final version.  And I know I had

21   never seen it before.  And I know Dr. Winkler had

22   never seen it before.  And I got the very strong

23   impression, especially given Dr. Elizabeth Owen's

24   reaction to it, that she had never seen it before

25   because she got quite upset and started complaining

Melissa Kaye

Page 249

1    that she felt infantilized and she -- she kind of went

2    off.  And Dr. Mundy also had a bunch of questions and

3    concerns.  And so I got the strong impression that

4    none of these directors had been involved in drafting

5    that.

6             So at the meeting, that became the topic of

7    discussion.  And, you know, I expressed concerns about

8    it.  And, you know, I almost -- I basically felt it

9    was -- you know, it was setting up a situation where

10   there was going to be fraud on the Court.

11   Misrepresentation to the Court.

12        Q    Can you explain what you meant by that?

13        A    Yeah.  Because basically the stakeholders

14   involved in hiring these doctors for private work are

15   the same stakeholders for which they provide a city-

16   salaried service to.  So the lawyers, the prosecutors,

17   the judges, all these same pool of individuals -- and

18   the same defendant pool, actually -- is -- that the --

19   the FPECC doctors are paid by the city to do neutral,

20   objective court clinic evaluations for competency and

21   for 390 exams, which are really -- they have a label

22   pre-pleading, presentence exams, but they're kind of

23   like mental health --

24             THE REPORTER:  They've been labeled

25   what?

Melissa Kaye

Page 250

```
 1                    THE WITNESS:  Pre -- pre-pleading,
 2     presentence exams, but they're very much more -- in
 3     practical terms, they're used -- in practical terms,
 4     they're used more as like a mental health screening.
 5     A mental health evaluation.  And they can be ordered
 6     at any time during proceeding.  They're sometimes even
 7     ordered at arraignment, even though they're
 8     technically presentence.
 9     BY MS. CANFIELD:
10          Q    I don't understand quite how there'd be a
11     fraud on the Court.  Are you saying that --
12          A    Yeah.  I'm sorry.  Go ahead.
13                    MS. HAGAN:  Please explain.
14                    THE WITNESS:  So basically --
15                    THE REPORTER:  I'm sorry, Ms. Hagan.
16     Please repeat what you just said.
17                    MS. HAGAN:  I said she needs to finish
18     her answer.  She needs to explain.
19                    MS. CANFIELD:  I'm just trying to move
20     it along.  Again, I want to finish tonight.
21                    THE WITNESS:  You know, I -- these are
22     -- these are very complex and layered issues.
23                    And so some of the doctors were kind of
24     developing overly friendly relationships with lawyers
25     and being influenced in how in the findings of their
```

Melissa Kaye

Page 251

1    730 exams in order to establish a business

2    relationship that would get them private referrals.

3    BY MS. CANFIELD:

4         Q    Okay.

5         A    And so I found that problematic.  And the

6    other thing that was problematic that was going on,

7    particularly under Dr. Owen in Brooklyn and Queens is

8    the -- the -- the -- the doctors were being paid to do

9    neutral competency exams, and they weren't supposed to

10   be getting influenced by -- whether or not that lawyer

11   could refer them a private case and had a certain

12   agenda with the finding of fit or unfit, which is

13   exactly what was happening.

14        The other problem was with the private

15   practice policy, it was saying that the doctors could

16   do "mitigation reports," which is basically what a lot

17   of the times the Court is ordering a 390 for.

18        So they were farming out all of the court-

19   ordered 390s that would have been done on their city-

20   salaried time to themselves as private referrals.

21        Q    Okay.

22        A    So they were doing city work as private

23   referrals.  And the third reason I had a problem with

24   it is because the defendant pool -- it was kind of

25   artificially trying to isolate the ethical and legal

Melissa Kaye

Page 252

1    parameters by borough, which was ridiculous because

2    many defendants had cases in multiple boroughs, either

3    simultaneously or -- or consecutively, right?  So that

4    made no sense.

5              And so what was happening is these doctors

6    were ending up conflicting themselves out of city-

7    salaried job duties because they had already --

8    because they were doing private work on these cases.

9    And, you know --

10        Q    Okay.

11        A    -- so it just seemed like -- and no one

12   would give me a straight answer if this had ever even

13   been formally vetted by the COB.

14             And so --

15        Q    All right.  Hold on.  I just want to back

16   up.  I have a question about that.

17             When you said nobody -- you said it was

18   vetted, who are you talking about?  Dr. Macdonald or

19   Dr. Jain?

20        A    When I say nobody, Dr. Ford had actually

21   said it was being vetted by the COB.  But when I then

22   went back and asked specifically, Dr. Jain said it was

23   -- well, let me just finish.

24             So after the meeting, I -- I came out

25   against it.  So I became a permanent target for Dr.

Melissa Kaye

Page 253

```
 1    Owen and Dr. Mundy.  They were -- that was, like --
 2    that was it.  I was, like -- I was persona non grata.
 3    I -- I was public enemy number one.  And they started
 4    -- suddenly I became the problem child in the Bronx
 5    and I was bonkers.  And they wouldn't answer my emails
 6    and on and on.  So that precipitated them coming after
 7    me.
 8            And then after that meeting, that's when
 9    they really started disliking me and -- and not -- and
10    -- and defaming me.  And then after that meeting, I
11    met one-on-one with Dr. Jain and I was very clear that
12    I didn't think there should be any private practice
13    policy because Dr. Winkler was already telling me
14    about the abuses that were going on with some of
15    doctor -- some of the psychologists that had worked
16    under Dr. Owen, and some of the abuses that Owen had
17    -- herself had been involved with.  Like socializing
18    and partying and -- with -- with defense attorneys and
19    prosecutors to private practice.
20            So all these, like, very questionable
21    boundary violations as far as, like, whether, you
22    know, this is -- these are business relationships --
23    private business relationships or are these
24    relationships that city employees have with city
25    employees.
```

Melissa Kaye

Page 254

1          Q    Okay.  I'm going to stop you now just so I
2     can ask you follow-up questions.  Because I'm going to
3     forget my follow-up questions if you continue, but
4     I'll let you talk after.
5               First question is this.
6                    MS. CANFIELD:  Please, Ms. Hagan.
7     Please, Ms. Hagan.
8          Q    Your position was that you believe there
9     should be no private practice policy.  Does that mean
10    there should be no policy or no one should engage in
11    private practice?
12                    MS. HAGAN:  Objection.  Objection.
13                    THE WITNESS:  I -- thank you for asking
14    that.  I -- I never really -- I always felt it was a
15    little funky and I never even knew about the Conflict
16    of Interest Board until they started talking about it.
17                    But as I started -- as I was -- when
18    that was brought to my attention and then I started
19    thinking about it more, then I went online and I
20    looked at it and I read --
21    BY MS. CANFIELD:
22         Q    Okay.  But my question is -- I know you want
23    to tell me how you got there, but my question is did
24    you have a problem with doctors engaging in private
25    practice or did you have a problem with there being a

Melissa Kaye

Page 255

1    memorialized policy at CHS?

2         A    I --

3                    MS. HAGAN:  Objection as to form.

4                    THE WITNESS:  I -- once I realized the

5    issues and once I looked at a previous finding of the

6    COB, I did not think that they should be doing private

7    practice within the City of New York.

8    BY MS. CANFIELD:

9         Q    Okay.  Okay.  Thank you.  Thank you.  But

10   weren't you as well engaging in private practice with

11   your consultancy and doing your -- evaluations?

12        A    -- I'm talking about --

13                   MS. HAGAN:  Objection.

14                   THE WITNESS:  Yes.  Thank you for

15   clarifying that.  I'm talking about specifically doing

16   forensic psychiatric legal exams for the same

17   stakeholders doing the same work --

18   BY MS. CANFIELD:

19        Q    Okay.

20        A    -- for the same legal stakeholders in the

21   same court setting.  I thought that was -- it was --

22   with -- with potentials to bias and alter CPL 730

23   results and exams to "woo" private practice.  It was

24   fraught with the outsourcing of 390 exams as --

25        Q    Okay.  Okay.  I understand now.  I

Melissa Kaye

Page 256

1    understand.

2         A    -- treatment.  I didn't say, "Oh, you can't

3    have a -- you can't have a private" -- I wasn't saying

4    --

5         Q    Right.

6         A    -- all moonlighting.  I was just saying

7    specific psychiatric legal exams for the same

8    stakeholders that they were providing city services

9    for --

10        Q    Okay.

11        A    -- for the same population of defendants --

12        Q    All right.  So in the beginning --

13             THE REPORTER:  I'm sorry.  What did you

14   say after "defendants"?

15             THE WITNESS:  And the same courts and

16   the same attorneys.

17   BY MS. CANFIELD:

18        Q    Okay.  You stated that once this private

19   practice policy was unveiled, you said that all the

20   directors were unhappy and that Dr. Ford said that she

21   felt "infantisized"?

22        A    No.  I didn't say that.  I'm sorry.  Let me

23   clarify, if I did.  I said Dr. Elizabeth Owen, the

24   director of the Queens Court Clinic, felt

25   infantilized.

Melissa Kaye

Page 257

```
 1        Q    Okay.
 2        A    And I think that's I-N-F-A-N-T-A-L-I-Z-E-D.
 3   It means, like, made to feel or treat --
 4        Q    I know what it means.  I just wanted to make
 5   sure that --
 6              MS. HAGAN:  -- for the record.
 7   BY MS. CANFIELD:
 8        Q    -- I thought you said Dr. Ford testified to
 9   that.
10        A    I may have mistakenly said that.
11        Q    Okay.
12        A    Dr. Ford was not at that meeting.  Dr. Owen
13   said that and Dr. -- I -- I know that they were very
14   unhappy that I voiced concerns about defendants' legal
15   rights being violated and there being possible
16   deceptive practice in -- in the 730 practice that
17   could affect the Court's ability to rule neutrally on
18   capacity.  They did not like that.
19        Q    Was there anyone -- what was Dr. Winkler's
20   position on the policy, if you know?
21              MS. HAGAN:  Would you allow her to
22   finish what she was saying --
23              MS. CANFIELD:  No.  I need to move
24   forward.  I need to --
25              MS. HAGAN:  She needs to be able to say
```

Melissa Kaye

Page 258

1    because this is -- this goes to the core of her claims

2    and the constitutional --

3                    MS. CANFIELD:  I know.  And there's

4    something that --

5                    MS. HAGAN:  -- be able to articulate

6    that.  So you won't say that she didn't.  So what --

7                    MS. CANFIELD:  No.  I'm saying she can

8    --

9                    MS. HAGAN:  -- complain about exactly

10   at the meeting.

11                   THE REPORTER:  Please repeat what you

12   just said, Ms. Hagan.

13                   MS. HAGAN:  Dr. Kaye needs to finish

14   saying what she was complaining about as far as why

15   the policy was problematic, and what it implicated,

16   before Ms. Canfield cut her off.

17                   Dr. Kaye was explaining the legal and

18   the constitutional implications that were invoked by

19   this problematic policy.

20                   Could you finish testifying, Dr. Kaye?

21                   MS. CANFIELD:  Actually, Dr. Kaye

22   explained it and I said I understood it.  And I would

23   say it's probably ethical considerations rather than

24   constitutional considerations.

25                   MS. HAGAN:  That's not what she said.

Melissa Kaye

Page 259

1                    MS. CANFIELD:  But we're both

2      testifying right now --

3                    MS. HAGAN:  Yes.

4                    MS. CANFIELD:  -- so let me follow-up

5      with my question to Dr. Kaye.

6                    MS. HAGAN:  Well, let her finish what

7      she was saying.

8                    MS. CANFIELD:  No.  We're moving on.

9                    MS. HAGAN:  You cut her off.

10                   MS. CANFIELD:  She already finished it.

11                   MS. HAGAN:  No.  You can't cut her off

12     like that.  That's not right.

13                   MS. CANFIELD:  Ms. Hagan, you have an

14     opportunity when we're finished to question the

15     witness.

16                   MS. HAGAN:  You can't cut off the

17     deponent.

18                   MS. CANFIELD:  I can.

19                   MS. HAGAN:  No, you cannot.

20                   MS. CANFIELD:  I can.  It's my

21     deposition.  Dr. Kaye --

22                   MS. HAGAN:  No, you can't.  No, you

23     can't.

24                   THE REPORTER:  Please speak one at a

25     time.  I'm sorry, ladies.

Melissa Kaye

Page 260

1    BY MS. CANFIELD:

2         Q    Dr. Kaye, what was Dr. Winkler's position on

3    the private practice policy?

4         A    He was --

5                   MS. HAGAN:  If you know.

6                   THE WITNESS:  -- he was fairly quiet at

7    the meeting relative to Dr. Owen and Dr. Mundy.

8    Afterwards, he said, yeah, you know, he agreed with

9    all my concerns and that, you know, it led to --

10   possibly led to biased reports being submitted to the

11   Court.  But he said to me -- well, do you want exact

12   quote or do you want a paraphrase?

13   BY MS. CANFIELD:

14        Q    Whatever you feel comfortable sharing.

15        A    He said, "Well, screw it.  They said I could

16   do it, so" -- he said, "I don't care.  Screw it.  They

17   said I could do it.  It's their problem."

18        Q    Okay.  Now so other than --

19        A    He really didn't say "screw it."  He said,

20   "Fuck it."

21        Q    I figured that.  Other than expressing your

22   concerns to Dr. Jain at that meeting and after the

23   meeting, did you express your concerns to anyone else

24   about the private practice policy?  And when I say

25   "anyone else," I'm talking about anyone that you

Melissa Kaye

                                        Page 261

1    reported to.

2        A    I -- you mean in my chain of command --

3        Q    Right.

4        A    -- above Dr. Jain?

5        Q    Correct.

6        A    That would be Dr. Ford.  I complained to her

7    about numerous things in a meeting I had with her on

8    November 30th.

9        Q    I want to know specifically about the

10   private practice policy.  Did you specifically

11   complain to her about that?

12       A    No.  She cut that meeting short.  I don't

13   think I had time to.  It was on my list, but she --

14       Q    Okay.  Okay.

15       A    -- about that.

16       Q    Now we got on this topic on the private

17   practice policy when I asked you why do you believe

18   your shift change was retaliatory.  Are there any

19   other reasons other than your complaints regarding the

20   private practice policy that you believe led to the

21   fact that your shift was changed?

22       A    I believe it -- that my complaint at that

23   meeting in January 2018 about misuse of HIPAA releases

24   for -- for criminal defendants because I felt coercing

25   possibly incapacitated individuals into signing a

Melissa Kaye

                                              Page 262

1    HIPAA release without legal representation was a

2    violation of their constitutional rights.  I

3    complained about that in January.  And I believe that

4    my complaint about the private practice policy and my

5    complaint about pay parity caused me to be targeted.

6    And the shift change was just the beginning of an

7    absolute hellish campaign of terror to make me quit.

8         Q    Okay.  Is it your belief that you were the

9    only unionized employee that had their shift changed?

10                  MS. HAGAN:  Objection.  As to

11   unionized, she didn't say that.

12                  MS. CANFIELD:  I know she didn't.  I'm

13   asking the question.

14   BY MS. CANFIELD:

15        Q    Is it your belief that you're the only

16   unionized employee that had their shift changed?

17        A    I believe that Patsy Yang is a cunning and

18   ruthless individual and the way that her and Jonathan

19   Wangel did this was to cover their tracks.

20   Ostensibly, "everybody" had to be the same.  Suddenly

21   -- suddenly, the system couldn't handle a 30-minute

22   lunch, although my time had been put in on a 30-minute

23   lunch prior for years and it was the same Axial [ph]

24   system at central office that -- they all use the same

25   system.  So that was a rouse.

Melissa Kaye

Page 263

1            And the other rouse was, oh, the doctors in

2    Manhattan -- the three psychiatrists or four

3    psychiatrists -- the four male part-time psychiatrists

4    are getting their shift changed, too.  They have to

5    have an hour unpaid lunch.  Well, you know, it turns

6    out that some of them didn't take a lunch because they

7    were part-time and they didn't work long enough to

8    have a lunch.

9            Others, you know, they didn't -- they might

10   not have had a full eight-hour day or they might have

11   had the luxury of having a nice long lunch in

12   Chinatown down at Center City -- in Center City by --

13   you know, on Center Street -- I'm sorry.  By where the

14   -- the courthouse was in Manhattan.  And it didn't

15   affect them and impact them and upend their life or

16   their children's lives.

17           So it was very convenient to have that as a

18   rouse that it was affecting them, but it wasn't

19   affecting them the same as it was affecting me.  I was

20   the only full-time employee that it caused hardship

21   for and there was no need for it.  I mean, it was very

22   -- it was very crafty to use 30 minutes of unpaid time

23   to force -- to force me out so I would have to torture

24   my children in the morning to come to work every day

25   because suddenly, not only did they change -- add the

Page 264

1    30 minutes of time to my workday, they moved my start

2    time to 8:00 in the morning.  And the courthouse

3    didn't even open and get going till 9:30 or 10:00.  I

4    would have been fine if they had let me work -- I was

5    already working -- I was already on-site an extra half

6    hour, and that wasn't enough.  They -- they had to

7    just go in for the kill and make -- and make it nine

8    hours.

9               So everybody else was on-site for eight

10   hours, but they made it so I had to be on-site for

11   nine hours.  And --

12      Q    When you say "everyone else," are you

13   talking about the other directors who were managerial?

14      A    I'm talking about all the FPECC --

15               MS. HAGAN:  Objection.  Objection.

16               THE WITNESS:  -- employees.

17               THE REPORTER:  I'm sorry.  Please start

18   your answer over.

19               MS. HAGAN:  I'm saying objection

20   because Counsel continues to try to testify with her

21   questions.  She did not say anything about the other

22   directors being managerial and non-managerial.  Dr.

23   Kaye doesn't know what their status was.

24               MS. CANFIELD:  I think there's

25   testimony that the other three are managerial.  So

Melissa Kaye

Page 265

1   that's been established.

2   BY MS. CANFIELD:

3       Q    My question is when you say "everybody," I

4   want to know who everybody is.  Are you talking about

5   your comparative directors?

6       A    I'm talking about other CHS FPECC employees.

7   I'm not aware that anyone had an adverse --

8                MS. HAGAN:  Can you hold on for a

9   second, please?  Hold on for a second, please.  Hold

10  on.

11               I'm sorry.  I had to stop the vacuuming

12  in the background.  I'm sorry.

13               MS. CANFIELD:  Okay.  Well, at least

14  you have a clean house.

15               MS. HAGAN:  We try, in some parts.

16               Okay.  Yes.  Keep going.

17               THE WITNESS:  So I'm not aware that any

18  other FPECC director or FPECC employee had the system

19  manipulated to the point where they had to be working

20  a nine-hour day.  There was no reason for it.  There

21  was no functional, operational reason for it.  It was

22  sadistic and it was retaliatory, and I know that and

23  they know it.  And I had conversations with Dr. Jain

24  about it and he was fully aware of how difficult it

25  was for me.  And -- and Dr. Ford was fully aware of

Melissa Kaye

Page 266

1    how difficult it was for me.  And that's why they dug

2    their heels in about it because they knew ultimately

3    it was going to break me.

4    BY MS. CANFIELD:

5        Q    So tell me, why was it difficult for you?

6    What changed and made it difficult?

7        A    Being at work at 8:00 in the morning instead

8    of 9:00 in the morning when I'm trying to get two kids

9    to school and one of my kids has problems and issues

10   that contribute to chronic sleep deprivation.  And

11   then to have to drag him out of bed an hour early so

12   -- you know, so that I -- I could accommodate an

13   unnecessary shift change that -- that violated the

14   agreement that my union and I had with CHS about when

15   I rolled over.  I was told nothing would change and

16   everything would stay the same.

17            They had a duty and a right to inform me

18   that this was going to happen, because had I been told

19   that, I would not have been -- I would have not rolled

20   over.  I would -- I don't know what I would have done.

21   I would have looked for a unionized line at Bellevue.

22   I would have done whatever I needed to do, but there

23   would be no way I would have ever agreed to that.

24   They -- it was a bait and switch and it was

25   retaliatory.  And it was done to drive me out of my

Melissa Kaye

Page 267

1     job, and it worked.

2          Q     So --

3          A     They had to do a lot of other terrible

4     things to me before I just couldn't take it anymore.

5     And they also used the criminal defendants and the

6     legal system as pawns in this -- in this attempt to

7     get me to quit.  I mean, they wouldn't staff my -- my

8     clinic.

9          Q     Okay.  I'm going to get there.  I just want

10    to talk a little bit more about the shift change.

11          You said that prior to the shift change, you

12    were going in at 9:00 a.m.  And then with the shift

13    change, you were going in at 8:00 a.m.; is that

14    correct?

15          A     They told me I had to come in at 8:00.

16          Q     Okay.  And what time did your son and

17    daughter need to be at school?

18          A     Well, school -- what do you mean "need to be

19    at school"?  What time did school start?

20          Q     Yes.

21          A     I think school started -- gosh, I don't even

22    know.  I should remember.  I think it was like maybe

23    -- I think they had to be there at 8:25 if I'm not

24    mistaken.

25          Q     Okay.

Melissa Kaye

Page 268

1      A     I could be wrong about that.  It might be

2    8:00.

3      Q     Okay.

4      A     It was something.  It was some weird, like,

5    time almost not on the hour, at a half hour.  I think

6    8:25.

7      Q     And how far from your apartment did you need

8    to travel to bring your children to school?

9      A     Three blocks.

10     Q     Okay.  And when you were required to go in

11   at 8:00 a.m., would you have another caretaker take

12   your children to school?

13     A     No.  I -- I -- I -- the school was not open

14   as early as I needed to have them dropped off to -- to

15   get there by 8:00, but they did open, like, 15 minutes

16   after the time I -- I needed to drop them off.  And I

17   spoke with the person who did coverage for the early

18   morning and I told them what was going on.  And as a

19   favor to me, he was coming in 15 minutes early so I

20   could drop them off early.

21     Q     When you say the person that does coverage

22   for you, are you talking about someone that helps you

23   take the kids to school in the morning or someone at

24   the school?

25     A     One of the teachers at school that did

Melissa Kaye

Page 269

1    coverage for the early -- the early morning period at

2    the school.  There was an early morning drop-off

3    period at the school and they would have different

4    teachers cover that -- to come in and cover that.  And

5    one of the teachers that did it most frequently, I

6    talked to him and he said he would come in a little

7    bit early so I could drop them off earlier than they

8    normally would be dropped -- allowing people to drop

9    off kids.

10        Q    Okay.  And so what time would you be able to

11   do drop-off?  The earliest you could drop off?

12        A    I think it was -- I think he had the school

13   ready and open for me -- he had to come in and get

14   everything open and ready before he could bring kids

15   in the school.  I don't know if he would get there at

16   7:00 or 7:15 to do that.  I don't know exactly what

17   that entailed, lifting up the gate and doing all this

18   other stuff.

19        Q    What time were your children allowed or able

20   to go to the school?  7:15 or 7:30?

21        A    I don't remember, but I know that there was

22   -- there were times -- it was a conflict for me to --

23   I wasn't able to definitely get them there every day

24   at the time -- and get to work unless I had him agree

25   to come in early for me.

Melissa Kaye

Page 270

1        Q      Okay.  So sometime between 7:15 and 7:30,
2    you would be able to drop off your children in order
3    to get to work by 8:00?
4        A      Yeah.
5        Q      Okay.  And how long is the train ride?  You
6    were living on the upper east side?  How long was the
7    train ride to the Bronx courts?  Twenty minutes?
8        A      Well, you know, it's variable with the
9    trains, but it was -- it was a walk -- you know, the
10   train -- it's a walk to the train.  It's a schlep to
11   the train from -- you have to go to 86th and
12   Lexington.
13       Q      For the Express, yes.
14       A      Well, it had to be the four, right?  The six
15   -- I mean, you know, you could take the six from 77th
16   and Lex, but you had to get on the four.
17       Q      Okay.
18       A      And, you know, I mean you have -- it was --
19   it could be door to door 40 minutes if you want to --
20   if you want to calculate in possible delays and
21   problems.
22       Q      Okay.  Forty minutes from the time that you
23   left your house, dropped off the kids and then were
24   able to make it to the Bronx courthouse?
25       A      Yeah.  Once you got to the Bronx, it was the

Melissa Kaye

Page 271

1    Yankee Stadium stop.

2         Q    Right.

3         A    -- a bit of a walk up the hill, over the

4    Grand Concourse, down the hill and then into the

5    building.

6         Q    Okay.  So when you were required to come in

7    at 9:00, you would just drop off your children at

8    8:25.  There was no sort of like an early morning

9    drop-off; is that correct?

10        A    No.  I would drop them off before 8:25

11   because -- maybe 8:10 or something.

12        Q    Okay.

13        A    But the school was fully open by then.  It

14   wasn't, like, an issue that the other -- you know, and

15   then they -- yeah.  Yeah.

16        Q    Okay.  All right.  I'm trying to get an idea

17   about how the shift changed affected your morning

18   commute and your morning.

19             So essentially --

20        A    It --

21        Q    -- it caused the need to get the children up

22   an hour or so earlier.

23        A    Yeah.  My son would cry that, you know,

24   "Mommy, Mommy, I'm so tired."  You know, it was awful.

25   Like, I was like torturing my children and I was going

Melissa Kaye

Page 272

1    to work knowing I'm torturing my children to satisfy
2    sadistic retaliatory shift change.
3            It was -- it created a really negative to --
4    to do that to me.  It was very hostile, and then it
5    was cruel and so unnecessary.
6            And then I -- I -- I tried every which way
7    to get it restored to what they had promised me it
8    would be, and they would say -- and -- and Jain would
9    say, "Well, you can come in at 9:00, but then you have
10   to stay till 6:00."  I'm like, "The courts close at
11   4:00.  It's pitch black up here and my kids' school
12   closes at 6:00."  Like, that's not helping me.  Why
13   did you change my shift?  It was wrong.  It was -- it
14   was wrong and I -- when I had a big -- in October, I
15   told him -- I said, you know, I was so upset because
16   it was just killing us.  And then there were a lot of
17   other things, too.  This wasn't the only thing.
18           It was all these other -- I know you don't
19   want me to get into that --
20      Q    We're going to get into them.  I just want
21   to close off each thing we're talking about.  And I do
22   have another follow-up with the shift change.  I'm
23   going to share my screen again and show you paragraph
24   57 of the complaint.
25           And you say here that "Yang, Wangel and Jain

Melissa Kaye

Page 273

1   knew the shift change would make it impossible for

2   Kaye to care for her sick son."  And I guess what I

3   want to know is that other than the disruption in

4   having to get up an hour earlier, what type of illness

5   does your son suffer from that made it impossible for

6   you to care for him having to be at work an hour

7   earlier?

8        A    Because he has -- he has a -- I guess it

9   stems from an immune problem, but he has this -- he

10  had an excoriating rash all over his body that was

11  disfiguring and disabling and they couldn't figure out

12  what it was.  It was -- you know, of course it was

13  severe eczema, but you know, they thought he had all

14  these immunologic problems driving it and he got all

15  this work up and he had patch testing and all of this.

16  And he ended up, you know, as we honed in on the

17  diagnosis, they were able to hone in on the treatment.

18  He has allergic contact dermatitis where common

19  chemicals in the environment cause just this horrible

20  kind of blistering, excoriating rash.  Fragrance is

21  one of them.  Lanolin, neomycin, this thing called

22  thiourea which is a component of rubber.  I mean, all

23  of these things.  And as we started trying to identify

24  -- we identified those and started trying to eliminate

25  his contact with them, it wasn't completely possible.

Melissa Kaye

Page 274

1    But, you know, he wasn't using fragranced soap.  That

2    was -- you know, that kind of stuff.

3            And he had been put on these steroids and he

4    was growing black hair on his body.  I mean, it was

5    awful.  And he was having behavior and emotional

6    problems from the high-potency steroids.  It was --

7    and simultaneously, he was -- he had some life-

8    threatening anaphylactic -- anaphylaxis to cashews.

9    And ended up, you know, having to carry EpiPen.  And

10   so he had these type four just delayed

11   hypersensitivity allergies, then he had these acute

12   mediated food allergies.  So he had all this -- and

13   plus, he had all these developmental delays.  That's

14   why I had -- needed services from the DOE.

15           And it was just really frustrating dealing

16   with the allopathic medical approach to his illness

17   and the steroids and I -- an allergist referred me to

18   a doctor who specialized in -- she's an M.D.

19   pediatrician, but she's from China and she has a

20   specialty in traditional Chinese medicine treating

21   children with asthma, eczema, food allergies, these --

22   these kind of allergic diseases.  These immunologic,

23   allergic diseases with Chinese medicine protocols that

24   she studied scientifically at the Jaffe Food Center.

25           And when I started -- and I found her on --

Melissa Kaye

Page 275

1    I'm thinking it was like May of 2018.  And she had a

2    protocol that he was supposed to be on and I had to

3    apply all of these potions like they were these things

4    that I would -- she would -- I would buy from her and

5    it was actually her husband's business who I would --

6    he had the business of selling the things that she

7    prescribed.

8              It wasn't prescribed in a medical sense.  It

9    was like alternative medicine.

10             But I had to put it all over his skin and I

11   was supposed to do it in the morning.  And I was like,

12   well, this kid is completely sleep deprived already

13   because of the shift change, so you know, am I going

14   to inflict more sleep deprivation on him to put his

15   medicine on him?  To put the Chinese -- the TCM --

16   standing for traditional Chinese medicine ointments

17   and creams on him?  Or, you know -- and so it kind of

18   -- I was like he had already suffered with this sleep

19   deprivation from the rash itself.  The pain, the

20   itching.  And then the steroids were, like,

21   psychostimulant and he was all revved up from those.

22   So he had these chronic sleep issues and deprivation

23   because of the illness.  And then, you know, this

24   unnecessary shift change was like a nail on the

25   coffin.  It was awful.

Melissa Kaye

Page 276

```
 1              And so sometimes I'm like, okay.  This --
 2      and so it made it very difficult for me to comply with
 3      this Chinese medicine protocol for him with this --
 4      and be at the Bronx in the morning.
 5              It would have been --
 6      Q    So --
 7      A    -- if I had been able to -- to be there --
 8              THE REPORTER:  I'm sorry.  Repeat
 9      everything you said after 8:00 in the morning.
10              THE WITNESS:  it would have been doable
11      if I was allowed to go there at 9:00, like they had
12      promised me when I rolled over.  My shift would have
13      been 9:00 to 5:30.
14      BY MS. CANFIELD:
15      Q    Okay.  Does your son still apply the -- what
16      you call the Chinese medicine or potions, or have they
17      got the eczema under control?
18      A    He had a very intense -- you know, there
19      were herbal pills -- capsules he had to take twice a
20      day.  The -- the treatment creams on the skin.  And
21      then these therapeutic baths that he -- and he does
22      take this therapeutic bath still.
23              I'm waiting to get more of the creams
24      because he's having problems still with his hands
25      because all this washing with the pandemic and him not
```

Melissa Kaye

Page 277

1      -- him -- if he doesn't use fragrance-free soap, and

2      they make -- whatever.  His hands -- but there's --

3      you know, there's been a supply chain issue, so --

4      yes.  I have the herbal bath treatments that he still

5      takes a bath in those.  We've run out right now of the

6      -- of the capsules and some of the creams we've run

7      out of.  And so I'm just waiting till that, you know

8      --

9          Q    Okay.

10         A    -- the supply chain -- the supply chain

11     issue around that is resolved.

12         Q    Okay.  All right.  I'm going to move beyond

13     the shift change unless there's something -- I think

14     you've told me how it's affected your family's life

15     and why you believe it was retaliatory.

16              Any other reasons why you believe it was

17     retaliatory besides the equal pay complaint, the HIPAA

18     release complaint and the complaint about the private

19     practice policy?

20                   MS. HAGAN:  Excuse me.  Could you

21     clarify the question?  Retaliatory?  You talking about

22     the shift change being retaliatory or if she explained

23     --

24                   MS. CANFIELD:  Yes.

25                   MS. HAGAN:  -- other forms of

Melissa Kaye

Page 278

1    retaliation?

2                    MS. CANFIELD:  No, no.  The reasons

3    that she believes the shift change was retaliatory.

4    BY MS. CANFIELD:

5        Q    I believe you testified because your

6    complaints of pay equity, your complaints about the

7    private practice policy and your complaints about the

8    HIPAA release.  Is there anything else that you

9    believe or things that you did that caused retaliation

10   with respect to the shift change?

11       A    I believe I was targeted for retaliation

12   because somehow -- and it seems very sexist and -- to

13   me.  Somehow I was scapegoated for the redacted issue

14   -- redacted records issue that CHS got itself into by

15   defying a court order.

16       Q    Is this the redacted issue that we talked

17   about earlier today -- this morning?

18       A    It was an ongoing issue.  It probably

19   started -- you know, it periodically rears its head.

20       Q    Okay.

21       A    It started I would say for -- for the -- for

22   the incident where I was scapegoated for that, I would

23   say it started maybe in, like, mid-2017 where CHS was

24   very much involved in it because they were custodians

25   of the records at the time.  Even though they hadn't

Melissa Kaye

Page 279

```
 1    come -- you know, it'd be another year or so before
 2    they took over the court clinics, they were getting
 3    court orders from judges in the Bronx.  Senior,
 4    experienced judges in the Bronx, multiple court orders
 5    from different judges for different defendants.
 6        Q     Right.  Right.
 7        A     And it was -- defying them and handing out
 8    redacted records.  And defense counsel was up in arms.
 9    They went to Judge Torres, the chief administrative
10    judge, and complained to him.
11        Q     Okay.  I know, I'm going to stop you.  Other
12    than the redacted records, too.  I'm familiar with the
13    redacted records.  I think that --
14        A     Yes.
15        Q     -- we talked about it this morning.
16    Anything else that you believe you did that --
17        A     I believe that because I was not willing to
18    roll over to the unsound decisions of CHS and its
19    legal advisors, and the Court threatened to hold HHC
20    in contempt, somehow that was turned around to be my
21    fault as if I created that problem.  I -- I kept
22    trying to step back and let it be between the courts
23    who were writing these orders that CHS was defying,
24    and letting them deal with it.  And of course, I'm
25    going to get a little bit caught in the crossfires.  I
```

Melissa Kaye

Page 280

1    was the medical director.  I had -- I was -- I was an

2    intermediary, but it wasn't my fault and I wasn't

3    doing anything wrong.

4         But I --

5    Q    But isn't that issue --

6              THE REPORTER:  I'm sorry.  Repeat what

7    you said after, "I wasn't doing anything wrong."

8              THE WITNESS:  I became "the

9    troublemaker."

10   BY MS. CANFIELD:

11   Q    But isn't that issue still related to the

12   redacted records?  The contempt issue?

13   A    Well, CHS got itself into that situation

14   because they were not complying with judicial orders

15   in the Bronx.

16   Q    Concerning unredacted records, correct?

17   A    Unredacted records.

18   Q    Okay.  All right.

19   A    And then I had mentioned to Jain -- Dr.

20   Jain, I told him -- it was all around the same time

21   because I had found out about -- I had found Dr. Lee.

22   I had gotten my kid to see her and I had been told

23   about this protocol that he was going to go on.  And

24   this was May-ish of 2018.  So I mentioned it to Jain

25   -- Dr. Jain, that I may look into FMLA to -- to deal

Melissa Kaye

Page 281

1    with it because I wanted to make sure I complied fully

2    with the protocol.

3             And so that was another thing I felt like --

4    then they started messing around with me about and

5    denying it, then retroactively denying it.  And then

6    --

7        Q    All right.  Let's talk about that then.

8    Okay.  You brought up your FMLA leave.

9             You believe that your FMLA leave was denied

10   or not granted as a result of retaliatory animus,

11   meaning that this was deliberately done to you in

12   retaliation for your complaints?

13       A    I believe that I started having a lot of

14   repeated difficulties with routine matters.  When I

15   rolled over from Bellevue, I was on a 40 hour a week

16   pay with a 30-minute half hour lunch.  I was denied

17   access to Chronos, the electronic timekeeping system.

18   They didn't install it in the Bronx, so I was

19   dependent on Dr. Jain to enter in my time.  And I told

20   him at the beginning of July that I work a -- you

21   know, that I work an eight-hour day with a 30-minute

22   unpaid lunch, and he lurched at me.  He was, like,

23   sitting in his chair and he got this aggressive

24   posture with his body and he said, "No, you don't.

25   That's not true."  And he leaned forward and he, like

Melissa Kaye

Page 282

1    -- and it was like he was attacking me, you know?  And

2    accusing me of lying about that.

3              And I said, "It is true."  I said, "Let me

4    get my" -- I had paper copies of all my timesheets I

5    had turned into Bellevue for the last ten years, as

6    did LaKeisha.  They were in her office.  I went and I

7    got a timesheet from Bellevue, a copy, and I said,

8    "Look here."  And I would show him.  And I showed him

9    what -- what it was.  And he proceeded to ignore me.

10   And then I never had access to Chronos until the

11   middle of August.  And when I looked in there, he had

12   been putting my time in wrong.  He had been putting me

13   in for seven hours of work and one hour of unpaid

14   lunch.  So I was getting docked an hour of pay every

15   day for six weeks.  And that's --

16        Q    Do you believe that he was doing that

17   intentionally, or was it as a result of the decision

18   by Jonathan Wangel to retroactively make you work the

19   nine-hour day that we were just talking about

20   consistent with the work rules at CHS?

21              MS. HAGAN:  Objection as to form, and

22   assumes facts and --

23              MS. CANFIELD:  That evidence will bear

24   it out.

25   //

Melissa Kaye

Page 283

1    BY MS. CANFIELD:

2         Q     Do you think that Dr. Jain was deliberately

3    entering in your time?

4         A     I believe he was deliberately entering it in

5    wrong because he knew I was working a 40-hour work

6    week.  He knew I was -- had a 30-minute lunch.  And it

7    was before Wangel did -- in August, he did

8    retroactively alter my timesheets.  He and Dr. Jain

9    and Patsy Yang.  But at this time, they didn't go back

10   that -- I wish I had -- they kicked me out of my

11   office, so I don't have all these copies of the stuff

12   that I normally would have had if they hadn't kicked

13   me out of my office.

14            But they're -- these -- we had to meet my

15   union representative, Nate Santamaria [ph], we met

16   with Jonathan Wangel in September -- September 7th.

17   And I remember that day because --

18        Q     What year?  2018 or 2019?

19        A     '18.  '18.  I was double booked --

20   intentionally double booked for a meeting in the Bronx

21   when I told Dr. Jain and Andrea Swenson that I wasn't

22   -- be down on Water Street.

23            But -- so those hours were -- he -- so I was

24   getting docked an hour of pay a week for six weeks,

25   and then --

Melissa Kaye

Page 284

1        Q     And were you ever reimbursed that money or
2   was it hours that you weren't working because you were
3   not working the number of hours that you should have
4   been working?
5        A     No.  I was working the -- the normal hours I
6   always worked.  I was working eight hours a day with
7   my 30-minute lunch.  There was nothing that I was
8   doing differently, I just was no longer allowed to
9   fill out my timesheets because they denied me access
10   to the electronic timekeeping system.  And --
11        Q     Okay.  My question is were you not paid?
12   Okay.  Two things.  One, you said that you were denied
13   access to electronic timekeeping system.  Was it even
14   installed then when you say that you were denied
15   access?
16        A     No.  They didn't bother installing it --
17        Q     Okay.  So you believe -- you believe --
18              THE REPORTER:  I'm sorry.  What did you
19   say after "installing it"?
20              THE WITNESS:  No.  They did not install
21   it.  They delayed installing it.  They knew they were
22   taking over the clinics in January, but in July, they
23   hadn't even started to consider doing whatever it is
24   they needed to do to install the electronic
25   timekeeping system.

Melissa Kaye

Page 285

1    BY MS. CANFIELD:

2         Q    Okay.  And you believe the fact that they

3    didn't install it until late in the game, that that

4    was deliberately an act of retaliation against you?

5         A    I believe there was deliberate retaliatory

6    sabotage directed against the Bronx Court Clinic --

7         Q    Okay.

8         A    -- in order to make me look bad and to force

9    me to quit.

10        Q    Okay.  And when you say that you were docked

11   pay, were you -- did you have to take annual leave to

12   cover those hours or you just did not receive that pay

13   in your check?  Or was it corrected eventually by

14   payroll and timekeeping?

15        A    Well, that's a lot of questions and I want

16   to be succinct.

17                  MS. HAGAN:  Objection to the form.  It

18   is a compound question.

19                  MS. CANFIELD:  It is.  Well, let's take

20   them one at a time.

21                  THE WITNESS:  Thank you.

22   BY MS. CANFIELD:

23        Q    When you say "docked pay," were you not paid

24   your full paycheck or were you required to take annual

25   leave to cover your full paycheck?

Melissa Kaye

Page 286

1      A    Okay.  To clarify, annual leave is paid

2   because when you separate from service, you can

3   convert annual leave into a cash value.

4      Q    Correct.  I'm talking about when you were

5   docked though.  I'm not talking about when you left.

6      A    So when -- so I was unfairly and

7   illegitimately being docked annual leave that I

8   shouldn't have been.

9      Q    Okay.

10      A    And I have never to this day had all of the

11   surreptitious alterations in my pay and my timesheets

12   which have subsequently affected my pension addressed.

13   They have, to this date, not -- to this day, have not

14   been addressed.

15          We went down -- and when I say "we," I'm

16   talking about Nate Santamaria and myself went down to

17   meet with Mr. Wangel the beginning of September

18   because of this.

19          I was -- we were told -- Mr. Wangel admitted

20   to me and my union member that Patsy Yang was behind

21   the shift change.  That she was behind this

22   retaliatory shift change.  He admitted that to us in

23   the meeting and he promised that he brought out some

24   sheets that he had and my union was --

25          And some of this was beyond my

Melissa Kaye

Page 287

```
1    sophistication and skillset.  Like, it was a lot of
2    stuff my -- you know, I wasn't used to scrutinizing
3    this kind of computerized paperwork for -- I'd never
4    had this problem at Bellevue.  So it was --
5             So all this stuff, and my union -- he went
6    through some of it with my union.  My union had a lot
7    of concerns and questions.  Mr. Wangel had promised us
8    at that meeting on September 7, 2018, that he was
9    going to get documentation from the Axial system, or
10   something like that.  Which was the -- like, the
11   motherboard or the -- the primary central timekeeping
12   system through central office for HHC.  And that my
13   union had wanted this kind of documentation to prove
14   that I wasn't being unfairly docked pay.
15        Q    And did your union ever receive that
16   information?
17             Okay.  Was your union --
18                  THE REPORTER:  Please repeat your
19   answer.
20                  THE WITNESS:  No.
21   BY MS. CANFIELD:
22        Q    Did your union ever -- or was it expressed
23   to you by your union that the issue had been resolved
24   with timekeeping and payroll subsequent to meeting
25   with Mr. Wangel?
```

Melissa Kaye

Page 288

1        A    No.

2        Q    Okay.  Did your union then file a grievance

3    on your behalf?

4                 MS. HAGAN:  Okay.  Okay.  I'm going to

5    stop you for a second because there's an hour left to

6    this deposition.  I just want to make sure.  Can you

7    please check your time --

8                 MS. CANFIELD:  I'm going to need more

9    time than an hour.

10                MS. HAGAN:  Well, it's an hour.  You

11   have seven hours a day.

12                MS. CANFIELD:  I know.  I'm going to

13   need more time.

14   BY MS. CANFIELD:

15       Q    Dr. Kaye, did your union file --

16                MS. HAGAN:  How much time do we have

17   left?

18                MS. CANFIELD:  Excuse me.  You're

19   wasting time.

20                MS. HAGAN:  Wait, wait, wait, wait.

21   I'm going to ask him --

22   BY MS. CANFIELD:

23       Q    Dr. Kaye, did you --

24                MS. HAGAN:  No.  I'm asking the

25   reporter a question.

Melissa Kaye

Page 289

1                    MS. CANFIELD:  Excuse me, Ms. Hagan.

2                    MS. HAGAN:  I have a right to ask a

3      question as far as time management is concerned.

4                    MS. CANFIELD:  Not when I'm still

5      trying to get through the deposition.

6                    MS. HAGAN:  You're cutting me off.  I'm

7      trying --

8                    MS. CANFIELD:  Off the record, please.

9      Off the record.

10                    THE REPORTER:  The time is 5:29 p.m.

11     We're off the record.

12                         (Off the record.)

13                    THE REPORTER:  The time is 5:30 p.m.

14     We're back on the record.

15                    MS. HAGAN:  And there are 54 minutes

16     left.  Thank you.

17     BY MS. CANFIELD:

18          Q    Dr. Kaye, did your union file a grievance on

19     your behalf regarding your pay and the docking of your

20     pay?

21          A    I have --

22          Q    That's a yes or no question, please.  I'm

23     sorry.  I'm trying to get through this.  Yes or no?

24          A    No.  I can't -- it's not a yes or no

25     question because I have been after my union from when

Melissa Kaye

Page 290

1    I found out about this in August 2018 to February of
2    this year to address all of the payroll and pension
3    irregularities that I have suffered for retaliation by
4    CHS.  And they have chosen to, you know, conspire with
5    Mr. Wangel and politics and they assigned me a union
6    rep who kept going in and out and in and out from a
7    medical problem.  So I'd go -- they'd tell me he was
8    going to help me and then he'd be out for three months
9    with a medical problem.  They didn't give me any
10   replacement.
11         And I have sent email after email to my
12   union and they have not responsibly followed up with
13   the grievances that should have been filed over -- and
14   this isn't just the first instance of -- of being
15   docked pay.  They reduced my salary.  I --
16         Q    Okay.  The --
17         A    Well, no.  I'm sorry, Ms. Canfield, but I
18   got W-2s that showed that my salary had been reduced.
19   I don't know how they did it, if they cut my longevity
20   pay or if they changed me to an attending two, but I
21   was -- I got, like, $28,000 pay cuts from CHS and I
22   got docked for taking off the Jewish holidays after
23   the system told me that I had time, and timekeeping
24   told me that I had time.  And I got emails from Labor
25   Relations that told me I had time.  And they would

Melissa Kaye

Page 291

1    send me these drop-and-run Friday afternoon emails

2    that I was getting docked pay.  And they did it two

3    pay periods in a row.  And the --

4                    THE REPORTER:  Please speak slower.

5                    THE WITNESS:  -- surreptitiously denied

6    my educational leave and changed it -- docked me

7    annual leave without telling me.  And this was just an

8    ongoing assault with --

9    BY MS. CANFIELD:

10        Q    I'm going to stop you right now, please.

11             Okay.  Did you file a complaint against your

12   union for breach of duty of their representation?

13        A    I --

14                    MS. HAGAN:  Objection.

15                    THE WITNESS:  I contacted the NLRB.

16   BY MS. CANFIELD:

17        Q    Okay.  And did you file a grievance or bring

18   an improper practice claim against your union?

19        A    I explained the situation --

20                    MS. HAGAN:  Objection.

21                    THE WITNESS:  -- to them and they told

22   me to contact the -- the Manhattan DA's office.

23   BY MS. CANFIELD:

24        Q    Okay.  And have you contacted the Manhattan

25   DA's office concerning the conduct of Doctors Council?

Melissa Kaye

                                                    Page 292

1        A    Not yet.

2                    MS. HAGAN:  Objection.

3   BY MS. CANFIELD:

4        Q    Okay.  You mentioned your board examination

5   being docked pay.  Were you eventually paid for the

6   time that you spent taking the -- your board

7   examination?

8                    MS. HAGAN:  Objection.

9                    THE WITNESS:  I endured a lot of --

10  BY MS. CANFIELD:

11       Q    The question is were you eventually paid for

12  that time?  Yes or no?

13       A    I had -- I had --

14       Q    Yes or no please.

15       A    I didn't --

16       Q    I'm going to have to call you back, Dr.

17  Kaye, if you do not just answer my questions.

18            Were you eventually paid for that time?

19                    MS. HAGAN:  Objection.

20                    Continue.  Answer the question as you

21  see fit.

22                    MS. CANFIELD:  No.  That's my time --

23  that's my question.

24  BY MS. CANFIELD:

25       Q    Were you eventually paid for that time --

Melissa Kaye

Page 293

1              MS. HAGAN:  -- how she answers your

2      question.

3              MS. CANFIELD:  Excuse me, Ms. Hagan.

4      BY MS. CANFIELD:

5          Q    Were you eventually paid the time?

6              MS. HAGAN:  Do not harass --

7              THE REPORTER:  I'm sorry.  I didn't get

8      anything that either of you two just said.

9              MS. HAGAN:  Ms. Canfield is harassing

10     the witness.  She's cutting -- bullying.

11             MS. CANFIELD:  I am not.  You keep

12     continuous -- you interrupt me.

13     BY MS. CANFIELD:

14         Q    Dr. Kaye, were you eventually paid the time

15     that you spent taking your board examination?

16         A    I was denied the time.  I was harassed and

17     humiliated, and I had to fight and complain and

18     threaten to go to central office and contact Bellevue

19     before I was eventually given part of the time for an

20     all-day board exam.  And I continued to push the

21     issue.  They claimed that my board exam in child and

22     adolescent psychiatry was irrelevant to my job, when

23     in fact we have 16, 17-year-olds rotating through the

24     court clinic who've been waived into Adult Court for

25     violent felonies.  It was not irrelevant to my job.

Melissa Kaye

Page 294

1        Q    Okay.  Let me ask you a question.  Isn't it
2   true that as a result of the fact that you petitioned
3   to have your board examination paid for, that CHS and
4   HHC changed their policies and now everyone can have
5   their board exams paid for?  Isn't that true?
6        A    I have no idea what their policies are.
7        Q    All right.  I'm going to talk to you now
8   about taking FMLA leave.  Did you ever, during the
9   time that you were employed by CHS, ever have your
10  FMLA leave denied?
11       A    Yes.
12       Q    Okay.  When?
13       A    I don't remember the timeline.  Initially, I
14  filled out the paperwork -- well, Dr. Lee filled out
15  the paperwork and I submitted it.  And there was --
16  because of the nature of his illness, she had put in
17  dates where we knew he would be out of school and I
18  was going to be taking time off and doing his creams
19  at a more frequent interval.  And then if he had
20  periodic flares, that was unpredictable.
21            So she had written something in there.  I
22  don't remember that there was these set days, and then
23  there were these unknown days.
24            And I took some FMLA, and then it was
25  retroactively denied because Dr. Lee didn't define the

Melissa Kaye

Page 295

1    -- the days where he was possibly going to have a

2    flare, which is ridiculous.  She --

3         Q    Let's be careful here.  Was it retroactively

4    denied or did they just simply ask for more

5    information?

6         A    No.  They --

7                   MS. HAGAN:  Objection -- testifying.

8                   THE REPORTER:  I'm sorry.  What did you

9    say, Ms. Hagan?

10                  MS. HAGAN:  I said objection.

11   Counsel's testifying.  Form of question.  Objection to

12   form.

13   BY MS. CANFIELD:

14        Q    Go ahead, Dr. Kaye.

15        A    If I recall, I got an email that said --

16   because I had put in for it I think and it said that

17   -- I think it was denied and it had to be resubmitted.

18        Q    Okay.

19        A    I believe that it was retroactively denied

20   is the way I read -- recall reading that email.  And

21   --

22        Q    Okay.  Did you eventually -- were you

23   eventually granted FMLA time once you resubmitted the

24   paperwork with more specific dates?

25                  MS. HAGAN:  Objection.  You're

Melissa Kaye

Page 296

1    testifying.

2                 MS. CANFIELD:  No.  It's a question.  I

3    said "were you."

4                 THE WITNESS:  Well, I'm sorry.  I can't

5    really answer that yes or no because what happened is

6    that they were then charging me my -- you know, I had

7    eight hours of -- of time a day for FMLA and they were

8    telling me to put in this one code for FMLA and this

9    other code for annual leave.  Because I had annual

10   leave, so it wasn't unpaid time.  And then they were

11   charging me 18 hours a day instead of 9.

12   BY MS. CANFIELD:

13        Q    Was that eventually corrected?

14        A    I have no idea because all these concerns

15   that I brought to everyone's attention were considered

16   me -- you know, I was labeled as being petty and

17   having a litany of complaints and not being a team

18   player, and resistant and overly concerned about

19   benefits.  None of it was taken seriously.  I -- and

20   the payroll --

21        Q    Was that the same with your union, too?  Did

22   you complain to your union about the FMLA leave?

23        A    I complained to my union about the reduction

24   in pay as demonstrated by my W-2s in '18 -- I guess it

25   would be '18 and '19.  I complained -- I was supposed

Melissa Kaye

Page 297

1  to get the doctors in Doctors Council union after

2  ratification of the contract were supposed to get

3  backpay, which periodically happened over the, you

4  know, 20 years.  You would get some amount of money.

5  And I never got any information about how much I was

6  supposed to get, and if I got it all.  CHS wouldn't

7  give me any information.  My union -- I have slews of

8  emails -- I guess we'll go to the Manhattan DA's

9  office at some point --

10      Q    Did you turn over those emails to your

11  attorney so they could be turned over to me about your

12  complaints about CHS?

13                 MS. HAGAN:  Objection.

14                 THE WITNESS:  No because we're not

15  suing my union at this point, so I didn't.

16  BY MS. CANFIELD:

17      Q    But aren't they complaints to your union

18  about CHS?

19                 MS. HAGAN:  Objection.

20                 THE WITNESS:  They're complaints about

21  discrepancies in my pay and wanting to clarify -- I --

22  Jonathan Wangel fiddled around with my full-time

23  status so I would only get two-thirds of my bonus

24  retention.  I was even told that when I called central

25  office.  It was Matthew Camponese's [ph] secretary.

Melissa Kaye

Page 298

1    She's like, "Oh, no.  Jonathan Wangel confirmed that

2    you're only part-time."  So --

3    BY MS. CANFIELD:

4        Q    So let me ask you a question.  Right now,

5    I'm going to call for the production of the emails

6    between you and your union about pay discrepancies.

7                    MS. HAGAN:  Objection.  And I'll take

8    it under advisement.

9                    MS. CANFIELD:  You can take it under

10   advisement.

11   BY MS. CANFIELD:

12       Q    You can continue.

13       A    Yeah.  So then I guess, you know, the FMLA

14   -- you know, I don't know if I got double charged.  I

15   don't -- I -- there was just so much monkey business

16   going -- going on with my time and leave that it was

17   just one thing after another.  The retroactive -- my

18   union said that it was unheard of.  And I spoke to

19   people at Bellevue -- just like gratuitously docking

20   employees' pay.  And this happened two -- two pay

21   periods in a row, docking me for the Jewish holidays,

22   taking off the Jewish holidays with this dump-and-run

23   email Friday afternoon when I'm supposed to get paid

24   and my paycheck is --

25                    And I asked if I could, you know -- well,

Melissa Kaye

Page 299

1    this was not an error of mine.  Chronos said I had

2    time.  I called payroll, they said I had time.  Labor

3    Relations sent me an email and said I had time.  It

4    wasn't my error.  So if it is an error, I can -- why

5    can't I have code 45 which is advanced annual leave?

6    And --

7          Q    Did you request advanced annual leave?

8          A    Yes, I did.  And I --

9          Q    Okay.  And was it granted?  When you had

10   exhausted all your annual leave, was it granted?

11         A    I was marginalized and ignored.  No one

12   responded to my email.

13         Q    Okay.  All right.  The record will reflect

14   what happened because I know there's plenty of emails

15   on that topic.

16              Why did you request FMLA leave?

17              MS. HAGAN:  -- so --

18              MS. CANFIELD:  Excuse me.  Why --

19              THE REPORTER:  I'm sorry, Ms. Hagan.

20   If you can start over, whatever you just said.

21              MS. HAGAN:  First and foremost, how can

22   she say she knows there's so many emails on this topic

23   and didn't produce them?  What are you talking about?

24   BY MS. CANFIELD:

25         Q    Dr. Kaye, for what reason did you take FMLA

Melissa Kaye

Page 300

1    leave?

2         A    To provide the -- Dr. Lee TCM protocol for

3    my son.

4         Q    Okay.  Is that the only reason that you took

5    FMLA, or did you take it at any other time for another

6    reason?

7         A    I think I had taken some annual leave for --

8    for a death in the family, which was the normal thing

9    that always would -- how it was done at Bellevue.  And

10   if they wanted to do it differently, that was fine.

11   But I came back and there was this big bruhaha that I

12   should have taken FMLA for that.

13        Q    Were you taking care of your children during

14   that time or was it bereavement leave?

15        A    Well, it was -- it was partially bereavement

16   leave, but it was also ended up being over what would

17   have been, like, the winter break for -- for the

18   holiday season.  And that was something that I -- that

19   Dr. Lee had put down as a schedule time that I would

20   take off to do the treatments more intensely -- more

21   frequently.

22        Q    Okay.  Okay.

23        A    So it was -- so I think I took the four days

24   of bereavement leave and then I think -- I'm -- I'm

25   not really sure, but I remember that they were trying

Melissa Kaye

Page 301

1      to act like I had -- was trying to pull a fast one or

2      something because I didn't put in for FMLA because I

3      had a death in my family.  And they started --

4           Q    Okay.  All right.  Any other time that you

5      took FMLA leave other than the time that you described

6      to take care of your son's medical condition?

7           A    Well, no.  I had asked for the -- the

8      tabulation that they're supposed to keep for my FMLA.

9      I wanted those documents.  I had asked for those and I

10     was never able to get them.

11          Q    Okay.  What about --

12               THE WITNESS:  So I'm getting a text

13     about --

14               MS. CANFIELD:  Yeah.  Let's take a

15     five-minute break.  I'm getting a call from a client.

16               THE WITNESS:  Okay.  Thank you.

17               THE REPORTER:  The time is 5:44 p.m.

18     We're off the record.

19                    (Off the record.)

20               THE REPORTER:  The time is 5:51 p.m.

21     We're back on the record.

22               MS. CANFIELD:  Okay.

23     BY MS. CANFIELD:

24          Q    Dr. Kaye, we were talking about your FMLA

25     usage and I had asked you what purposes you had taken

Melissa Kaye

Page 302

1    FMLA.  If it was for your son's medical condition.

2            Have you ever taken FMLA -- requested FMLA

3    for your own medical condition while working for CHS?

4        A    I -- I know I requested reasonable

5    accommodations for my medical condition.

6        Q    Okay.

7        A    But I can't recall -- I don't -- I don't

8    recall -- I mean, I went out on FMLA at HHC with the

9    pregnancy stuff, but --

10       Q    Okay.

11       A    -- I don't think I -- I don't think I did.

12       Q    Okay.

13       A    I know I did request reasonable

14   accommodations for myself.

15       Q    Okay.  And were those reasonable

16   accommodation requests granted?

17       A    No.

18       Q    No?  Okay.  What was your request?

19       A    To be returned to my previous shift that had

20   been my shift at Bellevue when I was grandfathered in

21   and that I was promised I would be able to keep.

22       Q    Okay.

23       A    And also possibly a split shift and some

24   partial remote work.

25       Q    Okay.  And is it your testimony that your

Melissa Kaye

Page 303

1   reasonable accommodation request was flatly denied, or

2   was there some modification given to you for your

3   medical condition?

4                MS. HAGAN:  Objection to form.

5                THE WITNESS:  All I recall is that I

6   think they said that -- I think the split shift --

7   they didn't really -- it wasn't like I got to talk to

8   anybody.  I was kind of -- I was called on the phone.

9   I didn't get to have a discussion.  This person -- I'm

10  trying to think of his name.  I think it was Kevin

11  Marazzo [ph] and there was this other person --

12  Gardner [ph] or -- with an R.  Robert or Randy,

13  Ronald.  Somebody Gardner.  These were the two people

14  I had interacted with over email mostly.  Maybe one or

15  two phone calls.

16  BY MS. CANFIELD:

17       Q    Okay.  And what did they tell you in

18  relation to your accommodation request?

19       A    Well, I didn't really get to interact with

20  management.  They would just give me these, like --

21  these vague kind of -- well, you know -- like, Jain

22  never talked to me about it.  Ford never talked to me

23  about it.  Yang never talked to me.  Wangel never

24  talked to me.  Macdonald never talked to me.  No one

25  ever talked to me.  They avoided me like I was

Melissa Kaye

Page 304

1   radioactive because I had dared to ask for equal pay.

2         So it -- he just would -- he called me up.

3   He sounded like an old man.  He sounded a little -- I

4   don't know.  Just old.

5       Q    Who is "he"?  The EEO person?

6       A    Yeah.  Marazzo I think.

7       Q    Okay.

8       A    And he -- he said --

9       Q    What did he say?

10      A    That my -- my request for a split shift was

11  denied.  My request for a return to my previous shift,

12  which was, you know, eight and a half hours.

13  Everybody else was working eight hours.  How can you

14  say that I needed to be there nine hours?  That's

15  crazy.

16      Q    Okay.  So what did he tell you about that --

17  returning to your prior shift?

18      A    And he said something like -- that because I

19  -- that he was told that because I had an EEOC

20  complaint, they were told to do nothing and that they

21  weren't going to allow me to do anything because

22  something like -- he said something like it was

23  because of my EEOC complaint, that they weren't going

24  to give me my shift back.  And by the way, my -- my

25  union was told the same thing by Wangel, about the

Melissa Kaye

Page 305

1   harassment around the educational leave and the shift

2   change.  He told my union member that it was because

3   they were -- about my EEOC complaint and that my union

4   member --

5        Q    So it's your testimony that your reasonable

6   accommodation was never granted?

7        A    I never got my shift returned to what it was

8   supposed to be before the retaliatory, harmful shift

9   change.

10       Q    Did you get any adjustment to your shift as

11  a result of your reasonable accommodation request?

12       A    Nothing that was reasonable.  They -- they

13  said that I could come in at 9:00 and leave at 6:00,

14  or come in even sometimes at 10:00 and leave at 7:00.

15  That's not reasonable.  That was not -- that doesn't

16  -- that didn't help me because either I had problems

17  on the front end or problems on the back end.  And all

18  they needed to do -- it wasn't going to cost them a

19  dime.  It wasn't going to impact the service in one

20  iota of a way, is to give me back the shift that they

21  promised I was going to have when I rolled over, but

22  they knew that if they kept torturing me with this

23  shift change, that it would force me out the door.

24  And the goal was to force me out the door, and I know

25  that because Dr. Jain in a meeting that I had with him

Melissa Kaye

Page 306

1    in October 2018, he didn't want to meet with me.  He

2    would avoid me like the plague.  I kind of got him to

3    come into my office that day.  I wrangled him into my

4    office.  He reluctant -- he kept saying he had to go

5    to Brooklyn, he had to do this, he had to do that.

6    But I got him into my office and I complained about

7    the shift change and he said something to me that was

8    causing this -- it was like killing me.  And he said

9    something like, you know -- I talked about the

10   hardship of my kids and stuff like that, and he said

11   that childcare issues aren't a concern for CHS.

12   Something like that.

13           And I did get upset.  I started to cry.  I

14   was like, "I'm going to have to quit.  This is going

15   to -- you know, force me to resign."  And he became,

16   like, so excited when I said that.  He's like, "Well,

17   what's your resignation date?  When are you going to

18   resign?"  I'm going -- I'm going to AAPL, which is the

19   American Academy of Psychiatry and the Law.  And

20   there's job postings there and I -- I can fill your

21   position.  I need to know what -- and he kept

22   pressuring me, like, when I was leaving.  And -- and

23   to give him a resignation date.

24           And then the other thing that they kept

25   doing to humiliate me was to put me into People Soft

Melissa Kaye

Page 307

1   and make Dan Mundy the -- the -- my direct report-to.

2   So he kept getting emails coming --

3        Q    Okay.  Why do you think that -- okay.  So

4   you're saying that the People Soft and sharing your

5   personal information, I think that's how you

6   characterized it in the complaint, was in retaliation

7   for your complaint?

8        A    It was just very suspicious.  It kept

9   happening over and over again.

10       Q    Okay.  And so what reason would they do

11  that?  You had given some things that you believe why

12  they had changed your shift and you said the HIPAA --

13       A    I --

14       Q    Hold on.  You said the HIPAA changes, your

15  pay equity -- complaints, pay equity complaints and

16  private practice complaints.

17            What I want to know is are there any other

18  complaints that you made that you believe caused

19  retaliation, whether denying reasonable accommodation,

20  denying FMLA, any problems with People Soft, any

21  problems with timekeeping in Chronos?  What else did

22  you complain about that you believe caused

23  retaliation?

24       A    I complained about the private practice to

25  either IG or DOI.  I complained --

Melissa Kaye

Page 308

1        Q     When did you do that?

2        A     It was -- it came out in July-ish.  I think

3    I did that in September.  Early -- early September,

4    late August.  I don't know.

5        Q     Of 2018?

6        A     September -- yeah.

7        Q     And how did you complain to DOI?

8        A     I called them from my office.

9        Q     You called them from your office?  Did you

10   ever follow-up with --

11       A     Actually -- was --

12             THE REPORTER:  I'm sorry.  What was the

13   question?

14             THE WITNESS:  -- from her office, yeah.

15             MS. CANFIELD:  I asked her how she

16   complained to DOI about the private practice policy.

17   BY MS. CANFIELD:

18       Q     And you just testified you called them from

19   your phone in your office?

20       A     I think it might have been in LaKeisha's

21   office that I called them from.  It might have -- my

22   office of LaKeisha's office.

23       Q     And did --

24       A     I'm not 100 percent it was DOI.  It was some

25   kind of number, like, report -- you know, concern kind

Melissa Kaye

Page 309

```
 1     of public fraud number.  And I believe it was -- I
 2     don't know if it was like some number that HHC had on
 3     its website to report fraud.  I'm -- I'm -- I'm -- I
 4     don't know if it --
 5          Q    Did you actually speak to a person or did
 6     you have to leave a message?
 7          A    No.  I spoke to a person several times.
 8          Q    And what was that person's name?
 9          A    I didn't -- I don't know.
10          Q    Did you ever have follow-up email
11     conversations with this person?
12          A    He told me to call back in a month, and I
13     did.  And he told me it was still being investigated.
14          Q    And you talked to him several times, but you
15     don't know his name?
16          A    Uh-uh.
17                    THE REPORTER:  Please verbalize your
18     answer.
19                    THE WITNESS:  No, I don't.
20     BY MS. CANFIELD:
21          Q    Did he ever send you an email?
22          A    No.
23          Q    Did he request information from you byway of
24     email?
25          A    No.
```

Melissa Kaye

Page 310

1        Q     Did you ever email him information?

2        A     No.

3        Q     Okay.  Did you go and sit for an interview

4    with DOI?

5        A     No.

6        Q     Okay.  Any other complaints besides the

7    private practice complaint you made to Dr. Jain, DOI,

8    the HIPAA release complaints and the pay equity

9    complaints?

10        A     I complained to COB.

11        Q     COIB?

12        A     Yeah, COIB.

13        Q     About the private practice policy?

14        A     Yes.

15        Q     Okay.  And when did you do that?

16        A     I did it twice.  The first time I did it not

17    -- not too long.  After I realized that they weren't

18    going to take me seriously and that I was getting

19    information that Dr. Mundy was rigging exams.

20    Elizabeth Owen was rigging exams, in cahoots with

21    attorneys.  I --

22        Q     Did you complain to anyone that they were

23    rigging exams?  That Dr. Owen and Dr. Ford were

24    rigging exams?

25        A     Yeah.  No, Dr. Mundy.

Melissa Kaye

Page 311

1          Q     Who'd you complain to?

2          A     Dr. Ford wasn't doing exams.  It wasn't Dr.

3     Ford.

4          Q     Who did you complain to about Dr. Owen

5     rigging exams?

6          A     In that meeting in -- with Dr. Jain, in

7     October of '18, I -- he -- I was complaining that

8     Mundy was being -- that I was being put under Mundy's

9     supervision.  And I think it happened -- I know it

10    happened, like, three or four times over the course of

11    the CHS when I was under the auspice of CHS.

12         Q     Okay.  Are you talking about the emails that

13    he -- on which he was copied?  Where you claim that

14    your personal information was being shared?

15         A     Yeah.  He got a copy of the FMLA.  And he --

16    so I -- and I had gotten upset about that, so I was

17    being reprimanded for getting upset about that by Dr.

18    Jain in that meeting.

19         Q     Okay.

20         A     And I said, "I do not want" -- you know, "I

21    am not comfortable with Dr. Mundy's behavior and what

22    he does and how he was hired."  And I explained how

23    when I was talking to Dr. Mundy when he was thinking

24    about getting the job for directorship, and Elizabeth

25    Owen had been elevated to this kind of administrative

Melissa Kaye

Page 312

1    role in CHS by -- by Patsy Yang.  And she was

2    interviewing people.  I know she interviewed Dr. Jain.

3    She interviewed Dr. Mundy.  She interviewed Dr. Barry.

4    Anybody who she was interviewing -- she was like part

5    of the leadership administrative team.

6              And Mundy told me -- he's like, "Well, you

7    know, I got interviewed and I had to agree that, you

8    know, if" -- you have to remember, Elizabeth Owen was

9    in charge of that pilot -- the Queens pilot project

10   and they were obsessed with cutting -- cutting the

11   turnaround time and the numbers down and getting,

12   like, manufacturing the statistics about how

13   successful it was.  So any delay in a case was going

14   to mess up their optics.

15             So he said that he -- Elizabeth Owen said,

16   you know -- that he agreed as part of being hired that

17   he would "cut corners and do a less thorough job" on

18   -- on exams and find people unfit, especially

19   misdemeanors, to get them off the island.  That's what

20   he told --

21        Q    Who said that?

22        A    Mundy told me that.  And so --

23        Q    So he would find people unfit to get them

24   off the island.  And why is that?

25        A      He -- he told me that part of being hired

Melissa Kaye

Page 313

1    was to agree to do a less thorough job to find people

2    unfit and get them off the island because of the

3    loophole in New York City -- well, it's New York

4    State.  If you're found unfit on a misdemeanor, your

5    case is dismissed and --

6        Q    Okay.  Wait.  Stop there.  So who -- who --

7                MS. HAGAN:  No, she has to finish.  She

8    has --

9    BY MS. CANFIELD:

10       Q    No.  I want to know who told Dr. Mundy --

11               MS. HAGAN:  No because this goes to her

12   --

13               THE REPORTER:  I'm sorry.  Please speak

14   one at a time.

15               MS. HAGAN:  I'm saying she goes to her

16   constitutional claims and you keep interrupting her

17   every time she talks about her first amendment

18   retaliation claims.

19               MS. CANFIELD:  I'm just trying to

20   figure out the veracity of her testimony.

21   BY MS. CANFIELD:

22       Q    Who did Dr. Mundy say to him -- that told

23   him that he had to find people fit to get them off

24   Rikers in order to get the director position?

25       A    No, that's not what I said.

Melissa Kaye

Page 314

1        Q     Okay.

2        A     He interviewed with Elizabeth Owen for the

3    position as director, and told me that he was informed

4    and had to agree to do a less thorough job and cut

5    corners to find people unfit, not fit.  Unfit.

6    Especially on misdemeanors.  So they're -- to get them

7    off the island.

8        Q     Okay.  So you're saying that Elizabeth Owen

9    interviewed Dr. Mundy for the Manhattan director

10   position and that he told you that Dr. Owen said, "As

11   a condition of your hiring, you have to find them

12   unfit"?

13       A     That's not quite what I'm saying, but he was

14   told to do a less thorough job and cut corners to find

15   people unfit to get them off the island.

16       Q     Okay.  And you're saying --

17       A     That's almost verbatim quote.  He said, "On

18   misdemeanors."  And the -- the -- the CPL 730 law in

19   New York State has a provision that if an inmate -- if

20   a defendant is found unfit on a misdemeanor, his

21   charges are dropped, his case is dismissed and he's

22   released from custody.  So --

23       Q     I understand that.  I understand.  I'm not

24   interested in the law.  What I'm more interested in is

25   this conversation between Dr. Mundy and Dr. Owen.

Melissa Kaye

Page 315

1             This was during his job interview?

2                   MS. HAGAN:  But the law impacts -- it's

3       a matter --

4                   MS. CANFIELD:  I understand the law.  I

5       want to know about the complaint.

6                   MS. HAGAN:  Well, it's a matter of

7       public concern and that's part of her first amendment

8       --

9                   MS. CANFIELD:  I understand, Ms.

10      Hagan.  I want to know who said what when.

11                  THE REPORTER:  I missed what you said,

12      Ms. Hagan.  I'm sorry.

13                  MS. HAGAN:  I said this is part of her

14      first amendment retaliation complaint -- claim and

15      that this is a matter of public concern.  And I asked

16      Counsel to stop interrupting her because she's making

17      the record to substantiate her claim.  That's what I

18      said.

19      BY MS. CANFIELD:

20         Q    I just want to know who said what to whom

21      because as I see it, it's all hearsay.

22              So who said -- you said Dr. Mundy told you

23      that Dr. Owen told him that he had to do a less

24      thorough job in order to find them unfit to get them

25      off Rikers?

Melissa Kaye

Page 316

1              MS. HAGAN:  How is -- had the
2    conversation with Dr. Kaye?  Stop testifying.
3              THE REPORTER:  Please repeat what you
4    said, Ms. Hagan.
5              MS. HAGAN:  I said how is it hearsay if
6    Dr. Kaye --
7              MS. CANFIELD:  It doesn't matter.  It
8    doesn't matter.  This is evidence --
9              MS. HAGAN:  -- with Dr. Kaye.
10             THE REPORTER:  I missed what you said
11   again, Ms. Hagan.  I'm sorry.
12             MS. HAGAN:  How is it hearsay if Dr.
13   Mundy had the conversation with Dr. Kaye?  This is
14   something that she had a conversation with Dr. Mundy
15   about, that he had a conversation --
16             MS. CANFIELD:  I'm not going to go into
17   you about the rules of federal evidence.
18             MS. HAGAN:  Yes.
19   BY MS. CANFIELD:
20       Q    Dr. Kaye, after Dr. Mundy told you this, did
21   you in turn tell someone else about it?
22       A    I told Dr. Winkler and --
23       Q    Okay.
24       A    -- he said, "That didn't happen during my
25   interview."  And I told -- I told Jeff Bloom.  And I

Melissa Kaye

Page 317

1    told --

2         Q    Okay.

3         A    -- and I told Dr. Jain.  And when I told Dr.

4    Jain that I -- you know, about my concerns about Dr.

5    Mundy in general and that it was particularly

6    offensive and concerning to be put as his subordinate

7    --

8         Q    Okay.

9         A    -- and then I told him about this what I

10   call rigging exams.  He told -- he responded to me --

11   he got this very, like -- starting pursing his lips

12   and furrowing his brow.  And he said to me, "We have

13   to make CHS look good.  We have to make CHS look

14   good."  And then he, you know, kept reverting back to,

15   "When are you going to quit?  When are you going to

16   resign?"

17             And then he was very dismissive and callous

18   about my childcare issues, and he had been bragging to

19   me ever since I met him that his wife was a child

20   psychiatrist.  So I -- I asked -- I told him.  I said,

21   "Well, if this is not an issue that, you know, fits

22   into your life experience, why don't you talk to your

23   wife about how difficult it is for a single mother to

24   have her shift changed unnecessarily?"  And then he

25   got very angry with me and he said, "Don't -- don't

Melissa Kaye

Page 318

1   bring my wife into this.  That -- you're being

2   abusive."  And I said, "No.  You know, changing my

3   shift is abusive.  That's what's abusive."

4           And so that was the last time I met with him

5   and I do not believe he followed up on any of my

6   concerns about Dr. Mundy.  And I think I continue to

7   get put under him as his subordinate.

8       Q    Okay.  All right.  I'm going to move on now

9   because we're running out of time.

10              MS. CANFIELD:  Ms. Hagan, I did send

11   you a document.  I sent the court reporter --

12   unfortunately, my comments are on the document, but I

13   don't think it matters much because I'm -- these are

14   comments that I want to ask -- I want to talk to the

15   witness about.

16              MS. HAGAN:  Let her -- I'd like to look

17   at the document first, too.

18              MS. CANFIELD:  Okay.  I'm going to

19   share it.  You can look at it at the same time.  These

20   are the medical records that we received from Dr.

21   Paola Alessio.

22              MS. HAGAN:  Paola.

23              MS. CANFIELD:  Paola Alessio.

24              THE WITNESS:  Paola.  Paola.  It's -- I

25   think it's for Paula in Italian.

Melissa Kaye

                                                    Page 319

1                    MS. HAGAN:  Yeah.

2                    MS. CANFIELD:  So this is a 67-page

3      document.

4                    MS. HAGAN:  Mm-hmm.

5                    MS. CANFIELD:  It's bearing Bates

6      stamps number D001588 to D001654.  The front page is a

7      cover letter from Dr. Alessio indicating that the --

8                    MS. HAGAN:  And I'd like to point out

9      that Counsel was supposed to produce all -- all

10     documents that she subpoenaed and got responses to her

11     subpoenas, and she never produced this document.

12                   MS. CANFIELD:  I'm producing them right

13     now.

14                   MS. HAGAN:  -- before the deposition.

15     I didn't --

16                   MS. CANFIELD:  And --

17                   MS. HAGAN:  -- before the deposition.

18                   MS. CANFIELD:  You can make the record,

19     but the same thing happened during your depositions of

20     the defendants.  So --

21                   MS. HAGAN:  Not true.

22                   MS. CANFIELD:  Okay.  You can take it

23     up with the Court.  These are the medical records that

24     were provided by Dr. Alessio --

25                   THE REPORTER:  I'm sorry.  I can't take

Melissa Kaye

Page 320

1    the record with you both speaking at the same time.

2                   MS. HAGAN:  There's a combination of

3    documents here because you have I guess some kind of

4    medical record production email, but then on top of

5    that, you have the Amended Complaint in here as well.

6    The First Amended Complaint.  Are you trying to

7    introduce both into evidence here?

8                   MS. CANFIELD:  No.  What I have here --

9    it's a 67-page document.  The first page is a cover

10   letter from Dr. Alessio indicating that they received

11   a request for authorizations and that this is the

12   material that's being disclosed.  And close record

13   contains 63 pages.  And there's the -- a note that

14   says 75 cents per page at 42.25.

15                   The next document is a cover letter

16   from my office requesting the information from Dr.

17   Alessio.  And after that is the HIPAA release that Dr.

18   Kaye signed and filled out for the release of the

19   records.

20                   And here's the invoice that Dr. Alessio

21   charged the Law Department for the records.

22                   MS. HAGAN:  Mm-hmm.

23                   MS. CANFIELD:  The records begin on

24   Bates stamped page D001592.

25   //

Melissa Kaye

Page 321

```
 1    BY MS. CANFIELD:
 2         Q    Now, Dr. Kaye, if you look at this document,
 3    it's dated what appears to be a email to Dr. Alessio
 4    from Psychology Today dated January 19, 2019, where
 5    you say, "Hi, Dr. Paola Alessio.  This email comes to
 6    you via your profile at Psychology Today."  From
 7    Melissa, email melissakayemd@gmail.com, and your phone
 8    number.  The subject is "Possible session."
 9              "Hi, I got your name from Marina R.  I'm
10    going through a lot and looking for therapy.  Thanks,
11    Melissa."
12              Dr. Kaye, do you recognize this email?
13         A    I don't, but I sent out of requests
14    beginning in December because I was looking for a
15    therapist since the beginning of -- of December.  So
16    --
17         Q    Okay.
18         A    -- I'm not surprised to -- to see this
19    because it was --
20         Q    Okay.
21         A    -- I was looking for someone to talk to.
22         Q    Okay.  And then there's some correspondence
23    between you and Dr. Alessio about scheduling an
24    appointment.
25              You described her earlier as a bio-energetic
```

Melissa Kaye

Page 322

1    therapist.  What exactly does that mean?

2                   MS. HAGAN:  No, she didn't.  You're

3    mischaracterizing her testimony.

4                   MS. CANFIELD:  Then I'll withdraw the

5    question.

6    BY MS. CANFIELD:

7        Q    It looks here that there's a handwritten

8    note that's dated January 28th, it looks like 2019,

9    where there's some notes perhaps reflecting a

10   conversation that you had with Dr. Alessio about the

11   death of your brother.  And you have two children.

12   You have a boy with health problems and that you're

13   suing your employer.  Does that -- are those three

14   things that you may have shared with Dr. Alessio?

15       A    Yeah.  I was going through a lot of stress.

16   Like I said -- I mean, before my brother died.  And

17   then of course during and after.  So those were

18   stressors in my life, yes.

19       Q    Okay.  I'm going to just turn you to Bates

20   stamped page number D001598.  And it's an email from

21   you to Dr. Alessio dated March 11, 2019, in which

22   you're asking for additional times for therapy because

23   you're meeting with your union.

24                   You say, "The reason is that I have time

25   today.  And Thursday, my union is having a seminar

Melissa Kaye

Page 323

1    about the retirement process, which I will be doing in

2    five months.  So I wanted to attend, if possible."

3                    MS. HAGAN:  Objection.

4                    THE WITNESS:  Yeah.

5    BY MS. CANFIELD:

6        Q    Were you, in March, planning on retiring in

7    five months, which would have been August 2019?

8        A    If things didn't get better at work and I

9    had to, I was going to look in -- I wanted to look

10   into it because it was pretty unbearable.  And this

11   was March 19th.  I had -- I had been going through --

12   it was one thing after another.  The shift change, the

13   -- the mucking around with my time, the non-

14   transparency with my timesheets, the -- being

15   excluded.  I was being harassed and -- and teased by

16   administrative staff.  Andrea Swenson was basically

17   ridiculing me and mocking me and turning her report-

18   tos against me, including LaKeisha.  I mean, people --

19   I'd have a nice conversation with them and then two

20   weeks later, they'd come up to cover in Bronx Court

21   Clinic -- this woman, Anansa Gail [ph] from the --

22   from the Manhattan Court Clinic would come up to cover

23   for -- for LaKeisha.  And she would, like, glare at me

24   and wouldn't even, like, talk to me.  And it was

25   insane.

Melissa Kaye

Page 324

1          And I'd ask for help with the Chronos

2     timekeeping program and -- and I would get made fun

3     of.  I would ask that people --

4          Q    Sorry to interrupt.  Did you share any of

5     this with Dr. Alessio?

6          A    Well, she basically said, "It sounds like

7     it's a snake pit.  You know, you should get out of

8     there."  That was always her -- her position on what

9     was happening to me at work.  That these people sound

10    like --

11         Q    Okay.

12         A    -- horrible and you should -- it's a snake

13    pit and you should get out of there.  I mean, she --

14    she was of the opinion that the work environment was

15    very harmful and negative for me, and I should -- I

16    should get out.

17         Q    Okay.

18         A    -- talked about --

19              THE REPORTER:  What did you say after

20    "I should get out"?

21              THE WITNESS:  We talked about that in

22    my sessions.

23              MS. CANFIELD:  Okay.

24              MS. HAGAN:  And for purposes of the

25    record, this is Exhibit D and it bears the Bates stamp

Melissa Kaye

Page 325

1    D1588 to I think it's D1654.

2                    (Exhibit D was marked for

3                    identification.)

4                    MS. CANFIELD:  Yes.  Thank you, Ms.

5    Hagan.

6    BY MS. CANFIELD:

7         Q    I'm going to direct you to another email.

8    It's Bates stamped D001604.  And it looks like on

9    April 30th of 2019, you informed your therapist that

10   you officially sued --

11        A    Mm-hmm.

12        Q    -- HHC?

13        A    Mm-hmm.

14        Q    Okay.

15                   THE REPORTER:  Please verbalize your

16   answer.

17                   THE WITNESS:  Yes.

18   BY MS. CANFIELD:

19        Q    Okay.  Then -- I'm sorry?

20        A    Yes.  Your -- yes.  Go ahead.

21                   THE REPORTER:  Ms. Hagan, did you say

22   something?

23                   MS. HAGAN:  I asked if there was a

24   question that Ms. Canfield had.

25                   MS. CANFIELD:  I haven't asked it yet.

Melissa Kaye

Page 326

1    BY MS. CANFIELD:

2         Q    In the email -- document Bates stamped

3    number D001606, you again -- you say that you didn't

4    have a chance to review the complaint that was filed,

5    but it looks pretty good.  And that you also send your

6    therapist a copy of the complaint.

7              For what reason did you send your therapist

8    a copy of the complaint?

9         A    Because suing my employer, especially when

10   my employer is New York City, was incredibly stressful

11   and I needed support around it.

12        Q    Okay.  Now you also discuss that you learned

13   on May 6th of 2019 -- and this document's Bates

14   stamped D001608 -- that you learn some information

15   about your family related -- and you -- and related to

16   wishing that your brother was there to process it with

17   you.

18              When did your brother die?

19        A    December 15th or 16th of 2018.

20        Q    Okay.  And was part of the reason that you

21   were seeking therapy was to process the death of your

22   brother?

23        A    It added to my problems.  I started looking

24   for therapy before my brother died, but I started

25   sending out and requesting to find a therapist in

Melissa Kaye

Page 327

1   December before my brother died.  And then after my

2   brother died, it was -- I -- you know, there was as

3   much or more of a need.  I needed support around my

4   being what I felt was being bullied and harassed and

5   pushed out of my job, and then the death of my brother

6   unexpectedly.  And so I was looking for a therapist to

7   talk to.

8       Q    Okay.  And then it appears, too, that you

9   share with your therapist that you -- someone had

10  notified you that you had a half-brother; is that

11  true?

12      A    Yeah.

13           MS. HAGAN:  Objection.

14           THE WITNESS:  Well, I had gotten an

15  email from this woman, Gaye [ph], who is a third

16  cousin.  You can read the email.  And apparently, you

17  know, shortly after my brother died -- my brother died

18  in December.  This is May.  She told me that through

19  some kind of ancestry.com or 123 DNA or whatever those

20  sites are, that she had gotten this close match with

21  -- with this person.  And it turned out that the

22  person was my father's son, who my father never knew.

23  We didn't know that he had fathered this person,

24  Jonathan, before he left Brooklyn, before he left New

25  York, before he met my mom, before he married her,

Melissa Kaye

Page 328

1   before I was born.

2               He was -- I guess Jonathan was -- I

3   don't remember.  I think it turned out that he was

4   maybe five years older than me.  And so it was pretty

5   shocking and, you know, it would -- he would have also

6   been -- my brother who died, he would have also been

7   -- Jonathan would have been my brother's half-brother,

8   too.

9               So it was shocking news, and then my

10  brother was gone so I didn't really -- the one person

11  that, you know, it would have impacted the most was my

12  -- my brother who had died.

13              And so I had to -- so I started

14  communicating with this person, Jonathan, who is my

15  unknown half-brother through my father.

16  BY MS. CANFIELD:

17      Q    And do you have a relationship with this

18  individual now?

19      A    I was in touch with him.  I met him.  He had

20  -- ironically, he had ties to Manhattan and the

21  Pentagon, just like my brother who passed away did.

22              And I did meet Jonathan and I was scheduled

23  to meet him and his daughter, Rebecca, who would be my

24  niece.  And then Jonathan had some kind of incident

25  where he fell and had hurt his -- got a head injury

Melissa Kaye

Page 329

1   and he was going to reschedule, and then the pandemic

2   hit.   And I don't know, I just -- I never heard from

3   him after the pandemic.   And I've thought about

4   reaching out to him, but my life has been -- like

5   everybody's -- you know, turned upside down.   And the

6   lawsuit continues to drag on and I'm having employment

7   issues because of the retaliatory disciplinary

8   actions.

9            So I have a very full plate and I did not

10  reach out to him since the pandemic hit, and he did

11  not reach out to me.   So --

12       Q     Okay.

13       A     -- I would say prior to the pandemic, yes,

14  we were in touch and we were communicating, and we had

15  met on one occasion.

16       Q     Okay.   I also want to point you to an email

17  Bates stamped D001621.   Which you -- before you sent a

18  picture of Dr. Ford in what looks like an article

19  concerning a book that Dr. Ford has written?

20       A     Mm-hmm.

21       Q     And you refer to her as -- you state as the

22  subject matter of the email, "She's as much politician

23  as a doctor.   Very power-hungry."

24            It sounds like that you dislike Dr. Ford

25  very strongly; is that fair to say?

Melissa Kaye

Page 330

```
 1                   MS. HAGAN:  Objection.
 2                   THE WITNESS:  I wouldn't categorize
 3      that.  I -- I don't respect Dr. Ford.  She engages in
 4      a lot of forensic and clinical practice violations
 5      that are harmful to the courts, that are harmful to
 6      patients.  She behaves inappropriately with patients.
 7      She puts herself -- she says that she's in love with
 8      her patients and allow -- allows them to use her as a
 9      masturbatory tool.  She doesn't believe in record
10      review, that's why Nicolas Feliciano is braindead.
11      She tried to ruin my career because I wanted to use
12      unredacted records.  She lied and said that's the
13      standard, and it's not the standard.
14                   So I don't respect her.  I don't think
15      she's a nice person.  She didn't give -- when my -- in
16      2012 and I sent her an email that my father had died
17      and I was going back to Colorado for the funeral, she
18      never even responded to the email.  And I just thought
19      that was pretty telling and pretty cold.
20                   And then similarly, when my brother
21      died in 2018, she was -- she never offered any
22      condolences and she never acknowledged it.  And --
23      went through the -- I mean, sorry.  Dr. Jain went
24      through the motions and sent me an email asking if
25      there was anything he could do.  It was kind of
```

Melissa Kaye

Page 331

1   proforma.  And then when I actually asked him -- I

2   said, "Yes.  There's something you can do.  You can

3   restore my shift to what it was before," because

4   things were bad and really hard for my kids and -- and

5   me before my brother died.  And they're even worse

6   now.

7               I have two grieving children.  I have a

8   grieving mother.  I'm grieving.  Please give me my

9   shift back.  And then he forwarded that to Dr. Ford

10  who writes back, "Ignore this."  I mean, who acts like

11  that?  And then she puts -- and then she puts herself

12  out as being concerned about her staff and staff

13  trauma, and being transparent and being supportive and

14  -- and talking to people and talking things out.  She

15  never spoke to me.  She -- she had one meeting with me

16  that I forced her to have in November 2018.  And she

17  cut the meeting short.

18              So I don't -- I don't appreciate the

19  hypocrisy.  I don't appreciate the boundary

20  violations.  I don't appreciate the -- being sloppy in

21  the way she practices medicine and then putting

22  herself out there as some kind of -- some kind of

23  social justice reformer when it's all about selling

24  her books and -- and -- and giving talking points.

25  //

Melissa Kaye

Page 332

1    BY MS. CANFIELD:

2        Q    Okay.

3        A    And she discriminated against me and she

4    didn't -- she's married to a very wealthy man who

5    comes from old money in Texas, hobnobbing with the

6    Bush family.  I mean, she doesn't have to worry about

7    supporting her kids, and yet she couldn't -- she could

8    care less about me getting paid less than my male

9    colleagues, and she didn't -- and then she retaliates

10   against me and tells me, you know, she doesn't let me

11   come to the work group.  She tries to whip up a storm

12   against me because I want to use unredacted records,

13   and the Court's in agreement, and Winkler's in

14   agreement, and Jain's in agreement.  I mean not Jain,

15   and Colley's in agreement, and Ciric's in agreement.

16   And then she turns everybody against me?  I mean, it's

17   mean.  She's mean.

18       Q    Can I ask you a question?  Was the issue

19   with the redacted medical records in 2015, was it so

20   much the redacted records or the fact that was

21   upsetting, or the fact that you refused to conduct the

22   evaluation at all?

23           MS. HAGAN:  Objection.  Objection.

24   Mischaracterizes the -- that actually does -- it

25   mischaracterizes Dr. Kaye's testimony, assumes facts

Melissa Kaye

Page 333

1     that were not discussed.

2                    MS. CANFIELD:  It's just a question.

3     She can deny it.  Just a question.

4                    MS. HAGAN:  The best she understands

5     the question.

6     BY MS. CANFIELD:

7          Q     Did you refuse to conduct the competency

8     examination without the unredacted records?

9          A     Dr. Winkler and I both informed the courts,

10    and Dr. Ciric and Dr. Colley were in agreement, that

11    we cannot discharge our duty and do a full competency

12    exam with redacted medical records.  And that using

13    redacted medical records does not inform -- properly

14    inform the Court about some -- we are unable to inform

15    the Court about someone's capacity with -- for me,

16    with a reasonable degree of medical certainty.  And --

17         Q     So now when Judge Torres was going to hold

18    HHC in contempt, was that because we would not turn

19    over the redacted records -- unredacted records or is

20    that because we weren't conducting the competency

21    exam?

22         A     Well, that's a misstatement and that speaks

23    to all the rumor mill that these people base their

24    hatred and retaliation on.  And it's all rumors.

25                    Judge Torres was never going to hold HHC or

Melissa Kaye

Page 334

1    CHS in contempt.  That is misinformation and if

2    anybody had spoken to me and asked me about the

3    situation in a professional and appropriate manner,

4    they would know the facts and not be basing the

5    decision to manage me out on rumor.

6              No.  Judge Torres was the chief

7    administrative judge in the Bronx.  He was not going

8    to hold CHS in contempt.  It was Judge John S. Moore

9    who had ordered records, who was in Treatment Court,

10   in Youth Court, in Sex Offender Court, and had

11   previously been a bureau chief under Morgenthau.  He

12   was a very seasoned and experienced judge who

13   understood criminal mental -- criminal law and mental

14   health issues.  And he ordered records for a certain

15   case because obviously, if there's HIV-related

16   information, that is -- you know, psychiatry is a

17   medical subspecialty.  People get cognitive -- the

18   cognitive difficulties.  They can become psychotic.

19   They can develop mood symptoms.  They can have all

20   kinds of problems related to HIV that directly have a

21   bearing on their capacity.  And similarly with

22   substance abuse.  So --

23        Q    Okay.  And --

24        A    -- I refuse -- no, I need to finish because

25   I did not refuse to do anything other than I told the

Melissa Kaye

Page 335

1    courts I could not render an opinion with a reasonable

2    degree of medical certainty because it -- and Dr.

3    Winkler supported this opinion.

4            The argument was I couldn't know what was

5    redacted and say that it didn't matter.  She wants --

6    Ford wanted us to do this illogical thing where you

7    say, oh, you tell the courts that this is our opinion

8    and what -- you know, and so -- and we are going to

9    say this opinion because -- and we don't know what's

10   redacted, but because we're going to mention that it

11   doesn't affect the opinion.  Well, how can you say it

12   doesn't affect the opinion if you don't know what's

13   redacted?  It's an illogical argument.  And I opposed

14   violating a defendant's constitutional right to a fair

15   trial and due process by rigging these competency

16   exams because CHS chose to not address their concerns

17   with the Court directly.

18           If Judge Moore ordered unredacted records,

19   it was the obligation of HHC/CHS to challenge that in

20   court.  And that's what Judge Moore pushed them to do.

21           He said, "You do not defy it."  It is

22   unheard of for an agency to receive a judicial

23   subpoena for unredacted records and to turn over

24   redacted records.  It's unheard of.  And he wanted

25   Deandra Newton [ph], who was HHC counsel involved in

Melissa Kaye

Page 336

1    this -- and it was also Lucy Calterjeroni [ph] or

2    something.  She was involved in this -- an HHC lawyer.

3    She wanted them -- he wanted them in their court room.

4    And legal aid was up in arms because this was

5    happening -- this had happened on six cases.  And

6    under no circumstance were they going to allow this to

7    happen.

8            And Judge -- and they went to Judge Torres

9    to tell him this was happening in multiple court

10   rooms.  It was Judge Moore, Judge Lieb.  And I -- yes.

11   I'm not going to violate a defendant's constitutional

12   rights because CHS thinks that they can just

13   "wantingly" be in contempt of court.  No.

14       Q    Okay.  Okay.  Okay.  I'm going to stop you

15   there.  Thank you very much.  Let's go back to this

16   document because I want to get through it.

17           So on August 14th -- and the document's

18   Bates stamped number D001627 -- you notified Dr.

19   Alessio that you have to cancel your appointment

20   because you need to get your son into therapy.

21           What type of therapy did you need to get

22   your son into?

23               MS. HAGAN:  Objection.  Relevance.  And

24   we're not going to -- she's not going to answer that

25   question.

Melissa Kaye

Page 337

BY MS. CANFIELD:

1   Q    Let me ask you this.  Do you believe your

2   son needed to get into therapy because of the -- your

3   work situation?

4   A    It was stressing both of my children out

5   excessively, that's for sure.

6   Q    Okay.  Then it's relevant to litigation.

7        So what type of therapy were you --

8   A    May I read this?  Because I --

9   Q    Yes.

10  A    -- I'm not sure.  I'm not sure.  This is

11  August 2019.

12          MS. HAGAN:  Can you enlarge this so

13  that I can see this?

14          THE WITNESS:  Yeah.  I'm literally

15  squinting here.  Oh, I'm sorry.  Now it's like I can't

16  see it.  Can you -- please, Counselor, can -- oh, I

17  can't see it.

18          MS. CANFIELD:  Is that too big?  It's

19  off my screen.

20          THE WITNESS:  Yeah.  It -- that's --

21  yeah, just let me try to read it.  If we could just --

22  I -- I'm trying to think.  I had -- it's just I'm

23  trying to think back to August.  It's hard because my

24  son had services and I guess I was getting him --

Melissa Kaye

Page 338

1          I mean, the stress of all this was --
2     was not nothing.  So yeah, I was -- I had my kids in
3     therapy.  So, yeah.  I mean, I'm remembering I had my
4     kids in therapy.
5          I was hoping that, you know --
6     BY MS. CANFIELD:
7        Q    What type of therapy were your children
8     involved in?
9                MS. HAGAN:  Objection.
10               THE WITNESS:  I -- whatever -- just the
11    -- it was not a specialized therapy.  It was just
12    typical, supportive psychotherapy for -- for them.  It
13    wasn't -- are you asking was it -- what type of
14    modality of therapy was being used for -- for the
15    treatment?
16    BY MS. CANFIELD:
17       Q    I guess what I'm asking is are you seeking
18    damages related to what you claim is harm against your
19    children as a result of the actions of HNH and the
20    individually named defendants?  Are you claiming that
21    your children were harmed as a result?
22       A    Well, absolutely unequivocally my children
23    were harmed, and they're still being harmed.
24       Q    Okay.
25       A    But, you know, the damages as they're stated

Melissa Kaye

Page 339

1    in the complaint written in 2019 are -- are very

2    different than -- and less than the damages now.  I

3    mean, I -- I'm -- I suffered retaliatory disciplinary

4    actions that have seriously impacted my professional

5    career and my ability to be gainfully employed.

6              So, yeah.  My children were hurt and they --

7    they've suffered and there's no question about that.

8    So -- yeah.

9        Q    Okay.  So let me ask you, how have -- how

10   has your son been impacted by your employment

11   situation with CHS?

12             MS. HAGAN:  I'm going to object.  I

13   mean, are you asking if Dr. Kaye is seeking monetary

14   damages for the impact of these -- of her employment

15   on her children?

16             MS. CANFIELD:  Yes.

17             MS. HAGAN:  Because --

18             MS. CANFIELD:  She just said yes.

19             MS. HAGAN:  No, she didn't say that

20   she's seeking monetary damages for that.

21             Did you testify to that, Dr. Kaye?

22             THE WITNESS:  I was asked if my

23   children have been harmed by the -- all the

24   retaliation that I suffered.  The -- the lawsuit, the

25   stress, the --

Melissa Kaye

Page 340

1              I mean, this is -- I have to turn this

2     -- now I'm getting calls about them.  I'm getting

3     calls about the children.

4                    Now let me just state --

5                    MS. HAGAN:  I think we've reached seven

6     hours at this point.

7                    THE WITNESS:  What I said was that the

8     stress of -- of the viciousness and targeting of me

9     because I was unwilling to stand by and allow the

10    criminal justice system to be corrupted and perverted

11    by CHS so they could manufacture optics and statistics

12    that they're reforming in court.  You know, justice --

13    criminal justice reformers.

14                   You know, I mean I think that I was

15    targeted and pushed out of my job.  Now I'm unemployed

16    and I'm having trouble, and I will continue to have

17    trouble for the rest of my career because of the --

18    being falsely accused of violating HIPAA in the course

19    of practicing forensic psychiatry, which makes no

20    sense.

21    BY MS. CANFIELD:

22         Q    But, Dr. Kaye, you're going off the topic.

23    I'm going to ask you about that.  What I want to know

24    is you said that your children have been affected --

25    negatively affected by your employment situation at

Melissa Kaye

Page 341

1   CHS.  What I want to know is are you seeking

2   compensatory damages on behalf of your children

3   because they suffered?

4        A    I -- I mean, I don't know how my

5   compensatory damages would be calculated and what goes

6   into it.  I know that they've been harmed.  I know

7   that they continue to be harmed.  I know that my

8   career has been ended.

9        Q    Okay.  Hold on about your career.  I just

10  want to know about your children.  If that's what

11  you're claiming, then I'm going to call for HIPAA

12  releases so I can get the therapy records of your son

13  and your daughter --

14                  MS. HAGAN:  She's not claiming --

15  BY MS. CANFIELD:

16       Q    -- because we are -- Magistrate Judge Codd

17  [ph] said that this is something I could pursue if

18  that was in fact --

19                  MS. HAGAN:  She didn't say she was.

20  She didn't say she was seeking --

21                  MS. CANFIELD:  She just did say that.

22  So unless -- so, Ms. Hagan, we can take this off the

23  record.

24                  Unless there's a stipulation that she's

25  not seeking damages related to their harm, then I'm

Melissa Kaye

Page 342

1    entitled to those records.

2              MS. HAGAN:  Uh-huh.  Well, we'll have

3    --

4              MS. CANFIELD:  Maybe this is something

5    that I can -- we can write to the Court and I can call

6    the witness back.  And I can ask her about her son and

7    daughter's therapy.  I mean, she clearly says that her

8    daughter's in therapy, and her son, she's trying to

9    get him into therapy.  So why don't we put that --

10   we'll mark this for --

11             MS. HAGAN:  -- medical license --

12             MS. CANFIELD:  Excuse me.  We'll mark

13   this --

14             THE REPORTER:  I'm sorry, Ms. Hagan.

15   I'm missing almost everything --

16             MS. CANFIELD:  Ms. Hagan, let me make

17   the record please.  You can make it after I've

18   finished.

19             MS. HAGAN:  -- asked her about the harm

20   to her medical license and her ability to practice --

21             MS. CANFIELD:  I haven't gotten there

22   yet.  Please, stop.

23             THE REPORTER:  I'm sorry.  I'm sorry.

24   I'm sorry.

25             Ms. Hagan, please, what did you just

Page 343

1    say?

2                    MS. HAGAN:  I said Ms. Canfield needs

3    to ask her about the -- about the harm to Dr. Kaye's

4    medical license and her ability to pursue a medical

5    license in New Mexico.  Because those are the things

6    that she has been complaining about, and Ms. Canfield

7    has known about those things as recently as when we --

8    the parties met for the settlement conference.

9                    So I don't believe that Ms. Canfield's

10   asking these questions in good faith.  In fact, I

11   believe that she's trying to intimidate and harass Dr.

12   Kaye because Dr. -- we are at the seven-hour mark.

13   And Ms. Canfield has not in good faith asked questions

14   about the damages that Dr. Kaye has sustained.

15   Instead, she's trying to harass Dr. Kaye instead of

16   using the time wisely and judiciously.

17                   MS. CANFIELD:  Are you finished, Ms.

18   Hagan?

19                   MS. HAGAN:  Yes, ma'am.

20                   MS. CANFIELD:  I am not.  I am just

21   trying to clarify because if you are seeking damages

22   on behalf of the harm that you claim your children

23   have suffered, then we are entitled to see what that

24   alleged harm is.

25                   MS. HAGAN:  And she's never said she

Melissa Kaye

                                              Page 344

1    has.

2                    MS. CANFIELD:  She --

3                    MS. HAGAN:  -- had this discussion on

4    multiple --

5                    MS. CANFIELD:  Okay.  So we're going to

6    mark this and we're going to write to the Court about

7    it.

8                    MS. HAGAN:  Yes.

9                    MS. CANFIELD:  We will write to the

10   Court.

11                   MS. HAGAN:  Yes.

12   BY MS. CANFIELD:

13        Q    All right.  So you also, Dr. Kaye, in the

14   second paragraph say that, you know, the City answered

15   the complaint instead of trying to get it dismissed.

16   Special says this is a good sign.  We are waiting for

17   an assigned mediator.  And then you say here in the

18   fifth sentence, "Against my lawyer's advice, I am

19   going to resign soon."

20        A    Mm-hmm.

21        Q    Okay?

22        A    Mm-hmm.

23        Q    So had you decided at that point that you

24   were going to resign from your position at CHS?

25        A    Well, I --

Melissa Kaye

Page 345

1              MS. HAGAN:  Objection.

2              THE WITNESS:  -- I had decided that it

3     was such a hostile and abusive work environment, and I

4     was having cardiac palpitations.  I was having my IBS

5     -- my irritable bowel syndrome.  All of these stress-

6     related symptoms were going through the roof.  I was

7     just -- I was -- I was under attack.  Every day it was

8     something.  Every day I would -- I would ask the

9     clerical staff and Ms. Swenson not to -- to run the --

10     the coffee maker and the microwave at the same time

11     because it caused the circuits to blow and I'd be --

12     my -- my lights would go out.  My computer would go

13     out.  And I just made that simple request and they

14     were mocking me and -- and acting like it was just

15     this most ridiculous thing.  And then they would go

16     deliberately do it to make my -- so I couldn't work.

17     I mean, it was just sabotage.  It was awful.

18              And I loved my job.  I was very good at

19     my job.  I had strong relationships with --

20     professional relationships with all the stakeholders.

21     The judges, the -- the defense, prosecution.  I was --

22     I was -- I was trusted and I was respected and I took

23     my work very seriously.  And I -- I believed that my

24     work was important.

25              And I stepped outside of my job because

Melissa Kaye

Page 346

1   I saw how CHS was intentionally cutting corners and

2   altering the results of the exams in conjunction with

3   MOCJ, so -- so they could empty Rikers through the

4   back door.  This was all pre-bail reform.

5                    And -- and Ford was abusive and Jain --

6   Dr. Jain had stopped speaking to me.  He would come up

7   to the Bronx and he wouldn't even knock on my door and

8   tell me he was there.  And he would --

9   BY MS. CANFIELD:

10       Q    Okay.  Okay.  I'm going to stop you right

11   there.  You already testified to that, so I'm going to

12   move on, okay?

13            I'm going to share the screen again.  This

14   next email to Dr. Alessio, it's Bates stamped D001635.

15   And you say, "Sorry.  Now they're coming up to monitor

16   me.  I may have to take 4:00 p.m. on Thursday if it's

17   still available."

18            Who is "they" and why did you believe that

19   they were monitoring you?  This is dated September 10,

20   2019.

21       A    September 10th --

22                    MS. HAGAN:  And objection to form.

23   It's a compound question.

24                    THE WITNESS:  2019.  Well, they were

25   definitely tracking me.  They had --

Melissa Kaye

Page 347

```
1    BY MS. CANFIELD:
2         Q    Who's "they"?
3         A    Well, CHS leadership.  Yang, Wangel, Jain,
4    Ford.  They had this -- this psychologist that they
5    had hired tracking me.  They -- I'd hear them talking
6    about me.  "Is she here?  What is she doing?"
7              They -- they -- the office that I had --
8         Q    Well, excuse me.  Let me stop you.  You said
9    they hired a psychologist to track you?
10        A    No, I didn't say that.  I said they had a
11   psychologist up there and I caught her -- she had --
12   she got off at 5:00.
13        Q    What was her name?
14        A    Anansa Brayton.  And I also had in my office
15   as I said, the circuits kept blowing and it was dark
16   and I couldn't use my computer and there was a bad
17   cell phone reception there to start with.  So we had
18   an -- defendant office down the hall and across the
19   little -- like, down the hall and around the corner.
20   And I would go in there to work and Anansa Brayton
21   would come in and she -- to see if I was there, and
22   then she would make up this excuse.  "Oh.  Oh, I'm
23   here looking for my shredder."  Just these completely
24   implausible excuses.
25              One time when I had taken the shift from
```

Melissa Kaye

Page 348

1    9:00 to 6:00 --

2         Q    Let me ask you.  You said --

3         A    But I want to finish --

4         Q    But I'm confused.  You said that Dr. Brayton

5    came into your office to see if you were there, to spy

6    on you?  But you're saying -- sorry.  Now they are

7    coming up to monitor me  Wasn't Dr. Brayton assigned

8    to the Bronx Court Clinic?

9         A    Right, right.  But I'm just saying that --

10   then I --

11                   THE REPORTER:  Assigned to the Bronx

12   what?

13                   MS. CANFIELD:  Court clinic.

14                   THE WITNESS:  So I -- I would get --

15   and this one day I was getting off at 6:00, she got

16   off at 5:00.  And I had been in the out-defendant

17   office and I -- I was coming back to my other -- my

18   main office.  It was like ten of 6:00 -- quarter of

19   6:00.  And she was there walking around looking for

20   me.  And she got caught red-handed.  And I asked her

21   point blank if she was spying on me and she was -- she

22   was hemming and hawing and she got very nervous and

23   started making excuses that didn't make any sense

24   about why she was there at almost 6:00, an hour after

25   she was --

Melissa Kaye

Page 349

1   BY MS. CANFIELD:

2       Q    But why would she want to spy on you?

3       A    She was being asked to track me.

4       Q    By whom?

5       A    Jain, Ford.

6       Q    Okay.  Do you have any evidence of that

7   other than your own speculations?

8       A    I know I was under surveillance on my emails

9   --

10              THE REPORTER:  I'm sorry.  Please

11   repeat the question.

12              MS. CANFIELD:  I said do you have any

13   evidence of that other than your own speculation.

14              MS. HAGAN:  Objection.  Argumentative.

15              THE WITNESS:  I -- I'm a forensic

16   psychiatrist and I can connect the dots.  It was very

17   obvious that they were doing -- that Anansa was making

18   notes.  And when I would -- she would be in my office

19   and I would just be talking normal, she'd be writing

20   everything down.  And when she -- when I -- I asked

21   her if she was spying on me, she couldn't give me a

22   straight answer.  And she didn't say no and she made

23   excuses about -- brought up Dr. Jain and was kind of

24   rambling about --

25   //

Melissa Kaye

Page 350

1    BY MS. CANFIELD:

2        Q    Okay.  So other than Dr. Brayton, was anyone

3    else monitoring you?

4        A    I think they were all watching me and asking

5    if I was in my office, and if I wasn't in my office.

6    I felt like they were -- and I know they were

7    monitoring my emails.  And --

8        Q    Okay.  Okay.  I'm going to move on because I

9    want to make sure that we get through everything.

10            So --

11                MS. HAGAN:  We're actually at the

12    seven-hour mark.  We're over seven hours, so I'm going

13    to have to -- we're going to have to call this to a

14    close.

15                MS. CANFIELD:  I would like to finish

16    this document and then I will petition the Court for

17    an additional hour, hour and a half.

18                MS. HAGAN:  Mm-hmm.  Okay.

19    BY MS. CANFIELD:

20        Q    So, Dr. Kaye, if you take a look at this

21    document -- it's Bates stamped D001638.  And the

22    subject is "Fwd: case management plan."  And it looks

23    like for some reason, Jeff Bloom sends you the case

24    management plan.

25                How is it that Mr. Bloom had a copy of the

Melissa Kaye

Page 351

1   case management plan?

2        A    What is a case management plan?

3        Q    That's what I want to know.  Why would Mr.

4   Bloom send you a case management plan that you in turn

5   forwarded to your therapist?

6                MS. HAGAN:  Objection.  Could you

7   scroll down further so she can see --

8                MS. CANFIELD:  I can.  And I can show

9   you that the attachment is actually the civil case

10  management plan and scheduling order in this case.

11               MS. HAGAN:  Well, that's a public

12  document.  So --

13               MS. CANFIELD:  I know.  I just have a

14  question.

15  BY MS. CANFIELD:

16       Q    Why you sent it to Jeff Bloom?

17               MS. HAGAN:  She didn't send it to Jeff

18  Bloom.  Jeff Bloom sent it to her.

19               MS. CANFIELD:  Okay.

20  BY MS. CANFIELD:

21       Q    Why did Jeff Bloom send this to you, if you

22  know?

23               MS. HAGAN:  She can't speak for Jeff

24  Bloom.

25               MS. CANFIELD:  But she can answer my

Melissa Kaye

Page 352

```
 1    questions and not you.  Thank you.
 2              MS. HAGAN:  She can't --
 3    BY MS. CANFIELD:
 4         Q    Dr. Kaye, why did Jeff Bloom send you this
 5    case management plan?
 6         A    I don't know.
 7         Q    Is it because your attorney didn't send it
 8    to you?
 9         A    I -- I don't know.
10              MS. HAGAN:  I sent her everything.
11    What are you talking about?
12              THE REPORTER:  I'm sorry, Ms. Hagan.
13    Repeat what you said.
14              MS. HAGAN:  First off, I sent Dr. Kaye
15    everything.  So I'm not sure what she's trying to --
16    record because Dr. Kaye --
17              THE REPORTER:  I'm sorry, Ms. Hagan.
18    You're breaking up.  Please start over.
19              MS. HAGAN:  First and foremost, I'm not
20    sure if Ms. Canfield is on some kind of vendetta, but
21    I talk to Dr. Kaye probably several times a week.  And
22    on top of that, the things that I submitted to the
23    Court I always give to Dr. Kaye.  So I'm not sure what
24    this exercise is about.
25              I mean, you need to use this time
```

Melissa Kaye

Page 353

 1    better.  I mean, are you trying to harass --
 2                    MS. CANFIELD:  Okay.  So let's move on
 3    then.  Dr. Kaye --
 4                    I'm going to move to another --
 5                    THE REPORTER:  I'm sorry.  You're both
 6    speaking at the same time.
 7                    MS. HAGAN:  No, no.  So this isn't
 8    going --
 9                    Dr. Kaye, do I or do I not share the
10    documents that I submit to the Court --
11                    MS. CANFIELD:  Excuse me?  You're
12    burning into my time.
13                    MS. HAGAN:  No, no, no --
14                    MS. CANFIELD:  You have your own time,
15    Ms. Hagan.  Ms. Hagan, you have your own time.
16                    MS. HAGAN:  No, no, no.
17                    MS. CANFIELD:  This is improper.
18                    THE REPORTER:  Just a second.  Just a
19    second.
20                    MS. HAGAN:  Dr. Kaye, I have a
21    question.
22                    THE REPORTER:  Just a second.
23                    MS. CANFIELD:  Please go off the
24    record.  Please go off the record.
25                    MS. HAGAN:  No, don't go off the

Melissa Kaye

                                                      Page 354

1    record.

2                    THE REPORTER:  Just a second.

3                    The time is 6:55 p.m.  We're off the

4    record.

5                        (Off the record.)

6                    THE REPORTER:  The time is 7:06 p.m.

7    and we're back on the record.

8                    MS. HAGAN:  And we've used 7 hours and

9    24 minutes.

10                   MS. CANFIELD:  The stenographer has

11   just notified the parties that this deposition of Dr.

12   Kaye has lasted 7 hours and 24 minutes.

13                   Counsel for the defendants does have

14   some more questioning.  I am requesting an additional

15   hour, an additional hour and a half to get through

16   some of the damages.  There were a lot of allegations

17   in this complaint.  There was also a lot of very

18   length responses from the witness.

19                   It seems based on my conversations with

20   Ms. Hagan that she will not consent to the additional

21   time.  That's fine.  But I do plan on making an

22   application to the Court requesting the additional

23   time so that this case is decided on its merits and

24   not on a technicality.

25                   So we're going to close the deposition

Melissa Kaye

Page 355

1   now.  Dr. Kaye, I apologize for not completing the
2   deposition.  I appreciate your time.  I also
3   appreciate the efforts that you have had to take for,
4   you know, childcare.  I understand the difficulties.
5   But I am -- I haven't finished and I am going to write
6   to the Court to request an additional hour and a half.
7                  So thank you very much.
8                  THE WITNESS:  Thank you.
9                  MS. HAGAN:  Thank you.
10                 MS. CANFIELD:  All right.  We're
11  closed.
12                 THE REPORTER:  The time is 7:08 p.m.
13  We're off the record.
14                 (Signature Reserved.)
15                 (Whereupon, at 7:08 p.m., the
16                 proceeding was concluded.)
17
18
19
20
21
22
23
24
25

Melissa Kaye

Page 356

1           CERTIFICATE OF NOTARY PUBLIC

2               I, EMMANUEL SABATINO, the officer before

3      whom the foregoing proceedings were taken, do hereby

4      certify that any witness(es) in the foregoing

5      proceedings, prior to testifying, were duly sworn;

6      that the proceedings were recorded by me and

7      thereafter reduced to typewriting by a qualified

8      transcriptionist; that said digital audio recording of

9      said proceedings are a true and accurate record to the

10     best of my knowledge, skills, and ability; that I am

11     neither counsel for, related to, nor employed by any

12     of the parties to the action in which this was taken;

13     and, further, that I am not a relative or employee of

14     any counsel or attorney employed by the parties

15     hereto, nor financially or otherwise interested in the

16     outcome of this action.

17                                 *Emmanuel Sabatino*

18

19                              EMMANUEL SABATINO

20                         Notary Public in and for the

21                              State of New York

22

23     [X] Review of the transcript was requested.

24

25

Melissa Kaye

Page 357

1          CERTIFICATE OF TRANSCRIBER

2              I, JACOBEY RADTKE, do hereby certify that

3      this transcript was prepared from the digital audio

4      recording of the foregoing proceeding, that said

5      transcript is a true and accurate record of the

6      proceedings to the best of my knowledge, skills, and

7      ability; that I am neither counsel for, related to,

8      nor employed by any of the parties to the action in

9      which this was taken; and, further, that I am not a

10     relative or employee of any counsel or attorney

11     employed by the parties hereto, nor financially or

12     otherwise interested in the outcome of this action.

13

14

15                              JACOBEY RADTKE

16

17

18

19

20

21

22

23

24

25

Melissa Kaye

```
                                          Page 358
 1   Kaye v. New York City Health And Hospitals Corporation
 2   Melissa Kaye (#4897710)
 3                  E R R A T A   S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____    _____
24   Melissa Kaye                         Date
25
```

Melissa Kaye

Page 359

1   Kaye v. New York City Health And Hospitals Corporation

2   Melissa Kaye (#4897710)

3                   ACKNOWLEDGEMENT OF DEPONENT

4      I, Melissa Kaye, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____    _____

12  Melissa Kaye                        Date

13  *If notary is required

14                  SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                  _____ DAY OF _____, 20___.

16

17

18                  _____

19                  NOTARY PUBLIC

20

21

22

23

24

25

Melissa Kaye

**[& - 2020]**                                                                     Page 1

| **&** |
| --- |
| **&**   72:23 73:6,8 74:5 75:25 76:23 234:24 |

| **0** |
| --- |
| **000053**   107:25 |

| **1** |
| --- |
| **1**   3:22 90:9 220:14 |
| **1/22/2018**   3:7 |
| **10**   167:13 346:19 |
| **100**   2:15 308:24 |
| **10007**   2:16 |
| **108**   3:7 |
| **1099**   136:24 137:5 137:11 138:13,24 141:18 |
| **1099s**   137:21 141:20 |
| **10:00**   122:18 264:3 305:14 |
| **10:03**   1:19 4:5 |
| **10:46**   37:9 |
| **10:52**   37:12 |
| **10:57**   40:11 |
| **10:59**   40:14 |
| **10th**   346:21 |
| **11**   322:21 |
| **11412**   2:6 |
| **11:42**   71:11 |
| **11:49**   71:14 |
| **12**   129:1 138:18 159:24 |
| **12137**   1:7 |
| **123**   327:19 |
| **13**   154:6 |
| **136**   3:22 |
| **137**   3:23 |
| **141**   3:24 |
| **14th**   336:17 |

**15**   1:18 4:13 59:4 59:5 167:13 268:15,19
**150**   133:10
**156**   3:17
**15th**   326:19
**16**   293:23
**16th**   326:19
**17**   147:20 293:23
**18**   24:5 108:19 283:19,19 296:11 296:24,25 311:7
**19**   296:25 321:4
**192**   3:8
**196-04**   2:5
**1990s**   22:8,10
**1996**   123:21,24 125:9
**1999**   113:6 139:18 201:17,24 202:14
**19th**   51:8 323:11
**1:00**   212:9
**1:18**   1:7
**1:33**   150:13
**1:40**   150:16
**1st**   237:8

| **2** |
| --- |
| **2**   3:23 138:20,25 197:12 |
| **2,000**   64:20 190:12 190:24 |
| **20**   113:18 120:17 132:20 137:1 167:12 185:2 211:12 297:4 359:15 |
| **2000**   202:15,16 203:8 204:9 |
| **2000s**   17:6 20:1,9 |
| **2004**   124:4,6 125:9 204:10,13 209:20 |

**2005**   52:10
**2008**   52:10 83:7 207:16 212:2
**2009**   53:19,19
**2010**   124:15,15 126:10 127:8 135:2,5
**2011**   83:8
**2012**   17:19,22 330:16
**2013**   45:23 74:9
**2014**   45:23 46:20 48:8,9 52:6,15 59:4 74:9 75:16 121:11 129:14,19 130:18,24 135:11 209:23 210:7
**2015**   17:17,22 28:4 31:21 34:18,23 70:12 75:16 85:22 138:25 139:7 141:3,21 142:13 148:8 149:18 150:25 173:3 174:24 176:16,25 177:22 178:8 183:12 207:7,18 207:23 332:19
**2015-2016**   70:13
**2015-2021**   3:23,24
**2016**   28:3,4 70:12 134:23 137:21 138:13 141:1 148:2 149:18 150:24 204:22 207:14 210:5,11 210:11
**2016-2017**   70:14
**2017**   41:6,12 89:21 134:18,19 137:20 140:24 147:16

149:19 150:24,25
161:24 164:8,10
176:21,24 177:23
278:23
**2018**   24:11 39:23
40:18 42:3 72:10
73:18,19 74:4
75:25 76:5,24
82:10 85:23 86:11
87:16 88:14 89:21
90:9 92:16 99:8
108:19 112:11
134:13 137:20
140:22 147:14
151:1 207:17,18
207:19 209:24
210:17 212:5
214:2,13 215:7
216:5 220:14
245:6 261:23
275:1 280:24
283:18 287:8
290:1 306:1 308:5
326:19 330:21
331:16
**2019**   132:19
133:20,21 134:1,6
137:20 138:12
140:17 147:2,12
197:12,16 199:5
201:7 283:18
321:4 322:8,21
323:7 325:9
326:13 337:12
339:1 346:20,24
**2019-032851**   2:19
**2020**   14:9 22:22
28:9 132:12,22,25
133:2,17 137:5,6
137:12 140:13
145:16 146:8,20

Melissa Kaye

**[2020 - aapl]**                                    Page 2

146:24
**2021**   1:18 3:22
   4:13 28:20 123:10
   129:12 131:9
   135:11,19 136:23
   138:25 139:23
   140:10 141:21
   142:13 145:4
   146:25
**21-2743**   2:20
**212**   2:18
**219**   3:9
**22**   197:17
**22220**   356:17
**23**   3:18 128:12
**24**   129:2,3,8 354:9
   354:12
**25**   205:25
**25-1**   197:19
**26323**   357:14
**28,000**   290:21
**28th**   322:8
**29**   198:15 199:5
**2:30**   56:16,22
**2:37**   161:14
**2s**   290:18 296:24

─────── **3** ───────

**3**   3:24 199:5 201:7
**30**   121:19 153:20
   154:3,4,10 161:9
   197:16 262:21,22
   263:22 264:1
   281:16,21 283:6
   284:7
**30th**   88:13 197:2
   197:11,11,13
   198:12,15 220:7
   237:7 238:6 261:8
   325:9
**32**   198:14

**325**   3:10
**336**   3:18
**337-2439**   2:8
**34**   217:9
**35**   64:23
**35,000**   217:11
**356-2461**   2:18
**36**   219:12
**36,000**   64:23
**37**   84:9,14,20
   92:21 219:12
**37.5**   154:8
**38,000**   64:21
**390**   203:11,20
   204:5,16 210:15
   249:21 251:17
   255:24
**390s**   204:20 210:3
   251:19
**3:22**   198:19
**3:29**   198:22
**3rd**   197:22,23
   198:3,4,9,11,14

─────── **4** ───────

**40**   35:12 154:8
   161:10 270:19
   281:15 283:5
**40,000**   47:10
**42.25.**   320:14
**45**   299:5
**4897710**   1:23
   358:2 359:2
**4:00**   272:11
   346:16
**4:25**   245:13
**4:34**   245:16

─────── **5** ───────

**53**   108:9
**54**   289:15

**55**   237:16
**57**   272:24
**5:00**   347:12
   348:16
**5:29**   289:10
**5:30**   153:13
   276:13 289:13
**5:44**   301:17
**5:51**   301:20

─────── **6** ───────

**6**   3:3
**6/4/2021**   3:10
**60**   133:11
**60,000**   47:11
**63**   320:13
**67**   319:2 320:9
**69**   3:16
**6:00**   121:24 122:1
   122:10 161:20
   272:10,12 305:13
   348:1,15,18,19,24
**6:30**   56:15,15,21
**6:55**   354:3
**6th**   326:13

─────── **7** ───────

**7**   287:8 354:8,12
**730**   51:19 54:6,21
   102:3,4 103:4,24
   104:2,4,14 112:6
   166:23 173:5,8
   191:18 203:10,10
   203:19 204:5,16
   204:24,25 205:8
   205:17,24 210:6
   210:15 211:20
   214:20 251:1
   255:22 257:16
   314:18
**730s**   205:12,22
   206:14 210:3

**75**   320:14
**77th**   270:15
**7:00**   269:16
   305:14
**7:06**   354:6
**7:08**   355:12,15
**7:15**   269:16,20
   270:1
**7:30**   269:20 270:1
**7th**   283:16

─────── **8** ───────

**86th**   270:11
**8:00**   153:19
   199:18 225:18
   264:2 266:7
   267:13,15 268:2
   268:11,15 270:3
   276:9
**8:10**   271:11

─────── **9** ───────

**9**   3:16,17 296:11
**917**   2:8
**9:00**   153:13 266:8
   267:12 271:7
   272:9 276:11,13
   305:13 348:1
**9:30**   264:3

─────── **a** ───────

**a.m.**   1:19 4:5 37:9
   37:12 40:11,14
   71:11,14 199:18
   267:12,13 268:11
**aabr**   3:24 139:13
   139:15,25 140:11
   141:5,10,20 147:8
   149:16,25 150:4,5
   150:20 151:23
   154:20
**aapl**   306:18

Melissa Kaye

**aback** 46:13 47:14
**abetted** 1:12 4:12
**abhishek** 1:9 2:12
  4:9 9:3 26:23
**ability** 11:7,21
  12:9,14,17 94:9
  154:19 169:17
  257:17 339:5
  342:20 343:4
  356:10 357:7
**able** 11:18 16:21
  24:6,12 38:25
  92:11 93:15
  107:14,15 108:16
  108:16 112:13
  131:22 171:2
  184:4 185:11
  257:25 258:5
  269:10,19,23
  270:2,24 273:17
  276:7 301:10
  302:21
**abruptly** 164:3
**absent** 4:19
**absolute** 262:7
**absolutely** 206:22
  338:22
**absolutes** 216:7
**absorb** 205:19,19
**absorbed** 216:14
**abuse** 94:9 334:22
**abuses** 253:14,16
**abusive** 318:2,3,3
  345:3 346:5
**academy** 306:19
**accept** 86:14,15
  176:8
**accepted** 47:24
  80:11 184:13,14
  184:17

**accepting** 19:18
**access** 46:11 192:4
  217:2 281:17
  282:10 284:9,13
  284:15
**accommodate**
  266:12
**accommodation**
  302:16 303:1,18
  305:6,11 307:19
**accommodations**
  131:11,14 302:5
  302:14
**accomplish** 235:12
**accurate** 151:16
  195:24 229:7
  356:9 357:5
**accurately** 65:20
**accused** 340:18
**accusing** 282:2
**acknowledged**
  330:22
**acknowledgement**
  359:3
**acknowledgeme...**
  4:16
**acm** 207:9
**acronym** 35:8
  139:14
**act** 285:4 301:1
**acted** 236:18
**acting** 90:9 191:23
  345:14
**action** 68:9 172:19
  194:12 356:12,16
  357:8,12
**actions** 94:11
  329:8 338:19
  339:4
**active** 164:11

**actively** 85:23
  164:12 213:3
**activities** 27:3
  50:22 174:2
**activity** 56:19,21
  96:8
**acts** 331:10
**actual** 244:4,5
**acute** 51:17
  187:20 274:11
**acutely** 185:14
**ada** 181:20 182:10
**add** 10:9 201:9
  263:25
**added** 326:23
**addition** 205:10
**additional** 204:12
  205:22 207:3,4
  322:22 350:17
  354:14,15,20,22
  355:6
**additionally** 4:19
  54:14
**additions** 359:6
**address** 33:3
  61:12 62:21
  103:12 112:23
  124:25 125:20
  168:11 234:6
  290:2 335:16
**addressed** 75:22
  102:6 286:12,14
**addressing** 62:6
**adjustment**
  305:10
**administer** 4:16
**administration**
  54:14 173:1,4
**administrative**
  54:7 74:17 79:18
  98:6 136:10

  181:25 204:12,22
  204:23 223:13
  279:9 311:25
  312:5 323:16
  334:7
**administrator**
  102:18
**admissions** 127:20
  128:12
**admitted** 51:13
  286:19,22
**admitting** 123:20
  125:14 129:20
  135:5
**adolescent** 201:5
  293:22
**adult** 293:24
**advance** 36:3
**advanced** 299:5,7
**advancement**
  139:14
**advantage** 125:22
**adverse** 265:7
**advice** 344:18
**advisement** 137:3
  137:14 139:3
  141:24 155:20,24
  298:8,10
**advisors** 279:19
**advocated** 190:24
  191:8
**affect** 154:19
  247:2 257:17
  263:15 335:11,12
**affidavit** 70:15
  231:4
**affiliated** 129:25
**affiliation** 186:10
  186:13
**afford** 7:19 169:21

Melissa Kaye

**[afforded - answer]**

**afforded** 211:25
**afform** 186:12
**afternoon** 56:16
  56:22 291:1
  298:23
**agencies** 154:6
**agency** 105:1
  132:9 139:13
  189:25 335:22
**agenda** 104:25
  173:2 251:12
**ages** 159:21
**aggressive** 281:23
**ago** 15:14 35:17
  66:8,10,10,12
  108:11 142:20
**agree** 4:17,21 7:15
  7:15 234:25
  239:15 269:24
  312:7 313:1 314:4
**agreed** 45:1 92:2,7
  117:24,25 213:13
  260:8 266:23
  312:16
**agreement** 47:20
  73:2,6 79:11 93:3
  117:10 165:25
  240:7,7 266:14
  332:13,14,14,15
  332:15 333:10
**agreements** 93:4
  246:25
**ahead** 19:13 71:2
  103:20 119:11
  127:17 250:12
  295:14 325:20
**aid** 144:4,13
  175:14 181:25
  212:11 336:4
**aided** 1:12 4:11

**al** 9:5 13:23 14:2,4
  14:5,10 28:8
  33:10
**albans** 2:6
**albany** 204:23,23
**albuquerque** 1:21
  6:15 161:3
**alessio** 23:4,4 24:3
  24:15,17,19 25:9
  25:17 33:18
  318:21,23 319:7
  319:24 320:10,17
  320:20 321:3,5,23
  322:10,14,21
  324:5 346:19
  346:14
**algorithms** 54:8
**aligned** 173:6
**allegations** 192:12
  194:6 195:23
  196:9,12 199:11
  199:13 200:15
  217:10 354:16
**allege** 194:4 233:6
  238:24 247:13
**alleged** 109:20
  343:24
**alleges** 201:23
**allergic** 273:18
  274:22,23
**allergies** 274:11
  274:12,21
**allergist** 274:17
**allopathic** 274:16
**allow** 81:4 257:21
  304:21 330:8
  336:6 340:9
**allowed** 87:1
  129:4 154:12
  231:24 269:19
  276:11 284:8

**allowing** 269:8
**allows** 330:8
**alter** 255:22 283:8
**alterations** 286:11
**altering** 346:2
**alternative** 275:9
**ambush** 166:18
**ambushed** 163:11
  164:14
**amended** 3:8
  108:3 194:11,12
  195:15 199:2
  320:5,6
**amendment**
  204:24 205:5,23
  210:6,10,13
  313:17 315:7,14
**american** 201:2,3
  201:4 306:19
**amount** 113:7
  210:2 245:23
  246:3 297:4
**amounted** 64:19
**anansa** 323:21
  347:14,20 349:17
**anaphylactic**
  274:8
**anaphylaxis** 274:8
**ancestry.com**
  327:19
**andrea** 26:22
  240:25 241:16
  242:10 283:21
  323:16
**anesthesiologist**
  28:21
**angry** 215:1
  317:25
**animus** 281:10
**anne** 48:16 60:20
  164:14 172:11

182:7 184:19
**announce** 176:22
  176:22
**announced** 92:15
  171:10
**annual** 285:11,24
  286:1,3,7 291:7
  296:9,9 299:5,7,10
  300:7
**answer** 3:14 6:10
  8:1 9:8 10:1,4,8
  11:10 12:9,19,25
  13:8 16:9,18,21
  17:13 18:13,18,24
  18:25 19:1 20:15
  22:4,15 27:9
  31:17 34:11 37:23
  39:3 41:3,19,21,22
  44:16 58:9,15
  65:18,20 67:12
  68:12,18 69:11
  71:25 73:23 74:21
  74:24,25 75:19
  76:2 80:23 83:1
  85:5 86:7 88:4
  89:5,6 93:22 95:4
  96:22 97:3 98:12
  99:1 101:11,14,16
  105:4 135:15
  139:9 141:14
  144:24 151:7,15
  156:9,20 157:3
  162:14 168:21
  169:3,16,20,24
  170:12 171:2,14
  171:16 172:7
  173:16,16 175:23
  178:5 179:5,6,25
  180:10,23 188:8
  193:7 207:25
  212:24 224:5

227:2 229:22,23
235:15 238:11
239:13 243:3
245:19 250:18
252:12 253:5
264:18 287:19
292:17,20 296:5
309:18 325:16
336:24 349:22
351:25
**answered** 18:11
18:14 171:13,17
344:14
**answering** 7:24
10:5,17 169:11,18
178:25 179:10
180:15,17,24
193:12,13
**answers** 81:4,8
168:25 169:22
293:1
**anybody** 117:22
172:9 303:8 312:4
334:2
**anymore** 26:14
121:7 267:4
**anyway** 90:7
226:2
**apartment** 160:14
161:2,2 268:7
**apologies** 152:11
198:25
**apologize** 81:9
116:17 183:14,14
355:1
**apparently** 327:16
**appear** 109:13,25
**appeared** 219:13
**appears** 199:1
321:3 327:8

**appended** 359:7
**apples** 232:12,15
**applicable** 4:25
**application** 354:22
**applied** 76:12
193:18 202:2,6
**applies** 11:3
**apply** 80:12 275:3
276:15
**applying** 202:3,7
**appointment**
24:13 321:24
336:19
**appreciate** 331:18
331:19,20 355:2,3
**appreciated**
187:17
**approach** 108:18
274:16
**approached**
237:19
**appropriate**
213:14 334:3
**approximately**
128:16 131:8,25
134:5 140:6,11
206:5
**april** 14:9,9 28:9
82:10 85:20 86:2
86:11 87:16 153:3
168:16,23 197:2
197:11,13,16
198:12,15 207:17
207:18 212:2
214:1,2,2 216:14
220:6 237:3,15,16
238:2,6 239:20
248:7 325:9
**argument** 111:2
228:14 335:4,13

**argumentative**
223:19 224:1,12
224:12 235:14
236:16 349:14
**arm** 131:18
**arm's** 88:6,10
**arms** 279:8 336:4
**arraignment**
99:17 250:7
**arrange** 122:2,8
**arrested** 177:14
**arrests** 209:16
**article** 329:18
**articulate** 258:5
**artificially** 251:25
**aside** 7:3
**asked** 18:10,14
47:14 48:10 68:3
77:2,3 86:18 87:7
87:10 103:2 105:3
111:22,24 112:21
112:23 142:4,8,21
142:24 143:17,21
144:6,7 148:11
156:22 170:11
171:12,17,21
185:20 187:3,5
192:1 193:17
230:17 252:22
261:17 298:25
301:7,9,25 308:15
315:15 317:20
325:23,25 331:1
334:2 339:22
342:19 343:13
348:20 349:3,20
**asking** 16:16
18:25 28:2 55:7
101:15 108:14
142:9 145:9,10
169:10 170:24

174:20 187:6
213:2 218:17
233:16,17 234:21
237:13 245:10
254:13 262:13
288:24 322:22
330:24 338:13,17
339:13 343:10
350:4
**asks** 9:15
**aspects** 184:8
**assault** 291:8
**assert** 156:12
**asserting** 156:14
158:13
**assess** 142:21
**assessed** 113:3
**assessments** 45:10
51:13
**assigned** 4:3 290:5
344:17 348:7,11
**assist** 216:4
237:14
**assistant** 8:25
136:10 207:10,10
**associated** 15:22
203:24 204:4
229:9
**association** 139:14
**assuage** 228:4
**assumes** 103:15
127:13 143:11
178:2,2 213:6
239:11 282:22
332:25
**assuming** 129:12
160:8 200:14
**assured** 153:11
240:4
**asthma** 274:21

Melissa Kaye

**astounding** 246:1
**attached** 3:12
**attachment** 351:9
**attack** 345:7
**attacking** 282:1
**attacks** 187:23
**attempt** 94:25
  232:7 267:6
**attempted** 62:15
**attend** 323:2
**attendance** 5:7
  67:17
**attended** 103:18
  104:10
**attending** 16:2
  47:4 48:11 63:14
  63:16,22 64:13
  76:15 78:19,20
  79:2,2,16 80:1
  124:1,2,9,18,21,22
  124:23 125:11,12
  126:12 127:10
  128:20 129:17,20
  129:22 130:7,16
  130:16,25 131:4
  136:7 187:11
  190:13 201:17,24
  202:4 208:6 219:7
  290:20
**attending's** 126:14
**attendings** 126:1
  126:21 130:1,8,12
  130:21,22 136:14
  143:15
**attention** 6:22
  153:5 219:3
  220:21 221:21
  254:18 296:15
**attorney** 37:19
  38:14 65:15 67:3
  67:13,18,20 95:11

156:7 157:4
  297:11 352:7
  356:14 357:10
**attorney's** 176:7
  181:13 182:11
  245:4
**attorneys** 72:17
  74:11 76:23
  143:22 156:3
  173:8 177:20
  234:23 235:1
  253:18 256:16
  310:21
**audio** 356:8 357:3
**august** 123:17
  129:11 160:15,18
  202:14 210:21
  211:2 282:11
  283:7 290:1 308:4
  323:7 336:17
  337:12,24
**auspice** 311:11
**authored** 192:15
  192:17 248:1
**authority** 189:23
  209:14
**authorizations**
  320:11
**authorized** 4:15
**autonomy** 190:2
**available** 43:20
  175:13 185:5
  346:17
**avenue** 2:5
**averaged** 140:19
**avoid** 306:2
**avoided** 303:25
**awake** 152:15
**aware** 76:10 189:4
  245:2 265:7,17,24
  265:25

**awful** 271:24
  274:5 275:25
  345:17
**axial** 262:23 287:9

**b**

**b** 3:5,8 73:8 108:4
  159:22 192:18,20
  192:25 194:10
**babysitters** 68:6
**bachelor's** 200:17
**back** 29:3 37:13
  40:15 48:18 51:12
  65:1,9 66:2,2
  71:15 77:14,21
  85:22 87:17 96:20
  97:1,7,10 103:6
  105:5 116:18
  118:21,22 121:25
  124:15,16 126:10
  127:8 131:13
  135:4 138:12
  139:7 150:17
  161:15,17 170:7
  170:10 176:25
  179:8 180:5
  189:17 193:22
  198:23 221:4
  245:17 252:15,22
  279:22 283:9
  289:14 292:16
  300:11 301:21
  304:24 305:17,20
  309:12 317:14
  330:17 331:9,10
  336:15 337:24
  342:6 346:4
  348:17 354:7
**background** 26:14
  200:14 265:12
**backlog** 206:2,7
  206:13,25 209:22

210:14
**backpay** 119:9
  297:3
**bad** 94:11 178:7
  285:8 331:4
  347:16
**badaracco** 48:16
  60:21,24 61:18
  62:7,13,18 63:9
  64:3,25 164:14
  172:11 175:3
  182:7,7 184:20
  187:7,16 188:2,11
  189:4,10,21,22,24
  190:3,4,14,20,22
  191:5,6 246:20
**badaracco's** 234:5
**bail** 346:4
**bait** 266:24
**balances** 94:9
**bantle** 73:8 74:5
  75:25 76:23
  234:24
**bargaining** 47:17
  47:20 79:11 83:18
  84:1,6,8,13,23
  90:21 91:1,6,10
  92:3 93:11,13,16
  93:19 117:10
**barry** 59:12 81:24
  100:5 163:12
  182:8 207:11
  312:3
**base** 113:8,10,12
  113:16,23 115:10
  233:25 333:23
**based** 44:21 45:13
  120:23 121:8,8,9
  126:16 150:21
  178:8,10 240:6
  354:19

Melissa Kaye

**basically** 48:5,24
63:8,10 88:18
92:19 99:7 100:3
115:18 164:13
186:21 249:8,13
250:14 251:16
323:16 324:6
**basing** 334:4
**basis** 51:10 150:2
205:23 234:16
**bates** 107:24
196:23,24 219:12
319:5 320:24
322:19 324:25
325:8 326:2,13
329:17 336:18
346:14 350:21
**bath** 276:22 277:4
277:5
**bathroom** 150:7
150:11
**baths** 276:21
**bear** 282:23
**bearing** 233:15
319:5 334:21
**bears** 324:25
**beautiful** 6:17
**becoming** 82:13
116:12 117:5
118:9 193:19
**bed** 266:11
**bee** 32:6 49:1
105:11
**began** 219:1
**beginning** 87:15
87:16 89:21
108:12,13 130:18
133:18 217:9
220:3 228:8 245:6
247:18 248:2
256:12 262:6

281:20 286:17
321:14,15
**behalf** 2:2,10
68:24 288:3
289:19 341:2
343:22
**behaves** 330:6
**behavior** 94:11
143:2 274:5
311:21
**belief** 83:16
112:15 262:8,15
**believe** 14:1 20:1
22:22 23:13 24:6
30:5 34:5,12
40:18 42:10 44:10
44:17,20 45:12,15
46:16 52:24 59:21
59:25 61:18 78:2
82:15 84:20 89:15
90:16 92:20 98:20
101:23 110:7,8,14
111:8 115:2,5,8,8
143:7 161:22
186:5 188:23
189:3,20 190:4,7,8
190:11,14,16,22
197:7 208:4
217:10,16 235:3
238:25 239:6
243:23,23 247:15
247:16 248:13,17
254:8 261:17,20
261:22 262:3,17
277:15,16 278:5,9
278:11 279:16,17
281:9,13 282:16
283:4 284:17,17
285:2,5 295:19
307:11,18,22
309:1 318:5 330:9

337:2 343:9,11
346:18
**believed** 55:13,19
80:10 171:20
345:23
**believes** 169:22
278:3
**bellevue** 30:18
41:1,5,5,11,11,17
45:19 46:6 48:18
49:23 50:4,8 51:6
51:11,12,18,25
52:4,13 53:18
54:3 59:7 60:22
73:21 75:4,10,13
77:13 84:22 86:20
87:17,18 88:7
90:12,24 92:19
105:10 112:22
118:20 139:7
143:23 144:2
154:5 161:22
162:24 163:2,20
163:22 164:2,6,18
164:22 165:7,12
165:20 166:1,10
175:4 182:4
184:21,23 185:3,8
185:13 187:24
190:18 191:15
192:8,9 193:18,22
208:6 218:4,20
219:2,9 220:17
230:16 237:6
246:21 266:21
281:15 282:5,7
287:4 293:18
298:19 300:9
302:20
**bellevue's** 219:2

**belt** 47:6
**benefit** 34:6 94:4
186:19
**benefits** 87:8
88:21 91:23 92:12
93:18 94:2,3
115:21 153:7
186:15,17,25
218:2,12 220:17
221:16 229:9
230:2 240:9
296:19
**bentley** 72:23 73:6
**bereavement**
300:14,15,24
**berger** 202:23,25
203:1,1,2
**best** 74:3 81:6
121:22 161:20
169:17 190:11
333:4 356:10
357:6
**beth** 102:16
**better** 94:13 102:8
122:12 194:19
323:8 353:1
**beyond** 121:24
122:1,10 277:12
286:25
**bhc** 220:8
**bhs** 3:9
**bias** 255:22
**biased** 260:10
**big** 164:12,15
246:2 272:14
300:11 337:19
**bigger** 196:11
**bill** 77:13,17 87:17
102:16,19 118:17
118:20 141:8

Melissa Kaye

**billed** 141:6
**billing** 126:13,14
  126:17,18 135:12
  138:14 146:17
  154:22
**bio** 321:25
**birth** 158:24
**bit** 26:11 77:21
  129:16 132:25
  161:21 196:11
  215:11 267:10
  269:7 271:3
  279:25
**bizarre** 245:9
**black** 272:11
  274:4
**blanche** 235:4
**blank** 156:24
  171:1 348:21
**blind** 139:15
**blindsided** 235:19
**blistering** 273:20
**block** 110:9
**blocks** 268:9
**bloom** 103:11,18
  103:24 182:2
  316:25 350:23,25
  351:4,16,18,18,21
  351:24 352:4
**bloom's** 103:18
**blow** 345:11
**blowing** 347:15
**board** 78:7 201:2
  201:3,4,10 248:8
  254:16 292:4,6
  293:15,20,21
  294:3,5
**bodies** 96:8
**body** 25:18 273:10
  274:4 281:24

**boggling** 246:4
**boilerplate** 200:3
**bold** 172:19,21
**bonkers** 253:5
**bonus** 93:4 115:9
  233:25 297:23
**book** 329:19
**booked** 283:19,20
**books** 331:24
**born** 328:1
**borough** 133:6
  214:19 252:1
**boroughs** 214:18
  252:2
**bother** 284:16
**boulder** 158:10
**boundary** 253:21
  331:19
**bowel** 20:17,21
  21:5 345:5
**box** 242:25 243:5
  244:2,3,15,20
**boxes** 244:14
**boy** 160:3 322:12
**bragging** 317:18
**brain** 155:22
**braindead** 330:10
**brainstorming**
  104:2
**brayton** 212:20
  347:14,20 348:4,7
  350:2
**breach** 291:12
**break** 9:19 10:13
  10:16,17 40:6
  43:19 71:5,6,8
  106:9,12,16
  121:15 122:2,10
  122:17 150:7,7
  157:11 161:5
  175:10 266:3

300:17 301:15
**breaking** 352:18
**breaks** 122:19
**bridge** 205:13
**briefly** 121:14
**bring** 76:18
  121:25 239:24
  268:8 269:14
  291:17 318:1
**bronx** 50:4,5,7,9
  51:3 52:1,6 59:10
  59:11 82:10,18
  83:4,10,19 90:8
  92:10 95:22,24
  96:2 101:18
  108:15 111:23
  114:12 115:7
  176:7 181:12
  182:10 203:3,7
  204:15 205:15,16
  205:18 206:20
  207:8,20 209:10
  209:19,23 213:9
  214:15,20 216:4
  253:4 270:7,24,25
  276:4 279:3,4
  280:15 281:18
  283:20 285:6
  323:20 334:7
  346:7 348:8,11
**brookdale** 133:4
**brooklyn** 77:8
  81:20 82:11,14
  83:17 101:6,6,19
  114:10 163:6
  166:7 243:11
  251:7 306:5
  327:24
**brother** 322:11,16
  326:16,18,22,24
  327:1,2,5,10,17,17

328:6,7,10,12,15
  328:21 330:20
  331:5
**brother's** 39:10
  328:7
**brought** 64:22,22
  78:7 113:25 153:4
  153:10 219:2
  238:1 254:18
  281:8 286:23
  296:15 349:23
**brow** 317:12
**bruhaha** 300:11
**brutal** 153:18,18
**buffalo** 90:1
**buffer** 94:8
**building** 203:4
  271:5
**bullied** 327:4
**bullpen** 102:24
**bullying** 193:21
  293:10
**bump** 78:14 79:9
  81:20
**bumped** 87:17
**bumping** 79:21
**bunch** 99:6 133:3
  249:2
**bureau** 95:23
  334:11
**bureaucratic**
  189:24
**burning** 353:12
**bush** 332:6
**busier** 210:23
**business** 53:25
  56:20 177:17
  241:5,17,22
  242:11,16,20,23
  243:5,8,11,17,19
  243:22 244:3,4,5

Melissa Kaye

244:13,15,17,19
244:20 251:1
253:22,23 275:5,6
298:15
**busy**   206:21
210:23,23 211:3
**buttresses**   228:13
**buy**   275:4
**byway**   309:23

**c**

**c**   2:1 3:9,20 4:1
14:24 219:14,21
219:21 224:9
**cahoots**   310:20
**calcified**   15:11
35:6,7
**calcium**   35:9
**calculate**   123:1
270:20
**calculated**   149:3
341:5
**call**   36:25 37:4,7
43:19,19,22,23
44:3 61:4 88:14
129:5 136:10,21
136:25 138:16
140:4 141:19
179:8 180:5 245:9
245:11 247:1
276:16 292:16
298:5 301:15
309:12 317:10
341:11 342:5
350:13
**called**   5:21 9:4
25:18 32:1,3 35:7
35:7 61:2 70:24
78:2 82:16 84:14
92:3,7 102:3
127:2,7 139:13
169:23 176:7

190:6 216:23
236:7 273:21
297:24 299:2
303:8 304:2 308:8
308:9,18,21
**calling**   136:7
138:22 146:9
173:7
**callous**   317:17
**calls**   44:15 100:13
215:2 303:15
340:2,3
**calterjeroni**   336:1
**campaign**   262:7
**camponese's**
297:25
**cancel**   336:19
**candidates**   213:4
213:5,10
**canfield**   2:13 3:3
5:8,8 6:2,9 7:10
7:14,20 8:5,6,12
8:13,16,24 11:9,16
11:18,25 12:3,7,12
12:24 13:4,12,13
13:16,17,20 14:16
15:4,8,13,18 16:1
16:8,15,19,23 17:3
17:16 18:13,20
19:2,4 20:10,19
21:17 22:3,18
23:23,24 24:1,14
26:7,12,16 27:19
29:10,15 30:3
31:1,19,20 32:17
33:23 34:4,9,10
35:23,25 36:8,12
36:13,18,22,23
37:2,6,14,15,20
38:1,12,23 39:2,25
40:5,8,10,16,17

41:14,19 42:1,9,11
42:14,19,25 43:5
43:10,15,25 44:6,7
44:19 49:6 50:12
50:23 52:19 54:23
55:17 56:1 58:3
58:12,19 62:9
63:20 65:8 66:5
66:17,23 67:7,14
67:16 68:1,21
69:12,14,22 70:9
71:1,7,17,18 72:1
72:7,16 73:1,9,14
73:25 74:2,8,14,23
75:1,8,23 76:21
77:20 79:6 81:3,6
81:13,14 82:5
83:5,15,22 84:16
85:8,17 86:8
87:22 89:2,11,23
90:3 92:1,9 93:14
93:24 95:18 96:19
96:25 97:5,8
98:13,16,17,24
100:7 101:12,21
103:9,17 104:11
105:16,18 106:3,8
106:11,15,18,23
107:4,10,13,18,21
107:22 108:2,5,10
108:20 109:23
110:4,5,13,17,22
111:1,5,15 116:10
116:18,24 117:4
117:19 118:6,25
119:6,15,18 120:1
121:12,21 122:3
122:13,16,22,25
123:6 125:8 126:3
127:5,17 128:15
133:24 134:4,10

134:17,22 135:7
135:18 136:4
137:4,10,15,19
138:3,7,11 139:4
139:11 140:16,21
141:16 142:1,16
143:6,20 144:1,8
144:18 145:3,22
147:1 148:7,21
149:15 150:3,8,18
151:3,17 152:3
154:16 155:1,7,8
155:21 156:1,8,11
156:17,18,22
157:6,10,12,18
159:16 161:4,7,10
161:16 162:17
165:17,24 166:9
168:17,22 169:1,6
170:1,9,14,21
171:3,7,15,19
172:6 173:20
174:4 176:15
177:21 178:4,6,12
178:19,25 179:2,7
179:10,18 180:2,4
180:7,16,20,22
181:6,7 182:3
183:2,5,7 184:2
185:21 186:4
188:21 189:12,16
191:3,11,13
192:14,18,24
193:4,9,15 194:1
194:16 195:5,12
195:13 196:18,22
197:8,18,25 198:2
198:6,7,12,13,16
198:24 199:6
200:1 201:21,22
204:6 206:10,12

208:1 210:1,8,12
213:1 214:12
215:18,25 216:2
218:18 219:21,22
219:25 220:5,11
220:20 221:1,3,7,9
221:12 222:4,9
223:4 224:4,6,8,10
224:15,17 225:7
225:11,17,21
226:13,24 227:12
227:14,17,23
228:3,7,9,13,17,20
228:23 229:1
230:21 231:8,10
232:1,19 233:3,5
236:10,23 238:13
238:18 239:13,16
240:20 241:14
242:7,21 243:1,6
245:12,18,22
246:7 247:11
250:9,19 251:3
254:6,21 255:8,18
256:17 257:7,23
258:3,7,16,21
259:1,4,8,10,13,18
259:20 260:1,13
262:12,14 264:24
265:2,13 266:4
276:14 277:24
278:2,4 280:10
282:23 283:1
285:1,19,22
287:21 288:8,12
288:14,18,22
289:1,4,8,17
290:17 291:9,16
291:23 292:3,10
292:22,24 293:3,4
293:9,11,13

295:13 296:2,12
297:16 298:3,9,11
299:18,24 301:14
301:22,23 303:16
308:15,17 309:20
313:9,19,21 315:4
315:9,19 316:7,16
316:19 318:10,18
318:23 319:2,5,12
319:16,18,22
320:8,23 321:1
322:4,6 323:5
324:23 325:4,6,18
325:24,25 326:1
328:16 332:1
333:2,6 337:1,19
338:6,16 339:16
339:18 340:21
341:15,21 342:4
342:12,16,21
343:2,6,13,17,20
344:2,5,9,12 346:9
347:1 348:13
349:1,12 350:1,15
350:19 351:8,13
351:15,19,20,25
352:3,20 353:2,11
353:14,17,23
354:10 355:10
**canfield's** 169:16
343:9
**capacities** 123:22
123:23
**capacity** 50:2
90:11 123:25
129:17 133:25
142:5,7,22 143:5
147:19,23 148:11
152:10 257:18
333:15 334:21

**capsules** 276:19
277:6
**card** 242:20 243:8
243:11,17,22
244:3,4,5,13,20
**cardiac** 33:16
345:4
**cardiologist** 21:16
21:18 22:1 33:1
**cards** 241:5,17,22
242:11,16,23
243:5,19 244:2,3
244:15,18,20
**care** 12:22 13:14
14:13 16:20 17:6
17:23 19:8,15,16
19:19 27:24 59:19
127:20 129:19
131:5 148:5
187:20,21 260:16
273:2,6 300:13
301:6 332:8
**career** 191:19
234:13 330:11
339:5 340:17
341:8,9
**careful** 295:3
**cares** 188:18
**caretaker** 268:11
**caring** 131:7
**carry** 131:16
274:9
**carrying** 131:16
132:11
**case** 1:6 9:4 51:21
70:21,21 146:22
146:25 174:15,25
175:14 205:16
251:11 312:13
313:5 314:21
334:15 350:22,23

351:1,2,4,9,10
352:5 354:23
**caseload** 131:5,5
131:17
**cases** 52:12 144:5
206:1,3,6,21 207:6
209:17,22 211:18
214:3,17,19 252:2
252:8 336:5
**cash** 286:3
**cashews** 274:8
**cat** 114:18 116:15
219:21
**categorize** 330:2
**categorized** 39:13
**caught** 235:22
279:25 347:11
348:20
**cause** 94:14
273:19
**caused** 110:8
151:10 262:5
263:20 271:21
278:9 307:18,22
345:11
**causing** 25:13,15
214:7 306:8
**cell** 6:19 7:5,7,13
8:8,21 347:17
**census** 133:10
151:10
**center** 263:12,12
263:13 274:24
**centers** 50:10
163:7
**central** 62:7,8,11
62:13,17,19 64:12
190:9 262:24
287:11,12 293:18
297:24

Melissa Kaye

cents 320:14
certain 32:14
40:20 93:3 168:5
251:11 334:14
certainly 97:24
109:5,19 248:11
certainty 333:16
335:2
certificate 356:1
357:1
certifications
201:1,10
certified 4:22
certify 356:4
357:2
chain 41:11 261:2
277:3,10,10
chair 281:23
challenge 98:19
335:19
challenging 149:4
chance 227:25
326:4
change 3:9 10:9
39:8 63:24 76:14
76:18 77:3 80:2,4
80:4 83:24 93:1
124:5,7 135:10
153:2,12 154:18
157:25 158:5
163:10,21,23
164:25 165:3,5
167:25 168:3,3
187:13 191:21
199:15,16 204:7
204:15,24 205:20
205:20 214:6
219:3 220:9,14,16
221:18 230:11,18
232:25 233:1,22
239:7,23 240:4,14

241:6,7,16 244:22
261:18 262:6
263:25 266:13,15
267:10,11,13
272:2,13,22 273:1
275:13,24 277:13
277:22 278:3,10
286:21,22 305:2,9
305:23 306:7
323:12 358:4,7,10
358:13,16,19
changed 18:1 19:8
48:1 63:12,13,15
63:22,25 64:9
76:7 77:2,9 78:11
78:16 79:4 80:17
85:10 127:24
153:17 158:8,11
159:1,5 164:3
187:4,14 219:5,6
234:6,8,10 239:1
239:15 241:1,3
247:14 261:21
262:9,16 263:4
266:6 271:17
290:20 291:6
294:4 307:12
317:24
changes 79:25
94:10 99:9 192:3
307:14 359:6
changing 79:23
234:2 239:25
240:22 241:12
318:2
chaos 153:25
characterize 189:5
215:19
characterized
184:6 307:6

characterizes
241:12
charge 56:11,23
90:8 163:6 177:15
237:12 239:2,9
312:9
charged 205:10,11
298:14 320:21
charges 314:21
charging 296:6,11
chart 124:25
125:7 128:2
charting 131:23
charts 127:22
chattering 57:8
check 59:13
285:13 288:7
checks 94:9
chemicals 273:19
chewing 116:15
chief 48:17 60:21
95:23 98:6 136:8
136:9 181:25
219:8 279:9 334:6
334:11
child 68:24 201:4
253:4 293:21
317:19
childcare 122:2,9
128:25 149:1,4,6
306:11 317:18
355:4
childish 228:3
children 6:25 7:13
68:8 159:17 160:8
160:22 245:10
263:24 268:8,12
269:19 270:2
271:7,21,25 272:1
274:21 300:13
322:11 331:7

337:5 338:7,19,21
338:22 339:6,15
339:23 340:3,24
341:2,10 343:22
children's 263:16
china 274:19
chinatown 263:12
chinese 274:20,23
275:15,16 276:3
276:16
choice 191:19
222:21
cholesterol 14:6
29:12 33:16
chopping 110:8
chose 119:2
335:16
chosen 290:4
christmas 175:10
chronic 21:2
266:10 275:22
chronos 217:2
281:17 282:10
299:1 307:21
324:1
chs 3:9 27:12
30:15,17 39:14
40:25 41:4,6,12,16
59:3 76:3,10,12,16
78:9 80:12 84:22
85:9,20,25 86:10
89:12 90:15 92:15
92:17 94:18 98:7
100:10,11 102:2
104:2,7,8,9,21
112:16 119:10,20
139:7 143:23
144:2 151:9
152:18,24 154:6
161:22 163:4,23
164:13 166:12,22

Melissa Kaye

**[chs - close]** Page 12

167:16 168:5
171:10,22,23
172:17,23,25
173:3,3,6,25
176:21 177:2,4,23
177:25 178:8
179:4 182:20
183:9 184:7,14
187:18 191:17
193:21 206:16
211:25 212:2
216:13 218:20
219:5 220:8,17
230:15 231:17,18
232:21,24 233:7
234:8 237:7 245:5
245:25 246:10,23
247:25 248:7
255:1 265:6
266:14 278:14,23
279:18,23 280:13
282:20 290:4,21
294:3,9 297:6,12
297:18 302:3
306:11 311:11,11
312:1 317:13,13
334:1,8 335:16,19
336:12 339:11
340:11 341:1
344:24 346:1
347:3
**chunk**  151:8,11
**chunks**  149:23
151:7,13
**church**  2:15
**circuits**  345:11
347:15
**circumstance**
336:6
**ciric**  46:2 48:12
51:2 58:21 59:23

60:1 64:19 74:10
74:16 75:3,17
76:19 86:23 89:10
89:12,14,15,21
95:11 100:5
112:18 113:2
117:9 119:7 120:3
120:9,11 171:8,9
182:8 187:7 208:5
218:8,14 222:24
222:25 223:9
232:20 233:24
333:10
**ciric's**  90:13
167:21 219:6
332:15
**city**  1:7 2:10,14
4:8 6:14 9:1,2
27:13,15 68:19,23
74:19 79:12 104:1
105:14 123:14
185:4,7,12 186:6
188:4 189:6
190:18 211:19
249:15,19 251:19
251:22 252:6
253:24,24 255:7
256:8 263:12,12
313:3 326:10
344:14 358:1
359:1
**civil**  82:21,22,23
83:14 351:9
**claim**  291:18
311:13 315:14,17
338:18 343:22
**claimed**  293:21
**claiming**  192:10
215:8 338:20
341:11,14

**claims**  258:1
313:16,18
**clarification**  54:4
138:22
**clarify**  24:23
53:24 126:11
138:16 210:10
256:23 277:21
286:1 297:21
343:21
**clarifying**  255:15
**claudia**  182:1
**clean**  207:5 265:14
**cleaned**  166:8
**clear**  19:2 61:14
76:22 167:19
206:6,13,25
229:24 253:11
**clearance**  29:2
**cleared**  206:2
209:21 210:17
**clearing**  210:14
**clearly**  55:10
76:15 94:16 119:3
181:2 342:7
**clerical**  345:9
**clerk**  158:11
**click**  194:25
**client**  7:19 18:23
67:13 144:7 156:7
157:2,4 301:15
**clients**  144:9
**clinic**  50:4 52:3
53:25 60:5 77:8
82:10,11,14,18
83:4,10 86:10
90:5,10,14,24
92:11 93:8 101:18
101:19 108:15,16
114:10,12,16,23
115:1,7 132:9

167:19 187:10,12
202:7,8 203:7,15
203:17,19 204:15
206:21 207:8,16
207:19,19,22
208:7 209:10,11
209:13,19,23
214:4,15 216:5
219:9 222:16,17
222:23 231:12
237:17 243:12
249:20 256:24
267:8 285:6
293:24 323:21,22
348:8,13
**clinical**  29:2 54:15
56:12,19 108:18
131:6 330:4
**clinicians**  95:9
**clinics**  27:13,14,16
41:7,10,13 50:5,10
60:3 76:4,6,20
78:8,9,10 84:5
85:21 86:1 89:13
90:9 94:18 102:8
114:4,21 119:12
152:19 162:24
163:20,21 164:2,6
164:23 165:7
166:1,12 171:11
171:24 172:17,23
173:14 176:21,23
177:24 202:11
204:8 212:18
216:11 241:7
244:9 279:2
284:22
**close**  27:21 272:10
272:21 320:12
327:20 350:14
354:25

closed  211:3 223:1
  355:11
closely  129:24
  196:7
closes  272:12
closing  19:16
  64:18
cob  252:13,21
  255:6 310:10
codd  341:16
code  296:8,9 299:5
coenzyme  29:20
  29:25 31:2
coerced  234:12
coercing  261:24
coercive  232:7
coffee  345:10
coffin  275:25
cognitive  334:17
  334:18
coib  310:11,12
cold  11:14 330:19
collateral  145:8
colleague  59:22
  80:6
colleagues  44:23
  45:1 59:18,20
  89:1 332:9
collect  145:9
collected  110:1
  126:16
collective  47:17,20
  79:11 83:18 84:1
  84:5,7,13,23 90:21
  90:25 91:6,10
  92:3 93:11,13,16
  93:19 94:6 117:10
college  158:4
  200:23
colley  42:4 59:1,2
  59:5 60:17 61:22

62:6,12,18 63:10
  64:3 65:1 75:7,21
  90:7 95:12 100:6
  102:17 104:14,16
  108:14,23 111:14
  111:19,21 112:5
  112:23 162:4,7,20
  163:24,25 164:3
  165:6,10,13,23
  172:11 175:2
  182:6 184:1,3,6,20
  190:5 246:21
  333:10
colley's  332:15
colonoscopy  22:21
colorado  200:18
  330:17
combat  29:21
combination
  128:21,23 320:2
come  11:24 56:13
  56:14 64:18 89:12
  97:1 102:23
  127:21,25 128:14
  130:8 152:15
  172:15 190:17
  208:15,16 213:9
  214:8 248:9
  263:24 267:15
  269:4,6,13,25
  271:6 272:9 279:1
  305:13,14 306:3
  323:20,22 332:11
  346:6 347:21
comes  43:14
  155:11 321:5
  332:5
comfortable  44:1
  260:14 311:21
coming  43:1
  136:15 187:22

214:17 218:23
  253:6 268:19
  307:2 346:15
  348:7,17
command  41:11
  261:2
commensurate
  234:10
comments  55:23
  318:12,14
commission  74:19
common  160:5
  273:18
communicate
  178:13
communicated
  55:4 190:20
communicating
  7:22,25 328:14
  329:14
communication
  115:25 162:11
community  166:5
  178:17 179:15
commute  271:18
company  126:18
  136:1
comparable  76:19
  114:1 115:11
  117:8 118:5 136:2
  136:15 233:23
comparative
  265:5
comparator  45:25
  46:1 47:1 60:2
  86:25 112:18,19
  112:20 117:8
  120:9,18 218:14
  218:23 232:9
  234:14,17

comparators
  112:17 217:12
  233:12
compare  113:13
  115:10
compared  52:25
  93:19 120:3
  150:25 151:1
  209:10
compensate
  144:16
compensated
  115:5,14 144:11
  144:13
compensation
  138:23 217:20
compensatory
  341:2,5
competency  146:3
  152:5,8 166:24
  173:8 177:18
  203:11 205:1
  249:20 251:9
  333:7,11,20
  335:15
complain  258:9
  261:11 293:17
  296:22 307:22
  308:7 310:22
  311:1,4
complained  75:6,7
  86:17 95:8 216:16
  216:19,20 234:23
  240:13 261:6
  262:3 279:10
  296:23,25 306:6
  307:24,25 308:16
  310:10
complaining
  115:24 121:10
  219:1 248:25

Melissa Kaye

**[complaining - consolidation]**                                                Page 14

258:14 311:7
343:6
**complaint**  3:8
57:25 60:19 61:6
65:10 74:17,18
75:4,9,12 77:16
108:3 113:1 119:7
120:2,16 121:5,8
153:16,17 192:11
192:13,15,22
194:3,4,11,12
195:15,23 197:9
197:10 198:25
199:2,11 200:5,12
216:8,22 217:5,6,9
233:6,8 234:14,16
235:6,10 238:24
242:1 247:13,14
247:20 261:22
262:4,5 272:24
277:17,18,18
291:11 304:20,23
305:3 307:6,7
310:7 315:5,14
320:5,6 326:4,6,8
339:1 344:15
354:17
**complaints**  56:9
62:21 188:6 189:2
189:5 191:25
261:19 278:6,6,7
281:12 296:17
297:12,17,20
307:15,15,16,18
310:6,8,9
**complete**  54:6
169:19 359:8
**completed**  145:12
**completely**  104:1
149:7 211:11
224:7 225:12

228:9 273:25
275:12 347:23
**completing**  355:1
**complex**  250:22
**complicated**
146:23 236:5
**complied**  281:1
**comply**  276:2
**complying**  280:14
**component**  273:22
**compound**  21:15
285:18 346:23
**compromised**
51:16
**computer**  7:22
43:1,6,13 192:7
206:18,19,23,23
345:12 347:16
**computer's**  192:4
**computerized**
287:3
**concept**  89:9
**concern**  100:4,6
166:4,21 174:7
182:20 190:7,20
196:13 306:11
308:25 315:7,15
**concerned**  61:6
91:20 99:13 100:5
120:3,5 156:16
163:11 167:10
172:24 184:6
216:18 289:3
296:18 331:12
**concerning**  176:13
200:5,7,7,9 217:10
238:21 241:17
280:16 291:25
317:6 329:19
**concerns**  49:12
91:14,21 99:15,25

118:17,20 153:4
166:16,23 167:1,3
168:12 178:11,14
178:16,18,21
179:3,15,21,22
180:8,25 181:1,3,9
182:20,22,23
183:9,17,21
184:10 187:17
190:19 228:5
237:21 249:3,7
257:14 260:9,22
260:23 287:7
296:14 317:4
318:6 335:16
**concluded**  355:16
**conclusion**  44:15
100:21
**concourse**  271:4
**condition**  11:6
12:8 21:11 22:5,7
30:6,9 33:3,8
34:18 301:6 302:1
302:3,5 303:3
314:11
**conditions**  5:15
86:14 93:1 153:2
168:3 233:1
238:21 247:3
**condolences**
330:22
**conduct**  1:13 4:12
54:21 144:19
291:25 332:21
333:7
**conducting**  45:10
54:17 95:15
333:20
**conference**  36:10
343:8

**confirm**  47:19
**confirmed**  298:1
**conflict**  248:7
254:15 269:22
**conflicting**  252:6
**confused**  348:4
**conjunction**  92:20
98:5 346:2
**connect**  349:16
**connection**  9:20
70:16 190:1
241:21
**consecutively**
252:3
**consent**  5:9,12
354:20
**consider**  21:6,9
49:12 66:3,3
115:18,19 176:1
188:16 284:23
**considerations**
258:23,24
**considered**  60:1
87:9 113:23
174:16 175:17
240:6 296:15
**considering**
184:11
**considers**  113:5
**consistent**  125:9
150:20 177:11
209:23 210:16
282:20
**consistently**
142:12 149:25
150:21
**consolidate**  162:24
164:18
**consolidation**
164:2

conspire  290:4
constant  192:2
  246:1
constitute  5:4
constitution  99:9
  174:18
constitutional
  99:4,11 100:1
  166:25 175:16
  233:21 258:2,18
  258:24 262:2
  313:16 335:14
  336:11
construed  113:7
consult  150:1
consultancy
  145:16 147:11
  150:22 152:4,21
  154:21 255:11
consultant  140:2,8
consultation  142:6
  142:6,7 143:2
consultations
  142:12 148:6,18
consulting  140:2
  142:4 143:22
  145:24 146:1,3,10
  146:16 147:5
  152:5 155:15
consults  147:23
consumed  122:15
consumers  140:4
contact  7:2 46:14
  71:22 72:11 75:15
  136:11 273:18,25
  291:22 293:18
contacted  41:4,5
  46:13,18,22 72:2,4
  72:17 73:15 74:4
  144:4,5 291:15,24

contacting  72:18
contains  320:13
contemporaneous
  36:9
contemporaneou...
  225:5 247:23
contempt  279:20
  280:12 333:18
  334:1,8 336:13
context  53:16
contingent  128:24
continuation
  172:14
continue  18:23
  117:9 135:11
  139:19 154:19
  179:5 211:23,24
  221:1 254:3
  292:20 298:12
  318:6 340:16
  341:7
continued  17:7
  64:8 293:20
continues  264:20
  329:6
continuous  293:12
contract  240:7
  297:2
contracts  246:25
contribute  266:10
control  2:20 190:3
  276:17
controlled  174:22
convenient  186:23
  263:17
conversation
  57:20,23 118:8
  170:4 220:15
  225:24 314:25
  316:2,13,14,15
  322:10 323:19

conversations
  163:9,16 230:25
  231:1 265:23
  309:11 354:19
convert  286:3
converted  133:6
  185:2,11
coordinating
  207:11
cope  25:19
copied  311:13
copies  192:9 198:9
  243:18,24 282:4
  283:11
copy  137:11
  197:12 224:11,19
  243:21 248:20
  282:7 311:15
  326:6,8 350:25
core  258:1
corner  194:25
  195:2 347:19
corners  312:17
  314:5,14 346:1
corporate  64:10
  76:18 78:1,2,14
  79:23 80:3,5
  81:21 82:17
  240:10
corporation  1:8
  2:11 4:9 8:25 9:2
  9:5 48:4 126:20
  126:23 135:9
  358:1 359:1
corporations
  138:14
correct  9:11 28:4
  31:5,8 40:19
  54:18 64:24 69:6
  71:20 73:7 78:20
  78:23 80:13 85:7

  88:9 92:12 93:17
  111:18 114:4,5,10
  114:11,13,14,22
  114:24 120:4,9,14
  120:25 146:13
  147:9 159:17
  160:10 161:24
  195:24 199:13
  200:15,20 201:5,8
  201:18,25 202:18
  203:4,5,20 215:9
  218:20,24 222:5,7
  233:11 235:2,6,7
  238:6 239:3
  244:25 245:1
  261:5 267:14
  271:9 280:16
  286:4 359:8
corrected  112:21
  120:24 285:13
  296:13
correcting  89:9
correction  121:1,2
correctional
  166:13
corrections  102:23
  359:6
correctly  162:15
  241:12
corresponded
  210:19
correspondence
  321:22
corresponds
  221:17
corrupted  340:10
corrupting  176:10
cost  94:7 305:18
couldn't  273:11
  345:16

**[council - cuts]**

**council** 85:1,3
92:17 168:12
185:1 220:23
221:23 226:1
229:9,10,11
230:10,23 291:25
297:1
**counsel** 5:8,11,13
8:25 69:23 75:15
169:21 180:23
245:10 264:20
279:8 315:16
319:9 335:25
354:13 356:11,14
357:7,10
**counsel's** 217:15
239:12 295:11
**counselor** 137:3
337:17
**county** 158:10
205:6,15 231:20
**couple** 9:7 26:17
62:14 130:23
135:22
**course** 40:10 62:6
62:14 128:2 164:3
193:2 273:12
279:24 311:10
322:17 340:18
**court** 1:1 9:13,15
10:20 27:13,15
36:19 37:1,4,7
39:15,15 41:7,10
41:13 50:4,5,9
52:3 53:25 60:3,5
76:4,6,20 78:8,8
78:10 82:10,11,14
82:18 83:4,10
84:4 85:21 86:10
89:13 90:5,8,10,14
90:24 92:10 93:8

94:18 95:24,25
96:4 98:7,9,12
101:18,19 102:8
114:4,10,12,16,21
114:23,25 115:7
119:12 157:8
163:20 167:19
169:8 171:11,24
172:17,23 173:8
173:14 174:3,3
176:13 177:18,24
187:10,12 195:16
196:16 197:16
202:6,8,11 203:4,7
203:9,14,17,18
204:8,15,16
206:20 207:8
208:7 209:10,11
209:13,19,23
212:18 214:4,15
216:4,11,19 219:9
222:16,17,22
231:12 237:17
241:7 243:11
244:9 249:10,11
249:20 250:11
251:17,18 255:21
256:24 260:11
278:15 279:2,3,4
279:19 285:6
293:24,24 318:11
319:23 323:20,22
333:14,15 334:9
334:10,10 335:17
335:20 336:3,9,13
340:12 342:5
344:6,10 348:8,13
350:16 352:23
353:10 354:22
355:6

**court's** 36:4,17
257:17 332:13
**courtesy** 7:19
36:21
**courthouse** 51:3
263:14 264:2
270:24
**courthouses** 50:14
**courts** 96:2 98:2,4
210:20 211:3
256:15 270:7
272:10 279:22
330:5 333:9 335:1
335:7
**cousin** 327:16
**cover** 65:11,12
136:8,11 142:9
262:19 269:4,4
285:12,25 319:7
320:9,15 323:20
323:22
**coverage** 124:2,9
124:18 125:18,18
126:21 128:20
129:17 130:25
131:4 132:18
268:17,21 269:1
**covered** 209:14
**covering** 125:25
136:13,14 186:17
**cpl** 203:10,11
204:24,25 255:22
314:18
**crafty** 263:22
**crazy** 304:15
**creams** 275:17
276:20,23 277:6
294:18
**created** 172:25
173:1 272:3
279:21

**credentials** 217:13
**crescendo** 27:11
**criminal** 45:11
95:24 96:7 99:4
99:12,16 100:1
152:9 173:6 184:8
203:4,10 261:24
267:5 334:13,13
340:10,13
**criminally** 205:11
**crippled** 212:14
**crippling** 212:10
**critical** 53:7
**cross** 217:15
**crossfires** 279:25
**cruel** 272:5
**cry** 271:23 306:13
**cryptic** 87:7
**crystals** 15:11
35:6,10
**cuff** 15:12
**culture** 48:5
**cunning** 262:17
**current** 68:9
220:17
**currently** 12:21
13:14 14:12 16:6
29:4,11 31:11
123:7
**custodians** 278:24
**custody** 314:22
**cut** 97:4,4 131:23
132:3,4 193:8
194:5 258:16
259:9,11,16
261:12 290:19
312:17 314:4,14
331:17
**cutoff** 34:22
**cuts** 192:3 290:21

Melissa Kaye

cutting 289:6
293:10 312:10,10
346:1
cv 1:7
cyclone 45:6

**d**

d 3:1,10,20,20 4:1
13:25,25 14:24
32:7 90:16 157:24
158:22 257:2
324:25 325:2
d001588 319:6
d001592 320:24
d001598 322:20
d001604 325:8
d001606 326:3
d001608 326:14
d001621 329:17
d001627 336:18
d001635 346:14
d001638 350:21
d001654 319:6
d1588 325:1
d1654 325:1
da's 179:14 291:22
291:25 297:8
damages 121:2
338:18,25 339:2
339:14,20 341:2,5
341:25 343:14,21
354:16
dan 222:12 226:5
231:1 307:1
daniel 90:15
dared 304:1
dark 347:15
das 212:16
data 206:17,17,22
date 1:18 17:11,15
21:22 22:17 39:21
72:6 120:13

147:24 196:17,20
201:6 234:13
286:13 306:17,23
358:24 359:12
dated 108:19
197:11,11,13,23
198:3 220:6 238:6
321:3,4 322:8,21
346:19
dates 109:7,21
148:16 294:17
295:24
daughter 267:17
328:23 341:13
daughter's 342:7
342:8
davidson 46:17,22
day 120:19,19
131:10,15 153:21
154:10,10,11
199:17 212:6
216:22 236:8
237:6,7 238:12
239:21 263:10,24
265:20 269:23
276:20 281:21
282:15,19 283:17
284:6 286:10,13
288:11 293:20
296:7,11 306:3
345:7,8 348:15
359:15
days 10:14 51:12
56:16 212:7
241:23,25 294:22
294:23 295:1
300:23
dayshift 138:18
dc 84:9,14,20
92:21

dcanfiel 2:17
de 14:21,22,25
deal 62:15 127:24
247:5 279:24
280:25
dealing 114:18
274:15
dealt 62:15
deandra 335:25
death 39:10 300:8
301:3 322:11
326:21 327:5
debate 65:24
december 24:5,5
24:11 41:6,12
161:24 212:5
321:14,15 326:19
327:1,18
deceptive 257:16
decide 98:11
decided 27:12
76:3,17 77:15
92:24 124:11
152:16 158:4
191:24 344:23
345:2 354:23
decision 91:15
156:15 188:4
191:17 222:13
239:7 240:6 241:6
242:9 282:17
334:5
decisions 279:18
declaration 70:16
70:24
declare 359:4
decreased 133:10
154:8
deemed 45:5
213:14 359:6

defaming 253:10
defend 211:10
defendant 54:5
68:10,11 174:25
214:21 249:18
251:24 314:20
347:18 348:16
defendant's
335:14 336:11
defendants 1:14
1:15 2:10 4:13,13
5:9 9:1 45:11
51:23,23 99:5,12
99:16 100:1 152:9
166:24 174:8
194:10 205:10,11
233:20 252:2
256:11,14 257:14
261:24 267:5
279:5 319:20
338:20 354:13
defending 106:25
defense 179:15
253:18 279:8
345:21
define 41:23 147:6
294:25
definitely 27:20
52:10 209:17,18
269:23 346:25
definition 79:14
79:20 229:10
defy 335:21
defying 39:15 98:7
278:15 279:7,23
degree 158:16
200:17,18,22
333:16 335:2
delay 312:13
delayed 274:10
284:21

Melissa Kaye

**delays** 270:20
274:13
**deliberate** 285:5
**deliberately**
281:11 283:2,4
285:4 345:16
**demonstrate**
213:18
**demonstrated**
296:24
**demotion** 240:15
240:16,19 242:5
242:20
**denial** 192:4
**denied** 46:11
217:2 281:9,16
284:9,12,14 291:5
293:16 294:10,25
295:4,17,19 303:1
304:11
**dental** 186:16
**deny** 113:23 333:3
**denying** 281:5,5
307:19,20
**department** 2:14
9:1 68:19,23
69:17,21 102:23
320:21
**depend** 41:23
**dependent** 281:19
**depends** 65:19
**deplete** 30:23
**deponent** 259:17
359:3
**deposed** 69:20
**deposition** 1:17
4:6 5:2 6:21 7:4
36:3,20 37:17
38:3 43:16 65:16
65:23 66:1,6,11,13
66:24 67:21 69:15

69:16 81:7 100:15
103:18 169:23
170:1 179:20
224:18 259:21
288:6 289:5
319:14,17 354:11
354:25 355:2
**depositions** 7:21
36:21 106:25
227:24 319:19
**depression** 143:3
**deprivation**
266:10 275:14,19
275:22
**deprived** 275:12
**deputy** 82:18
101:18 207:12
**derken** 181:21
**dermatitis** 273:18
**described** 171:22
301:5 321:25
**describing** 50:25
**description** 3:6,21
87:12
**designated** 79:12
204:25
**desk** 197:13
**despite** 217:12
**detail** 93:9
**detailed** 87:12
**details** 79:19
115:15
**determine** 11:3
142:22
**devalued** 57:16
**devastating**
154:14
**develop** 35:10
334:19
**developing** 250:24

**development**
57:14
**developmental**
274:13
**device** 6:20
**devices** 8:7
**dexilant** 32:2,3,21
32:24
**diagnosed** 20:16
20:20,23
**diagnoses** 98:1
**diagnosis** 273:17
**dialogue** 164:21
**diana** 158:9
**diblasio** 173:1
**didn't** 303:9
**die** 63:11 76:13
186:21 214:10
326:18
**died** 322:16
326:24 327:1,2,17
327:17 328:6,12
330:16,21 331:5
**diem** 123:13
124:10 129:14,15
130:15,16 133:16
145:25 146:7,8,12
149:22 212:5
**difference** 64:23
153:23 230:14
**different** 28:14
43:10 64:10 69:12
76:12 79:8,23
82:3 104:1 123:22
129:16 146:9
191:14 201:11
205:9 232:13,16
237:17 269:3
279:5,5 339:2
**differently** 44:22
44:24 50:16

101:25 284:8
300:10
**difficult** 10:20
26:8 142:19
265:24 266:1,5,6
276:2 317:23
**difficulties** 281:14
334:18 355:4
**digital** 356:8 357:3
**dime** 305:19
**dinging** 43:1
**diplomate** 201:2,3
201:4
**dire** 214:16
**direct** 45:22 65:22
180:23 220:21
233:12 235:22
307:1 325:7
**directed** 94:17
285:6
**directing** 221:21
**directly** 105:10
126:18 141:7
172:10 216:20
334:20 335:17
**director** 45:19
53:17 54:16 59:6
59:6 82:11,13,18
90:10,11,15 91:5
101:6,7,18,19
163:1 165:11
187:10 202:21
204:10 207:13
208:7,8,12 211:19
211:21 216:9
219:9 222:15,16
222:24 223:2
231:2,12,15,17,18
231:21 239:1,1,8
240:22,23 241:8
242:3,17,18 243:9

243:14 244:10,22
256:24 265:18
280:1 313:24
314:3,9
**directors** 60:2
233:10 241:6
242:10 247:24
248:4,18 249:4
256:20 264:13,22
265:5
**directorship**
216:11 311:24
**disabling** 273:11
**disagree** 218:25
**discharge** 142:23
333:11
**discharged** 190:15
**disciplinary** 94:10
329:7 339:3
**disclose** 235:11
**disclosed** 320:12
**discovered** 45:16
45:23,23 112:19
**discovery** 38:4,5
38:11,14 137:16
**discrepancies**
297:21 298:6
**discrepancy** 80:13
112:20 113:9,9
**discrete** 79:13,20
**discriminated**
45:13 332:3
**discriminating**
44:21
**discrimination**
44:11,13,18
**discriminatory**
188:5 189:1,6
**discuss** 144:6
226:10,14 326:12

**discussed** 100:9
117:3 179:16
230:20 333:1
**discussing** 184:22
**discussion** 55:16
95:16 164:17
172:13 184:19
185:8,10 209:13
213:25 222:1,11
222:12 226:22
227:9 249:7 303:9
344:3
**discussions** 163:5
164:1,6,24 165:2,3
166:19
**diseases** 274:22,23
**disfiguring** 273:11
**disguised** 94:25
**dislike** 329:24
**disliking** 253:9
**dismissed** 313:5
314:21 344:15
**dismissive** 55:6
317:17
**disparity** 105:9
**disruption** 273:3
**disruptive** 43:16
175:1
**disseminated** 46:5
**distancing** 133:11
**distinct** 104:22
**distortions** 246:4
**distress** 25:16
**distributed** 247:25
248:19
**district** 1:1,2 9:6
176:7 181:13
182:10
**division** 45:19
59:6 74:18 90:11
163:2 165:12

202:21 216:9
244:7,9
**dna** 327:19
**doable** 276:10
**doc** 102:23
**docked** 282:14
283:24 285:10,23
286:5,7 287:14
290:15,22 291:2,6
292:5
**docket** 197:17,19
198:8 199:3
**docking** 289:19
298:19,21
**doctor** 13:5,18,21
14:8,19 17:24
19:19 21:6,9,11
23:23 25:6 34:25
127:19 128:21
129:3 138:17,19
143:18 244:24
253:15 274:18
329:23
**doctor's** 12:21
13:14
**doctors** 14:12 16:5
16:11,16 21:13
22:23,24 27:23
28:19 34:17 46:6
52:25 85:1,3
92:16,19,22,23
128:4 130:22
133:8,12 142:8
143:13,14 151:11
154:7 167:23
168:12 185:1
186:9,13 208:14
213:22 220:23
221:23 226:1
229:8,10,11
230:10,23 248:13

248:16 249:14,19
250:23 251:8,15
252:5 254:24
263:1 291:25
297:1,1
**document** 40:22
105:17,21,25
107:1,13,24
110:23 128:2
136:24 141:10
176:3 196:6 199:4
219:11 220:2,4,6
221:1,2,6,11
224:19 318:11,12
318:17 319:3,11
320:9,15 321:2
326:2 336:16
350:16,21 351:12
**document's**
326:13 336:17
**documentation**
287:9,13
**documents** 37:21
38:2 65:13 155:18
301:9 319:10
320:3 353:10
**doe** 70:10,17,21
274:14
**doh** 59:4
**doi** 307:25 308:7
308:16,24 310:4,7
**doing** 8:11 44:1
49:24,25 76:5
114:18 123:13,15
124:9,11,16,18
126:13 129:13,17
129:22 131:4
146:2,12,16
148:10,17 150:24
152:21 154:1,21
155:15 174:2

Melissa Kaye

| | | | |
|---|---|---|---|
| 203:7,9,11,18 | 57:3,6,11 58:4,4,6 | 161:17 162:4,4,7,8 | 248:21,23 249:2 |
| 204:5,8,14 210:3 | 58:21,22 59:1,2,3 | 162:20 163:3,13 | 251:7 252:18,19 |
| 211:18 213:22 | 59:5,12 60:17,20 | 163:23,25 164:3,4 | 252:20,22,25 |
| 214:17 217:3 | 60:23 61:18,18 | 164:13 165:6,10 | 253:1,11,13,16 |
| 251:22 252:8 | 62:6,6,12,12,18,18 | 165:13,23 167:21 | 256:20,23 257:8 |
| 255:6,11,15,17 | 63:9,10 64:3,25 | 169:1,2,16,18,21 | 257:12,12,13,19 |
| 269:17 280:3,7 | 65:1 66:11,21,22 | 170:3 171:2,8,8,9 | 258:13,17,20,21 |
| 282:16 284:8,23 | 71:19 74:10,16 | 172:5,7,11,11 | 259:5,21 260:2,2,7 |
| 294:18 306:25 | 75:3,6,7,17,20,21 | 175:3,9 178:24 | 260:7,22 261:4,6 |
| 311:2 323:1 347:6 | 76:19 77:3,11 | 179:19 180:14 | 264:22 265:23,25 |
| 349:17 | 80:23 81:4,9,24,25 | 182:7,8,8 184:3,6 | 280:19,21,25 |
| **donna**   2:13 5:8 | 81:25 83:9 85:10 | 184:12,12,19 | 281:19 283:2,8,21 |
| 8:24 | 85:12,12,15,18,19 | 187:6,9,16 188:2 | 288:15,23 289:18 |
| **door**   99:22,23 | 85:20 86:3,4,10,10 | 188:11 189:4,10 | 292:16 293:14 |
| 270:19,19 305:23 | 86:18 87:11,11,24 | 189:20,22,23,23 | 294:14,25 295:14 |
| 305:24 346:4,7 | 88:5,7 89:6,21 | 189:25 190:3,4,5 | 299:25 300:2,19 |
| **dot**   190:1,1,1 | 90:7,13,17,20 | 190:14,19,20,22 | 301:24 305:25 |
| **dots**   349:16 | 92:24 95:5,10,11 | 190:23 191:5,5,6,7 | 310:7,19,23,23,25 |
| **double**   211:16 | 95:11 96:11,13,24 | 193:4,15 194:22 | 311:2,2,4,6,17,21 |
| 283:19,20 298:14 | 97:21 98:13,18 | 199:7 203:1,2 | 311:23 312:2,3,3 |
| **downtown**   85:24 | 99:7 100:15,15 | 207:5,11,15,15,20 | 313:10,22 314:9 |
| **dr**   4:6 5:13 6:3 | 101:1,4,5,17 102:2 | 208:4,8 211:14 | 314:10,25,25 |
| 7:21 8:8,17 13:23 | 102:18,18 103:2 | 212:3,3,11,19,20 | 315:22,23 316:2,6 |
| 14:4,5,10,21,22,25 | 104:6,9,13,13,16 | 213:8,9,23 215:3 | 316:9,12,13,14,20 |
| 16:22,24 17:4 | 104:17,18 105:25 | 215:19,22 216:3,3 | 316:20,22 317:3,3 |
| 18:21 19:5,6 20:4 | 106:19 107:23 | 216:7,8,20 218:1 | 317:4 318:6,20 |
| 21:6,9,20,21 22:9 | 108:21,23,24,24 | 220:1,7 221:11,13 | 319:7,24 320:10 |
| 22:12,19,20 23:23 | 108:24,25,25 | 224:1,9,21 225:1 | 320:16,17,20 |
| 25:9,17,21,23 28:8 | 109:5,18,20 | 225:22 226:14,21 | 321:2,3,5,12,23 |
| 30:5,8 31:10 33:9 | 111:13,14,19,20 | 227:8,15 228:1,17 | 322:10,14,21 |
| 33:9,15,18 34:23 | 111:21,21,25 | 229:25 231:4,16 | 324:5 329:18,19 |
| 35:24 37:16 39:7 | 112:4,5,23,23,24 | 231:17 232:20 | 329:24 330:3,23 |
| 39:9,9,20 42:5,10 | 112:25 114:3,6,7,9 | 233:10,10,10 | 331:9 332:25 |
| 44:8,20 45:12,16 | 114:20 115:3,10 | 234:4,22 235:9,12 | 333:9,10,10 335:2 |
| 45:18 48:16 50:16 | 115:16 116:11 | 237:12,20,20,23 | 336:18 339:13,21 |
| 51:1,1 52:24 53:3 | 117:22,25 118:2,7 | 243:11,13,21 | 340:22 343:3,11 |
| 53:4,6,7,8,11,12 | 118:13,16 119:10 | 244:3,4,10,11,11 | 343:12,14,15 |
| 53:17,19 54:1,2,9 | 119:11,11,11 | 244:11,12,12,14 | 344:13 346:6,14 |
| 54:10 55:2,4,6,10 | 120:2,9,11 123:7 | 244:19,21 246:20 | 348:4,7 349:23 |
| 55:12,13,16,18,19 | 153:5,5,9,16 155:6 | 246:20 247:17,19 | 350:2,20 352:4,14 |
| 55:23 56:6,9,10,11 | 157:13,13,20 | 247:25 248:1,18 | 352:16,21,23 |

Melissa Kaye

**[dr - emergencies]**

353:3,9,20 354:11
355:1
**draft** 248:13,19
**drafting** 249:4
**drag** 266:11 329:6
**draw** 49:10
**drink** 10:13
**drive** 206:19
266:25
**driving** 273:14
**drop** 151:10
268:16,20 269:2,7
269:8,11,11 270:2
271:7,9,10 291:1
**dropped** 268:14
269:8 270:23
314:21
**druthers** 246:17
**due** 174:8 233:20
335:15
**dug** 266:1
**duly** 5:21 356:5
**dump** 298:22
**duties** 204:11
220:18 252:7
**duty** 190:15
266:17 291:12
333:11

**e**

**e** 2:1,1 3:1,5,20,20
3:20,20 4:1,1
14:24 23:7 32:7
73:8,11 157:24
158:22 177:8
257:2 358:3,3,3
**earlier** 60:12
65:14 120:8
160:11 184:12
199:8 217:19
235:8 237:3 269:7
271:22 273:4,7

278:17 321:25
**earliest** 269:11
**early** 17:5 20:1,8
22:8,10 24:5,11
39:22,23 48:9
52:6,7 53:19
56:14,22 74:4
75:25 76:5,24
77:11 92:15
152:14 246:15
266:11 268:14,17
268:19,20 269:1,1
269:2,7,25 271:8
308:3,3
**earned** 113:11,20
**east** 270:6
**easy** 233:18 234:1
234:11
**ecf** 196:24 197:1
197:17 199:5
**eczema** 273:13
274:21 276:17
**edited** 248:13
**education** 68:20
68:23 69:2,17,21
**educational** 291:6
305:1
**eeo** 75:10,13 216:8
304:5
**eeoc** 61:13,24
74:18 77:16
112:25 119:3
153:16,16 191:25
216:22 234:13
235:6,10 237:12
239:2,9 242:1
247:14,19 304:19
304:23 305:3
**effect** 168:4
**effects** 29:22 30:1
30:19,23 31:4

32:23
**efforts** 214:22
355:3
**eight** 263:10 264:9
281:21 284:6
296:7 304:12,13
**either** 10:23 51:14
104:8,13 178:5
183:13 188:3
248:2 252:2 293:8
305:16 307:25
**electronic** 6:20
131:20 192:5
281:17 284:10,13
284:24
**elephants** 48:24
**elevated** 14:6
29:12 311:25
**eligible** 204:25
205:12
**eliminate** 273:24
**elizabeth** 1:8 2:11
4:9 9:2 26:22 39:5
48:7 92:18 108:14
114:19 163:6
166:5 207:16
231:19 237:18
248:6,23 256:23
310:20 311:24
312:8,15 314:2,8
**email** 3:7 35:25
36:13,14 39:10,19
39:20,21 40:18,24
44:8 46:6,9,12,12
53:20 60:11 87:6
88:16,17 103:12
105:19 106:7,20
107:10 108:13,24
109:11,18 110:23
111:14,14,19,20
112:8,11 115:16

117:22 118:2,19
118:21 162:11,16
216:4 217:23
218:1 220:6 224:2
224:3,6 225:12,23
226:2,17,22,22
228:18,22 229:6
229:25 234:22
238:5,6 240:2,25
241:2,16 242:11
243:24 244:5
290:11,11 295:15
295:20 298:23
299:3,12 303:14
309:10,21,24
310:1 320:4 321:3
321:5,7,12 322:20
325:7 326:2
327:15,16 329:16
329:22 330:16,18
330:24 346:14
**emailed** 107:2
116:11
**emailing** 173:7
177:14
**emails** 38:4,5,10
38:13,25 39:13
42:19 48:21,22
63:6 64:8 65:14
88:16 100:12
109:17,25 110:1
131:21 163:7,8
186:12 219:10,10
246:3 253:5
290:24 291:1
297:8,10 298:5
299:14,22 307:2
311:12 349:8
350:7
**emergencies**
127:21

emergency  7:1
128:4
emmanuel  1:22
4:3 356:2,19
emotional  25:15
274:5
emphasize  230:8
employed  30:15
30:18 84:21 123:7
123:9,18 139:6,12
166:6 294:9 339:5
356:11,14 357:8
357:11
employee  41:1
92:4 93:20 98:22
116:12 117:6
118:9 130:14
234:15 262:9,16
263:20 265:18
356:13 357:10
employees  94:5
234:9 246:1
253:24,25 264:16
265:6 298:20
employer  322:13
326:9,10
employment  41:16
88:8 139:5 142:2
155:10 167:4
184:18 193:18
221:16 238:22
329:6 339:10,14
340:25
empty  346:3
endeavor  173:11
ended  98:6 206:2
273:16 274:9
300:16 341:8
endured  292:9
enemy  253:3

energetic  321:25
engage  8:10
143:21 173:7
254:10
engages  330:3
engaging  254:24
255:10
enlarge  337:13
ensure  215:22
entailed  269:17
enter  281:19
entered  73:5,13
entering  283:3,4
enterprise  154:5
enticement  230:1
entire  107:11
221:2,6 227:25
234:13
entitled  342:1
343:23
environment
273:19 324:14
345:3
enzymes  30:24
epipen  274:9
equal  48:12 80:6
87:3,9 113:24,24
277:17 304:1
equity  59:9 112:14
114:1 188:6
217:10 278:6
307:15,15 310:8
erica  53:3
erroneously  60:16
error  299:1,4,4
es  356:4
escorted  237:24
especially  86:18
248:23 312:18
314:6 326:9

esquire  2:3,13
essentially  271:19
establish  251:1
established  114:6
232:14,20 265:1
estimate  128:17
estimation  210:15
et  9:5
ethical  216:16
251:25 258:23
evaluate  144:7,9
evaluation  50:10
102:5 142:7 145:6
145:7,10,13 173:9
174:17 204:11
216:10 244:9
250:5 332:22
evaluations
102:25 103:1
142:5,11 144:20
144:21 145:1
147:19 148:11
152:10 249:20
255:11
evaluator  50:3
52:2 90:23 105:14
202:8 222:23
evaluators  93:6
95:17 97:19
108:14 174:1
175:9 211:21
evening  149:5
evenings  148:25
events  215:8
eventually  90:13
92:2 175:18,19
176:6 177:14
199:3 212:20
285:13 292:5,11
292:18,25 293:5
293:14,19 295:22

295:23 296:13
everybody  244:14
262:20 264:9
265:3,4 304:13
332:16
everybody's
243:20 329:5
everyone's  239:8
239:15 296:15
everything's  168:2
230:12 239:22,25
evidence  138:23
213:7 239:11
245:3 282:23
316:8,17 320:7
349:6,13
evidentiary  5:1
exact  22:16 34:22
57:18 63:2,13
81:18 107:1,4
179:14 184:4,5
260:11
exactly  19:25
41:15 46:24 59:16
79:15 88:17 93:2
162:20 198:10
212:13 223:15
230:13,13,13
239:23 251:13
258:9 269:16
322:1
exam  28:8 51:20
52:3 54:7,21
95:15 175:5,12,15
175:18,19 176:9
177:19 205:1
211:20 293:20,21
333:12,21
examination  3:2
6:1 173:18,19
174:22,23 292:4,7

293:15 294:3
333:8
**examinations**
54:18 174:12
191:18 203:17
210:16
**examined** 5:23
176:6
**examiners** 93:7
**example** 173:21
**exams** 98:1 108:18
152:5,8 166:24
173:5 174:10
203:9,12,13,14
204:5,17 205:8,17
214:20,25 249:21
249:22 250:2
251:1,9 255:16,23
255:24 256:7
294:5 310:19,20
310:23,24 311:2,5
312:18 317:10
335:16 346:2
**excessively** 337:6
**exchanges** 39:7
**excited** 306:16
**excluded** 101:2
104:10 192:6
323:15
**excoriating**
273:10,20
**excuse** 18:20 57:2
150:11 179:19
277:20 288:18
289:1 293:3
299:18 342:12
347:8,22 353:11
**excuses** 347:24
348:23 349:23
**exercise** 164:23
352:24

**exercising** 166:11
**exhausted** 155:9
217:15 299:10
**exhibit** 3:7,8,9,10
36:15 108:1,2,3,4
108:5,6,8 192:16
192:18,20,25
194:10 219:14,20
219:21 224:9,22
225:2,15 227:20
324:25 325:2
**exhibits** 3:12
35:24 36:5,20
227:25 234:25
**expanded** 205:9
**expecting** 36:21
**expedite** 170:2
175:4
**experience** 31:12
178:10 213:12,19
217:12 317:22
**experienced** 32:24
96:6 105:14
172:20 206:16
279:4 334:12
**experiences** 178:8
**expiring** 127:23
**explain** 35:4 87:25
249:12 250:13,18
**explained** 77:4
87:25 258:22
277:22 291:19
311:22
**explaining** 258:17
**explains** 227:8
**explore** 188:12
**explored** 164:12
**exploring** 187:16
246:19,22 247:4
**express** 169:22
183:20 190:19

260:23 270:13
**expressed** 181:8
216:19 249:7
287:22
**expressing** 181:2
260:21
**expunged** 46:10
**extended** 153:21
247:6
**extensive** 26:24
**extensively** 182:6
**extent** 13:2,9 38:8
41:20 58:9 93:22
**extra** 213:20 264:5
**extreme** 172:19
**eyes** 240:18

**f**

**f** 14:24 49:17
257:2
**face** 88:7,7
**facilities** 133:7,7
149:18
**facility** 142:21
148:5
**fact** 77:1 80:9
103:11 109:14
110:6,11 111:9
146:12 166:11
188:2,24 189:4
229:4 241:3
261:21 285:2
293:23 294:2
332:20,21 341:18
343:10
**factors** 35:6,11,11
35:13
**facts** 110:20
127:14 143:11
178:2 200:4 213:6
239:11 282:22
332:25 334:4

**factual** 200:13
201:16
**factually** 199:13
**failing** 49:11
**fair** 10:18 17:21
21:1,10 51:10
88:19 113:14
175:6 247:12
329:25 335:14
**fairly** 142:12
150:20 230:6
260:6
**faith** 190:14
191:23 343:10,13
**fall** 94:21
**false** 118:13
211:11 222:6,10
246:5 247:7
**falsehoods** 245:24
**falsely** 340:18
**falsities** 246:3
**familiar** 23:19
279:12
**family** 68:5,7 90:2
132:8 300:8 301:3
326:15 332:6
**family's** 277:14
**fan** 165:19
**faq** 168:8
**far** 21:13 22:24
27:25 52:22 94:10
120:19 122:15
156:16 172:20
253:21 258:14
268:7 289:3
**farkas** 49:15 50:15
51:4 52:23 55:18
57:6,11 58:4
**farming** 251:18
**fast** 301:1

Melissa Kaye

**[father - five]**

**father** 327:22
328:15 330:16
**father's** 327:22
**fathered** 327:23
**fault** 279:21 280:2
**favor** 268:19
**favorably** 52:25
53:5 55:2,20
57:12 58:6
**february** 39:22,23
40:18 42:2 133:18
290:1
**federal** 316:17
**feel** 43:25 86:25
87:2 97:8 113:19
166:14 211:8
257:3 260:14
**feeling** 27:6 57:19
178:8
**feels** 66:10
**feet** 103:5
**felice** 14:21 15:1
**felice's** 14:22
**feliciano** 330:10
**fell** 205:18 207:4
328:25
**fellowships** 47:6
**felonies** 293:25
**felt** 55:22 57:13,15
58:5 94:18 100:3
132:23 158:13
166:6 170:11
171:21 176:10
186:20 231:5
249:1,8 254:14
256:21,24 261:24
281:3 327:4 350:6
**female** 23:9,10
35:11 47:10 48:1
52:24

**females** 58:5
**fictitious** 1:11 4:11
**fiddled** 297:22
**fifth** 344:18
**fight** 293:17
**figueroa** 174:25
175:6 179:16
182:12,18 183:10
**figure** 43:21,22
122:14 273:11
313:20
**figured** 47:24
260:21
**file** 2:19 74:16,17
75:3,9 77:15
288:2,15 289:18
291:11,17
**filed** 69:16 75:12
112:25 153:15
195:16,21 196:16
197:12,15,15,16
197:22 199:3,5,9
201:6 235:5,9
237:12 242:1
290:13 326:4
**filing** 239:2,9
247:13
**fill** 167:21 284:9
306:20
**filled** 294:14,14
320:18
**final** 248:19,20,20
**finally** 11:1
**financially** 149:14
356:15 357:11
**find** 24:6 72:14
152:20 156:3
163:13 173:24
185:7 312:18,23
313:1,23 314:5,11
314:14 315:24

326:25
**finding** 176:8
251:12 255:5
**findings** 250:25
**fine** 10:14 23:18
37:2,6 58:13
69:13 106:3
109:23 121:21,22
122:13 153:13,14
208:2,3 215:25
221:3 264:4
300:10 354:21
**finger** 131:19
**finish** 10:17 80:19
80:23 81:4 86:7
89:4 96:17,22,23
98:15 99:1 119:1
150:8 161:19
168:21,25 169:7
169:25 170:12,18
170:19 171:2
173:22 178:23
181:5 193:7,13
229:22,22 250:17
250:20 252:23
257:22 258:13,20
259:6 313:7
334:24 348:3
350:15
**finished** 10:6 89:6
119:15 169:2
193:9,11,12,12
217:16,17 259:10
259:14 342:18
343:17 355:5
**finishes** 224:4
**finishing** 180:1
**fire** 94:20,25 112:1
230:3
**fired** 94:14

**firm** 70:5,8 72:19
72:21 73:3
**firms** 72:18
**first** 5:21 14:7
17:4 18:8 19:5
20:20 21:21 23:11
23:15 24:2,12
27:6 39:19 49:10
61:16,21 70:12
71:22 72:2,3
73:15 83:3 85:19
98:23 106:22
107:8 123:16,16
129:10 154:2
159:4 164:7
177:12 189:22
191:2,19,19
194:11 195:14
196:12 199:2
200:13 202:9
217:8 223:25
224:16 228:21
237:7 240:21
242:9 246:12
254:5 290:14
299:21 310:16
313:17 315:7,14
318:17 320:6,9
352:14,19
**fit** 173:24 251:12
292:21 313:23
314:5
**fits** 317:21
**five** 16:12,17
21:12 22:25 27:24
28:1 31:21 71:7
122:18 167:17,18
198:17 245:12
301:15 323:2,7
328:4

Melissa Kaye

**fix** 232:4,8 233:18
234:1,11 236:4,5
**fixed** 232:6
**flags** 166:20
176:14
**flare** 295:2
**flares** 20:18 21:3
294:20
**flatfooted** 235:22
**flatly** 303:1
**floor** 51:8
**flow** 210:18
230:15
**fluctuations** 210:2
**fmla** 280:25 281:8
281:9 294:8,10,24
295:23 296:7,8,22
298:13 299:16,25
300:5,12 301:2,5,8
301:24 302:1,2,2,8
307:20 311:15
**focused** 104:7
167:10 174:14
**folded** 113:12,22
**follow** 15:3 26:17
27:21 48:21 87:20
112:4 118:7
129:23 137:16
139:3 157:8 169:9
170:10 171:6
189:20 254:2,3
259:4 272:22
308:10 309:10
**followed** 87:19,21
117:21 189:18
290:12 318:5
**following** 19:19
201:1 204:13
205:23
**follows** 5:23

**food** 274:12,21,24
**force** 175:7,20
176:2,5 263:23,23
285:8 305:23,24
306:15
**forced** 144:4 151:9
222:14 234:12
331:16
**ford** 1:8 2:11 4:9
9:3 26:22 39:5,9
39:20 42:5,10
44:8,20 45:13,18
48:7 50:16 51:1
52:24 53:4,6,8,11
53:17,20 55:2,4,13
55:19,23 56:6,10
56:11 57:3 58:1,6
58:22 59:3,18
61:15,18 75:6,21
85:12,20 86:10,18
87:24 88:6,7
92:18 95:5 97:21
99:7 100:3 102:2
103:2 104:6,13,17
108:14 111:13,21
112:5,23 115:16
117:23 118:2
153:5,10 163:3
168:5 184:12
187:9 190:20,23
191:5,8 207:16
208:4,8 212:3,11
218:1 229:25
237:18,20,23
248:6 252:20
256:20 257:8,12
261:6 265:25
303:22 310:23
311:2,3 329:18,19
329:24 330:3
331:9 335:6 346:5

347:4 349:5
**ford's** 56:10 66:21
66:22 104:18
**foregoing** 5:9,12
356:3,4 357:4
359:5
**foremost** 98:23
299:21 352:19
**forensic** 45:10,20
49:24 50:1,3,5,10
51:13 53:18 54:17
59:6,7 90:11
95:15 97:19
102:25 105:14
163:2 165:12
166:4 185:13
191:18 201:3
202:8,20,22 203:9
204:11 208:6
213:12 216:10
222:23 244:8,8
255:16 330:4
340:19 349:15
**forewarning**
164:21
**forget** 158:9 254:3
**form** 13:19 15:2,6
16:7,13 21:14
22:2 27:8 31:16
37:22 38:19 44:14
62:3 69:18 70:18
78:22 88:3 95:2
119:13 125:24
134:3,25 135:14
139:8 140:14
141:13 143:10,24
146:21 148:3
149:20 151:2,5,25
152:22 154:24
162:11,13 166:2
166:15 171:25

172:4 173:15
175:21 178:1,15
183:23 212:23
231:14 235:13
236:15 239:10
255:3 282:21
285:17 295:11,12
303:4 346:22
**forma** 99:17
**formal** 216:15
248:9
**formally** 86:15
90:6 176:24
184:13,17 216:13
252:13
**formed** 177:24
**forms** 277:25
**forth** 200:4,4
**forty** 270:22
**forward** 51:21
118:17,19 119:9
120:13 123:3
204:9 225:2
257:24 281:25
**forwarded** 111:19
331:9 351:5
**forwards** 108:24
226:25
**found** 77:12
176:13 242:4,4,5
251:5 274:25
280:21,21 290:1
313:4 314:20
**foundation** 178:3
239:12
**four** 22:23 56:16
78:8 93:7 162:23
164:2 167:17
206:3,6,14 263:2,3
270:14,16 274:10
300:23 311:10

fpecc   216:10 244:8
    244:8 247:24
    249:19 264:14
    265:6,18,18
fragrance   273:20
    277:1
fragranced   274:1
fraternal   160:2,7
fraud   216:18
    249:10 250:11
    309:1,3
fraught   255:24
free   217:15 277:1
freezing   12:2
frequent   294:19
frequently   269:5
    300:21
friday   291:1
    298:23
friendly   250:24
front   6:20 7:5,8,16
    305:17 319:6
frustrating   274:15
fuck   260:20
full   129:25 131:10
    131:15,16,16
    132:2,11 194:21
    194:22 202:17
    203:8 212:4,19
    263:10,20 285:24
    285:25 297:22
    329:9 333:11
fully   265:24,25
    271:13 281:1
fun   324:2
functional   82:16
    240:10 265:21
functioning
    207:12
funded   205:4

funding   190:3
    207:4
funeral   330:17
funky   208:14
    254:15
furrowing   317:12
further   221:14
    224:4 228:22
    351:7 356:13
    357:9
future   26:5 121:9
fwd   350:22

**g**

g   4:1 157:24
    158:22
gail   323:21
gainfully   339:5
game   246:2 285:3
gap   64:19
gaps   135:2
gardner   303:12,13
gastroenterologist
    17:7
gate   269:17
gavend   157:22
    158:22
gaye   327:15
gender   45:13
general   26:5 94:4
    168:11 196:5
    317:5
generally   233:15
    236:1
genetic   22:5,7 30:6
    30:9 33:3,8
gestured   99:23
getting   36:3 39:14
    45:24 46:25 47:2
    48:23 59:17 64:21
    71:3 76:7 78:11
    78:13 80:16 85:10

87:1 88:25 98:6
    100:24 101:2
    113:24 119:4
    126:4,6,11 131:10
    131:15 136:3
    149:4 168:15
    173:7 174:24
    184:20 187:25
    188:16 219:5
    231:2 234:8
    240:14 244:22
    245:8 251:10
    263:4 279:2
    282:14 283:24
    291:2 301:12,15
    307:2 310:18
    311:17,24 312:11
    332:8 337:25
    340:2,2 348:15
gi   17:2,8,10 18:2,4
    18:8 19:6,8,9,17
    19:20 20:12 21:6
    21:9 31:9,11,22
    32:16
gilbert   182:15
gillian   102:16
ginger   181:15,19
girl   160:3
girls   158:4,8
give   10:4,8 13:11
    18:15,24,25 53:22
    69:16 72:5,6,6
    87:4,25 88:20
    91:19 92:24 94:1
    118:3,4 168:7
    173:21 188:3
    189:6,10,13 195:1
    218:2,12,15
    233:23 252:12
    290:9 297:7
    303:20 304:24

305:20 306:23
    330:15 331:8
    349:21 352:23
given   69:15 82:1
    86:18 91:3 93:5
    94:16 158:3,19,20
    158:24 175:15
    186:1,22 188:24
    208:7 243:4
    244:23 248:11,16
    248:23 293:19
    303:2 307:11
    359:9
giving   87:8,18
    92:11 99:1 230:1
    331:24
glad   47:8,8,11
glare   323:23
gmail.com   321:7
go   19:13 29:3 37:8
    51:12,20 59:3
    65:1,11 68:8 71:2
    103:20 114:2
    119:2 121:20,24
    122:1,9 123:23
    124:24 127:17
    128:10 130:9
    132:7,10 142:21
    148:11 150:10
    152:14 153:9
    165:18 167:6,6
    170:7,10,19 180:1
    186:7 187:9 191:6
    192:12 195:7,25
    196:8,14 200:6
    202:16 208:16,16
    211:22,23 214:18
    217:5,6 218:5
    221:4 246:10
    250:12 264:7
    268:10 269:20

270:11 276:11
280:23 283:9
290:7 293:18
295:14 297:8
306:4 310:3
316:16 325:20
336:15 345:12,12
345:15 347:20
353:23,24,25
**goal** 186:1 305:24
**goddess** 158:9
**goes** 151:12 156:7
258:1 313:11,15
341:5
**going** 6:23 7:12
9:7 10:14 11:20
18:23,24 25:23
29:3 32:5 35:25
36:8,13,15,25 37:4
39:5 52:20,21
53:9,11,23,23 54:1
55:8,8,11 57:18
63:13 65:9 67:12
69:10,11 70:22
71:24 72:2 75:21
76:17 80:15 81:3
83:17 86:9 88:9
92:23 93:1,5
94:20 96:14,17,25
97:8 104:8,23
105:19,20,24
106:19 118:16,19
119:9 120:13
121:5,13,14
122:18 125:15
128:6,25 136:21
141:19 148:24
151:15 153:8,11
156:9,20,23,24
157:3 162:24
163:22 164:13,15

164:22 165:5,6,15
165:16 167:5,6,7,8
167:8,20,25,25
168:2,3,7,18,22
169:6,9 170:3,5,6
170:22 171:10
176:1 177:20
179:7 180:5 184:4
186:22,24,25
191:11 193:6
194:9,21 196:13
196:23 198:7
200:2,11 205:3,4
210:19 216:24,24
217:4,5,5,14 218:3
220:19 221:4
222:2 224:11,25
225:13,18 226:11
227:5 228:15,16
229:4 230:11,12
230:15 236:2
239:22,25 240:8
242:19 245:4
246:11,24 247:1
248:8,15 249:10
251:6 253:14
254:1,2 264:3
265:16 266:3,18
267:9,12,13
268:18 271:25
272:20,23 275:13
277:12 279:11,25
280:23 287:9
288:4,8,12,21
290:6,8 291:10
292:16 294:7,18
295:1 298:5,16,16
304:21,23 305:18
305:19,21 306:14
306:14,17,18,18
310:18 312:13

316:16 317:15,15
318:8,18 321:10
322:15,19 323:9
323:11 325:7
329:1 330:17
333:17,25 334:7
335:8,10 336:6,11
336:14,24,24
339:12 340:22,23
341:11 344:5,6,19
344:24 345:6
346:10,11,13
350:8,12,13 353:4
353:8 354:25
355:5
**good** 4:2 6:3,4
152:17 161:7
166:3,8 190:14
191:23 227:5
317:13,14 326:5
343:10,13 344:16
345:18
**google** 121:3
**gosh** 267:21
**gotten** 187:11
280:22 311:16
327:14,20 342:21
**gracie** 3:23 123:13
123:18,21,25
124:5 126:6 128:8
129:11,21 130:16
130:17 132:13,13
132:14,16 133:1,1
133:9,9,10,20,25
134:6,14,19,24
135:25 136:6,9,18
136:19 137:6,12
137:21 138:13,24
139:5 142:10
143:9,9,14 146:7
146:12 147:7

149:17,24 150:23
151:18 154:20
**gradation** 64:11
**graduate** 158:16
**grand** 271:4
**grandfathered**
153:1 221:18
230:11 240:8
302:20
**granted** 69:5,7
281:10 295:23
299:9,10 302:16
305:6
**grata** 253:2
**gratuitously** 99:3
99:16 175:8
298:19
**great** 7:16 123:2
**greenfield** 235:4
**gregory** 14:21
**grievance** 288:2
289:18 291:17
**grievances** 290:13
**grieving** 331:7,8,8
**ground** 103:5,6
**group** 104:2 105:3
111:24 158:4
332:11
**groupwise** 63:6
**growing** 274:4
**guarantees** 246:24
**guess** 20:4 25:9
27:24 65:23 66:3
66:3 84:11 106:9
110:9 146:8
151:13 161:4
178:2 190:21
213:2 236:21,21
273:2,8 296:24
297:8 298:13
320:3 328:2

Melissa Kaye

**[guess - half]**                                                                                           Page 28

337:25 338:17
**guessing**   135:1
**gyn**   28:7

**h**

**h**   3:5 13:25 34:23
358:3
**hagan**   2:3,4 5:11
5:11 6:8 7:9,12,17
8:1,9,15 9:15 11:8
12:10,23 13:2,7,8
13:19 14:15 15:2
15:6,10,16,23 16:7
16:13,18,21 17:1
18:10,14,17,22
20:4,14 21:14
22:2,14 23:22
27:8 29:9,14
30:21 31:16 33:22
34:1,7 35:21 36:2
36:11,16,19,25
37:3,18,22 38:7,19
39:1 41:2,18,20
42:7,21 43:8
44:14 47:21 50:20
52:16 54:19 55:14
55:21 58:8 62:3
65:4,17 66:19
67:5,10,22 68:17
69:9,18 70:6,18
71:16,20,22,24
72:12,13,18,22
73:7,11,22,24 74:7
74:12,20 75:5,18
76:1 78:22 80:18
80:22 81:3 82:25
83:12,20 84:10,15
85:4 86:6 88:3
89:4,18,25 91:22
92:5,13 93:21
95:2 96:21 97:3
98:14,23,25

101:10,14 102:13
103:15,19,22
104:15 105:18,20
105:23,24 106:5,9
106:13,17,21
107:1,6,8,17,20
108:1,8 109:15
110:3,12,16,19,24
111:4,12 116:16
117:1,13,16,17
118:11 119:1,13
119:17,21 120:15
122:14,20,23
123:5 125:24
126:25 127:13
134:3,7,16,21,25
135:14,20 137:2,7
137:13,18,23,25
138:1,5 139:1,8
140:14,18 141:13
141:23 142:15,18
143:10,24 144:14
145:17,19,21
146:21 148:3,20
149:20 150:6,10
151:2,5,25 152:22
154:24 155:5,19
155:23 156:4,6,9
156:14,20,23
157:2,9 159:15
160:25 161:9
162:13 166:2,15
168:20,24 169:2
169:10,13,15
170:8,9,12,17,18
170:25 171:12,17
171:25 172:3,4
173:15,22 175:21
178:1,9,15,22
179:5,9,12,25
180:3,10,14,19,21

181:2 183:1,3,23
185:17,24 188:7
189:8,15 190:25
191:4 192:14,16
192:22 193:1,7,11
194:13,17,20,24
195:10 196:14,20
196:25 197:7,14
197:20 198:1,4,11
198:14,18 207:24
209:25 210:4
212:23 213:6
215:15,16,18
216:1 219:16,18
219:20,23 220:1
220:10,19,25
221:5,8,10 222:3,8
223:18,23,25
224:8,10,13,16,18
224:21,23,25
225:8,15,17,20
226:12,17,19,21
227:1,7,12,16,17
227:18,19,21,23
228:6,8,11,15,21
228:24 229:21
231:7,14 232:22
235:13 236:15
238:17 239:10,14
239:18 241:10,24
242:12,14,24
245:7,21 246:13
250:13,15,17
254:6,7,12 255:3
255:13 257:6,21
257:25 258:5,9,12
258:13,25 259:3,6
259:9,11,13,16,19
259:22 260:5
262:10 264:15,19
265:8,15 277:20

277:25 282:21
285:17 288:4,10
288:16,20,24
289:1,2,6,15
291:14,20 292:2,8
292:19 293:1,3,6,9
295:7,9,10,25
297:13,19 298:7
299:17,19,21
303:4 313:7,11,15
315:2,6,10,12,13
316:1,4,5,9,11,12
316:18 318:10,16
318:22 319:1,4,8
319:14,17,21
320:2,22 322:2
323:3 324:24
325:5,21,23
327:13 330:1
332:23 333:4
336:23 337:13
338:9 339:12,17
339:19 340:5
341:14,19,22
342:2,11,14,16,19
342:25 343:2,18
343:19,25 344:3,8
344:11 345:1
346:22 349:14
350:11,18 351:6
351:11,17,23
352:2,10,12,14,17
352:19 353:7,13
353:15,15,16,20
353:25 354:8,20
355:9
**haganlawoffices...**
2:7
**hair**   274:4
**half**   77:7 131:24
132:4,4 211:3,20

212:6 214:20,21
264:5 268:5
281:16 304:12
327:10 328:7,15
350:17 354:15
355:6
**hall** 103:8 104:1
347:18,19
**hand** 194:25 195:2
**handed** 244:14
348:20
**handing** 279:7
**handle** 154:3
262:21
**hands** 276:24
277:2
**handwritten**
322:7
**happen** 64:15,16
113:17 128:6
129:2 162:25
216:15 266:18
316:24 336:7
**happened** 19:25
59:19 92:14 107:9
121:6,10 128:5
133:19 153:15
164:20 176:16
195:11 210:11,11
215:9 223:6,8,12
223:15 226:25
227:7 247:5 296:5
297:3 298:20
299:14 311:9,10
319:19 336:5
**happening** 56:19
67:24 148:15
163:14 166:19
167:15 172:24
173:14 237:2
251:13 252:5

307:9 324:9 336:5
336:9
**happens** 205:15
**happy** 213:4
**harass** 293:6
343:11,15 353:1
**harassed** 293:16
323:15 327:4
**harassing** 293:9
**harassment** 192:2
193:20 305:1
**hard** 17:11,14
19:9 49:1,7 53:6
151:13,15 196:5
206:19 208:19
236:4 331:4
337:24
**hardcopies** 107:14
**hardcopy** 197:13
**hardship** 214:6
263:20 306:10
**harm** 338:18
341:25 342:19
343:3,22,24
**harmed** 338:21,23
338:23 339:23
341:6,7
**harmful** 305:8
324:15 330:5,5
**harper** 108:24
**hatred** 333:24
**hawing** 348:22
**head** 10:21 90:14
92:10 115:6
148:16 243:11
278:19 328:25
**heads** 53:22 241:7
**health** 1:7 2:10 4:8
9:2,4 29:5 34:17
34:18 48:3 96:3,6
113:18 166:13

184:8 249:23
250:4,5 322:12
334:14 358:1
359:1
**healthcare** 84:14
127:3
**hear** 6:16 9:18
11:7,19,21,22,23
12:5,14 14:17
26:8,13 37:25
54:21 154:17
200:10 226:6,7
227:22 236:2
347:5
**heard** 10:1 242:9
329:2
**hearing** 5:17
25:25 61:16,21
**hearsay** 223:17
315:21 316:5,12
**heart** 21:25 33:9
**heat** 11:14 12:2
26:10,12
**heater** 11:19
165:16
**heels** 111:25 266:2
**held** 78:18,19
82:14 142:2 205:7
**hellish** 262:7
**hello** 34:20 220:12
**help** 21:24 25:19
47:15,23,24 54:6
65:6 68:3 128:10
128:14 194:22
214:4 235:18
236:3 290:8
305:16 324:1
**helpful** 34:12,14
197:2
**helping** 213:23
272:12

**helps** 30:1 268:22
**hemming** 348:22
**herbal** 276:19
277:4
**hereto** 356:15
357:11 359:7
**hey** 136:7
**hhc** 48:3 50:3 62:8
62:11 76:11,12,13
80:5 87:13 113:6
120:6,17,25 185:1
189:25 190:1
218:25 233:14
234:13 279:19
287:12 294:4
302:8 309:2
325:12 333:18,25
335:19,25 336:2
**hi** 321:5,9
**hicks** 77:13,17
87:17 102:16,20
112:25 118:1,17
118:20
**hierarchal** 189:24
**high** 99:6 172:12
187:24 274:6
**higher** 59:24
209:14,17 234:18
234:18
**hijacking** 184:7
**hill** 271:3,4
**hipaa** 23:22 99:17
261:23 262:1
277:17 278:8
307:12,14 310:8
320:17 340:18
341:11
**hire** 99:24 208:17
209:3
**hired** 53:8,17
59:11 90:15,22

Melissa Kaye

**[hired - implement]**

101:5,8 113:6
114:3,9 187:9
202:9,14 208:17
212:18,20 231:17
231:18 244:23
311:22 312:16,25
347:5,9
**hiring**  129:16
249:14 314:11
**history**  86:19
105:7
**hit**  133:2 190:8
221:19 246:15
329:2,10
**hiv**  334:15,20
**hmm**  10:24 45:21
106:5,13,17 109:9
110:3 111:4 123:5
137:18 157:9
179:9,12 198:1,18
239:18 319:4
320:22 325:11,13
329:20 344:20,22
350:18
**hnn**  202:1,2,2
338:19
**hobnobbing**  332:5
**hold**  52:14 57:2
101:3,3 132:20
150:11 193:4,4
231:8 252:15
265:8,9,9 279:19
307:14 333:17,25
334:8 341:9
**holding**  187:21
**holiday**  300:18
**holidays**  210:20
290:22 298:21,22
**hollis**  2:5
**home**  129:4 132:6
147:19,23 148:5

148:18 152:5,15
**homes**  148:25
155:13,14
**hone**  273:17
**honed**  273:16
**honest**  95:7
**hope**  235:12
**hoped**  236:3
**hopefully**  26:10
**hoping**  185:6
187:14 338:5
**horrible**  273:19
324:12
**hospital**  50:9
56:21 123:14
125:15 126:7
129:6 130:3,5
133:1,3 134:14,19
134:24 139:6
187:22
**hospitals**  1:7 2:11
4:8 9:2,4 48:4
113:18 133:4
358:1 359:1
**hostile**  272:4
345:3
**hostility**  94:16
230:4
**hour**  56:14 129:2
129:8 138:18
153:20,20,24
154:8,9,9 263:5,10
264:6 265:20
266:11 268:5,5
271:22 273:4,6
281:15,16,21
282:13,14,19
283:5,24 288:5,9
288:10 343:12
348:24 350:12,17
350:17 354:15,15

355:6
**hours**  56:20
122:20,23 128:16
128:17 129:1,3
131:8,23,25 132:4
134:5 140:6
152:19,24 153:21
169:7 199:17,17
264:8,10,11
282:13 283:23
284:2,3,5,6 285:12
288:11 296:7,11
304:12,13,14
340:6 350:12
354:8,12
**house**  7:7 8:22
127:19 128:20
129:3 138:17,19
265:14 270:23
**hss**  28:21
**huge**  246:15
**huh**  10:21,24
342:2
**human**  74:18,19
**humiliate**  306:25
**humiliated**  293:17
**humming**  26:13
**hundred**  84:18
**hungry**  329:23
**hurt**  188:16
328:25 339:6
**hurtful**  27:3
199:20,23
**husband's**  275:5
**hyper**  174:14
**hypersensitivity**
274:11
**hypocrisy**  331:19
**hypothetical**
117:14,18

**i**

**i.e.**  118:4
**ibs**  345:4
**icon**  194:25
**idea**  166:4,8
271:16 294:6
296:14
**identification**
108:7 192:21
219:15 325:3
**identified**  107:24
273:24
**identify**  5:7 26:21
273:23
**iep**  69:7,8 70:22
**ig**  307:25
**ignore**  39:10 282:9
331:10
**ignored**  299:11
**illegitimately**
286:7
**illness**  11:7 21:2
273:4 274:16
275:23 294:16
**illogical**  335:6,13
**immediately**  83:17
246:9
**immune**  273:9
**immunologic**
273:14 274:22
**impact**  166:24
263:15 305:19
339:14
**impacted**  154:14
328:11 339:4,10
**impacts**  315:2
**impair**  12:14,17
**implausible**
347:24
**implement**  242:20

implicated 258:15
implications
258:18
important 10:5
345:24
impossible 273:1,5
impression 57:20
57:25 248:23
249:3
improper 291:18
353:17
improve 102:4
improvement
104:4
inability 189:5
inactive 201:15
inadvertently
60:12
inappropriate
174:16
inappropriately
176:25 330:6
incapacitated
261:25
incarcerated
51:25
incarnation
130:25
incident 95:8
193:21 205:15
278:22 328:24
incidents 58:17
include 28:5,12
172:13
included 93:13
115:9 233:25
243:20
includes 79:17
including 46:7
92:18 99:7 105:12
323:18

income 3:23,24
120:20
incomplete 201:8
incorrect 200:21
219:4
incorrectly 23:6
increase 64:20
77:9 78:13 190:24
206:1 234:11
increased 77:24
153:19 199:16
incredibly 326:10
indicate 91:12
indicating 319:7
320:10
indication 165:4
230:17
indirectly 172:10
individual 51:25
262:18 328:18
individualized
69:1
individually
338:20
individuals 26:21
27:2 177:3 181:12
249:17 261:25
infantilized 249:1
256:25
infantisized
256:21
infiltration 172:16
inflict 275:14
influence 174:10
influenced 174:11
250:25 251:10
inform 111:23
235:21,25 266:17
333:13,14,14
informally 112:21

information 46:7
62:16 145:8
200:14 206:18
219:4 287:16
295:5 297:5,7
307:5 309:23
310:1,19 311:14
320:16 326:14
334:16
informed 97:18
162:8 164:3,16
247:19 314:3
325:9 333:9
infrequent 147:25
infrequently
51:11
inhibitor 32:11
inhibitors 32:1
initially 205:25
213:8 294:13
initiated 104:25
injure 35:2
injury 328:25
inmate 314:19
inmates 51:13
inpatient 49:22
50:1 51:22 54:11
56:11,18,24
185:12 187:8,24
208:5
insane 323:25
inserting 110:19
inside 182:4
insinuating 192:17
insisted 88:12,13
227:20,23
install 281:18
284:20,24 285:3
installed 284:14
installing 284:16
284:19,21

instance 290:14
institution 95:25
120:25
instruct 18:23
instructed 3:14
insurance 126:9
126:17,18 135:12
integrity 167:9
174:8
intended 1:11 4:11
4:24
intense 175:15
276:18
intensely 300:20
intentional 234:4
intentionally
282:17 283:20
346:1
interact 303:19
interacted 303:14
interacting 61:20
62:7,11 100:10,11
interaction 61:14
interactions 175:3
interest 173:13
248:8 254:16
interested 18:6
109:3,6,19 117:5
146:15 186:15
230:8 314:24,24
356:15 357:12
interfere 177:18
interfered 152:20
174:20,21
interference 173:9
173:13,18
interfering 11:21
173:4 176:24
interim 90:10
intermediary
280:2

Melissa Kaye

**internal** 75:3 79:9
104:2,21
**internally** 112:22
**internet** 9:19
**internist** 17:5
28:21
**interpret** 215:24
**interpreted** 205:5
**interrupt** 54:9
86:3 182:16
293:12 324:4
**interrupted** 81:9
**interrupting**
225:19 313:16
315:16
**intersection** 96:7
**interval** 294:19
**interview** 213:10
310:3 315:1
316:25
**interviewed**
145:11 213:11,16
312:2,3,3,7 314:2
314:9
**interviewing**
212:21 213:3,4
312:2,4
**intimidate** 343:11
**introduce** 320:7
**intrusion** 172:22
174:16
**investigated**
309:13
**investment** 174:15
**invitation** 104:13
104:16,17
**invited** 102:10
103:10,11 104:7,9
109:14 110:7,11
**invoice** 320:20

**invoked** 258:18
**involved** 27:12
45:2 62:17,20
65:6 85:22,23
92:16 95:9 96:3
98:7 126:15,19
163:1 164:21
172:9 249:4,14
253:17 278:24
335:25 336:2
338:8
**involvement**
173:25
**iota** 305:20
**ironically** 328:20
**irregularities**
33:16 290:3
**irrelevant** 293:22
293:25
**irritable** 20:17,21
21:5 345:5
**ish** 280:24 308:2
**island** 114:21,23
114:25 205:14
312:19,24 313:2
314:7,15
**isolate** 251:25
**issue** 21:25 45:1,2
45:3,5,7,9,12
58:21,22,23 59:9
59:15 61:13,19,24
65:2,6 95:13
97:16,18,21,24
98:18 99:3,3,4
100:3 112:15
113:15,16 115:24
116:12 117:21
119:9 120:5
184:24 232:5,9
243:15 271:14
277:3,11 278:13

278:14,16,18
280:5,11,12
287:23 293:21
317:21 332:18
**issued** 96:9
**issues** 18:5,9 20:12
31:9,12,23 47:18
52:1,5,9,9,15
71:23 73:16 86:12
87:13 95:16 99:11
104:25 125:1,20
127:25 128:25
149:1 232:17
237:21 250:22
255:5 266:9
275:22 306:11
317:18 329:7
334:14
**it'd** 47:12 247:2
279:1
**it'll** 26:10 165:18
195:1 196:17
**italian** 23:19
318:25
**italy** 25:1
**itching** 275:20

**j**

**j** 85:15 159:22
**jacobey** 357:2,15
**jaffe** 274:24
**jail** 51:15
**jain** 1:9 2:12 4:10
9:3 26:23 39:8,9
85:15,20 86:10
153:5,16 184:13
213:9,23 216:3,7,8
216:20 235:9,12
237:12,20 244:10
244:10,14 247:17
247:19,25 248:19
252:19,22 253:11

260:22 261:4
265:23 272:8,25
280:19,20,24,25
281:19 283:2,8,21
303:21 305:25
310:7 311:6,18
312:2 317:3,4
330:23 332:14
346:5,6 347:3
349:5,23
**jain's** 332:14
**james** 181:15,19
**january** 22:22
99:8 108:19
132:25 145:2
261:23 262:3
284:22 321:4
322:8
**jd** 53:3 207:11
**jeckel** 181:20
**jeff** 182:2 316:25
350:23 351:16,17
351:18,21,23
352:4
**jeremy** 42:4 59:1,5
61:22 62:12 64:3
90:7 100:6 102:16
108:14 162:4,7
175:2 182:6
183:25 184:20
246:20,20
**jessica** 86:13
153:10 220:7
237:24 238:4
239:20
**jewish** 290:22
298:21,22
**jlc** 1:8
**job** 1:23 54:25
82:3,4 91:4 92:7
92:11 94:13 98:21

Melissa Kaye

**[job - kind]** Page 33

120:23 124:20
127:10 132:24
148:24 167:2,13
176:12 186:1
187:9 188:14
202:7 204:11
208:7 209:5
220:18 231:2
232:25 246:16
252:7 267:1
293:22,25 306:20
311:24 312:17
313:1 314:4,14
315:1,24 327:5
340:15 345:18,19
345:25
**john** 95:22 177:5,7
334:8
**join** 104:14 105:3
**joint** 15:12 35:10
**jonathan** 1:10
2:12 4:10 9:3
26:22 92:18
216:25 220:7
236:9 237:25
238:4,9 239:20,21
247:21 262:18
282:18 283:16
297:22 298:1
327:24 328:2,7,14
328:22,24
**jpc** 1:8
**judge** 95:22,24,25
96:6,10 98:6
176:1 181:22,23
181:24,24,25
182:14,15 215:1
225:4 279:9,10
333:17,25 334:6,7
334:8,12 335:18
335:20 336:8,8,10

336:10 341:16
**judges** 95:21,21
178:18 181:22
212:15 249:17
279:3,4,5 345:21
**judgment** 111:3
**judicial** 280:14
335:22
**judiciously** 343:16
**judith** 96:10
181:23
**july** 15:17,19,20
28:20 86:16 90:9
216:15 220:14
237:8 247:19
248:3 281:20
284:22 308:2
**june** 237:7 245:6
247:18 248:2
**jurisdiction** 200:5
200:9
**justice** 173:6
331:23 340:10,12
340:13

**k**

**k** 49:17
**k000035** 219:12
**kaye** 1:4,17 2:2
4:7,7 5:13,14,14
5:20 6:3 7:21 8:8
8:17 9:4 18:21
19:5 20:4 25:23
35:24 37:16 45:16
71:19 80:23 81:4
81:10 86:3 89:7
96:11,13,24 98:13
98:18 105:25
106:19 107:23
108:21 114:7
119:11 123:7
157:13,13,20,20

157:21,22 158:3
158:18,19,21,21
159:4,5 161:17
169:2,16,18,21
170:3 171:2,8
172:7 178:24
179:19 193:5,15
194:22 199:7
215:22 216:3
218:10 220:1,7,8
221:11,13 224:1,9
224:21 225:1,22
226:21 227:9,15
228:1,17 258:13
258:17,20,21
259:5,21 260:2
264:23 273:2
288:15,23 289:18
292:17 293:14
295:14 299:25
301:24 316:2,6,9
316:13,20 320:18
321:2,12 339:13
339:21 340:22
343:12,14,15
344:13 350:20
352:4,14,16,21,23
353:3,9,20 354:12
355:1 358:1,2,24
359:1,2,4,12
**kaye's** 109:20
155:6 172:5
180:15 215:19
332:25 343:3
**keep** 25:24,25
26:14 109:6,19
186:19 208:19
209:4 220:19
228:15,16 265:16
293:11 301:8
302:21 313:16

**kelly** 181:20,21
**kept** 48:15 88:6,10
154:1 230:12
239:22 279:21
290:6 305:22
306:4,21,24 307:2
307:8 317:14
347:15
**kevin** 303:10
**kicked** 283:10,12
**kid** 275:12 280:22
**kids** 25:14 40:4
43:23 68:4 71:4
149:1,5 152:15
153:23 188:15
266:8,9 268:23
269:9,14 270:23
272:11 306:10
331:4 332:7 338:2
338:4
**kill** 264:7
**killing** 272:16
306:8
**kim** 16:22,25 17:4
19:6 21:6,9 22:19
22:20 31:10
**kind** 7:17 27:14
48:5,14,19,25
49:11 51:17 54:7
55:6 77:12 87:18
88:16 94:8,10,11
102:22 122:4,9
128:21 135:23
136:2,12,18
147:25 158:13
163:11 164:14,20
166:6,18 168:6
172:12,13,14,17
185:6 186:10,16
187:14,15 208:14
215:4 246:23

Melissa Kaye

**[kind - l]**                                                                 Page 34

| | | | |
|---|---|---|---|
| 249:1,22 250:23 | 66:4,10 68:11 | 181:1,4,8 182:12 | 277:3,7 278:19 |
| 251:24 273:20 | 70:7,23 72:3 | 183:20 184:5,6,7 | 279:1,11 281:21 |
| 274:2,22 275:17 | 73:18 75:12,14 | 186:11,13,20,24 | 282:1 287:2 |
| 287:3,13 303:8,21 | 77:6 79:16,19 | 187:1,17,18 | 288:12 290:4,19 |
| 306:2 308:25,25 | 80:9 81:1,18 | 188:14,15,18 | 296:6,16 297:4 |
| 311:25 320:3 | 82:12,14 83:1,9,25 | 189:3 190:10 | 298:13,14,14,25 |
| 327:19 328:24 | 84:3,7,11 85:5 | 191:16,17,22 | 299:14 302:4,13 |
| 330:25 331:22,22 | 86:23,25 87:4,8,14 | 192:5 194:20 | 303:21 304:4,12 |
| 349:23 352:20 | 88:15,19,22,23 | 195:8,14,15,18 | 305:24 306:9,15 |
| **kinds** 177:16 | 89:24 90:4,7,20 | 196:1,2,4,22,24 | 306:21 307:17 |
| 334:20 | 91:2,7 92:6,7,24 | 199:1,15 202:5 | 308:4,25 309:2,4,9 |
| **kings** 231:19 | 93:22,25 94:4,5,7 | 206:15,24,24 | 309:15 311:9,20 |
| **knew** 105:7,10,11 | 95:6,8,16,21 96:9 | 207:22 208:2,3,16 | 312:2,7,8,16 |
| 105:12 168:15 | 98:3,11 99:2,5,15 | 208:19 209:2,12 | 313:10 315:5,10 |
| 226:4 254:15 | 100:8,14,14,18 | 209:15 211:9,10 | 315:20 317:4,14 |
| 266:2 273:1 283:5 | 102:5 104:3,4,4,19 | 213:10,20 221:13 | 317:21 318:2 |
| 283:6 284:21 | 105:6,7,12 107:12 | 223:5,7,11,13 | 324:7 327:2,17,23 |
| 294:17 305:22 | 109:2,7,21,24 | 227:15 230:9,9 | 328:5,11 329:2,5 |
| 327:22 | 110:2 112:13,22 | 232:4 233:12,14 | 332:10 334:4,16 |
| **knock** 346:7 | 115:19 120:19,22 | 234:4,13 236:1 | 335:4,8,9,12 338:5 |
| **know** 6:18 7:1,19 | 126:25 127:1,23 | 237:3,24 240:5,14 | 338:25 340:12,14 |
| 8:24 10:10,12 | 128:1,7,9 129:1,1 | 241:11 242:2 | 340:23 341:1,4,6,6 |
| 17:20 18:11,17,19 | 129:4,7 130:9,19 | 243:10,13,13,19 | 341:7,10 344:14 |
| 18:23,25 19:1 | 130:24 131:19 | 243:19 244:1,2,18 | 349:23 350:6 351:3 |
| 20:3,5,22,22,23 | 132:9,18 133:5 | 244:21 245:9 | 351:13,22 352:6,9 |
| 22:17 23:15 24:6 | 134:9 136:9,23 | 247:8 248:20,21 | 355:4 |
| 30:12,12 32:5,9,15 | 138:12 143:16 | 249:7,8,9 250:21 | **knowing** 18:7 |
| 34:14,22 36:11 | 147:18 149:3,5 | 252:9 253:22 | 86:19 272:1 |
| 40:24 41:4 42:18 | 150:1 151:6,12,16 | 254:22 257:4,13 | **knowledge** 96:8 |
| 43:3,4,8,20,21,24 | 152:13,14,16 | 257:20 258:3 | 223:15 356:10 |
| 44:2,3,4 46:9,13 | 153:13,13,22,24 | 260:5,8,9 261:9 | 357:6 |
| 46:25 47:15 48:19 | 155:11,13 162:22 | 262:12 263:5,9,13 | **knowledgeable** |
| 48:20,22,25 49:1,2 | 163:8,10,14,14 | 264:23 265:4,22 | 96:5 |
| 49:4,9,10,11,15,20 | 164:10 166:6 | 265:23 266:12,20 | **known** 157:19,22 |
| 50:15 51:20 52:14 | 167:5,7,11,14,15 | 267:22 269:15,16 | 248:5 343:7 |
| 53:22,23 54:4,21 | 167:20,21,25 | 269:21 270:8,9,15 | **knows** 8:2 103:16 |
| 55:1 56:8,11,18,20 | 168:14,15 169:15 | 270:18 271:14,23 | 223:14 299:22 |
| 59:4,23 60:7,23 | 172:13 173:1 | 271:24 272:15,18 | |
| 61:1,8,12 62:4,10 | 175:3,16,25 176:2 | 273:3,12,13,16 | **l** |
| 62:12,16,17 63:1,3 | 176:9 177:12,17 | 274:1,2,9 275:13 | **l** 13:25 14:24 23:7 |
| 64:6,7 65:9,24 | 179:14,21,22 | 275:17,23 276:18 | 32:7 73:8,11 |
| | | | 157:17 177:8 |

257:2
**label** 249:21
**labeled** 249:24
  296:16
**labor** 290:24
  299:2
**laboy** 86:13
  153:10 170:5
  191:20 217:20
  220:7,12 222:1
  226:8 229:4 230:8
  237:24 238:4,15
  238:20 239:20
**lack** 113:1
**ladies** 259:25
**lakeisha** 102:17
  206:23 207:9,20
  282:6 323:18,23
**lakeisha's** 308:20
  308:22
**lanolin** 273:21
**laptop** 8:10,14,19
  8:20
**largest** 84:12
**lasted** 354:12
**late** 27:11 285:3
  308:4
**law** 2:4,14 9:1
  72:17,19,20 96:7
  181:23 182:14
  184:8 203:10
  306:19 314:18,24
  315:2,4 320:21
  334:13
**law.nyc.gov** 2:17
**laws** 5:1
**lawsuit** 65:21
  68:10 69:16
  211:10 329:6
  339:24

**lawyer** 11:2 72:15
  99:10,11 120:21
  120:22 175:13
  176:12 251:10
  336:2
**lawyer's** 344:18
**lawyers** 146:24
  212:16 249:16
  250:24
**layered** 250:22
**lead** 122:12
**leader** 165:21
**leadership** 92:17
  165:21 230:24,25
  246:23 312:5
  347:3
**leads** 100:21
**leaned** 281:25
**leaning** 103:2
**learn** 22:6 46:3
  62:5,20 176:20
  240:21 246:5
  326:14
**learned** 74:9,15
  75:2,16 76:5,25
  77:1,22 80:8,12
  161:23 162:2
  166:10 177:23
  223:13 241:5,15
  326:12
**learning** 51:1
  58:20 62:19
**leave** 91:6,19 92:2
  214:5 281:8,9
  285:11,25 286:1,3
  286:7 291:6,7
  294:8,10 296:9,10
  296:22 298:16
  299:5,7,10,16
  300:1,7,14,16,24
  301:5 305:1,13,14

309:6
**leaving** 56:23
  57:20,22 91:9
  306:22
**led** 21:25 61:17
  72:11 75:24 76:23
  98:20 260:9,10
  261:20
**lee** 280:21 294:14
  294:25 300:2,19
**leery** 230:7
**left** 41:16 59:3
  82:10 86:22
  102:22 131:19
  214:24 222:25
  270:23 286:5
  288:5,17 289:16
  327:24,24
**legal** 44:15 75:15
  97:19 144:4,13
  174:9 175:6,14
  176:10 177:19
  178:17 181:25
  184:9 212:11
  248:7 251:25
  255:16,20 256:7
  257:14 258:17
  262:1 267:6
  279:19 336:4
**legitimate** 97:17
**length** 88:6,11
  354:18
**letter** 3:10 235:1
  319:7 320:10,15
**letting** 132:5
  214:17 279:24
**level** 77:24,24
  78:17 201:17,24
**levels** 77:23 99:18
**levy** 72:24 73:6,8
  73:10 74:5 75:25

76:24 234:24
**lex** 270:16
**lexington** 270:12
**license** 201:12,13
  342:11,20 343:4,5
**licensed** 25:1
**licensing** 201:11
**licensure** 25:4
  201:12
**licensures** 201:1
**lieb** 96:10,10
  181:23,23 336:10
**lieb's** 181:23
**lied** 105:8 330:12
**life** 120:19 154:14
  154:18 263:15
  274:7 277:14
  317:22 322:18
  329:4
**lifting** 269:17
**lights** 345:12
**line** 3:9,15 47:2,4
  48:10 59:24,25
  60:6 63:11,11,13
  63:21,25,25 64:9
  76:7,14,14 78:17
  78:24,24,24,25,25
  79:1,1,3,8,9,17,18
  79:22 80:4,16
  85:10 150:9
  167:22 185:1,7,11
  185:12,16,19,22
  186:2,6,7,21 187:3
  187:5,13 188:4,25
  189:6,11,19 190:1
  190:18 218:16
  219:4,6 220:8,14
  220:16 221:16,24
  222:2,18,21,24
  223:2,3 227:10
  229:5,12,14,19,20

Melissa Kaye

**[line - macdonald]** Page 36

230:1,18 231:3,13
231:16,19,22,22
231:24 232:8,10
233:2,8,22 234:6,9
266:21 358:4,7,10
358:13,16,19
**lines**  76:7 77:1,9
77:23 78:16 79:4
79:12,20,20 185:1
185:3,3,4,6 202:6
219:5 233:13
234:2,8
**linked**  43:13 78:3
82:17
**lip**  87:18
**lipitor**  29:17,21
30:2,4,8,19 31:5
33:6,7,8,10
**lips**  317:11
**list**  221:20 261:13
**listing**  221:15
**lists**  201:10
**litany**  240:1
296:17
**literally**  105:4
337:15
**litigation**  68:14
69:4 70:16 71:23
72:12 73:16 337:7
**little**  26:1,11 77:21
122:10 132:18,25
142:3 161:21
163:12 196:11
215:11 254:15
267:10 269:6
279:25 304:3
347:19
**live**  160:8,22
**lived**  128:9 129:5
160:12

**lives**  153:25
263:16
**living**  94:7 160:12
160:18 270:6
**lloyd**  177:10
**load**  130:12 132:4
132:11
**locally**  21:8
**located**  6:5,12
14:10
**location**  1:20
153:8
**locked**  186:16,18
**logistics**  173:18
**long**  10:14 15:14
24:15 30:4 32:20
35:17 87:12
123:18 124:3
146:23 148:1
160:12 168:10
187:21 202:13
206:25 263:7,11
270:5,6 310:17
**longer**  32:18 63:3
63:3 120:12
129:21 130:7
133:16 218:4
242:2 284:8
**longevity**  113:5,7
113:10,11,18,19
113:22,25 115:9
233:24 240:9
290:19
**longitudinal**  54:6
**longstanding**
80:13 113:12
232:4,8
**lonnie**  182:15
**look**  42:11 48:15
59:18 61:25 62:2
63:7 79:12 105:21

105:25 106:22,23
107:10,23 115:11
118:22 142:24
190:16 195:22
219:17,20,23
220:2,3 221:10
280:25 282:8
285:8 317:13,13
318:16,19 321:2
323:9,9 350:20
**looked**  38:4 46:9
62:24 65:25 66:1
66:2,8,11,12
254:20 255:5
266:21 282:11
**looking**  39:4 47:19
107:17 115:19
187:8,15 248:8
321:10,14,21
326:23 327:6
347:23 348:19
**looks**  103:5,6
122:11 150:20
322:7,8 325:8
326:5 329:18
350:22
**loop**  27:22 109:6
109:20
**loophole**  313:3
**lori**  46:17,22
**lorraine**  182:1
**lose**  87:4 88:25
186:25
**losing**  98:21
**loss**  91:23,23
**lot**  25:13 56:9
70:23,24 85:25
87:18 91:16 97:9
145:8 152:17
166:4 185:8 190:2
208:13 209:12,15

215:5 222:13
237:17 251:16
267:3 272:16
281:13 285:15
287:1,6 292:9
321:10 322:15
330:4 354:16,17
**louder**  26:1
**louise**  212:6
**love**  191:19 330:7
**loved**  345:18
**lower**  45:24
113:16,17
**lucy**  336:1
**lunch**  121:15
123:1 153:20
154:3,4,9 262:22
262:23 263:5,6,8
263:11 281:16,22
282:14 283:6
284:7
**lurched**  281:22
**lure**  230:3
**luxury**  228:2,2
263:11
**lying**  282:2

---

**m**

**m**  3:20 90:16
**m.d.**  42:4 46:2
90:16 92:21 93:5
202:23 233:14
274:18
**m.d.'s**  233:17
**ma'am**  97:22
199:22 219:22,22
343:19
**mac**  195:9,10
**macdonald**  26:23
248:1 252:18
303:24

Melissa Kaye

**magistrate** 341:16
**main** 348:18
**maintain** 167:9
**maker** 345:10
**making** 42:20 99:8
  102:8 149:2,7
  167:10 215:2
  222:13 233:7,24
  315:16 348:23
  349:17 354:21
**male** 23:8 44:23
  45:1,25 46:1 47:1
  48:2 52:25 59:17
  59:20,22 60:1,4
  80:6 86:25 89:1
  93:7 112:16,18,19
  112:20 117:8
  120:18 167:18
  182:10 217:11
  234:14,17 263:3
  332:8
**man** 304:3 332:4
**manage** 39:5,20
  44:9 53:9,12 55:8
  55:8,11 334:5
**managed** 103:25
**management**
  26:20 41:7,8,12
  86:1 94:12 246:23
  289:3 303:20
  350:22,24 351:1,2
  351:4,10 352:5
**manager** 207:11
  222:20
**managerial** 92:4
  93:20 94:8 98:22
  110:10 111:10
  115:13,23 116:12
  117:6,11 118:9
  188:25 217:22
  218:5 220:23

221:24 222:2,21
  223:3 226:11,22
  227:9,10,10 229:5
  229:12,14,18
  230:1,18 231:3,13
  231:16,19,22
  264:13,22,22,25
**managers** 154:12
**manhattan** 50:5,9
  52:3 60:5 90:5,8
  90:10,14,24 93:8
  108:16 114:4
  167:19 175:12
  187:10 207:22
  208:18 209:11,13
  219:9 222:16,17
  222:22 263:2,14
  291:22,24 297:8
  314:9 323:22
  328:20
**manipulate** 184:9
**manipulated**
  265:19
**manner** 5:2 120:7
  166:17 171:23
  175:5 247:21
  334:3
**mansion** 132:13
  143:9
**mantra** 239:22
**manufacture**
  340:11
**manufacturing**
  312:12
**marazzo** 303:11
  304:6
**march** 133:18
  322:21 323:6,11
**margaret** 21:20
**marginalized**
  101:2 299:11

**marginalizing**
  230:5
**marina** 321:9
**mark** 109:18,21
  157:7 342:10,12
  343:12 344:6
  350:12
**marked** 108:6
  192:20 194:10
  219:14 325:2
**marks** 109:16,24
**married** 159:11,13
  327:25 332:4
**mary** 48:16 60:20
  164:13 172:11
  182:7 184:19
**masturbatory**
  330:9
**match** 327:20
**material** 320:12
**matter** 4:7 38:24
  69:24 86:11 121:7
  239:24 315:3,6,15
  316:7,8 329:22
  335:5
**matters** 53:25
  69:21 96:6 121:7
  281:14 318:13
**matthew** 297:25
**mayor's** 166:22
  173:25
**mayors** 173:5
**mckelvey** 182:1
**mean** 27:11 38:6
  44:2 45:17 65:19
  65:20,25 80:25
  85:20,22 88:24
  96:5 97:24 99:10
  104:3 105:4
  112:10 127:4
  129:3,12 132:3,13

139:1 145:24,24
  147:6,17 149:24
  155:12,12 158:20
  167:1 171:24
  172:21 176:11
  188:9 189:18
  193:23 196:24
  197:11 203:23
  208:16 214:2
  217:2 232:11
  236:13 240:11
  241:11 244:21
  248:19 254:9
  261:2 263:21
  267:7,18 270:15
  270:18 273:22
  274:4 302:8 322:1
  322:16 323:18
  324:13 330:23
  331:10 332:6,14
  332:16,17,17
  338:1,3 339:3,13
  340:1,14 341:4
  342:7 345:17
  352:25 353:1
**meaning** 74:17
  233:10 281:11
**means** 5:3 82:17
  121:5,6 149:22
  225:5 229:10
  257:3,4
**meant** 125:13,16
  172:8 173:10
  249:12
**meat** 200:11
**mediated** 274:12
**mediator** 344:17
**medical** 11:6
  16:20 20:22 21:11
  27:22,24 51:14,18
  60:2 98:8,10

Melissa Kaye

**[medical - misled]**                                                    Page 38

| | | | |
|---|---|---|---|
| 100:12 101:6 | 102:15,19,20,21 | **mental** 29:5 96:3,6 | 182:11,18 183:9 |
| 124:25 125:17 | 132:8,8 168:23 | 184:7 249:23 | **mill** 333:23 |
| 127:3 131:20 | 216:9,11,20 | 250:4,5 334:13,13 | **mind** 56:11 116:18 |
| 133:7 135:5 136:8 | 217:19 237:15,19 | **mentality** 49:1 | 155:12 172:16 |
| 142:25 200:18,22 | 244:7,10 247:24 | **mention** 335:10 | 246:4 |
| 200:22 204:10 | 247:25 248:4,18 | **mentioned** 28:17 | **mine** 97:21,24 |
| 208:7 239:1 | 249:6 252:24 | 39:19 99:14 | 194:21 299:1 |
| 240:22 242:2,17 | 253:8,10 257:12 | 226:21 227:9 | **minimize** 107:18 |
| 243:14 244:24 | 258:10 260:7,22 | 280:19,24 292:4 | 195:6 |
| 274:16 275:8 | 260:23 261:7,12 | **merged** 78:9 | **minor** 68:24 |
| 280:1 290:7,9 | 261:23 283:20 | **merits** 354:23 | **minus** 83:8 |
| 301:6 302:1,3,5 | 286:23 287:8,24 | **mess** 312:14 | **minute** 71:8 |
| 303:3 318:20 | 305:25 311:6,18 | **message** 40:1 43:6 | 122:19 154:3,4 |
| 319:23 320:4 | 322:23 331:15,17 | 43:6,14 162:16 | 165:19 198:17 |
| 332:19 333:12,13 | **meetings** 85:24 | 309:6 | 262:21,22 281:16 |
| 333:16 334:17 | 92:17 164:1 | **messages** 6:24 | 281:21 283:6 |
| 335:2 342:11,20 | 167:16 192:6 | 42:12 | 284:7 301:15 |
| 343:4,4 | 211:22,23 238:19 | **messing** 281:4 | **minutes** 121:19 |
| **medically** 51:16 | **melania** 51:4 | **met** 61:18 63:9 | 122:21,24 153:20 |
| **medication** 12:13 | **melanie** 49:15 | 64:25 88:6,7,11 | 153:23 154:10 |
| 12:16 29:12,19 | 50:15 52:23 | 143:14,15,18,23 | 161:9 263:22 |
| 31:14,22 33:2,20 | **melissa** 1:4,17 2:2 | 163:8 238:4,8,14 | 264:1 268:15,19 |
| 33:25 34:6 | 4:6,7 5:14,20 | 253:11 283:15 | 270:7,19,22 |
| **medications** 31:10 | 157:13,20,21,22 | 317:19 318:4 | 289:15 354:9,12 |
| 31:11 34:12,13 | 158:3,21 159:4 | 327:25 328:19 | **minutia** 173:25 |
| 127:22,23 142:24 | 220:8 321:7,11 | 329:15 343:8 | **miscategorized** |
| 142:25 143:4 | 358:2,24 359:2,4 | **methodist** 133:5 | 211:8 |
| **medicine** 18:2 | 359:12 | **mexico** 1:21 6:13 | **mischaracterizes** |
| 19:17 34:25 | **melissakayemd** | 6:14 14:10 160:12 | 172:1,5 188:8 |
| 201:12,14 274:20 | 321:7 | 160:13,19 343:5 | 189:9 191:1 210:5 |
| 274:23 275:9,15 | **member** 68:7 | **mh** 59:4 | 223:19 332:24,25 |
| 275:16 276:3,16 | 83:10 84:22 89:10 | **micromanagement** | **mischaracterizing** |
| 331:21 | 90:21,25 91:20 | 174:1,5,13 | 183:3 191:9 322:3 |
| **meet** 52:2 53:19 | 92:8 286:20 305:2 | **microwave** 345:10 | **misdemeanor** |
| 59:11 88:14 | 305:4 | **mid** 17:5 278:23 | 313:4 314:20 |
| 283:14 286:17 | **members** 68:5 | **middle** 131:12 | **misdemeanors** |
| 306:1 328:22,23 | 83:25 | 154:9,10 157:14 | 312:19 314:6,18 |
| **meeting** 59:14 | **memorialized** | 158:19,21 159:4,5 | **misinformation** |
| 64:6,7 67:9 87:14 | 255:1 | 159:6 282:11 | 334:1 |
| 88:11,13,14 99:14 | **memory** 112:12 | **miguel** 174:25 | **misled** 234:3 |
| 100:23 101:25 | | 175:6 179:16 | |

Melissa Kaye

**[misrepresentation - name]**                                              Page 39

**misrepresentation**
 249:11
**misrepresented**
 113:4
**missed**  224:14
 315:11 316:10
**missing**  342:15
**misstatement**
 333:22
**mistake**  46:5,10
**mistaken**  82:16
 267:24
**mistakenly**  257:10
**mistruths**  246:4
**misunderstood**
 146:6
**misuse**  261:23
**mitigate**  94:8
**mitigation**  251:16
**mm**  10:24 45:21
 106:5,13,17 109:9
 110:3 111:4 123:5
 137:18 157:9
 179:9,12 198:1,18
 239:18 319:4
 320:22 325:11,13
 329:20 344:20,22
 350:18
**moa**  168:4,7
**mocj**  103:25
 104:22 173:5
 177:10 346:3
**mocked**  192:6
**mocking**  323:17
 345:14
**modality**  338:14
**model**  129:19,22
 130:13,15 135:22
 135:24
**modern**  102:7

**modification**
 303:2
**modified**  69:6,7
**modify**  70:22
**modifying**  69:5
**mom**  153:22
 327:25
**moment**  11:14
 116:20
**mommy**  271:24,24
**monday**  1:18
 212:8
**monetary**  339:13
 339:20
**money**  99:24
 149:2,6 284:1
 297:4 332:5
**monies**  230:14
**monitor**  346:15
 348:7
**monitoring**  346:19
 350:3,7
**monkey**  298:15
**month**  77:6,7
 140:12,20,25,25
 141:4,9 150:22
 206:4,6 227:7
 309:12
**monthly**  150:2
 205:23
**months**  62:14 63:3
 63:4 207:1,1,1
 211:2 225:13
 226:25 290:8
 323:2,7
**montoya**  182:1
**mood**  334:19
**moonlighter**
 138:16
**moonlighting**
 124:17 127:9,15

128:12 143:16
 256:6
**moore**  95:22
 181:24 334:8
 335:18,20 336:10
**morgenthau**  95:23
 334:11
**morning**  4:2 6:3,5
 6:19 34:17 56:15
 56:22 152:14
 153:19 161:23
 188:23 217:21
 263:24 264:2
 266:7,8 268:18,23
 269:1,2 271:8,17
 271:18 275:11
 276:4,9 278:17
 279:15
**mornings**  152:13
 212:8
**mother**  188:14
 317:23 331:8
**motherboard**
 287:11
**motion**  111:2
**motions**  330:24
**motivated**  44:10
**motivation**  98:21
**move**  43:9 51:21
 52:20 81:7 101:12
 123:3 156:21
 169:8 191:11
 193:6 229:5,13,17
 229:18 250:19
 257:23 277:12
 318:8 346:12
 350:8 353:2,4
**moved**  81:16 90:1
 175:12 208:5
 229:11,20 264:1

**moving**  48:23
 78:17 193:10
 259:8
**mucking**  323:13
**mullan**  212:6,19
**multiple**  35:19
 92:17 193:18
 231:1 252:2 279:4
 336:9 344:4
**mundy**  90:15,17
 90:21 108:25
 109:5,18 114:3
 115:3,10 119:11
 222:12 226:5
 231:1,4,16 233:10
 244:11,21 249:2
 253:1 260:7 307:1
 310:19,25 311:8
 311:23 312:3,6,22
 313:10,22 314:9
 314:25 315:22
 316:13,14,20
 317:5 318:6
**mundy's**  226:14
 244:19 311:8,21
**myles**  208:19,23
 208:24

**n**

**n**  2:1 3:1,20 4:1
 32:7 73:8 85:16
 90:16 157:24
 158:22 257:2,2
**nail**  275:24
**name**  4:2,12 8:24
 13:21 14:19,22
 21:18 23:3,4,12,16
 28:10 46:17 60:4
 70:4,5 72:20
 84:25 85:14 104:5
 104:20 126:22
 155:14 157:13,14

Melissa Kaye

**[name - notify]**

157:20,21,25
158:3,8,8,17,18,19
158:20,21,22,24
159:1,1,5,5,6
177:12,12 181:18
182:13 208:22
303:10 309:8,15
321:9 347:13
**name's** 23:4
**named** 1:13 27:25
95:20 158:21
338:20
**names** 1:10 4:10
28:20 33:12 81:15
81:18 135:9,10
155:12 158:5,11
159:21 183:11
209:2,6
**nate** 283:15
286:16
**naturally** 166:20
**nature** 294:16
**navigate** 107:14
**near** 64:18 90:2
189:23
**nebulous** 115:15
118:1 229:25
**necessarily** 239:15
**necessary** 359:6
**need** 10:15 11:15
11:15 19:22 26:3
39:25 42:11 61:12
89:4 96:14 105:20
105:24 106:4,9,11
106:16 119:23,23
121:23 122:2,8,10
133:11,13 150:10
150:11 156:2,21
171:5,5 176:3
188:16 195:25
214:16 215:11

223:11 224:19
227:4,16,19
229:21 234:11
257:23,24 263:21
267:17,18 268:7
271:21 288:8,13
306:21 327:3
334:24 336:20,21
352:25
**needed** 72:14
120:25 128:10
149:22 166:7
233:22 266:22
268:14,16 274:14
284:24 304:14
305:18 326:11
327:3 337:3
**needs** 8:3 80:19
96:21 120:24
250:17,18 257:25
258:13 343:2
**negative** 272:3
324:15
**negatively** 340:25
**neglected** 214:14
**negotiated** 152:25
154:7
**negotiating** 94:7
**negotiations**
117:21 154:4
**neither** 87:21
356:11 357:7
**neomycin** 273:21
**nervous** 348:22
**neurology** 201:3
**neutral** 97:25
174:2,17 249:19
251:9
**neutrally** 257:17
**never** 6:16 48:24
61:15 77:15 86:19

87:19 96:14,17
104:12 117:21
118:14,14,18,23
120:6,7 130:11,14
188:11 189:9,18
211:13,13,25
217:22 218:19
230:17 246:14
248:11,21,22,24
254:14,15 282:10
286:10 287:3
297:5 301:10
303:22,22,23,23
303:24 305:6,7
319:11 327:22
329:2 330:18,21
330:22 331:15
333:25 343:25
**new** 1:2,7,21 2:6
2:10,14,16,16 4:8
4:16 6:6,13,14
8:25 9:1,6 14:10
68:19,22 72:14
82:6,8 90:15
105:14 123:14
130:5 133:3 156:3
160:12,13,14,19
161:2 172:18
201:13 231:17
235:17 241:18
244:22 255:7
313:3,3 314:19
326:10 327:24
343:5 356:21
358:1 359:1
**newly** 231:17,18
**news** 328:9
**newton** 335:25
**nice** 263:11 323:19
330:15

**nickname** 158:25
159:6,7,10
**nicolas** 330:10
**nicole** 70:2,4
**niece** 328:24
**nine** 153:21
199:17 264:7,11
265:20 282:19
304:14
**nlrb** 291:15
**nod** 10:21
**noise** 42:20
**noisy** 165:16
**non** 99:10,11
154:6 172:8,16
173:10 220:23
221:23 231:22
253:2 264:22
323:13
**normal** 284:5
300:8 349:19
**normally** 269:8
283:12
**notary** 1:22 4:15
356:1,20 359:13
359:19
**note** 109:16 125:2
125:5,6,21 155:5
170:25 320:13
322:8
**noted** 359:7
**notes** 114:7 322:9
349:18
**nothing's** 168:2
230:11 239:25
**notification** 19:16
**notified** 162:21,22
327:10 336:18
354:11
**notify** 162:12

**november** 1:18
4:13 24:5,11
88:13 261:8
331:16
**number** 109:25
113:13 139:19
210:15 220:22
221:4,22 228:11
253:3 284:3
308:25 309:1,2
319:6 321:8
322:20 326:3
336:18
**numbers** 107:25
210:16 219:12
312:11
**numerous** 91:3
95:9,9 261:7
**nurse** 28:5,7
**nurse's** 43:23
**nurses** 128:4
**nursing** 147:19,23
148:5,18,24 152:5
155:13,14
**nyc** 107:25 108:9
**nyp** 129:25 130:3
130:4 133:3
135:24,25 136:1
136:14,16,17,20
**nypd** 130:2
**nyu** 185:3,6,11,16
185:19,22 186:7

**o**

**o** 3:20 4:1 23:7
34:23 66:16
157:17 177:8
**oath** 9:10 226:9
**oaths** 4:16
**object** 110:17
245:4 339:12

**objected** 100:16
155:6
**objection** 4:19
5:17 6:8 7:9 8:15
11:8 12:10,23
13:19 14:15 15:2
15:6,10,16,23 16:7
16:13 17:1 18:10
20:14 21:14 22:2
22:14 27:8 29:9
29:14 30:21 31:16
33:22 34:1,7
37:18,22 38:7,19
39:1 41:2,18 42:7
42:21 44:14 47:21
50:20 52:16 54:19
55:14,21 58:8
62:3 65:4,17
66:19 67:5,10,22
68:17 69:9,18
70:6,18 71:24
72:13,22 73:22
74:7,12,20 75:5,18
76:1 78:22 82:25
83:12,20 84:10,15
85:4 88:3 89:25
91:22 92:5,13
93:21 95:2 101:10
102:13 103:15,19
104:15 110:12,16
111:12 117:1,13
117:17 118:11
119:13 120:15
125:24 127:13
134:3,7,16,21,25
135:14,20 137:7
137:23 138:2,7
139:1,2,8 140:14
140:18 141:13
142:15,18 143:10
143:24 144:14

145:17,21 146:21
148:3,20 149:20
151:2,5,25 152:22
154:24 156:4,7
159:15 160:25
162:13 166:2,15
171:12,25 172:4
173:15 175:21
178:1,9,15,22
183:23 185:17,24
188:7 189:8,8,15
190:25 207:24
209:25 210:4
212:23 213:6
215:15,18 222:3
223:18 226:12
229:21 231:7,14
232:22 235:13
236:15 238:17
239:10 241:10,24
242:12,14,24
245:7,21 246:13
254:12,12 255:3
255:13 262:10
264:15,15,19
282:21 285:17
291:14,20 292:2,8
292:19 295:7,10
295:11,25 297:13
297:19 298:7
303:4 323:3
327:13 330:1
332:23,23 336:23
338:9 345:1
346:22 349:14
351:6
**objections** 100:19
**objective** 97:25
173:10 174:2
249:20

**obligation** 335:19
**observation** 54:6
**obsessed** 312:10
**obtained** 38:11
**obvious** 49:2,3,3
160:4 349:17
**obviously** 334:15
**occasion** 329:15
**occur** 35:17
**occurred** 20:8
164:7
**occurring** 177:22
**october** 72:9 214:2
214:13 215:7
216:5 272:14
306:1 311:7
**offender** 96:1
334:10
**offensive** 317:6
**offer** 94:19
**offered** 91:4 110:9
111:10 115:12,15
117:12,14,18
185:16,19,22
214:18,19 217:21
217:22,25 330:21
**office** 43:24 50:24
51:3,4 61:2,5 62:7
62:8,11,14,17,20
64:12 75:10,13
99:7 102:1,21,22
166:23 173:6,25
176:7,12 179:14
181:13 182:11
190:9 214:24
262:24 282:6
283:11,13 287:12
291:22,25 293:18
297:9,25 306:3,4,6
308:8,9,14,19,21
308:22,22 320:16

Melissa Kaye

**[office - okay]**                                                    Page 42

347:7,14,18 348:5
348:17,18 349:18
350:5,5
**officer**   136:9
356:2
**offices**   2:4 130:10
**official**   89:17
94:17 104:5 237:1
237:5
**officially**   325:10
**oh**   10:4 47:7 48:22
57:2 61:11 98:14
119:17 121:4
130:4 138:7
152:11 160:4
213:17 229:13
256:2 263:1 298:1
335:7 337:16,17
347:22,22
**ointments**   275:16
**okay**   6:14 7:8 8:5
8:12,20,23 9:8,10
9:13,18,22,23,25
10:2,4,6,10,20,24
11:6,25,25 12:3,6
12:21 13:10,16
14:4,19,25 15:14
16:2,5 17:9,25
18:3,6 19:11,14,21
19:23 20:2,11,25
21:4,7,10 22:6
23:8,11,15,18,21
23:24 24:15,19,21
25:3,7,21,22 26:1
27:1,5 28:11,17,17
28:18,24 29:3,3,11
29:18 31:2,4,7,9
31:14 32:8,10,18
32:20 33:7,14
34:5,13 35:2,5,14
35:17 36:18 37:14

38:13,17,24 39:17
39:24 40:22 41:15
42:2,10,14 43:15
43:15,25 44:6,6,13
45:15 46:14,21
49:19 50:13,18
51:4,7,9 52:5,20
54:13,17,24 55:1
55:12,18 56:2,7,12
57:6,10,10,17,21
58:4,12,12,20 59:8
59:20 60:7,15,17
60:23 61:1,4,17,23
62:1,19 64:2,4,17
64:25 66:6 67:3,8
68:5 69:8 70:10
70:15 71:2,9 72:8
72:11,20 73:9,20
74:3,9,15,23 75:9
75:24 76:22 77:21
78:16 79:7,24
80:15 81:23,25
82:4,8,12,24 83:6
83:16,23 84:3,7,17
84:19 85:2,9
87:23 89:24 90:4
90:13,20 91:7,9,12
92:10 93:15,18
100:25 101:3,4,22
101:22 104:12
108:23 109:13
110:4,6 111:1,11
112:2,14,14 114:2
114:6,15,20,20
115:2,2,12,17,22
116:2,4 117:11
118:25 119:7
120:11 121:12,15
121:17,19 122:3
122:13 123:23
124:3,5,13 125:3

126:4,10,22 127:6
127:8 128:16
129:9 130:4,6,18
132:12,17,19,20
132:22 133:15,20
134:5,13,18,23
135:8,19 136:5,21
137:11 138:8,8,21
140:6,10 141:5
142:11,17 143:7
143:21 144:19
145:6,15,23
146:15,18 147:2
147:10 148:2,8,13
148:17 149:9,16
150:19 151:18,23
152:4,18 154:17
155:4,7,18 157:19
157:23 158:7,23
158:23,23 159:3
159:13,21 160:4
160:11,18 161:4,6
161:11 162:2,9,18
162:20 163:18
164:5,9,22 165:6,9
165:14,17,18,25
166:10 171:20
176:18 177:1
178:13 179:19
181:14 184:11,22
186:23 187:25
188:22 194:2,7,16
195:12,20,20,23
196:8,11,12
197:20,25 199:21
200:12,21,25
201:16 202:2,9,13
202:16,24 203:3,6
203:16,22,25
204:7,13,18 207:2
207:7,14,18

208:24 209:7,19
210:8,13 211:1,5,5
214:9 215:4 217:4
217:4,7 218:6
220:10,19 221:15
221:21 228:7,19
228:19,20,24
232:2 233:6
234:20,22 235:8
236:24 238:3,8,8
238:14,19,24
239:6,16 241:2
242:22 243:1,7,10
243:16,21 244:12
244:16,19,24,24
245:2,20,22 246:8
247:12 251:4,21
252:10 254:1,22
255:9,9,19,25,25
256:10,18 257:1
257:11 260:18
261:14,14 262:8
265:13,16 267:9
267:16,25 268:3
268:10 269:10
270:1,5,17,22
271:6,12,16 276:1
276:15 277:9,12
278:20 279:11
280:18 281:8
284:11,12,17
285:2,7,10 286:1,9
287:17 288:2,4,4
290:16 291:11,17
291:24 292:4
294:1,12 295:18
295:22 299:9,13
300:4,22,22 301:4
301:11,16,22
302:6,10,12,15,18
302:22,25 303:17

Melissa Kaye

**[okay - page]**                                                   Page 43

304:7,16 307:3,3
307:10 310:3,6,15
311:12,19 313:6
314:1,8,16 316:23
317:2,8 318:8,18
319:22 321:17,20
321:22 322:19
324:11,17,23
325:14,19 326:12
326:20 327:8
329:12,16 332:2
334:23 336:14,14
336:14 337:7
338:24 339:9
341:9 344:5,21
346:10,10,12
349:6 350:2,8,8,18
351:19 353:2
**old** 63:7 159:23
304:3,4 332:5
**older** 209:2 328:4
**olds** 293:23
**once** 88:6,7,11
140:12,19,25
141:4,9 150:22
166:10 175:25
212:2 255:4,5
256:18 270:25
295:23
**one's** 196:19,23
**ones** 32:2 158:10
**ongoing** 28:16
104:22 145:7
167:16 278:18
291:8
**online** 254:19
**op** 28:25
**open** 102:24
164:21 166:18
235:16 264:3
268:13,15 269:13

269:14 271:13
**opened** 222:25
**openly** 99:19
**operated** 166:22
**operating** 211:24
**operational**
265:21
**operative** 197:9
**operatives** 173:4
177:9,10
**opinion** 45:5 99:10
99:11 143:5
177:25 248:12
324:14 335:1,3,7,9
335:11,12
**opportunity**
105:21,25 106:1
169:21 195:16,18
199:8,10 219:17
220:2 224:2,22
225:1,8 248:11,16
259:14
**opposed** 335:13
**opposite** 212:13
230:19
**opposition** 111:2
**optics** 173:2
312:14 340:11
**option** 195:1
246:20
**options** 133:16
190:17
**oranges** 232:12,16
**order** 8:10 36:4,17
118:4 126:12
172:12 175:7,8,20
176:1,2,2,5 215:12
251:1 270:2
278:15 285:8
313:24 315:24
351:10

**ordered** 51:19
174:3 177:18
203:9 204:16
250:5,7 251:19
334:9,14 335:18
**ordering** 98:3,4
251:17
**orders** 39:15 98:7
203:10 279:3,4,23
280:14
**organization**
139:17
**organize** 164:6
**organized** 163:20
**orient** 132:21
**original** 163:19
**originally** 215:6
**orthodontic**
186:17
**ostensibly** 56:14
56:15 94:19
262:20
**outcome** 174:15
174:21,22 356:16
357:12
**outer** 133:6
**outpatient** 132:9
**outside** 4:18 132:8
143:19 148:24
155:10 167:2
203:16 345:25
**outsourcing**
255:24
**overlap** 52:13
**overlaps** 50:22
**overly** 250:24
296:18
**overnight** 124:16
127:9,15 128:21
129:13 138:17

**oversaw** 50:9
114:21
**oversee** 50:4 90:5
114:3,9
**overseeing** 114:12
114:15
**oversight** 89:13
152:18 163:22
164:23 165:7
166:1,11,13
**overtime** 121:20
**ow** 114:17
**owen** 114:19
119:11 163:6
166:5 231:19
233:11 244:4,11
244:12 251:7
253:1,16,16
256:23 257:12
260:7 310:20,23
311:4,25 312:8,15
314:2,8,10,25
315:23
**owen's** 243:22
248:23
**owns** 136:18

|            p            |
| --- |

**p** 2:1,1 4:1 66:16
177:8
**p.m.** 150:13,16
161:12,14 198:19
198:22 245:13,16
289:10,13 301:17
301:20 346:16
354:3,6 355:12,15
**page** 3:2,6,15,21
196:15 319:2,6
320:9,9,14,24
322:20 358:4,7,10
358:13,16,19

Melissa Kaye

pages   198:15,15
320:13
paid   45:24 46:4,25
47:2,9,11 48:12
51:1 58:20 59:17
59:21 60:8 62:22
64:21 74:10,16
75:2,16 78:12
87:1 88:25 112:16
120:12,17,23
125:23 126:1,4,6
126:12,16 131:10
131:15 135:8,11
135:19 136:3,23
138:20 141:5,6
144:16,21,25
217:11 233:9,17
249:19 251:8
284:11 285:23
286:1 292:5,11,18
292:25 293:5,14
294:3,5 298:23
332:8
pain   275:19
painful   193:20
palpitations   33:17
345:4
pandemic   22:17
22:22 24:21 30:13
132:22,23 133:2,8
137:9 151:10
276:25 329:1,3,10
329:13
paola   23:14
318:21,22,23,24
318:24 321:5
paper   90:7 282:4
papers   70:23,24
paperwork   287:3
294:14,15 295:24

paragraph   200:25
201:9,23 217:9
221:4,22 272:23
344:14
parameters   252:1
paraphrase
260:12
parent   136:1
parents   68:7
158:20
parity   49:12 59:15
61:7 86:12 87:13
88:19,20,24 89:9
113:1 115:19,23
118:4 120:5 153:5
190:6,8 192:1
218:3,7,13,13
229:14,19 232:5,9
234:23 235:1
237:13,21,23
240:13 262:5
parole   206:3,6
207:5
parolee   205:6
206:14 209:22
parolees   204:25
205:10,12,17,18
205:24 210:7
part   35:18 38:14
47:17 54:10 60:5
60:8 76:11 79:14
84:5,8 90:23 93:7
94:11 96:2 102:7
103:3 111:24
113:8,23 126:19
137:16 138:1,6
167:17,18 176:11
184:24 186:7,11
186:14 202:7,7,10
202:13,14,15
206:15 208:13,14

209:2 211:10
212:5 213:24
217:8 222:23
234:5 263:3,7
293:19 298:2
312:4,16,25 315:7
315:13 326:20
partial   221:19
302:24
partially   300:15
participate   102:10
105:15 108:17
109:14 142:22
participating   27:2
32:6 112:5,6
particular   26:21
38:17 46:15 102:2
177:2 213:11
particularly   251:7
317:5
parties   4:17,20
200:10 343:8
354:11 356:12,14
357:8,11
partner   70:3
partner's   70:4
parts   188:10
265:15
partying   253:18
passed   77:5,12,12
87:16 103:7
328:21
patch   273:15
paternal   160:2
path   52:22
patient   124:24
125:20 130:12
132:4 142:21
patients   19:18,18
49:25 51:24
125:16,16,19

126:2,9 127:25
128:3,5 129:18,18
129:21,23,24
130:9 131:7 132:7
133:13 136:8
140:3,5 142:9
330:6,6,8
patricia   1:9 2:11
4:9 9:3 26:23
patsos   66:13
patsy   92:18 99:6
99:21 175:1 177:4
245:25 262:17
283:9 286:20
312:1
paucity   133:13
paula   318:25
paulina   23:13,14
pawns   267:6
pay   47:17,17
49:12 59:9,14
61:7,19 64:10,11
64:11,13,18,23
76:19,19 78:3,5,6
79:22 80:6,13
82:17 86:12,22
87:3,9,12 88:19,20
88:23 89:9 94:7
94:19,24 105:9
112:14,19 113:1,5
113:7,9,11,19,19
113:22,24,25,25
114:1 115:9,19,23
118:4,5 119:8
120:3,5 121:4,8
125:13 136:15,19
153:5 188:6 190:6
190:8,12 192:1,3,3
217:10 218:3,7,13
218:13 229:14,19
230:15 232:4,8

233:13,16,23,24
234:11,23 235:1
237:13,20,23
240:9,13 262:5
277:17 278:6
281:16 282:14
283:24 285:11,12
285:23 286:11
287:14 289:19,20
290:15,20,21
291:2,3 292:5
296:24 297:21
298:6,20,20 304:1
307:15,15 310:8
**paycheck** 136:22
285:24,25 298:24
**paying** 48:1 59:25
126:8 136:2 149:6
234:18
**payroll** 237:6,7
285:14 287:24
290:2 296:20
299:2
**paystubs** 3:22
155:17
**pc** 126:20 127:2
195:9
**pcs** 127:7 136:3
142:9
**pediatrician**
274:19
**pending** 9:5 11:2
93:4 220:14
**penn** 209:15
**pennsylvania**
200:19,23,24
201:14
**pension** 120:18
246:15 286:12
290:2

**pentagon** 328:21
**people** 49:4 67:23
68:3 95:20 99:6
99:20 102:21
104:7,8 113:14
164:21 166:6,19
167:8 173:24
177:17,19 181:3
182:1,17,23
183:11 185:14
187:19 188:15
193:24 209:4
214:19 237:17,18
240:18 241:18
245:5 247:9 248:9
269:8 298:19
303:13 306:25
307:4,20 312:2,18
312:23 313:1,23
314:5,15 323:18
324:3,9 331:14
333:23 334:17
**people's** 219:5
243:18 244:17
**percent** 84:18
205:25 308:24
**perform** 145:15
146:19 147:11
151:19,23
**performed** 141:12
**performing**
125:10,22 134:11
134:14,19,24
149:17 203:15,17
**period** 40:25 54:2
65:21 143:25
148:1 155:17
184:16 247:6
269:1,3
**periodic** 52:9
294:20

**periodically** 48:20
124:19 278:19
297:3
**periods** 210:23,23
291:3 298:21
**permanent** 252:25
**permissible**
215:23
**permission** 245:10
**permitted** 4:24
233:1
**perpetuating**
216:18
**person** 64:5 67:4
118:15 162:10
163:8,17 212:4,6
213:11 268:17,21
303:9,11 304:5
309:5,7,11 327:21
327:22,23 328:10
328:14 330:15
**person's** 309:8
**persona** 253:2
**personal** 97:21,23
97:24 154:18
223:15 307:5
311:14
**personally** 149:14
**personhood**
158:14
**persons** 1:11 4:11
**pertain** 167:3
243:15
**pertaining** 125:1
**pervasive** 48:1,3,5
**perverted** 340:10
**peter** 16:22,24
**petition** 350:16
**petitioned** 294:2
**petty** 296:16

**ph** 70:2 102:16,16
102:17 177:10,11
177:13 181:20,21
182:15 212:20
217:3 262:23
283:15 297:25
303:11,12 323:21
327:15 335:25
336:1 341:17
**pharmacologic**
148:12
**pharmacology**
147:23
**phased** 130:22
131:1 135:22
185:2
**phaseout** 130:20
**phasing** 135:24
**phd** 92:22
**phone** 6:19 7:5,7
7:13 8:8,21 42:15
42:20,23 43:2,7,13
67:6 100:12
118:15 163:9
215:2 245:9 303:8
303:15 308:19
321:7 347:17
**phrase** 44:9,10
**physical** 15:21
16:2 25:15 28:12
28:13,14,18 34:25
**physician** 19:15
47:2,5 48:11
59:24 60:6 63:14
63:16,16,17,22,22
76:15,20 78:19,20
79:2 80:2,7 86:24
92:22 93:5,7
113:21 167:22
187:4,12 188:3,24
189:10,19 201:24

202:4 208:10
218:16 219:7
233:22 234:10
243:14
**physicians** 48:2,2
95:10
**pick** 122:4,7,9
**picked** 230:4
**picking** 40:3 217:1
**picture** 329:18
**pictures** 42:22,23
**pills** 276:19
**pilot** 312:9,9
**pin** 215:12
**pinning** 21:22
**pinpoint** 17:11,15
19:7
**pit** 324:7,13
**pitch** 272:11
**place** 139:6
**plague** 306:2
**plaintiff** 1:5 2:2
4:7 5:12,15 68:10
68:12 219:11
239:14
**plaintiff's** 192:22
**plan** 69:2 162:23
163:10,19 164:11
350:22,24 351:1,2
351:4,10 352:5
354:21
**planning** 142:23
142:23 167:13
323:6
**plate** 329:9
**played** 97:13
**player** 177:11
214:23 296:18
**pleading** 203:12
249:22 250:1

**please** 5:7 9:16,18
9:20,22 10:10,12
10:23 13:24 14:23
17:12 18:12,21
23:5 24:25 25:24
25:25 26:3 32:4
37:8 43:11 49:16
58:14 63:18 66:14
80:20 86:6 97:10
101:16 105:22
106:6 109:6,19
116:19 117:15
119:24 132:22
133:22 137:14
139:3 144:23
156:25 157:7,16
162:6 168:24
169:14,25 170:9
170:14,18,25
172:2 173:21
174:11 179:25
180:12 181:5
191:10 193:1,14
196:11 198:6
201:19 206:8
215:17 216:1
219:16,19,24
220:25 221:6
223:23 224:3,23
225:17,18 226:19
227:13,17 228:6
228:11 229:22
232:23 238:10
243:2 250:13,16
254:6,7 258:11
259:24 264:17
265:9,9 287:18
288:7 289:8,22
291:4,10 292:14
309:17 313:13
316:3 325:15

331:8 337:17
342:17,22,25
349:10 352:18
353:23,24
**plenty** 171:4
299:14
**plethora** 213:20
**ploy** 94:20
**plus** 83:8 274:13
**point** 18:4 63:8
99:18 100:11
123:9 124:14,17
131:3 157:22
183:6,8 187:6
204:7,13 221:19
228:4 246:9
265:19 297:9,15
319:8 329:16
340:6 344:23
348:21
**pointer** 131:19
**points** 331:24
**policies** 294:4,6
**policy** 216:17
248:1,5,9 251:15
253:13 254:9,10
255:1 256:19
257:20 258:15,19
260:3,24 261:10
261:17,20 262:4
277:19 278:7
308:16 310:13
**political** 166:22
173:2,2,10 174:19
177:10
**politician** 329:22
**politicizing** 166:23
**politics** 290:5
**pool** 249:17,18
251:24

**poorly** 25:12
26:18,19 50:16
55:13
**population** 205:9
256:11
**port** 209:14
**portion** 171:1
217:17
**posed** 169:20
**position** 78:19,20
82:7,8 90:5,6,14
101:7 115:13
117:11 163:3
165:11,22 184:14
184:21,22 202:3,3
208:9 212:22
213:15 217:22
222:19,25 230:3
235:18 241:18
245:5 254:8
257:20 260:2
306:21 313:24
314:3,10 324:8
344:24
**positions** 93:12
185:5 191:15
**positive** 210:10
**possibility** 246:21
**possible** 146:23
196:14 257:15
270:20 273:25
321:8 323:2
**possibly** 14:24
94:12 184:20
222:2 230:8
260:10 261:25
295:1 302:23
**postings** 306:20
**posture** 281:24
**potency** 274:6

potentials  255:22
potions  275:3
  276:16
power  189:23
  190:2 329:23
practical  250:3,3
practice  17:6 18:1
  19:8,17,20 20:7
  48:3 126:15
  135:22 201:12,13
  216:17 247:25
  251:15 253:12,19
  254:9,11,25 255:7
  255:10,23 256:19
  257:16,16 260:3
  260:24 261:10,17
  261:20 262:4
  277:19 278:7
  291:18 307:16,24
  308:16 310:7,13
  330:4 342:20
practices  331:21
practicing  340:19
practitioner  19:10
  28:7
practitioners  28:5
prasad  102:17
  207:9,20
prasad's  206:23
pre  28:25 30:17
  132:23 203:12
  249:22 250:1,1
  346:4
precipitated  253:6
predictability
  210:24
pregnancy  302:9
pregnant  53:21
preparation  65:22
  66:4

prepare  37:17
  38:3 65:16
prepared  357:3
presbyterian
  130:5 133:3
prescribed  32:2
  33:7,12 275:7,8
presence  4:18
present  31:22
  34:19 67:8 121:9
  151:1 206:20
  238:15,20
presented  213:5
  232:5
presentence
  203:12 249:22
  250:2,8
pressure  173:23
  174:9 175:14
pressured  231:2
pressuring  175:2
  175:4,7,11 306:22
pretty  39:16 56:22
  85:25 132:1
  149:25 186:18
  209:23 210:16
  216:14 323:10
  326:5 328:4
  330:19,19
prevent  30:1
previous  35:12
  80:24 130:25
  188:6 255:5
  302:19 304:11
previously  117:3
  164:17 230:20
  241:19 248:6
  334:11
primarily  151:19
  152:6 167:5

primary  17:6,23
  19:8,15,16,19
  54:25 126:14
  148:24 287:11
printed  242:23
printer  8:22
prior  20:23 35:14
  36:14 39:12 45:12
  68:13 72:18 82:13
  83:16,17 155:6
  195:15 246:8
  262:23 267:11
  304:17 329:13
  356:5
priority  173:3
prison  51:14,15
private  129:18,20
  129:22 130:9,20
  130:22,24 135:22
  136:6,14 143:14
  185:3 216:17
  247:25 249:14
  251:2,11,14,20,22
  252:8 253:12,19
  253:23 254:9,11
  254:24 255:6,10
  255:23 256:3,18
  260:3,24 261:10
  261:16,20 262:4
  277:18 278:7
  307:16,24 308:16
  310:7,13
privately  154:22
privilege  11:3
  67:13,15 125:14
  156:7,12,12 157:5
privileged  72:1
  156:17
privileges  123:20
  125:14 135:5

pro  99:17 118:3
probably  17:24
  30:17,18 78:18
  87:14 220:4
  258:23 278:18
  352:21
probation  204:19
problem  8:2 26:13
  39:14 45:6 64:24
  152:23 153:15
  234:7 236:4
  251:14,23 253:4
  254:24,25 260:17
  273:9 279:21
  287:4 290:7,9
problematic  99:18
  100:4 213:13
  240:15 251:5,6
  258:15,19
problems  17:2,8
  17:10 19:6 32:16
  59:13 102:5 149:3
  266:9 270:21
  273:14 274:6
  276:24 305:16,17
  307:20,21 322:12
  326:23 334:20
procedural  4:25
procedure  184:8
  203:10
proceed  36:6
  71:16
proceeded  282:9
proceeding  1:20
  4:4,23 250:6
  355:16 357:4
proceedings  356:3
  356:5,6,9 357:6
process  102:5
  167:9 173:9 174:8
  174:14 233:21

323:1 326:16,21
335:15
**processed** 136:19
**produce** 299:23
319:9
**produced** 4:22
38:13 108:9,10
219:11 319:11
**producing** 319:12
**production** 136:22
136:25 138:22
141:20 298:5
320:4
**professional** 29:6
50:22 57:14 95:16
96:8 97:18 98:2
126:20,23 135:9
235:21 334:3
339:4 345:20
**professionally**
49:9
**professionals**
27:22 34:17 97:18
97:19,20
**profile** 321:6
**proforma** 331:1
**program** 158:12
324:2
**project** 312:9
**promised** 152:24
168:1 191:20
212:11 239:19
272:7 276:12
286:23 287:7
302:21 305:21
**promises** 231:25
**promoted** 101:17
204:10
**promotion** 101:1,4
101:9,20,22,23
204:14

**proper** 76:13
199:4 218:23
**properly** 333:13
**property** 160:24
209:16
**proposed** 199:2
238:25
**proposing** 99:8
**prosecution**
345:21
**prosecutors**
249:16 253:19
**prospective**
213:10
**protection** 91:24
246:24
**protocol** 275:2
276:3 280:23
281:2 300:2
**protocols** 274:23
**proton** 32:1,11
**prove** 287:13
**provide** 72:8
97:25 98:9 169:19
249:15 300:2
**provided** 225:5,7
227:25 228:1
319:24
**providing** 150:22
256:8
**provision** 314:19
**pscyhopharmac...**
140:3
**psych** 81:16,16
**psychiatric** 51:22
125:1 127:20
133:4,7 142:25
187:20,20 255:16
256:7
**psychiatrically**
185:14

**psychiatrist** 29:7
33:25 34:14 47:12
60:4,8 90:17,19,20
90:23 115:3,4
202:10,20 208:20
317:20 349:16
**psychiatrists** 47:9
108:15 111:18
129:20,23 167:18
209:3 212:21
263:2,3,3
**psychiatry** 45:20
47:9 48:17 53:18
59:7 60:21 93:7
163:2 165:12
201:2,4,5 202:22
216:10 244:9
293:22 306:19
334:16 340:19
**psychologist** 24:25
25:1,5 29:7 33:19
49:22 57:15 77:9
78:5,6 83:23,24,25
90:18 95:11 115:3
233:15 347:4,9,11
**psychologists** 76:6
77:23 78:7,10
80:16 81:15,19
84:4 85:3 92:25
95:10 111:18
209:1 212:21
253:15
**psychology** 49:24
76:8,8 78:11,12,15
78:15,25 79:1,7,8
80:1,1 81:17,21,21
90:12 92:23 321:4
321:6
**psychopharmace...**
146:4

**psychopharmac...**
142:5 148:14
**psychopharmac...**
140:1,7
**psychopharmac...**
142:6 146:5
**psychosis** 143:3
**psychostimulant**
275:21
**psychotherapy**
338:12
**psychotic** 187:22
334:18
**psyd** 53:3 92:22
207:11
**public** 1:22 113:12
167:11 253:3
309:1 315:7,15
351:11 356:1,20
359:19
**pull** 198:8 212:12
301:1
**pulled** 130:21
207:17 212:3
**pump** 32:1,11
**punch** 247:17
**punished** 88:24
**punitive** 236:13,18
236:21,22 247:21
**purpose** 34:24
**purposes** 7:3
30:25 108:8,12
109:15,22 174:19
301:25 324:24
**pursing** 317:11
**pursue** 76:18
341:17 343:4
**push** 64:13 86:21
293:20
**pushed** 87:2 327:5
335:20 340:15

Melissa Kaye

**[pushing - reach]** Page 49

| | | | |
|---|---|---|---|
| **pushing** 190:12 | 49:13 55:3 63:19 | 296:2 298:4 | **quotations** 110:2 |
| **put** 7:3 42:15 | 68:12 69:11 76:22 | 308:13 322:5 | **quote** 260:12 |
| 48:19 102:2 | 80:24 81:5 85:6 | 325:24 332:18 | 314:17 |
| 137:14 141:21 | 86:4 87:23 93:23 | 333:2,3,5 336:25 | **r** |
| 143:5 156:24 | 94:22 95:3 96:20 | 339:7 346:23 | **r** 2:1 3:20 4:1 |
| 168:9 170:25 | 97:7,10 98:24 | 349:11 351:14 | 13:25,25 34:23 |
| 201:14 215:11 | 101:11,15,16 | 353:21 | 49:17 303:12 |
| 220:23 221:23 | 109:16,18,21,24 | **questionable** | 321:9 358:3,3 |
| 226:1 239:11 | 110:18,21 116:19 | 253:20 | **rack** 155:22 |
| 242:13,15,17,17 | 119:16,22,24 | **questioning** 150:9 | **radioactive** 304:1 |
| 248:12 262:22 | 131:3 133:22 | 354:14 | **radtke** 357:2,15 |
| 274:3 275:10,14 | 135:16 138:4,10 | **questions** 3:14 | **raise** 58:23 76:9 |
| 275:15 294:16 | 143:2 146:6 | 7:24 8:2 9:7,19 | 81:22 82:1,6 |
| 295:16 296:8 | 150:23 154:19 | 12:9,19 26:17 | 86:22 92:25 94:19 |
| 300:19 301:2 | 155:6,9 156:2,10 | 27:21 49:10 59:13 | 94:24 116:12 |
| 306:25 311:8 | 156:21,22 157:3 | 81:8 101:15 | 166:20 186:22 |
| 317:6 318:7 342:9 | 160:5 170:22,24 | 121:23 128:1 | 190:12 |
| **puts** 330:7 331:11 | 171:3,8 173:12 | 157:11 168:11,19 | **raised** 176:14 |
| 331:11 | 175:22 178:3,20 | 168:23 169:9,11 | **raises** 94:7 |
| **putting** 282:12,12 | 179:1,25 180:3,6,8 | 169:11,16,19,20 | **raishid** 14:2 |
| 331:21 | 180:11,15,18 | 169:24 170:20 | **raising** 58:21,22 |
| **q** | 182:19 183:2,5,13 | 179:11 180:24,24 | **rambling** 349:24 |
| **qualified** 48:13 | 183:24 188:1,22 | 215:21 249:2 | **ran** 96:1 |
| 356:7 | 188:22 191:10 | 254:2,3 264:21 | **random** 177:17 |
| **quality** 97:25 | 193:5,13,14,16 | 285:15 287:7 | **randy** 303:12 |
| **quantify** 142:20 | 199:7,12 206:9,11 | 292:17 343:10,13 | **range** 64:11,13 |
| 191:16 | 212:25 224:5 | 352:1 | 78:5,6 79:22 |
| **quarter** 348:18 | 225:13 227:2 | **quick** 49:9,9 | 190:13 |
| **queen** 49:1 105:11 | 229:2 231:6 | **quid** 118:3 | **ranges** 78:3 |
| **queens** 77:8 81:19 | 235:11 237:11 | **quiet** 260:6 | **ranking** 99:6 |
| 114:15 163:7 | 239:6 241:15,21 | **quit** 208:17 209:3 | **rash** 273:10,20 |
| 166:7 205:14 | 242:8,8 243:16 | 209:5 245:5 262:7 | 275:19 |
| 213:21,23 251:7 | 248:15 252:16 | 267:7 285:9 | **rashida** 13:23 14:4 |
| 256:24 312:9 | 254:5,22,23 259:5 | 306:14 317:15 | 14:5,10 28:9 33:9 |
| **question** 8:3,18 | 259:14 262:13 | **quite** 21:1 66:8 | 33:10 |
| 9:23,25 10:2,6,6 | 265:3 277:21 | 76:22 127:12 | **rate** 187:23 |
| 10:17 11:1 13:9 | 284:11 285:18 | 167:10 248:25 | **ratification** 297:2 |
| 13:12 18:11,18 | 288:25 289:3,22 | 250:10 314:13 | **rationale** 227:8 |
| 21:15 30:10 34:9 | 289:25 292:11,20 | **quitting** 247:7 | **rattled** 163:12 |
| 37:25 38:9 41:21 | 292:23 293:2 | **quo** 118:3 | **reach** 25:8 74:11 |
| 41:23 42:25 43:11 | 294:1 295:11 | | 76:23 87:10 162:9 |

193:22 329:10,11
reached   24:4,10
   74:4 77:3,11
   146:24 162:4,7
   340:5
reaching   75:24
   329:4
reacted   190:5
reaction   248:24
read   10:23 40:24
   96:19 97:7,10
   106:10 116:21
   121:3 221:1,5
   224:2,22 225:1
   227:19,25 228:14
   228:18 254:20
   295:20 327:16
   337:9,22 359:5
reading   116:18
   295:20
ready   71:16
   269:13,14
reagan   177:13
real   168:6 213:18
realized   255:4
   310:17
really   25:14 29:19
   42:17,17,24 51:14
   94:25 95:15 102:7
   103:3 126:15
   132:24 135:25
   150:10 151:16
   172:12 177:17
   184:25 186:18
   208:15 209:2
   211:3 244:18
   249:21 253:9
   254:14 260:19
   272:3 274:15
   296:5 300:25
   303:7,19 328:10

331:4
rears   278:19
reason   14:25 15:9
   16:24 25:6,8
   39:14 52:12 61:4
   68:22 121:23
   154:1 155:22
   158:2 234:3 242:4
   248:17 251:23
   265:20,21 299:25
   300:4,6 307:10
   322:24 326:7,20
   350:23 358:6,9,12
   358:15,18,21
reasonable   86:23
   131:11,13 187:2
   302:4,13,15 303:1
   305:5,11,12,15
   307:19 333:16
   335:1
reasons   110:14
   111:6 117:2
   152:17 158:5
   214:5 230:19
   261:19 277:16
   278:2
reassured   191:21
rebecca   328:23
recall   19:25 22:12
   22:16 24:12,20
   28:20 38:24 39:7
   39:9,16,21 41:3,15
   46:18 53:14,15,15
   56:17 58:10,16
   73:5,12,15 74:13
   109:10,12 112:9
   112:10 134:8
   148:17 162:15
   164:7 172:22
   184:4 199:13
   295:15,20 302:7,8

303:5
recaptured   240:2
receive   6:23 43:5,6
   104:16,17 137:5
   137:21 141:10,17
   285:12 287:15
   335:22
received   19:15
   83:24 104:13
   136:23 137:12
   138:13,23 141:20
   244:1,2 318:20
   320:10
receiving   28:13
   42:19 109:10
   112:8
reception   347:17
receptive   187:16
recognize   321:12
recollection   40:21
   74:3 161:25 171:9
   171:18
recommend   33:20
   33:24 34:3
recommendation
   143:4
recommendations
   148:14
recommended
   25:19 30:24
record   4:4,5,20
   5:7 13:24 14:23
   19:3 23:5 37:8,10
   37:11,13 40:12,13
   40:15 71:12,13,15
   97:13 100:3 108:9
   108:12 109:16,22
   116:21 122:15
   131:20 150:14,15
   150:17 156:24
   157:7 161:12,13

161:15 198:20,21
   198:23 215:15,20
   226:9 227:5 245:3
   245:14,15,17,21
   257:6 289:8,9,11
   289:12,14 299:13
   301:18,19,21
   315:17 319:18
   320:1,4,12 324:25
   330:9 341:23
   342:17 352:16
   353:24,24 354:1,4
   354:5,7 355:13
   356:9 357:5
recorded   5:2
   356:6
recording   4:22
   356:8 357:4
records   45:10
   95:14,14 97:16,17
   98:5,8,10,19
   100:12,17 155:17
   278:14,25 279:8
   279:12,13 280:12
   280:16,17 318:20
   319:23 320:19,21
   320:23 330:12
   332:12,19,20
   333:8,12,13,19,19
   334:9,14 335:18
   335:23,24 341:12
   342:1
rectified   190:8
red   166:20 176:14
   246:2 348:20
redacted   45:9
   95:14 97:16,17
   98:10,19 100:2,17
   278:13,14,16
   279:8,12,13
   280:12 332:19,20

Melissa Kaye

333:12,13,19
335:5,10,13,24
**reduced** 290:15,18
356:7
**reduction** 296:23
**refer** 54:5 251:11
329:21
**referrals** 251:2,20
251:23
**referred** 242:10
274:17
**referring** 38:15
45:7 187:19
215:13
**reflect** 299:13
**reflected** 238:5
240:15,18
**reflecting** 322:9
**reform** 346:4
**reformer** 331:23
**reformers** 340:13
**reforming** 340:12
**refresh** 112:12
**refusals** 176:3
**refuse** 333:7
334:24,25
**refused** 105:4
175:8,25 176:5
214:1 332:21
**regarding** 61:7
65:21 71:23 72:12
99:12 182:23
183:9 199:15
205:24 215:6
261:19 289:19
**regardless** 165:21
**regular** 51:9 150:1
**regularly** 149:18
**rehab** 34:25
**reimbursed** 284:1

**reiterated** 93:2
**rejected** 89:1,8
**related** 21:25
28:22 33:8 86:10
93:4 204:18 214:6
280:11 326:15,15
334:15,20 338:18
341:25 345:6
356:11 357:7
**relates** 245:9
**relation** 69:1,16
115:23 143:1
241:2,5 303:18
**relations** 290:25
299:3
**relationship** 251:2
328:17
**relationships**
250:24 253:22,23
253:24 345:19,20
**relative** 113:10
260:7 356:13
357:10
**release** 23:22
262:1 277:18
278:8 310:8
320:17,18
**released** 314:22
**releases** 99:17
261:23 341:12
**relevance** 336:23
**relevant** 69:10
104:6 157:4 337:7
**reluctant** 306:4
**remained** 112:16
**remaining** 226:10
233:7
**remember** 20:5,7
28:9 32:2 33:12
35:9 38:17 39:4
39:13 48:22 56:5

58:1 60:4 63:12
70:4,5,12,13,20,21
88:17 89:16
102:19 126:23
127:4 147:24
163:7,8,15,17
182:12 185:19
186:12 193:15
209:5 213:17
243:20 267:22
269:21 283:17
294:13,22 300:25
312:8 328:3
**remembering**
338:3
**remote** 1:20
302:24
**remotely** 4:18
**render** 143:4
335:1
**rendered** 126:2
**renew** 127:22
**renewed** 127:24
135:4
**rent** 160:16,19,20
160:24
**rented** 160:17
**renting** 161:1
**rep** 290:6
**repeat** 12:5 17:12
24:8 26:3 30:7
32:13 58:15 63:18
105:22 107:5
116:5 117:15
122:6 138:10
144:23 149:11
157:16 169:14
172:2 181:18
198:6 201:19
206:8 215:17
218:9 219:19

223:23 226:19
238:11 243:2
250:16 258:11
276:8 280:6
287:18 316:3
349:11 352:13
**repeated** 281:14
**repeatedly** 168:1
**rephrase** 191:10
**replace** 30:25
**replacement**
212:13 290:10
**report** 42:3,5
45:17,22 48:8
145:10 167:8
202:19 216:24,24
235:22 236:12
307:1 308:25
309:3 323:17
**reported** 1:22 42:4
45:16,18 105:9
202:21 236:8,12
236:14,20 247:21
261:1
**reporter** 4:2,3
5:16 9:13,15
10:21 11:22 13:6
13:10 17:12 24:8
25:22 26:4 27:14
27:17 29:23 32:12
37:9,12 40:11,14
41:8 50:7 57:22
58:14,18 63:18
66:14 71:11,14
73:10 74:24 77:17
77:19 80:20 85:13
97:12,13,22
105:22 106:6
107:3,5 116:5,9,20
116:21 117:15
122:6 125:4

133:22 137:24
144:23 145:19
149:11 150:13,16
156:25 157:16
161:11,14 169:13
170:15 172:2
177:7 180:12
181:17 198:5,19
198:22 199:22,24
201:19 204:2
206:8 215:16
218:9 219:18
223:21 224:14,23
226:19 227:3,21
232:15,18 238:10
243:2 245:13,16
249:24 250:15
256:13 258:11
259:24 264:17
276:8 280:6
284:18 287:18
288:25 289:10,13
291:4 293:7 295:8
299:19 301:17,20
308:12 309:17
313:13 315:11
316:3,10 318:11
319:25 324:19
325:15,21 342:14
342:23 348:11
349:10 352:12,17
353:5,18,22 354:2
354:6 355:12
**reports** 251:16
260:10
**represent** 9:1 85:3
**representation**
177:19 262:1
291:12
**representative**
46:17 283:15

**represented** 69:23
70:1 71:19 72:19
83:18
**reprimanded**
311:17
**request** 39:11
94:23 121:19
299:7,16 302:13
302:18 303:1,18
304:10,11 305:11
309:23 320:11
345:13 355:6
**requested** 69:6,7
97:14 116:22
137:15 155:16
234:9 302:2,4
356:23
**requesting** 320:16
326:25 354:14,22
**requests** 142:4
302:16 321:13
**require** 148:25
**required** 152:20
205:22 268:10
271:6 285:24
359:13
**requiring** 20:12
**reschedule** 329:1
**resented** 56:24
57:3
**resentful** 57:7
**reserved** 355:14
**residency** 200:23
**resign** 132:23
246:11,19 306:15
306:18 317:16
344:19,24
**resignation** 144:5
306:17,23
**resigned** 89:15,22
89:24 120:12,13

132:24 171:9
215:9 216:5
**resigning** 247:7
**resistant** 296:18
**resolved** 120:7
277:11 287:23
**resolving** 70:21
**respect** 112:14
150:23 278:10
330:3,14
**respected** 45:4
57:15 345:22
**respectful** 235:20
235:25
**respective** 60:3
**respond** 8:17
106:1 109:7
**responded** 47:7
299:12 317:10
330:18
**responds** 109:5
**response** 14:17
60:18 76:24
109:20 155:6
**responses** 319:10
354:18
**responsibilities**
79:18 124:20
127:11
**responsibility**
98:2 180:23
**responsibly**
290:12
**rest** 154:5 224:2
224:22 225:2
340:17
**restore** 195:6,6,7
331:3
**restored** 39:11
272:7

**restroom** 10:13
**resubmitted**
295:17,23
**result** 69:4 281:10
282:17 294:2
305:11 338:19,21
**results** 255:23
346:2
**resume** 124:13
**retainer** 73:2,13
**retainment** 73:6
**retaliated** 44:25
100:24,25
**retaliates** 332:9
**retaliating** 236:7
**retaliation** 188:5
189:1 192:2
206:16 211:11
233:19 278:1,9,11
281:12 285:4
290:3 307:6,19,23
313:18 315:14
333:24 339:24
**retaliatory** 189:7
239:2,5,8 242:5
247:15 261:18
265:22 266:25
272:2 277:15,17
277:21,22 278:3
281:10 285:5
286:22 305:8
329:7 339:3
**retarded** 139:15
**retention** 93:4
115:9 233:25
297:24
**retire** 246:11,15
246:18
**retirement** 323:1
**retiring** 247:8
323:6

**retroactive** 121:1
  121:2 298:17
**retroactively**
  281:5 282:18
  283:8 294:25
  295:3,19
**return** 304:11
**returned** 302:19
  305:7
**returning** 304:17
**revealed** 235:9
  237:11
**reverting** 317:14
**review** 37:21 38:2
  66:7 124:25
  127:22 195:17
  199:9,11 326:4
  330:10 356:23
**reviewed** 38:18
  44:8 195:19,19,20
  238:5
**reviewing** 65:13
**revved** 275:21
**rho** 34:23
**rid** 233:19
**ride** 270:5,7
**ridiculed** 192:7
**ridiculing** 323:17
**ridiculous** 88:23
  252:1 295:2
  345:15
**rigging** 310:19,20
  310:23,24 311:5
  317:10 335:15
**right** 7:15 8:5,23
  8:23,24 21:10,10
  22:21 27:20 29:1
  35:14 40:16 46:21
  52:20 54:9 59:10
  64:12 71:10 87:14
  91:11 95:19 101:7

105:17,19 106:19
107:21 120:8
121:12 123:3
130:6 131:18
136:21 138:21
141:19 146:11,14
157:10 178:4
190:22,23 192:11
194:2,9,9,25 195:2
198:16 199:19
215:5,9 216:21
217:8 218:19,19
218:21 219:10
225:14,20 230:22
232:14 233:3,3
235:5 236:11,25
237:9,22 240:12
247:12,18 252:3
252:15 256:5,12
259:2,12 261:3
266:17 270:14
271:2,16 277:5,12
279:6,6 280:18
281:7 289:2
291:10 294:7
298:4 299:13
301:4 318:8
319:12 335:14
344:13 346:10
348:9,9 355:10
**rights** 74:19,19
97:20 99:5,12
100:1 166:25
174:8 175:16
233:21,21 257:15
262:2 336:12
**rikers** 51:18 153:9
167:6 175:1
185:15 187:19
205:13,13,15
313:24 315:25

346:3
**risk** 35:6,11,11,13
98:20
**rob** 202:25 203:1
**robert** 95:23
202:22 303:12
**robin** 246:2
**role** 54:1 59:5
124:5,7 164:24,25
165:3,5 167:21
213:24 219:8
230:24,25 312:1
**roles** 187:14
**roll** 217:7 279:18
**rolled** 92:23
222:20 231:16,21
247:1 266:15,19
276:12 281:15
305:21
**rolling** 93:11
**rollover** 222:18
**ronald** 303:13
**roof** 345:6
**room** 36:10 99:20
129:5 336:3
**rooms** 128:5
336:10
**ross** 26:23 248:1
**rotating** 293:23
**rotator** 15:12
**round** 125:20
130:8
**rounding** 129:18
**rouse** 262:25
263:1,18
**routine** 28:7
281:14
**row** 70:11 291:3
298:21
**rubber** 273:22

**ruin** 330:11
**rule** 80:12 257:17
**rules** 5:1 76:12
80:8 282:20
316:17
**rumbling** 57:8
164:1
**rumor** 223:17
245:24 246:6
247:7 333:23
334:5
**rumors** 246:1
247:10 333:24
**run** 103:25 277:5
277:6 291:1
298:22 345:9
**runaround** 48:15
77:14 119:5
**running** 214:9
318:9
**runs** 136:18
**ruthless** 262:18

s

**s** 2:1 3:5,20,20 4:1
13:25 23:7,7
49:17 66:16,16
90:15 95:22
157:17 334:8
358:3
**sabatino** 1:22 4:3
9:13 11:20 12:4
356:2,19
**sabotage** 285:6
345:17
**sadistic** 265:22
272:2
**safety** 30:25
**saint** 2:6
**sake** 224:12
**salaried** 130:1,11
130:14,21 133:8

Melissa Kaye

249:16 251:20
252:7
**salaries**  46:8 77:10
115:11
**salary**  64:20 78:14
113:3,8,10,13,16
113:23 115:10
125:13 190:13
234:1 290:15,18
**saldana**  70:2
**santamaria**
283:15 286:16
**sarah**  102:16
**satisfactory**  120:6
120:7
**satisfy**  272:1
**saturday**  129:8
152:14
**savvy**  42:17
**saw**  18:4 21:11
22:12,20 23:2
28:7,8,19,21 29:4
46:12 60:10 80:16
110:23,25 132:6
214:25 244:3,12
346:1
**saying**  48:15 58:1
61:23 86:21
101:24 128:19
136:7 147:5
154:17 157:2
178:24 192:24
214:14 215:22
216:3,6,7 218:1
223:7 226:16
230:12 239:22
250:11 251:15
256:3,6 257:22
258:7,14 259:7
264:19 306:4
307:4 313:15

314:8,13,16 348:6
348:9
**says**  9:15 109:2,5
109:19 200:25
220:12,22 320:14
330:7 342:7
344:16
**scale**  79:10
**scapegoated**  45:3
278:13,22
**schedule**  24:7,12
56:10,13 57:7
121:24 300:19
**scheduled**  86:15
328:22
**scheduling**  321:23
351:10
**schlep**  270:10
**schneider**  208:19
208:23
**school**  20:23 43:19
43:23 44:4 68:8
266:9 267:17,18
267:19,19,21
268:8,12,13,23,24
268:25 269:2,3,12
269:15,20 271:13
272:11 294:17
**scientifically**
274:24
**screen**  107:11
194:15,21,22
195:3,3 272:23
337:20 346:13
**screening**  29:2
250:4
**screw**  260:15,16
260:19
**scroll**  196:13
200:2 219:24
221:14 224:3

225:11 228:21
351:7
**scrolling**  224:17
**scrutinizing**  287:2
**scuttlebutt**  223:17
**season**  300:18
**seasoned**  96:5
334:12
**sec**  25:22
**second**  35:22 40:7
52:14 80:22 97:12
106:21 123:16
129:10,11 150:6
150:11 182:16
214:21 225:22
265:9,9 288:5
344:14 353:18,19
353:22 354:2
**secondly**  191:7
**secretary**  181:23
182:14 297:25
**secretively**  172:8
**section**  200:13,13
**see**  7:22 14:4,25
16:24 20:13 21:7
21:8,21 22:1
24:15,19 33:24
43:19 51:9,23,24
52:12 94:24
102:24 108:21,23
109:2,23 124:24
125:15,20 127:23
194:17,21 196:15
197:4,20 206:21
222:15 243:21,21
244:6,19 280:22
292:21 315:21
321:18 337:14,17
337:18 343:23
347:21 348:5
351:7

**seeing**  13:5,22
14:7,20 16:6 17:4
17:8,9,21,23 18:8
19:5 21:4 22:9
24:2,17 25:9
31:10 33:2,15,18
49:25 186:12
**seeking**  184:17
191:14 326:21
338:17 339:13,20
341:1,20,25
343:21
**seen**  16:11,17,22
19:14 21:16,19
22:25 27:23 28:1
28:2 34:18,23
243:10,16 248:5
248:21,22,24
**selling**  275:6
331:23
**semi**  230:25
**seminar**  322:25
**send**  36:5,5,23
48:21 88:15
111:13 118:21
162:10 213:22
214:20 291:1
309:21 318:10
326:5,7 351:4,17
351:21 352:4,7
**sending**  42:23
109:10 131:21
326:25
**sends**  350:23
**senior**  95:17,21
105:13 279:3
**seniority**  48:13
**sense**  149:8,12,13
174:14 252:4
275:8 340:20
348:23

Melissa Kaye

**[sent - similarly]**

sent  53:20 60:13
  60:16 87:6 107:10
  107:15 108:2
  111:14,20 112:11
  112:25 118:18
  128:3 133:9 215:2
  217:24 218:1
  221:7,9 225:12
  234:22 235:1
  242:11 243:18,24
  290:11 299:3
  318:11 321:13
  329:17 330:16,24
  351:16,18 352:10
  352:14
sentence  225:23
  344:18
separate  76:11
  79:13,21 103:24
  104:21,24,24,25
  105:1 113:20
  225:12 286:2
september  72:9
  139:22,23 145:14
  283:16,16 286:17
  287:8 308:3,3,6
  346:19,21
series  219:10
serious  213:25
seriously  45:4
  49:12 60:20 119:4
  296:19 310:18
  339:4 345:23
servant  113:12
  167:11
serve  174:17
served  198:2
service  51:19
  82:21,22,23 83:14
  87:19 126:13
  175:5 211:24

212:3,10,12,14
  214:8 249:16
  286:2 305:19
services  126:2
  141:6,8 166:7,13
  256:8 274:14
  337:25
session  321:8
sessions  324:22
set  76:11 157:11
  196:12 200:4
  294:22
setting  200:4,10
  249:9 255:21
settlement  343:8
seven  169:7
  282:13 288:11
  340:5 343:12
  350:12,12
severe  273:13
sex  44:17,21 58:7
  96:1 120:23
  334:10
sexist  278:12
share  36:8 178:20
  179:3 180:9 194:9
  272:23 318:19
  324:4 327:9
  346:13 353:9
shared  45:1
  178:16 179:22
  181:1 184:7
  311:14 322:14
sharing  187:18
  198:25 260:14
  307:4
she'd  48:18,19
  349:19
she'll  171:4
sheets  286:24

shew  230:2
shift  39:8,11
  121:13 127:22
  128:12 129:2
  153:7,17 154:17
  164:13 199:15,16
  214:6 247:14
  261:18,21 262:6,9
  262:16 263:4
  266:13 267:10,11
  267:12 271:17
  272:2,13,22 273:1
  275:13,24 276:12
  277:13,22 278:3
  278:10 286:21,22
  302:19,20,23
  303:6 304:10,11
  304:17,24 305:1,7
  305:8,10,20,23
  306:7 307:12
  317:24 318:3
  323:12 331:3,9
  347:25
shifted  54:2
  136:12
shifting  154:1
shifts  124:17
  127:9,15 128:21
  129:8,13 138:17
  138:19
shock  172:10
shocking  328:5,9
shoot  49:10
short  10:16 71:6
  142:3 261:12
  331:17
shortly  61:3
  111:21 327:17
shot  247:5
shoulder  15:7
  28:15,22 35:1,2,13

35:15,19
shouldn't  286:8
show  105:17
  106:19 192:11
  217:23 234:24
  272:23 282:8
  351:8
showed  110:10
  224:8 282:8
  290:18
showing  36:14
  197:24
shown  95:5
shredder  347:23
shredding  192:8
shrugging  47:7
shuffles  103:5
shunned  105:3
  111:25
sic  14:2,24 23:7,13
  32:7 49:17 220:24
sick  273:2
side  29:21 30:1,19
  30:23 31:4 32:23
  270:6
sign  70:19,23
  344:16
signature  355:14
  356:17 357:14
signed  70:15,24
  73:13 320:18
significant  113:6
significantly  47:3
signing  99:17
  261:25
similar  78:18
  204:20
similarly  51:22
  100:2 136:2
  330:20 334:21

Melissa Kaye

**[simple - specialist]**                                                        Page 56

simple  345:13
simply  295:4
simultaneously
  247:23 252:3
  274:7
single  153:22
  221:19 317:23
singled  100:22
sir  29:13
sit  310:3
site  167:7 264:5,9
  264:10
sites  327:20
sitting  213:21
  281:23
situation  19:24
  25:10 27:7 46:23
  53:24 77:4 94:13
  116:1,6 122:5,9
  147:25 179:16
  226:14 247:4
  249:9 280:13
  291:19 334:3
  337:4 339:11
  340:25
six  63:4,4 121:1
  167:23 214:24
  218:4 270:14,15
  282:15 283:24
  336:5
skills  356:10 357:6
skillset  287:1
skimmed  38:20
  66:20,20,21
skin  275:10
  276:20
skip  217:14
slated  77:6
sleep  266:10
  275:12,14,18,22

slews  297:7
slippery  168:6
slips  136:22
sloppy  331:20
slow  9:16 131:22
  210:20,21
slower  291:4
small  194:14
snake  324:7,12
snubbing  98:9
soap  274:1 277:1
social  23:2,3,8,11
  25:4 29:4,6 56:20
  133:11 331:23
socializing  253:17
sociopath  56:6
  58:2
soft  306:25 307:4
  307:20
softspoken  26:8
solanki  108:24
somebody  236:2
  303:13
someone's  42:22
  333:15
someplace  214:21
son  68:25 69:8
  267:16 271:23
  273:2,5 276:15
  300:3 327:22
  336:20,22 337:3
  337:25 339:10
  341:12 342:6,8
son's  301:6 302:1
soon  71:6 191:25
  344:19
sophistication
  287:1
sorry  7:11 13:6,11
  14:17 19:13 23:17
  24:8 26:9 30:7

32:12 37:24 40:7
42:23 45:17 57:22
58:14 62:10 63:5
69:5 71:2 80:20
81:11 82:5 86:3,8
96:16 97:2,6,7
106:2 107:3,7
112:3 114:17
116:5,14,15,16
130:2 132:13,16
132:20 133:23
138:9 139:2 146:5
147:21 149:11
150:25 155:2
156:25 158:23
160:4 162:6 169:4
169:13,17 170:15
170:15 177:7
179:20 180:12
181:17,17 198:5
200:7 201:20
204:2 206:9,10
208:22 215:16
218:9 219:18
222:9 223:5,21
224:14 227:3,3,5
227:21 232:3,15
238:10 245:8
248:14 250:12,15
256:13,22 259:25
263:13 264:17
265:11,12 276:8
280:6 284:18
289:23 290:17
293:7 295:8 296:4
299:19 308:12
313:13 315:12
316:11 319:25
324:4 325:19
330:23 337:16
342:14,23,23,24

346:15 348:6
349:10 352:12,17
353:5
sort  200:11 271:8
sought  80:14
  193:18
sound  236:13,19
  324:9
sounded  304:3,3
sounds  177:22
  221:15 223:12
  324:6 329:24
sources  143:19
southern  1:2 9:6
span  147:24 148:9
speak  9:16 11:2,23
  40:22 67:20 79:17
  80:20 85:9 86:9
  86:12 88:2 110:9
  117:25 118:1
  153:10 156:25
  162:6 169:5 182:4
  183:8 214:1 217:6
  227:6 247:9
  259:24 291:4
  309:5 313:13
  351:23
speaking  65:14
  94:6 120:21
  163:24 216:6
  233:20 235:3
  237:13 320:1
  346:6 353:6
speaks  110:23
  333:22
special  2:3,4,7
  5:11 71:19,22
  72:11,18 344:16
specialist  20:13
  47:2,5 48:11
  59:24 60:6 63:14

63:17,23 76:15
79:3 80:2,7 86:24
113:21 167:22
187:5,13 188:3,24
189:11,19 208:10
218:16 219:7
233:23 234:10
**specialists** 76:20
**specialized** 274:18
338:11
**specializing** 18:1
19:17
**specialty** 274:20
**specific** 16:14,20
25:11 31:18 58:17
79:22 128:11
206:18 256:7
295:24
**specifically** 53:16
54:5 55:2 62:1,5
93:10 102:15
105:2 111:22,24
147:6 152:25
174:21 183:16
185:19 187:4
203:6 222:11
252:22 255:15
261:9,10
**specifics** 205:2
**specify** 63:5
143:25
**speculation**
349:13
**speculations** 349:7
**spell** 13:24 14:22
23:5,6,15 32:4
49:16 66:14 73:10
**spelled** 32:13
**spelling** 32:6,15
90:16

**spent** 292:6
293:15
**spite** 233:19
**split** 70:3 302:23
303:6 304:10
**spoke** 55:5 60:23
67:3,18 85:10
87:24 116:11
118:14,14,18
181:12,22,22,24
181:24,25 182:6,7
182:8,8,11,14,17
182:17,22 183:12
183:25 184:12
216:9 237:15
239:21 268:17
298:18 309:7
331:15
**spoken** 334:2
**spreading** 247:9
**spreadsheet** 60:10
60:11
**spy** 348:5 349:2
**spying** 348:21
349:21
**square** 3:23
123:13,19,21,25
124:6 126:6 128:8
129:11 130:17
132:13,14,16
133:1,21 134:1,6
134:14,19 136:1
137:6,12,22
138:13,24 139:5
143:9 146:8,13
147:7 149:17
150:24 151:18
154:20
**squinting** 337:16
**squirming** 222:13

**stadium** 271:1
**staff** 26:20,24
54:11 56:9 57:4,7
124:25 125:17
128:1 131:6
187:23 188:15
207:3,8 208:13,18
209:18 211:13,14
211:21,23 212:4
213:21 267:7
323:16 331:12,12
345:9
**staffed** 207:20,22
**staffing** 52:1,5,9,9
52:15 214:16
**stakeholders**
178:17 249:13,15
255:17,20 256:8
345:20
**stamp** 107:24
219:12 324:25
**stamped** 196:23
196:24 320:24
322:20 325:8
326:2,14 329:17
336:18 346:14
350:21
**stamps** 319:6
**stand** 203:11
340:9
**standard** 330:13
330:13
**standardized**
108:18
**standing** 275:16
**stands** 48:3 207:10
244:8
**start** 10:5 14:7
17:4,9 18:8 19:5
24:2 25:9 27:6
30:10 81:5 101:3

139:16 199:17
224:23 264:1,17
267:19 299:20
347:17 352:18
**started** 6:18 17:21
17:23 27:10,12
30:5,8,16 76:4,4
83:7 101:2 123:24
124:16,18 129:15
129:16,25 136:1
136:13,14 173:4,7
192:1 193:19
215:2 217:1 236:7
237:2 248:25
253:3,9 254:16,17
254:18 267:21
273:23,24 274:25
278:19,21,23
281:4,13 284:23
301:3 306:13
326:23,24 328:13
348:23
**starting** 140:10
317:11
**starts** 103:7
**state** 6:6,11,12
74:18 174:3
201:13,14 313:4
314:19 329:21
340:4 356:21
**stated** 160:11
256:18 338:25
**staten** 114:21,23
114:25
**states** 1:1 25:2,5
174:18
**statins** 33:11,13
**station** 209:15
**statistics** 312:12
340:11

Melissa Kaye

status 201:15
264:23 297:23
statute 204:24
205:5,24 210:6
stay 93:2,12,15
96:14 129:4 153:8
153:12 167:13,25
168:2 184:25
185:7 186:2
191:17,24 211:17
220:16 225:24
229:4 230:12,23
230:24 231:24
233:2 266:16
272:10
stayed 70:3
staying 246:21
stems 273:9
stenographer
354:10
stenographic 5:3
step 279:22
stepped 90:4
345:25
steps 162:25
stern 216:23 236:8
236:17,20 247:20
steroids 274:3,6
274:17 275:20
steve 48:12 59:23
60:1 64:19 86:23
89:9,12,14,15
100:5 112:18
113:2 117:8 119:7
120:3 187:7 208:5
218:8,14 219:6
222:23,25 223:9,9
233:23
steven 46:2 74:10
74:16 75:3,17
177:13

stipulate 5:15
stipulation 5:4,13
341:24
stipulations 5:10
7:18 91:3,9
stop 35:21 80:15
80:19,19 123:15
129:9 170:14
217:4 225:17,18
225:19 236:11
254:1 265:11
271:1 279:11
288:5 291:10
313:6 315:16
316:2 336:14
342:22 346:10
347:8
stopped 124:7,8,9
124:11 129:10,13
131:12 148:17
151:4 346:6
storm 332:11
stormed 99:7
102:1,21
straight 252:12
349:22
strain 25:13
strategic 104:5,18
104:20
street 2:15 86:11
128:8 129:5,6
153:4 237:16,16
263:13 283:22
stress 20:17 21:3
25:20 322:15
338:1 339:25
340:8 345:5
stressed 25:10
27:6
stressful 27:4
154:1 193:20

326:10
stressing 337:5
stressors 322:18
strict 152:19
strike 138:1,3,5
strong 248:22
249:3 345:19
strongly 329:25
structure 189:25
structures 233:13
students 68:7
studied 274:24
studies 158:12,15
stuff 71:4 131:23
269:18 274:2
283:11 287:2,5
302:9 306:10
style 49:11
subject 38:24
220:8 321:8
329:22 350:22
subjected 192:2
submit 353:10
submitted 260:10
294:15 352:22
subordinate 317:6
318:7
subpoena 335:23
subpoenaed
319:10
subpoenas 319:11
subscribed 359:14
subsequent 210:13
210:14 238:19
287:24
subsequently
179:6 199:10
286:12
subspecialty
334:17

substance 65:10
334:22
substances 12:13
12:16
substantiate
315:17
successful 312:13
succinct 81:12
97:8 285:16
suck 48:6
sudden 240:13
suddenly 163:9
164:12 240:11
253:4 262:20,21
263:25
sue 68:22 70:10
sued 68:13,16
325:10
suffer 273:5
suffered 275:18
290:3 339:3,7,24
341:3 343:23
sufficient 211:13
suggest 7:18
115:22
suggestions
248:12
suggestive 173:16
suggests 221:25
229:6
suing 297:15
322:13 326:9
suitable 169:23
sullivan 21:20,21
22:9,13 30:5,8
33:9,15
summary 111:2
summer 130:15
131:4,9,12 132:1
151:11

sunday   129:8
super   153:25
superiors   183:21
supervision   311:9
supervisor   75:20
  188:18 235:25
supervisors   182:5
  236:1
supplement   30:1
supply   277:3,10
  277:10
support   26:24
  56:8 88:19 235:18
  326:11 327:3
supported   57:13
  57:14 335:3
supporting   332:7
supportive   49:8,9
  49:14 331:13
  338:12
supposed   29:21
  36:2 73:23 144:16
  174:17,19 213:23
  225:5 251:9 275:2
  275:11 296:25
  297:2,6 298:23
  301:8 305:8 319:9
supreme   95:25
sure   6:21 7:23
  28:6 42:24 49:16
  49:17,18 65:11
  81:18 84:18 89:18
  107:9 110:24
  130:23 139:3
  147:20 167:11,14
  168:14 171:4
  195:11 197:2,3,8
  201:21 214:9
  245:3 257:5 281:1
  288:6 300:25
  337:6,11,11 350:9

352:15,20,23
surgeon   47:12
surgeons   47:11
surgery   15:5,7,15
  15:22 16:3 28:15
  28:16,22 47:8
  131:13,17 132:2
  132:11
surgical   15:3
surname   158:17
surplus   133:12
surprise   172:10
surprised   246:5
  321:18
surreptitious
  166:17 171:22,23
  172:15 192:3
  286:11
surreptitiously
  291:5
surveillance   349:8
suspicious   307:8
sustained   343:14
swarm   245:24
swear   4:17 5:17
swenson   26:22
  240:25 241:16
  242:11 283:21
  323:16 345:9
switch   164:16
  186:24 216:15
  266:24
switched   82:22
  130:13
switchover   19:25
  77:6 237:5
sworn   4:20 5:21
  356:5 359:14
symptoms   334:19
  345:6

syndrome   20:17
  20:21 21:5 345:5
system   30:24
  46:11 154:3 174:9
  176:10 184:9
  192:5 208:14
  262:21,24,25
  265:18 267:6
  281:17 284:10,13
  284:25 287:9,12
  290:23 340:10
systematic   194:6

**t**

t   3:5,20,20 32:7
  66:16 73:8 157:17
  257:2 358:3,3
tabulation   301:8
tactics   166:5
take   4:4,15 9:14
  10:12,17,21 11:13
  29:20,21 31:2
  32:18,22 33:20
  34:13 39:17,25
  40:6 43:18 59:19
  60:19 71:5,7 76:3
  82:4 92:7,11
  107:23 115:22
  121:15 127:20
  137:2,13,23 139:2
  141:23 150:6
  154:11 155:19,23
  157:11 161:5
  165:19 170:16
  171:10 188:4,13
  191:22 194:6
  195:21 198:16
  214:5 231:2,12
  245:11,12 263:6
  267:4 268:11,23
  270:15 276:19,22
  285:11,19,24

298:7,9 299:25
  300:5,20 301:6,14
  310:18 319:22,25
  341:22 346:16
  350:20 355:3
takeaway   57:24
taken   4:7 12:13,16
  31:14,22,25 33:11
  33:11 45:4 46:13
  47:14 77:7 85:21
  86:1 107:11
  117:12 119:4
  162:25 185:23
  186:1,3 220:22
  221:23 226:1
  296:19 300:7,12
  301:25 302:2
  347:25 356:3,12
  357:9
takeover   89:17
  92:15 94:17
takes   277:5
talk   48:16 52:21
  60:20 102:4 103:8
  103:21 107:6
  124:24 128:4
  161:21 163:12
  170:4,6 214:3
  217:18 220:13
  225:25 226:7
  227:4 229:3
  237:24 240:22
  254:4 267:10
  281:7 294:7 303:7
  317:22 318:14
  321:21 323:24
  327:7 352:21
talked   28:13 37:19
  61:15 78:4 85:19
  91:15 116:3,7
  117:20 146:25

Melissa Kaye

**[talked - therapy]**

226:18 229:8
269:6 278:16
279:15 303:22,22
303:23,24,24,25
306:9 309:14
324:18,21
**talking** 10:15
62:13 81:1 101:9
103:17,24 113:9
119:9,19 123:10
146:1 147:7,8
156:13 170:14
177:2,2,4,5,5
181:3 215:6
223:22 225:16
226:5 227:4
252:18 254:16
255:12,15 260:25
264:13,14 265:4,6
268:22 272:21
277:21 282:19
286:4,5,16 299:23
301:24 311:12,23
331:14,14,24
347:5 349:19
352:11
**talks** 217:9 313:17
**target** 100:18
252:25
**targeted** 45:6
111:9 262:5
278:11 340:15
**targeting** 340:8
**tasha** 177:10
**taskforce** 104:2,5
104:18,20
**tasks** 203:23 204:3
**tat** 228:4
**tax** 136:24 141:10
155:17

**taxes** 149:7
**tcm** 275:15 300:2
**teachers** 268:25
269:4,5
**team** 132:10
214:23 296:17
312:5
**tear** 15:12
**teased** 323:15
**tech** 42:17,17
**technicality**
354:24
**technically** 250:8
**telephone** 67:4,18
162:10
**tell** 5:22 9:18,22
26:3 46:24 53:20
53:21 55:1,12,18
57:11 62:1 64:4
68:2 118:18 119:3
155:18 176:20
179:13 220:25
226:4 254:23
266:5 290:7
303:17 304:16
316:21 335:7
336:9 346:8
**telling** 75:21
115:18 154:2
188:17,19 225:25
226:9,15 240:25
253:13 291:7
296:8 330:19
**tells** 228:18 332:10
**temporarily** 70:3
**tempted** 6:23
**ten** 153:23 206:17
282:5 348:18
**tendencies** 105:11
**tendonitis** 35:8

**termination** 111:9
**terms** 203:7
209:19 210:16
238:21 250:3,3
**terrible** 267:3
**terrific** 198:13
**terror** 262:7
**testified** 5:23
21:13 22:24 34:16
60:12 65:14
100:16 110:22
114:3 120:8,11
143:8 146:11
150:19 171:20
183:17 184:11
188:23 217:19,21
229:3 235:8 257:8
278:5 308:18
346:11
**testify** 103:11
110:20 127:14,16
191:2,4 239:17
264:20 339:21
**testifying** 105:2
117:19 118:11
204:5 215:8,20
227:1,13 239:12
258:20 259:2
295:7,11 296:1
316:2 356:5
**testimony** 27:25
77:25 78:1 85:2
104:12 150:21
163:19 172:1,5
183:4 188:8 189:9
191:1,9 210:5
215:19 264:25
302:25 305:5
313:20 322:3
332:25 359:8

**testing** 273:15
**texas** 332:5
**text** 6:23 109:17
136:10 162:16,19
301:12
**texts** 71:3
**thank** 5:16 6:16
8:23 11:17 26:6,7
26:15 27:17 40:16
58:18 71:10,17
73:9 77:19 81:13
81:13 97:15 106:2
116:9 138:21
139:16 145:15
155:16 159:11
161:18 170:22
194:8 196:11
198:24 199:24
200:25 201:16
203:22 220:13
221:6 232:18
254:13 255:9,9,14
285:21 289:16
301:16 325:4
336:15 352:1
355:7,8,9
**thanks** 39:17
321:10
**that'd** 7:16 123:1
**therapeutic**
276:21,22
**therapist** 25:17
321:15 322:1
325:9 326:6,7,25
327:6,9 351:5
**therapists** 28:12
56:21
**therapy** 15:21
16:3 28:14,14,18
321:10 322:22
326:21,24 336:20

Melissa Kaye

**[therapy - time]** Page 61

336:21 337:3,8
338:3,4,7,11,14
341:12 342:7,8,9
**thereof** 128:22
**thing** 10:16 56:5
94:15 107:12
125:19 129:15
148:4 152:17
190:22,23 235:25
240:4 242:1 251:6
272:17,21 273:21
281:3 298:17
300:8 304:25
306:24 319:19
323:12 335:6
345:15
**things** 56:3 65:21
76:25 88:19 99:22
101:13 102:8
167:1,3 170:10
193:19 194:3
196:2 210:20,21
214:9 239:4 240:1
261:7 267:4
272:17 273:23
275:3,6 278:9
284:12 307:11
322:14 323:8
331:4,14 343:5,7
352:22
**think** 20:8 23:7,13
24:4 27:10 32:3,7
35:7 39:22,22
46:17 48:8,17
49:17 52:8,17
59:4 63:9 64:21
66:9 67:2,2 70:19
72:23 79:16 82:15
84:14 86:23 87:6
89:14,16,17,20
92:21 93:6,25

94:3,4,23 108:17
123:16 124:16
127:2 129:14,19
130:23 131:1
132:17 133:5,17
136:18 139:18
143:13,13,15
145:2 161:7
162:19 163:11
167:12,17 169:20
175:13,24 176:3
177:8 182:1,9
184:12 185:25
186:2,9,9 187:7
195:3 197:5
204:21 207:10
208:21,25 209:1
209:12 210:11
214:24 215:6,7
217:14 221:19
229:24 234:5,25
240:24,24 243:25
253:12 255:6
257:2 261:13
264:24 267:21,22
267:23 268:5
269:12,12 277:13
279:13 283:2
295:16,17 300:7
300:23,24 302:11
302:11 303:6,6,10
303:10 304:6
307:3,5 308:2,20
311:9 318:6,13,25
325:1 328:3
330:14 337:23,24
340:5,14 350:4
**thinking** 197:1
254:19 275:1
311:23

**thinks** 336:12
**thiourea** 273:22
**third** 85:13 251:23
327:15
**thirds** 297:23
**thirty** 122:21,23
**thorough** 98:1
312:17 313:1
314:4,14 315:24
**thought** 25:18,19
47:25 56:6 58:1
76:13 96:23 143:2
164:11 166:3,8
170:19 182:19,20
191:23 230:2
235:20,24 245:5
255:21 257:8
273:13 329:3
330:18
**thread** 108:13
220:4
**threaten** 293:18
**threatened** 99:19
99:19 102:1
279:19
**threatening** 112:1
274:8
**three** 21:12 47:4
48:11 63:2,14,16
63:16 64:13 76:8
76:15,25 77:24
78:6,12,15,20 79:1
79:2,8,16 80:1,2
81:16,17,22 83:3
83:25 93:6 122:18
122:23 176:3
187:11 190:13
201:17,24 206:3,5
206:14 212:7
213:12 214:25
219:7 241:23,25

263:2 264:25
268:9 290:8
311:10 322:13
**threw** 153:25
**thursday** 322:25
346:16
**thursdays** 56:17
212:8
**tie** 98:18
**tiers** 64:10
**ties** 328:20
**tight** 86:9
**till** 56:15 176:23
264:3 272:10
277:7
**time** 1:19 5:6 10:8
19:7 21:1 22:12
22:19 26:25 28:8
37:9,12 39:18
40:11,14,25 42:6
46:16 48:7 50:3
50:24,25 54:2
57:5 60:5,8 61:16
62:5 63:5 65:22
66:8 67:17 71:11
71:14 74:11 80:10
80:11,21 82:12
84:21 90:23,25
93:7 106:24 107:6
115:6 119:10,19
121:25 122:12,15
123:1 129:25
132:2 135:2,23
143:25 148:1,9,23
149:3,23 150:13
150:16,19 151:8,8
151:11,13 155:17
157:1 161:8,11,14
165:13,22,23
167:12,17,18
170:16 171:4

| | | | |
|---|---|---|---|
| 177:5 180:13 | 354:3,6,21,23 | 241:19 242:16 | 305:2 309:12,13 |
| 184:16 198:19,22 | 355:2,12 | 243:7 244:22,23 | 312:6,20,22,25 |
| 199:17 202:7,7,10 | **timeframe** 63:2 | **titles** 46:8 78:2,2,3 | 313:10,22 314:3 |
| 202:13,14,15,17 | 179:14 215:13 | 78:11 241:13 | 314:10,14 315:22 |
| 202:22 203:8 | **timeframes** 215:5 | **today** 6:21 9:8 | 315:23 316:20,22 |
| 205:2 206:1 | **timekeeping** 192:5 | 10:8 32:6 36:6 | 316:25,25 317:1,3 |
| 208:13,15 209:3 | 281:17 284:10,13 | 37:17 67:21 123:4 | 317:3,9,10,20 |
| 210:17 211:16 | 284:25 285:14 | 160:11 161:20 | 327:18 334:25 |
| 212:4,5,17,19 | 287:11,24 290:23 | 194:7 278:17 | **tone** 236:17,21 |
| 216:5,21 218:22 | 307:21 324:2 | 321:4,6 322:25 | **tonight** 250:20 |
| 220:13 222:17,23 | **timeline** 294:13 | **today's** 65:16 | **tool** 330:9 |
| 227:5,6 234:24 | **timely** 187:20 | **told** 35:4 39:9 41:6 | **top** 64:13 148:16 |
| 235:1 237:5 238:3 | **times** 129:7 | 41:11 46:23 47:22 | 190:13 195:1 |
| 245:13,16 247:6 | 132:18 191:14 | 48:4,9 50:17 53:8 | 211:17 320:4 |
| 250:6 251:20 | 193:19 251:17 | 53:9,11 55:7 | 352:22 |
| 259:25 261:13 | 269:22 309:7,14 | 59:14 61:9 62:4 | **topic** 121:13 |
| 262:22 263:3,7,20 | 311:10 322:22 | 62:13,23 63:8,10 | 187:25 217:15 |
| 263:22 264:1,2 | 352:21 | 63:24 64:1,2,7 | 249:6 261:16 |
| 267:16,19 268:5 | **timesheet** 282:7 | 65:6 67:23 77:2 | 299:15,22 340:22 |
| 268:16 269:10,19 | **timesheets** 192:4,8 | 79:3,7,10 80:3,10 | **topics** 121:14 |
| 269:24 270:22 | 192:9 282:4 283:8 | 81:19,23 83:24 | **torres** 98:6 181:24 |
| 278:25 280:20 | 284:9 286:11 | 91:8 101:5 115:13 | 182:14,15 279:9 |
| 281:19 282:12 | 323:14 | 118:16 153:16 | 333:17,25 334:6 |
| 283:3,9 285:20 | **timespan** 72:6 | 164:19 168:6 | 336:8 |
| 288:7,9,13,16,19 | **tired** 271:24 | 186:5,21 188:11 | **torture** 263:23 |
| 289:3,10,13 | **tit** 228:3 | 190:5 216:7,8,21 | **torturing** 271:25 |
| 290:23,24,25 | **title** 25:6 45:24 | 218:11 219:3 | 272:1 305:22 |
| 292:6,12,18,22,25 | 49:21 54:15 64:10 | 221:17 223:11,14 | **tos** 323:18 |
| 293:5,14,16,19 | 76:18 77:4 78:15 | 231:23,23 232:23 | **tosyl** 157:15,17,20 |
| 294:9,18 295:23 | 79:23,25 80:3,5 | 233:2 234:6 | 157:20,21 159:7,8 |
| 296:7,10 297:22 | 81:21 82:14,16,17 | 235:23 236:6 | 159:9 |
| 298:2,16 299:2,2,3 | 82:21 83:14 | 237:20 238:1 | **total** 126:5 |
| 300:5,14,19 301:4 | 110:10 111:10 | 242:2 247:17,20 | **totally** 48:14 |
| 301:5,17,20 | 113:9,17 115:23 | 248:6 266:15,18 | 103:23 |
| 310:16 312:11 | 153:7 207:12 | 267:15 268:18 | **touch** 328:19 |
| 313:14,17 318:4,9 | 208:10 218:6 | 272:15 277:14 | 329:14 |
| 318:19 320:1 | 220:24 226:11 | 280:20,22 281:19 | **touches** 157:4 |
| 322:24 323:13 | 229:5 234:18,18 | 283:21 286:19 | **track** 96:14 347:9 |
| 343:16 345:10 | 238:25 239:7,8,15 | 290:23,24,25 | 349:3 |
| 347:25 352:25 | 240:10,10,14,22 | 291:21 297:24 | **tracking** 346:25 |
| 353:6,12,14,15 | 240:25 241:3,8,19 | 304:19,20,25 | 347:5 |

Melissa Kaye

tracks  262:19
trade  33:19
traditional  274:20
275:16
train  96:23 170:19
270:5,7,10,10,11
training  24:25
209:4 213:12
trains  270:9
trajectory  164:18
transcriber  357:1
transcript  4:22
10:23 66:11,13
171:1 356:23
357:3,5 359:5,8
transcriptionist
356:8
transcripts  66:1,6
66:24
transfer  86:15
153:1 184:14,17
transferred
220:17
transition  20:7
41:24 112:15
119:20 161:22,24
162:3 164:25
171:22 179:4
182:22,24 183:9
183:16,18 187:6
218:20 227:10
232:21 233:7
237:1,1,2 246:8
247:2
transitioned  40:25
41:16 96:3 119:10
129:19 163:23
219:8 232:24
transitioning
166:12 194:2

transparency
323:14
transparent
172:16 235:17
331:13
transparently
172:9
trauma  35:12,14
331:13
traumas  35:19
travel  268:8
treat  44:24 53:4
125:16 257:3
treated  25:12
26:18,19 50:16
52:24 55:2,24
57:11 58:6 101:24
230:6 236:19
treating  34:8
44:22 54:11 55:13
55:19 274:20
treatment  22:25
29:5 50:1,2 51:17
51:17 54:11,15
55:24 56:12 57:4
57:7 125:1 142:23
175:6 185:13
186:17 219:8
256:2 273:17
276:20 334:9
338:15
treatments  277:4
300:20
trial  203:11
335:15
tried  88:12 168:4
190:11 272:6
330:11
tries  332:11
triple  121:2

trouble  21:22
25:24 39:15
340:16,17
troublemaker
280:9
true  76:16 80:9
177:25 178:7
190:10 191:22
206:22 213:2
231:11 242:9
281:25 282:3
294:2,5 319:21
327:11 356:9
357:5 359:8
trusted  345:22
truth  5:22,22,23
truthfully  9:8
try  42:16,18 81:11
86:9 107:6 109:7
109:22 121:20
155:14 161:19
211:9 213:13
214:23 215:4
264:20 265:15
337:22
trying  18:15 81:7
81:8 86:21 89:14
89:15 94:8 96:13
96:13 99:25
101:12 103:7
105:8 107:8,9,20
167:24 169:8,16
169:19,24 170:2
176:8 177:18
180:11 182:9
190:16,21 193:22
193:23 194:5,6
206:20 215:19,23
221:10 230:2
232:4 233:19
235:18 240:24

243:24 250:19
251:25 266:8
271:16 273:23,24
279:22 289:5,7,23
300:25 301:1
303:10 313:19
320:6 337:23,24
342:8 343:11,15
343:21 344:15
352:15 353:1
tuesday  212:8
turn  11:14 26:10
26:11 43:17,17
165:15,19 297:10
316:21 322:19
333:18 335:23
340:1 351:4
turnaround
312:11
turned  12:2 105:4
205:4 223:2 247:6
279:20 282:5
297:11 327:21
328:3 329:5
turning  323:17
turnover  208:13
208:18
turns  103:6 263:5
332:16
twenty  270:7
twice  88:8 276:19
310:16
twins  53:21
159:25
two  6:25 28:19
63:2 66:10 70:8
70:11 76:8 77:24
78:5,12,15,19,25
79:7 80:1 81:16
81:21 83:24 96:7
108:15 109:17

Melissa Kaye

**[two - unpaid]**

122:18,20,23
135:9 144:10,11
144:19 149:18
153:23 159:20
188:9 198:9
203:14 209:5
211:21 214:25
220:22 221:4,22
225:12 226:25
228:11 232:12,16
236:3 247:17
266:8 284:12
290:20 291:2
293:8 297:23
298:20,20 303:13
303:15 322:11
323:19 331:7
**type** 15:5 22:25
27:24 29:5 44:13
74:16 94:14
131:18 136:24
148:10 164:25
203:13,16 204:8
204:14 273:4
274:10 336:21
337:8 338:7,13
**typewriting** 356:7
**typical** 338:12
**typically** 175:25
233:17
**typing** 7:22 131:19
**typos** 196:3
199:12,14,16

**u**

**u** 3:20,20 49:17
90:16
**uh** 10:21,24
309:16,16 342:2
**ultimately** 266:2
**uma** 177:11

**unable** 188:3
189:10 333:14
**unavailable** 43:24
**unbearable**
323:10
**unclear** 35:3,3,18
54:7
**undergoing** 51:16
**understand** 4:21
6:25 7:14 9:10,23
10:1,15 11:3
12:17 13:3,9 27:9
33:19 38:8 69:19
119:21 135:15
139:9 158:15
190:21 212:24
219:6 220:15
225:23 233:4,4
250:10 255:25
256:1 314:23,23
315:4,9 355:4
**understanding**
83:21 92:4 120:20
120:22 121:3
163:18 213:19
**understands** 333:4
**understood** 10:2
258:22 334:13
**undivided** 6:22
**uneasy** 91:15
**unemployed**
340:15
**unequivocally**
338:22
**unexpectedly**
327:6
**unfairly** 286:6
287:14
**unfavorable** 55:23
56:3

**unfavorably** 55:5
**unfit** 173:24 176:8
251:12 312:18,23
313:2,4 314:5,5,12
314:15,20 315:24
**unfortunately**
236:6 318:12
**unhappy** 256:20
257:14
**unheard** 298:18
335:22,24
**union** 46:13,14,16
47:23 58:22 65:1
65:5 83:11 86:22
86:24 87:2,3,8,25
88:21 89:10 91:20
92:8,12,16 94:12
94:20 115:20,20
118:4 152:25
153:6 154:5
167:15,24 168:4
186:2,8,10,11,14
186:15,25 191:21
218:2,12,15,15
226:10 229:9,10
229:11 230:2,10
230:23 231:23
234:12,17 238:15
238:20 240:8
246:22 266:14
283:15 286:20,24
287:5,6,6,13,15,17
287:22,23 288:2
288:15 289:18,25
290:5,12 291:12
291:18 296:21,22
296:23 297:1,7,15
297:17 298:6,18
304:25 305:2,3
322:23,25

**unionized** 167:22
220:23 221:16,24
222:18,20,24
223:2,10 229:5
230:24 231:22,24
232:8,10 233:2,8
234:9,14 240:9
262:9,11,16
266:21
**unions** 92:16 94:5
**unit** 49:22 50:1,2
51:14,23 53:18
56:12,18,24 83:18
84:1,6,8,13,23
90:21 91:1,6,10
92:3 93:11,13,16
93:19 185:13,13
187:8,24 188:19
208:6
**united** 1:1 25:2,5
174:18
**units** 127:25
**university** 200:18
200:19,24
**unknown** 294:23
328:15
**unlawful** 1:13
4:12
**unnecessarily**
317:24
**unnecessary**
266:13 272:5
275:24
**unofficial** 237:2
**unofficially** 76:5
85:21
**unpaid** 125:17
153:19,20 154:9,9
154:10 263:5,22
281:22 282:13
296:10

Melissa Kaye

unpredictable
  294:20
unredacted  45:10
  95:14 98:4,8
  280:16,17 330:12
  332:12 333:8,19
  335:18,23
unrelated  224:7
  224:20 228:10
unsound  279:18
unsubstantiated
  245:24
unsupportive  95:6
unusual  234:21
unveiled  256:19
unwilling  340:9
upend  263:15
upper  194:25
  195:2 270:6
upset  25:14
  212:15 248:25
  272:15 306:13
  311:16,17
upsetting  332:21
upside  329:5
usage  301:25
use  8:9 10:13,23
  36:1,4,6,24 100:16
  131:18 162:11
  262:24 263:22
  277:1 330:8,11
  332:12 347:16
  352:25
uses  4:24 25:6
ushered  86:12
usually  210:21

**v**

v  1:6 73:11 157:24
  158:22 177:8
  358:1 359:1

vacation  211:15
  211:18
vacations  211:16
vacuuming  265:11
vague  87:7 117:22
  303:21
value  286:3
van  181:20,21
variable  128:19,24
  270:8
varied  152:1
  155:13
various  158:5
  177:9 214:5
vendetta  352:20
venue  200:5,9
veracity  313:20
verbal  10:22 240:6
  240:7 246:25
verbalize  309:17
  325:15
verbally  86:17
  238:2 240:1
verbatim  314:17
verbiage  184:5
verify  167:24
veritext  4:4
version  197:1
  198:14 248:20
versions  197:15
  198:12
versus  45:9 95:14
  198:15 223:17
vetted  172:9
  252:13,18,21
vibrate  42:15
viciousness  340:8
videoconference
  1:17 2:3,13
view  195:1

vine  214:10
violate  336:11
violated  257:15
  266:13
violating  335:14
  340:18
violation  262:2
violations  204:19
  204:19 216:17
  253:21 330:4
  331:20
violent  187:23
  188:19 293:25
virtually  4:23
voice  25:24,25
  26:14 94:5 99:25
  248:12
voiced  187:17
  257:14
volpe  177:5,8
volume  43:17
  206:1 209:9,14,17
  209:22
voluntary  124:1,9
  124:21,22 125:10
volunteer  125:12
  126:12,14
vs  9:4

**w**

w  138:20,25
  290:18 296:24
wait  80:18,18,18
  80:22 106:21
  132:20 150:6
  156:6,6,6 225:1
  288:20,20,20,20
  313:6
waiting  102:22
  185:6 248:10
  276:23 277:7
  344:16

waived  293:24
walk  270:9,10
  271:3
walking  103:7
  348:19
wall  103:3 190:9
wangel  1:10 2:12
  9:3 26:23 86:13
  92:18 153:11
  168:5 170:5
  191:20 216:25
  220:8,12 222:1
  229:3 230:9,12
  236:9 237:25
  238:4,14,20
  239:20,21 247:22
  262:19 272:25
  282:18 283:7,16
  286:17,19 287:7
  287:25 290:5
  297:22 298:1
  303:23 304:25
  347:3
wangle  4:10
  217:20 226:7
waning  210:18
want  6:20 7:23
  10:9,12 23:6
  27:21 37:7 39:17
  52:14,22 54:5
  55:1 63:7 65:11
  65:20 72:3,5
  88:20 91:13,18,18
  91:19 94:1 99:24
  103:3 132:24
  153:9 154:11
  155:14 161:21
  170:7,10 171:4
  179:21,22 181:8
  183:20 189:3
  192:23 195:14,15

Melissa Kaye

**[want - witness]**

200:3,6 215:21
217:18,23 220:21
221:13 223:13
224:1 226:6,6
227:1 229:13
235:19 236:1
244:1,2 246:18,25
250:20 252:15
254:22 260:11,12
261:9 265:4 267:9
270:19,20 272:19
272:20 273:3
285:15 288:6
306:1 307:17
311:20 313:10
315:5,10,20
318:14,14 329:16
332:12 336:16
340:23 341:1,10
348:3 349:2 350:9
351:3
**wanted**   6:18 53:19
53:20,21,24 54:3
59:12 65:11 80:13
87:8 97:24 102:4
102:7,24 105:15
117:7,9 126:21
138:12 144:6
163:10,12 167:14
167:15 168:14
175:11 176:4
180:25 184:25
186:6,18 187:5
188:25 211:12
218:3,12 227:15
230:9,18,23,24
234:19 235:16
242:13,15 246:10
246:14 257:4
281:1 287:13
300:10 301:9

323:2,9 330:11
335:6,24 336:3,3
**wanting**   98:22
124:8 297:21
**wantingly**   336:13
**wants**   335:5
**ward**   102:16
**warm**   26:10
**warnings**   188:13
**washing**   276:25
**wasting**   288:19
**watching**   350:4
**water**   86:11 153:4
205:14 237:16,16
283:22
**wavering**   246:10
**waxing**   210:18
**way**   20:11 24:16
42:14 44:1 55:24
69:13 71:5 85:22
86:21 94:24 99:22
110:1 136:2,3,22
150:20 153:2
169:18,22 174:10
176:25 187:22,22
188:5 194:7,18
196:10 205:4
227:20 233:13,13
262:18 266:23
272:6 295:20
304:24 305:20
331:21
**ways**   102:4
**we've**   122:15,17
232:14,20 277:5,6
340:5 354:8
**wealthy**   332:4
**weapons**   177:14
**website**   168:8,9
309:3

**week**   56:16 123:16
128:18 129:10,11
140:7,9 151:20,21
151:24 152:2,7
154:8 212:7,7
281:15 283:6,24
352:21
**weekend**   124:18
127:10 136:8
138:18 151:22,24
152:2
**weekends**   124:8
148:25 151:19
152:6
**weeks**   214:24
282:15 283:24
323:20
**weird**   268:4
**weiss**   108:25
**weissman**   53:3,7
53:12 54:3,10,10
55:6,10,12,16 58:5
**weissman's**   54:1
**welcome**   27:18
161:17 229:17
**went**   48:9 112:24
124:15,16 126:10
127:8 132:6 135:4
154:7 158:10
163:4 187:12
191:5 203:8 206:1
212:18 240:1
249:1 252:22
254:19 279:9
282:6 286:15,16
287:5 302:8
330:23,23 336:8
**whip**   332:11
**who've**   293:24
**whoa**   164:15

**wide**   27:13,15
**wife**   317:19,23
318:1
**wife's**   90:2
**willing**   108:17
279:17
**wing**   166:22
**winkler**   59:12
81:24,25 82:1
83:9 95:10 100:5
100:15,16 101:1,4
101:5,17 102:18
103:16 104:9
108:25 114:7,9,20
119:11 162:5,8
163:13 164:4
175:9 182:8 207:5
207:11,15,15,21
211:15 212:3,12
213:8 215:3
231:17 233:10
244:4,11 248:21
253:13 316:22
333:9 335:3
**winkler's**   243:11
243:14 244:13
257:19 260:2
332:13
**winter**   300:17
**wiped**   206:17,19
**wire**   116:15
**wisely**   343:16
**wish**   283:10
**wishing**   326:16
**withdraw**   144:12
206:11 322:4
**withdrawn**   205:21
209:20
**witness**   4:17,20,21
5:18,21 7:18
11:13,17,21 12:1

Melissa Kaye

**[witness - worked]**                                    Page 67

| | | | |
|---|---|---|---|
| 12:11 13:15 15:3 | 141:15 142:19 | 318:15,24 323:4 | 146:1,7,12,16,20 |
| 15:7,11,17,24 | 143:12 144:3,15 | 324:21 325:17 | 147:4,11 148:10 |
| 16:22 17:2,14 | 144:25 145:18 | 327:14 330:2 | 149:16,17 150:22 |
| 18:15 20:6,16 | 146:22 148:4 | 337:15,21 338:10 | 150:24 151:14,18 |
| 21:16 22:16 24:10 | 149:13,21 151:6 | 339:22 340:7 | 151:20,24 152:20 |
| 26:2,6,9,15 27:10 | 152:1,23 156:5 | 342:6 345:2 | 152:21 153:18,19 |
| 27:15,18 29:25 | 157:17 161:1,6 | 346:24 348:14 | 153:21 154:8,20 |
| 30:22 32:14 34:2 | 162:15 165:15,18 | 349:15 354:18 | 154:21 174:2 |
| 37:19,24 38:10,20 | 166:3,16 169:4,12 | 355:8 356:4 | 185:12 187:1 |
| 40:2,6,9 41:4,10 | 171:18 173:17,23 | **witnesses** 227:24 | 191:18 192:7 |
| 41:22 42:8,13,16 | 175:24 177:8 | **woman** 14:3 44:20 | 202:6 203:8,16,18 |
| 42:22 43:3,12,18 | 178:10,16 179:8 | 177:13 323:21 | 203:24 204:4,8,12 |
| 44:2,17 47:22 | 179:13 180:5 | 327:15 | 204:14,18 209:9 |
| 50:8,21 52:17 | 181:19 183:25 | **women** 49:2,5,7 | 210:19 211:16 |
| 54:20 55:15,22 | 185:18,25 188:9 | 49:14 70:8 177:11 | 213:14,19 214:23 |
| 57:24 58:10,16 | 193:2,17 194:14 | **women's** 158:12 | 233:13,14 240:17 |
| 62:4 65:5,19 | 194:19,23 195:8 | 158:15 | 240:18 249:14 |
| 66:16,20 67:6,23 | 197:5 199:23 | **wondering** 71:5 | 251:22 252:8 |
| 68:19 69:20 70:7 | 204:4 210:9 213:8 | 248:10 | 255:17 263:7,24 |
| 70:19 71:3,9 72:5 | 218:11 222:10 | **woo** 255:23 | 264:4 266:7 |
| 72:14,23 73:12,23 | 223:20 224:19 | **word** 29:23 172:15 | 269:24 270:3 |
| 74:1,13,22,25 75:6 | 227:2 228:19 | 172:22 191:23 | 272:1 273:6,15 |
| 75:20 76:3 77:18 | 229:24 231:15 | **wording** 63:13 | 281:20,21 282:13 |
| 78:23 80:25 81:11 | 232:17,23 235:16 | **words** 39:20 57:19 | 282:18,20 283:5 |
| 83:2,13,21 84:12 | 236:17 238:12 | **work** 25:10,13,18 | 302:24 323:8 |
| 85:7,15 86:8 88:5 | 239:19 241:11,25 | 26:18 27:6 36:12 | 324:9,14 332:11 |
| 89:8,20 90:1 | 242:13,15,25 | 49:4 50:2,18 | 337:4 345:3,16,23 |
| 91:23 92:6,14 | 243:4 245:8,23 | 56:12,23 59:3 | 345:24 347:20 |
| 95:5 97:2,6,15,23 | 246:14 250:1,14 | 79:15 86:14 97:25 | **workday** 264:1 |
| 99:2 101:17 | 250:21 254:13 | 104:9 109:8,22 | **worked** 45:18 50:3 |
| 102:14 103:21,23 | 255:4,14 256:15 | 123:13,15 124:8 | 56:10,13,15 60:8 |
| 104:19 111:13 | 259:15 260:6 | 124:10,13 125:10 | 93:9 100:10 104:8 |
| 114:17 116:7,14 | 264:16 265:17 | 125:15,23 126:19 | 123:21 130:14 |
| 116:17,23 117:2 | 276:10 280:8 | 128:17 129:4 | 131:6 132:25 |
| 117:20 118:13 | 284:20 285:21 | 130:15 131:11 | 133:17 135:5 |
| 119:2,23 120:16 | 287:20 291:5,15 | 132:6 134:11,14 | 137:8 141:11 |
| 121:18 122:1,4,8 | 291:21 292:9 | 134:19,24 135:3,3 | 151:7,8,8,9,11 |
| 125:6,25 127:1,18 | 293:10 296:4 | 136:15 137:6,21 | 187:7 201:17,23 |
| 134:8 135:1,17,21 | 297:14,20 301:12 | 138:24 140:9 | 202:15 207:15,16 |
| 137:8 138:9 | 301:16 303:5 | 141:12 143:8,8,22 | 208:11,12,14,20 |
| 139:10 140:15,19 | 308:14 309:19 | 143:23 145:12,16 | 211:13 216:13 |

Melissa Kaye

**[worked - zoom]**

230:6 253:15
267:1 284:6
**worker**   23:2,3,8
25:4 29:4,6
**worker's**   23:11
**workers**   56:20
84:14
**workgroup**   102:3
102:11 103:4,10
103:12 104:3,14
104:21,22 105:13
108:17 109:14
110:7,11 112:6
**workgroups**
103:24,25
**working**   46:6 57:5
70:8 73:20 76:6
78:10 83:3,7,10,19
92:25 123:12
129:11 131:9,12
132:1,12 133:25
134:6,12 139:16
140:7,11 144:1
149:17 151:4
153:2,6,7 167:18
168:3 197:18
202:10,19 203:3
211:9,24 219:1
222:22 232:25
247:3 248:7 264:5
265:19 283:5
284:2,3,4,5,6
302:3 304:13
**workload**   211:17
**works**   121:17
189:24
**world**   153:24
**worry**   332:6
**worse**   47:13
211:25 331:5

**wouldn't**   218:13
**wow**   128:19
**wrangled**   306:3
**write**   125:2,4,6,21
169:7 221:22
342:5 344:6,9
355:5
**writes**   331:10
**writing**   64:5 112:4
137:3,14,17 139:3
141:22 176:1,2
279:23 349:19
**written**   5:4 294:21
329:19 339:1
**wrong**   103:13
198:25 236:18
268:1 272:13,14
280:3,7 282:12
283:5
**wrote**   85:19 87:11
112:10 145:10

**x**

**x**   3:1,5 32:7 195:5
356:23

**y**

**y**   73:11 90:16
157:17
**yang**   1:9 2:11 4:9
9:3 26:23 77:3,11
85:11,18 86:4
87:11,12 92:18,24
99:6,21 102:18
111:25 112:24
116:11 117:25
118:7,13,16 120:2
175:1 177:4
189:23,25 234:22
245:25 262:17
272:25 283:9
286:20 303:23

312:1 347:3
**yang's**   66:11
**yankee**   271:1
**yeah**   21:2 26:12
28:19,23 31:3
32:7 40:5 41:5
43:18 47:7 55:22
57:9 61:11 66:25
67:2,2 82:19
88:17,18 96:12
121:18 122:22
124:23 125:18
127:1 129:13
130:19 132:15
134:12 137:8,9
143:12,13 144:3
144:17 145:5
146:5 147:18,22
148:15 150:5
152:12 157:21
159:10 160:4,5,6,6
160:6,7 165:20
173:23 183:15,19
191:11 195:10
196:18,22,25
208:25 209:8
213:17 214:14
236:21 249:13
250:12 260:8
270:4,25 271:15
271:15,23 298:13
301:14 304:6
308:6,14 310:12
310:25 311:15
319:1 322:15
323:4 327:12
337:15,21,22
338:2,3 339:6,8
**year**   15:20 46:18
47:10 64:20,21
66:9,10 70:10,11

70:12 108:10
121:1 123:10
129:12 139:6
140:10 145:14
209:5 279:1
283:18 290:2
293:23
**years**   16:12,17
21:12 23:1 28:1
31:21 32:22 35:20
66:10 70:11 83:3
104:23,24 113:18
120:17 126:24
130:23 135:23
137:20 138:12,25
139:19,21 141:11
141:21 142:12
151:14 154:6
167:12,13 185:2
206:17 208:20,25
211:12 218:4
262:23 282:5
297:4 328:4
**york**   1:2,7 2:6,10
2:14,16,16 4:8,16
6:6 8:25 9:2,6
68:19,22 105:14
123:14 130:5
133:3 160:14
161:2 201:13
255:7 313:3,3
314:19 326:10
327:25 356:21
358:1 359:1
**yorkville**   127:2
**young**   188:15
**youth**   96:1 334:10

**z**

**z**   257:2
**zoom**   4:14 107:12
107:15,19 132:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.