UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - -X
MELISSA KAYE,

                        Plaintiff,

            -against-

                        18 CV 12137

HEALTH AND HOSPITALS CORPORATION, et al.,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - -X
                        October 4, 2021
                        10:04 a.m.


VIRTUAL DEPOSITION of ABHISHEK JAIN, M.D., a Defendant

herein, taken pursuant to Court Order, and held via

videoconference, before Marci Loren Dustin, a Court

Reporter and Notary Public of the State of New York.



2

```
 1 | A P P E A R A N C E S:
 2 |
 3 |         THE LAW OFFICES OF SPECIAL HAGAN
   |                 Attorneys for Plaintiff
 4 |                 196-04 Hollis Avenue
   |                 Saint Albans, New York 11412
 5 |         BY:   SPECIAL HAGAN, ESQ.
 6 |         DONNA CANFIELD, ESQ.
   |                 Attorney for Defendants
 7 |                 100 Church Street
   |                 New York, New York  10007
 8 |         BY:   DONNA CANFIELD, ESQ.
 9 |
10 |         ALSO PRESENT:
11 |          MELISSA KAYE
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
```



 1          IT IS HEREBY STIPULATED AND AGREED by and
 2     between the attorneys for the respective parties
 3     herein, that filing and sealing be and the same
 4     are hereby waived.
 5
 6          IT IS FURTHER STIPULATED AND AGREED that
 7     all objections, except as to the form of the
 8     question, shall be reserved to the time of the
 9     trial.
10
11          IT IS FURTHER STIPULATED AND AGREED that
12     the within deposition may be signed and sworn to
13     before any officer authorized to administer an
14     oath, with the same force and effect as if signed
15     and sworn to before the Court.
16
17
18
19
20
21
22
23
24

4                        **ABHISHEK JAIN, M.D.**

1            THE REPORTER:  My name is Marci Loren Dustin,

2        your remote court reporter.  The parties are

3        present via videoconference to take the deposition

4        of Abhishek Jain, M.D., in the matter of Melissa

5        Kaye against Health and Hospitals Corporation, et

6        al. Today's date is October 4, 2021, and the time

7        is 10:04 a.m.  It is important that everyone speak

8        one at a time, as delays do occur in transmission.

9            Please note that pursuant to CPLR 3113(d),

10       the oath can be administered remotely by me.

11       Counsel, please state your name and who you

12       represent and whether you stipulate to that

13       authority; and the defending attorney, please

14       agree that the witness is who they say they are.

15            MS. HAGAN:  My name is Special Hagan.  I'm

16       here on behalf of Dr. Melissa Kaye, plaintiff.

17            MS. CANFIELD:  Donna Canfield from the New

18       York City Law Department on behalf of all the

19       defendants.  Dr. Jain is -- Dr. Abhishek Jain is

20       the defendant in this action.

21

22   ABHISHEK JAIN, M.D.,

23   having first been duly sworn by the Notary Public

24   (Marci Loren Dustin), and stating his business address

800.DAL.8779
dalcoreporting.com

1  as Office of Mental Health, 330 5th Avenue, New York,

2  New York 10001, was examined and testified as follows:

3

4          MS. HAGAN:  And just for the record, Dr. Kaye

5      is actually watching the deposition, just so that

6      we have full transparency.  And Dr. Kaye is the

7      actual plaintiff in this matter.

8

9  EXAMINATION

10 BY MS. HAGAN:

11      Q.   Good morning, Dr. Jain.

12      A.   Good morning.

13      Q.   The reporter went over some of the

14 admonishments that typically take place during a

15 deposition.  I'm going to -- I'm going to go over some

16 -- a few more housekeeping rules and introductory

17 questions.  So I hope you don't mind.  I'm not sure if

18 you've been deposed before, but they're pretty pro

19 forma.

20          The first thing I would like to ask is if

21 you've had any medication within the last 48 hours that

22 -- first off, have you had any medication in the last 48

23 hours?

24          MS. CANFIELD:  Objection.  You can answer.



1        You can answer, Dr. Jain.

2        A.    No.

3        Q.    You haven't had any -- you haven't ingested

4    any substances or beverages that would impair your

5    ability to testify truthfully and honestly today?

6        A.    No.

7        Q.    Okay.  The reporter went over some basic

8    introductory instructions.  I'm just going to reiterate

9    some of them and then, I guess, expand on them some.

10   One of them would be for you to answer your question --

11   answer any questions that I may pose to you verbally.

12   So if you -- you shouldn't shake your head or nod your

13   head.  You need to say yes or no, or I don't know.  The

14   reporter can't take down gestures.

15        She -- the reporter also mentioned that only

16   one of us can really speak at a time, because she can

17   only take down the voices of one person -- the voice of

18   one person, so I'm just going to reiterate that.  If you

19   don't understand a question or you need me to repeat

20   something, please be sure to ask me.  If you don't, I'm

21   going to assume that you understood, and we'll proceed

22   accordingly; is that okay?

23        A.    Yes.

24        Q.    Okay.  What I would also ask is that, you



 1  know, at times -- I know there's been a significant
 2  amount of time since some of the events in this
 3  complaint has transpired.  I'm going to ask you at times
 4  to try and estimate.  I don't want you to guess.  But to
 5  the extent that you can kind of estimate, I do have a
 6  right to try to ask you to, you know, approximate or
 7  perhaps to, I guess, kind of speculate -- not speculate,
 8  but just kind of -- just like estimate sometimes when
 9  things may have occurred, the quantity of things, the
10  distance of things.  Just typical, I guess, quantitative
11  discussion.  Is that okay?
12       A.   I'll do the best I can, yes.
13       Q.   Sure.
14            Now, I'm going to ask you something pretty
15  basic.  Have you ever been deposed before?
16       A.   Yes.
17       Q.   In what -- in what context?
18       A.   As an expert witness.
19       Q.   Okay.  And what case was that?
20            MS. CANFIELD:  Objection to form.  You can
21            answer.  You can answer, Dr. Jain.
22       A.   Okay.  There were matters of cases involving,
23  as an expert witness for guardianship case, for example,
24  as well as also in my capacity as a medical director in



1    the Office of Mental Health regarding an HR matter.

2    Those are two examples of cases.

3         Q.   So you said an HR matter and a medical

4    director.  And can you repeat the last portion of your

5    answer, please.  I'm sorry.

6         A.   Yes.  This was in my capacity as a medical

7    director with the Office of Mental Health.

8         Q.   And -- and what was the name of that case?

9         A.   I'm not sure if I'm able to share that

10   information.

11        Q.   Yes, you are.

12             MS. CANFIELD:  I'm going to object.  Perhaps,

13        I can consult with Dr. Jain off the record, and we

14        can circle back to that question.  I don't know

15        the circumstances of whether --

16             MS. HAGAN:  He said it was an HR matter.

17        Q.   So were you a defendant, Dr. Jain?

18        A.   No.

19        Q.   Were you a witness?

20        A.   I was an expert witness.

21        Q.   Okay.  You were an expert witness.

22        A.   Yes, in both of these matters.

23        Q.   And this is the office of health and mental

24   hygiene?



```
 1            MS. CANFIELD:  Objection to form.  You can
 2        answer.
 3        A.   No.  No.  It's the Office of Mental Health.
 4        Q.   Okay.  And this is a state agency, I take it?
 5        A.   Yes.
 6            MS. CANFIELD:  Objection to form.  You can
 7        answer.
 8        Q.   Now, you're saying that this is a state
 9    agency.  Is this where you currently work, Dr. Jain?
10        A.   Yes.
11        Q.   And how long have you been working at the
12    Office of Mental Health?
13        A.   For about 16 months.
14        Q.   So when did you start?
15        A.   June 1st, 2020.
16        Q.   And how did -- what's your exact title there?
17        A.   Medical director of the division of forensic
18    services.
19        Q.   How many staff do you manage?
20        A.   I oversee forensic services, which
21    encompasses at least four forensic psychiatric centers,
22    as well as our correctional-based operations, providing
23    mental health treatment for state prisoners in New York.
24    So let's say, overseeing a large service.  I don't
```



1  directly supervise specific individuals.

2      Q.   Well, how many people are in the -- I guess,

3  the forensic services division; it would be a

4  division --

5          MS. CANFIELD:  Objection as to form.  You can

6      answer.

7      A.   Yeah.  The services -- so we overlap.  Our

8  Office of Mental Health employs about 14,000 employees.

9  And there's an overlap between the forensic services and

10  the Office of Mental Health.  I'm unable to state the

11  exact number that fall under division of forensic

12  services because there's an overlap.  So overall, the

13  Office of Mental Health employs 14,000 people.  And

14  that's -- that's our organization that I'm employed

15  with.

16      Q.   And what's your current -- what's your

17  current salary, Dr. Jain?

18      A.   290,000 per year.

19      Q.   And what was your salary when you left CHS?

20      A.   I believe it was 221,000 per year.

21      Q.   And were you a -- how many W-2s did you

22  receive each year?

23          MS. CANFIELD:  Objection as to form.  You can

24      answer.



 1        A.    I believe I received one per year for my
 2   employment with -- currently with Office of Mental
 3   Health.
 4        Q.    Now, did you receive more than one W-2 for
 5   your employment with CHS?
 6        A.    To the best of my knowledge, only one W-2.
 7        Q.    And who was the W-2 from?
 8        A.    New York City Health and Hospitals.
 9        Q.    Did you receive a W-2 from any other entity?
10        A.    At the beginning, when I first started my
11   position with health and hospitals, the earlier part of
12   that year, I was working with Columbia University, and I
13   received a W-2 during my employment period prior to my
14   employment with Correctional Health Services.
15        Q.    In what capacity were you working in at
16   Columbia?
17        A.    I was in a forensic psychiatry research
18   fellowship.
19        Q.    Now, I'm going to go back a little bit.
20   Where did you get your -- what was your highest level of
21   education?  Let's start there.
22        A.    I have a medical degree.
23        Q.    From?
24        A.    From Northeast Ohio University's College of



1   Medicine.

2       Q.   And when did you get that degree?

3       A.   2006.

4       Q.   And did you do any fellowships at that time

5   after you left?

6       A.   I did residency after medical school as a

7   four-year residency at the University of Pittsburgh from

8   2006 to 2010.  And then I also did two additional

9   fellowships after that, one in forensic psychiatrist at

10  Case Western Reserve University in Ohio from 2010 to

11  2011.  And then a psychosomatic medicine fellowship at

12  Cleveland Clinic, also in Ohio, from 2011 to 2012.

13      Q.   And where -- where did you first work once

14  you completed your fellowships?

15      A.   University of Pittsburgh Medical Center.

16      Q.   And in what capacity did you work?

17      A.   I had multiple roles there.  I was an

18  assistant professor of psychiatry.  I was also medical

19  director of the forensic psychiatry services.  I was

20  initially associate program director of the forensic

21  psychiatry fellowship, and then program director of the

22  forensic psychiatry fellowship.  And I was also medical

23  director of the psychiatric consultation service at one

24  of our regional hospitals called UPMC East.



1        Q.    Now, after you completed -- I guess you
2   worked there from -- okay.  Let's stop.
3             When -- how long did you work at the
4   University of Pittsburgh Medical Center?
5        A.    Five years.
6        Q.    So you worked there from 2012 to 2017?
7        A.    Correct.
8        Q.    Okay.  And then where did you work after
9   that?
10        A.    Then I worked at Columbia University from
11   2017 through -- to April of 2018.
12        Q.    Now, how did you hear about the job at CHS?
13        A.    This was something brought to my attention
14   from various sources, including my mentor, Dr. Paul
15   Applebaum, as well as forensic psychiatrists in the
16   community, as well as a posting that was available
17   online from correctional health services.
18        Q.    Did anyone from -- did anyone from MOCJ reach
19   out to you about this job?
20        A.    No.
21        Q.    Anyone from City Hall?
22        A.    No.
23        Q.    Did you know any of the defendants prior to
24   working at CHS?



1        A.    Can I clarify specifically the defendants?

2        Q.    Yes.  So they would be Dr. Ford, Dr. Yang,

3   Mr. Wangel.

4        A.    Okay.  Yes.  Dr. Ford, I had interacted with

5   a few times at national conferences.

6        Q.    And how often -- you said "a few times."  How

7   close to the time that you were hired at CHS, and I

8   guess the time that you may have last interacted with

9   Dr. Ford prior to being hired, what was the time period?

10        MS. CANFIELD:  Objection to form.  You can

11   answer.

12        A.    I believe prior to my employment, I had some

13   contact with her.  I believe, phone communication,

14   rather informal interaction.  And then prior to that

15   also, interacted at the -- at a national conference in

16   October, I believe, 2017.

17        Q.    So did Dr. Ford reach out to you about --

18   about, I guess, working in this particular position at

19   CHS?

20        A.    I believe, as I recall, it was more mutual.

21   People had made me aware.  And I had reached out to her,

22   and she had also reached out to me.

23        Q.    And then who did you interview with once you,

24   I guess, went through the process?



1        A.    Yes.  So I interviewed, as I recall, with Dr.
2   Ford, Dr. Ross MacDonald, Dr. Alex Garcia-Mansilla, and
3   Dr. Liz Owen.
4        Q.    I'm going to ask you some questions to follow
5   up.  Did you know Dr. -- Dr. MacDonald beforehand?
6        A.    No.
7        Q.    Dr. Garcia-Mansilla?
8        A.    No.
9        Q.    Dr. Owen?
10        A.    No.
11        Q.    Dr. Katz?
12        A.    No.
13        Q.    And you didn't know Dr. Yang?
14        A.    No.
15        Q.    Okay.  So you only knew Dr. Ford before
16   working at CHS?
17        A.    That's correct.
18        Q.    Okay.  And what were you told the position
19   was going to entail when you were interviewed?  Do you
20   remember?
21            MS. CANFIELD:  Objection as to form.  You can
22        answer.
23        A.    Yes.  Overall, I was made aware this is a new
24   position, and it would be involved with overseeing the



16                          ABHISHEK JAIN, M.D.

1    four forensic psychiatry court clinics that serve the

2    five boroughs of New York City.  And the position was to

3    oversee these court clinics that serve the 730

4    competency to stand trial evaluations, as well as 390

5    pre-sentencing evaluations that serve the court system

6    of New York City.

7         Q.   Now, prior to working in your former capacity

8    as medical director of the forensic psychiatry --

9    psychiatric court clinics, had you done any 730

10   examinations yourself?

11             MS. CANFIELD:  Objection to form.  You can

12        answer.

13        A.   The 730 examinations are competency to stand

14   trial evaluations.  And yes, I had done competency to

15   stand trial evaluations prior to my position.

16        Q.   And was this during your -- your fellowship

17   or afterwards?

18        A.   I had performed competency to stand trial

19   evaluations in Ohio and in Pennsylvania, both during

20   training and in -- in my employment positions there.

21   Their statute is not called 730, of course, but they're

22   comparable examinations in those states.

23        Q.   I mean, do they adhere to the precedent

24   Dusky?



 1          A.    Yes.

 2                MS. CANFIELD:  Objection.  Put in an

 3          objection after that last question, please.

 4                MS. HAGAN:  And for the record -- for the

 5          record, the deponent said yes.  And that was --

 6          and my question pertained to the Dusky precedent.

 7          And Dusky's spelled D-U-S-K-Y.

 8          Q.    So -- so Dr. Jain, you said that you

 9   performed, I guess, the equivalent of competency exams

10   during your training and employment status -- employment

11   prior to coming to CHS; is that right?

12          A.    Yes.

13          Q.    And how many would you say you did before you

14   started working at CHS?

15          A.    I would have to estimate, but at least 600.

16          Q.    And these are competency to stand trial?

17          A.    Yes.

18          Q.    And do they -- they require two examiners?

19          A.    In Ohio and Pennsylvania, no, they do not

20   require two examiners.  In New York, they do.

21          Q.    So how did the competency to stand trial

22   evaluation -- evaluations differ in Ohio and

23   Pennsylvania than they do in New York?

24          A.    Sorry --

800.DAL.8779
dalcoreporting.com


18                              **ABHISHEK JAIN, M.D.**

1              MS. CANFIELD:  Objection as to form.  You can
2        answer.
3        A.    May I modify a previous response I gave --
4        Q.    Sure.
5        A.    -- regarding the number of examinations?
6              I also oversaw a forensic psychiatry
7    fellowship program in Pennsylvania and provided
8    oversight of our trainees who did competency to stand
9    trial evaluations.  So my number of, at least, at 600 as
10   an estimate were ones that I did directly myself.  Also,
11   in addition to that, I did numerous -- different types
12   of capacity evaluations for patients and forensic
13   examinees throughout my career.
14       Q.    Now, I was asking you earlier -- and thank
15   you for the clarification.  I was asking you earlier how
16   did those exams that you administered in Ohio and
17   Pennsylvania differ from the 730 competency exams that
18   you administered, or at least presided over in --
19   presided over here in New York?
20             MS. CANFIELD:  Objection to form.  He can
21        answer.
22       A.    Yeah.  There are -- each jurisdiction, each
23   state, each court system has different procedures
24   involved with competency to stand trial evaluations.



```
 1   Two -- for example, two key differences from New York
 2   compared to other states, is that New York, by statute,
 3   requires two exam -- two examiners for competency to
 4   stand trial evaluations.  And at Number 2, another
 5   example is that individuals who are found not competent
 6   or unfit or facing misdemeanors in New York State, their
 7   case is essentially dismissed, and they're sent for
 8   treatment instead.  Whereas, misdemeanors in Ohio and
 9   Pennsylvania were not dismissed after finding of
10   incompetence.
11        Q.   Now, were any, I guess, objectives conveyed
12   to you when you interviewed or when you started the
13   position as medical director?
14             MS. CANFIELD:  Objection to form.  He can
15        answer.
16        A.   Yes.  Generally speaking, both my own vision,
17   as well as the objectives of the position itself,
18   involved the consolidation of the four court clinics to
19   provide some consistency across the city.  Also, to have
20   a efficient process to have examinations conducted for
21   the court system and for inmates waiting for their
22   examination, namely, at Rikers.  And also, to maintain
23   the integrity and objectives and ethics of our field in
24   the court clinics as well.  And that was an important
```



1   component of this to maintain the accuracy, quality, and

2   ethics of our work in the court clinics.

3        Q.   At any point, was it conveyed to you that the

4   -- the mayor wanted to close Rikers Island at any cost?

5             MS. CANFIELD:   Objection to form.   You can

6        answer.

7        A.   If I understand the question, generally, what

8   was publicly known, that there was a intention and a

9   goal towards closing Rikers from the mayor's position.

10       Q.   Did that -- did that goal manifest itself in

11  how CHS operated?

12            MS. CANFIELD:   Objection to form.   He can

13       answer.

14       A.   So CHS, essentially, was the broad umbrella

15  overseeing the court clinics.   Our forensic psychiatric

16  evaluation court clinics, our goal was to serve the

17  court system to efficiently have examinations completed.

18  And again, to maintain the integrity and quality of our

19  work, so we can render an objective evaluation for the

20  court system.   That was not directly connected to Rikers

21  closing in that context.

22       Q.   When you mentioned efficiency, what do you

23  mean by that?

24       A.   Yeah.   So many times, not only in New York,



1    but throughout the country, many inmates wait for their

2    competency to stand trial evaluations, wait for court

3    orders, wait for their case to be heard in court.  And

4    often times, they're waiting lengthy periods for their

5    case to be processed.  And in order to avoid those

6    delays and inefficiencies in the system, that was our --

7    one of our goals, to reduce that inefficiency across the

8    system; so that inmates are not languishing,

9    unnecessarily waiting for their examinations and court

10   dates.

11        Q.   Now, Dr. Kaye raised a number of issues with

12   the administration of forensic evaluations while you

13   were there.  You're aware of that; right?

14        MS. CANFIELD:  Objection as to form.  You can

15        answer.

16        A.   I believe so, yes.

17        Q.   For example, Dr. Kaye raised -- raised

18   concern about, I guess, the use of redacted medical

19   records.  Do you recall that?

20        MS. CANFIELD:  Objection.  You can answer.

21        A.   Yeah.  I had -- we had some discussions

22   regarding medical records when they needed to be

23   appropriately obtained in the course of doing our

24   examinations for the courts.  And one concern that was



1   raised, was that the records that were being sent to the

2   examiners were redacted.  For example, removing

3   information regarding HIV and substance use.  And so in

4   order to do the examinations, we also agreed that in

5   many circumstances, substance use and HIV would be

6   important information for the examiners to have in order

7   to render a diagnosis and an opinion regarding their

8   examination.  And at times, there was some -- also

9   resistance from judges to sign orders to release

10  un-redacted records to the examiners.  So this was a

11  discussion that we had during my -- my time with CHS.

12        Q.   At any time, did CHS approach the courts with

13  the proposal of using redacted medical records instead

14  of un-redacted records?

15             MS. CANFIELD:  Objection to form.  You can

16        answer.

17        A.   I'm sorry.  Can you clarify the question?

18        Q.   At any point, did CHS management or legal or

19  both, approach the judges pertaining to the usage of

20  redacted medical records rather than un-redacted medical

21  records?

22             MS. CANFIELD:  Objection.  You can answer if

23        you can.

24        A.   Yeah.  I'm not sure what discussions others



1   had on the matter.  My involvement was to discuss when

2   it might be necessary to have those records and why they

3   would be important to have for us and in what

4   circumstance.  And also, to communicate the times when

5   we think that that information would be important to

6   render an opinion, and for the examiners to be able to

7   do their -- to serve the courts by conducting these

8   examinations.

9          Q.   Did you ever work in conjunction with CHS's

10  management to engage any judges to, I guess, use the --

11  use redacted medical records instead of un-redacted

12  medical records?

13             MS. CANFIELD:  Objection as to form.  Asked

14        and answered.  You can answer again.

15         Q.   Yeah.  I guess -- I guess I would ask yes or

16  no.

17             MS. CANFIELD:  Objection.  You can answer if

18        you're able.

19         A.   Can you repeat the question.  I will see if I

20  can answer as a yes or no.

21         Q.   Yes or no.  Did you participate in any

22  efforts by CHS to, I guess, develop a form where

23  redacted medical records would be used instead of

24  un-redacted medical records?



```
 1            MS. CANFIELD:  Objection as to form.  Again,
 2       I don't know if it's a yes-or-no response, but you
 3       can answer if you're able.
 4       A.    Yeah.  I'm not sure if I can answer that as a
 5  yes or no.
 6       Q.    Okay.  Well, how would you answer it then?
 7       A.    Each borough, each case sometimes would have
 8  a unique circumstance.  And at times, if the judges were
 9  resistant to signing an order for un-redacted records,
10  full records, then there may be a consideration where
11  they would be able to sign a redacted record.  But that
12  was determined case by case, and often in consultation
13  with the examiners and the directors to see what
14  information might be necessary, and if -- if redacted
15  would be sufficient or un-redacted would be sufficient.
16  However, on balance, we would make an effort to try to
17  obtain un-redacted records so that the examiners could
18  have the information if they needed for their
19  examinations.
20       Q.    Did CHS ever seek to provide redacted medical
21  records that basically redacted HIV substance use --
22  substance use?  And what was the other area that the
23  redacted medical records would, I guess -- I guess
24  obscure?
```



```
 1            MS. CANFIELD:  Objection.  Compound.  You can

 2        answer if you're able.

 3        A.   So for the second question I was asked, I

 4    believe HIV and substance abuse were the two main types

 5    of information that were redacted -- taken out from --

 6    blacked out from the record.

 7        Q.   Is that something that CHS pursued, or was

 8    this something that the court pursued?

 9            MS. CANFIELD:  Objection as to form.  You can

10        answer.  Asked and answered.

11        A.   Yes.  To the best -- to the best of my

12    understanding, there were two components to this.

13    Because these were medical treatment records, CHS and

14    Rikers had an interest of making sure that those records

15    were appropriately disclosed for non-treatment purposes.

16    And then also, some judges had expressed reluctance,

17    either through the judges or through defense attorneys,

18    about having full records disclosed for the competency

19    to stand trial evaluations.  So in certain

20    circumstances, the judges or CHS would determine that

21    the HIV and substance use information was not material

22    to a competency to stand trial evaluation.  But that was

23    often case by case.  And again, we made efforts to try

24    to have the full records that were un-redacted in the
```



26                        **ABHISHEK JAIN, M.D.**

1   cases that we were trying to obtain records.

2        Q.   Did CHS ever make the determination that HIV

3   and substance use information were not, I guess,

4   necessary to make, or to, I guess, engage in a full

5   evaluation?

6             MS. CANFIELD:  Objection.  Asked and

7        answered.  He can answer again.

8        A.   I'm not sure if CHS ever made that

9   determination.  I know there were discussions about what

10  would be appropriate and able to be disclosed also by

11  law.

12       Q.   Did -- did Dr. Kaye ever raise those

13  objections with you as far as the use of redacted

14  medical records?

15       A.   Yes.

16            MS. CANFIELD:  Objection as to form.  You can

17       answer.

18       Q.   You said yes, right, Dr. -- Dr. Jain?

19       A.   Yes.

20       Q.   And how did she respond?

21            MS. CANFIELD:  Objection to form.  You can

22       answer.

23       A.   I responded by supporting the idea that when

24  full records are needed, that we would support that.



1    And we worked with our CHS legal counsel, as well as

2    with judges, to see what type of legal language, what

3    type of reasoning and any information we need to share,

4    so that the judges would be able to sign over -- would

5    sign an order to release full un-redacted records.  So I

6    was in support of this when Dr. Kaye brought this up.

7          Q.   It was Dr. Kaye's position that un-redacted

8    medical records were always required.  Did you agree

9    with that?

10               MS. CANFIELD:  Objection as to form.

11          Speculation.  There's no foundation, but you can

12          answer.

13          A.   Yeah.  I don't think I can answer that as an

14    always.

15          Q.   So okay.  It's your position that there are

16    circumstances where an examiner or evaluator would not

17    need or should not obtain un-redacted medical records;

18    is that the case?

19               MS. CANFIELD:  Objection as to form.  Asked

20          and answered.  He can answer again.

21          A.   No.  If an examiner believes that that

22    information is important for them to render an opinion,

23    or there's relevant HIV or substance use information,

24    then I would not oppose that.  I would support the



1   examiners and the directors if they needed that

2   information.

3        Q.   Now, Dr. Kaye alleges that she was treated

4   differently than when Dr. Winkler made the similar, I

5   guess -- or advocated similarly for the use of

6   un-redacted medical records.  Would you agree or

7   disagree?

8             MS. CANFIELD:  Objection as to form.  You can

9        answer.

10       A.   To my recollection, I don't think we treated

11  those requests differently.  And I'm not sure what

12  manner.

13       Q.   And she also made the same assertion as it

14  pertained to Dr. -- Dr. Mundy and to Dr. Ciric.

15            MS. CANFIELD:  Objection as to form.  You can

16       answer if you're able.

17       A.   I did not work with Dr. Ciric.

18       Q.   Did you work with Dr. Colley?

19       A.   No.

20       Q.   Okay.  So you just worked with Dr. Mundy and

21  Dr. Winkler; right?

22       A.   Yes.

23       Q.   And they both expressed similar concerns as

24  far as the usage of redacted medical records.  They both



 1   were -- they both opposed the usage of redacted medical

 2   records.  Dr. Kaye alleges that she was treated

 3   differently for objecting than they were.  Would you

 4   agree or disagree?

 5              MS. CANFIELD:  Objection.  No foundation for

 6         your assertions, but you can answer if you're

 7         able.

 8         A.   Yeah.  I don't believe that we treated those

 9   requests differently, necessarily in any manner.  When

10   those requests were requested by our examiners or

11   directors, we would look at the request and discuss them

12   similarly among all the directors and examiners.

13         Q.   And you would disagree with the

14   representation that Dr. Kaye experienced retaliation

15   when she raised these concerns with CHS management?

16              MS. CANFIELD:  Objection as to form.  You can

17         answer.

18         A.   Can you repeat the question?  Sorry.

19         Q.   The question was:  You would disagree with

20   Dr. Kaye in her assertion that she experienced -- she

21   experienced retaliation when she raised concerns about

22   the redacted medical records to CHS management?

23              MS. CANFIELD:  Objection as to form.  You can

24         answer.



**ABHISHEK JAIN, M.D.**

```
 1       A.   Yes.  I would disagree with that.  There was
 2  no retaliation for those types of requests.
 3       Q.   Now, I just wanted to kind of give you -- I
 4  just kind of get an idea as to where and how you
 5  functioned within CHS.  So who was your immediate
 6  supervisor, Mr. -- Dr. Jain?  I'm sorry.
 7       A.   For the majority of the time, it was Dr.
 8  Elizabeth Ford.
 9       Q.   And when was she your supervisor?
10       A.   From April 2018 through -- I believe, she
11  left that position in December of 2019.
12       Q.   She didn't leave in February of 2020?
13            MS. CANFIELD:  Objection to form.  You can
14       answer.
15       A.   That may have been correct.  I knew it was
16  either end of 2019 or towards the beginning of 2020.  So
17  I don't have the exact date in front of me, but it was
18  around that period.
19       Q.   And then, after Dr. Ford left, who became
20  your supervisor -- your direct supervisor?
21       A.   Dr. Ross MacDonald.
22       Q.   And what was Dr. MacDonald's title?
23       A.   I believe it was chief medical officer for
24  correctional health services.
```



1       Q.    During your time at CHS, did you receive any
2   promotions?
3       A.    No.  I don't think I would necessarily call
4   them promotions.  After Dr. Ford left, the
5   organizational chart changed, but it was not a formal
6   change in positions or titles.
7       Q.    Did you receive any increases in salary?
8       A.    I believe we received the standard increase
9   in salary that was given to all employees similarly.  Or
10  at least to my knowledge, it was part of the standard
11  increase annually.
12      Q.    When did you start out when you were hired at
13  CHS; what was your salary?
14      A.    As I recall, it -- I believe it was 200 and
15  -- 216, I believe.  It may have been 221.  I don't
16  recall if my salary increased from 221 or increased from
17  221 afterwards, but it was around that number.
18      Q.    Okay.  And then your salary increased to 221
19  by the time you left; is that right?
20          MS. CANFIELD:  Objection to form.  You can
21      answer.
22      A.    I believe so.
23      Q.    Now, who did Dr. Ford report to when she was
24  your supervisor?



```
 1          A.    I believe she reported to Dr. Ross MacDonald.
 2          Q.    And who did Dr. MacDonald report to?
 3          A.    I believe he reported to Dr. Patsy Yang.
 4          Q.    And then, I guess, Dr. Yang reported to Dr.
 5   Katz; is that right?
 6          A.    As I understand, yes.
 7          Q.    Okay.  Now, when -- when Dr. MacDonald became
 8   your direct supervisor; what was the time period for
 9   that?
10          A.    I believe it was after Dr. Ford left, and
11   then also prior to when I left, so as you mentioned
12   earlier, Dr. Ford left in February of 2020.  It was from
13   February of 2020 through the end of May 2020.
14          Q.    There was never a time when there were two
15   interim directors that served, I guess, as your
16   immediate supervisor?
17          A.    Yes, there was an interim director.
18          Q.    Who were they?
19          A.    It was Dr. Virginia Barber-Rioja, and I
20   believe only her.  She was the only interim director at
21   that time.
22          Q.    Now, is Dr. Ri -- is Dr. Rioja a
23   psychologist?
24          A.    Yes.
```



1      Q.   And does she provide treatment?

2      A.   I believe she oversees the treatment services

3  for correctional health services.  I'm not sure if she

4  provides direct treatment.

5      Q.   Now, did there ever come a time when Dr. Kaye

6  raised concerned about Dr. Barber-Rioja being involved

7  in court clinics?

8      A.   I'm sorry.  Can you repeat that?  I missed

9  the beginning of that.

10          MS. HAGAN:  Strike that.

11     Q.   So I was going to ask you some questions

12 about that, but let's just kind of move on to something

13 else.

14          I was looking at the -- we're talking about

15 the managerial structure.  Were you ever evaluated

16 during the time you were at CHS?

17          MS. CANFIELD:  Objection to form.  You can

18      answer.

19     A.   Yes.

20     Q.   And who evaluate -- who gave you those

21 evaluations?

22     A.   Dr. Elizabeth Ford.

23     Q.   And how often were you evaluated?

24     A.   I believe initially, at six months, and then



 1  annually after that.

 2              MS. HAGAN:  I call for the production of Dr.

 3       Jain's performance evaluations.

 4              MS. CANFIELD:  Put it in writing.  We'll take

 5       it under advisement.

 6

 7  DOCUMENT/INFORMATION REQUESTED:

 8

 9       Q.   Now, the six -- what was your rating for the

10  six-month evaluation?

11       A.   I don't recall.

12       Q.   What were your -- what were your ratings for

13  the annual evaluations?

14       A.   I don't recall.

15       Q.   Has anyone ever filed a complaint of

16  discrimination against you, Dr. Jain?

17       A.   No.  Prior to this matter, no.

18       Q.   Has anyone filed a grievance against you?

19       A.   No.

20       Q.   So have you ever been sued before?

21       A.   No.

22       Q.   So I'm going to ask you some questions about

23  just the stakeholders involved with CHS.  For example,

24  my first questions deals with MOCJ.  Can you explain who



```
 1   they are?
 2              MS. CANFIELD:  Objection as to form.  You can
 3         answer if you're able.
 4         A.    My understanding is it's the mayor's office
 5   of criminal justice.
 6         Q.    How often would you interact with MOCJ?
 7              MS. CANFIELD:  Objection to form.  You can
 8         answer.
 9         A.    The interactions would be occasional
10   throughout my employment there in meetings.  So I would
11   estimate every few months or so.
12         Q.    Now, what does the mayor's office of criminal
13   justice do, I guess, in relation to CHS?
14              MS. CANFIELD:  Objection to form.  You can
15         answer if you're able.
16         A.    I don't think I'm able to answer that.
17         Q.    Okay.  MOCJ -- did MOCJ provide policy
18   guidance as to how CHS operated?
19         A.    Not to my knowledge, no.
20         Q.    Did Tasha Lloyd ever facilitate any meetings
21   with judges on your behalf or on -- on the behalf of Ms.
22   Swenson?
23              MS. CANFIELD:  Objection to form.  You can
24         answer if you're able.
```



36                        **ABHISHEK JAIN, M.D.**

1        A.    Yes.

2        Q.    Now, Tasha Lloyd worked at the Mayor's Office

3    of Criminal Justice; right?

4        A.    Yes.

5            Q.    Okay.

6            MS. CANFIELD:  Objection to form.

7        Q.    Now, what was Tasha Lloyd's title; do you

8    recall?

9        A.    I don't recall.

10       Q.    How often would you interact with Ms. -- Ms.

11   Lloyd?

12           MS. CANFIELD:  Objection to form.  You can

13       answer.

14       A.    To the best of my recollection, it was

15   perhaps every few months or as matters arose regarding

16   the court clinic or other 730 evaluation issues.

17       Q.    Did you go to a monthly workgroup meeting

18   with MOCJ?

19       A.    I believe at the beginning, there were

20   monthly meetings or periodic meetings.

21       Q.    And how was -- I'm sorry.

22       A.    I don't recall the exact time period, but

23   there were, at the beginning, some meetings.

24       Q.    How often -- who -- first off, how -- who



1    determined which staff from CHS attended the MOCJ

2    meetings?

3            MS. CANFIELD:  Objection to the form.  You

4        can answer.

5        A.   When those were -- those meetings were

6    started prior to my employment with CHS.  And my

7    understanding was that there was already a mailing list

8    with different individuals.  And I'm not sure who

9    created that initial invitation list.

10       Q.   But you attended these meetings until --

11       A.   Yes.

12       Q.   -- until the work group was disbanded; right?

13       A.   Yes.  I would make an effort to attend those

14   meetings.

15       Q.   When did the work group disband?

16           MS. CANFIELD:  Objection as to form.  You can

17       answer.

18       A.   I don't recall.

19       Q.   Now, did -- did the court clinics have a

20   budget?

21       A.   Yes.

22       Q.   What was that budget?

23       A.   I don't know.

24       Q.   Did you preside over the budget?



**ABHISHEK JAIN, M.D.**

1        A.    No.

2        Q.    Did you hire anyone while you were working at

3   CHS?

4        A.    I was involved in the hiring process, yes.

5        Q.    And who were you -- and what hires were you

6   involved with?

7        A.    I don't recall all the hires I was involved

8   with, but it was during the period from April 2018

9   through the end of May 2020.  During my employment, I

10  was involved with the hiring during that period.

11       Q.    So let's -- let's start.  Did you participate

12  in the hiring of Dr. Winkler?

13       A.    Not in the hiring, no.

14       Q.    Dr. Winkler was promoted right before you

15  started.  So did you play a part in his promotion?

16            MS. CANFIELD:  Objection as to form.  You can

17       answer.

18       A.    No.

19       Q.    Okay.  So what role did you play in Dr.

20  Winkler's, I guess, transition from being a deputy

21  director to a director of -- of court clinic?

22            MS. CANFIELD:  Objection as to form.  You can

23       answer if you're able.

24       A.    Yeah.  As the director of the court clinics,



1   I provided supervision and oversight of Dr. Winkler.

2           Q.    Now, you said that you participated in the

3   hiring process.  Did you hire anyone else besides Dr.

4   Winkler?  Let's say, for example, did you hire Dr.

5   Brayton?

6               MS. CANFIELD:  Objection as to form.  You can

7           answer.

8           A.   I just want to clarify the beginning of that.

9   I actually was not involved in the hiring of Dr.

10  Winkler.

11          Q.   Okay.  You were basically involved with just

12  him transitioning into his new role; is that right?

13          A.   Yes, that's correct.

14              MS. CANFIELD:  Objection.  You can answer.

15          A.   Yes, that's correct.

16          Q.   Okay.  And then I asked you if you

17  participated in the hiring of Dr. Brayton.  Did you?

18          A.   Yes.

19          Q.   And Dr. Brayton initially worked at the

20  Brooklyn Court Center; right -- Court Clinic?

21              MS. CANFIELD:  Objection to form.  You can

22          answer.

23          A.   She was hired for the Bronx Court Clinic, but

24  she initially spent a few months at the Brooklyn Court



1    Clinic.

2          Q.    Why was that?

3          A.    Any new hire that comes in, they initially

4    have a period of training, period of getting used to the

5    procedures of the court clinic.  And in this context,

6    Dr. Winkler also offered to provide supervision.  And

7    also in discussion with Dr. Kaye, it was decided that it

8    would be helpful to have Dr. Brayton for a few months in

9    the Brooklyn Court Clinic, so she could get used to the

10   procedures.  Dr. Winkler had also, prior to that, been

11   in the Bronx Court Clinic, so he would be able to

12   provide direct information, education regarding the

13   Bronx Court Clinic.  And also, Dr. Winkler is a

14   psychologist, just like Dr. Brayton.  So they would also

15   have that common training background and educational

16   background.  So Dr. Winkler could also show her specific

17   things such as conducting psychological testing in the

18   court clinics and for 730 purposes.  So there were

19   multiple reasons and multiple different discussions

20   regarding why it would be useful to have her start in

21   the Brooklyn Court Clinic first.

22         Q.    Now, were you aware that Dr. Kaye hired Dr.

23   Winkler?

24               MS. CANFIELD:  Objection as to form.  You can



1        answer.  No foundation.

2        A.    I'm not sure if I was aware that Dr. Kaye

3   hired Dr. Winkler.

4        Q.    Were you aware that Dr. Kaye trained Dr.

5   Winkler?

6            MS. CANFIELD:  Objection as to form.  You can

7        answer.

8        A.    I'm not sure if Dr. Kaye trained Dr. Winkler.

9        Q.    Are you aware that Dr. Kaye had 20 years of

10  experience working at the court clinics?

11       A.    Yes.

12           MS. CANFIELD:  Objection as to form.  You can

13       answer.

14       Q.    And you were aware that Dr. Kaye was the most

15  senior, I guess, court center director?

16       A.    I know that she had been in that position for

17  20 or so years.  And I don't recall if she had been the

18  longest serving one of the court clinic directors, but I

19  know that she had over, you know, 20 or so years of

20  experience.

21       Q.    The other court -- let's try to go over the

22  other court clinic directors at the time.  Dr. Mundy,

23  did he have as much experience as Dr. Kaye?

24       A.    He had not as many years as a court clinic



1  director as Dr. Kaye.

2        Q.    Okay.  Did he have as much professional

3  experience as Dr. Kaye, post-fellowship, post, I

4  guess -- what do you, guys, call it?  Post-fellowship

5  and post-residency?

6            MS. CANFIELD:  Objection as to form.  You can

7        answer.

8        A.    Yeah.  So in terms of his experience, he --

9  the psychiatrist, forensic, a trained psychiatrist also

10  had other medical training and background.  So I know he

11  had extensive experience.  In number of years, I would

12  say that Dr. Kaye had more experience than Dr. Mundy,

13  but I can't speak to each of the specific experience --

14  experiences each of them had.

15        Q.    Were any of your other -- were any of the

16  other directors triple board certified when you started

17  at CHS?

18            MS. CANFIELD:  Objection as to form.  You can

19        answer.

20        A.    Can I clarify if you're referring to the

21  directors?

22        Q.    The directors of the court clinics, yes.

23        A.    Yes.  So when we say "board certified,"

24  that's specifically referring to psychiatrists in this



1    context.  So Dr. Mundy was also triple board certified

2    in psychiatry, three areas of psychiatry.

3         Q.   Was this the case when you started at CHS, or

4    did this happen as time progressed?

5         A.   No.  He had three board certifications prior

6    to my employment with CHS.

7         Q.   Do you recall what they were in?

8         A.   I recall they were in general psychiatry,

9    forensic psychiatry, and psychosomatic medicine.

10        Q.   Okay.  And do you recall what Dr. Kaye's

11   certification -- certifications were in?

12        A.   Yes.  I believe they were in general

13   psychiatry, forensic psychiatry, and child and

14   adolescent psychiatry.

15        Q.   Now, I'm going to go back into your -- into

16   our stakeholders just to kind of get an idea as to how

17   the court clinics functioned in the community.  Now --

18        A.   Sorry.  May I modify one response?

19        Q.   Yes, sir.

20        A.   So you're asking about Dr. Mundy's board

21   certifications.  I know he's been trained in those three

22   areas that I mentioned.  And I know he's board certified

23   in general psychiatry and forensic psychiatry.  I just

24   want to clarify that I'm not -- and I know at one point,



1  he was certified in psychosomatic medicine, but I can't

2  speak to if he was still actively board certified in

3  that area.  So I just wanted to make that distinction.

4       Q.   Okay.  So thank you.

5            I wanted to kind of go into, I guess, your --

6  I guess CHS's relationship with the defense community.

7  For purposes of this lawsuit, what defense community

8  organizations did CHS engage for the Bronx?

9            MS. CANFIELD:  Objection as to form.  In

10       purposes of this lawsuit?

11       Q.   Well, I'm talking about the Bronx legal

12  defense community, what organizations did CHS engage?

13            MS. CANFIELD:  Objection as to form.  You can

14       answer.

15       A.   Yeah.  I'm not entirely sure what "engage"

16  would mean here.  What I can say is that the Bronx Legal

17  Aid Society and Bronx Defender Services, their clients

18  were seen by our court clinic in Bronx.

19       Q.   Uh-huh. (Indiscernible) in this lawsuit.  How

20  did you engage the Legal Aid Society?

21            MR. HAGAN:  Strike the remainder of the

22       uh-huh comment.

23            MS. CANFIELD:  Objection to the form.  You

24       can answer.



```
1      A.    Yeah.  So Legal Aid Society was involved with
2   a lot of the meetings prior to my involvement with
3   correctional health services, including -- as well as
4   the district attorneys, assistant district attorneys,
5   and the judges and court system, because we serve the
6   courts system.  And so their involvement in each borough
7   as the pilot and as the court clinics were being
8   developed, they had -- the Legal Aid Society had one
9   attorney, at least appointed to each of the boroughs to
10  sit in on defendants who were represented by Legal Aid
11  Society and who were facing 730 or 390 examinations.
12     Q.    Now, I guess I would ask you, we talked about
13  Dr. Winkler transitioning from the Bronx Court Clinic as
14  a deputy director to the Brooklyn Court Clinic as
15  director.  When did Dr. Brayton -- when -- okay.  Doctor
16  -- Dr. Kaye basically alleges that the center was
17  understaffed between April and December of 2018.  Would
18  you agree -- would you agree or disagree with that?
19          MS. CANFIELD:  Objection to form.  You can
20      answer.
21     A.    From what time periods again?
22     Q.    From April 2018 to December 2018.
23     A.    During that time, I know that we were working
24  on hiring more staff in the clinic to provide
```

1  examinations.  And we, at different times, needed to

2  provide additional staffing for cases to be seen during

3  that time.

4       Q.   Was Dr. Kaye the only full-time examiner at

5  that time -- or evaluator at that time, I should say?

6            MS. CANFIELD:  Objection to form.  You can

7       answer.

8       A.   From April of 2018 through December -- until,

9  I believe, December of '18, we had part-time examiners

10 there in addition to Dr. Kaye.  And we also had other

11 examiners from other boroughs who had provided

12 examinations there.  So I do believe during that time

13 period, Dr. Kaye may have been the only full-time

14 psychiatrist there.

15      Q.   So during that time period, Dr. Kaye was the

16 only one who could -- I mean, during that time period,

17 730s, there was a challenge to get them done.  Would

18 that be accurate?

19           MS. CANFIELD:  Objection to form.  You can

20      answer.

21      A.   At times, yes.

22      Q.   Okay.  And what were those challenges?

23      A.   Scheduling challenges to have the defendants

24 produced on days when Dr. Kaye and other examiners would



```
 1   be available.  Also, scheduling challenges when public
 2   defenders, such as Legal Aid Society attorneys would
 3   need to be sitting in on the examinations as well.  And
 4   then there were other examiners -- other challenges that
 5   were outside of our control, such as defendants being
 6   able to be produced to the court clinic.  And for
 7   example, some transportation issues at times or
 8   production issues or refusals from defendants.  So there
 9   were various challenges during that time that their
10   examination's completed.
11        Q.   Was the representation ever made to Dr. Kaye
12   that Dr. Winkler would not assume a full-time position
13   at the Brooklyn Court Clinic until another full-time
14   replacement had been hired for her clinic?
15             MS. CANFIELD:  Objection as to form.  You can
16        answer.
17        A.   Not to my knowledge.  I'm not sure if that
18   specific statement was made, but not to my knowledge.
19        Q.   Now, just for purposes of just clarity, did
20   CHS take over the court clinics all at the same time, or
21   was it like -- was it a staggered process?
22        A.   Yeah.  As I recall, it was a staggered
23   process.  The first phase was in April of 2018 when the
24   Brooklyn and Queens Court Clinics were brought under
```



1   CHS.  And then I believe in July 2018 is when the

2   Manhattan and Bronx Court Clinics were brought under

3   CHS.

4        Q.   Now, during the early part of your ten-year

5   at CHS, didn't Dr. Kaye complain to you about pay

6   parity?

7             MS. CANFIELD:  Objection as to form.  You can

8        answer.

9        A.   At which period?

10       Q.   Well, I would say about April 19th, 2018, did

11  Dr. Kaye complain to you about a gender -- gender-based

12  pay parity?

13       A.   I knew there were those matters that were of

14  concern that were brought up and that were being

15  resolved through CHS through HR and labor prior to my

16  employment with CHS.  And my understanding was also that

17  those were issues that pre-dated CHS as well.

18       Q.   But Dr. Kaye was eventually -- the Bronx

19  Court Clinic was eventually, I guess, absorbed by CHS;

20  isn't that right?

21            MS. CANFIELD:  Objection to form.  You can

22       answer.

23       A.   Yes.

24       Q.   And that took place in about July of 2018; is



1    that right?

2         A.    That's correct.

3         Q.    And so I guess I would like to kind of ask

4    again:  Do you recall an email that Dr. Kaye sent to Dr.

5    Yang, yourself, and Dr. Ford and some other CHS

6    management that further elaborated on the pay parity

7    issues that she identified that came along with her

8    employment?

9         A.    I believe so.

10        Q.    And what did you do when you learned of Dr.

11   Kaye's complaint?

12             MS. CANFIELD:  Objection as to form.  You can

13        answer.

14        A.    So I acknowledged that this was brought

15   forward, and also made sure to inform the appropriate

16   individuals who could help resolve the matter.  This

17   would be our HR and labor.

18        Q.    And who in HR -- who in HR would have been

19   the appropriate person to address the issue?

20        A.    So my main contact person was, at that time,

21   Jessica Laboy.

22        Q.    And what was Ms. Laboy's position?

23        A.    I don't know her exact title.

24        Q.    Was Ms. Laboy responsible for hiring -- I



 1   mean, CHS's hiring?

 2              MS. CANFIELD:  Objection to form.  You can

 3       answer.

 4       A.   Yeah.  She was involved in the hiring

 5   procedures.

 6       Q.   And you said that you put Dr. Kaye in contact

 7   with Ms. Laboy in order to address her issues?

 8       A.   Yes.

 9       Q.   And do you know what happened after you put

10   Dr. Kaye in contact with Ms. Laboy?

11       A.   Yes.  I had her in contact with Ms. Laboy, as

12   well as our labor relations.  And at that point, that

13   was a matter I knew that they needed to resolve.  I

14   wasn't aware of the details or where things were in the

15   procedure.  I became more aware of this matter as this

16   complaint went forward, and this lawsuit came forward.

17   So otherwise, I would make efforts to appropriately

18   direct those questions to the appropriate individuals

19   who could help resolve that.

20       Q.   And during your time at CHS, did you have EEO

21   training?

22       A.   Yes.  As I recall, I believe there was a

23   general EEO training as part of our orientation.  I

24   don't recall the exact details, but I do remember there



 1  was some component of that.

 2        Q.   Now, did you have any EEO training after

 3  orientation?

 4        A.   I believe there was a additional or -- sorry,

 5  additional training regarding those matters.  But again,

 6  I don't recall the details of that training.

 7        Q.   So you don't know if it was computer-based or

 8  if it was live training?

 9             MS. CANFIELD:  Objection to the form.  You

10        can answer.

11        A.   I do recall a live component of it.  I'm not

12  sure if there was also a computer.  I don't recall if

13  there was also a computer training regarding that as

14  well.  I know we would have periodic computer trainings,

15  but I do recall that there was a live training

16  component.

17        Q.   Did there ever come a time when Dr. Kaye told

18  you it was improper, if not illegal, to throw out your

19  notes when you, I guess, did evaluations?

20             MS. CANFIELD:  Objection to form.  You can

21        answer.

22        A.   Can you repeat that question?

23        Q.   On May 17th, 2018, did Dr. Kaye ever tell you

24  that it was improper to throw out your notes when you



1    did evaluations?

2           MS. CANFIELD:  Objection as to form.  You can

3       answer.

4       A.   She may have said that.  At the same time, I

5    also had kept my notes, so -- as part of your evaluation

6    process.

7       Q.   So at any point, did you ever accuse Dr. Kaye

8    of taking your notes?

9           MS. CANFIELD:  Objection to form.  You can

10      answer.

11      A.   Yes.

12      Q.   Okay.  So what happened?

13      A.   Yes.  So around December of 2018, I was

14   looking for one of my notes from the charts where I had

15   left it there in the Bronx Court Clinic.  And when I

16   went to obtain it, I was informed that my charts --

17   there were ten charts, actually, in which ten notes were

18   removed.  And only those notes of mine were removed from

19   those charts.  All the other material was left in the

20   charts.  And I was informed that those are in Dr. Kaye's

21   office.  And so those were taken.  And those were my

22   personal notes that I used to render examinations --

23   that I used to render reports following examinations.

24      Q.   Now, throwing away notes, generally, wouldn't



```
 1    that be a Class E felony?
 2              MS. CANFIELD:  Objection as to form.  You can
 3        answer.
 4        A.    I can't speak to the technical-legal issue.
 5        Q.    Would it be against the law?
 6        A.    Again, I'm not --
 7              MS. CANFIELD:  Objection to form.  You can
 8        answer.  You can answer.
 9        A.    Yeah.  So generally speaking, we keep our
10    notes.  Whether it's unlawful, I think that's a specific
11    jurisdiction in a case-by-case matter.
12        Q.    In New York, did you ever learn that it would
13    be illegal to throw out your notes?
14              MS. CANFIELD:  Objection to form.  You can
15        answer.
16        A.    Yeah.  So again, as part of our procedures,
17    we keep our notes.  Whether I can speak to the specific
18    types of notes, what notes, and so forth, are illegal or
19    are not illegal, I can't speak to the technical legality
20    or the -- or the criminal charges that would be
21    involved.  And again, the notes vary.  There might be --
22    notes can mean multiple things.  But the notes taken
23    during an examination, I would make -- I would keep
24    those and retain them.
```



1        Q.    Now, I'm getting -- you're licensed -- you're

2   licensed to practice here in New York; right?

3        A.    Yes.

4        Q.    And so there was a process.  You had to take

5   an exam, I take it, right, to get -- to be licensed

6   here; am I right?

7        A.    There's an application process for licensure,

8   which includes all of our examinations as physicians.

9        Q.    Right.

10        A.    And all the proper board certifications.

11        Q.    And you have some kind of continuing

12   education requirement; am I right?

13             MS. CANFIELD:  Objection to form.  You can

14        answer.

15        A.    Yes.

16        Q.    So during that continuing education, I guess,

17   requirement -- aren't there courses that basically go

18   into what is considered illegal and legal conduct -- and

19   ethical conduct?

20             MS. CANFIELD:  Objection to form.  You can

21        answer.

22        A.    Not necessarily for forensic examinations.

23        Q.    Okay.  So it's your testimony that you're not

24   sure whether or not throwing out the notes would be

 1   illegal, per se; is that right?

 2           MS. CANFIELD:  Objection.  Asked and

 3       answered.  You can answer again.

 4       A.   Yeah.  I believe I answered that.

 5       Q.   You can -- I mean, just for the record, would

 6   it be yes or no; you don't know?

 7           MS. CANFIELD:  Objection.  You can answer.

 8       A.   I'll try to rephrase what I said earlier,

 9   which is that my understanding is that it depends on the

10   type of case, depends on the type of examination, and

11   the type of record it is.  There might be some legal

12   implications at the same time that may not apply in all

13   circumstances as well.  But what I can speak to is the

14   procedure that I would do personally, which is to keep

15   my notes.

16       Q.   The notes that were allegedly missing in ten

17   --  from the ten files that you identified, right, would

18   the -- the absence of those notes, would that be

19   illegal?

20           MS. CANFIELD:  Objection as to form.

21       Absence, what do you mean?  You can answer.

22       A.   I'm not sure what the technical-legal issue

23   would be involved there.

24       Q.   Well, Dr. Jain, you -- you accused Dr. Kaye



1    of taking your notes.  Whatever came of your accusation?

2    Was she found, I guess, culpable in this regard?

3            MS. CANFIELD:  Objection as to form.  You can

4        answer.

5        A.   Yeah.  So this was not a legal matter.  This

6    was something I brought forward to my supervisor as a

7    concern regarding the unusual procedure, why are my

8    notes missing from the chart.  And after that, I'm not

9    sure what repercussions occurred after that for Dr.

10   Kaye.  I informed my supervisor.  And also at that time,

11   as I recall, Dr. Kaye was away from the clinic on a

12   leave.  So I don't recall what the issues were or the

13   outcome was immediately after that.  For me, it raised a

14   significant concern of feeling targeted, that my notes

15   are being taken out of the chart.  And those were my

16   personal notes I used to render examinations.  There

17   would be no reason for someone to take out my notes,

18   especially because they're my notes and not others.

19       Q.   Now --

20       A.   And also, Dr. Kaye was not supervising me at

21   that time, so also, it was unclear as to why my notes

22   would be missing.

23       Q.   Are you -- was it ever proven that Dr. Kaye

24   took your notes?



1       A.   It was brought to my attention.  I informed

2    my supervisors.  I'm not sure after that if it was

3    proven or not.  The information that was provided to me

4    was that those notes were not in the chart, that they

5    were -- and we were not able to obtain them because they

6    were locked in Dr. Kaye's office.

7       Q.   Did the notes ever reappear?

8       A.   I don't recall if my notes reappeared or not.

9       Q.   Okay.  Was Dr. Kaye ever written up for

10   allegedly taking your notes?

11      A.   I don't recall if she was formally written

12   up.

13      Q.   Now, Dr. Kaye alleges that the story that you

14   discussed right now of her taking your notes was to

15   cover up for your throwing out the notes and that you

16   recreated the notes because they were missing from the

17   files because you never had them there.  Do you disagree

18   with that assertion?

19      A.   I disagree with --

20           MS. CANFIELD:  Objection to form.  You can

21      answer.

22      Q.   Go ahead.

23      A.   I disagree with that.  I did not destroy my

24   notes.  And I did not -- you know, I did not take them



1    out and destroy them.

2        Q.    And you did not recreate them?

3        A.    No.

4              MS. HAGAN:  I'm going to take a bathroom

5        break.  Can we get back together in ten minutes?

6              MS. CANFIELD:  Sure.

7              MS. HAGAN:  Okay.  Great.  Thanks.

8

9              (Recess taken from 11:19 a.m. until 11:32

10             a.m.)

11

12   BY MS. HAGAN:

13       Q.    Okay.  Dr. Jain, I want to kind of make sure

14   that I get -- close a few things before I move on to

15   another area of, I guess, discussion.

16             Now, earlier, you said that Dr. Owen was part

17   of the panel that interviewed you when you started at

18   CHS; is that right?

19       A.    That's right, yes.

20       Q.    Now, were you -- are you aware where Dr. Owen

21   works now?

22             MS. CANFIELD:  Objection as to form.  You can

23       answer.

24       A.    I'm not sure where she works at this moment.



 1   I know when I left correctional health services, she was
 2   the director of the Queens Court Clinic.
 3          Q.    Is Dr. Owen still at the Queens Court Clinic?
 4                MS. CANFIELD:  Objection as to form.  You can
 5          answer again.
 6          A.    I'm not entirely sure.
 7          Q.    Okay.  Have you stayed in touch with Dr.
 8   Owen?
 9          A.    No.
10          Q.    Okay.  Now, you also said that you had a
11   vision for the court clinics when you first started.
12   Can you elaborate on that vision for us?
13          A.    Yeah.
14                MS. CANFIELD:  Objection as to form.  You can
15          answer again.
16          A.    Yes.  One of the things that drew me to the
17   court clinics was the ability to do objective
18   evaluations for the court system.  And this is
19   consistent with my career vision, as well as my core]
20   ethics and foundation as a forensic psychiatrist.  So my
21   vision was to serve the court system accurately,
22   ethically, promote the different ethics of our field,
23   the principles of forensic psychiatry, as well as an
24   opportunity to do examinations myself, and to serve the

 1  court system through that lens.  So this was a broad

 2  mission for me and vision, that we would help serve the

 3  court system through our forensic psychiatric skills and

 4  our training.

 5        Q.   What specific goals did you have for the

 6  court clinics?

 7             MS. CANFIELD:  Objection as to form.  You can

 8        answer again.

 9        A.   Yeah.  So the specific goals I had were one,

10  to consolidate the court clinic consistent with the

11  goals of correctional health services, and to provide

12  some consistency with policies and procedures across the

13  court clinic, as well as to serve the system by -- as we

14  discussed previously, to help -- have an efficient

15  process, an effective process for the court system, as

16  well as maintain the integrity and quality of our work.

17  So those were my broad goals in my position.

18        Q.   So to consolidate the court clinics, what do

19  you mean by that?

20        A.   So prior to CHS, and this predated my

21  employment, the four court clinics were managed not

22  under one management.  The Bronx and Manhattan were

23  under Bellevue, and Queens and Brooklyn, Staten Island

24  were under Kings County.  So there was different



1  management of those court clinics prior to CHS.

2      Q.   But by July of 2018, all four clinics were

3  being managed by CHS.  So would that have been, I guess,

4  an accomplishment of one of your goals, or did you have

5  a further -- a further vision when you meant

6  consolidate?

7          MS. CANFIELD:  Objection as to form.  You can

8      answer.

9      A.   Yeah.  So the goal and vision to consolidate

10 was not mine originally.  That was prior to my

11 employment.  But as I learned more about the system and

12 those goals, my goals were also consistent with that,

13 and I saw the value and the benefit of consolidation

14 that could help support the core systems, our examiners,

15 and the courts.

16     Q.   Now, you talked about the consistencies with

17 the policies and procedures.  Let's start with the

18 procedures.  Which procedures did you want to make

19 consistent?

20     A.   So there were a number of procedures.  So for

21 example, earlier you mentioned records.  So an efficient

22 process to obtain medical records when examiners needed

23 those records.  So to have a process in place to -- from

24 the point of the examiners deciding that they might need



1  additional patient records to render an opinion to the

2  judges' administering an order, so that we could obtain

3  those disclosures from the health services.  And then

4  assist them in place for different entities such as

5  Rikers Island treatment, as well as Bellevue, and

6  Elmhurst Hospital, for example, to provide those records

7  to our examiners when we needed.

8          Prior to that, as one example, it would take

9  sometimes weeks, multiple weeks, lengthy periods to get

10  those records.  That was one thing that would often

11  delay a case.  So we made efforts to try to expedite

12  that process, so we can get those records more

13  efficiently, and was able to reduce that down to a

14  matter of one to two days in many circumstances.  That

15  was one example of having consistent procedures across

16  the system so that obtaining those records would be more

17  efficient.

18      Q.   I guess I kind of feel like we started in the

19  middle when we're talking about like ordering the

20  records.  I guess one thing that probably would be good

21  for the record is to know how 730 fitness exams come to

22  be.  Based on the statute and your recollection, how

23  would an inmate be subjected to the 730 evaluation

24  process?



1            MS. CANFIELD:  Objection to form.  You can

2      answer.

3      A.   So typically, these are questions raised by a

4  defense attorney, could be an ADA as well, or the courts

5  themselves.  The bottom line is the courts -- a judge

6  would order a 730 examination based on concerns raised

7  regarding the defendant's ability to understand the

8  proceedings against them or the ability to assist in

9  their defense.  And so these 730 examinations were

10  initiated by, essentially, a court order from a judge.

11  And then those examinations were then ordered, depending

12  on the appropriate court clinic.  So if it was a Bronx

13  case, those cases would then be evaluated by the court

14  -- the Bronx Court Clinic.

15      Q.   Now, we -- we kind of touched on this

16  earlier, but 730 examinations are, I guess, typically

17  administered by two evaluators; is that right?

18      A.   Yes.

19      Q.   So ideally, the evaluators would have the

20  same determination; would that be accurate, the ideal?

21      A.   No.

22      Q.   Okay.  So what happens?

23      A.   The two examiners would render an independent

24  opinion.



1       Q.    Okay.  And what happens when you have the two

2    examiners as splitting?

3       A.    Then by statute, a third examiner needs to be

4    assigned to that case.

5       Q.    Now, for purposes of efficiency and

6    functionality, ideally, you would want a psychiatrist

7    and a psychologist; is that right?

8       A.    Not necessarily.  By statute, it could be

9    either/or, two psychiatrists, two psychologists or one

10   of each.

11      Q.    Was there a push toward having one of each

12   because of the presence of psychological testing?

13      A.    Yeah.  Oftentimes, psychological testing

14   would need to be done by a psychologist.  So having a

15   psychologist also involved in the case would be

16   available to do testing.  At least, that was something

17   that we supported in clinics and wanted to make sure we

18   had available.

19      Q.    Now, was there ever a time that the

20   determination of any of the inmates contro -- any of the

21   inmates' 730 examinations controverted?

22            MS. CANFIELD:  Objection as to form.  You can

23       answer.

24      A.    If I understand the question, were there ever



1    times when a 730 opinion was controverted?

2         Q.   Yes.  While you were at CHS.

3         A.   Yes, that would happen, any as forensic

4    examination.

5         Q.   Okay.  Do you recall a Jose Gonzalez being

6    controverted?

7         A.   I remember elements of the case, such as

8    additional examiners, a second examination being

9    ordered.  Actually, more than a second.  They had other

10   multiple examinations on that case.  Whether it was

11   formally controverted, I believe so, throughout the

12   years, because I know that case, I believe, also

13   predated my involvement with CHS.  It was a longer case.

14   So I do believe that that case was controverted and then

15   additional examinations were ordered on that case.

16        Q.   At any point, did you review the transcript

17   of Dr. Kaye, which he gave testimony during the

18   controversion hearing?

19        A.   Yes.

20        Q.   Okay.  What do you remember about that?

21        A.   So I remember the reason I was reviewing it

22   was, I was asked to provide supervision of Dr. Brayton,

23   who was an examiner in the clinic.  And there was a

24   question that came up regarding that case and



1  particularly some information that was obtained by that

2  case through recordings.  And so, in order to provide

3  general supervision to Dr. Brayton, I reviewed the

4  material, including the transcript and other material

5  that was relevant in this case to help provide

6  supervision to Dr. Brayton on that matter.

7       Q.   Okay.  So at any point, was there, I guess, a

8  sentiment among CHS management that Mr. Gonzalez be

9  found fit, that you know of?

10           MS. CANFIELD:  Objection as to form.  You can

11      answer.

12      A.   No.  To my knowledge, there was never any

13 intention or push from any management for any particular

14 opinion in that case.

15      Q.   Did Dr. Yang or -- did Dr. Yang ever ask

16 about the Jose Gonzalez case?

17      A.   Not to me.  Not to my knowledge.

18      Q.   Do you know who she asked?

19      A.   I don't know if she asked anyone.  I'm not

20 sure.

21      Q.   Did labor relations ever look into the Jose

22 Gonzalez case, to your knowledge?

23           MS. CANFIELD:  Objection as to form.  You can

24      answer.



1      A.   I'm not sure if labor relations looked into

2  the case.  But certain elements of the case had come up.

3  It was a controversial case.  There were a lot of

4  questions about information that was obtained during the

5  examination process of that case and what would be

6  important for examiners to have and what would be

7  appropriate for them to have in that matter.  So those

8  various questions came up, and that's when I brought it

9  to the attention of my supervisor, Dr. Ford, how do we

10 handle some of these matters, generally speaking.  Also

11 in the interest of our procedures in the court clinic,

12 how we obtain examination information, and how we obtain

13 information from defendants.

14     Q.   Now, earlier you mentioned that you referred

15 Dr. Kaye to both Ms. Laboy and labor.  What labor did

16 you refer Dr. Kaye to when she raised her pay parity

17 agree -- I mean, complaint to you?

18          MS. CANFIELD:  Objection to form.  You can

19      answer.

20     A.   So just to clarify.  I believe Jessica Laboy

21 works with HR, and our labor individual was Attorney

22 Jonathan Wangel.

23     Q.   Okay.  Now, I guess I should -- I'm not sure

24 if I mentioned him amongst the defendants in the case,

**ABHISHEK JAIN, M.D.**

1   but he was amongst the defendants in the case.  He is

2   one of the defendants in the case.  I'm sorry.  You are

3   aware of that; right?

4          A.   Yes, I'm aware of that from the complaint.

5          Q.   Now, did you read the complaint yourself, Dr.

6   Jain?

7          A.   Yes.  I had an opportunity to read that

8   complaint.

9          Q.   When did you read the complaint?

10         A.   I believe it was brought to my attention

11  around or after December of 2018.

12         Q.   Who did you speak to when you read the

13  complaint?

14              MS. CANFIELD:  Objection to form.  You can

15         answer.

16         A.   The complaint was actually brought to my

17  attention -- it was publicly available online.  And I

18  think at that time, I spoke with my supervisor, Dr.

19  Ford.

20         Q.   And what did you speak about?

21         A.   Just speaking about the nature of this, what

22  the procedures are next, how we need to -- you know,

23  what steps I need to do going forward.  You know, this

24  is -- as I mentioned earlier, I've never been named in



1    such a complaint, so this was a concern for me.  I

2    valued my work.  I valued my ethics and position as a

3    forensic psychiatrist.  And it's not something I was

4    anticipating.  So I just wanted guidance on what our

5    next steps need to be, and especially in the interest of

6    my own reputation, career, I needed to make sure, you

7    know, that I was doing things appropriately and right

8    and to help resolve this matter.

9         Q.   So what exactly did you say to Dr. Ford when

10   you learned of this lawsuit?

11        A.   I'm not -- I don't recall what I said

12   exactly.

13        Q.   I mean, kind of, what did you say?

14             MS. CANFIELD:  Objection as to form.  He just

15        testified he doesn't remember.

16             MS. HAGAN:  No, he did not.

17        Q.   Dr. Jain, to the extent that you remember,

18   what did you say to Dr. Ford?

19             MS. CANFIELD:  Objection.  Asked and

20        answered.  You can answer again.

21        A.   Yeah.  As I mentioned earlier, it was about

22   the complaint itself, the procedures of what happens

23   next.  I remember also being concerned about what this

24   -- what implications this might have for my own career



1   and also my work with CHS.  And so it was more of those

2   general types of issues.  And then that this would be

3   handled through a legal process, and just to follow that

4   process.

5        Q.   What did Dr. Ford say to you?

6        A.   That was the general discussion about that

7   matter.  She also just kind of generally described that

8   there would be more legal follow-up, more -- that this

9   matter may go on for some time, and that somebody from

10  legal would be reaching out, and that there would be a

11  legal process to go forward with this.

12       Q.   Now, earlier you said you did about 600

13  examinations between the time -- between your fellowship

14  and, I guess, your residency -- no, between your

15  fellowship and your employment.  Was that the case?

16       A.   Yeah.  Before CHS, I would estimate about 600

17  while I was in Ohio and Pennsylvania.

18       Q.   Now, did you keep a list of all of the exams

19  that you took?

20       A.   Not all the exams, no.

21       Q.   Now, do either Ohio or Pennsylvania require

22  that you keep a list?

23       A.   Not to my knowledge, no.

24       Q.   Now, we also talked briefly about the notes.



1  Now, Dr. Jain, did you ever speak to Dr. Kaye yourself

2  about your notes disappearing allegedly?

3          MS. CANFIELD:   Objection as to form.  You can

4      answer.

5      A.   No.  Not directly.

6      Q.   Why not?

7      A.   Well, there were multiple reasons.  One, soon

8  after working at CHS and starting there, I had made

9  various efforts to meet with each of the directors to

10  have regular meetings with them, just to have ongoing

11  communication and collaboration.  And that was offered

12  to all the directors.  Three of the directors

13  immediately said that would be a great idea and agreed.

14  When I mentioned this to Dr. Kaye, she was very

15  resistant to this, asked a lot of questions about why we

16  need to meet.  And then shortly after that, around --

17  around October of 2018, I was also informed that she did

18  not want to meet with me alone, which was very puzzling

19  to me.  And I didn't understand the context of that.

20  And that, along with other interactions, that my intent

21  was to be collegial in other interactions that were

22  adversarial with me through advisement.  Also, from the

23  supervision from Dr. Ford as well, it was decided that

24  these types of matters are probably dealt with better



1   through Dr. Ford.  I was not given the opportunity, like

2   I would have with other directors, to be able to

3   communicate with Dr. Kaye directly and to have a

4   collegial interaction with her because my interactions

5   with her had become -- she had become increasingly

6   adversarial in those interactions, despite my efforts to

7   be supportive and understanding of what's happening in

8   the clinic.  So that was a significant reason why I was

9   not able to have that discussion with her directly.

10          And the second reason was that many staff,

11   including myself, had felt targeted in the Bronx Court

12   Clinic, and felt that there were -- there was a factor

13   there of intimidation and kind of looking for

14   information against us.  So -- so for me, the matter was

15   concerning, so I raised it to my supervisor, but I did

16   not have the direct interaction with Dr. Kaye.  Then my

17   supervisor advised that they would handle it through

18   their means.

19          Q.   You're talking about Dr. Ford?

20          A.   Yes.  Dr. Ford was my supervisor at that

21   time.

22          Q.   Now, did it ever come to be that -- that

23   there was a mistake about Dr. Kaye not wanting to be

24   alone with you?



```
 1          MS. CANFIELD:  Objection to form.  You can
 2     answer.
 3     A.    I'm not sure if there was a mistake.
 4     Q.    So was there ever a time when you -- when Dr.
 5  Kaye specifically asked to meet with you after the
 6  perception was that she did not want to meet with you
 7  alone?
 8     A.    I don't recall if she wanted to meet with me
 9  alone.  I do recall, perhaps, some phone calls.  There
10  was a specific matter, but I was informed that she did
11  not want to meet with me, and that if there was an
12  examination, that we were co-examiners on, that she
13  would need to have an attorney present, and an attorney
14  present for other interactions as well which, again, was
15  very puzzling to me, compounded with our earlier
16  interaction, where she was very resistant to any type of
17  ongoing meetings.  I was very concerned.  And so then, I
18  didn't have those direct one-on-one meetings, unless
19  there was some very extenuating or specific
20  circumstance.  Otherwise, through advisement through Dr.
21  Ford, I decided not to have those discussions directly.
22     Q.    So you say first, I guess -- this goes back
23  to my original question about the notes.  And -- and I
24  don't think we -- we got a firm answer.
```



```
 1              Did you ever speak to Dr. Ford about her
 2   removing -- allegedly removing the notes from your
 3   files?
 4        A.   Yes.
 5             MS. CANFIELD:  Objection to form.  You can
 6        answer.
 7        Q.   Could you repeat your answer?
 8        A.   Yes.
 9        Q.   And what did you say to Dr. -- what did you
10   say to Dr. Kaye -- let me rephrase that.
11             Did you ever speak to Dr. Kaye about removing
12   the notes from your file?
13        A.   No.
14             MS. CANFIELD:  Objection.  Asked and
15        answered.
16        Q.   You said no; right?  You have to say yes or
17   no.  You shook your head.
18        A.   I said no.
19        Q.   Okay.  So you never spoke to Dr. Kaye.
20             Then you said that there was never a time
21   when Dr. -- when Dr. Kaye approached you after it was
22   mistaken that she did not want to meet alone with you?
23             MS. CANFIELD:  Objection as to form.  You can
24        answer again.
```



 1        A.    I didn't understand the question.

 2        Q.    Was there ever a time when it was brought to

 3   your attention that the sentiment that Dr. Kaye did not

 4   want to meet alone with you was a mistake?

 5        A.    So there was a clarification that Dr. Kaye

 6   did not want to meet with me without an attorney

 7   present, and did not want to have an examination with

 8   me -- a 730 examination conducted as co-examiners unless

 9   an attorney is present.

10        Q.    So you didn't want to be -- it was -- it was

11   alleged that Dr. Kaye did not want to meet with you

12   unless you were either doing an examination or an

13   attorney was present; is that what you're saying?

14        A.    Yes.  So to clarify this -- so attorneys

15   often sit in on 730 examinations.  And so she did not

16   want to have an examination with just both of us

17   present.

18             THE WITNESS:  I'm sorry.  I'm getting a

19        message, some error.

20             MS. HAGAN:  You're getting an error from me?

21

22             (Off the record for technical

23             issues.)

24



1  BY MS. HAGAN:

2        Q.   So you were -- you were testifying that --

3  that basically -- you were testifying that Dr. Kaye

4  would not meet with you alone unless you were doing

5  exams or unless there was an attorney present; right?

6        A.   Yeah.

7        Q.   And was it ever addressed?

8        A.   So addressed exactly how so?  I'm not sure.

9        Q.   I mean you were her direct -- you were her

10  direct supervisor; right?

11        A.   Yes.

12        Q.   So, you know, how do you continue to function

13  with Dr. Kaye if, you know, she won't engage you

14  directly?

15        A.   Yeah.  It was very challenging.  So we would

16  try to have communication by email.  She often would

17  tell me that if she wants -- any question I have needs

18  to be in email or in writing.  Which over -- you know,

19  we would have communications with Lucrecia who was the

20  administrator in the court clinic.  Or if there was a

21  specific matter on occasion, and I did need to speak

22  with her directly, we would have a brief phone call and

23  try to resolve a specific matter.

24              And also, if there were issues regarding



1   supervision or other types of matters, I would involve

2   Dr. Ford and get her consultation on how to proceed in

3   those matters as well.  So it was a challenge.  We were

4   still able to function and provide the support in the

5   clinic that we needed to function.  At the same time, my

6   ability to have an open, ongoing communication was

7   compromised due to that adversarial posture from Dr.

8   Kaye.  And that was not -- I was not able to have those

9   types of communications as I would with the other

10  directors.

11

12          (Plaintiff's Exhibit 1, DOCUMENT BATES

13          STAMPED NYC_671 through 672, was marked for

14          identification.)

15

16     Q.   I'm going to show you what's marked as

17  Plaintiff's Exhibit 1.  It should be in the -- I guess

18  -- let's see if it's going to open.  It is opening.

19  Okay.  Then I need to share this.  I'm sorry.  Let's see

20  if I can get back to the main screen.

21          Plaintiffs Exhibit 1 bears the Bates stamp

22  series NYC_671 through 672.  I'm going to, I guess --

23          MS. CANFIELD:  Hold on a second.  I need to

24      find it.

800.DAL.8779
dalcoreporting.com



1    Q.   So Plaintiff's Exhibit 1 is NYC-671 through

2  672.  And it's an email from Mr. Muir, Clarence Muir,

3  associate director of field operations to -- to

4  defendant, Dr. Jain.  And the subject is conversation

5  with Dr. Kaye, October 5th, 2018.  And I'm going to

6  scroll to the bottom of the email, Dr. Jain, so that you

7  can get the full context.  I'm not sure if you can fully

8  see it.  Now, do you vaguely remember this email by any

9  chance?

10    A.   Yes, this is the email I recall when I was

11  speaking earlier.

12    Q.   So just for purposes of the record, the email

13  starts with an email from Mr. Muir to Jonathan Wangel,

14  Ms. Swenson, and Carlos Castellanos.  And Mr. Jain --

15  Dr. Jain on the thread, it says, "Good Morning.  Ms.

16  Swenson and I placed a call to Dr. Kaye this morning at

17  9:30 a.m. and left a message for her to call us back.

18  She called back at 10 a.m., and we inquired why she did

19  not want to work alone with Dr. Jain.  She stated that

20  she did not say that she wouldn't work evaluations with

21  Dr. Jain.  What was said while scheduled was that she

22  shouldn't be alone with Dr. Jain when the attorney has

23  the right to be present.

24        Now, she then asked if Rikers' staff have



1    access to iSight or records from private institutions

2    that are posted on iSight.  She also mentioned that --

3    that someone had brought up her FPECC's site lack of

4    cases in iSight, but that they have -- but that they

5    have 42 cases that were just ordered prior to their

6    training on the system.  They are working to ensure that

7    all new cases are entered.

8           So before we scroll up, I wanted to ask some

9    questions.  Is that okay, Dr. Jain?

10          A.   Yes.

11          Q.   Okay.  So the second sentence of the first

12   paragraph says, "She stated that she did not say that

13   she wouldn't do evaluations with Dr. Jain.  What was

14   said that -- what was said while scheduling was that,

15   she should not be alone with Dr. Jain when the attorney

16   has the right to be present.  Now, isn't that a bit

17   different than what you just testified to about her not

18   wanting to be alone with you at all?

19          MS. CANFIELD:  Objection to form.  You can

20       answer.

21          A.   No.  Because this is what I was saying as

22   well, that I was informed initially that she did not

23   want to be alone with me.  And then there was a

24   clarification that she did not want to do

1    examinations -- 730 examinations without an attorney

2    present, and not want to -- and I was also informed, as

3    I recall, that did not want to meet with me without an

4    attorney present overall as well.  And so -- so this is

5    consistent with -- I mean, it may not have been word for

6    word what I had said earlier, but it's consistent with

7    what I was saying earlier.

8         Q.   Now, there's also a discussion about iSight

9    and workload.  Now, in terms of, you know, busyness and

10   workload, how would you rate the Bronx Center?

11        A.   In terms of volume of cases, it had the least

12   number of 730 examinations of the court clinics.

13        Q.   Was the -- the issue with the lack of -- the

14   42 cases that were just ordered, for example, in this

15   instance, were they ever addressed as far as being

16   inputted into the system?  Do you know?

17             MS. CANFIELD:  Objection as to form.  You can

18        answer.

19        A.   So I'm not understanding the question.  If

20   you can repeat that, please.

21        Q.   Was iSight always accurate when it, I guess,

22   quantified the amount of 730 examinations that were

23   conducted at the clinics?

24        A.   Initially, when we transitioned to iSight,



1   there were some challenges of making sure that there was

2   consistency in iSight when it first started.

3        Q.   Now, in this instance, first and foremost --

4   I guess I should go back.

5             You were working with Dr. Kaye from April to

6   October of 2018, at this point, right?  So this is only

7   about seven months, would that be acc -- well, it would

8   be like, yeah, seven months.  Would that be accurate?

9        A.   Yeah.  I would say closer to perhaps six at

10  this point.

11       Q.   Right.

12       A.   Even five.

13       Q.   Right.  So then, between that window, would

14  you -- when did Dr. Kaye -- when did it become clear to

15  you that Dr. Kaye would not meet with you one on one?

16            MS. CANFIELD:  Objection to form.  You can

17       answer.

18       A.   So it was building up.  And so for example,

19  in September, I had tried creating a schedule where I

20  would meet with each of the directors on a weekly basis.

21  And that was met with resistance from Dr. Kaye.  And

22  then there were other concerns raised, just kind of some

23  interactions that were somewhat adversarial in posture,

24  which were unclear to me why at that time.  And then in



```
1   October, when I received this call -- this message
2   regarding that she does not want to be alone with me,
3   which is -- you know, when I first heard that part of
4   it, that was concerning.
5            So after those different -- it wasn't just
6   one incident.  It was the totality of the interactions
7   that made me arrive at that -- that I needed some
8   supervision and advice from Dr. Ford how to proceed in
9   this matter.  And that's when it was decided that based
10  on all of this, there are concerns, if I were to make an
11  effort -- you know, if we were to try to meet alone, so
12  I avoided those.  And also based on Dr. Kaye's -- such
13  requests from Dr. Kaye as well.  So I had spoken with
14  Dr. Ford, and that was the decision at that time.
15       Q.   Did Dr. Kaye ever say to you, I don't want to
16  meet alone with you?
17       A.   She was very resistant and very defensive
18  when I asked to have regular meetings as a supervisor
19  and with her as director of the clinic.
20       Q.   But my question to you was:  Did she say, Dr.
21  Jain, I do not want to meet alone with you?
22       A.   Not --
23            MS. CANFIELD:  Objection.  You can answer.
24       Q.   What did you say, Dr. Jain?
```



 1        A.    I'm sorry, it's --

 2        Q.    I asked if she -- did Dr. Kaye ever

 3   specifically say to you, I do not want to meet alone

 4   with you?

 5        A.    Not directly to me, no.

 6        Q.    Who did she tell that to?

 7        A.    So I --

 8              MS. CANFIELD:  Objection to form.  You can

 9        answer.

10        A.    Yup.  So in -- I don't know exactly who she

11   said that to.  I can't say who I learned this from.  And

12   also, as I mentioned, based on our prior interactions, I

13   thought at that time, it was a reasonable conclusion,

14   and that I should take appropriate caution if there is

15   going to be that type of adversarial posture towards me.

16        Q.    Now, you're saying that this adversarial

17   posture -- now, in May of 2018, you became aware that

18   Dr. Kaye filed a complaint with the EEOC; is that right?

19              MS. CANFIELD:  Objection as to form.  You can

20        answer if you're able.

21        A.    At that time, I was aware of their general

22   hiring and her employment issues that predated CHS, but

23   I did not know the details of what the complaints were

24   and what the issues were.

1       Q.    Now, did there ever come a time that Dr. Kaye

2    complained about being demoted from medical director to

3    director?

4       A.    Yes.

5       Q.    Would it be fair to say that this happened in

6    and around June 4th, 2018?

7       A.    It did not occur.  There was no demotion.

8       Q.    Did her title change from medical director to

9    director?

10           MS. CANFIELD:  Objection to form.  You can

11       answer.

12       A.    Her formal title never changed.  At that

13   time, there were various different types of titles,

14   corporate titles, functional titles.  And at that time,

15   there was also a question of what our business cards

16   would say.

17       Q.    Well, at any point, did Dr. Kaye have medical

18   director on her business cards?

19       A.    I had not -- I don't believe I saw it

20   directly, but I was aware that the different directors

21   had different titles, I believe, on their business

22   cards.  So I'm not sure what was exactly on the business

23   card.  However, I am aware that she had described that

24   she is a -- she described her role as medical director.



1       Q.   And did anyone else have -- for example, Dr.

2    Mundy is also a doctor, right, for purposes of having

3    completed medical school and done a residency; is that

4    right?

5       A.   Yes, that's correct.

6       Q.   And so did Dr. Mundy's title change as well?

7            MS. CANFIELD:  Objection to form.  You can

8       answer.

9       A.   I'm not sure if his title had changed.  He

10   had a new position with CHS when he was hired, and all

11   four were directors of their clinics.  There were four

12   directors at each clinic.

13

14           (Plaintiff's Exhibit 2, DOCUMENT BATES

15           STAMPED NYC_235 to 237, was marked for

16           identification.)

17

18      Q.   Right.  So I'm going to show you what's

19   marked as Plaintiff's Exhibit 2, and it bears the Bates

20   stamp NYC_235 to 237.  And I'm going to bring your

21   attention to the top of the exchange which is -- it's

22   from you -- the email is from you, Dr. Jain, and it's

23   addressed to an Amanda Ferdinand.  And --

24           MS. CANFIELD:  Can you please let the witness



1          read the entire email thread that you're going up.

2              MS. HAGAN:  I'm just basically --

3              MS. CANFIELD:  I think he needs the context,

4          since there seems -- he seems to be copied on a

5          message on the bottom.

6              MS. HAGAN:  Well, actually, they're the

7          business cards.

8              MS. CANFIELD:  Okay.  So can you let him

9          review that, please.

10         Q.   Okay.  Do you see the business card -- first

11 off, I wanted to make the record clear.  The record --

12 the record -- for purposes of the record, the email is

13 from you, Dr. Jain.  And it's to -- it's to Amanda

14 Ferdinand, as I said, and the subject is business cards.

15 And I'll scroll down to the bottom of this email.  You

16 see these various business cards.  One for Dr. Owen,

17 right, for the Queens Forensic Psychiatry Court Clinic.

18 She's listed as director; right?  Then for Dr. Kaye,

19 she's listed as director; right?

20         A.   Yes.

21         Q.   The same for Dr. Winkler, he's listed as

22 director.  However, Dr. Mundy's card is not here.  So

23 it's a question as to whether or not Dr. Mundy's title

24 changed from medical director to director.  Are you

```
 1  aware if it changed or not?
 2          MS. CANFIELD:  Can you scroll up more to see
 3      what this --
 4      A.    Yes.
 5          MS. HAGAN:  Sure.
 6      Q.    Now, there's another email from Lorrie Drain.
 7  Do you know who that is?
 8      A.    Yes.  She's one of the administrative staff
 9  at CHS.
10      Q.    Okay.  And it -- it is to Andrea Swenson,
11  because you're not really on this.  But she says, "Hi
12  Andrea, please review and let me know if you want any
13  corrections before the order's processed.  Also, Dr.
14  Jain only has one number listed, a second number is
15  required for the order."  Right?  So I guess this is
16  your business card, right, Dr. Jain?
17      A.    Yes.
18      Q.    Okay.  So then we go further up.
19          MS. CANFIELD:  But can you let him read all
20      the emails, please.  I think there was one before
21      this one from Dr. Owen.
22          MS. HAGAN:  There is no -- there is one,
23      okay.  Here's one.
24      Q.    And this one's from Dr. Swenson -- from Ms.
```



88                        **ABHISHEK JAIN, M.D.**

```
 1  Swenson, Dr. Kaye, Winkler, and Dr. Owen; right?
 2        A.    Uh-huh.  Yes.
 3        Q.    And it says, "Please confirm the information
 4  on the cards, so I can get them sent out.  Dr. Jain made
 5  the final call for the position, name, and wording of
 6  the clinic name."  Now, is that true, Dr. Jain?  Were
 7  you the person who made the final decision as to
 8  everyone being called director?
 9        A.    For the purposes of the business cards, yes.
10        Q.    Yeah.  And was it everyone's title as far as
11  their position in the clinics?  Were they all directors?
12        A.    They were all directors of the clinics, yes.
13        Q.    Now, did Dr. Kaye ever express concern to you
14  that her title was changed from medical director to
15  director?
16        A.    Yes.  Those concerns were raised, and we had
17  discussions regarding what the titles should be on the
18  business cards.  And for consistency and clarity, we
19  agreed director, which in my opinion, also captured the
20  idea that each of the directors are the leaders of the
21  clinic or overseeing the service in the clinic.  And so,
22  for example, someone else had requested they wanted to
23  be senior director, and there were other things kind of
24  mentioned, medical director, clinical director.  So for
```



```
 1   consistency on the business cards, I asked if what would
 2   make the most sense, and then we had a meeting and
 3   discussions and then arrived at director would be the
 4   clearest answer.  It was not a demotion.  It was not a
 5   change in the actual functional title or corporate
 6   title.  This was simply for the business cards, and that
 7   was the decision across the four clinics.  Just for
 8   clarity, that there are -- that these are the point
 9   people for the clinic.  These are the directors of the
10   clinic.
11        Q.   But why was it -- why did you feel it was
12   necessary to change everyone's title to director and not
13   allow, let's say, for example, Dr. Kaye and Dr. Mundy
14   continue to function as medical directors?
15             MS. CANFIELD:  Objection.  Asked and
16        answered.  You can answer again.
17        A.   Again, there was no formal reason outside of,
18   just for consistency and in order to make the business
19   cards.  Director, including my own title, was director.
20   For example, even my corporate title and my functional
21   title were -- were different.  And so -- but we agreed
22   that the director would make the most sense.  And then
23   ultimately, Dr. Kaye said that if it's okay with Dr.
24   Mundy, then she's okay with director.  And that's how I
```

1    recall it.

2         Q.   Well, first off, who -- who agreed that it

3    made the most sense to change everyone's title to

4    director besides yourself?

5         A.   So I raised this with Dr. Ford.  I raised it

6    with the court clinic directors.  I raised it with also

7    our leadership with CHS, just to make sure there wasn't

8    some major difference that I'm missing.  And so I

9    reviewed these -- you know, the discussion of what would

10   make the most sense on the business cards.  And so that

11   was just a decision after we discussed it both with the

12   directors, Dr. Ford, and then also with our CHS HR

13   leadership.

14        Q.   Now, who is CHS leadership?

15        A.   So this was a meeting.  We would often have

16   periodic meetings.  Dr. Ford, Dr. MacDonald, Patsy Yang,

17   these were other individuals who would often be at --

18   typically at CHS leadership meetings.

19        Q.   So Dr. MacDonald, Dr. Ford, those would be

20   the other leadership participants that you are

21   referencing when you said that you collectively made a

22   decision to make the change from medical director to

23   director; is that right?

24             MS. CANFIELD:  Objection to form.  You can



1        answer.

2        A.   Yeah.  So in discussion, we reviewed it, and

3   those were the individuals involved in some of the

4   meetings, as well as the court clinic directors

5   themselves.

6        Q.   Now, why isn't Dr. Winkler's card on this

7   thread?  You have -- you have Dr. Wink -- not Winkler,

8   Dr. Mundy.  I'm sorry.  Why isn't Dr. Mundy's card on

9   this thread?

10       A.   I'm not sure.  I can't answer that.

11       Q.   I mean, is it clear -- is it certain that Dr.

12  Mundy's title was actually changed from director -- from

13  medical director to director?

14       A.   All four directors were called director when

15  I first started the position.  In fact, our introductory

16  emails, everyone was introduced as director of their

17  respective court clinics.  I saw no opposition at that

18  time, no resistance to that, so that was another

19  indication for me that director would make sense on the

20  business cards.  Now, there's -- I appreciate there's a

21  difference in the corporate titles and functional

22  titles, but in terms of introductions and business

23  cards, that was the decision for all four directors.  So

24  -- and this was Dr. Mundy's first position with CHS as a

1   director, so I'm not sure if he was director of

2   Manhattan Court Clinic for CHS.  So I cannot say that

3   his title was changed.

4        Q.   Now, I want to go further up in this email

5   thread right now.  And you see this is the next email.

6   You see this; right?

7        A.   Yes.

8        Q.   And this is an email from Dr. Owen to

9   yourself, along with Ms. Swenson, Dr. Kaye, and Dr.

10  Winkler; right?  And she says, "Looks good to me."  Do

11  you see that?  You've gotten a chance to read it; right?

12  Dr. Jain?

13           MS. CANFIELD:  It looks like he's frozen.

14

15           (Off the record for technical

16           issues.)

17

18           MS. CANFIELD:  Did you hear the question?

19           THE WITNESS:  Could you repeat the question,

20       please.

21       Q.   The question -- the question I posed was that

22  did you see the email from Dr. Owen to yourself, Ms.

23  Swenson, Dr. Kaye, and Dr. Winkler?  And Dr. Owen says,

24  "Looks good to me."  You saw this email, right --



1        A.    Yes.

2        Q.    -- you've gotten a chance to see it?

3             Then Dr. Kaye, on May 25th, responds to Ms.

4    Swenson and Dr. Jain, yourself, about the business

5    cards.  And she says, Hi, Andrea.  My title at BCC, the

6    Bronx Court Clinic, I guess, has always been medical

7    director, not director.  Please let me know why this

8    changed."  You saw this; right?

9        A.    Yes.  I'm reading that right now.  Yes.

10       Q.    And then Ms. Swenson responds on May 25th,

11   CC'ing you, "It was Dr. Jain's decision, not mine.  As I

12   mentioned in the previous email, he's copied on here.

13   Thank you -- "Thanks, Andrea."  You see that; right?

14       A.    Yes.

15       Q.    And then you respond to Ms. Ferdinand and Ms.

16   Swenson, "Amanda, do you know the court clinic

17   director's technical title including me?  I thought it

18   was just director and not medical director or senior

19   director."  You see that; right?

20       A.    Yes.

21       Q.    Now, was there ever a time where you were

22   given correspondence that was referenced to justify the

23   change?

24            MS. CANFIELD:  Objection to form.  You can



1       answer.

2       A.   So again, it was not formally changed.  This

3  was for the business cards.  And when we were

4  introduced, everyone was introduced as director,

5  including in earlier emails when I first started the

6  position.  And then when it came time to make the

7  business cards, I sought consultation and advice from

8  others, including court directors, what would make the

9  most sense.  And for consistency across the clinics, we

10  decided to call each person director.  This was not a

11  change in their functional role or in their corporate

12  title.  This was simply for the business cards.

13           MS. HAGAN:  Now, I'm going to show you what's

14       going to be marked as Plaintiffs Exhibit 3, and it

15       bears the Bates stamp series Kaye3rdProduction_50.

16

17           (Plaintiff's Exhibit 3, DOCUMENT BATES

18           STAMPED Kaye3rdProduction_50, was marked for

19           identification.)

20

21       Q.   So the letter is from -- I'm not sure if you

22  see Plaintiff's Exhibit 3.  Dr. Jain, do you see the

23  actual letter?

24       A.   Yes, I see what you're showing on the screen.



**ABHISHEK JAIN, M.D.**                                   95

1      Q.   Right.  And for purposes of the record, the

2   letter is from -- it's dated June 12th, 2016.  And it's

3   from Gary Belkin, Dr. Gary Belkin, executive deputy

4   commissioner for mental hygiene.  Dr. Jain, have you

5   ever met or dealt with Dr. Belkin?

6           MS. CANFIELD:  Objection to form.  You can

7       answer.

8      A.   No.  Not to my knowledge, no.

9      Q.   Okay.  So you never interacted with Dr.

10  Belkin?

11     A.   Not to my knowledge.

12     Q.   Okay.  Now, the letter is dated June 12th,

13  2016, and it's to the Honorable Fern A. Fisher.  Had you

14  heard of Judge Fisher by any chance?

15     A.   I don't recall.  I don't believe so.

16     Q.   Okay.  Now, I'd like to give you an

17  opportunity to review the letter so that, you know, you

18  have some context.  When you get a chance to review the

19  letter, please let me know, and then I can ask you some

20  questions on it.  Okay.  And if you need me to scroll

21  down, please let me know.  Okay?

22     A.   Okay.  Okay.

23     Q.   Now, I want to -- okay.  Now, I want to draw

24  your attention to the CC's on this letter.



800.DAL.8779
dalcoreporting.com

```
 1       A.   Yes.
 2       Q.   The first CC is Steven Ciric, M.D.  You see
 3  that; right?
 4       A.   Yes.
 5       Q.   He refers to himself as director of forensic
 6  services at Bellevue Hospital Center.  You see that;
 7  right?
 8       A.   Yes.
 9       Q.   And then you see Dr. Owen, and she refers to
10  herself as director of forensic psychiatry.  You see
11  that as well; right?
12       A.   Yes.
13       Q.   And then you see Dr. Kaye.  And she refers to
14  herself as medical director.  You see this; right?
15       A.   Yes.
16       Q.   Now, in this same letter, just for purposes
17  of clarity, Dr. Belkin identifies himself as director of
18  community services for the City of New York.  You see
19  that; right?
20       A.   If you can actually scroll -- oh, yes.  Yes.
21  I see it there.
22       Q.   Now, in the previous paragraph, right, Dr.
23  Belkin then says, "Evaluating a defendant in order to
24  determine whether he or she is fit to proceed to trial,
```



 1  is the court function of the forensic court clinics."
 2  And then he referenced -- he then references Criminal
 3  Procedure Law 730.20, mandates that an order directing
 4  such an evaluation be issued to an appropriate director.
 5  And then he CC's the NYCRR, states that such an order
 6  shall be addressed to the director of community and
 7  mental health services of New York City.  Now, he
 8  designates himself as that.  Are you -- did you get that
 9  from the letter, Dr. Jain?
10       A.   Yes.
11            MS. CANFIELD:  Objection as to form.  He can
12       answer.
13       Q.   Dr. Jain answered in the affirmative for the
14  purpose of the record; is that right?
15       A.   Yes.
16       Q.   Okay.  Now, this letter has been referenced
17  as justification for the -- the title change that you
18  had that you implemented during the time of your tenure.
19  However, it's clear here that Dr. Kaye is still
20  referenced as medical director, even though you have the
21  executive deputy commissioner for mental hygiene
22  designated himself as the director of community services
23  for the city of New York.  You see this; right?
24            MS. CANFIELD:  Objection as to form.  He



1        didn't say that this letter formed the basis for

2        his business cards.  You're testifying to that

3        now.  Objection.  You can answer if you understand

4        the question.

5        A.   No.  I did not say that, no.

6        Q.   Have you ever seen this letter before, Dr.

7   Jain?

8             MS. CANFIELD:  Objection.  Asked and

9        answered.  You can answer again.

10             MS. HAGAN:  You're coaching the witness.  I

11        never asked him that.

12        Q.   Have you ever seen this letter before, Dr.

13   Jain?  Remember, you're under oath.

14        A.   I'm not sure if I've seen this specific

15   letter.

16        Q.   Have you heard about this letter?

17        A.   I believe that this letter or a similar

18   letter were referenced in terms of the consolidation of

19   the court clinics.  So I have likely come across the

20   letter, but I'm not sure if that was the exact same

21   letter that I had seen previously.

22        Q.   Right.  Now, I wanted to draw your attention

23   to the actual time that Dr. Kaye filed her complaint, at

24   least one of them.  Now, we talked earlier about Dr. --



1   Dr. Kaye's complaint to Dr. Yang.  Do you recall that?

2           MS. CANFIELD:  Objection to form.  You can

3       answer.

4       A.   I believe we talked about the complaint

5   regarding employment in general.  I'm not sure who --

6   which time we're referencing or who it was directed to.

7       Q.   Okay.  Well, I can make this a little bit

8   more plain.  Earlier, we discussed that Dr. Kaye

9   complained to you and Dr. Yang about pay parity.  You do

10  recall that discussion; right?

11      A.   There was a discussion with me that there is

12  some pay parity issue that HR legal is dealing with.

13  And then I also had a email, which I was CC'd on that

14  outlined some of the agreements regarding the transition

15  from Bellevue to CHS.  And that that was an HR matter

16  being resolved through our HR and labor relations to

17  assist Dr. Kaye in that matter.

18          MS. HAGAN:  Now, I'm going to bring your

19      attention to what will be marked as Plaintiff's

20      Exhibit 4.

21

22          (Plaintiff's Exhibit 4, DOCUMENT BATES

23          STAMPED NYC_281 through NYC_283, was marked

24          for identification.)



1        Q.    And I'm going to show you an email that

2   bears the Bates stamp series NYC, underscore, 281, NYC,

3   underscore 282, and 283.

4             MS. CANFIELD:  What is the date of this

5        email?

6             MS. HAGAN:  The email actually is something

7        that Dr. Jain, I guess, forwarded to himself about

8        pay equity for court clinic medical directors, and

9        it was dated June 20th, 2018.

10            MS. CANFIELD:  It looks like -- it looks like

11       he sent it to Dr. Kaye, and Dr. Kaye sent it to

12       him.

13            MR. HAGAN:  Right.

14            THE WITNESS:  Yes.  I did not forward this

15       email.

16            MS. CANFIELD:  Right.

17       Q.    But at this time, there is a discussion.  And

18  there is a -- at this time, there is a complaint from

19  Dr. Kaye to Dr. Yang.  So I'm scrolling down to the

20  bottom of it, so you can read it.  And at the bottom,

21  the date is May 3rd, 2018.  You see that, right, Dr.

22  Jain?

23       A.    Yes.

24            MS. CANFIELD:  Objection to form.  You can



1       answer.

2       A.    Yes.   I see the date of the email.

3       Q.    And the email is from Dr. Kaye to Dr. Yan.

4  You see that; right?

5       A.    Yes.

6       Q.    And the subject is pay equity for court

7  clinic medical directors.  You see that; right?

8       A.    Yes.

9       Q.    And have you seen this email before?

10      A.    I recall receiving an email like this.  And I

11 recall being aware that this matter was being raised and

12 addressed by CHS, HR, and labor.  And I, at that point,

13 recognized that that was a matter being handled by our

14 other areas of CHS and not me directly.  But I was aware

15 that this was brought to my attention.

16      Q.    Now, to go back to Exhibit 1 -- no, Exhibit

17 2.  I'm sorry.  Let's go back to Exhibit 2.  I'm sorry.

18 Exhibit 2.

19           Now, the pay equity email was on May 3rd,

20 2018; right?  And --

21           MS. HAGAN:  Am I going to the right one?

22           MS. CANFIELD:  Objection.  We've never seen

23      this email that you have on the screen.

24           MS. HAGAN:  That's the wrong one, actually.



1        I'm sorry.  Stopping share.  It's the wrong one,

2        so -- sorry.  My apologies.  I was looking for

3        Exhibit 2.  There should be Exhibit 2.

4        Q.   Now, Plaintiff's Exhibit 2 -- and you should

5   see it now.  Or is it still not sharing?

6             MS. CANFIELD:  No, we can't see it.

7             MS. HAGAN:  Here it is.  So Plaintiff's

8        Exhibit 2, right.

9        Q.   Now, we were discussing Plaintiff's Exhibit

10  2, and we were talking about the business cards.  And

11  that was dated May 25th; right?

12       A.   The previous email was May 2018, yes.

13       Q.   Correct.  And then in Exhibit 4 -- Exhibit 4

14  was dated May 3rd, 2018.  You see that; right?

15       A.   Actually, the screen --

16            MS. CANFIELD:  Not yet.

17       A.   -- the screen is frozen that you're sharing,

18  so I can't see it.

19       Q.   Okay.  Exhibit -- are you seeing right now

20  Exhibit 4?

21            MS. CANFIELD:  No, we can't see it.  It's

22       frozen.  It looks like it's a tornado.

23       Q.   Okay.  Are you seeing it now?

24       A.   Yes.  May 3rd, 2018.



1      Q.    Right.

2      A.    Yes.

3      Q.    So Exhibit 2 was May 25th, and Exhibit 3 --

4  and Exhibit 4 was May -- Exhibit 4 is May 25th, and

5  Exhibit 2 is May 3rd. Would you agree with me Dr. -- Dr.

6  Jain?

7      A.    I'm sorry.  I cannot see the screen, but if

8  those are the dates of the emails, then I have no

9  disagreement with that.

10      Q.    Now, at any point, did you tell Dr. Kaye when

11  she filed her complaint with the EEOC, that you would

12  have to tell Mr. Wangel?

13      A.    Yes.  When it was initially brought to my

14  attention, I informed Dr. Kaye that I would bring it to

15  the appropriate individuals who would help resolve that

16  issue.

17      Q.    And why was Dr. Wangel -- not Dr. Wangel --

18  Mr. Wangel identified as the appropriate person and not

19  the EEOC officer, HSC?

20          MS. CANFIELD:  Objection as to form.  You can

21      answer.

22      A.    I'm not sure.  When I initially started, and

23  I still had -- I believe I also, at that time, spoke

24  with Dr. Ford.  But nonetheless, I needed to see who I



1  should address this with, and I was informed that it was

2  labor relations, Jonathan Wangel.  So as I recall, I was

3  informed that he would be the appropriate person to help

4  address this matter.

5       Q.   Do you know -- during that time period, do

6  you know who the EEOC officer was at HSC?

7            MS. CANFIELD:  Objection to form.  You can

8       answer.

9       A.   I don't recall who it was at that time.

10      Q.   By the time you left, do you remember who was

11 the EEO officer?

12           MS. CANFIELD:  Objection to form.  You can

13      answer.

14      A.   I had some contacts with the EEOC.  I'm not

15 sure who the exact director was.

16      Q.   Okay.  Did you ever receive any materials in

17 EEO office?

18           MS. CANFIELD:  Objection to form.  You can

19      answer.

20      A.   I believe so.  I'm not sure specifically what

21 you're referring to.

22      Q.   Now, you said that your interactions with Dr.

23 Kaye were adversarial by the time -- October 2018;

24 right?



1        A.    Yes.

2        Q.    Now, what do you mean by that exactly?

3        A.    Yeah.  So as I mentioned earlier, my attempts

4    at trying to have a collaborative or collegial

5    interaction were resisted.  I was accused of incorrectly

6    putting her hours in Kronos, which is our timekeeping

7    system, for example, which is inaccurate; because if

8    anything, I was trying to be supportive and help put her

9    hours in, as she had requested, and also to provide

10   coverage in the clinic and other support in the clinic.

11   When these issues regarding her pay parity were raised

12   or her schedule, I was also faced with some -- an

13   adversarial interaction there, where I was only trying

14   to help assist and help support.  And same with matters

15   such as, for example, there was some time off needed for

16   an examination, a board examination, and I supported

17   that.  But then I was also being accused of not

18   supporting that or not doing those matters.  And then as

19   I also mentioned, my notes were taken from the chart.

20   My -- in the statements that were just discussed

21   earlier, not wanting to meet with me --

22       Q.    But I'm going to ask you something --

23       A.    -- but all of these became -- the totality of

24   everything, yes, led me to a reasonable conclusion that



1  there seems to be an adversarial posture here, and it's

2  not entirely clear to me why.

3       Q.   I'm going to ask you a question here, Dr.

4  Jain.  Did Dr. Kaye ever have a verbal argument with you

5  between the time you were hired in April 2018 and

6  October 2018?

7       A.   A verbal argument?

8       Q.   Yes.

9       A.   Can you clarify?

10      Q.   Like we're having a conversation right now;

11 right?  Did Dr. Kaye ever speak to you in an adversarial

12 tone?

13      A.   Yes.

14      Q.   Between April and October of 2018?

15      A.   Yes.

16      Q.   Okay.  When did she speak to you in an

17 adversarial tone between those two dates?

18      A.   So a few times that I did have direct

19 interactions --

20      Q.   Well, let's just go the first time.  The

21 first time between April of 2018 and October of 2018,

22 when was the first time that Dr. Kaye spoke to you from

23 an adversarial tone?

24      A.   So the first that I recall was in the summer



1    of 2018.  Also, when I was wanting to set up -- one

2    example, I'm remembering from that time, was when I

3    wanted to set up individual meetings with each of the

4    directors.  And I was faced with a lot of resistance,

5    defensiveness, demanding why we need to meet, that she

6    needed an agenda before we meet.  And so that was very

7    unclear to me.  No other directors had done that type of

8    posture --

9         Q.   So your testimony is that Dr. Kaye stood in

10   your face and told you -- asked you, why did we need to

11   meet, and we need an agenda before we met; is that what

12   you're testifying to?

13        A.   I didn't --

14             MS. CANFIELD:  Objection.  The testimony

15        speaks for itself.  You can answer.  Please don't

16        interrupt the --

17        Q.   Did Dr. --

18             MS. CANFIELD:  But you're interrupting the

19        witness as he's testifying.  If you can stop doing

20        that, just to rephrase what he just said.  You can

21        answer.

22        Q.   Did Dr. Kaye call you and tell you she would

23   not meet with you without an agenda?  Yes or no?

24        A.   Can I repeat that question.  Did she --



1        Q.   Did Dr. Kaye ever call you or verbally speak

2   to you and tell you she would not meet with you without

3   an agenda?

4        A.   She said that she -- she was questioning why

5   we needed to meet and also questioning, in a very

6   resistant manner, about why we needed to have these

7   meetings and what the agenda was.

8        Q.   I'm asking you --

9        A.   -- so that would --

10       Q.   -- if it was a verbal conversation, though,

11  Dr. Jain.  Did she verbally tell you that, or was it --

12  where were you?  Were you on the phone, or were you face

13  to face?

14       A.   Yeah.  So I had an email exchange where I

15  first asked about having meetings.  And then the next

16  time I was in the court clinic, I recall an interaction

17  when she asked me to come into her office, and then

18  somewhat aggressively asked why we needed to meet, and I

19  asked that we wanted to meet, so what did I want to talk

20  about.  And so I was taken aback by that tone and

21  wondered why -- why this is coming forward.  And then

22  also, compounded with the other accusations about

23  supposedly changing her schedule, supposedly impacting

24  her time off, that tone and everything as I mentioned,



**ABHISHEK JAIN, M.D.**                                    109

```
 1   the totality of everything, yes, was adversarial.
 2        Q.   Did you have a problem with any of the tone
 3   -- the tone of any of the male directors at the clinic?
 4            MS. CANFIELD:  Objection to form.  Assumes
 5        there was a tone.  You can answer.
 6        A.   With the male directors?
 7        Q.   Yes.  Did you have any problems with the male
 8   directors and their tone?
 9        A.   I cannot answer that.
10        Q.   Okay.  Did you have a problem with Dr.
11   Winkler's tone with you, Dr. Jain?
12        A.   No.
13        Q.   Did you have a problem --
14        A.   There was -- well --
15        Q.   Did you have a problem with Dr. Mundy's tone
16   with you?
17        A.   There -- again, I cannot answer that.
18        Q.   Why not?
19        A.   Well, I'd have to review and reflect on each
20   of my interactions with them.  In the course of an
21   interaction, I cannot say whether or not there were
22   instances where there may have been a tone, but I had no
23   instances where there was a consistency of that tone or
24   a consistency of that posture.
```



1        Q.    Was there ever a time -- okay.

2              Was Dr. Winkler adversarial with you at any

3    point?

4        A.    I would characterize our discussions more

5    about procedures where people openly expressed opinions,

6    which I welcomed those types of discussions.  But was

7    the posture taken where it was actually adversarial or

8    directed at me particularly, no.

9        Q.    Okay.  So Dr. Winkler didn't have an

10   adversarial dynamic with you that's established; right?

11       A.    I think that would be a fair statement, yes.

12       Q.    And Dr. Mundy, did he have an adversarial

13   dynamic with you, Dr. Jain?

14       A.    In totality, no.

15       Q.    And did Dr. Weiss have an adversarial dynamic

16   with you?

17       A.    Dr. Weiss, no.

18       Q.    Okay.  So --

19             MS. CANFIELD:  I think you're forgetting Dr.

20        Owens.

21             MS. HAGAN:  No, I'm not.  I'm asking about

22        the men.  Do not -- do not -- do not coach the

23        witness.

24       Q.    Now, Dr. Jain, at any point, did you



 1  circulate policies for the staff to discuss during the

 2  course of your tenure as center director?

 3       A.   Yeah.  We often drafted policies to discuss

 4  with the directors.

 5       Q.   Now, at any point, did you circulate a

 6  private practice policy for discussion?

 7       A.   Yes.

 8       Q.   Okay.  What do you recall about that private

 9  practice policy?

10       A.   The private practice policy, from my

11  recollection, was the first policy that we drafted for

12  the court clinics.  And it was a policy to set the

13  parameters of what private practice would be appropriate

14  in the context of the examiner's role as forensic

15  examiners for the court clinics.  So to make sure that

16  there were no conflicts, to set appropriate parameters

17  for when it would be appropriate to do private policy,

18  when it would not be appropriate to do private policy.

19  So as I recall, those were the procedures regarding

20  private policy.

21       Q.   Did you obtain comments from all of your

22  directors on this policy?

23       A.   Yes.  As I sent out the policy for draft, as

24  my practice typically was, it was to draft it and then



1   seek consultation and input from the directors.

2        Q.    Did Dr. Kaye ever raise a concern about what

3   she deemed to be double-dipping or the potential for

4   that taking place?

5        A.    I'm not sure those specific terms.   In

6   general, that was a common concern, a common discussion,

7   something I also agreed with, that there needs to be a

8   separation of private practice and not conflicting with

9   our work in the court clinic, our primary focus in the

10  court clinic, and also making sure there isn't doing

11  private practice while somebody's actually in work

12  hours.   So we had our procedures in place with that,

13  which I agreed with.

14       Q.    Was there any, you know -- was there an

15  effort made to incentivize the directors to, I guess,

16  remain at the clinic by encouraging to have private

17  practices?

18       A.    I wouldn't say encourage to have private

19  practice, but private practice was supported when it was

20  appropriate.

21       Q.    How did that play -- how did this policy

22  interact, or I guess correlate with the conflict of

23  interest towards Rule 68?

24            MS. CANFIELD:   Objection as to form.   I don't



1        know if you want to opine on the law, but answer

2        the best you can.

3             MS. HAGAN:  You're writing the policy.

4        Please don't coach the witness.

5        A.   Yeah.  So part of our procedure to review the

6   policy was also to review with legal counsel.  And they

7   incorporated the different matters, legal provisions

8   needed from policies such as the conflict of interest

9   board.

10       Q.   Okay.  And to your knowledge, what were the

11  parameters that were put in place to ensure there would

12  be no conflict?

13       A.   So as I recall, some of the measures we had

14  in place were that individuals were not permitted to do

15  private criminal cases in their borough, any private 730

16  examinations that were also done by any of the court

17  clinics and then also each -- if they had any type of

18  patient or any other interaction that would create a

19  conflict with our court clinic -- within work in the

20  court clinic or seeing defendants in the court clinics,

21  those private practice -- practices would not be

22  permitted under this policy.

23       Q.   Did it ever come to your attention that any

24  of the directors used the centers to see any of their



1   private patients?

2           MS. CANFIELD:  Objection to form.  You can

3       answer.

4       A.   When I first started -- at the beginning, I

5   wasn't sure if examiners or directors were using the

6   clinics, but it did come about that we should set that

7   as a parameter in the private practice policy, that they

8   should not be using our court clinic time or space to do

9   those types of examinations.  So I'm not sure.  Every

10  now and then, there would be a request from an attorney

11  or a judge or a private examiner asking if they could

12  use our clinics, and we would refer back to the policy

13  and say, no, they cannot.  But I don't recall

14  specifically if that was happening with some routine.

15  But certainly, that was part of our parameter in the

16  private practice policy.

17      Q.   So what was your position towards Dr. Kaye's

18  concerns about double-dipping and rigging of the exams

19  as by-products of this particular policy?

20          MS. CANFIELD:  Objection as to form.  You can

21      answer.

22      A.   I'm not sure I had concerns regarding Dr.

23  Kaye's private practice.  I'm --

24      Q.   No.  I didn't ask you about Dr. Kaye's



1   private practice.

2          A.    I'm sorry.  I misunderstood.

3          Q.    I'm talking about her concerns that the

4   policy would further encourage double-dipping and

5   rigging of examinations for --

6              MS. CANFIELD:  Objection as to form.  You can

7          answer.

8          Q.    What was your position or your posture in

9   that regard?

10         A.    I agreed with that.  I thought that that was

11  a important concern and something that we incorporated

12  in the policy, as I would do with all of the directors,

13  male and female directors, because that was brought up

14  earlier.  I had no issues.  I would incorporate feedback

15  and input from the directors.

16         Q.    Did you convey your agreement to -- or share

17  your agreement with Dr. Kaye that you would -- about her

18  concerns?

19         A.    Could you repeat that question, please.

20         Q.    Well, up until now, you said in totality,

21  your dynamic with Dr. Kaye was adversarial.

22         A.    Uh-huh.

23         Q.    However, you're testifying that you agreed

24  with the concerns she raised regarding the private



116                          **ABHISHEK JAIN, M.D.**

1   practice policy.  Did you ever tell her, Dr. Kaye, I

2   agree with you about this private -- your concerns about

3   the private practice policy?

4           MS. CANFIELD:  Objection as to form.  You can

5       answer.

6       A.   I -- I both agreed with the premises, as well

7   as incorporated those concerns into our private practice

8   policy.  And --

9       Q.   But my question is:  Did you tell her that?

10      A.   I believe either at a meeting or in some way,

11  acknowledged that that was a similar issue that I had.

12  But overall, I incorporated it into the policy.  So as I

13  recall, I did my best to communicate.  But ultimately,

14  the form of communication was that I incorporated it

15  into the policy as well.  So I believe I may have said

16  it, but I certainly incorporated it, and I took that

17  suggestion seriously.

18      Q.   Now, you also testified earlier that staff at

19  the Bronx Court Clinic felt targeted.  Who were the

20  staff people that felt targeted by Dr. Kaye -- who you

21  determined felt targeted by Dr. Kaye?

22          MS. CANFIELD:  Objection to the form.  You

23      can answer.

24      A.   Yeah.  So the staff in the clinic were Dr.



1    Mullan and Dr. Brayton.  Those were two examiners at

2    that time at the court clinics.  And then also, we had

3    other interactions from staff -- administrative staff

4    who were up there.  And there was a general environment

5    that was tense, that they would describe to me.  And

6    they also felt that they were often targeted or felt

7    like there may have been a campaign against them.  And

8    so that was described to me on more than one occasion.

9         Q.   So let's start with each person.  Dr. Mullan,

10   what did she say about Dr. Kaye?

11             MS. CANFIELD:  Objection as to form.  You can

12        answer.

13        A.   Yeah.  So in general, Dr. Mullan, from what I

14   recall, had been in the clinic for about a year.  And

15   initially, there were -- she would do the work, and I

16   had no complaints from Dr. Kaye or Dr. Mullan.  But as

17   time went on, increasingly, Dr. Mullan expressed to me,

18   towards the end of her time there at the clinic, that

19   there was a tense environment there.  She felt targeted

20   by Mr. Bloom and also Dr. Kaye, who worked closely with

21   Mr. Bloom, and that there were times where she felt that

22   there was a campaign and that she felt that there was

23   also no support from Dr. Kaye when those issues were

24   being raised.  And so they would often describe that



 1  setting, that environment in the clinic to me.

 2       Q.   And when you say -- first and foremost, let's

 3  kind of lay some foundation.

 4            Dr. Mullan, in what capacity does she work at

 5  the -- at the clinic?

 6       A.   She was a part-time psychiatrist who was

 7  conducting 730 and 390 examinations.

 8       Q.   Okay.  And you say that there was a campaign

 9  -- she felt there was a campaign against her.  What kind

10  of campaign are you saying?

11       A.   Yeah.  So she would, at times, feel

12  intimidated by the clinic and by Mr. Bloom on some

13  occasions, and described that there was kind of a

14  posture, or almost it seemed to me like -- almost, you

15  know, concerning where she was not able to feel

16  comfortable there doing her work.  And that also that,

17  for example, there was some reputation or something

18  about her rendering opinions that were always in one

19  direction, and that --

20       Q.   Malingering -- was the rumor that Dr. Mullan

21  quite often found people, I guess, malingering?

22       A.   That was one of the concerns she raised, that

23  people thought that she had that type of meaning in her

24  opinions and --



 1       Q.   Was it true that she often found defendants
 2  malingerers?
 3       A.   I cannot say if she had that meaning.
 4       Q.   Did you review her reports to determine
 5  whether or not there was any truth to that allegation,
 6  as her supervisor?
 7       A.   I reviewed her procedures.  On occasion, we
 8  would discuss some of her cases and her thinking behind
 9  it.  I was very mindful and thoughtful not to interfere
10  with her opinion, but I was interested in knowing how
11  she arrived at her opinions.  And I -- in reviewing the
12  procedures there, I didn't think that there was anything
13  that indicated to me that she had an inappropriate
14  leaning or a bias in one direction or another.  She may
15  have had --
16            MS. CANFIELD:  Let him finish.
17            MS. HAGAN:  I didn't say anything.
18            MS. CANFIELD:  Okay.  Sorry.  Go ahead.
19       A.   Yeah.  I was just going to finish that.
20  There may have been times where her opinion was
21  malingering, where other examiners may have not had that
22  opinion.  But to me, that's not a bias.  That's a
23  objective opinion that just happens to not be in line
24  with others.



1      Q.   About how many times would you say -- about

2  how many reports would you say that Dr. Mullan wrote

3  during your tenure at the Bronx Court Clinic.  Do you

4  know?

5      A.   I would not know specifically, no.

6      Q.   Okay.  So she was part time.  And when you

7  say she was intimidated by Dr. Kaye, what do you mean by

8  that exactly?

9      A.   Yeah.  So initially, they were able to work,

10 what I would describe as, well together.  And then as

11 time went on, she also described to me the interactions

12 with Mr. Bloom and Dr. Kaye.  She felt like that

13 atmosphere was intimidating.

14     Q.   Okay.  But what do you -- how did she define

15 intimidating, Dr. Mullan?

16     A.   That there was a tense environment.  Dr. Kaye

17 would often be having meetings with Mr. Bloom for long

18 periods in her office.  They felt that they couldn't

19 approach her with certain types of questions.  And

20 that --

21     Q.   Who is they?

22     A.   Dr. Mullan and Dr. Brayton both expressed

23 this to me.  And then they also described -- and Dr.

24 Mullan also described to me at times where -- with



1    interacting with Mr. Bloom, that -- and at some of the

2    examinations also, that there were times --

3              MS. HAGAN:  Oh, he's freezing.

4              THE WITNESS:  Can you hear me now?

5              MS. CANFIELD:  Yes, but we missed the last

6         part of your answer.

7              THE WITNESS:  Okay.  Can you repeat what the

8         last part of my answer was?

9              MS. HAGAN:  You were saying that there were

10        times --

11             MS. CANFIELD:  Can the court reporter do it,

12        because she has --

13             MS. HAGAN:  Okay.  Sure.

14             MS. CANFIELD:  Yeah.

15             MS. HAGAN:  You can do it verbatim.  Why not.

16

17             (The requested testimony was read back.)

18

19        Q.   Does that refresh your recollection, Dr.

20   Jain?

21        A.   Yes.  I can do my best to pick up where that

22   statement was.

23        Q.   Yes.

24        A.   So there were times where Dr. Mullan



**ABHISHEK JAIN, M.D.**

1   expressed to me that she felt intimidated and -- by

2   Mr. Bloom.  And even in their interactions and their

3   examinations, that he was trying to push towards certain

4   opinions in the examination.  And she also did not feel

5   comfortable raising this with Dr. Kaye, because of that

6   environment.  And that she felt that both of them had

7   been working together closely, and that she felt

8   intimidated not being able to raise this in the court

9   clinic appropriately.

10        Q.   Now, for purposes of clarity, was Dr. Kaye

11  ever Dr. Mullan's supervisor?

12        A.   Dr. Mullan was a locum tenens, so was not in

13  our organizational structure at CHS.  But in essence, as

14  the director of the court clinic, Dr. Kaye essentially

15  had that oversight role with Dr. Mullan.

16        Q.   Did Dr. Kaye sign off on Dr. Mullan's time?

17        A.   No.

18        Q.   Did Dr. Kaye schedule Dr. Mullan's

19  examinations?

20        A.   I believe so.  Or the examinations were done

21  in the court clinic itself.  I'm not sure what decisions

22  were made.  They were often -- they needed to be

23  scheduled, so both examiners could be present.  So I

24  presume that there was some coordination of scheduling



```
 1   for Dr. Kaye and Dr. Mullan.
 2        Q.   Did Dr. Kaye ever evaluate Dr. Mullan's
 3   performance?
 4        A.   Dr. Mullan did not have any formal
 5   evaluations, because she was not an employee of CHS.
 6        Q.   So how was her performance actually assessed
 7   if she wasn't -- she wasn't given performance
 8   evaluations?
 9             MS. CANFIELD:  Objection as to form.  You can
10        answer.
11        A.   So any feedback or any information was
12   provided, as I recall, through feedback from the
13   directors or feedback from herself as well.  So --
14        Q.   Did Dr. Kaye ever complain to you, Dr. Jain,
15   about Dr. Mullan?
16        A.   She brought up that -- from what I recall,
17   that I believe in general terms, that there were
18   concerns raised by attorneys in the court clinic.
19        Q.   Did she ever -- did Dr. Kaye ever -- did Dr.
20   Kaye ever criticize Dr. Mullan's work herself?
21             MS. CANFIELD:  Objection as to form.  You can
22        answer.
23        A.    I think in those instances, I don't recall
24   specifically, but there were mentions of that others
```



1    have complained about her.

2         Q.   Okay.  Now, Dr. Brayton, you mentioned that

3    she also had, I guess, issues, for lack of a better

4    word, with Dr. Kaye; is that right?

5         A.   She herself raised that there was a tense

6    environment in the clinic, and that there was often

7    intimidation in the clinic, both from Dr. Kaye and

8    Mr. Bloom.

9         Q.   I'm going to -- I'm going to backtrack one

10   second.  You said Dr. Mullan worked at the clinic for a

11   year.  Why didn't she continue to work at the clinic?

12        A.   So there were -- initially she had said that

13   her -- I believe because of school issues with her

14   children, she had given a certain time that she will no

15   longer be able to work there.  However, also, it came to

16   my attention and she discussed with me as well, that

17   there were other matters in the clinic too, other

18   tensions, other concerns in the clinic that made it a

19   difficult environment to work in.

20        Q.   So you said that she had issues with her

21   children and school.  She was a part-time worker.

22   Couldn't CHS accommodate her schedule if she had school

23   -- child care issues?

24             MS. CANFIELD:  Objection as to form.  You can



1          answer.

2          A.   Yeah.  I'm not sure what the specific issues

3    were.  I just know that one of the reasons she gave is

4    something related to the educational time or something

5    about her schooling with her children.  And that was the

6    time that she needed -- that she gave that as kind of a

7    general time that she can't work after that, but I don't

8    recall the details.

9          Q.   Now, we were talking about Dr. Brayton and

10   you said there was a tense atmosphere at the center.

11   Would that be accurate?

12         A.   Yes.

13         Q.   Now, initially, you testified that Dr.

14   Brayton trained under Dr. Winkler for -- I guess, let's

15   try -- let's try to pinpoint some times.  Dr. Brayton

16   was hired when?

17         A.   Dr. Brayton was hired in the fall towards the

18   end of 2018.

19         Q.   Okay.  And then how long did she -- how long

20   did Dr. Winkler train Dr. Brayton?

21         A.   I believe she was in the Brooklyn Court

22   Clinic for maybe about two months.

23         Q.   Okay.  Did there ever come a time where Dr.

24   Ford determined that Dr. Brayton needed to get to the



1  Bronx Court Clinic because of the workload issues there

2  at the clinic?

3       A.   Yeah.  That was a general discussion of when

4  the timeline would be for her to appropriately go to the

5  Bronx Court Clinic.

6       Q.   Now, did Dr. Brayton have any previous

7  forensic psychiatric experience?

8       A.   Dr. Brayton?

9       Q.   Well, let's say, did Dr. Brayton ever have

10  any forensic evaluation experience prior to her

11  position?

12       A.   Yes.

13       Q.   Okay.  And where was that experience?

14       A.   I believe that was in family court.

15       Q.   But isn't that different from criminal

16  defendants in a penal institution?

17            MS. CANFIELD:  Objection as to form.  You can

18       answer.

19       A.   Yes, it's a different type of evaluation.

20       Q.   Right.  So she wasn't doing 730 examinations

21  prior to working at the court clinic?

22       A.   She, from what I can recall, had some

23  experience doing 730s in her training and in her career.

24  Immediately prior to the court clinic, her role was with



ABHISHEK JAIN, M.D.                    127

1   the family court, which were not 730 examinations.

2        Q.   Now, what did the training of Dr. Winkler

3   provided to Dr. Brayton entail?  What did that entail?

4        A.   So day to day, I'm not entirely sure what

5   that supervision or training looked like, in general.

6   When Dr. Winkler and I would be in contact, we discussed

7   that she was initially starting with observing

8   examinations and then doing 730 examinations herself as

9   an independent examiner.  And then, also, involved in

10  doing psychological testing with the Brooklyn Court

11  Clinic.  Also be involved in those matters.  I believe

12  she also had testified on a number of occasions in the

13  Brooklyn Court Clinic as well.

14       Q.   Did any judges raise issues with Dr.

15  Brayton's work?

16       A.   Not to my knowledge.

17       Q.   Did the legal -- did the defense community --

18  did any of the defense organizations raise questions

19  about Dr. Brayton's work?

20       A.   The only time it was brought up was from

21  Mr. Bloom.

22       Q.   So it's your testimony that no one else

23  complained about Dr. Brayton's reports or the substance

24  of the reports themselves to you?



1       A.   To my direct knowledge, the main person was

2  Mr. Bloom.  In the course of training and the course of

3  when she was initially starting, there's often feedback.

4  But I don't recall necessarily anything specific, any

5  complaints from other attorneys regarding her work.  Not

6  to my knowledge.

7       Q.   Did there come a time when you would come to

8  the Bronx Court Clinic and just meet with Dr. Brayton

9  and not Dr. Kaye?

10      A.   Yes.

11      Q.   Why?

12      A.   This was requested by Dr. Kaye.  Dr. Kaye

13  would ask that I provide supervision to Dr. Brayton on

14  occasion, especially in matters in which they were both

15  co-examiners.  And Dr. Kaye was not able to provide

16  supervisor.

17      Q.   Well, were there times where you excluded Dr.

18  Kaye from meetings with Dr. Brayton?

19      A.   I would not say excluded.  We had a procedure

20  in place where I'd provide supervision, and Dr. Kaye and

21  myself and Dr. Winkler met about that.  And so it was

22  not an exclusion.  It was just to provide that

23  supervision.

24      Q.   Did there ever come a time Dr. Kaye was



1  designated as Dr. Brayton's supervisor for the very

2  limited purposes of signing her time sheets?

3       A.   Well, yes.  She was, as the supervisor and

4  director of the clinic, just like all the other

5  directors did with their staff.  Yes, she was assigned

6  to -- enter and sign off of Kronos for Dr. Brayton.  And

7  also, this was something that had been decided mutually,

8  because Dr. Kaye had raised a question about not being

9  aware sometimes of Dr. Brayton's schedule or time off.

10  So to accommodate that, we came to an agreement that it

11  makes most sense, just like every other director

12  oversees their staff, that Dr. Kaye also oversee Dr.

13  Brayton in the court clinic.

14       Q.   So is it your testimony that Dr. Brayton was

15  Dr. Kaye's staff person?

16       A.   The supervision that was provided to do Dr.

17  Kaye -- sorry, to Dr. Brayton was after discussion with

18  Dr. Kaye and Dr. Winkler, of how to handle that.  It was

19  determined that, yes, Dr. Kaye would be the supervisor

20  for the clinic, for procedures.  And of course, she can

21  supervise and be available for any consultation for Dr.

22  Brayton as needed.  If there were specific matters

23  regarding cases were Dr. Brayton and Dr. Kaye were both

24  co-examiners, then I'll provide supervision and be

1   available for Dr. Brayton.  And then if there were

2   specific matters --

3        Q.   The specific question --

4        A.   Just to finish this, and if there were

5   specific matters regarding psychological testing,

6   because Dr. Brayton and Dr. Winkler were both

7   psychologists, that Dr. Winkler would provide that

8   supervisor.

9        Q.   Because that was the question I was going to

10  have.  Wouldn't the prospect of Dr. Kaye being Dr.

11  Brayton's supervisor be problematic to the extent that

12  they may be actually assigned the same -- they may be

13  evaluating the same inmate at any given time?

14          MS. CANFIELD:  Objection.  Asked and

15       answered.  You can answer again.

16       A.   Yes.  And that's why we had that procedure

17  and distinction in place.  For when those matters arose,

18  we would provide appropriate supervision.

19       Q.   Did Dr. Kaye raise this concern with you in

20  the course of her discussions with you?

21          MS. CANFIELD:  Objection to form.  You can

22       answer.

23       A.   Concerns regarding what?  I may have missed

24  that.



 1        Q.   About supervising Dr. Brayton because of the

 2   potential for there to be a conflict, such as the one we

 3   just discussed.

 4             MS. CANFIELD:  Objection to form.  You can

 5        answer.

 6        A.   Yes.  This was -- we had a meeting together,

 7   Dr. Kaye, Dr. Winkler and myself, the three of us,

 8   regarding that and how we would handle those matters

 9   when there's a -- when both the director and Dr. Kaye

10   and Dr. Brayton are both co-examiners, how we would

11   handle that.  So yeah, we -- it was a concern, but it

12   was a mutual concern that we resolved.

13        Q.   So you agreed with Dr. Kaye and you resolved

14   the concern in a mutually accepted way -- acceptable

15   way; is that right?

16             MS. CANFIELD:  Objection to form.  You can

17        answer.

18        A.   That was my understanding of how that

19   resolved, and that was the goal of trying to resolve

20   that.

21        Q.   Was Dr. Kaye's posture towards you regarding

22   Dr. Brayton adversarial?

23             MS. CANFIELD:  Objection to the form.  You

24        can answer.



132                    **ABHISHEK JAIN, M.D.**

1        A.   In that instance, we were able to have a

2   discussion along with Dr. Winkler present regarding that

3   specific matter.  We were able to resolve that specific

4   matter.

5        Q.   But the question was:  Was it adversarial?

6   That was the question.

7             Was Dr. Kaye adversarial when she raised her

8   concerns about supervising Dr. Brayton.  Yes or no?

9             MS. CANFIELD:  Objection to form.  You can

10       answer.

11       A.   I can't answer that yes or no.

12       Q.   So you can't -- you can't say that Dr. Kaye

13  was either professional or -- or let's say adversarial

14  or neutral in her, I guess, approach in expressing her

15  concern about being Dr. Brayton's supervisor.  You can't

16  -- you can't answer yes or no?

17            MS. CANFIELD:  Objection to form.  You can

18       answer.

19       A.   So there are multiple interactions regarding

20  that.  In that particular instance, and my goal was to

21  make sure that we don't have an adversarial interaction,

22  because that's not my posture, we were able to come

23  together and resolve that particular matter.

24       Q.   And the private practice policy when Dr. Kaye



ABHISHEK JAIN, M.D.                    133

1  raised concerns, was she adversarial in that context?

2       A.   She was not adversarial in that particular

3  context with me.

4       Q.   Right.  With you.  Okay.

5            MS. HAGAN:  Well, it's like 1:22.  Would you

6       like -- I'd like to take a break until like 2:15.

7       Is that okay for -- okay with everyone?

8            MS. CANFIELD:  Sure.  Take a lunch break.

9            MS. HAGAN:  Yes, please.  So let's meet back

10      -- let's actually -- let me give myself another

11      few minutes.  Let's meet back at 2:25.  Does that

12      work?

13           MS. CANFIELD:  Yes.  And do you anticipate

14      going until 6:00 tonight.

15           MS. HAGAN:  Probably, yes.  At the rate this

16      is going, yes.  So let's take a break.  Okay.

17      Thanks.

18

19           (Luncheon recess taken from 1:23 p.m.

20           until 2:28 p.m.)

21

22  BY MS. HAGAN:

23      Q.   So Dr. Jain, were there times when you spoke

24  about just staffing issues, just general staffing issues



 1   that involved the various clinics and -- and

 2   particularly the Bronx Court Clinic?

 3          MS. CANFIELD:  Objection as to form.  You can

 4       answer if you're able.

 5       A.   Yes.  There were times in general that we

 6   would have those discussions.

 7       Q.   And -- and of the clinics, how would you

 8   describe the Bronx?

 9       A.   In what way, specifically?

10       Q.   Well, did they have any problems meeting, I

11   guess, performance thresholds?

12       A.   The Bronx often had cases that -- both with

13   production issues as well as cases being examined and

14   evaluated and some staffing, generally.  Those were

15   considerations in the Bronx.  Also by volume, it was the

16   clinic that had the least number of cases.

17       Q.   And how did you determine that the Bronx had

18   the least number of cases?  How did you quantify their

19   output?

20       A.   By the number of 730 examination orders that

21   were sent to the clinics.

22       Q.   And who kept that -- who kept track of that?

23       A.   That was a combination of our administrative

24   staff, including Lucrecia and Andrea Swenson, as well as



ABHISHEK JAIN, M.D.                                    135

1  we had a computer system that kept track of that, and

2  that each clinic may have had their own system

3  individually that kept track of the number of cases as

4  well.

5        Q.   Now, did there come a time where the hard

6  drive at the Bronx Court Clinic crashed and their data

7  basically went with it?

8        A.   That's what was informed to me that either

9  the day before the transition to CHS or the day before,

10  that the hard drive had crashed.  The further details, I

11  was not aware of.  But I was aware that there was some

12  computer issue there.

13        Q.   Were there ever --

14        A.   And I believe that IT was also working on

15  resolving that.

16              MS. HAGAN:  I'm sorry for interrupting you.

17        Q.   Were there ever times where there's -- that

18  the numbers that were projected from the Bronx

19  contradicted -- were contradicted by either Dr. Kaye or

20  some of the Bronx defense organizations?

21        A.   Well, there were numerous times where the

22  Bronx defense attorneys would send emails to the mayor's

23  office claiming that there was a number of backlog of

24  cases in the clinic, which was not true.  It was not



1    accurate.  And how they obtained that information is not

2    entirely clear to me in the first place, but the numbers

3    that they were reporting were inaccurate.  And we

4    systematically went through the ones that they were

5    claiming and found that each -- the numbers were not

6    lining up with what they were saying, that we had been

7    addressing a lot more of the issue, but it seemed to be

8    a way to paint that CHS was not seeing those cases.

9         Q.   Was there an email that listed each inmate

10   that hadn't been seen by CHS between, let's say,

11   November 2018 and January 2020 -- no, November 20 --

12   November 2019 and January 2020?

13        A.   Was there an email to me or in general?

14        Q.   In general, that circulated about the

15   specific defendants that had not been seen by the court

16   clinic and -- and the amount of time that they had been

17   actually detained without being seen -- being evaluated?

18        A.   I'm not sure.  That's a very broad question.

19   Was there an email such as that?  It's very possible.

20        Q.   Because you just --

21        A.   I know that --

22        Q.   What you testified just a minute or two ago,

23   was that there was a -- I guess, some kind of narrative

24   being circulated that there was a backlog at the



1    clinics, and that CHS went through the system and

2    identified the alleged defendants that had not been seen

3    and explained why each defendant may have been wherever

4    they were in the system.  Is that what you testified to?

5              MS. CANFIELD:  Objection as to form.  Go

6         ahead, Dr. Jain.

7         A.   Yes.  I'm referring to one email that I

8    recall specifically from -- regarding the Bronx Court

9    Clinic to the mayor's office regarding a supposed

10   backlog of cases.  And that was an email that I recall

11   reviewing with our administrative staff, and

12   systematically going through each case and identified

13   that that email was not accurate.

14        Q.   Now, did you write this email, Dr. Jain?

15        A.   No.  This email was not written by me.  This

16   email was from Mr. Bloom to the mayor's office.

17        Q.   And did you respond to the email?

18        A.   As I recall, I either helped draft a response

19   as we reviewed the cases.  I'm not sure if it was sent

20   formally by me or by someone else from CHS, but I was

21   involved with making sure we reviewed the case.  I just

22   don't recall who specifically responded to that email.

23             MS. HAGAN:  I call for the production of this

24        email.



138                        **ABHISHEK JAIN, M.D.**

1   DOCUMENT/INFORMATION REQUESTED:

2

3        Q.   Now, was it sent in like January or February

4   of 2020?

5        A.   I'm not sure.  The time period may have been

6   towards the end of 2019 or beginning of 2020.

7             MS. HAGAN:  So I'll follow up in writing.

8             MS. CANFIELD:  We'll take it under

9        advisement.

10       Q.   Now, to be clear -- let's make sure the

11  record's clear.  Dr. Brayton's last day of work at the

12  clinic was November 22nd, 2019; is that right?

13            MS. CANFIELD:  Objection to form.  You can

14       answer.

15       A.   From what I recall, November 2019 is correct.

16       Q.   Did the -- did the court clinic stop seeing

17  defendants from -- from, let's say, November 2019 to

18  January 2020?

19       A.   There were a number of challenges in having

20  staff review these cases.  And so we worked with each of

21  our court clinics, all four court clinics, to see if

22  there was a possibility of having those cases seen and

23  fulfill those orders.  So I don't recall -- I do recall

24  that there was a challenge at that time period.  I don't



1    think I can testify to that no cases were seen.

2          Q.   Did there ever come a time when Dr. Kaye

3    asked about when you, guys, would be able to see

4    defendants since they were going for, I guess, periods

5    of time without being seen at the clinic?

6               MS. CANFIELD:  Objection to the form.  You

7          can answer.

8          A.   Yes.  There were those types of discussions

9    consistently among our court clinics, among our

10   administrative staff about having cases seen and when we

11   can schedule them and fulfill those orders.

12         Q.   Did Dr. Kaye raise those concerns with you

13   and/or management?

14         A.   I think those were general concerns that were

15   raised with administration.  I was aware of them.  They

16   were also raised kind, you know, throughout our

17   leadership.  We recognized that that was an aspect that

18   we needed to make sure to fulfill and address in the

19   Bronx Court Clinic.

20         Q.   But specifically, I asked you if Dr. Kaye had

21   raised those questions with you and/or management; yes

22   or no?

23               MS. CANFIELD:  Objection as to form.  You can

24         answer.



1        A.    She may have.  Very possible, because those

2    discussions were occurring, and there were multiple

3    discussions regarding it.

4        Q.    So I'm going ask you.  From the period that I

5    identified, from November of 2019 to January of 2020,

6    did the Bronx Court Clinic stop seeing inmates?

7            MS. CANFIELD:  Objection as to form.  You can

8        answer again.

9        A.    So again, there were challenges in seeing

10   them, but I would not classify it as the Bronx Court

11   Clinic stopped seeing them.  We had to still make our

12   efforts to fulfill those orders.  So there was an effort

13   to have them seen in some manner, whether they were seen

14   in the Bronx Court Clinic, whether they were evaluated

15   by another court clinic, whether there were examiners

16   from other court clinics going to the Bronx to see them.

17   So there were multiple efforts.  I don't think that

18   would be a fair classification to say, across the board,

19   that Bronx just stopped seeing cases.  We had to fulfill

20   those orders.

21       Q.    Would you -- Dr. Kaye posits that from

22   November 20, 2019 to January 2007 -- to January 2020

23   when she actually resigned, there were no completed 730

24   examinations during that period in the Bronx.  She



1  didn't complete any, and the clinic did not complete

2  any.  Would you agree or disagree with that, between

3  that period?

4            MS. CANFIELD:  Objection as to form.  You can

5        answer.

6        A.    Yeah.  I don't think I can agree with that.

7  To my knowledge, yes, there were challenges, but to say

8  that they were stopped being seen, I cannot testify to

9  that.

10       Q.    Dr. Kaye testified that three days after --

11 two to three days after she resigned, the Bronx Court

12 Clinic resumed seeing inmates.  Would you agree or

13 disagree with that?

14       A.    So again, I would say that we didn't stop

15 seeing them while she was there.  And so I can't say

16 that they resumed, because that would be a

17 mischaracterization.  We were able to continue to try

18 and accommodate -- accommodate those cases the best we

19 could.

20       Q.    Why wasn't Dr. Kaye seeing anybody during

21 that time then?

22            MS. CANFIELD:  Objection as to form.  You can

23        answer.

24       A.    That was -- I can't answer that directly.



1    I'm not sure.  There were instances where Dr. Kaye did

2    not want to work with certain co-examiners.  And there

3    were also challenges of our staff going to the Bronx

4    because we had, as I described previously, there was

5    tension in the Bronx that people were aware of that.

6    They were concerned about the environment in those

7    interactions and potential intimidation.  And so there

8    was a lot of reluctance from staff to be able to provide

9    coverage up there in the Bronx Court Clinic.

10          Q.   Okay.  So you -- I want to break out your

11   answer to two parts.  You said there are certain

12   co-evaluators that Dr. Kaye didn't want to interact

13   with.  By this time, Dr. Mullan was gone; right?

14          A.   Yes.

15          Q.   Now, before we move on, did Dr. Winkler ever

16   complain to you about Dr. Mullan?

17          A.   About Dr. Mullan?

18          Q.   Yes.

19          A.   Not to my knowledge.  There were similar

20   comments that were -- it wasn't direct complaints from

21   him, but he was echoing what he had heard he said about

22   her from Mr. Bloom in the Bronx.

23          Q.   So did Dr. Winkler share Mr. Bloom's

24   sentiments that Dr. Mullan had the predisposition of



1   diagnosing individuals with malingering?

2        A.   I'm not sure if he himself believed that.

3   All I knew is the information he was sharing with me

4   about what Mr. Bloom had said.

5        Q.   So you're saying that Dr. Winkler was the

6   person who told you that Dr. Bloom -- Mr. Bloom was

7   going around telling people that Dr. Mullan was going

8   around kind of like haphazardly finding people

9   malingering; right?

10        A.   There were --

11             MS. CANFIELD:   Objection.   Hold on.

12        Objection as to form.   Go ahead.

13        Q.   Yes.   Keep going.

14        A.   There were multiple people who informed me of

15   that.

16        Q.   Who were the other people besides Dr.

17   Winkler, and I guess, indirectly Mr. Bloom, who else?

18        A.   Well, Dr. Mullan told me directly her

19   concerns.

20        Q.   Right.

21        A.   And also, Dr. Mundy had raised a concern that

22   he was on a phone call.   And he was informed of this as

23   well, that there were these concerns and these

24   characterizations occurring in the Bronx regarding Dr.



1    Mullan.  Those were the individuals that come to my mind

2    currently.  But there were multiple individuals who had

3    informed me of this.  So it wasn't just one source.

4          Q.   Now, you said that there were -- after -- you

5    know, during this -- let me -- let me phrase this

6    correctly.

7               During this window where there was just Dr.

8    Kaye at the Bronx Court Clinic as the sole, full-time

9    employee from November 2019 to January 2020, you're

10   saying that there were people who would not -- who she

11   would not interact with to do evaluations?

12              MS. CANFIELD:  Objection as to form.  You can

13         answer.

14         A.   As a -- as a group overall, there was

15   reluctance from Dr. Kaye to work with certain examiners.

16   I don't know those individuals specifically, but she was

17   very particular about who she would work with.

18         Q.   Did she tell you who she would work with, Dr.

19   Jain?

20         A.   She said she would work with Dr. Winkler, and

21   otherwise, there was a lot of resistance with the other

22   examiners and who she would work with.

23         Q.   Who were the other examiners that were

24   resistant with working with Dr. Kaye after Dr. Brayton



 1  left and Dr. Mullan was gone?

 2          MS. CANFIELD:  Objection as to form.  You can

 3      answer.

 4      A.   Yeah.  So in general, because of the climate

 5  in the Bronx Court Clinic and the other interactions,

 6  not just what they were hearing, but also interactions

 7  with other attorneys, the way they were describing

 8  things, there was a general sentiment among the other

 9  directors as well that there was -- there needed to be

10  caution before examiners go there to the Bronx Court

11  Clinic.

12      Q.   Who was the other director?  Who were the

13  other directors?

14      A.   The other directors, the three directors, Dr.

15  Mundy, Dr. Owen, and Dr. Winkler.

16      Q.   They all had -- they all had concerns about

17  interactions with Dr. Kaye?

18      A.   They had concerns about interacting with and

19  providing co-examinations with Dr. Kaye, and also with

20  individuals like Mr. Bloom or the court clinic.

21      Q.   Now, Dr. Winkler worked under Dr. Kaye for

22  years.  And in fact -- let's start with that.  Dr.

23  Winkler worked under Dr. Kaye; isn't that right?

24          MS. CANFIELD:  Objection to form.  He can



1        answer.

2        A.    From -- let me clarify.  From what I

3    understand, they both worked in the Bronx Court Clinic

4    for multiple years.  And during that time, Dr. Kaye was

5    the -- the director of the clinic.

6        Q.    Right.  And Dr. Winkler was the deputy

7    director; am I right?

8        A.    Correct.

9        Q.    And wasn't Dr. Kaye Dr. Winkler's supervisor?

10       A.    I'm not sure their exact setup, but if she

11   was the director and he was the deputy director, then

12   that would stand to reason.

13       Q.    Now, you're saying that Dr. Winkler's

14   position, at some point, developed into having concerns

15   with working with Dr. Kaye; is that right?

16            MS. CANFIELD:  Objection to form.  You can

17       answer.

18       A.    So to clarify, in general, there were

19   concerns about any examiner going there to the Bronx.

20   Dr. --

21       Q.    I'm asking you about Dr. Winkler.

22       A.    So Dr. Winkler had provided examinations.  We

23   were thoughtful when he would be used there, so he

24   didn't across the board say no, but he did raise



```
 1  concerns in general about --

 2        Q.    What were his concerns?

 3        A.    -- issues that were going on in the Bronx.

 4        Q.    What were his concerns?

 5              MS. CANFIELD:  Let the witness finish his

 6        response, please, before you ask your question.

 7        Go ahead, Dr. Jain.

 8        Q.    What were Dr. Winkler's -- what were his

 9  concerns?

10        A.    Yeah.  So the concerns were the ones that I

11  had mentioned previously regarding the tense

12  environment, the adversarial environment, some of the

13  interactions with the attorneys, people being very --

14  the examiners being cautious --

15        Q.    But I'm asking you what Dr. Winkler said

16  specifically.  You're giving a general discussion.

17        A.    Right.  Those were general issues that Dr.

18  Winkler had brought up and also in general discussion --

19        Q.    Dr. Winkler said to you specifically that Dr.

20  Kaye was adversarial.  Is that what you're telling me?

21              MS. CANFIELD: Objection.  Objection.  And

22        counsel, can you please let the witness finish his

23        response before you interrupt him?  The court

24        reporter can't take down both of you, guys,
```



```
1        talking at the same time.  You're interrupting
2        him.  Go ahead, Dr. Jain.
3        Q.    Dr. Winkler specifically said that Dr. Kaye
4   was adversarial.  Is that the term he used?
5        A.    No.
6        Q.    Okay.  What did he call her?
7        A.    I said that the environment was adversarial.
8   The environment was tense --
9        Q.    But I'm asking you what he called her.
10  You're describing in generalities.  I asked you
11  specifically, what did Dr. Winkler call Dr. Kaye?
12            MS. CANFIELD:  Objection.  Assumes that he
13        called her anything.
14            MS. HAGAN:  But he called --
15            MS. CANFIELD:  Dr. Jain, answer.
16        Q.    Did Dr. -- did Dr. Winkler specifically use
17  any negative adjectives to describe Dr. Kaye?
18        A.    Not that I recall.
19        Q.    Okay.  Then we can leave that -- leave that
20  one alone.
21            Now, did Dr. Mundy use any negative
22  adjectives to describe Dr. Kaye?
23            MS. CANFIELD:  Objection.  You can answer.
24        A.    Not that I recall.
```



ABHISHEK JAIN, M.D.                              149

1        Q.   Now, as Dr. Kaye's supervisor, when you

2   reviewed Dr. Kaye's 730 examination reports and 390

3   reports, did you have any complaints about the quality

4   of those reports?

5        A.   I don't recall specific issues with the

6   quality of the reports.  There were some questions

7   regarding how information was obtained, but otherwise, I

8   had no specific complaints about the quality of the

9   report in and of itself.  I was also not often in those

10  examinations, so I can't speak to the accuracy of those

11  reports.  But no, I did not have any specific concerns

12  regarding the quality of the final product or report

13  itself.

14           MS. HAGAN:  Okay.  So now, I'm going to show

15       you what's going to be marked as Plaintiff's

16       Exhibit 5, and I'm going to share it.

17

18           (Plaintiff's Exhibit 5, DOCUMENT BATES

19           STAMPED NYC_2014, was marked for

20           identification.)

21

22       Q.   Now, earlier I was asking you some questions

23  about --

24           MS. HAGAN:  I'm not going into the exhibit



1        yet, Ms. Canfield.

2        Q.   I was asking you some questions about just

3    what the -- you know, just some of the issues that you

4    and Dr. Ford would discuss during your interactions in,

5    I guess, managing the clinic.  So Exhibit Number 5, I

6    got -- if I got this right, contains an email that's

7    from -- well, it actually has quite a bit.

8            MS. HAGAN:  This is the wrong one.  That's

9        not what I wanted.  Oh, boy.  Well, I'm going to

10       just make sure this is right.

11       Q.   Exhibit Number 5 is NYC, underscore, 2014.

12   And it's an email from you, Dr. Jain, to Dr. Ford.  And

13   the subject is non-urgent list of items to discuss.  And

14   I'm going to scroll down to the extent that there's

15   anything that's readable for you to look at, because

16   there's a significant portion that's redacted.

17           MS. HAGAN:  And I'm going to have to follow

18       up with counsel, because there's no privilege

19       cited or anything.  It's just redacted.  So I will

20       follow up in writing, and I'm sure your counsel

21       will take it under advisement.

22       Q.   So I'm going to allow you to read it, and

23   when you're done, Dr. Jain, just let me know.

24       A.   Okay.



1        Q.   Now, Dr. Jain, the email is from you to Dr.

2   Ford, and it's dated June 18th, 2018.  Now, that's

3   pretty early in your tenure at CHS; wouldn't you say?

4        A.   That was about two months into my tenure at

5   CHS.

6             MS. CANFIELD:  Is there more to this email

7        that he should be reading, just to get it in

8        context?

9             MS. HAGAN:  That's it.

10            MS. CANFIELD:  Well, how about Number 7, what

11       is this.

12            MS. HAGAN:  Well, yeah.  We can look at

13       Number 7.  The rest is redacted, counsel.  I can't

14       give him more than what you gave me.

15            MS. CANFIELD:  Well, there's some -- there's

16       Number 7 he can read.

17            MS. HAGAN:  Yeah.

18            THE WITNESS:  Yup.  Thank you.  I've had a

19       chance to read that.

20       Q.   So now, do you remember this email, Dr. Jain?

21       A.   As you're bringing it up, it's refreshing my

22   recollection.

23       Q.   Now, the first point goes into the private

24   practice policy.  And we talked about that some before



1  the break, remember?

2        A.   Yes.

3        Q.   And you're saying in the email that you're

4  going to strategize with the directors.  But you said

5  that most of the directors and staff will likely be on

6  board and some will raise a stink.  Now, who are you

7  talking about as those who would raise a stink.  Who are

8  you referencing, Dr. Jain?

9        A.   From what I recall, there were individuals in

10  the clinics who had been doing private practice for a

11  consistent period of their time prior to the CHS.  So I

12  believe I was referring to those individuals.

13       Q.   Do you know who they were?

14       A.   I don't recall exactly, but I know there were

15  a group of individuals who were doing private practice

16  on some regularity.  I didn't know to the extent,

17  because a lot of that predated by employment with CHS,

18  but I did know that private practice was an issue that

19  was brought up pretty regularly by a lot of the staff in

20  the clinics.

21       Q.   And what was the stink that they raised?

22            MS. HAGAN:  I'm sorry.  I have -- I have my

23       one issues with standing up.

24            MS. CANFIELD:  Object --



```
 1        Q.   What was the stink --
 2             MS. CANFIELD:  Object --
 3        Q.   -- that was raised?
 4             MS. CANFIELD:  Objection as to form.
 5        A.   So what was the stink that was raised, I
 6   believe, was the last question.
 7        Q.   Yes, sir.
 8        A.   So with any policy, there might be some
 9   individuals who like it or not.  And so it was more of a
10   general comment that some will raise a stink, not
11   appreciate the change in their ability to do private
12   practice perhaps, and that there was a new policy coming
13   forward.  This was a common -- with any new leadership
14   and management and reorganization.  It's not
15   unsurprising that some individuals who are coming on
16   under new management will have some issues if things are
17   being changed.  So that was really a general comment
18   regarding that change, and perhaps what they were used
19   to doing before.
20        Q.   But what specifically -- I mean from what I
21   understood from you, the private practice only -- the
22   private practice policy only prohibited the employees
23   from doing private practice work in the borough where
24   they worked in; isn't that right?
```



1          MS. CANFIELD:  Objection as to form.  You can

2      answer.

3      A.   Yeah.  So there were a few different

4  limitations.  One, private criminal cases in the

5  borough, as I recall.  But then also any private 730s

6  involving the city, whether it was in their own borough

7  or another borough within New York City.  And then also

8  some limitations on private work with their private

9  treatment or other civil types of cases, non-criminal

10  forensic examinations.

11      Q.   Now, the next bullet you have is the Bronx;

12  right?  And you say, "Melissa seems to be staying with

13  us unless there are problems with her benefits."  Why do

14  you -- why do you say she seems to be staying with us?

15  What's going on here?

16      A.   Yeah.  That's what she had told me.

17  Initially, as we had -- as you had mentioned before and

18  as we had discussed, initially during the transition,

19  there were comments made by Dr. Kaye about the

20  transition, concerns about the transition, and regarding

21  various benefits and expectations and understanding that

22  she had with CHS regarding those, and it wasn't clear.

23          At one point, she had called me early on

24  within, you know, the first few weeks, even as I recall,



1    of her stating that she may be looking for employment

2    elsewhere.  So I wasn't sure what was happening there.

3    But then as we talked a little bit more, I understood

4    and wanted to relay to Dr. Ford that Dr. Kaye seems to

5    be staying with us unless there are further problems

6    with her benefits or further issues that she encounters

7    that she may choose to find employment elsewhere.

8    So I was just relaying that information because it

9    wasn't clear at that point whether Dr. Kaye -- we just

10   weren't sure what was happening exactly.  So I wanted to

11   relay that with Dr. Ford that, to my understanding, she

12   was staying with us.

13          Q.   Now, I'm going to ask you some questions

14   here.  Now, at some point, did you email or say there

15   was a rumor that was circulating that Dr. Kaye was

16   leaving, and that it wasn't true?

17              MS. CANFIELD:  Objection to form.  You can

18        answer.

19          A.   From what I recall, someone had told me that

20   there was a rumor that she's leaving.  And my responses,

21   if they came up, were not to my knowledge.  So, if

22   anything, I was trying to address that.  What I

23   understand is that those rumors were not accurate at

24   that time.



1      Q.   But didn't you testify that when you first

2  started, Dr. Kaye told you she was looking elsewhere?

3  So if that was true -- if that's what you just testified

4  to, then there would have been a consistent rumor that

5  Dr. Kaye was looking to leave?

6            MS. CANFIELD:  Objection to form.  You can

7        answer.

8      A.   I'm not sure if there was a consistent rumor.

9  That was what was told to me from Dr. Kaye, and then

10  that's what some other people asked me about.  But I'm

11  not sure what the rumors were or if there were

12  consistent rumors.

13      Q.   Did you test -- did you email saying that Dr.

14  Kaye would ensure that there would be a transition upon

15  her departure if she so chose to leave?  She wouldn't

16  just leave you, guys, hanging, per se?

17      A.   Yeah.  I recall that when we had our initial

18  conversation, even when she brought up that possibility,

19  I got the sense that it was not something that we would

20  have to scramble for last minute, that we would be able

21  to collaborate and figure out a transition period.

22      Q.   So now, you also go into her -- you also go

23  into saying that she may be asking about the FMLA leave

24  regarding her son.  Now, why would she be asking for



1   FMLA at this time?  Her shift hadn't changed yet.  What

2   made you -- what made you suggest that she would be

3   asking for FMLA?

4           MS. CANFIELD:  Objection to form.  You can

5       answer.

6       A.   As I recall, one of our first -- one of my

7   first discussions with Dr. Kaye, she had shared with me

8   that her son has some health issues, some medical

9   issues, and that she may be thinking about needing some

10  time off to provide care for him.  So that's all I -- I

11  knew.  And there is a typo here in this email as I'm

12  reading this.  This says his health issues are not known

13  by you.  Actually, this is incorrect.  This should say

14  his health issues are known by you and others, because

15  when I asked Dr. Kaye if Dr. Ford already knew this, my

16  recollection is that Dr. Ford was already aware, and

17  that Dr. Kaye said it would be okay for me to share this

18  with Dr. Ford regarding management and the organization

19  of the court clinic.

20      Q.   So you're -- so within two months, at least,

21  you knew that Dr. Kaye had a son with health issues at

22  least; right?  This would be accurate from this email;

23  right?

24      A.   She had informed me of this, yes.



1        Q.    Now, there's a significant blocked out part

2   here.  Do you have any vague recollection what this was

3   about if it didn't involve anything that was

4   attorney-client privilege?

5        A.    I have no recollection of this blackout area.

6              MS. HAGAN:  Olay.  But then -- I want to put

7         this on the record for you to contemplate.  Again,

8         I'm going to have to follow up with counsel about

9         the redacted areas.

10       Q.    Hiring is still a challenge, so can quickly

11  run through some pieces.  So first and foremost, where

12  is hiring a challenge, and why is hiring a challenge?

13       A.    At that time, all four of our clinics, we

14  were just having different discussions about hiring.

15  Each clinic had unique considerations for what those

16  challenges might be.  And that's why, you know, I'm

17  indicating here that it will be helpful to just kind of

18  talk through them.  Each of the clinics had different

19  challenges, different openings, different considerations

20  that they needed to fill.

21       Q.    Okay.  So now you say, hopefully, we get --

22  hopefully we start getting some strong candidates.

23  Also, by the way, although I like stability in the

24  clinic, I also don't mind having good balance of



```
 1   experience and steady new -- and you have stability
 2   versus stagnancy that we were talking about earlier.
 3   Now, first off, you know, what are you talking about
 4   when you're saying, "I don't mind having a good balance
 5   of experience."  Who are you referencing when it comes
 6   to experience amongst the court clinics?
 7              MS. CANFIELD:  Objection to form.  You can
 8         answer.
 9         A.   So in general, I knew that we had certain
10   examiners in our court clinic that had been there for
11   many years.  So I definitely valued experience and
12   having individuals there.  At the same time, we also
13   know that when there's new trainees or strong candidates
14   coming up, they may take a job for a year or two or for
15   a few years early on in their career.  So I was not
16   necessarily opposed to the idea of if they are new
17   individuals coming in, to also support that as well.
18   Some of the individuals had talked about just making
19   sure that, you know, we're hiring people that will be
20   there for the extent -- you know, for a long period of
21   their career, which this was more of a philosophical
22   distinction, that I think a good balance of both is
23   healthy, having individuals there with a lot of
24   experience, we have that stability, but also making sure
```



1  that if there are strong candidates, as part of their

2  job, part of their career development, that they would

3  work in the court clinics, and then there would be new

4  candidates coming forward.  So the bottom line here was

5  I was not locked into only hiring people just because we

6  thought they would be with us for multiple, multiple

7  years.  This was more like we can have a balance of

8  both.

9       Q.   But Dr. Jain, you stayed at CHS only two

10 years yourself; right?

11      A.   That's correct, yes.

12      Q.   And why did you leave CHS?

13      A.   I left CHS because of opportunities with the

14 Office of Mental Health.

15      Q.   Were you approached about that opportunity.

16      A.   I was made aware that there was an

17 opportunity with the Office of Mental Health.

18      Q.   Who made you aware of that opportunity?

19      A.   I was informed of this from multiple sources,

20 some mentors, some individuals, other forensic

21 psychiatrists, saying there might be this opportunity

22 that you may be a good fit for.

23      Q.   Who is the mentor?

24      A.   I don't recall exactly who, but there were



1    multiple ones who had reached out to me about that.

2        Q.    Okay.  So back to this email.  Stagnancy,

3    were you eluding to Dr. Kaye when you referenced

4    stagnancy, and I guess, longer established evaluators?

5        A.    No.

6             MS. CANFIELD:  Objection.  You can answer.

7        A.    No.  Not to my recollection.  I wasn't

8    referring to any one specific person here.

9        Q.    Okay.  So Dr. Kaye alleges that right after

10   she told you about her EEOC complaint and her complaint

11   of pay parity, which was in May of 2018, that in July of

12   2018, you began to surreptitiously change her time

13   sheets.  Now, do you agree or disagree with that

14   representation?

15       A.    I disagree.

16       Q.    Okay.  So what happened?  Why -- did you

17   change Dr. Kaye's time sheets?

18       A.    In her favor, yes.

19       Q.    Okay.  Now, at some point -- and what do you

20   mean in her favor?  Let me -- let me flush this out.

21   How were the changes that you made in her favor?

22       A.    When we transitioned over to Kronos time

23   system that was in the Manhattan and Bronx Court Clinics

24   in July of 2018, I was informed, and Dr. Kaye told me

1    that her hours need to remain the same as they were with

2    Bellevue.  Right when that transition to Kronos occurred

3    in July, I believe around that time, Dr. Kaye was

4    actually out so -- on a different matter.  But in that

5    time period, I was, on her behalf, filling her time

6    sheets as she had requested that I do.  And that also in

7    the course of doing that, I realized that her time that

8    was entered was not consistent with what she requested,

9    which was to keep her hours the same as they were in

10   Bellevue.  So in her favor, I made that change to make

11   sure they were consistent per request as they were at

12   Bellevue.

13        Q.   Now, were you not responsible for changing

14   Dr. Kaye's shift from 9:30 to 5:30 to 8 -- to 8 to 5?

15        A.   No.  I do not make that final decision.

16        Q.   Who did?

17        A.    I believe that was a discussion with labor

18   and HR.  My --

19        Q.   Was it Mr. Wangel and Ms. Laboy, or was it

20   somebody else?

21        A.   Those were my main contact people, but I'm

22   not sure if they had further discussion regarding her

23   hours.  If I can just add this, that I know --

24        Q.   That's before you went there --



1          MS. CANFIELD:  Let the witness --

2     Q.    When you went there, was Ms. Yang involved in

3   the decision to change Dr. Kaye's hours?

4          MS. CANFIELD:  Ms. Hagan, the witness was

5      talking.

6          MS. HAGAN:  Yeah, I got that.  He's not

7      talking now.

8          MS. CANFIELD:  But he was talking.  But you

9      keep interrupting him.

10     Q.    Was Dr. Yang --

11         MS. CANFIELD:  Go ahead, Dr. Jain, finish

12     your -- finish your statement, and then answer

13     counsel's question.

14     Q.    Was Dr. Yang involved in the decision to

15   change Dr. -- Dr. Kaye's hours?

16     A.    So this is related to what I was about to

17   answer previously as well, that the decision wasn't

18   about one specific person.  There was a decision, as my

19   understanding is, that across the board for CHS, that

20   everyone would have a one-hour lunch.  So in that

21   context, who made that final decision, may have been Dr.

22   Yang or others involved, but it was a decision across

23   the board.

24     Q.    Did Dr. Yang speak to you about having all



1    employees have the one-hour lunch?

2         A.   It was brought up to me, and I --

3         Q.   Who brought it up to you?  I asked if Dr.

4    Yang brought it up.

5         A.   Yes.  I believe Dr. Yang brought it up to me,

6    as well as Jonathan Wangel, Jessica Laboy.  I know that

7    there were some --

8         Q.   Did Dr. Ford tell you that Dr. Kaye needed to

9    take an hour lunch?

10        A.   At that time, I believe Dr. Ford was actually

11   away on leave.

12        Q.   Okay.

13        A.   And the consistent message was that everyone

14   -- what I was informed of, was that everyone needed to

15   follow the one-hour lunch rule going forward.  And I --

16   I supported and tried to advocate for -- if we can keep

17   things the same -- the way they are, that would be

18   helpful.  But ultimately, it's the decision of

19   management how -- the way they want to handle that.

20        Q.   And did management include Ms. -- Ms. Yang;

21   right?

22             MS. CANFIELD:  Objection.  You can answer.

23        A.   Yeah.  Again, I'm not entirely sure who

24   specifically made those decisions, but I do know that



1    Dr. Yang was involved in those decisions as the head of

2    CHS.

3         Q.   Now, what time do the courts open?  You've

4    done some forensic evaluations since you were at CHS.

5    What time did the courts open?

6         A.   As I recall, each court was a little

7    different.  I don't recall the exact times they opened,

8    each one.

9         Q.   Well, Dr. -- Dr. Kaye's hours were from 8 to

10   5.  Were there any courts open at 8:00?  Were the Bronx

11   Courts open at 8:00?

12             MS. CANFIELD:  Objection to form.  You can

13        answer.

14        A.   I don't recall exactly when the Bronx Court

15   opened.

16        Q.   You did do a number of evaluations in the

17   Bronx, didn't you?

18        A.   Yes.

19        Q.   Did you do any when the courts opened in the

20   Bronx?

21        A.   Right when they opened in the morning, I

22   would often go there in the morning.  And I'm not -- and

23   I don't recall exactly when they -- I just don't

24   remember what time they opened.



1        Q.   Let's put -- let's put it in context.  You

2   have inmates that are being probably brought -- being

3   presented as the terminology that you guys use; right?

4   They're being presented from Rikers Island.  Am I right?

5        A.   Often, yes.

6        Q.   Now, Rikers is -- how far is Rikers from the

7   Bronx Court Clinic?

8        A.   I'm not sure, by just the time.  But I know

9   that the transportation was not always a direct line

10  from the Rikers to Bronx either, or -- or to the other

11  court clinics, but I wasn't directly involved with that

12  information.

13       Q.   But my point is, was there ever a time when

14  the inmates were, I guess, picked up from their

15  respective facilities before 10:00 or, let's say, before

16  8:00 to be presented to the court clinic, at 8:00?

17       A.   I'm not sure.

18       Q.   Were you ever there at the court clinic

19  yourself at 8:00, the Bronx Court Clinic?

20       A.   I would, often times, to each of the court

21  clinic, come early --

22       Q.   But my question is the Bronx.

23            MS. CANFIELD:  Let him finish his question,

24       please --



**ABHISHEK JAIN, M.D.**                                    167

```
 1              THE WITNESS:  I'm trying to answer.
 2              MS. CANFIELD:  -- let him finish his answer.
 3              THE WITNESS:  I'm trying to answer the
 4         question, please.
 5              MR. CANFIELD:  Dr. Jain, please answer.
 6              MS. HAGAN:  He is answering.
 7              MS. CANFIELD:  No, he's saying you're
 8         interrupting him.  Dr. Jain, please continue.
 9              MS. HAGAN:  Sure.  Yes.  Yes.
10         A.   Just trying to answer.  Yeah, so I would
11    often go to different court clinics early.  And I don't
12    recall specific time when I was not able to get into the
13    Bronx Court Clinic, but I don't recall the exact time
14    that --
15         Q.   But my question, specifically, was that did
16    you ever go to the Bronx Court Clinic at 8:00 in the
17    morning, looking to do an evaluation yourself?
18              MS. CANFIELD:  Objection.  You can answer.
19         A.   Not to do an evaluation.  I believe the
20    earliest we would do our defendant examinations, those
21    were not individuals at Rikers, may have been somewhere
22    between 9 and 10.  But no, I did not do examinations at
23    8 a.m.
24         Q.   Now, was Dr. Kaye the only full-time employee
```



1    affected by this shift change?

2              MS. CANFIELD:  Objection to form.  You can

3         answer.

4         A.    I don't believe, no.

5         Q.    Who else had shift change -- who else had

6    experience with shift change when -- in, I guess, August

7    of 2018?

8         A.    Yeah.  So we had multiple examiners who had

9    come from Bellevue.  So to my recollection, we had at

10   least three psychiatrists who had shifted over from

11   Bellevue to the Manhattan Court Clinic under -- they're

12   always in the Manhattan Court Clinic, but under CHS

13   management.

14        Q.    Dr. Mundy; right?

15        A.    Dr. Mundy was the director.  In addition to

16   Dr. Mundy, there were three other psychiatrists who had

17   come from Bellevue, and their hours were also changed so

18   that they would have a one-hour lunch.

19        Q.    Were they psychiatrists or psychologists?

20        A.    Psychiatrists.

21        Q.    But they were part time.  They weren't

22   full-time employees, were they?

23             MS. CANFIELD:  Objection.  You can answer.

24        A.    Yes, they were part-time.



1       Q.    And they were not directors, were they?

2       A.    They were not directors, no.

3       Q.    Okay.  So again, Dr. Kaye was the only

4    full-time Bellevue employee that was basically that

5    basically experience a shift change; is that right?

6             MS. CANFIELD:  Objection as to form.  You can

7         answer.

8       A.    I'm not sure.  I don't know all the full-time

9    employees.  There may have been others from Bellevue

10   that came over from Bellevue to CHS management.

11      Q.    Like specifically, Dr. Weiss, Dr. Harper, and

12   Dr. Soloniski [ph.], weren't those the three that

13   basically experienced a shift change?

14            MS. CANFIELD:  Objection as to form.  You can

15        answer if you're able.

16      A.    Yes.  As I recall, those were the three

17   individuals who were also directly impacted by the shift

18   change.

19      Q.    And were there any other directors made to

20   work nine hours a day besides Dr. Kaye?

21      A.    The other --

22            MS. CANFIELD:  Objection.  You can answer.

23      A.    The other directors were not part of the

24   union.  They were in a managerial line, so they had



1   different agreements with CHS.

2       Q.   So is it your testimony that you were

3   enforcing the collective bargaining agreement when you

4   required Dr. Kaye to work either from 8 to 5 or 9 to 6?

5           MS. CANFIELD:  Objection.  I don't think it

6       was his decision, as he testified.  But go ahead,

7       Dr. Jain.

8           MS. HAGAN:  You keep coaching the witness.

9           MS. CANFIELD:  He already testified that --

10      go ahead, Dr. Jain.

11          MS. HAGAN:  You think that.  And you know

12      better.  So keep going.

13          MS. CANFIELD:  Go ahead, Dr. Jain.

14      A.   Yes.  So -- yes.  The decision that was made

15  to change the hours was not mine.  It was also, in my

16  understanding, consistent with what the contract was or

17  the agreement was with the union, doctors' counsel.  And

18  so I believe that change was made consistent with that

19  agreement.

20      Q.   Now, in July of 2018, Dr. Kaye does

21  eventually ask for FMLA due to the hardship that the

22  shift change had on her, you know -- on her and her

23  family.  You -- you do recall that; right?

24          MS. CANFIELD:  Objection to form.  You can



1      answer.

2      A.   I don't recall the exact time period.  I do

3   recall that a request was made regarding that.

4      Q.   Did you have a fairly intense conversation

5   with Dr. Kaye about the shift change and the effect that

6   was having on your family and herself?

7           MS. CANFIELD:  Objection to form.  You can

8      answer.

9      A.   There was a -- there was a conversation early

10  on that that was -- and I think "intense" would be a

11  fair description of that, where it was brought to my

12  attention that there's -- the shift change issue, that

13  there's some hardship, which I certainly, you know,

14  acknowledged and appreciated that was brought to my

15  attention.  And when that was brought up, I tried to

16  inform whoever could help with that, help resolve that

17  issue, and I also helped provide any information I could

18  to support that change and provide any information from

19  a clinical standpoint from my position as director that

20  could help make the decision regarding the

21  accommodations.

22     Q.   Wasn't there an overall sentiment, including

23  from management, to manage Dr. Ford in order -- not Dr.

24  Ford, Dr. Kaye out?



1              MS. CANFIELD:  Objection to form.  You can

2         answer.

3         Q.    Dr. Jain, wasn't there a general sentiment

4    from like CHS management to manage out Dr. Kaye?

5         A.    Not that I'm aware of.

6         Q.    Did Dr. Ford ever express frustration about

7    Dr. Kaye to you?

8         A.    I would say that when I started, there was an

9    understanding that we would be working with all the

10   directors, and that there was an interest in

11   collaborating with each of the directors.

12        Q.    My question is:  Did Dr. Ford or like any of

13   the other CHS management, express frustration about Dr.

14   Kaye to you?

15        A.    I think in general, as time went on, and

16   there was increasing, as I mentioned, some adversarial

17   posturing, some difficulty in having the Bronx Court

18   Clinic staffed, there was some frustration regarding

19   some of the resistance and some of the challenges we

20   were having in the Bronx Court Clinic.

21        Q.    Wasn't Dr. Kaye frustrated because of -- I'm

22   sorry.  Wasn't Dr. Kaye partially frustrated because she

23   -- her time had been changed, and she was experiencing a

24   loss in payment?



 1            MS. CANFIELD:  Objection to form.  You can

 2        answer.

 3        A.   I -- I believe that some of the frustration

 4    stemmed from -- my direct involvement was being accused

 5    of changing the time sheets.  As I explained earlier, I

 6    was trying to change that in her favor.  So to me, it

 7    wasn't clear where the frustration was coming from

 8    exactly.  However, I also know that there were ongoing

 9    discussions and emails regarding frustration with her

10    schedule going forward and other issues.  So I know in

11    general, there were those frustrations from her as well.

12        Q.   But isn't it true that Dr. Kaye had worked

13    from 9:30 to 5:30 shift for years without incident, and

14    then there was a decision made that now -- now, the

15    organization had to adhere to an alleged collective

16    bargaining agreement?

17            MS. CANFIELD:  Objection to form.  You can

18        answer.

19        A.   I can't speak to what happened prior to CHS.

20        Q.   Wasn't there a discrepancy about the

21    interpretation of the provision of the collective

22    bargaining agreement that was referenced to justify Dr.

23    Kaye's shift change?

24            MS. CANFIELD:  Objection to form.  Assumes



1          facts.  You can answer.

2          A.    I don't know.

3          Q.    Did you ever review the collective bargaining

4     agreement yourself?

5          A.    I don't believe I reviewed it.  I may, at

6     most, have been aware of it.  But the specific details,

7     I did not look at.  That was -- I knew something being

8     resolved through, again, our labor relations and our HR.

9          Q.    Did Dr. Kaye ever accuse you of time fraud?

10              MS. CANFIELD:  Objection.  You can answer.

11         A.    Can you please repeat that question.

12         Q.    I said did Dr. Kaye ever accuse you of time

13    fraud?

14         A.    I don't -- I'm not sure if those terms were

15    used exactly.  I know that when I made efforts to, in

16    her favor, change the Kronos time in her favor, as you

17    mentioned, there was an intense conversation kind of

18    around that period, and there may have been some kind of

19    general statements about something about the time sheet

20    being fraudulent.  But didn't accuse me of fraud itself,

21    just something about the system.  I didn't really quite

22    follow.

23         Q.    Now, wasn't -- weren't there multiple

24    incidents where Dr. Kaye was denied access to Kronos?



```
 1              MS. CANFIELD:  Objection.  You can answer.
 2       A.   No.  To my recollection, she was never denied
 3  access to Kronos.
 4       Q.   Were there multiple instances where Dr. Kaye
 5  could not access Kronos for whatever reason?
 6       A.   Kronos, being a computer system, there are
 7  sometimes technical glitches where many of us encounter
 8  some challenges with Kronos at times.
 9       Q.   And in those instances where Dr. Kaye could
10  not access Kronos herself, didn't you enter her time for
11  her?
12       A.   Based on her request, I entered the times for
13  her in her favor.  Also to make sure she doesn't miss a
14  paycheck, I tried to fulfill that responsibility the
15  best I could.  I also helped reach out to IT and others
16  to make sure that they could help her regain access or
17  resolve any technical glitch.
18       Q.   Now, by any chance, where there times where
19  you got it -- got it wrong, where you made mistakes in
20  entering her time?
21              MS. CANFIELD:  Objection.  You can answer.
22       A.   I would make a lot of effort to make sure
23  it's accurate.  I would also make my efforts to make
24  sure if there was any issues that she raised that were
```



1   resolved immediately.  There were times I would sign off

2   on her time sheet, I noticed that she herself had

3   entered her schedule incorrectly, sometimes in a way

4   that would not be favorable to her.  So in her favor, I

5   would try to remind her, you don't need to take hours

6   for this time.  You don't need to use personal time.  So

7   --

8        Q.   So this is the question to you, because

9   you're kind of going far afield.

10       A.   Well, I'm answering the question about --

11       Q.   I asked if you made a mistake, Dr. Jain?

12   Have you ever made a mistake?  It's either yes or no.

13   Did you make mistakes?

14            MS. CANFIELD:  Objection.  Please don't

15        harass the witness.  He's trying to respond to

16        your question.

17            MS. HAGAN:  No.

18            MS. CANFIELD:  Go ahead, Dr. Jain.

19            MS. HAGAN:  He's all over the place.

20       Q.   All right.  Did you make mistakes on Dr.

21   Kaye's time sheet, that's all I'm asking you, ever?

22            MS. CANFIELD:  Objection.  You can answer.

23       A.   I'm not sure.  And if there were mistakes, I

24   would resolve them if they were brought to my intention.



1   They were not intentional mistakes, and there were

2   efforts to make sure that they were accurate.

3         Q.   So even though you had this adversarial

4   dynamic with Dr. Kaye --

5         A.   I did not have an adversarial relationship.

6   I said that the position from Dr. Kaye was adversarial

7   towards me.

8         Q.   Okay.  Now, I'm going to show you what's

9   going to be marked as Exhibit 6.

10

11              (Plaintiff's Exhibit 6, DOCUMENT BATES

12              STAMPED NYC_3947 THROUGH NYC_3957, was

13              marked for identification.)

14

15              MS. HAGAN:  And for the record, Plaintiff's

16         Exhibit 6 bears the Bates stamp series NYC_3947 --

17         I don't know what this is down here.  I don't know

18         how you have it stamped over here.  I'm not sure

19         what that says.  3948, 3949, 3950, and it goes all

20         the way to 30 -- 3957.  So 6 is NYC_3947 to 3957.

21              MS. CANFIELD:  Please show him the entire

22         document, please.

23              MS. HAGAN:  Sure.  I can start from -- I

24         don't know.



1        Q.   It looks like -- this -- this would be a

2    Kronos time sheet, the login; right?  Would you

3    recognize that, Dr. Jain?

4        A.   Yes.  Sounds familiar.

5        Q.   And when you completed Dr. Kaye's time sheets

6    on occasion, this is what you saw; is that right?

7        A.   I believe so.  This is very similar to what I

8    saw.

9        Q.   Okay.  Well, this instance is -- this is Dr.

10   Brayton's, I guess, time sheet, from March 22nd.  I

11   guess this is where it starts; right?  And at this time,

12   it appears that Dr. Kaye might be signing off on Dr.

13   Brayton's time; is that right?

14           MS. CANFIELD:  Objection.  You can answer.

15       A.   The way it appears to me, yes, this looks

16   like it's Dr. Kaye signing off on Dr. Brayton's time

17   sheet.

18       Q.   Okay.  So can I -- can I move up?

19       A.   Yes.

20       Q.   Okay.  So then we're now -- I guess we need

21   to start in the middle of the page.  Now, there's an

22   email from Ciara Smith to -- I guess it's CC'ing Jessica

23   Laboy.  I don't know who it's to but, you know, it looks

24   like the "to" is missing; right?  And it says, "Dear



1  colleagues, the 2018 time keeping year will be ending on

2  Saturday, April 27th, 2019."  And the 2019, that doesn't

3  seem to be right either.  Time keeping year will begin

4  on Sunday, April 28th, 2018.  It's a little bit

5  problematic there, isn't it; right?

6       A.   Yes.  Sure.

7       Q.   Yeah.  And to assist with the closing of the

8  2018 year, supervisors must review and approve or deny

9  employees' request, annual leave, sick leave, et cetera,

10  on a weekly basis in Kronos.  Now, were you doing that

11  on a weekly basis with Dr. Kaye, approving or denying

12  employee's request, her request?

13       A.   Sorry.  Can you repeat that again?  I was

14  reading at the same time you were asking the question,

15  so --

16       Q.   I was asking as her supervisor, were you

17  approving her requests in her time sheets every week?

18       A.   Yes.

19       Q.   Okay.  Now, you were signing off on them as

20  well?

21       A.   Yes.

22       Q.   And you were, you know, informing payroll of

23  any changes you may have made to the employees

24  previously signed, you know, time card; right?



1          MS. CANFIELD:  Objection.  You can answer.

2      A.   Yes.  I believe so.  If there was any changes

3  or any modifications needed or any particular request

4  needed, I would often reach out to payroll, as I was

5  advised to do so.

6      Q.   But you weren't just doing so.  As it says

7  here in this bullet point, you know, "Previously signed

8  off time card to ensure those changes are accurately

9  processed on the payroll system."  You see that; right?

10 Maybe you want to read the rest of that.

11     A.   Yes.

12     Q.   And then it says, "Please ensure above is

13 done no later than May 1st, 2019.  Payroll will be

14 unable to process any correction after May 1st, 2019.

15 If you have any questions or need assistance, please

16 send an email to CHS payroll."  Right?  So you see that?

17     A.   Yes.

18     Q.   And there's the Kronos login template again.

19 And then, I guess here, Dr. Kaye is asking you, Dr.

20 Jain -- they call you Beesh; is that -- that's what they

21 call you?

22     A.   Yes.

23     Q.   Okay.  Beesh.  So Hi Beesh, please sign off

24 on Anansa's request for sick time on March 22nd.  I was



```
1    out during that time.  I believe that you were assigned
2    to her -- you were assigned to sign her time sheets
3    while I was out.  So I think it is appropriate for you
4    to sign off on this request.  If I'm supposed to do it,
5    please let me know.  Now, would it have been appropriate
6    for her to sign off on Dr. Brayton's request if she
7    wasn't there to actually witness that she wasn't in the
8    office?
9         A.   I'm not sure I can answer that.  I don't
10   quite understand the question.
11        Q.   Well, I'm going to ask you something.  You
12   took vacations and days off; right?
13        A.   Yes.
14        Q.   And were there times when your subordinates
15   would have you or ask you to sign their time sheets
16   during times when they were out of the office, and you
17   were also out of the office?
18        A.   I was providing supervision across four
19   clinics, so there were times when -- maybe not quite
20   understanding the question, but yes, I would sign off on
21   their time sheets.
22        Q.   I guess my question would be like, for
23   example, in those instances where both of you are out,
24   you wouldn't -- you wouldn't have any firsthand
```



1   knowledge to know that a person was where they said they

2   were, because neither one of you were at work.  Would

3   that be accurate?

4          MS. CANFIELD:  Objection.  You can answer.

5      A.   We would know if people were in the clinic or

6   not in the sense that we had administrative staff.  And

7   again, there's work to do.  There's schedules.  So we

8   generally knew if people were sick or not.  People were

9   very forthcoming about their time, and I did not

10  identify any issues with that.

11     Q.   So how would you describe Dr. Brayton and Dr.

12  Kaye's dynamic?  You said that she was adversarial with

13  you.  Was she adversarial with Dr. -- Dr. Brayton?

14     A.   Yes.  So the interactions that were shared

15  with me from Dr. Brayton were that she felt intimidated

16  in the clinic.  She felt that she could not ask

17  questions of Dr. Kaye.  She was often very concerned if

18  she raised a question, that she would be somehow not

19  quite reprimanded but, you know, talked to strongly, or

20  there's a very intense interaction there.  So she had

21  reluctance to interact with Dr. Kaye in many instances.

22     Q.   I'm going to ask you something.  From your

23  own personal experience, Dr. Jain, was Dr. Kaye

24  adversarial because she was a woman, and she spoke with



1    some level of certitude, or was she -- was she

2    adversarial because she questioned in the same fashion

3    that her male colleagues questioned some of the

4    policies?

5              MS. CANFIELD:  Objection to form.  You can

6         answer.

7         A.    Yeah.  I disagree.  I don't think it was

8    because she was female, not from my standpoint.  I

9    didn't view it differently from her other female

10   colleagues or male colleagues.  I would approach them

11   similarly, both taking their advisement, taking their

12   collaboration equally.  It had nothing to do with being

13   a female, from my perspective, whether -- all I can

14   speak is what I observed and what came from my own

15   intent, which was not viewing it as adversarial just

16   because she's female.  These were adversarial patterns

17   throughout my work with her that had nothing to do with

18   her being a female.

19        Q.    What -- I mean, we discussed the notes, and

20   we are not quite sure how the note -- your notes being

21   taken were resolved.  Did you end up reviewing the ten

22   files that Dr. Kaye allegedly took your notes from and

23   finding them later, or were they still missing, and you

24   just never did anything about them?



1           MS. CANFIELD:  Objection.  You can answer.

2      A.   I don't recall how it was resolved.  Dr. Kaye

3  was out during that period.  So we were not able to

4  resolve that immediately.  And then I also brought it to

5  the attention of Dr. Ford at that time.  And Dr. Ford

6  provided support to me and also said that she would help

7  resolve that issue.  I'm not sure -- I don't recall how

8  that matter finally resolved regarding these ten notes.

9      Q.   So even though these are very sensitive

10  documents that really required confidentiality, there

11  was no resolution made to determine what happened to

12  those notes; am I right?

13           MS. CANFIELD:  Objection to form.  You can

14      answer.

15      A.   These were personal notes that I took in the

16  course of an examination to render an opinion regarding

17  a 730 examinations.

18      Q.   And aren't they confidential?

19      A.   They're not treated exactly the same as

20  confidentiality as other protected health information.

21  These are evaluations for the court.

22      Q.   Right.

23      A.   And so --

24      Q.   They're HIPAA exempt; right?



 1      A.    Excuse me?

 2      Q.    They're HIPAA exempt?

 3      A.    Yes.  My understanding is that they don't

 4 fall under the same protective health information as

 5 typically -- as defined in HIPAA, where there is a

 6 purpose for healthcare and treatment.  These are court

 7 evaluations.

 8      Q.    Now, I'll let you read the rest of the email,

 9 but I want to bring your attention to the top.

10           MS. CANFIELD:  Can he read the rest first,

11      because he's missing context.

12           MS. HAGAN:  I would like to ask him some

13      questions, and then we can go back to these.

14           MS. CANFIELD:  Well, he's entitled to look at

15      the whole document before you question him.

16           MS. HAGAN:  Well, he's entitled to look at

17      it, but I'm asking him to draw -- I'm drawing his

18      attention to one page since the document --

19           MS. CANFIELD:  Can he read -- can he read the

20      entire document first, please.

21           MS. HAGAN:  I would like, for purposes of

22      this deposition --

23           MS. CANFIELD:  And then I would like to read

24      all the documents.



186                          **ABHISHEK JAIN, M.D.**

```
1              MS. HAGAN:  You have it.
2              MS. CANFIELD:  I'm entitled to that.  I don't
3       have it.
4              MS. HAGAN:  Yes, you do.
5              MS. CANFIELD:  You sent me a book of 600 and
6       something documents.  I can't find this one.
7              MS. HAGAN:  It wasn't 600 pages.  It was 275.
8              MS. CANFIELD:  All right.  475. It's still
9       something --
10             MS. HAGAN:  204.  It wasn't 405.  It was 204
11      pages of exhibits this morning.  So thank you.
12      Please do not misrepresent.
13             MS. CANFIELD:  It's 476 pages.
14             MS. HAGAN:  You're combining two different
15      things.  You're talking about --
16             MS. CANFIELD:  No, I'm not.  Ms. Hagan, I
17      want to see the entire document, please.  I'm
18      entitled -- I want to look at them now, please.
19             MS. HAGAN:  Why don't you pull it up.  You
20      have it.  So --
21             MS. CANFIELD:  I can't find it in the 476
22      documents.
23             MS. HAGAN:  No.  It was 204 pages of exhibits
24      this morning.
```



```
 1              MS. CANFIELD:  Ms. Hagan, do you we need to
 2         call the court now.
 3              MS. HAGAN:  We can call the court because
 4         it's right there.  I have it.  We could bring it
 5         up.  204 pages.  So let's call the court.
 6              MS. CANFIELD:  Can you --
 7              MS. HAGAN:  No.  You call the court.
 8              MS. CANFIELD:  -- please scroll back down.
 9         Please stop yelling.
10              MS. HAGAN:  Because you're stalling, so you
11         can run down the clock on this deposition.
12              MS. CANFIELD:  No.  I'm -- if you had
13         produced the documents to me, I wouldn't have to
14         have you do this.
15              MS. HAGAN:  It's 63 hours, that's what I'm
16         trying to get at.
17         Q.   Dr. Jain, right now --
18              MS. CANFIELD:  Excuse me.  I'm going to call
19         -- I'm going to call the court.  I want to read
20         the rest of the document.  I'm entitled to see the
21         whole document.  Please scroll back down, and let
22         me see.
23              MS. HAGAN:  You can see the documents as I'm
24         asking the question.
```



1            MS. CANFIELD:  Okay.  I'm going to take a
2       break right now.  I'm going to call the court.
3            MS. HAGAN:  Go ahead.  I'm going to ask the
4       question though.
5            MS. CANFIELD:  No.  No.  No.  Excuse me.  No,
6       excuse me.  Ms. Hagan, you're wasting time.  Let
7       me review the document.
8       Q.   Well, I'm going to ask.  Was there ever a
9  time that Dr. Kaye --
10            MS. CANFIELD:  Ms. Hagan.  Off the record,
11       please.  Off the record, please.
12            MS. HAGAN:  I'm not even looking at the
13       exhibit.
14       Q.   Did you mistakenly -- did you make a mistake
15  in --
16            MS. CANFIELD:  Don't answer that question,
17       because it's out of context.
18            MS. HAGAN:  I've already removed the
19       document.  We're not even using it as an exhibit.
20       Q.   So was there ever a time when you erroneously
21  entered --
22            MS. CANFIELD:  Hold on.  Hold on.  I need to
23       call the court now.  Excuse me, Dr. Jain.  Dr.
24       Jain, excuse me.  Do not answer.  We need to call



```
 1       the court.
 2            MS. HAGAN:  Because she's running down the
 3       clock intentionally.
 4            MS. CANFIELD:  No, I'm not.  If you would
 5       just show the document, I would not need to do
 6       this.
 7            MS. HAGAN:  Ten pages, he's supposed to read
 8       ten pages during a seven-hour deposition?  I don't
 9       think so.  Go ahead.  Call the court.
10            MS. CANFIELD:  Yes.  Yes.  You need to show
11       us the document.
12            MS. HAGAN:  You have it.
13            MS. CANFIELD:  I do not.  You sent me --
14            MS. HAGAN:  Let's call the court.  It's 204
15       pages.  You're going to call the court.  Let's go
16       ahead.  Let's do it.
17
18            (Whereupon, the Court was called, and a
19            voicemail was left.)
20
21            MS. CANFIELD:  I will email him.  We can stay
22       on the record while I do this email, or we can run
23       down the clock --
24            MS. HAGAN:  No.
```



1          MS. CANFIELD:  -- o you can show me -- you

2     have two options.  You can show me the email.

3          MS. HAGAN:  I'm going to ask questions.

4     You're not going to --

5          MS. CANFIELD:  Hold on.  You can show me the

6     email, or you can stay on the record while I send

7     an email to Magistrate Judge Cott.  I don't know

8     how you want to spend time, but it seems to me it

9     would be better if you just showed me the email.

10         MS. HAGAN:  No.  You're running down the

11    clock either way, and it's not going to happen.

12    So we're going to go to another topic, and then we

13    can revisit this one.

14         MS. CANFIELD:  No.  I am going to write to

15    Magistrate Judge Cott first.

16         MS. HAGAN:  Why don't you write him while

17    we're --

18         MS. CANFIELD:  No, I'm not going to do that,

19    because I need to concentrate on what questions

20    you ask.  So --

21         MS. HAGAN:  Okay.

22    Q.   So Dr. Jain --

23         MS. CANFIELD:  I'm sorry.  Dr. Jain, wait

24    until I finish doing this.



**ABHISHEK JAIN, M.D.**                    191

1          MS. HAGAN:  So we're off the clock.  That

2     means --

3          MS. CANFIELD:  Now, we're on the clock

4     because --

5          MS. HAGAN:  We're off the clock because --

6     it's not my fault the Magistrate Cott is not there

7     to pick up his call.  You need to email him.

8          MS. CANFIELD:  I'm doing that right now, Ms.

9     Hagan.

10          MS. HAGAN:  Okay.  So we're going to put it

11     back up so that you can see it, and you can read

12     it.  I think you should have it by now.  Do you

13     need to see it from the beginning again, Ms.

14     Canfield?  This is where we stopped, right here.

15     You're not reading the email.  I would like to

16     note for the record that counsel is not reading

17     the email.  She's proceeding --

18          MS. CANFIELD:  I'm still writing it.

19          MS. HAGAN:  Yes, please read.  I'm trying to

20     cooperate with counsel's demands.

21          MS. CANFIELD:  Okay.  Dear Magistrate Judge

22     Cott, the parties have an issue that requires

23     Court's intervention.  Plaintiff's counsel has

24     presented an email on screen for the witness, but



192                         **ABHISHEK JAIN, M.D.**

```
1        has refused to allow the witness and his

2        counsel --

3             MS. HAGAN:  No.  You're looking at it now.

4             MS. CANFIELD:  -- to review the completed --

5        complete email.  Plaintiff claims she had provided

6        the documents to counsel, consistent with your

7        Honor's orders.  She has, instead, sent a PDF of

8        476 pages which are in no order, and the exhibits

9        are not marked.  I will copy you on this.

10            MS. HAGAN:  They don't have to be ordered,

11       and they don't have to be marked.  And you are

12       looking at them.  They are up right now in front

13       of -- of counsel, and counsel continues to right,

14       even though I am cooperating with her request.  I

15       am on page 9 of the exhibit, because we read them

16       together, but now she is saying that she needs to

17       read them again.

18            So we will sit here and wait for counsel to

19       read.  Have you -- have you made any progress in

20       reading the document, Counsel, because we've been

21       on this page --

22            MS. CANFIELD:  I can't -- I can't scroll up.

23       I see what --

24            MS. HAGAN:  Can you just scroll up now?
```



ABHISHEK JAIN, M.D.                    193

```
 1          MS. CANFIELD:  Please be professional, Ms.
 2     Hagan.
 3          MS. HAGAN:  I think you need to be
 4     professional.
 5          MS. CANFIELD:  I'm asking to review the
 6     document, which is within my rights, and the
 7     witness's rights.
 8          MS. HAGAN:  Yeah.  And it's right here.
 9          MS. CANFIELD:  Can you -- can you scroll up?
10     We've already read this part.
11          MS. HAGAN:  Yeah.  I've already asked you if
12     I could --
13          MS. CANFIELD:  Okay.  Can you please stop.
14     So I want the witness, Dr. Jain, to read this.
15     Okay.  You questioned him on that.  Can you scroll
16     up again.  Dr. Jain, are you satisfied with this?
17          THE WITNESS:  So I just want to clarify that
18     this is the balances and projections for Dr. Kaye
19     through Kronos.  I just want to make sure that's
20     what we're looking at.
21          MS. HAGAN:  Yes.
22          MS. CANFIELD:  Okay.  Can we scroll up again?
23          THE WITNESS:  Yes.
24     Q.   Now, before I go into it, do you notice that
```



1   Dr. Kaye has a negative balance that would go against

2   her pension at this point in the time sheets?

3            MS. CANFIELD:  Objection as to form.  You can

4        answer if you're able.

5        Q.   The vested annual, you see this portion, it

6   says negative 27 here (indicating)?

7        A.   Yeah.  I'm not entirely sure how this would

8   work or what implication this particular number would

9   have.

10       Q.   So you're finished with that part; right?

11           MS. CANFIELD:  Yes.  Can you scroll?

12           MS. HAGAN:  No, I'm asking him.  He's

13       supposed to be reading it; right?

14       Q.   Are you finished, Dr. Jain?

15       A.   Well, there's no specific question yet.  I

16  don't have a specific --

17

18           (Cell phone interruption.)

19

20           MS. CANFIELD:  Yes, this is Donna Canfield.

21       Q.   Yes.  So now we're going up to --

22           MS. CANFIELD:  Can you hold on one second,

23       your Honor.  I have the Court on the phone.

24           MS. HAGAN:  Sure.



ABHISHEK JAIN, M.D.                    195

1            MS. CANFIELD:  Your Honor, you're on --

2       you're on speaker.

3            JUDGE COTT:  Are we on the record?

4            MS. HAGAN:  Yes, Judge Cott.  Good afternoon.

5            JUDGE COTT:  Good afternoon, everyone.  What

6       seems to be the issue?

7            MS. CANFIELD:  The issue appears to have been

8       resolved.  The issue was that Ms. Hagan was

9       showing an exhibit on the screen, but was not

10      allowing myself or the witness to review the

11      entire document before questioning on one portion

12      of the document.  And when I had asked for an

13      opportunity to review, she had refused, which

14      prompted me to write to the Court.  And also to

15      point out, which I have not pointed out up to this

16      point, because I do not want to trouble the court,

17      is that rather than providing the exhibits before

18      the deposition, I have been provided like almost a

19      like a dump of documents that are not marked.  And

20      today before the deposition, I received a PDF of

21      476 pages that was represented to me to be the

22      exhibits for this particular witness for this

23      deposition today.  And you know, the form that has

24      been provided, it's impossible for me to find a



1          document as we're being shown on the screen

2          because the Bates stamps aren't searchable.

3               And so that's -- in a nutshell, that's the

4          issue.  At this point, the problem seems to be

5          resolved, because Ms. Hagan has agreed to let me

6          review the full document on the screen.  That

7          satisfied parts of the problem, but again, she's

8          not provided the exhibits that are consistent with

9          your Honor's order.

10              MS. HAGAN:  Your Honor, I beg to differ with

11         counsel's representation as to what has

12         transpired.  The court ordered, from what I

13         understand, that the exhibits be provided prior to

14         the deposition.  I have complied with that.

15         Counsel has insisted that they be stamped and

16         ordered in a certain fashion so that she would

17         prefer them to be a certain way.  I didn't

18         believe, nor have I ever experienced in the 20

19         years of my practice that one, I -- and especially

20         from the law department who I am opposing counsel

21         with every other time I sue, that I had to provide

22         these exhibits in advance, premarked, for usage at

23         a deposition.  And I, again, this is not the first

24         Zoom deposition that counsel and I had prior to



1         your Honor's order.  This group of depositions is
2         the first time that this counsel has raised this
3         issue with me and/or the court.  And I've said as
4         much in the letter.
5             But I would like to stress to you, Judge
6         Cott, I have been in compliance.  All of the
7         documents are Bates stamped.  And she can easily
8         put -- she could easily make them searchable
9         herself, but she's chosen not to.  It just
10        happened that this set of documents were not
11        searchable.  But counsel has not only a document
12        production with the same documents, she also has
13        the exhibits that I may or may not use today.  But
14        what I'm concerned about is that counsel has ended
15        these depositions every day early, and that she's
16        using this opportunity to run down the clock and
17        read ten pages of the document, when I'm only
18        asking the deponent to look at the first paragraph
19        of the first email.  The rest of them are time
20        sheets, your Honor.
21            JUDGE COTT:  Well, it sounds to me like the
22        issue that prompted Ms. Canfield to email me has
23        been resolved.  So I'm not sure you need the court
24        to take any further action.  I would just suggest



1          that you both practice what I call the golden rule
2          of litigation, which is do unto others as you
3          would have them do unto you.  So Ms. Hagan, I'm
4          not sure you would be happy if Ms. Canfield gave
5          you 474 pages of documents right before a
6          deposition she was taking, and you had to scramble
7          during the deposition to try and find things
8          either, if that's, in fact, what's happening.  But
9          I don't know what's happening exactly.  And all
10         I've been told is the issue that caused the email
11         has been resolved.  So if that's true, then I
12         don't think there's anything that you need to
13         decide.
14              MS. CANFIELD:  For the immediate instance,
15         the issue has been resolved.  I would like going
16         forward that -- that in order for Ms. Hagan to
17         provide the exhibits as they are marked, and not
18         do a dump of 476 documents, which as your Honor
19         recognized.  I can't search, at the same time I'm
20         trying to listen to the questions, and defend a
21         deposition.  It's just impossible.
22              JUDGE COTT:  Can I just say the following:
23         In the normal course, when a deposition takes
24         place and people are all sitting in the deposition



1        room, the lawyer who is taking the deposition, if

2        they mark an exhibit, they're going to mark an

3        exhibit and say to the court reporter, this is

4        Exhibit 1 to the deposition of Mr. Smith.  And

5        then the lawyer will hand a copy to the court

6        reporter to either put the sticker on or to mark

7        it as such, and then will similarly hand that

8        exhibit, a copy of it, to adversary counsel.

9        That's how it's been time from time immemorial.

10            Now, we're dealing with remote depositions,

11       and we should try and replicate that process as

12       much as possible.  And for either side to give the

13       other hundreds of pages in advance, doesn't really

14       serve that purpose.  It just requires the

15       non-deposing lawyer to have to scramble each time

16       the deposing lawyer is going to ask questions

17       about a particular exhibit.  And I'm sure, Ms.

18       Hagan, it would frustrate you if Ms. Canfield gave

19       you hundreds of documents too.  So I would just

20       encourage the parties to try and replicate the

21       normal process as much as possible in a remote

22       deposition, because that is expeditious, serves

23       the witness the best, which both sides want.  The

24       parties want a clear record, so otherwise, you're



```
1          going to have a lot of this stuff that has nothing
2          to do with getting factual information from a
3          witness.
4              So whatever you want me to work out, you
5          should see that there isn't delay, so either side
6          has to go find the document or tell the other side
7          where the document is.  These are not trade
8          secrets.  If you're going to have ten exhibits for
9          a witness at a deposition, then say it's 1 through
10         10, and here they are.  Mark them as such, and
11         then pass them along to the other side.  It seems
12         pretty straightforward to me.  I don't know why
13         this would be problematic.  So that's what I would
14         encourage you all to do.
15             But in any event -- and also, I'm not going
16         to be at the ready every time an email comes.  I
17         just happened to see your email and happened to be
18         free at this moment.  So, you know, if you have
19         other issues, I'm not necessarily be able to snap
20         to it like this either, just for the record.  But
21         I trust that you are all, as officers of the
22         court, will be able to work these issues out going
23         forward.  Okay.  Thank you both very much.  Have a
24         good afternoon.
```



ABHISHEK JAIN, M.D.                    201

```
 1              MS. CANFIELD:  Thank you, your Honor.
 2              MS. HAGAN:  Thank you.
 3
 4              (Recess taken from 3:54 p.m. until 4:01
 5              p.m.)
 6
 7  BY MS. HAGAN:
 8        Q.   At any point, did Dr. Kaye claim at a
 9  breakfast meeting about the CHS private practice policy?
10        A.   I don't recall Dr. Kaye complaining about the
11  private practice policy.
12        Q.   So, for example -- so is it your testimony
13  that on July 13th, 2018, that Dr. Kaye didn't complain
14  about the private practices policy and pay
15  discrimination she was experiencing?
16              MS. CANFIELD:  Objection.  You can answer.
17        A.   I think there were two separate issues there.
18  I think the pay parity issue was something that was
19  brought to my attention, as we discussed previously.
20  Specifically, regarding the private practice policy, I
21  remember discussions that the private practice policy
22  that we drafted, including with her input, that what's
23  favorable, including that she support that private
24  practice policy.
```



```
 1        Q.   Did Dr. Mundy -- did you ever recall Dr.
 2   Mundy making a statement that, quote:  I don't care
 3   about that.  I get paid $200,000 to go to a few meetings
 4   and work on my private practice.  Do you ever remember
 5   him saying something to that effect?
 6             MS. CANFIELD:  Objection.  You can answer.
 7        A.   I don't recall that, no.
 8        Q.   Okay.  Then on August 13th, did at any point,
 9   Dr. Kaye complain about a pay discrepancy of being
10   docked five hours a week in pay?
11             MS. CANFIELD:  Objection.  You can answer.
12        A.   Yeah.  I'm not sure about that specific date.
13        Q.   Was there ever a time that Dr. Kaye
14   complained that you were incorrectly inputted her time?
15        A.   Yes.  As we discussed previously, when we
16   transitioned to Kronos time system and I was putting in
17   the hours on her behalf, she had raised the complaint --
18   the accusation that I had done it intentionally or
19   incorrectly, which was not accurate.  I had made efforts
20   to do that in her support and in her favor.
21        Q.   But was it incorrect regardless of whether or
22   not it was intentional?
23        A.   I don't know whether it was incorrect.  The
24   hours that I was asked to enter are the hours that I
```



1  entered, I didn't see any -- I don't recall any specific

2  discrepancy there.  And if there were some errors, I

3  made efforts to resolve those errors if they were

4  brought to my attention.

5       Q.   Now, in August -- the end of August -- well,

6  would it be fair to say that in August of 2018, you told

7  Dr. Kaye officially that her hours had been changed?

8            MS. CANFIELD:  Objection to form.  You can

9       answer.

10      A.   Yeah.  I don't recall exactly when, but I do

11 recall it would have been in the summer of 2018 when she

12 was informed that her hours were formally changed.

13      Q.   And also, during that same summer,

14 specifically on August 28th, did Dr. Kaye take an educ

15 -- I guess an educational leave for the child and

16 adolescent -- adolescent psychiatry board examination?

17      A.   I believe --

18           MS. CANFIELD:  Objection to form.  Go ahead.

19      A.   I believe it was around that time, yes.

20      Q.   And initially, was she docked for taking that

21 certification?

22      A.   Yes.  I believe, initially, we had some

23 discussion on what -- that would be granted as an

24 educational leave or whether that would be taken out of



1  her personal time.  There were those early discussions

2  regarding that.

3        Q.    Who made a decision to dock, Dr. Jain?

4              MS. CANFIELD:  Objection as to form.  I think

5        she took annual leave.  She wasn't docked.  Go

6        ahead.  You can answer.

7        Q.    Who made the decision?

8              MS. CANFIELD:  Objection to form.  You can

9        answer.

10       A.    I'm not sure she was docked.  Her request was

11  to use educational time, not personal time or annual

12  leave, for that purpose.  And so from my standpoint, I

13  tried supporting that.  I reached out to our HR and

14  labor to make sure that we could accommodate that for

15  her.  And then the decision was made, I'm not sure

16  exactly by whom, but that -- the early decision was that

17  this particular type of exam would not be covered, the

18  educational leave.  But then it was my understanding

19  that she eventually was able to use educational leave.

20  So I believe that issue was resolved.

21       Q.    Now, was Dr. Kaye originally made to use

22  vacation time in order to sit for this examination?

23             MS. CANFIELD:  Objection as to form.

24       A.    I don't recall.  But I do -- I don't recall



1    exactly what she was asked to do, but I do know that,

2    initially, there was a discussion on whether she would

3    be able to take educational leave for that or not.  So

4    she may have been advised, at some point, to take

5    vacation time or personal time or annual leave for that

6    exam.

7         Q.   Now, also during the fall -- the fall --

8    summer of -- September of 2018, did you also -- did Dr.

9    Kaye -- did you and Dr. Kaye and Ms. Swenson have issues

10   with scheduling of meetings?

11        A.   Can you please repeat those dates again?  I

12   was just --

13        Q.   Dr. Kaye -- Dr. Kaye alleges that you and Ms.

14   Swenson intentionally scheduled meetings that would

15   conflict with her schedule or with her obligations as

16   the director at the Bronx Court Clinic.  Would you agree

17   or disagree with that assertion?

18        A.   I disagree.

19        Q.   Okay.  And why would you disagree?

20        A.   Because we made every effort to include her

21   in the meetings, to schedule them around her

22   availability.  We also rescheduled meetings if she was

23   not able to make them.  If there were some instances

24   where we had to proceed with the meeting such as with a



1    judge or court personnel because they had blocked off

2    their time, then we asked Dr. Kaye if that would be okay

3    with us to proceed, or should we try to reschedule.  So

4    we made every efforts to schedule those meetings with

5    her.  So our intent was not to schedule without her at

6    all.  In fact, we made efforts to include her in that

7    process.

8         Q.   And for example, on September 7th, 2018, was

9    there an instance where you -- you and Ms. Swenson

10   scheduled a meeting when you knew that Dr. Kaye would be

11   at Water Street discussing her issues with her shift

12   change and -- and time sheets?

13        MS. CANFIELD:  Objection to form.  You can

14        answer.

15        A.   Yeah.  I'm not sure if I recall the exact

16   instance.  I know that there were times, as I've

17   mentioned previously, that if we scheduled, it would be

18   trying to accommodate her schedule and her availability.

19   But then after it was scheduled, if she had another -- a

20   conflict, then we would ask if it's okay to proceed

21   without her or if we should reschedule.  So there may

22   have been an instance where we had to proceed.  But this

23   is after discussing it with Dr. Kaye and certainly

24   keeping her in the loop regarding the meeting.



1    Q.   So like had there ever been instance like,

2  for example, you and/or Ms. Swenson scheduled a

3  mandatory training for iSight in the Bronx during the

4  Jewish holidays?

5         MS. CANFIELD:   Objection as to form.   You can

6       answer.

7    A.   Yeah.   I'm not sure if they were

8  intentionally scheduled around any particular religious

9  observance.   And if -- if they were and people brought

10 it to our attention, we would make efforts to change

11 that, depending on if there were conflicts or scheduling

12 raised by any director or any examiner.

13   Q.   Now, we discussed earlier when Dr. Brayton

14 was hired.   Would it be fair to say that Dr. Brayton may

15 have been hired on September 17, 2018?

16   A.   I believe that's about the right time period,

17 fall of 2018, yes.

18   Q.   And then she worked at the -- well, she was

19 being trained at the Brooklyn Court Clinic from -- would

20 you say September of 2018 until when in 2018.

21        MS. CANFIELD:   Objection.   If you know.

22   A.   Yeah.   I'm not sure of the exact date or

23 time.   My rough recollection is about a couple of

24 months.



1        Q.    Okay.   Now, during that time, Dr. Kaye was

2   the only full-time employee at the clinic as we

3   established earlier.   Were any other efforts made, such

4   as transferring -- the possible transfer of any of the

5   other evaluators to the Bronx?

6        A.    So one clarification.   She was not the only

7   full-time employee.   We had a full-time administrative

8   time.

9        Q.    You're talking about Lucrecia Persaud?

10       A.    Yes.

11       Q.    Would Ms. Persaud do any 730 evaluations?

12       A.    No.

13       Q.    So was the only -- so Dr. Kaye was the only

14   full-time staff person that could do a 730 evaluation at

15   the Bronx Court Clinic; right?

16       A.    That's correct.

17       Q.    From -- and 730 evaluations need at least two

18   evaluators; am I right?

19       A.    That's correct, yes.

20       Q.    So the question I had was, was there ever a

21   discussion of transferring one of the other evaluators

22   from one of other sites to work in the Bronx so that the

23   cases that came through the Bronx were seen in a timely

24   fashion?



1        A.    Yes.

2        Q.    And what happened?

3        A.    So multiple instances of this occurred

4    throughout my period where we would reach out to my

5    directors and see if there was some way to accommodate

6    that.  And you know, one example is, Dr. Winkler would

7    sometimes go and do those examinations.  In other

8    instances, there were challenges and some resistance

9    because of, as we mentioned previously, some of the

10   tense environment that was described in the Bronx, some

11   of the concerns with interacting with some of the Legal

12   Aid Society attorneys regarding the examiners.  And also

13   -- Dr. Kaye also expressed, in general, that she had a

14   -- you know, that she would work with some individuals.

15   And so in order to accommodate those, we would make

16   efforts to either have the directors offered to have

17   some of their examiners go to the Bronx, two examiners

18   to go to the Bronx to do those examinations, or have the

19   Bronx cases produced to another clinic, so they could be

20   seen there.

21       Q.    Who were the other examiners that were

22   produced to see the exams in the Bronx from the other

23   clinics?

24       A.    I just want to finish up one thing with that



1    answer.  Also, part of the scheduling challenges was to

2    have -- to make sure that the attorney who was sitting

3    in on the case, their schedule could be accommodated as

4    well.  So yeah.  Sorry.

5         Q.   Back to the people who you said that would be

6    transferred to the Bronx from time to time to see these

7    examinations, who were these individuals?

8         A.   So sometimes, it was Dr. Winkler from the

9    Brooklyn Court Clinic.  Sometimes, it would be two

10   examiners from Manhattan.  Sometimes, it was -- it may

11   have included Dr. Mundy.  Dr. Dimitri comes to mind

12   also.  Dr. Harper comes to mind.  And then Dr. Owen, I

13   believe, also had helped out.  So there -- I don't

14   remember each -- each individual instance, but there

15   were a number of examiners that we would try to reach

16   out to and try to accommodate.

17        Q.   Now, eventually, did -- in October of 2018,

18   do you recall that Dr. Kaye filed a request for a

19   reasonable accommodation?

20             MS. CANFIELD:  Objection to form.  You can

21        answer.

22        A.   I don't recall the exact date.

23        Q.   Do you recall that she did actually file for

24   a reasonable accommodation?



1       A.    As I recall, yes.

2       Q.    And what was the outcome of her application?

3       A.    So the extent of my involvement was asking

4    about the court clinic hours and what our needs were in

5    the court clinic, and I provided that information.  And

6    then I believe the outcome was that they were able to

7    make some accommodations to her schedule.  I believe

8    that that was the eventual outcome in her case.

9       Q.    But Dr. Kaye specifically sought a

10   restoration of the eight-hour workday that she

11   previously worked rather than the nine-hour workday that

12   she had been required to work.  Was that ever a proposed

13   alternative to what she had?

14          MS. CANFIELD:  Objection as to form.  You can

15       answer if you're able.

16       A.    Yeah.  I'm not sure of the exact question.

17   But certainly, there were different proposals regarding

18   what could meet both her request, as well as any

19   requirements from the agreement.  So that would have

20   some preliminary discussions, share what I could to be

21   supportive of her request.  But ultimately, the final

22   decisions were not in my hand.  Those are with HR and

23   labor.

24       Q.    Well, you keep saying "HR and labor."  Are



1    you saying that the final decision makers as to whether

2    or not Dr. Kaye was allowed to work an eight-hour day or

3    a nine-hour day rested in, I guess, Ms. Laboy and Mr.

4    Wangel's hands?

5             MS. CANFIELD:  Objection to form.  You can

6        answer.

7        A.   Yeah.  And thank you for the clarification.

8    I worked directly with HR and labor.  Those were my

9    primary contacts.  Who they spoke to and who they made

10   the final decision with, I'm not sure about that.

11       Q.   But you didn't make the final decision.

12   That's what you're saying?

13       A.   No, I did not.

14       Q.   And did you -- I mean, to the extent that you

15   know, because you did go through this with Dr. Kaye.

16   Dr. Kaye originally asked to work remotely when she

17   initially filled out her reasonable accommodation

18   request.  Do you recall that?

19             MS. CANFIELD:  Objection to form.  You can

20       answer.

21       A.   I don't recall that specifically, no.

22       Q.   Okay.  Did you engage in what's known as an

23   interactive process with Dr. Kaye, meaning --

24             MS. CANFIELD:  Objection.



```
 1            MS. HAGAN:  I'm going to explain what I'm
 2        asking him.  Could you let me finish.
 3        Q.   My question is:  When Dr. Kaye initially
 4   proposed or asked to work remotely, did you offer -- or
 5   did someone, I guess, from the management offer Dr. Kaye
 6   an alternative to the remote option that she was
 7   seeking?
 8            MS. CANFIELD:  Objection as to form.  It
 9        assumes that he's in charge of reasonable
10        accommodations, but you can go ahead and answer.
11            MS. HAGAN:  Again, please don't coach your
12        witness.
13        A.   I don't recall.
14        Q.   At any point, did you review Dr. Kaye's
15   application in conjunction with the management involved
16   in making the decision-making process?
17            MS. CANFIELD:  Objection to form.  You can
18        answer.
19        A.   I don't recall if I reviewed the application.
20   I know there are some general questions sent to me about
21   the court clinics and the hours and what our needs are,
22   and I answered those.  But otherwise, as I recall, I was
23   not directly involved in the actual application or the
24   review process of the application, just those specific
```



1    questions that were posed to me.

2          Q.   Were inmates ever presented to the court

3    clinic before 10:00 in the morning?

4                MS. CANFIELD:  Objection to the form.  Asked

5          and answered.  You can answer it again.

6          A.   Before 10, they may have been.  I'm not sure

7    the exact hour each and every time.

8          Q.   In making your assessment, isn't that one of

9    questions you probably needed to ask or to answer in

10   order to determine whether or not Dr. Kaye's schedule,

11   you know, would actually meet the needs of the clinic?

12               MS. CANFIELD:   Objection to form.  You can

13         answer.

14         A.    Yes.  Generally speaking, when I was asked

15   about the hours, I did share that we -- as I recall,

16   generally have defendants produced after or around

17   10:00.  However, there are instances where they may come

18   early or there might be an out defendant who is

19   scheduled earlier.  So some of those are determined case

20   by case and by each individual court clinic.  So I did

21   my best to share that information.

22         Q.    Now, what -- did there ever come a time when

23   Dr. Kaye made complaints that her personal information

24   and health information were being disclosed to a Dr.



1    Mundy in -- in the emails?

2         A.    That particular issue was brought up

3    regarding a schedule of a -- what I recall, a annual

4    examination, a physical examination.  It was just a

5    scheduling type of email.  And that's -- that's one that

6    I remember.

7         Q.    Was there an instance where Dr. Mundy was

8    reflected to be her supervisor in PeopleSoft?

9         A.    Yes.

10        Q.    And did Dr. Kaye raise this issue on more

11   than one occasion that Dr. Mundy should not have been

12   her supervisor in PeopleSoft?

13        A.    Yes.

14        Q.    Was there a time when Dr. Mundy -- when Dr.

15   Kaye complained that Dr. Mundy was reflected

16   inappropriately as her supervisor in PeopleSoft?

17        A.    Yes.  He was incorrectly listed as her

18   supervisor in PeopleSoft.

19        Q.    And who is responsible for entering that

20   information into PeopleSoft?

21        A.    So my main contact there was through our HR

22   department.  And when I reached out when this was first

23   brought to my attention, I believe it may have been

24   September or at least fall of 2017, I immediately



1    informed our HR.  And she said that they'll -- they did

2    notice that there was an incorrect identification there,

3    and that they made that change in PeopleSoft.  But then

4    they also advised me that there's other computer

5    systems.  So they made the change to the best of their

6    ability at that time.  And so from my standpoint, I

7    thought the matter was addressed and resolved.

8         Q.   Did you ever seek to distance yourself from

9    Dr. Kaye at some point due to the quote, unquote,

10   adversarial dynamic that the two of you had?

11        A.   We tried to maintain the work and the court

12   clinic.  As I described earlier, also after discussing

13   with Dr. Ford and also Dr. Kaye, commenting that she did

14   not want to have meetings with me alone, and also was

15   very resistant to our, like, a weekly directors meeting

16   with me, then through advisement through Dr. Ford,

17   especially with the tense environment that was there and

18   other types of issues such as being accused regarding

19   her schedule and my notes missing from the clinic, I was

20   advised that if there were direct supervision issues, I

21   would talk to Dr. Ford, and we would discuss how to

22   handle those.

23        Q.   Well, Dr. Mundy, being reflected as her

24   supervisor in PeopleSoft, you say it was inadvertent.



```
 1    But are you testifying that it wasn't an effort to avoid

 2    further contact with Dr. Kaye?

 3         A.    No.

 4         Q.    Okay.  Now, at any point after, I guess -- I

 5    guess I'm going to get more into the exchange that you

 6    had with Dr. Kaye in her office.  In or around October

 7    11th, is it true to say that you and Dr. Kaye may have

 8    had a spirited discussion about the shift change that

 9    she experienced under your -- your watch during the

10    summer of 2018?

11              MS. CANFIELD:  Objection as to form.

12         Compound.  You can answer if you're able to.

13         A.    Sorry.  Can you please repeat that.

14         Q.    Did you have a spirited exchange with Dr.

15    Kaye about the shift change in her -- in her office?

16              MS. CANFIELD:  Objection as to form.  You can

17         answer.

18         A.    I believe this was the question that was also

19    asked earlier about the intense exchange or spirited

20    exchange.  Yes.  There was some -- as I recall, some

21    interaction where Dr. Kaye had raised those concerns

22    about her schedule and about her shift.  And so that

23    would be another example also of what I was describing

24    as kind of an adversarial interaction, part of that
```



1   pattern where it was unclear to me.  I had made efforts

2   to try to change the schedule in her favor.  I had tried

3   to resolve the issue the best I could, but still, that

4   heated exchange and intensity was directed at me, which

5   was unclear.

6        Q.   So you were not part of the effort by the

7   defendant or Dr. Ford and other management to manage Dr.

8   Kaye out?

9            MS. CANFIELD:  Objection to form.  You can

10           answer.

11       A.   I never had the intention of managing her

12   out.  I'm not sure what that even means.

13       Q.   Did you ever view Dr. Kaye as a problem

14   employee?

15       A.   We made all efforts to work with her.  And as

16   I described, as time went on, I knew that there were

17   challenges, but I still focused on trying to work with

18   her, trying to support her, trying to make sure that the

19   clinic works.  So I know there were challenges as I

20   described in that adversarial type of posture that she

21   would often have with me.  But I would not label someone

22   as, quote, unquote, a problem.  I would try to work with

23   them and resolve them, and that's the efforts I made.

24       Q.   When you say, "There were challenges," what



1   do you mean by that?

2          A.   So there were a lot of the things I described

3   already.  Resistance to meet with me, have a regular

4   meetings, to work together.  There were a number of

5   policies where there was a lot of resistance, which is

6   fine, because we received feedback from the directors,

7   and I welcomed that.  But then there were times when

8   policies that were only in draft form were then

9   mentioned by various attorneys, and they said that they

10  obtained this from the Bronx Clinic.  And there were

11  questions about those -- those policies.  And so as I

12  also mentioned, notes were taken.  There were a lot of

13  challenges in having that collegial interaction, despite

14  all my efforts to be supportive.  And so that was a

15  challenge compared to the other directors.

16         Q.   Now, I'm going to ask you something.  You

17  mentioned these other attorneys from the Bronx that

18  claim they got a policy that you and Dr. Ford may have

19  written together that was in draft form.  Who were those

20  other attorneys in the Bronx that may have gotten this

21  draft policy?

22         A.   So I'm not sure who the attorneys were

23  exactly.  But what I was told is from individuals and

24  Legal Aid Society, that there is a draft of a policy



```
 1   being sent around.  And then when I asked where it came
 2   from, they said that it was from the Bronx.
 3        Q.   Who were the individuals from the Legal Aid
 4   Society that claimed that they got the draft policy?
 5   Who were they?
 6        A.   There were multiple -- there were multiple
 7   individuals.
 8        Q.   What are their names?
 9        A.   They -- they're there during meetings, so I
10   don't recall exactly who.  But other Legal Aid Society
11   attorneys that spoke generally about policies that were
12   being made available --
13        Q.   Dr. Jain, did you speak to someone
14   specifically?
15        A.   Yes.
16        Q.   What was their name?  Who was this person?
17        A.   So I was informed by individuals at various
18   meetings, such as Dr. -- I'm sorry, Mr. Bob Peck who is
19   a Legal Aid Society attorney.  And again, I can't verify
20   who sent the email or where it was from or who
21   specifically sent it.  But he had informed me that these
22   policies were being circulated around Legal Aid.
23        Q.   Now, at any point --
24        A.   I will also -- I will add.  Other attorneys
```



 1    from other Legal Aid Society boroughs as well had

 2    mentioned that there were policy drafts being

 3    circulated.

 4         Q.   What were their names then?

 5         A.   So I can speak generally that the other Legal

 6    Aid Society attorneys were Samantha Smalls from Staten

 7    Island, and Rosemary Vassallo from Manhattan, and Bryan

 8    Coakley from Queens.  I'm just listing off all of the

 9    Legal Aid Society attorneys who we would interact with.

10         Q.   Did they tell you -- they each told you that

11    they had draft policies that she shouldn't have, that

12    that came out of Bronx Court Clinic specifically?

13         A.   They mentioned that there were policies that

14    were being -- that Legal Aid had policies that were

15    being circulated.  I don't know exactly who sent them,

16    and they wouldn't tell me where exactly, but --

17         Q.   Why was it determined it was from the Bronx

18    Court Clinic and not somewhere else?

19         A.   Because that was one of the places they said

20    was circulated from the Bronx.

21         Q.   Okay.

22         A.   I don't recall who exactly -- I don't recall

23    who said that.  And I don't recall who from the Bronx

24    sent that.  What I do recall is in that multiple CHS



1    meetings, there were comments made from Mr. Bloom that

2    were, in my opinion, only based on information that he

3    would have had from policies, that he would have had

4    from drafts or internal discussions we've had.  So based

5    again, I'm being careful here, because I'm telling you

6    how I know this information and how I determined it.  It

7    was based on suggestion from some Legal Aid Society

8    attorneys, as well as also observing Mr. Bloom's

9    interactions in our mayor's office meetings.  So do I

10   know for sure that it was sent by the Bronx, and

11   specifically whom?  No.  However, the pattern to me was

12   suggestive that that was a concern.

13        Q.   I'm going to ask you something.  Did you, in

14   fact, report that Dr. Kaye possibly circulated this

15   draft policy to Dr. Wangel?

16        A.   Sorry.  Can you repeat that question, please?

17        Q.   Did you ever report Dr. Kaye as circulating a

18   draft policy -- one of the draft policies that we're

19   going to probably discuss within the next few minutes to

20   outside of agency to Dr. Wangel?

21        A.   I raised general concerns that there's

22   suspicion that a policy that was in draft form was being

23   circulated to Legal Aid Society.  I don't recall if I

24   specified whom exactly at that time, but I did outline



1  what I had heard and the different concerns that were

2  raised.

3       Q.   Did you -- or were you aware that there was

4  an investigation conducted by Dr. Wangel into Dr. Kaye's

5  email usage?

6            MS. CANFIELD:  Objection as to form.  You can

7       answer.

8       A.   I'm not aware if there were -- I'm not sure

9  if I'm aware of that.

10      Q.   So did Dr. -- did Mr. Wangel ever come back

11 to you and tell you that Dr. Kaye had, in fact,

12 circulated the policy?

13      A.   I had heard nothing specific regarding that,

14 that I recall.

15      Q.   Did you ever ask Dr. Kaye yourself whether or

16 not she circulated the policy outside of the court

17 clinics?

18      A.   I was not given that opportunity, no.

19      Q.   How could you not be given that opportunity

20 if you were her supervisor?

21           MS. CANFIELD:  Objection.  You can answer.

22      A.   Yeah.  As I mentioned from the beginning,

23 that my ability to have direct conversations with Dr.

24 Kaye were compromised because of her resistance to meet



1  with me directly and to have those types of discussions.

2       Q.   So you couldn't call Dr. Kaye and ask her,

3  Dr. Kaye, are you circulating my policy outside of CHS?

4            MS. CANFIELD:  Objection.  You can answer.

5       A.   At that time, it would not have been a

6  reasonable option.

7       Q.   Now, at any given point, were you aware that

8  Dr. Kaye's request for a reasonable accommodation was

9  denied by Mr. Granderson?

10           MS. CANFIELD:  Objection as to form.  Assumes

11      facts.  You can answer.

12      A.   I'm not sure I was aware of what was approved

13  or denied.

14      Q.   Okay.  Were you ever -- did you ever learn --

15  okay.  Well, did you ever learn that Dr. Kaye actually

16  requested a reasonable accommodation?  We talked about

17  this some; right?

18      A.   Yes.

19           MS. CANFIELD:  Objection.  Go ahead.

20      Q.   And do you know the outcome of that request?

21      A.   From what -- from what I recall, I believe

22  that the outcome was they provided some accommodation

23  for her schedule.

24      Q.   Was Dr. Kaye ever told that a reasonable



1  accommodation could not be provided for a third-party,

2  meaning her son?

3      A.   Sorry.  Can you please repeat that.

4      Q.   Did you ever learn or find out that Dr. Kaye

5  was denied a reasonable accommodation because it was for

6  her -- to take care of her son?

7          MS. CANFIELD:  Objection as to form.  You can

8      answer.

9      A.   Yeah.  I don't think I'm aware of that

10 specific issue.

11     Q.   Did you follow up to find out what the exact

12 outcome of the reasonable accommodation was?

13         MS. CANFIELD:  Objection.  You can answer.

14     A.   From what I recall, that there was a -- some

15 decision made about her schedule and a reasonable

16 accommodation.  And I tried -- and then based on that,

17 my recollection is that I supported that, and that we

18 would accommodate the schedule accordingly.  I don't

19 remember the details of the outcome.

20     Q.   Now, I'm going to ask you some questions

21 about the psychological testing policy.  Dr. Jain, on or

22 around November 8th, 2018, did you circulate the policy

23 for internal, I guess discussion, amongst the directors

24 about psychological testing?



1           MS. CANFIELD:  Objection to form.  Do you

2      have something to refresh his recollection as to

3      the dates?

4           MS. HAGAN:  No, I don't.  No, I don't.  I

5      don't.

6      Q.    Did you have a psychological testing policy,

7  Dr. Jain, that you drafted along with Dr. Ford?

8      A.    Along with all the other directors, yes.

9      Q.    Right.  And did -- and along with the other

10 directors, did that mean that you solicited their

11 comments on the actual psychological testing policy?

12     A.    Yes.

13     Q.    And did Dr. Kaye provide her input into the

14 discussion?

15     A.    Yes.

16     Q.    And did she raise questions about the policy

17 being restrictive and preventing physicians from

18 ordering psychological testing when deemed necessary to

19 complete a 730 evaluation, specifically?

20     A.    I believe the issues were about any

21 restriction in being able to render an independent

22 opinion or independent examination.  So I do recall some

23 email exchanges regarding that.

24     Q.    Now, that -- that concern goes to an inmate's



1   constitutional right; isn't that right, Dr. Jain?

2           MS. CANFIELD:  Objection.  Answer if you can.

3       A.   I'm not sure if I can answer that.

4       Q.   Well, I'm going to probe you.  The whole

5   field of forensic psychiatry involves the intersection

6   between the law and psychiatry; right?

7       A.   Yes.

8           MS. CANFIELD:  Objection.

9       Q.   The medical legal standards, that's the

10  terminology I've been hearing.  Is that -- is that the

11  correct term?

12      A.   It's the intersection of psychiatry and the

13  law, yes.

14      Q.   A medical legal standard; right?  So then,

15  the constitutional provisions that would be invoked in

16  this instance would be the Fifth Amendment.  Would that

17  be true, Dr. Jain?

18          MS. CANFIELD:  Objection.  You can answer if

19      you can.

20      A.   So there are various constitutional

21  provisions that go into -- not just one particular

22  amendment, but various provisions that go into the

23  standards regarding competency to stand trial and

24  protection of due process procedures --



```
1          Q.   So what constitutional amendments -- what
2     constitutional amendments would be invoked, Dr. Jain?
3               MS. CANFIELD:  Objection.  He's not a lawyer.
4          You can answer if you can.
5               MS. HAGAN:  Yes.  It's a medical-legal
6          profession.  So he does have some expertise.
7          Q.   So what constitutional provisions are
8     invoked, Dr. Jain?
9          A.   The various provisions regarding
10    self-incrimination.  There's provisions regarding
11    disclosure of information, rights to due process.
12    There's various constitutional provisions that are
13    afforded, and that we pay attention to when thinking of
14    competency to stand trial.
15         Q.   So primarily the Fifth and Fourteenth
16    Amendment.  Would that be accurate?
17         A.   I think those are two important amendments in
18    this context.
19         Q.   Okay.  So would you say that Dr. Kaye's
20    concerns about some of the policies invoke those
21    constitutional amendments?
22              MS. CANFIELD:  Objection.  You can answer if
23         you can.
24         A.   I think those broad constitutional concerns
```



```
 1   is something that we all think about when we draft these
 2   policies and that we think about with our procedures.
 3       Q.   So Dr. Kaye wasn't really specifically just
 4   thinking about doing her job, per se.  But she was also
 5   thinking about the constitutional protections that are
 6   afforded to the inmates that you, guys, encounter in the
 7   course of your daily work; is that right?
 8           MS. CANFIELD:  Objection.  How does he know
 9       what Dr. Kaye thinks?  Go ahead.
10           MS. HAGAN:  Uh-huh.  Keep going.
11       A.   Yeah.  That's -- I don't know what she was
12   thinking at that time.
13       Q.   Well, in this instance, she raised issues
14   about, you know, the policy being restrictive.  I'm
15   assuming that you -- you addressed those concerns;
16   right?
17           MS. CANFIELD:  Objection.  You can answer.
18       A.   Yes.  In terms of preserving the independent
19   -- the examiners' ability to render an independent
20   opinion and independent examination, those were concerns
21   I also shared, and that also reflected in the policy.
22   Those are also concerns that Dr. Kaye raised.
23       Q.   Now, again, you have -- I'm going to go back
24   to your discussion about Dr. Kaye being adversarial.
```



1   But yet, you're incorporating some of the concerns that

2   she raised in the very policies that we're discussing.

3   Now, was it adversarial because she asked the question,

4   or was it adversarial because you just didn't like Dr.

5   Kaye?

6              MS. CANFIELD:  Objection.  You can answer.

7        A.    Neither.  I didn't view that as adversarial.

8        Q.    But this is yet a third instance where Dr.

9   Kaye's input seems to have been somewhat of a help to

10  the furtherance of CHS and its -- and its goals; am I

11  right?

12             MS. CANFIELD:  Objection to form.  You can

13        answer.

14       A.    Yes.  I made efforts to collaborate with Dr.

15  Kaye, incorporate her opinion, and I did not -- I did

16  not have an adversarial posture towards her.  But the

17  adversarial posture was from her towards me and others

18  and the totality of the time we were together.  But yes,

19  there were other instances where I made efforts to

20  incorporate her input.  They were welcomed, and I valued

21  her experience and thoughts on those types of policies.

22       Q.    Now, I'm going to ask you something.  Was

23  there ever a time where there was a complaint filed

24  against you about your failure to fill out the New York



1  State Physician's Profile?

2        A.   There was an anonymous letter sent around

3  about me.  I'm not sure who sent that.  It was very

4  concerning.  I was made aware that certain people at the

5  court clinics were aware of it, and had brought it to my

6  attention.  But then when the anonymous letter came

7  forward, then I addressed it immediately.  That was

8  another example of somebody who I felt was, perhaps,

9  targeting me incorrectly.

10       Q.   Did you complete the physician's profile

11  before this complaint surfaced?

12       A.   I completed it when I was made aware that I

13  needed to complete it, so I could be in compliance with

14  it.

15       Q.   But you weren't in compliance before the

16  anonymous complaint; right?

17       A.   I'm not sure of the exact nature of -- at

18  that time.  Whatever was brought to my attention, I

19  resolved immediately when it was brought to my

20  attention.

21       Q.   So before it was brought to your attention,

22  you had not completed the profile; am I right?

23            MS. CANFIELD:  Objection.  You can answer

24       again.



232                          **ABHISHEK JAIN, M.D.**

1       A.   I don't recall exactly what was completed or

2   not in the profile or whether there were elements that

3   needed to be completed.  What I know is after it was

4   brought to the my attention, I immediately addressed it.

5       Q.   So you completed it after it was brought to

6   your attention; am I right?

7            MS. CANFIELD:  Objection.  Asked and

8        answered.

9       A.   I --

10      Q.   Yes, you completed --

11      A.   I addressed whatever issues were brought

12  forward.

13      Q.   After it was brought to your attention; am I

14  right?

15      A.   I cannot have addressed that I was not aware

16  of.  So yes, I addressed them after they were brought

17  forward.

18      Q.   So they weren't false allegations -- they

19  weren't false allegations; am I right?

20           MS. CANFIELD:  Objection.  You can answer.

21      A.   They were false.

22      Q.   But you hadn't completed the profile until

23  after you were made aware; am I right?

24           MS. CANFIELD:  Objection.



1      A.   Yes.  That letter had multiple accusations.

2  Those were not founded.

3      Q.   What were the - what were the accusations in

4  the letter, the anonymous letter?

5      A.   I don't recall each accusation, but the one

6  about the profile I addressed, and that was something

7  that was brought to my attention.  The other accusations

8  had to do with matters such as I was not qualified, some

9  other attacks of my ability to do that work, which were

10  not true.

11      Q.   Well, did the allegations basically assert

12  that because you hadn't completed the profile, that --

13  that impacted your ability to practice medicine pursuant

14  to 2995-A?

15      A.   I'm not sure what exactly was in that letter.

16  I don't recall the exact details, but I remember those

17  general accusations.  And I'm not sure if that

18  necessarily even disqualified me.  I know it didn't,

19  because I reviewed it with legal counsel and made sure

20  that I was following all the appropriate requirements

21  that were asked of me.  If there was some elements of

22  that profile that was not there, then I addressed it

23  when it was brought to my attention.

24          MS. CANFIELD:  Do we have a copy --

```
 1        A.   I did take it very seriously.
 2             MS. CANFIELD:  Do we have a copy of this
 3        letter?
 4             MS. HAGAN:  No, I don't.
 5        Q.   Now, on November 20th, 2018, was there an
 6   instance where Dr. Winkler and Dr. Mullan got into a
 7   dispute with each other about how Dr. Winkler
 8   administered psychological tests?
 9        A.   I don't recall a dispute.
10        Q.   Okay.  What do you recall?
11        A.   I actually don't recall specifically of this
12   incident.  So if there's more, that might help me
13   refresh my memory.
14        Q.   Now, did you ever exclude Dr. Kaye from a
15   meeting in or around November 30th, 2018?
16        A.   I don't recall ever excluding Dr. Kaye from a
17   meeting.  Again, if there were meetings in the court
18   clinic, we accommodated and tried to work around her
19   schedule.  And if there were some conflict, we'd try to
20   resolve that or ask if it was appropriate to move
21   forward.
22        Q.   For example, around that time, there seemed
23   to have been an effort being made by a clerk named
24   William Kalish.  Do you recall him?
```



ABHISHEK JAIN, M.D.                    235

1      A.   Yes.  Mr. Kalish was a clerk in the Bronx

2  courts.

3      Q.   And was there -- and initially, wasn't there

4  an email sent out that excluded Dr. Kaye from this

5  meeting?

6          MS. CANFIELD:  Objection.  You could answer.

7      A.   I wouldn't characterize it as excluding her.

8  I think we tried scheduling it, including her schedule

9  and her availability.

10     Q.   I'm sorry.  Keep going.  I'm sorry.

11     A.   Yeah.  And then if there were instances that

12 after we scheduled it, we're made aware that there was a

13 change or that she was unable to attend, then we would

14 ask, is it okay to be able to proceed with the meeting,

15 especially with court personnel, judges, because we also

16 wanted to respect their schedule and their time.  At the

17 same time, we also made it clear that we would

18 incorporate any information that Dr. Kaye wanted to

19 include in the meeting, and then follow up with her to

20 share anything that came from the meeting as well.  So

21 there was no intention to exclude her.  We made all

22 attempts to include her.

23     Q.   But ultimately, didn't Dr. -- didn't

24 Mr. Kalish kind of initiate or, I guess, somewhat insist

1   that the meeting eventually take place in Dr. Kaye's

2   office so that she would be included?

3        A.   I don't recall exactly.

4        Q.   Didn't Mr. Kalish basically say, oh, the

5   meeting's going to take place in your house, Dr. Kaye,

6   see you when we have our meeting?

7             MS. CANFIELD:  Objection.  Again, if you have

8        a document, you want to refresh the recollection

9        of the witness, I have no objection to it.

10       Q.   Did you meet in Dr. Kaye's office when you

11  met with Mr. Kalish; do you recall?

12       A.   I don't recall meeting with Dr. Kalish --

13  Mr. Kalish in Dr. Kaye's office.  I don't recall that

14  specific instance.

15       Q.   Did you meet Mr. Kalish at the Bronx Court

16  Clinic with Dr. Kaye?

17       A.   I believe we did meet with Mr. Kalish.  I met

18  with Mr. Kalish so that -- a few times in the Bronx

19  Court Clinic.  And I do recall, to the best of my

20  recollection, that at least one instance was with Dr.

21  Kaye.  I'm not sure if that's what you're referring to.

22       Q.   Now, on the same day, did Dr. -- did Ms. --

23  Ms. Lloyd from -- from MOCJ work with Ms. Swenson to

24  schedule a meeting with several judges from the Bronx



1   Supreme Court without Dr. Kaye?

2            MS. CANFIELD:  Objection.  You can answer.

3       A.   I'm not sure if it was without Dr. Kaye.  I'm

4   not aware of that.  Again, all my interactions were --

5   made efforts to include Dr. Kaye.

6       Q.   Then would you say around December 3rd -- I

7   mean, I guess -- was the -- the emails with Dr. Mundy

8   being CC'd on Dr. Kaye's personal matters resolved

9   immediately, or did it take some time, Dr. Jain?

10           MS. CANFIELD:  Objection as to form.  You can

11       answer.

12      A.   So my understanding is from my end, I

13  addressed them immediately by telling who I thought

14  would resolve it.  I learned later there was another

15  email also sent that listed Dr. Mundy as Dr. Kaye's

16  supervisor, for which I felt was initially addressed.

17  However, when that came to my attention, I brought that

18  forward as well.  And I was told that there may be

19  multiple places within the system that that issue was

20  not resolved.  So they may have made the change in one

21  place, in the computer system initially.  And then later

22  on, there may have been other places where -- that they

23  were not aware of.  So I don't know all the details, but

24  as far as my involvement was, I made efforts to try to



1  inform and resolve that.

2       Q.   Now, at any point, did Lorraine McEvilley

3  from Legal Aid ever complain about you, Dr. Jain?

4       A.   I was -- never directly to me, no.

5       Q.   Did she ever complain about you?  I didn't

6  ask if she complained directly to you.  I asked if she

7  complained about you?

8       A.   I don't know who she complained about me to,

9  so I don't know --

10      Q.   I asked if she did.  That is what I asked

11 you.  I asked if Lorraine McEvilley complained about

12 you.  Yes or no?

13      A.   I don't know.

14           MS. CANFIELD:  Objection.

15      Q.   Was there ever a time that Ms. McEvilley

16 alleged that you were more inclined to find a person

17 malingering than to find them fit when you conducted 730

18 examinations?

19      A.   I was never notified of this.

20      Q.   How many 730 exams did you perform while you

21 were at -- while you were at the CHS?

22      A.   I would estimate over a hundred, but I'm not

23 sure of the exact number.

24      Q.   How many of those exams took place in the



1    Bronx?

2          A.    Early on, there was a lot of those exams that

3    were conducted in the Bronx.  I was hoping to provide

4    coverage in the clinic, supporting those needs there.  I

5    don't know exactly the number.

6          Q.    Would you say between 20 and 30?

7          A.    I'm not sure.

8          Q.    Would you say it's more than 30?

9          A.    I'm not sure.

10         Q.    Would you say it's more than 50?

11         A.    I'm not sure.

12         Q.    How often would you say you went to the Bronx

13    to help with coverage?

14         A.    Initially, it was with some frequency.  As I

15    recall, some instances, multiple times a week.  At least

16    at the beginning, certainly multiple times a month.  But

17    I don't recall, in my entire time there, how often it

18    was.  But it was much more frequently at the beginning.

19         Q.    Now, by any chance, how often would you say

20    that you would make finding space on the records and not

21    necessarily evaluations as well?

22         A.    Very rarely.  And I can maybe -- it would be

23    very rare.  It would not be very frequently.

24         Q.    Now, I alluded to the assistance of Tasha

1   Lloyd and her assistance of cultivating a relationship

2   of the judges in the Bronx.  I wanted to kind of -- kind

3   of refer to it a little bit more in depth.  Was a

4   representation ever made, quote, unquote, we consider

5   judges in the court to be our client.  It's helpful to

6   interact with judges to know what sort of issues are

7   happening.  Was that CHS's general position -- in

8   general when it came to the judges?

9        A.   I'm not sure if it was a general position,

10  but I certainly agree with that general sentiment that

11  we served the courts.  We served the judges' orders.  So

12  we would make efforts to listen and understand what the

13  judges' needs were in the court clinic.  So relationship

14  and interactions with the judges were an important

15  component of -- of the work that we did.

16       Q.   Now, the meeting I was referring to involved

17  Judges Torres, Grosso, and Michelle.  Do you recall that

18  meeting?

19       A.   There were, I believe, two separate meetings

20  of Judge Torres and Judge Grosso, if I'm recalling

21  correctly.

22       Q.   And was Dr. Kaye at either of these meetings?

23       A.   Yes.

24       Q.   Okay.  Were there ever a meeting -- was she



1    at both of the meetings?

2         A.   From what I recall, she was at one of the

3    meetings that had to be rescheduled with her input.  At

4    the other meeting, I believe that she said she was not

5    able to make it to that one.

6         Q.   Now, how often would you say that you would

7    read an order from the court regarding, I guess, the

8    issuance of, in some instances, medical records?

9         A.   How often would we request medical records?

10         Q.   Like for example, how often would you say --

11    what was your experience with CHS interacting with the

12    court regarding the usage of redacted medical records?

13         A.   So as -- as we discussed earlier, sometimes

14    when we needed records to render an opinion on an

15    examination and the -- and the examiners thought that

16    the records would be helpful to them, they would seek an

17    order from the court to have those records released and

18    sent to the examiners for their evaluation.  In those

19    instances, we would make efforts to make sure that they

20    were un-redacted, so they would have a full record.  In

21    some instances, the judges did not want to sign an order

22    regarding un-redacted records.  They would only sign an

23    order for redacted records.

24         Q.   Was there ever an instance where CHS refused



1   to comply with an order from the court to produce redact

2   -- un-redacted medical records?

3        A.   I'm not sure if there was ever an instance

4   where CHS refused if the order was to release

5   un-redacted records.  Sometimes, the orders were not

6   clear or the orders specified redacted records from

7   judges.  In those instances, as I recall, CHS would not

8   be able to release un-redacted records unless that was

9   specified in the orders.

10       Q.   So did CHS insist that the orders specify

11  that the records be un-redacted, or was that something

12  that came from the court?

13       A.   The court would have to be the final --  the

14  signature from the judge would have to be on the order

15  in order for CHS to release un-redacted records.

16       Q.   Was CHS ever threatened with contempt if they

17  failed to produced un-redacted medical records?

18       A.   That I'm not aware of.  I don't recall the

19  issue of contempt coming up specifically.

20       Q.   Now, I have some questions about -- and I'll

21  revisit this a little bit more.

22            On December 10th, 2018, there were minutes

23  that were circulating about citywide pilot agenda and

24  the turnaround to complete reports.  At any point, was



1    it represented that it took, on average, 11 days for

2    reports to be -- I guess, evaluations to be turned

3    around for felonies and eight days for misdemeanors?

4        A.    I'm sorry.  Can you repeat the question?  I

5    just wanted to get the --

6        Q.    For example, for the citywide pilot agenda,

7    right, was it ever represented that it took, on average,

8    11 days for an evaluator to produce a report and eight

9    days for an evaluator to produce a report for a

10   misdemeanor?

11       A.    I'm not sure of the exact time period.  I

12   know there were general timelines when I first started

13   regarding the procedures and the duration it took for

14   the orders, the examination, the next court date, but I

15   don't remember the exact times.

16       Q.    Did you ever represent to any judges in the

17   Bronx that it would only take three weeks to -- for an

18   evaluator to produce an evaluation once they've seen an

19   actual inmate?

20       A.    From what I recall, each judge's would try to

21   see if there's a way we could have an efficient process

22   to have the reports submitted to court.  The pilot, for

23   example, in Queens, I know you're asking about the

24   Bronx, but just as an example, the pilot in Queens,



1  represented, from what I can recall, that the report

2  would be submitted back to court for misdemeanors in

3  seven business days and 14 business days for felonies.

4  And then other judges in our boroughs were asking about

5  if there was a similar type of timeline we can duplicate

6  in the other boroughs.  And so you weren't always able

7  to accomplish that in all four court clinics.  So we had

8  to meet with the judges and see what their needs were.

9  And in one instance, I do recall a judge in the Bronx

10  asking if we turn them around in three weeks.  And at

11  that time, I think we were still undecided whether that

12  would be -- it would be accomplished or not.  But that

13  was something we were discussing, could we meet that

14  judge's request.

15       Q.   You didn't -- did you represent to that judge

16  that you could -- that the Bronx Court Clinic could, in

17  fact, turn around the report in three weeks, and she

18  made that representation without Dr. Kaye?

19            MS. CANFIELD:  Objection to form.  You can

20       answer.

21       A.   Yeah.  So as I recall, there may have been

22  request of that in a meeting.  And then I knew it would

23  be important to also make sure that that's okay with Dr.

24  Kaye before we finalized that.  And so it may have been



1  brought up in a meeting with the judges, but my

2  recollection is I also wanted to make sure that Dr. Kaye

3  would be on board with that or at least have that

4  discussion with Dr. Kaye first.

5       Q.   Now, at any point, and I guess this is -- I'm

6  not sure how central this is to the practice of forensic

7  psychiatry.  And by no -- by no means am I an expert in

8  this.  But what is your understanding of the term "dual

9  agency," Dr. Jain?

10      A.   So dual agency is a term that we use

11  regarding the dual role between treatment providers and

12  forensic examiners for the court system.  So treatment

13  providers have a particular relationship, particular

14  goal in providing treatment to the patient; whereas,

15  forensic examiners provide an objective examination and

16  opinion for a third-party, usually on a very specific

17  legal matter.  And so a dual agency is something that we

18  make efforts to avoid so that we can keep the treatment

19  rules separate from the forensic examination rules.

20      Q.   Now, were there concerns raised about the

21  participation or involvement of Dr. Alex Garcia-Mansilla

22  sitting in on a 730 exam and the supervision of Dr.

23  Brayton?

24      A.   Yes.  There were discussions regarding what



1  her role would be and how we would be able to balance

2  and keep the treatment role separate from -- from the

3  forensic examination role.

4        Q.   Now, Doctor, earlier I think we established

5  that Dr. Alex Garcia-Mansilla managed the treatment at

6  Rikers; is that right?

7        A.   My understanding is she oversaw the

8  psychological assessments for CHS.

9        Q.   For CHS.  The psychological assessments for

10  CHS all together?

11        A.   I believe her -- her -- I'm going by my

12  memory.  But my recollection was she was director of

13  psychological assessments for CHS.

14        Q.   And what about Rikers Island; didn't she

15  provide treatment as well or oversee treatment?

16        A.   So I don't know specifically, but my

17  recollection is that she did provide some oversight of

18  treatment at the Rikers Island side.

19        Q.   Wasn't it the -- because I think it was --

20  wasn't it the understanding that Dr. Alex

21  Garcia-Mansilla supervised both clinical and forensic

22  assessment?

23        A.   She oversaw the psychological testing, not

24  the actual opinions of the forensic examinations.



```
1       Q.   Now, I'm using the term "doctor"
2  euphemistically -- I said I'm using the term "doctor"
3  euphemistically.  That's what I said.  Is Dr. Alex
4  Garcia-Mansilla a medical doctor?
5       A.   No.
6       Q.   So wouldn't it be somewhat problematic that
7  she is providing the oversight -- she is providing
8  oversight over clinical assessment?
9       A.   No.
10           MS. CANFIELD:  Objection.  You can answer.
11      Q.   You said no.  And why -- why not?  Why isn't
12  this a problem?
13      A.   She's not -- if I understand the question,
14  she's not prescribing medication.  She is involved in
15  the oversight of psychological assessment, psychological
16  testing for CHS.
17      Q.   Now, did there come a time when Mr. Bloom
18  objected to the presence of Dr.  Garcia-Mansilla at one
19  of the evaluations with Dr. Brayton because he felt that
20  his client would be prejudiced?
21           MS. CANFIELD:  Can you repeat that?
22      Q.   Did there -- did there ever come a time when
23  Mr. Bloom objected to the presence of Dr.
24  Garcia-Mansilla because he felt that it would prejudice
```



 1  his client?

 2        A.   Yes.  I recall there was one instance where

 3  that was brought to my attention.

 4        Q.   And what was the reaction of CHS?  I mean,

 5  did Mr. Bloom's concerns, were they -- were they

 6  addressed?

 7        A.   They were not appropriate concerns.  Prior to

 8  this, we had discussed with Dr. Ford, Dr. Kaye, Dr.

 9  Garcia-Mansilla, about the appropriate role Dr.

10  Garcia-Mansilla would have in the clinic.  After

11  discussion with Dr. Ford, Dr. Kaye, Dr.

12  Garcia-Mansilla, we agreed that it would be appropriate

13  for her to sit in and observe the examination in the

14  court clinic.  And she also, being a forensic examiner,

15  forensic expert, appreciates the difference between

16  treatment and forensic examinations.  So she also

17  discussed that there was some overlap or potential

18  concerns of a dual agency, that she would recuse

19  herself.  But we, as I recall, for those instances --

20  for that instance, I believe there was one.  We also

21  made an effort to make sure there wasn't a patient that

22  she provided treatment of at Rikers Island.  So we were

23  very careful of the procedures there, also careful of

24  keeping the dual agencies separate.  And so in that



```
 1   context, the concerns were due to the environment that
 2   was created and the confrontation from Mr. Bloom.  The
 3   decision was that Dr.  Garcia-Mansilla would not sit in
 4   to avoid that confrontation.  But the concern itself was
 5   not valid, because we had thought through those
 6   potential dual agency issues beforehand.
 7          Q.   Well, wasn't the -- and I'm going to jog your
 8   memory a little bit.
 9               Wasn't there a managing dual agency policy
10   written and then backdated after this incident on
11   December 12th with Mr. Bloom?
12               MS. CANFIELD:  Objection as to form.  You can
13        answer.
14          A.   Can you repeat the question?
15          Q.   For example, from my understanding, this
16   incident with Mr. Bloom took place in or around December
17   12th of 2018, right, Decemberish; right?
18               MS. CANFIELD:  Objection.  You can answer.
19          A.   I don't recall exactly.  I'm not sure.
20          Q.   Would you say it was around the holiday time,
21   the holiday season?
22          A.   I don't recall exactly when it was.
23          Q.   Now, there was also a managing dual agency
24   policy that was circulated by yourself and Dr. Ford,
```



1    wasn't it?

2         A.   Yes.  There was a policy that was drafted

3    along with input from the directors and from Dr. Ford

4    and others.

5         Q.   Now, didn't this policy take place after this

6    incident with Dr. Garcia-Mansilla?

7              MS. CANFIELD:  Objection as to form.  You can

8         answer.

9         A.   Yeah.  I don't recall exactly when that

10   policy was.

11        Q.   And just for purposes of clarity, a physician

12   is bound by HIPAA; is that right?

13             MS. CANFIELD:  Objection.  You can answer.

14        A.   Maybe, depending on the context of the

15   interaction with the individual and whether they're

16   under HIPAA covered entity.  There's various factors.

17        Q.   Well, the forensic --

18        A.   It's a very broad term.

19        Q.   Is a forensic examiner who administers 730

20   examinations ever bound by HIPAA?

21             MS. CANFIELD:  Objection to form.  You can

22        answer.

23        A.   Yeah.  I think ever, yes, there may be

24   instances where HIPAA would be relevant in a forensic



1    examination.

2         Q.    When would those be?

3         A.    So for example, if someone's doing an

4    evaluation under a HIPAA-covered entity, whether they're

5    providing treatment -- it's a forensic examination, but

6    there's some treatment, a component along with that.

7    For certain civil matters, my understanding is that

8    there might be more HIPAA provisions that have to be

9    followed.  And other instances like certain criminal

10   evaluations, it becomes more complex, because those are

11   court-ordered and inherently non-confidential

12   examinations.  So the similar types of privacy issues,

13   confidentiality may not apply.

14        Q.    Now, was there another policy that was

15   drafted by you and Dr. Ford regarding the presence of

16   third-party observers during exams?

17        A.    I believe there may have been an early draft.

18   I don't recall if that particular policy was finalized.

19        Q.    Okay.  Now, we touched upon the Jose Gonzalez

20   controversial hearing.  Now, I asked you some questions

21   earlier, but I want to kind of revisit that a little

22   bit.  Did you read Dr. Kaye's testimony at the hearing

23   for Jose Gonzalez?

24             MS. CANFIELD:  Objection.  Asked and



1          answered.  You can answer -- answer again.

2          A.    Yeah.  I believe I reviewed the transcript of

3    her testimony.

4          Q.    Did you find Dr. Kaye's recording of the exam

5    to be problematic?

6          A.    I had concerns about it.

7          Q.    What were those concerns, Dr. Jain?

8          A.    So ethically, there might be instances where

9    recordings are appropriate in a forensic examination.

10   But surreptitious recordings are something that are not

11   consistent with our guidelines in forensic psychiatry.

12   Also, whether recordings are permitted in our court

13   clinics as part of our evaluation process, that was also

14   unclear.  Also, whether recordings are permitted within

15   the courts or court clinics, those were a concern as

16   well.  And so those were my questions regarding the

17   appropriateness of that type of recording, especially if

18   it was done without consent and surreptitiously, and I

19   needed guidance on how to proceed, particularly because

20   this issue was brought up in the context of another 730

21   examination and whether those recordings needed to be

22   accessed, and if those recordings were appropriate, and

23   how we would handle those procedures going forward.

24         Q.    Now, I'm going to ask you a question.  How



```
 1   did you learn that Dr. Kaye recorded the examination of
 2   Jose Gonzalez?
 3        A.   In -- there was a second 730 examination
 4   ordered on that case, and the two examiners, Dr. Brayton
 5   and Dr. Mullan were the appointed examiners there.  And
 6   it was --
 7        Q.   I'm asking you how did you learn about Dr.
 8   Kaye recording it?  I'm not asking about the second set.
 9   I'm asking you how you learn Dr. Kaye recorded the exam
10   that she took?
11        A.   Yeah.
12             MS. CANFIELD:  Objection.  He's answering the
13        question.  Please.
14        A.   It was based on that second set of 730
15   examinations by those doctors.  That's how it was
16   brought to my attention.
17        Q.   So did Dr. Brayton tell you that Dr. Kaye had
18   recorded the exam?
19        A.   I was aware that it was in the transcript
20   which Dr. Brayton had, and I'm not sure.  I don't recall
21   exactly if she told me or I came across it in the
22   transcript or not, but --
23        Q.   Did Dr. Brayton share the transcript that she
24   obtained with you, Dr. Jain?
```



1          A.    Yes.

2          Q.    Okay.  Did you ask her for that transcript?

3          A.    Yes.

4          Q.    Why did you ask Dr. Brayton for the

5    transcript?

6          A.    If I'm recalling correctly, there was

7    supervision of that case in general, because it was a

8    very complex case.  And in the course of providing that

9    supervision, it was -- again, I'm not sure, but it was

10   brought to my attention that there was a recording that

11   was done in a previous 730 exam on that case.

12         Q.    Okay.  Who else did the recording?

13               MS. CANFIELD:  Objection to form.  You can

14         answer.

15         A.    Who else did the recording?  My understanding

16   is, based on the transcript, the only recording I was

17   aware of was Dr. Kaye in that particular case.

18         Q.    What about Dr. Charter, the other expert

19   involved, did she record the exam?

20         A.    That I don't recall, because Dr. Charter did

21   not work with us in CHS.

22         Q.    Did you read the entire controversion hearing

23   transcripts, or did you just read Dr. Kaye's?

24         A.    I don't recall if I read all of it.  I did



1    recall reading parts of it.  So I don't recall if I read

2    all of it.

3          Q.   At any point, did you discuss with Dr. Kaye

4    why she recorded the exam to begin with?

5          A.   I was not given that opportunity, no.

6          Q.   How could you say you weren't given that

7    opportunity when you were her supervisor?  What stopped

8    you from asking Dr. Kaye, did you record the exam and

9    why?

10              MS. CANFIELD:  Objection as to form.  Asked

11         and answered.  Answer it again.

12         A.   Yeah.  As mentioned previously, there were

13   many factors that it would not be reasonable for me to

14   speak to Dr. Kaye directly because of the other pattern

15   of interactions that I've described.  So I spoke with

16   Dr. Ford about how to proceed.  Also, I was interested

17   in knowing what implications this would have for our

18   procedures going forward in the court clinic regarding

19   recordings and so forth.

20         Q.   I'm going to ask you something:  Did the fact

21   that Dr. Kaye -- had the fact that Dr. Kaye had filed an

22   EEO complaint, an EEO charge, and a lawsuit by that

23   time, stopped you from engaging with Dr. Kaye?

24         A.   It was not those specific issues, but it was



1  the general adversarial pattern that was created, which

2  may have been connected to those issues.  But it wasn't

3  just because of those complaints that were filed.

4         Q.   Did you speak to Dr. Kaye before she filed

5  her first EEO complaint against management at CHS?

6              MS. CANFIELD:  Objection as to form.  You can

7         answer if you're able.

8         A.   I can't -- I don't know when the first

9  complaint was.

10        Q.   Would you say filing a complaint is

11 adversarial?

12        A.   I think the inherent nature of that suggests

13 an adversarial -- adversarial procedure.

14        Q.   So because she complained, you determined

15 that Dr. Kaye was adversarial; is that right?

16        A.   No.

17             MS. CANFIELD:  Objection.

18        Q.   Did Dr. Kaye -- outside of, you know, trying

19 to get you or to convince you to change her shift back,

20 besides that one -- besides that one intense

21 conversation that we discussed earlier, had there been

22 any other intense exchanges with Dr. Kaye verbally that

23 you had?

24        A.   As I recall, there were different



```
1    interactions that were intense, not just with myself.
2         Q.    I'm asking about you -- I'd like to keep you
3    focused.  We only have until 6:00.
4         A.    Right.
5         Q.    Did Dr. Kaye have any more adversarial
6    intense conversation with you, Dr. Jain, outside of the
7    October 2018 discussion when her shift was changed?
8              MS. CANFIELD:  Objection to the form.  You
9         can answer.
10        A.    Sorry.  Was there a --
11        Q.    No.  I'm waiting for you.  Did she have any
12   more intense exchanges with you after -- after the
13   October '18 meeting?
14        A.    Was that directed at me?
15        Q.    Yes, you.  I'm only talking to you.
16        A.    Well, no, there was an objection, so I wanted
17   to clarify.
18              MS. CANFIELD:  You can answer, Dr. Jain.
19              THE WITNESS:  Okay.  Thank you.
20        A.    So yes.  As I was answering previously, there
21   were exchanges where I was present, and also with me
22   regarding those various matters.  I don't recall each
23   and every instance, but there were those -- there was
24   intense exchanges.
```



```
 1        Q.   I want -- I want to ask you about the other
 2   intense exchanges that Dr. Kaye had with you.  What were
 3   the other instances?
 4        A.   I don't recall each instance.
 5        Q.   How much of these intense exchanges would you
 6   say you had with Dr. Kaye?
 7        A.   Again, there was a pattern of these
 8   throughout my time in working there.
 9        Q.   I'm asking you:  How many did you have, you,
10   yourself, have with Dr. Kaye?
11             MS. CANFIELD:  Objection.  Asked and
12        answered.  You can answer again.
13        A.   I can't put a number on that.
14        Q.   You can't put a number on it, and you can't
15   give me any circumstances for the other instances.  I'm
16   trying to understand how you say that this is a pattern,
17   if you can only give me one example.  Are the other ones
18   so traumatic that you don't remember what happened
19   during those arguments that you had with Dr. Kaye?
20             MS. CANFIELD:  Objection.  You're harassing
21        the witness now.  You can answer, Dr. Jain.
22        A.   So there was a pattern based on the totality
23   of my time there, of my interactions, and also based on
24   other interactions when I was present with her as well.
```



1   So --

2        Q.   But Dr. -- but Dr. Jain, you only remember

3   one instance that happened with you.  You only remember

4   the time that Dr. Kaye asked you about the shift change.

5   You cannot give me any other details about any other

6   intense conversations you had with Dr. Kaye.  You had --

7             MS. CANFIELD:  You keep interrupting him.  He

8        was still talking.

9             MS. HAGAN:  He keeps talking about other

10       things.  I'm asking him about his particular

11       interactions with Dr. Kaye.  That's all.  That's

12       it.

13            MS. CANFIELD:  And he's providing it.  He's

14       providing it.

15            MS. HAGAN:  I'm asking him about other

16       intense argument with Dr. Kaye.  That's what I'm

17       asking.

18       Q.   What was it about, specifically?

19       A.   So as I recall, there were at least two

20   instances of that in that summer of those interactions.

21       Q.   Right.  And what was the second one about?

22       A.   The second one about?

23       Q.   Yes.

24       A.   There were similar matters regarding her



1   complaint about the scheduling, about the hours.  It was

2   also complaints about the meeting with me.  And then,

3   those were two that I recall at this time.  Again, there

4   was a pattern of other interactions that were concerning

5   to me, such as my notes being taken out of the chart,

6   and other times where there was suggestion that I was

7   being targeted.  And so based on those, that was a

8   sufficient pattern for me, along with all the other

9   concerns that were occurring at the clinic.  And --

10       Q.   Now, you agree that you --

11            MS. CANFIELD:  Let him finish, please.  Let's

12       him finish.

13            MS. HAGAN:  Okay.  (Indiscernible) yes.

14       A.   So to me, this was a sufficient -- those

15   patterns -- along, again, it's not in a vacuum.  I can't

16   answer this in a vacuum.  But those interactions, other

17   interactions, other observations, other information I

18   was getting from other staff, all of that built towards

19   the totality of this concerning interaction, this

20   concerning pattern.

21       Q.   Now, Dr. Jain, I'm going to ask you some more

22   questions about the hostile work environment you're

23   describing for yourself.  However, the crux -- one of

24   the crux -- one of the main issues of this lawsuit



1  involves Dr. Kaye alleging that she experienced hostile

2  work environment that you participated in creating, so

3  much so that Dr. Kaye felt compelled to -- to retire

4  before she intended to.  Now, one of the things that she

5  cites is that, you know, first and foremost, there was

6  this whole push to do off-site examinations.  Do you

7  recall that?

8         A.   There was a discussion about off-site

9  examinations, yes.

10        Q.   Right.  And at one point, was there an

11  off-site examination scheduled with a highly dangerous

12  inmate by the name of Jose Ramirez?

13        A.   I don't recall.

14        Q.   Now, was there a policy that was actually

15  distributed after or right before this whole, I guess,

16  initiative to see Mr. Ramirez took place?

17             MS. CANFIELD:  Objection to form.  You can

18        answer.

19        A.   I don't recall when that discussion regarding

20  Mr. Ramirez took place.  I do recall that we drafted a

21  policy regarding off-site examinations.

22        Q.   So you drafted a policy regarding off-site

23  examinations.  And what was that policy; do you recall?

24        A.   Yeah.  The general elements of the policy, I



1    may not remember each individual detail, but it was

2    generally along the lines of that if there is a

3    defendant, a 730 defendant, who is hospitalized and not

4    able to be seen in the court clinic, what would be the

5    appropriate procedure, to see them in the hospital.  And

6    so we were very careful in saying that we would not

7    automatically go and see them in the hospital.  That

8    ultimately, there would have to be various safety

9    provisions, a court order to see them in the hospital.

10   The hospital would have to be in agreement.  There would

11   have to be a safe space to see them.  The directors --

12   yeah, the court clinic directors would have to be in

13   agreement.  And it would be the final call after having

14   those discussions with the court clinic directors and

15   myself, on whether it was appropriate to have them be

16   seen in the hospitals.  Each clinic had functioned

17   differently.  Some clinics had gone to the hospitals to

18   see these examinations, and some had to declined to do

19   so.  And so we wanted to reach some parameters where

20   there was guidance on when it would be appropriate to go

21   and when it would not be appropriate to go to the

22   outside hospitals.

23        Q.   So now, Dr. Kaye alleges that efforts were, I

24   guess, intensified to push her out when this outside

800.DAL.8779
dalcoreporting.com



1   policy was intensified to push her out when this

2   off-site policy was cultivated so that she would be

3   required to see this Jose Ramirez.  Would you agree or

4   disagree with that?

5        A.   I disagree with that.

6        Q.   Now, did you ever see email exchanges from,

7   let's say for example, Jeremy Colley and others that

8   they basically described how violent Mr. Ramirez was?

9        A.   I don't recall specifics, but it would not be

10  unusual if there was a consideration of a 730 defendant

11  in a hospital to have that type of exchange with a

12  hospital director to see -- to even consider if it was

13  appropriate to even see them in the hospital.

14       Q.   Did Dr. Kaye express concern about the

15  security in place to see Mr. Ramirez?

16       A.   I don't recall specifically about that case,

17  but in general, yes.  Those types of concerns were

18  brought up by Dr. Kaye and other directors as well, case

19  by case.

20       Q.   But I'm talking about Mr. Ramirez.  So we're

21  really specifically talking about Dr. Kaye and Dr.

22  Colley and other people expressing concerning that it

23  may not be such a good idea to engage in an off-site

24  examination of this particular inmate.  Do you know how



1  that particular case was resolved?

2       A.   There -- there was a beep there, but I think

3  how that case was resolved --

4       Q.   Yes.

5       A.   Yes.  In that instance, I don't recall

6  exactly.  I remember discussions about making sure that

7  it would be safe.  However, if an examiner or director

8  were not in support of seeing them off-site, we would

9  support that decision.  So I don't recall how that was

10 decision was made.  So as far as I recall, there was no

11 directive to require an examiner to see any defendant

12 off-site.

13      Q.   Was there -- you know, did it take the

14 corroboration of others to support Dr. Kaye's position

15 in order for the exam to be forgone, rather than just

16 Dr. Kaye's reluctance?

17      A.   Sorry.  Can you repeat that?

18      Q.   Did -- did the reconsideration to see Dr. --

19 I mean to see Mr. Ramirez, require the corroboration of

20 Dr. Kaye's other colleagues in order for the decision to

21 be made that Dr. Kaye would not have to see Mr. Ramirez

22 by herself in this setting?

23           MS. CANFIELD:  Objection to the form.  You

24      can answer.



```
 1        A.    I'm not sure if I follow the question.
 2        Q.    Was Dr. Kaye's refusal enough for CHS to
 3   reconsider its position, or did she need Dr. Colley and
 4   whomever else to support her in order for the decision
 5   to be made that she did not have to see Mr. Ramirez off
 6   site?
 7              MS. CANFIELD:  Objection.  You can answer.
 8        A.    Yeah.  From -- from my position, if a
 9   director raises that, including Dr. Kaye, that I would
10   support that decision.  If there were some extenuating
11   circumstance or we really needed to have the individual
12   seen, those discussions would occur with Dr. Ford, other
13   leadership to see if that would be appropriate how to
14   handle.  But -- and sometimes, some examiners were more
15   willing to go to see examinations off-site than others.
16   So --
17        Q.    Now, I'm going to ask you some questions
18   about Dr. Kaye's concerns about a phishing email from a
19   Teleakie Parker.  Teleakie is spelled T-E-L-E-A-K-I-E,
20   Parker.  Now do you recall that email exchange or some
21   kind of interaction surrounding the quote, unquote,
22   phishing email?
23        A.    Yeah, I remember a general email exchange
24   regarding that.
```



1          Q.    Now, what part, if any, did you play in

2    addressing concerns raised by Dr. Kaye?

3          A.    From what I recall, when those questions came

4    up, if I'm recalling correctly, it was -- I'm not sure

5    if it was a phishing email.  I'm not entirely sure what

6    the email was.  But there were some information in

7    there, as I recall, such as a -- requesting social

8    security numbers, which was -- I thought, you know, a

9    somewhat unusual request.  So I reached out to our CHS

10   leadership, including Dr. Ford and others, my immediate

11   supervisor, regarding how to proceed, because this was

12   an unusual email.  So, you know, so I certainly

13   supported the idea that such a request over email was

14   puzzling and concerning.  So we wanted to make sure to

15   address that before information was shared.

16         Q.    The question I would pose in this regard

17   would be, you said it was a puzzling email.  But was

18   there also a project, per se, that was taking place that

19   involved Dr. Kaye?  Was that ultimately the

20   determination as to what precipitated that email in the

21   first place?

22              MS. CANFIELD:  Objection.  You can answer.

23         A.    Yeah.  I'm not aware of a project.

24         Q.    Okay.  Are you aware that Dr. Kaye was the



1   only director on the -- involved in this query of sorts

2   from Ms. Parker's unit?

3           MS. CANFIELD:  Objection as to form.  You can

4       answer.

5       A.   I don't recall who all was involved there.  I

6   know -- I do recall that Dr. Kaye was involved.  I'm not

7   sure if others were involved as well.

8       Q.   What steps did you take as Dr. Kaye's direct

9   supervisor to ensure that her email -- that her personal

10  information was not, in fact, compromised?

11          MS. CANFIELD:  Objection.  You can answer.

12      A.   So from what I recall, you know naturally, in

13  a circumstance like that, I would advise, please don't

14  share that information.  And then I brought it to other

15  leadership at CHS to make sure this was appropriate,

16  what information was needed.  Is there -- if truly this

17  information is needed for some purpose, that's a

18  legitimate HR purpose.  For example, is there a way to

19  share that information without sharing social security

20  number or other more secure types of data?  And so I

21  tried addressing that with our HR and their leadership

22  to try to make sure (indiscernible) --

23      Q.   What's the -- I'm sorry.  I'm sorry.

24          Was there ever a clear-cut discussion as to



 1  why Ms. Parker was seeking that information from Dr.
 2  Kaye?
 3          MS. CANFIELD:  Objection to form.  You can
 4      answer.
 5      A.   I don't recall if there's a clear-cut answer
 6  at that point.
 7      Q.   Ever?  Was there a clear-cut answer ever as
 8  to why Ms. Parker was asking Dr. Kaye for that
 9  information?
10      A.   I don't know.
11      Q.   Okay.  Now, do you recall an inmate by the
12  name of Herschel Gary?
13      A.   No.
14      Q.   At any point, did you say that Mr. Bloom
15  through CHS, under the bus, because he was a misdemeanor
16  -- a misdemeanant.  And he had been, I guess, hadn't
17  been seen since 2016?  Do you recall that?
18      A.   I don't recall -- recall that defendant.
19      Q.   Okay.  Was there a time that Jacobi wouldn't
20  allow Mr. Gary to leave to complete his exam?
21          MS. CANFIELD:  Objection to form.  You can
22      answer.  Go ahead.
23      A.   Yeah.  So as I recall, again, not knowing the
24  specific defendant's name, I do recall a defendant who



```
 1    was at Jacobi Hospital.  And during a meeting, I believe
 2    it was with the mayor's office, this defendant had a 730
 3    pending.  He was at an outside hospital, and Mr. Bloom,
 4    in the meeting, said that CHS refused to see this
 5    individual at this outside hospital.  And so it was as
 6    very broad blanket statement.  And it was accusatory
 7    towards CHS.  And so that, I do recall.  I don't recall
 8    the specific defendant's name, but I do recall that
 9    instance where there was a defendant who was
10    hospitalized who needed a 730 exam.
11            Q.   Now, I want to ask you some questions
12    about -- I guess there seems to be, I guess, conflicting
13    accounts as to what transpired between, I guess,
14    perhaps, anywhere from late October 2019 until January
15    2020.  On the one hand, Dr. Kaye and some of the defense
16    community would argue there was a moratorium or work
17    stoppage at the Bronx Court Clinic.  And on the other
18    hand, it was maybe CHS's position that maybe some of the
19    defendants weren't seen because they weren't being
20    produced to the clinic, or they were being produced
21    elsewhere.  Would that be an accurate assessment as to
22    what transpired or at least the different accounts of
23    what transpired?
24            MS. CANFIELD:  Objection to form.  You can
```



1       answer.

2       A.    I'm sorry.  Can you restate -- can you

3  restate the question.  I apologize.

4       Q.    Okay.  Dr. Kaye and some of her former

5  colleagues allege that there was a work stoppage in the

6  Bronx Court Clinic from November -- let's say late

7  October 2019 to January 2020 when Dr. Kaye resigned.

8  Now, you would disagree with that; am I right?

9       A.    Yeah.  I would not consider that a work

10 stoppage.

11      Q.    Now, Dr. Kaye alleges that on this period

12 from October 2019 until the day she felt constructively

13 discharged, that she did not see one criminal defendant;

14 is that true, Dr. Jain?

15      A.    I don't know if she did or not.

16      Q.    Now, you were her supervisor.  How could you

17 not know if Dr. Kaye was actually working?

18           MS. CANFIELD:  Objection.  You can answer.

19      A.    I don't recall at this time the number of

20 cases in that period that she was seeing or not seeing.

21 I know that during that time that she -- there were

22 challenges in having 730 examinations done in the court

23 clinic.

24      Q.    Now, if in fact -- if in fact 730 evaluations



1    weren't being done, that means the criminal defendants

2    were basically sitting in jail waiting to be produced;

3    am I right?

4          A.    No.

5          Q.    Okay.  So where were they?  If they weren't

6    misdemeanants and they weren't at liberty, the ones who

7    were on Rikers, where were they outside of Rikers?

8          A.    Yeah.  If I understand the question, if they

9    had 730 exams waiting in one borough, we would make

10   efforts to have them seen in another court clinic.

11         Q.    How many inmates that would've normally been

12   seen in the Bronx were transported to another borough?

13         A.    That I don't recall.

14         Q.    Now, Dr. Kaye alleges that she only saw maybe

15   one, if that, during this period.  You have probably the

16   most experienced evaluator on your staff.  Why wasn't

17   she working, Dr. Jain?

18               MS. CANFIELD:  Objection.  You can answer.

19         A.    Yup.  So for multiple reasons that I gave

20   earlier, because we had challenges in retaining and

21   recruiting staff in the Bronx Court Clinic for a --

22   because of the tense environment, we had difficulty in

23   recruiting and retaining staff in the Bronx Court

24   Clinic.



1        Q.    Okay.  After Dr. Kaye --

2        A.    I'm not finished.  I was waiting for the --

3        Q.    Okay.  Sorry.  Keep going.

4        A.    Okay.  Also, there were challenges in having

5   other examiners, co-examiners, participate with Dr. Kaye

6   in the Bronx Court Clinic.  Also, if examinations -- if

7   defendants were produced to other clinics, Dr. Kaye said

8   -- I was informed that she would not travel to the other

9   court clinics.  They would only be seen in the Bronx

10  Court Clinic.  And so there were multiple challenges in

11  order to have an examination done with Dr. Kaye during

12  that time.

13       Q.    But you -- so you're -- is there anything in

14  writing that says that Dr. Kaye refused to see any

15  inmates during this period from October 2019 to January

16  2020 when she felt compelled to resign?

17       A.    Any written statement that she would not see

18  those cases?

19       Q.    Yes.

20       A.    I don't recall.

21       Q.    Did, in fact, Dr. Kaye write an email saying

22  because of what was going on and because of the number

23  of inmates in backlog that was developing, that she

24  would be willing to travel during this time?



**ABHISHEK JAIN, M.D.**                 273

1        A.    I don't recall.

2        Q.    Okay.  Now, were there ever complaints from

3   the defense community, the Bronx defense community, for

4   example, Mr. Bloom, that there -- there was a backlog at

5   the Bronx Court Clinic in and around December of 2019?

6        A.    Yes.

7        Q.    And what do you remember the complaint being,

8   exactly?

9        A.    I remember it being an inaccurate complaint

10  regarding the number of cases that there was a backlog

11  on.  As I described earlier --

12       Q.    Let's -- let's just stop.  Was there a

13  backlog in the Bronx?

14       A.    There were cases that were being -- waiting

15  to be seen, yes.

16       Q.    Okay.  And when a backlog, does that present

17  an issue of staleness as far as the findings are

18  concerned?  Like, for example, you have two evaluators

19  that may or may not see an inmate at the same time;

20  right?  Let's say Evaluator A says inmate X on November

21  1st; right?  But then, you know, Evaluator B needs to

22  see inmate X as well.  But they may need to wait a few

23  weeks because the inmate may have some challenges, and

24  there may be some scheduling issues.  Suppose this

1   inmate recovers or has some treatment and is no longer

2   in the cycle the psychotic state that they presented in

3   when the first evaluation took place, would the first

4   evaluation now be stale if, in fact, this inmate had

5   been remediated?  Is that the term?

6           MS. CANFIELD:  Objection as to form.  You can

7       answer if you're able.

8       A.   Yeah.  Without knowing the specifics, I think

9   in general terms, that is something we think about.  If

10  there's a long gap between the first and second

11  examination, the two findings may not necessarily be

12  consistent, because there might be a change in clinical

13  status of the defendant.

14      Q.   Now, was there ever a time in December,

15  specifically December 18th, that Mr. Bloom confronted

16  you, Dr. Jain, about your refusal to circulate staff to

17  the Bronx to see inmates?

18          MS. CANFIELD:  Objection to the form.  You

19      can answer.

20      A.   So I don't recall the specifics, but

21  Mr. Bloom had many email exchanges, and that at times

22  were aggressive towards us, towards CHS, accusing other

23  clinics and other examiners of certain -- criticizing

24  their practices.



1       Q.   Did (Indiscernible) contact you about seeing
2    a defendant Butler regarding -- during this period?
3       A.   I don't recall a specific name of the
4    defendant.
5       Q.   Did Judge Michael actually contact you about
6    the work stoppage in the Bronx?
7            MS. CANFIELD:  Objection to form.  You can
8        answer.
9            A.   Yeah.  I don't recall -- I believe a
10           judge did contact me, but I don't recall a
11           specific defendant's name.
12      Q.   But Judge Michael did contact you about the
13   situation in the Bronx during this period; right?
14           MS. CANFIELD:  Objection to form.
15      A.   I don't -- it was one of the judges from the
16   Bronx.  I don't recall specifically which one.
17      Q.   Did, by any chance, Mr. Bloom confront you
18   about Dr. Kaye being effectively rubber roomed during
19   the period of October of 2019 and her resignation and
20   her forced retirement in January of 2020?
21      A.   That type of accusation was in a -- from what
22   I recall, was in an email to multiple people.  So it
23   wasn't just directed at me.
24      Q.   And did you respond to the email?



1        A.    I don't recall if I did.

2        Q.    You don't know if you did or not, something

3   that's defamatory, Dr. Jain?  Weren't you upset this

4   email was circulating?

5            MS. CANFIELD:  Objection to form.  You can

6        answer.

7        A.    So when that email came forward, it certainly

8   raised concerns that I reviewed with our leadership at

9   CHS about how to respond to something of -- of that

10  nature.  And then whether I responded or we responded

11  from CHS, I don't recall.  I do recall that one email

12  that I did respond to with the mayor's office, also CC'd

13  there, was regarding the number of backlogs, which was

14  an inaccurate statement.  And we responded to that email

15  with the correct number of cases that were seen, the

16  correct number that were actually remaining to be seen.

17  And so it was a much different number than Mr. Bloom had

18  sent to the mayor's office.

19       Q.    But there was a backlog; am I right?

20       A.    There were cases to be seen, just like there

21  are in every clinic.

22       Q.    Like, for example, there were a number of

23  cases that started from January 2020 -- from July --

24  July 2nd, 2019, all the way to January 16th, 2020,



1  during that period.  Do you recall the list of

2  individuals that were provided?

3           MS. CANFIELD:  Objection to form.  You can

4      answer.

5      A.   Yeah.  There were often a list of cases.

6  Sometimes the -- the order was, perhaps, months prior to

7  the court clinics doing the examination -- for many

8  reasons, whether the defendant refused, there were

9  challenges in scheduling.  There could be a number of

10  reasons why those cases were waiting that long, but

11  there may have been a case that was that long.

12      Q.   Now, I'm going to go back to something.  Now,

13  Dr. Kaye testified in the Jose Gonzalez matter in or

14  around -- in or around February of 2019, to be exact,

15  February 7th, 2019.  Do you recall around the time when

16  she -- she testified?

17      A.   I recall that -- I believe her testimony was

18  generally -- I don't recall the details.  I did not

19  attend the hearing or aware, generally, that the hearing

20  was occurring.

21      Q.   Would you agree with me that the hearing took

22  place in the winter of 2019?

23      A.   I don't recall.

24      Q.   Okay.  So I loathe to get into a discussion



1    of a 300-page transcript at this point.  I don't know if

2    you need to read all 300 pages to confirm whether or not

3    Dr. Kaye actually testified that day.  So I'm not going

4    to go there.  But what I'm going to ask you is whether

5    or not you evaluated Dr. Kaye and the other directors in

6    or around February of 2019.  Do you recall that?

7         A.   I recall that there were evaluations, annual

8    evaluations that we conducted, and I believe it was

9    around that time period, yes.

10        Q.   Now, were there two versions of Dr. Kaye's

11   evaluation; do you recall that discussion with Dr. Ford?

12        A.   There were discussions with Dr. Ford

13   regarding the evaluations, yes.

14        Q.   Now, do you remember what you initially gave

15   -- rated Dr. Kaye in your first evaluation of her?

16        A.   I don't recall specifically.

17        Q.   Okay.  Let's see if we can refresh your

18   recollection.

19             MS. HAGAN:  Actually, could you give me five

20        minutes -- could you give me five minutes, and

21        then I can finish.  Okay.  Thanks.

22

23             (Recess taken from 5:46 p.m. until 5:51

24             p.m.)



1

2      Q.   I want to ask a question about the licensure

3  regarding Dr. Kaye.  At some point, we were talking

4  about the phishing email and the credentialing.  Was

5  there ever a time in July of 2019 that Dr. Kaye

6  submitted paperwork to you updating her licensure --

7  licensure, and you ignored it?

8      A.   I'm not sure what ignoring it means or which

9  licensure paperwork you're referring to.

10     Q.   Well, her medical license were up for renewal

11 in July of 2019.  Do you recall that?

12     A.   I don't recall those details, no.

13     Q.   What would be the consequence of a doctor

14 working without a current medical license?

15     A.   Without a medical license -- you need a

16 medical license in order to practice.

17     Q.   Well, an updated medical license.  Like I

18 think -- like periodically -- I don't know how doctors

19 work, like I'm not a doctor, but I would think every so

20 often you have to renew your license; am I right?

21     A.   Yes.

22     Q.   And at the time, Dr. Kaye had submitted

23 paperwork to you to renew her license before the

24 expiration date came.  Do you recall that?



1        A.    No, I don't recall that.

2        Q.    Now, Dr. Kaye alleges that you intentionally

3   failed to update her license.  And as a result, she was

4   potentially subject to discipline.  Were you aware of

5   that?

6             MS. CANFIELD:  Objection.  You can answer.

7        A.    Yeah.  This is something that I'm not aware

8   of.  This is not to my knowledge.

9        Q.    Now, was there ever a time where there was an

10  incident that you were aware of between Dr. Kaye and Ms.

11  Swenson?

12       A.    What incident?

13       Q.    Well, in -- in or about May 31st of 2019, do

14  you recall there being an incident where Dr. Kaye

15  allegedly told Ms. Swenson that it was doctors like her

16  that made her job possible or something to that effect?

17       A.    I remember some interaction with Ms. Swenson

18  and Dr. Kaye, yes.

19       Q.    Did you speak to Dr. Kaye about what

20  transpired between she and Ms. Swenson?

21       A.    No.

22       Q.    Who did you speak to?

23             MS. CANFIELD:  Objection.  You can answer.

24       A.    Yeah.  I'm not sure if I spoke with anyone



1   specifically.  I know it was brought to my attention,

2   and then I informed the proper channels from my end,

3   which would be my supervisor, Dr. Ford.  And then from

4   there, I know that Ms. Swenson also had other people she

5   reported to.  So from what I recall, that incident was,

6   you know, processed through those channels.

7         Q.   Did you have a number of email exchanges with

8   Ms. Swenson about this incident?

9         A.   I remember some emails.  And my recollection

10  of those emails is that -- I remember those emails, and

11  I recall trying to just figure out the next steps of

12  what needed to be done from a procedural standpoint.

13        Q.   Now, at any point, were you aware of what

14  transpired as far as Dr. Kaye's retention bonus?

15        A.   No.

16        Q.   So you had no part in that?

17        A.   I had no part in that, no.

18        Q.   And I just want to make sure I covered

19  everything.  I guess the question I have to kind of

20  close this out, the incident with Dr. Kaye and Ms.

21  Swenson possibly could have pre -- serious implications

22  for Dr. Kaye's medical license.  Would you agree,

23  depending on the charges that were brought against her?

24             MS. CANFIELD:  Objection as to form.  You can



**ABHISHEK JAIN, M.D.**

1        answer.

2        A.   Yeah.  I'm not sure they would have

3    implications on her license.

4        Q.   Have you heard of the term "disruptive

5    physician" before?

6        A.   I don't recall exactly what that refers to.

7        Q.   Though, you've never heard of that particular

8    allegation lodged toward a doctor before?

9        A.   I may have heard of it, but I don't have the

10   specific definition.

11       Q.   Now, earlier you said that you applied to

12   work here in New York through your medical license; am I

13   right?

14       A.   Yes.

15       Q.   And do you recall that during that process,

16   you had to, I guess, disclose if there was any kind of

17   disciplinary or other infractions in your, I guess, in

18   your personnel files; am I right?

19            MS. CANFIELD:  Objection as to form.  You can

20        answer if you're able.

21       A.   Yeah.  I don't recall exactly what they asked

22   on those forms.

23       Q.   So you don't recall having to disclose

24   whether or not you had any personnel actions in your



1  personnel files prior to applying for licensure here in

2  New York?

3          MS. CANFIELD:  Objection to form.  You can

4     answer.

5     A.   I recall there were specific questions about

6  those types of issues.  And so from what I recall, I

7  don't know the exact wording, but I do recall having to

8  fill out those types of forms.

9     Q.   When the memo was written to -- let me -- let

10  me scratch that.

11          Who made the decision to write a memo to Dr.

12  Kaye regarding the incident with Ms. Swenson rather than

13  just have a verbal?

14     A.   I don't recall specifically who made that

15  decision.

16     Q.   Were you part of that decision-making

17  process, Dr. Jain?

18     A.   I was aware it was occurring, but the

19  specific decision, I was not involved with.

20     Q.   So you didn't contribute to the decision?

21     A.   As I recall, there was a broad decision about

22  this.  It was brought to my attention.  But I don't

23  recall being the one to make a decision about this or

24  having -- outside of what was presented to me, being



1  concerning and being aware of that as a director of the

2  court clinic, that this was occurring in the court

3  clinic, the specific determination of what needs to be

4  done next or the warning or those procedures, I don't

5  recall being involved in that specific decision.

6      Q.   But would it be fair to ask or to even say

7  that even though you may not have been involved in the

8  decision as to the selection or the avenue of recourse

9  that was going to be pursued against Dr. Kaye.  You were

10  a witness to the deliberations, whether they were like

11  verbally or in person; right?

12      A.   I don't believe I was involved with the

13  direct deliberations there.  I know I was CC'd on some

14  emails and knew broadly what was occurring.  And the

15  extent of my involvement also -- or part of my

16  involvement was also a decision as to who should

17  actually -- once this warning needs to be issued, who

18  actually should give it.  And so, in that context, I was

19  aware that it would be not me who makes that -- who

20  delivered that warning.

21      Q.   I guess my question again will go back to Dr.

22  Kaye.  Did anyone ever speak to Dr. Kaye about what

23  happened or to get her version of events of what

24  transpired between she and Dr. - she and Ms. Swenson?



 1  I'm sorry, I'm calling a lot of doctors' names.  I'm

 2  sorry.

 3          MS. CANFIELD:  Objection to form.  You can

 4      answer.

 5      A.   I wasn't there with the discussions directly

 6  with Dr. Kaye in general.  And these procedures, I know

 7  there's often a chance to have that type of discussion

 8  and receive different views of what occurred, but I

 9  wasn't part of that specific discussion.

10      Q.   Again, I would just ask again and -- was this

11  part of -- I mean, you've said that, you know, you've

12  alleged that Dr. Kaye was adversarial in her

13  interactions with you.  But she also seemed to give good

14  substantive guidance to some of the initiatives that you

15  were trying to implement while you were a director at

16  the court clinics.  At any point, did you seek to -- I

17  guess, engage Dr. Kaye before she left the clinic?

18      A.   Yes.  Throughout the -- you know, employment

19  especially in the beginning, I made many efforts to

20  engage her, to provide support, to also meet with her

21  regularly.  And so I did make efforts for that as well.

22  And you know, certainly, I made all my efforts to be

23  collaborative with her, as I did with every director.

24  So the totality of the pattern was more adversarial.



1   But you know, certainly, I made efforts to have

2   instances where I could collaborate and could

3   incorporate.  It doesn't mean that I would ignore --

4   despite the adversarial posture from her, I would try to

5   incorporate her input as much as possible.  And those

6   are good examples of times where I did.  I did include

7   those input from her, and I think that highlights my

8   efforts I made to also be fair and include her.

9        Q.   This is my last topic, and I guess my last

10  question or so, depending on your answer.

11            Before Dr. Kaye retired, were you aware of

12  Dr. Kaye's complaint to the Board of Corrections?

13       A.   Dr. Kaye's complaint to the Board of

14  Corrections?

15       Q.   Yes.

16       A.   Specifically which complaint?  I just want to

17  clarify.

18       Q.   There was a complaint that was filed with the

19  Board of Corrections in or around January of 2020.  Do

20  you recall that, against CHS?

21       A.   I recall an email being sent that I believe

22  was a letter.  So this may have been the complaint

23  you're referring to --

24       Q.   Yes.



1        A.   -- regarding CHS.  And I don't recall exactly

2   who it was sent to.  It was a email that was sent

3   broadly to many individuals.  So I do recall generally,

4   but I don't recall the details of who it was sent to and

5   what the exact content was.

6        Q.   Did you take any steps to address any of the

7   allegations in Dr. Kaye's complaint?

8        A.   Throughout, if we would have any complaints

9   or allegations, especially regarding procedures in the

10  court clinic, making sure that our procedures were

11  ethical, I made efforts to address those and resolve

12  those throughout my time at CHS.  I -- I do recall that

13  there were also other complaints in general regarding

14  Rikers, and those would kind of involve me directly.

15          MS. HAGAN:  Now, I'm going to show you, and

16      I'm not sure if I Bates stamped this.  So Counsel,

17      please forgive me.  I will go through and make

18      sure that I will provide you with the Bates

19      stamped copy of the Board of Correction complaint,

20      if I haven't done so; all right?

21

22          (Plaintiff's Exhibit 7, BOARD OF

23          CORRECTION AND INSPECTOR GENERAL

24          COMPLAINT PLAINTIFF FILED ON JANUARY



1          7TH, 2020, was marked for

2          identification.)

3

4     Q.    But I want to show you what's marked as

5  Plaintiff's Exhibit 7.  And this is the last exhibit of

6  the day.  And it's the -- what's being shown to the

7  witness is the Board of Correction and inspector general

8  complaint that plaintiff filed on January 7th, 2020.  Do

9  you see the document, Dr. Jain?

10     A.    Yes, I see it on my screen.

11     Q.    Okay.  Now, do you need time to read it?

12     A.    Yes, if you could -- or is there a

13  particular --

14     Q.    No.  We could --

15          MS. CANFIELD:  Read the whole thing, please.

16          MS. HAGAN:  Read the whole thing.

17     A.    Okay.

18     Q.    Okay.  So I'm going to draw your attention to

19  the second paragraph so far.

20          MS. CANFIELD:  Did you read the whole thing?

21      I only got down to --

22          THE WITNESS:  But there's more actually.

23          MS. HAGAN:  It's six pages long, so -- now

24      that I'm letting you, guys, read this, I'd like to



1        have an opportunity to question the witness on the

2        exhibit.  This is my last set of questions.  Is

3        that understood?

4              MS. CANFIELD:  Sure.

5              THE WITNESS:  Okay.  Okay.

6        Q.   Now, that you've read the document in its

7   entirety, I'm not sure that this is probably under the

8   best circumstances.  Does it refresh your recollection

9   as to whether or not you had come across the document,

10  or was it referenced by management?

11       A.   Yes.  I recall this -- whether it was exactly

12  this document or something similar, it does refresh my

13  memory regarding elements of that.

14       Q.   Were you ever approached by the Board of

15  Correction about this complaint?

16       A.   Not me -- that I'm aware of, no.

17       Q.   You said not me personally -- you were about

18  to say not me personally.  Who was actually approached?

19       A.   Well, I can only speak for myself.  I don't

20  know if anyone was approached, but I was not approached.

21       Q.   Was anyone -- did anyone approach you from

22  the inspector general's office about this complaint?

23       A.   I'm not aware.  I'm not sure.

24       Q.   You're not aware if someone spoke to you or



1   not from the inspector general's office?

2        A.   Well, I'm sorry.  I thought you said somebody

3   -- whether they spoke to the inspector general.  No.

4   The answer is no one, to my recollection, specifically

5   discussed this letter with me from what I recall.  No.

6        Q.   Now, do you agree that there have been due

7   process rights violations for criminal defendants in the

8   administration of the 730 examinations?

9        A.   I'm sorry.  I couldn't -- entire -- I

10  couldn't hear the entire question.

11       Q.   Let me backtrack.  First off, before I go

12  into that, did anyone from the department of

13  investigations contact you, Dr. Jain, about the

14  complaint?

15       A.   I don't recall a specific question about this

16  complaint.

17       Q.   So you have never received any correspondence

18  or any engagement about this complaint, even though

19  you're named in it; is that right?

20       A.   So --

21            MS. CANFIELD:  Objection.  Go ahead.  You can

22       answer.

23       A.   Yeah.  As I recall, when this came forward,

24  and again, I'm not recalling the exact time period or



```
 1    what occurred, I do recall that because our leadership
 2    was involved, Dr. Yang, Dr. MacDonald, others, that I
 3    don't recall exactly how it was handled.  Elements of
 4    these different complaints within here were not entirely
 5    new to me.  I had heard about some of these, and so
 6    those were systematically addressed when they came
 7    forward.  But there were also general types of
 8    complaints that were brought forward in here which, you
 9    know, I was mindful of to try to address during my time.
10    But again, specifically about this letter, I don't
11    recall specifically what occurred with this specific
12    letter.
13          Q.   Have you ever testified under oath about --
14    about CHS, Dr. Jain?
15          A.   Under oath about CHS, in what context?
16    About --
17          Q.   Any -- any context.  If you -- if you had to
18    provide an oath and then you discussed CHS.  Did that
19    ever happen?
20               MS. CANFIELD:  Objection to form.  You can
21          answer.
22          A.   Yeah.  So I've testified in 730 examinations.
23    I have testified -- there was a internal review as well,
24    which I testified under oath there.  And so those are
```



1  matters in which these issues -- not these issues, but

2  those were general matters which I testified in.

3       Q.   Now, Dr. Kaye alleges that she experienced

4  retaliation when she mentioned some of the, I guess,

5  issues that she identified fairly early on in -- in Dr.

6  Yang's official, I guess, tenure at CHS.  Do you ever

7  recall Dr. Yang making a statement during the meeting,

8  there's the door.  If you don't like how we're doing

9  things here, we've got the money, and there's the door?

10      A.   No, I don't recall that.

11      Q.   Now, did -- did Patsy have a group of

12 individuals that she liked to engage professionally

13 during the course of her, I guess, tenure there at CHS?

14           MS. CANFIELD:  Objection to the form of the

15      question.  You can answer.

16      A.   Yeah.  I can't speak to her preference.

17      Q.   Were you part of this group that regularly

18 met with Ms. Patsy?

19           MS. CANFIELD:  Excuse me.  Dr. Yang, is that

20      who you're referring to?

21           MS. HAGAN:  Dr. Yang refers to herself as

22      Patsy.

23           MS. CANFIELD:  You referred to her on the

24      record as Dr. Yang, just for clarification for the



1          record.  Now, we have Patsy.  So you're speaking

2          about Dr. Yang; correct.

3                MS. HAGAN:  Yes, Ms. Yang.  Yes.

4                MS. CANFIELD:  Dr. Yang, yes.  You can

5          answer, Dr. Jain.

6          A.   So the beginning of the question was about a

7    certain group.  But then the second part of the

8    question, did I meet regularly --

9          Q.   Were you part of that group?

10         A.   Part of what group?

11         Q.   Did you meet regularly with Dr. Yang?

12         A.   At the beginning of the employment, yes, I

13   was part of some meetings that were regularly -- that

14   regularly occurred with Dr. Yang, yes.

15         Q.   Now, did that -- did those regular meetings

16   continue when you -- as your employment progressed, or

17   did they decrease in number?

18         A.   They decreased in number.  However, there

19   were meetings that were still occurring and as needed.

20         Q.   Now, were there ever instances where CHS

21   encouraged evaluators to find the inmates that were

22   charged with misdemeanors, incompetence, so the charges

23   could be dropped?

24         A.   No.



**ABHISHEK JAIN, M.D.**

1        Q.    So you never heard of anything like that?

2        A.    No.

3        Q.    Okay.  And was there ever a time where --

4   where there was an effort to obscure the transparency of

5   the forensic evaluation examination by one, as we

6   discussed earlier, discouraging the reporting of

7   examinations?

8        A.   I can't agree with that -- the way the

9   question's asked.  There was no encouragement to reduce

10  the transparency of the examination.  I think with

11  recordings, that is a complex issue with a different

12  ethical implications and different procedures in place.

13  So when recordings are used in the forensic

14  examinations, there's often careful procedures and

15  thought before those are used.  So we would need to be

16  consistent with that type of ethical procedure before

17  recording the exam.

18       Q.   What ethical procedure was in place at CHS

19  before (indiscernible)?

20       A.   What ethical procedures were in place before?

21       Q.   Yes, at CHS, before Dr. Kaye was allegedly --

22  was accused of the unauthorized, quote, unquote, usage

23  of recording?

24            MS. CANFIELD:  Objection.  You can answer.



1        A.    Yeah.   I'm not sure if there was a specific

2   -- specific internal ethics regarding this matter.   The

3   general practice had been, to my knowledge, that

4   recordings were not done in the court clinics.   On one

5   occasion that I recall, a judge had requested a court --

6   a judge had requested an interview be recorded.   And

7   that was only because the defense attorney had requested

8   that it be recorded.   However, there were specific

9   orders in place for that specific procedure before we

10  authorized that.   And then eventually, the defendant did

11  not show up for that particular examination anyways.

12  But in general, the examiners, myself, the directors,

13  would follow our usual forensic ethics and guidance

14  regarding recordings.   And so to my knowledge,

15  recordings were not done in the court clinics.   That was

16  the first instance outside of that specific judge's

17  order for court recording that I came across.   And that

18  was in the -- Mr. Gonzalez's case that you were

19  referring previously.   That was the first instance where

20  I saw that there was some recording done of a case by

21  one of our examiners at their own behest.

22        Q.    Was there ever a time that you read the AAPL,

23  A-A-P-L, Guidelines as they pertain to recording?

24        A.    Yes.



1       Q.   And was it ever determined that there was a

2    definitive position taken as to whether or not recording

3    was, I guess - I guess, a standard practice within the

4    profession?

5            MS. CANFIELD:  Objection as to form.  You can

6        answer.

7       A.   Yes.  So the guidelines specify that

8    surreptitious recordings should not occur.  However --

9       Q.   You said that the guidelines -- you said that

10   the AAPL -- the AAPL literature basically discourages or

11   does not condone surreptitious recording.  And I'm

12   asking you, specifically, which document or which

13   repository would have said that surreptitious recording,

14   quote, unquote, was prohibited or unethical?

15           MS. CANFIELD:  Objection to the form.  You

16       can answer.

17      A.   So as I recall, this was in the AAPL, either

18   resource document or guidelines regarding forensic

19   psychiatric examinations.  There's also a separate

20   guidance that I recall that, I believe, has to do

21   specifically with video recordings.  So there's a few

22   different -- at least two different areas where

23   recordings are mentioned in the AAPL Guidance.  And both

24   of those, as I recall, have some deliberations about the

1    pros and cons and the appropriate procedures to take

2    with forensic examinations and recordings.

3         Q.   But they don't necessarily reference

4    surreptitious reporting.  It's just in general what the

5    pros and cons would be in terms of the defendants and/or

6    the evaluation -- evaluator's ability to take

7    comprehensive notes without being distracted by note

8    taking; right?

9              MS. CANFIELD:  Objection to form.  You can

10        answer.

11        A.   Based on my recollection, there is AAPL

12   Guidance in a resource document.  I believe it's

13   regarding forensic psychiatric examinations regarding

14   the aspect of recording.  And I believe in that

15   document, it states that surreptitious recording should

16   not occur.  The menu's different -- specific wording,

17   but I do recall that the word "surreptitious recordings"

18   was discussed in that document.

19        Q.   Now, I'm going to ask you something.  Now,

20   you do know that New York is a one-party reporting

21   state; right?

22        A.   Yes.

23        Q.   So it doesn't necessarily matter if the

24   individual is surreptitiously, quote, unquote, recording



1    or is recording without the other person's consent.  The

2    fact is New York is a one-party consent state.  So you

3    only need the one person who's probably recording in

4    order for the recording to be permissible.

5              MS. CANFIELD:  Objection.  Under the criminal

6         law.  You can answer.

7              MS. HAGAN:  Objection to counsel -- counsel

8         coaching the witness.

9              MS. CANFIELD:  You can answer, Dr. Jain.

10   A.    Okay.  So can you repeat the question again?

11   Q.    My question is that New York is a one-party

12   recording state, a one-party consent state.  You are

13   aware of that; right?

14   A.    Yes.

15   Q.    So the persons who's recording doesn't --

16   don't necessarily have to disclose they're doing so

17   anyway, generally; am I right?

18             MS. CANFIELD:  Objection.  You can answer.

19   A.    It depends on the context.

20   Q.    In what context is it required in a one-party

21   recording state, that the person who's recording must

22   disclose that they're doing so?

23             MS. CANFIELD:  Objection.  You can answer.

24   A.    So there might be other areas.  So for



1  example, if I'm doing a private interview clinically or

2  physically examining a patient and I choose to

3  surreptitiously record, I think that would raise

4  concerns.  So there might be a specific law regarding

5  one-party consent in general.  But when we're talking

6  about forensic examinations or clinical assessments,

7  there's other layers of ethical considerations that we

8  have to take into account as well.

9       Q.   So I -- I would be loathed to ask, but in

10 this instance, CHS had no policy in place against

11 recording anything at that time; am I right?

12           MS. CANFIELD:  Objection.  You can answer.

13      A.   No.  I'm not sure if CHS had a general policy

14 regarding recording or not at that time.

15      Q.   Was there ever reference or an allusion made

16 to CHS standard -- custom and practice or regarding

17 recording at that time?

18           MS. CANFIELD:  Objection.  You can answer.

19      A.   If I understand the question, the general

20 practice in each of the clinics was there was no

21 recording, especially no surreptitious recording of

22 examinations unless there was a specific court order.

23 This is my understanding.

24      Q.   Where did you -- first off, who presided over



1   that policy?  Because clearly, Dr. Kaye was not aware of

2   that before she recorded Mr. Gonzalez's exam.

3        A.   So I'm not aware -- again, I'm not aware of a

4   specific policy.  I'm referring to more the general

5   practice in the court clinics that -- to my knowledge,

6   that examiners were not recording 730 examinations or

7   390 examinations.  But there's very careful ethics

8   regarding that issue.  The only time I'm aware that a

9   recording did come up was in one instance when a defense

10  attorney wanted the exam recorded.  And that was through

11  a court order.  Otherwise -- and part of the reason I'm

12  aware that there -- as I'm remembering, why it was at

13  that time evident to me that recordings were not a

14  regular practice, because when that court order came

15  forward in one of the boroughs, I did generally ask and

16  also received some guidance.  And there was a general

17  practice that we would not do recordings ourselves.  And

18  if a recording was needed, that we would do that through

19  the proper procedures through a judge and a court order.

20       Q.   I guess one of the questions I'd like to ask

21  you, when was the last time you received any training

22  from any institution akin to like, let's say, AAPL or

23  any like institution, or I guess, facility that would be

24  associated with your license as a forensic psychiatrist,

 1  Dr. Jain?

 2          MS. CANFIELD:  Objection.  You can answer.

 3      A.   Yeah.  So -- so I think there's a number of

 4  things there.  So AAPL does not license psychiatrists.

 5      Q.   Oh, no.  I didn't say that.  I said when was

 6  the last time you received training.  There's a

 7  difference.

 8      A.   I received -- I attend AAPL meetings

 9  regularly.  I participate in various trainings, various

10  academic projects, academic types of conferences and

11  interactions.  I'm a counselor of the American Academy

12  of Psychiatry and Law.  So I'm involved with AAPL on the

13  national level.  I'm also involved with different

14  organizations throughout -- both regionally and

15  nationally.  And also frequently involved in giving

16  presentations and academic projects through there as

17  well.

18      Q.   Now, did you ever speak to Dr. Colley about

19  recording examinations?

20      A.   I don't recall if I specifically spoke with

21  Dr. Colley?

22      Q.   Did you -- I mean, who else did you speak to

23  specifically to determine whether or not it was - it was

24  custom or practice or any kind of, I guess, custom and



1  practice to record at CHS?

2      A.   Yeah.  So I spoke with Dr. Ford.  I spoke

3  with our directors of CHS.  I spoke with other examiners

4  who had been there.

5      Q.   Now, when you refer to the directors, who are

6  the other directors?

7      A.   The other directors who I mentioned

8  previously, Dr. Winkler, Dr. Mundy, Dr. Owen.

9      Q.   So okay.  Let's -- let's break them down.

10  Dr. Winkler told you that he doesn't believe or that Dr.

11  Winkler does not believe in recording exams.

12      A.   No.  I didn't say that that's what he said.

13      Q.   Okay.  So what did Dr. Winkler say about

14  recording examination?

15      A.   So I don't recall exactly, but the general

16  sentiment among the directors and the examiners was, we

17  don't do surreptitious recordings.  And if recordings

18  are needed, there should be a procedure in place, like a

19  court order or some procedure to make sure it's an

20  appropriate recording.  From -- as I recall, that was

21  the general sentiment among the examiners and the

22  directors.

23      Q.   Now, I want to ask you some questions about

24  the 730 team.  Now, Dr. Jain, did you play a part in the



1   creation of this team?

2        A.    No.

3        Q.    And just to make sure that I close everything

4   out as far as the -- I guess allegations regarding the

5   recordings.  At any point, is your, I guess, knowledge

6   about, you know, medical practice and licensure, did Dr.

7   Kaye ever either violate PHI or HIPAA during the course

8   of what you (indiscernible) surreptitiously recording

9   the inmate?

10        A.    You had your mouth covered for that last

11   part.  Sorry.

12        Q.    I said, at any point, did Dr. Kaye violate

13   PHI or HIPAA when she allegedly surreptitiously recorded

14   the inmate?

15        A.    So it's a complex answer because, again,

16   HIPAA is a very specific type of law.  And again, this

17   is an area of ethical concern of recording defendants

18   surreptitiously.  Whether it was proper violation of a

19   protected health information or HIPAA, that's a more

20   complex answer because we were not providing treatment

21   in the court clinics.  However, certain provisions of

22   HIPAA or protected health information may still apply to

23   us in the court clinics.  So it's a complex area, and

24   this is why I also sought consultation from my

1  supervisors, more input on how to handle these types of

2  matters.

3          Certainly, if there's, you know, those types

4  of recordings on a device that is not authorized or

5  proper procedures are not in place for that information,

6  then, you know, those are the specific matters worth

7  raising.  Again, I cannot conclude myself whether those

8  were violated.  However, the concerns were raised by it.

9      Q.   Were -- were those violations completely

10 referenced in the memorandum that was generated by, I

11 guess, management and then eventually signed by Dr.

12 Ford?

13     A.   I don't recall exactly what was referenced in

14 that document.

15         MS. HAGAN:  I was trying to keep it to the

16         last -- you know, will you permit me one last

17         document, Ms. Canfield?  I know we're well over

18         6:00.

19         MS. CANFIELD:  Yeah.  I -- I have just a

20         couple of questions myself, so if you could

21         expedite things.

22         MS. HAGAN:  Okay.  So what I'll do is I'll

23         show the memorandum from Dr. Ford, and that will

24         be my last exhibit.  Is that fair?



1          MS. CANFIELD:  Yeah.  I mean that was your

2      last exhibit.  I thought it was just going to be

3      five minutes of questioning.  It ended up being a

4      half hour.  So yeah.

5          MS. HAGAN:  He did read it, so I was trying

6      to be fair.

7          MS. CANFIELD:  He read it very quickly, but

8      okay.

9          MS. HAGAN:  Yeah.  Sure.

10

11          (Plaintiff's Exhibit 8, DOCUMENT BATES

12          STAMPED D_1489 and D_1490, was marked for

13          identification.)

14

15      Q.   At any point, was Dr. Brayton remediated

16  during her employment at the -- the court clinics?

17      A.   Dr. Brayton, I wouldn't use the term

18  "remediation."

19      Q.   What term would you use instead?

20      A.   As part of any new hire or anyone in the

21  clinic, we provided supervision, training, if they're

22  coming on board.  I would not characterize her as being

23  in remediation.

24      Q.   At any point, did you determine that Dr. --



1   did anyone ever complain about the quality of Dr.

2   Brayton's work?

3         A.    It was raised by Dr. Kaye.

4         Q.    Did -- besides Dr. Kaye, was anyone in the

5   legal community complaining about Dr. Brayton's work?

6         A.    So -- not specifics.  There was one meeting I

7   had with Mr. Bloom, Ms. McEvilley, Dr. Kaye, and Brayton

8   present, the five of us.  And there were some concerning

9   statements being said by Mr. Bloom and Ms. McEvilley in

10  front of Dr. Brayton about her and saying that she's in

11  remediation and bringing up vague concerns there, as I

12  recall.  But I thought that was very inappropriate also

13  to do that in front of Dr. Brayton.  I thought that that

14  reinforced for me that that was a tense environment, and

15  there was an intimidation factor there.  And so I was

16  concerned for Dr. Brayton at that point regarding the

17  way they were speaking of her.  So there was that

18  meeting.  Otherwise, I don't have awareness of specific

19  issues that Dr. Brayton was -- specific complaints

20  regarding Dr. Brayton or anything that would be --

21  anything unusual that stood out for me, just in the

22  typical course of doing evaluations.

23        Q.    So did anyone else besides Ms. McEvilley and

24  Mr. Bloom complain about Dr. Brayton, even if it wasn't



1  in front of her face?

2        A.    Again, I'm not recalling specific issues

3  regarding her.  Dr. Kaye would share, kind of general

4  things that people have complained about her, but it

5  wasn't clear to me exactly what those issues were.

6        Q.    So this is Plaintiff's Exhibit 8.  And it

7  bears the Bates stamp series D_1489 and D_1490.  I'm

8  sure you've come across both.  And you should see the

9  document at this point.  Now, it's the same memo.  But

10  one version has signed under protest; the other one

11  doesn't.  Would you prefer to read both, or would you

12  just like to read the one version of the document?

13  Well, they both have it signed under protest.  I'm not

14  sure what happened here.  Well, I have both policies,

15  that's why.  One is the audio recording, and the other

16  one's unprofessional conduct.  I would like to draw your

17  attention to the audio recording portion of the

18  document, if that's okay.

19        A.    Okay.  I think you're asking me, so --

20        Q.    Yes.  So you need -- do you need to read the

21  May 29th audio recording memo?

22        A.    Yes, if I may, just read it here.  Okay.  And

23  can you scroll down, please.  Thank you.

24              MS. CANFIELD:  The last paragraph.



```
 1              MS. HAGAN:  Okay.  Got it.

 2              THE WITNESS:  Okay.

 3       Q.    So before I ask you anything, I don't want to

 4  leave this open.  Did Dr. Winkler ever complain about

 5  Dr. Brayton's writing ability or style to you or anyone

 6  else?

 7       A.    I wouldn't say complaints.  But in the course

 8  of supervision and training, there were areas where we

 9  discussed, just like we would of any court clinic

10  examiner that we're providing supervision to, that there

11  are areas of improvement.

12       Q.    Would you say that Dr. Brayton was actually

13  qualified to administer forensic evaluations when she

14  was hired for that position?

15       A.    By statute, yes, she was qualified.

16       Q.    But I understand by statute, but by

17  competence.  Was she competent to actually perform

18  forensic evaluations in the context of a penological

19  intuition, such as the court clinics?

20              MS. CANFIELD:  Objection to form.  You can

21         answer.

22       A.    Yeah.  So she was competent to do those.  As

23  any new examiner or new hire, there was a time to get

24  her aware of the procedures and specific aspects of the
```



1  examination, but she had the core qualifications to do

2  the work.

3       Q.   Okay.  So now, I'm going to question you

4  about this, and then I'll turn everything over to

5  counsel.

6            Now, the first paragraph goes into saying

7  that this memorandum serves as a notice that you

8  inappropriately recorded a 730 competency evaluation

9  without authorization.  Now, your unauthorized recording

10 of private health information is in violation of CHS

11 custom and practice.  So I guess the first portion of it

12 was, a 730 competency evaluation without authorization.

13 Was it custom and practice for CHS to acquire any of the

14 evaluators to obtain authorization prior to, I guess,

15 recording anyone?

16           MS. CANFIELD:  Objection.  You can answer.

17      A.   Yes.  To the best of my knowledge, each court

18 clinic, if recordings came up, they would have a --

19 their own procedures in place to make sure that the

20 recording was done appropriately, whether it was getting

21 a court order or other procedures.  But this came up

22 very rarely.  And again, during my time, there was one

23 instance where there was a request for court -- for

24 recordings of the examination.



 1        Q.   Was -- is authorization required for a

 2   court-ordered exam?

 3        A.   I'm going to repeat the question, because I

 4   heard a beep there.  Is authorization required for

 5   court-ordered examinations?

 6        Q.   Yes.

 7        A.   So I would say depending on the context and

 8   the setting, generally speaking, yes.  In my experience,

 9   and with other forensic psychiatrists, prior to a

10   recording, they would often have some procedure in place

11   to make sure it's authorized.  So what recording device

12   is being used, is it appropriate for the -- the

13   retaining attorney or the court and depending on which

14   context they're working in, there might be other

15   requirements of that setting, their organization,

16   whichever service they're providing.  Their organization

17   would also have some procedure in place for

18   authorization.

19        Q.   Is that -- is your position supported by any

20   literature or precedent, Dr. Jain?

21        A.   So there's no specific -- regarding this

22   matter, again, there's AAPL guidance on this issue and

23   different guidelines, and it's very specific --

24        Q.   Which --



1       A.    Let me --

2       Q.    I'm asking which ones though, because you

3  never told me which one referenced this position that

4  you're alluding to.  What is the name of the publication

5  that you're referencing by AAPL?

6       A.    So there's two guidelines regarding

7  recordings that I came across through AAPL.

8       Q.    And they specifically say that authorization

9  is required before you record?

10      A.    That I don't recall what they specifically

11 say.  However, typical practice and my understanding

12 with many forensic examiners is that they would often

13 have some authorization for the recording.  And those

14 procedures can defer.  There isn't one specific

15 authorized procedure for the practice of recording, but

16 they outline some procedures in place.  And the one

17 consistent guidance I did find is that surreptitious

18 recordings should not be done.  So some procedure for

19 the proper recording of these examinations should be

20 done, whether it's through the attorney who's retaining

21 them, whether it's through the judge, whether it's

22 through the organization they're working for.  But no,

23 there isn't one specified procedure for that that I came

24 across.  There may be some out there, but this is based

1    on my review of the literature I came across, as well as

2    awareness, both as a former director of a forensic

3    psychiatry training program, as well as interacting with

4    multiple forensic examiners nationally.

5         Q.   So ultimately, that -- this is your opinion,

6    not necessarily any written custom; is that right?

7              MS. CANFIELD:  Objection.  You can answer.

8         A.   So each setting is different.

9         Q.   I guess I'm going to ask you, like for

10   example, the write-up goes on to say that Dr. Kaye

11   engaged in the unauthorized recording of private health

12   information.  Now, isn't that an allusion to PHI and/or

13   HIPAA in that sentence?

14        A.   Yeah.  Generally, it's referring to patient

15   confidentiality.  I don't know what specific law they're

16   referring to.

17        Q.   And in this instance, Dr. Kaye is not

18   treating any patients.  She's engaging inmates; am I

19   right?

20        A.   She is examining inmates for the purposes of

21   court evaluations.

22        Q.   Right.  So there's no treatment component to

23   what she does; am I right?

24        A.   You're correct, yes.



1       Q.   Okay.  So then as a provider of mental

2  health, substance abuse and general medical services,

3  CHS is protected by restrictive patient confidentiality

4  laws; right?  Now, that's just CHS generally.  But then

5  it goes on to say that violation of these

6  confidentiality laws may lead to civil and criminal

7  penalty as well as disciplinary actions through CHS.

8  Now, Dr. Jain, what's your concept of progressive

9  discipline?  I mean, to the extent that you know, what

10 are the various stages of progressive discipline?

11          MS. CANFIELD:  Objection.  You can answer.

12      A.   Yeah.  I don't know the specific stages.

13 When these matters come up, I would seek guidance from

14 HR regarding those.

15      Q.   Then -- then it goes on to say, "You are

16 hereby reminded that protecting the confidentiality of

17 our patients is a term and a condition of employment.

18 And it should be treated seriously by all staff in the

19 execution of your duties."  Now, Dr. Jain, where are the

20 patients that are being referred to in this memo?

21          MS. CANFIELD:  Objection.  You can answer if

22      you're able.

23      A.   I'm not sure if I'm able to answer that.

24      Q.   There are no patients involved in Dr. Kaye's



1    work; am I right?

2         A.    No.

3               MS. CANFIELD:  Objection.

4         A.    That's not right.

5         Q.    Dr. Kaye does not see patients; am I right?

6         A.    They are patients under CHS that are

7    receiving treatment under CHS.

8         Q.    But she is not treating them.  They're not

9    her patients; am I right?

10        A.    This is correct.  They are not her patients.

11        Q.    Okay.  So it would be more accurate that the

12   confidentiality of our inmates is a term and condition

13   of your employment, would that be right, more so than

14   patients in this context since Dr. Kaye evaluates

15   inmates?

16              MS. CANFIELD:  Objection as to form.  You can

17        answer.

18        A.    Yeah.  I'm not sure.  This is from CHS's

19   lens.  They're using the term "patients" in this

20   particular document.  When we refer to our relationship

21   with the evaluee or defendant, but again, this is a memo

22   from -- appears to be a memo from CHS.

23        Q.    It's from Dr. Ford.  That's what it says,

24   from Dr. Ford.



1      A.   Yes.  From Dr. Ford, and it's referencing

2 CHS.  So I think in that lens, they're choosing to use

3 the term "patients" as a broad term.

4      Q.   But in all likelihood, I should be even more

5 accurate and precise, it would be defendant not patient.

6 Wouldn't that be accurate?

7           MS. CANFIELD:  Objection.

8      A.   I'm not -- again, if I am doing the

9 examination, I would use the word "defendant" myself

10 because of my relationship.  But broadly speaking from

11 CHS, the term "patient" may be what they use in these

12 general descriptions.  So --

13      Q.   And -- I'm sorry.  I'm just trying to make

14 sure that I speed it up, so Ms. Canfield can have her

15 time.  I know everyone's tired.  So I just want to make

16 sure I'm being fair.

17           So the reason why I'm cutting you off is that

18 in this instance, these patients -- really Dr. Kaye was

19 never employed as a treating physician at CHS.  Would

20 that be accurate?

21      A.   I don't know if she was ever employed in that

22 position, but in the course of my time, she was a

23 forensic examiner.

24      Q.   And that means she had an evaluee/defendant



**ABHISHEK JAIN, M.D.**

1  relationship with -- with the defendants that were --

2  were evaluated; right?

3       A.   Yes.

4       Q.   Okay.  And then Dr. Kaye seemed to have been

5  made to execute a CHS confidentiality statement.  Now,

6  did this confidentiality statement exist before this

7  memo was issued to her?

8            MS. CANFIELD:  Objection to form.  You can

9       answer.

10      A.   Yeah.  I'm not sure if I can answer that.  I

11 don't know when that existed.

12      Q.   Did you participate in the drafting of the

13 confidentiality statement, Dr. Jain?

14      A.   I don't recall.

15      Q.   Okay.  And then the last thing I'm going to

16 ask, did you participate in the drafting of this

17 particular memo?

18      A.   I don't recall specifically my involvement

19 with this particular memo.

20      Q.   Did you agree that Dr. Kaye should have been

21 actually issued this memo based on her recording of the

22 examination?

23      A.   I was not posed with that particular

24 decision.  So I can't say if I agreed or disagreed.  I



1    certainly, as I outlined, saw some general concerns

2    regarding recordings in our court clinics and wanted to

3    make sure that we had a process regarding how to handle

4    that.  But I didn't have a specific opinion on whether

5    or not what the repercussions should be for Dr. Kaye.

6              MS. HAGAN:  Well, thank you, Dr. Jain.  That

7         is all I have.

8              MS. CANFIELD:  All right.  Just a couple of

9         quick questions.  And Ms. Hagan, if you could

10        please put Exhibit Number 7 back up, please, and

11        go to page 5.  I think it is page 5.

12             MS. HAGAN:  Here it is, yes.

13             MS. CANFIELD:  Can you scroll down.  I don't

14        know if this is a -- all right, page 6 then.

15

16   EXAMINATION

17   BY MS. CANFIELD:

18        Q.   I don't see it here.  But Dr. Jain, did you

19   see a part in this letter to the Board of Corrections

20   where Dr. Kaye alleged that -- that management at CHS

21   refused to staff the Bronx Clinic?

22             MS. HAGAN:  Objection as to form.  You can

23        answer.

24        A.   Yeah, I believe there was a section regarding



**ABHISHEK JAIN, M.D.**

1  staffing earlier.

2       Q.   I believe it's actually right here in the

3  bold under retaliation and gross mismanagement.  If you

4  could go back.  In bold it says, "I've been prevented

5  from doing my job because CHS has refused to staff the

6  Bronx Court Clinic, rendering the service

7  non-operational."

8            Did you and/or CHS make efforts to hire

9  examiners for the Bronx Court Clinic?

10           MS. HAGAN:  Objection as to form.

11      A.   I'm sorry.  Can you repeat the question,

12  please.

13      Q.   Did you and/or CHS management undertake any

14  efforts to hire examiners or staff the Bronx Clinic with

15  examiners?

16      A.   Yes.

17      Q.   Okay.  And did you have any difficulties in

18  hiring for the Bronx Clinic?

19      A.   Yes.

20           MS. HAGAN:  Objection.

21      Q.   Can you explain?

22           MS. HAGAN:  I'm going to have to ask that Dr.

23       Jain -- give me an opportunity to object and then

24       proceed with answering the question.  I also want



1       to note for the record that the last two questions

2       that were posed by counsel were preceded by

3       objections, so the record is clear.  You can

4       proceed.  I'm sorry.

5            MS. CANFIELD:  Do you mind reading back the

6       question.

7

8            (The requested testimony was read back.)

9

10      Q.   Can you explain, Dr. Jain?

11           MS. HAGAN:  And I'm objecting again as to its

12      form.

13      A.   Yes.  There were challenges in retaining and

14  recruiting staff for the Bronx Court Clinic.  As I

15  described, there was a tense environment.  There were

16  concerns raised to me by Dr. Brayton, Dr. Mullan as we

17  discussed previously.  Also concerns from other

18  directors, from other clinics regarding having their

19  examiners go to the Bronx as well to do examinations due

20  to the concerns that were occurring there in the Bronx

21  as well.

22      Q.   And again, I know you testified to some of

23  those concerns earlier, one being the tension.  And I

24  believe you testified between Dr. Kaye and perhaps some



1  of the attorneys at Legal Aid pressuring some of the

2  examiners.  Were there any other issues that were

3  expressed to you that contributed to that tension?

4          MS. HAGAN:  Objection as to form.  Leading.

5      A.    Yeah.  There were general issues such as

6  scheduling.  Dr. Kaye had a limited schedule of what

7  days she would do examinations, and oftentimes would

8  need to take time off from work.  So to have two

9  examiners -- I'm sorry, a co-examiner also line up with

10 her schedule.  That was one challenge.  There was also

11 resistance about working with certain examiners, as well

12 as other examiners expressing their concerns about

13 providing examinations in the Bronx Court Clinic, also,

14 because of that environment and interactions there in

15 the court clinic.  And so those tensions created some

16 difficulty in being able to have staff go to the Bronx

17 Court Clinic.

18         There were also a lot of -- a number of

19 aggressive emails from Mr. Bloom regarding the Bronx

20 Court Clinic that were known citywide.  And even at some

21 instances, our examiners, when they had interactions

22 with Mr. Bloom, they raised concerns, and again, an

23 adversarial process -- posture from him as well.  And so

24 there were concerns about interactions in the Bronx



1   Court Clinic, staffing there, having examinations

2   produced -- having examiners go there to do the

3   examinations and also hire individuals there due to

4   those concerns about retention and recruitment.  And you

5   know, again, one of the key things there was that Dr.

6   Brayton and Dr. Mullan, as they were leaving, they

7   described that situation to me.  So that further

8   reaffirmed some of the challenges there in the Bronx.

9        Q.    Okay.  And after the departure of Dr. Brayton

10  and Dr. Mullan, were you able to hire a replacement for

11  those two?

12        A.    As I recall, I don't know the exact timeline,

13  but I don't believe those two we had -- we were able to

14  hire for those two positions there.  I know we did hire

15  individuals in the Bronx at some point after their

16  departure.  I just don't recall the exact timeline.

17        Q.    Okay.  One last question.  Much earlier

18  today, you were asked by Dr. Kaye's counsel about any

19  adversarial tone or interactions with the other male

20  directors of the court clinics, specifically Dr. Winkler

21  and Dr. Mundy.  Counsel did not ask about the other

22  female director of the court defendant, and that would

23  be Dr. Owen.  In totality, would you describe your

24  relationship with Dr. Owen as being adversarial?



322                         **ABHISHEK JAIN, M.D.**

1       A.    No.

2       Q.    Okay.  Did you ever have disagreements with

3   Dr. Owen?

4       A.    I would say naturally as part of -- of when

5   the transition to CHS occurred, there were different

6   interactions from each of the directors regarding

7   policies, regarding their opinions, and at times

8   disagreement with certain policies, and that would take

9   them into account as I would each of the directors.  So

10  in that context, yeah, there were sometimes where I

11  would say there were professional discussions,

12  professional disagreements.  But on balance, the

13  totality of my interactions with the other directors, I

14  would not classify as adversarial.  I would classify

15  those as more collegial in the efforts to work together.

16      Q.    Okay.  And is that something you found

17  lacking in Dr. Kaye?

18      A.    Yes.  That was a significant area of

19  challenge for me.

20          MS. CANFIELD:  All right.  I have no other

21      questions.  Thank you, Dr. Jain.

22          MS. HAGAN:  I would like to follow up with a

23      few questions.  I promise.  No more documents.

24  FURTHER EXAMINATION



BY MS. HAGAN:

    Q.   I just have a question about your feelings
towards Dr. Kaye.  First off, did you like Dr. Kaye as a
person, Dr. Jain?

    A.   I had no problems with individuals.  I was
very open to interacting and having a collaborative
collegial relationship with each of the directors and
each of staff.  I made efforts towards that.

    Q.   That's not what I asked you.  I asked if you
liked her as a person.

         MS. CANFIELD:  Objection.  You can answer.

    A.   As an individual, I had no personal issue
with her.

    Q.   This is despite the fact that she allegedly
stole your notes; is that right?

    A.   I had concerns about my interactions with
her.  I was also supportive of concerns that she raised.
But -- so I made efforts to try to have those types of
positive interactions with her and try to mend a working
relationship despite some of those key concerns that
were coming up there.

    Q.   Did you ever -- what did you think of Dr.
Kaye as a professional?

    A.   As a professional, I think there's multiple



1   layers of that.  I think there were aspects such as I

2   highly valued her experience in the court clinic, highly

3   valued -- in effect, we were often in line regarding

4   some of the basic tenets of forensic psychiatry and the

5   procedures of forensic psychiatry.  So I valued her

6   professional views regarding that.  However, I had

7   concerns about the professional interactions both with

8   myself and others, as I have described throughout the

9   day today.  So I would separate out her professionalism,

10  the quality of her work versus her professional

11  interactions with individuals.

12         Q.   And you described having a cordial, if not, I

13  guess, collaborative relationship with Dr. Owen.  Did

14  Dr. Owen ever file any complaints of discrimination

15  against you and/or CHS during the time you worked there?

16         A.   Not that I'm aware, no.

17         Q.   Did Dr. Owen ever complain about her

18  compensation during the time that she worked there?

19         A.   Not that I recall.

20         Q.   Did she ever complain about staffing at the

21  Queens Court Clinic during the time that you worked

22  there?

23         A.   At times, yes.

24         Q.   Did she complain that she was understaffed at



1   the Queens Court Clinic?

2         A.   There were some openings that we were trying

3   to fill in the court clinics, especially early on,

4   including Queens.  So, yes, there were discussions about

5   staffing.

6         Q.   Isn't it true that the Queens Court Clinic

7   had the most staff of all the centers?

8         A.   That's not true.

9         Q.   Did Manhattan have more staff than the Queens

10  center?

11        A.   I believe Manhattan had more staff than

12  Queens.

13        Q.   And that was headed by Dr. Mundy; wasn't that

14  -- wasn't that right?

15        A.   That's correct, yes.

16        Q.   And Dr. Owen, you never had any problems with

17  Dr. Owen during the course of her employment; is that

18  right?

19        A.   Again, as I've stated earlier, I wouldn't

20  classify them as problems.  I would work with each of

21  the directors.  At times, they would raise concerns and

22  issues.  We would try and process them and address them

23  together.  So I considered them as healthy discussions,

24  disagreements, professionally.  But I did not have what



1   I would call necessarily -- you know, I don't know what

2   exactly problems is referring to, but you know, if those

3   issues came up professionally, we would try to resolve

4   them with each of the directors, male and female.

5       Q.   So what distinguishes a healthy discussion

6   with a colleague and an adversarial dynamic with a

7   colleague?

8       A.   So a number of things.  If there's a question

9   about a policy or procedure or substantive issues

10  regarding our work, I think those are healthy.  To start

11  going and taking someone's notes out of the chart, to

12  start having a environment that is intimidating, having

13  difficulty with staff being able to approach you, I

14  would say that that starts crossing the line.  I'm

15  reminded also of one interaction where I was trying to

16  understand Dr. Kaye's circumstance.  And she made the

17  comment that I don't have children, referring to me.

18  And I don't know what she's going through, and my wife

19  might know what I'm going through.  And I thought that

20  crossed the line, bringing my -- - me, my wife, anything

21  personal about my children or not having children.  I

22  thought that was another example of something where it

23  was just crossing the line and becoming adversarial

24  rather than trying to be collegial and trying to work



1    through this professionally.

2         Q.    Didn't Dr. Kaye mention your wife because

3    your wife is a child psychiatrist?

4              MS. CANFIELD:  Objection as to form.  You can

5         answer if you want.  I mean, not if you want.  I

6         mean if you're able.

7         A.    I don't know why she mentioned my wife.  I

8    don't know what her --

9         Q.    Is your wife a child psychiatrist?

10        A.    I'm sorry?

11        Q.    Is your wife a child psychiatrist?

12        A.    She is a child psychiatrist, yes.

13        Q.    And isn't Dr. Kaye board-certified in youth

14   and adolescent psychiatry herself?

15        A.    I believe so, yes.

16        Q.    Okay.  And you keep mentioning the situation

17   with your notes.  But you haven't been able to prove

18   that it was, in fact, Dr. Kaye that took those notes; am

19   I right?

20             MS. CANFIELD:  Objection.  You can respond.

21        A.    I believe I answered this.

22        Q.    Let me rephrase my question, so I can get a

23   more precise answer.  Did you see Dr. Kaye remove the

24   notes from your files yourself?



328                       ABHISHEK JAIN, M.D.

```
 1        A.    No.
 2        Q.    Okay.  And as far as the questions that Dr.
 3   Kaye was responding to, was there ever a time that Dr.
 4   Kaye ever told you that she was not going to respond to
 5   your question, or she did not want to respond to your
 6   question?
 7        A.    Which question?
 8        Q.    Any question.  As her supervisor, do you
 9   recall --
10        A.    Yes.  As I outlined earlier, she said that
11   she did not want to meet with me.  I was told that by
12   others.
13        Q.    Did Dr. Kaye tell you herself --
14        A.    She --
15        Q.    -- I don't want to meet with you, Dr. Jain --
16        A.    No.
17        Q.    -- for any reason?
18              MS. CANFIELD:  Let him respond, please.
19        A.    So she questioned why I wanted to meet with
20   her and --
21        Q.    Did she say I don't want to meet with you?
22              MS. CANFIELD:  Let him respond, please.
23        A.    I'd like to finish.
24        Q.    Okay.  Sure.
```



```
 1        A.   So she told me -- she questioned why I wanted
 2   to meet with her.  And then when I was informed by
 3   others that -- as we had talked about, that she told him
 4   that she did not want to meet with me alone.  Based on
 5   that pattern, based on those discussions, and
 6   furthermore based on my discussions with Dr. Ford, it
 7   was determined that yes, it's not reasonable to try to
 8   -- try to address that directly myself because of those
 9   concerns.  It was not a situation where I felt
10   comfortable being able to ask her those types of
11   questions, especially with the context that I've
12   described throughout the day for myself and as well as
13   other staff of being targeted, of having that type of
14   hostile, tense environment.  All those things suggested
15   that having those types of discussions would be very
16   challenging with her.
17        Q.   But at the end of the day, were your notes
18   ever found, Dr. Jain?
19        A.   That I'm not aware of.
20        Q.   So your notes went missing in perpetuity
21   after Dr. Kaye allegedly stole them from the file?
22        A.   I am not sure.  I don't recall what occurred
23   after I reported them.  I discussed them with Dr. Ford.
24   I don't know what happened to them afterwards.  I don't
```



330                          **ABHISHEK JAIN, M.D.**

1   recall.

2              MS. HAGAN:  That's all that I have.  Thank

3       you, Dr. Jain, for your time.  Thank you for

4       dealing and bearing with us today.

5              MS. CANFIELD:  Yes.  Thank you for your time.

6              THE REPORTER:  Okay.  Ms. Canfield --

7              MS. CANFIELD:  Yes.

8              THE REPORTER:  -- are you ordering a copy?

9              MS. CANFIELD:  Yes.

10

11

12             (Time noted:  7:11 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24



```
 1    STATE OF NEW YORK          )

 2                              )   ss:

 3    COUNTY OF                  )

 4

 5         I, ABHISHEK JAIN, M.D., hereby certify

 6    that I have read the pages of the foregoing

 7    testimony of this deposition and hereby

 8    certify it to be a true and correct record.

 9

10

11                         _____

12                         ABHISHEK JAIN, M.D.

13

14

15    Sworn to before me this

16    ____day of _____, 2021.

17    _____

18         Notary Public

19

20

21

22

23

24
```



332

```
1                    I   N   D   E   X

2

3      EXAMINATION                        5

4      BY MS. HAGAN:

5      EXAMINATION BY                     317

6      MS. CANFIELD:

7      FURTHER EXAMINATION                322

8      BY MS. HAGAN:

9

10      (Plaintiff's Exhibit 1, DOCUMENT    77

11      BATES STAMPED NYC_671 through 672,

12      was marked for identification.)

13      (Plaintiff's Exhibit 2, DOCUMENT    85

14      BATES STAMPED NYC_235 to 237, was

15      marked for identification.)

16      (Plaintiff's Exhibit 3, DOCUMENT    94

17      BATES STAMPED Kaye3rdProduction_50,

18      was marked for identification.)

19      (Plaintiff's Exhibit 4, DOCUMENT    99

20      BATES STAMPED NYC_281 through

21      NYC_283, was marked for

22      identification.)

23                                         149

24
```



800.DAL.8779
dalcoreporting.com

```
1       (Plaintiff's Exhibit 5, DOCUMENT
2       BATES STAMPED NYC_2014, was marked
3       for identification.)
4       (Plaintiff's Exhibit 6, DOCUMENT      177
5       BATES STAMPED NYC_3947 THROUGH
6       NYC_3957, was marked for
7       identification.)
8       (Plaintiff's Exhibit 7, BOARD OF      287
9       CORRECTION AND INSPECTOR GENERAL
10      COMPLAINT PLAINTIFF FILED ON
11      JANUARY 7TH, 2020, was marked for
12      identification.)
13      (Plaintiff's Exhibit 8, DOCUMENT      305
14      BATES STAMPED D_1489 and D_1490,
15      was marked for identification.)
16
17      DOCUMENT/INFORMATION REQUESTED:       34
18      DOCUMENT/INFORMATION REQUESTED:       138
19
20
21
22
23   (EXHIBITS RETAINED BY MS. HAGAN)
24
```



334

```
1              C E R T I F I C A T I O N
2    STATE OF NEW YORK          )
3                               )   ss:
4    COUNTY OF WESTCHESTER   )
5              I, MARCI LOREN DUSTIN, Court
6    Reporter and Notary Public within and for the
7    County of Westchester, State of New York, do
8    hereby certify:
9                That I reported the proceedings
10   that are hereinbefore set forth, and that such
11   transcript is a true and accurate record of
12   said proceedings.
13                AND, I further certify that I am
14   not related to any of the parties to this
15   action by blood or marriage, and that I am in
16   no way interested in the outcome of this
17   matter.
18                IN WITNESS WHEREOF, I have
19   hereunto set my hand.
20
21
22
23             MARCI LOREN DUSTIN
24                Court Reporter
```



1              ERRATA  SHEET

2  Deposition of: ABHISHEK JAIN, M.D.

3  Re: MELISSA KAYE vs. HEALTH AND HOSPITALS CORPORATION, et al.

4  Date Taken: October 4, 2021

5  Page          Line #          Correction   Reason

6  _____      _____      _____

7  _____      _____      _____

8  _____      _____      _____

9  _____      _____      _____

10 _____      _____      _____

11 _____      _____      _____

12 _____      _____      _____

13 _____      _____      _____

14 _____      _____      _____

15 _____      _____      _____

16 _____      _____      _____

17

18                       _____

19                             (Signature)

20 Sworn to before me this

21 __day of_____, 2021.

22 _____

23       Notary Public

24



800.DAL.8779
dalcoreporting.com

This Page Intentionally Left Blank

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

ABHISHEK JAIN, M.D.
October 4, 2021

**$**

**$200,000 (1)**
202:3

**[**

**[ph] (1)**
169:12

**A**

**AAPL (13)**
295:22;296:10,10,
17,23;297:11;
300:22;301:4,8,12;
310:22;311:5,7

**A-A-P-L (1)**
295:23

**aback (1)**
108:20

**Abhishek (3)**
4:4,19,22

**ability (13)**
6:5;59:17;63:7,8;
77:6;153:11;216:6;
223:23;229:19;
233:9,13;297:6;
308:5

**able (68)**
8:9;23:6,18;24:3,
11;25:2;26:10;27:4;
28:16;29:7;35:3,15,
16,24;38:23;40:11;
47:6;57:5;62:13;
72:2,9;77:4,8;83:20;
118:15;120:9;122:8;
124:15;128:15;
132:1,3,22;134:4;
139:3;141:17;142:8;
156:20;167:12;
169:15;184:3;194:4;
200:19,22;204:19;
205:3,23;211:6,15;
217:12;226:21;
235:14;241:5;242:8;
244:6;246:1;256:7;
262:4;274:7;282:20;
313:22,23;320:16;
321:10,13;326:13;
327:6,17;329:10

**above (1)**
180:12

**absence (2)**
55:18,21

**absorbed (1)**
48:19

**abuse (2)**

**25:4;313:2**

**academic (3)**
301:10,10,16

**Academy (1)**
301:11

**acc (1)**
81:7

**acceptable (1)**
131:14

**accepted (1)**
131:14

**access (6)**
79:1;174:24;175:3,
5,10,16

**accessed (1)**
252:22

**accommodate (10)**
124:22;129:10;
141:18,18;204:14;
206:18;209:5,15;
210:16;225:18

**accommodated (2)**
210:3;234:18

**accommodation (10)**
210:19,24;212:17;
224:8,16,22;225:1,5,
12,16

**accommodations (3)**
171:21;211:7;
213:10

**accomplish (1)**
244:7

**accomplished (1)**
244:12

**accomplishment (1)**
61:4

**accordingly (2)**
6:22;225:18

**account (2)**
299:8;322:9

**accounts (2)**
269:13,22

**accuracy (2)**
20:1;149:10

**accurate (19)**
46:18;63:20;80:21;
81:8;125:11;136:1;
137:13;155:23;
157:22;175:23;
177:2;182:3;202:19;
228:16;269:21;
314:11;315:5,6,20

**accurately (2)**
59:21;180:8

**accusation (4)**
56:1;202:18;233:5;
275:21

**accusations (5)**
108:22;233:1,3,7,

**17**

**accusatory (1)**
269:6

**accuse (4)**
52:7;174:9,12,20

**accused (6)**
55:24;105:5,17;
173:4;216:18;294:22

**accusing (1)**
274:22

**acknowledged (3)**
49:14;116:11;
171:14

**acquire (1)**
309:13

**across (19)**
19:19;21:7;60:12;
62:15;89:7;94:9;
98:19;140:18;
146:24;163:19,22;
181:18;253:21;
289:9;295:17;307:8;
311:7,24;312:1

**action (2)**
4:20;197:24

**actions (2)**
282:24;313:7

**actively (1)**
44:2

**actual (8)**
5:7;89:5;94:23;
98:23;213:23;
226:11;243:19;
246:24

**actually (41)**
5:5;39:9;52:17;
65:9;68:16;86:6;
91:12;96:20;100:6;
101:24;102:15;
110:7;112:11;123:6;
130:12;133:10;
136:17;140:23;
150:7;157:13;162:4;
164:10;181:7;
210:23;214:11;
214:15;234:11;
261:14;270:17;
275:5;276:16;278:3,
19;284:17,18;
288:22;289:18;
308:12,17;316:21;
318:2

**ADA (1)**
63:4

**add (2)**
162:23;220:24

**addition (3)**
18:11;46:10;
168:15

**additional (7)**
12:8;46:2;51:4,5;
62:1;65:8,15

**address (13)**
4:24;49:19;50:7;
104:1,4;139:18;
155:22;266:15;
287:6,11;291:9;
325:22;329:8

**addressed (19)**
76:7,8;80:15;
85:23;97:6;101:12;
216:7;229:15;231:7;
232:4,11,15,16;
233:6,22;237:13,16;
248:6;291:6

**addressing (3)**
136:7;266:2;
267:21

**adhere (2)**
16:23;173:15

**adjectives (2)**
148:17,22

**administer (2)**
3:13;308:13

**administered (5)**
4:10;18:16,18;
63:17;234:8

**administering (1)**
62:2

**administers (1)**
250:19

**administration (3)**
21:12;139:15;
290:8

**administrative (7)**
87:8;117:3;134:23;
137:11;139:10;
182:6;208:7

**administrator (1)**
76:20

**admonishments (1)**
5:14

**adolescent (4)**
43:14;203:16,16;
327:14

**advance (2)**
196:22;199:13

**adversarial (64)**
71:22;72:6;77:7;
81:23;83:15,16;
104:23;105:13;
106:1,11,17,23;
109:1;110:2,7,10,12,
15;115:21;131:22;
132:5,7,13,21;133:1,
2;147:12,20;148:4,7;
172:16;177:3,5,6;
182:12,13,24;183:2,

**15,16;216:10;**
**217:24;218:20;**
**229:24;230:3,4,7,16,**
**17;256:1,11,13,13,**
**15;257:5;285:12,24;**
**286:4;320:23;**
**321:19,24;322:14;**
**326:6,23**

**adversary (1)**
199:8

**advice (2)**
82:8;94:7

**advise (1)**
267:13

**advised (5)**
72:17;180:5;205:4;
216:4,20

**advisement (7)**
34:5;71:22;73:20;
138:9;150:21;
183:11;216:16

**advocate (1)**
164:16

**advocated (1)**
28:5

**affected (1)**
168:1

**affirmative (1)**
97:13

**afforded (2)**
228:13;229:6

**afield (1)**
176:9

**afternoon (3)**
195:4,5;200:24

**afterwards (3)**
16:17;31:17;
329:24

**again (79)**
20:18;23:14;24:1;
25:23;26:7;27:20;
45:21;49:4;51:5;
53:6,16,21;55:3;59:5,
15;60:8;69:20;73:14;
74:24;89:16,17;94:2;
98:9;100:17;130:15;
140:8,9;141:14;
158:7;164:23;169:3;
174:8;179:13;
180:18;182:7;
191:13;192:17;
193:16,22;196:7,23;
205:11;213:11;
214:5;220:19;222:5;
229:23;231:24;
234:17;236:7;237:4;
252:1;254:9;255:11;
258:7,12;260:3,15;
268:23;284:21;

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 338 of 374

ABHISHEK JAIN, M.D.                                                    MELISSA KAYE v.
October 4, 2021                              HEALTH AND HOSPITALS CORPORATION, et al.

285:10,10;290:24;
291:10;298:10;
300:3;303:15,16;
304:7;307:2;309:22;
310:22;314:21;
315:8;319:11,22;
320:22;321:5;325:19
**against (16)**
4:5;34:16,18;53:5;
63:8;72:14;117:7;
118:9;194:1;230:24;
256:5;281:23;284:9;
286:20;299:10;
324:15
**agencies (1)**
248:24
**agency (10)**
9:4,9;222:20;
245:9,10,17;248:18;
249:6,9,23
**agenda (7)**
107:6,11,23;108:3,
7;242:23;243:6
**aggressive (2)**
274:22;320:19
**aggressively (1)**
108:18
**ago (1)**
136:22
**agree (22)**
4:14;27:8;28:6;
29:4;45:18,18;67:17;
103:5;116:2;141:2,6,
12;161:13;205:16;
240:10;260:10;
263:3;277:21;
281:22;290:6;294:8;
316:20
**AGREED (17)**
3:1,6,11;22:4;
71:13;88:19;89:21;
90:2;112:7,13;
115:10,23;116:6;
131:13;196:5;
248:12;316:24
**agreement (12)**
115:16,17;129:10;
170:3,17,19;173:16,
22;174:4;211:19;
262:10,13
**agreements (2)**
99:14;170:1
**ahead (21)**
57:22;119:18;
137:6;143:12;147:7;
148:2;163:11;170:6,
10,13;176:18;188:3;
189:9,16;203:18;
204:6;213:10;

224:19;229:9;
268:22;290:21
**Aid (20)**
44:17,20;45:1,8,
10;47:2;209:12;
219:24;220:3,10,19,
22;221:1,6,9,14;
222:7,23;238:3;
320:1
**akin (1)**
300:22
**al (1)**
4:6
**Alex (5)**
15:2;245:21;246:5,
20;247:3
**allegation (2)**
119:5;282:8
**allegations (6)**
232:18,19;233:11;
287:7,9;303:4
**allege (1)**
270:5
**alleged (6)**
75:11;137:2;
173:15;238:16;
285:12;317:20
**allegedly (10)**
55:16;57:10;71:2;
74:2;183:22;280:15;
294:21;303:13;
323:14;329:21
**alleges (11)**
28:3;29:2;45:16;
57:13;161:9;205:13;
262:23;270:11;
271:14;280:2;292:3
**alleging (1)**
261:1
**allow (4)**
89:13;150:22;
192:1;268:20
**allowed (1)**
212:2
**allowing (1)**
195:10
**alluded (1)**
239:24
**alluding (1)**
311:4
**allusion (2)**
299:15;312:12
**almost (3)**
118:14,14;195:18
**alone (20)**
71:18;72:24;73:7,
9;74:22;75:4;76:4;
78:19,22;79:15,18,
23;82:2,11,16,21;

83:3;148:20;216:14;
329:4
**along (13)**
49:7;71:20;92:9;
132:2;200:11;226:7,
8,9;250:3;251:6;
260:8,15;262:2
**alternative (2)**
211:13;213:6
**although (1)**
158:23
**always (8)**
27:8,14;80:21;
93:6;118:18;166:9;
168:12;244:6
**Amanda (3)**
85:23;86:13;93:16
**Amendment (3)**
227:16,22;228:16
**amendments (4)**
228:1,2,17,21
**American (1)**
301:11
**among (7)**
29:12;66:8;139:9,
9;145:8;302:16,21
**amongst (4)**
67:24;68:1;159:6;
225:23
**amount (3)**
7:2;80:22;136:16
**Anansa's (1)**
180:24
**and/or (9)**
139:13,21;197:3;
207:2;297:5;312:12;
318:8,13;324:15
**Andrea (5)**
87:10,12;93:5,13;
134:24
**annual (8)**
34:13;179:9;194:5;
204:5,11;205:5;
215:3;278:7
**annually (2)**
31:11;34:1
**anonymous (4)**
231:2,6,16;233:4
**answered (19)**
23:14;25:10;26:7;
27:20;55:3,4;69:20;
74:15;89:16;97:13;
98:9;130:15;213:22;
214:5;232:8;252:1;
255:11;258:12;
327:21
**anticipate (1)**
133:13
**anticipating (1)**

69:4
**anyways (1)**
295:11
**apologies (1)**
102:2
**apologize (1)**
270:3
**appears (4)**
178:12,15;195:7;
314:22
**Applebaum (1)**
13:15
**application (6)**
54:7;211:2;213:15,
19,23,24
**applied (1)**
282:11
**apply (3)**
55:12;251:13;
303:22
**applying (1)**
283:1
**appointed (2)**
45:9;253:5
**appreciate (2)**
91:20;153:11
**appreciated (1)**
171:14
**appreciates (1)**
248:15
**approach (7)**
22:12,19;120:19;
132:14;183:10;
289:21;326:13
**approached (6)**
74:21;160:15;
289:14,18,20,20
**appropriate (36)**
26:10;49:15,19;
50:18;63:12;67:7;
83:14;97:4;103:15,
18;104:3;111:13,16,
17,18;112:20;
130:18;181:3,5;
233:20;234:20;
248:7,9,12;252:9,22;
262:5,15,20,21;
263:13;265:13;
267:15;297:1;
302:20;310:12
**appropriately (7)**
21:23;25:15;50:17;
69:7;122:9;126:4;
309:20
**appropriateness (1)**
252:17
**approve (1)**
179:8
**approved (1)**

224:12
**approving (2)**
179:11,17
**approximate (1)**
7:6
**April (14)**
13:11;30:10;38:8;
45:17,22;46:8;47:23;
48:10;81:5;106:5,14,
21;179:2,4
**area (7)**
24:22;44:3;58:15;
158:5;303:17,23;
322:18
**areas (8)**
43:2,22;101:14;
158:9;296:22;
298:24;308:8,11
**argue (1)**
269:16
**argument (3)**
106:4,7;259:16
**arguments (1)**
258:19
**arose (2)**
36:15;130:17
**around (36)**
30:18;31:17;52:13;
68:11;71:16,17;84:6;
143:7,8;162:3;
174:18;203:19;
205:21;207:8;
214:16;217:6;220:1,
22;225:22;231:2;
234:15,18,22;237:6;
243:3;244:10,17;
249:16,20;273:5;
277:14,14,15;278:6,
9;286:19
**arrive (1)**
82:7
**arrived (2)**
89:3;119:11
**aspect (2)**
139:17;297:14
**aspects (2)**
308:24;324:1
**assert (1)**
233:11
**assertion (4)**
28:13;29:20;57:18;
205:17
**assertions (1)**
29:6
**assessed (1)**
123:6
**assessment (5)**
214:8;246:22;
247:8,15;269:21

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 339 of 374
MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.
ABHISHEK JAIN, M.D.
October 4, 2021

**assessments (4)**
246:8,9,13;299:6
**assigned (5)**
64:4;129:5;130:12;
181:1,2
**assist (5)**
62:4;63:8;99:17;
105:14;179:7
**assistance (3)**
180:15;239:24;
240:1
**assistant (2)**
12:18;45:4
**associate (2)**
12:20;78:3
**associated (1)**
300:24
**assume (2)**
6:21;47:12
**Assumes (5)**
109:4;148:12;
173:24;213:9;224:10
**assuming (1)**
229:15
**atmosphere (2)**
120:13;125:10
**attacks (1)**
233:9
**attempts (2)**
105:3;235:22
**attend (4)**
37:13;235:13;
277:19;301:8
**attended (2)**
37:1,10
**attention (41)**
13:13;57:1;67:9;
68:10,17;75:3;85:21;
95:24;98:22;99:19;
101:15;103:14;
113:23;124:16;
171:12,15;184:5;
185:9,18;201:19;
203:4;207:10;
215:23;228:13;
231:6,18,20,21;
232:4,6,13;233:7,23;
237:17;248:3;
253:16;254:10;
281:1;283:22;
288:18;307:17
**attorney (21)**
4:13;45:9;63:4;
67:21;73:13,13;75:6,
9,13;76:5;78:22;
79:15;80:1,4;114:10;
210:2;220:19;295:7;
300:10;310:13;
311:20

**attorney-client (1)**
158:4
**attorneys (22)**
3:2;25:17;45:4,4;
47:2;75:14;123:18;
128:5;135:22;145:7;
147:13;209:12;
219:9,17,20,22;
220:11,24;221:6,9;
222:8;320:1
**audio (3)**
307:15,17,21
**August (6)**
168:6;202:8;203:5,
5,6,14
**authority (1)**
4:13
**authorization (8)**
309:9,12,14;310:1,
4,18;311:8,13
**authorized (5)**
3:13;295:10;304:4;
310:11;311:15
**automatically (1)**
262:7
**availability (3)**
205:22;206:18;
235:9
**available (8)**
13:16;47:1;64:16,
18;68:17;129:21;
130:1;220:12
**Avenue (2)**
5:1;284:8
**average (2)**
243:1,7
**avoid (4)**
21:5;217:1;245:18;
249:4
**avoided (1)**
82:12
**aware (70)**
14:21;15:23;21:13;
40:22;41:2,4,9,14;
50:14,15;58:20;68:3,
4;83:17,21;84:20,23;
87:1;101:11,14;
129:9;135:11,11;
139:15;142:5;
157:16;160:16,18;
172:5;174:6;223:3,8,
9;224:7,12;225:9;
231:4,5,12;232:15,
23;235:12;237:4,23;
242:18;253:19;
254:17;266:23,24;
277:19;280:4,7,10;
281:13;283:18;
284:1,19;286:11;

289:16,23,24;298:13;
300:1,3,3,8,12;
308:24;324:16;
329:19
**awareness (2)**
306:18;312:2
**away (3)**
52:24;56:11;
164:11

**B**

**back (31)**
8:14;11:19;43:15;
58:5;73:22;77:20;
78:17,18;81:4;
101:16,17;114:12;
121:17;133:9,11;
161:2;185:13;187:8,
21;191:11;210:5;
223:10;229:23;
244:2;256:19;
277:12;284:21;
317:10;318:4;319:5,
8
**backdated (1)**
249:10
**background (3)**
40:15,16;42:10
**backlog (9)**
135:23;136:24;
137:10;272:23;
273:4,10,13,16;
276:19
**backlogs (1)**
276:13
**backtrack (2)**
124:9;290:11
**balance (8)**
24:16;158:24;
159:4,22;160:7;
194:1;246:1;322:12
**balances (1)**
193:18
**Barber-Rioja (2)**
32:19;33:6
**bargaining (4)**
170:3;173:16,22;
174:3
**Based (21)**
62:22;63:6;82:9,
12;83:12;175:12;
222:2,4,7;225:16;
253:14;254:16;
258:22,23;260:7;
297:11;311:24;
316:21;329:4,5,6
**basic (3)**
6:7;7:15;324:4

**basically (15)**
24:21;39:11;45:16;
54:17;76:3;86:2;
135:7;169:4,5,13;
233:11;236:4;263:8;
271:2;296:10
**basis (2)**
81:20;98:1;179:10,
11
**BATES (17)**
77:12,21;85:14,19;
94:15,17;99:22;
100:2;149:18;
177:11,16;196:2;
197:7;287:16,18;
305:11;307:7
**bathroom (1)**
58:4
**BCC (1)**
93:5
**bearing (1)**
330:4
**bears (6)**
77:21;85:19;94:15;
100:2;177:16;307:7
**became (5)**
30:19;32:7;50:15;
83:17;105:23
**become (3)**
72:5,5;81:14
**becomes (1)**
251:10
**becoming (1)**
326:23
**beep (2)**
264:2;310:4
**Beesh (3)**
180:20,23,23
**beforehand (2)**
15:5;249:6
**beg (1)**
196:10
**began (1)**
161:12
**begin (2)**
179:3;255:4
**beginning (15)**
11:10;30:16;33:9;
36:19,23;39:8;114:4;
138:6;191:13;
223:22;239:16,18;
285:19;293:6,12
**behalf (6)**
4:16,18;35:21,21;
162:5;202:17
**behest (1)**
295:21
**behind (1)**
119:8

**believes (1)**
27:21
**Belkin (6)**
95:3,3,5,10;96:17,
23
**Bellevue (19)**
60:23;62:5;96:6;
99:15;162:2,10,12;
168:9,11,17;169:4,9,
10
**benefit (1)**
61:13
**benefits (3)**
154:13,21;155:6
**besides (8)**
39:3;90:4;143:16;
169:20;256:20,20;
306:4,23
**best (17)**
7:12;11:6;25:11,
11;36:14;113:2;
116:13;121:21;
141:18;175:15;
199:23;214:21;
216:5;218:3;236:19;
289:8;309:17
**better (4)**
71:24;124:3;
170:12;190:9
**beverages (1)**
6:4
**bias (2)**
119:14,22
**bit (10)**
11:19;79:16;99:7;
150:7;155:3;179:4;
240:3;242:21;249:8;
251:22
**blacked (1)**
25:6
**blackout (1)**
158:5
**blanket (1)**
269:6
**blocked (2)**
158:1;206:1
**Bloom (35)**
117:20,21;118:12;
120:12,17;121:1;
122:2;124:8;127:21;
128:2;137:16;
142:22;143:4,6,6,17;
145:20;222:1;
247:17,23;249:2,11,
16;268:14;269:3;
273:4;274:15,21;
275:17;276:17;
306:7,9,24;320:19,22
**Bloom's (3)**

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 340 of 374

ABHISHEK JAIN, M.D.                                                          MELISSA KAYE v.
October 4, 2021                                      HEALTH AND HOSPITALS CORPORATION, et al.

142:23;222:8;
248:5
**board (26)**
42:16,23;43:1,5,20,
22;44:2;54:10;
105:16;113:9;
140:18;146:24;
152:6;163:19,23;
203:16;245:3;
286:12,13,19;287:19,
22;288:7;289:14;
305:22;317:19
**board-certified (1)**
327:13
**Bob (1)**
220:18
**bold (2)**
318:3,4
**bonus (1)**
281:14
**book (1)**
186:5
**borough (9)**
24:7;45:6;113:15;
153:23;154:5,6,7;
271:9,12
**boroughs (7)**
16:2;45:9;46:11;
221:1;244:4,6;
300:15
**both (41)**
8:22;16:19;19:16;
22:19;28:23,24;29:1;
67:15;75:16;90:11;
116:6;120:22;122:6,
23;124:7;128:14;
129:23;130:6;131:9,
10;134:12;146:3;
147:24;159:22;
160:8;181:23;
183:11;198:1;
199:23;200:23;
211:18;241:1;
246:21;296:23;
301:14;307:8,11,13,
14;312:2;324:7
**bottom (7)**
63:5;78:6;86:5,15;
100:20,20;160:4
**bound (2)**
250:12,20
**boy (1)**
150:9
**Brayton (63)**
39:5,17,19;40:8,
14;45:15;65:22;66:3,
6;117:1;120:22;
124:2;125:9,14,15,
17,20,24;126:6,8,9;

127:3;128:8,13,18;
129:6,13,14,17,22,
23;130:1,6;131:1,10,
22;132:8;144:24;
182:11,13,15;207:13,
14;245:23;247:19;
253:4,17,20,23;
254:4;305:15,17;
306:7,10,13,16,19,20,
24;308:12;319:16;
321:6,9
**Brayton's (15)**
127:15,19,23;
129:1,9;130:11;
132:15;138:11;
178:10,13,16;181:6;
306:2,5;308:5
**break (8)**
58:5;133:6,8,16;
142:10;152:1;188:2;
302:9
**breakfast (1)**
201:9
**brief (1)**
76:22
**briefly (1)**
70:24
**bring (5)**
85:20;99:18;
103:14;185:9;187:4
**bringing (3)**
151:21;306:11;
326:20
**broad (9)**
20:14;60:1,17;
136:18;228:24;
250:18;269:6;
283:21;315:3
**broadly (3)**
284:14;287:3;
315:10
**Bronx (127)**
39:23;40:11,13;
44:8,11,16,17,18;
45:13;48:2,18;52:15;
60:22;63:12,14;
72:11;80:10;93:6;
116:19;120:3;126:1,
5;128:8;134:2,8,12,
15,17;135:6,18,20,
22;137:8;139:19;
140:6,10,14,16,19,
24;141:11;142:3,5,9,
22;143:24;144:8;
145:5,10;146:3,19;
147:3;154:11;
161:23;165:10,14,17,
20;166:7,10,19,22;
167:13,16;172:17,20;

205:16;207:3;208:5,
15,22,23;209:10,17,
18,19,22;210:6;
219:10,17,20;220:2;
221:12,17,20,23;
222:10;235:1;
236:15,18,24;239:1,
3,12;240:2;243:17,
24;244:9,16;269:17;
270:6;271:12,21,23;
272:6,9;273:3,5,13;
274:17;275:6,13,16;
317:21;318:6,9,14,
18;319:14,19,20;
320:13,16,19,24;
321:8,15
**Brooklyn (13)**
39:20,24;40:9,21;
45:14;47:13,24;
60:23;125:21;
127:10,13;207:19;
210:9
**brought (59)**
13:13;27:6;47:24;
48:2,14;49:14;56:6;
57:1;67:8;68:10,16;
75:2;79:3;101:15;
103:13;115:13;
123:16;127:20;
147:18;152:19;
156:18;164:2,3,4,5;
166:2;171:11,14,15;
176:24;184:4;
201:19;203:4;207:9;
215:2,23;231:5,18,
19,21;232:4,5,11,13,
16;233:7,23;237:17;
245:1;248:3;252:20;
253:16;254:10;
263:18;267:14;
281:1,23;283:22;
291:8
**Bryan (1)**
221:7
**budget (3)**
37:20,22,24
**building (1)**
81:18
**built (1)**
260:18
**bullet (2)**
154:11;180:7
**bus (1)**
268:15
**business (26)**
4:24;84:15,18,21,
22;86:7,10,14,16;
87:16;88:9,18;89:1,6,
18;90:10;91:20,22;

93:4;94:3,7,12;98:2;
102:10;244:3,3
**busyness (1)**
80:9
**Butler (1)**
275:2
**by-products (1)**
114:19

**C**

**call (34)**
31:3;34:2;42:4;
76:22;78:16,17;82:1;
88:5;94:10;107:22;
108:1;137:23;
143:22;148:6,11;
180:20,21;187:2,3,5,
7,18,19;188:2,23,24;
189:9,14,15;191:7;
198:1;224:2;262:13;
326:1
**called (10)**
12:24;16:21;78:18;
88:8;91:14;148:9,13,
14;154:23;189:18
**calling (1)**
285:1
**calls (1)**
73:9
**came (33)**
49:7;50:16;56:1;
65:24;67:8;94:6;
124:15;129:10;
155:21;169:10;
183:14;208:23;
220:1;221:12;231:6;
235:20;237:17;
240:8;242:12;
253:21;266:3;276:7;
279:24;290:23;
291:6;295:17;
300:14;309:18,21;
311:7,23;312:1;
326:3
**campaign (5)**
117:7,22;118:8,9,
10
**can (410)**
4:10;5:24;6:1,16,
16;7:5,12,20,21;8:4,
13,14;9:1,6;10:5,23;
14:1,10;15:21;16:11;
18:1,20;19:14;20:5,
12,19;21:14,20;
22:15,17,22,23;
23:14,17,19,20;24:3,
4;25:1,9;26:7,16,21;
27:11,13,20;28:8,15;

29:6,16,18,23;30:13;
31:20;33:8,17;34:24;
35:2,7,14,23;36:12;
37:4,16;38:16,22;
39:6,14,21;40:24;
41:6,12;42:6,18,20;
44:13,16,24;45:19;
46:6,19;47:15;48:7,
21;49:12;50:2;51:10,
20,22;52:2,9;53:2,7,
8,14,17,22;54:13,20;
55:3,5,7,13,21;56:3;
57:20;58:5,22;59:4,
12,14;60:7;61:7;
62:12;63:1;64:22;
66:10,23;67:18;
68:14;69:20;71:3;
73:1;74:5,23;77:20;
78:7,7;79:19;80:17,
20;81:16;82:23;83:8,
19;84:10;85:7,24;
86:8;87:2,19;88:4;
89:16;90:24;93:24;
95:6,19;96:20;97:11;
98:3,9;99:2,7;100:20,
24;103:20;104:7,12,
18;106:9;107:15,19,
20,24;109:5;113:2;
114:2,20;115:6;
116:4,23;117:11;
121:4,7,11,15,21;
123:9,21;124:24;
126:17,22;129:20;
130:15,21;131:4,16,
24;132:9,17;134:3;
138:13;139:1,7,11,
23;140:7;141:4,6,22;
144:12;145:2,24;
146:16;147:22;
148:19,23;151:12,16;
154:1;155:17;156:6;
157:4;158:10;159:7;
160:7;161:6;162:23;
164:16,22;165:12;
167:18;168:2,23;
169:6,14,22;170:24;
171:7;172:1;173:1,
17;174:1,10,11;
175:1,21;176:22;
177:23;178:14,18,18;
179:13;180:1;181:9;
182:4;183:5,13;
184:1,13;185:10,13,
19,19;187:3,6,11,23;
189:21,22;190:1,2,5,
6,13;191:11,11;
192:24;193:9,9,13,
15,22;194:3,11,22;
197:7;198:22;

201:16;202:6,11;
203:8;204:6,8;
205:11;206:13;
207:5;210:20;
211:14;212:5,19;
213:10,17;214:5,12;
217:12,13,16;218:9;
221:5;222:16;223:6,
21;224:4,11;225:3,7,
13;227:2,3,18,19;
228:4,4,22,23;
229:17;230:6,12;
231:23;232:20;
237:2,10;239:22;
243:4;244:1,5,19;
245:18;247:10,21;
249:12,14,18;250:7,
13,21;252:1;254:13;
256:6;257:9,18;
258:12,17,21;261:17;
264:17,24;265:7;
266:22;267:3,11;
268:3,21;269:24;
270:2,2,18;271:18;
274:6,19;275:7;
276:5;277:3;278:17,
21;280:6,23;281:24;
282:19;283:3;285:3;
289:19;290:21;
291:20;292:15;
293:4;294:24;296:5,
16;297:9;298:6,9,10,
18,23;299:12,18;
301:2;307:23;
308:20;309:16;
311:14;312:7;
313:11,21;314:16;
315:14;316:8,10;
317:13,22;318:11,21;
319:3,10;323:11;
327:4,20,22

**candidates (4)**
158:22;159:13;
160:1,4

**CANFIELD (435)**
4:17,17;5:24;7:20;
8:12;9:1,6;10:5,23;
14:10;15:21;16:11;
17:2;18:1,20;19:14;
20:5,12;21:14,20;
22:15,22;23:13,17;
24:1;25:1,9;26:6,16,
21;27:10,19;28:8,15;
29:5,16,23;30:13;
31:20;33:17;34:4;
35:2,7,14,23;36:6,12;
37:3,16;38:16,22;
39:6,14,21;40:24;
41:6,12;42:6,18;44:9,

13,23;45:19;46:6,19;
47:15;48:7,21;49:12;
50:2;51:9,20;52:2,9;
53:2,7,14;54:13,20;
55:2,7,20;56:3;
57:20;58:6,22;59:4,
14;60:7;61:7;63:1;
64:22;66:10,23;
67:18;68:14;69:14,
19;71:3;73:1;74:5,
14,23;77:23;79:19;
80:17;81:16;82:23;
83:8,19;84:10;85:7,
24;86:3,8;87:2,19;
89:15;90:24;92:13,
18;93:24;95:6;97:11,
24;98:8;99:2;100:4,
10,16,24;101:22;
102:6,16,21;103:20;
104:7,12,18;107:14,
18;109:4;110:19;
112:24;114:2,20;
115:6;116:4,22;
117:11;119:16,18;
121:5,11,14;123:9,
21;124:24;126:17;
130:14,21;131:4,16,
23;132:9,17;133:8,
13;134:3;137:5;
138:8,13;139:6,23;
140:7;141:4,22;
143:11;144:12;
145:2,24;146:16;
147:5,21;148:12,15,
23;150:1;151:6,10,
15;152:24;153:2,4;
154:1;155:17;156:6;
157:4;159:7;161:6;
163:1,4,8,11;164:22;
165:12;166:23;
167:2,5,7,18;168:2,
23;169:6,14,22;
170:5,9,13,24;171:7;
172:1;173:1,17,24;
174:10;175:1,21;
176:14,18,22;177:21;
178:14;180:1;182:4;
183:5;184:1,13;
185:10,14,19,23;
186:2,5,8,13,16,21;
187:1,6,8,12,18;
188:1,5,10,16,22;
189:4,10,13,21;
190:1,5,14,18,23;
191:3,8,14,18,21;
192:4,22;193:1,5,9,
13,22;194:3,11,20,
20,22;195:1,7;
197:22;198:4,14;

199:18;201:1,16;
202:6,11;203:8,18;
204:4,8,23;206:13;
207:5,21;210:20;
211:14;212:5,19,24;
213:8,17;214:4,12;
217:11,16;218:9;
223:6,21;224:4,10,
19;225:7,13;226:1;
227:2,8,18;228:3,22;
229:8,17;230:6,12;
231:23;232:7,20,24;
233:24;234:2;235:6;
236:7;237:2,10;
238:14;244:19;
247:10,21;249:12,18;
250:7,13,21;251:24;
253:12;254:13;
255:10;256:6,17;
257:8,18;258:11,20;
259:7,13;260:11;
261:17;264:23;
265:7;266:22;267:3,
11;268:3,21;269:24;
270:18;271:18;
274:6,18;275:7,14;
276:5;277:3;280:6,
23;281:24;282:19;
283:3;285:3;288:15,
20;289:4;290:21;
291:20;292:14,19,23;
293:4;294:24;296:5,
15;297:9;298:5,9,18,
23;299:12,18;301:2;
304:17,19;305:1,7;
307:24;308:20;
309:16;312:7;
313:11,21;314:3,16;
315:7,14;316:8;
317:8,13,17;319:5;
322:20;323:11;
327:4,20;328:18,22;
330:5,6,7,9

**capacity (7)**
7:24;8:6;11:15;
12:16;16:7;18:12;
118:4

**captured (1)**
88:19

**card (8)**
84:23;86:10,22;
87:16;91:6,8;179:24;
180:8

**cards (21)**
84:15,18,22;86:7,
14,16;88:4,9,18;89:1,
6,19;90:10;91:20,23;
93:5;94:3,7,12;98:2;
102:10

**care (4)**
124:23;157:10;
202:2;225:6

**career (8)**
18:13;59:19;69:6,
24;126:23;159:15,
21;160:2

**careful (6)**
222:5;248:23,23;
262:6;294:14;300:7

**Carlos (1)**
78:14

**case (58)**
7:19,23;8:8;12:10;
19:7;21:3,5;24:7,12,
12;25:23,23;27:18;
43:3;55:10;62:11;
63:13;64:4,15;65:7,
10,12,13,14,15,24;
66:2,5,14,16,22;67:2,
2,3,5,24;68:1,2;
70:15;137:12,21;
210:3;211:8;214:19,
20;253:4;254:7,8,11,
17;263:16,18,19;
264:1,3;277:11;
295:18,20

**case-by-case (1)**
53:11

**cases (41)**
7:22;8:2;26:1;
46:2;63:13;79:4,5,7;
80:11,14;113:15;
119:8;129:23;
134:12,13,16,18;
135:3,24;136:8;
137:10,19;138:20,22;
139:1,10;140:19;
141:18;154:4,9;
208:23;209:19;
270:20;272:18;
273:10,14;276:15,20,
23;277:5,10

**Castellanos (1)**
78:14

**caused (1)**
198:10

**caution (2)**
83:14;145:10

**cautious (1)**
147:14

**CC (1)**
96:2

**CC'd (4)**
99:13;237:8;
276:12;284:13

**CC'ing (2)**
93:11;178:22

**CC's (2)**

care (4)
95:24;97:5

**Cell (1)**
194:18

**Center (10)**
12:15;13:4;39:20;
41:15;45:16;80:10;
96:6;111:2;125:10;
325:10

**centers (3)**
9:21;113:24;325:7

**central (1)**
245:6

**certain (20)**
25:19;67:2;91:11;
120:19;122:3;
124:14;142:2,11;
144:15;159:9;
196:16,17;231:4;
251:7,9;274:23;
293:7;303:21;
320:11;322:8

**certainly (13)**
114:15;116:16;
171:13;206:23;
211:17;239:16;
240:10;266:12;
276:7;285:22;286:1;
304:3;317:1

**certification (2)**
43:11;203:21

**certifications (4)**
43:15,11,21;54:10

**certified (6)**
42:16,23;43:1,22;
44:1,2

**certitude (1)**
183:1

**cetera (1)**
179:9

**challenge (9)**
46:17;77:3;138:24;
158:10,12,12;219:15;
320:10;322:19

**challenges (28)**
46:22,23;47:1,4,9;
81:1;138:19;140:9;
141:7;142:3;158:16,
19;172:19;175:8;
209:8;210:1;218:17,
19,24;219:13;
270:22;271:20;
272:4,10;273:23;
277:9;319:13;321:8

**challenging (2)**
76:15;329:16

**chance (10)**
78:9;92:11;93:2;
95:14,18;151:19;
175:18;239:19;

Case 1:18-cv-12137-JPC-JLC    Document 225-3    Filed 03/05/22    Page 342 of 374

ABHISHEK JAIN, M.D.                                    MELISSA KAYE v.
October 4, 2021                     HEALTH AND HOSPITALS CORPORATION, et al.

275:17;285:7

**change (44)**
31:6;84:8;85:6;
89:5,12;90:3,22;
93:23;94:11;97:17;
153:11,18;161:12,17;
162:10;163:3,15;
168:1,5,6;169:5,13,
18;170:15,18,22;
171:5,12,18;173:6,
23;174:16;206:12;
207:10;216:3,5;
217:8,15;218:2;
235:13;237:20;
256:19;259:4;274:12

**changed (17)**
31:5;84:12;85:9;
86:24;87:1;88:14;
91:12;92:3;93:8;
94:2;153:17;157:1;
168:17;172:23;
203:7,12;257:7

**changes (3)**
161:21;179:23;
180:2,8

**changing (3)**
108:23;162:13;
173:5

**channels (2)**
281:2,6

**characterizations (1)**
143:24

**characterize (3)**
110:4;235:7;
305:22

**charge (2)**
213:9;255:22

**charged (1)**
293:22

**charges (3)**
53:20;281:23;
293:22

**chart (7)**
31:5;56:8,15;57:4;
105:19;260:5;326:11

**Charter (2)**
254:18,20

**charts (5)**
52:14,16,17,19,20

**chief (1)**
30:23

**child (7)**
43:13;124:23;
203:15;327:3,9,11,12

**children (6)**
124:14,21;125:5;
326:17,21,21

**choose (2)**
155:7;299:2

**choosing (1)**
315:2

**chose (1)**
156:15

**chosen (1)**
197:9

**CHS (160)**
10:19;11:5;13:12,
24;14:7,19;15:16;
17:11,14;20:11,14;
22:11,12,18;23:22;
24:20;25:7,13,20;
26:2,8;27:1;29:15,
22;30:5;31:1,13;
33:16;34:23;35:13,
18;37:1,6;38:3;
42:17;43:3,6;44:8,
12;47:20;48:1,3,5,15,
16,17,19;49:5;50:20;
58:18;60:20;61:1,3;
65:2,13;66:8;70:1,
16;71:8;83:22;85:10;
87:9;90:7,12,14,18;
91:24;92:2;99:15;
101:12,14;122:13;
123:5;124:22;135:9;
136:8,10;137:1,20;
151:3,5;152:11,17;
154:22;160:9,12,13;
163:19;165:2,4;
168:12;169:10;
170:1;172:4,13;
173:19;180:16;
201:9;221:24;224:3;
230:10;238:21;
241:11,24;242:4,7,
10,15,16;246:8,9,10,
13;247:16;248:4;
254:21;256:5;265:2;
266:9;267:15;
268:15;269:4,7;
274:22;276:9,11;
286:20;287:1,12;
291:14,15,18;292:6,
13;293:20;294:18,
21;299:10,13,16;
302:1,3;309:10,13;
313:3,4,7;314:6,7,22;
315:2,11,19;316:5;
317:20;318:5,8,13;
322:5;324:15

**CHS's (6)**
23:9;44:6;50:1;
240:7;269:18;314:18

**Ciara (1)**
178:22

**circle (1)**
8:14

**circulate (4)**

111:1,5;225:22;
274:16

**circulated (11)**
136:14,24;220:22;
221:3,15,20;222:14,
23;223:12,16;249:24

**circulating (5)**
155:15;222:17;
224:3;242:23;276:4

**circumstance (6)**
23:4;24:8;73:20;
265:11;267:13;
326:16

**circumstances (8)**
8:15;22:5;25:20;
27:16;55:13;62:14;
258:15;289:8

**Ciric (3)**
28:14,17;96:2

**cited (1)**
150:19

**cites (1)**
261:5

**City (11)**
4:18;11:8;13:21;
16:2,6;19:19;96:18;
97:7,23;154:6,7

**citywide (3)**
242:23;243:6;
320:20

**civil (3)**
154:9;251:7;313:6

**claim (2)**
201:8;219:18

**claimed (1)**
220:4

**claiming (2)**
135:23;136:5

**claims (1)**
192:5

**Clarence (1)**
78:2

**clarification (6)**
18:15;75:5;79:24;
208:6;212:7;292:24

**clarify (13)**
14:1;22:17;39:8;
42:20;43:24;67:20;
75:14;106:9;146:2,
18;193:17;257:17;
286:17

**clarity (6)**
47:19;88:18;89:8;
96:17;122:10;250:11

**Class (1)**
53:1

**classification (1)**
140:18

**classify (4)**

140:10;322:14,14;
325:20

**clear (16)**
81:14;86:11;91:11;
97:19;106:2;136:2;
138:10,11;154:22;
155:9;173:7;199:24;
235:17;242:6;307:5;
319:3

**clear-cut (3)**
267:24;268:5,7

**clearest (1)**
89:4

**clearly (1)**
300:1

**clerk (2)**
234:23;235:1

**Cleveland (1)**
12:12

**client (3)**
240:5;247:20;
248:1

**clients (1)**
44:17

**climate (1)**
145:4

**Clinic (197)**
12:12;36:16;38:21;
39:20,23;40:1,5,9,11,
13,21;41:18,22,24;
44:18;45:13,14,24;
47:6,13,14;48:19;
52:15;56:11;59:2,3;
60:10,13;63:12,14;
65:23;67:11;72:8,12;
76:20;77:5;82:19;
85:12;86:17;88:6,21,
21;89:9,10;90:6;
91:4;92:2;93:6,16;
100:8;101:7;105:10,
10;108:16;109:3;
112:9,10,16;113:19,
20;114:8;116:19,24;
117:14,18;118:1,5,
12;120:3;122:9,14,
21;123:18;124:6,7,
10,11,17,18;125:22;
126:1,2,3,21,24;
127:11,13;128:8;
129:4,13,20;134:2,
16;135:2,6,24;
136:16;137:9;
138:12,16;139:5,19;
140:6,11,14,15;
141:1,12;142:9;
144:8;145:5,11,20;
146:3,5;150:5;
157:19;158:15,24;
159:10;166:7,16,18,

19,21;167:13,16;
168:11,12;172:18,20;
182:5,16;205:16;
207:19;208:2,15;
209:19;210:9;211:4,
5;214:3,11,20;
216:12,19;218:19;
219:10;221:12,18;
234:18;236:16,19;
239:4;240:13;
244:16;248:10,14;
255:18;260:9;262:4,
12,14,16;269:17,20;
270:6,23;271:10,21,
24;272:6,10;273:5;
276:21;284:2,3;
285:17;287:10;
305:21;308:9;
309:18;317:21;
318:6,9,14,18;
319:14;320:13,15,17,
20;321:1;324:2,21;
325:1,6

**clinical (6)**
88:24;171:19;
246:21;247:8;
274:12;299:6

**clinically (1)**
299:1

**clinics (87)**
16:1,3,9;19:18,24;
20:2,15,16;33:7;
37:19;38:24;40:18;
41:10;42:22;43:17;
45:7;47:20,24;48:2;
59:11,17;60:6,18,21;
61:1,2;64:17;80:12,
23;85:11;88:11,12;
89:7;91:17;94:9;
97:1;98:19;111:12,
15;113:17,20;114:6,
12;117:2;134:1,7,21;
137:1;138:21,21;
139:9;140:16;
152:10,20;158:13,18;
159:6;160:3;161:23;
166:11;167:11;
181:19;209:23;
213:21;223:17;
231:5;244:7;252:13,
15;262:17;272:7,9;
274:23;277:7;
285:16;295:4,15;
299:20;300:5;
303:21,23;305:16;
308:19;317:2;
319:18;321:20;325:3

**clock (8)**
187:11;189:3,23;

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

ABHISHEK JAIN, M.D.
October 4, 2021

190:11;191:1,3,5;
197:16
**close (5)**
14:7;20:4;58:14;
281:20;303:3
**closely (2)**
117:20;122:7
**closer (1)**
81:9
**closing (3)**
20:9,21;179:7
**coach (3)**
110:22;113:4;
213:11
**coaching (3)**
98:10;170:8;298:8
**Coakley (1)**
221:8
**co-evaluators (1)**
142:12
**co-examinations (1)**
145:19
**co-examiner (1)**
320:9
**co-examiners (7)**
73:12;75:8;128:15;
129:24;131:10;
142:2;272:5
**collaborate (3)**
156:21;230:14;
286:2
**collaborating (1)**
172:11
**collaboration (2)**
71:11;183:12
**collaborative (4)**
105:4;285:23;
323:6;324:13
**colleague (2)**
326:6,7
**colleagues (6)**
179:1;183:3,10,10;
264:20;270:5
**collective (4)**
170:3;173:15,21;
174:3
**collectively (1)**
90:21
**College (1)**
11:24
**collegial (7)**
71:21;72:4;105:4;
219:13;322:15;
323:7;326:24
**Colley (6)**
28:18;263:7,22;
265:3;301:18,21
**Columbia (3)**
11:12,16;13:10

**combination (1)**
134:23
**combining (1)**
186:14
**comfortable (3)**
118:16;122:5;
329:10
**coming (11)**
17:11;108:21;
153:12,15;159:14,17;
160:4;173:7;242:19;
305:22;323:21
**comment (4)**
44:22;153:10,17;
326:17
**commenting (1)**
216:13
**comments (5)**
111:21;142:20;
154:19;222:1;226:11
**commissioner (2)**
95:4;97:21
**common (4)**
40:15;112:6,6;
153:13
**communicate (3)**
23:4;72:3;116:13
**communication (5)**
14:13;71:11;76:16;
77:6;116:14
**communications (2)**
76:19;77:9
**community (13)**
13:16;43:17;44:6,
7,12;96:18;97:6,22;
127:17;269:16;
273:3,3;306:5
**comparable (1)**
16:22
**compared (2)**
19:2;219:15
**compelled (2)**
261:3;272:16
**compensation (1)**
324:18
**competence (1)**
308:17
**competency (18)**
16:4,13,14,18;17:9,
16,21;18:8,17,24;
19:3;21:2;25:18,22;
227:23;228:14;
309:8,12
**competent (3)**
19:5;308:17,22
**complain (14)**
48:5,11;123:14;
142:16;201:13;
202:9;238:3,5;306:1,

24;308:4;324:17,20,
24
**complained (12)**
84:2;99:9;124:1;
127:23;202:14;
215:15;238:6,7,8,11;
256:14;307:4
**complaining (2)**
201:10;306:5
**complaint (46)**
7:3;34:15;49:11;
50:16;67:17;68:4,5,8,
9,13,16;69:1,22;
83:18;98:23;99:1,4;
100:18;103:11;
161:10,10;202:17;
230:23;231:11,16;
255:22;256:5,9,10;
260:1;273:7,9;
286:12,13,16,18,22;
287:7,19,24;288:8;
289:15,22;290:14,16,
18
**complaints (17)**
83:23;117:16;
128:5;142:20;149:3,
8;214:23;256:3;
260:2;273:2;287:8,
13;291:4,8;306:19;
308:7;324:14
**complete (8)**
141:1,1;192:5;
226:19;231:10,13;
242:24;268:20
**completed (16)**
12:14;13:1;20:17;
47:10;85:3;140:23;
178:5;192:4;231:12,
22;232:1,3,5,10,22;
233:12
**completely (1)**
304:9
**complex (6)**
251:10;254:8;
294:11;303:15,20,23
**compliance (3)**
197:6;231:13,15
**complied (1)**
196:14
**comply (1)**
242:1
**component (7)**
20:1;51:1,11,16;
240:15;251:6;312:22
**components (1)**
25:12
**Compound (2)**
25:1;217:12
**compounded (2)**

73:15;108:22
**comprehensive (1)**
297:7
**compromised (3)**
77:7;223:24;
267:10
**computer (8)**
51:12,13,14;135:1,
12;175:6;216:4;
237:21
**computer-based (1)**
51:7
**concentrate (1)**
190:19
**concept (1)**
313:8
**concern (22)**
21:18,24;48:14;
56:7,14;69:1;88:13;
112:2,6;115:11;
130:19;131:11,12,14;
132:15;143:21;
222:12;226:24;
249:4;252:15;
263:14;303:17
**concerned (8)**
33:6;69:23;73:17;
142:6;182:17;
197:14;273:18;
306:16
**concerning (11)**
72:15;82:4;118:15;
231:4;260:4,19,20;
263:22;266:14;
284:1;306:8
**concerns (75)**
28:23;29:15,21;
63:6;81:22;82:10;
88:16;114:18,22;
115:3,18,24;116:2,7;
118:22;123:18;
124:18;130:23;
132:8;133:1;139:12,
14;143:19,23;145:16,
18;146:14,19;147:1,
2,4,9,10;149:11;
154:20;209:11;
217:21;222:21;
223:1;228:20,24;
229:15,20,22;230:1;
245:20;248:5,7,18;
249:1;252:6,7;260:9;
263:17;265:18;
266:2;276:8;299:4;
304:8;306:11;317:1;
319:16,17,20,23;
320:12,22,24;321:4;
323:16,17,20;324:7;
325:21;329:9

**conclude (1)**
304:7
**conclusion (2)**
83:13;105:24
**condition (2)**
313:17;314:12
**condone (1)**
296:11
**conduct (3)**
54:18,19;307:16
**conducted (7)**
19:20;75:8;80:23;
223:4;238:17;239:3;
278:8
**conducting (3)**
23:7;40:17;118:7
**conference (1)**
14:15
**conferences (2)**
14:5;301:10
**confidential (1)**
184:18
**confidentiality (11)**
184:10,20;251:13;
312:15;313:3,6,16;
314:12;316:5,6,13
**confirm (2)**
88:3;278:2
**conflict (8)**
112:22;113:8,12,
19;131:2;205:15;
206:20;234:19
**conflicting (2)**
112:8;269:12
**conflicts (2)**
111:16;207:11
**confront (1)**
275:17
**confrontation (2)**
249:2,4
**confronted (1)**
274:15
**conjunction (2)**
23:9;213:15
**connected (2)**
20:20;256:2
**cons (2)**
297:1,5
**consent (5)**
252:18;298:1,2,12;
299:5
**consequence (1)**
279:13
**consider (3)**
240:4;263:12;
270:9
**consideration (2)**
24:10;263:10
**considerations (4)**

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 344 of 374

ABHISHEK JAIN, M.D.                                                    MELISSA KAYE v.
October 4, 2021                                   HEALTH AND HOSPITALS CORPORATION, et al.

134:15;158:15,19;
299:7
**considered (2)**
54:18;325:23
**consistencies (1)**
61:16
**consistency (9)**
19:19;60:12;81:2;
88:18;89:1,18;94:9;
109:23,24
**consistent (22)**
59:19;60:10;61:12,
19;62:15;80:5,6;
152:11;156:4,8,12;
162:8,11;164:13;
170:16,18;192:6;
196:8;252:11;
274:12;294:16;
311:17
**consistently (1)**
139:9
**consolidate (4)**
60:10,18;61:6,9
**consolidation (3)**
19:18;61:13;98:18
**constitutional (10)**
227:1,15,20;228:1,
2,7,12,21,24;229:5
**constructively (1)**
270:12
**consult (1)**
8:13
**consultation (7)**
12:23;24:12;77:2;
94:7;112:1;129:21;
303:24
**contact (14)**
14:13;49:20;50:6,
10,11;127:6;162:21;
215:21;217:2;275:1,
5,10,12;290:13
**contacts (2)**
104:14;212:9
**contains (1)**
150:6
**contemplate (1)**
158:7
**contempt (2)**
242:16,19
**content (1)**
287:5
**context (31)**
7:17;20:21;40:5;
43:1;71:19;78:7;
86:3;95:18;111:14;
133:1,3;151:8;
163:21;166:1;
185:11;188:17;
228:18;249:1;

250:14;252:20;
284:18;291:15,17;
298:19,20;308:18;
310:7,14;314:14;
322:10;329:11
**continue (3)**
76:12;89:14;
124:11;141:17;
167:8;293:16
**continues (1)**
192:13
**continuing (2)**
54:11,16
**contract (1)**
170:16
**contradicted (2)**
135:19,19
**contribute (1)**
283:20
**contributed (1)**
320:3
**contro (1)**
64:20
**control (1)**
47:5
**controversial (2)**
67:3;251:20
**controversion (2)**
65:18;254:22
**controverted (5)**
64:21;65:1,6,11,14
**conversation (9)**
78:4;106:10;
108:10;156:18;
171:4,9;174:17;
256:21;257:6
**conversations (2)**
223:23;259:6
**convey (1)**
115:16
**conveyed (2)**
19:11;20:3
**convince (1)**
256:19
**cooperate (1)**
191:20
**cooperating (1)**
192:14
**coordination (1)**
122:24
**copied (2)**
86:4;93:12
**copy (7)**
192:9;199:5,8;
233:24;234:2;
287:19;330:8
**cordial (1)**
324:12
**core (2)**

61:14;309:1
**core] (1)**
59:19
**corporate (5)**
84:14;89:5,20;
91:21;94:11
**Corporation (1)**
4:5
**correction (5)**
180:14;287:19,23;
288:7;289:15
**Correctional (7)**
11:14;13:17;30:24;
33:3;45:3;59:1;60:11
**correctional-based (1)**
9:22
**corrections (5)**
87:13;286:12,14,
19;317:19
**correctly (4)**
144:6;240:21;
254:6;266:4
**correlate (1)**
112:22
**correspondence (2)**
93:22;290:17
**corroboration (2)**
264:14,19
**cost (1)**
20:4
**Cott (10)**
190:7,15;191:6,22;
195:3,4,5;197:6,21;
198:22
**Counsel (32)**
4:11;27:1;113:6;
147:22;150:18,20;
151:13;158:8;
170:17;191:16,23;
192:2,6,13,13,18,20;
196:15,20,24;197:2,
11,14;199:8;233:19;
287:16;298:7,7;
309:5;319:2;321:18,
21
**counselor (1)**
301:11
**counsel's (3)**
163:13;191:20;
196:11
**country (1)**
21:1
**County (1)**
60:24
**couple (3)**
207:23;304:20;
317:8
**course (19)**
16:21;21:23;

109:20;111:2;128:2,
2;129:20;130:20;
162:7;184:16;
198:23;229:7;254:8;
292:13;303:7;
306:22;308:7;
315:22;325:17
**courses (1)**
54:17
**Court (277)**
3:15;4:2;16:1,3,5,
9;18:23;19:18,21,24;
20:2,15,16,17,20;
21:2,3,9;25:8;33:7;
36:16;37:19;38:21,
24;39:20,20,23,24;
40:5,9,11,13,18,21;
41:10,15,18,21,22,
24;42:22;43:17;
44:18;45:5,7,13,14;
47:6,13,20,24;48:2,
19;52:15;59:2,3,11,
17,18,21;60:1,3,6,10,
13,15,18,21;61:1;
63:10,12,13,14;
67:11;72:11;76:20;
80:12;86:17;90:6;
91:4,17;92:2;93:6,
16;94:8;97:1,1;
98:19;100:8;101:6;
108:16;111:12,15;
112:9,10;113:16,19,
20,20;114:8;116:19;
117:2;120:3;121:11;
122:8,14,21;123:18;
125:21;126:1,5,14,
21,24;127:1,10,13;
128:8;129:13;134:2;
135:6;136:15;137:8;
138:16,21,21;139:9,
19;140:6,10,14,15,
16;141:11;142:9;
144:8;145:5,10,20;
146:3;147:23;
157:19;159:6,10;
160:3;161:23;165:6,
14;166:7,11,16,18,
19,20;167:11,13,16;
168:11,12;172:17,20;
184:21;185:6;187:2,
3,5,7,19;188:2,23;
189:1,9,14,15,18;
194:23;195:14,16;
196:12;197:3,23;
199:3,5;200:22;
205:16;206:1;
207:19;208:15;
210:9;211:4,5;
213:21;214:2,20;

216:11;221:12,18;
223:16;231:5;
234:17;235:15;
236:15,19;237:1;
240:5,13;241:7,12,
17;242:1,12,13;
243:14,22;244:2,7,
16;245:12;248:14;
252:12,15;255:18;
262:4,9,12,14;
269:17;270:6,22;
271:10,21,23;272:6,
9,10;273:5;277:7;
284:2,2;285:16;
287:10;295:4,5,15,
17;299:22;300:5,11,
14,19;302:19;303:21,
23;305:16;308:9,19;
309:17,21,23;310:13;
312:21;317:2;318:6,
9;319:14;320:13,15,
17,20;321:1,20,22;
324:2,21;325:1,3,6
**court-ordered (3)**
251:11;310:2,5
**courts (15)**
21:24;22:12;23:7;
45:6;61:15;63:4,5;
165:3,5,10,11,19;
235:2;240:11;252:15
**Court's (1)**
191:23
**cover (1)**
57:15
**coverage (4)**
105:10;142:9;
239:4,13
**covered (4)**
204:17;250:16;
281:18;303:10
**CPLR (1)**
4:9
**crashed (2)**
135:6,10
**create (1)**
113:18
**created (4)**
37:9;249:2;256:1;
320:15
**creating (2)**
81:19;261:2
**creation (1)**
303:1
**credentialing (1)**
279:4
**criminal (14)**
35:5,12;36:3;
53:20;97:2;113:15;
126:15;154:4;251:9;

**considered - criminal (343)**          DALCO Reporting, Inc.                    Min-U-Script®
                                         800.325.8779

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

ABHISHEK JAIN, M.D.
October 4, 2021

270:13;271:1;290:7;
298:5;313:6
**criticize (1)**
123:20
**criticizing (1)**
274:23
**crossed (1)**
326:20
**crossing (2)**
326:14,23
**crux (2)**
260:23,24
**culpable (1)**
56:2
**cultivated (1)**
263:2
**cultivating (1)**
240:1
**current (3)**
10:16,17;279:14
**currently (3)**
9:9;11:2;144:2
**custom (6)**
299:16;301:24,24;
309:11,13;312:6
**cutting (1)**
315:17
**cycle (1)**
274:2

**D**

**D_1489 (2)**
305:12;307:7
**D_1490 (2)**
305:12;307:7
**daily (1)**
229:7
**dangerous (1)**
261:11
**data (2)**
135:6;267:20
**date (10)**
4:6;30:17;100:4,
21;101:2;202:12;
207:22;210:22;
243:14;279:24
**dated (6)**
95:2,12;100:9;
102:11,14;151:2
**dates (5)**
21:10;103:8;
106:17;205:11;226:3
**day (16)**
127:4,4;135:9,9;
138:11;169:20;
197:15;212:2,3;
236:22;270:12;
278:3;288:6;324:9;

329:12,17
**days (12)**
46:24;62:14;
141:10,11;181:12;
243:1,3,8,9;244:3,3;
320:7
**dealing (3)**
99:12;199:10;
330:4
**deals (1)**
34:24
**dealt (2)**
71:24;95:5
**Dear (2)**
178:24;191:21
**December (14)**
30:11;45:17,22;
46:8,9;52:13;68:11;
237:6;242:22;
249:11,16;273:5;
274:14,15
**Decemberish (1)**
249:17
**decide (1)**
198:13
**decided (6)**
40:7;71:23;73:21;
82:9;94:10;129:7
**deciding (1)**
61:24
**decision (43)**
82:14;88:7;89:7;
90:11,22;91:23;
93:11;162:15;163:3,
14,17,18,21,22;
164:18;170:6,14;
171:20;173:14;
204:3,7,15,16;212:1,
10,11;225:15;249:3;
264:9,10,20;265:4,
10;283:11,15,19,20,
21,23;284:5,8,16;
316:24
**decision-making (2)**
213:16;283:16
**decisions (4)**
122:21;164:24;
165:1;211:22
**declined (1)**
262:18
**decrease (1)**
293:17
**decreased (1)**
293:18
**deemed (2)**
112:3;226:18
**defamatory (1)**
276:3
**defend (1)**

198:20
**defendant (26)**
4:20;8:17;78:4;
96:23;137:3;167:20;
214:18;218:7;262:3,
3;263:10;264:11;
268:18,24;269:2,9;
270:13;274:13;
275:2,4;277:8;
295:10;314:21;
315:5,9;321:22
**defendants (26)**
4:19;13:23;14:1;
45:10;46:23;47:5,8;
67:13,24;68:1,2;
113:20;119:1;
126:16;136:15;
137:2;138:17;139:4;
214:16;269:19;
271:1;272:7;290:7;
297:5;303:17;316:1
**defendant's (4)**
63:7;268:24;269:8;
275:11
**Defender (1)**
44:17
**defenders (1)**
47:2
**defending (1)**
4:13
**defense (15)**
25:17;44:6,7,12;
63:4,9;127:17,18;
135:20,22;269:15;
273:3,3;295:7;300:9
**defensive (1)**
82:17
**defensiveness (1)**
107:5
**defer (1)**
311:14
**define (1)**
120:14
**defined (1)**
185:5
**definitely (1)**
159:11
**definition (1)**
282:10
**definitive (1)**
296:2
**degree (2)**
11:22;12:2
**delay (2)**
62:11;200:5
**delays (2)**
4:8;21:6
**deliberations (3)**
284:10,13;296:24

delivered (1)
284:20
**demanding (1)**
107:5
**demands (1)**
191:20
**demoted (1)**
84:2
**demotion (2)**
84:7;89:4
**denied (5)**
174:24;175:2;
224:9,13;225:5
**deny (1)**
179:8
**denying (1)**
179:11
**Department (4)**
4:18;196:20;
215:22;290:12
**departure (2)**
156:15;321:9,16
**depending (7)**
63:11;207:11;
250:14;281:23;
286:10;310:7,13
**depends (3)**
55:9,10;298:19
**deponent (2)**
17:5;197:18
**deposed (2)**
5:18;7:15
**deposing (1)**
199:16
**deposition (22)**
3:12;4:3;5:5,15;
185:22;187:11;
189:8;195:18,20,23;
196:14,23,24;198:6,
7,21,23,24;199:1,4,
22;200:9
**depositions (3)**
197:1,15;199:10
**depth (1)**
240:3
**deputy (6)**
38:20;45:14;95:3;
97:21;146:6,11
**describe (8)**
117:5,24;120:10;
134:8;148:17,22;
182:11;321:23
**described (22)**
70:7;84:23,24;
117:8;118:13;
120:11,23,24;142:4;
209:10;216:12;
218:16,20;219:2;
255:15;263:8;

273:11;319:15;
321:7;324:8,12;
329:12
**describing (4)**
145:7;148:10;
217:23;260:23
**description (1)**
171:11
**descriptions (1)**
315:12
**designated (2)**
97:22;129:1
**designates (1)**
97:8
**despite (5)**
72:6;219:13;286:4;
323:14,20
**destroy (2)**
57:23;58:1
**detail (1)**
262:1
**details (14)**
50:14,24;51:6;
83:23;125:8;135:10;
174:6;225:19;
233:16;237:23;
259:5;277:18;
279:12;287:4
**detained (1)**
136:17
**determination (6)**
26:2,9;63:20;
64:20;266:20;284:3
**determine (8)**
25:20;96:24;119:4;
134:17;184:11;
214:10;301:23;
305:24
**determined (11)**
24:12;37:1;116:21;
125:24;129:19;
214:19;221:17;
222:6;256:14;296:1;
329:7
**develop (1)**
23:22
**developed (2)**
45:8;146:14
**developing (1)**
272:23
**development (1)**
160:2
**device (2)**
304:4;310:11
**diagnosing (1)**
143:1
**diagnosis (1)**
22:7
**differ (3)**

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 346 of 374

ABHISHEK JAIN, M.D.                                    MELISSA KAYE v.
October 4, 2021                    HEALTH AND HOSPITALS CORPORATION, et al.

17:22;18:17;
196:10
**difference (4)**
90:8;91:21;248:15;
301:7
**differences (1)**
19:1
**different (43)**
18:11,23;37:8;
40:19;46:1;59:22;
60:24;62:4;79:17;
82:5;84:13,20,21;
89:21;113:7;126:15,
19;154:3;158:14,18,
19,19;162:4;165:7;
167:11;170:1;
186:14;211:17;
223:1;256:24;
269:22;276:17;
285:8;291:4;294:11,
12;296:22,22;
297:16;301:13;
310:23;312:8;322:5
**differently (6)**
28:4,11;29:3,9;
183:9;262:17
**difficult (1)**
124:19
**difficulties (1)**
318:17
**difficulty (4)**
172:17;271:22;
320:16;326:13
**Dimitri (1)**
210:11
**direct (18)**
30:20;32:8;33:4;
40:12;50:18;72:16;
73:18;76:9,10;
106:18;128:1;
142:20;166:9;173:4;
216:20;223:23;
267:8;284:13
**directed (5)**
99:6;110:8;218:4;
257:14;275:23
**directing (1)**
97:3
**direction (2)**
118:19;119:14
**directive (1)**
264:11
**directly (25)**
10:1;18:10;20:20;
71:5;72:3,9;73:21;
76:14,22;83:5;84:20;
101:14;141:24;
143:18;166:11;
169:17;212:8;

213:23;224:1;238:4,
6;255:14;285:5;
287:14;329:8
**director (97)**
7:24;8:4,7;9:17;
12:19,20,21,23;16:8;
19:13;32:17,20;
38:21,21,24;41:15;
42:1;45:14,15;59:2;
78:3;82:19;84:2,3,8,
9,18,24;86:18,19,22,
24,24;88:8,14,15,19,
23,24,24;89:3,12,19,
19,22,24;90:4,22,23;
91:12,13,13,14,16,
19;92:1,1;93:7,7,18,
18,19;94:4,10;96:5,
10,14,17;97:4,6,20,
22;104:15;111:2;
122:14;129:4,11;
131:9;145:12;146:5,
7,11,11;168:15;
171:19;205:16;
207:12;246:12;
263:12;264:7;265:9;
267:1;284:1;285:15,
23;312:2;321:22
**directors (89)**
24:13;28:1;29:11,
12;32:15;41:18,22;
42:16,21,22;71:9,12,
12;72:2;77:10;81:20;
84:20;85:1,11,12;
88:11,12,20;89:9,14;
90:6,12;91:4,14,23;
94:8;100:8;101:7;
107:4,7;109:3,6,8;
111:4,22;112:1,15;
113:24;114:5;
115:12,13,15;123:13;
129:5;145:9,13,14,
14;152:4,5;169:1,2,
19,23;172:10,11;
209:5,16;216:15;
219:6,15;225:23;
226:8,10;250:3;
262:11,12,14;263:18;
278:5;295:12;302:3,
5,6,7,16,22;319:18;
321:20;322:6,9,13;
323:7;325:21;326:4
**director's (1)**
93:17
**disagree (20)**
28:7;29:4,13,19;
30:1;45:18;57:17,19,
23;141:2,13;161:13,
15;183:7;205:17,18,
19;263:4,5;270:8

**disagreed (1)**
316:24
**disagreement (2)**
103:9;322:8
**disagreements (3)**
322:2,12;325:24
**disappearing (1)**
71:2
**disband (1)**
37:15
**disbanded (1)**
37:12
**discharged (1)**
270:13
**disciplinary (2)**
282:17;313:7
**discipline (3)**
280:4;313:9,10
**disclose (4)**
282:16,23;298:16,
22
**disclosed (4)**
25:15,18;26:10;
214:24
**disclosure (1)**
228:11
**disclosures (1)**
62:3
**discourages (1)**
296:10
**discouraging (1)**
294:6
**discrepancy (3)**
173:20;202:9;
203:2
**discrimination (3)**
34:16;201:15;
324:14
**discuss (10)**
23:1;29:11;111:1,
3;119:8;150:4,13;
216:21;222:19;255:3
**discussed (24)**
57:14;60:14;90:11;
99:8;105:20;124:16;
127:6;131:3;154:18;
183:19;201:19;
202:15;207:13;
241:13;248:8,17;
256:21;290:5;
291:18;294:6;
297:18;308:9;
319:17;329:23
**discussing (6)**
102:9;206:11,23;
216:12;230:2;244:13
**discussion (39)**
7:11;22:11;40:7;
58:15;70:6;72:9;

80:8;90:9;91:2;
99:10,11;100:17;
111:6;112:6;126:3;
129:17;132:2;
147:16,18;162:17,22;
203:23;205:2;
208:21;217:8;
225:23;226:14;
229:24;245:4;
248:11;257:7;261:8,
19;267:24;277:24;
278:11;285:7,9;
326:5
**discussions (34)**
21:21;22:24;26:9;
40:19;73:21;88:17;
89:3;110:4,6;130:20;
134:6;139:8;140:2,3;
157:7;158:14;173:9;
201:21;204:1;
211:20;222:4;224:1;
245:24;262:14;
264:6;265:12;
278:12;285:5;
322:11;325:4,23;
329:5,6,15
**dismissed (2)**
19:7,9
**dispute (2)**
234:7,9
**disqualified (1)**
233:18
**disruptive (1)**
282:4
**distance (2)**
7:10;216:8
**distinction (3)**
44:3;130:17;
159:22
**distinguishes (1)**
326:5
**distracted (1)**
297:7
**distributed (1)**
261:15
**district (2)**
45:4,4
**division (4)**
9:17;10:3,4,11
**dock (1)**
204:3
**docked (4)**
202:10;203:20;
204:5,10
**Doctor (9)**
45:15;85:2;246:4;
247:1,2,4;279:13,19;
282:8
**doctors (3)**

253:15;279:18;
280:15
**doctors' (2)**
170:17;285:1
**DOCUMENT (44)**
77:12;85:14;94:17;
99:22;149:18;
177:11,22;185:15,18,
20;186:17;187:20,
21;188:7,19;189:5,
11;192:20;193:6;
195:11,12;196:1,6;
197:11,17;200:6,7;
236:8;288:9;289:6,9,
12;296:12,18;297:12,
15,18;304:14,17;
305:11;307:9,12,18;
314:20
**DOCUMENT/INFORMATION (2)**
34:7;138:1
**documents (15)**
184:10;185:24;
186:6,22;187:13,23;
192:6;195:19;197:7,
10,12;198:5,18;
199:19;322:23
**done (26)**
16:9,14;46:17;
64:14;85:3;107:7;
113:16;122:20;
150:23;165:4;
180:13;202:18;
252:18;254:11;
270:22;271:1;
272:11;281:12;
284:4;287:20;295:4,
15,20;309:20;311:18,
20
**Donna (2)**
4:17;194:20
**door (2)**
292:8,9
**double-dipping (3)**
112:3;114:18;
115:4
**down (20)**
6:14,17;62:13;
86:15;95:21;100:19;
147:24;150:14;
177:17;187:8,11,21;
189:2,23;190:10;
197:16;288:21;
302:9;307:23;317:13
**Dr (1006)**
4:16,19,19;5:4,6,
11;6:1;7:21;8:13,17;
9:9;10:17;13:14;
14:2,2,4,9,17;15:1,2,
2,3,5,5,7,9,11,13,15;

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

ABHISHEK JAIN, M.D.
October 4, 2021

17:8;21:11,17;26:12,
18,18;27:6,7;28:3,4,
14,14,14,17,18,20,21;
29:2,14,20;30:6,7,19,
21,22;31:4,23;32:1,2,
3,4,4,7,10,12,19,22,
22;33:5,6,22;34:2,16;
38:12,14,19;39:1,3,4,
9,17,19;40:6,7,8,10,
13,14,16,22,22;41:2,
3,4,4,8,8,9,14,22,23;
42:1,3,12,12;43:1,10,
20;45:13,15,16;46:4,
10,13,15,24;47:11,
12;48:5,11,18;49:4,4,
5,10;50:6,10;51:17,
23;52:7,20;55:24,24;
56:9,11,20,23;57:6,9,
13;58:13,16,20;59:3,
7;65:17,22;66:3,6,15,
15;67:9,15,16;68:5,
18;69:9,17,18;70:5;
71:1,1,14,23;72:1,3,
16,19,20,23;73:4,20;
74:1,9,10,11,19,21,
21;75:3,5,11;76:3,13;
77:2,7;78:4,5,6,15,
16,19,21,22;79:9,13,
15;81:5,14,15,21;
82:8,12,13,14,15,20,
24;83:2,18;84:1,17;
85:1,6,22;86:13,16,
18,21,22,23;87:13,
16,21,24;88:1,1,4,6,
13;89:13,13,23,23;
90:5,12,16,16,19,19;
91:6,7,8,8,11,24;
92:8,9,9,12,22,23,23,
23;93:3,4,11;94:22;
95:3,4,5,9;96:9,13,
17,22;97:9,13,19;
98:6,12,23,24;99:1,1,
8,9,17;100:7,11,11,
19,19,21;101:3,3;
103:5,5,10,14,17,17,
24;104:22;106:3,4,
11,22;107:9,17,22;
108:1,11;109:10,11,
15;110:2,9,12,13,15,
17,19,24;112:2;
114:17,22,24;115:17,
21;116:1,20,21,24;
117:1,9,10,13,16,16,
17,20,23;118:4,20;
120:2,7,12,15,16,22,
22,23;121:19,24;
122:5,10,11,12,14,15,
16,16,18,18;123:1,1,
2,2,4,14,14,15,19,19,

20;124:2,4,7,10;
125:9,13,14,15,17,20,
20,23,24;126:6,8,9;
127:2,3,6,14,19,23;
128:8,9,12,12,13,15,
17,18,20,21,24;
129:1,6,8,9,12,12,14,
15,16,17,18,18,19,21,
23,23;130:1,6,6,7,10,
10,19;131:1,7,7,9,10,
13,21,22;132:2,7,8,
12,15,24;133:23;
135:19;137:6,14;
138:11;139:2,12,20;
140:21;141:10,20;
142:1,12,13,15,16,17,
23,24;143:5,6,7,16,
18,21,24;144:7,15,
18,20,24,24;145:1,
14,15,15,17,19,21,21,
22,23;146:4,6,9,9,13,
15,20,21,22;147:7,8,
15,17,19,19;148:2,3,
3,11,11,15,16,16,17,
21,22;149:1,2;150:4,
12,12,23;151:1,1,20;
152:8;154:19;155:4,
4,9,11,15;156:2,5,9,
13;157:7,15,15,16,
17,18,21;160:9;
161:3,9,17,24;162:3,
14;163:3,10,11,14,
15,15,21,24;164:3,5,
8,8,10;165:1,9,9;
167:5,8,24;168:14,
15,16;169:3,11,11,
12,20;170:4,7,10,13,
20;171:5,23,23,24;
172:3,4,6,7,12,13,21,
22;173:12,22;174:9,
12,24;175:4,9;
176:11,18,20;177:4,
6;178:3,5,9,12,12,16,
16;179:11;180:19,
19;181:6;182:11,11,
13,13,15,17,21,23,23;
183:22;184:2,5,5;
187:17;188:9,23,23;
190:22,23;193:14,16,
18;194:1,14;201:8,
10,13;202:1,1,9,13;
203:7,14;204:3,21;
205:8,9,13,13;206:2,
10,23;207:13,14;
208:1,13;209:6,13;
210:8,11,11,12,12,
18;211:9;212:2,15,
16,23;213:3,5,14;
214:10,23,24;215:7,

10,11,14,14,15;
216:9,13,13,16,21,
23;217:2,6,7,14,21;
218:7,7,13;219:18;
220:13,18;222:14,15,
17,20;223:4,4,10,11,
15,23;224:2,3,8,15,
24;225:4,21;226:7,7,
13;227:1,17;228:2,8,
19;229:3,9,22,24;
230:4,8,14;234:6,6,7,
14,16;235:4,18,23;
236:1,5,10,12,13,16,
20,22;237:1,3,5,7,8,9,
15,15;238:3;240:22;
244:18,23;245:2,4,9,
21,22;246:5,20;
247:3,18,19,23;
248:8,8,8,9,11,11,11;
249:3,24;250:3,6;
251:15,22;252:4,7;
253:1,4,5,7,9,17,17,
20,23,24;254:4,17,
18,20,23;255:3,8,14,
16,21,21,23;256:4,
15,18,22;257:5,6,18;
258:2,6,10,19,21;
259:2,2,4,6,11,16;
260:21;261:1,3;
262:23;263:14,18,21,
21;264:14,16,18,20,
21;265:2,3,9,12,18;
266:2,10,19,24;
267:6,8;268:1,8;
269:15;270:4,7,11,
14,17;271:14,17;
272:1,5,7,11,14,21;
274:16;275:18;
276:3;277:13;278:3,
5,10,11,12,15;279:3,
5,22;280:2,10,14,18,
19;281:3,14,20,22;
283:11,17;284:9,21,
22,24;285:6,12,17;
286:11,12,13;287:7;
288:9;290:13;291:2,
2,14;292:3,5,7,19,21,
24;293:2,4,5,11,14;
294:21;298:9;300:1;
301:1,18,21;302:2,8,
8,8,10,10,13,24;
303:6,12;304:11,23;
305:15,17,24;306:1,
3,4,5,7,10,13,16,19,
20,24;307:3;308:4,5,
12;310:20;312:10,
17;313:8,19,24;
314:5,14,23,24;
315:1,18;316:4,13,

20;317:5,6,18,20;
318:22;319:10,16,16,
24;320:6;321:5,6,9,
10,18,20,21,23,24;
322:3,17,21;323:3,3,
4,22;324:13,14,17;
325:13,16,17;326:16;
327:2,13,18,23;
328:2,3,13,15;329:6,
18,21,23;330:3

**draft (15)**
111:23,24;137:18;
219:8,19,21,24;
220:4;221:11;
222:15,18,18,22;
229:1;251:17

**drafted (8)**
111:3,11;201:22;
226:7;250:2;251:15;
261:20,22

**drafting (2)**
316:12,16

**drafts (2)**
221:2;222:4

**Drain (1)**
87:6

**draw (5)**
95:23;98:22;
185:17;288:18;
307:16

**drawing (1)**
185:17

**drew (1)**
59:16

**drive (2)**
135:6,10

**dropped (1)**
293:23

**dual (9)**
245:8,10,11,17;
248:18,24;249:6,9,23

**due (9)**
77:7;170:21;216:9;
227:24;228:11;
249:1;290:6;319:19;
321:3

**duly (1)**
4:23

**dump (2)**
195:19;198:18

**duplicate (1)**
244:5

**duration (1)**
243:13

**during (68)**
5:14;11:13;16:16,
19;17:10;22:11;31:1;
33:16;38:8,9,10;
45:23;46:2,12,15,16;

20;317:5,6,18,20;
47:9;48:4;50:20;
53:23;54:16;65:17,
67:4;97:18;104:5;
111:1;120:3;140:24;
141:20;144:5,7;
146:4;150:4;154:18;
181:1,16;184:3;
189:8;198:7;203:13;
205:7;207:3;208:1;
217:9;220:9;251:16;
258:19;269:1;
270:21;271:15;
272:11,15,24;275:2,
13,18;277:1;282:15;
291:9;292:7,13;
303:7;305:16;
309:22;324:15,18,21;
325:17

**Dusky (2)**
16:24;17:6

**D-U-S-K-Y (1)**
17:7

**Dusky's (1)**
17:7

**Dustin (2)**
4:1,24

**duties (1)**
313:19

**dynamic (8)**
110:10,13,15;
115:21;177:4;
182:12;216:10;326:6

---

**E**

**earlier (44)**
11:11;18:14,15;
32:12;55:8;58:16;
61:21;63:16;67:14;
68:24;69:21;70:12;
73:15;78:11;80:6,7;
94:5;98:24;99:8;
105:3,21;115:14;
116:18;149:22;
159:2;173:5;207:13;
208:3;214:19;
216:12;217:19;
241:13;246:4;
251:21;256:21;
271:20;273:11;
282:11;294:6;318:1;
319:23;321:17;
325:19;328:10

**earliest (1)**
167:20

**early (15)**
48:4;151:3;154:23;
159:15;166:21;
167:11;171:9;

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 348 of 374

ABHISHEK JAIN, M.D.                                                    MELISSA KAYE v.
October 4, 2021                                    HEALTH AND HOSPITALS CORPORATION, et al.

197:15;204:1,16;
214:18;239:2;
251:17;292:5;325:3
**easily (2)**
197:7,8
**East (1)**
12:24
**echoing (1)**
142:21
**educ (1)**
203:14
**education (4)**
11:21;40:12;54:12,
16
**educational (8)**
40:15;125:4;
203:15,24;204:11,18,
19;205:3
**EEO (8)**
50:20,23;51:2;
104:11,17;255:22,22;
256:5
**EEOC (6)**
83:18;103:11,19;
104:6,14;161:10
**effect (5)**
3:14;171:5;202:5;
280:16;324:3
**effective (1)**
60:15
**effectively (1)**
275:18
**efficiency (2)**
20:22;64:5
**efficient (5)**
19:20;60:14;61:21;
62:17;243:21
**efficiently (2)**
20:17;62:13
**effort (12)**
24:16;37:13;82:11;
112:15;140:12;
175:22;205:20;
217:1;218:6;234:23;
248:21;294:4
**efforts (42)**
23:22;25:23;50:17;
62:11;71:9;72:6;
140:12,17;174:15;
175:23;177:2;
202:19;203:3;206:4,
6;207:10;208:3;
209:16;218:1,15,23;
219:14;230:14,19;
237:5,24;240:12;
241:19;245:18;
262:23;271:10;
285:19,21,22;286:1,
8;287:11;318:8,14;

**eight (2)**
243:3,8
**eight-hour (2)**
211:10;212:2
**either (23)**
25:17;30:16;70:21;
75:12;116:10;
132:13;135:8,19;
137:18;166:10;
170:4;176:12;179:3;
190:11;198:8;199:6,
12;200:5,20;209:16;
240:22;296:17;303:7
**either/or (1)**
64:9
**elaborate (1)**
59:12
**elaborated (1)**
49:6
**elements (7)**
65:7;67:2;232:2;
233:21;261:24;
289:13;291:3
**Elizabeth (2)**
30:8;33:22
**Elmhurst (1)**
62:6
**else (17)**
33:13;39:3;85:1;
88:22;127:22;
137:20;143:17;
162:20;168:5,5;
221:18;254:12,15;
265:4;301:22;
306:23;308:6
**elsewhere (4)**
155:2,7;156:2;
269:21
**eluding (1)**
161:3
**email (105)**
49:4;76:16,18;
78:2,6,8,10,12,13;
85:22;86:1,12,15;
87:6;92:4,5,8,22,24;
93:12;99:13;100:1,5,
6,15;101:2,3,9,10,19,
23;102:12;108:14;
136:9,13,19;137:7,
10,13,14,15,16,17,22,
24;150:6,12;151:1,6,
20;152:3;155:14;
156:13;157:11,22;
161:2;178:22;
180:16;185:8;
189:21,22;190:2,6,7,
9;191:7,15,17,24;
192:5;197:19,22;

198:10;200:16,17;
215:5;220:20;223:5;
226:23;235:4;
237:15;263:6;
265:18,20,22,23;
266:5,6,12,13,17,20;
267:9;272:21;
274:21;275:22,24;
276:4,7,11,14;279:4;
281:7;286:21;287:2
**emails (13)**
87:20;91:16;94:5;
103:8;135:22;173:9;
215:1;237:7;281:9,
10,10;284:14;320:19
**employed (3)**
10:14;315:19,21
**employee (7)**
123:5;144:9;
167:24;169:4;208:2,
7;218:14
**employees (7)**
10:8;31:9;153:22;
164:1;168:22;169:9;
179:23
**employees' (1)**
179:9
**employee's (1)**
179:12
**employment (29)**
11:2,5,13,14;
14:12;16:20;17:10,
10;35:10;37:6;38:9;
43:6;48:16;49:8;
60:21;61:11;70:15;
83:22;99:5;152:17;
155:1,7;285:18;
293:12,16;305:16;
313:17;314:13;
325:17
**employs (2)**
10:8,13
**encompasses (1)**
9:21
**encounter (2)**
175:7;229:6
**encounters (1)**
155:6
**encourage (4)**
112:18;115:4;
199:20;200:14
**encouraged (1)**
293:21
**encouragement (1)**
294:9
**encouraging (1)**
112:16
**end (11)**
30:16;32:13;38:9;

117:18;125:18;
138:6;183:21;203:5;
237:12;281:2;329:17
**ended (2)**
197:14;305:3
**ending (1)**
179:1
**enforcing (1)**
170:3
**engage (12)**
23:10;26:4;44:8,
12,15,20;76:13;
212:22;263:23;
285:17,20;292:12
**engaged (1)**
312:11
**engagement (1)**
290:18
**engaging (2)**
255:23;312:18
**enough (1)**
265:2
**ensure (6)**
79:6;113:11;
156:14;180:8,12;
267:9
**entail (3)**
15:19;127:3,3
**enter (3)**
129:6;175:10;
202:24
**entered (6)**
79:7;162:8;175:12;
176:3;188:21;203:1
**entering (2)**
175:20;215:19
**entire (9)**
86:1;177:21;
185:20;186:17;
195:11;239:17;
254:22;290:9,10
**entirely (9)**
44:15;59:6;106:2;
127:4;136:2;164:23;
194:7;266:5;291:4
**entirety (1)**
289:7
**entities (1)**
62:4
**entitled (5)**
185:14,16;186:2,
18;187:20
**entity (3)**
11:9;250:16;251:4
**environment (23)**
117:4,19;118:1;
120:16;122:6;124:6,
19;142:6;147:12,12;
148:7,8;209:10;

216:17;249:1;
260:22;261:2;
271:22;306:14;
319:15;320:14;
326:12;329:14
**equally (1)**
183:12
**equity (3)**
100:8;101:6,19
**equivalent (1)**
17:9
**erroneously (1)**
188:20
**error (2)**
75:19,20
**errors (2)**
203:2,3
**especially (12)**
56:18;69:5;128:14;
196:19;216:17;
235:15;252:17;
285:19;287:9;
299:21;325:3;329:11
**essence (1)**
122:13
**essentially (4)**
19:7;20:14;63:10;
122:14
**established (4)**
110:10;161:4;
208:3;246:4
**estimate (8)**
7:4,5,8;17:15;
18:10;35:11;70:16;
238:22
**et (2)**
4:5;179:9
**ethical (8)**
54:19;287:11;
294:12,16,18,20;
299:7;303:17
**ethically (2)**
59:22;252:8
**ethics (8)**
19:23;20:2;59:20,
22;69:2;295:2,13;
300:7
**euphemistically (2)**
247:2,3
**evaluate (2)**
33:20;123:2
**evaluated (8)**
33:15,23;63:13;
134:14;136:17;
140:14;278:5;316:2
**evaluates (1)**
314:14
**Evaluating (2)**
96:23;130:13

**evaluation (28)**
17:22;20:16,19;
25:22;26:5;34:10;
36:16;52:5;62:23;
97:4;126:10,19;
167:17,19;208:14;
226:19;241:18;
243:18;251:4;
252:13;274:3,4;
278:11,15;294:5;
297:6;309:8,12

**evaluations (42)**
16:4,5,14,15,19;
17:22;18:9,12,24;
19:4;21:2,12;25:19;
33:21;34:3,13;51:19;
52:1;59:18;78:20;
79:13;123:5,8;
144:11;165:4,16;
184:21;185:7;
208:11,17;239:21;
243:2;247:19;
251:10;270:24;
278:7,8,13;306:22;
308:13,18;312:21

**evaluator (8)**
27:16;46:5;243:8,
9,18;271:16;273:20,
21

**evaluators (9)**
63:17,19;161:4;
208:5,18,21;273:18;
293:21;309:14

**evaluator's (1)**
297:6

**evaluee (1)**
314:21

**evaluee/defendant (1)**
315:24

**Even (21)**
81:12;89:20;97:20;
122:2;154:24;
156:18;177:3;184:9;
188:12,19;192:14;
218:12;233:18;
263:12,13;284:6,7;
290:18;306:24;
315:4;320:20

**event (1)**
200:15

**events (2)**
7:2;284:23

**eventual (1)**
211:8

**eventually (8)**
48:18,19;170:21;
204:19;210:17;
236:1;295:10;304:11

**everyone (9)**

4:7;88:8;91:16;
94:4;133:7;163:20;
164:13,14;195:5

**everyone's (4)**
88:10;89:12;90:3;
315:15

**evident (1)**
300:13

**exact (29)**
9:16;10:11;30:17;
36:22;49:23;50:24;
98:20;104:15;
146:10;165:7;
167:13;171:2;
206:15;207:22;
210:22;211:16;
214:7;225:11;
231:17;233:16;
238:23;243:11,15;
277:14;283:7;287:5;
290:24;321:12,16

**exactly (44)**
69:9,12;76:8;
83:10;84:22;105:2;
120:8;152:14;
155:10;160:24;
165:14,23;173:8;
174:15;184:19;
198:9;203:10;
204:16;205:1;
219:23;220:10;
221:15,16,22;222:24;
232:1;233:15;236:3;
239:5;249:19,22;
250:9;253:21;264:6;
273:8;282:6,21;
287:1;289:11;291:3;
302:15;304:13;
307:5;326:2

**exam (19)**
19:3;54:5;204:17;
205:6;245:22;252:4;
253:9,18;254:11,19;
255:4,8;264:15;
268:20;269:10;
294:17;300:2,10;
310:2

**EXAMINATION (54)**
5:9;19:22;22:8;
53:23;55:10;63:6;
65:4,8;67:5,12;
73:12;75:7,8,12,16;
105:16,16;122:4;
134:20;149:2;
184:16;203:16;
204:22;215:4,4;
226:22;229:20;
241:15;243:14;
245:15,19;246:3;

248:13;251:1,5;
252:9,21;253:1,3;
261:11;263:24;
272:11;274:11;
277:7;294:5,10;
295:11;302:14;
309:1,24;315:9;
316:22;317:16;
322:24

**examinations (88)**
16:10,13,22;18:5;
19:20;20:17;21:9,24;
22:4;23:8;24:19;
45:11;46:1,12;47:3;
52:22,23;54:8,22;
56:16;59:24;63:9,11,
16;64:21;65:10,15;
70:13;75:15;80:1,1,
12,22;113:16;114:9;
115:5;118:7;121:2;
122:3,19,20;126:20;
127:1,8,8;140:24;
146:22;149:10;
154:10;167:20,22;
184:17;209:7,18;
210:7;238:18;
246:24;248:16;
250:20;251:12;
253:15;261:6,9,21,
23;262:18;265:15;
270:22;272:6;290:8;
291:22;294:7,14;
296:19;297:2,13;
299:6,22;300:6,7;
301:19;310:5;
311:19;319:19;
320:7,13;321:1,3

**examination's (1)**
47:10

**examined (2)**
5:2;134:13

**examinees (1)**
18:13

**examiner (16)**
27:16,21;46:4;
64:3;65:23;114:11;
127:9;146:19;
207:12;248:14;
250:19;264:7,11;
308:10,23;315:23

**examiners (70)**
17:18,20;19:3;
22:2,6,10;23:6;24:13,
17;28:1;29:10,12;
46:9,11,24;47:4;
61:14,22,24;62:7;
63:23;64:2;65:8;
67:6;111:15;114:5;
117:1;119:21;

122:23;140:15;
144:15,22,23;145:10;
147:14;159:10;
168:8;209:12,17,17,
21;210:10,15;241:15,
18;245:12,15;253:4,
5;265:14;272:5;
274:23;295:12,21;
300:6;302:3,16,21;
311:12;312:4;318:9,
14,15;319:19;320:2,
9,11,12,21;321:2

**examiners' (1)**
229:19

**examiner's (1)**
111:14

**examining (2)**
299:2;312:20

**example (45)**
7:23;19:1,5;21:17;
22:2;34:23;39:4;
47:7;61:21;62:6,8,
15;80:14;81:18;85:1;
88:22;89:13,20;
105:7,15;107:2;
118:17;181:23;
201:12;206:8;207:2;
209:6;217:23;231:8;
234:22;241:10;
243:6,23,24;249:15;
251:3;258:17;263:7;
267:18;273:4,18;
276:22;299:1;
312:10;326:22

**examples (2)**
8:2;286:6

**exams (15)**
17:9;18:16,17;
62:21;70:18,20;76:5;
114:18;209:22;
238:20,24;239:2;
251:16;271:9;302:11

**except (1)**
3:7

**exchange (10)**
85:21;108:14;
217:5,14,19,20;
218:4;263:11;
265:20,23

**exchanges (10)**
226:23;256:22;
257:12,21,24;258:2,
5;263:6;274:21;
281:7

**exclude (2)**
234:14;235:21

**excluded (3)**
128:17,19;235:4

**excluding (2)**

234:16;235:7

**exclusion (1)**
128:22

**Excuse (7)**
185:1;187:18;
188:5,6,23,24;292:19

**execute (1)**
316:5

**execution (1)**
313:19

**executive (2)**
95:3;97:21

**exempt (2)**
184:24;185:2

**Exhibit (55)**
77:12,17,21;78:1;
85:14,19;94:14,17,
22;99:20,22;101:16,
16,17,18;102:3,3,4,8,
9,13,13,19,20;103:3,
3,4,4,5;149:16,18,24;
150:5,11;177:9,11,
16;188:13,19;
192:15;195:9;199:2,
3,4,8,17;287:22;
288:5,5;289:2;
304:24;305:2,11;
307:6;317:10

**exhibits (11)**
186:11,23;192:8;
195:17,22;196:8,13,
22;197:13;198:17;
200:8

**exist (1)**
316:6

**existed (1)**
316:11

**expand (1)**
6:9

**expectations (1)**
154:21

**expedite (2)**
62:11;304:21

**expeditious (1)**
199:22

**experience (24)**
41:10,20,23;42:3,8,
11,12,13;126:7,10,
13,23;159:1,5,6,11,
24;168:6;169:5;
182:23;230:21;
241:11;310:8;324:2

**experienced (9)**
29:14,20,21;
169:13;196:18;
217:9;261:1;271:16;
292:3

**experiences (1)**
42:14

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 350 of 374

ABHISHEK JAIN, M.D.                                                    MELISSA KAYE v.
October 4, 2021                        HEALTH AND HOSPITALS CORPORATION, et al.

**experiencing (2)**
172:23;201:15
**expert (7)**
7:18,23;8:20,21;
245:7;248:15;254:18
**expertise (1)**
228:6
**expiration (1)**
279:24
**explain (4)**
34:24;213:1;
318:21;319:10
**explained (2)**
137:3;173:5
**express (4)**
88:13;172:6,13;
263:14
**expressed (8)**
25:16;28:23;110:5;
117:17;120:22;
122:1;209:13;320:3
**expressing (3)**
132:14;263:22;
320:12
**extensive (1)**
42:11
**extent (10)**
7:5;69:17;130:11;
150:14;152:16;
159:20;211:3;
212:14;284:15;313:9
**extenuating (2)**
73:19;265:10

**F**

**face (4)**
107:10;108:12,13;
307:1
**faced (2)**
105:12;107:4
**facilitate (1)**
35:20
**facilities (1)**
166:15
**facility (1)**
300:23
**facing (2)**
19:6;45:11
**fact (17)**
91:15;145:22;
198:8;206:6;222:14;
223:11;244:17;
255:20,21;267:10;
270:24,24;272:21;
274:4;298:2;323:14;
327:18
**factor (2)**
72:12;306:15

**factors (2)**
250:16;255:13
**facts (2)**
174:1;224:11
**factual (1)**
200:2
**failed (2)**
242:17;280:3
**failure (1)**
230:24
**fair (11)**
84:5;110:11;
140:18;171:11;
203:6;207:14;284:6;
286:8;304:24;305:6;
315:16
**fairly (2)**
171:4;292:5
**fall (7)**
10:11;125:17;
185:4;205:7,7;
207:17;215:24
**false (3)**
232:18,19,21
**familiar (1)**
178:4
**family (4)**
126:14;127:1;
170:23;171:6
**far (13)**
26:13;28:24;80:15;
88:10;166:6;176:9;
237:24;264:10;
273:17;281:14;
288:19;303:4;328:2
**fashion (3)**
183:2;196:16;
208:24
**fault (1)**
191:6
**favor (11)**
161:18,20,21;
162:10;173:6;
174:16,16;175:13;
176:4;202:20;218:2
**favorable (2)**
176:4;201:23
**February (7)**
30:12;32:12,13;
138:3;277:14,15;
278:6
**feedback (6)**
115:14;123:11,12,
13;128:3;219:6
**feel (5)**
62:18;89:11;
118:11,15;122:4
**feeling (1)**
56:14

**feelings (1)**
323:2
**fellowship (8)**
11:18;12:11,21,22;
16:16;18:7;70:13,15
**fellowships (3)**
12:4,9,14
**felonies (2)**
243:3;244:3
**felony (1)**
53:1
**felt (26)**
72:11,12;116:19,
20,21;117:6,6,19,21,
22;118:9;120:12,18;
122:1,6,7;182:15,16;
231:8;237:16;
247:19,24;261:3;
270:12;272:16;329:9
**female (8)**
115:13;183:8,9,13,
16,18;321:22;326:4
**Ferdinand (3)**
85:23;86:14;93:15
**Fern (1)**
95:13
**few (19)**
5:16;14:5,6;35:11;
36:15;39:24;40:8;
58:14;106:18;
133:11;154:3,24;
159:15;202:3;
222:19;236:18;
273:22;296:21;
322:23
**field (4)**
19:23;59:22;78:3;
227:5
**Fifth (2)**
227:16;228:15
**figure (2)**
156:21;281:11
**file (4)**
74:12;210:23;
324:14;329:21
**filed (13)**
34:15,18;83:18;
98:23;103:11;
210:18;230:23;
255:21;256:3,4;
286:18;287:24;288:8
**files (7)**
55:17;57:17;74:3;
183:22;282:18;
283:1;327:24
**filing (2)**
3:3;256:10
**fill (4)**
158:20;230:24;

283:8;325:3
**filled (1)**
212:17
**filling (1)**
162:5
**final (11)**
88:5,7;149:12;
162:15;163:21;
211:21;212:1,10,11;
242:13;262:13
**finalized (2)**
244:24;251:18
**finally (1)**
184:8
**find (14)**
77:24;155:7;186:6,
21;195:24;198:7;
200:6;225:4,11;
238:16,17;252:4;
293:21;311:17
**finding (4)**
19:9;143:8;183:23;
239:20
**findings (2)**
273:17;274:11
**fine (1)**
219:6
**finish (16)**
119:16,19;130:4;
147:5,22;163:11,12;
166:23;167:2;
190:24;209:24;
213:2;260:11,12;
278:21;328:23
**finished (3)**
194:10,14;272:2
**firm (1)**
73:24
**first (62)**
4:23;5:20,22;
11:10;12:13;34:24;
36:24;40:21;47:23;
59:11;73:22;79:11;
81:2,3;82:3;86:10;
90:2;91:15,24;94:5;
96:2;106:20,21,22,
24;108:15;111:11;
114:4;118:2;136:2;
151:23;154:24;
156:1;157:6,7;
158:11;159:3;
185:10,20;190:15;
196:23;197:2,18,19;
215:22;243:12;
245:4;256:5,8;261:5;
266:21;274:3,3,10;
278:15;290:11;
295:16,19;299:24;
309:6,11;323:3

**firsthand (1)**
181:24
**Fisher (2)**
95:13,14
**fit (4)**
66:9;96:24;160:22;
238:17
**fitness (1)**
62:21
**Five (8)**
13:5;16:2;81:12;
202:10;278:19,20;
305:3;306:8
**flush (1)**
161:20
**FMLA (4)**
156:23;157:1,3;
170:21
**focus (1)**
112:9
**focused (2)**
218:17;257:3
**follow (13)**
15:4;70:3;138:7;
150:17,20;158:8;
164:15;174:22;
225:11;235:19;
265:1;295:13;322:22
**followed (1)**
251:9
**following (3)**
52:23;198:22;
233:20
**follows (1)**
5:2
**follow-up (1)**
70:8
**force (1)**
3:14
**forced (1)**
275:20
**Ford (75)**
14:2,4,9,17;15:2,
15;30:8,19;31:4,23;
32:10,12;33:22;49:5;
67:9;68:19;69:9,18;
70:5;71:23;72:1,19,
20;73:21;74:1;77:2;
82:8,14;90:5,12,16,
19;103:24;125:24;
150:4,12;151:2;
154:4,11;157:15,16,
18;164:8,10;171:23,
24;172:6,12;184:5,5;
216:13,16,21;218:7;
219:18;226:7;248:8,
11;249:24;250:3;
251:15;255:16;
265:12;266:10;

278:11,12;281:3;
302:2;304:12,23;
314:23,24;315:1;
329:6,23
**foremost (4)**
81:3;118:2;158:11;
261:5
**forensic (72)**
9:17,20,21;10:3,9,
11;11:17;12:9,19,20,
22;13:15;16:1,8;
18:6,12;20:15;21:12;
42:9;43:9,13,23;
54:22;59:20,23;60:3;
65:3;69:3;86:17;
96:5,10;97:1;111:14;
126:7,10;154:10;
160:20;165:4;227:5;
245:6,12,15,19;
246:3,21,24;248:14,
15,16;250:17,19,24;
251:5;252:9,11;
294:5,13;295:13;
296:18;297:2,13;
299:6;300:24;
308:13,18;310:9;
311:12;312:2,4;
315:23;324:4,5
**forgetting (1)**
110:19
**forgive (1)**
287:17
**forgone (1)**
264:15
**form (221)**
3:7;7:20;9:1,6;
10:5,23;14:10;15:21;
16:11;18:1,20;19:14;
20:5,12;21:14;22:15;
23:13,22;24:1;25:9;
26:16,21;27:10,19;
28:8,15;29:16,23;
30:13;31:20;33:17;
35:2,7,14,23;36:6,12;
37:3,16;38:16,22;
39:6,21;40:24;41:6,
12;42:6,18;44:9,13,
23;45:19;46:6,19;
47:15;48:7,21;49:12;
50:2;51:9,20;52:2,9;
53:2,7,14;54:13,20;
55:20;56:3;57:20;
58:22;59:4,14;60:7;
61:7;63:1;64:22;
66:10,23;67:18;
68:14;69:14;71:3;
73:1;74:5,23;79:19;
80:17;81:16;83:8,19;
84:10;85:7;90:24;

93:24;95:6;97:11,24;
99:2;100:24;103:20;
104:7,12,18;109:4;
112:24;114:2,20;
115:6;116:4,14,22;
117:11;123:9,21;
124:24;126:17;
130:21;131:4,16,23;
132:9,17;134:3;
137:5;138:13;139:6,
23;140:7;141:4,22;
143:12;144:12;
145:2,24;146:16;
153:4;154:1;155:17;
156:6;157:4;159:7;
165:12;168:2;169:6,
14;170:24;171:7;
172:1;173:1,17,24;
183:5;184:13;194:3;
195:23;203:8,18;
204:4,8,23;206:13;
207:5;210:20;
211:14;212:5,19;
213:8,17;214:4,12;
217:11,16;218:9;
219:8,19;222:22;
223:6;224:10;225:7;
226:1;230:12;
237:10;244:19;
249:12;250:7,21;
254:13;255:10;
256:6;257:8;261:17;
264:23;267:3;268:3,
21;269:24;274:6,18;
275:7,14;276:5;
277:3;281:24;
282:19;283:3;285:3;
291:20;292:14;
296:5,15;297:9;
308:20;314:16;
316:8;317:22;
318:10;319:12;
320:4;327:4
**forma (1)**
5:19
**formal (4)**
31:5;84:12;89:17;
123:4
**formally (5)**
57:11;65:11;94:2;
137:20;203:12
**formed (1)**
98:1
**former (3)**
16:7;270:4;312:2
**forms (2)**
282:22;283:8
**forth (2)**
53:18;255:19

**forthcoming (1)**
182:9
**forward (26)**
49:15;50:16,16;
56:6;68:23;70:11;
100:14;108:21;
153:13;160:4;
164:15;173:10;
198:16;200:23;
231:7;232:12,17;
234:21;237:18;
252:23;255:18;
276:7;290:23;291:7,
8;300:15
**forwarded (1)**
100:7
**found (8)**
19:5;56:2;66:9;
118:21;119:1;136:5;
322:16;329:18
**foundation (5)**
27:11;29:5;41:1;
59:20;118:3
**founded (1)**
233:2
**four (14)**
9:21;16:1;19:18;
60:21;61:2;85:11,11;
89:7;91:14,23;
138:21;158:13;
181:18;244:7
**Fourteenth (1)**
228:15
**four-year (1)**
12:7
**FPECC's (1)**
79:3
**fraud (3)**
174:9,13,20
**fraudulent (1)**
174:20
**free (1)**
200:18
**freezing (1)**
121:3
**frequency (1)**
239:14
**frequently (3)**
239:18,23;301:15
**front (5)**
30:17;192:12;
306:10,13;307:1
**frozen (3)**
92:13;102:17,22
**frustrate (1)**
199:18
**frustrated (2)**
172:21,22
**frustration (6)**

172:6,13,18;173:3,
7,9
**frustrations (1)**
173:11
**fulfill (6)**
138:23;139:11,18;
140:12,19;175:14
**full (10)**
5:6;24:10;25:18,
24;26:4,24;27:5;
78:7;196:6;241:20
**full-time (13)**
46:4,13;47:12,13;
144:8;167:24;
168:22;169:4,8;
208:2,7,7,14
**fully (1)**
78:7
**function (5)**
76:12;77:4,5;
89:14;97:1
**functional (5)**
84:14;89:5,20;
91:21;94:11
**functionality (1)**
64:6
**functioned (3)**
30:5;43:17;262:16
**FURTHER (16)**
3:6,11;49:6;61:5,5;
87:18;92:4;115:4;
135:10;155:5,6;
162:22;197:24;
217:2;321:7;322:24
**furtherance (1)**
230:10
**furthermore (1)**
329:6

### G

**gap (1)**
274:10
**Garcia-Mansilla (13)**
15:2,7;245:21;
246:5,21;247:4,18,
24;248:9,10,12;
249:3;250:6
**Gary (4)**
95:3,3;268:12,20
**gave (10)**
18:3;33:20;65:17;
125:3,6;151:14;
198:4;199:18;
271:19;278:14
**gender (1)**
48:11
**gender-based (1)**
48:11

**general (72)**
43:8,12,23;50:23;
66:3;70:2,6;83:21;
99:5;112:6;117:4,13;
123:17;125:7;126:3;
127:5;133:24;134:5;
136:13,14;139:14;
145:4,8;146:18;
147:1,16,17,18;
153:10,17;159:9;
172:3,15;173:11;
174:19;209:13;
213:20;222:21;
233:17;240:7,8,9,10;
243:12;254:7;256:1;
261:24;263:17;
265:23;274:9;285:6;
287:13,23;288:7;
290:3;291:7;292:2;
295:3,12;297:4;
299:5,13,19;300:4,
16;302:15,21;307:3;
313:2;315:12;317:1;
320:5
**generalities (1)**
148:10
**Generally (21)**
19:16;20:7;52:24;
53:9;67:10;70:7;
134:14;182:8;
214:14,16;220:11;
221:5;262:2;277:18,
19;287:3;298:17;
300:15;310:8;
312:14;313:4
**general's (2)**
289:22;290:1
**generated (1)**
304:10
**gestures (1)**
6:14
**given (11)**
31:9;72:1;93:22;
123:7;124:14;
130:13;223:18,19;
224:7;255:5,6
**giving (2)**
147:16;301:15
**glitch (1)**
175:17
**glitches (1)**
175:7
**goal (7)**
20:9,10,16;61:9;
131:19;132:20;
245:14
**goals (9)**
21:7;60:5,9,11,17;
61:4,12,12;230:10

Case 1:18-cv-12137-JPC-JLC    Document 225-3    Filed 03/05/22    Page 352 of 374

ABHISHEK JAIN, M.D.                                                    MELISSA KAYE v.
October 4, 2021                              HEALTH AND HOSPITALS CORPORATION, et al.

**goes (8)**
73:22;151:23;
177:19;226:24;
309:6;312:10;313:5,
15
**golden (1)**
198:1
**Gonzalez (8)**
65:5;66:8,16,22;
251:19,23;253:2;
277:13
**Gonzalez's (2)**
295:18;300:2
**Good (16)**
5:11,12;62:20;
78:15;92:10,24;
158:24;159:4,22;
160:22;195:4,5;
200:24;263:23;
285:13;286:6
**Granderson (1)**
224:9
**granted (1)**
203:23
**Great (2)**
58:7;71:13
**grievance (1)**
34:18
**gross (1)**
318:3
**Grosso (2)**
240:17,20
**group (10)**
37:12,15;144:14;
152:15;197:1;
292:11,17;293:7,9,10
**guardianship (1)**
7:23
**guess (109)**
6:9;7:4,7,10;10:2;
13:1;14:8,18,24;
17:9;19:11;21:18;
23:10,15,15,22;
24:23,23;26:3,4;
28:5;32:4,15;35:13;
38:20;41:15;42:4;
44:5,6;45:12;48:19;
49:3;51:19;54:16;
56:2;58:15;61:3;
62:18,20;63:16;66:7;
67:23;70:14;73:22;
77:17,22;80:21;81:4;
87:15;93:6;100:7;
112:15,22;118:21;
124:3;125:14;
132:14;134:11;
136:23;139:4;
143:17;150:5;161:4;
166:14;168:6;

178:10,11,20,22;
180:19;181:22;
203:15;212:3;213:5;
217:4,5;225:23;
235:24;237:7;241:7;
243:2;245:5;261:15;
262:24;268:16;
269:12,12,13;281:19;
282:16,17;284:21;
285:17;286:9;292:4,
6,13;296:3,3;300:20,
23;301:24;303:4,5;
304:11;309:11,14;
312:9;324:13
**guidance (1)**
35:18;69:4;252:19;
262:20;285:14;
295:13;296:20,23;
297:12;300:16;
310:22;311:17;
313:13
**guidelines (7)**
252:11;295:23;
296:7,9,18;310:23;
311:6
**guys (7)**
42:4;139:3;147:24;
156:16;166:3;229:6;
288:24

**H**

**Hagan (149)**
4:15,15;5:4,10;
8:16;17:4;33:10;
34:2;44:21;58:4,7,
12;69:16;75:20;76:1;
86:2,6;87:5,22;
94:13;98:10;99:18;
100:6,13;101:21,24;
102:7;110:21;113:3;
119:17;121:3,9,13,
15;133:5,9,15,22;
135:16;137:23;
138:7;148:14;
149:14,24;150:8,17;
151:9,12,17;152:22;
158:6;163:4,6;167:6,
9;170:8,11;176:17,
19;177:15,23;185:12,
16,21;186:1,4,7,10,
14,16,19,23;187:1,3,
7,10,15,23;188:3,6,
10,12,18;189:2,7,12,
14,24;190:3,10,16,
21;191:1,5,9,10,19;
192:3,10,24;193:2,3,
8,11,21;194:12,24;
195:4,8;196:5,10;

198:3,16;199:18;
201:2,7;213:1,11;
226:4;228:5;229:10;
234:4;259:9,15;
260:13;278:19;
287:15;288:16,23;
292:21;293:3;298:7;
304:15,22;305:5,9;
308:1;317:6,9,12,22;
318:10,20,22;319:11;
320:4;322:22;323:1;
330:2
**half (1)**
305:4
**Hall (1)**
13:21
**hand (5)**
199:5,7;211:22;
269:15,18
**handle (11)**
67:10;72:17;
129:18;131:8,11;
164:19;216:22;
252:23;265:14;
304:1;317:3
**handled (3)**
70:3;101:13;291:3
**hands (1)**
212:4
**hanging (1)**
156:16
**haphazardly (1)**
143:8
**happen (4)**
43:4;65:3;190:11;
291:19
**happened (15)**
50:9;52:12;84:5;
161:16;173:19;
184:11;197:10;
200:17,17;209:2;
258:18;259:3;
284:23;307:14;
329:24
**happening (7)**
72:7;114:14;155:2,
10;198:8,9;240:7
**happens (4)**
63:22;64:1;69:22;
119:23
**happy (1)**
198:4
**harass (1)**
176:15
**harassing (1)**
258:20
**hard (2)**
135:5,10
**hardship (2)**

170:21;171:13
**Harper (2)**
169:11;210:12
**head (4)**
6:12,13;74:17;
165:1
**headed (1)**
325:13
**Health (37)**
4:5;5:1;8:1,7,23;
9:3,12,23;10:8,10,13;
11:3,8,11,14;13:17;
30:24;33:3;45:3;
59:1;60:11;62:3;
97:7;157:8,12,14,21;
160:14,17;184:20;
185:4;214:24;
303:19,22;309:10;
312:11;313:2
**healthcare (1)**
185:6
**healthy (4)**
159:23;325:23;
326:5,10
**hear (4)**
13:12;92:18;121:4;
290:10
**heard (13)**
21:3;82:3;95:14;
98:16;142:21;223:1,
13;282:4,7,9;291:5;
294:1;310:4
**hearing (9)**
65:18;145:6;
227:10;251:20,22;
254:22;277:19,19,21
**heated (1)**
218:4
**help (20)**
49:16;50:19;60:2,
14;61:14;66:5;69:8;
103:15;104:3;105:8,
14,14;171:16,16,20;
175:16;184:6;230:9;
234:12;239:13
**helped (4)**
137:18;171:17;
175:15;210:13
**helpful (5)**
40:8;158:17;
164:18;240:5;241:16
**HEREBY (3)**
3:1,4;313:16
**herein (1)**
3:3
**Here's (1)**
87:23
**Herschel (1)**
268:12

**herself (15)**
96:10,14;123:13,
20;124:5;127:8;
171:6;175:10;176:2;
197:9;248:19;
264:22;292:21;
327:14;328:13
**Hi (3)**
87:11;93:5;180:23
**highest (1)**
11:20
**highlights (1)**
286:7
**highly (3)**
261:11;324:2,2
**himself (6)**
96:5,17;97:8,22;
100:7;143:2
**HIPAA (14)**
184:24;185:2,5;
250:12,16,20,24;
251:8;303:7,13,16,
19,22;312:13
**HIPAA-covered (1)**
251:4
**hire (12)**
38:2;39:3,4;40:3;
305:20;308:23;
318:8,14;321:3,10,
14,14
**hired (14)**
14:7,9;31:12;
39:23;40:22;41:3;
47:14;85:10;106:5;
125:16,17;207:14,15;
308:14
**hires (2)**
38:5,7
**hiring (19)**
38:4,10,12,13;39:3,
9,17;45:24;49:24;
50:1,4;83:22;158:10,
12,12,14;159:19;
160:5;318:18
**HIV (7)**
22:3,5;24:21;25:4,
21;26:2;27:23
**Hold (6)**
77:23;143:11;
188:22,22;190:5;
194:22
**holiday (2)**
249:20,21
**holidays (1)**
207:4
**honestly (1)**
6:5
**Honor (6)**
194:23;195:1;

196:10;197:20;
198:18;201:1
**Honorable (1)**
  95:13
**Honor's (3)**
  192:7;196:9;197:1
**hope (1)**
  5:17
**hopefully (2)**
  158:21,22
**hoping (1)**
  239:3
**Hospital (12)**
  62:6;96:6;262:5,7,
  9,10;263:11,12,13;
  269:1,3,5
**hospitalized (2)**
  262:3;269:10
**Hospitals (7)**
  4:5;11:8,11;12:24;
  262:16,17,22
**hostile (3)**
  260:22;261:1;
  329:14
**hour (3)**
  164:9;214:7;305:4
**hours (26)**
  5:21,23;105:6,9;
  112:12;162:1,9,23;
  163:3,15;165:9;
  168:17;169:20;
  170:15;176:5;
  187:15;202:10,17,24,
  24;203:7,12;211:4;
  213:21;214:15;260:1
**house (1)**
  236:5
**housekeeping (1)**
  5:16
**HR (24)**
  8:1,3,16;48:15;
  49:17,18,18;67:21;
  90:12;99:12,15,16;
  101:12;162:18;
  174:8;204:13;
  211:22,24;212:8;
  215:21;216:1;
  267:18,21;313:14
**HSC (2)**
  103:19;104:6
**hundred (1)**
  238:22
**hundreds (2)**
  199:13,19
**hygiene (3)**
  8:24;95:4;97:21

I

**idea (8)**
  26:23;30:4;43:16;
  71:13;88:20;159:16;
  263:23;266:13
**ideal (1)**
  63:20
**ideally (2)**
  63:19;64:6
**identification (9)**
  77:14;85:16;94:19;
  99:24;149:20;
  177:13;216:2;288:2;
  305:13
**identified (7)**
  49:7;55:17;103:18;
  137:2,12;140:5;
  292:5
**identifies (1)**
  96:17
**identify (1)**
  182:10
**ignore (1)**
  286:3
**ignored (1)**
  279:7
**ignoring (1)**
  279:8
**illegal (7)**
  51:18;53:13,18,19;
  54:18;55:1,19
**immediate (4)**
  30:5;32:16;198:14;
  266:10
**immediately (11)**
  56:13;71:13;
  126:24;176:1;184:4;
  215:24;231:7,19;
  232:4;237:9,13
**immemorial (1)**
  199:9
**impacted (2)**
  169:17;233:13
**impacting (1)**
  108:23
**impair (1)**
  6:4
**implement (1)**
  285:15
**implemented (1)**
  97:18
**implication (1)**
  194:8
**implications (6)**
  55:12;69:24;
  255:17;281:21;
  282:3;294:12
**important (11)**
  4:7;19:24;22:6;
  23:3,5;27:22;67:6;

115:11;228:17;
  240:14;244:23
**impossible (2)**
  195:24;198:21
**improper (2)**
  51:18,24
**improvement (1)**
  308:11
**inaccurate (4)**
  105:7;136:3;273:9;
  276:14
**inadvertent (1)**
  216:24
**inappropriate (2)**
  119:13;306:12
**inappropriately (2)**
  215:16;309:8
**incentivize (1)**
  112:15
**incident (13)**
  82:6;173:13;
  234:12;249:10,16;
  250:6;280:10,12,14;
  281:5,8,20;283:12
**incidents (1)**
  174:24
**inclined (1)**
  238:16
**include (8)**
  164:20;205:20;
  206:6;235:19,22;
  237:5;286:6,8
**included (2)**
  210:11;236:2
**includes (1)**
  54:8
**including (16)**
  13:14;45:3;66:4;
  72:11;89:19;93:17;
  94:5,8;134:24;
  171:22;201:22,23;
  235:8;265:9;266:10;
  325:4
**incompetence (2)**
  19:10;293:22
**incorporate (6)**
  115:14;230:15,20;
  235:18;286:3,5
**incorporated (6)**
  113:7;115:11;
  116:7,12,14,16
**incorporating (1)**
  230:1
**incorrect (4)**
  157:13;202:21,23;
  216:2
**incorrectly (6)**
  105:5;176:3;
  202:14,19;215:17;

231:9
**increase (2)**
  31:8,11
**increased (3)**
  31:16,16,18
**increases (1)**
  31:7
**increasing (1)**
  172:16
**increasingly (2)**
  72:5;117:17
**independent (7)**
  63:23;127:9;
  226:21,22;229:18,19,
  20
**indicated (1)**
  119:13
**indicating (2)**
  158:17;194:6
**indication (1)**
  91:19
**indirectly (1)**
  143:17
**Indiscernible (6)**
  44:19;260:13;
  267:22;275:1;
  294:19;303:8
**individual (10)**
  67:21;107:3;
  210:14;214:20;
  250:15;262:1;
  265:11;269:5;
  297:24;323:12
**individually (1)**
  135:3
**individuals (39)**
  10:1;19:5;37:8;
  49:16;50:18;90:17;
  91:3;103:15;113:14;
  143:1;144:1,2,16;
  145:20;152:9,12,15;
  153:9,15;159:12,17,
  18,23;160:20;
  167:21;169:17;
  209:14;210:7;
  219:23;220:3,7,17;
  277:2;287:3;292:12;
  321:3,15;323:5;
  324:11
**inefficiencies (1)**
  21:6
**inefficiency (1)**
  21:7
**inform (3)**
  49:15;171:16;
  238:1
**informal (1)**
  14:14
**information (56)**

8:10;22:3,6;23:5;
  24:14,18;25:5,21;
  26:3;27:3,22,23;
  28:2;40:12;57:3;
  66:1;67:4,12,13;
  72:14;88:3;123:11;
  136:1;143:3;149:7;
  155:8;166:12;
  171:17,18;184:20;
  185:4;200:2;211:5;
  214:21,23,24;215:20;
  222:2,6;228:11;
  235:18;260:17;
  266:6,15;267:10,14,
  16,17,19;268:1,9;
  303:19,22;304:5;
  309:10;312:12
**informed (26)**
  52:16,20;56:10;
  57:1;71:17;73:10;
  79:22;80:2;103:14;
  104:1,3;135:8;
  143:14,22;144:3;
  157:24;160:19;
  161:24;164:14;
  203:12;216:1;
  220:17,21;272:8;
  281:2;329:2
**informing (1)**
  179:22
**infractions (1)**
  282:17
**ingested (1)**
  6:3
**inherent (1)**
  256:12
**inherently (1)**
  251:11
**initial (2)**
  37:9;156:17
**initially (27)**
  12:20;33:24;39:19,
  24;40:3;79:22;80:24;
  103:13,22;117:15;
  120:9;124:12;
  125:13;127:7;128:3;
  154:17,18;203:20,22;
  205:2;212:17;213:3;
  235:3;237:16,21;
  239:14;278:14
**initiate (1)**
  235:24
**initiated (1)**
  63:10
**initiative (1)**
  261:16
**initiatives (1)**
  285:14
**inmate (15)**

62:23;130:13;
136:9;243:19;
261:12;263:24;
268:11;273:19,20,22,
23;274:1,4;303:9,14
**inmates (19)**
19:21;21:1,8;
64:20;140:6;141:12;
166:2,14;214:2;
229:6;271:11;
272:15,23;274:17;
293:21;312:18,20;
314:12,15
**inmates' (1)**
64:21
**inmate's (1)**
226:24
**input (11)**
112:1;115:15;
201:22;226:13;
230:9,20;241:3;
250:3;286:5,7;304:1
**inputted (2)**
80:16;202:14
**inquired (1)**
78:18
**insist (2)**
235:24;242:10
**insisted (1)**
196:15
**INSPECTOR (5)**
287:23;288:7;
289:22;290:1,3
**instance (35)**
80:15;81:3;132:1,
20;178:9;198:14;
206:9,16,22;207:1;
210:14;215:7;
227:16;229:13;
230:8;234:6;236:14,
20;241:24;242:3;
244:9;248:2,20;
257:23;258:4;259:3;
264:5;269:9;295:16,
19;299:10;300:9;
309:23;312:17;
315:18
**instances (29)**
109:22,23;123:23;
142:1;175:4,9;
181:23;182:21;
205:23;209:3,8;
214:17;230:19;
235:11;239:15;
241:8,19,21;242:7;
248:19;250:24;
251:9;252:8;258:3,
15;259:20;286:2;
293:20;320:21

**instead (6)**
19:8;22:13;23:11,
23;192:7;305:19
**institution (3)**
126:16;300:22,23
**institutions (1)**
79:1
**instructions (1)**
6:8
**integrity (3)**
19:23;20:18;60:16
**intended (1)**
261:4
**intense (15)**
171:4,10;174:17;
182:20;217:19;
256:20,22;257:1,6,
12,24;258:2,5;259:6,
16
**intensified (2)**
262:24;263:1
**intensity (1)**
218:4
**intent (3)**
71:20;183:15;
206:5
**intention (5)**
20:8;66:13;176:24;
218:11;235:21
**intentional (2)**
177:1;202:22
**intentionally (5)**
189:3;202:18;
205:14;207:8;280:2
**interact (8)**
35:6;36:10;112:22;
142:12;144:11;
182:21;221:9;240:6
**interacted (4)**
14:4,8,15;95:9
**interacting (6)**
121:1;145:18;
209:11;241:11;
312:3;323:6
**interaction (19)**
14:14;72:4,16;
73:16;105:5,13;
108:16;109:21;
113:18;132:21;
182:20;217:21,24;
219:13;250:15;
260:19;265:21;
280:17;326:15
**interactions (47)**
35:9;71:20,21;
72:4,6;73:14;81:23;
82:6;83:12;104:22;
106:19;109:20;
117:3;120:11;122:2;

132:19;142:7;145:5,
6,17;147:13;150:4;
182:14;222:9;237:4;
240:14;255:15;
257:1;258:23,24;
259:11,20;260:4,16,
17;285:13;301:11;
320:14,21,24;321:19;
322:6,13;323:16,19;
324:7,11
**interactive (1)**
212:23
**interest (6)**
25:14;67:11;69:5;
112:23;113:8;172:10
**interested (2)**
119:10;255:16
**interfere (1)**
119:9
**interim (3)**
32:15,17,20
**internal (4)**
222:4;225:23;
291:23;295:2
**interpretation (1)**
173:21
**interrupt (2)**
107:16;147:23
**interrupting (6)**
107:18;135:16;
148:1;163:9;167:8;
259:7
**interruption (1)**
194:18
**intersection (2)**
227:5,12
**intervention (1)**
191:23
**interview (3)**
14:23;295:6;299:1
**interviewed (4)**
15:1,19;19:12;
58:17
**intimidated (5)**
118:12;120:7;
122:1,8;182:15
**intimidating (3)**
120:13,15;326:12
**intimidation (4)**
72:13;124:7;142:7;
306:15
**into (33)**
39:12;43:15,15;
44:5;54:18;66:21;
67:1;80:16;108:17;
116:7,12,15;146:14;
149:24;151:4,23;
156:22,23;160:5;
167:12;193:24;

215:20;217:5;223:4;
226:13;227:21,22;
234:6;277:24;
290:12;299:8;309:6;
322:9
**introduced (3)**
91:16;94:4,4
**introductions (1)**
91:22
**introductory (3)**
5:16;6:8;91:15
**intuition (1)**
308:19
**investigation (1)**
223:4
**investigations (1)**
290:13
**invitation (1)**
37:9
**invoke (1)**
228:20
**invoked (3)**
227:15;228:2,8
**involve (3)**
77:1;158:3;287:14
**involved (45)**
15:24;18:24;19:18;
33:6;34:23;38:4,6,7,
10;39:9,11;45:1;
50:4;53:21;55:23;
64:15;91:3;127:9,11;
134:1;137:21;163:2,
14,22;165:1;166:11;
213:15,23;240:16;
247:14;254:19;
266:19;267:1,5,6,7;
283:19;284:5,7,12;
291:2;301:12,13,15;
313:24
**involvement (11)**
23:1;45:2,6;65:13;
173:4;211:3;237:24;
245:21;284:15,16;
316:18
**involves (2)**
227:5;261:1
**involving (2)**
7:22;154:6
**iSight (8)**
79:1,2,4;80:8,21,
24;81:2;207:3
**Island (8)**
20:4;60:23;62:5;
166:4;221:7;246:14,
18;248:22
**issuance (1)**
241:8
**issue (36)**
49:19;53:4;55:22;

80:13;99:12;103:16;
116:11;135:12;
136:7;152:18;
171:12,17;184:7;
191:22;195:6,7,8;
196:4;197:3,22;
198:10,15;201:18;
204:20;215:2,10;
218:3;225:10;
237:19;242:19;
252:20;273:17;
294:11;300:8;
310:22;323:12
**issued (4)**
97:4;284:17;316:7,
21
**issues (71)**
21:11;36:16;47:7,
8;48:17;49:7;50:7;
56:12;70:2;75:23;
76:24;83:22,24;
92:16;105:11;
115:14;117:23;
124:3,13,20,23;
125:2;126:1;127:14;
133:24,24;134:13;
147:3,17;149:5;
150:3;152:23;
153:16;155:6;157:8,
9,12,14,21;173:10;
175:24;182:10;
200:19,22;201:17;
205:9;206:11;
216:18,20;226:20;
229:13;232:11;
240:6;249:6;251:12;
255:24;256:2;
260:24;273:24;
283:6;292:1,1,5;
306:19;307:2,5;
320:2,5;325:22;
326:3,9
**items (1)**
150:13

**J**

**Jacobi (2)**
268:19;269:1
**jail (1)**
271:2
**Jain (132)**
4:4,19,19,22;5:11;
6:1;7:21;8:13,17;9:9;
10:17;17:8;26:18;
30:6;34:16;55:24;
58:13;68:6;69:17;
71:1;78:4,6,14,15,19,
21,22;79:9,13,15;

82:21,24;85:22;
86:13;87:14,16;88:4,
6;92:12;93:4;94:22;
95:4;97:9,13;98:7,
13;100:7,22;103:6;
106:4;108:11;
109:11;110:13,24;
121:20;123:14;
133:23;137:6,14;
144:19;147:7;148:2,
15;150:12,23;151:1,
20;152:8;160:9;
163:11;167:5,8;
170:7,10,13;172:3;
176:11,18;178:3;
180:20;182:23;
187:17;188:23,24;
190:22,23;193:14,16;
194:14;204:3;
220:13;225:21;
226:7;227:1,17;
228:2,8;237:9;238:3;
245:9;252:7;253:24;
257:6,18;258:21;
259:2;260:21;
270:14;271:17;
274:16;276:3;
283:17;288:9;
290:13;291:14;
293:5;298:9;301:1;
302:24;310:20;
313:8,19;316:13;
317:6,18;318:23;
319:10;322:21;
323:4;328:15;
329:18;330:3
**Jain's (2)**
    34:3;93:11
**January (17)**
    136:11,12;138:3,
    18;140:5,22,22;
    144:9;269:14;270:7;
    272:15;275:20;
    276:23,24;286:19;
    287:24;288:8
**Jeremy (1)**
    263:7
**Jessica (4)**
    49:21;67:20;164:6;
    178:22
**Jewish (1)**
    207:4
**job (7)**
    13:12,19;159:14;
    160:2;229:4;280:16;
    318:5
**jog (1)**
    249:7
**Jonathan (4)**

67:22;78:13;104:2;
164:6
**Jose (9)**
    65:5;66:16,21;
    251:19,23;253:2;
    261:12;263:3;277:13
**judge (26)**
    63:5,10;95:14;
    114:11;190:7,15;
    191:21;195:3,4,5;
    197:5,21;198:22;
    206:1;240:20,20;
    242:14;244:9,15;
    275:5,10,12;295:5,6;
    300:19;311:21
**judges (27)**
    22:9,19;23:10;
    24:8;25:16,17,20;
    27:2,4;35:21;45:5;
    127:14;235:15;
    236:24;240:2,5,6,8,
    14,17;241:21;242:7;
    243:16;244:4,8;
    245:1;275:15
**judges' (3)**
    62:2;240:11,13
**judge's (3)**
    243:20;244:14;
    295:16
**July (12)**
    48:1,24;61:2;
    161:11,24;162:3;
    170:20;201:13;
    276:23,24;279:5,11
**June (6)**
    9:15;84:6;95:2,12;
    100:9;151:2
**jurisdiction (2)**
    18:22;53:11
**justice (3)**
    35:5,13;36:3
**justification (1)**
    97:17
**justify (2)**
    93:22;173:22

**K**

**Kalish (10)**
    234:24;235:1,24;
    236:4,11,12,13,15,17,
    18
**Katz (2)**
    15:11;32:5
**Kaye (399)**
    4:5,16;5:4,6;21:11,
    17;26:12;27:6;28:3;
    29:2,14,20;33:5;40:7,
    22;41:2,4,8,9,14,23;

42:1,3,12;45:16;46:4,
10,13,15,24;47:11;
48:5,11,18;49:4;50:6,
10;51:17,23;52:7;
55:24;56:10,11,20,
23;57:9,13;65:17;
67:15,16;71:1,14;
72:3,16,23;73:5;
74:10,11,19,21;75:3,
5,11;76:3,13;77:8;
78:5,16;81:5,14,15,
21;82:13,15;83:2,18;
84:1,17;86:18;88:1,
13;89:13,23;92:9,23;
93:3;96:13;97:19;
98:23;99:8,17;
100:11,11,19;101:3;
103:10,14;104:23;
106:4,11,22;107:9,
22;108:1;112:2;
115:17,21;116:1,20,
21;117:10,16,20,23;
120:7,12,16;122:5,
10,14,16,18;123:1,2,
14,19,20;124:4,7;
128:9,12,12,15,18,20,
24;129:8,12,17,18,
19,23;130:10,19;
131:7,9,13;132:7,12,
24;135:19;139:2,12,
20;140:21;141:10,
20;142:1,12;144:8,
15,24;145:17,19,21,
23;146:4,9,15;
147:20;148:3,11,17,
22;154:19;155:4,9,
15;156:2,5,9,14;
157:7,15,17,21;
161:3,9,24;162:3;
164:8;167:24;169:3,
20;170:4,20;171:5,
24;172:4,7,14,21,22;
173:12;174:9,12,24;
175:4,9;177:4,6;
178:12,16;179:11;
180:19;182:17,21,23;
183:22;184:2;188:9;
193:18;194:1;201:8,
10,13;202:9,13;
203:7,14;204:21;
205:9,9,13,13;206:2,
10,23;208:1,13;
209:13;210:18;
211:9;212:2,15,16,
23;213:3,5;214:23;
215:10,15;216:9,13;
217:2,6,7,15,21;
218:8,13;222:14,17;
223:11,15,24;224:2,

3,15,24;225:4;
226:13;229:3,9,22,
24;230:5,15;234:14,
16;235:4,18;236:5,
16,21;237:1,3,5;
240:22;244:18,24;
245:2,4;248:8,11;
253:1,8,9,17;254:17;
255:3,8,14,21,21,23;
256:4,15,18,22;
257:5;258:2,6,10,19;
259:4,6,11,16;261:1,
3;262:23;263:14,18,
21;264:21;265:9;
266:2,19,24;267:6;
268:2,8;269:15;
270:4,7,11,17;
271:14;272:1,5,7,11,
14,21;275:18;
277:13;278:3,5,15;
279:3,5,22;280:2,10,
14,18,19;281:20;
283:12;284:9,22,22;
285:6,12,17;286:11;
292:3;294:21;300:1;
303:7,12;306:3,4,7;
307:3;312:10,17;
314:5,14;315:18;
316:4,20;317:5,20;
319:24;320:6;
322:17;323:3,3,23;
327:2,13,18,23;
328:3,4,13;329:21
**Kaye3rdProduction_50 (2)**
    94:15,18
**Kaye's (52)**
    27:7;43:10;49:11;
    52:20;57:6;82:12;
    99:1;114:17,23,24;
    129:15;131:21;
    149:1,2;161:17;
    162:14;163:3,15;
    165:9;173:23;
    176:21;178:5;
    182:12;213:14;
    214:10;223:4;224:8;
    228:19;230:9;236:1,
    10,13;237:8,15;
    251:22;252:4;
    254:23;264:14,16,20;
    265:2,18;267:8;
    278:10;281:14,22;
    286:12,13;287:7;
    313:24;321:18;
    326:16
**keep (22)**
    53:9,17,23;55:14;
    70:18,22;143:13;
    162:9;163:9;164:16;

170:8,12;211:24;
229:10;235:10;
245:18;246:2;257:2;
259:7;272:3;304:15;
327:16
**keeping (4)**
    179:1,3;206:24;
    248:24
**keeps (1)**
    259:9
**kept (5)**
    52:5;134:22,22;
    135:1,3
**key (3)**
    19:1;321:5;323:20
**kind (40)**
    7:5,7,8;30:3,4;
    33:12;43:16;44:5;
    49:3;54:11;58:13;
    62:18;63:15;69:13;
    70:7;72:13;81:22;
    88:23;118:3,9,13;
    125:6;136:23;
    139:16;143:8;
    158:17;174:17,18;
    176:9;217:24;
    235:24;240:2,2;
    251:21;265:21;
    281:19;282:16;
    287:14;301:24;307:3
**Kings (1)**
    60:24
**knew (15)**
    15:15;30:15;48:13;
    50:13;143:3;157:11,
    15,21;159:9;174:7;
    182:8;206:10;
    218:16;244:22;
    284:14
**knowing (4)**
    119:10;255:17;
    268:23;274:8
**knowledge (25)**
    11:6;31:10;35:19;
    47:17,18;66:12,17,
    22;70:23;95:8,11;
    113:10;127:16;
    128:1,6;141:7;
    142:19;155:21;
    182:1;280:8;295:3,
    14;300:5;303:5;
    309:17
**known (5)**
    20:8;157:12,14;
    212:22;320:20
**Kronos (16)**
    105:6;129:6;
    161:22;162:2;
    174:16,24;175:3,5,6,

Case 1:18-cv-12137-JPC-JLC    Document 225-3    Filed 03/05/22    Page 356 of 374

ABHISHEK JAIN, M.D.                                                                      MELISSA KAYE v.
October 4, 2021                                                  HEALTH AND HOSPITALS CORPORATION, et al.

8,10;178:2;179:10;
180:18;193:19;
202:16

**L**

**label (1)**
218:21
**labor (17)**
48:15;49:17;50:12;
66:21;67:1,15,15,21;
99:16;101:12;104:2;
162:17;174:8;
204:14;211:23,24;
212:8
**Laboy (11)**
49:21,24;50:7,10,
11;67:15,20;162:19;
164:6;178:23;212:3
**Laboy's (1)**
49:22
**lack (3)**
79:3;80:13;124:3
**lacking (1)**
322:17
**language (1)**
27:2
**languishing (1)**
21:8
**large (1)**
9:24
**last (25)**
5:21,22;8:4;14:8;
17:3;121:5,8;138:11;
153:6;156:20;286:9,
9;288:5;289:2;
300:21;301:6;
303:10;304:16,16,24;
305:2;307:24;
316:15;319:1;321:17
**late (2)**
269:14;270:6
**later (4)**
180:13;183:23;
237:14,21
**Law (13)**
4:18;26:11;53:5;
97:3;113:1;196:20;
227:6,13;298:6;
299:4;301:12;
303:16;312:15
**laws (2)**
313:4,6
**lawsuit (7)**
44:7,10,19;50:16;
69:10;255:22;260:24
**lawyer (5)**
199:1,5,15,16;
228:3

**lay (1)**
118:3
**layers (2)**
299:7;324:1
**lead (1)**
313:6
**leaders (1)**
88:20
**leadership (13)**
90:7,13,14,18,20;
139:17;153:13;
265:13;266:10;
267:15,21;276:8;
291:1
**Leading (1)**
320:4
**leaning (1)**
119:14
**learn (7)**
53:12;224:14,15;
225:4;253:1,7,9
**learned (5)**
49:10;61:11;69:10;
83:11;237:14
**least (22)**
9:21;17:15;18:9,
18;31:10;45:9;64:16;
80:11;98:24;134:16,
18;157:20,22;
168:10;208:17;
215:24;236:20;
239:15;245:3;
259:19;269:22;
296:22
**leave (22)**
30:12;56:12;
148:19,19;156:5,15,
16,23;160:12;
164:11;179:9,9;
203:15,24;204:5,12,
18,19;205:3,5;
268:20;308:4
**leaving (3)**
155:16,20;321:6
**led (1)**
105:24
**left (18)**
10:19;12:5;30:11,
19;31:4,19;32:10,11,
12;52:15,19;59:1;
78:17;104:10;145:1;
160:13;189:19;
285:17
**legal (40)**
22:18;27:1,2;
44:11,16,20;45:1,8,
10;47:2;54:18;55:11;
56:5;70:3,8,10,11;
99:12;113:6,7;

127:17;209:11;
219:24;220:3,10,19,
22;221:1,5,9,14;
222:7,23;227:9,14;
233:19;238:3;
245:17;306:5;320:1
**legality (1)**
53:19
**legitimate (1)**
267:18
**lengthy (2)**
21:4;62:9
**lens (3)**
60:1;314:19;315:2
**letter (32)**
94:21,23;95:2,12,
17,19,24;96:16;97:9,
16;98:1,6,12,15,16,
17,18,20,21;197:4;
231:2,6;233:1,4,4,15;
234:3;286:22;290:5;
291:10,12;317:19
**letting (1)**
288:24
**level (3)**
11:20;183:1;
301:13
**liberty (1)**
271:6
**license (13)**
279:10,14,15,16,
17,20,23;280:3;
281:22;282:3,12;
300:24;301:4
**licensed (3)**
54:1,2,5
**licensure (7)**
54:7;279:2,6,7,9;
283:1;303:6
**liked (2)**
292:12;323:10
**likelihood (1)**
315:4
**likely (2)**
98:19;152:5
**limitations (2)**
154:4,8
**limited (2)**
129:2;320:6
**line (10)**
63:5;119:23;160:4;
166:9;169:24;320:9;
324:3;326:14,20,23
**lines (2)**
262:2
**lining (1)**
136:6
**list (7)**
37:7,9;70:18,22;

150:13;277:1,5
**listed (7)**
86:18,19,21;87:14;
136:9;215:17;237:15
**listen (2)**
198:20;240:12
**listing (1)**
221:8
**literature (3)**
296:10;310:20;
312:1
**litigation (1)**
198:2
**little (9)**
11:19;99:7;155:3;
165:6;179:4;240:3;
242:21;249:8;251:21
**live (3)**
51:8,11,15
**Liz (1)**
15:3
**Lloyd (5)**
35:20;36:2,11;
236:23;240:1
**Lloyd's (1)**
36:7
**loathe (1)**
277:24
**loathed (1)**
299:9
**locked (2)**
57:6;160:5
**locum (1)**
122:12
**lodged (1)**
282:8
**login (2)**
178:2;180:18
**long (10)**
9:11;13:3;120:17;
125:19,19;159:20;
274:10;277:10,11;
288:23
**longer (4)**
65:13;124:15;
161:4;274:1
**longest (1)**
41:18
**look (9)**
29:11;66:21;
150:15;151:12;
174:7;185:14,16;
186:18;197:18
**looked (2)**
67:1;127:5
**looking (12)**
33:14;52:14;72:13;
102:2;155:1;156:2,5;
167:17;188:12;

192:3,12;193:20
**Looks (9)**
92:10,13,24;
100:10,10;102:22;
178:1,15,23
**loop (1)**
206:24
**Loren (2)**
4:1,24
**Lorraine (2)**
238:2,11
**Lorrie (1)**
87:6
**loss (1)**
172:24
**lot (18)**
45:2;67:3;71:15;
107:4;136:7;142:8;
144:21;152:17,19;
159:23;175:22;
200:1;219:2,5,12;
239:2;285:1;320:18
**Lucrecia (3)**
76:19;134:24;
208:9
**lunch (6)**
133:8;163:20;
164:1,9,15;168:18
**Luncheon (1)**
133:19

**M**

**MacDonald (9)**
15:2,5;30:21;32:1,
2,7;90:16,19;291:2
**MacDonald's (1)**
30:22
**Magistrate (4)**
190:7,15;191:6,21
**mailing (1)**
37:7
**main (7)**
25:4;49:20;77:20;
128:1;162:21;
215:21;260:24
**maintain (5)**
19:22;20:1,18;
60:16;216:11
**major (1)**
90:8
**majority (1)**
30:7
**makers (1)**
212:1
**makes (2)**
129:11;284:19
**making (12)**
25:14;81:1;112:10;

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 357 of 374
MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.
ABHISHEK JAIN, M.D.
October 4, 2021

137:21;159:18,24;
202:2;213:16;214:8;
264:6;287:10;292:7

**male (8)**
109:3,6,7;115:13;
183:3,10;321:19;
326:4

**malingerers (1)**
119:2

**Malingering (6)**
118:20,21;119:21;
143:1,9;238:17

**manage (4)**
9:19;171:23;172:4;
218:7

**managed (3)**
60:21;61:3;246:5

**management (29)**
22:18;23:10;29:15,
22;49:6;60:22;61:1;
66:8,13;139:13,21;
153:14,16;157:18;
164:19,20;168:13;
169:10;171:23;
172:4,13;213:5,15;
218:7;256:5;289:10;
304:11;317:20;
318:13

**managerial (2)**
33:15;169:24

**managing (4)**
150:5;218:11;
249:9,23

**mandates (1)**
97:3

**mandatory (1)**
207:3

**Manhattan (10)**
48:2;60:22;92:2;
161:23;168:11,12;
210:10;221:7;325:9,
11

**manifest (1)**
20:10

**manner (4)**
28:12;29:9;108:6;
140:13

**many (25)**
9:19;10:2,21;
17:13;20:24;21:1;
22:5;41:24;62:14;
72:10;120:1,2;
159:11;175:7;
182:21;238:20,24;
255:13;258:9;
271:11;274:21;
277:7;285:19;287:3;
311:12

**March (2)**

178:10;180:24

**Marci (2)**
4:1,24

**mark (4)**
199:2,2,6;200:10

**marked (19)**
77:13,16;85:15,19;
94:14,18;99:19,23;
149:15,19;177:9,13;
192:9,11;195:19;
198:17;288:1,4;
305:12

**material (4)**
25:21;52:19;66:4,4

**materials (1)**
104:16

**matter (39)**
4:4;5:7;8:1,3,16;
23:1;34:17;49:16;
50:13,15;53:11;56:5;
62:14;66:6;67:7;
69:8;70:7,9;72:14;
73:10;76:21,23;82:9;
99:15,17;101:11,13;
104:4;132:3,4,23;
162:4;184:8;216:7;
245:17;277:13;
295:2;297:23;310:22

**matters (30)**
7:22;8:22;36:15;
48:13;51:5;67:10;
71:24;77:1,3;105:14,
18;113:7;124:17;
127:11;128:14;
129:22;130:2,5,17;
131:8;233:8;237:8;
251:7;257:22;
259:24;292:1,2;
304:2,6;313:13

**may (98)**
3:12;6:11;7:9;
14:8;18:3;24:10;
30:15;31:15;32:13;
38:9;43:18;46:13;
51:23;52:4;55:12;
70:9;80:5;83:17;
93:3,10;100:21;
101:19;102:11,12,14,
24;103:3,4,4,5;
109:22;116:15;
117:7;119:14,20,21;
130:12,12,23;135:2;
137:3;138:5;140:1;
155:1,7;156:23;
157:9;159:14;
160:22;161:11;
163:21;167:21;
169:9;174:5,18;
179:23;180:13,14;

197:13,13;205:4;
206:21;207:14;
210:10;214:6,17;
215:23;217:7;
219:18,20;237:18,20,
22;244:21,24;
250:23;251:13,17;
256:2;262:1;263:23;
273:19,19,22,23,24;
274:11;277:11;
280:13;282:9;284:7;
286:22;303:22;
307:21,22;311:24;
313:6;315:11

**maybe (8)**
125:22;180:10;
181:19;239:22;
250:14;269:18,18;
271:14

**mayor (1)**
20:4

**mayor's (11)**
20:9;35:4,12;36:2;
135:22;137:9,16;
222:9;269:2;276:12,
18

**McEvilley (6)**
238:2,11,15;306:7,
9,23

**MD (3)**
4:4,22;96:2

**mean (32)**
16:23;20:23;44:16;
46:16;50:1;53:22;
55:5,21;60:19;67:17;
69:13;76:9;80:5;
91:11;105:2;120:7;
153:20;161:20;
183:19;212:14;
219:1;226:10;237:7;
248:4;264:19;
285:11;286:3;
301:22;305:1;313:9;
327:5,6

**meaning (4)**
118:23;119:3;
212:23;225:2

**means (7)**
72:18;191:2;
218:12;245:7;271:1;
279:8;315:24

**meant (1)**
61:5

**measures (1)**
113:13

**medical (69)**
7:24;8:3,6;9:17;
11:22;12:6,15,18,22;
13:4;16:8;19:13;

21:18,22;22:13,20,
20;23:1,11,12,23,24;
24:20,23;25:13;
26:14;27:8,17;28:6,
24;29:1,22;30:23;
42:10;61:22;84:2,8,
17,24;85:3;86:24;
88:14,24;89:14;
90:22;91:13;93:6,18;
96:14;97:20;100:8;
101:7;157:8;227:9,
14;241:8,9,12;242:2,
17;247:4;279:10,14,
15,16,17;281:22;
282:12;303:6;313:2

**medical-legal (1)**
228:5

**medication (3)**
5:21,22;247:14

**Medicine (5)**
12:1,11;43:9;44:1;
233:13

**meet (49)**
71:9,16,18;73:5,6,
8,11;74:22;75:4,6,11;
76:4;80:3;81:15,20;
82:11,16,21;83:3;
105:21;107:5,6,11,
23;108:2,5,18,19;
128:8;133:9,11;
211:18;214:11;
219:3;223:24;
236:10,15,17;244:8,
13;285:20;293:8,11;
328:11,15,19,21;
329:2,4

**meeting (34)**
36:17;89:2;90:15;
116:10;131:6;
134:10;201:9;
205:24;206:10,24;
216:15;234:15,17;
235:5,14,19,20;
236:1,6,12,24;
240:16,18,24;241:4;
244:22;245:1;
257:13;260:2;269:1,
4;292:7;306:6,18

**meetings (43)**
35:10,20;36:20,20,
23;37:2,5,10,14;45:2;
71:10;73:17,18;
82:18;90:16,18;91:4;
107:3;108:7,15;
120:17;128:18;
202:3;205:10,14,21,
22;206:4;216:14;
219:4;220:9,18;
222:1,9;234:17;

240:19,22;241:1,3;
293:13,15,19;301:8

**meeting's (1)**
236:5

**Melissa (3)**
4:4,16;154:12

**memo (11)**
283:9,11;307:9,21;
313:20;314:21,22;
316:7,17,19,21

**memorandum (3)**
304:10,23;309:7

**memory (4)**
234:13;246:12;
249:8;289:13

**men (1)**
110:22

**mend (1)**
323:19

**Mental (17)**
5:1;8:1,7,23;9:3,
12,23;10:8,10,13;
11:2;95:4;97:7,21;
160:14,17;313:1

**mention (1)**
327:2

**mentioned (35)**
6:15;20:22;32:11;
43:22;61:21;67:14,
24;68:24;69:21;
71:14;79:2;83:12;
88:24;93:12;105:3,
19;108:24;124:2;
147:11;154:17;
172:16;174:17;
206:17;209:9;219:9,
12,17;221:2,13;
223:22;255:12;
292:4;296:23;302:7;
327:7

**mentioning (1)**
327:16

**mentions (1)**
123:24

**mentor (2)**
13:14;160:23

**mentors (1)**
160:20

**menu's (1)**
297:16

**message (5)**
75:19;78:17;82:1;
86:5;164:13

**met (7)**
81:21;95:5;107:11;
128:21;236:11,17;
292:18

**Michael (2)**
275:5,12

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 358 of 374

ABHISHEK JAIN, M.D.                                                    MELISSA KAYE v.
October 4, 2021                                    HEALTH AND HOSPITALS CORPORATION, et al.

**Michelle (1)**
240:17
**middle (2)**
62:19;178:21
**might (19)**
23:2;24:14;53:21;
55:11;61:24;69:24;
153:8;158:16;
160:21;178:12;
214:18;234:12;
251:8;252:8;274:12;
298:24;299:4;
310:14;326:19
**mind (7)**
5:17;144:1;158:24;
159:4;210:11,12;
319:5
**mindful (2)**
119:9;291:9
**mine (4)**
52:18;61:10;93:11;
170:15
**minute (2)**
136:22;156:20
**minutes (7)**
58:5;133:11;
222:19;242:22;
278:20,20;305:3
**mischaracterization (1)**
141:17
**misdemeanant (1)**
268:16
**misdemeanants (1)**
271:6
**misdemeanor (2)**
243:10;268:15
**misdemeanors (5)**
19:6,8;243:3;
244:2;293:22
**mismanagement (1)**
318:3
**misrepresent (1)**
186:12
**miss (1)**
175:13
**missed (3)**
33:8;121:5;130:23
**missing (10)**
55:16;56:8,22;
57:16;90:8;178:24;
183:23;185:11;
216:19;329:20
**mission (1)**
60:2
**mistake (6)**
72:23;73:3;75:4;
176:11,12;188:14
**mistaken (1)**
74:22

**mistakenly (1)**
188:14
**mistakes (5)**
175:19;176:13,20,
23;177:1
**misunderstood (1)**
115:2
**MOCJ (8)**
13:18;34:24;35:6,
17,17;36:18;37:1;
236:23
**modifications (1)**
180:3
**modify (2)**
18:3;43:18
**moment (2)**
58:24;200:18
**money (1)**
292:9
**month (1)**
239:16
**monthly (2)**
36:17,20
**months (13)**
9:13;33:24;35:11;
36:15;39:24;40:8;
81:7,8;125:22;151:4;
157:20;207:24;277:6
**moratorium (1)**
269:16
**more (53)**
5:16;11:4;14:20;
42:12;45:24;50:15;
61:11;62:12,16;65:9;
70:1,8,8;87:2;99:8;
110:4;117:8;136:7;
151:6,14;153:9;
155:3;159:21;160:7;
215:10;217:5;
234:12;238:16;
239:8,10,18;240:3;
242:21;251:8,10;
257:5,12;260:21;
265:14;267:20;
285:24;288:22;
300:4;303:19;304:1;
314:11,13;315:4;
322:15,23;325:9,11;
327:23
**morning (10)**
5:11,12;78:15,16;
165:21,22;167:17;
186:11,24;214:3
**most (11)**
41:14;89:2,22;
90:3,10;94:9;129:11;
152:5;174:6;271:16;
325:7
**mouth (1)**

303:10
**move (5)**
33:12;58:14;
142:15;178:18;
234:20
**much (12)**
41:23;42:2;197:4;
199:12,21;200:23;
239:18;258:5;261:3;
276:17;286:5;321:17
**Muir (3)**
78:2,2,13
**Mullan (31)**
117:1,9,13,16,17;
118:4,20;120:2,15,
22,24;121:24;122:12,
15;123:1,4,15;
124:10;142:13,16,17,
24;143:7,18;144:1;
145:1;234:6;253:5;
319:16;321:6,10
**Mullan's (5)**
122:11,16,18;
123:2,20
**multiple (33)**
12:17;40:19,19;
53:22;62:9;65:10;
71:7;132:19;140:2,
17;143:14;144:2;
146:4;160:6,6,19;
161:1;168:8;174:23;
175:4;209:3;220:6,6;
221:24;233:1;
237:19;239:15,16;
271:19;272:10;
275:22;312:4;323:24
**Mundy (30)**
28:14,20;41:22;
42:12;43:1;85:2;
89:13,24;91:8;
110:12;143:21;
145:15;148:21;
168:14,15,16;202:1,
2;210:11;215:1,7,11,
14,15;216:23;237:7,
15;302:8;321:21;
325:13
**Mundy's (8)**
43:20;85:6;86:22,
23;91:8,12,24;109:15
**must (2)**
179:8;298:21
**mutual (2)**
14:20;131:12
**mutually (2)**
129:7;131:14
**myself (17)**
18:10;59:24;72:11;
128:21;131:7;

133:10;195:10;
257:1;262:15;
289:19;295:12;
304:7,20;315:9;
324:8;329:8,12

**N**

**name (14)**
4:1,11,15;8:8;88:5,
6;220:16;261:12;
268:12,24;269:8;
275:3,11;311:4
**named (3)**
68:24;234:23;
290:19
**namely (1)**
19:22
**names (3)**
220:8;221:4;285:1
**narrative (1)**
136:23
**national (3)**
14:5,15;301:13
**nationally (2)**
301:15;312:4
**naturally (2)**
267:12;322:4
**nature (4)**
68:21;231:17;
256:12;276:10
**necessarily (15)**
29:9;31:3;54:22;
64:8;128:4;159:16;
200:19;233:18;
239:21;274:11;
297:3,23;298:16;
312:6;326:1
**necessary (5)**
23:2;24:14;26:4;
89:12;226:18
**need (46)**
6:13,19;27:3,17;
47:3;61:24;64:14;
68:22,23;69:5;71:16;
73:13;76:21;77:19,
23;95:20;107:5,10,
11;162:1;176:5,6;
178:20;180:15;
187:1;188:22,24;
189:5,10;190:19;
191:7,13;193:3;
197:23;198:12;
208:17;265:3;
273:22;278:2;
279:15;288:11;
294:15;298:3;
307:20,20;320:8
**needed (43)**

21:22;24:18;26:24;
28:1;46:1;50:13;
61:22;62:7;69:6;
77:5;82:7;103:24;
105:15;107:6;108:5,
6,18;113:8;122:22;
125:6,24;129:22;
139:18;145:9;
158:20;164:8,14;
180:3,4;214:9;
231:13;232:3;
241:14;252:19,21;
265:11;267:16,17;
269:10;281:12;
293:19;300:18;
302:18
**needing (1)**
157:9
**needs (14)**
64:3;76:17;86:3;
112:7;192:16;211:4;
213:21;214:11;
239:4;240:13;244:8;
273:21;284:3,17
**negative (4)**
148:17,21;194:1,6
**neither (2)**
182:2;230:7
**neutral (1)**
132:14
**New (42)**
4:17;5:1,2;9:23;
11:8;15:23;16:2,6,
17:20,23;18:19;19:1,
2,6;20:24;39:12;
40:3;53:12;54:2;
79:7;85:10;96:18;
97:7,23;153:12,13,
16;154:7;159:1,13,
16;160:3;230:24;
282:12;283:2;291:5;
297:20;298:2,11;
305:20;308:23,23
**next (10)**
68:22;69:5,23;
92:5;108:15;154:11;
222:19;243:14;
281:11;284:4
**nine (1)**
169:20
**nine-hour (2)**
211:11;212:3
**nod (1)**
6:12
**non-confidential (1)**
251:11
**non-criminal (1)**
154:9
**non-deposing (1)**

199:15
**nonetheless (1)**
103:24
**non-operational (1)**
318:7
**non-treatment (1)**
25:15
**non-urgent (1)**
150:13
**nor (1)**
196:18
**normal (2)**
198:23;199:21
**normally (1)**
271:11
**Northeast (1)**
11:24
**Notary (1)**
4:23
**note (5)**
4:9;183:20;191:16;
297:7;319:1
**noted (1)**
330:12
**notes (60)**
51:19,24;52:5,8,14,
17,18,22,24;53:10,
13,17,18,18,21,22,22;
54:24;55:15,16,18;
56:1,8,14,16,17,18,
21,24;57:4,7,8,10,14,
15,16,24;70:24;71:2;
73:23;74:2,12;
105:19;183:19,20,22;
184:8,12,15;216:19;
219:12;260:5;297:7;
323:15;326:11;
327:17,18,24;329:17,
20
**notice (3)**
193:24;216:2;
309:7
**noticed (1)**
176:2
**notified (1)**
238:19
**November (14)**
136:11,11,12;
138:12,15,17;140:5,
22;144:9;225:22;
234:5,15;270:6;
273:20
**number (48)**
10:11;18:5,9;19:4;
21:11;31:17;42:11;
61:20;80:12;87:14,
14;127:12;134:16,18,
20;135:3,23;138:19;
150:5,11;151:10,13,

16;165:16;194:8;
210:15;219:4;
238:23;239:5;
258:13,14;267:20;
270:19;272:22;
273:10;276:13,15,16,
17,22;277:9;281:7;
293:17,18;301:3;
317:10;320:18;326:8
**numbers (4)**
135:18;136:2,5;
266:8
**numerous (2)**
18:11;135:21
**nutshell (1)**
196:3
**NYC (3)**
100:2,2;150:11
**NYC_2014 (1)**
149:19
**NYC_235 (2)**
85:15,20
**NYC_281 (1)**
99:23
**NYC_283 (1)**
99:23
**NYC_3947 (3)**
177:12,16,20
**NYC_3957 (1)**
177:12
**NYC_671 (2)**
77:13,22
**NYC-671 (1)**
78:1
**NYCRR (1)**
97:5

---

## O

**oath (7)**
3:14;4:10;98:13;
291:13,15,18,24
**object (4)**
8:12;152:24;153:2;
318:23
**objected (2)**
247:18,23
**objecting (2)**
29:3;319:11
**Objection (314)**
5:24;7:20;9:1,6;
10:5,23;14:10;15:21;
16:11;17:2,3;18:1,
20;19:14;20:5,12;
21:14,20;22:15,22;
23:13,17;24:1;25:1,
9;26:6,16,21;27:10,
19;28:8,15;29:5,16,
23;30:13;31:20;

33:17;35:2,7,14,23;
36:6,12;37:3,16;
38:16,22;39:6,14,21;
40:24;41:6,12;42:6,
18;44:9,13,23;45:19;
46:6,19;47:15;48:7,
21;49:12;50:2;51:9,
20;52:2,9;53:2,7,14;
54:13,20;55:2,7,20;
56:3;57:20;58:22;
59:4,14;60:7;61:7;
63:1;64:22;66:10,23;
67:18;68:14;69:14,
19;71:3;73:1;74:5,
14,23;79:19;80:17;
81:16;82:23;83:8,19;
84:10;85:7;89:15;
90:24;93:24;95:6;
97:11,24;98:3,8;
99:2;100:24;101:22;
103:20;104:7,12,18;
107:14;109:4;
112:24;114:2,20;
115:6;116:4,22;
117:11;123:9,21;
124:24;126:17;
130:14,21;131:4,16,
23;132:9,17;134:3;
137:5;138:13;139:6,
23;140:7;141:4,22;
143:11,12;144:12;
145:2,24;146:16;
147:21,21;148:12,23;
153:4;154:1;155:17;
156:6;157:4;159:7;
161:6;164:22;
165:12;167:18;
168:2,23;169:6,14,
22;170:5,24;171:7;
172:1;173:1,17,24;
174:10;175:1,21;
176:14,22;178:14;
180:1;182:4;183:5;
184:1,13;194:3;
201:16;202:6,11;
203:8,18;204:4,8,23;
206:13;207:5,21;
210:20;211:14;
212:5,19,24;213:8,
17;214:4,12;217:11,
16;218:9;223:6,21;
224:4,10,19;225:7,
13;226:1;227:2,8,18;
228:3,22;229:8,17;
230:6,12;231:23;
232:7,20,24;235:6;
236:7,9;237:2,10;
238:14;244:19;
247:10;249:12,18;

250:7,13,21;251:24;
253:12;254:13;
255:10;256:6,17;
257:8,16;258:11,20;
261:17;264:23;
265:7;266:22;267:3,
11;268:3,21;269:24;
270:18;271:18;
274:6,18;275:7,14;
276:5;277:3;280:6,
23;281:24;282:19;
283:3;285:3;290:21;
291:20;292:14;
294:24;296:5,15;
297:9;298:5,7,18,23;
299:12,18;301:2;
308:20;309:16;
312:7;313:11,21;
314:3,16;315:7;
316:8;317:22;
318:10,20;320:4;
323:11;327:4,20
**objections (3)**
3:7;26:13;319:3
**objective (4)**
20:19;59:17;
119:23;245:15
**objectives (3)**
19:11,17,23
**obligations (1)**
205:15
**obscure (2)**
24:24;294:4
**observance (1)**
207:9
**observations (1)**
260:17
**observe (1)**
248:13
**observed (1)**
183:14
**observers (1)**
251:16
**observing (2)**
127:7;222:8
**obtain (11)**
24:17;26:1;27:17;
52:16;57:5;61:22;
62:2;67:12,12;
111:21;309:14
**obtained (7)**
21:23;66:1;67:4;
136:1;149:7;219:10;
253:24
**obtaining (1)**
62:16
**occasion (7)**
76:21;117:8;119:7;
128:14;178:6;

215:11;295:5
**occasional (1)**
35:9
**occasions (2)**
118:13;127:12
**occur (5)**
4:8;84:7;265:12;
296:8;297:16
**occurred (10)**
7:9;56:9;162:2;
209:3;285:8;291:1,
11;293:14;322:5;
329:22
**occurring (9)**
140:2;143:24;
260:9;277:20;
283:18;284:2,14;
293:19;319:20
**October (19)**
4:6;14:16;71:17;
78:5;81:6;82:1;
104:23;106:6,14,21;
210:17;217:6;257:7,
13;269:14;270:7,12;
272:15;275:19
**off (36)**
5:22;8:13;36:24;
75:22;86:11;90:2;
92:15;105:15;
108:24;122:16;
129:6,9;157:10;
159:3;176:1;178:12,
16;179:19;180:8,23;
181:4,6,12,20;
188:10,11;191:1,5;
206:1;221:8;265:5;
290:11;299:24;
315:17;320:8;323:3
**offer (2)**
213:4,5
**offered (3)**
40:6;71:11;209:16
**Office (37)**
5:1;8:1,7,23;9:3,
12;10:8,10,13;11:2;
35:4,12;36:2;52:21;
57:6;104:17;108:17;
120:18;135:23;
137:9,16;160:14,17;
181:8,16,17;217:6,
15;222:9;236:2,10,
13;269:2;276:12,18;
289:22;290:1
**officer (5)**
3:13;30:23;103:19;
104:6,11
**officers (1)**
200:21
**official (1)**

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 360 of 374

ABHISHEK JAIN, M.D.                                                                    MELISSA KAYE v.
October 4, 2021                                          HEALTH AND HOSPITALS CORPORATION, et al.

292:6
**officially (1)**
  203:7
**off-site (10)**
  261:6,8,11,21,22;
  263:2,23;264:8,12;
  265:15
**often (44)**
  14:6;21:4;24:12;
  25:23;33:23;35:6;
  36:10,24;62:10;
  75:15;76:16;90:15,
  17;111:3;117:6,24;
  118:21;119:1;
  120:17;122:22;
  124:6;128:3;134:12;
  149:9;165:22;166:5,
  20;167:11;180:4;
  182:17;218:21;
  239:12,17,19;241:6,
  9,10;277:5;279:20;
  285:7;294:14;
  310:10;311:12;324:3
**Oftentimes (2)**
  64:13;320:7
**Ohio (10)**
  11:24;12:10,12;
  16:19;17:19,22;
  18:16;19:8;70:17,21
**Olay (1)**
  158:6
**once (4)**
  12:13;14:23;
  243:18;284:17
**one (135)**
  4:8;6:10,16,17,18;
  11:1,4,6;12:9,23;
  21:7,24;41:18;43:18,
  24;45:8;46:16;52:14;
  59:16;60:9,22;61:4;
  62:8,10,14,15,20;
  64:9,11;68:2;71:7;
  81:15,15;82:6;86:16;
  87:8,14,20,21,22,23;
  98:24;101:21,24;
  102:1;107:1;117:8;
  118:18,22;119:14;
  124:9;125:3;127:22;
  131:2;137:7;144:3;
  148:20;150:8;
  152:23;154:4,23;
  157:6,6;161:8;
  163:18;165:8;182:2;
  185:18;186:6;
  190:13;194:22;
  195:11;196:19;
  208:6,21,22;209:6,
  24;214:8;215:5,11;
  221:19;222:18;

227:21;233:5;
  236:20;237:20;
  241:2,5;244:9;
  247:18;248:2,20;
  256:20,20;258:17;
  259:3,21,22;260:23,
  24;261:4,10;269:15;
  270:13;271:9,15;
  275:15,16;276:11;
  283:23;290:4;294:5;
  295:4,21;298:3;
  300:9,15,20;304:16;
  306:6;307:10,10,12,
  15;309:22;311:3,14,
  16,23;319:23;
  320:10;321:5,17;
  326:15
**one-hour (4)**
  163:20;164:1,15;
  168:18
**one-on-one (1)**
  73:18
**one-party (6)**
  297:20;298:2,11,
  12,20;299:5
**ones (1)**
  18:10;136:4;
  147:10;161:1;
  258:17;271:6;311:2
**one's (2)**
  87:24;307:16
**ongoing (4)**
  71:10;73:17;77:6;
  173:8
**online (2)**
  13:17;68:17
**only (45)**
  6:15,17;11:6;
  15:15;20:24;32:20,
  20;46:4,13,16;52:18;
  81:6;87:14;105:13;
  127:20;153:21,22;
  160:5,9;167:24;
  169:3;197:11,17;
  208:2,6,13,13;219:8;
  222:2;241:22;
  243:17;254:16;
  257:3,15;258:17;
  259:2,3;267:1;
  271:14;272:9;
  288:21;289:19;
  295:7;298:3;300:8
**open (8)**
  77:6,18;165:3,5,10,
  11;308:4;323:6
**opened (5)**
  165:7,15,19,21,24
**opening (1)**
  77:18

**openings (2)**
  158:19;325:2
**openly (1)**
  110:5
**operated (2)**
  20:11;35:18
**operations (2)**
  9:22;78:3
**opine (1)**
  113:1
**opinion (21)**
  22:7;23:6;27:22;
  62:1;63:24;65:1;
  66:14;88:19;119:10,
  20,22,23;184:16;
  222:2;226:22;
  229:20;230:15;
  241:14;245:16;
  312:5;317:4
**opinions (7)**
  110:5;118:18,24;
  119:11;122:4;
  246:24;322:7
**opportunities (1)**
  160:13
**opportunity (16)**
  59:24;68:7;72:1;
  95:17;160:15,17,18,
  21;195:13;197:16;
  223:18,19;255:5,7;
  289:1;318:23
**oppose (1)**
  27:24
**opposed (2)**
  29:1;159:16
**opposing (1)**
  196:20
**opposition (1)**
  91:17
**option (2)**
  213:6;224:6
**options (1)**
  190:2
**order (46)**
  21:5;22:4,6;24:9;
  27:5;50:7;62:2;63:6,
  10;66:2;87:15;89:18;
  96:23;97:3,5;171:23;
  192:8;196:9;197:1;
  198:16;204:22;
  209:15;214:10;
  241:7,17,21,23;
  242:1,4,14,15;262:9;
  264:15,20;265:4;
  272:11;277:6;
  279:16;295:17;
  298:4;299:22;
  300:11,14,19;302:19;
  309:21

**ordered (9)**
  63:11;65:9,15;
  79:5;80:14;192:10;
  196:12,16;253:4
**ordering (3)**
  62:19;226:18;
  330:8
**orders (15)**
  21:3;22:9;134:20;
  138:23;139:11;
  140:12,20;192:7;
  240:11;242:5,6,9,10;
  243:14;295:9
**order's (1)**
  87:13
**organization (6)**
  10:14;157:18;
  173:15;310:15,16;
  311:22
**organizational (2)**
  31:5;122:13
**organizations (5)**
  44:8,12;127:18;
  135:20;301:14
**orientation (2)**
  50:23;51:3
**original (1)**
  73:23
**originally (3)**
  61:10;204:21;
  212:16
**others (21)**
  22:24;56:18;94:8;
  119:24;123:24;
  157:14;163:22;
  169:9;175:15;198:2;
  230:17;250:4;263:7;
  264:14;265:15;
  266:10;267:7;291:2;
  324:8;328:12;329:3
**otherwise (8)**
  50:17;73:20;
  144:21;149:7;
  199:24;213:22;
  300:11;306:18
**ourselves (1)**
  300:17
**out (66)**
  13:19;14:17,21,22;
  25:5,6;31:12;51:18,
  24;53:13;54:24;
  56:15,17;57:15;58:1;
  70:10;88:4;111:23;
  142:10;156:21;
  158:1;161:1,20;
  162:4;171:24;172:4;
  175:15;180:4;181:1,
  3,16,17,23;184:3;
  188:17;195:15,15;

200:4,22;203:24;
  204:13;209:4;
  210:13,16;212:17;
  214:18;215:22;
  218:8,12;221:12;
  225:4,11;230:24;
  235:4;260:5;262:24;
  263:1;266:9;281:11,
  20;283:8;303:4;
  306:21;311:24;
  324:9;326:11
**outcome (8)**
  56:13;211:2,6,8;
  224:20,22;225:12,19
**outline (2)**
  222:24;311:16
**outlined (3)**
  99:14;317:1;
  328:10
**output (1)**
  134:19
**outside (14)**
  47:5;89:17;222:20;
  223:16;224:3;
  256:18;257:6;
  262:22,24;269:3,5;
  271:7;283:24;295:16
**over (22)**
  5:13,15;6:7;18:18,
  19;27:4;37:24;41:19,
  21;47:20;76:18;
  161:22;168:10;
  169:10;176:19;
  177:18;238:22;
  247:8;266:13;
  299:24;304:17;309:4
**overall (6)**
  10:12;15:23;80:4;
  116:12;144:14;
  171:22
**overlap (4)**
  10:7,9,12;248:17
**oversaw (3)**
  18:6;246:7,23
**oversee (4)**
  9:20;16:3;129:12;
  246:15
**overseeing (4)**
  9:24;15:24;20:15;
  88:21
**oversees (1)**
  33:2;129:12
**oversight (7)**
  18:8;39:1;122:15;
  246:17;247:7,8,15
**Owen (24)**
  15:3,9;58:16,20;
  59:3,8;86:16;87:21;
  88:1;92:8,22,23;

96:9;145:15;210:12;
302:8;321:23,24;
322:3;324:13,14,17;
325:16,17
**Owens (1)**
110:20
**own (10)**
19:16;69:6,24;
89:19;135:2;154:6;
182:23;183:14;
295:21;309:19

**P**

**page (7)**
178:21;185:18;
192:15,21;317:11,11,
14
**pages (15)**
186:7,11,13,23;
187:5;189:7,8,15;
192:8;195:21;
197:17;198:5;
199:13;278:2;288:23
**paid (1)**
202:3
**paint (1)**
136:8
**panel (1)**
58:17
**paperwork (3)**
279:6,9,23
**paragraph (6)**
79:12;96:22;
197:18;288:19;
307:24;309:6
**parameter (2)**
114:7,15
**parameters (4)**
111:13,16;113:11;
262:19
**parity (9)**
48:6,12;49:6;
67:16;99:9,12;
105:11;161:11;
201:18
**Parker (4)**
265:19,20;268:1,8
**Parker's (1)**
267:2
**part (43)**
11:11;31:10;38:15;
48:4;50:23;52:5;
53:16;58:16;82:3;
113:5;114:15;120:6;
121:6,8;158:1;160:1,
2;168:21;169:23;
193:10;194:10;
210:1;217:24;218:6;

252:13;266:1;
281:16,17;283:16;
284:15;285:9,11;
292:17;293:7,9,10,
13;300:11;302:24;
303:11;305:20;
317:19;322:4
**partially (1)**
172:22
**participants (1)**
90:20
**participate (6)**
23:21;38:11;272:5;
301:9;316:12,16
**participated (3)**
39:2,17;261:2
**participation (1)**
245:21
**particular (29)**
14:18;66:13;
114:19;132:20,23;
133:2;144:17;180:3;
194:8;195:22;
199:17;204:17;
207:8;215:2;227:21;
245:13,13;251:18;
254:17;259:10;
263:24;264:1;282:7;
288:13;295:11;
314:20;316:17,19,23
**particularly (4)**
66:1;110:8;134:2;
252:19
**parties (5)**
3:2;4:2;191:22;
199:20,24
**parts (3)**
142:11;196:7;
255:1
**part-time (4)**
46:9;118:6;124:21;
168:24
**pass (1)**
200:11
**patient (9)**
62:1;113:18;
245:14;248:21;
299:2;312:14;313:3;
315:5,11
**patients (14)**
18:12;114:1;
312:18;313:17,20,24;
314:5,6,9,10,14,19;
315:3,18
**Patsy (6)**
32:3;90:16;292:11,
18,22;293:1
**pattern (12)**
218:1;222:11;

255:14;256:1;258:7,
16,22;260:4,8,20;
285:24;329:5
**patterns (2)**
183:16;260:15
**Paul (1)**
13:14
**pay (16)**
48:5,12;49:6;
67:16;99:9,12;100:8;
101:6,19;105:11;
161:11;201:14,18;
202:9,10;228:13
**paycheck (1)**
175:14
**payment (1)**
172:24
**payroll (5)**
179:22;180:4,9,13,
16
**PDF (2)**
192:7;195:20
**Peck (1)**
220:18
**penal (1)**
126:16
**penalty (1)**
313:7
**pending (1)**
269:3
**Pennsylvania (8)**
16:19;17:19,23;
18:7,17;19:9;70:17,
21
**penological (1)**
308:18
**pension (1)**
194:2
**people (30)**
10:2,13;14:21;
89:9;110:5;116:20;
118:21,23;142:5;
143:7,8,14,16;
144:10;147:13;
156:10;159:19;
160:5;162:21;182:5,
8,8;198:24;207:9;
210:5;231:4;263:22;
275:22;281:4;307:4
**PeopleSoft (7)**
215:8,12,16,18,20;
216:3,24
**per (8)**
10:18,20;11:1;
55:1;156:16;162:11;
229:4;266:18
**perception (1)**
73:6
**perform (2)**

238:20;308:17
**performance (5)**
34:3;123:3,6,7;
134:11
**performed (2)**
16:18;17:9
**perhaps (11)**
7:7;8:12;36:15;
73:9;81:9;153:12,18;
231:8;269:14;277:6;
319:24
**period (39)**
11:13;14:9;30:18;
32:8;36:22;38:8,10;
40:4,4;46:13,15,16;
48:9;104:5;138:5,24;
140:4,24;141:3;
152:11;156:21;
159:20;162:5;171:2;
174:18;184:3;
207:16;209:4;
243:11;270:11,20;
271:15;272:15;
275:2,13,19;277:1;
278:9;290:24
**periodic (3)**
36:20;51:14;90:16
**periodically (1)**
279:18
**periods (5)**
21:4;45:21;62:9;
120:18;139:4
**permissible (1)**
298:4
**permit (1)**
304:16
**permitted (4)**
113:14,22;252:12,
14
**perpetuity (1)**
329:20
**Persaud (2)**
208:9,11
**person (23)**
6:17,18;49:19,20;
88:7;94:10;103:18;
104:3;117:9;128:1;
129:15;143:6;161:8;
163:18;182:1;
208:14;220:16;
238:16;284:11;
298:3,21;323:4,10
**personal (13)**
52:22;56:16;176:6;
182:23;184:15;
204:1,11;205:5;
214:23;237:8;267:9;
323:12;326:21
**personally (3)**

55:14;289:17,18
**personnel (5)**
206:1;235:15;
282:18,24;283:1
**persons (1)**
298:15
**person's (1)**
298:1
**perspective (1)**
183:13
**pertain (1)**
295:23
**pertained (2)**
17:6;28:14
**pertaining (1)**
22:19
**phase (1)**
47:23
**PHI (3)**
303:7,13;312:12
**philosophical (1)**
159:21
**phishing (4)**
265:18,22;266:5;
279:4
**phone (7)**
14:13;73:9;76:22;
108:12;143:22;
194:18,23
**phrase (1)**
144:5
**physical (1)**
215:4
**physically (1)**
299:2
**physician (3)**
250:11;282:5;
315:19
**physicians (2)**
54:8;226:17
**Physician's (2)**
231:1,10
**pick (2)**
121:21;191:7
**picked (1)**
166:14
**pieces (1)**
158:11
**pilot (5)**
45:7;242:23;243:6,
22,24
**pinpoint (1)**
125:15
**Pittsburgh (3)**
12:7,15;13:4
**place (37)**
5:14;48:24;61:23;
62:4;112:4,12;
113:11,14;128:20;

130:17;136:2;
176:19;198:24;
236:1,5;237:21;
238:24;249:16;
250:5;261:16,20;
263:15;266:18,21;
274:3;277:22;
294:12,18,20;295:9;
299:10;302:18;
304:5;309:19;
310:10,17;311:16
**placed (1)**
    78:16
**places (3)**
    221:19;237:19,22
**plain (1)**
    99:8
**plaintiff (5)**
    4:16;5:7;192:5;
287:24;288:8
**Plaintiffs (2)**
    77:21;94:14
**Plaintiff's (21)**
    77:12,17;78:1;
85:14,19;94:17,22;
99:19,22;102:4,7,9;
149:15,18;177:11,15;
191:23;287:22;
288:5;305:11;307:6
**play (5)**
    38:15,19;112:21;
266:1;302:24
**Please (62)**
    4:9,11,13;6:20;8:5;
17:3;80:20;85:24;
86:9;87:12,20;88:3;
92:20;93:7;95:19,21;
107:15;113:4;
115:19;133:9;147:6,
22;166:24;167:4,5,8;
174:11;176:14;
177:21,22;180:12,15,
23;181:5;185:20;
186:12,17,18;187:8,
9,21;188:11,11;
191:19;193:1,13;
205:11;213:11;
217:13;222:16;
225:3;253:13;
260:11;267:13;
287:17;288:15;
307:23;317:10,10;
318:12;328:18,22
**pm (7)**
    133:19,20;201:4,5;
278:23,24;330:12
**point (55)**
    20:3;22:18;43:24;
50:12;52:7;61:24;

65:16;66:7;81:6,10;
84:17;89:8;101:12;
103:10;110:3,24;
111:5;146:14;
151:23;154:23;
155:9,14;161:19;
166:13;180:7;194:2;
195:15,16;196:4;
201:8;202:8;205:4;
213:14;216:9;217:4;
220:23;224:7;238:2;
242:24;245:5;255:3;
261:10;268:6,14;
278:1;279:3;281:13;
285:16;303:5,12;
305:15,24;306:16;
307:9;321:15
**pointed (1)**
    195:15
**policies (23)**
    60:12;61:17;111:1,
3;113:8;183:4;219:5,
8,11;220:11,22;
221:11,13,14;222:3,
18;228:20;229:2;
230:2,21;307:14;
322:7,8
**policy (74)**
    35:17;111:6,9,10,
11,12,17,18,20,22,23;
112:21;113:3,6,22;
114:7,12,16,19;
115:4,12;116:1,3,8,
12,15;132:24;
151:24;153:8,12,22;
201:9,11,14,20,21,
24;219:18,21,24;
220:4;221:2;222:15,
18,22;223:12,16;
224:3;225:21,22;
226:6,11,16;229:14,
21;249:9,24;250:2,5,
10;251:14,18;261:14,
21,22,23,24;263:1,2;
299:10,13;300:1,4;
326:9
**portion (6)**
    8:4;150:16;194:5;
195:11;307:17;
309:11
**pose (2)**
    6:11;266:16
**posed (4)**
    92:21;214:1;
316:23;319:2
**position (40)**
    11:11;14:18;15:18,
24;16:2,15;19:13,17;
20:9;27:7,15;30:11;

41:16;47:12;49:22;
60:17;69:2;85:10;
88:5,11;91:15,24;
94:6;114:17;115:8;
126:11;146:14;
171:19;177:6;240:7,
9;264:14;265:3,8;
269:18;296:2;
308:14;310:19;
311:3;315:22
**positions (3)**
    16:20;31:6;321:14
**positive (1)**
    323:19
**posits (1)**
    140:21
**possibility (2)**
    138:22;156:18
**possible (7)**
    136:19;140:1;
199:12,21;208:4;
280:16;286:5
**possibly (2)**
    222:14;281:21
**post (1)**
    42:3
**posted (1)**
    79:2
**post-fellowship (2)**
    42:3,4
**posting (1)**
    13:16
**post-residency (1)**
    42:5
**posture (17)**
    77:7;81:23;83:15,
17;106:1;107:8;
109:24;110:7;115:8;
118:14;131:21;
132:22;218:20;
230:16,17;286:4;
320:23
**posturing (1)**
    172:17
**potential (5)**
    112:3;131:2;142:7;
248:17;249:6
**potentially (1)**
    280:4
**practice (52)**
    54:2;111:6,9,10,13,
24;112:8,11,19,19;
113:21;114:7,16,23;
115:1;116:1,3,7;
132:24;151:24;
152:10,15,18;153:12,
21,22,23;196:19;
198:1;201:9,11,20,
21,24;202:4;233:13;

245:6;279:16;295:3;
296:3;299:16,20;
300:5,14,17;301:24;
302:1;303:6;309:11,
13;311:11,15
**practices (4)**
    112:17;113:21;
201:14;274:24
**pre (1)**
    281:21
**preceded (1)**
    319:2
**precedent (3)**
    16:23;17:6;310:20
**precipitated (1)**
    266:20
**precise (2)**
    315:5;327:23
**predated (4)**
    60:20;65:13;83:22;
152:17
**pre-dated (1)**
    48:17
**predisposition (1)**
    142:24
**prefer (2)**
    196:17;307:11
**preference (1)**
    292:16
**prejudice (1)**
    247:24
**prejudiced (1)**
    247:20
**preliminary (1)**
    211:20
**premarked (1)**
    196:22
**premises (1)**
    116:6
**prescribing (1)**
    247:14
**presence (4)**
    64:12;247:18,23;
251:15
**present (18)**
    4:3;73:13,14;75:7,
9,13,17;76:5;78:23;
79:16;80:2,4;122:23;
132:2;257:21;
258:24;273:16;306:8
**presentations (1)**
    301:16
**presented (7)**
    166:3,4,16;191:24;
214:2;274:2;283:24
**pre-sentencing (1)**
    16:5
**preserving (1)**
    229:18

**preside (1)**
    37:24
**presided (3)**
    18:18,19;299:24
**pressuring (1)**
    320:1
**presume (1)**
    122:24
**pretty (5)**
    5:18;7:14;151:3;
152:19;200:12
**prevented (1)**
    318:4
**preventing (1)**
    226:17
**previous (6)**
    18:3;93:12;96:22;
102:12;126:6;254:11
**previously (17)**
    60:14;98:21;142:4;
147:11;163:17;
179:24;180:7;
201:19;202:15;
206:17;209:9;
211:11;255:12;
257:20;295:19;
302:8;319:17
**primarily (1)**
    228:15
**primary (2)**
    112:9;212:9
**principles (1)**
    59:23
**prior (33)**
    11:13;13:23;14:9,
12,14;16:7,15;17:11;
32:11;34:17;37:6;
40:10;43:5;45:2;
48:15;60:20;61:1,10;
62:8;79:5;83:12;
126:10,21,24;152:11;
173:19;196:13,24;
248:7;277:6;283:1;
309:14;310:9
**prisoners (1)**
    9:23
**privacy (1)**
    251:12
**private (49)**
    79:1;111:6,8,10,13,
17,18,20;112:8,11,
16,18,19;113:15,15,
21;114:1,7,11,16,23;
115:1,24;116:2,3,7;
132:24;151:23;
152:10,15,18;153:11,
21,22,23;154:4,5,8,8;
201:9,11,14,20,21,
23;202:4;299:1;

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 363 of 374

MELISSA KAYE v.                                                    ABHISHEK JAIN, M.D.
HEALTH AND HOSPITALS CORPORATION, et al.                          October 4, 2021

309:10;312:11
**privilege (2)**
　150:18;158:4
**pro (1)**
　5:18
**probably (9)**
　62:20;71:24;
　133:15;166:2;214:9;
　222:19;271:15;
　289:7;298:3
**probe (1)**
　227:4
**problem (9)**
　109:2,10,13,15;
　196:4,7;218:13,22;
　247:12
**problematic (5)**
　130:11;179:5;
　200:13;247:6;252:5
**problems (8)**
　109:7;134:10;
　154:13;155:5;323:5;
　325:16,20;326:2
**procedural (1)**
　281:12
**procedure (20)**
　50:15;55:14;56:7;
　97:3;113:5;128:19;
　130:16;256:13;
　262:5;294:16,18;
　295:9;302:18,19;
　310:10,17;311:15,18,
　23;326:9
**procedures (42)**
　18:23;40:5,10;
　50:5;53:16;60:12;
　61:17,18,18,20;
　62:15;67:11;68:22;
　69:22;110:5;111:19;
　112:12;119:7,12;
　129:20;227:24;
　229:2;243:13;
　248:23;252:23;
　255:18;284:4;285:6;
　287:9,10;294:12,14,
　20;297:1;300:19;
　304:5;308:24;
　309:19,21;311:14,16;
　324:5
**proceed (14)**
　6:21;77:2;82:8;
　96:24;205:24;206:3,
　20,22;235:14;
　252:19;255:16;
　266:11;318:24;319:4
**proceeding (1)**
　191:17
**proceedings (1)**
　63:8

**process (36)**
　14:24;19:20;38:4;
　39:3;47:21,23;52:6;
　54:4,7;60:15,15;
　61:22,23;62:12,24;
　67:5;70:3,4,11;
　180:14;199:11,21;
　206:7;212:23;
　213:16,24;227:24;
　228:11;243:21;
　252:13;282:15;
　283:17;290:7;317:3;
　320:23;325:22
**processed (4)**
　21:5;87:13;180:9;
　281:6
**produce (4)**
　242:1;243:8,9,18
**produced (12)**
　46:24;47:6;187:13;
　209:19,22;214:16;
　242:17;269:20,20;
　271:2;272:7;321:2
**product (1)**
　149:12
**production (5)**
　34:2;47:8;134:13;
　137:23;197:12
**profession (2)**
　228:6;296:4
**professional (11)**
　42:2;132:13;193:1,
　4;322:11,12;323:23,
　24;324:6,7,10
**professionalism (1)**
　324:9
**professionally (4)**
　292:12;325:24;
　326:3;327:1
**professor (1)**
　12:18
**Profile (8)**
　231:1,10,22;232:2,
　22;233:6,12,22
**program (4)**
　12:20,21;18:7;
　312:3
**progress (1)**
　192:19
**progressed (2)**
　43:4;293:16
**progressive (2)**
　313:8,10
**prohibited (2)**
　153:22;296:14
**project (2)**
　266:18,23
**projected (1)**
　135:18

**projections (1)**
　193:18
**projects (2)**
　301:10,16
**promise (1)**
　322:23
**promote (1)**
　59:22
**promoted (1)**
　38:14
**promotion (1)**
　38:15
**promotions (2)**
　31:2,4
**prompted (2)**
　195:14;197:22
**proper (6)**
　54:10;281:2;
　300:19;303:18;
　304:5;311:19
**proposal (1)**
　22:13
**proposals (1)**
　211:17
**proposed (2)**
　211:12;213:4
**pros (2)**
　297:1,5
**prospect (1)**
　130:10
**protected (4)**
　184:20;303:19,22;
　313:3
**protecting (1)**
　313:16
**protection (1)**
　227:24
**protections (1)**
　229:5
**protective (1)**
　185:4
**protest (2)**
　307:10,13
**prove (1)**
　327:17
**proven (2)**
　56:23;57:3
**provide (36)**
　19:19;24:20;33:1;
　35:17;40:6,12;45:24;
　46:2;60:11;62:6;
　65:22;66:2,5;77:4;
　105:9;128:13,15,20,
　22;129:24;130:7,18;
　142:8;157:10;
　171:17,18;196:21;
　198:17;226:13;
　239:3;245:15;
　246:15,17;285:20;

287:18;291:18
**provided (20)**
　18:7;39:1;46:11;
　57:3;123:12;127:3;
　129:16;146:22;
　184:6;192:5;195:18,
　24;196:8,13;211:5;
　224:22;225:1;
　248:22;277:2;305:21
**provider (1)**
　313:1
**providers (2)**
　245:11,13
**provides (1)**
　33:4
**providing (15)**
　9:22;145:19;
　181:18;195:17;
　245:14;247:7,7;
　251:5;254:8;259:13,
　14;303:20;308:10;
　310:16;320:13
**provision (1)**
　173:21
**provisions (11)**
　113:7;227:15,21,
　22;228:7,9,10,12;
　251:8;262:9;303:21
**psychiatric (8)**
　9:21;12:23;16:9;
　20:15;60:3;126:7;
　296:19;297:13
**psychiatrist (13)**
　12:9;42:9,9;46:14;
　59:20;64:6;69:3;
　118:6;300:24;327:3,
　9,11,12
**psychiatrists (10)**
　13:15;42:24;64:9;
　160:21;168:10,16,19,
　20;301:4;310:9
**psychiatry (31)**
　11:17;12:18,19,21,
　22;16:1,8;18:6;43:2,
　2,8,9,13,13,14,23,23;
　59:23;86:17;96:10;
　203:16;227:5,6,12;
　245:7;252:11;
　301:12;312:3;324:4,
　5;327:14
**psychological (17)**
　40:17;64:12,13;
　127:10;130:5;
　225:21,24;226:6,11,
　18;234:8;246:8,9,13,
　23;247:15,15
**psychologist (5)**
　32:23;40:14;64:7,
　14,15

**psychologists (3)**
　64:9;130:7;168:19
**psychosomatic (3)**
　12:11;43:9;44:1
**psychotic (1)**
　274:2
**Public (2)**
　4:23;47:1
**publication (1)**
　311:4
**publicly (2)**
　20:8;68:17
**pull (1)**
　186:19
**purpose (6)**
　97:14;185:6;
　199:14;204:12;
　267:17,18
**purposes (17)**
　25:15;40:18;44:7,
　10;47:19;64:5;78:12;
　85:2;86:12;88:9;
　95:1;96:16;122:10;
　129:2;185:21;
　250:11;312:20
**pursuant (2)**
　4:9;233:13
**pursued (3)**
　25:7,8;284:9
**push (6)**
　64:11;66:13;122:3;
　261:6;262:24;263:1
**Put (15)**
　17:2;34:4;50:6,9;
　105:8;113:11;158:6;
　166:1,1;191:10;
　197:8;199:6;258:13,
　14;317:10
**putting (2)**
　105:6;202:16
**puzzling (4)**
　71:18;73:15;
　266:14,17

### Q

**qualifications (1)**
　309:1
**qualified (3)**
　233:8;308:13,15
**quality (9)**
　20:1,18;60:16;
　149:3,6,8,12;306:1;
　324:10
**quantified (1)**
　80:22
**quantify (1)**
　134:18
**quantitative (1)**

Case 1:18-cv-12137-JPC-JLC    Document 225-3    Filed 03/05/22    Page 364 of 374

ABHISHEK JAIN, M.D.                                                    MELISSA KAYE v.
October 4, 2021                              HEALTH AND HOSPITALS CORPORATION, et al.

7:10
**quantity (1)**
7:9
**Queens (14)**
47:24;59:2,3;
60:23;86:17;221:8;
243:23,24;324:21;
325:1,4,6,9,12
**query (1)**
267:1
**question's (1)**
294:9
**quick (1)**
317:9
**quickly (2)**
158:10;305:7
**quite (7)**
118:21;150:7;
174:21;181:10,19;
182:19;183:20
**quote (8)**
202:2;216:9;
218:22;240:4;
265:21;294:22;
296:14;297:24

**R**

**raise (15)**
26:12;112:2;122:8;
127:14,18;130:19;
139:12;146:24;
152:6,7;153:10;
215:10;226:16;
299:3;325:21
**raised (53)**
21:11,17,17;22:1;
29:15,21;33:6;56:13;
63:3,6;67:16;72:15;
81:22;88:16;90:5,5,
6;101:11;105:11;
115:24;117:24;
118:22;123:18;
124:5;129:8;132:7;
133:1;139:15,16,21;
143:21;152:21;
153:3,5;175:24;
182:18;197:2;
202:17;207:12;
217:21;222:21;
223:2;229:13,22;
230:2;245:20;266:2;
276:8;304:8;306:3;
319:16;320:22;
323:17
**raises (1)**
265:9
**raising (2)**
122:5;304:7

**Ramirez (10)**
261:12,16,20;
263:3,8,15,20;
264:19,21;265:5
**rare (1)**
239:23
**rarely (2)**
239:22;309:22
**rate (2)**
80:10;133:15
**rated (1)**
278:15
**rather (7)**
14:14;22:20;
195:17;211:11;
264:15;283:12;
326:24
**rating (1)**
34:9
**ratings (1)**
34:12
**reach (7)**
13:18;14:17;
175:15;180:4;209:4;
210:15;262:19
**reached (6)**
14:21,22;161:1;
204:13;215:22;266:9
**reaching (1)**
70:10
**reaction (1)**
248:4
**read (49)**
68:5,7,9,12;86:1;
87:19;92:11;100:20;
121:17;150:22;
151:16,19;180:10;
185:8,10,19,19,23;
187:19;189:7;
191:11,19;192:15,17,
19;193:10,14;
197:17;241:7;
251:22;254:22,23,24;
255:1;278:2;288:11,
15,16,20,24;289:6;
295:22;305:5,7;
307:11,12,20,22;
319:8
**readable (1)**
150:15
**reading (10)**
93:9;151:7;157:12;
179:14;191:15,16;
192:20;194:13;
255:1;319:5
**ready (1)**
200:16
**reaffirmed (1)**
321:8

**realized (1)**
162:7
**really (10)**
6:16;87:11;153:17;
174:21;184:10;
199:13;229:3;
263:21;265:11;
315:18
**reappear (1)**
57:7
**reappeared (1)**
57:8
**reason (10)**
56:17;65:21;72:8,
10;89:17;146:12;
175:5;300:11;
315:17;328:17
**reasonable (15)**
83:13;105:24;
210:19,24;212:17;
213:9;224:6,8,16,24;
225:5,12,15;255:13;
329:7
**reasoning (1)**
27:3
**reasons (6)**
40:19;71:7;125:3;
271:19;277:8,10
**recall (256)**
14:20;15:1;21:19;
31:14,16;34:11,14;
36:8,9,22;37:18;
38:7;41:17;43:7,8,
10;47:22;49:4;50:22,
24;51:6,11,12,15;
56:11,12;57:8,11;
65:5;69:11;73:8,9;
78:10;80:3;90:1;
95:15;99:1,10;
101:10,11;104:2,9;
106:24;108:16;
111:8,19;113:13;
114:13;116:13;
117:14;123:12,16,23;
125:8;126:22;128:4;
137:8,10,18,22;
138:15,23,23;148:18,
24;149:5;152:9,14;
154:5,24;155:19;
156:17;157:6;
160:24;165:6,7,14,
23;167:12,13;
169:16;170:23;
171:2,3;184:2,7;
201:10;202:1,7;
203:1,10,11;204:24,
24;206:15;210:18,22,
23;211:1;212:18,21;
213:13,19,22;214:15;

215:3;217:20;
220:10;221:22,22,23,
24;222:23;223:14;
224:21;225:14;
226:22;232:1;233:5,
16;234:9,10,11,16,
24;236:3,11,12,13,
19;239:15,17;
240:17;241:2;242:7,
18;243:20;244:1,9,
21;248:2,19;249:19,
22;250:9;251:18;
253:20;254:20,24;
255:1,1;256:24;
257:22;258:4;
259:19;260:3;261:7,
13,19,20,23;263:9,
16;264:5,9,10;
265:20;266:3,7;
267:5,6,12;268:5,11,
17,18,18,23,24;
269:7,7,8;270:19;
271:13;272:20;
273:1;274:20;275:3,
9,10,16,22;276:1,11,
11;277:1,15,17,18,
23;278:6,7,11,16;
279:11,12,24;280:1,
14;281:5,11;282:6,
15,21,23;283:5,6,7,
14,21,23;284:5;
286:20,21;287:1,3,4,
12;289:11;290:5,15,
23;291:1,3,11;292:7,
10;295:5;296:17,20,
24;297:17;301:20;
302:15,20;304:13;
306:12;311:10;
316:14,18;321:12,16;
324:19;328:9;
329:22;330:1
**recalling (5)**
240:20;254:6;
266:4;290:24;307:2
**receive (7)**
10:22;11:4,9;31:1,
7;104:16;285:8
**received (11)**
11:1,13;31:8;82:1;
195:20;219:6;
290:17;300:16,21;
301:6,8
**receiving (2)**
101:10;314:7
**Recess (4)**
58:9;133:19;201:4;
278:23
**recognize (1)**
178:3

**recognized (3)**
101:13;139:17;
198:19
**recollection (25)**
28:10;36:14;62:22;
111:11;121:19;
151:22;157:16;
158:2,5;161:7;168:9;
175:2;207:23;
225:17;226:2;236:8,
20;245:2;246:12,17;
278:18;281:9;289:8;
290:4;297:11
**reconsider (1)**
265:3
**reconsideration (1)**
264:18
**record (38)**
5:4;8:13;17:4,5;
24:11;25:6;55:5,11;
62:21;75:22;78:12;
86:11,11,12,12;
92:15;95:1;97:14;
158:7;177:15;
188:10,11;189:22;
190:6;191:16;195:3;
199:24;200:20;
241:20;254:19;
255:8;292:24;293:1;
299:3;302:1;311:9;
319:1,3
**recorded (10)**
253:1,9,18;255:4;
295:6,8;300:2,10;
303:13;309:8
**recording (52)**
252:4,17;253:8;
254:10,12,15,16;
294:17,23;295:17,20,
23;296:2,11,13;
297:14,15,24;298:1,
3,4,12,15,21,21;
299:11,14,17,21,21;
300:6,9,18;301:19;
302:11,14,20;303:8,
17;307:15,17,21;
309:9,15,20;310:10,
11;311:13,15,19;
312:11;316:21
**recordings (29)**
66:2;252:9,10,12,
14,21,22;255:19;
294:11,13;295:4,14,
15;296:8,21,23;
297:2,17;300:13,17;
302:17,17;303:5;
304:4;309:18,24;
311:7,18;317:2
**records (58)**

21:19,22;22:1,10,
13,14,20,21;23:2,11,
12,23,24;24:9,10,17,
21,23;25:13,14,18,
24;26:1,14,24;27:5,8,
17;28:6,24;29:2,22;
61:21,22,23;62:1,6,
10,12,16,20;79:1;
239:20;241:8,9,12,
14,16,17,22,23;
242:2,5,6,8,11,15,17
**record's (1)**
138:11
**recourse (1)**
284:8
**recovers (1)**
274:1
**recreate (1)**
58:2
**recreated (1)**
57:16
**recruiting (3)**
271:21,23;319:14
**recruitment (1)**
321:4
**recuse (1)**
248:18
**redact (1)**
242:1
**redacted (23)**
21:18;22:2,13,20;
23:11,23;24:11,14,
20,21,23;25:5;26:13;
28:24;29:1,22;
150:16,19;151:13;
158:9;241:12,23;
242:6
**reduce (3)**
21:7;62:13;294:9
**refer (5)**
67:16;114:12;
240:3;302:5;314:20
**reference (2)**
297:3;299:15
**referenced (11)**
93:22;97:2,16,20;
98:18;161:3;173:22;
289:10;304:10,13;
311:3
**references (1)**
97:2
**referencing (6)**
90:21;99:6;152:8;
159:5;311:5;315:1
**referred (3)**
67:14;292:23;
313:20
**referring (17)**
42:20,24;104:21;

137:7;152:12;161:8;
236:21;240:16;
279:9;286:23;
292:20;295:19;
300:4;312:14,16;
326:2,17
**refers (1)**
96:5,9,13;282:6;
292:21
**reflect (1)**
109:19
**reflected (4)**
215:8,15;216:23;
229:21
**refresh (7)**
121:19;226:2;
234:13;236:8;
278:17;289:8,12
**refreshing (1)**
151:21
**refusal (2)**
265:2;274:16
**refusals (1)**
47:8
**refused (9)**
192:1;195:13;
241:24;242:4;269:4;
272:14;277:8;
317:21;318:5
**regain (1)**
175:16
**regard (3)**
56:2;115:9;266:16
**regarding (113)**
8:1;18:5;21:22;
22:3,7;36:15;40:12,
20;51:5,13;56:7;
63:7;65:24;76:24;
82:2;88:17;99:5,14;
105:11;111:19;
114:22;115:24;
128:5;129:23;130:5,
23;131:8,21;132:2,
19;137:8,9;140:3;
143:24;147:11;
149:7,12;153:18;
154:20,22;156:24;
157:18;162:22;
171:3,20;172:18;
173:9;184:8,16;
201:20;204:2;
206:24;209:12;
211:17;215:3;
216:18;223:13;
226:23;227:23;
228:9,10;241:7,12,
22;243:13;245:11,
24;251:15;252:16;
255:18;257:22;

259:24;261:19,21,22;
265:24;266:11;
273:10;275:2;
276:13;278:13;
279:3;283:12;287:1,
9,13;289:13;295:2,
14;296:18;297:13,
13;299:4,14,16;
300:8;303:4;306:16,
20;307:3;310:21;
311:6;313:14;317:2,
3,24;319:18;320:19;
322:6,7;324:3,6;
326:10
**regardless (1)**
202:21
**regional (1)**
12:24
**regionally (1)**
301:14
**regular (5)**
71:10;82:18;219:3;
293:15;300:14
**regularity (1)**
152:16
**regularly (8)**
152:19;285:21;
292:17;293:8,11,13,
14;301:9
**reinforced (1)**
306:14
**reiterate (2)**
6:8,18
**related (2)**
125:4;163:16
**relation (1)**
35:13
**relations (6)**
50:12;66:21;67:1;
99:16;104:2;174:8
**relationship (12)**
44:6;177:5;240:1,
13;245:13;314:20;
315:10;316:1;
321:24;323:7,20;
324:13
**relay (2)**
155:4,11
**relaying (1)**
155:8
**release (5)**
22:9;27:5;242:4,8,
15
**released (1)**
241:17
**relevant (3)**
27:23;66:5;250:24
**religious (1)**
207:8

**reluctance (5)**
25:16;142:8;
144:15;182:21;
264:16
**remain (2)**
112:16;162:1
**remainder (1)**
44:21
**remaining (1)**
276:16
**remediated (2)**
274:5;305:15
**remediation (3)**
305:18,23;306:11
**remember (33)**
15:20;50:24;65:7,
20,21;69:15,17,23;
78:8;98:13;104:10;
151:20;152:1;
165:24;201:21;
202:4;210:14;215:6;
225:19;233:16;
243:15;258:18;
259:2,3;262:1;264:6;
265:23;273:7,9;
278:14;280:17;
281:9,10
**remembering (2)**
107:2;300:12
**remind (1)**
176:5
**reminded (2)**
313:16;326:15
**remote (3)**
4:2;199:10,21;
213:6
**remotely (3)**
4:10;212:16;213:4
**remove (1)**
327:23
**removed (3)**
52:18,18;188:18
**removing (4)**
22:2;74:2,2,11
**render (13)**
20:19;22:7;23:6;
27:22;52:22,23;
56:16;62:1;63:23;
184:16;226:21;
229:19;241:14
**rendering (2)**
118:18;318:6
**renew (2)**
279:20,23
**renewal (1)**
279:10
**reorganization (1)**
153:14
**repeat (25)**

6:19;8:4;23:19;
29:18;33:8;51:22;
74:7;80:20;92:19;
107:24;115:19;
121:7;174:11;
179:13;205:11;
217:13;222:16;
225:3;243:4;247:21;
249:14;264:17;
298:10;310:3;318:11
**repercussions (2)**
56:9;317:5
**rephrase (4)**
55:8;74:10;107:20;
327:22
**replacement (2)**
47:14;321:10
**replicate (2)**
199:11,20
**report (10)**
31:23;32:2;149:9,
12;222:14,17;243:8,
9;244:1,17
**reported (5)**
32:1,3,4;281:5;
329:23
**REPORTER (12)**
4:1,2;5:13;6:7,14,
15;121:11;147:24;
199:3,6;330:6,8
**reporting (4)**
136:3;294:6;297:4,
20
**reports (12)**
52:23;119:4;120:2;
127:23,24;149:2,3,4,
6,11;242:24;243:2,22
**repository (1)**
296:13
**represent (3)**
4:12;243:16;
244:15
**representation (6)**
29:14;47:11;
161:14;196:11;
240:4;244:18
**represented (5)**
45:10;195:21;
243:1,7;244:1
**reprimanded (1)**
182:19
**reputation (2)**
69:6;118:17
**request (26)**
29:11;114:10;
162:11;171:3;
175:12;179:9,12,12;
180:3,24;181:4,6;
192:14;204:10;

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 366 of 374

ABHISHEK JAIN, M.D.                                                    MELISSA KAYE v.
October 4, 2021                              HEALTH AND HOSPITALS CORPORATION, et al.

210:18;211:18,21;
212:18;224:8,20;
241:9;244:14,22;
266:9,13;309:23
**requested (14)**
29:10;34:7;88:22;
105:9;121:17;
128:12;138:1;162:6,
8;224:16;295:5,6,7;
319:8
**requesting (1)**
266:7
**requests (6)**
28:11;29:9,10;
30:2;82:13;179:17
**require (5)**
17:18,20;70:21;
264:11,19
**required (10)**
27:8;87:15;170:4;
184:10;211:12;
263:3;298:20;310:1,
4;311:9
**requirement (2)**
54:12,17
**requirements (3)**
211:19;233:20;
310:15
**requires (3)**
19:3;191:22;
199:14
**reschedule (2)**
206:3,21
**rescheduled (2)**
205:22;241:3
**research (1)**
11:17
**Reserve (1)**
12:10
**reserved (1)**
3:8
**residency (4)**
12:6,7;70:14;85:3
**resign (1)**
272:16
**resignation (1)**
275:19
**resigned (3)**
140:23;141:11;
270:7
**resistance (11)**
22:9;81:21;91:18;
107:4;144:21;
172:19;209:8;219:3,
5;223:24;320:11
**resistant (7)**
24:9;71:15;73:16;
82:17;108:6;144:24;
216:15

**resisted (1)**
105:5
**resolution (1)**
184:11
**resolve (22)**
49:16;50:13,19;
69:8;76:23;103:15;
131:19;132:3,23;
171:16;175:17;
176:24;184:4,7;
203:3;218:3,23;
234:20;237:14;
238:1;287:11;326:3
**resolved (22)**
48:15;99:16;
131:12,13,19;174:8;
176:1;183:21;184:2,
8;195:8;196:5;
197:23;198:11,15;
204:20;216:7;
231:19;237:8,20;
264:1,3
**resolving (1)**
135:15
**resource (2)**
296:18;297:12
**respect (1)**
235:16
**respective (3)**
3:2;91:17;166:15
**respond (12)**
26:20;93:15;
137:17;176:15;
275:24;276:9,12;
327:20;328:4,5,18,22
**responded (5)**
26:23;137:22;
276:10,10,14
**responding (1)**
328:3
**responds (2)**
93:3,10
**response (6)**
18:3;24:2;43:18;
137:18;147:6,23
**responses (1)**
155:20
**responsibility (1)**
175:14
**responsible (3)**
49:24;162:13;
215:19
**rest (6)**
151:13;180:10;
185:8,10;187:20;
197:19
**restate (2)**
270:2,3
**rested (1)**

212:3
**restoration (1)**
211:10
**restriction (1)**
226:21
**restrictive (3)**
226:17;229:14;
313:3
**result (1)**
280:3
**resumed (2)**
141:12,16
**retain (1)**
53:24
**retaining (5)**
271:20,23;310:13;
311:20;319:13
**retaliation (5)**
29:14,21;30:2;
292:4;318:3
**retention (2)**
281:14;321:4
**retire (1)**
261:3
**retired (1)**
286:11
**retirement (1)**
275:20
**review (22)**
65:16;86:9;87:12;
95:17,18;109:19;
113:5,6;119:4;
138:20;174:3;179:8;
188:7;192:4;193:5;
195:10,13;196:6;
213:14,24;291:23;
312:1
**reviewed (12)**
66:3;90:9;91:2;
119:7;137:19,21;
149:2;174:5;213:19;
233:19;252:2;276:8
**reviewing (4)**
65:21;119:11;
137:11;183:21
**revisit (3)**
190:13;242:21;
251:21
**Ri (1)**
32:22
**rigging (2)**
114:18;115:5
**right (203)**
7:6;17:11;21:13;
26:18;28:21;31:19;
32:5;36:3;37:12;
38:14;39:12,20;
48:20;49:1;54:2,5,6,
9,12;55:1,17;57:14;

58:18,19;63:17;64:7;
68:3;69:7;74:16;
76:5,10;78:23;79:16;
81:6,11,13;83:18;
85:2,4,18;86:17,18,
19;87:15,16;88:1;
90:23;92:5,6,10,11,
24;93:8,9,13,19;95:1;
96:3,7,11,14,19,22;
97:14,23;98:22;
99:10;100:13,16,21;
101:4,7,20,21;102:8,
11,14,19;103:1;
104:24;106:10,11;
110:10;124:4;
126:20;131:15;
133:4;138:12;
142:13;143:9,20;
145:23;146:6,7,15;
147:17;150:6,10;
153:24;154:12;
157:22,23;160:10;
161:9;162:2;164:21;
165:21;166:3,4;
168:14;169:5;
170:23;176:20;
178:2,6,11,13,24;
179:3,5,24;180:9,16;
181:12;184:12,22,24;
186:8;187:4,17;
188:2;191:8,14;
192:12,13;193:8;
194:10,13;198:5;
207:16;208:15,18;
224:17;226:9;227:1,
1,6,14;229:7,16;
230:11;231:16,22;
232:6,14,19,23;
243:7;246:6;249:17,
17;250:12;256:15;
257:4;259:21;
261:10,15;270:8;
271:3;273:20,21;
275:13;276:19;
279:20;282:13,18;
284:11;287:20;
290:19;297:8,21;
298:13,17;299:11;
312:6,19,22,23;
313:4;314:1,4,5,9,13;
316:2;317:8,14;
318:2;322:20;
323:15;325:14,18;
327:19
**rights (4)**
193:6,7;228:11;
290:7
**Rikers (18)**
19:22;20:4,9,20;

25:14;62:5;166:4,6,6,
10;167:21;246:6,14,
18;248:22;271:7,7;
287:14
**Rikers' (1)**
78:24
**Rioja (1)**
32:22
**role (12)**
38:19;39:12;84:24;
94:11;111:14;
122:15;126:24;
245:11;246:1,2,3;
248:9
**roles (1)**
12:17
**room (1)**
199:1
**roomed (1)**
275:18
**Rosemary (1)**
221:7
**Ross (3)**
15:2;30:21;32:1
**rough (1)**
207:23
**routine (1)**
114:14
**rubber (1)**
275:18
**Rule (3)**
112:23;164:15;
198:1
**rules (3)**
5:16;245:19,19
**rumor (5)**
118:20;155:15,20;
156:4,8
**rumors (3)**
155:23;156:11,12
**run (4)**
158:11;187:11;
189:22;197:16
**running (2)**
189:2;190:10

**S**

**safe (2)**
262:11;264:7
**safety (1)**
262:8
**salary (7)**
10:17,19;31:7,9,13,
16,18
**Samantha (1)**
221:6
**same (30)**
3:3,14;28:13;

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

ABHISHEK JAIN, M.D.
October 4, 2021

47:20;52:4;55:12;
63:20;77:5;86:21;
96:16;98:20;105:14;
130:12,13;148:1;
159:12;162:1,9;
164:17;179:14;
183:2;184:19;185:4;
197:12;198:19;
203:13;235:17;
236:22;273:19;307:9

**satisfied (2)**
193:16;196:7

**Saturday (1)**
179:2

**saw (10)**
61:13;84:19;91:17;
92:24;93:8;178:6,8;
271:14;295:20;317:1

**saying (26)**
9:8;75:13;79:21;
80:7;83:16;118:10;
121:9;136:6;143:5;
144:10;146:13;
152:3;156:13,23;
159:4;160:21;167:7;
192:16;202:5;
211:24;212:1,12;
262:6;272:21;
306:10;309:6

**schedule (30)**
81:19;105:12;
108:23;122:18;
124:22;129:9;
139:11;173:10;
176:3;205:15,21;
206:4,5,18;210:3;
211:7;214:10;215:3;
216:19;217:22;
218:2;224:23;
225:15,18;234:19;
235:8,16;236:24;
320:6,10

**scheduled (11)**
78:21;122:23;
205:14;206:10,17,19;
207:2,8;214:19;
235:12;261:11

**schedules (1)**
182:7

**Scheduling (13)**
46:23;47:1;79:14;
122:24;205:10;
207:11;210:1;215:5;
235:8;260:1;273:24;
277:9;320:6

**school (5)**
12:6;85:3;124:13,
21,22

**schooling (1)**

125:5

**scramble (3)**
156:20;198:6;
199:15

**scratch (1)**
283:10

**screen (11)**
77:20;94:24;
101:23;102:15,17;
103:7;191:24;195:9;
196:1,6;288:10

**scroll (17)**
78:6;79:8;86:15;
87:2;95:20;96:20;
150:14;187:8,21;
192:22,24;193:9,15,
22;194:11;307:23;
317:13

**scrolling (1)**
100:19

**se (4)**
55:1;156:16;229:4;
266:18

**sealing (1)**
3:3

**search (1)**
198:19

**searchable (3)**
196:2;197:8,11

**season (1)**
249:21

**second (17)**
25:3;65:8,9;72:10;
77:23;79:11;87:14;
124:10;194:22;
253:3,8,14;259:21,
22;274:10;288:19;
293:7

**secrets (1)**
200:8

**section (1)**
317:24

**secure (1)**
267:20

**security (3)**
263:15;266:8;
267:19

**seeing (16)**
102:19,23;113:20;
136:8;138:16;140:6,
9,11,19;141:12,15,
20;264:8;270:20,20;
275:1

**seek (6)**
24:20;112:1;216:8;
241:16;285:16;
313:13

**seeking (2)**
213:7;268:1

**seem (1)**
179:3

**seemed (5)**
118:14;136:7;
234:22;285:13;316:4

**seems (12)**
86:4,4;106:1;
154:12,14;155:4;
190:8;195:6;196:4;
200:11;230:9;269:12

**selection (1)**
284:8

**self-incrimination (1)**
228:10

**send (3)**
135:22;180:16;
190:6

**senior (3)**
41:15;88:23;93:18

**sense (9)**
89:2,22;90:3,10;
91:19;94:9;129:11;
156:19;182:6

**sensitive (1)**
184:9

**sent (30)**
19:7;22:1;49:4;
88:4;100:11,11;
111:23;134:21;
137:19;138:3;186:5;
189:13;192:7;
213:20;220:1,20,21;
221:15,24;222:10;
231:2,3;235:4;
237:15;241:18;
276:18;286:21;
287:2,2,4

**sentence (2)**
79:11;312:13

**sentiment (8)**
66:8;75:3;145:8;
171:22;172:3;
240:10;302:16,21

**sentiments (1)**
142:24

**separate (7)**
201:17;240:19;
245:19;246:2;
248:24;296:19;324:9

**separation (1)**
112:8

**September (6)**
81:19;205:8;206:8;
207:15,20;215:24

**series (5)**
77:22;94:15;100:2;
177:16;307:7

**serious (1)**
281:21

**seriously (3)**
116:17;234:1;
313:18

**serve (11)**
16:1,3,5;20:16;
23:7;45:5;59:21,24;
60:2,13;199:14

**served (3)**
32:15;240:11,11

**serves (2)**
199:22;309:7

**service (5)**
9:24;12:23;88:21;
310:16;318:6

**services (22)**
9:18,20;10:3,7,9,
12;11:14;12:19;
13:17;30:24;33:2,3;
44:17;45:3;59:1;
60:11;62:3;96:6,18;
97:7,22;313:2

**serving (1)**
41:18

**set (9)**
107:1,3;111:12,16;
114:6;197:10;253:8,
14;289:2

**setting (5)**
118:1;264:22;
310:8,15;312:8

**setup (1)**
146:10

**seven (3)**
81:7,8;244:3

**seven-hour (1)**
189:8

**several (1)**
236:24

**shake (1)**
6:12

**shall (2)**
3:8;97:6

**share (16)**
8:9;27:3;77:19;
102:1;115:16;
142:23;149:16;
157:17;211:20;
214:15,21;235:20;
253:23;267:14,19;
307:3

**shared (4)**
157:7;182:14;
229:21;266:15

**sharing (4)**
102:5,17;143:3;
267:19

**sheet (6)**
174:19;176:2,21;
178:2,10,17

**sheets (13)**
129:2;161:13,17;
162:6;173:5;178:5;
179:17;181:2,15,21;
194:2;197:20;206:12

**shift (20)**
157:1;162:14;
168:1,5,6;169:5,13,
17;170:22;171:5,12;
173:13,23;206:11;
217:8,15,22;256:19;
257:7;259:4

**shifted (1)**
168:10

**shook (1)**
74:17

**shortly (1)**
71:16

**show (17)**
40:16;77:16;85:18;
94:13;100:1;149:14;
177:8,21;189:5,10;
190:1,2,5;287:15;
288:4;295:11;304:23

**showed (1)**
190:9

**showing (2)**
94:24;195:9

**shown (2)**
196:1;288:6

**sick (3)**
179:9;180:24;
182:8

**side (5)**
199:12;200:5,6,11;
246:18

**sides (1)**
199:23

**sign (15)**
22:9;24:11;27:4,5;
122:16;129:6;176:1;
180:23;181:2,4,6,15,
20;241:21,22

**signature (1)**
242:14

**signed (7)**
3:12,14;179:24;
180:7;304:11;
307:10,13

**significant (6)**
7:1;56:14;72:8;
150:16;158:1;322:18

**signing (5)**
24:9;129:2;178:12,
16;179:19

**similar (10)**
28:4;23;98:17;
116:11;142:19;
178:7;244:5;251:12;

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 368 of 374

ABHISHEK JAIN, M.D.                                                MELISSA KAYE v.
October 4, 2021                                    HEALTH AND HOSPITALS CORPORATION, et al.

259:24;289:12

**similarly (5)**
28:5;29:12;31:9;
183:11;199:7

**simply (2)**
89:6;94:12

**sit (6)**
45:10;75:15;
192:18;204:22;
248:13;249:3

**site (2)**
79:3;265:6

**sites (1)**
208:22

**sitting (5)**
47:3;198:24;210:2;
245:22;271:2

**situation (4)**
275:13;321:7;
327:16;329:9

**six (4)**
33:24;34:9;81:9;
288:23

**six-month (1)**
34:10

**skills (1)**
60:3

**Smalls (1)**
221:6

**Smith (2)**
178:22;199:4

**snap (1)**
200:19

**social (2)**
266:7;267:19

**Society (16)**
44:17,20;45:1,8,
11;47:2;209:12;
219:24;220:4,10,19;
221:1,6,9;222:7,23

**sole (1)**
144:8

**solicited (1)**
226:10

**Soloniski (1)**
169:12

**somebody (4)**
70:9;162:20;231:8;
290:2

**somebody's (1)**
112:11

**somehow (1)**
182:18

**someone (9)**
56:17;79:3;88:22;
137:20;155:19;
213:5;218:21;
220:13;289:24

**someone's (2)**

**sometimes (15)**
7:8;24:7;62:9;
129:9;175:7;176:3;
209:7;210:8,9,10;
241:13;242:5;
265:14;277:6;322:10

**somewhat (6)**
81:23;108:18;
230:9;235:24;247:6;
266:9

**somewhere (2)**
167:21;221:18

**son (5)**
156:24;157:8,21;
225:2,6

**soon (1)**
71:7

**sorry (51)**
8:5;17:24;22:17;
29:18;30:6;33:8;
36:21;43:18;51:4;
68:2;75:18;77:19;
83:1;91:8;101:17,17;
102:1,2;103:7;115:2;
119:18;129:17;
135:16;152:22;
172:22;179:13;
190:23;210:4;
217:13;220:18;
222:16;225:3;
235:10,10;243:4;
257:10;264:17;
267:23,23;270:2;
272:3;285:1,2;290:2,
9;303:11;315:13;
318:11;319:4;320:9;
327:10

**sort (1)**
240:6

**sorts (1)**
267:1

**sought (3)**
94:7;211:9;303:24

**Sounds (2)**
178:4;197:21

**source (1)**
144:3

**sources (2)**
13:14;160:19

**space (3)**
114:8;239:20;
262:11

**speak (32)**
4:7;6:16;42:13;
44:2;53:4,17,19;
55:13;68:12,20;71:1;
74:1,11;76:21;
106:11,16;108:1;

149:10;163:24;
173:19;183:14;
220:13;221:5;
255:14;256:4;
280:19,22;284:22;
289:19;292:16;
301:18,22

**speaker (1)**
195:2

**speaking (10)**
19:16;53:9;67:10;
68:21;78:11;214:14;
293:1;306:17;310:8;
315:10

**speaks (1)**
107:15

**Special (1)**
4:15

**specific (73)**
10:1;40:16;42:13;
47:18;53:10,17;60:5,
9;73:10,19;76:21,23;
98:14;112:5;125:2;
128:4;129:22;130:2,
3,5;132:3,3;136:15;
149:5,8,11;161:8;
163:18;167:12;
174:6;194:15,16;
202:12;203:1;
213:24;223:13;
225:10;236:14;
245:16;255:24;
268:24;269:8;275:3,
11;282:10;283:5,19;
284:3,5;285:9;
290:15;291:11;
295:1,2,8,9,16;
297:16;299:4,22;
300:4;303:16;304:6;
306:18,19;307:2;
308:24;310:21,23;
311:14;312:15;
313:12;317:4

**specifically (55)**
14:1;42:24;73:5;
83:3;104:20;114:14;
120:5;123:24;134:9;
137:8,22;139:20;
144:16;147:16,19;
148:3,11,16;153:20;
164:24;167:15;
169:11;201:20;
203:14;211:9;
212:21;220:14,21;
221:12;222:11;
226:19;229:3;
234:11;242:19;
246:16;259:18;
263:16,21;274:15;

275:16;278:16;
281:1;283:14;
286:16;290:4;
291:10,11;296:12,21;
301:20,23;311:8,10;
316:18;321:20

**specifics (4)**
263:9;274:8,20;
306:6

**specified (4)**
222:24;242:6,9;
311:23

**specify (2)**
242:10;296:7

**speculate (2)**
7:7,7

**Speculation (1)**
27:11

**speed (1)**
315:14

**spelled (2)**
17:7;265:19

**spend (1)**
190:8

**spent (1)**
39:24

**spirited (3)**
217:8,14,19

**splitting (1)**
64:2

**spoke (16)**
68:18;74:19;
103:23;106:22;
133:23;182:24;
212:9;220:11;
255:15;280:24;
289:24;290:3;
301:20;302:2,2,3

**spoken (1)**
82:13

**stability (3)**
158:23;159:1,24

**staff (42)**
9:19;37:1;45:24;
72:10;78:24;87:8;
111:1;116:18,20,24;
117:3,3;129:5,12,15;
134:24;137:11;
138:20;139:10;
142:3,8;152:5,19;
182:6;208:14;
260:18;271:16,21,23;
274:16;313:18;
317:21;318:5,14;
319:14;320:16;
323:8;325:7,9,11;
326:13;329:13

**staffed (1)**
172:18

**staffing (8)**
46:2;133:24,24;
134:14;318:1;321:1;
324:20;325:5

**stages (2)**
313:10,12

**staggered (2)**
47:21,22

**stagnancy (3)**
159:2;161:2,4

**stakeholders (2)**
34:23;43:16

**stale (1)**
274:4

**staleness (1)**
273:17

**stalling (1)**
187:10

**stamp (6)**
77:21;85:20;94:15;
100:2;177:16;307:7

**STAMPED (12)**
77:13;85:15;94:18;
99:23;149:19;
177:12,18;196:15;
197:7;287:16,19;
305:12

**stamps (1)**
196:2

**stand (15)**
16:4,13,15,18;
17:16,21;18:8,24;
19:4;21:2;25:19,22;
146:12;227:23;
228:14

**standard (5)**
31:8,10;227:14;
296:3;299:16

**standards (2)**
227:9,23

**standing (1)**
152:23

**standpoint (5)**
171:19;183:8;
204:12;216:6;281:12

**start (13)**
9:14;11:21;31:12;
38:11;40:20;61:17;
117:9;145:22;
158:22;177:23;
178:21;326:10,12

**started (19)**
11:10;17:14;19:12;
37:6;38:15;42:16;
43:3;58:17;59:11;
62:18;81:2;91:15;
94:5;103:22;114:4;
156:2;172:8;243:12;
276:23

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 369 of 374

MELISSA KAYE v.                                                    ABHISHEK JAIN, M.D.
HEALTH AND HOSPITALS CORPORATION, et al.                          October 4, 2021

**starting (3)**
71:8;127:7;128:3
**starts (3)**
78:13;178:11;
326:14
**state (14)**
4:11;9:4,8,23;
10:10;18:23;19:6;
231:1;274:2;297:21;
298:2,12,12,21
**stated (3)**
78:19;79:12;
325:19
**statement (12)**
47:18;110:11;
121:22;163:12;
202:2;269:6;272:17;
276:14;292:7;316:5,
6,13
**statements (3)**
105:20;174:19;
306:9
**Staten (2)**
60:23;221:6
**states (4)**
16:22;19:2;97:5;
297:15
**stating (2)**
4:24;155:1
**status (2)**
17:10;274:13
**statute (7)**
16:21;19:2;62:22;
64:3,8;308:15,16
**stay (2)**
189:21;190:6
**stayed (2)**
59:7;160:9
**staying (4)**
154:12,14;155:5,
12
**steady (1)**
159:1
**stemmed (1)**
173:4
**steps (5)**
68:23;69:5;267:8;
281:11;287:6
**Steven (1)**
96:2
**sticker (1)**
199:6
**still (17)**
44:2;59:3;77:4;
97:19;102:5;103:23;
140:11;158:10;
183:23;186:8;
191:18;218:3,17;
244:11;259:8;

293:19;303:22
**stink (6)**
152:6,7,21;153:1,5,
10
**stipulate (1)**
4:12
**STIPULATED (3)**
3:1,6,11
**stole (1)**
323:15;329:21
**stood (2)**
107:9;306:21
**stop (8)**
13:2;107:19;
138:16;140:6;
141:14;187:9;
193:13;273:12
**stoppage (4)**
269:17;270:5,10;
275:6
**stopped (6)**
140:11,19;141:8;
191:14;255:7,23
**Stopping (1)**
102:1
**story (1)**
57:13
**straightforward (1)**
200:12
**strategize (1)**
152:4
**Street (1)**
206:11
**stress (1)**
197:5
**Strike (2)**
33:10;44:21
**strong (3)**
158:22;159:13;
160:1
**strongly (1)**
182:19
**structure (2)**
33:15;122:13
**stuff (1)**
200:1
**style (1)**
308:5
**subject (5)**
78:4;86:14;101:6;
150:13;280:4
**subjected (1)**
62:23
**submitted (4)**
243:22;244:2;
279:6,22
**subordinates (1)**
181:14
**substance (10)**

22:3,5;24:21,22;
25:4,21;26:3;27:23;
127:23;313:2
**substances (1)**
6:4
**substantive (2)**
285:14;326:9
**sue (1)**
196:21
**sued (1)**
34:20
**sufficient (4)**
24:15,15;260:8,14
**suggest (2)**
157:2;197:24
**suggested (1)**
329:14
**suggestion (3)**
116:17;222:7;
260:6
**suggestive (1)**
222:12
**suggests (1)**
256:12
**summer (6)**
106:24;203:11,13;
205:8;217:10;259:20
**Sunday (1)**
179:4
**supervise (2)**
10:1;129:21
**supervised (1)**
246:21
**supervising (3)**
56:20;131:1;132:8
**supervision (23)**
39:1;40:6;65:22;
66:3,6;71:23;77:1;
82:8;127:5;128:13,
20,23;129:16,24;
130:18;181:18;
216:20;245:22;
254:7,9;305:21;
308:8,10
**supervisor (41)**
30:6,9,20,20;
31:24;32:8,16;56:6,
10;67:9;68:18;72:15,
17,20;76:10;82:18;
119:6;122:11;
128:16;129:1,3,19;
130:8,11;132:15;
146:9;149:1;179:16;
215:8,12,16,18;
216:24;223:20;
237:16;255:7;
266:11;267:9;
270:16;281:3;328:8
**supervisors (3)**

57:2;179:8;304:1
**support (20)**
26:24;27:6,24;
61:14;77:4;105:10,
14;117:23;159:17;
171:18;184:6;
201:23;202:20;
218:18;264:8,9,14;
265:4,10;285:20
**supported (7)**
64:17;105:16;
112:19;164:16;
225:17;266:13;
310:19
**supporting (4)**
26:23;105:18;
204:13;239:4
**supportive (5)**
72:7;105:8;211:21;
219:14;323:17
**Suppose (1)**
273:24
**supposed (4)**
137:9;181:4;189:7;
194:13
**supposedly (2)**
108:23,23
**Supreme (1)**
237:1
**sure (178)**
5:17;6:20;7:13;
8:9;18:4;22:24;24:4;
25:14;26:8;28:11;
33:3;37:8;41:2,8;
44:15;47:17;49:15;
51:12;54:24;55:22;
56:9;57:2;58:6,13,
24;59:6;64:17;66:20;
67:1,23;69:6;73:3;
76:8;78:7;81:1;
84:22;85:9;87:5;
90:7;91:10;92:1;
94:21;98:14,20;99:5;
103:22;104:15,20;
111:15;112:5,10;
114:5,9,22;121:13;
122:21;125:2;127:4;
132:21;133:8;
136:18;137:19,21;
138:5,10;139:18;
142:1;143:2;146:10;
150:10,20;155:2,10;
156:8,11;159:19,24;
162:11,22;164:23;
166:8,17;167:9;
169:8;174:14;
175:13,16,22,24;
176:23;177:2,18,23;
179:6;181:9;183:20;

184:7;193:19;194:7,
24;197:23;198:4;
199:17;202:12;
204:10,14,15;206:15;
207:7,22;210:2;
211:16;212:10;
214:6;218:12,18;
219:22;222:10;
223:8;224:12;227:3;
231:3,17;233:15,17,
19;236:21;237:3;
238:23;239:7,9,11;
240:9;241:19;242:3;
243:11;244:23;
245:2,6;248:21;
249:19;253:20;
254:9;264:6;265:1;
266:4,5,14;267:7,15,
22;279:8;280:24;
281:18;282:2;
287:10,16,18;289:4,
7,23;295:1;299:13;
302:19;303:3;305:9;
307:8,14;309:19;
310:11;313:23;
314:18;315:14,16;
316:10;317:3;
328:24;329:22
**surfaced (1)**
231:11
**surreptitious (10)**
252:10;296:8,11,
13;297:4,15,17;
299:21;302:17;
311:17
**surreptitiously (7)**
161:12;252:18;
297:24;299:3;303:8,
13,18
**surrounding (1)**
265:21
**suspicion (1)**
222:22
**Swenson (26)**
35:22;78:14,16;
87:10,24;88:1;92:9,
23;93:4,10,16;
134:24;205:9,14;
206:9;207:2;236:23;
280:11,15,17,20;
281:4,8,21;283:12;
284:24
**sworn (3)**
3:12,15;4:23
**system (32)**
16:5;18:23;19:21;
20:17,20;21:6,8;45:5,
6;59:18,21;60:1,3,13,
15;61:11;62:16;79:6;

80:16;105:7;135:1,2;
137:1,4;161:23;
174:21;175:6;180:9;
202:16;237:19,21;
245:12
**systematically (3)**
136:4;137:12;
291:6
**systems (2)**
61:14;216:5

**T**

**talk (3)**
108:19;158:18;
216:21
**talked (11)**
45:12;61:16;70:24;
98:24;99:4;151:24;
155:3;159:18;
182:19;224:16;329:3
**talking (23)**
33:14;44:11;62:19;
72:19;102:10;115:3;
125:9;148:1;152:7;
159:2,3;163:5,7,8;
186:15;208:9;
257:15;259:8,9;
263:20,21;279:3;
299:5
**targeted (9)**
56:14;72:11;
116:19,20,21;117:6,
19;260:7;329:13
**targeting (1)**
231:9
**Tasha (4)**
35:20;36:2,7;
239:24
**team (2)**
302:24;303:1
**technical (6)**
53:19;75:22;92:15;
93:17;175:7,17
**technical-legal (2)**
53:4;55:22
**Teleakie (2)**
265:19,19
**T-E-L-E-A-K-I-E (1)**
265:19
**telling (4)**
143:7;147:20;
222:5;237:13
**template (1)**
180:18
**ten (11)**
52:17,17;55:16,17;
58:5;183:21;184:8;
189:7,8;197:17;

200:8
**tenens (1)**
122:12
**tenets (1)**
324:4
**tense (13)**
117:5,19;120:16;
124:5;125:10;
147:11;148:8;
209:10;216:17;
271:22;306:14;
319:15;329:14
**tension (3)**
142:5;319:23;
320:3
**tensions (2)**
124:18;320:15
**tenure (7)**
97:18;111:2;120:3;
151:3,4;292:6,13
**ten-year (1)**
48:4
**term (17)**
148:4;227:11;
245:8,10;247:1,2;
250:18;274:5;282:4;
305:17,19;313:17;
314:12,19;315:3,3,11
**terminology (2)**
166:3;227:10
**terms (11)**
42:8;80:9,11;
91:22;98:18;112:5;
123:17;174:14;
229:18;274:9;297:5
**test (1)**
156:13
**testified (22)**
5:2;69:15;79:17;
116:18;125:13;
127:12;136:22;
137:4;141:10;156:3;
170:6,9;277:13,16;
278:3;291:13,22,23,
24;292:2;319:22,24
**testify (4)**
6:5;139:1;141:8;
156:1
**testifying (7)**
76:2,3;98:2;
107:12,19;115:23;
217:1
**testimony (13)**
54:23;65:17;107:9,
14;121:17;127:22;
129:14;170:2;
201:12;251:22;
252:3;277:17;319:8
**testing (13)**

40:17;64:12,13,16;
127:10;130:5;
225:21,24;226:6,11,
18;246:23;247:16
**tests (1)**
234:8
**Thanks (4)**
58:7;93:13;133:17;
278:21
**thinking (6)**
119:8;157:9;
228:13;229:4,5,12
**third (2)**
64:3;230:8
**third-party (3)**
225:1;245:16;
251:16
**though (10)**
97:20;108:10;
177:3;184:9;188:4;
192:14;282:7;284:7;
290:18;311:2
**thought (7)**
83:13;93:17;
115:10;118:23;
160:6;216:7;237:13;
241:15;249:5;266:8;
290:2;294:15;305:2;
306:12,13;326:19,22
**thoughtful (2)**
119:9;146:23
**thoughts (1)**
230:21
**thread (5)**
78:15;86:1;91:7,9;
92:5
**threatened (1)**
242:16
**three (15)**
43:2,5,21;71:12;
131:7;141:10,11;
145:14;168:10,16;
169:12,16;243:17;
244:10,17
**thresholds (1)**
134:11
**throughout (14)**
18:13;21:1;35:10;
65:11;139:16;
183:17;209:4;258:8;
285:18;287:8,12;
301:14;324:8;329:12
**throw (3)**
51:18,24;53:13
**throwing (3)**
52:24;54:24;57:15
**timekeeping (1)**
105:6
**timeline (4)**

126:4;244:5;
321:12,16
**timelines (1)**
243:12
**timely (1)**
208:23
**times (49)**
7:1,3;14:5,6;20:24;
21:4;22:8;23:4;24:8;
46:1,21;47:7;65:1;
106:18;117:21;
118:11;119:20;
120:1,24;121:2,10,
24;125:15;128:17;
133:23;134:5;
135:17,21;165:7;
166:20;175:8,12,18;
176:1;181:14,16,19;
206:16;219:7;
236:18;239:15,16;
243:15;260:6;
274:21;286:6;322:7;
324:23;325:21
**tired (1)**
315:15
**title (24)**
9:16;30:22;36:7;
49:23;84:8,12;85:6,
9;86:23;88:10,14;
89:5,6,12,19,20,21;
90:3;91:12;92:3;
93:5,17;94:12;97:17
**titles (8)**
31:6;84:13,14,14,
21;88:17;91:21,22
**today (7)**
6:5;195:20,23;
197:13;321:18;
324:9;330:4
**Today's (1)**
4:6
**together (12)**
58:5;120:10;122:7;
131:6;132:23;
192:16;219:4,19;
230:18;246:10;
322:15;325:23
**told (25)**
15:18;51:17;
107:10;143:6,18;
154:16;155:19;
156:2,9;161:10,24;
198:10;203:6;
219:23;221:10;
224:24;237:18;
253:21;280:15;
302:10;311:3;328:4,
11;329:1,3
**tone (14)**

106:12,17,23;
108:20,24;109:2,3,5,
8,11,15,22,23;321:19
**tonight (1)**
133:14
**took (19)**
48:24;56:24;70:19;
116:16;181:12;
183:22;184:15;
204:5;238:24;243:1,
7,13;249:16;253:10;
261:16,20;274:3;
277:21;327:18
**top (2)**
85:21;185:9
**topic (2)**
190:12;286:9
**tornado (1)**
102:22
**Torres (2)**
240:17,20
**totality (11)**
82:6;105:23;109:1;
110:14;115:20;
230:18;258:22;
260:19;285:24;
321:23;322:13
**touch (1)**
59:7
**touched (2)**
63:15;251:19
**toward (2)**
64:11;282:8
**towards (19)**
20:9;30:16;83:15;
112:23;114:17;
117:18;122:3;
125:17;131:21;
138:6;177:7;230:16,
17;260:18;269:7;
274:22,22;323:3,8
**track (3)**
134:22;135:1,3
**trade (1)**
200:7
**train (1)**
125:20
**trained (6)**
41:4,8;42:9;43:21;
125:14;207:19
**trainees (2)**
18:8;159:13
**training (25)**
16:20;17:10;40:4,
15;42:10;50:21,23;
51:2,5,6,8,13,15;
60:4;79:6;126:23;
127:2,5;128:2;207:3;
300:21;301:6;

305:21;308:8;312:3

**trainings (2)**
51:14;301:9

**transcript (10)**
65:16;66:4;252:2;
253:19,22,23;254:2,
5,16;278:1

**transcripts (1)**
254:23

**transfer (1)**
208:4

**transferred (1)**
210:6

**transferring (2)**
208:4,21

**transition (10)**
38:20;99:14;135:9;
154:18,20,20;156:14,
21;162:2;322:5

**transitioned (3)**
80:24;161:22;
202:16

**transitioning (2)**
39:12;45:13

**transmission (1)**
4:8

**transparency (3)**
5:6;294:4,10

**transpired (8)**
7:3;196:12;269:13,
22,23;280:20;
281:14;284:24

**transportation (2)**
47:7;166:9

**transported (1)**
271:12

**traumatic (1)**
258:18

**travel (2)**
272:8,24

**treated (6)**
28:3,10;29:2,8;
184:19;313:18

**treating (3)**
312:18;314:8;
315:19

**treatment (26)**
9:23;19:8;25:13;
33:1,2,4;62:5;154:9;
185:6;245:11,12,14,
18;246:2,5,15,15,18;
248:16,22;251:5,6;
274:1;303:20;
312:22;314:7

**trial (16)**
3:9;16:4,14,15,18;
17:16,21;18:9,24;
19:4;21:2;25:19,22;
96:24;227:23;228:14

**tried (11)**
81:19;164:16;
171:15;175:14;
204:13;216:11;
218:2;225:16;
234:18;235:8;267:21

**triple (2)**
42:16;43:1

**trouble (1)**
195:16

**true (13)**
88:6;119:1;135:24;
155:16;156:3;
173:12;198:11;
217:7;227:17;
233:10;270:14;
325:6,8

**truly (1)**
267:16

**trust (1)**
200:21

**truth (1)**
119:5

**truthfully (1)**
6:5

**try (34)**
7:4,6;24:16;25:23;
41:21;55:8;62:11;
76:16,23;82:11;
125:15,15;141:17;
176:5;198:7;199:11,
20;206:3;210:15,16;
218:2,22;234:19;
237:24;243:20;
267:22;286:4;291:9;
323:18,19;325:22;
326:3;329:7,8

**trying (30)**
26:1;105:4,8,13;
122:3;131:19;
155:22;167:1,3,10;
173:6;176:15;
187:16;191:19;
198:20;206:18;
218:17,18,18;256:18;
258:16;281:11;
285:15;304:15;
305:5;315:13;325:2;
326:15,24,24

**turn (3)**
244:10,17;309:4

**turnaround (1)**
242:24

**turned (1)**
243:2

**two (49)**
8:2;12:8;17:18,20;
19:1,1,3,3;25:4,12;
32:14;62:14;63:17,

23;64:1,9,9;106:17;
117:1;125:22;
136:22;141:11;
142:11;151:4;
157:20;159:14;
160:9;186:14;190:2;
201:17;208:17;
209:17;210:9;
216:10;228:17;
240:19;253:4;
259:19;260:3;
273:18;274:11;
278:10;296:22;
311:6;319:1;320:8;
321:11,13,14

**type (22)**
27:2,3;55:10,10,
11;73:16;83:15;
107:7;113:17;
118:23;126:19;
204:17;215:5;
218:20;244:5;
252:17;263:11;
275:21;285:7;
294:16;303:16;
329:13

**types (29)**
18:11;25:4;30:2;
53:18;70:2;71:24;
77:1,9;84:13;110:6;
114:9;120:19;139:8;
154:9;216:18;224:1;
230:21;251:12;
263:17;267:20;
283:6,8;291:7;
301:10;304:1,3;
323:18;329:10,15

**typical (3)**
7:10;306:22;
311:11

**typically (6)**
5:14;63:3,16;
90:18;111:24;185:5

**typo (1)**
157:11

## U

**ultimately (8)**
89:23;116:13;
164:18;211:21;
235:23;262:8;
266:19;312:5

**umbrella (1)**
20:14

**unable (3)**
10:10;180:14;
235:13

**unauthorized (3)**

294:22;309:9;
312:11

**unclear (6)**
56:21;81:24;107:7;
218:1,5;252:14

**undecided (1)**
244:11

**under (32)**
10:11;34:5;47:24;
48:2;60:22,23,24;
98:13;113:22;
125:14;138:8;
145:21,23;150:21;
153:16;168:11,12;
185:4;217:9;250:16;
251:4;268:15;289:7;
291:13,15,24;298:5;
307:10,13;314:6,7;
318:3

**underscore (3)**
100:2,3;150:11

**understaffed (2)**
45:17;324:24

**understood (4)**
6:21;153:21;155:3;
289:3

**undertake (1)**
318:13

**unethical (1)**
296:14

**unfit (1)**
19:6

**union (2)**
169:24;170:17

**unique (2)**
24:8;158:15

**unit (1)**
267:2

**University (6)**
11:12;12:7,10,15;
13:4,10

**University's (1)**
11:24

**unlawful (1)**
53:10

**unless (9)**
73:18;75:8,12;
76:4,5;154:13;155:5;
242:8;299:22

**unnecessarily (1)**
21:9

**unprofessional (1)**
307:16

**unquote (7)**
216:9;218:22;
240:4;265:21;
294:22;296:14;
297:24

**un-redacted (21)**

22:10,14,20;23:11,
24;24:9,15,17;25:24;
27:5,7,17;28:6;
241:20,22;242:2,5,8,
11,15,17

**unsurprising (1)**
153:15

**unto (2)**
198:2,3

**unusual (5)**
56:7;263:10;266:9,
12;306:21

**up (80)**
15:5;27:6;48:14;
57:9,12,15;65:24;
67:2,8;79:3,8;81:18;
86:1;87:2,18;92:4;
107:1,3;115:13,20;
117:4;121:21;
123:16;127:20;
136:6;138:7;142:9;
147:18;150:18,20;
151:21;152:19,23;
155:21;156:18;
158:8;159:14;164:2,
3,4,5;166:14;171:15;
178:18;183:21;
186:19;187:5;191:7,
11;192:12,22,24;
193:9,16,22;194:21;
195:15;209:24;
215:2;225:11;
235:19;242:19;
245:1;252:20;
263:18;266:4;
279:10;295:11;
300:9;305:3;306:11;
309:18,21;313:13;
315:14;317:10;
320:9;322:22;
323:21;326:3

**update (1)**
280:3

**updated (1)**
279:17

**updating (1)**
279:6

**UPMC (1)**
12:24

**upon (2)**
156:14;251:19

**upset (1)**
276:3

**usage (7)**
22:19;28:24;29:1;
196:22;223:5;
241:12;294:22

**use (27)**
21:18;22:3,5;

Case 1:18-cv-12137-JPC-JLC   Document 225-3   Filed 03/05/22   Page 372 of 374

ABHISHEK JAIN, M.D.                                              MELISSA KAYE v.
October 4, 2021                          HEALTH AND HOSPITALS CORPORATION, et al.

23:10,11;24:21,22;
25:21;26:3,13;27:23;
28:5;114:12;148:16,
21;166:3;176:6;
197:13;204:11,19,21;
245:10;305:17,19;
315:2,9,11
**used (14)**
23:23;40:4,9;
52:22,23;56:16;
113:24;146:23;
148:4;153:18;
174:15;294:13,15;
310:12
**useful (1)**
40:20
**using (8)**
22:13;114:5,8;
188:19;197:16;
247:1,2;314:19
**usual (1)**
295:13
**usually (1)**
245:16

**V**

**vacation (2)**
204:22;205:5
**vacations (1)**
181:12
**vacuum (2)**
260:15,16
**vague (2)**
158:2;306:11
**vaguely (1)**
78:8
**valid (1)**
249:5
**value (1)**
61:13
**valued (7)**
69:2,2;159:11;
230:20;324:2,3,5
**various (20)**
13:14;47:9;67:8;
71:9;84:13;86:16;
134:1;154:21;219:9;
220:17;227:20,22;
228:9,12;250:16;
257:22;262:8;301:9,
9;313:10
**vary (1)**
53:21
**Vassallo (1)**
221:7
**verbal (4)**
106:4,7;108:10;
283:13

**verbally (5)**
6:11;108:1,11;
256:22;284:11
**verbatim (1)**
121:15
**verify (1)**
220:19
**version (3)**
284:23;307:10,12
**versions (1)**
278:10
**versus (2)**
159:2;324:10
**vested (1)**
194:5
**via (1)**
4:3
**video (1)**
296:21
**videoconference (1)**
4:3
**view (3)**
183:9;218:13;
230:7
**viewing (1)**
183:15
**views (2)**
285:8;324:6
**violate (1)**
303:7,12
**violated (1)**
304:8
**violation (3)**
303:18;309:10;
313:5
**violations (2)**
290:7;304:9
**violent (1)**
263:8
**Virginia (1)**
32:19
**vision (8)**
19:16;59:11,12,19,
21;60:2;61:5,9
**voice (1)**
6:17
**voicemail (1)**
189:19
**voices (1)**
6:17
**volume (2)**
80:11;134:15

**W**

**W-2 (5)**
11:4,6,7,9,13
**W-2s (1)**
10:21

**wait (6)**
21:1,2,3;190:23;
192:18;273:22
**waiting (9)**
19:21;21:4,9;
257:11;271:2,9;
272:2;273:14;277:10
**waived (1)**
3:4
**Wangel (14)**
14:3;67:22;78:13;
103:12,17,17,18;
104:2;162:19;164:6;
222:15,20;223:4,10
**Wangel's (1)**
212:4
**wants (1)**
76:17
**warning (3)**
284:4,17,20
**wasting (1)**
188:6
**watch (1)**
217:9
**watching (1)**
5:5
**Water (1)**
206:11
**way (20)**
116:10;131:14,15;
134:9;136:8;145:7;
158:23;164:17,19;
176:3;177:20;
178:15;190:11;
196:17;209:5;
243:21;267:18;
276:24;294:8;306:17
**week (3)**
179:17;202:10;
239:15
**weekly (4)**
81:20;179:10,11;
216:15
**weeks (7)**
62:9,9;154:24;
243:17;244:10,17;
273:23
**Weiss (3)**
110:15,17;169:11
**welcomed (3)**
110:6;219:7;
230:20
**weren't (16)**
155:10;168:21;
169:12;174:23;
180:6;231:15;
232:18,19;244:6;
255:6;269:19,19;
271:1,5,6;276:3

**Western (1)**
12:10
**what's (18)**
9:16;10:16,16;
72:7;77:16;85:18;
94:13;149:15;
154:15;177:8;198:8,
9;201:22;212:22;
267:23;288:4,6;
313:8
**Whereas (2)**
19:8;245:14
**Whereupon (1)**
189:18
**wherever (1)**
137:3
**whichever (1)**
310:16
**whole (8)**
185:15;187:21;
227:4;261:6,15;
288:15,16,20
**whomever (1)**
265:4
**who's (4)**
298:3,15,21;
311:20
**wife (7)**
326:18,20;327:2,3,
7,9,11
**William (1)**
234:24
**willing (2)**
265:15;272:24
**window (2)**
81:13;144:7
**Wink (1)**
91:7
**Winkler (61)**
28:4,21;38:12,14;
39:1,4,10;40:6,10,13,
16,23;41:3,5,8;45:13;
47:12;86:21;88:1;
91:7;92:10,23;110:2,
9;125:14,20;127:2,6;
128:21;129:18;
130:6,7;131:7;132:2;
142:15,23;143:5,17;
144:20;145:15,21,23;
146:6,21,22;147:15,
18,19;148:3,11,16;
209:6;210:8;234:6,7;
302:8,10,11,13;
308:4;321:20
**Winkler's (6)**
38:20;91:6;109:11;
146:9,13;147:8
**winter (1)**
277:22

**within (13)**
3:12;5:21;30:5;
113:19;154:7,24;
157:20;193:6;
222:19;237:19;
252:14;291:4;296:3
**without (22)**
75:6;80:1,3;
107:23;108:2;
136:17;139:5;
173:13;206:5,21;
237:1,3;244:18;
252:18;267:19;
274:8;279:14,15;
297:7;298:1;309:9,
12
**witness (47)**
4:14;7:18,23;8:19,
20,21;75:18;85:24;
92:19;98:10;100:14;
107:19;110:23;
113:4;121:4,7;147:5,
22;151:18;163:1,4;
167:1,3;170:8;
176:15;181:7;
191:24;192:1;
193:14,17,23;195:10,
22;199:23;200:3,9;
213:12;236:9;
257:19;284:10;
284:10;288:7,22;
289:1,5;298:8;308:2
**witness's (1)**
193:7
**woman (1)**
182:24
**wondered (1)**
108:21
**word (5)**
80:5,6;124:4;
297:17;315:9
**wording (3)**
88:5;283:7;297:16
**work (87)**
9:9;12:13,16;13:3,
8;20:2,19;23:9;
28:17,18;37:12,15;
60:16;69:2;70:1;
78:19,20;112:9,11;
113:19;117:15;
118:4,16;120:9;
123:20;124:11,15,19;
125:7;127:15,19;
128:5;133:12;
138:11;142:2;
144:15,17,18,20,22;
153:23;154:8;160:3;
169:20;170:4;182:2,
7;183:17;194:8;

200:4,22;202:4;
208:22;209:14;
211:12;212:2,16;
213:4;216:11;
218:15,17,22;219:4;
229:7;233:9;234:18;
236:23;240:15;
254:21;260:22;
261:2;269:16;270:5,
9;275:6;279:19;
282:12;306:2,5;
309:2;314:1;320:8;
322:15;324:10;
325:20;326:10,24
**workday (2)**
211:10,11
**worked (21)**
13:2,6,10;27:1;
28:20;36:2;39:19;
117:20;124:10;
138:20;145:21,23;
146:3;153:24;
173:12;207:18;
211:11;212:8;
324:15,18,21
**worker (1)**
124:21
**workgroup (1)**
36:17
**working (28)**
9:11;11:12,15;
13:24;14:18;15:16;
16:7;17:14;38:2;
41:10;45:23;71:8;
79:6;81:5;122:7;
126:21;135:14;
144:24;146:15;
172:9;258:8;270:17;
271:17;279:14;
310:14;311:22;
320:11;323:19
**workload (3)**
80:9,10;126:1
**works (4)**
58:21,24;67:21;
218:19
**worth (1)**
304:6
**write (6)**
137:14;190:14,16;
195:14;272:21;
283:11
**write-up (1)**
312:10
**writing (8)**
34:4;76:18;113:3;
138:7;150:20;
191:18;272:14;308:5
**written (8)**

57:9,11;137:15;
219:19;249:10;
272:17;283:9;312:6
**wrong (4)**
101:24;102:1;
150:8;175:19
**wrote (1)**
120:2

**Y**

**Yan (1)**
101:3
**Yang (30)**
14:2;15:13;32:3,4;
49:5;66:15,15;90:16;
99:1,9;100:19;163:2,
10,14,22,24;164:4,5,
20;165:1;291:2;
292:7,19,21,24;
293:2,3,4,11,14
**Yang's (1)**
292:6
**year (11)**
10:18,20,22;11:1,
12;117:14;124:11;
159:14;179:1,3,8
**years (15)**
13:5;41:9,17,19,
24;42:11;65:12;
145:22;146:4;
159:11,15;160:7,10;
173:13;196:19
**yelling (1)**
187:9
**yes-or-no (1)**
24:2
**York (26)**
4:18;5:1,2;9:23;
11:8;16:2,6;17:20,
23;18:19;19:1,2,6;
20:24;53:12;54:2;
96:18;97:7,23;154:7;
230:24;282:12;
283:2;297:20;298:2,
11
**youth (1)**
327:13
**Yup (3)**
83:10;151:18;
271:19

**Z**

**Zoom (1)**
196:24

**1**

**1 (7)**
77:12,17,21;78:1;
101:16;199:4;200:9
**1:22 (1)**
133:5
**1:23 (1)**
133:19
**10 (4)**
78:18;167:22;
200:10;214:6
**10:00 (3)**
166:15;214:3,17
**10:04 (1)**
4:7
**10001 (1)**
5:2
**10th (1)**
242:22
**11 (2)**
243:1,8
**11:19 (1)**
58:9
**11:32 (1)**
58:9
**11th (1)**
217:7
**12th (4)**
95:2,12;249:11,17
**13th (2)**
201:13;202:8
**14 (1)**
244:3
**14,000 (2)**
10:8,13
**16 (1)**
9:13
**16th (1)**
276:24
**17 (1)**
207:15
**17th (1)**
51:23
**18 (2)**
46:9;257:13
**18th (2)**
151:2;274:15
**19th (1)**
48:10
**1st (4)**
9:15;180:13,14;
273:21

**2**

**2 (13)**
19:4;85:14,19;
101:17,17,18;102:3,
3,4,8,10;103:3,5
**2:15 (1)**

133:6
**2:25 (1)**
133:11
**2:28 (1)**
133:20
**20 (7)**
41:9,17,19;136:11;
140:22;196:18;239:6
**200 (1)**
31:14
**2006 (2)**
12:3,8
**2007 (1)**
140:22
**2010 (2)**
12:8,10
**2011 (2)**
12:11,12
**2012 (2)**
12:12;13:6
**2014 (1)**
150:11
**2016 (3)**
95:2,13;268:17
**2017 (4)**
13:6,11;14:16;
215:24
**2018 (61)**
13:11;30:10;38:8;
45:17,22,22;46:8;
47:23;48:1,10,24;
51:23;52:13;61:2;
68:11;71:17;78:5;
81:6;83:17;84:6;
100:9,21;101:20;
102:12,14,24;104:23;
106:5,6,14,21,21;
107:1;125:18;
136:11;151:2;
161:11,12,24;168:7;
170:20;179:1,4,8;
201:13;203:6,11;
205:8;206:8;207:15,
17,20,20;210:17;
217:10;225:22;
234:5,15;242:22;
249:17;257:7
**2019 (28)**
30:11,16;136:12;
138:6,12,15,17;
140:5,22;144:9;
179:2,2;180:13,14;
269:14;270:7,12;
272:15;273:5;
275:19;276:24;
277:14,15,22;278:6;
279:5,11;280:13
**2020 (24)**
9:15;30:12,16;

32:12,13,13;38:9;
136:11,12;138:4,6,
18;140:5,22;144:9;
269:15;270:7;
272:16;275:20;
276:23,24;286:19;
288:1,8
**2021 (1)**
4:6
**204 (5)**
186:10,10,23;
187:5;189:14
**20th (2)**
100:9;234:5
**216 (1)**
31:15
**221 (4)**
31:15,16,17,18
**221,000 (1)**
10:20
**22nd (3)**
138:12;178:10;
180:24
**237 (2)**
85:15,20
**25th (5)**
93:3,10;102:11;
103:3,4
**27 (1)**
194:6
**275 (1)**
186:7
**27th (1)**
179:2
**281 (1)**
100:2
**282 (1)**
100:3
**283 (1)**
100:3
**28th (2)**
179:4;203:14
**290,000 (1)**
10:18
**2995-A (1)**
233:14
**29th (1)**
307:21
**2nd (1)**
276:24

**3**

**3 (4)**
94:14,17,22;103:3
**3:54 (1)**
201:4
**30 (3)**
177:20;239:6,8

ABHISHEK JAIN, M.D.
October 4, 2021

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

**300 (1)**
278:2
**300-page (1)**
278:1
**30th (1)**
234:15
**3113d (1)**
4:9
**31st (1)**
280:13
**330 (1)**
5:1
**390 (5)**
16:4;45:11;118:7;
149:2;300:7
**3948 (1)**
177:19
**3949 (1)**
177:19
**3950 (1)**
177:19
**3957 (2)**
177:20,20
**3rd (6)**
100:21;101:19;
102:14,24;103:5;
237:6

**4**

**4 (8)**
4:6;99:20,22;
102:13,13,20;103:4,4
**4:01 (1)**
201:4
**405 (1)**
186:10
**42 (2)**
79:5;80:14
**474 (1)**
198:5
**475 (1)**
186:8
**476 (5)**
186:13,21;192:8;
195:21;198:18
**48 (2)**
5:21,22
**4th (1)**
84:6

**5**

**5 (9)**
149:16,18;150:5,
11;162:14;165:10;
170:4;317:11,11
**5:30 (2)**
162:14;173:13

**5:46 (1)**
278:23
**5:51 (1)**
278:23
**50 (1)**
239:10
**5th (2)**
5:1;78:5

**6**

**6 (6)**
170:4;177:9,11,16,
20;317:14
**6:00 (3)**
133:14;257:3;
304:18
**600 (6)**
17:15;18:9;70:12,
16;186:5,7
**63 (1)**
187:15
**672 (3)**
77:13,22;78:2
**68 (1)**
112:23

**7**

**7 (6)**
151:10,13,16;
287:22;288:5;317:10
**7:11 (1)**
330:12
**730 (54)**
16:3,9,13,21;
18:17;36:16;40:18;
45:11;62:21,23;63:6,
9,16;64:21;65:1;
75:8,15;80:1,12,22;
113:15;118:7;
126:20;127:1,8;
134:20;140:23;
149:2;184:17;
208:11,14,17;226:19;
238:17,20;245:22;
250:19;252:20;
253:3,14;254:11;
262:3;263:10;269:2,
10;270:22,24;271:9;
290:8;291:22;300:6;
302:24;309:8,12
**730.20 (1)**
97:3
**730s (3)**
46:17;126:23;
154:5
**7th (4)**
206:8;277:15;

288:1,8

**8**

**8 (7)**
162:14,14;165:9;
167:23;170:4;
305:11;307:6
**8:00 (6)**
165:10,11;166:16,
16,19;167:16
**8th (1)**
225:22

**9**

**9 (3)**
167:22;170:4;
192:15
**9:30 (3)**
78:17;162:14;
173:13

DALCO Reporting, Inc.
800.325.8779

Min-U-Script®