UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

MELISSA KAYE, M.D.,

                    Plaintiff,

                    INDEX NO.: 18-CV-12137

       -against-


HEALTH AND HOSPITALS CORPORATION; ELIZABETH FORD;

ABHISHEK JAIN; PATRICIA YANG; and JONAHTHAN WANGEL,

et al.,

                    Defendants.

------------------------------------------------X

                    Remote Deposition
                    New York, New York 11716


                    September 27,  2021
                    10:08 a.m.


     DEPOSITION of ELIZABETH FORD, M.D., a Defendant

     herein, taken by the Plaintiff, held at the

     above-mentioned time and place, before KIARA

     MILLER, a Notary Public of the State of New

     York.

```
 1

 2    A P P E A R A N C E S:

 3

 4            THE LAW OFFICES OF SPECIAL HAGAN
              Attorney for Plaintiff
 5            196-04 Hollis Avenue
              Saint Albans, New York 11412
 6            EMAIL: SPECIAL@HAGANLAWOFFICES.NET
              BY:  SPECIAL HAGAN, ESQ.
 7

 8            NEW YORK CITY LAW DEPARTMENT
              Attorney for Defendants
 9            100 Church Street
              New York, New York 10007
10            EMAIL: DCANFIEL@LAW.NYC.GOV
              BY:  DONNA CANFIELD, ESQ.
11

12

13

14    ALSO PRESENT:

15    MELISSA KAYE, Plaintiff

16

17

18

19

20

21

22

23

24

25
```

1

2      F E D E R A L   S T I P U L A T I O N

3

4           IT IS HEREBY STIPULATED AND AGREED by

5      and between the counsel for the respective

6      parties hereto, that the filing, sealing, and

7      certification of the within deposition shall be

8      and the same are hereby waived;

9           IT IS FURTHER STIPULATED AND AGREED

10     that all objections, except as to the form of

11     the question shall be reserved to the time of

12     trial.

13          IT IS FURTHER STIPULATED AND AGREED

14     that the within deposition may be signed before

15     any notary public with the same force and

16     effect as if signed and sworn to before this

17     court.

18

19

20

21

22

23

24

25

1                        E. FORD, M.D.

2    E L I Z A B E T H   F O R D, M.D., after having first

3    been duly sworn by a Notary Public of the State of

4    New York, was examined and testified as follows:

5                        COURT REPORTER:  Please state

6            your name for the record.

7                        THE WITNESS:  Elizabeth Ford,

8            M.D.

9                        COURT REPORTER:  Please state

10           your address for the record.

11                       THE WITNESS:  145 Palacade

12           Avenue, Dobbs Ferry, New York 10522.

13   EXAMINATION BY

14   MS. HAGAN:

15           Q    Good morning, Dr. Ford.

16                How are you?

17           A    I'm fine.  Thank you.

18           Q    I know this is not the first time

19       you've been deposed; is that right?

20           A    That's correct.

21           Q    So it's not the first time?

22           A    It is not.

23                   MS. CANFIELD:  Objection.  Can

24           you repeat the question.  I thought

25           you said it is not.

1                     E. FORD, M.D.

2          Q    Is this the first time you've been

3     deposed, Dr. Ford?

4          A    No.

5          Q    So I'm going to give you some

6     sample, you know, not sample, but just

7     standard admonitions not to go too far off.

8               Just as a reminder, only one of us

9     can speak at a time.  So please let me

10    finish my question and then answer.  Second

11    thing is that if you need to take a break,

12    just let me know.  I would just ask that you

13    let me finish the question and answer the

14    question and then we can take a break.

15              If you have any, like if need to

16    take lunch or whatever at a certain time,

17    just let me know.  This is usually -- I

18    don't know, it's not always a seven-hour

19    process, but sometimes people like to have

20    lunch.  So if you would like to, you can let

21    me know, probably maybe midway into the

22    deposition, whether or not you'd like to

23    step out for lunch for an hour.  I'm fine

24    with that.

25              As far as objections are

1                    E. FORD, M.D.

2    concerned, if your counsel has objected to a

3    question, I just ask that unless she

4    instructs you not to answer the question,

5    that you answer the question to the best of

6    your ability.

7              Is that okay?

8         A    Yes.

9         Q    As far as your ability to remember

10   things, I know that some time has passed.

11   So I do have a right to ask you estimates,

12   but I don't expect you to guess.  So if you

13   don't remember, it's fine.  And also, you're

14   nodding your head.  So, for the record, when

15   you answer, please make sure you say yes or

16   no, or I don't know.  The reporter can't

17   take down facial or head gestures.

18             Is that okay?

19        A    Yes.

20        Q    And then, you happen to take

21   anything that will impair your ability to

22   testify truthfully today, would you?

23        A     No.  I have not.

24        Q    Have you taken any medications

25   within the last 24 hours?

```
 1                    E. FORD, M.D.
 2                  MS. CANFIELD:  Objection.
 3          A    No.
 4                  MS. CANFIELD:  You can answer.
 5          A    No.
 6          Q    Are you on any psychotropic
 7     medications, Dr. Ford?
 8                  MS. CANFIELD:  Objection.  You
 9              can answer.
10          A    No.
11          Q    Have you been prescribed any
12     medications at all?
13                  MS. CANFIELD:  Objection.
14              When?
15                  MS. HAGAN:  Her entire life.
16          Q    **MARK Dr. Ford, have you been
17     prescribed any medications within the last
18     year?
19                  MS. CANFIELD:  Objection.
20                  I'm going to direct you not to
21              respond to that question.  It's not
22              relevant, it's personal and violates
23              HIPPA.  So, no, she's not going
24              to --
25                  MS. HAGAN:  That's not a valid
```

```
 1                    E. FORD, M.D.
 2          objection.
 3               MS. CANFIELD:  It is.  And
 4          she's not going to answer it.  It's
 5          a HIPPA violation.  She's not going
 6          to waive it.  You have no right to
 7          --
 8               MS. HAGAN:  I have a right to
 9          know if she's taken anything in the
10          last year that would impair her
11          ability to testify truthfully today.
12               MS. CANFIELD:  You already
13          asked her if she has taken anything
14          that would impair her ability to
15          testify truthfully today.  She
16          responded no.  So let's move on.
17               What she took six months ago
18          has no bearing on today.  So I'm
19          going to direct her not to answer.
20          I suggest you move on, unless you
21          want to call the Court, or we can
22          mark it, we can call the Court
23          later.
24               MS. HAGAN:  We can call the
25          Court now.
```

```
 1                    E. FORD, M.D.
 2               MS. CANFIELD:  Let's just mark
 3          it.  I'm sure --
 4               MS. HAGAN:  We can call the
 5          Court now because you're being
 6          disruptive.  I'm going to ask the
 7          question just for the record so that
 8          it's clear.
 9      Q    Dr. Ford, have you been prescribed
10   any medication that would impair your
11   ability to testify truthfully today?
12               MS. CANFIELD:  You can answer
13          that.
14      A    No.
15      Q    Have you been given any
16   psychological diagnosis within the last
17   year?
18               MS. CANFIELD:  Objection.
19          It's relevance again.
20               MS. HAGAN:  That is not a
21          valid objection.  You can answer.
22               MS. CANFIELD:  Objection.
23          Don't answer that.  Your
24          psychological condition is not at
25          issue here.  She asked you if you --
```

```
 1                    E. FORD, M.D.
 2            Counsel, you asked her if she was
 3            able to testify truthfully.  That's
 4            sufficient.  In terms of laying of
 5            foundation.
 6       Q    **MARK Dr. Ford, have you ever
 7     been diagnosed with any psychological
 8     condition, yes or no?
 9            MS. CANFIELD:  Objection.  Do
10            not answer that.  Move on.  You can
11            mark that one, too.
12            MS. HAGAN:  We're going to
13            call the Court.
14                (Calls Court.)
15            MS. CANFIELD:  If we're moving
16            on, can we have the court reporter
17            mark those two questions so she can
18            easily go back for when the Court
19            calls us.
20            MS. HAGAN:  It's several
21            questions that were asked.  So it
22            may be more.  We can go back at some
23            point, but we're not going to do
24            that now.
25       Q    So, Dr. Ford, where are you
```

1                     E. FORD, M.D.

2      working currently?

3           A    I am currently awaiting starting

4      two new positions.  So I'm currently

5      unemployed, other than a small consulting

6      contract with my prior employer.

7           Q    What are the two positions you're

8      waiting to start?

9           A    An associate professor of

10     psychiatry at Columbia University.  And

11     working title at Health and Hospitals

12     Central Office as the medical director for

13     justice involved behavioral health.

14          Q    Is this a part-time or full-time?

15          A    Both positions are part-time.  So

16     three days at one and two days at another.

17          Q    Who would be your supervisor at

18     H&H?

19          A    Charles Barron

20          Q    Is this the former politician or

21     someone else?

22          A    I don't know if he's the

23     politician.  He's the current medical

24     director of behavioral health, I believe, at

25     Health and Hospitals.  He's a psychiatrist.

```
 1                      E. FORD, M.D.
 2          Q    So it's a different person.
 3               The associate professor position
 4     of psychiatry, that's part-time, too, right?
 5          A    Three days a week.
 6          Q    Where were you working prior to
 7     these two job offers?
 8          A    I was working at a nonprofit
 9     organization called CASES.  The Center for
10     Alternative Sentencing and Employment
11     Services, in Harlem.  They have offices in
12     Brooklyn.  And I was the chief medical
13     officer there.
14          Q    Why did you leave CASES?
15          A    I had -- I was missing working
16     with physicians, and I was missing working
17     on a larger systems level for the patients
18     that I want to take care of.
19          Q    How long were you at CASES?
20          A    Sixteen months, I believe.
21          Q    And how much were you making at
22     CASES?
23          A    I worked there .9 -- so it was
24     90 percent time, and my salary was 270,000 a
25     year, I believe.
```

1                         E. FORD, M.D.

2              Q    Now, were you asked to resign,

3     Dr. Ford?

4              A    No.

5              Q    So you voluntarily resigned?

6              A    Yes.

7              Q    And you said you missed working

8     with patients?

9              A    Physicians.

10             Q    Physicians.

11             A    Yes.

12             Q    And who were you working with?

13             A    I was primarily working with

14    social workers and lawyers, and there were

15    two or three psychologists.

16             Q    And how big was your staff?

17             A    I did not have any staff there.

18    Sorry.  That's until -- I did hire a

19    psychologist towards the end of my time

20    there, but I didn't have any direct reports

21    until she arrived.

22             Q    Who is she?

23             A    Her name is Erin Weinstein.

24             Q    Now, when did you start at CASES

25    exactly?

1              E. FORD, M.D.

2         A    March 23, 2020.

3         Q    Now, while you were at CASES, did

4    you take any leave of absences?

5         A    No.

6         Q    So you just worked full-time for

7    the 16 months, you know, outside of regular

8    vacation; is that correct?

9         A    That's correct.

10        Q    And prior to CASES, you were at

11   CHS; is that right?

12        A    Yes.

13        Q    And was your whole salary paid by

14   H&H?

15        A    Yes.  I believe so.

16        Q    What was your salary at H&H?

17        A    Do you mean when I ended?

18        Q    Yes.

19        A    250,000 a year.

20        Q    And PAGNY didn't pay any of your

21   salary; is that right?

22        A    Not to my knowledge, no.

23        Q    So it was all paid by H&H and the

24   City of New York; is that right?

25              MS. CANFIELD:  Objection.  You

1                    E. FORD, M.D.

2          can answer if you understand.

3      A    Again, to the best of my

4    knowledge, it was all paid for by Health and

5    Hospitals.

6      Q    Now, what was your job title when

7    you were at H&H?

8      A    At what point?

9      Q    Well, when you started, I guess --

10   let's go back to, I guess, your initial --

11   just some initial questions that I typically

12   ask deponents.

13          Dr. Ford, where did you get your

14   undergraduate degree?

15     A    Yale University.

16     Q    What did you get your degree in?

17     A    Biology.

18     Q    What year did you graduate from

19   Yale?

20     A    1994.

21     Q    And then what was your next

22   degree?

23     A    Medical degree.

24     Q    And where was that from?

25     A    The University of Virginia.

                          E. FORD, M.D.

1

2         Q    And when did you get that?

3         A    2000.

4         Q    And then after that, did you do

5    any fellowships?

6         A    I did do a fellowship.  I did a

7    residency first in psychiatry at New York

8    University School of Medicine.  And then I

9    did a fellowship in forensic psychiatry the

10   year after that.

11        Q    When was that, the forensic

12   psychiatry?

13        A    That was 2004 to 2005.

14        Q    Where did you do the forensic

15   psychiatry residency?

16        A    NYU School of Medicine.

17        Q    And then after you completed the

18   forensic psychiatry residency, where did you

19   go?

20        A    I took a position on an inpatient

21   psychiatry in Bellevue Hospital as an

22   attending physician.

23        Q    Was this attending level one?

24        A    I was paid by NYU, so there was

25   no -- there wasn't a -- I don't know.  We

```
1                        E. FORD, M.D.
2      didn't have titles like that.
3           Q    So how long were you in Bellevue
4      as an attending physician?
5           A    About three months.  I was
6      promoted to the unit chief at that time,
7      same unit.
8           Q    So out of just completing your
9      residency, three months afterwards you were
10     promoted to unit chief?
11          A    That's correct.
12          Q    Had you had any experience working
13     prior to this residency in this capacity?
14               MS. CANFIELD:  Objection as to
15          form.  You can answer.
16          A    I'll try to.  Do you mean as a
17     unit chief had I ever had experience?
18          Q    Let's start with that.
19          A    No.  This was my first position as
20     a unit chief.
21          Q    How long had you been practicing
22     medicine prior to being promoted to unit
23     chief?
24          A    So when you say practice medicine,
25     do you mean when I was licensed and could
```

```
 1                    E. FORD, M.D.
 2      practice independently?
 3           Q    Yes.
 4           A    I received my license when I was a
 5      second year resident.  So I guess for four
 6      years, five years, four or five years.
 7           Q    So what year was this that you got
 8      promoted to unit chief?
 9           A    2005.
10           Q    And this is at Bellevue?
11           A    Yes.
12           Q    And who was you supervisor at the
13      time?
14           A    I hope I don't get his first
15      name -- Dr. Morris, I believe was his last
16      name, Raphael, first name, I think.
17           Q    How long were you unit chief?
18           A    About 18 months.
19           Q    And why did you change positions?
20           A    I left that position during the
21      eighth month of my second pregnancy.
22           Q    And why was that?
23           A    Because I was having a high risk
24      pregnancy, and I had a toddler, and the job
25      was difficult.
```

1                          E. FORD, M.D.

2          Q    And why was the job difficult?

3          A    The inpatient unit at Bellevue was

4     one of the high risk units for people at

5     Rikers Island with serious mental illness.

6     It was a lot of crisis all the time and I

7     was increasingly feeling like it was hard to

8     be available as I wanted to be that

9     pregnant.

10         Q    Available to who?

11         A    To my staff and the patients.

12         Q    Did you have issues being

13    available to your family?

14              MS. CANFIELD:  Objection.

15         Q    You can answer.

16         A    I didn't -- I don't think I had

17    issues.  I wanted to be with them more.

18         Q    And you couldn't in your job

19    capacity at that time; is that right?

20              MS. CANFIELD:  Objection.  You

21          can answer.

22         A    I found it difficult to balance.

23         Q    And why was that?

24         A    I think because both having a

25    young family and a challenging professional

```
1                    E. FORD, M.D.

2     job was a lot, and I wanted to be both

3     places all the time and couldn't.

4          Q    Did you express any of this to

5     your supervisor?

6          A    Indeed.

7          Q    So you spoke to Dr. Morris about

8     this; am I right?

9          A    No.  He was not my supervisor at

10    the time I left that position.

11         Q    Who was your supervisor?

12         A    A psychiatrist named Ken Hoag.

13         Q    And what did you tell Mr. Hoag

14    regarding the balance?

15         A    That I needed to leave the

16    position in order to take more time to raise

17    my family.

18         Q    But prior to that, you didn't tell

19    him that you needed adjustments to your job

20    or anything like that, in order to

21    accommodate your family and the job?

22              MS. CANFIELD:  Objection as to

23         form.  You can answer.

24         A    I don't remember what

25    conversations I had with him prior to that,
```

1                    E. FORD, M.D.

2       that end conversation.

3            Q    Did you ask for any adjustments to

4       your job so that you could accommodate your

5       family?

6                    MS. CANFIELD:  Objection as to

7               form.  You can answer.

8            A    I don't think so.

9            Q    Did you have any difficulty

10      getting to work due to day care when you

11      were working at that capacity?

12           A    I got to work on time every day.

13      It was -- the mornings were pretty chaotic,

14      but I'm not sure what you mean by

15      difficulty.  I was able to do it.

16           Q    You were able to do it, but it was

17      a struggle; am I right?

18                    MS. CANFIELD:  Objection as to

19               form.  You can answer.

20           A    I didn't -- it was difficult.

21           Q    But the question was, did you --

22      you said it was difficult, and why was it

23      difficult?

24                    MS. CANFIELD:  Objection.  You

25               can answer.

1                    E. FORD, M.D.

2         A    Sure.  Because I had -- still do

3    have a husband who worked full-time, and I

4    had two -- I had a -- how old was he, 18

5    month son, and a very large belly, and I

6    needed to get him to day care, which didn't

7    open until about half hour before I needed

8    to get to work.

9         Q    Did you believe that you could or

10   anyone could balance the life of a

11   professional woman and being a mother?

12              MS. CANFIELD:  Objection as to

13         form.  You can answer.

14        A    I'm sorry.  Did I believe that

15   then, do I believe that in general?

16        Q    Yes.  In general.

17        A    I do.  Um-hmm.

18        Q    And at the time, did you believe

19   it?

20        A    I don't know if I thought about it

21   at the time, actually.

22        Q    Did you think about it afterwards?

23              MS. CANFIELD:  Objection as to

24         form.  You can answer.

25        A    I mean, yeah, I think about those

1                    E. FORD, M.D.

2     balances all the time for myself and for my

3     staff.

4          Q    Now, when you worked under

5     Mr.  Hoag, were you allowed to work a

6     modified schedule?

7                    MS. CANFIELD:  Objection as to

8               form.  You can answer.

9          A    Again, I don't believe I ever

10    asked for a modified schedule, so I don't

11    know the answer to that.

12         Q    I'm not asking if you asked for

13    it, but were you allowed to work a modified

14    schedule?  Did you work 9:00 to 5:00 or an

15    eight-hour schedule at that time?

16         A    I did work -- well, I mean -- yes,

17    I worked a 9:00 to 5:00 schedule.  I was

18    available on call all the time, but I did

19    work a full schedule.  I never asked about a

20    different one.  So I don't know if I would

21    have been allowed to.

22         Q    Were you allowed to come and go as

23    you pleased at that time?

24         A    No.  Not that I recall.

25         Q    So did you come to work the same

1                    E. FORD, M.D.

2    time every day and leave the same time every

3    day?

4         A    I came to work the same time every

5    day, with the exception of maybe I would

6    come in early if something particular was

7    going on in the unit, but I arrived at work

8    every day, and I did not leave work every

9    day.  Frequently I was coming home later

10   than I wanted to.

11        Q    So you worked extended hours, and

12   you didn't -- did you work part-time at any

13   point, when Mr. Hoag was your supervisor?

14        A    No.  Um-um.

15        Q    So you worked five days a week,

16   eight hours a day, if not more?

17        A    That's correct.

18        Q    During the time that you were unit

19   chief?

20        A    That's correct.

21        Q    The entire time?

22        A    The entire time.

23        Q    So after you became -- after you

24   were promoted to unit chief, you decided to

25   leave that position.  What did you do after

```
 1                    E. FORD, M.D.
 2      you left that position?
 3           A    I was on maternity leave at that
 4      time, and I didn't have a particular plan
 5      for my next move.  During my maternity leave
 6      I accepted a position to work in the
 7      emergency room at Bellevue Hospital.
 8           Q    In what capacity were you working
 9      in the emergency room?
10           A    I was an attending physician.
11           Q    And how long were you working
12      there?
13           A    About 18 months.
14           Q    What year, what time period is
15      this?
16           A    I believe I started October 2007
17      or fall 2007 until May of 2009.
18           Q    And what was your next position
19      after that, Dr. Ford?
20           A    The director of the division of
21      forensic psychiatry at Bellevue Hospital.
22           Q    And how did you get that job,
23      Dr. Ford?
24           A    I was offered that job by the
25      chief of psychiatry at Bellevue.
```

Page 26

```
 1                         E. FORD, M.D.

 2          Q    Who was that?

 3          A    Marianne Badaracco.

 4          Q    Was she your supervisor when you

 5     started working there?

 6          A    Yes.  In that position, yup.

 7          Q    And this is in May 2009?

 8          A    Correct.

 9          Q    Now, were you supervising Dr. Kaye

10     at that time?

11          A    I believe the division of forensic

12     psychiatry included the Bronx Court Clinic.

13     So when I started in May, my understanding

14     was that I was Dr. Kaye's supervisor.

15          Q    Now, was Dr. Belkin, I guess the

16     director of the court clinics at that time?

17               MS. CANFIELD:  Objection as to

18          form.  You can answer.

19          A    I don't know.  I don't know.

20          Q    You are familiar with Dr. Belkin;

21     am I right?

22          A    Yeah.  I'm familiar with him.

23          Q    How long did Dr. Belkin serve in

24     the capacity as the director of all the

25     court clinics?
```

```
 1                    E. FORD, M.D.
 2              MS. CANFIELD:  Objection as to
 3          form.  You can answer.
 4       A    I don't know Dr. Belkin's
 5   involvement with the court clinics.
 6       Q    Let me just make sure that I get
 7   this right then.
 8              I'm going to show you what's going
 9   to be marked as Plaintiff's Exhibit 1.
10                     (Whereupon, Letter 06/12/16 Dr.
11                     Belkin (NYC1003) was marked as
12                     Plaintiff's Exhibit 1 for
13                     identification as of this date.)
14       Q    So at this time, so I don't take
15   up too much more of your time while we're
16   moving through this document.
17              At this time, you are -- had you
18   met Dr. Kaye in 2009?
19       A    I don't remember.
20       Q    When was the first time you
21   remember meeting Dr. Kaye?
22       A    I don't remember the year.  I
23   think it was in my office at Bellevue
24   Hospital, but I don't remember.
25       Q    You're not sure what capacity you
```

```
 1                    E. FORD, M.D.
 2      were serving in at that time; is that right?
 3                    MS. CANFIELD:  Objection as to
 4            form.  You can answer.
 5            A    I don't think I met Dr. Kaye prior
 6      to my position as the division director, but
 7      I'm not sure.
 8            Q    So even though you were the
 9      director of forensic psychiatry over at
10      Bellevue in May of 2009 -- and how long did
11      you have that position for director of
12      forensic psychiatry at Bellevue?
13                    MS. CANFIELD:  Objection as to
14            form.  You can answer.
15            A    Five years.
16            Q    So from May 2009 to 2014, you were
17      the director of forensic psychiatry at
18      Bellevue; is that right?
19            A    Yes.
20            Q    You're not sure at that time
21      whether or not you worked with Dr. Kaye or
22      not?
23                    MS. CANFIELD:  Objection as to
24            form.  You can answer.
25            A    I believe you had asked me when
```

1                      E. FORD, M.D.

2        did I first meet her.  I do recall working

3        with Dr. Kaye when I was the division

4        director.

5            Q     How was your working relationship

6        with Dr. Kaye at that time?

7            A     I thought it was professional and

8        friendly.

9            Q     And how would you describe her as

10       an employee at that time?

11           A     We didn't interact too much, but I

12       found her to be excellent at the work that

13       she was doing in the Bronx.  I found her to

14       be an advocate for herself and the trainees

15       and staff that she had at the clinic.  I

16       found her to be precise and professional.

17           Q     So this is from 2009 to 2014, that

18       was your perspective on Dr. Kaye at that

19       time?

20           A     Yes.  There were a few -- yes.

21       From my personal experience with her, yes.

22           Q     Did she collaborate with you when

23       you had questions or any ideas about the

24       clinics?

25                      MS. CANFIELD:  Objection as to

```
 1                      E. FORD, M.D.
 2           form.  You can answer.
 3           A    I'm not entirely sure I understand
 4      the question.
 5           Q    Well, would you say that Dr. Kaye
 6      was cooperative when you had questions about
 7      the clinics and operations at that time?
 8           A    Yes.
 9           Q    And would you say that she was
10      willing to collaborate with you if you had
11      any desire to do so at that time?
12           A    Yes.
13           Q    Now, I'm going to go back to the
14      question I had about Dr. Belkin or
15      Mr. Belkin.  I'm going to see if I can share
16      the screen with you.
17                Now, Dr. Ford, I have what's going
18      to be marked as Plaintiff's Exhibit 1.  For
19      the record, it bears the Bates stamp series
20      NYC1003.  And it's a letter dated -- it's a
21      letter dated June 12, 2016, I guess from
22      Dr. Belkin to the Honorable Fern A. Fisher.
23                Do you see that?
24           A    I do.
25           Q    Have you ever seen this letter
```

```
 1                    E. FORD, M.D.
 2      before?
 3           A    No.
 4           Q    Now, you do know that Dr. Belkin
 5      was serving in the capacity as deputy
 6      commissioner of mental hygiene; is that
 7      right?
 8           A    I do know that, yes.
 9           Q    Do you know who succeeded
10      Dr. Belkin after he left his position?
11           A    No.  I don't know if there was
12      someone between him and the person I'm
13      thinking of.
14           Q    Who are you thinking of now?
15           A    Hillary Cunnings.
16           Q    Now, did --
17           A    I'm sorry.  Go ahead.
18           Q    You said Hillary Cunnings and then
19      what?
20           A    I believe she's left also, but
21      that's the person I was thinking of.
22           Q    Now, did Dr. Belkin serve in this
23      capacity the whole time that you were
24      working there, Dr. Ford?
25           A    I'm sorry.  That I was working
```

```
 1                    E. FORD, M.D.
 2    where?
 3         Q    Working as director of forensic
 4    psychiatry at Bellevue?
 5                   MS. CANFIELD:  Objection as to
 6               form.  You can answer.
 7         A    Sure.  I actually don't know who
 8    the executive deputy commissioner of mental
 9    hygiene was when I was at Bellevue Hospital.
10         Q    Do you know who the executive
11    director of -- it's actually deputy
12    commissioner of mental hygiene, was when you
13    were at CHS?
14         A    Yes.  I believe it was Dr. Belkin.
15         Q    Was he the executive deputy
16    commissioner the whole time?
17         A    The whole time I was at CHS?
18         Q    Yes.
19         A    No.  He left and, again, I think
20    it was Hillary Cunnings who took over.
21         Q    Now, going back to your time
22    working with Dr. Kaye from 2009 to 2014, you
23    established or you've testified that
24    Dr. Kaye, you had a friendly relationship
25    with Dr. Kaye at that time; is that right?
```

```
 1                      E. FORD, M.D.
 2      Or cordial, cordial friendly, right?
 3                  MS. CANFIELD:  Objection as to
 4            form.  You can answer.
 5            A    Yes.
 6            Q    At any time did you complete
 7      performance evaluations with Dr. Kaye,
 8      during that period?
 9            A    I don't remember.
10            Q    You're not sure if you did or not?
11                  MS. CANFIELD:  Objection as to
12            form.  You can answer.
13            A    I'm not sure if I did or not.
14            Q    At any point was there an issue
15      with backlog of cases in Manhattan during
16      that time period?
17            A    I'm not sure.  I'm not sure.  It
18      sounds vaguely familiar, but I'm not sure.
19            Q    At some point did your
20      relationship or view of Dr. Kaye change?
21            A    When I was at Bellevue?
22            Q    Well, after you left Bellevue.
23            A    No.  Not that -- no.
24            Q    So where did you go after you left
25      Bellevue?
```

```
 1                    E. FORD, M.D.
 2        A    I went to Correctional Health
 3   Services.  Which at the time was part of the
 4   Department of Health and Mental Hygiene in
 5   the city.
 6        Q    And when was that?
 7        A    That was September of 2014.
 8        Q    What role did you have at that
 9   point?
10        A    The executive director of mental
11   health for Correctional Health Services.
12        Q    Who were you supervising at that
13   time?
14             MS. CANFIELD:  Objection as to
15         form.  You can answer.
16        A    Do you mean who was I directly
17   supervising?
18        Q    Yes, ma'am.
19        A    I'm not going to be able to recall
20   everybody.  But there was a -- there was a
21   couple of psychologists.  I believe I was
22   the direct supervisor for the head of the
23   discharge planning service in the jail, a
24   couple of research assistants.  The position
25   was contract oversight of the prison
```

```
1                        E. FORD, M.D.
2      healthcare service.
3           Q    Were the court clinics under your
4      purview at that time?
5           A    When I started that position?
6           Q    Yes.
7           A    No.
8           Q    When did the court clinics become
9      under your purview again?
10                    MS. CANFIELD:  Objection as to
11              form.  You can answer.
12          A    I believe it was in 2018.
13          Q    And how did that happen?
14          A    There was a functional -- there
15     was a decision made above my head to
16     consolidate the four court clinics in the
17     city, under one management structure, and
18     that was Correctional Health Services.  I
19     don't know the operational structure about
20     how the transfer specifically happened.  I
21     believe it was a functional transfer.
22          Q    Did your salary increase when the
23     court clinics were assigned to you?
24                    MS. CANFIELD:  Objection as to
25              form.  You can answer.
```

Page 36

1                         E. FORD, M.D.

2          A     I don't know.  I don't know.

3          Q     When you said that the decision

4     took place to consolidate the court clinics

5     was above your head.  What do you mean by

6     that, Dr. Ford?

7          A     That was a decision made by --

8     well, actually, I can't tell you exactly who

9     made it.  But my understanding is, that it

10    was a decision made with the City and Health

11    and Hospitals.

12         Q     You said it was made with the City

13    and Health and Hospitals.  Do you know why

14    they decided to consolidate the clinics?

15         A     I do not.

16         Q     Did you participate in any of the

17    discussions?

18         A     I was asked by my supervisor about

19    the pros and cons of a move like that.

20         Q     And who was your supervisor at the

21    time?

22         A     I think it was Homer Venters.  No.

23    I think it was -- there was a period of time

24    where my supervisor left and there was a

25    gap.  And at that point my supervisor was a

```
 1                     E. FORD, M.D.
 2     woman named Patsy Yang.  I don't know if I
 3     spoke with Homer or Patsy.
 4          Q    When did Ms. Yang become your
 5     supervisor?
 6          A    She was never really my
 7     supervisor, like direct reporting.  I
 8     reported to the chief medical officer at
 9     Correctional Health Services.
10          Q    And who was that?
11          A    That was Homer Venters,
12     V-E-N-T-E-R-S.  And then following his
13     departure, it was Ross McDonald.
14          Q    When did Dr. McDonald become your
15     supervisor?
16          A    I don't remember.
17          Q    Would it be fair to say that you
18     were evaluated six times while you were at
19     CHS?
20               MS. CANFIELD:  Objection as to
21          form.
22          A    I'm sorry.  That I was evaluated?
23          Q    Yes.
24          A    I don't know how many times I was
25     evaluated.
```

```
 1                      E. FORD, M.D.
 2         Q    Were you ever evaluated?
 3              MS. CANFIELD:  Objection as
 4         to form.  You can answer.
 5         A    I remember receiving -- I remember
 6    discussing a performance evaluation once
 7    with Dr. McDonald.
 8         Q    When was that?
 9         A    I think that was in 2019.
10         Q    And what was your rate?
11         A    I think it was exceeds
12    expectation.  I think.
13              MS. HAGAN:  So I'm calling for
14         the production of Dr. Ford's
15         performance evaluation from
16         Dr. McDonald in 2019.
17              MS. CANFIELD:  If you can put
18         that in writing.  We'll take that
19         under advisement.
20         Q    So, Dr. Ford, when you became
21    executive director of mental health services
22    at CHS in September of 2014, what were your
23    job functions at that time?
24         A    So that position was for the
25    Department of Health and Mental Hygiene.  I
```

```
 1                      E. FORD, M.D.

 2      understood my job functions to be primarily

 3      quality oversight of the care that was being

 4      provided to individuals in the New York City

 5      jail system by Corizon.  Which was the

 6      provider of the services.

 7          Q    Now, in 2018, you said that your

 8      oversight now included CHS, right?  At that

 9      time, what were your job functions?

10               MS. CANFIELD:  Objection as to

11           form.  You can answer.

12          A    Yeah.  So -- CHS, I stayed with

13      CHS.  It moved from the Department of Health

14      and Mental Hygiene to Health and Hospitals

15      in 2015.  And then at that time my job

16      description -- my job title changed to chief

17      of psychiatry.

18               My job description for that role

19      was primarily clinical oversight of all of

20      the clinical care in the mental health

21      service that was being delivered in the

22      jail.  Quality assurance, quality

23      improvement.  Program and policy

24      development.  Recruitment of staff.

25      Education of staff.  Those are some of the
```

```
 1                    E. FORD, M.D.
 2      main.
 3           Q    Now, what would you say your role
 4      was role was when it came to the court
 5      clinics, how did you interact with the court
 6      clinics?
 7                    MS. CANFIELD:  Objection as to
 8               form.  You can answer.
 9           A    Is this during or after they
10      became part of Correctional Health?
11           Q    When it became apart of
12      Correctional Health, yes.
13           A    My role was to -- I played a role
14      in transition of the clinics into the
15      service.  And I was the supervisor of --
16      there was a director overall of the court
17      clinics.  So I supervised that individual.
18                    I was primarily the person to whom
19      he would go with any kinds of quality
20      concerns.  Also improvement ideas, issues
21      that were happening in the clinics.
22           Q    Who was that?
23           A    Who was what?
24           Q    Who was the director of the court
25      clinics?
```

```
 1                      E. FORD, M.D.
 2          A    A doctor named Abhishek Jain.
 3               Do you need me to spell his first
 4      name?
 5          Q    No.  I have that.
 6               MS. CANFIELD:  The court
 7            reporter might need it.
 8               MS. HAGAN:  She has a list of
 9            names.
10               MS. CANFIELD:  Oh, she does,
11            okay.  Sure.
12          Q    So you supervised the director of
13      court clinics.  Now, did Dr. Jain -- did you
14      evaluate Dr. Jain?
15          A    I did.
16          Q    How many times did you evaluate
17      Dr. Jain?
18          A    I don't remember.  I don't
19      remember.  I can't remember when he was
20      hired.
21          Q    Would it be fair to say he was
22      hired in April of 2018?
23          A    That sounds about right.
24          Q    So that would mean that he may
25      have gotten an evaluation at the end of that
```

1                          E. FORD, M.D.

2       year; would that be right?

3            A    Yes.  I think I did a six-month

4       evaluation and then another one a year

5       later.  So I think I did two.

6            Q    And what did you rate Dr. Jain?

7            A    I don't remember.

8                 MS. HAGAN:  I'm going to call

9              for the production of the

10             evaluations for Dr. Jain.

11                MS. CANFIELD:  If you could

12             put it in writing.  We'll take it

13             under advisement.

14           Q    Now, how was Dr. Jain as an

15      employee?

16           A    In what sense?

17           Q    Well, was he a good manager?

18           A    I found him to be a good manager.

19           Q    Did you find him to be

20      knowledgeable about the field of forensic

21      psychiatry?

22           A    Yes.

23           Q    Now, we were kind of going through

24      your professional trajectory.  But I didn't

25      backtrack to ask you this.  You did do a

1                    E. FORD, M.D.

2    residency in forensic psychiatry; is that

3    right?

4         A    I did a fellowship in forensic

5    psychiatry, yes.

6         Q    By any chance, did you actually do

7    any 730 exams yourself?

8         A    I did.  Yes.

9         Q    When was that?

10        A    I did 730 exams during that

11   fellowship at the Manhattan Court Clinic.

12   And I was the training director for the NYU

13   forensic psychiatry fellowship for four

14   years.  And I believe I did several

15   evaluations in that role also.

16        Q    How many 730 tests would you say

17   you've done?

18        A    I don't know.

19        Q    Would it be between one and ten?

20        A    More than that.

21        Q    One and 25?

22        A    I would say about, somewhere

23   between 30 and 50.

24        Q    And this is at the Manhattan Court

25   Clinic?

1                    E. FORD, M.D.

2          A     I did the 730 evaluations when I

3     was a fellow at the Manhattan Court Clinic.

4     And, actually, apologies, there were a few

5     other times when I did 730 evaluations.

6               I also did them when I was -- as

7     part of the fellowship, as a fellow at Kirby

8     Forensic Psychiatry Center.  And I also did

9     them for people who were admitted to the

10     inpatient unit at Bellevue Hospital, for

11     whom an evaluation at the court clinic was

12     not possible.

13          Q     So these would be off site

14     evaluations?

15               MS. CANFIELD:  Objection as to

16           form.  You can answer if you can.

17          A     The ones at Bellevue Hospital?

18          Q     Yes.

19          A     Well, they weren't off site to me.

20     They were where I was working, but they were

21     not in the court clinic.

22          Q     And this is while you were a

23     fellow?

24               MS. CANFIELD:  Objection as to

25           form.

                        E. FORD, M.D.

1

2        A    No.  That was when I was working

3    as an attending physician, a unit chief, and

4    then -- I don't think I did any as the

5    division director.

6        Q    Now, when you resumed your

7    position -- when you resumed management of

8    the court clinics in 2018 -- let me

9    backtrack.

10            Had you ever testified at a

11    controversion hearing?

12            MS. CANFIELD:  Could you

13        repeat that.  I didn't hear it.  I

14        hear like someone's cell phone

15        buzzing and then dinging.

16        Q    Have you ever testified at a

17    controverted hearing?

18        A    No.

19        Q    You have not.  Have you ever been

20    contra verted?

21            MS. CANFIELD:  I'm sorry.  I

22        still didn't hear you.

23        Q    Have you ever been controverted,

24    Dr. Ford?

25        A    Controverted.  No.  I don't think

```
 1                    E. FORD, M.D.
 2     so.  Not to my knowledge.
 3          Q    Now, when you were doing these 730
 4     examinations, who was your supervisor at the
 5     Manhattan Court Clinic?
 6          A    During my fellowship?
 7          Q    Yes.
 8          A    My supervisor was -- well, my
 9     supervisor formally was my fellowship
10     director, who was Richard Rosner.  And then
11     the person who I went over my 730 exams with
12     as a supervisor was a doctor named Howard
13     Owens.
14          Q    So going back to the 2018 time
15     period, when you were now the, I guess chief
16     of psychiatry, right?  Who were your direct
17     reports at that time?
18          A    In 2018, this is pre or post
19     transition of the court clinics?
20          Q    Well, let's start with pre.
21          A    Pre.  I can't recall the exact org
22     chart.  I can't recall the exact org chart,
23     but if I remember correctly, there was a
24     medical director, a clinical director.
25          Q    Can you give me the name.
```

```
 1                    E. FORD, M.D.
 2        A    The medical director was *Bepan
 3    Subetin.
 4             A clinical director, her name was
 5    Virginia Barbara Rioja, a psychologist.  A
 6    director of court services named, Angela
 7    Solimo, S-O-L-I-M-O.  A director of social
 8    work named Bill Collins.  I believe that --
 9    I think he was still there.
10             There was a gentleman named
11    Anthony Waters who was director of staff
12    development.  I think he was still there
13    then.  Director of substance abuse treatment
14    named Jonathan Giftos, G-I-F-T-O-S.  I can't
15    recall if it was 2018, I think so, director
16    of the young adults services named Lily
17    Hoffman.
18             I feel I'm -- oh, there was a
19    director of specialty mental health housing
20    in the jails.  And I can't recall who
21    that -- that person changed over.  I can't
22    remember who it was at that time.  And I had
23    a special assistant, like an administrative
24    assistant, I think, for some of that time
25    named Suzanna Lewis.  I hope I didn't forgot
```

```
 1                    E. FORD, M.D.
 2     anybody.
 3          Q    Now, post transition, did you have
 4     the same number of direct reports or less?
 5          A    Post transition, I added the
 6     director of the court clinics as a direct
 7     report.
 8          Q    So that would be Dr. Jain?
 9          A    Correct.
10          Q    Now, to your understanding, what
11     were the functions of the court clinics?
12                    MS. CANFIELD:  Objection to
13               form.  You can answer.
14          A    My understanding is that the court
15     clinics are responsible for conducting
16     evaluations ordered by the criminal courts.
17     I think they are primarily for indigent
18     defendants.  And the bulk of the work are
19     conducting competence to stand trial
20     evaluations, or 730 evals.
21                    In addition to something called
22     390 evaluations, which I believe are sort of
23     other court ordered mental health
24     evaluations for aiding and things like
25     sentencing or probation.  Stuff like that.
```

1                    E. FORD, M.D.

2          Q    Did you ever do a 390 evaluation?

3          A    I think I did one or two.  I

4     probably did a handful in fellowship.

5          Q    But you're not quite sure?

6          A    I know I did at least one, but,

7     yes, I'm not sure how many.

8          Q    Was there ever a time that a

9     decision was made to, I guess, change the

10    way that 730 exams were administered?

11         A    Not that I'm aware of.

12         Q    Was there ever any discussions of

13    expediting the turnaround of 730

14    examinations?

15         A    Yes.

16         Q    When?

17         A    I don't know exact dates.  I

18    remember there was discussion about that

19    when I was at Bellevue.  I don't remember

20    which clinic or if it was both the Manhattan

21    and Bronx.  And then there was discussion,

22    yeah, about some of the other court clinics.

23              Yeah.  I don't remember.  It was

24    not an infrequent conversation, because

25    there was an interest in making sure that

```
 1                    E. FORD, M.D.
 2      defendants didn't have to stay in jail
 3      longer because of a delay in getting
 4      evaluations completed.
 5           Q    Now, at any point did you support
 6      doing 730 examinations without medical
 7      records?
 8           A    No.
 9           Q    Did you ever support doing
10      evaluations with redacted medical records?
11                    MS. CANFIELD:  Objection as to
12               form.  You can answer.
13           A    I was aware that medical records
14      needed to be redacted, I think it was
15      substance use and HIV information fell under
16      different requirements, and so those needed
17      to be redacted.
18           Q    Who told you that they fell under
19      different requirements?
20           A    I believe it was our counsel at
21      Correctional Health.
22           Q    Who was your counsel at
23      Correctional Health?
24           A    At the time, I think it was
25      Patrick Alberts.
```

1                    E. FORD, M.D.

2        Q    How did it come to be that the

3    medical records needed to be redacted?

4              MS. CANFIELD:  Objection as to

5         form.

6        A    I don't know the history of those

7    laws.  So I don't know.  I can't tell you

8    that.

9        Q    Now, you served in this capacity

10   twice, right?

11             MS. CANFIELD:  Objection.

12       Q    As presiding over the court

13   clinics; is that right?

14             MS. CANFIELD:  There's a

15        beeping in the middle of your

16        question.  I didn't hear it.

17             MS. HAGAN:  I'm not sure.

18       Q    You were the manager of the court

19   clinics twice; is that right?

20             MS. CANFIELD:  Objection as to

21        form.  You can answer.

22       A    I was the supervisor for the

23   Manhattan and Bronx clinics in 2009 to 2014.

24   And then at CHS for all four clinics, well,

25   for Kings County and Queens, I think from

```
 1                      E. FORD, M.D.
 2      April of 2018 until my departure, and then
 3      the Bronx and Manhattan.  When I returned, I
 4      was on a leave that summer, so fall of 2018
 5      until departure.
 6           Q    I'm going to ask you initially,
 7      from 2009 to 2014, did you ever hear anyone
 8      say that medical records needed to be
 9      redacted in order for an evaluation to be
10      completed?
11                   MS. CANFIELD:  Objection as to
12              form.  You can answer.
13           A    I don't remember.
14           Q    When was the first time you
15      learned that medical records needed to be
16      redacted?
17                   MS. CANFIELD:  Objection as to
18              form.  You can answer.
19           A    I don't know the first time I
20      learned.  The first time I remember
21      retaining it, I guess, was back when
22      Mr. Alberts told me when I was at
23      Correctional Health Services.  I don't know
24      when that was.
25           Q    So you're not sure when it was.
```

1                     E. FORD, M.D.

2                Did anybody confirm with you prior

3     to administering this edict that the medical

4     records need to be redacted?

5                MS. CANFIELD:  Objection as to

6           form.  You can answer.

7         A    Did anyone confer -- I think -- I

8     don't remember.  I have a vague recollection

9     of having a conversation about whether I had

10    ever done reports and records had been

11    redacted.

12        Q    Had you?

13               MS. CANFIELD:  Objection.  You

14          can answer.

15        A    Yes.

16        Q    When do you remember doing a

17    report where the medical records were

18    redacted?

19        A    I don't remember the year or the

20    location.  I have a visual memory of the

21    records with the black boxes through them.

22        Q    So you're saying that it was

23    standard practice during the time you were

24    doing forensic evaluations that the medical

25    records were redacted?

```
 1                    E. FORD, M.D.
 2              MS. CANFIELD:  Objection as to
 3         form.  You can answer.
 4       A    I'm not saying it -- I don't know
 5    if it was standard practice or not.  I'm
 6    saying that I have done an evaluation in the
 7    past that have redacted medical records.
 8       Q    Now, is there ever a possibility
 9    in your professional capacity where a
10    person's medication could impact or impair
11    their ability to, I guess, participate in
12    their own defense?
13              MS. CANFIELD:  Objection as to
14         form.  You can answer.
15       A    So I would answer that I do
16    believe there are medications that can
17    impair a person's cognitive abilities.  And
18    if they -- and whether they impact their
19    ability to assist with their defense is
20    another question.  But, yeah, some
21    medications can impair someone's cognitive
22    ability.
23       Q    What about their ability to
24    participate in their defense, logically
25    speaking?  If their cognitive abilities have
```

```
 1                        E. FORD, M.D.
 2      been impaired, then what about their ability
 3      to actually participate in their defense?
 4           A    I think it's certainly possible.
 5           Q    Would you also make that same
 6      determination when it came to a person's
 7      usage of illegal narcotics?
 8                    MS. CANFIELD:  Objection as to
 9               form.  You can answer.
10           A    Yes.  The usage of illegal
11      narcotic could also certainly potentially
12      impair that.
13           Q    Are you saying that you would
14      agree that the redaction of substance abuse,
15      HIV status, that that information should be
16      redacted?
17                    MS. CANFIELD:  Objection as to
18               form.  You can answer.
19           A    What I'm saying is that that is --
20      those are the restrictions as I know them
21      now.  And so that's what I work with.
22           Q    Did you agree with those
23      restrictions yourself personally?
24           A    I didn't know the -- I don't know
25      the history well enough to know how they
```

```
 1                    E. FORD, M.D.
 2    developed.  I do remember at some point
 3    thinking it would be nice to know that
 4    information.
 5          Q    Did you take the position against
 6    Dr. Kaye when she raised these issues with
 7    you?
 8                    MS. CANFIELD:  Objection as to
 9              form.  Assumes facts not in
10              evidence, but you can answer.
11          A    If you could just refresh my
12    memory about what time you're referring to.
13          Q    Well, did there ever come a time
14    where Dr. Kaye -- where I think you're
15    talking to Dr. Kaye raised an issue with
16    redacted medical records?
17          A    I think there was a time -- I
18    don't remember if it was before Correctional
19    Health took over or not.  I do have a
20    recollection of a case, and I believe
21    Dr. Kaye was asking for full unredacted
22    records, and there was back and forth about
23    that.
24          Q    What was your position when she
25    was asking for those unredacted records?
```

```
 1                    E. FORD, M.D.

 2        A    My position was that we should be

 3    following whatever the guidelines were for

 4    Correctional Health in terms of releasing

 5    those records.

 6        Q    Is it your testimony that

 7    potentially defendants' constitutional

 8    rights would be violated if Dr. Kaye and

 9    others were not allowed to conduct

10    evaluations with unredacted records?

11               MS. CANFIELD:  Objection as to

12          form.  You can answer if you're

13          able.

14        A    I'm sorry.  Is the question

15    whether that would be unconstitutional?

16        Q    Well, their constitutional rights

17    would be affected, as far as the ability to

18    stand trial and you're fit?

19        A    I can't form an opinion about

20    that.  I don't know.

21        Q    I'm going to ask you, going back

22    to the actual use of the redacted records.

23    Did you have an issue or take issue with

24    Dr. Kaye for raising those questions with

25    CHS management?
```

```
 1                      E. FORD, M.D.
 2                 MS. CANFIELD:  Objection as to
 3             form.  You can answer.
 4         A    I don't believe I took issue with
 5      Dr. Kaye initially.  I remember -- I think
 6      that there was a, ruling is not the word,
 7      but I think that she was told that the
 8      records could not be produced without
 9      redactions.  I have a memory that this went
10      on for some time.  I don't know if ever -- I
11      don't recall.  I don't know if I ever spoke
12      with Dr. Kaye directly about it.
13         Q    So you're not sure if you ever
14      spoke to her about it yourself?
15         A    Correct.  I'm not sure.
16         Q    Did you think to speak to her
17      about it yourself?
18                 MS. CANFIELD:  Objection as to
19             form.  You can answer.
20         A    I probably thought about it.  I
21      also thought that this was an issue that was
22      not under my direct purview, and that I
23      should be leaving this to the attorneys to
24      resolve.
25         Q    Why wouldn't it be under your
```

```
 1                    E. FORD, M.D.
 2     direct purview if Dr. Kaye was amongst
 3     employees that you managed?
 4                    MS. CANFIELD:  Objection as to
 5                form.  You can answer.
 6          A    Sure.  This was before I was
 7     Dr. Kaye's manager.  This was pre -- I
 8     believe this was pre-transition.
 9          Q    Is it your testimony that Dr. Kaye
10     never raised the issue again once you became
11     her manager?
12                    MS. CANFIELD:  Objection as to
13                form.  You can answer.
14          A    I don't remember if she did or
15     not.  I don't remember.
16          Q    At any point did you refer to
17     Dr. Kaye as being a problem?
18                    MS. CANFIELD:  Objection as to
19                form.  You can answer.
20          A    Sure.  There was -- I don't
21     remember that, but I was in preparation for
22     the deposition, there was some emails that I
23     reviewed.  And there was one where I said --
24     I do think I used that word.
25          Q    Why?
```

```
 1                    E. FORD, M.D.
 2          A     At the time I was -- I believe
 3     this was at the tail end of the redacted
 4     records, and I was frustrated.  And I was
 5     thinking about the defendant who was -- at
 6     the time I was managing just the jail
 7     service.  So I was thinking about the
 8     delays.  I was frustrated.
 9          Q     Did you say that Dr. Kaye was a --
10     she had been a problem for a long time and
11     that she needed to be managed out?
12          A     I believe that's similar to my
13     recall of what the email said.
14          Q     But why did you say that?
15          A     Well, again, the problem was the
16     frustration.  I also was aware of, from my
17     time at Bellevue, there had been concerns
18     raised to me outside of psychiatry about
19     Dr. Kaye's working relationship with others.
20                And with respect to the manage
21     out, I don't recall thinking I -- it was
22     something to sort of actively do to her.  I
23     remember thinking if the rules are that we
24     can't give other than redacted records, then
25     we'll just have to impart to Dr. Kaye that
```

1                    E. FORD, M.D.

2    this is how things will go.  And then if

3    that's not -- if it's not acceptable to her

4    in that position, then I wasn't sure what we

5    could do.

6        Q    Did you ever say that you should

7    manage out anyone else while you were at CHS

8    in 2018 until you left?

9                    MS. CANFIELD:  Objection as to

10            form.  You can answer.

11       A    I don't know if I ever said that.

12   I do remember that there was another

13   employee who was not a direct report of

14   mine.  I was talking with a supervisor about

15   that person.  And I had a similar response,

16   which was that these are the -- something

17   like, these are the rules, and if -- you

18   know, we'll need to just make sure that the

19   person knows the rules.

20       Q    I have a question.  What do you

21   mean when you say manage it out?  Who would

22   you typically mean by that?

23       A    Sorry.  I wasn't clear in my

24   answers before.  I mean, making sure that

25   the policies are clear to the individual.

1                    E. FORD, M.D.

2       And then if they don't follow them

3       despite -- I think it's called progressive

4       discipline.  I'm not sure if that's the

5       right term.  Following the steps of making

6       sure the policies are followed.

7           Q    I understand you're saying making

8       sure the policies are followed.  But when

9       you say managed out, in just conventional

10      parlance, right, would you say that that's

11      basically code language of pushing someone

12      out of employment?

13          A    No.  That is not how I meant it.

14          Q    You didn't want to push Dr. Kaye

15      out; is that what you're saying?

16          A    That's correct.

17          Q    I'm going to show you what will be

18      marked as Plaintiff's Exhibit 2.  And this

19      is an email you said you basically reviewed

20      in preparation for today's deposition.

21              What other emails did you review

22      in preparation for today's deposition?

23          A    I was sent a very long list of

24      emails.  So I reviewed those.

25          Q    Did you speak to counsel in

1                    E. FORD, M.D.

2      preparation for today's deposition?

3           A    I did.

4           Q    And how many times would you say

5      you spoke to counsel?

6           A    Once.

7           Q    And when was that?

8           A    Thursday of last week.

9           Q    So now I'm going to show you what

10     will be marked as Plaintiff's Exhibit 2,

11     okay?

12          A    Um-hmm.

13                    (Whereupon, Email

14                    (NYC_000077-000079) was marked

15                    as Plaintiff's Exhibit 2 for

16                    identification as of this date.)

17          Q    Plaintiff's Exhibit 2 bears the

18     Bates Stamp series NYC077 to NYC0079.  I

19     guess I'm going to start from the beginning

20     of the email thread, right.

21                    As you discussed -- well, it

22     starts from, I guess, Ms. Yang to Patrick

23     Alberts, who was the counsel who was

24     assigned to this at CHS; is that right?

25          A    I don't know if he was the counsel

Page 64

```
 1                    E. FORD, M.D.
 2    assigned to this.  I recall him being the
 3    legal counsel for CHS.
 4        Q    And the subject says, "Judge
 5    Torres wants to hold us in contempt."
 6              Do you remember that?
 7        A    I just remember looking at this
 8    email in my review.
 9        Q    Do you remember the events that
10    surround or lead up to the email?
11        A    Sort of.
12        Q    Okay.  What do you remember?
13        A    That there was a case that was
14    being -- that Dr. Kaye didn't feel
15    comfortable completing because the records
16    were redacted, and that it had escalated to
17    a point that was -- well, that I had never
18    experienced, where a judge appeared to be
19    getting involved.
20        Q    So, now, Mr. Alberts responds to
21    Ms. Yang, that he spoke to Erin at MOCJ.  Do
22    you remember Erin?
23        A    I don't remember who Erin is or
24    was.
25        Q    About this judge again, and asked
```

```
 1                    E. FORD, M.D.
 2     Lucy to provide the correct language for the
 3     subpoena, which she did.
 4               Do you know who Lucy is?
 5          A    I think that's the Lucy **
 6     Khozoengineer roan any -- I can't spell that
 7     for you.  I'm sorry.  I think she worked for
 8     Patrick.
 9          Q    And Mr. Alberts says that he may
10     have the misperception, meaning the judge,
11     that his 730 order entitled him to substance
12     abuse information.  Which they do not.
13               Now, had you read anywhere in any
14     the psychiatric publication that medical
15     records should be redacted?
16               MS. CANFIELD:  Objection as to
17          form.  You can answer.
18          A    I don't think so.  That would not
19     probably be the academic article I would
20     choose to read.  So I don't recall reading
21     that academic publication.
22          Q    Outside of CHS, had you come
23     across any literature or any professional
24     practice that called for the redaction of
25     medical records in the administration of 730
```

```
 1                        E. FORD, M.D.
 2      examinations?
 3                    MS. CANFIELD:  Objection as to
 4             form.  You can answer.
 5          A    In the administration of 730
 6      exams, no, not specifically with that.
 7          Q    I mean, practically speaking, you
 8      acknowledged that it would probably be nice
 9      to have the unredacted records; is that
10      right?
11                    MS. CANFIELD:  Objection as to
12             form.  You can answer.
13          A    It doesn't -- I think the law is
14      what it is, so.
15          Q    What law are you referring to?
16          A    Sorry.  This, that you're talking
17      about here, that the 730 orders don't
18      entitle them to substance use information.
19          Q    At any point did you read any
20      specific legal provision that supported this
21      position?
22                    MS. CANFIELD:  Objection as to
23             form.  Asked and answered.  You can
24             answer again.
25          A    Sure.  Not that I remember.
```

```
 1                   E. FORD, M.D.
 2              MS. HAGAN:  I'm going to note
 3           that, first off, the question was
 4           not asked and answered, and that the
 5           way that counsel objected basically
 6           is coaching the witness.  So I'm
 7           going to ask that counsel refrain
 8           from doing so forth forward and to
 9           stick with proper objections, which
10           can only take place in the form of
11           either speaking objections or -- not
12           speaking objections, objection to
13           form or just objections.  You're not
14           to elaborate as to the cause of the
15           objection outside of that.
16               So I'm going to proceed with
17           my questioning on this point.
18      Q    Now, Dr. Ford, had you read
19    anywhere anything that would support the
20    proposition that medical records should be
21    redacted in the 730 examination process?
22              MS. CANFIELD:  Objection as to
23           form.  You can answer.
24      A    I don't recall reading anything
25    specifically about 730 exams.
```

```
 1                    E. FORD, M.D.
 2        Q    What about the redaction of
 3   medical records?
 4        A    Yes.
 5             MS. CANFIELD:  Objection as to
 6        form.  Go ahead.
 7        Q    What did you read about the
 8   redaction of medical records?
 9        A    I don't know what -- I can't tell
10   you an article, but I do remember having
11   conversations about redacted medical records
12   when I was at Bellevue Hospital, as the
13   group delivering the records to the court
14   clinics, and that it's CHS -- I'm not sure
15   if it's CHS.  I can't remember.
16        Q    We're still dealing with the
17   interactions now with Ms. Yang and
18   Mr. Alberts, right?
19             Now, Mr. Alberts said that he
20   spoke to Erin again, and that Erin said that
21   Judge Torres is fine using the boilerplate
22   subpoena and understands its limitations.
23   However, he said that Dr. Kaye is refusing
24   to perform the examination until she
25   receives the entire unredacted record.  It
```

```
 1                         E. FORD, M.D.
 2      sounds like this problem is entirely unique
 3      to her, at least with respect to Judge
 4      Torres, right?
 5                 On the one hand, I'm glad that the
 6      judge isn't the problem, but how do you
 7      think we should approach provider, if at
 8      all.  In this case she's asking for
 9      something she legally can't have.  I don't
10      think it would be appropriate for us to
11      approach the patient and obtain an
12      authorization, and it's doubtful, his
13      attorney will either.
14                 Now, I'm going to ask you
15      something.  We've been discussing this.  And
16      there has been some back and forth.  Did you
17      ever take it upon yourself, Dr. Ford, to
18      read the law?
19                 MS. CANFIELD:  Objection as to
20            form.  You can answer if you're
21            able.
22      A     I remember looking at -- I believe
23      I reviewed the CPL 730 statutes, but I did
24      not review a law specific to redacted
25      records or tried to find one.
```

1                    E. FORD, M.D.

2        Q    Have you ever seen a law that

3    pertained to redacted medical records?

4        A    Gosh.  I don't know how to -- I

5    don't think so.  I don't know how to answer

6    that.  Like HIPPA, does HIPPA have stuff --

7    I mean, again, are we talking about just

8    730s?

9        Q    We're talking about 730.

10       A    Oh, yeah.  I don't think so.

11       Q    You have never seen anything that

12   mandated that 730 evaluators should have HIV

13   and substance abuse information redacted

14   from medical records, have you?

15              MS. CANFIELD:  Objection as to

16         form.  You can answer.

17       A    I don't think I've ever seen a

18   law.  I've just been advised by the various

19   counsel people.

20       Q    You referenced Mr. Alberts.

21   Anyone else?

22       A    There was a CHS -- no, just -- I

23   think -- I don't know if maybe the counsel

24   who followed him also.  I recall

25   Mr. Alberts.

```
 1                    E. FORD, M.D.
 2        Q    Who was the counsel that followed
 3   Mr. Alberts?
 4        A    I think it was Jonathan Wangel.  I
 5   think.
 6        Q    Jonathan Wangel was the counsel?
 7        A    I think so.  Although it was --
 8   I'm not sure if he was officially counsel.
 9   He was an attorney.  He also, I think,
10   managed labor.  I don't know.  I don't know.
11   He provided some advice.
12        Q    Now, on February 1, 2018, you did
13   chime in, as you recall, and you say at this
14   point, I guess this is to Dr. Yang, does
15   Jeremy know about this.  And are we
16   referencing Jeremy Colin?
17        A    Yes.
18        Q    Who was Jeremy to Dr. Kaye at this
19   point?
20        A    I believe he was her supervisor.
21        Q    So are you supervising Dr. Colin
22   yourself at that point?
23        A    No.
24        Q    So why are you involved in this if
25   this had nothing to do -- you weren't
```

Page 72

```
 1                    E. FORD, M.D.
 2     supervising the court clinics at this time,
 3     right?
 4                    MS. CANFIELD:  Objection as to
 5               form.
 6          A    Correct.
 7          Q    You were not supervising the court
 8     clinics at this time, were you, Dr. Ford?
 9          A    That's correct.
10          Q    Why are you receiving this email,
11     even though you were not supervising the
12     court clinics at that time?
13          A    I can't answer that.  The email
14     was sent to me.  I imagine this was in
15     thinking about the plans for the court
16     clinics to come over.  I guess I can't -- I
17     can't tell you why.
18          Q    Now, Ms. Yang was over the court
19     clinics at this time; am I right?
20          A    No.
21          Q    So why is she on this email, then?
22          A    I don't know.
23          Q    So then you say, "Absolutely
24     ridiculous demands on Kaye's part.  Standard
25     practice in forensic evaluations is to use
```

1                         E. FORD, M.D.

2       whatever records you have to form an opinion

3       and note any limitation in the formulation."

4                     Where did you get that?  Where is

5       that standard of practice?

6           A    That's my understanding from the

7       time when I was running the NYU forensic

8       fellowship and working with people who do

9       these evaluations, and my own experience as

10      a fellow.

11          Q    Did you read that anywhere?

12          A    I don't know.  I was certainly

13      taught that you use what you -- what's

14      available, you try to get whatever you can,

15      and then if that's not possible, you use

16      what's available to you.  And if after that

17      you still cannot form an opinion, then you

18      note that to the court.

19          Q    So you're not sure where you got

20      that information, but you said it was

21      standard practice; am I right, Dr. Ford?

22                  MS. CANFIELD:  Objection as to

23             form.  You can answer.

24          A    Sure.  I was referring to standard

25      practice in my experience.

```
 1                    E. FORD, M.D.
 2        Q    But standard experience from
 3   where?
 4        A    From my experience doing the 730s
 5   in the Manhattan Court Clinic, from doing
 6   them myself at these various places that I
 7   mentioned before.  And from being the
 8   fellowship director at NYU, and talking with
 9   other fellowship directors around the
10   country at various points during that time.
11        Q    Now, Dr. Kaye has been doing
12   forensic evaluations longer than you have;
13   am I right?
14        A    Yes.
15        Q    And Dr. Kaye has been practicing
16   psychiatry longer than you have; am I right?
17        A    I don't know -- I think that's
18   right.  Yeah.  I think that's right.
19        Q    Now, when you left, Dr. Kaye had
20   been at the Bronx Court Clinic practicing
21   forensic psychiatry for at least 20 years;
22   am I right?
23             MS. CANFIELD:  Objection as to
24        form.  You can answer.
25        A    Sure.  When -- I'm sorry, when --
```

```
 1                      E. FORD, M.D.
 2      I think she started -- when I was looking at
 3      the emails, I think she started in 1999
 4      maybe.
 5           Q    Right.  And you left --
 6           A    Yeah.  So that would be 20 years
 7      or more.
 8           Q    Right.  Right.  And you said after
 9      doing maybe forensic evaluations for perhaps
10      maybe, over a span of, what, 18 months, that
11      the standard practice, as far as you were
12      concerned, to use whatever records you had
13      at the time; is that right?
14                MS. CANFIELD:  Objection as to
15           form.  You can answer.
16           A    Sure.  I did 730 evaluations over
17      a longer period of time than 18 months.
18      But, yes, this is based on my experience
19      doing those evaluations and talking with
20      colleagues.
21           Q    Did you ever speak to Dr. Kaye
22      about this yourself?
23           A    I don't --
24                MS. CANFIELD:  Objection as to
25           form.  Go ahead.
```

```
 1                    E. FORD, M.D.
 2        A    No.  Nor would I have.  She was
 3     not somebody that reported to me at that
 4     time.
 5        Q    Even though she didn't report to
 6     you at that time, you say, "In any case,
 7     Kaye has been a problem for a long time and
 8     we will manage her out."  So let's break
 9     that down.
10            You said that Kaye has been a
11     problem for a long time, right.  And earlier
12     you said that you had heard from colleagues
13     at Bellevue that her working relationship
14     with others is problematic; am I right?
15        A    I don't believe I said colleagues
16     at Bellevue, but I did say the other stuff.
17        Q    The working relationship with
18     others, what are you referencing then?
19        A    I had received -- when I was at
20     Bellevue, in the director of division role,
21     I had received concerns -- I don't -- I'm
22     not sure if they ever -- say concerns from
23     training directors who had trainees that
24     went to the Bronx Court Clinic, saying that
25     they were concerned about having their
```

1                    E. FORD, M.D.

2     trainees work with Dr. Kaye.  And there

3     was -- I do remember there was -- I can't

4     remember the details, but there was some

5     sort of personnel thing that happened with a

6     psychologist who was working there.  I don't

7     know if maybe as an intern.  And, again, as

8     I mentioned before, I was frustrated when I

9     wrote this email.

10          Q    I'm going to ask you, you said

11    there were people who had problems sending

12    their trainees to work with Dr. Kaye.  Do

13    you remember these people?

14          A    I do.  Well, two of them.

15          Q    Who were they?

16          A    One was the director of psychology

17    at Bellevue named Allen Elliot.

18          Q    And who else?

19          A    And one was a fellowship director

20    at Albert Einstein named Merrill Rotter

21    (phonetic).

22          Q    Can you say the name again.

23          A    The last one?

24          Q    Merrill?

25          A    M-E -- I don't know how to spell

```
 1                    E. FORD, M.D.

 2      his first name, actually.  Rotter,

 3      R-O-T-T-E-R.

 4           Q    So these two doctors said that

 5      they did not want to send their trainees to

 6      work with Dr. Kaye; is that right?

 7                    MS. CANFIELD:  Objection as to

 8             form.

 9           A    No.  I said that they had concerns

10      about it.

11           Q    So what were the concerns exactly?

12           A    I don't recall the details.  I

13      remember it had to do with interpersonal --

14      I think it had to do with interpersonal

15      stuff.

16           Q    What do you mean interpersonal

17      stuff?

18           A    Professionalism, I think.

19           Q    What do you mean?

20           A    Again, I'm sorry I can't be more

21      detailed than that.  This is from a long

22      time ago.

23           Q    Did you ever speak to Dr. Kaye

24      about these allegations that these doctors

25      were reluctant or had concerns about sending
```

```
 1                      E. FORD, M.D.
 2      trainees to her?
 3           A    I don't think I did.
 4           Q    Why not?
 5           A    I recall being satisfied with her
 6      work and with her knowledge of what she was
 7      doing.  And I -- the details about what I
 8      was hearing were not, I guess they didn't
 9      rise the level for me where I felt like I
10      needed to step in.
11           Q    And then you said there were
12      professional questions or issues with her
13      professionalism.  Do you remember what that
14      was?
15           A    No.  I'm sorry.  I'm mostly
16      just -- I guess what I'm saying is that I
17      don't recall the complaints being anything
18      related to the actual work.  Like, the way
19      she does the work.
20           Q    And then you say again personnel
21      working as a psychologist, right?
22                So, like, you know, did she have
23      other personnel issues?  There was another
24      personnel issue you referenced, I'm sorry.
25      What was that?
```

```
 1                    E. FORD, M.D.
 2              MS. CANFIELD:  Objection as to
 3           form.  You can answer.
 4       A    Another -- I'm not -- I don't
 5    recall any others other than those two, I
 6    don't know.
 7       Q    You said that there was someone
 8    who she had personnel issue.  Do you
 9    remember who that was?
10       A    Oh, who the psychologist was at
11    the court clinic?
12       Q    Yes.
13       A    I don't remember.  I think it was
14    a woman.  I don't remember her name.
15       Q    Do you remember the issue?
16       A    No.  Sorry.
17       Q    Did Dr. Kaye have a disciplinary
18    history during this time period where you
19    were the medical -- the director from 2009
20    to 2014?
21       A    I don't recall ever being involved
22    in any kind of discipline with Dr. Kaye.
23       Q    So you didn't see anybody writing
24    her up or anything like that; am I right?
25       A    I didn't see anybody write her up.
```

```
 1                    E. FORD, M.D.
 2     I can't tell you -- I don't remember if I
 3     heard that somebody had done it at some
 4     point.
 5          Q    Dr. Ford, you were her direct
 6     supervisor at the time?
 7          A    It's true.  It's also like a
 8     decade ago.  I just don't remember.
 9          Q    But if you were her direct
10     supervisor at that time, and you got these
11     complaints about her, I think it would be,
12     especially if you said that she's been a
13     problem for a long time, right.  I think you
14     would remember if you wrote her up, wouldn't
15     you?
16               MS. CANFIELD:  Objection.
17          Argumentative.  You can answer.
18          A    Right.  So as I said, I don't
19     recall myself writing her up.
20          Q    Well, who else did, if you didn't?
21          A    I don't know if the people in the
22     psychology, I don't know if the
23     psychologist.  I don't know.
24          Q    Who could have written her up if
25     you didn't, Dr. Ford?
```

```
 1                    E. FORD, M.D.
 2        A    Well, maybe we're having two
 3   different meanings of written up.
 4        Q    If you're talking about someone
 5   being problematic or a bad employee, right,
 6   that usually falls under purview of the
 7   supervisor, which would have been you at
 8   that time, to write her up; am I right?
 9             MS. CANFIELD:  Objection as to
10             form, argumentative.  You can
11             answer.
12        A    Sure.  So I do not recall issuing
13   any kind of discipline to Dr. Kaye.
14        Q    Now, you said, "We will manage her
15   out."  Now, you said that you were not her
16   supervisor at that time.  You are
17   representing to, I guess Ms. Yang, that
18   you're going to manage her out.  How is
19   that?
20             MS. CANFIELD:  Objection as to
21             form.  You can answer.
22        A    Sure.  So at this point, we are
23   aware that the clinics will be coming over
24   to the Correctional Health.  And so I am
25   aware that at some point, if Dr. Kaye
```

```
 1                     E. FORD, M.D.
 2     chooses to, she will be part of Correctional
 3     Health Service.
 4              So that's the we part of it, I
 5     guess.  And, again, as I described earlier,
 6     what I meant by managing her out is that if
 7     she's not able to follow policies that we
 8     have, then we will pursue progressive -- you
 9     know, we will -- I can't remember the exact
10     terms but.
11          Q    We'll get rid of her; is that
12     right?
13          A    No --
14              MS. CANFIELD:  Object to the
15          form.
16          A    No.  That is not what I meant.
17          Q    So whenever I hear that Uber
18     director posted will send around links to
19     forensic psych world and send first
20     candidate Ross' way for second opinion as
21     well.
22              Now, are you seeking above her at
23     this point between you and Dr. Kaye, is that
24     what this means, this second part of your
25     email?
```

```
 1                    E. FORD, M.D.
 2                    MS. CANFIELD:  Objection as to
 3             form.  You can answer.
 4        A     Absolutely not.
 5        Q     What do you mean by that?
 6        A     So we had created a director of
 7   the court clinics position.  That's what
 8   Uber director means.  And I was very
 9   interested in having that person on board
10   prior to the court clinics, all of them
11   coming over.  Yeah.  I was managing a 500
12   plus service in the jail.
13        Q     So, now, this Uber director, was
14   that Dr. Jain?
15        A     Yes.  He's the one who was hired.
16        Q     Okay.  This email is written in
17   February of 2018.  The Bronx Court Clinic
18   doesn't become a part of CHS until when?
19        A     I think that was July 1st of 2018.
20   I think so.  I left the end of June for a
21   leave, but I believe that was the scheduled
22   date.
23        Q     So why did you go leave at the end
24   of June?
25        A     I took a leave of absence from
```

```
 1                      E. FORD, M.D.
 2      Correctional Health, to spend time with my
 3      family and take care of my health.
 4           Q    So something was wrong with you at
 5      that time?
 6                      MS. CANFIELD:  Objection as to
 7                form.
 8           A    Well, I had to take care of my
 9      health.
10           Q    You have talked about burnout at
11      some of your speeches in Columbia
12      University.  Were you experiencing burnout
13      at that time, in June of 2018?
14           A    Yeah, probably.
15           Q    And when you say "burnout," what
16      do you mean, Dr. Ford?
17           A    I mean feeling like, for me
18      particularly, I have experienced it before.
19      It feels like having less energy, feeling
20      less creative, not wanting to be at work in
21      the same kind of way as I'm used to.
22      Sleeping poorly, being irritable with my
23      family.
24           Q    Now, had you experienced burnout
25      prior to this June 2018 incident?
```

1                    E. FORD, M.D.

2                    MS. CANFIELD:  Object to the

3              form.  You can answer.

4         A    Sure.  Yes.  I believe that I

5    have.

6         Q    When?

7         A    I believe that was in 2007, when I

8    left the job at Bellevue as the unit chief.

9         Q    Did you experience burnout after

10   you left CHS?

11        A    In the past year there have been

12   times when I have felt burned out, although

13   not persistently.

14        Q    So you say in the past while you

15   were at CASES?

16        A    Correct.

17        Q    Did you take a leave of absence

18   any other time than June of 2018, when you

19   were at CHS?

20        A    I took -- yes.  I took a leave to

21   get my hip replaced in, when was that,

22   December of 2016.

23        Q    Now, when did you come back from

24   your leave of absence in June of 2018?

25        A    I don't recall the exact date, but

```
 1                    E. FORD, M.D.
 2     I believe it was in September of that year.
 3          Q    So, but by that time the court
 4     clinics had been transitioned over to you,
 5     over to CHS?
 6          A    Yes.
 7          Q    Fully?
 8          A    Yes.  I think so.
 9          Q    Now, I'm going to ask you this, if
10     you were burnt out, were you looking for
11     other jobs, Dr. Ford, during that time
12     between June of 2018 and September of 2018?
13          A    I was not.
14          Q    So you wanted to come back to CHS,
15     you just needed a break; is that right?
16          A    Yeah.  That's a -- I had some
17     health issues, but, yes, I was planing to
18     come back.
19          Q    I'm sorry to hear that.
20               So now I'm going to go into
21     your -- I guess Ms. Yang's response to you
22     after you say the managing out.
23               "Maybe the last 20 will do it.
24     That was some performance.  Doubt Jeremy
25     knows given what I understand is his
```

```
 1                      E. FORD, M.D.
 2      remove."
 3                      Now, what is Dr. Yang saying about
 4      his remove, what does she mean by that?
 5           A    I don't know.  I read that also in
 6      this review, and I don't know what that
 7      means, actually.
 8           Q    "I only found this by shallow
 9      digging.  Sadly dragging MOCJ to learn that
10      the word had it that the judge might hold
11      the City in contempt.  And it turns out it
12      is Dr. Kaye's own cyclone that has sucked in
13      detritus.
14                      Do you remember this language?
15      It's quite artful.
16           A    I remember reviewing this email.
17           Q    Dr. Collin does not stay in his
18      capacity much longer than this; am I right?
19           A    You mean in his management of the
20      court clinics?
21           Q    Yes.
22           A    He would have stopped that when
23      they went to Correctional Health.  So I
24      guess July.
25           Q    July.  So he's removed basically,
```

```
 1                    E. FORD, M.D.

 2    right?

 3                    MS. CANFIELD:  Objection as to

 4             form.  You can answer.

 5        A    Sure.  I don't know what that

 6    means.  He was in the -- my understanding is

 7    that until July 1st, he was the clinical

 8    supervisor for the Bronx Court Clinic.

 9        Q    Well, either -- she mentioned --

10    Dr. Yang or Ms. Yang basically says that

11    Jeremy knows given what I understand is his

12    remove.  So he was the court clinic director

13    in February, but was no longer the court

14    clinic director in July; am I right?

15        A    Yes.  That is correct.

16        Q    And then Dr. Jain becomes court

17    clinic director in April of 2018?

18        A    So this is -- it was a confusing

19    transfer, because not all the court clinics

20    came at the same time.

21             So Dr. Jain was the court clinic

22    director for, I believe for Brooklyn and

23    Queens, because they came over in April.

24    And Dr. Collin continued to be the director

25    for Manhattan and the Bronx.  And then when
```

```
1                    E. FORD, M.D.

2       all four of them were under Correctional

3       Health, then they were all under Dr. Jain.

4            Q    So why wasn't -- why didn't

5       Dr. Collin assume supervision over all four

6       of the court clinics rather than hire

7       someone else?  Hired Dr. Jain.

8            A    Dr. Collin worked at Bellevue

9       Hospital, not Correctional Health Services.

10           Q    But why couldn't he decide to --

11      why wasn't the decision made to have Dr.

12      Collin preside over all the court clinics

13      rather than hire someone else?

14           A    You mean like have all of them

15      under Bellevue?

16           Q    Yes.

17           A    I can't answer that.  I don't

18      know.

19           Q    Did you participate in any of

20      those discussions?

21           A    I did not.

22           Q    How did you think Dr. Collin was

23      as a manager?

24           A    I actually didn't have much

25      knowledge about him as a manager.  I
```

```
 1                   E. FORD, M.D.
 2     interacted with him very rarely, and
 3     primarily around issues of hospitalization
 4     of people in the jail.
 5          Q    In the efforts to have the Uber
 6     director, did you ever engage Dr. Collin or
 7     actually approach him about becoming an Uber
 8     director?
 9          A    I told him -- I sent him the job
10     description to see if he knew of anybody
11     that might be interested.
12          Q    Why not him?  It would have been a
13     smoother transition.  You're already
14     managing at least two of the clinics, right?
15               MS. CANFIELD:  Objection as to
16          form.  You can answer.
17          A    Sure.  It would have been a
18     significant demotion for him.
19          Q    Oh, it would have?
20          A    Yeah.  In my opinion.  Because he
21     was at that time managing the entire
22     division of forensic psychiatry at Bellevue
23     Hospital, which is a pretty prestigious
24     position.  And to become the director of the
25     court clinics for Correctional Health
```

```
 1                    E. FORD, M.D.
 2     Services, I think might have been a demotion
 3     (Mark).
 4          Q    So I'm going to ask you some --
 5     I'm going to show you another exhibit.  This
 6     goes back to your time where you were
 7     managing Dr. Kaye from 2009 to 2014.
 8               Now, you said that she was -- you
 9     had no problems with her performance; am I
10     right?
11          A    Yeah.  I don't recall any.
12          Q    Now, would you say that she was --
13     you said you didn't remember if you
14     evaluated her, right?
15          A    Yes.  I did say that.
16          Q    But you said you did evaluate her,
17     right?
18          A    No.  I don't remember if I
19     evaluated her or not.
20          Q    You don't remember at all.  But
21     you also said that, you know, she was a good
22     employee.  So I'm going to bring up this,
23     because you said that she had been a problem
24     for a while.  Now we're trying to figure out
25     exactly when she became a problem, or if she
```

```
 1                    E. FORD, M.D.
 2      was ever a problem, right.
 3              I'm trying to figure out the basis
 4      of your statement, that she had been a
 5      problem for a while, when you made that
 6      statement in 2018.  Okay.  So what I'm going
 7      to do is to have you share the screen again.
 8      Now, these are some of Dr. Kaye's
 9      performance evaluations, right?  Do you
10      remember seeing this, Dr. Ford?
11          A    No.  But that looks like my
12      handwriting.
13          Q    That would be your handwriting.
14              So this one says December 2009,
15      right?  I'm going to scroll through it so
16      that you have an opportunity to look at it.
17                  MS. HAGAN:  I haven't produced
18              this yet, counsel, but I will.
19              After post deposition today.
20                  MS. CANFIELD:  I'm sorry.  You
21              have not produced this?
22                  MS. HAGAN:  I have not.
23                  MS. CANFIELD:  Is there a
24              reason why you have not?  This would
25              have been part of the initial
```

```
 1                    E. FORD, M.D.
 2          disclosures I would have thought.
 3               MS. HAGAN:  Well, I didn't
 4          have them at the time.
 5       Q    At the time when you were her
 6    supervisor, were you required to do annual
 7    evaluations?
 8       A    Yeah.  I think, yes.
 9       Q    Now, for the December 2009
10    evaluation, I'm going to scroll down a
11    little bit, okay?
12       A    Okay.
13       Q    You clearly are initialing -- I
14    guess this would be on January 4, 2010.  You
15    see that, right?
16       A    I do.
17       Q    Now, you say, generally how would
18    you rate this practitioner's skills and
19    competence in their overall performance.
20    And you say overall performance, acceptable,
21    right?
22       A    That's checked, yes.
23       Q    And then you say Dr. Kaye is easy
24    to work with, highly skilled and dedicated
25    to her service; is that right?
```

1                    E. FORD, M.D.

2          A    That's what I wrote.

3          Q    Now, this is in 2010, right?

4               MS. CANFIELD:  Objection as to

5          form.  You can answer.

6          A    I believe the evaluation was done

7     in 2009.

8          Q    Well, no.  The date says 2010,

9     January 4 -- January 6, 2010.  You see that?

10              MS. CANFIELD:  Objection as to

11         form.  You can answer, Dr. Ford.

12         A    Sure.  So there -- my

13    understand -- it's a month difference.  I

14    did the review of the charts on January 6,

15    and then -- yeah.  I guess this was the

16    December eval that I did in January.

17         Q    Now, we go down further.

18              Now, this is a professional

19    practice evaluation.  The year is from

20    July 2012 to December 31, 2012.

21              You see that, right?

22         A    I do.

23         Q    This is your handwriting; is that

24    right, Dr. Ford?

25         A    Yes.  The Melissa Kaye, forensic

```
 1                        E. FORD, M.D.
 2        psychiatry, that's definitely mine.  Yeah,
 3        that looks like mine.
 4                   MS. CANFIELD:  Ms. Hagan, is
 5              this another document that you have
 6              not turned over to Defendants?
 7                   MS. HAGAN:  You will have it
 8              at the close of deposition.  Like, I
 9              got the documents this morning from
10              you.
11                   MS. CANFIELD:  Okay.  No.
12              This document did not come from me.
13                   MS. HAGAN:  I'm just
14              documenting that you gave me at
15              least six sets of documents this
16              morning at 9:40 a.m.  So, yes,
17              you'll get them at -- my documents.
18                   MS. CANFIELD:  Okay.
19        Q    January 10, 2013, you see that's
20        the time -- that's when you actually filled
21        out the evaluation?
22                   Could you say yes for the record,
23        please.
24        A    Yeah.  I was just thinking about
25        the answer.  Yes.
```

1                    E. FORD, M.D.

2          Q    Now, I'm going to scroll to the

3     end again.  And it says, again, generally

4     how would you rate this practitioner's

5     skills and competence in their overall

6     performance, right.  And you say again,

7     acceptable; am I right?

8          A    Yup.

9          Q    And then you have, general

10    comments, Dr. Kaye continues with her

11    excellent leadership in quality of forensic

12    evaluations at the Bronx Court Clinic.

13              You see that, right?

14         A    I see that.

15         Q    Now, you said that she was a

16    problem -- now, you said that you stopped

17    working in that capacity as director of CHS

18    at Bellevue in 2014; am I right?

19         A    No.  Not CHS.  But I stopped

20    working at Bellevue at the forensic division

21    in 2014.

22         Q    Right.  And then you resume

23    in 2018, right?

24              MS. CANFIELD:  Objection as to

25         form.

```
 1                    E. FORD, M.D.
 2        A    I'm sorry, in 2000 what?
 3        Q    You resume management of the court
 4   clinics in 2018?
 5        A    Yes.  I mean -- yeah.
 6        Q    Right.  So when did Dr. Kaye
 7   become a problem?
 8              MS. CANFIELD:  Objection as to
 9         form.  You can answer.
10        A    Sure.  Sorry.  Just as I mentioned
11   earlier, these were -- the comment was that
12   I made in the email was related to these
13   concerns that have been expressed by others,
14   that I imagine I didn't feel rose to the
15   level of putting on a performance
16   evaluation, or else I would have done that.
17        Q    But you didn't believe that -- you
18   didn't believe that in 2013, right?  You
19   leave the -- in 2013, you clearly didn't
20   believe that Dr. Kaye had issues with
21   leadership or issues with getting along with
22   people, because you didn't write that in her
23   performance evaluation; am I right?
24              MS. CANFIELD:  Objection as to
25         form.  You can answer.
```

```
 1                    E. FORD, M.D.
 2        A    I don't -- I mean, I don't -- I
 3   believed at the time that she had excellent
 4   leadership, and I think I wrote good
 5   evaluation -- I can't -- you'll have to pull
 6   it up again, but what I wrote there is what
 7   I believe.  Now, I also --
 8        Q    -- quality of forensic eval --
 9             MS. CANFIELD:  Excuse me,
10        Ms. Hagan.  The witness was still
11        talking.  You're talking over her.
12        Can she finish her response, please.
13             MS. HAGAN:  I was asking her
14        what she said?
15             MS. CANFIELD:  Well, can she
16        finish her response, please.  This
17        is not the first time you've talked
18        over her.
19             Can she finish her response,
20        please.  Thank you.
21        Q    Go ahead, Dr. Ford.
22        A    That's okay.  I was just going to
23   reiterate that I had heard these comments,
24   and I guess at the time that I was filling
25   her evaluation I didn't feel like it had
```

```
 1                    E. FORD, M.D.

 2     affected -- like her work reports that I

 3     reviewed I thought were good.

 4          Q    Was there ever a time that

 5     Dr. Kaye stepped up and filled in for the

 6     Manhattan Court Clinic when there was a

 7     shortage of staff?

 8                    MS. CANFIELD:  Objection as to

 9              form.  You can answer.

10          A    I don't know.  I don't know.  I

11     can't remember.

12          Q    You don't remember whether or not

13     Dr. Kaye went above and beyond her job, and

14     worked from home to basically fill in with

15     the Manhattan Court Clinic?

16          A    I don't remember.

17          Q    You don't remember.  So you're not

18     sure if -- you don't remember Dr. Kaye

19     helping or assisting you when you had

20     problems or I guess issues with the

21     management at the Manhattan Court Clinic?

22                    MS. CANFIELD:  Objection as to

23              form.  You can answer.

24          A    Yeah.  I don't remember anything

25     specifically.  Yeah.  I don't remember.
```

```
 1                       E. FORD, M.D.
 2       Sorry.
 3            Q     No problem.
 4                  Dr. Ford, when did your impression
 5       of Dr. Kaye change?
 6                  MS. CANFIELD:  Objection as to
 7             form.  You can answer.
 8            A     Sure.  My impression about what?
 9       It never changed about the quality of her
10       exams.
11            Q     What about the quality of her
12       leadership?
13            A     I don't know if that ever changed.
14       I don't think that changed either.
15            Q     What about her interactions with
16       other employees?
17            A     There was -- so I had, again,
18       whatever I was hearing, I wish had details,
19       at Bellevue, but I -- there was a time at
20       CHS, and I know this was in some of the
21       emails a little bit, but I can't remember
22       when exactly -- that there was a -- I think
23       there was a comment that there was an
24       interaction between Dr. Kaye and the
25       administrative, the head of operational lead
```

```
 1                      E. FORD, M.D.
 2        for the clinics, that was unprofessional.
 3        And that concerned me.  Maybe that was 2019.
 4        I can't remember.
 5             Q    Did you ever have any dispute with
 6        Dr. Kaye?
 7                  MS. CANFIELD:  Objection as to
 8               form.  You can answer.
 9             A    Not that I'm aware of.
10             Q    Did you ever feel the need to
11        discipline Dr. Kaye?
12             A    I felt the need to report to
13        our -- when I was at Correctional Health,
14        this was in 2019, I think, I did feel the
15        need to report to -- I think it was HR or
16        labor, I don't know, about the -- what I
17        heard was an unprofessional interaction,
18        that I just referenced, and also about an
19        audio recording that had been done in the
20        clinic.  So that's --
21             Q    So I'm going to go back.  I'm
22        going to stop you right there.  I have some
23        other questions about Dr. Kaye's performance
24        and, honestly, her interactions with
25        Dr. Jain.
```

```
 1                    E. FORD, M.D.

 2               Did Dr. Jain ever complain to you

 3     about Dr. Kaye?

 4          A    Did he complain -- no.

 5          Q    Did you ever express concern about

 6     Dr. Jain's performance evaluations as it

 7     pertained to Dr. Kaye?

 8               MS. CANFIELD:  Objection as to

 9          form.  You can answer if you're

10          able.

11          A    So, again, my review of the

12     emails, to sort of refresh my memory, that I

13     believe the -- I think it was a 2019

14     evaluation, Dr. Jain had -- I believe

15     Dr. Jain had rated Dr. Kaye as competent in

16     a couple of areas.  Which, at least from my

17     history with her, I was just struck by it,

18     and I thought that needed more explanation.

19               Because I think -- if I can

20     remember, I think it's like competent and

21     then it's exceeds expectation or something

22     like there are higher ones above competent.

23     So I had questions about that.  He and I

24     talked about that.

25          Q    So Dr. Jain never complained to
```

1                    E. FORD, M.D.

2     you about Dr. Kaye or his interactions with

3     Dr. Kaye?

4                 MS. CANFIELD:  Objection.

5             Asked and answered.  You can answer

6             again.

7          A    Yeah.  He did not complain to me.

8     He was -- we did meet for supervision once a

9     week.  And he would tell me concerns that

10    Dr. Kaye had shared with him.

11         Q    What concerns did he share with

12    you?

13         A    So I'll try to think of some

14    examples.  There was some when I came back

15    from leave about time.  And she had -- he

16    said that she had expressed some -- about

17    some of the policies we were working on.

18    That she had concerns about him -- I think

19    it was him supervising somebody else in the

20    clinic.  I recall something about sitting in

21    on examinations.  Those are the things that

22    come to mind right now.

23         Q    So I'm going to ask you some, I

24    guess, preliminary questions.

25                 When you were Dr. Kaye's

1                    E. FORD, M.D.

2      supervisor between 2009 and 2014, how often

3      would you interact with her?

4           A    Oh, not often.  I think we had an

5      annual division meeting.  I can't remember

6      how frequently that was, actually.  There

7      was some annual division -- there was some

8      division meeting where I meet with her as a

9      group.  Individually, I think at some

10     point -- I'm having a vague recollection at

11     some point I think we tried to have monthly

12     meetings.

13          Q    So you may have met with her

14     monthly back when you were her supervisor

15     from 2009 to 2014, but you're not sure,

16     right?

17          A    Correct.

18          Q    And then when you became her

19     indirect supervisor again in 2018, right,

20     how often would you say that you interacted

21     with her?

22          A    As needed.  And that would

23     probably be -- she and I had a couple of

24     individual meetings at her -- I think they

25     were at her request.  And she was part of

```
 1                      E. FORD, M.D.
 2      a -- and then there were director meetings.
 3      I can't remember how frequently those were.
 4      I don't know.
 5           Q    Now, at any point did Dr. Kaye
 6      become apart of a work group?
 7           A    I -- in 2018, prior to the court
 8      clinics coming over, I emailed Dr -- I think
 9      it was Dr. Collin and Dr -- I can't
10      remember.  It must have been somebody at
11      Kings County, asking if they had any
12      recommendations or anybody interested from
13      the court clinics who would want to be part
14      of the work group, to think about just sort
15      of the practice of the 730 exams.
16           Q    Now, I'm going to open the email
17      that you alluded to earlier, about your
18      concerns that you had about Dr. Jain's
19      completion of evaluation, right.  And I want
20      to ask you some questions on that.  And that
21      will be Plaintiff's Exhibit 3.  And it bears
22      the Bates Stamp series NYC1368 to 1369.
23                     THE WITNESS:  Can we take a
24               break after this?
25                     MS. HAGAN:  Sure.
```

```
1                      E. FORD, M.D.

2                  I'm going to share the screen.

3                  (Whereupon, Email (NYC

4                  1368-1369) was marked as

5                  Plaintiff's Exhibit 3 for

6                  identification as of this date.)

7        Q    Dr. Ford, I'm going to start you

8   at the beginning of the email thread.

9                  Now, here is an email from you to

10  Dr. Jain on February 21 of 2019.

11                 You see that, right?

12       A    I do.

13       Q    Is this a list of everybody who

14  would have been under the purview of CHS in

15  the court clinics at this time?

16       A    Is there more to that email?

17       Q    Okay.

18       A    So looking at the size of this, I

19  believe these are only the outstanding

20  evaluations.  This doesn't look like the

21  entire court clinic staff.

22       Q    How many more people would you say

23  would have been on this list?

24       A    Sorry.  And this is -- if I could

25  see the subject.  You know, it says, for you
```

```
1                    E. FORD, M.D.

2      and your clinic leaders.  Well, let's see.

3      I'd have to go through each of these.

4                    Well, actually, now that I look at

5      it more closely, it looks -- and these are

6      just -- these look like just the evaluations

7      of the evaluators, not the admin staff.  So

8      maybe -- I don't know if this was everybody,

9      but it's probably most everybody.

10          Q    Dr. Winkler is not on this list.

11          A    Well, then his evaluation must

12     have already been done.  Because it says

13     here that have not yet been received.

14          Q    So I'm going to ask you, why are

15     some of the names in caps and then others

16     aren't?

17          A    You mean, why is Dr. Jain and

18     Dr. Mundy in caps a few times?

19          Q    For example, with the entry for

20     Dr. Brayton, right, you have Dr. Jain's, I

21     guess, name in caps.  Why is it in caps

22     there and not in the other entries?

23          A    Yeah.  So this was a cut and paste

24     from Excel 5 that I got from HR.  And I

25     imagine this has happened very frequently in
```

```
 1                      E. FORD, M.D.
 2      all those files, I think some people who
 3      enter the data use caps and some people
 4      don't.
 5           Q    That's your explanation, not that
 6      these had already been completed?
 7           A    Correct.
 8           Q    You're representing that because
 9      Dr. Winkler is not on this list, that his
10      had been completed; is that your testimony?
11           A    I imagine that that's correct
12      because this was -- I was just sending
13      Dr. Jain the evals that had not yet been
14      received.
15           Q    So this is February 21, 2019.  So
16      let's just make a note of that.
17                MS. CANFIELD:  Ms. Hagan, do
18           you think we can take a break now?
19                MS. HAGAN:  I'd like to finish
20           this line of questioning before we
21           take a break.
22                MS. CANFIELD:  That's fine.
23           Q    So then, Dr. Ford, then there's an
24      email from Dr. Jain to you on the 26th of
25      February, saying, "Hi, Elizabeth, here are
```

1                    E. FORD, M.D.

2      the test evaluations for the directors.

3      Dr. Kaye, Mundy, Owen and Winkler."  Right.

4             So if the people on this list had

5      not been completed, why are they on this

6      list of people to be completed?

7           A    So the list I sent to Dr. Jain was

8      from February 21.

9           Q    Right.

10          A    And then it looks like five days

11     later he's sending me evaluations for these

12     people.  Yeah.

13          Q    Winkler wasn't on this list.  You

14     said just now that the reason why Winkler

15     wasn't on this list is because she had

16     completed his evaluation.  But clearly, he

17     hadn't.  He's saying that he sent it to you.

18          A    So I don't think that's clear.

19     Every evaluation that Dr. Jain has to do,

20     the procedure was that I needed to review

21     his evaluations of others.

22             So I don't actually know when

23     Dr. Winkler's evaluation was completed.

24     Dr. Jain appears to have bundled all four

25     director evaluations into one email for me.

1                   E. FORD, M.D.

2     So I don't know when Dr. Winkler's eval was

3     completed.

4          Q    Dr. Kaye's briefer due to less

5     opportunities to collaborate compared to the

6     other directors.  I also have Drs. Owen and

7     Kaye as annual, and Drs. Mundy and Winkler

8     as probation because they are newer to those

9     director positions.  Right?  So please let

10    me know what you think.  After your review I

11    will send their evaluation to you to review.

12    And then, you know, you're going back and

13    forth.

14              Going back to this list, Dr. Mundy

15    is on this list as well.  So if these are

16    people who he hasn't completed, why would

17    Dr. Mundy be on this list?

18              MS. CANFIELD:  Objection as to

19         form.  You can answer.

20         A    So I'm not sure how I can -- so

21    this list here appears to be the list of

22    evals that haven't been received by HR.  I

23    don't know the status of if they have been

24    completed or not, but HR has not received

25    them.  And HR can't receive them until --

```
 1                    E. FORD, M.D.
 2        well, I mean, by policy.  HR is not supposed
 3        to receive them until I have reviewed them.
 4              So then Dr. Jain's followup email
 5        is sending me a batch of the evaluations
 6        that I have to review before they can go to
 7        HR one day before the deadline.
 8          Q    And then you respond back to
 9        Dr. Jain.  "Owen, Mundy and Winkler look
10        fine, right?  I think Melissa is as strong
11        as the others in some areas, yet is rated as
12        competent in most and without comment.
13        Suggest that if you find her to be competent
14        in some areas where other less experienced
15        directors are excellent or superior.  You
16        provide some comments about how to improve.
17        I know this is a challenging process, but it
18        is striking that the other three have lots
19        of comments and hers doesn't.  I'm happy to
20        read comments in advance or we can talk
21        tomorrow.
22              So there's a lot to uncap here.
23        First and foremost, you have determined,
24        from your interactions with Dr. Kaye, that
25        she's as strong as some of the other
```

```
 1                    E. FORD, M.D.
 2      directors in some areas, but she's rated
 3      competent.
 4               Why did you feel compelled to
 5      raise that issue?
 6                    MS. CANFIELD:  Objection as to
 7                form.  You can answer.
 8          A    With Dr. Jain?
 9          Q    With Dr. Jain about Dr. Kaye.
10          A    Yes.  Because I wanted to make
11      sure that the evaluation was as fair as
12      possible.
13          Q    At that time, were you aware that
14      Dr. Jain had filed an EEOC complaint against
15      you and/or CHS?
16          A    I don't know.
17          Q    Hadn't Dr. Kaye complained to you
18      about pay parity and a shift change?
19          A    I do recall that Dr. Kaye had
20      written -- she and I had spoken once or
21      twice about that, and I know that she had
22      been concerned about those issues.  I had
23      heard about that at least since I had gotten
24      back from leave.
25          Q    You said you spoke to Dr. Kaye
```

1                          E. FORD, M.D.

2       once or twice about that.  Now, what is

3       that?  Are you --

4            A    Oh, sorry.  About -- we had a --

5       she wanted to talk with me after I got back

6       from leave about a few things, including the

7       time -- I think it was something about -- it

8       was about an educational leave for her board

9       exam, and a decision that had been made

10      while I was on leave about her hours, like

11      the shift.  And she had concern -- she also

12      I believe expressed concerns that she

13      thought Dr. Jain was -- she was having

14      trouble like feeling that Dr. Jain was -- I

15      can't remember the exact words.  Again,

16      something like the relationship with

17      Dr. Jain wasn't going well.

18           Q    Now, are you testifying that

19      Dr. Kaye only bought pay parity concerns to

20      your attention while you were her manager

21      under CHS the second time?

22           A    No.  I did not say that.

23           Q    Okay.  Did she raise pay parity

24      issues with you when you were her supervisor

25      from 2009 to 2014?

```
 1                    E. FORD, M.D.

 2        A    I believe she did, yes.

 3        Q    And what happened?

 4        A    I spoke -- I can't remember when

 5   she did that.  I don't know when in that

 6   time frame, but she did speak with me about

 7   that.  I recall having -- I can't tell you

 8   how many, more than one discussions with my

 9   supervisor at the time about her concerns.

10   I recall that things were going very slowly.

11             I wasn't responsible, I

12   couldn't -- I had a hard time figuring out

13   how to be involved with the finance issues

14   and HR.  That wasn't something that I

15   controlled in that position.  So things were

16   going slow in that regard.  I encouraged

17   Dr. Kaye to reach out to my supervisor

18   directly, as I always do.

19        Q    And this is Dr. Badaracco?

20        A    Correct.  And I --

21        Q    I'm sorry.

22        A    No.  Go ahead.

23        Q    It's a delay.  I'm sorry.  I

24   apologize, Dr. Ford.

25        A    That's okay.  I was finished.  It
```

```
 1                    E. FORD, M.D.
 2    was Dr. Badaracco.
 3         Q    So Dr. Batarocco.  And then you --
 4    but ultimately her issues, Dr. Kaye's issues
 5    about a pay parity were not addressed at
 6    that time; is that right?
 7              MS. CANFIELD:  Objection as to
 8         form.  You can answer.
 9         A    I don't -- I can't tell you that
10    for sure.  I don't recall leaving that
11    position and having a memory that it was
12    resolved for her.
13         Q    And then Dr. Kaye then brought pay
14    parity up again while you were her manager
15    or indirect supervisor at CHS in 2018, this
16    last stint?
17              MS. CANFIELD:  Objection as to
18         form.  Is that a question or is that
19         a statement?
20              MS. HAGAN:  No.  I'm asking
21         her.
22         Q    You brought it up again after you
23    became chief of psychiatry at CHS?
24         A    I don't recall a specific time,
25    but I have a vague recollection that prior
```

                           E. FORD, M.D.

1

2    to the transfer -- so this would have been

3    pre-July 1st, it had been raised.  I think

4    she was also concerned about retention bonus

5    and union -- oh, yeah, yeah, sorry.  Now I'm

6    remembering.  Yes.  She did bring it up to

7    me prior, and I can't remember if she

8    brought it up after I returned from leave.

9        Q    Did you believe that Dr. Kaye was

10   being paid fairly in comparison to the other

11   forensic evaluators?

12              MS. CANFIELD:  Objection as to

13          form.  You can answer.

14       A    At the time -- let's see.  Hold

15   on.  Let me try to recall here.

16              I remember thinking that she was

17   paid less than the other MD director.  So

18   there were two other clinic directors or

19   psychologists and there was a significant

20   pay difference there, between MDs and PHDs.

21              With respect to the other MD in

22   another clinic, the other MD -- oh, no,

23   wait.  No.  I'm sorry.  Hold on.  When I was

24   at -- sorry.  Is this specifically about CHS

25   or Bellevue?

1                    E. FORD, M.D.

2        Q    Either one.  'Cause there's

3    documents here that she was paid less than,

4    right?

5                MS. CANFIELD:  Objection as to

6         form.  You're testifying.

7        Q    Let's talk about Dr. Ciric first.

8    She was paid less than Dr. Ciric; is that

9    right?

10                MS. CANFIELD:  Objection as to

11         form.  You can answer.

12        A    My recollection is that -- and

13    this is from the Bellevue time.  My

14    recollection is that she was paid less than

15    Dr. Ciric.  And that that was the issue that

16    I was advocating for to resolve.

17        Q    And it was never rectified; is

18    that right?

19        A    I don't know if it was ever

20    rectified.  I don't recall it being

21    rectified prior to my departure.

22        Q    Do you feel that it was fair that

23    Dr. Kaye was paid less than Dr. Ciric?

24                MS. CANFIELD:  Objection as to

25         form.  You can answer.

1                    E. FORD, M.D.

2        A    I was told that because of the

3    hiring date and the way that salaries

4    increase with cost of living over the years,

5    that -- and the relatively slow rate of

6    increase for people's salary when they stay

7    in service, that it related to hiring date.

8    I did think it was important to have parity

9    with salaries for people who are in similar

10   positions.

11       Q    So you did think it was unfair

12   that she --

13                 MS. CANFIELD:  Objection.

14                 MS. HAGAN:  I didn't finish my

15            question.

16       Q    Do you think it was unfair that

17   Dr. Kaye was paid less than Dr. Ciric at

18   that time?

19                 MS. CANFIELD:  Objection as to

20            form.  You can answer.

21       A    Sure.  I don't know enough about

22   it to be able to tell you if it was fair or

23   not.  It felt like -- I couldn't -- at the

24   time I don't recall having a good sense that

25   there was a reason that I could understand

```
 1                    E. FORD, M.D.
 2      for the difference.
 3           Q    Why was Dr. Kaye in the lower
 4      civil service title than Dr. Ciric?
 5                    MS. CANFIELD:  Objection as to
 6              form.  You can answer.
 7           A    Sure.  I wasn't aware that she
 8      was.  I don't know.
 9           Q    Dr. Kaye was an attending
10      physician, do you remember that?
11           A    Well, I think all of the people,
12      all the doctors who worked for Bellevue were
13      attending physicians at residency.
14           Q    Dr. Ciric was not, he was a
15      physician specialist.  Do you remember that?
16           A    Oh, no.  I'm sorry.  I don't know
17      the difference between those two.
18           Q    So at that time, your testimony is
19      you don't know the difference between a
20      physician specialist and the attending
21      physicians positions?
22           A    Yes.  That's correct.  It was
23      not -- I worked primarily with people who
24      were under NYU pay lines.  So I wasn't
25      familiar with those titles.
```

1                    E. FORD, M.D.

2          Q    Even though you were supervising

3     her and you had the ability to impact her

4     salary, or any of your direct report

5     salaries?

6                    MS. CANFIELD:  Objection as to

7               form.  Assumes fact.  She can

8               answer.

9          A    Sure.  So I was actually not -- I

10    was not responsible for the salaries or

11    the -- it sounds like, you called them civil

12    service titles.  I was responsible for

13    hiring from a clinical perspective.  So

14    vetting people clinically.  And I was

15    responsible for the clinical work.  And I

16    did feel like I was responsible for

17    advocating for my staff in ways however I

18    could.  But I was not responsible, nor did I

19    even have, that I can recall, even access to

20    sort of budgets about much of what I did in

21    there.

22         Q    Now, that changed when you became

23    CHS chief of psychiatry, right?

24         A    What, access to budgets or --

25         Q    Access to budgets and the ability

```
 1                    E. FORD, M.D.
 2      to determine salaries.
 3           A    I would say there was more
 4      transparency to me, but I was not the person
 5      who could approve salaries.
 6           Q    You couldn't approve salaries?
 7           A    That's correct.
 8           Q    You couldn't hire and fire people
 9      within CHS?
10                MS. CANFIELD:  Objection as to
11             form.  You can answer.  Different
12             question.
13           A    Sure.  I was -- I could hire
14      people.  The salary, I could propose, but I
15      couldn't approve it until it went through
16      HR.
17           Q    Were you able to fire people?
18           A    I guess.
19           Q    Now, I'm going to --
20           A    I'm sorry.  Go ahead.
21           Q    Go ahead.  I'm sorry.
22           A    I was going to say, I was able to
23      present to my supervisors concerns I had if
24      I was thinking about firing somebody.  But,
25      again, I didn't have the final say, like
```

1                   E. FORD, M.D.

2      they would determine if it was an

3      appropriate reason or not.

4           Q    Who had the final say if someone

5      got fired?

6           A    That's a good question.  I think

7      it was labor relations would -- I think the

8      way it worked is that -- I don't think I

9      actually ever fired anybody.  But -- I think

10     the way it works is that I would -- if it

11     was me doing it, say and would talk with

12     labor about it, and that they would say this

13     is reasonable or not.  And then ultimately,

14     I believe HR or labor were the ones who sort

15     of did the firing.

16          Q    Now, you said, you suggested if

17     you find her to be competent in some areas

18     where other less experienced directors are

19     excellent or superior, you provide some

20     comments about how to improve.  Now, I'm

21     going to ask you some questions about that.

22               What criteria was utilized to

23     determine that Dr. Kaye was competent versus

24     the other directors being excellent or

25     superior, do you know?

```
 1                     E. FORD, M.D.
 2          A    I don't know.
 3               MS. CANFIELD:  Objection as to
 4            form.
 5          Q    You said you don't know?
 6          A    Right.
 7               I'm sorry, can we please take a
 8      break soon.
 9          Q    Okay, Ms. Ford.  I'm sorry.  Can
10      you bear with me another five minutes and
11      then I'll be done with this email?
12          A    Sure.
13          Q    I'm sorry about this, Dr. Ford.
14               Now, you say that again, I know
15      this is a challenging process, why was it a
16      challenging process for him to rate
17      Dr. Kaye?
18               MS. CANFIELD:  Objection as to
19            form.  You can answer.
20          A    Sure.  That's not my -- I didn't
21      mean it's a challenging process to rate
22      Dr. Kaye.  I just mean it's a challenging
23      process to do a lot of performance
24      evaluations in a short period of time.
25          Q    But then you say, but it is
```

```
                           E. FORD, M.D.
 1
 2     striking that the three others have -- the
 3     three others -- I'm going to edit this --
 4     have lots of comments and hers doesn't.
 5               Now, why did you point that out?
 6        A    I must have felt that it was
 7     striking.  Particularly because of my
 8     earlier comment that my experience had been
 9     that she's strong in other areas.  And if
10     there's some change to that, or if she's
11     less strong than other directors, then I do
12     think it's important for anybody to have
13     comments about how they can improve.
14        Q    Now, I'm going to ask you a
15     question here.
16               You're saying that it wasn't
17     because Dr. Jain and Dr. Kaye had a strained
18     relationship, that you had these issues with
19     the performance evaluations, you're saying
20     it's because you felt that she was a strong
21     employee, and you were questioning the
22     evaluation as a whole in comparison to the
23     others; am I right?
24               MS. CANFIELD:  Objection form.
25          You can answer if you're able.
```

```
 1                   E. FORD, M.D.
 2        A    I mean, I can't remember the
 3     evaluations, but based on this email, what
 4     I'm saying is that, other less -- that she's
 5     rated as competent, but without comments
 6     about how to improve.  And that, to me, I
 7     personally just -- you know, we as -- we
 8     work with a lot of -- I have worked with a
 9     lot of highly skilled physicians and many of
10     whom are just so excellent.  So competent
11     almost seems like, you know, that's -- I
12     don't know.  It warrants some discussion
13     about how to get better.
14        Q    So you don't think that
15     Dr. Jain's, I guess, rating was retaliatory?
16               MS. CANFIELD:  Objection as to
17          form.  You can answer.
18        A    I don't remember that or -- no.
19     That wasn't -- I don't recall having that
20     thought at all.
21        Q    Now, I mean, just in comparison,
22     Dr. Winkler had been in the position let's
23     say April of 2018 to February of 2019, yet
24     he received an excellent to superior
25     evaluation.  Do you recall that?
```

```
 1                    E. FORD, M.D.

 2              MS. CANFIELD:  Objection as to

 3         form.  You can answer.  If you want

 4         to show her something.

 5    A    I mean, I don't remember what --

 6              MS. HAGAN:  Wait, wait, wait.

 7         Ms. Canfield, that's blatant and you

 8         know that it's improper.  I want to

 9         show her something?  What kind of

10         objection is that?  That's

11         ridiculous.

12              You cannot hint if she needs

13         to see something.  What are you

14         talking about?

15              MS. CANFIELD:  There's no

16         foundation to any of your questions.

17         You're assuming facts not in

18         evidence.  If you have something to

19         show her --

20              MS. HAGAN:  It's improper.  I

21         have ---

22              MS. CANFIELD:  Your questions

23         are improper, too.  They are not

24         foundation.

25              MS. HAGAN:  Do not do it
```

```
 1                    E. FORD, M.D.
 2           again.  Or else we will be on the
 3           phone with Judge *Kott.  Do you
 4           understand me?  Don't do it again.
 5                    MS. CANFIELD:  This is
 6           perfect.  Thank you very much.
 7                    MS. HAGAN:  Don't do it again.
 8           Q    So now, Dr. Ford, I'm showing you
 9     what's been marked as -- what will be marked
10     as Exhibit 4.
11                    (Whereupon, Performance
12                     Evaluation (NYC1336-1342) was
13                     marked as Plaintiff's Exhibit 4
14                     for identification as of this
15                     date.)
16           Q    This is Dr. Winkler's performance
17     evaluation.  And it bears the Bates series
18     NYC1336 through NYC1342.
19                    Now, do you remember this
20     document?
21           A    No.
22           Q    Well, it says here that
23     Dr. Winkler was appointed on April 30, 2018.
24     Would that be accurate?
25           A    That sounds about right.
```

```
 1                      E. FORD, M.D.
 2         Q    Were you responsible for getting
 3    Dr. Winkler into this position of, I guess,
 4    clinical director?
 5         A    Was I responsible -- I mean, I
 6    guess.  We posted -- it was a complicated
 7    process, because there was one director of
 8    two clinics when we were thinking of this
 9    transfer.
10              So we posted -- I believe the
11    process is we -- I created an org chart, a
12    structure, and we created four director
13    positions.  The director who was of the
14    Queens and the Brooklyn clinic at the time
15    chose -- I don't know if it was chose --
16    became the Queens clinic director.  And then
17    we posted for this Brooklyn clinic director.
18              And we had -- I can't remember how
19    many applications, we did some interviews,
20    Dr. Winkler applied.  I probably would have
21    signed his -- the paper that approved his
22    hiring.
23         Q    Did you ever speak with
24    Dr. Winkler personally and encourage him to
25    apply for this position?
```

1              E. FORD, M.D.

2        A    Yeah -- probably.  I called all

3   the -- did I call all the psychologists?  I

4   think I called everyone I could think of in

5   all the clinics.  I told them that the

6   position was up, if they wanted to apply.

7        Q    Going back to what we were

8   discussing earlier about the shorter time

9   period and the superior evaluation.  He's on

10  probation here, according to this

11  evaluation.  You see that, right?

12              MS. CANFIELD:  Object to the

13         form.

14       A    Yeah.  That just means he hasn't

15  been in the position for -- that's a

16  six-month thing.

17       Q    Right.  And here he is being

18  evaluated after six months in his position.

19  Right?

20              And you see the evaluation skill,

21  S for superior, E for exceeds expectations.

22  C, fully competent.  Going all the way down

23  the line, right.  So for our purposes, I'm

24  going to stick with those first three

25  because no one seems to be rated under that,

```
 1                    E. FORD, M.D.

 2      right.  And you see that he's getting rated

 3      E and F and not applicable, right?

 4           A    I'm seeing that.

 5           Q    Then you have some

 6      competent/excellent here, right.

 7                Now, from what you're seeing,

 8      would you say that these ratings are

 9      consistent with your experience with

10      Dr. Winkler?

11                     MS. CANFIELD:  Objection as to

12                form.  You can answer.

13           A    Sure.  I didn't directly supervise

14      Dr. Winkler, so I can't -- I really -- I

15      don't know.  I don't know.

16           Q    Did you know Dr. Winkler before or

17      outside of CHS?

18           A    Yes.  I worked with Dr. Winkler

19      when he -- in Bellevue for a year maybe.  I

20      think -- he was a -- I can't remember.  He

21      was either a psychology intern or a

22      psychologist at Bellevue Hospital on the

23      inpatient unit.  I think when I was the unit

24      chief there.

25           Q    Did you ever publish any documents
```

```
 1                      E. FORD, M.D.
 2      with Dr. Winkler?
 3           A    I published an article with him, I
 4      can't remember the year, but, yes.
 5           Q    So you knew Dr. Winkler prior to
 6      supervising -- prior to him being under your
 7      management; am I right?
 8           A    Yes.  At CHS, yes.  I did know him
 9      prior to that.
10           Q    I'm going to keep going down.  I
11      guess I'm going to look for the overall
12      rating that you gave him.
13                So the -- he said over the past
14      year, which is not accurate, it was only six
15      months; am I right?
16           A    Yeah.  It appears that you are
17      right.
18           Q    Dr. Winkler has impressively and
19      seamlessly transitioned into his role as
20      director of the Brooklyn Staten Island Court
21      Clinic.  He has been a knowledgeable and
22      steady leader and an exceptional role model
23      for clinical and administrative staff.  He
24      has actively been invested in recruiting,
25      hiring and training staff.
```

1               E. FORD, M.D.

2               Now, did he have an opportunity to

3       do all that in six months?

4               MS. CANFIELD:  Objection as to

5           form.  You can answer.

6       A    Let's see.  The transition into

7       the role, yes, that could be in six months.

8       Knowledgeable and steady leader, yeah.  An

9       exceptional role model for clinical and

10      administrative staff.  I mean, I think that

11      could be rated in six months.  Actively been

12      invested in recruiting hiring and training

13      new staff.  I do recall that he was -- that

14      Dr. Winkler was trying to recruit actively.

15      Q    And then you have like develop a

16      systematic evaluation process for clinical

17      staff evaluations and reports, and all this.

18      And then you have exceeds expectations,

19      right?

20      A    I see that.

21      Q    Well, I know that I represented to

22      you that we were going to take a break.  Why

23      don't we do that.  And then why don't we get

24      back at 1:35.  So that gives us an hour.

25              THE WITNESS:  Could we take a

```
 1                     E. FORD, M.D.
 2           shorter lunch break?
 3                  MS. HAGAN:  I will need to
 4           take an hour.
 5                      (Whereupon, a recess was taken
 6                      from 12:34 p.m. to 1:38 p.m.)
 7           Q    I want to ask you some more
 8      questions about the complaint itself.
 9                  Did you have an opportunity to
10      read the amended compliant, Dr. Ford?
11           A    I think so.  I'm not sure the
12      difference between the amended complaint and
13      the complaint, but I think I do.
14           Q    Did you feel that there were
15      misrepresentations in that document?
16                  MS. CANFIELD:  Objection as to
17             form.  You can answer.
18           A    Yes.
19           Q    Which ones?
20                  MS. CANFIELD:  Objection as to
21             form.  You can answer.
22           A    I don't have the document in front
23      of me.
24           Q    We can look at it.
25                  First and foremost, for example,
```

```
 1                    E. FORD, M.D.
 2      Dr. Kaye alleges that you and CHS management
 3      engaged in retaliatory shift change when she
 4      started to complain about pay parity.  Do
 5      you remember that?
 6                 MS. CANFIELD:  Objection as to
 7            form.  Complain about pay --
 8                 MS. HAGAN:  Please don't coach
 9            the witness.  Let her answer.
10                 MS. CANFIELD:  I don't hear
11            you.
12                 MS. HAGAN:  You heard the
13            question.
14                 MS. CANFIELD:  I did not hear
15            the question.  When she complained
16            about what?
17         Q    When Dr. Kaye complained about pay
18      parity, she alleged she was experiencing
19      retaliation in the form of a retaliatory
20      shift change.
21                 Do you recall that, Dr. Ford?
22         A    No.  I do not recall that
23      specifically, because I believe that
24      happened when I was on leave.  I recall
25      returning from leave in the fall of 2018 and
```

```
 1                          E. FORD, M.D.
 2        hearing that there had been a disagreement
 3        about her shift.  I think that's what you
 4        were referring to.
 5             Q    Right.  Now, at the time, was it
 6        your experience that the directors of the
 7        court clinics worked 9:00 to 5:00?
 8                     MS. CANFIELD:  Objection as to
 9                form.  You can answer.
10             A    I think mostly, yes.  I was more
11        concerned with the hours per day rather than
12        the specific time of start and stop, but
13        that sounds about right.
14             Q    Why were you concerned about the
15        hours per day, Dr. Ford?
16             A    Because that's what people were
17        being paid for.
18             Q    Okay.  Now, were there any other
19        court clinic directors who experienced a
20        shift change?
21                     MS. CANFIELD:  Objection as to
22                form.  You can answer.
23             A    I don't know.
24             Q    Did any of other court directors
25        come to you to complain about a shift
```

Page 137

1                       E. FORD, M.D.

2      change?

3          A    Not that I recall -- not that I

4      recall, no.

5          Q    Did any of the other directors,

6      were they held to a specific schedule?

7          A    Were they held to a specific

8      schedule.  I don't -- I wasn't involved in

9      the determinations of their specific start

10     and stop times.  I did not talk -- I don't

11     recall talking with Dr. Jain about that.  I

12     don't recall that.

13         Q    Who made the decision to set the

14     hours of the directors in the clinics?

15                  MS. CANFIELD:  Objection as to

16              form.  You can answer.

17         A    The Brooklyn and Queens court

18     clinics, who made -- I believe that was HR.

19     I think that was HR.  And I think also for

20     the other two, although I don't -- again, I

21     wasn't around for that summer and I don't

22     know if there were changes to that.

23         Q    You said that you did at least 30

24     forensic evaluations over the course of your

25     career; am I right?

```
 1                    E. FORD, M.D.
 2          A    I did say that, yeah.
 3          Q    Did you ever possess that title of
 4     forensic evaluator as your job title?
 5          A    Let me think.  No.
 6          Q    Who in HR made the decision to, I
 7     guess, put the shift, I guess the hours in
 8     place?
 9               MS. CANFIELD:  Objection as to
10          form.  You can answer.
11          A    I don't actually know who in HR
12     did.  I don't recall.  I may have known, but
13     I don't know now.  I don't know.
14          Q    Did Dr. Kaye ever come to you to
15     complain about the shift change that she
16     experienced?
17          A    Yes.
18          Q    And when did this happen?
19          A    The best I can recall from the
20     emails, it was around the end of November
21     of 2018.
22          Q    November 2018.  And what do you
23     remember from that?
24          A    That she had requested to talk
25     with me about some things and catch me up to
```

```
 1                    E. FORD, M.D.

 2      speed from my leave.  That we met, I believe

 3      after like a director meeting.  That we met

 4      in person, and that she was concerned --

 5      she -- there was -- she was still unhappy

 6      with the shift, whatever the shift issue.

 7      And I can't recall if it had been move --

 8      there was still an issue with the shift

 9      issue, that she had taken the front -- well,

10      she had taken a board exam and had been

11      docked pay that day.  And that -- there was

12      some other things.  I do recall she

13      expressed concerns about Dr. Jain and his

14      interactions with her.  And there may have

15      been a couple other things.  Those are the

16      things I remember.

17           Q    Now, you said some people in HR

18      made the decision to, I guess, implement or

19      impose a set work out.

20                Would that have been, let's say,

21      Mr. Wangel, would he have been involved in

22      that decision making process?

23                MS. CANFIELD:  Objection as to

24           form.  You can answer.

25           A    Sorry.  Apologies for the dog.
```

1                    E. FORD, M.D.

2                    Can you hear me okay?

3          Q    Yes.  I can hear you.

4          A    I don't know if it would have been

5     Mr. Wangel.  What I recall is that -- yeah.

6     I don't know if -- I don't think Mr. Wangel

7     is part of HR.

8          Q    What about Ms. Yang?

9          A    So Ms. Yang was involved in most

10    of -- all of the decisions that I made

11    regarding personnel, in terms of time and

12    salary and hiring and discipline and things

13    like that, went through Ms. Yang.

14         Q    So did you and Ms. Yang ever talk

15    about Dr. Kaye?

16         A    Yeah.  I imagine we must have.  I

17    don't recall specific conversations, but I'm

18    sure we did.

19         Q    Did you ever talk about Dr. Kaye

20    in terms of this pay parity issue?

21         A    We had a conversation -- I recall

22    having conversations, I don't know if one or

23    more than one with Ms. Yang, prior to her

24    coming on board with CHS, and discussions

25    about pay parity and retention bonus, and

```
 1                    E. FORD, M.D.
 2      delaying the Manhattan clinic arrival in
 3      order for her to get the bonus.
 4          Q    Now, would you agree that the pay
 5      parity -- I mean the retention bonus and
 6      the -- what was the other thing that you
 7      mentioned?  Retention bonus and -- you said
 8      something else?
 9                    MS. CANFIELD:  Do you want the
10             court reporter to read it back?
11                    MS. HAGAN:  Yes.
12                    (Whereupon, the requested
13                    testimony was read by the court
14                    reporter.)
15          Q    Now, was there also an issue
16      regarding Dr. Kaye's longevity pay?
17          A    That sounds familiar.  That's
18      about all I can tell you.  That term sounds
19      familiar to me.
20          Q    You may have talked to Ms. Yang
21      about Dr. Kaye's retention bonus and
22      longevity pay; is that right?
23          A    I don't know if I talked with
24      Ms. Yang about longevity.  It's possible.
25          Q    Would it be fair to say that
```

```
 1                      E. FORD, M.D.

 2      longevity pay and retention bonus has

 3      nothing to do with Dr. Kaye's salary, per

 4      se; am I right?

 5                  MS. CANFIELD:  Objection as to

 6              form.  You can answer if you're

 7              able.

 8      A       Sure.  I don't actually know a

 9      whole lot about longevity pay.  That's not

10      something that I'm familiar with in the

11      systems that I've worked in, as most of the

12      employees I've had were not through sort of

13      city agencies.

14                  So I can't -- I don't know.  The

15      retention bonus, if my recollection is

16      correct, I believe that was an agreement

17      made at Bellevue with -- and I don't know

18      the details of why, but I think that was a

19      deal from Bellevue.

20      Q       Now, did you ever speak to

21      Ms. Yang about the shift change?

22      A       I don't know.  I don't know.

23      Q       Now, for years you worked with

24      Dr. Kaye from 2009 to 2014, and she worked

25      from 9 to 5.  Do you recall that?
```

1                        E. FORD, M.D.

2        A    I don't recall her specific hours,

3     but that sounds right.

4        Q    So she continued to work in the

5     same attending physician title when you

6     resumed your management of Dr. Kaye, I guess

7     indirectly in 2014.  Why was her 9 to 5

8     hours a problem then?

9                MS. CANFIELD:  Objection as to

10              form.  You can answer.

11       A    Sure.  Actually, I don't know,

12    because I was not around when those

13    decisions were made, that it was problem,

14    which sounds like it was the summer.

15       Q    You weren't around when you were

16    going to manage her out either, you said

17    that you weren't supervising her at that

18    time, right?

19                MS. CANFIELD:  Objection,

20              argumentative.  You can answer.

21       A    I was working at that time, during

22    the summer of 2018, I was not working, I was

23    on leave.

24       Q    So you weren't working at all, you

25    weren't privy to what was going on in the

Page 144

                          E. FORD, M.D.

1

2      clinics or anything during the summer

3      of 2018?

4           A     That's correct.

5           Q     You weren't emailing anyone, you

6      weren't contacting anyone during that

7      summer?

8           A     That's correct.

9           Q     So when you got back and Dr. Kaye

10     was complaining about this pay parity --

11     about the shift change, did you look into it

12     yourself to see whether or not it was

13     unreasonable for her to want to continue to

14     work the 9 to 5 shift?

15          A     I did.

16          Q     And what happened?

17          A     I recall speaking with at least

18     Mr. Wangel and possibly Jessica Laboy who

19     was responsible for HR at the time.  And

20     inquired about what the issue was, had it

21     been resolved, had it been resolved

22     reasonably.  And was told that this was an

23     issue -- I can't recall what the answer was,

24     but my take away impression was that it was

25     not -- that I didn't need to look into it

```
 1                        E. FORD, M.D.
 2      further.
 3           Q    Now, Dr. Kaye alleges that she was
 4      made to work nine hours while the other set
 5      of directors were not made to work nine
 6      hours.  Did you look into that?
 7                MS. CANFIELD:  Objection as to
 8           form.  You can answer.
 9           A    I think it was about -- it was
10      complicated -- it felt complicated at the
11      time.  It's hard to remember, but I think it
12      had to do with the lunch hour.  And the line
13      that Dr. Kaye was on was a union doctor
14      counsel line, and there were different lunch
15      hour requirements, something like that, but
16      the details have escaped me.
17           Q    Dr. Ford, was there ever an
18      explanation given that Dr. Kaye had to work
19      the nine hours because of the necessity of
20      the clinic and the courts?
21                MS. CANFIELD:  Objection as to
22           form.  You can answer.
23           A    Sorry.  Can I repeat the question
24      and you tell me if I've got it right, the
25      question?
```

1                     E. FORD, M.D.

2          Q    Sure.

3          A    Are you asking if I know whether

4     Dr. Kaye was ever told she had to work those

5     hours because of the court requirements?

6          Q    Yes.

7          A    I don't know.  I'm not aware of

8     that.

9          Q    To your knowledge, when does the

10    Court open?

11              You said you do 30 of these exams,

12    Dr. Ford.  I'm going to hold you to this.

13    What time does the Court open, Dr. Ford?

14              MS. CANFIELD:  Objection.  You

15         can answer.

16         A    I am embarrassed to say that I

17    don't know for sure in each court, but I

18    would imagine around nine.

19         Q    Not 10:00?

20              MS. CANFIELD:  Objection.

21         A    I don't know if the courts open at

22    10.

23         Q    You don't know if the courts open

24    at ten or nine?

25         A    What I'm telling was that I don't

```
 1                    E. FORD, M.D.

 2      know for sure what time every court opens.

 3           Q    You're not sure what time every

 4      court opens.  Do you know if it was

 5      necessary that Dr. Kaye either worked from 9

 6      to 6 or 8 to 5?

 7                 MS. CANFIELD:  Objection as to

 8            form.  You can answer.

 9           A    If it was necessary with respect

10      to the Court?

11           Q    If it was a requirement.  Like,

12      why did she have to work nine hours and the

13      other directors had the option to work

14      eight?

15                 MS. CANFIELD:  Objection as to

16            form.  You can answer.

17           A    Yeah.  I'm not -- I don't know

18      if -- I don't know how to answer that.

19                 I don't know -- I don't remember

20      hearing anything that it was a court

21      requirement.  I don't also remember hearing

22      anything that there was an idea that it was

23      eight versus nine hours with other

24      directors.  I do clearly remember that the

25      other directors chose managing real lines,
```

```
 1                    E. FORD, M.D.
 2       which allowed for more flexibility and I
 3       think a different lunch thing.
 4           Q    So are you representing that all
 5       the directors were on a managerial line
 6       except for Dr. Kaye?
 7           A    I believe that they all -- I'm
 8       saying that that's my best recollection,
 9       yeah.
10           Q    Now, at any time did Dr. Kaye tell
11       you that her children had special needs or
12       had specific ailments she had to address?
13           A    She did.
14           Q    What did she tell you?
15           A    She told me that she has two
16       children, one of whom, I believe her son has
17       a chronic illness.  I can't -- I think auto
18       immune, but I can't for sure, that requires
19       significant at home care.  And that at times
20       it is unpredictable.
21                I think she also told me some
22       details about his education.  I can't recall
23       how much of that was at home versus in a
24       school.
25           Q    Specifically, did Dr. Kaye say
```

1                      E. FORD, M.D.

2      that her son had skin ailments that she had

3      to attend to, and that's why she needed to

4      work a certain schedule?

5           A    She did say that.

6           Q    When did she have that

7      conversation, do you recall?

8           A    I don't recall.  I don't recall.

9      I think in the fall of 2018.

10          Q    Now, you have children of your

11     own, I take it, right?

12          A    Yes.

13          Q    And how many children do you have,

14     Dr. Ford?

15          A    Two.

16          Q    So you kind of understand or at

17     least have talked about the balance of

18     motherhood and just trying to get to work,

19     and just having a very narrow short period

20     of time to work, and to actually take care

21     of your family; am I right?

22          A    I'm familiar with that, yes.

23          Q    Now, did you exhibit that same

24     level of consideration to Dr. Kaye when

25     she's coming to you with these issues?

1                    E. FORD, M.D.

2                    MS. CANFIELD:  Objection as to

3            form.  You can answer if you're

4            able.

5        A    I do remember hearing this from

6    Dr. Kaye and talking with people, a few

7    levels, and advocating for a shift that

8    would allow her to take care of her family

9    in the way that she wanted, and that would

10   meet the needs of the clinic.

11       Q    Were the needs of the clinic not

12   being met under Dr. Kaye's prior schedule of

13   9 to 5?

14       A    Not that I was aware of.

15       Q    They were being met?

16                   MS. CANFIELD:  Objection as to

17           form.  You can answer.

18       A    Sure.  Yes.  As I said, I believe

19   they were being met.  I didn't hear

20   otherwise.

21       Q    She had no performance issues when

22   she was working the 9 to 5 shift, from what

23   you knew?

24       A    And the 9 to 5 shift was -- that

25   you're referring to, that was when I was at

Page 151

1                    E. FORD, M.D.

2       Bellevue?

3            Q    Up until then, up until the change

4       was after she filed her EEOC charge.  So

5       basically up until, let's say, May of 2018,

6       or at least the first EEO complaint there

7       was no change, she was working 9 to 5,

8       right?

9                    MS. CANFIELD:  Objection as to

10               form.  You can answer.

11           Q    Up until then, had you heard any

12      complaints about the performance at the

13      Bronx Court Clinic?

14                   MS. CANFIELD:  Objection as to

15               form.  You can answer.

16           A    So I can only speak to the time

17      when I was there until 2014.  I don't know

18      between 2014 and '18.  But I did not hear

19      concerns about, when I was there at

20      Bellevue, about the 9 to 5 shift.

21           Q    When you were there -- once you

22      became the director, which was in 2018,

23      right, you didn't hear any complaints about

24      the clinic's performance up until your

25      leave, right?

```
 1                    E. FORD, M.D.

 2              MS. CANFIELD:  Objection as to

 3         form.  You can answer.

 4         A    So the court clinic did not come

 5    under -- I wasn't -- the court clinic was

 6    not part of CHS prior to my leave.

 7         Q    But there were no complaints about

 8    the Bronx Court Clinic in terms of

 9    performance or leading -- or seeing people

10    at that time, right?

11              MS. CANFIELD:  Objection as to

12         form.  You can answer.

13         A    I don't know.  I didn't see any

14    performance evaluations that had been done

15    by Bellevue.

16         Q    Ultimately, you had made a

17    determination that Dr. Kaye could work the 9

18    to 5 shift regardless -- I mean, was anybody

19    being monitored on that level where they had

20    to work a certain set of hours?

21              MS. CANFIELD:  Objection as to

22         form.  Compound.  You can answer if

23         you're able.

24         A    Was any -- yeah.  I guess I don't

25    understand.  Are you saying was everyone
```

```
 1                    E. FORD, M.D.
 2      monitored about the hours that they work?
 3           Q    Yes.
 4           A    Indeed, everybody was, yeah.
 5           Q    Okay.  So how were they monitored?
 6           A    I think at that time we had
 7      implemented Kronos, but I can't recall if we
 8      still had paper time sheets.  There's a time
 9      keeping system and also -- sorry.  Go ahead.
10           Q    Keep going.  Keep going.  You said
11      and also.  Keep going.
12           A    And just also, it was the
13      supervisor's responsibility to also be aware
14      of people generally being in the office --
15      I'm sorry, at work.
16           Q    At any point, could you have said,
17      look, I'm just going to allow her to work
18      the 9 to 5, she's always worked with 9 to 5,
19      and there's been no problems with the
20      clinic, couldn't you just have made that
21      determination, Dr. Ford?
22                    MS. CANFIELD:  Objection as to
23              form.  You can answer if you're
24              able.
25           A    No.  I did try to do that.
```

                         E. FORD, M.D.

1

2        Q    And what happened?

3        A    I was told that there was -- it

4    has to do with her -- it has to do something

5    with the lunch hour and that the issue was

6    resolved.

7        Q    Who told you it had to do with the

8    lunch hour?

9        A    I don't remember.

10       Q    And who told you that the issue

11   was resolved?

12       A    I don't remember.  Yeah.  I don't

13   remember.

14       Q    Now, did it ever come to your

15   attention that Dr. Kaye's personnel file was

16   lost?

17            MS. CANFIELD:  Objection as to

18        form.

19       A    That her personnel file was lost.

20   No.  It was lost, I don't think so.

21       Q    What happened to her personnel

22   file, are you aware that it was lost?

23       A    No.

24            MS. CANFIELD:  Objection as to

25        form.

1                    E. FORD, M.D.

2        Q    So it never came to your attention

3    that her personnel file was lost?

4             MS. CANFIELD:  Objection as to

5          form.

6        A    No.  Not that I recall.

7        Q    So I'm going to, I guess, enter --

8    and this wasn't produced, this was more

9    of -- because this wouldn't have been

10   produced in the part of discovery, but I'm

11   going to, I guess, show you what will be

12   marked as Plaintiff's Exhibit 5.

13                  (Whereupon, Dr. Ford's Book

14                   Excerpts was marked as

15                   Plaintiff's Exhibit 5 for

16                   identification as of this date.)

17       Q    You've written a number of books

18   over the years; am I right?

19            MS. CANFIELD:  I'm sorry.  I

20         couldn't hear.

21       Q    You've written a number of books

22   over the years; would that be accurate?

23       A    I've written one book and I've

24   edited one book, and I've written one book

25   chapter.

1                    E. FORD, M.D.

2        Q    The Landmark Decisions in Forensic

3    Evaluation -- Forensic Psychiatry, did you

4    write that book?

5        A    I edited it.

6        Q    And then you wrote, sometimes

7    amazing things happen.  Is that the book

8    that you wrote?

9        A    It is.

10        Q    So I'm going to discuss some

11    excerpts from your book, okay.

12              What, first of all, prompted you

13    to write the book in the first place?

14        A    I was approached by a publisher, I

15    had been approached a number of times, but

16    at this particular moment I had been

17    approached, and I felt like I had reached a

18    point in my career where I had something to

19    say, and I was concerned about the popular

20    impression of the patients that I took care

21    of at Bellevue.

22        Q    What were the impressions of the

23    patients you took care of at Bellevue?

24        A    Generally, that they were throw

25    away people.  And they were described as

1                    E. FORD, M.D.

2      monsters and psychos in the tabloids.  And I

3      found them to be totally different than that

4      and I wanted to bring that to light.

5          Q    And you also talked about your, I

6      guess your experiences, like motherhood and

7      the job.  You talked about a number of

8      cases, or probably pertinent to this case,

9      though.

10              What I'm going to do is I'm going

11     to share the screen with you.  And the first

12     is going to be -- in order to facilitate

13     things, I made it somewhat of a Power Point

14     presentation, right.

15              So, for example, on page 49 of

16     your book, you say, "As usual, the team is

17     already assembled.  By the time I come

18     rushing in after dropping my son at day care

19     at 8:00 a.m., having frantically hailed a

20     cab to get me down to the east side of

21     Manhattan to the hospital."

22              Now, do you recall having this

23     kind of frantic type of morning when you had

24     your son?

25          A    Yes.

```
 1                    E. FORD, M.D.

 2          Q    Did you think about this, when

 3     Dr. Kaye was explaining to you the

 4     importance of having her shift from 9 to 5?

 5          A    Definitely.

 6               MS. CANFIELD:  Objection as to

 7          form.  You can answer.

 8          Q    You said definitely, right?

 9          A    I said definitely, yes.  That's

10     why I advocated otherwise.

11          Q    So you're saying that you didn't

12     participate any effort to manage her out by

13     changing her shift because you knew that it

14     was going to be problematic, you're saying

15     you denying that; am I right?

16               MS. CANFIELD:  Objection as to

17          form.  You can answer.

18          A    Could you rephrase the question.

19          Q    Are you denying that you had any

20     part in changing her shift in an effort to

21     manage her out after she complained?

22               MS. CANFIELD:  Objection as to

23          form.  You can answer.

24          A    What I'm saying is that I did not

25     have -- I did not play a role in changing
```

```
 1                        E. FORD, M.D.
 2      her shift.
 3           Q    And you did not think that
 4      changing her shift would have the effect of
 5      disruption of discharging her?
 6                    MS. CANFIELD:  Objection.
 7               Objection.
 8                    MS. HAGAN:  Keep going.
 9                    MS. CANFIELD:  You can answer
10             but that's a legal term of art.
11             She's not a lawyer, but go ahead.
12           A    Sorry.  Can you say the question
13      again.
14           Q    Did you have any part in any
15      efforts to force out Dr. Kaye from CHS?
16                    MS. CANFIELD:  Objection.  You
17             can answer.
18           A    No.
19           Q    Do you believe Dr. Kaye was forced
20      out of CHS?
21           A    No.  My understanding is that,
22      although I don't -- I'm not sure if it
23      proceeded when I left CHS, I believe she
24      issued her resignation letter.
25           Q    Well, you had issued your
```

```
 1                    E. FORD, M.D.
 2    resignation letter, or at least the staff
 3    was told that you were resigning from CHS in
 4    December of 2020 -- in 2019; is that right?
 5         A    I believe the staff were notified.
 6    I notified my superiors just before
 7    Thanksgiving of that year.
 8         Q    Right.  And Dr. Kaye left in
 9    January of 2020.  Do you recall that?
10                    MS. CANFIELD:  Objection as to
11              form.  You can answer.
12         A    Sure.  I recall she left around
13    this time that I was leaving.  I didn't
14    recall that it was January.
15         Q    Now, if someone was put in the
16    position where she had to choose between
17    taking care of her children or working,
18    would you say that that would be the
19    equivalent of being forced out of work?
20                    MS. CANFIELD:  Objection as to
21              form.  You can answer.
22         A    I don't know if I can answer.
23    Like, is there a specific example?
24         Q    Well, you yourself actually felt
25    compelled to resign or take leave of absence
```

Page 161

```
 1                    E. FORD, M.D.
 2    to take care of your family; am I right?
 3         A    I felt compelled internally.  I
 4    did not receive any kind of -- there was
 5    no -- I didn't feel forced by my work at
 6    all.
 7         Q    Well, because you never were held
 8    to a strict schedule of having to work a set
 9    amount of hours; is that true?
10              MS. CANFIELD:  Objection as to
11           form.  You can answer.
12         A    Sure.  I was held to a specific --
13    I had specific hours that I needed to be in
14    the hospital during that time.
15         Q    Were you ever threatened with your
16    pay being docked or your time being docked
17    if you did not come to work and leave work
18    at a certain amount of time?
19              MS. CANFIELD:  Objection as to
20           form.  You can answer.
21         A    This was when I was at Bellevue?
22         Q    Yes.
23         A    Yeah.  I had a conversation with
24    Dr. Badaracco about -- I had asked for an
25    early departure one day to pick up my
```

```
 1                    E. FORD, M.D.
 2    children, and she reminded me that I needed
 3    to stay the whole time or I wouldn't get
 4    that salary.
 5         Q    So this is one day, she threatened
 6    your whole salary for one day; is that what
 7    you're saying?
 8         A    Sorry.  No, no.  Not the whole
 9    salary, just that block of time.
10         Q    Would you say that someone had --
11    Dr. Kaye -- first of all, did Dr. Kaye ever
12    tell you that if she was forced to work the
13    hours that she was -- that her shift being
14    changed is going to push her out?
15              MS. CANFIELD:  Objection.  You
16         can answer if you're able.
17         A    I don't recall her saying that it
18    would force her out.
19         Q    You don't recall her saying that
20    she would be forced to resign if she had had
21    to work on that shift change?
22              MS. CANFIELD:  Objection as to
23         form.  You can answer.
24         A    I don't recall her saying that.  I
25    recall her saying it would be a real
```

1                    E. FORD, M.D.

2       hardship for her.

3            Q    Did you ever get a shift change

4       yourself at Bellevue?

5                    MS. CANFIELD:  Objection as to

6                form.  You can answer.

7            A    At Bellevue, I was on a NYU pay

8       line, so the -- there weren't formal time

9       sheets at that point when I was working

10      there.

11                    Did I ever get a formal shift

12      change.  Yes.  I worked from -- I can't

13      recall when it was.  I worked from like

14      eight hour -- I worked from basically 9 to

15      5, Monday, Wednesday, Friday, and then 7 to

16      3, Tuesday and Thursday.

17           Q    So you did have a shift change?

18           A    Yeah.  I guess that's right.

19           Q    Now, on page 100 of your book, you

20      say, "I'm like many female physicians who

21      have young children trying to avoid the

22      gnawing feeling of inadequacy that comes

23      with taking care of children and patients

24      who need so much."  Right.

25                    Now, do you feel that that's a

1                    E. FORD, M.D.

2       dilemma, that all female professionals in

3       your field experience?

4                    MS. CANFIELD:  Objection as to

5              form.  You can answer.

6       A    Do all female physicians

7       experience this?  I would say no.  If they

8       have children, I think it's possible.  I

9       can't speak for all female physicians.

10      Q    Did you feel that Dr. Kaye was

11      being subjected to harassment, to the extent

12      that she was being forced to work this shift

13      change?

14                   MS. CANFIELD:  Objection as to

15             form.  The word "forced."  You can

16             answer.

17      A    I didn't conceptualize it as

18      harassment.  I wasn't fully clear about the

19      rationale, of which is, again, why I tried

20      to get more information about that.

21      Q    Now, you said at times that you

22      really kind of had issues with how, you

23      know, trying to get this balance between

24      motherhood and your job, and you felt

25      compelled to resign more than once because

```
                              E. FORD, M.D.
 1
 2      of the issues that you had with, I guess
 3      balancing these two.
 4               Now, your testimony is that you
 5      had no part in that, in Dr. Kaye's shift
 6      change, even though you had these issues and
 7      you wrote that you were going to manage her
 8      out; is that right?
 9               MS. CANFIELD:  Objection as to
10          form.  There's a lot of colloquy and
11          it's a compound question, but you
12          can answer if you're able.
13      Q    The question is, that you had no
14      part, even though you said that you were
15      going to manage her out?
16               MS. CANFIELD:  Objection as to
17          form.  You can answer.
18      A    Sorry.  I lost the question.
19      Q    The question is, you said that you
20      had no part in managing Dr. Kaye out, right?
21               MS. CANFIELD:  Objection as to
22          form.  You can answer.
23      A    I did not try to fire Dr. Kaye, if
24      that's what you're asking.
25      Q    Did you ever say you were going to
```

                          E. FORD, M.D.

1

2       manage out an Erica Weisman?

3              A    I don't recall saying that.  I do

4       recall that there were -- that I had some

5       concerns about doctor -- well, yeah, I don't

6       remember saying that.

7              Q    Did Dr. Weisman -- was Dr. Weisman

8       terminated?

9              A    I don't know.  She did not report

10      to me.

11             Q    Who did she report to?

12             A    This was at Bellevue?

13             Q    Um-hmm.

14             A    I think she reported to Allen

15      Elliot in the psychology department.

16             Q    So you had no part in her

17      departure or her demise?

18             A    I did not.  I was not involved

19      with Dr. Weisman's departure.

20             Q    I'm going to leave that for now.

21                  So you're saying -- so what were

22      your concerns about Dr. Weisman exactly,

23      specifically?

24             A    This was at Bellevue?

25             Q    Just in general.  You said that

1                    E. FORD, M.D.

2        you had concerns about her.  What were they?

3            A    Right.  But, again, I'm

4        clarifying, at Bellevue, because I didn't

5        work with her any other times.

6            Q    Okay.  So that would be it.

7            A    She sometimes would in meetings,

8        in my opinion, talk down to some of the

9        people in the meetings.

10           Q    Who was she talking down to?

11           A    Well, I don't know.  I can't

12       recall the names of people.  But, in

13       general, these would be like in team

14       meetings where there would be people with

15       either no degrees or a master's degree,

16       counselors, therapists.

17           Q    And what did Dr. Weisman have?

18           A    A PhD and a JD.

19           Q    So you believe or perceived that

20       she felt that she was superior to these

21       other people; am I right?

22                   MS. CANFIELD:  Objection as to

23               form.  You can answer.

24           A    I don't know how she felt.  I was

25       not happy with the manner of communication

1                     E. FORD, M.D.

2      in some of those meetings.

3           Q    When you say you weren't happy,

4      what did you do?

5           A    I imagine -- I think I talked to

6      Erica, to Dr. Weisman directly, and I recall

7      speaking with Allen Elliot at least once.

8           Q    And so when you spoke to them,

9      what did you tell them?

10          A    I don't remember.

11          Q    But did Dr. Weisman eventually get

12     terminated from service?

13          A    She left Bellevue, I don't

14     remember when that was, or if that -- I

15     don't remember if that was before or after I

16     left Bellevue.  I don't recall.

17          Q    Now, at some point would you

18     say -- could it be said that Dr. Weisman was

19     pushed out?

20          A    I can't say that.  I don't know.

21          Q    Was she pushed out?

22          A    I don't know.

23          Q    Would you say that Dr. Kaye was

24     pushed out?

25          A    No.

                     E. FORD, M.D.

1

2       Q    Okay.  Why not?

3       A    'Cause I have no knowledge of

4    anybody trying to push her out.

5       Q    So you're saying that even though

6    she expressed to you that this shift change

7    would have the effect of pushing her out,

8    and then even though she was -- the shift

9    change was imposed and she had to continue

10   to work under those conditions, that she was

11   not pushed out?

12            MS. CANFIELD:  Objection as to

13        form.  You can answer.

14      A    Is the question, do I think the

15   shift change was trying to push her out?

16      Q    Yes.

17      A    No.  I do not have that

18   understanding.

19      Q    Even though she came to you fairly

20   emotionally and told you that it would?

21      A    Once she told me of that, that's

22   when I started advocating on her behalf to

23   get it changed.  Again, I was not around for

24   the initial decision about the shift.

25      Q    It's your testimony that you could

```
 1                    E. FORD, M.D.

 2      not get it changed?

 3           A    My recollection is that we

 4      eventually did change it.  We did change it

 5      eventually.

 6           Q    Dr. Kaye was still being, made to

 7      work nine hours versus the eight hours that

 8      she was accustomed to working.

 9           A    Um-hmm.

10           Q    So I don't know that that was in

11      effect.  Now, how did you advocate Dr. Kaye?

12           A    I spoke with my boss and I spoke

13      with HR and I spoke with labor relations.

14           Q    So who was your boss?

15           A    I believe my boss at the time was

16      Ross MacDonald.

17           Q    Now, your boss was Ross MacDonald.

18      What did you say to Dr. MacDonald?

19           A    I don't remember.

20           Q    How many conversations did you

21      have with Dr. MacDonald about the shift

22      change?

23           A    I don't know how many.

24           Q    Who would have been in the

25      position to say, okay, Dr. Kaye's
```

 1                    E. FORD, M.D.

 2      complaining, we'll just let her work the

 3      hours she wants to work, who would have been

 4      able to make that decision?

 5           A    I think that would have been

 6      Ms. Yang.  I think she ultimately would be

 7      the one that would approve that.

 8           Q    Did you speak to Ms. Yang?

 9           A    I think I did.

10           Q    What did Ms. Yang say to you?

11           A    I believe she said she was aware

12      it was being handled, something like that.

13           Q    She was aware that it was being

14      handled, but ultimately, you don't know if

15      it had been addressed; am I right?

16           A    Dr. Jain was managing this, so

17      what I know is what I would hear from him or

18      what would trickle up.  The specifics of it,

19      I don't know about.

20           Q    How would you say that the

21      workloads at the various clinics compared to

22      each other, were they equally busy or were

23      there differences?

24           A    It's -- the reason I'm sort of

25      hesitating is just because equally busy is

1                    E. FORD, M.D.

2       hard to describe.  There were -- my

3       impression, and then we looked at data, it

4       looks like, if I recall correctly, I believe

5       the Manhattan clinic had the most 730 orders

6       ordered, which lead to higher volume of

7       cases.  They also had, I think they also had

8       the most or close to the most staff.

9                    Queens I think was slightly

10      smaller in terms of orders and staff.

11      Brooklyn and Queens -- I think Brooklyn was

12      more a part of Manhattan.  And then the

13      Bronx had many fewer orders and also many

14      fewer staff.

15           Q    Dr. Kaye alleges she was treated

16      differently because of her complaints,

17      because she was a woman; would you disagree

18      with that?

19                    MS. CANFIELD:  Objection as to

20               form.  You can answer.

21           A    I would disagree with that.

22           Q    Why do you believe that the Bronx

23      clinic should have had less staff than the

24      others?

25                    MS. CANFIELD:  Objection as to

1                       E. FORD, M.D.

2              form.  You can answer.

3         A    I didn't say that I believe they

4    should have less staff.

5         Q    So what was done to address the

6    issue of the staffing in the Bronx clinic?

7              MS. CANFIELD:  Objection as to

8         form.  You can answer.

9         A    So what I recall is that we tried

10   to get -- and I think we were successful

11   with getting either a second line, I recall

12   we were able to get at least a locum

13   (phonetic) tenants to be a third evaluator

14   up at the clinic.

15        Q    Third evaluator?

16        A    Yeah.  So Dr. Kaye -- there was a

17   line for psychologist who was -- the person

18   I remember in that line was Dr. Brayton for

19   a while and then there was a third -- we got

20   a locum tenant, and I was trying to get a

21   permanent line up there.

22        Q    Was there ever a time when

23   Dr. Kaye worked at the Bronx clinic where

24   there were three evaluators there at the

25   same time?

```
                        E. FORD, M.D.
 1
 2        A    I think there was.  I think there
 3    was a time when Dr. Kaye -- I'm counting
 4    Dr. Kaye as a potential evaluator.  And
 5    Dr. Brayton and Dr. Mullen was a locum.  So
 6    I think --
 7        Q    What's a locum?
 8        A    Oh, sorry.  Like a -- the doctor
 9    who's hired on a temporary basis.  They do
10    three months shifts and stuff.
11        Q    So she wasn't a full-time salaried
12    employee?
13        A    Correct.  We were trying to get
14    that line approved.
15             MS. CANFIELD:  Can I interrupt
16         for a second.  There's this odd
17         dinging every once in a while.  It's
18         really interrupting.  I can't hear.
19             MS. HAGAN:  I don't know what
20         you're referencing.  I don't know.
21             MS. CANFIELD:  It seems to be
22         coming from you, Ms. Hagan, because
23         you --
24             MS. HAGAN:  You're not talking
25         about the dog, are you, Ms.
```

```
 1                    E. FORD, M.D.
 2          Canfield?  The dinging is a problem,
 3          but not the dog.  Is that what
 4          you're saying?  Because there's been
 5          a dog that we've heard quite a bit
 6          and you haven't complained about the
 7          dog, right?  But you're complaining
 8          about the phone.  Do not do this
 9          during my deposition.  Do not.
10               MS. CANFIELD:  Ms. Hagan --
11               MS. HAGAN:  I have no control
12          over the dinging that you claim to
13          be hearing.  Okay.  I don't.
14               MS. CANFIELD:  I'm asking,
15          does anyone else hear it.  Am I just
16          the only one hearing it because I
17          can't hear the question.
18               MS. HAGAN:  It's not
19          appropriate to have this
20          conversation.
21               MS. CANFIELD:  Ms. Hagan, it's
22          completely unprofessional.  I'm just
23          asking, can we put it on vibrate
24          because --
25               MS. HAGAN:  Well, apparently,
```

```
                          E. FORD, M.D.
 1                I have no -- I don't know what
 2                you're talking about, quite frankly.
 3                That's to begin with.  I don't know
 4                what you're talking about.  On top
 5                of that, you're disrupting my
 6                deposition.  Please stop.  I'm going
 7                to move on with the --
 8
 9                      MS. CANFIELD:  Excuse me,
10                excuse me.  I'm just asking if you
11                put it on vibrate.  I'm having a
12                hard time --
13                      Is anyone else hearing a
14                dinging or is it on my end?  No one
15                else hears a ding.
16                      THE WITNESS:  I do.
17                      MS. CANFIELD:  I'm just
18                asking, if you can put it on vibrate
19                because it's disruptive.  Now, Dr.
20                Ford took care of the dog for me.
21                      MS. HAGAN:  You're being
22                disruptive.
23                      MS. CANFIELD:  Excuse me.
24                Your tone is so unprofessional.  I'm
25                just asking to put it on vibrate.
```

```
 1                        E. FORD, M.D.

 2                    MS. HAGAN:  And your tone is,

 3              too.  It's very unprofessional, Ms.

 4              Canfield.  Very unprofessional and

 5              intimidating.  The rolling the eyes.

 6                    MS. CANFIELD:  I'm asking to

 7              put on the vibrate.

 8                    MS. HAGAN:  And is intimidate.

 9               You're intimidating, Ms. Canfield.

10              I'm scared, yes, I'm very

11              threatened.

12         Q    So now going back on to the

13     question here.

14                    Now, we were talk about the

15     workload at the Bronx clerk clinic versus

16     the other clinics.  I was asking you about

17     the staffing.

18                    And so you said earlier that you

19     did not -- we were talking about Dr. Mullen

20     and you said that she's a locum, a locum

21     hire, am I right, a per diem or temporary

22     hire; is that right?

23                    MS. CANFIELD:  Objection.

24         A    Yeah.  I think.

25         Q    While Dr. Brayton worked at the
```

Page 178

1                      E. FORD, M.D.

2       clinic; is that right?

3            A    Yeah.  I think that's right.

4            Q    So, now, at one point Dr. Kaye

5       also worked with Dr. Winkler for years; am I

6       right?

7            A    Yeah.

8                 MS. CANFIELD:  Objection.  You

9            can answer.

10           A    If I recall correctly, I believe

11      she and Dr. Winkler were the two evaluators

12      at the clinic for at least most of the time

13      I was at Bellevue.

14           Q    So let's say in 2009 to 2014

15      Dr. Winkler was there for the most part of

16      that time, right?

17           A    I think so.  That's what I recall.

18           Q    He eventually became deputy

19      director of the clinic; am I right?

20                MS. CANFIELD:  Objection as to

21           form.  You can answer.

22           A    I don't remember.  I don't

23      remember.

24           Q    But he worked with her as a

25      full-time staff person up until he left,

1            E. FORD, M.D.

2    which was in April of 2018; is that right?

3            MS. CANFIELD:  Objection as to

4        form.  You can answer.

5        A    I don't know if he was full-time

6    or part-time.  So I don't know that.  He --

7    I remember that he was in the Bronx clinic

8    at the time when I was at CHS and we were

9    preparing for the move, for the transfer of

10   the clinics.  Yes.  I remember that.

11       Q    Was there a period of time where

12   Dr. Kaye was the only full-time employee at

13   the Bronx clinic after Dr. Winkler left?

14       A    Those are details I just can't

15   remember.

16       Q    Did Dr. Kaye ever come to you

17   complaining about the lack of staff at the

18   clinic?

19       A    Yes.  I think so.  Yes.

20       Q    After Dr. Winkler left, who was

21   hired to work full-time at the clinic?

22       A    I don't remember who the -- I

23   don't remember her -- I can't remember the

24   order.  I think there were two or three -- I

25   can't remember the name.  I think it was a

Page 180

1                    E. FORD, M.D.

2      woman psychologist.

3           Q    Was it Dr. Brayton?

4           A    I know that she worked at the

5      clinic.  I don't know if she was the first

6      one.

7           Q    So you're saying that someone

8      between April of 2018 and December of 2018

9      that worked at the clinic before Dr. Brayton

10     was actually hired to work there full-time?

11               MS. CANFIELD:  Objection as to

12          form.  You can answer if you're

13          able.

14          A    Yeah.  I'm saying I don't know.  I

15     recall that Dr. Brayton worked at the

16     clinic.  The time of her employment there,

17     that I can't remember.

18          Q    Now, how many evaluators are

19     needed to do a 730 competency exam?

20          A    Two.

21          Q    So if there was only one full-time

22     person at the clinic, there could have

23     potentially been a problem completing these

24     exams; am I right?

25               MS. CANFIELD:  Objection as to

1                    E. FORD, M.D.

2          form.  You can answer.

3          A    Well, the evaluations -- you need

4    two evaluators.  They don't have to be at

5    the same time.  So you could schedule on the

6    days when people were there.  I believe

7    there's also -- there was also scheduling

8    for -- like, I think the exams were

9    scheduled to coincide with the days there

10   were two evaluators there.

11         Q    Would you say that there was

12   adequate coverage after Dr. Winkler left the

13   site?

14              MS. CANFIELD:  Objection as to

15         form.  You can answer.

16         A    I can't speak to the coverage from

17   July 1st 'til when I came back from the

18   leave.  So do you mean when I came back?  I

19   think there was a psychologist in place at

20   that time.

21         Q    So you came back in September of

22   2018, and your testimony is that there was a

23   psychologist there at that time?

24         A    I think so.

25         Q    A full-time psychologist?

Page 182

```
 1                      E. FORD, M.D.
 2          A    No.  I don't know full-time or
 3     part-time.  I don't remember.
 4          Q    Do you recall Dr. Kaye ever
 5     complaining to you that there was inadequate
 6     staffing after the court clinic?
 7          A    Yes.  I do.
 8          Q    So what happened?
 9          A    Again, I think as I said earlier,
10     I advocated for another line at the clinic.
11          Q    When you say "advocate," who did
12     you advocate to?
13          A    Dr. MacDonald and Ms. Yang.
14          Q    And what happened when you
15     advocated?
16          A    Eventually I think it was
17     approved.
18          Q    Who approved it?
19          A    Well, I imagine it was Ms. Yang.
20     She approved all of the new line sort of
21     things.
22          Q    So in November of 2018, do you
23     recall Dr. Kaye complaining to you about the
24     staffing at the clinic?
25                    MS. CANFIELD:  Objection as to
```

Page 183

1                          E. FORD, M.D.

2              form.  You can answer.

3         A    I'm sorry.  When did you say.

4         Q    November of 2018.

5         A    I don't remember -- I don't

6    remember if it was then.

7         Q    At any point was there a

8    moratorium declared on the administration

9    of -- examinations at the clinic?

10        A    You mean a time saying they have

11   to stop?

12        Q    Yes.  At the Bronx Court Clinic.

13        A    Let's see.  I can't remember if

14   there were times -- not times, it may have

15   been once, when we didn't have enough

16   evaluators and had to schedule -- like had

17   to not schedule an evaluation a certain day.

18   But I don't recall saying the clinic is

19   closed to evals.

20        Q    You don't recall.  There is a time

21   that Dr. Brayton left.  Do you recall that?

22        A    I recall that she left.  I don't

23   know -- I can't remember when.

24        Q    Dr. Kaye alleges that from

25   November 2019 to January 2020 there was a

Page 184

```
 1                    E. FORD, M.D.
 2       moratorium on evaluations at the clinic.
 3                    Do you recall that being the case
 4       at the time?
 5                    MS. CANFIELD:  Objection as to
 6              form.  Is this something she alleged
 7              in the complaint?
 8                    MS. HAGAN:  It doesn't have to
 9              be.  Can we please keep objections
10              to be proper.  It doesn't have to be
11              in the complaint, Ms. Canfield.
12              Stop it.  Stop it now.
13                    MS. CANFIELD:  We're entitled
14              to know as to what she's complaining
15              about.
16                    MS. HAGAN:  Stop it.
17         Q    I'm asking you a question.  Please
18       answer.
19         A    And the question was aware of a
20       moratorium between December --
21         Q    November 2019 and January of 2020.
22         A    I don't recall that, no.
23         Q    Was there a backlog of cases at
24       that time at the Bronx Court Clinic?
25         A    I don't recall.  There were
```

```
 1                    E. FORD, M.D.
 2      backlogs of cases throughout all the clinics
 3      at various times.
 4           Q    Do you ever recall there being a
 5      backlog of cases at the Bronx Court Clinic
 6      while you were there?
 7           A    I don't -- I guess the best way to
 8      answer is, I don't have a recollection that
 9      there were never any backlogs at the Bronx
10      Court Clinic.
11           Q    I'm going to bring something to
12      your attention.  And this will be
13      Plaintiff's Exhibit 6.
14                         (Whereupon, Email (NYC_00892)
15                         was marked as Plaintiff's
16                         Exhibit 6 for identification as
17                         of this date.)
18           Q    And, for the record, Plaintiff's
19      Exhibit 6 is Bate Stamped NYC892.  And I'm
20      going to draw your attention to the bottom
21      of the email, November 19, 2018.  And it's
22      from Dr. Kaye, right.  And she said to you,
23      "Hi, Elizabeth, welcome back.  Looking
24      forward to seeing you at the directors
25      meeting on the 30th.  I have some important
```

```
 1                    E. FORD, M.D.
 2      personnel related matters that I need to
 3      discuss with you.  Is there a time prior to
 4      the 30th that we can meet in person."
 5               You see that, right?
 6         A    I do.
 7         Q    Now, did you just come back from
 8      leave at that time?
 9         A    Well, I wasn't coming back from
10      the summer leave.  I don't know, maybe I was
11      on vacation.  I don't know.
12         Q    You testified earlier that you
13      came back from leave in September of 2018;
14      is that right?
15         A    Yup.  That's right.
16         Q    So you came back.  I guess there
17      might have been another time you might have
18      been out of the office.
19               So here on November 20th, you
20      respond, "Hi, Melissa.  Nice to hear from
21      you.  Happy to meet with you, but can't do
22      it the person before the 30th since I'm
23      overloaded the Rikers responsibilities and
24      will be on the island every day except
25      Thursday and Friday.  And if phone possible,
```

Page 187

1                        E. FORD, M.D.

2        can we find something next week or only in

3        person can we meet after the directors

4        meeting."

5                     Do you remember having a meeting

6        with Dr. Ford around this time?

7              A    I'm sorry, with Dr. Ford or

8        Dr. Kaye?

9              Q    With Dr. Kaye.  I'm sorry.

10             A    That's okay.  Yes.  I believe we

11       had a meeting on the 30th that was I think

12       the day of our directors meeting.

13             Q    And she clearly wanted to meet

14       with you about personnel issues.  You recall

15       that, right?

16             A    Yes.  That's what that email says,

17       yup.

18             Q    Right.  Did Dr. Kaye, did she ever

19       complain that she was unable to move the 730

20       exams or address the workload at the clinic

21       because there wasn't a second time full-time

22       employee like she was used to having?

23             A    I recall conversations with

24       Dr. Kaye where she was talking about the

25       difficulty of moving cases around because of

1                    E. FORD, M.D.

2     staffing.

3          Q    And what did you do about that?

4          A    I don't -- so I was in

5     communication with Dr. Jain very closely

6     about this and Dr. Jain managed that.

7          Q    You didn't talk to Dr. Kaye any

8     more?

9          A    I don't remember.  I think I would

10    have followed up with her, but I don't

11    remember.

12         Q    Now, did there ever come a time

13    when Dr. Kaye complained about having

14    Dr. Mundy reflected as her supervisor on

15    documents?

16         A    I saw that in my review of the

17    emails.

18         Q    So you don't remember these

19    complaints without the review of the emails?

20         A    Well, the emails refresh my memory

21    of that time.

22         Q    What did they refresh your memory

23    about?

24         A    I think that Dr. Mundy was

25    included in a -- like he was cc'd I think as

```
 1                        E. FORD, M.D.
 2        a supervisor on a -- I don't know, I can't
 3        recall if it was a time issue or a salary
 4        issue or -- it was sort of personal
 5        information that he had been included on
 6        erroneously.
 7             Q    Had anybody else experienced that?
 8             A    Not that came to my attention.  So
 9        I don't know if other people did or not.
10             Q    Now, at some point did you ever
11        say -- did you ever ask if you could bring
12        Dr. Kaye over from Bellevue at the same rate
13        of pay as Dr. Mundy?
14             A    I'm very sorry.  I don't -- could
15        you repeat the question.
16             Q    Were there ever any other staff
17        persons that had similar, I guess, erroneous
18        entries of like supervisors that weren't
19        their supervisors?
20                  MS. CANFIELD:  Objection as to
21             form.  You can answer.
22             A    Sure.  I was aware of an error
23        like that on the treatment side, not the
24        court clinic side.  And I don't know if it
25        had happened to other people in the court
```

```
 1                    E. FORD, M.D.
 2     clinic or not.
 3          Q    Then I subsequently asked whether
 4     or not there was an instance where you
 5     advocated that Dr. Kaye get paid the same
 6     amount as Dr. Mundy?
 7               MS. CANFIELD:  Objection as to
 8          form.  You can answer.
 9          A    Yes.  I do believe that I did
10     that.
11          Q    And what happened?
12          A    I think -- I can't remember.  I
13     can't remember if that -- I believe there
14     was a salary differential of 2,000 between
15     their two lines.  And I can't recall if
16     there was something that had to do with the
17     union versus management.  I can't recall
18     what happened.
19          Q    But here you have Dr. Kaye who had
20     been working as a director at the center for
21     20 years, and Dr. Mundy clearly had not been
22     working there for 20 years, right?
23          A    That's correct.
24               MS. CANFIELD:  Objection as to
25          form.
```

```
 1                    E. FORD, M.D.

 2          Q    Did you hire Dr. Mundy?

 3          A    Into the court clinic position?

 4          Q    Yes.

 5          A    Sort of.  Oh, did I do that or

 6     Dr. Jain.  I think -- I can't remember.  I

 7     mean, I was aware of his hiring.  I can't

 8     remember which of us.

 9          Q    Did you sign off on the hire?

10          A    I did.

11          Q    And so you signed off on the hire

12     and he was paid on par, if not more than

13     Dr. Kaye; is that right?

14               MS. CANFIELD:  Objection as to

15          form.

16          A    I don't -- let's see.  I don't

17     recall what he was hired in at.  I recall

18     trying to -- gosh, I don't recall.  I recall

19     trying to be fair with the salary, but I

20     can't remember what that was.

21          Q    So you're not sure about that?

22          A    Correct.

23          Q    Now, Dr. Kaye alleges that she was

24     basically demoted when the medical director

25     title was removed from her title and she was
```

1                    E. FORD, M.D.

2      made a director.  Would you disagree with

3      that?

4          A    Can you repeat the question.  I

5      didn't hear it.

6          Q    Dr. Kaye says that she was demoted

7      when she was no longer allowed to put

8      medical director as her title.

9               Would you agree with that?

10         A    I would not agree with that.

11         Q    Why not?

12         A    Because we decided the director

13     was as a standard title that could be

14     applied across the clinics, regardless of

15     somebody's degree.  However, I was fine with

16     Dr. Kaye using medical director as her

17     title.  I was fine.

18         Q    But she wasn't allowed to do it

19     any more once this edict was issued, right?

20              MS. CANFIELD:  Objection as to

21          form.

22         A    I was not aware she was not

23     allowed to use that title.

24         Q    I'm going to show you what will be

25     marked as Exhibit 7.

Page 193

1                    E. FORD, M.D.

2                    (Whereupon, Email (NYC_000248)

3                    was marked as Plaintiff's

4                    Exhibit 7 for identification as

5                    of this date.)

6          Q    Now, Dr. Mundy was still allowed

7     to be called medical director.  Did you know

8     that?

9                    MS. CANFIELD:  Objection as to

10              form.  You can answer.

11         A    I mean, I thought both were

12    allowed to be called medical director.

13         Q    No.  I'm going to show you what

14    will be marked as Plaintiff's Exhibit 7.

15    Plaintiff's Exhibit 7 is a series of email

16    exchange, I guess would appear to be between

17    you and Dr. Jain.

18                  You see this, right?

19         A    I see that.

20         Q    The Bates Stamp would be NYC00248.

21    And it starts with, I guess, with an email

22    from Dr. Jain to you, and it says, "Am I

23    wrong the court clinic's title is director

24    rather than medical director or clinical

25    director.  I actually thought director would

Page 194

1                       E. FORD, M.D.

2       even be considered higher, administrative

3       and clinical rather than just clinical.

4       It's for business cards.  Turning into more

5       of a thing than I expected."

6                   Do you remember this?

7           A    I remember reading this email in

8       my review.

9           Q    But you don't remember it

10      happening at the time?

11          A    Well, it refreshed my memory some

12      of the issues.

13          Q    You went on to become medical

14      director at CASES; is that right?

15          A    Chief medical officer.

16          Q    Right.  But you were also

17      considered the medical director; am I right?

18          A    Not to my knowledge, no.

19          Q    Were you ever medical director

20      after you left CHS?

21          A    I was the chief medical officer at

22      CASES.  That's the only position that I had.

23          Q    Are you going to be medical

24      director subsequent hereto now?

25          A    I don't know what my titles are

```
 1                    E. FORD, M.D.
 2     going to be actually.  I don't know.
 3          Q    So earlier when you testified that
 4     you were going to be medical director, that
 5     was inaccurate?
 6               MS. CANFIELD:  Objection as to
 7           form and argumentative.
 8          A    I hope what I said, and if I
 9     didn't it was an error, I said I think my
10     title might be that, but I haven't started
11     the position yet, and those details haven't
12     been finalized.
13          Q    Now, Dr. Mundy would be -- is
14     still allowed to be called medical director.
15     Are you aware of that?
16               MS. CANFIELD:  Objection.
17               Ms. Hagan, you're testifying.
18           Just ask your questions.
19               MS. HAGAN:  No.  Well, your
20           objections are improper.  So if
21           we're going to have improper
22           conduct, we're going to have to call
23           it both ways, okay.
24               MS. CANFIELD:  Your questions
25           are leading.
```

1                    E. FORD, M.D.

2            MS. HAGAN:  Who to?  To you.

3            And we're not at trial.  So I can

4            ask her whatever kind of questions I

5            want.  Stop it.

6            MS. CANFIELD:  I don't think

7            so.

8            MS. HAGAN:  I'm going to call

9            the Court if you continue, do you

10           understand me?  I'm going to call

11           the Court.  It's enough.

12           MS. CANFIELD:  That's fine.

13           As you said, I'm shaking.  Come on,

14           go.

15           MS. HAGAN:  Yes.  Exactly.

16           'Cause I know Judge *Kott --

17       Q   So May 29, 2018 you, Dr. Ford,

18     basically say, "Correct that they are called

19     directors, but I think at least a few of

20     them prefer medical, or the psychologist or

21     clinical or psychologist.  Agree with you

22     that director makes more sense and is

23     consistent across clinics, although since

24     Liz and Melissa functionally transferred,

25     they may get to keep their titles if they

1                     E. FORD, M.D.

2     really want.  Check with HR.  Did this

3     happen?"  And you said "sigh."

4               Do you see this?

5          A    I see that.

6          Q    Why did you sigh at the end of

7     that?

8          A    I imagine because it was 5:49 p.m.

9     and I was -- this was an issue about

10    business cards, and that I also -- I'm not

11    sure -- my understanding was that someone

12    with an MD could keep the medical director

13    title.  So I think I was also a little bit,

14    like I'm not sure why this is happening.

15         Q    Apparently Dr. Kaye was not

16    allowed to keep that title, and she

17    complained about it.  What happened, did you

18    try to advocate for her on this front, too,

19    or no?

20               MS. CANFIELD:  Objection as to

21          form.  You can answer.

22         A    I recall hearing from Dr. Jain

23    which actually looks like it's in that

24    email, that he was managing it and that it

25    was resolved.

1                    E. FORD, M.D.

2        Q    What does it mean, it was

3   resolved?

4        A    Well, let's see.  Let me read the

5   email.

6             It look likes it says, it's fine

7   with Dr. Kaye, and if it's fine with

8   Dr. Mundy.  Honestly, I don't know if I read

9   it -- I don't know if I thought at the time

10  it's fine to be medical director or it's

11  fine to be director.

12       Q    I don't see where you say where

13  Dr. Mundy would be fine being called medical

14  director.  I can read you the email and and

15  this section here.  It doesn't say anything

16  about Dr. Mundy being fine with being called

17  director either.  It just --

18            MS. CANFIELD:  Objection.

19         Argumentative.  The email speaks for

20         itself.

21       Q    The email says nothing about

22  Dr. Mundy being fine with being called

23  director.  Do you see anything to that

24  effect in this email, Dr. Ford?

25       A    What I read was that it says, but

```
 1                    E. FORD, M.D.
 2       she also said it's ultimately fine with her
 3       if it's fine with Dan.  Dan is Dr. Mundy.
 4       That's all I said.
 5           Q    Right.  But Dan was never called
 6       director, Dan was always called medical
 7       director?
 8                    MS. CANFIELD:  Argumentative.
 9               Objection.  I don't know if that's a
10               question.  Only answer if there's a
11               question.  That was not a question.
12                    MS. HAGAN:  You cannot direct
13               her what to say and what to answer.
14                    MS. CANFIELD:  It wasn't even
15               a question.
16                    MS. HAGAN:  You don't know
17               what it was.  And she was going to
18               answer the question until you
19               interjected and coached the witness.
20                    MS. CANFIELD:  Unless it's a
21               question --
22                    MS. HAGAN:  It was a question
23               and you are coaching the witness.
24                    MS. CANFIELD:  I am not.
25                    MS. HAGAN:  I've about had it.
```

Page 200

```
 1                    E. FORD, M.D.

 2                    MS. CANFIELD:  That's fine.

 3             Let her answer the question first.

 4                    MS. HAGAN:  And there's a

 5             question posed.

 6        Q    Are you aware that Dr. Mundy is

 7     allowed to keep his title of medical

 8     director?

 9                    MS. CANFIELD:  Objection.  You

10             can answer.

11        A    I was not really aware of this

12     title issue or that he was allowed or not.

13     I assumed that both Dr. Mundy and Dr. Kaye

14     preferred and were able to be called medical

15     director.

16        Q    Did you ever speak to Dr. Kaye

17     about this issue?

18        A    I don't recall if I did or not.  I

19     don't remember.

20        Q    You don't recall if you did or

21     not.  Do you recall -- you're not sure how

22     it was resolved, right?  Would that be

23     accurate?

24                    MS. CANFIELD:  Objection as to

25             form.  You can answer.
```

```
 1                    E. FORD, M.D.
 2        A    It's correct that I don't know how
 3   it was resolved.  I do remember reading
 4   emails from both Dr. Kaye and Dr. Mundy that
 5   had medical director in their titles.  So I
 6   probably assumed it had been resolved in
 7   that way.
 8        Q    Now, did there ever come a time
 9   that Dr. Kaye brought to your attention that
10   she was being unfairly docked pay?
11        A    Yes.
12        Q    What do you recall about that?
13        A    I think that she brought that to
14   my attention at the same November 30th
15   meeting -- oh, my gosh.  I'm so sorry.  I
16   don't know what to do about the dog.
17             I recall her saying that she had
18   taken a board exam, but I don't remember if
19   it was the regular psychiatry boards or the
20   forensic boards, and that she had been
21   docked pay for that time.
22        Q    Now, had anybody else been docked
23   pay for taking board exams?
24        A    In my experience ever?
25        Q    Well, while you were managing
```

```
 1                    E. FORD, M.D.
 2     court clinics.
 3          A    I actually don't know.  I don't
 4     know.
 5          Q    Did anybody else complain that
 6     their pay had been docked?
 7          A    Not that I heard.
 8          Q    So Dr. Kaye was the only person
 9     who raised this issue with you; is that
10     right?
11          A    Yes.  Dr. Jain had told me about
12     it, but her issue was the only one that I
13     heard about.  That's right.
14          Q    Now, do you remember what exams
15     that Dr. Kaye was sitting for?
16          A    Again, I don't recall which board
17     exam it was.  Either the general psychiatry
18     or the -- actually, it could have been child
19     adolescent.  I think she's boarded in that,
20     too.  It was a board exam.
21          Q    Are there any other CHS staff
22     members that are triple board certified?
23          A    I don't know.
24               MS. CANFIELD:  Objection as to
25          form.
```

1                    E. FORD, M.D.

2         Q    Do you know of any other CHS staff

3    members who were triple board certified?

4              MS. CANFIELD:  Objection as to

5         form.

6         A    Yes.  I know of one, two maybe.

7    On the other -- not in the court clinics.

8    And then I know, I think another person is

9    being hired.

10        Q    Was Dr. Mundy triple board

11   certified?

12        A    I don't recall.  He did two

13   fellowships.  So he may have been triple

14   board certified.  I don't remember.

15        Q    Was Dr. Ciric triple board

16   certified?

17        A    I don't know.  I don't think so.

18        Q    Was Dr. Winkler triple board

19   certified?

20        A    Dr. Winkler was a psychologist.

21   I'm less familiar with the psychology board,

22   if there's even boards.

23        Q    So there are no boards for

24   psychology, right?

25              MS. CANFIELD:  Objection to

1                    E. FORD, M.D.

2          form.

3          A    I don't know.  I think there is an

4     exam that's similar to a board, but I don't

5     know the details.

6          Q    Now, did CHS management ever play

7     a part in influencing the outcome of any

8     exams while you were there?

9          A    Not to my knowledge, no.

10         Q    Did CHS management ever express or

11    follow any particular cases more closely

12    than others?

13         A    There were times when there we

14    were -- when there somebody who had a long

15    delay between the order for the 730 and the

16    evaluation at the various clinics.  I can't

17    remember where.  But those cases, I only

18    heard of maybe a couple.  I think Dr. Jain

19    knew of more.  And we would try to get those

20    cases completed quickly or faster.

21         Q    Now, did like media coverage also

22    impact how exams were processed?

23         A    Not to my knowledge.

24         Q    So let's say the Jose Gonzalez

25    case, the EMT killer case.  Were you aware

1                    E. FORD, M.D.

2       of that case?

3                    MS. CANFIELD:  Can we list

4             this as confidential.

5            Q    The EMT killer case, are you aware

6       of that?

7            A    It ring some bells.  I couldn't

8       tell you any details, but I don't know.

9            Q    Were you aware that management

10      wanted him to be found fit?

11           A    No.  I was not aware of that.

12           Q    You didn't have any part in

13      following up what was happening with that

14      particular case during the course of your

15      employment?

16           A    In terms of the outcome of that

17      case?

18           Q    Yes.

19           A    No.  I did not.

20           Q    Were you aware that there was a

21      contra version exam -- a contra version

22      hearing, I'm sorry?

23           A    Now that you say it, it's

24      reminding me that maybe that was correct,

25      but I don't know.

1                    E. FORD, M.D.

2        Q    What do you remember about the

3   contra version hearing?

4        A    Just that as you say it, I'm

5   thinking that there might have been a contra

6   version.  That's like literally all I can

7   remember.

8        Q    We'll go back to that.

9             Now, Dr. Kaye also talked about

10  being a victim of harassment in terms of her

11  credentialing and fishing emails.  Do you

12  remember that?

13       A    My memory was refreshed by looking

14  at some of the emails that related to -- I

15  was forwarded an email that had to do with,

16  I think request for licensing and

17  credentialing stuff on a very short time

18  line.

19       Q    Now, were other directors

20  subjected to that short time line, as far as

21  licensing and credentialing?

22       A    I don't know.

23       Q    Dr. Kaye, there was a question as

24  to whether or not this information was lost.

25             Were you aware of that?

```
 1                    E. FORD, M.D.
 2                    MS. HAGAN:  Objection as form.
 3               You can answer.
 4          A    Aware that the credentials had
 5     been lost?
 6          Q    Well, Dr. Kaye alleged that all
 7     this information was on file, and during the
 8     course of the email exchange there was a
 9     question as to whether or not that
10     information had been, you know, I guess
11     lost.
12                    MS. CANFIELD:  Is that a
13               question?
14          Q    I'm asking, Dr. Ford, do you
15     remember any of those kind of conversations?
16                    MS. CANFIELD:  Object as to
17               form.  Go ahead.
18          A    I don't remember conversations
19     about credentials being lost.
20          Q    Well, do you recall Dr. Kaye being
21     concerned about the nature of the emails and
22     the questioning that they were requiring
23     from her?
24          A    I do recall that, yes.
25          Q    And what did you do?
```

```
 1                      E. FORD, M.D.

 2         A    So those -- my recollection is

 3    that Dr. Jain was managing that and that --

 4    but mostly HR and -- and then I stopped

 5    hearing about it, so I feel like it got

 6    resolved.

 7         Q    Could it be fair to say that --

 8    I'm going to ask you.

 9              Dr. Kaye views this as a

10    retaliatory action, in retaliation of her

11    complaint.  She amended her EEOC charge in

12    September of 2018, and here it is in

13    December 3rd, 2018, management is asking her

14    all these questions about her credentials.

15    Now, she's alleging that there is

16    retaliation that took place here.

17              Would you disagree with that?

18              MS. CANFIELD:  Objection.

19         A    I don't have any knowledge of

20    retaliation.

21         Q    So, now, in this instance, what

22    did you do to ensure that Dr. Kaye was not

23    being a victim of identify theft?

24              MS. CANFIELD:  Objection as to

25         form.  You can answer.
```

```
 1                     E. FORD, M.D.

 2          A     What did I do personally?

 3          Q     Yeah.  Did you look into it

 4     yourself?

 5          A     No.  I did not look into the

 6     identity theft personally.  I communicated

 7     with Dr. Jain to keep me updated on whatever

 8     investigation was happening.  I'm not sure

 9     who does that, HR or, I'm not sure, IT, I

10     can't remember who.  What I did was talk

11     with Dr. Jain about keeping me updated until

12     it was resolved.

13          Q     Now, at some point did you say it

14     would be better for you to respond to

15     Dr. Kaye about this instead of Dr. Jain?

16               MS. CANFIELD:  Objection as to

17          form.  You can answer.

18          A     I don't know.  Did I --

19          Q     I'm going to help you.

20          A     I don't remember.

21          Q     I'm going to help you out,

22     Dr. Ford.

23          A     Okay.  Thank you.

24          Q     I'm going to show you what's

25     marked as Plaintiff's Exhibit 8.
```

Page 210

```
1                          E. FORD, M.D.

2                    (Whereupon, Email

3                    (NYC_000969-970) was marked as

4                    Plaintiff's Exhibit 8 for

5                    identification as of this date.)

6         Q    And it bears the Bate Stamp series

7    NYC969 through 970.  So at the bottom of the

8    email, it's an email from, I guess, Justine

9    McGranaghan.  Do you remember this person?

10        A    Vaguely.

11        Q    And then there's Dr. Jain and then

12   there's a Keisha Bailey.

13              "As discussed, my colleague Maria

14   Oliver has now updated Melissa Kaye's

15   information on PeopleSoft to reflect that

16   she reports" -- different emails.  Okay,

17   here it is.

18              Then, "FYI, I should briefly reply

19   all to Dr. Kaye's email with this updated

20   information."  Right?  This is from Dr. Jain

21   to you and Mr. Wangel.

22              Do you see that?

23        A    I do see that, yup.

24        Q    Then you suggest, "How would you

25   suggest I reply to Melissa or better for you
```

1                    E. FORD, M.D.

2       to do it.  Would prefer to see -- I guess

3       you meant, see -- leave Beesh out of this.

4            A    I think I meant to keep, but, yes,

5       I do see that.

6            Q    Why do you say you prefer to keep

7       Beesh out of this?

8            A    Because I -- let's see.  Can we --

9            Q    Did you want to go further up or

10      down?

11           A    No.  Sorry.  To the first part of

12      the thread.

13           Q    Okay.  Sure.

14           A    So this is related to the reports

15      to and Dr. Mundy getting that information.

16                My understanding is this about the

17      email that was erroneously sent with a CC to

18      Dr. Kaye.  And that -- I don't know -- I

19      actually don't know why I wrote to the

20      prefer -- my guess is that it was because I

21      was responsible for the org chart, like the

22      ultimate org chart and the reporting and --

23           Q    So it wasn't because they had an

24      acrimonious relationship, she and Dr. Jain?

25           A    Not that I recall.  This -- not

1                     E. FORD, M.D.

2      that I recall.  There was -- Dr. Kaye had

3      told me on that November meeting that she

4      was having some troubles with Dr. Jain.

5           Q    What did she say?

6           A    Well, again, I can't remember the

7      specifics.  Something about getting along or

8      him not being sensitive to her.  I can't

9      remember.  I'm sorry.

10          Q    At any point did Dr. Kaye tell you

11     that Dr. Jain was destroying his handwritten

12     notes of exams?

13          A    I think she may have told me

14     that -- I think she may have told me that.

15     I'm not sure if I heard it from her or

16     someone else.

17          Q    Is that a class E felony?

18          A    I have no idea.

19          Q    When that was brought to your

20     attention about Dr. Jain allegedly

21     destroying his notes, what did you do?

22          A    I spoke with Dr. Jain, and I spoke

23     with -- I think I spoke with Mr. Wangel, and

24     Dr. Jain had the notes.  I think I recall --

25     he had the notes, so they hadn't been

```
 1                       E. FORD, M.D.
 2      destroyed.
 3                  I recall there was concern that
 4      the notes had been removed from a file or
 5      they had gone missing.  And that I recall
 6      the notes appeared again and -- that's what
 7      I recall.
 8           Q    Did any lawyers complain to you
 9      about Dr. Jain?
10                  MS. CANFIELD:  Objection as to
11             form.  You can answer.
12           A    I'm trying to think.  Not that I
13      can -- I don't think so.  Not that I
14      remember.
15           Q    So you never heard any complaints
16      from Legal Aid Society or any of the other
17      defense community about Dr. Jain?
18           A    No.  Not that I remember.
19           Q    Did you hear any other complaints
20      about Dr. Brayton from any of the defense
21      community?
22           A    No.  I don't think so.
23           Q    Did you hear any complaints about
24      the moratorium or exams from the complaints
25      community?
```

 1                     E. FORD, M.D.

 2                     MS. CANFIELD:  Objection as to

 3              form.  You can answer.

 4         A    Yeah.  I don't recall moratorium,

 5    but I don't remember hearing from any

 6    attorneys, I guess you call it moratorium.

 7         Q    What about work stoppage?

 8         A    I don't recall hearing from any

 9    attorneys about that.

10         Q    What about judges?

11         A    No judges.  Sorry.  I don't recall

12    hearing from any judges about that either.

13         Q    Now, I'm going to show you what

14    will be marked as Plaintiff's Exhibit 9.

15                     (Whereupon, Email

16                     (NYC_002869-2870) was marked as

17                     Plaintiff's Exhibit 9 for

18                     identification as of this date.)

19         Q    So Plaintiff's Exhibit 9 is --

20    before I move on.  Did Peter Jones from

21    Legal Aid Society ever talk to you about the

22    court clinics?

23         A    I'm sorry.  What was the name?

24         Q    Peter Jones.

25         A    That name is not familiar to me.

1                     E. FORD, M.D.

2          Q    So you don't know Peter Jones from

3     Legal Aid Society?

4          A    Peter Jones.  I don't remember

5     that name.  I don't remember that name.

6          Q    I'm going to continue.  So I'm

7     going to mark this as Exhibit 9.  And it's

8     going to be -- it bears the Bates series

9     NYC2869 to NYC2870.  It starts with a

10    message from Andrea Swenson to Dr. Jain.

11               You see that, right?

12         A    Yes.  I see that.

13         Q    And Ms. Swenson's complaining

14    about Dr. Kaye.  She says, "Hello, please

15    help me with something.  These timekeeping

16    reports have become a problem.  Dr. Kaye

17    does not want to be treated like a secretary

18    and responsible for giving Dr. Brayton her

19    timekeeping report.  She thinks this is a

20    secretary's job and that she is being

21    treated like a secretary.  She says that

22    physicians are the reason why I and Lucrecia

23    have a job and she should be treated like

24    one."  Right.

25               Now, did you have a problem with

1                    E. FORD, M.D.

2      what Ms. Swenson said or alleged against

3      Ms. Swenson?

4                    MS. CANFIELD:  Objection as to

5                form.  You can answer.

6          A    Sure.  I don't -- I wasn't on this

7      email.  I learned of this, I can't remember

8      when I learned of it.  If you have a thread

9      maybe I --

10         Q    -- this part.  I don't know when

11     or whatever.

12              So you said you don't remember --

13     now, Dr. Ford, do you recall an allegation

14     of unprofessional conduct or complaint of

15     unprofessional conduct being made against

16     Dr. Kaye regarding this incident?

17         A    I recalling learning about this

18     incident from Dr. Jain.  And then at some

19     point I recall having access to this email.

20     I can't remember at what point.  And then I

21     recall discussing with, I think it was

22     Dr. MacDonald, who was my supervisor.  And I

23     think it was -- I heard reports from

24     Dr. Jain about updates.  I feel like it

25     was -- and I think it was investigated.

```
 1                    E. FORD, M.D.
 2        Q    What was unprofessional about this
 3   email, about -- was it unprofessional that
 4   Dr. Kaye said she did not want to be treated
 5   like a secretary?
 6               MS. CANFIELD:  Objection as to
 7          form.  You can answer.
 8        A    Sure.  I guess I would say it
 9   depends on the tone, but I don't think it's
10   unreasonable for a physician to say that
11   they are not a secretary.
12        Q    Is it unprofessional for her to
13   say that she's the reason that Ms. Swenson
14   has a job and Lucrecia have jobs?
15        A    I do find that unprofessional.
16        Q    Is it unprofessional or is it
17   offensive?
18        A    I'm sorry, is it?
19        Q    Unprofessional or offensive.
20        A    I think things that are offensive
21   are also unprofessional.  So it goes with
22   both.
23        Q    So if someone offends you, it's
24   your opinion that it's unprofessional?
25               MS. CANFIELD:  Objection as to
```

1                    E. FORD, M.D.

2          form.  You can answer if you're

3          able.

4      A    Well, let's see.  So I think --

5   being offended by is an individual response.

6   So I think people can have varying responses

7   to statements that may or may not be

8   offensive.  My understanding was that

9   Lucrecia felt offended.

10          But was Lucrecia there when this

11   exchange took place?

12      A    My understanding is that she was,

13   but I don't -- actually, no, I take that

14   back.  I don't remember completely, but

15   that's what I recall.

16      Q    Now, I would like to bring your

17   attention to this portion of it.

18          "She would further like to know if

19   Dr. Mundy, Owen and Winkler are being

20   treated like secretaries and asked to

21   distribute administrative paperwork."

22          So, first and foremost, were

23   Dr. Mundy and Owen and Winkler being

24   required to sign off on time sheets?

25      A    I don't remember, but I think yes.

```
 1                    E. FORD, M.D.

 2         Q    Oh, you do?

 3         A    I think for their staff, for the

 4    clinical staff.

 5         Q    Was Dr. Brayton Dr. Kaye's staff

 6    person?

 7         A    She was -- thank you for

 8    refreshing with this question line.  I

 9    actually, now that I think about it, I don't

10    remember if it was operations -- I'm sorry.

11    There was an administrative side and a

12    clinical side to each clinic.  And I

13    actually, now that you bring it up to me, I

14    can't recall if the administrative, like the

15    head administrator signed everyone's time

16    sheets or just the administrative people.

17         Q    Who was the head administrator?

18         A    For all the court clinics?

19         Q    Um-hmm.  Yes.

20         A    I think it was Andrea Swenson at

21    this time.

22         Q    So when did this administration

23    function come into play?

24              MS. CANFIELD:  Objection as to

25         form.
```

Page 220

1                    E. FORD, M.D.

2          A    My recollection is that in the

3     conceptualization of the clinics prior to

4     the transfer, the org charts were created to

5     have clinical side and administrative side.

6          Q    And when did that happen?

7          A    When did the org chart get

8     discussed or when did it get implemented?

9          Q    When did it get implemented.

10         A    I believe it was implemented at

11    the time that the clinics transferred over

12    to CHS.

13         Q    Now, and that's -- I mean, that

14    didn't happen all at once.  Some of that

15    happened, I guess, in the summer months, I

16    mean, prior to July 2018 when the Bronx

17    actually was transferred, and there were

18    others that were earlier; am I right?

19         A    The Brooklyn and Queens clinic

20    transferred over in the -- I think the end

21    of April of 2018.

22         Q    Right.  Now, she also writes, "She

23    thinks she's not being taken seriously as a

24    physician if she comes off of payroll, it's

25    criminal.  I told her that we talked about

Page 221

```
 1                     E. FORD, M.D.
 2     Teleakie, and that Jessica responded and she
 3     said I was lying.  We have known about this
 4     since March and have done nothing."
 5                Do you recall any of that?
 6          A    I don't recall this other than
 7     just reading this email.  I don't recall --
 8     yeah.  I don't recall anything further,
 9     other than what you're showing me on the
10     screen.
11          Q    So then I'm going to scroll up
12     some, Dr. Ford.
13                Dr. Jain says, unfortunately --
14     FYI, unfortunately -- and he's emailing you
15     at this point.
16                I did not get this until later in
17     the day, but Andrea, Clarence and Carlos
18     were able to work something out to address
19     these concerns regarding Dr. Kaye.  Andrea
20     called me more recently and described that
21     Dr. Kaye continued for 40 minutes.  It was a
22     tense environment throughout the day.
23     Dr. Brayton and Lucrecia were also present
24     at the clinic, right?  Do you remember that?
25          A    I see this email and I remember
```

Page 222

```
 1                         E. FORD, M.D.
 2      that this event sort of happened.
 3           Q    Now, he talks about Dr. Kaye's
 4      refusal, alleged refusal to see more than
 5      two people a day.  I guess at some point
 6      they must have requested that she see three.
 7                Now, also there is more
 8      information regarding interactions between
 9      Mr. Bloom and Drs. Brayton and Mullan that
10      recently I learned, and that we should
11      discuss -- I guess there's a typo here --
12      let me know when you next have some time.
13      Sorry to email this late on a Friday, but
14      didn't want to sit on it anymore and keep
15      you informed."
16                Are you remembering any more after
17      hearing that?
18           A    Well, it looks like I forwarded
19      this email to Dr. MacDonald and Mr. Wangel.
20           Q    But that part seems to be missing.
21           A    Yeah.  I don't recall anything
22      over the weekend or further about that.
23           Q    Just for the record, I call for
24      production of the email that Dr. Ford
25      forwarded to Drs. Ross and Mr. Wangel.
```

```
 1                    E. FORD, M.D.
 2              MS. CANFIELD:  It's right
 3         there.
 4              MS. HAGAN:  It's not right
 5         there.  That's not true.  It's not
 6         there.
 7              MS. CANFIELD:  It's right
 8         above -- this is all we have.
 9              MS. HAGAN:  No.  That's not
10         true.  I'm going to follow up in
11         writing.
12              MS. CANFIELD:  Ms. Hagan, it
13         says forward --
14              MS. HAGAN:  It does not say
15         forward.  It does not.
16              MS. CANFIELD:  The subject
17         says forward.
18              MS. HAGAN:  It's not there.
19         I'm not going to go back and forth
20         with you.  I will followup in
21         writing.
22              MS. CANFIELD:  We'll take it
23         under advisement, but everything has
24         been produced.
25              MS. HAGAN:  It has not been
```

1                    E. FORD, M.D.

2            produced and you know it hasn't.  So

3            let's go.

4       Q    June 3rd, Dr. MacDonald says to

5   you, Dr. Ford, that, "I agree assistance

6   with Bronx."  Do you see that?

7       A    I do.

8       Q    Now, there seems to be somewhat of

9   a gap here again.  We'll followup in

10  writing.

11           Then at 8:00 a.m. the next day, on

12  June 4th, a Mr. Wangel chimes in, "We'll

13  draft a separate writeup in addition to the

14  unauthorized recording.  Can be served

15  simultaneously."

16           Do you remember that?

17      A    I saved this email.  Yeah.  I

18  remember hearing from Jonathan that they

19  would be managing this piece from here on.

20      Q    But you are actually responsible

21  for giving her these different writeups; am

22  I right?

23      A    My understanding, and I think I

24  learned about this a few weeks later, what I

25  thought I was supposed to do was like

1                    E. FORD, M.D.

2       actually give Dr. Kaye the pieces of paper.

3              I mean, I didn't know that I was

4       supposed to do that, but I was told that,

5       and then we scheduled a time to do that.

6       Q    So you scheduled a time for you to

7       actually give her the actual writeup; am I

8       right?

9       A    Yes.  That's correct.

10      Q    And do you know what happened

11      during that time?

12      A    During the meeting?

13      Q    Yes.

14      A    Sort of.  And I also -- there's an

15      email, I think, that I sent, that I reviewed

16      that helped refresh, but I believe it was

17      the beginning of July that we met.  I

18      remember that we met in the clinic, in the

19      Bronx clinic.

20             I believe Dr. Kaye's

21      representation was there, who's name I can't

22      remember, I'm sorry, and Clarence Muir was

23      there also, who was -- I think he might

24      have -- I can't remember his official title.

25      I believe he was part of operations.  And I

Page 226

```
 1                        E. FORD, M.D.
 2      remember -- I don't remember how long it
 3      lasted.
 4                I remember that Dr. Kaye told me
 5      that this was the first or close to the
 6      first time she was hearing about this, and
 7      had a lot of -- I don't know of a lot.  I
 8      remember that she had questions about the
 9      process of how this had all -- I think about
10      how the letter had been created.  And I
11      didn't have a lot of those answers.
12                And she had questions about the HR
13      and labor processes, that I also didn't have
14      a lot of answers -- I'm not sure I had any
15      answers about.  And she had a concern that
16      she had not been told about this prior to
17      receiving a letter.  And I think she also
18      sign -- I don't remember if she signed it at
19      that time, but I do recall that she
20      eventually signed it under protest.
21           Q    At any point did Dr. Kaye tell you
22      that she believed that this letter was in
23      retaliation for her lawsuit?
24           A    I don't remember if she said that
25      or not in that meeting.  Sorry.
```

1                    E. FORD, M.D.

2        Q    Now, as far as this memo is

3    concerned, right, did you ever speak to

4    Dr. Kaye and get her version of what

5    transpired between she and Ms. Winston and

6    Ms. Persuad?

7        A    I don't think that I did.  I know

8    Dr -- my recollection is that Dr. Jain had

9    those discussions and spoke to me about

10   those.  And I was under the impression that

11   conversations were -- that this was being

12   managed by labor.

13       Q    If it was managed by Dr. Jain and

14   labor, why are you giving her the memo?

15       A    So I was not clear about that.

16   And I recall talking with labor and HR about

17   that.  And I think, unfortunately, after the

18   fact, I can't remember why or if I thought

19   to inquire prior to delivering it.

20       Q    Now, I'm going to, I guess, show

21   you another exhibit, because I have some

22   questions, and this is the actual memo.

23            MS. CANFIELD:  Ms. Hagan, is

24          it possible after this line of

25          questioning that we can take a

Page 228

```
 1                      E. FORD, M.D.
 2             break, like five minutes?
 3                  MS. HAGAN:  Yeah.  I'd like to
 4             get through this, though.
 5                  MS. CANFIELD:  Like I said,
 6             after this, please.
 7                      (Whereupon, Memo (NYC_002978)
 8                      was marked as Plaintiff's
 9                      Exhibit 10 for identification as
10                      of this date.)
11        Q    The date is June 6, 2019.  It's
12    from you, Dr. Ford, to Dr. Kaye.
13             Do you see at that?
14        A    I see that, yes.
15        Q    Now, did you participate in the
16    drafting of this memo at any point?
17        A    I did not.
18        Q    So why did you agree to give this
19    to Dr. Kaye?
20        A    I don't know.
21        Q    You weren't there when any of
22    allegations in this memo took place; am I
23    right?
24        A    You mean was I present at the
25    time?
```

1                    E. FORD, M.D.

2          Q    You had no firsthand knowledge as

3     to what happened that lead to this --

4          A    That's correct.

5          Q    And you didn't write this memo; am

6     I right?

7          A    That's correct.

8          Q    Now, it's dated June 6.  You see

9     that, right?

10         A    I see that.

11         Q    But everybody who is there signed

12    on July 1st, 2019.  You see that, right?

13         A    I see that.

14         Q    Why is there a discrepancy between

15    the date that it was actually allegedly sent

16    by you to Dr. Kaye and the date that

17    everyone signed?

18              MS. CANFIELD:  Objection as to

19         form.  You can answer.

20         A    Sure.  So my recollection is that

21    I received -- I can't -- I don't know -- I

22    wasn't part of the drafting of those, so I

23    can't speak to the June 6th date.  And I

24    look -- I refreshed my mind with the emails

25    that I saw.  It appeared that I got notified

1                    E. FORD, M.D.

2      somewhere in the middle of June that it was

3      my responsibility to deliver these.  And I

4      believe it took -- I believe Dr. Kaye was on

5      leave at that time, and July 1st, once she

6      got back, we scheduled this was the earliest

7      we could do.

8          Q    Now, you're signing off on this,

9      but you had absolutely no firsthand

10     knowledge about any of these things; am I

11     right.

12               MS. CANFIELD:  Objection as to

13            form.  You can answer.

14         A    It's correct that I have no

15     firsthand knowledge.  I did have knowledge

16     that there had been a investigation, and

17     this was the recommendation from the

18     investigation.

19         Q    Who conducted the investigation?

20         A    I don't remember who.  I have a

21     recollect -- I think it went to the office

22     of compliance -- I'm going to get the name

23     wrong.  I think there was a corporate

24     compliance investigation.

25         Q    Do you recall any of the other

1                    E. FORD, M.D.

2      employees that may have been involved in, I

3      guess, what lead up to this memo?

4           A    No.

5           Q    Do you know who drafted the memo?

6           A    I don't recall who specifically,

7      but I believe it was drafted by labor

8      relations.

9           Q    And who was in charge of labor

10      relations at the time?

11           A    I think it was Jonathan Wangel.

12           Q    And --

13           A    I think.

14           Q    So you're not sure if it was

15      Jonathan Wangel, but you believe it could

16      have been?

17           A    I think -- yeah.  I'm not sure,

18      but I think it was.

19           Q    Who's Mr. Muir?

20           A    That's Clarence Muir.  He's the

21      operations gentleman who was with me at the

22      meeting.  And, as I said earlier, I can't

23      recall if he was the head of the

24      administrative part of the clinics at that

25      time, or at a higher level.  I don't

Page 232

1                          E. FORD, M.D.

2       remember.

3            Q    Now, you don't remember Dr. Kaye

4       specifically saying this memo's because she

5       filed a lawsuit?

6            A    I don't remember her saying that.

7            Q    Now, did Ms. Swenson report to

8       Mr. Muir?

9            A    That's what I don't remember.  I

10      think so.  There were -- I think so.  There

11      is a lot of -- this is a while ago.

12           Q    Did Mr. Muir report to Mr. Wangel?

13           A    I don't believe so.  I believe Mr.

14      Muir reported to Carlos Castillanos who was

15      the head of operations.

16           Q    Now, this particular memo, the

17      allegations of unprofessional conduct can

18      have a big impact on a physician's career;

19      am I right?

20                MS. CANFIELD:  Objection.

21           Conclusion.  You can answer.

22           A    I don't know if a kind of memo

23      like this -- this doesn't -- my

24      understanding of this is it was like a

25      warning.  I don't think this -- this doesn't

Page 233

```
 1                    E. FORD, M.D.
 2       get reported anywhere.  I certainly didn't
 3       report it.
 4            Q    It doesn't say warning on the memo
 5       at all, does it?
 6                    MS. CANFIELD:  Objection as to
 7               form.  Maybe you can show her the
 8               entire document.
 9            Q    Do you see the word warning
10       anywhere in this document?
11                    MS. CANFIELD:  Objection as to
12               form.  You can answer.
13            A    If you can just show me.
14            Q    I'm going to search so we can look
15       for it right now, warning.
16                    MS. CANFIELD:  I think going
17               forward you're expected to adhere to
18               the NYC Health and Hospital
19               principals of professional conduct.
20               I think that is a warning of putting
21               someone on notice.
22                    MS. HAGAN:  You're testifying
23               for the record, Ms. Canfield.  This
24               document say nothing about a
25               warning.
```

```
1                    E. FORD, M.D.
2         Q    Do you see the word warning in
3    here?
4              MS. HAGAN:  And do not coach
5         the witness again.
6              MS. CANFIELD:  Objection as to
7         form.
8         Q    Is the word warning in this
9    document?
10        A    If you could just scroll up so I
11   can see the top.
12        Q    Sure.
13        A    Let's see.  I don't see a warning.
14   That was my understanding of what it was.
15   And there was communication after this --
16   after the meeting I had with Dr. Kaye, where
17   I emailed HR and labor to ask why they
18   weren't there.  And there was some
19   explanation that this was considered a
20   warning or a pre-discipline.
21        Q    Is pre-discipline written in this
22   memo?
23              MS. CANFIELD:  Objection as to
24         form.  That's not what she
25         testified, but go ahead, you can
```

1                     E. FORD, M.D.

2           answer.

3           A    I don't see that in here, no.

4           Q    Now, have you ever heard of the

5    term disruptive physician, Dr. Ford?

6           A    Disruptive physician?

7           Q    Yes.

8           A    No.  I haven't heard that as a

9    formal term of art.  No.

10          Q    Have you ever heard of physicians

11   being brought up on charges of

12   unprofessional conduct or being a disruptive

13   physician?

14          A    I know that there is the office

15   for -- well, I can't remember the title, but

16   it's basically about physician misconduct.

17   There's a state reporting about that.

18          Q    Are you aware that Dr. Kaye is

19   obligated to report that she has this

20   document in her personnel file?

21               MS. CANFIELD:  Objection as to

22          form.  You can answer.

23          A    Sure.  I am not aware that she

24   would have to report this, no.

25          Q    Would you report this if you had

1                        E. FORD, M.D.

2     this document in your personnel file?

3          A     Probably not.

4          Q     So if you were applying for a

5     license in another state, you would not

6     report this document in your personnel file?

7          A     Well, I guess, what I first do is

8     consult with somebody who knows better than

9     I what should be reported, but because this

10    doesn't relate to patient care, and it's not

11    a discipline, I don't think this is a -- I

12    don't think this is a reportable thing.  So

13    I guess that's my answer.  I would consult

14    first before I do anything.

15         Q     At any point did you tell

16    Dr. Kaye's union representative that this

17    was, I guess, a preliminary step toward

18    termination?

19                MS. CANFIELD:  Objection as to

20           form.

21         A     No.  Not that I remember.

22         Q     You allege that -- you recall that

23    Dr. Kaye told you that she had not received

24    any kind of progressive discipline before

25    getting this particular document.

Page 237

```
 1                    E. FORD, M.D.
 2              Do you recall that.
 3                  MS. CANFIELD:  Objection as to
 4           form.
 5       A    What I recall is that she said
 6    that nobody had talked to her about it, like
 7    before this letter arrived.
 8       Q    And you hadn't talked to her about
 9    it, including yourself, right?
10                  MS. CANFIELD:  Objection as to
11           form.
12       A    That's correct.
13                  MS. HAGAN:  Let's take 15
14           minutes.  You said you wanted to
15           take a break.
16                  MS. CANFIELD:  Thank you.
17                  (Whereupon, a recess was taken
18                  from 3:33 p.m. to 3:53 p.m.)
19       Q    Dr. Ford, I'm just going to ask
20    you some general questions.
21                  Now, do you recall a time in
22    January 2014 that Dr. Kaye complained to you
23    and Doctor's Council about age
24    discrimination amongst female physicians?
25       A    I don't recall -- no.  I don't
```

```
                           E. FORD, M.D.
 1
 2     remember that.
 3          Q    Now, you said you left Bellevue in
 4     July.  Was July 2, 2014 the actual time that
 5     you left Bellevue to go to CHS?
 6          A    I think July 2nd was my last day
 7     at Bellevue.  And then I didn't -- I took
 8     the summer, and then started at CHS on
 9     September 2nd, or somewhere around there,
10     2014?
11          Q    Now, Dr. Kaye -- we went over
12     earlier that Dr. Kaye complained about
13     redacted medical records.  Do you recall
14     whether Dr. Ciric, Winkler and/or Mundy
15     complained about the redacted medical
16     records as well?
17          A    I don't recall -- yeah.  I don't
18     recall.
19          Q    Now, Dr. Collin, did he actually
20     also complain?
21               MS. CANFIELD:  Objection as to
22          form.
23          A    I don't know.
24          Q    Did you hear complaints about
25     redacted medical records from any of the
```

1                    E. FORD, M.D.

2    male evaluators and/or managers at CHS at

3    the time?

4         A    Gosh, I can't recall.  I'm sorry.

5    I can't remember.

6         Q    Now, I'm going to continue on the

7    line of, I guess discipline, and some of the

8    adverse employees action that Dr. Kaye

9    experienced.

10              Now, is it your testimony that the

11   unprofessional conduct memo was not

12   retaliatory for Dr. Kaye's lawsuit?

13        A    It was not my understanding that

14   that was retaliatory.

15        Q    How did you feel when you found

16   out that Dr. Kaye filed a lawsuit against

17   you and the other managers at CHS?

18        A    Not great.

19        Q    Well, explain.  Elaborate.

20        A    Well, it doesn't feel good to be

21   sued.  So I did feel like I had tried my

22   very best to advocate for her requests.

23   Yeah.

24        Q    Did you feel that the base she

25   alleged you engaged in were untrue?

Page 240

                          E. FORD, M.D.

1

2          A    As I mentioned before, my

3     recollection of reading the complaint is

4     that there were areas in there that I did

5     not think were correct.

6          Q    Like what?

7          A    So I'd have to look.  If we could

8     look at the complaint.

9          Q    We'll get to that.  But I'm just

10    trying to base off your memory.

11         A    Sure.  I can't give you those

12    details, unfortunately.  But I remember

13    reading and thinking that's -- I don't agree

14    with that.

15         Q    By the time the lawsuit was filed,

16    how would you describe your relationship

17    with Dr. Kaye?

18         A    And if you could just remind me,

19    the lawsuit was filed when?

20         Q    There was the amended complaint,

21    and there were a number of things.  Let's

22    say the amended complaint was filed -- the

23    amended complaint was filed in April 30,

24    2019.

25                  MS. CANFIELD:  Do you know

Page 241

                          E. FORD, M.D.
1
2            when it was served?
3                 MS. HAGAN:  That was around
4            that time, so yes.
5       A    So the question is, what was my
6    relationship with Dr. Kaye like at that
7    point?
8       Q    Yes.  In April, May of 2019.
9       A    I don't recall that it was any
10   different than at any other time in our
11   working relationship.
12      Q    So it didn't impact your
13   relationship either way; is that what you're
14   testifying?
15      A    I'm sorry.  What didn't impact?
16      Q    The lawsuit.
17      A    No.  I mean, it didn't impact my
18   professional relationship with her.
19      Q    What about your feelings toward
20   Dr. Kaye, were you angry with her by that
21   point?
22      A    I was not angry with Dr. Kaye.  I
23   do strongly believe in everybody's -- I do
24   strongly believe that if someone feels a
25   grief, they can file a lawsuit.  So that

```
 1                    E. FORD, M.D.
 2      is -- I felt -- I guess I felt disappointed.
 3            Q    Disappointed, what do you mean?
 4            A    Probably the best feeling.
 5            Q    Disappointed in who?
 6            A    I don't know if I was disappointed
 7      with anybody.  Just that the situation was
 8      as it was.
 9            Q    Have you ever been sued before,
10      Dr. Ford?
11            A    Not to my knowledge, no.
12            Q    Has anyone ever accused you of
13      discrimination in the past?
14            A    Nope.
15            Q    Has anyone filed a grievance
16      against you in the past?
17            A    Not that I'm aware of.
18            Q    Now, getting back to the
19      unprofessional conduct memorandum that we
20      were talking about earlier.  I want to draw
21      your attention to that.
22                 It says, memorandum serves as a
23      notice of other staff -- well, let's move on
24      from that.  I'm sorry, I didn't mean to go
25      back to that.  I'm sorry.
```

Page 243

```
 1                    E. FORD, M.D.
 2               I want to talk about recording
 3     exams.  Let's go back to this.  So this will
 4     be marked as Plaintiff's Exhibit 11.
 5                    (Whereupon, May 29, 2019 Exam
 6                    Recording was marked as
 7                    Plaintiff's Exhibit 11 for
 8                    identification as of this date.)
 9          Q    This is the audio recording of
10     730 competency evaluations.  You see that,
11     right?
12          A    No.  I don't see anything on the
13     screen.
14          Q    Oh, I'm sorry.  Let me do the
15     share again.  I'm sorry.
16               The recording of the exam, right.
17     And here it is, May 29, 2019.
18               You see that, right?
19          A    I do.
20          Q    We just established that the
21     complaint was filed on April 30, 2019.  You
22     saw that, right?
23          A    I heard you say that, yes.
24          Q    Right.  So on May 29th, there's a
25     memo from you, Dr. Ford, to Dr. Kaye,
```

Page 244

```
 1                    E. FORD, M.D.

 2      regarding the audio recording of 730

 3      competency evaluations.

 4                    You see that, right?

 5           A    I see that.

 6           Q    Did you write this memo?

 7           A    I did not write this memo.

 8           Q    Did you have a part in writing the

 9      memo?

10           A    I did not have a part in writing

11      this memo.

12           Q    Again, why are you signing and

13      issuing these memos that you didn't have any

14      part in writing?  Did you have a right to

15      say, no, I'm not going to do this because I

16      didn't write it?

17           A    So I guess -- I was certainly

18      aware of the issues that had been presented

19      as problematic and that there was, again, I

20      think it was corporate compliance and

21      investigation, and that the recommendation

22      had been to issue a form like this.

23                    I was the responsible -- I mean, I

24      was the head of the service.  And while I --

25      and I also agreed that these were both, in
```

Page 245

```
 1                    E. FORD, M.D.
 2      my opinion, inappropriate things to have
 3      done.  I was surprised, it is true, to learn
 4      that this was the first, at least according
 5      to Dr. Kaye, this was the first she had
 6      heard of these things.
 7           Q    So first and foremost, you didn't
 8      write this memo, did you participate in any
 9      kind of process to develop the language in
10      the memo?
11                    MS. CANFIELD:  Objection.
12                Asked and answered.  You can answer
13                again.
14           A    Yeah.  I was not involved in
15      drafting this memo.
16           Q    Was anyone involved that had any
17      background in psychiatry or psychology in
18      drafting this memo?
19           A    I don't know.
20           Q    Do you know who wrote the memo?
21           A    Again, as I answered -- this was
22      the same for the other memo that we talked
23      about, I don't remember -- I don't know or
24      remember -- actually, I don't remember.  I
25      probably knew at the time who wrote it.
```

```
 1                    E. FORD, M.D.
 2        Q    Did anyone come to you to ask you
 3   about what was the standard practice in
 4   forensic psychiatry as it pertained to
 5   recording exams?
 6             MS. CANFIELD:  Objection.  You
 7          can answer.
 8        A    I had discussion with -- yes.  I
 9   believe I spoke with Dr. MacDonald,
10   Ms. Yang, Mr. Wangel.  Certainly I remember
11   speaking with Dr. Jain.  And he did some
12   research into standards of practice about
13   recording.  And I did agree that recording
14   defendants evaluation without their consent
15   seemed at least unethical.  I don't know if
16   there's a specific law that makes it
17   illegal.
18        Q    Did you tell Dr. Kaye that
19   Mr. Wangel was a (inaudible) --
20        A    I don't -- not that I remember.  I
21   don't know.
22        Q    Now, I'm going to get into the
23   substance of it.  This memo serves as a
24   notice that you inappropriately recorded the
25   730 competency evaluation without
```

                          E. FORD, M.D.

 1

 2     authorization.

 3            Why was her recording of the 730

 4     competency evaluation inappropriate?

 5        A    In my opinion, and this is in my

 6     opinion, it has to do with notifying the

 7     defendant that they're being recorded.  I

 8     don't know if the Office of Corporate

 9     Compliance found another reason that it was

10     inappropriate.

11        Q    Now, you didn't tell Dr. Kaye that

12     because she didn't notify the defendant that

13     she had recorded the exam that it was

14     inappropriate?  Did you tell her that?

15            MS. CANFIELD:  Objection as to

16        form.

17        A    Could you rephrase that, please.

18        Q    Did you tell Dr. Kaye that you

19     found her recording the exam without consent

20     inappropriate?

21            MS. CANFIELD:  Objection as to

22        form.  You can answer.

23        A    I don't -- I probably told her

24     that during that meeting, the July 1st

25     meeting.

1                    E. FORD, M.D.

2        Q    So why isn't that reflected in

3    this document, it's from you?  There's

4    nothing that talks about consent in here.

5                MS. CANFIELD:  Objection,

6            argumentative.  You can answer.

7        A    Yeah.  So without -- it says, this

8    memo serves as a notice that you

9    inappropriately recorded without

10    authorization, meaning consent.  That's how

11    I interpret it.

12        Q    That's what you said, but you

13    didn't write this, so you're not sure what

14    it means; am I right?

15                MS. CANFIELD:  Objection.  You

16            can answer.

17        A    My understanding from

18    conversations with the various folks I spoke

19    with and said it, I essentially meant that.

20        Q    Who are the various folks that you

21    spoke with?  Because I'm assuming that they

22    contributed to the authoring of this

23    document.

24        A    Well, I'm not assuming that they

25    contributed to it, but the people that I

```
 1                    E. FORD, M.D.
 2      spoke with were Dr. MacDonald, Ms. Yang,
 3      Mr. Wangel, Dr. Jain.  Maybe there were
 4      others.  I think I spoke also with
 5      Drs. Barbara and Subetti, because I know
 6      they both have histories of doing forensic
 7      evals.  And I spoke with Dr. Garcia, who
 8      also has -- and just trying to see what
 9      their understanding of recording was.
10           Q    Isn't Dr. Garcia a psychologist
11      and not a psychiatrist?
12           A    She is.  In my opinion, it doesn't
13      matter for this purpose.  They both are
14      doing 730 exams.
15           Q    You're saying that you believe
16      that Ms. Garcia has knowledge about the
17      standards and practice in this particular
18      field; is that right?
19           A    My understanding and my
20      recollection is that Dr. Garcia, who's a
21      PHD, has experience doing 730 evaluations.
22           Q    Now, did there ever come a time
23      that Ms. Garcia's role in the 730 process
24      was questioned by Dr. Jain?
25           A    I think there was -- Dr. Jain
```

```
 1                    E. FORD, M.D.
 2     mentioned something about that to me.  I
 3     don't remember the details, but I think that
 4     that -- I think Dr. Kaye did bring that up
 5     to him.
 6         Q    We're to going revisit that.
 7     Because I want to keep focused on this.
 8              Now, your unauthorized recording
 9     of private health information -- first off,
10     before I go into that.  You do know that New
11     York is a one party consent state; is that
12     right?
13              MS. CANFIELD:  Objection as to
14         form.
15         A    I just learned that on Thursday.
16         Q    So New York is a one party consent
17     state.  Meaning, that the other person
18     doesn't have to consent to be recorded.
19              You understand that, right?
20         A    I understand that -- what I was
21     told on Thursday was that you can record
22     someone without their consent, or that was
23     not illegal.
24         Q    Okay.  So you may have deemed it
25     inappropriate, but it was not illegal; is
```

Page 251

1                    E. FORD, M.D.

2        that right?

3            A    Yeah.  I'm not sure we -- I

4        thought it was inappropriate, and I thought

5        it was unethical at the time.

6            Q    You don't say unethical -- well,

7        you don't say anything, because you didn't

8        write this, but it's coming from you, right,

9        Dr. Ford?

10                   MS. CANFIELD:  Objection as to

11               form.  Argumentative.  Go ahead.

12           A    Sure.  I interpreted my delivery

13       of this letter as sort of presenting it to

14       Dr. Kaye.  It is true that it says from me.

15       My interpretation of that was that somewhat

16       proforma because I was the head of services.

17           Q    Then you go, "Your unauthorized

18       recording of private health information is

19       in violation of CHS custom and practice."

20                   We're not going to go back through

21       this.  Now, unauthorized, you're saying that

22       the person who would have authorized, if

23       they could have, let's say, would have been

24       the defendant or the inmate; am I right?

25           A    Certainly, yes, that would be one

1                    E. FORD, M.D.

2     of them.  At the time, I was not -- again,

3     didn't know about this one party recording

4     thing, but in my mind, it was also, again,

5     not illegal, but it would have been

6     appropriate to notify the examiners and the

7     defense attorney as well.

8         Q    Have you ever notified anyone that

9     you can record this?

10                  MS. CANFIELD:  Objection as to

11            form.

12        A    I have never recorded anyone.

13        Q    You have never recorded anyone; is

14    that what you said?

15        A    That's what I said.

16        Q    Why not?

17        A    I don't know.  I don't know.

18        Q    Now, then you have recording of

19    private health information.  And you do know

20    that the clinics are HIPPA exempt, you know

21    that, right?

22        A    I understand that they are not

23    healthcare delivery systems.

24        Q    Wouldn't that be irrelevant, the

25    private health information portion of this

Page 253

```
 1                    E. FORD, M.D.

 2       memo?

 3                    MS. CANFIELD:  Objection as to

 4              form.

 5            A    Wouldn't that -- would the

 6       private -- well, what this memo appears to

 7       be saying is related to CHS, not related to

 8       HIPPA criminal law.

 9            Q    You're referencing private health

10       information.  What does that have to do with

11       the exam itself?

12                    MS. CANFIELD:  Objection as to

13              form.  Argumentative.  You can

14              answer.

15            A    Is your question that -- is your

16       question that there's no private health

17       information in these exams?

18            Q    Why -- I don't know how you can

19       answer or speak to the contents of this to

20       some extent, because you didn't write this,

21       but it did come from you.

22                    So the question is, why would this

23       language regarding the private health

24       information be appropriate for this memo?

25                    MS. CANFIELD:  Objection as to
```

1                    E. FORD, M.D.

2             form.  Asked and answered.  You can

3             answer again.

4        A    Sure.  It's an important point you

5    raised that I did not write this memo.  So

6    the specific language and the decisions

7    around that language, I can't shed a whole

8    lot of light on that for you.  I can tell

9    you my personal opinion about the recording.

10       Q    I'm going to keep going, then.

11            Now, the CHS custom and practice.

12   Where did this evolve?  How did you learn of

13   the CHS custom and practice?

14       A    So, again, I didn't write the

15   memo.

16       Q    Do you recall there being a CHS

17   custom and practice against recording?

18       A    I recall having conversations with

19   many of the people that I just told you

20   about to ascertain recording practices

21   across all the clinics.

22       Q    At any point did you ask Dr. Kaye

23   if there was a custom and practice against

24   recording yourself?

25       A    I don't believe that I asked her.

1                      E. FORD, M.D.

2      I think Dr. Jain asked her.  I think he also

3      asked the other clinic directors.

4          Q    Dr. Kaye has been working at the

5      clinic longer than anybody involved in this

6      lawsuit.  Would you agree with that?

7          A    Yes.

8          Q    Based on that, would you believe

9      that she would probably be most the privy as

10     to what the custom and practice at CHS would

11     be as it pertains to whether or not forensic

12     evaluations could be recorded?

13              MS. CANFIELD:  Objection as to

14          form.  You can answer.

15         A    Actually, no, because she was only

16     part of CHS at this time for less than a

17     year.

18         Q    Did CHS conduct forensic

19     evaluations prior to their merging of the

20     court clinics?

21              MS. CANFIELD:  Objection as to

22          form.  You can answer.

23         A    I don't think so.

24         Q    So let's be clear.  CHS was not

25     doing any court evaluations prior to the

```
 1                    E. FORD, M.D.
 2      merger of the forensic court clinics?
 3           A    I believe that's correct, yes.
 4           Q    Now, you go on to the next
 5      paragraph:  "As a provider of mental health,
 6      substance abuse and general medical
 7      services, CHS is protected by restrictive
 8      patient confidentiality laws."  Okay.
 9                "Violation of these
10      confidentiality laws may lead to civil and
11      criminal penalties, as well as progressive
12      disciplinary action through CHS."
13                So CHS is protected by these
14      restrictive patient confidentiality laws,
15      but you agree with, that the court clinics
16      themselves were not subject to these
17      confidentiality laws; am I right?
18                    MS. CANFIELD:  Objection as to
19            form.
20           A    The most clear answer I can give
21      you is that I am not entirely sure what the
22      confidentiality laws are specifically
23      related to the clinic.
24           Q    Are the clinics bound by any
25      confidentiality laws, to your knowledge?
```

Page 257

```
 1                    E. FORD, M.D.

 2                    MS. CANFIELD:  Objection as to

 3              form.  You can answer.

 4         A    I don't know.  That's a good

 5    question.

 6         Q    So here you're saying that they're

 7    bound by them, but you're not sure.

 8              Now, violation of these

 9    confidentiality laws may lead to civil and

10    criminal penalties as well as progressive

11    disciplinary action through CHS.

12              Again, you're not sure about the

13    confidentiality laws that would be

14    applicable in this context; would that be

15    right?

16                    MS. CANFIELD:  Objection as to

17              form.  You can answer.

18         A    I did not write this memo.

19         Q    But you're not sure about them.

20              This memo is saying that Dr. Kaye

21    could -- could lead to civil and criminal

22    penalties, which is quite menacing language;

23    would you agree?

24                    MS. CANFIELD:  Objection.  You

25              can answer.
```

1                    E. FORD, M.D.

2          A    Would I agree this is menacing

3    language.

4          Q    Or punitive in nature, would you

5    say?

6                    MS. CANFIELD:  Objection.

7          A    I would not call this punitive.  I

8    would just call -- this, to me, is a

9    description of the disciplinary process that

10   was drafted by the person who wrote this.

11   To me, this doesn't sound punitive.  Just

12   sounds like --

13         Q    So you wouldn't be affected by

14   this, if you received this memo?

15         A    Would I be affect -- I would not

16   like to receive this memo.

17         Q    No, you wouldn't.

18         A    No.

19         Q    You would be upset; am I right?

20         A    I don't know what I would be.  But

21   I would be under advisement, if I got this

22   memo.

23         Q    And then, "You are hereby reminded

24   that protecting the confidentiality of our

25   patients is a term condition of employment

1                      E. FORD, M.D.

2      and should be treated seriously by all staff

3      in the execution of their duties."

4               You see that, right?

5          A    I do see that.

6          Q    Now, these inmates that Dr. Kaye

7      was evaluating, are they patients?

8               MS. CANFIELD:  Objection as to

9            form.

10         A    Sure.  So in the capacity of

11     being evaluated for an evaluation, they are

12     not Dr. Kaye's patients, they are defendants

13     that she's evaluating.

14         Q    So she's not administering

15     treatment; is that right?

16         A    I believe that that's correct.  I

17     do not believe evaluations are considered

18     treatment.

19         Q    So the term patient is inaccurate,

20     that should not be there; am I right?

21              MS. CANFIELD:  Objection as to

22            form.  You can answer.

23         A    Sure.  I don't -- I didn't draft

24     it.

25         Q    But, again, it should not be

```
 1                      E. FORD, M.D.
 2      there.  I'm not asking if you drafted it.
 3      This is inappropriate?
 4           A    Yeah.  I don't know if it should
 5      be there or it shouldn't be there.
 6           Q    Is the term patient inappropriate
 7      if Dr. Kaye is not treating anyone?
 8                    MS. CANFIELD:  Objection.  She
 9              just answered she doesn't know.  You
10              can answer again.
11           A    I will say again, I did not write
12      this letter.
13           Q    Let's be clear.  These inmates
14      that Dr. Kaye was interviewing, these
15      inmates were not her patients; am I right?
16                    MS. CANFIELD:  Objection as to
17              form.  Argumentative now and
18              harassing the witness, but you can
19              answer.
20           Q    I'm going to ask you again.  These
21      patients, these inmates that Dr. Kaye was
22      seeing, they were not her patients; am I
23      right?
24                    MS. HAGAN:  Objection.  Keep
25              going.
```

Page 261

1                    E. FORD, M.D.

2        A    The people that Dr. Kaye would

3    evaluate at the clinic are not considered

4    her patients.

5        Q    So she wouldn't be bound by HIPPA;

6    am I right?

7                MS. CANFIELD:  Object to the

8             form.  You can answer.

9        A    I don't know the answer.  I don't

10   know.

11       Q    You were director of this program.

12   You mean to tell me that you didn't know if

13   the clinics themselves were bound by HIPPA?

14                MS. CANFIELD:  Objection to

15             form.  Harassing.  You can answer.

16       A    So one of the important reasons

17   that I hired and posted for a position for

18   somebody to run these clinics, was because

19   this was not my area of expertise over the

20   course of my career.  And I do not

21   remember -- I don't remember the specifics

22   of the confidentiality.

23       Q    You managed the clinics from 2009

24   to 2014; that's right?

25                MS. CANFIELD:  Objection to

1                    E. FORD, M.D.

2          form.

3          A    Yeah.

4          Q    And then you managed the clinics

5     for another, I guess, two years, from 2018

6     to 2020; is that right?

7          A    Well, I was the indirect

8     supervisor of the supervisor.

9          Q    That's six years.  During the

10    course of those six years you would not say

11    that you have a level of expertise and

12    familiarity as to the clinics and their

13    operations?

14              MS. CANFIELD:  Objection.

15          Argumentative.

16          A    I would not say that.  What I

17    would say is that I'm not an expert on the

18    confidentiality laws.  In my practice of

19    that and my discussions, we tried to keep

20    everything within the -- the evaluations

21    were in the presence of the defense attorney

22    and the evaluators and trainees, and those

23    reports were kept -- were sent to the

24    courts.  And if the -- there wasn't a whole

25    lot of communication of that stuff outside

```
 1                          E. FORD, M.D.
 2       of those areas.
 3            Q    Well, would it be fair to say that
 4       Dr. Kaye was falsely accused of breaching
 5       patient's confidentiality since she was not
 6       treating patients?
 7                     MS. CANFIELD:  Objection as to
 8                form.  You can answer.
 9            A    I can't answer that.
10            Q    Why not?
11            A    In my reading of this thing that
12       you have up here, it says, "You are hereby
13       reminded that protecting the confidentiality
14       of our patients," so you are reminded of it.
15       I'm not sure that I see in here that she's
16       being accused of what you just said.
17            Q    Well, she was not dealing with
18       patients, so that is false, isn't it?
19                     MS. CANFIELD:  Objection.
20                Asked and answered.
21                     Can we move on.
22                     MS. HAGAN:  No.
23            Q    It's false --
24                     MS. CANFIELD:  You can answer
25                again, Dr. Ford.
```

Page 264

1               E. FORD, M.D.

2       Q    It is false that it was alleged

3    that Dr. Kaye was involved with patients;

4    isn't that right?

5       A    All I can say is I don't see

6    something in this memo that says Dr. Kaye

7    was treating patients.

8       Q    Right.  So it's false?

9            MS. CANFIELD:  Objection.

10      Q    It says, "You are hereby reminded

11   that protecting the confidentiality of our

12   patients is a term in condition of

13   employment."

14           Now, if she's not treating

15   patients, how is that a term of condition of

16   her employment?

17      A    I don't have an answer for you

18   other than what I've described for you

19   already.

20      Q    Dr. Ford, isn't it false that

21   treating patients would be a term of

22   condition of Dr. Kaye's employment?

23           MS. CANFIELD:  Objection.

24           Asked and answered at least three

25           times.  She just said she didn't

1                    E. FORD, M.D.

2          know.

3               MS. HAGAN:  She does know.

4     Q    Dr. Kaye did not treat patients,

5     right?

6     A    I know that Dr. Kaye did not treat

7     patients in the court clinics.

8     Q    Right.  She did not.  So this

9     would be false; am I right?

10              MS. CANFIELD:  Objection.

11           Misleading.  Objection.  You can

12           answer.

13    Q    Yes or no.

14

15              MS. HAGAN:  And you can say

16           objection.

17    A    I can say what, I'm sorry?

18    Q    I'm objecting for Ms. Canfield.

19    Keep going.

20    A    "You are hereby reminded that

21    protecting the confidentiality is a term and

22    condition of employment and should be

23    treated seriously by all staff in the

24    execution of your duties."  You're asking me

25    if that's a false statement?

1                           E. FORD, M.D.

2           Q    Yes.

3           A    Gosh, I am literally -- I don't

4     know how to answer this other than to tell

5     you that I do agree that these were not

6     patients to Dr. Kaye.

7                    This is language from a labor

8     relations -- this is labor relations stuff,

9     and -- I mean, I don't know if this is

10    boilerplate language.  I don't know.

11          Q    So the private health information

12    specifically, does that implicate HIPPA, in

13    your view?

14                    MS. CANFIELD:  Objection.

15               Asked and answered.  You can answer

16               again.

17                    MS. HAGAN:  I never asked that

18               question.  Please stop --

19                    MS. CANFIELD:  You did.  I

20               think she testified that this is not

21               HIPPA, it's confidentiality.

22                    MS. HAGAN:  I never did.  I

23               asked a different question.

24          Q    The private health information, is

25    this part of HIPPA, does it implicate HIPPA?

1                    E. FORD, M.D.

2        A    When I think of private health

3    information, which I thought about prior to

4    HIPPA, but when I think about private health

5    information now, I do think of HIPPA.

6        Q    Okay.  Now, isn't it also true

7    that you falsely accused HHC of a HIPPA

8    violation that didn't occur?

9              MS. CANFIELD:  Objection.  You

10         can answer.

11       A    I don't know what -- I don't know.

12       Q    In this instance, HHC, if she has

13   unauthorized -- engaged in unauthorized

14   recording of private health information, and

15   you said that you would think of HIPPA prior

16   to maybe HIPPA being a thing, then wouldn't

17   that be the same?

18             MS. CANFIELD:  Objection.

19         Answer if you can.

20       A    I couldn't hear the last part of

21   the question.

22       Q    Okay.  Now, you're saying that

23   HIPPA was implicated, as far as you are

24   concerned, with the reference to the private

25   health information in the memo; am I right?

```
 1                    E. FORD, M.D.

 2                    MS. CANFIELD:  Objection.  You

 3            can answer.

 4       A    What I'm saying is that when I

 5   hear the phrase private health information,

 6   I think about HIPPA.

 7            In this memo, I'm not sure that I

 8   thought one way or the other about HIPPA.  I

 9   was concerned about the recording.

10       Q    Now, again, could it be construed

11   that this is a false report?

12       A    That -- I'm sorry, that what was a

13   false report?

14       Q    First off, you're accusing her of

15   something that implicates the violation of

16   private health information.  The

17   unauthorized recording of private health

18   information.  Doesn't that allude to a HIPPA

19   violation?

20                    MS. CANFIELD:  Objection.

21            Asked and answered.  You can answer

22            again.

23       A    Again, I was -- in this memo, I

24   was focused on the authorized recording.

25   And I was not aware of private health
```

Page 269

```
 1                    E. FORD, M.D.
 2      information was some CHS language or
 3      something else.  I don't know.
 4           Q    I'm going to keep going.
 5                "Going forward, you are expected
 6      to adhere to CHS confidentiality statement
 7      attached.  Follow all confidentiality
 8      protocols and apply sound judgment in the
 9      execution of your duties."
10                Now, the confidentiality
11      statement, that did not exist prior to the
12      issuance of this memo; am I right?
13           A    I don't -- gosh, I don't know.  I
14      don't remember.  I think there was -- I
15      don't know, it was around this time that
16      that confidentiality statement was created.
17      I don't remember if it was before or after
18      May 29th.
19           Q    So then you have, "You are to
20      expressly avoid the unauthorized recording
21      of any confidentiality patient health
22      information."
23                Again, the term patient; am I
24      right?
25           A    It does say patient.
```

1                    E. FORD, M.D.

2          Q    Yes.  "Failure to comply may

3     result in administrative action up to and

4     included termination of employment."

5               You see that, right?

6          A    I see that.

7          Q    Now, would you consider this to be

8     a disciplinary document?

9          A    So as for the other document that

10    we went through, I don't -- I considered

11    this to be a warning.  Like a heads up,

12    please don't do this again.

13         Q    So you're saying this is not

14    disciplinary?

15         A    In my opinion, yes, it was -- when

16    I spoke with or communicated with labor

17    relations after the fact, I was told this

18    was pre-discipline.

19         Q    It's not written in this document

20    that it's pre-discipline; is that right?

21         A    I agree that pre-discipline is not

22    written in here.

23         Q    Did you tell Dr. Kaye that this

24    was a pre-disciplinary memo?

25              A    I don't remember what my language

Page 271

1                    E. FORD, M.D.

2        was.  I imagine that I had said warning, but

3        I don't know.  I don't recall.

4             Q    Now, again, this document is dated

5        May 29, 2019.  You see that, right?

6             A    I do.

7             Q    And, again, you have here that

8        everyone is signing on July 1st, 2019.  You

9        see that, right?

10            A    I do.

11            Q    Why is this document dated well

12       over a month prior to?

13            A    So, again, as for the other

14       document that was dated in early June, I

15       was -- I don't know why this was dated

16       May 29th, since I didn't draft the document.

17       I recall receiving notification that I was

18       responsible for delivering this to Dr. Kaye

19       sometime in the middle of June.  And then

20       July 1st was the first time that we could

21       meet in person.

22            Q    Now, didn't you feel compelled as

23       the messenger of this document, at this

24       level in your career, to insist upon

25       documents being accurate?

```
1                    E. FORD, M.D.
2              MS. CANFIELD:  Objection to
3          form.  You can answer.
4      A    Yeah.  I did read the document,
5    and I reviewed it and I was focused on
6    the -- I did agree that, in my opinion, it
7    seemed unauthorized.  And I was aware that
8    the corporate compliance had determined
9    this.  And I assumed that this was standard
10   language for this kind of thing.
11        Q    For any number of reasons,
12   couldn't that document be considered a false
13   report?
14        A    I don't know.  What do you mean?
15             MS. CANFIELD:  Objection.
16        Q    Well, there are a number of things
17   that Dr. Kaye would say that were untrue in
18   that document.  Now, if, in fact, she's
19   right, wouldn't that be considered a false
20   report?
21        A    I can't -- I don't know if it
22   would be a false report.
23        Q    What's a false report, as far as
24   you're concerned?
25             MS. CANFIELD:  Objection.  You
```

```
 1                    E. FORD, M.D.
 2         can answer.
 3         A    I don't know.  I have no -- you're
 4    talking about if there's like a formal
 5    definition of it, but I imagine a false
 6    report is something that is documenting
 7    something as fact that is not.
 8         Q    Well, according the Office of
 9    Professional Conduct, for a physician to
10    make a false report, that can basically
11    cause you to lose your license.  You're
12    aware of that, right?
13              MS. CANFIELD:  Objection.  You
14         can answer if you can.
15         A    Let's see.  A false report --
16    yeah.  I mean, that sounds right.  I don't
17    know if it's related to the specific like
18    patient encounters or -- obviously Medicaid
19    fraud is a false report, those kind of
20    things.
21         Q    Also in this instance where you
22    have a document that falsely accuses another
23    practitioner or has false allegations in it,
24    that would be considered a false report,
25    would you agree?
```

```
 1                    E. FORD, M.D.
 2                    MS. CANFIELD:  Objection as to
 3              form.  You can answer.
 4         A    So I can't comment on this being a
 5    false report or not.  This was a -- my
 6    understanding is this was a result of an
 7    investigation.
 8         Q    Did you see any investigatory
 9    documents yourself?
10         A    I did not.  I believe I was not --
11    I believe that was confidential.
12         Q    So you're delivering a document on
13    behalf -- based on, in your capacity, on
14    investigation, you have no idea and
15    knowledge about; am I right?
16                    MS. CANFIELD:  Objection as to
17              form.  You can answer.
18         A    I'm delivering a document -- I
19    delivered a document that was created by the
20    labor relations department, which I trusted,
21    and it was based on an investigation that
22    the Office of Corporate Compliance, who I
23    assumed does good investigations had done.
24                    So are you asking if I believed
25    that what they had done?
```

```
 1                   E. FORD, M.D.
 2        Q    I mean, I would think you would
 3    want to read this document, read whatever
 4    investigatory report that the Office of
 5    Corporate Compliance wrote before you gave
 6    this document under your name to Dr. Kaye;
 7    wouldn't that be the case?
 8              MS. CANFIELD:  Objection.  You
 9         can answer again.
10        A    I would -- so I trusted the
11    investigation, the investigatory process.  I
12    recall that I was not privy to that
13    information.  And I've been part of those --
14    I mean, I've been asked about things and
15    told it's confidentiality in other matters
16    so.
17        Q    But you're not issuing --
18              MS. CANFIELD:  She's not
19         finished with her answer, Ms. Hagan.
20        A    Sorry.  I know I'm going on.
21              So I guess is your question, did I
22    think to contact the Office of Corporate
23    Compliance and insist on seeing their
24    investigation?
25        Q    Yeah.  Or anything associated with
```

1                    E. FORD, M.D.

2      this memo that's you're going to be giving

3      under your name, so that, you know, you at

4      least know why you're giving something of

5      this nature to an employee.

6          A    So I did talk with -- I talked

7      with people about the allegations and

8      about -- and that the investigation had been

9      founded.  And, again, I -- as I thought that

10     I was the -- I thought that there had been

11     discussion already with Dr. Kaye about this,

12     and that I was, as the head of the service,

13     responsible for delivering the memo.

14         Q    Isn't it true that this recording

15     involved a fairly notorious inmate by the

16     name of Jose Gonzalez, do you recall that?

17         A    I don't remember the name of the

18     person involved in the case.  I -- gosh, I

19     don't even know it was like a high profile

20     case.  I think so.

21         Q    So you're not sure.

22              Do you recall that Dr. Kaye

23     testified during a contra version hearing,

24     and at that point she referenced that she

25     had recorded the exam?

                          E. FORD, M.D.

1

2        A    I don't recall that.  Although I

3    do remember hearing from Dr. Jain that he

4    had learned of the potential recording, I

5    think from a transcript or from the hearing

6    somehow.

7        Q    Right.  So you're not aware of

8    unless I suggest whether or not this

9    involved a hearing or the defendant or any

10   of that; am I right?

11       A    I'm sorry.  I don't understand the

12   question.  I'm sorry.

13       Q    Let's move on.

14            I'm going to go through what's

15   going to be marked as Exhibit 12.

16                    (Whereupon, Video Recording of

17                    Forensic Psychiatric was marked

18                    as Plaintiff's Exhibit 12 for

19                    identification as of this date.)

20   (A discussion was held off the record.)

21            MS. HAGAN:  You can have them.

22       They're all yours.

23            MS. HAGAN:  We're not doing

24       that.  We're in Zoom right now.  So

25       please stop.

```
 1                    E. FORD, M.D.
 2              MS. CANFIELD:  I'm asking
 3         after the deposition, if you can
 4         please send --
 5              MS. HAGAN:  When I get to it.
 6              MS. CANFIELD:  Then I will be
 7         writing to Magistrate Judge Kott*.
 8         It's a professional courtesy.  I
 9         should not have to bring this up.
10              MS. HAGAN:  When I get a
11         chance.  That's what I said.
12         Q    So, now, the document that I'm
13    referencing is Exhibit 12, is Video and
14    Recording of Forensic Psychiatric
15    Evaluations by APPL.
16              Do you see that, Dr. Ford?
17         A    It's not on the screen.
18         Q    Let me share it.
19              Do you see it now?
20         A    I do, yeah.
21         Q    So yes.  So you see this document,
22    right?
23         A    Yeah.
24         Q    At any point have you come across
25    this document or read this document
```

1                    E. FORD, M.D.

2     yourself, Dr. Ford?

3          A    If you could scroll down.  Can you

4     scroll through the document.

5          Q    Dr. Hope, do you remember him?

6          A    I do.

7          Q    So he actually penned there.  He's

8     one of the authors of this document.  It

9     talks about the Video Recording of Forensic

10    Psychiatric Evaluations.

11               You see that, right?

12         A    Yes.

13         Q    Now, we're going to page 12 of

14    this, which would be the equivalent of

15    NYC4094.  And basically it says that the

16    recommendations of the AAPL task force on

17    video recording forensic interviews.

18               You see that, right?

19         A    I do.

20         Q    "The task force on video recording

21    forensic interviews began by reviewing the

22    current case law and professional

23    guidelines."  And it then says, "There were

24    no specific AAPL or APA standards or

25    guidelines on video recording forensic

```
 1                       E. FORD, M.D.
 2      interviews."
 3                  You see that, right?
 4          A    I see that.  Yeah.
 5          Q    How did you determine that it was
 6      inappropriate again to -- or agree that it
 7      was inappropriate to record exams if there
 8      had been no guidelines specifically on this
 9      topic?
10          A    So I recall -- first of all, I
11      will just note that this is about video
12      recording, which is slightly different than
13      audio recording.  But, regardless, I relied
14      on Dr. Jain and his review of whatever was
15      out there with respect to the audio
16      recording of competency evaluations and my
17      conversations with other experts.
18          Q    You're saying that you relied upon
19      Dr. Jain, and that they didn't rely -- that
20      no one relied upon you, it was Dr. Jain who
21      served as the knowledge base, of the subject
22      matter expert right here I should say?
23          A    What I'm saying is that in the
24      conversations that I had with Dr. MacDonald,
25      Ms. Yang, Mr. Wangel, as I've mentioned
```

```
 1                    E. FORD, M.D.
 2    before, and Dr. Jain, that the information
 3    we shared with them about whether this would
 4    be appropriate or not was based on
 5    Dr. Jain's research, as well as the
 6    expertise of people that he and I both asked
 7    around about.
 8        Q    So I guess to make it clear, was
 9    Dr. Jain asked to research this topic for, I
10    guess, the Office of Corporate Compliance in
11    their efforts to write this memo -- I mean,
12    not this memo, but just in their general
13    efforts?
14            MS. CANFIELD:  Objection to
15          form.  You can answer if you're
16          able.
17        A    Is the question, was Dr. Jain
18    asked by the corporate compliance office to
19    do this?
20        Q    Or management in general.
21        A    I asked Dr. Jain to look into what
22    was available in the literature about this
23    process.  I can't remember what he -- I
24    can't remember the outcomes of it, but I do
25    remember asking him, and we, I believe -- I
```

Page 282

```
 1                     E. FORD, M.D.
 2    recall having conversations with him about
 3    it.
 4        Q    So you said you recall having
 5    conversations with him about it, but you
 6    don't know if he was necessarily tasked with
 7    this or not, but he was the subject matter
 8    for  -- am I right?
 9                 MS. CANFIELD:  Objection as to
10           form.
11        A    What I said is that I did ask him
12    to do research on this topic.
13        Q    So now I'm going to direct you to
14    what's known as, I guess as Plaintiff's
15    Exhibit 13.  And I'm not sure if you
16    actually saw this document.  But it's from
17    --
18        A    Your screen just -- could you pull
19    it up again.
20                     (Whereupon, Email
21                     (NYC_2794-2800) was marked as
22                     Plaintiff's Exhibit 13 for
23                     identification as of this date.)
24        Q    Here it is.  So it's from Ms.
25    Patsos to Ms. Yang and Mr. Wangel.  And
```

1                     E. FORD, M.D.

2       let's see if you're cc'd.

3                First and foremost, did you see

4       any documents that look like this during the

5       course of your, I guess, discussion of what

6       transpired with Dr. Kaye?

7            A    This does not look familiar to me.

8            Q    Now, one of the documents that it

9       references as a source is the American

10      Academy of Psychiatry and Law Task Force

11      document, the video recording of forensic

12      psychiatric evaluations.  Is what we just

13      reviewed as Exhibit No. 12.

14               You see that, right?

15           A    I see that -- I think that the one

16      you pulled up may have been the 1998

17      version.  But I do see that here at the

18      bottom about 2013.

19           Q    And then it also -- well, it

20      actually has a footnote here.  It says the

21      video recording of forensic psychiatric

22      evaluations AAPL task force approved by AAPL

23      executive counsel, May 31, 1998, revised

24      May 2013.  So that's not accurate.  The site

25      is inaccurate.  This is what's actually what

Page 284

```
 1                    E. FORD, M.D.
 2      we referenced.  You understand?
 3           A    I mean, I --
 4                MS. CANFIELD:  She's
 5           testifying.  So, yes, let's move on.
 6                MS. HAGAN:  I'm not
 7           testifying.
 8           Q    So, now, were you aware that
 9      Dr. Mundy was questioned about the actual
10      custom and practice?
11           A    I was not aware of that.  I was
12      not aware as far as this investigation.
13           Q    Were you aware that Dr. Owen was
14      interviewed?
15           A    I was not.
16           Q    Do you know if any of the other
17      forensic evaluators were interviewed?
18           A    I don't know.
19           Q    Just for purposes of the record, I
20      just want to bring up Exhibit 12 again.
21      Exhibit 12, it is the same document.  It
22      says May 31, 1998, as revised in May 2013.
23                You see that, right?
24           A    I do, yes.
25           Q    Just making sure.  Okay.
```

Page 285

                         E. FORD, M.D.

1

2              So, now, at any point did you

3     question the methodology -- now I'm hearing

4     a recording in the background again or an

5     echo in the background.  I don't consent to

6     being recorded.

7              So, by any chance, did anyone --

8     did you have a chance to review this

9     document?

10        A    This document does not look

11    familiar to me.

12        Q    Did you review any document from

13    the Office of Corporate Compliance

14    pertaining to this investigation?

15        A    I don't -- no.  I don't think so.

16        Q    So you just took it the word of, I

17    guess, whoever presented you with this memo.

18    Who gave you did memo to give to Dr. Kaye?

19              MS. CANFIELD:  Objection.  You

20         can answer again.

21        A    I think it was sent to me by

22    Samantha Kent or Jonathan Wangel and labor

23    relations.

24        Q    So Ms. Kent works in labor

25    relations?

1                    E. FORD, M.D.

2          A    She did at the time.  I don't know

3     if she's still there, actually.

4          Q    Mr. Wangel does or did?

5          A    Yes.  I -- yes.  I think he --

6     sorry.  Yes.  At some point he did, yes.

7          Q    Now, Dr. Kaye also alleges that

8     this memo was in retaliation for her filing.

9               Do you disagree?

10               MS. CANFIELD:  Objection.  You

11          can answer.

12          A    I did not see this as retaliation.

13          Q    Did anybody else get written up

14     for recording exams?

15          A    I was not aware of any instance of

16     anyone recording an exam ever during my time

17     and familiarity with the clinics.

18          Q    Did you read the transcript from

19     the controversial hearing that Dr. Kaye

20     testified at?

21          A    I did not read the whole

22     transcript.  I believe in one of the

23     meetings that I had with Dr. Jain, he showed

24     me a highlighted portion that had -- I can't

25     remember the words of it, but something to

```
 1                    E. FORD, M.D.

 2      the effect that Dr. Kaye had said she had

 3      recorded.

 4           Q    So you would not be aware that Dr.

 5      Charter (phonetic), the other evaluator, the

 6      other expert in the case, that she actually

 7      recorded her examination of Mr. Gonzalez?

 8                 MS. CANFIELD:  Objection.  You

 9            can answer if you're able.

10           A    I don't know who that doctor is or

11      where they work or anything.

12           Q    But that's not the question.

13      You're not aware that she did as well,

14      record her interaction with the inmate?

15                 MS. CANFIELD:  Again,

16            objection.  There's no foundation

17            for any of this, but go ahead.

18           A    I'm not aware of what you just

19      said, that some other doctor recorded also.

20           Q    Now, earlier -- now, at any point

21      did it come to your attention that Dr.

22      Collin recorded exams?

23           A    No.  I'm not aware of that.

24           Q    So did you speak to anyone above

25      Dr. Jain or anyone who may have had more
```

Page 288

1                    E. FORD, M.D.

2    experience than Dr. Jain about the practice

3    of recording exams?

4         A    I spoke with Dr. Barbara,

5    Dr. Garcia.  I spoke with -- I don't recall.

6    I have a recollection of speaking with --

7    who was it -- I can't remember who.  I feel

8    like one of the sort of meetings of forensic

9    psychiatrists, I raised the question.

10        Q    Now, Dr. Barbara is a

11   psychologist; is that right?

12        A    Yes.  Sorry.  She is a

13   psychologist.

14        Q    And Dr. Garcia, Mensia Garcia,

15   she's a psychologist; is that right?

16        A    Yes.

17        Q    Have any of these individuals have

18   anywhere near as much experience as Dr. Kaye

19   in doing forensic evaluations?

20             MS. CANFIELD:  Objection as to

21         form.  You can answer.

22        A    I don't know.  That's a good

23   question.  I don't know.

24        Q    Were any of them doing them for 20

25   years?

```
1                      E. FORD, M.D.

2          A    I'm not sure when Dr. Garcia

3     started doing evaluations.  Probably not.

4          Q    Dr. Garcia, was she working at CHS

5     the first time you started work there back

6     in 2009?

7          A    CHS didn't exist in 2009.

8          Q    Was she working at the court

9     clinics at that time?

10         A    No.  She was not.  I believe she

11    was in private practice.  Doing some stuff

12    in private work.

13         Q    In 2009?

14         A    I don't know if -- I don't know

15    what she was doing in 2009.

16         Q    Right.  And for Ms. Barbara Rioja,

17    was that the same, was she working there

18    in 2009?

19         A    In the clinics?

20         Q    Yes.

21         A    No.

22         Q    Do you know when Ms. Barbara Rioja

23    actually started working in the clinics?

24         A    I don't believe she ever worked in

25    the clinics.
```

1                    E. FORD, M.D.

2         Q    Do you know that she did 730

3    exams?

4         A    I know that she did some in

5    private practice.  She may have done some as

6    part of training in forensic psychology.

7         Q    Do you see in reports from both of

8    these individuals in private practice that

9    they did these exams, yourself?

10        A    No.  I have not seen reports of

11   theirs, no.

12        Q    So you don't have any firsthand

13   knowledge that they did 730 exams; am I

14   right?

15        A    I have they're saying that they

16   do.

17        Q    I asked you if you had firsthand

18   knowledge.  That's what I asked.

19        A    Sorry.  Then I guess I don't quite

20   understand.  You mean have I seen the

21   reports that they have done privately?

22        Q    Yes.

23        A    Not that I can remember.

24        Q    I'm going to ask you some

25   questions about Dr. Kaye's pay parity

Page 291

                              E. FORD, M.D.
1
2       complaints.

3                   This will be marked as Exhibit 14.

4                        (Whereupon, Email

5                        (NYC_1530-1532) was marked as

6                        Plaintiff's Exhibit 14 for

7                        identification as of this date.)

8          Q    It's bears the Bate Stamp series

9       NYC1530 through 1532.  Okay.

10                  Before I get into that, Dr. Ford,

11      would it be considered -- you were aware of

12      Dr. Kaye's testimony at the controversial

13      hearing for Jose Gonzalez; am I right?

14                  MS. CANFIELD:  Objection.  You

15             can answer.

16         A    Was I aware that she had

17      testified, is what you mean?

18         Q    Yes.

19         A    Yes.  I think.

20         Q    So you knew that she had

21      testified, and you also played a part in the

22      decision to issue these memos to Dr. Kaye in

23      the wake of that testimony; am I right?

24                  MS. CANFIELD:  Objection.  You

25             can answer.

1                    E. FORD, M.D.

2        A    I knew that she had testified

3    after she testified, as I learned about the

4    report that she had recorded.  And that lead

5    to me sending that information to -- the

6    allegation to -- I can't remember who I sent

7    it to.  I think Dr. MacDonald and Yang and

8    Wangel, Mr. Wangel.

9        Q    Was it a collective decision to

10   issue this memo or could anyone of you said,

11   no, the memo should not have been issued?

12            MS. CANFIELD:  Objection to

13        form. You can answer.

14       A    I don't know if any of us could

15   have said, no, could it have been issued.  I

16   recall it being approved by Ms. Yang and --

17   let me stop there.

18       Q    Now, I'm going to go to Exhibit

19   14, which again bears the Bate Stamp series

20   NYC1530 to 1532.

21            Now, I'm going to start at the

22   beginning of the email thread.  And that's

23   an email from Dr. Kaye to Ms. Gillen dated

24   May 3, 2018.  You see that?  Or do I have

25   the share function up.  I don't.

Page 293

```
 1                     E. FORD, M.D.

 2              You see it now, right?

 3         A    I do, yes.

 4         Q    Now, she says that she's been

 5    employed at H&H Bellevue Hospital as a

 6    forensic psychiatrist court evaluated since

 7    1999.  You see that, right?

 8         A    I do.

 9         Q    You see that she says she's a

10    medical director of the Bronx Court Clinic

11    since 2004, right?

12         A    Yes.

13         Q    Now, she notes that -- she first

14    sites the Steven Ciric as the medical

15    director of the Manhattan Court Clinic, was

16    on the physician specialist line.  You saw

17    that, right?

18         A    I see that on the screen here.

19    Yeah.

20         Q    Now, is that a managerial title?

21         A    Again, back to my earlier

22    testimony, that -- I don't know the

23    difference between physician specialist and

24    attending three line in terms of managerial

25    or not.  I don't know.
```

```
                              E. FORD, M.D.
 1
 2        Q    At any point did you tell Dr. Kaye
 3   that she would have to be a manager in order
 4   to receive pay parity?
 5        A    I don't think so.  I did tell her
 6   that -- not at this time at Bellevue, but in
 7   at CHS, that there might be more flexibility
 8   about pay if she was on a managerial line.
 9   I recall that there were some fairly rigid
10   pay structures at Health and Hospitals.
11        Q    Why is it that Dr. Kaye wasn't
12   allowed to be placed in the physician
13   specialist line?
14             MS. CANFIELD:  Objection.  You
15        can answer.
16        A    Sure.  I don't know.  I believe
17   that decision was made -- predated me by a
18   long time.
19        Q    She asked for it here in May of
20   2018, she asked Ms. Yang to be placed in the
21   physician specialist line.  Why wasn't it
22   that she's allowed to work in that title?
23             MS. CANFIELD:  Objection.  The
24        document speaks for itself, but you
25        can answer.
```

1                    E. FORD, M.D.

2          A    So -- sorry.  It says, just so I'm

3     clear in my answer.  It says in here a

4     request to become a physician specialist?

5          Q    "My lower pay also reflects the

6     hostile work environment in which I was

7     hired.  At the time I was hired, Manuel

8     Trujillo was the director of the Department

9     of Psychiatry at Bellevue."  And then she

10    goes about the blatant chauvinist and stuff

11    like that.

12             Did you know Dr. Trujillo?

13         A    Sort of.  I know his name.  I

14    never really had much interaction with him.

15         Q    Was he chauvinist?

16         A    I don't know.

17         Q    Did Dr. Berger treat women in a

18    highly sexist manner, to your knowledge?

19         A    I don't know.  I did not work

20    directly with Dr. Berger.

21         Q    Had he a history of sexual

22    misconduct?

23         A    Not to my knowledge.

24         Q    Do you know if he was fired based

25    on allegations of sexual harassment?

```
1                    E. FORD, M.D.
2        A    I don't know how he was fired.
3    Because that happened before I arrived.
4        Q    Dr. Kaye, in approximately in 2012
5    and she brought up pay inequality to the
6    attention of the director of the division of
7    forensic psychiatry to you, Dr. Ford.  Do
8    you see that?
9        A    I saw that.  I see that now, yeah.
10       Q    She said you told her that you
11   would speak to Dr. Badaracco.  Do you see
12   that?
13       A    I see that.
14       Q    Did you ever tell her that it was
15   like moving elephants to get anything done
16   around Bellevue about this?
17       A    I don't remember those words, but
18   it sounds like something I probably said.
19       Q    Why would you say that?
20       A    Because it -- I had been -- part
21   of my job was, I saw at Bellevue was to
22   advocate for all of the physicians.  And I
23   was -- I had been frustrated about the way
24   that HR and finance sort of were separate
25   from my role.  And that I had spoken with
```

1                    E. FORD, M.D.

2     Dr. Badaracco about other issues.  And it

3     just seemed very slow and hard to get HR

4     changes done.

5          Q    Now, at the end, Dr. Kaye

6     concludes by saying, she had been trying for

7     years to rectify this, and believes the

8     problem needs to be corrected since it is

9     unlawful to pay me less because I am a

10    woman.  I request my line to be changed to

11    physician specialist with retention of all

12    my current benefits, et cetera.  Right.

13               So she clearly asked to be a

14    physician specialist title.  Did you receive

15    any feedback as to why she should not be

16    placed in this title?

17         A    I'd appreciate you, by the way,

18    going through this and bringing me to this.

19               I recall that it had something to

20    do with the functional transfer.  And that I

21    think I was told that people had to stay in

22    the line that they were in -- the way the

23    functional transfer worked is that they had

24    to stay in the line and title that they were

25    in, in this case at Bellevue or Health and

Page 298

```
1                        E. FORD, M.D.

2       Hospitals.

3            Q    And are you sure that took place

4       for everyone?

5            A    Am I sure that everyone stayed in

6       their title?

7            Q    Yes.

8            A    In their line?

9            Q    Yes.

10           A    I -- gosh.  Am I sure.  I think

11      there was some disparity between -- I'm not

12      sure.  Sorry to take so long on that.

13           Q    Now, you do say in your response,

14      I'm good with your response, I guess to

15      Ms. Yang, right.  And you said, "I fully

16      acknowledge that I may have referenced

17      elephants (cannot remember) although do

18      remember many meetings with finance and MAB,

19      I guess that's Dr. Badaracco, about this

20      very issue."

21                You recall that, right?

22           A    I see that email here, yes.

23           Q    Now, at any point did you dispute

24      whether or not Dr. Kaye had the same

25      workloads or comparable workloads to the
```

```
 1                      E. FORD, M.D.

 2     other directors?

 3          A    Did I dispute?

 4          Q    Or had analysis or some kind of

 5     discussion about Dr. Kaye's workload in

 6     comparison to the other directors.

 7          A    I think that did come up.  I

 8     believe we did -- gosh, I think we sort of

 9     looked at the workloads for each clinic.

10     And I believe -- I think I may have

11     requested it to try to justify an increased

12     line, but I needed the data.  So I recall

13     that.

14          Q    So you're denying that you played

15     a part in any way in the pay disparity and

16     the title disparity that Dr. Kaye

17     experienced at CHS and H&H?

18                    MS. CANFIELD:  Objection as to

19              form.  You can answer.

20          A    I was not involved in -- I'm

21     sorry.  Could you rephrase it.  It's hard

22     to --

23          Q    Well, did you play a part in the

24     decision of not increasing Dr. Kaye's

25     salary?
```

Page 300

```
 1                    E. FORD, M.D.
 2        A     I did not play a part in that.  I
 3   advocated for an increased salary for her.
 4        Q     Who decided that Dr. Kaye should
 5   not get more money?
 6                 MS. CANFIELD:  Objection as to
 7             form.  You can answer.
 8        A     The way that it worked in terms of
 9   salaries at CHS, was that I would submit a
10   request, and then it would go to HR, and
11   then those would be reviewed -- my
12   understanding is that those would be
13   reviewed by Ms. Yang for approval or not.
14        Q     Was Ms. Yang the final decision
15   maker when it came to salary and titles and
16   positions?
17        A     That's -- yes.  That was my
18   experience.
19        Q     So now I'm going to show you
20   what's going to marked as Exhibit 15.  And
21   it's Dr. Kaye's EEOC charge.
22                 You see that, right?
23                    (Whereupon, Dr. Kaye's EEOC
24                    Charge (NYC_3330-3331) was
25                    marked as Plaintiff's Exhibit 15
```

Page 301

```
 1                    E. FORD, M.D.

 2                      for identification as of this

 3                      date.)

 4          A    I do.

 5          Q    And it's dated September 13, 2018.

 6    Do you see that?

 7          A    I do.

 8          Q    And I guess it's an additional

 9    document to the May 22, 2018 EEOC charge.

10                    You see that, right?

11          A    I don't know.  Sorry.  Do I see

12    that it's the --

13          Q    Right here.  It says digitally

14    signed by Melissa Kaye.

15          A    I do see that.  I see that it's

16    digitally signed, yeah.

17          Q    Right.  So just to put context in

18    this exhibit.

19                    Dr. Kaye alleges, I'm a

20    55-year-old Caucasian female who has worked

21    for Bellevue Hospital and HHC since 1999.

22    Most recently at the Bronx Court Clinic

23    medical director.  I believe I've been

24    discriminated against because of my sex and

25    equal pay act."
```

```
 1                    E. FORD, M.D.
 2              And then she goes, "Specifically
 3    I've been paid less than the male Manhattan
 4    Court Clinic medical directors, despite
 5    having the same title and job duties.  I've
 6    been paid under an Attending III title since
 7    1999, when the men who have worked at the
 8    Manhattan Court Clinic medical director have
 9    been paid the physician specialist.  Right.
10    And the physician specialist title carries
11    significant pay increase and the male
12    Manhattan Court clinic medical directors
13    have made significantly more money than I
14    over the last 20 years I have worked there.
15              Right?  You see all that, right?
16         A    I do see that.
17         Q    Then I'm scrolling down more
18    because she has a supplement to her charge
19    and that's filed on September 7, 2018.
20              You see that, right?
21         A    Yes.
22         Q    She's supplementing her charge.
23    She's adding that basically her supervisor
24    Dr. Jain after and pay parity and after she
25    filed the EEOC complaint regarding Dr. Jain
```

```
 1                        E. FORD, M.D.
 2      called me the next day to inform me that he
 3      had reported my actions to Jonathan Wangel.
 4                 Do you see that?
 5           A    I see that on the screen here.
 6           Q    At any point did Dr. Jain tell you
 7      that he reported Dr. Kaye's charge to labor
 8      relations?
 9           A    I think that in one of our
10      supervision sessions Dr. Jain told me that
11      he had notified Dr. Wangel -- I'm sorry
12      Mr. Wangel, about Dr. Kaye's report of
13      filing.
14           Q    At any point did you tell or
15      admonish Dr. Jain that retaliation is
16      prohibited under the law?
17           A    Did I -- so retaliation, I don't
18      think I said that.  He was not bringing this
19      up as retaliation.  He told me he had, as
20      was appropriate, notified labor relations
21      that an EEOC complaint had been filed.  That
22      somebody who reported to him.
23           Q    Did he notify the EEO office?
24           A    I don't know.  I'm not sure what
25      the advice was from labor relations.  I'm
```

```
 1                    E. FORD, M.D.
 2      not sure.
 3          Q    Have you received ever EEO
 4      training yourself, Dr. Ford?
 5          A    I think there has been -- I think
 6      I have as part of manager training at some
 7      point in my career.  I wish I could tell you
 8      exactly when.
 9          Q    Did you receive any EEO training
10      while you were at CHS?
11          A    I believe that I did.  I believe
12      it was part of an annual training.
13          Q    She goes on and she talks about,
14      in July of 2018 she is demoted in terms of
15      title.  So from -- she files her EEOC charge
16      in May of 2018.  And Dr. Kaye complains that
17      she was demoted in title.
18               Now, you disagree that the change
19      of medical director to director is a
20      demotion, right?
21          A    I do not see that director is a
22      demotion from medical director.  And, again,
23      I was not under the impression that medical
24      director was a title she couldn't use.
25          Q    Now, she also complains that the
```

```
 1                    E. FORD, M.D.
 2     title director is not commensurate with her
 3     training credentials, expertise.  Would you
 4     disagree with that?
 5          A    I don't know what that means
 6     exactly.  Director to me is like the head
 7     person of a thing.
 8          Q    Do you believe that the difference
 9     in title would have a negative impact on
10     Dr. Kaye's degree -- I mean, professional
11     opportunities?
12          A    So I don't agree that director is
13     a lesser title.  Are you -- is your
14     question, if director was a lesser title
15     would that be a problem or?
16          Q    Would it negatively impact, the
17     change from medical director to director,
18     would it negatively impact her job
19     opportunities?
20          A    Not that I'm aware of.
21               MS. CANFIELD:  Objection.
22          Q    For the record, Dr. Ford said not
23     that I'm aware of.  Is that clear?  Is that
24     right?
25          A    Yes.
```

Page 306

1                    E. FORD, M.D.

2         Q    Now, on August 6, 2018, she

3    complains of a shift change.

4              Do you see that?

5         A    I do see that, yes.

6         Q    Now, she says, "When I returned

7    from scheduled annual leave I was informed

8    by Dr. Jain that he and Mr. Wangel had

9    discussed that I would no longer be allowed

10   to take my long established, formerly agreed

11   upon 30-minute unpaid lunch break.  And

12   instead I would be required to take an hour

13   unpaid lunch break.  Thereby increasing the

14   length of my work shift from eight and a

15   half hours a day to nine hours a day."

16             You see that, right?

17        A    I see that.

18        Q    "In addition, Dr. Jain and

19   Mr. Wangel have also changed the start time

20   of my shift from 9:00 a.m. to 8:00 a.m.

21   without explanation or justification."

22             Do you see that?

23        A    I see that.

24        Q    Now, did you play any part in

25   either change that Dr. Kaye just described?

```
1                      E. FORD, M.D.

2        A    No.

3        Q    Now, again, is there any practical

4    business reason for having this change?

5                 MS. CANFIELD:  Objection.  You

6            can answer.

7        A    I don't know the reasoning behind

8    it, that was going on between CHS, when it

9    was made, is there a business reason.

10       Q    Well, your subordinate is

11   enforcing something, right?  Dr. Jain was

12   your subordinate, wasn't he?

13       A    Again, this was when I was on

14   leave.  So I was not involved at all in

15   these conversations.

16       Q    But you came back and Dr. Kaye was

17   probably still complaining; am I right?

18       A    You are correct.  In fact, we've

19   talked about that already.  That she spoke

20   with me when I came back and I started to

21   advocate for her about this.

22       Q    Right.  Now, at any point did you

23   do anything about any of the allegations

24   that were in the EEOC charge?

25                 MS. CANFIELD:  Objection as to
```

Page 308

                         E. FORD, M.D.

1                    form.  You can answer.

2

3          A    Sure.  I don't recall seeing that,

4    the thing that you just pulled up, before

5    today, so.

6          Q    Were you ever given instructions

7    not to destroy your emails or any other

8    documents from CHS or any other legal

9    department?

10         A    Yes.  That sounds familiar.  I

11   think I was.  I'm not -- I don't know at

12   what point, but that sounds familiar.

13         Q    You're not sure at what point.

14   Did you receive an email?

15         A    I don't know.

16         Q    You don't know if you got a call

17   or an email?

18         A    Yeah.  I don't remember.

19         Q    Now, did you know that Dr. Kaye

20   filed a number of complaints about

21   malfeasance against CHS and HHC?

22         A    I was aware of the complaint that

23   we're talking about today, the one from end

24   of May of 2019 and I was --

25         Q    In the lawsuit?

```
                         E. FORD, M.D.
  1
  2        A     Sorry.   The lawsuit that we're
  3    talking about.   And I was aware of --
  4    although not the details that you just
  5    described me, but of the EEO complaint.   But
  6    then you said about malfeasance against CHS
  7    and Health and Hospitals?
  8        Q     Right.
  9        A     Yeah.   I don't think I was aware
 10    of others and those.
 11        Q     I'm going to pull up Exhibit 16.
 12    That bears the Bate Stamp series -- well, it
 13    doesn't bear the Bate Stamp series, but I
 14    will give it to counsel.
 15             MS. CANFIELD:   You've got to
 16        Bates stamp it please beforehand.
 17             MS. HAGAN:   At some point I
 18        will.
 19                 (Whereupon, Letter from Dr. Kaye
 20                 to Board of Correction and
 21                 Inspection General was marked as
 22                 Plaintiff's Exhibit 16 for
 23                 identification as of this date.)
 24        Q     It's dated January 7th.   And it's
 25    Dr. Kaye's complaint to the Board of
```

```
 1                         E. FORD, M.D.
 2       Correction and Inspector General.
 3                    Do you see that?
 4                    MS. CANFIELD:  What date?  On
 5               January 7th.  What year?
 6                    MS. HAGAN:  January  7, 2020.
 7                    MS. CANFIELD:  If you could
 8               show it on the screen.  That'd be
 9               helpful.
10                    We've never seen it.
11                    MS. HAGAN:  Yes.  You have.
12          Q    It's from Dr. Kaye.  And it says,
13       "Dear Board of Correction and Inspector
14       General."
15                    At any point -- before I get into
16       this, at any point, was your office or were
17       you ever contacted by the Department of
18       Investigation regarding any complaints by
19       Dr. Kaye?
20          A    I was contacted by the Department
21       of Investigation, I think a couple of times
22       during my time at CHS.  They did not tell me
23       that they said they couldn't tell me what it
24       was about.  One of or -- yeah.
25          Q    One of them were hers, right?
```

1                   E. FORD, M.D.

2          A    I don't know if one of them were

3     hers.  And also, I was told not to talk

4     about any of those interviews.  That they

5     were confidential.

6          Q    Who told you that?

7          A    Every time DOI has talked to me,

8     they've always said keep this confidential.

9     So I don't know if this includes in a

10    deposition or not.

11         Q    Were you contacted about

12    Dr. Kaye's allegations?

13              MS. CANFIELD:  Objection.

14         Asked and answered.  You can answer

15         again.

16         A    Sure.  Again, I was contacted by

17    DOI on I think more than one occasion about,

18    like they were asking questions, but they

19    did not tell me who had made a complaint or

20    what specific issue they were investigating.

21         Q    Now, Dr. Kaye alleges that CHS and

22    HHC management were rigging examinations.

23    Did you ever hear of any allegations to that

24    effect?

25         A    I did not.  No.

1                    E. FORD, M.D.

2        Q    Did you hear of any allegations

3    that there was double dipping on the part

4    of, I guess the forensic evaluators?

5                    MS. CANFIELD:  Objection.  You

6           can answer.

7        A    I did not hear any allegations

8    about that.  I do remember working on a

9    policy prior to -- I believe it was prior to

10   the transition, to ensure that there was no

11   double dipping.  And I'm assuming you mean

12   by that, getting paid for like private work

13   while you're on city time, that kind of

14   thing.

15       Q    Did Dr. Kaye ever raise those

16   questions or concerns to you during the

17   course of her employment?

18       A    About double dipping?

19       Q    Yes.

20       A    I don't remember that.

21       Q    Did Dr. Kaye also raise any

22   concerns to you about HIPPA waivers that

23   were going to be put in place?

24       A    HIPPA waivers.  I don't remember

25   that.

1                    E. FORD, M.D.

2          Q    At any point did you witness or

3     participate in pressuring Dr. Kaye or any of

4     the other evaluators to find defendants fit

5     or unfit?

6          A    No.

7          Q    Now, I did see that there's a dual

8     agency prohibition.  Was there anything that

9     prompted you to write a dual agency policy?

10                    MS. CANFIELD:  Objection.  You

11              can answer.

12         A    So let's -- if we're talking --

13    dual agency.  I don't think we called it a

14    dual agency policy, but I imagine you

15    mean -- I don't think we had anything called

16    dual agency.  If I could just read this.

17         Q    I'll going to pull it back up.

18    I'm looking for something that you --

19         A    I'm sorry.  I think, I do

20    recall -- actually, now this is coming back

21    to me.

22                    So I recall prior to the clinic

23    transition, like it was very high in my list

24    of requirements that we were very clear that

25    individuals could not be both providing

```
 1                        E. FORD, M.D.
 2      treatment at CHS and also doing evaluations
 3      for the same person.  And to keep the
 4      forensic evaluation and the correctional
 5      health treatment very separate.
 6                   And here's the policy, that I
 7      think is about that.
 8                        (Whereupon, Managing Dual Roles
 9                        Policy (NYC_1188-1190) was
10                        marked as Plaintiff's Exhibit 17
11                        for identification as of this
12                        date.)
13           Q    That you wrote, right?
14           A    Yeah.  Well, I mean, I worked on
15      it with Dr. Jain, with feedback from others,
16      but, yes.
17           Q    At any point prior to this policy
18      being written did Dr. Kaye raises about dual
19      agency with you?
20                   MS. CANFIELD:  Objection.
21                   Can I ask if this has been --
22              did you produce this or did you --
23              it has no Bate Stamp numbers on it.
24                   MS. HAGAN:  You produced it.
25                   MS. CANFIELD:  But there's no
```

```
1                    E. FORD, M.D.
2          Bate Stamp.
3               MS. HAGAN:  Cause it's not
4          here.  You produced it.  So again --
5               MS. CANFIELD:  I just want to
6          make sure that's the purpose of Bate
7          Stamping, so we're referring to the
8          same document.  So if you could pull
9          up the one we produced --
10              MS. HAGAN:  I'm not pulling up
11         that one.  No, I did not.  Clearly I
12         did not.
13    Q    Now, Dr. Ford --
14              MS. CANFIELD:  Okay.  But, Ms.
15         Hagan --
16              MS. HAGAN:  I will give you
17         the one that has the Bates Stamp
18         number, but please stop stalling.
19              MS. CANFIELD:  I need to get
20         the marked exhibits during the
21         deposition.
22              MS. HAGAN:  At some point.
23              MS. CANFIELD:  It's just
24         difficult to verify the document as
25         an attorney.
```

```
 1                      E. FORD, M.D.
 2                 MS. HAGAN:  You're buying a
 3            lot of time.
 4        Q    Now, again, Dr. Ford, are you
 5    familiar with this document that you
 6    participated in writing?
 7                 MS. CANFIELD:  Objection.
 8        A    It looks familiar.  I'd have to
 9    look at the details, but that definitely
10    looks familiar.
11        Q    And my question was, did this
12    document come into existence after Dr. Kaye
13    raised these issues with you or before?
14        A    The idea of dual roles and the
15    need to have a policy about that was
16    something that I had been discussing, I
17    mean, even prior to -- around the time that
18    CHS -- that I was notified that CHS might be
19    taking over the clinics.  So that was, I
20    don't know when, like early 2018 or
21    something.
22                 So I had been talking about it and
23    working on draft language around that for a
24    long time.
25        Q    And who were you circulating this
```

1                    E. FORD, M.D.

2       draft language to?

3           A    At the -- who was I circulating it

4       to.  Well, at the time when I was drafting

5       it, I wasn't circulating it to anybody.  I

6       was trying to collect information.  And then

7       when there was a draft, like an actual draft

8       to be circulated for feedback, that was,

9       probably must have been some months later,

10      circulated it to -- well, Dr. Jain was

11      there, involved in it.  Circulated it to

12      Dr. Barbara.  I think Dr. Garcia,

13      Dr. Subetti, Dr. MacDonald.

14              And then eventually the draft got

15      circulated to all -- I believe it got

16      circulated to all the directors of the

17      clinic for their feedback as well.

18          Q    Now, did you also write a private

19      practice policy?

20          A    There was one written, yes.  I

21      can't remember if I wrote it or if Dr. Jain

22      wrote it, but we came up with one of those,

23      which also had its initial ideas in very

24      early 2018.

25          Q    So it's your testimony that the

Page 318

```
 1                    E. FORD, M.D.
 2     policy came out before Dr. Kaye could have
 3     possibly complained; is that right?
 4              MS. CANFIELD:  Objection.  Go
 5          ahead.
 6       A    Well, the official policy -- I
 7     don't recall the dates when the official
 8     policy came out.  What I'm saying is that we
 9     were working on these policies, which was
10     fairly complicated, over many months, and
11     that that process started long before
12     July 1st, 2018.
13       Q    But my question is, did it become
14     before Dr. Kaye complained about, you know,
15     malfeasance?
16              MS. CANFIELD:  Objection.  I
17          don't think we have a date for when
18          she complained.  It's difficult for
19          her to answer the question.
20              MS. HAGAN:  She doesn't need a
21          date.  I'm asking based on her
22          recollections if she remembers.
23       A    I don't remember at all hearing a
24     complaint from Dr. Kaye about dual agency or
25     private practice prior to my already
```

```
 1                    E. FORD, M.D.
 2      starting policy work in those areas.
 3          Q    But you're not sure when you
 4      started; am I right?
 5                    MS. CANFIELD:  Objection.  You
 6             can answer.
 7          A    Yeah.  I'm sure that I started
 8      thinking about it and recognizing we needed
 9      a policy at the time that CHS, the decision
10      was made to move it over to -- to move the
11      clinics over.  When that time was, I don't
12      know.
13          Q    Was the policy in wake of the
14      agency to encourage or to attract more
15      talent to the clinics?
16          A    Which policy was that?
17          Q    The private policy.
18          A    No.  Actually, in fact, I was
19      concerned that it would be a deterrent.
20      Because the -- my recollection of the
21      various clinics, not in the Bronx, I would
22      say, is that there may be some looser rules
23      around private practice work.  And I wanted
24      to be very clear about avoiding any
25      conflicts and making sure that the exams
```

Page 320

```
 1                    E. FORD, M.D.
 2     were objective.
 3              So I was actually concerned it
 4     might diminish recruitments, but it seemed
 5     ethically important, regardless.
 6        Q    Now, I'm going to show the private
 7     practice policy as was penned by
 8     Dr. MacDonald.
 9              Now, you said you participated
10     in -- well, at least he signed off.  You
11     said you participated in the drafting of
12     this as well, right?
13        A    Yes.  In the -- these clinic
14     policies.  I don't know if I wrote the whole
15     thing or Dr. Jain wrote a draft and I edited
16     it.  And then Dr. MacDonald, as the chief
17     medical officer, had to sign on these
18     policies.
19        Q    At any point did it ever come to
20     your attention that specific evaluators had
21     been given incentive to find a certain way
22     in the administration of their exams?
23              MS. CANFIELD:  Objection.
24        A    No.  That did not come to my
25     attention.
```

Page 321

1              E. FORD, M.D.

2        Q    Exhibit 18, for purposes of the

3   record, would be the private practice policy

4   as penned by Dr. MacDonald.  It bears the

5   Bate Stamp series 3864 through 3866, NYC3864

6   through 3866, and it's signed by

7   Dr. MacDonald on June 17, 2018.

8              You see that, right?

9        A    I do.

10             (Whereupon, Private Practice

11             Policy (NYC_3864-3866) was

12             marked as Plaintiff's Exhibit 18

13             for identification as of this

14             date.)

15        Q    So Dr. Kaye alleges that she made

16   complaints about these various things and

17   that basically she experienced further

18   retaliation by CHS staff and management.

19             Now, you don't recall Dr. Kaye --

20             MS. CANFIELD:  We can't hear

21        you.  You're talking really low.

22        Q    I said you don't recall Dr. Kaye

23   making these various complaints, do you?

24             MS. CANFIELD:  Objection.

25        A    Which complaints are you referring

Page 322

1                        E. FORD, M.D.

2        to?

3            Q    Complaints about the private

4        practice policy, the complaints about

5        ordering the psychological reports.

6                  Do you recall complaints about

7        that?

8                  MS. CANFIELD:  Objection.  Are

9              these in the complaint?

10           Q    I just said before, do you recall

11       any complaints that Dr. Kaye made about the

12       recording -- not the recording.

13                 Do you recall any complaints that

14       Dr. Kaye made about ordering psychological

15       tests, having to go through Dr. Jain?

16           A    I remember that there was -- I

17       think with all of the policies there was

18       feedback, important substance feedback for

19       most of the directors, including Dr. Kaye.

20                 I think that there was a

21       concern -- I think it was Dr. Kaye who was

22       concern -- who did voice a -- Dr. Jain sent

23       the policy around for feedback, and I think

24       she had feedback that -- had something to do

25       with supervision of psychological testing.

```
 1                    E. FORD, M.D.
 2      If the -- yeah.  Details escape me, but if
 3      you have the policy, I could maybe look at
 4      it.
 5           Q    I'm not going to do that just yet.
 6                Now, at any given point, were
 7      there any meetings, all staff meetings with
 8      Ms. Yang and CHS staff, do you recall any of
 9      those?
10           A    Were there any all staff meetings.
11      I think there were.  Yes.  I don't know if
12      they were all staff, like all CHS treatment
13      staff or all CHS, including the court
14      clinics.  I do think -- so I can't recall
15      that.
16                I don't know if there was a
17      meeting with like all treatment and court
18      clinics together with Ms. Yang.  I don't
19      remember.
20           Q    I'm going to ask you some
21      questions about the FMLA aspects of
22      Dr. Kaye's complaint.
23                At any point did Dr. Kaye tell you
24      she needed to take FMLA to take care of her
25      son?
```

Page 324

                          E. FORD, M.D.

1

2      A    I'm sorry.  Just one moment.

3           (Brief pause)

4           Okay.  I'm so sorry.  I think your

5      question is about FMLA; is that right?  And

6      did Dr. Kaye ever talk to me about FMLA?

7      Q    Yes.

8      A    I think that she did, yeah.  I

9      think it, probably more than once, I think.

10     I believe she did mention that she needed to

11     take FMLA.

12     Q    Do you recall her FMLA request

13     being denied?

14          MS. CANFIELD:  Objection as to

15          form.  You can answer.

16     A    Yeah.  I don't know the outcome of

17     the FMLA request.  I was blind to those.

18     Q    Here you have Dr. Kaye making

19     various complaints, and you didn't bother to

20     keep track as to any of the outcomes of any

21     of those complaints?

22          MS. CANFIELD:  Objection as to

23          form.  You can answer.

24     A    So Dr. Jain was Dr. Kaye's

25     supervisor.  And so if there was an issue

1                    E. FORD, M.D.

2      that rose above him that was concerning, I

3      would look into it.

4          Q    Now, at any point -- well, the

5      issue had risen above him.  At some point

6      Dr. Kaye complained to Dr. Yang and

7      Dr. MacDonald and yourself about FMLA and

8      her reasonable accommodation request.

9                    Do you remember those things?

10                   MS. CANFIELD:  Objection as to

11              form.  You can answer.

12         A    I actually don't remember a

13     specific -- I remember that there was

14     concern about reasonable accommodation

15     relate -- I think it was related to the

16     healthcare for her son.  And I don't

17     remember the -- there was a -- about FMLA.

18     I don't remember hearing that there was an

19     issue about that.

20         Q    You're not aware of the FMLA

21     complaint that -- the FMLA, I guess,

22     application that Dr. Kaye filed?

23                   MS. CANFIELD:  Objection.

24              Asked and answered.  You can answer

25              again.

```
                          E. FORD, M.D.
 1
 2        A     Yeah.  I think I was aware that
 3    she had requested FMLA.  I don't recall
 4    hearing anything further that it had been
 5    denied or that there was a problem about --
 6        Q     And you don't recall it being --
 7    defense having extended an FMLA request?
 8             MS. CANFIELD:  Objection.
 9        A     I'm sorry, who --
10        Q     Well, you and CHS management.
11             MS. CANFIELD:  Objection.  Go
12         ahead.
13        A     I did not ever -- I did not field
14    FMLA requests.  I mean, I wasn't a recipient
15    of those requests, but I never denied -- I
16    never denied any FMLA.
17        Q     Now, how would you describe your
18    relationship with Dr. Yang and Dr. Kaye?
19             MS. CANFIELD:  Objection.  Go
20         ahead.
21        A     How would I describe the
22    relationship with Dr. Jain and Dr. Kaye; is
23    that what you asked?
24        Q     Yes.
25        A     I would say that it was cordial.
```

Page 327

1                          E. FORD, M.D.

2          And I think that there was a little bit

3          of -- I think initially it was -- how would

4          I describe it.  That's a good question.

5                    I think that it was -- there were

6          times when it was a little prickly.  I think

7          they have -- they were getting used to each

8          other.  I don't know.  But I -- I don't

9          recall that it was like super smooth.  I

10         recall having many conversations with Dr.

11         Jain about being new to CHS and new to New

12         York, and just sort of getting used to the

13         lay of the court land here in New York City.

14         Q    Would you say that Dr. Kaye is

15         difficult to work with?

16         A    I haven't worked directly -- I

17         don't believe I've ever worked directly with

18         Dr. Kaye as a colleague.

19         Q    But you were privy to some

20         complaints she's made, and you said that you

21         had no complaints about the quality of her

22         work.  My question, yes or no, is would you

23         say that she was difficult to work with,

24         based on your own knowledge?

25         A    Based on my interactions with her,

1                    E. FORD, M.D.

2      she was professional with me and she did --

3      her work in the clinics was, the reports

4      were very good.

5          Q    At any point did you opt to have

6      Dr. Winkler attend a work force meeting or

7      task force meeting with you rather than

8      Dr. Kaye?

9          A    No.  I believe that's a reference

10     to a request I made to Dr. Collin for --

11     because this work group met before the court

12     clinics came over to CHS, and he was in

13     charge of those two clinics.  I asked for

14     his -- if I wanted a representative -- he

15     was requesting a representative from the

16     Bronx clinic and the Manhattan clinic to

17     join the work group.

18         Q    But what happened, Dr. Kaye

19     alleges that you decided to go for her

20     subordinate rather than her, her male

21     subordinate.  Do you recall any allegations

22     to that affect?

23         A    I recall that allegation.  That

24     is, in fact, incorrect.  I asked Dr. Collin,

25     who was Dr. Kaye's supervisor at the time,

```
 1                      E. FORD, M.D.
 2      and he referred Dr. Winkler to the meeting.
 3           Q    Instead of Dr. Kaye, even though
 4      she had more experience than Dr. Winkler?
 5           A    I can't tell you about the thought
 6      process behind Dr. Colli's decision.
 7           Q    So you're saying it was Dr.
 8      Colli's decision, not yours, for Dr. Winkler
 9      to attend?
10           A    Yes.  That's correct.  I was not
11      Dr. Winkler or Dr. Kaye's supervisor at the
12      time.
13           Q    So now I'm going to draw your
14      attention to I guess Exhibit Number 19.  It
15      bears the Bate Stamp series NYC1059 through
16      1061.  I'm going to share the screen now.
17                      (Whereupon, Email
18                      (NYC_1059-1061) was marked as
19                      Plaintiff's Exhibit 19 for
20                      identification as of this date.)
21           Q    I'm going to give you some
22      context.  It starts with December 28, 2018,
23      apparently it's through Dr. Jain's.
24                Now, earlier we discussed that
25      Dr. Kaye made the allegation that Dr. Jain
```

```
                        E. FORD, M.D.
 1
 2     destroyed his notes after he, I guess,
 3     involved doing his interviews, right?
 4          A    Yes.  I remember that allegation.
 5          Q    So here Dr. Jain is saying -- this
 6     is you first -- I guess -- let's go back
 7     over to the bottom of this exhibit.  It
 8     says:
 9                "Hi, Elizabeth.  Letting you know
10     that I am in the Bronx court clinic.  I was
11     told that Dr. Kaye has taken my handwritten
12     notes out of the charts and has them in her
13     possession."
14                What charts is he referring to?
15          A    I believe he's referring to the
16     defendant files in the Bronx Court Clinic.
17          Q    "They are no longer in the chart
18     and we cannot find them.  We can discuss it
19     more tomorrow."
20                You see that, right?
21          A    I do see that, yes.
22          Q    And then you write back to him,
23     who else is it, thanks Beesh.
24                Is that what you call Dr. Jain,
25     Beesh?
```

Page 331

```
 1                    E. FORD, M.D.

 2        A    Yes.  That's what he goes by.

 3        Q    Who else is aware of this?  Right?

 4   And then he says, in person are over the

 5   phone.  I'm free now, but okay, also for

 6   when we meet tomorrow, Beesh.

 7             You see this, right?

 8        A    I see that.

 9        Q    Now, are you guys texting or

10   actually is this an email exchange?

11        A    These are emails.  They're coming

12   from the email accounts.

13        Q    Now, he responds to you, we looked

14   again and cannot locate them.  According to

15   Lucrecia, some of the charts were originally

16   pulled on November 8, 2018 and there were

17   subsequent charts as well.

18             You see this, right?

19        A    Yes.

20        Q    Now, does this seem like a good

21   relationship if someone is accusing the

22   other of stealing their handwritten notes?

23             MS. CANFIELD:  Objection.  You

24        can answer.

25        A    I'm sorry, where --
```

```
 1                    E. FORD, M.D.
 2        Q    He accuses Dr. Kaye of stealing
 3   his notes.
 4        A    I don't see where it says that
 5   they've been stolen.
 6        Q    I'm told that Dr. Kaye has taken
 7   my handwritten notes out of the charts and
 8   has them in her possession.  They are no
 9   longer in the chart, and we cannot find
10   them.
11             What does that sound like?
12        A    It sounds like he is concerned
13   that Dr. Kaye has taken the note.  They
14   may be in her office.  She's the director of
15   the clinic.  I don't read that to mean she's
16   stolen them.
17        Q    So let's go further.  And then you
18   write back, "Thank you.  Spoke with JW."
19             Is that Jonathan Wangel?
20        A    Yes.
21        Q    "As many specifics as you can get
22   would be helpful.  How many charts, when
23   your notes were put in there, and how you
24   know that.  Is there any legitimate reason
25   why the notes should be missing when the
```

1                    E. FORD, M.D.

2     request to pull them came through," et

3     cetera, right?  This is what you respond to,

4     right?

5          A    Yup.

6          Q    And then he writes, "My notes were

7     at least ten cases, which I gave to Lucrecia

8     to file, are not in their respective charts.

9     These are my personal notes that I take

10    during interviews and, and they serve as an

11    aid to help me write my reports."

12              Now, do you remember when Dr. Kaye

13    actually made the allegation that he did --

14    that he basically kept his notes?

15              MS. CANFIELD:  Objection to

16         form. You can answer.

17         A    I feel -- I remember an allegation

18    that he destroyed them.

19         Q    Right.

20         A    Yeah.  Okay.

21         Q    Do you remember when that

22    happened?

23         A    No.  I don't.

24         Q    Was this before or after the

25    allegation -- after this email?

```
 1                    E. FORD, M.D.
 2        A    I think -- I don't know.  I don't
 3     know.  I'm sorry.
 4        Q    Was it November 30, 2018,
 5     specifically?
 6             MS. CANFIELD:  If you have
 7          something to refresh her
 8          recollection, that would be great.
 9             MS. HAGAN:  No.  She doesn't
10          have to have something to refresh
11          her recollection.
12             MS. CANFIELD:  She just said
13          she doesn't know.
14             MS. HAGAN:  She was thinking.
15          Stop coaching the witness.
16             MS. CANFIELD:  I'm not
17          coaching.
18        A    I remember meeting with Dr. Kaye
19     on November 30th.  I can't remember if
20     handwritten notes came up in that meeting or
21     not.
22        Q    "Now, Lucrecia emailed me for my
23     notes on those defendants on November 8th.
24     I provided them on November 13th.  A
25     handwritten post-it note on the charts
```

```
 1                    E. FORD, M.D.
 2      indicate, and Lucrecia also confirms that my
 3      notes were received on these cases."
 4                    Now, did he show you or send any
 5      emails to this effect?
 6           A    To the -- I'm sorry.  To the
 7      effect of the post-it notes or what?
 8           Q    Yes.  Did he email Lucrecia about
 9      the notes or that provided them on November
10      13th.  Did you see any emails?
11           A    He told me about that in one of
12      them.  I believe he told me about it.
13           Q    But did you see them yourself?
14           A    I don't remember.  I don't
15      remember.
16           Q    Now, at the end he says, there's
17      no legitimate reason for these notes to be
18      missing or taken by Dr. Kaye without my
19      knowledge.  This is unusual and concerning."
20                    Do you see that?
21           A    Yes.  I see that.
22           Q    Now, on the one hand, you have
23      Dr. Kaye alleging that Dr. Jain had
24      destroyed his notes.
25                    You do recall that, right?
```

```
 1                    E. FORD, M.D.
 2          A    I recall that she alleged that at
 3     some point, yeah.
 4          Q    Right.  And now you have Dr. Jain,
 5     I'm not specifying what happened, I'm just
 6     saying, you also have now this email by Dr.
 7     Jain saying that Dr. Kaye took his notes,
 8     right?
 9          A    Yes.  The email is saying that.
10          Q    Now, if Dr. Jain had destroyed his
11     notes, wouldn't that be a serious charge?
12          A    So I would be concerned about
13     that.  I don't know if it's a serious charge
14     or not.  I do remember that Dr. Jain and I
15     had conversations about handwritten notes in
16     general, I can't -- and policies, I can't
17     remember exactly the time line, because he
18     had come from a state where, I think
19     handwritten note and the practice was
20     different than in New York State.  Something
21     like that.
22               If he had -- if the handwritten
23     notes were part of the record and they had
24     been destroyed, I would be very concerned.
25          Q    Did you ever look into whether or
```

Page 337

```
1                      E. FORD, M.D.

2        not his handwritten notes had been

3        destroyed, Dr. Ford?

4             A    I did.  Yes.

5             Q    Okay.  What happened?

6             A    The -- it was -- I can't remember

7        if it was -- how it came to be, but the

8        notes were found, I believe back in the

9        charts.

10            Q    Did you ever look into finding

11       whether or not Dr. Jain actually destroyed

12       his records?

13                 MS. CANFIELD:  Objection.

14            Asked and answered.  You can answer

15            again.

16            A    So my recollection is that the

17       notes were found and they were back in the

18       charts.

19            Q    That's not what I asked you.

20                 Did you ever find out whether or

21       not at any point that Dr. Jain destroyed any

22       of his notes?

23                 MS. CANFIELD:  Objection.

24            Asked and answered.

25            A    Sure.  I did not find out at any
```

```
1                    E. FORD, M.D.

2     point that Dr. Jain had ever destroyed any

3     notes.

4          Q    Was there an investigation to

5     determine whether or not Dr. Jain had ever

6     destroyed any notes?

7               MS. CANFIELD:  Objection.

8          Asked and answered.

9          A    So there was a -- I don't know an

10    investigation outside of what I did, but I

11    looked into it, and I think I -- I can't

12    remember who I spoke with.  I think some

13    administrative staff.  And then the notes

14    were there.

15         Q    Did you report it to corporate

16    compliance?

17         A    I don't think I did.  I was -- my

18    first -- what I first did was try to figure

19    out if there was -- if the notes had been

20    destroyed, and they were discovered.  So in

21    my mind, they couldn't have been destroyed.

22         Q    How long did it take you to

23    determine that the notes had not been

24    destroyed?

25         A    That's a good question.  I don't
```

1                          E. FORD, M.D.

2      know.  I recall that when Dr. Jain told

3      me -- he told me about this in supervision,

4      he said, I have the notes, they're -- I

5      don't know.  He said, the notes are back --

6      I don't know.  I don't know.  Sorry.

7           Q    Are you certain -- I mean, based

8      on your investigation -- let me strike that.

9      Based on your investigation, could you

10     determine whether or not the notes were

11     recreated or they had actually always been

12     in existence?

13          A    Are you asking could I determine

14     whether the notes reappeared or were copies?

15          Q    Yes.  Or had been recreated versus

16     the originals.

17          A    I did not determine that.

18          Q    So you're not sure if Dr. Kaye's

19     allegation that Dr. Jain had destroyed his

20     handwritten notes are true; am I right?

21                    MS. CANFIELD:  Objection.  You

22               can answer.

23          A    I guess I have -- I have one

24     doctor's word against the other.  So I guess

25     I'm not sure.

1                    E. FORD, M.D.

2        Q    Then you also have Dr. Jain now

3    that the notes allegedly appear in these

4    files; am I right?

5        A    I think that's how it went.  I

6    can't recall exactly, but I remember the --

7    what I do remember is that it got resolved.

8        Q    Are there cameras in the clinic,

9    Dr. Ford?

10        A    I should know that.  In the Bronx

11    court clinic, are there cameras.  The truth

12    is, that right at this moment, I don't

13    remember.  I don't know.

14        Q    Did Dr. Jain ever tell

15    Dr. Winkler, to your knowledge, that he was

16    throwing out the notes?

17        A    Sorry.  Did Dr. Jain tell

18    Dr. Winkler?

19        Q    Yes.  To your knowledge.

20        A    Not to my knowledge, no.  Not to

21    my knowledge.

22        Q    Now, at any point did you hear

23    Dr. Kaye or learn of Dr. Kaye raising

24    concerns about the --

25                    MS. CANFIELD:  Could you

Page 341

                          E. FORD, M.D.

 1

 2           repeat that.  I didn't hear that.

 3           Q    By any chance, did you learn from

 4      Dr. Kaye about -- did you hear any

 5      complaints about Dr. Kaye -- from Dr. Kaye

 6      about HIPPA violations?

 7           A    I don't know.

 8           Q    At any point did you hear Dr. Yang

 9      or Ms. Yang tell anyone there that -- they

10      don't like how things are being done here?

11           A    I didn't hear the first part.  Did

12      Dr. Yang say?

13           Q    Did you ever hear Dr. Yang tell

14      anyone, "We got the money, and if you don't

15      like how we're doing things here, there's

16      the door"?  Did you ever hear him make that

17      kind of statement?

18           A    No.

19           Q    Did you ever hear Dr. Kaye raise

20      issues about HIPPA waivers at the all staff

21      meeting with Dr. Yang?

22           A    No.

23           Q    Now, let's see.  At any point, did

24      Dr. Kaye complain about an off-site

25      evaluation?

```
 1                     E. FORD, M.D.
 2        A    I don't know if she complained
 3   about a specific off-site evaluation.  I
 4   know that -- what I do know is that pretty
 5   much every director had concerns about
 6   off-site evaluations.
 7        Q    And what concerns were those?
 8        A    Particularly at the beginning of
 9   the transition and the discussions around
10   the transition.  The issue that came to my
11   attention most frequently was concern that
12   the evaluations would be conducted at Rikers
13   Island.
14        Q    Now, at any point was there any
15   issues with having to go to hospitals,
16   Jacobi, for example, to conduct an exam?
17        A    There were -- there was -- I do
18   recall times, I can't remember the specific
19   cases or, frankly, even clinics, but where
20   individuals were considered -- and I think
21   this was typically by the hospital, and I
22   remember it most at Bellevue.  But too sick
23   to travel from the hospital to the clinic
24   for their evaluation.  And so the hospitals
25   would periodically request that those
```

1                    E. FORD, M.D.

2    evaluations be done in the hospital.

3         Q    Now, at any point did you and/or

4    Dr. Jain meet with judges in the Bronx and,

5    I guess, represent a specific turnaround

6    time for the production of 730 to courts?

7         A    I recall only one meeting I ever

8    had with judges with respect to the court

9    clinics.  And I believe that was in

10   Manhattan.  Was it Manhattan?  I'm sorry.  I

11   can't remember the bureau.  Where we talked

12   and in that meeting -- I can't remember the

13   judge, but we -- one topic of the meeting

14   was turnaround time.  And we talked about --

15   we didn't set like numbers, but we talked

16   about CHS's interest in being as efficient

17   as possible with the examinations.

18        Q    At any point do you agree that

19   examinations in the Bronx should be produced

20   within three weeks of the order?

21        A    Did I agree that, sorry, that

22   exams in the Bronx should be produced within

23   three weeks of the order; is that the

24   question?

25        Q    Right.

Page 344

```
1                    E. FORD, M.D.
2        A    I mean, I don't recall that
3    specifically, but it does seem reasonable,
4    prior to the next court date, which is
5    usually a month from the time of the order.
6        Q    How did you come to the conclusion
7    that three weeks is a reasonable turnaround
8    time?
9        A    Well, your question was be
10   produced to the clinic.  So what I'm basing
11   that -- what I'm saying is that, in my
12   experience and from what I've learned from
13   others, the court calendars are usually
14   marked for a month after.  So a 730 is
15   ordered, and then the next hearing is
16   typically a month later.
17              And then in order the
18   individual -- so an individual can be
19   evaluated on a day, but it takes some time
20   to write the report, and to collect the
21   records, if they are needed, and all that
22   other stuff.
23              So to -- I think it's good
24   practice to try to have the examination as
25   close to the next hearing date as possible.
```

```
 1                    E. FORD, M.D.
 2      However, with enough time for the evaluation
 3      to be written and the records reviewed
 4      comprehensively.
 5           Q    And to obtain the records, right?
 6           A    Yeah.
 7           Q    Is it true that CHS and HHC don't
 8      have necessarily control or possession of
 9      the records in all the instances where exams
10      are ordered?
11           A    I don't know.  I'm not -- so exams
12      are ordered for people who are out, who are
13      not in custody, so Correctional Health would
14      not have records for those individuals.
15           Q    So did the three-week estimation
16      take into account that medical records might
17      need to be ordered in order for the
18      evaluators to complete their exams?
19           A    So I just -- before I answer that,
20      is the three weeks, was that part of a
21      policy?
22           Q    Well, I'm going to refresh your
23      recollection.
24           A    Okay.  Great.  Thank you.
25           Q    Exhibit 20 is marked Bates Stamp
```

```
 1                        E. FORD, M.D.
 2      series 2680 through 2681.  And I'm going to
 3      share the screen.  Now, I'm going to scroll
 4      down.
 5                        (Whereupon, Email
 6                        (NYC_2680-2681) was marked as
 7                        Plaintiff's Exhibit 20 for
 8                        identification as of this date.)
 9                        On April 3, 2019, Dr. Jain says,
10      "Hi, Elizabeth.  If you have a minute
11      sometime today for a quick phone call, would
12      like your advice and to keep you in the loop
13      on how to best approach Dr. Kaye tomorrow,
14      which she returns from being off."
15                        Now, is that odd that he's asking
16      you for advice on how to approach Dr. Kaye
17      if they have a collegial work relationship?
18                        MS. CANFIELD:  Objection.
19           A     I mean, I think Dr. Kaye and -- I
20      think Dr. Jain is still finding his way in
21      his leadership role.  It was not unusual,
22      Dr. Jain would also ask me about messaging
23      to other clinic directors as well.
24           Q     Like who?
25           A     Every one of them.
```

```
                          E. FORD, M.D.
 1
 2           Q    Can you refer another instance

 3     where he may have asked for the same type of

 4     guidance for any of the other clinical

 5     medical directors?

 6           A    Well, let's see.  Specific to

 7     turning around reports in three weeks or

 8     just anything?

 9           Q    Just in general.

10           A    Let's see.  Let me think.  There

11     was a time when there was a question about

12     how to talk with Dr. Mundy about one of his

13     staff.  There was a time about how to

14     approach Dr. Owen regarding -- I can't

15     remember what it was regarding.  But I know

16     we had a conversation about how to talk with

17     Dr. Owen.

18           Q    So are you saying to some degree

19     that Dr. Jain had communication issues, and

20     this is why he would approach you about

21     communicating with his staff?

22                MS. CANFIELD:  Objection.  You

23           can answer.

24           A    What I'm saying is that these --

25     the issues were really complicated, and
```

1                    E. FORD, M.D.

2      Dr. Jain was, again, less than a year at

3      this -- certainly around this time he was

4      about a year in, getting used to -- and only

5      less than a year, I guess, with the

6      Manhattan and the Bronx supervision.

7          Q    Now, he goes on to say he met with

8      the criminal court judges yesterday and they

9      requested turning around reports in three

10     weeks from the time they order 730.  So they

11     want the report in three weeks; is that

12     clear?

13         A    I didn't recall that, but that's

14     what it says here.

15         Q    " it seemed doable, based on the

16     schedule and volume, but I'm not sure how

17     Dr. Kaye will receive it."

18              You see that, right?

19         A    I see that.

20         Q    Now, in the event that this is

21     true, do you think, in your opinion, of

22     doing the 730 exams, that may sometimes

23     require medical records be ordered, that

24     three weeks to obtain the records and to

25     write a comprehensive exam -- I mean,

```
 1                   E. FORD, M.D.
 2      evaluation, is doable?
 3                   MS. CANFIELD:  Objection.  You
 4             said this is requested by the
 5             courts, but go ahead.
 6             Q    I'm asking you, Dr. Ford.  Do you
 7      think?
 8             A    So there are a number of factors,
 9      but I do think it's doable if the individual
10      is produced for the evaluation.  If the
11      records are ordered, and we had a -- I do
12      remember, on my other hat at CHS, the
13      treatment side, we were working very hard to
14      try to have records turned around within a
15      couple of days of the request.  And the
16      writing of the report could take, and the
17      review of the records, let's say they are
18      four hours, so I do think that it's doable
19      if those factors are in place.
20             Q    You're assuming that in your
21      testimony that, one, the facility will
22      produce the records in a timely fashion,
23      that's one assumption you're making; am I
24      right?
25             A    So what I'm telling you is that
```

```
 1                    E. FORD, M.D.
 2     your question was about, is it doable in
 3     three weeks, and I was telling you the
 4     circumstances that would make it doable.
 5         Q    Is a three-week turnaround a
 6     practical turnaround to represent to the
 7     Court?
 8              MS. CANFIELD:  Objection.
 9          Asked and answered.
10              I know we're getting close for
11          past ten til, Dr. Ford.  Do we have
12          to have a hard stop at six?
13              THE WITNESS:  I do.  Yes.
14              MS. HAGAN:  I'd like to finish
15          this line of questioning and then
16          we'll have to figure out how much
17          time we have left if I need to
18          reopen to have Dr. Ford back then.
19              MS. CANFIELD:  She has a hard
20          stop at six.  So you're not going --
21          not going to be able to finish your
22          questioning.  Maybe we should break
23          now and we should schedule --
24              MS. HAGAN:  I'd like to finish
25          this line of questioning and then we
```

```
 1                    E. FORD, M.D.

 2          can reschedule.  And that's fine.

 3          Because I have six minutes until

 4          6:00 and we can finish.

 5     Q    Now, we met with the criminal

 6   court judges yesterday.  Now I'm going back

 7   to your -- my line of questioning regarding

 8   the production of these records.

 9               And the question is, you have --

10   Dr. Kaye or any other evaluator really

11   doesn't have any control as to how quickly

12   these various facilities produce these

13   records and release them to the various

14   evaluators; is that right?

15               MS. CANFIELD:  Objection.  You

16          can answer.

17     A    I think that's generally correct,

18   yeah.

19     Q    Right.  So you can't -- no one can

20   predict how long it will take for the

21   records to be produced from the various

22   facilities to the evaluators; am I right?

23     A    No.  I don't think that's correct.

24   I mean, you can offer -- you can't be a

25   hundred percent accurate, but you can
```

1                     E. FORD, M.D.

2      predict, based on how long it's taken

3      whatever facility to produce records in the

4      past, that that's probably how long it will

5      take when you ask them this time.

6          Q    Now, the medical records is only

7      one source of collateral data; is that

8      right?

9          A    Yes.

10         Q    There may be instances, for

11     example, where a forensic evaluator might

12     listen to prison recordings; am I right?

13     Like recordings, phone recordings between an

14     inmate and people who he or she may engage;

15     is that right?

16         A    I don't know the answer -- I don't

17     know if that's done routinely or not.

18         Q    Well, have you --

19         A    Good question.

20         Q    Have you ever referenced any other

21     collateral data besides medical records to

22     make your determinations?

23         A    I have used psychological testing

24     reports.  I don't know if I've ever used

25     prison recordings.  But I believe that

```
1                     E. FORD, M.D.
2      whatever collateral information is produced
3      can be used for this report.
4           Q    But didn't you respond to Beesh,
5      "Sorry, Beesh, just getting to this.  Have
6      been sorting through the kinks for the new
7      EMR for most of the day."
8                What's EMR?
9           A    Electrical Medical Records.
10          Q    "What are particular concerns?
11     Seems reasonable request from judges.  Don't
12     imagine that you will be telling Melissa
13     tomorrow that is a done deal.  Just
14     informing her of request and asking her for
15     thoughts," right?
16          A    It says that, yes.
17          Q    But, now, he's represented to the
18     judges that it's doable, right?
19               MS. CANFIELD:  Objection.
20          A    Sure.  If you could go down to the
21     email that he wrote to me.
22               He said, it seemed doable.  I
23     don't know -- it doesn't say to me that he
24     told that to the judges.
25          Q    So then you -- then I guess he
```

1                    E. FORD, M.D.

2        responds, "Just got this yesterday from

3        Elizabeth.  I'll try to talk to her before

4        we meet with Melissa today.  She seems to

5        also suggest that it's better to inform

6        Melissa and get her thoughts instead of

7        telling her that this is a done deal."

8                    You see that, right?

9             A     I do.  Yeah.

10            Q     So clearly he had told the judges

11       that this is a done deal, that they can

12       comply.  Is that clear?

13            A     That's not clear to me from this.

14       No.

15            Q     So what does done deal mean?

16                  MS. CANFIELD:  Objection.  You

17             can answer.

18            A     Sure.  How I interpret this email

19       is that he would talk with Melissa to get

20       her response and feedback before he or

21       anybody in CHS would agree officially to

22       this kind of arrangement.

23            Q     So you don't get that he's already

24       agreed to this without Dr. Kaye?

25            A     I do not get that.  Dr. Jain

```
 1                       E. FORD, M.D.

 2      sought guidance and supervision pretty

 3      regularly.  Doesn't seem like something he

 4      would do.

 5           Q    But Dr. Kaye was his supervisor,

 6      and there's questions whether or not he was

 7      able to effectively communicate with her,

 8      especially he's seeking guidance from you as

 9      to how he should approach her in the first

10      place; am I right?

11                     MS. CANFIELD:  Objection.

12               It's argumentative.  I think it's

13               time now.

14                     MS. HAGAN:  It's 5:58.  Let

15               that be known.  I would ask the

16               reporter how much time we have left

17               on the record.

18       (A discussion was held off the record.)

19                     MS. CANFIELD:  I'd like to

20               request an expedited transcript,

21               please.

22                     COURT REPORTER:  How many

23               days?

24                     MS. CANFIELD:  Ms. Hagan, when

25               can you get the court reporter the
```

Page 356

```
 1                    E. FORD, M.D.

 2           exhibit?

 3                  MS. HAGAN:  When I get to

 4           them.

 5                  MS. CANFIELD:  Three days,

 6           please.

 7                  MS. HAGAN:  When I get to

 8           them.

 9                  MS. CANFIELD:  Well, I want it

10           expedited.  So, please, you need to

11           get the exhibits to the court

12           reporter.

13                     (Whereupon, this examination was

14                     concluded at 6:00 p.m.)

15

16

17

18

19  _____

20  ELIZABETH FORD, M.D.

21

22

23  Subscribed and sworn to
    before me on this _____  day
24  of _____, _____.

25
```

1                          E. FORD, M.D.

2    _____
     Notary Public
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 358

1

2

3                         I N D E X

4   WITNESS: ELIZABETH FORD, M.D.

5   EXAMINATION BY                              PAGE

6          MS. HAGAN                            4

7

8                      E X H I B I T S

9   PLAINTIFF'S            DESCRIPTION          PAGE

10  1                     Letter 06/12/16 Dr.   27
                          Belkin (NYC1003)
11
    2                     Email                 63
12                        (NYC_000077-000079)

13  3                     Email (NYC 1368-1369) 107

14  4                     Performance Evaluation 128
                          (NYC1336-1342)
15
    5                     Dr. Ford's Book       155
16                        Excerpts

17  6                     Email (NYC_00892)     185

18  7                     Email (NYC_000248)    193

19  8                     Email (NYC_000969-970) 210

20  9                     Email (NYC_002869-2870) 214

21  10                    Memo (NYC_002978)     228

22  11                    May 29, 2019 Exam     243
                          Recording
23
    12                    Video Recording of    277
24                        Forensic Psychiatric
                          Evaluations
25                        (NYC_4083-4098)

13                          Email (NYC_2794-2800)    282

14                          Email (NYC_1530-1532)    291

15                          Dr. Kaye's EEOC Charge   301
                            (NYC_3330-3331)

16                          Letter from Dr. Kaye to  309
                            Board of Correction and
                            Inspection General

17                          Managing Dual Roles      314
                            Policy (NYC_1188-1190)

18                          Private Practice Policy  321
                            (NYC_3864-3866-

19                          Email (NYC_1059-1061)    329

20                          Email (NYC_2680-2681)    346

R E Q U E S T S

DESCRIPTION                                        PAGE

2019 Dr. MacDonald Performance Evaluation    38

Dr. Jain Performance Evaluation              42

Forwarded Email from Dr. Ford to Dr. Ross    223
and Mr. Wangel

Page 360

1

2                    C E R T I F I C A T E

3

4        I, KIARA MILLER,

5        A Shorthand Reporter and Notary Public of the

6        State of New York, do hereby certify:

7

8        That the witness whose examination is

9        hereinbefore set forth, was duly sworn or

10       affirmed by me, and the foregoing transcript is

11       a true record of the testimony given by such

12       witness.

13

14       I further certify that I am not related to any

15       of the parties to this action by blood or

16       marriage, and that I am in no way interested in

17       the outcome of this matter.

18

19

20                    _____

21                         KIARA MILLER

22

23

24

25

Page 361

1

2                          E R R A T A   S H E E T

3

4    CORRECTION                              PAGE      LINE

5    _____                         _____    _____

6

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25