UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - -X
MELISSA KAYE,

                    Plaintiff,

        -against-

                 18 CV 12137

HEALTH AND HOSPITALS CORPORATION, et al.,

                 Defendants.
- - - - - - - - - - - - - - - - - - - - - - -X
                October 6, 2021
                10:16 a.m.

VIRTUAL DEPOSITION of BARRY WINKLER, M.D., a witness

herein, taken pursuant to Court Order, and held via

videoconference, before Marci Loren Dustin, a Court

Reporter and Notary Public of the State of New York.

800.DAL.8779
dalcoreporting.com


2

```
1   A P P E A R A N C E S:

2

3        THE LAW OFFICES OF SPECIAL HAGAN
                Attorneys for Plaintiff
4                196-04 Hollis Avenue
                Saint Albans, New York 11412
5        BY:   SPECIAL HAGAN, ESQ.

6        NEW YORK CITY LAW DEPARTMENT
                Attorney for Defendants
7                100 Church Street
                New York, New York  10007
8        BY:   DONNA CANFIELD, ESQ.

9        ALSO PRESENT:
10        Melissa Kaye

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



1            IT IS HEREBY STIPULATED AND AGREED

2    by and between the attorneys for the respective parties

3    herein, that filing and sealing be and the same are

4    hereby waived.

5

6            IT IS FURTHER STIPULATED AND AGREED

7    that all objections, except as to the form of the

8    question, shall be reserved to the time of the trial.

9

10           IT IS FURTHER STIPULATED AND AGREED

11   that the within deposition may be signed and sworn to

12   before any officer authorized to administer an oath,

13   with the same force and effect as if signed and sworn

14   to before the Court.

15

16

17

18

19

20

21

22

23

24



4                         **BARRY WINKLER, M.D.**

1              THE REPORTER:  My name is Marci Loren Dustin,
2        your remote court reporter.  The parties are
3        present via videoconference to take the deposition
4        of Barry Winkler, M.D., in the matter of Melissa
5        Kaye against Health And Hospitals Corporation, et
6        al.  Today's date is October 6, 2021, and the time
7        is 10:16 a.m.  It is important that everyone speak
8        one at a time, as delays do occur in transmission.
9        Please note that pursuant to CPLR 3113(d), the
10       oath can be administered remotely by me.  Counsel,
11       please state your name and who you represent and
12       whether you stipulate to that authority; and the
13       defending attorney, please agree that the witness
14       is who they say they are.
15              MS. HAGAN:  Special Hagan for Dr. Melissa
16       Kaye.  I stipulate.
17              MS. CANFIELD:  Donna Canfield from the New
18       York City Law Department on behalf of all the
19       defendants in this action.  I can stipulate that
20       Dr. Barry Winkler is Dr. Barry Winkler.
21  BARRY WINKLER, M.D.,
22  having first been duly sworn by the Notary Public
23  (Marci Loren Dustin), was examined and testified as
24  follows:



```
 1   EXAMINATION BY
 2   MS. HAGAN:
 3        Q.    Good morning, Dr. Winkler.
 4        A.    God morning.
 5        Q.    Dr. Winkler, I'm just going to go over some
 6   housekeeping issues, just to, I guess, make sure that
 7   everything is clear.  Dr. Winkler, the reporter just
 8   administered an oath, so you understand that you have to
 9   testify truthfully today.  Am I right?
10        A.    Yes, I do understand.
11        Q.    And Dr. Winkler, you know that the reporter
12   can only take down verbal responses, so please be sure
13   to say yes or no.  Do not shake your head or nod so that
14   she can make sure that there's a clear record; is that
15   clear?
16        A.    That's clear.
17        Q.    And, also, as the reporter just conveyed, she
18   can only take down one voice at a time.  So I just ask
19   that you allow me to finish the question, and then wait
20   for your counsel, if she does object, to object and then
21   proceed -- basically proceed accordingly, whether or not
22   she tells you to answer the question.  Is that clear?
23        A.    Yes, I understand.
24        Q.    You answered that you understood what I was
```



1    saying, right, Dr. Winkler?

2         A.   Yes, I understand.

3         Q.   So now, I'm sure that there's been a

4    significant amount of time that has passed since some of

5    the events in this lawsuit or that we're going to talk

6    about today that have transpired.  So I'm going to ask,

7    you know, even if you don't remember the precise dates

8    or precise times or precise quantities, that you may be

9    able to estimate or kind of like, I guess -- like not to

10   estimate or approximate when things may have occurred or

11   quantities.  You understand that I have the right to ask

12   you those questions; right?

13        A.   Yes, I understand.

14        Q.   Okay.  And so I'm just going to ask you some

15   general questions just to begin with, and then kind of

16   proceed to some of the substance of the lawsuit.

17             Now, Dr. Winkler, have you taken any

18   medications within the last 24 hours?

19             MS. CANFIELD:  Objection as to form.  How

20        about last 24 hours that may affect his ability to

21        testify?

22             MS. HAGAN:  No.

23             MS. CANFIELD:  You're asking him to reveal

24        his medical health.


800.DAL.8779
dalcoreporting.com

1          MS. HAGAN:  I just asked if he took any

2      medication.  I'm not going there with the rest of

3      it.

4      Q.   Have you taken any medication in the last 24

5  hours, Dr. Winkler?

6          MS. CANFIELD:  I'm going to object.  If

7      you're comfortable revealing your medical

8      condition, I'm not.  I would say if there's any

9      medications that would affect your ability to

10      testify accurately and truthfully, that would be

11      an appropriate question.

12          MS. HAGAN:  You can't coach the witness.

13          MS. CANFIELD:  No.  I'm asking you to ask him

14      that.

15          MS. HAGAN:  Ms. Canfield, you can't tell me

16      how to ask questions.  I asked the question the

17      way I did for a reason.

18      Q.   Dr. Winkler, have you taken any medication in

19  the last 24 hours?

20          MS. CANFIELD:  And I'm going to again object.

21      And Dr. Winkler, if you're not comfortable

22      responding to that, I'm fine with it, and we can

23      take it up with the court.

24          MS. HAGAN:  Sure.



8                        **BARRY WINKLER, M.D.**

1              THE WITNESS:  I'm comfortable responding.

2              MS. CANFIELD:  Okay.

3        A.    I take a medication for gastric reflux that

4   does not affect my abilities to participate in this

5   proceeding in any way.

6        Q.    Have you taken any other medication besides

7   the medication for gastric reflux?

8        A.    No.

9              MS. CANFIELD:  Objection.

10       Q.    So that's the only medication you've had

11  within the last 24 hours?

12       A.    Correct.

13       Q.    Have you ingest -- have you imbibed any

14  alcoholic beverages within the last 24 hours?

15       A.    No.

16       Q.    So Dr. Winkler, what is your highest level of

17  education?

18       A.    Well, I have both a juris doctorate degree

19  and a -- what they call a doctoral degree in psychology.

20  I think they're roughly equivalent in level.

21       Q.    Now, when did you get your law degree?

22       A.    1980.

23       Q.    And where did you get the law degree?

24       A.    Fordham Law School.



1       Q.   Okay.  And where did you get your PsyD; is

2   that what they call it?

3       A.   Correct.  I got that from Yeshiva University.

4       Q.   When did you get that degree?

5       A.   2006.

6       Q.   Now, I also -- it was also brought to my

7   attention that you were a member of the police

8   department.  When did you work there?

9       A.   I worked there from 1981 until 2000.

10      Q.   And you retired?

11      A.   Correct.

12      Q.   And what department did you work at?

13      A.   The South Hampton Town Police Department,

14  which is on Long Island.

15      Q.   And I'm assuming you got your law degree

16  right before you started at the police department,

17  interestingly enough.  Did you -- did you practice

18  before you went into -- into the police department?

19      A.   Yes, I did.

20           MS. CANFIELD:  Objection.

21      Q.   Okay.  Where did you -- where did you work?

22      A.   I worked for a while for a law firm in

23  Riverhead, and then I had my own private practice.

24      Q.   Now, where -- what was the name of the law



 1  firm in Riverhead?

 2        A.   McNulty, Gilmartin, Haferly [ph.], Neshy

 3  [ph.], that was the -- those were the partners.

 4        Q.   And how long were you at McNulty, et al. Law?

 5        A.   Roughly a year.

 6        Q.   So this is from 1980 to 1981?

 7        A.   Roughly, yes.

 8        Q.   And what was your area of expertise?

 9        A.   I didn't have any at that the point.  I was a

10  new lawyer, and they had me covering various cases and

11  issues.

12        Q.   And then you went into the police department?

13        A.   That's correct.

14        Q.   And you stayed at the same police department,

15  the South Hampton Law -- the South Hampton Police

16  Department for, I guess, the 19 years?

17        A.   That's correct.

18        Q.   Now, for your pension to vest, wouldn't you

19  have to stay at the police department for 20 years?

20        A.   Yes.  I worked part-time for that department

21  for a few years prior to going on full time.  And that

22  time was counted towards vesting toward my pension.

23        Q.   And how long did you work full -- part-time?

24        A.   I think it was about four years.



1        Q.    And at any point, did you work as an

2   undercover police officer?

3        A.    Yes.

4        Q.    How long did you do that?

5        A.    I would say I did it for about six years,

6   five years.  I don't remember exactly.

7        Q.    Do you know what years that you worked in

8   this capacity?

9        A.    I would say early '90s.  I believe it was

10  early '90s.

11       Q.    And what department were you working in when

12  you were working in an undercover capacity?

13       A.    At that point, I was assigned to the Suffolk

14  County District Attorney's Office, East End Drug Task

15  Force.

16       Q.    So Dr. Winkler, have you ever been deposed

17  before?

18       A.    No.

19       Q.    Have you ever been sued before?

20       A.    No.

21            MS. CANFIELD:  I object -- objection to form.

22       Q.    Have you ever sued anyone?

23       A.    No.

24       Q.    Have your ever been named as a defendant in



1  any lawsuit?

2       A.   No.

3       Q.   Now, Doctor, have you ever been a witness in

4  any lawsuit?

5            MS. CANFIELD:  Objection to form.  You can

6       answer.

7       A.   No.

8       Q.   Now, when did you -- when did you obtain your

9  degree in psychology?  I'm assuming that you did at some

10  point.

11           MS. CANFIELD:  Objection to form.  Asked and

12      answered.  You can answer again.

13      A.   2006.

14      Q.   Did you do any graduate work in psychology

15  before you got your PsyD?

16      A.   Yes, I did.

17      Q.   Where did you do that?

18      A.   I received a master's degree in forensic

19  psychology from John Jay College.

20      Q.   And when was that?

21      A.   2001.

22      Q.   And did you get an undergraduate degree in

23  psychology?

24      A.   No.



**BARRY WINKLER, M.D.**                                          13

1      Q.    And what was your undergraduate degree in?

2      A.    I received a -- earned, rather, a bachelor's

3  in business administration degree.

4      Q.    And where is this from?

5      A.    Pace University in Manhattan.

6      Q.    And when did you receive this degree?

7      A.    1977.

8      Q.    So did you do any fellowships upon your

9  completion of, I guess, either the PsyD or the master's

10  in forensic psychology?

11      A.    Yes.  I completed a forensic psychology

12  fellowship at Bellevue Hospital after completing my PsyD

13  degree.

14      Q.    And when did you complete that?

15      A.    That ran for a year from 2006 to 2007.

16      Q.    And did you work with Dr. Ford or any of the

17  -- or Dr. Ford at that time?

18      A.    I believe at that time, yes.  I believe I was

19  working with Dr. Ford.  I think she might have been a

20  fellow at that point.

21      Q.    So you both were fellows at the same time?

22      A.    If I'm remembering correctly, I also did a

23  pre-doctoral internship at Bellevue.  So I don't recall

24  if I worked with Dr. Ford.  That would have been the

1  year before the fellowship.  I don't recall if I worked

2  with her during that internship year or the fellowship

3  year.

4        Q.   Did you publish a paper with Dr. Ford and Dr.

5  Virginia Barber Rioja?

6        A.   I was part of the team, yes, that

7  co-published a paper.

8        Q.   And that was in 2009; is that right?

9        A.   I don't recall, but it sounds right.

10        Q.   Okay.  So how did it come -- what was your

11  first job that involved psychology or psychiatry?

12        A.   My first job was at Bellevue on the forensic

13  inpatient unit.

14        Q.   And when was that?

15        A.   That was after I completed the fellowship in

16  2007.

17        Q.   And how long did you stay there?

18        A.   I stayed at that job for about one year.

19        Q.   And what was your position exactly at that

20  time?

21        A.   I was a psychologist on the forensic

22  inpatient unit.

23        Q.   And what -- what functions did you perform at

24  that time?



1        A.   I did intake interviews for newly admitted

2   patients, had therapy patients, attended treatment team

3   meetings.  Also, there were times when the psychologist

4   would do brief interviews of patients who had been sent

5   from Rikers Island for possible admission.  We would do,

6   on a rotating basis, interviews to provide an opinion as

7   to whether the person -- the patient needed admission.

8        Q.   Okay.  And you did this for a year.

9             Now, what did you do after you left Bellevue?

10       A.   Well, I still worked for Bellevue, but then I

11  began working at the Bronx Court Clinic.

12       Q.   So you worked for Bellevue part time or --

13  how did that work that you worked in both places?

14            MS. CANFIELD:  Objection to form.  You can

15       answer.

16       A.   I -- my job changed.  I still worked at

17  Bellevue, but instead of being an inpatient

18  psychiatrist, I now worked full time at the Bronx Court

19  Clinic.

20       Q.   So how did -- how did it come to you that you

21  went from the forensic inpatient unit to Bellevue's

22  Bronx Court Clinic?

23       A.   I was told, it was around 2008, that the

24  funding for my line for the inpatient psychologist



1  position would no longer be available after a certain

2  point and that there was an opening at the Bronx Court

3  Clinic if I wanted to take it, and I took it.

4          Q.   Who told you that?

5          A.   That was Dr. Hoge.

6          Q.   And Dr. Hoge was who?  What was Dr. Hoge's

7  position when he told you that?

8          A.   He would have been the director of the

9  forensic psychiatry division in that -- at Bellevue at

10  that time.

11         Q.   And the -- so you applied for the position in

12  the Bronx Court Clinic.  Who interviewed you for that

13  position?

14         A.   I recall meeting with Dr. Kaye.  I don't know

15  if we actually interviewed.  My memory is the job was

16  offered to me.  I don't remember formally interviewing

17  for it.

18         Q.   Okay.  So you met with Dr. Kaye, but you

19  don't recall if you were formally interviewed by her or

20  anyone else for that matter; is that right?

21         A.   I don't believe Dr. Kaye formally interviewed

22  me, no.

23         Q.   Okay.  So you ended up working with Dr. Kaye

24  at that time.  Now, was she your supervisor at that



1   time?

2          A.    Yes, she was.

3          Q.    Your supervisor wasn't Alan Elliot at that

4   time?

5          A.    Well, they would both be considered my

6   supervisors.  So Alan Elliot was the -- is the director

7   of psychology at Bellevue, so I would report to Dr.

8   Elliot.  I think like on a monthly basis, we would check

9   in.  But my direct day-to-day supervisor was Dr. Kaye.

10         Q.    And when you say you reported directly to --

11  I mean you reported monthly to Dr. Elliot, what did that

12  entail?

13         A.    We would meet roughly once a month just to

14  check in.  Dr. Elliot checked in with all of the

15  psychologists just to see how things were going, seeing

16  if there were any problems.

17         Q.    Now --

18         A.    It was a routine supervision.

19         Q.    I'm sorry.

20               Now, did Dr. Elliot -- who completed your

21  performance evaluations?

22               MS. CANFIELD:  Objection to form.  You can

23         answer.

24         A.    I think it was Dr. Elliot.



1        Q.    And did he process your time and leaves

2   requests?

3              MS. CANFIELD:  Objection to form.  You can

4        answer.

5        A.    Yes, I believe he did.

6        Q.    Now, you said that Dr. Kaye was your -- I

7   guess direct -- or your day-to-day supervisor.  How did

8   she -- how did she supervise you on a day-to-day basis?

9   What functions did she perform?

10       A.    Well, she was the director of the clinic.  We

11  would see cases together.  We would discuss clinic

12  policies.  She would determine the schedule.  If I had

13  questions about matters in the clinic, I would go to

14  her.

15       Q.    And how was communication with Dr. Kaye about

16  those things?

17       A.    It was fine.

18       Q.    So she readily and willingly engaged you when

19  you had questions about, you know, the exams or the

20  process; would that be accurate?

21       A.    Yes.

22       Q.    And I'm assuming since Dr. Kaye would have

23  been at the clinic probably, I guess at this point,

24  about eight years.  She had a pretty good idea as to how



1  the clinic functioned and just the administration of the

2  examinations themselves; would that be accurate?

3        A.   Yes.

4            MS. CANFIELD:  Objection to form.  You can

5        answer.

6            MS. HAGAN:  For the record, the deponent said

7        yes.

8        A.   Yes.

9            MS. HAGAN:  Thank you.

10       Q.   So Dr. Winkler, you worked at the forensic --

11  the Bronx Forensic Court Clinic from 2008 to 2000 --

12  March of 2018; is that right?

13       A.   Yes.  I think my first -- I think my last day

14  was actually in April, but -- in 2018.

15       Q.   Now, during that time, how would you describe

16  your relationship with Dr. Kaye?

17       A.   I think my relationship with Dr. Kaye overall

18  was a very good one.

19       Q.   And could you elaborate?

20       A.   Well, we were the only two members of the --

21  only two doctors in the clinic.  There were certain

22  cases, once in a while, we necessarily didn't see eye to

23  eye on or certain ideas on how to approach a case.  But

24  overall, we got along very well.  Dr. Kaye is a very



20                          **BARRY WINKLER, M.D.**

1  knowledgeable clinician.  I learned a lot from her.  I

2  think we approached our interviews and our case

3  conceptualizations in a very similar manner.

4       Q.   At some point, would you say that Dr. Kaye

5  helped you develop as a professional in the forensic

6  psychiatry field?

7       A.   Yes, I think she did.

8       Q.   And as a supervisor, would you say that Dr.

9  Kaye was fair?

10      A.   Yes.

11      Q.   And would you say she was helpful?

12      A.   Yes.

13      Q.   Now, initially -- at some point -- let me --

14  let me backtrack.

15          When you started -- when we discussed when

16  you went over to the clinic, we said that Alan Elliot --

17  Dr. Elliot was your indirect supervisor, and Dr. Kaye

18  was your direct supervisor.  At some point, did Dr. --

19  did Dr. Jeremy Colley come into the picture?

20      A.   Yes.

21      Q.   Okay.  When was that?

22      A.   I don't remember the exact year, but Dr.

23  Colley eventually became the director of the forensic

24  psychiatry division at Bellevue.  So since the clinic



1    was part of that division, he became part of our

2    supervision structure.

3         Q.   And when was that?

4         A.   I don't remember what year he took over.

5         Q.   Okay.  Let's see.  You said you don't

6    remember.  Let's try to approximate then.  Would you say

7    this is around 2010?

8         A.   My sense is it would have been later than

9    that, but I honestly don't recall.

10         Q.   I'm going to try to -- I'm going to try to

11    see if I can get some kind of estimate.  Would -- would

12    it have been 2015?

13         A.   That sounds -- it seems it was later to me.

14    Yeah, closer to when I left the Bronx Clinic when he

15    took over.

16         Q.   So would this be around the time that Dr.

17    Ford came to CHS that Dr. Colley was your -- in the

18    supervisory orbit?

19              MS. CANFIELD:  Objection to form.  You can

20         answer.

21         A.   Do you mean when Dr. Ford went to work for

22    CHS?

23         Q.   Right.

24         A.   I just want to clarify.



 1        Q.    Yes.

 2        A.    I think so.  Not exactly sure, but I think

 3   so.

 4        Q.    So I guess the years that you worked with Dr.

 5   Kaye at the Bronx Court Clinic from 2008 to 2018 --

 6   April 2018, you would say that your working relationship

 7   was -- was pretty good?

 8        A.    Yes, that's accurate.

 9             MS. HAGAN:  You went mute.  I'm sorry.

10             THE WITNESS:  Can you hear me now?

11             MS. HAGAN:  I can hear you now.

12        A.    Yes, that's accurate.

13        Q.    Okay.  So then what -- I -- and in April

14   2018, could you like list your -- the managerial

15   structure as you knew it at that time?  So at that time

16   -- let me just be clear.  Dr. Kaye was still your direct

17   supervisor, right, in April 2018?

18             MS. CANFIELD:  Objection to form.  You can

19        answer.

20        A.    Yes, she was.

21        Q.    And then who was Dr. Kaye's supervisor?

22        A.    At that time, I believe it was still Dr.

23   Colley.

24        Q.    And who was Dr. Colley's supervisor?



1        A.    I believe Dr. Colley reported directly to Dr.

2   Maryanne Badaracco.

3        Q.    And do you recall who Dr. Badaracco's

4   supervisor was?

5        A.    I don't know.  Dr. Badaracco is the director

6   of psychiatry for the hospital.  I'm not sure who she

7   answers to or reports to.

8        Q.    Now, was there a time -- when is the first

9   time you learned of changes that were going to be taking

10  place with the forensic psychiatry clinics?

11       A.    Are you referring to the CHS takeover?

12       Q.    Yes.

13       A.    We began -- when I say we, I mean Dr. Kaye

14  and I -- began to hear rumors about CHS wanting to take

15  over -- consolidate and take over the court clinics.  I

16  believe that was in -- I think it was some point in

17  2017, I believe.

18       Q.    Were there questions or issues raised with

19  the Office of Health and Mental Hygiene in 2015?

20            MS. CANFIELD:  Objection to form.  You can

21       answer.

22       A.    I'm not -- I'm not sure what you mean by

23  issues raised with them.

24       Q.    Like for example, the usage of redacted



1  medical records.  When was the first time you, I guess,

2  engaged about that?

3          MS. CANFIELD:  Objection to form.  You can

4      answer.

5      A.   We went through a period where we started to

6  receive redacted medical records from Rikers Island.  I

7  want to say that was somewhere -- it could have been

8  around 2015.

9      Q.   Okay.  And what was your position at that

10  time about the redacted medical records?

11          MS. CANFIELD:  Objection to form.  You can

12      answer.

13      A.   I did not feel it was appropriate for them to

14  be redacted.

15      Q.   Why not, Dr. Winkler?

16      A.   Because we -- in making our determination as

17  to whether somebody is fit to proceed or not, we felt

18  that we needed all the information that could be made

19  available.  And secondly, the process they were using at

20  the time, from what we were told, involved whoever was

21  redacting the records, entering some type of a key word

22  that would then result in large portions of records

23  being redacted.  And then there were some records that

24  were completely useless because they were so heavily



1  redacted.

2        Q.   Now, did you believe that the medical

3  information was relevant in terms of determining whether

4  nor not a defendant was fit to proceed, Dr. Winkler?

5        A.   The -- the issue was that without the

6  redacted -- we didn't know what was redacted, and it

7  could have been potentially useful or beneficial in

8  determining if someone was fit to proceed.

9        Q.   Now, at any point, did you voice your

10 concerns about the provision of redacted medical

11 records?

12       A.   Yes.

13       Q.   When did you do that?

14       A.   Around the time that we started to experience

15 the problem, Dr. Kaye and I had a lot of discussions

16 about it.  At some point, I contacted -- I forget where

17 we got the information, but we found -- I believe we

18 learned that a standard order for the records that we

19 had always used, the legal department at Rikers Island

20 had made a determination that that order was no longer

21 sufficient to receive the type of information that was

22 now being redacted.

23       Q.   Okay.  So do you recall who in the Rikers

24 Legal Department made that decision?



1        A.   I do not.  Sorry.

2        Q.   Now, you said you and Dr. Kaye discussed this

3   at length.  Who else did you discuss your position on

4   redacted medical records?

5        A.   I'm fairly --

6             MS. CANFIELD:  Objection to form.  You can

7        answer.

8        A.   I'm fairly certain that Dr. Colley was

9   involved in the discussions.  There were some -- not

10  that they were involved in discussions, but I believe

11  certain judges were advised that we were getting

12  redacted records.  I actually had a conversation at one

13  point with a representative of the legal department at

14  Rikers Island in order to prepare a new form order that

15  would conform to what the wording that they wanted in

16  order for us to now receive non-redacted records.

17       Q.   Now, who was your supervisor at that time

18  when you worked with the Rikers Legal Department to

19  develop a new form?

20       A.   Dr. Kaye.

21       Q.   And who was your indirect supervisor?

22       A.   It still would have been Dr. Elliot.

23       Q.   Okay.  Now, at any point, did you engage a

24  Mr. Volpe from the Office of Mental Health and Hygiene



 1   about this issue?

 2        A.   The name is familiar.  Yeah, John Volpe.  I

 3   don't recall -- I remember -- I recall the name.  I

 4   don't recall what interactions I had with him though.

 5        Q.   Do you recall an interest of Mr. Volpe in the

 6   Miguel Figueroa case?

 7             MS. CANFIELD:  What is that case again?

 8             MS. HAGAN:  Miguel Figueroa.

 9        A.   I recognize the name.  I don't remember the

10   details though.

11        Q.   Was there an -- in this instance, and I'm

12   referring to Miguel Figueroa, were there -- did he --

13   was he an inmate that presented particular problems as

14   far as being produced?

15             MS. CANFIELD:  Objection to form.  You can

16        answer.

17        A.   I think he -- I know which inmate you're

18   speaking about.  My recollection was that he was, yes.

19        Q.   And what do you recall exactly about that,

20   about Mr.  Figueroa?

21        A.   I'm not sure if I'm remembering the correct

22   defendant, but there was a defendant who at one point

23   was a particular behavior problem at Rikers Island.  And

24   he had been transferred repeatedly from Rikers to



**BARRY WINKLER, M.D.**

1   Bellevue and from Bellevue back to Rikers Island.  And

2   eventually, my understanding -- excuse me, was that

3   Bellevue, which would have been Dr. Colley, I believe at

4   the time making the decisions, said that they would no

5   longer admit that patient at Bellevue Hospital.  I don't

6   recall definitively if that was Mr. Figueroa, but I

7   think it might have been him.

8        Q.   Do you recall having discussions about a

9   forced order and whether or not that would be

10  appropriate in this context with Mr.  Figueroa?

11            MS. CANFIELD:  Objection as to form.

12       A.   If Mr. Figueroa, again, I have to qualify it.

13  If he, in fact, was the defendant I'm speaking of, then

14  yes, I think we did have discussions about a forced

15  order about that defendant.

16       Q.   And do you remember the content of those

17  discussions?

18       A.   I don't.

19       Q.   Now --

20       A.   Other than -- other than a force order for

21  whatever reason would have been required in the content

22  of the discussion that I would imagine.

23       Q.   Was there some interference with Mr.

24  Figueroa's 730 examination during that time to get him



1  off of Rikers Island?

2          MS. CANFIELD:  Objection as to form.  He can

3      answer.

4      A.    Again if -- if Mr. Figueroa is the defendant

5  that I'm thinking of, we received word at one point that

6  Patsy Yang had called the district attorney's office to

7  ask if Mr. Figueroa could be found unfit without an

8  examination and moved out of Rikers Island.

9      Q.    And what was your -- what did you think of

10  that?

11      A.    I thought it was inappropriate.

12      Q.    Could you elaborate?

13      A.    Well, someone cannot be found unfit to

14  proceed without an examination per the statute.

15      Q.    And when -- when Dr. Yang attempted to -- I

16  guess when Dr. Yang engaged in this effort, which

17  evaluators did she expect to find him unfit?

18          MS. CANFIELD:  Objection to form.  You can

19      answer.

20      A.    Honestly, I can't honestly say that she --

21  all I know is that she asked -- the information I

22  believe we received is that she asked if it could be

23  done.  I don't know if she -- I don't recall if she told

24  them she wanted it done, but my understanding was that



1  it would -- the DA would just have -- DA's office would

2  just have said that that defendant was unfit.  It never

3  happened.  So I don't know what mechanism, but there

4  would have been no other examiners to see him other than

5  myself and Dr. Kaye.

6       Q.   Now, did you ever hear from Dr. Yang directly

7  yourself at that time?

8       A.   Not that I recall.

9       Q.   Okay.  Had you ever met Dr. Yang at that

10 point?

11      A.   No, I don't think I had.

12      Q.   At that point, had Dr. Yang revealed her role

13 or her position as far as the court clinics at that

14 point?

15           MS. CANFIELD:  Objection as to form.  You can

16      answer.

17      A.    I'm not sure what you mean by her role or her

18 position.

19      Q.   Well, you just said that Dr. Yang contacted

20 the DA's office to see if Mr.  Figueroa could be found

21 unfit without an examination; right?

22      A.   That's correct.

23           MS. CANFIELD:  Objection to form.  You can

24      answer.



```
 1        A.    That's correct.

 2              MS. HAGAN:  He said sure.  Right?

 3        Q.    Huh?

 4        A.    I said that is correct.

 5        Q.    Right.  At that time, what did you understand

 6   Dr. Yang's position to be?

 7              MS. CANFIELD:  Objection to form.  You can

 8        answer.

 9        A.    As far as I knew, she was the head of CHS.

10   I'm not sure her exact title.

11        Q.    Now, what did you understand her position to

12   be as it pertained to the court clinics?

13              MS. CANFIELD:  Objection to form.  You can

14        answer.

15        A.    I don't recall.  I'm trying to remember the

16   time frame of when that happened.  I don't recall at

17   that point if she had any direct -- I don't know of any

18   direct involvement by her with the court clinics at that

19   point.

20        Q.    Did you find it odd that she would have

21   contacted the DA's office regarding Mr. Figueroa, since

22   you hadn't known her to be directly involved with the

23   court clinics?

24              MS. CANFIELD:  Objection to form.  You can
```



1        answer.

2        A.    It was certainly an unusual request.

3        Q.    How often was the Department of Health &

4  Mental Hygiene involved in the administration of the

5  forensic evaluations at the court clinics?

6             MS. CANFIELD:  Objection to form.  You can

7        answer.

8        A.    Well, do you mean the day-to-day operations,

9  like the evaluations that we did?

10       Q.    I guess we can start with the day to day and

11 just the overall -- general operations of the clinic.

12       A.    Well, they weren't involved in the day-to-day

13 operations.  But OMH is eventually involved in most

14 cases where someone's found unfit.  They, depending on

15 the charges under the law, often go into OMH custody for

16 restoration of fitness.

17       Q.    And would this be Kirby?

18       A.    It could be Kirby, or it could be Mid-Hudson.

19       Q.    And how often would you say that -- let me --

20 let me rephrase that.

21             The Office of Mental Health, who would they

22 typically engage from CHS regularly?  Would that have

23 been the director of the clinic or someone above the

24 director?



1            MS. CANFIELD:  Objection to form.  You can

2       answer.

3       A.   We didn't really have -- I don't know that

4    they have had, rather, any direct contact with the

5    clinics.  The -- once somebody in the example that I

6    just used about being found unfit, that would happen

7    with the court.  So our paperwork would go to the court.

8    And then assuming the judge agreed with our opinion and

9    there was an order for that defendant to be transferred,

10   then that would take place between the court, Rikers

11   Island, OMH, whatever the facility was.

12       Q.   And I just want to make sure that the

13   record's clear, because there's a state equivalent and a

14   city equivalent of the Office of Mental Health and

15   Hygiene.  Now, Dr. Yang worked at the department of

16   mental -- the Department of Mental Health and Hygiene.

17   That would be the city agency; is that right?

18            MS. CANFIELD:  Objection to form.  You can

19       answer.

20       A.   Yes, I believe that's right.

21       Q.   And OMH that you're talking about with Kirby

22   and Mid-Hudson, that's the state agency; is that right?

23       A.   That's correct.

24       Q.   So now, Dr. Winkler, were you -- what was



1    your -- let me rephrase this.

2              What was your understanding of the transition

3    from, let's say, Corizon to CHS; what do you remember

4    about that?

5              MS. CANFIELD:  Objection to form.  You can

6         answer.

7         A.   What I recall was that -- I recall hearing

8    that Corizon was a contract agency with the city, and

9    that the city had decided they no longer wanted to use a

10   contract agency to supply those services, and that they

11   wanted CHS to take over those services as a city agency.

12        Q.   Now, I guess now that we're kind of talking a

13   little bit about Dr. Yang, when was the first time you

14   met Dr. Yang, actually?

15        A.   As far as I recall, the first time I met Dr.

16   Yang was -- I believe it was towards the end of 2017.

17   She came to the Bronx Court Clinic with a number of

18   other individuals for a meeting with Dr. Kaye and

19   myself.

20        Q.   And what do you remember about that -- about

21   that meeting?

22        A.   I remember that we had been hearing, as I

23   mentioned earlier, about rumors that CHS was going to

24   take over the court clinics.  There were various rumors



1   circulating that the clinics would then be closed and

2   the clinicians would be moved to Rikers Island.  And

3   what I remember about that meeting was that Dr. Yang and

4   other individuals came to the court clinic to speak to

5   us about the transition and the (indiscernible).

6        Q.   And what was your impression of Dr. Yang at

7   that time?

8        A.   In terms of what?

9        Q.   Just in general.  I mean she was there, she's

10  speaking to you.

11       A.   I didn't really form any impression about

12  her.

13       Q.   At any point, did you believe that some of

14  the goals that Dr. Yang and CHS management had for the

15  court clinics and the turnarounds of the 730 exams were

16  unrealistic?

17            MS. CANFIELD:  Objection to form.  You can

18       answer.

19       A.   Nothing was discussed about that at that

20  meeting.  Are you talking about at any point since CHS

21  has taken over?

22       Q.   Yes.

23       A.   At one point -- well, I don't even know if

24  this was a CHS program.  At one point, the mayor's



1  office on criminal justice developed a pilot project,

2  which was implemented in the Queens Court Clinic.  And I

3  felt that those turnaround times, goals for reports,

4  seemed short to me.

5       Q.   Now, who was running the Queens Court Clinic

6  at that time?  Who was the director?

7       A.   At that time, it would have been Dr.

8  Elizabeth Owen.

9       Q.   Now, does Dr. Owen still work at CHS?

10      A.   No.

11      Q.   Now, you still work at CHS; right?

12      A.   Yes.

13      Q.   You said yes; right?

14      A.   Yes.

15      Q.   Okay.  Now, do you know why Dr. Owen no

16  longer works at CHS?

17      A.   She resigned.

18      Q.   Was this a voluntary resignation?

19      A.   I don't know.

20      Q.   Okay.  When did she resign?

21      A.   About two or three weeks ago.

22      Q.   Has a replacement been put in place yet?

23      A.   Not as far as I know.

24      Q.   Now, what were the goals identified with the



1   Queens Court Clinic that you, I guess, had some

2   skepticism about?

3            MS. CANFIELD:  Objection to form.  He can

4        answer.

5        A.   Are you referring to report preparation

6   times?

7        Q.   Any.  Well, we can start with that.

8        A.   Well, the only thing that I had any question

9   about was the report preparation time.  I believe their

10  goal was a seven-day turnaround time for misdemeanors

11  and a 14-day turnaround time for felony cases.

12       Q.   And you took issue with that?

13       A.   I wouldn't say -- I wouldn't say I took issue

14  with it.  I would say that I didn't feel it was

15  realistic in all cases, because different cases have

16  different requirements in terms of how quickly they can

17  be completed.

18       Q.   Well, why wasn't it actually realistic?  Like

19  as far as you said, different cases have different, I

20  guess, circumstances that would necessitate different

21  time frames; would that be accurate?

22            MS. CANFIELD:  Objection to form.  You can

23       answer.

24       A.   That's accurate.



1        Q.   So what would influence the turnaround of the

2   given case?

3        A.   If a defendant -- what would influence it

4   would be, for example, if a defendant needs to be seen

5   for a second interview, if a defendant requires

6   psychological testing to qualify any potential

7   psychiatric problems, if the examiners required medical

8   records, either from Rikers Island or other hospitals

9   where the defendant had been treated.

10       Q.   So those would be, I guess, the major factors

11  that would basically impact -- influence or impact the

12  turnaround.  For example, like, let's say -- let me just

13  ask.  Are there instances wherein defendants or inmates

14  refuse to appear for your scheduled examinations?

15       A.   Yes.

16       Q.   Okay.  So that would impact the turnaround;

17  am I right?

18       A.   Correct.  That's another factor.

19       Q.   Now, I'm going to go back to the 2017 meeting

20  that you had for the first time with Dr. Yang.  During

21  that time, was a discussion about HIPAA releases being

22  presented raised by Dr. Yang?

23       A.   I'm sorry.

24            MS. CANFIELD:  Objection to form.  You can



1        answer.

2        A.   I didn't hear the entire question.

3   Discussion of what?

4        Q.   Didn't Dr. Yang say that she wanted to

5   present HIPAA releases to all defendants at arraignment

6   at that time?

7             MS. CANFIELD:  Objection to form.  You can

8        answer.

9        A.   I don't recall if she said that at that

10  meeting.  That idea was floated at some point.  I don't

11  recall if it came from Dr. Yang or if it was a point

12  that was discussed among the different court clinic --

13  clinicians in the different boroughs.  I don't recall

14  Dr. Yang saying that at that meeting.

15       Q.   Do you recall Dr. Kaye expressing concern

16  about HIPAA releases at that time?

17            MS. CANFIELD:  Objection to form.  You can

18       answer.

19       A.   I recall at whatever point that issue came

20  up, and I don't recall that it happened at that meeting.

21  But at whatever point we learned about that idea, both

22  Dr. Kaye and I expressed opposition to it.

23       Q.   Okay.  At any point, do you recall Dr. Yang

24  ever say, "If you don't like it, there's the door"?



1            MS. CANFIELD:  Objection to form.  You can

2       answer.

3       A.   I recall at the -- at the meeting, which I

4  believe was at the end of 2017, I forget what it was in

5  reference to, what it was connected to, but I seem to

6  recall Dr. Yang saying something to the effect of if

7  they don't like it, they can leave.

8       Q.   Did she say also that we've got the money and

9  if you don't like it, then there's the door?

10           MS. CANFIELD:  Objection to form.  You can

11      answer.

12      A.   I don't recall any reference to the money

13 being connected to the statement about not liking it,

14 and I don't recall if she said there's the door.  My

15 recollection is she said, if they don't like it, they

16 can leave.  During that meeting, there was a discussion

17 about CHS having a different or separate budget line

18 with City Hall, which would enable them to make staffing

19 and other improvements, that for example, Bellevue and

20 Kings County, who had staffed the clinic previously,

21 would not have been able to do.

22      Q.   And how did you learn about this?

23           MS. CANFIELD:  Objection to form.  You can

24      answer.



1      A.    Learn about what?

2      Q.    About the different -- separate budget line

3  for CHS versus Bellevue and Kings County?

4      A.    Somebody said it at that meeting.  I don't

5  remember if it was Dr. Yang, or it was someone from CHS

6  who said that.

7      Q.    Now, at any point, were you asked or

8  approached about working in the work group?

9      A.    Do you mean after CHS took over?

10     Q.    Yes.

11     A.    After the takeover started?

12     Q.    Right.

13     A.    Yes.

14     Q.    And when would you say that happened?

15     A.    I believe it happened somewhere in the

16  beginning of 2018.  Maybe end of 2017, beginning of

17  2018.

18     Q.    Now, when -- when, I guess, CHS took over,

19  how do you -- do you recall Dr. Kaye's reaction as the

20  takeover started?

21          MS. CANFIELD:  Objection to form.  You can

22      answer.

23     A.    Can you be more specific?  I'm not sure what

24  you're referencing.



1       Q.   Well, you know, there may have been an

2    exchange with Dr. Yang and Dr. Kaye regarding the HIPAA

3    releases at that time, or at least she disagreed with

4    that as far as requiring the -- or seeking to have the

5    inmates execute on these HIPAA releases.  Do you recall

6    any animosity that may have, I guess, emerged around

7    that time between Dr. Kaye and Dr. Yang?

8            MS. CANFIELD:  Objection to form.  You can

9        answer.

10       A.   Not that I recall.

11       Q.   Did you ever tell Dr. Kaye that there was a

12   power struggle between she and Dr. Kaye -- Dr. Yang?

13       A.   Did I tell Dr. Kaye there was a power

14   struggle between her and Dr. Yang?

15       Q.   Right.

16       A.   I don't recall saying that.

17       Q.   Did you ever hear any complaints about Dr.

18   Kaye from Dr. Yang?

19       A.   No.

20       Q.   Did you hear any complaints about Dr. Kaye

21   from Dr. Ford?

22       A.   Not that I recall.

23       Q.   Now, at some point, Dr. --- you and Dr. Kaye

24   assisted Dr. Ford when she, I guess, worked for --



1    worked with the clinics prior to her position at CHS;

2    isn't that right?

3              MS. CANFIELD:  Objection to form.  You can

4         answer.

5         A.   I don't know what you mean assisted her.  Can

6    you be more specific?

7         Q.   For example, there was a backlog, I believe,

8    at the Manhattan Court Clinic.  And it appeared that you

9    and Dr. Kaye may have worked to address that backlog.

10   Do you remember that?

11             MS. CANFIELD:  Objection to form.  You can

12        answer.

13        A.   I do recall seeing some Manhattan cases

14   because they had a backlog, yes.

15        Q.   And when did that take place?

16        A.   I honestly don't recall.

17        Q.   But this is before Dr. Ford assumed her

18   capacity with CHS; is that right?  This is before --

19   this is the first time she was working with the clinics?

20             MS. CANFIELD:  Objection as to form.  You can

21        answer.

22        A.   I think it was, but I'm not certain.

23        Q.   Now, did Dr. Ford play any part in you being

24   hired at CHS -- not CHS.  We're talking about the Bronx



1    Court Clinic.  I'm sorry.

2            MS. CANFIELD:  Objection to form.  You mean

3        before CHS or after CHS?

4            MS. HAGAN:  Before CHS.

5        A.    So you mean when I got hired to work at the

6    Bronx Court Clinic?

7        Q.    Initially, yes.

8        A.    No, she did not.

9        Q.    Now, you were eventually promoted to director

10   of the Brooklyn Court Clinic; right?

11       A.    Yes.

12       Q.    Now, did Dr. Ford encourage you to seek that

13   promotion?

14       A.    The process was that once CHS took over the

15   clinics, they had an open position for a director of all

16   the clinics.  And I applied for that job and was not

17   given that job.  And I got a call from Dr. Ford to tell

18   me that I had not been chosen for the job, and she told

19   me that there were open director positions at the

20   Manhattan and the Brooklyn clinics and asked me if I

21   would be interested in one of those jobs.  I told her

22   that I would need to think about it.  I called her the

23   next day.  She said the Manhattan position was no longer

24   available but Brooklyn still was, and I said I would



**BARRY WINKLER, M.D.**                    45

1  take Brooklyn.

2        Q.   And what made you decide to take the Brooklyn

3  Court Clinic director position?

4        A.   It was a promotion.  It was an opportunity to

5  run my own clinic.

6        Q.   But not because of the working conditions at

7  the Bronx Court Clinic?

8        A.   No.

9        Q.   You said no?

10       A.   No.

11       Q.   Would you say that Dr. Kaye -- let me scratch

12  that.

13            So would you say that the work environment at

14  the Bronx Court Clinic was -- how -- let me stop there.

15  How would you describe the working conditions at the

16  Bronx Court Clinic at that time right before you left?

17       A.   Are you talking about the case load, the

18  relationship between Dr. Kaye and I?  What are you

19  referencing?

20       Q.   Okay.  Well, let's start, the relationship

21  between you and Dr. Kaye at the time, how was it?

22       A.   It was fine.

23       Q.   Okay.  Was the -- was the environment at the

24  Bronx Court Clinic combative?



```
 1              MS. CANFIELD:  Objection to form.  You can
 2         answer.
 3         A.    No.
 4              MS. HAGAN:  He said no.
 5         Q.    Was the environment at the Bronx Court Clinic
 6    adversarial?
 7         A.    No.
 8         Q.    Did it seem as if Dr. Kaye was working with
 9    the defense community to set people up?
10              MS. CANFIELD:  Objection to form.  You can
11         answer.
12         A.    To set people up for what?
13         Q.    Well, I guess, perhaps, for additional
14    scrutiny or for targeting by just -- I don't know.  Was
15    it hostile to, I guess, people who were outside of -- I
16    guess, outside of their cliques, as people would call
17    it?
18              MS. CANFIELD:  Objection to form.  You can
19         answer.
20         A.    You mean defense attorneys or court personnel
21    that we worked?
22         Q.    Well, let's break it -- let's flush it down.
23              Did Dr. Kaye have a good relationship with
24    the defense community?
```



1      A.   Yes.

2      Q.   And when I say "the defense community," can

3  you list out the various organizations she may have

4  engaged during that time, do you recall?

5      A.   Yes.  I recall that we engaged with Legal

6  Aid, Bronx Defenders Service or Society, I forget what

7  it's called.  We had also -- we would engage with 18B

8  attorneys, assigned attorneys.  And every once in a

9  while, we would engage with a private pay attorney.

10     Q.   So you -- how would you describe Dr. Kaye's

11 relationship with the Bronx Defenders?

12     A.   Initially, there were some issues with Bronx

13 Defenders based upon, I would say, the fault of the

14 attorney, quite frankly, not really knowing or following

15 the parameters of how the evaluations were done.  I did

16 not witness it, but I remember Dr. Kaye telling me at

17 one point, Bronx Defenders attempted to have a social

18 worker sit in on an evaluation under the guise of being

19 an attorney when they weren't actually an attorney.  I

20 wasn't present for that.  But then I believe Dr. Kaye

21 spoke with the particular attorney at Bronx Defenders

22 that I'm referencing.  And then after that, actually the

23 relationship was rather good.

24     Q.   And when would you say that took place?



1        A.   Wow, a few years before I left.  Maybe 2015,

2   2016.  I don't really remember.

3        Q.   And how would you say her relationship was

4   with Legal Aid?

5        A.   Very good.

6        Q.   And the 18B attorneys?

7        A.    It was fine.  There would always be an

8   individual attorney who through, quite frankly, no fault

9   of ours, Dr. Kaye's or mine, who was difficult to deal

10  with.  But you know, 18B is different attorneys;

11  whereas, Bronx Defenders and Legal Aid, you deal with

12  the same attorney, usually.  But overall, I would say it

13  was fine.

14       Q.   And what about the judges in the Bronx

15  Supreme Court?

16       A.   What about them?

17       Q.   How was her -- how was her relationship with

18  them?

19       A.   Very good.

20       Q.   Would it be fair to say that Dr. Kaye was

21  well respected amongst these different -- would it be

22  fair that Dr. Kaye was fairly well respected?

23            MS. CANFIELD:  Objection to form.  You can

24       answer.



```
 1        A.   By who?
 2        Q.   Let's say the Bronx Defenders, let's go with
 3   that.
 4        A.   I'm sorry.  I didn't hear the -- the Bronx
 5   what?
 6        Q.   The first one, as far as the Bronx Defenders,
 7   would you say that Dr. Kaye was well respected?
 8        A.   I think eventually, once the initial
 9   friction, for lack of a better word, was resolved, yes.
10        Q.   And would you say she was well represented
11   with Legal Aid?
12        A.   Yes.
13        Q.   And then would you say that Dr. Kaye was well
14   respected by the judges?
15        A.   Yes, I would.
16        Q.   And would you say that Dr. Kaye's
17   relationship with these various stakeholders enabled you
18   all to run the court clinics effectively?
19             MS. CANFIELD:  Objection to form.  He can
20        answer.
21        A.   Yes, I would.
22        Q.   Do you believe that Dr. Yang, Dr. Ford,
23   and/or Dr. Jain, effectively leveraged Dr. Kaye's
24   relationship with -- with the Bronx Defenders, Legal
```



1  Aid, and the judges in the unit in the --

2           MS. CANFIELD:  Objection to the form.

3       Q.   -- in the area?

4           MS. CANFIELD:  Objection to form.  You can

5       answer.

6       A.   I don't know what you mean by "effectively

7  leveraged."  Can you be more specific?

8       Q.   Well, did they actually approach Dr. Kaye to

9  see if she could facilitate a relationship with these

10  various entities when they came on board?

11          MS. CANFIELD:  Objection to form.  You can

12      answer.

13      A.   I don't recall specifically if they did, but

14  as -- I believe Dr. Kaye was the longest employed

15  clinician in the clinics at that time.  So it would have

16  made sense to approach her with questions about

17  operations, et cetera.

18      Q.   Did they?

19          MS. CANFIELD:  Objection to form.  You can

20      answer, if you're able.

21      A.   Who are you referring to again?  Tell me the

22  doctors you're referring to, Dr. Jain and who else?

23      Q.   Dr. Jain, Dr. Yang, and/or Dr. Ford, and I

24  guess Dr. MacDonald.  I'm sorry.  I didn't mention him.



1      A.    I don't know that Dr. MacDonald or Dr. Yang

2   ever did.  I think at some point Dr. Ford, there might

3   have been discussions about how to handle certain issues

4   at the clinic.  And I don't know about -- I'm not sure

5   about Dr. Jain's interactions.

6      Q.    Now, at any point, did Dr. Jain reach out to

7   you to, I guess to -- I guess get insight as to how to

8   engage Dr. Kaye?

9           MS. CANFIELD:  Objection to form.  You can

10        answer.

11     A.    He didn't reach out to me necessarily as how

12   to engage Dr. Kaye.  But he did ask me at -- sometimes

13   about the clinic, just overview of the operations of the

14   clinic.

15     Q.    How would you describe the dynamic between

16   Dr. Jain and Dr. Kaye?

17          MS. CANFIELD:  Objection to form.  You can

18        answer.

19     A.    I wasn't present for their interactions,

20   other than an occasional director's meeting.  The little

21   bit I saw at those meetings seemed professional,

22   cordial.  At those meetings, we were often asked to

23   provide opinions about things, and sometimes we did not.

24   Some of us didn't agree with other's opinions.



```
 1        Q.   When you say some of us didn't agree with
 2   other's opinions, what do you mean?
 3        A.   Well, some of the directors would not
 4   necessarily agree about opinions about procedures in the
 5   clinics or proposed procedures, common discussion about
 6   various operating issues.
 7        Q.   I guess I wanted to ask specifically about,
 8   did Dr. Jain ever complain to you about Dr. -- Dr. Kaye?
 9        A.   No.
10        Q.   Okay.  Did Dr. Kaye complain to you about Dr.
11   Jain?
12        A.   Yes.
13        Q.   What did she complain about?
14        A.   I recall at one point, she said that she did
15   not like to do interviews with him for evaluations
16   because he had a different style of interviewing that
17   didn't necessarily dovetail with how she was used to
18   doing her interviews.  I don't know that she necessarily
19   got along well with Dr. Jain after the takeover.
20        Q.   Could you repeat that.  I didn't hear that.
21        A.   I said I don't know -- I can't really provide
22   a lot of specifics, but my sense was that she did not
23   get along well with Dr. Jain.
24        Q.   Did Dr. Jain get along well with Dr. Kaye?
```



1        A.   I don't know.  I wasn't present for their

2   interactions.

3        Q.   At any point, did you ever tell Dr. Kaye that

4   Dr. Jain was naive?

5        A.   I think I did mention that to her at one

6   point, yes.

7        Q.   Do you recall the context of that

8   conversation?

9        A.   I'm trying to remember.  I honestly don't

10  recall if it was some -- I don't recall where it came

11  up, honestly.  I do remember making that comment to her

12  though.

13       Q.   Did you ever complain to Dr. Kaye that Dr.

14  Jain's exams were long and irrelevant -- and had

15  irrelevant detail?

16       A.   I recall telling Dr. Kaye that I thought Dr.

17  Jain's interviews were at times too long.  Just my

18  opinion.  We all have our own ways of doing interviews.

19  I remember telling Dr. Kaye, for example, that Dr. Jain

20  would always include a formal mental status that some of

21  us do not do unless it was necessary.  So there were

22  differences in interview style that I do recall telling

23  her about.

24       Q.   Did you ever tell her that the staff at the



1  Brooklyn Court Clinic hated doing exams with Dr. Jain?

2        A.   I don't know if I used the word "hated."  If

3  I did, it was probably meant more as a joke.  But I did

4  communicate to her that the staff would prefer not to do

5  interviews, because his interviews were so long, but

6  nobody ever refused to do an interview with him.

7        Q.   Now, did you ever tell Dr. Jain that you felt

8  that his reports were too long?

9        A.   I did tell him at one point that -- I don't

10  think I used the words "Your reports are too long."  But

11  I remember commenting to him that his reports were

12  longer than mine and that he wrote long reports.

13        Q.   Did he become defensive when you talked to

14  him about that?

15        A.   I don't remember him becoming defensive.  I

16  remember him just referencing his training.  I actually

17  remember discussing with him about the mental status

18  exams, which I mentioned earlier, and his -- he gave me

19  his rationale for it, that he would rather have the

20  information in the report if he had to testify.  But I

21  don't recall him becoming defensive.

22        Q.   Now, at any point with the working group, did

23  Dr. Kaye ever complain to you about not being invited to

24  participate in that?



1        A.    I do recall her complaining about that, yes.

2        Q.    Can you ex -- can you elaborate?

3        A.    I forget which meetings -- I believe she --

4   she did not participate in -- I forget how many meetings

5   we had.  We had a few.  I forgot which ones she was not

6   there for, but I do recall her complaining that she had

7   not been invited.

8        Q.    And was there a time that she complained that

9   you had been invited instead of her?

10       A.    Yeah.  I think she did say something to that

11  effect.  But I don't think it was a -- I shouldn't have

12  been there, and she should.  I think it was if I was

13  there, she should have been there situation.

14       Q.    Did you agree with her?

15       A.    Yeah.  I think she should have been there.

16       Q.    Now, who made the decision to invite you and

17  not Dr. Kaye?

18       A.    I think it was Dr. Ford.

19       Q.    Did Dr. Ford approach you directly about

20  going to the work group meeting?

21       A.    Not directly.  I think -- I think we got -- I

22  think it was an email process where -- I forget.  I

23  think it started out as they wanted two representative

24  from each clinic.  I don't remember how I wound up being

1   designated to go.

2        Q.   Now, by the time CHS took over the court

3   clinics, how would you describe how Dr. Kaye was being

4   treated by CHS management?

5           MS. CANFIELD:   Objection to form.   You can

6        answer.

7        A.   What do you mean by being treated?   That's

8   pretty broad.

9        Q.   Well, you said they invited you, if not Dr.

10  Kaye, to the work group.   Or, I can't say "they," well,

11  Dr. Ford, specifically, in this instance.   Were there

12  any other times where you -- you may have observed that

13  Dr. Kaye may not have been treated fairly, perhaps, by

14  CHS management?

15          MS. CANFIELD:   Objection.   Objection.   I

16       mean, I don't think we even have timelines as to

17       when this happened, but go ahead.   He can answer.

18          MS. HAGAN:   When CHS took over.   That's what

19       I'm saying.   That's the timeline.   CHS took over

20       in 2000 -- we're not sure when CHS took over.

21       That's not clear.

22          MS. CANFIELD:   No.   What's not clear is when

23       -- when not being invited to this meeting, because

24       I don't know when that happened either.   But go



1        ahead, you can answer.

2             MS. HAGAN:  You can't coach the witness, Ms.

3        Canfield.

4             MS. CANFIELD:  I'm not.  I'm just trying to

5        get a clear record, but go ahead.

6             MS. HAGAN:  You'll have an opportunity to do

7        so at the end.

8             MS. CANFIELD:  Okay.  I know.  I directed the

9        witness to go ahead.

10            MS. HAGAN:  Yes.

11       A.   Ms. Hagan, please ask your question again.

12       Q.   Yeah.  During the time that CHS took over,

13  right, how would you say that Dr. Ford treated Dr. --

14  Dr. Kaye?

15       A.   I don't know that I can comment on that.  I

16  wasn't present.  The takeover happened over a number of

17  months, so I wasn't present for interactions between

18  them.

19       Q.   What about Dr. Jain and -- and Dr. Kaye?

20       A.   I wasn't present at all for interactions

21  between Dr. Jain and Dr. Kaye, because I was already

22  down in Brooklyn by the time Dr. --

23       Q.   So at any point given point, for example, did

24  Dr. Kaye complain to you about the shift change that she



1    was experiencing?

2         A.    Yes, she did.

3         Q.    What do you recall about that complaint?

4         A.    I recall that she told me -- I forget what

5    her original shift was.  It might have been 9 to 5:30.

6    I'm not sure.  But I remember her telling me that her

7    shift had been changed, I believe, to start a half hour

8    earlier.

9         Q.    At any point, for example, did Dr. Kaye tell

10   you that she was being made to work more hours than the

11   other directors?

12        A.    I don't recall her saying that.

13        Q.    What do you recall her saying?

14        A.    What I recall her saying was -- about that

15   shift change was that it was -- she felt it was -- it

16   violated some prior agreement or -- or something between

17   doctors' counsel, her union.  And I'm not sure of that

18   agreement, whether it was maybe H&H about shift times or

19   number of hours.  And I -- I remember her saying that

20   she felt that violated that agreement.

21        Q.    At any point, did she tell you that she was

22   made to report to work at 8:00 in the morning?

23        A.    I thought it was 8:30, but she might have

24   said that she had been at some point.  I'm not positive.



1      Q.    Now, were you -- were you aware of any issues
2    that Dr. Kaye was experiencing with childcare at that
3    time?
4      A.    Yes.
5      Q.    What do you remember about that?
6      A.    What I remember was that one of her children
7    has or had a fairly serious allergic condition.  I think
8    maybe it's called a chemical allergy or something to
9    that effect.  And I remember her saying that having to
10   come to work earlier, interfered with her ability to
11   provide him some treatment or assistance that he needed
12   in the morning.
13     Q.    And do you ever recall Dr. Kaye complaining
14   about pay equity to Dr. Ford while you were there?
15          MS. CANFIELD:  Objection as to form.  You can
16     answer.
17     A.    I don't know about her -- I don't know if she
18   complained to Dr. Ford, but Dr. Kaye did complain to me
19   several times about pay inequity.
20     Q.    What did she -- what did she complain about
21   specifically?  What did she say?
22     A.    She said, from what I recall, that she was
23   paid less than her counterpart in Manhattan.
24     Q.    And who would that have been?



1        A.    I believe it was both for Dr. Richard Rosner.

2   Then after he left, I believe Dr. Steve Ciric took over.

3   And I believe, from what I recall, she claims she was

4   paid less than both of them.

5        Q.    Now, Dr. Winkler, I don't want to go too far

6   astray from the hours.  What -- what are your hours at

7   clinic director in Brooklyn?

8        A.    9 to 5.

9        Q.    Okay.  And have those always been your hours?

10       A.    Yes.

11       Q.    And how long is your lunch?

12       A.    One hour.

13       Q.    Are you made to sign in and out at specific

14  times?

15       A.    No.

16       Q.    Okay.  And when you submitted your reports,

17  your time sheets, who did you submit them to?

18       A.    I'm sorry?

19            MS. CANFIELD:  Objection to form.

20       Q.    When you submitted your time sheets, who did

21  you submit them to?

22       A.    I submit -- at the time it is submitted

23  electronically.

24       Q.    Right.

1        A.    So it was approved by Dr. Jain when he was

2    the director of the clinic.  And now, it's approved by

3    Dr. Weisman.

4        Q.    Dr. Weisman, is he the director of all the

5    clinics?

6        A.    She is the director --

7        Q.    She.

8        A.    -- of all the clinics, yes.

9        Q.    Okay.  I'm sorry.

10            And to your knowledge, were any of the other

11   directors -- first off, before I go into there, is your

12   lunch paid or unpaid?

13       A.    Unpaid.

14       Q.    And so you work a seven-hour workday; am I

15   right?

16       A.    Correct.

17       Q.    Okay.  And as far as you know, do the other

18   court clinic directors work a seven-hour workday?

19       A.    I don't know what they work.

20       Q.    Okay.  To your knowledge, did any of the

21   other directors have to change -- did any of the other

22   directors have a shift change?

23       A.    At any time or around the time of Dr. Kaye's

24   or --



1        Q.   Around the time of Dr. Kaye's.  Let's start
2   with that.
3        A.   Not that I'm aware of.
4        Q.   Okay.  Subsequent to Dr. Kaye's shift change?
5        A.   Not as far as I know, but that's not
6   something I would be aware of.
7        Q.   Now, what was your salary when you became
8   director of the Brooklyn Court Clinic?
9        A.   118,000.
10        Q.   And is that your salary today?
11        A.   Yes, it is.
12        Q.   Okay.  Now, are there any restrictions on
13   your salary based on your retirement from the South
14   Hampton Police Department?
15        A.   No.
16             MS. CANFIELD:  Objection to form.  You can
17        answer.
18        Q.   You said no?
19        A.   No.
20        Q.   Now, to be clear -- do you -- let me make
21   sure I get this clear.  Are you an H&H employee?
22        A.   I'm a CHS employee.  I am paid by Physician's
23   Affiliate Group of New York, PAGNY, P-A-G-N-Y.  Because
24   of -- because I receive a pension from the state already



1    as a retired police officer, under Civil Service Law,

2    until age 65, if you are back to work for a public

3    benefit corporation, municipality, et cetera, you have

4    to receive -- you have to get a waiver from civil

5    service in order to continue to collect your full

6    pension.  But if you work for a private company, which

7    in essence, PAGNY is, then you do not need the waiver.

8         Q.   So did you ever obtain a waiver at any time

9    since you worked for either Bellevue or CHS?

10             MS. CANFIELD:  Objection to form.  You can

11        answer.

12        A.   When I first worked for Bellevue, I applied

13   for the waiver, and it was a very complicated process.

14   I had to get in touch, from what I remember, with

15   someone in HR about it, and there was not an initial

16   determination made at that point.  And then, around that

17   time, I asked Dr. Elliot, who was my supervisor or my

18   psychology department supervisor, if I could be switched

19   to an NYU line, since that was a private company,

20   private hospital, and would no longer need -- no longer

21   need the waiver.  And that took a number of months, but

22   I was eventually changed to an NYU line.  And for the

23   remainder of the time that I worked for Bellevue, I was

24   a Bellevue employee who was paid by NYU.



1        Q.    And when did that take place?

2        A.    The changeover to NYU?

3        Q.    Yes.

4        A.    I think it was somewhere around 2009 or '10,

5    I believe.  It was early on in my time at the Bronx

6    Court Clinic.

7        Q.    So when you took the position as Brooklyn

8    director, did you seek to have that same arrangement, so

9    you wouldn't have to deal with the waiver issue?

10       A.    Originally what happened was, I was going to

11   be hired by CHS.  And then I was -- and I was -- I made

12   them aware of the fact that I would need the waiver.

13   And then they offered me the option of being paid by

14   PAGNY, in which case I would not need the waiver.  And

15   then I decided to take the PAGNY pay line.

16       Q.    Who offered you the option to be paid by

17   PAGNY?

18       A.    It was brought to my attention by Elizabeth

19   Ford, and then it was finalized by the HR department.

20       Q.    And HR department consists of who?  Is it Ms.

21   Laboy?

22       A.    I think it might have been.  I don't remember

23   their names.

24       Q.    Okay.  Okay.  So I have some questions about



1    the, I guess, the work group.  During the time in

2    engaging in work group and being involved in the work

3    group, what were some of the topics that were discussed?

4            MS. CANFIELD:  Objection to form.  You can

5        answer.

6        A.    There were a number of things that were

7    discussed.  I recall this idea of some standardization,

8    not complete standardization, but increased

9    standardization of our reports from the clinics, various

10   procedures, report content.  I think that idea of the

11   releases -- having defendants sign releases, I think

12   that was floated.  There were a lot of ideas floated.  I

13   believe there was a -- I believe there was an outline of

14   a sample report, headings that were floated at one

15   point.  There were a lot of things that were brought up

16   and discussed as potential ideas during those work

17   groups.

18       Q.    Okay.  Now, I want to also kind of make sure

19   that I got everything as far as Dr. Elliot was

20   concerned.  Did Dr. Elliot ever complain to you about

21   Dr. Kaye?

22       A.    No.

23       Q.    Okay.  Did anyone ever complain to you about

24   Dr. Kaye?



66                          **BARRY WINKLER, M.D.**

```
 1        A.    Not that I can recall.
 2        Q.    Now, had you ever made the -- I guess -- let
 3  me backtrack.
 4              What would you say the workload at the Bronx
 5  Court Clinic was like when you worked there?
 6        A.    Do you mean number of cases we saw per year,
 7  or how would you want me to quantify that?
 8        Q.    Well, let's start with the number of cases
 9  you saw.
10        A.    Well, it obviously would vary year to year,
11  but I believe we averaged 200, two and a quarter -- 225
12  rather, 730 evaluations per year.  I think that was kind
13  of our average number each year that we saw.
14        Q.    And how did that compare to, let's say, for
15  example, now that you're at the Brooklyn Court Clinic.
16  How does that compare with the Brooklyn Court Clinic?
17        A.    I think Brooklyn is busier, but we have more
18  clinicians in Brooklyn.
19        Q.    So how many 730s would Brooklyn see?
20        A.    I honestly don't know how many we're seeing
21  annually.  I don't know.  Off the top of my head, I
22  don't know.
23        Q.    Now, when you and Dr. Kaye worked at the
24  court clinic together, were you adequately staffed?
```

800.DAL.8779
dalcoreporting.com



1        A.    What do you mean by adequately staffed?

2        Q.    Well, could the Bronx Court Clinic had used

3   more clinicians?

4        A.    I think there were times where we were busy,

5   and we could have used another clinician.  I believe --

6   I think before I came to the court clinic in the Bronx,

7   there had been maybe an additional part-time clinician

8   there, I'm not sure, besides the two full-time.  There

9   were times it would ebb and flow, frankly.  But there

10  were times we could have used an additional clinician.

11       Q.    Would you say that there were staffing issues

12  at the Bronx Court Clinic during your time there?

13       A.    Staffing issues is broad.  I would just

14  revert back to where I think there were times we could

15  have used another clinician.  But again, it ebbs and

16  flows.

17       Q.    Would you -- would you say that it was

18  difficult to retain staff at the Bronx Court Clinic

19  while Dr. Kaye was there?

20           MS. CANFIELD:  Objection to form.  You can

21       answer.

22       A.    Do you mean while I was employed there?

23       Q.    Right.  Like, did you see -- was there ever

24  an attempt made to hire another clinician or -- another



1  clinician at the clinic?

2       A.    Not that I recall.

3       Q.    Okay.  And did you ever hear any discussion

4  about it being difficult to retain staff at the Bronx

5  Court Clinic?

6       A.    Not while I was there.

7       Q.    After, did you hear any complaints about or

8  any discussions about it being difficult to attract or

9  retain staff at the Bronx Court Clinic?

10       A.    I do recall hearing something to that effect,

11  yes, after I left.

12       Q.    So what did you hear?

13       A.    I forget where I heard it.  I might have

14  heard it from Dr. Jain.  I don't recall how specific it

15  was, other than they were having difficulty hiring

16  someone to go there.

17       Q.    Okay.  What did Dr. Jain say to you exactly?

18       A.    I don't remember exactly what he said.  It

19  would have been similar to what I just said, we're

20  having difficulty hiring someone to go there.

21       Q.    Did he tell you why?

22       A.    I don't recall him being specific.  I just

23  recall him saying they were having trouble getting

24  someone to fill a position.



1      Q.   Did anyone that you worked with express a

2   reluctance to go to the Bronx Court Clinic to work with

3   Dr. Kaye?

4      A.   You mean in my -- in the Brooklyn Clinic.

5      Q.   Anywhere.  I mean, I would think that you all

6   -- I mean, the clinicians and even the staff interacted

7   with each other.  Was there any banter or discussion

8   about going to work with Dr. Kaye in the court clinic

9   when there -- when there was a need?

10     A.   Well, no, because we didn't -- we would have

11  gone -- in the very beginning --

12          MS. HAGAN:  You're breaking up.  I can't hear

13      you at all.

14          THE WITNESS:  Can you hear me now?

15          MS. HAGAN:  Yes.

16     Q.   You said no, and then what happened?

17     A.   The only time we would have or went to the

18  Bronx Clinic was in the beginning -- there was a point

19  where they didn't have additional staff or enough staff

20  in the Bronx.  And I know I went up one time, at least

21  once, maybe twice, to cover a case.  And I think a

22  couple of -- maybe one other time, one of our clinicians

23  went.  The only reluctance I ever heard about going

24  there was that they just simply didn't want to have to



**BARRY WINKLER, M.D.**

1   go up to the Bronx, the physical location.

2       Q.   So it was the location, not Dr. Kaye?

3       A.   Correct.

4       Q.   Now, at any point, were you aware of a work

5   stoppage in the Bronx Court Clinic?

6           MS. CANFIELD:  Objection as to form.

7       A.   A work stoppage, no.

8       Q.   Okay.  So let's -- let's backtrack some.

9           At some point, Dr. Brayton was hired.  Do you

10  remember that?

11      A.   Yes.

12      Q.   Now, did you participate in the decision or

13  the process of hiring Dr. Brayton?

14      A.   I was part of the interview.  Dr. Jain and I

15  interviewed her.

16      Q.   Did Kaye -- did Dr. Kaye interview Dr.

17  Brayton?

18      A.   I believe she did.

19      Q.   Was she with you when she interviewed Dr.

20  Brayton?

21      A.   No.

22      Q.   Okay.  Now, do you recall when Dr. Brayton

23  started with -- started with CHS?

24      A.   I think maybe it was the end of -- towards



1    the end of 2018.  I'm not entirely sure.

2         Q.   And so you and Dr. Jain interviewed Dr.

3    Brayton, and this is the end of -- did you say

4    something?

5         A.   No.

6         Q.   Okay.  And this is the end of 2018.  Now, you

7    left the clinic in April of 2018; is that right?

8         A.   Yes.

9         Q.   So from April 2018 to the end of 2018, was

10   Dr. Kaye the only full-time staff person at the Bronx

11   Court Clinic -- I guess, the only full-time clinician at

12   the Bronx Court Clinic?

13        A.   As far as I know, she was.

14        Q.   Okay.  At any point, did Dr. Ford represent

15   to you that she wouldn't actually designate you as

16   director of the Brooklyn Court Clinic until a

17   replacement had been named for you?

18        A.   No, I don't recall that at all.

19        Q.   Okay.  So you ended up being, you know,

20   promoted to the director position in Brooklyn Court

21   Clinic.  But there hadn't been any coverage put in place

22   upon your departure; am I right?

23             MS. CANFIELD:  Objection to form.  You can

24        answer.



1        A.    As far as I know, I don't recall what plans

2   were made for coverage, but they hadn't -- when I left

3   to go to Brooklyn, they hadn't hired anybody to take my

4   place.

5        Q.    Okay.  And then did Dr. Kaye ever speak to

6   you about the lack of coverage between April of 2018 and

7   when Dr. Brayton was hired?

8        A.    I think I seem to recall some conversation

9   about lack of coverage.  I don't really remember

10  specifics, but I seem to remember her saying that she

11  was having difficulty with coverage.

12       Q.    How -- between April 2018 and the end of

13  2018, how often would you say you were, I guess,

14  requested to go to the Bronx Court Clinic to fill in

15  when there were issues with coverage?

16            MS. CANFIELD:  Objection to form.  You can

17       answer.

18       A.    I think I was asked to go -- as far as I

19  recall, I was asked to go twice.

20       Q.    Now, twice during that period from April 2018

21  to when Dr. Brayton was actually hired?

22            MS. CANFIELD:  Objection to form.  You can

23       answer.

24       A.    Twice at any point.  I think I only went to



1   the Bronx twice, maybe three times.  I don't recall, but

2   it wouldn't have been any more than that at any point

3   after I left.

4        Q.   Now, Dr. Brayton was eventually hired.  Did

5   you train Dr. Brayton initially?

6        A.   She -- yes -- well, she spent time in our

7   clinic.  I think it was about three months.  She saw

8   cases, and I supervised her reports.  I don't recall if

9   I supervised every one of her reports or some of the

10  other doctors contributed.  But yes, I did contribute to

11  her training.

12       Q.   Why was -- was she physically located in the

13  Brooklyn Court Clinic at that time?

14       A.   She would come to the clinic to see the

15  cases, yes.

16       Q.   But she didn't report to the Bronx Court

17  Clinic when you were training her; am I right?

18         MS. CANFIELD:  Objection to form.  You can

19    answer.

20       A.   Not as far as I know.

21       Q.   So she was reporting every day to the

22  Brooklyn Court Clinic during the period in which you

23  were training her; am I right?

24       A.   I think so, yes.



1       Q.    Why was the decision made that you would

2    provide Dr. Brayton the training?

3             MS. CANFIELD:  Objection to form.  You can

4        answer.

5       A.    I think it was that there were a couple of

6    reasons.  Since Dr. Kaye would be her co-examiner on --

7    on cases if she were to try to train in the Bronx, a

8    co-examiner would not supervise the other examiner's

9    reports.  Plus I had -- I don't know if this was a

10   factor, but I've had a lot of experience training

11   interns, et cetera.  I have a feeling it was more the

12   co-examiner issue, and that's why she came to Brooklyn.

13      Q.    Who made the decision that you would train

14   Dr. Brayton rather than Dr. Kaye?

15      A.    I believe it was Dr. Jain.

16      Q.    And when Dr. Brayton was hired, do you

17   believe that she was qualified to do the 730

18   examinations at the time?

19            MS. CANFIELD:  Objection to form.  You can

20       answer.

21      A.    When you say "qualified," what do you mean?

22      Q.    Well, did she have any forensic psychiatric

23   experience in the context of a penological institution?

24      A.    I forget what -- I forget about her CV, what



1    placement she had, but I know she came from family court

2    where she had been doing evaluations for the family

3    court system.  They are different evaluations.  I did

4    have a question of how well her skills would translate

5    to doing adult criminal defendant evaluations.

6          Q.   And did they translate?

7          A.   I think they did.  My primary issue with Dr.

8    Brayton was the -- the length of her reports and the

9    excessive detail.

10         Q.   Okay.  So how long were her reports?

11         A.   It varied, depending on the case.  But in my

12   opinion, they typically included too much detail and

13   were difficult to follow sometimes.

14         Q.   You said they were difficult to follow?

15         A.   Sometimes.

16         Q.   And you said they were also, at times, too

17   long; right?

18         A.   In my opinion.

19         Q.   And would there be a consistency with what

20   Dr. Brayton would write in the body of her reports and

21   the outcome that she reached?

22              MS. CANFIELD:  Objection to form.

23         A.   Was there -- say that again.

24         Q.   Were there times where what -- what she wrote



1  in the body of her reports were inconsistent with the

2  outcomes that she would each as far as whether or not

3  the defendant was fit to stand trial?

4       A.   Yes, I think that did happen.

5       Q.   Now, were there times, for example -- like

6  scratch that.

7            Dr. Kaye -- let's say Dr. Brayton was hired,

8  let's say, in the fall of 2018; would you give me that?

9            MS. CANFIELD:  Objection to form.  You can

10        answer.

11      A.   I don't know if that's accurate as to my

12  recollection.

13      Q.   Right.

14           MS. CANFIELD:  Is there something you can

15        show him to refresh his recollection?

16      Q.   Now, Dr. Brayton, you said was -- you trained

17  her for three months; is that right?

18      A.   I think it was about three months.  That's my

19  recollection.

20      Q.   Was that the original amount of time that you

21  anticipated training her?

22           MS. CANFIELD:  Objection to form.  You can

23        answer.

24      A.   I think we kept her longer than we initially



 1  planned.

 2       Q.    Okay.  Why was that?

 3       A.    My recollection is -- was because she was

 4  having difficulty with her reports.

 5       Q.    And what difficulty was she having

 6  specifically?

 7       A.    The thing I mentioned earlier, writing

 8  concisely, writing too much, in my opinion, clearly

 9  conveying the information.

10       Q.    Did Dr. Jain feel the same way as you did

11  about Dr. Brayton's reports?

12            MS. CANFIELD:  Objection to form.  You can

13       answer, if you're able.

14       A.    I -- I believe he did.  I seem to recall a

15  discussion where he had read one or however many of her

16  reports, and had the similar feeling as me at some point

17  in her training.

18       Q.    Who made the determination to extend her

19  training, I guess, time period with you?

20       A.    I was definitely part of that decision

21  process.  I seem to remember conveying it to Dr. Jain.

22  And I actually recall having a conversation or exchange

23  with Dr. Kaye, I believe about it, saying that I wasn't

24  sure she was ready to go yet, that she needed work on



1  her reports.

2        Q.   Now, during that time while Dr. Brayton was

3  getting trained, how was the -- how was Dr. Kaye dealing

4  with the workload at the Bronx Court Clinic?  Did she

5  convey that to you?

6             MS. CANFIELD:  Objection to form.  You can

7        answer.

8        A.   I don't recall if that was the time.  That

9  might have been the time they had hired a per diem

10 psychiatrist to work there.  I'm not sure if it was that

11 timeframe.

12       Q.   Would that have been Dr. Mullan?

13       A.   I know that Dr. Mullan was hired to work

14 there.  I -- I don't know if it was during that time

15 frame, but it could have been.

16       Q.   Okay.  Now, do you recall anything

17 surrounding the Jose Gonzalez case?

18            MS. CANFIELD:  Objection to form.  You can

19       answer.

20       A.   I recall that case.

21       Q.   Okay.  So let's start.  Now, you and Dr. Kaye

22 originally evaluated Mr. Gonzalez; is that right?

23       A.   Yes.

24       Q.   And what happened during that time?



```
 1              MS. CANFIELD:  Objection to form.  You can
 2       answer.
 3       A.   Do you mean how -- what finding did we come
 4  to or --
 5       Q.   Let's start with the examination itself.  Do
 6  you recall the examination?
 7       A.   I do recall part of it, yes.
 8       Q.   Okay.  What do you remember?
 9       A.   I remember how he presented during the
10  interview.
11       Q.   And how did -- how did he present, Dr.
12  Winkler?
13       A.   To me, he presented as psychotic.
14       Q.   He was psychotic?
15       A.   That's what I thought.
16       Q.   Okay.  And did Dr. Kaye agree with you at
17  that time; do you remember?
18       A.   Yes, she did.
19       Q.   And did anyone from CHS have a different
20  opinion about Mr. Gonzalez?
21              MS. CANFIELD:  Objection as to form.  You can
22       answer.
23       A.   I don't remember CHS -- anybody from CHS
24  being involved with it.  I know we saw him twice.  There
```



**BARRY WINKLER, M.D.**

```
 1   was a -- after we saw him the first time, Dr. Kaye and I
 2   found him or opined that he was unfit.  And then defense
 3   counsel hired a private evaluator to do an examination.
 4   That evaluator opined that he was fit.  And then he was
 5   ordered back to us, and we saw him a second time.  And
 6   we opined he was fit again -- I'm sorry, he was unfit
 7   again.  Excuse me.  And after that, we had a hearing on
 8   the case before the judge.
 9         Q.   Is this a controversion hearing; right?
10         A.   Correct.
11         Q.   And I guess, just for purposes of clarity, I
12   guess I just wanted to make sure I was right.  Now, did
13   the ADA hire the expert or defense counsel?
14              MS. CANFIELD:  Objection to form.  You can
15         answer.
16         A.   It was the ADA.  You're right.  I made a
17   mistake, it was the defense counsel.  Because we
18   determined -- we opined they were unfit.  The DA's
19   office hired the expert.
20         Q.   And if you recall, was the expert doctor Dr.
21   Charter?
22         A.   Yes.
23         Q.   Now, during the controversion hearing, at
24   some point, did the judge ask you what you relied upon
```



1    in making your determination that Mr. Gonzalez was

2    unfit?

3         A.   I believe the DA asked me, defendant's

4    counsel may have asked me on direct also.

5         Q.   Was there -- was there an instance where

6    there was a discussion about the recordings -- the

7    prison recordings and whether or not you listened to the

8    same recordings as, perhaps, the other evaluators to

9    come up with -- to make your determination?

10              MS. CANFIELD:  Objection as to form.

11         Recordings.  Did we determine that there were

12         recordings?  Go ahead, answer.

13         A.   I think you're referring to the recorded

14    telephone conversations from Rikers Island by the

15    defendant?

16         Q.   Exactly, yes.

17         A.   Yes.  There were a number of -- we received

18    quite a bit of information, actually from the DA's

19    office, which included both recordings and transcripts

20    of recordings of telephone calls that the defendant had

21    made while he was in Rikers Island to family members.

22    So there was a question of what I reviewed in my

23    evaluation.

24         Q.   Right.  And ultimately, the judge ordered a



1    third set of examiners; am I right?

2         A.    That's correct.

3         Q.    And the third set of examiners were who?

4         A.    I believe it was Dr. Mullan and, I think, Dr.

5    Brayton.

6         Q.    Okay.  And at that time, Dr. Brayton was

7    still fairly new at CHS; is that right?

8              MS. CANFIELD:  Objection to form.  You can

9         answer.

10        A.    Yeah.  I don't recall exactly when their

11   evaluation took place, but I think it's fair to say she

12   was fairly new at the time.

13        Q.    Were you concerned about Dr. Brayton's

14   assessment of -- of Mr. Gonzalez?

15        A.    I wasn't necessarily concerned, because in my

16   opinion, I felt that he was clearly psychotic.  And I

17   thought -- at least at the time I saw him.  And I felt

18   that if he continued to be as psychotic as he was, in my

19   opinion when I saw him, that neither she or Dr. Mullan

20   would have any problems seeing that.

21        Q.    Now, during the course of your examination of

22   Dr. -- I keep wanting to call him doctor --

23   Mr. Gonzalez, did you administer any psychological test?

24        A.    Yes, I did.



**BARRY WINKLER, M.D.**                                          83

```
 1        Q.   So explain to me, you know, how do they come
 2   into play, psychological tests?
 3        A.   They come into play in different questions,
 4   different situations.  In this particular situation,
 5   after Dr. Kaye and I did our initial evaluation, Dr.
 6   Charter, when she did her evaluation, she administered a
 7   psychological measure designed to assess for malingering
 8   of psychosis.  And in my opinion, when I reviewed her
 9   interview and her evaluation, which had been recorded by
10   the DA's office, I felt that she had not administered it
11   appropriately, properly.  I therefore, chose to
12   administer my own measure of potential malingering.  And
13   I believe I gave him something called TOMM.  But the
14   measures I gave did not, in fact, show that he was
15   malingering.
16        Q.   At any point, did anyone determine that you
17   had not administered the psychological test correctly?
18        A.   Not as far as I know.
19        Q.   So that determination was never made.
20             Did you administer the SIRS or the PIA test?
21             MS. CANFIELD:  Objection to form.  You can
22        answer.
23        A.    I think -- I know Dr. Charter did the SIRS.
24   I -- I might have given him the SIRS again.  And I think
```



```
 1   I -- I think I gave him the PAI also.  I don't remember
 2   exactly, but I think I did give him both of those.
 3        Q.   I'm going to ask you, Dr. Winkler, are these
 4   -- sometimes are these tests administered in a staggered
 5   way?  Like for example, one test -- if you administer
 6   one test and it doesn't -- and you determine based on
 7   that test, the other test may not be necessary, or it
 8   would necessitate the other test subsequent thereto?
 9             MS. CANFIELD:  Objection to form.  You can
10        answer.
11        A.   Do you mean like one might be like kind of
12   screening type of thing?
13        Q.   Right.  Exactly.
14        A.   Well, depending on the situation, that might
15   happen.  Depending on the question you have about a
16   defendant's capabilities or any independent patient,
17   whatever, that you're testing, you might issue a
18   screening measure and then decide whether to issue
19   something additional or not.
20        Q.   And did you -- did you engage in the
21   screening measure first with doctor -- Mr. Gonzalez?
22        A.    If I remember correctly, I think I gave him
23   something called a TOMM, which is an effort -- a measure
24   of effort motivation, which is typically given prior to
```



```
 1   other tests, because based on the individual's

 2   performance, you can extrapolate if you -- if the

 3   results show that they gave full effort on that first

 4   measure.  You can then extrapolate and assume that they

 5   gave full measure on the other -- full effort, rather,

 6   on the other measures that you give.  I think I gave it

 7   to him.  I don't remember if I did or not exactly

 8   though.

 9        Q.   At any point, was it ever conveyed to you

10   that CHS management or anyone else wanted to find

11   Mr. Gonzalez fit?

12            MS. CANFIELD:  Objection to form.  Asked and

13        answered.  You can answer again.

14        A.   Not that I recall.

15        Q.   Now, this was the EMT killer; am I right?

16            MS. CANFIELD:  Objection to form.  You can

17        answer.

18        A.   He was accused of killing an EMT, yes.

19        Q.   Was he convicted; do you know?

20        A.   I don't know.

21        Q.   Okay.  Now, he was accused of killing an

22   EMT -- I guess EMT driver; right?

23        A.   Right.

24            MS. CANFIELD:  Objection to form.  You can
```



```
 1      answer.
 2      Q.    Right.  And so the case had a fair amount of
 3 publicity; am I right?
 4      A.    Yes, I believe it did.
 5      Q.    Did anyone from CHS management talk to you
 6 about the case?
 7           MS. CANFIELD:  Objection to form.  You can
 8      answer.
 9      A.    Not that I recall.
10      Q.    Okay.  So then, Dr. -- Dr. Brayton and Dr.
11 Mullan basically conducted a third set of examinations;
12 is that right?
13           MS. CANFIELD:  Objection to form.  Asked and
14      answered.  You can answer it again.
15      A.    Yes, they did.
16      Q.    And in that instance, did the judge insist
17 upon them examining doctor -- Mr. Gonzalez separately?
18           MS. CANFIELD:  Objection to form.  You can
19      answer.
20      A.    I think they did -- I think the judge did,
21 yes, direct that.
22      Q.    And is that common?
23      A.    No, it's not.
24      Q.    In all the time that you have been engaging
```



| | |
|---|---|
| 1 | or doing 730 examinations, had you ever been ordered to |
| 2 | conduct the examination separate from the other |
| 3 | examiner? |
| 4 | A.    No. |
| 5 | Q.    Okay.  When you learned the judge required |
| 6 | that the examinations be done, you know, by Dr. Brayton |
| 7 | and Dr. Mullan separately, what did you -- what did you |
| 8 | think? |
| 9 | A.    I don't think split examinations are ever a |
| 10 | good idea. |
| 11 | Q.    Why is that? |
| 12 | A.    Several reasons.  You -- you run the risk of |
| 13 | a defendant being cooperative with one examiner and not |
| 14 | cooperative with another examiner.  Different defendants |
| 15 | present differently on different days.  Somebody who's |
| 16 | malingering may choose to malinger with one examiner and |
| 17 | not another.  I feel it's always better to do exams with |
| 18 | the other examiner.  Both examiners see the same thing |
| 19 | at the same time. |
| 20 | Q.    At any point -- I mean, did you raise |
| 21 | concerns or did you discuss your feelings about the |
| 22 | separate examination order? |
| 23 | A.    I think Dr. Kaye and I discussed it.  I don't |
| 24 | think Dr. Kaye felt it was a good idea either. |



1        Q.    Okay.  And how -- did you ever read or review

2   Dr. Brayton's examination?

3        A.    Yes, I do recall reading it.

4        Q.    And what do you remember?

5        A.    If I remember, I believe there was quite a

6   bit of reference to his records, the defendant's

7   records.  I remember she found him fit to proceed.

8        Q.    Now, the -- keep going.

9        A.    Go ahead.  No, that's it.  I'm done.

10       Q.    You said that is her -- her report focused on

11  the records.  Did she actually see Mr. Gonzalez?

12            MS. CANFIELD:  Objection to form.  You can

13        answer.

14       A.    I believe she did.  I didn't say it

15  necessarily focused on records.  It included a lot of

16  information from records, as I recall.  I don't -- I

17  honestly don't recall if she actually saw him.  I don't

18  recall at this point.

19       Q.    Do you recall if Dr. Mullan actually saw Jose

20  Gonzalez?

21       A.    I don't recall.  I know I did review her

22  report, but I don't recall.

23       Q.    So you're not sure if either or -- you're not

24  sure if Dr. Mullan and/or Dr. Brayton wrote their



1   reports only on the records or if they actually saw Mr.

2   Gonzalez; are you -- is that your testimony?

3            MS. CANFIELD:  Objection to form.  You can

4       answer.

5       A.   I don't recall.

6       Q.   Okay.  Now, do you recall if Dr. Brayton

7   administered any psychological test?

8       A.   I don't think she did.  I don't remember

9   seeing any.  But I don't recall seeing any in her

10  report.

11       Q.   At any point -- so I guess I'm going to ask

12  you.  Did Dr. Mullan find that Mr. Gonzalez was

13  malingering?

14       A.   Yes.

15       Q.   And did Dr. Brayton determine that

16  Mr. Gonzalez was malingering?

17       A.   I don't recall Dr. Brayton thinking he was

18  malingering or saying that in her report.

19       Q.   But she did find him fit though; right?

20       A.   She found him fit.

21       Q.   Okay.  Now, at any point, did you express any

22  disdain, or -- I'm not sure if disdain is the right

23  word.  Had you ever said that Dr. Mullan had a tendency

24  to over diagnose defendants' malingering?



1            MS. CANFIELD:  Objection to form.  You can

2       answer.

3       A.   I don't recall -- I don't recall saying that

4  Dr. Mullan had an over tendency to diagnose malingering,

5  but I did express disagreement with the opinion that Mr.

6  Gonzalez was malingering.

7       Q.   Okay.  Yeah.  So at any point, was Dr.

8  Brayton, quote, unquote, remediated?

9            MS. CANFIELD:  Objection to form.  You can

10      answer.

11      A.   I know she underwent some additional

12 training.

13      Q.   When was that?

14      A.   I -- I don't remember.

15      Q.   Was this toward the end of her tenure or in

16 the middle?

17           MS. CANFIELD:  Objection to form.  Or in the

18      beginning?

19      A.   I -- I want to say my recollection is maybe

20 the middle towards the end.

21      Q.   And what precipitated her getting this

22 additional training?

23      A.   I'm not sure.  I think -- think Dr. Kaye had

24 concerns about her reports, but I'm not positive.



1      Q.   Was that only -- the only factor that led to
2  the decision to provide her with additional training?
3           MS. CANFIELD:  Objection.  You can answer.
4      A.   I -- I don't know.  I wasn't -- I really
5  wasn't intimately involved with that.
6      Q.   Did you provide her with additional training?
7      A.   I don't recall if she came -- if she did more
8  cases with us after that.  I don't recall.  She might
9  have seen more cases with us.  I honestly don't
10 remember.
11     Q.   Did Dr. Kaye convey to you that any judges or
12 other lawyers were complaining about Dr. Brayton's work?
13     A.   Yes, she did say that to me.
14     Q.   What exactly did she say?
15     A.   I believe she referenced a judge saying that
16 -- I think she used the word "inconsistent."  The judge
17 used the word "inconsistent" with regard to one of Dr.
18 Brayton's reports.
19     Q.   What -- what other things did Dr. Kaye convey
20 to you about Dr. Brayton from these judges and/or, I
21 guess, lawyers?
22          MS. CANFIELD:  Objection to form.  You can
23          answer.
24     A.   I remember there was a comment about the



1  inconsistent report that a judge had said, according to

2  Dr. Kaye.  I know Dr. Kaye did not like Dr. Brayton's

3  interviews, did not like the way Dr. Brayton introduced

4  the interview.  I remember her mentioning that.  And I

5  think Dr. Kaye mentioned -- I forget if possibly a

6  lawyer from Legal Aid had complained about an interview

7  approach also.

8       Q.   Was this lawyer Jeff Bloom?

9       A.   I believe it might have been, yes.

10      Q.   Did Lorraine McEvilley also complain about

11  Dr. Brayton?

12           MS. CANFIELD:  Objection to form.  You can --

13      you can answer.

14      A.   I think, according to Dr. Kaye, yes, she

15  might have.  I seem to recall that.

16           THE WITNESS:  Can I just -- excuse me.  Can I

17      get a bathroom break in a minute?

18           MS. HAGAN:  Why don't we have a lunch break

19      instead.  How long do you need, Dr. Winkler, for a

20      break for lunch and bathroom and whatever?

21           THE WITNESS:  30 minutes would be plenty.

22           MS. HAGAN:  Does that work for you, Ms.

23      Canfield?

24           MS. CANFIELD:  Yeah.  I was going to say



BARRY WINKLER, M.D.                    93

```
 1        either 1:15 or 1:30.  I don't know.  We should

 2        probably ask the court reporter.

 3              MS. HAGAN:  Marci?

 4              THE REPORTER:  That's fine.

 5              MS. HAGAN:  Why don't we do 1:15.

 6

 7              (Luncheon recess taken.)

 8

 9              MS. HAGAN:  Last question and answer, please.

10

11              (The requested testimony was read back.)

12

13   BY MS. HAGAN:

14        Q.   I'm going to go back to the line of

15   questioning.  I hope you don't mind me asking you these

16   things again, Dr. Winkler.  Please bear with me.

17              So first I want to ask you, did Dr. Brayton

18   ever complain to you about Dr. Kaye?

19        A.   Didn't complain directly about Dr. Kaye, per

20   se.  She did complain about Dr. Kaye's comments about

21   her interview style.  And that Dr. Brayton's interview

22   style.  And that Dr. Brayton felt her interviews were

23   conducted the way she had to do them.

24        Q.   Okay.  Now, what did Dr. Brayton say that Dr.
```



 1   Kaye told her about her interview style?

 2        A.   I don't remember specifics other than the

 3   things I mentioned earlier, that Dr. Brayton had a

 4   certain way of introducing evaluation that I don't think

 5   Dr. Kaye did, asking a lot of extraneous questions, in

 6   Dr. Kaye's opinion.  So she was just not happy with the

 7   fact that her interviews were being criticized.

 8        Q.   And did Dr. Brayton ever say she didn't want

 9   to work with Dr. Kaye?

10        A.   What she told me is that she did not want to

11   work in the Bronx anymore.  She never directly say I

12   don't want to work with Dr. Kaye.

13        Q.   Did she tell you why she didn't want to work

14   in the Bronx anymore?

15        A.   She didn't say specifically.  I think it

16   revolves around, again, questions about her procedures,

17   her interview procedures, and possibly her reports.

18   When she got offered another job, that was in essence a

19   promotion, I believe somewhere else.  So she decided to

20   leave.

21        Q.   She decided to do what?

22        A.   To leave and take the other job.

23        Q.   Now, did you agree with the questions that

24   Dr. Kaye raised about Dr. Brayton's report?



1          MS. CANFIELD:  Objection to form.  You can

2      answer.

3      A.   I had my opinions about Dr. Brayton's

4  reports.  I think I've mentioned earlier that I felt

5  they were too long, and at times, were not always clear

6  which was why she was headed with her opinion.

7      Q.   Now, was there a time -- I guess, you know, I

8  had to learn a little bit about forensic psychiatry in

9  the course of this litigation.  I was under the

10  impression that the Dusky case kind of lays out the

11  types of questions or the types of topics that should be

12  covered during the course of a forensic evaluation; is

13  that -- is that true?

14          MS. CANFIELD:  Objection to the form.  You

15      can answer.

16      A.   I didn't hear.  What did you say, "lays it

17  down" in the beginning?

18      Q.   Dusky -- the Dusky decision.

19      A.   Dusky guides -- Dusky provides the overview

20  of what we need to determine -- to evaluate to determine

21  if someone is fit to proceed.  The questions that

22  different doctors ask, they -- some of them have their

23  own way about asking questions to arrive at their

24  determination as to whether someone meets the Dusky



1    standard for fitness.

2         Q.   Now, was there ever a complaint -- was there

3    ever a complaint of concern raised about Dr. Brayton

4    using a list to engage or to conduct her interviews?

5              MS. CANFIELD:  Objection as to form.  You can

6         answer.

7         A.   I seem to remember -- I remember Dr. Kaye

8    mentioning somebody about that.  I forget if Dr. Brayton

9    was using that when she was doing interviews in

10   Brooklyn.  But I remember Dr. Kaye mentioning that Dr.

11   Brayton had a very extensive interview form.  A lot of

12   the evaluators use a form to record their notes on.  But

13   I remember Dr. Kaye mentioning that Dr. Brayton had a

14   very comprehensive interview form with a number of

15   questions that Dr. Kaye felt were unnecessary.

16        Q.   Now, for purposes of doctor -- of

17   understanding some of the reasons why Dr. Brayton would

18   not have wanted to work in the Bronx, did you ever learn

19   where Dr. Brayton lived while she was working there at

20   the Brooklyn Court Clinic?

21             MS. CANFIELD:  Objection to form.  You can

22        answer.

23        A.   I believe Dr. Brayton lived in Brooklyn.

24        Q.   Right.  And you were located -- at least your



1   clinic at the time, and still is, is located in

2   Brooklyn; am I right?

3        A.   That's correct.

4        Q.   Okay.  And then wouldn't the commute be

5   longer to the Bronx than it would be to Brooklyn?

6            MS. CANFIELD:  Objection to form.  You can

7        answer.

8        A.   Yeah.  I guess depending on what part of

9   Brooklyn, but I would say that's a reasonable

10  assumption.  It would take longer to get to the Bronx.

11       Q.   And did Dr. Brayton ever complain about her

12  commute to the Bronx?

13       A.   I don't recall whether she did or not.

14       Q.   Did Dr. Brayton ever say that the Bronx Court

15  Clinic was adversarial?

16           MS. CANFIELD:  Objection to form.  You can

17       answer.

18       A.   I don't remember her using the word

19  "adversarial."

20       Q.   Did she ever describe the environment in the

21  Bronx in a negative way?

22       A.   I'll preface it by saying I did not have a

23  lot of contact with her after she went there.  But the

24  only negative comment would be what I referenced already



1  about how she didn't like the comments about her

2  interviewing and just didn't want to work in the Bronx

3  anymore.

4       Q.   At any point, did she say that Dr. Kaye would

5  not answer her questions or engage her?

6       A.   I do recall her saying something to the

7  effect of not -- Dr. Kaye not answering some of her

8  questions, I believe.

9       Q.   Do you recall if it involved the Jose

10 Gonzalez case specifically?

11      A.   I don't recall.

12           MS. CANFIELD:  Objection to form.

13      A.   I don't recall that.

14      Q.   So you're not sure if -- you're not sure if

15 --  you're not sure about the context, and you're not

16 sure if there was a reason behind, maybe, Dr. Kaye

17 allegedly not engaging or talking to Dr. Brayton about a

18 given topic; would that be accurate?

19           MS. CANFIELD:  Objection to form.  You can

20      answer.

21      A.   I don't know any details about why she may

22 not have spoken to her.

23      Q.   Now, at any point, did there -- did there

24 ever come a time when there was discussion about the



1    reporting of Dr. -- of Mr. Gonzalez's exam?

2            MS. CANFIELD:  What was the question?  I'm

3        sorry.

4        Q.   Was there -- were you ever contacted by the

5    Office of Corporate Compliance about the recording of

6    Mr. Gonzalez's exam?

7        A.   I was not contacted by the office of

8    corporate compliance, but I did become aware of the fact

9    that Mr. Gonzalez's exam was recorded.

10           Q.   When did you become aware?

11           A.   I knew when Dr. Kaye did it.

12           Q.   Oh, so you knew.  So how did you know?

13           A.   I was there.  She told me afterwards that she

14   had recorded it.

15           Q.   And did you have a problem with that?

16           A.   I -- I didn't have a problem with it.  It

17   didn't violate any rules that I was aware of.  At the

18   time, we generally did not record evaluations as a

19   standard practice, but I -- Mr. Gonzalez was an

20   extremely difficult defendant to capture everything he

21   said at times.  So I understand why Dr. Kaye would feel

22   the need to record it.

23           Q.   Did you know Dr. Kaye to record any other

24   exams?



 1      A.    No.  I think that's the only one I ever knew
 2  of.
 3      Q.    Okay.  And you said it wasn't a standard
 4  practice.  Was it something that you -- that you
 5  determined it wasn't a standard practice on your own or
 6  just from your experience there at the clinic?
 7          MS. CANFIELD:  Objection to form.  He can
 8      answer.
 9      A.    Do you mean -- I'm sorry.  Can you rephrase
10  it?
11      Q.    Was there like an unwritten policy against
12  recording exams in place at the clinics?
13      A.    It was -- I don't know if I would say it was
14  an unwritten policy, but it was something that we -- if
15  it was ever mandated.  At one point, I forget when it
16  was, there was some talk maybe in the DA's office that
17  they wanted to record evaluations at some point.  And we
18  felt that if it became a mandated policy, it would
19  create a lot of problems in terms of maintenance of the
20  equipment, storage of the recordings, et cetera.  So we
21  were more concerned about it, from my recollection,
22  becoming something they were going to make us do.
23      Q.    Did CHS or HAC have a policy regarding
24  recording forensic exams in place at the time the Jose



**BARRY WINKLER, M.D.**                                    101

 1  Gonzalez was allegedly recorded?

 2        A.    Not to my knowledge.

 3        Q.    And did you listen to Dr. Kaye's recording

 4  when you wrote any of your reports yourself?

 5        A.    No.

 6        Q.    Were you familiar with the AAPL literature on

 7  recording exams?

 8        A.    Yeah, I am familiar with it.  I believe it's

 9  -- I believe it says it's okay in certain situations.

10  I'm not a hundred percent sure.

11        Q.    But there wasn't a blanket prohibition

12  against it; am I right?

13        A.    Not as far as --

14              MS. CANFIELD:  Objection to form.

15        A.    Not -- as you know, there's no blanket

16  prohibition.

17        Q.    Now.  As far as the Office of Corporate

18  Compliance, were you aware that there was an

19  investigation, Dr. Winkler?

20        A.    Of what?

21        Q.    Regarding the Jose Gonzalez evaluation and

22  Dr. Kaye's recording of the exam.

23        A.    I don't think I knew there was an

24  investigation.  I knew, as I recall, once it -- it was



**BARRY WINKLER, M.D.**

1  determined or found out or learned that she had recorded

2  it, I remember some people, I don't recall who it was,

3  there was discussion whether it was appropriate or not

4  to do it.

5      Q.   You're not sure if -- I mean, there was a

6  discussion.  But did anyone discuss it with you, Dr.

7  Winkler, whether or not it was appropriate for her to

8  record?

9      A.   No, I don't remember them discussing it with

10  me as to whether it was appropriate or not.

11      Q.   Did Ms. Patsos from corporate compliance, did

12  she approve you?

13      A.   Not that the I recall.

14      Q.   Okay.  Did anyone from corporate compliance

15  approach you as to what happened with the Jose Gonzalez

16  evaluation?

17      A.   Not that I remember.

18      Q.   Okay.  Did you ever tell anyone that CHS

19  didn't have a policy of recording exams?

20      A.   Did I ever tell anyone that they didn't have

21  a policy of recording exams?

22      Q.   Right.  A policy or custom.

23          MS. CANFIELD:  Objection to the form.  You

24      can answer.



1      A.   I'm not sure I follow what you mean.

2      Q.   Well, did you ever say to anyone, well, you

3   know, I don't think it's our practice to record exams

4   here at CHS?

5           MS. CANFIELD:  Objection to the form.  He can

6        answer.

7      A.   I don't remember saying to anyone it's not

8   our practice here to record or exams.  I don't know

9   whether I said we don't typically do it.  I honestly

10   don't recall.

11      Q.   Now, to your -- to your -- did Dr. Kaye, at

12   any time, tell you or talk to you about being written up

13   for recording the exam?

14           MS. CANFIELD:  Objection to form.  You can

15        answer.

16      A.   I do remember her telling me that -- I forget

17   if she said she was written up.  But I seem to remember

18   saying that she considered it a problem, I believe, that

19   she recorded it.

20      Q.   And who did you understand the "they"

21   consisted of?

22      A.   I think the CHS hierarchy.

23      Q.   And when you say CHS hierarchy, who does that

24   entail?



104                    **BARRY WINKLER, M.D.**

```
 1        A.   I assume it would be Dr. Jain or whoever was
 2   above him at that point.  I don't remember if Dr. Ford
 3   was still there.  I'm not sure.
 4        Q.   Dr. MacDonald, would that -- would he be a
 5   part of that?
 6        A.   Yeah, he would be part of it.
 7             MS. CANFIELD:  Objection.  Leading.
 8        Q.   And would Dr. Yang be considered part of the
 9   hierarchy too?
10        A.   Yes, I believe so.
11        Q.   Okay.  So do you recall the conversation that
12   you had with Dr. Kaye about this -- this incident?
13             MS. CANFIELD:  Objection to form.  You can
14        answer.
15        A.   I don't recall the conversation.  I recall,
16   at some point, hearing from her that it was a problem --
17   they thought it was a problem.
18        Q.   Did you ever talk to her about how it was
19   resolved?
20        A.   No, I don't think I ever did.  If I did, I
21   don't remember.
22        Q.   Now --
23             MS. CANFIELD:  Wait.  Wait everyone was
24        frozen.  Was that question responded to?
```



1           MS. HAGAN:  He said I don't think I ever did.
2           MS. CANFIELD:  Can you read back the question
3      and answer, because everyone was frozen except for
4      me there for a second.
5           MS. HAGAN:  I asked Dr. Winkler, did he
6      recall learning from Dr. Kaye the outcome of the
7      investigation.  And then Dr. Winkler said I don't
8      recall.  I don't think I ever did.  Is that
9      accurate, Dr. Winkler?
10          MS. CANFIELD:  I think I missed the question
11     before that too.  Can the court reporter read back
12     two questions.  I missed it.  It was frozen.
13          MS. HAGAN:  No.  I mean, we can have her go
14     back.
15          MS. CANFIELD:  Yeah.
16          MS. HAGAN:  Marci, can you read back the
17     record, please.
18
19          (The requested testimony was read back.)
20
21     Q.   So we talked about -- you said you don't
22     recall having a conversation with Dr. Kaye about the
23     outcome or the resolution of the actual investigation
24     regarding her recording Jose Gonzalez; is that right?



1        A.    That's correct.

2        Q.    Now, I wanted to, I guess, get your

3   viewpoint.  Are the -- are the court clinics

4   HIPAA-exempt?

5            MS. CANFIELD:  Objection to the form.  Go

6        ahead.

7        A.    We -- as far as I know, yes, the court

8   clinics are exempt.

9        Q.    Can you elaborate on that so that the

10  record's clear exactly.

11       A.    I believe there was a determination years

12  ago.  I think Dr. Kaye may have had some paperwork to

13  this effect, a determination by someone, I forget who,

14  that said that the court clinics were HIPAA-exempt.

15       Q.    So in that instance, the gave -- what do you

16  mean by HIPAA-exempt?  Let me not lead you.  What do you

17  mean by HIPAA-exempt in the court clinic

18  (indiscernible).

19            MS. CANFIELD:  Objection to form.  He can

20       answer.

21       A.    That we do not come under the normal HIPAA

22  prohibitions about discussion -- a discussion of

23  personal information, medical information, history, et

24  cetera.



1      Q.   And I guess I was going to ask you in

2  general.  Did you think that CHS adhered to the

3  separation between treatment and the evaluation aspect

4  of this operation as it pertained to the operation of

5  the clinic?

6           MS. CANFIELD:  Objection to the form.  You

7       can answer.

8      A.   You mean if they kept the treatment and

9  evaluation sectors separate?

10     Q.   Yes.

11     A.   Yes, I feel that they did.

12     Q.   Were there times where Dr. Kaye raised

13  concerns about the presence of Dr. Alex Garcia-Mansilla

14  and Dr. Brayton's evaluation?

15     A.   I do recall an issue with that, yes.  I

16  forget why Dr. Garcia-Mansilla was involved.  I do

17  remember Dr. Kaye mentioning that, and thinking it was a

18  problem.  I don't remember the details of why Dr.

19  Mansilla-Garcia was involved.

20     Q.   Did you agree that Dr. Garcia-Mansilla being

21  involved in, I guess, sitting in on Dr. Brayton's

22  evaluation would be problematic?

23           MS. CANFIELD:  Objection as to form.  I don't

24       think any of this has been established that she



1        sat in, but go ahead, you an answer.

2        A.   Well, yeah, I don't -- I don't recall what

3   involvement Dr. Garcia-Mansilla had with the case.  I

4   don't -- I don't know what she did or didn't do, so I

5   really can't give an opinion.

6        Q.   Do you recall a managing dual agency policy

7   being issued by CHS after Dr. Kaye raised this issue?

8             MS. CANFIELD:  Objection, again, to

9        foundation.  You can answer.

10       A.   I don't recall if they issued it after that.

11       Q.   Do you recall a policy to that effect

12  happening, a managing dual role policy?

13            MS. CANFIELD:  Objection to form.  You can

14       answer.

15       A.   Yeah.  I believe there is a managing dual

16  roles policy.

17       Q.   Did you contribute to that policy?

18       A.   I don't recall if I did.  If I did in any

19  form, it would have been to review it and submit any

20  questions or changes.  But I honestly don't recall if I

21  did contribute to it.

22       Q.   I'm going to ask you some general questions

23  about Dr. Kaye and her communications with you about her

24  work environment at CHS after -- I guess during the time



 1   that Dr. Ford was back at CHS and onward.

 2             So at any point once Dr. Ford and Dr. Yang

 3   began to work at CHS, did Dr. Kaye complain to you about

 4   her working conditions under them?

 5             MS. CANFIELD:  Objection to form.  You can

 6        answer.

 7        A.   She -- I think I've discussed the specific

 8   complaint she made.  She was unhappy about her change of

 9   schedule.  She was unhappy about her -- what she said

10   was her difference in pay.  I don't recall other

11   complaints about the environment.

12        Q.   Did she complain about the policies that were

13   being implemented by this new hierarchical structure?

14             MS. CANFIELD:  Objection to form.  You can

15        answer.

16        A.   Can you give me an example of policy?

17        Q.   For example, the -- the redacted medical

18   records; did she complain about that?

19             MS. CANFIELD:  Objection to form.  You can

20        answer.

21        A.   That was not a -- the redacted medical

22   records wasn't a policy.  It just happened, and we all

23   in the clinics complained about it.  That wasn't

24   something that was a policy that we would get them.  It



1   was something that happened, and then we had to work to

2   get it corrected.

3        Q.   Did CHS try to implement a form that

4   basically redacted HIV status information and substance

5   -- prior substance abuse history from the medical

6   record.  Do you recall that?

7             MS. CANFIELD:  Objection as to form.  You can

8        answer.

9        A.   I do recall -- yes, at one point, they had a

10  form.  I think it was a proposed order form.  We have an

11  order form that we have the judges sign for records.

12  And I believe it was a proposed form to use.  It was

13  during the time where we were trying to settle the issue

14  of the redacted records.  And it did not allow for HIV

15  or substance abuse information.

16       Q.   At any point, did you encourage the removal

17  of redacted in the order so that it would facilitate the

18  process?

19            MS. CANFIELD:  Objection to form.  You can

20       answer.

21       A.   You mean the form order that we used?

22       Q.   Right.  Yes.

23       A.   I think, yes.  I -- I think we added

24  non-redacted records to our order form.  The words



**BARRY WINKLER, M.D.**                              111

1   "non-redacted."

2        Q.    I'm going to ask you something.  You -- how

3   often did you say you engaged Dr. Kaye before you left

4   the center -- before you left the Bronx Court Clinic?

5        A.    You mean spoke with her?

6        Q.    Yes.

7        A.    Every day.

8        Q.    And did you all talk about, you know, her

9   working environment up -- up until that time?

10            MS. CANFIELD:  Objection to form.  You can

11        answer.

12        A.    Specifically, we would discuss cases or

13   issues with cases, problems, if there was something like

14   the redacted records issue that was surfacing at the

15   time, we'd talk about that or issues scheduling

16   defendants or lawyers.  There were always things that we

17   spoke about related to the clinic.

18        Q.    Would you say that Dr. Kaye was enthusiastic

19   about her job generally?

20        A.    Yes.

21            MS. CANFIELD:  Objection to form.  You can

22        answer.

23        A.    I would say so.

24        Q.    Now, when she complained to you about pay



1  parity during that time, did her attitude towards the

2  job change?

3          MS. CANFIELD:  Objection to form.  You can

4      answer.

5      A.   No.  She was unhappy about that, but it

6  didn't change -- from what I recall, it didn't change

7  the way she approached her job.

8      Q.   Did you think that Dr. Kaye was treated

9  unfairly in terms of pay, due to conversations and your

10 observations at the clinic?

11         MS. CANFIELD:  Objection to form.  You can

12     answer.

13     A.   I don't know what her pay was, and I don't

14 know what the other doctor's pay was that she claims she

15 was paid less than.  I don't have that information.  If

16 what she told me was accurate and she was doing the same

17 job and getting paid less, then that would seem unfair

18 to me.

19     Q.   Did you say as much to doctor Dr. Kaye during

20 the course of those conversations?

21     A.   I believe I did.

22     Q.   Okay.  So then when the shift change took

23 place, you were at the Brooklyn Court Clinic; right?

24     A.   Yes.



## BARRY WINKLER, M.D.                      113

1              MS. CANFIELD:  Objection to form.  Yes.

2              MS. HAGAN:  Yes, he agreed.

3      Q.    And did Dr. Kaye talk to you about the change

4   once she went to the Brooklyn Court Clinic?

5              MS. CANFIELD:  Objection to form.  You can

6       answer.

7      A.    I remember her talking to me about it, yes.

8      Q.    Now, you and Dr. Kaye were talking pretty

9   much regularly, even after you left the Bronx Court

10  Clinic; is that right?

11             MS. CANFIELD:  Objection.  Leading.  You can

12      answer.

13     A.    We talked clearly not as often, but after I

14  left, I think we would talk sometimes once a week or

15  every couple of weeks.

16     Q.    But it was still a cordial relationship;

17  would I take it?

18     A.    Yes, that's correct.

19     Q.    And did Dr. Kaye, like, discuss the effects

20  that the shift change was having on her with you?

21     A.    Yes.

22     Q.    Okay.  What did she say exactly?

23     A.    Well, as I said earlier, she said that --

24  first she said that it was a violation of disagreement



1   with doctor's counsel, which I referenced earlier.  And

2   she said that it was impacting her ability to care for

3   her son in the morning for the treatments that he

4   needed.

5        Q.   And did Dr. Kaye raise the issue of her son

6   being treated or needing treatment prior to the shift

7   change with you?

8        A.   I was aware of it, yes.  She had -- it had

9   come up in discussion.  She had told me about her son.

10       Q.   And did it -- did it interfere with her

11  ability to do her work prior to the shift change, to

12  your knowledge?

13            MS. CANFIELD:  Objection to form.  You can

14       answer.

15       A.   Not to my knowledge.

16       Q.   So to your knowledge, before the shift

17  change, you didn't notice that Dr. Kaye had any issues

18  with type and leave length you worked with her; right?

19            MS. CANFIELD:  Objection to form.  You can

20       answer.  No foundation.  Go ahead.

21       A.   Not to my knowledge.

22       Q.   It didn't seem that she had any problems

23  covering the clinic at that time; right?

24            MS. CANFIELD:  Objection.  You can answer.



1          A.    No as far as I could see, no.

2          Q.    Okay.  And what time do the courts -- what

3    time do the courts open in the Bronx; do you remember?

4          A.    Courts themselves?

5          Q.    Well, the court in the Bronx -- in the Bronx.

6          A.    I think the court in the Bronx would

7    typically open about 10-, 10:30.

8          Q.    And what time would defendants be presented,

9    like the earliest?

10         A.    It would vary.  I think there were sometimes

11   when we would get defendants at 9:30 or 10:00.

12         Q.    But never before 9:00; is that right?

13              MS. CANFIELD:  Objection.  You can answer.

14         A.    Not that I recall, no.

15         Q.    Did you ever get defendants at 9:00?

16         A.    I don't think so, not that I recall.

17         Q.    So would it be fair to say that defendants

18   presented as early as 9:30 and around 10:00 onwards,

19   typically?

20         A.    Yes, I think that's fair to say.

21         Q.    So based on that, would it be necessary for a

22   center director to be at the clinic at 8:00 in the

23   morning?

24              MS. CANFIELD:  Objection.  There's no

1        foundation.  You can answer.

2        A.   I can't say whether it's necessary or not.

3   But the defendants, as you noted, were typically

4   produced 9:30 and later.

5        Q.   Okay.  So did Dr. Kaye complain about any

6   other, I guess, repercussions, associated the with the

7   change in shift?

8        A.   I believe, I think I mentioned this earlier

9   also, per this agreement with -- this prior agreement

10  with doctor's counsel and I think H&H, that it -- I

11  don't remember her saying it changed her -- changed the

12  length of her workday or changed her lunch hour or

13  something.  It somehow altered her schedule.

14       Q.   Did she talk to you about a conversation she

15  might have had with Mr. Wangel and/or Ms. Laboy prior to

16  taking the position over at CHS where she asked if there

17  would be any changes in her working conditions?

18       A.   She did mention --

19            MS. CANFIELD:  Objection to form.  You can

20       answer.

21       A.   She did mention having a conversation.  I

22  remember her mentioning Jonathan Wangel.

23       Q.   And what do you remember her mentioning about

24  Jonathan Wangel?



**BARRY WINKLER, M.D.**                    117

```
 1        A.    The specifics are really -- I don't remember
 2   if she had one conversation with him or more than one.
 3   I really don't remember the specifics of what he might
 4   have said.
 5        Q.    Now, did you observe any of -- did you
 6   observe Dr. Kaye being treated differently than any of
 7   the male directors yourself?
 8             MS. CANFIELD:  Objection to form.  You can
 9        answer.
10        A.    I did not observe that, no.
11        Q.    Did you -- did she complain to you about
12   being treated about her male counterparts outside of the
13   pay parity?
14             MS. CANFIELD:  Objection.  You can answer.
15        A.    I don't know if I recall anything other than
16   the pay parity.
17        Q.    What about the title change, do you remember
18   that?
19        A.    I do remember something about that, yes.
20             MS. CANFIELD:  Can you put in an objection
21        before that.  Thank you.
22             THE WITNESS:  Sorry.
23        Q.    What did you remember about the title change,
24   Dr. Winkler?
```



1          A.    I remember Dr. Kaye --

2                MS. CANFIELD:  Objection.  Yes.  Go ahead.

3          A.    -- telling me that they had changed her

4    title, I believe, from medical director to director.

5          Q.    And what do you remember about the

6    conversation, Dr. Winkler?

7          A.    Dr. Kaye felt that was a demotion.

8          Q.    When did you -- when did you have that

9    conversation with Dr. Kaye; do you remember?

10         A.    I'm fairly certain it was after I went to

11   Brooklyn, maybe mid to late 2018.  I honestly don't

12   recall.

13         Q.    And did you agree with Dr. Kaye that the

14   change in title from director -- from medical director

15   to director was a demotion, in fact?

16         A.    No, I don't agree that it's a demotion.

17         Q.    Okay.  Why don't you?

18         A.    Because the way I look at it, if the word

19   medical is in front of director, medical's a qualifier.

20   And to me, a medical director would be part of an

21   organization that would ultimately report to the

22   director.  So in my opinion, it didn't seem like a

23   demotion.

24         Q.    Did you think Dr. Kaye was being reasonable



**BARRY WINKLER, M.D.**                                      119

1   about that issue with the change in title?

2       A.   Well, I feel that it bothered her, and she

3   had her position about it.  I mean, I had my opinion,

4   she had her opinion.  I don't think it was unreasonable

5   to object to it.

6       Q.   Was everyone made to change their title to --

7   I mean to director?

8       A.   I don't know if anybody else's title was

9   changed.  I don't know what technical titles for the

10  other directors in the clinics are.

11      Q.   But you don't know if Dr. Mundy's title was

12  changed or not; right?

13          MS. CANFIELD:  Objection to form.  Maybe you

14      should define what you mean by title.

15      Q.   You wouldn't know if Dr. Mundy's title was

16  changed from medical director to director, would you?

17      A.   That's correct, I wouldn't know that.

18      Q.   Now, did Dr. Kaye also talk to you about

19  being excluded from meetings with Dr. Jain?

20      A.   Which meetings are you referring to?

21      Q.   Not the work meetings, just meetings at the

22  Bronx Court Clinic.

23      A.   I missed the first part.  There was noise.

24      Q.   Meetings at the Bronx Court Clinic.



1        A.   I seem to remember her saying that Dr. Jain

2   had come to the clinic and met with, might have been Dr.

3   Brayton, might have been Dr. Mullan, had met with the

4   other clinician there, and she had not been included.  I

5   do recall that.

6        Q.   Now, how often did Dr. Jain meet with you,

7   Dr. Winkler?

8        A.   We didn't have a regularly scheduled -- well,

9   we had a regularly scheduled meeting, but it didn't

10  always happen.  I would say he met with me once -- maybe

11  once a week, once every two weeks.

12       Q.   But -- okay.  And you said you had a

13  regularly scheduled meeting; was it a weekly, regularly

14  scheduled meeting, or was it more than once a week?

15       A.   It was a weekly, regularly scheduled, but

16  often times, he would cancel and say we'll meet next

17  week.

18       Q.   Did you know if he met with Dr. Kaye's office

19  when he met with you?

20            MS. CANFIELD:  Objection to form.

21       A.   I -- I don't know about how often he met with

22  Dr. Kaye.

23       Q.   Did you know how often he met with Dr. Mundy?

24       A.   I did not know.



1       Q.   Did you ever know how often he met with Dr.

2   Owen?

3       A.   No.

4       Q.   Were there instances where Dr. Jain met with

5   all of the directors except for Dr. Kaye?

6           MS. CANFIELD:  Objection to form.  You can

7       answer.

8       A.   I don't remember if there was a meeting when

9   Dr. Kaye -- meeting of the directors where Dr. Kaye

10  wasn't there.  We didn't have that many directors'

11  meetings all together.  I don't recall if we met without

12  her at any point.

13      Q.   Now, did you ever have any complaints about

14  Dr. Jain yourself?

15      A.   I didn't have complaints about Dr. Jain.  As

16  I mentioned earlier, I have a different approach to

17  doing my interviews and my reports, which I actually

18  discussed with him, and -- like I said earlier.

19      Q.   Now, at any point, did you have a discussion

20  with Dr. Kaye about Dr. Jain throwing out his notes?

21          MS. CANFIELD:  Objection to form.  You can

22      answer.

23      A.   We did, at one point, have a discussion about

24  keeping interview notes, yes.



122                    **BARRY WINKLER, M.D.**

1        Q.   And what was that discussion?

2        A.   I believe we spoke about the fact that Dr.

3   Jain destroyed his interview notes, and we did not -- we

4   put our interview notes in the file.  We had a different

5   procedure in the case file in the clinic.

6        Q.   And did Dr. Kaye tell you that Dr. Jain

7   destroyed his interview -- interview notes?

8        A.   I don't know if she told me, or I knew it

9   already.  I forget where I learned it.

10       Q.   Now, did you make the statement, "I can't

11  tell him had to do.  He's by boss, but I'm keeping my

12  notes, and I'm telling my people to keep theirs"?

13       A.   Yeah, I seem to remember saying something

14  along that line.

15       Q.   Now, did it ever come to your attention that

16  Dr. Jain accused Dr. Kaye of stealing his interview

17  notes?

18       A.   I did not know about that, no.

19       Q.   And you were -- you were still working at the

20  clinic at this time, I take it.  Did you know Dr. Kaye

21  to steal interview notes during the time that you worked

22  at the clinic with her?

23       A.   No.

24       Q.   Does that sound like something she would do



1   based on your knowledge of working with her all those

2   years?

3        A.   No.

4        Q.   Now, I'm just going to ask you about the, I

5   guess, dynamics between Dr. Ford and Dr. Kaye after she

6   started complaining about pay parity when CHS took over.

7   Did you ever see Dr. Ford and Dr. Kaye together during

8   that time?

9        A.   I think we had meetings.  I think Dr. Kaye

10  and I met with Dr. Ford.  This is -- this is post-CHS

11  we're talking?

12       Q.   Yes.

13       A.   I have to think now.  I don't recall if we --

14  I remember meetings with Dr. Kaye and Dr. Ford, but I'm

15  not -- I'm not sure if they were pre or post-CHS, to be

16  honest.

17       Q.   Did she seem to get along with each other's

18  -- generally?

19       A.   Yes, I think so.

20       Q.   At any point, did you notice tension between

21  the two of them?

22       A.   No, I didn't.

23       Q.   Did Dr. Kaye ever complain to you about how

24  she was being treated by Dr. Ford?



1        A.    I don't recall a specific complaint.   I

2   believe in the context -- I don't know whether she

3   referenced Dr. Ford.   I don't recall in the context of

4   the pay disparity and the title change and shift change.

5   I don't recall.   I think Dr. Ford was still there at

6   that time.   I don't recall a specific reference to Dr.

7   Ford.

8        Q.   And did you have -- did you have any

9   conversations with Dr. Kaye about how Dr. MacDonald was

10  engaging her?

11           MS. CANFIELD:   Objection to form.   You can

12       answer.

13       A.    When you say -- when you say "engaging her,"

14  do you mean meetings with Dr. MacDonald?

15       Q.   Well, just in general.   Just the treatment or

16  any kind of contact he may have had with her.

17       A.   I don't recall that.   I don't recall how much

18  contact Dr. MacDonald had with Dr. Kaye at the clinic at

19  that point.

20       Q.   So we went through the shift change and the

21  title change and some of the meetings, you know, that

22  Dr. Kaye was not being invited to some of these

23  meetings.   Did you notice that Dr. Kaye's attitude

24  towards work starting to change during this time?



```
 1              MS. CANFIELD:  Objection to form.  No
 2        foundation.  You can answer.
 3        A.   Do you mean her approach to her work or her
 4   attitude about what she was going through?
 5        Q.   Her attitude about what she was going
 6   through.  Let's start with that.
 7        A.   Well, she was not happy about it.
 8        Q.   Okay.  And can you elaborate?
 9        A.   Well, I think I already have.  She was
10   unhappy about the disparity in her pay, and she was
11   unhappy about the change in title and the change in the
12   work schedule.
13        Q.   Did it affect her attitude towards work in
14   general?
15        A.   Not as far as I know.
16        Q.   Did it affect how she spoke about CHS?
17        A.   Well, she was unhappy.  I keep coming back to
18   that.  So she wouldn't speak about CHS in glowing terms
19   if she was unhappy about what they were doing, but it
20   didn't change her approach about her doing her job, as
21   far as I could see.
22        Q.   Okay.  So I'm going to ask you some questions
23   about some of the policies that you may have worked on.
24   I'm going to show you the first one, and I'm going to
```



126                     **BARRY WINKLER, M.D.**

1    mark this as Plaintiff's Exhibit 1.

2

3              (Plaintiff's Exhibit 1, DOCUMENT BATES

4              STAMPED NYC_125 through NYC_127, was marked

5              for identification.)

6

7              MS. HAGAN:  For the record, Plaintiff's

8         Exhibit 1 bears the Bates Stamp Series NYC_125

9         through 127 and I'm sure you'll need an

10        opportunity to look at the document.

11        Q.   The first -- the first page is actually an

12   email from you to Dr. Kaye.  And the subject's third

13   party -- third party-observers during psych testing.  Do

14   you see that; right?

15        A.   I see that.

16        Q.   And I'm going to scroll downwards.  Now, you

17   sent an article to Dr. Kaye.  Do you remember that?

18        A.   Yes, I do remember that.

19        Q.   And for purposes of the record, the article

20   is entitled "Presence of Third-Party Observers During

21   Neuropsychological Testing."  Now, do you recall why you

22   sent this article to Dr. Kaye?

23        A.   I believe it was in response to a request by

24   attorneys to sit in during psychological testing of



```
 1   defendants.

 2        Q.   And what was your position about attorneys

 3   sitting in on psychological tests?

 4        A.   That they should not be allowed to sit in.

 5        Q.   And do you recall what attorney was

 6   interested in sitting in on an exam?

 7        A.   I don't recall.

 8        Q.   Do you recall the context in which the issue

 9   arose?

10        A.   No, I really don't.

11        Q.   Besides sending this article to Dr. Kaye, do

12   you recall any other conversations you may have had with

13   other CHS staff members about this particular topic?

14        A.   At any time?

15        Q.   Yes.

16        A.   I believe this topic came up again after I

17   moved down as director of Brooklyn.  And I believe I

18   sent this -- well, I sent it to one of the attorneys

19   there from Legal Aid who we deal with regularly, and I

20   believe I sent it to Dr. Jain also.

21        Q.   When you sent this article to Dr. Jain, what

22   led to that?

23             MS. CANFIELD:  Objection to form.  You can

24        answer.
```



128                    **BARRY WINKLER, M.D.**

1      A.   Well, if I'm remembering correctly that I did

2  send it to him, it would have been in response to a

3  discussion about allowing attorneys or anyone else to

4  sit in during psychological testing sessions.

5      Q.   Do you remember the circumstances that led

6  you to send this article to Dr. Jain?

7           MS. CANFIELD:  Object to the form.  He can

8       answer.

9      A.    I think it was a discussion about how some

10  directors were allowing people to sit in.  And I believe

11  it came up in discussion that I did not think it was

12  appropriate, and that I referenced this article and then

13  sent it.  That's my recollection.

14      Q.   Now, did you experience any retaliation when

15  you raised this issue?

16           MS. CANFIELD:  Objection.  He can answer.

17      A.   No, I didn't.

18      Q.   You didn't experience any hostility?

19      A.   Hostility, no.

20      Q.   And what directors would allow an attorney to

21  sit in on their exams?

22      A.    I believe Dr. Owen was allowing attorneys, at

23  times, to sit in on psychological testing.

24      Q.   Now, I'm going to show you what is --



```
 1              MS. HAGAN:  I'm going to stop the share, and
 2         then I'm going to open up another document.  I'm
 3         going to show you what's going to be marked as
 4         Plaintiff's Exhibit 2.
 5
 6              (Plaintiff's Exhibit 2, DOCUMENT BATES
 7              STAMPED NYC_291 to NYC_295, was marked for
 8              identification.)
 9
10    Q.    Plaintiff's Exhibit 2 bears the Bates Stamp
11    Series NYC_291 to NYC_295.  And I'll give you an
12    opportunity to read it.  But just for the record, this
13    exhibit is from Dr. Jain to, I guess, the center
14    directors.  And it's dated June 28th, 2018, and subject
15    is new FPECC policy.  And it says -- Dr. Jain says, here
16    is the finalized FPECC private practice policy.  Please
17    do not, in all caps, distribute to staff yet.  I think
18    the best way to disseminate the information is to meet
19    with the staff directly.  I'll talk each of you about
20    how to handle it at each of the boroughs.  For now, I am
21    jut sending among us directors first.  Hopefully, we can
22    have a plan to discuss with all the staff.  Now, you
23    remember this email; right?
24              MS. CANFIELD:  Objection.  You can answer.
```



**BARRY WINKLER, M.D.**

1      A.   I remember an email from Dr. Jain on practice

2  policy, yes.

3      Q.   Okay.  And do you recall reading -- what do

4  you -- what do you recall about the private practice

5  policy?

6           MS. CANFIELD:  Objection to form.  He can

7       answer.

8      A.   That there is a policy.  The private practice

9  policy is that the clinic clinicians are not allowed to

10 take any private practice cases in the borough in which

11 they work.  And they are not allowed to do any

12 competency evaluation private practice cases anywhere in

13 the city of New York.

14     Q.   Now, do you have a private practice yourself,

15 Dr. Winkler?

16     A.   Yes, I do.

17     Q.   Okay.  And I guess, did this happen before or

18 after the private practice policy in June of 2018?

19          MS. CANFIELD:  Objection to form.  Did what

20      happen?  You can answer.

21          MS. HAGAN:  The creation of his private

22      practice.

23     A.   I'm not sure I understand.  Did the policy

24 happen?  Did the --



1      Q.    No.  Did your practice -- when did you start

2  your practice -- your private practice?

3      A.    My private practice started probably back in

4  2009, maybe.

5      Q.    Did you have to adjust how you operated your

6  private practice after this policy was issued?

7      A.    I wasn't taking any 730 cases before that.

8  And yes, I did have to adjust, because now I was in

9  Brooklyn and I could not take any Brooklyn cases at all.

10     Q.    Now, were you aware that Dr. Kaye had

11  allegations that some of the directors were engaged from

12  double-dipping?

13     A.    What do you mean by double-dipping?

14     Q.    Well, I guess working -- I guess, to a

15  certain degree, either using city resources in order to,

16  I guess, conduct their private practices.  For example,

17  seeing their private practice cases at the court clinic.

18     A.    That --

19          MS. CANFIELD:  Objection to form.  You can

20      answer.

21     A.    That she was accused of it?

22     Q.    No.  No.  That she accused others of doing

23  such things.

24          MS. CANFIELD:  Objection to form.  You can



1        answer.

2        A.    I wasn't aware that she accused others.

3        Q.    Okay.  Okay.  Were you aware that any -- were

4    you aware of any of the other directors being accused

5    as-- I mean, engaging in double-dipping?

6            MS. CANFIELD:  Objection to form.  He can

7        answer.

8        A.    Not that I was aware of.

9        Q.    Okay.  Was there ever a time where perhaps --

10   not double-dipping necessarily.

11           Was there a time where -- I'm not going to

12   proceed to that one.

13   Were you aware of any potential problematic behavior

14   with the directors and their private practice since the

15   private practice policy was issued?

16           MS. CANFIELD:  Objection to form.  You can

17       answer.

18       A.    I wasn't aware of any problem.

19       Q.    Was it ever brought to your attention that

20   there might be some problems with how the directors were

21   engaged in private practice?

22           MS. CANFIELD:  Objection to form.  He can

23       answer.

24       A.    It didn't come to my attention.

1      Q.    No one complained to you?

2      A.    About the other directors?

3      Q.    Right.

4      A.    No.

5      Q.    So do you know what led -- led to this

6  practice of policy being issued by CHS management?

7      A.    As far as I know, it was, I believe initially

8  -- once CHS took over, I think Dr. Virginia Barber was

9  particularly involved in this, that they were looking to

10  eliminate all private practice for the clinicians, court

11  clinic clinicians.  And that this, excuse me, was a

12  compromise or solution they came up with.

13      Q.    Did Dr. Kaye ever complain to you or express

14  her opposition to you about the private practice policy?

15          MS. CANFIELD:  Objection.  He can answer.

16      A.    I don't recall her ever objecting to it.  I

17  don't -- not that I recall.

18      Q.    I just want to be -- I just want to make sure

19  that the record's clear.  When you say "clinicians,"

20  you're talking about the forensic court evaluators;

21  right?

22      A.    Yes.

23      Q.    And I was just wondering if there ever came a

24  time when -- that -- during the July 2018 directors'



1  meeting, did Dr. Kaye tell you that Mr. Millan reported

2  Dr. Mundy was throwing the results of exams to woo

3  private referrals?

4          MS. CANFIELD:  Objection to form.  You can

5      answer.

6      Q.   Read that -- say that -- the last part again.

7  I didn't really hear it.

8      A.   Did there ever come a time when Dr. Mullan

9  told you -- or Dr. Kaye told you that Dr. Mullan

10 reported that Dr. Mundy was throwing the result of exams

11 to woo private referrals?

12          MS. CANFIELD:  Objection to form.

13     A.   He might have said that to me.

14     Q.   And what was your reaction?

15          MS. CANFIELD:  Objection.  You can answer.

16     A.   If it's true, it's clearly inappropriate.

17 But I don't know if it's true or not.

18     Q.   Do you recall anybody's viewpoints towards

19 Dr. Kaye changing after she made that comment?

20          MS. CANFIELD:  Objection to form.  You can

21     answer.

22     A.   I don't recall any -- observing any change in

23 how people interacted with her after that.

24     Q.   Did you ever hear any comments that people



1  were upset or perhaps frustrated with Dr. Kaye because

2  of her position on private practice?

3          MS. CANFIELD:  Objection to form.  Private

4      practice or what Dr. Mundy is allegedly doing?

5          MS. HAGAN:  I said the private practice

6      policy.

7          MS. CANFIELD:  You can answer.

8      A.   Were people upset with her because of her

9  position on the private practice policy?

10     Q.   Yes.

11     A.   Not as far as I know.

12     Q.   Do you -- do you recall if Dr. Kaye opposed

13  the private practice policy herself?

14         MS. CANFIELD:  Objection.  You can answer.

15     A.   Not that I know of.  I don't know that she

16  opposed it.

17     Q.   She never said she was in opposition to it --

18  to you about it; right?

19         MS. CANFIELD:  Objection.

20     A.   Not that I recall.

21     Q.   So let me go to Plaintiff's Exhibit 3.

22

23         (Defendant's Exhibit 3, DOCUMENTS BATES

24         STAMPED NYC_320 to NYC_329, was marked for



```
 1              identification.)

 2

 3      Q.   And Plaintiff's Exhibit 3 bears the Bates

 4   Stamp Series NYC_320 to NYC_329.  Tell me when you see

 5   the document.  You're seeing the document; right?

 6      A.   Yeah.

 7      Q.   Now, this is for -- Exhibit 3 bears the Bates

 8   Stamp Series NYC_320 through 329.  I'm going to give you

 9   an opportunity to look at it.  In the meantime, I'm just

10   going to read on the record that the exhibit begins with

11   an email to Dr. Kaye to herself.  Then there's an email

12   from you, Dr. Winkler, to Dr. Kaye on July 6th, 2018.

13   You see that; right?

14           MS. CANFIELD:  Objection.  I see it beginning

15      with --

16           MS. HAGAN:  I did say that it was Dr. Kaye to

17      herself.  And then under that, there's an email

18      from Dr. Winkler to Dr. Kaye.

19           MS. CANFIELD:  Okay.  So the most recent of

20      the emails is the email from Dr. Kaye to herself.

21           MS. HAGAN:  Right.

22           MS. CANFIELD:  And she's forwarding all these

23      other correspondence that actually begins on June

24      1st, 2018, from Elizabeth Owen to Joseph Zayas.
```

**BARRY WINKLER, M.D.**                    137

1          MS. HAGAN:  Actually, it appears that the

2     initial email to --

3          MS. CANFIELD:  Which is Bates stamped

4     NYC_000321.

5          MS. HAGAN:  The original email is from

6     Antonio Diaz to James Smoot.  And the subject is

7     new CPL 730 procedures; right?  And then Dr. Owen,

8     on June 1st, 2018, to -- I guess Dr. Owen's email

9     is first (indiscernible).

10          MS. CANFIELD:  That was first.

11          MS. HAGAN:  And then after that, Antonio Diaz

12     emails James Smoot.

13          MS. CANFIELD:  Correct.

14          MS. HAGAN:  Subject, CPL 730 procedures.

15          MS. CANFIELD:  Correct.

16          MS. HAGAN:  And then Mr. Smoot then contacts

17     Dr. Winkler --

18          MS. CANFIELD:  Correct.

19          MS. HAGAN:  -- on July 2nd.

20          MS. CANFIELD:  Correct.

21     Q.   Now, for purposes of just getting to the crux

22   of this, and you're reading this, the July 2nd email

23   from James Smoot -- first off, who is James Smoot?  That

24   would be helpful.



1        A.   I think he's -- if I recall correctly, I

2    think he's head clerk or higher level clerk in the

3    Brooklyn criminal court system.

4        Q.   And you're saying high level clerk to the

5    judges in that -- in that courthouse; right?

6        A.   Yes.

7        Q.   So then he says to you, Dr. Winkler, can you

8    review the attachment and offer any insight as to how

9    this might facilitate your request and allow us to

10   expedite what we do on our -- on our end, please.  And

11   thanks.  I'm of the mindset that we can adopt this

12   polite program here, I guess, at the Kings County Court

13   Clinic and tweak it a bit to accommodate your request.

14   And then he says, Best, James.  And then you forward

15   this to Dr. Kaye.  Now, why did you forward this

16   exchange to Dr. Kaye; do you recall?

17       A.   I don't recall.  I don't even recall what the

18   email was about without seeing more.

19       Q.   So let's go down further.  This is the new

20   CPL 730 Form and Procedures for Criminal Courts.  You

21   see that; right?

22            MS. CANFIELD:  For Queens.

23            MS. HAGAN:  For Queens.  I said for Queens,

24       yes.



1        MS. CANFIELD:  Just note for the record, it

2        appears (indiscernible) information, that the

3        exhibits seem to be duplicated.

4           MS. HAGAN:  I don't see how this is

5        duplicated at all.  But this -- this is the

6        actual --

7           MS. CANFIELD:  No.  There's one copy of the

8        new form and procedures, and then the HIPAA

9        release, and then the words "disclosed."  And then

10       the same three documents repeat again.

11       Q.   Now, am I at a place where you have finished

12  -- gotten a chance to finish going through this

13  particular document, Dr. Winkler?

14       A.   Yeah, I skimmed it.  I haven't read it word

15  for word, to be honest, but I skimmed it.

16       Q.   Okay.  And then there is like the HIPAA

17  authorization to disclose form, and there's the order to

18  disclose and provide records.  That's on page 6 of the

19  exhibit.  Then, I guess, it repeats itself here after 6.

20  So I guess 7 through 10 might be repetitious.  Well,

21  actually the complete production from defendants.  So I

22  guess it's duplicative from their part.  But then again,

23  I'm not sure if the language is exactly the same.  So I

24  won't say that.  I won't commit to that yet.



1              So what I want to ask you, Dr. Winkler, I

2    want to ask you about the bullets from the Queens pilot

3    project, right, and whether you actually agree with

4    these bullets on whether or not it would be applicable

5    to the Brooklyn Court Clinic.  Okay.

6    So the first bullet informs a 730 Order Form similar to

7    the UCMS 730 Order Form for criminal court will be

8    utilized until such time that the UCMS supreme court

9    forms are rolled out.  Do you recall that?

10        A.   This is something that I think they were

11   doing in Queens.  And we weren't doing any of this in

12   Brooklyn.

13        Q.   Did you ever do any of this stuff in

14   Brooklyn?

15              MS. CANFIELD:  Objection to form.  He can

16        answer.

17        A.    This 730 Order Form, no.  I think this was a

18   review of the Queens pilot project, but we didn't do any

19   of that work in Brooklyn.

20        Q.    Okay.  So no HIPAA consent and/or release of

21   information form were ever used in Brooklyn?

22        A.    No.

23        Q.   So the information regarding to the records,

24   right, he -- I think (indiscernible) if the defense



1  attorney and defendant agree to do so, the defendant can

2  sign a HIPAA consent for the release of records to the

3  psychiatric examiner, or on a case-by-case basis, the

4  judge may sign an order to release certain information

5  records to the psychiatric examiners.  Now, you said

6  that that didn't happen in Brooklyn; am I right?

7          MS. CANFIELD:  Objection to form.  He can

8      answer.

9      A.   We never used HIPAA forms for records.  We

10  will, on a case-by-case basis, get a judicial order for

11  records.

12     Q.   So why didn't you ever use HIPAA forms?

13     A.   I don't think a HIPAA form -- I object to

14  using HIPAA form because -- primarily because if a

15  defendant -- if we're raising or the court or whoever,

16  the defense counsel is raising a question about the

17  defendant's capacity to proceed, then my argument is how

18  do they have the capacity to understand what they're

19  signing when they completed a HIPAA form.

20     Q.    Okay.  Now, there is a discussion here, and

21  maybe you can help me understand what's happening here.

22  This bullet talks about multiple cases, dockets, can be

23  listed on the same form as long as, 1:  The highest

24  charge of every one is either a misdemeanor or a felony.





**BARRY WINKLER, M.D.**

1            MS. CANFIELD:  What page are you on?  3 --

2       3 --

3            MS. HAGAN:  326.  326.

4       Q.   And the return part is the same, which should

5   also cover misdemeanor and felony issues.  Now, what

6   does that mean?

7            MS. CANFIELD:  Objection to form.  You can

8        answer if you can.

9       A.   When they say can be listed on the same form,

10  I'm not sure what form this is even referring to.

11      Q.   Okay.  Then the 730 order with endorsement

12  pages and criminal complaint, with any HIPAA and/or

13  judicial request for records.  And then I guess it

14  should be sent to a central email address.  Did you all

15  have a central email address that dealt with 730 orders

16  in Brooklyn?

17      A.   I think we might have had a central email

18  address for orders at one point.  But we get our orders

19  in Brooklyn.  Some are faxed -- a few of them are faxed.

20  A few of them are emailed, that I'm guessing they go to

21  that central email, and the rest are hand-delivered.

22      Q.   Now, here is probably where, I think we had a

23  discussion with, you know, your disagreement.  It says

24  that next court dated for all felony 730 examinations



1    are anticipated to be two weeks from the date that the

2    730 is ordered.  You disagreed with that; right?

3             MS. CANFIELD:  Objection.  You can respond.

4         A.   I believe that's very quick, yes.

5         Q.   If a 730 is ordered during the weekend, then

6    the court date would be two weeks from the following

7    Monday.  You disagreed with that; right?

8             MS. CANFIELD:  Objection.  You can answer.

9         A.   Yes, I think that is very quick.

10        Q.   Now, did -- did you all have designated

11   people at the Brooklyn courthouse that you

12   (indiscernible) completed 730 reports to?

13            MS. CANFIELD:  Objection to form.  You can

14        answer.

15        A.   We upload our reports to a system called

16   iSight.  It's an electronic report system that all the

17   court clinics are using now.  I believe -- I forget when

18   that was implemented.  Not soon -- it was implemented

19   not too long after CHS took over.  And prior to that, we

20   would send our completed reports to our coordinating

21   manager, who was in essence, the office manager, and

22   then she would forward them to the court.

23        Q.   Do you recall the Bronx Court Clinic hard

24   drive crashing pretty early on in CHS's management of



1    the clinic?

2              MS. CANFIELD:  Objection to form.  You can

3         answer.

4         A.    I think I do remember hearing something with

5    a problem with the hard drive there.

6         Q.    Now, what do you remember hearing?

7         A.    Really not much more than that.  But there

8    was some kind of a problem.

9         Q.    Now, did Brooklyn get iSight before the

10   Bronx?

11        A.    I don't know.

12        Q.    When did Brooklyn get iSight?

13        A.    I don't remember exactly.  I think we started

14   it maybe summer of 2018.

15        Q.    Would you say iSight accurately captured the

16   workload of the -- of the Brooklyn Court Clinic?

17        A.    I would say it does, because -- I know that

18   it does.  I don't know how efficiently the orders were

19   getting entered into it initially.  But now, all the

20   orders we receive are entered into iSight.

21        Q.    Initially, were -- were the orders being

22   efficiently inputted into the system?

23              MS. CANFIELD:  Objection to form.  You can

24        answer.



```
 1        A.   I don't know.  I didn't enter the orders, and
 2   I don't know -- I think there might have been some
 3   initial bugs in entering orders.  They were working it
 4   out and kind of ramping it up.  So I don't know
 5   initially if they were all getting in or not.
 6        Q.   I mean, would you say that iSight would be an
 7   accurate repository to assess the workload of a given
 8   clinic?
 9        A.   Currently, I would say yes.
10        Q.   Prior to currently, was it -- was there a
11   time that iSight was not necessarily accurate?
12        A.   Again, I don't know, because as I said, I
13   don't uploaded the orders.  I never did.  I know it was
14   phased in, and the coordinating manager in our office,
15   along with the other clerical people were working on
16   getting the orders entered.  So at the very beginning,
17   it probably only had a portion of our outstanding orders
18   entered.  Now, I think at this point, all active orders
19   are getting entered.  So initially, I can't say whether
20   it was accurate or not.
21        Q.   Now, did -- did Dr. Kaye ever complain to you
22   or anyone else complain to you about the data being
23   inaccurate regarding their center?
24             MS. CANFIELD:  Objection.  You can answer.
```



1          A.    You mean the iSight data?

2          Q.    The iSight data or the workload data.

3          A.    I don't recall if there was something -- I

4    don't recall if there was something connected with a

5    computer problem in the Bronx, that she might have

6    mentioned -- Dr. Kaye might have mentioned at one point

7    about problems uploading orders.  I don't really --

8          Q.    But she did -- she did complain about the

9    computer issue in the Bronx to you?

10               MS. CANFIELD:  Objection.  Leading.  You can

11         answer.

12         A.    I remember hearing about a computer problem

13   in the Bronx.

14         Q.    Was there a computer problem in the Bronx

15   before you left the Bronx Court Clinic?

16         A.    Not that I'm aware of, but I don't know that

17   we were using it as much as it's probably being used

18   now.

19         Q.    When you left the clinic, the Bronx Court

20   Clinic, did you learn of computer problems in the Bronx?

21               MS. CANFIELD:  Objection to the form.  You

22         can answer.

23         A.    Not as far as I know.

24         Q.    Did Dr. Kaye ever complain about Kronos to



**BARRY WINKLER, M.D.**                    147

```
1  you?
2       A.   I do remember her telling me she was having
3  difficulty accessing Kronos from her office computer.
4       Q.   At any point, did Dr. Kaye complain to you
5  about Dr. Jain incorrectly entering her time into
6  Kronos?
7            MS. CANFIELD:  Objection to form.  You can
8       answer.
9       A.   I don't recall if she said that or not.
10      Q.   Did Dr. Kaye ever complain to you about being
11 docked pay?
12           MS. CANFIELD:  Objection.
13      A.   I think she did say something at some point
14 about that.  I don't remember a lot of details, but I
15 have some memory that she mentioned some problem with
16 her time being docked some pay, I think.
17      Q.   Did she discuss her pay being docked during
18 the Jewish holidays?
19      A.   I do remember something, yes, around the
20 Jewish holidays.  I remember her saying something about
21 -- I think she said she took those days off, but then
22 got docked or something to that effect.
23      Q.   Now, I'm going to show you what's marked as
24 Plaintiff's Exhibit 4.
```



1                    (Plaintiff's Exhibit 4, DOCUMENT BATES

2                    STAMPED NYC_464 through 466 AND NYC-471

3                    through 477, was marked for identification.)

4

5          Q.   Plaintiff's Exhibit 4 bears the Bates Stamp

6    Series NYC_464 through 466, and then NYC-471 through

7    477.  It's all one -- one exhibit.  So what I'm going to

8    do is to start at the top of the exhibit, which is page

9    1.  And it's from Dr. Jain to the center directors.  And

10   the subject is psychological testing service; right?

11   And it's dated August 27th, 2018.  You see that; right?

12         A.   I don't see anything right now.

13              MS. HAGAN:  Oh, I'm sorry.  I didn't share

14         the screen.  I apologize.

15         Q.   Okay.  Now, do you see it now?

16         A.   Yes.  Psychological testing survey.

17         Q.   Now, I'm going to give you an opportunity to

18   read it.  Let me know when you need me to scroll.

19         A.   You can scroll.

20         Q.   Now, it appears in this first part of the

21   email, Dr. Jain is trying to develop, I guess, a survey

22   regarding psychological testing in our court clinics to

23   help him plan future training and education.  Was there

24   any future training and education after this survey took



1  place?

2          MS. CANFIELD:  Objection to form.  You can

3      answer.

4      A.    Education by who?

5      Q.    By anyone in the clinic.

6      A.    Well, within our clinic, we -- when we were

7  working completely in person, would routinely engage in

8  training with the interns who rotated through and the

9  fellows who rotated through at the time.

10     Q.    Now, did the Bronx Court Clinic have, like,

11 interns and fellows rotating through?

12     A.    We did have the Bellevue forensic track

13 interns rotated through for one of their rotations while

14 they were at Bellevue.  And at one point we had forensic

15 psychiatry fellows rotate through -- from the Albert

16 Einstein program.  So they did rotate at one point.

17     Q.    Now, when you left, did they continue to

18 rotate through?

19          MS. CANFIELD:  Objection to the form.  You

20     can answer.

21     A.    I didn't hear the second part.  When I left,

22 what?

23     Q.    When you left, did the fellows continue to

24 rotate through?



1        A.    No.   The fellows had stopped rotating

2   probably a couple of years before I left, I think.

3        Q.    Were there any problems with the fellows?

4        A.    The problems with the fellows were -- it

5   became -- it came to a point that both Dr. Kaye and I

6   felt that the quality of the fellows that were rotating

7   through, and the result and quality of their work,

8   became more effort for us to supervise and correct their

9   reports than to just do the work ourselves.  Plus, some

10  of the fellows who rotated through were resistant to our

11  supervision.  And so Dr. Kaye made the decision to

12  terminate that program or involvement with that program.

13       Q.    Now, you resumed the program when you went to

14  the Brooklyn Court Clinic; is that right?

15       A.    I didn't resume it.  When I went to the

16  Brooklyn Court Clinic, there were already SUNY Downstate

17  fellows who were rotating through.  And there were also

18  Brookdale Medical School for students who were rotating

19  through.  And I continued that for a while, and then I

20  ended that relationship with the both of them.

21       Q.    And was it for the same reasons?

22       A.    It wasn't necessarily for the same reason.

23  The difference with the fellows in the Bronx -- the

24  fellows in the Bronx were forensic psychiatry fellows.



1    They were forensic psychiatry trained.   Though chose to

2    be involved in forensic psychiatry.   The -- I'm sorry.

3    I used word "fellows" for Brooklyn.   I meant to use the

4    word "residents."   They were psychiatry residents in

5    Brooklyn when I took over.

6              The residents were forced to come to our

7    clinic.   They were forced to participate in a forensic

8    rotation somewhere as part of their residency training.

9    And my position became that they came in with little to

10   no forensic knowledge.   They had very short rotation

11   turnarounds.   It took quite a bit of time to orient them

12   and even bring them up to speed on how we operated and

13   what we did.   And for the most part, none of them left

14   with any interest in doing any forensic psychiatry work.

15   So I decided -- I spoke to Dr. Jain about it, and I told

16   him that I no longer wanted to supervise them.   I didn't

17   feel it was a good use of either my time or the other

18   clinicians who were supervising them.

19        Q.   And I'm going to scroll to, I guess, the

20   survey -- the survey as you completed it.   Now, you do

21   recall completing the survey, right, Dr. Winkler?

22        A.   As far as I know.   It says completed survey

23   attached, so I guess I did.

24        Q.   No.   Just, you know, I just want to make sure



1  that you recall.  I'm trying to help you out here?

2         A.   I can't recall doing it, but I'm assuming I

3  did.

4         Q.   So would your best guess how often -- you

5  talk about how often you administer psychological

6  testing.  We have for 730 examinations, five percent.

7  Now, before we talked about the volume in the Bronx.  So

8  you're saying -- were these numbers based on your volume

9  in the Bronx or in Brooklyn?

10        A.   This would have been in Brooklyn.

11        Q.   Okay.  Would you say that this percentage was

12  the same in -- in the Bronx?

13            MS. CANFIELD:  Objection to form.  You can

14        answer.

15        A.   My sense would be that -- and I think we

16 actually did a little bit more percentage-wise of

17 testing in the Bronx.  We did more of what they call 390

18 examinations, which you see listed there, which are

19 general psychiatric evaluations for the courts.  We got

20 more orders for those in the Bronx, it seemed, then we

21 do in Brooklyn.  And those -- those more often than a

22 730 would involve some testing.  But my sense was that

23 maybe slightly more in the Bronx, but it may be roughly

24 -- it's hard to estimate.  Roughly the same, maybe



1   slightly more in the Bronx.

2        Q.   Now, about how many 730 examinations would

3   you say Brooklyn had at this point?

4            MS. CANFIELD:  Objection to form.  He can

5        answer.

6        A.   I don't know.  I don't know what the total

7   number was for the year.  I don't have that information.

8        Q.   Okay.  And do you -- do you remember about

9   how many 390s that the Bronx may have had when you were

10  there for a year?

11       A.   I don't remember numbers, but I would -- I

12  would say we had more because -- I would say

13  percentage-wise, there were more in the Bronx than in

14  Brooklyn, because when I had the Bellevue forensic track

15  interns cycling through, they were legally allowed, with

16  supervision, to conduct and write the 390 evaluations.

17  And pretty much every week, they had a case to work on.

18  We get very few 390 evaluations in Brooklyn right now.

19       Q.   Have they been outsourced?

20       A.   No, I don't know that they've been

21  outsourced.  It's a difference why they're being ordered

22  or why they're not.  I don't know why they're not

23  ordered as frequently in Brooklyn.  They're court

24  ordered.



154                        **BARRY WINKLER, M.D.**

1        Q.    So the Brooklyn and Queens 390 exams are not

2   outsourced; is that your testimony?

3        A.    As far as I know, they're not.

4        Q.    Now, you said you -- you went to the -- the

5   circumstances in which you would order psychological

6   tests; right?  And you list suspected malingering,

7   cognitive testing, et cetera; right?  Now, these are

8   some of the circumstances that, you know, I guess,

9   precipitated ordering the exam for Mr. Gonzalez; right?

10           MS. CANFIELD:  Objection to the form.  You

11       can answer.

12       A.    Well, I wouldn't say I ordered them.  We

13   conducted them.

14       Q.    Right.

15       A.    So are you asking me if these reasons listed

16   here in Number 2 are applicable -- if some of them are

17   applicable to Mr. Gonzalez?

18       Q.    Yes.

19       A.    Yes.

20       Q.    Okay.  And then, I guess, in here, Number 3

21   says, "What specific questions do you think can be

22   answered through psychological testing?"  And you

23   answer, malingering psychosis and/or cognitive

24   functioning, intellectual functioning, neurocognitive



1   functioning, personality assessment, and diagnostic

2   clarification.  Now, I mean, I'm not going to go much

3   more into this, but I'm going to ask you generally:  Did

4   you think this survey was a good exercise by Dr. Jain of

5   just trying to assess or, I guess, develop education and

6   training as the -- in these instances [ph.]?

7             MS. CANFIELD:  Objection to form.  You can

8        answer.

9        A.   I guess it gave an overview of what the

10  different directors felt in terms of what could be

11  beneficial through psychological testing.  A good -- I

12  don't know how to quantify whether it's good or not, but

13  I'm assuming it gave him some information to work with.

14       Q.   Did this -- did this survey result in

15  training and/or education that would relate to the

16  topics covered in this particular survey?

17            MS. CANFIELD:  Objection to form.  You can

18       answer if you're able.

19       A.   Do you mean specific CHS-based training

20  programs related to these topics?

21       Q.   Well, first CHS-based training program

22  related to the topics, yes.

23       A.   No.

24       Q.   Okay.  Now, were you or any of your staff, I



1   guess, given the opportunity to pursue training in any

2   of these topics elsewhere?

3           MS. CANFIELD:  Objection to form.  Answer if

4        you can.  I don't think the topics are about

5        training.  They want to know how you did and why.

6        Go ahead, you can answer.

7        A.   Are you asking, do we have the opportunity of

8   the staff to seek -- to obtain training elsewhere?

9        Q.   Did CHS finance or support training

10  externally on any of these topics that are shown here?

11          MS. CANFIELD:  Objection to form.  You can

12       answer.

13       A.   I don't know that CHS provides financial

14  support.  They might.  I have never taken advantage of

15  it, but I -- I know -- I think -- actually, I think H&H

16  or CHS does provide some type of reimbursement for

17  relevant training.  And I think, possibly, the union,

18  the clinicians are in might provide some reimbursement

19  too.

20       Q.   Did you ever have any training pertaining to

21  any of these topics while you were at CHS?

22       A.   No.

23       Q.   Did you know if any of the other directors

24  had training pertaining to any of these topics at CHS?



1              MS. CANFIELD:  Objection.  You can answer.

2        A.   I don't know about what the other directors

3   did.

4        Q.   Did Dr. Jain preside over any training or any

5   of these topics at CHS?

6              MS. CANFIELD:  Objection to form.  You can

7         answer.

8        A.   I don't recall him doing any training.  I

9   know he did some interactions with the psychiatry

10  residents at one point.  I don't know if any of it

11  involved any training on psychological testing.

12       Q.   So what were your -- what were your opinions

13  of this survey overall?

14       A.   I don't recall having a firm opinion about

15  it.  It was something that it was sent to me to fill

16  out.  I just assumed it would provide an overview of the

17  kind of psychological testing that was being done in the

18  different clinics.  But I don't know if anything really

19  came out of it.

20       Q.   Now, did you -- I'm going to show you what's

21  going to be marked as Plaintiff's Exhibit 5.  And

22  Plaintiff's Exhibit 5 bears the Bates Stamp Series

23  NYC_837 through NYC_838.

24



158                         **BARRY WINKLER, M.D.**

1              (Plaintiff's Exhibit 5, DOCUMENT BATES

2              STAMPED NYC_837 through NYC_838, was marked

3              for identification.)

4

5       Q.   Now, this email is from Dr. Mundy to

6   Dr. James.  It's dated (indiscernible) 2018.  And the

7   subject is the draft psychological testing policy.  You

8   see that; right?

9       A.   Yes.

10      Q.   And you see -- you see that Dr. Mundy says,

11  "Cool, looks good"; right?

12      A.   Yes.

13      Q.   And then Dr. Jain responds to Dr. Mundy,

14  "Thanks everyone for you suggestions.  I incorporated

15  them.  I'm actually envisioning an entire

16  policy/procedure on the scope/limits of the 390s. So

17  Dan, we can include more specifics there.  Beesh."

18  Right?

19      A.   Yes.

20      Q.   And Beesh, for the record, is Dr. Jain;

21  right?

22      A.   Yes.

23      Q.   And then Dr. Mundy responds, "Looks good.  I

24  defer to the psychologists' concern about wording and



**BARRY WINKLER, M.D.**                    159

1  ethics.  One thought:  In Manhattan, we have encountered

2  judges who specifically request testing in the course of

3  ordering a 390 or drug court assessment.  I think an

4  official stance could be included, in substance, any

5  testing performed is at the discretion of the clinic,

6  and orders specifying testing are not inherently in the

7  scope of this policy, or something worded smarter than

8  that.  No biggie."

9        Now, did you agree with Dr. Mundy on that -- on

10 that point?

11       A.   Yeah.  I don't think the judges should be

12 able to order specific testing, because it's not always

13 warranted.  They don't always know what tests might be

14 applicable or appropriate, et cetera.  So I think -- go

15 ahead.

16       Q.   Did it interfere with your independence as an

17 evaluator?

18       A.   I'm sorry.  Say that again?

19       Q.   Does it interfere with your independence?

20       A.   Well, independence, I don't think that it

21 would -- I don't foresee it somehow interfering

22 necessarily in the ultimate conclusion as an evaluator.

23 But I see it as interfering in the process and, perhaps,

24 being needless.  And also some defendants, slash,



1  patients can only tolerate a certain amount of time with

2  an interviewer or test, and it might not be warranted or

3  fair to put them through a specific test.  Or it may not

4  be fair to put them through a specific test that's not

5  warranted.

6        Q.   Does it interfere with your clinical

7  judgment?

8             MS. CANFIELD:  Objection to form.  You can

9        answer.

10       A.   I think it interferes with your clinical

11 judgment in terms of how you would approach a particular

12 evaluation.  I don't know that it would necessarily

13 interfere with your ultimate clinical judgment or

14 conceptualist of the defendant after the interview or

15 the evaluation.

16       Q.   Now, you then commented, "I think E1 should

17 be reworded to better conform to the ethical guidelines

18 regarding third-party observers.

19             MS. CANFIELD:  I'm going to object.  Dr.

20       Winkler's comment occurred prior to Dr. Mundy.

21       This is in reverse order.

22             MS. HAGAN:  Oh.  Dr. Winkler --

23             MS. CANFIELD:  Look at the time stamp,

24       Winkler (indiscernible) 2:18, and Mundy is at



800.DAL.8779
dalcoreporting.com

```
 1        4:04.  Same day.  Dr. Mundy's comment is after Dr.

 2        Winkler's.  Just to make it clear for the record.

 3        Q.   Dr. Winkler, did you make the following

 4   statement?  I'm going to read it for you.

 5             "I think E1 should be reworded to better

 6   conform to the ethical guidelines regarding third-party

 7   observers.  Observers during testing, especially those

 8   with a relationship with the person being tested, such

 9   as attorneys, potentially violate the standardized

10   administration, validity, and reliability of the tests.

11   The only observers who should be allowed in the room are

12   other trained psychologists or students who have

13   received instruction and supervision in testing, and who

14   are observing as part of their training.  I'm concerned

15   that the current, quote, no reasonable alternative, end

16   quote, wording will open the door for others to argue

17   they should be allowed in.  Barry."  Do you remember

18   that?

19        A.   I don't specifically remember it, but I

20   clearly wrote it.

21        Q.   Right.  Let's go to Section E1 that you were

22   referencing so that we have some context.  And I think

23   that would be back in Exhibit 4.  So let's go back.

24             MS. CANFIELD:  Uh --
```



162                    **BARRY WINKLER, M.D.**

1          MS. HAGAN:  I'm going to go back, Ms.

2     Canfield.  Please allow me to go forward with my

3     deposition without interference.  You have the

4     exhibits today.  So --

5          MS. CANFIELD:  I'm going to object, because

6     this email correspondence was from November, and

7     Exhibit 4, assuming it went out, is dated in

8     August.

9          MS. HAGAN:  This is completely inappropriate.

10    That is not a proper objection.

11         MS. CANFIELD:  It is.  You're misleading the

12    witness.

13         MS. HAGAN:  It's not a proper objection.

14         MS. CANFIELD:  It might have been --

15         MS. HAGAN:  (Indiscernible ) objection to

16    form.

17         MS. CANFIELD:  Well, objection to form,

18    because it might have been other --

19         MS. HAGAN:  It's not an objection.  It's not.

20         MS. CANFIELD:  It is.  There might have been

21    several different versions of the drat, and you

22    can't conclude that --

23         MS. HAGAN:  You're coaching the witness, and

24    I'm going to note that yet again for the record,



```
 1          that --
 2               MS. CANFIELD:  That's fine.  But you're
 3          misleading the witness.  I just wanted to be clear
 4          on the record.
 5               MS. HAGAN:  3 -- 3B.  3 was the -- I think it
 6          was E.  You said E -- here you have --
 7               MS. CANFIELD:  You don't even have the survey
 8          up.  You just have the survey.  You don't have the
 9          policy.
10               MS. HAGAN:  So this is --
11               MS. CANFIELD:  Actually, the policy is even
12          older.  It's from June, not even August.
13               MS. HAGAN:  You are telling the witness by
14          coaching the witness.
15               MS. CANFIELD:  I'm just saying, you are
16          misleading.
17               MS. HAGAN:  You're coaching the witness
18          again.  Again.  So --
19               MS. CANFIELD:  Just saying, you're misleading
20          the witness.  So go ahead with your question.
21               MS. HAGAN:  I'm not leading the witness.  I
22          think that you need to stop.  That's what you need
23          to do.
24               MS. CANFIELD:  There's nothing that suggests
```



1        -- there's nothing --

2            MS. HAGAN:  You need to stop.

3            MS. CANFIELD:  -- attached to this email that

4        says that that is the policy.

5            MS. HAGAN:  I think that E1 should be

6        reworded.  So let's go --

7            MS. CANFIELD:  I think that's a fair -- I

8        think that's a comment to make, but you're

9        misleading the witness.  Actually, it's not even

10       the policy, again.

11           MS. HAGAN:  Are you finished?

12           MS. CANFIELD:  Yes.  You don't have the

13       policy.  You don't have the policy --

14           MS. HAGAN:  Are you finished?

15           MS. CANFIELD:  Yes, I am.

16           MS. HAGAN:  Thank you.  Okay.  Let's look at

17       the policy and make sure that we have the right

18       thing in front of us.

19           MS. CANFIELD:  Perfect.

20

21           (Plaintiff's Exhibit 6, DOCUMENT BATES

22           STAMPED NYC_840 THROUGH NYC_842, was marked

23           for identification.)

24



1        MS. HAGAN:  For purposes of this deposition,
2     what will be -- Exhibit 6 bears the Bates stamp
3     series 840, 841, and 842.
4     Q.   And I'm going to allow you to look at the
5  policy, Dr. Winkler, and then let me know when I need me
6  to scroll.  Okay?
7     A.   Okay.
8        MS. CANFIELD:  Did you email it to me?
9        MS. HAGAN:  You have it.
10        MS. CANFIELD:  I do not have it.  I would
11     have to search a different database.  It was not
12     provided to me in accordance with Magistrate
13     Cott's directive.
14        MS. HAGAN:  (Indiscernible).  Go ahead.
15        MS. CANFIELD:  That's a separate database.
16        MS. HAGAN:  You don't have the documents that
17     you produced to me.  Tell me --
18        MS. CANFIELD:  I don't have it handy to me.
19     As well as Judge Cott said, "Do unto others as you
20     would like them to do with you."
21        MS. HAGAN:  Yes.  Yes.
22        MS. CANFIELD:  I do not have it handy.  If
23     you want to, let's just stay on the record while I
24     find it then.



1           MS. HAGAN:  Yes.

2           MS. CANFIELD:  Because I have to search a

3      completely different database for it.

4           MS. HAGAN:  Go ahead.

5           MS. CANFIELD:  So stay on the record while I

6      do that.

7           MS. HAGAN:  He's reading.  Let's keep

8      reading.

9           THE WITNESS:  I'm going to take a quick

10      bathroom break if that is okay, while --

11           MS. CANFIELD:  Perfect.  Perfect.

12           THE WITNESS:  I will be right back.

13

14           (Recess taken from 3:12 p.m. until 3:17

15           p.m.)

16

17  BY MS. HAGAN:

18      Q.   Did you have an opportunity to read through

19  Exhibit 6?

20      A.   Hold on one second.  I kind of lost -- only

21  have a small icon on the screen now.

22      Q.   Okay.

23      A.   You have to make that larger.  Now, I think

24  I'm back, but I'm only seeing -- there we go.  Okay.



1        Q.   Is there a part of the document you need me
2   to go to, Dr. Winkler?
3        A.   Well, no.  I honestly didn't read every word
4   of it, but if you have a question about a specific
5   part --
6        Q.   Yes.  I do have a question about a specific
7   part.  In your email -- in the previous email, you
8   mention that you believe that the wording in section --
9   let's go up to it, E1, right, should be reworded to
10  better conform to the ethical guidelines regarding
11  third-party observers; right?  And you talk about
12  observers during the testing; right?  And I want to go
13  back to E1 in this document.  Okay.
14            Right now, E1 says -- at that time, E1 said,
15  "Administration and Documentation:  Unless no reasonable
16  alternative is available, psychological testing shall
17  not be performed with a non-examiner, e.g., attorney
18  present."  Now, was that what you were talking about
19  needing to be rewritten?
20       A.   Yes.
21       Q.   Okay.  And what exactly did you believe would
22  be more consistent with the actual guidelines?
23       A.   That should say psychological testing shall
24  not be performed with a non-examiner present.  That in



1  my opinion, there are -- I think I said in that email,

2  the -- unless no reasonable alternative is available,

3  leaves the door open to certain individuals making an

4  argument for being allowed to be present.

5       Q.   All right.  So now, I'm going to show you

6  what we've marked as -- did Dr. Kaye comply with your --

7  you know, your suggestion?

8            MS. CANFIELD:  Objection to form.

9       A.   I don't recall.  That was a draft.  I don't

10  recall what the final version was, whether that was

11  taken out or not.

12       Q.   Did it ever come to your attention that the

13  policy may have been circulated externally prior to

14  being finalized?

15       A.   Circulated to whom?

16       Q.   External stakeholders outside of the CHS

17  system.

18       A.   I wasn't aware of that, if it happened.

19       Q.   Had there ever been any discussions about CHS

20  policy being circulated externally outside -- outside of

21  CHS?

22       A.   When you say "external," do you mean -- when

23  you say "outside CHS," do you mean within H&H or --

24       Q.   Well, the defense community, the courthouses,



1   had the policy been circulated prior to their

2   finalization, or I guess, you know -- yeah, finalization

3   (indiscernible)?

4           A.    Not as far as I know.

5           Q.    So did you -- specifically, let me narrow it.

6   Did you know Dr. Kaye to circulate any policies outside

7   of CHS?

8           A.    Not that I'm aware of.  I don't know whether

9   she did it.

10          Q.    Do you know of any of the other directors who

11  circulated policy outside of CHS?

12          A.    Not that I'm aware of.  Not that I recall.

13          Q.    Did Mr. Peck or -- did Mr. Peck or anyone

14  else get any policies from Dr. Owen?

15          A.    I don't know if he did.

16          Q.    Now, I did ask you about the managing dual

17  role policy at one point.  I want to go over that with

18  you some.

19          A.    Okay.

20                MS. HAGAN:  So that particular -- this

21          particular exhibit will be marked as Plaintiff's

22          Exhibit 7.  And it bears the Bates Stamp Series

23          NYC_1188 to NYC_1190.  And I'm going to give you

24          an opportunity to scroll through the document.  I



1          just want to make sure that the Bates stamp series

2          are accurate, that's why I'm scrolling so quickly.

3          So it's right.

4

5              (Plaintiff's Exhibit 7, DOCUMENT BATES

6              STAMPED NYC_1188 to NYC_1190, was marked for

7              identification.)

8

9     Q.   I'm going to start -- and for purposes of the

10    record, the email is from Dr. Jain to the center

11    directors.  The subject is the FPECC Policy, managing

12    dual roles.

13            And I guess he -- he's telling you at this

14    point that (indiscernible) respective court clinic.  Do

15    you recall this document?

16            MS. CANFIELD:  Hold on.  I do not have this

17         document either.

18            MS. HAGAN:  You should have it.

19            MS. CANFIELD:  All right.  I think

20         (indiscernible).  Thank you.

21            MS. HAGAN:  Okay.  So do you recall receiving

22         this email, and then I guess the doc -- this

23         actual policy, Dr. Winkler?

24            THE WITNESS:  I don't see it.



**BARRY WINKLER, M.D.**                    171

```
1            MS. HAGAN:  Oh, let me share.  I'm sorry.
2       Sorry about that.  Now, you should see it.  Do you
3       have it?
4            THE WITNESS:  Yes.
5            Q.   Okay.  So here's the policy.  Do you
6       recall -- do you remember this document?
7       A.   I will look at it.
8            MS. CANFIELD:  You also knew the
9       (indiscernible) myself, please.
10           MS. HAGAN:  Oh, okay.  I'm sorry.
11      A.   Could you scroll just a little, please.
12      Q.   Okay.
13      A.   Just to catch.  Sorry.
14           MS. HAGAN:  Yeah, just give me a minute.  I'm
15      having technical difficulty again.
16
17           (Off the record for technical difficulties.)
18
19      Q.   So now, do you -- I'm going to go back to the
20  exhibit.  I'm going to share.  Now, to go back to the
21  exhibit, it's dated January 22nd, 2019.  You see that;
22  right?
23      A.   Yes, I see that email.
24      Q.   Right.
```



1              And at the bottom of the exhibit, for some

2    reason, the policy is dated December 21st, 2018.  You

3    see that; right?

4         A.   I see that.

5         Q.   Okay.  Now, prior to receiving the finalized

6    version of this exhibit -- of this policy, did you all

7    -- did you or anyone else have an opportunity to comment

8    on -- on the actual policy before it was finalized?

9         A.   I don't recall whether I did or not.

10        Q.   Okay.  Do you recall an incident that may

11   have contributed to this -- this policy being drafted to

12   begin with?

13             MS. CANFIELD:  Objection.  Asked and

14        answered.  You can answer again.

15        A.   I don't recall.

16        Q.   But any chance, was there an instance where

17   Dr. Alex Garcia-Mansilla may have tried to sit in on an

18   examination?

19             MS. CANFIELD:  Objection.  Asked and

20        answered.  You can answer it again.

21        A.   I think you're referring to what we discussed

22   earlier about her, at some point, trying to sit in on an

23   evaluation at the -- in the Bronx, but I don't recall --

24   I don't recall if that was the impetus to this policy.



BARRY WINKLER, M.D.                    173

1       Q.    Has there been any other instance prior --
2  outside of that that may have led to this policy being
3  drafted?
4            MS. CANFIELD:  Objection to form.  You can
5       answer.
6       A.    Not that I recall.
7       Q.    So you don't recall any other third-party
8  treating clinicians seeking to sit in on a forensic
9  psychiatric exam; right?
10            MS. CANFIELD:  Objection to form.  You can
11       answer.  No foundation.
12       A.    I don't recall any, no.
13       Q.    And do you recall any -- Dr. Alex
14  Garcia-Mansilla tried to sit in on this exam?
15            MS. CANFIELD:  Objection to form.  You can
16       answer.
17       A.    No, I don't.
18       Q.    And just for purposes of clarify, AAPL, as
19  well as just forensic psychiatry, in general, really --
20  really reiterate -- I guess, emphasizes the separation
21  between treating and evaluation; am I right?
22            MS. CANFIELD:  Objection.  You can answer.
23       A.    Yes.  It makes it clear there's a separation
24  between treatment and evaluation.



174                    **BARRY WINKLER, M.D.**

1        Q.   And do you believe that this policy
2   reiterates that position?
3        A.   You know, I didn't read it word for word.
4   I'd have to absorb it.  I don't know whether it does or
5   not.  I think it --
6        Q.   Can you take -- I'm sorry.
7        A.   I think it's an attempt to do that, but I
8   don't know if it does or not.
9        Q.   Would you say it's consistent with that
10  premise?
11       A.   Yes.  I'd say it's consistent with that
12  premise.
13       Q.   Do you recall Mr. Wangel or MOCJ getting
14  involved in the dual agency violations at the court
15  clinic?
16            MS. CANFIELD:  Objection to form.
17       A.   I don't recall knowing anything about that.
18            MS. HAGAN:  Okay.  So I'm going to go to
19       Plaintiff's Exhibit 8.
20
21            (Plaintiff's Exhibit 8, DOCUMENT BATES
22            STAMPED NYC_1268 to NYC_1269, was marked for
23            identification.)
24



1           MS. HAGAN:  Plaintiff's Exhibit 8 bears the

2       Bates Stamp Series NYC_1268 to NYC_1269.

3       Q.   Let me share the screen again.  And for

4   purposes of the record, the email is from you, Dr.

5   Winkler, to Dr. Jain -- Dr. Jain.  And it's dated

6   February 14th, 2019.  And I guess I want to go to the

7   beginning, so you'll have an opportunity to, you know,

8   get the full context.

9           The thread starts with Dr. Jain to the center

10  directors.  And it's the FPECC mission draft.  This is a

11  draft of the mission and the vision for FPECC that we

12  started discussing at our last directors' meeting.  I

13  think this is a good time to revisit it and discuss any

14  feedback or suggestions you have.

15          Do you recall a discussion about the mission

16  of the unit?

17      A.   I recall at some point having some discussion

18  about it.  I don't recall specifically when it was or

19  when it was discussed, but I do recall it being

20  discussed at some point.

21      Q.   You know, Dr. Owen says -- she says -- she

22  interjected -- she says, the idea of retaining highly

23  competent clinical staff.  Did you agree with her, you

24  know, I guess, input regarding that?



1        A.    Yes, I guess so.  I would think any staff --
2   I would hope any staff you would hire would be highly
3   competent.  So -- but I would agree, I guess, with that.
4        Q.    Now, ultimately, you -- you agree.  You say
5   it looks good, right, the mission statement; right?
6        A.    Yes.
7
8              (Plaintiff's Exhibit 9, DOCUMENTS BATES
9              STAMPED NYC_3996 THROUGH NYC_3998, NYC_3044
10             THROUGH NYC_3045, were marked for
11             identification.)
12
13       Q.    So then I'm going to show you what's marked
14  as Plaintiff's Exhibit 9.  And it pertains to
15  unauthorized recording.  And that's dated May 31st,
16  2019.  Now, prior to May 31st, 2019, were you aware of
17  any unauthorized recording policy in place at CHS?
18             MS. CANFIELD:  Objection.  Asked and
19        answered.  You can answer again.
20       A.    Not that I'm aware of.
21       Q.    Okay.  And did you have any input on this
22  policy that I'm going to show you regarding unauthorized
23  use -- unauthorized recordings?
24             MS. CANFIELD:  What are the Bates stamp



1       numbers?

2              MS. HAGAN:  Bates stamp numbers are NYC_3996

3       to 3998, and then NYC_4044 to 4045.

4       Q.   Now, I'm going to scroll to the actual policy

5    itself, if you don't mind, Dr. Winkler, do you?

6       A.   I don't mind.

7       Q.   Thank you.  So here it is.  Do you recall

8    seeing this document at any point?

9       A.   Yes.  I do recall seeing this, I believe.

10      Q.   And did you talk to Dr. Kaye about the actual

11   policy at any point?

12      A.   I don't recall if I did or not.

13      Q.   Did you sign a confidentiality agreement in

14   conjunction with this particular policy, by any chance?

15             MS. CANFIELD:  Objection to form.  You can

16      answer.

17      A.   A confidentiality agreement?

18      Q.   Yes.

19      A.   With regard to this policy?

20      Q.   Just in general, as far as your job at CHS.

21             MS. CANFIELD:  Objection to form.  You can

22      answer.

23      A.   I don't recall signing a specific

24   confidentiality agreement.  I don't know.  I can't



1   answer that.  I don't recall signing it.  Maybe it was

2   called something else.  I don't know.

3       Q.   Okay.  In 2019 -- in the summer of 2019, were

4   there any agreements circulated to you or any of the

5   other center directors regarding how you administered

6   exams?

7       A.   Agreements?

8       Q.   Yes.  For you to sign.

9       A.   I don't recall.  Possibly.  I don't recall.

10      Q.   Were you -- were any agreements circulated to

11  you as far as what information you would be able to

12  disclose or basically email to yourself?

13          MS. CANFIELD:  Objection to the form.  You

14      can answer.

15      A.   I honestly don't recall.  Poss --

16      Q.   Were you made -- I'm sorry.

17      A.   Possibly, but I don't recall.

18      Q.   Was it ever brought to your attention about

19  CHS's proper email procedure?

20      A.   Proper email for what?

21      Q.   As far as --

22          MS. CANFIELD:  Objection.  You can answer.

23      Q.   As far as sharing -- as far as emailing

24  documents outside of CHS.



1              MS. CANFIELD:  Objection.  You can answer.

2       A.   I don't recall if there was a specific

3  policy.  I know we are not allowed to email outside of

4  the system that has any confidential information.

5       Q.   When did you learn that?

6       A.   That's, I think, always been the rule.

7       Q.   Where was that rule written or stated?

8              MS. CANFIELD:  Objection to form.  You can

9       answer.

10      A.   I think it's a basic -- I think it relates to

11 basic HIPAA requirements that you cannot transmit

12 outside of a secure system any kind of confidential

13 information such as that.

14      Q.   But the court clinics are HIPAA-exempt, so

15 would that necessarily fall under HIPAA, Dr. Winkler?

16             MS. CANFIELD:  Objection to form.  You can

17      answer.

18      A.   I don't know.  I'm not really following what

19 you're asking me.

20      Q.   I'm asking whether or not you received any

21 documents from CHS pertaining to unauthorized recordings

22 outside of this policy at the beginning?

23      A.   I don't -- I don't recall.

24      Q.   Did you receive any documents pertaining to



180                      **BARRY WINKLER, M.D.**

1   email usage from CHS?

2           MS. CANFIELD:  Objection.  Asked and

3       answered.  You can answer again.

4       A.   I don't recall.

5       Q.   Do you recall signing anything about email

6   usage from CHS?

7           MS. CANFIELD:  Objection.  Asked and

8       answered.  You can answer it again.

9       A.   Again, I don't recall.

10      Q.   And do you recall any documents that required

11  you to sign regarding your knowledge of CHS's

12  unauthorized reporting policy?

13          MS. CANFIELD:  Objection.  Asked and

14      answered.  You can answer it again.

15      A.   I don't recall whether I signed anything.

16      Q.   And do you recall if you signed anything that

17  pertains to CHS's alleged confidentiality policy?

18          MS. CANFIELD:  Objection.  Asked and

19      answered.  He can answer again.

20      A.   Yeah, I don't recall.

21

22          (Plaintiff's Exhibit 10, DOCUMENT BATES

23          STAMPED NYC-360 THROUGH NYC_363, was marked

24          for identification.)



### BARRY WINKLER, M.D.                                        181

1        Q.   I'm going to show you what's marked as

2   Plaintiff's Exhibit 10.  Plaintiff's Exhibit 10 bears

3   the Bates Stamp Series NYC-1913.

4             Now, Dr. Winkler, can you see the document?

5        A.   Yes.

6        Q.   Now, Dr. Winkler, do you recall writing an

7   email to Dr. Jain, Bronx records request template

8   affidavit and order.

9        A.   I don't recall writing it, but I see it.  I'm

10  reading it.

11            MS. HAGAN:  There might be more than that.

12       It should be 1913 -- I'm sorry about that -- well,

13       actually --

14            MS. CANFIELD:  I only see 1913.

15            MS. HAGAN:  It's not even 1913.  I apologize.

16       Actually, it's the Bronx template.

17            MS. CANFIELD:  Oh, 1913 that you sent me is

18       1913.

19            MS. HAGAN:  Yeah.  I -- actually, I'm sorry.

20       I actually would like to mark Exhibit 10 to be

21       NYC_360 to NYC_363.  I apologize for that.

22            MS. CANFIELD:  Okay.

23            MS. HAGAN:  And that will be Exhibit 10

24       instead.



1        Q.   And it's an email from Dr. Winkler to Dr.

2   Jain dated July 11th, 2018.  Do you see that?  Do you

3   remember this email, Dr. Winkler?

4        A.   No, I don't remember it, but there it is.

5        Q.   For the purposes of the deposition, Dr.

6   Winkler sent Dr. Jain an email with the subject, "Bronx

7   Records Request Template Affidavit and Order" dated July

8   11th, 2018.  And you say, "Hi, Beesh, here are the forms

9   we use in the Bronx.  I think that specifically asking

10  for redacted records is a better approach."  You saw

11  that; right?

12       A.   Yes.

13       Q.   Now, did Dr. Jain have any reaction that you

14  suggested that you didn't ask for redacted records?

15            MS. CANFIELD:  Objection to form.  You can

16       answer.

17       A.   Can you say that again -- ask that again,

18  please.

19       Q.   Did Dr. Jain have a reaction when you said --

20  when you suggested that you did not specifically ask for

21  redacted records?

22       A.   I don't recall if he had any reaction to it.

23       Q.   Okay.  Now you used this document in the

24  Bronx.  How long would you say you used this document?



**BARRY WINKLER, M.D.**                                    183

```
1        A.    Can you scroll down a little bit more,
2   please.
3        Q.    Sure.
4        A.    I believe this looks like the form that I put
5   together.  I think I referenced earlier in my testimony
6   about putting together a form order for records that
7   complied with certain requirements for us to get
8   un-redacted records.  This looks like that form.  I
9   can't be 100 percent positive, but it looks like.  And
10  it is that form, I would say, we used it only for a
11  couple of years, two or three years, perhaps.
12       Q.    Now, this -- this form is something that you
13  and Dr. Kaye worked together on; is that right?
14            MS. CANFIELD:  Objection to form.  You can
15        answer.
16       A.    Yes.
17       Q.    And did you use this form in Brooklyn when
18  you went to Brooklyn?
19       A.    I don't remember if I used this form or not.
20  They might have had their own form already that they
21  used.  It's possible I used it, but I don't recall.
22       Q.    Now, did Dr. Jain have any issues with the
23  form as it is in its current state?
24            MS. CANFIELD:  Objection to form.  You can
```



1          answer.

2          A.    I don't recall if he had any issues with it.

3          Q.    Did you work with any CHS attorneys in

4     drafting this form?

5          A.    If this is the form I drafted, I -- I was

6     given this information by legal -- what was called

7     Rikers Island legal.  Some legal counsel at Rikers

8     Island who, I guess, was connected to their records

9     department who gave me the necessary information,

10    sections of the law, wording, et cetera.  I don't think

11    I worked with any CHS legal on this.

12         Q.    The Rikers --

13         A.    Excuse me.  Maybe Rikers Island legal was CHS

14    legal, and it wasn't termed that way.

15         Q.    Was it a Ms. Caltagirone?

16         A.    I don't recall.

17         Q.    Let me show you a document that deals with

18    this topic.  Maybe that will help.  So Plaintiff's

19    Exhibit 11 deals with --

20              MS. HAGAN:  I'm going mark this as

21         Plaintiff's Exhibit 11.

22

23              (Plaintiff's Exhibit 11, DOCUMENT BATES

24              STAMPED NYC_1913, was marked for



```
 1            identification.)

 2

 3      Q.   And I'm going to ask you this, actually.  And

 4  this is from you, Dr. Winkler.  And Plaintiff's Exhibit

 5  11 bears Bates Stamp Series NYC_1913.  And Dr. Winkler,

 6  this is from you to Ms. Persaud and Dr. Kaye.  And it's

 7  dated August 21st, 2107.  And the subject is Rikers

 8  Island record; right?  And -- and it basically -- just

 9  for the record, it's a conversation.  I spoke with Judge

10  Moore today about the -- whatever case.  He was aware of

11  the fact that we received redacted records and was

12  wondering if any progress had been made in resolving the

13  situation.  I told him about Judge Torres' involvement

14  and the fact that we still have not heard anything about

15  a resolution.  Judge Moore took Wanda Roberts' name and

16  telephone number and said he would be contacting her to

17  find out why his order has not been satisfied.  He said

18  it is unheard of for someone to supply redacted records

19  in response to a judicial subpoena.  Now, I'm going to

20  ask you about that last sentence.  Was it unheard of for

21  someone to supply redacted records in response to a

22  judicial subpoena?

23           MS. CANFIELD:  Objection to form.  You can

24      answer.
```

1        A.    That was the judge's words, that's why I put

2    it in quotes.   It -- up until the time that we started

3    to receive the redacted records, we had not received

4    redacted records in response to a judicial subpoena.

5        Q.    And who produced the redacted records in

6    response to a judicial body?

7        A.    It would have been the Rikers Island Records

8    Bureau.   That's Wanda Roberts is the woman -- I don't

9    know her exact title, but she's basically the director

10   of that Rikers Island Records Bureau, whatever it's

11   called.

12       Q.    Who would have given Ms. Roberts the

13   directive to redact the documents?

14           MS. CANFIELD:  Objection to form.  You can

15       answer.

16       A.    I honestly don't know who would have told her

17   to do that.

18       Q.    Was it before or after CHS took over

19   management of the clinics?

20       A.    This was before CHS took over.

21       Q.    Was it before or after Corizon was no longer

22   the vendor managing --

23       A.    I --

24           MS. CANFIELD:  Objection to form.  No



1          foundation.  He can answer.

2          A.    Not sure when -- because CHS took over from

3     Corizon before they took over the clinics.  I'm not

4     exactly sure when that transition occurred.  I believe

5     CHS was in control of the records or in control of the

6     services at Rikers at this time, but I'm not completely

7     sure.

8          Q.    So CHS may have been in control of the

9     records and services at Rikers at this time, August

10    21st, 2017; is that right?

11          MS. CANFIELD:  Objection as to form.  You can

12          answer.

13          A.    Yes, they may have been.

14          Q.    And had it been your experience up to that

15    point, that redacted records would be provided in

16    response to a -- a judicial subpoena?

17          A.    No.

18          Q.    So you had never experienced that before;

19    right?

20          A.    Not that I recall.  If it had ever happened,

21    it was an isolated incident and a mistake that was

22    corrected.  But it hadn't occurred as a regular

23    procedure.

24          MS. HAGAN:  Okay.  So I'm going to draw your



```
 1        attention to what's going to be marked as
 2        Plaintiff's Exhibit 12.  Plaintiff's Exhibit 12
 3        bears the Bates Series Kaye5thProduction012.
 4
 5             (Plaintiff's Exhibit 12, DOCUMENT BATES
 6             STAMPED KAYE5THPROD012, was marked for
 7             identification.)
 8
 9        Q.   Now, the top portion of the email is redacted
10   because that's what's stated between myself and Dr.
11   Kaye.  And then Dr. Winkler, this is an exchange between
12   you and Dr. Kaye from your personal email account.  Do
13   you see that, right, Dr. Winkler?
14        A.   I don't see it.
15             MS. CANFIELD:  It says 5th Production,
16        October 6th, 2021?
17             MS. HAGAN:  Yes.
18             MS. CANFIELD:  Underscore October 6th, 2021.
19        Is that the name of the document.
20             MS. HAGAN:  I don't have all that on here.  I
21        have Kaye5thProduction012, that's what I have.
22        That's what it says.
23        Q.   Now --
24             MS. CANFIELD:  Hold on.  I don't think I have
```



1         this document.

2              MS. HAGAN:  You do have the document.

3              MS. CANFIELD:  I can't find it from when you

4         sent it over.

5              MS. HAGAN:  It's amongst the exhibits that

6         you have this morning.  You have them.

7              MS. CANFIELD:  I don't have it.

8              MS. HAGAN:  It's there, Ms. Canfield.  All of

9         the --

10             MS. CANFIELD:  It's -- it's not in what you

11        sent over.  So let me find it.  I know you sent me

12        other documents today.  You just produced them.

13        Let me find it, please.  Okay.  And it's the same

14        one, October 6th, 2021.  It starts at Bates

15        Kaye5thProduction001 at the bottom.

16             MS. HAGAN:  This is not that exhibit.

17        Exhibit 12 is Kaye5thProduction012.  That's what

18        it says.

19             MS. CANFIELD:  You don't provide it, but I

20        will --

21             MS. HAGAN:  You have it.

22             MS. CANFIELD:  Yeah.  I found it in the

23        production, but --

24             MS. HAGAN:  You have it --



1            MS. CANFIELD:  -- I think this is a specific

2        exhibit.

3            MS. HAGAN:  You do have it.  You have them

4        all.

5        Q.   Dr. --

6            MS. CANFIELD:  I'm not going to quibble with

7        you.  I do not have it.

8            MS. HAGAN:  I will forward the emails with

9        all the exhibits again.  They were there.

10            MS. CANFIELD:  Thank you.

11            MS. HAGAN:  They're all there.

12        Q.   Now, Dr. Winkler, have you had an opportunity

13   to read the exhibit that's marked?

14        A.   I just read it now, yes.

15        Q.   Okay.  So for purposes of the record, the

16   email is from you to Dr. Kaye in your suspected personal

17   account -- Gmail account.  Right.  And you and say sent;

18   right?  And to begin the thread, it's an email from Dr.

19   Kaye and it says, "And get his approval to respond

20   before we do"; right?  And then you respond:  "I was

21   thinking about it, and I don't think this should wait

22   until you get back from vacation.  We don't need the

23   judges pissed at us, and with the city looking at

24   everything.  I don't think it's a good idea to drag our



 1    feet.  This needs to get resolved.  I'll send her an

 2    email, and just tell her we only got medical records,

 3    and we need everything"; right?  That's what you say

 4    back.  Then Dr. Kaye sends back: "Okay.  I think we

 5    should clearly state that redacted records of any sort

 6    are completely unacceptable and that HIV and substance

 7    abuse is central to a psychiatric exam; right?"  And

 8    then you say "sent."  Do you recall this exchange with

 9    Dr. Kaye?

10              MS. CANFIELD:  Can I ask, is there an email

11         before?

12              MS. HAGAN:  No.  No.

13              MS. CANFIELD:  There's not an email before

14         October 24th, 2017, that was --

15              MS. HAGAN:  I said no.

16         Q.   Dr. -- Dr. Winkler, do you recall --

17              MS. CANFIELD:  Okay.  Then I'll ask Dr. Kaye

18         during the deposition, because it looks like

19         there's another email correspondence before this,

20         and we'll ask for its production.

21              MS. HAGAN:  You should.

22         Q.   Now, Dr. Winkler, do you recall this email

23    exchange?

24         A.   I don't recall this specific exchange.



1         Q.    Okay.   Now, who's JHC?

2         A.    I believe that's Jeremy H. Colley, Dr.

3    Colley, who would have been, at that time, the director

4    of the forensic psychiatry division at Bellevue.

5         Q.    Now, clearly, you and Dr. Kaye had, you know,

6    as you said earlier a fair amount of discussion about

7    redacted medical records; right?

8         A.    That's correct.

9         Q.    And enough so that you discussed it outside

10   of work; am I right?

11             MS. CANFIELD:   Objection to form.   You can

12        answer.

13        A.    Well, we discussed it, yeah, outside of work,

14   yes.

15        Q.    And did Dr. Colley also have a position

16   against redacted medical records?

17        A.    I don't recall what Dr. Colley's position on

18   it was.   I believe that he agreed with us on it, but I

19   don't know for certain.

20        Q.    Did Dr. Colley confer with you and/or Dr.

21   Kaye about this topic and how to address it?

22        A.    I don't recall if he did.   I think we had

23   some discussion with it, but I'm not sure exactly when

24   or what or what he said, but I would imagine we had some



1  discussion with him about it.

2          MS. HAGAN:  Well, then, I would like to show

3      you another exhibit, and it's Plaintiff's Exhibit

4      13.

5

6          (Plaintiff's Exhibit 13, DOCUMENTS BATES

7          STAMPED KAYE5THPROD010 TO KAYE5THPROD011,

8          was marked for identification.)

9

10     Q.   Plaintiff's Exhibit 13 bears the Bates Stamp

11 Series Kaye5thProduction010 through 11.  You see the

12 email; right?  The first part is redacted because that's

13 between myself and Dr. Kaye, and I guess it's the last

14 part of the email.  I'm going to scroll down to the

15 beginning of the thread.

16          Now, Dr. Winkler, the beginning of the thread

17 is from you to Dr. Kaye, and it's dated September 21st,

18 2017.  Well, first -- the first email again says okay.

19 And then you respond:  I'm not bringing attention to

20 anything.  I'm trying to gather ammunition for us to use

21 when HHC legal and/or some judge tells us we can't ask

22 for the info any longer without a hearing.  Do you

23 recall that?

24     A.   I don't recall writing that, but I believe I



194                         **BARRY WINKLER, M.D.**

1    recall what it's referencing.

2         Q.    What is it referencing?

3         A.    I believe this refers to, at one point, and I

4    believe I mentioned this earlier, when we started to get

5    the redacted records as to substance abuse, there had

6    been a law passed, maybe 2016, a new law about substance

7    abuse -- obtaining substance abuse treatment program

8    records.  And the law, I reviewed it, it contained a

9    very elaborate procedure including having to go before a

10   judge for a hearing to get permission, to get the

11   records.  My position at the time, still is, is that

12   that law only applied to records from substance abuse

13   treatment programs, and that we were not asking for

14   substance abuse treatment program records.  We were just

15   asking for the defendant's self-report of substance use

16   as part of their mental health records.

17        Q.    And what were you -- why would you anticipate

18   that HHC legal would tell you that you, guys, could not

19   ask for that information any longer without a hearing?

20             MS. CANFIELD:  Objection to form.  You can

21        answer.

22        A.    I believe -- I forget who referenced that

23   law.  When we first started to look into why this

24   information was being redacted, I believe we were



1    directed to that law by somebody at HHC legal, or it was

2    passed down to us from HHC legal.  I don't recall

3    exactly, but I think that's what happened.

4         Q.   Now -- then, Dr. Kaye responded to you,

5    "Okay, LP."  Who's LP?

6         A.   That would be Lucrecia Persaud, the

7    coordinating manager at the clinic.

8         Q.   Okay.  "Should also call or email with the

9    court clerk and possible law secretary in the parts

10   where there are outstanding records.  I think the law 42

11   is up to the judge's discretion, clearly not strong

12   enough for HHC to fight turning over un-redacted records

13   via email."  And do you recall HHC fighting turning over

14   un-redacted records?

15        A.   What I recall is we -- we took steps to

16   advise Ms. Roberts that the records were not

17   appropriate, Wanda Roberts.  And I believe she told us

18   that it was a response to a new law.  And I think that

19   at that time, that was their position that they would

20   not turn over un-redacted records to us without going

21   through this burdensome procedure as per this law for a

22   hearing, et cetera, for the substance abuse records

23   anyway.

24        Q.   So then Dr. Kaye continues:  "I do not think

1  we should bring attention to the legal arguments against

2  giving us what we need.  That's between HHC legal and

3  the judges; right?  We need to step back and let the

4  courts duke it out with HHC legal, LAS, etc., but not

5  us."  Do you recall that?

6         A.    I don't necessarily recall it, but I see it

7  there.

8         Q.    Now, would you say Dr. Kaye or either -- Dr.

9  Kaye reaching out to the court about the medical records

10  is part of her job, per se?

11             MS. CANFIELD:  Objection as to form.  You can

12         answer.

13         A.    Yeah, I think that would be part of her job.

14         Q.    Would advocating on behalf of the defendant's

15  constitutional rights be part of Dr. Kaye's job?

16             MS. CANFIELD:  Objection as to form.  I don't

17         think it's -- objection to form.

18         A.    Well, yeah.  I'm not getting where this is --

19  when you say advocating for their constitutional rights,

20  what are you specifically referring to?

21         Q.    For example, earlier you testified that you

22  didn't believe that a defendant who might have a

23  psychiatric condition would be able to knowingly waive

24  or knowingly sign over a HIPAA release; am I right?



**BARRY WINKLER, M.D.**                               197

1      A.    Yes.

2      Q.    And wouldn't you believe -- wouldn't you

3  think that that would invoke that inmates or that

4  defendant's constitutional rights?

5           MS. CANFIELD:  Objection to form.

6      A.    I don't know whether it falls under a

7  constitutional right, but I think it's definitely a

8  questionable procedure.

9      Q.    Okay.  What constitutional rights are invoked

10 or, perhaps, touched on by the 730 process?

11          MS. CANFIELD:  Objection to form.  Are you

12      asking that as a doctor or a lawyer?

13          MS. HAGAN:  He's a forensic psychiatrist.

14      This is his job, a psychologist, whose job has

15      both a medical and legal tenants of practice.  And

16      he's both a lawyer and a psychologist.  Please

17      answer.

18          MS. CANFIELD:  That's why I asked.  Go ahead.

19      You can answer.

20          MS. HAGAN:  He can answer.

21      A.    The constitution, or at least it's been

22 determined by the Supreme Court, that it is

23 unconstitutional to prosecute someone if they don't have

24 a basic understanding of how the system works and their



198                          **BARRY WINKLER, M.D.**

1  charges against them.

2      Q.   Now, would it be part of Dr. Kaye's job or

3  any of the other directors' job to fight to ensure that

4  these protections are in place?

5          MS. CANFIELD:  Objection as to form.  You can

6      answer.

7      A.   When you say "protection," what are you

8  referring to?

9      Q.   Well, there's a constitutional protection

10  that -- you know, against, you know the due process of

11  law, right, with these inmates; right?  Would you agree?

12          MS. CANFIELD:  Objection to form.  You can

13      answer.

14      A.   There is due process rights.  Correct.

15      Q.   Now, would it be part and parcel of Dr.

16  Kaye's job to advocate for the protection of the

17  inmates' or the defendants' due process rights?

18          MS. CANFIELD:  Objection.  You can answer.

19      A.    I don't think it's any of our jobs to

20  advocate whole heart (indiscernible) or their due

21  process rights, but I think that advocating for

22  competence, appropriate completion of the exams that we

23  are directed to complete, is within our jobs and within

24  Dr. Kay's job.



```
 1        Q.   What about approaching the judges about
 2   redacted record?
 3            MS. CANFIELD:  Objection to form.
 4        A.   I absolutely believe that's within her job.
 5        Q.   So if Dr. Kaye did not approach the judge,
 6   you -- judges, you would believe she wasn't doing her
 7   job?
 8            MS. CANFIELD:  Objection to form.  You can
 9        answer.
10        A.   I wouldn't say that means she's not doing her
11   job.  But I think it is part of her job.  There's
12   nothing inappropriate by her getting the -- all of the
13   judges, contacting them.
14        Q.   Did you do that?
15        A.   I think I referred to one -- or there's one
16   email you showed where I think I had Lucrecia or
17   somebody call the judge to tell them that we were not
18   getting the records and got the judge involved.  So yes,
19   I would do it.
20        Q.   And did you know the other directors at the
21   other centers to do it?
22        A.   I don't know whether they do it or not or did
23   it or not.
24        Q.   Did CHS management ever tell you that it was
```



1  inappropriate to do that?

2          MS. CANFIELD:  Objection as to form.  You can

3      answer.

4      A.   I don't recall being told that.

5      Q.   Now, if complaining about legal violations

6  occurring as a result of violations in the

7  administration of CPL 730 beyond the scope of Dr. Kay's

8  job?

9          MS. CANFIELD:  Objection as to form.  You can

10      answer.

11     A.   You're going to have to break that down and

12  be more specific what you are referring to.

13     Q.   Specifically complaining about legal

14  violations; would that be part of Dr. Kaye's job?

15     A.   Well, what kind of legal violations?

16     Q.   Well, for example, let's say you have an

17  effort to conduct a 730 examination without two

18  evaluators.  Would that be Dr. Kaye's job to complain

19  about that?

20          MS. CANFIELD:  Objection to form.  You can

21      answer.

22     A.   To do an evaluation with one evaluator at a

23  time, you mean in separate interviews; is that what

24  you're saying?



1       Q.    No.  Just one.

2       A.    Well, that is not legal to do it that way.

3   So if it happened that way, and she was aware of it, I

4   would assume it would be part of her job to point that

5   out to someone.

6       Q.    It would?

7       A.    I'm sorry?

8       Q.    Why would it?  I mean, her job is to actually

9   evaluate the defendant.  Why should she complain if she

10  has completed her evaluation, and there wasn't a second

11  evaluator?

12          MS. CANFIELD:  Objection to form.  You can

13      answer.  Argumentative.

14      A.    Yeah.  It's confusing.  Are you referring to

15  a case that Dr. Kaye would be responsible to complete,

16  and someone does it with one evaluator?  Or are you

17  referring to her learning of somebody doing an

18  evaluation with one case that's not part of her clinic?

19      Q.    Well, I'm saying in general, if Dr. Kaye made

20  policy oriented (indiscernible), she didn't specifically

21  complain about how she administered exams or how exams

22  were administered in the Bronx.  What she complained

23  about were various violations of the 730 law.

24          MS. CANFIELD:  Objection.  Are you testifying



1          -- are you testifying, Ms. Hagan?

2               MS. HAGAN:  I'm asking for examples, and

3          that's what I'm giving him.

4      Q.    Did you ask --

5               MS. CANFIELD:  Okay.  No, you're -- you're

6          testifying.

7      Q.    Dr. Winkler, you asked for examples.  Dr.

8  Winkler, at any point, was there an effort made to do

9  examinations without records all together?

10     A.    Yes.  Some examinations are done without

11 records.

12     Q.    Okay.  Would it have been Dr. Kaye's job to

13 complain that examinations done with -- just solely on

14 the records was a violation of the CPLR?

15              MS. CANFIELD:  Objection as to form.  You can

16         answer if you're able.

17     A.    As far as I know, doing evaluations strictly

18 on the records does not violate the CPL 730 statute.

19     Q.    It doesn't.

20              Does it make it proper?

21              MS. CANFIELD:  Objection to form.  He can

22         answer.

23     A.    I don't -- it's not, in my opinion, a matter

24 of proper or improper.  I think doing -- writing



1   evaluations on -- just on records, is more difficult

2   because you need, in my experience, quite a bit more

3   information to come to a conclusion, come to an opinion,

4   rather, than you do if you are able to meet with the

5   defendant in person.

6          Q.   Dr. Kaye is aware that there are violations

7   in the administration of the CPL by CHS, and has legal

8   ramification.  Is she, as a non-officer of the court,

9   required to report this?

10             MS. CANFIELD:  Objection as to form.  I mean,

11        he's not a 30(b)(6) witness as to what his ethical

12        or legal obligations are, but you can answer, Dr.

13        Winkler, if you're able.

14         A.   I don't know if she has an obligation or not.

15         Q.   You don't know?

16         A.   I don't know what her obligation is in that

17   case.

18         Q.   Would you feel like you were obligated?

19         A.   Repeat the situation.

20         Q.   If you are aware of violations of the

21   administration of CPL 730 by CHS, and it has legal

22   ramifications, would you be required to report this?

23   Now, let's say you weren't a lawyer, would you be

24   required to report it?



**BARRY WINKLER, M.D.**

1          MS. CANFIELD:  Objection to form.  You can

2      answer, if you're able.

3      A.   I don't know if I would be required to report

4  it, but I -- depending on the violation, I might feel

5  obligated to report it.

6      Q.   Is that part of your job, Dr. Winkler?

7          MS. CANFIELD:  Objection.  Again, he's not a

8      30(b)(6) witness as to what job responsibilities

9      or the scope of his employment is or Dr. Kaye's,

10     but you can answer as best you're able, Dr.

11     Winkler.

12     A.   It's not a specific requirement of my job

13  that I'm aware of, but it's -- I think it might be an

14  ethical obligation to do it.

15     Q.   Right.  But just to be clear, you're saying

16  it might be an ethical obligation.  But it's not -- an

17  ethical obligation where?  Where, ethically, would you

18  be bound to do so, to report to CHS, if they were

19  violating the law?

20         MS. CANFIELD:  Objection as to form.  Again,

21     he's not an expert witness in ethics or the

22     requirements, job description, employment of an

23     evaluator, but go ahead.

24         MS. HAGAN:  Uh-huh.  You're coaching the



```
 1        witness.

 2              MS. CANFIELD:  No, I'm not.  I'm objecting.

 3        He's not a 30(b)(6), but go ahead, Dr. Winkler.

 4              MS. HAGAN:  Duly noted.  Speaking objection.

 5        A.   I don't know what the ethic -- there's

 6   ethical guidelines to psychiatrists and psychologists.

 7   They'd have to be reviewed so see if there's some area

 8   that appears applicable.  I mean, this is all very

 9   hypothetical and vague, so it's hard to give a direct

10   answer.

11        Q.   Have you ever seen any ethical guidelines

12   that require you, as a forensic psychiatrist, to report

13   violations of the CPL?

14              MS. CANFIELD:  Objection as to form.  He can

15        answer.

16        A.   You know, violations of the CPL is so broad.

17   So no.  In those words, no, I have not.

18        Q.   If CHS violations in administering the CPL

19   730 compromised public safety, would you be required to

20   report it?

21        A.   Compromised public safety?

22        Q.   Yes.

23        A.   I'm assuming -- I don't know.  This is --

24   when you say "compromised public safety," I'm not really
```



1  sure what you're getting at.

2         MS. CANFIELD:  Right.

3     Q.   For example, you have a -- you have a

4  defendant who is either being released due to a

5  determination of -- he has a misdemeanor.  He's found --

6  he's found unfit -- or he's found fit; right?  And he

7  wasn't found fit -- because you're asking me to provide

8  you with a scenario.  And I'm asking you what the scope

9  of your job is.  So I'm going to stop there.  What I'm

10 going to ask you is:  What is the scope of your job as

11 it pertains to the administration of discipline?

12        MS. CANFIELD:  Again, objection.  He's not a

13        30(b)(6) witness, but your personal opinion, Dr.

14        Winkler, you can provide it.

15    A.   Scope of my job that applies to what?  I

16 didn't hear the last part.

17    Q.   As far as the violations of 730.

18    A.   I can't answer that question.  I --

19    Q.   Do you have an obligation to report

20 violations of the 730 at the forensic meetings?

21    A.   What is a violation of 730?  What is that?

22 What do you mean by violation of 730?

23    Q.   If there are -- if there are -- if exams are

24 being administered in a way that's inconsistent with the



1   CPL, right, do you have an obligation to report that to

2   anyone?

3           MS. CANFIELD:  Objection again.  Same -- same

4        objection.  He's not a 30(b)(6).  But go ahead,

5        Dr. Winkler, to the extent that you can respond.

6        A.   To the extent that I can respond, if I

7   believe that someone is conducting evaluations that is

8   violating the CPL, then I would feel that, yes, that

9   should probably be recorded to someone.

10       Q.   Is that part of your job?

11          MS. CANFIELD:  Objection.  Answer if you're

12       able.

13       A.   That is part of my job.

14       Q.   Dr. Winkler, did you say that was not part of

15  your job?

16       A.   That's part of my job to report that.  Again,

17  I believe it's more of an ethical consideration.

18       Q.   But you can't cite where, what ethical

19  consideration; right?

20       A.   There's a code of ethics.  I don't have them

21  in front of me, so no, I can't.

22       Q.   If exams are wrongly used to get inmates off

23  of Rikers by calling them unfit when they are not, do

24  you have to report this?



**BARRY WINKLER, M.D.**

1              MS. CANFIELD:  Objection.  Again, he's not a

2         30(b)(6) witness.  Go ahead, Dr. Winkler.

3         A.   Could you repeat the question?  I didn't hear

4    all of it.

5         Q.   If exams are being wrongly administered to

6    get inmates off of Rikers by calling them unfit when

7    they're not, do you have to report this?

8              MS. CANFIELD:  Objection.  Go ahead.

9         A.   If I was -- if I knew that to be the -- to be

10   a fact, then I would feel, yes, I would need to report

11   that to someone.

12        Q.   Is that part of your job, Dr. Winkler?

13             MS. CANFIELD:  Objection as to form.  You can

14        answer if you're able.

15        A.   It's not specifically or explicitly stated as

16   part of my job, that I know of.

17        Q.   Now, going back to Exhibit 13, I've attached

18   -- you emailed Dr. Kaye: "I've attached my suggestions.

19   I've also emailed some links about CFR that have

20   relevant info.  I'm still looking into the HIV question.

21   Another issue is getting un-redacted records for the

22   remaining outstanding orders.  I was thinking we should

23   use -- we should have LP email that attorney at HHC,

24   tell her to get us those records ASAP.  Having LP do it

1  would send the additional message that we don't consider

2  this even worthy of an email from us, but that is just a

3  thought."  Do you recall writing that?

4        A.   I don't recall writing it, but clearly I did.

5        Q.   So what do you mean by that document?

6        A.   I think I meant that we were getting -- we

7  were not satisfied with the information from the HHC

8  attorneys.  And I think maybe we felt that we were kind

9  of being dismissed or not really capable of

10 understanding the question.  I think that's what I was

11 implying there.

12             MS. HAGAN:  Now, I'm going to go to what

13        would be Plaintiff's Exhibit 14.  And I'm going to

14        share.  Plaintiff's Exhibit 14 bears the Bates

15        Stamp Series Kaye5thProduction1 through 2.  And

16        I'm going to share the screen momentarily.

17

18             (Plaintiff's Exhibit 14, DOCUMENT BATES

19             STAMPED KAYE5THPROD001 THROUGH

20             KAYE5THPROD002, was marked for

21             identification.)

22

23        Q.   Now, the top is redacted because it's an

24 exchange between myself and Dr. Kaye.  And I'm going to



1    move to the beginning of the thread.  And the beginning

2    of the thread is dated November 16th, 2017.  You see

3    this; right?

4          A.   Yes.

5          Q.   And it's from Lucrecia Persaud to Dr. Kaye,

6    and it CC's you.  You see this; right?

7          A.   Yes.

8          Q.   And it says -- well, Ms. Persaud says, "Hi,

9    Dr. Kaye.  Today, we received redacted medical records

10   from Rikers for Mr. Cesar Mederocouret and Mr. Alberto

11   Cruz.  Thank you."  You saw that; right?

12         A.   Yes, I see it.

13         Q.   Okay.  And then you respond, Dr. Winkler, I

14   guess to Ms. Caltigirone.  Now, was this the agency

15   attorney you referenced before?

16         A.   I think it is.

17         Q.   Okay.

18         A.   It is.

19         Q.   So you say, "Hi, Ms. Caltagirone --

20   Catagirone."  I'm not sure how to pronounce the name.

21   "Please see the below.  This is an ongoing problem that

22   needs to be resolved.  The judges are becoming

23   increasingly frustrated by these delays."  Do you

24   remember this?



**BARRY WINKLER, M.D.**                          211

1       A.   I don't remember it, but I see it.

2       Q.   Do you remember the judges becoming

3   increasingly frustrated by the delays?

4       A.   I do recall that, yes.

5       Q.   Now, the delays not only affect -- affect the

6   judges.  They affect the defendants; right?

7       A.   Yes, that's correct.

8       Q.   The defendants are -- the defendants' -- the

9   defendants' attention is prolonged because they are not

10  able to proceed with the evaluation process; am I right?

11          MS. CANFIELD:  Objection.  You can answer.

12      A.   Yes, the longer the evaluation is delayed,

13  the longer they are retained.

14          MS. HAGAN:  Okay.  So then, I'm going to move

15          forward to what will be marked as Plaintiff's

16          Exhibit 15.  And it bears the Bates Stamp Series

17          NYC_80.

18

19          (Plaintiff's Exhibit 15, DOCUMENT BATES

20          STAMPED NYC_80, was marked for

21          identification.)

22

23      Q.   And for purposes of the record, NYC-80 is an

24  email that starts at the top, from Dr. Kaye to Tasha



1   Lloyd, and a number of other people, along with Tasha

2   Lloyd, Yanika King, Lucrecia Persaud, yourself, Dr.

3   Winkler, and a number of other HHC staff persons; right?

4   You see this; right?

5        A.   Yes, I see it.

6        Q.   And I'm going to scroll down to the beginning

7   of this spread so, I guess, you can have some context.

8   Now, who's Tasha Lloyd, Dr. Winkler?

9        A.   She's somebody who is associated -- it says

10  it here -- she's associated with the Mayor's Office of

11  Criminal Justice.  We refer to it as MOCJ, M-O-C-J.

12       Q.   Now, who did MOCJ -- what role did MOCJ play

13  with the court system?

14       A.   They don't necessarily play a role.  At one

15  point, MOCJ began a pilot project in the Queens Court

16  Clinic to reduce the amount of time between when a 730

17  competency evaluation was ordered, and the report was

18  actually sent to the court.

19       Q.   And was that appropriate; do you believe?

20            MS. CANFIELD:  Objection.  You can answer.

21       A.   I don't know -- I don't know if it's a matter

22  of whether it was appropriate or inappropriate.  I think

23  it's not a bad thing to try to speed up the process.  As

24  you mentioned earlier, people who are kept in jail --



1  whose evaluations are delayed are kept in jail longer.

2  So I don't think it's inappropriate to try and move

3  things quickly.

4       Q.   Do you feel that the court clinic warrants

5  trying to ensure that these evaluations should be

6  processed efficiently prior to this entity being --

7  becoming involved?

8            MS. CANFIELD:  Objection to form.  You can

9       answer.

10      A.   Well, at least speaking for the clinic, I was

11 involved in the Bronx.  I thought we were doing the best

12 job we could to move them forward.

13      Q.   Do you think anything would have made it

14 easier for you all to move the evaluations forward?

15      A.   No.  Aside from that redacted records issue,

16 which we discussed, I feel that we were moving the cases

17 as efficiently as we could, really.

18      Q.   Would staff in the Bronx -- would more staff

19 in the Bronx have been helpful?

20

21           MS. CANFIELD:  Objection to form.  You can

22      answer.

23      A.   More staff would have moved things quicker,

24 because you would have the availability of more



1  examiners; so you could see more cases.

2       Q.   On average, how many cases would an examiner

3  see per day?

4            MS. CANFIELD:  Objection to form.  Are you

5       talking about the Bronx?

6       Q.   On average, what was your experience, how

7  many how many examinations do you do in a day, Dr.

8  Winkler?

9            MS. CANFIELD:  Again, objection.  Bronx or

10      Brooklyn?

11           MS. HAGAN:  I'm speaking to Dr. Winkler.

12           MS. CANFIELD:  Okay.  Just trying to clarify.

13      Dr. Winkler, if you can answer --

14      Q.   Dr. Winkler, when you were at the Bronx, who

15  many exams did you do per day?

16      A.   We averaged about two exams a day.

17      Q.   Now, in Brooklyn, how many exams do you do

18  per day?

19      A.   We have a different number of doctors, but we

20  still try to average two exams per doctor per day.

21      Q.   Okay.  That's what I was trying to get at.

22  When you were in the Bronx, one doctor would do an

23  average of two exams a day; is that right?

24      A.   Yes.

800.DAL.8779
dalcoreporting.com



1        Q.    Okay.   That's what I wanted to get at.

2              So now, at any point, was there a discussion

3    from Dr. Kaye about her discussions about cutting

4    corners to speed up the process?  Did she address those

5    kind of concerns to you?

6        A.    I don't recall.   She might have.   I don't

7    recall honestly.

8        Q.    Do you think that there were efforts made by

9    MOCJ and/or CHS -- do you think that there were efforts

10   made by MOCJ and/or CHS to speed up the process by

11   cutting corners?

12       A.    In the Bronx or -- because MOCJ was involved

13   with Queens.   They weren't not involved with us.

14       Q.    Or just in general.

15       A.    I don't know that MOCJ -- I don't know about

16   cutting corners.   I don't know that their time frames

17   were realistic, as I said earlier.   In the Bronx, I

18   don't recall that there were attempts to cut corners

19   necessarily in -- in moving our exams along.

20       Q.    So would -- let's say, for example, doing an

21   exam based solely on the records, would that have been

22   considered cutting corners?

23             MS. CANFIELD:   Objection to form.   You can

24        answer.



1        A.   It's not an example of cutting corners, per

2   se.  If it is the only way to complete an exam, and the

3   examiners feel they have sufficient information to come

4   to an opinion, then as a last resort, I think it's

5   appropriate and not, per se, a way of cutting corners.

6        Q.   Has that ever occurred while you were there?

7        A.   I didn't hear the first part of your

8   question.

9        Q.   Has that ever occurred while you worked at

10  CHS?

11            MS. CANFIELD:  Objection to form.  You can

12       answer.

13       A.   Had what ever occurred?

14       Q.   And effort to just do an exam with just on

15  the record instead of asking for a court order?

16       A.   Have we ever -- there have been exams done on

17  records, but only if we have enough information to come

18  to the opinion.  If we don't, then the judge's advise

19  that we don't have enough information -- that we have

20  obtained the records.  We don't have enough information

21  to come to an opinion, and that the judge has the option

22  to issue a force order if they choose.  So we've never

23  been -- I've never been made to write a report or

24  records where a force order was an option.



1       Q.   Was there ever an effort -- and we talked

2   about this earlier, to -- I guess to present Mr.

3   Figueroa [ph.] to different sites so that a force order

4   process would be expedited?

5            MS. CANFIELD:  Objection to form.  You can

6       answer.

7       A.   I -- I don't understand.  Please, can you

8   rephrase it?

9       Q.   Was there a number of times that a defendant

10  would have to refuse production before a force order

11  would go into effect?

12           MS. CANFIELD:  Objection as to form.  You can

13      answer.

14      A.   Force orders, they don't go into effect.  The

15  judge has to issue it.  It's at their discretion.  We

16  would -- I think we would typically try and make two to

17  three attempts to have someone brought in to see them.

18  And then at that point, assuming that we were able to

19  get the records and the records did not contain enough

20  information to come to an opinion, we would then ask the

21  judge if they wanted to issue a force order.  And then

22  it's on the judge's discretion on that case if they want

23  to issue a force order.

24      Q.   Now, did this issue come into play in the



1   Miguel Figueroa case?

2        A.   I don't recall if he was force ordered.  He

3   -- we did eventually see him.  He might made been force

4   ordered, but I don't recall, per se, if he was or not.

5        Q.   Was there an effort to obtain a force order

6   because Mr. Figueroa had resisted production a few

7   times?

8        A.   I actually don't recall.  If he had resisted,

9   I assume that we would have asked for one, but I don't

10  recall if we did.

11       Q.   Now, at any time did Dr. Ford and/or Dr. Owen

12  seek to have, I guess, evaluations on the record, in

13  lieu of a force order?

14            MS. CANFIELD:  Objection to form.  You can

15       answer.

16       A.   I don't know about -- I can't speak for Dr.

17  Ford.  I know that Dr. Owen was very opposed to

18  requesting force orders.  And I don't know if she ever

19  did an evaluation where we would have gotten a force

20  order and did not.

21       Q.   Is it ever appropriate to ask for a force

22  order before writing a report?

23       A.   Is it ever appropriate to ask for one?

24       Q.   Let me make sure I have the question right.



800.DAL.8779
dalcoreporting.com

1          Is it appropriate to ask for a force order

2    before writing a report in opining on fitness based on

3    records alone?

4         A.   Yes, I think that's appropriate.

5         Q.   When?

6         A.   Well, I think I outlined the situation.  If

7    you made -- if the clinicians have made multiple,

8    whatever that is, typically two to three attempts -- did

9    you ask about getting a force order before getting

10   records?

11        Q.   Yes.

12        A.   I think it's appropriate.  I don't think it's

13   inappropriate to ask for a force order.  I don't know if

14   the judges would grant it if records had not been

15   obtained.  But it's the judge's discretion.  We do not

16   tell the judge to issue a force order.  It's a

17   suggestion.  There have been cases where judges have

18   issued the force order of their own initiative because

19   defendants have refused to come in, and the judges were

20   frustrated.

21             MS. HAGAN:  I'm going to show you what will

22        be marked as Plaintiff's Exhibit 17.

23

24             (Plaintiff's Exhibit 17, DOCUMENT BATES



```
 1              STAMPED NYC_1914 through NYC_1915, was
 2              marked for identification.)
 3
 4       Q.    And Plaintiff's Exhibit 17 bears the Bates
 5   Stamp Series NYC_1914 through NYC_1915.  Do you see
 6   that?
 7       A.    No, I don't see it.
 8       Q.    Let me share.  Now, do you see it?
 9       A.    Yes.
10       Q.    And for purposes of the record, the email
11   starts at the top with -- it's from Dr. Kaye to an
12   slaird@nyccourt.gov, and it CC's yourself.  Now, I'm not
13   sure who Ms. Laird is.  Do you recall?
14       A.    No.  I don't actually recall who that is.
15       Q.    So let's go down to the beginning, so you can
16   get a full context.  Would that be fair?
17       A.    Sure.
18       Q.    Okay.  So the email starts from a Wanda
19   Roberts to Ms. Persaud.  And it's regarding a CHS730
20   request.  The subject is medical record.  And it says,
21   "Good afternoon, Lucrecia.  Please review attached
22   medical records for Mr.  This is part one of the medical
23   records.  Thank you."  You see that; right?
24       A.    Yes.
```



1      Q.    And it's dated February 2nd, 2018.

2            Then we scroll -- we scroll up, and then Ms.

3      Persaud sends you an email.  I guess it must be with the

4      medical records, Dr. Winkler.  You see that; right?

5      A.    Yes.

6      Q.    And then you respond to Dr. Kaye and

7      Ms. Persaud and you say specifically -- you say, "Hi,

8      Lucrecia.  Please advise Ms. Roberts that these records

9      are useless.  They're redacted and do not include an

10     attestation/certification, which we need for the court.

11     Please advise her that we require un-redacted certified

12     records as soon as possible, since the court is

13     questioning the delay in this case."  Do you see that;

14     right?

15     A.    Yes.

16     Q.    And then Dr. Kaye writes to Ms. Laird, and

17     she tells the court -- I guess she works for the courts.

18     "They're still receiving these redacted records from

19     CHS, despite judicial orders for un-redacted records."

20     Do you require -- do you remember judicial orders for

21     un-redacted records coming to -- to the court clinic?

22     A.    I remember we were preparing orders at one

23     point.  It never said redacted records.  And at one

24     point, we actually put in the wording, which I think I



1   mentioned earlier, that we wanted, specifically,

2   non-redacted records.

3       Q.   Now, did you ever raise these concerns --

4   well, at this time, you know, Dr. Jain hadn't been

5   working there, but Dr. Ford was definitely around.  Did

6   you ever bring issues to Dr. Ford and/or Dr. MacDonald

7   about the continued production of redacted records?

8       A.   I don't remember ever raising anything with

9   Dr. MacDonald, but I believe we had a discussion about

10  it with Dr. Ford.

11      Q.   And who is we?

12      A.   That would have been Dr. Kaye and I.

13      Q.   And how did that discussion go?

14      A.   I don't remember.

15          MS. CANFIELD:  Objection to form.  You can

16      answer.

17      A.   Yeah, I don't remember any specific

18  discussion, but I'm assuming that it would have been

19  discussed with Dr. Ford, since it was a significant

20  problem.

21      Q.   Did Dr. Ford tell you that she would do

22  anything about the problem?

23      A.   I -- I don't recall what she said.

24      Q.   Did Dr. Ford have a position regarding the



```
 1    medical records?
 2         A.   I don't recall.  I actually don't recall if
 3    she had a position.  I don't believe she had a position
 4    supporting redacted records, but I don't honestly
 5    recall.
 6
 7              (Plaintiff's Exhibit 18, DOCUMENT BATES
 8              STAMPED NYC-1924 through NYC-1925, was marked
 9              for identification.)
10
11         Q.   I'm going to show you what's marked as
12    Plaintiff's Exhibit 18.  Plaintiff's Exhibit 18 bears
13    the Bates Stamp Series NYC-1924 through NYC-1925.  And
14    I'm going to share the screen.  And for purposes of the
15    record, Exhibit 18 -- at the top of Exhibit 18 is an
16    email from Dr. Kaye to you, Dr. Winkler.  And it's dated
17    February 23rd, 2018.  You see that; right?
18         A.   Yes.
19         Q.   Again, I'm going to scroll down to the
20    beginning, so you can get the full context.  Apparently,
21    this is an email from Dr. MacDonald to an Elizabeth
22    Moreira.  Do you know who Ms. Moreira is?
23         A.   She was -- I'm not sure of her current job.
24    She was a -- an administrator -- a kind of an
```

1   administrative supervisor on the forensic unit at

2   Bellevue.

3        Q.   Okay.  And Dr. MacDonald says, "Hi, Liz.  Can

4   you share with me the records you received for the cases

5   that Dr. Kaye could not complete?  Thanks, Ross."  You

6   see that; right?

7        A.   Yes.

8        Q.   And then -- now, do you recall any kind of

9   correspondence or any kind of inquiry from Dr. MacDonald

10  regarding any case you say you couldn't complete because

11  of the record?

12            MS. CANFIELD:  Objection as to form.  He can

13       answer.  It assumes facts.

14       A.   I don't recall any conversation with him, no.

15       Q.   Okay.  Now then, Ms. Moreira says to Dr.

16  MacDonald:  "It would have to be requested from the

17  clinic itself.  I can copy Melissa and the ACM, if you'd

18  like."  The ACM, who do you recall -- who is that?

19       A.   I think that would be Lucrecia Persaud,

20  Assistant Coordinating Manager, I think that was her

21  title.

22       Q.   Okay.  I wasn't sure.  But then, Dr.

23  MacDonald says, "Yes, please, to Ms. Moreira."  You see

24  that; right?



```
 1        A.    Uh-huh.  Yes.

 2        Q.    And then Ms. Moreira responds back to Dr.

 3   MacDonald, Dr. Kaye, and Ms. Persaud.  And she says. "No

 4   problem.  Do you have the defendant's name for the case

 5   in question?  I have copied Dr. Melissa Kaye and

 6   Lucrecia Persaud to this email.  To set some context,

 7   Dr. Ross MacDonald of CHS is trying to work on the

 8   redaction issue and is requesting to see the version of

 9   records we have received for outstanding cases in which

10   were redacted and therefore, left an opinion

11   un-rendered."  Do you -- you weren't here on that CC

12   just yet.  But do you remember seeing this at any point?

13        A.    I don't remember it, no.

14        Q.    So let's scroll up further.  Eventually, Dr.

15   Kaye sends this to you.  Do you recall Dr. MacDonald

16   being involved and discussing the redacted medical

17   records issues with you around this time?

18        A.    I don't recall it.  I see the email, but I

19   don't recall it.

20

21             (Plaintiff's Exhibit 19, DOCUMENTS BATES

22             STAMPED NYC_137 THROUGH NYC_138, was marked

23             for identification.)

24
```



1      Q.   Exhibit 19 bears the Bates Stamp Series

2   NYC_137 through NYC_138.  Before we get into that, I

3   would like to just follow up with the last discussion on

4   Dr. MacDonald.  Do you recall Dr. MacDonald demanding

5   that Dr. Kaye release records to him that date the Bronx

6   Court Clinic obtained their judicial subpoena for purses

7   of a CPL 730 exam?

8           MS. CANFIELD:  Objection as to form.  What?

9      Q.   I don't recall that, no.

10          MS. CANFIELD:  What are the Bates stamps?

11          MS. HAGAN:  NYC_137 to NYC-138.

12          MS. CANFIELD:  Thank you.

13      Q.   And for purposes of the record, the document

14   is from Dr. Kaye to a Ginger James at the Bronx DA, an

15   S. Gardner at the court, yourself, Dr. Winkler, and

16   Mr. Persaud.  Subject, "A Subpoena for Appearance and

17   Notes."  And I'm going to go to the bottom of the

18   exhibit and give you an opportunity to look at the

19   context.  So Ms. Persaud sends an email to Dr. Kaye on

20   March 15th, with FYI, subpoena for appearance and notes.

21   You see that, right, Dr. Winkler?

22      A.   Yes, I see it.

23      Q.   And then Dr. Kaye sends a response to an S.

24   Gardner and a Ginger James at the Bronx DA.  She has a



1    question mark.  And then she says, "Please note, as

2    previously discussed, there are serious HIPPA

3    restrictions and concerns regarding defendant's medical

4    records.  The Bronx Court Clinic can only release

5    medical records and other materials by judicial

6    subpoena.  If ADA Mortorno has further concerns or

7    questions, she may contact H&H legal department or the

8    court directly."  Do you remember that?

9         A.    I don't remember this specific instance, but

10   I remember these types of things coming up.

11        Q.    Okay.  So then Ms. Ginger -- who is Ms.

12   Ginger at the DA's office?

13        A.    Ginger James was ADA -- an ADA.  I forget.  I

14   think she had a supervisory position at some -- at some

15   level.  I forget exactly what it was.

16        Q.    Okay.  And she then responds, "Thank you for

17   reaching out to me, Dr. Kaye.  The subpoena was signed

18   by a judge, and it is returnable to the court.  Is there

19   still an issue?"  Right?  And then there's another

20   response from Dr. Kaye, and it CC's you.  "It would be

21   problematic for us to disseminate HIPPA-protected

22   information we obtained by judicial order to the DA or

23   defense directly."  Now, did you agree with this

24   position?



1       A.    Yes.

2       Q.    Okay.   Why?

3       A.    Because we are -- even though the clinic may

4   be HIPAA-exempt, that information was supplied to us by

5   judicial order.  We are not allowed to then turn around

6   and share it with somebody else without another order.

7       Q.    Now, would -- would Dr. Kaye asserting this,

8   be a part of her job?

9       A.    I would say it is, because the DA's office

10  asked for the records, and she needs to respond.

11      Q.    But then the DA's office also says that the

12  judge had signed an order to this effect.  Would that

13  still be part of Dr. Kaye's job to continue to point out

14  that this would be a problem?

15          MS. CANFIELD:  Objection to form.  You can

16      answer.

17      A.    Yes, I think it would be.

18      Q.    And what's that based on?

19      A.    I think I just said that we are not allowed

20  to share the records -- the judge -- when we get a

21  judicial order, the records are specifically to provide

22  this information about the defendant for the -- in this

23  case Bronx Court Clinic.  It's not Bronx Court Clinic

24  and anybody else who needs it.  So those records are



1    issued by judicial order directly to us.  And we are not

2    allowed to then turn around and give them to somebody

3    else, unless there's another judicial order saying,

4    okay, Bronx Court Clinic, you can now turn those records

5    over to, for example, the DA's office.

6         Q.   So then she says, "We can and will send the

7    records we used to complete our exam and our notes

8    directly to the court on Monday.  This is a serious and

9    sensitive issue, and we do not want to violate the

10   defendant's privacy rights or the initial intent of the

11   original order.  Thank you for understanding."

12              Now -- now, did you believe that this was a

13   serious and sensitive issue, Dr. Winkler?

14        A.   Yes.

15        Q.   Okay.  And did you believe the defendant's

16   privacy rights could have possibly been violated?

17        A.   Yes.

18        Q.   Now, Dr. Winkler, at any point, did you read

19   Dr. Kaye's lawsuit?

20        A.   Did I read it?

21        Q.   Yes.

22        A.   No.

23        Q.   So you've never read Dr. Kaye's lawsuit

24   against CHS and -- and any of the defendants?



230                    **BARRY WINKLER, M.D.**

```
 1        A.    No.

 2        Q.    Why not?

 3        A.    I just never have.

 4        Q.    But why?  I'm asking you why?

 5        A.    I've been very busy with my job and certain

 6   issues in my personal life and just never took the time

 7   to read it.

 8        Q.    Did you discuss it with Dr. Kaye at any

 9   point?

10        A.    I think at some point, she mentioned to me

11   that she had filed the lawsuit, yeah, when we were

12   speaking.  We haven't spoken in a while.

13        Q.    Do you know why?

14        A.    No.  I don't know why we haven't talked, but

15   I know she had told me that she filed a lawsuit.

16        Q.    And what was your reaction to that?

17        A.    I didn't necessarily have a reaction.  If she

18   feels she has legitimate claims, then she's pursuing her

19   legal options.

20              MS. HAGAN:  Why don't we take a break.

21

22              (Recess taken at 4:44 p.m. until 4:55

23              p.m.)

24
```



 1  BY MS. HAGAN:

 2       Q.   So Dr. Winkler, I wanted to talk to you about

 3  an incident that involved an Officer Ross.  Do you

 4  recall anything to that effect?

 5       A.   What was the officer's name?

 6       Q.   Officer Ross.  It was a CO and an inmate that

 7  may or may not have been properly restricted during the

 8  course of an examination.  Do you recall that?

 9            MS. CANFIELD:  Objection to form.

10       A.   No.  Not offhand, no.

11

12            (Plaintiff's Exhibit 20, DOCUMENT BATES

13            STAMPED NYC-1990 to NYC-1992, was marked for

14            identification.)

15

16            MS. HAGAN:  So I'm going to -- I'm going to

17       bring up what's marked as Plaintiff's Exhibit 20.

18       And it bears the Bates Stamp Series -- it bears

19       the Bates Stamp Series NYC-1990 to NYC-1992.  I

20       want to make sure I have the right number.  And

21       I'm not sure if you want to go through the actual

22       letter, but it's from -- it appears to be from

23       Mr. Bloom to Captains Jones and Lynch.  Do you

24       recall -- do you know who these two individuals



1       are?

2       A.   Which two individuals are you referencing?

3       Q.   Captains Jones and Lynch.

4       A.   Captains Jones and Lynch.  No, I don't.

5       Q.   Okay.  Now, you do remember working with Jeff

6  Bloom; right?

7       A.   Yes, I know Mr. Bloom.

8       Q.   Okay.  So on May 4th, 2018, Mr. Bloom says

9  that he's writing to inform you about an incident that

10 took place on May 2nd at 215 East 161st Street,

11 specifically on the third floor where the psychiatric

12 examinations take place.  My client, Mr. Was being

13 examined by Doctors Kaye and Winkler.

14      The examination had been ordered by a judge.

15 When we entered the DOC area, Officer Ross asked that

16 we show her our identification.  Each of us complied

17 with her request.  We then entered area -- interview

18 area; whereupon, the doctors commenced their

19 examination.  While I am not personally familiar with

20 DOC security protocol, I have always observed the

21 officers assigned to that particular tour perform their

22 duties in much the same way.  When we entered the

23 interview area, the defendant is always seated on the

24 wooden bench against the wall, so that she is facing

1    the door.  The defendant's left wrist is always cuffed

2    to the wall.  At the conclusion of the interview, we

3    leave the interview room, the doctor signs the papers

4    for the officer, and we are then let out of the DOC

5    area.  The officer closes and locks the door when we

6    leave.  On May 2nd, the officer, upon completion of the

7    examination asked doctors to sign the paperwork.  They

8    complied.  The officer then entered the interview room,

9    leaving us in the out -- outer area.  When one of the

10   doctors asked the officer to let us leave before she

11   uncuffed the defendant from the wall, the officer said

12   no.  She then uncuffed him from the wall and cuffed him

13   -- cuffed him behind his back.  Had he decided to do

14   so, the defendant could have run anywhere in the area

15   and could have caused serious physical injury to one of

16   us or to himself.

17        Now, do you recall anything like that happening?

18        A.   Yes, I recall the incident now.

19        Q.   Okay.  So what happened?

20        A.   It's exactly as stated in the letter,

21   actually.

22        Q.   Did you think that Mr. Bloom and/or Dr. Kaye

23   were being unfair by writing this up?

24        A.   No.



234                          **BARRY WINKLER, M.D.**

```
 1        Q.   Did you believe that Dr. -- Dr. Kaye or Dr.
 2   Bloom fostered a kind of like an adversarial or we're
 3   coming to get you kind of atmosphere in the Bronx Court
 4   Clinic?
 5             MS. CANFIELD:  Objection as to form.  You can
 6        answer.
 7        A.   We're coming to get you as to who, to anybody
 8   they interacted with or DOC?
 9        Q.   Well, just anyone who may not have been part
10   of the Legal Aid Society, or I guess, had some level of,
11   I guess, familiarity with Dr. Kaye?
12        A.   No.  I don't -- I don't have that -- I don't
13   think that's what was happening, no.
14        Q.   Did Dr. Kaye and/or Mr. Bloom target people?
15             MS. CANFIELD:  Objection to form.  You can
16        answer.
17        A.   Target people in what way?
18        Q.   Well, target any -- let's start with -- did
19   they target any other forensic evaluators with any kind
20   of reprisal or any kind of hostility?
21             MS. CANFIELD:  Objection to form.  Are we
22        talking post or pre-CHS?  You can answer, if you
23        can.
24        A.   I don't have any knowledge of any of that.
```



**BARRY WINKLER, M.D.**                235

```
1        Q.   Ever; is that right?
2             MS. CANFIELD:  Objection to form.  You can
3        answer.
4        A.   Not to my knowledge.
5        Q.   Okay.  Now, did any of the other center
6   directors approach you or talk to you, Mr. Winkler,
7   about not wanting to work with Dr. Kaye?
8             MS. CANFIELD:  Objection to form.  You can
9        answer.
10       A.   Not that I recall.
11       Q.   Was anyone intimidated by Dr. Kaye?
12       A.   Intimidated?
13       Q.   Yes.
14       A.   What do you mean by "intimidated"?  Like the
15  (indiscernible) intimidated?
16       Q.   Of the dictionary definition, nothing --
17  nothing special.  You know, sorry.
18       A.   No one has ever told me that they were
19  intimidated by Dr. Kaye.
20       Q.   You were not intimidated by Dr. Kaye; right?
21       A.   No.
22       Q.   Did Dr. Kaye ever yell at you, Dr. Winkler?
23            MS. CANFIELD:  Objection to form.  He can
24       answer.
```



**BARRY WINKLER, M.D.**

1      A.   No.  I don't recall yelling.  We would have

2   -- there were times we didn't agree on a case or

3   procedure.  We would discuss it.  I never -- I was never

4   yelled at.

5      Q.   Now, wasn't it particularly difficult to

6   staff the Bronx Court Clinic in general?

7           MS. CANFIELD:  Objection to form.  Again,

8       when?

9      A.   Right.  When are you talking about?

10      Q.   Okay.  When CHS took over the clinic, was it

11   difficult for -- was it difficult to staff the court

12   clinic?

13      A.   I -- I don't know about staffing and

14   difficulties with the clinic, because I wasn't there

15   anymore.  I went to Brooklyn.  So I don't know if it was

16   difficult or what was going on with the staffing.

17      Q.   Now, do you recall when Dr. Brayton resigned

18   from the clinic?

19      A.   I -- I don't necessarily recall.  I think it

20   might have been -- I don't know, maybe it was the end of

21   2018.  I honestly don't recall.

22      Q.   Would it be fair to say it was around

23   November of 2019?

24      A.   I don't know.



**BARRY WINKLER, M.D.**                                     237

1      Q.   And -- and do you remember when Dr. Kaye

2  resigned from CHS?

3      A.   I think it was early 2020.  I don't recall

4  that either, exactly.

5      Q.   Was there a time period between the time Dr.

6  Brayton resigned and Dr. Kaye resigned, where Dr. Kaye

7  wasn't seeing any 730s?

8      A.   I don't know.

9      Q.   Were you being called up to the Bronx to

10 provide assistance in completing 730s during that time

11 period?

12     A.   I was sent to the Bronx at some point to do a

13 case, might have been two cases.  But I don't recall --

14 I don't recall when that was.

15     Q.   Okay.  Was there ever a work stoppage, to

16 your knowledge, in the Bronx Court Clinic between

17 November of 2019 and January of 2020?

18     A.   I'm not aware of a work stoppage, no.

19     Q.   Were you aware of defendants that would

20 normally be produced in the Bronx Court Clinic being

21 produced elsewhere during that time period?

22     A.   I don't know if there was a defendant --

23 there could have been a defendant produced in Queens.  I

24 have some recollection of that, but I'm not positive.



**BARRY WINKLER, M.D.**

1        Q.   Were you -- were you aware of any backlog

2   that may have been in place at that time between

3   November of 2019 and January 2020?

4        A.   I'm not aware of any backlog.

5        Q.   Were you aware of any discussions of

6   approximately 40 cases that may not have been seen in

7   the Bronx during that period of time?

8        A.   I recall now.  I think -- I do recall hearing

9   something about that.  I think Jeff Bloom raised that or

10  mentioned that it was something that he was concerned

11  about, I believe.

12       Q.   Do you know if that was true, what he was

13  raising issues about?

14       A.   I don't know if it was true, no.

15       Q.   Did you know Mr. Bloom to write things that

16  were not true?

17       A.   No, not --

18            MS. CANFIELD:   Objection to form.  You can

19       answer.

20       A.   Not in my experience.

21       Q.   All right.  So it wasn't your experience that

22  he did write untruthful things.  How you would you

23  describe working with Jeff Bloom?

24       A.   I enjoyed working with Jeff Bloom.  I thought



```
 1   he was a good attorney and very easy to work with.
 2          Q.    Okay.  And how would you describe his quality
 3   of work?
 4          A.    Very good.  I think he's a very good attorney
 5   and always came very prepared to our evaluations.
 6          Q.    And would you say that he -- he was fair in
 7   his dealings with CHS staff?
 8                MS. CANFIELD:  Objection as to form.  You can
 9          answer.
10          A.    He was always fair, I felt, in his dealings
11   with me.
12          Q.    Okay.  Do you think that he was fair with
13   anyone else?
14          A.    Not that I ever noticed or observed.
15          Q.    Did you ever hear complaints about
16   Mr. Bloom's behavior towards CHS staff?
17          A.    No, I don't recall hearing any complaints
18   about him.
19                MS. HAGAN:  I'm going to show you what will
20          be marked as Plaintiff's Exhibit 21.  Plaintiff's
21          Exhibit 21 bears the Bates Stamp Series NYC_2739.
22
23                (Plaintiff's Exhibit 21, DOCUMENT BATES
24                STAMPED NYC_2739, was marked for
```



1          identification.)

2

3     Q.   And now, it's Bates stamped series NYC-2739.

4  And do you see the document that I'm referencing, Dr.

5  Winkler?

6     A.   Yeah, I see it now.

7     Q.   And the email starts with Ms. Swenson

8  emailing Dr. Kaye, Dr. Jain, and Clarence Muirjr.  And

9  the subject, "Question."  She says, "Hello.  I had a

10  question come up regarding who is permitted to attend

11  730 examinations in the Bronx.  I understand that the

12  general policy is that only attorneys are allowed to sit

13  in.  Would you have something in writing reflecting

14  that?  I'd like to add support to the policy.  So any

15  written information would be helpful."  You see that;

16  right?

17     A.   Yes.

18     Q.   Now, what was your dealings with Ms. Swenson?

19          MS. CANFIELD:  Objection.  You can answer.

20     A.   Well, Ms. Swenson is the administrative

21  supervisor -- she's the supervisor for the clerical

22  personnel for each of the court clinics.  So I sometimes

23  deal with her if I have questions about -- that are

24  clerical, staff.



1          Q.    Did you sign off on your clerical staff time
2    sheets?
3          A.    No, I don't.
4          Q.    And did you ever, since you have ever been at
5    the Brooklyn Court Clinic?
6          A.    No.
7          Q.    Okay.  Now, for your -- for the clinicians at
8    the clinic, do you just sign off on their time sheets?
9          A.    No.  I don't sign off on their time sheets
10   either, because they have some kind of computer issue.
11   So actually, Dr. Weisman has to sign off on them.
12         Q.    And -- and has this been the case of you not
13   signing off any of the clinician's time sheets since
14   you've been director at the Brooklyn Court Clinic?
15         A.    Yes.
16         Q.    Do you evaluate the other clinicians on site?
17         A.    When you say "evaluate," do you mean do I
18   have to prepare an annual evaluation form?
19         Q.    Yes.
20         A.    There was one year -- I believe it was one
21   year we were required to complete annual evaluations,
22   but then that has not been continued after that one time
23   that we did it.
24         Q.    Okay.  And then, did Dr. Kaye ever complain



242                    **BARRY WINKLER, M.D.**

1    to you that her managerial job functions had been taken

2    away from her?

3              MS. CANFIELD:  Objection to form.  You can

4         answer.

5         A.   Can you give me some more specifics?

6         Q.   Like, for example, it was my understanding

7    that at some point that Dr. Kaye managed Ms. Persaud.

8    Is that your understanding too?

9              MS. CANFIELD:  Objection to form.  When?  You

10        can answer.

11        A.   I believe that prior to the CHS takeover,

12   that the clerical staff of each clinic was directly

13   supervised by the clinic director.  So then yes, Dr.

14   Kaye would have supervised Ms. Persaud.

15        Q.   Now, do you, as a manager of the Brooklyn

16   Court Clinic have, I guess, access to the calendars of

17   the staff and the administrative staff and clinicians at

18   the clinic?

19        A.   You mean the assigned case -- their assigned

20   cases, that calendar?

21        Q.   Yes.

22        A.   Yes, I do.

23        Q.   Did Dr. Kaye ever complain to you that she

24   didn't have access to the calendar at her -- at her



```
 1   clinic?
 2             MS. CANFIELD:  Objection.  You can answer.
 3        A.   I -- I think she did say that at one point.
 4   Yes, I do seem to recall that.
 5        Q.   So she complained about having access to the
 6   calendar.  Do you recall how it was resolved, if it was
 7   resolved?
 8        A.   I don't know.  I don't recall, or I'm not
 9   sure I even know how it was ever resolved.
10        Q.   Now, was there ever a time where a Lorraine
11   McEvilley asked specifically that you conduct an exam
12   with Dr. Kaye?
13        A.   I do recall that, yes.
14        Q.   Do you remember exactly what the
15   circumstances were or somewhat what the circumstances
16   were?
17        A.   I -- I don't -- I don't.  If you can give me
18   some more specifics that might refresh me if I do --
19        Q.   Sure.
20        A.   -- have a memory of that.
21             MS. HAGAN:  So why don't we do this?  I'm
22        going to show you a document, what will be
23        Plaintiff's Exhibit 22.  Right.  And Plaintiff's
24        Exhibit 22 bears the Bates Stamp Series NYC_3036
```



1      and NYC_3037.

2

3            (Plaintiff's Exhibit 22, DOCUMENT BATES

4            STAMPED NYC_3036 and NYC_3037, was marked for

5            identification.)

6

7      Q.   You see that; right?

8      A.   Yes, I do see it.

9      Q.   Okay.  And for purposes -- I'm going to

10  scroll down so you can see the beginning of the thread.

11  Okay.  So the email starts from -- it starts with Dr.

12  Kaye emailing Ms. Persaud, Dr. Jain, Dr. Brayton, and

13  Ms. McEvilley.  You see this; right?

14     A.   Yes, I see it.

15     Q.   And in the subject is "Split Finding Parole

16  Case Third Evaluator Needed."  Do you see this?

17     A.   Yes.

18     Q.   And it says, "Hi, Lucrecia, will need a third

19  evaluator to complete the CPL 730 exam due to a split

20  finding.  Please coordinate with Dr. Jain to assign a

21  third evaluator."  You see that; right?

22     A.   Yes.

23     Q.   And then I would like to ask you:  How often

24  did you deal with Ms. McEvilley?  I guess it says here,



**BARRY WINKLER, M.D.**                              245

 1   she's the director of the parole revocation defense unit

 2   at Legal Aid Society.  Prior to you going on to become

 3   the director of the Brooklyn Court Clinic, how often

 4   would you interact with Ms. McEvilley?

 5       A.   I interacted with Ms. McEvilley fairly

 6   regularly.  She would sit in on any parole violation

 7   cases where a competency evaluation had been ordered.

 8       Q.   Okay.  And what was your working relationship

 9   like with Ms. McEvilley?

10       A.   Very good.

11       Q.   What did you think of Ms. McEvilley?

12       A.   I liked Ms. McEvilley.  I think she's a very

13   good lawyer, very bright.

14       Q.   Okay.  And did you think she treats the

15   staff, while you were there, fairly?

16       A.   Yes.

17       Q.   Okay.  So would you describe your

18   relationship or her relationship with any of the staff

19   as contentious?

20            MS. CANFIELD:  Objection to form.  You can

21       answer.

22       A.   No, I would not describe it as contentious.

23       Q.   Or hostile?

24            MS. CANFIELD:  Objection to form.  You can



1        answer.

2        A.    No, not hostile.

3        Q.    Okay.  So Ms. McEvilley writes to Dr. Kaye

4   and Ms. Persaud, Dr. Jain, and Dr. Brayton again, and

5   she says, "Good morning.  Regarding the split finding

6   with one of the parole cases, since a third evaluator is

7   needed, I ask that the third evaluator be someone other

8   than Dr. Jain.  It is my understanding that a forensic

9   competency evaluator cannot be a direct supervisor of

10  the second evaluator.  And since Dr. Brayton is one of

11  the evaluators on this case, and Dr. Jain is her direct

12  supervisor on this case, due to the Bronx Court Clinic

13  director, Dr. Kaye, being one of the other evaluators,

14  there would be an appearance of a conflict of interest

15  for Dr. Jain to be assigned as the third evaluator in

16  this matter."  Did you agree with Ms. McEvilley on this

17  point?

18       A.    I agree that a supervisor of another

19  clinician should not be the second evaluator on a

20  competency evaluation.

21       Q.    So you agree with her?

22       A.    Yes, I agree with her.

23             MS. CANFIELD:  Objection.

24       Q.    Then she says, "I request that if possible,



1  Dr. Barry Winkler, be third evaluator.  I am familiar

2  with his work, and I feel confident in his skill set and

3  integrity.  I am available to come to the Brooklyn Court

4  Clinic to sit in on this case, if that would help

5  facility the examination.  I guess she meant

6  "facilitate."

7       Now, Dr. Winkler, did you think that Ms.

8  McEvilley may have been overstepping her bounds by

9  requesting that you specifically sit in on the exam?

10      A.   No.  I think she's allowed to make a request

11 such as that.  I don't think it's overstepping.

12      Q.   At any point, did Ms. McEvilley or anyone

13 else state that Dr. Brayton was being remediated?

14      A.   No.

15           MS. CANFIELD:  Objection to form.

16      Q.   Did at any point, did anyone -- did Ms.

17 McEvilley or anyone else state that Dr. Brayton was

18 being remediated?

19      A.   I know that Dr. Brayton, at some point,

20 underwent additional training.  I believe the word

21 "remediated" might have been used at some point.

22      Q.   Who would have possibly used that word; do

23 you know?

24      A.   I'm not sure.



248                          **BARRY WINKLER, M.D.**

1       Q.   Would "remediated" have been the appropriate

2   word?

3       A.   I'm not exactly sure of the -- I'm not sure

4   of the exact definition of remediate.  But my

5   understanding was that she was receiving additional

6   training.

7       Q.   Okay.  Thank you.

8            Now, was there ever a time where the person

9   designated to do Dr. Brayton's performance evaluation

10  became an issue?

11           MS. CANFIELD:  Objection to form.  You can

12       answer.

13      A.   I don't know.  I don't recall.

14      Q.   You're not sure?

15      A.   Yeah.

16           MS. HAGAN:  So let's -- let's start with the

17       -- just a little bit of an overview, so we could

18       have a clear record regarding Dr. Brayton's tenure

19       at CHS.

20           So this will be Plaintiff's Exhibit 23?

21

22           (Plaintiff's Exhibit 23, DOCUMENT BATES

23           STAMPED NYC_2153, was marked for

24           identification.)



1      Q.   And Plaintiff's Exhibit 23 bears the Bates

2 Stamp Series NYC_2153.  And it's dated October 10th,

3 2018.  And I'm going to share the screen, because I'm

4 not sharing it apparently.  And now, can you see the

5 exhibit?

6      A.   I see it.

7      Q.   Okay.  So on October 10th, 2018, Dr. Kaye

8 emails you, Dr. Winkler, Dr. Mullan, and Ms. Persaud.

9 And the subject is "Psychological Testing Referral, DD."

10 Is that the initial of a defendant?

11      A.   I'm assuming that it is.

12      Q.   Okay.  She says, "Hi, Barry.  We need

13 malingering testing on (redacted).  He presented in

14 somewhat of a spurious manner with possible delusional

15 material, but it seemed overdone.  We need collateral

16 data to call it and for report preparation.  Perhaps,

17 you can use this as a training case for Dr. Brayton, and

18 she can do the testing and write up, the psychological

19 testing report."  You see that; right?

20      A.   Yes.

21      Q.   Now, would you say this is fairly early on in

22 Dr. Brayton's tenure?  This is October 2018; right?

23      A.   Yes.

24      Q.   So would you say this is around the time that



1  Dr. Brayton started at the court clinic?

2       A.   Yes, I believe it was.

3       Q.   And would you say that Dr. Kaye was being

4  helpful that -- suggesting that the testing -- that, you

5  know, that she can take part in the testing of this

6  particular defendant at this time?

7       A.   Yes.

8       Q.   Okay.  So then, you respond to Dr. Kaye:

9  "That's a good idea.  I put him on tentatively for

10 Friday, October 26.  I've cc'd Anansa on this email, so

11 she can confirm that she will be available that day."

12 You see that; right?

13      A.   Yes.

14      Q.   And she was there, of course; right?

15      A.   Yes.

16      Q.   How did this go when she sat in on that

17 training on that day?

18      A.   I don't remember what happened with that

19 case, honestly.  I don't remember if she did the testing

20 and did a report.  I don't recall.

21      Q.   Now, when you trained Dr. Brayton, was she

22 receptive to your critique and/or assessment of her

23 work?

24      A.   Yes.  I would say she was receptive.



1       Q.   But she was not receptive to Dr. Kaye's

2   assessment of her work; would that be accurate?

3            MS. CANFIELD:  Objection to form.  You can

4        answer.

5       A.   I don't know.  I can't speak to whether she

6   was receptive to Dr. Kaye or not.  I don't know.

7       Q.   Well, you testified earlier that Dr. Brayton

8   articulated to you that Dr. Kaye did not like how she

9   wrote her reports; right?

10      A.   Did not like how she conducted her interviews

11  in particular.

12      Q.   And did you like the way Dr. Brayton

13  conducted her interviews?

14           MS. CANFIELD:  Objection.  Asked and

15       answered.  You can answer.

16      A.   I did not -- I felt that she asked some

17  questions that didn't need to be asked.

18      Q.   Did you tell Dr. Brayton as much?

19      A.   I believe I did discuss it with her.

20      Q.   And how did Dr. Brayton react?

21      A.   She was receptive.

22      Q.   Did she alter or modify how she conducted the

23  interview that you gave her your case?

24      A.   She did not alter it significantly, no.



**BARRY WINKLER, M.D.**

1        Q.   And how did you react that she continued to

2   do whatever she did?

3        A.   I reinforced it with her again.

4        Q.   And then what happened?

5        A.   Well, I did not do that many interviews with

6   her.  That would have been towards the end of her

7   training with us.  And then I think not long after that,

8   she went up to the Bronx.

9        Q.   Okay.  Now, you said that at times, her

10  reports had some deficiencies.  Would that be accurate?

11       A.   Yes, that's accurate.

12       Q.   Now, did you identify these deficiencies to

13  Dr. Brayton?

14       A.   Yes.  I made corrections on some of her

15  reports.

16       Q.   And how did she react when you made these

17  corrections?

18       A.   She was receptive.

19       Q.   Did she try to improve upon her report

20  writing abilities after you critiqued her?

21       A.   I think she tried.

22       Q.   She tried.  What happened?  When you say,

23  "She tried," it suggests she wasn't successful.  What

24  happened?



1              MS. CANFIELD:  Objection to form.  He can

2        answer.

3        A.   Her report quality, in my opinion, did not

4   improve drastically.

5        Q.   And was it detrimental for her to constantly

6   perform her job?

7              MS. CANFIELD:  Objection to form.  You can

8        answer.

9        A.   I'm sorry.  Can you say it again?  I didn't

10  get all of it.

11       Q.   Are these detriments -- did it impact her

12  ability to constantly perform her job?

13       A.   It impacted her ability to clearly

14  communicate her opinion in her report.

15       Q.   Was Dr. Brayton competent?

16       A.   I think she's competent, but she had some

17  deficiencies that needed to be addressed.

18       Q.   I asked you:  Did you evaluate Dr. Brayton?

19             MS. CANFIELD:  I don't know if the court

20        reporter heard that.  It was --

21             THE REPORTER:  I got it.

22             MS. HAGAN:  I --

23             MS. CANFIELD:  I know, but can you just

24        repeat it.



254                         **BARRY WINKLER, M.D.**

```
 1        Q.   Did Dr. Brayton -- did you evaluate Dr.
 2   Brayton?
 3            MS. CANFIELD:  No.  The one before that, the
 4        competency.
 5            MS. HAGAN:  Was Dr. Brayton competent, and he
 6        said yes, but she has deficiencies.  That's what
 7        he said.  Isn't that right?
 8            MS. CANFIELD:  Did you get that.
 9            MS. HAGAN:  Yes, she got it.  Didn't you get
10        that.
11            THE REPORTER:  Yes, I did get it.
12            MS. HAGAN:  Okay.  Thank you.  I did not hear
13        it, but --
14        Q.   Now, Dr. Winkler, you evaluated Dr. Brayton,
15   didn't you?
16        A.   I supervised her work, some of it.
17        Q.   At some point, did you complete a performance
18   evaluation for Dr. Brayton?
19        A.   I don't recall if I did or not.
20
21            (Plaintiff's Exhibit 24, DOCUMENT BATES
22            STAMPED NYC_1310 and NYC_1311, was marked for
23            identification.)
24
```



**BARRY WINKLER, M.D.**                    255

1        Q.   Let me show you what's been marked as

2   Plaintiff's Exhibit 24.  Maybe this will help.

3   Plaintiff's Exhibit 24 bears Bates Stamp series]

4   NYC_1310 and NYC_1311.  And it starts with an email from

5   Dr. Kaye to Dr. Jain and Dr. Winkler.  Do you see this;

6   right?

7        A.   Yes.

8        Q.   And it's dated February 25th, 2019; is that

9   right?

10        A.   Yes.

11        Q.   And the subject is "Dr. Brayton's Employee's

12   Performance Evaluation"; right?

13        A.   Yes.

14        Q.   And I'm going to go to the bottom of it, so

15   you can get the full context.  I wouldn't want you not

16   to have that.  So at the beginning of this thread,

17   there's an email from Dr. Jain to Dr. Kaye and yourself.

18   And Dr. Jain says, "Hi, Dr. Kaye.  Dr. Brayton's

19   employee performance evaluation, blank form attached, is

20   due next Wednesday, February 27.  Would you like to

21   complete it or because she has thus far spent more time

22   in Brooklyn than Bronx, would you like Dr. Winkler and

23   me to complete it?  Either way should be fine.  And even

24   if Dr. Winkler and I formally complete it, we can



1  certainly incorporate any feedback you have regarding

2  what you have observed of her performance so far.  Thank

3  you so much."

4        Now, this is February 22nd, 2019, and we agreed

5  that Dr. Brayton started, perhaps, at court clinic with

6  CHS in the fall of 2018; would that be accurate?

7        A.   Yes, I think that's accurate.

8        Q.   So we are talking a good, let's say, three

9  months in 2018, another -- so she's been here about five

10 months.  Would that be accurate, five or six months;

11 right?

12            MS. CANFIELD:  Objection to the form.  You

13       can answer.

14       A.   That sounds accurate.

15       Q.   Okay.  Now, I'm going to scroll up.  Now, Dr.

16 Kaye responds, "Hi, Beesh.  Thanks for reaching out.

17 Dr. Brayton started in the Bronx in mid-December."

18 Would that be accurate?

19            MS. CANFIELD:  Objection to form.

20       A.   I think --

21            MS. CANFIELD:  You can answer.

22       A.   I think it is.

23       Q.   Okay.  "Since that time, as you know, I have

24       Been out due to the unexpected death of my



**BARRY WINKLER, M.D.**                    257

1   brother and FMLA to care for my child in the context of
2   the adverse shift change."  Do you recall that being
3   some of the circumstances at the time with Dr. Kaye?
4          A.    Yes, I do.
5          Q.    Okay.  As a result, I have not had much
6   opportunity to work with Dr. Brayton.  I know Barry
7   supervised and trained her for months in Brooklyn before
8   she was sent to work in the Bronx.  At this point, I
9   think it's best that you and Barry complete her
10  performance evaluation.  In so doing, please feel free
11  to incorporate the feedback I've given to both of you as
12  you see fit.  Anansa approached me last week asking if
13  she could shadow a clinician in an emergency room in
14  order to shore up her clinical skills.  I think that
15  experience could be helpful to her, but I told her she
16  would need to pursue approval and logistics of that
17  through you.  Thanks, Melissa."  You see that; right?
18         A.    Yes.
19         Q.    Now, in fact, you and Dr. Jain complete an
20  evaluation for Dr. Brayton?
21         A.    I may have.  I honestly don't remember
22  completing it, if I did.
23         Q.    What would you rate Dr. Brayton's performance
24  on?



258                     **BARRY WINKLER, M.D.**

1        A.   Rating in terms of -- what are the choices?

2        Q.   Well, there's fully competent.  You know, do

3   you remember the rating for yourself?

4        A.   I don't recall the ratings.

5        Q.   So you're not sure if you rated Dr. Brayton;

6   right?

7        A.   I don't recall.

8        Q.   And you're not sure if -- you're not sure

9   what you would have rated her; am I right?

10        A.   I don't know what the rating choices were.  I

11   don't recall --

12        Q.   Did you --

13        A.   -- (indiscernible).

14        MS. HAGAN:  I decided to modify the question.

15        Q.   Would you say that Dr. Brayton was a bad

16   employee?

17        A.   Bad employee, no.

18        Q.   Would you say that she did not perform the

19   functions of her job in a satisfactory manner?

20        A.   I would say she required improvement in how

21   she performed certain functions.

22        Q.   Would you have hired Dr. Brayton knowing how

23   she performed?

24        MS. CANFIELD:  Objection.  Hindsight's always



```
 1        20/20.  You can answer.
 2                MS. HAGAN:  Yeah.
 3        A.   If I knew the quality of her work, I probably
 4   would not have hired her -- would not hire her now.
 5        Q.   Okay.  Thank you.
 6             Now, I'm going to show you what will be
 7   marked as Plaintiff's Exhibit 25.  Plaintiff's Exhibit
 8   bears the Bates Stamp Series NYC_1649.
 9
10             (Plaintiff's Exhibit 25, DOCUMENT BATES
11             STAMPED NYC_1647, was marked for
12             identification.)
13
14        Q.   I want to make sure this is right, and let
15   me share it with you.  And Plaintiff's Exhibit 25 is an
16   email that appears to be Dr. Jain seeking some
17   contribution or some, you know, feedback from you.  And
18   it's dated August 27th, 2019.  And the subject is
19   "Anansa Supervision."  You see that; right?
20        A.   I see it.
21        Q.   Was this like -- did this happen between you
22   and Dr. Jain fairly frequently, I would say, during the
23   course of his tenure at CHS?
24        A.   Did what happen?
```



1        Q.   Did he reach out to you for guidance in

2   managing or writing things to specific employees?

3        A.   No, it wasn't a regular thing.  I think in

4   this case, since I had done some supervision of Dr.

5   Brayton, that's why he asked me if there was anything I

6   wanted to contribute or change.

7                MS. CANFIELD:  I'm sorry.  Did you say 1649?

8           It looks like 1647.  That's the proper one.

9                MS. HAGAN:  I guess it's 1647.  That's the

10          proper one.

11               MS. CANFIELD:  Thank you.  All right.  Thank

12          you.

13               MS. HAGAN:  Why we modify that for the

14          record.  Exhibit 25 is NYC_1647.  And just to make

15          sure that we don't miss anything, let's see what

16          1649 says.  We can pull that up.  For purposes of

17          -- that's an out-of-office email.  So I'm not sure

18          that that is for Dr. Winkler.  But back to --

19               MS. CANFIELD:  Okay.  I just wanted to clear

20          this up.

21        Q.   So back to 1647.  Now that Dr. Winkler had

22   some more time to think, I don't think he needed any,

23   but here it is:  "Hi, Barry, I'm going to reach out to

24   Dr. Kaye and CC you.  Anything you would like me to

1  change/add to this email?"  And then he writes, "Hi, Dr.

2  Kaye.  As we've generally discussed, we would like to

3  continue being available to provide supervision for Dr.

4  Brayton, especially on specific cases in which you may

5  not be able to do so because you are also the

6  co-examiner.  I believe Dr. Brayton?

7       Actually has some recent cases she would like to

8  discuss, and I would like -- I will try to meet with

9  her for supervision.  Please let us know, and we can

10  also be available by phone if there are any areas which

11  you think it would be useful for us to focus on with

12  her.  Thanks so much, Beesh."

13       Now, you know, does the issue -- was there a

14  concern by Dr. Kaye about supervising directly with Dr.

15  Brayton?

16       A.   I don't know of any issue other than she --

17  if she was the co-examiner, then as we discussed

18  previously, the supervisor doesn't typically or

19  shouldn't -- couldn't -- the co-examiner should not be

20  supervising the other examiner.

21       Q.   Right.  Right.  So ultimately, was there like

22  any resolution as it -- as it pertained to this issue

23  with Dr. Brayton and Dr. Kaye as far as --

24            MS. CANFIELD:  Objection.  Objection to form.



```
 1              MS. HAGAN:  I didn't even finish my question.
 2        So -- yes.
 3        Q.   Was there any resolution?
 4        A.   I'm not sure what you're asking me, if
 5   there's any resolution.
 6              (Plaintiff's Exhibit 26, DOCUMENT BATES
 7              STAMPED NYC_3111 and NYC_3112, was marked for
 8              identification.)
 9
10              MS. HAGAN:  Let's move on.  So I'm going to
11              be showing you what's marked as Exhibit 26 --
12              Plaintiff's Exhibit 26, and it bears the Bates
13              Stamp Series NYC_31 -- 3111 and NYC_3112.  And I'm
14              going to share it.
15        Q.   So here at the bottom of this email, there is
16   -- it's from Dr. Jain to Dr. Kaye and yourself.  Again,
17   this is on August 27th.  It starts with (indiscernible).
18   Now, do you kind of have to look at this?
19        A.   Well, I believe it's the same email that we
20   just reviewed.
21        Q.   Right.  But then we go up.  And then Dr. Kaye
22   responds:  "Hi, Beesh.  I'm reaching out to follow up on
23   your email about the operations and staffing at the
24   Bronx Court Clinic.  And this is on August 28th, 2019.
```

1  I'd like to find a time we can meet with Barry to come

2  up with a strategy and to develop our ability in the

3  Bronx to work as a team and discuss your expectations

4  and best practices that you'd like to use in the Bronx."

5  Do you recall that?

6      A.   This email do I recall, or do I recall

7  meeting?

8      Q.   Do you recall Dr. Kaye trying to meet with

9  the two of you to develop a team strategy on how to

10  supervise Dr. Brayton?

11      A.   I remember her talking about wanting to do

12  it, yes.

13      Q.   When did -- did the meeting ever take place?

14      A.   I don't recall if it did or not.

15      Q.   Okay.  Then Dr. Jain says, "This is a good

16  idea.  Unfortunately, I will not be able to meet today,

17  but we can try to plan something for next week, either

18  an in-person meeting or a phone call if that's more

19  conducive to get things started.  In the meantime, on a

20  separate note, would you be available for a brief phone

21  call today to get your input regarding our process for

22  getting records?  That's another topic."

23           Now, was Dr. Kaye being reasonable when

24  trying to have a meeting with you to figure out how Dr.



1   Brayton should be supervised going forward at that time?

2           MS. CANFIELD:  Objection to form.  You can

3       answer.

4       A.   I think that's a reasonable request.

5       Q.   Do you believe that Dr. Jain was being

6   cooperative with Dr. Kaye's effort in trying to resolve

7   the issues?

8       A.   If I recall, his response was that he said it

9   was a good idea to meet.

10      Q.   But did it ever happen?

11      A.   I don't recall that it happened.

12      Q.   You don't remember either way?

13          MS. CANFIELD:  Objection to form.

14      Q.   You don't remember if the meeting happened;

15  is that right?

16      A.   I don't recall having a meeting.

17      Q.   And you don't recall who evaluated Dr.

18  Brayton; is that correct?

19          MS. CANFIELD:  Objection to form.  You can

20      answer.

21      A.   The formal evaluation, I don't recall if I

22  did one for her or not.  I know the email says I did, so

23  I assume I did.  But I don't recall doing it.

24      Q.   You don't recall what you rated her at; am I



```
 1   right?
 2          A.    No, I don't recall doing it.
 3              MS. CANFIELD:  Just note for the record, I
 4         don't have a copy of that batch that you sent
 5         over.  Plaintiff's Exhibit Number 26.
 6              MS. HAGAN:  I'm not sending anymore because
 7         it's there.  You have it, you just can't find it
 8         right now.
 9              MS. CANFIELD:  Okay.  So I'll assume that you
10         will change your mind, and you'll send it over
11         later, consistent with Judge Cott's --
12              MS. HAGAN:  Because it's there in the email.
13         You need to look at your email.
14              MS. CANFIELD:  I am looking right now.  I've
15         looked twice.  It's not there.
16              MS. HAGAN:  You are stalling.  Please --
17              MS. CANFIELD:  I'm actually not.  I'm just
18         trying to be -- talking about reasonable.  I'm
19         trying to be reasonable here.  I don't have a
20         copy.  I'm noting it for the record that I don't
21         have a copy.
22              MS. HAGAN:  Because it will be a
23         misrepresentation, and if I'm right, I'm going to
24         write the court.
```



1            MS. CANFIELD:  That's fine.  If you're right,
2       I will apologize as you pointed out.  I do not see
3       it.
4            MS. HAGAN:  Stop it.
5            MS. CANFIELD:  Excuse me.
6       Q.   Now, Dr. Winkler, I'm going to show you
7  what's going to be marked as Plaintiff's Exhibit 27.
8  Plaintiff's Exhibit 27 bears the Bates Stamp Series
9  NYC_3117 to NYC_3119.
10
11            (Plaintiff's Exhibit 27, DOCUMENT BATES
12            STAMPED NYC_3117 THROUGH NYC_3119, was marked
13            for identification.)
14
15       Q.   Do you see that?
16       A.   I see an exhibit, yes.
17       Q.   Okay.  And the record -- and just for the
18  purposes of the record, it is from Dr. Jain to Dr. Ford.
19  And then it's regarding Dr. Brayton's supervision.  And
20  it's dated September 5th, 2019.  Do you see that?
21       A.   Yes.
22       Q.   Okay.  And I'm going to scroll down to the
23  bottom of the exhibit.  Do you see that?  I'm going to
24  go back to the bottom of this particular email thread,



1  not the exhibit.  I'm going to be asking about NYC_3119.

2  You see that?

3      A.   Yes.

4      Q.   Okay.  So it's Dr. Jain to Dr. Kaye and Dr.

5  Winkler.  And the subject is "Dr. Brayton's

6  Supervision."  It says, "Hi, Dr. Kaye.  As we've

7  generally discussed, we can continue being available to

8  provide supervision to Dr. Brayton, especially on

9  specific cases in which you may not be able to do so

10  because you are also the co-examiner.  I believe Dr.

11  Brayton actually has some recent cases she would like to

12  discuss," and -- you know, and this is an earlier email;

13  right?  And then it goes up to Dr. Kaye has read this

14  email already.  And go again.  And then Dr. Kaye talks

15  about being available to now speak on the phone.  Do you

16  see that?

17      A.   I see, "Can I call you at 9 a.m. if that

18  still works."

19      Q.   And that's Dr. Jain.  And then Dr. Kaye says,

20  "I'm leaving for a meeting at Water Street shortly.  Can

21  you call now or this afternoon?"  And then he says, "We

22  can try this afternoon.  No problem."  Right?  And then

23  Dr. Jain says, "Just as a brief update, as I think you

24  know, I will be helping out and seeing a case with Dr.



1  Brayton next Tuesday."  Now, Dr. Jain is Dr. Brayton's

2  supervisor; right?

3         A.   He was the supervisor for all the clinics.

4  So yeah, technically, he was one of her supervisors.

5         Q.   So wouldn't evaluating a case be problematic

6  in and of itself?

7         A.    If he was going to be the co-evaluator and to

8  also supervise her report, then that would be a problem.

9         Q.   Yes.  "Any supervision on the case, I will

10  suggest to her that she can come to either of you, Drs.

11  Kaye or Winkler, where as needed.  Otherwise, looking

12  forward to discussing the plan going forward next week.

13  All the best."  Right?

14             Now, then here it is, he says, "He plans on

15  meeting with Dr. Kaye and Winkler to discuss Dr.

16  Brayton's supervision, and let me know if you have any

17  thoughts about this."  And then you wouldn't know what

18  transpired there, and you're not sure if this meeting

19  ever took place between the three of you; am I right?

20             MS. CANFIELD:  Objection.  Asked and

21         answered.  He can answer again.

22         A.   Yeah.  I'm not sure if it ever happened.

23         Q.   Okay.  Now, at any point, did anyone from the

24  Department of Investigations ever approached you about



1    complaints involving CHS in the court clinics?

2         A.   Not allowed -- not sure if I'm allowed to

3    answer that.

4         Q.   You should be.

5         A.   I was approached at some point by the

6    Department of Investigation.

7         Q.   When was that?

8         A.   Recently.

9         Q.   How recent?

10        A.   I was contacted about a week ago.

11        Q.   And what -- to the extent that you can, what

12   did they ask you about, Dr. Winkler?

13             MS. CANFIELD:  Objection.  I think those

14        investigations are confidential.  He's not going

15        to be able to testify to it.

16        A.   I'm not going to.  They told me it was

17   confidential.  I'm not going to share that.

18        Q.   It was confidential, but were you ever

19   approached by the Board of Correction?

20        A.   Approached, no.

21        Q.   Did you receive any correspondence by the

22   Board of Correction?

23        A.   There was a complaint -- somebody filed a

24   complaint -- a defendant's family member, at some point,



1    filed a complaint.  This was a Brooklyn case.  I think

2    it involved a delay in their family member being

3    released because they claimed a report had not been sent

4    to the court when, in fact, it had, and the court was

5    unable to locate it.  That complaint was sent to the

6    Board of Corrections and was eventually passed on or

7    brought to my attention by Dr. Weisman.  And I generated

8    a response once I found out that a report had actually

9    been generated and that the court had just been unable

10   to locate it.

11        Q.   Now, did the Board of Correction approach you

12   about any of the complaints or any of the issues that

13   Dr. Kaye may have raised during the course of your

14   tenure at CHS?

15        A.   No.

16             MS. CANFIELD:  Objection.  Assumes facts.

17        Q.   You said no, right, Mr. Winkler?

18        A.   I haven't been approached by Board of

19   Correction.  It just was a complaint that filtered down

20   to them.

21        Q.   Were you ever approached by the Inspector

22   General's Office?

23        A.   No.

24        Q.   Okay.  And now, at any point, did you



**BARRY WINKLER, M.D.**                    271

1   participate in interviewing a Catalina Hackworth,

2   Doctor?

3          A.   Yes.

4          Q.   So you did; right?

5          A.   Yes.

6          Q.   And was Dr. Hackworth also retired?

7          A.   Yes.

8          Q.   Would it be fair to say that Dr. Hackworth

9   started after Dr. Kaye had left the Bronx Court Clinic?

10         A.   I don't -- I don't recall exactly when she

11  started, if there was any overlap, or it was after Dr.

12  Kaye left.

13         Q.   Would it be fair to say that Dr. Hackworth at

14  the court clinic approximately 13 months?

15         A.   I don't know.

16              MS. CANFIELD:  Objection to form.  I'm sorry,

17       Bronx Court Clinic?

18         Q.   Would it be fair to say that Dr. Hackworth

19  worked for CHS for approximately 13 months?

20         A.   I don't know how long she worked there.

21         Q.   Did Dr. Hack -- was Dr. Hackworth hired to

22  work specifically at a (indiscernible) clinic?

23         A.   She was hired to work at the Bronx Court

24  Clinic.



```
 1        Q.   Did she work there for the duration of her
 2   employment at CHS?
 3        A.   Yes.
 4        Q.   Okay.  Now, the pandemic, I guess, started in
 5   -- probably in March 2020.  Would that be accurate, Dr.
 6   Winkler?
 7        A.   It's when it impacted our operations, yes,
 8   March 2020.
 9        Q.   And how did it impact CHS operation?
10        A.   Initially, we worked completely remote from
11   home, five days a week.  And then in July, beginning of
12   July, 2020, we began a hybrid schedule of two days in
13   the office per week, three days at home.
14        Q.   Were there ever complaints that CHS weren't
15   seeing defendants for 730 examinations during the time
16   -- during the time?
17             MS. CANFIELD:  Objection.  This was after
18        (indiscernible) case employment; so it's
19        irrelevant to the litigation.
20             MS. HAGAN:  You can answer.
21        A.   There were delays, initially, in being able
22   to see any defendants because the video teleconference
23   system had to be established.  The doctors had to be
24   granted access to the virtual private network in order
```



**BARRY WINKLER, M.D.**                              273

1   to be able to access the share drive where the reports

2   are stored, and IT department took a long time to get

3   that set up quite frankly and running.

4        Q.   So when did it become operational, do you

5   know?

6        A.   I believe we started to see defendants

7   remotely about two to three weeks after we left the

8   offices and went to full remote from home.

9        Q.   When was that?

10       A.   March, I believe, 16th was our last day in

11  the office, whatever the Friday is in March.  Around the

12  16th was our last day in the office.

13       Q.   Now, Dr. Hackworth eventually left in March

14  2021.  Would that be accurate?

15       A.   She eventually left.  I don't remember

16  exactly if it was in March 2021 or not.

17       Q.   Do you remember the circumstances that led to

18  her leaving -- leaving?

19       A.   She -- my understanding is she got a new job.

20       Q.   Now, did you hear anything about Dr. Kaye's

21  resignation from (indiscernible)?

22            MS. CANFIELD:  Objection to form.  You can

23       answer.

24       A.   I was told by Dr. Jain that Dr. Kaye had



1   resigned.  I asked him why, he said he didn't know.  And

2   that's all I ever heard about it.

3        Q.   You didn't -- you didn't hear that Dr. Kaye

4   wasn't allowed to provide two weeks' notice when she

5   resigned.  Did you hear that?

6        A.   No.

7             MS. CANFIELD:  Objection to form.  You can

8        answer.

9        A.   I did not hear.

10       Q.   No; right?

11       A.   No.  I --

12            MS. CANFIELD:  No, he did not hear that.

13       A.   I did not hear it.

14            MS. HAGAN:  Let him answer the question.

15       Q.   He said no, he did not hear that.  Is that

16   right, Dr. Winkler?

17       A.   That is correct.

18       Q.   Okay.  Has it ever been your experience that

19   a person would not be allowed to give two weeks'

20   resignation when they resign from the court clinic?

21            MS. CANFIELD:  Objection to form.

22       A.   I don't know what the normal procedure is

23   when somebody resigns.

24       Q.   Has anyone resigned on the same day in your



1   experience with the court clinic?

2            MS. CANFIELD:   Objection to form.

3       A.   I haven't been involved in anybody who

4   resigned from the clinic; so I don't know.

5       Q.   Well, Dr. Ford was there when Dr. Ford

6   resigned; right?

7       A.   Dr. Ford left to go to another job.  But I

8   don't know the circumstances about how she left or what

9   happened.

10      Q.   Did Doctor -- you're not sure if Dr. Kaye --

11  Dr. Ford left the same day she issued her letter of

12  resignation?

13      A.   No, I have no idea.

14      Q.   Do you speak to Dr. Ford -- when was the last

15  time you spoke to Dr. Ford?

16      A.   I don't even remember.  Maybe a couple of

17  months after I went down to Brooklyn.  I don't even

18  remember the last time I spoke with her.

19      Q.   Are you and Dr. Ford friendly?

20      A.   Say that again.

21      Q.   Are you and Dr. Ford friendly?

22      A.   We are not friends.  I haven't spoken to her

23  since she left.

24      Q.   Okay.  And so you're not aware of any --



1    you're not aware, either way, of any instances where a

2    person would tender their letter of resignation and

3    would be told they have to leave on the spot?

4               MS. CANFIELD:  Objection.  No foundation.

5         Asked and answered.  You can answer it.

6         A.   I have not been involved with anyone who

7    resigned or tendered their resignation.  I don't know

8    what happened with other people who resigned.

9         Q.   Did you ever reach out to Dr. Kaye after she

10   resigned?

11        A.   No.

12        Q.   Why not?

13        A.   I figured if she wanted to speak with me, she

14   would contact me.

15        Q.   Weren't you and Dr. Kaye friends?

16        A.   Yes, I think we were friends.

17        Q.   So you think you were friends, but you didn't

18   reach out to your friend to find out what happened when

19   she left her job?

20               MS. CANFIELD:  Objection to form.  You can

21        answer.

22        A.   I didn't reach out.  She left precipitously.

23   I wasn't sure what happened.  I didn't get any

24   information.  I felt that if she wanted to talk to me



1   about it, she would contact me.

2          Q.    Did you and Dr. Kaye ever socialize outside

3   of work?

4          A.    Yeah.  There were some times when we did.

5          Q.    Can you describe?

6          A.    Say it again.

7          Q.    Can you describe?

8          A.    We had lunch at times.  I think we had dinner

9   a couple of times.

10         Q.    Did you ever meet Dr. Kaye's children?

11         A.    Yes, I did meet her children.

12         Q.    And how often would you say you came in

13   contact with her children?

14         A.    At one point, I saw them fairly regularly.

15   She lived close to where I lived in Manhattan.

16         Q.    So you would see them in the neighborhood?

17         A.    Yes, I would see them.  I was at her

18   apartment also, where I saw them.

19              MS. HAGAN:  So that's all I have.

20              MS. CANFIELD:  Okay.  I have a couple of

21         questions as follow-up.

22

23   EXAMINATION

24   BY MS. CANFIELD:



1        Q.   Dr. Winkler, you testified earlier that you

2   received word that Dr. Yang had called the DA's office

3   to have an inmate removed from Rikers' Island without

4   exam.  Who did you receive word from?

5             MS. HAGAN:  Objection as to form.  Compound

6        question.  Leading question.

7        Q.   You can answer.

8        A.   I don't recall if we received the information

9   from somebody in the DA's office, or it might have been

10  Jeff Bloom.  I don't honestly recall who told us that.

11       Q.   Okay.  Do you know how you were told?  Was

12  this in-person?

13            MS. HAGAN:  Objection to form.

14       A.   I believe we were told in-person.

15       Q.   Okay.  But you don't recall who, in fact, had

16  told you?

17       A.   I don't, no.

18       Q.   Is it possible that Dr. Kaye told you?

19            MS. HAGAN:  Objection to form.  Leading.

20       A.   My sense is that it was told to us by

21  somebody and that it was not Dr. Kaye telling me that it

22  happened.

23       Q.   And your sense was it someone from Bellevue

24  or was it someone on the defense side?



```
 1              MS. HAGAN:  Objection.  Leading.
 2         A.    I think it was -- my sense was that it was
 3    someone in the DA's office that called to tell us it had
 4    occurred or that it was defense, probably likely Jeff
 5    Bloom who had gotten that information somehow.
 6         Q.    Okay.  And what did you do with that
 7    information, if anything?
 8              MS. HAGAN:  Objection.
 9         A.    We -- I don't know that we did anything per
10    se, except continue with our normal procedure.  We did
11    eventually see that defendant.  We were obviously
12    concerned when we heard the information, but we did
13    eventually see that defendant and perform an evaluation
14    on him.
15         Q.    Okay.  And before you saw the defendant and
16    performed the evaluation, were you told again that you
17    needed to find this person unfit?
18              MS. HAGAN:  Objection to form.  Assumes facts
19         that weren't established.
20         A.    We -- from my recollection, whenever told
21    that we had to find the defendant unfit, we were told
22    that the DA's office had been called by Dr. Yang and
23    asked if the defendant could be found unfit by the DA's
24    office or deemed unfit and moved off Rikers.
```

1      A.    Okay.

2      Q.    So you were told this again right before you

3   were going to see or just this one instance that you

4   already testified to?

5           MS. HAGAN:  Objection.

6      A.    Just that one instance.

7      Q.    Okay.  And this particular individual was

8   never removed from Rikers without an examination --

9   examination; is that correct?

10          MS. HAGAN:  Objection.

11     A.    That's correct.  As far as I know, we saw

12  him.  We did an evaluation.

13     Q.    Okay.  I'm sorry.

14     A.    He was found fit.

15     Q.    Okay.  Thank you.  You also testified earlier

16  that Dr. Kaye complained to you about not being invited

17  to meetings.  Did you ever confirm that she had, in

18  fact, not been invited to meetings?

19          MS. HAGAN:  Objection.

20     A.    I don't know that she -- I didn't confirm per

21  se with the people who set the meetings up that she

22  wasn't invited.

23     Q.    Okay.  So it's possible that she was, in

24  fact, invited to these meetings and then for some could



800.DAL.8779
dalcoreporting.com

1   not attend?

2           MS. HAGAN:  Objection.  Leading.  That's not

3       what he testified to.

4           MS. CANFIELD:  That's a hypothetical.  It's

5       fair.

6       A.   It's possible.

7       Q.   Do you know when Dr. Kaye talked to you about

8   her shift change, do you know if she grieved this with

9   her union?

10          MS. HAGAN:  Objection.  No foundation.

11      A.   I seem to remember -- I don't know if she

12  grieved it per se, but I seem to remember her saying

13  that she had contacted doctor's counsel about it.

14      Q.   And did she ever share with you what the

15  results of that contact was?

16          MS. HAGAN:  Objection.  Assumes facts that

17      were not in evidence.

18      A.   I -- I think she said that they told her they

19  couldn't do anything about it.  I don't think she got no

20  satisfaction from it, or they told her she couldn't do

21  anything.

22      Q.   Okay.  And do you know if Dr. Kaye ever

23  requested to be switched to another line, like say, to

24  be paid by PAGNY like you were --



 1              MS. HAGAN:  Objection.

 2      Q.    -- or you are actually?

 3              MS. HAGAN:  Objection.

 4      A.    I don't know if she ever made that kind of

 5  request.

 6      Q.    Okay.  Did you ever suggest that, perhaps,

 7  she make a request to switch to another line?

 8              MS. HAGAN:  Objection.

 9      A.    I don't recall suggesting that.  I'm not sure

10  what line she would have switched to.

11      Q.    For instance, you switched at one point to

12  the PAGNY line after being on the line at Bellevue when

13  you came over to CHS.  Did you ever suggest to Dr. Kaye

14  that she, perhaps, be paid by PAGNY or switched to

15  another line?

16              MS. HAGAN:  Objection.  Dr. Winkler is not a

17         30(b)(6) witness.  He's not in the position to

18         tell you whether or not -- or tell Dr. Kaye what

19         she should do administratively with her job

20         function.

21              MS. CANFIELD:  That's correct.  I'm just

22         asking if he did.  That's a fair question.

23              MS. HAGAN:  Objection.

24      A.    I don't recall ever suggesting that to her,



1  no.

2      Q.   Okay.  Did -- did you ever suggest to Dr.

3  Kaye that she take a managerial line?

4           MS. HAGAN:  Objection.  Again, Dr. Winkler is

5       not a 30(b)(6)witness.

6           MS. CANFIELD:  That's not a proper objection.

7       I'm just asking if he did it.

8           MS. HAGAN:  (Indiscernible) Dr. Kaye about

9       administrative or job opportunities and especially

10      since Dr. Kaye's had been there for 20 years.  I

11      don't think he would be in a position to do that.

12          MS. HAGAN:  He testified he was her friend.

13      So you can answer the question, Dr. Winkler.

14      A.   I don't recall suggesting that she switch to

15  any type of a different line.

16      Q.   Do you recall her suggesting to you that she

17  was offered a managerial position and had declined it?

18          MS. HAGAN:  Objection.  Again, that assumes

19      facts that were not in -- on the record.

20          MS. CANFIELD:  You can answer.

21          MS. HAGAN:  If there's a document, that would

22      be fair to show.  Is there a document to this

23      effect, Ms. Canfield.

24      Q.   You can answer the question.



1          MS. HAGAN:  I'm asking if there's a document.

2      Is there a document, Ms. Canfield?

3          MS. CANFIELD:  I don't have a document ready,

4      but Dr. Winkler, you can answer the question.

5      A.   I don't recall if she ever mentioned that to

6  me.

7      Q.   Okay.  Now, you were also questioned earlier

8  today about the number of cases of -- 730 cases in the

9  Bronx versus the number of 730 in Brooklyn.  Prior to

10 CHS, do you have a sense of which court clinic saw the

11 most cases?  And I'm talking about 730.

12          MS. HAGAN:  Objection.  Asking him if he has

13      a workload and that he had an ability to compare

14      them to each other.

15          MS. CANFIELD:  He can answer.

16     A.   My sense is that Manhattan had the heaviest

17 workload.

18     Q.   And give a sense as to which court clinic had

19 the lightest workload.

20     A.   My sense is that it would have been Bronx or

21 Queens.

22     Q.   And what do you base this on?  Have you ever

23 seen figures, or have you been told?

24     A.   I believe some numbers would be shared at



1  certain meetings.  There were reports, I recall, in the

2  Bronx that Ms. Persaud had to prepare.  I think it was

3  monthly records of number of cases seen, and I seem to

4  recall seeing a report that had all the clinician

5  numbers on there.

6        Q.    Now, the reports that Ms. Persaud prepared

7  during the time that you were working in the Bronx Court

8  Clinic, would you or Dr. Kaye review those reports to

9  ensure their accuracy?

10       A.    I do recall reviewing some of those reports

11  to make sure they were accurate.

12       Q.    Okay.  Thank you.

13             Now, after CHS and after your promotion to

14  the director of the Brooklyn Court Clinic, were those

15  same reports generated by the administrative staff?  I'm

16  speaking specifically for the Brooklyn Court Clinic.  Do

17  you know?

18       A.    What happened was we started to institute

19  this system called iSight that I mentioned.  And to my

20  knowledge -- I think, perhaps, in the first few months

21  before iSight was formally up and running, they might

22  have continued to prepare the same reports.  But then

23  once iSight became fully operational, I think now that

24  data is generated by iSight.

1          Q.    Okay.  And the data that's generated by

2     iSight since iSight's been up and running, do you review

3     those reports before they're submitted?

4          A.    No, I don't.

5          Q.    Okay.  Do you know who does?

6                MS. HAGAN:  Objection.

7          A.    My assumption is that Ms. -- well, who would

8     submit that report in my clinic would be Ms. Stewart,

9     who is the coordinating manager.  And my assumption is

10    that Ms. Stewart forwards those reports to Ms. Swenson,

11    our supervisor, but that's an assumption that Ms.

12    Swenson reviews them.  I don't know that for a fact.

13                MS. CANFIELD:  Okay.  Thank you.

14                MS. HAGAN:  I have a few follow-up questions.

15                MS. CANFIELD:  I'm not finished yet.

16                MS. HAGAN:  Okay.  I didn't know.  I'm sorry.

17         Q.    Now, the word "remediation" has been used

18    today on several occasions.  What is remediation to you

19    as you use it?

20                MS. HAGAN:  Objection.  Asked and answered.

21                MS. CANFIELD:  You can answer.

22         A.    To me, remediation is retraining, addressing

23    an issue that needs additional training.

24         Q.    Do you see the distinction, actually, between

1   continued training and retaining?

2       A.   Yes, I do.

3       Q.   Okay.  And can I assume based on your

4   response that you see remediation as retraining and not

5   continued training; is that correct?

6       A.   Yes, that's correct.

7            MS. HAGAN:  Objection.

8            MS. CANFIELD:  Okay.  Thank you.

9       Q.   Now, who told you that Dr. Brayton was in

10  remediation?

11           MS. HAGAN:  Objection.

12      A.   It might have been Dr. Jain, but I don't

13  recall for certain.

14      Q.   Is it possible it was Dr. Kaye?

15           MS. HAGAN:  Objection.  Suggestive.

16      A.   It could have been Dr. Kaye.  I don't recall

17  who it was.

18      Q.   Is it also possible it was Mr. Bloom?

19           MS. HAGAN:  Objection.  Asked and answered.

20      He said he didn't recall.

21           MS. CANFIELD:  He can answer.

22      A.   I don't recall Mr. Bloom saying that to me.

23      Q.   Okay.  You testified earlier about some

24  inconsistency in Dr. Brayton's report as noted by a



1   judge.  Who told you that there were complaints by a

2   judge regarding Dr. Brayton's reports as being

3   inconsistent?

4          MS. HAGAN:  Objection.  Leading.  Compound

5      question.

6      A.   Dr. Kaye told me that.

7      Q.   And did you ever independently verify that?

8          MS. HAGAN:  Objection.

9      A.   I did not independently verify that, no.

10     Q.   Did you ever speak to Dr. Brayton about that

11  claim?

12     A.   No.  I don't recall speaking to her about

13  this.

14     Q.   You also testified that Dr. Brayton

15  complained to you that she felt that Dr. Kaye didn't

16  like how she conducted her interview; do you recall

17  that?

18         MS. HAGAN:  Objection.

19     A.   No.

20     Q.   You don't recall that Dr. Brayton complained

21  that she felt that Dr. Kaye didn't like how she

22  conducted the interview?

23     A.   I didn't say no.  I said I didn't recall it.

24     Q.   Okay.  Do you recall if Dr. Brayton shared



1   any specific comments or feedback that Dr. Kaye provided

2   her?

3            MS. HAGAN:  Objection.

4       A.   I don't recall specifics other than that

5   general comment about it.

6       Q.   Okay.  Do you recall her saying at any time

7   that there was a particular tone that, perhaps, was

8   dismissive from Dr. Kaye towards Dr. Brayton regarding

9   her work product?

10           MS. HAGAN:  Objection.  There's no foundation

11       for any of the questions.

12           MS. CANFIELD:  You can answer.

13      A.   I recall Dr. Brayton saying that -- something

14  to the effect that she didn't -- sometimes didn't feel

15  like she got an answer from Dr. Kaye if she had a

16  question about something.

17      Q.   Okay.  And was that just generally speaking

18  or on a particular matter that Dr. Brayton communicate

19  that to you?

20           MS. HAGAN:  Objection.

21      A.   As I recall, it was just a general -- general

22  comment, not a specific matter.

23           MS. CANFIELD:  Okay.  Thank you.

24      Q.   Now, there was also some questions and some



1  testimony by you about the recording that Dr. Kaye made

2  when evaluating Jose Gonzalez.  Would you agree, Dr.

3  Winkler, that there is a difference between making a

4  recording of an examination and making a recording of an

5  examination without consent?

6          MS. HAGAN:  Objection.  Form.

7      A.   I'm not sure I understands what you mean.

8  Can you rephrase that.

9      Q.   Sure.  There were some questions to you about

10 whether or not you thought it was proper to record an

11 evaluation.  And I want to know, is there a difference

12 between recording an evaluation when the individual is

13 aware of the recording?  And I'm speaking of the subject

14 of the evaluation, or versus when there is a recording

15 and the subject of the evaluation is unaware that the

16 evaluation is being recorded?

17         MS. HAGAN:  Objection as to form.  If you can

18     understand the question.

19     A.   I think if you -- in this type of an

20 evaluation, if you're telling someone they're being

21 recorded, I think it could potentially impact their

22 participation level.

23     Q.   Okay.  And would that be the case, regardless

24 of someone sitting for a competency -- competency



**BARRY WINKLER, M.D.**                    291

```
 1  evaluation?
 2           MS. HAGAN:  Objection.  Hypothetical.
 3       A.   Do you mean any situation where someone's
 4  told they're having a conversation that's being
 5  recorded?
 6       Q.   A situation where anyone would learn after
 7  the fact that their conversation was recorded without
 8  their consent?
 9           MS. HAGAN:  Objection.  What are we talking
10       about?  Excuse me.  During the course of a
11       forensic evaluation?
12           MS. CANFIELD:  But it's true.  But we're not
13       suggesting that inmates have lesser rights than
14       other people do, do we -- or are we.
15           MS. HAGAN:  No, but the context would be
16       different.
17           MS. CANFIELD:  I don't think Dr. Winkler has
18       answered my question.
19           MS. HAGAN:  No, he hasn't, if he understands
20       it.
21       A.   Could you please rephrase it?  I'm sorry.
22       Q.   Do you see a problem with recording in
23  evaluation without telling the subject of the evaluation
24  that's being recorded?
```



```
1              MS. HAGAN:  Objection.  Can you defined what
2         the problem is in this context?  I don't
3         understand the question.
4              MS. CANFIELD:  I'm not providing an answer.
5              MS. HAGAN:  But I'm asking you to explain it.
6              MS. CANFIELD:  You can object.  You can
7         object, but that's sufficient.
8              MS. HAGAN:  I don't understand the question.
9         I have a right to ask the same thing.
10        Q.   Dr. Winkler, you can respond.  Well, when you
11   say "a problem," are you speaking of it being illegal or
12   unethical -- or problem is a broad term.
13        Q.   How about ethical?
14        A.   It's not -- as far as I know, an ethical
15   provision to do it, as far as I'm aware.
16        Q.   And is that based on recommendations from the
17   governing bodies of forensic evaluations, or is that
18   your personal opinion?
19             MS. HAGAN:  Objection.
20        A.   Governing -- governing -- I'm sorry --
21   ethical guidelines both for psychology and psychiatry.
22        Q.   Okay.  So are you aware -- so you share an
23   opinion that differs from official CHS policy?
24             MS. HAGAN:  Objection.  We are not even sure
```



BARRY WINKLER, M.D.                     293

1        what the official CHS policy is and which -- when

2        it existed.  Are you saying that the CHS policy

3        that took place after Dr. Kaye --

4            MS. CANFIELD:  The current policy -- the

5        current policy.

6            MS. HAGAN:  When was it for?

7            MS. CANFIELD:  The current policy.

8     A.    The current policy is that we are not allowed

9  to do it, and so I would not do it because it would

10  violate the policy.

11     Q.    Okay.  But if the policy was not in place,

12  you would -- you would have no ethical dilemma or feel

13  conflicted about recording evaluation without the

14  subject of the evaluation's consent?

15            MS. HAGAN:  Objection.  Form.

16     A.    I have other reasons I wouldn't record.  I

17  don't think recording, in general, is a good idea from

18  the extent that it might set a precedent that we want

19  all evaluations recorded.  I'm not going to say I would

20  just do it.  I would have to figure out, besides --

21  based on the case if I thought it would be appropriate

22  or required or not.

23     Q.    There was some testimony earlier as well that

24  -- that Dr. Jain had destroyed his notes.  How do you



 1   know that Dr. Jain destroyed his notes?

 2              MS. HAGAN:  Objection.  Form.

 3        A.   I believe Dr. Jain said that he did not keep

 4   his notes.  That he told us that he does not keep his

 5   notes or did not then.

 6        Q.   And did he say he destroyed his notes, or he

 7   does not keep his notes in the file?

 8              MS. HAGAN:  Objection.  Leading.  He said --

 9        he already answered the question.

10              MS. CANFIELD:  He can answer again.

11        A.   I believe he said he destroys them.

12        Q.   Okay.  And -- and what context did he make

13   that comment to you?

14              MS. HAGAN:  Objection.

15        A.   If I recall correctly, there was a discussion

16   at one point about evaluators keeping notes.  Some

17   evaluators don't keep their notes.  And Dr. Jain, I

18   recall saying, that he was one of those evaluators that

19   did not keep his notes.

20        Q.   Okay.  And was this conversation, did it

21   occur before or after Dr. Kaye raised the issue

22   regarding Dr. Jain's destruction of his notes?

23              MS. HAGAN:  Objection.

24        A.   I don't recall.



1        Q.    Is it legal required that evaluators keep

2   their notes?

3            MS. HAGAN:  Objection.

4      Q.    If you know.

5            MS. HAGAN:  Objection.  Yeah.

6      A.    As far as I know, no.

7      Q.    Do you keep your notes?

8      A.    Yes.

9        Q.    You also testified to the fact that there

10  were students or fellows at the Bronx Court Clinic prior

11  to the transition to CHS.  Do you recall that?

12     A.    Yes.

13       Q.    Okay.  Were you aware that there were

14  specific complaints regarding Dr. Kaye from the fellows

15  at Albert Einstein?

16            MS. HAGAN:  Objection.  Form and foundation.

17     A.    I was not aware of that.

18       Q.    Okay.  And there was also some -- there was

19  also some testimony from you about the psychological

20  testing survey that Dr. Jain sent out, and counsel

21  showed you a copy of your completed survey.  Do you

22  recall that?

23     A.    I do.

24       Q.    Okay.  And you had testified that there was



1  slightly more psychological testing in the Bronx as
2  compared to Brooklyn.  Do you recall that?
3       A.   I do recall that.
4       Q.   Okay.  And psychological testing, that's
5  performed by the psychologist, right, not -- not the
6  psychiatrist; is that true?
7       A.   It is typically performed by psychologist.
8  Some psychiatrist received training on certain tests and
9  then administer them.
10       Q.   Okay.  Do you know if Dr. Kaye received that
11  training, so she is able to administer psychological
12  tests?
13            MS. HAGAN:  Objection.
14       A.   It's not like getting a training, and they
15  can administer all tests.  You generally need to be
16  trained on each specific test.  I don't recall if Dr.
17  Kaye had ever received any training on any psychological
18  tests.
19       Q.   Do you recall during your time at the Bronx
20  Court Clinic that Dr. Kaye ever performed psychological
21  testing?
22            MS. HAGAN:  Objection.
23       A.   I don't recall her performing any
24  psychological testing, no.



**BARRY WINKLER, M.D.**                                      297

```
 1        Q.    Thank you.  Now -- now, relatedly, there was
 2   some testimony or questions about Dr. Garcia-Mansilla.
 3   Do you recall that?
 4        A.    Yes.
 5        Q.    Now, she's -- she's a psychologist; correct?
 6        A.    Yes.
 7        Q.    Okay.  Do you have personal knowledge of Dr.
 8   Garcia-Mansilla sitting in on an evaluation?
 9             MS. HAGAN:  Objection.
10        A.    I do not have personal knowledge of that.
11        Q.    But you testified that you heard that she had
12   sat in on an evaluation; is that correct?
13             MS. HAGAN:  Objection.
14        A.    I believe I said that I heard that she wanted
15   to, or they were planning that she would.
16        Q.    And who did you hear that from?
17             MS. HAGAN:  Objection.
18        A.    I -- I don't recall if I heard that from Dr.
19   Jain or Dr. Kaye or both.  I honestly don't recall.
20        Q.    There was also an exhibit, I believe it was
21   Exhibit Number 18 where Dr. MacDonald had requested the
22   records from some of the records that Dr. Kaye did not
23   complete.  Do you recall that?
24        A.    I think that didn't relate to redacted
```



1    records.

2         Q.    Correct.  Correct.

3         A.    I remember that.

4         Q.    Okay.  Had you ever left an opinion

5    un-rendered when you were provided redacted records?

6              MS. HAGAN:  Objection.

7         A.    I believe we -- there were some cases with

8    the redacted records that led -- we did not form an

9    opinion because we could not.  So eventually, we either

10   got un-redacted records, or the judge issued a force

11   order to bring a particular defendant in.

12        Q.    Okay.  In the circumstances, did you

13   eventually complete the evaluation?

14        A.    I believe that my memory is that we did -- we

15   complete all the evaluations.  There may have been a

16   case -- every once in a while, the judge will rescind a

17   730 order.  So there may have been a case and a

18   situation where we can come to an opinion where the

19   judge rescinded the order.

20        Q.    Okay.  And are you thinking of both prior to

21   and after the CHS transition?

22              MS. HAGAN:  Objection to form.

23        A.    Yes.  It's basically been the same process,

24   both before and after CHS.



1        Q.   Did you ever learn that Mr. Bloom and Ms.
2   McEvilley were ever unhappy with CHS taking over clinic?
3             MS. HAGAN:  Objection.  No foundation.
4        A.   I think I did hear that they were unhappy
5   about that.
6        Q.   And who did you hear that from?
7             MS. HAGAN:  Objection.
8        A.   I -- I believe I heard it from Dr. Kaye, and
9   I might have heard it -- I remember hearing it from
10  Mr. Bloom on occasion -- on an occasion when I was up in
11  the Bronx doing a case.
12       Q.   Okay.  And what, specifically, did Dr. Kaye
13  say to you about Mr. Bloom and Ms. McEvilley being
14  unhappy with the condition of oversight by CHS at the
15  clinic?
16            MS. HAGAN:  Objection.
17       A.   I don't really recall the specifics.  I'm not
18  sure exactly -- I don't recall exactly why they were not
19  happy about it, or what they foresaw.  I don't really
20  recall.
21       Q.   Do you recall what Dr. Kaye reported to you
22  about their unhappiness?
23       A.   It was just general information that Lorraine
24  and Jeff -- Ms. McEvilley and Mr. Bloom were not happy



1  about it.

2       Q.   And as part of that unhappiness, did they

3  also express their displeasure with Dr. Jain?

4            MS. HAGAN:  Objection.

5       A.   I seem to remember hearing that -- I think it

6  might have been Jeff who had similar comments about the

7  length of Dr. Jain's interviews or certain questions

8  that were asked.

9       Q.   Did Dr. Kaye ever say that she was displeased

10 or unhappy with Dr. Jain?

11      A.   I don't know if I would say displeased,

12 unhappy.  I think we -- Dr. Kaye and I conduct our

13 interviews similarly.  I had discussed with Dr. Jain

14 directly how I thought his interviews were considerably

15 long.  And from what I recall, she had the same feeling

16 and opinion about his interviews.

17      Q.   Anything else about how he conducted his

18 interviews that she was unhappy about?

19           MS. HAGAN:  Objection.

20      A.   Not that I recall.

21      Q.   Same question regarding the Legal Aid

22 attorneys.  Anything else besides the length and how he

23 conducted his interviews that they were unhappy about?

24



```
 1              MS. HAGAN:  Objection.

 2      A.    Not that I recall.

 3              MS. CANFIELD:  Okay.  Thank you.

 4      Q.    Did Dr. Kaye ever talk to you about retiring?

 5              MS. HAGAN:  Objection.

 6      A.    She did talk about it at some point.  She had

 7   mentioned she might retire when she reached a certain

 8   age, I forget what that was.  She had talked about it

 9   generally.

10      Q.    Did she mention retirement around the time

11   that you learned of the transition to CHS?

12              MS. HAGAN:  Objection.  Lack foundation.

13      A.     I do remember her saying, I think she said

14   she might retire - I think she'll retire, she said in

15   August of that summer after CHS took over.

16      Q.    Did Dr. Kaye ever share with you that the

17   change in her work schedule were having an adverse

18   effect on her children's ability in school?

19              MS. HAGAN:  Objection.  Lacks foundation and

20         was not even part of the questioning today.

21         Objection.  It assumes that he has knowledge of

22         Dr. Kaye or her talking about her children.

23      A.     I don't -- I don't recall if -- I don't

24   recall if it impacted when her children had to go to
```



1    school, if that became a problem.  I don't recall

2    whether she mentioned that or not.

3              MS. CANFIELD:  All right.  I have no further

4         questions at this point.

5              MS. HAGAN:  I have a few.

6

7    FURTHER EXAMINATION

8    BY MS. HAGAN:

9         Q.   Dr. Winkler, did you have any firsthand

10   knowledge of the workload of the other clinics after CHS

11   transitioned?

12        A.   No.  I don't recall seeing any direct numbers

13   for the clinics after the CHS transition.

14        Q.   Now, you mentioned that Ms. Persaud made

15   other center managers generate reports prior to the

16   implementation of iSight; is that right?

17        A.   Yes.

18        Q.   And were you aware that the hard drive that

19   was the repository for documents for Ms. Persaud, that

20   it crashed?

21        A.   I do recall hearing that there was a computer

22   problem with --

23        Q.   Sorry.  Do you recall that there was a

24   computer problem.  Please continue.  I'm sorry.



1      A.   I recall hearing that there was a problem

2  with Ms. Persaud's computer.

3      Q.   Do you recall hearing that the reports -- the

4  retrieval (indiscernible) due to the problem on Ms.

5  Persaud's computer?

6          MS. CANFIELD:  Objection.  Lacks foundation.

7      You can answer.

8      A.   I believe I recall hearing that some

9  information was lost.

10     Q.   Now, was the -- were the other centers -- did

11 the other court clinics experience the same loss of

12 information as the Bronx Court Clinic?

13         MS. CANFIELD:  Objection.  Form.  You can

14     answer.  Again, no foundation.

15     A.   We did not have that problem in Brooklyn.  I

16 did not hear of a problem like that in Queens or

17 Manhattan.

18     Q.   Were there any backup systems for the other

19 boroughs regarding the storage information?

20         MS. CANFIELD:  Objection.  You can answer.

21     A.   I don't know if they have a backup system.

22     Q.   Now, you said that the reports -- were there

23 reports that you came across accurate, as far as

24 detailing the amount of cases that came through the


800.DAL.8779
dalcoreporting.com

1  clinician?

2        A.   The Bronx reports?

3        Q.   Yes.  Until the time you left.

4        A.   There were times when I did check them.  And

5  here and there, I would find an inaccuracy of a report

6  here or there, just a computation error, I think, by Ms.

7  Persaud.  But I think in general, they were accurate.

8        Q.   Now, Dr. Kaye's workload, specifically, was

9  it the same or the equivalent of the other directors,

10  Dr. Kaye's workload?

11            MS. CANFIELD:  Objection to form.  You can

12        answer.

13        A.   Well, the director has a number of duties

14  besides seeing cases.  So you're referring to the number

15  of cases or general duties compared to the other

16  directors.

17        Q.   Well, let's stick -- let's stick with the

18  number of cases first for a moment.  Would you say that

19  Dr. Kaye saw the same number of cases than the other

20  directors or the other clinician?

21            MS. CANFIELD:  Objection.  You can answer if

22        you're able.

23        A.   I don't know for certain.  My senses that

24  other clinics also maintained roughly a two doctor --



 1   two-case per doctor per day schedule, just what we had

 2   in the Bronx.

 3        Q.   Were the other doctors actually -- were the

 4   other clinic directors actually evaluating cases along

 5   with the other clinicians in the clinics?

 6             MS. CANFIELD:  Objection to form.  You can

 7        answer.

 8        A.   As far as I know, yes, they were.

 9        Q.   Okay.  Let's start with you.  Did you

10   evaluate cases along with the other clinicians in the

11   court clinic?

12        A.   Yes, I did.

13        Q.   And you would say the same for Dr. Owen

14   during that time period?

15        A.   As far as I know, she was seeing cases also,

16   yes.

17        Q.   And Dr. Mundy as well?

18        A.   Yes, as far as I know.

19        Q.   Okay.  And you would say that the average was

20   at least two a day; would that be accurate?

21        A.   (Indiscernible) accurate, but when we talked

22   in general about caseloads at directors' meetings, and

23   my impression was that we were all seeing roughly the

24   same per doctor -- number of cases per doctor per day.



1        Q.    Now, was the work of the Bronx Court Clinic

2   impacted by the number of staff that was present at it?

3              MS. CANFIELD:  Objection to form.  When?

4        A.    Yes.  If you could tell me when you're

5   talking about.

6        Q.    Okay.  Let's start before CHS took over.  Was

7   the Bronx Court Clinic adequately staffed before CHS

8   took over?

9              MS. CANFIELD:  Objection.  Asked and

10         answered.  You can answer again.

11       A.    Additional -- what I testified to was that

12  additional staff would allow more cases to be seen.  But

13  my recollection is that we were seeing more cases and

14  did not have significant backlog.

15       Q.    Did the Bronx clinic also see parole cases as

16  well?

17       A.    Yes, we did.

18       Q.    Now, did the other clinics see parole cases?

19       A.    No, Bronx was the only parole that sees them

20  or used to see them -- used to be the only parole.  I

21  don't know if it still has.

22       Q.    How many -- on average, how many parole cases

23  would the Bronx Court Clinic see in a given month?

24       A.    I think -- my recollection is it worked out



1    to two or three a month extra parole.

2         Q.   Now, I have questions about the clinicians

3    and -- when you hired the clinicians in general at the

4    Brooklyn Court Clinic, just I don't know Dr. Brayton,

5    did you have to give them training when they started?

6         A.   Yes.

7         Q.   Okay.  And how long did that training take

8    place?

9         A.   It depended on the experience level of the

10   clinician.  It really was open-ended.  There was no set

11   number or amount rather.  It would be -- it would depend

12   on how much experience, as I said, how quickly they

13   seemed to grasp the work and prepare their reports

14   appropriately.

15        Q.   Did Dr. Brayton require more training than

16   the other clinics that worked in the Brooklyn Court

17   Clinic that you hired?

18        A.   Yes.

19        Q.   Did any of the other clinicians at the

20   Brooklyn Court Clinic require remediation?

21             MS. CANFIELD:  Objection to form.  You can

22        answer.

23        A.   No.

24        Q.   Did any of the clinicians require additional



1  training after the initial training that you provided?

2      A.    No.

3      Q.    Did you have problems with how the other

4  clinicians wrote their reports, I guess, in the same

5  fashion as Dr. Brayton?

6      A.    No.

7      Q.    Is consent required for a court-ordered

8  examination?

9      A.    Well, the defendant can refuse to

10 participate, but then the case, in essence, goes on hold

11 until the evaluation is completed or in the rare

12 occasion where the judge withdraws the order.

13          MS. HAGAN:  Let me modify that.

14     Q.    Is consent to record required for a

15 court-ordered examination?

16     A.    I don't believe so.

17     Q.    Are you aware that New York is a one-party

18 reporting state?

19     A.    I am aware of that.

20     Q.    Now, were you treated differently after you

21 made comments on Dr. Jain's policies?

22     A.    Treated differently by who?

23     Q.    By Dr. Jain.

24     A.    No, I don't think I was.



```
 1        Q.    Were you treated differently by Dr. Ford?
 2        A.    No, I don't recall being treated differently.
 3        Q.    Were you treated any differently by Dr. Yang?
 4        A.    I've never had any actual contact with Dr.
 5   Yang, other than that one meeting where she came.
 6        Q.    Did Dr. Jain -- Dr. Jain ever treat you any
 7   differently when you voiced your, I guess, opinion as to
 8   the length and the context of his report?
 9        A.    No, he didn't.
10        Q.    Were you treated any differently after you
11   made comments about redacted records?
12        A.    No, I don't recall being treated any
13   differently.
14        Q.    Did anyone tell you you should not reach out
15   to the judges?
16        A.    I don't recall being told not to reach out to
17   the judges, no.
18        Q.    Did anyone express any concern or disdain
19   about your engagement of the defense bar?
20        A.    What do you mean by "engagement of the
21   defense bar"?
22        Q.    Like for example, it seemed like you and Dr.
23   Kaye had a pretty good rapport with Legal Aid; right?
24        A.    That's correct.
```



1      Q.   And at times, you two have probably worked to

2  coordinate your schedules, so that, you know, in a

3  fashion that was conducive and convenient for everyone;

4  is that right?

5      A.   Yes, that's correct.

6      Q.   And at times, would you share, you know,

7  literature and information in order to get feedback from

8  defense bar?

9           MS. CANFIELD:  Objection to form.  You can

10          answer.

11     A.   What -- what do you mean by literature and

12  information.

13     Q.   Well, there were probably documents that were

14  circulated within the unit; right?

15          MS. CANFIELD:  Objection.  You can answer.

16     A.   The only documents really we dealt with would

17  be the order from the court, complaint or indictment, if

18  we got a criminal history printout, and if we happen to

19  have records on a particular defendant.  Sometimes

20  defense counsel would have records that they had gotten

21  already on a defendant, that we would obtain from them.

22     Q.   And would you educate, at times, the defense

23  attorney's process, by any chance?

24     A.   Yes.  There were times where certain



**BARRY WINKLER, M.D.**                    311

1   attorneys needed some education about particulars of the

2   730.  I also recall Dr. Kaye and I doing a presentation

3   at one point.  We did a presentation for new judges at

4   one point about 730s and the court clinic.  And then we

5   did another presentation.  It was part of a larger

6   effort by the courts.  I think that was primarily for

7   defense counsel, new judges.

8            MS. HAGAN:  Well, I think that's all I have.

9       Thank you, Dr. Winkler.

10           MS. CANFIELD:  Yes, thank you.  I have

11      nothing further.  Sorry the day was so long.

12      THE REPORTER:  Would you like a copy, Ms.

13      Canfield.

14           MS. CANFIELD:  Yes.

15

16

17

18           (Time noted:  6:42 p.m.)

19

20

21

22

23

24



312

1    STATE OF NEW YORK          )

2                               )   ss:

3    COUNTY OF                  )

4

5        I, BARRY WINKLER, M.D., hereby certify

6    that I have read the pages of the foregoing

7    testimony of this deposition and hereby

8    certify it to be a true and correct record.

9

10

11                  _____

12                  BARRY WINKLER, M.D.

13

14   Sworn to before me this

15   _____day of _____, 2021.

16   _____

17       Notary Public

18

19

20

21

22

23

24



800.DAL.8779
dalcoreporting.com

```
1            I   N   D   E   X

2

3    EXAMINATION BY                            5

4    MS. HAGAN:

5    EXAMINATION                             277

6    BY MS. CANFIELD:

7    FURTHER EXAMINATION                     302

8    BY MS. HAGAN:

9    Plaintiff's Exhibit 1, DOCUMENT BATES      126

10   STAMPED NYC_125 through NYC_127, was

11   marked for identification.)

12   (Plaintiff's Exhibit 2, DOCUMENT BATES     129

13   STAMPED NYC_291 to NYC_295, was marked for

14   identification.)

15   (Defendant's Exhibit 3, DOCUMENTS BATES    135

16   STAMPED NYC_320 to NYC_329, was marked for

17   identification.)

18   (Plaintiff's Exhibit 4, DOCUMENT BATES     148

19   STAMPED NYC_464 through 466 AND NYC-471

20   through 477, was marked for

21   identification.)

22   (Plaintiff's Exhibit 5, DOCUMENT BATES     158

23   STAMPED NYC_837 through NYC_838, was

24   marked for identification.)
```

800.DAL.8779
dalcoreporting.com


DALCO

314

```
 1      (Plaintiff's Exhibit 6, DOCUMENT BATES        164
 2   STAMPED NYC_840 THROUGH NYC_842, was
 3   marked for identification.)
 4      (Plaintiff's Exhibit 7, DOCUMENT BATES        170
 5   STAMPED NYC_1188 to NYC_1190, was marked
 6   for identification.)
 7      (Plaintiff's Exhibit 8, DOCUMENT BATES        174
 8   STAMPED NYC_1268 to NYC_1269, was marked
 9   for identification.)
10      (Plaintiff's Exhibit 9, DOCUMENTS BATES       176
11   STAMPED NYC_3996 THROUGH NYC_3998,
12   NYC_3044 THROUGH NYC_3045, were marked for
13   identification.)
14      (Plaintiff's Exhibit 10, DOCUMENT BATES       180
15   STAMPED NYC-360 THROUGH NYC_363, was
16   marked for identification.)
17      (Plaintiff's Exhibit 11, DOCUMENT BATES       184
18   STAMPED NYC_1913, was marked for
19   identification.)
20      (Plaintiff's Exhibit 12, DOCUMENT BATES       188
21   STAMPED KAYE5THPROD012, was marked for
22   identification.)
23
24
```



```
 1      (Plaintiff's Exhibit 14, DOCUMENT BATES      209
 2      STAMPED KAYE5THPROD001 THROUGH
 3      KAYE5THPROD002, was marked for
 4      identification.)
 5      (Plaintiff's Exhibit 15, DOCUMENT BATES      211
 6      STAMPED NYC_80, was marked for
 7      identification.)
 8      (Plaintiff's Exhibit 17, DOCUMENT BATES      219
 9      STAMPED NYC_1914 through NYC_1915, was
10      marked for identification.)
11      (Plaintiff's Exhibit 18, DOCUMENT BATES      223
12      STAMPED NYC-1924 through NYC-1925, was
13      marked for identification.)
14      (Plaintiff's Exhibit 19, DOCUMENTS BATES     225
15      STAMPED NYC_137 THROUGH NYC_138, was
16      marked for identification.)
17      (Plaintiff's Exhibit 20, DOCUMENT BATES      231
18      STAMPED NYC-1990 to NYC-1992, was marked
19      for identification.)
20      (Plaintiff's Exhibit 21, DOCUMENT BATES      239
21      STAMPED NYC_2739, was marked for
22      identification.)
23
24
```

800.DAL.8779
dalcoreporting.com


DALCO

316

```
1      (Plaintiff's Exhibit 22, DOCUMENT BATES      244
2   STAMPED NYC_3036 and NYC_3037, was marked
3   for identification.)
4      (Plaintiff's Exhibit 23, DOCUMENT BATES      248
5   STAMPED NYC_2153, was marked for
6   identification.)
7      (Plaintiff's Exhibit 24, DOCUMENT BATES      254
8   STAMPED NYC_1310 and NYC_1311, was marked
9   for identification.)
10     (Plaintiff's Exhibit 25, DOCUMENT BATES      259
11  STAMPED NYC_1647, was marked for
12  identification.)
13     (Plaintiff's Exhibit 26, DOCUMENT BATES      262
14  STAMPED NYC_3111 and NYC_3112, was marked
15  for identification.)
16     (Plaintiff's Exhibit 27, DOCUMENT BATES      266
17  STAMPED NYC_3117 THROUGH NYC_3119, was
18  marked for identification.)
19
20
21  (EXHIBITS RETAINED BY MS. HAGAN)
22
23
24
```



800.DAL.8779
dalcoreporting.com
DALCO

```
 1                 C E R T I F I C A T I O N

 2

 3   STATE OF NEW YORK          )

 4                              )   ss:

 5   COUNTY OF WESTCHESTER      )

 6        I, MARCI LOREN DUSTIN, Court Reporter and Notary

 7   Public within and for the County of Westchester, State

 8   of New York, do hereby certify:

 9             That I reported the proceedings that are

10   hereinbefore set forth, and that such transcript is a

11   true and accurate record of said proceedings.

12             AND, I further certify that I am not related

13   to any of the parties to this action by blood or

14   marriage, and that I am in no way interested in the

15   outcome of this matter.

16             IN WITNESS WHEREOF, I have hereunto set my

17   hand.

18

19

20

21                  MARCI LOREN DUSTIN

22                    Court Reporter

23

24
```



800.DAL.8779
dalcoreporting.com
DALCO

318

```
 1                    ERRATA  SHEET

 2   Deposition of: BARRY WINKLER, M.D.

 3   Re: MELISSA KAYE vs. HEALTH AND HOSPITALS CORPORATION, et al.

 4   Date Taken: October 6, 2021

 5   Page          Line #            Correction   Reason

 6   _____      _____       _____

 7   _____      _____       _____

 8   _____      _____       _____

 9   _____      _____       _____

10   _____      _____       _____

11   _____      _____       _____

12   _____      _____       _____

13   _____      _____       _____

14   _____      _____       _____

15   _____      _____       _____

16   _____      _____       _____

17

18                           _____

19                                (Signature)

20   Sworn to before me this

21   __day of_____, 2021.

22   _____

23        Notary Public

24
```



MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

BARRY WINKLER, M.D.
October 6, 2021

**[**

**[ph] (4)**
10:2,3;155:6;217:3

**A**

**AAPL (2)**
101:6;173:18
**abilities (2)**
8:4;252:20
**ability (10)**
6:20;7:9;59:10;
114:2,11;253:12,13;
263:2;284:13;301:18
**able (25)**
6:9;40:21;50:20;
77:13;155:18;
159:12;178:11;
196:23;202:16;
203:4,13;204:2,10;
207:12;208:14;
211:10;217:18;
261:5;263:16;267:9;
269:15;272:21;
273:1;296:11;304:22
**above (2)**
32:23;104:2
**absolutely (1)**
199:4
**absorb (1)**
174:4
**abuse (9)**
110:5,15;191:7;
194:5,7,7,12,14;
195:22
**access (5)**
242:16,24;243:5;
272:24;273:1
**accessing (1)**
147:3
**accommodate (1)**
138:13
**accordance (1)**
165:12
**according (2)**
92:1,14
**accordingly (1)**
5:21
**account (2)**
188:12;190:17,17
**accuracy (1)**
285:9
**accurate (29)**
18:20;19:2;22:8,
12;37:21,24;76:11;
98:18;105:9;112:16;
145:7,11,20;170:2;

251:2;252:10,11;
256:6,7,10,14,18;
272:5;273:14;
285:11;303:23;
304:7;305:20,21
**accurately (2)**
7:10;144:15
**accused (7)**
85:18,21;122:16;
131:21,22;132:2,4
**ACM (2)**
224:17,18
**across (1)**
303:23
**action (1)**
4:19
**active (1)**
145:18
**actual (9)**
105:23;139:6;
167:22;170:23;
172:8;177:4,10;
231:21;309:4
**actually (49)**
16:15;19:14;26:12;
34:14;37:18;47:19,
22;50:8;54:16;71:15;
72:21;77:22;81:18;
88:11,17,19;89:1;
121:17;126:11;
136:23;137:1;
139:21;140:3;
152:16;156:15;
158:15;163:11;
164:9;181:13,16,19,
20;185:3;201:8;
212:18;218:8;
220:14;221:24;
223:2;233:21;
241:11;261:7;
265:17;267:11;
270:8;282:2;286:24;
305:3,4
**ADA (5)**
80:13,16;227:6,13,
13
**add (1)**
240:14
**added (1)**
110:23
**additional (16)**
46:13;67:7,10;
69:19;84:19;90:11,
22;91:2,6;209:1;
247:20;248:5;
286:23;306:11,12;
307:24
**address (6)**
43:9;142:14,15,18;

192:21;215:4
**addressed (1)**
253:17
**addressing (1)**
286:22
**adequately (3)**
66:24;67:1;306:7
**adhered (1)**
107:2
**adjust (2)**
131:5,8
**administer (9)**
3:12;82:23;83:12,
20;84:5;152:5;296:9,
11,15
**administered (12)**
4:10;5:8;83:6,10,
17;84:4;89:7;178:5;
201:21,22;206:24;
208:5
**administering (1)**
205:18
**administration (9)**
13:3;19:1;32:4;
161:10;167:15;
200:7;203:7,21;
206:11
**administrative (5)**
224:1;240:20;
242:17;283:9;285:15
**administratively (1)**
282:19
**administrator (1)**
223:24
**admission (2)**
15:5,7
**admit (1)**
28:5
**admitted (1)**
15:1
**adopt (1)**
138:11
**adult (1)**
75:5
**advantage (1)**
156:14
**adversarial (4)**
46:6;97:15,19;
234:2
**adverse (2)**
257:2;301:17
**advise (4)**
195:16;216:18;
221:8,11
**advised (1)**
26:11
**advocate (2)**
198:16,20
**advocating (3)**

196:14,19;198:21
**affect (8)**
6:20;7:9;8:4;
125:13,16;211:5,5,6
**affidavit (2)**
181:8;182:7
**Affiliate (1)**
62:23
**afternoon (3)**
220:21;267:21,22
**afterwards (1)**
99:13
**again (65)**
7:20;12:12;27:7;
28:12;29:4;50:21;
57:11;67:15;75:23;
80:6,7;83:24;85:13;
86:14;93:16;94:16;
108:8;127:16;134:6;
139:10,22;145:12;
159:18;162:24;
163:18,18;164:10;
171:15;172:14,20;
175:3;176:19;180:3,
8,9,14,19;182:17,17;
190:9;193:18;204:7,
20;206:12;207:3,16;
208:1;214:9;223:19;
236:7;246:4;252:3;
253:9;262:16;
267:14;268:21;
275:20;277:6;
279:16;280:2;283:4,
18;294:10;303:14;
306:10
**against (9)**
4:5;100:11;101:12;
192:16;196:1;198:1,
10;229:24;232:24
**age (2)**
63:2;301:8
**ago (3)**
36:21;106:12;
269:10
**agree (24)**
4:13;51:24;52:1,4;
55:14;79:16;94:23;
107:20;118:13,16;
140:3;141:1;159:9;
175:23;176:3,4;
198:11;227:23;
236:2;246:16,18,21,
22;290:2
**AGREED (7)**
3:1,6,10;33:8;

113:2;192:18;256:4
**agreement (8)**
58:16,18,20;116:9,
9;177:13,17,24
**agreements (3)**
178:4,7,10
**ahead (21)**
56:17;57:1,5,9;
81:12;88:9;106:6;
108:1;114:20;118:2;
156:6;159:15;
163:20;165:14;
164:4;197:18;
204:23;205:3;207:4;
208:2,8
**Aid (11)**
47:6;48:4,11;
49:11;50:1;92:6;
127:19;234:10;
245:2;300:21;309:23
**al (2)**
4:6;10:4
**Alan (3)**
17:3,6;20:16
**Albert (2)**
149:15;295:15
**Alberto (1)**
210:10
**alcoholic (1)**
8:14
**Alex (3)**
107:13;172:17;
173:13
**allegations (1)**
131:11
**alleged (1)**
180:17
**allegedly (3)**
98:17;101:1;135:4
**allergic (1)**
59:7
**allergy (1)**
59:8
**allow (7)**
5:19;110:14;
128:20;138:9;162:2;
165:4;306:12
**allowed (18)**
127:4;130:9,11;
153:15;161:11,17;
168:4;179:3;228:5,
19;229:2;240:12;
247:10;269:2,2;
274:4;19;293:8
**allowing (3)**
128:3,10,22
**alone (1)**
219:3
**along (11)**

19:24;52:19,23,24;
122:14;123:17;
145:15;212:1;
215:19;305:4,10
**alter (2)**
251:22,24
**altered (1)**
116:13
**alternative (3)**
161:15;167:16;
168:2
**always (17)**
25:19;48:7;53:20;
60:9;87:17;95:5;
111:16;120:10;
159:12,13;179:6;
232:20,23;233:1;
239:5,10;258:24
**ammunition (1)**
193:20
**among (2)**
39:12;129:21
**amongst (2)**
48:21;189:5
**amount (8)**
6:4;76:20;86:2;
160:1;192:6;212:16;
303:24;307:11
**Anansa (3)**
250:10;257:12;
259:19
**and/or (18)**
49:23;50:23;88:24;
91:20;116:15;
140:20;142:12;
154:23;155:15;
192:20;193:21;
215:9,10;218:11;
222:6;233:22;
234:14;250:22
**animosity (1)**
42:6
**annual (2)**
241:18,21
**annually (1)**
66:21
**answered (20)**
5:24;12:12;85:13;
86:14;154:22;
172:14,20;176:19;
180:3,8,14,19;
251:15;268:21;
276:5;286:20;
287:19;291:18;
294:9;306:10
**anticipate (1)**
194:17
**anticipated (2)**
76:21;143:1

**Antonio (2)**
137:6,11
**anymore (5)**
94:11,14;98:3;
236:15;265:6
**apartment (1)**
277:18
**apologize (4)**
148:14;181:15,21;
266:2
**Apparently (2)**
223:20;249:4
**appear (1)**
38:14
**Appearance (3)**
226:16,20;246:14
**appeared (1)**
43:8
**appears (6)**
137:1;139:2;
148:20;205:8;
231:22;259:16
**applicable (5)**
140:4;154:16,17;
159:14;205:8
**applied (4)**
16:11;44:16;63:12;
194:12
**applies (1)**
206:15
**approach (14)**
19:23;50:8,16;
55:19;92:7;102:15;
121:16;125:3,20;
160:11;182:10;
199:5;235:6;270:11
**approached (10)**
20:2;41:8;112:7;
257:12;268:24;
269:5,19,20;270:18,
21
**approaching (1)**
199:1
**appropriate (20)**
7:11;24:13;28:10;
102:3,7,10;128:12;
159:14;195:17;
198:22;212:19,22;
216:5;218:21,23;
219:1,4,12;248:1;
293:21
**appropriately (2)**
83:11;307:14
**approval (2)**
190:19;257:16
**approve (1)**
102:12
**approved (2)**
61:1,2

**approximate (2)**
6:10;21:6
**approximately (3)**
238:6;271:14,19
**April (9)**
19:14;22:6,13,17;
71:7,9;72:6,12,20
**area (10)**
10:8;50:3;205:7;
232:15,17,18,23;
233:5,9,14
**areas (1)**
261:10
**argue (1)**
161:16
**argument (2)**
141:17;168:4
**Argumentative (1)**
201:13
**arguments (1)**
196:1
**arose (1)**
127:9
**around (21)**
15:23;21:7,16;
24:8;25:14;42:6;
61:23;62:1;63:16;
64:4;94:16;115:18;
147:19;222:5;
225:17;228:5;229:2;
236:22;249:24;
273:11;301:10
**arraignment (1)**
39:5
**arrangement (1)**
64:8
**arrive (1)**
95:23
**article (7)**
126:17,19,22;
127:11,21;128:6,12
**articulated (1)**
251:8
**as- (1)**
132:5
**ASAP (1)**
208:24
**Aside (1)**
213:15
**aspect (1)**
107:3
**asserting (1)**
228:7
**assess (3)**
83:7;145:7;155:5
**assessment (5)**
82:14;155:1;159:3;
250:22;251:2
**assign (1)**

244:20
**assigned (6)**
11:13;47:8;232:21;
242:19,19;246:15
**assistance (2)**
59:11;237:10
**Assistant (1)**
224:20
**assisted (2)**
42:24;43:5
**associated (3)**
116:6;212:9,10
**assume (7)**
85:4;104:1;201:4;
218:9;264:23;265:9;
287:3
**assumed (2)**
43:17;157:16
**assumes (6)**
224:13;270:16;
279:18;281:16;
283:18;301:21
**assuming (11)**
9:15;12:9;18:22;
33:8;152:2;155:13;
162:7;205:23;
217:18;222:18;
249:11
**assumption (4)**
97:10;286:7,9,11
**astray (1)**
60:6
**atmosphere (1)**
234:3
**attached (6)**
151:23;164:3;
208:17,18;220:21;
255:19
**attachment (1)**
138:8
**attempt (2)**
67:24;174:7
**attempted (2)**
29:15;47:17
**attempts (3)**
215:18;217:17;
219:8
**attend (2)**
240:10;281:1
**attended (1)**
15:2
**attention (12)**
9:7;64:18;122:15;
132:19,24;168:12;
178:18;188:1;
193:19;196:1;211:9;
270:7
**attestation/certification (1)**
221:10

**attitude (5)**
112:1;124:23;
125:4,5,13
**attorney (16)**
4:13;47:9,14,19,19,
21;48:8,12;127:5;
128:20;141:1;
167:17;208:23;
210:15;239:1,4
**attorneys (17)**
3:2;46:20;47:8,8;
48:6,10;126:24;
127:2,18;128:3,22;
161:9;184:3;209:8;
240:12;300:22;311:1
**Attorney's (3)**
11:14;29:6;310:23
**attract (1)**
68:8
**August (9)**
148:11;162:8;
163:12;185:7;187:9;
259:18;262:17,24;
301:15
**authority (1)**
4:12
**authorization (1)**
139:17
**authorized (1)**
3:12
**availability (1)**
213:24
**available (12)**
16:1;24:19;44:24;
167:16;168:2;247:3;
250:11;261:3,10;
263:20;267:7,15
**average (7)**
66:13;214:2,6,20,
23;305:19;306:22
**averaged (2)**
66:11;214:16
**aware (43)**
59:1;62:3,6;64:12;
70:4;99:8,10,17;
101:18;114:8;
131:10;132:2,3,4,8,
13,18;146:16;
168:18;169:8,12;
176:16,20;185:10;
201:3;203:6,20;
204:13;237:18,19;
238:1,4,5;275:24;
276:1;290:13;
292:15,22;295:13,17;
302:18;308:17,19
**away (1)**
242:2

Min-U-Script®

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

BARRY WINKLER, M.D.
October 6, 2021

# B

**bachelor's (1)**
13:2
**back (33)**
28:1;38:19;63:2;
67:14;80:5;93:11,14;
105:2,11,14,16,19;
109:1;125:17;131:3;
161:23,23;162:1;
166:12,24;167:13;
171:19,20;190:22;
191:4,4;196:3;
208:17;225:2;
233:13;260:18,21;
266:24
**backlog (6)**
43:7,9,14;238:1,4;
306:14
**backtrack (3)**
20:14;66:3;70:8
**backup (2)**
303:18,21
**bad (3)**
212:23;258:15,17
**Badaracco (2)**
23:2,5
**Badaracco's (1)**
23:3
**banter (1)**
69:7
**bar (3)**
309:19,21;310:8
**Barber (2)**
14:5;133:8
**Barry (11)**
4:4,20,20,21;
161:17;247:1;
249:12;257:6,9;
260:23;263:1
**base (1)**
284:22
**based (13)**
47:13;62:13;84:6;
85:1;115:21;123:1;
152:8;215:21;219:2;
228:18;287:3;
292:16;293:21
**basic (3)**
179:10,11;197:24
**basically (8)**
5:21;38:11;86:11;
110:4;178:12;185:8;
186:9;298:23
**basis (5)**
15:6;17:8;18:8;
141:3,10
**batch (1)**

265:4
**BATES (60)**
126:3,8;129:6,10;
135:23;136:3,7;
137:3;148:1,5;
157:22;158:1;
164:21;165:2;
169:22;170:1,5;
174:21;175:2;176:8,
24;177:2;180:22;
181:3;184:23;185:5;
188:3,5;189:14;
193:6,10;209:14,18;
211:16,19;219:24;
220:4;223:7,13;
225:21;226:1,10;
231:12,18,19;239:21,
23;240:3;243:24;
244:3;248:22;249:1;
254:21;255:3;259:8,
10;262:6,12;266:8,11
**bathroom (3)**
92:17,20;166:10
**bear (1)**
93:16
**bears (27)**
126:8;129:10;
136:3,7;148:5;
157:22;165:2;
169:22;175:1;181:2;
185:5;188:3;193:10;
209:14;211:16;
220:4;223:12;226:1;
231:18,18;239:21;
243:24;249:1;255:3;
259:8;262:12;266:8
**became (10)**
20:23;21:1;62:7;
100:18;150:5,8;
151:9;248:10;
285:23;302:1
**become (5)**
54:13;99:8,10;
245:2;273:4
**becoming (6)**
54:15,21;100:22;
210:22;211:2;213:7
**Beesh (6)**
158:17,20;182:8;
256:16;261:12;
262:22
**began (6)**
15:11;23:13,14;
109:3;212:15;272:12
**begin (3)**
6:15;172:12;
190:18
**beginning (20)**
41:16,16;69:11,18;

90:18;95:17;136:14;
145:16;175:7;
179:22;193:15,16;
210:1,1;212:6;
220:15;223:20;
244:10;255:16;
272:11
**begins (2)**
136:10,23
**behalf (2)**
4:18;196:14
**behavior (3)**
27:23;132:13;
239:16
**behind (2)**
98:16;233:13
**Bellevue (27)**
13:12,23;14:12;
15:9,10,12,17;16:9;
17:7;20:24;28:1,1,3,
5;40:19;41:3;63:9,
12,23,24;149:12,14;
153:14;192:4;224:2;
278:23;282:12
**Bellevue's (1)**
15:21
**below (1)**
210:21
**bench (1)**
232:24
**beneficial (2)**
25:7;155:11
**benefit (1)**
63:3
**besides (6)**
8:6;67:8;127:11;
293:20;300:22;
304:14
**best (8)**
129:18;138:14;
152:4;204:10;
213:11;257:9;263:4;
268:13
**better (6)**
49:9;87:17;160:17;
161:5;167:10;182:10
**beverages (1)**
8:14
**beyond (1)**
200:7
**biggie (1)**
159:8
**bit (11)**
34:13;51:21;81:18;
88:6;95:8;138:13;
151:11;152:16;
183:1;203:2;248:17
**blank (1)**
255:19

**blanket (2)**
101:11,15
**Bloom (20)**
92:8;231:23;232:6,
7,8;233:22;234:2,14;
238:9,15,23,24;
278:10;279:5;
287:18,22;299:1,10,
13,24
**Bloom's (1)**
239:16
**board (6)**
50:10;269:19,22;
270:6,11,18
**bodies (1)**
292:17
**body (3)**
75:20;76:1;186:6
**borough (1)**
130:10
**boroughs (3)**
39:13;129:20;
303:19
**boss (1)**
122:11
**both (19)**
8:18;13:21;15:13;
17:5;39:21;60:1,4;
81:19;84:2;87:18;
150:5,20;197:15,16;
257:11;292:21;
297:19;298:20,24
**bothered (1)**
119:2
**bottom (7)**
172:1;189:15;
226:17;255:14;
262:15;266:23,24
**bound (1)**
204:18
**bounds (1)**
247:8
**Brayton (98)**
70:9,13,17,20,22;
71:3;72:7,21;73:4,5;
74:2,14,16;75:8,20;
76:7,16;78:2;82:5,6;
86:10;87:6;88:24;
89:6,15,17;90:8;
91:20;92:3,11;93:17,
22,24;94:3,8;96:3,8,
11,13,17,19,23;
97:11,14;98:17;
120:3;236:17;237:6;
244:12;246:4,10;
247:13,17,19;249:17;
250:1,21;251:7,12,
18,20;252:13;253:15,
18;254:1,2,5,14,18;

**blanket (2)**
256:5,17;257:6,20;
258:5,15,22;260:5;
261:4,6,15,23;
263:10;264:1,18;
267:8,11;268:1;
287:9;288:10,14,20,
24;289:8,13,18;
307:4,15;308:5
**Brayton's (23)**
77:11;82:13;88:2;
91:12,18;92:2;93:21;
94:24;95:3;107:14,
21;248:9,18;249:22;
255:11,18;257:23;
266:19;267:5;268:1,
16;287:24;288:2
**break (7)**
46:22;92:17,18,20;
166:10;200:11;
230:20
**breaking (1)**
69:12
**brief (1)**
15:4;263:20;
267:23
**bright (1)**
245:13
**bring (5)**
151:12;196:1;
222:6;231:17;298:11
**bringing (1)**
193:19
**broad (4)**
56:8;67:13;205:16;
292:12
**Bronx (143)**
15:11,18,22;16:2,
12;19:11;21:14;22:5;
34:17;43:24;44:6;
45:7,14,16,24;46:5;
47:6,11,12,17,21;
48:11,14;49:2,4,6,24;
64:5;66:4;67:2,6,12,
18;68:4,9;69:2,18,20;
70:1,5;71:10,12;
72:14;73:1,16;74:7;
78:4;94:11,14;96:18;
97:5,10,12,14,21;
98:2;111:4;113:9;
115:3,5,5,6;119:22,
24;143:23;144:10;
146:5,9,13,14,15,19,
20;149:10;150:23,
24;152:7,9,12,17,20,
23;153:1,9,13;
172:23;181:7,16;
182:6,9,24;201:22;
213:11,18,19;214:5,
9,14,22;215:12,17;

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 322 of 353

BARRY WINKLER, M.D.                                    MELISSA KAYE v.
October 6, 2021                        HEALTH AND HOSPITALS CORPORATION, et al.

226:5,14,24;227:4;
228:23,23;229:4;
234:3;236:6;237:9,
12,16,20;238:7;
240:11;246:12;
252:8;255:22;
256:17;257:8;
262:24;263:3,4;
271:9,17,23;284:9,
20;285:2,7;295:10;
296:1,19;299:11;
303:12;304:2;305:2;
306:1,7,15,19,23

**Brookdale (1)**
150:18

**Brooklyn (81)**
44:10,20,24;45:1,
2;54:1;57:22;60:7;
62:8;64:7;66:15,16,
17,18,19;69:4;71:16,
20;72:3;73:13,22;
74:12;96:10,20,23;
97:2,5,9;112:23;
113:4;118:11;
127:17;131:9,9;
138:3;140:5,12,14,
19,21;141:6;142:16,
19;143:11;144:9,12,
16;150:14,16;151:3,
5;152:9,10,21;153:3,
14,18,23;154:1;
183:17,18;214:10,17;
236:15;241:5,14;
242:15;245:3;247:3;
255:22;257:7;270:1;
275:17;284:9;
285:14,16;296:2;
303:15;307:4,16,20

**brother (1)**
257:1

**brought (7)**
9:6;64:18;65:15;
132:19;178:18;
217:17;270:7

**budget (2)**
40:17;41:2

**bugs (1)**
145:3

**bullet (2)**
140:6;141:22

**bullets (2)**
140:2,4

**burdensome (1)**
195:21

**Bureau (2)**
186:8,10

**busier (1)**
66:17

**business (1)**

13:3

**busy (2)**
67:4;230:5

## C

**calendar (3)**
242:20,24;243:6

**calendars (1)**
242:16

**call (13)**
8:19;9:2;44:17;
46:16;82:22;152:17;
195:8;199:17;
249:16;263:18,21;
267:17,21

**called (15)**
29:6;44:22;47:7;
59:8;83:13;84:23;
143:15;178:2;184:6;
186:11;237:9;278:2;
279:3,22;285:19

**calling (2)**
207:23;208:6

**calls (1)**
81:20

**Caltagirone (2)**
184:15;210:19

**Caltigrione (1)**
210:14

**came (24)**
21:17;34:17;35:4;
39:11,19;50:10;
53:10;67:6;74:12;
75:1;91:7;127:16;
128:11;133:12,23;
150:5;151:9;157:19;
239:5;277:12;
282:13;303:23,24;
309:5

**can (377)**
4:10,19;5:12,14,
18;7:22;12:5,12;
15:14;17:22;18:3;
19:4;21:11,19;22:10,
11,18;23:20;24:3,11;
26:6;27:15;29:2,18;
30:15,23;31:7,13,24;
32:6,10;33:1,18;
34:5;35:17;37:3,7,16,
22;38:24;39:7,17;
40:1,7,10,16,23;
41:21,23;42:8;43:3,5,
11,20;46:1,10,18;
47:2;48:23;49:19;
50:4,7,11,19;51:9,17;
55:2,2;56:5,17;57:1,
15;59:15;62:16;
63:10;65:4;66:1;

67:20;69:14;71:23;
72:16,22;73:18;74:3,
19;76:9,14,22;77:12;
78:6,18;79:1,21;
80:14;82:8;83:21;
84:9;85:2,4,13,16,24;
86:7,14,18;88:12;
89:3;90:1,9;91:3,22;
92:12,13,16,16;95:1,
15;96:5,21;97:6,16;
98:19;100:7,9;
102:24;103:5,14;
104:13;105:2,11,13,
16;106:9,19;107:7;
108:9,13;109:5,14,
16,19;110:7,19;
111:10,21;112:3,11;
113:5,11;114:13,19,
24;115:13;116:1,19;
117:8,14,20;121:6,
21;124:11;125:2,8;
127:23;128:7,16;
129:21,24;130:6,20;
131:19,24;132:6,16,
22;133:15;134:4,15,
20;135:7,14;138:7,
11;140:15;141:1,7,
21,22;142:7,8,9;
143:3,8,13;144:2,23;
145:24;146:10,22;
147:7;148:19;149:2,
20;152:13;153:4;
154:11,21;155:7,17;
156:4,6,11;157:1,6;
158:17;160:1,8;
172:14,20;173:4,10,
15,22;174:6;176:19;
177:15,21;178:14,22;
179:1,8,16;180:3,8,
14,19;181:4;182:15,
17;183:1,14,24;
185:23;186:14;
187:1,11;191:10;
192:11;194:20;
196:11;197:19,20;
198:5,12,18;199:8;
200:2,9,20;201:12;
202:15,21;203:12;
204:1,10;205:14;
206:14;207:5,6;
208:13;211:11;
212:7,20;213:8,21;
214:13;215:23;
216:11;217:5,7,12;
218:14;220:15;
222:15;223:20;
224:3,12,17;227:4;
228:15;229:4,6;
234:5,15,22,23;

235:2,8,23;238:18;
239:8;240:19;242:3,
5,10;243:2,17;
244:10;245:20,24;
248:11;249:4,17,18;
250:5,11;251:3,15;
253:1,7,9,23;255:15,
24;256:13,21;259:1;
260:16;261:9;263:1,
17;264:2,19;267:7,
17,20,22;268:10,21;
269:11;272:20;
273:22;274:7;276:5,
20;277:5,7;278:7;
283:13,20,24;284:4,
15;286:21;287:3,21;
289:12;290:8,17;
292:1,6,6,10;294:10;
296:15;298:18;
303:7,13,20;304:11,
21;305:6;306:10;
307:21;308:9;310:9,
15

**cancel (1)**
120:16

**CANFIELD (449)**
4:17,17;6:19,23;
7:6,13,15,20;8:2,9;
9:20;11:21;12:5,11;
15:14;17:22;18:3;
19:4;21:19;22:18;
23:20;24:3,11;26:6;
27:7,15;28:11;29:2,
18;30:15,23;31:7,13,
24;32:6;33:1,18;
34:5;35:17;37:3,22;
38:24;39:7,17;40:1,
10,23;41:21;42:8;
43:3,11,20;44:2;46:1,
10,18;48:23;49:19;
50:2,4,11,19;51:9,17;
56:5,15,22;57:3,4,8;
59:15;60:19;62:16;
63:10;65:4;67:20;
70:6;71:23;72:16,22;
73:18;74:3,19;75:22;
76:9,14,22;77:12;
78:6,18;79:1,21;
80:14;81:10;82:8;
83:21;84:9;85:12,16,
24;86:7,13,18;88:12;
89:3;90:1,9,17;91:3,
22;92:12,23,24;95:1,
14;96:5,21;97:6,16;
98:12,19;99:2;100:7;
101:14;102:23;
103:5,14;104:7,13,
23;105:2,10,15;
106:5,19;107:6,23;

108:8,13;109:5,14,
19;110:7,19;111:10,
21;112:3,11;113:1,5,
11;114:13,19,24;
115:13,24;116:19;
117:8,14,20;118:2;
119:13;120:20;
121:6,21;124:11;
125:1;127:23;128:7,
16;129:24;130:6,19;
131:19,24;132:6,16,
22;133:15;134:4,12,
15,20;135:3,7,14,19;
136:14,19,22;137:3,
10,13,15,18,20;
138:22;139:1,7;
140:15;141:7;142:1,
7;143:3,8,13;144:2,
23;145:24;146:10,
21;147:7,12;149:2,
19;152:13;153:4;
154:10;155:7,17;
156:3,11;157:1,6;
160:8,19,23;161:24;
162:2,5,11,14,17,20;
163:2,7,11,15,19,24;
164:3,7,12,15,19;
165:8,10,15,18,22;
166:2,5,11;168:8;
170:16,19;171:8;
172:13,19;173:4,10,
15,22;174:16;176:18,
24;177:15,21;178:13,
22;179:1,8,16;180:2,
7,13,18;181:14,17,
22;182:15;183:14,
24;185:23;186:14,
24;187:11;188:15,18,
24;189:3,7,8,10,19,
22;190:1,6,10;
191:10,13,17;192:11;
194:20;196:11,16;
197:5,11,18;198:5,
12,18;199:3,8;200:2,
9,20;201:12,24;
202:5,15,21;203:10;
204:1,7,20;205:2,14;
206:2,12;207:3,11;
208:1,8,13;211:11;
212:20;213:8,21;
214:4,9,12;215:23;
216:11;217:5,12;
218:14;222:15;
224:12;226:8,10,12;
228:15;231:9;234:5,
15,21;235:2,8,23;
236:7;238:18;239:8;
240:19;242:3,9;
243:2;245:20,24;

246:23;247:15;
248:11;251:3,14;
253:1,7,19,23;254:3,
8;256:12,19,21;
258:24;260:7,11,19;
261:24;264:2,13,19;
265:3,9,14,17;266:1,
5;268:20;269:13;
270:16;271:16;
272:17;273:22;
274:7,12,21;275:2;
276:4,20;277:20,24;
281:4;282:21;283:6,
20,23;284:2,3,15;
286:13,15,21;287:8,
21;289:12,23;291:12,
17;292:4,6;293:4,7;
294:10;301:3;302:3;
303:6,13,20;304:11,
21;305:6;306:3,9;
307:21;310:9,15;
311:10,13,14

**capabilities (1)**
84:16
**capable (1)**
209:9
**capacity (5)**
11:8,12;43:18;
141:17,18
**caps (1)**
129:17
**Captains (3)**
231:23;232:3,4
**capture (1)**
99:20
**captured (1)**
144:15
**care (2)**
114:2;257:1
**case (52)**
19:23;20:2;27:6,7;
38:2;45:17;64:14;
69:21;75:11;78:17,
20;80:8;86:2,6;
95:10;98:10;108:3;
122:5;153:17;
185:10;201:15,18;
203:17;217:22;
218:1;221:13;
224:10;225:4;
228:23;236:2;
237:13;241:12;
242:19;244:16;
246:11,12;247:4;
249:17;250:19;
251:23;260:4;
267:24;268:5,9;
270:1;272:18;
290:23;293:21;

298:16,17;299:11;
308:10
**case-by-case (2)**
141:3,10
**caseloads (1)**
305:22
**cases (58)**
10:10;18:11;19:22;
32:14;37:11,15,15,
19;43:13;66:6,8;
73:8,15;74:7;91:8,9;
111:12,13;130:10,12;
131:7,9,17;141:22;
213:16;214:1,2;
219:17;224:4;225:9;
237:13;238:6;
242:20;245:7;246:6;
261:4,7;267:9,11;
284:8,8,11;285:3;
298:7;303:24;
304:14,15,18,19;
305:4,10,15,24;
306:12,13,15,18,22
**Catagirone (1)**
210:20
**Catalina (1)**
271:1
**catch (1)**
171:13
**caused (1)**
233:15
**CC (2)**
225:11;260:24
**cc'd (1)**
250:10
**CC's (3)**
210:6;220:12;
227:20
**center (10)**
111:4;115:22;
129:13;145:23;
148:9;170:10;175:9;
178:5;235:5;302:15
**centers (2)**
199:21;303:10
**central (5)**
142:14,15,17,21;
191:7
**certain (25)**
16:1;19:21,23;
26:8,11;43:22;51:3;
94:4;101:9;118:10;
131:15;141:4;160:1;
168:3;183:7;192:19;
230:5;258:21;285:1;
287:13;296:8;300:7;
301:7;304:23;310:24
**certainly (2)**
32:2;256:1

**certified (1)**
221:11
**Cesar (1)**
210:10
**cetera (9)**
50:17;63:3;74:11;
100:20;106:24;
154:7;159:14;
184:10;195:22
**CFR (1)**
208:19
**chance (4)**
139:12;172:16;
177:14;310:23
**change (35)**
57:24;58:15;61:21,
22;62:4;109:8;112:2,
6,6,22;113:3,20;
114:7,11,17;116:7;
117:17,23;118:14;
119:1,6;124:4,4,20,
21,24;125:11,11,20;
134:22;257:2;260:6;
265:10;281:8;301:17
**change/add (1)**
261:1
**changed (10)**
15:16;58:7;63:22;
116:11,11,12;118:3;
119:9,12,16
**changeover (1)**
64:2
**changes (3)**
23:9;108:20;
116:17
**changing (1)**
134:19
**charge (1)**
141:24
**charges (2)**
32:15;198:1
**Charter (3)**
80:21;83:6,23
**check (3)**
17:8,14;304:4
**checked (1)**
17:14
**chemical (1)**
59:8
**child (1)**
257:1
**childcare (1)**
59:2
**children (6)**
59:6;277:10,11,13;
301:22,24
**children's (1)**
301:18
**choices (2)**

258:1,10
**choose (2)**
87:16;216:22
**chose (2)**
83:11;151:1
**chosen (1)**
44:18
**CHS (132)**
21:17,22;23:11,14;
31:9;32:22;34:3,11,
23;35:14,20,24;36:9,
11,16;40:17;41:3,5,9,
18;43:1,18,24,24;
44:3,3,4,14;56:2,4,
14,18,19,20;57:12;
62:22;63:9;64:11;
70:23;79:19,23,23;
82:7;85:10;86:5;
100:23;102:18;
103:4,22,23;107:2;
108:7,24;109:1,3;
110:3;116:16;123:6;
125:16,18;127:13;
133:6,8;143:19;
156:9,13,16,21,24;
157:5;168:16,19,21,
23;169:7,11;176:17;
177:20;178:24;
179:21;180:1,6;
184:3,11,13;186:18,
20;187:2,5,8;199:24;
203:7,21;204:18;
205:18;215:9,10;
216:10;221:19;
225:7;229:24;
236:10;237:2;239:7,
16;242:11;248:19;
256:6;259:23;269:1;
270:14;271:19;
272:2,9,14;282:13;
284:10;285:13;
292:23;293:1,2;
295:11;298:21,24;
299:2,14;301:11,15;
302:10,13;306:6,7
**CHS730 (1)**
220:19
**CHS-based (2)**
155:19,21
**CHS's (4)**
143:24;178:19;
180:11,17
**circulate (1)**
169:6
**circulated (8)**
168:13,15,20;
169:1,11;178:4,10;
310:14
**circulating (1)**

35:1
**circumstances (10)**
37:20;128:5;154:5,
8;243:15,15;257:3;
273:17;275:8;298:12
**Ciric (1)**
60:2
**cite (1)**
207:18
**City (10)**
4:18;33:14,17;
34:8,9,11;40:18;
130:13;131:15;
190:23
**Civil (2)**
63:1,4
**claim (1)**
288:11
**claimed (1)**
270:3
**claims (3)**
60:3;112:14;
230:18
**Clarence (1)**
240:8
**clarification (1)**
155:2
**clarify (3)**
21:24;173:18;
214:12
**clarity (1)**
80:11
**clear (21)**
5:7,14,15,16,22;
22:16;33:13;56:21,
22;57:5;62:20,21;
95:5;106:10;133:19;
161:2;163:3;173:23;
204:15;248:18;
260:19
**clearly (10)**
77:8;82:16;113:13;
134:16;161:20;
191:5;192:5;195:11;
209:4;253:13
**clerical (5)**
145:15;240:21,24;
241:1;242:12
**clerk (4)**
138:2,2,4;195:9
**client (1)**
232:12
**Clinic (180)**
15:11,19,22;16:3,
12;18:10,11,13,23;
19:1,11,21;20:16,24;
21:14;22:5;32:11,23;
34:17;35:4;36:2,5;
37:1;39:12;40:20;

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 324 of 353

BARRY WINKLER, M.D.                                                              MELISSA KAYE v.
October 6, 2021                                          HEALTH AND HOSPITALS CORPORATION, et al.

43:8;44:1,6,10;45:3,
5,7,14,16,24;46:5;
51:4,13,14;54:1;
55:24;60:7;61:2,18;
62:8;64:6;66:5,15,16,
24;67:2,6,12,18;68:1,
5,9;69:2,4,8,18;70:5;
71:7,11,12,16,21;
72:14;73:7,13,14,17,
22;78:4;96:20;97:1,
15;100:6;106:17;
107:5;111:4,17;
112:10,23;113:4,10;
114:23;115:22;
119:22,24;120:2;
122:5,20,22;124:18;
130:9;131:17;
133:11;138:13;
140:5;143:23;144:1,
16;145:8;146:15,19,
20;149:5,6,10;
150:14,16;151:7;
159:5;170:14;
174:15;195:7;
201:18;212:16;
213:4,10;221:21;
224:17;226:6;227:4;
228:3,23,23;229:4;
234:4;236:6,10,12,
14,18;237:16,20;
241:5,8,14;242:12,
13,16,18;243:1;
245:3;246:12;247:4;
250:1;256:5;262:24;
271:9,14,17,22,24;
274:20;275:1,4;
284:10,18;285:8,14,
16;286:8;295:10;
296:20;299:2,15;
303:12;305:4,11;
306:1,7,15,23;307:4,
17,20;311:4
**clinical (5)**
160:6,10,13;
175:23;257:14
**clinician (16)**
20:1;50:15;67:5,7,
10,15,24;68:1;71:11;
120:4;246:19;
257:13;285:4;304:1,
20;307:10
**clinicians (24)**
35:2;39:13;66:18;
67:3;69:6,22;130:9;
133:10,11,19;151:18;
156:18;173:8;219:7;
241:7,16;242:17;
305:5,10;307:2,3,19,
24;308:4

**clinician's (1)**
241:13
**clinics (45)**
23:10,15;30:13;
31:12,18,23;32:5;
33:5;34:24;35:1,15;
43:1,19;44:15,16,20;
49:18;50:15;52:5;
56:3;61:5,8;65:9;
100:12;106:3,8,14;
109:23;119:10;
143:17;148:22;
157:18;179:14;
186:19;187:3;
240:22;268:3;269:1;
302:10,13;303:11;
304:24;305:5;
306:18;307:16
**cliques (1)**
46:16
**close (1)**
277:15
**closed (1)**
35:1
**closer (1)**
21:14
**closes (1)**
233:5
**CO (1)**
231:6
**coach (2)**
7:12;57:2
**coaching (4)**
162:23;163:14,17;
204:24
**code (1)**
207:20
**co-evaluator (1)**
268:7
**co-examiner (7)**
74:6,8,12;261:6,17,
19;267:10
**cognitive (2)**
154:7,23
**collateral (1)**
249:15
**collect (1)**
63:5
**College (1)**
12:19
**Colley (11)**
20:19,23;21:17;
22:23;23:1;26:8;
28:3;192:2,3,15,20
**Colley's (2)**
22:24;192:17
**combative (1)**
45:24
**comfortable (3)**

7:7,21;8:1
**coming (5)**
125:17;221:21;
227:10;234:3,7
**commenced (1)**
232:18
**comment (12)**
53:11;57:15;91:24;
97:24;134:19;
160:20;161:1;164:8;
172:7;289:5,22;
294:13
**commented (1)**
160:16
**commenting (1)**
54:11
**comments (7)**
93:20;98:1;134:24;
289:1;300:6;308:21;
309:11
**commit (1)**
139:24
**common (2)**
52:5;86:22
**communicate (3)**
54:4;253:14;
289:18
**communication (1)**
18:15
**communications (1)**
108:23
**community (4)**
46:9,24;47:2;
168:24
**commute (2)**
97:4,12
**company (2)**
63:6,19
**compare (3)**
66:14,16;284:13
**compared (2)**
296:2;304:15
**competence (1)**
198:22
**competency (8)**
130:12;212:17;
245:7;246:9,20;
254:4;290:24,24
**competent (6)**
175:23;176:3;
253:15,16;254:5;
258:2
**complain (34)**
52:8,10,13;53:13;
54:23;57:24;59:18,
20;65:20,23;92:10;
93:18,19,20;97:11;
109:3,12,18;116:5;
117:11;123:23;

133:13;145:21,22;
146:8,24;147:4,10;
200:18;201:9,21;
202:13;241:24;
242:23
**complained (11)**
55:8;59:18;92:6;
109:23;111:24;
133:1;201:22;243:5;
280:16;288:15,20
**complaining (7)**
55:1,6;59:13;
91:12;123:6;200:5,
13
**complaint (12)**
58:3;96:2,3;109:8;
124:1;142:12;
269:23,24;270:1,5,
19;310:17
**complaints (13)**
42:17,20;68:7;
109:11;121:13,15;
239:15,17;269:1;
270:12;272:14;
288:1;295:14
**complete (20)**
13:14;65:8;139:21;
198:23;201:15;
216:2;224:5,10;
229:7;241:21;
244:19;254:17;
255:21,23,24;257:9,
19;297:23;298:13,15
**completed (12)**
13:11;14:15;17:20;
37:17;141:19;
143:12,20;151:20,22;
201:10;295:21;
308:11
**completely (7)**
24:24;149:7;162:9;
166:3;187:6;191:6;
272:10
**completing (4)**
13:12;151:21;
237:10;257:22
**completion (3)**
13:9;198:22;233:6
**Compliance (5)**
99:5,8;101:18;
102:11,14
**complicated (1)**
63:13
**complied (3)**
183:7;232:16;
233:8
**comply (1)**
168:6
**Compound (2)**

278:5;288:4
**comprehensive (1)**
96:14
**compromise (1)**
133:12
**compromised (3)**
205:19,21,24
**computation (1)**
304:6
**computer (11)**
146:5,9,12,14,20;
147:3;241:10;
302:21,24;303:2,5
**conceptualist (1)**
160:14
**conceptualizations (1)**
20:3
**concern (5)**
39:15;96:3;158:24;
261:14;309:18
**concerned (7)**
65:20;82:13,15;
100:21;161:14;
238:10;279:12
**concerns (8)**
25:10;87:21;90:24;
107:13;215:5;222:3;
227:3,6
**concisely (1)**
77:8
**conclude (1)**
162:22
**conclusion (3)**
159:22;203:3;
233:2
**condition (4)**
7:8;59:7;196:23;
299:14
**conditions (4)**
45:6,15;109:4;
116:17
**conducive (2)**
263:19;310:3
**conduct (7)**
87:2;96:4;131:16;
153:16;200:17;
243:11;300:12
**conducted (10)**
86:11;93:23;
154:13;251:10,13,22;
288:16,22;300:17,23
**conducting (1)**
207:7
**confer (1)**
192:20
**confident (1)**
247:2
**confidential (5)**
179:4,12;269:14,

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 325 of 353
MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

BARRY WINKLER, M.D.
October 6, 2021

17,18
**confidentiality (4)**
177:13,17,24;
180:17
**confirm (3)**
250:11;280:17,20
**conflict (1)**
246:14
**conflicted (1)**
293:13
**conform (4)**
26:15;160:17;
161:6;167:10
**confusing (1)**
201:14
**conjunction (1)**
177:14
**connected (4)**
40:5,13;146:4;
184:8
**consent (7)**
140:20;141:2;
290:5;291:8;293:14;
308:7,14
**consider (1)**
209:1
**considerably (1)**
300:14
**consideration (2)**
207:17,19
**considered (4)**
17:5;103:18;104:8;
215:22
**consisted (1)**
103:21
**consistency (1)**
75:19
**consistent (4)**
167:22;174:9,11;
265:11
**consists (1)**
64:20
**consolidate (1)**
23:15
**constantly (2)**
253:5,12
**constitution (1)**
197:21
**constitutional (6)**
196:15,19;197:4,7,
9;198:9
**contact (10)**
33:4;97:23;124:16,
18;227:7;276:14;
277:1,13;281:15;
309:4
**contacted (7)**
25:16;30:19;31:21;
99:4,7;269:10;

281:13
**contacting (2)**
185:16;199:13
**contacts (1)**
137:16
**contain (1)**
217:19
**contained (1)**
194:8
**content (3)**
28:16,21;65:10
**contentious (2)**
245:19,22
**context (20)**
28:10;53:7;74:23;
98:15;124:2,3;127:8;
161:22;175:8;212:7;
220:16;223:20;
225:6;226:19;
255:15;257:1;
291:15;292:2;
294:12;309:8
**continue (3)**
63:5;149:17,23;
228:13;261:3;267:7;
279:10;302:24
**continued (8)**
82:18;150:19;
222:7;241:22;252:1;
285:22;287:1,5
**continues (1)**
195:24
**contract (2)**
34:8,10
**contribute (4)**
73:10;108:17,21;
260:6
**contributed (2)**
73:10;172:11
**contribution (1)**
259:17
**control (3)**
187:5,5,8
**controversion (2)**
80:9,23
**convenient (1)**
310:3
**conversation (17)**
26:12;53:8;72:8;
77:22;104:11,15;
105:22;116:14,21;
117:2;118:6,9;185:9;
224:14;291:4,7;
294:20
**conversations (5)**
81:14;112:9,20;
124:9;127:12
**convey (3)**
78:5;91:11,19

**conveyed (2)**
5:17;85:9
**conveying (2)**
77:9,21
**convicted (1)**
85:19
**Cool (1)**
158:11
**cooperative (3)**
87:13,14;264:6
**coordinate (2)**
244:20;310:2
**coordinating (5)**
143:20;145:14;
195:7;224:20;286:9
**copied (1)**
225:5
**co-published (1)**
14:7
**copy (7)**
139:7;224:17;
265:4,20,21;295:21;
311:12
**cordial (2)**
51:22;113:16
**Corizon (4)**
34:3,8;186:21;
187:3
**corners (7)**
215:4,11,16,18,22;
216:1,5
**Corporate (5)**
99:5,8;101:17;
102:11,14
**Corporation (2)**
4:5;63:3
**corrected (2)**
110:2;187:22
**Correction (4)**
269:19,22;270:11,
19
**corrections (3)**
252:14,17;270:6
**correctly (6)**
13:22;83:17;84:22;
128:1;138:1;294:15
**correspondence (5)**
136:23;162:6;
191:19;224:9;269:21
**Cott (1)**
165:19
**Cott's (2)**
165:13;265:11
**Counsel (15)**
4:10;5:20;58:17;
80:3,13,17;81:4;
114:1;116:10;
141:16;184:7;
281:13;295:20;

310:20;311:7
**counted (1)**
10:22
**counterpart (1)**
59:23
**counterparts (1)**
117:12
**County (4)**
11:14;40:20;41:3;
138:12
**couple (8)**
69:22;74:5;113:15;
150:2;183:11;
275:16;277:9,20
**course (10)**
82:21;95:9,12;
112:20;159:2;231:8;
250:14;259:23;
270:13;291:10
**Court (178)**
3:14;4:2;7:23;
15:11,18,22;16:2,12;
19:11;22:5;23:15;
30:13;31:12,18,23;
32:5;33:7,7,10;34:17,
24;35:4,15;36:2,5;
37:1;39:12;43:8;
44:1,6,10;45:3,7,14,
16,24;46:5,20;48:15;
49:18;54:1;56:2;
61:18;62:8;64:6;
66:5,15,16,24;67:2,6,
12,18;68:5,9;69:2,8;
70:5;71:11,12,16,20;
72:14;73:13,16,22;
75:1,3;78:4;93:2;
96:20;97:14;105:11;
106:3,7,14,17;111:4;
112:23;113:4,9;
115:5,6;119:22,24;
131:17;133:10,20;
138:3,12;140:5,7,8;
141:15;142:24;
143:6,17,22,23;
144:16;146:15,19;
148:22;149:10;
150:14,16;153:23;
159:3;170:14;
174:14;179:14;
195:9;196:9;197:22;
203:8;212:13,15,18;
213:4;216:15;
221:10,12,17,21;
226:6,15;227:4,8,18;
228:23,23;229:4,8;
234:3;236:6,11;
237:16,20;240:22;
241:5,14;242:16;
245:3;246:12;247:3;

250:1;253:19;256:5;
262:24;265:24;
269:1;270:4,4,9;
271:9,14,17,23;
274:20;275:1;
284:10,18;285:7,14,
16;295:10;296:20;
303:11,12;305:11;
306:1,7,23;307:4,16,
20;310:17;311:4
**courthouse (2)**
138:5;143:11
**courthouses (1)**
168:24
**court-ordered (1)**
308:7,15
**courts (8)**
115:2,3,4;138:20;
152:19;196:4;
221:17;311:6
**cover (2)**
69:21;142:5
**coverage (6)**
71:21;72:2,6,9,11,
15
**covered (2)**
95:12;155:16
**covering (2)**
10:10;114:23
**CPL (14)**
137:7,14;138:20;
200:7;202:18;203:7,
21;205:13,16,18;
207:1,8;226:7;
244:19
**CPLR (2)**
4:9;202:14
**crashed (1)**
302:20
**crashing (1)**
143:24
**create (1)**
100:19
**creation (1)**
130:21
**criminal (8)**
36:1;75:5;138:3,
20;140:7;142:12;
212:11;310:18
**criticized (1)**
94:7
**critique (1)**
250:22
**critiqued (1)**
252:20
**crux (1)**
137:21
**Cruz (1)**
210:11

Case 1:18-cv-12137-JPC-JLC Document 225-8 Filed 03/05/22 Page 326 of 353

BARRY WINKLER, M.D.                                                    MELISSA KAYE v.
October 6, 2021                          HEALTH AND HOSPITALS CORPORATION, et al.

cuffed (3)
    233:1,12,13
current (7)
    161:15;183:23;
    223:23;293:4,5,7,8
Currently (2)
    145:9,10
custody (1)
    32:15
custom (1)
    102:22
cut (1)
    215:18
cutting (6)
    215:3,11,16,22;
    216:1,5
CV (1)
    74:24
cycling (1)
    153:15

                    D

DA (5)
    30:1;81:3;226:14,
    24;227:22
Dan (1)
    158:17
DA's (16)
    30:1,20;31:21;
    80:18;81:18;83:10;
    100:16;227:12;
    228:9,11;229:5;
    278:2,9;279:3,22,23
data (7)
    145:22;146:1,2,2;
    249:16;285:24;286:1
database (3)
    165:11,15;166:3
date (4)
    4:6;143:1,6;226:5
dated (20)
    129:14;142:24;
    148:11;158:6;162:7;
    171:21;172:2;175:5;
    176:15;182:2,7;
    185:7;193:17;210:2;
    221:1;223:16;249:2;
    255:8;259:18;266:20
dates (1)
    6:7
day (24)
    19:13;32:10,10;
    44:23;73:21;111:7;
    161:1;214:3,7,15,16,
    18,20,23;250:11,17;
    273:10,12;274:24;
    275:11;305:1,20,24;
    311:11

days (5)
    87:15;147:21;
    272:11,12,13
day-to-day (5)
    17:9;18:7,8;32:8,
    12
DD (1)
    249:9
deal (6)
    48:9,11;64:9;
    127:19;240:23;
    244:24
dealing (1)
    78:3
dealings (3)
    239:7,10;240:18
deals (2)
    184:17,19
dealt (2)
    142:15;310:16
death (1)
    256:24
December (1)
    172:2
decide (2)
    45:2;84:18
decided (7)
    34:9;64:15;94:19,
    21;151:15;233:13;
    258:14
decision (9)
    25:24;55:16;70:12;
    74:1,13;77:20;91:2;
    95:18;150:11
decisions (1)
    28:4
declined (1)
    283:17
deemed (1)
    279:24
defendant (45)
    11:24;25:4;27:22,
    22;28:13,15;29:4;
    30:2;33:9;38:3,4,5,9;
    75:5;76:3;81:15,20;
    87:13;99:20;141:1,1,
    15;160:14;196:22;
    201:9;203:5;206:4;
    217:9;228:22;
    232:23;233:11,14;
    237:22,23;249:10;
    250:6;279:11,13,15,
    21,23;298:11;308:9;
    310:19,21
defendants (22)
    4:19;38:13;39:5;
    65:11;87:14;111:16;
    115:8,11,15,17;
    116:3;127:1;139:21;

159:24;211:6,8;
219:19;229:24;
237:19;272:15,22;
273:6
defendants' (4)
    89:24;198:17;
    211:8,9
defendant's (14)
    81:3;84:16;88:6;
    135:23;141:17;
    194:15;196:14;
    197:4;225:4;227:3;
    229:10,15;233:1;
    269:24
Defenders (9)
    47:6,11,13,17,21;
    48:11;49:2,6,24
defending (1)
    4:13
defense (20)
    46:9,20,24;47:2;
    80:2,13,17;140:24;
    141:16;168:24;
    227:23;245:1;
    278:24;279:4;
    309:19,21;310:8,20,
    22;311:7
defensive (3)
    54:13,15,21
defer (1)
    158:24
deficiencies (4)
    252:10,12;253:17;
    254:6
define (1)
    119:14
defined (1)
    292:1
definitely (3)
    77:20;197:7;222:5
definition (2)
    235:16;248:4
definitively (1)
    28:6
degree (14)
    8:18,19,21,23;9:4,
    15;12:9,18,22;13:1,3,
    6,13;131:15
delay (2)
    221:13;270:2
delayed (2)
    211:12;213:1
delays (5)
    4:8;210:23;211:3,
    5;272:21
delusional (1)
    249:14
demanding (1)
    226:4

demotion (4)
    118:7,15,16,23
Department (28)
    4:18;9:8,12,13,16,
    18;10:12,14,16,19,
    20;11:11;25:19,24;
    26:13,18;32:3;33:15,
    16;62:14;63:18;
    64:19,20;184:9;
    227:7;268:24;269:6;
    273:2
departure (1)
    71:22
depend (1)
    307:11
depended (1)
    307:9
depending (6)
    32:14;75:11;84:14,
    15;97:8;204:4
deponent (1)
    19:6
deposed (1)
    11:16
deposition (6)
    3:11;4:3;162:3;
    165:1;182:5;191:18
describe (12)
    19:15;45:15;47:10;
    51:15;56:3;97:20;
    238:23;239:2;
    245:17,22;277:5,7
description (1)
    204:22
designate (1)
    71:15
designated (3)
    56:1;143:10;248:9
designed (1)
    83:7
despite (1)
    221:19
destroyed (5)
    122:3,7;293:24;
    294:1,6
destroys (1)
    294:11
destruction (1)
    294:22
detail (3)
    53:15;75:9,12
detailing (1)
    303:24
details (4)
    27:10;98:21;
    107:18;147:14
determination (11)
    24:16;25:20;63:16;
    77:18;81:1,9;83:19;

95:24;106:11,13;
206:5
determine (7)
    18:12;81:11;83:16;
    84:6;89:15;95:20,20
determined (4)
    80:18;100:5;102:1;
    197:22
determining (2)
    25:3,8
detrimental (1)
    253:5
detriments (1)
    253:11
develop (6)
    20:5;26:19;148:21;
    155:5;263:2,9
developed (1)
    36:1
diagnose (2)
    89:24;90:4
diagnostic (1)
    155:1
Diaz (2)
    137:6,11
dictionary (1)
    235:16
diem (1)
    78:9
difference (5)
    109:10;150:23;
    153:21;290:3,11
differences (1)
    53:22
different (30)
    37:15,16,19,19,20;
    39:12,13;40:17;41:2;
    48:10,21;52:16;75:3;
    79:19;83:3,4;87:14,
    15;95:22;121:16;
    122:4;155:10;
    157:18;162:21;
    165:11;166:3;
    214:19;217:3;
    283:15;291:16
differently (10)
    87:15;117:6;
    308:20,22;309:1,2,3,
    7,10,13
differs (1)
    292:23
difficult (12)
    48:9;67:18;68:4,8;
    75:13,14;99:20;
    203:1;236:5,11,11,16
difficulties (2)
    171:17;236:14
difficulty (7)
    68:15,20;72:11;

77:4,5;147:3;171:15

**dilemma (1)**
293:12

**dinner (1)**
277:8

**direct (13)**
17:9;18:7;20:18;
22:16;31:17,18;33:4;
81:4;86:21;205:9;
246:9,11;302:12

**directed (3)**
57:8;195:1;198:23

**directive (2)**
165:13;186:13

**directly (16)**
17:10;23:1;30:6;
31:22;55:19,21;
93:19;94:11;129:19;
227:8,23;229:1,8;
242:12;261:14;
300:14

**director (42)**
16:8;17:6;18:10;
20:23;23:5;32:23,24;
36:6;44:9,15,19;
45:3;60:7;61:2,4,6;
62:8;64:8;71:16,20;
115:22;118:4,4,14,
14,15,19,20,22;
119:7,16,16;127:17;
186:9;192:3;241:14;
242:13;245:1,3;
246:13;285:14;
304:13

**directors (33)**
52:3;58:11;61:11,
18,21,22;117:7;
119:10;121:5,9;
128:10,20;129:14,21;
131:11;132:4,14,20;
133:2;148:9;155:10;
156:23;157:2;
169:10;170:11;
175:10;178:5;
199:20;235:6;304:9,
16,20;305:4

**directors' (5)**
121:10;133:24;
175:12;198:3;305:22

**director's (1)**
51:20

**disagreed (3)**
42:3;143:2,7

**disagreement (3)**
90:5;113:24;
142:23

**discipline (1)**
206:11

**disclose (3)**
139:17,18;178:12

**disclosed (1)**
139:9

**discretion (5)**
159:5;195:11;
217:15,22;219:15

**discuss (16)**
18:11;26:3;87:21;
102:6;111:12;
113:19;129:22;
147:17;175:13;
230:8;236:3;251:19;
261:8;263:3;267:12;
268:15

**discussed (22)**
20:15;26:2;35:19;
39:12;65:3,7,16;
87:23;109:7;121:18;
172:21;175:19,20;
192:9,13;213:16;
222:19;227:2;261:2,
17;267:7;300:13

**discussing (5)**
54:17;102:9;
175:12;225:16;
268:12

**discussion (34)**
28:22;38:21;39:3;
40:16;52:5;68:3;
69:7;77:15;81:6;
98:24;102:3,6;
106:22,22;114:9;
121:19,23;122:1;
128:3,9,11;141:20;
142:23;175:15,17;
192:6,23;193:1;
215:2;222:9,13,18;
226:3;294:15

**discussions (11)**
25:15;26:9,10;
28:8,14,17;51:3;
68:8;168:19;215:3;
238:5

**disdain (3)**
89:22,22;309:18

**dismissed (1)**
209:9

**dismissive (1)**
289:8

**disparity (2)**
124:4;125:10

**displeased (2)**
300:9,11

**displeasure (1)**
300:3

**disseminate (2)**
129:18;227:21

**distinction (1)**
286:24

**distribute (1)**
129:17

**District (2)**
11:14;29:6

**division (4)**
16:9;20:24;21:1;
192:4

**doc (5)**
170:22;232:15,20;
233:4;234:8

**docked (4)**
147:11,16,17,22

**dockets (1)**
141:22

**Doctor (17)**
12:3;80:20;82:22;
84:21;86:17;96:16;
112:19;197:12;
214:20,22;233:3;
271:2;275:10;
304:24;305:1,24,24

**doctoral (1)**
8:19

**doctorate (1)**
8:18

**doctors (11)**
19:21;50:22;73:10;
95:22;214:19;
232:13,18;233:7,10;
272:23;305:3

**doctors' (1)**
58:17

**doctor's (4)**
112:14;114:1;
116:10;281:13

**DOCUMENT (50)**
126:3,10;129:2,6;
136:5,5;139:13;
148:1;158:1;164:21;
167:1,13;169:24;
170:5,15,17;171:6;
174:21;177:8;
180:22;181:4;
182:23,24;184:17,23;
188:5,19;189:1,2;
209:5,18;211:19;
219:24;223:7;
226:13;231:12;
239:23;240:4;
243:22;244:3;
248:22;254:21;
259:10;262:6;
266:11;283:21,22;
284:1,2,3

**Documentation (1)**
167:15

**DOCUMENTS (15)**
135:23;139:10;
165:16;176:8;

178:24;179:21,24;
180:10;186:13;
189:12;193:6;
225:21;302:19;
310:13,16

**done (10)**
29:23,24;47:15;
87:6;88:9;157:17;
202:10,13;216:16;
260:4

**Donna (1)**
4:17

**door (7)**
39:24;40:9,14;
161:16;168:3;233:1,
5

**double-dipping (4)**
131:12,13;132:5,
10

**dovetail (1)**
52:17

**down (18)**
5:12,18;46:22;
57:22;95:17;127:17;
138:19;183:1;
193:14;195:2;
200:11;212:6;
220:15;223:19;
244:10;266:22;
270:19;275:17

**Downstate (1)**
150:16

**downwards (1)**
126:16

**Dr (906)**
4:15,20,20;5:3,5,7,
11;6:1,17;7:5,18,21;
8:16;11:16;13:16,17,
19,24;14:4,4;16:5,6,
6,14,18,21,23;17:7,9,
11,14,20,24;18:6,15,
22;19:10,16,17,24;
20:4,8,17,17,18,19,
22;21:16,17,21;22:4,
16,21,22,24;23:1,1,3,
5,13;24:15;25:4,15;
26:2,8,20,22;28:3;
29:15,16;30:5,6,9,12,
19;31:6;33:15,24;
34:13,14,15,18;35:3,
6,14;36:7,9,15;38:20,
22;39:4,11,14,15,22,
23;40:6;41:5,19;
42:2,2,7,7,11,12,12,
13,14,17,18,20,21,23,
23,24;43:9,17,23;
44:12,17;45:11,18,
21;46:8,23;47:10,16,
20;48:9,20,22;49:7,

13,16,22,22,23,23;
50:8,14,22,23,23,23,
24;51:1,1,2,5,6,8,12,
16,16;52:8,8,8,10,10,
19,23,24,24;53:3,4,
13,13,16,16,19,19;
54:1,7,23;55:17,18,
19;56:3,9,11,13;
57:13,13,14,19,19,21,
21,22,24;58:9;59:2,
13,14,18,18;60:1,2,5;
61:1,3,4,23;62:1,4;
63:17;65:19,20,21,
24;66:23;67:19;
68:14,17;69:3,8;70:2,
9,13,14,16,16,19,22;
71:2,2,10,14;72:5,7,
21;73:4,5,7;74:2,6,14,
14,15,16;75:7,20;
76:7,7,16;77:10,11,
21,23;78:2,3,12,13,
21;79:11,16;80:1,20;
82:4,4,6,13,19,22;
83:5,5,23;84:3;86:10,
10,10;87:6,7,23,24;
88:2,19,24,24;89:6,
12,15,17,23;90:4,7,
23;91:11,12,17,19,
20;92:2,2,2,3,5,11,14,
19;93:16,17,18,19,
20,21,22,24,24;94:3,
5,6,8,9,12,24,24;
95:3;96:3,7,8,10,10,
13,13,15,17,19,23;
97:11,14;98:4,7,16,
17,99:1,11,21,23;
101:3,19,22;102:6;
103:11;104:1,2,4,8,
12;105:5,6,7,9,22;
106:12;107:12,13,14,
16,17,18,20,21;
108:3,7,23;109:1,2,2,
3;111:3,18;112:8,19;
113:3,8,19;114:5,17;
116:5;117:6,24;
118:1,6,7,9,13,24;
119:11,15,18,19;
120:1,2,3,6,7,18,22,
23;121:1,4,5,9,9,14,
15,20,20;122:2,6,6,
16,16,20;123:5,5,7,7,
9,10,14,14,23,24;
124:3,5,6,9,9,14,18,
18,22,23;126:12,17,
22;127:11,20,21;
128:6,22;129:13,15;
130:1,15;131:10;
133:8,13;134:1,2,8,9,
9,10,19;135:1,4,12;

136:11,12,12,16,18,
18,20;137:7,8,17;
138:7,15,16;139:13;
140:1;145:21;146:6,
24;147:4,5,10;148:9,
21;150:5,11;151:15,
21;155:4;157:4;
158:5,6,10,13,13,20,
23;159:9;160:19,20,
22;161:1,1,3;165:5;
167:2;168:6;169:6,
14;170:10,23;
172:17;173:13;
175:4,5,5,9,21;177:5,
10;179:15;181:4,6,7;
182:1,1,3,5,6,13,19;
183:13,22;185:4,5,6;
188:10,11,12,13;
190:5,12,16,18;
191:4,9,16,16,17,22;
192:2,5,15,17,20,20;
193:13,16,17;195:4,
24;196:8,8,15;198:2,
15,24;199:5;200:7,
14,18;201:15,19;
202:7,7,12;203:6,12;
204:6,9,10;205:3;
206:13;207:5,14;
208:2,12,18;209:24;
210:5,9,13;211:24;
212:2,8;214:7,11,13,
14;215:3;218:11,11,
16,17;220:11;221:4,
6,16;222:4,5,6,6,9,10,
12,19,21,24;223:16,
16,21;224:3,5,9,15,
22;225:2,3,5,7,14,15;
226:4,4,5,14,15,19,
21,23;227:17,20;
228:7,13;229:13,18,
19,23;230:8;231:2;
233:22;234:1,1,1,11,
14;235:7,11,19,20,
22,22;236:17;237:1,
5,6,6;240:4,8,8;
241:11,24;242:7,13,
23;243:12;244:11,12,
12,20;246:3,4,4,8,10,
11,13,15;247:1,7,13,
17,19;248:9,18;
249:7,8,8,17,22;
250:1,3,8,21;251:1,6,
7,8,12,18,20;252:13;
253:15,18;254:1,1,5,
14,14,18;255:5,5,5,
11,17,17,18,18,18,22,
24;256:5,15,17;
257:3,6,19,20,23;
258:5,15,22;259:16,

22;260:4,18,21,24;
261:1,3,6,14,14,23,
23;262:16,16,21;
263:8,10,15,23,24;
264:5,6,17;266:6,18,
18,19;267:4,4,4,5,6,8,
10,13,14,19,19,23,24;
268:1,1,15,15;
269:12;270:7,13;
271:6,8,9,11,13,18,
21,21;272:5;273:13,
20,24,24;274:3,16;
275:5,5,5,7,10,11,14,
15,19,21;276:9,15;
277:2,10;278:1,2,18,
21;279:22;280:16;
281:7,22;282:13,16,
18;283:2,4,8,10,13;
284:4;285:8;287:9,
12,14,16,24;288:2,6,
10,14,15,20,21,24;
289:1,8,8,13,15,18;
290:1,2;291:17;
292:10;293:3,24;
294:1,3,17,21,22;
295:14,20;296:10,16,
20;297:2,7,18,19,21,
22;299:8,12,21;
300:3,7,9,10,12,13;
301:4,16,22;302:9;
304:8,10,19;305:13,
17;307:4,15;308:5,
21,23;309:1,3,4,6,6,
22;311:2,9

**draft (4)**
158:7;168:9;
175:10,11

**drafted (3)**
172:11;173:3;
184:5

**drafting (1)**
184:4

**drag (1)**
190:24

**drastically (1)**
253:4

**drat (1)**
162:21

**draw (1)**
187:24

**drive (4)**
143:24;144:5;
273:1;302:18

**driver (1)**
85:22

**Drs (1)**
268:10

**Drug (2)**
11:14;159:3

**dual (6)**
108:6,12,15;
169:16;170:12;
174:14

**due (11)**
112:9;198:10,14,
17,20;206:4;244:19;
246:12;255:20;
256:24;303:4

**duke (1)**
196:4

**duly (2)**
4:22;205:4

**duplicated (2)**
139:3,5

**duplicative (1)**
139:22

**duration (1)**
272:1

**during (48)**
14:2;19:15;28:24;
38:20;40:16;47:4;
57:12;65:11,16;67:12;
72:20;73:22;78:2,14,
24;79:9;80:23;82:21;
95:12;108:24;
110:13;112:1,19;
122:21;123:7;
124:24;126:13,20,24;
128:4;133:24;143:5;
147:17;161:7;
167:12;191:18;
231:7;237:10,21;
238:7;259:22;
270:13;272:15,16;
285:7;291:10;
296:19;305:14

**Dusky (6)**
95:10,18,18,19,19,
24

**Dustin (2)**
4:1,23

**duties (3)**
232:22;304:13,15

**dynamic (1)**
51:15

**dynamics (1)**
123:5

**E**

**E1 (6)**
161:21;164:5;
167:9,13,14,14

**earlier (28)**
34:23;54:18;58:8;
59:10;77:7;94:3;
95:4;113:23;114:1;
116:8;121:16,18;

172:22;183:5;192:6;
194:4;196:21;
212:24;215:17;
217:2;222:1;251:7;
267:12;278:1;
280:15;284:7;
287:23;293:23

**earliest (1)**
115:9

**early (7)**
11:9,10;64:5;
115:18;143:24;
237:3;249:21

**earned (1)**
13:2

**easier (1)**
213:14

**East (2)**
11:14;232:10

**easy (1)**
239:1

**ebb (1)**
67:9

**ebbs (1)**
67:15

**educate (1)**
310:22

**education (7)**
8:17;148:23,24;
149:4;155:5,15;
311:1

**effect (16)**
3:13;40:6;55:11;
59:9;68:10;98:7;
106:13;108:11;
147:22;217:11,14;
228:12;231:4;
283:23;289:14;
301:18

**effectively (3)**
49:18,23;50:6

**effects (1)**
113:19

**efficiently (4)**
144:18,22;213:6,
17

**effort (13)**
29:16;84:23,24;
85:3,5;150:8;200:17;
202:8;216:14;217:1;
218:5;264:6;311:6

**efforts (2)**
215:8,9

**eg (1)**
167:17

**eight (1)**
18:24

**Einstein (2)**
149:16;295:15

**either (21)**
13:9;38:8;56:24;
63:9;87:24;88:23;
93:1;131:15;141:24;
151:17;170:17;
196:8;206:4;237:4;
241:10;255:23;
263:17;264:12;
268:10;276:1;298:9

**El (2)**
160:16;161:5

**elaborate (6)**
19:19;29:12;55:2;
106:9;125:8;194:9

**electronic (1)**
143:16

**electronically (1)**
60:23

**eliminate (1)**
133:10

**Elizabeth (4)**
36:8;64:18;136:24;
223:21

**Elliot (13)**
17:3,6,8,11,14,20,
24;20:16,17;26:22;
63:17;65:19,20

**else (18)**
16:20;26:3;50:22;
85:10;94:19;128:3;
145:22;169:14;
172:7;178:2;228:6,
24;229:3;239:13;
247:13,17;300:17,22

**else's (1)**
119:8

**elsewhere (3)**
156:2,8;237:21

**email (83)**
55:22;126:12;
129:23;130:1;
136:11,11,17,20;
137:2,5,8,22;138:18;
142:14,15,17,21;
148:21;158:5;162:6;
164:3;165:8;167:7,7;
168:1;170:10,22;
171:23;175:4;
178:12,19,20;179:3;
180:1,5;181:7;182:1,
3,6;188:9,12;190:16,
18;191:2,10,13,19,
22;193:12,14,18;
195:8,13;199:16;
208:23;209:2;
211:24;220:10,18;
221:3;223:16,21;
225:6,18;226:19;
240:7;244:11;

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 329 of 353
MELISSA KAYE v.                                                                          BARRY WINKLER, M.D.
HEALTH AND HOSPITALS CORPORATION, et al.                                                      October 6, 2021

250:10;255:4,17;
259:16;260:17;
261:1;262:15,19,23;
263:6;264:22;
265:12,13;266:24;
267:12,14
**emailed (3)**
142:20;208:18,19
**emailing (5)**
178:23;240:8;
244:12
**emails (4)**
136:20;137:12;
190:8;249:8
**emerged (1)**
42:6
**emergency (1)**
257:13
**emphasizes (1)**
173:20
**employed (2)**
50:14;67:22
**employee (6)**
62:21,22;63:24;
255:19;258:16,17
**employees (1)**
260:2
**Employee's (1)**
255:11
**employment (4)**
204:9,22;272:2,18
**EMT (4)**
85:15,18,22,22
**enable (1)**
40:18
**enabled (1)**
49:17
**encountered (1)**
159:1
**encourage (2)**
44:12;110:16
**End (17)**
11:14;34:16;40:4;
41:16;57:7;70:24;
71:1,3,6,9;72:12;
90:15,20;138:10;
161:15;236:20;252:6
**ended (3)**
16:23;71:19;
150:20
**endorsement (1)**
142:11
**engage (10)**
26:23;32:22;47:7,
9;51:8,12;84:20;
96:4;98:5;149:7
**engaged (8)**
18:18;24:2;29:16;
47:4,5;111:3;131:11;

132:21
**engagement (2)**
309:19,20
**engaging (6)**
65:2;86:24;98:17;
124:10,13;132:5
**enjoyed (1)**
238:24
**enough (8)**
9:17;69:19;192:9;
195:12;216:17,19,20;
217:19
**ensure (3)**
198:3;213:5;285:9
**entail (2)**
17:12;103:24
**enter (1)**
145:1
**entered (9)**
144:19,20;145:16,
18,19;232:15,17,22;
233:8
**entering (3)**
24:21;145:3;147:5
**enthusiastic (1)**
111:18
**entire (2)**
39:2;158:15
**entirely (1)**
71:1
**entities (1)**
50:10
**entitled (1)**
126:20
**entity (1)**
213:6
**environment (7)**
45:13,23;46:5;
97:20;108:24;
109:11;111:9
**envisioning (1)**
158:15
**equipment (1)**
100:20
**equity (1)**
59:14
**equivalent (4)**
8:20;33:13,14;
304:9
**error (1)**
304:6
**especially (4)**
161:7;261:4;267:8;
283:9
**essence (4)**
63:7;94:18;143:21;
308:10
**established (3)**
107:24;272:23;

279:19
**estimate (4)**
6:9,10;21:11;
152:24
**et (11)**
4:5;10:4;50:17;
63:3;74:11;100:20;
106:23;154:7;
159:14;184:10;
195:22
**etc (1)**
196:4
**ethic (1)**
205:5
**ethical (15)**
160:17;161:6;
167:10;203:11;
204:14,16,17;205:6,
11;207:17,18;292:13,
14,21;293:12
**ethically (1)**
204:17
**ethics (3)**
159:1;204:21;
207:20
**evaluate (7)**
95:20;201:9;
241:16,17;253:18;
254:1;305:10
**evaluated (3)**
78:22;254:14;
264:17
**evaluating (3)**
268:5;290:2;305:4
**evaluation (55)**
47:18;81:23;82:11;
83:5,6,9;94:4;95:12;
101:21;102:16;
107:3,9,14,22;
130:12;160:12,15;
172:23;173:21,24;
200:22;201:10,18;
211:10,12;212:17;
218:19;241:18;
245:7;246:20;248:9;
254:18;255:12,19;
257:10,20;264:21;
279:13,16;280:12;
290:11,12,14,15,16,
20;291:1,11,23,23;
293:13;297:8,12;
298:13;308:11
**evaluations (26)**
17:21;32:5,9;
47:15;52:15;66:12;
75:2,3,5;99:18;
100:17;152:19;
153:16,18;202:17;
203:1;207:7;213:1,5,

14;218:12;239:5;
241:21;292:17;
293:19;298:15
**evaluation's (1)**
293:14
**evaluator (18)**
80:3,4;159:17,22;
200:22;201:11,16;
204:23;244:16,19,21;
246:6,7,9,10,15,19;
247:1
**evaluators (12)**
29:17;81:8;96:12;
133:20;200:18;
234:19;246:11,13;
294:16,17,18;295:1
**even (22)**
6:7;35:23;56:16;
69:6;113:9;138:17;
142:10;151:12;
163:7,11,12;164:9;
181:15;209:2;228:3;
243:9;255:23;262:1;
275:16,17;292:24;
301:20
**events (1)**
6:5
**eventually (16)**
20:23;28:2;32:13;
44:9;49:8;63:22;
73:4;218:3;225:14;
270:6;273:13,15;
279:11,13;298:9,13
**everyone (6)**
4:7;104:23;105:3;
119:6;158:14;310:3
**evidence (1)**
281:17
**ex (1)**
55:2
**exact (4)**
20:22;31:10;186:9;
248:4
**exactly (29)**
11:6;14:19;22:2;
27:19;68:17,18;
81:16;82:10;84:2,13;
85:7;91:14;106:10;
113:22;139:23;
144:13;167:21;
187:4;192:23;195:3;
227:15;233:20;
237:4;243:14;248:3;
271:10;273:16;
299:18,18
**exam (19)**
99:1,6,9;101:22;
103:13;127:6;154:9;
173:9,14;191:7;

215:21;216:2,14;
226:7;229:7;243:11;
244:19;247:9;278:4
**EXAMINATION (27)**
5:1;28:24;29:8,14;
30:21;79:5,6;80:3;
82:21;87:2,22;88:2;
172:18;200:17;
231:8;232:14,19;
233:7;247:5;277:23;
280:8,9;290:4,5;
302:7;308:8,15
**examinations (18)**
19:2;38:14;74:18;
86:11;87:1,6,9;
142:24;152:6,18;
153:2;202:9,10,13;
214:7;232:12;
240:11;272:15
**examined (2)**
4:23;232:13
**examiner (8)**
87:3,13,14,16,18;
141:3;214:2;261:20
**examiners (8)**
30:4;38:7;82:1,3;
87:18;141:5;214:1;
216:3
**examiner's (1)**
74:8
**examining (1)**
86:17
**example (23)**
23:24;33:5;38:4,
12;40:19;43:7;53:19;
57:23;58:9;66:15;
76:5;84:5;109:16,17;
131:16;196:21;
200:16;206:3;
215:20;216:1;229:5;
242:6;309:22
**examples (2)**
202:2,7
**exams (32)**
18:19;35:15;53:14;
54:1,18;87:17;99:24;
100:12,24;101:7;
102:19,21;103:3,8;
128:21;134:2,10;
154:1;178:6;198:22;
201:21,21;206:23;
207:22;208:5;
214:15,16,17,20,23;
215:19;216:16
**except (4)**
3:7;105:3;121:5;
279:10
**excessive (1)**
75:9

**exchange (8)**
42:2;77:22;138:16;
188:11;191:8,23,24;
209:24
**excluded (1)**
119:19
**excuse (7)**
28:2;80:7;92:16;
133:11;184:13;
266:5;291:10
**execute (1)**
42:5
**exempt (1)**
106:8
**exercise (1)**
155:4
**Exhibit (107)**
126:1,3,8;129:4,6,
10,13;135:21,23;
136:3,7,10;139:19;
147:24;148:1,5,7,8;
157:21,22;158:1;
161:23;162:7;
164:21;165:2;
166:19;169:21,22;
170:5;171:20,21;
172:1,6;174:19,21;
175:1;176:8,14;
180:22;181:2,2,20,
23;184:19,21,23;
185:4;188:2,2,5;
189:16,17;190:2,13;
193:3,3,6,10;208:17;
209:13,14,18;211:16,
19;219:22,24;220:4;
223:7,12,12,15,15;
225:21;226:1,18;
231:12,17;239:20,21,
23;243:23,24;244:3;
248:20,22;249:1,5;
254:21;255:2,3;
259:7,7,10,15;
260:14;262:6,11,12;
265:5;266:7,8,11,16,
23;267:1;297:20,21
**exhibits (4)**
139:3;162:4;189:5;
190:9
**existed (1)**
293:2
**expect (1)**
29:17
**expectations (1)**
263:3
**expedite (1)**
138:10
**expedited (1)**
217:4
**experience (17)**

25:14;74:10,23;
100:6;128:14,18;
187:14;203:2;214:6;
238:20,21;257:15;
274:18;275:1;
303:11;307:9,12
**experienced (1)**
187:18
**experiencing (2)**
58:1;59:2
**expert (4)**
80:13,19,20;
204:21
**expertise (1)**
10:8
**explain (2)**
83:1;292:5
**explicitly (1)**
208:15
**express (6)**
69:1;89:21;90:5;
133:13;300:3;309:18
**expressed (1)**
39:22
**expressing (1)**
39:15
**extend (1)**
77:18
**extensive (1)**
96:11
**extent (4)**
207:5,6;269:11;
293:18
**External (2)**
168:16,22
**externally (3)**
156:10;168:13,20
**extra (1)**
307:1
**extraneous (1)**
94:5
**extrapolate (2)**
85:2,4
**extremely (1)**
99:20
**eye (2)**
19:22,23

**F**

**facilitate (4)**
50:9;110:17;138:9;
247:6
**facility (2)**
33:11;247:5
**facing (1)**
232:24
**fact (18)**
28:13;64:12;83:14;

94:7;99:8;118:15;
122:2;185:11,14;
208:10;257:19;
270:4;278:15;
280:18,24;286:12;
291:7;295:9
**factor (3)**
38:18;74:10;91:1
**factors (1)**
38:10
**facts (5)**
224:13;270:16;
279:18;281:16;
283:19
**fair (22)**
20:9;48:20,22;
82:11;86:2;115:17,
20;160:3,4;164:7;
192:6;220:16;
236:22;239:6,10,12;
271:8,13,18;281:5;
282:22;283:22
**fairly (13)**
26:5,8;48:22;
56:13;59:7;82:7,12;
118:10;245:5,15;
249:21;259:22;
277:14
**fall (3)**
76:8;179:15;256:6
**falls (1)**
197:6
**familiar (5)**
27:2;101:6,8;
232:19;247:1
**familiarity (1)**
234:11
**family (5)**
75:1,2;81:21;
269:24;270:2
**far (48)**
27:14;30:13;31:9;
34:15;36:23;37:19;
42:4;49:6;60:5;
61:17;62:5;65:19;
71:13;72:1,18;73:20;
76:2;83:18;101:13,
17;106:7;115:1;
125:15,21;133:7;
135:11;146:23;
151:22;154:3;169:4;
177:20;178:11,21,23,
23;202:17;206:17;
255:21;256:2;
261:23;280:11;
292:14,15;295:6;
303:23;305:8,15,18
**fashion (2)**
308:5;310:3

**fault (2)**
47:13;48:8
**faxed (2)**
142:19,14
**February (6)**
175:6;221:1;
223:17;255:8,20;
256:4
**feedback (6)**
175:14;256:1;
257:11;259:17;
289:1;310:7
**feel (19)**
24:13;37:14;77:10;
87:17;99:21;107:11;
119:2;151:17;
203:18;204:4;207:8;
208:10;213:4,16;
216:3;247:2;257:10;
289:14;293:12
**feeling (3)**
74:11;77:16;
300:15
**feelings (1)**
87:21
**feels (1)**
230:18
**feet (1)**
191:1
**fellow (1)**
13:20
**fellows (17)**
13:21;149:9,11,15,
23;150:1,3,4,6,10,17,
23,24,24;151:3;
295:10,14
**fellowship (4)**
13:12;14:1,2,15
**fellowships (1)**
13:8
**felony (4)**
37:11;141:24;
142:5,24
**felt (22)**
24:17;36:3;54:7;
58:15,20;82:16,17;
83:10;87:24;93:22;
95:4;96:15;100:18;
118:7;150:6;155:10;
209:8;239:10;
251:16;276:24;
288:15,21
**few (10)**
10:21;48:1;55:5;
142:19,20;153:18;
218:6;285:20;
286:14;302:5
**field (1)**
20:6

**fight (2)**
195:12;198:3
**fighting (1)**
195:13
**Figueroa (14)**
27:6,8,12,20;28:6,
10,12;29:4,7;30:20;
31:21;217:3;218:1,6
**Figueroa's (1)**
28:24
**figure (2)**
263:24;293:20
**figured (1)**
276:13
**figures (1)**
284:23
**file (3)**
122:4,5;294:7
**filed (4)**
230:11,15;269:23;
270:1
**filing (1)**
3:3
**fill (3)**
68:24;72:14;
157:15
**filtered (1)**
270:19
**final (1)**
168:10
**finalization (2)**
169:2,2
**finalized (5)**
64:19;129:16;
168:14;172:5,8
**finance (1)**
156:9
**financial (1)**
156:13
**find (16)**
29:17;31:20;85:10;
89:12,19;165:24;
185:17;189:3,11,13;
263:1;265:7;276:18;
279:17,21;304:5
**finding (4)**
79:3;244:15,20;
246:5
**fine (9)**
7:22;18:17;45:22;
48:7,13;93:4;163:2;
255:23;266:1
**finish (3)**
5:19;139:12;262:1
**finished (4)**
139:11;164:11,14;
286:15
**firm (3)**
9:22;10:1;157:14

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

BARRY WINKLER, M.D.
October 6, 2021

**first (36)**
4:22;14:11,12;
19:13;23:8;24:1;
34:13,15;38:20;
43:19;49:6;61:11;
63:12;80:1;84:21;
85:3;93:17;113:24;
119:23;125:24;
126:11,11;129:21;
137:9,10,23;140:6;
148:20;155:21;
193:12,18,18;194:23;
216:7;285:20;304:18
**firsthand (1)**
302:9
**fit (15)**
24:17;25:4,8;76:3;
80:4,6;85:11;88:7;
89:19,20;95:21;
206:6,7;257:12;
280:14
**fitness (3)**
32:16;96:1;219:2
**five (5)**
11:6;152:6;256:9,
10;272:11
**floated (4)**
39:10;65:12,12,14
**floor (1)**
232:11
**flow (1)**
67:9
**flows (1)**
67:16
**flush (1)**
46:22
**FMLA (1)**
257:1
**focus (1)**
261:11
**focused (2)**
88:10,15
**follow (5)**
75:13,14;103:1;
226:3;262:22
**following (4)**
47:14;143:6;161:3;
179:18
**follows (1)**
4:24
**follow-up (2)**
277:21;286:14
**force (23)**
3:13;11:15;28:20;
216:22,24;217:3,10,
14,21,23;218:2,3,5,
13,18,19,21;219:1,9,
13,16,18;298:10
**forced (4)**

28:9,14;151:6,7
**Ford (53)**
13:16,17,19,24;
14:4;21:17,21;42:21,
24;43:17,23;44:12,
17;49:22;50:23;51:2;
55:18,19;56:11;
57:13;59:14,18;
64:19;71:14;104:2;
109:1,2;123:5,7,10,
14,24;124:3,5,7;
218:11,17;222:5,6,
10,19,21,24;266:18;
275:5,5,7,11,14,15,
19,21;309:1
**Fordham (1)**
8:24
**forensic (38)**
12:18;13:10,11;
14:12,21;15:21;16:9;
19:10,11;20:5,23;
23:10;32:5;74:22;
95:8,12;100:24;
133:20;149:12,14;
150:24;151:1,2,7,10,
14;153:14;173:8,19;
192:4;197:13;
205:12;206:20;
224:1;234:19;246:8;
291:11;292:17
**foresaw (1)**
299:19
**foresee (1)**
159:21
**forget (22)**
25:16;40:4;47:6;
55:3,4,22;58:4;
68:13;74:24,24;92:5;
96:8;100:15;103:16;
106:13;107:16;
122:9;143:17;
194:22;227:13,15;
301:8
**forgot (1)**
55:5
**form (307)**
3:7;6:19;11:21;
12:5,11;15:14;17:22;
18:3;19:4;21:19;
22:18;23:20;24:3,11;
26:6,14,19;27:15;
28:11;29:2,18;30:15,
23;31:7,13,24;32:6;
33:1,18;34:5;35:11,
17;37:3,22;38:24;
39:7,17;40:1,10,23;
41:21;42:8;43:3,11,
20;44:2;46:1,10,18;
48:23;49:19;50:2,4,

11,19;51:9,17;56:5;
59:15;60:19;62:16;
63:10;65:4;67:20;
70:6;71:23;72:16,22;
73:18;74:3,19;75:22;
76:9,22;77:12;78:6,
18;79:1,21;80:14;
81:10;82:8;83:21;
84:9;85:12,16,24;
86:7,13,18;88:12;
89:3;90:1,9,17;
91:22;92:12;95:1,14;
96:5,11,12,14,21;
97:6,16;98:12,19;
100:7;101:14;
102:23;103:5,14;
104:13;106:5,19;
107:6,23;108:13,19;
109:5,14,19;110:3,7,
10,10,11,12,19,21,24;
111:10,21;112:3,11;
113:1,5;114:13,19;
116:19;117:8;
119:13;120:20;
121:6,21;124:11;
125:1;127:23;128:7;
130:6,19;131:19,24;
132:6,16,22;134:4,
12,20;135:3;138:20;
139:8,17;140:6,7,15,
17,21;141:7,13,14,
19,23;142:7,9,10;
143:13;144:2,23;
146:21;147:7;149:2,
19;152:13;153:4;
154:10;155:7,17;
156:3,11;157:6;
160:8;162:16,17;
168:8;173:4,10,15;
174:16;177:15,21;
178:13;179:8,16;
182:15;183:4,6,8,10,
12,14,17,19,20,23,24;
184:4,5;185:23;
186:14,24;187:11;
192:11;194:20;
196:11,16,17;197:5,
11;198:5,12;199:3,8;
200:2,9,20;201:12;
202:15,21;203:10;
204:1,20;205:14;
208:13;213:8,21;
214:4;215:23;
216:11;217:5,12;
218:14;222:15;
224:12;226:8;
228:15;231:9;234:5,
15,21;235:2,8,23;
236:7;238:18;239:8;

241:18;242:3,9;
245:20,24;247:15;
248:11;251:3;253:1,
7;255:19;256:12,19;
261:24;264:2,13,19;
271:16;273:22;
274:7,21;275:2;
276:20;278:5,13,19;
279:18;290:6,17;
293:15;294:2;
295:16;298:8,22;
303:13;304:11;
305:6;306:3;307:21;
310:9
**formal (2)**
53:20;264:21
**formally (5)**
16:16,19,21;
255:24;285:21
**forms (4)**
140:9;141:9,12;
182:8
**forward (11)**
138:14,15;143:22;
162:2;190:8;211:15;
213:12,14;264:1;
268:12,12
**forwarding (1)**
136:22
**forwards (1)**
286:10
**fostered (1)**
234:2
**found (18)**
25:17;29:7,13;
30:20;32:14;33:6;
80:2;88:7;89:20;
102:1;189:22;206:5,
6,6,7;270:8;279:23;
280:14
**foundation (15)**
108:9;114:20;
116:1;125:2;173:11;
187:1;276:4;281:10;
289:10;295:16;
299:3;301:12,19;
303:6,14
**four (1)**
10:24
**FPECC (5)**
129:15,16;170:11;
175:10,11
**frame (2)**
31:16;78:15
**frames (2)**
37:21;215:16
**frankly (4)**
47:14;48:8;67:9;
273:3

**free (1)**
257:10
**frequently (2)**
153:23;259:22
**friction (1)**
49:9
**Friday (2)**
250:10;273:11
**friend (2)**
276:18;283:12
**friendly (2)**
275:19,21
**friends (4)**
275:22;276:15,16,
17
**front (3)**
118:19;164:18;
207:21
**frozen (3)**
104:24;105:3,12
**frustrated (4)**
135:1;210:23;
211:3;219:20
**full (12)**
10:21,23;15:18;
63:5;85:3,5,5;175:8;
220:16;223:20;
255:15;273:8
**full-time (3)**
67:8;71:10,11
**fully (2)**
258:2;285:23
**function (1)**
282:20
**functioned (1)**
19:1
**functioning (3)**
154:24,24;155:1
**functions (5)**
14:23;18:9;242:1;
258:19,21
**funding (1)**
15:24
**FURTHER (8)**
3:6,10;138:19;
225:14;227:6;302:3,
7;311:11
**future (2)**
148:23,24
**FYI (1)**
226:20

**G**

**Garcia-Mansilla (8)**
107:13,16,20;
108:3;172:17;
173:14;297:2,8
**Gardner (2)**

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 332 of 353

BARRY WINKLER, M.D.                                    MELISSA KAYE v.
October 6, 2021                        HEALTH AND HOSPITALS CORPORATION, et al.

226:15,24

**gastric (2)**
8:3,7

**gather (1)**
193:20

**gave (13)**
54:18;83:13,14;
84:1,22;85:3,5,6;
106:15;155:9,13;
184:9;251:23

**general (23)**
6:15;32:11;35:9;
107:2;108:22;
124:15;125:14;
152:19;173:19;
177:20;201:19;
215:14;236:6;
240:12;289:5,21,21;
293:17;299:23;
304:7,15;305:22;
307:3

**generally (9)**
99:18;111:19;
123:18;155:3;261:2;
267:7;289:17;
296:15;301:9

**General's (1)**
270:22

**generate (1)**
302:15

**generated (5)**
270:7,9;285:15,24;
286:1

**Gilmartin (1)**
10:2

**Ginger (5)**
226:14,24;227:11,
12,13

**given (12)**
38:2;44:17;57:23;
83:24;84:24;98:18;
145:7;156:1;184:6;
186:12;257:11;
306:23

**giving (2)**
196:2;202:3

**glowing (1)**
125:18

**Gmail (1)**
190:17

**goal (1)**
37:10

**goals (3)**
35:14;36:3,24

**God (1)**
5:4

**goes (2)**
267:13;308:10

**Gonzalez (24)**

78:17,22;79:20;
81:1;82:14,23;84:21;
85:11;86:17;88:11,
20;89:2,12,16;90:6;
98:10;99:19;101:1,
21;102:15;105:24;
154:9,17;290:2

**Gonzalez's (3)**
99:1,6,9

**Good (32)**
5:3;18:24;19:18;
22:7;46:23;47:23;
48:5,19;87:10,24;
151:17;155:4,11,12;
158:11,23;175:13;
176:5;190:24;
220:21;239:1,4,4;
245:10,13;246:5;
250:9;256:8;263:15;
264:9;293:17;309:23

**governing (3)**
292:17,20,20

**graduate (1)**
12:14

**grant (1)**
219:14

**granted (1)**
272:24

**grasp (1)**
307:13

**grieved (2)**
281:8,12

**group (8)**
41:8;54:22;55:20;
56:10;62:23;65:1,2,3

**groups (1)**
65:17

**guess (87)**
5:6;6:9;10:16;
13:9;18:7,23;22:4;
24:1;29:16;32:10;
34:12;37:1,20;38:10;
41:18;42:6,24;46:13,
15,16;50:24;51:7,7;
52:7;65:1;66:2;
71:11;72:13;77:19;
80:11,12;85:22;
89:11;91:21;95:7;
97:8;106:2;107:1,21;
108:24;116:6;123:5;
129:13;130:17;
131:14,14,16;137:8;
138:12;139:19,20,22;
142:13;148:21;
151:19,23;152:4;
154:8,20;155:5,9;
156:1;169:2;170:13,
22;173:20;175:6,24;
176:1,3;184:8;

193:13;210:14;
212:7;217:2;218:12;
221:3,17;234:10,11;
242:16;244:24;
247:5;260:9;272:4;
308:4;309:7

**guessing (1)**
142:20

**guidance (1)**
260:1

**guidelines (7)**
160:17;161:6;
167:10,22;205:6,11;
292:21

**guides (1)**
95:19

**guise (1)**
47:18

**guys (1)**
194:18

---

## H

**H&H (6)**
58:18;62:21;
116:10;156:15;
168:23;227:7

**HAC (1)**
100:23

**Hack (1)**
271:21

**Hackworth (7)**
271:1,6,8,13,18,21;
273:13

**Haferly (1)**
10:2

**Hagan (219)**
4:15,15;5:2;6:22;
7:1,12,15,24;19:6,9;
22:9,11;27:8;31:2;
44:4;46:4;56:18;
57:2,6,10,11;69:12,
15;92:18,22;93:3,5,9,
13;105:1,5,13,16;
113:2;126:7;129:1;
130:21;135:5;
136:16,21;137:1,5,
11,14,16,19;138:23;
139:4;142:3;148:13;
160:22;162:1,9,13,
15,19,23;163:5,10,
13,17,21;164:2,5,11,
14,16;165:1,9,14,16,
21;166:1,4,7,17;
169:20;170:18,21;
171:1,10,14;174:18;
175:1;177:2;181:11,
15,19,23;184:20;
187:24;188:17,20;

189:2,5,8,16,21,24;
190:3,8,11;191:12,
15,21;193:2;197:13,
20;202:1,2;204:24;
205:4;209:12;
211:14;214:11;
219:21;226:11;
230:20;231:1,16;
239:19;243:21;
248:16;253:22;
254:5,9,12;258:14;
259:2;260:9,13;
262:1,10;265:6,12,
16,22;266:4;272:20;
274:14;277:19;
278:5,13,19;279:1,8,
18;280:5,10,19;
281:2,10,16;282:1,3,
8,16,23;283:4,8,12,
18,21;284:1,12;
286:6,14,16,20;
287:7,11,15,19;
288:4,8,18;289:3,10,
20;290:6,17;291:2,9,
15,19;292:1,5,8,19,
24;293:6,15;294:2,8,
14,23;295:3,5,16;
296:13,22;297:9,13,
17;298:6,22;299:3,7,
16;300:4,19;301:1,5,
12,19;302:5,8;
308:13;311:8

**half (1)**
58:7

**Hall (1)**
40:18

**Hampton (4)**
9:13;10:15,15;
62:14

**hand-delivered (1)**
142:21

**handle (2)**
51:3;129:20

**handy (2)**
165:18,22

**happen (2)**
33:6;76:4;84:15;
120:10;130:17,20,24;
141:6;259:21,24;
264:10;310:18

**happened (32)**
30:3;31:16;39:20;
41:14,15;56:17,24;
57:16;64:10;69:16;
78:24;102:15;
109:22;110:1;
168:18;187:20;
195:3;201:3;233:19;
250:18;252:4,22,24;

264:11,14;268:22;
275:9;276:8,18,23;
278:22;285:18

**happening (4)**
108:12;141:21;
233:17;234:13

**happy (4)**
94:6;125:7;299:19,
24

**hard (5)**
143:23;144:5;
152:24;205:9;302:18

**hated (2)**
54:1,2

**head (4)**
5:13;31:9;66:21;
138:2

**headed (1)**
95:6

**headings (1)**
65:14

**Health (9)**
4:5;6:24;23:19;
26:24;32:3,21;33:14,
16;194:16

**hear (34)**
22:10,11;23:14;
30:6;39:2;42:17,20;
49:4;52:20;68:3,7,
12;69:12,14;95:16;
134:7,24;149:21;
206:16;208:3;216:7;
239:15;254:12;
273:20;274:3,5,9,12,
13,15;297:16;299:4,
6;303:16

**heard (12)**
68:13,14;69:23;
185:14;253:20;
274:2;279:12;
297:11,14,18;299:8,9

**hearing (22)**
34:7,22;68:10;
80:7,9,23;104:16;
144:4,6;146:12;
193:22;194:10,19;
195:22;238:8;
239:17;299:9;300:5;
302:21;303:1,3,8

**heart (1)**
198:20

**heaviest (1)**
284:16

**heavily (1)**
24:24

**Hello (1)**
240:9

**help (6)**
141:21;148:23;

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 333 of 353
MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

BARRY WINKLER, M.D.
October 6, 2021

152:1;184:18;247:4;
255:2
**helped (1)**
20:5
**helpful (6)**
20:11;137:24;
213:19;240:15;
250:4;257:15
**helping (1)**
267:24
**HEREBY (2)**
3:1,4
**herein (1)**
3:3
**here's (1)**
171:5
**herself (4)**
135:13;136:11,17,
20
**HHC (11)**
193:21;194:18;
195:1,2,12,13;196:2,
4;208:23;209:7;
212:3
**Hi (13)**
182:8;210:8,19;
221:7;224:3;244:18;
249:12;255:18;
256:16;260:23;
261:1;262:22;267:6
**hierarchical (1)**
109:13
**hierarchy (3)**
103:22,23;104:9
**high (1)**
138:4
**higher (1)**
138:2
**highest (2)**
8:16;141:23
**highly (2)**
175:22;176:2
**himself (1)**
233:16
**Hindsight's (1)**
258:24
**HIPAA (19)**
38:21;39:5,16;
42:2,5;106:21;139:8,
16;140:20;141:2,9,
12,13,14,19;142:12;
179:11,15;196:24
**HIPAA-exempt (6)**
106:4,14,16,17;
179:14;228:4
**HIPPA (1)**
227:2
**HIPPA-protected (1)**
227:21

**hire (4)**
67:24;80:13;176:2;
259:4
**hired (20)**
43:24;44:5;64:11;
70:9;72:3,7,21;73:4;
74:16;76:7;78:9,13;
80:3,19;258:22;
259:4;271:21,23;
307:3,17
**hiring (3)**
68:15,20;70:13
**history (3)**
106:23;110:5;
310:18
**HIV (4)**
110:4,14;191:6;
208:20
**Hoge (2)**
16:5,6
**Hoge's (1)**
16:6
**Hold (3)**
166:20;170:16;
188:24;308:10
**holidays (2)**
147:18,20
**home (3)**
272:11,13;273:8
**honest (2)**
123:16;139:15
**honestly (22)**
21:9;29:20,20;
43:16;53:9,11;66:20;
88:17;91:9;103:9;
108:20;118:11;
167:3;178:15;
186:16;215:7;223:4;
236:21;250:19;
257:21;278:10;
297:19
**hope (2)**
93:15;176:2
**Hopefully (1)**
129:21
**Hospital (4)**
13:12;23:6;28:5;
63:20
**Hospitals (2)**
4:5;38:8
**hostile (3)**
46:15;245:23;
246:2
**hostility (3)**
128:18,19;234:20
**hour (3)**
58:7;60:12;116:12
**hours (11)**
6:18,20;7:5,19;

8:11,14;58:10,19;
60:6,6,9
**housekeeping (1)**
5:6
**HR (3)**
63:15;64:19,20
**Huh (1)**
31:3
**hundred (1)**
101:10
**hybrid (1)**
272:12
**Hygiene (5)**
23:19;26:24;32:4;
33:15,16
**hypothetical (3)**
205:9;281:4;291:2

# I

**icon (1)**
166:21
**idea (14)**
18:24;39:10,21;
65:7,10;87:10,24;
175:22;190:24;
250:9;263:16;264:9;
275:13;293:17
**ideas (3)**
19:23;65:12,16
**identification (27)**
126:5;129:8;136:1;
148:3;158:3;164:23;
170:7;174:23;
176:11;180:24;
185:1;188:7;193:8;
209:21;211:21;
220:2;223:9;225:23;
231:14;232:16;
240:1;244:5;248:24;
254:23;259:12;
262:8;266:13
**identified (1)**
36:24
**identify (1)**
252:12
**illegal (1)**
292:11
**imagine (2)**
28:22;192:24
**imbibed (1)**
8:13
**impact (6)**
38:11,11,16;
253:11;272:9;290:21
**impacted (4)**
253:13;272:7;
301:24;306:2
**impacting (1)**

114:2
**impetus (1)**
172:24
**implement (1)**
110:3
**implementation (1)**
302:16
**implemented (4)**
36:2;109:13;
143:18,18
**implying (1)**
209:11
**important (1)**
4:7
**impression (4)**
35:6,11;95:10;
305:23
**improper (1)**
202:24
**improve (2)**
252:19;253:4
**improvement (1)**
258:20
**improvements (1)**
40:19
**inaccuracy (1)**
304:5
**inaccurate (1)**
145:23
**inappropriate (8)**
29:11;134:16;
162:9;199:12;200:1;
212:22;213:2;219:13
**incident (6)**
104:12;172:10;
187:21;231:3;232:9;
233:18
**include (3)**
53:20;158:17;
221:9
**included (5)**
75:12;81:19;88:15;
120:4;159:4
**including (1)**
194:9
**inconsistency (1)**
287:24
**inconsistent (6)**
76:1;91:16,17;
92:1;206:24;288:3
**incorporate (2)**
256:1;257:11
**incorporated (1)**
158:14
**incorrectly (1)**
147:5
**increased (1)**
65:8
**increasingly (2)**

210:23;211:3
**independence (3)**
159:16,19,20
**independent (1)**
84:16
**independently (2)**
288:7,9
**indictment (1)**
310:17
**indirect (2)**
20:17;26:21
**indiscernible (25)**
35:5;106:18;137:9;
139:2;140:24;
143:12;158:6;
160:24;162:15;
165:14;169:3;
170:14,20;171:9;
198:20;201:20;
235:15;258:13;
262:17;271:22;
272:18;273:21;
283:8;303:4;305:21
**individual (3)**
48:8;280:7;290:12
**individuals (5)**
34:18;35:4;168:3;
231:24;232:2
**individual's (1)**
85:1
**inequity (1)**
59:19
**influence (3)**
38:1,3,11
**info (2)**
193:22;208:20
**inform (1)**
232:9
**information (50)**
24:18;25:3,17,21;
29:21;54:20;77:9;
81:18;88:16;106:23;
23;110:4,15;112:15;
129:18;139:2;
140:21,23;141:4;
153:7;155:13;
178:11;179:4,13;
184:6,9;194:19,24;
203:3;209:7;216:3,
17,19,20;217:20;
227:22;228:4,22;
240:15;276:24;
278:8;279:5,7,12;
299:23;303:9,12,19;
310:7,12
**informs (1)**
140:6
**ingest (1)**
8:13

BARRY WINKLER, M.D.
October 6, 2021

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

**inherently (1)**
159:6

**initial (8)**
49:8;63:15;83:5;
137:2;145:3;229:10;
249:10;308:1

**initially (12)**
20:13;44:7;47:12;
73:5;76:24;133:7;
144:19,21;145:5,19;
272:10,21

**initiative (1)**
219:18

**injury (1)**
233:15

**inmate (4)**
27:13,17;231:6;
278:3

**inmates (7)**
38:13;42:5;197:3;
198:11;207:22;
208:6;291:13

**inmates' (1)**
198:17

**inpatient (5)**
14:13,22;15:17,21,
24

**in-person (3)**
263:18;278:12,14

**input (3)**
175:24;176:21;
263:21

**inputted (1)**
144:22

**inquiry (1)**
224:9

**insight (2)**
51:7;138:8

**insist (1)**
86:16

**Inspector (1)**
270:21

**instance (11)**
27:11;56:11;81:5;
86:16;106:15;
172:16;173:1;227:9;
280:3,6;282:11

**instances (4)**
38:13;121:4;155:6;
276:1

**instead (5)**
15:17;55:9;92:19;
181:24;216:15

**institute (1)**
285:18

**institution (1)**
74:23

**instruction (1)**
161:13

**intake (1)**
15:1

**integrity (1)**
247:3

**intellectual (1)**
154:24

**intent (1)**
229:10

**interact (1)**
245:4

**interacted (4)**
69:6;134:23;234:8;
245:5

**interactions (7)**
27:4;51:5,19;53:2;
57:17,20;157:9

**interest (3)**
27:5;151:14;
246:14

**interested (2)**
44:21;127:6

**interestingly (1)**
9:17

**interfere (5)**
114:10;159:16,19;
160:6,13

**interfered (1)**
59:10

**interference (2)**
28:23;162:3

**interferes (1)**
160:10

**interfering (2)**
159:21,23

**interjected (1)**
175:22

**interns (5)**
74:11;149:8,11,13;
153:15

**internship (2)**
13:23;14:2

**interview (31)**
38:5;53:22;54:6;
70:14,16;79:10;83:9;
92:4,6;93:21,21;94:1,
17;96:11,14;121:24;
122:3,4,7,7,16,21;
160:14;232:17,23;
233:2,3,8;251:23;
288:16,22

**interviewed (7)**
16:12,15,19,21;
70:15,19;71:2

**interviewer (1)**
160:2

**interviewing (4)**
16:16;52:16;98:2;
271:1

**interviews (26)**

15:1,4,6;20:2;
52:15,18;53:17,18;
54:5,5;92:3;93:22;
94:7;96:4,9;121:17;
200:23;251:10,13;
252:5;300:7,13,14,
16,18,23

**intimately (1)**
91:5

**intimidated (6)**
235:11,12,14,15,
19,20

**into (19)**
9:18,18;10:12;
20:19;32:15;61:11;
83:2,3;144:19,20,22;
147:5;155:3;194:23;
208:20;217:11,14,24;
226:2

**introduced (1)**
92:3

**introducing (1)**
94:4

**investigation (5)**
101:19,24;105:7,
23;269:6

**Investigations (2)**
268:24;269:14

**invite (1)**
55:16

**invited (10)**
54:23;55:7,9;56:9,
23;124:22;280:16,18,
22,24

**invoke (1)**
197:3

**invoked (1)**
197:9

**involve (1)**
152:22

**involved (29)**
14:11;24:20;26:9,
10;31:22;32:4,12,13;
65:2;79:24;91:5;
98:9;107:16,19,21;
133:9;151:2;157:11;
174:14;199:18;
213:7,11;215:12,13;
225:16;231:3;270:2;
275:3;276:6

**involvement (4)**
31:18;108:3;
150:12;185:13

**involving (1)**
269:1

**irrelevant (3)**
53:14,15;272:19

**iSight (15)**
143:16;144:9,12,

15,20;145:6,11;
146:1,2;285:19,21,
23,24;286:2;302:16

**iSight's (1)**
286:2

**Island (21)**
9:14;15:5;24:6;
25:19;26:14;27:23;
28:1;29:1,8;33:11;
35:2;38:8;81:14,21;
184:7,8,13;185:8;
186:7,10;278:3

**isolated (1)**
187:21

**issue (38)**
25:5;27:1;37:12,
13;39:19;64:9;74:12;
75:7;84:17,18;
107:15;108:7;
110:13;111:14;
114:5;119:1;127:8;
128:15;146:9;
208:21;213:15;
216:22;217:15,21,23,
24;219:16;225:8;
227:19;229:9,13;
241:10;248:10;
261:13,16,22;286:23;
294:21

**issued (9)**
108:7,10;131:6;
132:15;133:6;
219:18;229:1;
275:11;298:10

**issues (23)**
5:6;10:11;23:18,
23;47:12;51:3;52:6;
59:1;67:11,13;72:15;
111:13,15;114:17;
142:5;183:22;184:2;
222:6;225:17;230:6;
238:13;264:7;270:12

**J**

**jail (2)**
212:24;213:1

**Jain (95)**
49:23;50:22,23;
51:6,16;52:8,11,19,
23,24;53:4,19;54:1,7;
57:19,21;61:1;68:14,
17;70:14;71:2;74:15;
77:10,21;104:1;
119:19;120:1,6;
121:4,14,15,20;
122:3,6,16;127:20,
21;128:6;129:13,15;
130:1;147:5;148:9,

15,20;145:6,11;
21;151:15;155:4;
157:4;158:13,20;
170:10;175:5,5,9;
181:7;182:2,6,13,19;
183:22;222:4;240:8;
244:12,20;246:4,8,
11,15;255:5,17,18;
257:19;259:16,22;
262:16;263:15;
264:5;266:18;267:4,
19,23;268:1;273:24;
287:12;293:24;
294:1,3,17;295:20;
297:19;300:3,10,13;
308:23;309:6,6

**Jain's (6)**
51:5;53:14,17;
294:22;300:7;308:21

**James (9)**
137:6,12,23,23;
138:14;158:6;
226:14,24;227:13

**January (3)**
171:21;237:17;
238:3

**Jay (1)**
12:19

**Jeff (9)**
92:8;232:5;238:9,
23,24;278:10;279:4;
299:24;300:6

**Jeremy (2)**
20:19;192:2

**Jewish (2)**
147:18,20

**JHC (1)**
192:1

**job (62)**
14:11,12,18;15:16;
16:15;44:16,17,18;
94:18,22;111:19;
112:2,7,17;125:20;
177:20;196:10,13,15;
197:14,14;198:2,3,
16,24;199:4,7,11,11;
200:8,14,18;201:4,8;
202:12;204:6,8,12,
22;206:9,10,15;
207:10,13,15,16;
208:12,16;213:12;
223:23;228:8,13;
230:5;242:1;253:6,
12;258:19;273:19;
275:7;276:19;
282:19;283:9

**jobs (3)**
44:21;198:19,23

**John (2)**
12:19;27:2

DALCO Reporting, Inc.
800.325.8779

Min-U-Script®

**joke (1)**
54:3

**Jonathan (2)**
116:22,24

**Jones (3)**
231:23;232:3,4

**Jose (8)**
78:17;88:19;98:9;
100:24;101:21;
102:15;105:24;290:2

**Joseph (1)**
136:24

**judge (35)**
33:8;80:8,24;
81:24;86:16,20;87:5;
91:15,16;92:1;141:4;
165:19;185:9,13,15;
193:21;194:10;
199:5,17,18;216:21;
217:15,21;219:16;
227:18;228:12,20;
232:14;265:11;
288:1,2;298:10,16,
19;308:12

**judges (25)**
26:11;48:14;49:14;
50:1;91:11,20;
110:11;138:5;159:2,
11;190:23;196:3;
199:1,6,13;210:22;
211:2,6;219:14,17,
19;309:15,17;311:3,7

**judge's (5)**
186:1;195:11;
216:18;217:22;
219:15

**judgment (2)**
160:7,11,13

**judicial (16)**
141:10;142:13;
185:19,22;186:4,6;
187:16;221:19,20;
226:6;227:5,22;
228:5,21;229:1,3

**July (8)**
133:24;136:12;
137:19,22;182:2,7;
272:11,12

**June (6)**
129:14;130:18;
136:23;137:8;163:12

**juris (1)**
8:18

**justice (2)**
36:1;212:11

**jut (1)**
129:21

## K

**Kaye (326)**
4:5,16;16:14,18,21,
23;17:9;18:6,15,22;
19:16,17,24;20:4,9,
17;22:5,16;23:13;
25:15;26:2,20;30:5;
34:18;39:15,22;42:2,
7,11,12,13,18,20,23;
43:9;45:11,18,21;
46:8,23;47:16,20;
48:20,22;49:7,13;
50:8,14;51:8,12,16;
52:8,10,24;53:3,13,
16,19;54:23;55:17;
56:3,10,13;57:14,19,
21,24;58:9;59:2,13,
18;65:21,24;66:23;
67:19;69:3,8;70:2,16,
16;71:10;72:5;74:6,
14;76:7;77:23;78:3,
21;79:16;80:1;83:5;
87:23,24;90:23;
91:11,19;92:2,2,5,14;
93:18,19;94:1,5,9,12,
24;96:7,10,13,15;
98:4,7,16;99:11,21,
23;103:11;104:12;
105:6,22;106:12;
107:12,17;108:7,23;
109:3;111:3,18;
112:8,19;113:3,8,19;
114:5,17;116:5;
117:6;118:1,7,9,13,
24;119:18;120:22;
121:5,9,9,20;122:6,
16,20;123:5,7,9,14,
23;124:9,18,22;
126:12,17,22;127:11;
131:10;133:13;
134:1,9,19;135:1,12;
136:11,12,16,18,20;
138:15,16;145:21;
146:6,24;147:4,10;
150:5,11;168:6;
169:6;177:10;
183:13;185:6;
188:11,12;190:16,19;
191:4,9,17;192:5,21;
193:13,17;195:4,24;
196:8,9;199:5;
201:15,19;203:6;
208:18;209:24;
210:5,9;211:24;
215:3;220:11;221:6,
16;222:12;223:16;
224:5;225:3,5,15;

226:5,14,19,23;
227:17,20;228:7;
230:8;232:13;
233:22;234:1,11,14;
235:7,11,19,20,22;
237:1,6,6;240:8;
241:24;242:7,14,23;
243:12;244:12;
246:3,13;249:7;
250:3,8;251:6,8;
255:5,17,18;256:16;
257:3;260:24;261:2,
14,23;262:16,21;
263:8,23;267:4,6,13,
14,19;268:11,15;
270:13;271:9,12;
273:24;274:3;
275:10;276:9,15;
277:2;278:18,21;
280:16;281:7,22;
282:13,18;283:3,8;
285:8;287:14,16;
288:6,15,21;289:1,8,
15;290:1;293:3;
294:21;295:14;
296:10,17,20;297:19,
22;299:8,12,21;
300:9,12;301:4,16,
22;304:19;309:23;
311:2

**KAYE5THPROD001 (1)**
209:19

**KAYE5THPROD002 (1)**
209:20

**KAYE5THPROD010 (1)**
193:7

**KAYE5THPROD011 (1)**
193:7

**KAYE5THPROD012 (1)**
188:6

**Kaye5thProduction001 (1)**
189:15

**Kaye5thProduction010 (1)**
193:11

**Kaye5thProduction012 (3)**
188:3,21;189:17

**Kaye5thProduction1 (1)**
209:15

**Kaye's (32)**
22:21;41:19;47:10;
48:9;49:16,23;61:23;
62:1,4;93:20;94:6;
101:3,22;120:18;
124:23;196:15;
198:2,16;200:14,18;
202:12;204:9;
228:13;229:19,23;
251:1;264:6;273:20;
277:10;283:10;

304:8,10

**Kay's (2)**
198:24;200:7

**keep (12)**
82:22;88:8;122:12;
125:17;166:7;294:3,
4,7,17,19;295:1,7

**keeping (3)**
121:24;122:11;
294:16

**kept (4)**
76:24;107:8;
212:24;213:1

**key (1)**
24:21

**killer (1)**
85:15

**killing (2)**
85:18,21

**kind (27)**
6:9,15;21:11;
34:12;65:18;66:12;
84:11;95:10;124:16;
144:8;145:4;157:17;
166:20;179:12;
200:15;209:8;215:5;
223:24;224:8,9;
234:2,3,19,20;
241:10;262:18;282:4

**King (1)**
212:2

**Kings (3)**
40:20;41:3;138:12

**Kirby (3)**
32:17,18;33:21

**knew (11)**
22:15;31:9;99:11,
12;100:1;101:23,24;
122:8;171:8;208:9;
259:3

**knowing (3)**
47:14;174:17;
258:22

**knowingly (2)**
196:23,24

**knowledge (18)**
61:10,20;101:2;
114:12,15,16,21;
123:1;151:10;
180:11;234:24;
235:4;237:16;
285:20;297:7,10;
301:21;302:10

**knowledgeable (1)**
20:1

**known (1)**
31:22

**Kronos (3)**
146:24;147:3,6

## L

**Laboy (2)**
64:21;116:15

**lack (4)**
49:9;72:6,9;301:12

**Lacks (2)**
301:19;303:6

**Laird (2)**
220:13;221:16

**language (1)**
139:23

**large (1)**
44:22

**larger (2)**
166:23;311:5

**LAS (1)**
196:4

**last (20)**
6:18,20;7:4,19;
8:11,14;19:13;93:9;
134:6;175:12;
185:20;193:13;
206:16;216:4;226:3;
257:12;273:10,12;
275:14,18

**late (1)**
118:11

**later (4)**
21:8,13;116:4;
265:11

**Law (25)**
4:18;8:21,23,24;
9:15,22,24;10:4,15;
32:15;63:1;184:10;
194:6,6,8,12,23;
195:1,9,10,18,21;
198:11;201:23;
204:19

**lawsuit (8)**
6:5,16;12:1,4;
229:19,23;230:11,15

**lawyer (7)**
10:10;92:6,8;
197:12,16;203:23;
245:13

**lawyers (3)**
91:12,21;111:16

**lays (2)**
95:10,16

**lead (1)**
106:16

**Leading (10)**
104:7;113:11;
146:10;163:21;
278:6,19;279:1;
281:2;288:4;294:8

**learn (8)**

Case 1:18-cv-12137-JPC-JLC    Document 225-8    Filed 03/05/22    Page 336 of 353

BARRY WINKLER, M.D.                                    MELISSA KAYE v.
October 6, 2021                        HEALTH AND HOSPITALS CORPORATION, et al.

40:22;41:1;95:8;
96:18;146:20;179:5;
291:6;299:1
**learned (8)**
20:1;23:9;25:18;
39:21;87:5;102:1;
122:9;301:11
**learning (2)**
105:6;201:17
**least (7)**
42:3;69:20;82:17;
96:24;197:21;
213:10;305:20
**leave (9)**
40:7,16;94:20,22;
114:18;233:3,6,10;
276:3
**leaves (2)**
18:1;168:3
**leaving (4)**
233:9;267:20;
273:18,18
**led (8)**
91:1;127:22;128:5;
133:5,5;173:2;
273:17;298:8
**left (35)**
15:9;21:14;45:16;
48:1;60:2;68:11;
71:7;72:2;73:3;
111:3,4;113:9,14;
146:15,19;149:17,21,
23;150:2;151:13;
225:10;233:1;271:9,
12;273:7,13,15;
275:7,8,11,23;
276:19,22;298:4;
304:3
**legal (39)**
25:19,24;26:13,18;
47:5;48:4,11;49:11,
24;92:6;127:19;
184:6,7,7,11,13,14;
193:21;194:18;
195:1,2;196:1,2,4;
197:15;200:5,13,15;
201:2;203:7,12,21;
227:7;230:19;
234:10;245:2;295:1;
300:21;309:23
**legally (1)**
153:15
**legitimate (1)**
230:18
**length (7)**
26:3;75:8;114:18;
116:12;300:7,22;
309:8
**less (4)**

59:23;60:4;112:15,
17
**lesser (1)**
291:13
**letter (4)**
231:22;233:20;
275:11;276:2
**level (8)**
8:16,20;138:2,4;
227:15;234:10;
290:22;307:9
**leveraged (2)**
49:23;50:7
**lieu (1)**
218:13
**life (1)**
230:6
**lightest (1)**
284:19
**liked (1)**
245:12
**likely (1)**
279:4
**liking (1)**
40:13
**line (16)**
15:24;40:17;41:2;
63:19,22;64:15;
93:14;122:14;
281:23;282:7,10,12,
12,15;283:3,15
**links (1)**
208:19
**list (4)**
22:14;47:3;96:4;
154:6
**listed (4)**
141:23;142:9;
152:18;154:15
**listen (1)**
101:3
**listened (1)**
81:7
**literature (3)**
101:6;310:7,11
**litigation (2)**
95:9;272:19
**little (8)**
34:13;51:20;95:8;
151:9;152:16;
171:11;183:1;248:17
**lived (4)**
96:19,23;277:15,
15
**Liz (1)**
224:3
**Lloyd (3)**
212:1,2,8
**load (1)**

45:17
**locate (2)**
270:5,10
**located (3)**
73:12;96:24;97:1
**location (2)**
70:1,2
**locks (1)**
233:5
**logistics (1)**
257:16
**Long (25)**
9:14;10:4,23;11:4;
14:17;53:14,17;54:5,
8,10,12;60:11;75:10,
17;92:19;95:5;
182:24;252:7;
271:20;273:2;
300:15;307:7;311:11
**longer (19)**
16:1;25:20;28:5;
34:9;36:16;44:23;
54:12;63:20,20;
76:24;97:5,10;
151:16;186:21;
193:22;194:19;
211:12,13;213:1
**longest (1)**
50:14
**look (11)**
118:18;126:10;
136:9;160:23;
164:16;165:4;171:7;
194:23;226:18;
262:18;265:13
**looked (1)**
265:15
**looking (5)**
133:9;190:23;
208:20;265:14;
268:11
**looks (8)**
158:11,23;176:5;
183:4,8,9;191:18;
260:8
**Loren (2)**
4:1,23
**Lorraine (3)**
92:10;243:10;
299:23
**loss (1)**
303:11
**lost (2)**
166:20;303:9
**lot (12)**
20:1;25:15;52:22;
65:12,15;74:10;
88:15;94:5;96:11;

97:23;100:19;147:14
**LP (4)**
195:5,5;208:23,24
**Lucrecia (9)**
195:6;199:16;
210:5;212:2;220:21;
221:8;224:19;225:6;
244:18
**lunch (6)**
60:11;61:12;92:18,
20;116:12;277:8
**Luncheon (1)**
93:7
**Lynch (3)**
231:23;232:3,4

**M**

**MacDonald (19)**
50:24;51:1;104:4;
124:9,14,18;222:6,9;
223:21;224:3,9,16,
23;225:3,7,15;226:4,
4;297:21
**Magistrate (1)**
165:12
**maintained (1)**
304:24
**maintenance (1)**
100:19
**major (1)**
38:10
**makes (1)**
173:23
**making (7)**
24:16;28:4;53:11;
81:1;168:3;290:3,4
**male (2)**
117:7,12
**malinger (1)**
87:16
**malingering (13)**
83:7,12,15;87:16;
89:13,16,18,24;90:4,
6;154:6,23;249:13
**managed (1)**
242:7
**management (9)**
35:14;56:4,14;
85:10;86:5;133:6;
143:24;186:19;
199:24
**manager (7)**
143:21,21;145:14;
195:7;224:20;
242:15;286:9
**managerial (4)**
22:14;242:1;283:3,
17

**managers (1)**
302:15
**managing (7)**
108:6,12,15;
169:16;170:11;
186:22;260:2
**mandated (2)**
100:15,18
**Manhattan (10)**
13:5;43:8,13;
44:20,23;59:23;
159:1;277:15;
284:16;303:17
**manner (3)**
20:3;249:14;
258:19
**Mansilla-Garcia (1)**
107:19
**many (15)**
55:4;66:19,20;
77:15;121:10;153:2,
9;214:2,7,7,15,17;
252:5;306:22,22
**March (8)**
19:12;226:20;
272:5,8;273:10,11,
13,16
**Marci (4)**
4:1,23;93:3;105:16
**mark (4)**
126:1;181:20;
184:20;227:1
**marked (44)**
126:4;129:3,7;
135:24;147:23;
148:3;157:21;158:2;
164:22;168:6;
169:21;170:6;
174:22;176:10,13;
180:23;181:1;
184:24;188:1,6;
190:13;193:8;
209:20;211:15,20;
219:22;220:2;223:8,
11;225:22;231:13,
17;239:20,24;244:4;
248:23;254:22;
255:1;259:7,11;
262:7,11;266:7,12
**Maryanne (1)**
23:2
**master's (2)**
12:18;13:9
**material (1)**
249:15
**materials (1)**
227:5
**matter (7)**
4:4;16:20;202:23;

212:21;246:16;
289:18,22
**matters (1)**
18:13
**may (47)**
3:11;6:8,10,20;
42:1,6;43:9;47:3;
56:12,13;81:4;84:7;
87:16;98:21;106:12;
124:16;125:23;
127:12;141:4;
152:23;153:9;160:3;
168:13;172:10,17;
173:2;176:15,16;
187:8,13;227:7;
228:3;231:7,7;232:8,
10;233:6;234:9;
238:2,6;247:8;
257:21;261:4;267:9;
270:13;298:15,17
**Maybe (28)**
41:16;48:1;58:18;
59:8;67:7;69:21,22;
70:24;73:1;90:19;
98:16;100:16;
118:11;119:13;
120:10;131:4;
141:21;144:14;
152:23,24;178:1;
184:13,18;194:6;
209:8;236:20;255:2;
275:16
**mayor's (2)**
35:24;212:10
**McEvilley (17)**
92:10;243:11;
244:13,24;245:4,5,9,
11,12;246:3,16;
247:8,12,17;299:2,
13,24
**McNulty (2)**
10:2,4
**MD (2)**
4:4,21
**mean (62)**
17:11;21:21;23:13,
22;30:17;32:8;35:9;
41:9;43:5;44:2,5;
46:20;50:6;52:2;
56:7,16;66:6;67:1,
22;69:4,5,6;74:21;
79:3;84:11;87:20;
100:9;102:5;103:1;
105:13;106:16,17;
107:8;110:21;111:5;
119:3,7,14;124:14;
125:3;131:13;132:5;
142:6;145:6;146:1;
155:2,19;168:22,23;

200:23;201:8;
203:10;205:8;
206:22;209:5;
235:14;241:17;
242:19;290:7;291:3;
309:20;310:11
**means (1)**
199:10
**meant (4)**
54:3;151:3;209:6;
247:5
**meantime (2)**
136:9;263:19
**measure (7)**
83:7,12;84:18,21,
23;85:4,5
**measures (2)**
83:14;85:6
**mechanism (1)**
30:3
**Mederocouret (1)**
210:10
**medical (5)**
6:24;7:7;24:1,6,10;
25:2,10;26:4;38:7;
106:23;109:17,21;
110:5;118:4,14,19,
20;119:16;150:18;
191:2;192:7,16;
196:9;197:15;210:9;
220:20,22,22;221:4;
223:1;225:16;227:3,
5
**medical's (1)**
118:19
**medication (7)**
7:2,4,18;8:3,6,7,10
**medications (2)**
6:18;7:9
**meet (12)**
17:13;120:6,16;
129:18;203:4;261:8;
263:1,8,16;264:9;
277:10,11
**meeting (32)**
16:14;34:18,21;
35:3,20;38:19;39:10,
14,20;40:3,16;41:4;
51:20;55:20;56:23;
120:9,13,14;121:8,9;
134:1;175:12;263:7,
13,18,24;264:14,16;
267:20;268:15,18;
309:5
**meetings (23)**
15:3;51:21,22;
55:3,4;119:19,20,21,
21,24;121:11;123:9,
14;124:14,21,23;

206:20;280:17,18,21,
24;285:1;305:22
**meets (1)**
95:24
**Melissa (5)**
4:4,15;224:17;
225:5;257:17
**member (3)**
9:7;269:24;270:2
**members (3)**
19:20;81:21;
127:13
**memory (4)**
16:15;147:15;
243:20;298:14
**Mental (10)**
23:19;26:24;32:4,
21;33:14,16,16;
53:20;54:17;194:16
**mention (6)**
50:24;53:5;116:18,
21;167:8;301:10
**mentioned (21)**
34:23;54:18;77:7;
92:5;94:3;95:4;
116:8;121:16;146:6,
6;147:15;194:4;
212:24;222:1;
230:10;238:10;
284:5;285:19;301:7;
302:2,14
**mentioning (7)**
92:4;96:8,10,13;
107:17;116:22,23
**message (1)**
209:1
**met (15)**
16:18;30:9;34:14,
15;120:2,3,10,18,19,
21,23;121:1,4,11;
123:10
**mid (1)**
118:11
**mid-December (1)**
256:17
**middle (2)**
90:16,20
**Mid-Hudson (2)**
32:18;33:22
**might (54)**
13:19;28:7;51:2;
58:5,23;64:22;68:13;
78:9;83:24;84:11,14,
17;91:8;92:9,15;
116:15;117:3;120:2,
3;132:20;134:13;
138:9;139:20;
142:17;145:2;146:5,
6;156:14,18;159:13;

160:2;162:14,18,20;
181:11;183:20;
196:22;204:4,13,16;
215:6;218:3;236:20;
237:13;243:18;
247:21;278:9;
285:21;287:12;
293:18;299:9;300:6;
301:7,14
**Miguel (4)**
27:6,8,12;218:1
**Millan (1)**
134:1
**mind (4)**
93:15;177:5,6;
265:10
**mindset (1)**
138:11
**mine (2)**
48:9;54:12
**minute (2)**
92:17;171:14
**minutes (1)**
92:21
**misdemeanor (3)**
141:24;142:5;
206:5
**misdemeanors (1)**
37:10
**misleading (5)**
162:11;163:3,16,
19;164:9
**misrepresentation (1)**
265:23
**miss (1)**
260:15
**missed (3)**
105:10,12;119:23
**mission (4)**
175:10,11,15;
176:5
**mistake (2)**
80:17;187:21
**MOCJ (9)**
174:13;212:11,12,
12,15;215:9,10,12,15
**M-O-C-J (1)**
212:11
**modify (4)**
251:22;258:14;
260:13;308:13
**moment (1)**
304:18
**momentarily (1)**
209:16
**Monday (2)**
143:7;229:8
**money (2)**
40:8,12

**month (3)**
17:13;306:23;
307:1
**monthly (3)**
17:8,11;285:3
**months (13)**
57:17;63:21;73:7;
76:17,18;256:9,10,
10;257:7;271:14,19;
275:17;285:20
**Moore (2)**
185:10,15
**more (47)**
41:23;43:6;50:7;
54:3;58:10;66:17;
67:3;73:2;74:11;
91:7,9;100:21;117:2;
120:14;138:18;
144:7;150:8;152:16,
17,20,21,23;153:1,
12,13;155:3;158:17;
167:22;181:11;
183:1;200:12;203:1,
2;207:17;213:18,23,
24;214:1;242:5;
243:18;255:21;
260:22;263:18;
296:1;306:12,13;
307:15
**Moreira (5)**
223:22,22;224:15,
23;225:2
**morning (8)**
5:3,4;58:22;59:12;
114:3;115:23;189:6;
246:5
**Mortorno (1)**
227:6
**most (4)**
32:13;136:19;
151:13;284:11
**motivation (1)**
84:24
**move (6)**
210:1;211:14;
213:2,12,14;262:10
**moved (5)**
29:8;35:2;127:17;
213:23;279:24
**moving (2)**
213:16;215:19
**much (15)**
75:12;77:8;112:19;
113:9;124:17;144:7;
146:17;153:17;
155:2;232:22;
251:18;256:3;257:5;
261:12;307:12
**Muirjr (1)**

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 338 of 353

BARRY WINKLER, M.D.                                                                    MELISSA KAYE v.
October 6, 2021                                            HEALTH AND HOSPITALS CORPORATION, et al.

240:8
**Mullan (15)**
    78:12,13;82:4,19;
    86:11;87:7;88:19,24;
    89:12,23;90:4;120:3;
    134:8,9;249:8
**multiple (2)**
    141:22;219:7
**Mundy (12)**
    120:23;134:2,10;
    135:4;158:5,10,13,
    23;159:9;160:20,24;
    305:17
**Mundy's (3)**
    119:11,15;161:1
**municipality (1)**
    63:3
**must (1)**
    221:3
**mute (1)**
    22:9
**myself (6)**
    30:5;34:19;171:9;
    188:10;193:13;
    209:24

**N**

**naive (1)**
    53:4
**name (11)**
    4:1,11;9:24;27:2,3,
    9;185:15;188:19;
    210:20;225:4;231:5
**named (2)**
    11:24;71:17
**names (1)**
    64:23
**narrow (1)**
    169:5
**necessarily (18)**
    19:22;51:11;52:4,
    17,18;82:15;88:15;
    132:10;145:11;
    150:22;159:22;
    160:12;179:15;
    196:6;212:14;
    215:19;230:17;
    236:19
**necessary (5)**
    53:21;84:7;115:21;
    116:2;184:9
**necessitate (2)**
    37:20;84:8
**need (31)**
    44:22;63:7,20,21;
    64:12,14;69:9;92:19;
    95:20;99:22;126:9;
    148:18;163:22,22;

164:2;165:5;167:1;
190:22;191:3;196:2,
3;203:2;208:10;
221:10;244:18;
249:12,15;251:17;
257:16;265:13;
296:15
**needed (12)**
    15:7;24:18;59:11;
    77:24;114:4;244:16;
    246:7;253:17;
    260:22;268:11;
    279:17;311:1
**needing (2)**
    114:6;167:19
**needless (1)**
    159:24
**needs (6)**
    38:4;191:1;210:22;
    228:10,24;286:23
**negative (2)**
    97:21,24
**neighborhood (1)**
    277:16
**neither (1)**
    82:19
**Neshy (1)**
    10:2
**network (1)**
    272:24
**neurocognitive (1)**
    154:24
**Neuropsychological (1)**
    126:21
**New (19)**
    4:17;10:10;26:14,
    19;62:23;82:7,12;
    109:13;129:15;
    130:13;137:7;
    138:19;139:8;194:6;
    195:18;273:19;
    308:17;311:3,7
**newly (1)**
    15:1
**next (7)**
    44:23;120:16;
    142:24;255:20;
    263:17;268:1,12
**nobody (1)**
    54:6
**nod (1)**
    5:13
**noise (1)**
    119:23
**none (1)**
    151:13
**non-examiner (2)**
    167:17,24
**non-officer (1)**

203:8
**non-redacted (4)**
    26:16;110:24;
    111:1;222:2
**nor (1)**
    25:4
**normal (3)**
    106:21;274:22;
    279:10
**normally (1)**
    237:20
**Notary (1)**
    4:22
**note (6)**
    4:9;139:1;162:24;
    227:1;263:20;265:3
**noted (4)**
    116:3;205:4;
    287:24;311:18
**notes (24)**
    96:12;121:20,24;
    122:3,4,7,12,17,21;
    226:17,20;229:7;
    293:24;294:1,4,5,6,7,
    16,17,19,22;295:2,7
**notice (4)**
    114:17;123:20;
    124:23;274:4
**noticed (1)**
    239:14
**noting (1)**
    265:20
**November (5)**
    162:6;210:2;
    236:23;237:17;238:3
**number (31)**
    34:17;57:16;58:19;
    63:21;65:6;66:6,8,
    13;81:17;96:14;
    153:7;154:16,20;
    185:16;212:1,3;
    214:19;217:9;
    231:20;265:5;284:8,
    9;285:3;297:21;
    304:13,14,18,19;
    305:24;306:2;307:11
**numbers (7)**
    152:8;153:11;
    177:1,2;284:24;
    285:5;302:12
**NYC_000321 (1)**
    137:4
**NYC_1188 (2)**
    169:23;170:6
**NYC_1190 (2)**
    169:23;170:6
**NYC_125 (2)**
    126:4,8
**NYC_1268 (2)**

174:22;175:2
**NYC_1269 (2)**
    174:22;175:2
**NYC_127 (1)**
    126:4
**NYC_1310 (2)**
    254:22;255:4
**NYC_1311 (2)**
    254:22;255:4
**NYC_137 (3)**
    225:22;226:2,11
**NYC_138 (2)**
    225:22;226:2
**NYC_1647 (2)**
    259:11;260:14
**NYC_1649 (1)**
    259:8
**NYC_1913 (2)**
    184:24;185:5
**NYC_1914 (2)**
    220:1,5
**NYC_1915 (2)**
    220:1,5
**NYC_2153 (2)**
    248:23;249:2
**NYC_2739 (2)**
    239:21,24
**NYC_291 (2)**
    129:7,11
**NYC_295 (2)**
    129:7,11
**NYC_3036 (2)**
    243:24;244:4
**NYC_3037 (2)**
    244:1,4
**NYC_3044 (1)**
    176:9
**NYC_3045 (1)**
    176:10
**NYC_31 (1)**
    262:13
**NYC_3111 (1)**
    262:7
**NYC_3112 (2)**
    262:7,13
**NYC_3117 (2)**
    266:9,12
**NYC_3119 (3)**
    266:9,12;267:1
**NYC_320 (3)**
    135:24;136:4,8
**NYC_329 (2)**
    135:24;136:4
**NYC_360 (1)**
    181:21
**NYC_363 (2)**
    180:23;181:21
**NYC_3996 (2)**
    176:9;177:2

**NYC_3998 (1)**
    176:9
**NYC_4044 (1)**
    177:3
**NYC_464 (2)**
    148:2,6
**NYC_80 (2)**
    211:17,20
**NYC_837 (2)**
    157:23;158:2
**NYC_838 (2)**
    157:23;158:2
**NYC_840 (2)**
    164:22
**NYC_842 (1)**
    164:22
**NYC-138 (1)**
    226:11
**NYC-1913 (1)**
    181:3
**NYC-1924 (2)**
    223:8,13
**NYC-1925 (2)**
    223:8,13
**NYC-1990 (2)**
    231:13,19
**NYC-1992 (2)**
    231:13,19
**NYC-2739 (1)**
    240:3
**NYC-360 (1)**
    180:23
**NYC-471 (2)**
    148:2,6
**NYC-80 (1)**
    211:23
**NYU (4)**
    63:19,22,24;64:2

**O**

**oath (3)**
    3:12;4:10;5:8
**object (12)**
    5:20,20;7:6,20;
    11:21;119:5;128:7;
    141:13;160:19;
    162:5;292:6,7
**objecting (2)**
    133:16;205:2
**Objection (388)**
    6:19;8:9;9:20;
    11:21;12:5,11;15:14;
    17:22;18:3;19:4;
    21:19;22:18;23:20;
    24:3,11;26:6;27:15;
    28:11;29:2,18;30:15,
    23;31:7,13,24;32:6,
    33:1,18;34:5;35:17;

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 339 of 353
MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

BARRY WINKLER, M.D.
October 6, 2021

37:3,22;38:24;39:7,
17;40:1,10,23;41:21;
42:8;43:3,11,20;
44:2;46:1,10,18;
48:23;49:19;50:2,4,
11,19;51:9,17;56:5,
15,15;59:15;60:19;
62:16;63:10;65:4;
67:20;70:6;71:23;
72:16,22;73:18;74:3,
19;75:22;76:9,22;
77:12;78:6,18;79:1,
21;80:14;81:10;82:8;
83:21;84:9;85:12,16,
24;86:7,13,18;88:12;
89:3;90:1,9,17;91:3,
22;92:12;95:1,14;
96:5,21;97:6,16;
98:12,19;100:7;
101:14;102:23;
103:5,14;104:7,13;
106:5,19;107:6,23;
108:8,13;109:5,14,
19;110:7,19;111:10,
21;112:3,11;113:1,5,
11;114:13,19,24;
115:13,24;116:19;
117:8,14,20;118:2;
119:13;120:20;
121:6,21;124:11;
125:1;127:23;
128:16;129:24;
130:6,19;131:19,24;
132:6,16,22;133:15;
134:4,12,15,20;
135:3,14,19;136:14;
140:15;141:7;142:7;
143:3,8,13;144:2,23;
145:24;146:10,21;
147:7,12;149:2,19;
152:13;153:4;
154:10;155:7,17;
156:3,11;157:1,6;
160:8;162:10,13,15,
17,19;168:8;172:13,
19;173:4,10,15,22;
174:16;176:18;
177:15,21;178:13,22;
179:1,8,16;180:2,7,
13,18;182:15;183:14,
24;185:23;186:14,
24;187:11;192:11;
194:20;196:11,16,17;
197:5,11;198:5,12,
18;199:3,8;200:2,9,
20;201:12,24;202:15,
21;203:10;204:1,7,
20;205:4,14;206:12;
207:3,4,11;208:1,8,

13;211:11;212:20;
213:8,21;214:4,9;
215:23;216:11;
217:5,12;218:14;
222:15;224:12;
226:8;228:15;231:9;
234:5,15,21;235:2,8,
23;236:7;238:18;
239:8;240:19;242:3,
9;243:2;245:20,24;
246:23;247:15;
248:11;251:3,14;
253:1,7;256:12,19;
258:24;261:24,24;
264:2,13,19;268:20;
269:13;270:16;
271:16;272:17;
273:22;274:7,21;
275:2;276:4,20;
278:5,13,19;279:1,8,
18;280:5,10,19;
281:2,10,16;282:1,3,
8,16,23;283:4,6,18;
284:12;286:6,20;
287:7,11,15,19;
288:4,8,18;289:3,10,
20;290:6,17;291:2,9;
292:1,19,24;293:15;
294:2,8,14,23;295:3,
5,16;296:13,22;
297:9,13,17;298:6,
22;299:3,7,16;300:4,
19;301:1,5,12,19,21;
303:6,13,20;304:11,
21;305:6;306:3,9;
307:21;310:9,15

objections (1)
3:7
obligated (2)
203:18;204:5
obligation (7)
203:14,16;204:14,
16,17;206:19;207:1
obligations (1)
203:12
observations (1)
112:10
observe (3)
117:5,6,10
observed (4)
56:12;232:20;
239:14;256:2
Observers (7)
126:20;160:18;
161:7,7,11;167:11,12
observing (2)
134:22;161:14
obtain (5)
12:8;63:8;156:8;

218:5;310:21
obtained (4)
216:20;219:15;
226:6;227:22
obtaining (1)
194:7
obviously (2)
66:10;279:11
occasion (3)
299:10,10;308:12
occasional (1)
51:20
occasions (1)
286:18
occur (2)
4:8;294:21
occurred (8)
6:10;160:20;187:4,
22;216:6,9,13;279:4
occurring (1)
200:6
October (9)
4:6;188:16,18;
189:14;191:14;
249:2,7,22;250:10
odd (1)
31:20
off (14)
29:1;61:11;66:21;
137:23;147:21;
171:17;207:22;
208:6;241:1,8,9,11,
13;279:24
offer (1)
138:8
offered (5)
16:16;64:13,16;
94:18;283:17
offhand (1)
231:10
Office (35)
11:14;23:19;26:24;
29:6;30:1,20;31:21;
32:21;33:14;36:1;
80:19;81:19;83:10;
99:5,7;100:16;
101:17;120:18;
143:21;145:14;
147:3;212:10;
227:12;228:9,11;
229:5;270:22;
272:13;273:11,12;
278:2,9;279:3,22,24
officer (12)
3:12;11:2;63:1;
231:3,6;232:15;
233:4,5,6,8,10,11
officers (1)
232:21

officer's (1)
231:5
offices (1)
273:8
official (3)
159:4;292:23;
293:1
often (18)
32:3,15,19;51:22;
72:13;111:3;113:13;
120:6,16,21,23;
121:1;152:4,5,21;
244:23;245:3;277:12
older (1)
163:12
OMH (4)
32:13,15;33:11,21
once (19)
17:13;19:22;33:5;
44:14;47:8;49:8;
69:21;101:24;109:2;
113:4,14;120:10,11,
11,14;133:8;270:8;
285:23;298:16
one (91)
4:8;5:18;14:18;
19:18;26:12;27:22;
29:5;35:23,24;44:21;
47:17;49:6;52:14;
53:5;54:9;59:6;
60:12;65:14;69:20,
22,22;73:9;77:15;
84:5,6,11;87:13,16;
91:17;100:1,15;
110:9;117:2,2;
121:23;125:24;
127:18;132:12;
133:1;139:7;141:24;
142:18;146:6;148:7,
7;149:13,14,16;
157:10;159:1;
166:20;169:17;
189:14;194:3;
199:15,15;200:22;
201:1,16,18;212:14;
214:22;218:9,23;
220:22;221:22,23;
233:9,15;235:18;
241:20,20,22;243:3;
246:6,10,13;254:3;
260:8,10;264:22;
268:4;277:14;280:3,
6;282:11;294:16,18;
309:5;311:3,4
one-party (1)
308:17
ones (1)
55:5
ongoing (1)

210:21
only (33)
5:12,18;8:10;
19:20,21;37:8;69:17,
23;71:10,11;72:24;
89:1;91:1,1;97:24;
100:1;145:17;160:1;
161:11;166:20,24;
181:14;183:10;
191:2;194:12;211:5;
216:2,17;227:4;
240:12;306:19,20;
310:16
onward (1)
109:1
onwards (1)
115:18
open (7)
44:15,19;115:3,7;
129:2;161:16;168:3
open-ended (1)
307:10
opening (1)
16:2
operated (2)
131:5;151:12
operating (1)
52:6
operation (3)
107:4,4;272:9
operational (2)
273:4;285:23
operations (7)
32:8,11,13;50:17;
51:13;262:23;272:7
opined (4)
80:2,4,6,18
opining (1)
219:2
opinion (36)
15:6;33:8;53:18;
75:12,18;77:8;79:20;
82:16,19;83:8;90:5;
94:6;95:6;108:5;
118:22;119:3,4;
157:14;168:1;
202:23;203:3;
206:13;216:4,18,21;
217:20;225:10;
253:3,14;292:18,23;
298:4,9,18;300:16;
309:7
opinions (6)
51:23,24;52:2,4;
95:3;157:12
opportunities (1)
283:9
opportunity (15)
45:4;57:6;126:10;

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 340 of 353

BARRY WINKLER, M.D.                                          MELISSA KAYE v.
October 6, 2021                              HEALTH AND HOSPITALS CORPORATION, et al.

129:12;136:9;
148:17;156:1,7;
166:18;169:24;
172:7;175:7;190:12;
226:18;257:6
**opposed (3)**
135:12,16;218:17
**opposition (3)**
39:22;133:14;
135:17
**option (4)**
64:13,16;216:21,
24
**options (1)**
230:19
**orbit (1)**
21:18
**order (63)**
25:18,20;26:14,14,
16;28:9,15,20;33:9;
63:5;87:22;110:10,
11,17,21,24;131:15;
139:17;140:6,7,17;
141:4,10;142:11;
154:5;159:12;
160:21;181:8;182:7;
183:6;185:17;
216:15,22,24;217:3,
10,21,23;218:5,13,
20,22;219:1,9,13,16,
18;227:22;228:5,6,
12,21;229:1,3,11;
257:14;272:24;
298:11,17,19;308:12;
310:7,17
**ordered (14)**
80:5;81:24;87:1;
143:2,5;153:21,23,
24;154:12;212:17;
218:2,4;232:14;
245:7
**ordering (2)**
154:9;159:3
**orders (21)**
142:15,18,18;
144:18,20,21;145:1,
3,13,16,17,18;146:7;
152:20;159:6;
208:22;217:14;
218:18;221:19,20,22
**organization (1)**
118:21
**organizations (1)**
47:3
**orient (1)**
151:11
**oriented (1)**
201:20
**original (4)**

58:5;76:20;137:5;
229:11
**Originally (2)**
64:10;78:22
**others (4)**
131:22;132:2;
161:16;165:19
**other's (3)**
51:24;52:2;123:17
**Otherwise (1)**
268:11
**ours (1)**
48:9
**ourselves (1)**
150:9
**out (42)**
29:8;47:3;51:6,11;
55:23;60:13;95:10;
102:1;121:20;140:9;
145:4;152:1;157:16,
19;162:7;168:11;
185:17;196:4,9;
201:5;227:17;
228:13;233:4,9;
256:16,24;260:1,23;
262:22;263:24;
266:2;267:24;270:8;
276:9,18,18,22;
293:20;295:20;
306:24;309:14,16
**outcome (3)**
75:21;105:6,23
**outcomes (1)**
76:2
**outer (1)**
233:9
**outline (1)**
65:13
**outlined (1)**
219:6
**out-of-office (1)**
260:17
**outside (17)**
46:15,16;117:12;
168:16,20,20,23;
169:6,11;173:2;
178:24;179:3,12,22;
192:9,13;277:2
**outsourced (3)**
153:19,21;154:2
**outstanding (4)**
145:17;195:10;
208:22;225:9
**over (47)**
5:5;20:16;21:4,15;
23:15,15;34:11,24;
35:21;41:9,18;44:14;
56:2,18,19,20;57:12,
16;60:2;89:24;90:4;

116:16;123:6;133:8;
143:19;151:5;157:4;
169:17;186:18,20;
187:2,3;189:4,11;
195:12,13,20;196:24;
229:5;236:10;265:5,
10;282:13;299:2;
301:15;306:6,8
**overall (5)**
19:17,24;32:11;
48:12;157:13
**overdone (1)**
249:15
**overlap (1)**
271:11
**oversight (1)**
299:14
**overstepping (2)**
247:8,11
**overview (5)**
51:13;95:19;155:9;
157:16;248:17
**Owen (12)**
36:8,9,15;121:2;
128:22;136:24;
137:7;169:14;
175:21;218:11,17;
305:13
**Owen's (1)**
137:8
**own (8)**
9:23;45:5;53:18;
83:12;95:23;100:5;
183:20;219:18

---

**P**

**Pace (1)**
13:5
**page (4)**
126:11;139:18;
142:1;148:8
**pages (1)**
142:12
**PAGNY (8)**
62:23;63:7;64:14,
15,17;281:24;282:12,
14
**P-A-G-N-Y (1)**
62:23
**PAI (1)**
84:1
**paid (11)**
59:23;60:4;61:12;
62:22;63:24;64:13,
16;112:15,17;
281:24;282:14
**pandemic (1)**
272:4

**paper (2)**
14:4,7
**papers (1)**
233:3
**paperwork (3)**
33:7;106:12;233:7
**parameters (1)**
47:15
**parcel (1)**
198:15
**parity (4)**
112:1;117:13,16;
123:6
**Parole (10)**
244:15;245:1,6;
246:6;306:15,18,19,
20,22;307:1
**part (54)**
14:6;15:12;21:1,1;
43:23;70:14;77:20;
79:7;97:8;104:5,6,8;
118:20;119:23;
134:6;139:22;142:4;
148:20;149:21;
151:8,13;161:14;
167:1,5,7;193:12,14;
194:16;196:10,13,15;
198:2,15;199:11;
200:14;201:4,18;
204:6;206:16;
207:10,13,14,16;
208:12,16;216:7;
220:22;228:8,13;
234:9;250:5;300:2;
301:20;311:5
**participate (7)**
8:4;54:24;55:4;
70:12;151:7;271:1;
308:10
**participation (1)**
290:22
**particular (20)**
27:13,23;47:21;
83:4;127:13;139:13;
155:16;160:11;
169:20,21;177:14;
232:21;250:6;
251:11;266:24;
280:7;289:7,18;
298:11;310:19
**particularly (2)**
133:9;236:5
**particulars (1)**
311:1
**parties (2)**
3:2;4:2
**partners (1)**
10:3
**parts (1)**

195:9
**part-time (3)**
10:20,23;67:7
**party (1)**
126:13
**party-observers (1)**
126:13
**passed (4)**
6:4;194:6;195:2;
270:6
**patient (3)**
15:7;28:5;84:16
**patients (4)**
15:2,2,4;160:1
**Patsos (1)**
102:11
**Patsy (1)**
29:6
**pay (17)**
47:9;59:14,19;
64:15;109:10;
111:24;112:9,13,14;
117:13,16;123:6;
124:4;125:10;
147:11,16,17
**Peck (2)**
169:13,13
**penological (1)**
74:23
**pension (4)**
10:18,22;62:24;
63:6
**people (19)**
46:9,12,15,16;
102:2;122:12;
128:10;134:23,24;
135:8;143:11;
145:15;212:1,24;
234:14,17;276:8;
280:21;291:14
**per (25)**
29:14;66:6,12;
78:9;93:19;116:9;
195:21;196:10;
214:3,15,18,20,20;
216:1,5;218:4;
272:13;279:9;
280:20;281:12;
305:1,1,24,24,24
**percent (3)**
101:10;152:6;
183:9
**percentage (1)**
152:11
**percentage-wise (2)**
152:16;153:13
**Perfect (3)**
164:19;166:11,11
**perform (7)**

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

BARRY WINKLER, M.D.
October 6, 2021

14:23;18:9;232:21;
253:6,12;258:18;
279:13
**performance (9)**
17:21;85:2;248:9;
254:17;255:12,19;
256:2;257:10,23
**performed (9)**
159:5;167:17,24;
258:21,23;279:16;
296:5,7,20
**performing (1)**
296:23
**perhaps (14)**
46:13;56:13;81:8;
132:9;135:1;159:23;
183:11;197:10;
249:16;256:5;282:6,
14;285:20;289:7
**period (9)**
24:5;72:20;73:22;
77:19;237:5,11,21;
238:7;305:14
**permission (1)**
194:10
**permitted (1)**
240:10
**Persaud (23)**
185:6;195:6;210:5,
8;212:2;220:19;
221:3,7;224:19;
225:3,6;226:16,19;
242:7,14;244:12;
246:4;249:8;285:2,6;
302:14,19;304:7
**Persaud's (2)**
303:2,5
**person (9)**
15:7;71:10;149:7;
161:8;203:5;248:8;
274:19;276:2;279:17
**personal (8)**
106:23;188:12;
190:16;206:13;
230:6;292:18;297:7,
10
**personality (1)**
155:1
**personally (1)**
232:19
**personnel (2)**
46:20;240:22
**persons (1)**
212:3
**pertained (3)**
31:12;107:4;
261:22
**pertaining (4)**
156:20,24;179:21,

24
**pertains (3)**
176:14;180:17;
206:11
**phased (1)**
145:14
**phone (4)**
261:10;263:18,20;
267:15
**physical (2)**
70:1;233:15
**physically (1)**
73:12
**Physician's (1)**
62:22
**PIA (1)**
83:20
**picture (1)**
20:19
**pilot (4)**
36:1;140:2,18;
212:15
**pissed (1)**
190:23
**place (24)**
23:10;33:10;36:22;
43:15;47:24;64:1;
71:21;72:4;82:11;
100:12,24;112:23;
139:11;149:1;
176:17;198:4;
232:10,12;238:2;
263:13;268:19;
293:3,11;307:8
**placement (1)**
75:1
**places (1)**
15:13
**Plaintiff's (71)**
126:1,3,7;129:4,6,
10;135:21;136:3;
147:24;148:1,5;
157:21,22;158:1;
164:21;169:21;
170:5;174:19,21;
175:1;176:8,14;
180:22;181:2,2;
184:18,21,23;185:4;
188:2,2,5;193:3,6,10;
209:13,14,18;211:15,
19;219:22,24;220:4;
223:7,12,12;225:21;
231:12,17;239:20,20,
23;243:23,23;244:3;
248:20,22;249:1;
254:21;255:2,3;
259:7,7,10,15;262:6,
12;265:5;266:7,8,11
**plan (4)**

129:22;148:23;
263:17;268:12
**planned (1)**
77:1
**planning (1)**
297:15
**plans (2)**
72:1;268:14
**play (6)**
43:23;83:2,3;
212:12,14;217:24
**Please (30)**
4:9,11,13;5:12;
57:11;93:9,16;
105:17;129:16;
138:10;162:2;171:9,
11;182:18;183:2;
189:13;197:16;
210:21;217:7;
220:21;221:8,11;
224:23;227:1;
244:20;257:10;
261:9;265:16;
291:21;302:24
**plenty (1)**
92:21
**Plus (2)**
74:9;150:9
**pm (5)**
166:14,15;230:22,
23;311:18
**point (130)**
10:9;11:1,13;
12:10;13:20;16:2;
18:23;20:4,13,18;
23:16;25:9,16;26:13,
23;27:22;29:5;30:10,
12,14;31:17,19;
35:13,20,23,24;
39:10,11,19,21,23;
41:7;42:23;47:17;
51:2,6;52:14;53:3,6;
54:9,22;57:23,23;
58:9,21,24;63:16;
65:15;69:18;70:4,9;
71:14;72:24;73:2;
77:16;80:24;83:16;
85:9;87:20;88:18;
89:11,21;90:7;98:4,
23;100:15,17;104:2,
16;109:2;110:9,16;
121:12,19,23;123:20;
124:19;142:18;
145:18;146:6;147:4,
13;149:14,16;150:5;
153:3;157:10;
159:10;169:17;
170:14;172:22;
175:17,20;177:8,11;

187:15;194:3;201:4;
202:8;212:15;215:2;
217:18;221:23,24;
225:12;228:13;
229:18;230:9,10;
237:12;242:7;243:3;
246:17;247:12,16,19,
21;254:17;257:8;
268:23;269:5,24;
270:24;277:14;
282:11;294:16;
301:6;302:4;311:3,4
**pointed (1)**
266:2
**police (11)**
9:7,13,16,18;10:12,
14,15,19;11:2;62:14;
63:1
**policies (6)**
18:12;109:12;
125:23;169:6,14;
308:21
**policy (77)**
100:11,14,18,23;
102:19,21,22;108:6,
11,12,16,17;109:16,
22,24;129:15,16;
130:2,5,8,9,18,23;
131:6;132:15;133:6,
14;135:6,9,13;158:7;
159:7;163:9,11;
164:4,10,13,13,17;
165:5;168:13,20;
169:1,11,17;170:11,
23;171:5;172:2,6,8,
11,24;173:2;174:1;
176:17,22;177:4,11,
14,19;179:3,22;
180:12,17;201:20;
240:12,14;292:23;
293:1,2,4,5,7,8,10,11
**policy/procedure (1)**
158:16
**polite (1)**
138:12
**portion (2)**
145:17;188:9
**portions (1)**
24:22
**position (37)**
14:19;16:1,7,11,
13;24:9;26:3;30:13,
18;31:6,11;43:1;
44:15,23;45:3;64:7;
68:24;71:20;116:16;
119:3;127:2;135:2,9;
151:9;174:2;192:15,
17;194:11;195:19;
222:24;223:3,3;

227:14,24;282:17;
283:11,17
**positions (1)**
44:19
**positive (4)**
58:24;90:24;183:9;
237:24
**Poss (1)**
178:15
**possible (11)**
15:5;183:21;195:9;
221:12;246:24;
249:14;278:18;
280:23;281:6;
287:14,18
**possibly (7)**
92:5;94:17;156:17;
178:9,17;229:16;
247:22
**post (1)**
234:22
**post-CHS (2)**
123:10,15
**potential (4)**
38:6;65:16;83:12;
132:13
**potentially (3)**
25:7;161:9;290:21
**power (2)**
42:12,13
**practice (34)**
9:17,23;99:19;
100:4,5;103:3,8;
129:16;130:1,4,8,10,
12,14,18,22;131:1,2,
2,3,6,17;132:14,15,
21;133:6,10,14;
135:2,4,5,9,13;
197:15
**practices (2)**
131:16;263:4
**pre (1)**
123:15
**precedent (1)**
293:18
**pre-CHS (1)**
234:22
**precipitated (2)**
90:21;154:9
**precipitously (1)**
276:22
**precise (3)**
6:7,8,8
**pre-doctoral (1)**
13:23
**preface (1)**
97:22
**prefer (1)**
54:4

BARRY WINKLER, M.D.
October 6, 2021

MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.

premise (2)
174:10,12
preparation (3)
37:5,9;249:16
prepare (5)
26:14;241:18;
285:2,22;307:13
prepared (2)
239:5;285:6
preparing (1)
221:22
presence (2)
107:13;126:20
present (15)
4:3;39:5;47:20;
51:19;53:1;57:16,17,
20;79:11;87:15;
167:18,24;168:4;
217:2;306:2
presentation (3)
311:2,3,5
presented (7)
27:13;38:22;79:9,
13;115:8,18;249:13
preside (1)
157:4
pretty (7)
18:24;22:7;56:8;
113:8;143:24;
153:17;309:23
previous (1)
167:7
previously (3)
40:20;227:2;
261:18
primarily (2)
141:14;311:6
primary (1)
75:7
printout (1)
310:18
prior (24)
10:21;43:1;58:16;
84:24;110:5;114:6,
11;116:9,15;143:19;
145:10;160:20;
168:13;169:1;172:5;
173:1;176:16;213:6;
242:11;245:2;284:9;
295:10;298:20;
302:15
prison (1)
81:7
privacy (2)
229:10,16
private (32)
9:23;47:9;63:6,19,
20;80:3;129:16;
130:4,8,10,12,14,18,

21;131:2,3,6,16,17;
132:14,15,21;133:10,
14;134:3,11;135:2,3,
5,9,13;272:24
probably (14)
18:23;54:3;93:2;
131:3;142:22;
145:17;146:17;
150:2;207:9;259:3;
272:5;279:4;310:1,
13
problem (33)
25:15;27:23;99:15,
16;103:18;104:16,
17;107:18;132:18;
144:5,8;146:5,12,14;
147:15;210:21;
222:20,22;225:4;
228:14;267:22;
268:8;291:22;292:2,
11,12;302:1,22,24;
303:1,4,15,16
problematic (4)
107:22;132:13;
227:21;268:5
problems (13)
17:16;27:13;38:7;
82:20;100:19;
111:13;114:22;
132:20;146:7,20;
150:3,4;308:3
procedure (9)
122:5;178:19;
187:23;194:9;
195:21;197:8;236:3;
274:22;279:10
procedures (9)
52:4,5;65:10;
94:16,17;137:7,14;
138:20;139:8
proceed (12)
5:21,21;6:16;
24:17;25:4,8;29:14;
88:7;95:21;132:12;
141:17;211:10
proceeding (1)
8:5
process (23)
18:1,20;24:19;
44:14;55:22;63:13;
70:13;77:21;110:18;
159:23;197:10;
198:10,14,17,21;
211:10;212:23;
215:4,10;217:4;
263:21;298:23;
310:23
processed (1)
213:6

produced (8)
27:14;116:4;
165:17;186:5;
189:12;237:20,21,23
product (1)
289:9
production (7)
139:21;188:15;
189:23;191:20;
217:10;218:6;222:7
professional (2)
20:5;51:21
program (9)
35:24;138:12;
149:16;150:12,12,13;
155:21;194:7,14
programs (2)
155:20;194:13
progress (1)
185:12
prohibition (2)
101:11,16
prohibitions (1)
106:22
project (4)
36:1;140:3,18;
212:15
prolonged (1)
211:9
promoted (2)
44:9;71:20
promotion (4)
44:13;45:4;94:19;
285:13
pronounce (1)
210:20
proper (10)
162:10,13;178:19,
20;202:20,24;260:8,
10;283:6;290:10
properly (2)
83:11;231:7
proposed (3)
52:5;110:10,12
prosecute (1)
197:23
protection (3)
198:7,9,16
protections (1)
198:4
protocol (1)
232:20
provide (19)
15:6;51:23;52:21;
59:11;74:2;91:2,6;
139:18;156:16,18;
157:16;189:19;
206:7,14;228:21;
237:10;261:3;267:8;

274:4
provided (5)
165:12;187:15;
289:1;298:5;308:1
provides (2)
95:19;156:13
providing (1)
292:4
provision (2)
25:10;292:15
psych (1)
126:13
psychiatric (9)
38:7;74:22;141:3,
5;152:19;173:9;
191:7;196:23;232:11
psychiatrist (6)
15:18;78:10;
197:13;205:12;
296:6,8
psychiatrists (1)
205:6
psychiatry (17)
14:11;16:9;20:6,
24;23:6,10;95:8;
149:15;150:24;
151:1,2,4,14;157:9;
173:19;192:4;292:21
psychological (31)
38:6;82:23;83:2,7,
17;89:7;126:24;
127:3;128:4,23;
148:10,16,22;152:5;
154:5,22;155:11;
157:11,17;158:7;
167:16,23;249:9,18;
295:19;296:1,4,11,
17,20,24
psychologist (8)
14:21;15:3,24;
197:14,16;296:5,7;
297:5
psychologists (3)
17:15;161:12;
205:6
psychologists' (1)
158:24
psychology (11)
8:19;12:9,14,19,
23;13:10,11;14:11;
17:7;63:18;292:21
psychosis (2)
83:8;154:23
psychotic (4)
79:13,14;82:16,18
PsyD (4)
9:1;12:15;13:9,12
Public (5)
4:22;63:2;205:19,

21,24
publicity (1)
86:3
publish (1)
14:4
pull (1)
260:16
purposes (17)
80:11;96:16;
126:19;137:21;
165:1;170:9;173:18;
175:4;182:5;190:15;
211:23;220:10;
223:14;226:13;
244:9;260:16;266:18
purses (1)
226:6
pursuant (1)
4:9
pursue (2)
156:1;257:16
pursuing (1)
230:18
put (10)
36:22;71:21;
117:20;122:4;160:3,
4;183:4;186:1;
221:24;250:9
putting (1)
183:6

## Q

qualified (2)
74:17,21
qualifier (1)
118:19
qualify (2)
28:12;38:6
quality (5)
150:6,7;239:2;
253:3;259:3
quantify (2)
66:7;155:12
quantities (2)
6:8,11
quarter (1)
66:11
Queens (15)
36:2,5;37:1;
138:22,23,23;140:2,
11,18;154:1;212:15;
215:13;237:23;
284:21;303:16
questionable (1)
197:8
quibble (1)
190:6
quick (3)

143:4,9;166:9
**quicker (1)**
213:23
**quickly (4)**
37:16;170:2;213:3;
307:12
**quite (7)**
47:14;48:8;81:18;
88:5;151:11;203:2;
273:3
**quote (3)**
90:8;161:15,16
**quotes (1)**
186:2

**R**

**raise (3)**
87:20;114:5;222:3
**raised (11)**
23:18,23;38:22;
94:24;96:3;107:12;
108:7;128:15;238:9;
270:13;294:21
**raising (4)**
141:15,16;222:8;
238:13
**ramification (1)**
203:8
**ramifications (1)**
203:22
**ramping (1)**
145:4
**ran (1)**
13:15
**rapport (1)**
309:23
**rare (1)**
308:11
**rate (1)**
257:23
**rated (3)**
258:5,9;264:24
**rather (9)**
13:2;33:4;47:23;
54:19;66:12;74:14;
85:5;203:4;307:11
**Rating (3)**
258:1,3,10
**ratings (1)**
258:4
**rationale (1)**
54:19
**reach (9)**
51:6,11;260:1,23;
276:9,18,22;309:14,
16
**reached (2)**
75:21;301:7

**reaching (4)**
196:9;227:17;
256:16;262:22
**react (3)**
251:20;252:1,16
**reaction (7)**
41:19;134:14;
182:13,19,22;230:16,
17
**read (23)**
77:15;88:1;93:11;
105:2,11,16,19;
129:12;134:6;
136:10;139:14;
148:18;161:4;
166:18;167:3;174:3;
190:13,14;229:18,20,
23;230:7;267:13
**readily (1)**
18:18
**reading (6)**
88:3;130:3;137:22;
166:7,8;181:10
**ready (2)**
77:24;284:3
**realistic (3)**
37:15,18;215:17
**really (25)**
33:3;35:11;47:14;
48:2;52:21;72:9;
91:4;108:5;117:1,3;
127:10;134:7;144:7;
146:7;157:18;
173:19,20;179:18;
205:24;209:9;
213:17;299:17,19;
307:10;310:16
**reason (5)**
7:17;28:21;98:16;
150:22;172:2
**reasonable (9)**
97:9;118:24;
161:15;167:15;
168:2;263:23;264:4;
265:18,19
**reasons (6)**
74:6;87:12;96:17;
150:21;154:15;
293:16
**recall (351)**
13:23;14:1,9;
16:14,19;21:9;23:3;
25:23;27:3,3,4,5,19;
28:6,8;29:23;30:8;
31:15,16;34:7,7,15;
39:9,11,13,15,19,20,
23;40:3,6,12,14;
41:19;42:5,10,16,22;
43:13,16;47:4,5;

50:13;52:14;53:7,10,
10,16,22;54:21;55:1,
6;58:3,4,12,13,14;
59:13,22;60:3;65:7;
66:1;68:2,10,14,22,
23;70:22;71:18;72:1,
23;73:1,8;77:14,22;
78:8,16,20;79:6,7;
80:20;82:10;85:14;
86:9;88:3,16,17,18,
19,21,22;89:5,6,9,17;
90:3,3;91:7,8;92:15;
97:13;98:6,9,11,13;
101:24;102:2,13;
103:10;104:11,15,15;
105:6,8,22;107:15;
108:2,6,10,11,18,20;
109:10;110:6,9;
112:6;115:14,16;
117:15;118:12;
120:5;121:11;
123:13;124:1,3,5,6,
17,17;126:21;127:5,
7,8,12;130:3,4;
133:16,17;134:18,22;
135:12,20;138:1,16,
17,17;140:9;143:23;
146:3,4;147:9;
151:21;152:1,2;
157:8,14;168:9,10;
169:12;170:15,21;
171:6;172:9,10,15,
23,24;173:6,7,12,13;
174:13,17;175:15,17,
18,19;177:7,9,12,23;
178:1,9,9,15,17;
179:2,23;180:4,5,9,
10,15,16,20;181:6,9;
182:22;183:21;
184:2,16;187:20;
191:8,16,22,24;
192:17,22;193:23,24;
194:1;195:2,13,15;
196:5,6;200:4;209:3,
4;211:4;215:6,7,18;
218:2,4,8,10;220:13,
14;222:23;223:2,2,5;
224:8,14,18;225:15,
18,19;226:4,9;231:4,
8,24;233:17,18;
235:10;236:1,17,19,
21;237:3,13,14;
238:8,8;239:17;
243:4,6,8,13;248:13;
250:20;254:19;
257:2;258:4,7,11;
263:5,6,6,8,14;264:8,
11,16,17,21,23,24;
265:2;271:10;278:8,

10,15;282:9,24;
283:14,16;284:5;
285:1,4,10;287:13,
16,20,22;288:12,16,
20,23,24;289:4,6,13,
21;294:15,18,24;
295:11,22;296:2,3,
16,19,23;297:3,18,
19,23;299:17,18,20,
21;300:15,20;301:2,
23,24;302:1,12,21,
23;303:1,3,8;309:2,
12,16;311:2
**receive (11)**
13:6;24:6;25:21;
26:16;62:24;63:4;
144:20;179:24;
186:3;269:21;278:4
**received (17)**
12:18;13:2;29:5,
22;81:17;161:13;
179:20;185:11;
186:3;210:9;224:4;
225:9;278:2,8;296:8,
10,17
**receiving (4)**
170:21;172:5;
221:18;248:5
**recent (4)**
136:19;261:7;
267:11;269:9
**Recently (1)**
269:8
**receptive (6)**
250:22,24;251:1,6,
21;252:18
**recess (3)**
93:7;166:14;
230:22
**recognize (1)**
27:9
**recollection (13)**
27:18;40:15;76:12,
15,19;77:3;90:19;
100:21;128:13;
237:24;279:20;
306:13,24
**recommendations (1)**
292:16
**record (49)**
5:14;19:6;57:5;
96:12;99:18,22,23;
100:17;102:8;103:3,
8;105:17;110:6;
126:7,19;129:12;
136:10;139:1;
158:20;161:2;
162:24;163:4;
165:23;166:5;

10,15;282:9,24;
170:10;171:17;
175:4;185:8,9;
190:15;199:2;
211:23;216:15;
218:12;220:10,20;
223:15;224:11;
226:13;248:18;
260:14;265:3,20;
266:17,18;283:19;
290:10;293:16;
308:14
**recorded (14)**
81:13;83:9;99:9,
14;101:1;102:1;
103:19;207:9;
290:16,21;291:5,7,
24;293:19
**recording (21)**
99:5;100:12,24;
101:3,7,22;102:19,
21;103:13;105:24;
176:15,17;290:1,4,4,
12,13,14;291:22;
293:13,17
**recordings (10)**
81:6,7,8,11,12,19,
20;100:20;176:23;
179:21
**records (122)**
24:1,6,10,21,22,23;
25:11,18;26:4,12,16;
38:8;88:6,7,11,15,16;
89:1;109:18,22;
110:11,14,24;111:14;
139:18;140:23;
141:2,5,9,11;142:13;
181:7;182:7,10,14,
21;183:6,8;184:8;
185:11,18,21;186:3,
4,5,7,10;187:5,9,15;
191:2,5;192:7,16;
194:5,8,11,12,14,16;
195:10,12,14,16,20,
22;196:9;199:18;
202:9,11,14,18;
203:1;208:21,24;
210:9;213:15;
215:21;216:17,20,24;
217:19,19;219:3,10,
14;220:22,23;221:4,
8,12,18,19,21,23;
222:2,7;223:1,4;
224:4;225:9,17;
226:5;227:4,5;
228:10,20,21,24;
229:4,7;263:22;
285:3;297:22,22;
298:1,5,8,10;309:11;
310:19,20

Case 1:18-cv-12137-JPC-JLC    Document 225-8    Filed 03/05/22    Page 344 of 353

BARRY WINKLER, M.D.                                    MELISSA KAYE v.
October 6, 2021                      HEALTH AND HOSPITALS CORPORATION, et al.

**record's (3)**
33:13;106:10;
133:19
**redact (1)**
186:13
**redacted (51)**
23:24;24:6,10,14,
23;25:1,6,6,10,22;
26:4,12;109:17,21;
110:4,14,17;111:14;
182:10,14,21;185:11,
18,21;186:3,4,5;
187:15;188:9;191:5;
192:7,16;193:12;
194:5,24;199:2;
209:23;210:9;
213:15;221:9,18,23;
222:7;223:4;225:10,
16;249:13;297:24;
298:5,8;309:11
**redacting (1)**
24:21
**redaction (1)**
225:8
**reduce (1)**
212:16
**refer (1)**
212:11
**reference (4)**
40:5,12;88:6;124:6
**referenced (8)**
91:15;97:24;114:1;
124:3;128:12;183:5;
194:22;210:15
**referencing (9)**
41:24;45:19;47:22;
54:16;161:22;194:1,
2;232:2;240:4
**Referral (1)**
249:9
**referrals (2)**
134:3,11
**referred (1)**
199:15
**referring (15)**
23:11;27:12;37:5;
50:21,22;81:13;
119:20;142:10;
172:21;196:20;
198:8;200:12;
201:14,17;304:14
**refers (1)**
194:3
**reflecting (1)**
240:13
**reflux (2)**
8:3,7
**refresh (2)**
76:15;243:18

**refuse (3)**
38:14;217:10;
308:9
**refused (2)**
54:6;219:19
**regard (2)**
91:17;177:19
**regarding (31)**
31:21;42:2;100:23;
101:21;105:24;
140:23;145:23;
148:22;160:18;
161:6;167:10;
175:24;176:22;
178:5;180:11;
220:19;222:24;
224:10;227:3;
240:10;246:5;
248:18;256:1;
263:21;266:19;
288:2;289:8;294:22;
295:14;300:21;
303:19
**regardless (1)**
290:23
**regular (2)**
187:22;260:3
**regularly (10)**
32:22;113:9;120:8,
9,13,13,15;127:19;
245:6;277:14
**reimbursement (2)**
156:16,18
**reinforced (1)**
252:3
**reiterate (1)**
173:20
**reiterates (1)**
174:2
**relate (2)**
155:15;297:24
**related (3)**
111:17;155:20,22
**relatedly (1)**
297:1
**relates (1)**
179:10
**relationship (19)**
19:16,17;22:6;
45:18,20;46:23;
47:11,23;48:3,17;
49:17,24;50:9;
113:16;150:20;
161:8;245:8,18,18
**release (7)**
139:9;140:20;
141:2,4;196:24;
226:5;227:4
**released (2)**

206:4;270:3
**releases (7)**
38:21;39:5,16;
42:3,5;65:11,11
**relevant (3)**
25:3;156:17;
208:20
**reliability (1)**
161:10
**relied (1)**
80:24
**reluctance (2)**
69:2,23
**remainder (1)**
63:23
**remaining (1)**
208:22
**remediate (1)**
248:4
**remediated (5)**
90:8;247:13,18,21;
248:1
**remediation (3)**
286:17,18,22;
287:4,10;307:20
**remember (140)**
6:7;11:6;16:16;
20:22;21:4,6;27:3,9;
28:16;31:15;34:3,20,
22;35:3;41:5;43:10;
47:16;48:2;53:9,11,
19;54:11,15,16,17;
55:24;58:6,19;59:5,6,
9;63:14;64:22;68:18;
70:10;72:9,10;77:21;
79:8,9,17,23;84:1,22;
85:7;88:4,5,7;89:8;
90:14;91:10,24;92:4;
94:2;96:7,7,10,13;
97:18;102:2,9,17;
103:7,16,17;104:2,
21;107:17,18;113:7;
115:3;116:11,22,23;
117:1,3,17,19,23;
118:1,5,9;120:1;
121:8;122:13;
123:14;126:17,18;
128:5;129:23;130:1;
144:4,6,13;146:12;
147:2,14,19,20;
153:8,11;161:17,19;
171:6;182:3,4;
183:19;210:24;
211:1,2;221:20,22;
222:8,14,17;225:12,
13;227:8,9,10;232:5;
237:1;243:14;
250:18,19;257:21;
258:3;263:11;

264:12,14;273:15,17;
275:16,18;281:11,12;
298:3;299:9;300:5;
301:13
**remembering (3)**
13:22;27:21;128:1
**remote (3)**
4:2;272:10;273:8
**remotely (2)**
4:10;273:7
**removal (1)**
110:16
**removed (2)**
278:3;280:8
**repeat (5)**
52:20;139:10;
203:19;208:3;253:24
**repeatedly (1)**
27:24
**repeats (1)**
139:19
**repercussions (1)**
116:6
**repetitious (1)**
139:20
**rephrase (6)**
32:20;34:1;100:9;
217:8;290:8;291:21
**replacement (2)**
36:22;71:17
**report (48)**
17:7;37:5,9;54:20;
58:22;65:10,14;
73:16;88:10,22;
89:10,18;92:1;94:24;
118:21;143:16;
203:9,22,24;204:3,5,
18;205:12,20;
206:19;207:1,16,24;
208:7,10;212:17;
216:23;218:22;
219:2;249:16,19;
250:20;252:19;
253:3,14;268:8;
270:3,8;285:4;286:8;
287:24;304:5;309:8
**reported (6)**
17:10,11;23:1;
134:1,10;299:21
**REPORTER (12)**
4:1,2;5:7,11,17;
93:2,4;105:11;
253:20,21;254:11;
311:12
**reporting (4)**
73:21;99:1;180:12;
308:18
**reports (50)**
23:7;36:3;54:8,10,

11,12;60:16;65:9;
73:8,9;74:9;75:8,10,
20;76:1;77:4,11,16;
78:1;89:1;90:24;
91:18;94:17;95:4;
101:4;121:17;
143:12,15,20;150:9;
251:9;252:10,15;
273:1;285:1,6,8,10,
15,22;286:3,10;
288:2;302:15;303:3,
22,23;304:2;307:13;
308:4
**repository (2)**
145:7;302:19
**represent (2)**
4:11;71:14
**representative (2)**
26:13;55:23
**represented (1)**
49:10
**reprisal (1)**
234:20
**request (15)**
32:2;126:23;138:9,
13;142:13;159:2;
181:7;182:7;220:20;
232:17;246:24;
247:10;264:4;282:5,
7
**requested (6)**
72:14;93:11;
105:19;224:16;
281:23;297:21
**requesting (3)**
218:18;225:8;
247:9
**requests (1)**
18:2
**require (6)**
205:12;221:11,20;
307:15,20,24
**required (15)**
28:21;38:7;87:5;
180:10;203:9,22,24;
204:3;205:19;
241:21;258:20;
293:22;295:1;308:7,
14
**requirement (1)**
204:12
**requirements (4)**
37:16;179:11;
183:7;204:22
**requires (1)**
38:5
**requiring (1)**
42:4
**rescind (1)**

Case 1:18-cv-12137-JPC-JLC    Document 225-8    Filed 03/05/22    Page 345 of 353
MELISSA KAYE v.                                                          BARRY WINKLER, M.D.
HEALTH AND HOSPITALS CORPORATION, et al.                                  October 6, 2021

298:16

**rescinded (1)**
298:19

**reserved (1)**
3:8

**residency (1)**
151:8

**residents (4)**
151:4,4,6;157:10

**resign (2)**
36:20;274:20

**resignation (6)**
36:18;273:21;
274:20;275:12;
276:2,7

**resigned (13)**
36:17;236:17;
237:2,6,6;274:1,5,24;
275:4,6;276:7,8,10

**resigns (1)**
274:23

**resistant (1)**
150:10

**resisted (2)**
218:6,8

**resolution (5)**
105:23;185:15;
261:22;262:3,5

**resolve (1)**
264:6

**resolved (7)**
49:9;104:19;191:1;
210:22;243:6,7,9

**resolving (1)**
185:12

**resort (1)**
216:4

**resources (1)**
131:15

**respected (4)**
48:21,22;49:7,14

**respective (2)**
3:2;170:14

**respond (11)**
143:3;190:19,20;
193:19;207:5,6;
210:13;221:6;
228:10;250:8;292:10

**responded (2)**
104:24;195:4

**responding (2)**
7:22;8:1

**responds (6)**
158:13,23;225:2;
227:16;256:16;
262:22

**response (13)**
126:23;128:2;
185:19,21;186:4,6;

187:16;195:18;
226:23;227:20;
264:8;270:8;287:4

**responses (1)**
5:12

**responsibilities (1)**
204:8

**responsible (1)**
201:15

**rest (2)**
7:2;142:21

**restoration (1)**
32:16

**restricted (1)**
231:7

**restrictions (2)**
62:12;227:3

**result (6)**
24:22;134:10;
150:7;155:14;200:6;
257:5

**results (3)**
85:3;134:2;281:15

**resume (1)**
150:15

**resumed (1)**
150:13

**retain (3)**
67:18;68:4,9

**retained (1)**
211:13

**retaining (2)**
175:22;287:1

**retaliation (1)**
128:14

**retire (3)**
301:7,14,14

**retired (3)**
9:10;63:1;271:6

**retirement (2)**
62:13;301:10

**retiring (1)**
301:4

**retraining (2)**
286:22;287:4

**retrieval (1)**
303:4

**return (1)**
142:4

**returnable (1)**
227:18

**reveal (1)**
6:23

**revealed (1)**
30:12

**revealing (1)**
7:7

**reverse (1)**
160:21

**revert (1)**
67:14

**review (8)**
88:1,21;108:19;
138:8;140:18;
220:21;285:8;286:2

**reviewed (5)**
81:22;83:8;194:8;
205:7;262:20

**reviewing (1)**
285:10

**reviews (1)**
286:12

**revisit (1)**
175:13

**revocation (1)**
245:1

**revolves (1)**
94:16

**reworded (4)**
160:17;161:5;
164:6;167:9

**rewritten (1)**
167:19

**Richard (1)**
60:1

**right (207)**
5:9;6:1,11,12;9:16;
14:8,9;16:20;19:12;
21:23;22:17;30:21;
31:2,5;33:17,20,22;
36:11,13;38:17;
41:12;42:15;43:2,18;
44:10;45:16;57:13;
60:24;61:15;67:23;
71:7,22;73:17,23;
75:17;76:13,17;
78:22;80:9,12,16;
81:24;82:1,7;84:13;
85:15,22,23;86:2,3,
12;89:19,22;96:24;
97:2;101:12;102:22;
105:24;110:22;
112:23;113:10;
114:18,23;115:12;
119:12;126:14;
129:23;133:3,21;
135:18;136:5,13,21;
137:7;138:5,21;
140:3,24;141:6;
143:2,7;148:10,11,
12;150:14;151:21;
153:18;154:6,7,9,14;
158:8,11,18,21;
161:21;164:17;
166:12;167:9,11,12,
14;168:5;170:3,19;
171:22,24;172:3;
173:9,21;176:5,5;

182:11;183:13;
185:8;187:10,19;
188:13;190:17,18,20;
191:3,7;192:7,10;
193:12;196:3,24;
197:7;198:11,11;
204:15;206:2,6;
207:1,19;210:3,6,11;
211:6,10;212:3,4;
214:23;218:24;
220:23;221:4,14;
223:17;224:6,24;
226:21;227:19;
231:20;232:6;235:1,
20;236:9;238:21;
240:16;243:23;
244:7,13,21;249:19,
22;250:12,14;251:9;
254:7;255:6,9,12;
256:11;257:17;
258:6,9;259:14,19;
260:11;261:21,21;
262:21;264:15;
265:1,8,14,23;266:1;
267:13,22;268:2,13,
19;270:17;271:4;
274:10,16;275:6;
280:2;292:9;296:5;
302:3,16;309:23;
310:4,14

**rights (10)**
196:15,19;197:4,9;
198:14,17,21;229:10,
16;291:13

**Rikers (30)**
15:5;24:6;25:19,
23;26:14,18;27:23,
24;28:1;29:1,8;
33:10;35:2;38:8;
81:14,21;184:7,7,12,
13;185:7;186:7,10;
187:6,9;207:23;
208:6;210:10;
279:24;280:8

**Rikers' (1)**
278:3

**Rioja (1)**
14:5

**risk (1)**
87:12

**Riverhead (2)**
9:23;10:1

**Roberts (6)**
186:8,12;195:16,
17;220:19;221:8

**Roberts' (1)**
185:15

**role (6)**
30:12,17;108:12;

169:17;212:12,14

**roles (2)**
108:16;170:12

**rolled (1)**
140:9

**room (4)**
161:11;233:3,8;
257:13

**Rosner (1)**
60:1

**Ross (5)**
224:5;225:7;231:3,
6;232:15

**rotate (4)**
149:15,16,18,24

**rotated (4)**
149:8,9,13;150:10

**rotating (6)**
15:6;149:11;150:1,
6,17,18

**rotation (2)**
151:8,10

**rotations (1)**
149:13

**roughly (8)**
8:20;10:5,7;17:13;
152:23,24;304:24;
305:23

**routine (1)**
17:18

**routinely (1)**
149:7

**rule (2)**
179:6,7

**rules (1)**
99:17

**rumors (3)**
23:14;34:23,24

**run (4)**
45:5;49:18;87:12;
233:14

**running (4)**
36:5;273:3;285:21;
286:2

---

## S

**safety (3)**
205:19,21,24

**salary (3)**
62:7,10,13

**same (40)**
3:3,13;10:14;
13:21;48:12;64:8;
77:10;81:8;87:18,19;
112:16;139:10,23;
141:23;142:4,9;
150:21,22;152:12,24;
161:1;189:13;207:3,

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 346 of 353

BARRY WINKLER, M.D.                                    MELISSA KAYE v.
October 6, 2021                            HEALTH AND HOSPITALS CORPORATION, et al.

3;232:22;262:19;
274:24;275:11;
285:15,22;292:9;
298:23;300:15,21;
303:11;304:9,19;
305:13,24;308:4
**sample (1)**
65:14
**sat (5)**
108:1;250:16;
297:12
**satisfaction (1)**
281:20
**satisfactory (1)**
258:19
**satisfied (2)**
185:17;209:7
**saw (21)**
51:21;66:6,9,13;
73:7;79:24;80:1,5;
82:17,19;88:17,19;
89:1;182:10;210:11;
277:14,18;279:15;
280:11;284:10;
304:19
**saying (39)**
6:1;39:14;40:6;
42:16;56:19;58:12,
13,14,19;59:9;68:23;
72:10;77:23;89:18;
90:3;91:15;97:22;
98:6;103:7,18;
116:11;120:1;
122:13;138:4;
147:20;152:8;
163:15,19;200:24;
201:19;204:15;
229:3;281:12;
287:22;289:6,13;
293:2;294:18;301:13
**scenario (1)**
206:8
**schedule (7)**
18:12;109:9;
116:13;125:12;
272:12;301:17;305:1
**scheduled (6)**
38:14;120:8,9,13,
14,15
**schedules (1)**
310:2
**scheduling (1)**
111:15
**School (4)**
8:24;150:18;
301:18;302:1
**scope (5)**
159:7;200:7;204:9;
206:8,10,15

**scope/limits (1)**
158:16
**scratch (2)**
45:11;76:6
**screen (6)**
148:14;166:21;
175:3;209:16;
223:14;249:3
**screening (3)**
84:12,18,21
**scroll (18)**
126:16;148:18,19;
151:19;165:6;
169:24;171:11;
177:4;183:1;193:14;
212:6;221:2,2;
223:19;225:14;
244:10;256:15;
266:22
**scrolling (1)**
170:2
**scrutiny (1)**
46:14
**se (8)**
93:20;196:10;
216:2,5;218:4;
279:10;280:21;
281:12
**sealing (1)**
3:3
**search (2)**
165:11;166:2
**seated (1)**
232:23
**second (8)**
38:5;80:5;105:4;
149:21;166:20;
201:10;246:10,19
**secondly (1)**
24:19
**secretary (1)**
195:9
**Section (2)**
161:21;167:8
**sections (1)**
184:10
**sectors (1)**
107:9
**secure (1)**
179:12
**security (1)**
232:20
**seeing (22)**
17:15;43:13;66:20;
82:20;89:9,9;131:17;
136:5;138:18;
166:24;177:8,9;
225:12;237:7;
267:24;272:15;

285:4;302:12;
304:14;305:15,23;
306:13
**seek (4)**
44:12;64:8;156:8;
218:12
**seeking (3)**
42:4;173:8;259:16
**seem (21)**
40:5;46:8;72:8,10;
77:14,21;92:15;96:7;
103:17;112:17;
114:22;118:22;
120:1;122:13;
123:17;139:3;243:4;
281:11,12;285:3;
300:5
**seemed (6)**
36:4;51:21;152:20;
249:15;307:13;
309:22
**seems (2)**
21:13
**sees (1)**
306:19
**self-report (1)**
194:15
**send (7)**
128:2,6;143:20;
191:1;209:1;229:6;
265:10
**sending (3)**
127:11;129:21;
265:6
**sends (5)**
191:4;221:3;
225:15;226:19,23
**sense (12)**
21:8;50:16;52:22;
152:15,22;278:20,23;
279:2;284:10,16,18,
20
**senses (1)**
304:23
**sensitive (2)**
229:9,13
**sent (24)**
15:4;126:17,22;
127:18,18,20,21;
128:13;142:14;
157:15;181:17;
182:6;189:4,11,11;
190:17;191:8;
212:18;237:12;
257:8;265:4;270:3,5;
295:20
**sentence (1)**
185:20
**separate (8)**

40:17;41:2;87:2,
22;107:9;165:15;
200:23;263:20
**separately (2)**
86:17;87:7
**separation (3)**
107:3;173:20,23
**September (2)**
193:17;266:20
**Series (28)**
126:8;129:11;
136:4,8;148:6;
157:22;165:3;
169:22;170:1;175:2;
181:3;185:5;188:3;
193:11;209:15;
211:16;220:5;
223:13;226:1;
231:18,19;239:21;
240:3;243:24;249:2;
259:8;262:13;266:8
**series] (1)**
255:3
**serious (5)**
59:7;227:2;229:8,
13;233:15
**Service (4)**
47:6;63:1,5;148:10
**services (4)**
34:10,11;187:6,9
**sessions (1)**
128:4
**set (11)**
46:9,12;82:1,3;
86:11;225:6;247:2;
273:3;280:21;
293:18;307:10
**settle (1)**
110:13
**seven-day (1)**
37:10
**seven-hour (2)**
61:14,18
**several (4)**
59:19;87:12;
162:21;286:18
**shadow (1)**
257:13
**shake (1)**
5:13
**shall (3)**
3:8;167:16,23
**share (21)**
129:1;148:13;
171:1,20;175:3;
209:14,16;220:8;
223:14;224:4;228:6,
20;249:3;259:15;
262:14;269:17;

273:1;281:14;
292:12;301:16;310:6
**shared (2)**
284:24;288:24
**sharing (2)**
178:23;249:4
**sheets (6)**
60:17,20;241:2,8,9,
13
**shift (17)**
57:24;58:5,7,15,
18;61:22;62:4;
112:22;113:20;
114:6,11,16;116:7;
124:4,20;257:2;
281:8
**shore (1)**
257:14
**short (2)**
36:4;151:10
**shortly (1)**
267:20
**show (23)**
76:15;83:14;85:3;
125:24;128:24;
129:3;147:23;
157:20;168:5;
176:13,22;181:1;
184:17;193:2;
219:21;223:11;
232:16;239:19;
243:22;255:1;259:6;
266:6;283:22
**showed (2)**
199:16;295:21
**showing (1)**
262:11
**shown (1)**
156:10
**side (1)**
278:24
**sign (14)**
60:13;65:11;
110:11;141:2,4;
177:13;178:8;
180:11;196:24;
233:7;241:1,8,9,11
**signed (6)**
3:11,13;180:15,16;
227:17;228:12
**significant (3)**
6:4;222:19;306:14
**significantly (1)**
251:24
**signing (5)**
141:19;177:23;
178:1;180:5;241:13
**signs (1)**
233:3

Case 1:18-cv-12137-JPC-JLC    Document 225-8    Filed 03/05/22    Page 347 of 353

MELISSA KAYE v.                                                                    BARRY WINKLER, M.D.
HEALTH AND HOSPITALS CORPORATION, et al.                                           October 6, 2021

**similar (5)**
20:3;68:19;77:16;
140:6;300:6
**similarly (1)**
300:13
**simply (1)**
69:24
**SIRS (3)**
83:20,23,24
**sit (15)**
47:18;126:24;
127:4;128:4,10,21,
23;172:17,22;173:8,
14;240:12;245:6;
247:4,9
**site (1)**
241:16
**sites (1)**
217:3
**sitting (5)**
107:21;127:3,6;
290:24;297:8
**situation (9)**
55:13;83:4;84:14;
185:13;203:19;
219:6;291:3,6;
298:18
**situations (2)**
83:4;101:9
**six (2)**
11:5;256:10
**skepticism (1)**
37:2
**skill (1)**
247:2
**skills (2)**
75:4;257:14
**skimmed (2)**
139:14,15
**slaird@nyccourtgov (1)**
220:12
**slash (1)**
159:24
**slightly (3)**
152:23;153:1;
296:1
**small (1)**
166:21
**smarter (1)**
159:7
**Smoot (5)**
137:6,12,16,23,23
**social (1)**
47:17
**socialize (1)**
277:2
**Society (3)**
47:6;234:10;245:2
**solely (2)**

202:13;215:21
**solution (1)**
133:12
**somebody (15)**
24:17;33:5;41:4;
87:15;96:8;195:1;
199:17;201:17;
212:9;228:6;229:2;
269:23;274:23;
278:9,21
**somehow (3)**
116:13;159:21;
279:5
**someone (26)**
25:8;29:13;32:23;
41:5;63:15;68:16,20,
24;95:21,24;106:13;
185:18,21;197:23;
201:5,16;207:7,9;
208:11;217:17;
246:7;278:23,24;
279:3;290:20,24
**someone's (2)**
32:14;291:3
**sometimes (10)**
51:12,23;75:13,15;
84:4;113:14;115:10;
240:22;289:14;
310:19
**somewhat (2)**
243:15;249:14
**somewhere (5)**
24:7;41:15;64:4;
94:19;151:8
**son (3)**
114:3,5,9
**soon (2)**
143:18;221:12
**sorry (36)**
17:19;22:9;26:1;
38:23;44:1;49:4;
50:24;60:18;61:9;
80:6;99:3;100:9;
117:22;148:13;
151:2;159:18;171:1,
2,10,13;174:6;
178:16;181:12,19;
201:7;235:17;253:9;
260:7;271:16;
280:13;286:16;
291:21;292:20;
302:23,24;311:11
**sort (1)**
191:5
**sound (1)**
122:24
**sounds (3)**
14:9;21:13;256:14
**South (4)**

9:13;10:15,15;
62:13
**speak (10)**
4:7;35:4;72:5;
125:18;218:16;
251:5;267:15;
275:14;276:13;
288:10
**speaking (12)**
27:18;28:13;35:10;
205:4;213:10;
214:11;230:12;
285:16;288:12;
289:17;290:13;
292:11
**Special (2)**
4:15;235:17
**specific (31)**
41:23;43:6;50:7;
60:13;68:14,22;
109:7;124:1,6;
154:21;155:19;
159:12;160:3,4;
167:4,6;177:23;
179:2;190:1;191:24;
200:12;204:12;
222:17;227:9;260:2;
261:4;267:9;289:1,
22;295:14;296:16
**specifically (28)**
50:13;52:7;56:11;
59:21;77:6;94:15;
98:10;111:12;159:2;
161:19;169:5;
175:18;182:9,20;
196:20;200:13;
201:20;208:15;
221:7;222:1;228:21;
232:11;243:11;
247:9;271:22;
285:16;299:12;304:8
**specifics (10)**
52:22;72:10;94:2;
117:1,3;158:17;
242:5;243:18;289:4;
299:17
**specifying (1)**
159:6
**speed (4)**
151:12;212:23;
215:4,10
**spent (2)**
73:6;255:21
**split (4)**
87:9;244:15,19;
246:5
**spoke (9)**
47:21;111:5,17;
122:2;125:16;

151:15;185:9;
275:15,18
**spoken (3)**
98:22;230:12;
275:22
**spot (1)**
276:3
**spread (1)**
212:7
**spurious (1)**
249:14
**staff (36)**
53:24;54:4;67:18;
68:4,9;69:6,19,19;
71:10;127:13;
129:17,19,22;155:24;
156:8;175:23;176:1,
2;212:3;213:18,18,
23;236:6,11;239:7,
16;240:24;241:1;
242:12,17,17;245:15,
18;285:15;306:2,12
**staffed (4)**
40:20;66:24;67:1;
306:7
**staffing (6)**
40:18;67:11,13;
236:13,16;262:23
**staggered (1)**
84:4
**stakeholders (2)**
49:17;168:16
**stalling (1)**
265:16
**Stamp (30)**
126:8;129:10;
136:4,8;148:5;
157:22;160:23;
165:2;169:22;170:1;
175:2;176:24;177:2;
181:3;185:5;193:10;
209:15;211:16;
220:5;223:13;226:1;
231:18,19;239:21;
243:24;249:2;255:3;
259:8;262:13;266:8
**STAMPED (28)**
126:4;129:7;
135:24;137:3;148:2;
158:2;164:22;170:6;
174:22;176:9;
180:23;184:24;
188:6;193:7;209:19;
211:20;220:1;223:8;
225:22;231:13;
239:24;240:3;244:4;
248:23;254:22;
259:11;262:7;266:12
**stamps (1)**

226:10
**stance (1)**
159:4
**stand (1)**
76:3
**standard (5)**
25:18;96:1;99:19;
100:3,5
**standardization (3)**
65:7,8,9
**standardized (1)**
161:9
**start (16)**
32:10;37:7;45:20;
58:7;62:1;66:8;
78:21;79:5;125:6;
131:1;148:8;170:9;
234:18;248:16;
305:9;306:6
**started (26)**
9:16;20:15;24:5;
25:14;41:11,20;
55:23;70:23,23;
123:6;131:3;144:13;
175:12;186:2;194:4,
23;250:1;256:5,17;
263:19;271:9,11;
272:4;273:6;285:18;
307:5
**starting (1)**
124:24
**starts (10)**
175:9;189:14;
211:24;220:11,18;
240:7;244:11,11;
255:4;262:17
**state (9)**
4:11;33:13,22;
62:24;183:23;191:5;
247:13,17;308:18
**stated (4)**
179:7;188:10;
208:15;233:20
**statement (4)**
40:13;122:10;
161:4;176:5
**status (3)**
53:20;54:17;110:4
**statute (2)**
29:14;202:18
**stay (4)**
10:19;14:17;
165:23;166:5
**stayed (2)**
10:14;14:18
**steal (1)**
122:21
**stealing (1)**
122:16

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 348 of 353

BARRY WINKLER, M.D.                                    MELISSA KAYE v.
October 6, 2021                          HEALTH AND HOSPITALS CORPORATION, et al.

**step (1)**
196:3
**steps (1)**
195:15
**Steve (1)**
60:2
**Stewart (2)**
286:8,10
**stick (2)**
304:17,17
**still (23)**
15:10,16;22:16,22;
26:22;36:9,11;44:24;
82:7;97:1;104:3;
113:16;122:19;
124:5;185:14;
194:11;208:20;
214:20;221:18;
227:19;228:13;
267:18;306:21
**stipulate (3)**
4:12,16,19
**STIPULATED (3)**
3:1,6,10
**stop (6)**
45:14;129:1;
163:22;164:2;206:9;
266:4
**stoppage (4)**
70:5,7;237:15,18
**stopped (1)**
150:1
**storage (2)**
100:20;303:19
**stored (1)**
273:2
**strategy (2)**
263:2,9
**Street (2)**
232:10;267:20
**strictly (1)**
202:17
**strong (1)**
195:11
**structure (3)**
21:2;22:15;109:13
**struggle (2)**
42:12,14
**students (3)**
150:18;161:12;
295:10
**stuff (1)**
140:13
**style (5)**
52:16;53:22;93:21,
22;94:1
**subject (20)**
129:14;137:6,14;
148:10;158:7;

170:11;182:6;185:7;
220:20;226:16;
240:9;244:15;249:9;
255:11;259:18;
267:5;290:13,15;
291:23;293:14
**subject's (1)**
126:12
**submit (5)**
60:17,21,22;
108:19;286:8
**submitted (4)**
60:16,20,22;286:3
**subpoena (9)**
185:19,22;186:4;
187:16;226:6,16,20;
227:6,17
**Subsequent (2)**
62:4;84:8
**substance (8)**
6:16;110:4,5,15;
159:4;191:6;194:5,6,
7,12,14,15;195:22
**successful (1)**
252:23
**sued (2)**
11:19,22
**sufficient (3)**
25:21;216:3;292:7
**Suffolk (1)**
11:13
**suggest (4)**
268:10;282:6,13;
283:2
**suggested (2)**
182:14,20
**suggesting (6)**
250:4;282:9,24;
283:14,16;291:13
**suggestion (2)**
168:7;219:17
**suggestions (3)**
158:14;175:14;
208:18
**Suggestive (1)**
287:15
**suggests (2)**
163:24;252:23
**summer (3)**
144:14;178:3;
301:15
**SUNY (1)**
150:16
**supervise (6)**
18:8;74:8;150:8;
151:16;263:10;268:8
**supervised (7)**
73:8,9;242:13,14;
254:16;257:7;264:1

**supervising (3)**
151:18;261:14,20
**supervision (14)**
17:18;21:2;150:11;
153:16;161:13;
259:19;260:4;261:3,
9;266:19;267:6,8;
268:9,16
**supervisor (25)**
16:24;17:3,9;18:7;
20:8,17,18;22:17,21,
24;23:4;26:17,21;
63:17,18;224:1;
240:21,21;246:9,12,
18;261:18;268:2,3;
286:11
**supervisors (2)**
17:6;268:4
**supervisory (2)**
21:18;227:14
**supplied (1)**
228:4
**supply (3)**
34:10;185:18,21
**support (3)**
156:9,14;240:14
**supporting (1)**
223:4
**Supreme (3)**
48:15;140:8;
197:22
**sure (84)**
5:6,12,14;6:3;7:24;
22:2;23:6,22;27:21;
30:17;31:2,10;33:12;
41:23;51:4;56:20;
58:6,17;62:21;65:18;
67:8;71:1;77:24;
78:10;80:12;88:23,
24;89:22;90:23;
98:14,14,15,16;
101:10;102:5;103:1;
104:3;123:15;126:9;
130:23;133:18;
139:23;142:10;
151:24;164:17;
170:1;183:3;187:2,4,
7;192:23;206:1;
210:20;218:24;
220:13,17;223:23;
224:22;231:20,21;
243:9,19;247:24;
248:3,3,14;258:5,8,8;
259:14;260:15,17;
262:4;268:18,22;
269:2;275:10;
276:23;282:9;
285:11;290:7,9;
292:24;299:18

**surfacing (1)**
111:14
**surrounding (1)**
78:17
**survey (15)**
148:16,21,24;
151:20,20,21,22;
155:4,14,16;157:13;
163:7,8;295:20,21
**suspected (2)**
154:6;190:16
**Swenson (5)**
240:7,18,20;
286:10,12
**switch (2)**
282:7;283:14
**switched (5)**
63:18;281:23;
282:10,11,14
**sworn (3)**
3:11,13;4:22
**system (13)**
75:3;138:3;143:15,
16;144:22;168:17;
179:4,12;197:24;
212:13;272:23;
285:19;303:21
**systems (1)**
303:18

---

**T**

**takeover (6)**
23:11;41:11,20;
52:19;57:16;242:11
**talk (20)**
6:5;86:5;100:16;
103:12;104:18;
111:8,15;113:3,14;
116:14;119:18;
129:19;152:5;
167:11;177:10;
231:2;235:6;276:24;
301:4,6
**talked (9)**
54:13;105:21;
113:13;152:7;217:1;
230:14;281:7;301:8;
305:21
**talking (21)**
33:21;34:12;35:20;
43:24;45:17;98:17;
113:7,8;123:11;
133:20;167:18;
214:5;234:22;236:9;
256:8;263:11;
265:18;284:11;
291:9;301:22;306:5
**talks (2)**

141:22;267:14
**target (4)**
234:14,17,18,19
**targeting (1)**
46:14
**Tasha (3)**
211:24;212:1,8
**Task (1)**
11:14
**team (4)**
14:6;15:2;263:3,9
**technical (3)**
119:9;171:15,17
**technically (1)**
268:4
**teleconference (1)**
272:22
**telephone (3)**
81:14,20;185:16
**telling (14)**
47:16;53:16,19,22;
58:6;103:16;118:3;
122:12;147:2;
163:13;170:13;
278:21;290:20;
291:23
**tells (3)**
5:22;193:21;
221:17
**template (3)**
181:7,16;182:7
**tenants (1)**
197:15
**tendency (2)**
89:23;90:4
**tender (1)**
276:2
**tendered (1)**
276:7
**tension (1)**
123:20
**tentatively (1)**
250:9
**tenure (5)**
90:15;248:18;
249:22;259:23;
270:14
**term (1)**
292:12
**termed (1)**
184:14
**terminate (1)**
150:12
**terms (9)**
25:3;35:8;37:16;
100:19;112:9;
125:18;155:10;
160:11;258:1
**test (13)**

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 349 of 353
MELISSA KAYE v.
HEALTH AND HOSPITALS CORPORATION, et al.
BARRY WINKLER, M.D.
October 6, 2021

82:23;83:17,20;
84:5,6,7,7,8;89:7;
160:2,3,4;296:16
**tested (1)**
161:8
**testified (14)**
4:23;196:21;251:7;
278:1;280:4,15;
281:3;283:12;
287:23;288:14;
295:9,24;297:11;
306:11
**testify (5)**
5:9;6:21;7:10;
54:20;269:15
**testifying (3)**
201:24;202:1,6
**testimony (9)**
89:2;93:11;105:19;
154:2;183:5;290:1;
293:23;295:19;297:2
**testing (40)**
38:6;84:17;126:13,
21,24;128:4,23;
148:10,16,22;152:6,
17,22;154:7,22;
155:11;157:11,17;
158:7;159:2,5,6,12;
161:7,13;167:12,16,
23;249:9,13,18,19;
250:4,5,19;295:20;
296:1,4,21,24
**tests (11)**
83:2;84:4;85:1;
127:3;154:6;159:13;
161:10;296:8,12,15,
18
**thanks (6)**
138:11;158:14;
224:5;256:16;
257:17;261:12
**theirs (1)**
122:12
**therapy (1)**
15:2
**therefore (2)**
83:11;225:10
**thereto (1)**
84:8
**thinking (6)**
29:5;89:17;107:17;
190:21;208:22;
298:20
**third (13)**
82:1,3;86:11;
126:12,13;232:11;
244:16,18,21;246:6,
7,15;247:1
**Third-Party (5)**

126:20;160:18;
161:6;167:11;173:7
**though (7)**
27:4,10;53:12;
85:8;89:19;151:1;
228:3
**thought (13)**
29:11;53:16;58:23;
79:15;82:17;104:17;
159:1;209:3;213:11;
238:24;290:10;
293:21;300:14
**thoughts (1)**
268:17
**thread (9)**
175:9;190:18;
193:15,16;210:1,2;
244:10;255:16;
266:24
**three (14)**
36:21;73:1,7;
76:17,18;139:10;
183:11;217:17;
219:8;256:8;268:19;
272:13;273:7;307:1
**throwing (3)**
121:20;134:2,10
**thus (1)**
255:21
**timeframe (1)**
78:11
**timeline (1)**
56:19
**timelines (1)**
56:16
**times (34)**
6:8;15:3;36:3;
37:6;53:17;56:12;
58:18;59:19;60:14;
67:4,9,10,14;73:1;
75:16,24;76:5;95:5;
99:21;107:12;
120:16;128:23;
217:9;218:7;236:2;
252:9;277:4,8,9;
304:4;310:1,6,22,24
**title (16)**
31:10;117:17,23;
118:4,14;119:1,6,8,
11,14,15;124:4,21;
125:11;186:9;224:21
**titles (1)**
119:9
**today (12)**
5:9;6:6;62:10;
162:4;185:10;
189:12;210:9;
263:16,21;284:8;
286:18;301:20

**Today's (1)**
4:6
**together (8)**
18:11;66:24;
121:11;123:7;183:5,
6,13;202:9
**told (46)**
15:23;16:4,7;
24:20;29:23;44:18,
21;58:4;94:1,10;
99:13;112:16;114:9;
122:8;134:9,9;
151:15;185:13;
186:16;195:17;
200:4;230:15;
235:18;257:15;
269:16;273:24;
276:3;278:10,11,14,
16,18,20;279:16,20,
21;280:2;281:18,20;
284:23;287:9;288:1,
6;291:4;294:4;
309:16
**tolerate (1)**
160:1
**TOMM (2)**
83:13;84:23
**tone (1)**
289:7
**took (42)**
7:1;16:3;21:4,15;
37:12,13;41:9,18;
44:14;47:24;56:2,18,
19,20;57:12;60:2;
63:21;64:7;82:11;
112:22;123:6;133:8;
143:19;147:21;
148:24;151:5,11;
185:15;186:18,20;
187:2,3;195:15;
230:6;232:10;
236:10;268:19;
273:2;293:3;301:15;
306:6,8
**top (7)**
66:21;148:8;188:9;
209:23;211:24;
220:11;223:15
**topic (6)**
98:18;127:13,16;
184:18;192:21;
263:22
**topics (11)**
65:3;95:11;155:16,
20,22;156:2,4,10,21,
24;157:5
**Torres' (1)**
185:13
**total (1)**

153:6
**touch (1)**
63:14
**touched (1)**
197:10
**tour (1)**
232:21
**toward (2)**
10:22;90:15
**towards (11)**
10:22;34:16;70:24;
90:20;112:1;124:24;
125:13;134:18;
239:16;252:6;289:8
**Town (1)**
9:13
**track (2)**
149:12;153:14
**train (3)**
73:5;74:7,13
**trained (7)**
76:16;78:3;151:1;
161:12;250:21;
257:7;296:16
**training (49)**
54:16;73:11,17,23;
74:2,10;76:21;77:17,
19;90:12,22;91:2,6;
148:23,24;149:8;
151:8;155:6,15,19,
21;156:1,5,8,9,17,20,
24;157:4,8,11;
161:14;247:20;
248:6;249:17;
250:17;252:7;
286:23;287:1,5;
296:8,11,14,17;
307:5,7,15;308:1,1
**transcripts (1)**
81:19
**transferred (2)**
27:24;33:9
**transition (7)**
34:2;35:5;187:4;
295:11;298:21;
301:11;302:13
**transitioned (1)**
302:11
**translate (2)**
75:4,6
**transmission (1)**
4:8
**transmit (1)**
179:11
**transpired (2)**
6:6;268:18
**treat (1)**
309:6
**treated (17)**

38:9;56:4,7,13;
57:13;112:8;114:6;
117:6,12;123:24;
308:20,22;309:1,2,3,
10,12
**treating (2)**
173:8,21
**treatment (10)**
15:2;59:11;107:3,
8;114:6;124:15;
173:24;194:7,13,14
**treatments (1)**
114:3
**treats (1)**
245:14
**trial (2)**
3:8;76:3
**tried (5)**
172:17;173:14;
252:21,22,23
**trouble (1)**
68:23
**true (8)**
95:13;134:16,17;
238:12,14,16;291:12;
296:6
**truthfully (2)**
5:9;7:10
**try (13)**
21:6,10,10;74:7;
110:3;212:23;213:2;
214:20;217:16;
252:19;261:8;
263:17;267:22
**trying (18)**
31:15;53:9;57:4;
110:13;148:21;
152:1;155:5;172:22;
193:20;213:5;
214:12,21;225:7;
263:8,24;264:6;
265:18,19
**Tuesday (1)**
268:1
**turn (4)**
195:20;228:5;
229:2,4
**turnaround (6)**
36:3;37:10,11;
38:1,12,16
**turnarounds (2)**
35:15;151:11
**turning (2)**
195:12,13
**tweak (1)**
138:13
**twice (7)**
69:21;72:19,20,24;
73:1;79:24;265:15

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 350 of 353

BARRY WINKLER, M.D.                                                    MELISSA KAYE v.
October 6, 2021                              HEALTH AND HOSPITALS CORPORATION, et al.

**two (30)**
19:20,21;36:21;
55:23;66:11;67:8;
105:12;120:11;
123:21;143:1,6;
183:11;200:17;
214:16,20,23;217:16;
219:8;231:24;232:2;
237:13;263:9;
272:12;273:7;274:4,
19;304:24;305:20;
307:1;310:1
**two-case (1)**
305:1
**type (7)**
24:21;25:21;84:12;
114:18;156:16;
283:15;290:19
**types (3)**
95:11,11;227:10
**typically (11)**
32:22;75:12;84:24;
103:9;115:7,19;
116:3;217:16;219:8;
261:18;296:7

**U**

**UCMS (2)**
140:7,8
**Uh (1)**
161:24
**ultimate (2)**
159:22;160:13
**ultimately (4)**
81:24;118:21;
176:4;261:21
**unable (2)**
270:5,9
**unacceptable (1)**
191:6
**unauthorized (6)**
176:15,17,22,23;
179:21;180:12
**unaware (1)**
290:15
**unconstitutional (1)**
197:23
**uncuffed (2)**
233:11,12
**under (9)**
32:15;47:18;63:1;
95:9;106:21;109:4;
136:17;179:15;197:6
**undercover (2)**
11:2,12
**undergraduate (2)**
12:22;13:1
**Underscore (1)**

**188:18**
**understands (2)**
290:7;291:19
**understood (1)**
5:24
**underwent (2)**
90:11;247:20
**unethical (1)**
292:12
**unexpected (1)**
256:24
**unfair (2)**
112:17;233:23
**unfairly (1)**
112:9
**unfit (18)**
29:7,13,17;30:2,
21;32:14;33:6;80:2,
6,18;81:2;206:6;
207:23;208:6;
279:17,21,23,24
**Unfortunately (1)**
263:16
**unhappiness (2)**
299:22;300:2
**unhappy (14)**
109:8,9;112:5;
125:10,11,17,19;
299:2,4,14;300:10,
12,18,23
**unheard (2)**
185:18,20
**union (3)**
58:17;156:17;
281:9
**unit (8)**
14:13,22;15:21;
50:1;175:16;224:1;
245:1;310:14
**University (2)**
9:3;13:5
**unless (4)**
53:21;167:15;
168:2;229:3
**unnecessary (1)**
96:15
**unpaid (2)**
61:12,13
**unquote (1)**
90:8
**unrealistic (1)**
35:16
**unreasonable (1)**
119:4
**un-redacted (9)**
183:8;195:12,14,
20;208:21;221:11,19,
21;298:10
**un-rendered (2)**

**225:11;298:5**
**unto (1)**
165:19
**untruthful (1)**
238:22
**unusual (1)**
32:2
**unwritten (2)**
100:11,14
**up (55)**
7:23;16:23;39:20;
46:9,12;53:11;55:24;
65:15;69:12,20;70:1;
71:19;81:9;103:12,
17;111:9,9;114:9;
127:16;128:11;
129:2;133:12;145:4;
151:12;163:8;167:9;
186:2;187:14;
195:11;212:23;
215:4,10;221:2;
225:14;226:3;
227:10;231:17;
233:23;237:9;
240:10;249:18;
252:8;256:15;
257:14;260:16,20;
262:21,22;263:2;
267:13;273:3;
280:21;285:21;
286:2;299:10
**update (1)**
267:23
**upload (1)**
143:15
**uploaded (1)**
145:13
**uploading (1)**
146:7
**upon (7)**
13:8;47:13;71:22;
80:24;86:17;233:6;
252:19
**upset (2)**
135:1,8
**usage (3)**
23:24;180:1,6
**use (15)**
34:9;96:12;110:12;
141:12;151:3,17;
176:23;182:9;
183:17;193:20;
194:15;208:23;
249:17;263:4;286:19
**used (29)**
25:19;33:6;52:17;
54:2,10;67:2,5,10,15;
91:16,17;110:21;
140:21;141:9;

**146:17;151:3;**
182:23,24;183:10,19,
21,21;207:22;229:7;
247:21,22;286:17;
306:20,20
**useful (2)**
25:7;261:11
**useless (2)**
24:24;221:9
**using (8)**
24:19;96:4,9;
97:18;131:15;
141:14;143:17;
146:17
**usually (1)**
48:12
**utilized (1)**
140:8

**V**

**vacation (1)**
190:22
**vague (1)**
205:9
**validity (1)**
161:10
**varied (1)**
75:11
**various (8)**
10:10;34:24;47:3;
49:17;50:10;52:6;
65:9;201:23
**vary (2)**
66:10;115:10
**vendor (1)**
186:22
**verbal (1)**
5:12
**verify (2)**
288:7,9
**version (3)**
168:10;172:6;
225:8
**versions (1)**
162:21
**versus (3)**
41:3;284:9;290:14
**vest (1)**
10:18
**vesting (1)**
10:22
**via (2)**
4:3;195:13
**video (1)**
272:22
**videoconference (1)**
4:3
**viewpoint (1)**

**106:3**
**viewpoints (1)**
134:18
**violate (5)**
99:17;161:9;
202:18;229:9;293:10
**violated (3)**
58:16,20;229:16
**violating (2)**
204:19;207:8
**violation (6)**
113:24;202:14;
204:4;206:21,22;
245:6
**violations (13)**
174:14;200:5,6,14,
15;201:23;203:6,20;
205:13,16,18;206:17,
20
**Virginia (2)**
14:5;133:8
**virtual (1)**
272:24
**vision (1)**
175:11
**voice (2)**
5:18;25:9
**voiced (1)**
309:7
**Volpe (3)**
26:24;27:2,5
**volume (2)**
152:7,8
**voluntary (1)**
36:18

**W**

**wait (4)**
5:19;104:23,23;
190:21
**waive (1)**
196:23
**waived (1)**
3:4
**waiver (8)**
63:4,7,8,13,21;
64:9,12,14
**wall (4)**
232:24;233:2,11,
12
**Wanda (4)**
185:15;186:8;
195:17;220:18
**Wangel (4)**
116:15,22,24;
174:13
**warranted (3)**
159:13;160:2,5

**warrants (1)**
213:4
**Water (1)**
267:20
**way (24)**
7:17;8:5;77:10;
84:5;92:3;93:23;
94:4;95:23;97:21;
112:7;118:18;
129:18;184:14;
201:2,3;206:24;
216:2,5;232:22;
234:17;251:12;
255:23;264:12;276:1
**ways (1)**
53:18
**Wednesday (1)**
255:20
**week (11)**
113:14;120:11,14,
17;153:17;257:12;
263:17;268:12;
269:10;272:11,13
**weekend (1)**
143:5
**weekly (2)**
120:13,15
**weeks (6)**
36:21;113:15;
120:11;143:1,6;
273:7
**weeks' (2)**
274:4,19
**Weisman (4)**
61:3,4;241:11;
270:7
**weren't (9)**
32:12;47:19;
140:11;203:23;
215:13;225:11;
272:14;276:15;
279:19
**What's (15)**
56:22;129:3;
141:21;147:23;
157:20;176:13;
181:1;188:1,10;
223:11;228:18;
231:17;255:1;
262:11;266:7
**whenever (1)**
279:20
**whereas (1)**
48:11
**wherein (1)**
38:13
**whereupon (1)**
232:18
**whole (1)**

198:20
**who's (4)**
87:15;192:1;195:5;
212:8
**whose (2)**
197:14;213:1
**willingly (1)**
18:18
**Winkler (118)**
4:4,20,20,21;5:3,5,
7,11;6:1,17;7:5,18,
21;8:16;11:16;19:10;
24:15;25:4;33:24;
60:5;79:12;84:3;
92:19;93:16;101:19;
102:7;105:5,7,9,
117:24;118:6;120:7;
130:15;136:12,18;
137:17;138:7;
139:13;140:1;
151:21;160:22,24;
161:3;165:5;167:2;
170:23;175:5;177:5;
179:15;181:4,6;
182:1,3,6;185:4,5;
188:11,13;190:12;
191:16,22;193:16;
202:7,8;203:13;
204:6,11;205:3;
206:14;207:5,14;
208:2,12;210:13;
212:3,8;214:8,11,13,
14;221:4;223:16;
226:15,21;229:13,18;
231:2;232:13;235:6,
22;240:5;247:1,7;
249:8;254:14;255:5,
22,24;260:18,21;
266:6;267:5;268:11,
15;269:12;270:17;
272:6;274:16;278:1;
282:16;283:4,13;
284:4;290:3;291:17;
292:10;302:9;311:9
**Winkler's (2)**
160:20;161:2
**withdraws (1)**
308:12
**within (10)**
3:11;6:18;8:11,14;
149:6;168:23;
198:23,23;199:4;
310:14
**without (20)**
25:5;29:7,14;
30:21;121:11;
138:18;162:3;
193:22;194:19;
195:20;200:17;

202:9,10;228:6;
278:3;280:8;290:5;
291:7,23;293:13
**witness (32)**
4:13;7:12;8:1;
12:3;22:10;47:16;
57:2,9;69:14;92:16,
21;117:22;162:12,
23;163:3,13,14,17,
20,21;164:9;166:9,
12;170:24;171:4;
203:11;204:8,21;
205:1;206:13;208:2;
282:17
**woman (1)**
186:8
**wondering (2)**
133:23;185:12
**woo (2)**
134:2,11
**wooden (1)**
232:24
**word (22)**
24:21;29:5;49:9;
54:2;89:23;91:16,17;
97:18;118:18;
139:14,15;151:3,4;
167:3;174:3,3;
247:20,22;248:2;
278:2,4;286:17
**worded (1)**
159:7
**wording (6)**
26:15;158:24;
161:16;167:8;
184:10;221:24
**words (5)**
54:10;110:24;
139:9;186:1;205:17
**work (84)**
9:8,12,21;10:23;
11:1;12:14;13:16;
15:13;21:21;36:9,11;
41:8;44:5;45:13;
55:20;56:10;58:10,
22;59:10;61:14,18,
19;63:2,6;65:1,2,2,
16;69:2,8;70:4,7;
77:24;78:10,13;
91:12;92:22;94:9,11,
12,13;96:18;98:2;
108:24;109:3;110:1;
114:11;119:21;
124:24;125:3,12,13;
130:11;140:19;
150:7,9;151:14;
153:17;155:13;
184:3;192:10,13;
225:7;235:7;237:15,

18;239:1,3;247:2;
250:23;251:2;
254:16;257:6,8;
259:3;263:3;271:22,
23;272:1;277:3;
289:9;301:17;306:1;
307:13
**workday (3)**
61:14,18;116:12
**worked (37)**
9:9,22;10:20;11:7;
13:24;14:1;15:10,12,
13,16,18;19:10;22:4;
26:18;33:15;42:24;
43:1,9;46:21;63:9,12,
23;66:5,23;69:1;
114:18;122:21;
125:23;183:13;
184:11;216:9;
271:19,20;272:10;
306:24;307:16;310:1
**worker (1)**
47:18
**working (28)**
11:11,12;13:19;
15:11;16:23;22:6;
41:8;43:19;45:6,15;
46:8;54:22;96:19;
109:4;111:9;116:17;
122:19;123:1;
131:14;145:3,15;
149:7;222:5;232:5;
238:23,24;245:8;
285:7
**workload (11)**
66:4;78:4;144:16;
145:7;146:2;284:13,
17,19;302:10;304:8,
10
**works (4)**
36:16;197:24;
221:17;267:18
**worthy (1)**
209:2
**wound (1)**
55:24
**Wow (1)**
48:1
**wrist (1)**
233:1
**write (7)**
75:20;153:16;
216:23;238:15,22;
249:18;265:24
**writes (3)**
221:16;246:3;
261:1
**writing (15)**
77:7,8;181:6,9;

193:24;202:24;
209:3,4;218:22;
219:2;232:9;233:23;
240:13;252:20;260:2
**written (4)**
103:12,17;179:7;
240:15
**wrongly (2)**
207:22;208:5
**wrote (7)**
54:12;75:24;88:24;
101:4;161:20;251:9;
308:4

---

**Y**

---

**Yang (36)**
29:6,15,16;30:6,9,
12,19;33:15;34:13,
14,16;35:3,6,14;
38:20,22;39:4,11,14,
23;40:6;41:5;42:2,7,
12,14,18;49:22;
50:23;51:1;104:8;
109:2;278:2;279:22;
309:3,5
**Yang's (1)**
31:6
**Yanika (1)**
212:2
**year (18)**
10:5;13:15;14:1,2,
3,18;15:8;20:22;
21:4;66:6,10,10,12,
13;153:7,10;241:20,
21
**years (18)**
10:16,19,21,24;
11:5,6,7;18:24;22:4;
48:1;106:11;123:2;
150:2;183:11,11;
283:10
**yell (1)**
235:22
**yelled (1)**
236:4
**yelling (1)**
236:1
**Yeshiva (1)**
9:3
**York (4)**
4:18;62:23;130:13;
308:17

---

**Z**

---

**Zayas (1)**
136:24

Case 1:18-cv-12137-JPC-JLC   Document 225-8   Filed 03/05/22   Page 352 of 353

BARRY WINKLER, M.D.                                    MELISSA KAYE v.
October 6, 2021                        HEALTH AND HOSPITALS CORPORATION, et al.

## 1

**1 (5)**
126:1,3,8;141:23;
148:9
**1:15 (2)**
93:1,5
**1:30 (1)**
93:1
**10 (7)**
64:4;139:20;
180:22;181:2,2,20,23
**10- (1)**
115:7
**10:00 (2)**
115:11,18
**10:16 (1)**
4:7
**10:30 (1)**
115:7
**100 (1)**
183:9
**10th (2)**
249:2,7
**11 (5)**
184:19,21,23;
185:5;193:11
**118,000 (1)**
62:9
**11th (2)**
182:2,8
**12 (4)**
188:2,2,5;189:17
**127 (1)**
126:9
**13 (6)**
193:4,6,10;208:17;
271:14,19
**14 (3)**
209:13,14,18
**14-day (1)**
37:11
**14th (1)**
175:6
**15 (2)**
211:16,19
**15th (1)**
226:20
**161st (1)**
232:10
**1647 (3)**
260:8,9,21
**1649 (2)**
260:7,16
**16th (3)**
210:2;273:10,12
**17 (3)**
219:22,24;220:4

**18 (6)**
223:7,12,12,15,15;
297:21
**18B (3)**
47:7;48:6,10
**19 (3)**
10:16;225:21;
226:1
**1913 (5)**
181:12,14,15,17,18
**1977 (1)**
13:7
**1980 (2)**
8:22;10:6
**1981 (2)**
9:9;10:6
**1st (2)**
136:24;137:8

## 2

**2 (5)**
129:4,6,10;154:16;
209:15
**2:18 (1)**
160:24
**20 (4)**
10:19;231:12,17;
283:10
**20/20 (1)**
259:1
**200 (1)**
66:11
**2000 (3)**
9:9;19:11;56:20
**2001 (1)**
12:21
**2006 (3)**
9:5;12:13;13:15
**2007 (2)**
13:15;14:16
**2008 (3)**
15:23;19:11;22:5
**2009 (3)**
14:8;64:4;131:4
**2010 (1)**
21:7
**2015 (4)**
21:12;23:19;24:8;
48:1
**2016 (2)**
48:2;194:6
**2017 (9)**
23:17;34:16;38:19;
40:4;41:16;187:10;
191:14;193:18;210:2
**2018 (40)**
19:12,14;22:5,6,14,
17;41:16,17;71:1,6,7,

9,9;72:6,12,13,20;
76:8;118:11;129:14;
130:18;133:24;
136:12,24;137:8;
144:14;148:11;
158:6;172:2;182:2,8;
221:1;223:17;232:8;
236:21;249:3,7,22;
256:6,9
**2019 (14)**
171:21;175:6;
176:16,16;178:3,3;
236:23;237:17;
238:3;255:8;256:4;
259:18;262:24;
266:20
**2020 (6)**
237:3,17;238:3;
272:5,8,12
**2021 (6)**
4:6;188:16,18;
189:14;273:14,16
**21 (3)**
239:20,21,23
**2107 (1)**
185:7
**215 (1)**
232:10
**21st (4)**
172:2;185:7;
187:10;193:17
**22 (3)**
243:23,24;244:3
**225 (1)**
66:11
**22nd (2)**
171:21;256:4
**23 (3)**
248:20,22;249:1
**23rd (1)**
223:17
**24 (9)**
6:18,20;7:4,19;
8:11,14;254:21;
255:2,3
**24th (1)**
191:14
**25 (4)**
259:7,10,15;
260:14
**25th (1)**
255:8
**26 (5)**
250:10;262:6,11,
12;265:5
**27 (4)**
255:20;266:7,8,11
**27th (3)**
148:11;259:18;

262:17
**28th (2)**
129:14;262:24
**2nd (5)**
137:19,22;221:1;
232:10;233:6

## 3

**3 (9)**
135:21,23;136:3,7;
142:1,2;154:20;
163:5,5
**3:12 (1)**
166:14
**3:17 (1)**
166:14
**30 (1)**
92:21
**30b6 (7)**
203:11;204:8;
205:3;206:13;207:4;
208:2;282:17
**30b6witness (1)**
283:5
**3111 (1)**
262:13
**3113d (1)**
4:9
**31st (2)**
176:15,16
**326 (2)**
142:3,3
**329 (1)**
136:8
**390 (5)**
152:17;153:16,18;
154:1;159:3
**390s (2)**
153:9;158:16
**3998 (1)**
177:3
**3B (1)**
163:5

## 4

**4 (5)**
147:24;148:1,5;
161:23;162:7
**4:04 (1)**
161:1
**4:44 (1)**
230:22
**4:55 (1)**
230:22
**40 (1)**
238:6
**4045 (1)**

177:3
**42 (1)**
195:10
**466 (2)**
148:2,6
**477 (2)**
148:3,7
**4th (1)**
232:8

## 5

**5 (4)**
60:8;157:21,22;
158:1
**5:30 (1)**
58:5
**5th (2)**
188:15;266:20

## 6

**6 (6)**
4:6;139:18,19;
164:21;165:2;166:19
**6:42 (1)**
311:18
**65 (1)**
63:2
**6th (4)**
136:12;188:16,18;
189:14

## 7

**7 (3)**
139:20;169:22;
170:5
**730 (42)**
28:24;35:15;66:12;
74:17;87:1;131:7;
137:7,14;138:20;
140:6,7,17;142:11,
15,24;143:2,5,12;
152:6,22;153:2;
197:10;200:7,17;
201:23;202:18;
203:21;205:19;
206:17,20,21,22;
212:16;226:7;
240:11;244:19;
272:15;284:8,9,11;
298:17;311:2
**730s (4)**
66:19;237:7,10;
311:4

## 8

**8 (3)**
174:19,21;175:1
**8:00 (2)**
58:22;115:22
**8:30 (1)**
58:23
**840 (1)**
165:3
**841 (1)**
165:3
**842 (1)**
165:3

### 9

**9 (5)**
58:5;60:8;176:8,
14;267:17
**9:00 (2)**
115:12,15
**9:30 (3)**
115:11,18;116:4
**90s (2)**
11:9,10