Page 1

1

UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
3    --------------------------------------X
4    MELISSA KAYE,
5                         Plaintiff,        CV #
                                             19-12137(JPO)
6              -against-
7    NEW YORK CITY HEALTH AND HOSPITALS
     CORPORATION; ELIZABETH FORD; PATRICIA
8    YANG; ABHISHEK JAIN and JONATHAN WANGEL
     (said names being fictitious, the
9    persons intended being those who aided
     and abetted the unlawful conduct of
10   the named Defendants),
11                         Defendants.
12   --------------------------------------X
13
14                        1250 Broadway
                          New York, New York
15
                          February 28, 2018
16                        10:11 A.M.
17
18

             EXAMINATION BEFORE TRIAL of PATRICIA
19
     YANG, one of the Defendants herein, taken by the
20
     Plaintiff, pursuant to Federal Rules of Civil
21
     Procedure, and Order, held at the above-mentioned
22
     time and place before Courtney Biondo, a Notary
23
     Public of the State of New York.
24
25

Page 2

```
1
2  A P P E A R A N C E S :
3
4     LAW OFFICES OF SPECIAL HAGAN
          Attorneys for Plaintiff
5         196-04 Hollis Avenue
          St. Albans, New York  11412
6
          BY:  SPECIAL HAGAN, ESQ.
7
8
9     NEW YORK CITY LAW DEPARTMENT
          OFFICE OF THE CORPORATION COUNSEL
10        Attorneys for Defendants
          100 Church Street
11        New York, New York  10007
12     BY:  DONNA A. CANFIELD, ESQ.
            Senior Counsel
13          Labor and Employment Law Division
14
15
       A L S O   P R E S E N T :
16
       Blanche Greenfield, Esq.
17     Deputy Counsel/Chief Employment Counsel
       NYC Health and Hospitals
18
19
20
21
22            *    *    *
23
24
25
```

Page 3

```
1
2        IT IS HEREBY STIPULATED AND AGREED by
3  and among counsel for the respective parties hereto,
4  that the sealing and certification of the within
5  deposition shall be and the same are hereby waived;
6        IT IS FURTHER STIPULATED AND AGREED that
7  all objections, except to the form of the question,
8  shall be reserved to the time of trial;
9        IT IS FURTHER STIPULATED AND AGREED that
10 the within deposition may be signed before any
11 Notary Public with the same force and effect as if
12 signed and sworn before the Court.
13
14
15
16
17
18
19            *    *    *
20
21
22
23
24
25
```

Page 4

```
1                 Patricia Yang
2       P A T R I C I A     Y A N G, after first
3  having been duly sworn by a Notary Public of the
4  State of New York, was examined and testified as
5  follows:
6       MS. HAGAN:  Good morning.
7       THE WITNESS:  Good morning.
8       MS. HAGAN:  I'm trying to figure out
9  what I should call you.  Should I be calling
10 you Dr. Yang --
11      THE WITNESS:  That's it.
12      MS. HAGAN:  -- or Patsy or --
13      THE WITNESS:  That's better, if that's
14 okay.
15      MS. HAGAN:  Okay.  Sure.
16      My name is Special Hagan, and I'm here
17 on behalf of Dr. Kaye.
18 EXAMINATION BY
19 MS. HAGAN:
20    Q  Would you state your name for the record?
21    A  Patricia Yang.
22    Q  What is your current address?
23    A  My business address is 55 Water Street,
24 New York, New York 10041.
25    Q  I'm sure you are aware or at least have
```

Page 5

```
1                 Patricia Yang
2  been, I guess, briefed as to why you are here today.
3  Right?
4    A  Yes.
5    Q  Did you review any documents before you
6  came in today?
7    A  No.
8    Q  Have you seen the Amended Complaint, by
9  any chance?
10   A  I believe I have.
11      MS. HAGAN:  Okay.  I am going to show
12 you what would be marked as Exhibit 1.
13      (Whereupon, a discussion was held off
14 the record.)
15      (A First Amended Complaint, Bates
16 stamped KAYE000415 through KAYE000446, was
17 received and marked Plaintiff's Exhibit 1
18 for identification at this time.)
19      THE WITNESS:  Yes.  This looks familiar,
20 yes.
21   Q  So when did you see that document?
22   A  When Miss Greenfield sent it over.  I
23 think when it was served to the system, which is the
24 Office of Legal Affairs, who shared it with us.
25   Q  Okay.  So testified earlier it was OLA.
```

2 (Pages 2 - 5)

Patricia Yang

1
2  OLA is Legal Affairs --
3    A  Yes.
4    Q  -- Office of Legal Affairs?
5    A  Office of Legal Affairs.
6    Q  And by any chance, have you been deposed
7  before?
8    A  Yes.
9    Q  And when have you been deposed?  When
10  were you deposed?
11    A  I can't remember precisely.  In various
12  points in my professional life.
13    Q  This year, when was the last time you
14  were deposed?
15    A  Not this year.
16    Q  In 2019?
17    A  No.
18    Q  You weren't deposed at all?
19    A  Not that I can recall.
20    Q  Have you been personally sued before?
21    A  Other than a domestic for divorce.
22    Q  Divorce?
23    A  If that is considered suing.
24    Q  When was that?  Well, you were in
25  litigation for that, so when was that?

Patricia Yang

1
2    A  It was resolved in 2011.
3    Q  And so you have an idea as to how
4  depositions go; is that right?
5    A  Yes.
6    Q  So you know that the testimony is given
7  and you are sworn to tell the truth?
8    A  I do.
9    Q  And you understand that only one of us
10  can speak at a time, right?
11    A  Yes.
12    Q  So during the course of the deposition,
13  because the stenographer can only take verbal
14  responses, you have to make sure that you either say
15  yes or no.  So gestures are not good because the
16  stenographer can't capture that in writing.  Is that
17  clear?
18    A  Understood.
19    Q  And if by any chance you don't understand
20  my question, feel free to ask me to repeat it,
21  because if you don't, I am going to assume that you
22  understood it.  Is that clear?
23    A  Yes, it is.
24    Q  If you need me to slow down even, feel
25  free to ask me.

Patricia Yang

1
2    A  Thank you.
3    Q  Now, there may come a time that you might
4  want to take a break during the course of the
5  deposition.  So if, in fact, you do need to take a
6  break, feel free to do so, but before you take the
7  break, if there is a pending question, I am going to
8  expect you or hope that you answer that first.  Is
9  that clear?
10    A  Yes.
11    Q  Okay.  Now, in the last twenty-four
12  hours, have you had any alcohol or anything like
13  that?
14    A  No.
15    Q  Have you had any medication or any --
16    A  No.
17    Q  So you haven't ingested anything that
18  would impair your ability to answer truthfully and
19  completely today, right?
20    A  Correct.
21    Q  And you know, there is going to be times
22  when you are not going to be sure about the exact
23  date of when things happened, so I am going to ask
24  you to try to estimate.
25        I may ask you questions to kind of get an

Patricia Yang

1
2  estimate or try to get your recollection as to when
3  things happened.  So it is better that you say that
4  you are not sure about the exact date, but I am
5  going to expect you to answer truthfully, whether or
6  not, you know, you remember precisely.  Is that
7  clear?
8    A  Yes.
9    Q  Now, you said that you read the
10  deposition.  When was the last time you looked --
11      MS. CANFIELD:  Objection.
12      MS. HAGAN:  I'm sorry.
13    Q  You said that you read the Amended
14  Complaint.  When was the last time you read the
15  Complaint?
16    A  It was when we were told that this was
17  moving forward.
18    Q  What do you mean "this"?
19    A  That I was going to be deposed.
20    Q  Okay.  When was that?
21    A  I don't recall.  It was sometime last
22  year.
23    Q  Okay.  And --
24    A  Or this year.  I don't recall.
25    Q  You are not sure?

Patricia Yang

2    A   Yes.
3    Q   Now, what is your current title at Health
4  and Hospitals?
5    A   Senior vice president.
6    Q   Senior vice president.  And what is your
7  highest level of education?
8    A   Doctorate.
9    Q   Where is that from?
10   A   Columbia.
11   Q   When did you get that?
12   A   2005, it was awarded with distinction.
13   Q   What was it in?
14   A   Public health policy.
15   Q   I am assuming you have a master's.  What
16  was that in?
17   A   Also in public health.
18   Q   And your bachelor's?
19   A   From Brown University in semiotics?
20   Q   What is that?
21   A   It is the study of signs and symbols.  It
22  is linguistics, philosophy.  It is a type of
23  communication.
24   Q   Howl did you get from semiotics to public
25  health?

Patricia Yang

2    A   Semiotics.  So the question of how I get
3  to semiotics is probably more germane.
4        I was in the accelerated medical
5  education program at Brown University, which, in
6  seven years, you earn an MD.
7        When I made the decision to drop that
8  program in the last year, I moved to semiotics,
9  which seemed to be -- all of my electives seemed to
10  work with that, and that's what I ended up with.
11  But the love for health issues has always been
12  there.
13   Q   I am assuming there was a gap between
14  your master's and doctorate as, far as --
15   A   Yes.
16   Q   -- when you pursued one versus the other?
17   A   Yes.
18   Q   When did you get your master's?
19   A   When?
20   Q   Yes.  What year?
21   A   I finished in 1980, but it was awarded in
22  January of '81.
23   Q   I am assuming you worked once you got
24  your master's.  Where did you work?
25   A   At New York City Health and Hospitals.

Patricia Yang

2    Q   In what capacity did you work?
3    A   Various.  I started out as a analyst in
4  central office, and eventually worked my way up to
5  being an Associate Executive Director at
6  Metropolitan Hospital.
7    Q   Associate --
8    A   Executive Director.
9    Q   So we are going to go through some of
10  your positions or all of your positions at H and H.
11       So you said you were an analyst at the
12  central office, right?
13   A   Yes.
14   Q   That's in 1981, right?
15   A   I think I -- I believe I started in 1980.
16  I finished the master's program, but I didn't have
17  the degree itself because of the Columbia timing.
18   Q   So from 1980 until when were you an
19  analyst?
20   A   I was an analyst and a senior analyst and
21  some other Civil Service title until 1983.
22   Q   Okay.  And then in 1983, what was your
23  next position?
24   A   I don't recall the exact title, but it
25  was at Metropolitan Hospital.  I think I came over

Patricia Yang

2  as a senior something.
3    Q   Okay.
4    A   And was promoted to an Associate
5  Executive Director.
6    Q   This is in '83?  When were you promoted
7  to an Associate Executive Director, when?
8    A   Probably around '83.
9    Q   And then after that, what was your next
10  position?
11   A   In '86 I went to Miami.  '86 to '87, I
12  was the Director of Planning at Mount Sinai of Miami
13  Bhish.
14   Q   Is this a hospital, as well?
15   A   Yes.
16   Q   Okay.  From 1986 to 1987, then what was
17  your next job after that?
18   A   I came back to New York City in '87 to
19  '88 as an Associate Executive Director at Bellevue
20  Hospital Center?
21   Q   Associate Executive Director?
22   A   Yes.
23   Q   Of what?
24   A   I don't remember the exact title, but it
25  was ambulatory care, the emergency department,

Page 14

1          Patricia Yang
2 affiliate services, ancillary services, materials
3 management, the HIV unit, victim services.  It was a
4 pretty broad profile.
5      Q   And then after this position, the
6 Bellevue Associate Executive Director position, what
7 was your position after that?
8      A   I went to the New York City Department of
9 Health.
10     Q   And this is in 1988?
11     A   Yes.
12     Q   Okay.  And how long were you at the
13 Department of Health?
14     A   I was there for about a year.
15     Q   What was your position at the Department
16 of Health?
17     A   It was a Senior Assistant Commissioner.
18     Q   Of exactly what?
19     A   It was called Family Health Services, I
20 think, at that point in time.
21     Q   And how did you did you get that job,
22 Patsy?
23     A   Please, call me anything that makes you
24 feel comfortable, but I am all right with Patsy.
25         How did I get that job?  The then Deputy

Page 15

1          Patricia Yang
2 Commissioner was someone who I knew from my earliest
3 central office days in Health and Hospitals?
4      Q   Who is the Deputy Commissioner that you
5 knew?
6      A   Dr. Mark Rappaport.
7      Q   Dr. Mark Rappaport.  Okay.
8          Then after you were at the Department of
9 Health, where did you go?
10     A   To Westchester County Department of
11 Health.
12     Q   When was that?  That was in 1989, right?
13     A   19 -- more '90.
14     Q   What was your position there?
15     A   I was the First Deputy Commissioner of
16 Health and occasionally Acting Commissioner of
17 Health for two or three stints in between
18 commissioners.
19     Q   And how many people would you say you
20 supervised at that point?
21     A   Oh, gosh.  I mean, the department itself
22 in Westchester was several hundred people, but I
23 have always tried to keep to the rule of no more
24 than eight direct reports, if that helps.
25     Q   Okay.  Then you were at Westchester from

Page 16

1          Patricia Yang
2 1990 until what?
3      A   2010.
4      Q   2010.  And then you came back to the City
5 of New York?
6      A   Yes.
7      Q   Now, did you go to H and H or somewhere
8 else?
9      A   I came to back to the City, to the New
10 York City Department of Health and Mental Hygiene.
11 It was now a merged department.
12     Q   And what Commissioner was there at that
13 time?
14     A   Dr. Thomas Farley.
15     Q   And how did you get that position?
16     A   How did I get that position?  In my
17 capacity as Acting Commissioner or First Deputy
18 Commissioner of Westchester, I did a lot of work at
19 a state level, and I was also president of an
20 association of New York health departments.  So I
21 did work a lot with the City, as well as all of the
22 other counties in the State of New York.  So he had
23 an opening and asked me to consider applying.
24     Q   This is Dr. Farley?
25     A   Correct.

Page 17

1          Patricia Yang
2      Q   So he reached out to you from while you
3 were at Westchester and asked you to apply?
4      A   He didn't directly, but his Chief
5 Operating Officer did.
6      Q   Who was that?
7      A   Andrew Rein, R-E-I-N.
8      Q   Now, at this time, what was your title at
9 Westchester?
10         MS. CANFIELD:  Objection.
11         Go ahead.
12     Q   In 2010, when you were at the Department
13 of Health and Mental Hygiene, what was your title?
14     A   Executive Deputy Commissioner.
15     Q   And what were you Executive Deputy
16 Commissioner of exactly?
17     A   Actually, when I first came to DOHMH, it
18 was Deputy Commissioner for Administration, but
19 within a few months, I was Executive Deputy
20 Commissioner, because Mr. Rein left.
21     Q   Okay.  So then how long were you -- so
22 Mr. Rein left.  So I am assuming that your title
23 changed to what, exactly?
24     A   Executive Deputy Commissioner.
25     Q   Okay.  It wasn't Executive Deputy

Page 18

Patricia Yang

1
2 Commissioner -- so you dropped the administration
3 altogether?
4    A   Correct.  Well, it folded under me.
5    Q   Okay.  Then what was your next position
6 after that?
7    A   I was there until -- I was at the City
8 Health Department from March 15th, 2010 until May
9 4th of 2014.  Cinco de Mayo, I started at City Hall.
10    Q   This is under Mayor Bloomberg, I take it?
11    A   No.  It was under Mayor de Blasio.
12    Q   I'm sorry.
13    A   It is okay.
14    Q   What was your job at City Hall?  We will
15 start there.
16    A   I was his Director of Health Policy.
17    Q   How did you get that job?
18    A   The deputy mayor reached out to me and
19 offered me a position.
20    Q   Who was the deputy mayor?
21    A   Lillian Barrios-Paoli.
22    Q   And Barrios is B-A-R-R-I-O-S?
23    A   Correct.
24    Q   Paoli is P-A-O-L-I?
25    A   Correct.  Hyphenated, Dr. Barrios-Paoli.

Page 19

Patricia Yang

1
2    Q   And in that capacity, what did you do?
3    A   Several things.  I aided City Hall.
4 There are projects and issues.  So in that capacity
5 with -- Dr. Barrios-Paoli was the liaison and
6 contact for New York City Department of Health and
7 Mental Hygiene, New York City Health and Hospitals,
8 New York City Office of Medical Examiner.  And I was
9 the representative from the mayor's office on the
10 joint task force for Behavioral Health and Criminal
11 Justice Task Force.  That's what it was called.
12    I separately worked with the First Deputy
13 Mayor Anthony Shorris on negotiations with the state
14 on what is called DSRIP.
15    Q   How do you spell that?
16    A   It is D-S-R-I-P, all caps, which is a
17 state initiative, Medicaid reform, and sort of the
18 landscape of Health and Hospitals, not the
19 corporation, but of hospitals in the City.
20    Q   Now, could you spell out the acronym?
21    A   For the life of me, I don't think I can
22 remember what it was.
23    Q   Okay.  So you were in this capacity from
24 May 2014 until when?
25    A   June 28th of 2015.

Page 20

Patricia Yang

1
2    Q   Were you appointed to a different
3 position at this point or did you apply for your
4 next position?
5    A   I was offered the opportunity to head up
6 an initiative that I had proposed.
7    Q   What was that initiative?
8    A   Transform the Correctional Health
9 Services as part of the mayor's criminal justice
10 reform efforts.  It was part of Mayor de Blasio's
11 initiative to reform the criminal justice system.
12    Q   You said you were offered the opportunity
13 to head up the initiative.  What initiative exactly
14 was this at the time?
15    A   Correctional Health Services has been --
16 in the City of New York has been run basically
17 through contracted providers.  Most recently, at
18 that point in time, there was a contract with Corizon,
19 C-O-R-I-Z-O-N, which is a for-profit prison
20 personnel provider based in Tennessee.
21    And because I was involved in my City
22 Hall capacity to improve and make more dignified and
23 humane how we deal with people who are detained and
24 placed in city custody, one of the issues that I
25 identified as the health person was that I thought

Page 21

Patricia Yang

1
2 we could -- we, as a city, could provide higher
3 quality of care and better accountability in a more
4 dignified way if we provided the services directly,
5 rather than through a contract.
6    Q   When you said you were offered to head up
7 the initiative, how did the initiative come to be?
8 Was it something that was from Mayor de Blasio or is
9 it something that, you know, there was a
10 brainstorming effort?  Exactly how did it come to be
11 exactly?
12    A   You know, as many people in City Hall,
13 the agency heads, department heads, there was -- it
14 wasn't one brain storming session.  It was a
15 continuum of ideas and proposals of ways we could
16 reform the criminal justice system in New York, and
17 it is everything from bail, to how NYPD does
18 arrests, to how the Department of Corrections
19 operates.
20    So the health issue was just one of many
21 items, and the proposal to let the Corizon contract
22 end and to move Correctional Health Services into
23 New York City Health and Hospitals was but one idea
24 for reforming health.
25    Q   Was City Hall pleased with how Corizon

6 (Pages 18 - 21)

Page 22

Patricia Yang

1
2 was actually operating the program?
3       MS. CANFIELD:  Objection.
4       You can answer.  You can answer.
5       A  I don't know that City Hall was
6 displeased.  I think everybody recognized that there
7 were opportunities do it better.
8       Q  Was there a DOI investigation?
9       MS. CANFIELD:  Objection.
10      You can answer.
11      A  Not that I can recall.
12      Q  So there was no -- there were no DOI
13 investigations into Corizon's performance?
14      A  Not that I -- I'm not recalling that,
15 which is not to say that it didn't happen.  There
16 were many observations about Corizon.  There were
17 reports.
18      MS. HAGAN:  I think I will show you what
19      has been marked as Plaintiff's Exhibit 2.
20      (A City of New York, Department of
21      Investigation report, Bates stamped
22      KAYE000384 through KAYE000414, was received
23      and marked Plaintiff's Exhibit 2 for
24      identification at this time.)
25      (Wherefupon, a discussion was held off

Page 23

Patricia Yang

1
2       the record.)
3       THE WITNESS:  Okay.
4       Q  Have you seen this document?
5       First, before we get into it --
6       A  I don't recall.
7       Q  You have never seen the document before?
8       A  I don't recall it, but it wouldn't
9 surprise me.
10      MS. HAGAN:  So for purposes of the
11      record, I didn't say what Exhibit 1 is, but
12      let's just be clear.
13      Exhibit 1 is Plaintiff's Amended
14      Complaint, First Amended Complaint, which is
15      Bates stamped KAYE415 to KAYE445.
16      And Plaintiff's Exhibit 2 is the DOI
17      report involving Corizon Health, and it is
18      marked as KAYE384 to KAYE414.
19      Q  Now, it is your testimony that you may or
20 may not have seen this document before?
21      A  I don't recall this.
22      Q  Was there ever a discussion about a DOI
23 investigation involving Corizon?
24      A  I don't recall it, but, you know, at that
25 point I was in City Hall, not at --

Page 24

Patricia Yang

1
2       Q  And at that point --
3       MS. CANFIELD:  Let her finish.
4       Q  I apologize.
5       A  I was at City Hall, not at DOHMH, which I
6 am gathering this is really focused on.
7       Q  Now, there was an effort to remove, I
8 guess, Correctional Health Services from management
9 under Corizon; is that right?
10      MS. CANFIELD:  Objection.
11      You can answer.
12      A  Can you repeat that question, please?
13      Q  You testified earlier that a decision was
14 made by City Hall to allow Corizon's contract to
15 end; is that right?
16      A  There was a decision to do that, yes.
17      Q  Right.  In fact, if you go to -- I guess
18 under the recommendations involved here in this
19 report by, I guess at the time, Commissioner Mark G.
20 Peters, one of the things he mentions is that the
21 contract itself is going to end and that they
22 recommend that it is not renewed.
23      Do you recall having that kind of
24 discussion?
25      A  Not with DOI.

Page 25

Patricia Yang

1
2       Q  Not with DOI.  Okay.
3       Now, who would have had a discussion with
4 DOI at that time?  Do you know, from City Hall?
5       A  I don't know.
6       Q  At any point, did you provide oversight
7 over Corizon at the time?
8       A  No.
9       Q  So who was the oversight for Corizon --
10      MS. CANFIELD:  Objection.
11      Q  -- at City Hall?
12      A  In City Hall?
13      Q  Yes.
14      A  Not me.  I don't know that somebody at
15 City Hall would have done that.  It is with the
16 Department of Health and Mental Hygiene.
17      Q  Do you know what precipitated this DOI
18 investigation?
19      A  No, but the performance of Corizon was
20 not a surprise.
21      Q  What do you mean by that?
22      A  There were concerns about whether that
23 contractor was the right contractor, the right
24 provider.
25      Q  What do you mean by the right provider?

7 (Pages 22 - 25)

Page 26

Patricia Yang

2 A  Again, it was part of the whole criminal
3 justice reform effort, and everyone was looking at
4 all aspects of criminal injustice.
5 Q  Was there a question of how they
6 performed background checks on staff?  Do you recall
7 that?
8 A  I recall that there was a question about
9 DOC and its fingerprinting and clearance of staff.
10 It is DOC, Department of Corrections, who does that,
11 not City Hall.
12 Q  Right.  Do you recall there ever being a
13 discussion as to several staff people being hired
14 without proper background checks at the time?
15 A  I do know that the issue of a Department
16 of Corrections backlog came up.  That was not
17 within, certainly, my purview.
18 *  Q  Do you recall there ever being an
19 instance where the Department of Corrections staff
20 person had let the background checks accumulate
21 unprocessed at their desk?
22     MS. CANFIELD:  Objection.
23     I am just curious as to the line of
24     questioning.  This sounds like a Corizon
25     case and not this case.

Page 27

Patricia Yang

2     MS. HAGAN:  But that wouldn't be a
3 proper objection, Miss Canfield.
4     MS. CANFIELD:  I am just interrupting
5 because I think that this is not relevant,
6 and I know that you have a free day today,
7 but --
8     MS. HAGAN:  No, I don't have a free day
9 today at all.
10     MS. CANFIELD:  You have a free day and a
11 free room.  I am just saying, let's go on
12 to --
13     MS. HAGAN:  Ms. Canfield, you can't
14 direct the deposition.  This is a speaking
15 objection, and it is not permissible.
16     MS. CANFIELD:  My co-counsel did just
17 point out to me this is more appropriate for
18 like the 30(b)(6) fact witness onto like the
19 policies of City Hall.  She is here as a
20 fact witness.
21     MS. HAGAN:  No, I understand that, but
22 that's not a proper objection.
23     MS. CANFIELD:  It doesn't matter.  Can
24 we just move on?
25     MS. HAGAN:  No, you can't tell me how to

Page 28

Patricia Yang

2 conduct my deposition.  So I am going to
3 resume my questioning, which was based on --
4     MS. CANFIELD:  Can we just --
5     MS. HAGAN:  I'm going to resume my
6 deposition, and you can make your objection
7 for the record.
8     MS. CANFIELD:  We are going to mark it
9 for objection after the deposition.
10     MS. HAGAN:  Okay.  I am going to still
11 continue.
12     MS. CANFIELD:  We can.  We will just
13 mark it for a ruling.
14     MS. HAGAN:  That's fine.  That's no
15 problem for me.
16 BY MS. HAGAN:
17 Q  So do you recall there being any
18 instances where staff persons who had felony
19 convictions, who should not have passed the
20 background check, managed to be hired to work at the
21 facilities under Corizon?
22 A  I did hear about a backlog of DOC
23 clearances by DOC, but I don't know -- I don't
24 remember when I heard that.
25 Q  Okay.

Page 29

Patricia Yang

2 A  I believe it came up after.  I mean, at
3 this point in time, a decision had already been made
4 by City Hall to move Correctional Health Services
5 from the City Health Department over to the City
6 Health and Hospitals system.
7     I was charged, from my position at City
8 Hall -- I mean, this is June.  That transfer was
9 finalized on June 29th of 2015.  So we were running
10 like crazy already trying to make this -- trying to
11 make all of the pieces happen.
12     I was not focused on this at this point
13 in time.  The decision had already been made by the
14 mayor.
15 Q  But you weren't part of that decision?
16     MS. CANFIELD:  Objection.
17     You can answer.
18 A  I was one of his staff who supported and
19 made a recommendation for that.
20 Q  Now, in part of your efforts to improve
21 the delivery of services at DHS, was the conduct of
22 background checks part of that initiative?
23     MS. CANFIELD:  Objection.
24     If you know.
25 A  Background checks were made the

8 (Pages 26 - 29)

Page 30

Patricia Yang

1
2  responsibility of Department of Correction.
3      Q   Solely Department of Correction?
4      A   Correct.
5      Q   Before, it wasn't clear; is that right?
6  Because you had the Department of Health and Mental
7  Hygiene, and you also had DOC, right?
8          MS. CANFIELD:  Objection.
9          If you know.  If you have personal
10         knowledge of the issues that she is
11         questioning you about.  If you don't, then
12         don't testify yes or no.
13         MS. HAGAN:  I am going to have to object
14         to the speaking objection of counsel on the
15         record at this point.
16     Q   You can proceed to answer to the best of
17  your ability.
18     A   I'm not clear on your question of whether
19  I had DOC -- I don't understand that.
20     Q   Well, according to this report, and if
21  you had an opportunity to review it to some degree,
22  it was alleged that the various agencies involved
23  were passing blame amongst each other as to who was
24  responsible for conducting the background checks,
25  whether or not it was Corizon or if it was DOC.

Page 31

Patricia Yang

1
2          And so my question is, going forward
3  under CHS, a decision was made that it would be
4  under the sole purview of DOC; is that right?
5          MS. CANFIELD:  Objection.
6          You can answer.
7      A   The decision at City Hall was for
8  Correctional Health Services -- the responsibility
9  for providing care, health care, to people who were
10 in the City's custody would move from being a
11 contracted service under the City Department of
12 Health and Mental Hygiene to the New York City
13 Health and Hospitals.
14         DOC -- there was no change in what DOC
15 had to do because DOC does not have responsibility
16 for health care.  It did not, and it still does not.
17     Q   So for CHS employees, right now, who does
18 the background checks?
19         MS. CANFIELD:  Objection.
20         Go ahead.
21     A   The Department of Correction.
22     Q   So for all CHS employees, Department of
23 Corrections does the background check?
24         MS. CANFIELD:  Objection.
25         You can answer.

Page 32

Patricia Yang

1
2      A   The security background checks, correct.
3      Q   So Dr. Kaye would have a security
4  background check and another background check; is
5  that what are you testifying to?
6          MS. CANFIELD:  Objection.
7          You can answer.
8      A   No.
9      Q   Okay.  Could you clarify, please?
10     A   Correctional Health Services is
11 responsible for ensuring that health care providers
12 are appropriately licensed and certified and
13 permitted.  That is different from the security
14 clearance that Department of Correction does.
15     Q   Could you explain the difference?
16     A   Correctional Health Services -- we,
17 Health and Hospitals look to make sure that doctors
18 have medical licenses that are valid in the City of
19 New York, for example.
20     Q   Okay.
21     A   That they did, in fact, attend and
22 graduate in good standing from an appropriate
23 accredited medical school, for example.
24         The Department of Correction will check
25 to see whether they have arrest records, criminal

Page 33

Patricia Yang

1
2  records, other reasons that would give the
3  Department of Correction concern for security.
4      Q   How often would this happen for an
5  employee?
6          MS. CANFIELD:  Objection.
7          You can answer.
8      A   The Department of Correction does that
9  for all new employees, new volunteers, contractors,
10 and then afterward, if cause.
11     Q   If cause?  What do you mean by that?
12     A   If an incident happened, if somebody was
13 found with contraband, if there were investigations,
14 if something happened that would make the Department
15 of Correction rescind somebody's clearance.
16     Q   Well, let's say, specifically, the
17 directors at the court clinics.  How often would the
18 directors at the court clinics have a criminal
19 background check?
20         MS. CANFIELD:  Objection.
21         You can answer.
22     A   On hire.
23     Q   And then after that?
24     A   If for cause.
25     Q   And what is for cause for a director at

9 (Pages 30 - 33)

Page 34

Patricia Yang

1    the court clinic?
2    Q   Who heads that team?
3    A   If it came to either our attention or the
4    Department of Correction's attention or DOI's
5    attention that something had occurred that raised a
6    question about a particular employee's conduct.
7    Q   How would that come to your attention?
8    A   Somebody would tell me.
9    Q   So you were saying that -- let's say, for
10   example, one of the directors, a criminal background
11   check was ordered on one of the directors after they
12   had been working there for some time.
13      Are you saying that it would have had to
14   come to your attention or someone on your staff's
15   attention?
16      MS. CANFIELD:  Objection.
17      You can answer.
18   A   If it were for cause.
19   Q   And for cause is someone telling you?
20      MS. CANFIELD:  Objection.
21      You can answer.
22   A   Yes.
23   Q   Is there some kind of policy in place
24   that would corroborate what you are saying?
25   A   Yes.  The Department of Correction has a

Page 35

Patricia Yang

1    policy about what -- about contraband, about overdue
2    familiarity, a range of issues that lay guardrails
3    around what people should or shouldn't do in a DOC
4    facility.
5    Q   What about CHS?  Is there a policy for
6    CHS?
7    A   I'm not sure we have a separate one.  We
8    certainly comply with DOC's.
9    Q   Have any of the directors that you know
10   of at the court clinics undergone an additional
11   criminal background check?
12   A   Not to my knowledge.
13   Q   And how often are the doctors or, I
14   guess, the directors at the court clinics, how often
15   are their licenses checked for currency?
16   A   On initial appointment and then at point
17   of reappointment.
18   Q   Reappointment for what?
19   A   There is a whole procedure.  I am not
20   close enough to explain it well.  My staff do that.
21   Q   Who is your staff that does that?
22   A   We have a team of people in Human
23   Resources and who do handle credentialing and
24   licenses.

Page 36

Patricia Yang

1    Q   Who heads that team?
2    A   Several people, but, ultimately, Jessica
3    Laboy, who is my Chief Administrative Officer.
4    Q   And Jessica Laboy is spelled L-A-B-O-Y?
5    A   Yes.
6    Q   And she is your Chief Administrative
7    Officer?
8    A   Correct.
9    Q   And she is responsible for ensuring that
10   all of the staff, or at least the licensed staff,
11   have current licenses; is that right?
12   A   Correct.
13   Q   Is there some kind of policy that
14   corroborates what are you saying?
15   A   It would be the New York City Health and
16   Hospital's system.
17   Q   Is there a specific name for the policy?
18   A   I don't know it.
19   Q   Did you have any part in writing the
20   policy?
21   A   No, I did not.
22   Q   Who did?
23   A   Some people in Health and Hospitals,
24   probably the Office of Legal Affairs, the Office of

Page 37

Patricia Yang

1    Medical Professional Affairs, the president's
2    office -- I don't know.
3    Q   So going back to your transition from
4    City Hall to H and H, this took place in 2015,
5    correct?
6    A   Correct.
7    Q   So initially, in 2015, in June of 2015,
8    what was your title?
9    A   June 29th of 2015, I was senior vice
10   president.
11   Q   Of?
12   A   For Correctional Health Services.
13   Q   What did that entail at the time?
14   A   At that moment, on June 29, 2015, we were
15   in the very, very busy process of getting
16   Correctional Health Services over to Health and
17   Hospitals with no disruption in service in the
18   twelve jails city wide.
19   Q   So this is the transition from Corizon to
20   H and H?
21   A   And from Corizon and the City Health
22   Department to Health and Hospitals.
23   Q   Now, what did the City Health Department
24   have to do with -- how were they involved in CHS?

10 (Pages 34 - 37)

Page 38

Patricia Yang

2  MS. CANFIELD:  Objection.
3      You can answer.
4   A  They oversaw the contract.
5   Q  Which contract?
6   A  The Corizon contract.
7   Q  Who was the person who oversaw the
8  Corizon contract from the health department?
9      MS. CANFIELD:  Objection.
10     You can answer.
11  A  I'm not sure what level you are asking,
12  but ultimately, Commissioner Farley, and under him,
13  there was a Department Commissioner, and under her,
14  there was an Assistant Commissioner, and their teams
15  oversaw the Corizon contract.
16  Q  So there is a transition from Department
17  of Health and Corizon over to CHS at this point, and
18  you were spearheading that; is that right?
19  A  Over to Health and Hospitals.
20  Q  I mean Health and Hospitals.  I'm sorry.
21     But you were spearheading that?
22  A  Yes.
23  Q  At that time, how many people did you
24  manage?
25  A  From June 29, 2015 until August 9th, I

Page 39

Patricia Yang

2  managed no one.  I was a division of one person.
3      On August 9th of 2015, several hundred
4  people from DOHMH transferred over, along with the
5  Corizon contract, and all other aspects of
6  Correctional Health Services.
7   Q  So is it fair to say that you -- I mean,
8  there was a dollar amount earmarked for the Corizon
9  contract.  Was that now used to finance the staff
10  that you now were supervising?
11  A  Yes.
12  Q  Okay.  And approximately how much was
13  that?
14  A  I don't recall.
15  Q  How many people did you absorb from DOHMH
16  at that point, approximately?
17  A  Maybe a hundred fifty, two hundred.
18  Q  And approximately, would you say how much
19  was the budget at that point?
20  A  I apologize.  I don't recall.
21  Q  No ballpark figure?
22  A  Several hundred million dollars.  Maybe
23  three, two -- two-something.
24  Q  And this was to operate CHS all together?
25  A  Correct.

Page 40

Patricia Yang

2   Q  And how many staff people comprised CHS
3  at that time?
4   A  I'm --
5      MS. CANFIELD:  If you don't know, you
6  don't know.
7   Q  Was it several hundred?
8   A  Yes, several hundred.
9   Q  And are we talking about three or four
10  hundred people?
11  A  So a few -- a couple hundred from DOHMH
12  and then Corizon.  All together, there was probably
13  about fifteen hundred people, FTEs, full-time
14  equivalents.
15  Q  Full time --
16  A  Equivalent.
17  Q  Equivalent.  Just make sure that you
18  speak up.
19     So at that point, you were the senior VP
20  of Correctional Health Services, and just to kind of
21  break out, just to be clear, what different units
22  consisted of Correctional Health Services at that
23  time?
24     MS. CANFIELD:  Objection.
25     You can answer.

Page 41

Patricia Yang

2   A  Let's see.  There was the -- we have
3  changed a lot in the last five years, but there has
4  always been medical service, mental health service,
5  nursing service, social work, re-entry/discharge
6  planning, dental, and operations, then
7  infrastructure.  There is HR, labor, IT, medical
8  records, patient relations.  I could go on.  Admin.
9   Q  Then do you have any other units, besides
10  infrastructure?
11  A  All of those that I was listing, I
12  consider under infrastructure.
13  Q  They are under infrastructure.  I'm
14  sorry.
15  A  Correct.
16     MS. CANFIELD:  Objection.
17     You can answer.
18  Q  So let me make sure, these were all of
19  the units under CHS.  You have medical, mental --
20  medical health services, mental health services,
21  nursing, social work, re-entry, right?
22  A  Yes.
23  Q  Dental health services and operations,
24  right?
25  A  Yes.

11 (Pages 38 - 41)

Page 42

Patricia Yang

1
2    Q   And then infrastructure?
3    A   Yes.
4    Q   And then you have HR, labor, IT, and
5 patient relations, right?
6    A   Yes.
7    Q   And would you say that this was -- this
8 program was separate and apart from H and H's
9 infrastructure or was it a part of H and H?
10   A   We were part of H and H.
11   Q   Are there duplicative roles in the
12 infrastructure in CHS and H and H?  Like would you
13 have a director of Labor Relations and
14 infrastructure under CHS, and a director of Labor
15 Relations under H and H?
16      MS. CANFIELD:  Objection.
17      You can answer.
18   A   Health and Hospitals' system has central
19 office -- I don't know what you would call it --
20 central office offices for these infrastructure
21 areas that give guidance to the system, which
22 consists of hospitals, ambulatory care, post acute
23 care, and Correctional Health Services.
24      They don't -- central office doesn't
25 manage all of those aspects at the hospitals.  It is

Page 43

Patricia Yang

1
2 way too much.
3    Q   So there is, I guess, an insular
4 structure within CHS, at least at that time --
5    A   Yes.
6    Q   -- of HR, labor, IT and patient
7 relations.
8    A   So patient relations I don't consider
9 infrastructure, or medical records or compliance or
10 quality assurance.
11   Q   Quality assurance.  Okay.
12   A   But those are all centralized functions.
13   Q   Okay.  So this is in August of 2015?
14   A   Yes.
15   Q   So I am assuming things changed.  It
16 evolved, right?
17   A   Yes.
18   Q   So when did it change?
19      MS. CANFIELD:  Objection.
20      You can answer.
21   A   It has been continuous.
22   Q   So to kind of bring us up to speed, at
23 what point -- so you were managing the court clinics
24 at that point; is that right?
25   A   That is not correct.

Page 44

Patricia Yang

1
2    Q   When did you come to manage the court
3 clinics?
4      MS. CANFIELD:  Objection.  You can
5      answer.
6    A   Probably 2018.
7    Q   When in 2018?
8    A   Let's see.  I think it was 2018 --
9 2019 -- time is doing a weird thing in my mind.
10 2018.
11      As part of our continuous efforts to
12 improve the Correctional Health Services, we
13 identified on our own and with the City that there
14 were delays -- there were delays or long
15 turn-arounds in producing reports that were court
16 ordered for competency reviews.
17      And so the court clinics had been
18 operated by Bellevue and Kings County Hospital, and
19 they were not -- they were not operating as a
20 unified structure.  They were four separate clinics
21 run by two different hospital systems.
22   Q   So who was in charge of these clinics at
23 the time?
24   A   Bellevue Hospital and Kings County
25 Hospital.

Page 45

Patricia Yang

1
2    Q   Was Jeremy Colley one of the people who
3 were in charge of the clinic?
4    A   Jeremy Colley was within Bellevue.
5    Q   So within Bellevue.  Was he the most
6 senior person at the time?
7      MS. CANFIELD:  Objection.
8      You can answer.
9    A   I don't know.  He reports to Chief of
10 Service, who reports to Chief Medical Officer, who
11 reports to the Chief Executive Officer, who reports
12 to a board.
13   Q   But you do know who Jeremy Colley is?
14   A   I do.
15   Q   Who was his equivalent at Kings County?
16   A   I don't know.
17   Q   So the turn around, how was that brought
18 to your attention, as far as turn around for the 730
19 and the 390 reports?
20   A   The City -- the Mayor's Office of
21 Criminal Justice --
22   Q   MOCJ?
23   A   MOCJ.  Thank you.
24      -- convened a task force of some sort, a
25 work group, looking at how court processing could be

12 (Pages 42 - 45)

Page 46

Patricia Yang

1
2 done more expeditiously, so people did not languish
3 in jail waiting for their cases to be processed.
4 This was one of the issues that came up.
5     Q   And just to be clear, where were the four
6 clinics?  There was one in Manhattan; is that right?
7     A   Yes.
8     Q   One in Queens?
9     A   Yes.
10    Q   One in the Bronx?
11    A   Yes.
12    Q   And one in Brooklyn?
13    A   Yes.
14    Q   To be clear, were you on this task force
15 with MOCJ?
16    A   I was busy with Correctional Health
17 Services.  I was on, you know, invitations or e-mail
18 distributions.  It wasn't a formal task force.  I
19 think people were just invited to come and would
20 come.  I was not a regular attendee.  I would come
21 in when they thought that I could be helpful.
22    Q   So in 2018, now CHS is something that you
23 manage?
24    A   Yes.
25    Q   And what was the managerial structure at

Page 47

Patricia Yang

1
2 the time?  You were at the top, I take it, right?
3     A   Yes.
4     Q   And then who reported directly to you at
5 that time?
6     A   I had a Chief Medical Officer who -- a
7 Chief Medical Officer, Chief Finance Officer, Chief
8 Operating Officer, a lot of chiefs.  Admin.  I did
9 not have at that point in time a Chief
10 Administrative Officer, but Labor Relations and HR
11 were operated by another person, a senior director.
12    Q   Okay.  And anyone else who was a direct
13 report?
14    A   A Senior director, there was a planning and
15 policy group and a quality assurance.
16    Q   Now, to the best of your recollection,
17 who was the Chief Medical Officer at that time?
18    A   It was either Home Venters or Ross
19 MacDonald.
20    Q   Can you repeat that again?
21    A   Homer, H-O-M-E-R, Venters, V-E-N-T-E-R-S.
22    Q   And the CFA?
23    A   Aaron Anderson, A-A-R-O-N,
24 A-N-D-E-R-S-O-N.
25    Q   So then -- I won't go into too much of

Page 48

Patricia Yang

1
2 this.  The Chief Operating Officer --
3     A   I think at that point in time, it was
4 Sara, with no H, Gillen, G-I-L-L-E-N.
5     Q   Okay.  So this is 2018, right?
6     A   Yes.
7     Q   And did this reporting structure change
8 at any point?  Did you keep these same direct
9 reports or at least these same positions as direct
10 reports throughout your tenure?
11        MS. CANFIELD:  Objection.
12    A   Pretty much.
13    Q   So they are the same people.  So I guess
14 I would like to figure out --
15    A   They are not the same people.
16    Q   Let's figure it out.  Admin, you had
17 Labor Relations and HR.  Who was in charge of Labor
18 Relations at the time?
19    A   Jonathan Wangel.
20        MS. CANFIELD:  Objection.
21        Give me half a chance here.
22    A   Jonathan Wangel, W-A-N-G-E-L.
23    Q   And HR?
24    A   I believe, at that point, it was also
25 Mr. Wangel.

Page 49

Patricia Yang

1
2     Q   Okay.  And Planning and Policy?
3     A   At that point in time, it was Patrick
4 Alberts, A-L-B-E-R-T-S.
5     Q   And Quality Assurance?
6     A   Roderick Calandria, C-A-L-A-N-D-R-I-A.
7     Q   So where would the court clinics actually
8 fall under these direct reports?  Who would be the
9 person?
10        You said Homer Venters, right, was your
11 direct report?  And then it was Ross MacDonald after
12 that?
13        MS. CANFIELD:  Objection.
14        You can answer.
15    A   Yes.  I don't remember when Homer left
16 and Ross --
17    Q   Okay.
18    A   -- was appointed.
19    Q   And then who reported to -- I guess who
20 was under Mr. MacDonald or Mr. Venters.
21    A   Doctors.
22    Q   Doctors?
23    A   Doctors.
24    Q   Who was under either one of these people?
25    A   Our Chief of Psychiatry, Dr. Elizabeth

13 (Pages 46 - 49)

Patricia Yang

1
2  Ford, our Chief Nursing Officer, Nancy Arias,
3  A-R-I-A-S, our Chief of Medicine, Zachary Rosner.
4      Q   So Dr. Ford's title exactly again?  It
5  was chief of what?
6      A   Chief of Psychiatry.
7      Q   And she was working there when you got
8  there, right?
9          MS. CANFIELD:  Objection.
10         You can answer.
11     A   When I got there.
12     Q   When you started managing the clinics and
13 the -- when you started managing CHS, right?
14     A   Yes.
15     Q   Was Dr. Ford there already as the Chief
16 of Psychiatry?
17     A   She didn't have that title, but she was
18 working at -- I think she had recently been hired by
19 Homer, Dr. Venters, while Correctional Health
20 Services was still with the City Health Department.
21     Q   Now, going back to the reports and the
22 turn-around, right, over a series of meetings
23 someone monitored or it was brought to the task
24 force's attention that these reports were taking, I
25 guess, an extended period of time to be completed,

Patricia Yang

1
2  right?
3          MS. CANFIELD:  Objection.
4          You can answer.
5      A   Correct.
6      Q   And exactly how did that come to be?  I
7  mean, did they report this to you?  Was there a
8  report that the task force actually generated?
9      A   Not that I can recall.
10     Q   So how did you determine what things
11 needed to be improved or changed as far as the
12 operations of the clinics were concerned?
13         MS. CANFIELD:  Objection.
14         You can answer.
15     A   There were many aspects.  So I would be
16 asked if there was something we could do to help
17 have the exchange of protective health information
18 easier.  So -- or there were complaints that staff
19 -- there were vacancies that weren't being filled.
20 There was a range of issues that came forward.
21     Q   Now, what is your familiarity with the
22 operations of the court clinics and what the
23 directors do exactly?
24     A   I would say remote.
25     Q   Had you had any background in psychiatry

Patricia Yang

1
2  or psychological services in the past?
3      A   No.
4      Q   So who did you rely on in order to, I
5  guess, facilitate the changes in the clinics?
6          MS. CANFIELD:  Objection.
7          You can answer.
8      A   The way things operate, it is my senior
9  team.
10     Q   Who is your senior team?
11     A   The leadership.  Pretty much the people
12 that I named.
13     Q   So let's go back.  The most senior person
14 we have here is Ross MacDonald, and then there would
15 be Dr. Ford.  So those two people would be the
16 people that you would rely upon in determining or
17 generating some kind of initiative; is that right?
18         MS. CANFIELD:  Objection.
19         You can answer.
20     A   The way ideas come up and initiatives
21 come up is a group process.
22     Q   Who is in that group?
23     A   My cupboard, my direct reports.
24     Q   And in this instance, since are you
25 making reforms to the court clinic, who would be

Patricia Yang

1
2  involved?
3      A   My top group, plus Dr. Ford.
4      Q   So are you talking about everybody who
5  are your direct reports that you named earlier?
6      A   Yes.
7      Q   And then Dr. Ford?
8      A   Yes.
9      Q   And Dr. MacDonald?
10     A   Dr. MacDonald is part of my senior team.
11     Q   Okay.  Yes.  Right.
12         So at that point -- for example, let's
13 just try to understand, I guess, where you are with
14 the clinics.
15         You are aware of the 390 exams and the
16 730?
17     A   Yes.
18         MS. CANFIELD:  Objection.
19         THE WITNESS:  I'm sorry.
20     Q   To the extent that you know, what does
21 the 390 exam entail?
22     A   An assessment as to -- with
23 recommendations for sentencing.
24     Q   Okay.  When is that administered?
25     A   Prior to sentencing.

14 (Pages 50 - 53)

Patricia Yang

2    Q   Is this at the pleading stage or what?
3  What exactly is a 390 exam?
4        MS. CANFIELD:  Objection.
5        You can answer.
6    A  I don't feel comfortable describing it.
7    Q   What do you mean?
8    A  I don't -- I'm not close enough to the
9  operation to tell you in a way that I feel
10  comfortable.
11    Q   To the extent that you know, what is a
12  390 exam?
13        MS. CANFIELD:  Objection.
14    A   Again, it is to make recommendations for
15  sentencing.
16    Q   And do you know what the requirements are
17  for the administration of a 390 exam?
18        MS. CANFIELD:  Objection.
19        You can answer.
20    A  I don't feel comfortable answering that.
21    Q   Did you confer with anyone about what
22  would be required to administer a 390 exam?
23        MS. CANFIELD:  Objection.
24        You can answer.
25    A  It comes up in conversation, in meetings,

Patricia Yang

2  but that was not key to the systematic reforms that
3  we were talking about.
4    Q   Wasn't the goal to streamline the
5  administration of the examinations themselves?
6    A   The goal was not to streamline.  The goal
7  was to streamline the process, not the exams
8  themselves.
9    Q   So to your knowledge, what is the
10  difference between a 390 and a 730 exam?
11    A   The 730 exam is competency to stand
12  trial, to go through the process of their case
13  processing, not sentencing.
14    Q   So sentencing versus -- not sentencing.
15  390 is what exactly, again?  Would you say it again?
16        MS. CANFIELD:  Objection.
17    A   For sentencing.
18    Q   Okay.  And then the 730 is the competency
19  to stand trial, right?
20    A   Correct.
21    Q   And what do you mean by competency to
22  stand trial?
23        MS. CANFIELD:  Objection.
24    A   Does someone understand the charges
25  against them?  Does somebody understand what the

Patricia Yang

2  role is of their lawyer, what the role is of the
3  court?  Do they understand the consequences?  Do
4  they understand what they are being alleged to have
5  done?  Things like that.
6    Q   Now, do you know what the 730 exam itself
7  entails, as far as the defendant --
8        MS. CANFIELD:  Objection.
9    Q   -- is concerned?
10        MS. CANFIELD:  You can answer.
11    A  I don't.  I'm not close enough to feel
12  comfortable explaining to you the operational
13  process.
14    Q   Do you know how many evaluators are
15  involved?
16        MS. CANFIELD:  Objection.
17    A  Two.
18    Q  Is this always the case?
19        MS. CANFIELD:  Objection.
20        You can answer.
21    A  I don't know enough to say whether it is
22  always the case.
23    Q   Should it be?
24        MS. CANFIELD:  Objection.
25    A  Yes.

Patricia Yang

2    Q   And when did you become familiar with the
3  CPL, which is the Criminal Procedure Law, that
4  implements these two exams?
5        MS. CANFIELD:  Objection.
6        You can answer.
7    A  Probably 2017.
8    Q  And how did you become familiar?
9    A  And perhaps even earlier.
10    Q  And how did you become familiar with it?
11    A  As part of Mayor de Blasio's larger
12  criminal justice reform effort, all aspects of the
13  system were raised and examined.
14    Q   And did you have a training of any kind?
15    A  No.
16    Q  So how did you learn about the CPL?
17        MS. CANFIELD:  Objection.
18    A  In meetings.  I am not -- my job and my
19  level of responsibility is not to conduct these.  It
20  is not -- I don't have the expertise to say that the
21  clinical standard is appropriate or not.  I am a
22  systems person.
23    Q   So you looked at -- would it be fair to
24  say that you looked at the system as it was being
25  administered at the time and made a determination as

Page 58

Patricia Yang

1
2 to how to shorten the turn-around, as far as the
3 production of these reports?
4      MS. CANFIELD: Objection.
5      You can answer.
6   A   That is some of what I did.
7   Q   Okay. What processes were put in place
8 to shorten the turn-around?
9   A   So if I can refrain something --
10  Q   Yes.
11  A   -- which was, prior to shortening, which
12 was part of the goal -- and the City actually
13 identified that they would do a pilot in Queens by
14 giving additional staff -- at some point in time, I
15 and my team raised the question and discussed the
16 merits of having the four clinics consolidate
17 management to Correctional Health Services.
18      They were clinics that had been operating
19 as stand-alones within the large Bellevue and Kings
20 County structures.
21      I understood that there was not
22 standardization among the four clinics, that they
23 did not have the resources, whether it was personnel
24 resources or other than personnel resources, that
25 they needed.

Page 59

Patricia Yang

1
2      I understood that they were not as
3 aligned in mission with Bellevue and Kings County's
4 mission as they were with ours, which was to deal
5 with criminal justice reform, so that people who
6 were in the City's custody were in custody the least
7 amount of time as necessary.
8   Q   In 2018, what would you say the budget
9 for the court clinics were?
10      MS. CANFIELD: Objection.
11      You can answer.
12  A   I don't recall.
13  Q   You said that they were under-resourced,
14 right?
15  A   Correct.
16  Q   In terms of other than personnel services
17 and personnel services; is that right?
18  A   That's what I learned.
19  Q   Right. Who did you learn that from?
20  A   My own eyes.
21  Q   And what do you mean your own eyes? What
22 do you mean? Did you go physically to the clinics?
23  A   I did.
24  Q   When did you go to the clinics?
25  A   This was after the decision was made.

Page 60

Patricia Yang

1
2   Q   When was that?
3   A   Late '17 or early '18.
4   Q   Did you meet with any of the directors of
5 the clinics at that time?
6   A   I did.
7   Q   Who did you meet with?
8   A   Dr. Kaye was one of the people I met
9 with, along with all of her staff.
10  Q   So in 2017, you met with Dr. Kaye at that
11 time?
12  A   That's not what I said.
13  Q   Okay.
14  A   I did meet with Kaye and her staff, as I
15 did with the directors and the staffs of the other
16 three clinics.
17  Q   When did you meet with Dr. Kaye?
18  A   It was probably in '18.
19  Q   Would you say early 2018?
20  A   Yes.
21  Q   And do you recall the conversation you
22 had with Dr. Kaye and her staff?
23  A   Yes. Myself, Dr. MacDonald, and Dr. Ford
24 went to visit and meet with each of the clinic staff
25 to explain to them the reason for the consolidation

Page 61

Patricia Yang

1
2 of  management from Bellevue and Kings County to
3 Correctional Health Services.
4   Q   So you, Dr. MacDonald, and Dr. Ford went
5 to each of these clinics one by one?
6   A   Correct.
7   Q   And at that time, what was your
8 recollection of the size of the Bronx clinic?
9   A   I don't understand the question about
10 size.
11  Q   As far as staff is concerned, how many
12 people were there?
13  A   I don't recall.
14  Q   Okay. Doctor, you recall that Dr. Kaye
15 had a staff?
16  A   Yes.
17  Q   And what would that staff consist of
18 generally?
19      MS. CANFIELD: Objection.
20      You can answer.
21  A   Administrative people, some clinic -- you
22 know, psychiatrists, psychologists. I don't recall.
23  Q   Do you remember name Lucretia Persaud?
24  A   No. It sounds familiar.
25  Q   Or Dr. Winkler?

16 (Pages 58 - 61)

Page 62

Patricia Yang

2      A   Yes.
3      Q   Were the centers actually staffed at the
4   time?
5      A   I don't know.
6      Q   Do you recall having any conversations
7   with Dr. Kaye when you met with her back in 2018 at
8   that time?
9      A   About what?
10     Q   Well, you said that you were explaining
11  the consolidation to each of the center directors,
12  right?
13     A   And their staffs.
14     Q   And their staffs.
15         Did you ever speak to Dr. Kaye about
16  operations or just some of the systematic changes
17  that you had -- that were envisioned for the
18  centers?
19     A   Yes.
20     Q   And what were those conversations about?
21     A   So they were not with Dr. Kaye directly.
22  They were with Dr. Kaye and her staff at that point
23  in time, to explain to them why we were doing this,
24  when we were doing this, that they would still have
25  a job, that their titles weren't changing, their

Page 63

Patricia Yang

2   work locations would remain the same, they were
3   still with Health and Hospitals, and to really
4   solicit from them what they saw as their -- I
5   wouldn't say wish list, but needs to operate better.
6      Q   At that time, were they also told that
7   their hours weren't going to be changing either?
8      MS. CANFIELD:  Objection.
9      You can answer.
10     A   We did not discuss that.
11     Q   So you are clear that you didn't talk
12  about changes in the operations of the clinics at
13  that time with Dr. Kaye or any of the center
14  directors?
15     MS. CANFIELD:  Objection.
16     You can answer.
17     Q   As far as the hours of the clinics were
18  concerned?
19     A   Didn't get that specific.
20     Q   Who would have made a determination as to
21  the hours of the clinics' operations?
22     A   Ultimately, Dr. Ford and Dr. MacDonald,
23  if there were changes, but we were not -- changing
24  the hours of the clinic was not one of the goals.
25     Q   The goals were -- one of the goals was to

Page 64

Patricia Yang

2   speed up the time that a defendant would be waiting?
3      A   That was the Queens pilot, but overall,
4   the goal was to provide more support to each of the
5   clinics.
6      Q   And for the Bronx, what support did they
7   need, if you remember?
8      A   I can't recall, but generally, the
9   clinics, some didn't have telephones.  There were
10  vacancies that could be filled.  There were requests
11  for additional staff.  There were requests for
12  equipment, computers.  There was some -- there were
13  requests for space.  There were requests to remove
14  detritus and old filing cabinets to have a better
15  work environment.  There were requests for, you
16  know, electrical work, so that when a microwave went
17  on, the computers didn't crash.
18     Q   Now, let's go back to something a little
19  bit less granular.
20         The Queens pilot project, what exactly
21  did that entail?
22     A   The clinic director Elizabeth Owens
23  requested -- identified that, if she got an
24  additional staff, she could hasten the through-put.
25     Q   So the Queens pilot project basically

Page 65

Patricia Yang

2   entailed more staff?
3      A   Yes.
4      Q   And nothing else?
5      A   And some -- I think there was some
6   resource to Legal Aid.
7      Q   Who was responsible -- so Dr. Owens, she
8   is responsible for the Queens pilot project by
9   herself or --
10     MS. CANFIELD:  Objection.
11     Q   How did it materialize?
12     MS. CANFIELD:  Objection.
13     A   She was one of the people who attended
14  the MOCJ meetings.
15     Q   And why was there just -- were there
16  other pilot projects, or no?
17     A   No.  And I was not part of that decision,
18  and the clinics did not report to me at that point
19  in time.  My attendance in those conversations was
20  sporadic.
21     Q   Who did the clinics report to at the time
22  of the Queens pilot project?
23     A   Bellevue and Kings County.
24     Q   Now, when was the next time you spoke to
25  Dr. Kaye after the 2018 meeting?

17 (Pages 62 - 65)

Page 66

Patricia Yang

2    A   I have not.
3    Q   You never spoke to her again?
4    A   No.
5    Q   How is that?
6        MS. CANFIELD:  Objection.
7    A   It is not -- it is not my job.
8    Q   Did you ever go back to the clinic after
9  that?
10   A   I did not.
11   Q   Okay.  Have you been to the clinic after
12 Dr. Kaye left?
13   A   I have not.
14   Q   Now, at some point, you had the Queens
15 pilot project.  How was success or how was
16 performance measured of this project?
17       MS. CANFIELD:  Objection.
18       You can answer.
19   A   The clinic has to report some data, as
20 requested, to MOCJ.
21   Q   What data is that?
22   A   Data -- it is just turn-around.
23   Q   Turn-around of the 390s and the 730s?
24   A   Just the 730s.
25   Q   Just the 730s?

Page 67

Patricia Yang

2    A   Yes.
3    Q   How were the 730s counted?
4    A   I'm not close enough to that, but I would
5  imagine it would be date the court ordered and the
6  date the report was provided.
7    Q   But as far as the number of them, how
8  would they be counted?
9        MS. CANFIELD:  Objection.
10       You can answer.
11   A   I'm not close enough to the data
12 collection to answer that.
13   Q   I am going to ask you, just to see if
14 this is reasonable to assume, could the 730 be
15 counted based on the orders from the judge to
16 conduct the 730s?
17       MS. CANFIELD:  Objection.
18       You can answer.
19   A   It is possible.
20   Q   Could they be counted based on each
21 evaluator conducting a 730?
22       MS. CANFIELD:  Objection.
23       You can answer.
24   A   I don't know.  It is possible.
25   Q   Could they also be counted based on the

Page 68

Patricia Yang

2  defendants themselves?
3        MS. CANFIELD:  Objection.
4        You can answer.
5    A   I don't understand what that metric would
6  look like, but --
7    Q   For example, M.B., a defendant, a judge
8  ordered that a 730 be conducted for him.  Would that
9  be one 730?  Because there are two evaluators.
10 Would it be one 730 for that defendant?
11       MS. CANFIELD:  Objection.
12       Could we mark this part of the record as
13       being sealed, named being sealed, being it
14       is an inmate's name.
15       MS. HAGAN:  It is.  I'm sorry.  So that
16       could be redacted or something.  I'm not
17       sure how that would work, but we can just
18       use the initials.
19       (Whereupon, a discussion was held off
20       the record.)
21   Q   John Doe, could it be that John Doe is
22 considered as one evaluation or two evaluations,
23 because there are two evaluators?
24       MS. CANFIELD:  Objection.
25       You can answer.

Page 69

Patricia Yang

2    A   I'm not close enough to the operations to
3  understand that.
4    Q   So how would you determine if there were
5  improvements if are you not sure how the 730s are
6  counted?
7        MS. CANFIELD:  Objection.
8        You can answer.
9    A   So the turn-around time that I see when I
10 ask to get an update has been that the turn-around,
11 average turn-around, has gone from about forty-five
12 days to single digit days.  That is a very good
13 indicator.
14       I know that the vacancies are budgeted
15 and filled.  I know that recruitment is under way to
16 backfill people who leave.  I know that space has
17 been allocated, phone lines are back in, so people
18 are not using their personal cell phones anymore.
19       I understand that there are policies and
20 procedures that standardize across the four clinics
21 how they can request and receive protected health
22 information and share it.  Things like that.
23   Q   Now, getting back to, first and foremost,
24 the exams and the turn-around.  For example, the
25 Queens pilot project, I am assuming you are

18 (Pages 66 - 69)

Page 70

Patricia Yang

1  referencing that when the exams went from forty-
2  seven days allegedly to single digit days.  Is that
3  right?  Wasn't that one of the successes of the
4  pilot project from your recollection?
5       MS. CANFIELD:  Objection.
6       You can answer.
7    A   Yes, but the reduction in turn-around
8  time days, turn-around time for reports, applied to
9  all of the clinics, not just Queens.
10   Q   All of them.  What happened?  Why was
11 there now this dramatic reduction in turn around?
12      MS. CANFIELD:  Objection you.
13      Can answer.
14   A   I believe that with the consolidation of
15 management and support to the clinics, to CHS, that
16 we were able to provide them with the resources that
17 they need to do their jobs.
18   Q   Now, could you explain what, I guess,
19 doing an exam would entail?
20      For example, you have the judge
21 administering an order for a 730 exam, for example,
22 to take place for a defendant to stand -- whether or
23 not he is competent, you know.  Right?  Whether or
24 not he is fit or unfit.

Page 71

Patricia Yang

1       Let me correct that.
2       So you have a judge issuing the order.
3  Then the director or the evaluator would have to
4  order medical records; is that right?
5       MS. CANFIELD:  Objection.
6       You can answer.
7    A   That's my understanding.
8    Q   And then after the director orders the
9  medical records, right, then what happens?  Do they
10 have control as to when the medical records would
11 arrive?
12   A   No.
13   Q   So how does that fit into this process?
14 Where do the medical records come from to begin
15 with?
16      MS. CANFIELD:  Objection.
17      You can answer.
18   A   They can come from a hospital or they can
19 come from Correctional Health Services.
20   Q   So if it came if Correctional Health
21 Services, the standard reason there would be some
22 more control as to when, you know -- I guess the
23 speed, right?
24   A   Yes.

Page 72

Patricia Yang

1    Q   But if it came from another hospital or
2  other facilities, there wouldn't be any control, am
3  I right?
4    A   If it were outside of Health and
5  Hospitals, correct.
6    Q   Right.  So how do you make a
7  determination -- how do you suggest that Health and
8  Hospitals -- I mean CHS would control, for example,
9  the turn-around when it came to the production of
10 medical records?
11      MS. CANFIELD:  Objection.
12      You can answer.
13   A   So in my capacity as a senior vice
14 president of Health and Hospitals, and with the
15 consolidation of the clinics to CHS, one of the
16 other system things that I did was I worked with the
17 CEOs of Bellevue and Elmhurst Hospitals, and with my
18 own staff, created a streamlined process, dedicated
19 accounts for receiving requests, flagging those
20 requests as coming from the court clinics, to
21 expedite production and return of those records to
22 the clinics.
23   Q   So you said filling of vacancies.  Now,
24 at what point -- I guess let's try to go into the

Page 73

Patricia Yang

1  staffing at the Bronx clinic.
2       At one point, you said you met Dr. Kaye
3  and Dr. Winkler at the Bronx clinic, right?
4       MS. CANFIELD:  Objection.
5       You can answer.
6    A   I think that Winkler was probably there
7  as part of the team that I met with.
8    Q   Right.  And at some point, did it ever
9  come to your knowledge that he was no longer there?
10      MS. CANFIELD:  Objection.
11      You can answer.
12   A   Dr. Winkler accepted a position in our --
13 to head up our Brooklyn clinic.
14   Q   And who replaced Dr. Winkler?
15   A   I don't know.  I don't have a name.
16   Q   Do you know -- so you are not sure if he
17 was ever replaced at the Bronx clinic?
18   A   So I thought -- I am not clear that he
19 was in the Bronx clinic.  I know that he now heads
20 up our Brooklyn clinic.
21      I know that Dr. Mundy also worked.  I
22 think he might have been in the Bronx.  He also
23 accepted a position --
24      Part of the streamlining that we did --

19 (Pages 70 - 73)

Page 74

Patricia Yang

1
2 and when I say streamlining, to make it one unified
3 service, rather than four distinct clinics -- was to
4 shore up the directorship of each clinic, so each
5 clinic had its own director. That was true in the
6 Bronx, but it was not true, for example, in Queens
7 and Brooklyn.
8       So we created and recruited for directors
9 of each of the clinics that didn't have one.
10 Dr. Mundy accepted the position for Manhattan and
11 Winkler went to Brooklyn.
12    Q   And who was in Queens?
13    A   Owens.
14    Q   Dr. Owens?
15    A   Yes.
16    Q   And then you had Dr. Kaye in Bronx?
17    A   Correct.
18    Q   Now, to be clear, because you had the 390
19 and the 730 exams, how many actual psychiatrists or
20 psychologists would be necessary to be at a given
21 center for it to be fully staffed?
22    A   I don't have the ability to answer
23 that. I rely on the staff requests and analysis of
24 those requests and recommendations to me.
25    Q   Now, to get back, the 730s, you are aware

Page 75

Patricia Yang

1
2 that they have to be administered by two different
3 people, either two psychologists or two
4 psychiatrists; is that right?
5    A   That's my understanding.
6    Q   Right. And then the 390, ideally that
7 would be administered by someone else; am I right?
8    A   I can't answer that.
9    Q   So are you not sure?
10    A   Correct.
11    Q   So would it be fair that, to have a
12 fully-staffed clinic, it would have to be either two
13 or three psychiatrists or psychologists at any given
14 site?
15       MS. CANFIELD: Objection.
16       You can answer.
17    A   I don't know how to answer that.
18    Q   What do you mean?
19       I mean, you are saying that you were
20 making sure that these vacancies were filled at the
21 various clinics, right?
22       You said that Dr. Winkler, he left the
23 Bronx clinic; is that right?
24    A   I don't recall if Winkler was in the
25 Bronx or Mundy was in the Bronx. I do know that

Page 76

Patricia Yang

1
2 Winkler applied and got appointed to head up the
3 Brooklyn clinic, and Mundy applied and got appointed
4 to head up the Manhattan clinic.
5    Q   Who is responsible for staffing the
6 various clinics?
7    A   The clinic directors reporting to
8 Dr. Jain, reporting to Dr. Ford, reporting to
9 Dr. MacDonald, reporting to me.
10    Q   And when was Dr. Jain hired?
11    A   I don't recall.
12    Q   Who hired Dr. Jain?
13    A   We did.
14    Q   Who is "we"?
15    A   We, Elizabeth Ford, Ross MacDonald, and I
16 approved it. But I rely on my chiefs of service and
17 my Chief Medical Officer to make those
18 recommendations and selections.
19    Q   Okay. So Jain was -- you approved it
20 ultimately?
21    A   Ultimately.
22    Q   So for the directors, who had final
23 hiring authority?
24    A   Ultimately, I signed the papers.
25    Q   Okay. And you had the ability to affect

Page 77

Patricia Yang

1
2 the conditions of the employment; am I right?
3       MS. CANFIELD: Objection.
4       You can answer.
5    A   Ultimately.
6    Q   So did you do the evaluations?
7    A   No.
8    Q   Who did the evaluations?
9    A   Dr. Jain.
10    Q   And who evaluated Dr. Jain, Dr. Ford?
11    A   Yes.
12    Q   Did Dr. MacDonald evaluate Dr. Ford?
13    A   Yes.
14    Q   Okay. And, of course, you evaluated
15 Dr. MacDonald, right?
16    A   Correct.
17    Q   Now, at any point in this, I guess, line
18 of authority that we just went through, if there was
19 a complaint of discrimination, who would that go to?
20    A   It could go to anybody.
21    Q   So for example, if there is a complaint
22 of discrimination, of pay disparity -- which is why
23 we are here to begin with. Dr. Kaye complained that
24 she wasn't being paid the same as the men amongst
25 the directors. You recall that complaint; am I

20 (Pages 74 - 77)

Patricia Yang

1                Patricia Yang
2 right?
3     A  I don't recall that complaint relative to
4 the court clinics.  I do recall that she had that
5 complaint at Bellevue.
6     Q  Okay.  Did Dr. Kaye ever complain to you
7 about her pay?
8     A  She asked for my assistance before the
9 court clinics came over to me.
10     Q  What did you do?
11     A  I understood that it was a Bellevue
12 situation.  I called the Bellevue CEO.
13     Q  Who was that?
14     A  William Hicks.  And I alerted him to the
15 complaint that I got from Dr. Kaye, since it was
16 relative to his operation, and I e-mailed him her
17 concern, and she thanked me for help helping her.
18     Q  Was it resolved at that point?
19     A  My understanding is that it was resolved.
20     Q  So did she ever -- she never complained
21 to you again after you referred her to Dr. Hicks?
22     A  I became aware -- I think she filed a
23 complaint.  I don't remember if it was an EEO
24 complaint or wherever she filed it, and I was
25 surprised because I had been assured by Mr. Hicks

Patricia Yang

1                Patricia Yang
2 that it had been resolved.
3     Q  How was it resolved, do you know?
4     A  No, I don't.
5     Q  So you don't know if Dr. Kaye's complaint
6 was resolved or not?
7     A  I was assured by the Chief Executive
8 Officer of Bellevue Hospital Center that it had been
9 taken care of.
10     Q  Which is Dr. Hicks?
11     A  Yes.  Mr. Hicks.
12     Q  Mr. Hicks.  I'm sorry.  There are so many
13 doctors involved.  I'm sorry.
14     A  I know.
15     Q  I was trying to be deferential.
16        So Mr. Hicks, did he provide you with
17 anything in writing that said this was resolved for
18 Dr. Kaye?
19     A  There might have been an e-mail or a
20 phone call, but I did follow up with him.
21     Q  Do you know how it was resolved?
22     A  No.
23     Q  Do you know who paid for it?
24     A  No.
25     Q  So you are not sure if it came out of

Patricia Yang

1                Patricia Yang
2 your budget or Mr. Hicks' budget?
3     A  It would not have come out of my budget
4 for the resolution of a Bellevue issue.
5     Q  Do you remember when this was resolved?
6     A  It would have been before she came over.
7     Q  Which is when?
8     A  The court clinics -- 2018.  So the
9 clinics were going to come over in April, but
10 because Dr. Kaye wanted her retention bonus, she
11 needed to stay --
12        It is this agreement or something, a
13 negotiated agreement, specifically for Bellevue
14 psychiatry.  And if you are there -- you have to be
15 there until June 30th to get a retention bonus for
16 the preceding fiscal year.
17        So Queens and Brooklyn came over to us in
18 April, and we delayed the Bellevue moves, the
19 Bellevue clinic moves, until July 1st so Dr. Kaye
20 could get her bonus.
21     Q  So you said you delayed the move so they
22 could do their bonuses.  Was that the way the salary
23 disparity was resolved?
24     A  No.  That has nothing to do with it.
25     Q  So what do you mean?  How did you make

Patricia Yang

1                Patricia Yang
2 the distinction between it being resolved -- how do
3 you make a distinction between the longevity and
4 retention bonus and then Dr. Kaye's salary actually
5 being increased?
6     A  Because they are unrelated.
7        MS. CANFIELD:  Objection.
8     Q  So explain.
9     A  There is a retention bonus if you stay
10 until the end of the fiscal year at Bellevue
11 psychiatry versus her allegations about pay
12 disparities at Bellevue.
13     Q  So do you recall how much Dr. Kaye was
14 being paid in comparison to her male comparatives?
15     A  I do not.
16     Q  In 2018, you believe that this one-time
17 payment resolved the issue?
18        MS. CANFIELD:  Objection.
19     A  No.  That's not what I said.
20     Q  Okay.  Explain.
21     A  The one-time payment was a retention
22 bonus for her if she stayed on the Bellevue payroll
23 until -- through June 30th.
24     Q  Okay.  So you don't know her salary in
25 comparison to her male comparators at all?

21 (Pages 78 - 81)

Page 82

Patricia Yang

1
2    MS. CANFIELD:  Objection.
3    A   That was a Bellevue matter.
4    Q   Now she is under your management.  What
5  happened then?
6    MS. CANFIELD:  Objection.
7    You can answer.
8    A   I am not aware of a disparity, a
9  gender-based disparity, in her pay as a court clinic
10  director.
11    What we did do, as another accommodation
12  to Dr. Kaye, was that -- all of the other three
13  directors are management positions.  She did not
14  want to become a manager.  She wanted to stay
15  unionized.  So I agreed to permit her to stay in her
16  union title, as an Attending Physician, which is a
17  different pay grade, pay structure.  But my
18  understanding is that it is -- it is almost -- there
19  is no great disparity there.
20    Q   So you say there is no great disparity.
21  Would you testify that all four of the directors
22  have the same salary?
23    MS. CANFIELD:  Objection.
24    You can answer.
25    A   Similar.

Page 83

Patricia Yang

1
2    Q   Are they the same?
3    MS. CANFIELD:  Objection.
4    A   I don't know.
5    Q   Would it be fair to say that Dr. Kaye is
6  the most senior amongst the four directors?
7    A   I don't know.
8    Q   You don't know when Dr. Kaye started?
9    A   I don't know.  She would have started
10  Bellevue and Ms. Owens would have started in Queens
11  and Kings.
12    Q   So are you not sure who amongst the
13  doctors, amongst the directors, who was there the
14  longest?
15    A   Between Dr. Owens and Dr. Kaye, no.
16    Q   What about Dr. Kaye and Dr. Mundy?
17    A   Mundy and --
18    Q   And Dr. Kaye?
19    A   Mundy would have been -- Mundy we
20  appointed as a director, so he is more recent.  I
21  believe he was also at Bellevue, and he forewent his
22  retention bonus to take the management job in
23  Manhattan.
24    Q   So you are saying that Dr. Mundy
25  abdicated, for lack of a better word, his union

Page 84

Patricia Yang

1
2  position so that he could get a higher salary; is
3  that right?
4    MS. CANFIELD:  Objection.
5    You can answer.
6    A   So he could accept the position as a
7  manager of the clinic in Manhattan.
8    Q   Was Dr. Kaye ever offered the management
9  position in writing?
10    A   My HR people would know that, but I am
11  sure she was.
12    Q   Who would know?
13    A   My Human Resources people.
14    Q   Is that Miss Laboy?
15    A   Right now, it is Miss Laboy, but at that
16  point in time, it was probably Jonathan Wangel?
17    Q   At any point, did Dr. Kaye put in writing
18  that she was complaining about pay disparity to you?
19    A   Yes.
20    Q   What did you say to her?
21    A   I offered to help her with Bellevue, and
22  she thanked me for that.
23    Q   At any point, did you craft an e-mail
24  making reference to removing the elephantine
25  reference that Dr. Ford mentioned to her?

Page 85

Patricia Yang

1
2    MS. CANFIELD:  Objection.
3    A   I don't recall.
4    Q   You never used the term "elephantine" at
5  all?
6    A   I don't recall.
7    Q   At any point -- let's back up.
8    Had you heard any complaints about
9  Dr. Kaye?
10    MS. CANFIELD:  Objection.
11    You can answer.
12    A   Sure.
13    Q   What did you hear?
14    A   Not so much that -- well, they are not
15  nice things.
16    Q   No, no.  We are here.  We've got to get
17  them out.
18    What did you hear about Dr. Kaye?
19    A   Generally, the sense was that she is
20  difficult.
21    Q   What do you mean by difficult?
22    A   Difficult.  So for example, she --
23  staff -- there were issues with retaining staff in
24  the Bronx clinic, that there were particular issues
25  that she wanted in terms of release of information,

22 (Pages 82 - 85)

Page 86

Patricia Yang

1
2 in terms of collegial work, collegiality.
3     Q   So let's go back.  You said the first
4 thing was retaining staff, there was problems
5 retaining staff.
6         Who told you there were problems
7 retaining staff in the Bronx?
8     A   My staff.
9     Q   And that was Dr. MacDonald and Dr. Ford?
10    A   And Ms. Laboy and Mr. Wangel.
11    Q   So these three people reported to you
12 that Dr. Kaye was having problems retaining staff?
13    A   Not that Dr. Kaye was having problems
14 retaining staff, but there were problems recruiting
15 and retaining staff in the Bronx.
16    Q   So at first -- but you are not sure who
17 was in the Bronx; am I right?
18        MS. CANFIELD:  Objection.
19        You can answer.
20    A   Correct.
21    Q   And at any point when this was brought to
22 your attention, did you ask any of your staff to
23 follow up with Dr. Kaye as to what was the problem,
24 why couldn't she retain staff in the Bronx?
25    A   I'm sure Dr. Jain and Dr. Ford may have

Page 87

Patricia Yang

1
2 had conversations with her.
3     Q   Did this impact the performance of the
4 Bronx?
5     A   It would have, but then the job of Ford
6 and MacDonald and -- more Ford and Jain, is to
7 reorganize staff, assign people to provide cover.
8 Sometimes Dr. Jain would go and do evaluations on
9 his own.
10    Q   Were there complaints about the turn-
11 around and the reports in the Bronx?
12    A   I don't recall specific complaints about
13 specific turn-around times of the clinics.
14        Overall, the goal was to streamline the
15 process by giving resources, taking a look at the
16 process, working with DOC, trying to work with the
17 courts, so that reports could be done in a more
18 timely manner.
19    Q   Were there ever complaints about
20 Dr. Kaye's performance as a director?
21    A   I don't recall.
22    Q   Were there any complaints about the
23 quality of the reports that she administered?
24    A   I don't recall.
25    Q   You mentioned something about

Page 88

Patricia Yang

1
2 collegiality.  What do you mean by that?
3     A   So I know that she, Dr. Kaye, wanted to
4 stay at Bellevue and not come over.  That was before
5 the transition and also after the transition.
6         I attempted, as a senior vice president
7 of the system, to try and secure her position here,
8 a position back with Bellevue, or even elsewhere in
9 the system, and nobody would entertain that.
10    Q   Why not?
11    A   They wouldn't give me reasons why.
12    Q   Who was nobody?
13    A   Nobody are the various people in the
14 hospital systems or in central.
15    Q   Let's be specific.  Who?
16        I mean, this is not the time to be
17 polite.  Who would not work with Dr. Kaye?
18    A   The Bellevue psychiatry people.
19    Q   Who was that?
20    A   They didn't want her back.
21    Q   Who were the Bellevue psychiatry people?
22    A   I don't know that -- I didn't have those
23 conversations directly.  I would have them with the
24 Chief Executive Officers who would ask their staff.
25    Q   Who were the Chief Executive Officers?

Page 89

Patricia Yang

1
2     A   William Hicks.
3     Q   So Mr. Hicks would tell you that his
4 staff did not want to work with Dr. Kaye anymore?
5     A   Not anymore, but that they did not have a
6 position for her.
7     Q   That's what Mr. Hicks told you?
8     A   That his staff -- that his chiefs -- his
9 psychiatry folks didn't have a position.
10    Q   Did you try to get or secure Dr. Kaye a
11 position with Bellevue on more than one occasion?
12    A   I made more than one inquiry.
13    Q   Now, you presided over all of these
14 hospitals; am I right?
15        MS. CANFIELD:  Objection.
16    A   Incorrect.
17    Q   You didn't any, I guess, authority over
18 Mr. Hicks?
19    A   Correct.
20    Q   So were there any other options, besides
21 Bellevue, for Dr. Kaye, if that's an instance?
22        MS. CANFIELD:  Objection.
23        You can answer.
24    A   Miss Greenfield and the systems Human
25 Resources person were aware that Dr. Kaye seemed to

23 (Pages 86 - 89)

Page 90

Patricia Yang

1
2  be unhappy with us and that she was seeking another
3  position and if they could assist.  That's about all
4  I can do there.
5      Q   Now, you also said that there were other
6  issues when you were talking about Dr. Kaye and
7  reports.  Could you elaborate?
8      A   I did.
9      MS. CANFIELD:  Objection.
10     Q   You mentioned -- you rattled off
11 retaining staff.  She had problems retaining staff.
12 That's what you said.  The Bronx clinic had problems
13 retaining staff.
14         You also said Dr. Kaye had issues with
15 collegiality.
16     A   Correct.
17     Q   Exactly what did you mean by
18 collegiality?  Had you heard any other complaints
19 about Dr. Kaye?
20     A   No.  I mean, people -- she writes a lot
21 of e-mails, raises issues that we thought had been
22 resolved.  So that's not a problem.  The problem
23 there was that we couldn't find a position for her
24 elsewhere in the system.
25     Q   Would you say that Dr. Kaye annoyed you

Page 91

Patricia Yang

1
2  at any point?
3      MS. CANFIELD:  Objection.
4          You can answer.
5      A   She did not annoy me.  The repeated
6  issues were annoying.
7      Q   Why?
8      A   Because I thought they had been resolved.
9      Q   Why?  Let's say they hadn't been resolved
10 and she was raising them again because they hadn't
11 been resolved.  Would be it fair to say that she had
12 the right to do that, if they hadn't been resolved?
13     MS. CANFIELD:  Objection.
14     A   Yes.
15     Q   So maybe you had been wrong in assuming
16 they had been resolved.
17     MS. CANFIELD:  Objection.
18     Q   Is that right?
19     A   That is possible.
20     Q   Nevertheless, you were annoyed because
21 you kept seeing these e-mails; am I right?
22     MS. CANFIELD:  Objection.
23     A   Correct.
24     Q   Okay.  Explain.
25     A   It was annoying that the issue kept

Page 92

Patricia Yang

1
2  coming up.
3      Q   What issue?
4      A   Her pay disparity at Bellevue.
5      Q   What about her hours?
6      A   The hours, I know that my staff had
7  talked to her.  I'm not sure if the unions did.
8          My recollection of the hour issue is,
9  because she remained in her union title, that title
10 requires somebody to work a total of forty-five
11 hours a week, with an hour lunch break each day.
12         So she was given the option to choose --
13 I don't know, a start between eight and nine or --
14 and to five or six, and I think -- I forgot what she
15 choose.  I think she chose eight to five.
16     Q   Who told you she was required to work
17 forty-five hours?
18     A   It is in the collective bargaining
19 contract.
20     Q   So you read the collective bargaining
21 agreement?
22     A   My HR labor person, Mr. Wangel.
23     Q   And Mr. Wangel advised you that she had
24 to work forty-five hours?
25     A   Correct, per the contract.

Page 93

Patricia Yang

1
2      Q   Was there ever a time that you were aware
3  that Dr. Kaye asked for reasonable accommodation to
4  care for her son?
5      MS. CANFIELD:  Objection.
6      A   Indirectly, yes.
7      Q   And what happened?
8      A   I was advised by the labor -- my labor
9  and the systems labor people that we need to comply
10 with the contract, the terms of the contract.
11     Q   Okay.  Was there a time that you became
12 aware that Dr. Kaye asked for FMLA to care for her
13 son?
14     A   I am aware of it.
15     Q   What part did you have in that?
16     MS. CANFIELD:  Objection.
17     A   None.
18     Q   So did Dr. Kaye ever complain to you
19 about being treated unfairly because she had to take
20 care of her son?
21     A   I don't recall if I got an e-mail about
22 that.
23     Q   Had anybody ever complained about FMLA
24 usage to you in the past?
25     MS. CANFIELD:  Objection.

24 (Pages 90 - 93)

Patricia Yang

1
2    You can answer.
3    A   Not to my recollection.  It is not
4 something that would get to me.
5    Q   Has anyone ever named you in an EEOC
6 complaint before?
7    A   I may have been.
8    Q   Are you aware of a Nicole Adams Flores
9 complaining about you?
10    A   Yes.  Thank you.  Yes.
11    Q   What do you remember about that?
12    A   I believe I was one of several people
13 named by her for a number of reasons.
14    Q   Do you recall her ever mentioning whether
15 or not she complained about you and her usage of
16 FMLA time?
17    A   I don't.
18    MS. CANFIELD:  Counsel, when you get a
19    place we can take a break --
20    MS. HAGAN:  We can take a break.
21    (Whereupon, a discussion was held off
22    the record.)
23    Q   Before we take a break, why don't we do
24 this.  I want to show you what would be marked as
25 Plaintiff's Exhibit 3.

Patricia Yang

1
2    (A document entitled "Charge of
3    Discrimination," Bates stamped KAYE000364
4    through KAYE000366, was received and marked
5    Plaintiff's Exhibit 3 for identification at
6    this time.)
7    (Whereupon, a discussion was held off
8    the record.)
9    (Whereupon, a short recess was taken at
10    this time.)
11    MS. HAGAN:  I'm going to show defendant
12    what has been marked as Plaintiff's
13    Exhibit 3, and that's Bates stamped KAYE364
14    through 366.
15    For the record, what has been marked
16    KAYE364 through 66 is Miss Nicole or Anna
17    Nicole Flores's Charge of Discrimination
18    with the EEOC.
19    I would like to draw your attention to
20    the last paragraph on page 366.  When you
21    have an opportunity to read the entire
22    paragraph, just let me know.
23    THE WITNESS:  Sure.
24    (Pause in the proceedings.)
25    THE WITNESS:  I'm sorry.  I have to

Patricia Yang

1
2    refresh my memory about this.
3    MS. HAGAN:  No problem.  Whenever you
4    are ready.
5    (Pause in the proceedings.)
6    THE WITNESS:  Okay.
7 BY MS. HAGAN:
8    Q   Now that you had an opportunity to review
9 the document, Patsy, does it refresh your
10 recollection at all?
11    A   A bit.
12    Q   Okay.  Now, I guess to kind of put this
13 in context, how do you know Mrs. Adams Flores?
14    A   She did work for Corizon.  And Dr. Ford,
15 back at the City Hall department, or Dr. Venters, at
16 that point in time, did appoint -- you know, move
17 her to one of our therapeutic housing units, or PACE
18 units, and then she accepted a position at the
19 Department of Correction.
20    Q   Now, when she moved from Corizon to
21 Department of Correction, were you still her
22 manager, in effect?
23    MS. CANFIELD:  Objection.
24    You can answer.
25    A   Remotely, yeah.

Patricia Yang

1
2    Q   Now, Dr. Flores, you are familiar with
3 her professional background; am I right?
4    A   She is a psychologist.
5    Q   Right.  Do you recall at the time her
6 asking you for a reasonable accommodation?
7    A   That wouldn't have come to me.  It would
8 have come to one of the staff.
9    Q   Do you remember who her supervisor was at
10 the time?
11    A   She would have reported to Corizon, up
12 Corizon's chain, which would have been a contract
13 that was overseen by the health department staff.
14    Q   At any point, did you deny Dr. Flores'
15 application for a reasonable accommodation, as she
16 alleges here?
17    MS. CANFIELD:  Objection.
18    You can answer.
19    A   I can't recall.  I wouldn't have done
20 that directly, but I can't recall the specifics of
21 the request.
22    Q   What was your opinion of Dr. Flores, in
23 general?
24    A   I didn't really have one.
25    Q   So did you ever work with her?

25 (Pages 94 - 97)

Patricia Yang

1
2      A   Not directly, but I would recognize her.
3   She would recognize me.   We would exchange
4   greetings.   She became the head of Health Affairs,
5   which in and of itself is an odd grouping within the
6   Department of Correction.
7      Q   Did you ever speak to any of your
8   colleagues about Dr. Flores?
9      A   We all did.
10     Q   What did you speak about?
11     A   What Nicole was asking for, what we
12  needed to say, what we needed to do.
13     Q   What was she asking for?
14     A   I mean, just the course of business.
15     Q   Did you ever complain about her
16  performance?
17     A   That wasn't for me to say.
18     Q   Did you ever have a part in denying her
19  request for a reasonable accommodation?
20        MS. CANFIELD:   Objection.
21        You can answer.
22     A   I don't recall having -- that I would do
23  that directly.
24     Q   Indirectly?
25     A   Indirectly, if staff made a

Patricia Yang

1
2   recommendation to me.   I don't recall the specifics
3   of this enough.   I haven't read this in a couple
4   years.
5      Q   So you don't recall the specifics of what
6   happened, what Dr. Flores alleges here?
7      A   I do remember that I was -- I recall that
8   I was characterized as a white Asian, which I am
9   not.
10        I know that she -- I recognize and I
11  recall that she believed that I should have only
12  been talking to her, and that was a misconception on
13  her part and the department's part.
14     Q   Really?
15     A   Yes.
16     Q   Why is she wrong?
17     A   Health Affairs -- she was not the sole
18  point of contact for Correctional Health Services to
19  the Department of Correction.
20     Q   But she was Deputy Commissioner?
21     A   There are many Deputy Commissioners.
22     Q   What was your title at that time?
23     A   Senior vice president.
24     Q   So there would be a Commissioner and a
25  Deputy Commissioner, correct?

Patricia Yang

1
2      A   One Commissioner and several Deputy
3   Commissioners, and my contact is the Commissioner.
4      Q   Did you speak to any other Deputy
5   Commissioners?
6         MS. CANFIELD:   Objection.
7         You can answer.
8      A   Probably, yes.
9      Q   So why wouldn't you speak to Dr. Flores,
10  if you spoke to the other Deputy Commissioners?
11        MS. CANFIELD:   Objection.
12     A   So I'm not sure, because this is a
13  different case, but, certainly, I talked to
14  Dr. Adams Flores.
15     Q   At any point, were you aware that she was
16  pregnant?
17     A   Sure.
18     Q   And are you aware that she was requesting
19  accommodations because she was having a difficult
20  pregnancy?
21     A   I think Dr. Ford let me know that.
22     Q   Was Dr. Ford ultimately responsible for
23  denying the reasonable accommodation request?
24        MS. CANFIELD:   Objection.
25        You can answer.

Patricia Yang

1
2      A   I don't know who is ultimately
3   responsible for approving FMLA.   I believe it is the
4   system.
5      Q   What about the reasonable accommodation?
6      A   I think that's also a system decision.
7      Q   So have you ever been trained in EEO
8   since you have been -- in your current capacity as
9   senior vice president?
10        MS. CANFIELD:   Objection.
11        You can answer.
12     A   Yes.
13     Q   How was that training?
14     A   We are all required to do the training,
15  either in person or online.
16     Q   What kind of training did you have?
17     A   I believe it was online.
18     Q   And when did you have the training?
19     A   I don't recall.
20     Q   Was it this year?
21        MS. CANFIELD:   Objection.   2000 --
22     Q   2020?
23        MS. CANFIELD:   2020?
24        MS. HAGAN:   Yes.
25     A   No.

26 (Pages 98 - 101)

Patricia Yang

1
2   Q   Did you have any in 2019?
3   A   I would have to check.
4   Q   And do you remember if you had computer
5   training or live training?
6   A   Probably computer.
7   Q   And this was something that is
8   administered through H and H?
9   A   Yes, correct.
10  Q   And you would have taken this at your
11  desk?
12  A   Correct.
13  Q   And how often would you have had this
14  training?
15      MS. CANFIELD:  Objection.
16  A   I believe these are annual or semiannual
17  requirements.  I don't know.
18  Q   So there would be some kind of record
19  that you actually completed the training?
20  A   There should be.
21  Q   How would it measure that you actually
22  grasped the concept?  Was there some type of test?
23  A   Yes.
24  Q   And you had to pass it in order for you
25  to have a certificate of completion; is that right?

Patricia Yang

1
2   A   Correct.
3   Q   How many times would you say that you
4   completed this training?
5   A   After the initial in-person Human
6   Resources orientation when I came over in 2015, I
7   don't know.
8   Q   Would you say once a year since 2015?
9   A   I have to -- there are so many required
10  trainings that we have to do annually or
11  semiannually.  I don't recall.  But when I am
12  prompted, I take them.
13      MS. HAGAN:  I call for the production of
14  the certificates of completion for
15  Dr. Yang's EEO training.
16      MS. CANFIELD:  If you put it in writing,
17  we will take it under advisement.
18      MS. HAGAN:  Sure.
19  Q   At any point, did you complete live
20  training?  Like did someone physically train you
21  about various aspects of diversity and EEO?
22  A   Ever?  Certainly.
23  Q   Well, since you have been at -- since you
24  have been senior vice president of CHS?
25  A   Yes.  My initial HR orientation.

Patricia Yang

1
2   Q   Okay.
3   A   There is a whole set of trainings that
4   you do.
5   Q   Like an onboarding process?
6   A   Correct.
7   Q   Now, who is the EEO officer at H and H?
8       MS. CANFIELD:  Objection.
9       You can answer.
10  A   I actually don't know who is in charge
11  for the system.  I know who to talk to.
12  Q   Who?
13  A   I mean, I talk to my people.  I will talk
14  to the Office of Legal Affairs.  I will talk to
15  Labor Relations.  I will talk to compliance,
16  corporate compliance.
17  Q   But you have never spoken to the EEO
18  officer?
19      MS. CANFIELD:  Okay.
20  A   I never had the need to.
21  Q   When you get an EEO complaint, you don't
22  report to the EEO office?
23  A   That's handled by my staff.
24  Q   But if someone complaints to you
25  directly, wouldn't you refer it to the EEO office?

Patricia Yang

1
2   A   So I am reluctant to answer in the
3   hypothetical.  I have not gotten that directly where
4   my staff were not able to handle it.
5   Q   When Dr. Kaye sent an e-mail, you didn't
6   forward that to the EEO office?
7       MS. CANFIELD:  Objection.
8       You can answer.
9   A   The e-mail that she sent about the
10  complaints about --
11  Q   Pay.
12  A   -- pay disparity at Bellevue?
13      Yes, I did not send it to the EEO office.
14  I sent it to the head of Bellevue to handle.
15  Q   But she was working for you at that time.
16      MS. CANFIELD:  Objection.
17  A   No, she was not.  She was working for
18  Bellevue.
19  Q   In May of 2018, you are saying Dr. Kaye
20  was working for Bellevue?
21  A   Correct.
22  Q   When did you assume leadership over CHS
23  in 2018?
24      MS. CANFIELD:  Objection.
25      You can answer.

27 (Pages 102 - 105)

Page 106

Patricia Yang

1
2    A  Over CHS --
3    Q  Over the court clinics, I mean.
4    A  April was the Queens -- the clinics, and
5  July 1, to accommodate Dr. Kaye, was for her clinic.
6    Q  So are you saying it wasn't until
7  Dr. Kaye was absorbed into -- it wasn't until
8  Dr. Kaye's, I guess, retention and longevity pay
9  were paid that you assumed management of her?  Is
10  that what you are saying?
11    MS. CANFIELD:  Objection.
12    You can answer.
13    A  That's correct.
14    Q  And it was only Dr. Kaye?
15    A  The clinic transfer did not happen -- I
16  postponed the clinic transfer until July 1 so
17  Dr. Kaye could get her retention bonus at Bellevue.
18    Q  You postponed it?
19    A  Correct.
20    Q  No one else?
21    A  With other people's consent, but it was
22  my decision.
23    Q  Who was other people?
24    A  Mr. Hicks.  Did he object?  He wasn't
25  happy about it, but --

Page 107

Patricia Yang

1
2    Q  Why not?
3    A  Because, frankly, the system and Bellevue
4  and Kings were relieved and thought it was a good
5  idea that Correctional Health Services should be
6  actually managing these clinics.
7    Q  So they allowed you to hold up this
8  transfer to accommodate Dr. Kaye?  That's what you
9  are testifying to today?
10    A  They did not have the authority to permit
11  me or allow me.
12    Q  Who did?
13    A  The president of the corporation agreed
14  that I could postpone it with this timeline.
15    Q  Who was the president at that time?
16    A  Oh, gosh, I don't know.  It was
17  Mr. Brezenof in 2018.  I am pretty sure it was
18  Brezenof, B-R-E-Z-E-N-O-F.
19    Q  So Mr. Brezenof allowed you to postpone
20  managing one director so that she could get her
21  longevity and retention?
22    A  I would like to state that in my terms.
23    Q  Yes.
24    A  That the system agreed that I could
25  postpone taking over the clinics that were run by

Page 108

Patricia Yang

1
2  Bellevue so that Dr. Kaye could get her retention
3  bonus.
4    Q  Now, going forward after that, what
5  measures were taken to ensure that Dr. Kaye was
6  being paid the same as her comparators?
7    MS. CANFIELD:  Objection.
8    You can answer.
9    A  That comes from my staff who run Human
10  Resources.
11    Q  And is that Dr. -- is that Miss Laboy and
12  Mr. Wangel?
13    A  It was probably, at that point in time,
14  Wangel.  Now, it is Laboy.
15    Q  What was Mr. Wangel's role at that time?
16    A  I think he was head of HR and Labor for
17  me.
18    Q  And you hired Mr. Wangel in that
19  capacity?
20    A  I did, along with affiliate
21  responsibilities.
22    Q  Did he come from the Department of Health
23  and Mental Hygiene?
24    A  He did.
25    Q  Had he worked with you before?

Page 109

Patricia Yang

1
2    A  He did.
3    Q  You were pleased with Mr. Wangel's
4  performance?
5    A  I was.
6    Q  Is he still working in that capacity
7  right now?
8    A  No.
9    Q  Why not?
10    A  He chose to get promoted to become the
11  Director of Labor Relations for the entire
12  corporation.
13    Q  So he applied for the Director of Labor
14  Relations for the entire corporation?
15    A  Yes.
16    Q  And Miss Laboy is now filling that?
17    MS. CANFIELD:  Objection.
18    A  She is now my Chief Administrative
19  Officer.
20    Q  Now, was there a time that that position
21  was occupied by someone else, other than Miss Laboy,
22  before Mr. Wangel left?
23    A  No, because it was a position that I
24  created.  I didn't have a Chief Administrative
25  Officer before then.

28 (Pages 106 - 109)

Patricia Yang

2    Q   So the Chief Administrative Officer, when
3   did you create that position?
4    A   I don't recall.
5    Q   So when did Mr. Wangel leave his
6   position?
7    A   Last year.
8    Q   Last year when?
9    A   Sometime last year.
10   Q   Was this in the fall of last year?
11   A   I can't recall.
12   Q   Winter?  I mean, toward the end, December
13  of last year?
14   A   I don't mean to frustrate you, but I
15  genuinely can't recall.
16   Q   I'm not frustrated.
17   A   Okay.
18   Q   Okay.  Andrea Swenson, who is she?
19   A   Andrea Swenson is -- I don't know her
20  title, but she is in the administrative side of the
21  court clinics.
22   Q   Did she report to Mr. Wangel or was she
23  above Mr. Wangel?
24   A   She was not above Mr. Wangel.  She
25  reported to -- she reports to Clarence Muir, who

Patricia Yang

2   reports to Carlos Castellanos, who reports to me.
3    Q   All right.  So what was Mr. Castellanos's
4   title?
5    A   He is my Chief Operations Officer.
6    Q   And he has been in that capacity for how
7   long?
8    A   He was promoted to that title probably
9   last year sometime.
10   Q   By you?
11   A   Yes.
12   Q   He applied and you promoted him?
13   A   Correct.
14   Q   So there was a change from Mr. Wangel --
15  that's complete and separate, right?  That's
16  separate, right?
17   A   Yes.
18   Q   So Mr. Wangel changed positions after
19  Dr. Kaye filed her lawsuit; is that right?
20   A   I don't know.  I don't remember when
21  Jonathan went upstairs.
22   Q   Did you evaluate Mr. Wangel?
23   A   I did.
24   Q   And how did you rate him?
25   A   It changed over time, depending on his

Patricia Yang

2   job.
3    Q   So in 2015, you hired Mr. Wangel, right?
4    A   Correct.
5    Q   And I am assuming that -- for the 2015
6   year, what did you rate him, do you recall?
7    A   Probably well.
8    Q   And 2016?
9    A   Maybe not so well.
10   Q   What happened in 2016?
11   A   His performance -- I don't know if it was
12  in '16 or '17, but his performance started not
13  holding up.
14   Q   What do you mean by that?
15   A   His performance just suffered for reasons
16  that we are not clear.
17   Q   Could you explain?
18   A   He didn't deliver things on time.  I
19  don't know, things like quality and quantity of
20  work.  There are set areas we have to evaluate.
21   Q   Now, did you put him on some kind of
22  performance improvement plan at some point?
23   A   Not officially, but he knew what the
24  issues were.  We would have regular meetings.
25   Q   And you rated him every year; is that

Patricia Yang

2   true?
3    A   I hope I did.
4       MS. HAGAN:  I call for the production of
5    Mr. Wangel's performance evaluations.
6       MS. CANFIELD:  If you put it in writing,
7    we will take it under advisement.
8    Q   Now, at any point, did anyone complain
9   about Mr. Wangel to you?
10   A   No.
11   Q   Had he been the subject of any EEO
12  complaints that you know of?
13   A   No.  I wouldn't know that.
14   Q   Now, have you read H and H's or CHS's EEO
15  policy?
16   A   Yes.
17   Q   And do you know what your role is as a
18  manager, if an EEO complaint is brought to your
19  attention?
20   A   Yes.
21   Q   What is it?
22   A   Assign, give it to -- raise the issue to
23  whoever needs to deal with it, which in my world is,
24  right now, Jessica Laboy.
25   Q   Not the EEO officer?

29 (Pages 110 - 113)

Patricia Yang

1
2    A   It is an option.
3    Q   Okay.
4    A   If it were in my shop, I would call in
5  OLA and everybody else and their brother or their
6  sister. But this was an issue in Bellevue about
7  Bellevue, so what I did, I raised it to the Chief
8  Executive Officer to handle.
9    Q   You don't know who the EEO officer at H
10 and H is right now; am I right?
11   A   I am embarrassed to say that I don't.
12       MS. CANFIELD:  Objection.
13   Q   And who is the EEO -- does CHS have the
14 equivalent of an EEO officer?
15   A   The responsibilities of EEO fall to Miss
16 Laboy.
17   Q   Is she the EEO officer at CHS?
18   A   Yes.
19   Q   Staff know to go to Miss Laboy for an EEO
20 complaint?
21   A   I would hope so.
22   Q   Is there a policy to that effect that
23 identifies Miss Laboy as EEO officer for CHS?
24   A   No.
25   Q   Who designated Miss Laboy as the EEO

Patricia Yang

1
2  officer?
3    A   I do.
4    Q   Is there anything in writing that says
5  Miss Laboy is the EEO officer for CHS?
6    A   Probably not.
7    Q   Why not?
8    A   Because people know to go to Jessica.
9    Q   How do they know to go if there is
10 nothing in writing?
11   A   Issues about Human Resources, about Labor
12 Relations, about employee complaints, they all to go
13 Jessica. They go to the Chief Administrative
14 Officer.
15   Q   Who tells them to do that?
16   A   If nobody -- if people don't know, they
17 can ask their supervisor. They can ask me.
18   Q   You have an open-door policy?
19   A   I do.
20   Q   Where are you sitting?
21   A   At Rikers or at 55? I have offices --
22   Q   You have more than one office?
23   A   Correct.
24   Q   How many offices do you have?
25   A   Two offices.

Patricia Yang

1
2    Q   Where?
3    A   On Rikers or at 55 Water.
4    Q   And how often are you at Rikers?
5    A   I try for once a week at least.
6    Q   And how often are you at 55 Water?
7    A   All of the other times, unless I am in
8  Albany or at 125 Worth Street or 160.
9    Q   So basically, staff could come to you or
10 someone else to find out who this EEO person is for
11 CHS, but there is nothing in writing that says who
12 this person is?
13       MS. CANFIELD:  Objection.
14       You can answer.
15   A   Correct.
16   Q   Now, do you provide training or have you
17 provided training for staff at CHS, EEO training?
18   A   We are part of the system, so the system
19 needs to do that.
20   Q   But do you ensure, yourself, as senior
21 vice president of CHS, that everyone has been
22 trained?
23   A   Yes.
24   Q   How do you do that?
25   A   It is part of the onboarding. So

Patricia Yang

1
2  everybody gets that when they come on board, and as
3  part of our quality assurance process for the Health
4  and Hospitals system, we have required training, and
5  people -- we have to report on percentage
6  compliance.
7    Q   So since 2015, would it be fair to say
8  that staff has received computer training every
9  year, at least since you have been senior vice
10 president of CHS?
11   A   I can't answer that.
12   Q   Would you be able to answer whether or
13 not the directors of the court clinics have received
14 EEO training?
15   A   I can't answer that.
16   Q   Is there anything that would say that
17 this is where the centers are supposed to go to file
18 an EEO complaint?
19       MS. CANFIELD:  Objection.
20       You can answer.
21   A   No.
22   Q   Why not?
23   A   As I said before, people know to go to
24 Jessica if they have an issue or complaint.
25   Q   Now, you have read the EEO policy for H

30 (Pages 114 - 117)

Page 118

Patricia Yang

1
2 and H, right?
3     A  Yes.
4     Q  And at no point did it come across to you
5 that you had an obligation, as a manager, to report
6 to EEO if you had -- if you came across -- if
7 somebody reported discrimination to you?
8         MS. CANFIELD:  Objection.
9         You can answer.
10     A  Again, if it were about me or about my
11 shop or about my staff, I would do that.
12         This was not an issue for me.  This was
13 about Bellevue, about a Bellevue employee, about
14 Bellevue, over which I have no authority.
15     Q  But Dr. Kaye continued to complain after
16 she was now part of your staff.  You are aware of
17 that, right?
18     A  I am not directly aware of that.
19     Q  But you indirectly knew she continued to
20 complain about her pay; am I right?
21         MS. CANFIELD:  Objection.
22     A  I was surprised when the EEO complaint
23 came out, or whoever it was she filed with after she
24 came.
25     Q  The EEOC complaint, you became aware of

Page 119

Patricia Yang

1
2 the EEOC complaint; am I right?
3     A  That was a couple years later.
4     Q  What did you do when Dr. Kaye -- when you
5 found out Dr. Kaye filed an EEOC complaint?
6     A  I sent it back up to the system.
7     Q  What is the system?
8     A  OLA.
9     Q  Office of Legal Affairs?
10     A  Office of Legal Affairs, and Bellevue,
11 again, and I said I was annoyed.  I didn't
12 understand that.  I thought it was resolved.
13     Q  Office of Legal Affairs consists of who?
14     A  In this case, I raised it, probably
15 inappropriately, to Miss Greenfield because I think
16 Dr. Kaye -- I go to Miss Greenfield for all manner
17 of resolution and assistance, even though,
18 technically, Dr. Kaye is not managerial.
19     Q  Okay.  So why did you go to Miss
20 Greenfield for Dr. Kaye, rather than your Chief
21 Administrative Officer or Mr. Wangel?
22     A  Because this was a Bellevue issue.
23     Q  But she is now your staff person, and she
24 is continue to complaining at this point.  She is no
25 longer at Bellevue.  Why are you going to Miss

Page 120

Patricia Yang

1
2 Greenfield or Bellevue?
3         MS. CANFIELD:  Objection.
4         You can answer.
5     A  Because it is a Bellevue issue.
6     Q  But she is no longer even on Bellevue's
7 payroll at this point.
8     A  But it was a Bellevue issue.
9     Q  But that doesn't explain -- she is no
10 longer a Bellevue employee.  Now she is experiencing
11 the disparity pay under your watch.  She is off --
12 she complained the first time in 2018, May 2018.
13 She continued to complain to 2019.  She is no longer
14 on the payroll.  What do you expect Bellevue to do
15 at that point?
16         MS. CANFIELD:  Objection.  I don't think
17     it has been established that she complained,
18     other than the first time, and then the EEOC
19     charge.
20         THE WITNESS:  Correct.
21     Q  The EEOC charge was made in 2018, right,
22 to your knowledge?
23     A  Right.
24     Q  And she complained again after that; am I
25 right?

Page 121

Patricia Yang

1
2     A  I only know about the EEOC piece, and I
3 flagged it to the Office of Legal Affairs for
4 awareness, and sent it back over to Mr. Hicks at
5 Bellevue, because it was still about the complaint
6 about Bellevue.  It was not here.
7         What I did is I asked my folks to
8 check, and there was not a pay disparity within CHS.
9         What her allegations were about were about
10 Bellevue's disparities, which I thought had been
11 resolved before she came over.
12     Q  What about after she filed her lawsuit?
13 She is still complaining of pay disparity then.
14 This is in December of 2018.  She is clearly now
15 your staff person.
16     A  That's right.
17     Q  Now, why didn't you -- what did you do to
18 attempt to address her complaints then after she
19 filed her lawsuit?
20         MS. CANFIELD:  Objection.
21     A  We looked at her salary and, basically,
22 because she chose -- she is the only director who
23 refused to become a manager.  The managers get
24 cost-of-living increases.
25         My understanding -- I believe that

31 (Pages 118 - 121)

Patricia Yang

1
2 I looked -- she is at the top of her salary range as
3 a unionized Attending Physician, plus all of the
4 differentials and everything else like that.
5        I think there is a $2,000 difference
6 between her and Dr. Mundy, who is the other
7 psychiatrist director of the clinics, and there is
8 only a $2,000 disparity because the managerial
9 cost-of-living increases kicked in.
10    Q   So are you saying she never asked to be a
11 Physician Specialist at any point?
12    A   I don't know about that.  That's a
13 Bellevue question.
14        MS. CANFIELD:  Objection.
15    Q   She was under your watch, under your
16 supervision.  She never asked to be a Physician
17 Specialist; is that right?
18        MS. CANFIELD:  Objection.
19        You can answer.
20    A   I don't know.  I don't know if the
21 Physician Specialist is the management title.
22    Q   So would it be fair -- do you know if
23 Dr. Mundy has a Physician Specialist title?
24    A   I'm not close enough to know the Civil
25 Service titles of everyone.

Patricia Yang

1
2    Q   How do you know that Dr. Mundy is a
3 manager and Dr. Kaye wasn't?
4    A   Because I asked that all of the clinical
5 director positions be management because they are
6 managers.
7    Q   So this is circular.  You first say you
8 don't know if the Physician Specialist title is a
9 managerial title --
10    A   Correct.
11    Q   -- and then you say that you asked that
12 everybody who is a director be in a managerial
13 title, but you said Dr. Kaye refused to do so.
14 Correct?
15    A   Correct.
16    Q   But you are not sure if the Physician
17 Specialist title is a managerial title and whether
18 or not the other directors have that title; am I
19 right?
20        MS. CANFIELD:  Objection.
21    A   Correct.  I don't know if the Physician
22 Specialist is the payroll title that is a managerial
23 title.
24    Q   So you don't know if the other directors
25 complied with your directive that they all be

Patricia Yang

1
2 managers; am I right?
3        MS. CANFIELD:  Objection.
4    A   I do know that they are all in management
5 titles.
6    Q   Do you know what their Civil Service
7 titles are?
8    A   I still don't know that.
9        MS. CANFIELD:  Objection.
10    Q   You don't know?
11    A   Correct.
12    Q   And so you are not sure if Dr. Kaye asked
13 to be in a Physician Specialist title at any point?
14 You are not sure about that, right?
15        MS. CANFIELD:  Objection.
16        You can answer.
17    A   I don't know if she asked to be a manager
18 in a management title.  I do know that she did not
19 want to be in a management title.
20    Q   But I asked you if you knew that she
21 asked to be a Physician Specialist at any point.
22    A   And I will again say, I don't know if a
23 Physician Specialist title is a unionized title or a
24 management title.
25    Q   Do you know if, for example, Dr. Mundy --

Patricia Yang

1
2 I asked you --
3        MS. HAGAN:  Strike that.
4    Q   Do you know if any of the directors are
5 physician specialists?
6    A   No.  I know they are all clinical
7 directors, which is the office title that I
8 approved.
9    Q   What about the Civil Service titles?
10    A   I don't know the payroll titles.
11    Q   Who would know the payroll titles?
12    A   My HR people.
13    Q   Do you sign off on what they do?
14    A   I sign off on certain papers.
15    Q   Which ones?
16    A   Significant actions that people believe I
17 need to sign off on.
18    Q   Like what?
19    A   You know, high level appointments.
20    Q   Ultimately, you approve who goes in what
21 title; am I right?
22    A   Ultimately, I sign off on what my staff
23 are recommending and wish.  I will ask questions.
24    Q   So you have someone who made a complaint
25 about being paid unfairly.  You have someone who is

32 (Pages 122 - 125)

Page 126

Patricia Yang

1
2  complaining about being in a given title, because
3  Dr. Kaye also alleges that she was hired at a lower
4  title than the other directors, and she was -- and
5  this happened because she was a woman.  But you
6  don't force her or insist that she take a managerial
7  position to address the issue?
8        MS. CANFIELD:  Objection.
9     A  It was offered to her and she refused.
10    Q  But she continued to complain?
11       MS. CANFIELD:  Objection.
12    A  I can't answer that.
13    Q  So it is your testimony that she refused,
14 rather than she asked for it and she was denied?
15       MS. CANFIELD:  Objection.
16    A  She has been offered -- she was initially
17 offered the management title.  She declined.
18       When she raised issues again, I think it
19 was the $2,000 -- I don't know.  It was a small
20 amount of money.  It was resolvable if she went into
21 a management title.  I believe that she, again,
22 declined.
23    Q  What is the management title you keep
24 referencing?
25    A  I don't know.

Page 127

Patricia Yang

1
2     Q  So you don't know if she complied or not?
3        MS. CANFIELD:  Objection.
4     A  I do.
5     Q  You don't know the management title.
6  What was the management title that are you
7  referencing that the other directors had?
8        MS. CANFIELD:  Objection.
9     A  I can tell you, it is not an Attending
10 Physician III.
11    Q  Was it a Physician Specialist?
12    A  I don't know.
13    Q  Okay.  Now, Dr. Kaye also alleges that,
14 after she complained or raised issues with the
15 administration of the clinic, that you started to
16 retaliate against her.  Is that true?
17    A  Absolutely not.
18       MS. CANFIELD:  Objection.
19    Q  Was there an avenue for the directors to
20 raise questions about the procedures that were being
21 put in place?
22       MS. CANFIELD:  Objection.
23       You can answer.
24    A  I would hope so.
25    Q  Could they raise them with you?

Page 128

Patricia Yang

1
2     A  Sure.
3     Q  And were you making a unilateral decision
4  as to how -- let's say, for example, the 730 teams
5  were created?
6        MS. CANFIELD:  Objection.
7     A  I don't make unilateral decisions and I
8  did make not make a decision about the 730 teams.
9     Q  Who made a decision to create the 730
10 teams?
11       MS. CANFIELD:  Objection.
12    A  I'm not sure what you mean by creating
13 730 teams.
14    Q  What is a 730 team?
15       MS. CANFIELD:  Objection.
16    A  I don't know.  I don't know what you
17 mean.
18    Q  Okay.  You don't know what the 730 team
19 is?
20    A  I don't know what you mean by a 730 team.
21    Q  Was there ever a time where there were
22 staff that were, I guess, hired to facilitate the
23 administration of 730 examinations?
24    A  Was there ever a time that we hired
25 people to fill vacancies to conduct the

Page 129

Patricia Yang

1
2  examinations?  Yes.  That's ongoing.
3     Q  So were there other people -- who were
4  these hires?  Who did the hires consist of?
5        MS. CANFIELD:  Objection.
6        You can answer.
7     A  There were vacancies, but they were
8  clerical administrative vacancies, they were
9  clinical vacancies.
10    Q  Did social workers ever -- were social
11 workers ever hired to participate in the 730
12 process?
13       MS. CANFIELD:  Objection.
14       You can answer.
15    A  Social workers are part of a mobile team
16 that are in the jails that do not conduct the
17 evaluations.
18    Q  So the 730 mobile teams, are you familiar
19 with that?
20       MS. CANFIELD:  Objection.
21    A  I am.
22    Q  Who creates the 730 mobile teams?
23    A  It was an initiative between the state
24 Office of Mental Hygiene and our staff.
25    Q  And how many people are on a 730 mobile

33 (Pages 126 - 129)

Patricia Yang

2 team?
3     A  I don't know that.
4     Q  What does the 730 mobile team consist of?
5     A  The 730 mobile team does not conduct
6 evaluations, which, I think, Dr. Kaye may have
7 misunderstood.  730 mobile teams are in the jails to
8 help support the transition of people who are
9 waiting to go upstate for restoration or are coming
10 back.
11     Q  Have there ever been complaints that the
12 730 mobile team members interfered with the
13 administration of -- interfered with defendants'
14 rights, I should say?
15     A  Not to my knowledge.
16     Q  That they offered legal advice, by any
17 chance?
18     A  Not to my knowledge.
19     Q  Did you ever get complaints from Legal
20 Aid that the 730 teams were overstepping their
21 bounds?
22     A  Not to my knowledge.
23     Q  So you never heard complaints about the
24 730 mobile teams?
25     A  No.  I heard praise.

Patricia Yang

2     Q  Who praised them?
3     A  Generally, everybody, including all the
4 way up to the Commissioner of the State Office of
5 Mental Hygiene.
6     Q  Did Legal Aid praise them?
7     A  I don't generally deal with the Legal
8 Aid.
9     Q  Did they ever write you about their
10 complaints with the 730 mobile teams?
11     A  No, not to my knowledge.
12     Q  What about the Bronx Defenders?
13     A  Not to my recollection.
14     Q  Had anyone ever complained to you
15 directly about the 730 mobile teams?
16     MS. CANFIELD:  Objection.
17     You can answer.
18     A  Not to my recollection.
19     Q  Now, if there were complaints about the
20 team, who would address those complaints?
21     A  Depending on what the complaint was, but
22 Dr. Ford, Dr. MacDonald, if it were a clinical
23 issue.
24     Q  So you said there were never any
25 complaints, to your knowledge, about the 730 mobile

Patricia Yang

2 teams?
3     A  That's not what I said.  What I said
4 was -- I thought I answered your question, so I
5 apologize if I didn't.
6     I am not -- I don't recall anybody
7 complaining to me about them.
8     Q  You said you don't recall?
9     A  Correct.
10     Q  Not that they didn't?
11     A  Correct.
12     Q  I am just making sure.  I want to make
13 sure that the record is clear.
14     So how would you describe your
15 relationship with or I guess I would say CHS's
16 relationship with Legal Aid?
17     MS. CANFIELD:  Objection.
18     A  I would hope that they see us as a good
19 partner and someone who has our patients' best
20 interests in mind and in heart.
21     Q  Have you ever complained about Legal Aid
22 or any of Legal Aid's staff treatment of CHS staff?
23     A  I have not.
24     Q  Have you ever complained about -- for
25 example, do you know Dr. Brayton, B-R-A-Y-T-O-N?

Patricia Yang

2     A  I don't know him or her.
3     Q  You never met or knew of Dr. Brayton?
4     A  I can't recall.
5     Q  Was there ever a time -- so you never
6 knew whether or not Dr. Brayton worked at the Bronx
7 center at all?
8     A  I am too far removed from the operations
9 to answer, to know that.
10     Q  Now, you said earlier that, when you
11 first took over the clinic initially, you started to
12 learn about the 390 and 730 processes.
13     Who specifically did you talk to when you
14 started --
15     A  I didn't learn about the processes.
16     Q  Okay.
17     A  I learned about their structure.
18     Q  Their structure.
19     A  And that they had a lot of complaints,
20 concerns, about not getting the support that they
21 needed to do their job.
22     Q  And how did you learn about the
23 structure?  Did you read the CPL?  What did you do
24 to learn?
25     MS. CANFIELD:  Objection.

34 (Pages 130 - 133)

Patricia Yang

2       You can answer.
3       A  It would come out from people, like
4  Dr. Owens, who is very vocal about needs.  It would
5  come out in group meetings where people talked about
6  their frustrations about getting medical records or
7  about their frustrations about filling vacancies.
8       Q  But you didn't yourself sit down and read
9  the CPL and learn about the legal parameters of
10 administration of either one of these exams; am I
11 right?
12      A  Correct.
13         MS. CANFIELD:  Objection.
14         You can answer.
15      Q  Even though you were conferring with
16 Dr. Owens, did you confer with Dr. Kaye or any of
17 the other doctors about the administration of the
18 exams?
19         MS. CANFIELD:  Objection.
20         You can answer.
21      A  I did not confer with Dr. Owens about the
22 administration of the exams.
23      Q  Did you confer with Dr. Kaye?
24      A  I did not confer with any of them about
25 the conduct of the exams.

Patricia Yang

2       Q  Why not?  They were administering these
3  exams.  They would know probably better than anybody
4  else how they were administered.  Why didn't you
5  engage them?
6          MS. CANFIELD:  Objection.
7          You can answer.
8       A  Because forgive the hierarchical matter,
9  but they are four levels down, five levels down.  So
10 I am that far removed from the details of the
11 operation that it wouldn't be the most effective or
12 efficient way to deal with those.  Those are people
13 that have greater expertise than me.  I am not the
14 expert in everything.
15      Q  So who is responsible for streamlining
16 these processes, if you were not engaging the
17 directors yourself?
18      A  My staff, and if there were needs that
19 they would request or recommendations that they
20 would make, they would make them to me.
21      Q  When you say your staff, are you saying
22 Dr. MacDonald and Dr. Ford?
23      A  Mostly Dr. Jain, Dr. Ford, and then
24 Dr. MacDonald.
25      Q  Dr. Jain, you said hired him, I guess,

Patricia Yang

2  after you got there; am I right?
3       A  After --
4          MS. CANFIELD:  Objection.
5          You can answer.
6       Q  After you became senior vice president of
7  CHS, you hired Dr. Jain; am I right?
8       A  Correctional Health Services did hire
9  Dr. Jain after the decision was made for CHS to
10 consolidate management of the clinics.
11      Q  Who was CHS?  When you say CHS hired him,
12 who are you referring to?
13      A  In this case, the direct supervisor for
14 Dr. Jain would have been Dr. Ford who is the hiring
15 manager.
16      Q  And did you participated in the hiring
17 process for Dr. Jain?
18         MS. CANFIELD:  Objection.
19      A  No, I did not.
20      Q  So it was just Dr. Ford and
21 Dr. MacDonald?
22      A  I don't recall who the interviewing teams
23 were.
24      Q  Did you have any part in approving his
25 hire?

Patricia Yang

2       A  I signed the paper.
3       Q  What is the paper?  What is it called?
4       A  It is a personnel action form or
5  something.
6       Q  So you are not sure what you signed?
7          MS. CANFIELD:  Objection.
8       A  You are asking me the name of the
9  bureaucratic form in the Health and Hospitals
10 system.  I don't know the name of it.  I know what
11 it looks like.
12      Q  And you signed it numerous --
13      A  Numerous.
14      Q  Numerous numbers of them?
15      A  Numerous.
16      Q  When you signed off for Dr. Jain did you
17 review his credentials or anything of that nature?
18         MS. CANFIELD:  Objection.
19      A  My staff do, and that all happens before
20 I get the personnel action request form to sign.
21      Q  So Dr. Ford and Dr. MacDonald?
22      A  And Miss Laboy and her staff.
23      Q  So you would say that there was a team of
24 people who participated in the hiring of Dr. Jain;
25 is that right?

35 (Pages 134 - 137)

Page 138

Patricia Yang

1
2    A   There is a team of people who make sure
3  that all of the Ts are crossed and all of the Is are
4  dotted before a person is processed for hiring, of
5  which I sign a piece of paper.  They are not
6  necessarily the people who did the screening and
7  interviewing and selection.
8    Q   Now, Dr. MacDonald is Dr. Ford's
9  supervisor; is that right?
10   A   Yes.
11   Q   Now, do you know Dr. MacDonald's
12 background?
13   A   Generally, yes.
14   Q   What is it?
15   A   He is an internist.
16   Q   Does he have any background in psychiatry
17 or psychology?
18   A   He is not a trained psychiatrist.
19   Q   So how is he managing Dr. Ford?
20     MS. CANFIELD:  Objection.
21   A   In the medical world, not everybody has
22 to be the subspecialist in order to provide guidance
23 and general clinical guidance to subspecialists.
24     It is similar to me.  I don't have the
25 expertise and technical expertise and knowledge for

Page 139

Patricia Yang

1
2  everything that I have to be responsible for, but I
3  do bring something different to the table, which is
4  a systems view and inquiry.
5    Q   So of these people that we are
6  discussing, Dr. Ford is the most senior or was the
7  most senior person, I guess, in the hierarchical
8  structure with a psychiatry or psychology
9  background; is that correct?
10   A   Correct.
11   Q   So it would stand to reason that, if
12 there were going to be operational changes or
13 systematic changes involving the administration of
14 psychiatric services, that she would be the person
15 that would spearhead it and then run it by you, as
16 far as the technical aspect of it?
17     MS. CANFIELD:  Objection.
18     You can answer.
19   A   If it were appropriate.
20   Q   Would you confer with Dr. Ford in terms
21 of policy, as far as whether or not it was compliant
22 with psychiatric medical-legal guidelines, if you
23 were making the change?
24     MS. CANFIELD:  Objection.
25     You can answer.

Page 140

Patricia Yang

1
2    A   I might ask certain questions.
3    Q   But would she be the person that you
4  would get guidance from, since she is the only one
5  with a psychiatric background in the hierarchy, at
6  least the most senior?
7    A   If I had a question, sure.
8    Q   Okay.  So between Dr. Ford, yourself, and
9  Dr. MacDonald, if there is going to be a change in
10 how, you know, 390s and 730s were administered, who
11 would ultimately be responsible for that?
12   A   Can you repeat that?
13   Q   Who would ultimately be responsible for
14 any changes in the administration of 390s and 730s?
15     MS. CANFIELD:  Objection.
16     You can answer.
17   A   That would be -- if it were clinical?
18   Q   Yes.
19   A   Dr. Ford.
20   Q   As far as, let's say, I guess, the
21 directors having the ability to engage in outside
22 work, who would be responsible for that?
23   A   Outside work?  That's a different
24 question.  That would be the team.  So if there is a
25 conflict of interest, Ford for anything dual -- if

Page 141

Patricia Yang

1
2  you are talking about dual employment --
3    Q   Right.
4    A   Right.
5    Q   Was there ever a time that there was a
6  policy that would permit the directors to engage in
7  outside employment?
8    A   I don't know if it is a policy, but I --
9  it is something that would go to COIB.
10   Q   Conflict of Interest Board.
11   A   That would something that we would
12 discuss internally.  We did discuss -- we did a have
13 a policy, because we wanted to make sure that
14 people's clinical boundary between doing evaluations
15 and doing treatment were very clear, because we
16 don't want to be evaluating people who the same
17 person ends of treating, for example.
18   Q   For example, was there a policy in place
19 that allowed the directors to engage in outside
20 work, as long as it wasn't in the same borough in
21 which they were doing the evaluations?
22   A   Yeah, I don't remember the specifics of
23 where we landed, but yes, there was enough of a
24 separation by case and by location of what -- so you
25 wouldn't be having a conflict.

36 (Pages 138 - 141)

Page 142

Patricia Yang
1
2    Q   Now, was that fool proof, as far as you
3 were concerned?
4        MS. CANFIELD:  Objection.
5        You can answer.
6    A   Fool proof?
7    Q   There were times that defendants were
8 presented -- let's say the defendant was arrested in
9 the Bronx, but there was a shortage, and he had to
10 be presented in Brooklyn.  Was it fool proof, this
11 policy that would allow these directors to work in
12 other boroughs?  That's my question.
13        MS. CANFIELD:  Objection.
14        You can answer.
15    A   So I don't think anything in life is fool
16 proof.  I believe that we made our best attempt at a
17 policy, given the fact that people wanted to
18 continue doing work and that there had been no
19 guidance before we assumed management of the
20 clinics.  People just did what they did.
21        So we wanted to put out some guidelines,
22 and I also rely on each licensed professional to
23 maintain their code of ethics.
24    Q   Now, was there a time that Dr. MacDonald
25 actually signed something to this effect that

Page 143

Patricia Yang
1
2 allowed them to do this, a policy?
3    A   Probably.
4    Q   Would you have approved that?
5    A   I would have reviewed it.
6    Q   Ultimately, did you have the ability to
7 sign off on whether or not Dr. MacDonald was able to
8 issue these policies?
9    A   That policy was after a lot of discussion
10 and a lot of thinking on the part of everybody on
11 the team.
12    Q   But ultimately, the authority --
13    A   Of course.
14    Q   -- rested with you?
15    A   Of course.  Everything ends up on me.
16    Q   Right.  But you do admit that there is a
17 possibility or potential for a director to end up
18 seeing someone or seeing people in another borough
19 other where they administer exams?
20        MS. CANFIELD:  Objection.
21        You can answer.
22    A   Yes.
23    Q   And you don't find that problematic?
24    A   We do.
25        MS. CANFIELD:  Objection.

Page 144

Patricia Yang
1
2        You can answer.
3    A   We do find that problematic.
4    Q   So what is the recourse then?  Are
5 you doing the cost-benefit analysis and permitting
6 the practice any way?
7        MS. CANFIELD:  Objection.
8        You can answer.
9    A   It was brought to my attention -- I don't
10 remember when -- that Dr. Ford discovered that,
11 before the clinics were consolidated under our
12 management, that people moonlighted without any
13 guidance and without any guard rails.
14        So we endeavored to come up with the best
15 policy that gave guidance to people to what they
16 could and could not do to minimize the conflict.
17        It is not fool proof.  It does depend on
18 the individual practitioner or professional to use
19 his or her own judgment to know when he or she is
20 doing something that maybe they shouldn't do.
21    Q   How do you monitor when there are
22 conflicts?
23    A   I believe the policy actually requires
24 somebody to check with somebody in the higher up or
25 to report that.  I am not clear.

Page 145

Patricia Yang
1
2    Q   Everybody time someone actually does
3 moonlighting or sees someone, are they to report
4 that to their managerial --
5    A   I don't recall the detail of the policy
6 at that point.
7    Q   How is it enforced then?
8    A   I believe, as in all things, in a
9 division of 1,700 people, you have policies and
10 procedures, and you expect people to comply with
11 them.
12    Q   Is it self reporting?
13    A   Self reporting or other people can report
14 on you.  That's a good thing in life.
15    Q   So someone can tell on you or the manager
16 or the director has to tell on themselves?
17    A   Yes.  I think that's reasonable.
18    Q   You do?
19    A   I think that's what -- how life works.
20 People can report situations that they see.  People
21 can report that they are facing a conundrum on their
22 own.  I'm not clear on the specific question.
23    Q   Well, I guess I can go back to your role
24 as senior VP of the CHS.
25    A   Yes.

37 (Pages 142 - 145)

Page 146

Patricia Yang

1
2     Q   What is it then?  Because you are saying
3  you have all of these different -- you have these
4  layers between you, and specifically as far as this
5  lawsuit is concerned, in CHS and the directors in
6  the clinic, right?  You say that there is at
7  least --
8     A   Four layers.
9     Q   Ford and MacDonald?
10    A   And Bhish, Dr. Jain.
11    Q   And Dr. Jain.  Right?
12        So between these three people and the
13 directors, you have no real, I guess, input in the
14 day-to-day to the director's existence; am I right?
15        MS. CANFIELD:  Objection.
16        You can answer.
17    A   Yes.
18    Q   At any point, you could hire and fire
19 these directors yourself, right?
20    A   At any point I could, but I wouldn't.
21    Q   Who would?
22    A   The decision to hire and fire somebody is
23 significant.
24    Q   Yes.  And who would be the person for the
25 directors?

Page 147

Patricia Yang

1
2     A   I wouldn't be the one who would hire or
3  fire.  I would listen to recommendations.  There
4  would be discussion.
5     Q   Would Bhish be the person, or Dr. Jain,
6  would he be the person who hired and fired someone?
7     A   He would be the hiring manager.
8     Q   Would he be responsible for terminating
9  the director?
10    A   Not on his own.
11    Q   Who would?  Who would he work with?
12    A   He would with work with Labor Relations.
13 He would work with Dr. Ford.  He would work with
14 Dr. MacDonald, our Labor Relations, the system's
15 Labor Relations.  If it were a manager, which in
16 this case, it isn't, it would be the management
17 side, Miss Greenfield's side, as opposed to the
18 Mr. Wangel's side.
19    Q   So for example, in this hierarchical
20 structure for the court clinics, so above
21 Dr. Jain -- Bhish seems to be convenient for me.
22 I'm not sure why.
23    A   Because it is Patsy and Bhish.
24    Q   Yes.
25        Now, above Dr. Jain, there would be

Page 148

Patricia Yang

1
2  Dr. Ford?
3     A   Correct.
4     Q   Dr. Ford, does she have the ability to
5  unilaterally decide to hire and fire someone?
6     A   We don't do things unilaterally in
7  Correctional Health Services.
8     Q   No, but you could though, if you wanted
9  to.
10    A   But I don't.
11    Q   But the thing is, you could.  It is one
12 thing that you don't, but ultimately, you do.  You
13 sign off on the hires and fires; am I right?
14    A   Correct.
15    Q   And you also could determine whether or
16 not a person is demoted; am I right?
17        MS. CANFIELD:  Objection.
18    A   Is demoted?  As much as the hiring and
19 firing.
20    Q   Now, at some point, Dr. Kaye alleges that
21 she was demoted after she complained of
22 discrimination --
23        MS. CANFIELD:  Excuse me.
24        (Whereupon, a discussion was held off
25        the record.)

Page 149

Patricia Yang

1
2        (Whereupon, the record was read by the
3        reporter.)
4     Q   Now, at some point she alleges that she
5  went from being medical director to director of the
6  centers; am I right?
7        MS. CANFIELD:  Objection.
8        You can answer.
9     A   I recall that she -- she was not -- I
10 recall that she took offense to the title, the
11 office title of director, because she wanted to be
12 medical director.
13        At the end of the day, everybody settled
14 on all of the clinic directors being called clinical
15 directors.
16    Q   And who was everybody?
17    A   Oh, gosh.  MacDonald, Ford, Jain, Laboy,
18 Wangel, me.  It was a compromise.
19    Q   Now, do people call you Dr. Yang at work?
20    A   Yes.
21    Q   And --
22    A   They also call me Patsy though.
23    Q   They call you Patsy, too, but there is a
24 good chance that, if they don't know you, they call
25 you Dr. Yang; am I right?

38 (Pages 146 - 149)

Patricia Yang

2  A  Yes.
3      Q  Now, if you are allowed to be called
4  Dr. Yang, why shouldn't Dr. Kaye be allowed to be
5  called medical director?
6          MS. CANFIELD:  Objection.
7          You can answer.
8          That doesn't make sense to me.
9      Q  Well --
10     A  She is still a doctor and people still
11  call her doctor.
12     Q  I mean, what about medical director?  Why
13  must she be called director versus medical director?
14     A  We actually thought we were elevating
15  everybody in perception, which was to be director of
16  the entire clinic operation, not just the medical
17  part of that clinic.  She took offense to it.
18         And my insistence was that every director
19  had to have the same title.  The other directors
20  liked being the director of everything.  She didn't
21  like being the director of everything.  She wanted
22  to be just the medical director.
23         So we all compromised and came up with
24  something like clinical director, and now they are
25  all four clinical directors.

Patricia Yang

2      Q  Did that happen while Dr. Kaye was there,
3  that they were all clinical directors?
4      A  Yes, before she resigned.
5      Q  When did that happen?
6      A  Probably in 2018, when we took the
7  clinics.
8      Q  Would that have been in her e-mail
9  signature, clinical director?
10     A  I don't know.  I only got one e-mail from
11  her when she was still at Bellevue.
12     Q  Did any of the other directors have
13  clinical director in their e-mail signature?
14     A  I don't know.
15     Q  How would you know if this actually took
16  place, that they were called clinical directors,
17  rather than directors?
18     A  I hope it is in the org chart?
19     Q  But you are not sure whether or not they
20  were just directors or clinical directors until
21  today.
22          MS. CANFIELD:  Objection.
23          You can answer.
24     A  Until today?
25     Q  Yes.  Now they are still clinical

Patricia Yang

2  directors; am I right?
3      A  Yes.
4      Q  If I were to get an e-mail from any of
5  these directors, they would have clinical director
6  in their signature?
7      A  I don't know because I don't -- I don't
8  know what there e-mail signatures are.
9      Q  You are not getting -- you don't see
10  e-mails that are from the directors of the center?
11     A  Really not.
12     Q  Never?
13     A  Never?  I will never say never.
14     Q  But it was still enough of a discussion
15  to insist that everyone have the same title; am I
16  right?
17     A  Correct.
18     Q  Even though Dr. Kaye protested against
19  it?
20     A  She protested against director.
21     Q  But she also protested against being
22  removed from her union title, according to you, and
23  you allowed her to stay in it; am I right?
24     A  She declined -- she did not want to be a
25  manager.

Patricia Yang

2      Q  So how is it that you allowed her to
3  decline being a manager, but you don't allow her to
4  keep her medical director title?
5      A  I made a concession to her.  I
6  conceded -- so that she could get a retention bonus,
7  I conceded holding back, postponing, the moving of
8  the clinic to July 1, not like April 1.
9          As a concession to her, I said, fine, we
10  will make an exception and let her stay as an
11  Attending Physician, because she didn't want to be a
12  manager.
13         What I didn't want to do was have, on a
14  public facing side, that the Bronx director would be
15  different from what the public saw in Manhattan,
16  Brooklyn, and Queens.
17     Q  But you had doctors who were directors,
18  and you had non-doctors who were directors.  For
19  example, Dr. Mundy is a psychiatrist, right?  And
20  then you have -- Miss Owens wasn't a doctor; am I
21  right?
22     A  She is a clinical psychologist.
23     Q  You said she is a clinical psychologist
24  on psychiatrist?
25     A  I think she is a psychologist.

39 (Pages 150 - 153)

Page 154

Patricia Yang

1
2  Q  You are not sure?
3  A  It has been so long.  I'm sorry.
4  Q  So you are not sure who is a doctor and
5  who is not amongst your staff?
6     MS. CANFIELD:  Objection.
7     You can answer.
8  A  I know that they are qualified for the
9  job.
10  Q  Mr. Winkler is not a doctor is he?
11  A  He is a psychologist.
12  Q  He is not?
13  A  Okay.
14  Q  So --
15  A  I don't know.
16  Q  There is a distinction.  It is a very --
17  I guess there is a -- psychiatrists could prescribe
18  medicine, and they are doctors.  Psychologists are
19  not.  So there is a distinction.
20     It is not that Dr. Kaye was the only
21  doctor.  You did have at least Dr. Mundy on staff.
22  So why is it that she and Dr. Mundy could not be
23  referred to as medical directors?
24     MS. CANFIELD:  Objection.
25     You can answer.

Page 155

Patricia Yang

1
2  A  As a system and as a unified service,
3  which is what we were making the court clinic
4  service -- and it is no longer called the court
5  clinics.  It is FPECC.  Right?  It is the Forensic
6  Psychiatric Evaluation Court Clinics.
7     That service was unified.  There was a
8  desire to standardize not just what they did, but
9  what they looked like.  And the fact that some
10  people could have a different office title was
11  something that was visible to the public and the
12  world that we felt needed to be consistent.
13  Q  But you had people with different
14  backgrounds in these positions.
15  A  And they were qualified for them.  The
16  clinic here is not a treatment clinic.
17  Q  No, it is an evaluation --
18  A  Correct.
19  Q  They are evaluating?
20  A  Correct.
21  Q  So is that your explanation as to why
22  they don't have to be called medical director,
23  because it was evaluation versus the treatment?
24  A  No.  I am trying to make that
25  differentiation when you were pointing out to me

Page 156

Patricia Yang

1  that psychiatrists can prescribe medications and
2  psychologists can't.
3
4  Q  Because you were telling me you weren't
5  sure.  That's why I made the distinction between
6  psychiatrists and psychologists.
7  A  Because from my remote perspective, the
8  fact that somebody is running the clinical operation
9  of these evaluation clinics, they can be a
10  psychiatrist or psychologist.  Either way, they are
11  qualified to do that, and that's what matters to me.
12  I don't retain that level of detail after years of
13  who is what in what payroll title or what.
14  Q  Okay.
15     MS. CANFIELD:  Off the record.
16     (Whereupon, a discussion was held off
17     the record, and a lunch recess was taken at
18     this time.)
19     MS. HAGAN:  We are back on the record,
20     and I want to show Patsy what is marked as
21     Plaintiff's Exhibit 4.
22     (Six pages containing Correctional
23     Health Services organizational charts were
24     received and marked Plaintiff's Exhibit 4
25     for identification at this time.)

Page 157

Patricia Yang

1
2     MS. HAGAN:  For the record, Plaintiff's
3     Exhibit 4 consists of organizational charts
4     for Correctional Health Services, updated
5     July 2019, and they have various Bates stamp
6     numbers.  So one is NYC 1622, NYC 1636, NYC
7     1630, NYC 1634, NYC 1635, and NYC 1629.
8  BY MS. HAGAN:
9  Q  Now, to the extent that you can read --
10  some of them are smaller than others, because I had
11  problems and thought it was just me reading the org
12  chart.  We are going to try to stick to the ones we
13  can actually all read.
14     So do you recognize these org charts, by
15  any chance, Patsy?
16  A  Yes.
17  Q  So Exhibit 4 consists of org charts that
18  were updated on July 2019.  Were these org charts
19  developed in the ordinary course of business at CHS?
20  A  Yes.
21  Q  Who is responsible for doing the org
22  charts?
23  A  Every department head does their own, and
24  Shavon Reid-Smith, who is my executive manager,
25  collects them.

40 (Pages 154 - 157)

Patricia Yang

1
2   Q  I want to start with the org chart on
3  top, which is on 1622.
4       Now, you report to Dr. Katz; is that
5  right?
6       A  Yes.
7       Q  And so, by any chance, did Dr. Katz have
8  any conversations with you about Dr. Kaye?
9       A  No.
10       MS. CANFIELD:  Objection.
11       Q  Was there ever a time that Dr. Katz ever
12  asked you about Dr. Kaye or any complaints that he
13  may have received from Dr. Kaye?
14       A  Not that I can recall.
15       Q  So you don't recall a time where Dr. Kaye
16  complained to Dr. Katz about being discriminated
17  against based upon her religion or any of the other
18  things we have discussed today?
19       A  I don't remember the content of her
20  complaint, but I do know that towards the end, she
21  did write to him, among other parties.
22       Q  Did Dr. Katz ever talk to you about her?
23       A  No.
24       Q  Why not?
25       A  That's not Dr. Katz's management style.

Patricia Yang

1
2  He depends on his senior people to handle things and
3  work together, and if there is an issue, to escalate
4  it to him.  If he has a particular question, he has
5  no problem asking it.
6       Q  Did you ever talk to Dr. Katz himself,
7  even though he didn't reach out to you about
8  Dr. Kaye?
9       A  I don't recall doing that.
10       Q  Now, as far as the EEO policy is
11  concerned, is Dr. Katz the person that would sign
12  off on any EEO complaints, as far as you are
13  concerned?
14       MS. CANFIELD:  Objection.
15       You can answer.
16       A  I don't know that he does.
17       Q  Well --
18       A  I suspect he is aware of the issues that
19  the system would raise to his attention as
20  appropriate.
21       Q  To the extent -- you said that you didn't
22  know who the EEO officer was; is that right?
23       MS. CANFIELD:  Objection.
24       You can answer.
25       A  I don't know the name, but all of my

Patricia Yang

1
2  issues get raised to the Office of Legal Affairs,
3  and, specifically, to Miss Greenfield.
4       Q  But you have never spoken to the EEO
5  officer or had any familiarity with the EEO policy,
6  right?
7       MS. CANFIELD:  Objection.
8       A  That's not what I said.  I said was aware
9  of the EEO policy.  I have read it.  My staff
10  handled the EEO issues with our EEO officer, and
11  that I, at executive level, raise issues as
12  appropriate to Miss Greenfield.
13       Q  So Miss Greenfield presided over the
14  legal department; isn't that right?
15       A  Actually --
16       MS. CANFIELD:  Objection.
17       A  I believe Andrea Cohen does.
18       Q  Who is Andrea Cohen?
19       A  She is the general counsel.
20       Q  So Miss Greenfield reports to Andrea
21  Cohen?
22       A  Yes.
23       Q  And what is Miss Greenfield's title?
24       A  Deputy General Counsel.
25       Q  This is kind of odd because she could --

Patricia Yang

1
2  Miss Greenfield could potentially be a witness.  I'm
3  not sure.  She is Deputy General Counsel.  She is
4  providing you with legal advice; is that right?
5       A  Yes.
6       Q  Is Miss Greenfield also the EEO officer,
7  by any chance?
8       A  I believe she is.
9       Q  Okay.
10       A  But my issues are not to her as the EEO
11  officer.  The EEO issues are handled by Jessica
12  Laboy, currently in that job, with the EEO officer
13  designated to us.
14       But my issue is that I deal with all
15  issues that have to do with serious employee
16  complaints or issues or unhappiness or incidents,
17  and I always make Miss Greenfield aware.
18       Q  So you are not sure if Miss Greenfield is
19  the EEO officer; is that right?
20       A  I know -- sorry.  I know the official EEO
21  officer is in the Office of Legal Affairs.
22       Q  Is that Miss Greenfield?
23       A  Probably.
24       MS. HAGAN:  This is odd because you are
25  not being deposed.

41 (Pages 158 - 161)

Page 162

Patricia Yang

1
2      MS. GREENFIELD:  I'm not the EEO
3  officer.
4      MS. HAGAN:  Miss Greenfield, for the
5  record, who is here has testified --
6      MS. GREENFIELD:  I'm not testifying.
7  I'm just saying.
8      MS. HAGAN:  You are the not the EEO
9  officer?
10     MS. GREENFIELD:  No.
11     MS. HAGAN:  I can't ask you because you
12  are not being deposed.
13     MS. GREENFIELD:  Do you want to step
14  outside for a second?
15     MS. HAGAN:  Can we?
16     MS. CANFIELD:  Off the record.
17     (Whereupon, a discussion was held off
18  the record.)
19 BY MS. HAGAN:
20     Q  So we were looking at the org chart
21  before.  We are back on the record.  We were looking
22  at the org chart before, before you stepped out or
23  we went on a break, a small break.
24     A  Yes.
25     Q  So the org chart, Exhibit 4, we were

Page 163

Patricia Yang

1
2  discussing whether or not you had spoken to Dr. Katz
3  about whether or not Dr. Kaye had actually --
4  whether or not Dr. Katz had spoken to you about
5  Dr. Kaye.  There is a lot of Ks.  And you said he
6  had not, right?
7     A  Correct.
8     Q  And that you had never brought her up to
9  him because of just how things were at HHC?
10    A  Correct.
11    Q  Right?
12    A  Yes.
13    Q  You said that, just to make sure, that
14  there is an EEO policy, but you are not sure who the
15  EEO officer of HHC is right now?
16    A  I don't know the name of it, but that's
17  not how I would do it.  My Chief Administrative
18  Officer is the person who works with the EEO
19  officer, and at an executive level, I make Blanche
20  Greenfield aware of issues involving my employees.
21    (A document entitled "NYC Health and
22  Hospitals Operating Procedure No. 20-32,
23  Equal Employment Opportunity (EEO) Program,"
24  Bates stamped D000715 through D000729, was
25  Received and marked Plaintiff's Exhibit 5

Page 164

Patricia Yang

1
2  for identification at this time.)
3     MS. HAGAN:  I am going to show you what
4  was marked as -- well, I will give you the
5  stapled version.  This is Plaintiff's
6  Exhibit 5.  All right?
7     This is titled "Operating Procedure
8  20-32, Equal Opportunity Program."
9     (Whereupon, a discussion was held off
10  the record.)
11     MS. HAGAN:  For the record, I did
12  mention it was Operating Procedure Number
13  20-32, Equal Employment Opportunity Program,
14  and it bears the Bates series D715 through
15  D729.
16    Q  Now, by any chance do you recognize this
17 document, Patsy?
18     I'm sorry.  I'm going to say Dr. Yang.
19 It is very deferential.  I feel better about it.  I
20 can't help it.
21    A  It is not a problem.  It's fine.  Do it.
22 That's okay.
23     (Whereupon, a discussion was held off
24  the record.)
25    A  Yes.  This is the policies of the system.

Page 165

Patricia Yang

1
2     Q  Okay.  So you are aware of this policy,
3  right?
4     A  Yes.
5     Q  You have seen it before?
6     A  Yes.
7     Q  And where did you see this?
8     A  This is a shared site in the
9  corporation -- I'm sorry, in Health and Hospitals,
10 where policies are posted.
11    Q  Thank you.
12     So to your understanding, for example, it
13 says -- it goes into the types of -- let's see.
14     First off, it goes into, in general, the
15 purpose, right?  And it basically talks about the
16 system's Equal Employment Opportunity Program, and
17 you are aware of that, I take it, being an employee
18 of H and H; am I right?
19    A  Yes.
20    Q  And it goes into the fact that there is
21 an EEO office and it is staffed by EEO personnel; is
22 that right?  And are you familiar with that, is that
23 right?
24    A  Yes.
25    Q  And do you know where the EEO office is?

42 (Pages 162 - 165)

Page 166

1              Patricia Yang
2    A   I don't know the address.  I don't know
3  if it is at 55 Water or 160.  I think it is at 55
4  Water.
5    Q   And, again, you are not quite sure where
6  or how a person would go about making a complaint
7  with the EEO, an EEO complaint, right?
8        MS. CANFIELD:  Objection.
9        You can answer.
10   A   I know that Ms. Laboy contacts the EEO
11 officer and they exchange information and discuss
12 the case as needed, or the complaint.
13   Q   Now, I want to draw your attention to
14 page 724 of the policy?
15       MS. CANFIELD:  Bates stamp?
16       MS. HAGAN:  Bates stamp 724.
17   Q   Now, have you gotten a chance to look at
18 paragraph B?
19   A   I didn't know that was the paragraph we
20 were looking at, but sure.
21   Q   Okay.
22   A   Yes.
23   Q   Now, in this instance, it talks about
24 complaints against senior management staff.
25       Now, would you consider Dr. Kaye's

Page 167

1              Patricia Yang
2  complaint a complaint against senior management
3  staff?
4        MS. CANFIELD:  Objection.
5        You can answer.
6    A   Yes.
7    Q   And here is says that it would go to the
8  Office of Legal Affairs, right?
9    A   Correct.
10       MS. CANFIELD:  Objection.
11   Q   Now, in this instance, if that's the
12 case, would it be your understanding that the Office
13 of Legal Affairs, their responsibility is to protect
14 the agency or to be neutral in such instances of a
15 complaint of discrimination?
16   A   To be neutral.
17       MS. CANFIELD:  Let me get an objection
18 in.
19       THE WITNESS:  I'm sorry.
20   Q   Now, would you think that there is a
21 conflict of interest in this instance, because,
22 typically, a lawyer would advise their clients how
23 to avoid liability?
24       MS. CANFIELD:  Objection.
25   A   I don't believe so.  I think the Office

Page 168

1              Patricia Yang
2  of General Counsel is a complex division.  It is
3  counsel also to the Board of Directors, not just to
4  the department -- to the corporation itself.  I'm
5  not sure -- I don't understand the question.
6    Q   Well, there is a question of whether or
7  not you would have access to recourse if the lawyers
8  who are advising the agency typically are acting in
9  the capacity as EEO officer.  Would that be fair?
10       MS. CANFIELD:  Objection.
11       You can answer.
12   A   I'm missing the --
13   Q   You say you go to Miss Greenfield when
14 you have EEO complaints; is that right?
15   A   What I said was that my Chief
16 Administrative Officer goes to the EEO officer on
17 EEO matters.  And issues involving my staff, I
18 generally -- if they are serious enough, I will make
19 the Office of Legal Affairs, specifically Blanche
20 Greenfield, aware.
21   Q   But in this instance, for example,
22 Dr. Kaye continued to complain about pay disparity,
23 religious discrimination, gender discrimination.
24 She complained about these things after -- at least
25 with the EEOC charge.

Page 169

1              Patricia Yang
2        You said you went to back to Miss
3  Greenfield about that; is that right?
4        MS. CANFIELD:  Objection.
5        You can answer.
6    A   Yes, and Mr. Hicks.
7    Q   But, again, Mr. Hicks was not in any
8  position to address these issues at this point.  She
9  was a member of your staff when she filed the EEOC
10 charge?
11   A   But the allegation of wrongdoing was
12 related to her time at Bellevue, not with me.
13   Q   It is your testimony there was no pay
14 disparity once she came onto your staff?
15   A   What I believe is that the -- when people
16 came over to us, that the pay equity issue was
17 looked at for all of the clinical directors.
18   Q   Now, you said that -- first off, you said
19 that you delayed, I guess, absorbing the Bronx
20 clinic right at first because you wanted to ensure
21 that Dr. Kaye received her retention and longevity;
22 is that right?
23   A   That's correct, because she raised
24 concern that she would lose her retention bonus.
25 And so I agreed and held off on moving that over so

43 (Pages 166 - 169)

Page 170

Patricia Yang

1
2 she could be on the Bellevue payroll until July 1.
3    Q   July of what?
4    A   2018.
5    Q   Right.  Now, she complained in May of
6 2018; is that right?
7    A   That's correct.
8    Q   So you are saying that because you waited
9 until July of 2018, that whatever pay disparity
10 issues she had, they were resolved before you got
11 her on?
12       MS. CANFIELD:  Objection.
13    A   That was my understanding.
14    Q   But then Dr. Kaye was also employed again
15 from July 2018 to 2019.  She was still working.  Now
16 she is working solely on CHS; would that be fair to
17 say?
18       MS. CANFIELD:  Objection.
19       You can answer.
20    A   She is still working in the Bronx clinic
21 doing evaluations, but now under our support and not
22 Bellevue's.
23    Q   Right.  So she is on your payroll?
24    A   Correct.
25    Q   And she is still complaining about pay

Page 171

Patricia Yang

1
2 disparity?
3    A   Correct.
4       MS. CANFIELD:  Objection.
5       You can answer.
6    Q   And did you do anything at that point,
7 now that she is on your payroll complaining about
8 pay disparity?
9    A   I did two things.  As I said before, I
10 raised it again to Miss Greenfield and Mr. Hicks,
11 asking or expressing peak that I thought it had been
12 resolved for the Bellevue allegations.
13       And while her allegations had nothing to
14 do with the parity with CHS, I did ask my HR people
15 to look and make sure that there wasn't that issue
16 existing on our side, and there wasn't.
17    Q   Now, at any point, did you speak to
18 Dr. Kaye about her complaints personally?
19    A   No.
20    Q   Why not?
21    A   Too far removed up the chain.
22    Q   At some point, didn't you tell her you
23 would look into it, via e-mail?
24    A   That was by e-mail in May.
25    Q   But you never felt compelled or obliged

Page 172

Patricia Yang

1
2 to call her or say, "Why don't you meet with me
3 about this"?
4    A   No.
5    Q   Why not?
6    A   I get so many complaints from so many
7 people that are getting resolved through the
8 supervisory structure, which is why it is there, as
9 a division, and we look into issues.  If there is a
10 resolution that needs to be made, it is done.  If
11 explanation needs to be given, it is done, not by
12 me, personally.
13    Q   But you felt that Dr. Kaye was a, quote,
14 unquote, difficult employee.  That is what you
15 heard, right?
16       MS. CANFIELD:  Objection.
17    A   Yes, but not at that point in time, and
18 this didn't factor into whether I would speak to her
19 or not.  She is four levels away.
20    Q   You heard from various people that
21 Dr. Kaye was a difficult employee, right?
22    A   People don't come up to me and say,
23 "Dr. Kaye is a difficult person."  It was a general
24 sense.
25       There would be, "Here's another e-mail,"

Page 173

Patricia Yang

1
2 "Here's another complaint," "Here's the same
3 complaint," "Here's a different complaint."
4       And so Dr. Kaye's concerns, she has every
5 right to raise them.  Every attempt was made to
6 resolve them.  Numerous attempts were made to
7 explain the resolution.
8    Q   Right.  You testified earlier that Dr --
9 that you had other doctors that refused to work with
10 Dr. Kaye; is that right?
11       MS. CANFIELD:  Objection.
12       You can answer.
13    A   That's not correct.
14    Q   What was it then?
15    A   As I said earlier, it came to my
16 attention that Dr. Kaye wished to stay at Bellevue.
17 So I made an inquiry on her behalf, and then late in
18 2018 maybe, probably toward the end of the year, it
19 was made -- I was made aware that she had requested
20 also to transfer out somewhere to Bellevue, so I
21 made another inquiry.
22    Q   Did anyone express interest in working
23 with Dr. Kaye?
24    A   No.
25    Q   No one?

44 (Pages 170 - 173)

Patricia Yang

1
2     A   Not to my knowledge.
3     Q   Now, going back to this org chart here --
4  now, on the org chart, we established that your
5  direct report is Dr. Katz?
6     A   That's correct.
7     Q   How long has Dr. Katz been your direct
8  report?
9     A   Oh, gosh.  Oh, I don't remember when he
10  started.
11       MS. CANFIELD:  I want to put in an
12     objection.  I don't know if you are his
13     direct report or you are his.
14     Q   I was talking about, he is your
15  supervisor.
16     A   He is my supervisor since he became the
17  president of Health and Hospitals.
18     Q   When did he become the president?
19     A   That's the one I don't remember.
20     Q   Okay.  Has he gotten a chance to evaluate
21  you since you have been there?
22     A   He has.
23     Q   And what was your evaluation?
24     A   Exceeds expectations.
25     Q   How many times has he evaluated you?

Patricia Yang

1
2     A   Once.
3     Q   Now, you testified earlier that
4  Dr. MacDonald is the Chief Medical Officer,
5  Mr. Castellanos is the Chief Operations Officer, and
6  Miss Laboy is the Chief Administrative Officer.
7       And you have Mr. Anderson as the
8  Assistant Vice President of Finance and Risk, and
9  then you have Michele Martelle -- I don't think you
10  mentioned earlier.  She is the Assistant Vice
11  President for Planning Evaluation and Re-Entry
12  Support Services.  Right?
13       So with these different units, where does
14  -- I would say that Dr. Kaye would have to -- would
15  it stand to reason that Dr. Kaye would fall under
16  Dr. MacDonald's section?  Right?
17     A   That's correct.
18     Q   And so all together, how many people does
19  Dr. MacDonald manage?
20     A   I couldn't tell you.
21       MS. CANFIELD:  Objection.
22       You can answer.
23     Q   How many?
24     A   I don't know.  Off the top of my head, I
25  can't tell you.

Patricia Yang

1
2     Q   Who are Dr. MacDonald's direct reports?
3     A   Those boxes there (indicating).
4     Q   So when you say "those boxes," you are
5  talking about Mr. Rosner --
6     A   Dr. Rosner.
7     Q   Dr. Rosner.
8     A   Dr. Rosner, Dr. Ford, Ms. Arias, and
9  Ms. Jordan.
10     Q   And is Dr. Ford still with CHS?
11     A   No.  She just left a couple of weeks ago.
12     Q   And what with was the circumstances of
13  her departure?
14     A   Voluntary.  She chose to go to the
15  community to head up a -- to work in a community
16  agency, because the quality of care we were
17  providing through CHS exceeds that of the community.
18  So when we stabilize people, and they leave jail,
19  they deteriorate, and they come back to us.
20       So her calling at that point was that she
21  wanted us to begin to balance out the quality and
22  availability of good quality care in the community
23  in the City of New York.
24     Q   Had there ever been complaints about
25  Dr. Ford?

Patricia Yang

1
2     A   Not to my knowledge.
3     Q   Had anyone filed any complaints of
4  discrimination against Dr. Ford?
5     A   Not to my knowledge.
6     Q   Have there been any complaints about her
7  performance?
8     A   Definitely not to my knowledge.
9     Q   Do you know if Dr. MacDonald evaluated
10  Dr. Ford?
11     A   I believe he did.
12     Q   And are you aware of his -- you know,
13  what he rated her as?
14     A   I didn't see it directly because -- I
15  didn't see it directly, but I would conclude that it
16  was the highest.
17     Q   And you are just saying this --
18     A   Because she is an exceptional
19  psychiatrist, an exceptional employee, an
20  exceptional leader.
21     Q   Now, I am going to draw you to what is
22  Bates stamped as NYC 1630, which is, I guess, two
23  pages back.
24     A   Okay.
25     Q   And it is the Chief Administrative

45 (Pages 174 - 177)

Page 178

Patricia Yang

1
2 Officer, I guess, chart. Are we on the same page?
3    A  Yes.
4    Q  Now, it appears during the course of, I
5 guess, Dr. Kaye's tenure at the Bronx clinic, she
6 started reporting to a Samantha Kent?
7    A  Who?
8    Q  Samantha Kent.
9    A  I'm sorry?
10    Q  Do you see Samantha Kent on the org
11 chart?
12    A  That who reported to Sam?
13    Q  Dr. Kaye. At least some of the staff at
14 the Bronx court clinic reported to Samantha Kent?
15    A  Not to my knowledge.
16    Q  Okay. Samantha Kent is here listed as
17 Senior Associate Director of Labor Relations, right?
18    A  Correct.
19    Q  And who did Miss Kent report to before?
20    MS. CANFIELD: Objection.
21    You can answer.
22    A  Before what?
23    Q  Well, you have -- before Jessica Laboy,
24 who was she reporting to?
25    A  Jonathan Wangel.

Page 179

Patricia Yang

1
2    Q  Did she report to Clarence Muir, too, or
3 no?
4    A  No.
5    Q  It is just Samantha Kent and Jonathan
6 Wangel?
7    MS. CANFIELD: Objection.
8    Q  Right?
9    A  Right.
10    Q  So as far as the Director of Labor
11 Relations, what did you have in mind for the Senior
12 Director or -- well, was Mr. Wangel Senior Associate
13 Director of Labor Relations or just Senior Director?
14    A  Senior Director.
15    Q  Okay. So what did Mr. Wangel's job
16 entail?
17    MS. CANFIELD: Objection.
18    You can answer.
19    A  With staff to resolve issues, working
20 with the unions, negotiating with unions in
21 cooperation with the corporate central office Labor
22 Relations, solving complaints, handling cases,
23 grievances, disciplinaries.
24    Q  Was there ever a time that you or -- did
25 it come to your attention that Mr. Wangel was

Page 180

Patricia Yang

1
2 monitoring Dr. Kaye's e-mails?
3    MS. CANFIELD: Objection.
4    You can answer.
5    A  Yes.
6    Q  Okay. Could you elaborate?
7    A  I don't remember the date, but there was
8 concern that, against system policy, that protected
9 information was being sent inappropriately from the
10 system's computers.
11    Q  What policy?
12    A  There is a system policy. I don't know
13 the name of it, but you, basically, are not supposed
14 to be using your personal devices for corporate
15 work.
16    Q  What would prompt an investigation into a
17 person's e-mail?
18    A  If there is reasonable suspicion that
19 somebody is inappropriately transmitting material
20 that shouldn't be transmitted.
21    Q  What constitutes reasonable suspicion?
22 What does that mean?
23    MS. CANFIELD: Objection.
24    You can answer.
25    A  It can be a number of things. It could

Page 181

Patricia Yang

1
2 be the number of people who report it, the degree of
3 suspicion, the level of documentation or proof,
4 or -- yeah, people reporting.
5    Q  So you are saying people reporting. Who
6 was reporting about Dr. Kaye's use?
7    A  There was a concern that was raised about
8 whether there were draft policies, internal, that
9 had not been finalized, that were finding their way
10 to external agencies.
11    Q  And could you explain how that came
12 about, the concerns?
13    A  I don't know the details of it, but when
14 it came to me, it was presented that there was
15 enough concern that there was inappropriate
16 transmittal or sharing of materials and that they
17 wanted to check her e-mail, so I said fine.
18    Q  Did you direct anyone to go into
19 Dr. Kaye's e-mail?
20    A  I did not direct, but I approved.
21    Q  Did you ask them to?
22    A  No, but that's not the way it operates.
23    Q  Explain how someone would -- how this
24 process of going into someone's e-mails works then.
25    A  I don't know the details of it, but what

46 (Pages 178 - 181)

Patricia Yang

1
2 happens is there -- one of my senior team, or, in
3 this case, several would come to me and say there is
4 reasonable concern that material is being
5 inappropriately transmitted, and they wanted to run
6 a check with IT, central IT.
7    Q.   Okay.
8    A   And I said fine.
9    Q   So who told you that?  Who did that?
10    A   It was a shared concern that was raised
11 to me.  Certainly, Jonathan did, Dr. Ford, Dr. Jain,
12 and Dr. MacDonald.
13    Q   So did you know of anybody who had
14 first-hand knowledge that Dr. Kaye was allegedly
15 sharing these incomplete or, I guess, unfinalized
16 policies with external staff?
17    A   I do not have first hand, no.
18    Q   I mean, did you know of anyone for a
19 fact -- these people are telling you that Dr. Kaye
20 is allegedly e-mailing specifically these policies?
21    A   And possibly other materials.
22    Q   Right.  But of these people that you just
23 named, did you find out that they knew for a fact,
24 first hand, this is what she was doing?
25    A   No.  That was why they were proposing to

Patricia Yang

1
2 investigate.
3    Q   Were they doing that with the other
4 directors?
5    A   There was not suspicion on that part.
6    Q   But the question is, were they doing it
7 with the other directors?
8       MS. CANFIELD:  Objection.
9       You can answer.
10    A   Not that I am aware of.
11    Q   And is it policy that everyone's e-mail
12 is monitored or just people who have -- there is
13 supposedly a reasonable suspicion?
14       MS. CANFIELD:  Objection.
15    A   If there is a reasonable suspicion.  And
16 the purpose of those are not to find something.  It
17 is to exonerate somebody, or disprove or prove.  It
18 is not going in with a bias.  You are doing an
19 investigation.
20    Q   Now.  You said you approved it.  Is that
21 right, Dr. Yang?
22    A   I gave them the okay, yes.
23    Q   And why did you do that?
24    A   Because my senior team had raised enough
25 concern that I thought the question should be

Patricia Yang

1
2 answered.
3    Q   So your senior team raised the issue.
4 There is a review of the e-mails.  Do you know what
5 happened after they reviewed the e-mails?  Did they
6 find that Dr. Kaye had sent these e-mails outside of
7 policy?
8    A   As I recall, there was -- there were
9 transmittals from her work account to her Gmail
10 account.
11    Q   And what happened once these were found,
12 these transmittals to her Gmail account?
13       MS. CANFIELD:  Objection.
14       You can answer.
15    A   I believe she was reminded -- I don't
16 know in what manner -- not to do that.  And I
17 believe that maybe an e-mail was sent to everybody
18 else reminding them not to send work materials
19 unsecured to their personal.
20       MS. HAGAN:  Now, I'm going to show
21    you --
22       I don't think I made the copies of
23    this.  I thought I did.
24       (Whereupon, a discussion was held off
25    the record.)

Patricia Yang

1
2       (A nine-page document consisting of a
3    U.S. District Court Civil Docket was
4    received and marked Plaintiff's Exhibit 6
5    for identification at this time.)
6       MS. HAGAN:  I'm going to show you what
7    is marked as Plaintiff's Exhibit 6.  That's
8    where we are now.
9       This is a docket.  It is not Bates
10    stamped.  This is the docket for the case
11    that was filed by Dr. Kaye.
12    Q   And I am going to draw your attention to
13 the date -- to the first page, once you turn it
14 over.  Turn the page.  On that first page, the first
15 filing is dated December 21st, 2018.  You see that,
16 right?
17    A   Yes.
18       MS. HAGAN:  Now, I'm going to show you
19    an e-mail that's dated January 12, 2019, and
20    it looks like there is no Bates stamp number
21    on.
22       (A three-page e-mail chain was received
23    and marked Plaintiff's Exhibit 7 for
24    identification at this time.)
25       (Whereupon, a discussion was held off

47 (Pages 182 - 185)

Page 186

Patricia Yang

1
2     the record.)
3         MS. HAGAN:  This would be Exhibit 7.
4     The e-mail on it is dated January 12, 2019.
5         For some reason, the Bates stamp didn't
6     actually translate, which is weird.
7     Q  Now, you see that e-mail, right,
8  Dr. Yang?
9     A  I do.
10    Q  Dr. Yang, that e-mail is from Mr. Wangel
11 to you; is that right?
12    A  Yes, it is.
13    Q  And the e-mail is discussing Dr. Kaye's
14 alleged use of the e-mail outside of work; is that
15 right?
16    A  I'm sorry.  Repeat that question.
17    Q  The e-mail is discussing Dr. Kaye's
18 alleged use --
19    A  Correct.
20    Q  -- of the e-mail in a noncompliant
21 fashion; is that right?
22    A  Correct.
23    Q  And the date of that e-mail is January
24 12th.  Now, on the sheet that I -- on Exhibit 6 that
25 I just gave you, I pointed out that the first entry

Page 187

Patricia Yang

1
2  was filed December 21st, 2018; is that right?
3     A  Yes.  I don't know what this document is,
4  but it is a log, sort of a chronology or something.
5     Q  Right.
6     A  Okay.
7         MS. HAGAN:  Now, for purposes of
8     clarity, Exhibit 6 is the Civil Docket for
9     Dr. Kaye's case, and it captures the court
10    filings, including Dr. Kaye's Complaint of
11    Discrimination that was filed against
12    Dr. Yang and the named defendants.
13        And I just ask Dr. Yang to look at the
14    first entry, which is the Complaint itself,
15    which was filed December 21st.
16    Q  And so we just looked at Exhibit 6 that
17 says that the Complaint was filed on December 21st,
18 and we looked at a document, Exhibit 7, that talks
19 about Dr. Kaye's usage -- alleged usage of the
20 e-mail.  Is that right?
21    A  I'm sorry.  I was lost in the e-mail.
22    Q  The e-mail -- we just looked at an e-mail
23 dated January 12 --
24    A  Yes.
25    Q  -- 2019.

Page 188

Patricia Yang

1
2     A  Yes.
3     Q  Which is less than a month later; is that
4  right?
5     A  That's correct.
6     Q  And at that point, were you aware that
7  Dr. Kaye had filed a discrimination complaint
8  against you?
9     A  I do not believe so.
10    Q  When did you find out that she filed a
11 lawsuit against you?
12    A  I really don't remember.
13    Q  You are not sure?
14    A  I'm not sure.
15    Q  Who did you --
16    A  I don't remember.
17    Q  Who did you speak to first about the
18 discrimination complaint?
19    A  It probably would have been Blanche
20 Greenfield.
21    Q  What did Miss Greenfield tell you?
22        MS. CANFIELD:  Objection.
23    Q  To the extent that it doesn't violate
24 attorney-client privilege.
25        Was Miss Greenfield engaging you as an

Page 189

Patricia Yang

1
2  attorney or was she engaging you as an EEO liaison?
3         MS. CANFIELD:  Objection.
4         Was she engaging her when?
5     A  I don't even know that we had a
6  conversation about it.  It was here -- this is here.
7  It wasn't advice.
8     Q  So she just told you, oh, a lawsuit has
9  been filed against you?
10    A  Yeah.  It might have been an e-mail.  It
11 may have just --
12    Q  To the extent that you remember and that
13 it doesn't constitute legal advice --
14        I don't know how you would make a
15 determination yourself, so I am going to stop with
16 that question.
17        Dr. Yang, by any chance, did you discuss
18 the substance of the Complaint, to the extent you
19 acknowledge that it had been filed against you, to
20 Miss Greenfield?
21        MS. CANFIELD:  I'm going to object and
22    just note for the record that, as of April
23    12, 2019, that Miss Kaye had failed to serve
24    the defendants with the litigation, which is
25    four months after or maybe five months after

48 (Pages 186 - 189)

Page 190

Patricia Yang

2 that e-mail.
3     So I guess I just don't understand the
4 purpose of this questioning.
5         MS. HAGAN:  First off, it doesn't
6     necessarily mean that she didn't have access
7     to ECF.
8         MS. CANFIELD:  Well, why don't you ask
9     her that?
10        MS. HAGAN:  I didn't get a chance.  You
11    are kind of coaching her and your steering
12    is improper.  It is an improper objection,
13    and it is not permissible.
14    Q   But back to the sum and substance of
15 this, you do acknowledge that the Complaint itself
16 was filed on December 21st, and that the monitoring
17 of Dr. Kaye's e-mail was on January 12th?
18        MS. CANFIELD:  Objection.
19    A   So I acknowledge that this piece of paper
20 says --
21    Q   The Complaint was filed --
22    A   12/21.
23    Q   Yes.
24    A   And I do acknowledge that on January 12,
25 actually, I -- Jonathan wrote back to me in response

Page 191

Patricia Yang

2 to my response to him of his e-mail of January 11,
3 transmitting to me the system's IT people's finding
4 of her e-mailing things in violation of corporate
5 policy.
6     Q   Okay.  And you also admit that none of
7 the other directors, their e-mails were not being
8 monitored at that time?  You admit to that, right?
9     A   I admit that there was no reason to
10 search their e-mails.
11    Q   But you also admit that they weren't
12 being searched at that time, right?
13    A   Yes, because there was no reason.
14    Q   Now, your counsel did point out that the
15 actual Complaint was served in April, if you go back
16 to Exhibit 6; is that right?
17        MS. CANFIELD:  Objection.
18        That's not what I pointed out.  I said
19    that, as of April, it had not been served.
20        MS. HAGAN:  We will get to that.
21    Q   Exhibit 6, if you go to the filing, if
22 you go down to -- if you go to the next page over --
23 in fact, it is going to be May 3rd, actually.  So
24 you go to, I guess, two pages in.  So you look for
25 entry number twenty-nine.

Page 192

Patricia Yang

2     A   Okay.
3     Q   At this point, could you -- I am going to
4 give you a chance to read entry number twenty-nine.
5         (Pause in the proceedings.)
6     A   Okay.
7     Q   Now, at this point in May, it says that
8 the Amended Complaint actually had been served.  And
9 at this time, on May 3rd, 2019, the Amended
10 Complaint had been served.  You see that, right?
11    A   Yes.
12        MS. HAGAN:  Now, I am going to direct
13    you to what is marked as Plaintiff's
14    Exhibit 8.
15        (A four-page Confidential Investigatory
16    Information Memorandum from Mr. Wangel to
17    Dr. Yang, dated May 9, 2019, was received
18    and marked Plaintiff's Exhibit 8 for
19    identification at this time.)
20        (Whereupon, a discussion was held off
21    the record.)
22        MS. HAGAN:  For purposes of the record,
23    Exhibit 8 is a memo, a Confidential
24    Investigatory Information Memorandum from
25    Mr. Wangel to Dr. Yang, and it is dated May

Page 193

Patricia Yang

2 9, 2019.
3     Q   Now, Dr. Yang, have you seen this
4 document before?
5     A   Yes.
6     Q   Where have you seen this document?
7     A   It is a memo, obviously, addressed to me.
8     Q   Who is Catherine Patsos?
9     A   She is the Chief Corporate Compliance
10 Officer, as her signature indicates.
11    Q   Does she report to you?
12    A   No, she does not.
13    Q   Who does she report to?
14    A   I believe she reports to Dr. Katz.
15    Q   Directly?
16    A   I believe so.
17    Q   And do you know what precipitated this
18 memo?
19    A   Yes.
20    Q   What happened?
21    A   In the course of supervision, as is done
22 with all of the clinical directors, in actual
23 written testimony, there was reference to Dr. Kaye's
24 audio tape of one of her clients, the evaluations.
25    Q   Now, had there been a policy against

49 (Pages 190 - 193)

Patricia Yang

1  recording clients at that time in H and H?
2  A  I don't know about H and H, but there was
3  not at CHS, which is what Miss Patsos recommended.
4  Q  But why would there be a meeting with
5  Dr. Kaye about recording an exam, if there had been
6  no policy in place?
7  A  So that's not quite how it happened.
8  Q  Okay.  Explain.
9  A  In the course of supervision, Dr. Jain
10  found that in the written testimony, the transcript,
11  there is reference to Dr. Kaye's having recorded her
12  work with one of her clients, one of our patients.
13        That was determined by Dr. Jain and then
14  to Dr. Ford as highly unusual.  We were concerned
15  about it.  None of the other clinical directors
16  audio tape their evaluations and their work with
17  clients.
18        So again, for safety and concern, given
19  better safe than sorry, I wanted this passed by the
20  corporate compliant office to if see if we had
21  breached any laws.
22  Q  Are you using the term patient and client
23  interchangeably?
24  A  Yes.

Patricia Yang

1  Q  The people who -- the defendants, that
2  Dr. Kaye sees --
3  A  Yes.
4  Q  -- they are not patients.
5  A  Correct.
6  Q  They are defendants; am I right?
7     MS. CANFIELD:  Objection.
8  A  Correct.
9  Q  Can you cite any policies that would
10  prohibit her, outside of CHS or H and H, from
11  recording these evaluations?
12  A  There is now.
13  Q  I said outside of CHS and H and H.
14  A  I don't believe -- I don't believe so, or
15  there may be now.
16  Q  Now, it seems as if you have
17  interchangeably used patient and client.  Would it
18  be fair to say that the defendants are neither,
19  because the defendant is not Dr. Kaye's client
20  either?  Is that fair?
21     MS. CANFIELD:  Objection.
22        You can answer.
23  A  Sure.
24  Q  So why would she be prohibited from

Patricia Yang

1  taping the exam?
2  A  It was highly unusual.  None of the other
3  clinical directors of the court clinics audio tape
4  their work.  None of the people who are on the
5  treatment side with their patients audio tape their
6  work.
7        So we wanted to make sure that no rules
8  or laws had been broken.  We determined, not that it
9  was -- it was not -- nothing serious had been
10  breached, but that it was advised that we make it
11  explicit in a policy that people should not audio
12  tape.
13  Q  I'm going to break down some of your
14  testimony.
15  A  Yes.
16  Q  You said none of the other directors
17  audio taped their exams right?
18  A  That was their response when they were
19  asked.
20  Q  However, when you go to page 472 of this
21  document, and you look at number eleven --
22     MS. CANFIELD:  472.
23     MS. HAGAN:  D472, which is page three of
24  four of the document.  Do you have that?

Patricia Yang

1     MS. CANFIELD:  I don't.
2     MS. HAGAN:  Page three of four, whether
3  or not it is paginated that way, at the
4  bottom.  It should be three of four of the
5  document.
6     MS. CANFIELD:  Yes.
7  Q  So paragraph eleven.
8  A  Correct.
9  Q  It says, "Two other forensic evaluators
10  claim that it was well known that audio recording
11  was prohibited during 730 competency evaluations,"
12  and the two doctors named are Dr. Mundy and
13  Dr. Owens.  You see that, right?
14  A  Yes.
15  Q  Now, you say "the other directors," but
16  why aren't the other directors listed?  Why is it
17  just Dr. Mundy and Dr. Owens?
18  A  I don't know why Miss Patsos didn't
19  include Mr. Winkler, Dr. Winkler.  I don't know.
20  Q  Could you say for a fact that Dr. Winkler
21  would testify or -- you said all of the directors?
22  A  That was my understanding.
23  Q  Would you say that Dr. Winkler would say
24  the same thing?

25 (Pages 194 - 197)

Page 198

Patricia Yang

2     MS. CANFIELD:  Objection.
3     A  I am not going to assume what he is going
4  to say.
5     Q  For whatever reason, he is not here on
6  this report?
7     A  That's correct.
8     Q  Okay.  So then --
9     A  I would have hoped that Miss Patsos would
10  have noted if Dr. Winkler had said that he did.
11     Q  Well, she didn't.
12     A  That's correct.
13     Q  So you can't say for a fact that all of
14  the other directors don't do it; is that fair?
15     A  That's fair.
16     Q  So then I am going to go to the OCC
17  findings, which is on the previous page.
18     Now, I want to direct your attention to
19  number five and then number six.  You can look at
20  five through nine, because I won't continue to just
21  kind of itemize, so look at five through nine.
22     (Pause in the proceedings.)
23     Q  Have you had an opportunity to look at
24  this?
25     A  Yes.

Page 199

Patricia Yang

2     Q  So five says that the operating
3  procedures -- that H and H does not have operating
4  procedures that prohibit audio recording.  You saw
5  that, right?
6     A  Yes.
7     Q  And CHS doesn't have that policy either;
8  is that correct?
9     A  That's correct.  It did not.
10     Q  And New York State permits only one -- it
11  is a one-party recording state.  You saw that,
12  right?
13     A  It was a fascinating fact to me.
14     Q  But it still continues to be, right?
15     A  Right.
16     MS. CANFIELD:  Objection.
17     Q  And then the American Academy of Forensic
18  Psychiatry and Law Task Force revised document,
19  again corroborates that it is not an issue to
20  record; is that right?
21     MS. CANFIELD:  Objection.
22     You can answer.
23     A  That's what it says.
24     Q  Then, again, you have it again, the
25  American Psychiatric Association Opinions of Ethics

Page 200

Patricia Yang

2  Committee, it says the psychiatrist should ethically
3  inform and allow a patient to refuse to have the
4  session recorded, but it doesn't prohibit them from
5  it; is that right?
6     MS. CANFIELD:  Objection.
7     A  It doesn't prohibit --
8     Q  It doesn't prohibit the psychiatrist from
9  recording them?
10     A  Correct.
11     Q  So even with all of these different
12  sources not outright prohibiting the psychiatrist or
13  the psychologists performing these exams from
14  recording, it is still your testimony that they
15  should be prohibited from doing so?
16     MS. CANFIELD:  Objection.
17     You can answer.
18     A  Yes.  That is the Correctional Health
19  Services policy.
20     Q  Why?
21     A  It is highly unusual.  It feels invasive.
22     Q  How do you know it is unusual?  You have
23  only -- you only referenced two doctors, Dr. Mundy
24  and Dr. Owens.  What other forensic psychiatrists or
25  psychologists do you know that don't record?

Page 201

Patricia Yang

2     MS. CANFIELD:  Objection.
3     You can answer.
4     A  Dr. Ford, other people, other
5  psychiatrists who we have on staff as treatment
6  psychiatrists.
7     Q  Do you know of any other forensic
8  psychiatrists, besides Dr. Mundy and Dr. Owens, that
9  have performed forensic exams outside of H and H,
10  that don't record?
11     A  No, but I don't -- I don't know what is
12  happening outside of H and H.
13     Q  So you don't know what the standard
14  practice is for forensic psychiatrists.  H and H is
15  not the only place that employs forensic
16  psychiatrists; is that right?
17     A  That's correct.
18     Q  And how would you know what the standard
19  of profession is then outside of H and H?
20     MS. CANFIELD:  Objection.
21     A  From Dr. Ford and Dr. Jain.
22     Q  Okay.  But you didn't do any additional
23  research yourself?
24     A  The Corporate Compliance Officer
25  basically did that for us.

51 (Pages 198 - 201)

Patricia Yang

1
2    Q   But I am asking you.  Did you do any
3  research yourself?
4    A   I would never pretend to have greater
5  expertise in corporate compliance than the Corporate
6  Compliance Officer.
7    Q   But you insisted on having this policy
8  after this, right?
9    A   It was actually the --
10      MS. CANFIELD:  Objection.
11    A   It was actually the Corporate Compliance
12  Officer's recommendation.
13    Q   Did you want to have this policy in
14  place?
15    A   Based on the recommendation of my
16  clinical staff and team leadership, yes.
17    Q   Prior to the Corporate Compliance Officer
18  writing this report, did you want a policy in place
19  that prohibited the recording of the forensic exams?
20    A   No, because I wasn't aware that was even
21  being done.
22    Q   When it came to your attention before
23  this report was actually being generated, did you
24  think there should be a policy that prohibited the
25  recording of exams?

Patricia Yang

1
2    A   I naively thought nobody was doing that
3  with their patients or their defendants or their
4  clients.  I mean the defendant is a defendant, but,
5  basically, it is a client of ours who is being
6  evaluated.
7    Q   But you keep using these terms
8  interchangeably.
9    A   What would you like me to use?
10    Q   I am just asking you, because you are
11  saying there is a patient, there is a client, there
12  is a defendant.  Clearly, they are different roles.
13  A client and a patient kind of connote treatment.
14    A   I don't thinks so.  A patient is
15  definitely treatment and that does not apply to the
16  court clinics.  In the court clinics, they are
17  defendants, but I call them clients.
18    Q   Why do you call them clients?
19    A   Because I am not going to take a side
20  whether they are a plaintiff or defendant.  They are
21  a client being evaluated for competency by my staff.
22    Q   So you believe they should not be
23  subjected to being recorded?  That's your belief?
24    A   Certainly without consent or knowledge.
25    Q   And this is based solely on the Corporate

Patricia Yang

1
2  Compliance Officer's report or is it your own
3  belief?
4    A   I frankly think that I would like to
5  know, and I would owe somebody else that courtesy,
6  to let them know that they were taping, or I was
7  taping them.
8    Q   Now, Dr. Kaye believes that you had this
9  investigation -- I guess orchestrated this
10  investigation with Dr. Patsos and Mr. Wangel because
11  she filed a lawsuit against you.
12      MS. CANFIELD:  Is that a question?
13      MS. HAGAN:  Yes.
14    Q   I am asking you, is that true?
15    A   That's absolutely not true.
16    Q   When you found out that Dr. Kaye filed
17  this lawsuit against you, what was your reaction?
18    A   Another lawsuit.
19    Q   You didn't feel compelled to do any
20  investigation to find out if any of the allegations
21  were true?  Did you read it?
22    A   I read the Amended --
23    Q   The Amended Complaint?
24    A   The first thing you gave me.
25    Q   The first exhibit?

Patricia Yang

1
2    A   Yes.
3    Q   Did you ask -- well, you know, it is
4  thirty-two pages of stuff here, allegations
5  involving me and other people.  Did you look into
6  whether it was true or not?
7    A   I had sufficient familiarity over the
8  course of time that the clinics reported to us, as
9  did, I think, the other people who are named, and
10  Dr. Kaye's concerns to have her own opinions as to
11  the charges.
12    Q   And what was your opinion at that point?
13    A   I did not believe it had merit.
14    Q   Any of them?  Not against you or anyone
15  else?
16    A   I am not going to say about all of them.
17    Q   Okay.  Some of them, did they have merit?
18    A   I don't believe so.
19    Q   So you are saying all of them.  None of
20  them had merit?  That's what you are saying, right?
21    A   I don't know how to answer this.
22    Q   Well, you either believe Dr. Kaye on some
23  level or you don't.
24    A   I believe that she believed her
25  allegations were still valid and unresolved.

52 (Pages 202 - 205)

Patricia Yang

2   Q   At any point, did you ask whether or not
3 Dr. Kaye could work different hours to accommodate
4 her children?
5       MS. CANFIELD:  Objection.
6       You can answer.
7   A   The question was asked, and again, it
8 is -- her desire to remain a unionized employee in
9 an Attending Physician is guided by the collective
10 bargaining contract, which requires a hour lunch,
11 and then her work, which amounts to a forty-five-day
12 hour -- a forty-five-hour day --
13   Q   Forty-five-hour week?
14   A   Forty-five-hour week.
15   Q   But Dr. Kaye disputes that she wanted to
16 remain an Attending Physician.  She disagrees with
17 you.  She want to be a Physician Specialist.  Are
18 you aware of that?
19   A   I am not aware that she wanted to move to
20 a management position.
21   Q   That's not what I said.  You don't know
22 whether or not the Physician Specialist title is
23 management or not.
24   A   Correct.
25   Q   Dr. Kaye wanted to be a Physician

Patricia Yang

2 Specialist because there was a larger salary range.
3 You don't know whether or not the Physician
4 Specialist line was management or not, right?
5       MS. CANFIELD:  Objection.
6       You can answer.
7   A   I don't know the payroll title, if a
8 Physician Specialist.  I do know that there are
9 managers, and as managers, it is not governed by the
10 same salary structure as a unionized position.
11   Q   But you don't know if the Physician
12 Specialist title is unionized or not?
13       MS. CANFIELD:  Objection.
14   A   Along with thousands of our titles, I
15 can't tell.  I need to look up whether it is group
16 eleven or group twelve.
17   Q   And you don't know if Dr. Kaye wanted to
18 be a Physician Specialist or not, do you?
19   A   My understanding is Dr. Kaye did not want
20 to be a manager.
21   Q   But you don't know if Dr. Kaye wanted to
22 be a Physician Specialist?
23       MS. CANFIELD:  Objection.
24       Asked and answered.
25   Q   I'm going to draw your attention to

Patricia Yang

2 Exhibit 1.
3       (Whereupon, a discussion was held off
4       the record.)
5   Q   Now, please look at page 424, paragraph
6 thirty-six.  For purposes of clarity, paragraph
7 thirty-six discusses the Physician Specialist title,
8 and also paragraph thirty-five.  Paragraphs thirty-
9 four through thirty-six address what we were just
10 talking about.
11       Now, at some point, you said that
12 Dr. Kaye didn't want to be a Physician Specialist;
13 is that right?
14       MS. CANFIELD:  Objection.
15   A   What I said was that I had been advised
16 that Dr. Kaye did not want to be in a managerial
17 position.
18   Q   And you don't know if the Physician
19 Specialist title is a managerial title.
20       MS. CANFIELD:  Objection.
21   A   I will repeat again that I do not keep
22 track of every tile, as to whether it is unionized
23 or not unionized.  I direct my staff, this should be
24 a union position or a management position.  They
25 find the appropriate titles.

Patricia Yang

2   Q   But, again, you can't say for certain
3 today that the Physician Specialist title is a
4 management title?
5       MS. CANFIELD:  Objection.
6   Q   Am I right?
7       MS. CANFIELD:  Objection.
8   Q   Yes or no?
9   A   Again, yes.  I know it is really
10 frustrating for you that I don't know.
11   Q   Yes, you cannot say that, right?
12       MS. CANFIELD:  Cannot say what?
13   Q   You cannot say that it is a managerial
14 title; is that right?
15   A   I do not know whether a Physician
16 Specialist title, that payroll title, is a group
17 eleven or group twelve title.  I would look it up.
18 If you would like me to look it up, I can --
19   Q   No, no, no.  You don't know today?
20   A   -- and then I can answer.
21   Q   No.
22       Now, I wanted to ask you about the amount
23 of pay differential.  Were you aware --
24       MS. HAGAN:  Let's scratch that.  Go down
25       to paragraph forty-two.

53 (Pages 206 - 209)

Page 210

Patricia Yang

2   Q  Earlier, I asked if you made any
3  reference to, you know, an elephantine comment made
4  by Ford and you said you didn't -- you said no,
5  right?
6   A  I thought you had asked if I used the
7  phrase elephantine.
8   Q  Yes, I did.  You are right.  Did you ever
9  use that term?
10   A  I don't recall.  I still don't recall.
11   Q  It is not a common term.  I would figure,
12  you know, whether or not it was part of your
13  vocabulary, you would know.  You don't hear people
14  referring to or using the word elephantine or
15  elephantine.  Is that accurate?
16   A  I majored in semiotics.  It is all about
17  communication and language and linguistics, so I am
18  not going to judge whether people refer to elephants
19  or whether something is elephantine or not.
20   Q  Have you ever heard or did you know of
21  Dr. Ford to reference or make the statement that,
22  when Dr. Kaye initially complained about disparate
23  pay, that it was like getting anything done around
24  here is like moving elephants?
25   A  Not directly, except for here.

Page 211

Patricia Yang

2   Q  You have never heard Dr. Ford say that?
3  Did Dr. Ford ever admit to you that she said that?
4   MS. CANFIELD:  Objection.
5   You can answer.
6   A  Not that I recall.
7   Q  Did Dr. Ford ever complain to you about
8  Dr. Kaye?
9   A  No.  I would not say complain.
10   Q  Did she ever say that Dr. Kaye has been a
11  problem for a long time?
12   A  I don't recall those words.
13   Q  Okay.  Did Dr. Ford ever complain about
14  Dr. Kaye's performance to you?
15   A  No, not that I can recall.
16   Q  I am going to show you what is marked as
17  Plaintiff's Exhibit -- I guess we are up to
18  Exhibit 8 now.
19   MS. CANFIELD:  Nine.
20   MS. HAGAN:  9.  Thank you.
21   (A three-page e-mail chain, Bates
22   stamped NYC 000077 through NYC 000079, was
23   received and marked Plaintiff's Exhibit 9
24   for identification at this time.)
25   (Whereupon, a discussion was held off

Page 212

Patricia Yang

2  the record.)
3   Q  Have you gotten a chance to review the
4  e-mail or do you remember the e-mail?
5   A  Which one?
6   Q  Here (indicating).  Go from the
7  beginning, which is in the back.
8   MS. HAGAN:  For the purposes of the
9   record, we have Exhibit 9, and it is from
10   Patrick Alberts to Dr. Yang, and it is Bates
11   stamped NYC 77 through NYC 79.
12   Q  Now, what I want to bring your attention
13  to, if you have gotten a chance to look at the
14  entire document, on NYC 77, first off, there is
15  language from you saying, "No wonder I am losing
16  sleep."  Do you remember saying something like?
17   A  I say that a lot.
18   Q  Okay.  And you are saying this in regard
19  to Judge Torres's wanting to hold us -- I'm not sure
20  who us -- I guess H and H or CHS in contempt, right?
21   A  The City.
22   Q  The City, right?
23   A  Yes.
24   Q  And do you remember any of anything
25  surrounding this incident?

Page 213

Patricia Yang

2   A  Vague.  And it was more than just one
3  incident.  It was an issue.
4   Q  What was the issue?
5   A  It was an issue that somehow came that
6  the Bronx court wanted full unredacted records,
7  including substance use information, and that
8  everybody needed to focus on how to do that, because
9  there did not seem to be a legal way to provide
10  that.
11   Q  And you disagreed with that; am I right?
12   MS. CANFIELD:  Objection.
13   You can answer.
14   A  I don't understand the question.
15   Q  You felt that it wasn't necessary for the
16  Bronx to have unredacted records; is that right?
17   MS. CANFIELD:  Objection to form.
18   A  What I was advised was that the Bronx was
19  the only place where that was happening and that
20  there was not a legal way to do that, to provide
21  that, and it was a concern, therefore, that the
22  judge was threatening to hold the City in contempt,
23  and it was a conundrum.  We had to figure something
24  out.
25   Q  Who was working in the Bronx at that

54 (Pages 210 - 213)

Patricia Yang

1 time? It was Dr. Kaye and who else?
2 
3    A   Dr. Kaye and her staff.
4    Q   Do you remember who her staff was in the
5 Bronx?
6    A   I do not.
7    Q   The only person you know for certain that
8 worked there was Dr. Kaye; is that right?
9    A   Correct.
10    Q   And it is your testimony that Dr. Kaye
11 was the only person who wanted to have these
12 unredacted records; is that right?
13    A   That wasn't --
14       MS. CANFIELD:  Objection.
15       You can answer.
16    A   That wasn't how it started.
17    Q   How did that start?
18    A   This started -- there was a problem in
19 the Bronx court that the judge wanted full
20 unredacted records, including information that was
21 protected by law and can't be provided.
22    Q   What law was protecting the unredacted
23 medical records?
24    A   State and federal laws around substance
25 use and mental health -- substance use issues.

Patricia Yang

1 
2    Q   Which law is that?
3    A   I don't know.  I would have to turn to my
4 attorneys.
5    Q   And who are you conferring with on the
6 legal side on this?
7    A   Patrick Alberts did work for us.  He is a
8 lawyer.  He was checking with OLA, and Aaron, who
9 was the legal person at MOCJ.
10    Q   You say on the next page, "Need your
11 FPECC uber clinician on board."
12    A   Yes.
13    Q   Who was that that you are referencing?
14    A   I think that was probably Dr. Jain.
15    Q   So you all were in the works for hiring
16 somebody --
17    A   Correct.
18    Q   -- to provide oversight?
19    A   Correct.
20       MS. CANFIELD:  Make sure she finishes
21 the question before you respond.
22       THE WITNESS:  Thank you.
23    Q   Wasn't Dr. Ford already there at that
24 time?
25    A   Yes.

Patricia Yang

1 
2    Q   So what happened to Dr. Ford?  Wasn't she
3 also overseeing this stuff?
4    A   Yes, but she had more than a full plate
5 already.  She was running the entire jail mental
6 health service.
7    Q   So it is your testimony that Dr. Ford
8 needed additional support?
9    A   Absolutely.
10    Q   Is that right?
11    A   It was part of the proposal to take -- to
12 centralize management in support of the four court
13 clinics.
14    Q   Did Dr. Jain actually provide the
15 supervision that you were looking for at that time?
16    A   Yes.
17    Q   And to your knowledge, he continued to
18 provide that, right?
19    A   Right.
20    Q   Okay.  Well, I am going to show you what
21 has been marked as --
22       MS. HAGAN:  Do you want to take a break
23 for a second?
24       MS. CANFIELD:  Yes.
25       (Whereupon, a short recess was taken at

Patricia Yang

1 
2 this time.)
3       (A three-page e-mail chain, which should
4 be Bates stamped NYC 205 through NYC 207,
5 was received and marked Plaintiff's Exhibit
6 10 for identification at this time.)
7       (Whereupon, a discussion was held off
8 the record.)
9       MS. HAGAN:  I'm going to show you what
10 is marked Plaintiff's Exhibit 10, and when
11 you get a chance to look through the
12 document, just let me know when you are
13 finished.  Okay, Dr. Yang?
14       THE WITNESS:  Yes.
15       MS. CANFIELD:  Can I ask a question?
16 There are no Bates stamps on this.
17       MS. HAGAN:  I'm not sure what is going
18 on with printing at this printer, because
19 this is actually your document, but for
20 whatever reason, the Bates stamps are not on
21 it.  It should be 205 through 206, but I'm
22 not sure.
23       MS. CANFIELD:  Did you produce these?
24       MS. HAGAN:  You produced them.
25       MS. CANFIELD:  I'm sorry.  What is the

Patricia Yang

1
2  orange.
3      MS. HAGAN:  I actually highlighted it.
4      MS. CANFIELD:  Okay.
5      MS. HAGAN:  So it is not necessarily how
6  the document came.  I highlighted it as I
7  was reading it.
8      MS. CANFIELD:  Okay.
9      MS. HAGAN:  But for purposes of clarity,
10 and for the record, it is NYC 205 through
11 NYC 207.
12     MS. CANFIELD:  Is there a heading on the
13 top of the first page?
14     MS. HAGAN:  It would be -- the subject
15 would be "Pay Equity For Court Clinic
16 Medical Directors."  That would be the only
17 place -- I didn't print out the prior page,
18 so it is 205 through 207, and the subject is
19 "Pay Equity For Court Clinic Medical
20 Directors."
21     MS. CANFIELD:  So this is not the
22 complete e-mail thread then?
23     MS. HAGAN:  No.
24     MS. CANFIELD:  Okay.
25     (Whereupon, a discussion was held off

Patricia Yang

1
2  the record.)
3      MS. HAGAN:  When you have had a chance
4  to look at the entire document, Dr. Yang,
5  could you please let me know, please?
6      THE WITNESS:  Yes.
7      (Pause in the proceedings.)
8      Q  So I want to draw your attention --
9  obviously, I highlighted some of this, right?
10     A  Yes.
11     Q  So I want to draw your attention, I
12 guess, to the e-mail on the first page sent by you
13 to Sara Gillen.  Who is that?
14     A  Sara was the Chief Operations Officer at
15 the time.
16     Q  Right.  And in this instance, you
17 reference -- you say, "In the meantime (and we
18 should brain storm for July, but not the entire
19 FPECC crew), I intend to send her this reply below
20 and separately sanitize her e-mail and send to Bill
21 and copy her, removing editorials and elephantine
22 quotes."
23     A  There you go.
24     Q  Right.  So does that refresh your
25 recollection in seeing that?

Patricia Yang

1
2      A  Not really, but --
3      Q  You did write this; is that right?
4      A  This is my e-mail.
5      Q  Right.
6      A  I don't have a recollection what of the
7  elephantine quote would be.
8      Q  Now, I am going help you out that with
9  that.
10     A  Great.  I hope so.
11     MS. HAGAN:  I think I printed out the
12 right thing.  No, I did not.  Oh, joy.
13     Q  At any point, did Dr. Ford admit to
14 making the statement that getting things to move
15 around here is like herding elephants.
16     A  I guess she did in this e-mail.
17     Q  Right.  Now, you have an exchange with
18 Mr. Wangel, and Mr. Wangel -- and we are in Exhibit
19 10 still -- says that this is EEO and strongly
20 suggests Blanche be looped in.  You see that, right?
21     A  Yes.
22     Q  What did Mr. Wangel mean by that?
23     MS. CANFIELD:  Objection.
24     You can answer.
25     A  Can I go back to the other one, which

Patricia Yang

1
2  is -- I don't recall Dr. Ford ever telling me that
3  moving things at Bellevue was like moving elephants.
4  I only know that it is in here, Dr. Kaye's e-mail,
5  and I wanted to remove the elephantine quote, which
6  was insulting to Bellevue.  That's what it was.
7      Q  What was the elephantine -- you wanted to
8  remove that part?
9      A  Yes.
10     Q  But you are not sure what it was or if it
11 was made or how it was made?
12     A  I am believing that it was -- I was going
13 to forward Dr. Kaye's concern to Mr. Hicks, since
14 these were all concerns about how she was treated at
15 Bellevue, but I was going to remove the quotes
16 that -- the sort of more editorial quote that, you
17 know, that moving things at Bellevue was like moving
18 elephants.  It didn't seem relevant to the issue
19 that I was asking Mr. Hicks to look into.
20     Q  And it is your testimony that Dr. Ford
21 never made that statement?
22     MS. CANFIELD:  Objection.
23     Q  That you know of?
24     A  Not directly.  Correct.
25     Q  Right.

56 (Pages 218 - 221)

Patricia Yang

1
2      Now, I was asking you what Mr. Wangel
3  meant when he says that this is EEO and he strongly
4  suggests that Blanche be looped in.  What did he
5  mean by that?
6      MS. CANFIELD:  Objection.
7      If you know.
8      Q  To your knowledge.
9      A  To my knowledge, it is that, as in all
10 serious things, as stated earlier, I bring Miss
11 Greenfield into matters for her awareness.
12     Q  Right.  But you are saying he is not just
13 saying -- all serious things, but just EEO
14 specifically?  Is that right?  He is saying this is
15 EEO.
16     A  Yes.
17     Q  Right.  So could it be fair to say that
18 Blanche, quote, unquote, is synonymous with EEO in
19 this instance?
20     MS. CANFIELD:  Objection.
21     A  No.  I believe at this point in time we
22 brought Blanche in, Miss Greenfield in, because it
23 was a matter that was EEO related at Bellevue.
24     Q  Okay.
25     A  It was not our EEO issue.  It was

Patricia Yang

1
2  Bellevue's EEO issue.
3      MS. HAGAN:  I am going to see if I can
4      print this out.  I'm sorry.  I hope it
5      shouldn't be too long.
6      (Whereupon, a short recess was taken at
7      this time.)
8      Q  Further up in the e-mail, you have --
9  well, the first part that is highlighted, you say,
10 "I can do that, but then I am dumping BHC into the
11 soup."
12     What is BHC?
13     A  Bellevue Hospital Center.
14     Q  And then you say, "I don't know and I
15 don't know what to know what they did to address her
16 EEOC issues."  Do you see that?
17     A  I do.
18     Q  Why do you say that?
19     A  Because it is not my issue.
20     Q  She is still your employee.
21     A  No, she was not my employee.
22     Q  Not yet?
23     A  She was Bellevue's employee.
24     Q  That's what you are maintaining at this
25 point?

Patricia Yang

1
2      MS. CANFIELD:  Objection.
3      A  It is a fact.
4      Q  But you had the power to address her
5  issue.  You just chose not to; am I right?
6      MS. CANFIELD:  Objection.
7      A  I did not have the power to address her
8  issue.
9      Q  You had the power not to address it
10 apparently, according to this e-mail.
11     MS. CANFIELD:  Objection.
12     Q  Is that right?
13     A  That's correct.  I didn't have to send
14 the e-mail, I didn't have to let Blanche know, and I
15 didn't have to let Mr. Hicks know.
16     Q  You also had the power not to actually
17 compensate her or address the disparity in pay,
18 correct?
19     A  That's incorrect.
20     MS. CANFIELD:  Objection.
21     Q  Okay.  You testified earlier that you
22 postponed transferring the court clinic or at least
23 absorbing the Bronx court clinic because of Dr. Kaye
24 and her retention and longevity pay issues, right?
25     A  That's correct.

Patricia Yang

1
2      Q  You made that determination that you
3  weren't going to absorb it, right?
4      MS. CANFIELD:  Objection.
5      A  Absorb what?
6      Q  Absorb the Bronx court clinic.
7      A  I was postponing the transfer of the
8  Bronx court clinic to me so she could stay on
9  Bellevue's payroll through June 30th, so she could
10 get her retention bonus.
11     Q  You made that decision.  That's the
12 point.
13     A  That's correct, on her behalf.
14     Q  You are also saying you are making the
15 decision on her behalf not to address her EEOC
16 complaint too, right?
17     MS. CANFIELD:  Objection.
18     A  That's not true.
19     Q  All of the other clinics are being
20 absorbed, right?  Brooklyn, Queens, Manhattan
21 clinics were all absorbed.  They were all
22 transferred, right?
23     A  And so was the Bronx, but at different
24 times.
25     Q  But at this time in May of 2018, was the

57 (Pages 222 - 225)

Page 226

Patricia Yang

1
2  Bronx the only clinic that was not under the CHS
3  umbrella?
4      A  No.
5      Q  What was the other clinic?
6      A  Manhattan.
7      Q  Manhattan.  When did Manhattan get
8  transferred?
9      A  July 1st, along with -- they were the two
10 Bellevue clinics.
11     Q  So what was the reason for delaying both
12 of the Bellevue clinics?
13         MS. CANFIELD:  Objection.
14     A  So as an accommodation to Dr. Kaye so she
15 could get her bonus.
16     Q  Just for Dr. Kaye?
17     A  Correct.
18     Q  But why not absorb the Manhattan clinic?
19 I mean, was it Dr. Mundy who was in the Manhattan
20 clinic?
21     A  I don't know that he was in that position
22 already at that time.  Probably -- maybe.  Yes.
23 Actually, he had moved.  He had foregone his
24 retention bonus to take the management position at
25 Manhattan.

Page 227

Patricia Yang

1
2      Q  So you are saying that you did this for
3  Dr. Kaye, but you still didn't absorb the Manhattan
4  clinic.  Why is that?
5          MS. CANFIELD:  Objection.
6      A  I don't understand your question.
7      Q  You said that you did not absorb both the
8  Manhattan and the Bronx clinics because Dr. Kaye
9  wanted to have the retention bonus.
10     A  That's correct.
11     Q  But if Dr. Mundy decided not to go with
12 his retention and longevity bonus -- right?  You are
13 saying he didn't?
14     A  Correct.
15     Q  You said he decided to obtain the
16 managerial title, correct?
17     A  Correct.
18     Q  Then if that was indeed the case, why
19 didn't you take the Manhattan clinic at that time,
20 too?
21     A  Because they were both Bellevue clinics
22 and to disrupt and separate a Bellevue operation
23 twice didn't make sense.
24     Q  Well, but you did do that.
25         MS. CANFIELD:  Objection.

Page 228

Patricia Yang

1
2      A  In one fell swoop.
3      Q  Okay.  So you would rather -- you put off
4  taking the Manhattan clinic to accommodate Dr. Kaye
5  and only Dr. Kaye?
6      A  I postponed taking the clinics from
7  Bellevue so that Dr. Kaye could get her retention
8  bonus.
9      Q  It is your testimony that Dr. Mundy
10 didn't get a retention bonus or a longevity
11 increase?
12     A  I don't know about the longevity, and I
13 don't know about longevity for either, but it is my
14 recollection that Dr. Mundy gave up his retention
15 bonus by taking the management job.
16     Q  Did he give up his longevity?
17     A  I don't know.
18     Q  And are you saying that he gave up his
19 retention?
20     A  That is my recollection.
21     Q  Is there anything in writing to that
22 effect?
23     A  I'm sure there is.
24     Q  Who would know that he gave up his
25 retention?

Page 229

Patricia Yang

1
2      A  My HR staff.
3      Q  So only people who stayed in their title
4  would get the retention; is that your testimony?
5      A  I'm not familiar --
6          MS. CANFIELD:  Objection.
7          THE WITNESS:  Thank you.
8      A  I'm not familiar with the Bellevue
9  contract that gave us permission, but my
10 recollection is that it was specific to certain
11 hospitals in the system, certain services.  I think
12 it may have been psychiatry only.  It may have been
13 others.  But the requirement to get the retention
14 bonus is you had to be on that payroll through the
15 entire fiscal year.
16     Q  So I want to draw your attention back to
17 Exhibit 1, which is the Amended Complaint, the First
18 Amended Complaint.  I think everyone has it.
19         Now, we talked with the shift change
20 earlier.  Now, were all of the directors at all of
21 the centers required to report at a fixed time, to
22 your knowledge?
23     A  The three management positions have
24 greater flexibility.  There is a general
25 understanding that management must be there as long

58 (Pages 226 - 229)

Patricia Yang

1   Patricia Yang
2   and whenever the job requires.
3       Q   Now, you keep saying management versus, I
4   guess, nonmanagerial, which would be Dr. Kaye.
5       A   Correct.
6       Q   Do they all perform the same functions?
7       A   There may be a difference in proportion
8   of clinical work versus administrative work, but
9   there is a blend of both.
10      Q   So let's go back.
11          All of the directors of the centers, you
12  said earlier they were all directors, right?
13      A   They are all using the office title,
14  functional title, of clinical director.
15      Q   If they are all using the functional or
16  office title of clinical directors, wouldn't it
17  stand to reason that they all were doing the same
18  thing, that they all had the same position?
19      A   They all have similar responsibilities,
20  the same responsibilities, but in slightly different
21  proportions possibly, depending on the work load and
22  case loads.
23      Q   Isn't it against the collective
24  bargaining agreement to treat them differently based
25  on work loads?

1   Patricia Yang
2       MS. CANFIELD:  Objection.
3       You can answer.
4       A   I don't think management is collectively
5   bargained.
6       Q   Okay.  Dr. Kaye is under the collective
7   bargaining agreement, and she is performing the same
8   functions as the managers, who are clinical -- which
9   you allege are clinical directors; is that right?
10      A   The job requirement of being the clinical
11  director of the FPECC clinics is the same.
12      Q   So they are all doing 390 and 730 exams;
13  is that right?
14      A   I don't know that everybody is doing 390.
15  I don't know the number of those.  Everybody is
16  doing 730.
17      Q   For certain, everyone is doing 730s?
18      A   That's correct.
19      Q   To your understanding, what are the
20  functions of a clinical director at a clinic, a
21  court clinic?
22      A   To make sure that court-ordered
23  evaluations are done and completed and written up
24  and provided back to the courts.
25      Q   And what other functions do they have?

1   Patricia Yang
2       A   Well, in order to do what I just said,
3   they have to make sure that staffing, appropriate
4   staffing, qualified staffing, are there, that the
5   staff are doing their job, doing high quality work,
6   that they are doing their jobs.
7       Q   Outside of what you testified earlier was
8   Dr. Kaye's decision not to take the managerial
9   title, what, to your knowledge, made her different
10  from the other clinical directors?
11      MS. CANFIELD:  Objection.
12      You can answer it.
13      A   That she didn't want to leave her
14  Attending Physician title.
15      Q   But nothing else?  Not her job functions,
16  not who she reported to, nothing else; is that
17  right?
18      A   In general, the responsibilities are the
19  same.
20      Q   So it is your testimony that they were
21  all performing the same job functions and that they
22  were all clinical directors, but for whatever
23  reason, they were treated -- they were treated
24  differently when it came to coming in and leaving
25  the centers; am I right?

1   Patricia Yang
2       MS. CANFIELD:  Objection.
3       You can answer.
4       A   Because they are not -- they are
5   managers.
6       Q   Dr. Kaye is doing the same thing as the
7   other managers, right?  She is coming in.  She is
8   performing the evaluations.  She is seeing to it
9   that they are completed.  Why is she any different
10  than the other directors?
11      A   Because she chose to stay in a
12  collectively bargained title that has different
13  rules than managers have.
14      Q   Is it because she is in this title that
15  she is required to come in at a certain time, or is
16  it because she is a manager?  She is not a manager.
17      MS. CANFIELD:  Objection.
18      A   They are the same, one and the same.
19      Q   Now, would you be able to testify that no
20  one else had Dr. Kaye's title, Dr. Kaye's
21  nonmanagerial title as a director at the center?
22      MS. CANFIELD:  Objection.
23      A   That's my understanding.
24      Q   You are saying, because she was in the
25  collective bargaining agreement, she couldn't get it

Patricia Yang

1
2 changed, if she asked for a leave under Family
3 Medical Leave Act, right?
4       MS. CANFIELD:  Objection.
5       A  So that's not my purview.  That's a
6 system decision.
7       Q  But you knew that she was complaining
8 about this.  You knew she was complaining at least
9 from the EEOC charge, right?
10      A  Okay.
11      Q  And you also knew she was complaining
12 about this after she filed her lawsuit; is that
13 right?
14      MS. CANFIELD:  Objection.  What is
15 "this"?
16      Q  She was complaining about her hours.
17      A  I was aware that she was complaining
18 about her hours.  Not to me, but yes, I was aware.
19      Q  Why is it that you could not treat her
20 like the other directors?
21      A  Because she is not in a management
22 position.
23      Q  And is that the only reason why she was
24 treated differently, because she wasn't in a
25 management decision?

Patricia Yang

1
2       A  Because she chose to stay in the
3 Attending Physician position, which, under the
4 collectively bargained agreement, requires a
5 physician in that title to work forty-five hours a
6 week.
7       Q  But you are not sure that the other
8 directors were all managers, right?
9       A  I know that they are all managers.  They
10 are all in management titles.  I cannot tell you
11 which specific payroll title that is, but they are
12 in management positions.
13      Q  What determines whether or not they are
14 managers?  Is it their Civil Service title or is it
15 their office title?
16      MS. CANFIELD:  Objection.
17      A  It is their payroll title.
18      Q  Is the payroll title different than the
19 Civil Service title?
20      A  That's a nuance that I don't know that I
21 can answer, but in my lay terms -- and I'm not a
22 labor lawyer, so I am not sure about that.  But in
23 my own mind, a Civil Service title is a unionized
24 title because it is Civil Service, and a payroll
25 title can be management titles and Civil Service

Patricia Yang

1
2 titles.  It is what shows up in your payroll system.
3       Q  Okay.  Who controls the payroll system?
4       A  Health and Hospitals.
5       Q  The payroll system, is it governed by the
6 City of New York?
7       MS. CANFIELD:  Objection.  You can
8 answer.
9       A  I don't know because we are a
10 quasi-benefit corporation.
11      Q  The payroll titles, who creates the
12 payroll titles?
13      A  I don't know the extent to which all of
14 the payroll titles that Health and Hospitals uses
15 are the same as what the City uses.  I know that
16 there are some differences, not every title that
17 Health and Hospitals has, a city or mayoral agency
18 has.
19      Q  Is it there a distinction between the
20 payroll title and the Civil Service title?
21      A  Yes.
22      Q  What is it?
23      A  A Civil Service title is the title that
24 is in the collective bargaining agreement.  A
25 payroll title is the title that shows up in the

Patricia Yang

1
2 payroll system.
3       Q  So are you saying that there are no
4 managers in the Civil Service system?
5       A  In my lay terms.  That's in my mind how
6 it works.  That may not be technically true.
7       Q  So you can't say for a fact whether or
8 not these other physicians have -- you don't know
9 what their Civil Service titles are?
10      A  I don't know what their payroll titles
11 are.
12      MS. CANFIELD:  Objection.
13      Q  Do you know if they have Civil Service
14 titles, these managers?
15      A  In my world, they do not have Civil
16 service titles.  They have payroll titles.
17      Q  You worked for the City of New York
18 throughout your entire career?
19      A  Not throughout.
20      Q  Off and on.  In the '80s, you worked for
21 Health and Hospitals, and you were an analyst.  You
22 testified to that earlier.  You know the difference
23 between a Civil Service title and an office title;
24 am I right?
25      A  Yes.

Patricia Yang

2    Q   And at that time, was there a payroll
3  title when you were working n H and H back in the
4  '80s?
5    A   Was there a payroll title?
6    Q   Yes.
7    A   Yes.
8    Q   So you are saying there is a Civil
9  Service title, a payroll title, and a civil -- a
10  payroll title, a Civil Service title, and an office
11  title. Is that what you are arguing? Are you
12  saying that today?
13    A   I am saying that there is a payroll
14  title, and that payroll title could be collectively
15  bargained, which would be a Civil Service title, or
16  it could be not collectively bargained, and it is a
17  management title.
18    Q   Is there an office title?
19    A   Some people have office titles. Some
20  people like to be directors things or -- yeah.
21    Q   Well, you are senior vice president,
22  right?
23    A   Yes.
24    Q   That would be what, what title is that?
25    A   I am very fortunate that senior vice

Patricia Yang

2  president happens to be both my role and my office
3  title and my management title. I'm one of the few.
4    Q   You are all three things, right?
5    A   Yes.
6    Q   But you are not sure if they are all
7  three things for the other directors of the centers;
8  am I right?
9    A   I know that their office title is
10  clinical director. I do not know their payroll
11  title.
12    Q   And you don't know if they have a Civil
13  Service title?
14    A   I am really -- if I find out that they
15  are union, that would be a surprise.
16    Q   But if they have a Civil Service title,
17  it doesn't necessarily mean they are union.
18    A   In my lay person's view, it is. Civil
19  Service is collectively bargained.
20    Q   I understand in your lay opinion, but not
21  all Civil Service titles are governed by the
22  collective bargaining agreement.
23        MS. CANFIELD: Objection.
24    A   I can't answer that. I'm not a labor
25  expert.

Patricia Yang

2    Q   You were in HR at one point, weren't you?
3  Weren't you over at HR at one point in your career?
4        MS. CANFIELD: Objection.
5    A   Somewhere, yes.
6    Q   So you would be familiar with the
7  distinctions between Civil Service, payroll, and
8  office titles. Wouldn't that be true?
9        MS. CANFIELD: Objection.
10    A   Yes.
11    Q   And so why are you using the term -- I
12  guess -- what is the word -- interchangeably, or at
13  least trying to make a distinction between a Civil
14  Service title and a payroll title when it doesn't
15  necessarily exist?
16        Do you know, is there a document that
17  says that these are the payroll titles for the
18  agency?
19    A   Yes.
20    Q   And what is that document?
21    A   It is the payroll.
22    Q   What is it called?
23    A   Payroll.
24    Q   Now, are you arguing today that the
25  payroll title does not exist in the Civil Service,

Patricia Yang

2  under the Civil Service titles? They don't have --
3  there are no titles in common between the Civil
4  Service and the payroll titles?
5        MS. CANFIELD: Objection.
6    A   I'm not saying that.
7    Q   You are not?
8    A   No.
9    Q   What are you saying?
10    A   I don't know what I am being asked.
11    Q   I am asking -- you are trying to say
12  that, because Dr. Kaye has an Attending Physician
13  title, that she is a Civil Service.
14    A   That is a Civil Service title.
15    Q   And you are saying the Physician
16  Specialist is not?
17        MS. CANFIELD: Objection.
18    A   I don't know -- the Physician Specialist
19  I'm sure is a payroll title. Whether it is a
20  management title or Civil Service title, I cannot
21  answer.
22    Q   Right. You can't for certain justify why
23  they would be allowed to come and go as they please
24  versus Dr. Kaye having to adhere to this schedule.
25        MS. CANFIELD: Objection.

61 (Pages 238 - 241)

Page 242

Patricia Yang

2    A  The clinical directors who are in
3  management payroll titles have different rules of
4  employment and work hours.
5    Q  The Physician Specialist, do you know for
6  a fact they are not governed by the collective
7  bargaining agreement?
8    A  I know this is really frustrating for
9  you.
10    Q  I'm not frustrated at all.
11    A  Good.  Good.  I feel frustrated then.
12    Q  Okay.  Sure.
13    A  Physician Specialist, I cannot tell you
14  if it is a management title or a collectively
15  bargained title.
16    Q  What about the physicians?  Are they
17  collective bargaining or a management position?
18    A  The Attending Physician?
19    Q  No, just physician.
20    MS. CANFIELD:  Objection.
21    A  It depends.
22    Q  It depends on what?
23    A  It depends on which title they are in.
24    Q  Now, I am going to switch up topics.
25    When Dr. Kaye filed her EEOC charge, at

Page 243

Patricia Yang

2  any point, did you say that you were miffed about
3  her filing the complaint?
4    A  Yes.  I was miffed.  I said earlier this
5  morning that I -- yeah.  I don't know if I used the
6  word miffed, but yeah.
7    Q  Now, Dr. Kaye alleges, because you were
8  miffed, her shift changed.
9    A  That's absolutely not true.
10    Q  So why did it change after she filed her
11  EEOC charge?
12    MS. CANFIELD:  Objection.
13    A  I don't believe that happened.
14    Q  She alleges that she filed her EEOC
15  charge in May, and by August, her shift changed,
16  even though she had been promised that it would not
17  change.
18    A  It may have been the timing of correction
19  because, again, before the court clinics came over
20  to us, they just operated without any support or
21  supervision, and it goes both ways.  So while they
22  got support and resources, they also had
23  accountability.
24    Q  Okay.  Now, you alleged earlier that,
25  when the transition to the clinics came over, that

Page 244

Patricia Yang

2  people who were transitioning from Corizon over, or
3  at least -- well, at that point, you guys were
4  absorbing all of the clinics.
5    Basically, none of her conditions of
6  employment would change, that's what Dr. Kaye
7  alleges happened, that you and Mr. Wangel assured
8  her that the conditions of her employment would be
9  the same.
10    MS. CANFIELD:  Objection.
11    You can answer.
12    A  I believe what we assured people, apart
13  from telling them the benefits of the consolidation
14  of management, was that there wasn't going to be a
15  change in their titles or their salaries or their
16  work locations, unless they wished it.
17    Q  Well, she didn't wish any change.  She
18  didn't want any change but, in fact, it did change.
19    MS. CANFIELD:  Objection.
20    A  My understanding is that it was -- the
21  issue that came up, that surfaced, was that she was
22  not -- her workday was not in compliance with her
23  title, her work hours.
24    Q  At some point, there were e-mail
25  exchanges between Dr. Kaye and Mr. Wangel and

Page 245

Patricia Yang

2  yourself asking for clarification as to what her
3  conditions would be like once she moved from
4  Bellevue over to CHS, and in these e-mail exchanges,
5  Dr. Kaye was assured she would continue to have the
6  same hours, same working conditions, nothing would
7  impact -- she had a whole laundry list of things.
8  She was trying to ensure that everything was the
9  same.  Did you ever see any e-mails to that effect?
10    A  I may have.
11    Q  And at that time, Dr. Kaye was assured
12  that nothing would change.  Why would she be told
13  one thing at that time, and then be switched over?
14  Why would she have to be subjected to a change?
15    MS. CANFIELD:  Objection.
16    You can answer.
17    A  I am conjecturing that neither she nor we
18  were aware that her work hours were not in
19  compliance with the collectively bargained
20  parameters of her title.
21    Q  Who brought that to your attention?  Why
22  was it a deal -- she said she was the only one in
23  that title.  Why does she have to be compliant with
24  the collective bargaining agreement and no one else?
25    A  Because she was the only one in that

62 (Pages 242 - 245)

1           Patricia Yang
2 title.
3      Q   Even still, she was still doing the same
4 work as the other directors.
5      A   Right.
6      Q   Right?
7      A   In a different title.
8      Q   But still the same work?
9      A   Similar.  Similar overall
10 responsibilities.
11     Q   I mean, in essence, could you have argued
12 that she was working out of title since the other
13 directors were in managerial titles and doing
14 managerial work, and she was in a title in the
15 collective bargaining agreement and was doing
16 managerial work?
17         MS. CANFIELD:  Objection.
18     A   I am not sure.  I would have to consult
19 with my labor folks as to whether Attending
20 Physician III includes the right balance of
21 managerial work, or supervisory work, I should say.
22     Q   Why wouldn't she be a supervisor?
23 Dr. Kaye was working as a director longer than the
24 other directors.  She was at the clinic since 1999.
25 Are you aware of that?

1           Patricia Yang
2         MS. CANFIELD:  Objection.
3      A   No.
4      Q   So you didn't know that Dr. Kaye had been
5 there before the other clinic directors?
6         MS. CANFIELD:  Objection.
7         You can answer.
8      A   We talked about that this morning.  I
9 didn't know when Dr. Owens started at Kings County,
10 and I didn't know when Dr. Kaye started at Bellevue.
11 They were not my employees.
12     Q   But at the same time, you had to know
13 that she had more experience than the other
14 directors, right?
15     A   I didn't have to.
16         MS. CANFIELD:  Objection.
17     A   I did not have to know that.
18     Q   At some point, Dr. Kaye wrote a letter to
19 you laying out what she complained.  She talked
20 about that she had been a court evaluator since
21 1999.  Did you know of anyone else who had been a
22 court elevator since 1999 at the clinic?
23         MS. CANFIELD:  Objection.
24     A   No, and I didn't ask.  I didn't see that
25 as relevant.

1           Patricia Yang
2      Q   Why wouldn't you think it is relevant?
3 If you had someone who had been there since the
4 inception of the clinics at your disposal, why
5 wouldn't you think that that was relevant?
6         MS. CANFIELD:  Objection.
7      A   Because I have HR staff that look at
8 these things.
9      Q   Still, she is a resource.  You are still
10 learning about the clinics themselves; am I right?
11     A   I am always learning about everything.
12     Q   Why wouldn't you go to the person who
13 would have the most knowledge about these clinics?
14         MS. CANFIELD:  Objection.
15     A   Because I have Dr. MacDonald and Dr. Ford
16 and Dr. Jain.
17     Q   Well, Dr. MacDonald isn't a psychiatrist
18 or psychologist.  You said he was an internist.
19 Didn't you say that?
20     A   Yes, and he is.
21     Q   So how would he know what was going on
22 with the court clinics if he never has performed a
23 forensic exam in his career?
24         MS. CANFIELD:  Objection.
25     A   At senior level of leadership and

1           Patricia Yang
2 management, you don't have to have the technical
3 expertise.  That's why you hire.  You have larger
4 context to bring forward.  You have critical
5 inquiry.  You have judgment.  You have experience.
6 All of those things matter.
7      Q   Now, you are saying also that -- well,
8 earlier, we talked about Dr. Ford's experience and
9 background, and you said she had more of a clinician
10 and evaluatory; am I right?  A treating background;
11 am I right?
12         MS. CANFIELD:  Objection.
13         You can answer.
14     A   I don't recall if those were my exact
15 words with you.  Yes, she is a forensic
16 psychiatrist.
17     Q   Had you ever known Dr. Ford to ever do a
18 forensic exam?
19     A   Not under my employment.
20     Q   Did you know Dr. Ford ever did one?
21     A   I believe she did.
22     Q   Now --
23     A   Or certainly ran a program.
24     Q   Now, would it surprise you that Dr. Kaye
25 had been there before Dr. Ford performing these

63 (Pages 246 - 249)

Page 250

Patricia Yang

1
2 forensic evaluations?
3        MS. CANFIELD:  Objection.
4        A  I am not sure that I would be surprised
5 or not surprised.
6        MS. HAGAN:  I am going to show you what
7 is marked Plaintiff's Exhibit 11.
8        (Whereupon, a discussion was held off
9 the record.)
10       (A two-page e-mail, dated May 3, 2018,
11 from Dr. Kaye to Dr. Yang was received and
12 marked Plaintiff's Exhibit 11 for
13 identification at this time.)
14       MS. CANFIELD:  Thank you.
15       MS. HAGAN:  When you are finished
16 reading it, I have some questions for you.
17       THE WITNESS:  Yes.  It is the same thing
18 as Exhibit 10.
19       MS. HAGAN:  It is not, actually.
20 Exhibit 11 is different.  The e-mail is
21 actually just to you.
22       Unfortunately, there are no Bates stamps
23 on it, but it is from --
24       MS. CANFIELD:  It is the same as --
25       THE WITNESS:  It is the same.

Page 251

Patricia Yang

1
2        MS. CANFIELD:  It is the same as page
3 two.
4        MS. HAGAN:  Let's look at Exhibit 11,
5 because this is just the complaint
6 specifically.  10 has more to it.
7        Q  Now, 11 is a complaint from Dr. Kaye to
8 you; is that right, Dr. Yang?
9        A  Yes, that's right.
10       Q  And it is dated May 3rd, 2018.  Let's
11 start with the last paragraph.
12       Earlier, you said that Dr. Kaye did not
13 want to be in the Physician Specialist line; is that
14 right?
15       MS. CANFIELD:  Objection.
16       That's not right.
17       Q  You said that she didn't -- well, you
18 said that she didn't want to be in a managerial --
19       A  She did not want to be in the management
20 title as the director of the clinic when the clinics
21 came over to us.
22       Q  You said that she didn't want her title
23 to be changed because she would be out of the
24 collective bargaining agreement; is that right?
25       MS. CANFIELD:  Objection.

Page 252

Patricia Yang

1
2        That's not what she testified to.
3        Q  Keep going.  You couldn't testify -- you
4 couldn't assert whether or not Dr. Mundy was a
5 Physician Specialist; is that right?
6        A  Because I don't know the title of
7 Physician Specialist.  That's correct.
8        Q  In this last paragraph, Dr. Kaye says:
9        "I have been trying for years to rectify
10 this and believe this problem needs to be corrected,
11 since it is unlawful to pay me less because I am a
12 woman.
13       "I request my line to be changed to
14 Physician Specialist with retention of all of my
15 current benefits, union membership, pension, et
16 cetera, with the consummate increase in compensation
17 equal to or higher than my male colleagues."
18       Now, first and foremost, could that be
19 done?
20       MS. CANFIELD:  Objection.
21       A  I'm not the labor expert, not the HR
22 expert.
23       Q  To your knowledge, could she have been
24 changed to Physician Specialist?
25       A  I am not the HR expert to determine

Page 253

Patricia Yang

1
2 qualifications.
3        Q  Did you ask anyone whether or not
4 Dr. Kaye's title could be changed to Physician
5 Specialist?
6        A  No, because what we posted -- and I don't
7 know the payroll title of the clinical directors for
8 the FPECC clinics when we took them over.
9        Q  You don't know if any one of them were
10 Physician Specialists?
11       MS. CANFIELD:  Objection.
12       You can answer.
13       A  Correct.
14       Q  Okay.  Now, she mentions is this in
15 e-mail twice that she has been a court elevator
16 since 1999, at least twice.
17       At no point did you think, perhaps, you
18 should engage Dr. Kaye as a resource or at least to
19 learn more about the court clinics?
20       Because you said at one point you engaged
21 Dr. Owens, but you didn't engage Dr. Kaye; is that
22 right?
23       MS. CANFIELD:  Objection.
24       A  Dr. Owens was the one that attended the
25 MOCJ meetings.

64 (Pages 250 - 253)

Page 254

Patricia Yang

1
2    Q   Why Dr. Owens and not Dr. Kaye?
3    A   You'd have to ask her.
4    Q   Ask who?
5    A   Dr. Owens.
6    Q   You don't make a determination as to who
7  goes to MOCJ?
8    A   They didn't -- they weren't working for
9  me.
10   Q   At this point, right now, who goes to the
11 MOCJ meetings from the court clinics?
12   A   I don't think that these meetings are
13 still happening.
14   Q   They are not?
15   A   I don't know.
16   Q   But you knew for a fact at that time that
17 Dr. Owens was going to these meetings?
18   A   I know that because, the one or two times
19 I went, she was there.
20   Q   And you've never been again?
21   A   I have not.
22   Q   Okay.  Again, you don't really know the
23 difference between what Dr. Kaye was doing at her
24 clinic versus what the other directors were doing,
25 do you?

Page 255

Patricia Yang

1
2        MS. CANFIELD:  Objection.
3        You can answer.
4    A   Do I really know what Dr. Kaye was doing?
5  Compared to the others?
6    Q   Yes.
7    A   Correct.  They all needed to run their
8  clinics.
9    Q   Again, you have been HR off and on
10 throughout your career.  Why is it that you didn't
11 insist or at least check to see if Dr. Kaye was
12 working out of title as an Attending Physician?
13       MS. CANFIELD:  Objection.
14   A   Because I asked my HR people to do that.
15   Q   You did.  Who did you ask?
16   A   That would have been somebody under Jess
17 Laboy's or Jonathan Wangel's shop, depending when
18 that was.
19   Q   Did they get back to you?
20   A   Yes.
21   Q   And what did they say?
22   A   That everything looked good.
23   Q   Who said that everything looked good?
24   A   I think probably Wangel or Laboy.
25   Q   Did you get something from them in

Page 256

Patricia Yang

1
2  writing that said that Dr. Kaye was not working out
3  of title?
4    A   No.
5    Q   So you are not -- so how are you -- were
6  you told verbally that she wasn't working out of
7  title?
8    A   When the clinics were coming over to us,
9  it was brought to my attention she did not want to
10 take the management position and she wanted to stay
11 in her collectively bargaining title, and that there
12 would be -- that could be accommodated, if I wanted
13 to grant that.
14       That is the end point of analysis done by
15 the HR people as to qualifications and job scope.
16   Q   I understand that you said that that was
17 the end all.
18   A   End point.
19   Q   End point.  But the things is, you had
20 three other directors, who were managers, performing
21 the same job functions, and Dr. Kaye doing something
22 completely different, doing the same thing with a
23 completely different title, a lesser title.
24       MS. CANFIELD:  Objection.
25   A   I don't think it was a lesser title.  It

Page 257

Patricia Yang

1
2  was an accommodation to her.
3    Q   Well, she couldn't come and go as she
4  pleased as she wanted.
5    A   Her staying in her title was an
6  accommodation to her.
7    Q   You said that she could not go -- she
8  could not have the hours she wanted, which was the
9  nine to five with a half hour lunch.
10   A   The collectively bargained title that she
11 is in requires a forty-five-hour work week with a
12 one hour lunch each day.
13   Q   Even if she asked for reasonable
14 accommodations, they could not accommodate her?
15       MS. CANFIELD:  Objection.
16   A   I believe all her requests were forwarded
17 to central for review.
18   Q   Okay.  Are you aware of the reasonable
19 accommodation process?
20       MS. CANFIELD:  Objection.
21   A   Yes.  Generally, yes.
22   Q   Okay.  What is it?
23   A   I refer the matter over to my staff to
24 review.  They work with the central office people as
25 to whether it is reasonable or not, provide

65 (Pages 254 - 257)

Patricia Yang

1     information, documentation, and a decision is given.
2
3        Q   Do you know what the standard is under --
4     do you know what the standard is in determining
5     whether or not be it is a reasonable accommodation?
6        A   Not specifically enough to describe.
7        Q   Would you know whether or not the
8     standard was whether or not it was an undue hardship
9     to the clinic?
10       A   I think that's part of the calculation.
11       Q   Would it have been an undue hardship to
12    the clinic if Dr. Kaye had a thirty-minute lunch
13    versus an hour lunch?
14          MS. CANFIELD:  Objection.
15       A   I can't speak to what led to the
16    decision.
17       Q   What I am asking you is, would it have
18    been an undue hardship if she just had thirty
19    minutes versus an hour for lunch?
20          MS. CANFIELD:  Objection.
21       A   I'm not close enough to the operation to
22    know that.
23       Q   Ultimately, you can make a determination;
24    am I right?  You can say whether or not she can have
25    the accommodation; am I right?

Patricia Yang

1
2        A   Based on the recommendation and review of
3     everyone else.
4        Q   But you have the ultimate say so.
5        A   I'm not sure on reasonable accommodations
6     that I do.  I think the system does.
7        Q   Who is the system?  Who is in that
8     system?
9        A   Health and Hospitals, whoever my staff
10    deals with on these.
11       Q   Who is the most senior person?  Who makes
12    the determination?  I'm sure Dr. Kaye is not the
13    only person who asked for reasonable accommodation
14    since you have been this capacity.
15          Who makes the determination?  Is it the
16    EEO officer?
17       A   I don't know that it is the EEO officer.
18    I think the EEO might come into it if it is an EEO
19    issue.  It doesn't have to be reasonable
20    accommodation.  It could be -- I believe it is
21    someone in HR.
22       Q   In this instance, she asked for
23    reasonable accommodation twice.  She asked for
24    reasonable accommodations to take care of her son,
25    and she also asked for reasonable accommodation for

Patricia Yang

1
2     herself, and in both instances, she was denied.  Are
3     you aware of that?
4          MS. CANFIELD:  Objection.
5        A   I am not aware of that.
6        Q   Are you aware of her being denied for her
7     son?
8          MS. CANFIELD:  Objection.
9        A   I'm not aware of that.
10       Q   You don't know that Dr. Kaye had a son
11    with a skin ailment?
12       A   With a what?
13       Q   A skin ailment.
14       A   No.
15       Q   It was never brought to your attention
16    that Dr. Kaye said that the shift change she is
17    experiencing was having a deleterious effect on her
18    family?
19       A   I am aware she asked for an accommodation
20    that was handle by my staff with the people in
21    central office.
22       Q   Do you recall your staff ever telling
23    Dr. Kaye that the reasonable accommodation process
24    does not apply to her family members, but just to
25    her as an employee?

Patricia Yang

1
2        A   I wouldn't get involved in that.
3        Q   Even though she had complained to you and
4     cc'd you on numerous e-mails regarding reasonable
5     accommodation requests to take care of her son?
6          MS. CANFIELD:  Objection.
7        A   I have great faith in my leadership team.
8     They know their work.  They know their job.  They
9     are very expert in it.
10       Q   But you have someone who is making EEO
11    complaints.  You said that, when she talked about
12    pay disparity, you bounced it back to Mr. Hicks,
13    right?
14       A   I object.  I can object to that?
15       Q   You can't object.
16          MS. CANFIELD:  I object.
17       Q   You can say -- you can ask that I
18    rephrase it, but you wouldn't object.
19       A   Okay.  I would ask that that
20    characterization be reframed.
21       Q   You said the pay equity issues fell under
22    Bellevue.  You said that, right?
23       A   That's correct.
24       Q   And that's why you didn't deal with her
25    EEO equal pay claim, right?

66 (Pages 258 - 261)

Page 262

```
1            Patricia Yang
2       MS. CANFIELD:  Objection.
3     A   That's why I didn't deal with it
4  directly.  I did deal with it in that I referred it
5  to Mr. Hicks, who is in charge of resolving and
6  investigating it, and I also did ultimately let Miss
7  Greenfield know so that she was aware, since this
8  was not my issue, but it was a system issue.
9     Q   But you said clearly in this e-mail,
10 Exhibit 10, that you are dumping BHC into the soup.
11    "I don't know and I don't want to know
12 what they did to address her EEOC issues."  That's
13 what you said.
14    A   That's correct.
15    Q   So how does that translate into you
16 dealing with it?
17       MS. CANFIELD:  Objection.
18    A   I deal with it in that I referred it to
19 the top person who could investigate and resolve the
20 matter.
21    Q   But you --
22    A   Not to me.
23    Q   You clearly say, "I don't know and don't
24 want to know."  How does that equate with you saying
25 that you referred it and that you addressed this
```

Page 263

```
1            Patricia Yang
2  issue, if you referred it elsewhere?
3       MS. CANFIELD:  Objection.
4     A   Out of respect for my colleague at
5  Bellevue, which it was referred to him.  He said he
6  was on it.  I followed up with him.  He said it was
7  resolved, taken care of.  That was it.
8       I didn't need to know the details of
9  it.  It wasn't my business.  I wouldn't want
10 somebody else in another facility getting into mine.
11    Q   But she continued to complain when she
12 worked for you.
13       MS. CANFIELD:  Objection.
14    A   Not to my knowledge, not about that,
15 which is when I was, as you said, miffed when the
16 EEO complaint came, because it was about the
17 Bellevue condition, which precedes her employment
18 with me.
19    Q   But she also complained about the shift
20 change, too, in the EEOC complaint.
21    A   Which is a different issue.
22    Q   Again, you don't address that either.
23    A   My staff did.
24    Q   And who was your staff?
25    A   Probably Mr. Wangel at the time.
```

Page 264

```
1            Patricia Yang
2     Q   But when there are EEO complaints, are
3  you saying that Mr. Wangel is the most senior person
4  and he makes the decision as to whether or not or
5  how EEO complaints are dealt with?
6       MS. CANFIELD:  Objection.
7       You can answer.
8     A   Mr. Wangel at that time, and now Jessica
9  Laboy or her staff, will work with the system's EEO
10 officer -- frankly, I can't remember his name -- and
11 they resolve those.
12    Q   In Exhibit 10 -- I am going to draw your
13 attention to Exhibit 10.  This is from Mr. Wangel to
14 you.
15    A   Yes.
16    Q   On the first page, Mr. Wangel clearly
17 says, "This is EEO.  Strongly suggest Blanche be
18 looped in."  Right?
19    A   Correct.
20    Q   That doesn't sound like someone who has
21 final say over the EEO issue in the unit; am I
22 right?
23       MS. CANFIELD:  Objection.
24       You can answer.
25    A   Correct.  He was telling me this is an
```

Page 265

```
1            Patricia Yang
2  EEO issue for Bellevue, and suggested that I loop
3  Blanche in because it is not our issue.  It is a
4  system issue; i.e., it is another facility within
5  the system.
6     Q   He didn't say anything about Bellevue
7  here?
8     A   I know that, but I was there in the
9  conversation.
10    Q   But there is no conversation.  He is not
11 mentioning anything about Bellevue, and there is no
12 written document where Mr. Wangel is deferring to
13 Blanche because it is an EEO -- a Bellevue issue.
14 He is deferring to Blanche because it is an EEO
15 issue.
16       MS. CANFIELD:  Objection.
17       You can depose Mr. Wangel and find out
18 what he --
19       MS. HAGAN:  Sure.
20    Q   But am I right?  You can't tell from this
21 document here the reason why he is deferring to
22 Blanche; am I right?
23       MS. CANFIELD:  Objection.
24    A   Can you repeat the question?
25    Q   From this document -- there is nothing on
```

67 (Pages 262 - 265)

Page 266

1           Patricia Yang
2  this document that says Mr. Wangel is deferring to
3  Blanche because it is an EEO issue; am I right?
4      A   He is saying, "This is an EEO issue," and
5  he is suggesting that I make Blanche aware that this
6  is going to Bellevue.
7      Q   And you also know, it says nothing about
8  him making Blanche aware that you are going to
9  Bellevue.  He never says that here in this e-mail.
10         He just says, "This is EEO.  Strongly
11 suggest Blanche be looped in," period.
12         You then say, "I can do that, but then I
13 am dumping BHC into the soup."
14         So it doesn't mean that necessarily
15 because Blanche has been looped in that it is a
16 Bellevue issue.
17         You are saying then, after you do that,
18 you are going to dump BHC into the soup.  That's
19 what you are saying in this e-mail.
20         MS. CANFIELD:  Objection.
21         You can answer.
22     A   So you can see below my draft e-mail is
23 referring the matter -- telling Dr. Kaye that I am
24 referring the matter to Bellevue.
25     Q   I will read what you have here.

Page 267

1           Patricia Yang
2      A   Please do.
3      Q   Okay.  "In the meantime, and we should
4  brainstorm for July, but not with the entire FPECC
5  crew.  I propose to send her this reply below and
6  separately sanitize her e-mail, and send to Bill,
7  and copy her, removing editorial and elephantine
8  quotes."  Right?
9          You say, "Dr. Kaye:  Thank you for
10 bringing your concern to my attention.  As you know,
11 the decision was made to postpone bringing the Bronx
12 court clinics into Correctional Health Services
13 until July 1st, 2018, specifically so that you would
14 be an employee of Bellevue through June 30th, and,
15 therefore, eligible to receive the retention bonus.
16         "As such, I will convey these serious
17 concerns and your request to the attention of
18 Mr. William Hicks, CEO of Bellevue.
19         "In the interim, we ask at CHS will
20 investigate possibilities for ensuring equitable and
21 appropriate remuneration in anticipation of the July
22 move."
23         Now, was that done?
24     A   Yes.
25     Q   What happened?

Page 268

1           Patricia Yang
2      A   Her desire to stay in the Attending
3  Physician III title could be accommodated, and her
4  salary was fine.
5      Q   Where was this?  Is this in writing that
6  her salary was fine at this point?
7      A   Yes.  I don't know if it was in writing
8  or not, but that's what my staff did.
9      Q   Did Dr. Kaye ever say to you she was fine
10 with her salary as it was after this e-mail?
11     A   I don't recall.
12     Q   Let me make sure I am clear with the
13 question.
14         Did Dr. Kaye ever tell you that, after
15 she complained on May 3rd, 2018, that she was fine
16 with how the salary disparity had been resolved?
17     A   No, but she didn't send me another
18 complaint, which is why I was miffed when the EEOC
19 complaints came in.
20     Q   Well, she said -- there was an EEOC
21 charge.  At that point, clearly, this is within the
22 same month, right?
23         MS. CANFIELD:  Objection.
24     A   I don't think so.
25     Q   You don't think -- it was in August of

Page 269

1           Patricia Yang
2  2018.  So clearly, now she is on your payroll.  She
3  is now -- now, she is now part of CHS, correct?
4      A   Correct.
5      Q   She has filed now an EEOC charge against
6  you now because now she is working for you, right?
7      A   Correct.
8      Q   At any point, did you say, "Now she has
9  brought me into this, Bill"?
10     A   I'm sorry?
11     Q   Did you ever say, "Bill, she has brought
12 me into this," as in Mr. Hicks?
13         MS. CANFIELD:  Objection.
14     A   I referred -- that was when I was miffed,
15 and I sent the EEOC complaint to Bill, Mr. Hicks,
16 and to Miss Greenfield, saying I thought this was
17 taken care of.
18     Q   Did you ever say, "Now she has brought me
19 into this"?
20     A   Brought me into this?
21     Q   As far as her pay disparity issues.
22 Didn't you ever say something like that?
23         MS. CANFIELD:  Objection.
24         Do you have something to refresh her
25 recollection?

68 (Pages 266 - 269)

Page 270

Patricia Yang

1
2      MS. HAGAN:  I am asking her from her
3  recollection.
4      A  I don't recall.
5      Q  You don't recall.
6          Now, at the same time, you say that you
7  don't recall whether or not you felt that way, but
8  you were miffed because you felt like it was
9  resolved.
10     A  Right.
11     Q  But then you also say, "In the interim,
12  we at CHS will investigate possibilities for
13  ensuring equitable and appropriate remuneration in
14  anticipation of the July move."
15         You said that the only option she had to
16  be paid like the other medical directors -- the
17  other directors, other clinical directors, as you
18  said, would be to have her be out of the collective
19  bargaining agreement.
20     MS. CANFIELD:  Objection.
21     A  I don't think I said that.
22     Q  You said she couldn't be in a union title
23  if she was going to be paid the same as the other
24  directors, right?
25     MS. CANFIELD:  Objection.

Page 271

Patricia Yang

1
2      A  I don't recall saying that.
3      Q  Could she stay in a union title and be
4  paid the same as the other union directors -- I
5  mean, the other clinical directors?
6      MS. CANFIELD:  Objection.
7      A  I believe, at that point in time, my
8  staff reviewed this.  They were -- there was parity.
9      Q  I am asking you if she could have stayed
10  in a union title of any kind and been paid the same
11  as the other clinical directors?
12     MS. CANFIELD:  Objection.
13     A  And I will tell you, again, that my
14  understanding from my staff was that, at the time of
15  that transfer, her desire to stay as an Attending
16  Physician III meant that she could still do the job
17  without being out of title, and her pay was parous
18  with the managing jobs.
19     Q  But she doesn't say that she wants to
20  stay as an Attending III.
21     MS. CANFIELD:  Objection.
22     Q  She asks specifically in Exhibit 11, on
23  the last page, that her line be changed to Physician
24  Specialist.
25     A  And this is at Bellevue, and Bellevue

Page 272

Patricia Yang

1
2  said -- I believe Bellevue took care of it.  I don't
3  know how they took care of the pay issue.
4      Q  But no.  She asked to be a Physician
5  Specialist.
6      A  And that's not my decision.
7      Q  Why couldn't you make her a Physician
8  Specialist while she was under your tutelage?
9      A  I'm not aware that she has to be a
10  Physician Specialist and, again, I don't know what a
11  Physician Specialist is, but I am not aware that she
12  has to be that as FPECC under CHH.
13     Q  So she would have had to make the request
14  again.  Is that what are you saying?
15     A  Yes.
16     Q  Okay.  And even with the EEOC charge, you
17  are saying that you couldn't have found a union
18  title for Dr. Kaye for her to be paid at the same
19  rate as the other directors of the centers?
20     MS. CANFIELD:  Objection.
21     A  That wouldn't be my technical expertise,
22  but my staff, who did look at the issue, said that
23  her being able to stay in the title she was in,
24  which is a collectively bargained title, she could
25  still do the work, not be out of title, and there

Page 273

Patricia Yang

1
2  was parity in pay.
3      Q  Is there something in writing that has
4  those points that you just said?
5      A  I don't know.
6      Q  Could you say today that you know for a
7  fact that Dr. Kaye did not ask to be a Physician
8  Specialist while she was under your management?
9      A  I am not aware.
10     Q  Okay.  But you can't say for a fact that
11  she didn't ask for that?
12     MS. CANFIELD:  Objection.
13     Q  Again --
14     A  I can only say I am not aware.
15     Q  Well, no.  I am going to ask you -- you
16  don't know.  The thing would be that you don't know.
17  Wouldn't that be the answer?  You don't know if she
18  asked for it?
19     MS. CANFIELD:  Objection.
20     A  I don't recall.
21     Q  You said you can't recall or you don't
22  know?
23     A  I don't recall hearing about that.
24     Q  Okay.  At no point did you speak to
25  Dr. Kaye, with someone who has been complaining, has

69 (Pages 270 - 273)

Page 274

Patricia Yang

2 been writing everyone about her problems.  You never
3 felt compelled to speak to Dr. Kaye?
4        MS. CANFIELD:  Objection.
5    A   Correct.
6    Q   Why not?
7    A   Because I knew everybody else was.
8    Q   Who is everybody else?
9    A   Her supervisor, her supervisor's
10 supervisors, her supervisor's supervisor's
11 supervisors, and also the HR people and the labor
12 people.
13    Q   But you never say, "Look, clearly there
14 is all of these e-mails going on.  Why don't I speak
15 to Dr. Kaye?"
16        She has filed an EEO complaint at least
17 once.  You don't ask her any questions.  You don't
18 decide you are going to call or find out what is
19 going on with the EEO investigation or anything?
20        MS. CANFIELD:  Objection.
21    A   Not directly with the complainant.
22    Q   But you have no EEO officer at CHS; is
23 that right?
24        MS. CANFIELD:  Objection.
25    A   That's not the way the corporation is

Page 275

Patricia Yang

2 structured.
3    Q   Do you have an EEO representative or
4 anybody that is known as an EEO person at CHS?
5        MS. CANFIELD:  Objection.
6    A   It is widely known who to go to if you
7 have issues, concerns about your own, about other
8 people, if there are employee issues, if there are
9 colleague issues.  People know where to go.
10    Q   You mentioned Miss Laboy was that person,
11 right?
12    A   Currently, yes.
13    Q   Does she have the title?  Does she have
14 EEO in her title anywhere?
15    A   She is the liaison to the system's EEO
16 officer.
17    Q   Is Miss Laboy referred to anywhere in
18 writing as the EEO liaison?
19    A   Not specifically, but nor do I list every
20 other thing she is responsible for.
21    Q   How would I know that Miss Laboy, outside
22 of word of mouth, was the EEO liaison that you are
23 referencing?
24    A   Common sense, common knowledge.
25    Q   How many people work at CHS?

Page 276

Patricia Yang

2    A   1,700.
3    Q   And you mean to tell me that all 1,700
4 people just common sense would know that she is the
5 EEO officer?
6    A   She is not the EEO officer.  She is the
7 person to whom you would raise issues about your
8 own, about FMLA, EEO, within her shop.  Not even
9 necessarily Jessica herself.  And that they are the
10 liaison, as appropriate, to the rest of the system.
11    Q   Okay.  So what is the process for filing
12 a complaint with CHS?  Is there a complaint form?
13    A   People can e-mail.  People can call.
14    Q   Who is responsible for putting documents
15 in place for the EEO office, EEO complaints?
16    A   HR.
17    Q   In CHS?
18    A   Correct.
19    Q   And that would be Miss Laboy?
20    A   Her shop.
21    Q   And do you know for a fact that she has
22 or has not done something like that?
23        MS. CANFIELD:  Objection.
24        You can answer.
25    A   Do I know for a fact --

Page 277

Patricia Yang

2    Q   If she has put an EEO policy in place for
3 CHS?
4    A   We follow the system's policy.
5    Q   Who is the system?
6    A   Health and Hospitals.
7    Q   Okay.  So if you follow the system, who
8 is the EEO person for the system?
9    A   I don't remember his name who is assigned
10 us to, but Jessica would know and who necessarily
11 works for Jessica would know.
12    Q   At any point, there are no e-mails from
13 Dr. Kaye to, let's say, Miss Laboy.  You do notice
14 that, right?
15        MS. CANFIELD:  Objection.
16    A   I don't know.
17    Q   The e-mails we went over today, right,
18 none of them are addressed to Miss Laboy from
19 Dr. Kaye, at least not --
20        No, none of them are.
21        And you said it is common sense.
22 Clearly, Dr. Kaye doesn't know that Miss Laboy is
23 the EEO person.
24        MS. CANFIELD:  Objection.
25        She didn't even work there yet.

70 (Pages 274 - 277)

Patricia Yang

2  A  Correct.
3  Q  Keep going.
4  A  Miss Laboy was not in that position at
5 that time.  It was Jonathan Wangel.
6      Q  So are you saying, at the time,
7 Mr. Wangel was the EEO person?
8      A  He was the person within Correctional
9 Health Services to whom you would bring issues like
10 EEO.
11     Q  But clearly in Exhibit 10, he is saying,
12 "This is EEO.  Strongly suggest Blanche be looped
13 in."
14     A  For two different reasons.  He is saying
15 that this is EEO, and he is saying that we need to
16 let Blanche know for her awareness.  This was going
17 to Bellevue to handle.
18     Q  Well, Mr. Wangel was your direct report,
19 right?
20     A  Correct, for a while.
21     Q  And if he was dealing with EEO issue,
22 wouldn't you be monitoring whether or not he was
23 actually investigating these complaints or resolving
24 these complaints or anything like that?
25     A  Yes, I would.

Patricia Yang

2      Q  So in this instance, why is it that he is
3 just -- why is he saying that we should go to
4 Blanche or loop Blanche in?
5      A  He was suggesting --
6          MS. CANFIELD:  Objection.
7      A  -- that I give Blanche a heads up that
8 this was going on.
9          This was going to Bellevue.  This was an
10 EEO Bellevue issue, not a CHS EEO issue.
11     Q  You would not ever check -- it is your
12 testimony that you would never monitor or follow
13 Mr. Wangel to see if he investigated this complaint,
14 the complaint involving the pay parity?
15         MS. CANFIELD:  Objection.
16     A  Correct, because it was not for
17 Mr. Wangel or me to investigate.
18     Q  Now, later on down the line, Dr. Kaye,
19 she files another complaint.  She files the EEO --
20 well, she seeks a reasonable accommodation, which
21 falls under EEO, right?
22         So at that point it would probably fall
23 under Miss Laboy; is that right?
24         MS. CANFIELD:  Objection.
25     A  Or Wangel at that point in time.  Depends

Patricia Yang

2 on when.
3      Q  Did you find out whether or not either
4 Mr. Wangel or Miss Laboy actually addressed the
5 reasonable accommodation, that they actually
6 followed through with the request and reported to
7 you?
8      A  Yes.
9      Q  Is there something in place either that
10 Mr. Wangel or Miss Laboy actually authored
11 themselves that is reflective of a reasonable
12 accommodation process?
13         MS. CANFIELD:  Objection.
14     A  I don't know.
15     Q  But this is someone who -- these two
16 people report to you, and this is something that is
17 integral to the organization.  Would you say that
18 having an EEO person or having an EEO policy is
19 important.
20     A  Of course, it is.
21         MS. CANFIELD:  Objection.
22     Q  So why is it that you are not sure, one,
23 who the EEO officer is for the organization --
24 right?
25     A  I don't know his name.

Patricia Yang

2      Q  But it is important though, right?
3      A  What is important is that my staff know
4 his name.
5      Q  But you should know his name, too.
6         MS. CANFIELD:  Objection.
7      A  I disagree.
8      Q  You don't believe -- you believe it is
9 important, but you don't think it is important
10 enough to know who the EEO officer is?
11         MS. CANFIELD:  Objection.
12     A  I know that my staff work with him all
13 the time.  I know that he is good.  He reports up to
14 the central office.  That's what I need to know.
15     Q  You don't know if there is a complaint
16 form even in CHS to file an EEO complaint, do you?
17         MS. CANFIELD:  Objection.
18     A  Correct, because I have never filed one
19 myself.
20     Q  But you are in charge of CHS.  This is
21 your -- this is your organization; am I right?
22     A  That's correct.
23     Q  And you have no idea whether or not there
24 is an avenue of recourse for someone within your
25 unit to file an EEO complaint of discrimination, of

71 (Pages 278 - 281)

Page 282

Patricia Yang

1
2  sexual harassment, of any kind; am I right?
3        MS. CANFIELD:  Objection.
4      A   In their orientation, everybody is told
5  about the process for EEO filing, as well as
6  everything else.
7      Q   But I am talking about your unit.  You
8  said you -- you don't have an EEO officer.
9      A   That's correct.
10     Q   You also said you have no EEO complaint
11 form, right?
12       MS. CANFIELD:  Objection.
13     A   That's not what I said.
14     Q   Do you have an EEO complaint form under
15 CHS?
16     A   No.  We would use the system's.
17     Q   You are saying that Blanche is part of
18 the system; am I right?
19       MS. CANFIELD:  Objection.
20     A   For good or for bad, I flag Miss
21 Greenfield on issues that relate to staff that I
22 think are important for her to know as the system's
23 person.
24     Q   You make a determination as to what
25 complaints are important and which ones aren't; am I

Page 283

Patricia Yang

1
2  right?
3        MS. CANFIELD:  Objection.
4      A   That's incorrect.
5      Q   Who makes the determination of which ones
6  go to Blanche and which ones don't?
7      A   The EEO office makes the determination,
8  but I have my own personal experience that decides
9  when I flag Miss Greenfield or not.
10     Q   Who is the EEO office are you saying
11 makes a determination as to whether or not it goes
12 to Miss Greenfield or Blanche?
13     A   That I don't know at all.  I don't know
14 how the internal EEO office operates.
15     Q   I am talking about your person.
16     A   An EEO complaint, if we get it, they will
17 bring it to our EEO officer.
18     Q   I am going to ask you a straight-up
19 question.
20     A   Yes.
21     Q   Mr. Wangel or Miss Laboy, everyone knows
22 that you either go to one or two of these people
23 during the period of this lawsuit, correct?
24     A   Correct.
25     Q   If someone files a complaint with them,

Page 284

Patricia Yang

1
2  what is there in place to ensure that the complaint
3  is investigated and looked into at some point?
4      A   Because they get back to the person.
5      Q   What person?
6      A   The complainant.
7      Q   Who is they?
8      A   Either the EEO office and/or, at that
9  point in time, Mr. Wangel.
10     Q   So is there some kind of repository that
11 shows Mr. Wangel or Miss Laboy somebody approached
12 them, and then they made a determination as to
13 whether or not they were going to refer it to
14 Blanche or whomever, or they were going to look into
15 it themselves?  Is there something that does that?
16       MS. CANFIELD:  Objection.
17     A   I'm not clear on the question.  Again,
18 Blanche is not -- Blanche is not -- everything is
19 not referred to Miss Greenfield that comes in.
20     Q   Right.
21     A   Sometimes it is just a heads up, which
22 was this case, because I was sending it over to
23 Bellevue, and therefore, it was no longer in my
24 purview.
25       I don't supervise Mr. Hicks.  So I was

Page 285

Patricia Yang

1
2  raising the issue on Dr. Kaye's behalf to Mr. Hicks.
3  I called him to have him pay attention to it, but
4  because he doesn't report to me, and I don't have
5  that kind of follow-up with him that I have with my
6  staff, I wanted Miss Greenfield to be aware.
7      Q   The reasonable accommodation process, you
8  said that that actually also fell under H and H,
9  right?
10     A   Correct.
11     Q   Okay.  So why is the reasonable
12 accommodation process treated differently than the
13 EEO process?
14       MS. CANFIELD:  Objection.
15     A   You would have to ask somebody else who
16 makes those decisions for the system.
17     Q   But you are making a distinction between
18 certain types of complaints going to the H and H and
19 Miss Greenfield and others staying within the unit
20 and being resolved in-house; am I right?
21       MS. CANFIELD:  Objection.
22     A   Some things.  But if somebody is asking
23 for a reasonable accommodation or somebody is filing
24 an EEO issue, it goes to the system's corollary.
25     Q   But reasonable accommodation is an

72 (Pages 282 - 285)

Page 286

Patricia Yang

1
2 amorphous term.  Somebody could be asking for an
3 ergonomic chair.  It could be asking for a nice, you
4 know, computer screen that dulls and brightens
5 or enlarges the font.
6        Would you feel compelled to go to H and H
7 to accommodate someone when you have the capacity to
8 order the chair or the screen, if it is within your
9 unit?
10    A  I would think that something minor could
11 be handled by our unit, but this was not minor.
12    Q  You mean to tell me thirty-minute lunch
13 was not considered minor?
14    A  Correct.
15    Q  Why is that?
16    A  Because it is against the collectively
17 bargained contract.
18    Q  Who was going to argue that Dr. Kaye was
19 breached the CBA?
20    A  We knew it.
21    Q  But the question is, who was going to
22 grieve that?  That's the question.
23    A  Anybody can grieve it.
24    Q  Now, you mean to tell me that it would
25 have posed an undue hardship regardless, because it

Page 287

Patricia Yang

1
2 was in breach of the collective bargaining
3 agreement?
4    A  I'm not going to speak for how that
5 decision was made.
6    Q  Now I am just asking you.
7    A  I'm not expert to opine.  I'm not going
8 to.
9    Q  You are saying you don't know if she
10 asked to go a Physician Specialist and whether or
11 not the Physician Specialist title was governed by
12 the collective bargaining agreement and --
13        First off, let me break this down.
14        The Physician Specialist title, do you
15 know whether or not the Physician Specialist title
16 required an hour lunch and a forty-five-hour work
17 week?
18    A  I do not.
19    Q  Okay.  So you don't know if that was the
20 case.  And she clearly asked to be put in this
21 title.  Do you know why she wasn't put in that
22 title?
23    A  I believe Bellevue looked at it and said
24 no.
25    Q  Do you know why you didn't put her in

Page 288

Patricia Yang

1
2 that title or anyone in your unit didn't put her in
3 that title?
4    A  I'm not aware that she had asked for that
5 as an alternative.  I'm sorry.  I'm not that close
6 to it.
7    Q  Not even in her EEOC charge, you don't
8 recall if she asked for that?
9    A  I don't recall.
10    Q  Okay.
11        MS. CANFIELD?  Can we take a quick
12 break?
13        MS. HAGAN:  Sure.
14        MS. CANFIELD:  Thank you.
15        (Whereupon, a short recess was taken at
16 this time.)
17        (A one-page e-mail chain, Bates stamped
18 NYC 000957, was received and marked
19 Plaintiff's Exhibit 12 for identification at
20 this time.)
21        MS. HAGAN:  I'm going to show you an
22 e-mail that's marked as Plaintiff's Exhibit
23 12, and Plaintiff's Exhibit 12 is Bates
24 stamped NYC 957.
25    Q  Again, here you have Dr. Kaye complaining

Page 289

Patricia Yang

1
2 about a number of things.
3        In this e-mail -- first off, who is
4 Yvette Villanueva, do you know?
5    A  She is Vice President for Human
6 Resources.  I don't know that that's her exact
7 title, but for the system.
8    Q  For the system, and you are talking about
9 H and H?
10    A  Yes.
11    Q  Okay.  And then she has Mr. Jain on this,
12 my next point, because I am assuming he started
13 working in April of 2018; is that right?
14    A  I don't recall.  But yes, Dr. Jain was
15 there.
16    Q  And then you have Mr. Wangel?
17    A  Correct.
18    Q  Dr. Ford?
19    A  Yes.
20    Q  And yourself?
21    A  Yes.
22    Q  And here you are on this reasonable
23 accommodations request.
24        Now, earlier, you said she hadn't made
25 the -- you weren't sure if they made the request; is

73 (Pages 286 - 289)

Page 290

Patricia Yang

1  that right?
2      A  No.  I knew that she made the request.
3  Not to me directly.
4      Q  But you are here on this.
5      A  Yes, but it is not being made to me.
6      Q  That's what you determined, but you are
7  on notice.  Okay.
8          So now, in this e-mail, the second
9  paragraph -- it is not necessarily indented, but it
10  goes on to say, "I have worked an
11  eight-and-a-half-hour shift from nine a.m. to
12  5:30 p.m. With a thirty-minute unpaid lunch for over
13  thirteen years, per an agreement between HHC and
14  Doctor's Council."
15         Now, Doctor's Council is the name of the
16  union that Dr. Kaye is a part of; is that right?
17      A  Right.
18      Q  Now, you just testified pretty adamantly
19  that the reason why she couldn't have the thirty
20  minute unpaid lunch is because it was violating the
21  collective bargaining agreement; am I right?
22      A  That's correct.
23      Q  So how is it that she was doing it for
24  thirteen years?  And she referencing an agreement.

Page 291

Patricia Yang

1  Why is it all of a sudden different now that your
2  staff has looked into it?
3      MS. CANFIELD:  Objection.
4      A  She is stating that there was an
5  agreement.  There did not appear to be an agreement.
6      Q  How do you say there wasn't an agreement?
7      A  Doctor's Council, Health and Hospitals,
8  and CHS all looked, and the agreement is that she
9  needs to take an hour lunch.
10      Q  Did anyone from Doctor's Council e-mail
11  your staff, i.e. Nate Santa Maria or anyone else
12  from Doctor's Council, e-mail your staff and say
13  there was no agreement for the last thirteen years?
14      A  I don't know who Nate Santa Maria is.
15      Q  Did anyone from Doctor's Council, to your
16  knowledge, e-mail your staff and tell them that
17  there was no such agreement?
18      A  I don't know.
19      Q  How do you know if there was an agreement
20  or not?  Did anyone tell you that there was no
21  agreement, outside of your staff?
22      MS. CANFIELD:  Objection.
23      You can answer.
24      A  This was looked at by the system.  She

Page 292

Patricia Yang

1  obviously addressed it to Yvette, and I know there
2  was conversation with Doctor's Council that had
3  Kevin Collins, who was aware of this also.
4      Q  And is Kevin Collins part of Doctor's
5  Council?
6      A  Yes.
7      Q  Did Doctor's Council ever tell you in
8  writing or anyone else or in any other way that
9  there was no thirteen-year agreement between them to
10  allow her to work this thirty-minute lunch?
11      MS. CANFIELD:  Objection.
12      You can answer.
13      A  There was no direct communication from
14  counsel as to whether there was or was not.
15      Q  So the only basis you have for making
16  this determination is from your staff.  That's what
17  they told you, right?
18      A  No.  That was after consultation with
19  Doctor's Council and central office.
20      Q  They told you that they conferred with
21  Doctor's Council; is that right?
22      MS. CANFIELD:  Objection.
23      You can answer.
24      A  Yes.

Page 293

Patricia Yang

1      Q  So you don't know for a fact if Doctor's
2  Council told them that or not?
3      A  Correct.
4      Q  Okay.  Now, Dr. Kaye says, "My previous
5  supervisors allowed accommodations for my son's
6  disability, and I have been more than able to
7  perform the essential functions of my job with this
8  schedule with no disruptions no work product."
9          Why all of a sudden now her supervisor
10  couldn't allow this accommodation?
11      A  I don't know the extent to which her
12  former supervisor was aware that she wasn't in
13  compliance with her collectively bargained --
14      Q  Her prior supervisor, prior to Mr. Jain,
15  who was that?  Do you know?  Was it Dr. Ford?
16      A  No.  It would have within somebody at
17  Bellevue.  Maybe Jeremy Colley, maybe somebody else.
18      Q  Jeremy Colley or Mary Anne Badaracco?
19      A  Mary Anne would have been higher than
20  Jeremy, so I don't think that she was her
21  supervisor.
22      Q  So it would have been Dr. Colley?
23      A  I'm not sure what the Bellevue structure
24  was.

74 (Pages 290 - 293)

Patricia Yang

2  Q  You don't know who her former supervisor
3 was?
4  A  No.
5  Q  Did you ever ask to find out whether or
6 not he allowed her to work the thirty-minute lunch?
7  A  I don't know if my staff did or not, but
8 given the fact that the clinics were so unsupported,
9 I don't know that that would have been fruitful.
10  Q  Did you ever make a determination that
11 the Bronx clinic was unsupported?
12  A  Again, in general, the clinics were on
13 their own.
14  Q  Okay.  Was there ever a time that the
15 Bronx clinic was unsupported?
16  A  I didn't say unsupported.
17  Q  You didn't have any resources.
18  A  Overall, the clinics -- and the issues
19 varied by the clinic, but they ranged from not
20 having staff vacancies filled to not having
21 telephones.
22  Q  Was there a time when there was a work
23 stoppage at the clinic, at the Bronx clinic?
24  A  I'm not aware of one.
25  Q  When Dr. Kaye left, has there been

Patricia Yang

2 someone to replace Dr. Kaye since she left?
3  A  Recruitment is ongoing.
4  Q  Are there directors at the clinic right
5 now?
6  A  Yes, because Dr. Jain is sort of stepping
7 in.
8  Q  And who is the second evaluator, if
9 Dr. Jain is stepping in?
10  A  I don't know what is going on right now.
11  Q  Are evaluations being done at the clinic
12 right now?
13  A  I believe they are.  It is Dr. Jain who
14 is making those arrangements and cross coverage.
15  Q  Is there backlog at the Bronx clinic?
16  A  I am not -- not that's been brought to my
17 attention.
18  Q  So there is been no backlog, as far as
19 you know, or has been within the last year at the
20 Bronx clinic?
21  A  I can't recall somebody raising that to
22 me.
23  Q  Do you know the circumstances in which
24 Dr. Kaye left H and H?
25  A  I saw her letter of resignation.

Patricia Yang

2  Q  And what did you think?
3  A  I accepted it.  It wasn't for me to -- I
4 think she actually sent it to Dr. Katz.
5  Q  Did you attempt to speak to Dr. Kaye
6 about her letter?
7  A  No.
8  Q  Why not?
9  A  I don't speak to people who are leaving
10 or coming.  I am too far removed, except for people
11 directly reporting to me, to interview them or exit
12 interview them.
13  Q  You were pretty animated about Dr. Ford.
14 You said she was a great --
15  A  Yes.
16  Q  How would you describe Dr. Kaye?
17  A  I don't know her.
18  Q  So --
19  A  I can't opine on her skills or anything.
20 I am not as familiar with her as I am with
21 Elizabeth.
22  Q  Well, Dr. Ford wasn't your direct report.
23 There was Dr. MacDonald in between the two of you.
24 How are you so familiar with Dr. Ford?
25  A  Because she part of my leadership group.

Patricia Yang

2  Q  Who is in your leadership group?
3  A  My direct reports and their direct
4 reports.
5  Q  But no one beneath them; is that what you
6 are testifying?
7  A  Generally, not.  It gets to be a really
8 large group.  Everybody wants to join, so we have
9 tried to, without hurting too many egos and
10 feelings, limit it to people who directly report to
11 me and their direct reports.  Other people can come
12 in for presentations or issues.
13  Q  Okay.  Now, Dr. Kaye alleges there were a
14 number of retaliatory measures taken against her
15 after she complained about various things in her
16 Complaint.  At one point, she complained about being
17 compensated in less than full-time rate.  Are you
18 aware of that?
19  A  I am aware that there was confusion
20 because she didn't have leave left or something like
21 that, so that when she took a day off, the way the
22 payroll system is set up -- and I am getting into
23 areas that I am not close enough to -- that there
24 would be a pay -- it would be a day docked until
25 there was a vacation day brought back in that she

Patricia Yang

1
2  earned.  Something like that.
3      Q  I think you are somewhat conflating the
4  issue.  At one point, Dr. Kaye was compensated as a
5  part-time employee versus a full-time employee.  Do
6  you recall e-mails to that effect?
7      A  No.
8      Q  You used an abbreviation earlier today,
9  FTE.
10     A  FTE.  Okay.
11     Q  And sometimes people are FTE 1.0, and
12  then you have .67; is that right?
13     A  You could have anything short of a 1.0.
14     Q  At one point, it was determined that
15  Dr. Kaye was a -- I guess sixty-seven hundredths of
16  an employee versus is 1.0 employee.  Do you recall
17  anything to that effect?
18     A  Not really.
19     Q  Did you ever get exasperated with a
20  flurry of e-mails trying to resolve her pay
21  compensation?
22         MS. CANFIELD:  Objection.
23     A  I don't get exasperated with e-mails.  I
24  get eager to resolve issues.
25     Q  You said you were losing sleep at some

Patricia Yang

1
2  point.  It was one e-mail exchange, right?
3      A  Right.
4      Q  And it wasn't necessarily just Dr. Kaye,
5  but any number of things, right?
6      A  I lose sleep over a lot of things.
7      Q  Right.
8      A  I still do.
9      Q  There are a number of -- and I am going
10  to show you what is marked as Plaintiff's Exhibit --
11  this will be Exhibit 13.
12         (A six-page e-mail chain, Bates stamped
13  NYC 000616 through NYC 000620, was received
14  and marked Plaintiff's Exhibit 13 for
15  identification at this time.)
16         (Whereupon, a discussion was held off
17  the record, and a short recess was taken at
18  this time.)
19     Q  Now you have Exhibit 13, right?
20     A  Yes.
21     Q  What is the Bates number at the bottom of
22  the page?
23     A  What's a Bates number?
24     Q  Is it 616?
25         MS. CANFIELD:  616 to 620.  They are

Patricia Yang

1
2  flipped around.  They are out of order.  So
3  that's 13.
4         MS. HAGAN:  13 should be 616 to 620.
5         MS. CANFIELD:  Right.
6         MS. HAGAN:  So when you have had an
7  opportunity look at all of them, even though
8  it is -- I'm sorry it is hard to read, but
9  this is what we have -- please let me know.
10         (Whereupon, a discussion was held off the
11  record.)
12     Q  Okay.  Now, it appears that this e-mail
13  is dated -- it consists of a chain of e-mails from
14  September 26 to September 27, 2018.  Is that right?
15     A  That's what the dates are.
16     Q  Do you recall seeing this exchange with
17  the subject "Total Work Hours"?
18     A  I don't recall, but, you know, this is
19  the kind of -- yeah.  I mean, it is not the kind of
20  thing I would retain a memory about.
21     Q  Right.  Now, it says -- you are talking
22  about the retention and we were talking about her
23  being compensated less than at a whole employee,
24  right?
25         We were talking about the FTE, and you

Patricia Yang

1
2  said that there could have been any number of
3  percentages, right?
4         At the bottom of 616, it says Dr. Kaye --
5         The first page, at the bottom, 616.
6      A  Yes.
7      Q  The last line.
8      A  Yes.
9      Q  "FTE status."  Full-time employment
10  status, is that what that stands for?
11     A  Yes.
12     Q  And then it says, "Retention amount," and
13  it says, "Dr. Kaye, .67 at 13,400," right?
14     A  Yes.
15     Q  Now, earlier, you said that the reason
16  why she was being paid differently is because she
17  had leave issues.  And at that time --
18     A  I was answering a different question.
19     Q  I was asking about this particular
20  incident.
21     A  Got it.
22     Q  Now, this happened to be a month after
23  she filed her EEOC charge.  Are you aware of that?
24     A  No.
25     Q  So in September of 2018, she is being

76 (Pages 298 - 301)

Page 302

Patricia Yang

1
2 compensated less than a full-time employee.  Now, a
3 series of e-mails were, I guess, exchanged about
4 this.  Do you recall?
5     A  I'm sorry.  What was the question?
6     Q  Do you recall Dr. Kaye complaining about
7 not being compensated or getting her full retention?
8     A  I don't know.  It is not something that
9 would have stuck with me since I had made the
10 decision to delay moving the clinics specifically so
11 she could get her retention.
12     Q  Now it is September, and she is e-mailing
13 not Bellevue, but she is e-mailing a bunch of people
14 over in H and H.
15        MS. CANFIELD:  Objection.  Who is she --
16     Q  Well, apparently, there has been an
17 exchange with people who are trying to address this,
18 and includes Mr. Wangel himself.
19        Do you know who Diane Cianci is?
20 C-I-A-N-C-I.  Do you know who that is?
21     A  I think everyone else is central office.
22     Q  So there is central office and -- even
23 though everyone has an HHC e-mail address?
24     A  Correct.
25     Q  So how is it that you can make a

Page 303

Patricia Yang

1
2 distinction between who would be considered Bellevue
3 versus HHC, if everyone has the same e-mail address?
4     A  You know their names or you don't
5 recognize their names.
6     Q  I mean, is there a distinction between
7 Bellevue employees and CHS employees in terms of the
8 H and H system, in general?
9        MS. CANFIELD:  Objection.
10       You can answer.
11     A  In what sense?
12     Q  Aren't you all covered by the same H and
13 H umbrella?  Aren't they all H and H employees?
14     A  Yes.
15     Q  So why would it be different, as far as,
16 you know, who dealt with this particular full-time
17 employment status?
18       Why should there be a distinction between
19 CHS and Bellevue at this point?  She is clearly on
20 your payroll at this point.
21     A  Yes.
22       MS. CANFIELD:  Objection.
23       THE WITNESS:  I'm sorry.
24     A  I think -- and it is hard to read this
25 e-mail, but I am going to take a guess at this --

Page 304

Patricia Yang

1
2 not a guess.  I am going to -- forgive me.
3       I believe, from the language of retention
4 amount, she was talking about the bonus that she got
5 at Bellevue.
6       And so it may well have come to Jonathan
7 because she was working for us.  You are correct.
8 But it was referred to central office to look at
9 because it was a Bellevue matter, not ours.  And
10 some issues get so technical that it ends up being a
11 central office matter to do all of the calculations
12 and the breakdowns and the history.
13     Q  It appears here that there was a question
14 as to whether or not these particular employees
15 were, in fact, eligible for the retention bonus.
16       Do you see that or do we need to go
17 through the actual text of the e-mail?
18       On the last page -- I will read it.  On
19 page 619, Angela Mullet wrote:
20       "Good afternoon:  April asked that I
21 forward you the total number of work hours for the
22 employees listed below.  The following is based on
23 the printout provided by payroll.  Kaye" -- and I
24 guess she has a number -- "total hours paid from
25 July 30th, 2017 to June 30th, 2018, 1,400 hours."

Page 305

Patricia Yang

1
2       Now, you would make the argument she is
3 all on Bellevue time at that time; is that right?
4     A  Yes.
5     Q  Right.  Okay.  So then there are other
6 breakdowns here.  I guess another employee by the
7 last name of Harper, and they are still on that same
8 calendar.  Now, who is Harper?  What employee has
9 that last name that you remember?
10    A  He might have been ours.
11    Q  But he is still being counted on the same
12 time frame as Dr. Kaye?
13    A  This does look like a question about the
14 retention bonuses that were paid to eligible staff
15 at Bellevue by Bellevue.
16    Q  Dr. Weiss, was he on Bellevue?
17    A  Yes.
18       MS. CANFIELD:  You are on --
19       MS. HAGAN:  618.  Page 618, yes.
20    A  If that's Jonathan Weiss, probably.
21    Q  Because here, from Matthew Campese to
22 Angela Mullet, right?  And then again, the group of
23 people here that all work at H and H in the central
24 office, right?  Beth Owens, Wayne Myrie, Diane
25 Cianci, and this Wendy Jolibois or whatever.

77 (Pages 302 - 305)

Page 306

Patricia Yang

1
2       Now, you said, "Total work hours.  Thank
3 you very much, Angela.  Based on the hours provided,
4 it would appear that the doctors FTE status during
5 the time period is as follows."
6       And then it lists the different doctors
7 and their various retention amounts.
8       Now, would this be kind of characteristic
9 of Dr. Kaye and the types of e-mails that you would
10 see involving her during this time period?
11       MS. CANFIELD:  Objection.
12   A  I don't know what is typical.
13   Q  You said she was difficult, right?
14   A  I didn't say she was difficult.  You
15 asked me what people thought and what I had heard
16 about her.
17   Q  But you saw a number of her e-mails and
18 you had wondered at some point why you were getting
19 these e-mails; is that right?
20       MS. CANFIELD:  Objection.
21   A  No.  I figured she was copying me so that
22 I paid attention.
23   Q  Did you?
24   A  Yes.  I knew my staff were working on it.
25   Q  Did you make sure that she was

Page 307

Patricia Yang

1
2 compensated adequately or fairly, based on the
3 amount of hours she worked?
4   A  Based on this long exchange, which is to
5 a level of technical detail I would not even wrap my
6 head around.  But Matt Campese was the head of Labor
7 Relations for the entire system.  He and all of
8 these people in HR's central office, all the experts
9 in these calculations went through and flipped it
10 over to Jonathan, who did work for me, who said,
11 basically, that this is taken care of.
12       And I said, "Great," because that's my
13 role.  My role is to make sure the right people are
14 handling the issue.  I don't handle the issue
15 directly.  I don't handle that level of issue.
16   Q  At some point, you do say, "Great.  Thank
17 you."
18   A  I do.
19   Q  So at some point, you do make sure the
20 issue was handled?
21   A  Yes.
22   Q  Because here you have Miss Cianci saying,
23 "Yes, it is dealt with."
24       And then you have Mr. Wangel saying,
25 "Thank you very much."  And then, "Bit later than

Page 308

Patricia Yang

1 this morning," after that.
2
3       And then you say, "Great.  Thank you,"
4 but it is not clear whether or not it had been
5 resolved at this point, is it?
6   A  Jonathan says a bit later this morning
7 that it will be done, but it is done.
8   Q  You say it will be done.  It doesn't say
9 it is done.
10   A  Correct.
11   Q  Okay.
12   A  But do I have faith that people don't go
13 through all of this work and all of this detail just
14 to let it have to come back to their table again if
15 they don't follow through to the end of it.
16   Q  But is it typical that, you know, the
17 staff during this transition were having this amount
18 of problems as enumerated here?
19       MS. CANFIELD:  Objection.
20   A  I'm sorry.  What was the question?
21   Q  Like did you see any types of exchanges
22 like this with any other staff members regarding
23 compensation?  Did they bring that to your attention
24 or was that something that just Dr. Kaye brought to
25 your attention?

Page 309

Patricia Yang

1
2       MS. CANFIELD:  Objection.
3       You can answer.
4   A  It depends on the case.
5   Q  In this instance, they are looking into
6 it for all of these people, determining whether or
7 not they are eligible; is that right?
8   A  I don't know what their calculations
9 were.  I guess it was just to make sure that they
10 were all correct.
11   Q  Was Dr. Kaye the only one that was
12 erroneous?
13   A  I don't know.
14   Q  Okay.  You know that she did claim it was
15 erroneous, that she was entitled to the full amount,
16 and that she did not receive that?
17       MS. CANFIELD:  Objection.
18       You can answer that.
19   A  I don't know that, but clearly something
20 led to this.
21   Q  Now, you do then follow up or you do have
22 some kind of exchange with Mr. Hicks about this.  Do
23 you recall that?
24   A  I have many exchanges with Mr. Hicks.
25 Maybe you could help me with that.

78 (Pages 306 - 309)

Page 310

Patricia Yang

1
2   MS. HAGAN: Okay. Let's see. Let's go
3   for Exhibit 14, and I will make a copy of
4   that.
5   (Whereupon, a discussion was held off
6   the record.)
7   (A one-page e-mail exchange, Bates
8   stamped NYC 000596, was received and marked
9   Plaintiff's Exhibit 14 for identification at
10  this time.)
11  Q  Now, have you had an opportunity to look
12 at Exhibit 14?
13  A  Yes. I am looking at it.
14  Q  Great. So Exhibit 14 is dated September
15 26th, and it is from you to Mr. Hicks, right?
16  A  Correct.
17  Q  And at that time, you confirmed that they
18 had what they need to resolve whatever issues that
19 are identified, with a total number of hours worked;
20 is that right?
21  A  That's Mr. Hicks confirming to me.
22  MS. CANFIELD: Is this part of Exhibit
23  Number 13?
24  MS. HAGAN: I don't think so. Exhibit
25  13 is 616 through 620.

Page 311

Patricia Yang

1
2   MS. CANFIELD: And this also doesn't
3   seem to be a complete e-mail.
4   MS. HAGAN: All it says is 596. I don't
5   think it went twenty pages long, but --
6   MS. CANFIELD: No. Exhibit 14 --
7   MS. HAGAN: I can give you the other two
8   pages, but they are separate. They are not
9   the same. I am certain of that because the
10  597 is another story. They are separate
11  pages.
12  There is no part one of two or -- you
13  know, usually, it would have more pages,
14  like it would say it has more pages to
15  it. There is nothing like that on here.
16  MS. CANFIELD: All right. So there is
17  no signature line. It doesn't appear it is
18  a complete e-mail.
19  MS. HAGAN: Well, I mean, you can check
20  your records. This is what I am producing
21  today. This is what I have.
22  So again, 596 here is between Dr. Yang
23  and Mr. Hicks. Right?
24  MS. CANFIELD: Okay. So there is a
25  chance that there is a complete copy of this

Page 312

Patricia Yang

1
2   e-mail thread. You just did not bring it or
3   print it out today.
4   MS. HAGAN: No. I mean, I can't tell
5   you, but I am sure this is what I thought
6   was relevant.
7   I mean, you have it. It is your
8   production.
9   MS. CANFIELD: No. Just for the
10  purposes of the witness, if this is not a
11  complete document, I just want to note that
12  on the record. That's all.
13  MS. HAGAN: Okay. Sure. I'm not sure
14  if it is or not. I can't answer that
15  question.
16  MS. CANFIELD: Okay. That's fine.
17  (Whereupon, a discussion was held off
18  the record.)
19  Q  Now, we can move on from Exhibit 14.
20  At any time, were there ever complaints
21 that Dr. Kaye was reporting to Dr. Mundy? Did you
22 ever see anything like that?
23  A  I know she was very upset because the
24 central payroll system or -- I don't know what the
25 system is called, but it is not CHS. It is the

Page 313

Patricia Yang

1
2 Health and Hospitals' system had incorrect
3 supervisory structure, so that it looked -- I don't
4 understand the system artifact enough, but it
5 showed -- it kept thinking that Mundy was her
6 supervisor, when he was not, and we kept asking the
7 system to fix it.
8   Q  Okay. And did this happen to anyone
9 else?
10  A  I don't know.
11  Q  Did anyone else --
12  A  Actually, I'm sorry. I do know. I had
13 people reporting to me who didn't report to me.
14  Q  Did anyone else complain that Dr. Mundy
15 was their supervisor and he wasn't?
16  A  No.
17  Q  Okay. So it was just Dr. Kaye?
18  MS. CANFIELD: Objection.
19  A  I did not hear of any others, but I do
20 know that there were data errors in structure,
21 architecture errors in the system that needed to be
22 fixed.
23  MS. HAGAN: Okay. So I'm going to show
24  you a another e-mail, and it is going to be
25  Exhibit Number 15.

79 (Pages 310 - 313)

Page 314

Patricia Yang

1
2      (A one-page e-mail chain, Bates stamped
3   NYC 2581, was received and marked
4   Plaintiff's Exhibit 15 for identification at
5   this time.)
6      (Whereupon, a discussion was held off
7   the record.)
8      MS. HAGAN:  Exhibit 15 is Bates stamped
9   2581.
10     MS. CANFIELD:  Do you have another one?
11     MS. HAGAN:  No.  That's it.
12     MS. CANFIELD:  Thank you.
13     MS. HAGAN:  And that is an e-mail
14   exchange between Dr. Yang and Jessica Laboy
15   and Jonathan Wangel.
16     Q  Now, at the bottom, it says, "Talked to
17   Andy."  Who is Andy?
18     A  Andy Cohen is the General Counsel for the
19   system.
20     Q  For H and H?
21     A  Yes.
22     Q  You have to clear, because when you say
23   system, what system?  So for H and H.
24        At one point wasn't the General Counsel
25   for H and H Sal Russo?

Page 315

Patricia Yang

1
2     A  Yes.
3     Q  When was that?  When did he stop being
4   the General Counsel?
5     A  I don't recall.
6     Q  Okay.  When did Andy Cohen stop being the
7   General Counsel?
8     MS. GREENFIELD:  Did you say stop or
9   start?
10     MS. HAGAN:  Well, start, because now it
11   is someone else.
12     MS. GREENFIELD:  No.
13     MS. HAGAN:  Andy currently is --
14     MS. GREENFIELD:  She.  Yes.
15     MS. HAGAN:  Okay.  I'm sorry.  I thought
16   Andy was a he.
17     Q  You said you to talked to Andy to push
18   Blanche to move Dr. Kaye back to Bellevue, right?
19     A  Correct.
20     Q  Now, why were you doing that?
21     A  Not because Miss Greenfield was
22   unresponsive, but because I knew that Dr. Kaye -- I
23   believe this is after she actually put in writing to
24   somebody, one of my staff somewhere, either Dr. Jain
25   or Dr. Ford, somebody -- it came to my attention

Page 316

Patricia Yang

1
2   that the first time -- before she came over, I was
3   aware that she wanted to stay at Bellevue.  That
4   didn't happen.
5      She then, in late 2015, in the fall
6   sometime maybe, put in writing -- I became aware she
7   had requested in writing a transfer.  She wanted
8   another job.  She wanted to go back to Bellevue.
9      So I made inquiries again to Bellevue,
10   and then solicited the help of central office also
11   to try and find a solution that would be more in
12   line with what Dr. Kaye wanted.
13     Q  Now, we talked about Exhibit 1.  Not
14   Exhibit 1.  Exhibit 12.  We were talking about --
15   no.  Exhibit 6.  I'm sorry.  Exhibit 6.  And we
16   talked about when the actual lawsuit was filed,
17   which was on the second page.
18     A  Let's see.
19     Q  And it was entry one.
20        Now, we have already established that it
21   wasn't physically served to you at that time, but we
22   did acknowledge that, according to the docket sheet,
23   it had been filed -- the lawsuit had been filed on
24   December 21st, 2018, right?
25     A  That's what this says.

Page 317

Patricia Yang

1
2     Q  Right.  And here you have this e-mail
3   exchange between yourself, Miss Laboy, Miss Yang --
4   not Miss Yang.  I'm sorry.  Mr. Wangel.  And you are
5   trying to get Dr. Kaye back.
6      This is less than a little over a month.
7   Is that right?
8     A  In response to her request in late 2018
9   to go back.
10     Q  Where did you see a request from Dr. Kaye
11   requesting to go back to Bellevue around the time
12   she filed her lawsuit?
13     A  So I didn't say it is around the time she
14   filed the lawsuit, but it was late 2018.  I don't
15   have it, but I recall seeing it.
16     Q  So you are saying, even at this late
17   point, Dr. Kaye believed she had a chance to go back
18   to Bellevue?
19     A  Yeah.  So Exhibit 7 actually says at one
20   point that Jonathan Wangel did have -- there is a
21   recent e-mail to Bellevue seeking to return.
22     Q  Where is that?
23     A  Exhibit 7.  I don't have a Bates stamp.
24     Q  Would it be the second --
25     A  The first page, at the top, January 11,

80 (Pages 314 - 317)

1            Patricia Yang
2  8:34 p.m., Jonathan Wangel.
3       Q   Okay.  Can I see your Exhibit 11, just
4  for purposes of --
5       MS. CANFIELD:  Exhibit 7.
6       Q   Exhibit 7.  Let me see your 7.
7       MS. GREENFIELD:  Hopefully we all have
8  the same exhibit.
9       MS. HAGAN:  We did have the same
10  exhibit, but I don't see the same thing.
11      Q   Where is it that you see that she sent a
12  recent e-mail asking to go to Bellevue?
13      A   That he found a recent e-mail.  There is
14  a recent e-mail, right there, this line
15  (indicating).
16      Q   See below?
17      A   "I will have more detail Monday.  I took
18  a quick look, and there is a recent e-mail" -- okay.
19          Are you referring to his effort to
20  monitor Dr. Kaye's usage of e-mail.
21      A   No.
22      Q   Well, which e-mail is he referencing?
23      A   Here it is (indicating).
24      Q   We could go further down.  On the next
25  page -- turn to the next page.

1            Patricia Yang
2       A   I know that --
3       Q   It says, "Jonathan:  You know the drill.
4  I need the date range and search terms, and appeared
5  I will set up Clearwell."
6          To your understanding, at that time, he
7  is look at Dr. Kaye's e-mail at that point using
8  Clearwell?
9       A   I don't know if Clearwell is the system,
10  but --
11      Q   We can go to the next page.  That will
12  make it even easier.
13      A   Yes.  Thank you.
14      Q   At the bottom, Jeffrey Herrera.
15          It says:  "Hi, Jeff" -- I am not even
16  sure why it would say "Hi, Jeff," because it is from
17  Jeff.
18          "Jessica Laboy is requesting that
19  Jonathan Wangel be provided access to the mailbox of
20  active employee Melissa Kaye.  Not sure if you need
21  search terms or date ranges.  Copying Jonathan, in
22  case he needs to provide you further detail."
23          That's on January 11, right?
24      A   Right.
25      Q   Clearly, he is looking at her e-mails.

2       A   So that was the other -- that was the
3  unrelated issue.  I mistook this for referencing an
4  e-mail where Dr. Kaye asked for a transfer back.  I
5  don't see it here.
6       MS. CANFIELD:  I believe we produced
7  that e-mail in discovery.
8       MS. HAGAN:  What are you talking about?
9       MS. CANFIELD:  The e-mail where she was
10  e-mailing Bellevue requesting to go back.
11      MS. HAGAN:  But you don't -- it is not
12  here.
13      MS. CANFIELD:  You didn't bring it to
14  the deposition, but we produced it.
15      MS. HAGAN:  I mean, Dr. Kaye asked to be
16  brought back to Bellevue on any number of
17  occasions.
18      MS. CANFIELD:  Yes.
19      MS. HAGAN:  But we don't necessarily
20  know which one and whether or not she
21  actually shared that interest with them.
22          If, in fact, her e-mail box was
23  monitored, it wasn't something that Dr. Kaye
24  necessarily conveyed to management.  She may
25  have been e-mailing back and forth to

1            Patricia Yang
2  Bellevue on her own.
3       MS. CANFIELD:  Correct.
4       MS. HAGAN:  Right.  Okay.
5       Q   At that time, Dr. Kaye didn't know that
6  her e-mail was being monitored, to your
7  understanding; am I right?
8       A   Probably not.
9       Q   Right.
10      A   And it is not monitoring on an ongoing
11  basis.  It is a date range that they have to give.
12          And the Jeff to Jeff is because they are
13  both Jeffs.
14      Q   There is more than one Jeff?
15      A   Yes.  There is Jeff Lutz in central IT,
16  and Jeff Herrera, who is in Correctional Health.
17      Q   I see that here.  Yes.  Right.  I'm
18  sorry.  That's helpful.
19          Now, earlier, you said that you weren't
20  sure when you became aware of Dr. Kaye's lawsuit,
21  right?
22      A   Correct.
23      MS. HAGAN:  Now, what I will do is I
24  will make a copy of this document before I
25  actually start talking about it.  Hold on a

81 (Pages 318 - 321)

Patricia Yang

2  second.
3      (Whereupon, a short recess was taken at
4  this time.)
5      (A one-page e-mail chain, Bates stamped
6  NYC 1114, was received and marked
7  Plaintiff's Exhibit 16 for identification at
8  this time.)
9      MS. HAGAN:  Now, we went over -- we are
10  at Exhibit 16.  So the last exhibit we had
11  was January 29th.
12      MS. CANFIELD:  Right.
13      MS. HAGAN:  And that's Exhibit 15.
14  Q   And so we were talking about everyone
15  working together to get Dr. Kaye back at Bellevue,
16  right?
17  A   Correct.
18      MS. CANFIELD:  Yes.
19      MS. HAGAN:  So I am going to show you
20  what is marked as Exhibit 16.  When are you
21  done, let me know.
22      MS. CANFIELD:  What is the Bates number?
23      MS. HAGAN:  This is Bates number NYC
24  1114.
25      (Whereupon, a discussion was held off

Patricia Yang

2  the record.)
3  Q   Now, do you recognize this e-mail, by any
4  chance?
5  A   It looks familiar, I guess.
6  Q   Earlier, you said that the FMLA -- you
7  were not familiar with or knew what was going on
8  with Dr. Kaye and her request for FMLA, right?
9  A   No.  I said I was aware vaguely of an
10  FMLA request.
11  Q   Right.  At any point, did you insist upon
12  any intervention?
13      Here is Doctor's Council, I guess
14  Mr. Collins that you were referring to earlier,
15  right?
16  A   Correct.
17  Q   And your recollection was that it was
18  resolved that she was denied FMLA; is that right?
19  A   I don't remember.  I don't think I said
20  that.
21  Q   Was she denied FMLA, to your knowledge?
22  A   I don't remember.  I don't know.
23  Q   But clearly, there was still issues with
24  the shift restoration.  She is still asking for it?
25  A   That's what it says in this e-mail.

Patricia Yang

2  Q   Again, there was no movement or any
3  attempt to accommodate Dr. Kaye at this point; am I
4  right?
5      MS. CANFIELD:  Objection.
6  A   I think this was being handled, as
7  Jonathan says up here, as an FMLA request.
8  Q   How are FMLA requests handled?
9  A   They are also sent to central office, the
10  system, Health and Hospitals Corporation.
11  Q   Who is in central office?
12      MS. CANFIELD:  Objection.
13      You can answer.
14  A   I don't know who Jonathan would deal
15  with.
16  Q   But you don't know -- I mean, you are
17  trained in this.  You have no idea who it would be?
18      MS. CANFIELD:  Objection.
19      THE WITNESS:  Thank you.
20  A   I am trained at a different level.  I am
21  thankfully spared from the details in handling these
22  cases.  My staff do that.
23  Q   So you are saying that you don't know who
24  the ultimate person would be to handle a FMLA
25  request?

Patricia Yang

2  A   Central.
3      MS. CANFIELD:  Objection.
4  A   Probably Human Resources.
5  Q   And you are saying that you are trained
6  at such a level that you would be spared knowing who
7  that person is?
8  A   I am not trained to actually process the
9  cases and handle the inquires.
10  Q   But there is somebody who has final
11  authority on FMLA requests, and you don't know that,
12  right?
13      MS. CANFIELD:  Objection.
14      You can answer.
15  A   I know it is not us.
16  Q   But you don't know who it is in central
17  office either?
18  A   It is somewhere in that shop, between
19  Yvette and -- they review it.
20  Q   But you don't know who it is?
21      MS. CANFIELD:  Objection.
22  A   Correct.
23  Q   Okay.  Now, I am going to show you what
24  is marked as Plaintiff's Exhibit 17.
25      (Whereupon, a discussion was held off the

82 (Pages 322 - 325)

Patricia Yang

1

2    record.)

3        (A one-page e-mail, Bates stamped NYC

4    001187, was received and marked Plaintiff's

5    Exhibit 17 for identification at this time.)

6        Q    This is Bates stamped 1187, and again,

7    this is a question as to any update on Melissa Kaye

8    going back to Bellevue, as she requested, right?

9        A    Yes.

10       Q    Now, clearly -- do you want Dr. Kaye to

11   go back at this point, or is it something she is

12   requesting solely?

13       A    My understanding is that it is what she

14   requested.  My strong desire with Dr. Kaye was to

15   address her issues and make her happier.

16       MS. HAGAN:  I don't have enough copies

17   of 18, but I am going to hope that you can

18   bear with me.

19       Exhibit 18 is another e-mail, dated

20   February 11, 2019.  I have one.  Okay.

21       (A one-page e-mail, Bates stamped NYC

22   001247, was received and marked Plaintiff's

23   Exhibit 18 for identification at this time.)

24       Q    In this e-mail, you say, "Can we please

25   get Bellevue to take back Melissa Kaye?  She asked

Patricia Yang

1

2    to be transferred back in November."  Right?

3        A    That's what the e-mail says.

4        Q    Do you know who she asked to be

5    transferred back?

6        A    I don't.

7        Q    Okay.  So you are just referencing -- you

8    are not sure what you are referencing.  You don't

9    know how or when?

10       MS. CANFIELD:  Objection.

11       A    It was brought to my attention that she

12   had requested to go back to Bellevue again.

13       Q    Now, you have asked at least four times

14   between 16, 17, and 18, right?

15       A    I thought it was 2015.

16       Q    Exhibits.

17       A    Oh, exhibits.  Okay.

18       Q    Exhibit 15, 16, 17, and 18, right?

19       We are looking at from January 22nd --

20   well, really, actually -- yeah.  January 22nd to

21   February 11th.  There are three --

22       It seems once a week, with the exception

23   of you maybe skipped a week in February, you have

24   asked whether Dr. Kaye is going to go back to

25   Bellevue.  Am I right?

Patricia Yang

1

2        A    That's what the e-mails say.

3        Q    Earlier, you said that Mr. Hicks -- that

4    no one over in Bellevue wanted to work with

5    Dr. Kaye; am I right?

6        A    No.  What I said was that Bellevue

7    repeatedly said they did not have a position for

8    her.

9        Q    But here you are continuing to ask --

10   this is between -- it seems like you are doing it

11   almost once a week, asking when are they going to

12   take Dr. Kaye.  Is that right?

13       MS. CANFIELD:  Objection.

14       A    That's how I operate, yes.

15       Q    Why are you so insistent?  I mean, there

16   doesn't seem like there has been an effort to hire

17   someone to replace her at the Bronx clinic; am I

18   right?

19       MS. CANFIELD:  Objection.

20       A    Those two are unrelated.

21       Q    If no one is at the Bronx clinic, if

22   Dr. Kaye leaves -- like right now, you said you are

23   in the process of hiring someone for Dr. Kaye,

24   right?

25       A    Correct.

Patricia Yang

1

2        Q    Now, if there is, I guess, a movement of

3    the staff, should there have been a stoppage of

4    people being seen at the clinic?

5        MS. CANFIELD:  Objection.

6        You can answer.

7        A    No.  The first -- the first effort would

8    have been to get staff over to those clinics to see

9    those cases.

10       Q    Well, it is Dr. Kaye's assertion that a

11   moratorium was called on exams at the Bronx clinic

12   after Dr. Brayton left.  Are you aware of that

13   moratorium?

14       A    No.

15       MS. CANFIELD:  Objection.

16       Q    So you are not aware that there were no

17   defendants seen at the Bronx clinic from November

18   until Dr. Kaye left?

19       MS. CANFIELD:  Objection.

20       You can answer.

21       A    I was not aware.

22       Q    How could you not know if there were no

23   people coming to the Bronx clinic to be seen?

24       MS. CANFIELD:  Objection.

25       A    That's a very good question.

83 (Pages 326 - 329)

Page 330

Patricia Yang

1
2    Q   Who should have told you, if there were
3  people not being seen at the Bronx clinic?
4        MS. CANFIELD:  Objection.
5        It assumes facts that are not
6     established.
7        THE WITNESS:  Right.
8    Q   If there were no one being seen at the
9  Bronx clinic, who should have told you?
10       MS. CANFIELD:  Objection.
11    A   If that were the case, I would have
12  expected Bhish, Dr. Jain, or Dr. Ford, or
13  Dr. MacDonald to let me know that.
14    Q   We did Dr. Ford resign, do you know?
15    A   I do.  February 14th, Valentine's Day.
16    Q   Was that the effective day of resignation
17  or did she send a letter of resignation before then?
18    A   Oh, she resigned -- I mean, she sent a
19  letter notifying us of her intention to resign.
20    Q   Was she told she couldn't come back that
21  day or she gave two-weeks notice?
22       MS. CANFIELD:  Objection.
23    A   I think she gave more than two-weeks
24  notice.
25    Q   So they she was able to give her letter

Page 331

Patricia Yang

1
2  of resignation and still continue to come to work;
3  is that right?
4    A   Yes.
5    Q   Now, what would be the circumstances
6  where a person would give a letter of resignation
7  and not be allowed to come back to work?
8    A   That's a determination made by labor.
9    Q   Who is Labor?
10    A   Our Labor Relations, in consultation with
11  the Health and Hospitals.
12    Q   Who is that?  Who are those people?
13    A   That would have been Samantha Kent, who
14  worked for Jessica Laboy at that point in time, with
15  Jonathan Wangel.
16    Q   Now, Dr. Kaye alleges that, when she gave
17  her letter of resignation, she was not allowed to
18  come back on the premises.
19        Would you be aware of any reason why she
20  would be banned from the premises?
21       MS. CANFIELD:  Objection.
22        You can answer.
23    A   I would not go into those details.
24    Q   No.  I mean, not you wouldn't go -- do
25  you know for a fact there is something she did that

Page 332

Patricia Yang

1
2  would warrant that type of reaction?
3    A   I was not involved in the discussions of
4  that detail.
5    Q   Dr. Kaye worked there for twenty years,
6  and she gives her letter of resignation, and she is
7  not given an opportunity to even pack her things.
8  She had to take whatever she can that night, or
9  else.
10    A   I don't recall --
11       MS. CANFIELD:  Objection.
12        You can answer.
13    A   I don't recall the exact details of it,
14  but I believe that arrangements were made for her to
15  come and get her things, and when the clinic opened
16  on that day, it was discovered she had already taken
17  all of her things and gone.
18    Q   Dr. Kaye alleges that she was not allowed
19  to come back.  Once she left -- once she gave her
20  letter of resignation, she alleges she was not
21  allowed to come back.
22       MS. CANFIELD:  Objection.
23        You can answer.
24    A   I am not the one closest to it, but my
25  recollection is that the next day, when she was --

Page 333

Patricia Yang

1
2  we were expecting her in clinic, the people who went
3  to clinic said that everything was gone.
4    Q   You are saying that you were expecting
5  Dr. Kaye to come back after she gave her letter of
6  resignation?
7    A   I am pretty sure that that was what was
8  going to happen.
9    Q   So you are under the impression she was
10  going to be able to work the full two weeks until
11  her last day?
12    A   No.  There was -- there was discussion
13  about accommodating whether she wanted to work off
14  site, whether we would just pay her so she could be
15  home, but we did make arrangements to get boxes for
16  her and everything, and everything was gone.  It was
17  packed up.
18    Q   Now, again, I am going back to these
19  repeated e-mails now from you.  You are not
20  delegating at this point?
21    A   Right.
22    Q   Every week, with the exception of the
23  week of, I guess, February 4th, you were e-mailing,
24  trying to see that someone take Dr. Kaye.  Is that
25  right?

84 (Pages 330 - 333)

Page 334

Patricia Yang

1
2     MS. CANFIELD: Objection.
3     A  Correct.
4     Q  Have you ever been this assertive in
5  trying to get a staff person to another site?
6     A  I am this assertive about everything.
7     Q  I am talking about this situation with a
8  staff person who has no identified performance
9  issues.  Have you ever worked this hard to try to
10  get them to another place?
11     MS. CANFIELD: Objection.
12     You can answer.
13     A  I have not experienced a senior clinician
14  who is so unhappy with us, who expressed a desire to
15  go back to another facility, that I didn't help.
16     Q  How do you know she was so unhappy with
17  you?  She never sent you e-mails.  Someone was
18  monitoring her e-mails.  Am I right?
19     MS. CANFIELD: Objection.
20     A  No.  Again, the monitoring was not
21  ongoing.  That was to answer a specific question,
22  and it was for a period of time.
23     Q  But she hadn't conveyed to anyone outside
24  of, I guess, the original transfer that she wanted
25  to go to Bellevue; is that right?

Page 335

Patricia Yang

1
2     MS. CANFIELD: Objection.  You can
3  answer.
4     A  I am not sure what you are talking about.
5     Q  Did she ever e-mail Mr. Wangel or
6  Mr. Jain or Dr. Ford, for that matter, that she
7  wanted to go back to Bellevue?
8     A  I don't know how it came to my attention,
9  but it came to my attention that she had requested
10  in late 2018 to go back to Bellevue.
11     Q  But the question is, do you know for a
12  fact that she e-mailed any of these individuals that
13  you manage and asked them specifically that she
14  wanted to go back?
15     MS. CANFIELD: Objection.
16     You can answer.
17     A  I don't recall who was the addressee in
18  an e-mail, but I do recall seeing an e-mail --
19     Q  Okay.
20     A  -- from Dr. Kaye asking to go back.
21     Q  You don't know if she made it to her --
22  you don't know when she sent that e-mail, and you
23  don't know who it was made out to?
24     MS. CANFIELD: Objection.
25     A  I can't remember that, no.

Page 336

Patricia Yang

1
2     Q  Okay.  Now, we were talking about the
3  shift restoration and the reasonable accommodation
4  request again, right, at one point?
5     And again, she is still asking in
6  April -- as persistent as you were trying to get her
7  to go, she was as persistent trying to get her
8  reasonable accommodation.
9     So on April 26, 2019, again, she is
10  asking about shift restoration, and I am going to
11  share the e-mail with you.  This would be Exhibit
12  Number 19.
13     (A two-page e-mail chain, Bates stamped
14     NYC 001478 through 001479, was received and
15     marked Plaintiff's Exhibit 19 for
16     identification at this time.)
17     (Whereupon, a discussion was held off
18     the record.)
19     Q  Now, are you aware of this, I guess,
20  additional attempt again to get a shift restoration
21  via a reasonable accommodation request in April at
22  this point?
23     MS. CANFIELD: Objection.
24     It doesn't appear that she is copied on
25     these e-mails.

Page 337

Patricia Yang

1
2     MS. HAGAN: Well, actually, the January
3  10th e-mail, she is.  Dr. Yang is.
4     MS. CANFIELD: Right.
5     MS. HAGAN: Then, after that, it appears
6  that a Kevin Marrazzo, who is the EEO
7  officer at this point, was actually copied
8  on the e-mail.
9     Q  Now, at any point, did you interact with
10  Mr. Marrazzo?
11     A  No.
12     Q  Why is that?
13     A  It is not my scope of -- it is not -- it
14  is not the level of work that I engage in.
15     Q  So your level of work -- it is your
16  representation that you are too senior to deal with
17  the EEO officer; is that right?
18     A  No.
19     MS. CANFIELD: Objection.
20     Q  What are you saying then?  Explain.
21     A  Unless it is necessary, and it didn't
22  appear to be necessary, that the EEO officer, as he
23  says here, took over the file, and he is asking for
24  whatever other information.
25     MS. CANFIELD: I think we are almost to

85 (Pages 334 - 337)

Page 338

Patricia Yang

1
2  seven hours, if not over seven hours.  So I
3  would say, just make note of a maximum ten
4  minutes at 6:30, and then we are going to
5  have to call the deposition.
6      MS. HAGAN:  Fair enough.  Okay.
7      Q  I just want to draw your attention back
8  to Exhibit 1.
9      Now, at any time, did you have like an
10  all-staff meeting where Dr. Kaye had an opportunity
11  to, I guess, contribute or opine about changes being
12  made at the court clinics?
13      A  I don't know.
14      Q  Have you ever told Dr. Kaye or anyone
15  else that, if they didn't like the way things were
16  being done, that there was the door?
17      A  No.
18      Q  So you have never used that language?
19      A  I don't think I would.
20      Q  If a staff person, for example, pointed
21  out -- for example, you said that you saw this
22  Complaint, right?  That you read the Amended
23  Complaint, right?
24      A  Yes.
25      Q  At one point, Dr. Kaye alleges, on page

Page 339

Patricia Yang

1
2  434, paragraph 110 -- first, we will go to 110, and
3  then we will go to 107.
4      Now, in 110, Dr. Kaye said she informed
5  Dr. Ford that destruction of handwritten notes would
6  be a class E felony.
7      Did you remember reading something like
8  that when you read this Complaint?
9      A  Sure.
10      Q  Did you look into that, by any chance?
11      A  I did have a -- I didn't go through each
12  point and item of these, because that wasn't what I
13  was going to do, but --
14      Q  But a class E felony, wouldn't you think
15  that that would be --
16      MS. CANFIELD:  Let her finish.
17      Q  A class E felony, wouldn't that be grave
18  enough importance to look into?
19      A  So to finish my sentence --
20      Q  Sure.
21      A  I didn't go through every point of this
22  because that didn't feel called for, but I did speak
23  with Dr. Jain, and he did not discard his notes.
24  They are in a notebook.
25      MS. HAGAN:  They are in a notebook.  I

Page 340

Patricia Yang

1
2  call for production of a copy of the
3  notebook then.
4      You will take that under advisement,
5  Counsel?
6      MS. CANFIELD:  Yeah, you have to be more
7  specific.  I am sure that these are
8  confidential notes.  I don't know if it
9  is something that we can --
10      MS. HAGAN:  They can be redacted, if
11  necessary, but you are alleging that --
12      Q  Did you see this notebook yourself?
13      A  No.
14      Q  You are just taking Dr. Jain's word that
15  he had --
16      A  That he retained his notes.
17      Q  -- that he retained his notes?
18      A  Yes.
19      Q  I draw your attention to paragraph 107,
20  and in 107, Dr. Kaye alleges, in or around January,
21  2018, she informed you that best practices regarding
22  the use of HIPAA release forms for -- about the best
23  practice for using HIPAA release forms.
24      She stated that the staff should obtain
25  and review unredacted medical records by way of

Page 341

Patricia Yang

1
2  court order, so they can comply with the
3  medical-legal standards in the field of forensic
4  psychiatry.
5      She says that you disregarded her
6  suggestion, and to date, that CHS continues to
7  commit HIPAA violations at the FPECC clinics.
8      MS. CANFIELD:  Objection.
9      I just want to note, for the record,
10  that January 2018, Dr. Kaye was not working
11  for Dr. Yang, nor at CHS.
12      MS. HAGAN:  Regardless of who she was
13  working for, Dr. Kaye brought this to
14  Dr. Yang's attention.
15      Q  Right?
16      MS. CANFIELD:  Objection.
17      Q  And she alleges --
18      A  Not that I recall.
19      Q  You don't recall that?
20      A  No.
21      Q  There is a discussion, according to Judge
22  Torres, and you said there was a cyclone she
23  committed -- there was an exchange we talked about
24  earlier today where there was a dispute as to
25  whether or not unredacted records were actually, in

86 (Pages 338 - 341)

Patricia Yang

1
2  fact, required to do forensic exams.
3       Would you agree that we discussed that
4  earlier?
5       A  We did discuss Judge Torres and the Bronx
6  clinic.
7          MS. CANFIELD:  Can I just show the
8      witness Exhibit Number 9?
9          MS. HAGAN:  Right.
10      Q  Now, why would there be such pushback if
11  someone who has been performing forensic
12  examinations for twenty years would say that the
13  norm would be for unredacted records.
14      A  I'm sorry.  Ask the question again.
15      Q  Why would there be such pushback if
16  Dr. Kaye, who has been performing forensic exams for
17  twenty years, said that unredacted records were
18  needed?
19          MS. CANFIELD:  Objection.
20      A  I can't explain that.
21      Q  Why was there pushback?
22          MS. CANFIELD:  Objection.
23      A  Because legal counsel advised us that --
24  as here, that it was -- it was Patrick Alberts and
25  everybody else's piece, that it was not legal to do.

Patricia Yang

1
2       Q  But clearly, Dr. Kaye had been doing it
3  for twenty years.  Why was it now it was illegal?
4          MS. CANFIELD:  Objection.
5      A  It may have been illegal the entire time.
6      Q  But now they decided, all of a sudden, it
7  is illegal.  Why would it be now Mr. Alberts decides
8  it is illegal now?
9          MS. CANFIELD:  Objection.
10      A  Because we didn't know it was going on
11  before, and if you find something going on that is
12  not legal, you need to act on it in my world.
13      Q  What specific statute did Mr. Alberts
14  reference that the production of unredacted records
15  would be illegal?
16          MS. CANFIELD:  Objection.
17      You can answer.
18      A  If it is not here, I can't cite it.
19      Q  But you are taking his word without any
20  legal authority or any medical authority that it is
21  illegal; is that right?
22          MS. CANFIELD:  Objection.
23      A  I am taking the advice of counsel at MOCJ
24  and CHS and Health and Hospitals.
25      Q  Was there a memo to this effect?

Patricia Yang

1
2      A  I don't know.
3      Q  You don't know.  You don't remember
4  reading anything like an e-mail or a memo at all
5  saying that it was -- outside of this, that perhaps
6  made reference to a specific statute?
7          MS. CANFIELD:  Objection.
8      She is currently looking at Exhibit 9
9      where she received legal advice.
10      Q  Was there any statute that you know of
11  that said it was legal for them to use redacted
12  records?
13      A  I know that there is federal and state
14  law, over all my decades of working here to
15  understand HIPAA and the specific federal and state
16  laws that prohibit release of special protected
17  information without specific consent.
18      Q  Wouldn't that apply if the defendants
19  were being treated and not evaluated?
20          MS. CANFIELD:  Objection.
21      A  It applies throughout.
22      Q  Are you testifying that there is no
23  distinction between treatment and evaluation and
24  what they have access to?
25          MS. CANFIELD:  Objection.

Patricia Yang

1
2      A  I don't even understand the question.
3      Q  In the 730 reports, there is reference
4  made to defendants' prior usage of drugs and medical
5  records.  If they are redacted, how could that
6  determination be made by the examiner?
7          MS. CANFIELD:  Objection.
8      You can answer.
9      A  I believe, in one of your exhibits,
10  Dr. Ford, with her forensic psychiatry experience,
11  cites that standard is that forensic psychiatry does
12  evaluations with the information that they have at
13  hand.
14      Q  But in those reports, which were
15  numerous, Dr. Kaye references medical records and
16  the defendants' usage of drugs from the medical
17  records.  Would you say that that's a problem then?
18          MS. CANFIELD:  Objection.
19      You can answer.
20      Q  They are not redacted.  So what type of
21  information would be redacted in medical records in
22  that instance then?
23          MS. CANFIELD:  Objection.
24      You can answer.
25      A  Without specific consent of the person,

87 (Pages 342 - 345)

Page 346

1          Patricia Yang
2 the patient, or the client, substance use, mental
3 health, in general circumstances, unless court
4 ordered, and HIV are the three sacred areas.
5     Q   So you are saying that they need -- these
6 defendants needed to complete and sign releases,
7 right?
8     MS. CANFIELD:  Objection.
9     You can answer.
10    A   Yes.  I think if you had specific release
11 from the defendant, the client, the patient.
12    Q   Now, Dr. Kaye also recognizes or noticed
13 that the inmates were incorrectly filling out the
14 HIPAA forms.  Did you notice that?
15    MS. CANFIELD:  Objection.
16    A   No.
17    Q   Were there ever complaints that the
18 inmates were or the defendants were completing or
19 incompletely fill out the HIPAA forms?
20    A   Not that I was aware, but I am not
21 surprised.
22    Q   And when she brought that to your
23 attention or anyone else's attention, had there ever
24 been any quality assurance to ensure that the forms
25 were completed correctly?

Page 347

1          Patricia Yang
2     MS. CANFIELD:  Objection.
3     A   The forms are completed -- if they are
4 completed correctly, we provide information.
5     Q   But when Dr. Kaye pointed out that they
6 weren't all completed correctly and the information
7 was still being provided, was anything done to stop
8 that from happening?
9     MS. CANFIELD:  Objection.
10    A   I would say that, if it came to my
11 attention that we were releasing information
12 improperly, we would stop that.  People would be
13 disciplined.
14    I think the issue here was that Dr. Kaye
15 was asking for information without consent.
16    Q   But she also notified that --
17    MS. CANFIELD:  All right.  It is 6:30.
18    MS. HAGAN:  I am going to have to ask
19 for, you know, I guess additional time then
20 and petition the court accordingly.
21    I know that you will do whatever you
22 have to do to stop it?
23    MS. CANFIELD:  That's what we do.
24
25    (Continued to Include Jurat.)

Page 348

1          Patricia Yang
2     MS. HAGAN:  I am going keep the record
3 open.  I am keeping the deposition open.
4          (TIME NOTED:  6:32 P.M.)
5
6
7     _____
8          PATRICIA YANG
9
     SUBSCRIBED AND SWORN TO BEFORE ME
10 THIS ____ DAY OF _____, 20___.
11
     _____
12    NOTARY PUBLIC
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 349

1          Patricia Yang
     INDEX TO EXAMINATION
2
     Witness        Examination By      Page
3
     Patricia Yang      Ms. Hagan       4 - 347
4
5
6          INDEX TO EXHIBITS
7 Plaintiff's     Description        Page
8 Exhibit 1   First Amended Complaint, Bates
         stamped KAYE000415 through
9        KAYE000446              5
10 Exhibit 2   City of New York, Department
         of Investigation report, Bates
11       stamped KAYE000384 through
         KAYE000414             22
12
     Exhibit 3   Document entitled "Charge of
13       Discrimination," Bates stamped
         KAYE000364 through KAYE000366   95
14
     Exhibit 4   Six pages containing Correctional
15       Health Services organizational
         charts                156
16
     Exhibit 5   Document entitled "NYC Health
17       and Hospitals Operating Procedure
         No. 20-32, Equal Employment
18       Opportunity (EEO) Program,"
         Bates stamped D000715 through
19       D000729              163
20 Exhibit 6   Nine-page document consisting
         of a U.S. District Court Civil
21       Docket                185
22 Exhibit 7   Three-page e-mail chain   185
23 Exhibit 8   Four-page Confidential
         Investigatory Information
24       Memorandum from Mr. Wangel to
         Dr. Yang, dated May 9, 2019   192
25

88 (Pages 346 - 349)

Page 350

```
1         Patricia Yang
   Plaintiff's    Description        Page
2
   Exhibit 9   Three-page e-mail chain,
3           Bates stamped NYC 000077
            through NYC 000079    211
4
   Exhibit 10  Three-page e-mail chain,
5           which should be Bates stamped
            NYC 205 through NYC 207   217
6
   Exhibit 11  Two-page e-mail, dated
7           May 3, 2018, from Dr. Kaye
            to Dr. Yang        250
8
   Exhibit 12  One-page e-mail chain,
9           Bates stamped NYC 000957   288
10 Exhibit 13  Six-page e-mail chain, Bates
            stamped NYC 000616 through
11          NYC 000620        299
12 Exhibit 14  One-page e-mail exchange,
            Bates stamped NYC 000596   310
13
   Exhibit 15  One-page e-mail chain,
14          Bates stamped NYC 2581   314
15 Exhibit 16  One-page e-mail chain,
            Bates stamped NYC 1114   322
16
   Exhibit 17  One-page e-mail, Bates
17          stamped NYC 001187   326
18 Exhibit 18  One-page e-mail, Bates
            stamped NYC 001247   326
19
   Exhibit 19  Two-page e-mail chain,
20          Bates stamped NYC 001478
            through 001479     336
21
22
23      (Index Continued)
24
25
```

Page 351

```
1         Patricia Yang
      INDEX TO REQUESTS
2
   Items Requested:        Page
3
   Certificates of completion for Dr. Yang's
4  EEO training        103
5  Production of Mr. Wangel's performance
   evaluations         112
6
   Notebook containing Dr. Jain's notes   339
7
8
9
      INDEX TO RULINGS
10
   Question Location:
11
      Page 26   Line 14
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 352

```
1      Patricia Yang
2      CERTIFICATION
3
4      I, Courtney Biondo, a Notary Public in
5  and for the State of New York, do hereby certify:
6      THAT the witness whose testimony is
7  hereinbefore set forth, was duly sworn by me; and
8      THAT the within transcript is a true
9  record of the testimony given by said witness.
10      I further certify that I am not related,
11  to this action; and either by blood or marriage, to
12  any of the parties
13      THAT I am in no way interested in the
14  outcome of this matter.
15      IN WITNESS WHEREOF, I have hereunto set
16  my hand this 10th day of March, 2020.
17
18
19
20
21      COURTNEY BIONDO
22
23
24
25
```

Page 353

```
1      Patricia Yang
      ERRATA SHEET
2     VERITEXT LEGAL SOLUTIONS
        1-800-727-6396
3
   330 OLD COUNTRY ROAD       1250 BROADWAY
4  MINEOLA, NEW YORK 11501   NEW YORK, NEW YORK 10001
5
6  NAME OF CASE:  Kaye v. NYC Health and Hospitals
   DATE OF DEPOSITION:  2/28/2020
7  NAME OF DEPONENT:  Patricia Yang
8  PAGE LINE(S)     CHANGE       REASON
9
10
11
12
13
14
15
16
17
18
19
20
21      PATRICIA YANG
22 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS ____ DAY OF _____, 20__.
23
24
      NOTARY PUBLIC
25
```

89 (Pages 350 - 353)

**[000077 - 2018]**                                                      Page 1

| 0 |
| --- |

**000077**   211:22
350:3
**000079**   211:22
350:3
**000596**   310:8
350:12
**000616**   299:13
350:10
**000620**   299:13
350:11
**000957**   288:18
350:9
**001187**   326:4
350:17
**001247**   326:22
350:18
**001478**   336:14
350:20
**001479**   336:14
350:20

| 1 |
| --- |

**1**   5:12,17 23:11,13
106:5,16 153:8,8
170:2 208:2
229:17 316:13,14
338:8 349:8
**1,400**   304:25
**1,700**   145:9 276:2
276:3
**1-800-727-6396**
353:2
**1.0**   298:11,16
**1.0.**   298:13
**10**   217:6,10 220:19
250:18 251:6
262:10 264:12,13
278:11 350:4
**100**   2:10

**10001**   353:4
**10007**   2:11
**10041**   4:24
**103**   351:4
**107**   339:3 340:19
340:20
**10:11**   1:16
**10th**   337:3 352:16
**11**   191:2 250:7,12
250:20 251:4,7
271:22 317:25
318:3 319:23
326:20 350:6
**110**   339:2,2,4
**1114**   322:6,24
350:15
**112**   351:5
**11412**   2:5
**11501**   353:4
**1187**   326:6
**11th**   327:21
**12**   185:19 186:4
187:23 189:23
190:24 288:19,23
288:23 316:14
350:8
**12/21**   190:22
**125**   116:8
**1250**   1:14 353:3
**12th**   186:24
190:17
**13**   299:11,14,19
300:3,4 310:23,25
350:10
**13,400**   301:13
**14**   310:3,9,12,14
311:6 312:19
350:12 351:11
**14th**   330:15
**15**   313:25 314:4,8
322:13 327:18

350:13
**156**   349:15
**15th**   18:8
**16**   112:12 322:7,10
322:20 327:14,18
350:15
**160**   116:8 166:3
**1622**   157:6 158:3
**1629**   157:7
**163**   349:19
**1630**   157:7 177:22
**1634**   157:7
**1635**   157:7
**1636**   157:6
**17**   60:3 112:12
325:24 326:5
327:14,18 350:16
**18**   60:3,18 326:17
326:19,23 327:14
327:18 350:18
**185**   349:21,22
**19**   15:13 336:12,15
350:19
**19-12137**   1:5
**192**   349:24
**196-04**   2:5
**1980**   11:21 12:15
12:18
**1981**   12:14
**1983**   12:21,22
**1986**   13:16
**1987**   13:16
**1988**   14:10
**1989**   15:12
**1990**   16:2
**1999**   246:24
247:21,22 253:16
**1st**   80:19 226:9
267:13

| 2 |
| --- |

**2**   22:19,23 23:16
349:10
**2,000**   122:5,8
126:19
**2/28/2020**   353:6
**20**   348:10 353:22
**20-32**   163:22
164:8,13 349:17
**2000**   101:21
**2005**   10:12
**2010**   16:3,4 17:12
18:8
**2011**   7:2
**2014**   18:9 19:24
**2015**   19:25 29:9
37:5,8,8,10,15
38:25 39:3 43:13
103:6,8 112:3,5
117:7 316:5
327:15
**2016**   112:8,10
**2017**   57:7 60:10
304:25
**2018**   1:15 44:6,7,8
44:10 46:22 48:5
59:8 60:19 62:7
65:25 80:8 81:16
105:19,23 107:17
120:12,12,21
121:14 151:6
170:4,6,9,15
173:18 185:15
187:2 225:25
250:10 251:10
267:13 268:15
269:2 289:13
300:14 301:25
304:25 316:24
317:8,14 335:10
340:21 341:10

350:7
**2019**   6:16 44:9
   102:2 120:13
   157:5,18 170:15
   185:19 186:4
   187:25 189:23
   192:9,17 193:2
   326:20 336:9
   349:24
**2020**   101:22,23
   352:16
**205**   217:4,21
   218:10,18 350:5
**206**   217:21
**207**   217:4 218:11
   218:18 350:5
**211**   350:3
**217**   350:5
**21st**   185:15 187:2
   187:15,17 190:16
   316:24
**22**   349:11
**22nd**   327:19,20
**250**   350:7
**2581**   314:3,9
   350:14
**26**   300:14 336:9
   351:11
**26th**   310:15
**27**   300:14
**28**   1:15
**288**   350:9
**28th**   19:25
**29**   37:15 38:25
**299**   350:11
**29th**   29:9 37:10
   322:11

**3**

**3**   94:25 95:5,13
   250:10 349:12
   350:7

**30**   27:18
**30th**   80:15 81:23
   225:9 267:14
   304:25,25
**310**   350:12
**314**   350:14
**322**   350:15
**326**   350:17,18
**330**   353:3
**336**   350:20
**339**   351:6
**347**   349:3
**366**   95:14,20
**3835**   352:19
**390**   45:19 53:15,21
   54:3,12,17,22
   55:10,15 74:18
   75:6 133:12
   231:12,14
**390s**   66:23 140:10
   140:14
**3rd**   191:23 192:9
   251:10 268:15

**4**

**4**   156:21,24 157:3
   157:17 162:25
   349:3,14
**424**   208:5
**434**   339:2
**472**   196:21,23
**4th**   18:9 333:23

**5**

**5**   163:25 164:6
   349:9,16
**55**   4:23 115:21
   116:3,6 166:3,3
**596**   311:4,22
**597**   311:10
**5:30**   290:13

**6**

**6**   27:18 185:4,7
   186:24 187:8,16
   191:16,21 316:15
   316:15 349:20
**616**   299:24,25
   300:4 301:4,5
   310:25
**618**   305:19,19
**619**   304:19
**620**   299:25 300:4
   310:25
**66**   95:16
**67**   298:12 301:13
**6:30**   338:4 347:17
**6:32**   348:4

**7**

**7**   185:23 186:3
   187:18 317:19,23
   318:5,6,6 349:22
**724**   166:14,16
**730**   45:18 53:16
   55:10,11,18 56:6
   67:14,21 68:8,9,10
   70:22 74:19 128:4
   128:8,9,13,14,18
   128:20,23 129:11
   129:18,22,25
   130:4,5,7,12,20,24
   131:10,15,25
   133:12 197:12
   231:12,16 345:3
**730s**   66:23,24,25
   67:3,16 69:5
   74:25 140:10,14
   231:17
**77**   212:11,14
**79**   212:11

**8**

**8**   192:14,18,23
   211:18 349:23
**80s**   237:20 238:4
**81**   11:22
**83**   13:6,8
**86**   13:11,11
**87**   13:11,18
**88**   13:19
**8:34**   318:2

**9**

**9**   192:17 193:2
   211:20,23 212:9
   342:8 344:8
   349:24 350:2
**90**   15:13
**95**   349:13
**957**   288:24
**9th**   38:25 39:3

**a**

**a.m.**   1:16 290:12
**aaron**   47:23 215:8
**abbreviation**
   298:8
**abdicated**   83:25
**abetted**   1:9
**abhishek**   1:8
**ability**   8:18 30:17
   74:22 76:25
   140:21 143:6
   148:4
**able**   70:17 105:4
   117:12 143:7
   233:19 272:23
   293:7 330:25
   333:10
**absolutely**   127:17
   204:15 216:9
   243:9

absorb  39:15
225:3,5,6 226:18
227:3,7
absorbed  106:7
225:20,21
absorbing  169:19
224:23 244:4
academy  199:17
accelerated  11:4
accept  84:6
accepted  73:13,24
74:10 96:18 296:3
access  168:7 190:6
319:19 344:24
accommodate
106:5 107:8 206:3
228:4 257:14
286:7 324:3
accommodated
256:12 268:3
accommodating
333:13
accommodation
82:11 93:3 97:6
97:15 98:19
100:23 101:5
226:14 257:2,6,19
258:5,25 259:13
259:20,23,25
260:19,23 261:5
279:20 280:5,12
285:7,12,23,25
293:11 336:3,8,21
accommodations
100:19 257:14
259:5,24 289:23
293:6
account  184:9,10
184:12
accountability
21:3 243:23

accounts  72:20
accredited  32:23
accumulate  26:20
accurate  210:15
acknowledge
189:19 190:15,19
190:24 316:22
acronym  19:20
act  234:3 343:12
acting  15:16 16:17
168:8
action  137:4,20
352:11
actions  125:16
active  319:20
actual  74:19
191:15 193:22
304:17 316:16
acute  42:22
adamantly  290:19
adams  94:8 96:13
100:14
additional  35:11
58:14 64:11,24
201:22 216:8
336:20 347:19
address  4:22,23
121:18 126:7
131:20 166:2
169:8 208:9
223:15 224:4,7,9
224:17 225:15
262:12 263:22
302:17,23 303:3
326:15
addressed  193:7
262:25 277:18
280:4 292:2
addressee  335:17
adequately  307:2

adhere  241:24
admin  41:8 47:8
48:16
administer  54:22
143:19
administered
53:24 57:25 75:2
75:7 87:23 102:8
135:4 140:10
administering
70:22 135:2
administration
17:18 18:2 54:17
55:5 127:15
128:23 130:13
134:10,17,22
139:13 140:14
administrative
36:4,7 47:10
61:21 109:18,24
110:2,20 115:13
119:21 129:8
163:17 168:16
175:6 177:25
230:8
admit  143:16
191:6,8,9,11 211:3
220:13
advice  130:16
161:4 189:7,13
343:23 344:9
advise  167:22
advised  92:23 93:8
196:11 208:15
213:18 342:23
advisement
103:17 113:7
340:4
advising  168:8
affairs  5:24 6:2,4
6:5 36:25 37:2

98:4 99:17 104:14
119:9,10,13 121:3
160:2 161:21
167:8,13 168:19
affect  76:25
affiliate  14:2
108:20
afternoon  304:20
afterward  33:10
agencies  30:22
181:10
agency  21:13
167:14 168:8
176:16 236:17
240:18
ago  176:11
agree  342:3
agreed  3:2,6,9
82:15 107:13,24
169:25
agreement  80:12
80:13 92:21
230:24 231:7
233:25 235:4
236:24 239:22
242:7 245:24
246:15 251:24
270:19 287:3,12
290:14,22,25
291:6,6,7,9,14,18
291:20,22 292:10
ahead  17:11 31:20
aid  65:6 130:20
131:6,8 132:16,21
aid's  132:22
aided  1:9 19:3
ailment  260:11,13
albans  2:5
albany  116:8
alberts  49:4
212:10 215:7

342:24 343:7,13
alcohol 8:12
alerted 78:14
aligned 59:3
allegation 169:11
allegations 81:11
121:9 171:12,13
204:20 205:4,25
allege 231:9
alleged 30:22 56:4
186:14,18 187:19
243:24
allegedly 70:3
182:14,20
alleges 97:16 99:6
126:3 127:13
148:20 149:4
243:7,14 244:7
297:13 331:16
332:18,20 338:25
340:20 341:17
alleging 340:11
allocated 69:17
allow 24:14
107:11 142:11
153:3 200:3
292:11 293:11
allowed 107:7,19
141:19 143:2
150:3,4 152:23
153:2 241:23
293:6 294:6 331:7
331:17 332:18,21
alones 58:19
alternative 288:5
altogether 18:3
ambulatory 13:25
42:22
amended 5:8,15
9:13 23:13,14
192:8,9 204:22,23

229:17,18 338:22
349:8
american 199:17
199:25
amorphous 286:2
amount 39:8 59:7
126:20 209:22
301:12 304:4
307:3 308:17
309:15
amounts 206:11
306:7
analysis 74:23
144:5 256:14
analyst 12:3,11,19
12:20,20 237:21
ancillary 14:2
anderson 47:23
175:7
andrea 110:18,19
160:17,18,20
andrew 17:7
andy 314:17,17,18
315:6,13,16,17
angela 304:19
305:22 306:3
animated 296:13
anna 95:16
anne 293:19,20
annoy 91:5
annoyed 90:25
91:20 119:11
annoying 91:6,25
annual 102:16
annually 103:10
answer 8:8,18 9:5
22:4,4,10 24:11
29:17 30:16 31:6
31:25 32:7 33:7
33:21 34:17,21
38:3,10 40:25

41:17 42:17 43:20
44:5 45:8 49:14
50:10 51:4,14
52:7,19 54:5,19,24
56:10,20 57:6
58:5 59:11 61:20
63:9,16 66:18
67:10,12,18,23
68:4,25 69:8 70:7
70:14 71:7,18
72:13 73:6,12
74:22 75:8,16,17
77:4 82:7,24 84:5
85:11 86:19 89:23
91:4 94:2 96:24
97:18 98:21 100:7
100:25 101:11
104:9 105:2,8,25
106:12 108:8
116:14 117:11,12
117:15,20 118:9
120:4 122:19
124:16 126:12
127:23 129:6,14
131:17 133:9
134:2,14,20 135:7
136:5 139:18,25
140:16 142:5,14
143:21 144:2,8
146:16 149:8
150:7 151:23
154:7,25 159:15
159:24 166:9
167:5 168:11
169:5 170:19
171:5 173:12
175:22 178:21
179:18 180:4,24
183:9 184:14
195:23 199:22
200:17 201:3

205:21 206:6
207:6 209:20
211:5 213:13
214:15 220:24
231:3 232:12
233:3 235:21
236:8 239:24
241:21 244:11
245:16 247:7
249:13 253:12
255:3 264:7,24
266:21 273:17
276:24 291:24
292:13,24 303:10
309:3,18 312:14
324:13 325:14
329:6,20 331:22
332:12,23 334:12
334:21 335:3,16
343:17 345:8,19
345:24 346:9
answered 132:4
184:2 207:24
answering 54:20
301:18
anthony 19:13
anticipation
267:21 270:14
anybody 77:20
93:23 132:6 135:3
182:13 275:4
286:23
anymore 69:18
89:4,5
apart 42:8 244:12
apologize 24:4
39:20 132:5
apparently 224:10
302:16
appear 291:6
306:4 311:17

336:24 337:22
appeared 319:4
appears 178:4
300:12 304:13
337:5
application 97:15
applied 70:9 76:2
76:3 109:13
111:12
applies 344:21
apply 17:3 20:3
203:15 260:24
344:18
applying 16:23
appoint 96:16
appointed 20:2
49:18 76:2,3
83:20
appointment
35:17
appointments
125:19
approached
284:11
appropriate 27:17
32:22 57:21
139:19 159:20
160:12 208:25
232:3 267:21
270:13 276:10
appropriately
32:12
approve 125:20
approved 76:16
76:19 125:8 143:4
181:20 183:20
approving 101:3
136:24
approximately
39:12,16,18

april 80:9,18
106:4 153:8
189:22 191:15,19
289:13 304:20
336:6,9,21
architecture
313:21
areas 42:21
112:20 297:23
346:4
argue 286:18
argued 246:11
arguing 238:11
240:24
argument 305:2
arias 50:2 176:8
arounds 44:15
arrangements
295:14 332:14
333:15
arrest 32:25
arrested 142:8
arrests 21:18
arrive 71:12
artifact 313:4
asian 99:8
asked 16:23 17:3
51:16 78:8 93:3
93:12 121:7
122:10,16 123:4
123:11 124:12,17
124:20,21 125:2
126:14 158:12
196:20 206:7
207:24 210:2,6
234:2 241:10
255:14 257:13
259:13,22,23,25
260:19 272:4
273:18 287:10,20
288:4,8 304:20

306:15 320:4,15
326:25 327:4,13
327:24 335:13
asking 38:11 97:6
98:11,13 137:8
159:5 171:11
202:2 203:10
204:14 221:19
222:2 241:11
245:2 258:17
270:2 271:9
285:22 286:2,3
287:6 301:19
313:6 318:12
323:24 328:11
335:20 336:5,10
337:23 347:15
asks 271:22
aspect 139:16
aspects 26:4 39:5
42:25 51:15 57:12
103:21
assert 252:4
assertion 329:10
assertive 334:4,6
assessment 53:22
assign 87:7 113:22
assigned 277:9
assist 90:3
assistance 78:8
119:17
assistant 14:17
38:14 175:8,10
associate 12:5,7
13:4,7,19,21 14:6
178:17 179:12
association 16:20
199:25
assume 7:21 67:14
105:22 198:3

assumed 106:9
142:19
assumes 330:5
assuming 10:15
11:13,23 17:22
43:15 69:25 91:15
112:5 289:12
assurance 43:10
43:11 47:15 49:5
117:3 346:24
assured 78:25
79:7 244:7,12
245:5,11
attempt 121:18
142:16 173:5
296:5 324:3
336:20
attempted 88:6
attempts 173:6
attend 32:21
attendance 65:19
attended 65:13
253:24
attendee 46:20
attending 82:16
122:3 127:9
153:11 206:9,16
232:14 235:3
241:12 242:18
246:19 255:12
268:2 271:15,20
attention 34:3,4,5
34:7,14,15 45:18
50:24 86:22 95:19
113:19 144:9
159:19 166:13
173:16 179:25
185:12 198:18
202:22 207:25
212:12 219:8,11
229:16 245:21

256:9 260:15
264:13 267:10,17
285:3 295:17
306:22 308:23,25
315:25 327:11
335:8,9 338:7
340:19 341:14
346:23,23 347:11
**attorney** 188:24
189:2
**attorneys** 2:4,10
215:4
**audio** 193:24
194:17 196:4,6,12
196:18 197:11
199:4
**august** 38:25 39:3
43:13 243:15
268:25
**authored** 280:10
**authority** 76:23
77:18 89:17
107:10 118:14
143:12 325:11
343:20,20
**availability**
176:22
**avenue** 2:5 127:19
281:24
**average** 69:11
**avoid** 167:23
**awarded** 10:12
11:21
**aware** 4:25 53:15
74:25 78:22 82:8
89:25 93:2,12,14
94:8 100:15,18
118:16,18,25
159:18 160:8
161:17 163:20
165:2,17 168:20

173:19 177:12
183:10 188:6
202:20 206:18,19
209:23 234:17,18
245:18 246:25
257:18 260:3,5,6,9
260:19 262:7
266:5,8 272:9,11
273:9,14 285:6
288:4 292:4
293:13 294:24
297:18,19 301:23
316:3,6 321:20
323:9 329:12,16
329:21 331:19
336:19 346:20
**awareness** 121:4
222:11 278:16

**b**

**b** 18:22 27:18 36:5
49:4 107:18
132:25 166:18
**bachelor's** 10:18
**back** 13:18 16:4,9
37:4 50:21 52:13
62:7 64:18 66:8
69:17,23 74:25
85:7 86:3 88:7,8
88:20 96:15 119:6
121:4 130:10
145:23 153:7
156:19 162:21
169:2 174:3
176:19 177:23
190:14,25 191:15
212:7 220:25
229:16 230:10
231:24 238:3
255:19 261:12
284:4 297:25
308:14 315:18

316:8 317:5,9,11
317:17 320:4,10
320:16,25 322:15
326:8,11,25 327:2
327:5,12,24
330:20 331:7,18
332:19,21 333:5
333:18 334:15
335:7,10,14,20
338:7
**backfill** 69:16
**background** 26:6
26:14,20 28:20
29:22,25 30:24
31:18,23 32:2,4,4
33:19 34:10 35:12
51:25 97:3 138:12
138:16 139:9
140:5 249:9,10
**backgrounds**
155:14
**backlog** 26:16
28:22 295:15,18
**bad** 282:20
**badaracco** 293:19
**bail** 21:17
**balance** 176:21
246:20
**ballpark** 39:21
**banned** 331:20
**bargained** 231:5
233:12 235:4
238:15,16 239:19
242:15 245:19
257:10 272:24
286:17 293:14
**bargaining** 92:18
92:20 206:10
230:24 231:7
233:25 236:24
239:22 242:7,17

245:24 246:15
251:24 256:11
270:19 287:2,12
290:22
**barrios** 18:21,22
18:25 19:5
**based** 20:20 28:3
67:15,20,25 82:9
158:17 202:15
203:25 230:24
259:2 304:22
306:3 307:2,4
**basically** 20:16
64:25 116:9
121:21 165:15
180:13 201:25
203:5 244:5
307:11
**basis** 292:16
321:11
**bates** 5:15 22:21
23:15 95:3,13
157:5 163:24
164:14 166:15,16
177:22 185:9,20
186:5 211:21
212:10 217:4,16
217:20 250:22
288:17,23 299:12
299:21,23 310:7
314:2,8 317:23
322:5,22,23 326:3
326:6,21 336:13
349:8,10,13,18
350:3,5,9,10,12,14
350:15,16,18,20
**bear** 326:18
**bears** 164:14
**beginning** 212:7
**behalf** 4:17 173:17
225:13,15 285:2

**behavioral** 19:10
**belief** 203:23
  204:3
**believe** 5:10 12:15
  29:2 48:24 70:15
  81:16 83:21 94:12
  101:3,17 102:16
  121:25 125:16
  126:21 142:16
  144:23 145:8
  160:17 161:8
  167:25 169:15
  177:11 184:15,17
  188:9 193:14,16
  195:15,15 203:22
  205:13,18,22,24
  222:21 243:13
  244:12 249:21
  252:10 257:16
  259:20 271:7
  272:2 281:8,8
  287:23 295:13
  304:3 315:23
  320:6 332:14
  345:9
**believed** 99:11
  205:24 317:17
**believes** 204:8
**believing** 221:12
**bellevue** 13:19
  14:6 44:18,24
  45:4,5 58:19 59:3
  61:2 65:23 72:18
  78:5,11,12 79:8
  80:4,13,18,19
  81:10,12,22 82:3
  83:10,21 84:21
  88:4,8,18,21 89:11
  89:21 92:4 105:12
  105:14,18,20
  106:17 107:3

108:2 114:6,7
118:13,13,14
119:10,22,25
120:2,5,8,10,14
121:5,6 122:13
151:11 169:12
170:2 171:12
173:16,20 221:3,6
221:15,17 222:23
223:13 226:10,12
227:21,22 228:7
229:8 245:4
247:10 261:22
263:5,17 265:2,6
265:11,13 266:6,9
266:16,24 267:14
267:18 271:25,25
272:2 278:17
279:9,10 284:23
287:23 293:18,24
302:13 303:2,7,19
304:5,9 305:3,15
305:15,16 315:18
316:3,8,9 317:11
317:18,21 318:12
320:10,16 321:2
322:15 326:8,25
327:12,25 328:4,6
334:25 335:7,10
**bellevue's** 120:6
121:10 170:22
223:2,23 225:9
**beneath** 297:5
**benefit** 144:5
236:10
**benefits** 244:13
252:15
**best** 30:16 47:16
132:19 142:16
144:14 340:21,22

**beth** 305:24
**better** 4:13 9:3
  21:3 22:7 63:5
  64:14 83:25 135:3
  164:19 194:20
**bhc** 223:10,12
  262:10 266:13,18
**bhish** 13:13
  146:10 147:5,21
  147:23 330:12
**bias** 183:18
**bill** 219:20 267:6
  269:9,11,15
**biondo** 1:22 352:4
  352:21
**bit** 64:19 96:11
  307:25 308:6
**blame** 30:23
**blanche** 2:16
  163:19 168:19
  188:19 220:20
  222:4,18,22
  224:14 264:17
  265:3,13,14,22
  266:3,5,8,11,15
  278:12,16 279:4,4
  279:7 282:17
  283:6,12 284:14
  284:18,18 315:18
**blasio** 18:11 21:8
**blasio's** 20:10
  57:11
**blend** 230:9
**blood** 352:11
**bloomberg** 18:10
**board** 45:12 117:2
  141:10 168:3
  215:11
**bonus** 80:10,15,20
  81:4,9,22 83:22
  106:17 108:3

153:6 169:24
225:10 226:15,24
227:9,12 228:8,10
228:15 229:14
267:15 304:4,15
**bonuses** 80:22
305:14
**borough** 141:20
143:18
**boroughs** 142:12
**bottom** 197:5
299:21 301:4,5
314:16 319:14
**bounced** 261:12
**boundary** 141:14
**bounds** 130:21
**box** 320:22
**boxes** 176:3,4
333:15
**brain** 21:14
219:18
**brainstorm** 267:4
**brainstorming**
21:10
**brayton** 132:25
133:3,6 329:12
**breach** 287:2
**breached** 194:22
196:11 286:19
**break** 8:4,6,7
40:21 92:11 94:19
94:20,23 162:23
162:23 196:14
216:22 287:13
288:12
**breakdowns**
304:12 305:6
**brezenof** 107:17
107:18,19
**briefed** 5:2

**brightens** 286:4
**bring** 43:22 139:3
  212:12 222:10
  249:4 278:9
  283:17 308:23
  312:2 320:13
**bringing** 267:10
  267:11
**broad** 14:4
**broadway** 1:14
  353:3
**broken** 196:9
**bronx** 46:10 61:8
  64:6 73:2,4,18,20
  73:23 74:6,16
  75:23,25,25 85:24
  86:7,15,17,24 87:4
  87:11 90:12
  131:12 133:6
  142:9 153:14
  169:19 170:20
  178:5,14 213:6,16
  213:18,25 214:5
  214:19 224:23
  225:6,8,23 226:2
  227:8 267:11
  294:11,15,23
  295:15,20 328:17
  328:21 329:11,17
  329:23 330:3,9
  342:5
**brooklyn** 46:12
  73:14,21 74:7,11
  76:3 80:17 142:10
  153:16 225:20
**brother** 114:5
**brought** 45:17
  50:23 86:21
  113:18 144:9
  163:8 222:22
  245:21 256:9

  260:15 269:9,11
  269:18,20 295:16
  297:25 308:24
  320:16 327:11
  341:13 346:22
**brown** 10:19 11:5
**budget** 39:19 59:8
  80:2,2,3
**budgeted** 69:14
**bunch** 302:13
**bureaucratic**
  137:9
**business** 4:23
  98:14 157:19
  263:9
**busy** 37:16 46:16

**c**

**c** 2:2 4:2 20:19
  49:6 302:20,20
**cabinets** 64:14
**calandria** 49:6
**calculation** 258:10
**calculations**
  304:11 307:9
  309:8
**calendar** 305:8
**call** 4:9 14:23
  42:19 79:20
  103:13 113:4
  114:4 149:19,22
  149:23,24 150:11
  172:2 203:17,18
  274:18 276:13
  338:5 340:2
**called** 14:19 19:11
  19:14 78:12 137:3
  149:14 150:3,5,13
  151:16 155:4,22
  240:22 285:3
  312:25 329:11
  339:22

**calling** 4:9 176:20
**campese** 305:21
  307:6
**canfield** 2:12 9:11
  17:10 22:3,9 24:3
  24:10 25:10 26:22
  27:3,4,10,13,16,23
  28:4,8,12 29:16,23
  30:8 31:5,19,24
  32:6 33:6,20
  34:16,20 38:2,9
  40:5,24 41:16
  42:16 43:19 44:4
  45:7 48:11,20
  49:13 50:9 51:3
  51:13 52:6,18
  53:18 54:4,13,18
  54:23 55:16,23
  56:8,10,16,19,24
  57:5,17 58:4
  59:10 61:19 63:8
  63:15 65:10,12
  66:6,17 67:9,17,22
  68:3,11,24 69:7
  70:6,13 71:6,17
  72:12 73:5,11
  75:15 77:3 81:7
  81:18 82:2,6,23
  83:3 84:4 85:2,10
  86:18 89:15,22
  90:9 91:3,13,17,22
  93:5,16,25 94:18
  96:23 97:17 98:20
  100:6,11,24
  101:10,21,23
  102:15 103:16
  104:8,19 105:7,16
  105:24 106:11
  108:7 109:17
  113:6 114:12
  116:13 117:19

  118:8,21 120:3,16
  121:20 122:14,18
  123:20 124:3,9,15
  126:8,11,15 127:3
  127:8,18,22 128:6
  128:11,15 129:5
  129:13,20 131:16
  132:17 133:25
  134:13,19 135:6
  136:4,18 137:7,18
  138:20 139:17,24
  140:15 142:4,13
  143:20,25 144:7
  146:15 148:17,23
  149:7 150:6
  151:22 154:6,24
  156:15 158:10
  159:14,23 160:7
  160:16 162:16
  166:8,15 167:4,10
  167:17,24 168:10
  169:4 170:12,18
  171:4 172:16
  173:11 174:11
  175:21 178:20
  179:7,17 180:3,23
  183:8,14 184:13
  188:22 189:3,21
  190:8,18 191:17
  195:8,22 196:23
  197:2,7 198:2
  199:16,21 200:6
  200:16 201:2,20
  202:10 204:12
  206:5 207:5,13,23
  208:14,20 209:5,7
  209:12 211:4,19
  213:12,17 214:14
  215:20 216:24
  217:15,23,25
  218:4,8,12,21,24

220:23 221:22
222:6,20 224:2,6
224:11,20 225:4
225:17 226:13
227:5,25 229:6
231:2 232:11
233:2,17,22 234:4
234:14 235:16
236:7 237:12
239:23 240:4,9
241:5,17,25
242:20 243:12
244:10,19 245:15
246:17 247:2,6,16
247:23 248:6,14
248:24 249:12
250:3,14,24 251:2
251:15,25 252:20
253:11,23 255:2
255:13 256:24
257:15,20 258:14
258:20 260:4,8
261:6,16 262:2,17
263:3,13 264:6,23
265:16,23 266:20
268:23 269:13,23
270:20,25 271:6
271:12,21 272:20
273:12,19 274:4
274:20,24 275:5
276:23 277:15,24
279:6,15,24
280:13,21 281:6
281:11,17 282:3
282:12,19 283:3
284:16 285:14,21
288:11,14 291:4
291:23 292:12,23
298:22 299:25
300:5 302:15
303:9,22 305:18

306:11,20 308:19
309:2,17 310:22
311:2,6,16,24
312:9,16 313:18
314:10,12 318:5
320:6,9,13,18
321:3 322:12,18
322:22 324:5,12
324:18 325:3,13
325:21 327:10
328:13,19 329:5
329:15,19,24
330:4,10,22
331:21 332:11,22
334:2,11,19 335:2
335:15,24 336:23
337:4,19,25
339:16 340:6
341:8,16 342:7,19
342:22 343:4,9,16
343:22 344:7,20
344:25 345:7,18
345:23 346:8,15
347:2,9,17,23
**capacity** 12:2
16:17 19:2,4,23
20:22 72:14 101:8
108:19 109:6
111:6 168:9
259:14 286:7
**caps** 19:16
**capture** 7:16
**captures** 187:9
**care** 13:25 21:3
31:9,9,16 32:11
42:22,23 79:9
93:4,12,20 176:16
176:22 259:24
261:5 263:7
269:17 272:2,3
307:11

**career** 237:18
240:3 248:23
255:10
**carlos** 111:2
**case** 26:25,25
55:12 56:18,22
100:13 119:14
136:13 141:24
147:16 166:12
167:12 182:3
185:10 187:9
227:18 230:22
284:22 287:20
309:4 319:22
330:11 353:6
**cases** 46:3 179:22
324:22 325:9
329:9
**castellanos** 111:2
175:5
**castellanos's** 111:3
**catherine** 193:8
**cause** 33:10,11,24
33:25 34:18,19
**cba** 286:19
**cc'd** 261:4
**cell** 69:18
**center** 13:20 61:11
63:13 74:21 79:8
133:7 152:10
223:13 233:21
**centers** 62:3,18
117:17 149:6
229:21 230:11
232:25 239:7
272:19
**central** 12:4,12
15:3 42:18,20,24
88:14 179:21
182:6 257:17,24
260:21 281:14

292:20 302:21,22
304:8,11 305:23
307:8 312:24
316:10 321:15
324:9,11 325:2,16
**centralize** 216:12
**centralized** 43:12
**ceo** 78:12 267:18
**ceos** 72:18
**certain** 125:14
140:2 209:2 214:7
229:10,11 231:17
233:15 241:22
285:18 311:9
**certainly** 26:17
35:9 100:13
103:22 182:11
203:24 249:23
**certificate** 102:25
**certificates** 103:14
351:3
**certification** 3:4
352:2
**certified** 32:12
**certify** 352:5,10
**cetera** 252:16
**cfa** 47:22
**chain** 97:12
171:21 185:22
211:21 217:3
288:17 299:12
300:13 314:2
322:5 336:13
349:22 350:2,4,8
350:10,13,15,19
**chair** 286:3,8
**chance** 5:9 6:6
7:19 48:21 130:17
149:24 157:15
158:7 161:7
164:16 166:17

174:20 189:17
190:10 192:4
212:3,13 217:11
219:3 311:25
317:17 323:4
339:10
**change** 31:14
43:18 48:7 111:14
139:23 140:9
229:19 243:10,17
244:6,15,17,18,18
245:12,14 260:16
263:20 353:8
**changed** 17:23
41:3 43:15 51:11
111:18,25 234:2
243:8,15 251:23
252:13,24 253:4
271:23
**changes** 52:5
62:16 63:12,23
139:12,13 140:14
338:11
**changing** 62:25
63:7,23
**characteristic**
306:8
**characterization**
261:20
**characterized**
99:8
**charge** 44:22 45:3
48:17 95:2,17
104:10 120:19,21
168:25 169:10
234:9 242:25
243:11,15 262:5
268:21 269:5
272:16 281:20
288:7 301:23
349:12

**charged** 29:7
**charges** 55:24
205:11
**chart** 151:18
157:12 158:2
162:20,22,25
174:3,4 178:2,11
**charts** 156:23
157:3,14,17,18,22
349:15
**check** 28:20 31:23
32:4,4,24 33:19
34:11 35:12 102:3
121:8 144:24
181:17 182:6
255:11 279:11
311:19
**checked** 35:16
**checking** 215:8
**checks** 26:6,14,20
29:22,25 30:24
31:18 32:2
**chh** 272:12
**chief** 2:17 17:4
36:4,7 45:9,10,11
47:6,7,7,7,9,17
48:2 49:25 50:2,3
50:5,6,15 76:17
79:7 88:24,25
109:18,24 110:2
111:5 114:7
115:13 119:20
163:17 168:15
175:4,5,6 177:25
193:9 219:14
**chiefs** 47:8 76:16
89:8
**children** 206:4
**choose** 92:12,15
**chose** 92:15
109:10 121:22

176:14 224:5
233:11 235:2
**chronology** 187:4
**chs** 31:3,17,22
35:6,7 37:25
38:17 39:24 40:2
41:19 42:12,14
43:4 46:22 50:13
70:16 72:9,16
103:24 105:22
106:2 114:13,17
114:23 115:5
116:11,17,21
117:10 121:8
132:22 136:7,9,11
136:11 145:24
146:5 157:19
170:16 171:14
176:10,17 194:4
195:11,14 199:7
212:20 226:2
245:4 267:19
269:3 270:12
274:22 275:4,25
276:12,17 277:3
279:10 281:16,20
282:15 291:9
303:7,19 312:25
341:6,11 343:24
**chs's** 113:14
132:15
**church** 2:10
**cianci** 302:19
305:25 307:22
**cinco** 18:9
**circular** 123:7
**circumstances**
176:12 295:23
331:5 346:3
**cite** 195:10 343:18

**cites** 345:11
**city** 1:7 2:9 11:25
13:18 14:8 16:4,9
16:10,21 18:7,9,14
19:3,6,7,8,19
20:16,21,24 21:2
21:12,23,25 22:5
22:20 23:25 24:5
24:14 25:4,11,12
25:15 26:11 27:19
29:4,5,5,7 31:7,11
31:12 32:18 36:16
37:5,19,22,24
44:13 45:20 50:20
58:12 96:15
176:23 212:21,22
213:22 236:6,15
236:17 237:17
349:10
**city's** 31:10 59:6
**civil** 1:20 12:21
122:24 124:6
125:9 185:3 187:8
235:14,19,23,24
235:25 236:20,23
237:4,9,13,15,23
238:8,9,10,15
239:12,16,18,21
240:7,13,25 241:2
241:3,13,14,20
349:20
**claim** 197:11
261:25 309:14
**clarence** 110:25
179:2
**clarification** 245:2
**clarify** 32:9
**clarity** 187:8
208:6 218:9
**class** 339:6,14,17

**clear** 7:17,22 8:9
9:7 23:12 30:5,18
40:21 46:5,14
63:11 73:19 74:18
112:16 132:13
141:15 144:25
145:22 268:12
284:17 308:4
314:22
**clearance** 26:9
32:14 33:15
**clearances** 28:23
**clearly** 121:14
203:12 262:9,23
264:16 268:21
269:2 274:13
277:22 278:11
287:20 303:19
309:19 319:25
323:23 326:10
343:2
**clearwell** 319:5,8
319:9
**clerical** 129:8
**client** 188:24
194:23 195:18,20
203:5,11,13,21
346:2,11
**clients** 167:22
193:24 194:2,13
194:18 203:4,17
203:18
**clinic** 34:2 45:3
52:25 60:24 61:8
61:21 63:24 64:22
66:8,11,19 73:2,4
73:14,18,20,21
74:4,5 75:12,23
76:3,4,7 80:19
82:9 84:7 85:24
90:12 106:5,15,16

127:15 133:11
146:6 149:14
150:16,17 153:8
155:3,16,16
169:20 170:20
178:5,14 218:15
218:19 224:22,23
225:6,8 226:2,5,18
226:20 227:4,19
228:4 231:20,21
246:24 247:5,22
251:20 254:24
258:9,12 294:11
294:15,19,23,23
295:4,11,15,20
328:17,21 329:4
329:11,17,23
330:3,9 332:15
333:2,3 342:6
**clinical** 57:21
123:4 125:6 129:9
131:22 138:23
140:17 141:14
149:14 150:24,25
151:3,9,13,16,20
151:25 152:5
153:22,23 156:8
169:17 193:22
194:16 196:4
202:16 230:8,14
230:16 231:8,9,10
231:20 232:10,22
239:10 242:2
253:7 270:17
271:5,11
**clinician** 215:11
249:9 334:13
**clinics** 33:17,18
35:11,15 43:23
44:3,17,20,22 46:6
49:7 50:12 51:12

51:22 52:5 53:14
58:16,18,22 59:9
59:22,24 60:5,16
61:5 63:12,17,21
64:5,9 65:18,21
69:20 70:10,16
72:16,21,23 74:3,9
75:21 76:6 78:4,9
80:8,9 87:13
106:3,4 107:6,25
110:21 117:13
122:7 136:10
142:20 144:11
147:20 151:7
155:5,6 156:9
196:4 203:16,16
205:8 216:13
225:19,21 226:10
226:12 227:8,21
228:6 231:11
243:19,25 244:4
248:4,10,13,22
251:20 253:8,19
254:11 255:8
256:8 267:12
294:8,12,18
302:10 329:8
338:12 341:7
**close** 35:21 54:8
56:11 67:4,11
69:2 122:24
258:21 288:5
297:23
**closest** 332:24
**coaching** 190:11
**code** 142:23
**cohen** 160:17,18
160:21 314:18
315:6
**coib** 141:9

**colleague** 263:4
275:9
**colleagues** 98:8
252:17
**collection** 67:12
**collective** 92:18,20
206:9 230:23
231:6 233:25
236:24 239:22
242:6,17 245:24
246:15 251:24
270:18 287:2,12
290:22
**collectively** 231:4
233:12 235:4
238:14,16 239:19
242:14 245:19
256:11 257:10
272:24 286:16
293:14
**collects** 157:25
**collegial** 86:2
**collegiality** 86:2
88:2 90:15,18
**colley** 45:2,4,13
293:18,19,23
**collins** 292:4,5
323:14
**columbia** 10:10
12:17
**come** 8:3 21:7,10
34:7,14 44:2
46:19,20,20 51:6
52:20,21 71:15,19
71:20 73:10 80:3
80:9 88:4 97:7,8
108:22 116:9
117:2 118:4 134:3
134:5 144:14
172:22 176:19
179:25 182:3

233:15 241:23
257:3 259:18
297:11 304:6
308:14 330:20
331:2,7,18 332:15
332:19,21 333:5
**comes** 54:25 108:9
284:19
**comfortable** 14:24
54:6,10,20 56:12
**coming** 72:21 92:2
130:9 232:24
233:7 256:8
296:10 329:23
**comment** 210:3
**commissioner**
14:17 15:2,4,15,16
16:12,17,18 17:14
17:16,18,20,24
18:2 24:19 38:12
38:13,14 99:20,24
99:25 100:2,3
131:4
**commissioners**
15:18 99:21 100:3
100:5,10
**commit** 341:7
**committed** 341:23
**committee** 200:2
**common** 210:11
241:3 275:24,24
276:4 277:21
**communication**
10:23 210:17
292:14
**community**
176:15,15,17,22
**comparatives**
81:14
**comparators**
81:25 108:6

**compared** 255:5
**comparison** 81:14
81:25
**compelled** 171:25
204:19 274:3
286:6
**compensate**
224:17
**compensated**
297:17 298:4
300:23 302:2,7
307:2
**compensation**
252:16 298:21
308:23
**competency** 44:16
55:11,18,21
197:12 203:21
**competent** 70:24
**complain** 78:6
93:18 98:15 113:8
118:15,20 120:13
126:10 168:22
211:7,9,13 263:11
313:14
**complainant**
274:21 284:6
**complained** 77:23
78:20 93:23 94:15
120:12,17,24
127:14 131:14
132:21,24 148:21
158:16 168:24
170:5 210:22
247:19 261:3
263:19 268:15
297:15,16
**complaining** 84:18
94:9 119:24
121:13 126:2
132:7 170:25

171:7 234:7,8,11
234:16,17 273:25
288:25 302:6
**complaint** 5:8,15
9:14,15 23:14,14
77:19,21,25 78:3,5
78:15,23,24 79:5
94:6 104:21
113:18 114:20
117:18,24 118:22
118:25 119:2,5
121:5 125:24
131:21 158:20
166:6,7,12 167:2,2
167:15 173:2,3,3
187:10,14,17
188:7,18 189:18
190:15,21 191:15
192:8,10 204:23
225:16 229:17,18
243:3 251:5,7
263:16,20 268:18
269:15 274:16
276:12,12 279:13
279:14,19 281:15
281:16,25 282:10
282:14 283:16,25
284:2 297:16
338:22,23 339:8
349:8
**complaints** 51:18
85:8 87:10,12,19
87:22 90:18
104:24 105:10
113:12 115:12
121:18 130:11,19
130:23 131:10,19
131:20,25 133:19
158:12 159:12
161:16 166:24
168:14 171:18

172:6 176:24
177:3,6 179:22
261:11 264:2,5
268:19 276:15
278:23,24 282:25
285:18 312:20
346:17
**complete** 103:19
111:15 218:22
311:3,18,25
312:11 346:6
**completed** 50:25
102:19 103:4
231:23 233:9
346:25 347:3,4,6
**completely** 8:19
256:22,23
**completing** 346:18
**completion** 102:25
103:14 351:3
**complex** 168:2
**compliance** 43:9
104:15,16 117:6
193:9 201:24
202:5,6,11,17
204:2 244:22
245:19 293:14
**compliant** 139:21
194:21 245:23
**complied** 123:25
127:2
**comply** 35:9 93:9
145:10 341:2
**comprised** 40:2
**compromise**
149:18
**compromised**
150:23
**computer** 102:4,6
117:8 286:4

computers 64:12
64:17 180:10
conceded 153:6,7
concept 102:22
concern 33:3
78:17 169:24
180:8 181:7,15
182:4,10 183:25
194:19 213:21
221:13 267:10
concerned 51:12
56:9 61:11 63:18
142:3 146:5
159:11,13 194:15
concerns 25:22
133:20 173:4
181:12 205:10
221:14 267:17
275:7
concession 153:5,9
conclude 177:15
condition 263:17
conditions 77:2
244:5,8 245:3,6
conduct 1:9 28:2
29:21 34:6 57:19
67:16 128:25
129:16 130:5
134:25
conducted 68:8
conducting 30:24
67:21
confer 54:21
134:16,21,23,24
139:20
conferred 292:21
conferring 134:15
215:5
confidential
192:15,23 340:8
349:23

confirmed 310:17
confirming 310:21
conflating 298:3
conflict 140:25
141:10,25 144:16
167:21
conflicts 144:22
confusion 297:19
conjecturing
245:17
connote 203:13
consent 106:21
203:24 344:17
345:25 347:15
consequences 56:3
consider 16:23
41:12 43:8 166:25
considered 6:23
68:22 286:13
303:2
consist 61:17
129:4 130:4
consisted 40:22
consistent 155:12
consisting 185:2
349:20
consists 42:22
119:13 157:3,17
300:13
consolidate 58:16
136:10
consolidated
144:11
consolidation
60:25 62:11 70:15
72:16 244:13
constitute 189:13
constitutes 180:21
consult 246:18
consultation
292:19 331:10

consummate
252:16
contact 19:6 99:18
100:3
contacts 166:10
containing 156:22
349:14 351:6
contempt 212:20
213:22
content 158:19
context 96:13
249:4
continue 28:11
119:24 142:18
198:20 245:5
331:2
continued 118:15
118:19 120:13
126:10 168:22
216:17 263:11
347:25 350:23
continues 199:14
341:6
continuing 328:9
continuous 43:21
44:11
continuum 21:15
contraband 33:13
35:2
contract 20:18
21:5,21 24:14,21
38:4,5,6,8,15 39:5
39:9 92:19,25
93:10,10 97:12
206:10 229:9
286:17
contracted 20:17
31:11
contractor 25:23
25:23

contractors 33:9
contribute 338:11
control 71:11,23
72:3,9
controls 236:3
conundrum
145:21 213:23
convened 45:24
convenient 147:21
conversation
54:25 60:21 189:6
265:9,10 292:3
conversations
62:6,20 65:19
87:2 88:23 158:8
convey 267:16
conveyed 320:24
334:23
convictions 28:19
cooperation
179:21
copied 336:24
337:7
copies 184:22
326:16
copy 219:21 267:7
310:3 311:25
321:24 340:2
copying 306:21
319:21
corizon 20:18
21:21,25 22:16
23:17,23 24:9
25:7,9,19 26:24
28:21 30:25 37:20
37:22 38:6,8,15,17
39:5,8 40:12
96:14,20 97:11
244:2
corizon's 22:13
24:14 97:12

corollary 285:24
corporate 104:16
179:21 180:14
191:4 193:9
194:21 201:24
202:5,5,11,17
203:25
corporation 1:7
2:9 19:19 107:13
109:12,14 165:9
168:4 236:10
274:25 324:10
correct 8:20 16:25
18:4,23,25 30:4
32:2 36:9,13 37:6
37:7 39:25 41:15
43:25 51:5 55:20
59:15 61:6 71:2
72:6 74:17 75:10
77:16 86:20 89:19
90:16 91:23 92:25
99:25 102:9,12
103:2 104:6
105:21 106:13,19
111:13 112:4
115:23 116:15
120:20 123:10,14
123:15,21 124:11
132:9,11 134:12
139:9,10 148:3,14
152:17 155:18,20
163:7,10 167:9
169:23 170:7,24
171:3 173:13
174:6 175:17
178:18 186:19,22
188:5 195:6,9
197:9 198:7,12
199:8,9 200:10
201:17 206:24
214:9 215:17,19

221:24 224:13,18
224:25 225:13
226:17 227:10,14
227:16,17 230:5
231:18 252:7
253:13 255:7
261:23 262:14
264:19,25 269:3,4
269:7 274:5
276:18 278:2,20
279:16 281:18,22
282:9 283:23,24
285:10 286:14
289:17 290:23
293:4 302:24
304:7 308:10
309:10 310:16
315:19 321:3,22
322:17 323:16
325:22 328:25
334:3
corrected 252:10
correction 30:2,3
31:21 32:14,24
33:3,8,15 34:25
96:19,21 98:6
99:19 243:18
correction's 34:4
correctional 20:8
20:15 21:22 24:8
29:4 31:8 32:10
32:16 37:13,17
39:6 40:20,22
42:23 44:12 46:16
50:19 58:17 61:3
71:20,21 99:18
107:5 136:8 148:7
156:22 157:4
200:18 267:12
278:8 321:16
349:14

corrections 21:18
26:10,16,19 31:23
correctly 346:25
347:4,6
corroborate 34:24
corroborates
36:15 199:19
cost 121:24 122:9
144:5
council 290:15,16
291:8,11,13,16
292:3,6,8,20,22
293:3 323:13
counsel 2:9,12,17
2:17 3:3 27:16
30:14 94:18
160:19,24 161:3
168:2,3 191:14
292:15 314:18,24
315:4,7 340:5
342:23 343:23
counted 67:3,8,15
67:20,25 69:6
305:11
counties 16:22
country 353:3
county 15:10
44:18,24 45:15
58:20 61:2 65:23
247:9
county's 59:3
couple 40:11 99:3
119:3 176:11
course 7:12 8:4
77:14 98:14
143:13,15 157:19
178:4 193:21
194:10 205:8
280:20
court 1:1 3:12
33:17,18 34:2

35:11,15 43:23
44:2,15,17 45:25
49:7 51:22 52:25
56:3 59:9 67:5
72:21 78:4,9 80:8
82:9 106:3 110:21
117:13 147:20
155:3,4,6 178:14
185:3 187:9 196:4
203:16,16 213:6
214:19 216:12
218:15,19 224:22
224:23 225:6,8
231:21,22 243:19
247:20,22 248:22
253:15,19 254:11
267:12 338:12
341:2 346:3
347:20 349:20
courtesy 204:5
courtney 1:22
352:4,21
courts 87:17
231:24
cover 87:7
coverage 295:14
covered 303:12
cpl 57:3,16 133:23
134:9
craft 84:23
crash 64:17
crazy 29:10
create 110:3 128:9
created 72:19 74:8
109:24 128:5
creates 129:22
236:11
creating 128:12
credentialing
35:24

**credentials** 137:17
**crew** 219:19 267:5
**criminal** 19:10
  20:9,11 21:16
  26:2,4 32:25
  33:18 34:10 35:12
  45:21 57:3,12
  59:5
**critical** 249:4
**cross** 295:14
**crossed** 138:3
**cupboard** 52:23
**curious** 26:23
**currency** 35:16
**current** 4:22 10:3
  36:12 101:8
  252:15
**currently** 161:12
  275:12 315:13
  344:8
**custody** 20:24
  31:10 59:6,6
**cv** 1:5
**cyclone** 341:22

**d**

**d** 19:16 47:24 49:6
**d000715** 163:24
  349:18
**d000729** 163:24
  349:19
**d472** 196:24
**d715** 164:14
**d729** 164:15
**data** 66:19,21,22
  67:11 313:20
**date** 8:23 9:4 67:5
  67:6 180:7 185:13
  186:23 319:4,21
  321:11 341:6
  353:6

**dated** 185:15,19
  186:4 187:23
  192:17,25 250:10
  251:10 300:13
  310:14 326:19
  349:24 350:6
**dates** 300:15
**day** 27:6,8,10
  92:11 146:14,14
  149:13 206:11,12
  257:12 297:21,24
  297:25 330:15,16
  330:21 332:16,25
  333:11 348:10
  352:16 353:22
**days** 15:3 69:12,12
  70:3,3,9
**de** 18:9,11 20:10
  21:8 57:11
**deal** 20:23 59:4
  113:23 131:7
  135:12 161:14
  245:22 261:24
  262:3,4,18 324:14
  337:16
**dealing** 262:16
  278:21
**deals** 259:10
**dealt** 264:5 303:16
  307:23
**decades** 344:14
**december** 110:12
  121:14 185:15
  187:2,15,17
  190:16 316:24
**decide** 148:5
  274:18
**decided** 227:11,15
  343:6
**decides** 283:8
  343:7

**decision** 11:7
  24:13,16 29:3,13
  29:15 31:3,7
  59:25 65:17 101:6
  106:22 128:3,8,9
  136:9 146:22
  225:11,15 232:8
  234:6,25 258:2,16
  264:4 267:11
  272:6 287:5
  302:10
**decisions** 128:7
  285:16
**decline** 153:3
**declined** 126:17
  126:22 152:24
**dedicated** 72:19
**defendant** 56:7
  64:2 68:7,10
  70:23 95:11 142:8
  195:20 203:4,4,12
  203:20 346:11
**defendants** 1:10
  1:11,19 2:10 68:2
  130:13 142:7
  187:12 189:24
  195:2,7,19 203:3
  203:17 329:17
  344:18 345:4,16
  346:6,18
**defenders** 131:12
**deferential** 79:15
  164:19
**deferring** 265:12
  265:14,21 266:2
**definitely** 177:8
  203:15
**degree** 12:17
  30:21 181:2
**delay** 302:10

**delayed** 80:18,21
  169:19
**delaying** 226:11
**delays** 44:14,14
**delegating** 333:20
**deleterious** 260:17
**deliver** 112:18
**delivery** 29:21
**demoted** 148:16
  148:18,21
**denied** 126:14
  260:2,6 323:18,21
**dental** 41:6,23
**deny** 97:14
**denying** 98:18
  100:23
**department** 2:9
  13:25 14:8,13,15
  15:8,10,21 16:10
  16:11 17:12 18:8
  19:6 21:13,18
  22:20 25:16 26:10
  26:15,19 29:5
  30:2,3,6 31:11,21
  31:22 32:14,24
  33:3,8,14 34:4,25
  37:23,24 38:8,13
  38:16 50:20 96:15
  96:19,21 97:13
  98:6 99:19 108:22
  157:23 160:14
  168:4 349:10
**department's**
  99:13
**departments**
  16:20
**departure** 176:13
**depend** 144:17
**depending** 111:25
  131:21 230:21
  255:17

depends  159:2
242:21,22,23
279:25 309:4
deponent  353:7
depose  265:17
deposed  6:6,9,10
6:14,18 9:19
161:25 162:12
deposition  3:5,10
7:12 8:5 9:10
27:14 28:2,6,9
320:14 338:5
348:3 353:6
depositions  7:4
deputy  2:17 14:25
15:4,15 16:17
17:14,15,18,19,24
17:25 18:18,20
19:12 99:20,21,25
100:2,4,10 160:24
161:3
describe  132:14
258:6 296:16
describing  54:6
description  349:7
350:1
designated  114:25
161:13
desire  155:8 206:8
268:2 271:15
326:14 334:14
desk  26:21 102:11
destruction  339:5
detail  145:5
156:12 307:5
308:13 318:17
319:22 332:4
details  135:10
181:13,25 263:8
324:21 331:23
332:13

detained  20:23
deteriorate  176:19
determination
57:25 63:20 72:8
189:15 225:2
254:6 258:23
259:12,15 282:24
283:5,7,11 284:12
292:17 294:10
331:8 345:6
determine  51:10
69:4 148:15
252:25
determined
194:14 196:9
290:7 298:14
determines  235:13
determining  52:16
258:4 309:6
detritus  64:14
developed  157:19
devices  180:14
dhs  29:21
diane  302:19
305:24
difference  32:15
55:10 122:5 230:7
237:22 254:23
differences  236:16
different  20:2
32:13 40:21 44:21
75:2 82:17 100:13
139:3 140:23
146:3 153:15
155:10,13 173:3
175:13 200:11
203:12 206:3
225:23 230:20
232:9 233:9,12
235:18 242:3
246:7 250:20

256:22,23 263:21
278:14 291:2
301:18 303:15
306:6 324:20
differential  209:23
differentials  122:4
differentiation
155:25
differently  230:24
232:24 234:24
285:12 301:16
difficult  85:20,21
85:22 100:19
172:14,21,23
306:13,14
digit  69:12 70:3
dignified  20:22
21:4
direct  15:24 27:14
47:12 48:8,9 49:8
49:11 52:23 53:5
136:13 174:5,7,13
176:2 181:18,20
192:12 198:18
208:23 278:18
292:14 296:22
297:3,3,11
directive  123:25
directly  17:4 21:4
47:4 62:21 88:23
97:20 98:2,23
104:25 105:3
118:18 131:15
177:14,15 193:15
210:25 221:24
262:4 274:21
290:4 296:11
297:10 307:15
director  12:5,8
13:5,7,12,19,21
14:6 18:16 33:25

42:13,14 47:11,14
64:22 71:4,9 74:5
82:10 83:20 87:20
107:20 109:11,13
121:22 122:7
123:5,12 143:17
145:16 147:9
149:5,5,11,12
150:5,12,13,13,15
150:18,20,21,22
150:24 151:9,13
152:5,20 153:4,14
155:22 178:17
179:10,12,13,13
179:14 230:14
231:11,20 233:21
239:10 246:23
251:20
director's  146:14
directors  33:17,18
34:10,11 35:10,15
51:23 60:4,15
62:11 63:2 74:8
76:7,22 77:25
82:13,21 83:6,13
117:13 123:18,24
125:4,7 126:4
127:7,19 135:17
140:21 141:6,19
142:11 146:5,13
146:19,25 149:14
149:15 150:19,25
151:3,12,16,17,20
151:20 152:2,5,10
153:17,18 154:23
168:3 169:17
183:4,7 191:7
193:22 194:16
196:4,17 197:16
197:17,22 198:14
218:16,20 229:20

230:11,12,16
231:9 232:10,22
233:10 234:20
235:8 238:20
239:7 242:2 246:4
246:13,24 247:5
247:14 253:7
254:24 256:20
270:16,17,17,24
271:4,5,11 272:19
295:4
**directorship** 74:4
**disability** 293:7
**disagree** 281:7
**disagreed** 213:11
**disagrees** 206:16
**discard** 339:23
**discharge** 41:5
**disciplinaries**
179:23
**disciplined** 347:13
**discovered** 144:10
332:16
**discovery** 320:7
**discriminated**
158:16
**discrimination**
77:19,22 95:3,17
118:7 148:22
167:15 168:23,23
177:4 187:11
188:7,18 281:25
349:13
**discuss** 63:10
141:12,12 166:11
189:17 342:5
**discussed** 58:15
158:18 342:3
**discusses** 208:7
**discussing** 139:6
163:2 186:13,17

**discussion** 5:13
22:25 23:22 24:24
25:3 26:13 68:19
94:21 95:7 143:9
147:4 148:24
152:14 156:16
162:17 164:9,23
184:24 185:25
192:20 208:3
211:25 217:7
218:25 250:8
299:16 300:10
310:5 312:17
314:6 322:25
325:25 333:12
336:17 341:21
**discussions** 332:3
**disparate** 210:22
**disparities** 81:12
121:10
**disparity** 77:22
80:23 82:8,9,19,20
84:18 92:4 105:12
120:11 121:8,13
122:8 168:22
169:14 170:9
171:2,8 224:17
261:12 268:16
269:21
**displeased** 22:6
**disposal** 248:4
**disprove** 183:17
**dispute** 341:24
**disputes** 206:15
**disregarded** 341:5
**disrupt** 227:22
**disruption** 37:18
**disruptions** 293:9
**distinct** 74:3
**distinction** 10:12
81:2,3 154:16,19

156:5 236:19
240:13 285:17
303:2,6,18 344:23
**distinctions** 240:7
**distributions**
46:18
**district** 1:1,2
185:3 349:20
**diversity** 103:21
**division** 2:13 39:2
145:9 168:2 172:9
**divorce** 6:21,22
**doc** 26:9,10 28:22
28:23 30:7,19,25
31:4,14,14,15 35:4
87:16
**doc's** 35:9
**docked** 297:24
**docket** 185:3,9,10
187:8 316:22
349:21
**doctor** 61:14
150:10,11 153:20
154:4,10,21
**doctor's** 290:15,16
291:8,11,13,16
292:3,5,8,20,22
293:2 323:13
**doctorate** 10:8
11:14
**doctors** 32:17
35:14 49:21,22,23
79:13 83:13
134:17 153:17,18
154:18 173:9
197:13 200:23
306:4,6
**document** 5:21
23:4,7,20 95:2
96:9 163:21
164:17 185:2

187:3,18 193:4,6
196:22,25 197:6
199:18 212:14
217:12,19 218:6
219:4 240:16,20
265:12,21,25
266:2 312:11
321:24 349:12,16
349:20
**documentation**
181:3 258:2
**documents** 5:5
276:14
**doe** 68:21,21
**dohmh** 17:17 24:5
39:4,15 40:11
**doi** 22:8,12 23:16
23:22 24:25 25:2
25:4,17
**doi's** 34:4
**doing** 44:9 62:23
62:24 70:20
141:14,15,21
142:18 144:5,20
157:21 159:9
170:21 182:24
183:3,6,18 200:15
203:2 230:17
231:12,14,16,17
232:5,5,6 233:6
246:3,13,15
254:23,24 255:4
256:21,22 290:24
315:20 328:10
343:2
**dollar** 39:8
**dollars** 39:22
**domestic** 6:21
**donna** 2:12
**door** 115:18
338:16

**dotted** 138:4

**dr** 4:10,17 15:6,7
16:14,24 18:25
19:5 32:3 49:25
50:4,15,19 52:15
53:3,7,9,10 60:8
60:10,17,22,23,23
61:4,4,14,25 62:7
62:15,21,22 63:13
63:22,22 65:7,25
66:12 73:3,4,13,15
73:22 74:10,14,16
75:22 76:8,8,9,10
76:12 77:9,10,10
77:12,12,15,23
78:6,15,21 79:5,10
79:18 80:10,19
81:4,13 82:12
83:5,8,15,15,16,16
83:18,24 84:8,17
84:25 85:9,18
86:9,9,12,13,23,25
86:25 87:8,20
88:3,17 89:4,10,21
89:25 90:6,14,19
90:25 93:3,12,18
96:14,15 97:2,14
97:22 98:8 99:6
100:9,14,21,22
103:15 105:5,19
106:5,7,8,14,17
107:8 108:2,5,11
111:19 118:15
119:4,5,16,18,20
122:6,23 123:2,3
123:13 124:12,25
126:3 127:13
130:6 131:22,22
132:25 133:3,6
134:4,16,16,21,23
135:22,22,23,23

135:24,25 136:7,9
136:14,14,17,20
136:21 137:16,21
137:21,24 138:8,8
138:11,19 139:6
139:20 140:8,9,19
142:24 143:7
144:10 146:10,11
147:5,13,14,21,25
148:2,4,20 149:19
149:25 150:4,4
151:2 152:18
153:19 154:20,21
154:22 158:4,7,8
158:11,12,13,15
158:16,22,25
159:6,8,11 163:2,3
163:4,5 164:18
166:25 168:22
169:21 170:14
171:18 172:13,21
172:23 173:4,8,10
173:16,23 174:5,7
175:4,14,15,16,19
176:2,6,7,8,8,10
176:25 177:4,9,10
178:5,13 180:2
181:6,19 182:11
182:11,12,14,19
183:21 184:6
185:11 186:8,10
186:13,17 187:9
187:10,12,13,19
188:7 189:17
190:17 192:17,25
193:3,14,23 194:6
194:10,12,14,15
195:3,20 197:13
197:14,18,18,20
197:21,24 198:10
200:23,24 201:4,8

201:8,21,21 204:8
204:10,16 205:10
205:22 206:3,15
206:25 207:17,19
207:21 208:12,16
210:21,22 211:2,3
211:7,8,10,13,14
212:10 214:2,3,8
214:10 215:14,23
216:2,7,14 217:13
219:4 220:13
221:2,4,13,20
224:23 226:14,16
226:19 227:3,8,11
228:4,5,7,9,14
230:4 231:6 232:8
233:6,20,20
241:12,24 242:25
243:7 244:6,25
245:5,11 246:23
247:4,9,10,18
248:15,15,16,17
249:8,17,20,24,25
250:11,11 251:7,8
251:12 252:4,8
253:4,18,21,21,24
254:2,2,5,17,23
255:4,11 256:2,21
258:12 259:12
260:10,16,23
266:23 267:9
268:9,14 272:18
273:7,25 274:3,15
277:13,19,22
279:18 285:2
286:18 288:25
289:14,18 290:17
293:5,16,23
294:25 295:2,6,9
295:13,24 296:4,5
296:13,16,22,23

296:24 297:13
298:4,15 299:4
301:4,13 302:6
305:12,16 306:9
308:24 309:11
311:22 312:21,21
313:14,17 314:14
315:18,22,24,25
316:12 317:5,10
317:17 318:20
319:7 320:4,15,23
321:5,20 322:15
323:8 324:3
326:10,14 327:24
328:5,12,22,23
329:10,12,18
330:12,12,13,14
331:16 332:5,18
333:5,24 335:6,20
337:3 338:10,14
338:25 339:4,5,23
340:14,20 341:10
341:11,13,14
342:16 343:2
345:10,15 346:12
347:5,14 349:24
350:7,7 351:3,6

**draft** 181:8 266:22
**dramatic** 70:12
**draw** 95:19 166:13
177:21 185:12
207:25 219:8,11
229:16 264:12
338:7 340:19
**drill** 319:3
**drop** 11:7
**dropped** 18:2
**drugs** 345:4,16
**dsrip** 19:14
**dual** 140:25 141:2

dulls 286:4
duly 4:3 352:7
dump 266:18
dumping 223:10
262:10 266:13
duplicative 42:11

**e**

e 2:2,2,15,15 17:7
46:17 47:21,21,21
47:24 48:4,22
49:4 78:16 79:19
84:23 90:21 91:21
93:21 105:5,9
107:18,18 151:8
151:10,13 152:4,8
152:10 171:23,24
172:25 180:2,17
181:17,19,24
182:20 183:11
184:4,5,6,17
185:19,22 186:4,7
186:10,13,14,17
186:20,23 187:20
187:21,22,22
189:10 190:2,17
191:2,4,7,10
211:21 212:4,4
217:3 218:22
219:12,20 220:4
220:16 221:4
223:8 224:10,14
244:24 245:4,9
250:10,20 253:15
261:4 262:9 266:9
266:19,22 267:6
268:10 274:14
276:13 277:12,17
288:17,22 289:3
290:9 291:11,13
291:17 298:6,20
298:23 299:2,12

300:12,13 302:3
302:12,13,23
303:3,25 304:17
306:9,17,19 310:7
311:3,18 312:2
313:24 314:2,13
317:2,21 318:12
318:13,14,18,20
318:22 319:7,25
320:4,7,9,10,22,25
321:6 322:5 323:3
323:25 326:3,19
326:21,24 327:3
328:2 333:19,23
334:17,18 335:5
335:12,18,18,22
336:11,13,25
337:3,8 339:6,14
339:17 344:4
349:22 350:2,4,6,8
350:10,12,13,15
350:16,18,19
eager 298:24
earlier 5:25 24:13
53:5 57:9 133:10
173:8,15 175:3,10
210:2 222:10
224:21 229:20
230:12 232:7
237:22 243:4,24
249:8 251:12
289:24 298:8
301:15 321:19
323:6,14 328:3
341:24 342:4
earliest 15:2
early 60:3,19
earmarked 39:8
earn 11:6
earned 298:2

easier 51:18
319:12
ecf 190:7
editorial 221:16
267:7
editorials 219:21
education 10:7
11:5
eeo 78:23 101:7
103:15,21 104:7
104:17,21,22,25
105:6,13 113:11
113:14,18,25
114:9,13,14,15,17
114:19,23,25
115:5 116:10,17
117:14,18,25
118:6,22 159:10
159:12,22 160:4,5
160:9,10,10 161:6
161:10,11,12,19
161:20 162:2,8
163:14,15,18,23
165:21,21,25
166:7,7,10 168:9
168:14,16,17
189:2 220:19
222:3,13,15,18,23
222:25 223:2
259:16,17,18,18
261:10,25 263:16
264:2,5,9,17,21
265:2,13,14 266:3
266:4,10 274:16
274:19,22 275:3,4
275:14,15,18,22
276:5,6,8,15,15
277:2,8,23 278:7
278:10,12,15,21
279:10,10,19,21
280:18,18,23

281:10,16,25
282:5,8,10,14
283:7,10,14,16,17
284:8 285:13,24
337:6,17,22
349:18 351:4
eeoc 94:5 95:18
118:25 119:2,5
120:18,21 121:2
168:25 169:9
223:16 225:15
234:9 242:25
243:11,14 262:12
263:20 268:18,20
269:5,15 272:16
288:7 301:23
effect 3:11 96:22
114:22 142:25
228:22 245:9
260:17 298:6,17
343:25
effective 135:11
330:16
efficient 135:12
effort 21:10 24:7
26:3 57:12 318:19
328:16 329:7
efforts 20:10
29:20 44:11
egos 297:9
eight 15:24 92:13
92:15 290:12
either 7:14 34:3
47:18 49:24 63:7
75:3,12 101:15
134:10 156:10
195:21 199:7
205:22 228:13
263:22 280:3,9
283:22 284:8
315:24 325:17

352:11
elaborate 90:7
  180:6
electives 11:9
electrical 64:16
elephantine 84:24
  85:4 210:3,7,14,15
  210:19 219:21
  220:7 221:5,7
  267:7
elephants 210:18
  210:24 220:15
  221:3,18
elevating 150:14
elevator 247:22
  253:15
eleven 196:22
  197:8 207:16
  209:17
eligible 267:15
  304:15 305:14
  309:7
elizabeth 1:7
  49:25 64:22 76:15
  296:21
elmhurst 72:18
else's 342:25
  346:23
embarrassed
  114:11
emergency 13:25
employed 170:14
employee 33:5
  115:12 118:13
  120:10 161:15
  165:17 172:14,21
  177:19 206:8
  223:20,21,23
  260:25 267:14
  275:8 298:5,5,16
  298:16 300:23

302:2 305:6,8
  319:20
employee's 34:6
employees 31:17
  31:22 33:9 163:20
  247:11 303:7,7,13
  304:14,22
employment 2:13
  2:17 77:2 141:2,7
  163:23 164:13
  165:16 242:4
  244:6,8 249:19
  263:17 301:9
  303:17 349:17
employs 201:15
endeavored
  144:14
ended 11:10
ends 141:17
  143:15 304:10
enforced 145:7
engage 135:5
  140:21 141:6,19
  253:18,21 337:14
engaged 253:20
engaging 135:16
  188:25 189:2,4
enlarges 286:5
ensure 108:5
  116:20 169:20
  245:8 284:2
  346:24
ensuring 32:11
  36:10 267:20
  270:13
entail 37:14 53:21
  64:21 70:20
  179:16
entailed 65:2
entails 56:7

entertain 88:9
entire 95:21
  109:11,14 150:16
  212:14 216:5
  219:4,18 229:15
  237:18 267:4
  307:7 343:5
entitled 95:2
  163:21 309:15
  349:12,16
entry 41:5,21
  175:11 186:25
  187:14 191:25
  192:4 316:19
enumerated
  308:18
environment
  64:15
envisioned 62:17
equal 163:23
  164:8,13 165:16
  252:17 261:25
  349:17
equate 262:24
equipment 64:12
equitable 267:20
  270:13
equity 169:16
  218:15,19 261:21
equivalent 40:16
  40:17 45:15
  114:14
equivalents 40:14
ergonomic 286:3
errata 353:1
erroneous 309:12
  309:15
errors 313:20,21
escalate 159:3
esq 2:6,12,16

essence 246:11
essential 293:8
established 120:17
  174:4 316:20
  330:6
estimate 8:24 9:2
et 252:15
ethically 200:2
ethics 142:23
  199:25
evaluate 77:12
  111:22 112:20
  174:20
evaluated 77:10
  77:14 174:25
  177:9 203:6,21
  344:19
evaluating 141:16
  155:19
evaluation 68:22
  155:6,17,23 156:9
  174:23 175:11
  344:23
evaluations 68:22
  77:6,8 87:8 113:5
  129:17 130:6
  141:14,21 170:21
  193:24 194:17
  195:12 197:12
  231:23 233:8
  250:2 295:11
  345:12 351:5
evaluator 67:21
  71:4 247:20 295:8
evaluators 56:14
  68:9,23 197:10
evaluatory 249:10
eventually 12:4
everybody 22:6
  53:4 114:5 117:2
  123:12 131:3

138:21 143:10
145:2 149:13,16
150:15 184:17
213:8 231:14,15
274:7,8 282:4
297:8 342:25
**everyone's** 183:11
**evolved** 43:16
**exact** 8:22 9:4
12:24 13:24
249:14 289:6
332:13
**exactly** 14:18
17:16,23 20:13
21:10,11 50:4
51:6,23 54:3
55:15 64:20 90:17
**exam** 53:21 54:3
54:12,17,22 55:10
55:11 56:6 70:20
70:22 194:6 196:2
248:23 249:18
**examination** 1:18
4:18 349:1,2
**examinations** 55:5
128:23 129:2
342:12
**examined** 4:4
57:13
**examiner** 19:8
345:6
**example** 32:19,23
34:10 53:12 68:7
69:24 70:21,22
72:9 74:6 77:21
85:22 124:25
128:4 132:25
141:17,18 147:19
153:19 165:12
168:21 338:20,21

**exams** 53:15 55:7
57:4 69:24 70:2
74:19 134:10,18
134:22,25 135:3
143:19 196:18
200:13 201:9
202:19,25 231:12
329:11 342:2,16
**exasperated**
298:19,23
**exceeds** 174:24
176:17
**exception** 153:10
327:22 333:22
**exceptional**
177:18,19,20
**exchange** 51:17
98:3 166:11
220:17 299:2
300:16 302:17
307:4 309:22
310:7 314:14
317:3 341:23
350:12
**exchanged** 302:3
**exchanges** 244:25
245:4 308:21
309:24
**excuse** 148:23
**executive** 12:5,8
13:5,7,19,21 14:6
17:14,15,19,24,25
45:11 79:7 88:24
88:25 114:8
157:24 160:11
163:19
**exhibit** 5:12,17
22:19,23 23:11,13
23:16 94:25 95:5
95:13 156:21,24
157:3,17 162:25

163:25 164:6
185:4,7,23 186:3
186:24 187:8,16
187:18 191:16,21
192:14,18,23
204:25 208:2
211:17,18,23
212:9 217:5,10
220:18 229:17
250:7,12,18,20
251:4 262:10
264:12,13 271:22
278:11 288:19,22
288:23 299:10,11
299:14,19 310:3,9
310:12,14,22,24
311:6 312:19
313:25 314:4,8
316:13,14,14,15
316:15 317:19,23
318:3,5,6,8,10
322:7,10,10,13,20
325:24 326:5,19
326:23 327:18
336:11,15 338:8
342:8 344:8 349:8
349:10,12,14,16
349:20,22,23
350:2,4,6,8,10,12
350:13,15,16,18
350:19
**exhibits** 327:16,17
345:9 349:6
**exist** 240:15,25
**existence** 146:14
**existing** 171:16
**exit** 296:11
**exonerate** 183:17
**expect** 8:8 9:5
120:14 145:10

**expectations**
174:24
**expected** 330:12
**expecting** 333:2,4
**expedite** 72:22
**expeditiously** 46:2
**experience** 247:13
249:5,8 283:8
345:10
**experienced**
334:13
**experiencing**
120:10 260:17
**expert** 135:14
239:25 252:21,22
252:25 261:9
287:7
**expertise** 57:20
135:13 138:25,25
202:5 249:3
272:21
**experts** 307:8
**explain** 32:15
35:21 60:25 62:23
70:19 81:8,20
91:24 112:17
120:9 173:7
181:11,23 194:9
337:20 342:20
**explaining** 56:12
62:10
**explanation**
155:21 172:11
**explicit** 196:12
**express** 173:22
**expressed** 334:14
**expressing** 171:11
**extended** 50:25
**extent** 53:20 54:11
157:9 159:21
188:23 189:12,18

236:13 293:12
**external** 181:10
182:16
**eyes** 59:20,21

**f**

**f** 107:18
**facilitate** 52:5
128:22
**facilities** 28:21
72:3
**facility** 35:5
263:10 265:4
334:15
**facing** 145:21
153:14
**fact** 8:5 24:17
27:18,20 32:21
142:17 155:9
156:8 165:20
182:19,23 191:23
197:21 198:13
199:13 224:3
237:7 242:6
244:18 254:16
273:7,10 276:21
276:25 293:2
294:8 304:15
320:22 331:25
335:12 342:2
**factor** 172:18
**facts** 330:5
**failed** 189:23
**fair** 39:7 57:23
75:11 83:5 91:11
117:7 122:22
168:9 170:16
195:19,21 198:14
198:15 222:17
338:6
**fairly** 307:2

**faith** 261:7 308:12
**fall** 49:8 110:10
114:15 175:15
279:22 316:5
**falls** 279:21
**familiar** 5:19 57:2
57:8,10 61:24
97:2 129:18
165:22 229:5,8
240:6 296:20,24
323:5,7
**familiarity** 35:3
51:21 160:5 205:7
**family** 14:19 234:2
260:18,24
**far** 11:14 45:18
51:11 56:7 58:2
61:11 63:17 67:7
133:8 135:10
139:16,21 140:20
142:2 146:4
159:10,12 171:21
179:10 269:21
295:18 296:10
303:15
**farley** 16:14,24
38:12
**fascinating** 199:13
**fashion** 186:21
**february** 1:15
326:20 327:21,23
330:15 333:23
**federal** 1:20
214:24 344:13,15
**feel** 7:20,24 8:6
14:24 54:6,9,20
56:11 164:19
204:19 242:11
286:6 339:22
**feelings** 297:10

**feels** 200:21
**fell** 228:2 261:21
285:8
**felony** 28:18 339:6
339:14,17
**felt** 155:12 171:25
172:13 213:15
270:7,8 274:3
**fictitious** 1:8
**field** 341:3
**fifteen** 40:13
**fifty** 39:17
**figure** 4:8 39:21
48:14,16 210:11
213:23
**figured** 306:21
**file** 117:17 281:16
281:25 337:23
**filed** 78:22,24
111:19 118:23
119:5 121:12,19
169:9 177:3
185:11 187:2,11
187:15,17 188:7
188:10 189:9,19
190:16,21 204:11
204:16 234:12
242:25 243:10,14
269:5 274:16
281:18 301:23
316:16,23,23
317:12,14
**files** 279:19,19
283:25
**filing** 64:14 185:15
191:21 243:3
276:11 282:5
285:23
**filings** 187:10
**fill** 128:25 346:19

**filled** 51:19 64:10
69:15 75:20
294:20
**filling** 72:24
109:16 134:7
346:13
**final** 76:22 264:21
325:10
**finalized** 29:9
181:9
**finance** 39:9 47:7
175:8
**find** 90:23 116:10
143:23 144:3
182:23 183:16
184:6 188:10
204:20 208:25
239:14 265:17
274:18 280:3
294:5 316:11
343:11
**finding** 181:9
191:3
**findings** 198:17
**fine** 28:14 153:9
164:21 181:17
182:8 268:4,6,9,15
312:16
**fingerprinting**
26:9
**finish** 24:3 339:16
339:19
**finished** 11:21
12:16 217:13
250:15
**finishes** 215:20
**fire** 146:18,22
147:3 148:5
**fired** 147:6
**fires** 148:13

**firing**  148:19
**first**  4:2 5:15 8:8
   15:15 16:17 17:17
   19:12 23:5,14
   69:23 86:3,16
   120:12,18 123:7
   133:11 165:14
   169:18,20 182:14
   182:17,24 185:13
   185:14,14 186:25
   187:14 188:17
   190:5 204:24,25
   212:14 218:13
   219:12 223:9
   229:17 252:18
   264:16 287:13
   289:3 301:5 316:2
   317:25 329:7,7
   339:2 349:8
**fiscal**  80:16 81:10
   229:15
**fit**  70:25 71:14
**five**  41:3 69:11
   92:10,14,15,17,24
   135:9 189:25
   198:19,20,21
   199:2 206:11,12
   206:13,14 208:8
   235:5 257:9,11
   287:16
**fix**  313:7
**fixed**  229:21
   313:22
**flag**  282:20 283:9
**flagged**  121:3
**flagging**  72:20
**flexibility**  229:24
**flipped**  300:2
   307:9
**flores**  94:8 96:13
   97:2,14,22 98:8

99:6 100:9,14
**flores's**  95:17
**flurry**  298:20
**fmla**  93:12,23
   94:16 101:3 276:8
   323:6,8,10,18,21
   324:7,8,24 325:11
**focus**  213:8
**focused**  24:6 29:12
**folded**  18:4
**folks**  89:9 121:7
   246:19
**follow**  79:20 86:23
   277:4,7 279:12
   285:5 308:15
   309:21
**followed**  263:6
   280:6
**following**  304:22
**follows**  4:5 306:5
**font**  286:5
**fool**  142:2,6,10,15
   144:17
**force**  3:11 19:10
   19:11 45:24 46:14
   46:18 51:8 126:6
   199:18
**force's**  50:24
**ford**  1:7 50:2,15
   52:15 53:3,7
   60:23 61:4 63:22
   76:8,15 77:10,12
   84:25 86:9,25
   87:5,6 96:14
   100:21,22 131:22
   135:22,23 136:14
   136:20 137:21
   138:19 139:6,20
   140:8,19,25
   144:10 146:9
   147:13 148:2,4

149:17 176:8,10
   176:25 177:4,10
   182:11 194:15
   201:4,21 210:4,21
   211:2,3,7,13
   215:23 216:2,7
   220:13 221:2,20
   248:15 249:17,20
   249:25 289:18
   293:16 296:13,22
   296:24 315:25
   330:12,14 335:6
   339:5 345:10
**ford's**  50:4 138:8
   249:8
**foregone**  226:23
**foremost**  69:23
   252:18
**forensic**  155:5
   197:10 199:17
   200:24 201:7,9,14
   201:15 202:19
   248:23 249:15,18
   250:2 341:3 342:2
   342:11,16 345:10
   345:11
**forewent**  83:21
**forgive**  135:8
   304:2
**forgot**  92:14
**form**  3:7 137:4,9
   137:20 213:17
   276:12 281:16
   282:11,14
**formal**  46:18
**former**  293:13
   294:2
**forms**  340:22,23
   346:14,19,24
   347:3

**forth**  320:25 352:7
**fortunate**  238:25
**forty**  69:11 70:2
   92:10,17,24
   206:11,12,13,14
   209:25 235:5
   257:11 287:16
**forward**  9:17 31:2
   51:20 105:6 108:4
   221:13 249:4
   304:21
**forwarded**  257:16
**found**  33:13 119:5
   184:11 194:11
   204:16 272:17
   318:13
**four**  8:11 40:9
   44:20 46:5 58:16
   58:22 69:20 74:3
   82:21 83:6 135:9
   146:8 150:25
   172:19 189:25
   192:15 196:25
   197:3,5 208:9
   216:12 327:13
   349:23
**fpecc**  155:5 215:11
   219:19 231:11
   253:8 267:4
   272:12 341:7
**frame**  305:12
**frankly**  107:3
   204:4 264:10
**free**  7:20,25 8:6
   27:6,8,10,11
**fruitful**  294:9
**frustrate**  110:14
**frustrated**  110:16
   242:10,11
**frustrating**  209:10
   242:8

**frustrations** 134:6
134:7
**fte** 298:9,10,11
300:25 301:9
306:4
**ftes** 40:13
**full** 40:13,15 213:6
214:19 216:4
297:17 298:5
301:9 302:2,7
303:16 309:15
333:10
**fully** 74:21 75:12
**functional** 230:14
230:15
**functions** 43:12
230:6 231:8,20,25
232:15,21 256:21
293:8
**further** 3:6,9
223:8 318:24
319:22 352:10

**g**

**g** 4:2 24:19 48:4
48:22
**gap** 11:13
**gathering** 24:6
**gender** 82:9
168:23
**general** 97:23
138:23 160:19,24
161:3 165:14
168:2 172:23
229:24 232:18
294:12 303:8
314:18,24 315:4,7
346:3
**generally** 61:18
64:8 85:19 131:3
131:7 138:13
168:18 257:21

297:7
**generated** 51:8
202:23
**generating** 52:17
**genuinely** 110:15
**germane** 11:3
**gestures** 7:15
**getting** 37:16
69:23 133:20
134:6 152:9 172:7
210:23 220:14
263:10 297:22
302:7 306:18
**gillen** 48:4 219:13
**give** 33:2 42:21
48:21 88:11
113:22 164:4
192:4 228:16
279:7 311:7
321:11 330:25
331:6
**given** 7:6 74:20
75:13 92:12 126:2
142:17 172:11
194:19 258:2
294:8 332:7 352:9
**gives** 332:6
**giving** 58:14 87:15
**gmail** 184:9,12
**go** 7:4 12:9 15:9
16:7 17:11 24:17
27:11 31:20 41:8
47:25 52:13 55:12
59:22,24 64:18
66:8 72:25 77:19
77:20 86:3 87:8
114:19 115:8,9,12
115:13 117:17,23
119:16,19 130:9
141:9 145:23
166:6 167:7

168:13 176:14
181:18 191:15,21
191:22,22,24
196:21 198:16
209:24 212:6
219:23 220:25
227:11 230:10
241:23 248:12
257:3,7 275:6,9
279:3 283:6,22
286:6 287:10
304:16 308:12
310:2 316:8 317:9
317:11,17 318:12
318:24 319:11
320:10 326:11
327:12,24 331:23
331:24 334:15,25
335:7,10,14,20
336:7 339:2,3,11
339:21
**goal** 55:4,6,6
58:12 64:4 87:14
**goals** 63:24,25,25
**goes** 125:20
165:13,14,20
168:16 243:21
254:7,10 283:11
285:24 290:11
**going** 5:11 7:21
8:7,21,22,23 9:5
9:19 12:9 24:21
28:2,5,8,10 30:13
31:2 37:4 50:21
63:7 67:13 80:9
95:11 108:4
119:25 139:12
140:9 157:12
164:3,18 174:3
177:21 181:24
183:18 184:20

185:6,12,18
189:15,21 191:23
192:3,12 196:14
198:3,3,16 203:19
205:16 207:25
210:18 211:16
216:20 217:9,17
220:8 221:12,15
223:3 225:3
242:24 244:14
248:21 250:6
252:3 254:17
264:12 266:6,8,18
270:23 273:15
274:14,18,19
278:3,16 279:8,9
283:18 284:13,14
285:18 286:18,21
287:4,7 288:21
295:10 299:9
303:25 304:2
313:23,24 322:19
323:7 325:23
326:8,17 327:24
328:11 333:8,10
333:18 336:10
338:4 339:13
343:10,11 347:18
348:2
**good** 4:6,7 7:15
32:22 69:12 107:4
132:18 145:14
149:24 176:22
242:11,11 255:22
255:23 281:13
282:20 304:20
329:25
**gosh** 15:21 107:16
149:17 174:9
**gotten** 105:3
166:17 174:20

212:3,13
**governed** 207:9
236:5 239:21
242:6 287:11
**grade** 82:17
**graduate** 32:22
**grant** 256:13
**granular** 64:19
**grasped** 102:22
**grave** 339:17
**great** 82:19,20
220:10 261:7
296:14 307:12,16
308:3 310:14
**greater** 135:13
202:4 229:24
**greenfield** 2:16
5:22 89:24 119:15
119:16,20 120:2
160:3,12,13,20
161:2,6,17,18,22
162:2,4,6,10,13
163:20 168:13,20
169:3 171:10
188:20,21,25
189:20 222:11,22
262:7 269:16
282:21 283:9,12
284:19 285:6,19
315:8,12,14,21
318:7
**greenfield's**
147:17 160:23
**greetings** 98:4
**grievances** 179:23
**grieve** 286:22,23
**group** 45:25 47:15
52:21,22 53:3
134:5 207:15,16
209:16,17 296:25
297:2,8 305:22

**grouping** 98:5
**guard** 144:13
**guardrails** 35:3
**guess** 5:2 24:8,17
24:19 35:15 43:3
48:13 49:19 50:25
52:5 53:13 70:19
71:23 72:25 77:17
89:17 96:12 106:8
128:22 132:15
135:25 139:7
140:20 145:23
146:13 154:17
169:19 177:22
178:2,5 182:15
190:3 191:24
204:9 211:17
212:20 219:12
220:16 230:4
240:12 298:15
302:3 303:25
304:2,24 305:6
309:9 323:5,13
329:2 333:23
334:24 336:19
338:11 347:19
**guidance** 42:21
138:22,23 140:4
142:19 144:13,15
**guided** 206:9
**guidelines** 139:22
142:21
**guys** 244:3

### h

**h** 12:10,10 16:7,7
37:5,5,21,21 42:8
42:9,9,10,10,12,12
42:15,15 47:21
48:4 102:8,8
104:7,7 113:14
114:9,10 117:25

118:2 165:18,18
194:2,2,3,3 195:11
195:11,14,14
199:3,3 201:9,9,12
201:12,14,14,19
201:19 212:20,20
238:3,3 285:8,8,18
285:18 286:6,6
289:9,9 295:24,24
302:14,14 303:8,8
303:12,13,13,13
305:23,23 314:20
314:20,23,23,25
314:25
**h's** 42:8 113:14
**hagan** 2:4,6 4:6,8
4:12,15,16,19 5:11
9:12 22:18 23:10
27:2,8,13,21,25
28:5,10,14,16
30:13 68:15 94:20
95:11 96:3,7
101:24 103:13,18
113:4 125:3
156:19 157:2,8
161:24 162:4,8,11
162:15,19 164:3
164:11 166:16
184:20 185:6,18
186:3 187:7 190:5
190:10 191:20
192:12,22 196:24
197:3 204:13
209:24 211:20
212:8 216:22
217:9,17,24 218:3
218:5,9,14,23
219:3 220:11
223:3 250:6,15,19
251:4 265:19
270:2 288:13,21

300:4,6 305:19
310:2,24 311:4,7
311:19 312:4,13
313:23 314:8,11
314:13 315:10,13
315:15 318:9
320:8,11,15,19
321:4,23 322:9,13
322:19,23 326:16
337:2,5 338:6
339:25 340:10
341:12 342:9
347:18 348:2
349:3
**half** 48:21 257:9
290:12
**hall** 18:9,14 19:3
20:22 21:12,25
22:5 23:25 24:5
24:14 25:4,11,12
25:15 26:11 27:19
29:4,8 31:7 37:5
96:15
**hand** 182:14,17,24
345:13 352:16
**handle** 35:24
105:4,14 114:8
159:2 260:20
278:17 307:14,15
324:24 325:9
**handled** 104:23
160:10 161:11
286:11 307:20
324:6,8
**handling** 179:22
307:14 324:21
**handwritten**
339:5
**happen** 22:15
29:11 33:4 106:15
151:2,5 313:8

316:4 333:8
**happened** 8:23 9:3
33:12,14 70:11
82:5 93:7 99:6
112:10 126:5
184:5,11 193:20
194:8 216:2
243:13 244:7
267:25 301:22
**happening** 201:12
213:19 254:13
347:8
**happens** 71:10
137:19 182:2
239:2
**happier** 326:15
**happy** 106:25
**harassment** 282:2
**hard** 300:8 303:24
334:9
**hardship** 258:8,11
258:18 286:25
**harper** 305:7,8
**hasten** 64:24
**head** 20:5,13 21:6
73:14 76:2,4 98:4
105:14 108:16
157:23 175:24
176:15 307:6,6
**heading** 218:12
**heads** 21:13,13
36:2 73:20 279:7
284:21
**health** 1:7 2:17
10:3,14,17,25
11:11,25 14:9,13
14:16,19 15:3,9,11
15:16,17 16:10,20
17:13 18:8,16
19:6,7,10,18 20:8
20:15,25 21:20,22

21:23,24 23:17
24:8 25:16 29:4,5
29:6 30:6 31:8,9
31:12,13,16 32:10
32:11,16,17 36:16
36:24 37:13,17,17
37:22,23,24 38:8
38:17,19,20 39:6
40:20,22 41:4,20
41:20,23 42:18,23
44:12 46:16 50:19
50:20 51:17 58:17
61:3 63:3 69:21
71:20,21 72:5,8,15
97:13 98:4 99:17
99:18 107:5
108:22 117:3
136:8 137:9 148:7
156:23 157:4
163:21 165:9
174:17 200:18
214:25 216:6
236:4,14,17
237:21 259:9
267:12 277:6
278:9 291:8 313:2
321:16 324:10
331:11 343:24
346:3 349:15,16
353:6
**hear** 28:22 85:13
85:18 210:13
313:19
**heard** 28:24 85:8
90:18 130:23,25
172:15,20 210:20
211:2 306:15
**hearing** 273:23
**heart** 132:20
**held** 1:21 5:13
22:25 68:19 94:21

95:7 148:24
156:16 162:17
164:9,23 169:25
184:24 185:25
192:20 208:3
211:25 217:7
218:25 250:8
299:16 300:10
310:5 312:17
314:6 322:25
325:25 336:17
**help** 51:16 78:17
84:21 130:8
164:20 220:8
309:25 316:10
334:15
**helpful** 46:21
321:18
**helping** 78:17
**helps** 15:24
**herding** 220:15
**hereinbefore**
352:7
**hereto** 3:3
**hereunto** 352:15
**herrera** 319:14
321:16
**hhc** 163:9,15
290:14 302:23
303:3
**hi** 319:15,16
**hicks** 78:14,21,25
79:10,11,12,16
80:2 89:2,3,7,18
106:24 121:4
169:6,7 171:10
221:13,19 224:15
261:12 262:5
267:18 269:12,15
284:25 285:2
309:22,24 310:15

310:21 311:23
328:3
**hierarchical** 135:8
139:7 147:19
**hierarchy** 140:5
**high** 125:19 232:5
**higher** 21:2 84:2
144:24 252:17
293:20
**highest** 10:7
177:16
**highlighted** 218:3
218:6 219:9 223:9
**highly** 194:15
196:3 200:21
**hipaa** 340:22,23
341:7 344:15
346:14,19
**hire** 33:22 136:8
136:25 146:18,22
147:2 148:5 249:3
328:16
**hired** 26:13 28:20
50:18 76:10,12
108:18 112:3
126:3 128:22,24
129:11 135:25
136:7,11 147:6
**hires** 129:4,4
148:13
**hiring** 76:23
136:14,16 137:24
138:4 147:7
148:18 215:15
328:23
**history** 304:12
**hiv** 14:3 346:4
**hold** 107:7 212:19
213:22 321:25
**holding** 112:13
153:7

**hollis** 2:5
**home** 47:18
  333:15
**homer** 47:21
  49:10,15 50:19
**hope** 8:8 113:3
  114:21 127:24
  132:18 151:18
  220:10 223:4
  326:17
**hoped** 198:9
**hopefully** 318:7
**hospital** 12:6,25
  13:14,20 44:18,21
  44:24,25 71:19
  72:2 79:8 88:14
  223:13
**hospital's** 36:17
**hospitals** 1:7 2:17
  10:4 11:25 15:3
  19:7,18,19 21:23
  29:6 31:13 32:17
  36:24 37:18,23
  38:19,20 42:18,22
  42:25 63:3 72:6,9
  72:15,18 89:14
  117:4 137:9
  163:22 165:9
  174:17 229:11
  236:4,14,17
  237:21 259:9
  277:6 291:8 313:2
  324:10 331:11
  343:24 349:17
  353:6
**hour** 92:8,11
  206:10,12,12,13
  206:14 257:9,11
  257:12 258:13,19
  287:16,16 290:12
  291:10

**hours** 8:12 63:7,17
  63:21,24 92:5,6,11
  92:17,24 206:3
  234:16,18 235:5
  242:4 244:23
  245:6,18 257:8
  300:17 304:21,24
  304:25 306:2,3
  307:3 310:19
  338:2,2
**house** 285:20
**housing** 96:17
**howl** 10:24
**hr** 41:7 42:4 43:6
  47:10 48:17,23
  84:10 92:22
  103:25 108:16
  125:12 171:14
  229:2 240:2,3
  248:7 252:21,25
  255:9,14 256:15
  259:21 274:11
  276:16
**hr's** 307:8
**human** 35:23
  84:13 89:24 103:5
  108:9 115:11
  289:5 325:4
**humane** 20:23
**hundred** 15:22
  39:3,17,17,22 40:7
  40:8,10,11,13
**hundredths**
  298:15
**hurting** 297:9
**hygiene** 16:10
  17:13 19:7 25:16
  30:7 31:12 108:23
  129:24 131:5
**hyphenated** 18:25

**hypothetical**
  105:3

**i**

**i.e.** 265:4 291:12
**idea** 7:3 21:23
  107:5 281:23
  324:17
**ideally** 75:6
**ideas** 21:15 52:20
**identification** 5:18
  22:24 95:5 156:25
  164:2 185:5,24
  192:19 211:24
  217:6 250:13
  288:19 299:15
  310:9 314:4 322:7
  326:5,23 336:16
**identified** 20:25
  44:13 58:13 64:23
  310:19 334:8
**identifies** 114:23
**iii** 127:10 246:20
  268:3 271:16,20
**illegal** 343:3,5,7,8
  343:15,21
**imagine** 67:5
**impact** 87:3 245:7
**impair** 8:18
**implements** 57:4
**importance**
  339:18
**important** 280:19
  281:2,3,9,9 282:22
  282:25
**impression** 333:9
**improper** 190:12
  190:12
**improperly**
  347:12
**improve** 20:22
  29:20 44:12

**improved** 51:11
**improvement**
  112:22
**improvements**
  69:5
**inappropriate**
  181:15
**inappropriately**
  119:15 180:9,19
  182:5
**inception** 248:4
**incident** 33:12
  212:25 213:3
  301:20
**incidents** 161:16
**include** 197:20
  347:25
**includes** 246:20
  302:18
**including** 131:3
  187:10 213:7
  214:20
**incomplete** 182:15
**incompletely**
  346:19
**incorrect** 89:16
  224:19 283:4
  313:2
**incorrectly** 346:13
**increase** 228:11
  252:16
**increased** 81:5
**increases** 121:24
  122:9
**indented** 290:10
**index** 349:1,6
  350:23 351:1,9
**indicates** 193:10
**indicating** 176:3
  212:6 318:15,23

indicator 69:13
indirectly 93:6
  98:24,25 118:19
individual 144:18
individuals 335:12
inform 200:3
information 51:17
  69:22 85:25
  166:11 180:9
  192:16,24 213:7
  214:20 258:2
  337:24 344:17
  345:12,21 347:4,6
  347:11,15 349:23
informed 339:4
  340:21
infrastructure
  41:7,10,12,13 42:2
  42:9,12,14,20 43:9
ingested 8:17
initial 35:17 103:5
  103:25
initially 37:8
  126:16 133:11
  210:22
initials 68:18
initiative 19:17
  20:6,7,11,13,13
  21:7,7 29:22
  52:17 129:23
initiatives 52:20
injustice 26:4
inmate's 68:14
inmates 346:13,18
input 146:13
inquires 325:9
inquiries 316:9
inquiry 89:12
  139:4 173:17,21
  249:5

insist 126:6 152:15
  255:11 323:11
insisted 202:7
insistence 150:18
insistent 328:15
instance 26:19
  52:24 89:21
  166:23 167:11,21
  168:21 219:16
  222:19 259:22
  279:2 309:5
  345:22
instances 28:18
  167:14 260:2
insular 43:3
insulting 221:6
integral 280:17
intend 219:19
intended 1:9
intention 330:19
interact 337:9
interchangeably
  194:24 195:18
  203:8 240:12
interest 140:25
  141:10 167:21
  173:22 320:21
interested 352:13
interests 132:20
interfered 130:12
  130:13
interim 267:19
  270:11
internal 181:8
  283:14
internally 141:12
internist 138:15
  248:18
interrupting 27:4
intervention
  323:12

interview 296:11
  296:12
interviewing
  136:22 138:7
invasive 200:21
investigate 183:2
  262:19 267:20
  270:12 279:17
investigated
  279:13 284:3
investigating
  262:6 278:23
investigation 22:8
  22:21 23:23 25:18
  180:16 183:19
  204:9,10,20
  274:19 349:10
investigations
  22:13 33:13
investigatory
  192:15,24 349:23
invitations 46:17
invited 46:19
involved 20:21
  24:18 30:22 37:25
  53:2 56:15 79:13
  261:2 332:3
involving 23:17,23
  139:13 163:20
  168:17 205:5
  279:14 306:10
issue 21:20 26:15
  80:4 81:17 91:25
  92:3,8 113:22
  114:6 117:24
  118:12 119:22
  120:5,8 126:7
  131:23 143:8
  159:3 161:14
  169:16 171:15
  184:3 199:19

213:3,4,5 221:18
  222:25 223:2,19
  224:5,8 244:21
  259:19 262:8,8
  263:2,21 264:21
  265:2,3,4,13,15
  266:3,4,16 272:3
  272:22 278:21
  279:10,10 285:2
  285:24 298:4
  307:14,14,15,20
  320:3 347:14
issues 11:11 19:4
  20:24 30:10 35:3
  46:4 51:20 85:23
  85:24 90:6,14,21
  91:6 112:24
  115:11 126:18
  127:14 159:18
  160:2,10,11
  161:10,11,15,16
  163:20 168:17
  169:8 170:10
  172:9 179:19
  214:25 223:16
  224:24 261:21
  262:12 269:21
  275:7,8,9 276:7
  278:9 282:21
  294:18 297:12
  298:24 301:17
  304:10 310:18
  323:23 326:15
  334:9
issuing 71:3
item 339:12
itemize 198:21
items 21:21 351:2

**j**

**jail** 46:3 176:18
216:5
**jails** 37:19 129:16
130:7
**jain** 1:8 76:8,10,12
76:19 77:9,10
86:25 87:6,8
135:23,25 136:7,9
136:14,17 137:16
137:24 146:10,11
147:5,21,25
149:17 182:11
194:10,14 201:21
215:14 216:14
248:16 289:11,14
293:15 295:6,9,13
315:24 330:12
335:6 339:23
**jain's** 340:14
351:6
**january** 11:22
185:19 186:4,23
187:23 190:17,24
191:2 317:25
319:23 322:11
327:19,20 337:2
340:20 341:10
**jeff** 319:15,16,17
321:12,12,14,15
321:16
**jeffrey** 319:14
**jeffs** 321:13
**jeremy** 45:2,4,13
293:18,19,21
**jess** 255:16
**jessica** 36:3,5
113:24 115:8,13
117:24 161:11
178:23 264:8
276:9 277:10,11

314:14 319:18
331:14
**job** 13:17 14:21,25
18:14,17 57:18
62:25 66:7 83:22
87:5 112:2 133:21
154:9 161:12
179:15 228:15
230:2 231:10
232:5,15,21
256:15,21 261:8
271:16 293:8
316:8
**jobs** 70:18 232:6
271:18
**john** 68:21,21
**join** 297:8
**joint** 19:10
**jolibois** 305:25
**jonathan** 1:8
48:19,22 84:16
111:21 178:25
179:5 182:11
190:25 255:17
278:5 304:6
305:20 307:10
308:6 314:15
317:20 318:2
319:3,19,21 324:7
324:14 331:15
**jordan** 176:9
**joy** 220:12
**jpo** 1:5
**judge** 67:15 68:7
70:21 71:3 210:18
212:19 213:22
214:19 341:21
342:5
**judgment** 144:19
249:5

**july** 80:19 106:5
106:16 153:8
157:5,18 170:2,3,9
170:15 219:18
226:9 267:4,13,21
270:14 304:25
**june** 19:25 29:8,9
37:8,10,15 38:25
80:15 81:23 225:9
267:14 304:25
**jurat** 347:25
**justice** 19:11 20:9
20:11 21:16 26:3
45:21 57:12 59:5
**justify** 241:22

**k**

**katz** 158:4,7,11,16
158:22 159:6,11
163:2,4 174:5,7
193:14 296:4
**katz's** 158:25
**kaye** 1:4 4:17 32:3
60:8,10,14,17,22
61:14 62:7,15,21
62:22 63:13 65:25
66:12 73:3 74:16
77:23 78:6,15
79:18 80:10,19
81:13 82:12 83:5
83:8,15,16,18 84:8
84:17 85:9,18
86:12,13,23 88:3
88:17 89:4,10,21
89:25 90:6,14,19
90:25 93:3,12,18
105:5,19 106:5,7
106:14,17 107:8
108:2,5 111:19
118:15 119:4,5,16
119:18,20 123:3
123:13 124:12

126:3 127:13
130:6 134:16,23
148:20 150:4
151:2 152:18
154:20 158:8,12
158:13,15 159:8
163:3,5 168:22
169:21 170:14
171:18 172:13,21
172:23 173:10,16
173:23 175:14,15
178:13 182:14,19
184:6 185:11
188:7 189:23
194:6 195:3 204:8
204:16 205:22
206:3,15,25
207:17,19,21
208:12,16 210:22
211:8,10 214:2,3,8
214:10 224:23
226:14,16 227:3,8
228:4,5,7 230:4
231:6 233:6
241:12,24 242:25
243:7 244:6,25
245:5,11 246:23
247:4,10,18
249:24 250:11
251:7,12 252:8
253:18,21 254:2
254:23 255:4,11
256:2,21 258:12
259:12 260:10,16
260:23 266:23
267:9 268:9,14
272:18 273:7,25
274:3,15 277:13
277:19,22 279:18
286:18 288:25
290:17 293:5

294:25 295:2,24
296:5,16 297:13
298:4,15 299:4
301:4,13 302:6
304:23 305:12
306:9 308:24
309:11 312:21
313:17 315:18,22
316:12 317:5,10
317:17 319:20
320:4,15,23 321:5
322:15 323:8
324:3 326:7,10,14
326:25 327:24
328:5,12,22,23
329:18 331:16
332:5,18 333:5,24
335:20 338:10,14
338:25 339:4
340:20 341:10,13
342:16 343:2
345:15 346:12
347:5,14 350:7
353:6
**kaye's** 79:5 81:4
87:20 106:8
166:25 173:4
178:5 180:2 181:6
181:19 186:13,17
187:9,10,19
190:17 193:23
194:12 195:20
205:10 211:14
221:4,13 232:8
233:20,20 253:4
285:2 318:20
319:7 321:20
329:10
**kaye000364** 95:3
349:13

**kaye000366** 95:4
349:13
**kaye000384** 22:22
349:11
**kaye000414** 22:22
349:11
**kaye000415** 5:16
349:8
**kaye000446** 5:16
349:9
**kaye364** 95:13,16
**kaye384** 23:18
**kaye414** 23:18
**kaye415** 23:15
**kaye445** 23:15
**keep** 15:23 48:8
126:23 153:4
203:7 208:21
230:3 252:3 278:3
348:2
**keeping** 348:3
**kent** 178:6,8,10,14
178:16,19 179:5
331:13
**kept** 91:21,25
313:5,6
**kevin** 292:4,5
337:6
**key** 55:2
**kicked** 122:9
**kind** 8:25 24:23
34:23 36:14 40:20
43:22 52:17 57:14
96:12 101:16
102:18 112:21
160:25 190:11
198:21 203:13
271:10 282:2
284:10 285:5
300:19,19 306:8
309:22

**kings** 44:18,24
45:15 58:19 59:3
61:2 65:23 83:11
107:4 247:9
**knew** 15:2,5
112:23 118:19
124:20 133:3,6
182:23 234:7,8,11
254:16 274:7
286:20 290:3
306:24 315:22
323:7
**know** 7:6 8:21 9:6
21:9,12 22:5
23:24 25:4,5,14,17
26:15 27:6 28:23
29:24 30:9 35:10
36:19 37:3 40:5,6
42:19 45:9,13,16
46:17 53:20 54:11
54:16 56:6,14,21
61:22 62:5 64:16
67:24 69:14,15,16
70:24 71:23 73:16
73:17,20,22 75:17
75:25 79:3,5,14,21
79:23 81:24 83:4
83:7,8,9 84:10,12
88:3,22 92:6,13
95:22 96:13,16
99:10 100:21
101:2 102:17
103:7 104:10,11
107:16 110:19
111:20 112:11,19
113:12,13,17
114:9,19 115:8,9
115:16 117:23
121:2 122:12,20
122:20,22,24
123:2,8,21,24

124:4,6,8,10,17,18
124:22,25 125:4,6
125:10,11,19
126:19,25 127:2,5
127:12 128:16,16
128:18,20 130:3
132:25 133:2,9
135:3 137:10,10
138:11 140:10
141:8 144:19
149:24 151:10,14
151:15 152:7,8
154:8,15 158:20
159:16,22,25
161:20,20 163:16
165:25 166:2,2,10
166:19 174:12
175:24 177:9,12
180:12 181:13,25
182:13,18 184:4
184:16 187:3
189:5,14 193:17
194:3 197:19,20
200:22,25 201:7
201:11,13,18
204:5,6 205:3,21
206:21 207:3,7,8
207:11,17,21
208:18 209:9,10
209:15,19 210:3
210:12,13,20
214:7 215:3
217:12 219:5
221:4,17,23 222:7
223:14,15,15
224:14,15 226:21
228:12,13,17,24
231:14,15 235:9
235:20 236:9,13
236:15 237:8,10
237:13,22 239:9

239:10,12 240:16
241:10,18 242:5,8
243:5 247:4,9,10
247:12,17,21
248:21 249:20
252:6 253:7,9
254:15,18,22
255:4 258:3,4,7,22
259:17 260:10
261:8,8 262:7,11
262:11,23,24
263:8 265:8 266:7
267:10 268:7
272:3,10 273:5,6
273:16,16,17,22
275:9,21 276:4,21
276:25 277:10,11
277:16,22 278:16
280:14,25 281:3,5
281:10,12,13,14
281:15 282:22
283:13,13 286:4
287:9,15,19,21,25
289:4,6 291:15,19
291:20 292:2
293:2,12,16 294:2
294:7,9 295:10,19
295:23 296:17
300:9,18 302:8,19
302:20 303:4,16
306:12 308:16
309:8,13,14,19
311:13 312:23,24
313:10,12,20
319:2,3,9 320:20
321:5 322:21
323:22 324:14,16
324:23 325:11,15
325:16,20 327:4,9
329:22 330:13,14
331:25 334:16

335:8,11,21,22,23
338:13 340:8
343:10 344:2,3,10
344:13 347:19,21
**knowing** 325:6
**knowledge** 30:10
35:13 55:9 73:10
120:22 130:15,18
130:22 131:11,25
138:25 174:2
177:2,5,8 178:15
182:14 203:24
216:17 222:8,9
229:22 232:9
248:13 252:23
263:14 275:24
291:17 323:21
**known** 197:11
249:17 275:4,6
**knows** 283:21
**ks** 163:5

**l**

**l** 2:15 18:24 36:5
48:4,4,22 49:4,6
**labor** 2:13 41:7
42:4,13,14 43:6
47:10 48:17,17
92:22 93:8,8,9
104:15 108:16
109:11,13 115:11
147:12,14,15
178:17 179:10,13
179:21 235:22
239:24 246:19
252:21 274:11
307:6 331:8,9,10
**laboy** 36:4,5 84:14
84:15 86:10
108:11,14 109:16
109:21 113:24
114:16,19,23,25

115:5 137:22
149:17 161:12
166:10 175:6
178:23 255:24
264:9 275:10,17
275:21 276:19
277:13,18,22
278:4 279:23
280:4,10 283:21
284:11 314:14
317:3 319:18
331:14
**laboy's** 255:17
**lack** 83:25
**landed** 141:23
**landscape** 19:18
**language** 210:17
212:15 304:3
338:18
**languish** 46:2
**large** 58:19 297:8
**larger** 57:11 207:2
249:3
**late** 60:3 173:17
316:5 317:8,14,16
335:10
**laundry** 245:7
**law** 2:4,9,13 57:3
199:18 214:21,22
215:2 344:14
**laws** 194:22 196:9
214:24 344:16
**lawsuit** 111:19
121:12,19 146:5
188:11 189:8
204:11,17,18
234:12 283:23
316:16,23 317:12
317:14 321:20
**lawyer** 56:2
167:22 215:8

235:22
**lawyers** 168:7
**lay** 35:3 235:21
237:5 239:18,20
**layers** 146:4,8
**laying** 247:19
**leader** 177:20
**leadership** 52:11
105:22 202:16
248:25 261:7
296:25 297:2
**learn** 57:16 59:19
133:12,15,22,24
134:9 253:19
**learned** 59:18
133:17
**learning** 248:10
248:11
**leave** 69:16 110:5
176:18 232:13
234:2,3 297:20
301:17
**leaves** 328:22
**leaving** 232:24
296:9
**led** 258:15 309:20
**left** 17:20,22 49:15
66:12 75:22
109:22 176:11
294:25 295:2,24
297:20 329:12,18
332:19
**legal** 5:24 6:2,4,5
36:25 65:6 104:14
119:9,10,13 121:3
130:16,19 131:6,7
132:16,21,22
134:9 139:22
160:2,14 161:4,21
167:8,13 168:19
189:13 213:9,20

215:6,9 341:3
342:23,25 343:12
343:20 344:9,11
353:2
**lesser** 256:23,25
**letter** 247:18
295:25 296:6
330:17,19,25
331:6,17 332:6,20
333:5
**level** 10:7 16:19
38:11 57:19
125:19 156:12
160:11 163:19
181:3 205:23
248:25 307:5,15
324:20 325:6
337:14,15
**levels** 135:9,9
172:19
**liability** 167:23
**liaison** 19:5 189:2
275:15,18,22
276:10
**licensed** 32:12
36:11 142:22
**licenses** 32:18
35:16,25 36:12
**life** 6:12 19:21
142:15 145:14,19
**liked** 150:20
**lillian** 18:21
**limit** 297:10
**line** 26:23 77:17
207:4 251:13
252:13 271:23
279:18 301:7
311:17 316:12
318:14 351:11
353:8

**lines** 69:17
**linguistics** 10:22
210:17
**list** 63:5 245:7
275:19
**listed** 178:16
197:17 304:22
**listen** 147:3
**listing** 41:11
**lists** 306:6
**litigation** 6:25
189:24
**little** 64:18 317:6
**live** 102:5 103:19
**living** 121:24
122:9
**load** 230:21
**loads** 230:22,25
**location** 141:24
351:10
**locations** 63:2
244:16
**log** 187:4
**long** 14:12 17:21
44:14 111:7
141:20 154:3
174:7 211:11
223:5 229:25
307:4 311:5
**longer** 73:10
119:25 120:6,10
120:13 155:4
246:23 284:23
**longest** 83:14
**longevity** 81:3
106:8 107:21
169:21 224:24
227:12 228:10,12
228:13,16
**look** 32:17 68:6
87:15 166:17

171:15,23 172:9
187:13 191:24
196:22 198:19,21
198:23 205:5
207:15 208:5
209:17,18 212:13
217:11 219:4
221:19 248:7
251:4 272:22
274:13 284:14
300:7 304:8
305:13 310:11
318:18 319:7
339:10,18
**looked** 9:10 57:23
57:24 121:21
122:2 155:9
169:17 187:16,18
187:22 255:22,23
284:3 287:23
291:3,9,25 313:3
**looking** 26:3 45:25
162:20,21 166:20
216:15 309:5
310:13 319:25
327:19 344:8
**looks** 5:19 137:11
185:20 323:5
**loop** 265:2 279:4
**looped** 220:20
222:4 264:18
266:11,15 278:12
**lose** 169:24 299:6
**losing** 212:15
298:25
**lost** 187:21
**lot** 16:18,21 41:3
47:8 90:20 133:19
143:9,10 163:5
212:17 299:6

**love** 11:11
**lower** 126:3
**lucretia** 61:23
**lunch** 92:11
156:17 206:10
257:9,12 258:12
258:13,19 286:12
287:16 290:13,21
291:10 292:11
294:6
**lutz** 321:15

| m |
| --- |

**m** 47:21
**m.b.** 68:7
**macdonald** 47:19
49:11,20 52:14
53:9,10 60:23
61:4 63:22 76:9
76:15 77:12,15
86:9 87:6 131:22
135:22,24 136:21
137:21 138:8
140:9 142:24
143:7 146:9
147:14 149:17
175:4,19 177:9
182:12 248:15,17
296:23 330:13
**macdonald's**
138:11 175:16
176:2
**mail** 46:17 79:19
84:23 93:21 105:5
105:9 151:8,10,13
152:4,8 171:23,24
172:25 180:17
181:17,19 183:11
184:17 185:19,22
186:4,7,10,13,14
186:17,20,23
187:20,21,22,22

189:10 190:2,17
191:2 211:21
212:4,4 217:3
218:22 219:12,20
220:4,16 221:4
223:8 224:10,14
244:24 245:4
250:10,20 253:15
262:9 266:9,19,22
267:6 268:10
276:13 288:17,22
289:3 290:9
291:11,13,17
299:2,12 300:12
302:23 303:3,25
304:17 310:7
311:3,18 312:2
313:24 314:2,13
317:2,21 318:12
318:13,14,18,20
318:22 319:7
320:4,7,9,22 321:6
322:5 323:3,25
326:3,19,21,24
327:3 335:5,18,18
335:22 336:11,13
337:3,8 344:4
349:22 350:2,4,6,8
350:10,12,13,15
350:16,18,19
**mailbox** 319:19
**mailed** 78:16
336:12
**mailing** 182:20
191:4 302:12,13
320:10,25 333:23
**mails** 90:21 91:21
152:10 180:2
181:24 184:4,5,6
191:7,10 245:9
261:4 274:14

277:12,17 298:6
298:20,23 300:13
302:3 306:9,17,19
319:25 328:2
333:19 334:17,18
336:25
**maintain** 142:23
**maintaining**
223:24
**majored** 210:16
**making** 52:25
75:20 84:24 128:3
132:12 139:23
155:3 166:6
220:14 225:14
261:10 266:8
285:17 292:16
295:14
**male** 81:14,25
252:17
**manage** 38:24
42:25 44:2 46:23
175:19 335:13
**managed** 28:20
39:2
**management** 14:3
24:8 58:17 61:2
70:16 82:4,13
83:22 84:8 106:9
122:21 123:5
124:4,18,19,24
126:17,21,23
127:5,6 136:10
142:19 144:12
147:16 158:25
166:24 167:2
206:20,23 207:4
208:24 209:4
216:12 226:24
228:15 229:23,25
230:3 231:4

234:21,25 235:10
235:12,25 238:17
239:3 241:20
242:3,14,17
244:14 249:2
251:19 256:10
273:8 320:24
**manager** 82:14
84:7 96:22 113:18
118:5 121:23
123:3 124:17
136:15 145:15
147:7,15 152:25
153:3,12 157:24
207:20 233:16,16
**managerial** 46:25
119:18 122:8
123:9,12,17,22
126:6 145:4
208:16,19 209:13
227:16 232:8
246:13,14,16,21
251:18
**managers** 121:23
123:6 124:2 207:9
207:9 231:8 233:5
233:7,13 235:8,9
235:14 237:4,14
256:20
**managing** 43:23
50:12,13 107:6,20
138:19 271:18
**manhattan** 46:6
74:10 76:4 83:23
84:7 153:15
225:20 226:6,7,7
226:18,19,25
227:3,8,19 228:4
**manner** 87:18
119:16 184:16

**march** 18:8
352:16
**maria** 291:12,15
**mark** 15:6,7 24:19
28:8,13 68:12
**marked** 5:12,17
22:19,23 23:18
94:24 95:4,12,15
156:20,24 163:25
164:4 185:4,7,23
192:13,18 211:16
211:23 216:21
217:5,10 250:7,12
288:18,22 299:10
299:14 310:8
314:3 322:6,20
325:24 326:4,22
336:15
**marrazzo** 337:6
337:10
**marriage** 352:11
**martelle** 175:9
**mary** 293:19,20
**master's** 10:15
11:14,18,24 12:16
**material** 180:19
182:4
**materialize** 65:11
**materials** 14:2
181:16 182:21
184:18
**matt** 307:6
**matter** 27:23 82:3
135:8 222:23
249:6 257:23
262:20 266:23,24
304:9,11 335:6
352:14
**matters** 156:11
168:17 222:11

**matthew** 305:21
**maximum** 338:3
**mayo** 18:9
**mayor** 18:10,11,18
  18:20 19:13 20:10
  21:8 29:14 57:11
**mayor's** 19:9 20:9
  45:20
**mayoral** 236:17
**md** 11:6
**mean** 9:18 15:21
  25:21,25 29:2,8
  33:11 38:20 39:7
  51:7 54:7 55:21
  59:21,22 72:9
  75:18,19 80:25
  85:21 88:2,16
  90:17,20 98:14
  104:13 106:3
  110:12,14 112:14
  128:12,17,20
  150:12 180:22
  182:18 190:6
  203:4 220:22
  222:5 226:19
  239:17 246:11
  266:14 271:5
  276:3 286:12,24
  300:19 303:6
  311:19 312:4,7
  320:15 324:16
  328:15 330:18
  331:24
**meant** 222:3
  271:16
**measure** 102:21
**measured** 66:16
**measures** 108:5
  297:14
**medicaid** 19:17

**medical** 11:4 19:8
  32:18,23 37:2
  41:4,7,19,20 43:9
  45:10 47:6,7,17
  71:5,10,11,15
  72:11 76:17 134:6
  138:21 139:22
  149:5,12 150:5,12
  150:13,16,22
  153:4 154:23
  155:22 175:4
  214:23 218:16,19
  234:3 270:16
  340:25 341:3
  343:20 345:4,15
  345:16,21
**medication** 8:15
**medications** 156:2
**medicine** 50:3
  154:18
**meet** 60:4,7,14,17
  60:24 172:2
**meeting** 65:25
  194:5 338:10
**meetings** 50:22
  54:25 57:18 65:14
  112:24 134:5
  253:25 254:11,12
  254:17
**melissa** 1:4 319:20
  326:7,25
**member** 169:9
**members** 130:12
  260:24 308:22
**membership**
  252:15
**memo** 192:23
  193:7,18 343:25
  344:4
**memorandum**
  192:16,24 349:24

**memory** 96:2
  300:20
**men** 77:24
**mental** 16:10
  17:13 19:7 25:16
  30:6 31:12 41:4
  41:19,20 108:23
  129:24 131:5
  214:25 216:5
  346:2
**mention** 164:12
**mentioned** 1:21
  84:25 87:25 90:10
  175:10 275:10
**mentioning** 94:14
  265:11
**mentions** 24:20
  253:14
**merged** 16:11
**merit** 205:13,17
  205:20
**merits** 58:16
**met** 60:8,10 62:7
  73:3,8 133:3
**metric** 68:5
**metropolitan** 12:6
  12:25
**miami** 13:11,12
**michele** 175:9
**microwave** 64:16
**miffed** 243:2,4,6,8
  263:15 268:18
  269:14 270:8
**million** 39:22
**mind** 44:9 132:20
  179:11 235:23
  237:5
**mine** 263:10
**mineola** 353:4
**minimize** 144:16

**minor** 286:10,11
  286:13
**minute** 258:12
  286:12 290:13,21
  292:11 294:6
**minutes** 258:19
  338:4
**misconception**
  99:12
**missing** 168:12
**mission** 59:3,4
**mistook** 320:3
**misunderstood**
  130:7
**mobile** 129:15,18
  129:22,25 130:4,5
  130:7,12,24
  131:10,15,25
**mocj** 45:22,23
  46:15 65:14 66:20
  215:9 253:25
  254:7,11 343:23
**moment** 37:15
**monday** 318:17
**money** 126:20
**monitor** 144:21
  279:12 318:20
**monitored** 50:23
  183:12 191:8
  320:23 321:6
**monitoring** 180:2
  190:16 278:22
  321:10 334:18,20
**month** 188:3
  268:22 301:22
  317:6
**months** 17:19
  189:25,25
**moonlighted**
  144:12

**moonlighting**
  145:3
**moratorium**
  329:11,13
**morning**  4:6,7
  243:5 247:8 308:2
  308:6
**mount**  13:12
**mouth**  275:22
**move**  21:22 27:24
  29:4 31:10 80:21
  96:16 206:19
  220:14 267:22
  270:14 312:19
  315:18
**moved**  11:8 96:20
  226:23 245:3
**movement**  324:2
  329:2
**moves**  80:18,19
**moving**  9:17 153:7
  169:25 210:24
  221:3,3,17,17
  302:10
**muir**  110:25 179:2
**mullet**  304:19
  305:22
**mundy**  73:22
  74:10 75:25 76:3
  83:16,17,19,19,24
  122:6,23 123:2
  124:25 153:19
  154:21,22 197:13
  197:18 200:23
  201:8 226:19
  227:11 228:9,14
  252:4 312:21
  313:5,14
**myrie**  305:24

**n**

**n**  2:2,15 4:2 17:7
  20:19 47:21,23,24
  47:24 48:4,22
  49:6 107:18
  132:25 238:3
  302:20
**naively**  203:2
**name**  4:16,20
  36:18 61:23 68:14
  73:16 137:8,10
  159:25 163:16
  180:13 264:10
  277:9 280:25
  281:4,5 290:16
  305:7,9 353:6,7
**named**  1:10 52:12
  53:5 68:13 94:5
  94:13 182:23
  187:12 197:13
  205:9
**names**  1:8 303:4,5
**nancy**  50:2
**nate**  291:12,15
**nature**  137:17
**necessarily**  138:6
  190:6 218:5
  239:17 240:15
  266:14 276:9
  277:10 290:10
  299:4 320:19,24
**necessary**  59:7
  74:20 213:15
  337:21,22 340:11
**need**  7:24 8:5 64:7
  70:18 93:9 104:20
  125:17 207:15
  215:10 263:8
  278:15 281:14
  304:16 310:18
  319:4,20 343:12

  346:5
**needed**  51:11
  58:25 80:11 98:12
  98:12 133:21
  155:12 166:12
  213:8 216:8 255:7
  313:21 342:18
  346:6
**needs**  63:5 113:23
  116:19 134:4
  135:18 172:10,11
  252:10 291:10
  319:22
**negotiated**  80:13
**negotiating**  179:20
**negotiations**  19:13
**neither**  195:19
  245:17
**neutral**  167:14,16
**never**  23:7 66:3
  78:20 85:4 104:17
  104:20 122:10,16
  130:23 131:24
  133:3,5 152:12,13
  152:13,13 160:4
  163:8 171:25
  202:4 211:2
  221:21 248:22
  254:20 260:15
  266:9 274:2,13
  279:12 281:18
  334:17 338:18
**nevertheless**  91:20
**new**  1:2,7,14,14,23
  2:5,9,11,11 4:4,24
  4:24 11:25 13:18
  14:8 16:5,9,20,22
  19:6,7,8 20:16
  21:16,23 22:20
  31:12 32:19 33:9
  33:9 36:16 176:23

  199:10 236:6
  237:17 349:10
  352:5 353:4,4,4
**nice**  85:15 286:3
**nicole**  94:8 95:16
  95:17 98:11
**night**  332:8
**nine**  92:13 185:2
  191:25 192:4
  198:20,21 211:19
  257:9 290:12
  349:20
**non**  153:18
**noncompliant**
  186:20
**nonmanagerial**
  230:4 233:21
**norm**  342:13
**notary**  1:22 3:11
  4:3 348:12 352:4
  353:24
**note**  189:22
  312:11 338:3
  341:9
**notebook**  339:24
  339:25 340:3,12
  351:6
**noted**  198:10
  348:4
**notes**  339:5,23
  340:8,16,17 351:6
**notice**  277:13
  290:8 330:21,24
  346:14
**noticed**  346:12
**notified**  347:16
**notifying**  330:19
**november**  327:2
  329:17
**nuance**  235:20

**number**   67:7
94:13 164:12
180:25 181:2
185:20 191:25
192:4 196:22
198:19,19 231:15
289:2 297:14
299:5,9,21,23
301:2 304:21,24
306:17 310:19,23
313:25 320:16
322:22,23 336:12
342:8
**numbers**   137:14
157:6
**numerous**   137:12
137:13,14,15
173:6 261:4
345:15
**nursing**   41:5,21
50:2
**nyc**   2:17 157:6,6,6
157:7,7,7 163:21
177:22 211:22,22
212:11,11,14
217:4,4 218:10,11
288:18,24 299:13
299:13 310:8
314:3 322:6,23
326:3,21 336:14
349:16 350:3,3,5,5
350:9,10,11,12,14
350:15,17,18,20
353:6
**nypd**   21:17

**o**

**o**   2:15 18:22,24
20:19,19 36:5
47:21,23,24
107:18 132:25

**object**   30:13
106:24 189:21
261:14,14,15,16
261:18
**objection**   9:11
17:10 22:3,9
24:10 25:10 26:22
27:3,15,22 28:6,9
29:16,23 30:8,14
31:5,19,24 32:6
33:6,20 34:16,20
38:2,9 40:24
41:16 42:16 43:19
44:4 45:7 48:11
48:20 49:13 50:9
51:3,13 52:6,18
53:18 54:4,13,18
54:23 55:16,23
56:8,16,19,24 57:5
57:17 58:4 59:10
61:19 63:8,15
65:10,12 66:6,17
67:9,17,22 68:3,11
68:24 69:7 70:6
70:13 71:6,17
72:12 73:5,11
75:15 77:3 81:7
81:18 82:2,6,23
83:3 84:4 85:2,10
86:18 89:15,22
90:9 91:3,13,17,22
93:5,16,25 96:23
97:17 98:20 100:6
100:11,24 101:10
101:21 102:15
104:8 105:7,16,24
106:11 108:7
109:17 114:12
116:13 117:19
118:8,21 120:3,16
121:20 122:14,18

123:20 124:3,9,15
126:8,11,15 127:3
127:8,18,22 128:6
128:11,15 129:5
129:13,20 131:16
132:17 133:25
134:13,19 135:6
136:4,18 137:7,18
138:20 139:17,24
140:15 142:4,13
143:20,25 144:7
146:15 148:17
149:7 150:6
151:22 154:6,24
158:10 159:14,23
160:7,16 166:8
167:4,10,17,24
168:10 169:4
170:12,18 171:4
172:16 173:11
174:12 175:21
178:20 179:7,17
180:3,23 183:8,14
184:13 188:22
189:3 190:12,18
191:17 195:8,22
198:2 199:16,21
200:6,16 201:2,20
202:10 206:5
207:5,13,23
208:14,20 209:5,7
211:4 213:12,17
214:14 220:23
221:22 222:6,20
224:2,6,11,20
225:4,17 226:13
227:5,25 229:6
231:2 232:11
233:2,17,22 234:4
234:14 235:16
236:7 237:12

239:23 240:4,9
241:5,17,25
242:20 243:12
244:10,19 245:15
246:17 247:2,6,16
247:23 248:6,14
248:24 249:12
250:3 251:15,25
252:20 253:11,23
255:2,13 256:24
257:15,20 258:14
258:20 260:4,8
261:6 262:2,17
263:3,13 264:6,23
265:16,23 266:20
268:23 269:13,23
270:20,25 271:6
271:12,21 272:20
273:12,19 274:4
274:20,24 275:5
276:23 277:15,24
279:6,15,24
280:13,21 281:6
281:11,17 282:3
282:12,19 283:3
284:16 285:14,21
291:4,23 292:12
292:23 298:22
302:15 303:9,22
306:11,20 308:19
309:2,17 313:18
324:5,12,18 325:3
325:13,21 327:10
328:13,19 329:5
329:15,19,24
330:4,10,22
331:21 332:11,22
334:2,11,19 335:2
335:15,24 336:23
337:19 341:8,16
342:19,22 343:4,9

343:16,22 344:7
344:20,25 345:7
345:18,23 346:8
346:15 347:2,9
**objections** 3:7
**obligation** 118:5
**obliged** 171:25
**observations**
22:16
**obtain** 227:15
340:24
**obviously** 193:7
219:9 292:2
**occ** 198:16
**occasion** 89:11
**occasionally** 15:16
**occasions** 320:17
**occupied** 109:21
**occurred** 34:5
**odd** 98:5 160:25
161:24
**offense** 149:10
150:17
**offered** 18:19 20:5
20:12 21:6 84:8
84:21 126:9,16,17
130:16
**office** 2:9 5:24 6:4
6:5 12:4,12 15:3
19:8,9 36:25,25
37:3 42:19,20,24
45:20 104:14,22
104:25 105:6,13
115:22 119:9,10
119:13 121:3
125:7 129:24
131:4 149:11
155:10 160:2
161:21 165:21,25
167:8,12,25
168:19 179:21

194:21 230:13,16
235:15 237:23
238:10,18,19
239:2,9 240:8
257:24 260:21
276:15 281:14
283:7,10,14 284:8
292:20 302:21,22
304:8,11 305:24
307:8 316:10
324:9,11 325:17
**officer** 17:5 36:4,8
45:10,11 47:6,7,7
47:8,10,17 48:2
50:2 76:17 79:8
104:7,18 109:19
109:25 110:2
111:5 113:25
114:8,9,14,17,23
115:2,5,14 119:21
159:22 160:5,10
161:6,11,12,19,21
162:3,9 163:15,18
163:19 166:11
168:9,16,16 175:4
175:5,6 178:2
193:10 201:24
202:6,17 219:14
259:16,17 264:10
274:22 275:16
276:5,6 280:23
281:10 282:8
283:17 337:7,17
337:22
**officer's** 202:12
204:2
**officers** 88:24,25
**offices** 2:4 42:20
115:21,24,25
**official** 161:20

**officially** 112:23
**oh** 15:21 107:16
149:17 174:9,9
189:8 220:12
327:17 330:18
**okay** 4:14,15 5:11
5:25 8:11 9:20,23
12:22 13:3,16
14:12 15:7,25
17:21,25 18:5,13
19:23 23:3 25:2
28:10,25 32:9,20
39:12 43:11,13
47:12 48:5 49:2
49:17 53:11,24
55:18 58:7 60:13
61:14 66:11 76:19
76:25 77:14 78:6
81:20,24 91:24
93:11 96:6,12
104:2,19 110:17
110:18 114:3
119:19 127:13
128:18 133:16
140:8 154:13
156:14 161:9
164:22 165:2
166:21 174:20
177:24 178:16
179:15 180:6
182:7 183:22
187:6 191:6 192:2
192:6 194:9 198:8
201:22 205:17
211:13 212:18
216:20 217:13
218:4,8,24 222:24
224:21 228:3
231:6 234:10
236:3 242:12
243:24 253:14

254:22 257:18,22
261:19 267:3
272:16 273:10,24
276:11 277:7
285:11 287:19
288:10 289:11
290:8 293:5
294:14 297:13
298:10 300:12
305:5 308:11
309:14 310:2
311:24 312:13,16
313:8,17,23 315:6
315:15 318:3,18
321:4 325:23
326:20 327:7,17
335:19 336:2
338:6
**ola** 5:25 6:2 114:5
119:8 215:8
**old** 64:14 353:3
**onboarding** 104:5
116:25
**once** 11:23 103:8
116:5 169:14
175:2 184:11
185:13 245:3
274:17 327:22
328:11 332:19,19
**ones** 125:15
157:12 282:25
283:5,6
**ongoing** 129:2
295:3 321:10
334:21
**online** 101:15,17
**open** 115:18 348:3
348:3
**opened** 332:15
**opening** 16:23

operate 39:24 52:8
63:5 328:14
operated 44:18
47:11 243:20
operates 21:19
181:22 283:14
operating 17:5
22:2 44:19 47:8
48:2 58:18 163:22
164:7,12 199:2,3
349:17
operation 54:9
78:16 135:11
150:16 156:8
227:22 258:21
operational 56:12
139:12
operations 41:6,23
51:12,22 62:16
63:12,21 69:2
111:5 133:8 175:5
219:14
opine 287:7
296:19 338:11
opinion 97:22
205:12 239:20
opinions 199:25
205:10
opportunities 22:7
opportunity 20:5
20:12 30:21 95:21
96:8 163:23 164:8
164:13 165:16
198:23 300:7
310:11 332:7
338:10 349:18
opposed 147:17
option 92:12 114:2
270:15
options 89:20

orange 218:2
orchestrated
204:9
order 1:21 52:4
70:22 71:3,5
102:24 138:22
232:2 286:8 300:2
341:2
ordered 34:11
44:16 67:5 68:8
231:22 346:4
orders 67:15 71:9
ordinary 157:19
org 151:18 157:11
157:14,17,18,21
158:2 162:20,22
162:25 174:3,4
178:10
organization
280:17,23 281:21
organizational
156:23 157:3
349:15
orientation 103:6
103:25 282:4
original 334:24
outcome 352:14
outright 200:12
outside 72:5
140:21,23 141:7
141:19 162:14
184:6 186:14
195:11,14 201:9
201:12,19 232:7
275:21 291:22
334:23 344:5
overall 64:3 87:14
246:9 294:18
overdue 35:2
oversaw 38:4,7,15

overseeing 216:3
overseen 97:13
oversight 25:6,9
215:18
overstepping
130:20
owe 204:5
owens 64:22 65:7
74:13,14 83:10,15
134:4,16,21
153:20 197:14,18
200:24 201:8
247:9 253:21,24
254:2,5,17 305:24

**p**

p 2:2,2,15 4:2
18:24 19:16
p.m. 290:13 318:2
348:4
pace 96:17
pack 332:7
packed 333:17
page 95:20 166:14
178:2 185:2,13,14
185:14,22 191:22
192:15 196:21,24
197:3 198:17
208:5 211:21
215:10 217:3
218:13,17 219:12
250:10 251:2
264:16 271:23
288:17 299:12,22
301:5 304:18,19
305:19 310:7
314:2 316:17
317:25 318:25,25
319:11 322:5
326:3,21 336:13
338:25 349:2,7,20
349:22,23 350:1,2

350:4,6,8,10,12,13
350:15,16,18,19
351:2,11 353:8
pages 156:22
177:23 191:24
205:4 311:5,8,11
311:13,14 349:14
paginated 197:4
paid 77:24 79:23
81:14 106:9 108:6
125:25 270:16,23
271:4,10 272:18
301:16 304:24
305:14 306:22
paoli 18:21,24,25
19:5
paper 137:2,3
138:5 190:19
papers 76:24
125:14
paragraph 95:20
95:22 166:18,19
197:8 208:5,6,8
209:25 251:11
252:8 290:10
339:2 340:19
paragraphs 208:8
parameters 134:9
245:20
parity 171:14
271:8 273:2
279:14
parous 271:17
part 20:9,10 26:2
29:15,20,22 36:20
42:9,10 44:11
53:10 57:11 58:12
65:17 68:12 73:8
73:25 93:15 98:18
99:13,13 116:18
116:25 117:3

118:16 129:15
136:24 143:10
150:17 183:5
210:12 216:11
221:8 223:9
258:10 269:3
282:17 290:17
292:5 296:25
298:5 310:22
311:12
**participate** 129:11
**participated**
136:16 137:24
**particular** 34:6
85:24 159:4
301:19 303:16
304:14
**parties** 3:3 158:21
352:12
**partner** 132:19
**party** 199:11
**pass** 102:24
**passed** 28:19
194:20
**passing** 30:23
**patient** 41:8 42:5
43:6,8 194:23
195:18 200:3
203:11,13,14
346:2,11
**patients** 132:19
194:13 195:5
196:6 203:3
**patricia** 1:7,18 4:1
4:21 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1

27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1
78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1

150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1
270:1 271:1 272:1

273:1 274:1 275:1
276:1 277:1 278:1
279:1 280:1 281:1
282:1 283:1 284:1
285:1 286:1 287:1
288:1 289:1 290:1
291:1 292:1 293:1
294:1 295:1 296:1
297:1 298:1 299:1
300:1 301:1 302:1
303:1 304:1 305:1
306:1 307:1 308:1
309:1 310:1 311:1
312:1 313:1 314:1
315:1 316:1 317:1
318:1 319:1 320:1
321:1 322:1 323:1
324:1 325:1 326:1
327:1 328:1 329:1
330:1 331:1 332:1
333:1 334:1 335:1
336:1 337:1 338:1
339:1 340:1 341:1
342:1 343:1 344:1
345:1 346:1 347:1
348:1,8 349:1,3
350:1 351:1 352:1
353:1,7,21
**patrick** 49:3
212:10 215:7
342:24
**patsos** 193:8 194:4
197:19 198:9
204:10
**patsy** 4:12 14:22
14:24 96:9 147:23
149:22,23 156:20
157:15 164:17
**pause** 95:24 96:5
192:5 198:22
219:7

**pay** 77:22 78:7
81:11 82:9,17,17
84:18 92:4 105:11
105:12 106:8
118:20 120:11
121:8,13 168:22
169:13,16 170:9
170:25 171:8
209:23 210:23
218:15,19 224:17
224:24 252:11
261:12,21,25
269:21 271:17
272:3 273:2
279:14 285:3
297:24 298:20
333:14
**payment** 81:17,21
**payroll** 81:22
120:7,14 123:22
125:10,11 156:13
170:2,23 171:7
207:7 209:16
225:9 229:14
235:11,17,18,24
236:2,3,5,11,12,14
236:20,25 237:2
237:10,16 238:2,5
238:9,10,13,14
239:10 240:7,14
240:17,21,23,25
241:4,19 242:3
253:7 269:2
297:22 303:20
304:23 312:24
**peak** 171:11
**pending** 8:7
**pension** 252:15
**people** 15:19,22
20:23 21:12 26:13
31:9 35:4,23 36:3

36:24 38:23 39:4
39:15 40:2,10,13
45:2 46:2,19
48:13,15 49:24
52:11,15,16 59:5
60:8 61:12,21
65:13 69:16,17
75:3 84:10,13
86:11 87:7 88:13
88:18,21 90:20
93:9 94:12 104:13
106:23 115:8,16
117:5,23 125:12
125:16 128:25
129:3,25 130:8
134:3,5 135:12
137:24 138:2,6
139:5 141:16
142:17,20 143:18
144:12,15 145:9
145:10,13,20,20
146:12 149:19
150:10 155:10,13
159:2 169:15
171:14 172:7,20
172:22 175:18
176:18 181:2,4,5
182:19,22 183:12
195:2 196:5,12
201:4 205:5,9
210:13,18 229:3
238:19,20 244:2
244:12 255:14
256:15 257:24
260:20 274:11,12
275:8,9,25 276:4
276:13,13 280:16
283:22 296:9,10
297:10,11 298:11
302:13,17 305:23
306:15 307:8,13

308:12 309:6
313:13 329:4,23
330:3 331:12
333:2 347:12
**people's** 106:21
141:14 191:3
**percentage** 117:5
**percentages** 301:3
**perception** 150:15
**perform** 230:6
293:8
**performance**
22:13 25:19 66:16
87:3,20 98:16
109:4 112:11,12
112:15,22 113:5
177:7 211:14
334:8 351:5
**performed** 26:6
201:9 248:22
**performing**
200:13 231:7
232:21 233:8
249:25 256:20
342:11,16
**period** 50:25
266:11 283:23
306:5,10 334:22
**permissible** 27:15
190:13
**permission** 229:9
**permit** 82:15
107:10 141:6
**permits** 199:10
**permitted** 32:13
**permitting** 144:5
**persaud** 61:23
**persistent** 336:6,7
**person** 20:25
26:20 38:7 39:2
45:6 47:11 49:9

52:13 57:22 89:25
92:22 101:15
103:5 116:10,12
119:23 121:15
138:4 139:7,14
140:3 141:17
146:24 147:5,6
148:16 159:11
163:18 166:6
172:23 214:7,11
215:9 248:12
259:11,13 262:19
264:3 275:4,10
276:7 277:8,23
278:7,8 280:18
282:23 283:15
284:4,5 324:24
325:7 331:6 334:5
334:8 338:20
345:25
**person's** 180:17
239:18
**personal** 30:9
69:18 180:14
184:19 283:8
**personally** 6:20
171:18 172:12
**personnel** 20:20
58:23,24 59:16,17
137:4,20 165:21
**persons** 1:9 28:18
**perspective** 156:7
**peters** 24:20
**petition** 347:20
**philosophy** 10:22
**phone** 69:17 79:20
**phones** 69:18
**phrase** 210:7
**physically** 59:22
103:20 316:21

**physician** 82:16
122:3,11,16,21,23
123:8,16,21
124:13,21,23
125:5 127:10,11
153:11 206:9,16
206:17,22,25
207:3,8,11,18,22
208:7,12,18 209:3
209:15 232:14
235:3,5 241:12,15
241:18 242:5,13
242:18,19 246:20
251:13 252:5,7,14
252:24 253:4,10
255:12 268:3
271:16,23 272:4,7
272:10,11 273:7
287:10,11,14,15
**physicians** 237:8
242:16
**piece** 121:2 138:5
190:19 342:25
**pieces** 29:11
**pilot** 58:13 64:3,20
64:25 65:8,16,22
66:15 69:25 70:5
**place** 1:22 34:23
37:5 58:7 70:23
94:19 127:21
141:18 151:16
194:7 201:15
202:14,18 213:19
218:17 276:15
277:2 280:9 284:2
334:10
**placed** 20:24
**plaintiff** 1:5,20 2:4
203:20
**plaintiff's** 5:17
22:19,23 23:13,16

94:25 95:5,12
156:21,24 157:2
163:25 164:5
185:4,7,23 192:13
192:18 211:17,23
217:5,10 250:7,12
288:19,22,23
299:10,14 310:9
314:4 322:7
325:24 326:4,22
336:15 349:7
350:1
**plan** 112:22
**planning** 13:12
41:6 47:14 49:2
175:11
**plate** 216:4
**pleading** 54:2
**please** 14:23 24:12
32:9 208:5 219:5
219:5 241:23
267:2 300:9
326:24
**pleased** 21:25
109:3 257:4
**plus** 53:3 122:3
**point** 14:20 15:20
20:3,18 23:25
24:2 25:6 27:17
29:3,12 30:15
35:17 38:17 39:16
39:19 40:19 43:23
43:24 47:9 48:3,8
48:24 49:3 53:12
58:14 62:22 65:18
66:14 72:25 73:3
73:9 77:17 78:18
84:16,17,23 85:7
86:21 91:2 96:16
97:14 99:18
100:15 103:19

108:13 112:22
113:8 118:4
119:24 120:7,15
122:11 124:13,21
145:6 146:18,20
148:20 149:4
169:8 171:6,17,22
172:17 176:20
188:6 191:14
192:3,7 205:12
206:2 208:11
220:13 222:21
223:25 225:12
240:2,3 243:2
244:3,24 247:18
253:17,20 254:10
256:14,18,19
268:6,21 269:8
271:7 273:24
277:12 279:22,25
284:3,9 289:12
297:16 298:4,14
299:2 303:19,20
306:18 307:16,19
308:5 314:24
317:17,20 319:7
323:11 324:3
326:11 331:14
333:20 336:4,22
337:7,9 338:25
339:12,21
**pointed** 186:25
191:18 338:20
347:5
**pointing** 155:25
**points** 6:12 273:4
**policies** 27:19
69:19 143:8 145:9
164:25 165:10
181:8 182:16,20
195:10

**policy** 10:14 18:16
34:23 35:2,6
36:14,18,21 47:15
49:2 113:15
114:22 115:18
117:25 139:21
141:6,8,13,18
142:11,17 143:2,9
144:15,23 145:5
159:10 160:5,9
163:14 165:2
166:14 180:8,11
180:12 183:11
184:7 191:5
193:25 194:7
196:12 199:7
200:19 202:7,13
202:18,24 277:2,4
280:18
**polite** 88:17
**posed** 286:25
**position** 12:23
13:10 14:5,6,7,15
15:14 16:15,16
18:5,19 20:3,4
29:7 73:13,24
74:10 84:2,6,9
88:7,8 89:6,9,11
90:3,23 96:18
109:20,23 110:3,6
126:7 169:8
206:20 207:10
208:17,24,24
226:21,24 230:18
234:22 235:3
242:17 256:10
278:4 328:7
**positions** 12:10,10
48:9 82:13 111:18
123:5 155:14
229:23 235:12

**possibilities**
  267:20 270:12
**possibility**  143:17
**possible**  67:19,24
  91:19
**possibly**  182:21
  230:21
**post**  42:22
**posted**  165:10
  253:6
**postpone**  107:14
  107:19,25 267:11
**postponed**  106:16
  106:19 224:22
  228:6
**postponing**  153:7
  225:7
**potential**  143:17
**potentially**  161:2
**power**  224:4,7,9
  224:16
**practice**  144:6
  201:14 340:23
**practices**  340:21
**practitioner**
  144:18
**praise**  130:25
  131:6
**praised**  131:2
**precedes**  263:17
**preceding**  80:16
**precipitated**  25:17
  193:17
**precisely**  6:11 9:6
**pregnancy**  100:20
**pregnant**  100:16
**premises**  331:18
  331:20
**prescribe**  154:17
  156:2

**presentations**
  297:12
**presented**  142:8
  142:10 181:14
**presided**  89:13
  160:13
**president**  10:5,6
  16:19 37:11 72:15
  88:6 99:23 101:9
  103:24 107:13,15
  116:21 117:10
  136:6 174:17,18
  175:8,11 238:21
  239:2 289:5
**president's**  37:2
**pretend**  202:4
**pretty**  14:4 48:12
  52:11 107:17
  290:19 296:13
  333:7
**previous**  198:17
  293:5
**print**  218:17 223:4
  312:3
**printed**  220:11
**printer**  217:18
**printing**  217:18
**printout**  304:23
**prior**  53:25 58:11
  202:17 218:17
  293:15,15 345:4
**prison**  20:19
**privilege**  188:24
**probably**  11:3
  13:8 36:25 40:12
  44:6 57:7 60:18
  73:7 84:16 100:8
  102:6 108:13
  111:8 112:7 115:6
  119:14 135:3
  143:3 151:6

  161:23 173:18
  188:19 215:14
  226:22 255:24
  263:25 279:22
  305:20 321:8
  325:4
**problem**  28:15
  86:23 90:22,22
  96:3 159:5 164:21
  211:11 214:18
  252:10 345:17
**problematic**
  143:23 144:3
**problems**  86:4,6
  86:12,13,14 90:11
  90:12 157:11
  274:2 308:18
**procedure**  1:21
  35:20 57:3 163:22
  164:7,12 349:17
**procedures**  69:20
  127:20 145:10
  199:3,4
**proceed**  30:16
**proceedings**  95:24
  96:5 192:5 198:22
  219:7
**process**  37:16
  52:21 55:7,12
  56:13 71:14 72:19
  87:15,16 104:5
  117:3 129:12
  136:17 181:24
  257:19 260:23
  276:11 280:12
  282:5 285:7,12,13
  325:8 328:23
**processed**  46:3
  138:4
**processes**  58:7
  133:12,15 135:16

**processing**  45:25
  55:13
**produce**  217:23
**produced**  217:24
  320:6,14
**producing**  44:15
  311:20
**product**  293:9
**production**  58:3
  72:10,22 103:13
  113:4 312:8 340:2
  343:14 351:5
**profession**  201:19
**professional**  6:12
  37:2 97:3 142:22
  144:18
**profile**  14:4
**profit**  20:19
**program**  11:5,8
  12:16 22:2 42:8
  163:23 164:8,13
  165:16 249:23
  349:18
**prohibit**  195:11
  199:4 200:4,7,8
  344:16
**prohibited**  195:25
  197:12 200:15
  202:19,24
**prohibiting**
  200:12
**project**  64:20,25
  65:8,22 66:15,16
  69:25 70:5
**projects**  19:4
  65:16
**promised**  243:16
**promoted**  13:4,6
  109:10 111:8,12
**prompt**  180:16

prompted  103:12
proof  142:2,6,10
  142:16 144:17
  181:3
proper  26:14 27:3
  27:22
proportion  230:7
proportions
  230:21
proposal  21:21
  216:11
proposals  21:15
propose  267:5
proposed  20:6
proposing  182:25
protect  167:13
protected  69:21
  180:8 214:21
  344:16
protecting  214:22
protective  51:17
protested  152:18
  152:20,21
prove  183:17
provide  21:2 25:6
  64:4 70:17 79:16
  87:7 116:16
  138:22 213:9,20
  215:18 216:14,18
  257:25 319:22
  347:4
provided  21:4
  67:6 116:17
  214:21 231:24
  304:23 306:3
  319:19 347:7
provider  20:20
  25:24,25
providers  20:17
  32:11

providing  31:9
  161:4 176:17
psychiatric  139:14
  139:22 140:5
  155:6 199:25
psychiatrist  122:7
  138:18 153:19,24
  156:10 177:19
  200:2,8,12 248:17
  249:16
psychiatrists
  61:22 74:19 75:4
  75:13 154:17
  156:2,6 200:24
  201:5,6,8,14,16
psychiatry  49:25
  50:6,16 51:25
  80:14 81:11 88:18
  88:21 89:9 138:16
  139:8 199:18
  229:12 341:4
  345:10,11
psychological  52:2
psychologist  97:4
  153:22,23,25
  154:11 156:10
  248:18
psychologists
  61:22 74:20 75:3
  75:13 154:18
  156:3,6 200:13,25
psychology  138:17
  139:8
public  1:23 3:11
  4:3 10:14,17,24
  153:14,15 155:11
  348:12 352:4
  353:24
purpose  165:15
  183:16 190:4

purposes  23:10
  187:7 192:22
  208:6 212:8 218:9
  312:10 318:4
pursuant  1:20
pursued  11:16
purview  26:17
  31:4 234:5 284:24
push  315:17
pushback  342:10
  342:15,21
put  58:7 64:24
  84:17 96:12
  103:16 112:21
  113:6 127:21
  142:21 174:11
  228:3 277:2
  287:20,21,25
  288:2 315:23
  316:6
putting  276:14

q

qualifications
  253:2 256:15
qualified  154:8
  155:15 156:11
  232:4
quality  21:3 43:10
  43:11 47:15 49:5
  87:23 112:19
  117:3 176:16,21
  176:22 232:5
  346:24
quantity  112:19
quasi  236:10
queens  46:8 58:13
  64:3,20,25 65:8,22
  66:14 69:25 70:10
  74:6,12 80:17
  83:10 106:4
  153:16 225:20

question  3:7 7:20
  8:7 11:2 24:12
  26:5,8 30:18 31:2
  34:6 58:15 61:9
  122:13 132:4
  140:7,24 142:12
  145:22 159:4
  168:5,6 183:6,25
  186:16 189:16
  204:12 206:7
  213:14 215:21
  217:15 227:6
  265:24 268:13
  283:19 284:17
  286:21,22 301:18
  302:5 304:13
  305:13 308:20
  312:15 326:7
  329:25 334:21
  335:11 342:14
  345:2 351:10
questioning  26:24
  28:3 30:11 190:4
questions  8:25
  125:23 127:20
  140:2 250:16
  274:17
quick  288:11
  318:18
quite  166:5 194:8
quote  172:13
  220:7 221:5,16
  222:18
quotes  219:22
  221:15 267:8

r

r  2:2,15 4:2 17:7
  18:22,22 19:16
  20:19 47:21,21,23
  47:24 49:4,6 50:3
  107:18 132:25

rails  144:13
raise  113:22
  127:20,25 159:19
  160:11 173:5
  276:7
raised  34:5 57:13
  58:15 114:7
  119:14 126:18
  127:14 160:2
  169:23 171:10
  181:7 182:10
  183:24 184:3
raises  90:21
raising  91:10
  285:2 295:21
ran  249:23
range  35:3 51:20
  122:2 207:2 319:4
  321:11
ranged  294:19
ranges  319:21
rappaport  15:6,7
rate  111:24 112:6
  272:19 297:17
rated  112:25
  177:13
rattled  90:10
reach  159:7
reached  17:2
  18:18
reaction  204:17
  332:2
read  9:9,13,14
  92:20 95:21 99:3
  113:14 117:25
  133:23 134:8
  149:2 157:9,13
  160:9 192:4
  204:21,22 266:25
  300:8 303:24
  304:18 338:22

339:8
reading  157:11
  218:7 250:16
  339:7 344:4
ready  96:4
real  146:13
really  24:6 63:3
  97:24 99:14
  152:11 188:12
  209:9 220:2
  239:14 242:8
  254:22 255:4
  297:7 298:18
  327:20
reappointment
  35:18,19
reason  60:25
  71:22 139:11
  175:15 186:5
  191:9,13 198:5
  217:20 226:11
  230:17 232:23
  234:23 265:21
  290:20 301:15
  331:19 353:8
reasonable  67:14
  93:3 97:6,15
  98:19 100:23
  101:5 145:17
  180:18,21 182:4
  183:13,15 257:13
  257:18,25 258:5
  259:5,13,19,23,24
  259:25 260:23
  261:4 279:20
  280:5,11 285:7,11
  285:23,25 289:22
  336:3,8,21
reasons  33:2 88:11
  94:13 112:15
  278:14

recall  6:19 9:21,24
  12:24 22:11 23:6
  23:8,21,24 24:23
  26:6,8,12,18 28:17
  39:14,20 51:9
  59:12 60:21 61:13
  61:14,22 62:6
  64:8 75:24 76:11
  77:25 78:3,4
  81:13 85:3,6
  87:12,21,24 93:21
  94:14 97:5,19,20
  98:22 99:2,5,7,11
  101:19 103:11
  110:4,11,15 112:6
  132:6,8 133:4
  136:22 145:5
  149:9,10 158:14
  158:15 159:9
  184:8 210:10,10
  211:6,12,15 221:2
  249:14 260:22
  268:11 270:4,5,7
  271:2 273:20,21
  273:23 288:8,9
  289:14 295:21
  298:6,16 300:16
  300:18 302:4,6
  309:23 315:5
  317:15 332:10,13
  335:17,18 341:18
  341:19
recalling  22:14
receive  69:21
  267:15 309:16
received  5:17
  22:22 95:4 117:8
  117:13 156:24
  158:13 163:25
  169:21 185:4,22
  192:17 211:23

217:5 250:11
  288:18 299:13
  310:8 314:3 322:6
  326:4,22 336:14
  344:9
receiving  72:20
recess  95:9 156:17
  216:25 223:6
  288:15 299:17
  322:3
recognize  98:2,3
  99:10 157:14
  164:16 303:5
  323:3
recognized  22:6
recognizes  346:12
recollection  9:2
  47:16 61:8 70:5
  92:8 94:3 96:10
  131:13,18 219:25
  220:6 228:14,20
  229:10 269:25
  270:3 323:17
  332:25
recommend  24:22
recommendation
  29:19 99:2 202:12
  202:15 259:2
recommendations
  24:18 53:23 54:14
  74:24 76:18
  135:19 147:3
recommended
  194:4
recommending
  125:23
record  4:20 5:14
  23:2,11 28:7
  30:15 68:12,20
  94:22 95:8,15
  102:18 132:13

148:25 149:2
156:15,17,19
157:2 162:5,16,18
162:21 164:10,11
164:24 184:25
186:2 189:22
192:21,22 199:20
200:25 201:10
208:4 212:2,9
217:8 218:10
219:2 250:9
299:17 300:11
310:6 312:12,18
314:7 323:2 326:2
336:18 341:9
348:2 352:9
**recorded** 194:12
200:4 203:23
**recording** 194:2,6
195:12 197:11
199:4,11 200:9,14
202:19,25
**records** 32:25 33:2
41:8 43:9 71:5,10
71:11,15 72:11,22
134:6 213:6,16
214:12,20,23
311:20 340:25
341:25 342:13,17
343:14 344:12
345:5,15,17,21
**recourse** 144:4
168:7 281:24
**recruited** 74:8
**recruiting** 86:14
**recruitment** 69:15
295:3
**rectify** 252:9
**redacted** 68:16
340:10 344:11
345:5,20,21

**reduction** 70:8,12
**refer** 104:25
210:18 257:23
284:13
**reference** 84:24,25
193:23 194:12
210:3,21 219:17
343:14 344:6
345:3
**referenced** 200:23
**references** 345:15
**referencing** 70:2
126:24 127:7
215:13 275:23
290:25 318:22
320:3 327:7,8
**referred** 78:21
154:23 262:4,18
262:25 263:2,5
269:14 275:17
284:19 304:8
**referring** 136:12
210:14 266:23,24
318:19 323:14
**reflective** 280:11
**reform** 19:17
20:10,11 21:16
26:3 57:12 59:5
**reforming** 21:24
**reforms** 52:25
55:2
**refrain** 58:9
**reframed** 261:20
**refresh** 96:2,9
219:24 269:24
**refuse** 200:3
**refused** 121:23
123:13 126:9,13
173:9
**regard** 212:18

**regarding** 261:4
308:22 340:21
**regardless** 286:25
341:12
**regular** 46:20
112:24
**reid** 157:24
**rein** 17:7,20,22
**relate** 282:21
**related** 169:12
222:23 352:10
**relations** 41:8 42:5
42:13,15 43:7,8
47:10 48:17,18
104:15 109:11,14
115:12 147:12,14
147:15 178:17
179:11,13,22
307:7 331:10
**relationship**
132:15,16
**relative** 78:3,16
**release** 85:25
340:22,23 344:16
346:10
**releases** 346:6
**releasing** 347:11
**relevant** 27:5
221:18 247:25
248:2,5 312:6
**relieved** 107:4
**religion** 158:17
**religious** 168:23
**reluctant** 105:2
**rely** 52:4,16 74:23
76:16 142:22
**remain** 63:2 206:8
206:16
**remained** 92:9
**remember** 6:11
9:6 13:24 19:22

28:24 49:15 61:23
64:7 78:23 80:5
94:11 97:9 99:7
102:4 111:20
141:22 144:10
158:19 174:9,19
180:7 188:12,16
189:12 212:4,16
212:24 214:4
264:10 277:9
305:9 323:19,22
335:25 339:7
344:3
**reminded** 184:15
**reminding** 184:18
**remote** 51:24
156:7
**remotely** 96:25
**remove** 24:7 64:13
221:5,8,15
**removed** 133:8
135:10 152:22
171:21 296:10
**removing** 84:24
219:21 267:7
**remuneration**
267:21 270:13
**renewed** 24:22
**reorganize** 87:7
**repeat** 7:20 24:12
47:20 140:12
186:16 208:21
265:24
**repeated** 91:5
333:19
**repeatedly** 328:7
**rephrase** 261:18
**replace** 295:2
328:17
**replaced** 73:15,18

**reply** 219:19 267:5
**report** 22:21 23:17
  24:19 30:20 47:13
  49:11 51:7,8
  65:18,21 66:19
  67:6 104:22
  110:22 117:5
  118:5 144:25
  145:3,13,20,21
  158:4 174:5,8,13
  178:19 179:2
  181:2 193:11,13
  198:6 202:18,23
  204:2 229:21
  278:18 280:16
  285:4 296:22
  297:10 313:13
  349:10
**reported** 47:4
  49:19 86:11 97:11
  110:25 118:7
  178:12,14 205:8
  232:16 280:6
**reporter** 149:3
**reporting** 48:7
  76:7,8,8,9 145:12
  145:13 178:6,24
  181:4,5,6 296:11
  312:21 313:13
**reports** 15:24
  22:17 44:15 45:9
  45:10,11,11,19
  48:9,10 49:8
  50:21,24 52:23
  53:5 58:3 70:9
  87:11,17,23 90:7
  110:25 111:2,2
  160:20 176:2
  193:14 281:13
  297:3,4,11 345:3
  345:14

**repository** 284:10
**representation**
  337:16
**representative**
  19:9 275:3
**request** 69:21
  97:21 98:19
  100:23 135:19
  137:20 252:13
  267:17 272:13
  280:6 289:23,25
  290:3 317:8,10
  323:8,10 324:7,25
  336:4,21
**requested** 64:23
  66:20 173:19
  316:7 326:8,14
  327:12 335:9
  351:2
**requesting** 100:18
  317:11 319:18
  320:10 326:12
**requests** 64:10,11
  64:13,13,15 72:20
  72:21 74:23,24
  257:16 261:5
  324:8 325:11
  351:1
**required** 54:22
  92:16 101:14
  103:9 117:4
  229:21 233:15
  287:16 342:2
**requirement**
  229:13 231:10
**requirements**
  54:16 102:17
**requires** 92:10
  144:23 206:10
  230:2 235:4
  257:11

**rescind** 33:15
**research** 201:23
  202:3
**reserved** 3:8
**resign** 330:14,19
**resignation** 295:25
  330:16,17 331:2,6
  331:17 332:6,20
  333:6
**resigned** 151:4
  330:18
**resolution** 80:4
  119:17 172:10
  173:7
**resolvable** 126:20
**resolve** 173:6
  179:19 262:19
  264:11 298:20,24
  310:18
**resolved** 7:2 78:18
  78:19 79:2,3,6,17
  79:21 80:5,23
  81:2,17 90:22
  91:8,9,11,12,16
  119:12 121:11
  170:10 171:12
  172:7 263:7
  268:16 270:9
  285:20 308:5
  323:18
**resolving** 262:5
  278:23
**resource** 65:6
  248:9 253:18
**resourced** 59:13
**resources** 35:24
  58:23,24,24 70:17
  84:13 87:15 89:25
  103:6 108:10
  115:11 243:22
  289:6 294:17

**325:4**
**respect** 263:4
**respective** 3:3
**respond** 215:21
**response** 190:25
  191:2 196:19
  317:8
**responses** 7:14
**responsibilities**
  108:21 114:15
  230:19,20 232:18
  246:10
**responsibility**
  30:2 31:8,15
  57:19 167:13
**responsible** 30:24
  32:11 36:10 65:7
  65:8 76:5 100:22
  101:3 135:15
  139:2 140:11,13
  140:22 147:8
  157:21 275:20
  276:14
**rest** 276:10
**rested** 143:14
**restoration** 130:9
  323:24 336:3,10
  336:20
**resume** 28:3,5
**retain** 86:24
  156:12 300:20
**retained** 340:16
  340:17
**retaining** 85:23
  86:4,5,7,12,14,15
  90:11,11,13
**retaliate** 127:16
**retaliatory** 297:14
**retention** 80:10,15
  81:4,9,21 83:22
  106:8,17 107:21

108:2 153:6
169:21,24 224:24
225:10 226:24
227:9,12 228:7,10
228:14,19,25
229:4,13 252:14
267:15 300:22
301:12 302:7,11
304:3,15 305:14
306:7
**return** 72:22
317:21
**review** 5:5 30:21
96:8 137:17 184:4
212:3 257:17,24
259:2 325:19
340:25
**reviewed** 143:5
184:5 271:8
**reviews** 44:16
**revised** 199:18
**right** 5:3 7:4,10
8:19 12:12,14
14:24 15:12 24:9
24:15,17 25:23,23
25:25 26:12 30:5
30:7 31:4,17
36:12 38:18 41:21
41:24 42:5 43:16
43:24 46:6 47:2
48:5 49:10 50:8
50:13,22 51:2
52:17 53:11 55:19
59:14,17,19 62:12
70:4,24 71:5,10,24
72:4,7 73:4,9 75:4
75:6,7,21,23 77:2
77:15 78:2 84:3
84:15 86:17 89:14
91:12,18,21 97:3,5
102:25 109:7

111:3,15,16,19
112:3 113:24
114:10,10 118:2
118:17,20 119:2
120:21,23,25
121:16 122:17
123:19 124:2,14
125:21 134:11
136:2,7 137:25
138:9 141:3,4
143:16 146:6,11
146:14,19 148:13
148:16 149:6,25
152:2,16,23
153:19,21 155:5
158:5 159:22
160:6,14 161:4,19
163:6,11,15 164:6
165:3,15,18,22,23
166:7 167:8
168:14 169:3,20
169:22 170:5,6,23
172:15,21 173:5,8
173:10 175:12,16
178:17 179:8,9
182:22 183:21
185:16 186:7,11
186:15,21 187:2,5
187:20 188:4
191:8,12,16
192:10 195:7
196:18 197:14
199:5,12,14,15,20
200:5 201:16
202:8 205:20
207:4 208:13
209:6,11,14 210:5
210:8 212:20,22
213:11,16 214:8
214:12 216:10,18
216:19 219:9,16

219:24 220:3,5,12
220:17,20 221:25
222:12,14,17
224:5,12,24 225:3
225:16,20,22
227:12 230:12
231:9,13 232:17
232:25 233:7
234:3,9,13 235:8
237:24 238:22
239:4,8 241:22
246:5,6,20 247:14
248:10 249:10,11
251:8,9,14,16,24
252:5 253:22
254:10 258:24,25
261:13,22,25
264:18,22 265:20
265:22 266:3
267:8 268:22
269:6 270:10,24
274:23 275:11
277:14,17 278:19
279:21,23 280:24
281:2,21 282:2,11
282:18 283:2
284:20 285:9,20
289:13 290:2,17
290:18,22 292:18
292:22 295:4,10
295:12 298:12
299:2,3,5,7,19
300:5,14,21,24
301:3,13 305:3,5
305:22,24 306:13
306:19 307:13
309:7 310:15,20
311:16,23 315:18
316:24 317:2,7
318:14 319:23,24
321:4,7,9,17,21

322:12,16 323:8
323:11,15,18
324:4 325:12
326:8 327:2,14,18
327:25 328:5,12
328:18,22,24
330:7 331:3
333:21,25 334:18
334:25 336:4
337:4,17 338:22
338:23 341:15
342:9 343:21
346:7 347:17
**rights** 130:14
**rikers** 115:21
116:3,4
**risk** 175:8
**road** 353:3
**roderick** 49:6
**role** 56:2,2 108:15
113:17 145:23
239:2 307:13,13
**roles** 42:11 203:12
**room** 27:11
**rosner** 50:3 176:5
176:6,7,8
**ross** 47:18 49:11
49:16 52:14 76:15
**rule** 15:23
**rules** 1:20 196:8
233:13 242:3
**ruling** 28:13
**rulings** 351:9
**run** 20:16 44:21
107:25 108:9
139:15 182:5
255:7
**running** 29:9
156:8 216:5
**russo** 314:25

**s**

s  2:2,15,15 18:22
  19:16 47:21,24
  49:4 50:3 353:8
sacred  346:4
safe  194:20
safety  194:19
sal  314:25
salaries  244:15
salary  80:22 81:4
  81:24 82:22 84:2
  121:21 122:2
  207:2,10 268:4,6
  268:10,16
sam  178:12
samantha  178:6,8
  178:10,14,16
  179:5 331:13
sanitize  219:20
  267:6
santa  291:12,15
sara  48:4 219:13
  219:14
saw  63:4 153:15
  199:4,11 295:25
  306:17 338:21
saying  27:11 34:9
  34:13,24 36:15
  75:19 83:24
  105:19 106:6,10
  122:10 135:21
  146:2 162:7 170:8
  177:17 181:5
  203:11 205:19,20
  212:15,16,18
  222:12,13,14
  225:14 227:2,13
  228:18 230:3
  233:24 237:3
  238:8,12,13 241:6
  241:9,15 249:7

262:24 264:3
266:4,17,19
269:16 271:2
272:14,17 278:6
278:11,14,15
279:3 282:17
283:10 287:9
307:22,24 317:16
324:23 325:5
333:4 337:20
344:5 346:5
says  115:4 116:11
  165:13 167:7
  187:17 190:20
  192:7 197:10
  199:2,23 200:2
  220:19 222:3
  240:17 252:8
  264:17 266:2,7,9
  266:10 293:5
  300:21 301:4,12
  301:13 308:6
  311:4 314:16
  316:25 317:19
  319:3,15 323:25
  324:7 327:3
  337:23 341:5
schedule  241:24
  293:9
school  32:23
scope  256:15
  337:13
scratch  209:24
screen  286:4,8
screening  138:6
sealed  68:13,13
sealing  3:4
search  191:10
  319:4,21
searched  191:12

second  162:14
  216:23 290:9
  295:8 316:17
  317:24 322:2
section  175:16
secure  88:7 89:10
security  32:2,3,13
  33:3
see  5:21 32:25
  41:2 44:8 67:13
  69:9 132:18
  145:20 152:9
  165:7,13 177:14
  177:15 178:10
  185:15 186:7
  192:10 194:21
  197:14 220:20
  223:3,16 245:9
  247:24 255:11
  266:22 279:13
  304:16 306:10
  308:21 310:2
  312:22 316:18
  317:10 318:3,6,10
  318:11,16 320:5
  321:17 329:8
  333:24 340:12
seeing  91:21
  143:18,18 219:25
  233:8 300:16
  317:15 335:18
seeking  90:2
  317:21
seeks  279:20
seen  5:8 23:4,7,20
  165:5 193:3,6
  329:4,17,23 330:3
  330:8
sees  145:3 195:3
selection  138:7

selections  76:18
self  145:12,13
semiannual
  102:16
semiannually
  103:11
semiotics  10:19,24
  11:2,3,8 210:16
send  105:13
  184:18 219:19,20
  224:13 267:5,6
  268:17 330:17
sending  284:22
senior  2:12 10:5,6
  12:20 13:2 14:17
  37:10 40:19 45:6
  47:11,14 52:8,10
  52:13 53:10 72:14
  83:6 88:6 99:23
  101:9 103:24
  116:20 117:9
  136:6 139:6,7
  140:6 145:24
  159:2 166:24
  167:2 178:17
  179:11,12,13,14
  182:2 183:24
  184:3 238:21,25
  248:25 259:11
  264:3 334:13
  337:16
sense  85:19 150:8
  172:24 227:23
  275:24 276:4
  277:21 303:11
sent  5:22 105:5,9
  105:14 119:6
  121:4 180:9 184:6
  184:17 219:12
  269:15 296:4
  318:11 324:9

330:18 334:17
335:22
**sentence** 339:19
**sentencing** 53:23
53:25 54:15 55:13
55:14,14,17
**separate** 35:8 42:8
44:20 111:15,16
227:22 311:8,10
**separately** 19:12
219:20 267:6
**separation** 141:24
**september** 300:14
300:14 301:25
302:12 310:14
**series** 50:22
164:14 302:3
**serious** 161:15
168:18 196:10
222:10,13 267:16
**serve** 189:23
**served** 5:23
191:15,19 192:8
192:10 316:21
**service** 12:21
31:11 37:18 41:4
41:4,5 45:10 74:3
76:16 122:25
124:6 125:9 155:2
155:4,7 216:6
235:14,19,23,24
235:25 236:20,23
237:4,9,13,16,23
238:9,10,15
239:13,16,19,21
240:7,14,25 241:2
241:4,13,14,20
**services** 14:2,2,3
14:19 20:9,15
21:4,22 24:8 29:4
29:21 31:8 32:10

32:16 37:13,17
39:6 40:20,22
41:20,20,23 42:23
44:12 46:17 50:20
52:2 58:17 59:16
59:17 61:3 71:20
71:22 99:18 107:5
136:8 139:14
148:7 156:23
157:4 175:12
200:19 229:11
267:12 278:9
349:15
**session** 21:14
200:4
**set** 104:3 112:20
297:22 319:5
352:7,15
**settled** 149:13
**seven** 11:6 70:3
298:15 338:2,2
**sexual** 282:2
**share** 69:22
336:11
**shared** 5:24 165:8
182:10 320:21
**sharing** 181:16
182:15
**shavon** 157:24
**sheet** 186:24
316:22 353:1
**shift** 229:19 243:8
243:15 260:16
263:19 290:12
323:24 336:3,10
336:20
**shop** 114:4 118:11
255:17 276:8,20
325:18
**shore** 74:4

**shorris** 19:13
**short** 95:9 216:25
223:6 288:15
298:13 299:17
322:3
**shortage** 142:9
**shorten** 58:2,8
**shortening** 58:11
**show** 5:11 22:18
94:24 95:11
156:20 164:3
184:20 185:6,18
211:16 216:20
217:9 250:6
288:21 299:10
313:23 322:19
325:23 342:7
**showed** 313:5
**shows** 236:2,25
284:11
**side** 110:20 147:17
147:17,18 153:14
171:16 196:6
203:19 215:6
**sign** 125:13,14,17
125:22 137:20
138:5 143:7
148:13 159:11
346:6
**signature** 151:9,13
152:6 193:10
311:17 352:19
**signatures** 152:8
**signed** 3:10,12
76:24 137:2,6,12
137:16 142:25
**significant** 125:16
146:23
**signs** 10:21
**similar** 82:25
138:24 230:19

246:9,9
**sinai** 13:12
**single** 69:12 70:3
**sister** 114:6
**sit** 134:8
**site** 75:14 165:8
333:14 334:5
**sitting** 115:20
**situation** 78:12
334:7
**situations** 145:20
**six** 92:14 156:22
198:19 208:6,7,9
299:12 349:14
350:10
**sixty** 298:15
**size** 61:8,10
**skills** 296:19
**skin** 260:11,13
**skipped** 327:23
**sleep** 212:16
298:25 299:6
**slightly** 230:20
**slow** 7:24
**small** 126:19
162:23
**smaller** 157:10
**smith** 157:24
**social** 41:5,21
129:10,10,15
**sole** 31:4 99:17
**solely** 30:3 170:16
203:25 326:12
**solicit** 63:4
**solicited** 316:10
**solution** 316:11
**solutions** 353:2
**solving** 179:22
**somebody** 25:14
33:12 34:8 55:25
92:10 118:7

144:24,24 146:22
156:8 180:19
183:17 204:5
215:16 255:16
263:10 284:11
285:15,22,23
286:2 293:17,18
295:21 315:24,25
325:10
**somebody's** 33:15
**someone's** 181:24
**somewhat** 298:3
**son** 93:4,13,20
259:24 260:7,10
261:5
**son's** 293:6
**sorry** 9:12 18:12
38:20 41:14 53:19
68:15 79:12,13
95:25 154:3
161:20 164:18
165:9 167:19
178:9 186:16
187:21 194:20
217:25 223:4
269:10 288:5
300:8 302:5
303:23 308:20
313:12 315:15
316:15 317:4
321:18 342:14
**sort** 19:17 45:24
187:4 221:16
295:6
**sound** 264:20
**sounds** 26:24
61:24
**soup** 223:11
262:10 266:13,18
**sources** 200:12

**southern** 1:2
**space** 64:13 69:16
**spared** 324:21
325:6
**speak** 7:10 40:18
62:15 98:7,10
100:4,9 171:17
172:18 188:17
258:15 273:24
274:3,14 287:4
296:5,9 339:22
**speaking** 27:14
30:14
**spearhead** 139:15
**spearheading**
38:18,21
**special** 2:4,6 4:16
344:16
**specialist** 122:11
122:17,21,23
123:8,17,22
124:13,21,23
127:11 206:17,22
207:2,4,8,12,18,22
208:7,12,19 209:3
209:16 241:16,18
242:5,13 251:13
252:5,7,14,24
253:5 271:24
272:5,8,10,11
273:8 287:10,11
287:14,15
**specialists** 125:5
253:10
**specific** 36:18
63:19 87:12,13
88:15 145:22
229:10 235:11
334:21 340:7
343:13 344:6,15
344:17 345:25

346:10
**specifically** 33:16
80:13 133:13
146:4 160:3
168:19 182:20
222:14 251:6
258:6 267:13
271:22 275:19
302:10 335:13
**specifics** 97:20
99:2,5 141:22
**speed** 43:22 64:2
71:24
**spell** 19:15,20
**spelled** 36:5
**spoke** 65:24 66:3
100:10
**spoken** 104:17
160:4 163:2,4
**sporadic** 65:20
**st** 2:5
**stabilize** 176:18
**staff** 26:6,9,13,19
28:18 29:18 35:21
35:22 36:11,11
39:9 40:2 51:18
58:14 60:9,14,22
60:24 61:11,15,17
62:22 64:11,24
65:2 72:19 74:23
85:23,23 86:4,5,7
86:8,12,14,15,22
86:24 87:7 88:24
89:4,8 90:11,11,13
92:6 97:8,13
98:25 104:23
105:4 108:9
114:19 116:9,17
117:8 118:11,16
119:23 121:15
125:22 128:22

129:24 132:22,22
135:18,21 137:19
137:22 154:5,21
160:9 166:24
167:3 168:17
169:9,14 178:13
179:19 182:16
201:5 202:16
203:21 208:23
214:3,4 229:2
232:5 248:7
257:23 259:9
260:20,22 263:23
263:24 264:9
268:8 271:8,14
272:22 281:3,12
282:21 285:6
291:3,12,13,17,22
292:17 294:7,20
305:14 306:24
308:17,22 315:24
324:22 329:3,8
334:5,8 338:10,20
340:24
**staff's** 34:14
**staffed** 62:3 74:21
75:12 165:21
**staffing** 73:2 76:5
232:3,4,4
**staffs** 60:15 62:13
62:14
**stage** 54:2
**stamp** 157:5
166:15,16 185:20
186:5 317:23
**stamped** 5:16
22:21 23:15 95:3
95:13 163:24
177:22 185:10
211:22 212:11
217:4 288:17,24

299:12 310:8
314:2,8 322:5
326:3,6,21 336:13
349:8,11,13,18
350:3,5,9,10,12,14
350:15,17,18,20
**stamps** 217:16,20
250:22
**stand** 55:11,19,22
58:19 70:23
139:11 175:15
230:17
**standard** 57:21
71:22 201:13,18
258:3,4,8 345:11
**standardization**
58:22
**standardize** 69:20
155:8
**standards** 341:3
**standing** 32:22
**stands** 301:10
**stapled** 164:5
**start** 18:15 92:13
158:2 214:17
251:11 315:9,10
321:25
**started** 12:3,15
18:9 50:12,13
83:8,9,10 112:12
127:15 133:11,14
174:10 178:6
214:16,18 247:9
247:10 289:12
**state** 1:23 4:4,20
16:19,22 19:13,17
107:22 129:23
131:4 199:10,11
214:24 344:13,15
352:5

**stated** 222:10
340:24
**statement** 210:21
220:14 221:21
**states** 1:1
**stating** 291:5
**status** 301:9,10
303:17 306:4
**statute** 343:13
344:6,10
**stay** 80:11 81:9
82:14,15 88:4
152:23 153:10
173:16 225:8
233:11 235:2
256:10 268:2
271:3,15,20
272:23 316:3
**stayed** 81:22 229:3
271:9
**staying** 257:5
285:19
**steering** 190:11
**stenographer** 7:13
7:16
**step** 162:13
**stepped** 162:22
**stepping** 295:6,9
**stick** 157:12
**stints** 15:17
**stipulated** 3:2,6,9
**stop** 189:15 315:3
315:6,8 347:7,12
347:22
**stoppage** 294:23
329:3
**storm** 219:18
**storming** 21:14
**story** 311:10
**straight** 283:18

**streamline** 55:4,6
55:7 87:14
**streamlined** 72:19
**streamlining**
73:25 74:2 135:15
**street** 2:10 4:23
116:8
**strike** 125:3
**strong** 326:14
**strongly** 220:19
222:3 264:17
266:10 278:12
**structure** 43:4
44:20 46:25 48:7
82:17 133:17,18
133:23 139:8
147:20 172:8
207:10 293:24
313:3,20
**structured** 275:2
**structures** 58:20
**stuck** 302:9
**study** 10:21
**stuff** 205:4 216:3
**style** 158:25
**subject** 113:11
218:14,18 300:17
**subjected** 203:23
245:14
**subscribed** 348:9
353:22
**subspecialist**
138:22
**subspecialists**
138:23
**substance** 189:18
190:14 213:7
214:24,25 346:2
**success** 66:15
**successes** 70:4

**sudden** 291:2
293:10 343:6
**sued** 6:20
**suffered** 112:15
**sufficient** 205:7
**suggest** 72:8
264:17 266:11
278:12
**suggested** 265:2
**suggesting** 266:5
279:5
**suggestion** 341:6
**suggests** 220:20
222:4
**suing** 6:23
**sum** 190:14
**supervise** 284:25
**supervised** 15:20
**supervising** 39:10
**supervision**
122:16 193:21
194:10 216:15
243:21
**supervisor** 97:9
115:17 136:13
138:9 174:15,16
246:22 274:9
293:10,13,15,22
294:2 313:6,15
**supervisor's** 274:9
274:10,10
**supervisors**
274:10,11 293:6
**supervisory** 172:8
246:21 313:3
**support** 64:4,6
70:16 130:8
133:20 170:21
175:12 216:8,12
243:20,22

supported   29:18
supposed   117:17
  180:13
supposedly   183:13
sure   4:15,25 7:14
  8:22 9:4,25 32:17
  35:8 38:11 40:17
  41:18 68:17 69:5
  73:17 75:9,20
  79:25 83:12 84:11
  85:12 86:16,25
  92:7 95:23 100:12
  100:17 103:18
  107:17 123:16
  124:12,14 128:2
  128:12 132:12,13
  137:6 138:2 140:7
  141:13 147:22
  151:19 154:2,4
  156:5 161:3,18
  163:13,14 166:5
  166:20 168:5
  171:15 188:13,14
  195:24 196:8
  212:19 215:20
  217:17,22 221:10
  228:23 231:22
  232:3 235:7,22
  239:6 241:19
  242:12 246:18
  250:4 259:5,12
  265:19 268:12
  280:22 288:13
  289:25 293:24
  306:25 307:13,19
  309:9 312:5,13,13
  319:16,20 321:20
  327:8 333:7 335:4
  339:9,20 340:7
surfaced   244:21

surprise   23:9
  25:20 239:15
  249:24
surprised   78:25
  118:22 250:4,5
  346:21
surrounding
  212:25
suspect   159:18
suspicion   180:18
  180:21 181:3
  183:5,13,15
swenson   110:18
  110:19
switch   242:24
switched   245:13
swoop   228:2
sworn   3:12 4:3 7:7
  348:9 352:7
  353:22
symbols   10:21
synonymous
  222:18
system   5:23 20:11
  21:16 29:6 36:17
  42:18,21 57:13,24
  72:17 88:7,9
  90:24 101:4,6
  104:11 107:3,24
  116:18,18 117:4
  119:6,7 137:10
  155:2 159:19
  164:25 180:8,12
  229:11 234:6
  236:2,3,5 237:2,4
  259:6,7,8 262:8
  265:4,5 276:10
  277:5,7,8 282:18
  285:16 289:7,8
  291:25 297:22
  303:8 307:7

312:24,25 313:2,4
  313:7,21 314:19
  314:23,23 319:9
  324:10
system's   147:14
  165:16 180:10
  191:3 264:9
  275:15 277:4
  282:16,22 285:24
systematic   55:2
  62:16 139:13
systems   44:21
  57:22 88:14 89:24
  93:9 139:4

**t**

t   2:15 4:2 47:21
  49:4 132:25
table   139:3 308:14
take   7:13 8:4,5,6
  18:10 47:2 70:23
  83:22 93:19 94:19
  94:20,23 103:12
  103:17 113:7
  126:6 165:17
  203:19 216:11,22
  226:24 227:19
  232:8 256:10
  259:24 261:5
  288:11 291:10
  303:25 326:25
  328:12 332:8
  333:24 340:4
taken   1:19 79:9
  95:9 102:10 108:5
  156:17 216:25
  223:6 263:7
  269:17 288:15
  297:14 299:17
  307:11 322:3
  332:16

talk   63:11 104:11
  104:13,13,14,15
  133:13 158:22
  159:6
talked   92:7 100:13
  134:5 229:19
  247:8,19 249:8
  261:11 314:16
  315:17 316:13,16
  341:23
talking   40:9 53:4
  55:3 90:6 99:12
  141:2 174:14
  176:5 208:10
  282:7 283:15
  289:8 300:21,22
  300:25 304:4
  316:14 320:8
  321:25 322:14
  334:7 335:4 336:2
talks   165:15
  166:23 187:18
tape   193:24
  194:17 196:4,6,13
taped   196:18
taping   196:2 204:6
  204:7
task   19:10,11
  45:24 46:14,18
  50:23 51:8 199:18
team   35:23 36:2
  52:9,10 53:10
  58:15 73:8 128:14
  128:18,20 129:15
  130:2,4,5,12
  131:20 137:23
  138:2 140:24
  143:11 182:2
  183:24 184:3
  202:16 261:7

teams   38:14 128:4
128:8,10,13
129:18,22 130:7
130:20,24 131:10
131:15 132:2
136:22
technical   138:25
139:16 249:2
272:21 304:10
307:5
technically   119:18
237:6
telephones   64:9
294:21
tell   7:7 27:25 34:8
54:9 89:3 127:9
145:15,16 171:22
175:20,25 188:21
207:15 235:10
268:14 271:13
276:3 286:12,24
291:17,21 292:8
312:4
telling   34:19 156:4
182:19 221:2
244:13 260:22
264:25 266:23
tells   115:15
ten   338:3
tennessee   20:20
tenure   48:10
178:5
term   85:4 194:23
210:9,11 240:11
286:2
terminating   147:8
terms   59:16 85:25
86:2 93:10 107:22
139:20 203:7
235:21 237:5

303:7 319:4,21
test   102:22
testified   4:4 5:25
24:13 162:5 173:8
175:3 224:21
232:7 237:22
252:2 290:19
testify   30:12 82:21
197:22 233:19
252:3
testifying   32:5
107:9 162:6 297:6
344:22
testimony   7:6
23:19 126:13
169:13 193:23
194:11 196:15
200:14 214:10
216:7 221:20
228:9 229:4
232:20 279:12
352:6,9
text   304:17
thank   8:2 45:23
94:10 165:11
211:20 215:22
229:7 250:14
267:9 288:14
306:2 307:16,25
308:3 314:12
319:13 324:19
thanked   78:17
84:22
thankfully   324:21
therapeutic   96:17
thing   44:9 86:4
145:14 148:11,12
197:25 204:24
220:12 230:18
233:6 245:13
250:17 256:22

273:16 275:20
300:20 318:10
things   8:23 9:3
19:3 24:20 43:15
51:10 52:8 56:5
69:22 72:17 85:15
112:18,19 145:8
148:6 158:18
159:2 163:9
168:24 171:9
180:25 191:4
220:14 221:3,17
222:10,13 238:20
239:4,7 245:7
248:8 249:6
256:19 285:22
289:2 297:15
299:5,6 332:7,15
332:17 338:15
think   5:23 12:15
12:25 14:20 19:21
22:6,18 27:5 44:8
46:19 48:3 50:18
65:5 73:7,23
78:22 92:14,15
100:21 101:6
108:16 119:15
120:16 122:5
126:18 130:6
142:15 145:17,19
153:25 166:3
167:20,25 175:9
184:22 202:24
204:4 205:9
215:14 220:11
229:11,18 231:4
248:2,5 253:17
254:12 255:24
256:25 258:10
259:6,18 268:24
268:25 270:21

281:9 282:22
286:10 293:21
296:2,4 298:3
302:21 303:24
310:24 311:5
323:19 324:6
330:23 337:25
338:19 339:14
346:10 347:14
thinking   143:10
313:5
thinks   203:14
thirteen   290:14,25
291:14 292:10
thirty   205:4 208:6
208:7,8,8,9 258:12
258:18 286:12
290:13,20 292:11
294:6
thomas   16:14
thought   20:25
46:21 73:19 90:21
91:8 107:4 119:12
121:10 132:4
150:14 157:11
171:11 183:25
184:23 203:2
210:6 269:16
306:15 312:5
315:15 327:15
thousands   207:14
thread   218:22
312:2
threatening
213:22
three   15:17 39:23
40:9 60:16 75:13
82:12 86:11
146:12 185:22
196:24 197:3,5
211:21 217:3

229:23 239:4,7
256:20 327:21
346:4 349:22
350:2,4
**tile** 208:22
**time** 1:22 3:8 5:18
6:13 7:10 8:3 9:10
9:14 14:20 16:13
17:8 20:14,18
22:24 24:19 25:4
25:7 26:14 29:3
29:13 34:12 37:14
38:23 40:3,13,15
40:23 43:4 44:9
44:23 45:6 47:2,5
47:9,17 48:3,18
49:3 50:25 57:25
58:14 59:7 60:5
60:11 61:7 62:4,8
62:23 63:6,13
64:2 65:19,21,24
69:9 70:9,9 81:16
81:21 84:16 88:16
93:2,11 94:16
95:6,10 96:16
97:5,10 99:22
105:15 107:15
108:13,15 109:20
111:25 112:18
120:12,18 128:21
128:24 133:5
141:5 142:24
145:2 156:18,25
158:11,15 164:2
169:12 172:17
179:24 185:5,24
191:8,12 192:9,19
194:2 205:8
211:11,24 214:2
215:24 216:15
217:2,6 219:15

222:21 223:7
225:25 226:22
227:19 229:21
233:15 238:2
245:11,13 247:12
250:13 254:16
263:25 264:8
270:6 271:7,14
278:5,6 279:25
281:13 284:9
288:16,20 294:14
294:22 297:17
298:5,5 299:15,18
301:9,17 302:2
303:16 305:3,3,12
306:5,10 310:10
310:17 312:20
314:5 316:2,21
317:11,13 319:6
321:5 322:4,8
326:5,23 331:14
334:22 336:16
338:9 343:5
347:19 348:4
**timeline** 107:14
**timely** 87:18
**times** 8:21 87:13
103:3 116:7 142:7
174:25 225:24
254:18 327:13
**timing** 12:17
243:18
**title** 10:3 12:21,24
13:24 17:8,13,22
37:9 50:4,17
82:16 92:9,9
99:22 110:20
111:4,8 122:21,23
123:8,9,13,17,17
123:18,22,23
124:13,18,19,23

124:23,24 125:7
125:21 126:2,4,17
126:21,23 127:5,6
149:10,11 150:19
152:15,22 153:4
155:10 156:13
160:23 206:22
207:7,12 208:7,19
208:19 209:3,4,14
209:16,16,17
227:16 229:3
230:13,14,16
232:9,14 233:12
233:14,20,21
235:5,11,14,15,17
235:18,19,23,24
235:25 236:16,20
236:20,23,23,25
236:25 237:23,23
238:3,5,9,9,10,10
238:11,14,14,15
238:17,18,24
239:3,3,9,11,13,16
240:14,14,25
241:13,14,19,20
241:20 242:14,15
242:23 244:23
245:20,23 246:2,7
246:12,14 251:20
251:22 252:6
253:4,7 255:12
256:3,7,11,23,23
256:25 257:5,10
268:3 270:22
271:3,10,17
272:18,23,24,25
275:13,14 287:11
287:14,15,21,22
288:2,3 289:7
**titled** 164:7

**titles** 62:25 122:25
124:5,7 125:9,10
125:11 207:14
208:25 235:10,25
236:2,11,12,14
237:9,10,14,16,16
238:19 239:21
240:8,17 241:2,3,4
242:3 244:15
246:13
**today** 5:2,6 8:19
27:6,9 107:9
151:21,24 158:18
209:3,19 238:12
240:24 273:6
277:17 298:8
311:21 312:3
341:24
**told** 9:16 63:6 86:6
89:7 92:16 182:9
189:8 245:12
256:6 282:4
292:18,21 293:3
330:2,9,20 338:14
**top** 47:2 53:3
122:2 158:3
175:24 218:13
262:19 317:25
**topics** 242:24
**torres** 341:22
342:5
**torres's** 212:19
**total** 92:10 300:17
304:21,24 306:2
310:19
**track** 208:22
**train** 103:20
**trained** 101:7
116:22 138:18
324:17,20 325:5,8

**training** 57:14
101:13,14,16,18
102:5,5,14,19
103:4,15,20
116:16,17,17
117:4,8,14 351:4
**trainings** 103:10
104:3
**transcript** 194:11
352:8
**transfer** 29:8
106:15,16 107:8
173:20 225:7
271:15 316:7
320:4 334:24
**transferred** 39:4
225:22 226:8
327:2,5
**transferring**
224:22
**transform** 20:8
**transition** 37:4,20
38:16 88:5,5
130:8 243:25
308:17
**transitioning**
244:2
**translate** 186:6
262:15
**transmittal** 181:16
**transmittals** 184:9
184:12
**transmitted**
180:20 182:5
**transmitting**
180:19 191:3
**treat** 230:24
234:19
**treated** 93:19
221:14 232:23,23
234:24 285:12

344:19
**treating** 141:17
249:10
**treatment** 132:22
141:15 155:16,23
196:6 201:5
203:13,15 344:23
**trial** 1:18 3:8
55:12,19,22
**tried** 15:23 297:9
**true** 74:5,6 113:2
127:16 204:14,15
204:21 205:6
225:18 237:6
240:8 243:9 352:8
**truth** 7:7
**truthfully** 8:18 9:5
**try** 8:24 9:2 53:13
72:25 88:7 89:10
116:5 157:12
316:11 334:9
**trying** 4:8 29:10
29:10 79:15 87:16
155:24 240:13
241:11 245:8
252:9 298:20
302:17 317:5
333:24 334:5
336:6,7
**ts** 138:3
**turn** 44:15 45:17
45:18 50:22 58:2
58:8 66:22,23
69:9,10,11,24 70:8
70:9,12 72:10
87:10,13 185:13
185:14 215:3
318:25
**tutelage** 272:8
**twelve** 37:19
207:16 209:17

**twenty** 8:11
191:25 192:4
311:5 332:5
342:12,17 343:3
**twice** 227:23
253:15,16 259:23
**two** 15:17 39:17
39:23,23 44:21
52:15 56:17 57:4
68:9,22,23 75:2,3
75:3,12 115:25
171:9 177:22
191:24 197:10,13
200:23 205:4
209:25 226:9
250:10 251:3
254:18 278:14
280:15 283:22
296:23 311:7,12
328:20 330:21,23
333:10 336:13
350:6,19
**type** 10:22 102:22
332:2 345:20
**types** 165:13
285:18 306:9
308:21
**typical** 306:12
308:16
**typically** 167:22
168:8

**u**

**u.s.** 185:3 349:20
**uber** 215:11
**ultimate** 259:4
324:24
**ultimately** 36:3
38:12 63:22 76:20
76:21,24 77:5
100:22 101:2
125:20,22 140:11

140:13 143:6,12
148:12 258:23
262:6
**umbrella** 226:3
303:13
**undergone** 35:11
**understand** 7:9,19
27:21 30:19 53:13
55:24,25 56:3,4
61:9 68:5 69:3,19
119:12 168:5
190:3 213:14
227:6 239:20
256:16 313:4
344:15 345:2
**understanding**
71:8 75:5 78:19
82:18 121:25
165:12 167:12
170:13 197:23
207:19 229:25
231:19 233:23
244:20 271:14
319:6 321:7
326:13
**understood** 7:18
7:22 58:21 59:2
78:11
**undue** 258:8,11,18
286:25
**unfairly** 93:19
125:25
**unfinalized** 182:15
**unfit** 70:25
**unfortunately**
250:22
**unhappiness**
161:16
**unhappy** 90:2
334:14,16

**unified** 44:20 74:2
155:2,7
**unilateral** 128:3,7
**unilaterally** 148:5
148:6
**union** 82:16 83:25
92:9 152:22
208:24 239:15,17
252:15 270:22
271:3,4,10 272:17
290:17
**unionized** 82:15
122:3 124:23
206:8 207:10,12
208:22,23 235:23
**unions** 92:7
179:20,20
**unit** 14:3 264:21
281:25 282:7
285:19 286:9,11
288:2
**united** 1:1
**units** 40:21 41:9
41:19 96:17,18
175:13
**university** 10:19
11:5
**unlawful** 1:9
252:11
**unpaid** 290:13,21
**unprocessed** 26:21
**unquote** 172:14
222:18
**unredacted** 213:6
213:16 214:12,20
214:22 340:25
341:25 342:13,17
343:14
**unrelated** 81:6
320:3 328:20

**unresolved** 205:25
**unresponsive**
315:22
**unsecured** 184:19
**unsupported**
294:8,11,15,16
**unusual** 194:15
196:3 200:21,22
**update** 69:10
326:7
**updated** 157:4,18
**upset** 312:23
**upstairs** 111:21
**upstate** 130:9
**usage** 93:24 94:15
187:19,19 318:20
345:4,16
**use** 68:18 144:18
181:6 186:14,18
203:9 210:9 213:7
214:25,25 282:16
340:22 344:11
346:2
**uses** 236:14,15
**usually** 311:13

**v**

**v** 47:21 353:6
**vacancies** 51:19
64:10 69:14 72:24
75:20 128:25
129:7,8,9 134:7
294:20
**vacation** 297:25
**vague** 213:2
**vaguely** 323:9
**valentine's** 330:15
**valid** 32:18 205:25
**varied** 294:19
**various** 6:11 12:3
30:22 75:21 76:6
88:13 103:21

157:5 172:20
297:15 306:7
**venters** 47:18,21
49:10,20 50:19
96:15
**verbal** 7:13
**verbally** 256:6
**veritext** 353:2
**version** 164:5
**versus** 11:16 55:14
81:11 150:13
155:23 230:3,8
241:24 254:24
258:13,19 298:5
298:16 303:3
**vice** 10:5,6 37:10
72:14 88:6 99:23
101:9 103:24
116:21 117:9
136:6 175:8,10
238:21,25 289:5
**victim** 14:3
**view** 139:4 239:18
**villanueva** 289:4
**violate** 188:23
**violating** 290:21
**violation** 191:4
**violations** 341:7
**visible** 155:11
**visit** 60:24
**vocabulary**
210:13
**vocal** 134:4
**voluntary** 176:14
**volunteers** 33:9
**vp** 40:19 145:24

**w**

**w** 48:22
**waited** 170:8
**waiting** 46:3 64:2
130:9

**waived** 3:5
**wangel** 1:8 48:19
48:22,25 84:16
86:10 92:22,23
108:12,14,18
109:22 110:5,22
110:23,24 111:14
111:18,22 112:3
113:9 119:21
149:18 178:25
179:6,12,25
186:10 192:16,25
204:10 220:18,18
220:22 222:2
244:7,25 255:24
263:25 264:3,8,13
264:16 265:12,17
266:2 278:5,7,18
279:13,17,25
280:4,10 283:21
284:9,11 289:16
302:18 307:24
314:15 317:4,20
318:2 319:19
331:15 335:5
349:24
**wangel's** 108:15
109:3 113:5
147:18 179:15
255:17 351:5
**want** 8:4 82:14
88:20 89:4 94:24
124:19 132:12
141:16 152:24
153:11,13 156:20
158:2 162:13
166:13 174:11
198:18 202:13,18
206:17 207:19
208:12,16 212:12
216:22 219:8,11

229:16 232:13
244:18 251:13,18
251:19,22 256:9
262:11,24 263:9
312:11 326:10
338:7 341:9
**wanted** 80:10
82:14 85:25 88:3
141:13 142:17,21
148:8 149:11
150:21 169:20
176:21 181:17
182:5 194:20
196:8 206:15,19
206:25 207:17,21
209:22 213:6
214:11,19 221:5,7
227:9 256:10,12
257:4,8 285:6
316:3,7,8,12 328:4
333:13 334:24
335:7,14
**wanting** 212:19
**wants** 271:19
297:8
**warrant** 332:2
**watch** 120:11
122:11
**water** 4:23 116:3,6
166:3,4
**way** 12:4 21:4
43:2 52:8,20 54:9
69:15 80:22 131:4
135:12 144:6
156:10 181:9,22
197:4 213:9,20
270:7 274:25
292:9 297:21
338:15 340:25
352:13

**wayne** 305:24
**ways** 21:15 243:21
**we've** 85:16
**week** 92:11 116:5
206:13,14 235:6
257:11 287:17
327:22,23 328:11
333:22,23
**weeks** 176:11
330:21,23 333:10
**weird** 44:9 186:6
**weiss** 305:16,20
**wendy** 305:25
**went** 13:11 14:8
60:24 61:4 64:16
70:2 74:11 77:18
111:21 126:20
149:5 162:23
169:2 254:19
277:17 307:9
311:5 322:9 333:2
**westchester** 15:10
15:22,25 16:18
17:3,9
**whereof** 352:15
**white** 99:8
**wide** 37:19
**widely** 275:6
**william** 78:14 89:2
267:18
**winkler** 61:25
73:4,7,13,15 74:11
75:22,24 76:2
154:10 197:20,20
197:21,24 198:10
**winter** 110:12
**wish** 63:5 125:23
244:17
**wished** 173:16
244:16

**witness** 4:7,11,13
5:19 23:3 27:18
27:20 53:19 95:23
95:25 96:6 120:20
161:2 167:19
215:22 217:14
219:6 229:7
250:17,25 303:23
312:10 324:19
330:7 342:8 349:2
352:6,9,15
**woman** 126:5
252:12
**wonder** 212:15
**wondered** 306:18
**word** 83:25 210:14
240:12 243:6
275:22 340:14
343:19
**words** 211:12
249:15
**work** 11:10,24
12:2 16:18,21
28:20 41:5,21
45:25 63:2 64:15
64:16 68:17 86:2
87:16 88:17 89:4
92:10,16,24 96:14
97:25 112:20
140:22,23 141:20
142:11,18 147:11
147:12,13,13
149:19 159:3
173:9 176:15
180:15 184:9,18
186:14 194:13,17
196:5,7 206:3,11
215:7 230:8,8,21
230:25 232:5
235:5 242:4
244:16,23 245:18

246:4,8,14,16,21
246:21 257:11,24
261:8 264:9
272:25 275:25
277:25 281:12
287:16 292:11
293:9 294:6,22
300:17 304:21
305:23 306:2
307:10 308:13
328:4 331:2,7
333:10,13 337:14
337:15
**workday** 244:22
**worked** 11:23 12:4
19:12 72:17 73:22
108:25 133:6
214:8 237:17,20
263:12 290:11
307:3 310:19
331:14 332:5
334:9
**workers** 129:10,11
129:15
**working** 34:12
50:7,18 87:16
105:15,17,20
109:6 170:15,16
170:20 173:22
179:19 213:25
238:3 245:6
246:12,23 254:8
255:12 256:2,6
269:6 289:13
304:7 306:24
322:15 341:10,13
344:14
**works** 145:19
163:18 181:24
215:15 237:6
277:11

| | | | |
|---|---|---|---|
| **world**   113:23 | 36:1 37:1 38:1 | 157:1 158:1 159:1 | 267:1 268:1 269:1 |
| 138:21 155:12 | 39:1 40:1 41:1 | 160:1 161:1 162:1 | 270:1 271:1 272:1 |
| 237:15 343:12 | 42:1 43:1 44:1 | 163:1 164:1,18 | 273:1 274:1 275:1 |
| **worth**   116:8 | 45:1 46:1 47:1 | 165:1 166:1 167:1 | 276:1 277:1 278:1 |
| **wrap**   307:5 | 48:1 49:1 50:1 | 168:1 169:1 170:1 | 279:1 280:1 281:1 |
| **write**   131:9 158:21 | 51:1 52:1 53:1 | 171:1 172:1 173:1 | 282:1 283:1 284:1 |
| 220:3 | 54:1 55:1 56:1 | 174:1 175:1 176:1 | 285:1 286:1 287:1 |
| **writes**   90:20 | 57:1 58:1 59:1 | 177:1 178:1 179:1 | 288:1 289:1 290:1 |
| **writing**   7:16 36:20 | 60:1 61:1 62:1 | 180:1 181:1 182:1 | 291:1 292:1 293:1 |
| 79:17 84:9,17 | 63:1 64:1 65:1 | 183:1,21 184:1 | 294:1 295:1 296:1 |
| 103:16 113:6 | 66:1 67:1 68:1 | 185:1 186:1,8,10 | 297:1 298:1 299:1 |
| 115:4,10 116:11 | 69:1 70:1 71:1 | 187:1,12,13 188:1 | 300:1 301:1 302:1 |
| 202:18 228:21 | 72:1 73:1 74:1 | 189:1,17 190:1 | 303:1 304:1 305:1 |
| 256:2 268:5,7 | 75:1 76:1 77:1 | 191:1 192:1,17,25 | 306:1 307:1 308:1 |
| 273:3 274:2 | 78:1 79:1 80:1 | 193:1,3 194:1 | 309:1 310:1 311:1 |
| 275:18 292:9 | 81:1 82:1 83:1 | 195:1 196:1 197:1 | 311:22 312:1 |
| 315:23 316:6,7 | 84:1 85:1 86:1 | 198:1 199:1 200:1 | 313:1 314:1,14 |
| **written**   193:23 | 87:1 88:1 89:1 | 201:1 202:1 203:1 | 315:1 316:1 317:1 |
| 194:11 231:23 | 90:1 91:1 92:1 | 204:1 205:1 206:1 | 317:3,4 318:1 |
| 265:12 | 93:1 94:1 95:1 | 207:1 208:1 209:1 | 319:1 320:1 321:1 |
| **wrong**   91:15 99:16 | 96:1 97:1 98:1 | 210:1 211:1 212:1 | 322:1 323:1 324:1 |
| **wrongdoing** | 99:1 100:1 101:1 | 212:10 213:1 | 325:1 326:1 327:1 |
| 169:11 | 102:1 103:1 104:1 | 214:1 215:1 216:1 | 328:1 329:1 330:1 |
| **wrote**   190:25 | 105:1 106:1 107:1 | 217:1,13 218:1 | 331:1 332:1 333:1 |
| 247:18 304:19 | 108:1 109:1 110:1 | 219:1,4 220:1 | 334:1 335:1 336:1 |
| **x** | 111:1 112:1 113:1 | 221:1 222:1 223:1 | 337:1,3 338:1 |
| **x**   1:3,12 | 114:1 115:1 116:1 | 224:1 225:1 226:1 | 339:1 340:1 341:1 |
| | 117:1 118:1 119:1 | 227:1 228:1 229:1 | 341:11 342:1 |
| **y** | 120:1 121:1 122:1 | 230:1 231:1 232:1 | 343:1 344:1 345:1 |
| **y**   4:2 36:5 132:25 | 123:1 124:1 125:1 | 233:1 234:1 235:1 | 346:1 347:1 348:1 |
| **yang**   1:8,19 4:1,10 | 126:1 127:1 128:1 | 236:1 237:1 238:1 | 348:8 349:1,3,24 |
| 4:21 5:1 6:1 7:1 | 129:1 130:1 131:1 | 239:1 240:1 241:1 | 350:1,7 351:1 |
| 8:1 9:1 10:1 11:1 | 132:1 133:1 134:1 | 242:1 243:1 244:1 | 352:1 353:1,7,21 |
| 12:1 13:1 14:1 | 135:1 136:1 137:1 | 245:1 246:1 247:1 | **yang's**   103:15 |
| 15:1 16:1 17:1 | 138:1 139:1 140:1 | 248:1 249:1 250:1 | 341:14 351:3 |
| 18:1 19:1 20:1 | 141:1 142:1 143:1 | 250:11 251:1,8 | **yeah**   96:25 141:22 |
| 21:1 22:1 23:1 | 144:1 145:1 146:1 | 252:1 253:1 254:1 | 181:4 189:10 |
| 24:1 25:1 26:1 | 147:1 148:1 149:1 | 255:1 256:1 257:1 | 238:20 243:5,6 |
| 27:1 28:1 29:1 | 149:19,25 150:1,4 | 258:1 259:1 260:1 | 300:19 317:19 |
| 30:1 31:1 32:1 | 151:1 152:1 153:1 | 261:1 262:1 263:1 | 327:20 340:6 |
| 33:1 34:1 35:1 | 154:1 155:1 156:1 | 264:1 265:1 266:1 | |

**year**   6:13,15 9:22
    9:24 11:8,20
    14:14 80:16 81:10
    101:20 103:8
    110:7,8,9,10,13
    111:9 112:6,25
    117:9 173:18
    229:15 292:10
    295:19
**years**   11:6 41:3
    99:4 119:3 156:12
    252:9 290:14,25
    291:14 332:5
    342:12,17 343:3
**york**   1:2,7,14,14
    1:23 2:5,9,11,11
    4:4,24,24 11:25
    13:18 14:8 16:5
    16:10,20,22 19:6,7
    19:8 20:16 21:16
    21:23 22:20 31:12
    32:19 36:16
    176:23 199:10
    236:6 237:17
    349:10 352:5
    353:4,4,4
**yvette**   289:4 292:2
    325:19

| z |
|---|

**z**   20:19 107:18
**zachary**   50:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foreging transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.