UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

MELISSA KAYE,

                    Plaintiff,

                    INDEX NO.: 18-CV-12137

     -against-


HEALTH AND HOSPITALS CORPORATION, et al,

                    Defendants.

------------------------------------------------X

                    Remote Deposition
                    New York, New York 11716


                    November 12, 2021
                    10:05 a.m.

    DEPOSITION of ROSS MACDONALD, a non-party

witness on behalf of the Defendants herein,

taken by the Plaintiff, held at the

above-mentioned time and place, before KIARA

MILLER, a Notary Public of the State of New

York.

Page 2

```
 1

 2   A P P E A R A N C E S:

 3

 4           THE LAW OFFICES OF SPECIAL HAGAN
             Attorney for Plaintiff
 5           196-04 Hollis Avenue
             Saint Albans, New York 11412
 6           EMAIL: EMAIL
             BY:  SPECIAL HAGAN, ESQ.
 7

 8           NEW YORK CITY LAW DEPARTMENT
             Attorney for Defendants
 9           100 Church Street
             New York, New York 10007
10           EMAIL: EMAIL
             BY:  DONNA CANFIELD, ESQ.
11

12

13   ALSO PRESENT:

14   Melissa Kaye

15

16

17

18

19

20

21

22

23

24

25
```

1

2      IT IS HEREBY STIPULATED AND AGREED by and

3      between the attorneys for the respective

4      parties herein, and in Compliance with Rule 221

5      of the Uniform Rules for the.

6      Trial Courts:

7      THAT the parties recognize the provision of

8      Rule 3115 subdivisions (b), (c) and/or (d).

9      All objections made at a deposition shall be

10     noted by the officer before whom the deposition

11     is taken and the answer shall be given and the

12     deposition shall proceed subject to the

13     objections and to the right of a person to

14     apply for appropriate relief pursuant to

15     Article 31 of the CPLR.

16     THAT every objection raised during a deposition

17     shall be stated succinctly and framed so as not

18     to suggest an answer to the deponent and, at

19     the request of the questioning attorney, shall

20     include a clear statement as to any defect in

21     form or other basis of error or irregularity.

22     Except to the extent permitted by CPLR Rule

23     3115 or by this rule, during the course of the

24     examination persons in attendance shall not

25     make statements or comments that interfere with

1
2    the questioning.
3    THAT a deponent shall answer all questions at a
4    deposition, except (i) to preserve a privilege
5    or right of confidentiality, (ii) to enforce a
6    limitation set forth in an order of a court, or
7    (iii) when the question is plainly improper and
8    would, if answered cause significant prejudice
9    to any person.  An attorney shall not direct a
10   deponent not to answer except as provided in
11   CPLR Rule 3115 or this subdivision.  Any
12   refusal to answer or direction not to answer
13   shall be accompanied by a succinct and clear
14   statement of the basis therefore.  If the
15   deponent does not answer a question, the
16   examining party shall have the right to
17   complete the remainder of the deposition.
18   THAT an attorney shall not interrupt the
19   deposition for the purpose of communicating
20   with the deponent unless all parties consent or
21   the communication is made for the purpose of
22   determining whether the question should not be
23   answered on the grounds set forth in Section
24   221.2 of these rules and in such event, the
25   reason for the communication shall be state for

1

2          the record succinctly and clearly.

3          THAT failure to object to any question or to

4          move to strike any testimony at this

5          examination shall not be a bar or waiver to

6          make such objection or motion at the time of

7          the trial of this action, and is hereby

8          reserved; and

9          THAT this examination may be signed and sworn

10         to by the witness examined herein before any

11         Notary Public, but failure to do so or to

12         return the original of the examination to the

13         attorney on whose behalf the examination is

14         taken shall not be deemed a waiver of the

15         rights provided by Rules 3116 and 3117 of the

16         CPLR and shall be controlled thereby, and

17         THAT certification and filing of the original

18         of this examination are waived; and

19         THAT the questioning attorney shall provide

20         counsel for the witness examined herein with a

21         copy of this examination at no charge.

22

23

24

25

Page 6

```
 1                      R. MACDONALD
 2    R O S S   M A C D O N A L D, after having first been
 3    duly sworn by a Notary Public of the State of New
 4    York, was examined and testified as follows:
 5                      COURT REPORTER:  Please state
 6             your name for the record.
 7                      THE WITNESS:  Ross MacDonald.
 8                      COURT REPORTER:  Please state
 9             your address for the record.
10                      THE WITNESS:  55 Water Street,
11             New York, New York 10041.  That's
12             Correctional Health Services on the
13             18th Floor.
14    EXAMINATION BY
15    MS. HAGAN:
16             Q    Good morning, Dr. MacDonald.  My
17        name is Special Hagan.  I'm here on behalf
18        of Dr. Kaye.
19                      You're aware of why you're being
20        deposed today, right?
21                      MS. CANFIELD:  Objection.
22             A    Yes.
23             Q    Did you review any documents prior
24        to today's deposition?
25             A    No.
```

```
 1                    R. MACDONALD
 2        Q    What did you do in preparation for
 3   today's deposition?
 4             MS. CANFIELD:  Objection to
 5        form.  You can answer.
 6        A    I had a conversation or two
 7   conversations with Ms. Canfield.
 8        Q    When did you have those
 9   conversations?
10        A    We had a brief conversation this
11   morning.  And then, I don't remember the
12   exact date of the first one, it was probably
13   in the week prior to the originals,
14   originally scheduled date for this
15   deposition.
16        Q    At any point did you read
17   Dr. Kaye's lawsuit?
18        A    No.
19        Q    So you've never read the complaint
20   that she filed in federal court?
21        A    No.
22        Q    When did you learn that Dr. Kaye
23   filed a lawsuit against HHC?
24        A    I think I've been aware of that
25   for several years.  For quite some time,
```

1                          R. MACDONALD

2       yeah.

3            Q    At any point were you told to

4       preserve documents?

5            A    You know, as a general practice, I

6       preserve all documents.  So I don't know if

7       I got a specific notification related to

8       this litigation, but my work documents,

9       emails, all that, I always preserve.

10           Q    Now, do you have a mobile phone?

11           A    Yes.

12           Q    An HHC issued mobile phone?

13           A    Yes.

14           Q    What's that number?

15           A    (347) 578-5607.

16           Q    Do you have any like, I guess any

17      devices, I'm not sure if iPad is still a

18      thing now, but do you have anything like

19      that?

20           A    No.  I have a work-issued laptop

21      as well.

22           Q    Okay.  And what's your current

23      email address?

24           A    Rmacdonald@nychhc.org.

25           Q    And how long has this been your

Page 9

1                    R. MACDONALD

2     email address?

3          A    Since 2016.

4          Q    And what was your email address

5     prior to that?

6          A    Rmacdonald@healthnyc.gov.

7     Actually, it probably would have changed

8     over in late 2015.

9          Q    And that would have been to the

10    HHC address?

11         A    Correct.

12         Q    I guess I didn't get into the

13    admonitions typically.  I just wanted to

14    ask:  Have you taken any medications that

15    would impair your ability to testify

16    truthfully and honestly today?

17         A    No.

18         Q    Just to make sure that, you know,

19    you probably already know this already, but

20    the reporter can only take down verbal

21    response.  So you have to say yes or no.

22    You can't shake your head or go "uh-uh."

23    She needs to kind of have clear, verbal

24    responses.

25              Is that clear?

R. MACDONALD

1

2          A     Yes.

3          Q     And have you ever been deposed

4    before, Dr. MacDonald?

5          A     Yes.

6          Q     When?

7          A     A number of times in the course of

8    my regular employment with Health and

9    Hospitals and the Department of Health prior

10   to that.  I also do some expert legal work,

11   which may involve being deposed from time to

12   time.

13         Q     Let's go through the depositions

14   that you've, I guess, participated in.

15               When was the first time you were

16   deposed?

17         A     I'm sorry.  I don't know have a

18   list in front of me.

19         Q     Have you been deposed since your

20   position in H&H?

21         A     Yes.

22         Q     And when were you deposed?

23         A     I was deposed most recently

24   related to litigation related to COVID

25   response in the New York City jails.

```
 1                         R. MACDONALD

 2          Q    What was the name of that case?

 3          A    I don't remember the exact name.

 4          Q    Do you remember who the plaintiff

 5     was?

 6          A    No.

 7          Q    Has anybody ever named you in a

 8     discrimination lawsuit?

 9          A    I don't know -- I have been named

10     in several lawsuits related to employment.

11     I don't know if it would be characterized as

12     a discrimination lawsuit.

13          Q    Well, the lawsuits that involved

14     employment issues, what were those?

15               MS. CANFIELD:  Objection to

16          form.  You can answer.

17          A    So there was a lawsuit filed by a

18     person employed by the Department of

19     Corrections that named me.

20          Q    What was that person's name?

21          A    Nicole Adams Flores.

22          Q    And you were deposed in that

23     matter?

24          A    I was not.

25          Q    And then what was another lawsuit?
```

1                    R. MACDONALD

2       A    That's the only one that I'm aware

3   of that applies to employment matters.

4       Q    You were never deposed regarding a

5   lawsuit against PAGNY?

6       A    Yes, actually.  Coming to mind is

7   a lawsuit against PAGNY for a physician.  I

8   was named Dr. Bhatti, B-H-A-T-T-I.

9       Q    Any other lawsuits?

10      A    I'm named from time to time in

11  patient-related lawsuits.  So there have

12  been several of those over the years.

13      Q    What was that outcome of

14  Dr. Bhatti's lawsuit?

15      A    I don't recall the outcome of that

16  matter.

17      Q    I'm sorry.  Were you deposed in

18  that lawsuit?

19      A    I was.

20      Q    And you don't remember the nature

21  of the lawsuit?

22      A    That was an employment matter

23  related to Dr. Bhatti felt like her

24  evaluations were unfair.  She was -- it was

25  around the time of the transition to Health

1                    R. MACDONALD

2        and Hospitals.  And she had had some

3        employment performance evaluation concerns

4        related to her time working for Corizon, if

5        I recall correctly.

6                    And there was -- I believe that

7        she was not offered a position with PAGNY

8        initially through the transition, and that

9        she was ultimately hired in a probationary

10       manner.  And that she had several

11       performance evaluations related to that

12       probation, which was the subject of the

13       lawsuit.

14            Q    Now, with Dr. Bhatti, when you say

15       performance evaluation, is that the exact

16       name of the document?

17            A    I don't recall the exact name of

18       the document that would have been discussed

19       in those cases.  It's the concept that she

20       had probationary performance evaluations.

21            Q    And what was your title when, I

22       guess when Dr. Bhatti was working with

23       CHS -- not CHS, with H&H?

24            A    Chief of medicine.

25            Q    Is this your current title?

```
 1                      R. MACDONALD

 2        A     No.

 3        Q     What is it now?

 4        A     Chief medical officer.

 5        Q     Have you also been given the title

 6   senior assistant VP?

 7        A     Yes.

 8        Q     When did that happen?

 9        A     That would have been 2017.

10        Q     Was this a promotion?

11        A     Yes.

12        Q     So when you were chief medical

13   officer, what was your salary?

14        A     What was my salary?

15        Q     Um-hmm.

16        A     I don't recall my exact salary at

17   that time.  It would have been in the range

18   between 250,000 and 300,000.

19        Q     And then, now as senior assistant

20   VP and chief medical officer, what is that?

21        A     I think it's approximately

22   300,000, maybe 301.

23        Q     Now, has anyone outright accused

24   you of discriminating against them?

25        A     Not commonly, not that I recall.
```

1               R. MACDONALD

2    The lawsuit that I mentioned filed by Nicole

3    Adams Flores included claims of

4    discrimination.  I don't know that those

5    were specifically lodged towards me.  I

6    don't remember the exact details of the

7    wording of that.

8         Q    Has anyone ever filed an EEO

9    complaint against you?

10        A    Not that I'm aware of.

11        Q    Has anyone filed an EEOC charge

12   against you?

13        A    Not that I'm aware of.

14        Q    Has anyone filed a charge with the

15   State Division of Human Rights against you?

16        A    Not that I'm aware of.

17        Q    Now, when was the last time you

18   received EEO or diversity training?

19        A    Annual training that I do through

20   H&H.

21        Q    How is the annual training

22   administered?

23        A    Through the online website that --

24   it's I believe called E-Learning modules.

25        Q    Now, as a manager, what is your

```
 1                    R. MACDONALD
 2    understanding of your responsibility if
 3    discrimination is brought to your attention?
 4         A    So I would enlist assistance from
 5    our human resources department who,
 6    depending on the circumstances, would also
 7    guide me in contacting EEO professionals
 8    within Health and Hospitals.
 9         Q    So are you saying that you would
10    enlist or would you report the
11    discrimination?
12         A    Well, I would report the
13    discrimination, you know, as required, and I
14    would seek guidance from human resources
15    professionals to make sure I was doing that
16    correctly.
17         Q    At any point did you report
18    Dr. Kaye's allegations of discrimination to
19    anyone?
20              MS. CANFIELD:  Objection to
21         form.  You can answer.
22         A    I didn't believe that there was
23    any lack of awareness about any of the
24    allegations that came to my attention
25    related to Dr. Kaye.
```

1                    R. MACDONALD

2          Q    But the question is, did you

3     report the claims to the EEO office?

4                    MS. CANFIELD:  Objection to

5               form.

6          A    No.  I didn't specifically report

7     them to the EEO office.

8          Q    Why not?

9          A    Because I believe them to have

10    been reported through proper channels.

11         Q    And what were the proper channels?

12         A    So by that I mean, I know that our

13    human resources department was well aware

14    and working on them, as soon as they came to

15    the attention of CHS leadership.

16         Q    When you say the human resources

17    department, who does that consist of?

18         A    I think at the time it was

19    probably primarily Jonathan Wangel.

20         Q    Anyone else?

21         A    There were many other staff

22    members of that department, but I'm not

23    recalling specifically who would have been

24    involved at that time.

25         Q    Who was the EEO officer during

1                    R. MACDONALD

2      that time?

3          A    I don't know.

4          Q    So you're not sure who the EEO

5      officer is?

6              MS. CANFIELD:  Objection to

7          form.  You can answer.

8          A    No.  I am not sure.

9          Q    So, today, do you know who the EEO

10     officer is at HHC?

11             MS. CANFIELD:  Objection to

12         form.  You can answer.

13         A    I know that the information is

14     available on the website.  I remember that

15     from the training.  And, again, my first

16     point of contact to get guidance on

17     reporting in the EEO matter would be CHS HR

18     leadership.

19         Q    Now, doesn't the policy require

20     you, the manager, to actually report any

21     discrimination to the EEO office?

22             MS. CANFIELD:  Objection to

23         form.  Objection.  You can answer.

24         A    Yes.  I believe it does.  I would

25     do that in consultation with the HR

Page 19

1                          R. MACDONALD

2      leadership, to make sure I did it correctly.

3           Q    Is it your understanding that you

4      need guidance to actually just report that

5      an employee actually -- report

6      discrimination to you?

7                     MS. CANFIELD:   Objection to

8                form.  You can answer.

9           A    So I've never had one of my direct

10     reports report discrimination to me.  And so

11     in that situation, to make sure I did it

12     correctly, I would seek guidance from HR

13     leadership.

14          Q    Even if it wasn't your direct

15     report, the fact that it was brought to your

16     attention, wouldn't you be obligated to just

17     report it to the EEO office?

18                    MS. CANFIELD:   Objection to

19               form.  You can answer.

20          A    Again, I don't -- when there's --

21     if an allegation was made directly to me,

22     yes.  If I became aware of an allegation

23     that had been made to a different supervisor

24     and our HR department was aware, then an

25     additional report for me, simply because of

```
 1                    R. MACDONALD
 2     my awareness, to my understanding, would not
 3     be required.
 4          Q    Now, Dr. MacDonald, what's your --
 5     let's kind of go into some little
 6     preliminary stuff.
 7               Where did you get your college
 8     degree?
 9          A    Cornell University.
10          Q    What did you get your degree in?
11          A    Biology and English.
12          Q    When did you get the degree?
13          A    2003.
14          Q    Where did you go to medical
15     school?
16          A    Cornell University.
17          Q    When did you start?
18          A    2004.
19          Q    And when did you finish your
20     degree?
21          A    2008.
22          Q    Now, isn't medical school
23     typically three years, rather than four?
24          A    No.
25          Q    So what happened -- so it's not.
```

1                    R. MACDONALD

2    So you were in a four-year program?

3         A    That's correct.

4         Q    And why was it four-year program

5    versus a three-year program?

6         A    That's the standard in the United

7    States.

8         Q    So you're saying there's a

9    four-year standard?

10        A    Correct.

11        Q    For medical school?

12        A    That's correct.

13        Q    Did you get any fellowships?

14        A    No.

15        Q    And what did you do your residency

16   in?

17        A    Internal medicine.

18        Q    Where did you do your residency?

19        A    Montefiore Hospital in the Bronx.

20        Q    And how long did you do your

21   residency?

22        A    Three years.

23        Q    When did you finish your

24   residency?

25        A    2011.

Page 22

1                         R. MACDONALD

2          Q    Now, what was your first job once

3     you completed your residency?

4          A    I was the deputy medical director

5     for the Bureau of Correctional Health

6     Services for New York City Department of

7     Health and Mental Hygiene.

8          Q    Who was your supervisor at that

9     time?

10         A    Homer Ventors (phonetic).

11         Q    And this is the Department of

12    Health and Mental Hygiene?

13         A    Correct.

14         Q    Now, did you have any other

15    employment prior to your residency being

16    completed?

17         A    No.

18         Q    So this was your first job?

19         A    Yes.

20         Q    And you started at -- when did you

21    start, at 2011?

22         A    Yes.

23         Q    And what did being the deputy

24    medical director of CHS entail at that time?

25         A    So at that time CHS was a bureau

```
 1                    R. MACDONALD

 2      of the Department of Health that oversaw

 3      healthcare delivery in the jail system.

 4      Which was provided through contracted means.

 5                 So there were a couple of

 6      different contractors over the years.  And

 7      that bureau was responsible for setting

 8      policies for healthcare delivery, for

 9      oversight of the performance of the

10      contract, for allocation of funding for

11      different clinical priorities.  And I was

12      the medical director for that bureau.  So

13      primarily focused on the medical care.

14           Q    Now --

15           A    I was the deputy medical director

16      initially for that bureau.

17           Q    So what contractors were involved

18      when you were deputy medical director?

19           A    So there was -- at that time I

20      believe it was called Prison Health

21      Services.  And at some point the name of

22      that entity changed to Corizon.  And I was

23      the primary contractor.

24                 There was also, one of the

25      facilities had a direct employment
```

Page 24

1                        R. MACDONALD

2       relationship with Health and Hospitals at

3       that time.

4              Q    And who was that?

5              A    That was the Vernon C. Bain Center

6       in the Bronx.

7              Q    And what did Vernon C. Bain Center

8       do?

9              A    It was a correctional facility

10      that was located in the Bronx.

11             Q    And who was housed there?

12             A    Mostly pretrial detainees as are

13      housed in most jails in New York City.

14             Q    It wasn't a specific population,

15      like male, female or a given age group or

16      anything like that?

17             A    It was males only.  It was I think

18      primarily people who had been arrested in

19      the Bronx and in Queens, if I'm not

20      mistaken.  And in general, it was a less --

21      there was no mental observation unit there.

22      And there was no -- there was less in the

23      way of substance use treatment.  So those

24      patients would be transferred to Rikers if

25      they needed that level of care.

1                  R. MACDONALD

2              So it was a little less acute than

3    some of the other jails, in terms of

4    pathology among the patient population.

5         Q    Now, what were your duties and

6    responsibilities as deputy director?

7              MS. CANFIELD:  Objection to

8         form.  You can answer.

9         A    I was helping the medical director

10   and assistant commissioner with setting

11   policy for care delivery, troubleshooting

12   work flows.  So how things are done in the

13   clinics.  Working with the IT group to

14   optimize the use of the electronic health

15   record to evaluate data, both for the

16   performance of the contract, the delivery of

17   health care, and the particular population

18   health considerations for our patient

19   population.

20        Q    So did you develop any policies

21   and is procedures to the jail systems in

22   that capacity?

23             MS. CANFIELD:  Objection to

24        form.  You can answer.

25        A    Yes.  The policies of CHS were

Page 26

1                    R. MACDONALD

2       well established, but I would have been

3       involved in the policy revision and have

4       input into that.

5            Q    Did you review clinical care --

6            A    Yes.

7            Q    -- provided?

8                 You said yes, right?

9            A    Yes.

10           Q    Did you have any part in the

11      direct patient care?

12           A    Yes.

13           Q    When you say direct patient care,

14      what exactly do you mean by that?

15           A    In those years I would typically

16      see patients one day a week at BCBC.

17           Q    Did you participate in quality

18      oversight?

19           A    Yes.

20           Q    Now, when did you become medical

21      director of the bureau?

22           A    That probably would have been in

23      2012.

24           Q    Were you promoted at that time?

25           A    Yes.

```
 1                    R. MACDONALD

 2        Q     And did you apply for the

 3   promotion or was it something that was

 4   internal?

 5        A     It was internal.

 6        Q     And who was the previous medical

 7   director?

 8        A     Homer Ventors.

 9        Q     What happened to Mr. Ventors or

10   Dr. Ventors?

11        A     Dr. Ventors had been promoted to

12   assistant commissioner for that bureau.

13        Q     How did your responsibilities

14   change when you became the medical director?

15        A     They were fairly similar.  You

16   know, I think I had a higher level of

17   decision making for the bureau.  You know,

18   previously Dr. Ventors had been filling that

19   role.  So I was advising him whereas as the

20   medical director, I was -- had more autonomy

21   in decision making.

22        Q     Now, when Dr. Ventors was promoted

23   to assistant commissioner, who became your

24   supervisor?

25        A     He remained my supervisor.
```

Page 28

1                    R. MACDONALD

2          Q     Now, were you evaluated when you

3     worked under Dr. Ventors?

4          A     Yes.

5          Q     And did you receive yearly

6     evaluations?

7          A     I don't remember the exact cadence

8     of those evaluations, but presumably.

9          Q     So is it fair to say that you had

10    favorable evaluations during that time?

11         A     Yes.

12         Q     There were never any complaints

13    about your performance?

14         A     No.

15         Q     But you did receive performance

16    evaluations from Dr. Ventors at that time?

17         A     Yes.

18         Q     Has any staff ever filed

19    grievances against you when you were at the

20    Department of Health?

21         A     Not that I'm aware of.

22         Q     Has any staff filed any grievances

23    against you since you've been at H&H?

24         A     Not that I'm aware of.

25         Q     Have you ever been the subject of

Page 29

1                         R. MACDONALD

2      any disciplinary proceedings since you've

3      practiced medicine?

4           A    No.

5           Q    Now, as medical director, did you

6      have ultimate responsibility and oversight

7      over the healthcare delivered at the prison?

8           A    Yes.  In large part.  I mean the

9      medical care, again, Dr. Ventors was

10     responsible for all of the care, including

11     medical and mental health.  I guess I was

12     responsible for the care delivered through

13     those contracts, to the extent that

14     oversight can control that, yes.

15          Q    Now, you touched on like prison

16     health services in Corizon.  Now, were these

17     contracts -- they were administered by the

18     Department of Health, right?

19          A    Yes.

20          Q    Now, when you say "administered,"

21     what do you mean by that?

22               MS. CANFIELD:  Objection to

23          the form.  You can answer.

24          A    I mean that the legal contracts

25     were held by the Department of Health.  They

1               R. MACDONALD

2     issued the request for proposals.  They

3     evaluated the entities that would apply to

4     fulfill those contracts.  They entered into

5     a legal agreement.  They paid the financial

6     balance of those contracts, and they were

7     responsible for oversight of the performance

8     of the contract.

9          Q    Now, when did Corizon's contract

10    end?

11         A    In, I think December 31, 2015.

12         Q    And did you have any part in the

13    transition from Corizon to CHS taking over

14    the services at the court clinics?

15              MS. CANFIELD:  Objection to

16         form.  You can answer.

17         A    So you're talking about -- can you

18    repeat that question, sorry.

19         Q    Did you have any part in the, I

20    guess, the transition from, I guess, from

21    Corizon to, I guess, the City providing

22    direct services at that time?

23              MS. CANFIELD:  Objection to

24         form.  You can answer.

25         A    Yeah.  I mean, I was involved in

```
 1                    R. MACDONALD
 2      the planning to move to a different model of
 3      care delivery.
 4           Q    Right.  Now, how long were you
 5      medical director?
 6           A    From sometime in 2012 to, I think
 7      August of 2015, when I moved to Health and
 8      Hospitals.
 9           Q    So when did your move from the
10      Department of Health to Health and Hospitals
11      take place?
12           A    August of 2015.
13           Q    Now, is it accurate to say that
14      CHS became a separate division of H&H
15      eventually?
16           A    Sorry.  I just have to log back
17      into my computer.  Yes.
18           Q    And what did that entail?
19                    MS. CANFIELD:  Objection to
20                form.
21           A    Well, I mean, to me it entailed a
22      creation of a new division within Health and
23      Hospitals to provide direct service for
24      healthcare delivery in the New York City
25      jails.
```

```
 1                    R. MACDONALD
 2         Q    Now, what part did you play, if
 3    any, in the transition?
 4              MS. CANFIELD:  Objection to
 5         form.  You can answer if you're
 6         able.
 7         A    So I was involved, you know, as
 8    part of the leadership team from the
 9    Department of Health, I was involved in the
10    planning for the transition.
11         Q    Who else was part of the
12    leadership team?
13         A    Dr. Ventors.
14         Q    Who else?
15         A    Nancy Aragas (phonetic), our
16    director of nursing.  Zachary Rosner
17    (phonetic), who became the deputy medical
18    director.  Elizabeth Ford, who was the
19    director of psychiatry for that bureau.
20         Q    Who else?
21         A    I think within the Department of
22    Health that's who's coming to mind.
23         Q    Anyone else?
24         A    I'm sorry.  Could you clarify that
25    question.
```

1                        R. MACDONALD

2          Q     Were there any other agencies

3     involved in the transition of the leadership

4     team?

5          A     Well, certainly Health and

6     Hospitals was involved as well, and City

7     Hall was involved.

8          Q     So who from City Hall was

9     involved?

10         A     Patsy Yang was involved.  She was

11    at City Hall at that time.

12         Q     And at that time you're saying it

13    around -- when was this when this transition

14    was taking place?

15               MS. HAGAN:  Objection to form.

16          You can answer.

17         A     So many of the staff of

18    Correctional Health Services moved from the

19    Department of Health to Health and Hospitals

20    in August of 2015.  The care was taken over

21    directly on January 1st, 2016.  And

22    obviously there was planning that lead up to

23    that in 2015.

24         Q     Now, who else from City Hall

25    besides Dr. Yang was involved?

1          R. MACDONALD

2               MS. CANFIELD:  Objection to

3          form.  You can answer.

4          A    I'm not aware of who else would

5     have been involved from City Hall.

6          Q    Anyone else from Health and

7     Hospitals?

8          A    I don't know the specific players

9     involved from Health and Hospitals.  I know

10    Dr. Brom Raju (phonetic), who was the

11    president at the time played a role.

12         Q    Can you spell his last name?

13         A    Raju, R-A-J-U.

14         Q    Anyone else?

15         A    I'm sure there were others, but

16    I'm not -- no one else is coming to mind

17    from Health and Hospitals.

18         Q    In your current capacity, you're

19    chief medical officer and senior assistant

20    vice president, right, of CHS, right?

21         A    Yes.

22         Q    Is your salary paid completely by

23    H&H?

24         A    Yes.

25         Q    And who determines ultimately what

```
 1                    R. MACDONALD

 2      staff people get paid?

 3                    MS. CANFIELD:  Objection to

 4            form.  You can answer.

 5           A     Can you repeat the question.

 6           Q     Who determines the salaries of the

 7      doctors, or the clinicians, as you would

 8      say?

 9           A     So there's a finance department

10      within CHS that plays a role for managers.

11      For many of our staff there are collective

12      bargaining agreements that dictate the

13      salaries for different positions.

14           Q     Have you ever determined how much

15      someone got paid yourself?

16           A     I don't know that I've determined

17      how much someone got paid.  I've requested

18      salary adjudgments for staff.

19           Q     Who have you requested salary

20      adjustments for?

21           A     I'm not recalling specific

22      examples.  That would often be part of my

23      role, when somebody takes on a new position,

24      when they take on new tasks within their

25      position, typically.  When they're promoted,
```

1           R. MACDONALD

2     there will be a discussion with HR and with

3     finance regarding their compensation.

4           Q    Now, you've mentioned that

5     Dr. Ford was part of the leadership team

6     that helped the transition and that she

7     worked at the Department of Health; is that

8     right?

9                MS. HAGAN:  Objection to form.

10          You can answer.

11          A    Yes.

12          Q    Did you hire Dr. Ford?

13          A    No.

14          Q    Who hired Dr. Ford?

15          A    Dr. Ventors.

16          Q    And do you remember when Dr. Ford

17    was hired?

18          A    No.  Not exactly.

19          Q    Now, when you were chief medical

20    officer at Department of Health, who were

21    your direct reports?

22          A    So just to clarify, I was not

23    chief medical officer at Department of

24    Health.

25          Q    I'm sorry.  What was your title

```
 1                    R. MACDONALD

 2     again, it was medical --

 3          A    Medical director for the Bureau of

 4     Correctional Health Services.

 5          Q    Who were your direct reports?

 6          A    Nancy Arias, our director of

 7     nursing, Zach Rosner, deputy medical

 8     director, Daniel Petrazelli (phonetic),

 9     director of pharmacy.  Mohammed Jaffa

10     (phonetic), I don't remember his exact title

11     at that time.  Pedro Rivera, who was the

12     director of infection control.

13          Q    This is as the medical director.

14     And you eventually, you start at CHS in

15     August of 2015.  Who were your direct

16     reports at that time?

17                    MS. CANFIELD:  Objection to

18               form.  You can answer.

19          A    I don't know that I recall all of

20     them.  I will name a few if that's okay.

21          Q    Sure.

22          A    So Zachary Rosner became my direct

23     report as assistant chief of medicine.

24     Dr. Louis Cintron (phonetic) was a direct

25     report also as assistant chief of medicine.
```

1                    R. MACDONALD

2     Tom Hayden, director of clinical pharmacy.

3     Nancy Arias, director of nursing.  There may

4     have been a few others, but they are not

5     coming to mind right now.

6          Q    When did you hire Dr. Ford?

7               MS. CANFIELD:  Objection to

8          form.  You can answer.

9          A    So to clarify, I didn't hire

10    Dr. Ford.  I became Dr. Ford's supervisor

11    when I was promoted to chief medical

12    officer.

13         Q    Okay.  When did that happen?  That

14    happened in 2017, right?

15         A    Yes.

16         Q    Did you evaluate Dr. Ford?

17         A    Yes.

18         Q    And when did you evaluate her?

19         A    I'm not sure the exact dates when

20    I evaluated her.

21         Q    What was the actual form called

22    when you evaluated Dr. Ford?

23         A    I don't know the title of the

24    specific form.

25         Q    Is there more than one evaluatory

```
 1                      R. MACDONALD

 2     document or instrument?

 3          A    I think that those documents are

 4     often under revision.  So I would generally

 5     use the one that was current at the time.

 6          Q    Have you heard of a professional

 7     practice evaluation?

 8          A    I don't know that I've heard that

 9     term specifically.

10          Q    But you have heard the term of

11     performance evaluations?

12          A    Yes.

13          Q    So it's a professional practice

14     evaluation.  Those are the performance

15     evaluations, right?

16                    MS. CANFIELD:  Objection to

17               form.  You can answer if you're

18               able.

19          A    I'm sorry.  I missed that.

20          Q    Strike that.

21                    What did you rate Dr. Ford during

22     the time that you evaluated her?

23          A    I don't remember specifically the

24     ratings that I gave her, but her performance

25     was very good.
```

1                    R. MACDONALD

2         Q    Did you ever have any complaints

3    about Dr. Ford?

4         A    No.

5         Q    Had anyone brought to your

6    attention -- had anyone complained to you

7    about Dr. Ford?

8         A    I don't remember specific

9    complaints about Dr. Ford, no.

10        Q    Now, who are your direct reports

11   since CHS assumed oversight of the forensic

12   psychiatric court clinics?

13        A    I'm sorry.  Could you repeat that

14   or clarify.

15        Q    Who were your direct reports since

16   CHS assumed oversight of the forensic

17   psychiatric court clinics?

18        A    So I don't remember the exact time

19   course.  My direct reports wouldn't have

20   changed when that occurred.  That program

21   was under Dr. Ford in the organizational

22   structure.  It would have become under my

23   purview when I was promoted to chief medical

24   officer.  I actually don't recall if that

25   happened before or after the program

```
 1                    R. MACDONALD

 2     actually came over.

 3          Q    So if I were to go to your direct

 4     reports in 2015, you have Zach Rosner, Louis

 5     Cintron, Tom Hayden, Nancy Arias, and then

 6     when you became chief medical officer

 7     in 2017, all I would have to do is add Dr.

 8     Ford; would that be accurate?

 9          A    Well, some of the people that were

10     my direct reports would have become reports

11     of other people at that time.  So the org

12     chart may have changed slightly, otherwise.

13     But, you know, my direct reports as chief

14     medical officer initially would have been

15     Dr. Ford, Dr. Rosner, who became the chief

16     of medicine.  Tom Hayden, the director of

17     pharmacy, Nancy Arias, who was at that time

18     the chief nursing officer.

19               So it wouldn't have changed too

20     much, but some of the direct reports that

21     were previously mine as the chief of

22     medicine would have gone to Dr. Rosner.

23          Q    Now, who actually determined the

24     commission work hours at the court clinics?

25                    MS. CANFIELD:  Objection to
```

Page 42

1                        R. MACDONALD

2              form.  You can answer.

3          A    Well, that's a complex question.

4     The court clinics had a long history of

5     oversight from Bellevue and King's County

6     Hospital when CHS took over.  And the goals

7     of that transition were really to

8     standardize and try to give attention to the

9     important work of those clinics, and

10    standardize the management as much as

11    possible.

12              So they historically and under CHS

13    would have clinical leadership and

14    administrative leadership.  So the work

15    hours of the clinics were determined through

16    some combination thereof.

17         Q    Let's just start with the first

18    part.  Standardized management, right; who

19    made the determination that management

20    needed to be standardized?

21         A    So, again, CHS volunteered to take

22    over those clinics.  Understanding the

23    importance of the work, and understanding

24    that they at times within their parent

25    institutions may not have been understood.

1                    R. MACDONALD

2       They are kind of to the side of the clinical

3       care that is the primary mission of most

4       hospitals.  And we wanted to bring some of

5       the administrative systems and sort of

6       attention that we felt our leadership team

7       had to those clinics, to try to improve the

8       work that was being done, to make it more

9       efficient, to do the best job that we could

10      for the clients and for the courts, and also

11      to move those cases timely.

12           Q    Taking back to the standardizing

13      of the management, who specifically -- you

14      said, first off, CHS volunteered to take

15      over the clinics.  Who at CHS volunteered?

16           A    So it was a decision that we made

17      collectively as the leadership.  I think it

18      was Dr. Ford's initial suggestion as a

19      project where CHS could lend some benefit to

20      the system and to the City.

21           Q    And who else?

22                MS. CANFIELD:  Objection to

23           form.  You can answer.

24           A    So that conversation would have

25      been primarily between myself, Dr. Ford,

1                    R. MACDONALD

2        Patsy Yang, our human resources and finance

3        leadership as well.

4              Q    Human resources where?

5              A    Within CHS.

6              Q    Who would that be?

7              A    I believe at the time it was

8        Jonathan Wangel.

9              Q    And this is at Department of

10       Health?

11             A    No.

12                  MS. CANFIELD:   Objection to

13            form.

14             Q    This is at H&H at this point?

15             A    Yes.

16             Q    And then finance is at H&H, right?

17             A    Yes.

18             Q    And who from finance?

19             A    It probably would have been Aaron

20       Anderson.

21             Q    Now, the standardization of

22       management, who made that determination that

23       the clinics needed to be standardized?

24             A    Again, that was the intention of

25       standardizing the -- consolidating the

1           R. MACDONALD

2     clinics under CHS, standardizing the

3     management of those clinics, and bringing to

4     bear, you know, our systems, whether it's IT

5     or administrative, to try to improve the

6     efficiency of those clinics was a collective

7     leadership decision with the people that I

8     mentioned.

9          Q    Now, who actually -- I guess,

10    what -- who actually made the decision to

11    standardize specific things?  Like who's

12    purview does that fall under?

13                MS. CANFIELD:  Objection to

14          form.  You can answer.

15          A    I mean, it depends on what the

16    specific thing is.  I think the conceptional

17    framework was what I was involved in and

18    what the leadership team was involved in.

19                The actual implementation of that

20    means evaluating leaders for each of the

21    different clinics, evaluating administrative

22    staff, evaluating workflows that exist, and

23    evaluating manners in which those things

24    could be standardize or improved.

25          Q    Who determined the salaries for

                              R. MACDONALD

1
2       the court -- for the center directors?

3              A    I don't know.

4              Q    So your direct report was

5       Dr. Ford.  So she would have been the most

6       senior person dealing with the court

7       clinics; am I right?

8              A    Yes.

9              Q    And your area of expertise, just

10      make sure that I have this right, you're an

11      internist, right?

12             A    Yes.  By training.

13             Q    By training.  And you've never --

14      you have no expertise and knowledge about

15      forensic psychiatric exams; is that right?

16             A    Not specific expertise about

17      forensic psychiatric exams.  I do have an

18      understanding from my career trajectory of

19      where they fit, in terms of the criminal

20      legal system in New York City, but I'm not

21      an expert in the performance of those

22      evaluations.

23             Q    So back to the salaries, how was

24      it determined what the -- who determined

25      exactly what each center director got paid?

```
 1                      R. MACDONALD
 2          A     I mean, I don't -- I wasn't
 3     specifically involved in that discussion in
 4     general with a project like that, a
 5     transition like that.  People would come
 6     over at the salaries they were making for
 7     the most part.
 8          Q     Was there a time where pay parity
 9     became an issue for Dr. Kaye and was it
10     brought to your attention?
11          A     I became aware of that, yes.
12          Q     When you say you became aware of
13     that, what do you remember?
14          A     Well, I was not particularly
15     involved in the issue, because it was mainly
16     handled by Dr. Yang, HR and Dr. Ford.
17          Q     Whose HR?
18          A     At the time I believe it would
19     have been Jonathan Wangel.
20          Q     At any point did you have the
21     ability to sign off on Dr. Kaye's salary?
22          A     No.
23          Q     Who would have had that authority?
24          A     Ultimately, Dr. Yang.
25          Q     And who would have had the
```

```
 1                    R. MACDONALD

 2      ultimate authority to determine whether or

 3      not Dr. Kaye was fired?

 4                    MS. CANFIELD:  Objection to

 5              form.  You can answer.

 6          A     That would have been Dr. Kaye's

 7      supervisor, Dr. Ford.  And that would be in

 8      consultation with HR.

 9          Q     So that would have been

10      Mr. Wangel?

11          A     Yeah.  And someone of that high of

12      a position, Dr. Yang would be involved in

13      that conversation as well.

14          Q     It would be Dr. Ford, Mr. Wangel,

15      and Ms. Yang or Dr. Yang, right?

16          A     Yes.  And myself.

17          Q     And yourself.  And I just wanted

18      to make sure, that Dr. Ford reported to you

19      at all times, right?

20          A     Yes.

21          Q     So like employment decisions such

22      as termination, promotion, et cetera, that

23      was a collective decision between yourself,

24      Dr. Ford, Dr. Wangel and Dr. Yang; is that

25      right?
```

1              R. MACDONALD

2              MS. CANFIELD:  Objection to

3          form.  You can answer.

4      A    Yeah.  In general.  I mean, it

5   depends on the level of the decision.  And,

6   you know, the individual supervisor has

7   autonomy for much of that, but if decisions

8   are complex or fraught or weighty, then

9   others from the leadership team would be

10  involved in that decision making as well.

11     Q    Now, I just have a question.  I

12  mean, this is general, what are the

13  conditions like at Rikers Island right now?

14             MS. CANFIELD:  Objection to

15         form.  You can answer.

16     A    Well, that's a complex question.

17  Rikers Island is a complex place.  And it is

18  a jail facility which has a fraught history,

19  which is well documented in the media and

20  other places.  It has experienced recent

21  challenges with absenteeism and lack of

22  staffing by security staff, which has made

23  the conditions challenging.

24             But, in general, if you came into

25  our clinics on Rikers Island you would see a

```
 1                    R. MACDONALD

 2      fairly, ordinary operating medical clinic

 3      where people are receiving clinical care

 4      from doctors, nurses, mental health

 5      professionals.

 6                 There is a huge healthcare

 7      delivery operation that continues doing

 8      everything from nursing home level of care

 9      to hemodialysis.  So it's a challenging

10      environment, but we are able to provide a

11      great deal of clinical care despite that.

12         Q    At any point did you seek outside

13      intervention to help with the services at

14      the jail?

15                 MS. CANFIELD:  Objection to

16            form.  You can answer.

17         A    In recent months I had made a

18      public statement that I felt that that was

19      required.

20         Q    Would you elaborate.

21         A    I wrote a letter to the city

22      counsel suggesting that the City should seek

23      outside assistance to deal with the

24      situation that I just described.

25         Q    Did anybody tell you to write that
```

```
 1                    R. MACDONALD
 2      letter, Dr. MacDonald?
 3          A    No.
 4          Q    Did you face any retaliation after
 5      you wrote that letter?
 6          A    No.
 7          Q    Did anyone talk to you after you
 8      wrote the letter?
 9          A    Yes.
10          Q    Who?
11          A    Certainly my supervisors were
12      interested in the content of the letter and
13      my concerns raised in the letter.
14          Q    Who is your supervisors?
15          A    Dr. Yang.
16          Q    And who else?
17          A    Dr. Katz.
18          Q    Were they upset that you wrote the
19      letter?
20          A    They were -- I wouldn't call it
21      upset.  I don't know that they agreed with
22      that that was the right thing to do in that
23      particular situation.  I think they
24      understood why I did it, and we were able to
25      discuss it in a professional manner.
```

Page 52

                              R. MACDONALD

1

2          Q     So you didn't go to your immediate

3     supervisors in this instance, you just went

4     to city counsel specifically?

5          A     That would be a function of the

6     particular politics of that moment, yes.

7          Q     When you mean that would be the

8     function of the particular politics of that

9     moment, what do you mean by that?

10         A     In that particular moment, that

11    was the pathway that I felt was most

12    effective to alleviate the concerns that my

13    patients were experiencing at that time.

14         Q     Now, you're saying patients,

15    you're the chief medical officer now, right?

16         A     Correct.

17         Q     So you consider the people housed

18    at Rikers Island your patients, right?

19         A     Yes.  I do in general.  I

20    recognize that the proceedings of the

21    forensic clinics, which I do oversee, that

22    those persons are in a different

23    relationship to my staff when they are being

24    evaluated in those clinics.

25         Q     But when you -- I'm sorry.

Page 53

1                          R. MACDONALD

2           A     But the bulk of our work as it was

3     for Bellevue and Kings County is clinical

4     work for patient care.  So I have to keep

5     those two things separate in my mind.

6           Q     When you went to City Hall, this

7     wasn't part of your job; is that right?

8                     MS. CANFIELD:  Objection to

9               form.  You can answer.

10          A     I'm not sure I understand the

11    question.

12          Q     Well, you're chief medical

13    officer, is it your understanding that it

14    was part of your job description to, I

15    guess, to go around or go above your

16    immediate supervisors and contact City Hall

17    directly because of what was happening at

18    the jail?

19          A     I'm not sure you're characterizing

20    the pathways there correctly.  I didn't go

21    to City Hall.

22          Q     I mean, I guess the city counsel.

23    I'm sorry.

24          A     Yeah.  No.  I don't think it's

25    part of my job description, per se.  I think

1                    R. MACDONALD

2       that was an extraordinary act which was part

3       of my fiduciary responsibility to my

4       patients and my staff.

5              Q     You didn't tell Dr. Yang or

6       Dr. Katz that you were doing so beforehand,

7       right?

8              A     Correct.

9              Q     Why not?

10             A     Because I didn't believe that the

11      things that I was arguing for were under

12      their control.

13             Q     And when did you write this

14      letter; do you recall?

15             A     September 10th, 2021.

16             Q     Of this year?

17             A     Yeah.

18             Q     And have you experienced any

19      retaliation since you've written this

20      letter?

21             A     Sorry.  I have to log in again.

22                   I don't believe so.  I've been

23      allowed to continue in my position and do my

24      work with my staff.

25             Q     No reduction in salary?

```
 1                        R. MACDONALD

 2            A     No.

 3            Q     No reduction in staff?

 4            A     No.

 5            Q     I'm going to show you what's

 6       marked as Exhibit 1.

 7                  MS. HAGAN:  Ms. Canfield, you

 8              should have this letter.  I sent it

 9              this morning.

10                  MS. CANFIELD:  Okay.

11                  MS. HAGAN:  And Exhibit 1

12              doesn't have Bate Stamps.  It's just

13              a letter from Dr. MacDonald.

14                     (Whereupon, Dr. MacDonald Letter

15                      was marked as Plaintiff's

16                      Exhibit 1 for identification as

17                      of this date.)

18            Q    It's a letter from Dr. MacDonald,

19       dated September 10, 2021.  You'll see it.

20       And I'll give you an opportunity to review

21       the letter.

22                  MS. HAGAN:  Now, have you

23              finished reading, Ms. Canfield?

24                  MS. CANFIELD:  Yes.

25            Q    Now, just for purposes of the
```

1                    R. MACDONALD

2        record, since it's not Bates stamped, this

3        is a letter from Dr. MacDonald, dated

4        September 10, 2021.  It's addressed to Keith

5        Powers, chair of the Criminal Justice

6        Committee, the New York City Council.  I

7        guess you sent it via email; would that be

8        accurate, Dr. MacDonald?

9             A    Yes.

10            Q    Do you recognize the letter that

11       we've just had, I guess had reviewed on the

12       record?

13            A    Yes.  I do.

14            Q    And it's clear that you wrote this

15       letter, right?

16            A    Correct.

17            Q    You have CC'd on the letter Corey

18       Johnson, the speaker, Vanessa Gibson, chair

19       committee on oversight investigation; is

20       that right?

21            A    Yes.

22            Q    Now, at some point in the letter

23       you make the statement that:

24       "Unfortunately, in 2021 we have witnessed

25       collapse in basic jail operations, such that

Page 57

                    R. MACDONALD

1

2       today I do not believe the City is capable

3       of safely managing the custody of those.  It

4       is charged with incarcerating in its jails,

5       nor maintaining the safety of those who work

6       there."

7               What prompted you to write that,

8       Dr. MacDonald?

9       A    Again, it was a discrete situation

10      that's developed over the course of 2021,

11      related to absenteeism and challenges with

12      staffing for correctional officers which had

13      created dangerous conditions that I describe

14      here.

15      Q    Now, in this paragraph where

16      you're seeing me hover, right, it says,

17      "Over ten years of leadership," you have

18      over ten years of leadership positions in

19      healthcare in city jails.  "I've seen

20      tremendous progress in the conditions of

21      confinement.  With the reduction of deaths

22      in custody from 21 and 24 deaths in 2012 and

23      2013 respectively to just three deaths

24      in 2019."

25              Where did you get those figures

Page 58

1                     R. MACDONALD

2     exactly, Dr. MacDonald?

3          A    Those are publically reported, but

4     they are figures related to the official

5     mortalities in custody during those years.

6          Q    So what about -- so wasn't there a

7     spike in suicides in 2020?

8                     MS. CANFIELD:  Objection to

9               form.  You can answer.

10         A    No.  I believe there was one

11    suicide in 2020, followed by a spike in

12    suicides in 2021.

13         Q    Right.  So your letter doesn't

14    talk about what happened in 2021, but it

15    stops in 2019 right before the pandemic; is

16    that right?

17                    MS. CANFIELD:  Objection to

18              form.  You can answer.

19         A    Well, I mean, I do say a little

20    lower down that the response -- I do address

21    the response to COVID 19 in the system.

22         Q    Now, since you've written this

23    letter, have you gotten any of the outside

24    help that you requested?

25         A    Yes.

1                     R. MACDONALD

2          Q     How did that happen?

3          A     So there've been a couple pathways

4     by which the State has assisted the City in

5     reducing the population detained in the New

6     York City jail system.

7          Q     And how is that?

8          A     One was through the passage of

9     legislation that released technical parol

10    violators.  One was through a mutual

11    agreement to take some additional sentenced

12    individuals to state facilities.  And one is

13    through a transfer of people living in the

14    women's facility to temporarily to state

15    custody.

16         Q     So this is when Rose M. Singer was

17    closed?

18         A     Not yet, but people are being

19    transferred to the state custody.

20         Q     So the things you just described,

21    did that involve the 191 people who were

22    released?

23              MS. CANFIELD:  Objection to

24         form.  You can answer.

25         A     I believe that is the number that

```
 1                    R. MACDONALD
 2       was quoted for the technical parole
 3       violators.
 4            Q    But there were additional people
 5       outside of beyond the 191?
 6                    MS. CANFIELD:  Objection to
 7                form.  You can answer.
 8            A    Yes.  So there were both releases
 9       and transfers of custody.
10            Q    And the transfers of custody are
11       not being counted toward the 191 people who
12       were actually released?
13            A    That's my understanding, yes.
14            Q    Were there any other measures
15       taken since you wrote this letter?
16            A    The opening of an additional
17       facility to manage new admissions, which I
18       recommended in the letter, has occurred
19       since then as well.
20            Q    Now, about the court clinics,
21       right, how have the court clinics been
22       operating during this time?
23                    MS. CANFIELD:  Objection to
24                form.  You can answer.
25            A    So the court clinics were
```

```
 1                    R. MACDONALD

 2      certain -- like anything in our society,

 3      were challenged by COVID 19.  The primary

 4      pathway for the performance of the

 5      evaluation moved to remote evaluation in

 6      2020, and that continues as the primary

 7      pathway for those evaluations to occur

 8      in 2021.

 9              The production of clients to the

10      evaluation is a challenge because it

11      requires Department of Correction staffing.

12      So there's been a lot of focus on trying to

13      get the Department of Correction to

14      prioritize bringing people to the

15      evaluations.

16          Q    You said the remote evaluations

17      started in 2020.  Do you remember what month

18      that was?

19          A    Not specifically the month, no.

20          Q    At any point was there -- did it

21      ever come to your attention that there was

22      work stoppage at the Bronx court clinic?

23              MS. CANFIELD:  Objection to

24          form.  You can answer.

25          A    I'm not aware of specific work
```

                          R. MACDONALD

1

2    stoppage.

3         Q    Was there a time that the Bronx

4    court clinic wasn't seeing any inmates?

5         A    Related to COVID?

6         Q    No.  Like when Dr. Kaye -- I'm

7    going to give you a specific window.

8              From October 2019 to January 2020,

9    were you aware that there was a time during

10   that time period where they were not seeing

11   anybody for 730 examinations?

12             MS. CANFIELD:  Objection to

13        form.  You can answer.

14        A    I don't -- I know that the Bronx

15   court clinic had struggled with evaluations

16   compared to the other clinics.  I don't know

17   that I was aware of a specific work

18   stoppage.  I think there were often cases

19   where supervisors had to assist with

20   evaluations.

21        Q    When you say "struggled," what do

22   you mean by that, the Bronx court clinic

23   struggled?

24        A    Well, the volume of evaluations

25   was lower than any other clinics.  The

                             R. MACDONALD

 1

 2      staffing was a challenge with higher rates

 3      of turnover than any other clinics.  And the

 4      conflict with Dr. Kaye contributed to some

 5      of the inefficiencies, in my estimation.

 6           Q    Let's start with the first part,

 7      the volume was lower.  Why was the volume

 8      lower, allegedly in the Bronx court clinics?

 9           A    I think it was probably

10      multifactorial.  Each borough is different.

11      I think the volume has been lower for quite

12      some time.

13           Q    But didn't the Bronx, unlike the

14      other boroughs, have parole violators as

15      well?

16                MS. CANFIELD:  Objection to

17           form.  You can answer.

18           A    I don't know that there was a

19      specific role for evaluation of parole

20      violators.  That was only in the Bronx.  I'm

21      not aware of that.  Could be.

22           Q    How did you make the determination

23      that the volume was lower in the Bronx

24      versus the other boroughs?

25           A    This is just my general sense from

1                    R. MACDONALD

2      my understanding of the clinics.

3           Q     Who told you that?

4           A     Dr. Ford told me that.  Dr. Jain,

5      who I supervised subsequent to Dr. Ford.

6           Q     How long did you supervise

7      Dr. Jain directly?

8           A     That would have been in an interim

9      capacity after Dr. Ford's departure.

10          Q     Would it be fair to say that

11     Dr. Ford left in February of 2020?

12          A     I don't recall the exact time, but

13     that's sounds like it could be right, yeah.

14          Q     When did Dr. Jain leave?

15          A     I don't recall when Dr. Jain left.

16     It was not -- I think he was involved in

17     some of the troubleshooting around standing

18     up remote evaluations through COVID.  So

19     that would have been into 2020, but I don't

20     know exactly when he left.

21          Q     Now, you also mentioned the

22     staffing was a challenge in the Bronx; what

23     do you mean by that?

24          A     I think that there were challenges

25     with recruitment and retention in the Bronx

Page 65

1                    R. MACDONALD

2       specifically.

3              Q     Could you elaborate?

4              A     I don't know the specifics of

5       that, as far as which staff, you know, which

6       positions were a struggle to fill or which

7       staff had left.  But I know from supervising

8       Dr. Ford and Dr. Jain, that that was one

9       thing that they were working on.

10             Q     Why were there challenges in

11      recruitment and retention, to your

12      understanding, in the Bronx?

13             A     I don't know specifically.  I do

14      think that the Bronx was a place where

15      people seemed to think there was a lot of

16      conflict, and where we struggled to get the

17      staff on the same page about the reasons for

18      transition to CHS.  And Dr. Kaye's

19      resistance to the transition was a big part

20      of that, in my opinion.

21             Q     Now, you said that there's lots of

22      conflict in the Bronx, what did you mean by

23      that?

24             A     Just that it was difficult to work

25      there.  It was not -- it didn't feel like a

1              R. MACDONALD

2    good team work type place, was the

3    impression that I got from those

4    supervisors.

5         Q    And you're saying the supervisors

6    are Dr. Ford and Dr. Jain?

7         A    Correct.

8         Q    And what do you mean by "team

9    work"?

10        A    Well, team work would mean, you

11   know, buying into the vision.  Again, I'm

12   framing this as CHS's efforts because of our

13   belief in the importance of the work to try

14   to give the court clinics the attention that

15   they deserved, to try to troubleshoot the

16   problems that they were dealing with.  To

17   allow them to do their work as efficiently

18   and as well as possible.  And everybody

19   being on board with that, and seeing that as

20   the goal, since it was, would be a measure

21   of how well the team work is going.

22        Q    And you said Dr. Kaye struggled

23   with the transition.  What do you mean by

24   that?

25        A    Well, I mean by that, that she

Page 67

1                    R. MACDONALD

2      didn't ever seem to buy into the framing

3      that I just described.  And rather than

4      being focused on the work, she was focused

5      on many different details of CHS management

6      that she found to be problematic.

7          Q    And what details of CHS management

8      did you remember Dr. Kaye finding

9      problematic?

10         A    Well, I think there were a litany

11     of them.  Many of them were laid out in a

12     letter that she wrote at some point, with a

13     list of concerns that she had about the

14     clinic and the management.

15         Q    Were any of those concerns valid?

16         A    In my opinion, the concerns raised

17     in that letter were easy rebuttable.

18         Q    And what letter are you

19     referencing?

20         A    I don't know the specific letter,

21     but I know that there was a letter that

22     was -- that I reviewed around the time of

23     her departure that had been shared with, I

24     think the district attorneys.

25         Q    And when you got that letter, what

Page 68

```
 1                         R. MACDONALD
 2     was your reaction?
 3                    MS. CANFIELD:  Objection to
 4               form.  You can answer.
 5          A    I wasn't particularly surprised by
 6     it.  Because I had been supervising two
 7     different supervisors who had struggled with
 8     Dr. Kaye's specific resistance to many of
 9     the standardization and efficiency efforts
10     that had been made.  And I knew of her
11     dissatisfaction with CHS, and so it wasn't
12     surprising to me.
13          Q    Now, as inmates in the -- that
14     come through the forensic psychiatric court
15     clinics, what's your understanding of their
16     constitutional protections?
17                    MS. CANFIELD:  Objection to
18               form.  You can answer if you're
19               able.
20          A    Of their constitutional
21     protections with regard to anything
22     specific?
23          Q    Well, you know -- I guess, let's
24     back up.  First and foremost, what is your
25     understanding of the 730 examination
```

1                       R. MACDONALD

2      process?  Like, what does it entail, from

3      your understanding?

4           A     So there's provision in New York

5      State law that delineates when an evaluation

6      should be performed to assess a person's

7      mental state and their ability to assist and

8      understand the legal circumstance that

9      they're in, and to work with their defense

10     attorneys to appropriately proceed with the

11     legal case against them.

12          Q     How many evaluators are necessary

13     to give the evaluations, to your knowledge?

14          A     At least two.

15          Q     And what's your understanding of

16     the 390 exam process?

17          A     The 390 exam process I'm not as

18     familiar with.  I know it's a smaller

19     proportion of the work, of the clinics.

20          Q     Now, I guess, I just want to kind

21     of be clear and have a clear record.  What

22     was Dr. Ford's exact title?

23          A     Chief of psychiatry.

24          Q     And what her responsibilities?

25          A     She oversaw the mental health

1                    R. MACDONALD

2      service within CHS, the FPECC clinics, of

3      course, as we're discussing here.  She

4      oversaw the social work department that was

5      responsible for discharge planning for

6      people leaving custody.

7           Q    Anything else?

8           A    You know, with that comes

9      ownership of policies and procedures,

10     management of the many different staff in

11     that department.  Yeah.  That's what comes

12     to mind.

13          Q    And Dr. Jain, what was his exact

14     title?

15          A    I don't know his exact title, but

16     he was the director of the FPECC clinics.

17          Q    Did you play a role in hiring

18     Dr. Jain?

19          A    I believe I interviewed Dr. Jain

20     when he applied for the position.

21          Q    Did you interview Dr. Ford at any

22     point?

23               MS. CANFIELD:  Objection to

24          form.  You can answer.

25          A    No.  I didn't interview Dr. Ford.

Page 71

1                          R. MACDONALD

2        As I mentioned, I became her supervisor when

3        I was promoted to chief medical officer.

4             Q     Now, you know, this is -- I'm

5        going back a little bit.  But how did you

6        get your position at the Department of

7        Health in July or June?

8             A     How did I get my position at the

9        Department of Health and mental hygiene?

10            Q     Yes.

11            A     I've been interested in

12       incarceration as a sociological phenomenon

13       before I entered medical school.  And I have

14       been interested in people who have criminal

15       justice involvement and their health and

16       well being for many years.  And I chose my

17       residency program in part because of the

18       tradition there of involvement in healthcare

19       for people with criminal justice

20       involvement.

21            I had been involved in starting a

22       clinic for people who had been recently

23       released from incarceration during my

24       residency, and I have been rotating even

25       into the jail system during residency.

R. MACDONALD

1

2        So I had a long standing interest

3   in the sociological and health, public

4   health underpinnings of the interface of

5   health and criminal justice.

6        Q    Did you apply for a specific

7   position before you started working at the

8   Department of Health?

9        A    I don't recall the details of the

10   application process.  I --

11        Q    Who did you interview with,

12   Dr. MacDonald?

13        A    Dr. Vendors.

14        Q    Did you know Dr. Vendors before

15   you started at the Department of Health?

16        A    I knew him through my contact with

17   him as part of that residency work that I

18   was doing, but not during residency.

19        Q    So did you interview with anyone

20   else besides Dr. Vendors before you started

21   working at the Department of Health?

22        A    I don't recall.

23        Q    And you don't recall if you saw a

24   specific job listing for the deputy director

25   position?

R. MACDONALD

1

2      A    No.  I think I became aware of it

3  because I had been in contact with

4  Dr. Vendors.  And that was the pathway

5  through which I was doing some work inside

6  the jail system even during residency.

7      Q    But you didn't have any prior

8  professional experience prior to this

9  position as the deputy director; is that

10  right?

11          MS. CANFIELD:  Objection to

12        form.  You can answer.

13      A    I moved into that position after I

14  completed my residency.

15      Q    Now, at any point did you write

16  any policies when you became the chief

17  medical officer at CHS?

18      A    I've been involved in policy

19  revision, and I'm sure I've signed off on

20  policies since that time, yes.

21      Q    When you say you signed off, what

22  do you mean by that exactly?

23      A    So CHS policies are stored in a

24  central location electronically, and there

25  are signed copies of the official policies,

Page 74

1                        R. MACDONALD

2        many of which are signed by me.  You know,

3        it depends on the individual services, who

4        signs which policies.

5             Q    I'm going to show you what's going

6        to be marked as Plaintiff's Exhibit 2.

7                          (Whereupon, FPECC Policy

8                          (NYC_291-295) was marked as

9                          Plaintiff's Exhibit 2 for

10                         identification as of this date.)

11            Q    For purposes of the record,

12       Plaintiff's Exhibit 2 bears the Bate Stamp

13       series NYC291 through 295.

14                 I don't think this is actually

15       addressed to you, Dr. MacDonald, but this is

16       the FPECC policy.  Do you recall this, the

17       private practice for FPECC clinical staff

18       members?

19            A    Yes.

20            Q    Now, this email actually is from

21       Dr. Jain to Drs. Mundy, Kaye, Winkler and

22       Owen.

23                 You see that, right?

24            A    Yes.

25            Q    And it's dated June 28, 2018.

1                         R. MACDONALD

2              You see that, right?

3         A    Um-hmm.

4         Q    I guess you're on some of the

5    earlier correspondence, I would take it, but

6    I don't see your name here.

7         A    Yeah.  My name is there.

8         Q    And, first and foremost, what role

9    did you play in writing the private practice

10   policy?

11             MS. CANFIELD:  Objection to

12         the form.  You can answer.

13        A    I didn't write the policy.  I

14   believe I reviewed it.

15        Q    And did you have any contributions

16   to the policy?

17        A    I don't remember specific

18   contributions to the policy.

19        Q    Did you review any documents in

20   your review of the policy?

21        A    I'm sorry.  Say that again.

22        Q    In the process of being engaged

23   about this policy, did you review any

24   documents referenced?

25        A    No.

1                           R. MACDONALD

2          Q     Why not?

3          A     I'm not sure I understand the

4     question.

5          Q     By any chance, did you raise any

6     concerns about the private practice policy?

7          A     No.

8          Q     Why not?

9          A     Because I thought that it fairly

10    laid out guidelines that were consistent

11    with professional practice and that had been

12    reviewed by others with more expertise in

13    this area, and I reviewed it and it seemed

14    reasonable to me.

15         Q     And who were the others with more

16    expertise that you're referencing?

17         A     Dr. Ford and Jonathan Wangel.

18         Q     Now, are you familiar with the

19    Conflict of Interest Board Rule 68?

20               MS. CANFIELD:  Objection to

21          form.  You can answer.

22         A     I'm familiar with the Conflict of

23    Interest Board.  I don't know specifically

24    which rule is 68.

25         Q     Well, the disclosure.  I mean, you

Page 77

1                         R. MACDONALD

2       have to make yearly disclosures yourself; am

3       I right, Dr. MacDonald?

4           A    Yes.

5           Q    So that same provision is invoked

6       as far as Chapter 68 specifically in the

7       policy itself; you see that, right?

8           A    Yes.

9           Q    So are you familiar with that and

10      how it has interplayed with this private

11      practice policy?

12                    MS. CANFIELD:  Objection to

13              form.  You can answer.

14          A    I mean, in a broad sense, yes.

15      The important role -- the important

16      principle is that no employees of the City

17      should engage in outside work that presents

18      a conflict of interest with work that is

19      their city duty.

20          Q    Did there come a time Dr. Kaye

21      expressed concern to you about this private

22      practice policy?

23          A    I don't recall Dr. Kaye expressing

24      concerns specifically to me about this

25      policy.

1                    R. MACDONALD

2          Q    At any point did you tell her that

3     or anyone that Dr. Yang supports private

4     practice as a way to retain and to recruit

5     clinicians?

6          A    Can you repeat the question.

7          Q    At any point did you tell Dr. Kaye

8     or anyone else that Dr. Yang supports

9     private practice for clinicians as a way to

10    retain and to recruit?

11         A    I don't remember saying that, no.

12         Q    Did Dr. Yang actually support the

13    private practice policy?

14         A    I do believe that she supported

15    the policy, yes.  And that there were

16    recruitment and retention considerations at

17    hand.

18              I mean, obviously a policy of

19    prohibiting any outside work would be one

20    pathway that our organization could take.

21    But instead the assessment was that the

22    conflicts of interest in outside work could

23    be managed, and that that would be better

24    for the overall operations of the clinics.

25    And part of that was because of an

Page 79

1                    R. MACDONALD

2    understanding that many of the staff of the

3    clinics have been engaged in this type of

4    work over many years.

5              So rather than prohibiting outside

6    work or not addressing it, our strategy was

7    to make a clear policy that would delineate

8    how it could be done without violating

9    conflicts of interest law or the spirit of

10   that.

11       Q    Did you all pursue an opinion from

12   the conflict of interest rule for this

13   particular policy?

14              MS. CANFIELD:  Objection to

15         form.  You can answer.

16       A    I don't know.  I know that

17   Jonathan Wangel was involved in the

18   development of this policy and he has

19   background in conflicts of interest.  And I

20   felt confident that the people who were more

21   expert than me at that end of it had looked

22   at it, and that it was sound.

23       Q    Now, wouldn't issuance of this

24   policy be outside of your expertise?  You

25   would agree with that, right?

Page 80

```
 1                      R. MACDONALD
 2                 MS. CANFIELD:  Objection to
 3            form.  You can answer.
 4        A    Yes.  If I were to write this
 5      policy myself, I would have to seek counsel
 6      from others who are more expert in the
 7      content.
 8        Q    And why is that?
 9        A    Because this is a policy that
10      touches on forensic practice, as well as
11      conflicts of interest.  So it's HR matters,
12      as well as areas outside of my clinical
13      expertise.
14        Q    So, I mean, there's also
15      implications of the OPMC and potential
16      misconduct with the Medical Licensing Board,
17      right?
18                 MS. CANFIELD:  Objection to
19            form.  You can answer.
20        A    I'm not sure I understand that.
21        Q    If you were actually writing
22      policies or issuing policies outside of your
23      area of expertise, couldn't you be subject
24      to a complaint with the Medical Licensing
25      Board?
```

1                    R. MACDONALD

2                    MS. CANFIELD:  Objection to

3              form.  You can answer.

4        A    I don't -- I mean, this would be

5    an administrative policy, right.  So I'm --

6    my oversight of this policy is in the

7    capacity as -- in my capacity as an

8    administrator, not as a clinician.

9        Q    But it does touch on things that

10   are specific to the practice of forensic

11   psychiatry, right?

12                   MS. CANFIELD:  Objection to

13             form.  You can answer.

14       A    Certainly.

15       Q    So this would be outside your area

16   of the expertise; am I right?

17                   MS. CANFIELD:  Objection to

18             form.  You can answer.

19       A    Yes.  In the same way that I have

20   oversight of policies for nursing or

21   pharmacy, despite the fact that I'm not a

22   nurse or a pharmacist.

23       Q    As a doctor, each doctor has a

24   specialty; am I right?

25       A    I think that's a complicated

1                         R. MACDONALD

2       question.  Doctors are trained and -- have

3       different training for sure.

4              Q    Well, you have a specialty, right?

5                   MS. CANFIELD:  Objection to

6                form.

7              A    I have completed a residency in

8       internal medicine and I'm board certified in

9       internal medicine.

10             Q    Right.  But you're not board

11      certified in forensic psychiatry, right?

12             A    Correct.

13             Q    Wouldn't it stand to reason that

14      the OPMC would take issue with a doctor

15      writing a policy outside of the area that he

16      is certified in?

17                  MS. CANFIELD:  Objection.

18             A    I'm not sure that they would.

19             Q    Please finish your answer.

20             A    I'm not sure that they would,

21      provided that that physician was acting as

22      an administrator in the oversight of that

23      policy.  The development of policy, per se,

24      I don't think is a function of professional

25      practice.

Page 83

1                      R. MACDONALD

2          Q    Now, at any point did Dr. Kaye

3     express concerns to you about HHC staff and

4     facilities being used to conduct private

5     forensic evaluations?

6          A    No.

7          Q    Were you aware of her complaint to

8     management to that effect?

9               MS. CANFIELD:  Objection to

10          form.  You can answer.

11         A    I don't recall that as a specific

12    complaint of hers.  It may have been one of

13    the things listed in the litany of concerns

14    that I mentioned in the letter.  I don't

15    recall all the specifics.

16         Q    Did you look into any of the

17    things that Dr. Kaye alleged especially --

18    let's stick with this issue.  Did you look

19    to see if HHC staff, the facilities were

20    being used to conduct private forensic

21    evaluations?

22         A    Say that again.

23         Q    Did you look into, did you

24    investigate whether or not HHC staff and

25    facilities were being used to conduct

Page 84

1                     R. MACDONALD

2      private forensic evaluations?

3           A    I do not remember an allegation

4      that the facilities were being used to

5      conduct private evaluations.  That was never

6      raised to me.

7           Q    Did you look at any allegations

8      that any of forensic psychiatrists or

9      evaluators engaged in double dipping?

10                    MS. CANFIELD:  Objection to

11               form.  You can answer.

12          A    I don't know what you mean by

13     double dipping.

14          Q    Well, they were basically

15     working -- they were on the City time but

16     working elsewhere.

17          A    No.  I was not aware of any

18     allegation of that.

19          Q    Did you look to see to make sure

20     that that didn't take place?

21                    MS. CANFIELD:  Objection to

22               form.  You can answer.

23          A    I didn't specifically look into

24     see to make sure that that didn't take

25     place.  But that was more concerted

Page 85

1                        R. MACDONALD

2      oversight was part of the goal of the

3      transition.  And so we had administrative

4      staff running those clinics.  We had methods

5      of time keeping that in many cases were more

6      robust than what had come before, to try to

7      make sure that this work was being done

8      appropriately.

9              I had confidence in the

10     administrative leadership of CHS to really

11     tighten up these clinics compared to what

12     was happening before.

13        Q    So when you mean "tighten up these

14     clinics," what do you mean by that?

15        A    Well, I mean by that

16     standardization of work rules.  So when do

17     people take lunches, how long are the

18     lunches, what are the work hours, how do we

19     document when people are on site doing their

20     work.  All those things.  Many of the things

21     that Dr. Kaye did not like about what we

22     tried to do, were specifically to make sure

23     that there was accountability for people's

24     time and that City resources were being used

25     appropriately.

Page 86

1                         R. MACDONALD

2          Q     Who made the determination that

3     they had to be standardization of work rules

4     to begin with?

5          A     That's just a principle of

6     management that we would all share.

7          Q     But I'm asking who made that

8     determination?

9          A     I can't say a specific person who

10    made that determination.  Because, again,

11    it's a principle of our approach.

12         Q     Were you part of that decision

13    making process?

14                    MS. CANFIELD:  Objection to

15              form.  You can answer.

16         A     Which decision making process

17    specifically are you referring to?

18         Q     Standardization of the work rules

19    specifically.

20         A     Again, I was part of the decision

21    making process about when CHS voluntarily

22    decided to consolidate these clinics under

23    the umbrella of CHS to make sure that work

24    flows made sense, that the staff of these

25    clinics were supported in doing their work

```
 1                      R. MACDONALD
 2      as efficiently as possible.
 3                 That any areas of uncertainty are
 4      evaluated and addressed through policies
 5      such as this one.  And the broad effort to
 6      consolidate and improve those clinics.  So I
 7      was involved in that decision making.  And
 8      part of that, absolutely, is standardization
 9      of both HR practice and work flow.
10           Q    What is your understanding of the,
11      I guess the hours of operation for the
12      courts in general?
13           A    I don't have much of a concept of
14      the hours of operation for the courts in
15      general.
16           Q    Did you need -- I mean, did you
17      know, I guess, when Dr. Kaye needed to be at
18      the court clinics and when she didn't have
19      to be there?
20                 MS. CANFIELD:  Objection to
21            form.  You can answer.
22           A    I would not have the level of
23      detail knowledge to say that.
24           Q    Who would have had that level of
25      detail knowledge?
```

1                    R. MACDONALD

2        A    Dr. Ford, Dr. Jain, in

3    collaboration with the administrative

4    leadership of the clinics.

5        Q    Now, at any point did you become

6    aware of Dr. Kaye's complaint about the

7    shift change that she was experiencing?

8        A    I was aware of a concern of the

9    timing of her hours.

10       Q    And who had the concern about the

11   timing of her hours, besides Dr. Kaye?

12       A    I don't know.

13       Q    Was there an issue with Dr. Kaye's

14   performance?

15       A    I think in sort of -- I think the

16   supervisors of Dr. Kaye, who I supervised,

17   really struggled to manage her, because she

18   was so resistant to almost every aspect of

19   what we were trying to do.

20            I think often times even I -- that

21   they were intimidated to giving her feedback

22   sometimes.  And so if you looked at her

23   performance evaluations, I imagine they were

24   good.  But she took a tremendous amount of

25   time of those supervisors related to the

Page 89

1                          R. MACDONALD

2       litany of concerns that were detailed in her

3       letters, and much of the content that we're

4       discussing here today, which had the effect

5       of the making the clinic much less

6       efficient.  Because so much time was spent

7       on these types of details, rather than, you

8       know, as I've mentioned, a good team work

9       based approach, to everyone pitching in to

10      get the work done as efficiently and as well

11      as possible.

12          Q    Have you attributed an employee's

13      separation previously to an inability to

14      engage in team work?

15              MS. CANFIELD:  Objection to

16          form.  You can answer if you're

17          able.

18          A    I believe that that could be an

19      element of feedback for an employee and a

20      performance issue, yes.

21          Q    But as far as Dr. Kaye's technical

22      performance of her job functions, you never

23      received any complaints about that, right?

24          A    Performance of evaluations

25      themselves?

Page 90

1                          R. MACDONALD

2          Q     Yes.

3          A     Not about the content of her

4     evaluations.

5          Q     Not about the quality of her work?

6          A     Correct.   Not about the content of

7     the evaluations.

8          Q     So you're saying that the issues

9     that you're identifying with Dr. Kaye was

10    that they struggled to manage her and you're

11    saying they, being Dr. Ford and Dr. Jain,

12    right?

13         A     Yes.

14         Q     And they were intimidated by her,

15    right?

16         A     I think at times.

17         Q     Who was intimidated by Dr. Kaye?

18         A     I think Dr. Jain in particular,

19    who was a newer manager, was intimidated by

20    Dr. Kaye.   That was my assessment.

21         Q     And who else?

22         A     I think Dr. Ford, who was a more

23    seasoned manager, you know, was exasperated

24    by Dr. Kaye, and continuous resistance and

25    focus on details of employment, and also

```
 1                     R. MACDONALD

 2      just the clear resistance to the

 3      philosophical rational for the

 4      standardization of the clinics.

 5              I don't think she believed that we

 6      were doing this work for the reasons that we

 7      believed we were, which was to make it

 8      better.  That's why we did it.

 9          Q    At any point did it come to your

10      attention that Dr. Ford said that, you know,

11      you all needed to manage Dr. Kaye out?

12                  MS. CANFIELD:  Objection to

13              form.  You can answer.

14          A    It's possible that Dr. Ford said

15      that.  Again, it would be -- if she said

16      that, it would be that her assessment that

17      those elements of resistance to the effort

18      were making it hard to operate the clinic,

19      and that long term it might not be viable

20      because it was such a challenge.

21          Q    When someone says "manage out,"

22      what is your understanding of that?

23          A    Well, I mean, that really gets at

24      what sometimes is our inability or our

25      ineffectiveness at documenting in formal
```

1                    R. MACDONALD

2     performance evaluations what the problem is,

3     which, you know, it doesn't always happen

4     well, and it can be hard to do even when

5     there are clinic problems.

6          Q    Is it fair to also say that

7     managing out means that you're looking to

8     terminate this person?

9               MS. CANFIELD:   Objection to

10               form.   You can answer.

11          A    I mean, only, obviously, if the

12     issues at hand can't be remediated.

13          Q    And at any point were there

14     efforts to quote/unquote remediate the

15     issues at hand with Dr. Kaye?

16          A    I believe Dr. Ford and Dr. Jain

17     spent a great deal of time on that.

18          Q    Did you work with them in

19     attempting to remediate quote/unquote the

20     issues with Dr. Kaye?

21          A    Only in an advisory position.   So

22     as their supervisor it was something that we

23     discussed as a challenge that they were

24     dealing with, and something that takes up a

25     significant amount of their supervisory

1                          R. MACDONALD

2          time.

3                  Q     Just to make sure I'm clear, there

4          was -- you didn't really substantively

5          participate in drafting the private practice

6          policy; am I right?

7                  A     Correct.

8                  Q     Now, the issues that Dr. Kaye

9          raised around the private practice policy,

10         I'm going to ask you whether or not you

11         agree that the policy had the potential to

12         actually lead to these things.

13                       She alleged that there would be

14         fraud on the court that could possibly come

15         off as an offshoot of this policy.  Would

16         you agree or disagree?

17                       MS. CANFIELD:  Objection to

18                  form.  You can answer.

19                  A     I'm sorry.  I didn't hear the

20         question.

21                  Q     She alleged that the private

22         practice policy, as it was written and

23         implemented, lead to fraud on the court.  Do

24         you agree or disagree?

25                       MS. CANFIELD:  Objection to

Page 94

1                          R. MACDONALD

2            form.  You can answer.

3            A    The phrase you said is fraud on

4       the court?

5            Q    Yes.  Are you familiar with that

6       phrase?

7            A    Not really, no.

8            Q    I'll leave that one.  Interference

9       with the administration of justice.

10                     MS. CANFIELD:  Is that a

11             question?

12            Q    Do you recall her making or

13       raising that issue with you, Dr. MacDonald?

14            A    I'm sorry, who raising --

15            Q    Dr. Kaye.

16            A    Dr. Kaye raising with me --

17            Q    Well, in the letter that you said

18       that she had written a litany of complaints,

19       do you remember that particular aspect of

20       her complaint?

21            A    Not specifically.

22            Q    Violation of defendant's due

23       process rights.

24            A    Again, I know that my level of

25       recollection of the letter was that she had

Page 95

1                          R. MACDONALD

2          a number of concerns about this policy,

3          which I didn't feel to be borne out based

4          on, again, the review of Mr. Wangel, who has

5          a background -- who is a lawyer and has a

6          background in conflicts of interest.

7               Q    So were you tapping into

8          Mr. Wangel's legal background?  I mean, he

9          was acting in a legal capacity, as far as

10         you were concerned?

11                   MS. CANFIELD:  Objection to

12              form.  You can answer.

13              A    No.  Just as I was acting as an

14         administrator, he was acting as an

15         administrator as well, but just my

16         assessment that this policy was

17         appropriately vetted and did not present an

18         undue risk as far as conflicts of interest

19         are concerned.

20              Q    When you use "appropriately

21         vetted," who was it vetted to, to your

22         knowledge?

23                   MS. CANFIELD:  Objection to

24              form.  You can answer.

25              A    Again, Mr. Wangel and Dr. Ford,

1                         R. MACDONALD

2     who both have quite a bit of expertise in

3     these areas.

4          Q    But you never saw any

5     correspondence from the conflict of interest

6     board that approved or disapproved the

7     policy ultimately; am I right?

8                    MS. CANFIELD:  Objection to

9              form.  You can answer.

10         A    Not that I'm aware of, no.

11         Q    Now, at the core of this it was

12    the violation of defendant's due process

13    rights.  Now, to your understanding, do you

14    know what the process rights involved would

15    be?

16                   MS. CANFIELD:  Objection to

17             form.  You can answer if you're

18             able.

19         A    As a legal term, I would hesitate

20    to lay those out.

21         Q    Well, in your letter, for example,

22    you kind of talk about the horrible

23    conditions at Rikers, right?

24                   MS. CANFIELD:  Objection.  You

25             can answer if you're able.

                              R. MACDONALD

1

2          Q     In the September 10, 2021 letter

3     that we went over earlier today, Exhibit 1,

4     you talked about some of the deplorable

5     conditions that the inmates had been

6     experiencing at Rikers; am I right?

7          A     At that time, yes.

8          Q     And you are aware of the Eighth

9     Amendment Protection against cruel and

10    unusual punishment; am I right?

11         A     Yes.

12         Q     In this instance, with these

13    deplorable conditions, inhumane conditions

14    that you described, would that evoke the

15    Eight Amendment?

16              MS. CANFIELD:   Objection to

17          form.   You can answer.

18         A     I would hesitate to comment on

19    that as a physician.

20         Q     Well, I mean, as a human being,

21    I'm not asking you as a physician.

22         A     As a human being and as a

23    physician, I object to that.  I did not do

24    so on Eighth Amendment grounds.

25         Q     But to your understanding the

1                         R. MACDONALD

2      Eighth Amendment would be invoked; is that

3      right?

4                    MS. CANFIELD:  Objection to

5              form.  You can answer again.

6           A     Again, I would leave that to

7      somebody with legal expertise.

8           Q     Well, would you say that being

9      housed in a shower where there's PCs and

10     other -- I don't know what else would be in

11     a shower, but appeared to be pretty bad,

12     would you say that that's cruel?

13                    MS. CANFIELD:  Objection to

14             form.  You can answer.

15          A     Yes.

16          Q     And unusual, right?

17          A     Yes.

18          Q     And it would be punishment, right?

19                    MS. CANFIELD:  Objection to

20             form.  You can answer.

21          A     I mean, it maybe, yeah.  I think

22     it's -- it's complicated exactly how that

23     situation comes about, but, yeah.

24          Q     And now we're talking about the

25     due process rights.  Now, according to the

1                    R. MACDONALD

2      CPL730 statute, you know, the inmate in this

3      instance or the defendant has a right to

4      have legal counsel, right?

5           A    Yes.

6           Q    And also to be able to actively

7      participate in the 730 process; am I right?

8           A    Yes.

9           Q    And so if the 730 process is

10     compromised in any way, then their ability

11     to participate in their defense is

12     compromised; am I right?

13          A    Potentially, yes.

14          Q    Right.  At any point did Dr. Kaye

15     raise concerns how the 730 exams were being

16     administered at the clinic?

17          A    How the exams were being

18     administered?

19          Q    Right.

20          A    Could you be more specific.

21          Q    Well, I mean, there were issues

22     with the redacted records.  Do you recall

23     that?

24               MS. CANFIELD:  Objection to

25          form.  You can answer.

1                    R. MACDONALD

2        A    Yes.  I mean, as I mentioned,

3   Dr. Kaye had any number of concerns and

4   complaints about any number of elements of

5   the process.

6        Q    What was your position on the use

7   of redacted records?

8        A    My position was that we had looked

9   into it and we were trying to balance the

10  legal opinions what about we were able to

11  share with the needs of the evaluators.

12            Certainly in the name of

13  efficiency, I would have preferred no

14  redaction, and we would pursue that, I

15  think, if it were legally viable based on

16  the advice we were getting.

17       Q    Let me just make sure I'm clear.

18  You said you would have preferred that there

19  would be no redacted medical records; am I

20  right?

21       A    For efficiency sake, yes.  Because

22  the redaction process takes time.  And it

23  could have also, though I don't think this

24  is as significant of a concern, if it's done

25  appropriately, it also does give less

Page 101

1                    R. MACDONALD

2      information.

3           Q     Why would CHS at a given time

4      insisting upon redacted records to begin

5      with?

6                    MS. CANFIELD:  Objection to

7                form.  You can answer.

8           A     Based on the opinion of the legal

9      department that that was a legal

10     requirement.

11          Q     Who's legal department?

12          A     I don't know specifically if that

13     was H&H or the City's law department.  Would

14     have been one of the two.

15          Q     Was H&H approaching the court to

16     figure out or to, I guess, have these

17     records redacted versus unredacted?

18                    MS. CANFIELD:  Objection to

19                form.  You can answer.

20          A     I don't know the details.  I know

21     that this question was investigated and that

22     our preference, for the sake of efficiency,

23     as I said, would be not to redact.

24          Q     Now, on the other hand, Dr. Kaye

25     was alleging that she could not do exams

1                    R. MACDONALD

2      with redacted medical records.  Do you

3      recall that?

4           A    Yes.

5           Q    And what do you remember?

6           A    I remember that in Dr. Ford's

7      opinion that that was not her understanding

8      as herself someone familiar with forensic

9      evaluation.

10          Q    Did you agree with Dr. Ford's

11     position or disagree?

12          A    I agreed with Dr. Ford's position,

13     yes.

14          Q    Why?

15          A    Because it seemed unreasonable to

16     me that redaction of those particular

17     elements would make it impossible to render

18     an opinion.  And Dr. Ford explained to me

19     that if there were specific circumstances

20     where there was reason to believe that those

21     redactions had impacted the assessment, that

22     that could be described in the report and

23     that there would be pathways in specific

24     cases to remedy that.

25          Q    Now, I'm going to ask you just the

Page 103

1                      R. MACDONALD

2      context of your abilities, I guess during

3      the time when Dr. Kaye was actually

4      employed.

5              Did you have final decision making

6      authority when it came to staffing decisions

7      at that time?

8                      MS. CANFIELD:  Objection to

9              form.  You can answer.

10      A     Again, it depends on the staffing

11      decision.

12      Q     Well, the center directors, like

13      Dr. Kaye and her comparators, did you have

14      final decision making authority in that

15      context?

16                      MS. CANFIELD:  Objection to

17              form.  You can answer.

18      A     No.  I mean, a change in any of

19      those positions would have to be done

20      collaboratively with the leadership team

21      that I laid out before.

22      Q     And the leadership team is

23      Dr. Yang, Ford, yourself, and Wangel, right?

24      A     Yes.  And Dr. Yang, Michael in

25      finance that's needed as well for those

```
 1                    R. MACDONALD
 2    decisions.
 3         Q    Who was the person in finance?
 4         A    Aaron Anderson.
 5         Q    He's still around?
 6         A    Yes.
 7         Q    Recredentialing, what role did you
 8    play in that?
 9              MS. CANFIELD:  Objection to
10         form.  You can answer.
11         A    Recredentialing was -- it's
12    primarily managed by HR under CHS.  So if
13    there were specific questions about which
14    elements of recredentialing packet were
15    required, they might inquire of me, but
16    otherwise it was handled by HR and the
17    leadership of the services.
18         Q    When would HR inquire of you about
19    recredentialing?
20         A    If there was a question as to what
21    was required for the recredentialing packet.
22         Q    What exactly?
23         A    Questions like which positions
24    would require certification and CPR, for
25    example.
```

1          R. MACDONALD

2          Q    At any point in your career were

3     you in charge of recredentialing?

4          A    As I said, in CHS, in general, the

5     recredentialing happens primarily through HR

6     with input from the clinical services.

7          Q    When you were at the Department of

8     Health, at any point did you play a more, I

9     guess, involved role in recredentialing?

10         A    I would sign off on the individual

11    packets in that role for physicians in the

12    medicine service.

13         Q    And you did not do that at CHS?

14         A    No.

15         Q    And I'm saying CHS, I mean I'm

16    talking about in terms of the time when

17    Dr. Kaye was involved in the recredentialing

18    process.  You were not involved in that,

19    right?

20         A    Correct.

21         Q    Were you aware of any

22    quote/unquote special projects involving

23    recredentialing during your time with

24    managing Dr. Kaye directly?

25         A    No.

1                    R. MACDONALD

2          Q     Were you ever aware of Dr. Kaye's

3     complaints about fishing emails to Teleakie

4     Parker?

5          A     I'm sorry.  Say that again.

6          Q     Did it ever come to your attention

7     that Dr. Kaye had concerns about fishing

8     emails when she was being asked to

9     recredential?

10         A     No.  I don't think I learned of

11    that.

12         Q     Did you attend a meeting at the

13    Bronx court clinic on January 29, 2018?

14         A     Possibly.

15         Q     Do you recall going to the Bronx

16    court clinic to kind of introduce yourself

17    of sorts?

18         A     Yes.

19         Q     What do you remember from that?

20         A     Not a great deal.  It was quite

21    some time ago.  I think we were at that time

22    going with Dr. Ford, Dr. Yang and maybe

23    representatives from the hospital systems,

24    to discuss the project and to meet some of

25    the staff from the clinics.

Page 107

1                          R. MACDONALD

2          Q     I'm going to show you what's going

3     to be marked as Plaintiff's Exhibit 3.

4                          (Whereupon, 01/11/18 Email was

5                          marked as Plaintiff's Exhibit 3

6                          for identification as of this

7                          date.)

8                     MS. CANFIELD:  This is also in

9             the packet?

10                     MS. HAGAN:  Today.

11         Q     I'm going to give you an

12    opportunity -- the portion that's redacted,

13    it's actually an email to me.  So it would

14    be attorney-client privilege.  I guess I

15    could have written that.

16                     MS. HAGAN:  Is this Bate

17            Stamped?

18                     MS. CANFIELD:  Yes.  It is.

19         Q     For purposes of the record,

20    Exhibit 3 bears the Bate Stamp series --

21    maybe it's not.  I thought it was.  I'm

22    sorry.  It's not Bate Stamped.  Sorry.

23                   It's an email from Dr. Kaye dated

24    January 11, 2018.

25                     MS. CANFIELD:  And you said

1                    R. MACDONALD

2          this was produced today to me?

3               MS. HAGAN:  Yes.

4               MS. CANFIELD:  Do you know

5          what the document is called?

6               MS. HAGAN:  The subject has

7          confirmed CHS site visit Bronx

8          forensic psychiatry court clinic.

9               MS. CANFIELD:  It doesn't seem

10         to be in one today.

11              MS. HAGAN:  It should be in

12         the email, but I will followup with

13         you.

14              MS. CANFIELD:  Thank you.

15         Q    Now, does seeing this email

16    refresh your recollection about attending a

17    meeting at the Bronx court clinic on

18    January 29 at that time?

19         A    Yes.  That's the meeting that I

20    was thinking it was.

21         Q    Now, do you remember meeting

22    Dr. Kaye at that time?

23         A    Yes.

24         Q    What do you remember about the

25    meeting?

1                    R. MACDONALD

2        A     I don't remember many of the

3    details of the meeting.  I think we might

4    have been in her office with Bill Hicks from

5    Bellevue was there, I remember Dr. Yang,

6    Dr. Ford.

7        Q     What did you talk about during the

8    time you were in Dr. Kaye's office?

9        A     I don't remember -- you know, I

10   remember, as I said, the overall goal of the

11   meeting was to introduce ourselves to

12   discuss the big picture reasons for the

13   change, but I don't remember specifics

14   beyond that.

15       Q     Now, at any point did you tell

16   Dr. Kaye that CHS is taking over the court

17   clinics so that they could use CPL to get

18   the inmates off of Rikers?

19       A     I don't think so.  I mean, I think

20   that the efficiency of the court clinics

21   absolutely impacts people who are

22   incarcerated.  And that that was part of the

23   organizational role.

24            Specifically, what I mean by that

25   is, many people are held in pretrial

```
 1                        R. MACDONALD

 2     detention awaiting a 730.  And a 730

 3     evaluation, if it's done efficiently, can

 4     reduce the amount of time that somebody goes

 5     through that portion of the legal

 6     proceeding.

 7                  So part of the reason that the

 8     work is very important, of course the

 9     evaluations are important, but for that to

10     be done efficiently, impacts whether people

11     will be held in pretrial detention longer

12     than they need to be.

13                  So I certainly may have mentioned

14     that as an important truth about the clinics

15     and the operation of the clinics.

16          Q     But you didn't say that CHS was

17     planning to take over the clinics so that

18     they could use CPL to get the inmates off of

19     Rikers?

20                  MS. CANFIELD:  Objection to

21               form.  You can answer again.

22          A     Absolutely not.

23          Q     You are aware of Dr. Kaye's

24     allegations that the 730 examinations were

25     being generated, right?
```

1                      R. MACDONALD

2              MS. CANFIELD:  Objection to

3          form.  You can answer.

4      A    I recall that that was one of the

5  many things that appeared in the letter,

6  yes.

7      Q    And you dispute that, right?

8      A    One hundred percent, absolutely I

9  dispute that.  We have never had any

10  influence over the content of any

11  evaluation.

12      Q    So you did not have any influence

13  on the Jose Gonzalez evaluation; am I right?

14      A    Yes.

15              MS. CANFIELD:  Objection to

16          form.

17      Q    You said yes, right?

18      A    Yes.

19      Q    And you would deny having any

20  influence over the Miguel Figueroa

21  evaluation?

22      A    Yes.

23      Q    And you would deny having any

24  influence over the James Dolo evaluation?

25      A    Yes.

1                          R. MACDONALD

2          Q    And so I'm going to ask you, at

3     any point in your career did you write an

4     article on dual loyalty?

5          A    Yes.

6          Q    What is that?

7          A    Dual loyalty refers to a pull

8     between competing interest that in the

9     context that I was writing it about was the

10    competing interest of a physician treating a

11    patient and competing factors.

12               In jail, the interests of the

13    security authority are a primary competing

14    factor.  But really, anywhere in which

15    there's a doctor/patient relationship there

16    are competing interests at play.  And we've

17    done some work to make sure that our staff

18    understand those competing interests, and

19    that they are attentive to them as they go

20    about their work.

21          Q    Now, is it to say the dual agency

22    issues that Dr. Kaye raised?

23               MS. CANFIELD:  Objection to

24          form.  You can answer.

25          A    I think my personal reading is

1                           R. MACDONALD

2       that that's a misapplication of the concept.

3       But I think it could be seen as an analogy,

4       yes.

5            Q    How do you say it's a

6       misapplication of the concept, explain.

7            A    Well, in this case it's a

8       misapplication because we are a group of

9       people who are explicitly sensitive to the

10      potential for dual agency, and we worked

11      very hard to make sure that there's a

12      firewall.

13           And there has not been any, in my

14      experience, any break down of that firewall.

15      We've maintained that, and we are people who

16      are particularly attentive to that work.

17      Hence, my writing in that area.

18           Q    So you're particularly attentive

19      to that work.  You said "we," who's the we?

20           A    I mean, everyone at CHS, the

21      leadership team that I talked about.  Dr.

22      Ford, Dr. Yang.  There was never any

23      intention among any of us to influence the

24      content of the evaluations.

25           Q    Who spearheaded the dual agency

1                    R. MACDONALD

2     policy that was ultimately issued by CHS?

3         A    Which policy are you referring to

4     specifically?

5         Q    Well, specifically there was a

6     dual agency policy, right?  Who was

7     responsible for that?

8                    MS. CANFIELD:  Objection to

9              form.  You can answer.

10                   Do you have a policy you can

11             show him?

12        Q    I didn't even ask that.  But I'm

13    asking him because he wrote an article on

14    dual loyalty, right, and he can see that

15    there was a dual agency policy.

16             Do you recall that?

17        A    I would like to see the policy

18    you're referring to, if that's possible.

19        Q    But you do recall ever having a

20    discussion about that?  That's the first

21    question.

22                   MS. CANFIELD:  Objection to

23             form.  That's a fact.

24        A    Yes, yes.  Absolutely.  So, again,

25    the relationship of the forensic evaluations

1                      R. MACDONALD

2      to the broader clinical service is a very

3      important issue that we've been attentive to

4      from the beginning.  So, yes, we've

5      discussed it.

6           Q    So I'm going to share with you the

7      dual agency policy right now.

8                Now, for purposes of the record,

9      Exhibit 4 bears the Bate Stamp series

10     NYC1188, 1189 and 1190.

11                    (Whereupon, Email

12                    (NYC_1188-1190) was marked as

13                    Plaintiff's Exhibit 4 for

14                    identification as of this date.)

15          Q    I'll scroll back up so that you

16     can see, I guess the origin of the email.

17     It's actually the email.  It says, "Just

18     passing along this recently approved policy

19     managing dual roles for forensic psychiatric

20     examination."

21                You see that, right?

22          A    Yes.

23          Q    And this is January 22, 2019.  You

24     see that as well, right?

25          A    Yes.

```
1                    R. MACDONALD
2         Q    Now, I'm going to scroll down.
3    Did you play any part in drafting this
4    policy, Dr. MacDonald?
5         A    I don't think I drafted this
6    policy, no.
7         Q    You played no part in it?
8         A    I think I probably reviewed it
9    before it was issued.
10        Q    When you say "reviewed," what does
11   that mean?
12        A    It means Dr. Ford would have
13   shared it with me for any feedback.
14        Q    Did you provide her with any
15   feedback on this particular policy?
16        A    I don't believe so, no.
17        Q    So Dr. Ford presented this to you
18   and basically, did you tell her she can sign
19   off on it?
20        A    I mean, I don't remember
21   specifically telling her that, but in
22   general I would have been aware of the
23   policies that she was signing for the
24   clinic, yes.
25        Q    Do you recall Dr. Kaye raising
```

1                    R. MACDONALD

2      issues with you about this particular

3      policy, or with management about this

4      particular policy?

5           A    I don't remember her raising

6      issues with me specifically about it.

7           Q    Now, there seems to be somewhat of

8      a discrepancy between the date it was

9      actually issued and the date that Dr. Jain

10     shared it with staff.

11               You see here the original issue

12     date is December 21, 2018; you see that,

13     right?

14          A    Um-hmm.

15          Q    Then there is the date on top of

16     January 22, 2019.  You do see this, too,

17     right?

18          A    Um-hmm.

19          Q    Do you recall what may have lead

20     to this policy being drafted in the first

21     place?

22          A    No.

23          Q    Was there any issue with Legal Aid

24     Society and, I guess, management, CHS

25     management?

Page 118

1                        R. MACDONALD

2          A     I'm not recalling a specific

3     issue.

4          Q     At any point did it come to your

5     attention that Legal Aid was objecting to

6     the presence of Dr. Jain in the evaluation

7     setting?

8          A     It sounds vaguely familiar, but

9     I'm not remembering specifically.

10          Q     Did it ever come to your attention

11     that they were objecting to the presence of

12     Dr. Barbara Rioja (phonetic)?

13          A     Again, I don't remember.

14          Q     What's your understanding of

15     Dr. Barbara Rioja's background?

16                MS. CANFIELD:  Objection to

17           form.  You can answer.

18          A     Dr. Barbara Rioja is a

19     psychologist by training, who has a

20     background in forensic psychology.

21          Q     Isn't she involved in providing

22     treatment to inmates?

23          A     She oversees the clinical care as

24     the co-chief of mental health, just as

25     Dr. Ford was the chief of psychiatry.

Page 119

1                    R. MACDONALD

2        Q    Was there a time when Dr. Rioja

3    was wanting to sit in on the examination and

4    Legal Aid objected to her presence there?

5              MS. CANFIELD:  Objection to

6         form.  You can answer.

7        A    It's possible.

8        Q    What was your position when that

9    the took place; do you recall?

10             MS. CANFIELD:  Object to the

11        form.  You can answer.

12       A    No.  I don't.

13       Q    Let me correct myself.  I was

14   Dr. Alex Garcia Mensia.

15             Do you recall?

16       A    Yes.  I think I do, yes.

17       Q    So what do you remember of that

18   incident that involved Dr. Alex Garcia

19   Mensia?

20       A    Not much just beyond what you've

21   mentioned.

22       Q    At any point was there

23   objections -- did you have issues with how

24   Legal Aid Society was engaging staff

25   management at the Bronx court clinic?

1                    R. MACDONALD

2              MS. CANFIELD:  Objection to

3         form.  You can answer.

4         A    Can you repeat the question.

5         Q    At any point did you begin to have

6    any concerns with how Legal Aid Society was

7    engaging management and/or staff at the

8    Bronx court clinic?

9         A    There was a particular attorney

10   from the Legal Aid Society in the Bronx

11   clinic who had a lot of complaints about

12   CHS, many of which mirrored the complaints

13   that Dr. Kaye was raising at the time.  I

14   can't remember his name at the moment.

15        Q    Now, did MOCJ and Wangel get

16   involved in the Alex Garcia Mensia

17   situation?

18             MS. CANFIELD:  Objection to

19         form.  You can answer.

20        A    I don't recall.

21        Q    Did you get involved with that?

22        A    No.

23        Q    You didn't advice anybody or

24   review the emails at any point?

25        A    No.  Not that I'm aware of.

1                     R. MACDONALD

2        Q    Now, I'm going to ask you some

3   questions specific to Dr. Kaye's pay parity

4   complaint.

5             Do you recall the issues

6   surrounding her complaint regarding pay

7   parity?

8        A    I really didn't have much

9   involvement with this element.  It was

10   handled through HR and primarily by Dr. Ford

11   and Dr. Yang.

12        Q    But you were CC'd on these emails;

13   am I right?

14        A    I would imagine that I was

15   probably CC'd on some of the emails, yes.

16        Q    Why didn't you feel the need to do

17   any more than, I guess, kind of allow these

18   other actors to I guess take lead on this

19   particular issue?

20             MS. CANFIELD:  Objection to

21        form.  You can answer.

22        A    So Dr. Yang was pretty proactively

23   involved and she oversees finance and HR,

24   which are not under my purview.  So when she

25   takes direct involvement in an issue that is

1                        R. MACDONALD

2       also more so in her area of expertise than

3       it is in mine, I would often take that

4       opportunity to attend to other matters.

5            Q    How often did Dr. Yang get

6       involved directly in these types of issues?

7                      MS. CANFIELD:  Objection to

8             form. You can answer.

9            A    It was not unusual.  Dr. Yang's a

10      very hands-on leader.

11           Q    Now, what is Dr. Yang's area of

12      expertise, just so the record is clear?

13           A    Her training is in public health,

14      but she spent many years in leadership

15      positions of various City agencies,

16      including the Public Hospital System and the

17      Department of Health, where she previously

18      served as the Chief Operating Officer.

19           Q    Were you aware that Dr. Kaye was

20      complaining that she was being paid less

21      than the male center directors during the

22      time that she was there?

23                      MS. CANFIELD:  Objection to

24            form.  You can answer.

25           A    I did become aware of that

Page 123

```
 1                        R. MACDONALD
 2        complaint at some point, yes.
 3             Q    Did you ask what steps could be
 4        taken to address the issues?
 5             A    By the time I became aware of
 6        that, I was certain that Dr. Ford and
 7        Dr. Yang were working on that issue, along
 8        with HR.
 9             Q    I'm going to show you what's going
10        to be marked as Plaintiff's Exhibit 5.
11                  And for purposes of the record,
12        Plaintiff's Exhibit 5 bears the Bate Stamp
13        series NYC196 through 198.
14                            (Whereupon, Email (NYC_196-198)
15                            was marked as Plaintiff's
16                            Exhibit 5 for identification as
17                            of this date.)
18             Q    Now, you see this email is from
19        Dr. Yang to Sarah Gillen (phonetic),
20        yourself, Dr. Ford, Jessica Laboy and Mr.
21        Wangel; is that right?
22             A    Yes.
23             Q    I'm going to ask you who these
24        people are.  Who is Sarah Gillen?
25             A    Sarah Gillen was the Chief
```

Page 124

1                         R. MACDONALD

2          Operating Officer at the time.

3                  Q    Is she still there?

4                  A    No.

5                  Q    What happened to her?

6                  A    She left for different employment.

7                  Q    Did she get fired?

8                  A    Not that I'm aware of.

9                  Q    Was she asked to resign?

10                 A    I don't know.

11                 Q    Who was Ms. Gillen's supervisor?

12                 A    Dr. Yang.

13                 Q    So she reported directly to

14         Dr. Yang?

15                 A    Yes.

16                 Q    She was the Chief Operating

17         Officer; is that right?

18                 A    Yes.

19                 Q    Who is the Chief Operating Officer

20         now?

21                 A    The roles changed a bit, but

22         Carlos Castillanos.

23                 Q    Was he the Chief Operating Officer

24         directly after Ms. Gillen left?

25                 A    I don't think so.  I think, as I

1                         R. MACDONALD

2       said, the role has changed and there's now a

3       chief administrative officer as well.

4            Q    Who is that?

5            A    That is now Jessica Laboy.

6            Q    So Ms. Laboy is the chief

7       administrative officer.  What was her

8       position when Ms. Gillen was there?

9            A    I don't know exactly what the

10      division of labor between her and Jonathan

11      Wangel was at that time.

12           Q    So she had no part in Ms. Gillen's

13      job, it was between she and Jonathan Wangel,

14      right?

15           A    Well, I'm not sure.  Jessica Laboy

16      would have also reported to Ms. Gillen, I

17      believe.

18           Q    So, then, this email is dated

19      May 3, 2018, right?

20           A    Yeah.

21           Q    And Dr. Yang says, "FYI, I deleted

22      this sentence in response to her about

23      promises come July.  Bill aware."

24                Did you understand what Dr. Yang

25      was referencing when she wrote this email?

```
 1                      R. MACDONALD
 2         A     I don't remember and I don't
 3    understand it now.
 4         Q     When did the Bronx court clinic
 5    come on board?
 6         A     I don't remember the exact date.
 7         Q     Would it be fair to say July 2018?
 8         A     That sounds right, yeah.
 9         Q     Would it be fair to say that the
10    Bronx court clinic was the last of the
11    clinics to be absorbed by CHS?
12                    MS. CANFIELD:  Objection to
13              form.  You can answer.
14         A     I don't remember that detail.
15         Q     Did it ever come to your attention
16    that Dr. Yang wanted Dr. Kaye to work
17    elsewhere rather than CHS?
18                    MS. CANFIELD:  Objection.  You
19              can answer.
20         A     I don't know if I would frame it
21    that way.  I think that there was a question
22    of whether -- you know, because of several
23    concerns that she raised about the
24    transition about whether there would be a
25    position that would be mutually beneficial
```

1                    R. MACDONALD

2      for her to stay with Bellevue.

3           Q    Were there efforts made to ensure

4      that Dr. Kaye could stay with Bellevue?

5           A    I believe it was explored.  I

6      don't know what the outcome of that was.

7           Q    So you don't know what the outcome

8      was.  Did anyone ever tell you that no one

9      wanted to work with Dr. Kaye?

10          A    Say that again.

11          Q    Did anyone ever tell you that no

12     one wanted to work with Dr. Kaye?

13          A    I did have a general sense that

14     Dr. Kaye had a reputation for being

15     difficult to work with.  I don't know if it

16     would be worded in exactly that way.

17          Q    When did you learn that Dr. Kaye

18     allegedly had a reputation for being

19     difficult to work with?

20          A    I'm not sure where I heard that

21     from.  I think I heard it many times over

22     the course of the years.

23          Q    Do you remember anyone telling you

24     that specifically?

25          A    Well, I remember it was perceived

1                     R. MACDONALD

2      by her supervisors to be part of the

3      retention difficulties in the Bronx.

4          Q    So you're talk about Dr. Jain and

5      Dr. Ford?

6          A    Yes.

7          Q    When did Dr. Ford tell you that

8      Dr. Kaye was difficult to work with?

9          A    I don't remember specific

10     conversation to that affect.

11         Q    When did Dr. Jain tell you that

12     Dr. Ford was difficult to work with?

13         A    Again, I don't remember specific

14     conversations to that effect.

15         Q    How was she difficult to work

16     with, do you remember?

17              MS. CANFIELD:  Objection to

18          form.  You can answer.

19         A    Again, I'm just indicating that

20     this was a perception that I have heard from

21     many people about her reputation.

22         Q    But you're only --

23         A    I can't speak to what it was based

24     on.

25         Q    You're only naming two people.

1                    R. MACDONALD

2      You say many.  I want to hear the other

3      people.  Who are these other many -- two

4      people versus many, who are they?

5           A    This was a general sense from her

6      time at Bellevue as well.

7           Q    Well, who are the people at

8      Bellevue that had issues with her, that

9      found her to be difficult?

10          A    I don't know.  Again, it's just

11     reputational, so I don't know who the

12     specific people are.

13          Q    But you're saying you heard from

14     many people.  But right now you've only

15     given me two names.  Are there any other

16     names that come to mind?

17          A    So I should be more specific.

18     I've heard from those people who know many

19     more people at Bellevue and that many people

20     have said that over the years.  That she had

21     a reputation of being difficult to work

22     with.  And over the years, my experience

23     with her supervisors was that they found her

24     to be very difficult to work with.

25          Q    Who are the people who knew the

```
                              R. MACDONALD
 1
 2      folks at Bellevue who found Dr. Kaye

 3      difficult to work with?

 4           A    I'm sorry.  Say that again.

 5           Q    You said that there were people

 6      who knew that Dr. Kaye was difficult to work

 7      with at Bellevue.  Who was this person or

 8      people that knew that she was difficult to

 9      work with?

10           A    I don't know.  It's just a general

11      sense that the department, probably people

12      in the department.  I'm not sure

13      specifically.  And, again, I don't know the

14      staff who left the Bronx clinic.

15                It's hard to establish for sure

16      that somebody left because of the work

17      environment or of a specific coworker.  I'm

18      just telling you that there was a general

19      sense, that I became aware of early on, that

20      she had a reputation for that.

21                Now, my own personal approach

22      would always be to engage with someone

23      independently and not take that as truth.

24           Q    You do that?

25           A    Yes.
```

                        R. MACDONALD

1

2        Q    Okay.  When did you engage

3    Dr. Kaye independently?

4        A    Well, I didn't specifically engage

5    her independently because I wasn't her

6    supervisor.  But I certainly remained open

7    to working with her.  As did my direct

8    reports who were her direct supervisors.

9        Q    Did you ever speak to Dr. Kaye

10   directly?

11       A    I had very little interaction with

12   Dr. Kaye directly.

13       Q    When you had the very little

14   interaction with Dr. Kaye, do you remember

15   the context?

16       A    I don't remember a specific

17   conversation.

18       Q    I'm going to go into the pay

19   parity email.  You did receive this on

20   May 3rd; you see that, right?

21       A    Yes.

22       Q    So Dr. Yang responds to Dr. Kaye,

23   "Thank you for bringing your concerns to my

24   attention.  As you know, the decision was

25   made to postpone bringing the Bronx court

Page 132

1                        R. MACDONALD

2       clinic into the CHS until July 1, 2018.

3       Specifically so that you will be an employee

4       of Bellevue through June 30th, and therefore

5       eligible to receive the retention bonus."

6       Right?  You see that, right?

7             A    Yes.

8             Q    "As such, I will convoy these

9       serious concerns and your request to the

10      attention of Mr. William Hicks, CEO of

11      Bellevue."  Right?

12            A    Um-hmm.

13            Q    So first and foremost, you weren't

14      quite sure exactly when the Bronx court

15      clinic was actually brought into CHS.

16      Earlier I asked you was July 2018, you

17      weren't sure.  Now it's here.  Would you

18      agree that that's when it happened?

19            A    Yes.

20            Q    Okay.  And then, do you recall

21      anything that happened involving Dr. Kaye's

22      retention bonus?

23                 MS. CANFIELD:  Objection to

24            form.  You can answer.

25            A    I don't recall the specifics.  I

1              R. MACDONALD

2     recall that it was raised as an issue about

3     whether the retention bonus would be paid

4     out, given the fact that it's in a

5     transition.

6          Q    At any point did Dr. Kaye question

7     or, I guess, dispute the amount that she was

8     paid for her retention bonus?

9          A    I don't recall that the amount was

10    an issue.

11         Q    So you don't recall that Dr. Kaye

12    had issues that she wasn't paid the full

13    20,000 that she was entitled to?

14         A    No.

15         Q    At any point -- I'm going to keep

16    going along with this.

17              Now, Dr. Kaye then goes into prior

18    to Dr. Yang's response.  I want to bring

19    your attention to the second paragraph.

20              She says, "I learned from my union

21    that H&H is known -- is a known pay

22    disparity between male and female physicians

23    who are doing the exact same work.  This has

24    been my situation.  Dr. Stephen Circic,

25    medical director of the Manhattan court

1                         R. MACDONALD

2        clinic was a physician specialist line.  He

3        worked 80 percent of the full-time line and

4        his extrapolated full-time salary was

5        approximately 30 percent higher than mine."

6                  You see that, right?

7        A     I see that, yes.

8        Q     Are you familiar with Steve

9        Circic?

10       A     No.

11       Q     Did you ever meet Steve Circic?

12       A     Not that I'm aware of.

13       Q     Do you recall who is responsible

14       for determining Dr. Circic's title?

15       A     No.

16       Q     Or salary?

17       A     No.

18       Q     Now, prior to this email on May 3

19       of 2018, had you heard any complaints from

20       Dr. Kaye, directly or indirectly, about pay

21       disparities?

22       A     Not that I'm aware of.

23       Q     Now, when this email was brought

24       to your attention, were any efforts made to

25       address this through your office?

Page 135

1                          R. MACDONALD

2          A     So I can certainly confirm that

3     Dr. Yang was working on that, since it was

4     addressed to her, and she was my supervisor,

5     and she oversaw finance, HR, and managed the

6     relationship with Bellevue.  Which seems to

7     be where the allegation is coming from her

8     time at Bellevue, as far as I can tell from

9     reading this email.

10         Q     Now, Dr. Kaye actually asked if

11    she can be placed in the physician's

12    specialist line.  Was there anything that

13    stopped you or anyone else from allowing her

14    to transition to that line rather than the

15    attending physician position that she had?

16                    MS. CANFIELD:  Objection to

17           form.

18         A     I don't recall.

19         Q     Now, what's your understanding,

20    what would be the qualifications for

21    physician specialist?

22         A     I don't know.

23         Q     What is your understanding of

24    physician specialist?

25                    MS. CANFIELD:  Objection to

```
 1                      R. MACDONALD
 2             form.  You can answer.
 3         A    It's a title within probably
 4    governed by collective bargaining agreements
 5    that probably has a specific pay rate
 6    associated with it.
 7         Q    Why was Steve Circic a physician
 8    specialist and not Dr. Kaye?
 9         A    I don't know.
10                MS. CANFIELD:  Objection.
11         Q    Now, Dr. Kaye was at attending
12    physician level three.  Do you recall that?
13         A    No.  I wasn't aware of that level
14    of specificity.
15         Q    Do you know the difference between
16    attending physician versus a physician
17    specialist?
18         A    Not the details of the
19    distinction.
20         Q    But both covered by the collective
21    bargaining agreement; am I right?
22         A    I believe so, yes.
23         Q    So why is it that Dr. Kaye was not
24    able to transition the physician specialist
25    line once CHS absorbed the Bronx court
```

```
 1                     R. MACDONALD
 2      clinic?
 3           A    I don't know.
 4           Q    Who would have made that
 5      determination?
 6           A    It would have been Dr. Yang in
 7      consultation with the HR leadership,
 8      Mr. Wangel, Ms. Laboy.
 9           Q    And you're in that leadership, I
10      mean, right?  You report to Dr. Yang; am I
11      right?
12                     MS. CANFIELD:  Objection to
13                form.
14           A    I do.
15           Q    Would Mr. Wangel and Ms. Laboy be
16      your, I guess, peer as far as level of
17      seniority in the organization?
18           A    At that time Ms. Gillen was
19      probably my peer.
20           Q    So she was more senior to these
21      other actors who were making these
22      determinations; am I right?
23                     MS. CANFIELD:  Objection to
24                form.  You can answer.
25           A    Yes.
```

1                     R. MACDONALD

2          Q    And so you are aware that Dr. Kaye

3     is a triple board certified physician,

4     right?

5                     MS. CANFIELD:  Objection to

6               form.  You can answer.

7          A    I believe that I've heard that

8     before, yes.

9          Q    And if that indeed is the case,

10    then why wouldn't she be a physician

11    specialist versus an attending level three?

12         A    I don't know the details of those

13    lines, nor the history of her career

14    trajectory compared to this other person.

15         Q    Did you look into this once you

16    saw this email?  I mean, this email has

17    fairly serious implications, would you

18    agree?

19                    MS. CANFIELD:  Objection to

20              form.  You can answer.

21         A    Again, this email was directed to

22    my supervisor and I confirmed that it was

23    received and that she was working on it.

24         Q    What did Dr. Yang tell you about

25    her position regarding Dr. Kaye's complaint?

1                          R. MACDONALD

2           A     I don't think we discussed it

3     really.

4           Q     So you never discussed Dr. Kaye's

5     complaint with Dr. Yang?

6           A     Not that I recall, no.

7           Q     Do you recall Dr. Weiss?

8           A     Yes.

9           Q     And what do you remember about

10    Dr. Weiss?

11          A     Dr. Weiss is a doctor in the --

12    who was initially in the Manhattan court

13    clinic.

14          Q     Where is he now?

15          A     He's now a director of the Bronx

16    court clinic.

17          Q     And Dr. Weiss is in the physician

18    specialist line; are you aware of that?

19                MS. CANFIELD:  Objection to

20          form.

21          A     I was not aware of that.

22          Q     So why would Dr. Weiss be in the

23    physician specialist line and not Dr. Kaye?

24                MS. CANFIELD:  Objection to

25          form.  Lacks foundation.

1                    R. MACDONALD

2          A     I don't know.

3          Q     So I'm going to direct your

4    attention to another exhibit, and this would

5    be Plaintiff's Exhibit 6.

6                         (Whereupon, Email (NYC_204-207)

7                         was marked as Plaintiff's

8                         Exhibit 6 for identification as

9                         of this date.)

10         Q     And Plaintiff's Exhibit 6 bears

11   the Bate Stamp series NYC204 through 207.

12   And I'm going to share the screen now.

13              MS. CANFIELD:  Do you know

14         when that was provided?

15              MS. HAGAN:  That was

16         previously produced?  Not today.

17              MS. CANFIELD:  Thank you.

18              That's 204 to 207?

19              MS. HAGAN:  Yes, 207.

20         Q     I'm going to start at the bottom

21   of the email.  The bottom of the email deals

22   with Dr. Kaye's complaint of the pay parity.

23   You see that, right?

24         A     Um-hmm.

25         Q     And then the subsequent email is

1                      R. MACDONALD

2       from Dr. Yang to Ms. Gillen, Jessica Laboy,

3       yourself, Dr. Ford, Aaron Anderson that you

4       referenced earlier, I guess, this guy from

5       finance, right?

6            A    Yes.

7            Q    And Mr. Wangel; am I right?

8            A    Yes.

9            Q    And at this point, Dr. Yang is

10      asking for collective input, right,

11      regarding her complaint?  You see this,

12      right, Dr. Kaye's complaint?

13           A    Yeah.  I mean, the email is

14      directed to Sarah Gillen and Jessica Laboy.

15      The others are CC'd.

16           Q    Right.  But you all have, I guess

17      the CC'd individuals with the exception of

18      Mr. Wangel and Mr. Anderson, you and

19      Dr. Ford are probably closer to Dr. Kaye

20      than the other individuals on this email; am

21      I right?

22                    MS. CANFIELD:  Objection to

23               form.  You can answer.

24           A    In the organizational chart, but I

25      interpret the to line to mean that those are

Page 142

1                          R. MACDONALD

2        the people who are primarily responsible for

3        the next steps and the others are CC'd for

4        awareness.

5             Q    I'm going to scroll up some.

6                  Dr. Yang again emails now you and

7        Ms. Gillen and then Dr. Ford.  It's to

8        everyone at this point.  I don't know if

9        that's any delineation in your mind at this

10       point, but here you have on May 3rd at 3:36.

11                 She says, "In the meantime, we

12       should brainstorm for July, but not the

13       entire FPECC crew.  I propose to send her

14       this reply below and separately sanitize her

15       email and send it to Bill and copy her,

16       removing editorials and elephantine quotes."

17                 Do you recall what she was

18       referencing when she said elephantine?

19            A    I don't know what she meant by

20       that.

21            Q    At some point Dr. Kaye alleged

22       that Dr. Ford said to her that, when she

23       brought up the pay parity issue in the past,

24       that getting things done like around here is

25       like herding elephants.

Page 143

1                       R. MACDONALD

2               Do you recall anything like that

3        being said or relayed to you?

4               A    No.

5               Q    At any point did Dr. Ford talk to

6        you about Dr. Kaye's complaints about pay

7        parity?

8               A    No.

9               Q    She never discussed that she tried

10       to address the issue with Dr. Kaye?

11              A    Not that I'm -- I don't recall the

12       outcome of the discussion that was set off

13       by this email.

14              Q    Did Dr. Ford ever have any

15       influence on how much each director got paid

16       at their respective clinics?

17              A    She wouldn't be the final decision

18       maker, she'd propose salary increases for

19       specific reasons.  And those would go to HR,

20       and that would have to be sorted out with HR

21       and finance, and also understanding the

22       collective bargaining agreement and how

23       those impact people's compensation.

24              Q    But to be clear, the final

25       decision maker in terms of salary and the

1                          R. MACDONALD

2      actual, I guess corporate title would have

3      been Dr. Yang; am I right?

4              MS. CANFIELD:  Object to the

5          form.  You can answer.

6      A     Yeah.  When Dr. Yang is involved

7      in a discussion at this level, she would be

8      the ultimate decision maker, yes.

9      Q     So Dr. Yang proposed the following

10     language: "Dr. Kaye, thank you for bringing

11     your concerns to my attention.  As you know,

12     the decision was made to postpone -- and

13     this is what we talked about earlier, right?

14     A     Yes.

15     Q     So now I'm going to scroll up

16     more, right.

17     A     Yeah.

18     Q     Then Jonathan Wangel says, "This

19     is a EEO.  Strongly suggest Blanch should be

20     moved in."

21              Now, why Blanch Greenfield being

22     moved into this?

23              MS. CANFIELD:  Objection to

24          form.  You can answer if you're

25          able.

```
 1                    R. MACDONALD

 2         A    I don't know.

 3         Q    Who is Blanch Greenfield?

 4         A    Blanch Greenfield is a I believe

 5    labor attorney.  I don't know her exact

 6    title.

 7         Q    Was she ever the agency EEO

 8    officer?

 9         A    I don't know.

10         Q    But she's an attorney; you would

11    agree to that, right?

12         A    I believe so, yes.

13         Q    Did you ever confer with

14    Ms. Greenfield about Dr. Kaye?

15         A    No.

16         Q    Did you ever confer with

17    Ms. Greenfield about any EEO matters?

18         A    No, not exactly.  I think I may

19    have conferred with Ms. Greenfield about

20    that matter that I mentioned to you

21    regarding Nicole Adams-Flores, who was an

22    employee of the Department of Correction.

23         Q    When you reference

24    Ms. Adams-Flores, what do you recall about

25    that?
```

```
 1                      R. MACDONALD
 2        A     About that matter or?
 3        Q     Yes.  About Ms. Flores' complaint
      in terms of -- let's start with, what was
 4
 5    your position in relation to Dr. Adams
 6    Flores?
 7                MS. CANFIELD:  Objection to
 8          form.  You can answer.
 9        A     So I was just performing the
10    duties that we discussed here, along the
11    time course that we did.  So chief of
12    medicine and then chief medical officer.
13        Q     Did Dr. Adams-Flores report to
14    you?
15        A     No.
16        Q     How did you interact with her,
17    then?
18        A     Well, she was not even part of
19    Health and Hospitals or CHS.  She was -- had
20    a position within the Department of
21    Correction, which involves some interface
22    with health services.  So we would interact
23    in that capacity.
24        Q     So why did you engage
25    Ms. Greenfield about Dr. Adams-Flores?
```

Page 147

```
 1                    R. MACDONALD
 2              MS. CANFIELD:  Objection.  You
 3         can answer.  To the extent it's not
 4         privileged.
 5      A    As I mentioned, Ms. Adams-Flores
 6    had several lawsuits, as I understand it,
 7    against her employer, and some of those
 8    expanded to include members of CHS, and I
 9    was named in one of those.
10      Q    How was she able to name you in
11    her lawsuit, Dr. MacDonald, if you did not
12    supervise her?
13              MS. CANFIELD:  Objection to
14         form.  You can answer if you're
15         able.
16      A    That's a good question.  I don't
17    know the answer to that.  That's probably
18    the content of my discussion with
19    Ms. Greenfield.
20      Q    How often did you speak to
21    Dr. Adams-Flores?
22      A    Probably a couple times a month.
23      Q    Did you have the ability to impact
24    the conditions of her employment?
25      A    I don't think so.  In general, she
```

1                              R. MACDONALD

2        may have had a position that involved

3        interface between agencies.  So one could

4        imagine that we might have feedback for how

5        she was doing in that role, but nobody ever

6        solicited such feedback from me.

7             Q    At one point didn't

8        Dr. Adams-Flores seek reasonable

9        accommodation from Dr. Yang and Dr. Yang

10       denied her request?

11                      MR. ABRAMOFF:  Objection to

12               form.  You can answer.

13            A    I remember something to that

14       effect, yes, in her prior employment.

15            Q    How Dr. Yang have the ability to

16       affect or to deny her request for leave?

17                      MS. CANFIELD:  Objection to

18               form.  You can answer.

19            A    I think that that allegation was

20       made from a time when she was previously

21       employed by CHS.

22            Q    So at that time you were also

23       employed with CHS, right?

24            A    Yes.

25            Q    And so wouldn't Dr. Adams-Flores

```
 1                       R. MACDONALD
 2      have been under your supervision if she was
 3      under Dr. Yang's supervision?
 4          A     No.  Because I was the chief of
 5      medicine and she worked in mental health.
 6          Q     So you had no part in mental
 7      health?
 8          A     Correct.
 9          Q     Even though she was a clinician?
10          A     At that time, correct.
11          Q     But Dr. Adam-Flores' request for
12      reasonable accommodation dealt with child
13      care issues and pregnancy.  Do you recall
14      that?
15                MS. CANFIELD:  Objection to
16             form.  It's a completely different
17             lawsuit, but you can answer if
18             you're able.
19          A     I learned about that after the
20      fact.
21          Q     And Dr. Kaye had child care issues
22      as well; you're aware of that, right?
23                MS. CANFIELD:  Objection to
24             form.  You can answer.
25          A     I don't remember that
```

1                          R. MACDONALD

2       specifically, actually, but.

3              Q     You don't recall Dr. Kaye

4       complaining the shift change is impacting

5       her ability to provide child care for her

6       children?

7                     MS. CANFIELD:  Objection to

8                form.  You can answer.

9              A     I remember that she had a problem

10      with the shift change.  I don't believe I

11      was involved at that level of detail.

12             Q     At any point did it come to your

13      attention that Dr. Ford had issues with

14      child care?

15                    MS. CANFIELD:  Objection to

16               form.  You can answer if you're

17               able.

18             A     At times.

19             Q     Wasn't Dr. Ford allowed to have a

20      flexible schedule so she could address her

21      child care issues?

22                    MS. CANFIELD:  Objection to

23               form.  You can answer.

24             A     Dr. Ford was a manager and she had

25      a flexible managerial schedule.

```
1                    R. MACDONALD

2        Q    And you're saying that Dr. Kaye

3    was not a manager?

4        A    I don't believe that she was

5    because she was in a represented title.

6    That's maybe a technical distinction within

7    HR, but she was paid hourly, is my

8    understanding, versus being a manager, which

9    would require to come out of the union.

10       Q    So you're saying that Dr. Kaye for

11   over 20 years was paid an hourly rate?

12            MS. CANFIELD:  Objection to

13        form.  You can answer.

14       A    What I'm saying is that she was

15   represented and in a union and in a union

16   title, and that the roles for those are

17   different.

18       Q    Now, you are aware that Dr. Kaye

19   had a flexible schedule up until CHS took

20   over management; am I right?

21            MS. CANFIELD:  Objection to

22        form.  You can answer.

23       A    That seems plausible.

24       Q    And when you all took over

25   management, did all the center directors
```

Page 152

```
 1                    R. MACDONALD
 2      have the same hours?
 3                    MS. CANFIELD:  Objection to
 4           form.  You can answer.
 5           A    I believe trying to standardize
 6      that was part of the standardization that I
 7      referred to.
 8           Q    The question is, did they actually
 9      have the same hours as Dr. Kaye?
10           A    I don't know.
11           Q    Do you know if any of the other
12      managers had their hours changed upon the
13      transition?
14                    MS. CANFIELD:  Objection to
15           form.
16           A    My understanding was that it was a
17      standardization across the board.
18           Q    My question to you is, do you know
19      for a fact that all of the center directors
20      had the same hours?
21           A    No.
22           Q    And my next question was, do you
23      know if any of the other center directors
24      had their shift change upon the absorption
25      of the court clinics?
```

```
 1                    R. MACDONALD
 2        A    No.
 3        Q    Now, Dr. Yang then responds to you
 4   guys, "I can do that, but then I'm dumping
 5   BHC into the soup."
 6             Is BHC Bellevue?
 7        A    Yes.
 8        Q    "I don't know and I don't want to
 9   know what they did to address her EEOC
10   issues."  You see that, right?
11        A    Yes.
12        Q    Now, it doesn't sound like she's
13   trying to deal with the problem if she says
14   she doesn't want to know.
15             What is your position on that?
16             MS. CANFIELD:  Objection to
17        form.  You can answer.
18        A    I think she's referring to the
19   fact that a prospective employer who will be
20   employed with us in the future in this
21   arrangement is making an allegation about
22   her current and long standing employer, who
23   is distinct from CHS.
24        Q    But the pay disparity continued
25   when she was absorbed in CHS; am I right?
```

Page 154

1                          R. MACDONALD

2                    MS. CANFIELD:  Objection to

3              form.  You can answer.

4          A    Well, again, I don't know the

5     details.

6          Q    Now, Dr. Kaye complained that she

7     was only the director that was required to

8     work nine hours a day.  Were the other

9     directors required to work nine hours?

10                   MS. CANFIELD:  Objection to

11             form.  You can answer.

12         A    I don't know.

13         Q    Now, then there's an email from

14    Sarah Gillen to Dr. Yang, Jonathan Wangel,

15    yourself, et cetera.  And now she says,

16    "Jessica is reviewing the salary at the time

17    we planned the transition.  I believe at the

18    time she was the highest paid, but Jessica

19    will confirm the numbers.  Right.  At this

20    moment two of her colleagues transitioned to

21    management roles which has increased their

22    pay above hers, but doesn't consider the

23    union benefits, differentials, et cetera,

24    that she receives.  Jessica will send in

25    full shortly."

1                    R. MACDONALD

2          Now, do you recall that email?

3     A    I don't remember this email

4     specifically, but I do remember in general,

5     that there was a pathway for her to become a

6     manager that may have increased her

7     compensation and she was not interested in.

8     I believe that to be the outcome, as I

9     understood it, of this matter.

10         Q    Dr. Kaye alleges that the

11    physician specialist title was still a union

12    title that would have allowed her to

13    increase her salary, and also it was a title

14    that Steve Circic and Dr. Weiss had had.

15             Why wasn't that an opinion rather

16    than her role as a managerial title?

17             MS. CANFIELD:  Objection to

18         form.  You can answer.

19    A    Yeah.  I mean, as a general rule,

20    we try to have managers in CHS be in

21    managerial titles and not be represented.

22         Q    But Dr. Weiss was in a managerial

23    title, why was it that he was able to work

24    in the physician specialist title?

25             MS. CANFIELD:  Objection to

Page 156

1                          R. MACDONALD

2              form.  There's no foundation.  You

3              can answer.

4         A    I'm not aware that that's the

5    case.

6         Q    What about Dr. Circic, why was he

7    allowed to work in that title?

8                   MS. CANFIELD:  Objection.

9         A    I am not aware of that at

10   Bellevue.

11        Q    Then Dr. Yang responds, "Thanks,

12   no urgency for the -- info.  We will need to

13   be able to offer a position that suits the

14   needs at FPECC.  It is fair and equitable to

15   the scope and responsibility.  We can offer

16   her a management position comparable to

17   Winkler and Mundy to run the Bronx under us.

18   Talk later."

19                   Now, do you recall what

20   Dr. Winkler's role was prior to his

21   promotion?

22                   MS. CANFIELD:  Objection.  You

23              can answer.

24        A    No.

25        Q    When you met Dr. Kaye, where was

Page 157

1                        R. MACDONALD

2       Dr. Winkler working?

3             A    I think he was one of the

4       examiners in Brooklyn, if I'm not mistaken.

5             Q    Dr. Winkler worked under Dr. Kaye;

6       would you agree with me?

7             A    Oh, yes.  I'm sorry.  I'm

8       mistaken.  Yes.

9             Q    And Dr. Kaye trained Dr. Winkler;

10      am I right?

11                    MS. CANFIELD:  Objection to

12             form.

13            A    I don't know that.

14            Q    Would you say that Dr. Kaye was

15      the longest serving forensic evaluator of

16      the FPECC system?

17            A    I don't know that specifically.  I

18      have no reason to dispute it, though.

19            Q    Let's keep going.

20                    Do you recall seeing this chart,

21      the salary from Jessica Laboy?

22            A    No.  I am copied on this email, so

23      I probably reviewed it but...

24            Q    Yeah.  You are copied.

25                    Now, this Kanish Salonki

```
 1                      R. MACDONALD

 2       (phonetic), is this a man or a woman?

 3            A    I don't know.

 4            Q    Oliver Harper, I'm taking that's a

 5       male, right?

 6            A    Yes.

 7            Q    You met Dr. Mundy; am I right?

 8            A    Yes.

 9            Q    Then you have Dr. Kaye.  Now,

10       there's a dispute about exactly how much she

11       was actually paid at this time.  It says

12       here that her salary is $191,571.  However,

13       Dr. Kaye does not agree with that.

14                 What documents do you know were

15       used to determine exactly what the salary

16       was?

17            A    I don't know.

18            Q    Why was Dr. Mundy a senior

19       director?

20                 MS. CANFIELD:  Objection to

21            form.  You can answer.

22            A    So here I believe that senior

23       director refers to a managerial title, that

24       he would be moving into.

25            Q    But Dr. Mundy didn't have anywhere
```

Page 159

1                         R. MACDONALD

2       near as much experience as Dr. Kaye.  Why

3       was he allowed to work in a senior director

4       capacity and she was not?

5                    MS. CANFIELD:  Objection to

6               form.  You can answer.

7            A    Yeah.  I believe that was because

8       he was a managerial position.

9            Q    He also happens to have a higher

10      civil service title here.  Dr. Kaye is

11      listed as an attending physician two, and

12      Dr. Mundy is listed as an attending

13      physician three.  Why is that?

14                   MS. CANFIELD:  Objection to

15              form.  You can answer.

16           A    I don't know.  All this would be

17      before CHS took over the clinic.  So I'm not

18      sure what the explanation for that would be.

19           Q    Were you aware that Dr. Kaye's

20      salary dropped after this pay differential

21      was actually administered to her?

22                   MS. CANFIELD:  Objection to

23              form and foundation.  You can

24              answer.

25           A    No.

```
 1                    R. MACDONALD
 2        Q    But you have no explanation for
 3   why Dr. Mundy was in a higher corporate
 4   title than Dr. Kaye, right?
 5             MS. CANFIELD:  Objection to
 6        form.  Asked and answered.  You can
 7        answer again.
 8        A    No.
 9        Q    And you have no idea why she was
10   in a higher organizational title, right?
11             MS. CANFIELD:  Objection to
12        form. You can answer again.
13        A    Well, I think you're
14   misrepresenting that column where it says
15   new title with CHS.  Again, that's
16   reflective of a managerial position that was
17   also offered to Dr. Kaye.
18        Q    But there's nothing in writing
19   that said that it was offered to her; am I
20   right?
21             MS. CANFIELD:  Objection to
22        form.  You can answer.
23        A    I don't know.
24        Q    Who would have provided Dr. Kaye a
25   written offer of the managerial title?
```

1                          R. MACDONALD

2          A     I think it would be an informal

3     discussion of her options first.  Then if

4     she indicated that she was not interested in

5     coming out of the union, that would be a

6     limitation to the positions that she might

7     be offered.

8          Q     She asked for the physician

9     specialist title, why couldn't she get that?

10                    MS. CANFIELD:  Objection to

11              form.  Asked and answered.  You can

12              answer again.

13         A     I don't know.

14         Q     Would you agree that the physician

15    specialist title was a higher paid title

16    than the attending physician title?

17                    MS. CANFIELD:  Objection to

18              form.  You can answer.

19         A     That's my assumption, yes.

20         Q     Now, CHS lowered Dr. Kaye from an

21    attending physician three to an attending

22    physician two.  Wouldn't that be a violation

23    of the collective bargaining agreement?

24                    MS. CANFIELD:  Objection to

25              form.  No foundation.  You can

Page 162

1                        R. MACDONALD

2              answer.

3         A    I'm not aware of that happening.

4         Q    Well, she's attending physician

5    two here, right?

6         A    That's what's written on this

7    email.

8         Q    Now, being that she's the most

9    senior person here, wouldn't she have been

10   an attending physician three at some point?

11        A    I don't know where the information

12   from this email came from.  Again, she was

13   employed by Bellevue at that time.

14        Q    So you would disagree that she was

15   an attending physician three at Bellevue?

16        A    No.  I just don't know.

17        Q    So now I'm going to show you

18   what's going to be marked as Plaintiff's

19   Exhibit 7.

20              MS. CANFIELD:  Ms. Hagan, I

21              was wondering, after this exhibit or

22              perhaps before, is it possible we

23              can take a lunch break or bathroom

24              break, or refreshment break or

25              something?

Page 163

1                           R. MACDONALD

2                    MS. HAGAN:  Why don't we take

3               a lunch break.  Why don't we get

4               back together at two.

5                    MS. CANFIELD:  Do you

6               anticipate this deposition going all

7               day to six?

8                    MS. HAGAN:  Yeah.

9                    (Whereupon, a recess was taken

10                   from 1:06 p.m. to 2:06 p.m.)

11          Q    Now, Dr. MacDonald, I'm going to

12     show you what's going to be marked as

13     Plaintiff's Exhibit 7.

14          A    Okay.

15          Q    Plaintiff's Exhibit 7 bears the

16     Bate Stamp series NYC379 to NYC380.

17                   MS. CANFIELD:  Was this sent

18             to me?

19                   MS. HAGAN:  Yes.  In October.

20                   MS. CANFIELD:  Thank you.

21                   (Whereupon, Email (NYC_379-380)

22                   was marked as Plaintiff's

23                   Exhibit 7 for identification as

24                   of this date.)

25          Q    It's an email from you,

Page 164

1                     R. MACDONALD

2        Dr. MacDonald, to Mr. Wangel and Ms. Laboy.

3        I'm going to scroll down to the bottom of

4        the email.  It starts on July 9, 2018.  And

5        it says, the subject is from you that says,

6        "Can you get me year to date pay for

7        everyone with the title attending

8        physician," right?

9             A     Uh-huh.

10            Q     Now, do you recall the context in

11       which this was sent, Dr. MacDonald?

12            A     I think we were trying to look at

13       some productivity measures for the clinical

14       staff working on Rikers Island.

15            Q     And what do you mean by

16       "productivity measures"?

17            A     Looking at different types of

18       encounters that they might be filling out in

19       the electronic health record, as a function

20       of how many shifts they've done or how much

21       they've been paid over a time period.

22            Q     And you were saying Rikers Island,

23       right?

24            A     Yes.  This was I think primarily

25       looking at the clinical care.

```
 1                    R. MACDONALD
 2        Q    I'm going to scroll up here.
 3    There's an email from you from I guess -- I
 4    guess there's another email from Mr. Wangel
 5    to you and Ms. Laboy.
 6             You see that, right?
 7        A    Um-hmm.
 8        Q    And the response the year to date
 9    through July 13th is Villar.
10             Do you know who that person is?
11        A    No.
12        Q    Dr. Kaye.
13        A    Yes.
14        Q    Dr. Weiss.
15        A    Yes.
16        Q    Dr. Harper.
17        A    Yes.
18        Q    And Dr. Solanki.
19        A    Yeah.
20        Q    Now, do you recall the breakdown
21    as to whether or not these other individuals
22    were full-time employees versus part-time
23    employees?
24        A    No.
25        Q    So then we're going to scroll up.
```

1                          R. MACDONALD

2       And you say, "Oh, sorry, I meant for PAGNY

3       jail care.  I realize that might take a

4       while and it's not urgent."

5                    What do you mean by that?

6           A    Well, I confirmed from what I

7       suspected is that I was intending to look at

8       the clinica care in the jail facilities, and

9       that's why I requested this information.

10          Q    So you weren't trying to address

11      the pay parity issues involved with

12      Dr. Kaye?

13          A    No.

14          Q    But you never followed up here

15      after these individuals were listed, right?

16                   MS. CANFIELD:  Objection to

17              form.  You can answer.

18          A    Yeah.  That's correct.  That

19      wasn't the information I was looking for.

20          Q    So you basically weren't looking

21      into this yourself at all?

22          A    No.  Not in that instance.

23          Q    In any instance did you look into

24      the matter?

25          A    Again, as we discussed previously

```
 1                      R. MACDONALD

 2      in the deposition, just to confirm that

 3      Dr. Yang and our HR staff were investigating

 4      that.

 5          Q    I'm going to show you some more

 6      emails.

 7               Now, we talked about, you said

 8      that Dr. Kaye made a number of complaints,

 9      right?

10          A    Yes.  I was referring specifically

11      to the letter which summarized most of them,

12      I think.

13          Q    Right.  But there were other

14      complaints prior to that.  Do you recall an

15      inmate by the name of Miguel Figueroa?

16          A    The name is familiar to me.

17          Q    What do you remember?

18          A    I'm not remembering the specifics

19      of his care or evaluation.

20          Q    Do you recall him being the EMT

21      killer?

22               MS. CANFIELD:  Objection to

23          form.  You can answer.

24          A    No.

25          Q    You said no?
```

Page 168

```
 1                      R. MACDONALD

 2          A    That's correct.  I don't.

 3          Q    Do you recall him presenting

 4     issues regarding force orders?

 5          A    No.

 6          Q    Do you recall Dr. Kaye raising

 7     concerns about the force order, or I guess

 8     trying to circumvent the force order

 9     process?

10               MS. CANFIELD:  Objection to

11          form.  You can answer.

12          A    No.

13          Q    Do you recall Dr. Kaye raising

14     concern about redacted medical records?

15               MS. CANFIELD:  Objection to

16          form.  You can answer.

17          A    Yes.

18          Q    So let's do that, then.

19               Plaintiff's Exhibit 8 bears the

20     Bate Stamp series -- I guess to be clear,

21     and I just want to make sure before I move

22     on a topic, at any point did you recall

23     Dr. Yang raising any questions or concerns

24     about getting Mr. Figueroa off of Rikers

25     Island because he was a disruptive inmate?
```

Page 169

```
 1                      R. MACDONALD

 2          A    No.

 3          Q    Do you recall Dr. Yang inquiring

 4     or I guess trying to figure out or getting

 5     him declared unfit so that he could be moved

 6     off the island?

 7                    MS. CANFIELD:  Objection to

 8               form.  You can answer.

 9          A    No.

10          Q    Do you recall anything having to

11     do with Jose Gonzalez being the EMT killer?

12          A    No.

13          Q    So let's just go -- we'll get to

14     that.  Now, this will be marked at

15     Plaintiff's Exhibit 8.

16                        (Whereupon, Email (NYC_75-76)

17                         was marked as Plaintiff's

18                         Exhibit 8 for identification as

19                         of this date.)

20          Q    And Plaintiff's Exhibit 8 bears

21     the Bate Stamp series NYC75 to NYC76, right?

22     Let me go down to the bottom of the exhibit.

23                    MS. CANFIELD:  And, again,

24               this was sent to me?

25                    MS. HAGAN:  This was in
```

Page 170

1                    R. MACDONALD

2          October.

3                    MS. CANFIELD:   Thank you.

4          Q     It's from Patrick Alberts to

5     Dr. Yang.  Who is Patrick Alberts?

6          A     Patrick Alberts was, I believe in

7     charge of risk management and some aspects

8     of our policies for CHS.

9          Q     And she says, "Judge Torres wants

10    to hold us in contempt."  And that's what

11    Mr. Alberts says to Dr. Yang.  Just spoke to

12    Aaron again --

13         A     I'm sorry.  Can you scroll down to

14    show me that.

15                    MS. CANFIELD:  Just let the

16             witness read the entire email thread

17             if you'd like him to comment on it.

18                    MS. HAGAN:  Sure.

19         Q     Let's start from the very

20    beginning.  You see this, right; from

21    Dr. Yang to Mr. Alberts, right?

22         A     Yes.

23         Q     It says, "Our courts are using

24    boilerplate language requesting records."

25    That's the question that she posted to him

Page 171

1                      R. MACDONALD

2      on February 1st, 2018, right?

3           A    Yes.

4           Q    Then Mr. Alberts' response, "I

5      spoke with Erin at MOCJ yesterday about this

6      judge again and asked Lucy to provide the

7      correct language for subpoena, which she

8      did.  He may have the misperception that his

9      730 orders entitle him to substance use

10     information, which they do not.  Erin

11     assured me that she would speak with him and

12     report back.  I'm not sure if there is some

13     kind of miscommunication or recalcitrance at

14     this point, but he seems to be refusing our

15     boilerplate language.  I didn't know about

16     the contempt threat."

17               Now, who is Erin?

18          A    I don't know.  Apparently someone

19     at the mayor's office of criminal justice,

20     but I don't know specifically.

21          Q    Who is Lucy?

22          A    Lucy is another attorney that

23     worked, I think, in Health and Hospitals.

24          Q    Did you have any part in the

25     boilerplate language regarding the 730

```
 1                    R. MACDONALD
 2      orders?
 3           A    No.
 4           Q    So you didn't confer with anyone,
 5      you didn't review it or anything for
 6      substance?
 7                MS. CANFIELD:  Objection to
 8             form.  You can answer.
 9           A    No.
10           Q    So now we're going to move up.
11                Now, Mr. Alberts is an attorney
12      advising staff in his legal capacity; would
13      that be accurate?
14                MS. CANFIELD:  Objection to
15             form.  You can answer.
16           A    I'm not sure about that.  He was
17      an administrator.  I don't think he was
18      acting as an attorney.
19           Q    But he is an attorney, though?
20           A    He is trained as an attorney, yes.
21           Q    So, then, Mr. Alberts responds to
22      Dr. Yang, "Just spoke with Erin again.  She
23      said Judge Torres is fine using the
24      boilerplate subpoena, and understands
25      limitations.  However, he said that Dr. Kaye
```

1                          R. MACDONALD

2       is refusing to perform the examination until

3       she receives the entire unredacted record.

4       It says this problem is entirely unique to

5       her, at least with respect to Judge Torres.

6       On one hand I'm glad that the judge isn't

7       the problem, but how do you think we should

8       approach the provider, if at all.  In this

9       case she's asking for something she legally

10      can't have.  I don't think it would be

11      appropriate for us to approach the patient

12      and obtain an authorization, and it's

13      doubtful his attorney will either."

14              Now, how is Mr. Patrick or telling

15      Dr. Yang that Dr. Kaye is not legally

16      entitled to unredacted medical records?

17              MS. CANFIELD:  Objection to

18          form.  You can answer if you're

19          able.

20      A    As I was discussing previously, we

21      had sought to reduce any administrative

22      barrier to receiving a full record, as far

23      as what's legal, and I think Patrick Alberts

24      was looking into that in conjunction with, I

25      don't know, counsel from H&H or from the

1                    R. MACDONALD

2     City.  And had clarified the legalities of

3     that under New York State law, to require

4     authorization from the patient to allow for

5     the release of this information, even in the

6     circumstance.  That's my understanding.

7            Q     Who redacted the medical --

8            A     What he's referring to.

9            Q     So who would have been responsible

10    for redacting the inmates' medical records?

11           A     If they are from correctional

12    health services, then it would be our

13    medical record staff.

14           Q     Who manages the medical records

15    staff?

16           A     At the time, it was probably

17    Patrick Alberts.

18           Q     Who did Patrick Alberts report to?

19           A     Patsy Yang.

20           Q     Directly?

21           A     Yeah.

22           Q     What was Mr. Alberts' title

23    exactly?

24           A     I don't remember his exact title.

25           Q     But he reported to Dr. Yang?

Page 175

1                        R. MACDONALD

2         A     Yes.

3         Q     So then Dr. Yang responds, "So I

4    went down Kaye's rabbit hole, which included

5    MOCJ thinking the judge was the problem.

6    Not so.  If she stays, we need to deal with

7    this.  Need your FPECC Uber clinician on

8    board."  Right?

9              Now, did it come to your attention

10   at some point that Judge Torres was

11   threatening to hold you in content?

12                   MS. CANFIELD:  Objection to

13         form.  You can answer.

14        A     No.  I don't think I was aware of

15   that.

16        Q     So no one ever told you this at

17   any point?

18        A     Not that I recall.

19        Q     And, then, what does Dr. Yang mean

20   when she says, "If she stays, we need to

21   deal with this"; what is she talking about,

22   Dr. Yang?

23        A     Well, I would be speculating, but

24   I think what she's talking about is this

25   level of delay and complexity with the

1                    R. MACDONALD

2    evaluation that's been introduced by the

3    demand for substance use information, which

4    was not standard among other examiners in

5    FPECC, nor was standard within the field, as

6    I understand it.

7         Q    Now, is Dr. Kaye at fault for CHS

8    being in contempt to Judge Moore's order for

9    unredacted medical records?

10                   MS. CANFIELD:  Objection to

11             form.  You can answer if you're

12             able.

13        A    Of course not.  Nor were we in

14   contempt.

15        Q    Would you say that Mr. Alberts has

16   more knowledge than Judge Moore regarding

17   the medical records?

18                   MS. CANFIELD:  Objection to

19             form.  You can answer if you're

20             able.

21        A    Yes.  I think Mr. Alberts had

22   investigated this specific question with our

23   H&H and/or the City's law department, to

24   understand what are the legalities related

25   to the release of this information.  So,

Page 177

1                    R. MACDONALD

2    yeah, he was very expert on this question.

3         Q    So you thought he was more

4    knowledgeable than Judge Moore?

5                    MS. CANFIELD:  Objection to

6            form.

7         A    I have no idea who Judge Moore is.

8    I know that Patrick Alberts is extremely

9    expert on this question because he had been

10   investigating it with the help of attorneys

11   from H&H and the City.

12        Q    Who is this FPECC Uber clinician

13   that Dr. Yang is referencing or hoping to

14   have on board?

15        A    I think that she was referencing

16   that we needed to hire a director for the

17   clinics.

18        Q    And that would have been Dr. Jain?

19        A    It did turn out to be Dr. Jain.  I

20   think she was referring to that position.

21        Q    Was Dr. Kaye ever approached about

22   that position?

23                    MS. CANFIELD:  Objection to

24            form.  You can answer.

25        A    I don't know.

1                    R. MACDONALD

2         Q    Do you know why she was approached

3    or wasn't approached?

4              MS. CANFIELD:  Objection to

5              form.  Assumes facts.  You can

6              answer.

7         A    I don't know that she wasn't

8    approached.  I think, as I -- I don't know

9    exactly what the time course was.  She may

10   have, as we discussed previously, indicated

11   her unwillingness to come out of the union.

12   That's clearly a managerial position.

13             She may have at that point

14   demonstrated that she was resistent to the

15   entire project of CHS consolidating and

16   taking these clinics in the interest of

17   making things more efficient, in which case

18   she would not have been a good candidate for

19   this position.

20        Q    So you're saying that Dr. Kaye was

21   being resistent to the changes being made to

22   make the court clinics more efficient; is

23   that your position?

24        A    Yes.

25             MS. CANFIELD:  Objection to

Page 179

```
 1                   R. MACDONALD
 2          form.
 3          Q    And you said yes, right?
 4          A    Yes.  That's the impression that I
 5      gathered from managing two separate people
 6      with expertise in this area who were in
 7      charge of these clinics.
 8          Q    Dr. Kaye worked there longer than
 9      the two people that you're referencing.  She
10      worked in this capacity at the clinic for 20
11      years.  Now, Dr. Jain -- is that one of the
12      people you're referencing?
13          A    Yes.
14          Q    He hadn't even been hired yet.
15      This is February 2018.  Dr. Yang is looking
16      for this Uber director.  How is it that he
17      has more expertise than Dr. Kaye?
18                   MS. CANFIELD:  Objection.  You
19              can answer if you're able to
20              understand the question.
21          A    That's not what I'm contending.
22      I'm contending that Dr. Ford certainly may
23      have that assessment by then.  And that it's
24      not unusual in projects like these, that
25      people that have been there the longest are
```

```
 1                      R. MACDONALD
 2      the most resistant to change.
 3              So a person's tenure in the
 4      position doesn't mean that they are going to
 5      be a willing participant in the process to
 6      improve.
 7          Q   Did Dr. Kaye say she was resistant
 8      to change?
 9          A   No.  Again, that's my impression
10      from having managed two separate
11      professionals who I worked with closely and
12      trust, who struggled to manage her and --
13          Q   Did you ever speak to Dr. Kaye
14      yourself?
15              MS. CANFIELD:  Objection.
16              Asked and answered.  You can answer
17              again.
18          A   No.  I had very little interaction
19      with Dr. Kaye directly.
20          Q   But you had these two managers who
21      were struggling to manage her, that were
22      coming to you, I guess fairly periodically
23      about her.  Why didn't you take it upon
24      yourself to speak to her yourself?
25              MS. CANFIELD:  Objection to
```

1                    R. MACDONALD

2           form.  You can answer.

3           A    I think there are a couple of

4    layers of management in between.  There were

5    a lot of people dealing with a lot of the

6    different issues that she was raising.  They

7    tended to be, frankly, outside my area of

8    expertise, as you've established.

9                It wasn't disputes about the

10   content of clinical evaluations, it was

11   disputes around HR, around administrative

12   issues, around compensation.  And I made

13   sure that her direct supervisors had the

14   appropriate support from the leadership of

15   CHS, whose purview was those areas.

16          Q    Now, did you engage Dr. Bhatti

17   yourself?

18          A    I did, yes.

19          Q    Why?

20          A    I was in a different role at the

21   time.  It was a different relationship.

22          Q    So you were in a different role,

23   and that was in 2000, what, 16?

24          A    Yes.

25          Q    So you weren't chief medical

Page 182

1                        R. MACDONALD

2       officer, you were chief of what?

3            A    Chief of medicine.

4            Q    Medicine.  Who did Dr. Bati report

5       to?

6            A    Probably one of the psych medical

7       directors.

8            Q    Who did the psych medical director

9       report to?

10           A    Probably the assistant chief of

11      medicine.

12           Q    Who was that?

13           A    Would have been Louis Cintron or

14      Zach Rosner.

15           Q    So that's two people removed from

16      you at least, right?  Dr. Bati, right?

17           A    Yes.

18           Q    And Dr. Kaye is at least two

19      people removed from you as well here.  She

20      was -- there was Dr. Jain that she reported

21      directly to; is that right?

22           A    Yeah.  Dr. Jain reported to

23      Dr. Ford who reported to me.

24           Q    Right.  Who reported to you?

25           A    Yeah.  That would be three layers

Page 183

```
 1                    R. MACDONALD
 2       in that situation.
 3            Q    Well, Dr. Jain, Dr. Ford and then
 4       you, and Dr. Bati would be three layers; am
 5       I right?
 6            A    Psych medical director, assistant
 7       chief, then me, yes.
 8            Q    So Dr. Bati was further removed
 9       from you and you could directly intervene,
10       but Dr. Kaye was only two people removed
11       from and you did not; is that right?
12                    MS. CANFIELD:  Objection to
13                 form.  You can answer.
14            A    So I would just say they were
15       equally far removed in terms of the
16       organizational chart.  That's not the only
17       determining factor.  Every situation is
18       different.  It's not to say that any
19       personnel issue that included a person two
20       layers below me that I would become involved
21       in, simply because I was involved in that
22       issue.
23            Q    But you were very much, I guess,
24       engaged in this particular issue with
25       Dr. Kaye; am I right?
```

```
 1                    R. MACDONALD

 2                    MS. CANFIELD:  Objection to

 3              form.  You can answer.

 4         A    I was not that much engaged in it

 5     because, again, the content was so much the

 6     purview of the CHS leadership that dealt

 7     with HR, that dealt with administrative

 8     issues, that dealt with legal issues, that

 9     dealt with compensation.

10              So I was not so much engaged with

11     it.  And, as you know, Dr. Kaye was writing

12     directly to my supervisor, Dr. Patsy Yang

13     who was very involved.  So I was not so much

14     engaged with it, really through just a

15     natural division of labor where different

16     members of the team handled different

17     issues.

18         Q    Well, wasn't Dr. Bati's issues

19     revolving around administrative issues as

20     well?

21                    MS. CANFIELD:  Objection to

22              form.  You can answer.

23         A    Yes.  In that particular instance

24     I primarily became responsible for it.  So,

25     again, division of labor and different
```

Page 185

1                      R. MACDONALD

2     circumstances is part of how management is

3     done.

4          Q    So here you have an email from

5     Dr. Ford saying, "Does Jeremy know about

6     this absolutely ridiculous demand on Dr.

7     Kaye's part.  Standard practice in forensic

8     evals is to use whatever records we have,

9     form an opinion and note any limitation in

10    the formulation.

11              Now, did you do any independent

12    research to see if Dr. Ford was actually

13    right in her assertion here?

14         A    No.

15         Q    Did you reference the APPL

16    guidelines regarding medical records?

17         A    No.

18         Q    Or the ABA, for that matter?

19         A    No.

20         Q    "In any case, Kaye has been a

21    problem for a long time and we will manager

22    her out."  We talked about this earlier,

23    right?

24         A    Um-hmm.  Yes.

25         Q    Now, what was your reaction when

1                          R. MACDONALD

2        you saw that, Dr. MacDonald?

3            A    I wasn't on this email.

4            Q    Okay.  "Whenever I hear that Uber

5        director posted will send around like link

6        to forensic psych world.  Am sending first

7        candidate Ross's way for second opinion as

8        well."

9                 You're Ross, right?

10           A    Correct.

11           Q    Were you the person who ultimately

12       supported her decision to hire Dr. Jain?

13           A    I interviewed several candidates

14       for that position and we talked about their

15       relative strengths and weaknesses, but it

16       was ultimately her decision.

17           Q    But then here you are now on the

18       email.  Maybe you recognize this now.

19       Dr. Yang is emailing Dr. Ford and yourself.

20                Maybe the last 20 will do it.

21       That was some performance.  Doubt Jeremy

22       knows given that I understand in his

23       removed.  I only found this by shallow

24       digging -- dragged me in MOCJ that word had

25       it that the judge might hold the city in

Page 187

```
 1                       R. MACDONALD

 2      contempt, and it turns out it is Kaye's own

 3      cyclone that has sucked in detritus."

 4                  Do you understand any of this?

 5                  MS. CANFIELD:  Objection to

 6              form.  You can answer.

 7          A    I can speculate about what it

 8      means.

 9          Q    Let's break it down, then.

10              "Maybe the last 20 will do it."

11      What does she mean by that?  What does Dr.

12      Yang mean by that?

13          A    I don't know.

14          Q    Was it the last 20,000 that was

15      really what Dr. Kaye was entitled to

16      regarding her retention bonus?

17                  MS. CANFIELD:  Objection to

18              form.

19          A    Possibly.

20                  MS. CANFIELD:  Speculation.

21          A    Possibly.  I don't know.

22          Q    "That was some performance."  What

23      the performance is Dr. Yang talking about?

24          A    I don't know.

25          Q    "Doubt Jeremy knows given what I
```

Page 188

1                          R. MACDONALD

2       understand is his remove."

3                     What does she mean by "remove"?

4                     MS. CANFIELD:  Objection to

5                form.  You can answer if you're

6                able.

7            A    I think she's referring to an

8       understanding that these clinics were not

9       very closely watched or managed by their

10      parent institutions.  And, therefore, that

11      there wouldn't be that level of detailed

12      understanding.

13           Q    And just for the purposes of the

14      record, Jeremy is Dr. Jeremy Collin, right?

15           A    I believe so, yes.

16           Q    Up until the transition, didn't

17      Dr. Kaye report to Dr. Collin?

18           A    I know Dr. Collin was in charge of

19      the forensic service, so that would make

20      sense.

21           Q    Right.  So at some point was

22      Dr. Collin removed from being in charge of

23      the forensic service?

24           A    I think that may have happened

25      recently.

Page 189

1                         R. MACDONALD

2          Q     Well, as far as this particular

3     email is concerned, February 1st, 2018,

4     right, the Bronx court clinic, first you

5     hired the Uber director, Dr. Jain.  And

6     would it be fair to say you hired him in

7     April of 2018?

8                    MS. CANFIELD:  Objection to

9               form.  You can answer.  The record

10              speaks for itself.

11         A     That sounds reasonable.

12         Q     So in April 2018, you hired

13    Dr. Jain.  And what happens to Dr. Colin?

14         A     Dr. Colin worked for Bellevue

15    Hospital, he didn't work for CHS.

16         Q     Was he Dr. Kaye's supervisor once

17    Dr. Jain got on board?

18         A     No.  He wasn't her supervisor once

19    the clinic came to CHS.

20         Q     Right.  And when did that happen?

21         A     Well, as we discussed previously,

22    you've represented to me that it was

23    July 1st, 2018, right?

24         Q     But Dr. Jain was hired in

25    April 2018.  So you're saying that between

Page 190

1              R. MACDONALD

2    April and July 2018, he wasn't her

3    supervisor?

4         A    I don't know.  I was, again, just

5    basing that on the date you established for

6    the Bronx clinic coming to CHS.  Which in

7    the previous questions we said was July 1st,

8    but maybe I'm misunderstanding that.  It

9    happened sooner.

10        Q    Then she goes on and she says,

11   "The judge might hold the City in contempt,"

12   right?

13             And earlier you disagreed that the

14   City was going to be held in contempt for

15   not producing unredacted records.

16             You saw that, right?

17             MS. CANFIELD:  Objection to

18        form.  You can answer.

19        A    I think that I said we were not,

20   as far as I know.  And here she says they

21   might.

22        Q    Right.  And she says, "It's Kaye's

23   own cyclone."  What did she mean by that?

24             MS. CANFIELD:  Objection to

25        form.  Answer if you're able.

Page 191

1                      R. MACDONALD

2          A    I mean, I would just be

3    speculating, but I think she's referring to

4    a pattern of creating conflict and obstacles

5    to getting things done.

6          Q    Now, didn't Dr. Colin have

7    concerns about using redacted medical

8    records?

9          A    I don't know.

10         Q    Didn't Dr. Winkler express

11   concerns about using redacted medical

12   records?

13         A    I don't know.

14         Q    And didn't even Dr. Circic express

15   concerns about using redacted medical

16   records?

17         A    I don't know.

18         Q    Why was it that Dr. Kaye was

19   singled out when she expressed concerns

20   about using redacted medical records, no one

21   else was?

22              MS. CANFIELD:  Objection to

23        form.  You can answer.

24         A    I will just be speculating.

25         Q    But you're oddly identifying

Page 192

1                         R. MACDONALD

2      Dr. Kaye as someone who was resisting.  Were

3      there any other staff members that you

4      recall that were resistant to using redacted

5      medical records besides Dr. Kaye?

6           A    No.  I'm not aware of anyone else

7      making an issue of it.  And I think that

8      this is an example where it became such an

9      issue that it rises to the level of the

10     judge and he's feeling like he has to hold

11     the City in contempt, and it's making a lot

12     of chaos and slowing down the process.  I

13     don't know of any other staff who were

14     engaging around that issue in that way.

15          Q    In what way exactly; explain?

16          A    In a way that creates so much

17     conflict.

18          Q    But how was Dr. Kaye creating so

19     much conflict?  What exactly did she do?

20          A    If you want to raise the email

21     again, I agree with Dr. Ford's assessment.

22          Q    Well, Dr. Ford is just saying that

23     she needed to be managed out?

24               MS. CANFIELD:  Objection to

25          form.  You can answer.

Page 193

1                          R. MACDONALD

2          A     No.  Dr. Ford had material

3    disagreement with her opinion on the matter.

4          Q     I'm going to show you what's going

5    to be --

6                     MS. CANFIELD:  Do you want to

7                pull it back up?  Do you want to see

8                it again?

9          Q     I'm going to show him a different

10   exhibit, because this might help him out.

11                     This is going to be marked as

12   Plaintiff's Exhibit 9.

13                          (Whereupon, Email (NYC_118-119)

14                          was marked as Plaintiff's

15                          Exhibit 9 for identification as

16                          of this date.)

17         Q     Plaintiff's Exhibit 9 bears the

18   Bate Stamp series NYC118 through 119.  And

19   I'm going to scroll to the bottom of it.

20                     Now, in 118 to 119, you email

21   Elizabeth Moreira.  Who is that?

22         A     That was an administrator in the

23   Bellevue forensic clinic.

24         Q     And you say, "Hi, Liz, can you

25   share with me the records you received for

Page 194

1                          R. MACDONALD

2       the cases that Kaye could not complete.

3       Thanks, Ross."

4                   You see that, right?

5            A    Um-hmm.

6            Q    Now, isn't this outside of your

7       area of expertise as far as the record

8       themselves and this whole issue?

9                   MS. CANFIELD:  Objection to

10              form.  You can answer.

11           A    No.  I don't think so.  Again, I

12      was engaged, as I said, our desire was to

13      have the most complete records available to

14      the examiners.  Again, the whole point of

15      this endeavor was to make things as

16      efficient and as effective as possible.

17                  So the question was raised whether

18      there was some inappropriate or overly

19      aggressive redaction going on by our medical

20      records team.  And that's why I was

21      interested in looking at these records, just

22      to make sure that they were being redacted

23      appropriately.

24           Q    And then Ms. Moreira responds to

25      you, "It would have to be requested from the

Page 195

1                    R. MACDONALD

2       clinic itself.  I can copy Melissa," I guess

3       Dr. Kaye, "and the ACM, if you'd like."

4                    Now, who's the ACM?

5            A     Probably referring to assistant

6       coordinating manager, some administrator in

7       the clinic.

8            Q     Who would that have been?

9            A     I don't know.

10            Q     So then you say back to

11       Ms. Moreira, "Yes, please," right?

12                    And then at this point, Ms.

13       Moreira emails you, Dr. Kaye and

14       Lacrecia Persaud.  So I'm assuming the ACM

15       must have been Ms. Persaud.

16                    Would that be accurate?

17            A     It would make sense, yeah.

18            Q     So then Ms. Moreira says, "No

19       problem.  Do you have a defense's name for

20       the case in question?  I have copied

21       Dr. Kaye and Lacrecia Persaud in this email.

22       To some extent Dr. Ross MacDonald of CHS is

23       trying to work on the redaction issue and is

24       requesting to see the versions of records we

25       have received for outstanding cases in which

                         R. MACDONALD

1

2    were redacted and, therefore, left an

3    opinion unrendered."

4             You see this, right?

5         A    Yes.

6         Q    Do you recall what Dr. Kaye said

7    to you when you made the request?

8         A    No.  I don't.

9         Q    Do you recall Dr. Kaye telling you

10   that she could not provide --

11        A    I'm sorry.  Can I interrupt for

12   one second.

13        Q    Yes, sir?

14        A    I just have to stop for one

15   second.

16             (Whereupon, a recess was taken

17             from 2:40 p.m. to 2:41 p.m.)

18        Q    I'm going to ask you, is there

19   someone else in the room?

20        A    No.  Someone came to my door.

21   That's why I stopped the proceedings.

22        Q    Okay.  There's no one else, like

23   there's no other legal counsel in the room?

24        A    No.  There's nobody in the room.

25   Someone came to my door.  That's why I

1                    R. MACDONALD

2     stopped the proceeding.

3          Q    I just had to ask because, you

4     know, if there is someone, we are entitled

5     to know.

6          A    Absolutely.  Of course.  That's

7     why I stopped.

8          Q    Fair enough.

9               MS. HAGAN:  Now, are there any

10          other -- there's no one else on the

11          zoom from defendants, right?

12         A    Not that I'm aware of.

13              MS. CANFIELD:  No.

14              MS. HAGAN:  Okay.  Just making

15          sure.

16         Q    So back to the question.  At any

17     point, did Dr. Kaye tell you that she could

18     not produce the records because she didn't

19     have a court order to you?

20         A    I don't remember how that turned

21     out, actually.

22         Q    So you don't remember if you

23     received the records at all from Dr. Kaye?

24         A    I don't remember receiving any

25     records.

Page 198

1                        R. MACDONALD

2          Q    And you don't remember if Dr. Kaye

3     told you she could not produce them because

4     she had not received an order?

5          A    I don't remember.

6          Q    How did you resolve the issue?

7          A    I think I probably left it at

8     that, if I wasn't able to get the records.

9     I was just trying to think of how I could be

10    of assistance to try to troubleshoot the

11    issue.

12         Q    When you didn't receive the

13    records, you just left them alone all

14    together?

15         A    Well, again, I think it was an

16    ongoing conversation about the legalities of

17    the redaction.  And it may have dropped my

18    idea to try to help and make sure that we

19    were redacting appropriately.  I was just

20    trying to troubleshoot the problem.

21         Q    Did your opinion of Dr. Kaye

22    change after this situation or this

23    incident?

24         A    No.

25              MS. CANFIELD:  Objection to

Page 199

1                     R. MACDONALD

2          form.

3          Q     You said no?

4          A     (No verbal response given.)

5          Q     Now, I'm going to ask you some

6     questions about the -- I'm going to show you

7     some instances where we discussed where

8     other people received redacted medical

9     records regarding the situation with Judge

10    Torres and Judge Moore.   Okay?

11         A     Okay.

12         Q     And this will be Plaintiff's

13    Exhibit 10.

14                    (Whereupon, Email

15                    (NYC_1914-1915) was marked as

16                    Plaintiff's Exhibit 10 for

17                    identification as of this date.)

18         Q     And it bears the Bate Stamp series

19    NYC1915 -- well, actually, sequentially,

20    1914 and 1915.   And I'm going to show you

21    the bottom.   The first email is from Wanda

22    Roberts.   You see that, right?

23         A     Yes.

24         Q     And it's to Lacrecia Persaud.   And

25    she says, "Good afternoon, Lacrecia.   Please

1                     R. MACDONALD

2       review the attached medical record for --

3       this is part one of the medical record,

4       thank you.  And she's the director of

5       medical records.  Do you know her to act in

6       this capacity, Ms. Roberts?

7            A    Yes.

8            Q    So then going up, there's the

9       email from Ms. Persaud, and the medical

10      records, and it's to Dr. Winkler.

11                You see that, right?

12           A    Yes.

13           Q    And then Dr. Winkler responds,

14      "Hi, Lacrecia.  Please advise Ms. Roberts

15      that these records are useless.  They are

16      redacted and do not include an attestation

17      certification which we need for the court.

18      Please advise her that we require

19      unredacted, certified records as soon as

20      possible since the court is questioning the

21      delay in this case.  You see that, right?

22           A    Yes.

23           Q    And this is from Dr. Winkler not

24      Dr. Kaye.  You see this, right?

25           A    Yes.

1                       R. MACDONALD

2          Q     And then Dr. Kaye says, "Hello,

3     Ms. Laird (phonetic).  We are still

4     receiving redacted medical records from CHS

5     despite judicial orders for unredacted

6     records.  This is holding up many cases.

7     Can you please forward this to Judge

8     Torres's office.  Thank you."  Right?

9          A     Yes.

10         Q     So how is it that Dr. Kaye is

11    being blamed for causing delays, when it

12    appears that Judge Torres is responsible as

13    well as the production of redacted records?

14                    MS. CANFIELD:  Objection to

15             form.  You can answer.

16         A     I can only say that this is one of

17    the problems that we were trying to

18    troubleshoot.  And our goal has always been

19    to work together to troubleshoot any barrier

20    to efficiently doing the evaluations.

21    That's why we took over the clinics.  There

22    is no other motivation that we could have.

23                    The results of what we were

24    advised about the legalities and a necessity

25    for redaction were maybe not favorable to

1                    R. MACDONALD

2      Dr. Kaye or Dr. Winkler or to certain

3      judges, but we were trying to troubleshoot

4      that problem in good faith.

5          Q    Why is it that Dr. Kaye was

6      determined to have caused the cyclone and

7      not Dr. Winkler; he's involved in this

8      particular incident as well?

9                    MS. CANFIELD:  Objection to

10               form.  You can answer.

11         A    Again, I'm not going to speak to

12     the impression that was left in another

13     email chain that I wasn't apart of it.  It's

14     becoming so speculative.

15               I think that there were many areas

16     where the impression was that this was not a

17     good faith effort on behalf of Dr. Kaye to

18     try to troubleshoot these issues with us.

19     Rather, it was trying to point fingers, and

20     that the situation escalated when she was

21     involved in it in ways that it didn't with

22     other examiners.

23         Q    But you can't really say that it

24     was attributed to her or Dr. Winkler, they

25     are both involved here.  You see that --

1              R. MACDONALD

2              MS. CANFIELD:  Objection to

3         form.  You can answer.

4    Q    Both Dr. Winkler and Dr. Kaye are

5    on the thread regarding the Judge Torres,

6    Judge Moore redacted medical record

7    incident.  However, Dr. Kaye is being called

8    the cyclone and Dr. Winkler isn't.  Why is

9    that?

10             MS. CANFIELD:  Objection to

11        form.  Assumes facts.  You can

12        answer.

13   A    I mean, when you pull out an

14   isolated email chain like that --

15   Q    But there are two emails.

16   A    Okay.  But it's happening in the

17   context of people working with all of these

18   players every day, trying to troubleshoot

19   these issues.

20             So I can't tell you based on the

21   records that you're showing me why the

22   perception of Dr. Kaye's supervisor and

23   Dr. Ford and others, was that she was

24   particularly recalcitrant on this issue and

25   would not work with CHS or others to try to

1                    R. MACDONALD

2     get to a better solution.

3          Q    Dr. Yang --

4          A    I can't understand --

5               MS. CANFIELD:  Let the witness

6          finish his response, please.

7          Q    Dr. Yang was further removed from

8     the process than you; is that right?

9               MS. CANFIELD:  Objection to

10         form.  You can answer if you're

11         able.

12         A    No.  Not necessarily.  For the

13    reasons that I explained.  She was further

14    removed in the organizational chart when she

15    took interest in this matter and --

16         Q    Why?

17         A    Because, as I explained, the

18    primary issues that were being raised were

19    in the areas of the legal concerns, the

20    compensation, the HR, all of those matters.

21         Q    But she hadn't -- Dr. Kaye hadn't

22    complained about compensation issues in

23    February of 2018.  She was simply saying

24    that she could not work with redacted

25    medical records at that time.  And this

Page 205

```
 1                        R. MACDONALD
 2      email, Dr. Yang refers to Dr. Kaye, they
 3      cyclone, and then she uses the term
 4      detritus.  Why she only using those
 5      terminologies in reference to Dr. Kaye and
 6      not Dr. Winkler, when both of them expressed
 7      concern about using redacted medical
 8      records?
 9                   MS. CANFIELD:  I'm going to
10              the object to the factual colloquy
11              or the performed factual colloquy
12              that followed that question or
13              proceeded that question, sorry, and
14              object to the question.  You can
15              answer if you're able to.
16          A    I don't know.
17          Q    You don't know.  There's no real
18      reason that there's a difference, as far as
19      you can see, because you weren't involved
20      directly you say, between why Dr. Yang is
21      referring to Dr. Kaye as a cyclone, and
22      she's not referring to Dr. Winkler as one?
23                   MS. CANFIELD:  Objection to
24              form.  Objection.  You can answer if
25              you're able.
```

1                    R. MACDONALD

2          A    I don't know.

3          Q    Now I'm going to show you what's

4    going to be marked as Plaintiff's Exhibit

5    11.  Plaintiff's Exhibit 11 bears the Bate

6    Stamp series NYC288.

7                    (Whereupon, Email (NYC_288) was

8                    marked as Plaintiff's Exhibit 11

9                    for identification as of this

10                   date.)

11                   MS. CANFIELD:  Just 288?

12                   MS. HAGAN:  Yes.

13                   MS. CANFIELD:  Was this sent

14              in October or November?

15                   MS. HAGAN:  This is

16              June 21, 2018.

17                   MS. CANFIELD:  No.  I'm saying

18              when did you send this document to

19              me?

20                   MS. HAGAN:  In October.

21                   MS. CANFIELD:  October.

22         Q    It's an email from Dr. Jain to

23    Dr. Ford.  And the subject is Jonathan.  I'm

24    assuming Jonathan is Jonathan Wangel, right?

25                   "I let Melissa know that I'll need

1                          R. MACDONALD

2      to tell Jonathan at least and she was

3      understanding that I need to report to

4      whomever from my end no problem.  She's

5      hopeful and feels more optimistic that this

6      will all lead to a positive outcome.  Just

7      passing along to you.  Thanks, Beech,"

8      right?

9              A    Yes.

10             Q    Then Dr. Ford is emailing you and

11     Dr. Barbara Rioja about Dr. Kaye's

12     complaint.  And she says, "FYI, nothing to

13     do.  Melissa is filing a EEO complaint with

14     respect to pay differential that I think

15     spans multiple years at Bellevue.  Jonathan

16     will be made aware."  Right?  And this is

17     June 21, 2018, you see this, right.

18             A    Yes.

19             Q    Now, why is Dr. Barber Rioja on

20     this email?

21                  MS. CANFIELD:  Objection to

22             form.  By the way, I don't have this

23             document.  Go ahead.  You can

24             answer.

25             A    You're asking why Dr. Barbara

1                          R. MACDONALD

2          Rioja is on this email that was written by

3          Dr. Ford?

4               Q    Well, you're on here.  And how is

5          Dr -- what is Dr. Barbara Reoha's

6          relationship to Dr. Kaye?

7                          MS. CANFIELD:  Objection to

8                     form.  You can answer.

9               A    I think this was probably a time

10         when Dr. Barbara Reoha's oversight of the

11         clinic was still a possibility.  And we had

12         not settled on the organizational structure

13         a hundred percent yet.

14                          MS. HAGAN:  For purpose of the

15                     record, this is defendant's

16                     production NYC288.  So even though I

17                     did produce it in October, in

18                     October 2021, this is certainly one

19                     of your emails, defendant's emails.

20                          MS. CANFIELD:  I understand

21                     that.  It did not come to me in

22                     October, and I understand that, it's

23                     consistent with magistrate Judge

24                     Cott (phonetic) which provide the

25                     exhibits either contemporaneous with

```
 1                    R. MACDONALD

 2           the deposition or prior to and I

 3           don't have it.

 4                MS. HAGAN:  Why don't you go

 5           check your email, 'cause it's there.

 6                MS. CANFIELD:  I have been

 7           check.  It's actually three

 8           documents I don't have, but we can

 9           discuss that at the end of the

10           deposition.

11           Q    So, Dr. MacDonald, you're saying

12      that you were debating whether or not you

13      were going to have Dr. Barbara Rioja act in

14      a managerial capacity over the clinics; am I

15      right?

16           A    That's a possible explanation for

17      why she was on this email.  I didn't send

18      this email so I don't know the answer to

19      your question.

20           Q    So, ultimately, what -- how it was

21      resolved with Dr. Barbara Rioja; was she

22      ultimately put in a managerial structure

23      over the clinics while Dr. Kaye was there?

24           A    Not at that time.

25           Q    When did she become a managerial
```

1              R. MACDONALD

2    over the clinics?

3                 MS. CANFIELD:  Objection to

4         form.  You can answer.

5         A    I don't know exactly, but I think

6    it was after Dr. Jain's departure.

7         Q    Now, clearly you're on notice

8    about Dr. Kaye's EEO complaint, right, about

9    the pay differential here?

10        A    Yes.

11        Q    And this is on June 21, 2018; is

12   that right?

13        A    Yes.

14        Q    And did you speak to Mr. Wangel

15   about Dr. Kaye's complaint at that point?

16        A    No.  This email chain reflects an

17   FYI to me that these staff are taking

18   complaints seriously and bringing it through

19   the appropriate channels.

20        Q    But you're their supervisor; am I

21   right?

22        A    Yes.

23        Q    So as their supervisor, what did

24   you do to followup to ensure that they

25   actually took the complaint seriously?

```
                              R. MACDONALD
 1
 2        A     Again, I have email documentation

 3     that you're showing to me attesting that

 4     they will.  And I do believe that they did.

 5     And I trust my supervisors to do the things

 6     that they tell me they are going to do.

 7        Q     How do you know that they did what

 8     they represented on this email?

 9                    MS. CANFIELD:  Objection to

10          form.  You can answer.

11        A     I believe that they did it.

12        Q     You see this, "Jonathan will be

13     made aware," right?

14        A     Yes.

15        Q     Do you know that she made Jonathan

16     aware?

17        A     I know that Jonathan was aware

18     subsequent to this.

19        Q     And you don't -- was Jonathan the

20     EEO officer for H&H at that time?

21        A     No.

22        Q     Was he the EEO officer for CHS at

23     that time?

24        A     I don't know.

25        Q     Why didn't you ensure that
```

1                         R. MACDONALD

2       Dr. Ford or Dr. Jain reported this to the

3       EEO office?

4                   MS. CANFIELD:  Objection to

5                form.  Assumes facts.  You can

6                answer.

7            A    Just as I said with my own

8       response, to make sure that the exact nature

9       of a complaint like this is reported

10      appropriately, I would recommend that they

11      consult with HR.  And Jonathan is HR.

12           Q    But you didn't know who the EEO

13      officer was earlier; am I right?

14                  MS. CANFIELD:  Objection to

15               form.  You can answer again.

16           A    Yes.

17           Q    So you have no idea if they

18      reported it to the EEO officer or not

19      because you don't know who the EEO officer

20      is, right?

21                  MS. CANFIELD:  Objection.

22               Again, assumes facts, that it should

23               be reported to the EEO officer, but

24               you can answer.

25           A    Again, I would advise them to

Page 213

```
 1                        R. MACDONALD
 2      discuss it with Jonathan to get his advice
 3      about how exactly it should be reported.
 4           Q    Wasn't it your testimony earlier
 5      today that an EEO complaint should be
 6      reported to the EEO officer?
 7                     MS. CANFIELD:  Objection to
 8                form.
 9           A    It was.  I think that there's
10      complexity here because, as you represented
11      to me, Dr. Kaye didn't work for CHS at this
12      time, or the clinic was in the process of
13      transition and the complaints being raised
14      were from an entity other than CHS at that
15      point.
16                     MS. CANFIELD:  Yes.  Like the
17                EEOC.
18           A    So that's a complex situation that
19      I will seek guidance from HR leadership on.
20      Which is what my staff told me they were
21      doing.
22           Q    At that time did Dr. Ford go out
23      on leave in the summer of 2018?
24           A    She did take a leave for a period
25      of time.  I don't remember the exact timing.
```

```
 1                    R. MACDONALD

 2     That could be another explanation for why

 3     she was copying Dr. Barbara Rioja.

 4          Q     And did she attempt to sign off

 5     her duties to Dr. Barbara Rioja?

 6                    MS. CANFIELD:  Objection to

 7               form.  You can answer.

 8          A     Some of them were signed off to

 9     Dr. Barbara Rioja.

10          Q     Now, Dr. Barbara Rioja has a

11     Ph.D., not a medical license; am I right?

12          A     Yes.

13          Q     So wouldn't that have been

14     problematic if Dr. Ford attempted to, I

15     guess, convey all of her responsibilities to

16     Dr. Barbara Rioja since she was not a

17     medical doctor?

18          A     No.

19          Q     She could have delegated them all?

20          A     Her responsibilities were

21     designated between Dr. Barbara Rioja and Dr.

22     Subetti (phonetic).  As it pertains to the

23     FPECC clinic, she could have delegated all

24     of her responsibilities, yes.

25          Q     At that time was Dr. Subetti even
```

1                    R. MACDONALD

2      working for CHS?

3            A    Yes.

4            Q    Was he a co-director at that time?

5            A    No.  She reported to Dr. Ford and

6      they covered her work when she was on leave.

7            Q    So Dr. Subetti was working in

8      conjunction with Dr. Barbara Rioja when she

9      went out on leave?

10                    MS. CANFIELD:  Objection to

11               form.  You can answer.

12           A    When Dr. Ford went out on leave,

13     yes.

14           Q    So from June to, let's say, the

15     fall of 2018, Dr. Barbara Rioja and

16     Dr. Subetti were filling in for her?

17           A    Again, I'm not going to confirm

18     those exact dates.

19           Q    So if that's the case, why isn't

20     Dr. Subetti on this email?

21           A    You asked me if -- all of her

22     duties could be delegated to Dr. Barbara

23     Rioja because she's a psychologist.  And I

24     explained that many of her duties were

25     delegated to a psychiatrist.

Page 216

1                          R. MACDONALD

2                 With regard to FPECC, yes, all of

3        her duties could be delegated to a

4        psychologist, Dr. Barbara Rioja, who is

5        absolutely qualified to be administrative

6        clinical director of the FPECC clinics, as

7        she is today.

8            Q    So I'm going to show you -- and

9        she is the administrator director of the

10       FPECC clinic, it's not shared between she

11       and Dr. Subetti?

12           A    Today it's Dr. Barbara Rioja who

13       has that in her direct organizational chart.

14           Q    And Dr. Subetti does not?

15           A    Correct.

16           Q    I'm going to show you what's going

17       to be marked as Plaintiff's Exhibit 12.

18       Plaintiff's Exhibit 12 bears the Bate Stamp

19       series NYC3270, and it's the EEO service

20       charge.

21                 MS. HAGAN:  And that should

22            have been produced in the October

23            production.

24                 MS. CANFIELD:  Thank you.

25                     (Whereupon, Email (NYC_3270) was

Page 217

                        R. MACDONALD

 1

 2                      marked as Plaintiff's Exhibit 12

 3                      for identification as of this

 4                      date.)

 5          Q     There's quite a bit of redaction

 6   here, but I'm asking to bear with me.  This

 7   is from Dr. Greenfield to Dr. Yang.  She

 8   says, "Patsy, was redacted, if so I would

 9   like to schedule a call next week to discuss

10   the allegations.  This is Dr. Melissa Kaye,

11   right?

12          A     Yeah.

13          Q     And then Dr. Yang responds to Ms.

14   Greenfield and Ms. Laboy and Dr. Hicks.

15   "Sorry.  This got stuck in my outgoing due

16   to a hurricane issues late yesterday.  This

17   is from Ms. Yang or Dr. Yang, right?

18               And then here you're CC'd on this.

19   And it's a letter from Dr. Kaye's attorney.

20   And Dr. Yang emails Ms. Laboy, yourself, and

21   a number of other people.  She says, "This

22   really is a Bellevue issue, but so we should

23   remain in the loop."  Right.

24               But at this point, the clinics

25   have been absorbed by CHS; am I right?  This

1                        R. MACDONALD

2         is July 7, 2018.

3              A    Yes.

4              Q    How is this a Bellevue issue now

5         the Bronx court clinic is now under the

6         purview of CHS?

7                   MS. CANFIELD:  Objection.

8              Maybe you should show him the

9              underlying document.

10                  MS. HAGAN:  There is no

11             underlying document.  This is what

12             I'm asking you right now.  How is

13             this an issue --

14                  MS. CANFIELD:  But it says

15             there's an attachment there, Melissa

16             Kaye -- under.

17                  MS. HAGAN:  You can't coach

18             the witness.

19                  MS. CANFIELD:  I'm not.  I'm

20             just saying --

21                  MS. HAGAN:  I'm asking your

22             client a question right now.

23                  MS. CANFIELD:  All right.

24             Answer if you can, Dr. MacDonald.

25                  MS. HAGAN:  Could you please.

1                    R. MACDONALD

2        Q    You're saying that this -- it's

3    been saying that this is a Bellevue issue,

4    but by now the clinics have been under the

5    CHS purview for six days.  How is that?

6                MS. CANFIELD:  Again, answer

7           if you're able.

8                MS. HAGAN:  Please stop

9           coaching the witness.

10               MS. CANFIELD:  You know what,

11          you're not showing him the complete

12          document.  So it's a really unfair

13          question because obviously you're

14          commenting on --

15               MS. HAGAN:  Coaching the

16          witness.

17               MS. CANFIELD:  I'm not.

18          You're misleading the witness.  But,

19          Dr. MacDonald, answer as best you

20          can.

21       Q    Were the court clinics under

22    Bellevue on July 7, 2018, yes or no?

23       A    Yes.

24       Q    They were under Bellevue?

25       A    I'm sorry.  I got confused.

Page 220

1                    R. MACDONALD

2              No.  As you represented, they had

3    been with CHS for six days.

4         Q    So if there's a pay parity issue,

5    how is it a Bellevue problem if now the

6    Bronx court clinic is under CHS?

7              MS. CANFIELD:  Again,

8              objection.  Assumes facts not

9              presented to the witness.  We don't

10             know what she complained about.  But

11             go ahead, Dr. MacDonald.

12        A    Yeah.  I mean, I think for a

13   person who, as you mentioned, had been

14   employed by Bellevue for many, many years,

15   and as I mentioned, the transition generally

16   takes people in at the salary that they were

17   at, that this would be an issue that would

18   have a great deal to do with Bellevue.

19             I also believe, as was mentioned,

20   I don't know exactly what we're talking

21   about here, but if it's a comparison to her

22   salary with Dr. Circic, that's a person who

23   is not employed by CHS, as far as I know.

24        Q    I'm going to show you what's going

25   to be marked as Plaintiff's Exhibit 13.  And

Page 221

```
 1                    R. MACDONALD
 2      it bears the Bate Stamp series K third
 3      production 109 through 112.
 4                    MS. HAGAN:  You should have
 5               received this during the October
 6               production, Ms. Canfield.
 7                    (Whereupon, EEOC Charge (Kaye's
 8                    3rdProduction_109-112) was
 9                    marked as Plaintiff's Exhibit 13
10                    for identification as of this
11                    date.)
12          Q    I'm going to scroll to Dr. Kaye's
13      EEOC charge so that you have some context,
14      right.  I'm not sure if you actually saw the
15      EEO charge itself.  Did you, Dr. MacDonald?
16          A    I don't believe so, no.
17          Q    At the time Dr. Kaye did complain
18      against Bellevue.  This is right before it
19      was absorbed by the court clinic, by CHS.
20      You see that, right?
21          A    Yes.
22          Q    In the particulars area, she said,
23      "I'm a 55-year-old Caucasian female who has
24      worked for Bellevue Hospital and HHC since
25      1999.  Most recently as the Bronx court
```

Page 222

1                           R. MACDONALD

2       clinic medical director.  I believe I have

3       been discriminated against because of my sex

4       in violation to equal pact as amended in

5       Title 7 of the Civil Rights Act as amended.

6       Specifically I've been paid less than the

7       male Manhattan court clinic medical

8       directors, despite having the same title and

9       job duties.  I've been paid under an

10      attending three title since 1999, while the

11      men, who have worked at the Manhattan court

12      clinic medical directors have been paid as a

13      physician specialist title.  The physician

14      specialist title carries a significant pay

15      increase, and the male Manhattan court

16      clinic medical directors have made

17      significantly more money than I over the

18      almost 20 years I have worked here.  I

19      believe I was given an attending three title

20      and underpaid compared to my male

21      counterparts because of my sex."

22                  Now, you see this, right?

23          A    Yes.

24          Q    Does this refresh your

25      recollection, if any?

1              R. MACDONALD

2              MS. CANFIELD:  Objection to

3         form.  You can answer.

4         A    I don't believe I've seen this

5    document.

6         Q    Now, just for purposes of clarity,

7    we talked about your -- activity of sorts in

8    the beginning of the deposition.

9    Dr. MacDonald, is it fair to say that you're

10   a Caucasian male?

11        A    Yes.

12        Q    So I want to go up some.  And then

13   Dr. Kaye supplemented her charge some.  And

14   I'd like to give you an opportunity to

15   review what she's written.

16             And this is a supplemental charge.

17   You see this, right?

18        A    Yes.

19        Q    And she says, "I filed a charge of

20   discrimination with the EEOC on May 22, 2018

21   based on sex discrimination against me in

22   the form of unequal pay.

23             MS. CANFIELD:  Ms. Hagan, you

24        froze.

25        Q    "Specifically I alleged that HHC

Page 224

1                       R. MACDONALD

2          has paid me less than other court clinic

3          medical directors, despite having the same

4          title and job duties."  Right.  And she lays

5          out her history.

6                  Do you recall reading any of this?

7          A    No.

8          Q    Now, she alleges that on July 1st.

9     The oversight of the Bronx court clinic was

10    transferred from Bellevue Hospital to

11    Correctional Health Services, both of which

12    are under the offices of HHC.

13                 Would you agree with that?

14         A    Yes.

15         Q    Now, then she says, in July

16    of 2018 Dr. Jain and Ms. Swenson switched

17    her title and demoted her from medical

18    director to title of director.

19                 Do you agree with that?

20         A    No.

21         Q    Why are you in disagreement?

22         A    That was not a demotion at all.

23    They were simply standardizing the titles

24    used in the clinic.  And it was represented

25    to her as not a demotion and not at all

```
 1                    R. MACDONALD
 2     specific to her role or her performance.
 3          Q    To your knowledge, were all of the
 4     directors of all the clinics all referenced
 5     as directors?
 6          A    My understanding was that the
 7     attempt was to standardize it in that way.
 8          Q    But the question is, were they all
 9     referred to as directors?
10          A    By whom?
11          Q    Just by CHS management.
12          A    I don't know.  What I know from
13     having conversations with Dr. Jain about
14     this very thing, is that there was meaning
15     assigned to it by Dr. Kaye that was not
16     intended in any manner, and that it was
17     solely to standardize the titles.
18               Whether the titles can be
19     completely standardized, whether someone
20     used the wrong title or used the wrong title
21     for someone else subsequent to that, the
22     fact remains that it was on a meaningful
23     change, nor was it intended to be a demotion
24     or a slight of any sort.
25          Q    Did everybody have the same
```

1                         R. MACDONALD

2        business cards and were all the directors

3        referred to as directors and not medical

4        directors?

5             A     I don't know.

6             Q     And who would have been

7        responsible for ensuring that everybody had

8        the same title?

9             A      Again, it would be part of the

10       leadership team, the management team,

11       Dr. Jain, Ms. Swenson, the HR department,

12       the CHS leadership team.  I simply know that

13       this was not a change that was intended to

14       mean anything about her position, nor was it

15       a demotion.  And that was made clear to her,

16       it's my understanding from talking about it

17       with Dr. Jain at that time.

18            Q     Asides yourself, who was the most

19       senior person to ensure that everyone had

20       the exact same title amongst the directors

21       of the clinics?

22                       MS. CANFIELD:  Objection to

23                 form.  You can answer.

24            A     With regard to being called

25       medical director versus director?

1                    R. MACDONALD

2          Q    Yes.

3          A    I'm not sure who made that

4     decision.  It wasn't my decision.

5          Q    It wasn't your decision.  Who's

6     decision was it?

7          A    I don't know.

8               MS. CANFIELD:  Objection to

9          form.

10         Q    Now, you have engaged in quality

11    assurance during the course of your career;

12    am I right?

13         A    Yes.

14         Q    And part of that effort, you

15    described earlier that you wanted to make

16    things more efficient and standardize things

17    throughout the court clinics, right?

18         A    Yes.

19         Q    And in this instance, there was an

20    effort to have all the directors at the

21    various clinics be referenced in the same

22    capacity, which would be the directors,

23    right?

24         A    That's my understanding, yes.

25         Q    Who made the decision that the

Page 228

```
 1                        R. MACDONALD
 2      titles needed to change?
 3                    MS. CANFIELD:  Objection.
 4                Asked and answered.  You can answer
 5                again.
 6           A    I don't know.  I know that it was
 7      represented to me by Dr. Jain after the fact
 8      as something that Dr. Kaye in particular had
 9      a real problem with.  Even though it was
10      clearly a mechanism just to standardize
11      those titles, and not intended to have any
12      meaning in terms of her position or be a
13      demotion.
14           Q    But you can't testify today that
15      all of the directors at each of the clinics
16      had, in fact, been called only director
17      versus medical director, right?
18                    MS. CANFIELD:  Objection to
19                form.  You can answer.
20           A    No.
21           Q    You can't?
22           A    During what time period?  Since
23      the beginning of time or subsequent to that?
24           Q    After they changed.  You said that
25      everybody had to have the same title.
```

Page 229

```
 1                      R. MACDONALD

 2      Right.  So after this is put in place, you

 3      can't testify today that each of the center

 4      directors were called directors and not

 5      medical directors, right?

 6                 MS. CANFIELD:  Objection to

 7            form.  You can answer.

 8      A    No.  I can't.  I can just say that

 9      that was not intended to be a slight or a

10      demotion.

11      Q    So now I'm going to show you what

12      will be marked as Plaintiff's Exhibit 14.

13      Plaintiff's Exhibit 14 bears the Bate Stamp

14      series NYC3322 to 3326.

15                 MS. HAGAN:  And it was

16            produced in the October production.

17            Actually, we don't need that because

18            it's just the same thing.  So let's

19            scratch that.

20                 MS. CANFIELD:  It's the same

21            thing as what?

22                 MS. HAGAN:  As 13.

23      Q    I'm going to go to -- now, did it

24      ever come to your attention that Dr. Kaye

25      requested a reasonable accommodation?
```

```
1                    R. MACDONALD
2               MS. CANFIELD:  Objection to
3          form.  You can answer.
4          A    I don't think so.
5          Q    So there was never a time where
6     Dr. Kaye approached management seeking a
7     reasonable accommodation to care for her
8     child?
9               MS. CANFIELD:  Objection to
10          form.  You can answer.
11          A    I just don't specifically recall
12     that.
13          Q    Do you know what management's
14     position was for that?
15               MS. CANFIELD:  Objection to
16          form.  You can answer.
17          A    No.  I don't know what the outcome
18     of that request would be.  There's a process
19     in place for those requests to be considered
20     and worked through.
21          Q    What's that process, do you know?
22          A    So there's, H&H has policy that
23     governs a formal accommodation request.  And
24     then there's a discussion between H&H
25     central and the supervisors around what
```

```
 1                      R. MACDONALD

 2      could be reasonably accommodated.

 3           Q    Now, I'm going to ask you some

 4      questions about that.

 5                 Dr. MacDonald, who presides over

 6      the reasonable accommodations process at

 7      H&H?

 8           A    I don't know specifically who

 9      presides over that.

10           Q    So you don't know who would be

11      engaged; am I right?

12                     MS. CANFIELD:  Objection to

13                 form.  You can answer.

14           A    No.  From my -- for when this

15      comes across my desk personally I, again,

16      reach out to CHS's HR leadership who direct

17      us in the right direction of how to submit

18      those.

19           Q    Now, this particular exhibit was

20      previously produced on one of the other

21      depositions.  It bears the Bate Stamp series

22      NYC757 and NYC758.

23                     MS. CANFIELD:  Is this going

24                 to be P14?

25                     MS. HAGAN:  Exhibit 14, yes.
```

```
 1                    R. MACDONALD
 2                    (Whereupon, Email (NYC_757-758)
 3                    was marked as Plaintiff's
 4                    Exhibit 14 for identification as
 5                    of this date.)
 6          MS. CANFIELD:  And did you
 7     produce it --
 8          MS. HAGAN:  It was produced
 9     previously.  And I can tell you --
10          MS. CANFIELD:  Yeah.  But
11     we've had hundreds of -- I don't
12     have hundreds of those documents.
13     I'm just going to ask after the
14     deposition if you can email me.
15          MS. HAGAN:  It's actually
16     produced at the Wangel deposition so
17     you should have it there.
18          MS. CANFIELD:  That was a
19     month and a half ago.  I don't have
20     it with me.
21          MS. HAGAN:  It should be in
22     your computer.
23          MS. CANFIELD:  Again, I'm
24     going to renew request for you to
25     produce all these documents again.
```

```
                              R. MACDONALD
 1
 2          Thank you.
 3                  MS. HAGAN:  Okay.  Sure.  I'll
 4          produce the ones that I have.
 5     Q    Now, I'm going to do the share
 6    screen.  Dr. MacDonald, you can see this
 7    screen, right?
 8     A    Yes.
 9                  MS. CANFIELD:  Can you just
10          share the Bate Stamp numbers again
11          on the bottom.
12                  MS. HAGAN:  757 and 758 NYC.
13                  MS. CANFIELD:  All right.
14          Thank you.
15     Q    So emails from Dr. Kaye to Yvette
16    Villaneuva.  Do you know who that is?
17     A    I don't know her exact title, but
18    she's in charge of HR, as I understand it,
19    for Health and Hospitals.
20     Q    And then Dr. Jain is on this
21    email, Mr. Wangel is on this email, Dr. Ford
22    and Dr. Kaye, right?
23     A    Yes.
24     Q    And she says, "Dear Ms. Yvette
25    Villaneuva.  I've been a dedicated public
```

1                         R. MACDONALD

2      servant in HHC for 19 years.  I work in a

3      the nonclinical setting at the Bronx court

4      clinic as a forensic psychiatric evaluator

5      and have been the medical director

6      since 2004."  Right.

7                  "Under my leadership the Bronx

8      court has produced quality examinations in a

9      most timely manner."

10                 Would you disagree with that?

11          A    I'm not prepared to agree with

12     that.

13          Q    Okay.  So what do you disagree

14     with?

15                 MS. CANFIELD:  Objection to

16            form.  You can answer.

17          A    I don't know the timeliness of

18     Dr. Kaye's evaluation production over the

19     course of her career.

20          Q    When you were there, when Dr. Kaye

21     was under your supervision or indirect

22     supervision, were there any complaints about

23     her timely production of reports?

24          A    As I mentioned, the Bronx clinic

25     consistently had a lower number of reports

Page 235

1                          R. MACDONALD

2      than the other clinics.  I don't know all

3      the root causes of that.

4           Q    Do you believe that Dr. Kaye had

5      any part in the alleged lower number of

6      reports than the other clinics?

7           A    I can't say for sure, but I

8      certainly would not attest that she didn't.

9           Q    Do you know when Dr. Winkler's

10     replacement was hired to fill the position

11     at the Bronx court clinic?

12          A    No.  Not specifically.

13          Q    Do you know when Dr. Brayton was

14     hired?

15          A    No.

16          Q    Do you know that there was a

17     period of time when Dr. Kaye was the only

18     full-time evaluator at the clinic?

19                    MS. CANFIELD:  Objection to

20               form.  You can answer.

21          A    Yes.  I mentioned there were

22     problems with retention, yes.

23          Q    Do you believe that Dr. Kaye was

24     responsible for there not being a second

25     evaluator at the clinic?

1                           R. MACDONALD

2          A     I don't know.

3          Q     What steps did you personally take

4     to ensure that there was full coverage at

5     that clinic, Dr. MacDonald?

6          A     I was supporting my supervisors

7     who were working very hard to achieve the

8     goals that we set out when we voluntarily

9     took over all of the clinics.

10         Q     So there is a window or gap

11    between when Dr. Winkler went to fill the

12    position at the Brooklyn court clinic as

13    director and when Dr. Brayton actually

14    filled in the position at the Bronx clinic,

15    right?  You do know that, right?

16         A     Yes.

17               MS. CANFIELD:  Objection to

18          form.  Go ahead.

19         Q     So would you agree with me that

20    from April 2018 to October 2018, Dr. Kaye

21    was the only full-time evaluator at the

22    Bronx court clinic?

23               MS. CANFIELD:  Objection to

24          form.  You can answer if you're

25          able.

1                    R. MACDONALD

2         A    I don't know the specific time

3    course.  That sounds reasonable.

4         Q    Do you know when iSight was

5    actually fully implemented at the Bronx

6    court clinic?

7         A    No.

8         Q    In fact, it wasn't actually

9    October, it was 2018, it was December 2018,

10   when Dr. Brayton was actually hired

11   full-time at the clinic.

12             So going back to iSight.  You

13   don't know when iSight was actually fully

14   implemented at the Bronx court clinic; am I

15   right?

16             MS. CANFIELD:  Objection.

17         Objection to the colloquy before the

18         question.  You can answer.

19         A    I don't know.

20         Q    Who was responsible for ensuring

21   that all the clinics had iSight?

22         A    The administrative side of the

23   clinics.  So Ms. Swenson, that would be her

24   primary responsibility.  Certainly any

25   barriers to that might be raised through

Page 238

1                    R. MACDONALD

2   Dr. Jain or Dr. Ford.

3          Q    And who would have been

4   responsible for assuring that the numbers in

5   iSight were accurate?

6          A    I don't know exactly which data

7   elements you're referring to.  I think there

8   are a number of different data elements in

9   general.

10         Q    Well, in particular to the 730

11  examination production, right.  'Cause

12  you're saying you disagree with the fact

13  that she was producing these reports in a

14  timely manner, right?

15         A    I said -- just to clarify, I said

16  I couldn't attest to that.

17         Q    Okay.  So then let's keep going.

18  She says she's worked an eight-and-a-half

19  hour shift --

20         A    Over a period of 19 years that

21  she's referencing.

22         Q    But you haven't worked there 19

23  years.  I understand.  So we're moving on

24  from that.

25         A    Okay.

1                         R. MACDONALD

2           Q    So she says, "I have worked an

3      eight-and-a-half-hour shift from 9:00 a.m.

4      to 5:30 p.m., with a 30-minute unpaid lunch

5      for over 13 years, per an agreement between

6      HHC and doctor's counsel."

7                 Were you aware of any agreement

8      between HHC and doctor's counsel regarding

9      work hours?

10          A    No.

11          Q    Did you ever learn of any

12     agreement during the course of these

13     discussions back and forth?

14          A    I didn't -- no.  I didn't.

15          Q    "In August my shift was

16     unexpectedly and adversely changed to

17     8:00 a.m. to 5:00 p.m. with an hour lunch."

18                Was it your -- earlier you said

19     that there was an effort to standardize the

20     hours amongst all of the clinics.  Could you

21     attest today that all of the directors of

22     each of the clinics worked 8:00 a.m. to

23     5:00 p.m.?

24                MS. CANFIELD:  Objection to

25           form.  You can answer.

1                      R. MACDONALD

2         A     No.  I don't know.

3         Q     And do you know if all of the

4    directors had one-hour lunches?

5         A     I think that would be the case for

6    all of the unionized directors, but I don't

7    know for sure.

8         Q     Then she says, "I am a single

9    mother with a chronically ill child and this

10   has directly interfered with my ability to

11   provide care to my child."

12              Now, do you remember that, now

13   that we're talking about it and seeing the

14   email?

15        A     I can't recall this specific -- I

16   remember there was a concern raised about

17   the shift and the lunch duration.  I don't

18   know that I remember -- that I've seen the

19   specific content of the reasonable

20   accommodation request.

21        Q     So now I'm going to get to that.

22              "I'm seeking reasonable

23   accommodation by return to my prior shift,

24   which was the 9:00 a.m. to 5:30 p.m. split

25   shift and ability to work remotely."  Right?

Page 241

```
 1                    R. MACDONALD

 2                    "My previous supervisors allowed

 3         accommodations for my son's disability, and

 4         I have been more than able to perform the

 5         essential functions of my job with no

 6         disruption in work product.  The above

 7         accommodations are needed so that I can

 8         administer treatment to my child as

 9         prescribed by his treating physician.  Due

10         to his age, the severity of the condition

11         and the nature of this treatment, I need

12         to -- administrate his care.  Please advise

13         me of informal process at HHC for seeking

14         reasonable accommodations.  Currently, I do

15         not know about HHC's policy process for

16         designated persons for obtaining reasonable

17         accommodations."

18                    Apparently, do you know today who

19         she would have to go to for reasonable

20         accommodations, Dr. MacDonald?

21                    MS. CANFIELD:  Objection.

22              Asked and answered.  You can answer

23              again.

24         A    As I said, I mean, I would start

25         with our CHS leadership to get their advice
```

Page 242

1                         R. MACDONALD

2       on that.

3            Q    I'm going to ask you a question,

4       you.  You're talking about you would start

5       with CHS leadership.  I'm asking you today

6       for --

7                 If I'm your staff person,

8       Dr. MacDonald, and I say, Dr. MacDonald, I

9       have -- I've been falling out from COVID for

10      the last two years.  I need a reasonable

11      accommodation.  Right.  Who are you going to

12      direct me to?  What is their name?

13                 MS. CANFIELD:  Objection to

14                 form.  Asked and answered.  You can

15                 answer again.

16           A    As I said many times, I would

17      double check to make sure I have the right

18      person with our CHS leadership.  It may very

19      well be Mr. Marazo, who I believe is on

20      this email chain, though I am not.  But I

21      want to make sure that I get that right.  So

22      I always go to our CHS leadership and HR, to

23      make sure that they are aware of the request

24      and that it goes through the right channel.

25           Q    I'm going to ask you a question,

```
 1                       R. MACDONALD
 2       and I want you to be succinct and fair.
 3               Do you know who the person is who
 4       is responsible for the processing reasonable
 5       accommodation requests?
 6                    MS. CANFIELD:  Objection to
 7               form.  Asked and answered.
 8       Q    What is their name?
 9                    MS. CANFIELD:  Asked and
10               answered.  You can answer again.
11       A    As I said, I would double check
12       with our HR leadership.  I know Mr. Morazo
13       who is on this email chain --
14       Q    But you don't know; isn't that
15       fair?
16                    MS. CANFIELD:  Excuse me.
17               You're harassing the witness.  He's
18               trying to respond.  You're harassing
19               him.
20                    MS. HAGAN:  He doesn't know
21               the person's name.  He needs to just
22               admit it so we can move on.  We
23               don't know his name.
24                    MS. CANFIELD:  Thank you.  He
25               does know his name.  He just --
```

1                       R. MACDONALD

2          Q     What's his name?

3                MS. HAGAN:  No.  He doesn't.

4          Q     At the time, did you know that Dr.

5     Kaye should have gone to Mr. Morazo?

6                MS. CANFIELD:  Does it matter?

7             Obviously Dr. Kaye didn't either, so

8             let's move on.

9                MS. HAGAN:  If Dr. Kaye

10            doesn't know -- I'm asking him a

11            question.  I'm not letting up.

12         Q     Did you know that Dr. Kaye should

13    have gone to Mr. Morazo at the time?

14         A     My job as a supervisor is to get

15    the person to the right people to address

16    their request.  And I know I could do that.

17    I don't have to know who it was at that

18    time.  And it's better if I double check so

19    I don't send them to the wrong person.

20         Q     Dr. MacDonald, would you have

21    known to go to Mr. Morazo if you needed a

22    reasonable accommodation at that time, yes

23    or no?

24         A     I wouldn't --

25                MS. CANFIELD:  Objection.

Page 245

                    R. MACDONALD

1

2               Asked and answered.

3          Q    I'm asking you right now.  Would

4     you know to go to him?

5          A    I wouldn't have gone to him

6     directly.  So, no, I would not have know to

7     go to him, because I would not have gone to

8     him directly.

9          Q    Does HHC have a reasonable

10    accommodation policy that basically lays out

11    who is the person?

12         A    Yes.

13         Q    Did you read that policy?

14         A    Yes.  And I could find it on the

15    Internet right now.  My point is, I know

16    exactly how to get this done for my staff.

17         Q    Right.  But you don't know that

18    person's name, though?

19         A    No.

20              MS. CANFIELD:  Objection.

21         Again, assumes that there's one

22         person -- officers.  Let's move on.

23         A    That person could have been

24    replaced yesterday, for all I know.

25         Q    But you didn't know and you didn't

1                          R. MACDONALD

2        have the policy at that time, because

3        Dr. Kaye didn't know it either; am I right?

4                    MS. CANFIELD:  Objection.

5                 There is a policy.  You can answer.

6        A     I absolutely knew that there was a

7        policy and how to get to it and how to get

8        to the appropriate people to address a

9        request like this.

10       Q     At the end of this email Dr. Kaye

11       says, "Please advice me of the formal

12       processes at HHC for seeking reasonable

13       accommodations.  Currently, I do not know

14       about HHC's policy process or designated

15       persons for obtaining reasonable

16       accommodations."  Right?

17                 You see that at the end of the

18       email, right?

19       A     I do.

20       Q     Then Mr. Wangel said, "Dr. Kaye,

21       Mr. Morazo is the EEO officer assigned to

22       Correctional Health Services."  Right?

23       A     Yes.

24       Q     "Please reach out to him directly

25       and is he will explain the procedure to

Page 247

                           R. MACDONALD

1

2       request a reasonable accommodation.  I have

3       included his contact information below.

4       Thank you."

5                  Now, he's designated as the EEO

6       officer for Correctional Health Services; am

7       I right?

8            A     That's what Mr. Wangel is

9       indicating here at that time, yes.

10           Q     Right.  Mr. Wangel doesn't send

11      Dr. Kaye a policy in this email.  You don't

12      see any attachments here, right?

13                  MS. CANFIELD:  Objection.  You

14              can answer.

15           A     No.  I don't.

16           Q     And then he directs Dr. Kaye to

17      contact Mr. Morazo, right.  And then Ms.

18      Laboy tells Mr. Wangel to remove PY, I guess

19      Ms. Yang, from the responses.  Do you know

20      why that would be the case?

21           A     No.

22           Q     Had you ever seen any email like

23      that before, to remove Ms. Yang from the

24      emails?

25           A     Yes.

Page 248

```
 1                      R. MACDONALD

 2          Q     Why?

 3          A     Patsy at times doesn't want to get

 4     extraneous emails in her inbox.  So she'll

 5     sometimes request to be removed from chains.

 6          Q     So a request from a person whose

 7     filed a EEOC complaint and complained of pay

 8     parity, and now she's saying that she needs

 9     to have her shift reverted so that she can

10     deal with a special needs child, that would

11     be an extraneous email?

12                      MS. CANFIELD:  Objection.

13                 Mischaracterization.  You can

14                 answer.

15          A     For the senior vice president to

16     be on every iteration of that email chain

17     would be, yes.

18          Q     From your knowledge, did Ms. Yang

19     contact any of you to find out if Dr. Kaye

20     received the reasonable accommodation?

21                      MS. CANFIELD:  Objection.  You

22                 can answer if you're able.

23          A     Not to my knowledge.

24          Q     Was there a reason why Dr. Kaye

25     could not go back to her shift of 9:00 to
```

Page 249

1                    R. MACDONALD

2       5:30?

3                    MS. CANFIELD:  Objection to

4            form.  You can answer.

5            A    I don't know.

6            Q    Did you speak to any of the staff

7       members about the reasonable accommodation

8       request that Dr. Kaye sought?

9            A    I did not.

10           Q    Okay.  Why not?

11           A    In general, these processes go

12      through, they follow the H&H policy, where

13      there's a process to discuss the potential

14      accommodation with the staff member's

15      supervisor.  The supervisor makes the

16      decision about whether their clinic can

17      accommodate that.

18           Q    Now, I have a question,

19      Dr. MacDonald.  Is there an appeals process

20      if the employee does not agree with the

21      outcome or the decision made at H&H?

22                   MS. CANFIELD:  Objection to

23            form.  What kind of decision?  You

24            can answer if you're able.

25           Q    If a reasonable accommodation

Page 250

```
 1                          R. MACDONALD

 2      request is denied, does the H&H employee

 3      have the option of appealing that decision?

 4           A    I don't know that detail.  I would

 5      look at the policy on the website to answer

 6      that question.

 7           Q    So you're not sure about that.

 8                I'm going to direct you to what's

 9      going to be known as Plaintiff's Exhibit 15.

10      And Plaintiff's Exhibit 15 is the Board of

11      Correction complaint.  And it was produced

12      in the October production.  It does not have

13      a Bate Stamp.

14                          (Whereupon, Correction Complaint

15                           was marked as Plaintiff's

16                           Exhibit 15 for identification as

17                           of this date.)

18                MS. CANFIELD:  What's the name

19           of the document?

20                MS. HAGAN:  It's the Board of

21           Correction complaint that Dr. Kaye

22           filed.

23                MS. CANFIELD:  I have

24           something that says board.

25                MS. HAGAN:  I guess that would
```

Page 251

```
 1                    R. MACDONALD

 2          be it.  January 7, 2020.  The

 3          October production.

 4               MS. CANFIELD:  I'm looking at

 5          it.  No, this is not -- this is

 6          about board exams that I'm looking.

 7               It was not provided.  If you

 8          could provide that as well.

 9               MS. HAGAN:  It should be

10          provided in the --

11               MS. CANFIELD:  It was not.  If

12          you can just put --

13               MS. HAGAN:  It's okay, Ms.

14          Canfield.  Now, I'm going to give an

15          opportunity for Dr. MacDonald to

16          read the document.  You have it.

17               MS. CANFIELD:  I do not have

18          it, but I would like to read it.  So

19          I will read it now.

20               MS. HAGAN:  It was produced.

21               MS. CANFIELD:  In fact, I

22          don't think this was ever produced.

23          Can you show me the Bate Stamp

24          numbers, please.

25               MS. HAGAN:  There is no Bate
```

Page 252

```
 1                    R. MACDONALD
 2          Stamp and I sent it --
 3               MS. CANFIELD:  Well, it was
 4          not properly produced.  It needs to
 5          be produced with Bate Stamps --
 6               MS. HAGAN:  Let's give him a
 7          chance to read it.
 8               MS. CANFIELD:  But I'm asking
 9          if you can produce this document.
10               MS. HAGAN:  I'll produce it
11          again.  I'll do it at whatever way I
12          please.  How about that.
13               MS. CANFIELD:  Well, we do it
14          with Bate Stamps.  But now we're
15          aware it's a -- document, please --
16               MS. HAGAN:  I'll do it
17          whatever way I please how about
18          that.
19               MS. CANFIELD:  We do it with
20          Bate Stamps.  It's a state document
21          he can read.
22               MS. HAGAN:  You don't have to
23          keep stalling.  Let him read.
24          I'll --
25               MS. CANFIELD:  I'm not
```

```
 1                        R. MACDONALD

 2              stalling.  I've asked for this

 3              several times.

 4                   MS. HAGAN:  And you've had it

 5              several times.

 6                   MS. CANFIELD:  Excuse me.  I'm

 7              not creating busy work for you, Ms.

 8              Hagan.  I'm just honestly saying I

 9              don't have it, it's not Bate

10              Stamped, that's how you refer to

11              them.  Can you please scroll through

12              them.

13                   MS. HAGAN:  Are you continuing

14              to read, Dr. MacDonald?  I know

15              there's a lot of talking in the

16              background.

17         A    I'm sorry.  Can you go to the top

18    again.

19         Q    Sure.

20         A    Okay.  You can scroll down.

21         Q    Now, do you recognize this

22    complaint, Dr. MacDonald?

23         A    Yes.

24                   MS. CANFIELD:  Can we read the

25              whole thing because I don't want see
```

```
 1                    R. MACDONALD
 2           it.  I don't have a copy.  And,
 3           actually, before Dr. Kaye's
 4           deposition on Monday, I would like a
 5           copy of this in my mail box, Bate
 6           Stamped, please.
 7                MS. HAGAN:  You'll have a
 8           copy.
 9                MS. CANFIELD:  Okay.  Please
10           provide that.
11      Q    Now, I'm going to ask you some
12   questions and I'm going to let you continue
13   to read, but I want to ask you some
14   questions about the dual agency, because we
15   talked about the dual loyalty discussion
16   earlier.
17           Now, there is a paragraph here
18   that talks about dual agency prohibitions,
19   right?  And it says, "A fundamental dictum
20   for the ethical practice of psychiatry is to
21   void dual agency in the practice of clinical
22   and forensic psychiatry.  This mandates a
23   clear distinct preparation between clinical
24   treatment and forensic assessments to guard
25   against ethical, legal and practice
```

1                       R. MACDONALD

2      violations.  Avoiding the overlap clinical

3      treatment with forensic activities to ensure

4      forensic evaluation render unbiased

5      psychiatric legal opinions and protects the

6      confidentiality afforded to patients in

7      treatment relationships.

8                She accuses CHS of wantonly

9      violating the dual agency prohibition,

10     causing direct harm in defendants.  In

11     treatment, a defendant is a patient and

12     there's a doctor/patient relationship that's

13     supportive, accepting and emphatic.  The

14     goal is to benefit the patient and the

15     relationship is not adversarial.  The

16     clinician provides treatment and advocacy

17     and diagnostic assessment for the purpose of

18     clinical care, with minimal scrutiny applied

19     to information obtained HIPPA applies.  By

20     contrast, in a forensic evaluation there is

21     no doctor/patient relationship.  There's

22     attorney-client privilege and judicial

23     authority.  The forensic evaluation is

24     neutral, objective and detached.  The

25     expertise and focus of the forensic

Page 256

R. MACDONALD

1

2      evaluator is to address the psychiatric

3      legal question for the Court.  The

4      evaluators attorneys and the court

5      scrutinize the information in an adversarial

6      setting.  The relationship between the

7      forensic evaluator in evaluating is based on

8      clinical judgment and there is no

9      therapeutical lines.  HIPPA does not apply.

10              Now, she does says CHS has

11     wantonly violated in the dual agency

12     prohibition, causing direct harm to

13     defendant.  You disagree with that; am I

14     right, Dr. MacDonald?

15         A    I do disagree with that, yes.

16         Q    Why do you disagree?

17         A    Because there's no evidence of

18     that, and we work very hard to respect the

19     principles which she lays out in this

20     section.

21         Q    You issued this policy, right,

22     this dual agency policy that we had talked

23     about earlier today, right?

24              Is that what you're referencing as

25     your efforts to --

Page 257

1                           R. MACDONALD

2          A      I don't believe that policy used

3     the term dual agency to talk about dual

4     roles.  And absolutely, you know, this is a

5     clear ethic and an important principle that

6     we've abided by from the beginning.

7                 The fact of wanting to do the

8     evaluations as efficiently as possible for

9     the sake of minimizing the time at a

10    population level, people stay in pretrial

11    detention has nothing to do with individual

12    evaluations, which must be protected.

13                And CHS has never done anything to

14    influence the results of any of the

15    evaluations in the court clinics.  And we

16    never would because we understand the

17    distinctions that she has laid out here.

18    The only sentence I disagree with is the one

19    that she's presented here in bold with no

20    evidence for, which is that we wantonly

21    violated these principles.  We, in fact,

22    agree with the principles she's laid out

23    here, and that's how we've operated from the

24    beginning.

25          Q      So at no point was there a push to

1                    R. MACDONALD

2      do evaluations either without records or

3      with redacted records by CHS management?

4                    MS. CANFIELD:  Objection to

5               form.  You can answer.  It seems to

6               be the right topic, but go ahead.

7           A    I think we've been through the

8      legitimate differences of clinical opinion

9      that someone like Dr. Ford had with Dr. Kaye

10     on that issue.  And that is not at all a

11     violation of any of the principles here.

12          Q    So there is a question as to

13     whether or not a defendant is entitled to a

14     thorough assessment of their psychiatric

15     status; is that fair?

16          A    No.  Absolutely not.  There's no

17     question that they are entitled to a

18     thorough assessment of their psychiatric

19     status.  The question is whether certain

20     types of information that are redacted from

21     the chart by law, and have to be, because we

22     haven't been able to get around the

23     provisions of New York State law that

24     require them to be, are a reason to not do

25     an evaluation, versus in the formulation, as

Page 259

1                        R. MACDONALD

2      Dr. Ford laid out in her email, indicating

3      what any barriers were.

4           Q    I'm going to ask you something.

5      What New York State law are you referencing

6      that requires the redaction of medical

7      records?

8           A    Again, I'm not an attorney, but I

9      represented to you that CHS looked into

10     these questions with attorneys who represent

11     CHS and H&H, and came to these conclusions.

12               Obviously, it's our preference,

13     given the reasons why we embarked on

14     consolidating these clinics, taking this

15     over, trying to make it better, that we

16     would want all the records to be unredacted.

17     Not require less effort on the part of our

18     staff who have to do those redactions and

19     the records would come virtually

20     instantaneously because it's all electronic.

21          Q    Now I'm going to ask you --

22          A    So there's no reason that we would

23     want to present a barrier to that for any

24     cause other than what we understood it to be

25     required by law.

1              R. MACDONALD

2          Q    Now, are there instances where a

3     person, I guess a medication that a person

4     might have or take, would impact their

5     ability to knowingly participate in their

6     defense?

7          A    Certainly.  And there are all

8     kinds of complex issues related to the

9     practice of doing these forensic

10    evaluations.

11         Q    And what about the substance abuse

12    history, would that have been something that

13    would have been redacted from these medical

14    records?

15         A    Again, only as far as it's legally

16    required to be.

17         Q    Now, if they were redacted, the

18    substance abuse history, couldn't that have

19    also impacted on a person's ability to be

20    fit?

21         A    I think that my understanding of

22    this, from talking to experts who I've

23    supervised, who are in charge of this

24    program, is that you can make a reasonable

25    determination of how much information that

1              R. MACDONALD

2    you were not privy to, might have impacted

3    your evaluation in a specific case, and that

4    you can include that in your report.  And

5    that that would be a reasonable way to deal

6    with that information, to then allow the

7    courts to make a decision about where to go

8    from there.

9        Q    Who are the experts that you're

10   identifying?

11              MS. CANFIELD:  Objection to

12        form.  Experts in charge of what?

13       Q    What experts are you identifying

14   that you conferred with regarding the

15   information that would be necessary for an

16   evaluator to make a reasonable assessment of

17   the records?

18       A    In this case, I'm representing an

19   opinion that I believe would be agreed to by

20   Dr. Elizabeth Ford, who is in charge of

21   these clinics, or the initial period under

22   which we took them over.

23       Q    Now, Dr. Ford, is it your opinion

24   that Dr. Ford had more expertise on this

25   subject matter than Dr. Kaye?

1                          R. MACDONALD

2          A     I think Dr. Ford had a broader

3     perspective that encompassed the range of

4     opinions from all the evaluators in both her

5     broad clinical experience in forensic

6     psychiatry, and her management of the

7     clinic.  I don't think that, if there's a

8     reasonable difference of opinion on a

9     matter, that the person who's been doing it

10    the longest is necessarily the person whose

11    opinion is most valid.

12         Q     Now, Dr. Kaye had been doing the

13    longest; am I right?

14         A     Probably had, yes.  It doesn't

15    mean that she is correct about every one of

16    her assertions.  That gets out the root of

17    the challenges that her supervisors face

18    with her, because any disagreement with Dr.

19    Kaye's opinion was taken as a personal

20    attack, when it was not.  And really the

21    effort was to work together to make the

22    clinics better.

23         Q     Did anyone really confer with

24    Dr. Kaye before imposing this particular set

25    of requirements on her, any other

```
 1                      R. MACDONALD

 2      directors -- I mean, you had Dr. Winkler

 3      saying that he needed unredacted records,

 4      right, and you also have Dr. Kaye saying she

 5      needs unredacted records.  Now, you have two

 6      doctors, two evaluators saying that they

 7      need unredacted records.

 8              So there's not just difference of

 9      opinion with Dr. Kaye and Dr. Ford, there's

10      at least another doctor saying that they

11      disagree with this, and even Dr. Mundy at

12      some point.

13          A    Again, all of those are aligned

14      that we want the records to be unredacted.

15      That would have been the easiest path and

16      the most efficient path, and that was our

17      goal.  It is only legal barriers that made

18      that impossible to do.

19          Q    So who put those legal barriers in

20      place, Dr. MacDonald?

21              MS. CANFIELD:  Objection.

22              Asked and answered.  You can answer

23              again.

24          A    Not CHS.

25          Q    So who did?
```

Page 264

1                    R. MACDONALD

2          A    Again, as I've said many times,

3    CHS's intention was to remove all barriers

4    to doing this process efficiently and

5    effectively.

6          Q    Who wanted to remove the barriers?

7          A    The investigation of the

8    legalities of that lead us to understand

9    that we need to continue to redact that

10   information.

11         Q    Dr. MacDonald, you keep saying

12   there are legal barriers, but who is

13   responsible for the legal barriers?

14         A    I don't know.  I'm not a lawyer

15   and I can't say.  But I know that that was

16   the investigation that was undertaken, and

17   that the advice of the counsel, the

18   interpretation of the law of New York State

19   was that we had to do it that way.

20         Q    If the court requested --

21         A    And so that's not for me to

22   disagree with, it's not for Dr. --

23                   MS. CANFIELD:  Hold on.  Hold

24          on.  One at a time, please.

25         Q    Dr. MacDonald, the court demanded

Page 265

```
 1                    R. MACDONALD
 2     unredacted records.  Judge Moore requested
 3     unredacted records, he ordered.  Yet CHS
 4     insisted upon producing redacted medical
 5     records.
 6               Where is CHS getting the authority
 7     to defy the Court?
 8               MS. CANFIELD:  Objection.
 9               Objection.  We've not -- who's Judge
10               Moore?  We haven't been talking
11               about Judge Moore.
12               MS. HAGAN:  We talked about
13               Judge Moore earlier.  Please.
14               MS. CANFIELD:  We talked about
15               Judge Torres.  Okay.  Whatever.  Go
16               ahead, answer.
17          Q    Is that going to be your answer,
18     Dr. MacDonald, who's Judge Moore; is that
19     your answer?
20          A    No.  I'm going to say that I'm not
21     an attorney.  I can't answer that question.
22     But I can say with certainty that CHS has no
23     motivation to hinder the evaluations.  And
24     so we would not be doing any of that unless
25     we were being counseled by lawyers that we
```

Page 266

```
 1                      R. MACDONALD
 2      had to do that.
 3           Q    Now, is Patrick James Albert an
 4      expert in criminal law?
 5           A    I don't believe so.  He's an
 6      attorney by training, and he was an
 7      administrator for CHS.
 8           Q    And wasn't he advising you and CHS
 9      management as to whether or not these
10      medical records should be redacted?
11           A    He was involved in the exploration
12      of that question.  I don't think that it
13      would have been his final decision.
14           Q    And didn't a Brendon McVay
15      (phonetic) also participate in the process
16      of determining whether or not these medical
17      records should be redacted?
18           A    Yes.  I believe so.
19           Q    And is Mr. McVay an expert in, I
20      guess the 730 examination process?
21                    MS. CANFIELD:  Objection to
22                form.  We are talking about HIPPA
23                laws, not examination process, but
24                go ahead.
25           A    I don't know him to be.
```

1                    R. MACDONALD

2        Q    Is he an expert on HIPPA laws?

3        A    I don't know him to be.

4        Q    Is he an expert on criminal

5   matters?

6        A    No.  But, again, he has the

7   resources of the law department and H&H's

8   legal department to help him with areas of

9   expertise that are beyond his.

10       Q    His purview?

11       A    Yes.

12       Q    Now, at any point was there an

13  issue with Dr. Kaye recording an

14  examination?

15       A    Yes.

16       Q    What do you remember about that?

17       A    I don't remember exactly how it

18  came to light, but it became known to the

19  clinic supervisors that Dr. Kaye was

20  recording examinations without their

21  awareness.

22       Q    And, I mean, what exactly do you

23  remember about that?

24       A    I remember that it came to light,

25  and there was a question -- you know, it

Page 268

1                    R. MACDONALD

2     seemed like a breach of policy.  And my

3     impression was that it had been done without

4     consent.  And there was a discussion of

5     whether it rose to the level of a

6     termination offense.

7          Q    Now, wasn't the instance with

8     Dr. Kaye allegedly recorded the exam

9     involving Jose Gonzalez?

10         A    I don't know.

11         Q    Do you know who Jose Gonzalez was

12    or is?

13         A    No.

14         Q    Do you remember him being the EMT

15    killer?

16              MS. CANFIELD:  Objection.

17           Asked and answered.  You can answer

18           again?

19         A    No.

20         Q    At any point during the process of

21    the discussions to, I guess, address the

22    issue of Dr. Kaye recording the examination,

23    did you ever speak to her --

24         A    No.

25         Q    -- about her claim?  Why not?

Page 269

1                       R. MACDONALD

2         A     There was no particular reason for

3     it to be worked out between her and I versus

4     at the level of her supervisors and HR and

5     legal, because there was some legal

6     questions around this.

7         Q     Did you inquire about disciplining

8     Dr. Kaye about recording the exam?

9         A     I don't recall.

10        Q     I'm going to show you what's going

11    to be marked as Plaintiff's Exhibit 15.  It

12    was produced in the October production.

13              MS. CANFIELD:  I think it's

14           16.

15              MS. HAGAN:  I guess you would

16           be right.  It would be 16.  And it

17           was produced in the October

18           production.  And it bears the Bate

19           Stamp series NYC2946.

20              (Whereupon, Email (NYC_2946) was

21              marked as Plaintiff's Exhibit 16

22              for identification as of this

23              date.)

24              MS. CANFIELD:  I just want to

25           be clear, when you say October

Page 270

1                      R. MACDONALD

2              production, you mean the emails you

3              sent me with the exhibits you used

4              in Dr. MacDonald's --

5                      MS. HAGAN:  Original

6              deposition.

7                      MS. CANFIELD:  That's what I

8              thought.  All right.  I'm looking

9              for it.  2946?

10                     MS. HAGAN:  Yes.

11                     MS. CANFIELD:  Got it.

12         Q    Now, Dr. MacDonald, there's an

13    email from you on June 18, 2019.  And it

14    says regarding recording the forensic exam.

15              You see that, right?

16         A    Um-hmm.

17         Q    And then Dr. Ford responds to you

18    and Dr. Wangel, "Note, Kaye was out on FMLA

19    and leave until the time I clarified my role

20    in this until yesterday.  Am calling her

21    today to schedule.  Clarence and I are

22    meeting with her."

23              Who's Clarence?

24         A    Clarence Mare is an administrator

25    manager within CHS.

1                    R. MACDONALD

2         Q    Would it be common that Dr. Ford

3    would meet with him and Dr. Kaye about a

4    matter of this sort?

5         A    I don't know that there were

6    commonly matters that rose to this level.

7    It doesn't seem unusual to me.

8         Q    And you write this email to

9    Dr. Ford with the subject, "Did we complete

10   the discipline", right?

11        A    Yes.

12        Q    Now, you're referring to the

13   recording exams in the discipline, okay.  So

14   what do you think that -- what does that

15   entail in your thought process,

16   Dr. MacDonald?

17             MS. CANFIELD:  Objection to

18        form.  You can answer.

19        A    It entails a meeting with Dr. Kaye

20   to go over the discipline and expectation.

21        Q    Now, at that time was there a

22   policy in place that prohibited forensic

23   evaluators from recording examinations?

24        A    No.  It hadn't occurred to us to

25   create such a policy.

Page 272

1                          R. MACDONALD

2          Q     So why are you referring to it as

3     discipline at this point if there was no

4     policy in place?

5          A     Because it still seemed like a

6     breach of the trust of the people involved.

7     It still seemed like a significant problem.

8     And even if there was not a specific policy

9     prohibiting it, it seemed clear to us that

10    there was reasonable judgment that would

11    have made it obvious that it should be

12    discussed with clinic leadership or with the

13    other parties who are being recorded.

14         Q     Now, you're saying all this.  Did

15    you refer to any, I guess, any guiding

16    documents in your assessment in making the

17    determination that recording exams was a

18    violation or breach of any kind of sort?

19                    MS. CANFIELD:  Objection to

20              form.  You can answer.

21         A     No.

22         Q     Okay.  Why not?

23         A     Because I'm making that assessment

24    as a person with a reasonable familiarity

25    with these clinics and just professional

Page 273

1                          R. MACDONALD

2       practice in general.  But if you're going to

3       be recording people, it's just basic decency

4       to let them know and to make sure that

5       everyone is aware of that, including your

6       supervisor, if you're doing it in a work

7       setting.

8            Q    Now, do you know who was present

9       when Dr. Kaye allegedly recorded

10      Mr. Gonzalez's exam?

11           A    No.

12           Q    Do you know when she recorded his

13      exam?

14           A    No.

15           Q    So who should she have told, if

16      you don't know who was there, who should she

17      have told?

18                     MS. CANFIELD:  Objection to

19               form.  You can answer.

20           A    Her supervisors.

21           Q    But her supervisors --

22           A    And people who were present,

23      whoever they might have been.

24           Q    Did you know if this was standard

25      practice or not?

1                      R. MACDONALD

2         A    I knew it to not be standard

3    practice.

4         Q    How did you make that

5    determination?

6         A    Because we had never heard of it

7    from anyone before.

8         Q    Did you consult with the APPL

9    guidelines for recording of examinations in

10   your assessment?

11        A    No.  I just explained to you why I

12   had a problem with it and what the problem

13   was.

14        Q    Okay.  I'm going to show you

15   what's going to be marked as Plaintiff's

16   Exhibit 17.  Plaintiff's Exhibit 17 are the

17   APPL guidelines.  I believe actually I

18   edited them.  So they don't have a Bate

19   Stamp, but they were produced today.

20                    (Whereupon, APPL Recording

21                    Guidelines was marked as

22                    Plaintiff's Exhibit 17 for

23                    identification as of this date.)

24             MS. CANFIELD:  Edited version?

25             MS. HAGAN:  Yes.

Page 275

1                    R. MACDONALD

2              MS. CANFIELD:  Is that APPL

3         video recording guidelines?

4              MS. HAGAN:  Yes.  And it

5         should be four pages.

6              MS. CANFIELD:  Thank you.  I

7         have that.

8         Q    Now, I'm going to show you some

9    highlighted portions of the document.  And

10   this is going to be Plaintiff's Exhibit 17.

11   Okay.

12             Now, the first portion I'm going

13   to show you, Doctor -- first off, I'm going

14   to show you the first page.  Title page is,

15   Video Recording the Forensic Psychiatric

16   Evaluation.  You see that, the APPL task

17   force, right?

18        A    Yes.

19        Q    I'm going to scroll down to the

20   highlighted portion here.  It says, "There

21   is some disagreement regarding the necessity

22   of obtaining consent for video recording

23   interviews.  Some experts feel that video

24   recording is equivalent to note taking and

25   that only consent to the interview is

Page 276

1                    R. MACDONALD

2    necessary."  You see that, right?

3         A    Yes.  I also see the next

4    sentence.

5         Q    "It is generally prudent to notify

6    the opposing attorney that you are planning

7    to videotape.  If the attorney has

8    objections, they may be raised before the

9    evaluation proceeds.  It's prudent, but it's

10   not necessarily required."

11             You do see that, right?

12        A    Yes.  And, again, talking about a

13   person who's working in the context of an

14   organized clinic, where they work with

15   colleagues and they work under an

16   administrated structure.  So it's not just

17   what APPL says about this that's at

18   question.  But as a person operating in a

19   clinic with my colleagues and my

20   supervisors, should I be recording routinely

21   without telling anybody.

22        Q    But she's not being accused of

23   recording routinely.  She's being accused of

24   recording this --

25        A    Should not record even once

1                          R. MACDONALD

2       without telling the people I work with and

3       my supervisors.  That the judgment question,

4       that I'm making a judgment about as a person

5       and as a manager of people in the variety of

6       different settings.

7              Q    But, Dr. MacDonald, you've already

8       testified earlier that you're not really

9       aware who was present at this exam; am I

10      right, besides Dr. Kaye?

11                   MS. CANFIELD:  Objection to

12              form.  You can answer.

13             Q    Right?

14             A    I'm certain that there was a

15      defendant present and another examiner and

16      probably an attorney.

17             Q    Right.

18             A    I don't know the specific

19      individuals.  But, again, this is more about

20      whether you would do that without telling

21      your supervisor in the course of your

22      employment in a clinic where you worked with

23      other people.

24             Q    How would it come to be that she

25      would be -- how would it come to be that

1               R. MACDONALD

2        Dr. Kaye, who does any number of 730 exams

3        in a given day, that she's going to record

4        this particular 730 exam, she's going to

5        tell Dr. Jain, oh, I'm going to record this

6        exam?  I mean, how do you propose that

7        works?  There was no process like that in

8        place beforehand; am I right?

9                    MS. CANFIELD:  Objection to

10               form.  You can answer.

11        A    Yeah.  So either it was an

12        extraordinary thing that she did only in

13        that case, in which case she should bring it

14        up to her supervisor, or as something she

15        routinely, in which case she should bring it

16        up to her supervisor.  It's a question of

17        judgment.

18        Q    But there was nothing in place to

19        that, right?  Now, I'm going to scroll --

20        A    Again, it's a question of

21        judgment.  There was no policy in place

22        because we didn't think we needed to write a

23        policy to cover that situation.

24        Q    Now, there's some advantages to

25        recording here, right.  It says, "The

1                       R. MACDONALD

2    advantages include accuracy of the record,

3    improvement in recording, and the ability to

4    use recordings in court to support an

5    expert's opinion.  The disadvantages include

6    the likely occurrence of more intricate

7    cross examination by the opposing attorney.

8    Close scrutiny by the expert, inconvenience

9    and unknown affect on the interviewer.  And

10   the remote possibility of their use as a

11   basis for liability," right?

12             But that wasn't the issue that

13   anyone had, right?

14                 MS. CANFIELD:  Objection to

15        form.

16        Q    Now, I'm going to this portion

17   here.

18             "The task force finds the option

19   of video recording to be an ethically

20   acceptable medical practice."  Right?

21             Now, how is it that if APPL that

22   governs psychiatry, the practice of

23   psychiatry, and it's the task force, they

24   find it to be ethically acceptable, but CHS

25   doesn't?

Page 280

```
 1                   R. MACDONALD

 2                   MS. CANFIELD:  Objection to

 3              form.  You can answer.

 4         A    I hope that one could recognize

 5    that there's a basic question of judgment

 6    about, even if something is accepted

 7    practice, to understand that when you

 8    operate within the context of a clinic,

 9    that's part of an organization, that you

10    should bring that up with your supervisor if

11    you're going to do something like that.

12              Because though you can find a

13    petition statement that says it's fine,

14    there might be a range of opinions about

15    that.  And in any case, it would normal and

16    appropriate to make sure that you're doing

17    it consistently with the policies of the

18    place where you work.

19         Q    Now, I have a question, Dr.

20    MacDonald.  Have any of the other directors

21    actually approached anyone, that you know

22    of, about recording?

23         A    No.  We would be happy to have a

24    discussion.  Maybe recording is the right

25    thing to be doing.  Maybe we should be doing
```

1                         R. MACDONALD

2      it for all of our evaluations.  But the

3      point is, it should not be done at the

4      discretion of individuals without a general

5      awareness of what we're doing in the

6      clinics.

7           Q    I just have a question.

8                Did anyone afford Dr. Kaye -- did

9      anyone afford Dr. Kaye the luxury of having

10     a discussion about whether or not this was

11     the way to go before writing her up?

12          A    That's exactly what would be

13     prompted by her bringing it to the attention

14     of her supervisor, which it is judgment

15     issue to do that without doing such.

16          Q    But she wasn't given that

17     opportunity.  Now you're saying, oh, we

18     could have discussed it had she not done it

19     first, but because she did it first, because

20     after all these years on occasion, without

21     any reprisal, she may have recorded, but on

22     this particular occasion it was determined

23     that it was problematic, right?

24               MS. CANFIELD:  Objection.

25               Misconstrues the facts.  You can

                        R. MACDONALD

1

2          answer if you're able.

3          Q    Do you recall how it came to be

4     that management learned that Dr. Kaye

5     actually recorded the Jose Gonzalez exam in

6     the first place?

7          A    I don't recall.  I think it was

8     related to testimony, some testimony that

9     she gave.

10         Q    Okay.  Was it the contra version

11    hearing of Mr. Gonzalez, do you recall?

12         A    I don't know specifically.

13         Q    Do you know what a contra version

14    hearing is?

15         A    Yes.

16         Q    Okay.  What is it?

17         A    It's an opportunity to

18    cross-examine the evaluators, if there's

19    dispute about the conclusions that they come

20    to.

21         Q    In that instance, wouldn't a

22    recorded exam be helpful to CHS because it

23    at least shows the methodology that was used

24    by the examiner, more so than the

25    recollection of the examiner?

1                          R. MACDONALD

2                    MS. CANFIELD:  Objection to

3              form.  You can answer.

4          A    Again, it's about the question of

5     judgment and operating with respect for

6     other people in your work place.

7          Q    But the question --

8          A    Not about the narrow question of

9     whether recording is the right thing to do

10    in these evaluations.  Which maybe it is.

11         Q    I'm asking you a question.  The

12    best evidence, and this just using common

13    sense, because you're trying to appeal

14    common sense on your end, I'm expecting the

15    same type of, I guess, latitude on mine,

16    right?

17                   You're saying to me, I'm asking

18    you, Dr. Kaye is at contra version hearing,

19    where one of her rulings or one of her

20    evaluations is subject to being questioned,

21    right.  And at the core of the contra

22    version hearing is the integrity of the

23    process and the validity of the exam; am I

24    right?

25         A    Yes.

Page 284

1                        R. MACDONALD

2           Q      And instead of Dr. Kaye getting on

3      the stand and just saying, this is what I'm

4      doing and these are my notes, instead she

5      has a recording of the exam basically

6      documenting, capturing specifically in

7      realtime what happened, right?  With a

8      recording; isn't that what happened?

9           A      Yes.

10          Q      So you have a recording versus

11     Dr. Kaye talking about, well, I took these

12     notes, I reached these determinations, and

13     you have that versus a recording.  And

14     you're telling me that Dr. Kaye's recording

15     is problematic; am I right?

16          A      Well, it sounds to me like you're

17     arguing that every evaluation Dr. Kaye does

18     should be recorded.

19          Q      I didn't say that at all.

20          A      How do you know which one is going

21     to be controverted?

22          Q      Well, in this instance Dr. Kaye

23     made a determination that this was a high

24     profile case, this was an EMT killer case,

25     and that the guy was thought disorder.

Page 285

1                          R. MACDONALD

2              Do you recall that?

3                    MS. CANFIELD:  Objection to

4          form.  You can answer.

5          A    No.

6          Q    Did you read any of the

7     transcripts associated with Mr. Gonzalez's

8     detention or the contra version hearing?

9          A    No.

10         Q    So you know nothing about

11    Mr. Gonzalez at all?

12         A    No.

13         Q    You don't recall there being an

14    EMT killer in New York City at that time?

15                   MS. CANFIELD:  Objection to

16         form.  You can answer.

17         A    I am aware of such a thing from

18    the news media.

19         Q    Right.  And this is the same

20    person.  He's one in the same.

21              So if it's in the news media,

22    would it be fair to say that this was a high

23    profile case?

24                   MS. CANFIELD:  Objection to

25         form.  You can answer.

1                        R. MACDONALD

2          A     Again, I don't -- sure.  Some

3     people would call it a high profile case.

4          Q     Right.  And if it's a high profile

5     case, wouldn't it stand to reason that

6     Dr. Kaye or someone in her position would

7     want to be more careful in actually how she

8     went about evaluating this individual?

9          A     I think you would want to take the

10    same amount of care for every evaluation

11    that you do.  And if there's a value to

12    recording evaluations, that's something that

13    should be discussed, and there should be an

14    infrastructure to support that in the

15    clinics.

16         Q     Do you know for a fact that

17    there's no value in recording examinations,

18    Dr. MacDonald?

19         A     No.  But I know for a fact that if

20    there is a value, then we should talk

21    through it as partners who work together to

22    do this work in those clinics.

23         Q     Now, the implications for

24    discipline for a doctor are huge; am I

25    right?

Page 287

1                    R. MACDONALD

2              MS. CANFIELD:  Objection to

3         form.  You can answer.

4         A     It depends on the nature of the

5    discipline.

6         Q     In the instance Dr. Kaye was

7    disciplined for recording this examination,

8    right?

9              MS. CANFIELD:  Objection to

10         form.  You can answer.

11         Q     You said yes, right?

12         A     That's my understanding, yes.

13         Q     And as a doctor, this is not

14    something that you would want in your

15    personnel file; am I right?

16         A     Correct.

17         Q     Now, why wouldn't you want that in

18    your personnel file, Dr. MacDonald?

19         A     Well, there are certain types of

20    disciplinary proceedings that have to be

21    reported to the Office of the Professions.

22         Q     Right.  I think we talked about

23    that earlier.

24         A     Yes.

25         Q     And this would impact your ability

```
 1                    R. MACDONALD

 2    to practice medicine; am I right?

 3         A    Well, I would say it's not clear

 4    to me that the discipline that we're talking

 5    about here would constitute one that needs

 6    to be reported to the Office of the

 7    Professions.

 8         Q    How do you make a determination of

 9    what needs to be reported and what doesn't

10    need to be reported?

11         A    Again, in consultation with HR

12    professionals.

13         Q    But what about Dr. Kaye, she

14    doesn't have the luxury of HR questions at

15    her disposal, right?  And she's trying to

16    apply for medical licenses and god knows

17    what else, right?

18             How does she make a determination

19    as to what should be reported and what

20    shouldn't?

21             MS. CANFIELD:  Objection to

22          form.  You can answer.

23         A    I don't think it's -- well, I

24    don't know the answer to that question.  She

25    could talk to her union representative, she
```

Page 289

1                          R. MACDONALD

2       could talk to an attorney.  She could read

3       the language of the question, which I don't

4       think requires discipline like this to be

5       reported.  There are many ways she could get

6       that information.

7            Q    Now, Dr. Kaye is being disciplined

8       for something where there was no policy that

9       she was in breach of in the first place;

10      would you agree with me?

11                     MS. CANFIELD:  Objection to

12                form.  You can answer.

13           A    Yes.  There was no policy

14      prohibiting that at the time.

15           Q    And she was disciplined,

16      regardless?

17                     MS. CANFIELD:  Objection to

18                form.  You can answer.

19           A    I think I explained the rational

20      for that, but, yes.

21           Q    So now, I'm going show you what's

22      going to be marked as Plaintiff's Exhibit

23      18.

24                     (Whereupon, 730CPL Statute was

25                     marked as Plaintiff's Exhibit 18

1                   R. MACDONALD

2                   for identification as of this

3                   date.)

4          MS. HAGAN:  Now, Plaintiff's

5     Exhibit 18 isn't Bate stamped, but

6     it was produced today, Ms. Canfield.

7     And this is the 730CPL statute?

8          THE WITNESS:  May I request

9     that we take a short break when we

10    have a chance?

11         MS. HAGAN:  Let's get through

12    this and then --

13         MS. CANFIELD:  Is this the 730

14    exam?

15         MS. HAGAN:  This is 730 CPL,

16    the CPLR 730 statute.

17         MS. CANFIELD:  In the criminal

18    law handbook?

19         MS. HAGAN:  Yes.

20         MS. CANFIELD:  Okay.  Thank

21    you.  If it would be possible to

22    take a quick break after questions

23    on this document, that would be

24    great.

25         MS. HAGAN:  Sure.

Page 291

1                         R. MACDONALD

2          Q    Now, this is Plaintiff's Exhibit

3     18.  And it's a 730.20 fitness to proceed

4     generally.  You see that, right?

5               Underlined here -- well, do you

6     want me to read the whole paragraph or could

7     we focus on the portions that are

8     underlined?

9          A    We can focus on the underlined

10    portions.

11         Q    So just to have context.  "Upon

12    receipt of an examination order, director

13    must designate two qualified psychiatric

14    examiners, of whom he may be one, to examine

15    the defendant to determine if he is an

16    incapacitated person."  That's general,

17    right?  You understand that, right?

18         A    Yes.

19         Q    "In conducting their examination,

20    the psychiatric examiners may employ any

21    method which is accepted by the medical

22    profession for the examination of persons

23    alleged to be mentally ill or mentally

24    defective."

25               You see that, right?

Page 292

1                          R. MACDONALD

2          A     Yes.

3          Q     Now, how does Dr. Kaye's behavior

4    or recording of the exam deviate from this

5    particular aspect of the CPL order?

6                     MS. CANFIELD:  Objection to

7                form.  You can answer.

8          A     I don't think the discipline was

9    intended to imply that she had violated this

10   provision of the law.  Again, it was really

11   about judgment.  Just because something is

12   legal or even accepted, to do it ad hoc in

13   certain cases without telling your

14   supervisor or anyone else showed a lack of

15   judgment.

16                     MS. HAGAN:  Why don't we take

17                a break.

18                     MS. CANFIELD:  Ten minutes?

19                     MS. HAGAN:  Okay.  Sure.

20                     (Whereupon, a recess was taken

21                     from 4:13 p.m. to 4:24 p.m.)

22          Q     At any point -- I want to ask, did

23   it come to your attention that Dr. Kaye was

24   being accused of stealing Dr. Jain's

25   handwritten notes?

1                    R. MACDONALD

2        A    No.  I don't think I heard about

3    that.

4        Q    So you never heard about any

5    dispute between the two of you about his

6    handwritten notes at any point?

7        A    Not that I recall, no.

8        Q    Do you know what Dr. Jain's

9    obligations would be as far as keeping his

10   handwritten notes when he conducted exams

11   would be?

12       A    No.  I'm not familiar.

13       Q    At any point did Dr. Kaye complain

14   about Dr. Mundy being designated her

15   supervisor and he should not have been?

16       A    I don't think I remember that

17   either.

18       Q    Dr. Mundy was never Dr. Kaye's

19   supervisor; is that right?

20       A    Correct.

21       Q    And you don't recall there being

22   issues with him being listed as her

23   supervisor in PeopleSoft?

24       A    No.  I don't think I knew about

25   that specifically.  Sometimes there were

Page 294

1                    R. MACDONALD

2     errors in PeopleSoft that needed to be

3     fixed.

4          Q    Did there ever come a time where

5     Dr. Kaye complained about Dr. Mundy being

6     CC'd on emails containing her private

7     medical information?

8          A    I don't think I was aware of that

9     either.

10         Q    I'm going to show you what would

11    be marked as Plaintiff's Exhibit 17.

12                    MS. CANFIELD:  I think

13              it's 19, if you're introducing

14              another exhibit.

15     (A discussion was held off the record.)

16                    (Whereupon, Email (NYC_962-963)

17                    was marked as Plaintiff's

18                    Exhibit 19 for identification as

19                    of this date.)

20         Q    Now, Exhibit 19 bears the Bate

21    Stamp series NYC962 through 963.  And this

22    was with the October production.

23                    MS. CANFIELD:  Production.

24              Thank you.

25                    MS. HAGAN:  That's the best

Page 295

```
 1                    R. MACDONALD
 2          way I can describe it.  Sorry.
 3                    MS. CANFIELD:  I know what you
 4             mean.
 5                    MS. HAGAN:  Doing my best
 6             here.
 7                    MS. CANFIELD:  That's all I
 8             ask.
 9          Q    So here you have -- I'm going to
10     start at the bottom so that you get an
11     opportunity to review it, Dr. MacDonald.
12          A    Yeah.
13          Q    So this is an email from Dr. Mundy
14     and it seems like it's HR system admin and
15     is Dr. Kaye and Denise Dudley.
16                    Do you recall who Denise Dudley
17     is?
18          A    No.
19          Q    This HR system administration, is
20     that like you and a bunch of other people?
21     Who is that?
22          A    It's not me.  It's an email
23     address box used by human resources.
24          Q    So then Dr. Mundy -- I guess it
25     really starts with this HR admin place,
```

Page 296

```
 1                    R. MACDONALD

 2     right.  It starts there.  It's to Dr. Kaye

 3     and Dr. Mundy and Denise Dudley.  And it

 4     says, subject is expiring license

 5     certification expiring four weeks.

 6              You see that, right?

 7         A    Yes.

 8         Q    And it says, "Dear Melissa Kaye,

 9     our records indicate that your license

10     and/or certification drug enforcement admin

11     will expire on December 31st, 2018.  Out of

12     date license information may result in

13     termination of access and disqualify you

14     from continued interaction with patients.

15     Please submit your updated document to the

16     appropriate party for recertification.

17     Failure to comply, blah, blah."

18              You see this, right?

19         A    Yes.

20         Q    Now, I'm going to go up to

21     Dr. Mundy responding to this email.  And

22     he's saying, "Please remove me from future

23     emails not addressed to clinicians reporting

24     to me, and Dr. Kaye does not report to me,

25     and I do not know her licensing status."
```

Page 297

1                    R. MACDONALD

2     Right?

3          A    Yes.

4          Q    Now, Dr. Kaye responds to Dr.

5     Ford, "Dr. Mundy continues to be incorrectly

6     copied on emails related on my personnel

7     matters at CHS."  Right?

8               Now, you are not on this email

9     yet.  You see this, right?  But Dr. Jain is

10    here, right?

11         A    Yes.

12         Q    "In September with CHS

13    occupational health sent HIPPA protected

14    information about me to Dr. Mundy in error.

15    I was assured by Dr. Jain that this CHS HR

16    error was corrected, but apparently it has

17    not been resolved."

18               You see that, right?

19         A    Yes.

20         Q    "In addition, CHS incorrectly

21    categorized me as a part-time employee of

22    the Manhattan court clinic.  As a result,

23    central office was misinformed by CHS in

24    listing me as .67 a full-time employee.

25    This caused me to receive a partial payment

```
1                    R. MACDONALD

2      of a full bonus due to me."  And remember

3      we -- I asked about the retention bonus, do

4      you remember that now?

5           A    I remember you asked me about it.

6           Q    Right.  Now, did you have any part

7      in rectifying or addressing the issue with

8      Dr. Kaye only receiving a portion of the

9      retention bonus?

10          A    No.

11          Q    Did you have any part in

12     addressing Dr. Kaye's salary disparity

13     issues?

14          A    No.

15          Q    I know at one point you said on

16     several occasions that the disparity issue

17     was something that involved Bellevue, but

18     Dr. Kaye continued to work for CHS after the

19     Bellevue; am I right?

20          A    Yes.

21          Q    Were steps taken to ensure that

22     Dr. Kaye's salary was comparable to the

23     other directors at the other clinics?

24          A    My understanding is that the --

25     again, as I mentioned, the issue that was
```

1                         R. MACDONALD

2      directly raised to Dr. Yang and was

3      primarily handled by Dr. Ford, Mr. Wangel,

4      Dr. Yang, my rough understanding is that the

5      other directors who had conversation that

6      was hired were managers.

7                   In other words, they were not

8      unionized positions.  And such a position

9      was offered, but I don't -- I wasn't

10     intimately involved in the resolution of

11     that issue, as we discussed previously.

12          Q    Were there steps taken to ensure

13     that Dr. Kaye was paid the equal amount --

14     the same amount of money as the directors at

15     the other court clinics?

16          A    I think her employment was

17     different, in that she remained in the

18     union.  So the pay may not have been equal

19     because you can't really compare a unionized

20     position to a managerial position.  That

21     doesn't have union benefits or

22     representation.

23          Q    Did Dr. Kaye perform the same

24     functions as the other court clinic

25     directors?

```
1                     R. MACDONALD
2        A     Again, I don't know what the
3   particular limitations of being in one title
4   versus the other would be.  But sometimes
5   there are limitations about whether she
6   could be involved in remediation for other
7   staff and the like.
8             So I don't know if her role was
9   different because she was -- had preferred
10  to remain in that unionized title.
11       Q     Would the remediation be an issue
12  not because of her union status, but because
13  she would be an evaluator, and there would
14  be a question of whether or not the
15  evaluator was actually independent, rather
16  than her being in the union?
17            MS. CANFIELD:  Objection to
18        form.  You can answer.  If that's
19        the question.
20       A     No.
21       Q     Is there a question of dual agency
22  if your supervisor is actually a
23  co-evaluator, to your understanding?
24       A     In an individual evaluation?
25       Q     The 730 examination, you testified
```

1                         R. MACDONALD

2          earlier that there are two examiners; am I

3          right?

4               A    Yes.

5               Q    Is it your understanding that the

6          examiners in their 730 capacity act

7          independently of each other?

8               A    Yes.

9               Q    Would it be problematic under the

10         concept of dual agency or dual loyalty or

11         whatever nomenclature you assigned to this,

12         would it be problematic that Dr. Kaye was

13         acting in a supervisory capacity with the

14         other evaluator?

15              A    Not necessarily.

16              Q    So why wouldn't it be an issue?

17              A    Because it would only be an issue

18         if there was some implicit expectation about

19         the results of the examination.  And the

20         supervisor who's administering a court

21         clinic understands that the group together,

22         the team, is working to towards independent

23         evaluation.

24              Q    So what are you basing this

25         opinion on, Dr. MacDonald, that a

1                    R. MACDONALD

2     co-evaluator could conceptually supervise

3     their co-evaluator?

4          A    So I'm -- not with regard to the

5     specific content of that case, but do they

6     have to be absolutely at the same level in

7     the organizational chart, no.

8          Q    The question is, could Dr. Kaye

9     conceivably be, let's say, for example,

10     there was an issue that arose with

11     Dr. Brayton and Dr. Kaye, during the course

12     of Dr. Brayton's employment.

13               Were you aware of that?

14          A    It sounds vaguely familiar to me.

15          Q    At some point Dr. Kaye raised

16     concerns about supervising Dr. Brayton

17     because she and Dr. Brayton were doing 730

18     examinations together.  Do you remember

19     that?

20          A    I don't remember that specific

21     concern being raised.

22          Q    It is your testimony today that

23     Dr. Kaye could have supervised Dr. Brayton

24     and not compromised the integrity of the 730

25     examination process; is that right?

1                          R. MACDONALD

2          A     I don't know the specific

3     situation there.  What I'm saying is that

4     supervisors can participate as evaluators

5     independently with evaluators that they

6     supervise at times.  And that that is not

7     inherently a conflict of interest.

8          Q     The question I have for you is,

9     what is the basis of your opinion?  Where

10    did you get that?

11         A     It's my understanding from

12    supervising at the clinic for many years.

13         Q     Did you read something that said

14    that this is permissible, Dr. MacDonald?

15         A     No.

16         Q     Do you think that what you just

17    said comports with the whole concept of dual

18    agency that we have been talking about off

19    and on today?

20         A     Yes.

21         Q     How does it comport with that?

22              MS. CANFIELD:  Objection.

23           Asked and answered.  You can answer

24           again.

25         A     It comports with it because there

```
 1                    R. MACDONALD
 2      is no understanding or ability to remove all
 3      competing interest from all evaluations or
 4      all clinical encounters.
 5                 That is not the standard that we
 6      aspire to.  The standard is that we
 7      understand them, that we manage them, that
 8      we minimize them, and that we have an
 9      awareness of what is and is not appropriate
10      in dealing with those.
11          Q    Would it be your understanding
12      that the examiners are independent?
13          A    Yes.  Their evaluations are
14      independent.
15          Q    Would it also be your
16      understanding that the evaluators avoid
17      having any undue influence on each other in
18      order to reach their independent
19      evaluations?
20          A    With regard to a specific
21      evaluation, yes.
22          Q    Right.  I'm going to leave it at
23      that.
24                 Dr. Kaye goes on and she says that
25      she's concerned about her personal data
```

```
 1                    R. MACDONALD
 2    continues to be mishandled.
 3              Now, at any point did you look
 4    into Dr. Kaye's allegations about fishing
 5    emails, that she was referencing?
 6         A    No.
 7              MS. CANFIELD:  Objection to
 8         form.  You can answer.
 9         Q    And are you aware of what fishing
10    emails are?
11         A    Yes.
12         Q    What are they?
13         A    It's emails attempting to get
14    people's personal information through a
15    scam.
16         Q    Would you say that a fishing email
17    that was circulated within the confines of
18    HHC would be a serious issue?
19              MS. CANFIELD:  Objection to
20         form.  You can answer.
21         A    Yeah.  I mean, fishing emails are
22    concerns to organizations and I know there
23    are policies related to IT where those
24    emails are supposed to be recorded and
25    identified for IT purposes.
```

Page 306

1                         R. MACDONALD

2          Q     Dr. Kaye did report the email.   Is

3     IT amongst any of these email recipients

4     here, from what you've seen so far?

5                    MS. CANFIELD:   Objection to

6              form.  Go ahead.   You can answer.

7          A     I'm not sure I understand the

8     question.   Are you suggesting that this is

9     being proposed to be a fishing email?

10         Q     Well, she says that -- okay.

11    Let's keep going.

12                    Dr. Yang responds, and you're on

13    this particular email, right, and she says,

14    "What's going on.  It needs to be fixed.

15    Let me know if you need me."   Right.

16                    This is regarding the expiring

17    license certification, right?

18         A     Yeah.

19         Q     And then Jessica Laboy says to you

20    and Dr. Yang and Dr. Ford, that PeopleSoft

21    has her supervisor as Daniel Mundy.   Looking

22    into why her supervisor was changed from Dr.

23    Jain.

24                    Now, did you have any further

25    discussion with Ms. Laboy regarding why her

```
1                      R. MACDONALD

2      supervisor was changed?

3           A    Not that I recall.

4           Q    Who would have had the ability to

5      change Dr. Kaye's supervisor in PeopleSoft?

6           A    I don't know.

7           Q    Do you have access to PeopleSoft,

8      Dr. MacDonald?

9           A    I can log in --

10               MS. CANFIELD:  Objection to

11           form.  Go ahead.

12          A    I can log in to PeopleSoft.  I

13     don't know how to assign people's

14     supervisor.

15          Q    Who knows how to assign people's

16     supervisor?

17          A    I don't know.  Probably HR.

18          Q    So someone in Ms. Laboy's camp

19     would have been able to change Dr. Kaye's

20     supervisor; is that right?

21          A    Yes.

22          Q    Would it have been Ms. Laboy

23     herself?

24          A    Again, I don't know.

25          Q    I'm going to show what's going to
```

Page 308

```
1                         R. MACDONALD

2      be marked as Plaintiff's Exhibit 20.

3      Plaintiff's Exhibit 20 bears the Bate Stamp

4      series NYC1285 to 1286.

5                         (Whereupon, Email

6                         (NYC_1285-1286) was marked as

7                         Plaintiff's Exhibit 20 for

8                         identification as of this date.)

9                    MS. CANFIELD:  Is this in that

10          October production?

11                    MS. HAGAN:  Yes.

12          Q    I'm going to scroll down to the

13      bottom.  The first email is from Ms. Mendez

14      to Dr. Kaye.  It CCs Dr. Mundy, Jain, Donna

15      Fong, Colleen Barrow and CHS Payroll.

16                    Do you see that?

17          A    Yes.

18          Q    And she says, "Melissa, attached

19      please find an approval regarding your

20      request for intermittent leave of absence to

21      care for your ill family member for any time

22      sheets submitted without proper code, please

23      complete the attached employee time sheet

24      changes data entry forms submit directly to

25      payroll.  Thank you."
```

1                     R. MACDONALD

2              You see that, right?

3        A    Yes.

4        Q    So then Mundy is on this email

5    again.  This is February, right?

6        A    Um-hmm.  Yes.

7        Q    Again, Dr. Kaye then responds to

8    Mr. Wangel, Dr. Ford, Dr. Jain, Ms. Mendez,

9    Mary Fritz,  Dr. Yang and Patrick Campese,

10   right, and Dr. Mundy.

11              And she says that, Mr. Wangel,

12   first, let me thank HHC for completing the

13   processing of my FMLA today.  This is

14   especially difficult time for me and my

15   family.  However, I am also writing to

16   express my ongoing concern about the

17   repeated HIPPA and privacy violations that

18   have transpired and have continued after

19   the FMLA notification process.  On at least

20   two prior occasions, Dr. Daniel Mundy was

21   copied on emails that contained my personnel

22   and medical information.  I initially

23   contacted my supervisor Dr. Jain in

24   September 2018, who indicated that he had

25   resolved the matter.  However, when it

```
 1                     R. MACDONALD
 2    happened again in December 2018, I contacted
 3    you and other HHC management about this
 4    violation and you indicated that it had been
 5    resolved in PeopleSoft."  Right?
 6            And she goes about how there have
 7    been repeated violations of HIPPA and her
 8    privacy rights and she feels compelled to
 9    report this matter to HHC corporate
10    compliance.  Right?
11        A    Yes.
12        Q    Now, at any point, are you aware
13    of corporate compliance looking into this
14    continued breach of her personnel
15    information?
16        A    No.  I'm not aware of that.
17        Q    Did corporate compliance ever
18    reach out to you regarding this particular
19    issue?
20        A    No.
21        Q    So then Dr. Yang responds to
22    Mr. Wangel and Ms. Laboy, Dr. Ford and
23    yourself, right.  And she says, "Is this
24    Yvette or Kevin."  Right.
25            Now, who is Yvette?
```

1                    R. MACDONALD

2        A    Yvette is the head of H&H HR.

3        Q    And Kevin is Mr. Morazo, who we

4   talked about earlier, right?

5        A    I don't know for sure.

6        Q    Well, then Dr. Yang asks

7   Ms. Laboy, you're CC'd at this point again,

8   "Can you or Jonathan send me email you last

9   sent asking this to be fixed," right?

10       A    Yes.

11       Q    Now, at this point, did you engage

12  or get involved with trying to rectify the

13  situation?

14       A    No.  Again, this is clearly an HR

15  issue, and the to line is Jessica Laboy.

16  I'm included here for awareness.

17       Q    Okay.  Ms. Laboy claims this

18  fixed, right, again?

19       A    Yes.

20       Q    "John should have emails notifying

21  Maria to remove Mundy."

22            Did you ask to see these emails

23  yourself, like Ms. yang did?

24       A    No.

25       Q    Why not?

1                    R. MACDONALD

2          A    Because Ms. Yang is looking into

3     it.  These are my colleagues in HR who are

4     attesting that they performed this basic HR

5     function.  She's their supervisor.  She's

6     checking into it.  It should have been done.

7          Q    So you're saying that it should

8     have been done.  You didn't take any further

9     steps to look into whether or not it

10    happened, right?

11         A    Yes.

12         Q    Now, were you ever aware of a

13    project that was being conducted by HR

14    involving, I guess, various employee's

15    personnel files?

16         A    No.

17         Q    So was it inaccurate for

18    Ms. Swenson to tell Dr. Kaye that there was

19    a project?

20              MS. CANFIELD:  Objection to

21         form.  You can answer.

22         A    I don't know what project you're

23    referring to.

24         Q    Well, I mentioned to you earlier

25    that Dr. Kaye complained of fishing emails,

Page 313

```
 1                         R. MACDONALD
 2      right?
 3              A     Yes.
 4              Q     And I mentioned to you that she
 5      complained about them, and there were
 6      questions about what steps had been taken to
 7      actually address the issue.
 8                     I'm going to direct you -- and
 9      this wasn't produced, this is from one of
10      the earlier depositions, Ms. Canfield.  It
11      bears the Bate Stamp series NYC2629, 2630.
12      And I'm going to share the screen.
13                         (Whereupon, Email
14                         (NYC_2629-2630) was marked as
15                         Plaintiff's Exhibit 21 for
16                         identification as of this date.)
17                     MS. CANFIELD:  Do you know
18              which deposition this was produced?
19                     MS. HAGAN:  This should be at
20              Mr. Wangel's deposition.
21              Q     I'm going to start at the bottom.
22      This is from Teleakie Parker.  Do you know
23      who Teleakie Parker is?
24              A     The name is familiar to me, but I
25      don't know the exact role.
```

Page 314

                          R. MACDONALD

1

2        Q    Teleakie Parker is assistant

3   coordinating manager of operations.  You're

4   familiar with that, right?

5        A    I am -- that doesn't really -- I'm

6   familiar with that title within operations,

7   but I don't know exactly what that person's

8   role was.

9        Q    So there's an email, March 7,

10   2019, and it says audit, Melissa Kaye.

11             Were you aware that there was an

12   audit taking place at HHC regarding various

13   files at that time?

14        A    No.

15        Q    "Hi.  While conducting an audit it

16   came across the following documents are

17   missing.  Please review the list below.

18   The required documents you must completely

19   submit."  Right?

20             Now, as a doctor yourself,

21   Dr. MacDonald, would you have -- would these

22   documents have -- would you have produced

23   these documents yourself or keep them up to

24   date?

25        A    Yes.

```
 1                      R. MACDONALD

 2          Q    And she says, "Please provide me

 3     with the following for credentialing, Social

 4     Security and date of birth."  Right.

 5               Now, would you find this to be odd

 6     considering that Dr. Kaye and you had been

 7     working at CHS, HHC for a numbers of years,

 8     at least the request of her Social Security

 9     number and date of birth?

10          A    Yeah.  I could see how that would

11     be perceived as odd.

12          Q    So Dr. Kaye express concerned,

13     right?

14          A    Yeah.

15          Q    So I'm going to go up here.

16     Dr. Kaye to Ms. Parker, she CCs Dr. Jain,

17     Dr. Ford and a number of other people.  She

18     explains to Ms. Parker that she's a

19     credentialed position in H&H, and she's been

20     as much since 1999.  And she basically

21     says -- well, I'll let you continue to read

22     it.

23               Important this first paragraph

24     that says, "We were to told that the

25     credentialing status of Bellevue court
```

1                    R. MACDONALD
2    clinic employees would roll over to CHS.  I
3    was never informed that I would be required
4    to recredential at CHS."  Right.
5              "Prior to your email, the only
6    credential and issue brought to my attention
7    was in December 2018.  That was an email
8    from HR admin regarding the pending
9    expiration of my DEA license.  I provided an
10   updated DEA certificate prior to its
11   expiration -- Bellevue medical's staff
12   office and Dr. Jain, supervisor, CHS, for a
13   copy of those emails.  Per below, I am now
14   being informed by CHS that much of my
15   credentialing employment information is
16   missing, including basic demographic
17   information such as my date of birth and
18   Social Security number.  This seems
19   implausible and is a serious matter that
20   needs clarification."  And then she explains
21   further.
22              When was this brought to your
23   attention, or do you remember?
24        A    I don't recall.
25        Q    At any point did you take any

Page 317

```
1                        R. MACDONALD

2      steps to address Dr. Kaye's concerns about

3      the fishing emails?

4                   MS. CANFIELD:  Objection to

5              form.  You can answer.

6         A    I don't remember this being raised

7      to me directly.

8         Q    Let's see if we can figure out one

9      of these if we can find one of these emails.

10     I'm sure you are on it.

11                   Now, I'm going to show you HR

12     payroll audit report.  And for purposes of

13     this deposition, it's under the Wangel

14     deposition.  And bears the Bate Stamp series

15     NYC2159, 2160 and 2161.

16                        (Whereupon, Email

17                        (NYC_2160-2161) was marked as

18                        Plaintiff's Exhibit 22 for

19                        identification as of this date.)

20        Q    At any point were you aware of an

21     HR audit report?

22        A    No.

23        Q    And this will be Exhibit 22.

24                   Have you seen anything like this

25     since you've been employed at CHS?
```

```
 1                    R. MACDONALD
 2         A    No.
 3         Q    Would you know of any reason why
 4    this would actually take place, that an HR
 5    audit report would be ordered in the first
 6    place?
 7              MS. CANFIELD:  I'm going to
 8              object to the characterization that
 9              this is an audit report.  You can
10              respond.
11         Q    Well, according to the title of
12    the document, it says, HR payroll audit
13    report.  Do you see that, Dr. MacDonald?
14         A    I see those words up top, yes.
15         Q    Right.  Have you seen anything
16    like this during the course of your
17    employment at H&H?
18         A    No.
19         Q    At any point did anybody explain
20    to you that this has taken place?
21         A    No.
22         Q    Here you have an email from CHS
23    personal actions, right.  Are you in this
24    administrative group?
25         A    No.  Not that I am aware of.
```

1                   R. MACDONALD

2          Q    "Attached you will find the

3     supporting documents for the HR payroll

4     audit report, October 30."

5                   Since you've been at HHC, have you

6     ever asked for an HR payroll audit report

7     any other employee?

8          A    For no employee, including

9     Dr. Kaye.

10         Q    Do you know why this would take

11    place?

12         A    No.

13              MS. CANFIELD:  Can you tell me

14         what the date was of the email that

15         Dr. Kaye sent to Mr. Wangel that's

16         Exhibit P21.

17              MS. HAGAN:  Are you talking

18         about 21?

19              MS. CANFIELD:  Yeah.  What is

20         the date on that email.

21              MS. HAGAN:  I think that would

22         be March 8, 2019.  We're going

23         forward now to July 3, 2019.

24              MS. CANFIELD:  Yeah.  I'm

25         trying to get -- the audit report

```
 1                    R. MACDONALD

 2            was dated December 10, 2018.  So

 3            three months earlier.

 4                 MS. HAGAN:  Well,

 5            March 7, 2019 she emails -- I mean,

 6            Ms. Parker emails Dr. Kaye asking

 7            for all these documents.

 8                 MS. CANFIELD:  Okay.  Yeah.

 9            Thank you.

10        Q    Now, are you on the spam admin

11    group, Dr. MacDonald?

12        A    No.

13                 MS. CANFIELD:  Is this another

14            exhibit, Ms. Hagan?

15                 MS. HAGAN:  I'm just asking

16            some questions.  Because I just

17            wanted to make sure that it makes

18            sense to go through this particular

19            email.  But he's not.

20        Q    It's your testimony today that you

21    weren't really aware of what happened with

22    the audit with Dr. Kaye?

23        A    Correct.

24        Q    And at no point did Dr. Ford talk

25    to you about the email audit?
```

1                          R. MACDONALD

2          A     Correct.

3          Q     So I have some questions regarding

4     the staffing at the Bronx court clinic.

5                Is it your understanding that

6     evaluations could be done without the

7     presence of two evaluators?

8                     MS. CANFIELD:  Objection to

9                form.  Asked and answered.  You can

10               answer again.

11         A     No.

12         Q     You said no, right?

13         A     Correct.

14         Q     Now, at some point Dr. Kaye asked

15    if she could perform -- as a reasonable

16    accommodation, she could perform the exam

17    remotely.  Do you recall us talking about

18    that earlier?

19         A     I remember that was part of the

20    request, yes.

21         Q     Now, that request to do so was

22    denied.  Do you recall why?

23                     MS. CANFIELD:  Objection to

24               form.  You can answer.

25         A     No.

Page 322

1                              R. MACDONALD

2                Q      Dr. Kaye requested to do some of

3        the exams from -- to write direct exams at

4        home.  Do you recall why she was denied the

5        right to do that?

6                A      No.

7                Q      Now, at this time the 730 exams

8        are being administered remotely; am I right?

9                A      Yes.  For the most part.

10               Q      And examiners are actually -- not

11       only are they administering exams remotely,

12       but they are also writing the reports at

13       home remotely; am I right?

14               A      At times, yes.

15               Q      Why is it permissible now versus

16       when Dr. Kaye was actually employed at the

17       court clinics?

18               A      Probably the same reason we're

19       having this deposition on Zoom versus doing

20       it in person.

21               Q      If it's inevitable now, right, and

22       it is doable now, why couldn't it have been

23       done before, when Dr. Kaye asked for it?

24               A      I don't know.

25               Q      At any point did Dr. Kaye get

1                    R. MACDONALD

2    docked for taking her board examinations?

3              MS. CANFIELD:  Objection to

4         form.  You can answer.

5    A    Can you repeat the question.

6    Q    Was there a time when Dr. Kaye was

7    docked pay when she took her board

8    examinations?

9    A    I vaguely remember that that

10   occurred because she coded for a board

11   examination that was not a requirement for

12   her work in the clinic.  If I recall

13   correctly.

14   Q    Were any of the other doctors

15   docked pay for taking board certification

16   examinations?

17             MS. CANFIELD:  Objection to

18        form.  Characterizing as docked.

19        You can answer.

20   A    I'm not aware of anyone else

21   taking a board certification exam that was

22   unrelated to their work.

23   Q    Is that your opinion, that it was

24   unrelated to her work?

25   A    That was my understanding of why

Page 324

1                    R. MACDONALD

2       it wasn't compensated.

3            Q    Do you know how that situation was

4       resolved?

5            A    No.

6            Q    Did you intervene?

7            A    No.

8            Q    So I'm going to show you some

9       documents.  At least one document.  And this

10      will be Plaintiff's Exhibit 23.  And it

11      bears the Bate Stamp series NYC960 to 961.

12                    MS. CANFIELD:  This is in that

13             October production?

14                    MS. HAGAN:  Yes.

15                    (Whereupon, Email (NYC_960-961)

16                    was marked as Plaintiff's

17                    Exhibit 23 for identification as

18                    of this date.)

19            Q    I'm going to scroll down to the

20      bottom.  And it's from -- the first email is

21      from you, Dr. MacDonald.  And it says, "I

22      supported the education leave for these.

23      It's once every ten years and it's in CHS'

24      best interest."

25                    Do you see that?

Page 325

1                        R. MACDONALD

2          A     Yes.

3          Q     And then Mr. Wangel says, "Just so

4     we're on the same page, H&H charges to

5     education on the house, no balance charge

6     and PAGNY charges to CME balance."

7                You see that, right?

8          A     Yes.

9          Q     And then you verify that.  And you

10    said, "Please see below.  Talk before

11    responding to Dr. Kaye.  Let me know."  And

12    you're going back and forth, right?

13         A     Yes.

14         Q     So you address this issue.

15                No, Dr. Kaye sat for examination

16    for child and adolescence psychiatry.  Do

17    you remember that?

18         A     Yes.  That was my understanding

19    subsequent.

20         Q     Now, how is it that that wasn't

21    related to her current job?

22         A     Well, the evaluation is done in a

23    clinic of adults.

24         Q     Would it be fair to say that a lot

25    of the inmates had problems as children as

Page 326

1                      R. MACDONALD

2      well?

3                      MS. CANFIELD:   Objection to

4            form.

5           A     Yes.

6           Q     You said yes, right?

7           A     Yes.

8           Q     Wouldn't having that background be

9      helpful to the court clinics because that

10     would provide her with an additional level

11     of insight?

12          A     Possibly.

13          Q     Now, I had some questions

14     regarding the work stoppage at the court

15     clinic.

16                Did there come a time where the

17     Bronx court clinic was not seeing 730

18     examinations, the 730 exams?

19                      MS. CANFIELD:   Objection as to

20            the form of the question.   You can

21            answer.

22          A     I think we discussed this.   I

23     don't remember the exact time frames.

24     Certainly after COVID there was a period of

25     time when none of the clinics were seeing

1               R. MACDONALD

2    exams.  I think you're referring to a

3    different period of time.

4        Q    Was there a time when Mr. Bloom

5    complained to you about the backlog of the

6    exams at the Bronx court clinic?

7        A    Yes.  That sounds familiar.

8        Q    And what do you remember about

9    that?

10       A    I remember talking with Dr. Jain

11   about strategies to try to keep examinations

12   going as best we could.

13       Q    Was there a discrepancy as to

14   whether or not defendants were being

15   produced versus whether or not exams were

16   being conducted all together?

17       A    I'm not sure I understand the

18   question.

19       Q    Well, it was Mr. Bloom's

20   contention that there was a work stoppage,

21   right?

22            On the other hand, you had

23   Dr. Jain and maybe Ms. Persaud saying that

24   the defendants weren't being produced.  Do

25   you recall that there was kind of like

```
 1                     R. MACDONALD
 2      conflicting accounts of what was transpiring
 3      at the Bronx court clinic?
 4                    MS. CANFIELD:  Objection to
 5             form.  You can answer.
 6      A     No.
 7      Q     Do you recall having received a
 8      complaint from Mr. Bloom regarding the
 9      impact that the stoppage was having on
10      criminal defendants awaiting trial?
11      A     I recall some communication from
12      Mr. Bloom.  I don't remember the specifics
13      of what his concern was.
14      Q     What steps were taken to address
15      Mr. Bloom's concerns about the work
16      stoppage?
17                    MS. CANFIELD:  Objection to
18             form.  You can answer.
19      A     I can't remember if there was some
20      formal response to Mr. Bloom at that time.
21      But, obviously, the intent of CHS has been
22      to do the evaluations timely from the
23      beginning.  That was the intent, as I said,
24      of taking over the clinics.  And so our
25      intentions and goals would have been aligned
```

Page 329

```
 1                      R. MACDONALD
 2      with this, if that was his assertion.
 3           Q    Do you know who Peter Jones is?
 4           A    No.
 5           Q    Had you engaged any of the staff
 6      at Legal Aid regarding the backlog of exams?
 7           A    I have not, no.
 8           Q    I'm going to show you what's going
 9      to be marked as Plaintiff's Exhibit, this
10      will be 23, if I recall correctly?
11                  MS. CANFIELD:  It's going to
12             be 24.
13                  MS. HAGAN:  24.
14                  (Whereupon, Email (Kaye's 6th
15                  Prod_557-559) was marked as
16                  Plaintiff's Exhibit 24 for
17                  identification as of this date.)
18           Q    This is from Mr. Bloom's
19      deposition.  And it bears the Bate Stamp
20      series K6 Production 557 through 559.  WS
21      12/09/2019 and.  I'm going to share the
22      screen with you.
23                  I want to draw your attention, I
24      guess, I don't know if you need to see the
25      entire thing, but I want to draw your
```

1            R. MACDONALD

2    attention to the list of defendants down

3    here.  Right.

4              Now, this is an email from

5    Mr. Bloom to, I guess Tina Lawongo

6    (phonetic) and Peter Jones.  Do you recall

7    that?

8              Do you know who they are?  That's

9    the beginning one.

10        A    I know who Tina Lawongo is.  I'm

11   not familiar with Peter Jones.

12        Q    Who's Tina Lawongo?

13        A    She's an attorney at the Legal Aid

14   Society.

15        Q    And in what capacity does she act,

16   do you know?

17        A    I don't know.

18        Q    So at any point did it come to

19   your attention that at least 40 cases were

20   waiting to be seen in December of 2019 at

21   the Bronx court clinic?

22        A    I was aware of some delays.  I

23   don't know that that number -- I mean,

24   there's a lot of complexity as to how their

25   cases are scheduled and produced.  So I'm

Page 331

1                        R. MACDONALD

2       not sure that I would attest to that number.

3       But, as I mentioned, we were working on

4       struggles with staffing at the clinic at

5       that time.

6            Q    Well, Dr. Kaye was still there.

7       Why wasn't she allowed to see any 730 exams?

8                      MS. CANFIELD:  Objection to

9                 form.  You can answer.

10           A    I don't know that to be the case.

11           Q    Well, Dr. Kaye contends that she

12      was rubber roomed, in fact, during the

13      period of October -- really, October 2019

14      until she believes she was constructed and

15      discharged.

16                     MS. CANFIELD:  Objection to

17                form, but you can answer.

18           A    What's the question?

19           Q    Why was Dr. Kaye prohibited from

20      seeing defendants from October 2019 to

21      January 2020?

22                     MS. CANFIELD:  Objection to

23                form.

24           A    I'm not aware that she was.

25           Q    So you're contending that you were

1                         R. MACDONALD

2      not aware that Dr. Kaye was not allowed to

3      see criminal defendants at that point?

4           A    Correct.

5           Q    You were not aware about the 40

6      defendants that had not been seen; is that

7      your testimony today, too?

8                     MS. CANFIELD:  Objection to

9                form.  You can answer.

10          A    I was aware about concerns about

11     processing at the Bronx clinic.  I'm just

12     not attesting to that 40 was the correct

13     number.

14          Q    What was the number that you

15     believed it to be?

16          A    I believe there were some delays.

17     It's a complex process to identify,

18     quote/unquote, backlog and put a number on

19     it.

20          Q    I'm going to show you what's going

21     to be marked as Plaintiff's Exhibit 25.

22                    MS. HAGAN:  And this produced

23               in October, Ms. Canfield.  And it

24               bears the Bate Stamp series 1718

25               through 1719.

Page 333

```
 1                        R. MACDONALD
 2                        (Whereupon, Email
 3                        (NYC_1718-1719) was marked as
 4                        Plaintiff's Exhibit 25 for
 5                        identification as of this date.)
 6          Q    I'm going to scroll down to the
 7     bottom.  Right.
 8               This is from Dr. Jain to you and
 9     Dr. Ford, and it's dated October 9, 2019.
10     Right.  And the subject is the Bronx court
11     clinic.  Right.
12               And Dr. Jain says, "Hi, everyone.
13     Thank you again for discussing this
14     yesterday.  This is the summary of my
15     interaction with Legal Aid attorney Lorraine
16     MvEvilley and Jeffrey Bloom in the Bronx.
17     This is rather lengthy, but thought it best
18     to send it to you because of the potential
19     impact on our processing staff."  Right.
20               At this point there's an incident
21     with Dr. Jain, Dr. Brayton and
22     Ms. McEvilley.
23               Do you remember this?
24          A    Vaguely.
25          Q    What do you remember?
```

Page 334

1                      R. MACDONALD

2          A    It's coming back to me as I read

3     this email.

4                    MS. CANFIELD:  Do you want to

5               take the time to read the entire

6               email?

7                    THE WITNESS:  Yes, please.

8          Q    Now, in this email Dr. Jain

9     alleges that there's a hostile environment

10    at the Bronx court clinic; is that right?

11         A    Yes.

12         Q    Now, do you know who a Ben is, by

13    any chance?

14         A    I'm sorry?

15         Q    Do you know -- he says, "After

16    this and after briefly speaking with Ben, I

17    decided to still sit in on the two

18    examinations."

19              Who is Ben?  Is he talking about

20    Brayton or Ben?  Who is Ben?

21         A    I think Benjamin Farver (phonetic)

22    who was at that time Dr. Jain's chief of

23    staff.

24         Q    Now, what do you recall about this

25    incident, outside of just the fact that

1                    R. MACDONALD

2      there were problem that Legal Aid expressed

3      about having Dr. Jain sit on the

4      examinations with Dr. Kaye and Dr. Brayton?

5           A    I mean, it's somewhat anglomaniac

6      (phonetic) of the challenges we were having

7      in the Bronx.

8           Q    Did you ever discuss this issue

9      with Dr. Kaye and/or Dr. Brayton?

10          A    No.

11          Q    Now, at any point -- I'm going to

12     ask you a question.  As a physician and as

13     an administrator for all these years,

14     especially dealing with doctors, right, has

15     there ever been a time where you determined

16     that it's better for a doctor to be given

17     the option of resignation in lieu of

18     termination versus being terminated?

19          A    Yes.  At times.

20          Q    Have you ever made the statement

21     that oftentimes a physician is best to be

22     given the opportunity to resign rather than

23     some of the implications that come along

24     with formal termination?

25          A    I may have said something to that

1                    R. MACDONALD

2      effect.

3            Q    In making a statement to that

4      effect, for a physician, what are the

5      implications of being terminated versus

6      resigning?

7            A    Well, being terminated for

8      problems related to your work as a physician

9      is reportable to the Office of the

10     Professions.

11           Q    So if you're terminated, you have

12     to report that to the Board, right?  The

13     Office of Professional Medical Conduct or

14     something like that; is that what it's

15     called?

16           A    Yes.

17           Q    What are the implications for your

18     career if you report something like that?

19           A    I don't know exactly, but I think

20     it could be problematic for your future

21     employment.

22           Q    Now, Dr. Kaye contends that she

23     felt compelled to resign, especially in

24     January after the work stoppage for two

25     months.  She felt that she was being set up

```
1                        R. MACDONALD

2    to be terminated.  Would you agree or

3    disagree?

4                    MS. CANFIELD:  Objection to

5          form.  You can answer.

6         A    I would disagree that she was

7    being set up to be terminated.  I don't

8    disagree that things were going poorly.  And

9    that there had been -- you know, as we've

10   discussed all day today, there was a serious

11   lack of trust, collaboration, team work,

12   going on with our efforts to improve the

13   work in the Bronx clinics.  It was --

14        Q    Would Dr. Kaye have been

15   terminated had she not resigned?

16        A    Not for anything that was pending

17   at the time.

18        Q    So are you saying that steps

19   weren't being taken to manage Dr. Kaye out

20   after she complained about various aspects

21   of the transition that we discussed earlier

22   today?

23                   MS. CANFIELD:  Objection to

24         form.  You can answer.

25        A    You asked about me about that
```

Page 338

1                            R. MACDONALD

2       phrase used by Dr. Ford.  I mean, I think

3       that implicit in that is to give people the

4       opportunity to be remediated or to be

5       managed out if the challenges with their

6       work performance can't be fixed.

7              Q    Were you aware of any opportunity

8       that Dr. Kaye was given to be remediated?

9              A    I'm aware that Dr. Jain and

10      Dr. Ford both spent time with Dr. Kaye

11      working on some of the challenges that we've

12      discussed here.

13             Q    Was Dr. Kaye put on a performance

14      improvement plan?

15             A    Not to my knowledge, no.

16             Q    Was Dr. Kaye given a formal

17      remediation program?

18             A    No.

19             Q    So had Dr. Kaye continued to work,

20      it's your position that she would not have

21      been terminated?

22             A    I can't know that she would have

23      been terminated.

24             Q    But it didn't look good for

25      Dr. Kaye if she continued to work there;

Page 339

1                       R. MACDONALD
2      would that be accurate?
3                       MS. CANFIELD:   Objection to
4             form.
5          A     I don't know that I would say
6      that.  I mean, it was not going well.  I
7      think we could all agree.
8          Q     How could you say it wasn't going
9      well.  I mean, she was doing the evaluations
10     when she had the opportunity to do them.
11                Why wasn't she allowed to continue
12     to work?
13                       MS. CANFIELD:   Objection to
14            form.  You can answer.
15         A     I mean, I just have a different
16     reading of it than that.  She was resistant
17     to so many different elements all the time
18     of what we were trying to do, and she
19     contributed to an environment that's
20     portrayed in that email, where our staff,
21     our supervisors feel persecuted for even
22     wanting to sit in on an evaluation in a
23     clinic where really our goal and intention
24     for even coming in there after all these
25     years of practicing exactly the way that it

Page 340

1                        R. MACDONALD

2      always practiced, was to try to make it

3      better.

4              It was not even an environment

5      where anyone wanted to be where we could

6      retain somebody good to be there with her.

7      So it wasn't going well.

8         Q    I'm going to ask you, Doctor, did

9      you ever have -- I mean, how is Dr. Kaye

10     exactly resistant?  What examples do you

11     have?

12              MS. CANFIELD:  Can you repeat

13          the question.  I didn't hear it.

14        Q    What example do you have of

15     Dr. Kaye being resistant?

16        A    So, I mean, the litany of

17     complaints that she lodged, which are easily

18     rebuttal, again, in my opinion.

19              The misunderstanding of our

20     intentions.  The implication that we are

21     trying to through malfeasance and

22     unethically influence the results of the

23     evaluations.  When, in fact, we are a group

24     of people who took over this clinic because

25     we believe the work and we want to make it

```
 1                        R. MACDONALD

 2      better, and we want to make it more

 3      efficient.

 4                Now, are we perfect?  No.  And did

 5      HR do some things wrong, did they have the

 6      wrong supervisor on there for a period of

 7      time that they shouldn't have.  Sure.  But

 8      each one of those things is interpreted as a

 9      personal attack, they're interpreted as

10      about here, they're interpreted as

11      retaliation.

12                The change in the title is a great

13      example.  It is completely meaningless to

14      one's work.  The distinction between medical

15      record, a director, it was not meant as a

16      slight or a demotion.  And yet everything is

17      perceived in that way.

18                The ability to accommodate

19      feedback, even within the course of this

20      deposition, it's like, if you haven't been

21      doing it for 20 years, then nobody can have

22      a differing opinion.

23                All of these things made it

24      challenging to do the basic goal of what we

25      had set out to do; which is to streamline
```

                          R. MACDONALD

1   the process, to make it better, to address

2   the efficiencies.  To recruit and retain

3   staff to do good work.  That's what we were

4   trying to do.  And it was all challenged by

5   her resistance to that very project.  Which

6   she didn't believe that we were motivated by

7   good intentions, and she resisted at every

8   step.  And it made it not a good place to

9   work.

10        Q    Now, you're saying that she

11   resisted you at every -- that she resisted

12   you every time.  And that her complaints

13   made it not a good place to work, but

14   Dr. Kaye wasn't the only person that raised

15   concerns about the changes that were being

16   made.

17             And we went over this earlier.  I

18   mentioned earlier that Dr. Winkler had

19   raised the concern, right.  But he wasn't

20   treated the same way as Dr. Kaye.  I raised

21   questions about Dr. Collin raising concern.

22             Now, what happen to Dr. Collin.

23   Does he still work at the actual court

24   clinic?  Does he still work in Bellevue,

1                     R. MACDONALD

2      let's begin with?

3           A    Yes.  Dr. Collin never worked for

4      CHS.  He still works for Bellevue, as I

5      understand.

6           Q    But he was no longer in charge of

7      any court clinic once Dr. Yang came on; am I

8      right?

9                     MS. CANFIELD:  Objection to

10                form.  You can answer.

11          A    Yes.  As I mentioned, the project

12     was to consolidate the clinics under CHS.

13     Dr. Collin never worked for CHS.

14          Q    Did Dr. Collin apply for Dr.

15     Jain's position?

16          A    I don't know.

17          Q    Was he considered to be the,

18     quote/unquote, Uber director?

19          A    I don't know.  He was not one of

20     the people I interviewed for that position.

21          Q    So there were other candidates

22     that were interviewed besides Dr. Jain,

23     right?

24          A    Yes.

25          Q    And Dr. Collin was not one of the

Page 344

```
 1                      R. MACDONALD
 2      people interviewed, right?
 3           A     Correct.
 4           Q     And do you know why that was?
 5           A     No.
 6                      MS. CANFIELD:  Objection to
 7                 form.  You can answer.
 8           Q     Would you have considered him a
 9      good candidate to replace instead of
10      Dr. Jain?
11           A     I don't know enough about his
12      background.  And I would have had to
13      interview him.
14           Q     Now, you were pretty animated as
15      you talked about the types of allegations
16      that Dr. Kaye had with her board of
17      correction complaint, amongst others.
18                      Did it anger you that Dr. Kaye
19      accused you and the other CHS management of
20      malfeasance?
21                      MS. CANFIELD:  Objection to
22                 form.  Mischaracterizing the
23                 witness's testimony, but you can
24                 answer.
25           A     No.  I don't harbor any personal
```

Page 345

R. MACDONALD

1

2    anger.  I think it's unfortunate that it

3    worked out that way.  Because she clearly

4    misperceived our intentions.  And to me

5    that's -- that's unfortunate and sad.  I

6    don't feel angry towards her.  Because I do

7    believe that she thinks that she was being

8    persecuted by us.  It's just simply that

9    that's not the realty of the situation.

10        Q    Why couldn't her shift be restored

11   back from 9:00 to 5:30?

12        A    I don't know the answer to that.

13   I wasn't involved in that discussion.  And,

14   ultimately, again, it was an HR issue about

15   standardization.

16        Q    Dr. Kaye alleges that she wasn't

17   taken seriously because she was a woman,

18   rather than the other males that complained.

19   Do you agree or disagree?

20        A    I disagree.  My direct supervisor

21   at CHS is a woman, and Dr. Ford who was

22   charged with running this initiative for CHS

23   is a woman.  So I don't know how CHS -- you

24   know, I can't speak to Bellevue for many

25   years or anything else.

Page 346

1                        R. MACDONALD

2                But I know at CHS our leadership

3       has the principles of equity at the

4       forefront, and certainly gender equity is a

5       huge part of that.

6            Q    Now, you said that there were no

7       efforts by CHS management to interfere with

8       the administration of the 730 exams, right?

9            A    Correct.

10           Q    And at no point did City Hall or

11      CHS ever have any interference or made any

12      inquiries about any specific exams, right?

13           A    No interference.  I don't know if

14      there were inquiries that might have come

15      from City Hall.  I can't control whether

16      that happened, but I'm not aware of any.

17           Q    Were you aware of Dr. Yang asking

18      about specific defendants, by any chance?

19           A    No.

20           Q    I want to direct your attention to

21      an exhibit.  And I'm going to make sure I

22      pull up the right one.

23                Before I get into it, what was

24      your familiarity with MOCJ?  What do you

25      know about them?

Page 347

```
 1                    R. MACDONALD
 2                    MS. CANFIELD:  Objection to
 3            form.  You can answer.
 4       A     They are a mayoral agency, I
 5   guess, or office that looks at issues
 6   relevant to criminal justice as part of City
 7   Hall.
 8       Q     You said that they look at issues.
 9   Now, was -- how often did you engage MOCJ?
10       A     Very rarely.
11       Q     Who engaged MOCJ from your office?
12       A     Probably Patsy's chief of staff or
13   data analysis people would be engaging MOCJ,
14   and sometimes Patsy would talk to their
15   leadership.
16       Q     Who was the chief of staff at that
17   time?
18       A     Ben Farver.
19       Q     Was John Volpe ever her chief of
20   staff?
21       A     No.
22       Q     Who's John Volpe?
23       A     John Volpe never worked for CHS.
24       Q     He worked for Department of
25   Health, right?
```

Page 348

                         R. MACDONALD

1

2       A    I believe so, yes.

3       Q    Did he work with you?

4       A    I've met John in different

5    capacities over time.

6       Q    Now, did you report to Ms. Yang

7    when you were at the Department of Mental

8    Health and Hygiene?

9       A    No.

10      Q    Did you know her at that time?

11      A    I knew of her.  I don't think we

12   had many interactions.

13      Q    I'm going to show you what's

14   marked as Plaintiff's Exhibit 26.  Okay.

15   Plaintiff's Exhibit 26 bears the Bate Stamp

16   series K6 Production 3 and 4.  And it's

17   actually produced at -- this would have been

18   Mr. Bloom's deposition.  I'm going to share

19   the screen with you now.  And I'm going to

20   draw your attention to the beginning of the

21   email -- well, the email from the beginning.

22                    (Whereupon, Email (Kaye's 6th

23                    Prod_3-4) was marked as

24                    Plaintiff's Exhibit 26 for

25                    identification as of this date.)

Page 349

```
 1                    R. MACDONALD
 2              Now, this is an email from
 3    Mr. Bloom to Connie Montoya and Claudia --
 4    Peter Jones and Claudia Montoya, right.  And
 5    I just want to draw your -- well, do you
 6    want to read it first before -- you're not
 7    on it, but do you want to read it first
 8    before we get into a discussion about it?
 9         A    Sure.
10         Q    For purposes of the record, the
11    email involves Miguel Figueroa and Marsik
12    had a 730 exam and he refused to board the
13    bus to Rikers an exam was scheduled for
14    December 28, 2015.  The court date was
15    January 19th, right.  And Mr. Bloom goes on
16    to describe Mr. Figueroa's stature, he's 285
17    pounds, he's 6-foot three and had been
18    violently attacking officers.
19              Had you heard anything about
20    Mr. Figueroa during the course of your
21    employment?
22         A    I'm generally aware of the name.
23         Q    What do you --
24              MS. CANFIELD:  Dr. MacDonald,
25         did you finish reading the email?
```

1               R. MACDONALD

2               THE WITNESS:  No.  Sorry.

3               MS. CANFIELD:  Why don't you

4          finish reading the email.

5          Q    Now, for purposes of clarity and

6     the record, Mr. Bloom says, "Melissa has

7     been receiving calls and emails from John

8     Volpe and Trish Marsik of the Mayor's

9     office, and Patsy Yang and Angela Solimo of

10    Dot DOC.

11               Was it your understanding that

12    Ms. Yang was working at DOC at that time?

13          A    No.

14          Q    "She told me that she received an

15    email from John today, in which he

16    encouraged Melissa to ask Judge Veijas for a

17    force order to get Mr. Figueroa to the

18    clinic."

19               Do you recall that?

20          A    No.

21          Q    At this point were you involved in

22    this case or involved with Mr. Figueroa on

23    any level?

24          A    No.

25          Q    So I'm going to ask you some more

```
 1                       R. MACDONALD

 2    questions again, going back to the Board of

 3    Correction complaint.

 4             Now, Dr. Kaye raises some issues

 5    about malfeasance and the interference with

 6    the examination.  And one of the examples

 7    that she has cited was the Miguel Figueroa

 8    case.

 9             Would you say that that was an

10    instance of influence, undue influence?

11                 MS. CANFIELD:  Objection.  You

12          can answer.

13        A    Not based on the evidence that's

14    just been presented to me.  And also those

15    people are part of an entity external to

16    CHS.

17        Q    So you're saying that CHS, in

18    2015, was not at the Department of Health?

19                 MS. CANFIELD:  Objection to

20          form.  You can answer.

21        A    I'm sorry.  What was the date of

22    that exchange?

23        Q    I can tell you.  December -- let's

24    get back to this.  This particular email was

25    December 16, 2015.
```

Page 352

1                        R. MACDONALD

2          A     And the allegations -- so that was

3     before CHS took over the forensic evaluation

4     clinics, correct?

5          Q     Well, Ms. Yang is asking about

6     these particular exams regardless of whether

7     or not they took over, quote/unquote.  Ms.

8     Yang is asking about this specific defendant

9     and getting a forced order at that time.

10         A     Was that clear from the email that

11    you showed me?

12         Q     I'm sure.

13         A     Or was that a question from MOCJ?

14         Q     No.  We can review it.

15         A     I mean, the information in the

16    email in question as it described her as an

17    employee of the Department of Correction.

18         Q     Well, you said that she was at the

19    mayor's office at that time.

20         A     My point is, this doesn't

21    establish that she was trying to influence

22    the outcome of an evaluation.

23         Q     Well, they wanted -- Melissa

24    believes that the mayor's office anticipates

25    a finding of unfitness.  Right?

1                      R. MACDONALD

2          A     But what is that based on?

3          Q     Well, "She told me that she

4     received an email from John today in which

5     she encouraged Melissa to ask Judge Viejas

6     for a forced order to get Mr. Figueroa to

7     the clinic.

8                 How often would you say that

9     someone would ask for a forced order for a

10    defendant?

11         A     You're showing me the email that

12    is -- one person's impression from that time

13    of what Dr. Kaye told them, based on her

14    conversations with four different people.

15         Q     Um-hmm.

16         A     And you're asking me -- you're

17    presenting this as evidence that Patricia

18    Yang was influencing the outcome of

19    evaluations.  Is that correct?

20         Q     Let's keep going.  We're going to

21    have another exhibit.  We're going to have

22    Exhibit 27.  K6 Production 73 through 78.

23    Right.

24                     (Whereupon, Email (Kaye's 6th

25                     Prod_73-78) was marked as

Page 354

```
 1                      R. MACDONALD
 2                      Plaintiff's Exhibit 27 for
 3                      identification as of this date.)
 4            MS. CANFIELD:  Is this also
 5        part of the Bloom deposition?
 6            MS. HAGAN:  Yes.
 7            MS. CANFIELD:  Do you know
 8        what the exhibit number was for
 9        Bloom?
10            MS. HAGAN:  I can't tell you
11        that off the top of my head.
12        Q    Now, the first email here is from
13    Angela Solimo, and it's to Dr. Kaye, and the
14    subject is MF for Miguel Figueroa.  And she
15    asks, "Dr. Kaye, are you expecting Miguel
16    Figueroa, AKA Figueroa, whatever, in the
17    Bronx court clinic tomorrow for 730 exam
18    evaluation.  If so, special transportation
19    will need to be made.  Please let me know
20    when you can."
21            Do you know who Angela Solimo is?
22        A    Yes.
23        Q    Who is she?
24        A    Angela Solimo works for CHS.
25        Q    And you were working for CHS in
```

Page 355

```
 1                     R. MACDONALD
 2      2015; am I right?
 3           A    Correct.
 4           Q    And even though they weren't
 5      managing the court clinics, she's asking Dr.
 6      Kaye about Mr. Figueroa; am I right?
 7           A    Yes.
 8           Q    So now Dr. Kaye is responding to
 9      Ms. Solimo, "Hi, Angela.  Yes.  We called
10      him in for tomorrow and have made DOC aware.
11      Thank you."  Right?
12           A    Yes.
13           Q    Then Ms. Solimo again reaches out
14      to Dr. Kaye.  "Thank you for the message
15      this morning.  This was communicated to
16      mental health leadership and a unit chef in
17      his facility."
18                Who's mental health leadership?
19           A    I don't know who she would have
20      been referring to at that time.
21           Q    Then she says, "The biggest
22      concern is his stability over rushing to
23      complete the 730 to my knowledge.  So if he
24      refuses, no need to agitate him.  I left a
25      message with your office as well.  Can best
```

Page 356

1                        R. MACDONALD

2      be reached," and she leaves her number,

3      right?

4           A    Yes.

5           Q    Then Dr. Kaye responds to not only

6      Ms. Solimo, but to John Volpe.  Where is

7      John Volpe working at this point?

8           A    I don't know.

9           Q    He's working over at the

10     Department of Mental Health and Hygiene; am

11     I right?

12          A    Maybe.  That's where I knew him to

13     work --

14          Q    Executive deputy commissioner

15     office, Division of Mental Health, Mental

16     Hygiene, New York City Department of Health

17     and Mental Hygiene, right?

18          A    There you go.

19          Q    Yes.  And who's executive deputy

20     commissioner at that time?

21          A    Probably --

22          Q    Would that have been Ms. Yang?

23          A    No.

24          Q    It wasn't?

25          A    It was not Ms. Yang.  It was Gary

1                    R. MACDONALD

2      Belkin.

3           Q    Gary Belkin.  You're saying that

4      he is reporting to Gary Belkin and asking

5      all these questions, not Dr. Yang?

6           A    Correct.

7           Q    "What is the process of getting

8      the judge to issue a force order?  What if

9      we don't want to wait three times for

10     refusal."  You see that?

11          A    Can you show me the email that he

12     was responding to again.

13          Q    "Thanks for the update.  I was

14     just getting ready to let you know that

15     defendant Miguel Figueroa refused production

16     today.  I understand that he is typically

17     uncooperative, so it may require a force

18     order from the judge to get him to produce

19     in the future.  However, most judges are

20     reluctant to issue force orders.  This is

21     from Dr. Kaye.  And typically require that

22     the defendant refuses three times before

23     they will even consider it.  We have

24     schedule him for December 28th.  His return

25     to court date is January 19, 2016.  Please

```
 1                     R. MACDONALD
 2        let me know if there are plans to try to get
 3        a force order."  Right?
 4             A    Yes.
 5             Q    And then John Volpe says, "But
 6        what if we don't want to wait three times."
 7        Right?
 8             A    Yes.
 9             Q    So then Ms. Solimo, "To my
10        knowledge, that order can only come from the
11        court as it requires a judge's signature.
12        It's not something we typically get involved
13        with from the jail side."  Right?
14             A    Yes.
15             Q    Okay.  "But who specifically
16        requests the force order, what party?
17        Please excuse any typos."  Right?
18             A    Yes.
19             Q    And then Dr. Collin says, "Hi,
20        John, going back a few emails, can you
21        clarify the statement to the pronoun we,
22        quote/unquote.  What is the process of
23        getting the judge to issue a force order?
24        What if we don't want to wait three times
25        refusal."  Right?
```

Page 359

1                    R. MACDONALD

2                    "And the judge orders the

3        evaluation and directs its completion,

4        including authorization for DOC to use

5        reasonable force to produce defendant for

6        his examination, as the judge deems

7        appropriate.  Whoever the we, quote/unquote,

8        is should reach out to the defendant's

9        attorney.  I would imagine who can then

10       petition the court if he thinks a force

11       order to completion of the 730 is in the

12       best interest of his client."  Right?

13                    And then Mr. Volpe responds, "The

14       we is City Hall.  They are tracking the

15       case."

16                    Now, you said earlier Dr. Yang was

17       working out of the City Hall; am I right?

18        A    At some point, yes.  I don't know

19       when she would have started at City Hall.

20       But I would not describe all opinions

21       ascribed to City Hall to Dr. Yang.

22        Q    Now, I'm going to ask you some

23       questions.  You disagree with any number of

24       aspects of Dr. Kaye's complaint to the Board

25       of Corrections.  What else would you say

```
 1                    R. MACDONALD

 2        that you dispute of Dr. Kaye's complaint to

 3        the Board of Corrections?

 4                    MS. CANFIELD:  I don't think

 5                    he read the whole complaint at least

 6                    today at the deposition.

 7                    MS. HAGAN:  Why don't we do

 8                    this.  We don't we take a break,

 9                    right.  Why don't we give

10                    Dr. MacDonald the opportunity during

11                    that break to read the --

12                    MS. CANFIELD:  But I hope it's

13                    just five minutes because at this

14                    point --

15                    MS. HAGAN:  It's five minutes.

16                    MS. CANFIELD:  We're going to

17                    be finished at 6:10, based on the

18                    hour and the two five-minute breaks.

19                    That's fine.  But before we do go,

20                    there are a number of exhibits that

21                    I do not have that I would like you

22                    to email me, if you could, Ms.

23                    Hagan.

24                    MS. HAGAN:  If you can email

25                    the ones you don't have or the ones
```

Page 361

1                    R. MACDONALD

2          that you're referencing, then I can

3          do that.

4              MS. CANFIELD:  I can say them

5          on the record now, if you want to

6          write it down because --

7              MS. HAGAN:  I'm not going --

8          just email me and then you can make

9          sure it's accurate and then we won't

10         have this problem for Monday.

11             Because it's not going to be

12         the same as me doing it.  If you

13         email, it will just be a more

14         efficient process.

15             MS. CANFIELD:  Either that or

16         you email them to the court

17         reporter, and when the transcript's

18         produced, which we are requesting a

19         copy so Dr. MacDonald can review for

20         accuracy.  I'm not going to buy the

21         transcript.  If you can just provide

22         it for the witness to certify.

23             MS. HAGAN:  Well, up until now

24         you have been asking for expedited

25         transcripts so --

1               R. MACDONALD

2               MS. CANFIELD:  I have not.

3          And we have been instructed not to

4          do that.  I'm going to ask for a

5          certified copy so Dr. MacDonald can

6          review it.

7               MS. HAGAN:  I'm going to have

8          to think about that one.  Because

9          that would incur more costs for

10         Dr. Kaye.  But what I can do is --

11              MS. CANFIELD:  I don't think

12         so.  All you have to do is give me a

13         copy.  You should have a couple of

14         copies that you've got.

15              MS. HAGAN:  I can send you an

16         electronic version of it.

17              MS. CANFIELD:  As long it's

18         certified by the court reporter.

19         That's fine.

20              MS. HAGAN:  Why don't we take

21         the break.  And then -- you have the

22         Board of Correction complaint or do

23         I need to sent it now?

24              MS. CANFIELD:  You need to

25         send that one, I don't have it.

```
 1                      R. MACDONALD
 2              MS. HAGAN:  I can send it to
 3          you.  And you guys can review it
 4          during the break.
 5              MS. CANFIELD:  Yeah.  Send it
 6          to me and I'll forward it to
 7          Dr. MacDonald.
 8              MS. HAGAN:  Okay.  Fair
 9          enough.
10                  (Whereupon, a recess was taken
11                  from 5:41 p.m. to 5:49 p.m.)
12      Q    Now, I'm going to ask you -- I
13  think you've had an opportunity to review
14  the Board of Correction complaint now,
15  right, Dr. MacDonald?
16      A    Yeah.  It's quite a long document.
17  So, I mean, we can go through it point by
18  point, if you'd like.
19      Q    I don't know if that's necessary.
20  I think that you -- it will probably be more
21  constructive for you to explain your
22  disagreement with the document.
23              MS. CANFIELD:  Just note that
24          he may not get everything if you
25          don't question him, but his general
```

1                    R. MACDONALD

2              impressions with the five minutes

3              that he had to read it.

4                    MS. HAGAN:  Yeah.  Sure.

5              Let's do that.

6         A     So the section on dual agency

7    prohibitions we discussed.  That I agree

8    with her assertions about the requirements,

9    but she presents no evidence that we have

10   wantonly violated dual agency prohibition,

11   causing direct harm to defendants.  Simply

12   not the case, that we do respect those

13   principles.

14        Q     What about the destruction of work

15   product?

16        A     Well, she -- I thought you were

17   going to have me go through it.

18        Q     No, no, I can ask you some

19   questions because that might make it easier

20   and make it more specific.

21        A     Well, there were several other

22   things I'd like to comment on before we get

23   to that.

24                    MS. CANFIELD:  Why don't you

25              allow him to comment and then you

Page 365

```
 1                    R. MACDONALD
 2         can question.
 3              MS. HAGAN:  Sure.
 4         A    Okay.  So we talked about the
 5    recording of forensic examinations.  I
 6    explained my assessment of that situation.
 7    Whereas here there is a statement that CHS
 8    abhors transparency at CPL 730 examinations
 9    and has prohibited recording to conceal the
10    poor quality and misconduct in exams.
11              Obviously, that's not the case.
12    We, as I said, would be open to recording
13    all exams, if we had a consensus among staff
14    that that's the best practice.  My personal
15    take is that if it's the best practice for a
16    case, it should be the best practice for all
17    cases.
18              But certainly we just need to have
19    a clarity on how that happens and a
20    consensus among all the people who work
21    together to do this work.  Not that we abhor
22    transparency.  And that kind of manipulation
23    of our intentions, when we have a reasonable
24    disagreement, is exactly what I'm discussing
25    that was the primary challenge of managing
```

1                    R. MACDONALD

2        Dr. Kaye.

3             Q      Would you agree --

4             A      May I finish?  That, in fact, when

5        there's a reasonable disagreement -- and

6        just an assertion, that the average person

7        would use their judgment to discuss

8        something like the occasional ad hoc

9        recording of an evaluation with their

10       supervisors and their colleagues, that then

11       becomes perceived as an organizational

12       desire to restrict or to act unethically --

13            Q      But wasn't that the case --

14            A      There's simply no evidence of that

15       and there --

16            Q      Wasn't there discipline in the

17       wake of this disagreement?

18            A      Again, the issue was the judgment

19       about doing that without discussion.  Not

20       that CHS has a problem with recording, per

21       se.  That's the issue.  And, yes, we ended

22       up issuing a policy to be clear about that,

23       because we can't have different examiners

24       having different approaches.  But to make

25       the leap that that is all in the interest of

Page 367

1                      R. MACDONALD

2      us abhorring transparency is --

3           Q    I have a question.

4           A    There is no evidence of that.

5           Q    Is there any standard practice in

6      place now as to how to administer the 730

7      examinations?

8           A    May I continue to go through --

9           Q    No.  I'm asking you a question

10     before we move on.  Because we're on this

11     topic.

12               Is there any standard document in

13     place or standard protocol in place as to

14     how 730 examinations should be administered

15     across the clinics?

16          A    So there is a supervisory

17     structure that has also been resisted at

18     every turn.  There is intentions that we

19     never even reached to really think deeply

20     about how do we systemically evaluate

21     quality in the evaluations --

22          Q    But Dr. Kaye is long gone.  Dr.

23     Kaye is long gone now.

24          A    May I finish answering the

25     question?

Page 368

```
 1                     R. MACDONALD
 2         Q    But I'm asking you -- I'm trying
 3    to make sure that my question is precise and
 4    clear.  I'm not sure it was.
 5              I'm asking you today, today, is
 6    there a standard protocol or standard
 7    operating procedure in place to administer
 8    730 examinations across all four clinics?
 9              Dr. Kaye has not worked at the
10    court clinics since January 2020.  We are
11    now in November of 2021.  No one is
12    resisting you any more.
13              Is there a standard protocol and
14    procedure in place now?
15         A    There's a whole suite of policies
16    that govern the evaluations in the clinics.
17         Q    Okay.  Today, if I get evaluated
18    at the Queens court clinic, right, I'm a
19    defendant, I stab my exboyfriend here in
20    Queens today.  Next year I stab him in the
21    Bronx, right.  From today, is there a way
22    that I'm going to get the same type of
23    process from the Bronx and the Queens
24    clinic?
25         A    You may have different examiners,
```

1                              R. MACDONALD

2        but the process, yes, should be the same.

3             Q    So they're going to all adhere to

4        the dusky standard; am I right?

5                    MS. CANFIELD:   Objection.   You

6                 can answer.

7             A    I'm not going to speak to the

8        specifics of how they are going to do their

9        evaluations.

10            Q    What are their reports going to

11       look like, Dr. MacDonald?

12                   MS. CANFIELD:   Objection to

13                the question.   You can answer if

14                you're able.

15            A    They are going to look like

16       forensic evaluation reports.

17            Q    What do forensic evaluation

18       reports look like to you, Dr. MacDonald?

19            A    They are a multipage document that

20       has a set of findings and a set of

21       determinations.

22            Q    Now, to your understanding, has

23       there been any, I guess, format or any kind

24       of other structure that's been imposed upon

25       all four clinics in order to get this

1               R. MACDONALD

2       standardized methodology in place?

3                    MS. CANFIELD:  Objection to

4               form.  You can answer if you're

5               able.

6       A       So there is some inherent

7       standardization in the eyesight process that

8       attempts to standardize how we document

9       different things.  There are interests of

10      autonomy on the part of evaluators that also

11      need to considered.

12                    So we are not there to

13      standardize -- it is not a cookie cutter

14      endeavor that can be completely standardized

15      across the board.  And that never has been

16      my intention to imply that that's what we

17      wanted out of it.  But we want to

18      thoughtfully, carefully, with the staff and

19      with the experts, figure out, how do we do

20      these things as consistently as possible, as

21      objectively as possible.  And as efficiently

22      as possible across all the clinics.  That's

23      the goal of the --

24      Q       Eyesight doesn't necessarily

25      impact the actual content of the report.

1                    R. MACDONALD

2    Doesn't eyesight just capture whether or not

3    the report was actually done and is a

4    repository for saving reports themselves?

5         A    Of course CHS does not contend

6    that we are going to advice the examiners on

7    the content of the report.  So, no, of

8    course the program that we use to document

9    the reports would not dictate the structure

10   of the report.

11              So it may provide general topic so

12   that we can standardize as much as possible.

13   And part of the goal that we, frankly, are

14   still struggling to reach after COVID and

15   the struggles that we've spent the day

16   discussing in this deposition, is a

17   collaborative process to understand, what

18   can we agree on fundamental elements of the

19   reports that should be in every report, and

20   how would they look.

21              Of course, they would remain to

22   the discretion of the individual examiners.

23        Q    But Dr. Kaye hasn't been there for

24   over a year.  And what's stopping you from

25   getting this consensus as to what should be

Page 372

1                        R. MACDONALD

2        in the report, the structure of the report.

3        She's not there any more.  Why don't you

4        have this consensus now?

5                        MS. CANFIELD:  Objection to

6                 form.

7             A    It's a continual quality

8        improvement process.  So is it completely

9        done, no, it will never be done.  And, as

10       you know, the last two years have been

11       fraught for many reasons for all elements of

12       our society.  And the FPECC clinics have not

13       been spared from that.

14                        So it's a lot of work to try to

15       get people in place, recruitment retention,

16       have the right people and support them.

17       That's the basic goal of what we've been

18       here.

19                        May I continue going through this

20       document that you asked me to review?

21            Q    I know that we're short on time.

22       So I'm going to try to -- since you got a

23       chance to read it, I'm going to try to ask

24       you some questions.  And if you need to read

25       a section, then I'll let you read it.  Is

```
 1                    R. MACDONALD

 2       that fair?

 3            A    (No verbal response.)

 4            Q    Because here's a discussion about

 5       the destruction of work product.  I had

 6       asked you earlier about Dr. Kaye's

 7       allegation that -- well, there's back and

 8       forth.

 9                 Dr. Jain accused Dr. Kaye of

10       stealing his notes.  And Dr. Kaye accused

11       Dr. Jain of destroying his notes.  Now this

12       Board of Correction complaint alludes to

13       that, under destruction of work product.

14                 Did you get a chance to read this

15       paragraph?

16            A    I did.

17            Q    Do you agree or disagree with

18       that?

19            A    I have no evidence of this.  This

20       is one element of this document that

21       didn't -- has never come to my attention.

22       And I do -- I don't know the answer to this

23       relatively simple question.  Which could be

24       worked out.  I guarantee that Dr. Jain,

25       Dr. Ford, would be open to discussing what
```

1                    R. MACDONALD

2      is the best practice and standardizing that

3      practice across the clinics.

4              So I don't think that what's

5      portrayed here is true, but I don't have

6      specifics on what the current policy for

7      this is.

8          Q    Now, then you have the next one,

9      the 730 team court liaisons, right?  What is

10     your familiarity with the 730 team?

11         A    So the 730 team is really designed

12     to provide continuity as people move back

13     and forth between restoration of fitness,

14     which happens in OMH state run facilities

15     where they have treatment over objection, to

16     returning to jail, where people often

17     historically would decompensate.  They lose

18     the treatment over objection and the jail

19     environment can be chaotic, and it's very

20     different from the inpatient setting.

21             And so these teams were designed

22     to follow those patients through the system

23     so that they don't get lost, so they don't

24     fall through the cracks.  So the key

25     elements of their care can be continued as

Page 375

1                       R. MACDONALD

2      they move through different settings.

3              Q    Now, she alleges that, "The 730

4      team and court liaisons comprise primarily

5      social workers and mental health counselors

6      who routinely make inquiries about

7      defendant's legal case and discuss the

8      defendant's details of their legal

9      situation.  Often giving unauthorized legal

10     advise.  They are also known to interject

11     gratuitous opinions of competency, something

12     from which they are neither qualified or

13     tasked to do."

14              Now, do you agree or disagree with

15     that?

16         A    I disagree with that.  I disagree

17     with that.  The program was designed by

18     Dr. Ford to address specific needs for our

19     patient population as they cycle between

20     these care settings.  It is not the

21     intention of the program, nor is it the

22     training of the staff of the program to do

23     these things that she alleges.

24         Q    Now, did the staff -- do you know

25     for a fact that the staff did not engage in

```
 1                    R. MACDONALD
 2      what Dr. Kaye alleged here in this
 3      paragraph?
 4           A    I have never heard of that, no.
 5      And I don't -- so since we're probably not
 6      going to have time to go through these,
 7      these allegations do not meet standards of
 8      evidence.
 9           Q    What standards of evidence are you
10      basing it on?
11           A    Okay.  Let's go to --
12           Q    By any chance, before you go --
13           A    Let's go to quid pro quo hiring.
14           Q    I have a question.  Did you
15      investigate any of these allegations once
16      you saw this complaint?
17           A    Yes.  I discussed them all with
18      the leadership of the FPECC clinics.
19           Q    Did you go and speak to any of the
20      730 team or delve an investigatory report in
21      response to these allegations?
22           A    No.  There's no substance to this
23      allegation.  I have regular meetings with
24      the people who actually run these teams.
25      And I know what the intentions of these
```

1                        R. MACDONALD

2      teams are, I know what the goals of these

3      teams are.  And this is essentially rumor

4      and hearsay.  And is put in a document as if

5      she had material facts about this.  But

6      there is no material fact behind it.

7          Q    Did the Department of

8      Investigation ever approach you about

9      Dr. Kaye's complaint?

10         A    No.

11         Q    Did the Board of Correction ever

12     approach you about Dr. Kaye's complaint?

13         A    I don't recall.

14         Q    Did the IG office ever approach

15     you about Dr. Kaye's complaint?

16         A    I've spoken to at least one person

17     in the District Attorney's Office.

18         Q    Which District Attorney's Office?

19         A    I don't recall.

20         Q    What was the discussion about?

21         A    The discussion was a brief one,

22     where the district attorney was concerned

23     about the things that were raised.  But

24     dubious about the way they were presented,

25     and wanted my reassurance that this was

```
 1                         R. MACDONALD
 2      related to a personnel issue, and that there
 3      was a person who was disgruntled with CHS,
 4      who had made these various allegations that
 5      are easily rebutted.
 6                  And that is what I told them and
 7      that continues to be my assessment, even
 8      though clearly we're not going to get a
 9      chance to go through the details.
10      Q    So now, I'm going to ask you some
11      questions about Nicholas Feliciano
12      (phonetic).
13                  Do you know anything about that
14      case?
15      A    Yes.
16      Q    Okay.  What do you know about
17      Mr. Feliciano?
18                  THE WITNESS:  So I would just
19                  ask my counsel what I'm allowed to
20                  disclose, if it involves protected
21                  health information.
22                  MS. CANFIELD:  I would say
23                  that you cannot disclose that
24                  information.
25                  MS. HAGAN:  Well, it's not
```

Page 379

```
1                       R. MACDONALD

2               necessarily disclose, I mean it's

3               public record.  The Board of

4               Correction complaint is out there.

5               I have it here right now.  We can

6               discuss it from the document, if

7               you'd like.

8                    MS. CANFIELD:  Why don't you

9               just show what's in the document.

10              Why don't you show the witness the

11              document.

12         Q    At any point did you respond to

13    findings from the Board of Correction about

14    Mr. Feliciano?

15         A    Yes.

16         Q    When did you make this response?

17         A    Recently.

18         Q    How recent?

19         A    I don't recall.  In the last few

20    months.

21         Q    Okay.  The report was issued on

22    October 18, 2021.  And today is November 12.

23    So would it be fair to say that you issued

24    your response between today and October 18?

25         A    Yes.  Presumably.
```

1                      R. MACDONALD

2          Q    And do you recall that

3    Mr. Feliciano basically attempted to hang

4    himself, to kill himself in his cell?

5               MS. CANFIELD:  Is this of

6               public information?  I don't know

7               how this has to do with Dr. Kaye.

8               It's not in her complaint.  Is

9               this --

10              MS. HAGAN:  It does have to do

11              with some of the allegations she

12              raised, right.

13              MS. CANFIELD:  Does she raise

14              the allegations in the DOC

15              complaint?

16         Q    Now, here it highlights -- I guess

17   there's a question of here right now, the

18   Feliciano report highlights the problems

19   with the MacDonald --

20              MS. CANFIELD:  Wait, wait.

21              Hold on.  You haven't answered my

22              question.  I don't understand where

23              you're going here.

24              MS. HAGAN:  I'm telling you

25              what it is.  I said it highlights

```
 1                    R. MACDONALD

 2          the problems with Dr. MacDonald and

 3          Dr. Ford's reckless disregard for

 4          doing thorough medical record

 5          reviews, the standard practice of

 6          requirement in all areas of

 7          medicine.  That's what the report

 8          does bring up some of the findings.

 9          And I wanted to go and talk about

10          some of the findings here.

11               MS. CANFIELD:  Okay.  But my

12          questions is, is the report

13          generated as a result of the

14          complaint made by Dr. Kaye?

15               MS. HAGAN:  We don't know.  We

16          don't know.  And that's why we have

17          questions about what the report

18          deals with --

19               MS. CANFIELD:  Can you pull

20          up -- can you share the report as an

21          exhibit because I do not have it.

22               MS. HAGAN:  Well, we can go

23          back to the Board of Corrections

24          report.

25               MS. CANFIELD:  Well, if you're
```

Page 382

1                         R. MACDONALD

2              going to use this in your case in

3              chief, you have to exchange it with

4              me, regardless of it's public

5              knowledge.  I don't have it.

6                   MS. HAGAN:  I can give it to

7              you.  I can produce it.  It's not a

8              problem.

9                   MS. CANFIELD:  Can you do that

10             now, please.

11                  MS. HAGAN:  Well, I haven't

12             even entered it because we're not

13             talking about it right now.  I'll do

14             it after.

15                  MS. CANFIELD:  No.  But it's

16             discoverable.  If you're planning to

17             use it in your case in chief,

18             regardless --

19                  MS. HAGAN:  I don't know yet.

20             I would like to continue with the

21             Board of Corrections complaint.

22                  MS. CANFIELD:  You still have

23             to produce it.

24                  MS. HAGAN:  At some point,

25             perhaps.

1                        R. MACDONALD

2                   MS. CANFIELD:  Well, discovery

3              is closed on the 19th.  So you need

4              to produce it.

5                   MS. HAGAN:  I understand.

6         Q    Dr. MacDonald, right, you said you

7    had some further issues with the Board of

8    Correction complaint.  Let's go through

9    that.

10        A    Sure.  So misuse of CPL 730

11   intent, CHS leadership expressed intent to

12   take over 730 exams to get people off the

13   island.  This political agenda to use the

14   CPL 730 exam is a means to empty Rikers

15   Island has perverted the examination process

16   and compromised validity of results and the

17   integrity of legal proceedings.

18             This is, again, a misunderstanding

19   of the basic fact that when these

20   evaluations are done efficiently, that

21   people spend less time in pretrial

22   detention, which is bad for them.  Stating

23   that fact and having an organizational

24   commitment to doing the evaluations

25   efficiently does not pervert the content of

Page 384

1                    R. MACDONALD

2      the evaluations.  It does not.

3                 And it does reflect an

4      organization that cares about the content

5      and efficiency of the work.  And that's why

6      we took over these clinics.  It has been

7      challenging for us as individuals and as

8      managers, but we believe in the work.  And

9      that's why undertook this endeavor, and

10     that's why we're still pushing to make it as

11     good as it can be.

12                 So to say that that inherently is

13     a conflict of interest reflects the

14     resistance to the entire endeavor.  And the

15     conflation of a legitimate organizational

16     desire to do things as efficiently as

17     possible while preserving quality as

18     malfeasance.

19          Q    Dr. MacDonald, was there ever a

20     time where there was a discrepancy between

21     the numbers that the Bronx court clinic

22     claimed to have been generating and what

23     eyesight captured the clinic?

24          A    I don't know specifically.  I'm

25     sure that there was.  Because these are

1              R. MACDONALD

2    complex systems.  And even to get a system

3    that tracks carefully the number of

4    evaluations outstanding is challenging.

5              When we came to some of the

6    clinics, we had to get working phone lines

7    into the clinics.  So are a lot of things

8    that might not go perfectly, even under a

9    CHS administration, but that doesn't change

10   the fact that our intent is to make the

11   process work better.

12        Q    So you're saying that these were

13   hiccups in the system rather than an

14   intentional effort to deceive; is that

15   right?

16        A    Absolutely.  One hundred percent.

17   And anyone who knows large systems such as

18   these, knows that there will be hiccups.

19   Knows that there will be errors in the HR

20   system.  And, yes, those errors, I wish they

21   were fixed quicker, too.  But when they're

22   consistent perceived as attacks or

23   malfeasance, then it's very hard to work in

24   a collaborative way with a person who thinks

25   that you are doing something wrong and

Page 386

1                    R. MACDONALD

2     targeting them, when you're not.

3          Q    So what about the Queens pilot

4     project, at some point Dr. Kaye alleges that

5     there is a misrepresentation around the

6     calculation of the turnaround time.  That

7     the numbers that were being told to City

8     Hall into any various number of

9     stakeholders, that they excluded cases on

10    hold, and it showed that there was dramatic

11    improvement, but they had excluded things

12    that would typically extend the turnaround

13    time for the Queens pilot project, but not

14    other clinics.

15               Would you agree or disagree with

16    that?

17         A    I would say that that project was

18    initiated and conceived before CHS took over

19    the clinics.  Our efforts were actually

20    orthogonal to that project.  I think that

21    there's always areas for critique of how the

22    data is measured and how the evaluation is

23    done.  That's the complexity of quality

24    improvement efforts in general.  And

25    Dr. Kaye might have a different opinion

Page 387

1                         R. MACDONALD

2      than someone else.

3             It doesn't mean that Dr. Kaye is

4      correct or that it is malfeasance to measure

5      it the way it was measured.  I think that

6      that project was done in good faith.

7      Although, as I pointed out, it was really

8      done under the guidance MOCJ when that

9      clinic was not part of CHS.

10          Q    Now, Dr. Kaye says in bold print,

11     "I have been prevented from doing my job

12     because CHS has refused to staff the Bronx

13     court clinic, rendering the service

14     non-operational.  This has caused scheduling

15     problems and a backlog of cases.  And strong

16     disapproval from important stakeholders."

17            Now, what's your position on that?

18          A    I think that's absolutely an

19     oversimplification.  And that our goal has

20     been to staff, recruit and retain.  And I

21     think that today the Bronx clinic is doing

22     pretty well.

23          Q    So what does the Bronx clinic look

24     like today?  Who's the director of the Bronx

25     clinic right now?

Page 388

```
 1                    R. MACDONALD

 2          A    Dr. Weiss.

 3          Q    And Dr. Weiss is a male, right?

 4          A    Yes.

 5          Q    And Dr. Weiss doesn't have any

 6     child care issues; am I right?

 7          A    I have no idea.

 8          Q    And does Dr. Weiss have a

 9     co-evaluator?

10          A    I don't have the staffing of the

11     Bronx clinic at my fingertips.  But I know

12     that their cases have been handled

13     efficiently in the last few weeks, based on

14     the data that I've seen most recently.

15          Q    So you're not sure if there is

16     another full-time evaluator at the Bronx

17     court clinic today?

18          A    There is.

19          Q    There is one?

20          A    I don't know whether it's

21     full-time or part-time.  I know that there

22     is staffing in the Bronx to adequately keep

23     up with the evaluations that are coming in.

24          Q    Now, Dr. Kaye alleges that that

25     wasn't the case when she was there.
```

Page 389

1                     R. MACDONALD

2                Would you agree or disagree with

3        that?

4        A    I acknowledge that we struggled

5        with staffing retention, recruitment in that

6        the clinic.  And that there was a period of

7        time where we were understaffed and that

8        impacted the evaluations being done.

9        Q    Are you attributing the staffing

10       and recruitment issues to Dr. Kaye solely?

11       A    No.  I think they are very complex

12       issues that we take a holistic approach to.

13       So I would not ascribe them solely to Dr.

14       Kaye.  Nor would ascribe them solely to the

15       managers in charge of hiring and filling

16       those positions.

17       Q    Now, did the Bronx court clinic

18       operations improve after Legal Aid Society

19       complained about backlog at the clinic?

20       A    Again, I explained that our

21       intentions at CHS would be aligned with

22       theirs.  We have been trying our best to do

23       the evaluations efficiently and effectively.

24                Again, that's the project at hand.

25       So the complaint probably was received at a

1                         R. MACDONALD

2      low point and things improved after that,

3      yes.

4           Q    How would you describe CHS's

5      relationship with Legal Aid Society?

6           A    I've always had a respectful

7      relationship with Legal Aid Society.  I

8      think we see them as our partners and the

9      important work that we're doing.  It's

10     cordial.

11          Q    Now, the efforts to make the exams

12     more efficient, how did that impact the

13     integrity of the exams?

14          A    It didn't.  It really focused on

15     scheduling, on process, on things like

16     telephones in the clinics, as I mentioned.

17     On clear channels of communication.  It even

18     focused on things that didn't work out the

19     way we might have hoped.  Like the redaction

20     question.  If we could have streamlined that

21     process more, we would have.

22               So we were looking at any elements

23     of reducing administrative burdens to the

24     evaluations being done.  Another thing would

25     be productivity of individual examiners and

```
 1                    R. MACDONALD

 2      scheduling as many cases as possible to be

 3      done during the week.

 4           Q     Does Dr. Owen still work at the

 5      Queens court clinic?

 6           A     No.

 7           Q     What happened to Dr. Owen?

 8           A     Dr. Owen has recently resigned.

 9           Q     Did she resign in lieu of

10      termination?

11           A     She was not being faced with

12      termination at that time.

13           Q     The question is, was termination

14      contemplated as it came to Dr. Owen?

15           A     There was an issue that was raised

16      that had not yet been fully investigated.

17           Q     What was the issue?

18           A     There was an issue related to the

19      independence of her evaluations, where some

20      of the language seemed to be similar to that

21      uses in a co-examiner's evaluation.

22           Q     The independence, what do you

23      mean?  Are you saying that she plagiarized?

24           A     It's not clear exactly what

25      happened.  She had an explanation for it,
```

1                         R. MACDONALD

2     which wasn't fully investigated before she

3     left.

4           Q    So someone raised concerns about

5     the report.  Who raised concerns about

6     Dr. Owen's report?

7           A    I think it was her co -- I don't

8     want to misspeak.  I don't remember exactly.

9           Q    Who was her co-examiner?

10          A    I don't recall.

11          Q    Does the co-examiner still work

12    there?

13          A    Yes.

14          Q    So Dr. Owen no longer works there.

15    Has she been replaced?

16          A    I don't believe so, no.

17          Q    So the Queens center does not have

18    a director; am I right?

19          A    Currently, it does not.

20          Q    Now, I just have a few more

21    questions then I'm finished.

22               How does the 730 -- what is the

23    funding source for the 730 mobile team?

24          A    City tax levy.

25          Q    A hundred percent city tax levy?

Page 393

1                    R. MACDONALD

2          A     Unless I am mistaken, yes.

3          Q     Has there ever been a time that

4     the 730 team concealed medical

5     documentation?

6          A     Not that I'm aware of, no.

7          Q     Does CHS bill Medicaid for the 730

8     team's activity?

9          A     No.

10               MS. HAGAN:  I think that's it

11               for me, unless I have questions upon

12               redirect.

13               Does counsel have any

14               additional questions?

15               MS. CANFIELD:  I just wanted

16               to invite the witness to, if there

17               is anything regarding the Board of

18               Corrections complaint that he did

19               not testify to, that was inaccurate

20               in her complaint, he's free to do so

21               now.

22               THE WITNESS:  Yeah.  So we

23               talked about the section on misuse

24               of CPL intent, which was false.

25               There's a section on quid pro quo

Page 394

```
 1                    R. MACDONALD
 2          hiring that alleges that FPECC
 3          evaluators engaged in quid pro quo
 4          agreement to cut corners and do a
 5          less thorough job in order to get
 6          people off the island.  This is not
 7          true.
 8              Again, the independence and
 9          integrity of the evaluations are
10          core to our mission.  And we are
11          simply trying to increase efficiency
12          by removing administrative areas
13          wherever we can.  As you --
14              MS. CANFIELD:  No, no, no.
15          It's my turn.  No, no, it's my turn.
16          No, no, no.
17              MS. HAGAN:  But you haven't
18          asked any questions.
19              MS. CANFIELD:  No.  I know.
20              MS. HAGAN:  I'll let him
21          finish and I'll ask my questions.
22              MS. CANFIELD:  That's fine.
23          Thank you.
24              MS. HAGAN:  Keep going.
25              THE WITNESS:  She alleges that
```

Page 395

1                       R. MACDONALD

2           this specifically, this quid pro quo

3           agreement that she alleges exists,

4           which does not exist, and presents

5           no evidence of, has caused furious

6           unfit findings.  And she uses an

7           example of, a hearsay example of an

8           anti social sex offender, there's no

9           evidence presented here that this

10          exists.  I guarantee that it does

11          not exist.  And then she's making a

12          causal inference about the findings

13          of the clinic based on this

14          allegation.

15                Statutory violations, this is

16          a mischaracterization of the ability

17          to render reports with incomplete

18          information, as long as the

19          incompleteness of the information is

20          clearly identified and delineated,

21          and the limitations of the reports

22          are available to the judge.

23                So there was a consistent

24          conflict over that concept, where

25          CHS asserts that this can be done,

Page 396

```
 1                    R. MACDONALD
 2         and this part of accepted practice.
 3         And Dr. Kaye was not receptive to
 4         that.
 5              MS. CANFIELD:  What about
 6         inadequate forensic evaluators?
 7              THE WITNESS:  Inadequate
 8         forensic evaluators.  I would argue
 9         a mischaracterization of the
10         oversight and supervision that we
11         were trying to bring to bear on
12         these clinics.  Something that the
13         clinics had struggled with for
14         years.
15              And often times involvement of
16         managerial staff or supervisory
17         staff to try to help with
18         development is, again, perceived as
19         some kind of outside intervention
20         that is, at its core, trying to
21         influence the results of
22         examinations.
23              CHS has no intention of
24         influencing the results of the
25         examinations.  So when we have more
```

```
 1                    R. MACDONALD

 2           junior staff members working with

 3           supervisors, that's perceived as

 4           undue influence.  And it's not.

 5           It's just trying to help people

 6           adjust.  It's a key part, as I

 7           mentioned, of retention and

 8           recruitment.  And it was really a

 9           struggle in the Bronx.

10                MS. CANFIELD:  Anything else?

11                THE WITNESS:  Forensic

12           psychiatry practice deviations.

13           Again, the sheer emphasis on doing

14           the work efficiently and effectively

15           does not mean that we were asking

16           anyone to cut corners.  We were

17           simply acknowledging that there are

18           implications and reason that the

19           evaluations should both be done well

20           and be done efficiently.

21                This second part about

22           endorsing foregoing face-to-face

23           evaluations is another

24           misinterpretation of the same

25           reasonable difference of opinion
```

1              R. MACDONALD

2         that I talked about.  Where the

3         limitations can be described in a

4         report, as long as they are clearly

5         delineated what the limitations are.

6         Including when face-to-face

7         evaluations can't be done.  And the

8         court can make appropriate

9         determinations about how they use

10        that information.

11             The order to conversate,

12        again, is taking something that is

13        meant to improve the process and

14        ascribing to it.  This malignant

15        intent.  So literally the order

16        conversate is to make it as easy as

17        possible when the examiners feel

18        that it's useful or when there are

19        barriers to coming to a conclusion,

20        that the treatment team who know the

21        patients can provide information to

22        the examiners.

23             That is not the examiner

24        substituting -- that is not the

25        treating clinician substituting

```
1                    R. MACDONALD

2          their interpretation for the

3          examiner.  That is simply another

4          way to provide more collateral

5          information.  Just as the redaction

6          became such a narrowly concrete

7          problem, this is in the other

8          direction, trying to get examiners

9          sources of information that they may

10         not readily have had access to

11         before.  And, again, it's looked at

12         as malfeasance instead of trying to

13         improve the process.

14              Destruction of work product,

15         we talked about.  I don't have much

16         to say about that.  Access to the

17         impatient unit, there are certainly

18         cares where this is beneficial and

19         it is not a violation of dual roles,

20         nor is it inherently prohibited

21         through HIPPA.  The 730 team, we

22         talked about.

23              The HIPPA and legal privilege

24         violations, I mean, I really don't

25         have much to say about this
```

```
 1                    R. MACDONALD

 2          particular section.  I do know that

 3          the exact documentation and forms is

 4          a constant area of struggle and

 5          people don't always agree about

 6          exactly how the form should be

 7          filled out, about exactly which

 8          forms are necessary for different

 9          things.

10               Again, Dr. Kaye takes

11          exception to some of the legal

12          conclusions that H&H's legal

13          department has made.  And so, again,

14          not malfeasance, in my opinion, but

15          maybe areas where things weren't

16          done perfectly, areas for

17          improvement and we're always happy

18          to look into those and to try to

19          continue to get better.

20               And nowhere would assert that

21          CHS has done a perfect job.  Only

22          that our intentions were to improve

23          this process and we will continue to

24          work towards that.

25               She doesn't like our medical
```

```
 1                    R. MACDONALD

 2         documentation.  Always an area for

 3         improvement in any healthcare

 4         delivery system.

 5              Funding misallocation.  She's

 6         asserting that Bellevue has been

 7         unable to run at full capacity due

 8         to insufficient funding, and somehow

 9         that CHS is implicated in taking

10         funding away from Bellevue.  This is

11         just not correct in any sense of how

12         these entities are funded.  It's

13         really just wrong.

14              CHS does not try to avoid

15         hospital runs to save money.  And

16         there is no mechanism by which CHS

17         saves money by avoiding hospital

18         runs.  It's just not correct.

19              Manipulation of statistics.

20         Again, I assert that that project,

21         which was not even initiated by CHS,

22         which was started before the

23         transition, was done in good faith,

24         as far as I know.  There could be

25         reasonable discussion about what are
```

Page 402

1               R. MACDONALD

2         the best metrics to define and how

3         should they be measured.  That's

4         part of the process of quality

5         improvement.

6               But, again, this document

7         turns those legitimate discussions

8         into an assumption that one side is

9         trying to commit fraud, basically.

10        There's no evidence for it, and it

11        makes it very hard to work

12        collaboratively.

13              Retaliation.  Again, I don't

14        believe that anyone was retaliating

15        again Dr. Kaye.  And that even the

16        most minor changes and errors in

17        management were perceived as

18        personal assaults.  And, again, I

19        don't harbor any ill will.  I just

20        feel sad that everything was

21        perceived in this way, because it's

22        really not our intention.

23              And we talked about the

24        challenges with staffing in the

25        Bronx, which we acknowledge, but

```
 1                         R. MACDONALD

 2             they are complex.  And I would

 3             advert that they are better today

 4             than they were then.

 5                  MS. CANFIELD:  Thank you.  If

 6             you're finished.  Dr. MacDonald, if

 7             you're finished, I'm finished.

 8   BY MS. HAGAN:

 9             Q    I have some followup questions,

10        Dr. MacDonald.

11             A    Sure.

12             Q    Now, you characterized the minor

13        issues that Dr. Kaye had in the wake of her

14        complaint is minor.  Dr. Kaye, the shift

15        change impacted her ability to provide child

16        care for her children, that wasn't minor to

17        her.

18                  Why do you believe that the change

19        in her shift was minor?

20                  MS. CANFIELD:  Objection to

21             form.  You can answer.

22             A    I don't believe I specifically

23        stated that that was minor.  I have been --

24        managed many staff over many years who are

25        distressed by the shifts that they have to
```

Page 404

1           R. MACDONALD

2    work or that are available to them.  It can

3    often be impactful to people's lives.  So I

4    don't mean to discount it.

5          Q    Well, Dr. Kaye worked this shift

6    for 19 years prior to -- or 18 years prior

7    to you and Ms. Yang and Dr. Ford coming on

8    board.

9               With the shift change, did it

10   affect or did it improve the output of the

11   reports in the Bronx once she had to go the

12   new shift that you guys put in place?

13               MS. CANFIELD:  Objection to

14          form.  You can answer.

15         A    I'm not going to draw a direct

16   link between those two things.  But, you

17   know, when the employer transitions, when

18   the parent organization transitions, when

19   the effort is around standardization and

20   streamlining of work flows, of course there

21   are going to be things that managers assert

22   that staff don't like.  And it's not to

23   discount that those things are important.

24   And we would never do that.

25         Q    Dr. MacDonald, but you can't

```
 1                    R. MACDONALD

 2      testify today that the other center

 3      directors had the exact same hours as

 4      Dr. Kaye, can you?

 5          A    Again, I think that was because

 6      they were in different positions which were

 7      not union positions.  It tends to be union

 8      positions that have these -- and, again, I

 9      was not involved in that particular element.

10      But it tends to be union restrictions that

11      have these standardized restrictions on work

12      hours.

13          Q    Dr. Kaye was in this union

14      position for 20 years.  And all of a sudden,

15      when you all came on to be her managers, now

16      why you feel the need to impose these union

17      restrictions on Dr. Kaye and no one else; is

18      that right?

19                MS. CANFIELD:  Objection to

20           form.  You can answer.

21          A    Yeah.  I mean, the frame work that

22      I've laid out is that the clinics were

23      managed in a haphazard fashion by multiple

24      different entities over many years.  And,

25      yes, when CHS came in to standardize things,
```

```
 1                    R. MACDONALD
 2      there were things that people didn't like.
 3          Q    Did the collective bargaining
 4      agreement dictate specific hours or did it
 5      dictate how many hours?
 6          A    Again, I was not involved in the
 7      details of that as our HR leadership was,
 8      and I don't know the specifics.
 9          Q    Then Dr. Kaye also complained
10      about her pay being docked for several weeks
11      in a row, and also that basically it was
12      docked, not just several weeks in a row, but
13      that she was unfairly penalized when she was
14      entitled to retention bonus.
15               Do you recall that?
16               MS. CANFIELD:  Objection.  You
17          can answer.
18          A    Again, I think we've talked
19      through that.  I was not as involved as
20      others in that.
21          Q    Well, Dr. Kaye got $13,600 versus
22      the $20,000 she was entitled to.  Is that
23      minor to you?
24               MS. CANFIELD:  Objection to
25          form.  She actually was paid the
```

Page 407

1                     R. MACDONALD

2           full amount so you can answer.

3                MS. HAGAN:  Initially she

4           wasn't.

5                MS. CANFIELD:  Again, the

6           State's -- you can answer.

7      A    I'm not minimizing Dr. Kaye's

8    individual concerns.  I'm just saying that

9    they were consistently slotted into a frame

10   of perception where she was being

11   individually persecuted by an organization

12   whose intentions were malfeasance.  And that

13   was not the realty of the situation by any

14   stretch of the imagination.

15     Q    And then what about the staffing

16   issues, that wasn't personal either, right,

17   Dr. MacDonald?  It was complicated.  That's

18   what you said.

19     A    The staffing issues, the issues of

20   recruitment and retention for these

21   position, yes.

22     Q    Yes.  That was complicated.  And

23   then --

24                MS. CANFIELD:  Objection to

25           form.  You can answer.

Page 408

1                      R. MACDONALD

2        Q    Now, you said that her allegations

3    regarding the funding are the malfeasance

4    regarding the funding.  I'm just going to

5    ask you something.

6             How is CHS funded?

7                 MS. CANFIELD:  Objection to

8          form.  You can answer.

9        A    Through city tax levy.

10       Q    All city tax levy?

11       A    Not entirely, but the bulk of CHS

12   is funded that way.

13       Q    What's the remainder of the

14   funding?

15       A    There's some grants and other

16   moneys that I don't totally understand.

17       Q    The Gotham Corporation, what's

18   that?

19       A    That's a unit of Health and

20   Hospitals unrelated to CHS.

21       Q    So The Gotham Corporation doesn't

22   fund CHS?

23       A    The Gotham Corporation?

24       Q    Um-hmm.

25       A    I've never heard of The Gotham

Page 409

```
 1                    R. MACDONALD
 2       Corporation.
 3            Q    Does CHS receive any funding from
 4       Strive?
 5            A    From Strive?
 6            Q    Thrive.
 7            A    Thrive.  So Thrive was, to my
 8       understanding, a mayoral program that
 9       earmarked certain city tax levy funding to
10       be under the purview of that program, and
11       some of the funding for a small number of
12       CHS programs were under that umbrella.  But
13       it's a small percentage of CHS's total work.
14            Q    What's the percentage?
15            A    I don't know the percentage.
16            Q    And the court clinics, what's the
17       funding source of the court clinics?
18            A    City tax levy.
19            Q    All of it?
20            A    Unless there's a small grant here
21       and there that I'm not aware of, or some
22       money that flows through the state, I
23       believe so.
24            Q    And what was the court clinics
25       budget?
```

Page 410

1                          R. MACDONALD

2          A     I don't know the total budget for

3     the court clinics.

4          Q     What is CHS's total budget?

5          A     I don't know the exact number.

6     It's somewhere in excess of 200 million

7     annually.

8          Q     Now, you also talked about the

9     staffing issues.  Dr. Kaye said that she was

10    either understaffed or provided with an Ep

11    (phonetic) staff.

12              Dr. Brayton went up to the court

13    clinic eventually in December of 2018.  Is

14    it your testimony that Dr. Brayton was

15    qualified to do the work of the court

16    clinic?

17         A     Yes.

18              MS. CANFIELD:  Objection to

19           form.  You can answer.

20         Q     You said yes, right?

21         A     Yes.

22         Q     How do you make that determination

23    that she was qualified?

24         A     Based on the assessments of my

25    supervisors.

Page 411

1                    R. MACDONALD

2         Q     At any point was Dr. Brayton

3    remediated?

4         A     I don't know that she was

5    remediated.

6         Q     At any point was Dr. Brayton's

7    training period extended?

8         A     I don't know the details of

9    whether her training period was extended.  I

10   mean, obviously new staff have additional

11   interaction with supervisors, to try to get

12   them comfortable in their roles, to give

13   them the support that they need.

14        Q     Dr. Kaye raised questions about

15   instances where evaluators are being

16   expected to do examinations on the record

17   without seeing the defendants.  Do you

18   recall any discussions to that effect?

19        A     Yes.  As I discussed, I think

20   that's a mischaracterization of discussion

21   whereby evaluations, reports can be written

22   that demonstrate and elaborate the

23   limitations of sources of information that

24   were available to the examiner, that can

25   still be useful to the courts.

1                    R. MACDONALD

2         Q    Now, at some point you just said

3    that Dr. Brayton -- that your superiors

4    evaluated Dr. Brayton and made an assessment

5    that she was qualified.  Who exactly made

6    that assessment?

7         A    I said my supervisors.  So they

8    would primarily be -- I mean, supervisors

9    who worked for me, primarily Dr. Jain.

10        Q    And you took Dr. Jain's word that

11   Dr. Brayton was qualified over Dr. Kaye, who

12   may have had issues with her work, right?

13        A    Yes.

14        Q    Why is that?

15        A    Because Dr. Jain was the

16   supervisor of the clinics, and I had worked

17   with him and known his background, his

18   training, and understood his judgment about

19   the work that was being done in those

20   clinics.  I did not have the same faith in

21   Dr. Kaye's judgment about her assessments of

22   her colleague or the general assessments

23   about what was the going on in the clinic,

24   for the reasons we've discussed.

25        Q    Now, I have a question about the

Page 413

                        R. MACDONALD

1

2    complaints.  Did you hear any complaints

3    regarding Dr. Brayton's work from anyone

4    outside of CHS?

5         A    No.

6         Q    So you never knew that Legal Aid

7    or some of the judges expressed concern

8    about Dr. Brayton's work?

9         A    I know that Mr. Bloom in the Bronx

10   often shared many of the same concerns that

11   Dr. Kaye was raising.  I was not aware of

12   others who had raised concerns.

13              MS. HAGAN:  Okay.  That's it

14        for me.

15              Do you have any other

16        questions, Ms. Canfield?

17              MS. CANFIELD:  I do not.

18              MS. HAGAN:  Thank you for your

19        time, Dr. MacDonald.

20              MS. CANFIELD:  Thank you very

21        much.  I apologize for the time.

22              THE WITNESS:  Thank you.  Take

23        care.

24              MS. CANFIELD:  And if we can

25        have a copy of those exhibits.

Page 414

1                    R. MACDONALD

2              MS. HAGAN:  I saw the email

3         that you sent.

4              MS. CANFIELD:  Okay.  And if I

5         can have a copy of the deposition

6         transcripts for the witness to

7         review, and to complete an errata

8         sheet on it.

9              MS. HAGAN:  I will give it to

10        you once I get them.  Is that fair?

11             MS. CANFIELD:  I need it for

12        summary judgment, but, yes.

13             MS. HAGAN:  Well, as soon as I

14        get them, you'll get them.

15             MS. CANFIELD:  Thank you.

16             MS. HAGAN:  Thank you.

17                  (Whereupon, this examination was

18                  concluded at 6:40 p.m.)

19

20

21

22

23

24

25

Page 415

1                          R. MACDONALD

2

3

4

5     _____

6     ROSS MACDONALD

7

8

9     Subscribed and sworn to
      before me on this _____  day
10    of _____, _____.

11

12    _____
      Notary Public
13

14

15

16

17

18

19

20

21

22

23

24

25

Page 416

1

2                        I N D E X

3   WITNESS: ROSS MACDONALD

4   EXAMINATION BY                              PAGE

5           MS. HAGAN                            6

6

7                      E X H I B I T S

8   PLAINTIFF'S           DESCRIPTION            PAGE

9   1                     Dr. MacDonald Letter   55

10  2                     FPECC Policy           74
                          (NYC_291-295)
11
    3                     01/11/18 Email         107
12
    4                     Email (NYC_1188-1190)  115
13
    5                     Email (NYC_196-198)    123
14
    6                     Email (NYC_204-207)    140
15
    7                     Email (NYC_379-380)    163
16
    8                     Email (NYC_75-76)      169
17
    9                     Email (NYC_118-119)    193
18
    10                    Email (NYC_1914-1915)  199
19
    11                    Email (NYC_288)        206
20
    12                    Email (NYC_3270)       217
21
    13                    EEOC Charge (Kaye's    221
22                        3rdProduction_109-112)

23  14                    Email (NYC_757-758)    232

24  15                    Correction Complaint   250

25  16                    Email (NYC_2946)       269

Page 417

1

2    17                        APPL Recording          274
                              Guidelines
3
     18                        730CPL Statute          290
4
     19                        Email (NYC_962-963)     294
5
     20                        Email (NYC_1285-1286)   308
6
     21                        Email (NYC_2629-2630)   313
7
     22                        Email (NYC_2160-2161)   317
8
     23                        Email (NYC_960-961)     324
9
     24                        Email (Kaye's 6th       329
10                            Prod_557-559)

11   25                        Email (NYC_1718-1719)   333

12   26                        Email (Kaye's 6th       349
                              Prod_3-4)
13
     27                        Email (Kaye's 6th       354
14                            Prod_73-78)

15

16

17

18

19

20

21

22

23

24

25

Page 418

1

2                    C E R T I F I C A T E

3

4        I, KIARA MILLER,

5        A Shorthand Reporter and Notary Public of the

6        State of New York, do hereby certify:

7

8        That the witness whose examination is

9        hereinbefore set forth, was duly sworn or

10       affirmed by me, and the foregoing transcript is

11       a true record of the testimony given by such

12       witness.

13

14       I further certify that I am not related to any

15       of the parties to this action by blood or

16       marriage, and that I am in no way interested in

17       the outcome of this matter.

18

19

20                    _____

21                         KIARA MILLER

22

23

24

25