UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

MELISSA KAYE, M.D.,

                          Plaintiff,

                          INDEX NO.: 18-CV-12137

          -against-


HEALTH AND HOSPITALS CORPORATION; ELIZABETH FORD;

ABHISHEK JAIN; PATRICIA YANG; and JONAHTHAN WANGEL,

et al.,

                          Defendants.

-----------------------------------------------------X

                          Remote Deposition
                          New York, New York 11716


                          September 30,  2021
                          10:09 a.m.


     DEPOSITION of JONATHAN WANGEL, a Defendant

     herein, taken by the Plaintiff, held at the

     above-mentioned time and place, before KIARA

     MILLER, a Notary Public of the State of New

     York.

```
 1

 2    A P P E A R A N C E S:

 3

 4            THE LAW OFFICES OF SPECIAL HAGAN
              Attorney for Plaintiff
 5            196-04 Hollis Avenue
              Saint Albans, New York 11412
 6
              BY:  SPECIAL HAGAN, ESQ.
 7

 8

 9            NEW YORK CITY LAW DEPARTMENT
              Attorney for Defendants
10            100 Church Street
              New York, New York 10007
11

12            BY:  DONNA CANFIELD, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2        F E D E R A L   S T I P U L A T I O N

3

4              IT IS HEREBY STIPULATED AND AGREED by

5        and between the counsel for the respective

6        parties hereto, that the filing, sealing, and

7        certification of the within deposition shall be

8        and the same are hereby waived;

9              IT IS FURTHER STIPULATED AND AGREED

10       that all objections, except as to the form of

11       the question shall be reserved to the time of

12       trial.

13             IT IS FURTHER STIPULATED AND AGREED

14       that the within deposition may be signed before

15       any notary public with the same force and

16       effect as if signed and sworn to before this

17       court.

18

19

20

21

22

23

24

25

Page 4

```
 1                        J. WANGEL
 2   J O N A T H A N   W A N G E L, after having first
 3   been duly sworn by a Notary Public of the State of
 4   New York, was examined and testified as follows:
 5                    COURT REPORTER:  Please state
 6              your name for the record.
 7                    THE WITNESS:  Jonathan Wangel.
 8                    COURT REPORTER:  Please state
 9              your address for the record.
10                    THE WITNESS:  55 Water Street,
11              Manhattan, New York 10041.
12   EXAMINATION BY
13   MR. HAGAN:
14         Q    Good morning, Mr. Wangel.  How are
15   you?
16         A    Good morning.  How are you?
17         Q    There's a lawsuit filed by Dr.
18   Kaye, you are aware of that; am I right?
19         A    Yes.
20         Q    So, Mr. Wangel, I'm sure you've
21   been deposed before, but I just want to make
22   sure for the record you have the court
23   admonitions before we start.
24                    COURT REPORTER:  Sorry.  When
25              you speak, I can't hear you that
```

```
 1                        J. WANGEL

 2            well.

 3                    (Technical difficulties.)

 4            Q    Mr. Wangel, I'm here deposing you

 5       here today because of Dr. Kaye's lawsuit

 6       against you a few other named defendants.

 7       You are aware of that, right?

 8            A    Yes.

 9            Q    So I'm sure you've been deposed

10       before, your an attorney.  Just the typical

11       admonitions of course only one of us can

12       speak at a time.  And I think you're

13       probably aware that you can give verbal

14       responses.  No nodding of the head or

15       uh-huh, just yes or no or passing of an

16       appropriate -- or I don't know or I don't

17       recall.  Are you clear about that?

18            A    Yeah.

19            Q    You are aware that you're

20       testifying under oath today; is that right?

21            A    Yes.

22            Q    If, in fact, you need me to repeat

23       a question, please do, please ask me to

24       repeat the question.  If you don't hear it

25       the first time or you don't understand it,
```

Page 6

                              J. WANGEL

1
2    please make sure that you let me know and I
3    will go over it again.  Is that okay?
4         A    Yes.
5         Q    Mr. Wangel?
6         A    Yes.
7         Q    Now, in the event that you need to
8    take a break, please make sure that you
9    answer the question first, then if you need
10   to take a break.  If you'd like to have a
11   lunch, please let me know how long the lunch
12   break hour is or the lunch break is; is that
13   clear?
14        A    Yes.
15        Q    I guess just some general
16   questions.  Have you had anything, have you
17   taken any medication that would impair your
18   ability to testify truthfully today?
19        A    No.
20        Q    Have you had any medications in
21   the last 24 hours?
22             MS. CANFIELD:  Objection.
23        A    No.
24        Q    You haven't had any alcoholic
25   beverages in the last 24 hours?

1                    J. WANGEL

2          A     No.

3          Q     So I questions I want to ask you

4    some general questions.  What did you do to

5    prepare for today's deposition?

6          A     Some prep with Ms. Canfield.

7          Q     When did that take place?

8          A     Sometime last week if I recall

9    correctly.

10          Q     And how many times did you meet

11    with Ms. Canfield?

12          A     Over what time period are you

13    talking about?  In preparation for this, or?

14          Q     In preparation for this

15    deposition.

16          A     Six months.

17          Q     Did you have --

18          A     Actually -- actually, sorry.

19    Twice I believe -- Ms. Canfield once.

20    (Inaudible).  I can't remember when and what

21    though it was.

22          Q     And had you had any phone

23    conversations with Ms. Canfield with

24    preparation for today's deposition?

25          A     Yes.

1                    J. WANGEL

2          Q     When were those?

3          A     That would be the same prior.

4          Q     Just some background information

5     Mr. Wangel.  What's your highest level of

6     education?

7          A     Law school?

8          Q     Where did you go to law school?

9          A     New York Law School.

10         Q     When did you graduate?

11         A      2003.

12         Q     So, Mr. Wangel, we are saying you

13    graduated from New York law school in 2003.

14    Just for the record, what is your full name?

15         A     Jonathan Wangel.

16         Q     Do you have a middle name?

17         A     I do.  It's Corey, C-O-R-E-Y.

18         Q     Have you gone by anymore other

19    names?

20         A     No.

21         Q     Besides John Corey Wangel?

22         A     No.

23         Q     When you graduated from law

24    school, where did you work?  What was your

25    first job?

```
 1                    J. WANGEL
 2        A    My first place of employment was
 3   the New York City Department of Health and
 4   Mental Hygiene.
 5        Q    And in what capacity were you
 6   working there?
 7        A    I worked in the general
 8   counselor's office and advocate's office.
 9        Q    Could you repeat yourself please.
10        A    The general counsel's office.
11        Q    As what?
12        A    Advocate's offices.
13        Q    What was your civil service title?
14        A    Agency attorney.
15        Q    What was your office title?
16        A    Title back then, I don't remember
17   of what.  Office title when I was hired, I
18   don't actually remember.  At some point I
19   became the deputy director, that was an
20   in-house title.  Probably like associate
21   counselor, pretty generic.  I don't remember
22   exactly when it was.
23        Q    When did you become the deputy
24   director of the unit?
25        A    Hard to say exactly.  A couple
```

                         J. WANGEL

1

2    years after I started.

3         Q    Would you say that it would have

4    been around 2005?

5         A    Best guess, yeah.  Hard to say

6    exactly.

7         Q    What was your next position after

8    you were deputy director of the unit?

9         A    Next position in terms of?

10        Q    Within the -- first of all, how

11   did you stay in the department of health?

12        A    I was in the health department

13   from a civil service title in November of

14   2013 -- I'm sorry.  What year?  November of

15   '03 through December of '15.

16        Q    I'm assuming you've had more than

17   one position there so.  You mentioned that

18   you were an attorney in the advocate's

19   office.

20             Did you have any number of

21   positions between that and the deputy

22   director position?

23        A    Well, civil service-wise I held

24   all of the attorney titles.  I think there's

25   four models.  At some point I became a

```
 1                    J. WANGEL
 2     manager.  I worked in the general counselor
 3     for a number of years in the disciplinary
 4     advocate's office.  At some point I became a
 5     deputy director.  From there I served as
 6     chief of staff.
 7          Q    At the disciplinary advocate's
 8     office, when were you there?
 9          A    I was there while I was at school
10     as an intern from '03 for a good eight, nine
11     years.  I don't remember exactly.  For a
12     while.
13          Q    Then you became a chief of staff.
14     When did you become the chief of staff?
15          A    It was -- I have to go back to my
16     CV to look at the exact dates.  It was under
17     commissioner Farly (phonetic), so it was a
18     while back.  I honestly don't remember what
19     year it was.  It was a while ago.
20          Q    Was it right before you came to H
21     and H?
22          A    It was before but not immediately
23     prior.  So I was the chief of staff for a
24     little while.  From there I held an attorney
25     position in the advocate's office.  I became
```

1                         J. WANGEL

2        the director of labor relations for the

3        department of mental hygiene.

4                    COURT REPORTER:  You're not

5               very clear either.  I hear you, but.

6                    THE WITNESS:  I'll speak up.

7                    COURT REPORTER:  Thank you.

8        Q    Now, how long would you say you

9        were the chief of staff at the department of

10       mental health and hygiene, the intern?

11       A    A little less than a year, I'd

12       say.

13       Q    And then you went to an attorney's

14       position in the Advo's (phonetic) office

15       again.  How long were you there in the

16       Advo's office?

17       A    Also about a year.

18       Q    Then you were the director of

19       labor relations; how long were you in that

20       capacity?

21       A    Probably two years, I want to say.

22       First, I was -- actually first, I was the

23       deputy director and then the director of

24       labor relations, which is different from the

25       advocate's office and the general counsel's

1                              J. WANGEL

2         office.

3              Q    Now, the director of labor

4         relations position, was that the position

5         you held immediately before you came to H&H.

6              A    Yes.

7              Q    Did you meet Dr. Yang or Ms. Yang

8         at the Department of Health and Mental

9         Hygiene?

10             A    I did.

11             Q    How did you work with Ms. Yang at

12        the Department of Health and Mental Hygiene?

13                  MS. CANFIELD:  Objection as to

14               form.  You can answer.

15             A    I'm not quite sure I understand

16        the question.

17             Q    Well, did you work with Ms. Yang

18        at Department of Health and Mental Hygiene?

19             A    She was an -- there.  We both

20        worked for the same employer.

21             Q    Right.  But did you work with her

22        as far as projects or initiatives?

23             A    In the commissioner's office yes.

24        As advocators as the issues come up.  She

25        held the title of chief operating

Page 14

                         J. WANGEL

1

2     officers -- when issues came up that

3     involved bringing something to that level,

4     yeah.

5           Q    How often would you say you worked

6     with Ms. Yang there?

7           A    Infrequently.

8           Q    Did you ever work with her on

9     anything that involved pay -- when you were

10    there?

11          A    I don't believe so, no.

12          Q    So you started at H&H in 2015,

13    December 2015; is that right?

14          A    Yes.

15          Q    And how did you get the position

16    at H&H?

17          A    I applied for a position.  I was.

18          Q    Were you encouraged to apply for a

19    position at H&H?

20          A    Was I encouraged to apply?

21          Q    Yes.

22          A    I wouldn't say I was encouraged.

23          Q    Were you recruited?

24          A    No.  I'm not sure exactly what you

25    mean by that.

J. WANGEL

1

2          Q     Did anyone suggest that you apply

3     for a position at H&H?

4          A     I don't believe so, no.

5          Q     Who interviewed you for your

6     position at H&H?

7          A     Dr. Yang.

8          Q     Did Dr. Yang speak to you about

9     working at H&H before they started?

10          A     She did.

11          Q     Was she the only person who

12     interviewed you?

13          A     I actually don't recall.  I may

14     have also talked to Dr. McDonald.

15          Q     Now, did you work with Dr.

16     McDonald when you were at the Department of

17     Mental Health and Hygiene?

18          A     No.  I don't believe I did.

19          Q     Did you and Dr. McDonald work at

20     the Department of Mental Health and Hygiene

21     at the same time?

22          A     I believe he did.

23          Q     But you hadn't met him at that

24     time?

25          A     I believe that's accurate, yes.

                        J. WANGEL

1

2        Q    And then what was your position

3   when you were hired by Dr. Yang?

4        A    It was primarily for the labor

5   relations director position I think the

6   Health and Hospitals side senior director.

7   And CHS was really -- at that time so it was

8   sort of a little bit for other things, but

9   primarily for the promotion.

10       Q    What was your salary when you were

11   hired?

12       A    It was 150, maybe flat, a little

13   higher.

14       Q    150?

15       A    150,000 dollars a year.

16       Q    And how long -- I guess you at H&H

17   there's like a corporate title and an office

18   title; is that right?

19       A    Yes.

20       Q    So what was your -- I guess the

21   senior director of labor relations was the

22   office title.  What was the corporate title?

23       A    Senior director is the corporate

24   title.  So the corporate title was senior

25   director and the functional title senior

```
 1                    J. WANGEL
 2      director for, I think it was, labor and
 3      relations.  It changed over time, but it was
 4      labor employment relations, or...
 5           Q   At that time how many people did
 6      you have as direct reports?
 7           A   Direct reports, hard to say.  When
 8      I first came on board -- I'm trying to
 9      think.  It's going back a little bit.  I
10      don't think there was anybody else in labor
11      at the time because it was all very new,
12      H&H.  All the clinical work was vendor while
13      I was doing work for H&H, so it was new.
14      Very few.  I don't remember offhand, but it
15      was possibly one or two when I first
16      started.
17           Q   And who was your supervisor?
18           A   Dr. Yang.
19           Q   Now, how long did Dr. Yang remain
20      your supervisor, your direct supervisor?
21           A   For the entire duration of my
22      employment at CHS.
23           Q   But Dr. Yang has always been your
24      direct supervisor?
25                    MS. CANFIELD:  Objection to
```

```
 1                      J. WANGEL
 2            form.  You can answer.
 3            A    I'm just thinking.  I believe
 4       that's accurate, yes.
 5            Q    Now, in your capacity of senior
 6       director -- now, do you still currently have
 7       the title of senior director for labor and
 8       employment relations?
 9            A    I do not.
10            Q    What's your current title?
11            A    I'm assistant vice president to
12       deputy counsel.
13            Q    Assistant vice president and
14       deputy counsel.
15            A    Assistant vice president is the
16       functioning title.  The corporate title is
17       deputy counsel.
18            Q    Did you have any other titles
19       before the -- in between the senior director
20       for labor relations and the assistant VP
21       deputy counsel titles?
22            A    I did not.
23            Q    When did you become assistant VP
24       and deputy counsel?
25            A    June or July of 2019.
```

```
 1                     J. WANGEL
 2          Q    Did you get an increase in the
 3     salary when you became assistant VP and
 4     deputy counsel?
 5          A    I did.
 6          Q    What was your salary at that
 7     point?
 8          A    At that point I think it was
 9     200,000, maybe 205,000.
10          Q    And was your salary completely by
11     a PAGNY or H&H?
12          A    Health and hospital.
13          Q    Just health and hospital?
14          A    Health and hospitals, yes.
15          Q    Now, I guess, for purposes of the
16     lawsuit, I guess you actually were promoted
17     during the time Dr. Kaye is actually at
18     health and hospitals.  So I guess I'd like
19     to kind of get into the job functions when
20     you were senior director of labor and
21     employment relations.  And then having
22     discussed what your work functions were once
23     you were promoted.
24               So initially as senior director
25     for labor and employment relations, what
```

1                    J. WANGEL

2      were your, I guess, responsibilities?

3           A    So maintaining relations with

4      multiple humans; oversee both disciplinary

5      matters and grievances filed by the union.

6      Those were the primary responsibilities for

7      the senior director of relations.

8           Q    So you were tasked with

9      interpreting and enforcing the collective

10     bargaining agreement that were necessary,

11     right?

12          A    Yes.

13          Q    And you presided over the

14     grievance process when the employees filed

15     grievances; would that be right?

16          A    When you say preside over, not

17     exactly sure what you mean.

18          Q    Well, if an employee filed a

19     grievance during that time period, would it

20     be fair to say that you actually dealt with

21     the unions, or I guess, engaged with the

22     union and/or engaged in the step process;

23     would that have been you?

24          A    It could have been.  I definitely

25     would have taking part of the process, but

Page 21

1                          J. WANGEL

2         there are other staff also who are handling

3         those matters as well.

4              Q    Would you have been the final say

5         for the agency position on the grievances?

6                    MS. CANFIELD:  Objection as to

7                form.  You can answer.

8              A    Potentially.

9              Q    What do you mean by that?

10             A    It just depends on the matters.

11        There are various steps.  I'm not sure if

12        you're familiar with the process.  But when

13        you say the position of the agency, I'm not

14        exactly sure what you're asking.

15             Q    For example, I don't want to give

16        you a hypothetical.  I know there's a step

17        process.  There's step one and step two and

18        perhaps maybe do an arbitration for the

19        Article 78; would that be accurate?

20                   MS. CANFIELD:  Objection,

21               form.  You can answer.

22             A    Yeah.  There's an actually a

23        defined grievance process that has four

24        steps.  One, two, three or arbitration or

25        depending on the step number civil service

```
                              J. WANGEL
 1

 2      rights, you can also chose to appeal step

 3      one.  Recommendation to administrative

 4      during trials and hearings.

 5                 The correctional health has staff

 6      that are both employed by H&H directly and

 7      PAGNY; sounds like you know.  And PAGNY has

 8      a completely separate process, which is

 9      outside of the city process.

10           Q    And you didn't preside over the

11      PAGNY process?

12           A    No.

13           Q    So, Mr. Wangel, you had, we just

14      discussed the grievance process, and I was

15      trying to figure out if you were the

16      ultimate authority, I guess, at the agency

17      when it came to making determinations as to

18      the agency's position on a given grievance.

19      And you gave me the answer that it depended,

20      right?

21           A    Yes.

22           Q    And under what circumstances would

23      you have the final say on, I guess, final

24      arbiter of the grievance?

25           A    Definitely not the arbiter for
```

Page 23

J. WANGEL

1

2    sure.  But if you're asking what position or

3    what health and hospitals is going to

4    advocate for from a disciplinary perspective

5    for what a potential settlement offer could

6    be in the grievance or what the ultimate

7    disposition could be in any one of those

8    matters, some of them are typically routine.

9    There are cases that come up all the time,

10   routine grievances; how to title things,

11   time-and-leave related cases.  Those are

12   tried and true, unless there's some

13   tremendous variation in the facts, which

14   typically doesn't happen unless some

15   egregious conduct.  Yeah, the office itself,

16   myself or everyone, a deputy could make a

17   decision on what stands Health and Hospitals

18   would take on a given case.

19            Sometime issues come up that could

20   impact the entire service or the entire

21   department, in which case you need input

22   from other leads.

23        Q    Who are these other leaders that

24   you would have gotten input from in those

25   instances?

                         J. WANGEL

1

2        A     It would depend on the case.  It

3    would depend on who's involved in the

4    agency's perspective, right.  It could be

5    head of service, could be Dr. Yang -- and

6    this is solely for correctional health now,

7    right?  It will all depend on what the

8    matter was.

9        Q     Now, in the instance of Dr. Kaye

10   when she filed her grievance, were you the

11   final decision maker when it came to the

12   outcome of her grievance?

13       A     Which grievance are you speaking

14   about?

15       Q     Well, there's at least one where

16   she talked about being docked pay.  Do you

17   recall that?

18       A     Vaguely.  I mean I deal with

19   thousands of disciplinary grievances.  This

20   is years ago, so you might have to help me

21   out with that.  What was the substance of

22   that grievance?

23       Q     You should be seeing a screen.

24       A     Yes.

25       Q     And for the purposes of today's

1                    J. WANGEL

2    deposition, I'm going to start with one

3    again.  This will be Plaintiff's Exhibit

4    One, and it bears the Bate Stamp series

5    NYC_1902, NYC_1903 and it should go all the

6    way to NYC_1906.

7                    (Whereupon, Email (NYC_1902 -

8                    1906) was marked as Plaintiff's

9                    Exhibit 1 for identification as

10                   of this date.)

11        Q    I guess it would kind of make

12   sense to go to the portion you'll read.

13   Let's start here.  I'm showing you it's an

14   email dated October 25, 2019, and it's from

15   Dr. Kaye.  It looks like she addresses it to

16   the Saadya.

17             Was Saadya your staff person at

18   that time?

19        A    She could have been.  At one point

20   I oversaw payroll functions as well, so

21   Saadya would have been one of the payroll

22   staff.

23        Q    So at that time Dr. Kaye was told

24   that she had six hours and 56 minutes of

25   AWOL, six hours and 56 minutes, during the

Page 26

1                        J. WANGEL

2        period of October 6, 2019, to

3        October 12, 2019.  And absence without pay

4        totals were $677.11, and it will be deducted

5        from her November 1, 2019, paycheck due to

6        not having enough sick time.

7                   Now, is that a common occurrence

8        there at H&H?

9           A    Is what a common occurrence?

10          Q    Well, people getting docked pay

11       for being AWOL from time to time.

12                   MS. CANFIELD:  Objection as to

13               form.  You can answer.

14          A    It could be.  It all depends on a

15       number of factors.  It could be the time

16       sheet coding, could be an error, could be a

17       staff member had a rebalances to cover, a

18       number of specific absences.  There's a

19       number of reasons why pay could potentially

20       be reduced.

21          Q    Now, at this time Dr. Kaye then

22       responded to Samantha Kent, Dr. Jain, her

23       union representative, Nate Santa Maria and

24       Kevin Collins, Collen Barrow and CHS

25       Payroll.  Of these people I'm thinking that

1                        J. WANGEL

2        Ms. Barrow must have worked in your office,

3        right?

4                        MS. CANFIELD:  Objection.

5             A     This is October of 2017, so I was

6        no longer with CHS at this time.

7             Q     So you weren't with CHS at this

8        time?

9             A     I was not.

10            Q     And you were CC'd on any of these

11       just to make sure.  Well, actually you were

12       CC'd on this e-mail.  I'm scrolling to the

13       portion where you're were CC'd?

14            A     Okay.

15            Q     And this is on November 26, 2019,

16       right.  And at this point, did you preside

17       over the grievance process or have any part

18       in the grievance process?

19            A     I did not.  I was not at

20       Correctional Health during this time.  I see

21       from the copy list Dr. Kaye CC'd a whole

22       bunch of folks including Dr. Katz.  There

23       are CHS staff, including Ms. Kent, Ms. Kent

24       was the head at the correctional health

25       during that period.  She would have been the

```
 1                    J. WANGEL
 2     appropriate person to respond on the
 3     grievance.
 4          Q    And you didn't have any part in
 5     this at all?
 6          A    Correctional Health is a little
 7     bit silent to the rest of the system when it
 8     comes to the grievance process.  So they2009
 9     handle labor in house themselves.  Only
10     certain matters that get evolved to the
11     system level would be able to come to me in
12     my currently role.  So I would have not been
13     involved in that.
14          Q    So here it seems as if you did
15     seek -- you decided to forward the emails to
16     Ms. Greenfield; why did you do that?
17          A    I don't recall.  I hadn't seen
18     this actually.
19          Q    Would you need to see more to
20     figure out why you diverted it to
21     Ms. Greenfield?
22          A    It's a couple of years ago.
23               MS. CANFIELD:  Can the witness
24          read the entire document from top
25          bottom and see why he forwarded it.
```

Page 29

1                          J. WANGEL

2          Q    Okay.  Where would you like to

3     start reading Mr. Wangel?

4          A    The top is good.

5                    MS. CANFIELD:  The bottom.

6               The bottom is the beginning of the

7               thread.

8                    MS. HAGAN:  I think we read

9               the beginning of the thread.

10         Q    Would you need to read that again

11    or would you like to --

12         A    So the first e-mail is another

13    reduction in dollars, right?  Can you go to

14    the top of this.  So this is from Dr. Kaye

15    to Wilma.  There's a different message now.

16         Q    Yes.

17                   MS. CANFIELD:  Can you make

18              the screen bigger.

19         A    It's fine as I can see the

20    whole -- Dr. Kaye to Wilma to labor payroll,

21    health service, Dr. Yang, me, so concerned

22    about payroll.  Okay.  Okay, done.

23         Q    So what made you decide -- reading

24    the e-mail and Dr. Kaye's decision to file a

25    grievance because she was docked pay for at

```
 1                    J. WANGEL

 2   least two pay periods, and she was docked

 3   two pay periods in a row for taking time off

 4   on Jewish high holidays, was that the reason

 5   why you decided to forwarded it to Blanche

 6   Greenfield?

 7              MS. CANFIELD:  Objection as to

 8         form.  You can answer.

 9       A    Again, this is talking almost two

10   years later now, but having reread this, I

11   believe I would have forwarded to Blanche

12   because Dr. Kaye mentions discrimination in

13   her e-mail.  Ms. Greenfield oversees EEO for

14   the system.

15       Q    At that time Ms. Greenfield did

16   oversee the Agency's EEO process; is that

17   right?

18       A    I believe so.

19       Q    I guess we kind of go back a

20   little bit.  When did you first meet Dr.

21   Kaye?

22       A    I don't know.  I don't have an

23   exact date, timeframe.  Within my time at

24   Correctional Health.

25       Q    Do you remember the circumstance
```

1                          J. WANGEL

2        that lead to the meeting?

3             A    I believe I do.

4             Q    What were they?

5             A    I remember having some

6        conversations with Dr. Kaye right around the

7        time she transitioned to Correctional Health

8        from, I believe it was Bellevue.  The

9        program she worked for was moving from

10       the -- site over to Correctional Health.

11            Q    Do you remember who else met with

12       you when you met with Dr. Kaye?

13            A    Dr. Kaye and I met a few times

14       both with and without union folks.  So hard

15       for me to remember exactly who was there.

16            Q    Well, I guess in that initial

17       meeting or in those early meetings, did you

18       meet with Kaye and -- did Jessica Laboy sit

19       with you?

20                 MS. CANFIELD:  Objection to

21            form.  You can answer.

22            A    I believe I early on we did meet

23       with Dr. Kaye regarding she had some

24       questions about the transition over.  And I

25       believe there was a time when I met with

Page 32

1              J. WANGEL

2     Ms. Laboy, Dr. Kaye, myself and I think

3     there was some other folks there.  It wasn't

4     a typical, we were sitting in a conference

5     room meeting.  I think we had gone office to

6     office to discuss different topics.

7          Q    At any point during those

8     meetings, did you tell Dr. Kaye that her

9     working conditions would not change with the

10    transfer from, I guess, it would have been

11    Bellevue to CHS?

12         A    I think we talked a lot about

13    compensation and --

14              COURT REPORTER:  I'm sorry.

15         Can you repeat your answer.

16         A    I think we talked about

17    compensation and Correctional Health,

18    including myself, there would be no change

19    of salary or loss of compensation.  Dr. Kaye

20    had expressed her interest in remaining the

21    doctor's counselor member or union member.

22    As far as working conditions, I don't think

23    we discussed work conditions.  Her work

24    location was remaining unchanged because her

25    job was remaining unchanged.

Page 33

1                              J. WANGEL

2          Q    What about her pension?  Would her

3    pension carry --

4          A    There would be nowhere to carry.

5    She would still and was at Health and

6    Hospitals, so I don't believe there was a

7    change in her pension.

8          Q    Did Dr. Kaye follow up with you in

9    an e-mail trying to ensure she understood

10   what was represented during the course of

11   that meeting?

12         A    It's possible.

13               MS. CANFIELD:  Objection to

14          form.  Jonathan, give me a little

15          chance to object.

16               THE WITNESS:  Sure.  Yeah, you

17          got it.

18         A    It's possible.

19         Q    And once she wrote this e-mail or

20   emails, did you respond confirming either

21   way if her understanding of what transpired

22   was actually accurate?

23         A    I don't recall.  I would need to

24   be refreshed.

25         Q    So let's do that then.

Page 34

                         J. WANGEL

1          Mr. Wangel, as I'm pulling up the
2   exhibit, have you ever been sued before?
3      A    I don't believe so.
4      Q    Have you ever been named as a
5   defendant in a lawsuit?
6      A    I believe just this one.
7      Q    So have you ever been deposed in a
8   case against the City of New York or H&H?
9      A    I have not.
10      Q    Have you ever been deposed in a
11   case against H&H?
12      A    I have not.
13      Q    Have you ever been I guess the
14   subject of any oath proceedings?
15      A    The subject of an oath, no.  I've
16   taken part in many as counsel.  I've never
17   been the subject of an oath proceeding.
18      Q    I'm going show you what's going to
19   be marked as Plaintiff's Exhibit Two.
20      A    Sure.
21                (Whereupon, e-mail (NYC_513) was
22                marked as Plaintiff's Exhibit 2
23                for identification as of this
24                date.)

```
 1                    J. WANGEL

 2        Q    You can see the screen; am I

 3   right?

 4        A    Yes.

 5        Q    And I'm going to give you an

 6   opportunity to read it.

 7               MS. HAGAN:  For purposes of

 8           the record Plaintiff's Exhibit Two

 9           bears the Bate Stamp series NYC_513.

10        Q    You see that, right?

11        A    I do.

12        Q    I'm going to allow you to read

13   this, and you let me know when I need to

14   scroll down, okay, Mr. Mr. Wangel.

15        A    Sure.  Okay.

16        Q    Now, I'm going to ask you some

17   questions.  I just want to make sure the

18   record is clear, this is an e-mail dated,

19   April 30, from Dr. Kaye to you and

20   Ms. Laboy.

21               First and foremost, what is

22   Jessica Laboy's title at that time?

23        A    I actually, I don't recall.

24        Q    Was she your supervisor at that

25   time?
```

1                    J. WANGEL

2          A    I think there was a very brief

3     period where she was.  She there was -- now

4     that you say that, there was a brief period

5     where I did report to Ms. Laboy not Dr.

6     Yang.  I don't recall if this was during

7     this period though.

8          Q    So here you are April 30, 2018,

9     and you and Ms. Laboy are on this e-mail.

10    And Dr. Kaye is thanking you both for taking

11    the time out to discuss the transition from

12    Bellevue to CHS; is that right?

13         A    (No verbal response.)

14         Q    So as you discussed in our initial

15    exchange, you said that she was concerned

16    about union membership.  So there are a few

17    things that she identifies, right, as

18    concerns and takeaways from the meeting.

19    So, for example, the first point she said

20    doctor's counsel union membership would all

21    associated benefits, including but not

22    limited to dental, legal, orthodontic,

23    vision, etc., that would stay the same.  And

24    it did, am I right?

25         A    As far as I know she remained in

```
 1                      J. WANGEL
 2      doctor's counsel, so I would say yes.
 3           Q    That goes to my second point,
 4      which basically said that she would not be
 5      taken out of the doctor's counsel union and
 6      be placed in a non-unionized managerial
 7      line; you saw that right?
 8           A    I see number two on the e-mail,
 9      yes.
10           Q    And you discussed this with her;
11      am I right?
12           A    I believe I did.
13           Q    Now, number three, she says, I
14      will receive the $20,000 retention bonus
15      owed to Bellevue physicians per a
16      memorandum, I guess, agreement, which is not
17      yet forthcoming.  I will remain eligible and
18      receive this bonus even if it is dispersed
19      after July 1, 2018, when my line has been
20      changed.
21                Were you ever discussing this
22      during this meeting with her?
23           A    We likely did.  I don't remember
24      exactly what was discussed, but I do
25      remember a conversation about what was
```

```
1                    J. WANGEL
2    mentioned.
3         Q    Now, did this actually happen Mr.
4    Wangel?
5                    MS. CANFIELD:  Objection to
6              form.
7         A    I believe it did.  Let me ask you
8    a question, when you say, did it happen, are
9    you asking was she paid the $20,000, Dr.
10   Kaye?
11        Q    Was Dr. Kaye paid the $20,000 in
12   one lump sum, or was there an issue as far
13   as whether or not she was entitled to a full
14   retention bonus or not?
15                   MS. CANFIELD:  Objection to
16             form. You can answer.
17        A    There's two pieces there.  I
18   believe that Dr. Kaye remained on Bellevue
19   payroll to a date certain to ensure she
20   would remain eligible for the $20,000, for
21   the retention bonus 'cause the way the
22   agreement for the retention is framed.  And
23   I believe that's why the transition occurred
24   when it did.
25                   I vaguely remember conversation --
```

                          J. WANGEL

1

2    I talked with doctor's counsel regularly

3    about retention bonus and the way things are

4    calculated.  There could have been an issue.

5    I don't remember the details if there was.

6    That's what I recall.

7         Q    Was there a time when Dr. Kaye

8    approached your office about not receiving

9    the entire $20,000 that she was entitled to?

10        A    I believe that's correct.

11        Q    What happened?  Do you recall?

12        A    I don't remember the exact

13   circumstances.

14        Q    Let's go through this e-mail first

15   and then we can go through some of the

16   specific instances in more detail.

17             Does that work?

18        A    Sure.

19        Q    Now, the fourth point she goes

20   into her longevity pay.  Now, at any point,

21   was there a controversy involving Dr. Kaye's

22   longevity pay?

23        A    Not that I recall.

24        Q    Is it your testimony that Dr. Kaye

25   received the longevity pay without having to

1                           J. WANGEL

2      raise any complaints beforehand?

3           A    She may have.  Again, this is

4      years ago, I don't remember.  I mean I deal

5      with issues of this type almost on a daily

6      basis.  It is hard to remember the specifics

7      of any one claim.  But it's possible, I just

8      don't recall.

9           Q    Now, there's also a question of

10     the go down to the NYCERS pension status

11     membership.  Did Dr. Kaye ever raise any

12     questions about her NYCERS pension status?

13          A    Not that I recall.  It's not

14     impossible, she may have.  Again, I don't

15     recall.

16          Q    And then was there a time where

17     Dr. Kaye raised any concern about her title

18     being changed from medical director?

19               MS. CANFIELD:  Objection to

20          form.  You can answer.

21          A    Again, it's possible, but I don't

22     recall specifically.

23          Q    And last but not least, did Dr.

24     Kaye ever raise any concerns or any issues

25     about having to report to Rikers Island or

Page 41

1                         J. WANGEL

2      city court clinics in different boroughs

3      during the course of your tenure there in

4      CHS?

5           A    I remember the Riker's

6      conversation, and the court clinics are

7      obviously not on Rikers.  Different

8      boroughs, I don't recall that piece of the

9      conversation.  But again, it's a while back,

10     so I don't recall specifically.

11          Q    So I'm going to get in some more

12     exhibits, so maybe perhaps this will refresh

13     your memory some; fair enough?

14          A    Yeah.

15          Q    So the first exhibit I'm going to

16     show you -- I guess this will be the third

17     exhibit.  This will be Plaintiff's Exhibit

18     No. Three.

19                    (Whereupon, e-mail (NYC_250 -

20                    251) was marked as Plaintiff's

21                    Exhibit 3 for identification as

22                    of this date.)

23          Q    I'm going to share the screen.

24               MS. CANFIELD:  Counsel, I just

25          want to ask the exhibits that you

Page 42

1                    J. WANGEL

2          sent over to me early this morning

3          they are not actually in order or

4          they are not marked as P1, P2, P3.

5          They are just a bunch of documents.

6                MS. HAGAN:  I'm aware of that.

7                MS. CANFIELD:  So that's

8          correct?

9                MS. HAGAN:  I'm aware of that.

10               MS. CANFIELD:  Okay.

11               MS. HAGAN:  So you have the

12          exhibits as per the Court's order.

13               MS. CANFIELD:  But they are

14          not marked as exhibits.

15               MS. HAGAN:  The Court ordered

16          me to give you exhibits and you have

17          them.

18               MS. CANFIELD:  I'll followup

19          with the Court.

20      Q    Now, Exhibit Three.

21               MS. HAGAN:  The exhibit is not

22          premarked, so you got them as I have

23          them.

24      Q    Exhibit Three, Mr. Wangel, it

25      bears the bate stamp series NYC_251, and

Page 43

1                    J. WANGEL

2         it's an e-mail from Ms. Laboy to you and Dr.

3         Kaye.  And it was sent on Wednesday

4         May 30, 2018.

5                   You see that right.

6         A    E-mail on top of the screen, yes.

7                   MS. CANFIELD:  Ms. Hagan, you

8              gave one Bate Stamp, but this

9              appears to be a two-page document.

10                  MS. HAGAN:  That's it.

11                  MS. CANFIELD:  It's a two-page

12             document.

13                  MS. HAGAN:  I'm sorry.  It

14             will be NYC_250 to NYC_251, that's

15             Exhibit Three.  My apologizes.

16        Q    Have you had an opportunity to

17        read all of the initial page?

18        A    I haven't read anything yet.  I

19        scrolled back and forth.

20                  MS. CANFIELD:  Can you make

21             this bigger, so we can see the whole

22             page.  It will make it easier and, I

23             think, quicker for all of us to read

24             it.  There's only three quarters on

25             the screen.

```
 1                       J. WANGEL
 2                  MS. HAGAN:  This is as big as
 3             I can get.  I don't have a large
 4             computer screen.  Sorry,
 5             Ms. Canfield.
 6        A     What I am directly going to?
 7        Q     So the first e-mail Dr. Kaye
 8   actually emails you on May 30, and she said
 9   I just spoke with Nicole at NYCERS pension.
10   She checked with her supervisor and told me
11   that NYCERS has no information or no
12   indication that any CHS employee is or will
13   be a member of NYCERS.  She says, therefore,
14   under CHS I will not continue to accrue
15   service time toward my pension, nor will
16   adjustments in my final rate be changed
17   based on future salary increase.  NYCERS
18   told me to contact my union in HR
19   department.  It sounds like this compulsory
20   change of my line from BHC to CHS is going
21   to cause me to lose an accrued service time
22   going forward and negatively impact my final
23   pension situation.  This is intolerable.
24   I'm seeking to remedy this problem.  Any
25   assistance you can provide me with will be
```

Page 45

1                           J. WANGEL

2        appreciated.  Right?

3                    Then, I guess, Ms. Laboy gets back

4        to Dr. Kaye; is that right?

5            A    There's a response from Ms. Laboy

6        in the e-mail, yes.

7            Q    Did you look into, I guess, Dr.

8        Kaye's concerns regarding the pension?

9            A    Me personally?  I don't recall

10        that I did.  Typically NYCERS doesn't speak

11        to anybody but the pension member about any

12        specific employee that's the case across the

13        board.

14                    Dr. Kaye's original e-mail

15        references somebody named Nicole.  I don't

16        know who Nicole is at NYCERS.  I don't know

17        what the basis of that conversation was.

18        There are folks who handle benefits for

19        Health and Hospitals.  And Ms. Fong, who is

20        copied on the next e-mail, she is the

21        correct liaison for the central office that

22        handles the NYCER issues.

23            Q    Now, do you recall the outcome of

24        this inquiry in this instance?

25            A    I have not.

Page 46

J. WANGEL

2      Q     Do you recall whether or not CHS,

3   the other Bellevue employees that

4   transitioned to CHS whether or not their

5   pensions actually transitioned as well?

6      A     I don't recall having any

7   conversation about it.  Yeah, it's possible,

8   but I don't recall the specifics.

9      Q     Did anyone else who transitioned

10  in Bellevue to CHS reach out to you or any

11  one in your office regarding NYCERS?

12     A     Again, it's possible, but I don't

13  recall specifics if they did.

14     Q     Now, I'm going to show you another

15  e-mail regarding Dr. Kaye and the issues

16  with her retention bonus.

17           Do you recall if there were any

18  discussions about that with her office or a

19  Colleen Barrow by any chance?

20     A     Colleen started working for

21  payroll also.  Again, it's a while back.  I

22  don't recall the specifics.

23     Q     I'm going to show you the initial

24  discussion first.  Perhaps that will jog

25  your memory some.

```
 1                        J. WANGEL
 2                        (Whereupon, e-mail (NYC_594-595)
 3                        was marked as Plaintiff's
 4                        Exhibit 4 for identification as
 5                        of this date.)
 6        Q    And for purposes of the discussion
 7   this will be marked as Plaintiff's Exhibit
 8   Four.  And Plaintiff's Exhibit Four bears
 9   the bate stamp series NYC_594, NYC_595.
10                        And, I guess, for purposes that
11   you get the full picture of what transpired
12   here, I'm going to have you start at the
13   bottom of the exhibit.
14                        It's dated September 26, 2016.
15   Who is Angela Mulett?
16        A    I don't know.  I don't recall.
17   This.  If you scroll a little bit, I believe
18   looking at this these are the hours worked
19   working at Bellevue.  Without seeing the
20   entire chain I would imagine that Angela
21   probably works for the payroll at Bellevue
22   or Correctional Health.  The site -- looks
23   like the hours worked.
24        Q    It looks like Ms. Mullet's e-mail
25   address has an NYCHHC.org post, would that
```

```
 1                    J. WANGEL
 2    have placed her somewhere else outside of
 3    HHC systems?
 4         A    Everybody at Health and Hospitals
 5    has that same -- that's everybody who works
 6    for the system.
 7         Q    At this time there was a full
 8    transition for former Bellevue employees to
 9    the NYCHHC post at that point; am I right?
10                   MS. CANFIELD:  Objection to
11              form.  Vague and ambiguous.
12         Q    This will be September 2018,
13    right?
14         A    I'm confused.  So everybody,
15    Correctional Health included, are all part
16    of Health and Hospitals as a corporation.
17    There's all one employer.  There's no
18    separate employers there.
19         Q    At any point did Bellevue
20    employees have a Bellevue host for their
21    e-mail?
22                   MS. CANFIELD:  Objection.
23         A    Sorry.  Not that I'm aware of.  I
24    mean I believe every H&H paid employee has
25    that same host address no matter where you
```

1                    J. WANGEL

2        work.  The post site, docs site, personal

3        health --

4             Q     To Bellevue too?

5             A     That's my understanding.

6             Q     I'm going to scroll up so you can

7        see more.  Matthew Campese, who is he?

8             A     He ran good relations for the

9        system, the entire Health and Hospitals

10       system.

11            Q     So he presided over labor and

12       relations for all of Health and Hospitals;

13       is that right?

14            A     Generally, yes.  Correctional

15       Health was a little bit different than the

16       rest.  So they had a little bit more

17       independence -- than other sites throughout

18       the system.

19            Q     And Mr. Campese title at this

20       time, what was it?

21            A     He was the assistant vice

22       president.

23            Q     Of what?

24            A     Labor Relations.

25            Q     And now in that capacity were you

```
 1                    J. WANGEL
 2   reporting to Mr. Campese or were you
 3   somewhere else?
 4              MS. CANFIELD:  Objection to
 5         form. You can answer.
 6       A    What time period are we talking
 7   about?
 8       Q    September 2018.
 9       A    I never directly reported to
10   Mr. Campese.
11       Q    Was he your indirect supervisor?
12       A    I wouldn't even say that.  Were
13   there matters that came up or were there
14   matters at Correctional Health that I would
15   include central office labor because it had
16   other potential impact, yes.  But I never
17   reported to either directly or indirectly.
18   But we had open dialogue about matters,
19   which would go for all clinics.
20       Q    So Mr. Campese said, thank you
21   very much, Angela.  Based on the hours
22   provided, it would appear that the doctors
23   full-time employee status during the
24   required time period is as follows, and then
25   he list.  At the top of it, for the purposes
```

Page 51

1                           J. WANGEL

2        of our discussion, Dr. Kaye is listed at

3        .67.

4                    Is that .67 of a 1.0 full-time

5        employee status?

6             A    I can't speak for Mr. Campese, but

7        the e-mail says FTE status retention amount,

8        so.

9             Q    I'm asking you about the decimal,

10       the .6700s, is that a percentage of the

11       full-time employment status that he's

12       representing that she's not working

13       full-time; is that what that means?

14            A    Again, that's what I would say.

15       Again, I can't speak for Mr. Campese, but

16       the .67 I believe is out of 1.0 FTE status

17       with 1.0 FTE being a full 4000 and .67

18       representing --

19            Q    And consistent with that he

20       estimates that Dr. Kaye would be entitled to

21       13,400, right?

22            A    Based on what the e-mail says,

23       yes.

24            Q    Yes.  So then the other

25       individuals here, are you aware of what

1                          J. WANGEL

2         their status was within the CHS system?

3                          MS. CANFIELD:   Objection as to

4                   form.   You can answer.

5              A    I believe they were all part of

6         FTE as well.

7              Q    Now, Dr. Kaye was a central

8         director; you remember that right?

9              A    I do.

10             Q    Now Dr. Solanky (phonetic), was he

11        or she a center director?

12             A    I don't recall the titles of the

13        other three.

14             Q    Would it be fair to say that the

15        other three were phycologist at the

16        Manhattan center?

17             A    They could have been.  Again, I

18        don't recall their exact titles.

19             Q    Let's see how much remember as far

20        as the directors are concerned.  Dr. Kaye

21        was definitely a director of the Bronx Court

22        clinic; would that be fair to say?

23             A    I do recall that, yes.

24             Q    Dr. Owen was director of the

25        Brooklyn or Queens court at any given point;

Page 53

```
 1                    J. WANGEL
 2      is that right?
 3                    MS. CANFIELD:  Objection as to
 4              form.  You can answer.
 5          A    I believe so.
 6          Q    Dr. Winkler eventually became the
 7      director of the Brooklyn court center; is
 8      that right?
 9          A    Again, hard to recall, but I know
10      the name.  I know he's a director.  I don't
11      recall when, where for which borough, but.
12          Q    And Dr. Mundy would have been the
13      director of the Manhattan center; am I
14      right?
15          A    I believe that's correct.
16          Q    So it's fair to say that neither
17      Dr. Solanky, Dr.Weiss and Dr. Harper for
18      those time periods were not directors of any
19      centers at that time; would that be fair?
20                    MS. CANFIELD:  Objection as to
21              form.  You can answer.
22          A    To my knowledge I believe that's
23      correct.  Yes.
24          Q    And Mr. Campese then emails you
25      directly on September 26.  And at that
```

Page 54

1                         J. WANGEL

2       time -- well, you e-mail him first.  I'm

3       sorry I skipped over something.

4                 Then you say to Ms. Mulett.  I'll

5       confirm first thing tomorrow morning,

6       Angela.  Thank you.  And it appears that

7       there was an e-mail that's, I guess, took

8       place in between here and your e-mail, but

9       we don't have that e-mail.

10                So I have to follow up on that

11      with counsel, and I'll be sure to put that

12      in writing for her to take it under

13      advisement.

14                      MS. CANFIELD:  What are you

15                  asking for.

16                      MS. HAGAN:  I'm asking for the

17                  e-mail that Mr. Mr. Wangel actually

18                  received again from Ms. Mulett in

19                  the between the one that he received

20                  from Mr. Campese.  There had to have

21                  been another e-mail.

22                      MS. CANFIELD:  So you based on

23                  that on what?  The testimony of the

24                  witness.

25                      MS. HAGAN:  I'm basing it on

Page 55

```
 1                    J. WANGEL
 2          the contents of the e-mail.  Mr.
 3          Wangel is responding to something to
 4          Angela and that e-mail is missing.
 5          So I'll followup in writing and I
 6          know you'll take it under
 7          advisement.
 8              MS. CANFIELD:  Mr. Wangel, you
 9          can testify.
10      A    I think -- can you scroll down a
11   little bit it may be helpful.  Hang on.  So
12   Matt Campese is writing.  So scroll up a
13   little bit.  So that's Matt writing to, but
14   he says, Jonathan, if you can confirm that
15   these doctors are board eligible, right?  So
16   that's Matt asking me something.  And I'm
17   thanking Angela for providing the
18   information, and I'm writing to Matt to say
19   I'll confirm follow up with this thread.
20              (Reporter clarification.)
21      A    The e-mail from Mr. Campese says,
22   Jonathan forward, and then he ask the
23   question, can you please confirm.  So my
24   response to Matt is, I'll confirm first
25   thing tomorrow and I'm also thanking Angela
```

1                         J. WANGEL

2      for informing me.

3            Q    Now, I'm going to ask you some

4      general questions.

5                 How often would you say during the

6      time that you're working at CHS that, did

7      you interact with Dr. Kaye?

8            A    Again, we had a conversation

9      before the transition, and then that I

10     recall meeting prior to the filing of this

11     claim.  Where I believe Mr. Santa Maria

12     advised counsel, and Dr. Kaye had a whole

13     bunch of questions about the time keeping

14     issues.  And I pulled the time sheet records

15     and tried my best to explain to her whatever

16     I could best concerns that they had.

17                As far as work, work doesn't

18     overlap.  I don't recall any work-related

19     item.  And otherwise via e-mail, I would

20     say.

21           Q    Did you have any impression of Dr.

22     Kaye during your time there?

23           A    I'm not sure what you mean.

24           Q    I mean did you take a position as

25     to the type of professional Dr. Kaye was

1                         J. WANGEL

2      during the course of your employment at CHS?

3          A     No.  Not exactly sure what you

4      mean, but everybody is a professional

5      everybody.  All there health professionals

6      in one way or another, we're all on the same

7      team.  I do the same thing out every day.  I

8      don't have any pre-formed opinions or

9      anything like that --

10         Q     Did you hear any, I guess,

11     commentary about Dr. Kaye from Dr. Yang?

12                    MS. CANFIELD:  Objection to

13            form. You can answer.

14         A     I'm not sure what you mean by the

15     commentary.

16         Q     Well, did Dr. Yang ever discuss

17     Dr. Kaye with you?

18         A     We had discussions.  Hard to

19     remember specifics about topics involving

20     Dr. Kaye.  I don't know if we really had

21     conversations about Dr. Kaye as a person, if

22     that's what you're asking.

23         Q     What topic did you have that

24     involved Dr. Kaye?  What topics of

25     discussion did you have with the Dr. Yang

1                    J. WANGEL

2    that involved Dr. Kaye?

3         A    It would had to have been a labor

4    relations matter.

5         Q    Like what?

6         A    Privacy issue.

7         Q    You said a privacy issue.  Now,

8    what do you recall about the privacy issue?

9         A    I assume you're aware that there

10   was an instance of recording that Dr. Kaye

11   did for a court proceeding.

12        Q    Were there any other impressions

13   that Dr. Yang conveyed to you about Dr.

14   Kaye?

15                MS. CANFIELD:  Objection to

16          form. You can answer.

17        A    Yeah.  You said any other

18   impression?  I'm not sure I understand what

19   was the first impression.

20        Q    Did she ever criticize Dr. Kaye to

21   you?

22        A    Not that I recall.

23        Q    Had you ever heard any complaints

24   about Dr. Kaye?

25        A    Did I hear complaints about Dr.

Page 59

1                    J. WANGEL
2      Kaye?  Not that I recall.
3           Q    Did you have any complaints about
4      Dr. Kaye?
5           A    Not that I recall.
6           Q    So let's continue with the
7      retention stuff.
8                So here we had a discussion about
9      the initial calculation of Dr. Kaye's time,
10     right?  I'd like to ask you what steps were
11     taken to determine whether or not Dr. Kaye
12     was actually a full-time employee or a
13     part-time employee?
14          A    You're talking about in relation
15     to the e-mail with the FTE calculation?
16          Q    Yes.
17          A    That would have been done by her
18     former site.  Correctional health would not
19     have records from Bellevue.
20          Q    So you're saying Correctional
21     Health would have had to obtain the records
22     from Bellevue, and then Correctional Health
23     would have had to take what Bellevue
24     represented as her actual work status; would
25     that have been accurate?

Page 60

1                         J. WANGEL

2                    MS. CANFIELD:  Objection to

3              form. You can answer.

4         A    I believe that's correct.  That's

5    why Ms. Mulett was the one making the

6    calculations, she works for Bellevue or had

7    worked for Bellevue.

8         Q    She had worked for Bellevue, but

9    then she transitioned, right?

10        A    I don't recall.  Angela, you're

11   talking about?

12        Q    Yes.

13             On September 26, 2018, would it be

14   fair to say Ms. Mulett was working for CHS,

15   or was she still working for Bellevue?

16                  MS. CANFIELD:  Objection to

17             form.  You can answer.

18        A    I don't recall Ms. Mulett working

19   for CHS.  That, I don't recall.  I don't

20   know.

21        Q    I'm going to show you what's going

22   to be marked as Plaintiff's Exhibit Five.

23                  (Whereupon, e-mail (NYC_609-611)

24                  was marked as Plaintiff's

25                  Exhibit 5 for identification as

Page 61

J. WANGEL

1                          J. WANGEL

2                     of this date.)

3          Q    Plaintiff's Exhibit five bears the

4     bate stamp series NYC_609, NYC_610, NYC_611.

5               And it starts with the same, I

6     guess, time analysis from Ms. Mulett on

7     September 26, 2018.  You see that, right?

8          A    I do.

9          Q    Did you need to look at it again

10    or should I scroll up?

11         A    You can scroll up.

12         Q    So then it has the same break

13    down, total discussion of the total work

14    hours.  It's from Mr. Campese to Ms. Mulett;

15    you see that, right?

16         A    I do.

17         Q    And Mr. Campese addresses it to

18    you as well; you see that, right?

19         A    Yeah.  The e-mail is to me and he

20    asked me to --

21         Q    You and Mr. Campese worked

22    together in CHS; is that right?

23         A    No.

24         Q    Where is Mr. Campese?

25         A    At what point in time?

Page 62

                         J. WANGEL

1

2        Q    At this point in time in September

3   26, 2018.

4        A    Mr. Campese works at the mayor's

5   office.

6        Q    That's where he worked in

7   September 26, 2018?

8        A    He worked for the central office.

9        Q    Just for purposes of clarity of

10  the record, when you're saying the central

11  office, central office means H&H's central

12  office?

13       A    Right.

14       Q    At 55 Water Street.

15       A    They have a number of buildings,

16  but that's one where he was working, yes, at

17  55.

18       Q    That is where he was working

19  Mr. Campese?

20       A    I believe so.

21       Q    And where were you working

22  exactly, physically?

23       A    Fifty-five Water Street.

24       Q    And you were at CHS at that time;

25  am I right?

1              J. WANGEL

2        A    That's correct.

3        Q    Now, I'm going to scroll up, and

4   I'm not sure if I'm going to get this one

5   right, but this Kerry Kolodziejski,

6   basically he is emailing Mr. Campese and

7   yourself.  And the subject is total work

8   hours; you see that, right?

9        A    Yes, I do.  It's a variation

10  sheet.

11       Q    And Kerry says just checked the

12  percentage of FTE of 20k and came up with

13  the same numbers you provided below; you see

14  that, right?

15       A    I can see it.

16       Q    So then we go up.  And then you

17  say, I confirmed all the list are board

18  certified in psychiatry.  Do you need me to

19  send supporting documentation?

20            You see that, right?

21       A    I do.

22       Q    Now, when you say you have

23  confirmed they are all board certified, are

24  you saying that they are, that all their

25  licenses are current, or if they are

Page 64

1                        J. WANGEL

2       certified in a given area of psychiatry?

3           A    I believe it's an area of

4       psychiatry.  Yeah, the area of the

5       psychiatry.

6           Q    So then Mr. Campese then emails

7       you back.  Mr. Wangel on September 27.  He

8       said I don't think we need it.  Your

9       confirmation should be good enough.  Diane,

10      can the below docs be added to the payment

11      list at the amount listed below.

12               So you all are making the

13      determination that Dr. Kaye is entitled to a

14      part-time or partial payment based on the

15      representations of Ms. Mulett who you

16      testified did not work at H&H at that time.

17          A    That's incorrect.

18          Q    Okay.  So explain.

19          A    So Ms. Mulett I believe, I don't

20      know, but by virtue of the fact that she has

21      an NYC e-mail address I'm assuming she

22      worked at Bellevue, if not, she could have

23      worked for the central office.  But she's an

24      H&H employee.

25          Q    Okay.  So you earlier testified

1                           J. WANGEL

2        that Bellevue would have had these payroll

3        records and time of leave records and they

4        would have been the entity that would have

5        determined whether or not Dr. Kaye was a

6        full-time employee or a part-time employee,

7        right?

8             A     They don't determine whether or

9        not people are part-time.  All they do is

10       calculation based on hours worked.  They

11       review the time records of the actual hours

12       worked, which is what Ms. Mulett did, and

13       break down the .67, part of the e-mail

14       chain.  That's how the payment gets

15       calculated.  The facility worked at

16       determines whatever the FTE status was.

17            Q     Who did Ms. Mulett report to?

18            A     I don't know.  Again, I believe

19       she worked for Bellevue or at Bellevue she's

20       an employee of Health and Hospitals working

21       at Bellevue.  I would guess.

22            Q     Now, you say, FYI, FYI, and you

23       send this to Ms. Laboy; you see that, right?

24            A     I do.

25            Q     So what happens after you send

Page 66

1                        J. WANGEL

2       this FYI e-mail to Ms. Laboy; do you

3       remember any further?

4                  MS. CANFIELD:  Objection as to

5             form.  You can answer.

6          A    I don't.  I mean I was sending it

7       to them to let them know it could be a

8       process.

9          Q    Let's see if this can help.  Going

10      to show you another exhibit.  This is going

11      to be Plaintiff's Exhibit Six, and it will

12      be marked as such.

13                       (Whereupon, e-mail

14                       (Kaye3rdProd_68-70) was marked

15                       as Plaintiff's Exhibit 6 for

16                       identification as of this date.)

17                  MS. HAGAN:  Now, I redacted

18             this because Dr. Kaye sent this to

19             me.  So this portion that's redacted

20             is because it's an e-mail to me.

21             I'm going down to the portion that

22             was part of the original e-mail.

23                  MS. CANFIELD:  Have these

24             documents been produced?

25                  MS. HAGAN:  Yes, they have.

Page 67

1              J. WANGEL

2              MS. CANFIELD:  When were they

3         produced?

4              MS. HAGAN:  I'm not sure,

5         Counsel, but they were certainly

6         produced as exhibits today, but they

7         were also produced.

8              MS. CANFIELD:  Did you produce

9         a privilege along with the

10        redactions?

11             MS. HAGAN:  There were no

12        privilege logs.

13             MS. CANFIELD:  They have

14        redacted comments.

15             MS. HAGAN:  No.  You received

16        these documents with the same

17        redactions, and you never raised the

18        issue until today.

19             MS. CANFIELD:  You just told

20        me we got them at 5:00 o'clock in

21        the morning, so we would not have

22        had an opportunity to review

23        everything.  It's the attorney's

24        responsibility to provide the

25        privilege log.

Page 68

1                       J. WANGEL

2              MS. HAGAN:  You had these

3          documents already.  I reproduced

4          them, so it will be easier to review

5          the exhibits, Ms. Canfield.

6              MS. CANFIELD:  We'll take this

7          up with the Court.

8              MS. HAGAN:  Yes, you have

9          them.  You'll see that you have them

10          in the initial productions.  I just

11          produced them again, like you did.

12     Q     So for purposes of this deposition

13     today the documents represented for Exhibit

14     Six bears the Bates stamp series

15     Kaye3rdProduction 68, 66, 69, 70.  And for

16     purposes of Mr. Wangel's review.  First and

17     foremost you'll see that the document is

18     from Mr. Santa Maria.

19              Do you have any familiarity with

20     Mr. Santa Maria?

21     A     I do.

22              MS. CANFIELD:  Objection as to

23          form.  You can answer.

24     Q     You said you do, right, Mr.

25     Wangel?

Page 69

                          J. WANGEL

1

2        A    I do.  He works at Doctors

3   Counsel.

4        Q    Who is he?

5        A    He's a representative.

6        Q    And then you have the date is

7   October 4, 2018; you see that, right?

8        A    I do.

9        Q    And the e-mail -- and Mr. Santa

10  Maria is addressing Mary Badaracco; do you

11  recall who that is?

12       A    I do not.

13       Q    And it CC'd Dr. Kaye and the

14  subject is Dr. Kaye's retention bonus.

15  Would it be fair to say that Dr. Badaracco

16  may have been Dr. Kaye's supervisor while

17  she was at Bellevue?

18            MS. CANFIELD:  Objection to

19         form.

20       A    I don't know.  It could have been.

21  I don't know.

22       Q    Let's go further.  In this

23  subsequent e-mail Dr. Badaracco sends an

24  e-mail to Nate Santa Maria, Todd Hixson and

25  Jeremy Colley.  Do you know who Jeremy

Page 70

1                            J. WANGEL

2       Colley was at that time?

3             A    I don't know.

4             Q    Do you know who Dr. Colley was at

5       any given time?

6             A    I don't believe so, no.  I don't

7       recall the name.

8             Q    Do you recall the person named

9       Todd Hixson?

10            A    I don't.

11            Q    So Dr. Badaracco writes in

12      response to the subject Dr. Kaye's retention

13      bonus.  Hi, I'm writing to confirm that

14      Dr. Kaye was employed full-time as an

15      attending psychiatrist by Bellevue Hospital

16      working at the Bronx court clinic from

17      July 1, 2017, through June 30, 2018, and so

18      is eligible for the full H&H psychiatry

19      retention bonus.  Dr. Kaye's paymaster

20      became H&H Correctional Health on July 1,

21      2018.

22                 Did you see this at any point?

23            A    I don't recall.  It's possible,

24      yes.  I'm not copied on this chain.  It's

25      possible.  I don't recall seeing this --

                    J. WANGEL

1

2      Q    Now, Dr. Badaracco was the chief

3      of psychiatry at Bellevue and Dr. Colley's

4      boss.  Do you recall that, do you recall

5      vaguely coming across her name during the

6      course of the transition?

7              MS. CANFIELD:  Objection to

8          form.  You can answer.

9      A    It's possible, yes, but I don't

10     recall.

11     Q    Let's go to another portion of

12     this e-mail where you're involved, right.

13     So Dr. Badaracco then says, I appreciate

14     working with you on trying to resolve Dr.

15     Kaye's retention bonus for July 2017 to

16     June 2018.  As we spoke this afternoon, Dr.

17     Kaye fulfills all the criteria to receive

18     the retention payment.  If you are in

19     agreement, please confirm.

20              So, I guess, Mr. Santa Maria was

21     emailing Dr. Badaracco and Dr. Kaye

22     confirmed; you see that, right?

23     A    I see the e-mail, yeah.

24     Q    Now, I'm going to show you another

25     e-mail.  Then and this will be marked as

Page 72

```
 1                    J. WANGEL
 2      Plaintiff's Exhibit Seven.
 3                    (Whereupon, e-mail (NYC_797) was
 4                    marked as Plaintiff's Exhibit 7
 5                    for identification as of this
 6                    date.)
 7           Q    Now, Plaintiff's Exhibit Seven
 8      bears the bate stamp series NYC_797.  And
 9      it's from you, Mr. Wangel, to Ms. Laboy.
10      I'll give you an opportunity to read it.
11      And it's dated --
12           A    I'm a little confused.  The top of
13      this says it's from me, but the e-mail says
14      from Dr. Kaye.
15           Q    Right.  It seems you have
16      something you must have forwarded to --
17           A    Right, okay.
18           Q    So who's Wayne Myrie; do you
19      remember him?
20           A    Works for the central office
21      payroll.
22           Q    And she puts Dr. Badaracco,
23      Mr. Santa Maria, Peter Moreinis, Pedro
24      Rivera, Mr. Campese and Dr. Colley.  Now, do
25      you recall anyone else on this e-mail
```

Page 73

                              J. WANGEL

1

2      thread.  For example, Peter Moreinis, do you

3      know who he is?

4           A    Peter I don't know.  Some of the

5      folks on this --

6           Q    What about Pedro Rivera?

7           A    Yeah.

8           Q    And who is he?

9           A    He was or still is did the

10     director of labor relations for Bellevue

11     hospital.

12          Q    Now, Dr. Kaye points out that she

13     worked full-time at Bellevue starting

14     May 2000 through June 30, 2018.  She

15     basically points out again she was the

16     eligible for the full retention payment.

17     But unfortunately she received a partial

18     payment because she was incorrectly listed

19     as part-time by central office.

20               You see that, right?

21          A    I see that, yes.

22          Q    After you received this e-mail,

23     what did you do?  Do you recall?

24               MS. CANFIELD:  Objection to

25          form.  Go ahead.

Page 74

1                         J. WANGEL

2          A    I do not.

3          Q    What would you have done since you

4     don't recall what you did in this instance?

5          A    The e-mail is from Dr. Kaye to the

6     central office payroll.  Addressing, again,

7     for prior work at Bellevue.  Correctional

8     Health did not have any part in, and did not

9     do the calculations for.  This is all about

10    hours worked prior to coming to Correctional

11    Health.  So, again, in my role at CHS the

12    calculation is all based on Bellevue

13    time-keeping records.

14              So, again, we would have had been

15    central office Bellevue working out the

16    exact hours worked and time to pay to try

17    and determine to say what entity she was

18    and --

19         Q    Now, at any point did you tell

20    Nate Santa Maria or Kevin Colley, I guess,

21    Dr. Yang or Dr. Jain were myths that Dr.

22    Kaye filed an EEOC charge?

23              MS. CANFIELD:  Objection to

24         form.  You can answer.

25         A    So I'm sorry it froze for like a

1                        J. WANGEL

2       second.

3            Q    Did you either tell Mr. Santa

4       Maria or Mr. Collins that Dr. Jain and Dr.

5       Yang were myths that Dr. Kaye had filed an

6       EEOC charge?

7                    MS. CANFIELD:   Objection to

8                form. You can answer.

9            A    I don't believe I said that.

10           Q    So you never said that.  And Dr.

11      Kaye believes and has alleged that this

12      partial payment of her retention bonus was

13      in retaliation for her EEOC charge.  Were

14      you aware that Dr. Kaye at that point had

15      filed an EEOC charge?

16           A    I don't recall.  I don't remember

17      the timing.

18           Q    Do you ever remember that Dr.

19      Kaye -- at any point did you remember Dr.

20      Kaye filing an EEOC charge?

21           A    I remember this -- I don't recall

22      the other charge, if there is one.

23           Q    I'm going to show you again

24      another exhibit.  Okay.  I'm going to mark

25      this as Plaintiff's Exhibit Eight.

```
 1                         J. WANGEL

 2                         (Whereupon, e-mail (NYC_544) was

 3                         marked as Plaintiff's Exhibit 8

 4                         for identification as of this

 5                         date.)

 6          Q     And Plaintiff's Exhibit Eight

 7     bears the Bates stamp series NYC_544.

 8                    Scroll down to the bottom, so that

 9     you can see this.  The first portion of the

10     e-mail thread is from Dr. Yang and it's

11     addressed to, I guess, Dr. MacDonald and Dr.

12     Ford.  And then you're CC'd along with

13     Ms. Laboy.

14                    You see that, right?

15          A     I do.

16          Q     And then this is dated

17     September 19.  You see that, right?

18          A     Yes.

19          Q     And then Dr. Yang then emails you,

20     Mr. Wangel, again with Ms. Laboy.  And she

21     CCs Drs. Ross and Ford, and the subject

22     again is Dr. Kaye, right?

23          A     Yes.

24          Q     And she ask, can you send us the

25     full, I guess, ATT A, would that be
```

```
 1                    J. WANGEL
 2    attachment A?
 3         A    I was actually trying to figure
 4    out what that was too, but that sounds
 5    plausible.
 6         Q    Also please clarify this is
 7    appended to the older claim against Bellevue
 8    Hospital corporation alleging gender pay
 9    discrimination, which I thought got
10    resolved.
11              Do you recall Dr. Yang actually
12    raising this question?
13         A    I just remember what you're
14    showing me in the e-mail thread.
15         Q    No.  I'm just asking you whether
16    or not you had discussions with Dr. Yang
17    about Dr.Kaye's EEOC charge?
18         A    From what I recall -- I mean I do
19    know there was a claim regarding, I guess,
20    pay while at Bellevue.  Again, as my
21    capacity in labor relations I would not get
22    involved in that type of issue.  It's not a
23    grievance.  If it's a discrimination claim,
24    it goes to the EEOC and address like every
25    other claim, which is why, yes, Blanche
```

```
 1                   J. WANGEL

 2      Greenfield is involved.

 3           Q    It appears you have some

 4      involvement this e-mail right above it.

 5      It's from you to Dr. Yang, Ms. Laboy, and

 6      you say I don't have the completed

 7      attachment A.  You have some attachment.

 8      Now, you're saying you're waiting for

 9      Blanche to resend.  We the office of Labor,

10      OLA, I guess office of labor -- what's the

11      A?

12           A    I'm not sure why it says OLA.

13           Q    Was it a typo, you believe?

14           A    I'm not sure.  Could be a typo.

15           Q    You said you responded to the

16      older claim, but you do again.  But don't

17      think there was a final disposition.  OLA

18      will have to submit an emailed response the

19      new issues.

20           A    The OLA is the office of legal

21      affairs, but we -- oh, so I'm saying, we, we

22      as a system, I believe.  Right?  Not, we,

23      meaning my office at Correctional Health.  I

24      was not then part of the office of legal

25      affairs.  I think I responded to the older
```

Page 79

1              J. WANGEL

2     office legal.

3                (reporter clarification.)

4         A    So in my e-mail the Wednesday,

5     September 19, 2018, 11:42 a.m. e-mail, I

6     write, that I don't have the complete

7     attached A and I'm waiting for Blanche to

8     resend.  And this in response to Dr. Yang's

9     e-mail asking me send full attached A.  So

10    when I write we, we the system, we in a

11    broader sense, we -- a broader office of

12    legal affairs, that they, legal affairs,

13    responded to the older claim, but I don't

14    think there was a final disposition.  To say

15    OLA will have to submit an amended response

16    for the new issues based on this e-mail

17    complaint.

18        Q    So just to be clear were you not a

19    part of the office of legal affairs at this

20    time in September 19, 2018?

21        A    That's correct.

22        Q    Okay.  And then you say that there

23    was an actual response, which would be akin

24    to the position statement; would that right?

25                MS. CANFIELD:  Objection as to

Page 80

1                          J. WANGEL

2              form.  You can answer.

3         A    I guess so.  I don't recall

4    specifically.  I just remember what you're

5    showing me now.

6              MS. HAGAN:  To the extent they

7              exist, I call for the production of

8              the Office of Legal Affairs position

9              statement to Dr. Kaye's initial EEOC

10             complaint.  I'll followup in

11             writing, and I'm sure Ms. Canfield

12             will take it under advisement, but I

13             definitely will put it in writing.

14        Q    So then Dr. Yang responds to you

15   on the 19th, Mr. Wangel, CC'ing Dr. Ross and

16   Dr. Ford.  Saying, I think Bellevue paid up.

17   So this new complaint with old complaint

18   face sheet is puzzling.

19             So what does she mean that

20   Bellevue paid up; what does she mean by

21   that?

22        A    I have no idea.  I don't recall.

23        Q    And then you e-mail Ms. Greenfield

24   and you ask her if she has a minute, right?

25        A    That's what it says, yeah.

Page 81

1                         J. WANGEL

2          Q     Were you directed to reach out to

3     Ms. Greenfield?

4          A     I don't believe so, no.

5          Q     You just did so on your own

6     volition?

7          A     Are you asking me?

8          Q     Yes.

9          A     Again, this is years ago.  I dealt

10    with Ms. Greenfield on almost --

11         Q     Your supervise said she thought

12    that the issue would be resolved by

13    Bellevue.  Why would you feel compelled to

14    reach out to Ms. Greenfield?

15               MS. CANFIELD:  Objection as to

16          form.  You can answer?

17         A     Again, hard to say.  I don't have

18    it.  I'm not familiar with this, but I'm

19    reaching out to the party that would.

20         Q     Then Ms. Greenfield responds that

21    she's out for now, right?

22         A     That's what the e-mail says.

23         Q     Right.  So then I'm going to show

24    you another document, and this is going to

25    be Plaintiff's Exhibit Nine.

Page 82

1              J. WANGEL

2              Let me share the screen I'm sorry.

3              Mr. Wangel, so Plaintiff's Exhibit

4     Nine bears the Bates stamp series

5     Kaye3rdProduction 109 through 110, 111, and

6     112.  And I'm going to start at the bottom

7     of exhibit, which would be Dr. Kaye's EEOC

8     charge.  You see this, right?

9         A    I do.

10                   (Whereupon, e-mail

11                   (Kaye3rdProd_109-111) was marked

12                   as Plaintiff's Exhibit 9 for

13                   identification as of this date.)

14        Q    Have you seen an EEOC charge

15    before?

16        A    I believe so, yes.

17        Q    Now, in this charge Dr. Kaye is

18    alleging she's been discriminated against

19    based on her sex.  You see that, right?

20              MS. CANFIELD:  Objection.  You

21         can answer.

22        A    Yeah.

23        Q    And she also alleges this is a

24    continuing action.  You see that, right?

25        A    I see the box, yes.

Page 83

J. WANGEL

1

2      Q    Then Dr. Kaye goes on to say she's

3      a 55-year-old Caucasian female who worked at

4      Bellevue hospital and HHC since 1999.  Most

5      recently as Bronx Court Clinic medical

6      director.  And she says, she believes she's

7      been discriminated against based on her sex,

8      unequal pay act as amended in title 7 as

9      amended.  Specifically I've been paid less

10     than the male Manhattan court clinic medical

11     directors despite having the same title and

12     job duties.  I've been paid under an

13     attending three titles since 1999, while the

14     men that worked at the Manhattan court

15     clinics medical directors have been paid a

16     physician specialist title.  The physician

17     specialist title carries a significant pay

18     increase and male Manhattan court clinics

19     medical directors have made significantly

20     more money than I over the almost past 20

21     years I have worked there.  I believe I was

22     given an attending three title and under

23     paid compared to my male counterparts

24     because of my sex.  Based on the above I

25     believe I have been discriminated against

Page 84

                              J. WANGEL

1

2      because of my sex in violation of the equal

3      pay act in 1963.  Now, you've seen this,

4      right?

5                     MS. CANFIELD:  Objection.  You

6                can answer.

7           A    I believe so.

8           Q    Now, for purposes of just

9      establishing a bit of a time line.  This

10     EEOC chart was filed on May 22, 2018.  You

11     see that, right?

12          A    Yes.

13          Q    And then Dr. Kaye supplements her

14     charge, right, and just for purposes of just

15     seeing this, she supplements her charge in

16     September of 2018.  That I'm going to allow

17     you to read the supplement, or at least try

18     to get through that.  I want you to see what

19     she alleges here as well.

20                    Would that be fair?

21          A    Sure.

22                    MS. CANFIELD:  Where does it

23               say that it was filed.  I see that

24               it was signed, but I don't see where

25               this is filed on that date.

1                          J. WANGEL

2                    Am I missing something?

3                    MS. HAGAN:  Well, we can go to

4              that as well.

5          A     (Reading.)

6          Q     Now, first off I want to establish

7      the timeframe again.  Which you may have

8      received this document or seen this document

9      initially.  Again, going back to Exhibit

10     Eight.  There is a discussion amongst you,

11     Dr. Yang and a Ms. Greenfield discussing Dr.

12     Kaye and the Attachment A, which would have

13     been found in Exhibit Nine, Attachment A.

14     You see this, right?

15         A     I see it, yes.

16         Q     And Exhibit Eight is dated

17     September 19th.  You see that, right?

18                    MS. CANFIELD:  I'm sorry,

19              where are you saying?

20         Q     In the emails from Dr. Yang asking

21     about Attachment A, which dealt with a

22     supplemental EEOC charge.  We went through

23     that.

24                    So now, I'm going to ask you some

25     questions about this EEOC charge that Dr.

1                         J. WANGEL

2          Kaye filed.  First and foremost, did you

3          remember or recall any of Dr. Kaye's

4          allegations of gender discrimination based

5          on pay, and I guess, what you guys would

6          call functional clout?

7                    MS. CANFIELD:  Objection to

8               form.  You can answer, if you're

9               able.

10         A    I'm familiar with the underlying

11         issues that are raised.  As far as the

12         specific gender, no, I don't remember having

13         any direct conversations about

14         discrimination.

15         Q    The physician specialist title a

16         superior title than the attending physician

17         title?

18                    MS. CANFIELD:  Objection.  You

19               can answer.

20         A    I'm actually not certain.

21         Q    When this complaint came in, when

22         this charge came in, did you do any research

23         to find out whether or not Dr. Kaye's

24         allegations had any merit?

25                    MS. CANFIELD:  Objection.  You

```
 1                    J. WANGEL

 2          can answer.

 3          A    I don't believe I did.

 4          Q    Okay.  Why not?

 5          A    Because in my role at Correctional

 6     Health it wasn't my job.  Discrimination

 7     complaints are addressed by the office of

 8     EEO.  Not by me.

 9          Q    Now, did you ever -- so let's see.

10     So you didn't look into this, this

11     particular complaint, right?  Now, the

12     discussion that you had between you and

13     Dr. Yang, Ms. Greenfield and any member of

14     the H&H management.

15               Did you look into any of the

16     allegations of the supplemental charge of

17     discrimination that Dr. Kaye filed?

18                    MS. CANFIELD:  Objection to

19               form.  You can answer.

20          A    I don't believe so.  I mean I

21     remember having discussion about -- but not

22     anything directly in response to this

23     charge.

24          Q    Did Dr. Jain ever reach out to you

25     and tell you that Dr. Kaye filed a EEOC
```

Page 88

1                    J. WANGEL

2      charge?

3           A    I don't recall.

4           Q    Now, in her supplemental charge

5      Dr. Kaye says, Dr. Jain called me the very

6      next day to inform me that he reported my

7      actions to Jonathan Mr. Wangel, senior

8      director of labor relations.

9                You see that, right?

10          A    I do.

11          Q    And you're saying you don't

12     remember this happened, right?

13          A    I don't recall the discussion with

14     Dr. Kaye about the EEOC charge.

15          Q    What about the discussion about

16     Dr. Kaye's title being reduced from medical

17     director to director.

18                Do you recall that exchange?

19                MS. CANFIELD:  Objection as to

20           form.  You can answer.

21          A    I don't.

22          Q    So you're not aware of any

23     occurrences on July of 2018 where Dr. Kaye

24     may have circulated the emails expressing

25     concern about being demoted from medical

Page 89

1                        J. WANGEL

2       director to director of the Bronx court

3       clinic?

4                        MS. CANFIELD:   Objection.

5            A    Yeah, she may have.  Again, this

6       is a while back.  I don't recall the

7       specifics.  I'm really not sure --

8            Q    Would a functional title change of

9       this nature been a broken promise by you Mr.

10      Wangel from that April 30th meeting that we

11      discussed?

12           A    I would say no.

13           Q    Why not?

14           A    One, the office of labor relations

15      has nothing to do with the title change.  I

16      think the title change here was due to

17      uniformity.  I think there was, if I recall

18      correctly, everybody functionally had the

19      same title or the same goal.  When Dr. Kaye

20      came forward over to CHS as the discussion

21      we had prior to, no change in compensation,

22      time, union, pension and everything we

23      discussed, remained the same.  So...

24           Q    But in the April 30th e-mail that

25      Dr. Kaye sent to you in the wake of this

Page 90

```
 1                    J. WANGEL
 2     meeting one of the things she specifically
 3     asked was whether or not her title changed
 4     from medical director.  According to that
 5     e-mail it appeared that your assured her
 6     that it would not change, you and Ms. Laboy.
 7               Do you recall that or do we need
 8     to go back to that e-mail?
 9               MS. CANFIELD:  Objection as to
10          form.  You can answer.
11       A    Yeah.  We need to go back.  When I
12     have conversation I'm speaking about civil
13     service titles, not functional titles.
14     Right.
15       Q    But she specifically said or asked
16     you about the medical director title, so
17     let's go back to that.  Because she listed
18     --
19       A    Can I just say -- I would never
20     make an assertion that in perpetuity, the
21     title wouldn't change, the issue wouldn't
22     change.  I mean nobody is guaranteed the
23     exact same circumstances for the entirety of
24     their employment for the future.  I could
25     never make a claim that way.
```

```
 1                    J. WANGEL
 2               When I spoke to Dr. Kaye we were
 3       talking about compensation based items,
 4       along with, again, union membership,
 5       pension, things like that.  Between myself
 6       and Ms. Laboy and everything else would
 7       remain the same as far as compensation,
 8       time, pension, all of that stuff.
 9          Q    I want to direct your attention to
10       Exhibit Two, which bears bate series NYC_513
11       and then number 14.  And Dr. Kaye asked you
12       from based on her, from the conversation she
13       had with you and Ms. Laboy during that
14       meeting, right.  Number 14, she says, my job
15       description and title of medical director
16       remained unchanged.  Right?  I will continue
17       to perform forensic psychiatric evaluations
18       at the Bronx criminal supreme courts and
19       provide administrative functions at the
20       Bronx Court clinic.
21               Now, she clearly she believed that
22       after her conversations with the two of you
23       that she was going to continue in her
24       capacity after the transition to CHS.  Is
25       that clear from just this e-mail on
```

                          J. WANGEL
1
2    April 30?
3                    MS. CANFIELD:  Objection.  You
4          can answer.
5         A    All I see from this e-mail from
6    April 30th is what Dr. Kaye is -- exactly
7    what's here in this e-mail.  She's says my
8    current benefits at Bellevue are, and goes
9    through a list of items.
10        Q    At any point if she was mistaken,
11   Mr. Wangel, why did didn't you correct her
12   because this is clearly her synopsis of the
13   meeting?  If she was incorrect, why didn't
14   you correct her, if that was the case?
15                   MS. CANFIELD:  Objection to
16         form. You can answer.
17        A    I'm looking.  I am almost positive
18   I had multiple conversations with Dr. Kaye
19   and doctor's counsel about these issues.
20   Again, I am not in charge of health
21   services, I am not in charge of FPECC and I
22   can not assert with all perpetuity that all
23   of those items would remain unchanged.
24                   At the time of the transition, I
25   provided as much information as I could to

Page 93

```
 1                     J. WANGEL
 2     try to help Dr. Kaye -- give her information
 3     about benefits, time, all that stuff.  I
 4     mean it was never, none of this was ever
 5     done in any intention with malice or to
 6     reduce compensation or anything like that.
 7              Can I say I've never corrected any
 8     of those items, no.  You're showing a list
 9     of 14 or 15 items that Dr. Kaye is saying
10     these are her current duties.
11         Q    Now, I'm going to go back to
12     Exhibit Two.  Now, Exhibit Two, was dated
13     April 30; you see that, right, Exhibit Two?
14         A    Yes.
15         Q    Now, Exhibit Nine, which is Dr.
16     Kaye's EEOC charge was dated May 22, 2018.
17     You see that, right?
18         A    I see the signature.
19         Q    Now, I'm going to show you what
20     will be marked as Exhibit Ten.  Now, the
21     Exhibit Ten bears the Bates stamp series
22     NYC_259.
23                     (Whereupon, e-mail (NYC_259) was
24                     marked as Plaintiff's Exhibit 10
25                     for identification as of this
```

Page 94

1                        J. WANGEL

2                        date.)

3          Q    I'm going to give you an

4    opportunity to review the exhibit before you

5    get a chance to talk about it.  Now, again,

6    it starts with the discussion on April 30th.

7    You see that, right?

8          A    I do.

9          Q    As we scroll up there's an e-mail

10   from Dr. Kaye to Dr. Jain and CC'd

11   Ms. Swenson, and it's dated Monday, June 4,

12   2018.  You see that, right?

13         A    I do.

14         Q    Just to kind of have a clear

15   record.  On June 4, 2018, Dr. Kaye says:

16   Hi, Beesh.  I wanted to loop you in on my

17   situation since I'm not sure what's been

18   communicated to you and Andrea.  I have

19   worked at the Bellevue hospital Bronx court

20   clinics since 1999.  And I have been medical

21   director from 2004 to the present.  My

22   current line is being transferred from

23   Bellevue to CHS under the auspices of HHC

24   regarding my position benefits titled job

25   description, etc, CHS HR and Doctors'

1                    J. WANGEL

2    Council union reached an agreement in

3    February 2018 that everything will stay the

4    same and nothing will change.  The funding

5    of my line and reporting structure, however,

6    will change.  I will report to you rather

7    than Jeremy Colley, and I will be paid by

8    CHS rather than Bellevue.

9              Now, just to be clear the

10   conversation that Dr. Kaye memorialized to

11   the extent that she could took place on

12   April 30.  You see this, right?

13              MS. CANFIELD:  Objection.  You

14        can answer.

15   A    I see the e-mail dated April 30.

16   Q    Right.  Then on June 4th, she's

17   having a discussion with Dr. Jain about her

18   title being changed and who she reports to

19   being changed.

20              You see that, right?

21   A    I do.

22   Q    So do you recall who was

23   responsible for changing who Dr. Kaye

24   reports to?

25   A    I mean I know I can recall the

1                    J. WANGEL

2     hierarchy of the leadership structure.  I

3     don't know who ultimately made the decision.

4          Q    Well, did you play a part in

5     making the decision in her reporting

6     structure would change?

7          A    No.

8          Q    Then Dr. Jain responds.  Thought

9     you should be aware of this from Melissa,

10    this all started with the business cards

11    being -- I guess he's emailing Dr. Ford.

12    Thought you should be aware of this from

13    Melissa.  This all started with the business

14    cards being ordered as Director for court

15    clinic directors.  I also looked at the

16    positing and my own hiring paperwork, and it

17    indicates the position as director.  Not a

18    problem, but just so you know, the

19    designations was out of left field.

20              So did you ever speak to Dr. Jain

21    about the title change?

22         A    It's possible, but I don't recall

23    specifically.

24         Q    Did you ever speak to Dr. Ford

25    about the title change?

Page 97

J. WANGEL

1

2      A      Same.  Possible.  I don't recall

3  any specific conversations about it.

4      Q      So do you recall Dr. Kaye raising

5  this issue with you or having questions

6  about why this title change and she believed

7  whether or not it was in retaliation for her

8  complaint?

9              MS. CANFIELD:  Objection as to

10          form.  You can answer.

11     A      I just remember the issue in

12  general.  I don't remember a specific

13  conversation.  If I recall correctly the

14  position as director was just the sort of

15  had uniformity from site to site.  That's

16  all I recall about this.

17     Q      You said knew that it involved a

18  matter of having uniformity from site to

19  site.

20              Why are you privy to this effort,

21  if you had no part in the decision-making

22  process, Mr. Wangel?

23              MS. CANFIELD:  Objection.

24          Argumentative.  You can answer.

25     A      I mean there were so many other

Page 98

1                          J. WANGEL

2        issues raised by Dr. Kaye I can't recall

3        some of the conversations I had.  Honestly,

4        I don't recall.  I don't have a role when it

5        comes to what title --

6            Q    You said there were so many issues

7        being risen by Dr. Kaye.  What do you mean

8        by that?

9            A    I dealt with Dr. Kaye, Doctors'

10       Council on a whole bunch of time keeping

11       issues, lunch break, pay issues.  Pretty

12       much everything we discussed thus far today.

13           Q    And did you resolve any of those

14       issues?

15           A    You'd have to be more specific.

16           Q    Well, let's go back to the

17       retention bonus.  We didn't quite finish

18       that.

19               Now, the exhibit that's going to

20       be shown here will be marked as Plaintiff's

21       Exhibit 11.  It bears the bait stamp series

22       NYC_886, NYC_882, NYC_883, NYC_884, 885,

23       886, 887 and 888.

24                       (Whereupon, e-mail (NYC_882-888)

25                        was marked as Plaintiff's

Page 99

1                    J. WANGEL

2                    Exhibit 11 for identification as

3                    of this date.)

4          Q    Now, it should be noted that

5     Defendant's production.  This is how it

6     looked, how it was produced.  If you prefer

7     to read it in this current capacity

8     especially pages of 888, 887, 886 and 885,

9     please let me know.  That's going to be

10    pretty hard to read, but it's up to you.

11         A    I'm fine.

12         Q    So again, we have the same

13    announcement that we discussed earlier,

14    designating Dr. Kaye to a part-time status.

15    You see that, right?

16         A    .67.

17         Q    Right, and $13,400 retention.  And

18    then the confirmation from Kerry

19    Kolodziejski of the percentage of 20,000

20    that the purported .67, I guess, board

21    status would have equated to.  Then you said

22    you confirmed them all again.  So these are

23    the earlier emails that we went through, and

24    then let's see.  Let's keep going.

25                    Here it is.  Then on

```
1                        J. WANGEL
2        November 14, 2018.  You said these were the
3        calculations on Kaye, which appear to be
4        double checked.  Possible they can prepare a
5        breakdown that we can forward to Doctors'
6        Council and Kaye.  What did you mean by
7        that?  Do you remember?
8             A     Yeah, sure.  So I think we were
9        trying to provide Doctors' Council with back
10       up of how it was derived.  It's not just
11       somebody in payroll saying .67.  We wanted
12       to show exactly how we came to that .67.
13            Q     Then we go to Colleen Barrow.
14       Where does Ms. barrow work at this time; do
15       you know?
16            A     She was at Correctional Health the
17       last time -- I haven't talk talked with her,
18       Ms. barrow in a while.  I'm not sure since
19       COVID.
20            Q     What unit was she working in?
21            A     Payroll.
22            Q     Was she working with you?  You
23       were in labor relations, and payroll, Is
24       that a unit that worked closely together
25       with labor relations, or was it just a
```

```
 1                    J. WANGEL
 2    different side of it?
 3         A    It's not assumably a part of the
 4    Department of Labor, but there was a
 5    transition to a electronic time keeping at
 6    Correctional Health, which required a whole
 7    lot of union.  So early on -- time keeping
 8    was certainly a challenge.  It's a different
 9    pay Kronos.  Eventually we went to
10    electronic time keeping.  So at one point
11    time keeping did fall under my purview.
12    There was Ms. Barrow was a member of
13    payroll.
14         Q    So Ms. barrow was a member of
15    payroll team who worked under you at one
16    time; is that right?
17         A    That's correct.
18         Q    So then she says to you, Jonathan,
19    I sent an e-mail to Angela Mulett, wages and
20    salary -- that's another unit?
21         A    I believe that's the central
22    office wages and salaries, but yes, that's
23    correct.
24         Q    She had wages and salary.  I'm
25    just reading the e-mail.
```

1              J. WANGEL

2         A    Yeah.

3         Q    Dr. Kaye should have received the

4    full $20,000 retention amount because she is

5    equal time employee working 40 hours per

6    week.  Her full-time employment status

7    should be one not .67.  You see that, right?

8         A    I do.

9         Q    Now, Ms. Barrow works for you, and

10   she made the determination; is that correct?

11        A    I don't know.  Based on this

12   e-mail I don't know if she just --

13   Ms. Barrow said Dr. Kaye should receive the

14   full 20k because she's a full-time employee

15   working 40 hours.  That's what the e-mail

16   read.

17        Q    How did she make this

18   determination when you have a e-mail thread

19   that spans at least a month saying

20   otherwise; how did that happen?

21             MS. CANFIELD:  Objection as to

22        form.  You can answer.

23        A    Yeah.  From what I recall because

24   Dr. Kaye raised a concern and Doctors'

25   Council was involved we at Correctional

1                          J. WANGEL

2      Health was trying to verify the Bellevue

3      calculation.  Right.  Colleen was working on

4      that in conjunction with a whole list of

5      other folks, and that's why she was

6      involved.

7                    Again, CHS does not have

8      involvement and should -- we were triple

9      checking Bellevue calculations, which we

10     really shouldn't be doing, but we were doing

11     to try to respond Doctors' Council and get

12     Dr. Kaye paid correctly.

13          Q    Now, Dr. Kaye disputes the

14     motivation and she attributes this problem

15     to ongoing retaliation from her EEOC charge.

16     Would you disagree with that?

17                    MS. CANFIELD:  Objection as to

18            form.  You can answer.

19          A    I am unaware of discriminating

20     against Dr. Kaye, including myself, anybody

21     in my office -- Dr. Kaye, in which way or

22     form.  It was completely unacceptable if

23     that were the case.

24          Q    Then you, Mr. Wangel, respond to

25     Ms. Barrow, Angela responded.  I'm guessing

Page 104

1                         J. WANGEL

2      you're talking about Ms. Mulett.

3                    MS. CANFIELD:  Is that a

4           question?

5                    Objection.  You can answer.

6          Q     You were speaking to Ms. Angela

7      Mulett; is that right?

8          A     I believe so, yes.

9          Q     Now, we're scrolling up and this

10     is the New York City health and hospital

11     corporation time sheet profile request,

12     right, is this the same system that's in

13     place right now?

14                    MS. CANFIELD:  Objection as to

15          form.  You can answer.

16         A     Yes.

17         Q     So here you have, I guess, a

18     discussion or a break down of Dr. Kaye's

19     actual work time and annual leave time and

20     then a host of other fields, right.  Now,

21     this actual print out doesn't necessarily

22     disclose how many hours she worked for the

23     time period shouldn't there be another print

24     out here, Mr. Wangel?

25                    MS. CANFIELD:  Objection to

1                     J. WANGEL

2          form.  You can answer.

3          A    I'm not a 100 percent certain.  It

4     does -- there is actual work time, which I

5     believe is like physical hours worked not

6     other paid time, like, annual or sick that

7     are shown below.  I'm not sure what you mean

8     should there be another screen.

9          Q    Well, it says actual time usage I

10    mean it looks like it's 113 for this year

11    period; is that accurate?

12         A    Honestly, I'm not the expert when

13    it comes the main frame system we did have

14    somebody to take care of --

15         Q    So you're not even sure just based

16    on this.  It was clear that Ms. Barrow had

17    determined that by November 15 that Dr. Kaye

18    was entitled to the full $20,000.  You do

19    see that, right?

20              MS. CANFIELD:  Objection as to

21         form.  You can answer.

22         A    I see that in e-mail, yeah.

23         Q    What did you do, once Ms. Barrow

24    made this determination what did you do to

25    follow-up?

Page 106

1              J. WANGEL

2              MS. CANFIELD:  Objection as to

3         form.  You can answer.

4         A    I don't recall.

5         Q    Did you have any conversations

6    with Dr. Yang about you know, Dr. Kaye

7    receipt of the full amount versus the

8    partial amount that she had received up

9    until that point?

10        A    I don't recall a specific

11   conversation, but if Dr. Kaye's truly

12   entitled to the full 1.0 20,000 I would have

13   taken appropriate steps to get her paid

14   correctly.

15        Q    I'm going to show you what will be

16   marked as Plaintiff's Exhibit 12 and for the

17   purpose of the record Plaintiff's Exhibit 12

18   bears the Bates series NYC_1058 you see

19   that, Mr. Wangel?

20                  (Whereupon, Email (NYC_1058) was

21                  marked as Plaintiff's Exhibit 12

22                  for identification as of this

23                  date.)

24        A    I see the e-mail.

25        Q    Right.  And this is e-mail is to

1               J. WANGEL

2       Mr. Collins from Doctors' Council and it CCs

3       you Mr. Wangel, right?

4            A     Yep.

5            Q     And at that point on December

6       19th, 2018, Mr. Collins says, "Good morning.

7       We've been informed by the payroll that Dr.

8       Kaye should be receiving the remainder of

9       her retention bonus payment of 6600 on the

10      12/28 paycheck."  You see that right?

11           A     I do.

12           Q     Now after seeing all these emails,

13      Mr. Wangel, do you recall if Dr. Kaye

14      received the 6600 dollar lump sum payment?

15           A     I believe she did.

16           Q     What makes you believe that?

17           A     Just my recollection.

18           Q     And had anybody else experienced

19      issues obtaining their retention bonus that

20      transitioned from Bellevue to CHS at the

21      time?

22           A     I don't recall, but I can tell you

23      that I have regular conversations with

24      Mr. Collins' Doctors' Council about dozens

25      and dozens, and dozens of Doctors' Council

1                    J. WANGEL

2    members and their FTE related

3    (unintelligible).

4         Q    Now, at any point did it come up

5    to your attention that Dr. Ford had

6    mentioned or said to the effect that Dr.

7    Kaye needed to be managed out?

8         A    I'm sorry, can you say that one

9    more time.

10        Q    At any point did Dr. Ford convey

11   to you that Dr. Kaye needed to be managed

12   out?

13             MS. CANFIELD:  Objection.  You

14         can answer.

15        A    I don't recall a conversation no.

16        Q    Do you recall -- what do recall

17   Dr. Kaye's relationship was with Dr. Ford,

18   how would you describe it?

19        A    It's hard for me to comment I was

20   not involved in the day-to-day I don't know

21   what the interaction was I don't think Dr.

22   Ford was Dr. Kaye's immediate supervisor.

23        Q    Okay.  But even if she wasn't did

24   you recall any conversations she may have

25   had about Dr. Kaye with you?

Page 109

1                          J. WANGEL

2          A     Nothing specific comes to mind.  I

3     would need a little bit more -- I don't

4     recall any specific conversation about Dr.

5     Kaye.

6          Q     Now, I'm going to ask you some

7     more questions about some of the changes

8     that Dr. Kaye actually experienced during

9     her transition from CHS to H&H.  So I'm

10    going to show you what will be marked as

11    Plaintiff's Exhibit 13.

12                        (Whereupon, Email (NYC_350-355)

13                         was marked as Plaintiff's

14                         Exhibit 13 for identification as

15                         of this date.)

16         Q     Now, Plaintiff's Exhibit 13 bears

17    the Bates series NYC_350 to NYC_ and they're

18    in sequential order I guess this would be

19    355 you see that right, Mr. Wangel?

20         A     I see the 355, yes.

21         Q     Yes.  And this list -- actually,

22    the e-mail is from Zachary Feigman, and I'm

23    not sure if I'm pronouncing his name

24    correctly, to Ms. Swenson and Guilaine

25    Blaise; is that correct?

1              J. WANGEL

2       A    Looks correct.

3       Q    Who are these -- where do these

4  individuals work, Mr. Wangel?

5       A    Andrea Swenson was more like the

6  administrator manager over FPECC.

7  Ms. Blaise worked with me at labor relations

8  administrative associate, and Zach, I don't

9  remember.

10      Q    Now the subject is, "Need some

11  info" and I guess Zach, as you called him,

12  is saying, "Hey, Andrea, We need who the

13  managers are for each of the FPECC

14  employees" right "Also, can you confirm who

15  gets the timestamp button and who gets the

16  direct entry."  What's a timestamp button,

17  do you know?

18      A    I do and just before I address the

19  timestamp button what's the date on this

20  e-mail?

21      Q    The date on this e-mail is

22  July 2, 2018?

23      A    I said that Ms. Blaise worked with

24  labor she didn't work with -- she may -- she

25  was in operations before -- she may have

```
                            J. WANGEL
 1
 2      been with operations she may have been labor
 3      it's hard to say at this point I don't
 4      recall when she made the switch.
 5              So the time stamp button I'd have
 6      to give you a little bit of background about
 7      time keeping so you'd understand.  So like I
 8      said the entire health and hospital paper
 9      time sheets up until, basically the
10      pandemic.  Correctional health shortly after
11      it move to Bellvuie Kronos for the
12      electronic time keeping similar to city time
13      throughout all agencies and because the
14      individual units are located at the courts
15      and there's not a large number of staff
16      assigned to each of the courts it's not cost
17      effective nor is it easy to install
18      electronic device at the time the court
19      building they're very expensive and there's
20      not a lot of staff using them.  So in lieu
21      of using biometric device to scan you can
22      click a button in the Kronos, which is the
23      timekeeping system for correctional health.
24      Basically, click a virtual button and it
25      populates your time sheet with the current
```

```
 1                      J. WANGEL
 2      time.  So it's a way to capture time.
 3          Q    So then it lists various staff
 4      members and Dr. Kaye is the only director
 5      here, you notice this, right?
 6                   MS. CANFIELD:  Objection to
 7               form.  You can answer.
 8          A    Again, it's hard for me to
 9      remember who was the director who was
10      (unintelligible.
11          Q    At the time in July 2018 was any
12      of the other individuals center directors,
13      clinic director?
14          A    I don't believe so.
15          Q    Why is that, why is she the only
16      clinic director on this list?
17          A    I don't know.
18          Q    And then there's another e-mail
19      from the Ms. Swenson to Zach Fiegman and
20      Guilaine Blaise and subject again, "Needs
21      more info" and then you know, she,
22      Dr. Mundy, they have, I guess, no timestamp
23      and it lists Oliver Harper, Kanishk Solanki,
24      and Jonathan Weiss, if they don't have a
25      timestamp are they just filling out paper
```

1              J. WANGEL

2    time sheets?

3         A    I'm a little uncertain where did

4    they work then.

5         Q    They worked under Dr. Mundy at the

6    Manhattan court clinic all three of these

7    individuals.  These were psychologist who

8    worked for Dr. Mundy.

9         A    I'm trying to understand.

10              MS. CANFIELD:  What's the

11         question?

12        A    Yeah, I'm a little confused.

13        Q    Fist off, who would have made a

14   decision whether or not a staff person would

15   have had to use a timestamp or they would

16   have to use another form of timekeeping.

17   Who made that decision?

18        A    It depends on your civil service

19   classification, depends on the salary,

20   depends on the direct manager depends to the

21   employee.  If you are unionized employee,

22   it's driven by I believe city wide

23   agreement.

24        Q    What would the city wide agreement

25   dictate in the instance?

Page 114

1               J. WANGEL

2        A    I'm trying to make sure I

3    understand -- versus time stamp.

4        Q    I'm trying to understand -- I'm

5    trying to get to why Dr. Kaye would have

6    been the only director who would have had --

7    would have been on this list of individuals

8    --

9        A    I don't know.  I mean it's hard

10   for me to know why this group decided time

11   stamp or no time stamp I wasn't consulted I

12   don't really know the details of why.  It's

13   a little difficult trying to decipher this.

14       Q    So you're not quite sure what the

15   rational behind this list was and what made

16   -- how the determination was made that some

17   people had to have time stamps and others

18   didn't.  Is that what you're testifying to?

19              MS. CANFIELD:  Objection as to

20          form.  You can answer.

21       A    Yeah.

22       Q    He said yeah.

23       A    I'm saying it's hard for me to

24   determine based on this e-mail chain.  It's

25   difficult for me to know what anybody's

```
 1                    J. WANGEL
 2      rational was to determine whether it's time
 3      --
 4           Q    The question is also then did you
 5      have any part in making this determination
 6      Mr. Wangel?
 7           A    I don't believe so.
 8           Q    Who would have been the most
 9      senior person in making this determination?
10                    MS. CANFIELD:  Objection as to
11              form.
12           A    It's sort of hard for me to answer
13      you know I can give advise or give guidance
14      on contracts that I do.  You know I think
15      time keeping was new.  This sort of time
16      keeping was new to correctional health.  You
17      know, I'm not sure everybody fully
18      understood how the decision should be made.
19      I'm not sure if it's a decision between --
20      implementing.  I don't recall being
21      consulted.  I was involved in the project
22      overall, yes, I don't know -- I don't see
23      myself in this chain so it's hard for me to
24      reply to the time stamp.
25           Q    I'm going to ask you something:
```

Page 116

1                    J. WANGEL

2    Time keeping was in what unit?

3         A    What unit?  I mean correctional

4    health had its own time keeping unit.

5         Q    Right.

6         A    And some role function -- not a

7    100 percent independent from the central

8    office though.

9         Q    Who was the most senior manager

10   over time keeping?

11        A    At this time is that what you're

12   asking?

13        Q    Yes.

14        A    In 2018 I believe it was Ms. Laboy

15   I want to say.  There was -- folks came and

16   went -- there was some turnover.  There was

17   Adelia Sferrazza was the head of payroll for

18   a little while, changed hands a couple of

19   times I can't actually recall in July

20   of 2018?

21        Q    In July of 2018 you were reporting

22   to Ms. Laboy; was that right?

23                MS. CANFIELD:  Objection as to

24           form.  You can answer.

25        A    I don't believe so.  This was only

```
 1                          J. WANGEL

 2      11 months before I left CHS I would say, no.

 3           Q    So you were and Ms. Laboy were not

 4      in the same unit at this time?

 5           A    I don't believe so I don't recall

 6      the time exactly.

 7           Q    Let's see where you are in this

 8      the e-mail chain.

 9                    MS. CANFIELD:  And Ms. Hagan I

10                just went through the exhibits you

11                sent me and this exhibit is not

12                included in the batch.

13                    MS. HAGAN:  It is in the

14                batch.

15                    MS. CANFIELD:  It's not in the

16                batch.  I just checked three times.

17                    MS. HAGAN:  I will send it

18                again, but it's in that batch.

19      BY MS. HAGAN:

20           Q    So Mr. Wangel, here you have an

21      e-mail from if Ms. Blaise to you on July 6

22      and Adelia Sferrazza you see that, right?

23           A    I do.

24           Q    And it says, "Good morning, here

25      the is the schedule that was provided by
```

1                     J. WANGEL

2        Ms. Swenson.  Regards.  Need some info."

3        Now, why would Ms. Blaise be sending you a

4        schedule from Ms. Swenson?

5             A    I don't know.  (Unintelligible.)

6             Q    Well, here she is assistant

7        director of correctional health services

8        policy and planning and labor relations.  So

9        Mrs. Blaise is working in labor relations;

10       isn't that where you were working at that

11       time?

12            A    Yes, I would say.

13            Q    She was working with you and for

14       you at that time, right?

15            A    She worked in labor relations,

16       yeah.

17            Q    Yes, for you and you were her

18       supervisor; is that right?

19            A    I believe so, yeah.

20            Q    So, Ms. Blaise is in the e-mail

21       thread from, I guess the initial e-mail, you

22       see this, right?  So, she's reporting to you

23       Ms. Swenson is engaging Ms. Blaise about the

24       schedule and the time stamps.  Why is

25       Ms. Swenson engaging Ms. Blaise, your staff

Page 119

1               J. WANGEL

2       person, about how various CHS staff people

3       are actually recording their time?

4                   MS. CANFIELD:  Objection to

5              form.  You can answer.

6           A    It's hard for me to remember

7       specifically about the entire context here,

8       but it could have been about the 30 minute

9       lunch piece it could have been a whole list

10      of topics, again, this e-mail came from

11      years ago without any context it's hard to

12      tell.

13          Q    Well, then here's further context

14      here, then again, Ms. Sferrazza, Ms. Adelia

15      Sferrazza, she e-mails you and Ms. Blaise

16      and she tells you, "Please see the schedule

17      below that will need to be added to Kronos

18      and ATLS."  Now, if they weren't time

19      stamping did the employees use Kronos

20      instead?

21          A    So -- I'm not sure.  That's the

22      phrasing.  So everybody used Kronos in some

23      form or another, right, so now as part of

24      the limitation of Kronos is you had to have

25      a base schedule entered into Kronos, right.

```
 1                      J. WANGEL
 2       That's sort of how the system works; so, you
 3       need to keep the schedule up-to-date and
 4       that was part of the project.  ATLS, ATLS
 5       how the central office folks call it, uses
 6       the mainframe at central office; so there
 7       was at one time when scheduling became part
 8       of the time keeping process and schedules
 9       had to be uploaded or entered into Kronos.
10       So that could be what this is about.  It's
11       hard for me to know exactly but that is part
12       of the time keeping process.
13            Q    Now, I guess the question I would
14       have is that Ms. Swenson was responsible for
15       administrative staff, why was she engaging
16       in -- why is she engaging in the schedule of
17       the clinical staff including Dr. Kaye?
18                      MS. CANFIELD:  Objection to
19                 form.  Go ahead.
20            A    So as you've shown me more e-mails
21       I believe that Ms. Blaise before she goes by
22       DG, she was helping the time keeping folks
23       help to get the schedules entered because
24       there was a tremendous amount of work
25       involved in not getting schedules for all
```

Page 121

```
 1                      J. WANGEL
 2      staff entered into Kronos correctly.  Again,
 3      this is just a snippet of a chain, but she
 4      was helping the time keeping folks at one
 5      point get all that stuff entered into
 6      Kronos.
 7                   MS. HAGAN:  As I represented
 8              to the reporter.
 9                      (Whereupon, a recess was taken
10                      from 12:30 p.m. to 1:02 p.m.)
11                   MS. HAGAN:  We're going resume
12              it's -- just for purposes of time
13              keeping it's now 1:02 pm going on
14              1:03 pm.  And we have approximately
15              three and a half hours left of the
16              deposition so I want to resume and
17              just let you know that.  You should
18              be available to 6:00, right?
19      A    I'm sorry say that part again.
20      Q    You'll be available until six pm
21      today; is that right?
22      A    'Til six?  I don't think we go
23      until six.
24      Q    This deposition sent to you and
25      you have to --
```

1                    J. WANGEL

2        A    Yes, that's fine, I'll make myself

3    available that's fine.

4        Q    Thank you, Mr. Wangel.   I

5    appreciate that.

6             Going forward I want to kind of

7    ask you some more questions about Dr. Kaye's

8    -- the change in Dr. Kaye's --

9             MS. CANFIELD:   I'm sorry I was

10               on mute.   I just want to say for the

11               record before we get started that

12               I'm missing Exhibits P1, 2, and 3,

13               and 13 they're not in the documents

14               that you sent over today earlier.

15               MS. HAGAN:   I'm not quite sure

16               if -- I believe that I sent them to

17               you.   If they're not I will send

18               them to you again, I believe that I

19               sent them to you in a, I guess a

20               batch - a batch of documents because

21               I wanted you to have them before

22               today's deposition.   And that's why

23               I sent them to you at 5:00 o'clock

24               this morning.

25               MS. CANFIELD:   As per the

```
 1                      J. WANGEL

 2              court's orders my motion to compel

 3              is granted.  So, all sets of

 4              documents need to be sent over to me

 5              and I expect them in the subsequent

 6              depositions as well.

 7                      MS. HAGAN:  I'm sorry, Ms.

 8              Canfield, I will look through that

 9              batch of documents to make sure that

10              I haven't already sent them and if I

11              haven't -- if I haven't I will send

12              them again.  But I'm assuming they

13              were there, but I apologize if

14              they're not.  So, let's keep going.

15      BY MS. HAGAN:

16              Q    So, Mr. Wangel, I want to continue

17         with the changes in Dr. Kaye's working

18         conditions upon her transfer from Bellevue

19         to the CHS, so I was going to ask you some

20         questions about the first and foremost the

21         -- to continue on with the retention bonus

22         so that would be -- I would be showing you

23         another exhibit which will be marked as

24         Plaintiff's Exhibit 14.

25                      Plaintiff's Exhibit 14.  The Bates
```

Page 124

1                         J. WANGEL

2      stamp series NYC_385 and it's dated

3      July 13, 2018.  Do you see that, Mr. Wangel?

4           A    I do.

5                         (Whereupon, Email (NYC_385) was

6                         marked as Plaintiff's Exhibit 14

7                         for identification as of this

8                         date.)

9           Q    And Mr. Wangel, just getting into

10     a discussion of Dr. Kaye's complaints about

11     the 30 minute lunch that she was being made

12     to forfeit for an hour lunch.  Do you recall

13     that?

14                    MS. CANFIELD:  Objection as to

15               form.  You can answer.

16          A    I remember the conversation about

17     the lunch period I wouldn't categorize it as

18     forfeiture.

19          Q    Is it your understanding -- do you

20     remember Dr. Kaye's working hours prior to

21     her discussions with you about her lunch

22     hour?

23                    MS. CANFIELD:  Objection as to

24               form.  You can answer.

25          A    I know that pursuant to the

Page 125

1              J. WANGEL

2     Doctors' Council contract with health and

3     hospitals it's 40 hour work week.  So,

4     specific schedules and hours I don't recall

5     about specific hours.

6          Q    Would you say that it was static

7     40 hours that you were not told otherwise by

8     anyone else?

9          A    With what was 40 hours, Dr. Kaye's

10    schedule?

11         Q    As far as the work weeks for

12    everyone who transitioned from Bellevue or

13    transitioned from another entity to CHS,

14    would you testify that everyone had to be on

15    the 40 hour week or was it a sliding scale?

16              MS. CANFIELD:  Objection as to

17         form.  You can answer.

18         A    Again, the work hours are

19    consistent with the contract.  I wasn't very

20    deeply involved with the actual transition

21    folks from one facility to another or

22    specific schedules versus specific personnel

23    I'm not sure how to respond.  Again, it's a

24    40 hour work week.

25         Q    I'm sure you weren't intimately

Page 126

1                       J. WANGEL

2        involved or I guess very involved with maybe

3        types of issues generally.  But it appeared

4        that Dr. Kaye did reach you and did engage

5        you on some level regarding this 30 minute

6        doctor lunch, you did see this right?

7            A    I did.

8            Q    Would you need to read or review

9        this e-mail in order to get an idea of how

10       she engaged?

11           A    I'm happy to reread it.

12           Q    In order get the record clear.

13       This is an e-mail from Dr. Kaye to you on

14       July 13 2018 and the subject is, "30 minute

15       lunch" and it's to you Mr. Wangel I can

16       provide information regarding Bellevue

17       physicians taking a 30 minute lunch.

18       Approximately 13 years ago there was an

19       agreement between doctor's counsel union and

20       Bellevue hospital to increase the

21       physician's salaries by increasing their

22       workweek from 37 and a half hours per week

23       to 40 hours per week.  And at the same time

24       decrease their unpaid lunch time from one

25       hour to a half hour.  I recall being at

Page 127

1                    J. WANGEL

2      union meetings when this was discussed and

3      later when it was formerly implemented at

4      Bellevue or MD or HHC pay line.  I am

5      uncertain if I still have documentation

6      about this in storage, but if necessary I'm

7      guessing that either doctor's counsel, HHC,

8      Bellevue payroll, or the city has archived

9      documents pertaining to this official

10     change."  And she says, "I don't know if

11     there was -- if this was a city wide

12     collective bargaining agreement or specific

13     to Bellevue.  I do know that it applied to

14     all physicians working for Bellevue and that

15     included the Bronx and Manhattan court

16     clinics doctor's.  I hope this information

17     is helpful.  Regards."

18                    Now, does that jog your

19     recollection any?

20          A    With regard to the response to

21     which question?

22          Q    With just what happened between

23     you and --

24          A    Yeah, I can tell you there's more

25     conversations about the 30 minute lunch.

```
 1                    J. WANGEL
 2        Like I said, the Doctors' Council contract
 3        calls for a 40 hour workweek there were
 4        titles at other hospitals that require 37
 5        and a half workweek or 35 hour workweek and
 6        across the board system wide it's an hour
 7        lunch.  You are on-site working for the
 8        hours specified in your contract plus an
 9        hour of unpaid lunch.  Are there one off
10        instances where a request can be made on a
11        daily basis.  You have some, you know,
12        overriding concern and perhaps you don't
13        have balance to cover (unintelligible) and
14        amend the request, sure, but system wide
15        it's generally an hour lunch.  I remember
16        speaking about this counsel about some
17        specific Bellevue agreements I am not aware
18        of one, if one was ever produced.  I don't
19        recall Dr. Kaye ever mentioning this issue
20        when we had our conversation before this
21        transition took place.  I don't remember
22        specific conversation about this particular
23        topic.  I don't believe there was one.  I
24        know Dr. Kaye had an opportunity to become a
25        annual employee, which she chose not to, in
```

```
 1                       J. WANGEL
 2     which case the annual agreement calls for a
 3     straight 40 hours where lunch is built in.
 4     So, 40 hours work and lunch is built in and
 5     that would have alleviate her concern.  I
 6     believe she was also offered the managerial
 7     employee that's group 11.  If you're a
 8     manager you have flextime, which is more
 9     flexibility as to the schedule.  I believe
10     that option was not exercised.  Ultimately,
11     as a unionized doctor under the contract a
12     40 hour workweek and everybody pays an hour
13     lunch.  That's how --
14          Q    Question, with Dr. Kaye's
15     background -- first off, what PAGNY
16     (phonetic) position would she have been
17     offered at this time, do you know?
18          A    There were Doctor's Council
19     members who worked for PAGNY also
20     represented by Doctor's Council just a
21     different part of it.
22          Q    Did you offer Dr. Kaye a PAGNY
23     position?
24               MS. CANFIELD:  Objection.  You
25          can answer.
```

1                      J. WANGEL

2          A     Wouldn't be my place to do so, no.

3          Q     How did you know that Dr. Kaye was

4     offered a PAGNY position?

5          A     I just know that there are other

6     staff holding different -- I mean everybody

7     in a similar role they have different civil

8     service qualifications.

9          Q     The question is how:  Do you know

10    that Dr. Kaye was offered a PAGNY position,

11    what firsthand knowledge do you have to that

12    affect?

13         A     I don't know I don't recall.

14         Q     Do you know who offered her a

15    PAGNY position?

16         A     I don't.  Again, I wasn't involved

17    in, you know, the discussion to bring this

18    program over to correctional health.

19         Q     Just for purposes of closure do

20    you know when Dr. Kaye was offered a ^

21    position?

22         A     I don't.

23         Q     So were any other directors at any

24    of the other centers offered a -- in the

25    PAGNY line?

1                    J. WANGEL

2               MS. CANFIELD:  Objection as to

3          form.

4          A    I believe there was one, there

5     were four directors at the time.  I think

6     one, possibly two.  I mean all the remaining

7     three I believe there was one possible had

8     how to the break down.

9          Q    Wasn't Dr. Winkler a PAGNY

10    employee?

11         A    Could have been again I don't

12    recall specifically who is in which line.

13              MS. CANFIELD:  Is it possible

14          there's that ringing again and I've

15          seen the witness squint.

16         A    It's very loud.

17         Q    I've tried to silence my phone

18    I've tried to do everything besides turn it

19    off I don't have the luxury of turning off

20    my phone.

21     (A discussion was held off the record.)

22    BY MS. HAGAN:

23         Q    Going back to my line of

24    questioning.  Mr. Wangel, you said that you

25    remember some things that transpired along

```
 1                    J. WANGEL
 2      with -- as it pertains to Dr. Kaye's -- her
 3      suit or I guess her issues with the change
 4      from a 30 minute lunch to an hour lunch.
 5      Now, Dr. Kaye prior to this were you aware
 6      that the Dr. Kaye worked from 9:00 a.m. to
 7      5:30 p.m.?
 8           A    Prior to what?
 9           Q    5:30 p.m. prior to I guess the
10      change that was put in place those were her
11      work hours were you aware of that?
12                MS. CANFIELD:  Objection to
13           form.  You can answer.
14           A    I don't believe so.
15           Q    So, she never told you that she
16      needed to work a certain set of hours to
17      address the needs of her children?
18                MS. CANFIELD:  Objection to
19           form.  You can answer.
20           A    You were speaking pre-transition,
21      right, so like I said before the initial
22      conversation I had with Dr. Kaye, you know,
23      in talking about compensation and other
24      things, the issue of the 30 minute lunch did
25      not come up it wasn't addressed at that time
```

```
 1                    J. WANGEL
 2     and this chain looks like it's a couple of
 3     weeks after the transition took place.
 4          Q    Right.  But I'm going back to
 5     whether Dr. Kaye disclosed why she had to
 6     the work a 9:00 a.m. to 5:30 p.m. schedule?
 7          A    I believe she did.  I believe if I
 8     recall correctly it was related to child
 9     care and at the time that we had the
10     discussion I said it was not having to
11     provide the detail it was care for a child
12     that intermittent would be appropriate, she
13     could reach out to the department if that's
14     appropriate and, you know.  But otherwise
15     generally speaking if she's asking for a
16     permanent reduction in the number of minutes
17     or hours she needs to be in the workplace,
18     the contract calls for the 40 hours, there's
19     an hour lunch, anything else would be, you
20     know, violations.
21               I can't unilaterally change
22     schedules for the staff.  It's not my shop.
23     It's not my department.  I don't know what
24     the need is.
25          Q    Dr. Kaye worked this schedule for
```

1                    J. WANGEL

2     years, Dr. Kaye -- would you agree with me,

3     Dr. Kaye worked at the -- as the director of

4     the court clinic or at the court clinic in

5     the one capacity from 2000 up until the time

6     she left, which would have been 2020, right,

7     and you start working for the CHS in 2015;

8     is that right, Mr. Wangel?

9                    MS. CANFIELD:  Objection as to

10             form.  You can answer.

11        A    Correct.

12        Q    It's correct, right?

13        A    I started working in 2015, that's

14     correct.

15        Q    Who made the decision that

16     everyone -- that all of sudden this

17     collective bargaining agreement had to be

18     enforced in a uniform way?

19                    MS. CANFIELD:  Objection as to

20             form.  You can answer.

21        A    I don't believe there was anybody

22     who made the uniform decision I think that

23     that's how the work schedule -- that's

24     typical throughout the entire health and

25     hospital system to take an hour lunch,

Page 135

1                              J. WANGEL

2         that's how it happens throughout the rest of

3         the correctional health and on the PAGNY

4         lines for the folks on Rikers there are

5         physicians that's their schedule 40 hours

6         with an hour lunch for the nine hours a day.

7         I don't think anybody made a unilateral

8         decision you want to bring conformity with

9         the normal.

10            Q    Mr. Wangel, this is July 13 this

11        is about 12 days after Dr. Kaye was

12        officially brought over to CHS, right.  For

13        12 days why wasn't she put on the one hour

14        lunch break who made the determination

15        within 12 days of her starting that she had

16        to be put on a hour lunch break rather than

17        the 30 minutes that she had?

18                    MS. CANFIELD:  Objection as to

19               form.  You can answer.

20            A    I can't speak to who made that

21        decision I don't recall I don't have that

22        knowledge.  You're talking about a

23        transition of a number of programs part of a

24        large operation, you know, you're only

25        talking two weeks in, right.  This is day 10

```
 1                    J. WANGEL
 2    it's like -- or less.  So I again, I can't
 3    speak to exactly how the issue came up.
 4         Q    I want to give you some
 5    perspective.  How many people work at H&H?
 6         A    H&H direct pay staff you're
 7    asking?
 8         Q    Yes, how many people work at H&H?
 9         A    More than 40,000.
10         Q    How many of people worked at CHS
11    about that time, about?
12         A    Well, you're counting apples to
13    apples.  It's about 70,000 including the
14    affiliates that CHS has a heavy number of
15    staff also pushing 3,000, I'd say.
16         Q    So out of the 3,000 Dr. Kaye's
17    work schedule comes across someone's work
18    radar and at that time within 12 days of her
19    being transitioned into this line it is
20    brought someone's attention that she's
21    working an hour verses 30 minutes of 3,000
22    people and she's engaging you who has, I
23    guess, purview over 3,000 people at the
24    time.  How did that happen?
25                    MS. CANFIELD:  Objection as to
```

```
 1                         J. WANGEL
 2              form.  You can answer if you're
 3              able.
 4         A    You're saying there's 3,000 people
 5     with leadership of FPECC.  They don't
 6     supervise 3,000 people it's a much smaller
 7     group of staff that they manage.  My
 8     position as the head of legal at the time of
 9     correctional health I mean, this question as
10     to the contract interpretation or what are
11     the appropriate hours to work those kinds of
12     questions are appropriate to labor probably.
13         Q    Did anyone from the FPECC
14     management come to you about Dr. Kaye's work
15     hours?
16         A    I definitely had conversations
17     with the FPECC staff about the scheduling to
18     recall a conversation with one individual I
19     don't remember specifically again this is
20     three years ago.
21         Q    Any of the other directors have
22     their hours changed?
23         A    Not that I'm aware of, I mean it's
24     possible.  I believe that the eight hours
25     worked one hour lunch was consistent with
```

1                     J. WANGEL

2      the way the other directors were working

3      pursuant to their own contract are only

4      required to be on site for the eight hours.

5           Q    So you're not sure if there were

6      any other directors who were subjected to

7      this change or a change in their hours; am I

8      right?

9                     MS. CANFIELD:  Objection as to

10               form.  You can answer.

11          A    I don't recall.

12          Q    Would it be your testimony or

13     could you say for certain that all of the

14     directors worked eight hour days, 40 hour

15     weeks?

16                    MS. CANFIELD:  Objection as to

17               form.  You can answer.

18          A    I could say that they should be

19     working consistent with their collective

20     bargaining agreements and management roles.

21     So, managers work a 35 hour week with an

22     hour lunch and the doctors work an eight

23     hour day with a lunch built in and other

24     (unintelligible) hour day.

25          Q    Are you that depending on the

Page 139

```
 1                        J. WANGEL

 2      entity they were employed by that was the

 3      distinguishing factor and not gender?

 4                  MS. CANFIELD:  Objection as to

 5             form.  You can answer.

 6           A     Tells you what the collective

 7      bargaining agreement calls for each --

 8           Q     And I'm asking you about this --

 9      I'm asking you what the reason was for Dr.

10      Kaye's work week to be changed.  She

11      allege's that it was gender discrimination

12      and retaliation and you're are citing a

13      collective bargaining agreement and/or I

14      guess entity managerial entity?

15                  MS. CANFIELD:  Objection to

16             form.  You can answer.

17           A     My response to that those are the

18      hours that the collective bargaining

19      agreement calls for I am not aware of any

20      fact or circumstance where Dr. Kaye's hours

21      were changed based on gender discrimination.

22           Q     Did Dr. Jain ever give you a

23      directive to change Dr. Kaye's hours?

24                  MS. CANFIELD:  Objection as to

25             form.  You can answer.
```

1                    J. WANGEL

2        A    No.  I'm not responsible for Dr.

3    Kaye's hours.

4        Q    Did Dr. Jain discuss with you or

5    insist upon Dr. Kaye's hours being changed?

6              MS. CANFIELD:  Objection as to

7         form.  You can answer.

8        A    I had discussions with Dr. Jain

9    about the requirements of the contract, but

10   any changes in schedule would not run

11   through me.  I give advice to counsel about

12   how the bargaining agreements are

13   constructed and what's required.

14   (Unintelligible).  Operational decision is

15   made, that's not a labor relations decision.

16   That happened with the leadership

17   department.

18       Q    I'm going to ask you something,

19   Mr. Wangel, you're the senior, now, you're

20   the assistant vice president of labor

21   relations, right, but at the time you were

22   the senior director of labor relation,

23   right?

24       A    At the time in July 2018 you're

25   asking?

Page 141

1                      J. WANGEL

2          Q    Yes.

3          A    I was the senior director of labor

4    relations for correctional health services.

5          Q    Now, were you acting in the legal

6    capacity or were you acting -- first off,

7    were you acting in the legal capacity, let's

8    just ask that question first?

9                MS. CANFIELD:  Objection.

10         A    I was not of counsel.

11         Q    You were not counsel?

12         A    My corporate title was not counsel

13   at that time.

14         Q    What was you corporate title

15   again?

16         A    Senior director.

17         Q    You were not in like an agency

18   attorney, or executive attorney title or

19   anything akin to that, right?

20         A    I was not an attorney title while

21   at correctional health.

22         Q    Okay.  So I'm going to further up

23   in the e-mail I'm going to finish with this

24   one that was the Exhibit 14.

25                I'm going to show you what will be

Page 142

1                        J. WANGEL

2      marked as Exhibit 15.

3                        (Whereupon, Email (NYC_395-400)

4                        was marked as Plaintiff's

5                        Exhibit 15 for identification as

6                        of this date.)

7           Q    I'm going to show you what's been

8      marked as Plaintiff's Exhibit 15.

9           A    That will work.

10          Q    I'm going to show you what's being

11     marked as Plaintiff's Exhibit 15,

12     Plaintiff's Exhibit 15, bears the Bates

13     series NYC_385.  And --

14                    MS. CANFIELD:  I'm sorry 385.

15                    MS. HAGAN:  385.

16                    MS. CANFIELD:  That was No.

17             14.

18                    MS. HAGAN:  Oh, it is.  I'll

19             change it.  This will be number 15

20             then.  Will be marked as an e-mail

21             bearing the Bates series 395, 396,

22             397, 398, 399, and 400.  395 to 400,

23             you see that, right?

24                    MS. CANFIELD:  No, it's not up

25             yet.

Page 143

1                          J. WANGEL

2                    MS. HAGAN:  So I'm going to

3               show you what's going to be marked

4               as Plaintiff's Exhibit 15.

5          Q    I'm going to show you that and

6     then I'm going to go back to what's going to

7     be Plaintiff's Exhibit 14.  Plaintiff's

8     Exhibit 14 was the e-mail where Dr. Kaye

9     explains she can reference an agreement that

10    was made between Doctors' Council union and

11    Bellevue 13 years ago, you saw that, we were

12    discussing that earlier, right?

13         A    Right.

14         Q    So, anyone who was working a 37

15    hour workweek would go to 40 hours a week

16    and their lunch hour would decrease from one

17    hour to half hour.  You saw that, right?

18         A    I see the e-mail.

19         Q    This is the e-mail she sent you on

20    July 13, 2018 that was Exhibit 14.  Exhibit

21    15 you have an e-mail thread and I'm going

22    to start at the beginning of the e-mail

23    thread for purposes of clarity.  In the

24    beginning of the e-mail thread there's a

25    Bates stamp NYC_396 and it comes from Dr.

Page 144

1                    J. WANGEL

2      Kaye, the same e-mail we were discussing

3      earlier; you see this right?

4           A    Yes.

5           Q    And then we scroll up and it's

6      from you -- there's another e-mail

7      subsequent thereto from you to Mr. Campese;

8      you see that right?

9           A    I do.

10          Q    And it's -- the subject is 30

11     minute lunch.  Now, you say, "Below is an

12     e-mail from a former Bellevue staffer

13     Doctor's Council now with CHS FPECC.  Are

14     you familiar with the agreement referenced

15     trying to determine if these staff should be

16     on a standard one hour lunch."  Now, at this

17     time you're not sure yourself; am I right?

18          A    Not sure about what?

19          Q    Whether or not the staff should be

20     on a standard one hour lunch?

21          A    No.  That's the general rule.

22          Q    Well, I'm just saying you're not

23     the sure you're trying to determine.  That's

24     what you are saying.  These are your words

25     trying to the determine if the staff should

Page 145

                        J. WANGEL

1
2      be on a standard one hour lunch.  That
3      doesn't sound like someone who has made a
4      determination as of yet; am I right?
5                    MS. CANFIELD:  Objection.  You
6             can answer.
7           A    I'm responding to Dr. Kaye's
8      e-mail saying it should be a 30 minute
9      lunch.  So my e-mail to Mr. Campese and Ms.
10     McCarthy is trying to determine if she
11     should be on a standard one hour lunch
12     because that's the standard.
13          Q    You've been at CHS all of, let's
14     see three years now and Dr. Kaye's been
15     working there for 18 at the time; am I
16     right?
17                   MS. CANFIELD:  Objection.
18          A    She was not working at CHS, sorry.
19          Q    Well, she was working at the Bronx
20     court clinics for 18 years; am I right?
21          A    I'll take your word for it.
22          Q    On July 23, you get an e-mail from
23     Mr. Campese going to you, Michelle McCarthy
24     and Rosalind Barrow.  First off, who's
25     Michelle McCarthy?

Page 146

1                    J. WANGEL

2          A    She was formally Mr. Campese's

3    deputy.

4          Q    And Rosalind Barrow who is she?

5          A    She also works at central office

6    labor relations deputy director.

7          Q    Now, you say, Rosalind, do you

8    have any info on this in your file, Matt,

9    right.  Who's Ms. Barrow where does he work?

10         A    She works at the central office

11   labor relations.

12         Q    Then Ms. Barrow e-mails back, "I

13   have attached the MOU, language of the

14   contract, as well as the Scott Van Orden

15   Payroll memo on the additional hours for the

16   Doctors."  You see that, right?

17         A    I do.

18         Q    And she said deputy director labor

19   relations in New York City health and

20   hospital, so that would have meant that she

21   is from the office of labor relations.  Now,

22   is this from your office, Mr. Wangel?

23         A    Again, it's been so long central

24   labor relations oversees labor for the

25   entire system although, correctional health

Page 147

1                        J. WANGEL

2      does operate somewhat independently.

3          Q    Okay.  She sends these documents

4      that she's referencing, right?  And on the

5      first one it's dated November 23, 2004, you

6      see this right?

7          A    Yes.

8          Q    Now, in this document effective

9      February 1st 2005, 130.5 hours additional

10     per year except for PCP hourly sectional.

11     HHC half hour per day if any change will

12     inform Doctors Council."  Now, she's working

13     for HHC at this point, right, Dr. Kaye,

14     right?

15               MS. CANFIELD:  Objection as to

16          form.  You can answer.

17          A    She's always been working in the

18     health and hospitals I think.  Correctional

19     health and Bellevue are health and

20     hospitals, so.

21          Q    You receive this document and it's

22     saying specifically a half hour a day.  Did

23     you read this document, Mr. Wangel?

24          A    I'm sure I did at the time.

25          Q    How are you still determining that

                                J. WANGEL

1
2       she has to take a hour lunch period if it

3       clearly says a half hour?

4            A    Can you direct me to where it

5       shows a half hour lunch.

6            Q    It says a half hour here let's go

7       further.  We can go further.

8                    MS. CANFIELD:  Can you show

9               him exactly where you're pointing?

10              Do you see where it is, Mr. Wangel?

11                   MS. HAGAN:  Sure.

12           A    I do.  I believe so effective

13      2-1-05, 130. -- hours additional per year

14      except primary care hours, etc.  And HHC an

15      extra half hour per day.  Going from 37 and

16      a half to 40 hours a week.  That's

17      referencing extra time at work.

18           Q    Do you see anything about the 37

19      and a half hours or 40 per week here?

20           A    Sure.

21                   MS. CANFIELD:  What you

22              represented I think is

23              (unintelligible.)

24           A    Right.

25           Q    Let's keep going through the rest

```
 1                    J. WANGEL
 2     of the document so that we can work together
 3     on this, okay.
 4              So, I want to draw your attention
 5     to -- let's just make sure I have this
 6     right.  I'm going to draw your attention
 7     here now to this memo this Scott Van Orden.
 8              MS. CANFIELD:  And I just want
 9          to add for the record I don't have
10          this document either in the files
11          that you sent over.
12              MS. HAGAN:  I strongly believe
13          that I sent them to you, but if I
14          have not what I will do is I will
15          send them to you again in the bulk
16          that I sent them to you in the first
17          place and I will actually make sure
18          that I direct you to the actual page
19          numbers that each of the exhibits
20          are on.  I hope that you are not
21          misrepresenting the record because I
22          am certain that I have sent them all
23          to you, but if I haven't I apologize
24          I will make sure that I have no --
25          not overlooking anything.  But I am
```

1                    J. WANGEL

2              certain that they are in that batch

3              of documents.

4    BY MS. HAGAN:

5         Q    Now, there is a memo from Mr. Van

6    Orden to the payroll managers and it's dated

7    January 8, 2005, you see that, Mr. Wangel,

8    right?

9         A    I do.

10        Q    It says the full-time annualized

11   employees the normal work week for an

12   annualized Pay Code "A" physicians and

13   dentist" which Dr. Kaye is she's a

14   physician; am I right?

15        A    From my understanding.

16        Q    So, employees now working 37 and a

17   half hours will be required to work 40

18   hours.  Employees now working 35 hours will

19   required to work 37 and a half hours per

20   week.  Primary care physicians work week

21   requirements are not changing and will

22   continue to be required to work a minimum of

23   37 and a half hours, right.  So, at the time

24   of this arrangement Dr. Kaye was working

25   9:00 a.m. to 5:30 p.m.; would you agree or

Page 151

1                        J. WANGEL

2       disagree?

3                        MS. CANFIELD:   Objection to

4             form.   You can answer.

5             A       Could you repeat the question at

6       the time of this agreement in 2005.

7             Q       At the time that you met Dr. Kaye

8       she represented to you that she had been

9       working 9:00 a.m. 530 p.m.; is that right?

10            A       When I met Dr. Kaye prior to this

11      transition taking place she was still an

12      employee at Bellevue hospital, I believe Dr.

13      Kaye was trying to make a decision about how

14      she wanted the dispute in terms of her

15      employer to be I don't think we discussed

16      her actual hours of work at that time there

17      was no conversation about 37 and a half to

18      40 or lunch period or anything like that.

19      It was driven by compensation, time, and

20      benefits.

21            Q       Would it be fair to say that a

22      9:00 to 5:00 workday would be how many

23      hours, Mr. Wangel?

24            A       You're asking me would that

25      include lunch or not?

Page 152

1                          J. WANGEL

2          Q    Let's include lunch 9:00 to 5:00

3     with lunch is what?

4          A     Physically present for eight hours

5     and an hour for lunch that's a 35 hour

6     workweek.

7          Q    I'm asking you nine to five is how

8     many hours without a lunch break?

9          A    Eight hours.

10         Q    Eight hours a day and that would

11    have meant that Dr. Kaye was originally

12    working 37 and a half hours, right?

13              MS. CANFIELD:  Objection.

14         A    I don't understand how you get to

15    37 and a half.

16         Q    Well, according to this:

17    "Employees now working 37 and a half hours

18    will be required to work 40 hour per week."

19    Right.  And if Dr. Kaye's hours were -- if

20    she was working eight and a half hours a

21    day, right, and she was taking a half hour

22    lunch she was working eight hours day?

23         A    I can't speak to Dr. Kaye's hours

24    of work in 2005.

25         Q    That's what she represented to you

Page 153

                         J. WANGEL

1

2    when she was having her discussions about

3    her workday and her workweek she's

4    representing to you that she worked an eight

5    and a half hour day with a half hour lunch

6    and that's how she got to be -- how she

7    would work the eight hour day; is that

8    right?

9              MS. CANFIELD:  Objection.

10        A    My testimony was that when I met

11   with Dr. Kaye prior to this transition we

12   did not discuss the hours worked or anything

13   related to the lunch break.

14        Q    Now, according to this document,

15   right, it's not necessarily specifying how

16   long their lunch hour has to be.  Do you see

17   anything to that effect in here?

18        A    As you scroll through now like I

19   said before, the standard lunch break, the

20   one hour regardless of 35, 37 and a half --

21        Q    When you received this document

22   did you actually adhere to the document did

23   you take it into consideration?

24        A    I'm unclear consideration of what.

25        Q    Well, apparently Dr. Kaye's

J. WANGEL

1

2    position is supported by this document and

3    it doesn't appear that it was even

4    acknowledged.  Here a CHS employee Rosalind

5    Barrow shared with you the very document

6    that Dr. Kaye referenced in her prior e-mail

7    saying that this agreement had been reached

8    and she had been adhering to it up until

9    this point and when she referenced the

10   document after everyone had asked about it

11   there had been no efforts to adhere to it.

12   Why is that?

13            MS. CANFIELD:  Objection as to

14        form.  You can answer if you're

15        able.

16        A    So, Ms. Hagan, you said yourself

17   that this document does not speak to the

18   lunch break.  So, I'm not sure adherence to

19   what, there's no language about lunch break.

20   Adherence to what part of this document.

21   The 40 hour week is what she was required to

22   work.

23        Q    She was working a 40 hour workweek

24   and if she's saying I was working 9:00 to

25   5:30, right, why must -- if she's making the

Page 155

1              J. WANGEL

2      40 hours that way, why did her hours have to

3      the change to a nine hour workweek in order

4      to accommodate CHS's standard.  You were

5      requiring -- nine hours a day?

6                  MS. CANFIELD:  Objection as to

7             form.  You can answer.

8         A     Again, I am not required Dr. Kaye

9      to work in specific schedule.  I didn't want

10     then, not my decision to make.

11        Q     Who required --

12        A     Let me answer your question.  So

13     again, eight hours worked and an hour of

14     lunch is what standard as my e-mail said

15     throughout the entire system, right.  If

16     there is an operational decision that needs

17     to be made whether or not a director or

18     somebody in charge of the unit or somebody

19     who is supervising needs to be present at

20     their work location or a supervised staff

21     who otherwise would be available for work.

22     That's an operational decision made by the

23     program.

24                  If you need to be present for nine

25     hours a day to make that happen, that's a

1            J. WANGEL

2    decision that was made by the CHS, FPECC.

3         Q    I'm going to direct your attention

4    back to the portion of the document that we

5    were discussing earlier.  Prior to this

6    document coming into effect, Dr. Kaye was on

7    an hour lunch break, right?  And according

8    to this document on February 1, 2005, then a

9    half hour a day, was added per day, which

10   means then her lunch break went from an hour

11   to a half hour.  However, way she came up

12   with getting this additional half hour, she

13   choose or whoever chose to have the half

14   hour lunch break rather than the hour lunch

15   break, why was this not added, especially

16   she had been working in this capacity for

17   over 18 years at that time and she had this

18   document that's been basically issued by her

19   union, why was that not acceptable?

20             MS. CANFIELD:  Objection.

21        Compound question.  You can answer?

22        A    So again, this document doesn't

23   reference a lunch break.  We're not talking

24   about why break was a half hour a day --

25   that's three minute of work time going from

```
 1                    J. WANGEL
 2        37 and a half to 40, right?  I can't speak
 3        for Bellevue -- of FPECC.  Someone in a
 4        position of leadership at Health and
 5        Hospitals made a decision to move the entire
 6        FPECC program to Correctional Health.
 7             Q    Who was that?
 8             A    I have no idea.  That's not my
 9        decision to make.  I wasn't involved in
10        that.  I don't know.  A decision was made to
11        move the entire FPECC program over to
12        Correctional Health.  How Correctional
13        Health chooses to manage that program, I
14        mean, it's a difference, it's different
15        leadership managing FPECC, because it
16        changed hands.
17                  So if operationally management
18        feels that the management of the staff at
19        each of the FPECC sites needs to be present
20        for the full nine hours, eight hours work a
21        day or whatever, that hour break, that's
22        management's discretion.
23             Q    And were all the directors at all
24        of the court clinics, were each of them
25        required to work nine-hour days?
```

Page 158

                          J. WANGEL

1

2        A    I don't know.  But again, there

3   are other collective bargaining agreements

4   at play here.  Right?  So we have to conform

5   with the collective bargaining with Doctors'

6   Council and Health and hospital.

7        Q    Who made the decision that Dr.

8   Kaye could not reduce her lunch hour by half

9   an hour verses having to work an extra half

10  hour a day; who made that decision?

11       A    Ultimately I actually don't know

12  or I don't recall.

13       Q    And who told you that Dr. Kaye's

14  hours had to change?

15       A    I'm not sure somebody did tell me

16  that Dr. Kaye's hours had to change.

17       Q    So how did it come to be that Dr.

18  Kaye's hours changed then?

19       A    My general recollection is that in

20  uniform across the board, Health and

21  Hospitals doctors and other titles that are

22  H&H employees, everyone takes an hour break.

23  And to make an exception here, would mean

24  others would be entitled to the same; and

25  operationally that's not feasible.

1                    J. WANGEL

2          Q     Operationally for what exactly?

3     Operationally in terms of what?

4          A     If you had every staff member who

5     shouldn't be taking an hour lunch break as

6     typically and consistent across the system.

7     Leaving a half hour early, there would not

8     be--

9          Q     Let's put this in context.  Dr.

10    Kaye worked for the court clinics, right?

11    How is her leaving at 5:00 a problem for the

12    courts?

13         A     I don't know.  That's not my

14    decision to make.  I'm not a supervisor.  I

15    don't work for FPECC.  That's not a labor

16    and relation's decision.

17         Q     Is a operational decision from Dr.

18    Kaye's supervisor?

19         A     I don't know.  I can't speak for

20    them.  I don't manage FPECC.  It's not my

21    decision to determine what's necessary for

22    the FPECC program.

23         Q     Who manages FPECC?

24         A     Today I'm not sure.  There was

25    Dr. Jain, there was Dr. Ford, Andrea Swenson

Page 160

1                    J. WANGEL

2    was an administrating manager.  Those were

3    the folks.

4         Q    So you were not necessarily

5    responsible for changing Dr. Kaye's hours

6    but you participated in, I guess, reading

7    these various documents and perhaps giving

8    your opinion as to what you believe they

9    meant; am I right?

10        A    I don't give you an opinion.  I'm

11   telling you exactly what I told them.  This

12   is the collective bargaining call this is

13   the practice throughout the system.

14        Q    Where is the collective bargaining

15   agreement that said Dr. Kaye had to take an

16   hour lunch; where is that?

17        A     It's actually not there.  That's

18   the best practice for the entire system for

19   as long as anybody can remember.

20        Q    So there's no document that says

21   Dr. Kaye has to take an hour lunch?

22                MS. CANFIELD:  Objection to

23           form.  You can answer.

24        A    Not that I'm not aware of, no.

25        Q    Okay.  I'll move on.

Page 161

1                    J. WANGEL

2          A    And there's also no document that

3     says the other 42,000 people who worked with

4     the system have to take a lunch, but they

5     do.

6          Q    Now, at some point how would

7     describe Dr. Kaye's relationship with her

8     supervisor Dr. Jain?

9          A    I wouldn't hazard to guess.

10         Q    Did Dr. Jain ever come to you to

11    complain about Dr. Kaye at any time?

12         A    To complain, no.

13         Q    Did Dr. Jain ever accuse Dr. Kaye

14    of anything to your knowledge?

15         A    I'm not aware of it.

16         Q    So you don't recall Dr. Jain ever

17    having any allegations against Dr. Kaye

18    during the course of your employment?

19              MS. CANFIELD:   Objection as to

20         form.   You can answer.

21         A    Dr. Jain having accusations

22    against Dr. Kaye, you said?

23         Q    Yes.

24         A    Not that I recall.

25         Q    So I'm going to show you what is

Page 162

1                      J. WANGEL

2       to be marked Plaintiff's Exhibit 16.  For

3       purposes of the record Plaintiff's Exhibit

4       16 bears the Bates stamp series NYC_1060 to

5       NYC_1061.

6                      (Whereupon, Email

7                      (NYC_1060-1061) was marked as

8                      Plaintiff's Exhibit 16 for

9                      identification as of this date.)

10           Q    I'm going to start at the

11      beginning of the thread, as I had before.  I

12      think you should be seeing now NYC_1060 and

13      NYC_1061.  Do you see that?  Do you see sent

14      from my IPhone right now at the bottom of

15      the page?

16               MS. CANFIELD:  Yes.

17           Q    So it's an e-mail from Dr. Jain

18      to, I guess -- first, it's an e-mail from

19      Dr. Jain.  It says, may be better in person

20      or over the phone.  I'm free -- let me start

21      from the beginning.  I'm sorry.

22               So it starts from Dr. Jain at the

23      bottom of, in the middle of NYC_1061.  It

24      says:  Hi, Elizabeth I'm letting you know I

25      am in the Bronx court clinic.  I am told

Page 163

1                    J. WANGEL

2      that Dr. Kaye has handwritten notes out of

3      the charts and has them in her possession.

4      They are no longer in the charts and we

5      cannot find them.  We can discuss more

6      tomorrow.  Beesh.

7                    Do you recall this on December 20,

8      2018?  Do you recall any of this, Mr.

9      Wangel?

10          A    I don't believe so.

11          Q    So then Dr. Ford says, "thanks,

12     Beesh.  Who else is aware of this?"  Right?

13     Then Dr. Jain says, "maybe better in person

14     or over the phone.  I'm free now, but okay

15     also for when we meet tomorrow."  Then Dr.

16     Jain responds:  We looked again and cannot

17     locate them according to Lucrecia some of

18     the charts were pulled on November 18 and

19     there were subsequent charts as well."

20                    Now, at any point did it come to

21     your attention that Dr. Kaye accused Dr.

22     Jain of destroying his handwritten notes?

23          A    I'm sorry, destroy the notes?

24          Q    Did Dr. Jain himself destroy his

25     notes?

1                    J. WANGEL

2        A    Not that I recall.

3        Q    So you never heard any discussion

4    from either Dr. Jain or Dr. Kaye about the

5    destruction of handwritten notes in the

6    client's file?

7              MS. CANFIELD:  Objection.  You

8         can answer.

9        A    I'm trying to remember.  Again,

10   it's a while back.  As you scroll I'm trying

11   to remember the details, if I spoke with JW.

12   I'm trying to remember.  We spoke to, papers

13   were filed.  I don't recall.

14       Q    She's asking for specifics and she

15   felt like that would be more helpful.  Then

16   Dr. Jain describes it.  There were at least

17   ten files involved and then ten files

18   involved.  Is that enough for you or should

19   we scroll up even more?

20             MS. CANFIELD:  Objection.  For

21        what?

22       Q    Well, this is actually an exchange

23   between Dr. Ford and Mr. Wangel.  So she

24   sent him this thread to bring him up to

25   speed, so I guess she could obtain advice.

```
1                    J. WANGEL

2       Would that be accurate, Mr. Wangel?

3            A    All I know is she sent it to me.

4       The purpose of why she sent it, I can't

5       speak to it.  Trying to recall the details

6       here.

7                    MS. CANFIELD:  This e-mail

8               doesn't say Dr. Kaye accused Dr.

9               Jain of --

10                   MS. HAGAN:  I'm going to stop

11              you because you're testifying on --

12                   MS. CANFIELD:  I'm just saying

13              that she's saying that Dr. Kaye

14              maybe took the notes.

15                   MS. HAGAN:  I asked him that,

16              and again I would ask --

17           A    That's why I'm asking for

18      clarification.  I already testified that I'm

19      not aware of the destruction of files.  I

20      was asking to scroll.  I get the fact, the

21      e-mail, but I don't recall anything about

22      these files.

23           Q    Now, at any point now Dr. Kaye

24      also alleges that she was subject to she

25      felt that -- she's concerned about fishing
```

Page 166

1                    J. WANGEL

2      emails.  Do you recall?

3           A    Dr. Kaye was concerned about

4      fishing emails?

5           Q    Yes.

6           A    I think I need a little bit more

7      context.  Again, this is a while back so.

8           Q    At some point there was a series

9      of emails that were exchanged with Dr. Kaye

10     and staff about emails that she received

11     from a Teleakie (phonetic) Parker.  Do you

12     recall who that is?

13          A    I don't recall.

14          Q    Do you recall any e-mails that Dr.

15     Kaye may have sent showing concern that her

16     credentialing information, Social Security

17     number, that stuff was being sought out of

18     nowhere?

19          A    Yeah.  I think there was a while

20     back, if I remember the details.  I believe

21     central office HR had messaged a large group

22     of the staff related to a credentialing

23     issue of some sort.  I think there was a

24     concern of who spoke to.  It was a

25     legitimate purpose.

Page 167

1                    J. WANGEL

2          Q    So was this some kind of project

3     per se?

4          A    I mean it's an HR function.  I

5     think HR is required to keep everybody up to

6     date as far as credentialing.  It's just a

7     function of HR if I remember, there was some

8     concern about who and why they are asking.

9          Q    Did any of the other center

10    directors receive an e-mail as part of this

11    initiative; do you recall?

12         A    All I can say I believe it was

13    initiative that involved clinical staff.  I

14    can't speak who did -- I really wasn't

15    involved in the project.

16         Q    It involved clinical staff?

17              MS. CANFIELD:  Can you put an

18          objection before.  I got it out.  I

19          don't know if anyone heard me.

20         Q    And you said it involved clinical

21    staff; is that right?

22         A    Credentialing clinical staff,

23    yeah.

24         Q    So I want to kind of go through a

25    discussion of this fishing, of Dr. Kaye's

Page 168

                              J. WANGEL

1

2      concern about fishing emails.

3                 I'm going to first draw your

4      attention to what will be marked as

5      Plaintiff's Exhibit 17.

6                         (Whereupon, Payroll Audit Report

7                         (NYC_2159-2161) was marked as

8                         Plaintiff's Exhibit 17 for

9                         identification as of this date.)

10         Q     For purposes of the record exhibit

11     17 bears the Bates stamp series NYC_2159,

12     2160, 2161.  Let me just make sure I share

13     the screen.

14                 You should be looking at the

15     bottom of the Correctional Health

16     services -- you should see Health and

17     Hospitals corporation; Do you see that?

18         A     HR payroll audit report.

19         Q     Has there been any other audit

20     reports exercises prior to this exercise to

21     your knowledge, Mr. Wangel?

22                 MS. CANFIELD:  Objection as to

23                 form.  Can we see the whole email

24                 again.  I don't have this one in my

25                 batch.

1                      J. WANGEL

2            MS. HAGAN:  You have it

3        actually.  This is Defendant's

4        production.  I'm going to have to

5        look through the documents because I

6        did send you 125 pages worth of

7        exhibits this morning.  I think

8        that's actually consistent with the

9        number of pages that was produced

10       for today.  If there is a

11       discrepancy, it seems you don't have

12       any of the exhibits and that can't

13       be true.

14            MS. CANFIELD:  It's 165 pages.

15            MS. HAGAN:  It should

16       certainly should be there, but if

17       it's not, I will get them to you.

18       If it's there, I will direct you to

19       the pages accordingly as to where

20       they are.  I apologize for any

21       inconvenience, Ms. Canfield.  I'll

22       be sure to make sure that we get

23       this right.  I apologize.

24       Q    So now, NYC_2159 through 2161,

25   right.  And the bottom page is the Health

Page 170

1                           J. WANGEL

2       and Hospital audit report.

3                    Now, I'm asking, Mr. Wangel, had

4       there ever been an occasion prior to this

5       exercise that CHS to your knowledge had

6       engaged in any other exercise to this

7       effect?

8                    MS. CANFIELD:  Objection.  You

9              can answer.

10         A    So first of all, I'm not even sure

11      what this is related to.  It doesn't have

12      anybody's name or I'm not even sure what

13      this is.  I'm not sure why you're calling it

14      an exercise.

15         Q    Have you seen one of these before?

16         A    I'm sure.  Looks like a standard

17      mainframe-type printout.

18         Q    For the purposes of the record so

19      that's it's clear, it says, Health and

20      Hospital Corporation HR payroll audit

21      report.  You see that, right?

22         A    I see the title.

23         Q    It says the business unit

24      Correctional Health services.  I'm going to

25      ask you in your capacity, have you ever seen

Page 171

1                              J. WANGEL

2       an HR payroll audit report?

3                     MS. CANFIELD:  Is this the

4             full document.

5            Q    I'm asking in general.  I'm not

6       asking you for the whole document.

7            A    I mean there's a whole bunch of

8       different audits that are conducted.  I

9       can't tell you what information was related

10      to who and for what period of time.  I just

11      don't know what this is and why --

12           Q    These are reports generated by a

13      system.

14           A    I don't recall the specific

15      purpose of this document.

16           Q    I'm just asking you if you've seen

17      any report of this nature before.  I'm not

18      saying this report.  I'm asking you --

19           A    You're showing me one quarter of a

20      page.  I don't recall what this is.

21           Q    I'm asking you are these reports

22      generated by Health and Hospitals, Mr.

23      Wangel?

24                     MS. CANFIELD:  Objection.

25           A    I would they are.  Obviously from

Page 172

```
 1                      J. WANGEL
 2      the Health and Hospitals system, but I don't
 3      know if they are generated from Health and
 4      Hospital.
 5           Q    I'm asking have you ever seen one
 6      before?  I'm going to scroll up.  Counsel
 7      felt the need to --
 8           A    Obviously this is Dr. Kaye.
 9           Q    Okay, right.  So here we have her
10      title.  Her paid leave of absence, any
11      number of things, position number, effective
12      status date.
13           A    Okay.
14           Q    Et cetera, right?
15           A    Right.
16           Q    Now, looking at page one and page
17      two of this particular report for Dr. Kaye.
18      I'm not sure who these other employees are.
19      Have you ever seen one of these before?
20           A    I can't recall seeing this
21      document before.  I may have, but I don't
22      recall seeing it.
23           Q    I'm not saying this document for
24      any report similar to this, any other HR
25      payroll audit reports, have you ever seen
```

Page 173

1                          J. WANGEL

2        any of them before?

3             A    One, I'm not sure what an HR audit

4        report is.  I think it's titled audit

5        report.  I'm not sure what it's auditing.

6        I'm not exactly sure of the purpose.  I

7        can't say that I've seen this particular

8        report before.

9             Q    Did you know that Dr. Kaye was

10       part of an audit report exercise at any

11       given point?

12            A    I don't recall.

13                 MS. CANFIELD:  Objection as to

14          form.

15            Q    So then the CHS personnel actions,

16       is this some kind of mail group?  And, if

17       so, who presides over the mail group?

18            A    I guess personnel actions is HR

19       mailbox.  Copy, me, Laboy.

20            Q    Nos, who would send an e-mail that

21       says:  Hi, attached you will find supporting

22       documents for HR payroll audit report

23       October 30.  Kindly let us know if you have

24       any questions.  Thanks, Ali."

25                 Who's Ali?

Page 174

1                     J. WANGEL

2        A    Ali, she works for human

3    resources.

4        Q    She works for human resources,

5    right?

6             Now this Dr. Y, who's signature do

7    you know that to be?

8                  MS. CANFIELD:  Objection as to

9           form.  You can answer.

10       A    I actually don't know.  I've never

11   seen that particular before.

12       Q    Have you seen Dr. Yang ever sign

13   her name that way before?

14       A    I don't believe so, no.

15       Q    So you're not sure if it is her or

16   not?

17                  MS. CANFIELD:  Objection as to

18          form.  You can answer.

19       A    I believe I already did -- no, I

20   don't recognize that as Dr. Yang's

21   signature.

22       Q    But you can't say if it is or not.

23   You can't say if that's Dr. Yang's signature

24   or someone else's; am I right?

25       A    I don't know who's signature that

1                           J. WANGEL

2       is.

3            Q    Have you seen this report now that

4       we've reviewed it together?

5            A    Honestly, I was copied on it and

6       whoever called why it was run or who ran it

7       or for what purpose, no.

8                     MS. CANFIELD:  I'm going to

9                make sure you give me a chance to

10               object, okay.

11                    THE WITNESS:  Sure.

12           Q    I'm going to respectfully ask you.

13      Dr. Kaye had some concerns, very serious

14      concerns about being subject to fishing

15      types of emails where her identity had been

16      stolen in the past.  Do you recall those

17      conversations or any emails to that effect?

18                    MS. CANFIELD:  Objection as to

19               form. You can answer.

20           A    Only with regard to what you said

21      previously about credentialing.  I remember

22      it being part of that coming to my attention

23      in that context.

24           Q    Right.  And did anyone simply tell

25      Dr. Kaye that there was an exercise being

1                    J. WANGEL

2     done by random employees in which to review

3     their credentials?

4                    MS. CANFIELD:  Objection to

5              form.  You can answer.

6          A    I can't speak to what anybody else

7     says to Dr. Kaye.  I think I recall

8     communicating with multiple unions.  There

9     was a concern from a number staff related to

10    the union that it was, in fact, a legitimate

11    business purpose.

12         Q    Did anyone actually tell Dr. Kaye

13    that this is being done?

14         A    I can only speak to myself, and I

15    don't recall if I did or didn't.

16         Q    Why not?

17         A    Why not?  Why don't I remember?

18         Q    You don't have any reason why

19    you -- you don't remember even having an

20    exchange with Dr. Kaye; am I right?

21         A    That's correct.  And I'll tell you

22    typically a vast, vast, vast majority of the

23    time unless a unionized staff member reaches

24    out to me, I don't want to communicate with

25    staff without a union rep.  So if Dr. Kaye

1               J. WANGEL

2       has concerns, I would want her union to be

3       part of the conversation at least know

4       what's going.  Not to say that these

5       concerns aren't addressed.  But there's

6       comes a point the union should be there.  I

7       was communicating with multiple -- on

8       multiple fronts related to this issue.

9       There was a concern with a number of staff

10      and a number of different --

11          Q   What I'm going to do is I'm going

12      to show you what's going to be marked as

13      Plaintiff's Exhibit 18.  Plaintiff's Exhibit

14      18 bears Bates stamp series NYC_2629,

15      NYC_2630.  I'm going to show you the

16      beginning of the document.

17                      (Whereupon, Email

18                      (NYC_2629-2630) was marked as

19                      Plaintiff's Exhibit 18 for

20                      identification as of this date.)

21          Q   Now, before we get into the body

22      of it.  It says it's from Teleakie Parker,

23      assistant coordinating manager of

24      operations, right?  Where would operations

25      fall into the purview of your departments

Page 178

```
 1                    J. WANGEL
 2    over at CHS?
 3         A    It's separate and apart from
 4    labor, but I believe Ms. Parker she did work
 5    for operations at some point.  Now, I'm not
 6    sure if HR was asking operations folks to
 7    help with this.  I don't know.  Operations
 8    is separate and apart from labor.
 9         Q    At some point Dr. Kaye was told
10    that she was part of the project.  Would you
11    agree or was --
12               MS. CANFIELD:  Objection.  No
13          foundation.  You can answer.
14         Q    Would you agree from what you've
15    seen so far that Dr. Kaye was part of the
16    project?
17               MS. CANFIELD:  Objection.
18         A    Part of the project?
19         Q    Yes or no.  What was Dr. Kaye part
20    of the project?
21               MS. CANFIELD:  Objection as to
22          form.  No foundation.  Go ahead.
23         A    I wouldn't call it a project.  I
24    say that it's a requirement that certain
25    titles performing certain functions would be
```

1                    J. WANGEL

2    credentialing.

3          Q    So, Ms. Parker reaches out Dr.

4    Kaye and on March 7, 2019.  You see that,

5    right?

6          A    (No verbal response given.)

7          Q    And she ask for a list of required

8    documents that she must complete and submit.

9    You see this, right?

10         A    I do.

11         Q    And she says she has to do so by

12   March 11, 2019.  You see that, right?

13         A    I do.  It says please submit

14   before.

15         Q    And the e-mail on March 7 at

16   11:03 a.m., you see that?  So she has about

17   two business days to get all this stuff

18   together, right?

19              If the e-mail is sent on Thursday,

20   Mr. Wangel, and she only has 'til Monday,

21   how many business days does that give her?

22   It list at least one, two, three, four,

23   five, six, seven, eight, nine, ten, eleven

24   documents.

25         A    Two and a half.

Page 180

                              J. WANGEL

1

2          Q     Maybe two and a half business days

3     at best, right?

4          A     Are you asking me?

5          Q     Asking you.  I'm trying to

6     understand.

7          A     I can never tell.  Sometimes you

8     at the end of the question you say right and

9     you move on; sometimes you wait for a

10    response.  It's hard to know when you're

11    asking me for an answer.

12         Q     I'm working on that.  I'm going to

13    work on that.

14         A     I'm trying to figure out when I'm

15    suppose to answer that.  Yeah, two and a

16    half days.

17         Q     Two and a half business days.  So

18    then Dr. Kaye responds to Ms. Parker she's a

19    credential physician at H&H and has been

20    since 1999.  On July 1 the management of my

21    department was moved from Bellevue to

22    Correctional Health Services, both of which

23    are under auspice H&H.  Right?  And we were

24    told that the credentialing status of

25    Bellevue court clinics employees would roll

Page 181

1                         J. WANGEL

2      over to CHS.  I was never informed that I

3      would be required to re-credential at CHS.

4                  Is this true?

5           A    I don't know.  I see that I'm

6      copied on this e-mail, but labor relations

7      is not involved in any way in credentialing

8      or re-credentialing.

9           Q    I'm asking you if is it's true to

10     carry over from what you understood.

11          A    I never had a conversation or made

12     aware of it was happening.  I can speak

13     generally that credentialing and

14     re-credentialing happens all the time.  I

15     can't imagine that if you were credentialing

16     once it carries on to your entire duration

17     of employment with your employer.  I don't

18     know anything specific about was told to

19     staff in regards to the transition here.

20          Q    Mr. Wangel, you've been working

21     now at H&H and CHS and whatever other entity

22     is affiliated with this organization for a

23     group of doctors and physicians for sometime

24     now, at least since 2015.  I think you

25     probably know at this point that doctors

Page 182

```
 1                    J. WANGEL
 2    probably get re-credentialed every ten
 3    years; would that be accurate?
 4              MS. CANFIELD:  Objection as to
 5         form.  You can answer.
 6         A    Again, labor is not responsible
 7    for credentialing, and I am not familiar
 8    with the rules.
 9         Q    Did you know, yes or no, that
10    doctors were re-credentialed every ten
11    years?
12         A    No.
13         Q    You're not really that familiar
14    with the credentialing process; am I right?
15         A    I know a little bit.
16         Q    At any point did you represent to
17    Dr. Kaye or anyone else if they had
18    recurrent credentials at Bellevue that those
19    current credentials would then be
20    transferred over to CHS?
21         A    I don't recall having any
22    conversation about believe it or not whether
23    or not another facilities credentialing
24    process or verified credential carried over
25    to CHS.
```

Page 183

1                         J. WANGEL

2          Q    I'm going to ask you, were any

3     doctors told that they would have to

4     re-credential upon the transfer to CHS?

5                    MS. CANFIELD:  Objection as to

6               form.  You can answer.

7          A    I can only speak for myself.

8     Again, I'm not aware of those conversations.

9     It's not part of any function.  I was not

10    part of any conversation or made aware of

11    what was told instead.

12         Q    Who would have had those

13    conversations with Dr. Kaye?

14         A    I don't know whether it would have

15    been the former Bellevue.  There's a whole

16    credentialing unit for the system.  I think

17    it's handled centrally now.  HR was clearly

18    involved here because something had happened

19    and they were asking for documents --

20    re-credentialed as appropriate.  So HR

21    handles that function for CHS.

22         Q    Who's Wilma Soto?

23         A    She's the director of human

24    resources I believe.

25         Q    Did you send this e-mail direct to

Page 184

1                         J. WANGEL

2      Wilma Soto; am I right?  That's what it says

3      here, right?

4                    MS. CANFIELD:  Objection.

5                Documents speaks for itself.

6           Q    Yes or no, did you send the e-mail

7      to Wilma Soto?

8           A    What you're showing me, yes.  It

9      shows I sent the e-mail to Ms. Soto.

10          Q    Did you followup with Ms. Soto

11     after this?

12          A    I don't recall what the follow up

13     was.  I could have.  I don't recall

14     specifically.

15          Q    Mr. Wangel, I'm certain you would

16     agree with me that potentially having your

17     ID, your Social Security number and birth

18     date used for improper purposes can be of a

19     grave concern to anyone; am I right?

20          A    Sure.

21          Q    And so being in your position and

22     having spoken to Dr. Kaye about the

23     transition, wouldn't it have been of

24     interest to you for her or anyone else in

25     her position that there's this initiative

```
 1                      J. WANGEL

 2     and she shouldn't worry that it's not some

 3     kind of like issue.  It's not some kind of

 4     like nefarious effort by anyone?

 5               MS. CANFIELD:  Objection as to

 6          form.  You can answer.

 7          A    The question is whether or not I

 8     think somebody should have told Dr. Kaye

 9     that it was for a legitimate business

10     purpose?

11          Q    Yes.

12          A    I believe those conversations were

13     happening on a wide scale.  This went well

14     beyond Dr. Kaye's situation.  Again, there

15     was a whole host of staff who had concerns

16     about this and timeframe.  I think

17     ultimately there were some adjudgments made

18     as to the timeframe and the latitude people

19     were given to provide documentation that

20     need to be re-credentialed.

21               I understand the concerns for sure

22     and that was conveyed to all the staff or by

23     the union or by HR who had conversations

24     with the staff.

25          Q    I'm going to ask you, Mr. Wangel,
```

Page 186

1                           J. WANGEL

2       did you see fit at any given time to speak

3       to Dr. Kaye about the fact that there was a

4       legitimate business purpose allegedly for

5       this re-credentialing exercise?

6                    MS. CANFIELD:  Objection as to

7                form. You can answer.

8       A     You're asking whether I felt I

9       should personally reach out to Dr. Kaye or

10      whether someone should reach out to Dr.

11      Kaye?

12      Q     Well, you delegate to someone else

13      maybe you actually do so in writing so Dr.

14      Kaye would at least know --

15      A     Honestly, I had conversations with

16      HR because HR knew I was having

17      conversations.  There was a very big concern

18      and I was forwarding Dr. Kaye's concern to

19      Ms. Soto, who works for HR and works with

20      credentialing.

21      Q     I'm going to enter into the record

22      Plaintiff's Exhibit 19.  Right?  Plaintiff's

23      Exhibit 19 bears the Bates stamp series

24      NYC_3004, 3005, 3006, 3007 and 3008, right?

25                    (Whereupon, Email

Page 187

```
 1                      J. WANGEL
 2                      (NYC_3004-3008) was marked as
 3                      Plaintiff's Exhibit 19 for
 4                      identification as of this date.)
 5              Now, I'm going bring your
 6      attention to a portion of the e-mail where
 7      Dr. Kaye explains her position as to why
 8      she's adamant --
 9                      MS. HAGAN:  Does someone have
10              a dog in the background?
11                      THE WITNESS:  Yeah, I do.  I'm
12              sorry about that.
13         Q    In the e-mail from Dr. Kaye to, I
14      guess, spamadmin, why did Dr. Kaye's e-mail
15      go to spam.  Do you know?
16                      MS. CANFIELD:  Objection as to
17              form.  You can answer.
18         A    It appears that's who she sent it
19      to.
20         Q    Okay, well, I don't know.  It's
21      dated March 11, 2019.  It says, to whom it
22      may concern, I have been a physician at HHC
23      for two decades.  I was hired in 1999.  I
24      was a victim of identity theft(inaudible).
25         A    I see what you're saying.
```

Page 188

1                    J. WANGEL

2          Q     "The detective who investigated my

3     case at the time determined that it was

4     probable that this breech occurred during my

5     initial HHC credentialing process.

6     Following this negative experience I am

7     vigilant in my efforts to protect against

8     the misuse of my personal data."  Right?

9     "My department was transferred from Bellevue

10    hospital to Correctional Health Services

11    July 1st, 2018.  Since that time, I have

12    been subjected to repeated privacy

13    violations.  With each occurrence I

14    attempted to address the violation and was

15    assured on two occasions, incorrectly, that

16    the problem had been resolved."

17               Do you recall any of this?

18               MS. CANFIELD:  Objection as

19          form you can .

20          A     Generally.  I don't recall Dr.

21    Kaye's e-mail specifically to spamadmin,

22    which is an It box.  You think you're

23    getting something in your e-mail from an

24    outside any type of spam-related thing.

25    They typically block those types of

1                          J. WANGEL

2       messages.

3            Q    Further from some time away Dr.

4       Ford go to it, and she sent it to Ms. Laboy

5       who then CC's you.  Right?  This is on

6       July 2, 2019.  So at some so point it makes

7       it out of the spam.  And Dr. Ford then

8       emails both of you.  She says please send me

9       whatever resolution you have for this.

10           A    She didn't e-mail me.  I was

11      copied.  She emailed HR.

12           Q    Right.  You're copied and so is

13      Wilma Soto and Jessica Laboy.

14           A    It's to Jessica and me as a CC.

15           Q    Why would she CC you?  I'm just

16      curious.

17                MS. CANFIELD:  Objection.

18           A    I can't speak to why I'm copied on

19      the e-mail.

20                MS. CANFIELD:  Objection.

21                Jonathan, make sure you pause

22           please.

23                THE WITNESS:  Sorry.

24           Q    Then Ms.  Laboy continues CCing

25      you.  Then again Dr. Ford goes from CCing

```
 1                    J. WANGEL

 2        you to actually addressing it to you.  She

 3        says, who should I direct Melissa to speak

 4        to in Doctors' Council.  And Ms. Laboy

 5        answers, Kevin, right?  I guess she seeks

 6        additional guidance from Ms. Kent.

 7                 Did you have any further dealings

 8        or any further involvement in this issue

 9        with Dr. Kaye in fishing --

10        A    No.  I can tell you at the time --

11        this is July 2019 -- I was basically tying

12        up certain business at Correctional Health.

13        I actually was there just to close out

14        certain things, this not being one of those

15        items.  I was already transitioning to the

16        new position at that point.

17        Q    So I'm going to ask you now about

18        some questions that are involved, that

19        involved the Dr. Kaye's reporting of a 730

20        exam.

21        A    You can keep talking.  I hear you.

22        Q    So I'm going to ask you some

23        questions that involve Dr. Kaye's recording

24        of a 730 examination.  Do you remember any

25        of those of what happened?
```

1              J. WANGEL

2              MS. CANFIELD:  Objection.

3         A    I recall some of the circumstance,

4    yes.

5         Q    What do you recall?  Let's start

6    with that.

7         A    I recall that there was an

8    instance where Dr. Ford became aware of

9    reviewing the transcripts that Dr. Kaye was

10   recording certain proceedings on a personal

11   device of the notes to the Court and there

12   were others taking part in the hearing.

13        Q    First and foremost, let's kind of

14   put this into context.  How familiar are you

15   with 730 examinations from this point?

16        A    Not very.

17        Q    You're very familiar with them?

18        A    I said not very.

19        Q    Where does 730 examinations take

20   place?

21        A    Where did it take place?

22        Q    Where did it typically take place?

23   Where?

24              MS. CANFIELD:  Objection as to

25         form.  You can answer.

```
 1                    J. WANGEL
 2        A    I believe Dr. Kaye's place of
 3    business in the court clinics.
 4        Q    We're not talking about a hearing.
 5    We're talking about the examinations.  To
 6    your understanding what is a 730
 7    examination, Mr. Wangel?
 8              MS. CANFIELD:  Objection as to
 9         form.  You can answer.  He said he
10         wasn't that familiar, so.
11              MS. HAGAN:  I think you're
12         prompting the witness.
13        A    Yeah.
14        Q    To your knowledge, Mr. Wangel,
15    what is a 730 examination?
16        A    I believe it has to do with
17    fitness to stand trial.
18        Q    Would you say that the 730
19    examination process for forensic psychiatry
20    is distinct from treatment?
21              MS. CANFIELD:  Objection as to
22         form.  You can answer.
23        A    I can't speak to the area of
24    the -- I don't know.  It's not my area of
25    expertise.  I have no idea.
```

```
1                    J. WANGEL

2        Q    At some point you made a

3   determination that Dr. Kaye should not have

4   recorded the examinations she conducted; am

5   I right?

6             MS. CANFIELD:  Objection.

7        A    Sorry.  Yeah, I noticed, and -- no

8   that is not correct.

9        Q    Who made the determination you

10  should not record the examination?

11            MS. CANFIELD:  Objection.

12       A    So the issue itself was sent to

13  corporate compliance for a determination.

14  That's what corporate compliance does.

15       Q    Who sent it to corporate

16  compliance, Mr. Wangel?

17       A    I believe I did.

18       Q    Why did you send it corporate

19  compliance?

20       A    Because it's not a labor relations

21  determination to make.

22       Q    Did Ms. Yang tell you to send it

23  to corporate compliance?

24       A    We definitely discussed it, and

25  then I think jointly we decided that was the
```

```
 1                    J. WANGEL
 2     appropriate remedy to -- whether or not it
 3     was appropriate.
 4          Q    So you and Ms. Yang determined
 5     that you should send, I guess, the matter to
 6     corporate compliance.
 7               Now, Mr. Wangel, how did you come
 8     to learn that Dr. Kaye recorded the
 9     examination?
10               MS. CANFIELD:  Asked and
11          answered.  You can answer it again.
12          A    I believe Dr. Ford brought it to
13     my attention.
14          Q    Who?
15          A    Dr. Ford.
16          Q    Dr. Ford.
17               Dr. Ford contacted you and told
18     you that Dr. Kaye had recorded an
19     examination.  Do you recall when that
20     conversation took place?
21          A    I don't remember the exact timing.
22          Q    She emailed you?
23          A    I'm sure she did.
24          Q    And how did she, I guess,
25     substantiate or support her claim that --
```

```
 1                        J. WANGEL
 2              MS. CANFIELD:  Objection.
 3              COURT REPORTER:  Can you
 4          repeat that.
 5         Q    How did Dr. Ford support her claim
 6    or back up her claim that Dr. Kaye had
 7    recorded the examination?
 8         A    To my understanding, if my
 9    recollection is correct that in her -- I
10    can't speak to her what she does, her
11    day-to-day clinical work in the course of
12    business at H&H.  I think she was reviewing
13    the transcript and was actually in the court
14    transcript that Dr. Kaye had testified she
15    recorded it.
16         Q    I mean you're an attorney, Mr.
17    Wangel, right?
18         A    That's correct.
19         Q    So for Dr. Ford to be reviewing a
20    transcript of what, of a court hearing.  Do
21    you recall what it was?
22              MS. CANFIELD:  Objection to
23          form. You can answer.
24         A    I don't recall.
25         Q    Did you read the transcript
```

```
 1                    J. WANGEL

 2     yourself, Mr. Wangel?

 3          A    I believe at the time I did.

 4          Q    Do you remember that Dr. Kaye was

 5     testifying at the controverting hearing?

 6          A    I don't recall that.

 7          Q    Do you know what a controverting

 8     hearing is?

 9          A    I don't.

10          Q    So you're reading a transcript,

11     you're not sure why Dr. Kaye was testifying

12     or the context at which she was testifying.

13     But Dr. Ford brings this to your attention,

14     and you read this transcript; am I right?

15          A    I read the portion that was

16     relevant to the recording.

17          Q    You read a portion of the

18     transcript.  You didn't read the entire

19     controversion hearing transcript; am I

20     right?

21               MS. CANFIELD:  Objection as to

22          form.  You can answer.

23          A    I'd say that's accurate.

24          Q    You don't know if any person who

25     engaged in evaluations or examinations had
```

Page 197

 1                         J. WANGEL

 2      actually recorded the inmate or defendant in

 3      that instance?

 4                  MS. CANFIELD:  Objection as to

 5              form.  You can answer.

 6           A    If I was aware who recorded?

 7           Q    First off, do you know if anyone

 8      else testified besides Dr. Kaye that day?

 9                  MS. CANFIELD:  Objection as to

10              form.  You can answer.

11           A    I don't recall I definitely read a

12      portion of the transcript.  I can't say that

13      I read the entire thing.  I read the portion

14      that was relevant to the recording.

15           Q    Did you know that there were two

16      other people who actually testified at the

17      controversion hearing?

18           A    I don't recall.

19           Q    Did you read that Dr. Winkler

20      testified at any point?

21           A    I don't recall.

22           Q    Dr. Nicole Charter testified at

23      the contoversion hearing.

24                  MS. CANFIELD:  Objection.

25           A    I don't recall.

1                    J. WANGEL

2        Q    Did at any point did it come to

3    your attention that Dr. Charter actually

4    recorded her examination?

5             MS. CANFIELD:  Objection.

6          Assumes facts.  You can answer.

7        A    I don't recall.

8        Q    So, Mr. Wangel, you made a

9    determination with Ms. Yang that what was

10   brought to your attention by Dr. Ford needed

11   to be referred to corporate compliance; is

12   that right?

13            MS. CANFIELD:  Objection.

14       A    Can you just repeat the whole

15   question.  Say it again.

16       Q    At some point you and Ms. yang

17   came to the determination that Dr. Kaye's

18   recording of one examination should be

19   brought to corporate compliance, right?

20            MS. CANFIELD:  Objection as to

21          form.  You can answer.

22       A    So the head, the chief of the

23   mental health service and the head of

24   Correctional Health had concerns.  It was

25   not an appropriate topic for labor and

1                           J. WANGEL

2       relations to investigate and we sent it to

3       corporate compliance, which is an entity

4       that's outside of Correctional Health.  And

5       that is what the corporate compliance office

6       does.  They make an examination of whether

7       something was appropriate or not.

8             Q    I'm going to ask you something.

9       Was there a policy, a written policy against

10      recording at the time that this referral was

11      made to the corporate compliance department?

12            A    I don't believe so.

13            Q    So why was a determination made to

14      defer the matter to corporate compliance if

15      there had been no policy in place to begin

16      with?

17            A    There's not a policy on every

18      subject; otherwise we'd have a huge number

19      of policies.  So in this case it seemed as

20      if the conduct at least raised some concerns

21      at the very least, and it was coming to me

22      from the highest folks in the mental health.

23      And the decision was made to send the issue

24      to corporate compliance.

25            Q    At any point did you reference any

Page 200

```
 1                          J. WANGEL
 2      materials to bolster or support or to guide
 3      Ms. Yang or Dr. Ford in their assessment of
 4      the situation, since there was no policy
 5      that CHS had in place?
 6                    MS. CANFIELD:  Objection as to
 7               form.  You can answer you .
 8           A    Not exactly sure what you mean.
 9           Q    Well, for example, CHS never had a
10      policy against recording examinations in
11      place; am I right?
12                    MS. CANFIELD:  Objection as to
13               form.  You can answer.
14           A    Yes.  That was my attorney.
15           Q    And you're an attorney and you
16      know that New York is a one-party recording
17      state; am I right?
18                    MS. CANFIELD:  Objection as to
19               form.  You can answer.
20           A    I'm an attorney.
21           Q    Your an attorney, but did you know
22      that New York State is a one-party recording
23      state?
24                    MS. CANFIELD:  Objection.
25           A    Generally.  But I'm not a privacy
```

```
 1                        J. WANGEL
 2    lawyer.  I don't know if there are other
 3    situations where it might not be appropriate
 4    to record.
 5         Q    During the course of this exercise
 6    did you do any research whatsoever in order
 7    to make an informed assessment as to whether
 8    Dr. Kaye engaged in inappropriate conduct?
 9                   MS. CANFIELD:  Objection as to
10              form.  You can answer.
11         A    Like I said the issue was sent to
12    corporate compliance.  That's their job.
13    It's not my job to do that.
14         Q    I'm going to show you some
15    exhibits.
16              If it wasn't your job, Mr. Wangel,
17    I'm surprised you were reading the
18    transcript to begin with.  Why was that?
19                   MS. CANFIELD:  Objection.
20              It's argumentative, but you can
21              answer.
22         A    By the head of the mental health
23    service who had some concerns, and it's
24    difficult to know how to respond to that
25    without reading what was said.
```

1                         J. WANGEL

2         Q    Couldn't you have said at some

3    point at the beginning of the exchange, it's

4    not my purview, Ms. Yang, I think you should

5    do something different?

6                   MS. CANFIELD:  Objection as to

7              form.  You can answer.

8         A    Ms. Yang or Ms. Ford?

9         Q    It was Dr. Ford and Ms. Yang.

10   First Dr. Ford approached you; am I right?

11        A    I believe that's correct.  I think

12   she did reach out.

13        Q    At that point couldn't you have

14   said, hey, Dr. Ford, I don't think this is

15   in my scope, my work area.  I don't really

16   know too much about this process and this

17   doesn't seem like something that would be

18   under my purview, right?

19                   MS. CANFIELD:  Objection.  You

20             can answer.

21        A    That was the ultimate decision

22   that was made.  That's what happened.

23        Q    Actually it's not in writing

24   that's what happened.  Instead something

25   else transpired in writing.  Let's look at

```
 1                        J. WANGEL
 2      that.
 3                 Let's go into Plaintiff's Exhibit
 4      20.  Right?  Plaintiff's Exhibit 20, let's
 5      start at the bottom.  And it's an e-mail
 6      from you --
 7                        (Whereupon, Email
 8                        (NYC_2688-2690) was marked as
 9                        Plaintiff's Exhibit 20 for
10                        identification as of this date.)
11           Q    The bate stamp, Exhibit 20 bears
12      the Bates stamp number NYC_2688, 2689 and
13      2690.  Do you see it?
14                   MS. CANFIELD:  I don't have
15                this either.
16                   MS. HAGAN:  It should be in
17                that file.  From what you're saying,
18                I didn't send you anything, and I
19                know that's not true.  I will go
20                through them and mark each page.
21                I'm certain I sent you all of with
22                my note and the package.  And you
23                can send the package to the Court so
24                they can see that I actually sent
25                them all.  Let's keep going.
```

Page 204

1                      J. WANGEL

2          Q    So, Mr. Wangel, the e-mail starts

3     on March 20, 2019.  You see that, right?

4          A    I did.

5          Q    It's from you to Ms. Patsos,

6     right?  And you're referring the matter to

7     her.  And you say, it appears Dr. Kaye a

8     psychiatrist in CHS forensic physiatric

9     evaluation court clinics electronically

10    recorded on multiple occasions evaluations

11    of patients.

12               Where is the evidence that Dr.

13    Kaye did so on multiple occasions?  What

14    were the other occasions?  Do you know?

15         A    I don't recall.

16         Q    So the recordings appear to have

17    been created without the consent of the

18    patient or counsel.

19               Now, Dr. Kaye is a forensic

20    psychiatrist.  Do you know that forensic

21    psychiatrist don't treat the inmates that

22    they engage?

23         A    Yes, right.  They are there to

24    make an evaluation.

25         Q    You're referring to the

1                    J. WANGEL

2      defendant/inmate as a patient.  They are not

3      her patient.

4           A    So --

5                     MS. CANFIELD:  I don't think

6                there was a question there,

7                Jonathan.

8           Q    No, I'm asking you.  Are you aware

9      that inmate and defendants that Dr. Kaye was

10     seeing at that time were not her patients?

11                     MS. CANFIELD:   Objection.

12          A    I can tell you that Correctional

13     Health and Health and Hospitals is in the

14     business of care, and we do not refer to

15     persons in custody as inmates.

16          Q    Well, Dr. Kaye is not taking care

17     of an inmate.  She's examining them.

18          A    I don't either, but I refer to the

19     folks who are incarcerated as patients.

20          Q    Clear here that Dr. Kaye is not

21     acting as a treating physician.  She's

22     acting as an evaluator, which is distinct

23     from being a treating physician.  I mean the

24     repercussion from using the wrong

25     terminology could potentially have an impact

Page 206

```
 1                    J. WANGEL

 2      on Dr. Kaye to actually practice medicine,

 3      which is what happened after this exchange

 4      was taken place.  I'm just pointing this out

 5      to you.

 6                    MS. CANFIELD:  Now are you

 7              testifying or are you trying to --

 8                    MS. HAGAN:  I'm going further

 9              into the e-mail.

10          Q    The recordings appear to have been

11      created without the consent of the patient

12      or counsel.  It is not the practice of CHS

13      to electronically record evaluations.

14              Now, CHS only had the court

15      clinics and its purview, and their purview

16      since 2018.  Would that be accurate?

17                    MS. CANFIELD:  Objection as to

18              form.  You can answer.

19          A    I believe so.

20          Q    You sure that there wasn't any

21      interactions between CHS and the court

22      clinics in 2015?

23          A    Correctional Health services

24      became part of Health and Hospitals again.

25      It was -- multiple times in 2015.  I can't
```

                              J. WANGEL

1

2       speak to if there was interaction.  Again, I

3       do labor, not med work, so I don't know.

4            Q    How did you make a determination

5       that it was not a practice of CHS to

6       electronically record evaluations?

7            A    How did I make that determination?

8            Q    Yes.

9            A    I believe I asked Dr. Ford.  And I

10      can tell you that previously you asked about

11      why I referred to as a patient.  I believe

12      that folks who appear in are already in US

13      custody are under the care of CHS.  Whether

14      it's Dr. Kaye's patient or a patient of

15      Correctional Health, we refer to those folks

16      as patients and not inmates.

17           Q    Just to be clear, Dr. Kaye over

18      the 20-year career working at the court

19      clinics never had a patient.  She has never

20      treated any of the inmates that she has

21      evaluated over the years, so they are not

22      her patients.

23                MS. CANFIELD:  Ms. Hagan, you

24           misstated --

25                MS. HAGAN:  You're having a

```
                              J. WANGEL
 1
 2            speaking objection and that's
 3            inappropriate, I'm going back to
 4            what I'm saying.
 5       Q    So Dr. Kaye has never had a
 6    patient; would you agree?  If the
 7    evaluator -- to your knowledge have you
 8    known Dr. Kaye to ever treat any of the
 9    inmates that she has seen and has
10    evaluated?
11            MS. CANFIELD:  Objection as to
12            form.  You can answer.
13       A    Again, we don't refer Correctional
14    Health, Health and Hospital do not refer
15    incarcerate person as -- my e-mail said the
16    recordings appear to have been potentially
17    created without the consent of the patients,
18    not without the consent of Dr. Kaye's
19    patients.
20       Q    I'm going to proceed.  Not it is
21    not the practice of CHS - now, CHS has the
22    court clinics in their purview from anywhere
23    from three years to maybe one year and a
24    half at this time.  How does CHS have any
25    practice of doing anything if they have
```

Page 209

                              J. WANGEL
1
2    never managed the court clinics prior to?
3                    MS. CANFIELD:  Objection as to
4              form.  You can answer.
5         A    Again, as a person who works in
6    labor relations, I don't know.  I'm not
7    involved in the rational as to why this
8    program moved to Correctional Health.  I
9    don't know any why they specifically
10   expertise with regards to FPECC asking Dr.
11   Ford, Dr. yang or anybody else.  It's not my
12   position.
13        Q    You made statements, conclusory
14   statements here without knowing for certain
15   and actually not seeing anyone practice and
16   not actually engaging anyone.  You're saying
17   that there's a practice and you're not even
18   sure of it yourself; am I right?
19                   MS. CANFIELD:  Objection as to
20             form.  You can answer.
21             Argumentative and harassing.
22        Q    I'm going to ask you have you ever
23   seen a practice or not of the evaluators
24   electronically or not electronically
25   recording the examinations?

1                          J. WANGEL

2          A     I was informed that it's not a

3     practice.  And in this instance my

4     understanding Dr. Kaye used a personal

5     device, right, and are there other potential

6     risk with using a personal device to record

7     work product and that was one of the reasons

8     why it was considered --

9          Q     I'm going to ask you something,

10    Mr. Wangel, have you ever sat in on a 730

11    examination up until this point?

12         A     No.

13         Q     Have you sat on one after these

14    allegations have come to light?

15         A     No.  I haven't.

16         Q     How do you know what the practice

17    is first hand?

18               MS. CANFIELD:  Objection.

19         A     First hand, I wouldn't.

20         Q     You would not know firsthand what

21    the practice was because you have never

22    attended a 730 evaluation, have you?

23               MS. CANFIELD:  Objection.  You

24          can answer -- again.

25         A     I have never attended a 730 exam.

```
 1                    J. WANGEL
 2     And my information was based on the
 3     information I received from the chief of
 4     mental health for Correctional Health
 5     Services.  It is not the practice of FPECC
 6     or CHS to record these examinations.
 7          Q    Regardless of who the information
 8     came from, as an attorney wouldn't it
 9     constitute hearsay anyway; since you don't
10     have any firsthand knowledge yourself of
11     what the practice is?
12                    MS. CANFIELD:  Objection.  You
13               can answer.
14          A    I'm not sure how the 730 is
15     corporate compliant.
16          Q    You don't have any firsthand
17     knowledge and as a practicing attorney you
18     do know what the concept of hearsay; am I
19     right?
20                    MS. CANFIELD:  Objection, as a
21               practicing attorney.  He testified
22               that he wasn't functioning as
23               counsel.
24          Q    This man went to three years of
25     law school, he has passed the bar
```

1                     J. WANGEL

2      examination, he has taken -- I'm assuming he

3      knows what the definition of hearsay is;

4      don't you, Mr. Wangel?

5                     MS. CANFIELD:  Objection as to

6                form.  You can answer.

7           A    So I'm not sure why you think this

8      is a corporate -- whatever.  What my emails

9      says it appears that Dr. Kaye, right,

10     electronically recorded.

11          Q    You say it is not the practice.

12     We were going back to the practice.  You are

13     saying there is a practice at CHS that you

14     have no firsthand knowledge that exist.  You

15     have never been to a 730 examination, you

16     said that, right?  At this time you have

17     never been to one and after this e-mail you

18     said you have never been to one, right?

19                     So you don't know firsthand what

20     the practice of CHS is as it pertains to

21     whether or not these exams are recorded or

22     not; am I right?

23                     MS. CANFIELD:  Objection as to

24                form.  You can answer.

25          A    You are correct to say I never

```
 1                      J. WANGEL

 2      attended a 730.  This e-mail conversation

 3      had a CHS chief of the mental health service

 4      who is in charge of the entire mental health

 5      service including FPECC who says it is not

 6      the practice, and that's what I was

 7      conveying to corporate compliance.

 8           Q    What I am asking you is whether

 9      you had any firsthand knowledge about any

10      CHS policy of recording evaluations.  Have

11      you seen that in practice yourself because

12      there is no written policy; we agreed to

13      that.  Have you seen an actual policy in

14      practice where electronically recording

15      evaluations is prohibited?

16                     MS. CANFIELD:  Objection.  You

17                can answer.

18                     And can we move off this

19                point.  I think you've made your

20                point.

21           A    Yeah.  There was no policy at the

22      time specifically in this instance.  But

23      again, this involved a personal device and

24      there are policies in place about recording

25      on something that's not a CHS device.
```

Page 214

1          J. WANGEL

2          Q    That policy took place after this

3     transpired; would that be correct?

4                    MS. CANFIELD:  Objection as to

5              form.  You can answer.

6          A    There are plenty of private

7     policies that are corporate wide.

8          Q    Was the policy drafted after Dr.

9     Kaye was accused of doing this?

10         A    What policy?

11         Q    A policy that prohibited or at

12    least, I guess, threatened some kind of

13    disciplinary action should anyone engage in

14    the recording of anyone at HHC going

15    forward.

16                   MS. CANFIELD:  Objection.

17         A    A policy was put in place

18    afterward; that is correct.

19         Q    Afterwards.  Not beforehand.

20         A    That particular policy was after

21    this occurrence, correct.

22         Q    Now, in the course of the policy

23    being drafted, did you participate in the

24    drafting of that policy, Mr. Wangel?

25         A    I believe so.  I don't recall the

Page 215

1                         J. WANGEL

2       specifics though.

3            Q    Did you read anything -- did you

4       ever read anything from APPL about recording

5       of examinations?

6                    MS. CANFIELD:  Objection as to

7                form.  You can answer.

8            A    I don't believe so.

9            Q    Why not?

10           A    Why didn't I?

11           Q    Right.  Why didn't you?

12           A    I don't know.  I can't.

13           Q    So at some point Dr. Yang gives

14      you what appears to be a thumbs up regarding

15      the recording on April 4.  You see that,

16      right?

17                    MS. CANFIELD:  Objection as to

18                form.  Where is that?

19           Q    Thumb mark here.  You see this,

20      right?

21           A    I do.

22           Q    Clearly been referred and

23      everything else.  Was this a thing that's

24      common between you and Dr. Yang regarding

25      matters of this nature?

Page 216

```
 1                        J. WANGEL

 2              MS. CANFIELD:  Objection as to

 3          form.  You can answer.

 4      A    Is what something that's common?

 5      Q    Well, she's sending you thumbs up

 6  like this is great.  Right?  Isn't that

 7  usually what that means?

 8      A    I think it's pretty common.  More

 9  of an acknowledgment that I followed up.  I

10  don't know if it means certainly means a

11  good thing.  Thumbs up is an acknowledgment

12  of my response.

13      Q    Would be it fair to say that Dr.

14  Kaye was not in Dr. Yang's good graces at

15  this point?

16              MS. CANFIELD:  Objection as to

17          form.  You can answer.

18      A    I can't answer that.

19      Q    You can't say that you never heard

20  Dr. Yang say anything negative about Dr.

21  Kaye?

22      A    Not that I recall.  I mean we

23  discussed the topic that we just talked

24  about only about the appropriate steps we

25  would take.
```

```
                              J. WANGEL
 1
 2         Q    At any point did you hear Dr. Yang
 3    say that Dr. Kaye was difficult to work
 4    with?
 5              MS. CANFIELD:  Objection.
 6         A    No.
 7         Q    Or that others complained that Dr.
 8    Kaye was difficult to work with?
 9         A    I don't believe so, but I'm not
10    sure who you're speaking about.
11         Q    I'm talking about Dr. Yang.  Did
12    you ever hear Dr. Yang say that others
13    complained about Dr. Kaye being difficult to
14    work with?
15              MS. CANFIELD:  Objection as to
16          form.  You can answer.
17         A    No.
18         Q    So you didn't -- so at this point
19    you're not saying that there was any
20    animosity or retaliatory animus toward Dr.
21    Kaye by Dr. Yang?
22         A    I can't say that, no.
23         Q    And you're saying that Dr. Yang
24    never miff that Dr. Kaye filed the EEOC
25    charge against her and HHC?
```

1                    J. WANGEL

2          A    You keep using that word miff.  I

3    never heard Dr. Yang or myself use the word

4    miff.

5          Q    So you're saying you've never used

6    the word miff before?

7          A    I don't believe so.

8          Q    I'm going to show you what is

9    going to be marked as Plaintiff's Exhibit

10   21.

11                    (Whereupon, Email (NYC_2794,

12                    2797-2800) was marked as

13                    Plaintiff's Exhibit 21 for

14                    identification as of this date.)

15         Q    Plaintiff's Exhibit 21 bears the

16   Bates stamp series NYC_ -- I'm going to show

17   you what will be marked as Plaintiff's

18   Exhibit 21.  And Plaintiff's Exhibit 21

19   bears the bate stamp series NYC_2794.  Then

20   it skips to NYC2797, 2798, 2799, and let me

21   move this up, 2800.

22         A    Actually nothing on the screen.

23         Q    You should see the corporate

24   compliance report, right?  Do you see that

25   it should say confidential and the water

Page 219

1                     J. WANGEL

2      mark; do you see that?

3              A    I do.

4              Q    So first to give us context I'd

5      like to show you an e-mail.  It's an e-mail

6      from Dr. Yang to Dr. Ford, Dr. MacDonald and

7      yourself.  You're CC'd on this; you see this

8      right?

9              A    Hold on.

10             Q    It's an e-mail from Dr. Yang to

11     Dr. Ford, Dr. MacDonald and then yourself;

12     you see that right?

13             A    I do.

14             Q    It's dated May 9, 2019, and as an

15     attachment it has a summary investigation

16     memorandum.  You see that right?

17             A    Yeah.

18             Q    And then to go further down into

19     it, it says from Ms. Patso to Ms. Doctor

20     Yang and yourself and Sophia.  It says, Hi,

21     Patsy.  Please see the attached memorandum

22     summarizing the Office of Corporate

23     Compliance investigation of the report

24     regarding Dr. Kaye, including

25     recommendations.  Please let me know if you

```
 1                    J. WANGEL
 2      have any questions.
 3                Did you read this summary,
 4      confidential investigatory memorandum?
 5           A    I'm sure I did.
 6           Q    You did.  Did you have any input
 7      as far as the content of the memorandum or
 8      any suggestions thereafter?
 9                    MS. CANFIELD:  Objection as to
10                form.  You can answer.
11           A    Non whatsoever.
12           Q    None.  Did you talk to anyone
13      about the context of the memorandum?
14           A    You're talking about before this,
15      you're saying; is that what you're asking
16      me?
17           Q    Well, either before or after.
18           A    Well, clearly there was
19      conversations post the issuance of the
20      report.  I had nothing to do with the
21      investigation about corporate compliance or
22      what was being investigated.  It was
23      completely insulated office.
24           Q    If it had been determined Dr. Kaye
25      had actually violated an established policy
```

Page 221

```
 1                      J. WANGEL
 2       at H&H, right, I guess wouldn't she have
 3       encountered your office in terms of
 4       discipline if that was the case?
 5                      MS. CANFIELD:  Objection as to
 6                 form.  You can answer.
 7            A    Could you just repeat the first
 8       part of your question.
 9            Q    If, in fact, there had been an
10       established policy in place, right, where
11       recording was prohibited and Dr. Kaye
12       allegedly violated that established policy
13       and she was subjected to punitive measures;
14       would your office have had to engage her at
15       that point?
16            A    If the report required -- if the
17       report recommended disciplinary action
18       against Dr. Kaye through labor than, yes.
19            Q    As a member of the collective
20       bargaining unit, wouldn't Dr. Kaye have
21       fallen under labor if she had, in fact,
22       reached an established CHS policy?
23                      MS. CANFIELD:  Objection.  You
24                 can answer.
25            A    I mean I'm not sure I totally
```

Page 222

```
 1                         J. WANGEL
 2      understand the question.  Could you repeat
 3      it or rephrase it.
 4          Q    Well, the policy subsequently
 5      wrote after all this transpired, right, Dr.
 6      Kaye allegedly did it again, right.
 7      Wouldn't she have had the conversation
 8      subjected to your office's jurisdiction at
 9      that point if she had actually violated the
10      established policy put in place after this
11      incident took place?
12                    MS. CANFIELD:  Objection.
13                Asked and answered.  You can answer
14                  it again.
15          A    Only if the decision was made to
16      actually proceed with the administrative
17      disciplinary.
18          Q    Who would have made that decision
19      Mr. Wangel?
20          A    You're asking me on a what-if
21      scenario.  I don't know.
22          Q    In this instance, who would have
23      made the decision to discipline Dr. Kaye?
24          A    It which instance?
25          Q    In this instance.  I mean there
```

                              J. WANGEL
1
2      were all these findings, right.  It was
3      determined there wasn't a written policy in
4      place; it was determined that New York is a
5      one-party reporting state.  It was also
6      determined at that time -- these are
7      findings here.  I'm not just making it up.
8      The findings kind of speak for themselves --
9      that the AAFPL did not prohibit or stated it
10     was against any ethical standards to
11     actually record.  In fact, the paper
12     examines both pros and cons of recording.
13              So the question, therefore, is --
14     I'm referencing this article here.  That's
15     what I'm talking about AAFPL, the American
16     Academy of Forensic Psychiatry Laws, which
17     you said you didn't look at when you were
18     kind of discussing whether or not it would
19     be appropriate to pursue any kind of action
20     against Dr. Kaye.  Before I get further --
21     I'm sorry.
22              MS. CANFIELD:  Is there a
23         question here?
24              MS. HAGAN:  I'm stopping
25         myself.

Page 224

1                    J. WANGEL

2        Q    Mr. Wangel, you represent members

3    of the collective bargaining union, right?

4             MS. CANFIELD:  Objection.

5        A    No.

6        Q    You don't represent.  You preside

7    over an office that deals with employees

8    that are members of unions, right?

9             MS. CANFIELD:  Objection.

10          Already answered.

11       A    That's fair to say.

12       Q    You're fairly familiar with the

13   term aggressive discipline; am I right?

14       A    I am.

15       Q    Now, would you say getting a memo

16   of this nature would be the first step of

17   the disciplinary process or somewhere in the

18   middle?

19             MS. CANFIELD:  Objection as to

20          form.  You can answer.

21       A    Neither.

22       Q    Huh?

23       A    Neither.  I would say it's

24   neither.

25       Q    Where would this document fall in

1              J. WANGEL

2     the purview, in the spectrum of discipline?

3          A    Which document are you referring

4     to?

5          Q    I'm talking about the memorandum

6     that Dr. Kaye eventually received that

7     basically said that she had engaged in

8     inappropriate recording of an inmate?

9          A    The memo from Dr. Ford.

10         Q    Yes.

11         A    It would be outside of discipline.

12         Q    How could it be outside of

13    discipline?  She's being warned if she does

14    it again she's going to be either written up

15    or terminated; how is that not discipline?

16              MS. CANFIELD:  Objection.  You

17         can answer.

18         A    So there's a counsel conducted

19    member of management, the supervisor and is

20    outside of labor relations.  My office has

21    no involvement with this issue.  There's no

22    charges, there's no hearing, that should be

23    supervisor counseling.

24         Q    I'm going to ask you something

25    supervisory counsel could it just been a

Page 226

```
 1                    J. WANGEL
 2     verbal discussion rather than a written
 3     document that Dr. Kaye may have continue to
 4     refer to unless it was removed from her
 5     file?
 6               MS. CANFIELD:  Objection as to
 7          form.  You can answer.
 8        A    You're asking me, could it have
 9     been done verbally.
10        Q    Yes.
11        A    A conversation could have
12     happened.  Sure.
13        Q    Why did management feel the need
14     to reduce this to writing especially if it
15     potentially continued to have an impact of
16     Dr. Kaye's employability going forward?
17               MS. CANFIELD:  Objection.
18          Assume facts.  You can answer.
19        A    I can't speak for Dr. Ford.  That
20     came from Dr. Ford.  I can't speak for her.
21     It didn't come from my office.
22        Q    So Dr. Ford is the person that
23     determined that Dr. Kaye should receive a
24     written memo; is that right?
25               MS. CANFIELD:  Objection as to
```

Page 227

1                          J. WANGEL

2              form.  You can answer.

3         A    I just know she issued it.  I

4    can't say for certain it was her.

5         Q    I'm going to show you what's going

6    to be marked as Plaintiff's Exhibit 22.

7    Plaintiff's Exhibit 22 bears bate series

8    NYC_2804, right?

9                     (Whereupon, Email (NYC_2804) was

10                    marked as Plaintiff's Exhibit 22

11                    for identification as of this

12                    date.)

13        Q    And it starts with an e-mail from

14   Ms. Patso to Dr. Yang and yourself and, I

15   guess, Ms. Khalid again, right.  And it goes

16   back to referencing the office of corporate

17   investigation, right; you see that right?

18                    MS. CANFIELD:  Can we see the

19              bate stamp, please.

20                    MS. HAGAN:  The bate stamp is

21              NYC_2804.  That's it.

22        Q    Scroll up.  From Dr. Ford to

23   Dr. Yang and doctors MacDonald and yourself,

24   Mr. Wangel; you see that right?

25        A    I see that.

Page 228

1                    J. WANGEL

2          Q    Dr. Ford specifically says, thank

3     you.  I'm out tomorrow, but we'll follow up

4     on Monday about the discipline.  You see

5     that right?

6          A    I see that, yeah.

7          Q    You see the word discipline in Dr.

8     Ford's e-mail; am I right?

9          A    I do.

10         Q    You just testified that it wasn't

11    disciplinary, but clearly Dr. Ford believes

12    at this time that it's a disciplinary memo,

13    right?

14              MS. CANFIELD:  Objection.  You

15          can answer.

16         A    Possibly.

17         Q    She's using that terminology; am I

18    right?

19         A    She used the term discipline.

20         Q    So then I'm going to show you

21    another document.  This is going to be

22    marked as Plaintiff's Exhibit 23 and it

23    bears the Bates series the first page would

24    be NYC_2869, NYC_2870.  This would be

25    Plaintiff's Exhibit 23.

Page 229

1                         J. WANGEL

2                         (Whereupon, Email

3                         (NYC_2869-2870) was marked as

4                         Plaintiff's Exhibit 23 for

5                         identification as of this date.)

6         Q    I guess to go back into a full

7    discussion, this is another incident that

8    Dr. Kaye is alleged to have engaged in, I

9    guess, in some kind of inappropriate conduct

10   of sorts.  So here there's a complaint from

11   Andrea Swenson to Dr. Jain and Mr. Muirjr.

12   You see this, right?

13        A    I see what's displayed.

14        Q    Do you recall Ms. Swenson

15   complains about an interaction that she had

16   with Dr. Kaye?

17             MS. CANFIELD:  Objection.

18        A    Vaguely.  Without --

19        Q    Do you need to read the e-mail?

20        A    I do.

21        Q    Why don't I give you sometime to

22   read that.

23        A    Okay.

24        Q    I'm going to ask you some more

25   questions, right.

1             J. WANGEL

2             Now, Mr. Wangel, after reading

3        this e-mail does this refresh your

4        recollection?

5        A    A little bit.  It's kind of all

6        over the place.

7        Q    Well, Ms. Swenson wrote this now

8        and Ms. Swenson seemed to be upset; am I

9        right?

10       A    I guess so.  If you say so, yeah.

11       Q    This is involving a fishing email

12       that we discussed earlier --

13       A    There's a lot on the e-mail.

14       There's a bunch of different topics, so.

15       Q    Well, apparently it was a exchange

16       or conversation that Ms. Swenson and Dr.

17       Kaye had.  And Ms. Swenson felt, I guess,

18       that Dr. Kaye used inappropriate language

19       and, I guess, expressing or articulating her

20       frustration with the lack of outcome.  At

21       that point of her inquiries about the

22       fishing emails that she had suspected,

23       right?

24             MS. CANFIELD:  Objection to

25             form.  You can answer.

Page 231

1              J. WANGEL

2        A    I guess so, yeah.

3        Q    And was this incident ever brought

4    to your attention, Mr. Wangel?

5              MS. CANFIELD:  Objection as to

6          form.  You can answer.  That subject

7          of the e-mail?

8        Q    The content of the e-mail.

9    Ms. Swenson's allegations of against Dr.

10   Kaye.  Did the contents of this e-mail and

11   the allegations therein, were they ever

12   brought to your attention Mr. Wangel?

13       A    They could have been.  I don't

14   recall specifically.  What's the timing of

15   this?

16       Q    This is May 31, 2019.  Right?

17       A    Just for context this is right

18   around the time the last -- I stayed on with

19   CHS for a number of months overlap.  I was

20   trying to transition at this point.

21       Q    I have a question.  At some point

22   was your position ever kind of fluid or in

23   flux?

24             MS. CANFIELD:  Objection as to

25         form.  You can answer.

Page 232

1                    J. WANGEL

2        A     Which position?

3        Q     How you worked between the units

4    and the management, was there ever a time

5    where you just kind of like, even if had to

6    give a title, you performed multiple

7    functions because management, you know, took

8    to you?

9              MS. CANFIELD:  Objection as to

10             form.  You can answer, if you're

11             able.

12       A     I mean kind of hard to respond.

13   You can only do what's in your purview as

14   far as your specific role.  I was

15   responsible for a number of different areas.

16   Like I said before time, payroll stuff --

17   but after transitioned out, there's

18   different roles.  People come to you because

19   they come for advice or direction.  So labor

20   does that, not just with regards to personal

21   health but across the system.  Some place to

22   go to for help.

23       Q     I'm going to draw your attention

24   to another exhibit.

25             MS. CANFIELD:  It just said my

Page 233

```
                              J. WANGEL
 1
 2              internet is unreliable.  I don't
 3              know what the issue is.
 4                        (Whereupon, a recess was taken
 5                        from 3:06 p.m. to 3:17 p.m.)
 6         Q    I'm going to try to move on to
 7    another email, another exhibit.  So I'm
 8    going t to move to Exhibit No. 24.
 9              Now again, you maintain that the
10    memos that Dr. Kaye received were not
11    disciplinary in nature.  Would you agree
12    with that?
13                   MS. CANFIELD:  Objection as to
14              form.  You can answer.
15         A    I'm sorry I was reconnecting.  Say
16    it again.  I'm sorry.
17         Q    You would agree that it's your
18    position that the memos that Dr. Kaye
19    received were not disciplinary in nature.
20    I'm going to ask you, you said that the one
21    audio regarding specifically was not
22    disciplinary, right?
23         A    You said memos.
24         Q    Yes.
25         A    We're talking about the memo from
```

```
 1                    J. WANGEL
 2      Dr. Ford, right?
 3           Q    Right.
 4                Dr. Kaye received two memos.  One
 5      as it pertained to audio recording exams,
 6      and then Dr. Kaye received another memo as
 7      it pertained to unprofessional conduct.
 8                Do you recall the second memo?
 9           A    I don't recall the second one
10      offhand.
11           Q    So I will show you that one.  So,
12      Mr. Wangel, by any chance have you seen --
13      Exhibit 24 bears the Bates stamp series
14      NYC_2978.
15                Do you see that document, Mr.
16      Wangel?
17           A    I do.
18                     (Whereupon, Memorandum
19                     (NYC_2978) was marked as
20                     Plaintiff's Exhibit 24 for
21                     identification as of this date.)
22           Q    Now, by any chance -- it's dated
23      June 6, 2019, and the subject is
24      unprofessional conduct and communication.
25      You see that, right?
```

Page 235

1                         J. WANGEL

2         A     I do.

3         Q     And it talks about Ms. Swenson and

4    the statement that Dr. Kaye allegedly made.

5    Quote, "you have a job because of physicians

6    like me", or words to that effect.  And that

7    she had disrupted the work space for

8    approximately 40 minutes by speaking

9    unprofessionally to Ms. Swenson in the work

10   space.

11              Now, would you say this is

12   actually disciplinary or would it be in the

13   beginning of the spectrum of progressive

14   discipline?

15              MS. CANFIELD:  Objection.

16         Asked and answered.  You can answer

17         again.

18        A     So with a EEO notice that's coming

19   from a supervisor outside of labor relations

20   --

21        Q     Yes?

22        A     -- it's not part of the formal

23   disciplinary process.  It's the counseling

24   from a supervisor.

25        Q     How come this doesn't say anything

Page 236

```
 1                    J. WANGEL

 2      about counseling in this e-mail?

 3                    MS. CANFIELD:   Objection as to

 4           form.  You can answer.

 5           A    I don't know I can't speak to the

 6      documents construction.

 7           Q    The last sentence of -- I'd like

 8      to ask about the last sentence.  The last

 9      sentence says employees engage in

10      unprofessional conduct or act contrary to

11      NYC Health and Hospital policies and

12      procedures may be subject to administrative

13      action up to and including termination of

14      employment.

15                    Now, it's not quite clear as to

16      whether or not this is just a warning or

17      counseling memo, especially the last

18      sentence is threatening termination should a

19      further incident take place; would that be

20      fair to say?

21           A    The last sentence says, the

22      employees who engage in unprofessional

23      conduct may be subject to admin action up to

24      and including termination of employment.  I

25      mean this is pretty nonspecific as far as
```

```
 1                          J. WANGEL
 2      the who and what.  It's just general -- I
 3      don't know who put this put together -- it
 4      is a document that came from a supervisor to
 5      a subordinate.  It is not through labor
 6      relations.  There's no due process hearing
 7      here, there's no notice of statement of
 8      process served, no hearing judgment or
 9      arbitrator or anybody.  This is something
10      from a supervisor to a subordinate in the
11      regular course of business.
12           Q    This is something that's been put
13      in Dr. Kaye's personnel file, and this is
14      something that she has to reference when she
15      applies for medical licenses because it is
16      in her personnel file.
17                So even though she may not have
18      been subjected to a formal disciplinary
19      process, would you agree this document is in
20      her personnel file?
21                MS. CANFIELD:  I'm gong to
22                object to the earlier part where you
23                testified that this is something
24                that's reportable.  But you can
25                answer.
```

Page 238

1                       J. WANGEL

2          A     I don't know whether or not it's

3     reportable.  I'm not sure what's in Dr.

4     Kaye's personal file, so.

5          Q     Would this memo go in her

6     personnel file?

7          A     You said would it go.  Again, I

8     don't know who's placing what in Dr. Kaye's

9     personnel file.  It's an outside thing.

10    This had nothing to do with my file.

11         Q     Dr. Kaye signs under protest as

12    you see, right.  Almost a full month later

13    on July 1st, 2019.  It's debatable that the

14    meeting took place on June 6, or would all

15    these people in attendance signed the same

16    day as Dr. Ford, Mr. Muirjr and Dr. Kaye on

17    July 1, 2019?

18              Would you agree that there seems

19    to be a discrepancy between the dates of the

20    memo and the dates of the signatures on the

21    document?

22              MS. CANFIELD:  Objection as to

23         form.  You can answer.

24         A     I mean there's a date on the memo.

25    There's a date, which I'm assuming is Dr.

1              J. WANGEL

2      Kaye's signature on the first line.  Which

3      she's saying on 7/1 she received and signed

4      under protest.  Then it looks like Dr. Ford

5      and Mr. Muirjr on the same day.  When you

6      say it's a discrepancy, I don't know whether

7      this is --

8          Q    I'm sorry.  The date of the memo

9      says June 6, 2019, right?  Are we in

10     agreement on that?

11         A    Yes, we are.

12         Q    Then the date on the signatures on

13     all three signatories says July 1, 2019.

14     Are we in agreement on that?

15         A    Yes.

16         Q    I'd like to go to another exhibit,

17     and this would be -- now, what will be

18     marked as Plaintiff's Exhibit 25.  25 bears

19     the Bates stamp series NYC_2945.  It starts

20     with an e-mail from Dr. Ross MacDonald, he

21     has a question regarding the recording of

22     forensic exam, question mark.  Right?

23                      (Whereupon, Email (NYC_2945) was

24                      marked as Plaintiff's Exhibit 25

25                      for identification as of this

Page 240

1                    J. WANGEL

2               date.)

3        Q    And then he has an e-mail from

4    Dr. Ford to Drs. Ross, Dr. MacDonald and you

5    Mr. Wangel and the subject again is, did we

6    complete the discipline.  You see that

7    right?

8        A    Okay, sure.

9        Q    Now again, we have these two

10   professionals who have been engaged in

11   various individuals at HHC referring to

12   these incidents as discipline.  You do see

13   this, right?

14               MS. CANFIELD:  Objection.

15       A    I do.

16               THE WITNESS:  Sorry.

17       Q    So Dr. Ford says, note, Kaye was

18   out on FMLA and leave until the time I

19   clarified my role in this until yesterday.

20   I am calling her today to schedule.

21   Clarence and I are meeting with her.

22               This is on June 18, 2019, I would

23   say about at least 13 days or so, two weeks

24   before the signing of the documents that we

25   referenced as Exhibit 24, right?

```
1                         J. WANGEL
2              MS. CANFIELD:  Objection.
3         A    Before the signing?
4         Q    Yes.  I'm going to show you
5    another document in this line of
6    questioning.  Mark this as Plaintiff's
7    Exhibit 26.
8                   (Whereupon, Email (NYC_1521,
9                   1525) was marked as Plaintiff's
10                  Exhibit 26 for identification as
11                  of this date.)
12        Q    Mr. Wangel, now we talked about
13   this document somewhat.  The audio recording
14   730 competency evaluation.  Now, Mr. Wangel
15   did you participate in the drafting of this?
16              MS. CANFIELD:  Please give the
17              Bates Stamp number for the record.
18              MS. HAGAN:  The Bates stamp
19              series is NYC_1521 and NYC_1525.
20              For the record NYC_1525 on that page
21              shows Mr. Wangel emailed Dr. Kaye.
22              I guess it showed a read receipt
23              that he actually obtained sign under
24              protest document.
25              MS. CANFIELD:  I'm sorry.
```

1                    J. WANGEL

2           What are you saying that document

3           represents.

4                MS. HAGAN:  Represents that he

5           received an amended signature of the

6           written allegation.  That's the

7           subject of the e-mail says.

8                MS. CANFIELD:  I didn't

9           understand.  You're kind of going

10          out.

11     Q    It says it's the amended signature

12   of written allegations.  Then we're going up

13   to the subsequent document, which is the

14   memo from Dr. Ford to Dr. Kaye.  Do you

15   remember this document, Mr. Wangel?

16     A    As you're showing it to me, yes.

17     Q    Did you have any part in authoring

18   this document, Mr. Wangel?

19     A    It's possible that I was

20   consulted.  I mean it's not uncommon.

21     Q    Did you research any of the issues

22   involved in the audio recording of forensic

23   evaluations?

24                MS. CANFIELD:  Objection.

25           Asked and answered.  You can answer

Page 243

J. WANGEL

1
2       again.

3       A     I don't recall.

4       Q     So you don't recall -- you don't

5    recall you researched it all in your

6    participation in the drafting of the

7    document?

8       A     I'm not certain that I did.  I may

9    have been consulted.  Again, I don't recall.

10   I'm not sure.

11      Q     But you're not denying that you

12   had a part in this at all?

13                 MS. CANFIELD:  Objection as to

14            form.  You can answer.

15      A     Like I said, I honestly don't

16   recall.  I don't know.

17      Q     Now, at any point did Dr. Kaye ask

18   you or approach you about reasonable

19   accommodations?

20      A     I believe I testified earlier when

21   we had the discussion about the 30-minute

22   meal time.  I think it was we talked about

23   FMLA accommodation, but anytime issue to

24   have accommodation or anything to that

25   effect comes up, it's not in my purview to

Page 244

1                    J. WANGEL

2       accommodate.

3            Q    But I'm just asking you -- I

4       understand what your position is.  I'm

5       asking you if she approached you about

6       reasonable accommodations regarding her

7       workday.  Did she, yes or no?

8            A    It's possible.  I don't recall

9       specifics, but it's possible.

10           Q    You say you don't recall

11      specifics, but then one year after, did you

12      ever been tell anyone that they were not to

13      deal with this because filed an EEOC charge?

14           A    I'm sorry.  You lost me.

15           Q    Did you tell staff that you could

16      not deal with because she had filed an EEOC

17      charge?

18           A    Couldn't deal with what?

19           Q    I guess Dr. Kaye and her

20      reasonable accommodation?

21           A    Certainly not.  And request for

22      accommodation are handled outside of

23      Correctional Health which is central office

24      at the time -- handled -- CHS.

25           Q    So you're saying you would never

Page 245

1                          J. WANGEL

2        say that to anyone?

3              A    You're asking me?

4              Q    Yes.

5              A    Yes, absolutely.

6              Q    I'm going to show you what's been

7        marked as Plaintiff's Exhibit 27.

8                          (Whereupon, Email (NYC_755 -

9                          756) was marked as Plaintiff's

10                         Exhibit 27 for identification as

11                         of this date.)

12             Q    And Plaintiff's Exhibit 27 bears

13       the bate stamp series NYC_755 and NYC_756.

14                   I'm going to start at the

15       beginning of the thread.  It starts with an

16       e-mail from Dr. Kaye to Ms.  Villanueva, and

17       you're CC'd on this Mr. Wangel, you see

18       that?  And is Dr. Yang, Ford.  You see this,

19       right?

20             A    I do.

21             Q    And it's dated October 25, right?

22             A    It is.

23             Q    And Dr. Kaye talks about being a

24       dedicated public servant for 19 years, the

25       medical director since 2004.  And she says,

```
 1                    J. WANGEL
 2      she worked an eight and a half hour shift
 3      with a 30-minute unpaid lunch for over 13
 4      years.  She's asking for a reasonable
 5      accommodation to return to her prior shift,
 6      split shifts or the ability to work
 7      remotely.  She talks about the past
 8      practice.  You see this, right?
 9              You need more time to read it.
10      A     I see it.  I'll let you know if I
11      need more time.
12      Q     So then -- are you done?
13      A     Go ahead.
14      Q     And so then Kevin Marrazzo, the
15      EEO officer, you reach out to him, right?
16      I'm not sure if you reach out, but you
17      reference him.  You say Mr. Marrazzo is the
18      EEO officer assigned to Correctional Health
19      Services.  Please reach out to him directly
20      and he will explain the procedure to request
21      reasonable accommodation.  So you refer to
22      him initially, right?  But then you write at
23      the top back to Ms. Villanueva without any
24      party CC'd.  Just FYI CHS has been in
25      communication with legal affairs Blanche
```

```
 1                    J. WANGEL

 2       regarding this employee pending EEOC matter.

 3                 Now, Mr. Wangel, why did you feel

 4       did the need to tell Ms.  Villanueva that

 5       there was a pending EEOC matter pending?

 6            A    I don't recall.

 7            Q    Do you think that this was helpful

 8       or even appropriate?

 9            A    I'm not sure how I can answer

10       that.

11            Q    I mean you wrote this, Mr. Wangel.

12       I mean, what were you thinking?

13                 MS. CANFIELD:  Objection.

14              Asked and answer, you can answer

15              again.

16            Q    I'm asking what went through your

17       mind when you wrote this?

18            A    I honestly don't recall this.

19       It's three years ago.

20            Q    But you're saying, hey, there's a

21       pending EEOC matter even though Dr. Kaye is

22       asking for reasonable accommodations; what

23       does one have to do with the other?

24            A    Which two things?

25            Q    The pending EEOC charge and Dr.
```

Page 248

1                      J. WANGEL

2    Kaye's request for accommodation?

3                    MS. CANFIELD:   Objection.   I

4            don't think he testified to that.

5            A       --

6            Q    Sorry.   Why did you feel the need

7    to tell Ms. Villanueva there's a pending

8    EEOC matter?

9            A    Yeah.   I don't recall.

10           Q    And you have no further

11   explanation as to that, as to why you did

12   that?

13           A    I don't.

14           Q    I'm going to direct your attention

15   to what's going to be marked as Plaintiff's

16   Exhibit 28.

17                    (Whereupon, Email (NYC_757 -

18                    758) was marked as Plaintiff's

19                    Exhibit 28 for identification as

20                    of this date.)

21           Q    Bears the Bates stamp series

22   NYC_757 and 758.

23                Now, again you see Dr. Kaye's

24   email request for an accommodation, as we

25   went over.   And we see your email.   Now,

Page 249

1                      J. WANGEL

2      you're referring to Dr. Kaye to

3      Mr. Marrazzo, right.  It says, please reach

4      out to him directly and he will explain the

5      procedure to request the accommodation.

6                  Now, at any point did you contact

7      Mr. Marrazzo and tell him there was a

8      pending EEOC charge that pertained to Dr.

9      Kaye?

10         A    I don't believe so.

11         Q    Did you contact anyone else

12     outside of Ms. Villanueva about Dr. Kaye's

13     pending EEOC charge?

14         A    I don't believe so, no.

15         Q    But you just felt compelled to

16     tell Ms. Villanueva, that was the only

17     person, right?

18              MS. CANFIELD:  Objection as to

19          form.  You can answer.

20         A    I believe I already testified to

21     that.

22         Q    Was Dr. Kaye reasonable

23     accommodations ever granted?

24              MS. CANFIELD:  Objection.

25         A    I don't know.

1                    J. WANGEL

2        Q    So now Ms. Laboy says to you, can

3   you remove PY from the responses.  Have you

4   ever been told this?

5        A    Yeah, I have.

6        Q    Why?  Why have you been told this?

7        A    In plenty of instances there a

8   member of leadership doesn't want to be

9   copied on a whole set of exchanges that they

10  don't need to be involved in, and ask to be

11  taken off the exchange.

12       Q    Ms. Yang as a senior officer of

13  CHS has a duty to address instances of

14  discrimination and other allegations of

15  improper conduct in her capacity.  Why

16  should she be removed from these emails?

17            MS. CANFIELD:  Objection as to

18        form.  You can answer.

19       A    This is a string about a request

20  for accommodation.  Everybody request

21  accommodation copies Dr. Yang -- she emails

22  about this. (inaudible)

23       Q    Dr. Kaye has had a number of

24  issues; am I right?

25            MS. CANFIELD:  Objection as to

Page 251

1                    J. WANGEL

2          the form.  You can answer.

3          A    That's what you're saying.

4          Q    I'm asking you.  We've been --

5          A    We've been talking about this for

6     six hours now.

7          Q    Exactly, exactly.  So it would

8     stand to reason that Dr. Kaye, seeing that

9     she's not getting any traction, would be

10    concerned about any further endeavors and

11    she would go to the most senior person in

12    her program in order to see change; would

13    you agree?

14               MS. CANFIELD:  Objection.  You

15          can answer.

16         A    Yeah.  Nothing Dr. Kaye in writing

17    to Dr. Yang directly if she's not on an

18    e-mail.  Dr. Kaye is more than welcome to

19    put her in there.

20         Q    Nonetheless she writes these

21    things and, I guess, you're told to remove

22    her, remove Dr. Yang from these emails.  Has

23    Dr. Yang ever told you, I don't want any

24    more emails from Dr. Kaye?

25               MS. CANFIELD:  Objection.  You

Page 252

```
1                    J. WANGEL
2          can answer.
3          A    Not that I recall.
4          Q    Now, we also talk about Dr. Kaye's
5     pursuit of FMLA.  Do you recall that?
6          A    Somewhat.
7          Q    What do you recall of Dr. Kaye's
8     attempt of FMLA?
9          A    Our discussion or Dr. Kaye's
10    attempts?
11         Q    What discussion?
12         A    You're talking about what we
13    discussed today on this deposition or
14    outside of that?
15         Q    At the time.  At the time.
16         A    I mean again, all I recall is that
17    an issue came to my attention about FMLA.  I
18    would have directed it to the appropriate
19    folks.  I don't get involved in FMLA.
20         Q    So you don't get involved at all?
21         A    I mean a request may come to me.
22    Somebody may ask me for the information.
23    It's not in the purview of labor to make
24    that decision about whether or not somebody
25    is eligible for FMLA.
```

1                     J. WANGEL

2          Q    I'm going to draw your attention

3     what's going to be marked as Plaintiff's

4     Exhibit 29.  Plaintiff's Exhibit 29 bears

5     the Bates Stamp NYC_1114.

6                     (Whereupon, Email (NYC_1114) was

7                     marked as Plaintiff's Exhibit 29

8                     for identification as of this

9                     date.)

10         Q    It's dealing with Dr. Kaye's

11    request for her prior shift to be restored.

12    You see that right?

13         A    (No verbal response given.)

14         Q    Now, Dr. Kaye says:  Dear, Drs.

15    Jain and Ford, thank you for your well

16    wishes.  My family and I mourn my brother's

17    untimely death.  He meant a lot to all of us

18    and it will definitely take time.  With that

19    said, I may need additional time to

20    readjust, as you know me and my children

21    have been struggling with my current shift.

22    As I'm sure you can imagine things are more

23    difficult for my family and I now.

24    Especially since my children were extremely

25    close to their uncle.  So she goes on,

                              J. WANGEL

1

2        right.  And she says, if possible I ask that

3        you and the agency restore me back to my old

4        shift.  My son has always needed me to work

5        the prior shift so that I can assist him

6        with his medical treatment, but since his

7        ailments have been further aggravated, I

8        need to be there for him now even more.  You

9        see this, right?

10            A    I do.

11            Q    Then you respond to Dr. Jain and

12       Ford and Yang, please don't respond.  This

13       will be treated as a request for

14       intermittent FMLA.  I'll be in touch

15       shortly.  You see this, right?

16            A    I do.

17            Q    You just testified that you didn't

18       really deal with FMLA, didn't you?

19            A    That wasn't my testimony.

20            Q    So what is it?  How are you --

21            A    I said I don't make the decision

22       to determine whether or not FMLA is approved

23       or not.

24            Q    How did you make the determination

25       this request by Dr. Kaye to return to her

Page 255

1                          J. WANGEL

2        prior schedule was a request for

3        intermittent FMLA leave?

4              A    Based on Dr. Kaye's e-mail.

5              Q    She doesn't FMLA at all?

6              A    The circumstances mentioned in the

7        her e-mail seemed appropriate for

8        intermittent FMLA request.

9              Q    You're making a determination,

10       one, that it is appropriate for FMLA, but

11       then you say you don't deal with FMLA.  You

12       tell them not to respond.  You tell your

13       superiors and then Dr. Kaye's not to respond

14       to that.  You see this, right?

15                    MS. CANFIELD:  Objection.  You

16              can answer.

17             A    I do see it, yes.

18             Q    Dr. Kaye also raises a number of

19       whistleblowing issues in her complaint.  Are

20       you aware of those allegations?

21             A    Somewhat.  I don't recall the

22       specifics, no.

23             Q    At some point, Mr. Wangel, didn't

24       you give permission to access Dr. Kaye's

25       mailbox, e-mail box?

Page 256

1                              J. WANGEL

2                    MS. CANFIELD:  Objection.  You

3            can answer.

4         A    Did I give permission, is that

5    what you're asking?

6         Q    Didn't you obtain permission to

7    access Dr. Kaye's e-mail box and to monitor

8    her emails?

9                    MS. CANFIELD:  Objection.

10        A    I believe at one point I did have

11   access.  I wouldn't phrase it as monitoring

12   her emails.

13        Q    What would you phrase it as?

14        A    Investigator access.  It's typical

15   that labor engage in investigation.

16        Q    Has labor investigated any of the

17   other center directors in this fashion?

18        A    I'm not sure I could respond.

19        Q    Yes or no.  Let's go down the

20   list.

21        A    All I can say if a similar

22   allegation arose, it would be the same

23   action.

24        Q    What allegation arose against Dr.

25   Kaye?

```
 1                    J. WANGEL

 2        A    If I recall the reasons for the

 3   investigation were the potential that the

 4   sensitive information was sent outside of --

 5        Q    What kind of sensitive

 6   information?

 7        A    Information that was still

 8   confidential and should have remained

 9   confidential and not sent outside of the

10   workstation.

11        Q    What information are you

12   referencing?

13        A    I don't recall specifically.

14        Q    So who told you to, one, monitor

15   Dr. Kaye's emails?

16              MS. CANFIELD:  Objection as to

17         form.  You can answer.

18        A    Again, you keep saying monitor.  I

19   assume watching the e-mail trend.  That's

20   not what happened.

21        Q    So what happened?

22        A    It's an investigation to see

23   whether or not information was sent out.

24        Q    What was the outcome of the

25   investigation?
```

1                   J. WANGEL

2        A    I don't recall the specifics.  I

3   mean this is typical in labor, right.

4   There's hundreds of cases, if not thousands,

5   of grievances happening at a time.  It's

6   very hard to remember especially this long

7   ago.  If I recall correctly, I think there

8   was -- I can't even speak.

9        Q    Okay.  Mr. Wangel, did there ever

10  come a time that Dr. Kaye basically

11  criticized a private practice policy that

12  you put in place?

13       A    A private practice policy.

14            MS. CANFIELD:  Can you put an

15       objection before that question.

16       Q    Now, Mr. Wangel, did you ever

17  participate in a drafting of a private

18  practice policy?

19       A    It's possible.

20       Q    Did it ever come to your attention

21  that Dr. Kaye had issues or felt that there

22  were ethical issues that were raised by this

23  private practice policy that you penned

24  along with others?

25       A    Again, it's very much remember the

Page 259

```
 1                       J. WANGEL
 2    specifics.  If you refresh my memory, I'm
 3    more than happy to --
 4         Q    Well, Dr. Kaye alleges that she
 5    raised issues about the potential of double
 6    dipping specifically and the conflict of
 7    interest and that she experienced
 8    retaliation in weight of those complaint.
 9    Do you recall that?
10                   MS. CANFIELD:  Object based on
11             form.
12         A    I remember Dr. Kaye raising a
13    concern about the 730 process in general.
14    And my role as a labor relations was not one
15    of whether or not 730 exams are conducted
16    appropriately or inappropriately.  Again, I
17    said I'm not the expert on the process, so
18    it's hard to recall the specifics there.
19         Q    Well, Dr. Kaye raised issues in
20    several context.  One, that involved with
21    the potential double dipping as it was
22    contained in the private policy that was
23    being circulated within CHS.  Then she also
24    raised some concerns about the --
25                   MS. CANFIELD:  Objection.
```

Page 260

```
 1                      J. WANGEL
 2              Are you testifying?
 3              MS. HAGAN:  No, I'm asking.
 4              I'm trying to ask Mr. Wangel if he
 5              is familiar or remembers the
 6              instances where Dr. Kaye raised
 7              issues with some of the initiatives
 8              and policies that were raised on
 9              under the CHS.  So far Mr. Wangel
10              may have participated in the
11              drafting of it.  He's not quite sure
12              if Dr. Kaye raised issues about
13              that, about specifics instances.  So
14              I'm trying to give him context.  I'm
15              trying to get down to the nuts and
16              bolts of this.
17              MS. CANFIELD:  He didn't
18              testify to any of that.
19              MS. HAGAN:  Okay.  So let's
20              keep going.
21         Q    So, Mr. Wangel, you said you
22       participated in the drafting of the private
23       practice policy; is that right?
24              MS. CANFIELD:  Objection.
25         A    No.  I did not say that.
```

```
1                    J. WANGEL
2          Q    Did you have any part in drafting
3     the private practice policy?
4          A    I believe I said I may have, but I
5     don't recall.
6          Q    Oh, you don't recall.  Did you
7     participate in the drafting of any other
8     policies that came out of CHS?
9          A    Sure.  Yes.
10         Q    I'm going to show you what's
11    marked as Plaintiff's Exhibit 30.  I'm going
12    to -- Exhibit 30 bears the Bates Stamp
13    series NYC_2192, 2193, 2194, 2195 and 2196,
14    2197, and what appears to be 2198.
15                    (Whereupon, Email
16                    (NYC_2192-2198) was marked as
17                    Plaintiff's Exhibit 30 for
18                    identification as of this date.)
19                    For purposes of giving you the
20    opportunity to refresh your recollection,
21    I'm going to prior email thread.  It appears
22    that a Jeffrey Herrera is e-mailing a
23    Jeffrey Lutz and you Jonathan Wangel and
24    CC'ing Ms. Laboy.  Subject:  Email Access to
25    Active Employee.
```

Page 262

1                        J. WANGEL

2              Do you see that right?

3         A    I do.

4         Q    Is there a reason why Dr. Kaye's

5    not specifically referenced in the subject

6    of the email?  I mean it is her email.  Is

7    there a reason why this clandestine

8    referring to, I guess, this investigation

9    that took place?

10             MS. CANFIELD:  Objection as to

11             form.  You can answer.

12        A    You're asking me why Dr. Kaye's

13   name isn't mentioned in the subject line of

14   the e-mail?

15        Q    Yes.

16        A    I have no idea why Jeff Herrera

17   wouldn't put an employee's name in the

18   subject of his e-mail.

19        Q    Let's start, who is Jeff Herrera?

20        A    He worked at the time in

21   Correctional Health Department.

22        Q    What was his title?

23        A    He was the director or senior

24   director.

25        Q    Of what, IT?

1                    J. WANGEL

2          A     Correct.  Yeah, some IT.  I'm not

3    sure if it's director or senior director,

4    but some IT title.

5          Q     Let's go to Mr. Lutz, who is he?

6          A     He is the Correctional Health and

7    Hospitals EITS, which is also It, commonly

8    known as.  He works in the central corporate

9    office.

10         Q     Then let's go to, well, we know

11   who Ms. Laboy is, right?  She's requesting,

12   Ms. Laboy is requesting that you be provided

13   access to the mailbox of active employee

14   Melissa Kaye; you see that right?

15         A     Yes.

16         Q     Has Ms. Laboy ever asked for you

17   to have access any of the other forensic

18   psychiatric evaluators mailboxes?

19                MS. CANFIELD:  Objection as to

20          form.  You can answer.

21         A     I don't believe so.

22         Q     So Dr. Kaye was the only one,

23   right?

24         A     As far as I remember.

25         Q     So then Mr. Lutz says, approved.

1              J. WANGEL

2      Joe, please work with Jonathan on this.  I

3      don't know who is Joe.  Joe is Jeffrey

4      Herrera?

5              A    No.  Joe is, Joe Moore.

6              Q    And who is Mr. Moore?

7              A    He also works for central office

8      IT.

9              Q    So then you go up to Mr. Moore he

10     says, Jonathan you know the drill.  I need

11     the date range and search terms and I will

12     set you up in Clearwell.  You see that?

13             A    Yes.

14             Q    Have you done this before?

15             A    I believe I testified to that.

16     It's common.  It's part of labor relations

17     investigations.  It's not uncommon to search

18     employee e-mail.

19             Q    Had you investigated Dr. Kaye's

20     e-mail before?

21             A    I don't believe so, no.

22             Q    And you're saying that -- and then

23     you say, you ask for a specific date range,

24     July 1st through present outbound e-mail to

25     external recipients.  Focus on legal aid

Page 265

1                    J. WANGEL

2       society and personal e-mail address all or

3       part of the phrase FPECC policy

4       psychological testing, and thank you with an

5       exclamation point.  Right?

6            A    You're asking if I see it?

7            Q    Yeah.

8            A    Yeah, I see it.

9            Q    Thanks.  And then we go up and it

10      looks like Mr. Moore kinds of gives you a

11      report, right.  It says this is complete

12      previous collection was 460 messages.  The

13      recollect date added 101 messages.  So there

14      must have been a previous collection.

15               What is he referencing Mr. Wangel?

16      Was there another investigation of Dr.

17      Kaye's mailbox?

18                    MS. CANFIELD:  Objection as to

19               form.  You can answer.

20            A    My request to the previous email

21      where I say thank you -- because Joe, the

22      guy in IT, actually has to do this, joe

23      Moore.  It's not a quick or easy task that

24      he has to do.  So that's why he goes through

25      a lot of emails relating to certain

Page 266

1                        J. WANGEL

2        investigations.

3                So with regards to this, the

4        collection process, it doesn't just happen

5        immediately.  Again, I don't work for IT,

6        but it's not just a point in time.  It's

7        referencing to do that's because you can

8        have a person, a series of e-mails and then

9        a reply, and then a third and fourth and

10       fifth.  He's not going to produce seven

11       emails for me -- so all the previous emails

12       are just rolled up into the one, so you get

13       them all in a single thing.

14           Q    I'm aware of the process, but I

15       think you may differ on what it takes or

16       what entails.  But I appreciate that

17       Clearwell is very sophisticated program.

18       But I'm sure that Mr. Moore has other things

19       he's working on so -- I mean perhaps there's

20       an issue, but I don't believe -- I know it

21       doesn't Clearwell very long to engage in

22       type of process, but we won't go there

23       today.

24                Now, in the paragraph I'm focusing

25       on it appears that Mr. Laboy found that Dr.

```
                              J. WANGEL
 1
 2        Kaye sent a total of 87 documents, 120 items
 3        through her personal Gmail address in
 4        violation of the acceptable use policy,
 5        section nine.  Usually by BCC'ing her
 6        personal email address and at least one
 7        which contained patient information, copied
 8        to folder, Patient.  I did not review all
 9        87.  I picked a couple at random to see what
10        method she was using to send e-mails to her
11        personal account.
12               Now, Mr. Wangel, if, in fact, Dr.
13        Kaye had a breach of policy on this level,
14        why wasn't she brought up on any charges or
15        talked to?
16        A     I mean I don't recall the
17        specifics of that incident.  I'd have to
18        refresh my memory of what occurred in this
19        email from IT.  I mean a lot goes into a
20        decision whether or not the charges should
21        be brought against a staff member.
22        Q     I'm going to ask you something.
23        Did you talk to Dr. Kaye about her usage or
24        her activities with the e-mail?
25        A     I don't recall if me or anybody in
```

1                          J. WANGEL

2          my office did.

3                Q    Did you tell -- let's go through

4          each of the defendants.  Did you tell Dr.

5          Yang that Dr. Kaye was doing this?

6                A    I don't recall specifically.  I

7          may have had a conversation with Dr. Yang

8          specifically about this.  It's possible.

9                Q    Did you tell Dr. Ford that Dr.

10         Kaye was engaged in this activity?

11               A    Again, possible, but I don't

12         recall any specific conversations.

13               Q    I'm going to ask, did you tell

14         Dr. Jain?

15               A    Same answer.

16               Q    Are you sure -- you keep referring

17         to the individuals as patients versus the

18         inmates.  I'm going to ask you from your

19         training and from your knowledge of what

20         CHS', the various services that CHS

21         provides, Dr. Kaye was not treating any

22         patients.  She wasn't treating anybody.  She

23         was evaluating inmates.  So what exactly,

24         what kind of information did she actually,

25         was actually found to be inappropriate?

```
 1                    J. WANGEL
 2              MS. CANFIELD:  Objection as to
 3          form.  This e-mail is not from the
 4          witness.  It's from Joe Moore, but
 5          you can answer.
 6              MS. HAGAN:  I'm assuming that
 7          Mr. Wangel read the report.
 8      Q    Did you read the report, Mr.
 9   Wangel?
10      A    I'm sure I did.  So again, to
11   address the patient issue you raised, it is
12   Correctional Health Services and even if Dr.
13   Kaye is not the treating physician, the
14   person under evaluation is a patient of
15   Correctional Health.  And across the board,
16   we do not refer to incarcerated persons as
17   inmates.  They are patients.
18      Q    None of the people she encounter
19   are her patients.  They are not her
20   patients.
21      A    I am not saying that they're Dr.
22   Kaye's patients.  Am I?
23      Q    In fact, when Dr. Kaye engages
24   these inmates, they are handcuffed and they
25   are in custody.  They are not --
```

Page 270

J. WANGEL

1

2        A     Correct.   Right.   And the DOC is

3     responsible for their custody and control

4     and remain in their custody, Correctional

5     Health is charged with care.   And for a

6     number of reasons, including mental health

7     reasons, they are referred to as patients,

8     not inmates.

9        Q     She's not engaging in a mental

10    health capacity.   She's accepting --

11       A     I am not saying she is.

12             MS. CANFIELD:   Okay.

13             We're going to move forward

14    upwards.   Again, says he already has case

15    opened on Dr. Kaye and collected her e-mail

16    from October 15, 2018 to October 7, 2018.

17    Per our discussion, I will collect all new

18    e-mail from December 7, 2018, until today

19    and will merge it into the old collection

20    and have it ready for you by Monday.

21             Now, you said you had not had more

22    than one of these, I guess, investigations

23    of Dr. Kaye's email.   Would you like to

24    change your testimony to that effect?

25       A     I believe I said I didn't recall.

```
 1                    J. WANGEL
 2      Based on Joes's e-mail of 10/15/18, 12/7/18.
 3           Q    In a subsequent e-mail you asked
 4      for access for to the e-mail box for July 1
 5      onward and I'm assuming it's for
 6      July 1st, 2019.  Let's go back down, if
 7      necessary.
 8           A    Again, it's hard to remember the
 9      specifics of any one investigation, but this
10      type of thing is common.  There are tons of
11      things happening at any given time so
12      remembering the specifics about this
13      particular one is not easy.
14           Q    Do you know the outcome of this
15      investigation?  This is a lot of effort for
16      you not to remember what happened.
17           A    It's really not.  Again, this is
18      common.  There's nothing super --
19           Q    Well, you talk about it being a
20      lot of effort for Mr. Moore, but you're
21      saying it was not a lot of effort for you
22      either.
23           A    It's in the report.
24           Q    So you go and having Mr. Moore
25      practice is exercised and then you reading
```

Page 272

1                         J. WANGEL

2      this, you don't --

3           A    I can tell you that my office has

4      never drafted disciplinary charges against

5      Dr. Kaye.  We have never taken disciplinary

6      actions against Dr. Kaye in Labor Relations.

7           Q    So then I'm going to show you

8      what's marked as Plaintiff's Exhibit 31.

9                     (Whereupon, Email (NYC_1134) was

10                    marked as Plaintiff's Exhibit 31

11                    for identification as of this

12                    date.)

13          Q    It bears the Bates stamp series

14     NYC_1134.  It's from you, Mr. Wangel, to Dr.

15     Ford.  And it starts the beginning of the

16     e-mail is from Dr. Jain to Dr. Ford.  And

17     they are discussing the distribution of the

18     psychological testing policy.

19                Do you see that?

20          A    I see the subject line.  I haven't

21     read the whole policy.

22          Q    I'll let you read it.

23                What's important to me for our

24     discussion is that Dr. Jain says, it was

25     also brought to my attention today that

Page 273

1                           J. WANGEL

2      either this policy or the discussion of this

3      policy was being circulated among the legal

4      aid attorneys citywide and they were

5      concerned.

6                  Now, did you tell Dr. Jain that

7      Dr. Kaye had been circulating the

8      psychological testing policy?

9           A    I don't recall specifically having

10     that discussion with her.

11          Q    So then Dr. Ford says to Dr. Jain:

12     Hi, Beesh, there is something to do if you

13     know information that the policy is being

14     circulated to legal aid attorneys, including

15     Jonathan for guidance.  Right?  You see

16     this?

17          A    I do.

18          Q    And then you say, do we know for

19     sure that Dr. Kaye circulated the draft

20     externally.  Right?

21          A    That's what the e-mail says.

22          Q    Then you follow up, you say,

23     please forward me the draft.  Right?

24          A    Right.

25          Q    Now, does it ever come to your

Page 274

1                        J. WANGEL

2       attention -- do you ever find that Dr. Kaye

3       ever distributed this policy?

4            A    As a result of the IT

5       investigation -- I'm trying to.  I honestly

6       don't recall.  I don't remember if there was

7       an outbound draft policy that went --

8                        MS. HAGAN:  To the extent it

9                exist, if there was any kind of like

10               documentation or emails to reflect

11               that to determine that Dr. Kaye had

12               actually distributed the policy of

13               any other that pertains to CHS, I

14               call for the production of any and

15               all correspondence to that effect.

16               And I'll put it in writing and I'm

17               sure that counsel will take it under

18               advisement.

19           Q    Now, Mr. Wangel, by any chance was

20      there any chance that you had any -- with

21      Dr. Kaye and the usage of redacted records?

22           A    Not that I recall.

23           Q    Did you provide any guidance or

24      advice pertaining to that?

25           A    I'm not even sure exactly -- with

1                        J. WANGEL

2        regard to redacted records.

3             Q    Talking about redacted medical

4        records to do 730 evaluations.  Did you

5        provide any guidance or work with the legal

6        department to engage to analysis with the

7        court?

8             A    I don't recall.

9             Q    Did you ever work with Blanche

10       Greenfield or anyone else in the legal

11       department to develop any kind of like

12       strategy as to how you would approach the

13       court about the usage of redacted or

14       unredacted records?

15            A    It's possible.  I deal with all

16       sorts of issues.

17            Q    Would you have been roped in this

18       then you too?

19            A    I could have been.

20            Q    Why is this, Mr. Wangel?

21            A    I don't know.  I can't say.

22            Q    Your background isn't in criminal

23       law, is it?

24            A    No.  Not specifically.  I have no

25       such degree.

1                       J. WANGEL

2         Q     You have a criminal justice

3    degree, but you have not been in court and

4    litigated in criminal matters; am I right?

5         A     That's correct.

6         Q     And you have never attending or

7    dealt with any 730 matters; is that right?

8         A     Right.

9         Q     I assume that you read the

10   statute, the 730 statute; am I right?

11        A     I don't recall, but that's

12   probably a fair --

13        Q     Yeah.  You probably done some

14   reading on it, but you wouldn't say that

15   this is your area of expertise.  Right?

16        A     The area of 730 exams, yes, that's

17   right.

18        Q     Right.  But you are providing

19   legal advice or guidance on usage of

20   redacted or unredacted medical records; am I

21   right?

22              MS. CANFIELD:  Objection.  He

23         didn't testify to that.  You can

24         answer.

25        A     I'm not sure what you're referring

```
1                    J. WANGEL
2    to exactly.  That, I don't recall any
3    specifics on that.
4         Q    Well, I want to ask you some
5    questions about your involvement in the use
6    of redacted medical -- of I guess.
7                    COURT REPORTER:  You just got
8         cut off.
9    (A discussion was held off the record.)
10        Q    So at this point you're not
11   necessarily versed in, I guess, the 730 exam
12   process, per se.  But you did have input in
13   the discussion of whether or not the medical
14   records would be an appropriate way to
15   pursue or to engage in 730 examinations.
16              Do you recall that?
17        A    No.  I would have to be refreshed.
18        Q    I have a question.  Are you aware
19   that the court clinics are exempt?
20                   MS. CANFIELD:  Objection.  You
21        can answer.
22        A    You froze for a second.  I didn't
23   hear what you said.
24        Q    Are you aware the court clinics
25   are HIPPA exempt?
```

1                    J. WANGEL

2        A    I believe that's correct.

3        Q    I guess the question I would have

4   and to be honest with you to kind of

5   understand the role of CHS, what is your

6   understanding of the role of CHS as far as

7   the 730 exam process is concerned beyond the

8   evaluators as far as, I guess, whether or

9   not they release medical records?

10                 MS. CANFIELD:  Objection to

11            form. You can answer.

12       A    Again, I'm not familiar with that

13   as far as --

14       Q    I'm going to leave that and come

15   back.

16            Are you aware of any questions

17   surrounding the rollout and the

18   implementation of iSight?

19       A    The implementation rollout of...

20       Q    iSight.  You're aware of Isight,

21   right?

22       A    I remember the acronym.  I forget

23   exactly what function it performs though.

24       Q    So you're not really sure of what

25   function Isight actually --

Page 279

1                          J. WANGEL

2          A     At this point I don't recall at

3    this point in time.  I may have then.  But

4    again this is years later.

5          Q    I'm going to show what will be

6    marked as Plaintiff's Exhibit 32.  In

7    Plaintiff's Exhibit 32 bears the Bates stamp

8    series NYC_668.

9                     (Whereupon, Email (NYC_668) was

10                    marked as Plaintiff's Exhibit 32

11                    for identification as of this

12                    date.)

13         Q    And it starts with an e-mail from

14   Mr. Muirjr to you, Mr. Wangel, on

15   October 5, 2018.  And it says:  Good

16   morning.  Ms. Swenson and I placed a call to

17   Dr. Kaye this morning at 9:30 a.m. and left

18   a message for her to call us back.  She

19   called back at 10:00 a.m. and inquired why

20   she didn't not want to work alone with

21   Dr. Jain.  But that's not what I have of

22   interest here.

23              She also mentioned that someone

24   had brought up her FPECC's site lack of

25   cases in iSight, but that they have 42 cases

Page 280

1                    J. WANGEL

2    that were just ordered prior to their

3    training on the system.  They are working to

4    ensure that all cases are entered .

5              Now, Mr. Wangel, it seems like, is

6    this related to labor relations?

7         A    I can't speak to why Mr. Muirjr

8    would --

9         Q    Did you respond to this, Mr.

10   Wangel?

11        A    I don't recall.

12        Q    So you don't recall if you

13   responded to this particular e-mail or not,

14   or if you had any further dealings with

15   iSight or how it's being rolled out in the

16   Bronx.

17        A    No.  I don't recall from the sense

18   of the e-mail it looks like an issue about

19   how to receive the cases in a timely way.  I

20   remember there were all types of issue about

21   having the cases in a timely manner.  Other

22   than to that extent, I don't recall.

23        Q    So now I'm going to go what's

24   marked as Exhibit 33.

25              (Whereupon, Email (NYC_2654) was

Page 281

                              J. WANGEL

1                             J. WANGEL

2                             marked as Plaintiff's Exhibit 33

3                             for identification as of this

4                             date.)

5          Q    This is an e-mail from Dr. Ford

6     to -- first off, Exhibit 33 bears the Bates

7     stamp series NYC_2654.  Right?  This will be

8     Exhibit 33 and it is from Dr. Ford to Dr.

9     Wangel, you see that, and it's dated

10    March 18, 2019.  You see this, right?

11         A    I do.

12         Q    Dr. Ford basically is opining

13    about Dr. Kaye's percentage of productivity

14    being the same as other directors and she

15    talks about the volume of case.  Then in the

16    previous e-mail, as we discussed, there

17    seems to be an issue with the information

18    being inputted into iSight.

19              Now, the question I have, Mr.

20    Wangel, is why is Dr. Ford talking to you

21    about Dr. Kaye's productivity?

22         A    I don't know.  Maybe she raised

23    some concerns about the level of

24    productivity.  I don't recall.  That's one

25    of the typical, most common reasons you

1                    J. WANGEL

2      would consult somebody over in labor

3      relations is --

4           Q    Have you ever spoken to Dr. Kaye

5      about her productivity?

6           A    It wouldn't be my place to do so.

7           Q    How would you engage Dr. Kaye in

8      your day-to-day?

9                    MS. CANFIELD:  Objection.

10          A    I wouldn't.

11          Q    I mean typically labor relations

12     would be involved if there's a violation of

13     health department agreement; is that right?

14          A    Even for some exhibits you've

15     shown me today.  I mean staff reached out

16     directly on their own volition.  I mean you

17     see notes from Dr. Kaye directed to me

18     without being prompted.  I do get some

19     questions and concerns from staff on the

20     regular.  If there's a disciplinary matter,

21     it would go through the process.  As I said,

22     no charges were drafted against Dr. Kaye.

23                    MS. HAGAN:  How much time do I

24          have left, Ms. Miller?

25

Page 283

1                        J. WANGEL

2              COURT REPORTER:  We're at five

3         and a half hours.

4              MS. HAGAN:  Thank you.

5         Q    I want to ask you some questions

6    about Dr. Kaye being docked educational

7    leave.  Do you recall any discussions about

8    that?

9         A    Supervisory -- the subject, yes.

10        Q    Okay.  What do you recall?

11        A    I recall that Dr. Kaye had

12   attended some sort of certification or exam.

13   I can't remember specifically what it was

14   for or what the subject was.  I remember

15   that topic or the subject of that exam or

16   certification, whatever it was, wasn't

17   directly on point with what she does for

18   Correctional Health system as a whole.  And

19   a question came up as to whether or not time

20   for something that's not directly work

21   related should be excused or not.

22        Q    Now, Dr. Kaye alleges that she was

23   docked pay in retaliation for her protected

24   activities, meaning she was docked pay

25   because she had filed complaints of

Page 284

```
 1                    J. WANGEL
 2    discrimination and that she engaged in -- do
 3    you take a different position on that,
 4    Mr. Wangel?
 5                    MS. CANFIELD:  Objection.
 6        A    I do.
 7        Q    What's your position?
 8        A    That in no way shape or form was
 9    any pay, deduction of pay, retaliation in
10    any way meant to be discriminatory or
11    anything like.  I believe it's actually to
12    the contrary, when Dr. Kaye raised the issue
13    I think Correctional Health changed the
14    entire policy in regard to those types of
15    courses would be on the house or not.  I
16    believe her time was restored and I believe
17    it's a now accepted practice across the
18    board for everybody.
19        Q    Are you speaking for yourself when
20    you're saying there was basically no
21    discriminatory animus or retaliatory animus
22    that was involved?
23                    MS. CANFIELD:  Objection as to
24         form.  You can answer.
25        A    You're asking if I'm speaking for
```

```
 1                      J. WANGEL
 2     myself.  Who else would I be speaking for?
 3          Q    Because the way you said it seemed
 4     like you were speaking for FPECC, senior
 5     management and all the others.
 6          A    I'm speaking for any myself.  I'm
 7     not aware of any other individual taking any
 8     sort action that would be retaliatory.
 9          Q    Now, has it been your experience
10     any other doctors or any other licensed
11     professionals have been docked pay for
12     taking board examinations?
13                MS. CANFIELD:  Objection as to
14            form.  You can answer.
15          A    It's difficult to practice I
16     believe up until that point, was that you
17     had to use your own time.  So if physician
18     or clinician chose to cover their attendance
19     that was directly related to their job
20     function or vocation, they could do that.  I
21     don't remember the specifics of that time
22     sheet that Dr. Kaye submitted, but for
23     whatever reason they didn't cover the
24     attendance with her time.  An issue was
25     raised, change position of CHS across the
```

1                    J. WANGEL

2      boards and she was restored her time.

3          Q    Was it ever brought to your

4      attention that Dr. Kaye was having problems

5      with inputting her time in Kronos?

6          A    Generally, I know there was some

7      issues.  I don't recall the specifics.

8          Q    What do you recall?

9          A    Hard to say.  I remember back and

10     forth with her and Dr. Jain.  Again, it's a

11     while back.  It's hard to remember the exact

12     issue.

13         Q    Well, I guess I can identify you

14     and help you.  At some point Dr. Kaye

15     alleged that Dr. Jain was changing her time

16     behind her back.  Do you recall something to

17     that effect?

18         A    I do, generally.  I don't think

19     that's what I remember.  I don't think

20     Dr. Jain was trying to do anything malicious

21     or in any way negatively impact Dr. Kaye.  I

22     think she was just trying to get the time

23     sheets processed.  I think she thought she

24     was doing the correct thing.  I don't

25     remember exactly what or how adjudgments

Page 287

1                    J. WANGEL

2      were made though.

3           Q    Well, Dr. Kaye alleges that

4      because of Dr. Jain's actions and her being

5      banned from the system that she was docked

6      pay during this period of time, that

7      Dr. Jain had solo access to her time cards.

8      Do you recall that?

9                    MS. CANFIELD:  Objection as to

10               form.  You can answer.

11          A    When you say banned from the

12     system, what do you mean?

13          Q    Didn't have access to her, she

14     didn't have access to any of her time, but

15     Dr. Jain had solely access.

16                   MS. CANFIELD:  Objection.

17          A    So across the board time keepers

18     have access, supervisors have access and the

19     staff members have access.  I'm not sure, I

20     don't recall Dr. Kaye being blocked out.

21     She should have had access.  I don't know

22     why she wouldn't.

23          Q    Well, Dr. Kaye's had ongoing

24     issues with access to Kronos.  I'm going to

25     show you an exhibit where it's on in Dr.

Page 288

1                    J. WANGEL

2    Kaye's tenure under CHS.  But it's

3    demonstrative of some of the problems she

4    experienced with Kronos.

5                This will be Plaintiff's Exhibit

6    34.

7                        (Whereupon, Email (NYC_317-319)

8                        was marked as Plaintiff's

9                        Exhibit 34 for identification as

10                       of this date.)

11        Q    And Exhibit 34 -- and I'm going to

12    share the screen -- bears Bate Stamp series

13    NYC_317, NYC_318 and NYC_319.  You do see

14    that, right?

15        A    I do.

16        Q    Go down to the latter part of the

17    exhibit, and it's from Dr. Kaye to Dr. Jain.

18    You see this, right?

19        A    I do.

20        Q    Hi, Beesh.  Our Kronos system is

21    not working in the Bronx.  CHS IT people

22    came today.  It's still not up and running

23    and they said it won't be until they fix our

24    connectivity.  Please let me know how to

25    process my time until then.  Right?  And

Page 289

```
 1                      J. WANGEL
 2      then Dr. Jain responds to her, I'm getting
 3      some information on how to process.  Thanks
 4      for letting me know.  Right?
 5               And then Dr. Jain gets in contact
 6      with Jessica, I'm assuming this is Jessica
 7      Laboy, would that be fair to say?
 8          A    Probably.
 9          Q    Hope you had a nice holiday.  You
10      mentioned there was a way to enter missed
11      dates for Kronos.  Wanted to make sure to
12      follow up on this for Dr. Kaye.  So now he
13      is entering the time for Dr. Kaye the access
14      that she has requested; would that be
15      accurate?
16               MS. CANFIELD:  Objection.  You
17          can answer.
18          A    I mean to say he's not working on
19      getting her access, I'm not sure you can
20      tell that solely from this chain.  It seems
21      like he's trying to help get her time
22      sheets -- directly.
23          Q    Hi, Beesh, I guess this is from
24      Ms. Laboy, hope you had a nice holiday as
25      well.  Jonathan copied.  Will provide you
```

1                    J. WANGEL

2      with information on how to do so.  Best,

3      Jessica.

4           So you're helping him with this

5      access in Kronos, is that within your job

6      scope?

7                MS. CANFIELD:  Objection as to

8           form.  You can answer.

9      A    What was the question?

10     Q    Was that within the scope of your

11     job even at that time?

12     A    It could have been.  It certainly

13     would, Kronos was new, right.  I was sort of

14     the -- implementations needed to get

15     electronic time keeping to CHS.  For a

16     system of our size to still use paper, it is

17     not a simple undertaken to move to something

18     that's electronic, especially sites.  We

19     don't run the jails.  It's not within our

20     purview -- very easily there.  So any time

21     you move to a new systems, there's bumps in

22     the road.  So certainly, if I was involved

23     in time keeping, certainly.

24     Q    Now you say, Hi.  Dr. Kaye should

25     have the ability to manually enter time for

Page 291

```
 1                     J. WANGEL

 2      any date.  If for some reason your not, I'll

 3      check it out tomorrow.

 4             Now, did you know for a fact that

 5      Dr. Kaye could actually manually enter her

 6      time?

 7        A    Well, I can't speak to whether or

 8      not she was saying she couldn't get in or do

 9      whatever it was.  I didn't have any personal

10      knowledge about whether she could or

11      couldn't have.  She should have the ability

12      to do that.  Whether she could actually do

13      that, that I don't know.

14        Q    Is that your testimony today, did

15      she or anybody else have the ability to

16      manually input their time?

17                 MS. CANFIELD:  Objection.

18             Asked and answered.  You can answer.

19        A    You're asking me whether or not

20      any employee of CHS should be able to

21      manually enter their time.

22        Q    Right.

23        A    No.  No.

24        Q    Who wouldn't be?

25        A    There are different rules, for
```

```
 1                    J. WANGEL
 2    different folks depending on the number of
 3    different practices.  And you have
 4    management can decide whether or not they
 5    want a manager to manually enter their time
 6    or not -- has a complete different time
 7    keeping system than H&H does.  Typical city
 8    rules.
 9        Q    So Dr. Kaye contends that she
10    could not manually enter her time.  Has that
11    been your experience.
12              MS. CANFIELD:  Objection. you
13         can answer.
14        A    You said continually.  I think at
15    this point --
16        Q    I did not say continually.  I said
17    she is contending.
18              COURT REPORTER:  Can you
19         repeat the question.
20        Q    Dr. Kaye, is contending that she
21    did not have the ability to manually enter
22    her time.  I'm asking whether or not that
23    was common.
24              MS. CANFIELD:  Objection as to
25         form.  You can answer.
```

1                          J. WANGEL

2          A    Yeah, I mean there were issues

3     with the roll out across the board.  Again,

4     like I said, this is a brand new electronic

5     system for a couple of thousand people.

6     Multiple for dozen of places.  Like you

7     would expect there were some bumps in the

8     road.  We did the best we could to roll it

9     out as smoothly as possible.  And anybody

10    who had an issue, we tried to correct as

11    soon as possible.

12         Q    Now, Dr. Kaye contends that her

13    inability to access Kronos was, took place

14    for a sustained period of time to the

15    detriment of her compensation.

16              MS. CANFIELD:  Objection.  Are

17         you testifying?

18              MS. HAGAN:  No, I'm asking him

19         a question.

20              MS. CANFIELD:  Just ask the

21         question then.  You're putting in a

22         lot of colloquy.  You can just move

23         the deposition by asking him a

24         question.

25              MS. HAGAN:  I'm going to ask

1                              J. WANGEL

2            the question.

3            Q    So was it your experience that Dr.

4     Kaye repeatedly had this problem?

5            A    Which problem?

6            Q    The problem with the access to

7     Kronos; was this resolved in July of 2018?

8            A    I don't recall specifically.  I

9     would imagine it was addressed.  I can't say

10    for sure.

11           Q    I'm going to move on then 'cause

12    you're not sure how it was resolved.  Do you

13    remember if it was ever resolved for Dr.

14    Kaye?

15           A    Again, specifically I don't.  But

16    I can tell you that -- to say that her

17    compensation was negatively impacted, but I

18    can tell you that as an annualized salaried

19    employee, which Dr. Kaye was, even if you

20    don't submit your time sheet, you still get

21    your annual paycheck.  So it's ordinarily

22    unlikely that you're pay would be --

23           Q    I'm going to show you what will be

24    marked as Plaintiff's Exhibit 35.

25                     (Whereupon, Email (NYC_974-975)

Page 295

```
 1                    J. WANGEL

 2                    was marked as Plaintiff's

 3                    Exhibit 35 for identification as

 4                    of this date.)

 5          Q    And Plaintiff's Exhibit 35,

 6     plaintiff's Exhibit 35 bears the Bates stamp

 7     series NYC_974 and NYC_975.  Do you see

 8     that?

 9          A    I don't see that.

10          Q    Do you see NYC Health Hospitals?

11          A    I do see that.

12          Q    I wanted to draw your attention to

13     the beginning of the e-mail thread.  It's

14     from a Justine McGranaghan and it's to a

15     Carla Phillips.  And it says supervisor

16     change for Dr. Kaye, M. Kaye.  Hi, Carla, it

17     says, I was recently informed that Dr. Kaye

18     was supposed to be reporting to Dr. Jain.

19     If PeopleSoft is OHS's only personnel data

20     source, then disregard, as this data was

21     corrected in PeopleSoft this morning.  I

22     just wanted to ensure that this supervisor

23     change has been corrected everywhere

24     possible.  Thank you so much. Best.

25                    Now, do you recall Dr. Kaye
```

```
 1                    J. WANGEL

 2      raising an issue with Dr. McGranaghan, the

 3      Manhattan Court Clinic Director, being

 4      listed as her supervisor?

 5          A    Generally yes because the e-mail

 6      you're showing me talks about OHS.  And the

 7      e-mail sent by OHS, which typically goes to

 8      a supervisor, that went to Dr. McGranaghan

 9      in lieu of Dr. Jain because the reporting

10      may have been inaccurate because of whatever

11      source.

12          Q    Did you ever deal with anything or

13      address the e-mail?

14               MS. CANFIELD:  Objection to

15            form.  You can answer.

16          A    I am on this e-mail?

17          Q    Let's see.  Let's scroll up

18      further.  Well, you are, here you are CC'd

19      on December 3.  FYI, just additional

20      followup regarding Dr. Kaye assigned

21      supervisor and make sure it's assigned as

22      me.  Thanks, Beesh.

23               You see this right?

24               Now, did there ever come a time

25      that Dr. Kaye raised a concern to being CC'd
```

Page 297

1                         J. WANGEL

2      on a e-mail that had her personal

3      information on it?

4           A    I do generally remember that Dr.

5      Kaye had concerns, yes.

6           Q    Did you take any steps to rectify

7      this situation?

8           A    I think that's what was happening

9      here.  Again, it's not a labor function.  If

10     a supervisor of records is in incorrect,

11     needs to be corrected by HR.

12          Q    You're repeatedly saying this is

13     not a labor function, yet you're on all

14     these emails, Mr. Wangel.  Why is that?

15          A    On this I'm copied.  I would

16     imagine they raised the concern to Doctors'

17     Counsel -- so I'm aware of what's happening.

18     Looks like they are addressing us here.

19          Q    I'm going to show you what's going

20     to be marked Plaintiff's Exhibit 36.

21                      (Whereupon, Email

22                      (NYC_1283-1284) was marked as

23                      Plaintiff's Exhibit 36 for

24                      identification as of this date.)

25          Q    Plaintiff's Exhibit 36 bears the

```
 1                       J. WANGEL

 2      Bates stamp series NYC_1283 and 1284.  It

 3      starts with an e-mail from Maria Mendez to

 4      Dr. Kaye.  It looks like it involves a

 5      request for FMLA/intermittent, as discussed

 6      earlier.  She basically says, attached,

 7      please find an approval letter regarding

 8      your request for an intermittent leave of

 9      absence to care for your ill family member.

10      For any time sheet submitted without the

11      proper codes, please see the attached

12      employee time sheet changes.  You see that,

13      right?

14           A    I do.

15           Q    So then Dr. Kaye then talks about,

16      she goes into, she thanks you for helping

17      her complete -- first let me thank you HHC

18      for completing the processing of my FMLA

19      today.  She talks about the difficult times

20      that she's experiencing.  But then she goes

21      on and she mentions on at least two prior

22      occasions Dr. Daniel Mundy was copied on

23      e-mails that contained my personnel

24      information.  I initially contacted my

25      supervisor, Dr. Jain in September 2018 who
```

```
 1                    J. WANGEL
 2      indicated that he had resolved the matter.
 3      However, when it happened again in December
 4      2018, I contacted you and the other HHC
 5      management about this violation and you
 6      indicated that it had been resolved in
 7      PeopleSoft.  So there is a question quite
 8      frankly, Mr. Wangel, what part did you play
 9      in this?
10           A    What part did I play in what?
11           Q    Well, let's keep going.  Ms. Yang
12      or Dr. Yang then emails you and Jessica
13      Laboy.  And she ask this Yvette or Kevin.
14      Who supervised Yvette?
15           A    Dr. Katz.
16           Q    Okay.  And who supervises Kevin?
17           A    I'm not even sure.  Kevin is, I
18      think he's IT, so it would also be Dr. Katz.
19      I think if I remember Kevin correctly, he
20      worked in IT, so I'm pretty sure it's also
21      Dr. Katz.
22           Q    So you're saying that neither you
23      nor Ms. Laboy supervised Yvette nor Kevin?
24           A    That's correct.
25           Q    Now, could she have been
```

```
1                       J. WANGEL

2       referencing Kevin Collins from Doctors'

3       Council?

4             A     Could she have been, sure, but

5       very unlikely.  Doctors' Counsel has nothing

6       to do with PeopleSoft or any internal

7       record.  I'm almost positive --

8             Q     So then Ms. Laboy follow ups

9       Yvette.  And is this Villanueva?

10            A     I would say so, yes.

11            Q     Is it your testimony that

12      Ms. Villanueva did not fall under your

13      purview?

14            A     That's correct.  That's correct.

15            Q     Now, at any point did it come to

16      your attention that Dr. Kaye had allegations

17      that her pay was being unfairly docked?  We

18      talked about this earlier that her pay was

19      docked on two Jewish holidays back to back.

20      Did ever come to your attention?

21            A     I believe it did.

22            Q     And what did you do?

23            A     What did I do in regards to.

24            Q     Well, it was brought to your

25      attention, did you take any steps to address
```

Page 301

1                        J. WANGEL

2       the issue?

3            A    I believe my recollection is Dr.

4       Kaye did not want to charge leave or absence

5       for the holidays she was out because the

6       holiday were citywide bargaining agreement

7       and not to charge them.

8            Q    Are you saying that the Jewish

9       holidays that Dr. Kaye took off were not

10      part of her collective bargaining agreement?

11           A    Yes.

12           Q    Where does it say in the

13      collective bargaining that they are not

14      covered?

15           A    It doesn't say which holidays are

16      included and those are not included.

17           Q    And you're certain about that?

18           A    As certain as I could be.

19           Q    So you went to the collective

20      bargaining agreement and you found out

21      specifically that those particular holidays

22      are not listed in the bargaining agreement

23      for anyone to take off?

24           A    I don't recall actively taking

25      those steps.  Taken off automatically,

```
1                    J. WANGEL
2      presumably, if they were.
3           Q    Yon Kippur, the most holy day in
4      the Jewish calendar is not covered by the
5      collective bargaining agreement?
6           A    You're asking me or telling me?
7           Q    I'm asking.
8           A    I believe that's correct, yes.
9           Q    Oh, that's interesting.  Okay.
10     Now, Dr. Kaye raised some issues about dual
11     agency as it pertained to, I guess,
12     Dr. Garcia Mensia in the Bronx.  Do you
13     recall any discussion of that?
14          A    No.
15          Q    So you don't recall any emails or
16     any discussion about Dr. Kaye having concern
17     with Dr. Garcia Mensia being in the Bronx
18     and supervising Dr. Breighton?
19          A    Supervising who, I'm sorry.
20          Q    Dr. Breighton?
21          A    I don't recall.
22          Q    Do you remember Jeff Bloom raising
23     that issue from Legal Aid Society?
24          A    I don't.  I don't remember the
25     details of this.
```

1                    J. WANGEL

2          Q    Do you recall anyone from Legal

3    Aid Society raising concerns about the

4    presence of third parties in 730 exams?

5          A    I really don't.  I do not.

6          Q    So you don't recall any issues

7    that Legal Aid Society may have had in the

8    operations of the court clinics?

9          A    I mean if there were, again, this

10   would not have been a Labor issue.  And we

11   would have gone to FPECC leadership or Dr.

12   Ford or whom ever.

13              MS. CANFIELD:  I'm going to

14          take a ten-minute break.

15                   (Whereupon, a recess was taken

16                   from 4:43 p.m. to 4:57 p.m.)

17         Q    Mr. Wangel, we touched on this

18   earlier today when I was talking about Dr.

19   Kaye acting in evaluatory capacity and not a

20   treatment capacity.  You do recall that part

21   of our discussion?

22         A    Evaluatory and not a --

23         Q    Treatment.

24         A    Sure.  Yes.

25         Q    And you were making a distinction

```
 1                    J. WANGEL
 2      between inmate and patients, right?
 3           A    Yes.
 4           Q    And during the course of our
 5      discussion, not necessarily during the
 6      course of our discussion, but you researched
 7      several topics that pertained to court
 8      clinics during your tenure at CHS; would
 9      that be fair to say?
10           A    I don't think so.
11           Q    Well, for example, for the private
12      practice policy, did you play a part in
13      drafting that?
14                    MS. CANFIELD:  Objection as to
15                form.  You can answer.
16           A    It's possible.  I don't recall
17      specifically.  Again, I recall drafting lots
18      of different things.
19           Q    If you were involved, let's say,
20      in the drafting of that policy, for example,
21      I would believe as an attorney you would
22      have done some kind of legal research in
23      order to opine on any given topic; would
24      that be the case?
25                    MS. CANFIELD:  Objection.  You
```

Page 305

1                          J. WANGEL

2              can answer.

3         A    Could be.  I mean I would say if I

4    was consulted only for a Labor Relations

5    issue or topic or lens, possibly.  It would

6    depend why I was involved.

7         Q    At any point did the topic of dual

8    agency, I guess, present itself during the

9    course of your tenure in CHS?

10        A    When you say dual agency, I'm not

11   exactly sure what you're referring to.

12        Q    Well, one of tenants of forensic

13   psychiatry is that there is a strict

14   demarcation between treatment and

15   evaluation.  Dr. Kaye was solely an

16   evaluator.  However, in order for the 730

17   process to have some legitimacy, it's pretty

18   fundamental tenant of forensic psychiatry

19   that treatment be isolated from the

20   evaluation, so in order to avoid what's

21   known as dual agency.

22             I'm actually am engaging in

23   colloquy because I want to be sure you're

24   clear what I'm talking about.

25        A    I appreciate it in this instance.

                              J. WANGEL

1                         J. WANGEL

2      Thank you.

3           Q    So, Mr. Wangel, during the course

4      of your work at CHS, right, did this issue

5      present itself as it pertained to the court

6      clinics or any of the court clinics for that

7      matter?

8           A    I do not believe so.  Not through

9      my office.  I'm trying to recall a time it

10     would have.  I don't recall it being an

11     issue for me.

12          Q    Now, I'm going to ask you if

13     you're familiar with a staff person by the

14     name of Alex Garcia Mensia?

15          A    I don't recall that name.

16          Q    Now, I guess, Dr. Garcia Mensia is

17     a psychologist that works in the hospital at

18     CHS, on Rikers.  Are you aware of that?

19               MS. CANFIELD:  Objection.

20          A    No.  And when you say the

21     hospital, I'm assuming you mean in the jail

22     some place.

23          Q    In the jail, yes.

24          A    Right.  I don't know the name of

25     that.

1                    J. WANGEL

2         Q    She's actually in a treating

3    capacity, right?  Are you aware of that?

4              MS. CANFIELD:  Objection.  You

5          can answer.

6         A    Again, I'm not familiar with her

7    or what her title is.  Only what you're

8    telling me.

9         Q    To be specific Dr. Garcia Mensia

10   works at Rikers treating inmates

11   specifically.  Now dual agency frowns upon

12   the same person treating and evaluating a

13   given inmate, or in this instance, it would

14   be either an inmate or patient, as you have

15   referenced several times throughout this

16   deposition.  So, for example, if Dr. Kaye

17   was evaluating Inmate A, she could not then

18   go and treat Inmate A because there would be

19   a dual agency issue.

20              So I'm bringing up an instance

21   with Dr. Garcia Mensia because there was an

22   exchange at one point that involved

23   Dr. Garcia Mensia being sent to the Bronx.

24   Do you recall that?

25              MS. CANFIELD:  Objection

Page 308

1                       J. WANGEL

2          everything you said before that

3          question.

4     A     I don't.

5     Q     Had you ever been contacted by

6   anyone involving Legal Aid Society objecting

7   to Dr. Garcia Mensia sitting in on the 730

8   examination?

9     A     I mean I don't recall

10  specifically.  If I was, I probably would

11  have passed it along to the appropriate

12  folk.

13    Q     So even though you may have been

14  CC'd on the e-mail involved in a discussion

15  that dealt with this particular instance,

16  you're saying that it's your position that

17  you would have fielded it off to someone

18  else?

19          MS. CANFIELD:  Objection as to

20          form.  He can answer.

21    A     I mean it would depend on, if it

22  was being referred back to me to take some

23  sort of disciplinary action against a staff

24  member, then no.  But if it was someone

25  externally raising an issue about what is or

1                          J. WANGEL

2      is not appropriate programmatically, I would

3      have given it to the appropriate clinical

4      folks to handle the 730 process.

5           Q    I'm going to ask you something and

6      I'm going to kind of backtrack.

7                What is your understanding of

8      MOCJ's role in the running of the court

9      clinics?

10          A    I'm not super familiar with it.

11     Again, this was not my role at CHS.  There's

12     whole, units, departments that do this.  I

13     don't know.  I'm not the expert here.

14          Q    Do you know what MOCJ is?

15          A    Yeah.  It's the mayor's office.  I

16     know the acronym.  I don't know how it

17     relates to 730 exams.  I was not involved in

18     CHS.

19          Q    How often did you engage MOCJ in

20     the course of your work?

21               MS. CANFIELD:  Objection as to

22          form.  You can answer.

23          A    If I was at all, it was as an

24     e-mail bystander.  I don't recall any direct

25     dealings with MOCJ on the 730 process.

1                    J. WANGEL

2        Q    I'm going to bring your attention

3    to what's going to be plaintiff's last

4    exhibit.  Plaintiff's Exhibit 37.  It bears

5    the Bates stamp series 1134 and 1135.

6                    (Whereupon, Email

7                    (NYC_1134-1135) was marked as

8                    Plaintiff's Exhibit 37 for

9                    identification as of this date.)

10       Q    Can you see what looks like an

11   Adobe produced document?

12       A    I do.

13       Q    And I'm going to start at the

14   beginning of the thread, right.  It's an

15   e-mail from Dr. Jain, who -- Dr. Kaye,

16   Dr. Mundy, Dr. Owen and Dr. Winkler.  And it

17   is regarding the psychological testing

18   policy at corrections.  Right?

19            It says, thank you for your input

20   regarding the FPECC psychological testing

21   policy.  You see this, right?

22       A    Um-hmm.

23       Q    And then there is an e-mail from

24   Dr. Kaye to Dr. Jain and forward regarding

25   the policy and Dr. Kaye raises concerns

Page 311

1                        J. WANGEL

2        about the proposed administrative policy

3        which places restrictions upon MD clinic

4        directors.  That's what Dr. Kaye brought up,

5        right?  Do you recall seeing the

6        psychological testing policy, Mr. Wangel?

7             A    Not specifically.  It's possible,

8        but I don't recall specifically.

9             Q    Did you participate in drafting

10        the policy in any way?

11             A    I don't believe so.

12             Q    So then Dr. Kaye raises another

13        issue.  Another issue with the involvement

14        with Dr. Alex Garcia.  We already had an

15        instance which Legal Aid challenged what was

16        perceived to be an impropriety in the exam

17        process when Dr. Garcia sought to become

18        involved in forensic evaluations while

19        actively in the role of a treatment

20        supervision of Rikers Island clinical staff.

21        And you see this now, right?

22             A    Um-hmm.

23             Q    And do you vaguely remember

24        anything that had to do with these types of

25        allegations regarding Dr. Garcia Mensia?

Page 312

1                      J. WANGEL

2          A    I don't know.  I don't.

3          Q    So then Dr. Jain says the response

4    is not surprising from Dr. Kaye and similar

5    to what I'm anticipated yesterday.  I don't

6    feel pressure to respond to her e-mail

7    immediately especially because you and I

8    were both CC'd and I already responded to

9    her previous emails about this.  If you

10   think it's appropriate, I can reply with you

11   CC'd, something along the lines of what I

12   sent you yesterday.  That these are good

13   points that we've considered, and the

14   purpose of this policy is not reviewing or

15   approving individual testing request.

16              Then Dr. Jain talks about, it was

17   also bought to his attention today either

18   this policy or a discussion of this policy

19   was being circulated.

20              So this was the discussion that we

21   talked about earlier that prompted as least

22   one of the e-mail investigation that you

23   were engaged.  Would that be accurate, Mr.

24   Wangel?

25         A    Yeah, it certainly could be.

1                          J. WANGEL

2        Again, like I said, to do an e-mail search

3        for specific terms of a specific document it

4        would have to be an expert on the 730

5        process or -- either compensation, so it's

6        very possibly.

7               Q    Now, you mentioned at one point

8        that Dr. Kaye's emails contained or at least

9        the e-mails that were subject to the

10       investigation were found to be in violation

11       of the acceptable use policy, involved the,

12       I guess, the transmittal of confidential or

13       sensitive information.  And in this instance

14       Dr. Jain is referring to a draft policy.

15       How would you determine that was either

16       confidential or sensitive?

17              A    It would depend on the substance

18       of it.  Based on a draft that were not final

19       policy.  You have to take there were

20       separate cases on the city.  Hard to say

21       exactly.  Without seeing it again, I don't

22       recall.

23              Q    And you don't recall what happened

24       here.  We weren't able to establish if Dr.

25       Kaye if there was a written report that was

Page 314

1              J. WANGEL

2     written I guess in the culmination of your

3     investigation.

4              Was there a report after you

5     monitored Dr. Kaye's e-mail address, e-mail

6     box?

7              MS. CANFIELD:  Objection as to

8         form.  You can answer.

9         A    Again, if there was no -- no

10    formal discipline was taken against Dr.

11    Kaye.  So there were no charges with the

12    investigation had rose to that level or not

13    receiving discipline, then likely no.

14        Q    Did you discuss the content of

15    your investigation or the subject of your

16    investigation with Dr. Yang?

17        A    Possibly.  But do I recall

18    specifically, no.

19        Q    Did you discuss it with Dr. Jain?

20        A    No, less likely.  But again, I

21    don't recall.

22        Q    Dr. Ford?

23        A    Same answer.  She's in the middle.

24    More likely to Jain less likely to -- I

25    don't recall specifically.

1              J. WANGEL

2                   MS. HAGAN:  Well, I'm actually

3              done.  I'm going to -- if Ms.

4              Canfield has any followup questions,

5              I yield the floor to her at this

6              particular time.

7                   MS. CANFIELD:  I don't have

8              any followup questions.  We are

9              finished.

10                      (Whereupon, this examination was

11                      concluded at 5:14 p.m.)

12

13

14  _____

15  JONATHAN WANGEL

16

17

18  Subscribed and sworn to
    before me on this _____  day
19  of _____, _____.

20

21  _____
    Notary Public
22

23

24

25

1

2                          I N D E X

3   WITNESS: JONATHAN WANGEL

4   EXAMINATION BY                              PAGE

5          MR. HAGAN                             4

6

7                        E X H I B I T S

8   PLAINTIFF'S          DESCRIPTION           PAGE

9   1                    Email (NYC_1902 - 1906)  25

10  2                    E-mail (NYC_513)        35

11  3                    E-mail (NYC_251)        41

12  4                    E-mail (NYC_594-595)    47

13  5                    E-mail (NYC_609-611)    61

14  6                    E-mail                  66
                         (Kaye3rdProd_68-70)
15
    7                    E-mail (NYC_797)        72
16
    8                    E-mail (NYC_544)        76
17
    9                    E-mail                  82
18                       (Kaye3rdProd_109-111)

19  10                   E-mail (NYC_259)        94

20  11                   E-mail (NYC_882-888)    99

21  12                   Email (NYC_1058)        106

22  13                   Email (NYC_350-355)     109

23  14                   Email (NYC_385)         124

24  15                   Email (NYC_395-400)     142

25  16                   Email (NYC_1060-1061)   162

Page 317

1

2    17              Payroll Audit Report      168
                     (NYC_2159-2161)
3
     18              Email (NYC_2629-2630)     177
4
     19              Email (NYC_3004-3008)     187
5
     20              Email (NYC_2688-2690)     203
6
     21              Email (NYC_2794,          218
7                    2797-2800)

8    22              Email (NYC_2804)          227

9    23              Email (NYC_2869-2870)     229

10   24              Memorandum (NYC_2978)     234

11   25              Email (NYC_2945)          240

12   26              Email (NYC_1521, 1525)    241

13   27              Email (NYC_755 - 756)     245

14   28              Email (NYC_757 - 758)     248

15   29              Email (NYC_1114)          253

16   30              Email (NYC_2192-2198)     261

17   31              Email (NYC_1134)          272

18   32              Email (NYC_668)           279

19   33              Email (NYC_2654)          281

20   34              Email (NYC_317-319)       288Mark

21   35              Email (NYC_974-975)       295

22   36              Email (NYC_1283-1284)     297

23   37              Email (NYC_1134-1135)     310

24

25

Page 318

```
 1

 2

 3                    R E Q U E S T S

 4  DESCRIPTION                               PAGE

 5  Missing e-mail from Ms. Mulett            54

 6

 7  Office of Legal Affairs Position Statement  80

 8

 9  Distribution of Policies by Dr. Kaye      274

10  Documentation

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 319

1

2                     C E R T I F I C A T E

3

4          I, KIARA MILLER,

5          A Shorthand Reporter and Notary Public of the

6          State of New York, do hereby certify:

7

8          That the witness whose examination is

9          hereinbefore set forth, was duly sworn or

10         affirmed by me, and the foregoing transcript is

11         a true record of the testimony given by such

12         witness.

13

14         I further certify that I am not related to any

15         of the parties to this action by blood or

16         marriage, and that I am in no way interested in

17         the outcome of this matter.

18

19

20              _____

21                     KIARA MILLER

22

23

24

25