MELISSA KAYE

strip me of my authority that I had as a physician.

And then as far as my corporate title, there was a decrease in my pay that was unlawful and surreptitious.

How that happened, I don't know if they lowered my corporate title from attending III to attending II or if they took along my longevity pay or what happened to that money.

But my W-2s were reflecting about a $28,000 pay cut once I transferred over to CHS.

Q. When was that?

A. The official change as far as my payroll was concerned was July 1, 2018.

Q. Prior to that, had you had any dealings with Dr. Yang or anyone else?

A. Yes, we began to -- The Bronx Court Clinic, which is under the management of Bellevue Hospital at the time in 2015 --

December of 2015 we started getting e-mails and phone calls from CHS, Dr. Yang and her operatives.

At that time in 2015 CHS, Correctional House Services, was still under

MELISSA KAYE

the auspices of the Department of Health and Mental Hygiene but they began to interfere with the Court ordered competency exams at that time.

I believe it was in 2016 that CHS was transferred from DOHMH to HHC and the interference continued.

But the initial contact that Dr. Yang made with the court clinics was related to case of Miguel Figueroa was the Defendant's name.

And he was -- He had some felony but I don't know what it was. But he was quite a disruptive fellow. And he caused some problems on Rikers Island that Dr. Yang didn't like.

And by that time CHS was overseeing Rikers Island as far as the healthcare delivery was concerned.

So, Dr. Yang wanted him found unfit so he could be removed from Rikers Island and sent to Mid Hudson. She just wanted him off the island.

She started -- We started getting phone calls and e-mails and a lot of pressure

MELISSA KAYE

to alter the administration of the exam in ways that I felt violated the defendants due process rights and constitutional rights.

Typically a defendant who refuses production for his exam three times, at that point the Court will consider ordering a force order for production.

And Miguel Figueroa had never refused production and yet CHS was pushing for him to be force ordered into the court clinic, which I felt was cruel and extreme because a force order can, you know, can be risky and violent.

And it is up to the Court to decide to do that and up to defense counsel to decide to oppose it. But certainly doing it before a defendant has even refused production once seemed extreme.

And so that was a real concern. I felt it violated his constitutional rights. And this was -- Dr. Yang began pushing for this exam to be expedited and moved up from when it was scheduled.

I believe it was sometime in January

MELISSA KAYE

that he was doing the Christmas winter break. She wanted it done over the Christmas winter break.

My co-examiner, I only had one up there and I was always pretty much under staffed. And Dr. Winkler was on vacation, so I didn't have a co-examiner to see him, number one.

Number two, when the statute specifically states that the defense attorney may be present when the defense attorney requests to be present or when the defendant asked for his attorney to be present --

Q.      Dr. Kaye, who did you complain to?

MS. CANFIELD:   She is still finishing.

A.      Dr. Yang was pressuring the case to be present when the case -- Dr. Yang was pressuring us to see the Defendant without his lawyer present. She was pressuring us to find him unfit.

We got a call from the Bronx District Attorney's Office saying that CHS had reached out to them asking them to accept an

```
 1                    MELISSA KAYE
 2   unfit finding without an exam.
 3              And they were really taken back by
 4   that.  So, she also was pressuring us to reach
 5   out to the Court and have the court calendar
 6   changed.
 7              And because his return to court date
 8   was in February, she wanted his return to court
 9   date moved up earlier.  My direct supervisor,
10   who I complained to and was involved in this,
11   Jeremy Collie, you know --
12              He wrote back an e-mail saying, you
13   know, we have no authority over the court's
14   calendar and we are not going to try to move
15   this case up.  He has to be seen with his
16   attorney present and, you know --
17        Q.    Dr. Kaye, I am going to stop you
18   because we only have an hour.
19              Did you complain to anyone outside
20   of CHS and H&H?
21              MS. CANFIELD:  Objection to form,
22        when and about what?
23        A.    During the course of this incident
24   in December of 2015, yes, I complained to the
25   DA's office and I complained to legal aid and
```

```
 1                    MELISSA KAYE
 2   then my chain of command.
 3        Q.     Okay.  Now, from 2000 -- When you
 4   became medical director up until, I guess, your
 5   shift change, what were your office hours?
 6        A.     I worked an eight and a half hour
 7   day.  Eight hour paid and thirty minute unpaid
 8   lunch.
 9        Q.     What time did you come to work?
10        A.     My schedule was 9:00 to 5:30 and at
11   times I would take shift changes but it was an
12   eight hour work day and it was 9:00 to 5:30.
13        Q.     When did you pick up your kids from
14   school?
15             MS. CANFIELD:  Objection to form.
16        Q.     When did you take your kids to
17   school, what time?
18        A.     There was an error in my previous
19   deposition.  The drop off -- The school started
20   at 8:25 or 8:35.
21             I would take them before, you know,
22   I would get them there ten or fifteen minutes
23   early.  I think the start time was 8:25 a.m.
24        Q.     On the shift change, what time were
25   you able to drop off your kids at that point?
```

```
                         MELISSA KAYE
 1
 2       A.      Around 7:15, I believe, around
 3   there.
 4       Q.      When is the first time you reported
 5   to Dr. Ford?
 6               MS. CANFIELD:  Objection to form.
 7       Reported what?
 8       Q.      When was the first time that you
 9   reported to Dr. Ford?
10       A.      I worked at the Bronx Clinic and
11   that was under the auspice of Bellevue Hospital
12   division of Forensic Psychiatry.  So, whoever
13   was the director of the division of Forensic
14   Psychiatry was my direct report to.
15               Dr. Ford became the director of the
16   division of Forensic Psychiatry, I believe, in
17   2009.  I think she was there until 2014 or
18   2015.  He was the director at that point I
19   reported to her.
20               She left in 2014 or 2015 to go work
21   for CHS.
22       Q.      And then who did you report to after
23   she left at that time?
24       A.      Dr. Jeremy Collie.
25       Q.      Then when did you report to Dr. Ford
```

MELISSA KAYE

Because if he doesn't get -- If the judge doesn't get an accurate report on his mental state, the judge cannot rule accurately on his competency or lack thereof.

And, therefore, it violates his constitutional rights to have a fair trial to due process.

So, yes, their attempt to clamp down on the psychological testing was an attempt to control and manipulate the content and results of the exams.

That is why I opposed it.

Q. Dr. Kaye --

A. They started monitoring my e-mails because I gave that policy out, they claim, but I did not.

Q. This took place in January 2019, is that right, yes or no?

A. I believe it was around then. I can't -- I don't know -- Yeah, it was around -- It was around then, I would say.

Q. Then in March -- In March 2019 did you complain about opining on fitness without an exam?

```
 1                    MELISSA KAYE
 2       A.    Oh, absolutely.  I complained about
 3   that from the -- Yeah, I mean, it is completely
 4   violates the defendants constitutional rights
 5   to a fair trial.
 6             If he doesn't even get examined
 7   and for --
 8       Q.    And who did you complain to about
 9   this?
10       A.    I complained to Jain, Ford, Legal
11   Aid, I believe I might have discussed it with
12   judges.  I don't know if I discussed it with
13   Judge Lieb.
14             I think there were ADAs that I
15   spoken to.  I mean, everyone was pretty much
16   taken back by the CHS doing this.
17             It had never been done before, you
18   know, a competency exam is a contemporaneous
19   exam of someones mental state.
20             It's not a retroactive evaluation of
21   someones mental state line an insanity
22   evaluation.  It's the here and now and you
23   can't do a here and now examination unless you
24   examine the defendant.
25       Q.    I am going to switch topics now, I'm
```