Page 360

1   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

2   ------------------------------------------------------------X

    MELISSA KAYE,

3

                                        PLAINTIFF,

4

5               -against-            Case No.:

                                     18-cv-12137

6

7   NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, ELIZABETH

    FORD, PATRICIA YANG, ABHISHEK JAIN and JONATHAN WANGEL

8   (said names being fictitious, the persons intended being

    those who aided and abetted the unlawful conduct of the

9   named Defendants),

10                                      DEFENDANTS.

    ------------------------------------------------------------X

11

12                      DATE:   February 3, 2022

13                      TIME:   1:32 P.M.

14

15

16      CONTINUED DEPOSITION of the Plaintiff, MELISSA KAYE,

17   taken by the Defendant, pursuant to a Order and to the

18   Federal Rules of Civil Procedure, held at the above date

19   and time, via videoconference, before Lisa R. Anzelone, a

20   Notary Public of the State of New York.

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3    LAW OFFICES OF SPECIAL HAGAN
              Attorney for the Plaintiff
 4            MELISSA KAYE
              196-04 Hollis Avenue
 5            Saint Albans, New York 11412
              BY:  SPECIAL HAGAN, ESQ.

 6

 7

      CORPORATION COUNSEL OF THE CITY OF NEW YORK
 8    GEORGIA M. PESTANA, ESQ.
              Attorneys for the Defendants
 9            NEW YORK CITY HEALTH AND HOSPITALS
              CORPORATION, ELIZABETH FORD, PATRICIA YANG,
10            ABHISHEK JAIN and JONATHAN WANGEL (said names being
              fictitious, the persons  intended being those who
11            aided and abetted the unlawful conduct of the named
              Defendants)
12            100 Church Street
              New York, New York  10007
13            BY:  DONNA CANFIELD, ESQ.
              File #:  2019-032851
14            Control #:  22-0312

15

16

17                  *        *         *

18

19

20

21

22

23

24

25
```

Page 362

1          F E D E R A L   S T I P U L A T I O N S

2

3

4          IT IS HEREBY STIPULATED AND AGREED by and between

5    the counsel for the respective parties herein that the

6    sealing, filing and certification of the within deposition

7    be waived; that the original of the deposition may be

8    signed and sworn to by the witness before anyone authorized

9    to administer an oath, with the same effect as if signed

10   before a Judge of the Court; that an unsigned copy of the

11   deposition may be used with the same force and effect as if

12   signed by the witness, 30 days after service of the

13   original & 1 copy of same upon counsel for the witness.

14

15         IT IS FURTHER STIPULATED AND AGREED that all

16   objections except as to form, are reserved to the time of

17   trial.

18

19               *    *    *    *

20

21

22

23

24

25

MELISSA KAYE

Page 363

1    M E L I S S A   K A Y E, called as a witness, having been

2    first duly sworn by a Notary Public of the State of New

3    York, was examined and testified as follows:

4    EXAMINATION BY

5    MS. CANFIELD:

6        Q.    Please state your name for the record.

7        A.    Melissa Kaye.

8              MS. CANFIELD:  I just want to put on the

9              record to make a brief statement that we have not

10             yet received the transcript of Dr. Kaye's last

11             deposition that was taken two weeks ago and I had

12             a preliminary discussion with Ms. Hagan prior to

13             going on the record and she has stated that she

14             will forward to us a link that came from the

15             reporting company.

16             MS. HAGAN:  No, I did not.  I told her I

17             would give you what I had.  You were insisting

18             upon the link.  I said I would give you the

19             scanned copy of the deposition and that's what I

20             will provide.

21             Let's move forward.

22             MS. CANFIELD:  Defendants are just concerned

23             that that might not be a certified original copy

24             so if you could send us the link for the court

25             reporting company that would be great.

MELISSA KAYE

1          MS. HAGAN:  You won't get a copy until I

2     rectify whatever is happening with the court

3     reporting company.  I thought you already had it.

4     It's clear today that you don't.

5          MS. CANFIELD:  There would be no reason for

6     us to have it since you were supposed to provide

7     it to us.

8          MS. HAGAN:  I would have given it to you if

9     you would have asked for it.

10         MS. CANFIELD:  It was Court Ordered as this

11    deposition is Court Ordered for me to provide a

12    copy today.

13         MS. HAGAN:  We're here since 1:30.

14         MS. CANFIELD:  Ms. Anzelone, we may be going

15    on and off the record if there's a lot of

16    colloquy so I just want to let you know because I

17    do have one hour today and I don't want that hour

18    actually to be gobbled up by colloquy.

19         Thank you.

20    Q.    Dr. Kaye, how are you today?

21    A.    (Indicating).

22    Q.    I'm sorry.  I can't hear you.

23    A.    Good morning, Ms. Canfield.

24    Q.    Good morning -- good afternoon here but it's good

25    morning where you are.  You're in Albuquerque, New Mexico;

MELISSA KAYE

Page 365

1    is that correct?

2        A.    That's correct.

3        Q.    If you can just keep your voice up so the court

4    reporter can hear your responses that would be appreciated.

5        A.    Okay.

6        Q.    Dr. Kaye, do you know of any reason why you

7    cannot answer my questions today truthfully?

8        A.    No.

9        Q.    Okay.  Do you know of any reason why you may not

10   understand the questions that I ask of you today?

11       A.    If your question is clear I will do my best to

12   answer it.  If it's unclear I'll ask for clarification.

13       Q.    All right.  Terrific.  That's fair enough.

14             In preparation for your deposition today --

15       A.    I'm sorry.  It's a snow day today so this is more

16   complicated than I had thought.

17       Q.    Right.  Okay.

18             And did you do anything to prepare for your

19   deposition today?

20                  MS. HAGAN:  Objection.

21                  You can answer.

22       A.    I -- I talked to with Ms. Hagan over Zoom.

23       Q.    Did you speak to anyone else other than

24   Ms. Hagan?

25       A.    No.

MELISSA KAYE

1          MS. HAGAN:  Objection.

2      Q.    Okay.  I had just a couple of matters that I want

3  to follow up with you based on your testimony in your last

4  deposition.  And one of those areas that I want to question

5  you on is your testimony, and, again, I don't have the

6  transcript here to read it to you, back to you but you did

7  testify that after or upon the merger with Correctional

8  Health Services which I will be referring to Correctional

9  Health Services or CHS, you stated or testified that your

10  administrative duties were taken away upon that merger.

11  Can you tell me what administrative duties were taken away?

12      A.    Well, it was a gradual decrease and elimination

13  of any kind of administrative or operational authority or

14  input from me.  It -- I was no longer -- I was deprived

15  access of the shared calendar repeatedly.  Even my -- my

16  staff had access to it.  I'd have to go to my staff to --

17  to put in days that I might be out or change things that I

18  needed to change and I repeatedly was denied access to the

19  shared calendar so I couldn't really be involved in any

20  kind of administrative activities.

21      Q.    Other than the shared calendar was there anything

22  else that you no longer had access to that you had access

23  to prior to the merger with CHS?

24          MS. HAGAN:  Objection.

25          Could you allow Dr. Kaye to finish her

MELISSA KAYE

1              answer?

2                   MS. CANFIELD:  She's finished.  I'm moving

3              on in the deposition.

4      A.     Okay.  I was denied access to Kronos and that's

5   with a C, Kronos with a C electronic time keeping system.

6      Q.     I think Kronos is actually spelled K-R-O-N-O-S.

7      A.     Okay.  All right.  Then it's with a K.  Sorry.

8   My mistake.

9              And I was denied access to the i-Sight electronic

10  system for logging and accessing the court orders and the

11  reports.

12     Q.     Anything else?

13     A.     I was excluded from administrative decisions and

14  activities and meetings.

15     Q.     Such as what?

16     A.     Well, an example was due to Dr. Yain entering my

17  time incorrectly into Kronos I had a meeting with Jonathan

18  Wangel in September 7th, I think it was, 2018.  I -- I was

19  down on Water Street with Jonathan Langhorn (phonetic), my

20  union, about these timekeeping irregularities that had

21  happened as soon as I started working for CHS.  As soon as

22  I complained to the EEOC and about the private practice

23  policy --

24     Q.     Okay.  I'm going to stop you right there because

25  your question is not responsive.

MELISSA KAYE

Page 368

```
 1                    MS. HAGAN:  Objection.
 2                    It is responsive.
 3                    MS. CANFIELD:  It's not responsive.
 4                    MS. HAGAN:  You're interrupting her as she's
 5           trying to explain the adverse employment
 6           actions --
 7      A.    I was --
 8      Q.    Excuse me.  No, we're moving on.  This is very
 9   limited.
10           My question was what were your administrative
11   duties that were taken away?  We're not talking about your
12   time.  I'm going to stop you right there and ask a
13   follow-up question --
14                    MS. HAGAN:  I'm going to --
15                    MS. CANFIELD:  Off the record, please.
16                    (Whereupon, an off-the-record discussion was
17           held, after which the proceedings continued as
18           follows:)
19      Q.    Dr. Kaye, you said -- you first testified that
20   you were denied access to the shared calendar.  Did you
21   have access to the shared calendar prior to the merger with
22   CHS?
23                    MS. HAGAN:  Objection as to form.
24      A.    There was no shared calendar prior to the merger.
25      Q.    Now, you also testified that you were deprived
```

MELISSA KAYE

Page 369

```
 1    access to Kronos.  Did you have access to Kronos prior to
 2    the merger with CHS?
 3                    MS. HAGAN:  Objection to form.
 4        A.      There was no Kronos prior to the merger.
 5        Q.      And you also testified that you were deprived
 6    access to the i-Sight electronic I'm assuming case
 7    management system.  Did you have access to i-Sight prior to
 8    the merger with CHS?
 9                    MS. HAGAN:  Objection to form.
10        A.      Well --
11        Q.      It's a yes or no answer.
12                Did you have access to i-Sight prior to the
13    merger to CHS?
14                    MS. HAGAN:  Objection.
15                    She can't just answer that question yes or
16             no.
17                    Answer to the best of your ability or at
18             least rephrase the question, Ms. Canfield.
19        Q.      Excuse me.  You can answer.
20        A.      There was no i-Sight prior to the merger.
21        Q.      Okay.  Thank you.
22                So my question however was in your last
23    deposition you said that your administrative duties were
24    taken away upon the merger but you just testified that you
25    didn't have these administrative duties before the merger;
```

 1    is that correct?

 2                 MS. HAGAN:  Objection.  Form.

 3       A.     No, that's not correct.  I was not allowed to

 4    participate in activities like scheduling meetings,

 5    planning of operational procedures.  I was taken -- those

 6    were taken away from me.  I was replaced by Andrea Swenson

 7    and Clarence Muir and Abhishek Jain.  I was not --

 8       Q.     Okay.

 9       A.     I was not at administrative operations or

10    activities.

11       Q.     I understand now.  Thank you.  I understand now.

12                 So my question is:  Were the other directors

13    meaning the directors of the Manhattan court clinic, the

14    Queens court clinic, the Brooklyn court clinic, did they

15    not answer to Dr. Jain?

16                 MS. HAGAN:  Objection as to form.

17       A.     Can you rephrase the question please?

18                 MS. CANFIELD:  Read the question back,

19                 please.

20                 (Whereupon, the referred to question was

21                 read back by the Reporter.)

22                 MS. HAGAN:  And I objected to form and I

23                 still object to form.

24       A.     I can't answer the question the way it's posed.

25       Q.     So let me rephrase it.

MELISSA KAYE

Page 371

```
 1            You said that Andrea Swenson was responsible for
 2    some administrative duties; is that correct?
 3                   MS. HAGAN:  Objection as to form.
 4                   That's not what she testified to.
 5    Q.     May I ask you this:  Did Dr. Jain oversee all the
 6    court clinics?
 7                   MS. HAGAN:  Objection.
 8    A.     Yes.
 9    Q.     Okay.  Following the merger of CHS; is that
10    correct?
11                   MS. HAGAN:  Objection to form.
12    A.     He started overseeing them before the merger
13    actually officially started.
14    Q.     Okay.  And Andrea Swenson, did she have a certain
15    amount of administrative oversight of all the court clinics
16    following the merger?
17                   MS. HAGAN:  Objection as to form.
18                   Answer if you can.
19    A.     Andrea Swenson's role was to provide
20    administrative services and work with the directors in
21    administrative activities.  She did not work with me.  She
22    worked with the other directors but she excluded me.  She
23    mocked me, she marginalized me and she undermined my work
24    ethic performance, that did not happen to the other
25    directors.  I know for a fact.  I talked with Dr. Winkler,
```

MELISSA KAYE

1    she was very differential to Dr. Winkler and

2    Dr. Monday -- man, who did she not impinge upon her

3    (inaudible) --

4        Q.    So no one -- so your administrative duties

5    weren't taken away, they were just reorganized had when

6    your clinic merged under CHS; isn't that correct?

7                     MS. HAGAN:  Objection to form.  Objection to

8               form.

9                     You are testifying.

10                    And answer the question if you can,

11              Dr. Kaye.

12       A.    That's a false statement.  It's inaccurate.  It

13   mischaracterizes what I experienced.  I was marginalized.

14   My administrative authority was removed and I was

15   marginalized in participating in administrative discussions

16   and decisions.

17       Q.    Okay.

18       A.    To me it did not happen to the other directors.

19       Q.    Okay.  And you testified you base that on your

20   conversations with Dr. Winkler; is that correct?

21                    MS. HAGAN:  Objection.

22       A.    I base that --

23                    MS. HAGAN:  You can answer to the extent

24              that you can.

25       A.    I -- I -- it was evident from the way that I was

1    spoken to, the way that I was mocked and teased and
2    whenever I tried to engage in a professional dialogue about
3    a serious administrative issue including Damian McClaren
4    getting seen about his attorney, I then got written up by
5    Andrea Swenson as a disruptive physician.  Andrea Swenson
6    was directly responsible for administrative board
7    oversight.  I had trouble -- I was being harassed with my
8    credentials for three months.  Contemporaneously with the
9    Damian McClaren issue I asked her for her support and her
10   involvement if she was the administrator.  She sabotaged me
11   credentially (sic).  That didn't happen to other directors.
12       Q.    Okay.  I'm going to stop you there and move on.
13   I think you've answered my question.
14            So the next topic is:  You testified that you
15   received a $28,000 pay cut in 2019.  What do you attribute
16   that alleged pay cut to?
17                MS. HAGAN:  Objection as to form and -- and
18            it mischaracterizes her testimony.
19                You can answer.
20       A.    I was supposed to have a salary with my longevity
21   pay and my incremental pay increases to collective
22   bargaining, my final salary was supposed to be 207.  NYCERS
23   confirmed that with me.  I got a W-2 in 2018 that had a
24   final salary of 173 or something like that and then it
25   added another 20,000 for the retention bonus that all the

MELISSA KAYE

Page 374

1    doctors got.

2        Q.    Let me stop you right there, Dr. Kaye.  I'm

3    talking about 2019, you just said 2018 --

4                MS. HAGAN:  Objection as to form.

5        Q.    Hold on.

6                MS. HAGAN:  You have to allow her to finish.

7                She never testified to the $28,000 reduction in

8                2019 you confirmed that in your letter and now

9                you're trying to pose that same testimony on my

10               client.  She never said she got a reduction in

11               2019.  She said she --

12               MS. CANFIELD:  Ms. Hagan, I believe --

13               MS. HAGAN:  She said 2018 and 2019.

14               MS. CANFIELD:  I believe you confirmed in

15               your letter to Magistrate Judge --

16               MS. HAGAN:  I did not confirm that at all.

17               MS. CANFIELD:  You did.

18               MS. HAGAN:  I did not confirm that at all.

19       A.    Can I correct the record, please?

20       Q.    Yes.

21       A.    I got I got a W-2 in 2018 and 2019 that reflected

22   an illegitimate pay decrease.

23       Q.    Okay.  And what do you attribute that

24   illegitimate pay increase to?

25       A.    Retaliation and the ongoing surreptitious,

1    alteration to my time sheet by Dr. Jain and whoever he was

2    working with, Dr. Yang, all of these people.  Jonathan

3    Wangel, as I was saying before, in that meeting I was

4    excluded from when I was downtown meeting with Jonathan

5    Wangel with my union in early September 2018 was about this

6    issue.  I had been having pay discrepancy issues and I had

7    been dealing with it through my union to the point where I

8    then realized my union is failing to address this properly

9    because they were more interested in the codling an

10   appeasing Mr. Wangel and Ms. Yang than they were in doing

11   their job to defend me, a union member.

12       Q.    So, Dr. Kaye, you said this was in September

13   2018?

14       A.    It started -- no.

15       Q.    Let me be clear.  You said the meeting that you

16   had with your union was in September 2018; is that correct?

17       A.    I noticed the pay decreases and changes as soon

18   as I got access to Kronos in August 2018.  Setup a meeting

19   with Wangel?

20       Q.    Okay.  And how did you setup that meeting, did

21   you do that by e-mail with your union?

22       A.    I don't know.  My union set it up with Wangel.

23   He kept changing it but there is -- there are e-mails

24   confirming that -- that we met with him that day.

25       Q.    Okay.  And what was the result of meeting with

MELISSA KAYE

1    your union and Mr. Wangel?

2        A.      My union raised the concerns about --

3        Q.      And what was the response?

4              MS. HAGAN:  Well, objection.  You have to

5              let her finish answering her question.

6        Q.      Go ahead.

7        A.      Mr. Wangel said he would look into it, into I

8    think he called it the Axial system (phonetic) at central

9    office and he would get certain paperwork for my union to

10   review and that never happened.

11       Q.      Okay.  Did your union ever follow up with Mr.

12   Wangel to make sure that he in fact followed up with the

13   information?

14       A.      I had been following up with my union about the

15   pay discrepancies and the other issues contemporaneously

16   until I finally just gave up and resigned.

17       Q.      Okay.  When you followed up with them did you do

18   so by e-mail?

19              MS. HAGAN:  Objection as to form.

20       A.      I --

21              MS. HAGAN:  You can answer.

22       A.      I know I had a lot of phone calls with them so

23   there were definitely phone calls.

24       Q.      Okay.  If you followed up with them by e-mail did

25   you turn over all the e-mails in discovery?

1                     MS. HAGAN:  Objection as to form.

2                     You can answer if you can.

3         A.    I -- well, I considered my union correspondence

4    privileged because my union wasn't being sued so I was -- I

5    wasn't going to -- I didn't divulge union communication.

6    I -- I mean...

7         Q.    Well, those communications are the subject of

8    this litigation and they should have been turned over so

9    I'm going to ask you to find those e-mails and turn them

10   over to your attorney and I will write The Court to let

11   them know that certain information has not been turned over

12   in this litigation.

13                    Additionally --

14                    MS. HAGAN:  I don't know if that's

15                    necessarily true.  I think Dr. Kaye has provided

16                    all the e-mails that she has and if she was

17                    corresponding on H&H servers then you defendants

18                    would already have them, you would be able to

19                    produce them.

20                    MS. CANFIELD:  That is correct but --

21                    MS. HAGAN:  Yes.

22                    MS. CANFIELD: -- as for the record --

23                    MS. HAGAN:  If she has them.

24                    MS. CANFIELD:  Excuse me.  As --

25                    MS. HAGAN:  Plaintiff --

MELISSA KAYE

Page 378

```
 1              MS. CANFIELD:  Hold on.  Hold on --
 2              MS. HAGAN:  Under her custody command and
 3         control.  If Dr. Kaye no longer works there she
 4         may not have access to these e-mails.  However,
 5         defendants do have access to the e-mails.
 6              MS. CANFIELD:  Okay.
 7         Ms. Hagan, Ms. Hagan, please stop, please stop.
 8    Q.    Dr. Kaye, there is a number of e-mails that we
 9  see based on the evidence that you forwarded to your Gmail
10  account.  I want to know if you searched your Gmail account
11  and turned over all e-mail correspondence that you had with
12  your union concerning any of the issues in this litigation?
13              MS. HAGAN:  Objection as to form.
14              Answer if you can.
15    A.    That's a lot -- I mean, that's -- you're asking
16  me a lot of questions.
17              Now, could you please rephrase that because
18  it's --
19    Q.    Yes.  I will rephrase.
20              Did you communicate with your union using your
21  Gmail account?
22    A.    Yes.
23              MS. HAGAN:  Objection.
24    Q.    Okay.  Did you turn over any correspondence with
25  your union using your Gmail account concerning any of the
```

1    issues in this litigation?

2              MS. HAGAN:   Objection as to form.

3       A.    When you say, "turn over", what do you mean?

4       Q.    Provide to your attorney.

5              MS. HAGAN:   Objection as to form.

6       A.    If I -- if I did I may have, I don't know, I may

7    have recapped phone calls and -- and typed that up in

8    e-mails and sent that to her.  I don't know.

9       Q.    Okay.

10      A.    I considered my representation by my union

11   separate from my representation in this litigation.

12      Q.    It's not.  If there are the same issues that you

13   discussed with your union the same issues that you're suing

14   H&H over so to the extent that --

15              MS. HAGEN:  I don't think --

16              MS. CANFIELD:  I'm talking,

17         Ms. Hagan, I'm talking --

18              MS. HAGAN:  I know you're talking.

19              MS. CANFIELD:  Please do not interrupt me.

20              Ms. Court Reporter, please go off the record

21         now.

22              (Whereupon, an off-the-record discussion was

23         held, after which the proceedings continued as

24         follows:)

25              MS. CANFIELD:  Back on the record.

MELISSA KAYE

Page 380

1       Q.      Dr. Kaye, we're going to shift topics.

2               You also testified that your staff was taken away

3       from the Bronx court clinic.  Can you tell me what staff

4       was taken away from the Bronx court clinic?

5       A.      Yes.  Elizabeth Ford started phasing Barry

6       Winkler out of the court clinic in February right after our

7       January meeting.

8       Q.      Anyone other than Dr. Winkler?

9               MS. HAGAN:  Let her finish answering her

10              question.

11              MS. CANFIELD:  No.

12      Q.      Anyone other than Dr. Winkler?

13              MS. HAGAN:  Let the record reflect that Ms.

14              Canfield is not allowing Dr. Kaye to finish her

15              answers.

16      Q.      Anyone other than Dr. Winkler?

17      A.      When Dr. Winkler left the court services was

18      non-operational.

19      Q.      That's not responsive.

20              Anyone other than Dr. Winkler that was taken away

21      from the Bronx court clinic?

22              MS. HAGAN:  Objection.

23      A.      He was taken away and not replaced.

24      Q.      Okay.  But was anyone else taken away?

25              MS. HAGAN:  Objection.

MELISSA KAYE

Page 381

1       A.      He was the only person.   There are only two

2    evaluators.   There was no one else to take away.

3       Q.      Thank you.

4               In your last deposition you also testified that

5    you filed a complaint with the New York State Inspector

6    General's office and the Department of Justice in September

7    2019.  Did you provide a copy of those complaints to your

8    attorney?

9                    MS. HAGAN:  Objection as to form.

10      A.      Two questions.  You're asking me -- you're asking

11   me about the date.  I'm not a hundred percent sure about

12   the date.  I did file a complaint and there was no copy to

13   be had it was done online.

14      Q.      It was done online.  Okay.

15              And do you recall --

16      A.      DOJ -- I'm sorry.  The DOJ complaint was done

17   online.

18      Q.      Okay.  And what about the New York State

19   Inspector General's office, how did you file that

20   complaint?

21      A.      Online.

22      Q.      So both were online?

23      A.      Yes.

24      Q.      Do you recall when you filled them out online?

25      A.      I don't recall the date.

MELISSA KAYE

Page 382

```
 1      Q.     Okay.  When you completed your online complaint
 2   did you receive any e-mail confirming receipt of those
 3   complaints?
 4              MS. HAGAN:  Objection as to form.
 5      A.     I don't recall getting an e-mail confirmation
 6   from -- right after I sent it.
 7      Q.     Would you have any way of confirming the date
 8   that you made the DOJ online complaint?
 9              MS. HAGAN:  Objection as to form.
10      A.     I don't have a way to confirm.
11      Q.     Do you have any way to confirm the date that you
12   filed the New York State Inspector General's complaint
13   online?
14      A.     No.
15              MS. HAGAN:  Objection as to form.
16      Q.     Did anyone ever follow up with you from the
17   Department of Justice concerning your complaint that you
18   filed online?
19              MS. HAGAN:  Objection to form.
20      A.     I never got a phone call, no.
21      Q.     Did anyone send you an e-mail?
22              MS. HAGAN:  Objection.
23      A.     I believe they sent me an e-mail and said they
24   were forwarding the complaint to the New York State IG or
25   AG, something like that.
```

MELISSA KAYE

Page 383

1    Q.     And the e-mail that you received from the

2    Department of Justice, did you send that e-mail to your

3    attorney?

4    A.     I don't recall.

5    Q.     Did you receive anything from the New York State

6    Inspector General's office after you filed a complaint with

7    them online?

8    A.     I don't recall that they contacted me.

9    Q.     Do you know if there was an investigation as a

10   result of the DOJ complaint that you filed online?

11            MS. HAGAN:  Objection to form.

12   A.     I do not know.

13   Q.     Do you know if there was any investigation as a

14   result of the complaint you filed online with the New York

15   State Inspector General's office?

16            MS. HAGAN:  Objection as to form.

17   A.     Could you repeat the question?

18            MS. CANFIELD:  Can you read that back,

19            please.

20            (Whereupon, the referred to question was

21            read back by the Reporter.)

22   A.     No, I don't.

23   Q.     Okay.

24            Is there any way that Dr. Ford would have found

25   out about any of -- either the DOJ or the New York State

```
 1    Inspector General's office complaints that you filed
 2    online?
 3                   MS. HAGAN:  Objection.
 4                   She can't answer that.  She doesn't have
 5             firsthand knowledge as to how Dr. Ford would have
 6             found out about those complaints.
 7                   You could answer.
 8    A.      I have no idea who could have found out or not.
 9    Q.      Okay.
10             Would that be the same for Dr. Jain, you would
11    have no idea whether or not he knew about the complaints
12    you filed online with the DOJ and the New York State
13    Inspector General's office?
14                   MS. HAGAN:  Objection.
15    A.      I wouldn't know.
16    Q.      Okay.  And how about Dr. Yang, do you know if she
17    ever learned of the DOJ or the New York State Inspector
18    General office's complaint that you filed online?
19                   MS. HAGAN:  Objection as to form.
20    A.      I wouldn't be surprised if she did.
21    Q.      Okay.  And why would you not be surprised if she
22    knew?
23                   MS. HAGAN:  Objection.
24                   You can answer if you can.
25    A.      Well, I think it's pretty clear from the -- the
```

MELISSA KAYE

1    irregular funding sources that have empowered her.

2           It's pretty clear that these that the irregular

3    funding sources of CHS have empowered her in a way that

4    gives her absolute authority and control in -- in a manner

5    that allows her to act with impunity and with legality and

6    I think she has a lot of political clout behind her.  So,

7    yeah, if it was a politically embarrassing situation I -- I

8    can't rule out that they didn't call her.  I don't know.

9       Q.     Okay.

10           And what about Mr. Wangel (phonetic), do you know

11   if Mr. Wangel learned of the complaint that you filed with

12   the DOJ and the complaint you filed with the New York State

13   Inspector General's office online?

14              MS. HAGAN:  Objection.

15              It's assuming that the employer already

16              knows if the complaint is actually filed, that's

17              the law,

18              Ms. Canfield.  I'm not sure how you would know

19              whether or not my client would have firsthand

20              knowledge of that, that's the law though.  You're

21              asking her to --

22              MS. CANFIELD:  Excuse me.  I want her to

23              answer, please.  No colloquy or we're a going off

24              the record.

25       Q.     Dr. Kaye?

MELISSA KAYE

Page 386

1             MS. HAGAN:  Okay.

2     A.      Please re-ask the question what's the question?

3             MS. CANFIELD:  If you can read back my last

4             question before counsel's colloquy.

5             (Whereupon, the referred to question was

6             read back by the Reporter.)

7     A.      I believe that he did know about the complaint

8     with the conflict of interest board which mirrored this

9     complaint with DOJ and IG.  So, yes, I believe Dr. Wangel

10    knew about the DOJ complaint and that it mirrored each

11    other.

12    Q.      Okay.  So when you talk about the complaint with

13    the conflict of interest board are you referring to the

14    complaint you made regarding the private practice policy

15    that you testified to at your last deposition?

16            MS. HAGAN:  Objection as to form.

17    A.      So I -- I'm referring to the complaint I made

18    about the conflict of interest violations of the prior

19    practice which I included in the DOJ and IG or AG, I'm not

20    sure which one, report.

21    Q.      Okay.

22    A.      They overlap, they overlap.

23    Q.      Okay.

24            But you don't know definitively whether or not

25    Mr. Wangel was aware of the fact that you made these two

MELISSA KAYE

Page 387

1    online complaints; is that correct?

2              MS. HAGAN:  Objection as to form.  It's

3         suggestive, the question.

4              MS. CANFIELD:  It's not a proper objection.

5    Q.    You can answer.

6              MS. HAGAN:  Objection.

7    A.    I complained to Dr. Jain about it and -- directly

8    and I -- I'm certain that he would have reported it to

9    Dr. -- Mr. Wangel.

10   Q.    You complained to Dr. Jain about what?

11   A.    About --

12             MS. HAGAN:  Objection.

13   A.    -- conflict of interest issues.

14   Q.    Okay.

15   A.    Product and the private practice policy and I

16   complained to him about those in early July of 2018 and --

17   Q.    Okay.

18   A.    -- I complained about the complaint

19   discrimination.  And he told me that he was reporting me to

20   Mr. Wangel.  He indicated I was in trouble and he was

21   reporting me to Mr. Wangel.

22   Q.    Okay.

23         So, you also testified in your last deposition

24   that you're unable to get a medical license in New Mexico.

25   I want to know why are you unable to get a medical

MELISSA KAYE

Page 388

```
 1    license -- let me back up.
 2             Have you applied for a medical license in New
 3    Mexico?
 4                 MS. HAGAN:  Objection as to form.
 5                 You can answer.
 6    A.      Yes.
 7    Q.      When?
 8                 MS. HAGAN:  Objection.
 9    A.      When did I start?
10    Q.      When did you apply for a medical license in New
11    Mexico?
12    A.      I started about a year ago, last February.
13    Q.      And when --
14    A.      A year ago.
15    Q.      When you say you started, what is the process for
16    applying for a medical license in another state
17    specifically New Mexico?
18                 MS. HAGAN:  Objection as to form.
19    A.      There's different layers of the application.  You
20    have to get all of your credentialing from your medical
21    school and your residencies and all of that has to be
22    compiled and sent to the licensing board, that's -- that
23    would be step one.  So I hired an outside third-party
24    vendor, I think it's called FCSV to do that.  I paid that
25    fee.  Once that was done and completed then I was eligible
```

MELISSA KAYE

Page 389

1    to proceed with the actual New Mexico license process

2    internally that they had which involved filling out an

3    application and paying a fee and then obtaining letters of

4    recommendation and work verification forms and disclosing

5    any disciplinary actions that had been taken against me.

6         Q.    Okay.

7         A.    That was --

8         Q.    So --

9         A.    -- phase 2.  And so --

10        Q.    Let me stop you right there.

11              So have you completed phase one?

12                   MS. HAGAN:  Objection.

13                   I would like to note for the record that

14              Dr. Kaye was interrupted yet again by

15              Ms. Canfield when she tried to answer her

16              question about the process.

17                   MS. CANFIELD:  Okay.

18        Q.    Dr. Kaye, have you completed -- have you

19   completed phase one?

20        A.    Phase one where I paid the third-party vendor to

21   get my credentialing from my med school and residencies,

22   that was done, and that's what made me eligible to go to --

23   or made -- prompted me to go to the second phase which was

24   to fill out the paperwork for New Mexico and the

25   application and disclosing disciplinary actions and getting

MELISSA KAYE

Page 390

1    recommendations and work verification forms.

2        Q.     Now, did you get your recommendation forms?

3               MS. HAGAN:  Objection as to form.

4        A.     I asked for the -- yes, I sent the recommendation

5    requests to the individuals I listed on my application.

6        Q.     And did that individual provide the

7    recommendation form as part of the application process if

8    you know?

9        A.     Three individuals.

10              MS. HAGAN:  Objection.

11       A.     I have to get it from three individuals.

12       Q.     Okay.  And have you gotten recommendations from

13   three individuals?

14       A.     Yes.

15              MS. HAGAN:  Objection.

16       Q.     And who were those three individuals?

17              MS. HAGAN:  Objection.

18              Answer if you recall.

19       A.     Karen Stevenson, an MD, and I think I might have

20   actually asked four people.  Hold on.  Let me think.  Alan

21   Geller (phonetic) --

22              MS. HAGAN:  If you don't --

23              MS. CANFIELD:  Hold on.  She's --

24       Q.     Go ahead, Dr. Kaye.

25       A.     Alan Geller, DO.  I -- I think I might have

MELISSA KAYE

Page 391

1   gotten one from Ellie Sherman Berman Cohen or Cohen Berman,

2   MD, and I think I might have gotten one from Dr. Donna

3   Anthony, MD.

4       Q.     How do you spell her last name?

5       A.     Anthony, A-N --

6       Q.     Oh.  Anthony?

7       A.     Yeah.

8       Q.     All right.

9              And in terms of work verification did you secure

10  all the documents you needed for your work verification?

11              MS. HAGAN:  Objection as to forge.

12      A.     No, I can't.

13      Q.     Why can't you?

14      A.     Because CHS engaged in ongoing retaliation

15  against me including the manufactured disciplinary actions,

16  they're not going to fill out a form in good faith if they

17  fill it out at all.

18      Q.     Hold on.

19              Have you asked CHS or H&H to fill out the work

20  verification form?

21              MS. HAGAN:  Objection as to form.

22      A.     I think that that would be an enormous risk given

23  the level of retaliation I experienced at the institution.

24  They would be in position to fill it out without my knowing

25  what they write, send it to the board and -- and perpetuate

MELISSA KAYE

Page 392

1    the false allegations of me being a disrupted physical and
2    of me violating HIPAA by recording a patient.  I disclosed
3    those files malicious disciplinary actions to the medical
4    board, I had to disclose those, I will have to disclose
5    those for the rest of my career.  It impedes and delays my
6    ability to work, my ability to get a license and my ability
7    to get a job because --
8        Q.    Hold on, hold on.  I'm going to ask you about
9    that.  I haven't asked you about that.  I -- just for right
10   now I want to know, yes or no, did you ask H&H or CHS to
11   verify your employment?
12             MS. HAGAN:  Objection as to form.
13       Q.    Yes or no?
14       A.    No.  I --
15       Q.    Thank you.  Hold on.  No --
16       A.    No.
17       Q.    Did you ask -- hold on.
18       A.    You're asking me -- no, I don't ask them to
19   verify my employment.  They have to fill out a form and
20   rate me on my behavior and my performance.  Who is going to
21   do that in good faith?  Who is going to do that without a
22   conflict of interest and a retaliatory amicus?  No one.
23       Q.    Okay.  Let me ask you this:  Did you reach out to
24   anyone at H&H and let them know that you needed this work
25   verification as part of your licensing process in New

MELISSA KAYE

Page 393

1    Mexico, did you reach out to anyone?

2              MS. HAGAN:  Objection.

3    A.      Who would I reach out to?  Patsy Yang?

4    Q.      Did you reach out to Dr. Badaracco (phonetic)?

5    A.      It can't be from Bellevue, it has to be from CHS.

6    You're -- Bellevue is not CHS.  They're asking for my last

7    employer which was CHS.  I can't reach out to Dr. Badaracco

8    or Dr. (inaudible).  I have to reach out to people who have

9    consistently retaliated against me in the most egregious

10   illegal way that you can imagine.

11   Q.      Okay.

12   A.      So --

13   Q.      I understand that but --

14             MS. HAGAN:  And you're asking if she reached

15             out during the middle of litigation.

16             MS. CANFIELD:  That's fine.  She can reach

17             out in the middle of the litigation.

18   Q.      Dr. Kaye, I want to ask this:  CHS is part of

19   Health and Hospitals Corporation, did you know that?

20             MS. HAGAN:  Objection as to form.

21   A.      Well, that's pretty condescending.  Of course I

22   knew that.

23   Q.      Okay.  So why couldn't reach out to Dr. Badaracco

24   who is also part of the Health and Hospitals Corporation?

25             MS. HAGAN:  Objection.

1    A.    Because I have to follow the rules of the

2    licensing board and they are -- the rules are to reach out

3    to the agency that you were employed by within the last two

4    years.  I wasn't employed at Bellevue, I was employed by

5    CHS.  And I was told by Samantha Kent and William Soto that

6    they were going to expunge the disciplinary action from my

7    record, I was told that in a meeting with my union in

8    August 2019, and that never happened.  And I -- and --

9    and -- and then I received legal counsel from Douglas

10   Nadjari who I've mentioned -- this is the third time I've

11   mentioned his name.  I mentioned it in a settlement

12   conference and I mentioned it in my redirect or my cross or

13   whatever that was.  And -- and I was told by an attorney

14   who specializes in representing physicians in disciplinary

15   and licensing issues that I have to declare those bogus

16   allegations of being a disruptive physician and -- and

17   being -- violating HIPAA for recording a forensic exam, I

18   have to disclose those or I face potential sanctions on my

19   New York license.

20          So this is -- this has lasting impact on my

21   ability to get licensed, my ability to get jobs.  I have to

22   disclose these bogus retaliatory actions that --

23   Q.    Okay.

24          Let me ask you a question:  Were you formally

25   disciplined when you worked at CHS?

MELISSA KAYE

Page 395

1            MS. HAGAN:   Objection as to form.

2            You can answer if you can.

3      A.      I -- according to Dr. -- according to my

4   attorney, my other attorney, I have attorneys for

5   specialized things, Dr. -- Mr. Nadjari told me that they

6   used the word pre-termination, they used the word

7   discipline, you have to disclose.

8      Q.      Okay.  And did you receive a letter to file that

9   said that you -- that -- anything about pre-termination or

10  discipline?

11            MS. HAGAN:   Objection as to form.

12     A.      Katherine Pathos (phonetic) put that in her

13  letter.  Elizabeth Ford informed my union and I that I was

14  facing a pre-termination meeting --

15     Q.      Let me stop you.

16            Are all the -- let me stop you.

17            Is any of that in writing --

18     A.      No.

19     Q.      -- that Dr. Ford -- is there something in writing

20  in your personnel file that says this is a pre-termination

21  meeting?

22            MS. HAGAN:   Objection.

23     A.      There's --

24     Q.      Yes or no, is there something in your file --

25     A.      In my personnel file?  They put it in e-mails --

MELISSA KAYE

Page 396

```
 1    they put it in e-mails and where -- I don't know if
 2    Pathos's investigative report is in my personnel file or
 3    not because I was told my personnel file was lost and
 4    didn't exist anymore.
 5        Q.    Okay.
 6        A.    So I have no idea.
 7              When I went down to look at my personnel file I
 8    was told it didn't exist so --
 9        Q.    Let me ask you this --
10        A.    This is the third -- I'm not going to risk losing
11    my license in New York.
12        Q.    I understand.  I have a question.
13              When you had the conversation with Samantha Kent
14    and William Soto in August 2019 you testified that you had
15    that with your attorneys from doctor's counsel; is that
16    correct?
17        A.    No, no, I did not testify to that.
18              My union rep, I do not believe he was an
19    attorney, I do not believe my union rep was an attorney.
20    He never told me --
21        Q.    Okay.
22        A.    -- he was an attorney.
23        Q.    Okay.
24        A.    And I want to just think for a moment about the
25    timing of this.  I -- it was -- if I said 2019 I was wrong.
```

MELISSA KAYE

Page 397

1    It was 2018 because I -- it -- no.  Wait.  Let me let me

2    just think for a minute.

3              I was served the disciplinary notices which Ford

4    had told my union was pre-termination.  I was served those

5    at a meeting in July 2019, right, so it was August 2019

6    that -- that my union and I went downtown to Water Street

7    and met with Kent and Soto to look at my personnel file.

8    Q.     Okay.

9    A.     So it was in July 2019 I -- I got served the

10   disciplinary action and then we went -- you know, we went

11   and it took us a while to setup the meeting and then a

12   month later I went down, met with them, and was told by

13   Samantha Kent at that meeting that "department agrees to

14   expunge these" if "nothing else happens".  And I asked her

15   who the department was and she said Dr. Ford and so there

16   was an agreement at that meeting between us that -- "us"

17   meaning everybody at the meeting including my union rep,

18   May Santamaria (phonetic), that if nothing else happened by

19   May of the following year --

20   Q.     Which is May of 2020?

21   A.     2020, it would be expunged and then --

22   Q.     Okay.

23   A.     -- if I agreed to that, I agreed -- my union

24   encouraged me not to write a rebuttal to the fabricated

25   allegations because CHS agreed to expunge them because they

MELISSA KAYE

Page 398

```
 1   were false and they were malicious and it was in their best

 2   interest to do that.  However, it was never done and I

 3   never had a chance to write a rebuttal and then I --

 4       Q.    Hold on, hold on.  Let me ask you:  How do you

 5   know it was never expunged in May of 2020?

 6       A.    Because I was never contacted to confirm that

 7   and --

 8       Q.    Hold on, hold on.  Did you contact anyone at H&H

 9   to ask them if it had been expunged from your records?

10       A.    I was --

11             MS. HAGAN:  Objection.

12       A.    I can't -- I can't -- I -- I was told by

13   Mr. Nadjari that they can't expunge it, you never know who

14   has it and what they're going to do with it, you need to

15   declare these so it was moot, it was moot.  The damage is

16   done.

17       Q.    So what did Mr. Nadjari say about you practicing

18   in New Mexico?

19             MS. HAGAN:  Objection.

20             This is protected by attorney/client

21         privilege.

22             MS. CANFIELD:  It's not your privilege to

23         assert, it's her privilege.  If she wants to

24         share, she can.

25             MS. HAGAN:  I'm asserting it for her.
```

MELISSA KAYE

```
                                              Page 399
 1              MS. CANFIELD:  You can't do that.
 2              MS. HAGAN:  It's attorney/client privilege,
 3         she's not going to disclose that.
 4              MS. CANFIELD:  She just disclosed --
 5              MS. HAGAN:  She communicated with her
 6         attorney, that's it.
 7              MS. CANFIELD:  She just disclosed what he
 8         said.
 9              MS. HAGAN:  Ms. Canfield, that's improper.
10              MS. CANFIELD:  She can disclose if she --
11              MS. HAGAN:  No, she doesn't wish to disclose
12         a conversation that she had with an attorney she
13         retained.
14              MS. CANFIELD:  Then the attorney is going to
15         have to be an expert witness because I want to
16         know --
17              MS. HAGAN:  I know what you want to know but
18         she is not going to disclose --
19              MS. CANFIELD:  I'm moving on --
20    A.    I would like to answer --
21              MS. HAGAN:  No, no, Dr. Kaye.
22              MS. CANFIELD:  Yes, she can answer.
23              MS. HAGAN:  She's not going to answer the
24         question.
25              MS. CANFIELD:  Are you being obstructionist?
```

1                    Please.

2       Q.       Go ahead, Dr. Kaye.

3       A.       Under the advice of my attorney, Mr. Nadjari, I

4    disclosed the -- the retaliation disciplinary actions to

5    the New Mexico Medical Board as I disclosed to all the

6    headhunters who contacted me when asking me about

7    disciplinary history as I will have to disclose for the

8    rest of my life if I'm going to be in compliance with the

9    law and not have trouble with my New York license.  Cause

10   if I fail to disclose that is more serious than the

11   retaliation or as serious as the retaliatory disciplinary

12   actions because the retaliatory discipline actions are

13   disciplinary actions and I'm required to disclose that.

14      Q.       Okay.  I have two follow-up questions.  One:  The

15   name of the headhunters, who are they?

16      A.       I don't know the exact...

17      Q.       Do you have the agency?

18      A.       I would have to get back to you on that.  I --

19   I -- they call me.  I -- I -- I talk to them, I tell them

20   I'm interested, they ask me these questions, they say

21   they're going to get back to me after they review it with

22   their -- you know, with the agency looking for the doctor

23   and it's happened three times that they haven't after I

24   disclosed these.

25      Q.       Okay.  Another question:  As part of this phase

MELISSA KAYE

Page 401

```
1    two of the application process when you're required to give
2    recommendations, work verifications, any prior
3    disciplinary, are you required to disclose any litigation
4    that you've been involved in?
5              MS. HAGAN:  Objection as to form.
6       A.    You're absolutely required to disclose any time
7    you've been sued for malpractice.
8       Q.    Disclose malpractice?
9       A.    Any time that you've been involved in a
10   malpractice case, yep, you have to disclose that.  And --
11   and given that I was -- given that I was disciplined in a
12   retaliatory manner in the context of this litigation it --
13   it -- it's relevant to the disclosing of the -- of the
14   physician -- disruptive physical allegation in the HIPAA
15   violations allegation that Ford and Swenson made against
16   me.  I can't disclose that without explaining that it was
17   retaliatory in response to me filing a lawsuit.
18      Q.    Okay.  So you disclosed your current civil
19   lawsuit to the headhunters and to -- on this employment
20   application; is that right?
21             MS. HAGAN:  Objection.
22      A.    That I was a victim of a retaliatory smear
23   campaign which included false and fabricated disciplinary
24   actions.
25      Q.    Okay.  And did you --
```

MELISSA KAYE

1      A.      Why was I the target of this?  It's because I

2   asked for equal pay and I raised constitutional concerns

3   about --

4      Q.      Yes, I'm familiar with your litigation.

5              I have another question follow up.  After you

6   disclosed your litigation did you receive any response

7   to -- from the medical board?

8                     MS. HAGAN:  Objection.

9      A.      My application is incomplete.

10     Q.      Why is it incomplete?

11                    MS. HAGAN:  Objection.

12     A.      Cause I cannot obtain a work verification form

13  from an agency that has engaged in extreme and relentless

14  retaliation against me for over two years.

15     Q.      But you haven't -- but you haven't asked them to

16  verify your employment, correct?

17     A.      I did not.

18                    MS. HAGAN:  Objection.

19     Q.      Why not?

20                    MS. HAGAN:  Objection.

21                    Asked and answered.

22     Q.      I want to hear it.  Why not?

23                    MS. HAGAN:  Objection.

24                    Asked and answered.

25     A.      They won't fill it out in good faith because --

MELISSA KAYE

```
 1      Q.      How do you know that.  Hold on.  How do you know
 2   that?  How do you know that?
 3                   MS. HAGAN:  Okay.
 4                   Asked and answered.
 5                   You asked her these questions already, Ms.
 6           Canfield, you've already asked her these
 7           questions.
 8      A.      I'll tell you how --
 9                   MS. CANFIELD:  I heard your objection.
10      Q.      Why not?
11                   MS. HAGAN:  Again, asked and answered.
12                   MS. CANFIELD:  Please,
13           Ms. Hagan.
14                   MS. HAGAN:  Well, you're asking --
15                   MS. CANFIELD:  Off the record.
16                   (Whereupon, an off-the-record discussion was
17           held, after which the proceedings continued as
18           follows:)
19                   MS. CANFIELD:  Please read back my last
20           question.
21                   (Whereupon, the referred to question was
22           read back by the Reporter.)
23      Q.      Dr. Kaye, how do you know that H&H would not
24   properly complete your work verification?
25                   MS. HAGAN:  Objection.
```

MELISSA KAYE

1      A.      The best predictor of future behavior is past

2    behavior.   Their past behavior has been nothing but

3    retaliatory, unlawful, vicious.

4      Q.      Okay.   My next question:   Have you reached out to

5    anyone at H&H to determine whether or not they would

6    properly complete your work verification?

7                    MS. HAGAN:   Objection.

8                    That would be improper of Dr. Kaye to --

9                    MS. CANFIELD:   Excuse me.   It's a question.

10     Q.      Did you reach out?   Whether it's improper or not

11   is a matter of law.   Did you reach out to --

12                   MS. HAGAN:   It's improper as a matter of law

13            so you're asking her to break the law?

14                   MS. CANFIELD:   No.   I'm saying -- the

15            question is as to whether it is please stop

16            interrupting.

17     Q.      Did you reach out to anyone, Dr. Kaye, about

18   whether or not they would complete your work verification?

19     A.      I was told I'm not allowed to contact anyone at

20   H&H during this litigation.

21     Q.      Who told you that?

22                   MS. HAGAN:   Objection.

23                   Privileged.

24     Q.      Let me ask you this:   Did your attorney that you

25   hired in New Mexico for your credentialing, did they tell

MELISSA KAYE

Page 405

```
 1    you not to reach out to H&H to determine whether or not
 2    they would complete your work verification properly?
 3                    MS. HAGAN:  Objection.
 4                    That mischaracterizes her testimony.  She
 5               didn't say she hired an attorney in New Mexico,
 6               she didn't.
 7    Q.      This David Nadjari, is he an attorney?
 8    A.      It's Doug.
 9    Q.      Doug?
10    A.      D-O-U-G, Douglas, and Nadjari, I'll spell it for
11    you, it's N-A-D-J-A-R-I.
12    Q.      Right.
13              Is Mr. Nadjari an attorney?
14    A.      Yes.
15    Q.      Did Mr. Nadjari recommend that you not contact
16    your former employer H&H to determine whether or not they
17    would properly complete your work verification?
18                    MS. HAGAN:  Objection as to form and
19               attorney/client privilege.
20    A.      My conversations with
21    Mr. Nadjari are -- are privileged and I did disclose to you
22    in the spirit of cooperation that he told me that the
23    physician -- the disruptive physician allegation is a
24    serious allegation and I need to disclose it and I have.
25    Q.      Okay.  But --
```

MELISSA KAYE

Page 406

1      A.      And I need to disclose it.  I --

2      Q.      But you're not answering my question.  My

3   question is did he recommend that you reach out to your

4   former employer and let them know that you're applying for

5   a medical license in New Mexico and request that they

6   complete your work verification?

7                   MS. HAGAN:  I'm instructing Dr. Kaye not to

8               answer that question because that's protected by

9               the attorney/client privilege.

10                  Please move on.

11                  MS. CANFIELD:  That's not your privilege to

12              wave.

13     A.      Dr. Kaye --

14                  MS. HAGAN:  No, it's my privilege to wave as

15              her attorney, yes, it is.

16                  MS. CANFIELD:  No.

17                  MS. HAGAN:  I'm instructing her not to

18              answer the question.

19     Q.      Dr. Kaye --

20                  MS. CANFIELD:  Thank you.  Thank you.

21     Q.      Dr. Kaye?

22                  MS. HAGAN:  She's not going to answer that

23              question.

24     A.      I will answer that --

25                  MS. HAGAN:  Dr. Kaye, please don't answer

MELISSA KAYE

Page 407

```
 1            that question.  I'm your attorney.  Please don't
 2            answer that question.  I'm asserting the
 3            attorney/client privilege.  Do not answer that
 4            question.
 5                 MS. CANFIELD:  You cannot assert -- it's not
 6            your privilege, it's her privilege.
 7                 MS. HAGAN:  It is my privilege to assert it,
 8            I'm her attorney.
 9                 MS. CANFIELD:  It's not.  Please go back to
10            law school.  It's her privilege.
11                 MS. HAGAN:  You go back to law school.  I
12            graduated before you.  You could call The Court
13            if you'd like.
14                 MS. CANFIELD:  She said --
15                 MS. HAGAN:  She's not going to answer that
16            question, she's not.  So if you'd like to call
17            Judge Cott we can.  She's not answering that
18            question.  Please move on.
19                 MS. CANFIELD:  Then she's precluded from
20            testifying about this at trial.  If that's what
21            you want to do that's fine.
22                 MS. HAGAN:  No, you can't make -- you can't
23            make that determination.
24                 MS. CANFIELD:  Then she's precluded from
25            testifying to it at trial.
```

MELISSA KAYE

```
                                                    Page 408
 1              MS. HAGAN:  You can't preclude her from
 2         doing anything.  You have to make the motion.
 3         What are you talking about she's precluded?  File
 4         a motion.  Go ahead.
 5              MS. CANFIELD:  Yes because --
 6              MS. HAGAN:  Go ahead.  Keep going.
 7    Q.    Dr. Kaye, you can respond.
 8              MS. HAGAN:  No, she's not going to respond.
 9         Move on.
10    A.    I was -- I --
11              MS. HAGAN:  Don't answer the question,
12         Dr. Kaye.  I'm asserting the attorney/client
13         privilege.
14              MS. CANFIELD:  Off the record.  Off the
15         record.
16              (Whereupon, an off-the-record discussion was
17         held, after which the proceedings continued as
18         follows:)
19              (Whereupon, a short recess was taken.)
20    Q.    Dr. Kaye, did you show the counseling memos to
21    Dr. Nadjari?
22              MS. HAGAN:  Objection.
23              Attorney/client privilege.  She's not
24         answering that question.
25              MS. CANFIELD:  That's not privileged.
```

MELISSA KAYE

Page 409

```
 1    Q.     Did you show --
 2                MS. HAGAN:  It is privileged.
 3                MS. CANFIELD:  Excuse me.
 4    Q.     Did you show the counseling memos to Mr. Nadjari?
 5                MS. HAGAN:  I'm directing my client not to
 6          answer that question.
 7                It's privileged.
 8                MS. CANFIELD:  It's not privileged.
 9                MS. HAGAN:  It is.  Well, we've got to move
10          on.
11    Q.     Do you know if Mr. Nadjari reached out to H&H to
12    determine if the counseling memos have been expunged?
13                MS. HAGAN:  Objection.
14                It's privileged.
15                MS. CANFIELD:  It's not privileged.
16                MS. HAGAN:  I'm directing her not to answer
17          the question.
18    Q.     Did you reach out to H&H to determine whether the
19    counseling memos were expunged?
20                MS. HAGAN:  Objection as to form.
21    Q.     You can answer, Dr. Kaye.
22    A.     In the midst of litigation I was under the
23    impression that I'm not supposed to communicate directly
24    with anybody from H&H.
25    Q.     Do you know whether or not
```

```
 1    Ms. Hagan reached out to H&H to determine whether the
 2    counseling memos were expunged?
 3                    MS. HAGAN:  Objection.
 4                    Directing her no not to answer.
 5                    MS. CANFIELD:  It's not privileged.
 6                    MS. HAGAN:  I'm her attorney.
 7                    Privileged.
 8    Q.      So, Dr. Kaye, is it correct that no one reached
 9    out to H&H to determine whether or not the counseling memos
10    were expunged so you don't know --
11                    MS. HAGAN:  Objection.
12    Q.      -- if they have been expunged --
13                    MS. CANFIELD:  Hold on.
14    Q.      They may have been expunged --
15                    MS. HAGAN:  You're testifying, counsel.
16                    You're testifying, counsel.  You can't get the
17                    answer you want so now you're testifying to make
18                    a record.
19                    MS. CANFIELD:  Ms. Hagan, please.
20                    MS. HAGAN:  Objection to form.
21                    MS. CANFIELD:  Off the record.
22                    (Whereupon, an off-the-record discussion was
23                    held, after which the proceedings continued as
24                    follows:)
25    Q.      Dr. Kaye, do you have a response to any of the
```

MELISSA KAYE

Page 411

1    questions that I've asked you since we returned from our

2    break?

3         A.    Can you please just --

4              MS. HAGAN:  Objection as to form.

5         Q.    You can answer, Dr. Kaye.

6         A.    Can we just please reiterate the question and

7    then I will -- because I'm a little -- it was a while ago

8    that you asked that question.  Can you please just ask me

9    the question again?

10        Q.    Dr. Kaye, do you know if your attorney reached

11   out to H&H about the work verification process?

12             MS. HAGAN:  Objection.

13             Do not answer.  That's attorney/client

14             privilege.  Do not -- I'm instructing her not to

15             answer that question.

16        Q.    You can answer.  It's your privilege.  You can

17   wave it if you want --

18             MS. HAGAN:  She cannot answer.  She's been

19             instructed by her attorney not to answer that

20             question.  You can't tell her to override her

21             attorney.

22             Dr. Kaye, do not answer that question.

23             THE WITNESS:  Well, I'd like to answer

24             another question if I may.

25        Q.    What would you like to answer?  Please tell me.

MELISSA KAYE

Page 412

```
 1      A.      To your question.
 2      Q.      Yes.  Please go.
 3              MS. HAGAN:  Objection.
 4              No.
 5              MS. CANFIELD:  Please --
 6              MS. HAGAN:  No.  You are not answering the
 7      question.  She's not --
 8      A.      I would like to correct the record.  I'm sorry.
 9      Q.      Yes, please correct the record.
10      A.      Because you are referring to these as counseling
11  notices.  They were disciplinary and that word was used and
12  they were -- the word termination or pre-termination and
13  disciplinary were used so counseling mischaracterizes.
14      Q.      Okay.  I understand what you're saying now.
15              So what are you referring to that -- what
16  documents are you referring to when you say they're
17  disciplinary, what specifically are you referring to?
18      A.      The documents that have -- that Ms. Pathos
19  generated --
20      Q.      Okay.
21      A.      -- and the two -- Dr. Ford had told my union was
22  pre-termination, memos, warnings, whatever word you want to
23  use, the content was -- was -- it was in the context of
24  discipline and termination and pre-termination, everyone
25  was using that language.  It can't just be redefined as
```

MELISSA KAYE

1    counseling so that people don't have to be responsible

2    for --

3        Q.     Dr. Kaye, what document -- Dr. Kaye, what

4    document are you referring to?  You said the Pathos memo.

5    What document are you referring to from Dr. Ford?

6        A.     She served me memos on July 1, 2019 in a meeting

7    with my union and Clarence Muir that had very menacing

8    language accused me of violating HIPAA for recording a

9    forensic exam and accused me of being a disruptive

10   physician for speaking to Swenson about her failure to

11   contact an attorney, coming to exams and her failure to

12   take my re-credentialing questions and obstructionism that

13   I was getting from CHS seriously.  Okay?  So she wrote me

14   up as a disruptive physician and she wrote me up accusing

15   me of violating HIPAA.  Okay?

16       Q.     Were they --

17       A.     They were disciplinary actions with me, they rise

18   to the level of disciplinary, they weren't counseling.  She

19   didn't discuss -- she didn't come in there and have a

20   conversation with me.  When I tried to bring up the fact --

21   after she had read the Apple recording policy she -- she

22   didn't even -- she didn't even know about it and when I

23   told her that I thought the disciplinary actions that she

24   was serving me were retaliatory and she turned her head and

25   starting having like physical convulsions with her body.  I

MELISSA KAYE

Page 414

1   mean --

2       Q.      Dr. Kaye, hold on.

3               Were those the only two memos that you're talking

4   about that you believe are obstructing your ability to

5   achieve a medical license in New Mexico, the Pathos memo

6   and the July 1, 2019 memo from Dr. Ford, is there anything

7   else?

8               MS. HAGAN:  Objection to form.

9       A.      There were two disciplinary actions that I was

10  served by Dr. Ford and there was a third corporate

11  compliance investigative report that was -- the fifth was

12  biased, it was inaccurate.  Ms. Pathos didn't even know

13  that two evaluators had to sit in at 7:30, that's how

14  clueless she was and she --

15      Q.      Hold on --

16      A.      -- that I -- that I --

17      Q.      Dr. Ford, Dr. Ford, Dr. Ford --

18      A.      Discipline, that's what she -- wrote.

19              MS. HAGAN:  She's --

20      Q.      Dr. Kaye --

21      A.      I should be disciplined.  That's game over.  I

22  have to disclose.

23      Q.      Dr. Kaye, did Dr. Ford issue you two -- are you

24  talking about two disciplinary counsel -- what you are

25  characterizing disciplinary memos from Dr. Ford, one

MELISSA KAYE

Page 415

1    concerning the memos and one concerning Ms. Swenson?

2              MS. HAGAN:   Objection to form.

3       A.     The way that she wrote, she said -- the way it

4    went -- she categorized my interactions and miscategorized,

5    grossly miscategorized my interactions with

6    Ms. Swenson, used the language consistent with writing up a

7    physician as being disruptive.

8       Q.     Okay.

9       A.     It's a serious charge.

10      Q.     Okay.

11             My question is did you show these to Dr. Nadjari?

12             MS. HAGAN:   We're going to have to end this.

13             It's 3:00.

14      Q.     Did you show these to Dr. Nadjari?

15             MS. HAGAN:   Okay.

16      A.     I -- I --

17             MS. HAGAN:   Dr. Kaye, do not answer the

18             question.  Do not answer the question.  It's

19             attorney/client privilege.

20             MS. CANFIELD:   She's answering the question.

21             You're obstructing.

22             MS. HAGAN:   She's not answering the

23             question.

24             MS. CANFIELD:   Whether or not she showed

25             them --

MELISSA KAYE

```
 1                    MS. HAGAN:  It's 3:00 p.m. and it's over for
 2              us.  We're going to have to --
 3                    MS. CANFIELD:  No, it's not over.  I will
 4              write to The Court requesting --
 5                    MS. HAGAN:  Go ahead.
 6                    MS. CANFIELD:  She's claiming she can't get
 7              her license but she's not testifying to what she
 8              showed her attorney.
 9                    MS. HAGAN:  She did.  Well, she's not --
10                    MS. CANFIELD:  She did not.  You told her
11              not to answer.
12     Q.     I want to know did you show those counseling
13     memos to your attorney?
14                    MS. HAGAN:  I'm sorry.  This deposition has
15              to end.  It's 3:00.
16                    MS. CANFIELD:  No, it's not ending.
17                    MS. HAGAN:  Well, it is ending.
18                    Goodbye.
19                    MS. CANFIELD:  You're welcome to go,
20              Dr. Kaye can stay.
21                    MS. HAGAN:  Dr. Kaye is not going to stay.
22     A.     Not without my attorney I cannot.
23     Q.     Just answer the question.  Did you send those to
24     your attorney?
25                    MS. HAGAN:  She's not answering the question
```

MELISSA KAYE

Page 417

```
 1              and she's not going to -- Dr. Kaye, please leave
 2              the deposition.
 3                      MS. CANFIELD:  Ms. Hagan, you're improper.
 4              I just want to know if she showed them to her
 5              attorney.
 6                      MS. HAGAN:  She's not going to answer that
 7              question.
 8      A.      I can answer that question.
 9              Mr. Nadjari, I retained him, I paid him money to
10      advise me on this matter.  I am not going to speak about
11      our private communications.
12      Q.      So how can he give you advice if you haven't
13      showed him the counseling memos?
14                      MS. HAGAN:  She didn't say that she didn't
15              show him the counseling memos.
16                      MS. CANFIELD:  Well, she's not responding,
17              it's an inference that she didn't tell him.  I'm
18              assuming she didn't show him.
19                      MS. HAGAN:  You're testifying and stop.
20                      Dr. Kaye, please leave, please leave.
21      Q.      I'm assuming you did not show him the counseling
22      memos.
23                      MS. HAGAN:  Leave the deposition.
24      A.      Because I am telling you he advised me on this
25      matter.
```

MELISSA KAYE

```
 1      Q.      Based on him --
 2              MS. HAGAN:  It's enough.
 3              Dr. Kaye, please don't say anything else.
 4      Q.      Based on him reviewing the counseling memos?
 5              MS. HAGAN:  I'm asking you to end the
 6          deposition.
 7      Q.      Okay.  So I -- so the assumption is that you did
 8  not --
 9              MS. HAGAN:  It's three o'clock.
10      Q.      For purposes of your litigation you did not
11  disclose so you can up your damages, that's what we're
12  going to argue to the jury so you can go and -- but
13  that's --
14              MS. HAGAN:  You can argue, you can argue.
15              MS. CANFIELD:  We're going to because you
16          have not --
17      A.      Let me just say a general statement.
18      Q.      Yes.
19      A.      I hired an attorney who specializes in defending
20  doctors in disciplinary and licensure matters and I
21  communicated with him.  My communications are privileged
22  and I think that it would be ridiculous to assume that I
23  didn't communicate to him about what happened to me.  I'll
24  leave it at that.
25      Q.      So you didn't -- so is it ridiculous for me to
```

MELISSA KAYE

1    assume that you did not show him the documents?

2              MS. HAGAN:  We're ending this deposition.

3    Q.    So you did not show him the documents?

4              MS. HAGAN:  No, she did not testify to that.

5              Dr. Kaye --

6    Q.    Then you did show him the documents?

7              MS. HAGAN:  Dr. Kaye, I have to leave.

8    A.    You're inferring.

9    Q.    So I'll assume that you did not show the

10   documents.

11             MS. HAGAN:  Leave right now.

12   Q.    So he was not able to give you proper legal

13   advice?

14             MS. HAGAN:  She's not testifying to that.

15             She's not testifying to that at all, counsel.

16             You're bullying this witness.

17             MS. CANFIELD:  So the jury will just know

18             that you didn't fully disclose what happened.

19             MS. HAGAN:  That's not the case.  You're

20             testifying --

21             MS. CANFIELD:  No but you you're directing

22             your witness not to testify.

23             MS. HAGAN:  I'm directing my witness not to

24             break the attorney/client privilege.

25   Q.    So -- okay.  So you did not give him the

MELISSA KAYE

Page 420

1    documents for him to make an intelligent decision?

2              MS. HAGAN:  No, she didn't say that at all.

3              MS. CANFIELD:  Because you're telling her

4         not to testify.

5              MS. HAGAN:  This is attorney/client

6         privilege.

7              We're going to end this.

8              Dr. Kaye, I think --

9              MS. CANFIELD:  We will move to preclude --

10             MS. HAGAN:  It's 3:03, let's -- come on.

11             MS. CANFIELD:  We will move to preclude any

12        testimony --

13             MS. HAGAN:  You can move.

14             MS. CANFIELD:  -- on Dr. Kaye's inability to

15        get her medical licensure because she has not

16        fully disclosed --

17             MS. HAGAN:  She is not --

18             MS. CANFIELD:  She testified that she

19        mislead her attorney in legal advice --

20    A.    I didn't say --

21             MS. HAGAN:  She testified that --

22             THE WITNESS:  I told her my --

23    Q.    What did you tell him then?  Did you show him the

24    documents?

25             MS. HAGAN:  You can't keep a straight face,

Page 421

1            you can't even keep a straight face.  You're --

2            it's ridiculous.  Are you kidding me?

3                Dr. Kaye, let's go, let's go.

4    A.    At least I get to end with a laugh.

5                MS. CANFIELD:  I'll take it up with The

6            Court because you refuse to tell me.

7                MS. HAGAN:  I have to go.  I have another

8            call.  I have to go clearly.  Let's go.

9                MS. CANFIELD:  Okay.

10               I'll bring it to The Court.

11               Thank you.

12               It's a 24 hour turn around.

13           Ms. Hagan, I need your transcript.  You are

14           ordered and it's been two weeks, you have not

15           produced it and 24 hour turnaround for this one,

16           Ms. Anzelone.

17               (Whereupon, at 3:04 P.M., the Examination of

18           this witness was concluded.)

19

20

21                    o           o           o           o

22

23

24

25

MELISSA KAYE

Page 422

1                    D E C L A R A T I O N

2

3            I hereby certify that having been first duly

4    sworn to testify to the truth, I gave the above testimony.

5

6            I FURTHER CERTIFY that the foregoing transcript

7    is a true and correct transcript of the testimony given by

8    me at the time and place specified hereinbefore.

9

10

11

                         _____

12                              MELISSA KAYE

13

14

15   Subscribed and sworn to before me

16   this _____ day of _____ 20___.

17

18

     _____

19            NOTARY PUBLIC

20

21

22

23

24

25

MELISSA KAYE

Page 423

1                    E X H I B I T S

2

3    (None)

4

5                    I N D E X

6

7    EXAMINATION BY                              PAGE

8    MS. CANFIELD                                363

9

10

11        INFORMATION AND/OR DOCUMENTS REQUESTED

12   INFORMATION AND/OR DOCUMENTS               PAGE

13   (None)

14

15

16            QUESTIONS MARKED FOR RULINGS

17   PAGE LINE    QUESTION

18   (None)

19

20

21

22

23

24

25

MELISSA KAYE

Page 424

1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK        )

                                    :  SS.:

4    COUNTY OF NASSAU        )

5

6             I, LISA R. ANZELONE, a Notary Public for and

7    within the State of New York, do hereby certify:

8             That the witness whose examination is

9    hereinbefore set forth was duly sworn and that such

10   examination is a true record of the testimony given by that

11   witness.

12             I further certify that I am not related to any

13   of the parties to this action by blood or by marriage and

14   that I am in no way interested in the outcome of this

15   matter.

16             IN WITNESS WHEREOF, I have hereunto set my hand

17   this 4th day of February 2022.

18

19                              *Lisa R. Anzelone*

20

                                LISA R. ANZELONE

21

22

23

24

25

Page 425

ERRATA SHEET

VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Kaye, Melissa v. New York City Health & Hospital Corp.
DATE OF DEPOSITION: 2/3/2022
WITNESSES' NAME: Melissa Kaye

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |
| ____ | _____ | _____ | _____ |

_____
Melissa Kaye

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20__.


_____          _____
(NOTARY PUBLIC)                        MY COMMISSION EXPIRES:

| & | | | |
|---|---|---|---|
| **&**   362:13 425:2 | **24357**   424:20 | **achieve**   414:5 | **agreed**   362:4,15 |

**1**

**1**   362:13 413:6
  414:6
**100**   361:12
**10007**   361:12
**11412**   361:5
**12137**   360:5
**173**   373:24
**18**   360:5
**196-04**   361:4
**1:30**   364:13
**1:32**   360:13

**2**

**2**   373:23 374:21
  389:9
**2/3/2022**   425:3
**20**   422:16 425:22
**20,000**   373:25
**2018**   367:18
  373:23 374:3,13
  374:21 375:5,13
  375:16,18 387:16
  397:1
**2019**   373:15 374:3
  374:8,11,13,21
  381:7 394:8
  396:14,25 397:5,5
  397:9 413:6 414:6
**2019-032851**
  361:13
**2020**   397:20,21
  398:5
**2022**   360:12
  424:17
**207**   373:22
**22-0312**   361:14
**24**   421:12,15

**24357**   424:20
**28,000**   373:15
  374:7

**3**

**3**   360:12
**30**   362:12
**363**   423:8
**3:00**   415:13 416:1
  416:15
**3:03**   420:10
**3:04**   421:17

**4**

**4th**   424:17

**7**

**7:30**   414:13
**7th**   367:18

**a**

**abetted**   360:8
  361:11
**abhishek**   360:7
  361:10 370:7
**ability**   369:17
  392:6,6,6 394:21
  394:21 414:4
**able**   377:18
  419:12
**absolute**   385:4
**absolutely**   401:6
**access**   366:15,16
  366:18,22,22
  367:4,9 368:20,21
  369:1,1,6,7,12
  375:18 378:4,5
**accessing**   367:10
**account**   378:10,10
  378:21,25
**accused**   413:8,9
**accusing**   413:14

**achieve**   414:5
**act**   385:5
**action**   394:6
  397:10 424:13
**actions**   368:6
  389:5,25 391:15
  392:3 394:22
  400:4,12,12,13
  401:24 413:17,23
  414:9
**activities**   366:20
  367:14 370:4,10
  371:21
**actual**   389:1
**added**   373:25
**additionally**
  377:13
**address**   375:8
**administer**   362:9
**administrative**
  366:10,11,13,20
  367:13 368:10
  369:23,25 370:9
  371:2,15,20,21
  372:4,14,15 373:3
  373:6
**administrator**
  373:10
**adverse**   368:5
**advice**   400:3
  417:12 419:13
  420:19
**advise**   417:10
**advised**   417:24
**afternoon**   364:24
**ag**   382:25 386:19
**agency**   394:3
  400:17,22 402:13
**ago**   363:11 388:12
  388:14 411:7

**agreed**   362:4,15
  397:23,23,25
**agreement**   397:16
**agrees**   397:13
**ahead**   376:6
  390:24 400:2
  408:4,6 416:5
**aided**   360:8
  361:11
**alan**   390:20,25
**albans**   361:5
**albuquerque**
  364:25
**allegation**   401:14
  401:15 405:23,24
**allegations**   392:1
  394:16 397:25
**alleged**   373:16
**allow**   366:25
  374:6
**allowed**   370:3
  404:19
**allowing**   380:14
**allows**   385:5
**alteration**   375:1
**amicus**   392:22
**amount**   371:15
**andrea**   370:6
  371:1,14,19 373:5
  373:5
**answer**   365:7,12
  365:21 367:1
  369:11,15,17,19
  370:15,24 371:18
  372:10,23 373:19
  376:21 377:2
  378:14 384:4,7,24
  385:23 387:5
  388:5 389:15
  390:18 395:2
  399:20,22,23

406:8,18,22,24,25
407:2,3,15 408:11
409:6,16,21 410:4
410:17 411:5,13
411:15,16,18,19
411:22,23,25
415:17,18 416:11
416:23 417:6,8
**answered** 373:13
402:21,24 403:4
403:11
**answering** 376:5
380:9 406:2
407:17 408:24
412:6 415:20,22
416:25
**answers** 380:15
**anthony** 391:3,5,6
**anybody** 409:24
**anymore** 396:4
**anzelone** 360:19
364:14 421:16
424:6,20
**appeasing** 375:10
**apple** 413:21
**application** 388:19
389:3,25 390:5,7
401:1,20 402:9
**applied** 388:2
**apply** 388:10
**applying** 388:16
406:4
**appreciated** 365:4
**areas** 366:4
**argue** 418:12,14
418:14
**asked** 364:9 373:9
390:4,20 391:19
392:9 397:14
402:2,15,21,24
403:4,5,6,11 411:1

411:8
**asking** 378:15
381:10,10 385:21
392:18 393:6,14
400:6 403:14
404:13 418:5
**assert** 398:23
407:5,7
**asserting** 398:25
407:2 408:12
**assume** 418:22
419:1,9
**assuming** 369:6
385:15 417:18,21
**assumption** 418:7
**attorney** 361:3
373:4 377:10
379:4 381:8 383:3
394:13 395:4,4
396:19,19,22
398:20 399:2,6,12
399:14 400:3
404:24 405:5,7,13
405:19 406:9,15
407:1,3,8 408:12
408:23 410:6
411:10,13,19,21
413:11 415:19
416:8,13,22,24
417:5 418:19
419:24 420:5,19
**attorneys** 361:8
395:4 396:15
**attribute** 373:15
374:23
**august** 375:18
394:8 396:14
397:5
**authority** 366:13
372:14 385:4

**authorized** 362:8
**avenue** 361:4
**aware** 386:25
**axial** 376:8

**b**

**b** 423:1
**back** 366:6 370:18
370:21 379:25
383:18,21 386:3,6
388:1 400:18,21
403:19,22 407:9
407:11
**badaracco** 393:4,7
393:23
**bargaining** 373:22
**barry** 380:5
**base** 372:19,22
**based** 366:3 378:9
418:1,4
**behavior** 392:20
404:1,2,2
**believe** 374:12,14
382:23 386:7,9
396:18,19 414:4
**bellevue** 393:5,6
394:4
**berman** 391:1,1
**best** 365:11 369:17
398:1 404:1
**biased** 414:12
**blood** 424:13
**board** 373:6 386:8
386:13 388:22
391:25 392:4
394:2 400:5 402:7
**body** 413:25
**bogus** 394:15,22
**bonus** 373:25
**break** 404:13
411:2 419:24

**brief** 363:9
**bring** 413:20
421:10
**bronx** 380:3,4,21
**brooklyn** 370:14
**bullying** 419:16

**c**

**c** 361:1 367:5,5
422:1 424:1,1
**calendar** 366:15
366:19,21 368:20
368:21,24
**call** 382:20 385:8
400:19 407:12,16
421:8
**called** 363:1 376:8
388:24
**calls** 376:22,23
379:7
**campaign** 401:23
**canfield** 361:13
363:5,8,22 364:5
364:10,14,23
367:2 368:3,15
369:18 370:18
374:12,14,17
377:20,22,24
378:1,6 379:16,19
379:25 380:11,14
383:18 385:18,22
386:3 387:4
389:15,17 390:23
393:16 398:22
399:1,4,7,9,10,14
399:19,22,25
403:6,9,12,15,19
404:9,14 406:11
406:16,20 407:5,9
407:14,19,24
408:5,14,25 409:3
409:8,15 410:5,13

410:19,21 412:5
415:20,24 416:3,6
416:10,16,19
417:3,16 418:15
419:17,21 420:3,9
420:11,14,18
421:5,9 423:8
**career** 392:5
**case** 360:5 369:6
401:10 419:19
425:2
**categorized** 415:4
**cause** 400:9
402:12
**central** 376:8
**certain** 371:14
376:9 377:11
387:8
**certification** 362:6
**certified** 363:23
**certify** 422:3,6
424:7,12
**chance** 398:3
**change** 366:17,18
425:5
**changes** 375:17
**changing** 375:23
**characterizing**
414:25
**charge** 415:9
**chs** 366:9,23
367:21 368:22
369:2,8,13 371:9
372:6 385:3
391:14,19 392:10
393:5,6,7,18 394:5
394:25 397:25
413:13
**church** 361:12
**city** 360:7 361:7,9
425:2

**civil** 360:18
401:18
**claiming** 416:6
**clarence** 370:7
413:7
**clarification**
365:12
**clear** 364:4 365:11
375:15 384:25
385:2
**clearly** 421:8
**client** 374:10
385:19 398:20
399:2 405:19
406:9 407:3
408:12,23 409:5
411:13 415:19
419:24 420:5
**clinic** 370:13,14,14
372:6 380:3,4,6,21
**clinics** 371:6,15
**clout** 385:6
**clueless** 414:14
**codling** 375:9
**cohen** 391:1,1
**collective** 373:21
**colloquy** 364:16
364:18 385:23
386:4
**come** 413:19
420:10
**coming** 413:11
**command** 378:2
**commission**
425:25
**communicate**
378:20 409:23
418:23
**communicated**
399:5 418:21

**communication**
377:5
**communications**
377:7 417:11
418:21
**company** 363:15
363:25 364:3
**compiled** 388:22
**complained**
367:22 387:7,10
387:16,18
**complaint** 381:5
381:12,16,20
382:1,8,12,17,24
383:6,10,14
384:18 385:11,12
385:16 386:7,9,10
386:12,14,17
387:18
**complaints** 381:7
382:3 384:1,6,11
387:1
**complete** 403:24
404:6,18 405:2,17
406:6
**completed** 382:1
388:25 389:11,18
389:19
**compliance** 400:8
414:11
**complicated**
365:16
**concerned** 363:22
**concerning** 378:12
378:25 382:17
415:1,1
**concerns** 376:2
402:2
**concluded** 421:18
**condescending**
393:21

**conduct** 360:8
361:11
**conference** 394:12
**confirm** 374:16,18
382:10,11 398:6
**confirmation**
382:5
**confirmed** 373:23
374:8,14
**confirming** 375:24
382:2,7
**conflict** 386:8,13
386:18 387:13
392:22
**considered** 377:3
379:10
**consistent** 415:6
**consistently** 393:9
**constitutional**
402:2
**contact** 398:8
404:19 405:15
413:11
**contacted** 383:8
398:6 400:6
**contemporaneou...**
373:8 376:15
**content** 412:23
**context** 401:12
412:23
**continued** 360:16
368:17 379:23
403:17 408:17
410:23
**control** 361:14
378:3 385:4
**conversation**
396:13 399:12
413:20
**conversations**
372:20 405:20

convulsions
413:25
cooperation
405:22
copy   362:10,13
363:19,23 364:1
364:12 381:7,12
corp   425:2
corporate   414:10
corporation   360:7
361:7,9 393:19,24
correct   365:1,2
370:1,3 371:2,10
372:6,20 374:19
375:16 377:20
387:1 396:16
402:16 410:8
412:8,9 422:7
correctional   366:7
366:8
correspondence
377:3 378:11,24
corresponding
377:17
cott   407:17
counsel   361:7
362:5,13 394:9
396:15 410:15,16
414:24 419:15
counsel's   386:4
counseling   408:20
409:4,12,19 410:2
410:9 412:10,13
413:1,18 416:12
417:13,15,21
418:4
county   424:4
couple   366:2
course   393:21
court   360:1
362:10 363:24

364:2,10,11 365:3
367:10 370:13,14
370:14 371:6,15
377:10 379:20
380:3,4,6,17,21
407:12 416:4
421:6,10
credentialing
388:20 389:21
404:25 413:12
credentially
373:11
credentials   373:8
cross   394:12
current   401:18
custody   378:2
cut   373:15,16
cv   360:5

### d

d   362:1 405:10,11
422:1 423:5
damage   398:15
damages   418:11
damian   373:3,9
date   360:12,18
381:11,12,25
382:7,11 425:3
david   405:7
day   365:15 375:24
422:16 424:17
425:22
days   362:12
366:17
dealing   375:7
decision   420:1
decisions   367:13
372:16
declare   394:15
398:15
decrease   366:12
374:22

decreases   375:17
defend   375:11
defendant   360:17
defendants   360:9
360:10 361:8,11
363:22 377:17
378:5
defending   418:19
definitely   376:23
definitively
386:24
delays   392:5
denied   366:18
367:4,9 368:20
department   381:6
382:17 383:2
397:13,15
deposition   360:16
362:6,7,11 363:11
363:19 364:11
365:14,19 366:4
367:3 369:23
381:4 386:15
387:23 416:14
417:2,23 418:6
419:2 425:3
deprived   366:14
368:25 369:5
determination
407:23
determine   404:5
405:1,16 409:12
409:18 410:1,9
dialogue   373:2
different   388:19
differential   372:1
directing   409:5,16
410:4 419:21,23
directly   373:6
387:7 409:23

directors   370:12
370:13 371:20,22
371:25 372:18
373:11
disciplinary   389:5
389:25 391:15
392:3 394:6,14
397:3,10 400:4,7
400:11,13 401:3
401:23 412:11,13
412:17 413:17,18
413:23 414:9,24
414:25 418:20
discipline   395:7
395:10 400:12
412:24 414:18
disciplined   394:25
401:11 414:21
disclose   392:4,4
394:18,22 395:7
399:3,10,11,18
400:7,10,13 401:3
401:6,8,10,16
405:21,24 406:1
414:22 418:11
419:18
disclosed   392:2
399:4,7 400:4,5,24
401:18 402:6
420:16
disclosing   389:4
389:25 401:13
discovery   376:25
discrepancies
376:15
discrepancy   375:6
discrimination
387:19
discuss   413:19
discussed   379:13

discussion 363:12
368:16 379:22
403:16 408:16
410:22
discussions 372:15
disrupted 392:1
disruptive 373:5
394:16 401:14
405:23 413:9,14
415:7
district 360:1,1
divulge 377:5
doctor 400:22
doctor's 396:15
doctors 374:1
418:20
document 413:3,4
413:5
documents 391:10
412:16,18 419:1,3
419:6,10 420:1,24
423:11,12
doing 375:10
408:2
doj 381:16,16
382:8 383:10,25
384:12,17 385:12
386:9,10,19
donna 361:13
391:2
doug 405:8,9
douglas 394:9
405:10
downtown 375:4
397:6
dr 363:10 364:20
365:6 366:25
367:16 368:19
370:15 371:5,25
372:1,2,11,20
374:2 375:1,2,12

377:15 378:3,8
380:1,8,12,14,16
380:17,20 383:24
384:5,10,16
385:25 386:9
387:7,9,10 389:14
389:18 390:24
391:2 393:4,7,8,18
393:23 395:3,5,19
397:15 399:21
400:2 403:23
404:8,17 406:7,13
406:19,21,25
408:7,12,20,21
409:21 410:8,25
411:5,10,22
412:21 413:3,3,5
414:2,6,10,17,17
414:17,20,23,23
414:25 415:11,14
415:17 416:20,21
417:1,20 418:3
419:5,7 420:8,14
421:3
due 367:16
duly 363:2 422:3
424:9
duties 366:10,11
368:11 369:23,25
371:2 372:4

**e**

e 361:1,1 362:1,1
363:1,1 375:21,23
376:18,24,25
377:9,16 378:4,5,8
378:11 379:8
382:2,5,21,23
383:1,2 395:25
396:1 422:1 423:1
423:5 424:1,1

early 375:5 387:16
eeoc 367:22
effect 362:9,11
egregious 393:9
either 383:25
electronic 367:5,9
369:6
eligible 388:25
389:22
elimination
366:12
elizabeth 360:7
361:9 380:5
395:13
ellie 391:1
embarrassing
385:7
employed 394:3,4
394:4
employer 385:15
393:7 405:16
406:4
employment 368:5
392:11,19 401:19
402:16
empowered 385:1
385:3
encouraged
397:24
engage 373:2
engaged 391:14
402:13
enormous 391:22
entering 367:16
equal 402:2
errata 425:1
esq 361:5,8,13
ethic 371:24
evaluators 381:2
414:13

everybody 397:17
evidence 378:9
evident 372:25
exact 400:16
exam 394:17
413:9
examination 363:4
421:17 423:7
424:8,10
examined 363:3
example 367:16
exams 413:11
excluded 367:13
371:22 375:4
excuse 368:8
369:19 377:24
385:22 404:9
409:3
exist 396:4,8
experienced
372:13 391:23
expert 399:15
expires 425:25
explain 368:5
explaining 401:16
expunge 394:6
397:14,25 398:13
expunged 397:21
398:5,9 409:12,19
410:2,10,12,14
extent 372:23
379:14
extreme 402:13

**f**

f 362:1 424:1
fabricated 397:24
401:23
face 394:18 420:25
421:1
facing 395:14

fact  371:25 376:12
  386:25 413:20
fail  400:10
failing  375:8
failure  413:10,11
fair  365:13
faith  391:16
  392:21 402:25
false  372:12 392:1
  398:1 401:23
familiar  402:4
fcsv  388:24
february  360:12
  380:6 388:12
  424:17
federal  360:18
fee  388:25 389:3
fictitious  360:8
  361:10
fifth  414:11
file  361:13 381:12
  381:19 395:8,20
  395:24,25 396:2,3
  396:7 397:7 408:3
filed  381:5 382:12
  382:18 383:6,10
  383:14 384:1,12
  384:18 385:11,12
  385:16
files  392:3
filing  362:6 401:17
fill  389:24 391:16
  391:17,19,24
  392:19 402:25
filled  381:24
filling  389:2
final  373:22,24
finally  376:16
find  377:9
fine  393:16 407:21

finish  366:25
  374:6 376:5 380:9
  380:14
finished  367:2
first  363:2 368:19
  422:3
firsthand  384:5
  385:19
follow  366:3
  368:13 376:11
  382:16 394:1
  400:14 402:5
followed  376:12
  376:17,24
following  371:9,16
  376:14 397:19
follows  363:3
  368:18 379:24
  403:18 408:18
  410:24
force  362:11
ford  360:7 361:9
  380:5 383:24
  384:5 395:13,19
  397:3,15 401:15
  412:21 413:5
  414:6,10,17,17,17
  414:23,25
foregoing  422:6
forensic  394:17
  413:9
forge  391:11
form  362:16
  368:23 369:3,9
  370:2,16,22,23
  371:3,11,17 372:7
  372:8 373:17
  374:4 376:19
  377:1 378:13
  379:2,5 381:9
  382:4,9,15,19

383:11,16 384:19
386:16 387:2
388:4,18 390:3,7
391:16,20,21
392:12,19 393:20
395:1,11 401:5
402:12 405:18
409:20 410:20
411:4 414:8 415:2
formally  394:24
former  405:16
  406:4
forms  389:4 390:1
  390:2
forth  424:9
forward  363:14,21
forwarded  378:9
forwarding
  382:24
found  383:24
  384:6,8
four  390:20
fully  419:18
  420:16
funding  385:1,3
further  362:15
  422:6 424:12
future  404:1

## g

g  405:10
game  414:21
geller  390:21,25
general  384:18
  418:17
general's  381:6,19
  382:12 383:6,15
  384:1,13 385:13
generated  412:19
georgia  361:8
getting  373:4
  382:5 389:25

413:13
give  363:17,18
  401:1 417:12
  419:12,25
given  364:8
  391:22 401:11,11
  422:7 424:10
gives  385:4
gmail  378:9,10,21
  378:25
go  366:16 376:6
  379:20 389:22,23
  390:24 400:2
  407:9,11 408:4,6
  412:2 416:5,19
  418:12 421:3,3,7,8
  421:8
gobbled  364:18
going  363:13
  364:14 367:24
  368:12,14 373:12
  377:5,9 380:1
  385:23 391:16
  392:8,20,21 394:6
  396:10 398:14
  399:3,14,18,23
  400:8,21 406:22
  407:15 408:6,8
  415:12 416:2,21
  417:1,6,10 418:12
  418:15 420:7
good  364:23,24,24
  364:24 391:16
  392:21 402:25
goodbye  416:18
gotten  390:12
  391:1,2
gradual  366:12
graduated  407:12
great  363:25

**grossly**   415:5

**h**

**h**   423:1
**h&h**   377:17
  379:14 391:19
  392:10,24 398:8
  403:23 404:5,20
  405:1,16 409:11
  409:18,24 410:1,9
  411:11
**hagan**   361:3,5
  363:12,16 364:1,8
  364:13 365:20,22
  365:24 366:1,24
  368:1,4,14,23
  369:3,9,14 370:2
  370:16,22 371:3,7
  371:11,17 372:7
  372:21,23 373:17
  374:4,6,12,13,16
  374:18 376:4,19
  376:21 377:1,14
  377:21,23,25
  378:2,7,7,13,23
  379:2,5,17,18
  380:9,13,22,25
  381:9 382:4,9,15
  382:19,22 383:11
  383:16 384:3,14
  384:19,23 385:14
  386:1,16 387:2,6
  387:12 388:4,8,18
  389:12 390:3,10
  390:15,17,22
  391:11,21 392:12
  393:2,14,20,25
  395:1,11,22
  398:11,19,25
  399:2,5,9,11,17,21
  399:23 401:5,21
  402:8,11,18,20,23

**held**   360:18
  368:17 379:23
  403:17 408:17
  410:23
**hereinbefore**
  422:8 424:9
**hereunto**   424:16
**hipaa**   392:2
  394:17 401:14
  413:8,15
**hired**   388:23
  404:25 405:5
  418:19
**history**   400:7
**hold**   374:5 378:1,1
  390:20,23 391:18
  392:8,8,15,17
  398:4,4,8,8 403:1
  410:13 414:2,15
**hollis**   361:4
**hospital**   425:2
**hospitals**   360:7
  361:9 393:19,24
**hour**   364:17,17
  421:12,15
**hundred**   381:11

**i**

**idea**   384:8,11
  396:6
**ig**   382:24 386:9,19
**illegal**   393:10
**illegitimate**   374:22
  374:24
**imagine**   393:10
**impact**   394:20
**impedes**   392:5
**impinge**   372:2
**impression**   409:23
**improper**   399:9
  404:8,10,12 417:3

**403:3,11,13,14,25**
  404:7,12,22 405:3
  405:18 406:7,14
  406:17,22,25
  407:7,11,15,22
  408:1,6,8,11,22
  409:2,5,9,13,16,20
  410:1,3,6,11,15,19
  410:20 411:4,12
  411:18 412:3,6
  414:8,19 415:2,12
  415:15,17,22
  416:1,5,9,14,17,21
  416:25 417:3,6,14
  417:19,23 418:2,5
  418:9,14 419:2,4,7
  419:11,14,19,23
  420:2,5,10,13,17
  420:21,25 421:7
  421:13
**hagen**   379:15
**hand**   424:16
**happen**   371:24
  372:18 373:11
**happened**   367:21
  376:10 394:8
  397:18 400:23
  418:23 419:18
**happening**   364:2
**happens**   397:14
**harassed**   373:7
**head**   413:24
**headhunters**
  400:6,15 401:19
**health**   360:7 361:9
  366:8,9 393:19,24
  425:2
**hear**   364:22 365:4
  402:22
**heard**   403:9

**impunity**   385:5
**inability**   420:14
**inaccurate**   372:12
  414:12
**inaudible**   372:3
  393:8
**included**   386:19
  401:23
**including**   373:3
  391:15 397:17
**incomplete**   402:9
  402:10
**incorrectly**   367:17
**increase**   374:24
**increases**   373:21
**incremental**
  373:21
**indicated**   387:20
**indicating**   364:21
**individual**   390:6
**individuals**   390:5
  390:9,11,13,16
**inference**   417:17
**inferring**   419:8
**information**
  376:13 377:11
  423:11,12
**informed**   395:13
**input**   366:14
**insisting**   363:17
**inspector**   381:5,19
  382:12 383:6,15
  384:1,13,17
  385:13
**institution**   391:23
**instructed**   411:19
**instructing**   406:7
  406:17 411:14
**intelligent**   420:1
**intended**   360:8
  361:10

interactions 415:4
415:5
interest 386:8,13
386:18 387:13
392:22 398:2
interested 375:9
400:20 424:14
internally 389:2
interrupt 379:19
interrupted
389:14
interrupting 368:4
404:16
investigation
383:9,13
investigative
396:2 414:11
involved 366:19
389:2 401:4,9
involvement
373:10
irregular 385:1,2
irregularities
367:20
issue 373:3,9
375:6 414:23
issues 375:6
376:15 378:12
379:1,12,13
387:13 394:15

**j**

j 405:11
jain 360:7 361:10
370:7,15 371:5
375:1 384:10
387:7,10
january 380:7
job 375:11 392:7
jobs 394:21
jonathan 360:7
361:10 367:17,19

375:2,4
judge 362:10
374:15 407:17
july 387:16 397:5
397:9 413:6 414:6
jury 418:12
419:17
justice 381:6
382:17 383:2

**k**

k 363:1 367:6,7
karen 390:19
katherine 395:12
kaye 360:2,16
361:4 363:7
364:20 365:6
366:25 368:19
372:11 374:2
375:12 377:15
378:3,8 380:1,14
385:25 389:14,18
390:24 393:18
399:21 400:2
403:23 404:8,17
406:7,13,19,21,25
408:7,12,20
409:21 410:8,25
411:5,10,22 413:3
413:3 414:2,20,23
415:17 416:20,21
417:1,20 418:3
419:5,7 420:8
421:3 422:12
425:2,3,21
kaye's 363:10
420:14
keep 365:3 408:6
420:25 421:1
keeping 367:5
kent 394:5 396:13
397:7,13

kept 375:23
kidding 421:2
kind 366:13,20
knew 384:11,22
386:10 393:22
know 364:16
365:6,9 371:25
375:22 376:22
377:11,14 378:10
379:6,8,18 383:9
383:12,13 384:15
384:16 385:8,10
385:18 386:7,24
387:25 390:8
392:10,24 393:19
396:1 397:10
398:5,13 399:16
399:17,17 400:16
400:22 403:1,1,2
403:23 406:4
409:11,25 410:10
411:10 413:22
414:12 416:12
417:4 419:17
knowing 391:24
knowledge 384:5
385:20
knows 385:16
kronos 367:4,5,6
367:17 369:1,1,4
375:18

**l**

l 362:1,1 363:1
422:1
langhorn 367:19
language 412:25
413:8 415:6
lasting 394:20
laugh 421:4
law 361:3 385:17
385:20 400:9

404:11,12,13
407:10,11
lawsuit 401:17,19
layers 388:19
learned 384:17
385:11
leave 417:1,20,20
417:23 418:24
419:7,11
left 380:17
legal 394:9 419:12
420:19
legality 385:5
letter 374:8,15
395:8,13
letters 389:3
level 391:23
413:18
license 387:24
388:1,2,10,16
389:1 392:6
394:19 396:11
400:9 406:5 414:5
416:7
licensed 394:21
licensing 388:22
392:25 394:2,15
licensure 418:20
420:15
life 400:8
limited 368:9
line 423:17 425:5
link 363:14,18,24
lisa 360:19 424:6
424:20
listed 390:5
litigation 377:8,12
378:12 379:1,11
393:15,17 401:3
401:12 402:4,6
404:20 409:22

418:10
**little** 411:7
**llc** 425:1
**logging** 367:10
**longer** 366:14,22
378:3
**longevity** 373:20
**look** 376:7 396:7
397:7
**looking** 400:22
**losing** 396:10
**lost** 396:3
**lot** 364:15 376:22
378:15,16 385:6

**m**

**m** 361:8 363:1
**magistrate** 374:15
**mail** 375:21
376:18,24 378:11
382:2,5,21,23
383:1,2
**mails** 375:23
376:25 377:9,16
378:4,5,8 379:8
395:25 396:1
**malicious** 392:3
398:1
**malpractice** 401:7
401:8,10
**man** 372:2
**management**
369:7
**manhattan** 370:13
**manner** 385:4
401:12
**manufactured**
391:15
**marginalized**
371:23 372:13,15
**marked** 423:16

**marriage** 424:13
**matter** 404:11,12
417:10,25 424:15
**matters** 366:2
418:20
**mcclaren** 373:3,9
**md** 390:19 391:2,3
**mean** 377:6
378:15 379:3
414:1
**meaning** 370:13
397:17
**med** 389:21
**medical** 387:24,25
388:2,10,16,20
392:3 400:5 402:7
406:5 414:5
420:15
**meeting** 367:17
375:3,4,15,18,20
375:25 380:7
394:7 395:14,21
397:5,11,13,16,17
413:6
**meetings** 367:14
370:4
**melissa** 360:2,16
361:4 363:7
422:12 425:2,3,21
**member** 375:11
**memo** 413:4 414:5
414:6
**memos** 408:20
409:4,12,19 410:2
410:9 412:22
413:6 414:3,25
415:1 416:13
417:13,15,22
418:4
**menacing** 413:7

**mentioned** 394:10
394:11,11,12
**merged** 372:6
**merger** 366:7,10
366:23 368:21,24
369:2,4,8,13,20,24
369:25 371:9,12
371:16
**met** 375:24 397:7
397:12
**mexico** 364:25
387:24 388:3,11
388:17 389:1,24
393:1 398:18
400:5 404:25
405:5 406:5 414:5
**middle** 393:15,17
**midst** 409:22
**minute** 397:2
**mirrored** 386:8,10
**miscategorized**
415:4,5
**mischaracterizes**
372:13 373:18
405:4 412:13
**mislead** 420:19
**mistake** 367:8
**mocked** 371:23
373:1
**moment** 396:24
**monday** 372:2
**money** 417:9
**month** 397:12
**months** 373:8
**moot** 398:15,15
**morning** 364:23
364:24,25
**motion** 408:2,4
**move** 363:21
373:12 406:10
407:18 408:9

409:9 420:9,11,13
**moving** 367:2
368:8 399:19
**muir** 370:7 413:7

**n**

**n** 361:1 362:1
367:6 391:5
405:11 422:1
423:5
**nadjari** 394:10
395:5 398:13,17
400:3 405:7,10,13
405:15,21 408:21
409:4,11 415:11
415:14 417:9
**name** 363:6 391:4
394:11 400:15
425:2,3
**named** 360:9
361:11
**names** 360:8
361:10
**nassau** 424:4
**necessarily** 377:15
**need** 398:14
405:24 406:1
421:13
**needed** 366:18
391:10 392:24
**never** 374:7,10
376:10 382:20
394:8 396:20
398:2,3,5,6,13
**new** 360:1,7,20
361:5,7,9,12,12
363:2 364:25
381:5,18 382:12
382:24 383:5,14
383:25 384:12,17
385:12 387:24
388:2,10,17 389:1

389:24 392:25
394:19 396:11
398:18 400:5,9
404:25 405:5
406:5 414:5 424:3
424:7 425:1,2
non 380:18
notary 360:20
363:2 422:19
424:6 425:25
note 389:13
noticed 375:17
notices 397:3
412:11
number 378:8
nycers 373:22

**o**

o 362:1 367:6,6
405:10 422:1
o'clock 418:9
oath 362:9
object 370:23
objected 370:22
objection 365:20
366:1,24 368:1,23
369:3,9,14 370:2
370:16 371:3,7,11
371:17 372:7,7,21
373:17 374:4
376:4,19 377:1
378:13,23 379:2,5
380:22,25 381:9
382:4,9,15,19,22
383:11,16 384:3
384:14,19,23
385:14 386:16
387:2,4,6,12 388:4
388:8,18 389:12
390:3,10,15,17
391:11,21 392:12
393:2,20,25 395:1

395:11,22 398:11
398:19 401:5,21
402:8,11,18,20,23
403:9,25 404:7,22
405:3,18 408:22
409:13,20 410:3
410:11,20 411:4
411:12 412:3
414:8 415:2
objections 362:16
obstructing 414:4
415:21
obstructionism
413:12
obstructionist
399:25
obtain 402:12
obtaining 389:3
office 376:9 381:6
381:19 383:6,15
384:1,13 385:13
office's 384:18
offices 361:3
officially 371:13
oh 391:6
okay 365:5,9,17
366:2 367:4,7,24
369:21 370:8
371:9,14 372:17
372:19 373:12
374:23 375:20,25
376:11,17,24
378:6,24 379:9
380:24 381:14,18
382:1 383:23
384:9,16,21 385:9
386:1,12,21,23
387:14,17,22
389:6,17 390:12
392:23 393:11,23
394:23 395:8

396:5,21,23 397:8
397:22 400:14,25
401:18,25 403:3
404:4 405:25
412:14,20 413:13
413:15 415:8,10
415:15 418:7
419:25 421:9
once 388:25
ongoing 374:25
391:14
online 381:13,14
381:17,21,22,24
382:1,8,13,18
383:7,10,14 384:2
384:12,18 385:13
387:1
operational
366:13 370:5
380:18
operations 370:9
order 360:17
ordered 364:10,11
421:14
orders 367:10
original 362:7,13
363:23
outcome 424:14
outside 388:23
overlap 386:22,22
override 411:20
oversee 371:5
overseeing 371:12
oversight 371:15
373:7

**p**

p 361:1,1 362:1
p.m. 360:13 416:1
421:17
page 423:7,12,17
425:5

paid 388:24
389:20 417:9
paperwork 376:9
389:24
part 390:7 392:25
393:18,24 400:25
participate 370:4
participating
372:15
parties 362:5
424:13
party 388:23
389:20
pathos 395:12
412:18 413:4
414:5,12
pathos's 396:2
patient 392:2
patricia 360:7
361:9
patsy 393:3
pay 373:15,16,21
373:21 374:22,24
375:6,17 376:15
402:2
paying 389:3
people 375:2
390:20 393:8
413:1
percent 381:11
performance
371:24 392:20
perpetuate 391:25
person 381:1
personnel 395:20
395:25 396:2,3,7
397:7
persons 360:8
361:10
pestana 361:8

phase  389:9,11,19
  389:20,23 400:25
phasing  380:5
phone  376:22,23
  379:7 382:20
phonetic  367:19
  376:8 385:10
  390:21 393:4
  395:12 397:18
physical  392:1
  401:14 413:25
physician  373:5
  394:16 401:14
  405:23,23 413:10
  413:14 415:7
physicians  394:14
place  422:8
plaintiff  360:3,16
  361:3 377:25
planning  370:5
please  363:6
  368:15 370:17,19
  374:19 378:7,7,17
  379:19,20 383:19
  385:23 386:2
  400:1 403:12,19
  404:15 406:10,25
  407:1,9,18 410:19
  411:3,6,8,25 412:2
  412:5,9 417:1,20
  417:20 418:3
point  375:7
policy  367:23
  386:14 387:15
  413:21
political  385:6
politically  385:7
pose  374:9
posed  370:24
position  391:24

potential  394:18
practice  367:22
  386:14,19 387:15
practicing  398:17
pre  395:6,9,14,20
  397:4 412:12,22
  412:24
preclude  408:1
  420:9,11
precluded  407:19
  407:24 408:3
predictor  404:1
preliminary
  363:12
preparation
  365:14
prepare  365:18
pretty  384:25
  385:2 393:21
prior  363:12
  366:23 368:21,24
  369:1,4,7,12,20
  386:18 401:2
private  367:22
  386:14 387:15
  417:11
privilege  398:21
  398:22,23 399:2
  405:19 406:9,11
  406:14 407:3,6,6,7
  407:10 408:13,23
  411:14,16 415:19
  419:24 420:6
privileged  377:4
  404:23 405:21
  408:25 409:2,7,8
  409:14,15 410:5,7
  418:21
procedure  360:18
procedures  370:5

proceed  389:1
proceedings
  368:17 379:23
  403:17 408:17
  410:23
process  388:15
  389:1,16 390:7
  392:25 401:1
  411:11
produce  377:19
produced  421:15
product  387:15
professional  373:2
prompted  389:23
proper  387:4
  419:12
properly  375:8
  403:24 404:6
  405:2,17
protected  398:20
  406:8
provide  363:20
  364:6,11 371:19
  379:4 381:7 390:6
provided  377:15
public  360:20
  363:2 422:19
  424:6 425:25
purposes  418:10
pursuant  360:17
put  363:8 366:17
  395:12,25 396:1

**q**

queens  370:14
question  365:11
  366:4 367:25
  368:10,13 369:15
  369:18,22 370:12
  370:17,18,20,24
  372:10 373:13
  376:5 380:10

383:17,20 386:2,2
  386:4,5 387:3
  389:16 394:24
  396:12 399:24
  400:25 402:5
  403:20,21 404:4,9
  404:15 406:2,3,8
  406:18,23 407:1,2
  407:4,16,18
  408:11,24 409:6
  409:17 411:6,8,9
  411:15,20,22,24
  412:1,7 415:11,18
  415:18,20,23
  416:23,25 417:7,8
  423:17
questions  365:7,10
  378:16 381:10
  400:14,20 403:5,7
  411:1 413:12
  423:16

**r**

r  360:19 361:1
  362:1 367:6
  405:11 422:1
  424:1,6,20
raised  376:2 402:2
rate  392:20
reach  392:23
  393:1,3,4,7,8,16
  393:23 394:2
  404:10,11,17
  405:1 406:3
  409:18
reached  393:14
  404:4 409:11
  410:1,8 411:10
read  366:6 370:18
  370:21 383:18,21
  386:3,6 403:19,22
  413:21

**realized** 375:8
**really** 366:19
**reason** 364:5
  365:6,9 425:5
**rebuttal** 397:24
  398:3
**recall** 381:15,24
  381:25 382:5
  383:4,8 390:18
**recapped** 379:7
**receipt** 382:2
**receive** 382:2
  383:5 395:8 402:6
**received** 363:10
  373:15 383:1
  394:9
**recess** 408:19
**recommend**
  405:15 406:3
**recommendation**
  389:4 390:2,4,7
**recommendations**
  390:1,12 401:2
**record** 363:6,9,13
  364:15 368:15,16
  374:19 377:22
  379:20,22,25
  380:13 385:24
  389:13 394:7
  403:15,16 408:14
  408:15,16 410:18
  410:21,22 412:8,9
  424:10
**recording** 392:2
  394:17 413:8,21
**records** 398:9
**rectify** 364:2
**redefined** 412:25
**redirect** 394:12
**reduction** 374:7
  374:10

**referred** 370:20
  383:20 386:5
  403:21
**referring** 366:8
  386:13,17 412:10
  412:15,16,17
  413:4,5
**reflect** 380:13
**reflected** 374:21
**refuse** 421:6
**regarding** 386:14
**reiterate** 411:6
**related** 424:12
**relentless** 402:13
**relevant** 401:13
**removed** 372:14
**reorganized** 372:5
**rep** 396:18,19
  397:17
**repeat** 383:17
**repeatedly** 366:15
  366:18
**rephrase** 369:18
  370:17,25 378:17
  378:19
**replaced** 370:6
  380:23
**report** 386:20
  396:2 414:11
**reported** 387:8
**reporter** 365:4
  370:21 379:20
  383:21 386:6
  403:22
**reporting** 363:15
  363:25 364:3
  387:19,21 425:1
**reports** 367:11
**representation**
  379:10,11

**representing**
  394:14
**request** 406:5
**requested** 423:11
**requesting** 416:4
**requests** 390:5
**required** 400:13
  401:1,3,6
**reserved** 362:16
**residencies** 388:21
  389:21
**resigned** 376:16
**respective** 362:5
**respond** 408:7,8
**responding** 417:16
**response** 376:3
  401:17 402:6
  410:25
**responses** 365:4
**responsible** 371:1
  373:6 413:1
**responsive** 367:25
  368:2,3 380:19
**rest** 392:5 400:8
**result** 375:25
  383:10,14
**retained** 399:13
  417:9
**retaliated** 393:9
**retaliation** 374:25
  391:14,23 400:4
  400:11 402:14
**retaliatory** 392:22
  394:22 400:11,12
  401:12,17,22
  404:3 413:24
**retention** 373:25
**returned** 411:1
**review** 376:10
  400:21

**reviewing** 418:4
**ridiculous** 418:22
  418:25 421:2
**right** 365:13,17
  367:7,24 368:12
  374:2 380:6 382:6
  389:10 391:8
  392:9 397:5
  401:20 405:12
  419:11
**rise** 413:17
**risk** 391:22 396:10
**role** 371:19
**rule** 385:8
**rules** 360:18 394:1
  394:2
**rulings** 423:16

**s**

**s** 361:1 362:1,1
  363:1,1 367:6
  423:1 425:5
**sabotaged** 373:10
**saint** 361:5
**salary** 373:20,22
  373:24
**samantha** 394:5
  396:13 397:13
**sanctions** 394:18
**santamaria**
  397:18
**saying** 375:3
  404:14 412:14
**says** 395:20
**scanned** 363:19
**scheduling** 370:4
**school** 388:21
  389:21 407:10,11
**sealing** 362:6
**searched** 378:10
**second** 389:23

secure  391:9
see  378:9
seen  373:4
send  363:24
  382:21 383:2
  391:25 416:23
sent  379:8 382:6
  382:23 388:22
  390:4
separate  379:11
september  367:18
  375:5,12,16 381:6
serious  373:3
  400:10,11 405:24
  415:9
seriously  413:13
served  397:3,4,9
  413:6 414:10
servers  377:17
service  362:12
services  366:8,9
  371:20 380:17
serving  413:24
set  375:22 424:9
  424:16
settlement  394:11
setup  375:18,20
  397:11
share  398:24
shared  366:15,19
  366:21 368:20,21
  368:24
sheet  375:1 425:1
sherman  391:1
shift  380:1
short  408:19
show  408:20 409:1
  409:4 415:11,14
  416:12 417:15,18
  417:21 419:1,3,6,9
  420:23

showed  415:24
  416:8 417:4,13
sic  373:11
sight  367:9 369:6
  369:7,12,20
signature  424:20
signed  362:8,9,12
sit  414:13
situation  385:7
smear  401:22
snow  365:15
soon  367:21,21
  375:17
sorry  364:22
  365:15 367:7
  381:16 412:8
  416:14
soto  394:5 396:14
  397:7
sources  385:1,3
southern  360:1
speak  365:23
  417:10
speaking  413:10
special  361:3,5
specialized  395:5
specializes  394:14
  418:19
specifically  388:17
  412:17
specified  422:8
spell  391:4 405:10
spelled  367:6
spirit  405:22
spoken  373:1
ss  424:3
staff  366:16,16
  380:2,3
start  388:9
started  367:21
  371:12,13 375:14

380:5 388:12,15
starting  413:25
state  360:20 363:2
  363:6 381:5,18
  382:12,24 383:5
  383:15,25 384:12
  384:17 385:12
  388:16 424:3,7
stated  363:13
  366:9
statement  363:9
  372:12 418:17
states  360:1
stay  416:20,21
step  388:23
stevenson  390:19
stipulated  362:4
  362:15
stop  367:24
  368:12 373:12
  374:2 378:7,7
  389:10 395:15,16
  404:15 417:19
straight  420:25
  421:1
street  361:12
  367:19 397:6
subject  377:7
subscribed  422:15
  425:22
sued  377:4 401:7
suggestive  387:3
suing  379:13
support  373:9
supposed  364:6
  373:20,22 409:23
sure  376:12
  381:11 385:18
  386:20
surprised  384:20
  384:21

surreptitious
  374:25
swenson  370:6
  371:1,14 373:5,5
  401:15 413:10
  415:1,6
swenson's  371:19
sworn  362:8 363:2
  422:4,15 424:9
  425:22
system  367:5,10
  369:7 376:8

**t**

t  362:1,1 422:1
  423:1 424:1,1
take  381:2 413:12
  421:5
taken  360:17
  363:11 366:10,11
  368:11 369:24
  370:5,6 372:5
  380:2,4,20,23,24
  389:5 408:19
talk  386:12 400:19
talked  365:22
  371:25
talking  368:11
  374:3 379:16,17
  379:18 408:3
  414:3,24
target  402:1
teased  373:1
tell  366:11 380:3
  400:19 403:8
  404:25 411:20,25
  417:17 420:23
  421:6
telling  417:24
  420:3
termination  395:6
  395:9,14,20 397:4

412:12,12,22,24
412:24
**terms** 391:9
**terrific** 365:13
**testified** 363:3
366:9 368:19,25
369:5,24 371:4
372:19 373:14
374:7 380:2 381:4
386:15 387:23
396:14 420:18,21
**testify** 366:7
396:17 419:4,22
420:4 422:4
**testifying** 372:9
407:20,25 410:15
410:16,17 416:7
417:19 419:14,15
419:20
**testimony** 366:3,5
373:18 374:9
405:4 420:12
422:4,7 424:10
**thank** 364:19
369:21 370:11
381:3 392:15
406:20,20 421:11
**things** 366:17
395:5
**think** 367:6,18
373:13 376:8
377:15 379:15
384:25 385:6
388:24 390:19,20
390:25 391:2,22
396:24 397:2
418:22 420:8
**third** 388:23
389:20 394:10
396:10 414:10

**thought** 364:3
365:16 413:23
**three** 373:8 390:9
390:11,13,16
400:23 418:9
**time** 360:13,19
362:16 367:5,17
368:12 375:1
394:10 401:6,9
422:8
**timekeeping**
367:20
**times** 400:23
**timing** 396:25
**today** 364:4,12,17
364:20 365:7,10
365:14,15,19
**told** 363:16 387:19
394:5,7,13 395:5
396:3,8,20 397:4
397:12 398:12
404:19,21 405:22
412:21 413:23
416:10 420:22
**topic** 373:14
**topics** 380:1
**transcript** 363:10
366:6 421:13
422:6,7
**trial** 362:17
407:20,25
**tried** 373:2 389:15
413:20
**trouble** 373:7
387:20 400:9
**true** 377:15 422:7
424:10
**truth** 422:4
**truthfully** 365:7
**trying** 368:5 374:9

**turn** 376:25 377:9
378:24 379:3
421:12
**turnaround**
421:15
**turned** 377:8,11
378:11 413:24
**two** 363:11 381:1
381:10 386:25
394:3 400:14
401:1 402:14
412:21 414:3,9,13
414:23,24 421:14
**typed** 379:7

**u**

**u** 362:1 405:10
**unable** 387:24,25
**unclear** 365:12
**undermined**
371:23
**understand**
365:10 370:11,11
393:13 396:12
412:14
**union** 367:20
375:5,7,8,11,16,21
375:22 376:1,2,9
376:11,14 377:3,4
377:5 378:12,20
378:25 379:10,13
394:7 395:13
396:18,19 397:4,6
397:17,23 412:21
413:7
**united** 360:1
**unlawful** 360:8
361:11 404:3
**unsigned** 362:10
**use** 412:23

**v**

**v** 425:2
**vendor** 388:24
389:20
**verification** 389:4
390:1 391:9,10,20
392:25 402:12
403:24 404:6,18
405:2,17 406:6
411:11
**verifications** 401:2
**verify** 392:11,19
402:16
**veritext** 425:1
**vicious** 404:3
**victim** 401:22
**videoconference**
360:19
**violating** 392:2
394:17 413:8,15
**violations** 386:18
401:15
**voice** 365:3

**w**

**w** 373:23 374:21
**wait** 397:1
**waived** 362:7
**wangel** 360:7
361:10 367:18
375:3,5,10,19,22
376:1,7,12 385:10
385:11 386:9,25
387:9,20,21
**want** 363:8 364:16
364:17 366:2,4
378:10 385:22
387:25 392:10
393:18 396:24
399:15,17 402:22
407:21 410:17

**[want - zoom]**

411:17 412:22
416:12 417:4
**wants**  398:23
**warnings**  412:22
**water**  367:19
397:6
**wave**  406:12,14
411:17
**way**  370:24 372:25
373:1 382:7,10,11
383:24 385:3
393:10 415:3,3
424:14
**we've**  409:9
**weeks**  363:11
421:14
**welcome**  416:19
**went**  396:7 397:6
397:10,10,12
415:4
**whereof**  424:16
**william**  394:5
396:14
**winkler**  371:25
372:1,20 380:6,8
380:12,16,17,20
**wish**  399:11
**witness**  362:8,12
362:13 363:1
399:15 411:23
419:16,22,23
420:22 421:18
424:8,11,16
**witnesses'**  425:3
**word**  395:6,6
412:11,12,22
**work**  371:20,21,23
389:4 390:1 391:9
391:10,19 392:6
392:24 401:2
402:12 403:24

404:6,18 405:2,17
406:6 411:11
**worked**  371:22
394:25
**working**  367:21
375:2
**works**  378:3
**write**  377:10
391:25 397:24
398:3 416:4
**writing**  395:17,19
415:6
**written**  373:4
**wrong**  396:25
**wrote**  413:13,14
414:18 415:3

|  | **x** |  |
| --- | --- | --- |

**x**  360:2,10 423:1,5

|  | **y** |  |
| --- | --- | --- |

**y**  363:1
**yain**  367:16
**yang**  360:7 361:9
375:2,10 384:16
393:3
**yeah**  385:7 391:7
**year**  388:12,14
397:19
**years**  394:4
402:14
**yep**  401:10
**york**  360:1,7,20
361:5,7,9,12,12
363:3 381:5,18
382:12,24 383:5
383:14,25 384:12
384:17 385:12
394:19 396:11
400:9 424:3,7
425:1,2

|  | **z** |  |
| --- | --- | --- |

**zoom**  365:22

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.