January 7, 2020

Dear Board of Correction and Inspector General:

I am a triple board-certified physician who has worked as a forensic psychiatrist for Health and Hospitals (H+H) for over 20 years. I have been a forensic court evaluator since 1999, and the Medical Director of the Bronx Court Clinic since 2004. As such, I am fully aware of needed court reforms. However, the improper methodologies utilized by H+H Correctional Health Services ("CHS") management to implement this objective pose incalculable costs and risks to defendants and the justice system.

I have repeatedly reported violations of the standard of practice in psychiatry, statutory law, and a misallocation of resources at the CHS Forensic Psychiatry Evaluation Court Clinics ("FPECC"). This misconduct has resulted in human rights violations, improper competency to stand trial examinations, denial of criminal defendants' constitutional right to due process, risks to the public, and poor patient care of inmates.

My opposition to this malfeasance has led to unrelenting retaliation to force my resignation and premature retirement from public service and has led me to file a lawsuit against H+H. I now respectfully report this matter of public concern to oversight agencies consistent with my duty as a physician to do so, and I request that action be taken to protect due process rights of criminal defendants and the integrity of the legal system.

### *Background*

CHS took over the four city court clinics in 2018, prior to which the Manhattan and Bronx Court Clinics were managed by Bellevue Hospital and the Brooklyn and Queens Court Clinics were managed by King's County Hospital. Under the management of Bellevue Hospital, the Court Clinics operated within proper medicolegal standards.

During the time relevant, the CHS court-clinics have been managed by the following H+H staff: Patricia Yang, Senior Vice President; Ross MacDonald, M.D., Chief Medical Officer; Jonathan Wangel, Esq., Director of Labor Relations and Risk Management; Elizabeth Ford, M.D., Chief of Psychiatry; Abhishek Jain, M.D., Director of FPECC; and Andrea Swenson, FPECC Administrator.

I began to raise concerns about the management of the clinics and medicolegal violations at the commencement of the tenure of CHS oversight of FPECC. From inception, CHS and FPECC leadership have harassed and threatened me in retaliation for expressing my concerns.

CHS asserts that it "serves as an essential partner in New York City's criminal justice reform efforts," and works in conjunction with the Mayor's Office of Criminal Justice. CHS has received considerable funding that is unfettered by the fiscal conduit and regulatory oversight of H+H, leading to less accountability and nonadherence to the medical model and standards of practice in law and medicine.

### *Evaluation of Competency to Stand Trial in NYS*

The Criminal Procedure Law ("CPL") 730 is a psychiatric-legal assessment for competency to stand trial It requires *two* qualified examiners to reach *independent* opinions and submit reports to the Court. **The purpose of the CPL 730 exam is to address the narrow psychiatric-legal question of competency to stand trial to ensure due process protections**. It is not for the purpose of treatment, disposition or to be used as a means to covertly sway the trajectory of legal proceedings.

Defendants found incompetent (unfit) to stand trial on a felony charge are committed to a prison hospital for restoration to competency. Defendants found incompetent on a misdemeanor charge have their charges dropped and the case is dismissed, and they are released from the custody of law enforcement to a civil hospital or to the community. CHS has exploited this loophole in the law through the misuse of CPL 730 competency examinations as a mechanism to get inmates released from Rikers Island (see below).

A CPL 390 is a pre-pleading, pre-sentence mental health assessment requires *one* evaluator and does not meet statutory requirements to render a determination of competency. Competency reports are privileged legal information that belongs to the Court and are to be released only to Court or by Court order.

### *Forensic Psychiatry Practice Standards*

Psychiatry is a medical subspecialty. Physical disease can present with psychiatric symptoms. As physicians, psychiatrists must exercise due diligence in assessing for an underlying medical disease, including HIV and substance abuse, both of which can be highly relevant in the assessment of defendants' mental state. Exclusion of this information fails to meet the standard of practice.

*Dual Agency Prohibitions*
A fundamental dictum for the ethical practice of psychiatry is to avoid dual agency in the practice of clinical and forensic psychiatry. This mandates a clear and distinct separation between clinical treatment and forensic assessments to guard against ethical, legal and practice violations. Avoiding the overlap of clinical treatment with forensic activities ensures forensic evaluators render unbiased psychiatric-legal opinions, and protects the confidentiality afforded to patients in treatment relationships.

**CHS has wantonly violated dual agency prohibition causing direct harm to defendants.** In treatment, a defendant is a patient and there is a doctor-patient relationship that is supportive, accepting and empathic. The goal is to benefit the patient and the relationship is not adversarial. The clinician provides treatment and advocacy and diagnostic assessment for the purpose of clinical care with minimal scrutiny applied to information obtained. HIPAA applies.

By contrast, in a forensic evaluation there is no doctor-patient relationship. There is attorney-client privilege and judicial authority. The forensic evaluation is neutral, objective and detached. The expertise and focus of the forensic evaluator is to address the psychiatric-legal question before the Court. The evaluators, attorneys and the Court scrutinize the information in an adversarial setting. The relationship between the forensic evaluator and evaluee is based on critical judgment and there is no therapeutic alliance. HIPAA does not apply.

*Recording Forensic Exams*
The American Academy of Psychiatry and the Law ("AAPL") is the governing body for the practice of forensic psychiatry and sets forth practice guidelines for the profession. The AAPL Task Force Report on Recording Forensic Evaluations notes that recording forensic exams is **"an ethical acceptable medical practice**….to create a more complete and accurate record in lieu of or in addition to note taking… Some…propose…recording should be the standard of practice for forensic evaluations…The purposes of…recording forensic interviews focus on creating a complete record."

CHS has stymied any professional dialogue about the recording of CPL 730 evaluations and issued a policy barring forensic recordings, thereby prohibiting forensic psychiatrists from practicing within an accepted, and often expected, standard of the profession. **CHS abhors transparency in CPL 730 examinations and has prohibited recording to conceal poor quality and misconduct in exams**.

CHS leadership manufactured disciplinary actions against me by conflating clinical and forensic practice standards and applying nonapplicable clinical practice standards to my work as a forensic psychiatrist. This was an attempt to intimidate and harass me and falsely accuse me of professional misconduct.

## **Subversion of CPL 730 Competency Exams**

*Misuse of CPL 730 Intent*
CHS leadership expressed intent to "take over 730 exams to get people off the Island." This political agenda to use the CPL 730 exam as a means to empty Rikers Island has perverted the examination process and compromised validity of results and the integrity of legal proceedings.

*Quid Pro Quo Hiring*
Senior FPECC evaluators engaged in a quid pro quo agreement to "cut corners and do a less thorough job" in order to "get people off the Island." This has caused spurious unfit findings. For example, an antisocial sex offender was found unfit on a misdemeanor charge that resulted in dismissal of the case and release of the inmate into the community without a requirement to register as a sex offender. Contemporaneously, the same defendant was found fit and malingering (intentional fabrication of symptoms to avoid culpability) in another borough.

*Statutory Violations*
CHS allowed competency opinions to be rendered based on a CPL 390 examination, which fails to meet statutory requirements for a determination of competency and could be a basis for an appeal. I have suffered retaliation because I opposed rendering competency opinions based on a CPL 390 exam; I have been ostracized, my supervisory chain of command does not meet with me, I am excluded from meetings, and I have been disparaged by other FPECC Directors.

Defense counsel has the legal right to be present during a CPL 730 competency exam and it is imperative to stop the exam immediately if a defendant makes a request for their attorney to be present. This could result in a delay, so it is counter to the CHS objective to complete 730 exams quickly. I am aware of a case in which a FPECC evaluator pressured a defendant to continue with the exam after he specifically requested for his attorney to be present.

Defense attorneys and FPECC staff note that CHS and FPECC leadership are unreceptive to reports of wrongdoing. Furthermore, due to the retaliation that I have experienced, FPECC staff are reluctant to report misconduct. When I tried to address an administrative failure in the Bronx that led to a defendant being seen without his lawyer, no corrective action was taken, and I was written up for "disrupting the work environment."

*Inadequate Forensic Evaluators*
A junior evaluator in the Bronx had difficulty conducting interviews, formulating cases and writing reports, which caused delays in processing cases and resulted in split findings. Legal personnel repeatedly complained, and I informed FPECC leadership, but no formal action was taken. Instead, FPECC leadership surreptitiously reviewed the evaluator's reports prior to submission to the Court. Defense attorneys opposed this non-transparency and expressed concern that it tainted the *independence* of the exam as required by law.

CHS hired a biased forensic evaluator who misdiagnosed psychotic defendants as malingerers. Defendants who are incorrectly diagnosed as malingering are unduly stigmatized and at risk of being deprived of needed mental health services and face a more negative outcome of their legal case.

FPECC clerical staff has participated in CPL 730 interviews and formulation of cases in violation of the statute, legal privilege and the privacy afforded to the CPL 730 process and reports. CHS and FPECC staff release CPL 730 reports and findings to parties other than the Court without the authority or authorization to do so.

Lawyers have raised concerns about a FPECC evaluator who fell asleep during an exam needing to be awakened by defense counsel, and who, at other times, has been noted to be 'hyperactive' and talk excessively and appear 'manic,' leading to speculation about drug abuse or mental illness.

*Forensic Psychiatry Practice Deviations*
CHS emphasizes rapid turnaround times for CPL 730 reports, precluding the due diligence necessary to ensure validity of the results. CHS abandoned longitudinal inpatient CPL 730 examinations that are sometimes necessary for data collection and diagnostic clarification.

In fact, CHS endorses foregoing face-to-face evaluations of defendants altogether and instead supports relying on a review of records alone to render an opinion of competency. This is a deviation from custom and practice in forensic psychiatry and jeopardizes defendants' due process rights. For example, a defendant was improperly remanded to custody on an unfit finding that was poorly substantiated based on a record review, and later in a face-to-face interview was found fit. In another case, a defendant with a high-profile felony charge was wrongly deemed competent based on an opinion rendered solely on records, and when interviewed face-to-face, he was found to be grossly psychotic and unequivocally unfit.

*"Order to Conversate"*
FPECC prompts treating clinicians on Rikers Island to participate in rendering competency opinions by obtaining a judicial "order to conversate," thereby sanctioning forensic evaluators and treating clinicians to *jointly* render psychiatric-legal opinions on fitness. This conflates clinical treatment and forensic evaluations, and it is in direct violation of dual agency prohibitions. It erodes defendants' HIPAA protections by requiring treating clinicians to provide information and testimony that discloses potentially embarrassing or harmful information relayed in confidence during the course of a treatment relationship. This is a flagrant aberration in the practice of forensic and clinical psychiatry that violates the sanctity of the treatment relationship and interferes with an objective impartial assessment of competency.

*Destruction of Work Product*
It is custom and practice to retain handwritten notes and other data generated during forensic examinations. A FPECC Director indicated that forensic evaluators under their direction routinely "throw away their notes so they don't have to get cross examined on them," and FPECC leadership had refused to keep handwritten notes as part of the defendants' files. I informed CHS leadership about this destruction of work product, but CHS has not issued a policy that delineates guidelines or requirement to preserve handwritten notes generated during forensic exams.

*Department of Corrections ("DOC") Orders to access to Inpatient Unit*
FPECC staff have obtained orders from DOC granting forensic evaluators access to treatment settings in order to perform psychiatric-legal exams, including entering the inpatient clinical treatment area of the Bellevue Forensic Prison Ward ("BHPW"). This raises concerns about dual agency and HIPAA violations.

*"730 Team"/Court Liaisons*
CHS created the "730 Team" and "Court Liaisons" on Rikers Island to "establish rapport with CHS mental health and substance use providers in the jail to relay information about the criminal justice status of their patients and opportunities for court-based diversion from jail." These inmates are a vulnerable population with serious mental illness and/or intellectual disability and often lack capacity to understand and sign HIPAA releases.

The "730 Team" and "Court Liaisons" are comprised primarily of social workers and mental health counselors who routinely make inquiries about the defendant's legal case and discuss with defendants' details of their legal situation, often giving unauthorized legal advice. They are also known to interject gratuitous opinions of competency, something for which they are neither qualified nor tasked to do.

The "730 Team" and "Court Liaisons" often persuade incapacitated defendants to sign HIPAA releases without the consent or knowledge of defense counsel, and at times, gratuitously distribute this protected health information ("PHI") through non-secure platforms to parties who did not request it. Defense lawyers have reached out to CHS leadership with concerns about this infringement on lawyer-client privilege and deleterious interference with legal strategy and defense options, but to no avail.

### *HIPAA & Legal Privilege Violations*

It is generally considered best practice to obtain unredacted medical records via a court order with a certification (attestation) that the records are accurate and complete. HIPAA released records are not certified and this can be problematic during court testimony.

Given defendants' competency is in question, their capacity to understand and sign a HIPAA release is uncertain, and since the content of the medical records could be harmful in court proceedings, many defense attorneys prefer to obtain records under the rubric of a court order.

CHS Rikers Island staff recklessly seek HIPAA releases for medical records in a haphazard manner. HIPAA release forms are often incorrectly or incompletely filled out, and sometimes medical records are released prior to obtaining a signed HIPAA consent.

I was threatened with termination when I tried to discuss with CHS leadership issues pertaining to the use of HIPAA releases in forensic exams, especially for defendants who may be incompetent and lack the capacity to sign a release.

### *Improper Medical Documentation*

The quality, accuracy and regulatory compliance of the medical records generated by CHS at Rikers Island are deficient. The records are internally inconsistent and contradictory, and not infrequently, entries in the medical record are anonymous, that is without the name, credentials or electronic signature of the provider making the entry.

The "730 Team" knowingly bundles clinical treatment with forensic services asserting "inevitable overlap" between forensic and clinical practice and deliberately omits full and accurate documentation of the encounters to obscure the nature and content of the legal aspects of the interaction. This is fraudulent documentation by omission.

### *Funding Misallocation Comprised Patient Care*

BHPW provides acute psychiatric treatment to mentally ill inmates, but it has been unable to run at full capacity due to insufficient funding. CHS and BHPW are both under the purview of H+H and serve criminal justice involved individuals with mental illness. Yet, the ample funding for CHS has not been allocated to BHPW to treat acutely mentally ill arrestees. As a result, at various hospitals throughout the city, **inmates are chained to hospital beds 24/7** under NYPD watch, an inhumane and costly misappropriation of resources.

CHS attempts to "avoid hospital runs" to "save money" hence has not made timely referrals to BHPW for inmates on Rikers in need of acute psychiatric care. Instead, CHS waits until inmates have severely decompensated and are grossly psychotic, and often violent, before making a referral. CHS promotes 'jail-

based hospital setting' treatment and has delegated psychiatric supervisory oversight of the care of inmates to providers without requisite training or credentials putting inmates at risk.

### *Manipulation of Statistics*

CHS initiated the "Queens Pilot Project" and infused the Queens Court Clinic with extra funding and staff to expedite CPL 730 exams, then touted success by a misrepresentation of the turnaround times for CPL 730 exams. Previous calculations of the average turnaround times included cases on hold, such as defendants incarcerated upstate, AWOL at-liberty defendants or defendants hospitalized indefinitely. The calculation of the turnaround time for the "Queens Pilot Project" excluded cases on hold, thus showed a dramatic, but misleading, decrease in the average turnaround time for CPL 730 exams.

### *Retaliation & Gross Mismanagement*

CHS has engaged in medicolegal practice violations and its culture of nonaccountability and retaliation seriously impedes functional operation of the agency. I have been the victim of relentless retaliatory harassment for opposing discrimination and malfeasance, including a malicious shift change to harm my young children, manufactured disciplinary allegations to harass me and impugn my professional reputation, sabotage of my recredentialing, non-transparency and surreptitious alterations to my time and leave balances, and pay docking for taking off for the Jewish High Holidays.

I have been ostracized and isolated, and most recently, **I have been prevented from doing my job because CHS has refused to staff the Bronx Court Clinic rendering the service non-operational**. This has caused scheduling problems and a backlog of cases, and strong disapproval from important stakeholders.

The Queens Court Clinic received extra funding that resulted in a plethora of doctors who often sit idly due to a lack of work. Yet, CHS will not send a forensic evaluator from another borough to the Bronx to perform CPL 730 exams, even though this is permissible per the collective bargaining agreement. This use of mentally ill defendants and the criminal justice system as a means to further a pattern of retaliation against me is particularly egregious.

A prohibition against retaliation is not just a matter of law, fair employment and Civil Rights, it ensures that employees feel empowered to voice their concerns and is a test of organization leadership. It is notable that employers typically do not waste resources retaliating against employees who are young, inexperienced or have no public credibility. Institutionalized retaliation often occurs against employees with credibility in their field who have stated their claims against organizational misconduct publicly.

I am available to provide specific details and additional information upon request. It is my sincere hope that an investigation will ensure the protection of mentally ill defendants' rights and the integrity legal system, and address the unlawful retaliation that I have experienced, especially in regard to the negative impact it has had on criminal justice involved mentally ill individuals.

Thank you for your attention to this serious matter.

Sincerely,


Melissa Kaye, M.D.