UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MELISSA KAYE,

Plaintiff,

-against-

NEW YORK CITY HEALTH AND HOSPITALS
CORPORATION; ELIZABETH FORD; PATRICIA
YANG; ABHISHEK JAIN; and JONATHAN
WANGEL (said names being fictitious, the persons
intended being those who aided and abetted the
unlawful conduct of the names Defendants),

Defendants.

------------------------------------------------------------------------x

**DEFENDANTS' LOCAL
RULE 56.1
STATEMENT OF
UNDISPUTED
MATERIAL FACTS**

18-cv-12137 (JPC)(JLC)

Pursuant to Local Rule 56.1 of the Civil Rules of this Court, Defendants New York City Health and Hospitals Corporation ("H+H"), Elizabeth Ford, Patricia Yang, Abhishek Jain, and Jonathan Wangel (collectively "defendants") by and through their attorney submit their statement of material facts as to which there is no genuine issue to be tried:

1.    Plaintiff, former Director of the Bronx Forensic Psychiatry Court Clinic at Correctional Health Services ("CHS"), brings this action alleging discrimination (gender and caregiver) and retaliation under 42 U.S.C. § 1983 for violations of the 1st and 14th Amendments of the United States Constitution; the Equal Pay Act; Family Medical Leave Act ("FMLA"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the New York Human Rights Law as contained in New York Executive Law § 296, et seq. ("NYHRL"); the New York City Human Rights Law as contained in the Administrative Code of the City of New York, § 8-107, et seq. ("NYCHRL"); and New York Labor Law § 740.  *See* Amended Complaint, filed May 3, 2019 (hereinafter, "Compl."), Exhibit "A."[1]

---

[1] References to all exhibits are to those annexed to the Declaration of Donna A. Canfield, dated March 4, 2022, ("Canfield Decl.") submitted herewith in support of defendants' motion for summary judgment.

2.      Plaintiff alleges that soon after the management of the forensic clinics transitioned in late 2017/early 2018, from Corizon to CHS, she experienced discrimination and retaliation. Specifically, Plaintiff alleges that: (1) she was subjected to pay disparities on account of her gender; (2) she was discriminated against on account of her caregiver status; (3) Defendants interfered with her FMLA rights when they granted her FMLA leave on October 30, 2018, and then revoked it on November 23, 2018, and retaliated against her for attempting to exercise her FMLA rights; (4) Defendants retaliated against her for complaining about the alleged gender-based pay disparity with her male counterparts; (5) Defendants violated her First Amendment right of free speech and rights under New York "whistleblower" law by retaliating against her because she raised concerns about the Criminal Procedure Law § 730 evaluation process, staff conflict of interest, HIPAA violations, and the destruction of evaluation notes; and (6) the intolerable working conditions resulted in her constructive discharge.  *See* Ex. A at ¶¶ 1-6.

## I.      Background

3.      In or about August 1999, Plaintiff was hired as an Attending Physician at Bellevue Hospital, working as a forensic evaluator in the Bronx Criminal Court Clinic.  *See* Deposition of Melissa Kaye, dated November 15, 2021, Exhibit "B" at 202:2-203:5.

4.      As a forensic evaluator, plaintiff was responsible for conducting court-ordered forensic examinations consistent with Criminal Procedure Law 730 ("CPL 730") and Criminal Procedure Law 390 ("CPL 390").  CPL 730 examinations are performed to determine whether a criminal defendant is competent to stand trial.  CPL 390 examinations are pre-pleading/pre-sentencing examinations.  *Id*. at 203:6-15.

5.      In 2004, Plaintiff became the Medical Director of the Bronx Criminal Court clinic. *Id*. at 204:7-12.  Other than additional administrative work, Plaintiff's forensic evaluation

job duties remained the same – performing court-ordered CPL 390 and CPL 730 examinations. *Id*. at 204:13-17.

6.      Between 1999 and 2017, Bellevue Hospital and Kings had oversight and management of the Bronx and Manhattan criminal court clinics; Kings County Hospital had oversight and management over both the Brooklyn and Queens criminal court clinics. *See* Kaye, Ex. B, at 50:4-14; *see also* Deposition of Abhishek Jain, M.D. dated October 4, 2021, annexed as Exhibit "C" at 60:20-61:1.

7.      At all times relevant, Dr. Marianne Badaracco ("Dr. Badaracco") was the Chief of Psychiatry at Bellevue Hospital. *See* Jain, Ex. C at 60:20-22; *See also* Deposition of Dr. Elizabeth Ford, dated September 27, 2021, annexed as Exhibit "D," at 25:24-26:3.

8.      From May 2009 to 2014, Dr. Elizabeth Ford ("Dr. Ford") was the Director of Forensic Psychiatry at Bellevue Hospital, where she supervised the Manhattan and Bronx criminal court clinics. *See* Ford, Ex. D at 28:16-19, 51:22-23. During this period of time, Plaintiff reported to Dr. Ford.  *Id*. at 26:9-14; *see also* Kaye, Ex. B, at 45:18-20.

9.      From 2014 until approximately July 1, 2018, Dr. Jeremy Colley ("Dr. Colley") was the Director of Forensic Psychiatry at Bellevue Hospital, where he supervised the Manhattan and Bronx criminal court clinics. Kaye, Ex. B at 59:3-7, 162:20-163:4. During this period of time, Plaintiff reported to Dr. Colley. *Id*. at 42:2-4, 59:3-7; Ford, Ex. D, at 88:17-89:8

10.      From approximately July 2001 to 2011, Dr. Stephen Ciric ("Dr. Ciric"), was employed by Bellevue Hospital as a Physician Specialist III in the Division of Forensic Psychiatry.  His responsibilities included performing admission assessments and comprehensive treatment plans; coordinating the medical care needs of patients and drafting psychiatric summaries/discharge documentation for patients referred by the New York City Department of

Correction and the New York City Police Department; and performing court-ordered evaluations for New York County Supreme and Criminal Courts.  *See* Curriculum Vitae Stephen J. Ciric, M.D., annexed as Exhibit "E."

11.     In or about 2011, Dr. Ciric accepted the position of Medical Director of the Manhattan Criminal Court clinic, and was promoted to Physician Specialist IV to compensate him for the additional responsibilities required of the position, the many cases seen at the clinic, the high turnover in staffing, and the loss of a full-time Psychologist, part-time Assistant Medical Director, and part-time Medical Director.  *See* "Human Resources Personnel Requisition Form Promotion," annexed as Exhibit "F."

12.     The Medical Director of the Manhattan Criminal Court clinic line was a unionized line at the time Dr. Ciric accepted the position in 2011. *See* Kaye, Ex. B, at 222:15-24.  Dr. Ciric's rate of pay thus was determined by the collectively bargained rate. *See* Clinicians Unit Collective Bargaining Agreement between the City of New York, the Health and Hospitals Corporation, and the Doctors Council, annexed as Exhibit "G."

13.     The Medical Director of the Bronx Criminal Court clinic was a unionized line at the time Plaintiff accepted the position in 2004. *Id.*  Consequently, Plaintiff's rate of pay was determined by the collectively bargained rate.  *Id.*

14.     The minimum and maximum pay rates for the Physician Specialist title is higher than the Attending Physician title.  *Id.*

15.     The Manhattan Criminal Court clinic is consistently the busiest of the four criminal court clinics, seeing approximately 1,200 to 1,400 criminal defendants annually.  The Bronx Criminal Court clinic, by comparison, sees the least number of criminal defendants, with an average of approximately 300 criminal defendants annually.  *See* Kaye, Ex. B, at 209:9-18;

Ford, Ex. D, at 171:20-172:14; Deposition of Barry Winkler, dated October 6, 2021, annexed as Exhibit "H" at 284:7-285:5; *see also* Forensic Psychiatry Evaluation Court Clinics ("FPECC") Clinic Case Listing Output 10/13/2021, annexed as Exhibit "I;" *See also* Email thread, "Big picture question," dated October 16, 2018, annexed as Exhibit "J."

16.     Staffing at the Manhattan Criminal Court clinic exceeds that of the Bronx Criminal Court clinic, with one full-time psychiatrist, two part-time psychiatrists, two part-time psychologists, one full-time social worker, and a forensic fellow.  The Bronx Criminal Court clinic, by comparison, staffs only one full-time psychiatrist and one full-time psychologist.  *See* Email, "RE: Updated FPECC Org Chart," dated February 7, 2018, annexed as Exhibit "K."

17.     In or about 2013/2014, Plaintiff learned that Dr. Ciric was compensated at a higher rate of pay.  *See* Kaye, Ex. B, at 45:22-46:8.

18.     In early 2014, Plaintiff informed Dr. Ford that she believed Dr. Ciric, as a Physician Specialist, was being compensated at a higher pay rate, and requested that her line be changed from Attending Physician III to Physician Specialist because she "was more qualified and [] had more seniority."  Kaye, Ex. B at 48:7. In response, Dr. Ford stated that she would look into it and speak with Dr. Badaracco.  *Id*. at 48:15-18; Ford, Ex. D at 118:12-18.

19.     Dr. Ford spoke to her supervisor, Dr. Badaracco, about plaintiff's salary concerns, since Dr. Ford was not involved in, nor had any responsibilities concerning compensation issues. *See* Ford, Ex. D at 114:23-116:1

20.     In or about late 2014/early 2015, Plaintiff spoke to Dr. Colley about what she believed to be a pay disparity between herself and Dr. Ciric, informing Dr. Colley that this issue had been raised with Dr. Ford without a resolution.  Kaye, Ex. B at 58:20-59:19. Plaintiff also

informed Dr. Colley that she believed there was another part-time psychiatrist in a Physician Specialist line who was compensated at a higher rate than she.  *Id*. at 60:3-13.

21.     Dr. Colley told Plaintiff that he would speak with Dr. Badaracco about Plaintiff's complaint regarding pay parity.  *Id*. at 60:19-22.  Shortly thereafter, Dr. Badaracco contacted Plaintiff to advise that she would look into Plaintiff's complaint.  *Id*. at 61:2-13, 61:23-25.

22.     Thereafter, Dr. Badarraco and Dr. Colley told Plaintiff that while her line could not be changed from Attending Physician to Physician Specialist, her pay would be increased to the top pay range in the collective bargaining agreement for an Attending Physician III.  *Id*. at 63:8-64:16.

23.     On November 21, 2017, Dr. Ciric resigned as Director of the Manhattan Court Clinic.  *See* "New York City Health and Hospitals Corporation Resignation Form," annexed as Exhibit "L."

## II.     Transition to Correctional Health Services

24.     In or about late 2017/early 2018, oversight and management of the Bronx, Manhattan, Brooklyn, and Queens court clinics transferred to Correctional Health Services. *See* Deposition of Patricia Yang, dated February 28, 2018, annexed as Exhibit "M" at 20:8-21:24, 44:2-25; *see also* Email Correspondence, dated December 8, 2017, annexed as Exhibit "N."

25.     CHS is a division of New York City Health + Hospitals, created as part of former-Mayor Bill de Blasio's criminal justice reforms, to improve care, provide dignity, and treat humanely those detained and placed in city custody. *See* Yang, Ex. M at 20:8-21:24, 31:7-13, 57:2-13; *see also* https://www.nychealthandhospitals.org/correctionalhealthservices (last visited January 18, 2022).

26.     The reorganization and consolidation of the four court clinics, collectively called the Forensic Psychiatric Evaluation Court Clinics or "FPECC," was consistent with the City's efforts to minimize the health impact of incarceration and reduce the length of stay in jail, by unifying the forensic service, standardizing the clinics, and providing the necessary resources in order to expedite the court processing of criminal defendants so they were in custody the least amount of time necessary. *See* Yang, Ex. M at 44:2-25, 45:17-46:15, 55:4-8, 57:23-59:7, 155:1-9; Jain, Ex. C at 60:5-61:15.

27.     During all relevant times, Dr. Patricia Yang held the position of Senior Vice President for Correctional Health Services. *See* Yang, Ex. M at 10:3-6.

28.     In 2015, Dr. Ford became the Chief of Psychiatry for Correctional Health Services. *See* Ford, Ex. D at 39:7-17; Yang, Ex. M at 49:25-50:6.  In this role, Dr. Ford assisted in the transition of the court clinics into the CHS, and supervised the Director of the Forensic Psychiatric Evaluation Court Clinics or "FPECC."  Dr. Ford remained in this role until December 2019. *See* Ford, Ex. D at 59:25-160:4.

29.     During all relevant times, Dr. Ross MacDonald held the position of Senior Assistant Vice President and Chief Medical Officer for Correctional Health Services. *See* Yang, Ex. M at 47:16-19; Deposition of Ross MacDonald, dated November 12, 2021, annexed as Ex. "O" at 13:25-14:9.

30.     During all relevant times, Sara Gillen held the position of Chief Operating Officer for Correctional Health Services. *See* Yang, Ex. M at 47:25-48:6;

31.     From approximately 2015 to June or July 2019, Jonathan Wangel held the position of Senior Director of Labor Relations. *See* Deposition of Jonathan Wangel, dated September 30, 2021 annexed as Exhibit "P" at 14:12-14, 16:16-17:4, 18:5-25.

32.     During all relevant times, Jessica Laboy held the position of Chief Administrative Officer.  *See* Yang, Ex. M at 36:3-13.

**A.  Citywide 730 Workgroup**

33.     On January 18, 2018, Dr. Ford sent an email to Dr. Colley, requesting that he "suggest one evaluator from the Bronx clinic and 1-2 psychiatrists from the Manhattan clinic who would be willing/able to participate in the workgroup to think about a standardized clinical approach to the exams."  Specifically, the workgroup sought to "create preliminary templates for 730 reports and guidelines about the interviewing process, medical records requests, and psychological testing."  *See* Email from Elizabeth Ford to Jeremy Colley, dated January 18, 2021, Email, dated March 27, 2018, from CHS Communications, both annexed as Exhibit "Q."

34.     That same day, Dr. Colley forwarded Dr. Ford's January 18, 2018 email to the clinic evaluators, stating "[s]ee below – let me know if you are interested."  On January 22, 2018, plaintiff responded by saying, "[l]et me know dates, and I'll try to work it in."  *See* Email thread, dated January 18, 2021 and January 22, 2018, at Exhibit "R."

35.     On or about February 12, 2018, Plaintiff learned that Dr. Barry Winkler was chosen to participate in the workgroup, named "Citywide 730 workgroup."  *See* Email, from plaintiff to Jeffery Bloom, dated February 12, 2018, annexed as Exhibit "S;" Winkler, Ex. H at 41:7-17, 55:19-56:1

36.     Plaintiff referred to Dr. Winkler's participation in the   "Citywide 730 workgroup," as a "730 schedule disruption per CHS" to Legal Aid attorney, Jeffery Bloom, and lamented that "[a]lthough I am a very senior, highly qualified examiner, I was not asked to participate in this process to 'standardize and streamline' 730s," and complained that she "was

not consulted about the date of the meeting so [she] did not have the opportunity to provide input on which day would be least disruptive for [Dr. Winkler] to be pulled." *Id.*

**B.  Medical Records**

37.     In or around February 2018, Patrick Alberts, legal counsel for CHS, Dr. Yang and Dr. Ford learned from the Mayor's Office for Criminal Justice ("MOCJ") that plaintiff had refused to perform a court-ordered 730 examination until she received unredacted medical records.  As a result, the judge overseeing the matter was threatening to hold Bellevue Hospital and the Bronx Court Clinic in contempt.  Dr. Ford commented to the group that the "[s]tandard practice in forensic evals is to use whatever records you have to form an opinion and not any limitations in the formulation," and that "[plaintiff] has been a problem for a long time and we will manage her out."  Dr. Yang noted that "[s]adly dragging in MOCJ to learn that word had it that the judge might hold the city in contempt and it turns out it is [plaintiff's] own cyclone that has sucked in detritus."  *See* Email, "Fwd: Judge Torres wants to hold us in contempt?" dated February 1, 2018, annexed as Exhibit "T;" Ford, 63:21-64:19.

38.     CHS legal counsel had determined that 730 orders do not entitle the release of substance abuse information, unless that information was specifically requested in the order or by subpoena.  *Id*.; *see also* Winkler, Ex. H at 110:3-15, 194:22-195:3; Letter, dated February 20, 2018 to Honorable Judith Lieb, Bronx County Supreme Court, Criminal Division, from Salvatore Russo, Senior Vice President and General Counsel, Legal Affairs, annexed as Exhibit "U."

39.     CHS legal counsel further determined it would be inappropriate to "approach the patient for us and obtain an authorization, and it's doubtful [the] attorney will either."  *See* Exhibit "T."

40.     Plaintiff, along with Drs. Winkler, Ciric, and Colley, all complained about using redacted medical records when performing 730 examinations.  *See* Kaye, Ex. B at 100:2-19, Winkler, Ex. H at 24:9-25:22, 109:17-23, 110:16-111:1; 222:3-10.

41.     Dr. Winkler was not treated any differently after complaining about having to use redacted medical records when performing 730 examinations.  *See* Winkler, Ex. H at 309:10-13

42.     On March 12, 2018, Plaintiff expressed her concerns regarding the use of redacted medical records to Dr. Colley, claiming that "relying on redacted records falls below the standard of practice for forensic (and clinical) psychiatry," because "we need to use unredacted records in order to render an opinion within a reasonable degree of medical certainty, and to avoid controversions and maintain our professional credibility."  Plaintiff was also concerned about facing a lawsuit, writing, "I also have concerns about the increased medicolegal liability of using redacted records.  I am aware of MD's successfully being sued for making a diagnosis of malingering, as well as for incomplete review of medical records."  *See* Email, dated March 12, 2018, from plaintiff to Dr. Jeremy Colley, annexed as Exhibit "V."

43.     On March 13, 2018, Plaintiff again expressed her concerns to Dr. Colley regarding the use of redacted medical records and the risk of a medical malpractice allegation, stating, "I am not willing to make myself vulnerable to a medical malpractice allegation simply because H&H legal department is pushing us to practice medicine below the standards set forth by our profession," and that "[a] successful civil medical malpractice lawsuit for failure to review the complete record or an unsubstantiated diagnosis of malingering is a slam dunk."  *See* Email, dated March 13, 2018 from plaintiff to Dr. Jeremy Colley, annexed as Exhibit "W."

44.     On March 23, 2018, Deirdre Newton, Senior Counsel at H+H, emailed plaintiff to remind her that she should not copy third parties on email correspondence with H+H's legal

counsel, as "communications with the system's attorneys are privileged." *See* Email, dated March 23, 2018 from Deirdre Newton to plaintiff, annexed as Exhibit "X." In response, plaintiff forwarded the email from Ms. Newton to two third parties, Judge Torres and a representative from the Bronx District Attorneys' Office. *Id.*; *see also* Email, dated March 23, 2018, annexed as Exhibit "Y."

### III. Terms and Conditions of Transition

45.     In or about December 2017, plaintiff learned from Dr. Colley that CHS was working to "consolidate the court clinics across the city under their control, removing them from Bellevue and Kings County." *See* Email correspondence dated December 8, 2017, between Jeremy Colley and plaintiff, annexed as Exhibit "Z." Plaintiff expressed concern as to whether her pay line would be converted to CHS lines, since she was approaching her 20-year longevity pay increase with Bellevue, and had a retroactive pay increase coming in the next year, and wanted to know "how aggressively to look for another job." *Id.*

46.     On January 5, 2018, Dr. Ford reached out to plaintiff and invited her to have a discussion about the upcoming court clinic transition to CHS. That same day, plaintiff spoke to Dr. Ford about her concerns regarding the transition to CHS, specifically, her concerns regarding compensation, remaining in Doctors Council, and her retention bonus. *See* email correspondence between Elizabeth Ford and plaintiff, dated January 5, 2018; email correspondence between Elizabeth Ford and Patricia Yang, dated January 5, 2018, both annexed as Exhibit "AA;" *see also* Ford, Ex. D at 116:13-117:8.

47.     On January 29, 2018, Dr. Yang agreed to delay the transfer of the Bellevue clinics to CHS until July 2018, to accommodate plaintiff, who would then be eligible to receive a $20,000 retention bonus pursuant to the Doctors Council collective bargaining agreement.

Exhibit AA; Yang, Ex. M at 80:8-20, 106:15-107:14, 153:5-8, 169:18-170:4, 226:5-25, 228:3-8; *see also* Email correspondence between Patricia Yang and William Hicks, dated January 29, 2018, and January 31, 2018, annexed as Exhibit "BB;" Email, dated March 27, 2018, from CHS Communications, annexed as Exhibit "CC."

48.     The Kings County clinics transitioned to CHS in April 2018.  Exhibit "CC."

49.     On February 23, 2018, plaintiff sent an email to Dr. Badaracco, "following up regarding my interest in a job at Bellevue on an HHC line," prior to "the CHS take over of the Bronx Court Clinic."  *See* Email, dated February 23, 2018, from plaintiff to Marianne Badaracco, annexed as Exhibit "DD."

50.     Plaintiff was informed by Dr. Badaracco and Dr. Colley when discussing the possibility of her staying at Bellevue in a Doctors Council HHC line, that HHC "lines had been phased out over the last 20 years and converted to private lines, like NYU lines at Bellevue instead of city lines."  Plaintiff did not want a NYU line, even if offered to her.  *See* Kaye, Ex. B at 184:16-185:9, 185:16-187:2.

51.     Both before and after the transition, plaintiff made multiple attempts to stay at Bellevue or find other employment.  *Id. See also* Ex. DD; Email thread, "Re: Psychiatry jobs Bellevue," dated May 25, 2018; Email, "seeking employment at Bellevue on HHC line," dated May 30, 2018; Email, "Job on 19," dated June 1, 2018; Email thread, entitled "19 job questions," dated June 5, 2018; Email thread, "Re: Updates for Dr. Kaye (Manhattan), dated September 11, 2018; Email thread, "RE: Retention Bonus," dated October 6, 2018; Email thread, "RE: Looking for HHC line," dated October 23-24, 2018; Email, "Employment Sought," dated December 11, 2018, all annexed as Exhibit "EE."

52.     After learning that plaintiff wished to return to Bellevue, Dr. Yang attempted to secure a position for plaintiff there, but was told "they didn't want her back," and no position was available for her at Bellevue.  *See* Yang Ex. M at 88:3-89:12; 89:20-90:4. Email, "MK," dated January 22, 2019, annexed as Exhibit "FF."

53.     In or about early 2018, Doctors Council, plaintiff's collective bargaining union, met with CHS leadership concerning the terms and conditions of the transition.  It was agreed that all employees who were part of Doctors Council would roll over to CHS in their same union positions, with the same terms and conditions of employment as outlined in the collective bargaining agreement. *See* Kaye, Ex. B at 92:14-93:13.

54.     In or about March 2018, Dr. Abhishek Jain was hired as the Director of Forensic Psychiatry Evaluation Court Clinics, to oversee the four court clinics that merged under CHS. Dr. Jain reported directly to Dr. Ford.  *See* Ford, Ex. D at 40:24-41:13, 84:6-14, 89:16-17, Jain, Ex. C at 30:5-11; *see also* Email, dated March 27, 2018, from Dr. Elizabeth Ford to Dr. Elizabeth Owen, plaintiff, Dr. Daniel Mundy, Dr. Barry Winkler, and Dr. Abhishek Jain, annexed as Exhibit "GG."

55.     Dr. Mundy accepted the position of the Director of the Manhattan Court Clinic, and Dr. Winkler accepted the position of Director of the Brooklyn Court Clinic.  Drs. Kaye and Owen accepted the positions of Directors of the Bronx and Queens Court Clinics, respectively. *See* Exhibit "GG;" Yang, Ex. M at 73:3-14, 74:2-11, 75:24-76:4.

56.     Andrea Swenson was appointed to the position of Senior Administrator for the Court Clinics.  In this role, Ms. Swenson would be responsible for managing the administrative staff and operations of the Court Clinics.  Yang, Ex. M at 73:3-14, 74:2-11, 75:24-76:4.  Dr. Alex Garcia-Mansilla, was announced as the Director of Psychological Assessment for CHS.  In

this role, Dr. Garcia-Mansilla would be responsible for oversight of psychological testing procedures and "issues related to all four clinics."  *Id*.; *see also* Ex. Q.

57.      Prior to becoming the Director of the Manhattan Court Clinic, Dr. Mundy was a part-time psychiatrist evaluator holding the non-managerial title of Attending Physician III.  As an Attending Physician III, Dr. Mundy was a unionized employee.  *See* Kaye, Ex. B at 90:13-23. *See also* Email, entitled, "RE" Bellevue 730 personnel," dated April 25, 2018, from Aaron Anderson to Patricia Yang and Sara Gillen, and email, entitled "RE: Pay Equity for Court Clinic Medical Directors," dated May 3, 2018, from Sara Gillen to Dr. Yang Jonathan Wangel, Ross MacDonald, Elizabeth Ford, and Jessica Laboy, annexed as Exhibit "HH;" Yang, Ex. M at 122:5-7; MacDonald, Ex. O at 158:18-159:8.

58.      Upon accepting the Director of the Manhattan Court Clinic position, Mr. Mundy chose to become a managerial, or non-unionized Group 11 employee.  With this, Dr. Mundy lost eligibility for his retention bonus, nor was he subject to the terms and conditions and the collectively bargained protections, of a unionized employee.  *See* Yang, Ex. M at 83:19-84:7; 226:18-227:23, 228:9-15; Kaye, Ex. B at 91:2-92:8.

59.      Prior to becoming the Director of the Brooklyn Court Clinic, Dr. Winkler was a full-time, psychologist evaluator at Bellevue, paid by an affiliate, New York University ("NYU").  Upon becoming the Director of the Brooklyn Court Clinic at CHS, Dr. Winkler became an employee of CHS, paid by a different affiliate, Physician's Affiliate Group of New York or PAGNY.  *See* Winkler, Ex. H at 62:7-64:15. *See also* Email, entitled, "RE: Bellevue 730 personnel," dated April 25, 2018, from Aaron Anderson to Patricia Yang and Sara Gillen, and email, entitled "RE: Pay Equity for Court Clinic Medical Directors," dated May 3, 2018, from

Sara Gillen to Dr. Yang, Jonathan Wangel, Ross MacDonald, Elizabeth Ford, and Jessica Laboy, annexed as Exhibit "II;" Yang, Ex. M at 122:5-7; MacDonald, Ex. O at 158:18-159:8.

60.     Prior to becoming the Director of the Queens Court Clinic, Dr. Elizabeth Owen, a psychologist, was the Director of the Brooklyn Court Clinic.  Upon becoming the Director of the Queens Court Clinic at CHS, Dr. Owen became a managerial, or non-unionized Group 11 employee at CHS.  *See* Email, entitled "AFR and Backfill for Liz Owen," dated February 6, 2018, from Elizabeth Ford to CHS Personnel Actions and Ross MacDonald, and email "RE" Bellevue 730 personnel," dated April 25, 2018, from Aaron Anderson to Patricia Yang and Sara Gillen, annexed as Exhibit "JJ;" *see also* Yang, Ex. M at 247:4-11.

61.     On or about April 19, 2018, Dr. Ford met with Dr. Jain and Drs. Winkler, Owen, Mundy, and plaintiff.  At this meeting, plaintiff expressed concerns regarding her union status, her salary, and her retention bonus.  *See* "Meeting Notification," for April 19, 2018, and email, dated April 19, 2018, Exhibit "KK."

62.     On April 24, 2018, plaintiff emailed Dr. Ford requesting permission to speak with Dr. Yang about "pay parity."  *See* Email, dated April 24, 2018, from plaintiff to Dr. Ford, annexed as Exhibit "LL."

63.     The next day, Dr. Ford responded by telling plaintiff

> "Of course.
> Likely that much more flexibility for your salary if
> you are willing to move into a managerial role, but I
> know that also means losing union/other benefits.
> Regardless, please let me know how it goes.  I want
> to be as supportive and fair as possible."

*Id.*

64.     On or before April 30, 2018, plaintiff met with Jessica Laboy and Jonathan Wangel about her July 1, 2018 line change from Bellevue to CHS.  Plaintiff memorialized in an

email her current benefits and job duties, and her "understand[ing] from our conversation that everything will stay the same and nothing will change" when her line is transferred from Bellevue to CHS. *See* Email, entitled "Melissa Kaye BHC to CHS line change," dated April 30, 2018, annexed as Exhibit "MM."

65.    On May 3, 2018, Plaintiff wrote to Dr. Yang to complain about what she believed to be a 30% pay discrepancy between herself and Dr. Ciric from the time that she worked at Bellevue, and requested, again, that her line be changed from Attending Physician III to Physician Specialist, "with retention of all my current benefits, union membership, pension etc. with a consummate increase in compensation equal to or higher than my male colleagues." *See* Email, entitled Pay Equity for Court Clinic Medical Directors," dated May 3, 2018, annexed as Exhibit "NN."

66.    That same day, Dr. Yang reached out to her team at CHS, to determine the court clinic directors' salaries, and whether plaintiff was paid commensurate to the scope and responsibility of the Bronx Court Clinic. *See* Email thread, entitled "FW: Pay Equity for Court Clinic Medical Directors," dated May 3, 2018, between Drs. Yang, MacDonald, Ford, Sara Gillen, Jessica Laboy, and Jonathan Wangel, annexed as Exhibit "OO." Dr. Yang responded to her team that plaintiff will be "offer[ed] a position that suits the needs of FPECC and is fair and equitable to the scope and responsibility. We can offer her the management position comparable to Winkler and Mundy, to run Bx under us." *Id.*

67.    CHS determined that plaintiff earned the highest salary of all the unionized doctors in Doctors Council. *Id.*

68.    Including differentials, plaintiff's salary was $203,912.00. Dr. Mundy's salary, after accepting a managerial line, was $205,000.00 – a difference of $1088.00. *Id.*

69.     As a managerial, or Group 11 employee, Dr. Mundy's salary rate is "established by surveys, conducted by Central Office and facility representatives, of comparable health care titles in the consolidated Metro area," as set forth in H+H's Operating Procedure 20-41, "Health and Hospitals Corporation Salary Policy. *See* https://www.nychealthandhospitals.org/wp-content/uploads/2016/07/hhc-salary-policy.pdf.

70.     Dr. Mundy oversaw the Manhattan Criminal Court clinic, by far the busiest of the four criminal court clinics, seeing approximately 1,200 to 1,400 criminal defendants annually, while plaintiff oversaw the Bronx Criminal Court clinic, which, by comparison, sees an average of approximately 300 criminal defendants annually.  Dr. Mundy also supervised three part-time psychiatrists, a psychologist, a Forensic Fellow, and a social worker.  Plaintiff, on the other hand, only supervised one psychologist.  *See* Kaye, Ex. "B" at 209:9-18; Ford, Ex. "D" at 171:20-172:14; Winkler, Exhibit "H" at 284:7-285:5; *see also* Email, "FPECC Org Chart," dated March 26, 2018, annexed as Exhibit "PP;" Exhibits I and J.

71.     Later that evening, on May 3, 2018, Dr. Yang responded to plaintiff's concerns regarding perceived pay inequity while employed by Bellevue, and stated that she will "convey these serious concerns and your request to the attention of Mr. William Hicks, CEO of Bellevue."  *See* Email, entitled "RE: Pay Equity for Court Clinic Medical Directors," dated May 3, 2018, annexed as Exhibit "QQ."

72.     Immediately thereafter, Dr. Yang forwarded plaintiff's concerns that she had been paid less than her male colleagues while at Bellevue to William Hicks, copying plaintiff.  *See* Email, entitled "Pay Equity Concern," dated May 3, 2018, annexed as Exhibit "RR."

73.     Plaintiff was offered a managerial position, but she declined, choosing to stay in the union as a member of the Doctors Council.  *See* Exhibit OO; Yang, Ex. M at 256:8-13; MacDonald, Ex. O at 160:9-17; Wangel, Ex. P at 128:23-129:9.

74.     Plaintiff believed that the offer to become managerial to afford more flexibility in her pay was a ploy to fire her for her complaints regarding the redacted medical records, since relinquishing her union status would obviate job protections offered by the collective bargaining agreement.  *See* Kaye, Ex. B at 93:18-95:15, 98:18-100:6.

75.     Dr. Yang requested that all court clinic directors be managerial or Group 11 employees.  *See* Yang, Ex. M at 123:2-6, 123:24-124:5.  However, as an accommodation to plaintiff, Dr. Yang allowed plaintiff to stay in her collective bargaining title.  *Id.*, 256:8-13.

76.     On or about June 21, 2018, plaintiff informed Dr. Jain that she was planning to file a complaint regarding what she believed to be pay disparity.  *See* Email, "Jonathan," dated June 21, 2018 annexed as Exhibit "SS."

77.     On or about June 28, 2018, H+H legal department received an attorney letter on behalf of plaintiff.  The letter, from Bantle & Levy LLP, alleged that "substantial evidence existed that [plaintiff] has been discriminated against based on her sex in the form of lack of pay equity." *See* Email, "Dr. Melissa Kaye," dated July 6, 2018, annexed as Exhibit "TT."

**A.  Titles for Clinic Directors**

78.     On May 11, 2018, Dr. Jain informed Andrea Swenson, Senior Administrator, Forensic Court Clinics, that the clinic directors at the Queens, Bronx, Manhattan, and Brooklyn court clinics would have the title "Director," and that Dr. Jain's title would also be "Director" of all four of the court clinics.  *See* Email, "RE: Titles," dated May 11, 2018, annexed as Exhibit "UU."

79.     On May 25, 2018, plaintiff emailed Andrea Swenson, in response to a business card confirmation request, to ask why her title was changing to "Director" from "Medical Director."  *See* Email, "Re: Business Cards," dated May 25, 2018, annexed as Exhibit "VV."

80.     After discussing plaintiff's concerns, it was decided that for the sake of simplicity and to equalize the titles of the court clinic directors, they would all have the title "Director."  *See* Email, "Re: Very basic question," dated May 29, 2018, annexed as Exhibit "WW;" *see also* Ex. VV.

81.     Plaintiff believes that the change in title, though made for all, from "Medical Director" to "Director" was a demotion and made in retaliation for complaining about pay parity.  *See* Kaye, Ex. B at 238:24-240:16.

**B.  Plaintiff's Complaints**

82.     In December 2015, plaintiff complained to Dr. Colley about Dr. Yang wanting a criminal defendant to be found unfit "so he could be removed from Rikers Island and sent to Mid Hudson," and "pushing for him to be forced ordered into the court clinic."  Kaye, Ex. B at 174:24-176:17, Deposition of Melissa Kaye, dated January 25, 2022, annexed as Exhibit "XX" at 10:21-16:2.

83.     Plaintiff also complained that she believed that CHS was "politicizing exams" and intruding on the 730 exam process.  *See* Kaye, Ex. B at 166:21-25, 172:21-176:25.

84.     In January 2018, plaintiff claims she complained of a proposed policy to force "possibly incapacitated individuals into signing a HIPAA release without legal representation was a violation of their constitutional rights."  Id., 261:22-262:2.

85.     In January 2019, plaintiff complained about CHS's psychological testing policy, believing that "this proposed administrative policy [] places restrictions upon the MD clinic

directors," since "physicians are to have unfettered independence within their standard of practice. Anything less necessarily raises questions about the legitimacy of the examination, opens the door to controversion by defense attorneys and prosecutors, and undermines the credibility of the examination results." *See* Email, "Re: CHS draft policies circulated?" dated January 11, 2019, annexed as Exhibit "YY."

86.     In March 2019, plaintiff claims she complained about "opining on fitness without an exam," to Drs. Jain and Ford, believing that "it completely violates the defendant's constitutional rights to a fair trial." *See* Kaye, Ex. XX at 50:23-51:10.

87.     Plaintiff also complained about CHS's private practice policy, believing that it "perpetuated a fraud on the Court," because the policy allowed "the stakeholders involving in hiring these doctors for private work are the same stakeholders for which they provide a city-salaried service to," and "developing overly friendly relationships with lawyers and being influenced in how in the findings of their 730 exams in order to establish a business relationship that would get them private referrals." *See* Kaye, Ex. B at 216:16-19, 249:6-255:24.

88.     Pursuant to H+H's Operating Procedure 50-1, "Corporate Compliance and Ethics Program," plaintiff had an obligation, as an employee of H+H and CHS, to report "fraud," "waste,"      and      "abuse."      See      https://www.nychealthandhospitals.org/wp-content/uploads/2018/01/OP-50-1-Corporate-Compliance-Program.pdf.

## IV.   Post-Transition to CHS

### A.  Shift Change

89.     On July 11, 2018, Dr. Jain received an email from timekeeping in which he was asked to clarify why, if plaintiff was a 40-hour employee, her schedule in Kronos, the timekeeping system, indicated a 35-hour work week. *See* Email, "Re: Kaye, M Schedule," dated

July 11, 2018, annexed as Exhibit "ZZ."  Dr. Jain responded, and looped in Jessica Laboy, who in turned added Jonathan Wangel to assist with the question.  *Id.*

90.     Mr. Wangel emailed Dr. Colley to determine "the rationale for permitting physicians to work 8 hours w/ only a 30 minute lunch (rather than 1 full hour which is standard). Please let me know if you have a couple of minutes to discuss."  *See* Email, "Re: FPECC Question," dated July 11, 2018, annexed as Exhibit "AAA;" *see also* Wangel, Ex. P at 134:115-135:9.

91.     Mr. Wangel directed timekeeping to change plaintiff's schedule in Kronos to reflect a 9 to 6 work day, with a ½ hour lunch between 5:30 and 6:00 p.m.  In response, timekeeping clarified that plaintiff's schedule would be changed in Kronos from 9 am to 5:30 with a ½ hour lunch, for a total of 8.5 hours per day with a ½ hour lunch. However, "[o]nce the ½ hour lunch change to an hour lunch her schedule will need to change form [sic] 9am-6pm." Ex. AAA.

92.     The next day, July 12, 2018, Dr. Jain emailed plaintiff to let her know that the Kronos scheduling issue had been resolved, and that "[h]opefully we'll get Kronos set up soon, and in the meantime I'll continue putting in your hours."  *See* Email, "Fw: Following up," dated July 12, 2018, annexed as Exhibit "BBB."

93.     On July 13, 2018, Dr. Jain confirmed that Kronos reflected a 9-5:30pm schedule for plaintiff and that plaintiff should get credit for a 40 hour work each week.  *See* Email, "Fw: Kaye, M Schedule," dated July 13, 2018, annexed as Exhibit "CCC."

94.     Plaintiff took sick days on July 11 and July 12, 2018, and annual leave from July 17 – July 25, 2018.  *See* Email, "Subject: Direct Deposit," dated July 10, 2018, and Email, "Out sick 7/12," dated July 12, 2018, annexed as Exhibit "DDD."  On July 23, 2018, plaintiff texted

Dr. Jain, stating "[m]y stepdad is in hospice my siblings and I need to deal with his end of life issues. I plan to return to work on 8/6." *See* Email, "Dr. Kaye time off," dated July 23, 2018, annexed as Exhibit "EEE."

95.     That same day, Human Resources was notified of plaintiff's leave of absence as a possible FMLA leave request. *Id.*

96.     Mr. Wangel confirmed that all employees covered by the Doctors Council agreement were to take the standard 1-hour lunch. *See* Email, "FW: 30 minute MD lunch," dated July 24, 2018, annexed as Exhibit "FFF."

97.     Plaintiff returned to work on August 6, 2018, but called out sick August 9-10, 2018. *See* Emails, "Touching Base," dated August 6 2018, and "Out Sick today," dated August 9, 2018, and "Out Sick today," dated August 10, 2018, annexed as Exhibit "GGG."

98.     On August 13, 2018, upon her return to work, plaintiff complained to Ciara Smith and Colleen Barrow of CHS Payroll that she believed she was getting docked pay because of a "apparent pay discrepancy in Kronos for on [sic] all of my time processed since July 1." Email, "Pay error," dated August 13, 2018, annexed as Exhibit "HHH."

99.     That same day, CHS Payroll notified Dr. Jain, Andrea Swenson, Jonathan Wangle, Ciara Smith and Colleen Barrow that "as of 8/5/2018 the code meal for the following employees will change from 30 minutes to an hour." The employees listed—Oliver Harper, Melissa Kaye, Kanishk Solanki, and Jonathan Weiss—were all members of the Doctors Council collective bargaining unit. *See* Email, "Meal Code," dated August 13, 2018, annexed as Exhibit "III."

100.    On August 15, 2018, Jonathan Wangel sent an email to Dr. Jain and Andrea Swenson, confirming the new schedule adjustment for Drs. Kaye, Solanki, Weiss and Harper. *See* Email, "Fwd: 1-Hour Lunch," dated August 15, 2018, annexed as Exhibit "JJJ."

101.    That same day, Dr. Jain notified plaintiff that her "schedule is now adjusted in Kronos as 8a-5p, with a 1-hour lunch." *Id.* In response, plaintiff complained that "this change in my work schedule and lengthening the duration of my shift conflicts with my family responsibilities." *Id.*

**B.  Educational Leave**

102.    On July 28, 2018, documentation was submitted to the "Court Clinic time keeper," concerning plaintiff's request for educational leave in order to take her Child and Adolescent Boards on 9/24/18.  *See* Email, "FW: Educational Leave 9/24/18," dated August 28, 2018, annexed as Exhibit "KKK."

103.    On October 5, 2018, plaintiff reached out to Dr. Jain to inform him that her requested "educational leave was overridden and charged to annual leave, and that I was docked 18 hours (2 full work days) for 9/24."  *See* Email thread, "Re: 9/24 Time sheet error," dated October 5, 2018, annexed as Exhibit "LLL."  Dr. Jain responded, "I am looking into this."  *Id.*

104.    Dr. Jain made the request to Payroll, on behalf of plaintiff, that this leave "should qualify as educational leave for Dr. Kaye.  She is a physician and this is part of her professional credentialing."   That same day, after numerous emails between Dr. Jain, plaintiff and CHS Payroll, Ciara Smith, Director of CHS Payroll, notified plaintiff that the 5 hours and 15 minutes duration of the exam was charged to educational leave, with the remaining hours for the day charged to annual leave.  *See* Email thread, "Re: Educational Leave 9/24/18," dated October 5, 2018, annexed as Exhibit "MMM."

105.    On October 9, 2018, plaintiff wrote to Ms. Smith, stating that she was improperly docked for taking a board exam, and that rather than charging only 5 hours and 15 minutes, she should be credited for a full day, or 8 hours.  *See* Email thread, "Re: Educational Leave 9/24/18," dated October 9, 2018, annexed as Exhibit "NNN."

106.    The practice at CHS is to only approve the time for the exam, not travel or any other time. *Id*.

107.    On October 31, 2018, plaintiff reached out to Nate Santa Maria of Doctors Council, stating that she "was supposed to get educational leave for the full day," since [w]hen I registered for the exam I was a Bellevue employee and CHS has no formal policy."  *See* Email, "Fw: Educational Leave for Board Certification Exam," dated October 31, 2018, annexed as Exhibit "OOO."

108.    On December 14, 2018, Ms. Smith notified plaintiff that "CHS is in the process of revising its policy with regard to education leave," and "will restore any leave you were charged."  On January 15, 2019, Ms. Smith notified plaintiff that "9/24 has been corrected in Kronos to reflect 9 hours of Education Leave (07)."  *See* Email thread, "Re: Docked Educational Leave," between December 14, 2018 and January 15, 2019, annexed as Exhibit "PPP."

## C.  PeopleSoft Problems

109.    On September 6, 2018, plaintiff received an email notifying her that "it's time for you to complete your Annual Health Assessment Review."  Dr. Mundy was copied on this email. *See* Email thread, "Fwd: Annual Health Assessment Review," dated September 6-13, 2018, annexed as Exhibit "QQQ."  The next day, Plaintiff responded, stating

> "CHS scheduled my health assessment on September 10th, a major Jewish Holiday.  I was also scheduled for mandatory iSight computer training during the Jewish High Holidays.  I am not

> available for any work related duties during this
> time.
>
> This pervasive lack of cultural sensitivity is
> concerning.  Also, I do not understand why a work
> peer and someone I do not know are gratuitously
> copied on an email that pertains to my private
> healthcare related matters.   I oppose this
> unwarranted dissemination of my personnel
> information." *Id.*

110.    CHS notified plaintiff that her health assessment appointment was cancelled, and
that plaintiff could reschedule her appointment at a time convenient for her.   CHS also
acknowledged that "person listed may be a human resource error," and thanked plaintiff for
"bringing this to our attention."  *Id.*

111.    In response, plaintiff declared that

> "Dan Mundy is NOT my supervisor in any way.  He
> is significantly junior to me.  I do NOT 'report to'
> him in any fashion and never have.  I have 18 years
> of seniority over Dan, I have superior training and
> credential to Dan, and we work in different
> boroughs. [emphasis in original].
>
> To site [sic] Dan Mundy as my superior or my
> 'report to' and copy him on my private HR matters
> is beyond careless and insulting, it is a serious
> privacy violation against me.  It is imperative that
> Dan Mundy never be copied on any of my HR or
> personnel related matters again." *Id.*

112.    By email, Dr. Jain clarified to CHS OHS that he, and "not Dan Mundy," was
plaintiff's supervisor, and forwarded the email thread to Dr. Ford, noting that plaintiff's
interactions in response to this apparent error were "unprofessional."  *Id.*

113.    On December 3, 2018, plaintiff notified Dr. Ford that Dr. Mundy continued to be
copied on emails related to her personnel matters, in this instance, the upcoming expiration of
her license/certification.   That same day, the error was corrected and Dr. Jain, and not Dr.

Mundy, was added as plaintiff's supervisor.  *See* Email, "Fw: Expiring License/Certification," dated December 3, 2018, annexed as Exhibit "RRR."

114.    On February 15, 2019, plaintiff wrote to Mr. Wangel regarding the fact that Dr. Mundy had again been copied on a personal email, this time an email approving plaintiff's FMLA leave request.  That same day, Mr. Wangel wrote to plaintiff that "[a]s of this evening, Vice President of H+H Human Resources, Yvette Villanueva, confirms that Ms. Mendez, an employee of H+H Central Office HR, now understands that Dr. Jain is your supervisor and Dr. Mundy is not to be included in any communication regarding your personnel matters."  *See* Email thread, "Fwd: Melissa Kaye FMLA/Intermittent – To care for ill family member leave approval," dated February 15, 2019 and email, "Re: simmering about to boil over," dated February 15, 2019, annexed as Exhibit "SSS."

115.    On June 3, 2019, Dr. Jain informed HR that PeopleSoft, a personnel management system still incorrectly listed Dr. Mundy as Dr. Kaye's supervisor.  On June 10, 2019, this issue was resolved.  *See* Email, "RE: PeopleSoft – Dr. Kaye assignment," dated June 3-10, 2019, annexed as Exhibit "TTT."

**D.  Retention Bonus**

116.    On September 17, 2018, Mr. Wangel forwarded a list of former Bellevue FPECC staff who were now at CHS that "should be on the retention lump sum list" to Matthew Campese, Assistant Vice President of Labor Relations at H+H, who sent the list to Bellevue for confirmation.  *See* Email, "Re: Docs Council Lump Sum," dated September 17-18, 2018, annexed as Exhibit "UUU;" Wangel, Ex. P at 49:6-24.

117.    Between September 19 and September 26, 2018, CHS sought to enact payment to the four psychiatrists, including plaintiff, who were eligible for a retention bonus.  *See* Email,

including attachments, entitled, "Docs Council Retention Bonus," dated September 26, 2018, and Email, "can you help us help ourselves?" dated September 26, 2018, annexed as Exhibit "VVV."

118. On September 26, 2018, Mr. Wangel requested that April Alexander, Director of Human Resources at H+H, have her team "confirm the total number of hours for the 3 part-timers, as well as confirm that Dr. Kaye is entitled to the max retention bonus?"  *See* Email, "FW: can you help us help ourselves?" dated September 26, 2018, annexed as Exhibit "WWW."

119. Based on the calculations provided by Bellevue and H+H Central Office, it was determined that plaintiff was eligible for a $13,400 retention bonus, based on .67 FTE ("Full-Time Employment").  *See* Email thread, "Re: Total Work Hours," dated September 26 and September 27, 2018, annexed as Exhibit "XXX."

120. On September 27, 2018, Mr. Campese provided Doctors Council with a list of the 4 additional doctors and their FTE status, which included plaintiff, who had been added to the retention payment list.  *See* Email, "RE: Doctors Council Retention payment list – Revised 9.27.18," dated September 27, 2017, annexed as Exhibit "YYY."

121. On October 31, 2018, plaintiff notified Bellevue Payroll that she had been a full-time employee of Bellevue from 8/1/17 to 6/30/18, and that she should have received the full retention bonus to which she was entitled.  *See* Email thread, "RE: FTE error causing bonus retention error," dated October 31, 2018, annexed as Exhibit "ZZZ."  Immediate efforts were made by both CHS and Bellevue to determine whether plaintiff's retention bonus needed to be adjusted.  *Id*.

122. On November 13, 2018, Nate Collins of Doctors Council sent an email to Mr. Campese, notifying him that in addition to plaintiff, there was another psychiatrist at Bellevue

who had retention bonus issues. *See* Email thread, "RE: some retention bonus issues," dated November 13-14, 2018, annexed as Exhibit "AAAA."

123.    On December 19, 2018, after determining plaintiff was employed at Bellevue as a 40 hour per week employee, Mr. Campese notified Mr. Collins that plaintiff would be receiving the remainder of her retention bonus payment. *See* Email thread, "Re: Total Work Hours – KAYE RETENTION PAYMENT," between September 2018 and December 19, 2018, and Email, "Dr. Kaye," dated December 19, 2018, annexed as Exhibit "BBBB."

### E.  Complaints of Discrimination and Retaliation

124.    Thereafter, on or about May 22, 2018, plaintiff filed a Charge of Discrimination with the EEOC against Bellevue Hospital.  On or about May 31, 2018, the EEOC sent notice of the Charge to Shirley Facey, EEO Coordinator at Bellevue.  *See* Notice of Charge of Discrimination, dated May 31, 2018, annexed as Exhibit "CCCC."

125.    On or about September 11, 2018, plaintiff filed a Supplemental Charge of Discrimination with the EEOC.  *See* EEOC Charge, received on September 11, 2018, annexed as Exhibit "DDDD."  In the Charge, plaintiff alleged that "the male Manhattan Court Clinic Medical Directors have made significantly more money than I over the almost 20 years I have worked here," and that as result of raising this pay disparity, "HHC has demoted me in title, extended the length of my workday, moved my shift to begin an hour earlier, and miscalculated my time," for "no legitimate or consistent reason." *Id.*

126.    On or about September 18, 2018, H+H Legal forwarded to Mr. Wangel a copy of an EEOC Charge filed by plaintiff on September 11, 2018.  Mr. Wangel then shared the EEOC Charge with Jessica Laboy and Dr. Yang. *See* Email, "FW: Melissa Kaye," dated September 18, 2018, annexed as Exhibit "EEEE."

127.    On or about May 2, 2019, H+H was served with an Amended Complaint, in which plaintiff alleged claims of discrimination and retaliation against H+H and Drs. Yang, Jain, and Ford, as well as Mr. Wangel.  *See* Ex. A.

### F.  Meetings

128.    On November 29, 2018, plaintiff complained to Dr. Jain that she had been excluded from a meeting that she originally said she was free to attend.  In response, Dr. Jain sought to reschedule the meeting to accommodate plaintiff.  *See* Email, "Fwd: Meeting 12/4," dated November 28-29, 2018, and Email, "FW: Meeting," dated November 30, 2019, annexed as Exhibit "FFFF."

### G.  Kronos

129.    On June 28, 2018, a request was made for Kronos accounts for FPECC staff at the Manhattan and Bronx court clinics.  *See* Email, "Kronos Accounts for FPECC Staff at Manhattan and Bronx, dated June 28, 2018, annexed as Exhibit "GGGG."

130.    In early July 2018, plaintiff emailed Dr. Jain informing him that the Kronos system was not working in the Bronx, and expressed concern that if her time was not entered, she did "risk[ed] getting taken off the payroll and losing my benefits and health insurance."  Dr. Jain reassured plaintiff that he was able to enter her time, that he was working on getting the issue resolved, and that "[t]his Kronos issue happened with a lot of us when we first started." *See* Email thread, "Re: Kronos not working in the Bronx," dated July 3-5, 2018, annexed as Exhibit "HHHH."

131.    In early November 2018, plaintiff emailed Dr. Jain, stating that Kronos was not allowing her to enter her time.  Dr. Jain immediately responded and entered plaintiff's time.  *See* Email, "RE: Kronos not accepting time input for Monday 10/29/18," dated November 5, 2018,

annexed as Exhibit "IIII."   In early February 2019, plaintiff emailed Dr. Jain regarding her inability to access Kronos.  That same day, Dr. Jain responded by entering plaintiff's time, and informed plaintiff that he had referred plaintiff's inability to access Kronos for resolution.  *See* Email, "RE: Kronos Access Denied: Time for this week, Sick Day Tomorrow: 2/13/ double docked," dated February 25, 2019; email, "Re: FPECC Kronos Assignment," dated February 25, 2019; email, "FMLA," dated February 25, 2019; email, "RE: URGENT CORRECTION NEEDED": FMLA TIME ERROR pay week 2/25-3/1," dated February 25-26, 2019, annexed as Exhibit "JJJJ."

### H.  FPECC Policies

132.   In early January 2019, Drs. Ford and Jain learned that a draft of FPECC's Psychological Testing Policy, which had been shared with the clinic directors on November 7, 2018, had been either distributed or discussed "among the Legal Aid attorneys citywide."  Dr. Jain was concerned that [i]f the draft of the policy was sent or discussed among the attorneys before our final approval, it undermines our internal discussions."   Email, "Re: CHS draft policies circulated?" dated January 11, 2019, and email, "FW: Draft – Psychological Testing Policy," dated January 11, 2019, both annexed as Exhibit "KKKK."

133.   Based on suspicions that plaintiff had shared the policy externally without consent, Mr. Wangel sought access to all outgoing email from the mailbox of plaintiff from the time period of July 1, 2018, until January 11, 2019, with a focus on "legal aid society and personal email addresses (gmail, Yahoo, etc.)" and "[a]ll of part of the phrase: FPECC policy Psychological Testing."  An initial review of the collection indicated that plaintiff "sent a total of 87 documents (121 items) to her personal gmail address in violation of the [] Acceptable Use

Policy." *See* Email, "RE: Email Access to Active Employee," dated January 11, 2019, annexed as Exhibit "LLLL."

**I.   FMLA Leave**

134.   On July 6, 2018, plaintiff requested Family Medical Leave Act ("FMLA") leave forms.  That same day, a Personnel Labor Relations Associate, Donna Fong, provided plaintiff with the requested forms.  *See* Email thread, "FMLA," dated July 6, 2018, annexed as Exhibit "MMMM."

135.   On October 5, 2018, plaintiff again requested FMLA\ leave forms in order to take FMLA leave for her son, as the "forms you previously sent me are not opening."  *See* Email thread, "RE: FMLA," dated October 5, 2018, annexed as Exhibit "NNNN."

136.   On October 15, 2018, plaintiff submitted her completed FMLA paperwork to take care of her son from "10/15 thru 10/26."   Email, "RE: FMLA paperwork Confidential Information," dated October 15, 2018, annexed as Exhibit "OOOO."  Plaintiff was informed that the FMLA paperwork was emailed to "Central Office for approval." *Id.*

137.   Plaintiff, Dr. Jain, CHS Payroll, and Doctors Council was notified that "[h]er leave code in the Kronos system should be 02 until we receive the approval notification."  *See* Email thread, "RE:  KayeMFLMA8Oct18," dated October 17, 2018, annexed as Exhibit "PPPP."

138.   On October 30, 2018, plaintiff received notice from Maria Mendez, Assistant Director, HRSS Leaves Administration at H+H, that her FMLA leave request was retroactively approved.  *See* Email, "Melissa Kaye FMLA/To care for ill family member leave approval – retro," dated October 30, 2018, annexed as Exhibit "QQQQ."

139.   On November 8, 2018, plaintiff notified Ms. Mendez that she planned to be out on FMLA leave on "11/13 and 11/14."  In response, Ms. Mendez requested clarification from

plaintiff's doctor regarding the frequency and duration of plaintiff's requests for FMLA intermittent leave. *See* Email thread, "Melissa Kaye FMLA/To care for ill family member leave approval – retro," dated November 8, 14, 2018, annexed as Exhibit "RRRR."

140.    On January 18, 2019, plaintiff submitted the updated FMLA paperwork, and on February 15, 2019, Plaintiff received notice from Ms. Mendez that her request for an intermittent leave of absence to care for her ill family member had been approved. *See* Email thread, "RE: Updated FMLA," dated January 18 – February 15, 2019, and Email, "Melissa Kaye FMLA/To care for ill family member leave approval," dated February 15, 2019, annexed as Exhibit "SSSS."

141.    On May 7, 2019, plaintiff requested clarification on the HHC FMLA leave policy, as well as her current FMLA leave balance. After providing plaintiff with documentation used to calculate her FMLA leave, plaintiff determined that she had used 27 FMLA leave days; CHS Payroll corrected her balance. *See* Email thread, "RE: FMLA annual schedule and balance," between May 2018 and July 2019, annexed as Exhibit "TTTT."

**J.  Reasonable Accommodation**

142.    In or about late October 2018, plaintiff sought a reasonable accommodation "to return to my prior shift, a split shift, and the ability to work remotely," to accommodate for her son's disability. Plaintiff's request for an accommodation was referred to CHS EEO Officer, Kevin Marrazzo. *See* Email, "Fw: Reasonable Accommodations Request," dated October 25, 2018, annexed as Exhibit "UUUU."

143.    Plaintiff's son suffers from an allergic contact dermatitis, where common chemicals in the environment cause a "blistering, excoriating rash." Beginning in May 2018,

plaintiff treated her son's condition with alternative, Chinese medicine "potions" that she "had to put all over his skin . . . in the morning."  Kaye, Ex. B at 273:4-275:11.

144.    On October 30, 2018, plaintiff was notified that "HHC policy does not allow third party accommodations, i.e. for children, spouses, etc." and that as an alternative, "you may qualify for FMLA (Family Medical Leave)."  *See* Email thread, "FW: CONFIDENTIAL – REASONABLE ACCOMMODATION REQUEST FORM," dated October 30, 2018, annexed as Exhibit "VVVV."  Plaintiff forwarded this email to her union representative, Nate Santa Maria.  *Id.*

145.    In or about early January 2019, plaintiff wrote to Drs. Jain and Ford, copying EEO personnel, her union, Dr. Yang, Mr. Wangel, and Mr. Campese, requesting that she be restored to her former shift, as a result of needing additional time to readjust due to her brother's untimely death, and that her current shift is even more difficult for her family, since her "children were extremely close to their uncle."  Mr. Wangel responded only to Drs. Ford and Jain, telling them "[p]lease do not respond.  This will be treated as a request for intermittent FMLA."  *See* Email, "RE: Shift Restoration," dated January 10, 2019, annexed as Exhibit "WWWW."

146.    On or about June 27, 2019, EEO Officer Mr. Marrazzo sent plaintiff a reasonable accommodation request form in response to her request.  On July 12, 2019, plaintiff submitted her request for a reasonable accommodation. *See* Email, "Fw: Request for a Reasonable Accommodation," dated July 12, 2019, annexed as Exhibit "XXXX."

147.    Between July 17, 2019, and October 8 2019, discussions among FPECC leadership, the EEO office, and plaintiff occurred concerning plaintiff's reasonable accommodation request to determine the reasonableness of plaintiff's request in combination with plaintiff's job duties and the needs of the Bronx Court Clinic.  *See* Email thread, "RE: Kay

description of job duties, reasonable accommodation," dated July 17, 2019, Email thread, "RE: Request for a Reasonable Accommodation," dated August 20, 2019, and Email thread, "RE: Request for a Reasonable Accommodation," dated October 8, 2019, annexed as Exhibit "YYYY."

148.    On October 23, 2019, plaintiff was notified that her reasonable accommodation request was approved to the extent that her "request for an accommodation for a later start time is granted as follows: that your shift will be changed from 8:00 am to 5:00 pm, to 9:00 am to 6:00 pm.; this shift change is on an as needed basis up to 5 days a week."  Plaintiff was also notified that it was "unable to approve your request to work remotely as a form of reasonable accommodation as your request is not reasonable and/or poses an undue hardship."   Email, "Grant of Reasonable Accommodation," dated October 23, 2019, annexed as Exhibit "ZZZZ."

### K.  Deductions in Pay

149.    On October 28, 2019, plaintiff was notified that she had 6 hours and 56 minutes absence without pay during the pay period of 10/06/19 – 10/12/19.  On November 8, 2019, plaintiff was notified that she had 8 hours absence without pay during the pay period of 10/13/19-10/19/19.  In both instances, plaintiff did not have any available leave time.  See Email thread, "RE: DEDUCTION OF PAY NOTICE," dated October 25-30, 2019 and Email thread, "RE: DEDUCTION OF PAY NOTICE," dated November 8-12, 2019, annexed as Exhibit "AAAAA."

### L.  Counseling Memo - Recording Forensic Evaluations Without Consent

150.    On March 20, 2019, Mr. Wangel referred an incident involving plaintiff to H+H's Corporate Compliance for review.  Specifically, it was learned that plaintiff had "electronically recorded on multiple occasions, evaluations of patients," apparently "without the consent of the

patient or counsel."  It was also learned that plaintiff made the recordings using her personal

iPhone.  *See* Email, "Referral," dated March 20, 2019, annexed as Exhibit "BBBBB."

151.    On May 9, 2019, the H+H's Office of Corporate Compliance ("OCC") completed

its investigation and issued a memorandum summarizing their findings.  *See* Confidential

Investigatory Information, dated May 9, 2019, annexed as Exhibit "CCCCC."  The OCC

determined that

> "[A]lthough Dr. Kaye did not technically violate
> any existing law or policy regarding the audio-
> recording of 730 competency evaluations her
> decision to record the defendant in the Proceeding
> during his 730 competency evaluation was
> inappropriate, and such recording was inconsistent
> with the custom and practice of performing 730
> competency evaluations.
>
> \*     \*     \*     \*     \*
>
> Based on the findings in this investigation, the OCC
> recommends that Dr. Kaye be disciplined in the
> form of counseling, and retrained on the custom and
> practice of conducting 730 competency evaluations.
> The OCC also recommends that CHS develop
> general policies and procedures for conducting 730
> competency evaluations, if such policies and
> procedures do not currently in [sic] exist, and more
> specifically to develop policies regarding any form
> of recording such evaluations." *Id.*

152.    On May 31, 2019, Policy # INT 50, entitled, "Unauthorized Recordings," was

distributed to the court clinic directors.  *See* Email, "FW: New Interdisciplinary and Revised

Nursing Policies, dated May 31, 2019, annexed as Exhibit "DDDDD."

153.    On or about July 1, 2019, Dr. Ford and Clarence Muirjr met with plaintiff to issue

her a counseling memo that she had "inappropriately recorded a 730 Competency Evaluation

without authorization."    *See* Memorandum, Re: Audio recording of 730 Competency

Evaluations, dated May 29, 2019, from Dr. Ford to plaintiff, and Email thread, "Re: Follow-up," between June 18, 2019 to June 21, 2019, annexed as Exhibit "EEEEE."

### M. Warning Letter - Workplace Conduct

154.    On March 7, 2019, plaintiff received an email from Teleakie Parker seeking information regarding her professional credentialing, which plaintiff found suspicious and thereafter expressed concern that CHS "may be mishandling my private and confidential information."  On May 7, 2019, Plaintiff forwarded the email to Catherine Patsos of H+H's Office of Corporate Compliance for investigation.  *See* Email thread, "CHS Phishing email physician credentialing failure to advise," between March and May 2019, annexed as Exhibit "FFFFF."

155.    On May 31, 2019, Andrea Swenson, the Senior Administrator for the Court Clinics, reported to Dr. Jain, Mr. Muiujr, and Samantha Kent that plaintiff had "screamed at [her] for a good 40 minutes," telling her that "physicians are the reason [Swenson and the other administrator] have a job," and wanted to know if Drs Mundy, Owen and Winkler were "being treated like secretaries."  According to Ms. Swenson, Plaintiff also reportedly told Ms. Swenson she was "lying" when Ms. Swenson said that she had talked about the Teleakie email, and that Ms. Swenson had "done nothing."  *See* Email thread, "FW: Assistance with Bronx," dated May 31, 2019, annexed as Exhibit "GGGGG."

156.    After discussing the interaction between Ms. Swenson and plaintiff with Dr. Jain, Drs. MacDonald and Ford agreed that the plaintiff's conduct was unprofessional.  Mr. Wangel suggested, and Dr. Ford agreed, to draft a warning memo to present to plaintiff.  *See* Email thread, "Re: Assistance with Bronx," dated June 3-4, 2019, annexed as Exhibit "HHHHH."

157.     On June 6, 2019, a warning memo for plaintiff, drafted by Samantha Kent, Associate Director of Employment & Labor Relations at CHS, regarding the incident with Ms. Swenson on May 31. 2018, was sent to Drs. Ford and MacDonald, as well as Mr. Wangel and Ms. Laboy, with instructions to present to plaintiff.  *See* Email, "Workplace Conduct Memo," dated June 6, 2019, and Email thread, "RE: Workplace Conduct Memo," dated June 6, 2019, annexed as Exhibit "IIIII."

158.     On or about July 1, 2019, Dr. Ford and Clarence Muirjr met with plaintiff to issue her a warning memo that she had "engaged in inappropriate and unprofessional conduct when you spoke with Ms. Andrea Swenson, Administrative Director for FPECC, on or about May 31, 2019."  *See* Memorandum Re: Unprofessional Conduct and Communication, dated June 6, 2019, from Dr. Ford to plaintiff, annexed as Exhibit "JJJJJ;" *see also* Email thread, "Re: Follow-up," between June 18, 2019 to June 21, 2019, annexed as Exhibit "KKKKK."

**N.  Notes**

159.     In October 2018, plaintiff emailed Dr. Jain, requesting his original notes for a file, so that the file could be closed.  Dr. Jain indicated in response that the files were in his office. Email, "Fw: Notes," dated October 2-3, 2018, annexed as Exhibit "LLLLL."

160.     On or about December 20, 2018, Dr. Jain notified Dr. Ford that he had learned that plaintiff had taken his handwritten notes out of the charts and "has them in her possession." Specifically, Dr. Jain stated that his "notes for at least 10 cases, which I gave to Lucrecia to file, are not in their respective charts."   Dr. Jain reported that "[w]hen he asked for notes on a particular case, Lucrecia said [plaintiff] asked for my notes, took them" and "Lucrecia could not find them."  Dr. Jain added that "[t]here is no legitimate reason for these notes to be missing or

taken by [plaintiff] without my knowledge.  This is unusual and concerning."  Email, "Fw: Bronx – my handwritten notes," dated December 20, 2018, annexed as Exhibit "MMMMM."

**O.  Staffing for the Bronx Clinic**

161.    On April 3, 2018, Dr. Ford recommended two candidates for interview, Drs. Jonathan Kent and Raina Lamade, to full the open position at the Bronx Court Clinic, previously held by Dr. Winkler prior to his promotion to Director of the Brooklyn Court Clinic.  *See* Email correspondence, between Susannah Lewis and Drs. Jain and Kaye, dated April 3-5, 2018, annexed as Exhibit "NNNNN."

162.    Plaintiff interviewed Dr. Kent on or about April 23, 2018.  *See* Email, dated April 24, 2018, from Dr. Kent to plaintiff, annexed as Exhibit "OOOOO."  Plaintiff did not believe Dr. Kent was "a good fit for the Bronx."  *See* Email, date April 24, 2018, from plaintiff to Drs. Jain and Winkler, annexed as Exhibit "PPPPP."

163.    On or about May 18, 2018, Plaintiff learned that Dr. Louise Mullan would be starting at the Bronx Court Clinic.  *See* Email, dated May 18, 2018, from Dr. Jain to Dr. Mullan and plaintiff, annexed as Exhibit "QQQQQ."  Dr. Mullan worked as a per diem or part-time psychiatrist at the Bronx Court Clinic until on or about June 14, 2019.  *See* Email, dated May 31, 2019, from Lucrecia Persaud to Andrea Swenson, annexed as Exhibit "RRRRR;" Jain, Ex. C at 118:4-7.

164.    On June 11, 2018, Dr. Jain sent plaintiff information concerning a psychologist who was interested in a full-time position, and wanted to know her "thoughts on him for a full-time Bronx psychologist position."  *See* Email, "Bronx Psychologist Candidate," dated June 11, 2018, annexed as Exhibit "SSSSS."

165.    Following Dr. Mullan's departure, efforts were made to hire another psychiatrist at the Bronx Court Clinic.  *See* Email, dated September 19, 2019, from Dr. Yang to Jessica Laboy, et al., annexed as Exhibit "TTTTT."

166.    On or about October 1, 2018, Dr. Anansa Brayton was hired as an evaluator at the Bronx Court Clinic.  *See* Email, dated October 1, 2018, from Dr. Jain to plaintiff, annexed as Exhibit "UUUUU."  Dr. Brayton worked full time as a psychologist at the Bronx Court Clinic until on or about November 11, 2019.  *See* Email, dated November 1, 2019, from Dr. Brayton to plaintiff, Dr. Jain, and Lucrecia Persaud, annexed as Exhibit "VVVVV."

167.    In anticipation of, and following Dr. Brayton's departure, leadership sought to backfill her position at the Bronx Court Clinic.  *See* Email thread, dated September 20, 2019, October 31, 2019, November 1-2, 4, 2019, entitled "What is plan for psychologist staffing in the Bronx?" between Drs. Ford, Jain, and Garcia-Mansilla, among others; email, dated October 31, 2019- November 12, 2019, from Dr. Jain to Wilma Soto and Kiesha Bailey, annexed as Exhibit "WWWWW."

168.    Efforts were also made to rotate in or transfer examiners from another borough to assist with cases in the Bronx Court Clinic.  *Id.*

169.    There were challenges in retaining and recruiting staff for the Bronx Court Clinic. Dr. Jain received concerns from Drs. Brayton and Mullan regarding the "tense" work environment, directors from the other boroughs expressed concerns about sending their examiners to the Bronx to do examinations because of the work environment, and plaintiff was resistant to work with certain examiners.  *See* Jain, Ex. C at 116:18-118:1, 120:16-121:2, 121:24-122:9, 124:2-19, 125:9-12, 144:7-145:20, 182:11-21, 208:1-210:16, 270:4-272:12, 318:8-321:8; Yang, Ex. M at 85:18-87:9.

### P.  Complaints to BOC

170.    On January 7, 2020, plaintiff submitted a letter to the Board of Correction and Inspector General for the Department of Correction, complaining of what she believed to be a "matter of public concern to oversight agencies consistent with my duty as a physician to do so, and I request that action be taken to protect due process rights of criminal defendants and the integrity of the legal system." *See* January 7, 2020 letter, annexed as Exhibit "XXXXX."

### Q.  Resignation/Retirement

171.    On January 13, 2020, plaintiff submitted her resignation. See "Receipt for Retirement Application, annexed as Exhibit "YYYYY."  Plaintiff alleges that she was forced out, or constructively discharged.

### R.  Complaints to New York State Inspector General and Department of Justice

172.    Plaintiff testified that she filed complaints online with the New York State Inspector General and the Department of Justice.  She cannot confirm when she filed these complaints with either agency, nor whether either agency contacted H+H or any of its employees.  *See* Deposition of Melissa Kaye, dated February 3, 2022, annexed as Exhibit "ZZZZZ" at 381:4-386:11.

### S.  Medical License in New Mexico

173.    Plaintiff has not submitted her work verification to CHS as part of the licensing process for a medical license in New Mexico, believing that "[b]ecause CHS engaged in ongoing retaliation against me including the manufactured disciplinary actions, they're not going to fill out a form in good faith if they fill it out at all." *Id.*, 387:23-392:22.

174.    Plaintiff has not contacted CHS or H+H to determine how they would complete her work verification for her medical license in New Mexico.  *Id.*, 403:23-404:23.

Dated:       New York, New York
             March 4, 2022

SYLVIA O. HINDS-RADIX
Corporation Counsel of the City of New York
    Attorney for Defendants
100 Church Street, Room 2-124
New York, New York 10007
(212) 356-2461

By:    ECF        /s/
           Donna A. Canfield
           Assistant Corporation Counsel
           dcanfiel@law.nyc.gov