UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
............................................................................................. X
MELISSA KAYE,

PLAINTIFF,

-against-

HEALTH AND HOSPITAL CORPORATION; ELIZABETH FORD;
ABHISHEK JAIN; JONATHAN WANGEL; and PATRICIA YANG (in
their official and individual capacities and as aiders and abettors)

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1**

DEFENDANTS.          18-12137(JPC)(JLC)

............................................................................................. X


Statements that are admitted below are admitted solely for the purpose of Defendants'

motion and not for trial or for any other purpose.  Plaintiff Melissa Kaye, M.D. ("Plaintiff" or

"Dr. Kaye"), submits this statement in opposition to Defendants': New York City Health and

Hospitals Corporation/Correctional Health Services ("H + H/CHS"); Elizabeth Ford, M.D.

("Ford"); Abhishek Jain, M.D. ("Jain"); Jonathan Wangel ("Wangel"); and Patricia (Patsy) Yang

("Yang"),  Statement of Undisputed Facts pursuant to Federal Rule of Civil Procedure 56(c ) and

Local Civil Rule 56.1(b).  Moreover, Plaintiff does not concede the materiality of any of

Defendants' statements.   Plaintiff's responses to Defendants' factual assertions are set forth

below.

1. Plaintiff, former Director of the Bronx Forensic Psychiatry Court Clinic at Correctional
   Health Services ("CHS"), brings this action alleging discrimination (gender and caregiver)
   and retaliation under 42 U.S.C. § 1983, for violations of the 1st and 14th Amendments of
   the United States Constitution; the Equal Pay Act; Family Medical Leave Act ("FMLA");
   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII");
   the New York State Human Rights Law as contained in New York Executive Law § 296, et.
   seq. ("NYSHRL"); the New York City Human Rights Law as contained in the Administrative

1

Code of the City of New York, § 8-107, et. seq. ("NYCHRL"); and the New York Labor Law § 740.  See Amended Complaint, filed May 3, 2019 (hereinafter "Compl."), "Exhibit A"

**RESPONSE:** Admit with qualifications.  Plaintiff filed the First Amended Complaint on May 3, 2019.  **Exhibit 1: Plaintiff's First Amended Complaint Filed on May 3, 2019.  ECF Dkt. 29** Defendants' Exhibit A is not the First Amended Complaint referenced, the document presented as Defendants' Exhibit A was Plaintiff's proposed First Amended Complaint filed on May 2, 2019.  **Exhibit A (ECF Dkt. 25-1)[1]**

Plaintiff raised the following causes of action in the First Amended Complaint she filed on May 2, 2019 and May 3, 2019:  the 1st and 14th Amendments of the United States Constitution; the Equal Pay Act; Family Medical Leave Act ("FMLA"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title VII"); 42 U.S.C. §§ 1983 and 1988; the New York Human Rights Law as contained in New York Executive Law §296 et. seq. ("NYHRL"); and New York City Human Rights Law as contained in the Administrative Code of the City of New York, §8-107 et. seq. ("NYCHRL"); and New York Whistleblowing Law.

- **Exhibit 1:  Plaintiff's First Amended Complaint was filed on May 3, 2019 (ECF Dkt. 29) p. 5 ¶7; and**

- **Exhibit 2:  Plaintiff's First Amended Complaint as filed on May 2, 2019 (ECF Dkt. 25-1)**

2. Plaintiff alleges that soon after the management of the forensic clinics transitioned in late 2017/early 2018, from Corizon to CHS, she experienced discrimination and retaliation. Specifically, Plaintiff alleges that: (1) she was subjected to pay disparities on account of her gender; (2) she was discriminated against on account of her caregiver status; (3) Defendants interfered with her FMLA rights when they granted her FMLA leave on

---

[1] Plaintiff raised the issue of Defendants' use of the "wrong" version of the Amended Complaint, during Dr. Kaye's Deposition on 11/25/21.  Defendants appeared to accept that they had used the wrong complaint on that day, however when they filed the motion herein, they inserted the same complaint again.  Plaintiff raised the issue with this Court on April 25, 2022. (ECF. Dkts. 234-235)  Ultimately, the Court determined that the Amended Complaint as filed at 25-1 was the controlling document.  Accordingly, Plaintiff filed an objection pursuant to Fed. R. Civ. P. 72 and respectfully raises the same objections herein to preserve the record.  (ECF. Dkt. 245)

October 30, 2018, and then revoked it on November 23, 2018, and retaliated against her for attempting to exercise her FMLA rights; (4) Defendants retaliated against her for complaining about the alleged gender-based pay disparity with her male counterparts; (5) Defendants violated her First Amendment right of free speech and rights under New York "whistleblower" law by retaliating against her because she raised concerns about the Criminal Procedure Law § 730 evaluation process, staff conflict of interest, HIPAA violations, and the destruction of evaluation notes; and (6) the intolerable working conditions resulted in her constructive discharge.  See Ex. A at ¶¶ 1-6.

**RESPONSE:  Disputed.**   Plaintiff contends that Defendant Yang and City Hall began interfering with the operations of the Court Clinics in or around December 2015.  Dr. Kaye contends that Defendants engaged in gender discrimination when they failed to provide her with the same compensation, corporate title and resources as her male comparators.  Defendants discriminated against Dr. Kaye based on her caregiver status when they demoted her in salary and title when she sought to maintain her shift of 18 years.  Defendants were aware of Dr. Kaye's caregiver status, they were also aware of her son's medical condition.

Dr. Kaye also alleges that Defendants interfered with and retaliated against her when she sought leave under the FMLA.  Firstly, Defendants' FMLA policy was not implemented in a consistent fashion.  Secondly, Defendants' timekeeping systems were inconsistent and problematic.  Specifically, there were two repositories, the ATLS/KRONOS and the Central Time Keeping System.  Despite staff advice to rely upon the latter, Defendants chose the system that enabled them to doctor Plaintiff's timesheets and leave balances.  These acts provided Defendants with the means to say that she worked less than the required 1250 hours and to surreptitiously demote her in salary. Plaintiff claims that her pay was unjustifiably docked by $31K in 2018 and by $28K in 2019.

Defendants were aware of Dr. Kaye's caregiver status. Defendant Ford's autobiography was unequivocal: on at least two occasions, she felt compelled to resign because she couldn't take

her kids to school or spend enough time with them.  Therefore, when Dr. Kaye posed a problem to Defendant Ford and management, Defendant Ford clearly stated that she needed to be managed.  Due to the childcare issues Dr. Kaye experienced from Defendants' discriminatory and retaliatory  shift change, and the same issues Defendant Ford had herself, a reasonable fact finder could determine that she  participated in the methodical campaign to constructively discharge Dr. Kaye from the Bronx Forensic Psychiatric Court Clinic (FPECC) .

Dr. Kaye's protected activities under the First Amendment 1983 and Section 740 of the New York Labor Law spanned from 2015 until 2021. During this time period, Dr. Kaye consistently raised concerns and objections about Defendants' policies.  Defendants began to retaliate against her in 2018.

On January 29, 2018, Defendant Yang threatened to terminate Dr. Kaye on the spot when she voiced her concerns about the Constitutionality and ethical underpinnings of Defendants' proposed policies, practices and forms.  At that meeting, in front of all of Dr. Kaye's staff, the CEO of Bellevue and H + H senior staff, Defendant Yang specifically told Dr. Kaye: "if you don't like the way we do things around here, there's the door; we've got all of the money."

Dr. Kaye also engaged in protected activities under Title VII, NYSHRL and NYCHRL. Dr. Kaye first filed a complaint of discrimination, that cited pay parity on May 3, 2018.  She emailed Defendant Yang and described ongoing discrimination in terms of her salary and corporate title, despite having superior credentials and longevity that surpassed her male comparators.  When she did not obtain any substantive response, on May 22, 2018, Dr. Kaye filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).  On September 22, 2018, Dr. Kaye amended her charge at the EEOC to include claims of retaliation.  The Amended

Complaint and record establish that Defendants' methodical and concerted adverse employment actions fostered a retaliatory hostile work environment that led to Dr. Kaye's constructive discharge.

In the wake of her complaints, Defendants: removed Dr. Kaye's staff, demoted her salary and title; imposed a retaliatory shift change; excluded her from meetings; unfairly gave her a marginal performance rating; and  implemented a work stoppage that did not end until the next business day after Dr. Kaye was forced to retire.

The pleaded facts and record also establish Dr. Kaye's claims under § 740 of the State Whistleblower law.  Citing Defendants' private practice policy, allegations of quid quo pro exam rigging, on numerous occasions, Dr. Kaye filed complaints with the following entities: Defendants' Office of Corporate Compliance; the Department of Investigation (DOI); the Inspector General's Office (IG Office); and the Office of the Attorney General (AG's Office). Plaintiff contends that her complaints were either ignored, and or that she experienced adverse employment actions due to her protected activities under this statute as well.

Dr. Kaye's claims  under the Equal Pay Act are pretty straight forward and present clear triable issues of fact.  Despite having the most longevity and most board certifications, Defendants insisted on paying her at least $38,000 less and refused to promote her to the Physician Specialist title to achieve parity.

- **Exhibit 1:  Plaintiff's Amended Complaint as filed on May 3, 2019 (ECF Dkt. 29) Background; and**

- **Exhibit 2:  Plaintiff's Amended Complaint as filed on April 30, 2019 (ECF Dkt. 25-1);**

3.  In or about August 1999, Plaintiff was hired as an Attending Physician at Bellevue Hospital, working as a forensic evaluator in the Bronx Criminal Court Clinic.  See Deposition of Melissa Kaye dated November 15, 2021, Exhibit "B" at 202:2-203:5

**RESPONSE:**  Admit and add, that  Dr. Kaye was hired on August 16, 1999 to work as an

Attending Physician at the Bronx Forensic Psychiatric Evaluation Court Clinic (FPECC).  Due to a

union grievance, on August 16, 2000, Dr. Kaye was paid at the rate of an Attending Physician

Level III.

- **Exhibit 3:  NYCERS Department Certificate of Benefits Service Form (D00076-D00079)**

4.  As a forensic evaluator, plaintiff was responsible for conducting court-ordered forensic examinations consistent with Criminal Procedure Law 730 ("CPL 730") and Criminal Procedure Law 390 ("CPL 390").  CPL 730 examinations are performed to determine whether a criminal defendant is competent to stand trial. CPL 390 examinations are pre-pleading/pre-sentencing examinations.  Id. at. 203:6-15.

**RESPONSE:** Admit and add. From 2004 until 2018, Dr. Kaye was also the Medical Director at

the Bronx Court Clinic. As Medical Director, she oversaw the clinic's operations and scheduling.

On May 14, 2018, 11 days after Dr. Kaye complained of pay parity, Defendants demoted Dr.

Kaye: in office title from Medical Director to Director; and they also demoted her in corporate

title from Attending Physician III to Attending Physician II.  In effect, Dr. Kaye lost all supervisory

authority and operational oversight of the clinic she managed for over 14 years.

- **Exhibit 4:  Kaye Decl. ¶¶ 52-through 54;**

- **Exhibit 5: Email forwarded by Yang to S. Gillen and J. LaBoy dated May 3, 2018 with the Subject:  Pay Equity for Court Clinic Medical Directors (NYC000208-NYC000211);**

- **Exhibit 6: Email from Jain dated May 11, 2018 with the Subject: Titles (NYC00216);**

- **Exhibit 7: Email from Kaye dated May 25, 2018 with the Subject: Business Cards (NYC00228-NYC000233);**

- **Exhibit 8:  Email from S. Gillen dated May 14, 2018 with the Subject: 730 Retention Bonus (NYC00220-NYC00221)**

5.   In 2004, Plaintiff became the Medical Director of the Bronx Criminal Court clinic. Id. at 204:7-12. Other than additional administrative work, Plaintiff's forensic evaluation job duties remained the same -performing court-ordered CPL 390 and CPL 730 examinations. Id. at. 204:13-17

**RESPONSE:** Deny.   Dr. Kaye became the Medical Director of the Bronx Forensic Psychiatric Court Clinic in 2004.  Dr. Kaye's job responsibilities and titles were reduced when she complained of discrimination on May 3rd and May 22, 2018. Behind the scenes, on May 14, 2018, Defendants took acts to reduce Dr. Kaye's title; they reduced here corporate title from Attending Physician III to Attending Physician II.  Then on May 25, 2018, Defendants notified Dr. Kaye that she would no longer be Medical Director of the Clinic.

Dr. Kaye testified that the title change would potentially impact her professional career prospects.  From Dr. Kaye's experience, the title of Director was less prestigious and was inconsistent with her credentials and status as a licensed physician. Within CHS and H +H, Dr. Kaye also experienced a demotion in corporate title.  On May 14, 2018, Defendants recorded Dr. Kaye as being an Attending Physician II.  Prior to the circulation of this email, Dr. Kaye had always been listed as an Attending Physician III.

Defendants have also failed to adduce evidence that demonstrated that Dr. Mundy was never listed as a Medical Director, or in the alternative that they ordered business cards at that time with his title listed as Director.  Missing from Defendants' productions is a "dummy" of Dr. Mundy's proposed business card, however, the business cards for the other three directors were listed.

- **Exhibit 4: Kaye Decl. ¶¶ 52-54;**

- **Exhibit 6: Email from Jain dated May 11, 2018 with the Subject: Titles NYC00216;**

- **Exhibit 7: Email from Kaye dated May 25, 2018 with Subject: Business Cards NYC00235; and[2]**

- **Exhibit 8:  Email from S. Gillen dated May 14, 2018 with the Subject: 730 Retention Bonus (NYC000220-NYC000221)**

6. Between 1999 and 2017, Bellevue Hospital and Kings had oversight and management of the Bronx and Manhattan criminal court clinics; Kings County Hospital had oversight and management over both the Brooklyn and Queens criminal court clinics.  See Kaye, Ex. B, at 50:4-14; see also Deposition of Abhishek Jain, M.D. dated October 4, 2021, annexed as Exhibit "C" at 60:20-61:1.

   **RESPONSE:**  Deny. The referenced testimony does not specify the time period that the

Court Clinics were managed by Bellevue and Kings County Hospitals.  Plaintiff testified that prior

to the consolidation of the Court Clinics under CHS: the Manhattan and Bronx Court Clinics

were managed by Bellevue; and the Brooklyn, Queens and Staten Island Court Clinics were

managed by Kings County Hospital.

   There are triable issues of disputed fact that pertain to when City Hall and or Defendant

Yang began to exert control over the operations of the Court Clinics.  Defendant Yang was

appointed Senior Vice President of Correctional Health Services (CHS) on June 18, 2015. Plaintiff

contends that Defendant Yang and City Hall began to interfere with the administration of the

Bronx Court Clinic in December 2015. Defendants however contend that the Court Clinics did

not come under their management until 2018; the transition process spanned from January

2018 to July 2018.

- **Exhibit 9: Kaye Dep. 11/15/21 p.50:1-14;**

---

[2] Depositions for purposes of this submission will be referenced as: Deponent's Last Name Dep. with the date the deposition was taken (if there was more than one or if there was an error) and the referenced page numbers:  (e.g. X Dep. 08/08/2022 p. 7:1-29)

- **Exhibit 10: Yang Dep. 2/28/20 p. 44:1-6[3];**

- **Exhibit 11: HHC June 18, 2015 Press Release;**

- **Exhibit 12: Email from Yang dated January 31, 2018 with the Subject:  730 Clinic Management Consolidation (NYC000064-NYC000065); and**

- **Exhibit 13:  Email from Jeffrey Bloom to Peter Jones dated December 16, 2015 (Kaye6thProd0003-Kaye6thProd0004)**

7.  At all times relevant, Dr. Marianne Badarracco ("Dr. Badaracco") was the Chief of Psychiatry at Bellevue Hospital.  See Jain, Ex. C at 60:20-22; See also Deposition of Dr. Elizabeth Ford, dated September 27, 2021, annexed as Exhibit "D," at 25:24-26:3.

**RESPONSE:**  Admit with qualification.  Dr. "Maryanne" Badaracco has a dual appointment:

Director of Psychiatry/Chief of Psychiatry at Bellevue Hospital; and Vice Chair of the

Department of Psychiatry at NYU School of Medicine took place in November 2008.  Dr.

Badaracco currently works in the aforementioned capacities.  **Exhibit 4: Kaye Decl. ¶ 7**

8.  From May 2009 to 2014, Dr. Elizabeth Ford("Dr. Ford") was the Director of Forensic Psychiatry at Bellevue Hospital, where she supervised the Manhattan and Bronx criminal court clinics.  See Ford, Ex. Defendant at 28:16-19, 51:22-23.  During this period of time, Plaintiff reported to Dr. Ford. Id. at 26:9-14; see also Kaye, Ex. B, 45:18-20

**RESPONSE:**  Admit and add.  During the time period of May 2009 to 2014, Defendant Ford

found Dr. Kaye "to be excellent at the work she was doing;" an advocate; precise and

professional. **Exhibit 14: Ford Dep. p. 29:11-21**

9.  From 2014 until approximately July 1, 2018, Dr. Jeremy Colley ("Dr. Colley") was the Director of Forensic Psychiatry at Bellevue Hospital, where he supervised the Manhattan and Bronx criminal court clinics.  Kaye, Ex. B at 59:3-7, 162:20-163:4.  During this period of time, Plaintiff reported to Dr. Colley. Id. at 42:2-4, 59:3-7; Ford, Ex. D, at 88:17-89:8.

---

[3] The stenographer made an error on the cover page of Defendant Yang's deposition.  Defendant Yang was deposed on February 28, 2020 at Veritext's Offices in Manhattan.

**RESPONSE:** Deny.  Dr. Colley was hired as Director of Forensic Psychiatry at Bellevue Hospital Center, NYU School of Medicine in September 2014.  Defendant Jain was hired in April 2018 and he began to engage Dr. Kaye soon thereafter. **Exhibit 15: Jain Deposition p.81:3-8**

10. From approximately July 2001 to 2011, Dr. Stephen Ciric ("Dr. Ciric"), was employed by Bellevue Hospital as a Physician Specialist III in the Division of Forensic Psychiatry. His responsibilities included performing admission assessments and comprehensive treatment plans; coordinating the medical care needs of patients and drafting psychiatric summaries/discharge documentation for patients referred by the New York City Department of Correction and the New York City Police Department; and performing court- ordered evaluations for New York County Supreme and Criminal Courts.  See Curriculum Vitae Stephen J. Ciric., M.D. annexed as Exhibit "E."

**RESPONSE:** Admit with qualifications.  The exhibit listed does not support the statement of fact; the exhibit does not contain the information asserted.  Exhibit E was Dr. Ciric's resume up until he was hired to work for Bellevue/H + H.

Dr. Ciric was initially hired in the Attending Physician title. In March 2004, he was promoted to the Physician Specialist title, by Dr. Mary Ann Badaracco. In February 2011, Dr. Ciric reduced his employment status from 1.0 FTE (full time equivalent) to .80FTE.  At that time it was determined that his only work cite would be the Manhattan Court Clinic.  Dr. Ciric was promoted to Director of the Clinic; based on an .80FTE, his annualized salary was 80% of approximately $190,000 per year or $152,000.  Upon learning of the disparity, Dr. Kaye argued that a promotion to the unionized Physician Specialist title would fully address her issues of pay and title parity.

- **Exhibit 16: Email from L. Rodriguez dated November 24, 2010 with the Subject: FW: Re: Budget Ciric on Forensic Court Clinic (D000374-D000378);**

- **Exhibit 17:  Bellevue Joint Oversight Committee Personnel Request Form for Steven Ciric, M.D. (D000437-D0000439); and**

- **Exhibit 18: Personnel Action Form for Steven Ciric with Effective Date April 5,**

2004 (D000451-D000454)

11. In or about 2011, Dr. Ciric accepted the position of Medical Director of the Manhattan Criminal Court clinic, and was promoted to Physician Specialist IV to compensate him for the additional responsibilities required of the position, the many cases seen at the clinic, the high turnover in staffing and the loss of a full-time Psychologist, part-time Assistant Medical Director, and part-time Medical Director. See "Human Resources Personnel Requisition Form Promotion," annexed as Exhibit "F."

**RESPONSE:**  Disputed. Dr. Ciric was transferred to the Manhattan Court Clinic to replace Dr. Rosner.   Drs. Rosner and Schneider were both being compensated at a higher annualized rate than Dr. Kaye.  Dr. Schneider's annualized salary was approximately $180K, he worked at a .90FTE rate of approximately 164K per year.

The Personnel Request Form clearly stated that Dr. Ciric no longer worked a full time 1.0 schedule. Therefore it was clear that he was not promoted because he had more responsibilities.  Instead, upon the transfer it can be argued that he performed less work as an .80 FTE employee but was compensated more than Dr. Kaye even though he didn't work as much.

Furthermore, Dr. Ciric had been in the Physician Specialist title since 2004.  This was the same time that Dr. Kaye was promoted to Medical Director of the Bronx Court Clinic.  However, unlike Dr. Ciric at that time, despite having more responsibilities, she was promoted within the Attending Physician line while Dr. Ciric went from being an Attending Physician to a Physician Specialist.  Therefore, despite whatever responsibilities he had, he was still in a higher civil service/corporate title than Dr. Kaye.

- **Exhibit 4:  Kaye Decl. ¶¶ 3-4;**

- **Exhibit 17:  Bellevue Joint Oversight Committee Personnel Request Form for Steven Ciric, M.D. (D000437-D000439); and**

- **Exhibit 18:  Personnel Action Form for Steven Ciric with Effective Date April 5, 2004 (D000451-D000454)**

12. The Medical Director of the Manhattan Criminal Court Clinic line was a unionized line at the time Dr. Ciric accepted the position in 2011.  See Kaye, Ex. B, at 222:15-24.  Dr. Ciric's rate of pay thus was determined by the collectively bargained rate.  See Clinicians Unit Collective Bargaining Agreement between the City of New York, the Health and Hospitals Corporation, and the Doctors Council, annexed as Exhibit "G."

RESPONSE: Deny.  Drs. Ciric and Kaye were both promoted in 2004. On April 5, 2004, Dr. Ciric was promoted into the Physician Specialist line.  In 2004, Dr. Kaye was promoted to Medical Director of the Bronx Court Forensic Psychiatric Evaluation Court Clinic.  Defendants have not provided a viable explanation as to why Dr. Kaye was not promoted or even hired into the Physician Specialist line in 2004, especially since she was a full-time employee with more administrative and managerial responsibilities than Dr. Ciric.

In 2004, prior to his promotion, Dr. Ciric was a part-time employee in the Attending Physician corporate title. In 2011, Dr. Ciric was promoted within the Physician Specialist line, by that time, a corporate title that he had already possessed for at least 7 years.

- **Exhibit 17:  Bellevue Joint Oversight Committee Personnel Request Form for Steven Ciric, M.D. (D000437-D000439);**

- **Exhibit 18:  Personnel Action Form for Steven Ciric with Effective Date April 5, 2004 (D000451-D000454); and**

- **Exhibit 19: Dr. Kaye's CV (NYC002541-NYC002544)**

13. The Medical Director of the Bronx Criminal Court clinic was a unionized line at the time Plaintiff accepted the position in 2004. Id. Consequently, Plaintiff's rate of pay was determined by the collectively bargained rate.  Id.

RESPONSE:  Deny.  Dr. Kaye had worked for H + H since 1999. She became a full time employee in 2000.  Dr. Kaye had to grieve to get into the Attending Physician Level III title despite the fact that she was doing work that exceeded the title.  Further, it was not until

12

2013/2014, that she learned that the Manhattan Court Clinic position was in the Physician Specialist unionized/corporate title.  Both the Physician Specialist and Attending Physician civil service/corporate titles are covered by the same union, Doctors Council.

   Both Drs. Kaye and Ciric were members of Doctors Council; Defendants have not met their burden of establishing legitimate reasons for not promoting Dr. Kaye into the Physician Specialist title, especially when both she and Ciric took Center Director positions in 2004. Additionally, Defendants have failed to explain why Jonathan Weiss was hired in the Physician Specialist title in 2013, and yet again, Dr. Kaye was not promoted to the Physician Specialist title.  Especially since she had begun to raise parity complaints to Defendant Ford and Dr. Badaracco in that very year, and even more so since she was more experienced than Dr. Weiss when he was hired.

- **Exhibit 4:  Kaye Decl. ¶¶ 3-4;**

- **Exhibit 17:  Bellevue Joint Oversight Committee Personnel Request Form for Steven Ciric, M.D. (D000437-D000439); and**

- **Exhibit 18:  Personnel Action Form for Steven Ciric with Effective Date April 5, 2004 (D000451-D000454)**

14. The minimum and maximum pay rates for the Physician Specialist title is higher than the Attending Physician title. Id.

   **RESPONSE:** Admit and add.  Dr. Kaye had superior credentials  and performed the same job functions as her comparator Dr. Ciric in 2004.  She also had been on the job a year longer, Dr. Ciric did not start working at Bellevue until July 2001, Dr. Kaye had started in 1999/2000. Yet she was not promoted or offered the position in the Physician Specialist unionized corporate title.  Both Drs. Kaye and Ciric had two board certifications,  however, Dr. Kaye had more longevity than Dr. Ciric.  She had been working at the Bronx Clinic since 1999,

while Dr. Ciric was teaching part time and completing his post-doctoral work. Again, had

Defendants promoted Dr. Kaye to the Physician Specialist position at any time during her

tenure, she would have had parity with her comparator Dr. Ciric.

- **Exhibit 19: Kaye's CV (NYC002541-NYC002544);**

- **Exhibit 20: Ciric CV (D000397-D000400); and**

- **Exhibit 26: Ciric's Appointment Letter dated June 21, 2001 (D000450)**

15. The Manhattan Criminal Court Clinic is consistently the busiest of the four criminal court
    clinics, seeing approximately 1,200 to 1,400 criminal defendants annually.  The Bronx
    Criminal Court Clinic, by comparison, sees the least number of criminal defendants, with
    an average of approximately 300 criminal defendants annually.  See Kaye, Ex. B, at 209:9-
    19; Ford, Ex D, at 171:20-172;14; Deposition of Barry Winkler, dated October 6, 2021,
    annexed as Exhibit "H" at 284:7-285:5; see also Forensic Psychiatry Evaluation Court
    Clinics ("FPECC") Clinic Case Listing Output 10/13/2021, annexed as Exhibit "I;" See also
    Email thread, "Big picture question," dated October 16, 2018, annexed as Exhibit "J."

RESPONSE: Deny.  While Plaintiff admitted that the Manhattan Clinic saw more cases, she

also testified that they had more staff. Dr. Kaye also testified that unlike the other Clinic

Directors, from 1999 to 2020, she was the only Director who had to conduct every 730

Examination.  The CPL 730  has the requirement that inmates be seen by two evaluators, and

the Bronx Court Clinic only had at best two evaluators eligible under the statute.

Dr. Kaye also disputes the tabulation of the Center's workload.  On at least one occasion, she

complained to Andrea Swenson (Swenson)  that 42 cases had not been inputted into the ISight

system.  There are also stark discrepancies between Dr. Kaye's records and Defendants' records

of the clinic's workload.  Dr. Kaye began keeping records cover the period of 2012 until her

constructive discharge.

For example, Dr. Kaye's records shows that she conducted 119 730 Examinations in 2018 and

that there were at least 119 examinations in 2018. For the time period that Defendants'

captured in ISight, which spanned from June 2018 until December 2018, according to Defendants' records (which are arguably inadmissible since it has not been established that the spreadsheet that was produced was generated from ISight) it has Dr. Kaye as having conducted 8 730 Examinations.  For that time period, it has the Bronx Court Clinic at 21 total 730 Examinations for the entire clinic.

The discrepancies in the numbers are just as blaring for Calendar Year 2019.  Again, Dr. Kaye had data for each month, while Defendants failed to produce data after  February 2019. Additionally, Dr. Kaye's data shows that she conducted 77 730 Examinations during calendar year 2019, while CHS has her listed as having only conducted 2.

Plaintiff respectfully avers that these discrepancies present material triable issues of disputed fact, thereby making issuance of summary judgment inappropriate.  Defendants have justified their disparate treatment of Dr. Kaye in terms of salary, staffing and civil service/corporate title on the Court Clinic's volume. Defendants have specifically argued that the Bronx Court Clinic saw the least amount of cases of the five boroughs. They also inferred that this served as justification for the reduced number of staff and resources allocated to the Clinic.

- **Exhibit 4: Kaye Decl. ¶¶19-31;**

- **Exhibit 9:  Kaye Dep 11/15/21. p. 209:16-18;**

- **Exhibit 21: Kaye's 730 Statistics for Calendar Years 2018 and 2019; and**

- **Exhibit 22:  Defendants' ISight chart  NYC003933**

16. Staffing at the Manhattan Criminal Court clinic exceeds that of the Bronx Criminal Court clinic, with one full-time psychiatrist, two part-time psychiatrists, two part-time psychologists, one-full-time social worker, and a forensic fellow. The Bronx Criminal Court clinic, by comparison, staffs only one full-time psychiatrist and one full-time psychologist. See Email, "RE: Updated FPECC Org Chart," dated February 7, 2018, annexed as Exhibit "K."

**RESPONSE:**  Admit with qualifications.  The listed exhibit does not have data that discusses the staffing at the Bronx Court Clinic for the time relevant in this lawsuit.  Plaintiff testified that she and Dr. Winkler worked at the Bronx Court Clinic from 2008 until March/April 2018.  After he left, Dr. Kaye did not have a full-time psychiatrist or psychologist from April 2018 until October 2018.

In October 2018, Defendants hired Dr. Anansa Brayton, however  she didn't begin to conduct 730 exams for the Bronx  Court Clinic until December 2018.  In the interim, Dr. Kaye had to rely on per diem staff and staff from other Court Clinics to conduct exams.  As she testified, the Bronx Court Clinic was without a full-time second evaluator from April 2018 to December 2018. The lack of a second evaluator became an issue again from October 2019 until January 2020, when Dr. Kaye was constructively discharged from the Clinic because of Defendants' imposed work stoppage.

- **Exhibit 9: Kaye Dep. 11/15/21 pgs. 212-213;**

- **Exhibit 23: Kaye Cross Exam. Dep. 1/25/22 p.58:9-25-59:2; and**

- **Exhibit 24: Winkler Dep. p. 15:20-25 and p.19:10-14**

17. In or about 2013/2014, Plaintiff learned that Dr. Ciric was compensated at a higher rate of pay. See Kaye, Ex. B, at 45:22-46:8

**RESPONSE:** Admit and add.  Dr. Kaye learned that she was paid less than Dr. Ciric when an email was inadvertently sent and distributed to staff.

- **Exhibit 9: Kaye Dep. 11/15/21 p.46:3-13**

18. In early 2014, Plaintiff informed Dr. Ford that she believed Dr. Ciric, as a Physician Specialist, was being compensated at a higher pay rate, and requested that her line be changed from Attending Physician III to Physician Specialist because she "was more qualified and [] had more seniority."  Kaye Ex. B at 48:7.  In response, Dr. Ford stated that

she would look into it and speak with Dr. Badaracco. Id. at 48:15-18; Ford, Ex. D at 118:12-18.

**RESPONSE:**  Deny as misleading.  Defendant Ford did speak to Dr. Kaye and the conversation culminated with her representation that she would speak to Dr. Badaracco about her pay and title parity concerns. However, whether Defendant Ford actually spoke to Dr. Badaracco was not clear.  Dr. Badaracco told Dr. Kaye that Defendant Ford never told her about Plaintiff's concerns.

Plaintiff adds the following detail to the statement of fact: When Dr. Kaye learned of the pay disparity, she went to her union representative, who at the time was Lori Davidson. Davidson informed Dr. Kaye that the gender disparities in pay at HHC were widespread, and that Dr. Kaye should be glad she wasn't a surgeon, where the disparities between the genders was even greater.

Dr. Kaye then testified that she had been approached by Defendant Ford about the disparity.  During the course of her testimony she noted that Defendant Ford had a queen bee mentality, where she was harder on women than men.  As she recollected what transpired, Dr. Kaye also mentioned Defendant Ford's comment about addressing issues of this nature: "getting things done is like moving elephants."  Accordingly, at her deposition, Defendant Ford admitted that she may have made this statement as she told Dr. Kaye about the prospects of having her parity concerns addressed.  Although Defendant Yang did not recall whether Defendant Ford made any references to elephants during the course of her deposition, an email she sent on May 3rd suggested that Defendant Ford follow up with Dr. Kaye sans the "elephantine" comment.

- **Exhibit 5:  Email forwarded by Yang dated May 3, 2018 with the Subject: Pay**

**Equity for Court Clinic Medical Directors, baring the bates stamp series:**

**NYC000208-NYC000211;**

- **Exhibit 9: Kaye Dep. 11/15/21 p. 46-48;**

- **Exhibit 10:  Yang Dep. p. 84:23-25-85:1-3; and**

- **Exhibit 14:  Ford Dep. p.296:10-25-297:1-4**

19. Dr. Ford spoke to her supervisor, Dr. Badaracco, about Plaintiff' salary concerns, since Dr. Ford was not involved in, nor had any responsibilities concerning compensation issues. See Ford, Ex. D at 114:23-116:1

**RESPONSE:** Deny.  Defendant Ford was Plaintiff's supervisor on two separate occasions.  The first was from 2008 to 2014, during that time Defendant Ford testified that she did not have the power to determine Dr. Kaye's salary. She testified that she went to Dr. Badaracco, but that she left before she could learn whether or not anything was done to address the disparities Dr. Kaye identified between she and her male comparators.

   Defendant Ford then testified that she did not know why Dr. Kaye was paid less and why she was in a lesser corporate/civil service title than Dr. Ciric.  She stated that she didn't know the difference between a Physician Specialist and an Attending Physician.  She conceded that the second time she supervised Dr. Kaye (between April 2018 until Dr. Kaye was constructively discharged in January 2020), that she did have the ability to propose salaries, hire and fire clinicians.  Defendant Ford however, failed to explain why or if she made any efforts to address Dr. Kaye's parity issues herself.

- **Exhibit 14: Ford Dep. pgs.  114-121**

20. In or about late 2014/early 2015, Plaintiff spoke to Dr. Colley about what she believed to be a pay disparity between herself and Dr. Ciric, informing Dr. Colley that this issue had been raised with Dr. Ford without a resolution.  Kaye, Ex. B at 58:20-59:19.  Plaintiff also informed Dr. Colley that she believed there was another part-time psychiatrist in a

Physician Specialist line who was compensated at a higher rate than she.  Id. at 60:3-13.

**RESPONSE:** Admit and add.  Dr. Kaye testified that she went to Dr. Colley who then went to Dr.

Badaracco.  Dr. Kaye also testified that when Dr. Badaracco learned of her pay parity issues,

that she expressed her concern but that she also told her that she could not change her

corporate/civil service titles (i.e. from Attending Physician to Physician Specialist). Dr. Kaye

testified that Dr. Badaracco told her that "you die in your line."  However, by 2013, Defendants

had hired yet another male psychiatrist with less experience than Dr. Kaye in the Physician

Specialist title, Dr. Jonathan Weiss.

- **Exhibit 9: Kaye Dep. 11/15/21 pgs. 58-64**

21. Dr. Colley told Plaintiff that he would speak with Dr. Badaracco about Plaintiff's complaint
    regarding pay parity.  Id. at 60:19-22.  Shortly thereafter, Dr. Badaracco contacted Plaintiff
    to advise that she would look into Plaintiff's complaint.  Id. at. 61:2-13, 61:23-25

    **RESPONSE:**  Admit and add.  Plaintiff also testified that Dr. Badaracco told her that she

    could not change her unionized/corporate title, and that she must "die in her line."

    - **Exhibit 9: Kaye Dep. 11/15/21 pgs. 58-64**

22. Thereafter, Dr. Badaracco and Dr. Colley told Plaintiff that while her line would not be
    changed from Attending Physician to Physician Specialist, her pay would be increased to
    the top pay range in the collective bargaining agreement for an Attending Physician III.  Id.
    at 63:8-64:16.

    **RESPONSE:** Admit and add.  Dr. Badaracco and Dr. Colley told Plaintiff that she would have to

"die in her line,"  and that corporate/civil service titles could not be changed.  In the aftermath

of that discussion, Dr. Kaye's salary was raised to the top of the Attending Physician Level III

salary range, however the difference between her salary and that of her comparator Dr. Steven

Ciric remained significant.  Dr. Kaye went from being paid $38,000 less to being paid $36,000

less.

- **Exhibit 9: Kaye Dep. 11/15/21 pgs. 63-64**

23. On November 21, 2017,  Dr. Ciric resigned as Director of the Manhattan Court Clinic.  See "New York City Health and Hospitals Corporation Form,"  annexed as Exhibit "L."

**RESPONSE:**  Deny.  Dr. Steven Ciric resigned on October 31, 2017.  His resignation was effective

as of November 21, 2017.  Defendant Ford hired Dr. Daniel Mundy to replace Dr. Ciric. Dr.

Mundy was hired in the unionized Physician Specialist corporate title, and Defendant Ford

submitted a vacancy request form to change his title to Senior Associate Director of the

Manhattan Court Clinic.

Dr. Mundy was hired at a salary of $205,000.  Despite having 18 years less seniority as a

forensic evaluator within the FPECC system than Dr. Kaye, Dr. Mundy had superior titles and a

higher salary; Dr. Kaye performed the same job functions with more clinical responsibilities

than Dr. Mundy at the Bronx Court Clinic.

- **Exhibit 4:  Kaye Decl. ¶¶ 52-53;**

- **Exhibit 25:  January 19, 2018 Vacancy Request Form for Daniel Mundy (D000350-D000351); and**

- **Exhibit 27:  Resignation Form as Completed by Steven Ciric, M.D. dated October 31, 2017) (D000431-D000432)**

I.      **Transition to Correctional Health Services**

24. In or about late 2017/early 2018, oversight and management of the Bronx, Manhattan, Brooklyn, and Queens court clinics transferred to Correctional Health Services.  See Deposition of Patricia Yang, dated February 28, 2018, annexed as Exhibit "M" at 20:8-21-24, 44:2-23; see also Email Correspondence, dated December 8, 2017, annexed as Exhibit "N."

**RESPONSE:**  Deny.  Defendant Yang was deposed on February 28, 2020. Plaintiff contends that

Defendant Yang interfered with the administration of 730 Examinations at the Bronx Court

Clinic as early as December 2015, when Defendant Yang was at the Department of Health and

Mental Hygiene (DOHMH).  At that time Defendant Yang functioned as a liaison with City Hall

and used her staff to exert pressure on the Court Clinics.

Plaintiff and Jeff Bloom contend, that email correspondence came from Defendant Yang's staff

person John Volpe, in or around December 2015.  At that time, Defendant Yang and City Hall

wanted to obtain a force order for a Miguel Figueroa, an inmate who was known to be very

violent and destructive.  However, at that time, Mr. Figueroa had not resisted production to any

hearings.

Defendant Yang and City Hall wanted to expedite his 730 exam by way of a compulsory

force order.  During the course of her testimony, Defendant Ford admitted that the use of force

orders was particularly inhumane; she also admitted that it could result in injuries to the staff

and or to the inmate.  Accordingly, practitioners in the field have been reluctant to use them to

produce inmates for their court appearances.

In this instance however, Defendant Yang and City Hall sought to defy the conventional

practice with this defendant for their own political ends. The cited email exchange showed that

Defendant Yang had involvement in the Court Clinic much earlier than January 2018, which was

what she testified to at her deposition.   This email was thereby consistent with Defendant

Yang's testimony, when she stated that she was "a representative from the mayor's office on

the joint task force for Behavioral and Criminal Justice task Force."  Defendant Yang further

testified that she worked separately with the First Deputy Mayor Anthony Shorris, and that she

served in this capacity from May 2014 until June 28, 2015.  Defendant Yang then testified that

she was appointed to head up an initiative that she had proposed, which was to "reform"

Correctional Health Services.

- **Exhibit 30:  Invoice for Defendant Yang's Deposition as taken on February 28, 2020;**

- **Exhibit 10:  Yang Dep. 2/28/20 p. 19-20;**

- **Exhibit 28:   Email from Bloom dated December 16, 2015 with the Subject: Call from Melissa Kaye (Kaye6thProd003-004); and**

- **Exhibit 29:  Email from Kaye to J. Bloom dated December 17, 2015 with the Subject Line: MF (Kaye6thProd0009-Kaye6thProd0013);**

25. CHS is a division of New York City Health + Hospitals, created as part of former Mayor Bill de Blasio's criminal justice reforms, to improve care, provide dignity, and treat humanely those detained and placed in city custody.  See Yang, Ex. M at 20:8-21:24, 31:7-13,57:2-13, see also https://www.nychealthandhospitals.org/correctionalhealthservices (last visited January 18, 2022)

**RESPONSE:**  Admit with qualifications.  The statement of fact is not supported by the

referenced deposition testimony.  In March 2018, former Mayor DeBlasio announced his

plans to close Rikers Island.  Health and Hospitals Corporation was engaged in a

reorganization that would consolidate the management of the forensic psychiatric

evaluation court clinics under CHS.

- **Exhibit 31 :  Fax from R. Peck: Correctional Health Services dated February 2, 2018**

26. The reorganization and consolidation of the four court clinics, collectively called the Forensic Psychiatric Evaluation Court Clinics or "FPECC," was consistent with the City's efforts to minimize the health impact of incarceration and reduce the length of the stay in jail, by unifying the forensic service, standardizing the clinics, and providing the necessary resources in order to expedite the court processing of criminal defendants so they were in custody the least amount of time necessary.  See Yang, Ex. M at 44:2-25, 45:17-46:15, 55:4-8, 57:23-59:7, 155:1-9; Jain, Ex. C at 60:5-61:15.

**RESPONSE:** Deny.  The referenced testimony does not support the statement of fact.   The

consolidation of the Court Clinics was part of former Mayor DeBlasio's efforts to close down

Rikers Island.  Plaintiff has disputed, that Defendants were concerned about the length of

incarceration for defendants with mental health issues.  Instead, Plaintiff  and Jeffrey Bloom

from Legal Aid have testified that Defendants were so focused on her constructive

discharge that from the months of November 2019 to January 2020, they declared a

moratorium on 730 Examinations to the detriment of inmates detained with mental health

issues.

- **Exhibit 31: Fax from R. Peck from Correctional Health Services dated February 2, 2018;**

- **Exhibit 32:  Email from Bloom dated December 9, 2015 with the Subject: 730 List (Kaye6thProd0557-Kaye6thProd0559); and**

- **Exhibit 33: Bloom Dep. p. 94:14-24-96:1-7**

Contrary to Defendant Yang's testimony in the referenced deposition excerpt, Defendants

callously effectuated conditions that led to approximately 40 defendants languishing for

prolonged periods because of a retaliatory vendetta they had against Dr. Kaye.   Dr. Kaye

provided the following testimony consistent with this position: CHS held "criminal

defendants and the legal system hostage in order to execute retaliation against me and

force me to quit."

**Exhibit 23: Kaye Dep. Cross Exam. 1/25/22 p. 53:20-25-55:1-6**

27. During all relevant times, Dr. Patricia Yang held the position of Senior Vice President for
Correctional Health Services.  See Yang, Ex. M at 10:3-6.

**RESPONSE:**  Disputed.  The referenced testimony does not support the claim that Defendant

Yang held her position for the relevant time period.  The parties disagree about the relevant

time period.  Plaintiff asserts that the relevant time period spans from 2013/2014 until her

forced constructive discharge/forced retirement in January 2020.  While Defendants have

contended that the relevant time period commenced upon Defendant Yang's tenure as Senior

Vice President of CHS, which could either be from 2015 to present; or from 2018 to present.

Plaintiff has asserted that that her pay parity claims extend back to 2013/2014. Dr. Kaye

testified during her deposition that she accidentally received an email during this time, that

showed that she worked in a lesser title and was paid $40,000 less than her comparator Dr.

Steve Ciric.  She testified that she went to her union and Defendant Ford at that time to

complain.   **Exhibit 9: Kaye Dep.  11/15/21 p. 44:8-25-50:1-6**

Dr. Kaye again complained about pay parity issues to Defendant Yang on May 3, 2018.

- **Exhibit 5:  Email forwarded by Yang to S. Gillen and J. LaBoy dated May 3, 2018 with the Subject:  Pay Equity for Court Clinic Medical Directors (NYC00208-NYC00211)**

Plaintiff also claims that her complaints about Defendant Yang/City Hall's interference with

the administration of the Court Clinics began in December 2015.  Consistent with Dr. Kaye's

testimony, was Defendant Yang's testimony that she became Senior Vice President of CHS on

June 29, 2015.  Dr. Kaye testified that Defendants engaged in a retaliatory campaign to make

her work environment so hostile that she would be forced to quit.  She testified that this

campaign commenced within days of her complaining to Defendant Yang and the EEOC in

January 2018 and May 2018 respectively.

As a result of her protected activities, Dr. Kaye: lost her staff person; was demoted in

corporate and office titles; was demoted in salary; was excluded from meetings; was ridiculed

and disrespected by staff; experienced a retaliatory shift change; her work product was

intentionally incorrectly inputted into Defendants' databases (i.e. Andrea Swenson and staff

failed to accurately input the number of cases that Dr. Kaye saw into Defendants' ISight

database); and she was prevented from working for over two months until she was forced to

retire/constructively discharged.

- **Exhibit 9: Kaye Dep. 11/15/21 p. 77:11-6; 112:14-25-113; 120-121; and 153-155:1-4;**

- **Exhibit 10: Yang Dep. p. 37;**

- **Exhibit 23 : Kaye Dep. Cross Exam 1/25/22:  p. 43:20-25; andp.46:5-14;**

- **Exhibit 28: Email from Bloom dated December 16, 2015 with the Subject: Call from Melissa Kaye Kaye6thProd003-Kaye6thProd004; and**

- **Exhibit 29:  Email from Kaye to J. Bloom dated December 17, 2015 with the Subject Line: MF (Kaye6thProd0009-Kaye0013)**

28. In 2015, Dr. Ford became the Chief of Psychiatry for Correctional Health Services.  See Ford, Ex. D at 39:7-17; Yang, Ex. M at 49:25-50:6.  In this role, Dr. Ford assisted in the transition of the court clinics into the CHS, and supervised the Director of Forensic Psychiatric Evaluation Court Clinics or "FPECC."  Dr. Ford remained in this role until December 2019.  See Ford, Ex. D at (sic)59:25-160:4.

   **RESPONSE:** Disputed.  Defendant Ford was Dr. Kaye's supervisor from May 2009 to

September 2014, and then again from July 2018 until she was constructively discharged in

January 2020.  Defendant Ford's resignation was announced to staff on December 2, 2019.

According to the email, Defendant Ford's resignation was effective as of February 14, 2020.

- **Exhibit 23: Kaye Dep. Cross Exam.  1/25/22 p.17:11-25-18:10-16; and**

- **Exhibit 34: Email from CHS Communications/Ross MacDonald, M.D. dated December 2, 2019 (NYC004255-NYC004256)**

29. During all relevant times, Dr. Ross MacDonald held the position of Senior Assistant Vice president and Chief Medical Officer for Correctional Health Services.  See Yang, Ex. M at 47:16-19; Deposition of Ross MacDonald, dated November 12, 2021, annexed as Ex. "O" at 13:25-14-9.

   **RESPONSE:** Deny.  Dr. Ross MacDonald has worked at CHS since 2011. He was initially hired in

the role of Deputy Medical Director for the Bureau of Correctional Health Services, which at

that time was a part of the New York Department of Mental Health and Hygiene.  He became

Medical Director for the Bureau of Correctional Health Services in 2012.  He continued in this

capacity until August 2015, when CHS moved from the Department of Health and Mental

Hygiene to H + H.

- **Exhibit 35:  MacDonald Dep. p.21-31**

30. During all relevant times, Sara Gillen held the position of Chief Operating Officer for
    Correctional Health Services.  See Yang, Ex. M at 47:25-48:6

   **RESPONSE:**  Admit and add.  Sara Gillen has worked as either Senior Assistant Vice President

and or Chief Operating Officer at H + H and or CHS since 2017.

- **Exhibit 4: Kaye Decl ¶8**

31. From approximately 2015 to June or July 2019, Jonathan Wangel held the position of
    Senior Director of Labor Relations.  See Deposition of Jonathan Wangel, dated September
    30, 2021 annexed as Exhibit "P" at 14:12-14, 16:16-17:4, 18:5-25

**RESPONSE:** Admit and add.  Defendant Wangel testified that he started at H + H in December

2015.  Defendant Wangel testified that he was interviewed by Defendant Yang, who he knew

when they both worked at the DOHMH.  He further testified that Defendant Yang encouraged

him to apply for his position at H + H, and that he may have also interviewed with Dr.

MacDonald.

   The record establishes, that Defendant Wangel acted in concert with the other Defendants to

create a retaliatory hostile work environment for Dr. Kaye at H + H.  Plaintiff testified that on or

around April 30, 2018, that she spoke to Defendant Wangel about the transition of her clinic

from Bellevue to CHS.  During that meeting with Defendant Wangel and his staff, he assured

her that none of the conditions of her employment would change.

Dr. Kaye was concerned about losing benefits, her pension, her title, work station, schedule as well as union protection.  Similar to the CHS fax that advertised the transition on February 2, 2018, Defendant Wangel assured Dr. Kaye that nothing would change.

- **Exhibit 31: Fax from R. Peck entitled Correctional Health Services Management Psychiatric Evaluation 730 Court Clinic dated February 2, 2018; and**

- **Exhibit 174: Email from Kaye to LaBoy and Wangel dated April 30, 2018 with the Subject: Melissa Kaye BHC to CHS Line Change" (NYC000513)**

After Dr. Kaye filed her EEOC Charge, on December 14, 2018, Dr. Kaye had a conversation with her union rep, Nate Santamaria.  During this conversation, Dr. Kaye also recalled that her union rep discussed the retaliatory shift change with Defendant Wangel.  According to the union rep, Defendant Wangel said that Defendant Yang was responsible for the retaliatory shift change and her title change, and that they were miffed/miff (sic) that she had filed a charge of discrimination with the EEOC.  Defendant Wangel denied ever using the word miff (sic incorrectly transcribed).

- **Exhibit 4: Kaye Decl. ¶¶76 and 154;**

- **Exhibit 9: Kaye Dep. 11/15/21 Dep. p.304-305; [4] and**

- **Exhibit 36: Wangel Dep. p. 217:18-25-218:1-7[5]**

32. During all relevant times, Jessica Laboy held the position of Chief Administrative Officer. See Yang, Ex. M at 36:3-13.

   **RESPONSE:** Admit and add.  Jessica Laboy has worked for Health and Hospitals since 2016.

- **Exhibit 4:  Kaye Decl. ¶ 9**

---

[4] Plaintiff recorded her deposition and the word "miffed" was omitted from the transcript on p. 305 at line 3 where "—" was indicated.
[5] The referenced testimony was taken down incorrectly.  The word "miffed" and not "miff" was said by both Plaintiff's Counsel and Defendant Wangel.

33. On January 18, 2018, Dr. Ford sent an email to Dr. Colley, requesting he "suggest one evaluator from the Bronx clinic and 1-2 psychiatrists from the Manhattan clinic who would be willing/able to participate in the workgroup to think about a standardized clinical approach to the exams."  Specifically, the workgroup sought to "create preliminary requests, and psychological testing."  See Email from Elizabeth Ford to Jeremy Colley, dated January 18, 2021, Email, dated March 27, 2018, from CHS Communications, both annexed as Exhibit "Q."

   **RESPONSE:** Deny and object.  Dr. Kaye testified that she did not recall receipt of this email correspondence as it pertained to the workgroup she asked Defendant Ford to join.   She also testified that the referenced email came from Dr. Colley and not Defendant Ford.  Dr. Kaye testified, that on January 29, 2018, before the meeting, she approached Defendant Ford about working with her workgroup.  She said that Defendant Ford did not give her a response.  She then elaborated that Defendant Ford averted eye contact and looked at the floor.   Consistent with this position, was her email dated February 12, 2018 where she later complained that Dr. Winkler, her staff person (who was her subordinate at the time), was invited by Defendant Ford to a meeting . Dr. Kaye felt that this was yet another instance where she had been subjected to gender discrimination and retaliation for her protected activities at the January 29, 2018 meeting.

   - **Exhibit 4:  Kaye Decl. ¶ 125, 136-140;**

   - **Exhibit 9: Kaye Dep. 11/15/21 p. 100:25-112:1-11; and**

   - **Exhibit 37: Email from Kaye dated February 12, 2018 with the Subject: 730 Schedule Disruption per CHS (NYC0105)**

34. That same day, Dr. Colley forwarded Dr. Ford's January 18, 2018 email to the clinic evaluators, stating"[s]ee below-let me know if you are interested."  On January 22, 2018, plaintiff responded by saying, "[l]et me know dates, and I'll try to work it in."  See Email thread, dated January 18, 2021 and January 22, 2018, at Exhibit "R."

   **RESPONSE:** Deny.  Dr. Kaye testified that she did not remember ever seeing the

referenced email.  Dr. Kaye began to be excluded from internal meetings, after she raised

concerns to Defendant Yang about their use of HIPAA releases, redacted records and their

private practice activities at the January 29, 2018 meeting.

- **Exhibit  4: Kaye Decl. ¶ 136;**

- **Exhibit 9: Kaye Dep. 11/15/21 p. 100:25-112:1-11; and**

- **Exhibit 23: Kaye Cross Exam  1/25/22 p.36:18-25-40**

35. On or about February 12, 2018, Plaintiff learned that Dr. Barry Winkler was chosen to participate in the workgroup named "Citywide 730 workgroup."  See Email from plaintiff to Jeffery (sic) Bloom, dated February 12, 2018, annexed as Exhibit "S;"  Winkler, Ex. H at 41:7-17, 55:19-56:1

**RESPONSE:**  Admit with qualifications.  Dr. Winkler testified that Dr. Kaye **should** have been

invited to the group meeting instead of him.  He also testified that Defendant Ford made the

decision to invite him instead of Dr. Kaye **not** Dr. Colley.  Dr. Winkler further testified that he

was not sure which group meeting it pertained to, but that at some point the decision was

made to reduce the number from two to one person to represent them at the meetings from

the Bronx Court Clinic.

- **Exhibit 24:  Winkler Dep. p. 54:22-25-56:1; and**

- **Exhibit 37: Email from Kaye dated February 12, 2018 with the Subject: 730 Schedule Disruption per CHS (NYC000105)**

36. Plaintiff referred to Dr. Winkler's participation in the "Citywide 730 workgroup," as a "730 schedule disruption per CHS" to Legal Aid attorney, Jeffery (sic) Bloom, and lamented that "[a]lthough I am a very senior, highly qualified examiner, I was not asked to participate in this process to 'standardize and streamline' 730s," and complained that she "was not consulted about the date of the meeting so [she] did not have the opportunity to provide input on which day would be least disruptive for [Dr. Winkler] to be pulled." Id.

**RESPONSE:** Dispute.  Although Dr. Kaye, was upset about not being a part of Defendant Ford's

internal workgroup, the referenced email pertains to a "Citywide Workgroup."

Plaintiff noted that Defendant Ford had specifically pulled Dr. Winkler away from conducting a 730 Examination on February 27th.   The consequence of doing so was that a defendant's detention was prolonged because their 730 examination had to be re-scheduled for when two evaluators were at the clinic.  Again Dr. Kaye has denied, that this email pertained to the Workgroup she asked Dr. Ford about on January 29, 2018.

Further, the phrasing of the statement of fact is argumentative and seeks to insinuate that Dr. Kaye did not place importance on the meetings.  In fact, her complaint articulates a contradictory position.  The email clearly shows that she was upset that Dr. Winkler, her subordinate was invited and that she was excluded.  Dr. Winkler corroborated Dr. Kaye's account at his deposition; he testified that as the more senior staff person, that she should have been invited instead of him.

- **Exhibit 24:  Winkler Dep. p. 54:22-25-56:1; and**

- **Exhibit 37: Email from Kaye dated February 12, 2018 with the Subject: 730 Schedule Disruption per CHS (NYC00105)**

### B. Medical Records

37. In or around February 2018, Patrick Alberts, legal counsel for CHS, Dr. Yang and Dr. Ford learned from the Mayor's Office for Criminal Justice ("MOCJ") that plaintiff had refused to perform a court-ordered 730 examination until she received unredacted medical records. As a result, the judge overseeing the matter was threatening to hold Bellevue Hospital and the Bronx Clinic in contempt.  Dr. Ford commented to the group that the "[s]tandard practice in forensic evals is to use whatever records you have to form an opinion and note any limitations in the formulation, " and that "[p]laintiff] has been a problem for a long time and we need to manage her out."  Dr. Yang noted "[s]adly dragging in OCJ to learn that word had it that the judge might hold the city in contempt and it turns out it is [plaintiff's] own cyclone that has sucked us in detritus."  See Email, "Fwd: Judge Torres wants to hold us in contempt?"  dated February 1, 2018, annexed as Exhibit "T;"  Ford, 63:21-64:19

**RESPONSE:** Disputed.  The statement of fact is incomplete, misleading and a does not

accurately depict what transpired.    This paragraph presents several triable issues of fact that pertain to Defendants' intent and credibility. Contrary to the quoted language in the referenced email, Dr. Kaye testified that Judge Torres never threatened to hold Defendants in contempt. Consistent with this position, is the absence of any admissible evidence to the contrary from Defendants.  Defendants have failed to produce any emails or any other written document that shows that Judge Torres directly spoke to or contacted any of H +H or CHS staff in or around the February 1, 2018.

Additionally, Dr. Kaye testified that the emails in question were rooted in rumor and innuendo.  She stated that there was an ongoing issue with the production of unredacted records.  Dr. Kaye noted that CHS had received multiple orders for unredacted records, from multiple senior judges:  mainly Judge Moore, Judge Villegas, Judge Lieb and Judge Villegas.   **Exhibit 9: Kaye Dep. 11/15/21 p.44:20-25-46:1-6**

Dr. Kaye further testified that she could not render an opinion of fitness to a degree of medical certainty with redacted medical records.  In an email, Dr. Kaye characterized CHS's insistence on using redacted medical records as "CHS's misguided political push to cut corners and do sloppy work to rush exams."  **Exhibit 38:  Email from Kaye dated June 14, 2017 with the Subject: Information Sharing CHS (Kaye 6th Prod0216-Kaye6thProd0218)** During her deposition, Dr. Kaye further explained that conducting examinations with redacted medical records would violate Defendants' right to due process under the law. **Exhibit 9: Kaye Dep. 11/15/21 at p. 95:13-25-99:1-25**

Dr. Kaye testified that her position was supported by Drs. Colley, Winkler and Ciric. However, unlike Dr. Kaye, Drs. Colley, Winkler and Ciric were men and they were not

scapegoated and labeled as cyclones by Defendants.  Instead they were taken seriously and were respected for their opinions.  **Exhibit 9: Kaye Dep. 11/15/21 p. 44:20-25-46:1-6; p.278:11-25-280:1-17; p.333-336:1-13**

On September 20, 2017, Plaintiff was supported by Judge Moore for standing her ground to the ire of Defendants.  Judge Moore contacted H + H staff person Deidre Newton directly after CHS had resisted production of unredacted medical records for a sustained period of time.  He got Ms. Newton to produce 1,100 pages of unredacted medical records, so that Dr. Kaye could make a reasonable determination of Defendants' mental fitness.

**Exhibit 39:  Email from McEvilley (of Legal Aid) dated September 20, 2017 with the Subject: William Rivera (Kaye6thProd306- Kaye6thProd308)**

CHS continued to refuse to produce unredacted medical records going into February 2018.  On February 15, 2018, Dr. Kaye sent an email to Ms. Laird who worked for Judge Torres, in which she requested unredacted records for Peter Hall.  At the time Mr. Hall's evaluation had been delayed by over six months, because Defendants failed to comply with the Court's order.  The subject order was rendered by Judge Villegas on December 28, 2017.

**Exhibit 40:  Order from the Honorable Judge Villegas dated December 28, 2017 (Kaye6thProd0398)** Contrary to Defendants' testimony Judge Villegas sought compliance in this separate instance, after Judge Moore had previously intervened on another unrelated case.  **Exhibit 41:  Email from Kaye dated February 15, 2018 with the Subject: Peter Hall Records (for six months)  (Kaye6thProd0396-0397)**

During the course of her deposition, Defendant Ford was questioned about the email that stated: Dr. Kaye had been a problem for a long time and that she needed to be

managed out.  Defendant Ford conceded, that in February 2018, she was not yet formally Dr. Kaye's direct supervisor. **Exhibit 14:  Ford Dep. p. 71-72**

Defendant Ford's intent behind the statement "managed out," presents a  triable issues of fact that involves her intent or animus.  A reasonable juror could determine that Defendant Ford sought to push Dr. Kaye out after the January 29, 2018 meeting, and or after her advocacy against the use of redacted medical records between 2017 and 2018. Defendant Ford however, testified that she did not mean termination when she made the comment, and that she envisioned progressive discipline. **Exhibit 14: Ford Dep. p.236-237**

However, when taken in context of  the words in Ford's by book about her childcare issues, and her knowledge about Plaintiff's child care issues, a reasonable juror could determine that Defendant Ford possessed discriminatory and retaliatory animus.  During the course of her deposition, Defendant Ford admitted that she had to resign on more than one occasion because she had childcare and family issues.

As was discussed in her book, Defendant Ford also confirmed that getting her children to school and commuting to work, presented any number of challenges.  A reasonable juror could thereby determine, that Plaintiff's shift change within weeks of her EEOC Charge was part of Defendant Ford's plan to "manage Dr. Kaye out."  Especially since on more than one occasion, Defendant Ford herself could not meet the challenges sometimes associated with motherhood and her professional career.

Dr. Kaye testified that Defendant Ford knew about her children's health problems since 2012, at least 6 years before the shift change. **Exhibit 4: Kaye Decl. ¶61** Dr. Kaye then testified about the meeting she had with Defendant Ford to discuss the effect the shift

change had on she and her children.  She said that when she confronted Defendant Ford,

that Defendant Ford ran out of the room and said that she needed to speak to Defendant

Wangel.  **Exhibit 9: Kaye Dep. 11/15/21 p. 51:25-53:1**

 Based on this record testimony and evidence, a reasonable juror could determine that

Defendants imposed an arbitrary shift change without any legitimate purpose, with the goal of

pushing Dr. Kaye out.  The record also shows that Defendants did not change the shifts of any

of the other Clinic Directors, and that they also did not insist that they work specified hours.

- **Exhibit 14: Ford Dep. p. 155-165;**

- **Exhibit 42:  Email from Kaye dated November 30, 2018 with the Subject: 30 Min MD Lunch (NYC00928-NYC00929); and**

- **Exhibit 43: Excerpts from Dr. Ford's Book, "Sometimes Amazing Things Happen" pgs. 49, 100, 104 and 134-135**

As it pertains to Plaintiff being a problem for a long time, well Defendant Ford's

evaluation of Dr. Kaye would suggest otherwise.  The record clearly established that

Defendant Ford supervised Plaintiff from 2009 to 2014.  During that time, Defendant Ford

admitted to completing two assessments of Dr. Kaye's performance: one in December

2009/January 2010; and another for the period of July 2012 through December 2012 (the

document was completed in January 2013).  During that time she could not recall any

problems with Dr. Kaye's performance. **Exhibit 14: Ford Dep. p. 92**   In both instances

Defendant Ford made complimentary comments about Dr. Kaye's performance. **Exhibit 44:**

**Kaye's 2009 and July 2012-December 2012 Performance Evaluations (Produced at**

**Defendant Ford's Deposition as taken on September 27, 2021)**

In direct contradiction to her statement that Dr. Kaye had been a problem for a long

time, in 2009, Defendant Ford wrote that Dr. Kaye was "easy to work with, highly skilled and dedicated to her service."  For the period of July 2012 to December 2012 (completed and signed by Defendant Ford in January 2013).  Defendant Ford also wrote: "Dr. Kaye continues with her excellent leadership in quality of forensic evaluations at the Bronx Court Clinic."

- **Exhibit 14: Ford Dep. p. 94; and**

- **Exhibit 44: Kaye's Performance Evaluations for 2009 and July 2012-2013 (produced on September 27, 2021 at Ford's Deposition)**

This paragraph presents triable issues of fact that must be resolved by a jury of Plaintiff's peers.  Defendant Ford conceded that her supervision of Dr. Kaye ended in 2014, when she took a leave of absence, and that she resumed being Dr. Kaye's supervisor sometime after the February 2018.  Based on the email and Dr. Kaye's glowing performance evaluation, the inevitable question presented to Defendant Ford was: at what time between 2014 and 2018 did Dr. Kaye become a problem?  Defendant Ford could not provide a definitive response to this query at her deposition.  **Exhibit 14: Ford Dep. p. 97-100**

Defendant Ford testified that she made the "manage out" comment out of frustration, because of Dr. Kaye's refusal to conduct forensic exams with redacted medical records. **Exhibit 14: Ford Dep. p. 60-62**  However, a reasonable juror could also determine that Defendant Ford also meant that she planned on pushing Dr. Kaye out of employment after she complained about HIPAA releases and defendants' policies at the January 29, 2019 meeting.

Lastly, there is also a triable issue of fact as to whether examinations could be

performed with redacted records.  Defendant Ford specifically testified at her deposition

that she had not read any literature to support that position; and that she had not read any

statute to the effect that prohibited the production of substance abuse information.

Therefore, the stance she took in the referenced email and by Defendants as it pertained to

redacted v. unredacted medical records presents yet another triable issue of fact.  **Exhibit**

**14: Ford Dep. p. 65-66**

38. CHS legal counsel had determined that 730 orders do not entitle the release of substance
abuse information, unless that information was specifically requested in the order or by
subpoena.  Id.; see also Winkler, Ex. H at 110:3-15, 194:22-195:3; Letter, dated February
20, 2018 to Honorable Judith Lieb, Bronx County Supreme Court, Criminal Division, from
Salvatore Russo, Senior Vice President and General Counsel, Legal Affairs, annexed as
Exhibit "U."

**RESPONSE:** Deny.  The statement of fact seeks to establish a legal conclusion and is

misleading.  Mr. Russo wrote that H+ H retained and collaborated with counsel, and that

based on their joint findings, that they had consternation about the production of

unredacted medical records.  The letter from Mr. Russo does not state anything about the

"release of substance abuse information."  **Exhibit 45: Letter from S. Russo to Judge Lieb**

**dated February 20, 2018 (NYC01921)**

The statement of fact also misstates Dr. Winkler's testimony. During his deposition, he

recalled that CHS had circulated a proposed order for the Courts to use as a template for

the production of medical records.  He testified that the form called for the redaction of HIV

and substance abuse information from medical records.  He also testified, that he suggested

that the order not specifically  use the language redacted records.

- **Exhibit 24: Winkler Dep. p. 110:2-24-111:1; and**

- **Exhibit 46: Email from Winkler dated July 11, 2018 with the Subject:  Bronx**

**Records Request Template Affidavit and Order (NYC00360-NYC00363)**

Whether 730 orders require the release of substance abuse/use information is a disputed

fact that goes to the core of Plaintiff's claims. Plaintiff's position is two-fold: one that it

would impair her ability to render a medical determination as to a defendant's competency;

and two that the redaction of the medical records would infringe upon their constitutional

rights.

Plaintiff maintains that redacted records of any sort are completely unacceptable, and

that HIV and substance abuse information play integral parts in psychiatric examinations.

**Exhibit 47:  Email from Kaye dated August 25, 2017 with the Subject: I Think I Should**

**Forward Email to JHC (i.e. Jeremy H. Colley) (Kaye5thProd012)**   Kaye further testified that

HIV status and substance abuse/use could cause cognitive difficulties that could affect a

Defendants' capacity.  Therefore redacting that information would be inappropriate and an

infringement on Defendants' constitutional rights, since she would not  be able to make a

fair assessment of their competency.   **Exhibit 9: Kaye Dep. 11/15/21 p. 333:17-25-334:1-**

**22.**  Plaintiff's position was further supported by Defendant Ford, when she testified that "it

would be nice to know" the Defendant's HIV status and or substance use/abuse history.

**Exhibit 14: Ford Dep. p. 55:13-25-56:1-4**

During the course of his deposition, Jeffrey Bloom testified that Defendants' position was

found to be in error by the Court in the Fortunato matter.  He recalled that Judge Poust

Lopez ordered CHS to produce unredacted records and that they had resisted.  After several

requests from the Court, Judge Poust Lopez threatened to hold CHS in contempt if they

didn't produce the so ordered unredacted records.  Mr. Bloom remembered that CHS

complied with the Judge's order approximately 15 minutes before they were ordered to

appear.  **Exhibit 33: Bloom Dep. p. 147:17-25-148:1-13**

39. CHS legal counsel further determined it would be inappropriate to "approach the patient
for us and obtain an authorization, and it's doubtful [the] attorney will either."  See
Exhibit "T."

**RESPONSE:** Disputed. The statement of fact is misleading.  Dr. Kaye denies that Judge Torres

ever threatened to hold CHS or H + H in contempt, again she testified that there was an

exchange with Judge Moore.  Additionally, the doctor patient relationship does not apply in

the context of forensic psychiatric evaluations.  The inmates are not treated or viewed as

patients in the context of forensic psychiatric evaluations.  The distinction between

treatment and assessment is otherwise known as dual agency. Adherence to this separation

is integral to the preservation of the legitimacy of the forensic evaluation process.

   Lastly, Dr. Kaye never insisted that CHS or anyone else obtain a waiver or consent from

any of the defendants, in fact she argued against HIPAA releases. Dr. Kaye specifically

maintained that obtaining HIPAA waivers/releases from Defendants would violate their

constitutional rights. She then explained that sometimes medical records contain

incriminating information, and due to the possible mental health status of some of the

defendants, a knowing and intelligent waiver may not be possible.  Dr. Kaye raised these

very points  with Defendant Yang at the January 29, 2018 meeting. In response, Defendant

Yang threatened to fire her in front of a room full of people: *"if you don't like the way we do*

*things around here, there's the door!"*  **Exhibit 9: Kaye 11/15/21 Dep. p. 95-101**

40. Plaintiff, along with Drs. Winkler, Ciric, and Colley, all complained about using redacted
medical records when performing 730 examinations.  See Kaye, Ex. B at 100:2-19, Winkler,
Ex. H at 24:9-25:22, 109:17-23, 110:16-111:1; 222:3-10.

**RESPONSE:** Admit with qualifications. Defendants must also admit that Drs. Winkler, Ciric and Colley were all males and that none of them experienced any retaliation or reprisal for raising the same issues as Dr. Kaye, a female.   Dr. Kaye testified that unlike Dr. Winkler and the other listed male colleagues, that she was the only one who experienced retaliation from Defendants.  **Exhibit 9: Kaye 11/15/21 Dep. p. 95-101**

41. Dr. Winkler was not treated any differently after complaining about having to use redacted medical records when performing 730 examinations.  See Winkler, Ex. H at 309:10-13

**RESPONSE:**  Deny.  Dr. Kaye testified that Dr. Winkler not only was accorded deference, but that he was promoted from Deputy Director to Director of the Brooklyn Court Clinic after he raised the same issues between December 2017 and January 2018.  **Exhibit 9: Kaye 11/15/21 Dep. p. 95-101**

42. On March 12, 2018, Plaintiff expressed her concerns regarding the use of redacted medical records to Dr. Colley, claiming that "relying on redacted medical records falls below the standard of practice for forensic (and clinical) psychiatry, "because" we need to use unredacted records in order to render an opinion within a reasonable degree of medical certainty, and to avoid controversions and maintain our professional credibility." Plaintiff was also concerned about facing a lawsuit, writing, "I also have concerns about the increased medicolegal liability of using redacted records. I am aware of MD's (sic) successfully being sued for making a diagnosis of malingering, as well as for incomplete review of medical records."  See Email, dated March 12, 2018, from plaintiff to Dr. Jeremy Colley, annexed as Exhibit "V."

**RESPONSE:**  Admits with qualification.  Dr. Kaye had multiple issues with the use of redacted medical records.  The stated fact conflates the practice and the professional obligations of forensic psychiatrists.  The practice area itself requires that the practitioner adhere to medicolegal standards in their determination of competence or fitness.

However a forensic psychiatrist's professional obligations and duties are distinct. Although as a licensed physician, Dr. Kaye must still factor in her obligations as a doctor: she

does not have an obligation to engage in advocacy on their behalf; and she also does not

owe a duty of care to inmates she evaluates as a professional.  As a forensic psychiatrist

ordered by the Court, Dr. Kaye must be neutral.  Therefore, she does not have any

obligation to advocate for the protection of defendants' constitutional rights, such as when

she raised the issue with Defendant Yang at the January 29, 2018 meeting.  She also does

not have an obligation to promote or consider the objectives of the prosecution.  In the

context of Court Ordered 730 Examinations, pursuant to the CPL, Dr. Kaye must reach an

unbiased determination of competence.  **Exhibit 48: New York State Criminal Procedure**

**Law (CPL) § 730**

    Therefore, when Dr. Kaye reached out to judges and the legal community, she was clearly

acting outside of the scope of her employment.  Consistent with that perspective, was the

decision of Defendants Wangel and Yang, to monitor Dr. Kaye's email box for external

messages to Legal Aid and other outside people/organizations.

- **Exhibit 9: Kaye 11/15/21 Dep. p. 95-101**

- **Exhibit 49: Email from Wangel dated January 11, 2019 with the Subject: Email**
  **Access to Active Employee (NYC002192-NYC002194); and**

- **Exhibit 50: Email from Joseph Moore dated January 11, 2019 with the Subject:**
  **Email Access to Active Employee (NYC002193-NYC002195 )**

43. On March 13, 2018, Plaintiff again expressed her concerns to Dr. Colley regarding the use
    of redacted medical records and the risk of a medical malpractice allegation, stating, "I am
    not willing to make myself vulnerable to a medical malpractice allegation simply because
    H & H legal department is pushing us to practice medicine below the standards set forth
    by our profession,"  and that "[a] successful civil medical malpractice lawsuit for failure to
    review the complete record or an unsubstantiated diagnosis of malingering is a slam
    dunk."  See Email, dated March 13, 2018 from plaintiff to Dr. Jeremy Colley, annexed as
    Exhibit "W."

    **RESPONSE:** Disputed. The statement of fact is incomplete and misleading.  Dr. Kaye did

email Dr. Colley about malpractice issues. However, she also complained about the

Constitutional violations associated with the use of redacted medical records at the January

29, 2018 meeting with Defendants.  It was this complaint that prompted Defendant Yang to

make the statement: "if you don't like the way we do things around here, there's the door."

Therefore,  reference to the email is misleading in that it suggests that it was Dr. Kaye's only

reason for objecting to the use of redacted medical records.  **Exhibit 9: Kaye Dep. 11/15/21**

**Dep. p. 95-101**

44. On March 23, 2018, Deidre Newton, Senior Counsel at H + H, emailed plaintiff to remind
her that she should not copy third parties on email correspondence with H + H's legal
counsel, as "communications with the system's attorneys are privileged."  See Email,
dated March 23, 2018 from Deirdre Newton to Plaintiff, annexed as Exhibit "X."  In
response, plaintiff forwarded the email from Ms. Newton to two third parties, Judge
Torres and a representative from the Bronx District Attorney's Office.   Id. see also Email
dated March 23, 2018, annexed as Exhibit "Y."

**RESPONSE:** Admit with qualifications.  At the time, Ms. Newton's email did not contain any

attorney client information, it was an admonition about breaching the privilege itself.

Secondly, neither H + H nor CHS had any policies in place about third party external

communications at that time.  Subsequent to this email, Kaye was never approached by

Newton or anyone from CHS/H+ H management about her emails to other external third

parties**. Exhibit  4: Kaye Decl. ¶ 169-171**

**II.      Terms and Conditions of Transition**

45. In or about December 2017, plaintiff learned from Dr. Colley that CHS was working to
"consolidate the court clinics across the city under their control, removing them from
Bellevue and Kings County."  See Email correspondence dated December 8, 2017,
between Jeremy Colley and plaintiff, annexed as Exhibit "Z."  Plaintiff expressed concern
as to whether her pay line would be converted to CHS lines, since she was approaching
her 20-year longevity pay increase with Bellevue, and had a retroactive pay increase
coming in the next year, and wanted to know "how aggressively to look for another job."
Id.

**RESPONSE: Admit.**

46. On January 5, 2018, Dr. Ford reached out to plaintiff and invited her to have a discussion about the upcoming court clinic transition to CHS.  That same day, plaintiff spoke to Dr. Ford about her concerns regarding the transition to CHS, specifically, her concerns regarding compensation, remaining in Doctors Council, and her retention bonus.  See email correspondence between Elizabeth Ford and plaintiff, dated January 5, 2018; email correspondence between Elizabeth Ford and Patricia Yang, dated January 5 , 2018, both annexed as Exhibit "AA;"  see also Ford, Ex. D at 116:13-117:8

**RESPONSE:** Admit with qualifications.  The referenced exhibit and testimony do not support the stated fact.  Exhibit AA does not contain two emails, it only contains one email from Defendant Ford to Defendant Yang.  The content of the email does not state what she discussed with Dr. Kaye on that day, and the referenced deposition testimony does not support the position that either of the topics listed were discussed on January 5, 2018. However, Dr. Kaye admits that she did raise the pay parity issue with Defendant Ford both times she was under her supervision. At her deposition, Defendant Ford admitted that she was on notice about Plaintiff's pay parity claims, and she claimed to have advocated on Dr.Kaye's behalf.

Defendant Ford made these representations, despite the fact that she did not fully understand the disparities between Drs. Kaye and Ciric:  she did not to know the differences in the corporate titles, Physician Specialist and Attending Physician; and  she also claimed not to know the outcome of her alleged efforts to obtain pay parity while Dr. Ciric was employed at H + H.  **Exhibit 14: Ford Dep. p. 116-120**   Dr. Kaye also admits that she had an email exchange with Defendant Ford once the latter returned from her leave of absence. At that time, they had agreed to talk about the transition.  **Exhibit 51:  Email from Kaye dated January 5, 2018 with the Subject:  Hi Melissa! (NYC003244)**

47. On January 29, 2018, Dr. Yang agreed to delay the transfer of the Bellevue clinics to CHS

until July 2018, to accommodate plaintiff, who would then be eligible to receive a $20,000 retention bonus pursuant to the Doctors Council collective bargaining agreement. Exhibit AA; Yang, Exhibit M at 80:8-20, 106:15-107:14, 153:5-8, 169:18-170:4; 226:5-25, 228:3-8; see also Email correspondence between Patricia Yang and William Hicks, dated January 29, 2018 and January 31, 2018, annexed as Exhibit "BB;" Email dated March 27, 2018, from CHS Communications, annexed as Exhibit "CC."

**RESPONSE:**   Deny. Exhibit AA does not support the stated fact.   Exhibit AA consists of an

email from Defendant Ford to Defendant Yang.   It is devoid of any discussion about Dr.

Kaye's retention bonus or any associated delay of transferring the clinics to CHS.

Although Defendant Yang testified that she sought to delay the transfer of the clinic to

accommodate Dr. Kaye, she also had hoped that Dr. Kaye would "bail."  **Exhibit 52: Email**

**from Yang dated February 1, 2018 with the Subject: Judge Torres wants to hold us in**

**Contempt (NYC00074)**  This stated fact presents an issue of intent that must be resolved at

trial.  A reasonable juror could determine that emails within two days of the January 29,

2018 "There's the door" Meeting,  where Defendant Yang was clearly looking for Dr. Kaye to

work elsewhere, could mean that Defendant Yang really intended to get rid of Dr. Kaye after

her protected activity.   **Exhibit 4: Kaye Decl. ¶¶ 125 and 173-174**

Further, Plaintiff contends that her union, not Defendant Yang was responsible for the

timing of the transition.  In a 2017/2018 MOA with Doctors Council, it was determined that

the Manhattan and Bronx Court Clinics would be absorbed by CHS so that eligible members

could obtain their retention bonuses and longevity pay.

- **Exhibit 53:  Email from Santamaria dated October 2, 2018 with the Subject: Retention Bonus for Fiscal Year of July 1, 2017 to June 2018 (NYC00640); and**

- **Exhibit 54:  Doctors Council MOA July 2017 (NYC00641-NYC000648)**

48. The Kings County clinics transitioned to CHS in April 2018.  Exhibit "CC."

**RESPONSE:** Admit with qualification.  The Exhibit does not support the stated fact.  Exhibit CC is an email thread between Drs. Kaye and Ford.  The two discuss scheduling a time to discuss the transition of the Court Clinics.  The exhibit does not assert or prove that the Kings County Clinic actually transitioned over to CHS at that time. However, an email from Defendant Ford on or around March 27, 2018, announced the transition to FPECC staff.

- **Exhibit 55:  Email from Ford dated March 27, 2018 with the Subject:  Welcome! (and CVs to review) (NYC001958-NYC001959)**

49. On February 23, 2018, plaintiff sent an email to Dr. Badaracco, "following up regarding my interest in a job at Bellevue on an HHC line," prior to "the CHS takeover of the Bronx Court Clinic."  See Email, dated February 23, 2018, from plaintiff to Marianne (sic) Badaracco, annexed as Exhibit "DD."

**RESPONSE: Admit.**

50. Plaintiff was informed by Dr. Badaracco and Dr. Colley when discussing the possibility of her staying at Bellevue in a Doctors Council HHC line, that HHC "lines had been phased out over the last 20 years and converted to private lines, like NYU lines at Bellevue instead of city lines."  Plaintiff did not want a NYU line, even if offered to her. See Kaye, Ex. B at 184:16-185:9, 185:16-187:2

**RESPONSE:**  Deny.  Dr. Kaye testified that she was waiting for the availability of a line that could be converted to a city line.  Therefore, NYU lines were not the only option if she sought employment with Drs. Badaracco and Colley.  The positions with Dr. Badaracco ultimately did not materialize for a number of reasons.  On one occasion Dr. Badaracco warned Dr. Kaye that the position she had would expose Dr. Kaye to physical danger at Rikers.  **Exhibit 9: Kaye Dep. 11/15/21 p. 184:16-25-188:11-20**  On another occasion, the position Dr. Badaracco had available didn't materialize, because she was unable to offer any specifics; Dr. Badaracco didn't specify the corporate title or salary of the available positions.

**Exhibit 56:  Email from Kaye dated June 1, 2018 Job on 19 (NYC003248)**

51. Both before and after the transition, plaintiff made multiple attempts to stay at Bellevue or find other employment.  Id. See also Ex. DD; Email thread, "Re: Psychiatry jobs Bellevue," dated May 25, 2018, "seeking employment at Bellevue on HHC line," dated May 30, 2018; Email, Job on 19," dated June 1, 2018; Email thread, entitled "19 job questions,"  dated June 5, 2018; Email thread, "Re: Updates for Dr. Kaye (Manhattan), dated September 11, 2018; Email thread, "RE: Retention Bonus," dated October 6, 2018: Email thread, "RE: "looking for HHC line," dated October 23-24, 2018, "Employment Sought," dated December 11, 2018, all annexed as Exhibit EE."

**RESPONSE:**  Admit with qualification.  Dr. Kaye wanted to stay in the union for the following reasons: job security and the dental benefits for her children.  She also did not want to lose her retention bonus or longevity pay.  Dr. Kaye spent 20 years specializing in forensic psychiatry, it was her passion and she did not want to leave the field to practice in another area.

  Due to the concerns she had about CHS beforehand, and then the hostility Dr. Kaye began to experience outright in 2018, Plaintiff began to explore other job options. Dr. Badaracco never offered Dr. Kaye a specific position.  When Dr. Kaye followed up directly with Dr. Badaracco and or HR, she still wasn't able to obtain any information about the corporate title of the positions, the salaries or whether or not she would remain a unionized employee.

  Dr. Kaye did not want to leave her unionized title, especially when the Physician Specialist title had the salary she sought with the protection.  Defendants have yet to provide any valid explanation as to why they were either unwilling or unable to promote Dr. Kaye into the Physician Specialist corporate title.  **Exhibit 4: Kaye Decl ¶ 42-44.**

52. After learning that plaintiff wished to return to Bellevue, Dr. Yang attempted to secure a position for plaintiff there, but was told "they didn't want her back," and no position was available for her at Bellevue.  See Yang Ex. M at 88:3-89:12; 89:20-90:4.  Email "MK," dated January 22, 2019, annexed as Exhibit "FF."

**RESPONSE:** Disputed.  Dr. Badaracco and Plaintiff discussed several positions.  At no time did Dr. Badaracco  or Dr. Colley, tell Dr. Kaye that they did not want to work with her. Additionally, Defendants have not proffered any admissible evidence to support the position that Bellevue "didn't want her back."  **Exhibit 9: Kaye Dep. 11/15/21 p. 184:16-25-188:11-20**

53. In or about early 2018, Doctors Council, plaintiff's collective bargaining union, met with CHS leadership concerning the terms and conditions of the transition.  It was agreed that all employees who were part of Doctors Council would roll over to CHS in their same union positions, with the same terms and conditions of employment as outlined in the collective bargaining agreement.  See Kaye, Ex. B at 92:14-93:13

   **RESPONSE: Admit.**

54. In or about March 2018, Dr. Abhishek Jain was hired as the Director of Forensic Psychiatry Evaluation Court Clinics, to oversee the four court clinics that merged under CHS Dr. Jain reported directly to Dr. Ford.  See Ford, Ex D at 40:24-41:13, 84:6-14, 89:16—17, Jain, Ex. C at 30:5-11; see also Email, dated March 27, 2018, from Dr. Elizabeth Ford to Dr. Elizabeth Owen, plaintiff, Dr. Daniel Mundy, Dr. Barry Winkler, and Dr. Abhishek Jain, annexed as Exhibit "GG."

   **RESPONSE:** Admit with qualifications.  Dr. Jain testified that he started at CHS in April 2018.

   **Exhibit 15: Jain Dep. p. 30:3-11**

55. Dr. Mundy accepted the position of the Director of the Manhattan Court Clinic, and Dr. Winkler accepted the position of Director of the Brooklyn Court Clinic.  Drs. Kaye and Owen accepted the positions of Directors of the Bronx and Queens Court Clinics, respectively.  See Exhibit "GG."

   **RESPONSE:**  Deny. The statement of fact is misleading and inaccurate.  The Action Request is contradicted by another Action Request Form that was produced by Defendants.  In the Action Request Form dated April 16, 2018,  Dr. Owen was hired at a salary of $118,478. According to the form, she was hired to fill a vacancy at the Queens Court Clinic.  This is distinct from Dr. Kaye who had been Medical Director at the Bronx Court Clinic for at least

14 years at that time.   **Exhibit 57:  Human Resources Action Request Form (D000219-D000220).**

Further the statement of fact ignores the demotion that Dr. Kaye experienced in May 2018.  On May 3, 2018 Dr. Kaye emailed Defendant Yang to complain about pay parity and discrimination.  **Exhibit: 5:  Email forwarded by Yang dated May 3, 2018 with the Subject: Pay Equity for Court Clinic Medical Directors (NYC000208-NYC000211)** On May 11, 2018, Defendant Jain emailed Andrea Swenson regarding Business Cards for the Center Directors. At that time, it appeared that Defendant Jain decided to give the Director title to at least three of the four Center Directors:  Dr. Kaye, Dr. Winkler, Dr. Owen.  **Exhibit 7: Email from Kaye dated May 25, 2018 with the Subject: Business Cards (NYC00228-NYC00233)** However, Andrea Swenson, the Administrator of the Forensic Psychiatric Court Clinics, contradicted Defendant Jain during the course of her deposition, she testified that she was ordered by Defendant Yang to change the Center Directors' titles.  **Exhibit 58: Swenson Dep. p. 53:20-25**

On May 25, 2018, Dr. Kaye, raised the issue that she had been demoted in title.  She stated that the change from "Medical Director" to "Director" was significant.  Dr. Kaye conveyed that as a licensed physician, the Medical Director title was more prestigious, and that it afforded her career prospects commensurate with her professional background and licensure.  Consistent with her sentiments was Defendants' demotion of Dr. Kaye on May 14, 2018  from Attending Physician III to Attending Physician II.

- **Exhibit 7: Email from Kaye dated May 25, 2018 with the Subject: Business Cards (NYC00228-NYC00233);**

- **Exhibit 8: Email from S. Gillen dated May 14, 2018 with the Subject: 730 Retention**

Bonus (NYC00220-NYC00221); and

- **Exhibit 59: Dr. Kaye's EEOC and Supplemental Charge (Kaye000078-Kaye000081)**

Defendants have contended that the title change was not a demotion.  They have also contended that all of the Center Directors' titles were changed to "Director."  However missing on the list of changed titles and business cards was Dr. Mundy, Director of the Manhattan Court Clinic.  Since Defendants did not produce any discovery regarding Dr. Mundy, there are triable issues of fact, as to whether like Dr. Kaye his office title was also changed from Medical Director to Director.  **Exhibit 7: Email from Kaye dated May 25, 2018 with the Subject: Business Cards (NYC00228-NYC00233)**  Additionally, from the May 14, 2018 email, it appeared that Dr. Kaye's corporate title was changed from Attending Physician III to Attending Physician II.  A change of this nature would clearly confirm that Dr. Kaye had been demoted in this context too. Again, up until this time, Dr. Kaye had only been listed as an Attending Physician III.  Defendants have also failed to produce any evidence to show that any of the other Center Directors experienced a change to a lower corporate title in May 2018.

The identity of the Defendant who ordered the title change also appears to be in conflict.  Defendants produced discovery that would suggest that Defendant Jain was responsible for the title changes, however, Andrea Swenson testified that it was Defendant Yang who insisted on the change. **Exhibit 58: Swenson Dep. p. 53:20-25-57:1-5**

This distinction is significant for purposes of establishing intent.  Defendants could assert that at that time Defendant Jain lacked the animus to retaliate against Dr. Kaye, since he was not a recipient of her May 3rd Pay Parity Email.  Therefore, if Ms. Swenson's

testimony is true, then the causal connection between Dr. Kaye's protected activity on May

3rd and her demotion claims would be more direct.    Since it would have been Defendant

Yang, who had at least two incidents where Dr. Kaye engaged in protected activities:

January 29, 2018 and May 3, 2018.

Based on the foregoing, Plaintiff respectfully asserts that this statement of fact presents

several disputed material issues that should be resolved at trial.  The statement of fact

poses the query as to whether a reasonable person of Dr. Kaye's stature would consider the

change in title a demotion.  There is also a question of whether the change is rooted in

gender and or retaliatory animus, especially since Defendants have not produced any

admissible evidence to establish a title change to a lesser corporate title other than Dr.

Kaye.

For purposes of clarity, Dr. Mundy, a male: was Dr. Kaye's direct comparator at the

Manhattan  Court Clinic, specifically, Dr. Mundy like Dr. Kaye was also a licensed physician. Drs.

Winkler and Owen were not licensed physicians during the time relevant, but they also

functioned in the same capacity as Dr. Kaye as Clinic Directors.

56. Andrea Swenson was appointed to the position of Senior Administrator for the Court
    Clinics. In this role, Ms. Swenson would be responsible for managing the administrative
    staff and operations of the Court Clinics. Yang, Ex. M at 73:3-14, 74:2-11, 75:24-76:4. Dr.
    Alex Garcia-Mansilla, was announced as the Director of Psychological Assessment for CHS.
    In this role, Dr. Garcia-Mansilla would be responsible for oversight of psychological testing
    procedures and "issues related to all four clinics."  Id; see also Ex. Q.

**RESPONSE:**  Admit with qualification.  The statement of fact is not supported by the

referenced exhibits.  According to Ms. Swenson, she was hired by CHS as Senior

Administrator of the Forensic Psychiatric Court Clinics in March 2018.  **Exhibit 58: Swenson**

**Dep. p. 15-19.** Ms. Swenson further testified that at some point, Defendant Yang asked her

to change her title to Administrator Director.  **Id.**  Ms. Swenson listed the following as her job functions:  administrative oversight for the four Court Clinics; assistance with the transition of the Bellevue and Kings County Clinics to CHS; assistance with the Queens Pilot project; and facilitation of the improvement of the efficiencies within the clinics.  **Id.**

Plaintiff also admits that on March 27, 2018, that Dr. Alex Garcia Mansilla was hired by Defendants to serve as Director of Psychological Assessment for CHS.  In that capacity, Dr. Garcia Mansilla was supposed to provide "oversight of psychological testing procedures and issues related to all four clinics."  **Exhibit 55: Email from Ford dated March 27, 2018 with the Subject: Welcome (and CVs to review) (NYC001958-NYC001959)**  Dr. Garcia Mansilla also provided oversight of treatment at Rikers Island.  **Exhibit 15: Jain Dep. p. 245-250:1-6**

Jeffrey Bloom, a Legal Aid Mental Health (aka MICA) attorney, raised concerns about Dr. Garcia Mansilla functioning in this dual capacity.  A fundamental tenet of forensic psychiatry is that someone who provides treatment should not participate in forensic examinations. This dual role otherwise known as dual agency is an ethical and professional violation.

- **Exhibit 15: Jain Dep. p. 247:21-25-249:1-6; and**

- **Exhibit 33: Bloom Dep. p. 192:18-25-204:3-11**

However Defendants did not see any problems with Dr. Garcia Mansilla serving in a dual capacity, despite this core edict of the profession.

Instead, Defendants accused Mr. Bloom and Dr. Kaye of propagating an adversarial atmosphere at the Bronx Court Clinic.  **Exhibit 15: Jain Dep. p. 320:18-24-321:1-16** In or around December 11, 2018, Dr. Garcia Mansilla attempted to sit in on a 730 Examination with Drs. Brayton and Mullan.  **Exhibit 60: Email from Bloom dated December 12, 2018**

with the Subject:  The Bronx Clinic (Kaye6thProd456-0458)  Also present at this examination was Mr. Bloom and attorneys from the prosecution.

Mr. Bloom testified that when he saw Dr. Garcia Mansilla, that he asked her a series of questions to determine whether it was appropriate for her to sit in on the 730 exam.  Mr. Bloom testified that once he learned that she had a clinical role in her capacity at Rikers, he objected to her presence. **Exhibit 33: Bloom Dep. p. 193-194** In the wake of that meeting, Defendant Ford called Mr. Bloom's supervisor, Peter Jones.  Mr. Jones would convey to Bloom that Ford had called about the incident with Garcia Mansilla, and that she had it "out" for him.  **Exhibit 33: Bloom Dep. p. 201:7-25-203:1-7**  When Defendant Ford was asked whether she had ever spoken to Peter Jones about the incident or about anything else for that matter, she testified that she didn't remember his name**. Exhibit 14: Ford Dep. p. 214:19-25-215:1-5**

Further, although Defendant Jain deemed Mr. Bloom's objection to Dr. Garcia Mansilla sitting in on the 730 Examination on December 12, 2018 as adversarial, on January 22, 2019, Defendant Ford nevertheless circulated a Dual Agency Policy that was backdated to December 21, 2018.

- **Exhibit 15: Jain Dep. 245-250 and 320-321; and**

- **Exhibit 61: Email from Ford dated January 22, 2019 with the Subject: FPECC Policy -Managing Dual Roles with the attached policy (NYC01188-NYC001190)**

57. Prior to becoming the Director of the Manhattan Court Clinic, Dr. Mundy was a part-time psychiatrist evaluator holding the non-managerial of Attending Physician III, Dr. Mundy was a unionized employee.  See Kaye, Ex. B at 90:13-23.  See also Email, entitled, "RE" Bellevue 730 personnel," dated April 25, 2018, from Aaron Anderson to Patricia Yang and Sara Gillen, and email, entitled "RE: Pay Equity for Court Clinic Medical Directors, dated May 3, 2018, from Sara Gillen to Dr. Yang Jonathan Wangel, Ross MacDonald, Elizabeth Ford, and Jessica Laboy, annexed as Exhibit "HH;" Yang, Ex. M at 122:5-7; MacDonald, Ex.

O at 158:18-159:8.

**RESPONSE:** Disputed.  The statement of fact is misleading.  When Dr. Mundy worked part

time at the Manhattan Court Clinic, he was in a higher corporate title and had a higher

annualized rate of compensation than Dr. Kaye.  Dr. Mundy's corporate title was Attending

Physician Level III, while Dr. Kaye had been demoted to an Attending Physician Level II.  Dr.

Mundy's annualized salary as a *part-time* employee was $176,828, while Dr. Kaye's

annualized salary as a *full-time* employee was $171,571 that year, which reflected a $28K

demotion in pay.  Defendants' chart inaccurately recorded Dr. Kaye's salary as $191K during

that time period. The number reflected in Defendants' exhibit added Dr. Kaye's differential

payments to her base salary, which deceptively gave the appearance that there was parity.

- **Exhibit 4: Kaye Decl. ¶¶ 94-103; and**

- **Exhibit 62: Kaye's W2s Kaye3rdProd0081-0082**

58. Upon accepting the Director of the Manhattan Court Clinic position, Mr. Mundy chose to
become a managerial, or non-unionized Group 11 employee. With this, Dr. Mundy lost
eligibility for his retention bonus, nor (sic) was he subject to the terms and conditions and
the collectively bargained protections, of a unionized employee. See Yang, Ex. M at 83:19-
84:7;226:18-227:23, 228:9-15; Kaye, Ex. B at 91:2-92:8.

**RESPONSE:**  Admit with qualification.  Upon becoming Senior Director of the Manhattan

Court Clinic, Dr. Mundy forfeited his retention bonus; upon his promotion he was no longer

a part of the union.  It should also be noted that after the initial year of the transition, all

unionized employees lost their retention bonuses too.  **However, the record contains**

**conflicting evidence as to whether Drs. Mundy and Kaye continued to both be considered**

**Group 11 employees for the time relevant.  In the exhibits referenced below, Dr. Kaye for**

**purposes of evaluating her performance, was considered a Group 11 employee.**

- **Exhibit 9: Kaye Dep. November 15, 2021 p. 90:20-25-91:1-8;**

- **Exhibit 64:  Email from Smith dated April 9, 2019 with the Subject:  Negative Vested Annual Leave…. (NYC2703-NYC02705); and**

- **Exhibit 65:  Email from Jain dated February 26, 2019 with the Subject: Overdue Performance Evaluations (NYC001326-NYC001327)**

59. Prior to becoming the Director of the Brooklyn Court Clinic, Dr. Winkler was a full-time, psychologist evaluator at Bellevue, paid by an affiliate, New York University ("NYU"). Upon becoming the Director of the Brooklyn Court Clinic at CHS, Dr. Winkler became an employee of CHS, paid by a different affiliate, Physician's Affiliate Group of New York or PAGNY.  See Winkler, Ex. H at 62:7-64:15.  See also Email, entitled, "RE: Bellevue 730 personnel," dated April 25, 2018, from Aaron Anderson to Patricia Yang and Sara Gillen, and email, entitled "RE: Pay Equity for Court Clinic Medical Directors," dated May 3, 2018, from Sara Gillen to Dr. Yang, Jonathan Wangel, Ross MacDonald, Elizabeth Ford, and Jessica Laboy, annexed as Exhibit "II;" Yang , Ex. M at 122:5-7; MacDonald, Ex. O at 158:18-159:8.

**RESPONSE:**  Disputed. The statement of fact is misleading and mischaracterizes Dr. Winkler's

testimony.  Dr. Winkler testified that between 2009 and 2010, he switched from being paid by

Bellevue to NYU.  The switch took place because of the pension he collected from the Suffolk

County Police Department.  Dr. Winkler explained that as a municipal employee, he could not

be paid a full salary from a municipal employer without a waiver, and that since the waiver

process was complicated, he asked to be switched to an NYU line instead.

For the remainder of the time he worked at the Bronx Court Clinic, from 2010 to 2018,

Dr. Winkler, was a Bellevue employee that was paid by NYU.  When he was promoted to

Director of the Brooklyn Court Clinic, he was originally supposed to be hired by CHS.  However,

the waiver issue arose again, and he opted for a PAGNY line.  Further, Dr. Winkler was hired to

work as Senior Director of the Brooklyn Court Clinic.  Although Dr. Kaye performed identical job

functions in the Bronx, was more experienced and credentialed than Dr. Winkler, she never

held the higher Senior Director job title.

- **Exhibit 24: Winkler Dep. p. 64-65; and**

- **Exhibit 63:  Winkler Action Request Form (D165)**

60. Prior to becoming the Director of the Queens Court Clinic, Dr. Elizabeth Owen, a psychologist, was the Director of the Brooklyn Court Clinic.  Upon becoming the Director of the Queens Court Clinic at CHS, Dr. Owen became a managerial, or non-unionized Group 11 employee at CHS.  See Email, entitled "AFR and Backfill for Liz Owen," dated February 6, 2018, from Elizabeth Ford to CHS Personnel Actions and Ross MacDonald, and email "RRE" Bellevue 730 personnel," dated April 25, 2018, from Aaron Anderson to Patricia Yang and Sara Gillen, annexed as Exhibit "JJ;"  see also Yang, Ex. M at 247: 4-11.

**RESPONSE:** Deny. The statement of fact and supporting exhibits are misleading.  The statement

implies that Dr. Kaye was not treated as a Group 11 employee.  There is a disputed issue of fact

as to whether Dr. Kaye was a Group 11 or 12 employee.  In some emails, Defendants treated

Dr. Kaye as a Group 11 employee, specifically when she was being evaluated by Defendant Jain.

However, when Dr. Kaye inquired about a "negative vested annual leave," H + H employees

insisted that she was not a Group 11 employee and that she had never been in that job group.

- **Exhibit 64:  Email from Smith dated April 9, 2019 with the Subject:  Negative Vested Annual Leave…. (NYC2703-NYC02705); and**

- **Exhibit 65:  Email from Jain dated February 26, 2019 with the Subject: Overdue Performance Evaluations (NYC001326-NYC001327)**

The referenced exhibits also list conflicting salary information for Dr. Owen.

Defendants submitted two Action Request Forms for  the Queens Director position.  One

that listed Dr. Owen's proposed salary at $114K and another that listed her proposed salary

at $205K.  Accordingly, if in fact Dr. Owen's salary was $114K, it would support Plaintiff's

position that women were paid less than men.  Dr. Winkler, a psychologist who was a Senior

Director at the Brooklyn Court Clinic, was paid $118K, while Dr. Owen who was also a

psychologist was paid $4k less.

- **Exhibit 66:  Owen Action Request Forms NYC00089-NYC00090**

Similarly, if Defendants' representations were to be taken as fact, by their own

admission, Dr. Kaye was paid several less than Dr. Mundy.   However, at the core of Dr.

Kaye's parity claims was the comparison between she and Dr. Ciric between 2001 and 2018.

Dr. Kaye contends that she was paid up to $38K less than Dr. Ciric.   She was also paid on a

lesser annualized pay scale than Drs. Ciric, Mundy and Weiss. **Exhibit 4: Kaye Decl. ¶¶  93-**

**100**

61. On or about April 19, 2018, Dr. Ford met with Dr. Jain and Drs. Winkler, Owen, Mundy and
Plaintiff.  At this meeting, Plaintiff expressed concerns regarding her union status, her
salary, and her retention bonus.  See "Meeting Notification," for April 19, 2018, and email
dated April 19, 2018, Exhibit "KK."

**RESPONSE:**  Deny.  The statement of fact is misleading.  Dr. Kaye had the April 19th, 2018

meeting as tentative on her calendar. The record is absent any admissible evidence that the

meeting ever took place, or that it addressed the listed subject matter.  **Exhibit 67:**

**Calendar from Lewis dated March 30, 2018 with the Subject: CHS Court Clinics Meeting.**

**(NYC00980)**

62. On April 24, 2018, plaintiff emailed Dr. Ford requesting permission to speak with Dr. Yang
about "pay parity."  See Email, dated April 24, 2018, from plaintiff to Dr. Ford, annexed as
Exhibit "LL."

**RESPONSE:** Admit with qualifications.  Plaintiff emailed Defendant Ford and requested her

permission to contact Defendant Yang about pay parity.  However, Defendant Ford was

deceptive about Plaintiff's career prospects. Defendant Ford did not disclose or entertain

ever promoting Dr. Kaye to the Physician Specialist unionized line, which would have put Dr.

Kaye on par with her male counterparts.  She never disclosed that promoting Dr. Kaye from

the Attending Physician unionized title to the Physician Specialist unionized title would not

be feasible in the context of the alleged "phase out" of unionized titles.  Defendant Ford

only suggested that Dr. Kaye would have more options, if she were willing to take a

managerial line and abandon her unionized protections and benefits.

- **Exhibit 68:  Email from Kaye dated April 25, 2018 with the Subject Pay Parity (NYC00171)**

63. The next day, Dr. Ford responded by telling plaintiff

> "Of course.
> Likely that much more flexibility for your salary if
> you are willing to move into a managerial role, but I
> know that also means losing union/other benefits.
> Regardless, please let me know how it goes. I want
> To be as supportive and fair as possible.

Id.

**RESPONSE:**  Disputed.  Defendant Ford's response to Dr. Kaye was deceptive.  The Physician

Specialist job line was also covered by the union, Doctors' Council.  Drs. Kaye and Ciric were

both members of this union, however the latter worked in the higher paying Physician

Specialist line since 2004.  This was despite the fact that Dr. Kaye, with more experience was

promoted in 2004 around the same time as Dr. CIric.  If Defendants had honored her request,

Dr. Kaye's salary would have been comparable to her male colleagues, which was what she

sought when she learned of the disparity.  The salary range for the Physician Specialist line even

back in 2008 was 137K to 186K

- **Exhibit 69:  Doctors Council Collective Bargaining Agreement (D000600-D000706 See D610)**

64. On or before April 30, 2018, plaintiff met with Jessica Laboy and Jonathan Wangel about
    her July 1, 2018 line change from Bellevue to CHS.  Plaintiff memorialized in an email her
    current benefits and job duties, and her "understand[ing] from our conversation that
    everything will stay the same and nothing will change" when her line is transferred from

Bellevue to CHS. See Email, entitled "Melissa Kaye BHC to CHS line change," dated April 30, 2018, annexed as Exhibit "MM."

**RESPONSE:** Admit with qualifications.  In the April 30th email, Dr. Kaye also listed the following conditions of her employment as remaining the same, this was  based on her understanding of what transpired during her meeting with Defendant Wangel and his staff:

    a)   She would receive the full 20K retention bonus as per the MOA;

    b)  Her 15 year longevity pay would continue and would increase when she reached 20 years of service in 2019;

    c)  Her NYCERS pension status and membership would remain unchanged;

    d)  Her job description and title of Medical Director would remain unchanged; and

    e)  She would not be required to report to Rikers Island or any other boroughs for work.

- **Exhibit 174:  Email from Kaye dated April 30, 2018 with the Subject:  Melissa Kaye BHC to CHS line Change (NYC00513)**

65. On May 3, 2018, Plaintiff wrote to Dr. Yang to complain about what she believed to be a 30% pay discrepancy between herself and Dr. Ciric from the time that she worked at Bellevue, and requested, again, that her line be changed from Attending Physician III to Physician Specialist, "with retention of all my current benefits, union membership, pension etc. with a consummate increase in compensation equal to or higher than my male colleagues.  "See Email, entitled Pay Equity for Court Clinic Medical Directors," dated May 3, 2018, annexed as Exhibit "NN."

**RESPONSE:** Admit with qualification.  Both Bellevue and CHS are part of Health and Hospitals

Corporation.

66. That same day, Dr. Yang reached out to her team at CHS, to determine the court clinic directors' salaries, and whether plaintiff was paid commensurate to the scope and responsibility of the Bronx Court Clinic. See Email thread, entitled "FW: Pay Equity for Court Clinic Medical Directors," dated May 3, 2018, between Drs. Yang, MacDonald, Ford, Sara Gillen, Jessica Laboy and Jonathan Wangel, annexed as Exhibit OO."  Dr. Yang responded to her team that plaintiff will be offere[ed] a position that suits the needs of FPECC and is fair and equitable to the scope and responsibility.  We can offer her the management position comparable to Winkler and Mundy, to run BX under us." Id.

**RESPONSE:**  Deny.  The the statement of fact as misleading.  Defendant Yang did send an email with the referenced writing.  However, Dr. Kaye was never officially offered a managerial position as described by Defendant Yang in the above referenced email.  Additionally, Defendants did not keep accurate records about the productivity of Dr. Kaye and or the Bronx Court Clinic.

Dr. Kaye has contested Defendants' data about her productivity and the output of the clinic.  Plaintiff has made the argument that Defendants intentionally failed to keep accurate records on the Bronx Court Clinic as a means to justify their intentional understaffing and under-resourcing of the clinic.  **Exhibit 70:  Email from Yang dated May 3, 2018 with the Subject: Pay Equity for Court Clinic Medical Directors (NYC0204-NYC0207)**

However, even if Defendants' assertions about the number of cases seen in the Court Clinic were true, Defendant Ford admitted that Dr. Kaye bore a much higher clinical burden than the other Court Clinic Directors and a lower administrative burden.  The record was clear, Dr. Kaye was the only Director who participated in close to all of the 730 Examinations that took place at her clinic.   She also bore the lowest administrative burden of all the Directors because Defendants never fully funded the Clinic and because Defendants refused to replace Dr. Winkler between April 2018 and December 2018. In a further effort to sabotage Dr. Kaye's performance, Defendants also declared a work stoppage from November 2019 to January 2020.

- **Exhibit 4: Kaye Decl. ¶¶ 51; 176-178; and 184-190; and**

- **Exhibit 71: Email from Gillen dated April 25, 2018 with the Subject: Time Sensitive Melissa Kaye Question (NYC0177-NYC0178)**

67. CHS determined that plaintiff earned the highest salary of all the unionized doctors in Doctors Council. Id.

**RESPONSE:** Deny.  The statement of fact is misleading and inaccurate.  Defendants misrepresent Dr. Kaye's annualized salary in their chart.  The $191K includes Dr. Kaye's retention bonus, which is not part of her salary.  Dr. Kaye grossed $196K that year minus the $20K retention bonus, which would have made her salary $176K in 2018.  Therefore, if a proper comparison were made, all of the males listed on Defendants' chart had higher annualized salaries than Dr. Kaye in 2018, either as part-time and or full-time employees.

**Exhibit 70: Email from Yang dated May 3, 2018 with the Subject Pay Equity for Court Clinic Medical Directors (NYC00204-NYC00207)**

68. Including differentials, plaintiff's salary was 203,912.00. Dr. Mundy's salary, after accepting a managerial line, was $205,000.00 -a difference of $1088.00 Id.

**RESPONSE:** Deny.  The statement of fact is misleading and inaccurate.  Defendants represent that Dr. Kaye's annualized salary included a 20K differential/retention bonus, and that her actual salary was $191,571.  However, Dr. Kaye contends that her annualized salary for the same period was approximately $171K in tax year 2019 and $176K in tax year 2018. Unlike Defendants, Dr. Kaye does not include the retention and longevity bonuses as part of her annualized salary. Dr. Kaye contends, that  in order to effectuate the appearance of pay parity, Defendants inaccurately included her 20K retention bonus. There is a disputed issue of fact surrounding Defendants' methodology for calculating Dr. Kaye's salary, and whether they demoted her in salary after she engaged in protected activities.

- **Exhibit 4: Kaye Decl. ¶¶ 92-103;**

- **Exhibit 62:  Dr. Kaye's W2 for years 2017-2019 (Kaye3rdProd00081-Kaye00082); and**

- **Exhibit 70: Email from Yang dated May 3, 2018 with the Subject Pay Equity for Court Clinic Medical Directors (NYC00204-NYC00207)**

69. As a managerial, or Group 11 employee, Dr. Mundy's salary rate is "established by surveys, conducted by Central Office and facility representatives, or comparable health care titles in the consolidated Metro area, "as set forth in H " H's Operating procedure 20-41, "Health and Hospitals Corporation Salary Policy. See https://www.nychealthandhospitals.org/wp-content/uploads/2016/07/hhc-salary-policy.pdf. (sic)

**RESPONSE:** Admit with qualification. Defendants have also treated Dr. Kaye as a Group 11 employee.

- **Exhibit 65:  Email from Jain dated February 26, 2019 with the Subject: Overdue Performance Evaluations (NYC001326-NYC001327); and**

- **Exhibit 72: Email from Jain dated January 24, 2019 with the Subject: Evaluations (NYC01199-NYC01200)**

70.  Dr. Mundy oversaw the Manhattan Criminal Court clinic, by far the busiest of the four criminal court clinics, seeing approximately 1,200 to 1,400 criminal defendants annually, while plaintiff oversaw the Bronx Criminal Court clinic, which, by comparison, sees an average of approximately 300 criminal defendants annually. Dr. Mundy also supervised three part-time psychiatrists, a psychologist, a Forensic Fellow, and a social worker. Plaintiff on the other hand, only supervised one psychologist.  See Kaye, Ex. "B" at 209:9-18; Ford, Ex. "Defendant" at 171:20-172:14; Winkler, Exhibit "H" at 284:7-288:5; see also Email, "FPECC Org Chart," dated March 26, 2018, annexed as Exhibit "PP;" Exhibits I and J.

**RESPONSE:** Disputed. The Manhattan Court Clinic was the first clinic and was treated as the flagship.  During the earlier part of Dr. Kaye's tenure, at least half of the 730 Examinations conducted in the Bronx would also take place in Manhattan. Dr. Kaye was told that to justify the funding and resources invested into the Manhattan Court Clinic, that those examinations would be counted towards their numbers.  Dr. Kaye would also travel to the Manhattan Court Clinic to do examinations, again in a further effort to bolster the stature of the Clinic.

Overall, Dr. Kaye disputes the data maintained by Defendants' ISight database. According to her records, not only did she see exponentially more inmates than Defendants

report, the Bronx Court Clinic as a whole also saw exponentially more inmates.  Defendants further conceded that although Dr. Kaye may have had a lighter administrative burden than the other Directors, she eclipsed them on the clinical side, since she examined almost all of the Defendants at the Bronx Court Clinic herself.

Plaintiff thereby contends that the statement of fact presents a dispute that should be resolved at trial.  Firstly, it presents a question of whether the Manhattan Court Clinic: was actually the busier clinic; and whether that justified the higher salary and resources that were expended to sustain its existence.  Secondly, the stated fact poses a question about the pay scale.  There is a question of whether Dr. Kaye's pay should have been dictated by her workload or job function.

It is Dr. Kaye's position that Defendants' position violates the collective bargaining agreement. The effect: that Dr. Kaye was paid less than her male comparators even though she bore a heavier clinical burden than them all. Dr. Kaye contends that unlike her male colleagues, she wrote all of her own reports.  Drs. Winkler, Ciric, and Mundy each had interns, social workers and fellows to draft reports for them that they would sign off on.

- **Exhibit 4: Kaye Decl ¶¶ 19-31;**

- **Exhibit 21:  Kaye Work Output Comparison for Calendar Years 2018 and 2019;**

- **Exhibit 71: Email from Gillen dated April 25, 2018 with the Subject; Time Sensitive Melissa Kaye question (NYC0177-NYC0178)**

- **Exhibit 73:  Defendants' Work product Spreadsheet (D1532)**

71. Later that evening, on May 3, 2018, Dr. Yang responded to plaintiff's concerns regarding perceived pay inequity while employed by Bellevue, and stated that she will convey these serious concerns and your request to the attention of Mr. William Hicks, CEO of Bellevue." See Email, entitled RE: Pay Equity for Court Clinic Medical Directors dated May 3, 2018, annexed as Exhibit "QQ."

**RESPONSE:** Deny. The statement of fact is inaccurate and argumentative. The referenced exhibit also does not support the statement of fact. The referenced exhibit is from Defendant Yang, but does not cc or mention Mr. Hicks.

Defendant Yang did forward Dr. Kaye's email complaint to Mr. Hicks. Defendant Yang also engaged in a number of email exchanges with Mr. Hicks about Dr. Kaye's parity complaints. However, Defendants have failed to produce any emails where either Defendant Yang or Mr. Hicks made any efforts to actually address the disparities at their respective cites.

Dr. Kaye contends that despite being on notice, neither Defendant Yang nor Mr. Hicks actually took any substantive steps to bring her salary up to par with her male comparators. Neither Defendant Yang nor Mr. Hicks took any steps to change her corporate title from Attending Physician to Physician Specialist, which would have also had the effect of allowing her to remain in the union with a salary that was comparable to the other male doctors who ran the Court Clinics during the relevant time period. Instead, there were various emails between Defendant Yang and Mr. Hicks that did not contain any formal discussion of how to address Dr. Kaye's complaints. Absent from the produced emails, was any discussion of specific positions, and or any discussions about promotions to the Physician Specialist corporate job title.

- **Exhibit 4:  Kaye Decl ¶¶ 32-44; and**

- **Exhibit 74: Email from Yang dated July 9, 2018 with the Subject VCB/JOC Approval (NYU-8894A/B); Adult Psychiatry -Attending Backfill/Parity Increase NYC002040-NYC002041**

72. Immediately thereafter, Dr. Yang forwarded plaintiff's concerns that she had been paid less than her male colleagues while at Bellevue to William Hicks, copying plaintiff. See Email, entitled "Pay Equity Concern," dated May 3, 2018, annexed as Exhibit "RR."

**RESPONSE:**  Admit.  Defendant Yang did notify Mr. Hicks in writing about Dr. Kaye's

concerns, however neither Defendant Yang nor Mr. Hicks gave Plaintiff a promotion in title

or salary.

- **Exhibit 4:  Kaye Decl. ¶¶ 32-44; and**

- **Exhibit 74: Email from Yang dated July 9, 2018 with the Subject VCB/JOC Approval
  (NYU-8894A/B); Adult Psychiatry -Attending Backfill/Parity Increase (NYC002040-
  NYC002041)**

73. Plaintiff was offered a managerial position, but she declined, choosing to stay in the union

    as a member of the Doctors Council.  See Exhibit OO; Yang, Ex. M at 256:8-13; MacDonald,

    Ex. O at 160:9-17; Wangel, Ex. P at 128:23-129:9.

**RESPONSE:**  Deny.  Exhibit OO is inadmissible for purposes of establishing that Defendants

ever formally offered Dr. Kaye a managerial position.  The referenced emails do not contain any

text that would suggest that Dr. Kaye was made a formal offer for a specific position.  The

referenced testimony from Defendant Yang's deposition does not state that she or anyone else

formally offered Dr. Kaye a position with an increase in pay and title.

  The referenced testimonies of Defendant Yang, Defendant Ford Dr. MacDonald and

Defendant Wangel also fail to support the statement of fact. Despite being in positions to do so,

neither Defendant Yang, Dr. MacDonald nor Defendant Wangel formally offered Plaintiff a

managerial position, an increase in pay and or a position within the Physician Specialist title.

None of the individuals listed above made any overtures to Dr. Kaye in writing with a specific

position in mind, that would have addressed her parity complaints.

  Dr. MacDonald testified that he didn't know if there was a written formal offer made to Dr.

Kaye of a higher salary or promotion in title.  When asked why Dr. Kaye was never offered a

position in the Physician Specialist corporate title, Dr. MacDonald maintained that he did not

know.  **Exhibit 35: MacDonald Dep. p.160-162.**  Defendant Wangel made the same statement

that he would not be in a position to promote Dr. Kaye in title or salary.  **Exhibit 36: Wangel**

**Dep. p. 128_23-130:2**  When asked, Defendant Yang testified that she didn't approach Dr. Kaye

at all, that she had heard through other staff members that Dr. Kaye would not want a

managerial position.  Defendant Yang also testified, that this was the "end point" of the

discussion.  This was despite the fact that as Senior Vice President, Defendant Yang had the

authority to address Dr. Kaye's concerns by herself.  **Exhibit 10: Yang Dep. p. 256:8-18**

74. Plaintiff believed that the offer to become managerial to afford more flexibility in her pay
was a ploy to fire her for her complaints regarding the redacted medical records, since
relinquishing her union status would obviate job protections offered by the collective
bargaining agreement.  See Kaye, Ex. B at 93:18-95:15, 98:18-100:6

**RESPONSE:**  Admit with qualifications.  Dr. Kaye testified that the union offered protections

that she would not otherwise have if she were a non-unionized employee.  She also testified

that she felt that the offer of a managerial position was a ploy to fire her, because of the

ongoing hostility she had experienced.

She testified that Defendant Ford had proven untrustworthy, and that she had experienced

hostility and retaliation after she complained about the redacted medical records and the

HIPAA releases at the January 29, 2018 meeting.  She noted that while she experienced a

reduction in staff at the clinic, Dr. Winkler got a promotion.  This was despite the fact that they

both complained to Judges and the legal community.  Dr. Kaye also explained that she wanted

the dental coverage for orthodontic treatment for her twins.  **Exhibit 9:  Kaye Dep. 11/15/21**

**p.93-101:1-2; 186:5-187:1-2.**

75. Dr. Yang requested that all court clinic directors be managerial or Group 11 employees.

See Yang, Ex. M at 123:2-6, 123:24-124:5.  However, as an accommodation to plaintiff, Dr. Yang allowed plaintiff to stay in her collective bargaining title.  Id. 256:8-13.

**RESPONSE:** Deny. Defendant Yang never conveyed to Plaintiff that her only option for pay parity would be to either  be a managerial or Group 11 employee.  Further, there is conflicting record evidence as to whether Dr. Kaye was a Group 11 employee. Dr. Kaye maintains that she never received a formal offer for a specific position from Defendants.  She further maintains that Defendants never explained why she could not work as a Physician Specialist as Director of the Bronx Court Clinic; Defendants *have never explained to her* why was treated differently than Drs. Ciric or Weiss.

- **Exhibit 4:  Kaye Decl ¶¶ 32-44;**

- **Exhibit 72: Email from Jain dated January 24, 2019 with the Subject: Evaluations (NYC01199-NYC01200);**

- **Exhibit 73:  Defendants' Work product Spreadsheet (Dr. Kaye is listed as a Group 11 Employee) (D001532); and**

- **Exhibit 75 : Email from Kaye dated April 4, 2019 with the Subject:   Negative Vested Annual Leave Good Morning Ms. Smith… (NYC02699-NYC02700)**

76. On or about June 21, 2018, plaintiff informed Dr. Jain that she was planning to file a complaint regarding what she believed to be pay disparity (sic).  See Email, "Jonathan," dated June 21, 2018 annexed as Exhibit "SS."

**RESPONSE:** Deny. The stated fact is a misrepresentation of what transpired, and the content of the referenced exhibit does not support the statement of fact.  Dr. Kaye had already filed two complaints about pay parity:  she emailed her first complaint of discrimination to Defendant Yang on May 3, 2018, after she had asked Defendant Ford if she could contact Defendant Yang directly.  Plaintiff filed her second complaint with the EEOC on May 22, 2018, after Defendant Yang and Mr. Hicks failed to respond to her internal inquiry.

Defendants' referenced Exhibit confirmed Dr. Kaye's allegation, that Defendant Jain had threatened her in retaliation. Dr. Kaye testified that when she told Defendant Jain that she had filed a charge of discrimination at the EEOC, he responded that he would have to report her to Defendant Wangel. Dr. Kaye took Defendant Wangel's response as a threat of further retaliation for her protected activities.

- **Exhibit 4:   Kaye Decl. ¶¶ 47-51;**

- **Exhibit 5:   Email forwarded by Yang dated May 3, 2018 with the Subject:  Pay Equity for Court Clinic Medical Directors (NYC000208-NYC000211);**

- **Exhibit 9:   Kaye Dep. 11/15/21 p. 247:12-22; and**

- **Exhibit 59:  Dr. Kaye's EEOC Charge of Discrimination  520-2018-01534 and the EEOC's File (D000752-D000762)**

77. On or about June 28, 2018, H + H legal department received an attorney letter on behalf of plaintiff.  The letter, from Bantle & Levy LLP, alleged that "substantial evidence existed that [plaintiff] has been discriminated against based on her sex in the form of lack of pay equity."  See Email, "Dr. Melissa Kaye," dated July 6, 2018, annexed as Exhibit "TT."

**RESPONSE:**  Admit and add.  Plaintiff's attorney sent the referenced demand letter approximately six weeks after Plaintiff's internal complaint to Defendant Yang on May 3, 2018.  The letter from Bantle & Levy was also sent after Plaintiff's EEOC Charge, which was filed on May 22, 2018.  Plaintiff filed a "supplemental charge" in September 2018.  In the "Supplemental Charge," Plaintiff alleged that she had experienced a retaliatory shift change and that she had been demoted, after she filed her EEOC charge in May.

- **Exhibit 59:  Dr. Kaye's EEOC Charge of Discrimination  520-2018-01534 and the EEOC's File (D000752-D000762)**

**A.  Titles for Clinic Directors**

78. On May 11, 2018, Dr. Jain informed Andrea Swenson, Senior Administrator, Forensic Court Clinics, that the clinic directors at the Queens, Bronx, Manhattan, and Brooklyn

court clinics would have the title of "Director," and that Dr. Jain's title would also be "Director" of all four of the court clinics.  See Email, "RE Titles," dated May 11, 2018, annexed as Exhibit "UU."

**RESPONSE:**  Deny.  The statement of fact is misleading and misrepresents what transpired.

Ms. Swenson testified that Defendant Yang had instructed her to change all of the Center

Directors' titles to Director.   Defendant Yang's demotion directive came eight days after Dr.

Kaye's May 3rd email to Defendant Yang that complained of pay parity.  Although each of the

Directors except Dr. Kaye had recently been appointed to their respective positions, Dr. Kaye's

comparator, Dr. Mundy's business cards were not produced.  Dr. Mundy was also listed as

Medical Director; however Defendants did not produce any evidence or business cards to show

that his title had also been changed.

- **Exhibit 4: Kaye Decl.  ¶¶ 57;**

- **Exhibit 6: Email from Jain dated May 11, 2018 with the Subject: Titles NYC00216;**

- **Exhibit 7:  Email from Kaye dated May 25, 2018 with the Subject:  Business Cards (NYC000228-NYC000233);**

- **Exhibit 8:  Email from S. Gillen dated May 14, 2018 with the Subject: 730 Retention Bonus (NYC00220-NYC00221);**

- **Exhibit 58: Swenson Dep. p.53:20-25-57:1-5; and**

- **Exhibit 59:  Dr. Kaye's EEOC Charge of Discrimination  520-2018-01534 and the EEOC's File (D000752-D000762)**

79. On May 25, 2018, plaintiff emailed Andrea Swenson, in response to a business card confirmation request, to ask why her title was changing to "Director" from Medical Director.  See Email, "Re: Business Cards," dated May 25, 2018, annexed as Exhibit "VV."

**RESPONSE:**  Admit.  Dr. Kaye emailed Ms. Swenson because she was concerned that the

title change would be viewed as a demotion.  Plaintiff was also concerned about the impact

that the change would have on her credibility as an expert.   Ms. Swenson contradicted the

text of her email to Dr. Kaye. During the course of her deposition, Ms. Swenson admitted

that Defendant Yang instructed her to change the titles not Defendant Jain.

- **Exhibit 6: Email from Jain dated May 11, 2018 with the Subject: Titles (NYC00216);**

- **Exhibit 58: Swenson Dep. p.53:20-25-57:1-5; and**

- **Exhibit 59:  Dr. Kaye's EEOC Charge of Discrimination  520-2018-01534 and the EEOC's File (D000752-D000762)**

80. After discussing, plaintiff's concerns, it was decided that for the sake of simplicity and to equalize the titles of the court clinic directors, they would all have the title "Director." See Email, "Re:  Very basic question,"  dated May 29, 2018, annexed as Exhibit "WW;"  see also Ex. VV.

**RESPONSE:** Deny.  Dr. Kaye denies that she ever agreed to the demotion in title from

Medical Director to Director.  Dr. Kaye testified that the change in title stripped her of

authority and of managerial duties.  Consistent with her beliefs, was the demotion in

corporate title that coincided with Dr. Kaye's demotion in office title.  As previously stated,

Defendants began to list Dr. Kaye as an Attending Physician II rather than an Attending

Physician III.  This demotion took place without any hearings or any other administrative

process.  Accordingly, Dr. Kaye was also deprived of due process and fair representation

from her union.

- **Exhibit 6: Email from Jain dated May 11, 2018 with the Subject: Titles (NYC00216);**

- **Exhibit:  8:  Email from S. Gillen dated May 14, 2018 with the Subject:  730 Retention Bonus (NYC000220-NYC000221);**

- **Exhibit 9: Kaye Dep. 11/15/21 p.238:24-25-244:1-23; and**

- **Exhibit 23: Kaye Dep. Cross Exam. 1/25/22  p.7:21-25-p.10:1-3**

81. Plaintiff believes that the change in title, though made for all, from "Medical Director" to "Director" was a demotion and made in retaliation for complaining about pay parity.  See Kaye, Ex. B at 238:24-240:16

**RESPONSE:** Deny. The statement of fact is misleading.  Defendants have not produced evidence to support their position that **all** of the Directors had their titles changed. Defendants did not produce any dummies of Dr. Mundy's business cards with the title Director rather than Medical Director.  Further, Dr. Kaye testified that she did not know whether  Dr. Mundy's title had been changed.  Plaintiff maintained her position, that as the only other Medical Director amongst the Court Clinic Directors, that the title change diminished her professional credibility in the field.

- **Exhibit 9: Kaye Dep. 11/15/21 p.238:24-25-244:1-23; and;**

- **Exhibit 23: Kaye Cross Exam. Dep.  1/25/22 p.7:21-25-p.10:1-3**

**B.  Plaintiff's Complaints**

82. In December 2015, plaintiff complained to Dr. Colley about Dr. Yang wanting a criminal defendant to be found unfit so he could be removed from Rikers Island and sent to Mid-Hudson," and "pushing for him to be forced ordered to into the court clinic."  Kaye, Ex. B at 174:24-176:17, Deposition of Melissa Kaye, dated January 25, 2022, annexed as Exhibit "XX" at 10:21-16:2.

**RESPONSE:**  Disputed  On December 16, 2015, Dr. Kaye was included on a flurry of emails where City Hall by way of Defendant Yang's staff person John Volpe attempted to expedite the examination process of Defendant Miguel Figueroa.  Dr. Kaye complained about City Hall and Defendant Yang attempting to use a force order against Miguel Figueroa, who had not previously resisted production.

Defendants wanted to obtain a force order for Mr. Figueroa, who had been particularly disruptive and violent while in custody.  Dr. Kaye explained the force order process during the

course of the email exchange.  Due to the inhumane and violent aspects of the process, Judges and attorneys both are reluctant to use them as a means to procure the production of defendants from their cells for their court appearances.  Despite these realities however, Defendant Yang and City  Hall sought to expedite Mr. Figueroa's departure from Rikers by any means necessary.  Dr. Kaye simply voiced concern and explained the process.  The email thread showed that City Hall and Defendant Yang exerted power over the Court Clinics well before 2018.

- **Exhibit 33: Bloom Dep. p. 22:2-25-23:1-5;**

- **Exhibit 28: Email from Bloom dated December 16, 2015 with the Subject: call from Melissa Kaye (Kaye6thProd0003-Kaye6thProd0004); and**

- **Exhibit 76: Email from Kaye dated December 18, 2015 with the Subject: MF (Kaye6thProd00014-Kaye6thProd0018)**

83. Plaintiff also complained that she believed that CHS was "politicizing exams" and intruding on the 730 exam process.  See Kaye, Ex. B at 166:21-25, 172:21-176:25.

**RESPONSE:**  Admit with qualifications.  Dr. Kaye testified that she believed that CHS had infiltrated the Court Clinics with the objective of politicizing the examination process.  Dr. Kaye was concerned about the constitutional implications of Defendants' policies and behaviors, particularly as they pertained to the Defendants' rights to due process.  She also explained how her emails and outreach were beyond the scope of her job as a neutral forensic evaluator.

- **Exhibit 9: Kaye Dep. 11/15/21 p.166:21-25-167:1-13 and p.172-176:1-16**

84. In January 2018, plaintiff claims she complained of a proposed policy to force "possibly incapacitated individuals into signing a HIPAA release without legal representation was a violation of their constitutional rights."  Id. 261:22-262:2.

**RESPONSE:** Admit and add.  Dr. Kaye testified that On January 29, 2018, that Defendant

Yang, Bill Hicks, Dr. MacDonald and Sara Gillen came to the Bronx Court Clinic as an act of intimidation after her ongoing advocacy against using redacted medical records to write 730 Examination reports.  During the course of the meeting, Dr. Kaye raised concerns about Defendants with possible mental health issues being able to have the capacity to understand the implications of releasing their medical records.  Jeffrey Bloom from Legal Aid explained that sometimes the medical records could have incriminating information, that could lead to his clients' convictions.  As such, procuring waivers of the sort proposed by Defendants transgresses upon inmates' protections under the 6th Amendment and due process clause.

Dr. Kaye also expressed concerns about the private practice activities amongst FPECC staff and the inherent conflict of interest it posed.  Dr. Kaye recalled that Defendant Yang retorted:  we've got all the money, and if you don't like the way we do things around here, there's the door.  Defendant Yang denied ever having made those comments.  However, Dr. Kaye was clear that any opposition to Defendant Yang's policies could result in her termination. Defendant Yang's intentions were unequivocal, especially after she threatened Dr. Kaye with termination in front of a room of staff and Executive H + H and Bellevue management.

- **Exhibit 9:  Kaye Dep. 11/15/21 p. 99-102:1-9;**

- **Exhibit 10:  Yang Dep. p. 338:7-19;**

- **Exhibit 13: Email from Bloom dated December 16, 2015 with the Subject: call from Melissa Kaye (Kaye6thProd0003-Kaye6thProd0004); and**

- **Exhibit 76: Email from Kaye dated December 18, 2015 with the Subject: MF (Kaye6thProd00014-Kaye6thProd00018)**

85. In January 2019, plaintiff complained about CHS's psychological testing policy, believing that "this proposed administrative policy [] places restrictions upon the MD clinic directors," since 'physicians are to have unfettered independence within their standard of practice.  Anything less necessarily raises questions about the legitimacy of the examination, opens the door to controversion by defense attorneys and prosecutors, and undermines the credibility of the examination results."  See Email, "Re: CHS draft policies circulated?"  dated January 11, 2019, annexed as Exhibit "YY."

**RESPONSE:**  Admit and add.  On August 27, 2018, Defendant Jain initially circulated a draft

Psychological Testing Survey.  Based on the results of that survey, on November 7, 2018,

Defendant Jain then circulated a draft Psychological Testing Policy.

On November 7th, Dr. Mundy expressed concerns about the Court ordering

psychological testing without any input from the examiners.  On November 8, 2018, Dr.

Kaye reiterated and expounded on those concerns.  It was Plaintiff's position, that as

worded, that the policy had the potential to undermine the court ordered evaluation

process by overriding the clinical discretion of the examiners to determine when testing was

appropriate.

On November 30, 2018 Defendants Jain and Ford conducted a meeting where the policy

was discussed amongst the Court Clinic directors.  Dr. Kaye attended this meeting at which

time she voiced her concerns again.  At that time, she also noted that the policy could have

constitutional implications that impacted criminal defendants' rights to fair trials.

On January 11, 2019, Dr. Kaye reiterated her concerns about the policy, she then

referenced the standards of practice, statutes and ethical guidelines.  Although Dr. Kaye's

comments were similar in substance to Dr. Mundy's, Defendant Jain became defensive only

towards Dr. Kaye.  Further, unlike with Dr. Mundy, Defendant Jain falsely accused Dr. Kaye

of circulating the policy to external organizations.  The policy was ultimately finalized and

approved by Defendant Ford on February 11, 2019.  The final policy incorporated Dr. Kaye's language despite the hostility and resistance both Defendants Ford and Jain expressed towards her in their email thread.

Prior to January 2019, Defendant Wangel was instructed to conduct an investigation into whether Dr. Kaye had circulated the draft policy externally.  Defendant Wangel admitted to conducting an "investigation" but refused to admit to "monitoring" Dr. Kaye's email box both on that occasion and on a previous one.  Defendant Jain also could not remember whether it was ever determined that Dr. Kaye circulated the policy externally. However, Defendant Wangel seized the opportunity to monitor Dr. Kaye's emails, and to ridicule her efforts to find other employment with Defendant Yang.  At her deposition, during her cross-examination, Dr. Kaye denied that she ever circulated the policy externally. A reasonable trier of fact could determine that the baseless investigation coupled with Defendants' callous remarks, reflected Defendants' ongoing animus and hostility towards Dr. Kaye.

In addition to the false accusation that Dr. Kaye had circulated the policy, in February 2019, Defendants Ford and Jain rated Dr. Kaye at the baseline of performance in several modules of her performance evaluation. Despite the overall rating, Dr. Kaye refused to sign the evaluation and sought to meet with Defendant Jain. Instead of meeting with her however, Defendant Jain avoided Dr. Kaye as was his custom at that time.

- **Exhibit 23:  Kaye Dep. Cross Exam. January 25, 2022 p.49:6-50:1-22;**

- **Exhibit 77: Email from Jain dated August 27, 2018 with the Subject: FPECC Psychological Testing Survey (NYC003306-NYC003308);**

- **Exhibit 78: Email from Jain dated November 7, 2018 with the Subject: Draft**

Psychological Testing Policy (NYC03399-NYC03402);

- **Exhibit 79: Email from Mundy dated November 7, 2018 with the Subject: Draft Psychological Testing Policy (NYC003851-NYC003852);**

- **Exhibit 80:  Emails from Kaye dated November 8, 2018 with the Subject: Draft Psychological Testing Policy (NYC03842-NYC03847);**

- **Exhibit 81: Agenda for November 30, 2018 Meeting (NYC002301);**

- **Exhibit 82:  Draft Psychological Testing Policy (NYC002429-NYC002431);**

- **Exhibit 83: Email from Wangel dated January 11, 2019 with the Subject: CHS draft policies circulated? (NYC001134-NYC001135);**

- **Exhibit 84: Finalized Psychological Testing Policy signed by Dr. Ford dated February 11, 2019 (NYC004063-NYC004065); and**

- **Exhibit 174: Email from Kaye dated April 30, 2018 with the Subject: Melissa Kaye BHC to CHS Line Change:" (NYC000513)**


86. In March 2019, plaintiff claims she complained about "opining on fitness without an exam," to Drs. Jain and Ford, believing that "it completely violates the defendant's constitutional rights to a fair trial."  See Kaye, Ex. XX at 50:23-51:10

   **RESPONSE:**  Admit.

87. Plaintiff also complained about CHS's private practice policy, believing that it "perpetuated a fraud on the Court," because the policy allowed "the stakeholders involving (sic) in hiring these doctors for private work are the same stakeholders for which they provide a city-salaried service to, " and "developing overly friendly relationships with lawyers and being influenced in how in (sic) the findings of their 730 exams in order to establish a business relationship that would get them private referrals."  See Kaye, Ex. B at 216:16-19, 249:6-255:24.

   **RESPONSE:** Admit and add.  Dr. Kaye complained about the private practice policy to

   Defendants Ford and Jain in a meeting they attended in April 2018.   During the course of

   that meeting, Dr. Kaye voiced her concerns about the policy.  In the wake of the meeting,

   she experienced marginalization and hostility from Drs. Mundy and Owen, who had been

engaged in the abuses she had identified.   When Defendant Ford was asked whether she

had gone to the Conflict of Interest Board, she responded that the Board would not

understand what they were doing anyway.  On September 4, 2018, Dr. Kaye also

complained about Defendants' policy to the New York State IG's Office and the Department

of Justice's Public Integrity Bureau.

- **Exhibit 4:  Kaye Decl.¶ 191;**

- **Exhibit 9:  Kaye Dep. 11/15/21  p. 249:6-261:15; and**

- **Exhibit 23:  Kaye Dep. Cross Exam. January 25, 2022 p. 43:5-47:3**

88. Pursuant to H + H Operating Procedure 50-1, "Corporate Compliance and Ethics Program," plaintiff had an obligation, as an employee of H + H and CHS, to report "fraud," "waste," and "abuse."  See https://www.nychealthandhopsitals.org/wp-content/uploads/2018/01/OP-50-Corporate-Compliance-Program.pdf.

**RESPONSE:**  Admit and add.  Consistent with the above referenced policy, Dr. Kaye reported

Defendants' policies that invoked the above referenced provision, to the New York State IG

and the Department of Justice's Public Integrity Bureau on September 4, 2018; March 2019;

January 8, 2021. In the event she was contacted by these agencies, it  well after she had

resigned from H +H and while she was in the middle of the lawsuit herein.  In these

instances, it was unclear if these agencies contacted any of the people or entities she cited

for abuses.

- **Exhibit 4:  Kaye Decl. ¶¶ 191;**

- **Exhibit 9:  Kaye Dep. 11/15/21  p. 249:6-261:15; and**

- **Exhibit 23:  Kaye Dep. Cross Exam. 1/25/22 p. 43:5-47:3**

**III.    Post-Transition to CHS**

**A.  Shift Change**

89.  On July 11, 2018, Dr. Jain received an email from timekeeping in which he was asked to clarify why, if plaintiff was a 40-hour employee, her schedule in Kronos, the timekeeping system, indicated a 35-hour work week. See Email, "RE: Kaye M. Schedule, "dated July 11, 2018, annexed as Exhibit "ZZ."  Dr. Jain responded, and looped in Jessica Laboy, who in turned(sic) added Jonathan Wangel to assist the question. Id.

**RESPONSE:**  Deny.  Plaintiff denies the statement of fact for the following reasons: it seeks to establish the truth of the matter asserted; and it seeks to establish Defendant Jain's intent.  Dr. Kaye initially inquired about her time being entered incorrectly by Defendant Jain on July 10, 2018.  The Bronx Court Clinic officially transitioned to CHS management on July 1, 2018, however, Dr. Kaye did not have access to KRONOS to enter her time herself. Instead, Defendant Jain had been entering her time for her.  **Exhibit 85:  Email: from Kaye dated July 10, 2018 with the Subject: Direct Deposit (NYC00366-NYC00367)**

Subsequent to this email, Defendant Wangel emailed Dr. Kaye's former supervisor Dr. Colley about the rationale that permitted physicians to work 8 hours with only a 30 minute lunch, rather than a full hour lunch.  Dr. Colley forwarded Defendant Wangel's email to Drs. Kaye and Mundy. Dr. Kaye responded that she would take the issue to her union.  She also noted that the arrangement took place between her union and H + H over 10 years ago.  Dr. Kaye's position was further supported by Rosalind Barrow, who attached the agreement and documents Dr. Kaye referenced in her email.

- **Exhibit 86: Email from Wangel dated July 11, 2018 with the Subject FPECC Question (NYC00369-NYC00370);**

- **Exhibit 87:  Email from Kaye dated July 13, 2018 with the Subject: 30 Minute Lunch (NYC000385);and**

- **Exhibit 88: Email from Rosalind Barrow dated July 24, 2018 with the Subject 30 Minute Lunch (NYC000402-NYC000403)**

Dr. Kaye raised concerns about the shift change and the impact it had on her compensation on August 13, 2018.  In the email, she noted, that she had not had access to KRONOS between July 1, 2018 and August 7, 2018.  During the time she did not have access, Defendant Jain entered her time for her in the system.  When Dr. Kaye approached staff about the issue, she stated that Defendant Jain had entered her time incorrectly and that she was going to be docked either 5 hours or 2.5 hours a week because of the error.  Despite the email circulated by Ms. Barrow, Defendants insisted on Dr. Kaye working a 9 hour day with an hour lunch.  This was despite the fact that there was no clear written policy in place that required employees covered under the Doctors' Council collective bargaining agreement to take a 1 hour lunch.  Defendant Wangel unequivocally admitted that no such language existed in the CBA and that he had not come across any such language to this effect at that time.

- **Exhibit 36: Wangel Dep. p. 160:20-24; p.134:15-25-160:20-24; and**

- **Exhibit 89:  Email from Kaye dated August 13, 2018 with the Subject Pay Error (NYC000429)**

90. Mr. Wangel emailed Dr. Colley to determine "the rationale for permitting physicians to work 8 hours w/ only a 30 minute lunch (rather than 1 full hour which is standard).  Please let me know if  you have a couple of minutes to discuss."  See Email, "re: FPECC Question," dated July 11, 2018, annexed as Exhibit "AAA;" see also Wangel, Ex. P at 134:115(sic)-135:9.

**RESPONSE:** Disputed.  The statement of fact is misleading to the extent that it suggested that Defendant Wangel eventually found language to justify Defendants' insistence that Dr. Kaye work a 9-hour work day. It is also misleading to the extent that Defendant Wangel and or Defendants collectively, would have changed their course of action towards Dr. Kaye had there been any pertinent provisions.

What is clear however, is that  Defendant Wangel sent the referenced email to Dr. Colley, who then forwarded it to Drs. Kaye and Mundy.  Again, despite confirmation from staff person Rosalind Barrow that Dr. Kaye was in fact right, Defendant Wangel and the remaining Defendants insisted on forcing Dr. Kaye to work a 9 hour day with a 1 hour lunch.

- **Exhibit 86: Email from Wangel dated July 11, 2018 with the Subject FPECC Question (NYC00369-NYC00370);**

- **Exhibit 87:  Email from Kaye dated July 13, 2018 with the Subject 30 Minute Lunch (NYC000385); and**

- **Exhibit 88: Email from Rosalind Barrow dated July 24, 2018 with the Subject 30 Minute Lunch (NYC000402-NYC000403)**

91. Mr. Wangel directed timekeeping to change plaintiff's schedule in Kronos to reflect a 9 to 6 work day, with a ½ hour lunch between 5:30 and 6:00 p.m. In response, timekeeping clarified that plaintiff's schedule would be changed in Kronos from 9 am to 5:30 with a ½ hour lunch, for a total of 8.5 hours per day with a ½ hour lunch.  However, "[o]nce the ½ hour lunch change to an hour lunch her schedule need to change form [sic] 9am-6pm." Ex, AAA.

**RESPONSE:** Disputed.  The statement of fact is misleading and contradicts the record, which clearly established that Defendant Jain entered Dr. Kaye's time from July 1st to August 13th of 2018.   The referenced exhibit does not support the statement of fact.  The email came from Defendant Wangel's staff person Saadya Ayarza.  She wrote the quoted language and Defendant Wangel thanked her for taking the steps listed.   At the time, Defendant Wangel supervised Ms. Ayarza.  Defendant Jain admitted to inputting Dr. Kaye's time between the month of July and August 2018.

- **Exhibit 85:  Email from Kaye dated July 10, 2018 with the Subject; Direct Deposit , (NYC00366-NYC00367);**

- **Exhibit 89:  Email from Kaye dated August 13, 2018 with the Subject: Pay Error, (NYC00429); and**

- **Exhibit 90:  Email from Ayarza dated July 11, 2018 with the Subject: Kaye M. Schedule (NYC000368)**

92. The next day, July 12, 2018, Dr. Jain emailed plaintiff to let her know that the Kronos scheduling issue had been resolved, and that "[h]opefully we'll get Kronos set up soon, and in the meantime I'll continue putting in your hours."  See Email, "Fw: Following up,"" dated July 12, 2018, annexed as Exhibit "BBB."

**RESPONSE:** Disputed.  The email attached exhibit is misleading and mischaracterizes the issues surrounding Dr. Kaye's inability to access KRONOS at the inception of CHS's management of the Bronx Court Clinic.  It also attempts to obscure Defendants' efforts to demote Dr. Kaye in salary without any due process.  As previously stated, the Bronx Court Clinic came under CHS's managerial purview on July 1, 2018.  Between June 29, 2018 and July 2, 2018, IT staff were supposed to set up accounts for FPECC staff at the Bronx and Manhattan Court Clinics.  On July 2, 2018 these accounts still had not been up and running.

**Exhibit 91: Email from Swenson dated July 2, 2018 with the Subject: KRONOS Accounts for FPECC Staff at Manhattan and Bronx (NYC000305-NYC000306)**

On July 3, 2018, Dr. Kaye contacted Defendant Jain, she put him on notice that she did not have access to KRONOS in the Bronx.  At that time, Dr. Kaye was under the impression that the system was not running due to a connectivity issue, not because her account had not been created in the system.   Dr. Kaye's problems and access to KRONOS persisted throughout the month of July. As previously stated, Dr. Kaye was not able to access her timesheets in the system until August 7, 2018.  At which time, she realized that Dr. Jain had been entering her time incorrectly, and that she was wrongly being docked between 2.5 to 5 hours a week.  Further, Dr. Kaye's KRONOS access remained problematic from July 2018 until January 2020, at which time Defendants continued to surreptitiously dock and or

demote Dr. Kaye in salary.

- **Exhibit 4: Kaye Decl. ¶ 74**

- **Exhibit 89: Email from Kaye dated August 13, 2018 with the Subject: Pay Error (NYC000429); and**

- **Exhibit 92: Email from Kaye dated July 3, 2018 with the Subject: KRONOS was not up and Running in the Bronx (NYC000317-NYC000319)**

93. On July 13, 2018, Dr. Jain confirmed that Kronos reflected a 9-5:30pm schedule for plaintiff and that plaintiff should get credit for a 40 hour work (sic) each week.  See Email, "Fw: Kaye, M. Schedule, "dated July 13, 2018, annexed as Exhibit "CCC."

**RESPONSE:** Deny.  The exhibit mischaracterizes what transpired.  Dr. Kaye should have been

compensated at a full-time rate with a half hour lunch.  However, this had not taken place and

on August 13, 2018, Dr. Kaye brought the errors and wrongful deductions in the system to the

attention of Defendants and their staff members.  Dr. Kaye was the only Court Clinic Director

required to work a 9 hour day 5 days a week.  The other directors worked 8 hours a day, which

were recorded either as a 35 hour or 40 hour work week, the other directors were considered

full-time employees.

  There is conflicting record evidence as to whether Dr. Winkler was required to work a 35 or

40-hour work week. On Dr. Winkler's Action Request form, it stated that he was required to

work a 35-hour work week. However, on his offer letter, it stated that he was required to work

a 40 hour work week.  Ultimately, Dr. Winkler confirmed during his deposition, that he worked

from 9AM to 5PM with a 1 hour unpaid lunch, for a work week of 35 hours. Again, unlike Dr.

Kaye who had more longevity and allegedly a less busy Clinic, he was permitted to work an 8

versus 9 hour work day.

- **Exhibit 24: Winkler's Dep.60:5-12;**

- **Exhibit 89:  Email from Kaye dated August 13, 2018 with the Subject Pay Error (NYC000429); and**

- **Exhibit 175: Dr. Barry Winkler's Action Request Form and Offer Letter dated 3/22/18, (D000174-D000176)**

94. Plaintiff took sick days on July 11 and July 12, 2018, and annual leave from July 17 -July 25, 2018.  See Email, "Subject: Direct Deposit," dated July 10, 2018, and Email "Out sick 7/12," dated July 12, 2018, annexed as Exhibit "DDD."  On July 23, 2018, plaintiff texted Dr. Jain, stating "[m]y stepdad is in hospice my siblings and I need to deal with his end of life issues.  I plan to return to work on 8/6."  See Email, "Dr. Kaye time off, dated July 23, 2018, annexed as Exhibit "EEE."

   **RESPONSE:**  Admit.

95. That same day, Human Resources was notified of plaintiff's leave of absence as a possible FMLA leave request. Id.

   **RESPONSE:** Disputed.  The statement of fact is not supported by the exhibit.  Defendant Jain

   stated that he did not know how to treat Dr. Kaye's absence to take care of her stepdad in

   terms of leave.  The email made no mention of the FMLA or that Dr. Kaye even used FMLA

   at that time.

   **Exhibit 93:  Email from Jain dated July 23, 2018 with the Subject:  Dr. Kaye Time off (NYC00393)**

96. Mr. Wangel confirmed that all employees covered by the Doctors Council agreement were to take the standard 1-hour lunch.  See Email, "FW: 30 minute MD lunch," dated July 24, 2018, annexed as Exhibit "FFF."

**RESPONSE:** Disputed. The referenced exhibit does not support the proposition that all

employees covered by Plaintiff's union were required to take a 1-hour lunch break. In fact

Defendant Wangel contradicted this position during the course of his deposition.  When asked

if he had read any document that said that a 1-hour lunch break was in fact required, he

admitted that there was no such document to that effect. **Exhibit 36: Wangel Dep. p. 160:20-**

**24.**

Instead the referenced exhibit supports Dr. Kaye's representation to Defendant Wangel on July 13, 2018.  Ms. Barrow circulated the referenced union documents to Defendant Wangel and his staff.  However, despite the documents that clearly supported Dr. Kaye's position for the ½ lunch, Defendants continued to insist that Dr. Kaye take a 1-hour lunch and work a 9-hour day.

- **Exhibit 88: Email from Rosalind Barrow dated July 24, 2018 with the Subject: 30 Minute Lunch (NYC000402-NYC000403); and**

- **Exhibit 89:  Email from Kaye dated August 13, 2018 with the Subject: Pay Error (NYC000429)**

97. Plaintiff returned to work on August 6, 2018, but called out sick August 9-10, 2018.  See Emails, "Touching Base," dated August 6 2018, and "Out Sick today," dated August 9, 2018, and "Out sick today," dated August 10, 2018, annexed as Exhibit "GGG."

   **RESPONSE:**  Admit.

98. On August 13, 2018, upon her return to work, plaintiff complained to Ciara Smith and Colleen Barrow of CHS payroll that she believed she was getting docked pay because of a (sic) "apparent pay discrepancy in Kronos for on [sic] all of my time processed since July 1." Email, "Pay error," dated August 13, 2018, annexed as Exhibit "HHH."

   **RESPONSE:**  Admit with qualifications.  Dr. Kaye wrote that she had not had access to KRONOS since the transition on between July 1, 2018 and August 7, 2018.  As was documented, Dr. Kaye was out of the office on August 9th through   11th.  When she was out of the office, Dr. Kaye told Defendant Jain her time and then he would make the entries himself.  When Dr. Kaye corrected Dr. Jain about the incorrect time entries he made, he told her she was lying about her hours and continued to incorrectly enter them into KRONOS.  Therefore, between July 1st to August 13th, Defendant Jain incorrectly entered Dr. Kaye's time into KRONOS.

- **Exhibit 4: Kaye Decl. ¶¶ 64-77; and**

- **Exhibit 89:  Email from Kaye dated August 13, 2018 with the Subject Pay Error (NYC000429)**

99. That same day, CHS Payroll notified Dr. Jain, Andrea Swenson, Jonathan Wangle (sic), Ciara Smith and Colleen Barrow that "as of 8/5/2018 the code meal for the following employees will change from 30 minutes to an hour."  The employees listed -Oliver Harper, Melissa Kaye, Kanishk, Solanki, and Jonathan Weiss -were all members of the Doctors Council collective bargaining unit.  See Email, "meal Code," dated August 13, 2018, annexed as Exhibit "III."

**RESPONSE:** Deny.  The email is misleading.  Of the employees listed, Dr. Kaye: was the only

Court Clinic Director; was the only full-time employee; and was the only Group 11

managerial employee.  Additionally, Defendant Wangel clearly testified that there was

nothing in writing that required the imposition of a 1-hour lunch on members of the

Doctors Council.

- **Exhibit 36: Wangel Dep. p. 160:20-24**

100.  On August 15, 2018, Jonathan Wangel sent an email to Dr. Jain and Andrea Swenson, confirming the new schedule adjustment for Drs. Kaye, Solanki, Weiss and Harper.  See Email, "Fwd: 1-Hour Lunch," dated August 15, 2018, annexed as Exhibit "JJJ."

**RESPONSE:**  Admit with qualifications.  Drs. Solanki, Weiss and Harper were not Clinic

Directors like Dr. Kaye.  Again Dr. Kaye was the only Court Clinic Director that was required

to take an hour lunch.  Although, Defendant Wangel and Defendants have stated that

members of the Doctors Council were required to take the hour lunch, this position was

refuted by Ms. Barrow's email, which was directly addressed to Defendant Wangel.  In the

latter instance, he admitted that he had not seen anything in writing that required

physicians who were members of Doctors Council to take an hour lunch.

- **Exhibit 36: Wangel Dep. p. 160:20-24; and**

- **Exhibit 88: Email from Rosalind Barrow dated July 24, 2018 with the Subject: 30 Minute Lunch (NYC000402-NYC000403)**

101.  That same day, Dr. Jain notified plaintiff that her "schedule is now adjusted in Kronos as 8a-5p, with a 1-hour lunch."  Id. In response, plaintiff complained that "this change in my work schedule and lengthening the duration of my shift conflicts with my family responsibilities. "

**RESPONSE:** Disputed.  The statement of fact is misleading and is only a partial account of what transpired.  Dr. Kaye complained about the impact the shift change had on she and her children on multiple occasions.  For example, on October 18, 2018, she had an intense discussion with Defendant Jain, and he responded that childcare issues were not a concern for CHS.  The parties provide conflicting accounts as to whether Defendant Jain made the comment.  Dr. Kaye insists that he did, while Defendant Jain insisted otherwise.  The stated fact is also in dispute to the extent that it seeks to establish that the KRONOS system was ever repaired so that Dr. Kaye was not illegally docked pay by Defendants.  Dr. Kaye contends that it was not and that she experienced demotions of 31K in 2018 and 36K to her salary in 2019.

However, it was clear that the two had a discussion about the shift change, that the conversation was intense, and that children and childcare were discussed.  In essence, this statement of fact presents a factual dispute that should be resolved at trial.  Whether Defendants had discriminatory animus in the imposition of the shift change invokes an assessment of intent, which has traditionally been deemed a factual issue that is in the proper province of a jury.  With that said, the statement of fact as worded is misleading to the extent that it attempts to present the circumstances as if Defendant Jain was the sole decisionmaker involved in Dr. Kaye's shift change.  Defendant Ford specifically stated that they should wait for Mr. Wangel to weigh in before they moved forward.  The record also contains discussion of Defendant Yang insisting that everyone have an hour lunch.

84

- **Exhibit 4: Kaye Decl. ¶¶ 94-97;**

- **Exhibit 9: Kaye Dep. 11/15/21 p. 305:10-25-306:1-23; and**

- **Exhibit 15: Jain Dep. p. 124-125**

**Educational Leave**

102.  On July 28, 2018, documentation was submitted to the "Court Clinic time keeper," concerning plaintiff's request for educational leave in order to take her Child and Adolescent Boards on 9/24/18.  See Email, "FW: Educational Leave 9/24/18, " dated August 28, 2018, annexed as Exhibit "KKK."

   **RESPONSE:**  Admit with qualifications.  Dr. Kaye submitted documentation on August 28, 2018 to Sharon Rivera about sitting for the Child and Adolescent Boards.

- **Exhibit 94:  Email from Kaye dated August 28, 2018 with the Subject: Educational Leave 9/24/18 (NYC003296 )**

103.  On October 5, 2018, plaintiff reached out to Dr. Jain to inform him that her requested "educational leave was overridden and charged to annual leave, and that I was docked 18 hours (2 full work days) for 9/24."  See Email thread, "Re: 9/24 Time sheet error," dated October 5, 2018, annexed as Exhibit "LLL."  Dr. Jain responded, " I am looking into this." Id.

**RESPONSE:**  Disputed.  The statement of fact provides a partial account of what transpired.  The paragraph is also misleading to the extent that Defendant Jain actually followed-up and or addressed the errors in Dr. Kaye's time sheets and pay.

Dr. Kaye pointed out additional errors on her time sheet.  Firstly, she noted that her entries were overridden; that she was docked two-full days of leave when she sat for her boards; and that her Time Review stated that she had only worked 36 hours rather than 40 hours for the two-week time period.  Defendant Jain did eventually agree that Dr. Kaye should not be docked pay for sitting for her board examinations.  However, there was a debate as to whether she should receive credit for part of the day or for the full day.   Ultimately,

Defendants Jain, Ford and Dr. MacDonald decided to wait until Defendant Wangel confirmed their position.  A full three months passed between the day Dr. Kaye: sat for the exam and was wrongly docked; and the resolution of the matter in December 2018.  Again, had Dr. Kaye not vigorously advocated for herself there would not have been an acknowledgement of wrongdoing.  Further, it remains unresolved whether Defendants actually addressed the issue, Dr. Kaye was demoted in salary by at least $31,000 in 2018.

- **Exhibit 4: Kaye Decl. ¶¶ 94-97;**

- **Exhibit 95:  Email from Smith dated October 5, 2018 with the Subject: Educational Leave 9/24/18 (NYC00689-NYC00690); and**

- **Exhibit 96:  Email from Smith dated October 12, 2018 with the Subject: Educational Leave 9/24/18 (NYC00720-NYC00723); and**

- **Exhibit 97:  Email from Ford dated November 30, 2018 with the Subject: Docked Educational Leave (NYC000924)**

104.  Dr. Jain made the request to Payroll, on behalf of plaintiff, that this leave 'should qualify as educational leave for Dr. Kaye.  She is a physician and this is part of her professional credentialing."  That same day, after numerous emails between Dr. Jain, plaintiff and CHS Payroll, Ciara Smith, Director of CHS payroll, notified plaintiff that the 5 hours and 15 minutes duration of the exam was charged to educational leave, with the remaining hours for the day charged to annual leave.  See Email thread, "re: Educational Leave 9/24/18," dated October 5, 2018, annexed as Exhibit "MMM."

**RESPONSE:** Disputed.  The statement of fact as worded, is misleading and does not accurately depict what transpired between August 2018 and December 2018.   On November 30, 2018, Defendant Ford noted that they should hold off on confirming whether Dr. Kaye should get the full day for the educational leave until they heard back from Defendant Wangel.  Defendant Ford took this position despite the fact that both Defendant Jain and Dr. MacDonald had agreed that Dr. Kaye should receive leave.

- **Exhibit 97:  Email from Ford dated November 30, 2018 with the Subject: Docked**

**Educational Leave (NYC000924)**

105.  On October 9, 2018, plaintiff wrote to Ms. Smith, stating that she was improperly docked for taking a board exam, and that rather than charging only 5 hours and 15 minutes, she should be credited for a full day, or 8 hours.  See Email thread, "Re: Educational Leave 9/24/18," dated October 9, 2018, annexed as Exhibit "NNN."

**RESPONSE:** Admit with qualifications. Plaintiff objects to the email thread baring the bates stamp number (NYC04272).  The text of the email is redacted; therefore a response cannot be formulated as it pertains to this page.  Plaintiff admits that she was told that she would only be credited for 5 hours and 15 minutes, the duration of the exam.  However, she denies that Ms. Smith ever told her about an already  existing policy that CHS and or H + H had to this effect.  Further, on October 12, 2018, Ms. Smith stated in an email that she had contacted Defendant Wangel, who agreed that Dr. Kaye should not receive credit for a full day for the exam.  Again, Ms. Smith did not reference a specific already existing policy.

- **Exhibit 95:  Email from Smith dated October 5, 2018 with the Subject: Educational Leave 9/24/18 (NYC00689-NYC00690); and**

- **Exhibit 96:  Email from Smith dated October 12, 2018 with the Subject Educational Leave 9/24/18 (NYC00720-NYC00723)**

106.  The practice at CHS is to only approve the time for the exam, not travel or any other time. Id.

**RESPONSE:** Disputed. Defendants have not cited any admissible evidence to support the claim that they had an already existing CHS policy.  Defendant Yang testified that CHS officially took over the Court Clinics in 2018, therefore there is a question as to what already-existing policy could have been in effect for them to reference.  The record is also devoid of any evidence as to when CHS as an entity came into existence.  Also absent from the record are any written policies penned by CHS on this subject or on any other administrative subject for that matter

that would be sufficient to establish a policy or custom of any sort.

Defendants have also failed to produce any admissible evidence to establish that they actually gave Dr. Kaye credit for the entire day.   Dr. Kaye asserts nevertheless, that during the course of her 20 year career at the Bronx Court Clinic, whenever she sat for her boards, she received paid leave for the entire day.   Plaintiff's position is supported by the email exchanges she had with Drs. Badaracco and Colley, who both agreed with her.

- **Exhibit 98: Email from Kaye to Dr. Badaracco dated October 19, 2018 with the Subject: Educational Leave for Board Exams (NYC002526); and**

- **Exhibit 99: Email from Kaye to Dr. Colley dated October 19, 2018 with the Subject: Educational Leave for Board Exams (NYC2527)**

107.  On October 31, 2018, plaintiff reached out to Nate Santa Maria of Doctors Council, stating that she "was supposed to get educational leave for the full day," since [w]hen I registered for the exam I was a Bellevue employee and CHS has no formal policy."  See Email, "FW: Educational Leave for Board Certification Exam," dated October 31, 2018, annexed as Exhibit OOO.

**RESPONSE:**  Admit with qualifications.  Dr. Kaye contacted both H + H employee Wayne Myrie and Nate Santa Maria.  In her email, she pointed out that CHS did not have a formal policy regarding educational leave.  She then referenced Bellevue's policy, as she learned from Drs. Badaracco and Colley, which was to give doctors the full day of leave when they sat for their boards.  However, to be clear, both Bellevue and CHS were under the auspices of H + H.

- **Exhibit 98: Email from Kaye to Dr. Badaracco dated October 19, 2018 with the Subject: Educational Leave for Board Exams (NYC02526); and**

- **Exhibit 99: Email from Kaye to Dr. Colley dated October 19, 2018 with the Subject: Educational Leave for Board Exams (NYC02527)**

108.  On December 14, 2018, Ms. Smith notified plaintiff that "CHS is in the process of revising its policy with regard to education leave," and "will restore any leave you were charged."  On January 15, 2019, Ms. Smith notified plaintiff that "9/24 has been corrected

in Kronos to reflect 9 hours of Educational Leave (07)." See Email thread, "Re: Docked Educational Leave," between December 14, 2018 and January 15, 2019, annexed as Exhibit "PPP."

**RESPONSE:** Disputed. Since Dr. Kaye was demoted 31K in salary that year, it remains unclear if the error was corrected a full 4 months after she was wrongly docked pay and time. These things were restored after a series of emails that she circulated to both Defendants and her union, which reiterated a long standing policy of where Doctors who sat for their boards were compensated for the full day. The resistance and hostility within 2 days after Dr. Kaye supplemented her EEOC charge could be interpreted by a reasonable fact finder as proof of the retaliatory hostile work environment, that she endured while she worked at the Bronx Court Clinic under Defendants' management.

- **Exhibit 59: Dr. Kaye's EEOC Charge of Discrimination 520-2018-01534 and the EEOC's File (D000752-D000762);**

- **Exhibit 94: Email from Kaye dated August 28, 2018 with the Subject Educational Leave 9/24/18 (NYC003296);**

- **Exhibit 97: Email from Ford dated November 30, 2018 with the Subject: Docked Educational Leave (NYC000924);**

- **Exhibit 98: Email from Kaye to Dr. Badaracco dated October 19, 2018 with the Subject: Educational Leave for Board Exams (NYC2526);**

- **Exhibit 99: Email from Kaye to Dr. Colley dated October 19, 2018 with the Subject: Educational Leave for Board Exams (NYC2527); and**

- **Exhibit 100: Email from Kaye dated October 5, 2018 with the Subject: 9/24 Time Sheet Error dated 10/5/18 (NYC03360)**

   **B. PeopleSoft Problems: Retaliatory Demotion in Report**

109. On September 6, 2018, plaintiff received an email notifying her that "it's time for you to complete your Annual Health Assessment Review." Dr. Mundy was copied on this email.

See Email thread, Fw:  Annual Health Assessment Review," dated September 6-13, 2018, annexed as Exhibit QQQ."  The next day, Plaintiff responded, stating

> "CHS scheduled my health assessment on
> September 10th, a major Jewish Holiday. I was also
> Scheduled for mandatory iSight computer training
> During the Jewish High Holidays.  I am not
> Available for any work related duties during this time.
>
> This pervasive lack of cultural sensitivity is concerning.
> Also, I do not understand why a work peer and someone I do not
> know are gratuitously copied on an email that pertains to my
> private health related matters.  I oppose this unwarranted
> dissemination of my personnel information. " Id.

**RESPONSE:** Admit with qualifications.  In the wake of Dr. Kaye's EEOC charge, she was demoted in salary and job title (i.e. both office and corporate titles).  When this email thread took place, she had 18 years of seniority over Dr. Mundy.  However, Dr. Mundy, a male, was paid at a higher annualized salary both before and after he was promoted to Senior Director of the Manhattan Court Clinic.  At the time of this email, Dr. Kaye was vigorously fighting for pay parity and for respect in the work place.  The disclosure of her personnel data was of particular concern to her, since she had previously experienced identity theft due to lapses in H + H staff's handling of her information.  Based on the hostility she had experienced to date at that time, a reasonable fact finder could determine that Defendants acted with animus.  A fact finder could also determine, that the scheduling of her health assessment and ISight training on two consecutive Jewish holidays within the same month evidenced a callous disregard of Dr. Kaye's cultural and religious background.

- **Exhibit 101: Email from Kaye dated September 17, 2018 with the Subject: Annual Health Assessment Review Appointment Canceled   (NYC0528-NYC0531)**

110.  CHS notified plaintiff that her health assessment appointment was cancelled, and that plaintiff could reschedule her appointment at a time convenient for her. CHS also

acknowledged that "person listed may be a human resource error," and thanked plaintiff for "bringing this to our attention." Id.

**RESPONSE:** Deny.  The statement of fact is misleading and mischaracterizes what transpired.

The problem with Dr. Mundy being listed as Dr. Kaye's supervisor persisted from September

2018 until July 2019.  During that time, Dr. Mundy was copied on emails that discussed health

issues that involved Dr. Kaye and her son; and he was also on emails about her credentialing.

Although Defendants have characterized these repeated incidents as "PeopleSoft Problems,"

the lackadaisical approach to addressing the issue, despite Dr. Kaye's emails, evidenced the

hostility that she encountered in Defendants' work environment.

Dr. Mundy started as Senior Director of the Manhattan Court Clinic in April 2018.

However, he was not listed as Dr. Kaye's supervisor until September 2018, which was after Dr.

Kaye had complained to the EEOC, and after Defendant Jain's comment in July 2018 that he was

going to report her to Defendant Wangel.  Dr. Kaye testified that after she filed at the EEOC,

Defendant Jain made every effort to avoid speaking and or meeting with her; and that she had

to corner him to discuss work.

- **Exhibit 101:  Email from Kaye dated September 17, 2018 with the Subject: Annual Health Assessment Review Appointment Canceled  (NYC00528-NYC00531);**

- **Exhibit 102: Email from Wangel dated December 3, 2018 with the Subject Expiring License Certification (NYC02262-NYC02263);**

- **Exhibit 103: Email from Yang dated February 15, 2019 with the Subject: Simmering About to Boil Over (NYC03911-NYC03913);**

- **Exhibit 104: Email from Kaye dated April 12, 2019 with the Subject: ATLS 2018 Time Keeping Year End Close (NYC03955-NYC03956);**

- **Exhibit 105:  Email from Jain dated April 16, 2019 with the Subject: ATLS 2018 Timekeeping Year End Close (NYC02727-NYC02731);**

- **Exhibit 106: Email from Jain dated June 10, 2019 with the Subject: PeopleSoft Dr. Kaye Assignment.  (NYC02933-NYC02935); and**

- **Exhibit 107: Email from Mundy dated July 16, 2019 with the Subject: Group 12 Performance Evaluation (NYC03033)**

111.  In response, plaintiff declared that:

> "Dan Mundy is NOT my supervisor in any way. He
> Is significantly junior to me. I do NOT 'report to'
> Him in any fashion and never have.  I have 18 years
> Of seniority over Dan, I  have superior training
> and credential (sic) to Dan, and we work in different
> boroughs. [emphasis in original]
>
> To site [sic] Dan Mundy as my superior or my
> 'report to' and copy him on my private HR matters
> is beyond careless and insulting, it is a serious
> privacy violation against me. It is imperative that
> Dan Mundy never be copied on any of my HR or
> personnel related matters again." Id.

**RESPONSE:**  Admit with qualifications.  Dr. Kaye wrote the email after she had been demoted in title and salary.  Dr. Kaye had 18 years more experience than Dr. Mundy, however he was paid more on an annualized basis than her both before and after he was promoted to Senior Director of the Manhattan Court Clinic.  Additionally, since Defendant Jain had made it a point to avoid interacting with her after she filed her EEOC charge, Dr. Kaye became even more concerned that she was being demoted even further with Defendants' designation of a relatively junior employee as her supervisor to do things such as completing her performance evaluation.

- **Exhibit 101:  Email from Kaye dated September 17, 2018 with the Subject Annual Health Assessment Review Appointment Canceled  (NYC00528-NYC00531);**

- **Exhibit 102: Email from Wangel dated December 3, 2018 with the Subject Expiring License Certification (NYC2262-2263);**

- **Exhibit 103: Email from Yang dated February 15, 2019 with the Subject: Simmering About to Boil Over (NYC3911-NYC3913);**

- **Exhibit 104: Email from Kaye dated April 12, 2019 with Subject ATLS 2018 Time Keeping Year End Close (NYC3955-NYC3956);**

- **Exhibit 105:  Email from Jain dated April 16, 2019 with the Subject: ATLS 2018 Timekeeping Year End Close (NYC2727-NYC2731);**

- **Exhibit 106: Email from Jain dated June 10, 2019 with the Subject: PeopleSoft Dr. Kaye Assignment.  (NYC2933-NYC2935); and**

- **Exhibit 107: Email from Mundy dated July 16, 2019 with the Subject: Group 12 Performance Evaluation (NYC3033)**

112.  By email, Dr. Jain clarified to CHS OHS that he, and "not Dan Mundy," was plaintiff's supervisor, and forwarded the email thread to Dr. Ford, noting that plaintiff's interactions in response to this apparent error were "unprofessional." Id.

**RESPONSE:** Disputed.  The statement of fact is misleading and mischaracterizes an obvious level of disdain and marginalization that was exhibited towards Dr. Kaye at this time. Despite representations otherwise, Dr. Mundy was wrongly listed as Dr. Kaye's supervisor from September 2018 until July 2019.  The repeated failure to address Dr. Kaye's complaints was unprofessional, not her exasperation with Defendants' apathy and inertia.

Dr. Kaye repeatedly raised the issue after she previously experienced identity theft at H + H.  Also as previously stated, Defendant Jain had been avoiding any contact with Dr. Kaye since she filed her EEOC charge in May 2018.  Dr. Kaye testified that she had to corner Defendant Jain to speak with him, therefore, she saw the designation of Dr. Mundy after he had been there for months as yet another demotion inflicted on her by Defendants because she had spoken up about discrimination and retaliation.  Again, Dr. Kaye had 18 years more experience at H + H and as a forensic evaluator than Dr. Mundy.

- **Exhibit 23: Kaye Dep. Cross Exam dated 1/25/22 p. 14-19**

113.  On December 3, 2018, plaintiff notified Dr. Ford that Dr. Mundy continued to be copied on emails related to her personnel matters, in this instance, the upcoming expiration of her license/certification.  That same day, the error was corrected and Dr. Jain, and not Dr. Mundy, was added as plaintiff's supervisor.  See Email, "Fw: Expiring License/Certification," dated December 3, 2018, annexed as Exhibit "RRR."

**RESPONSE:** Deny.  The "error" continued to persist until July 2019.  Dr. Kaye continued to

be demoted in terms of who she reported to, despite her entreaties that the problem be

addressed.

- **Exhibit 103: Email from Yang dated February 15, 2019 with the Subject: Simmering About to Boil Over (NYC3911-NYC3913);**

- **Exhibit 104: Email from Kaye dated April 12, 2019 with Subject ATLS 2018 Time Keeping Year End Close (NYC3955-NYC3956);**

- **Exhibit 105:  Email from Jain dated April 16, 2019 with the subject ATLS 2018 Timekeeping Year End Close (NYC2727-NYC2731);**

- **Exhibit 106: Email from Jain dated June 10, 2019 with the Subject PeopleSoft Dr. Kaye Assignment.  (NYC2933-NYC2935); and**

- **Exhibit 107: Email from Mundy dated July 16, 2019 with the Subject Group 12 Performance Evaluation (NYC3033)**

114.  On February 15, 2019, plaintiff wrote to Mr. Wangel regarding the fact that Dr. Mundy had again been copied on a personal email, this time an email approving plaintiff's FMLA leave request.  That same day, Mr. Wangel wrote to plaintiff that "[a]s of this evening, Vice President of H + H Human Resources, Yvette Villanueva, confirms that Ms. Mendez, an employee of H + H Central Office HR, now understands that Dr. Jain is your supervisor and Dr. Mundy is not to be included in any communication regarding your personnel matters."  See Email thread, "Fwd: Melissa Kaye FMLA/Intermittent -To care for ill family member leave approval,"  dated February 15, 2019 and email, "Re: simmering about to boil over," dated February 15, 2019, annexed as Exhibit "SSS."

**RESPONSE:**  Disputed.  Although Dr. Kaye received this response, Dr. Mundy continued to

be listed as her supervisor after this incident in February 2019.  It should be noted that this

incident took place approximately a week after Dr. Kaye testified in open court that she had

recorded Jose Gonzalez's 730 Examinations, and that against Defendants' wishes she found

him unfit.  Ms. Swenson specifically stated regarding Mr. Gonzalez: they want him found fit.

In the wake of this disclosure, Dr. Kaye was brought up on baseless disciplinary charges.

- **Exhibit 104: Email from Kaye dated April 12, 2019 with Subject ATLS 2018 Time Keeping Year End Close (NYC3955-NYC3956);**

- **Exhibit 105:  Email from Jain dated April 16, 2019 with the Subject ATLS 2018 Timekeeping Year End Close (NYC2727-NYC2731);**

- **Exhibit 106: Email from Jain dated June 10, 2019 with the Subject PeopleSoft Dr. Kaye Assignment.  (NYC2933-NYC2935);**

- **Exhibit 107: Email from Mundy dated July 16, 2019 with the Subject Group 12 Performance Evaluation (NYC3033); and**

- **Exhibit 147: Email from Swenson dated March 7, 2019 with the Subject: I am making mistakes so you don't have to (NYC002606-NYC002607)**

115.  On June 3, 2019, Dr. Jain informed HR that PeopleSoft, a personnel management system still incorrectly listed Dr. Mundy as Dr. Kaye's supervisor.  On June 10, 2019, this issue was resolved. See Email, "RE: PeopleSoft -Dr. Kaye assignment," dated June 3,-10, 2019, annexed as Exhibit "TTT."

**RESPONSE:**  Deny.  The problem persisted even after Defendants represented that it had

been resolved.  In July 2019, Dr. Mundy was again listed as Dr. Kaye's supervisor.  At that

time, he was asked to complete Dr. Kaye's performance evaluation; Dr. Kaye continued to

complain.

- **Exhibit 107: Email from Mundy dated July 16, 2019 with the Subject Group 12 Performance Evaluation (NYC3033)**

  **C.   Retention Bonus**

116.  On September 17, 2018, Mr. Wangel forwarded a list of former Bellevue FPECC staff

who were now at CHS that "should be on the retention lump sum list" to Matthew
Campese, Assistant Vice President of Labor Relations at H + H, who sent the list to
Bellevue for confirmation.  See Email, "Re: Docs Council Lump Sum," dated September 17-
18, 2018, annexed as Exhibit "UUU;"  Wangel, Ex. P at 49:6-24.

**RESPONSE:** Disputed.  Defendants received notices of Dr. Kaye's Supplemental EEOC Charge on

September 11th and 13th, 2018 from Dr. Kaye's law firm and the EEOC respectively.  Wayne

Myrie and April Alexander  both confirmed that any additional data needed to calculate Dr.

Kaye's retention bonus eligibility must come from H + H's Central office, since Dr. Kaye was no

longer on Bellevue's payroll or staff.  Mr. Myrie also confirmed that the remainder of Dr. Kaye's

retention bonus would have to come from H +H because Dr. Kaye was no longer on Bellevue's

payroll system.

    Based on the foregoing, a reasonable juror could determine that the protracted production

of Dr. Kaye's full retention bonus was also retaliatory.  Defendants received numerous

confirmations that Dr. Kaye was in fact a full-time 1.0 employee of Bellevue's from July 2017 to

June 2018.  They received notification from Dr. Kaye's former supervisor, Dr. Badaracco; they

received confirmation from Dr. Kaye; and they also received confirmation from her union

representative Kevin Collins.  Each of these individuals in addition to Ms. Barrow, confirmed

that Dr. Kaye was entitled to the full $20,000 retention bonus.

    However, Defendants fought tooth and nail for months that she wasn't.   Instead of

calculating Dr. Kaye's hours based on their Central payroll system, Defendants enlisted Angela

Mullett to calculate her hours and employment status based on the timesheets Defendant Jain

erroneously completed.  Therefore, instead of being credited for the 1700 hours she actually

worked, Ms. Mullett determined that Dr. Kaye had only worked 1184.  Further, Defendant Yang

also deceptively claimed that she made the decision to delay the transition of the Court Clinics

so that Dr. Kaye and the other Bellevue physicians could get their full retention bonuses. The truth was however, that Dr. Kaye's union insisted that the transition be delayed, as per the MOA that they entered into with H + H in July 2017.

- **Exhibit 53:  Email from Santamaria dated October 2, 2018 Subject:  Retention Bonus for Fiscal Year of July 1, 2017 to June 2018 (NYC00640);**

- **Exhibit 54:  Doctors Council MOA July 2017 (NYC00641-NYC000648);**

- **Exhibit 108: Letter from Buell dated September 11, 2018 with the Subject: Supplemental EEOC Charge of Melissa Kaye (D00741);**

- **Exhibit 109: Email from Diamond dated September 13, 2018 with the Subject: Supplemental EEOC Charge of Melissa Kaye Charge 520-2018-01534 (D00742-D00746);**

- **Exhibit 110:  Email from Wangel dated September 17, 2018 with the Subject: Docs Council Lump Sum (NYC000560);**

- **Exhibit 111: Email from Alexander dated September 26, 2018 with the Subject: Can You Help Us Help Ourselves (NYC000581-NYC000582);**

- **Exhibit 112: Email from Mullett to Campese dated September 28, 2018 with the Subject: Total Work Hours -KAYE RETENTION PAYMENT (NYC003419-NYC003422: look at (NYC003421));**

- **Exhibit 113: Email thread between Kaye and Badaracco dated October 4, 2018 with the Subject: Retention Bonus (NYC000707-NYC00708);**

- **Exhibit 114: Email from Kaye dated October 31, 2018 with the Subject: FTE Error Causing Bonus Retention Error (NYC00797);**

- **Exhibit 115: Email from Collins dated November 13, 2018 with the Subject: Some Retention Bonus Issues (NYC00864-NYC000865);**

- **Exhibit 116: Email from Barrow, Colleen dated November 15, 2018 with the Subject: Dr. Kaye Retention Bonus Payment (NYC000866); and**

- **Exhibit 117:  Email from Wangel dated December 3, 2018 with the Subject: Expiring License/Certification (NYC000978-NYC000979)**

117.  Between September 19 and September 26, 2018, CHS sought to enact payment to the four psychiatrists, including plaintiff, who were eligible for a retention bonus. See Email, including attachments, entitled, "Docs Council Retention Bonus," dated September 26, 2018, and Email, "can you help us help ourselves?" dated September 26, 2018, annexed as Exhibit "VVV."

RESPONSE:  Disputed.  Defendants intentionally incorrectly designated Dr. Kaye's

employment status.  Defendants insisted on calculating her status based on the time sheets

that were incorrectly completed by Defendant Jain, instead of doing as instructed and using

their Central Payroll system.  On November 15, 2018, Ms. Barrow felt compelled to

comment that Dr. Kaye should have been entitled to her full retention bonus based on the

City's payroll records.  In addition, Ms. Alexander also advised Defendant Wangel to use the

payroll system to calculate Dr. Kaye's time and status.   Defendant Wangel and Defendants

collectively ignored Ms. Alexander's advice as well, and insisted that Ms. Mullett (Ms.

Alexander's staff person) produce this data contrary to her supervisor's initial instructions.

- **Exhibit 111: Email from Alexander dated September 26, 2018 with the Subject Can You Help Us Help Ourselves (NYC000581-NYC000582);**

- **Exhibit 112: Email from Mullett to Campese dated September 28, 2018 (NYC003419-NYC003422 (look at NYC03421)); and**

- **Exhibit 116: Email from Barrow, Colleen dated November 15, 2018 with the Subject Dr. Kaye Retention Bonus Payment (NYC000866)**

118.  On September 26, 2018, Mr. Wangel requested that April Alexander, Director of Human Resources at H + H, (sic)have her team "confirm the total number of hours for the 3 part-timers, as well as confirm that Dr. Kaye is entitled to the max retention bonus?"  See Email, "FW: can you help us help ourselves?" dated September 26, 2018, annexed as Exhibit WWW.

RESPONSE:  Disputed.   The email misrepresents what took place.  Although Defendant

Wangel may have requested that Ms. Alexander engage in this task, Defendants went

around Ms. Alexander and enlisted her subordinate to do what they wanted: which was to

falsely report Dr. Kaye's actual hours worked and work status.

Ms. Alexander explained to Defendant Wangel, that since Dr. Kaye no longer worked at

Bellevue, that CHS staff would have to do a payroll query by way of H + H's central office to

calculate Dr. Kaye's the number of hours she worked from July 2017 to June 2018.  Instead

of taking this instruction, Ms. Mullett chose to calculate the number of hours that Dr. Kaye

worked by doing a query of her timesheets.  From July 1, 2018 to September 2018, Dr. Kaye

repeatedly complained that her time had been entered into the system incorrectly by

Defendant Jain.  Consistent with that premise was Ms. Mullet's incorrect determination that

Dr. Kaye had only actually worked 1184 hours and  that she grossed 1400 hours for the

relevant time period.  On November 15, 2018, however, Colleen Barrow, Assistant Director

of Payroll for CHS actually conducted a query of their payroll records and had determined

that Dr. Kaye had been paid for 1920 hours and had actually worked 1704 hours.

- **Exhibit 111:  Email from Alexander, dated September 26, 2018 with the Subject: Can You Help us Help Ourselves (NYC00581-NYC000582);**

- **Exhibit 112:  Email from Mullett to Campese dated September 28, 2018 with the Subject Total Work Hours (NYC003419-NYC003422); and**

- **Exhibit 116: Email from Barrow dated November 15, 2018 with the Subject Dr. Kaye Retention Bonus Payment (NYC00866)**

119.  Based on the calculations provided by Bellevue and H + H Central Office, it was determined that plaintiff was eligible for a $13,400 retention bonus, based on .67 FTE ("Full Time Employment").  See Email thread, "Re: Total Work Hours," dated September 26 and September 27, 2018, annexed as Exhibit "XXX."

**RESPONSE:** Disputed.  The stated fact misrepresents what transpired. Despite instructions

from Ms. Alexander to obtain Dr. Kaye's work status from the central payroll system, Ms.

Mullett calculated Dr. Kaye's hours based on Dr. Kaye's erroneously entered timesheets.

Again, when CHS's Assistant Director of Payroll, Ms. Barrow did a query of the payroll system, it was determined that Dr. Kaye had actually worked 1704 hours rather than the 1184 hours that Ms. Mullett had tabulated.  Therefore, had Defendants actually listened to Ms. Alexander on September 26, 2018 and or Ms. Barrow on November 15, 2018, Dr. Kaye would have received her full retention in September not  in December after the holidays.

- **Exhibit 111:  Email from Alexander, dated September 26, 2018 with the Subject: Can You Help us Help Ourselves (NYC00581-NYC000582);**

- **Exhibit 112:  Email from Mullett to Campese dated September 28, 2018 with the Subject Total Work Hours (NYC003419-NYC003422); and**

- **Exhibit 116: Email from Barrow dated November 15, 2018 with the Subject Dr. Kaye Retention Bonus Payment (NYC00866)**

120.  On September 27, 2018, Mr. Campese provided Doctors Council with a list of the 4 additional doctors and their FTE status, which included plaintiff, who had been added to the retention payment list.  See Email, "RE Doctors Council Retention payment list - Revised 9.27.18," dated September 27, 2017, annexed as Exhibit "YYY."

**RESPONSE:**  Admit with qualifications. None of the other doctors were Center Directors. Further, none of the other doctors had to have the union advocate that they receive the correct disbursement of their retention bonus.  Defendants did not miscalculate the work status of any of the other doctors.

121.  On October 31, 2018, plaintiff notified Bellevue Payroll that she had been a full-time employee of Bellevue from 8/1/17 to 6/30/18, and that she should have received the full retention bonus to which she was entitled.  See Email thread, RE: FTE error causing bonus retention error," dated October 31, 2018, annexed as Exhibit "ZZZ."  Immediate efforts were made by both CHS and Bellevue to determine whether plaintiff's retention bonus needed to be adjusted.  Id.

**RESPONSE:** Disputed.  The exhibit does not support the stated fact.  Dr. Kaye and Nate Santamaria emailed Dr. Badaracco about her FTE status during the time period of July 2017

to June 2018.  On October 4, 2018, Dr. Badaracco confirmed Dr. Kaye's FTE 1.0  status.  On

November 13, 2018, Kevin Collins, Dr. Kaye's union representative, advocated that Dr. Kaye

was owed an additional $6,600.

Due to the acrimony between the parties, a reasonable trier of fact could determine

that Defendants intentionally miscalculated Dr. Kaye's hours worked so that they would not

have to pay her the remaining money.  As per Bellevue staff person, Wayne Myrie, since Dr.

Kaye was on CHS's payroll, they would have to pay the difference.  The emails from

Defendant Wangel that inquired about Dr. Kaye's full-time status began to circulate in

September 2018, within days of Dr. Kaye filing and notifying H + H of her Supplemental

Charge of discrimination at the EEOC.

- **Exhibit 53:  Email from Santamaria dated October 2, 2018 Subject:  Retention Bonus for Fiscal Year of July 1, 2017 to June 2018 (NYC00640);**

- **Exhibit 54:  Doctors Council MOA July 2017 (NYC00641-NYC000648);**

- **Exhibit 108: Letter from Buell dated September 11, 2018 with the Subject Supplemental EEOC Charge of Melissa Kaye (D00741);**

- **Exhibit 109: Email from Diamond dated September 13, 2018 with the Subject: Supplemental EEOC Charge of Melissa Kaye Charge 520-2018-01534 (D00742-D00746);**

- **Exhibit 110:  Email from Wangel dated September 17, 2018 with the Subject Docs Council Lump Sum (NYC000560):**

- **Exhibit 113: Email thread between Kaye and Badaracco dated October 4, 2018 with the Subject Retention Bonus (NYC000707-NYC00708);**

- **Exhibit 114: Email from Kaye dated October 31, 2018 with the Subject: FTE Error Causing Bonus Retention Error (NYC00797); and**

- **Exhibit 115: Email from Collins dated November 13, 2018 with the Subject Some Retention Bonus Issues (NYC00864-NYC000865)**

122.  On November 13, 2018, Nate Collins of Doctors Council sent an email to Mr. Campese, notifying him that in addition to plaintiff, there was another psychiatrist at Bellevue who had retention bonus issues.  See Email thread, "re: some retention bonus issues," dated November 13-14, 2018, annexed as Exhibit "AAAA."

**RESPONSE:** Disputed.  The stated fact is misleading.  The other psychiatrist, Federico Zuniga was not a Court Clinic employee, and thereby did not have the same managerial hierarchy as Dr. Kaye. Specifically, Mr. Zuniga did not work for CHS and or the Forensic Psychiatric Borough Court Clinics.

- **Exhibit 4: Kaye Decl ¶ 86**

123.  On December 19, 2018, after determining plaintiff was employed at Bellevue as a 40 hour per week employee, Mr. Campese notified Mr. Collins that plaintiff would be receiving the remainder of her retention bonus payment.  See Email thread, "Re: Total Work Hours -KAYE RETENTION PAYMENT," between September 2018 and December 19, 2018, and Email, Dr. Kaye," dated December 19, 2018, annexed as Exhibit "BBBB."

**RESPONSE:**  Disputed.  The statement of fact mischaracterizes what transpired.  Dr. Kaye worked as a full-time employee for H + H since August 2000.  Defendants retaliated and penalized Dr. Kaye as part of an ongoing campaign in the wake of her complaints, when they misstated her full-time status.  None of the other Bellevue employees who transitioned to the Forensic Psychiatric Evaluation  Court Clinics received the wrong amount for their retention bonus.  Contrary to Defendants' representations, CHS staff calculated Dr. Kaye's hours while she was at Bellevue.  This took place, because Bellevue no longer had access to the information.  As per the email from April Alexander, CHS staff were instructed to do a payroll query through the Central Office.  Further, since Dr. Kaye was no longer on Bellevue's payroll, Wayne Myrie told CHS that they would have to pay the balance of Dr. Kaye's bonus.

Defendants' actions were addressed, only again after Dr. Kaye vigorously fought to be paid the full $20,000.  Since Dr. Kaye was now on CHS's payroll, Defendants vigorously resisted paying her the remaining $6,600 that she was entitled to pursuant to the CBA.   A reasonable juror could determine that the ongoing problems Dr. Kaye experienced in the conditions of her employment, were intentional acts committed by Defendants to make Dr. Kaye's work environment intolerable.

- **Exhibit 111:  Email from Alexander, dated September 26, 2018 with the Subject: Can You Help us Help Ourselves (NYC00581-NYC000582); and**

- **Exhibit 118: Email from Myrie dated December 18, 2018 with the Subject: Total work Hours -KAYE RETENTION PAYMENT (NYC001028-NYC001057)**

### D.  Complaints of Discrimination and Retaliation

124.  Thereafter, on or about May 22, 2018, plaintiff filed a Charge of Discrimination with the EEOC against Bellevue Hospital.  On or about May 31, 2018, the EEOC sent notice of the Charge to Shirley Facey, EEO Coordinator at Bellevue. See Notice of Charge of Discrimination, dated May 31, 2018, annexed as Exhibit "CCCC."

**RESPONSE:** Admit with qualifications.  In her charge, Dr. Kaye said she worked for Bellevue and HHC/H+H.  Additionally, Dr. Kaye had already complained of pay parity discrimination to Defendant Yang and Bill Hicks (CEO of Bellevue) internally on May 3, 2018.   Defendants began to retaliate against her on May 14, 2018, when they demoted her in title under the guise of making the titles of all of the Court Clinic directors uniform. At that time they had also reduced her corporate title from Attending Physician III to Attending Physician II.

- **Exhibit 5: Email forwarded by Yang to S. Gillen and J. LaBoy dated May 3, 2018 with the Subject:  Pay Equity for Court Clinic Medical Directors (NYC00208-NYC00211);**

- **Exhibit 6: Email from Jain dated May 11, 2018 with the Subject: Titles (NYC00216);**

- **Exhibit 7: Email from Kaye dated May 25, 2018 with Subject: Business Cards (NYC00235);**

- **Exhibit 8:  Email from S. Gillen dated May 14, 2018 with the Subject: 730 Retention Bonus (NYC00220-NYC00221); and**

- **Exhibit 59:  EEOC  Charge as filed on May 22, 2018 and Supplemental Charge as filed on September 7, 2018 (D00752-D00762)**

125.  On or about September 11, 2018, plaintiff filed a Supplemental Charge of Discrimination with the EEOC.  See EEOC Charge, received on September 11,2018, annexed as Exhibit "DDDD."  In the Charge, plaintiff alleged that "the male Manhattan Court Clinic Medical Directors have made significantly more money than I over the almost 20 years I have worked here," and that as (sic) result of raising this pay disparity, "HHC has demoted me in title, extended the length of my workday, moved my shift to begin an hour earlier, and miscalculated my time," for "no legitimate or consistent reason."  Id.

**RESPONSE:**  Deny.  The statement of fact is misleading and wrongly prefaces the male Court Clinic Directors with the specification that they were from the Manhattan Court Clinic.  Dr. Kaye's original EEOC Charge and her Supplemental Charge do not specify which Clinics.

Dr. Kaye's Supplemental Charge of Discrimination was filed on September 7, 2018, the EEOC stamped the charged as received on September 11, 2018.  Defendants subsequently retaliated against Dr. Kaye.  They scheduled mandatory training on two days, two weeks in a row that coincided with the Jewish Holidays (on September 7th and 10th). Dr. Kaye sat for the Child & Adolescent Psychiatry Board on September 24, 2018, Defendants unfairly docked her pay, although it was general practice to afford doctors a full day of leave.

During the month of October 2018, Defendant Jain became even more hostile towards Dr. Kaye.  Defendant Jain did all he could to avoid Dr. Kaye: specifically, he refused to meet with her, although he was her direct supervisor.  This aspect of Dr. Kaye's claims present issues of disputed fact on the following: whether the repeated designation of Dr. Mundy as Dr. Kaye's

supervisor was intentional and a further act of retaliation; and whether Defendant Jain falsely

accused Dr. Kaye of stealing his handwritten notes.  In the latter instance, Dr. Kaye also accused

Defendant Jain of throwing away his notes.  Ultimately, it was never proven that Dr. Kaye had

taken Defendant Jain's notes.

 A few weeks after Dr. Kaye filed her Supplemental Charge with the EEOC, on October 11,

2018, Dr. Kaye met with Defendant Jain.  On that day, she testified that she had to corner him

to discuss the impact that the shift change was having on she and her family.   Both Dr. Kaye

and Defendant Jain testified that the meeting was intense.  However, on a macrolevel, the

disdain that Defendant Jain displayed when he said CHS does not address child care issues, and

when he asked Dr. Kaye when she would be leaving so that he could post her job, was

indicative of the retaliatory hostile work environment Dr. Kaye was forced to endure at H +

H/CHS.

- **Exhibit 5: Email forwarded by Yang to S. Gillen and J. LaBoy dated May 3, 2018 with the Subject:  Pay Equity for Court Clinic Medical Directors (NYC00208-NYC00211);**

- **Exhibit 9: Kaye Dep. 11/15/21  p. 305:10-25-306:1-23;**

- **Exhibit 15: Jain Dep. p. 124-125;**

- **Exhibit 100: Email from Kaye dated October 5, 2018 with the Subject: 9/24 Time Sheet Error dated 10/5/18 (NYC03360);**

- **Exhibit 119: Email from Kaye with the Subject: Annual Health Assessment Review dated September 7, 2018 (NYC03310-NYC03311); and**

- **Exhibit 120: Email from Wangel dated September 26, 2018 with the Subject Docs Council Lump Sum (NYC002052)**

126. On or about September 18, 2018, H + H Legal forwarded Mr. Wangel a copy of an EEOC
Charge filed by plaintiff on September 11, 2018.  Mr. Wangel then shared the EEOC

Charge with Jessica Laboy and Dr. Yang.  See Email, "FW: Melissa Kaye, " dated September 18, 2018, annexed as Exhibit "EEEE."

**RESPONSE:** Deny.  The referenced exhibit is only a partial production.  Dr. Kaye respectfully directs the Court to reference her Exhibit 59, which has the complete Supplemental Charge as it was received by Defendants in September 2018.  Defendants had access to the EEOC Supplemental Charge before September 18, 2018, which also coincided with the two pay periods that Defendants scheduled meetings, trainings and docked Dr. Kaye's pay on two Jewish High holidays.

- **Exhibit 59:  EEOC  Charge as filed on May 22, 2018 and Supplemental Charge as filed on September 7, 2018 (D00752-D00762);**

- **Exhibit 108:  Letter from Buell dated September 11, 2018 with the Subject: Supplemental EEOC Charge of Melissa Kaye (D0741);**

- **Exhibit 109:  Email from Diamond dated September 13, 2018 with the Subject: Supplemental EEOC Charge of Melissa Kaye Charge 520-2018-01534 (D00742-D00746)**

127.  On or about May 2, 2019, H + H was served with an Amended Complaint in which plaintiff alleged claims of discrimination and retaliation against H + H and Drs. Yang, Jain, and Ford as well as Mr. Wangel.  See Ex. A.

**RESPONSE:**  Admit with qualifications.  Plaintiff served Defendants with Exhibit A on May 2, 2018 docketed at 25 on ECF.  The Amended Complaint attached as Exhibit A was a proposed Amended Complaint that was later revised and re-submitted at ECF Dkt. 29 on May 3, 2018.  Plaintiff served the Amended Complaint as docketed at ECF 29 after ECF Quality Control instructed Counsel to re-file the complaint and after Counsel obtained leave of Court to re-file her complaint as Amended.

- **Exhibit 1:  Plaintiff's Amended Complaint as filed on May 3, 2018 ECF Dkt. 29.**

### E. Meetings

128.  On November 29, 2018, Plaintiff complained to Dr. Jain that she had been excluded from a meeting that she originally said she was free to attend.  In response, Dr. Jain sought to reschedule the meeting to accommodate plaintiff. See Email, "Fwd: Meeting 12/4, "dated November 28-29, 2018, and Email, "FW: Meeting, "dated November 30, 2019, annexed as Exhibit "FFFF."

**RESPONSE:** Deny. Between September 2018 and January 2020, Dr. Jain repeatedly refused to meet with Dr. Kaye. He also excluded her from meetings that involved the operations of the Bronx Court Clinic.   For example, on September 7, 2018, Defendant Jain and Ms. Swenson intentionally scheduled a meeting in the Bronx with Chief Court Clerk Nat Hart, when they knew that she would be at a meeting in downtown Manhattan.

In or around November 29, 2018, Defendant Jain and Ms. Swenson excluded Dr. Kaye from a meeting with Chief Court Clerk William Kalish.  Prior to scheduling the meeting, Dr. Kaye stated that her schedule was always in flux due to the nature of scheduling 730 Exams.  She specifically said that her availability may change based on the production of inmates for exams.

As time elapsed and the meeting drew closer, Dr. Kaye notified Defendant Jain that she had a conflicting 730 on a high profile case, inmate Pagan. Despite notification of this conflict, Defendant Jain decided to proceed without her.   Fortunately, Chief Clerk Kalish had a conflict, which forced Defendant Jain and Ms. Swenson to re-schedule the meeting for the subsequent day.  Dr. Kaye confronted Defendant Jain about the scheduling conflict, but at no time did he admit wrongdoing.  Ultimately, Ms. Swenson would apologize for the scheduling conflict, but she would nevertheless continue to harass and marginalize Dr. Kaye in other contexts.

- **Exhibit 4: Kaye Decl. ¶¶ 132-134;**

- **Exhibit 121: Email from Kaye dated November 28, 2018 with the Subject: Meeting 12/4 3:35PM (NYC02179-NYC02180);**

- **Exhibit 122: Email from Kaye with the dated November 28, 2018 with the Subject: Meeting 12/4 (NYC003831);**

- **Exhibit 123: Email from Kaye dated November 29, 2018 with the Subject: Meeting 12/4 (NYC002302-NYC002304);**

- **Exhibit 124:  Email from Kaye dated November 29, 2018 with the Subject: Re Meeting 12/4 (NYC0914-NYC0916); and**

- **Exhibit 125: Email from Kalish dated November 30, 2018 with the Subject: Meeting (NYC00944-NYC00948)  (see pg. NYC00945)**

   **F.   Kronos**

129.   On June 28, 2018, a request was made for Kronos accounts for FPECC staff at the Manhattan and Bronx Court clinics.  See Email, "Kronos Accounts for FPECC Staff at Manhattan and Bronx, dated June 28, 2018, annexed as Exhibit "GGGG."

   **RESPONSE:**  Disputed.   The statement of fact is misleading. Defendants made the request

   for KRONOS to be set up, between June 29th and July 2nd, 2018, but on July 2, 2018, the

   accounts were still not operational.  Further, even subsequent to the alleged creation of

   KRONOS profiles for Plaintiff and her colleagues, from July 1, 2018 until October 2019, Dr.

   Kaye continued to experience inconsistent and problematic access to the system.

- **Exhibit 91: Email from Swenson dated July 2, 2018 with the Subject KRONOS Accounts for FPECC Staff at Manhattan and Bronx (NYC000305-NYC000306)**

130.   In early July 2018, Plaintiff emailed Dr. Jain informing him that the Kronos system was not working in the Bronx, and expressed concern that if her time was not entered, she did (sic) "risk[ed] getting taken off the payroll and losing my benefits and health insurance." Dr. Jain reassured plaintiff that he was able to enter her time, that he was working on getting the issue resolved, and that "[t]his Kronos issue happened with a lot of us when we first started."  See Email thread, "Re Kronos not working in the Bronx," dated July 3-5, 2018, annexed as Exhibit "HHHH."

**RESPONSE:**  Disputed.  The statement of fact is misleading.  Dr. Kaye had issues with access to KRONOS between July 2018 and January 2020.  Off and on during this period, her time was either entered inaccurately by Defendants, which ultimately led to her hours being under reported in H + H's time sheet tracking system; and effectively to her being demoted by 31K and 36K in salary in the years 2018 and 2019 respectively

Dr. Kaye's lack of access to KRONOS led to her being demoted in salary because her pay was constantly being docked.  It led to her being denied FMLA because the time sheet system, where Defendant Jain had been incorrectly entering her time had underreported her hours so that it did not look like she worked the requisite 1250 hours.  Defendants methodically recorded her FMLA usage incorrectly, over-docked her pay for various forms of excused absences and under-reported the hours she worked.

Defendants were instructed on how to properly calculate Dr. Kaye's work employment status.  They were told by Ms. Alexander and Mr. Myrie to do a payroll query of Dr. Kaye in the central office's system.  Instead of heeding this advice, Defendants conducted a query of their time sheet management system.  A system that was based on KRONOS, which they knew Dr. Kaye had disputed the time entries and did not have access to herself.

Due to the actions of Defendant Jain in concert with other H + H/CHS staff, Dr. Kaye was incorrectly recorded as only working 1184 hours.  Defendants persisted in their time theft, even though they were corrected by their own staff person, Ms. Barrow, who had done as Ms. Alexander instructed and had conducted a payroll query of the hours Dr. Kaye actually worked and for which she had been compensated.  Based on her computations and H + H's records, Dr. Kaye had worked approximately 1700 hours, which would have made her more

109

than eligible for FMLA and a full retention bonus.

However, it remains in dispute as to whether the amount Dr. Kaye was compensated for the time she worked was accurate.  Again, Dr. Kaye contends that she was illegally demoted $31K in salary in 2018 and was demoted again another $36K in 2019.  Therefore, Dr. Kaye's inability to access KRONOS and to correct the errors also led to her retention bonus being delayed. Again this was clearly attributable to Defendants' insistence that she was not a full time employee.

- **Exhibit 4: Kaye Decl. ¶¶ 94-97;**

- **Exhibit 111: Email from Alexander dated September 26, 2018 with the Subject: Can You Help Us Help Ourselves (NYC000581-NYC000582); and**

- **Exhibit 112: Email from Mullett to Campese dated September 28, 2018 NYC003419-NYC003422 (look at NYC03421)**

131.  In early November 2018, plaintiff emailed Dr. Jain stating that Kronos was not allowing her to enter her time. Dr. Jain immediately responded and entered plaintiff's time.  See Email, "RE: Kronos not accepting time input for Monday 10/29/18," November 5, 2018, annexed as Exhibit "IIII."  In early February 2019, plaintiff emailed Dr. Jain regarding her inability access Kronos.  That same day, Dr. Jain responded by entering plaintiff's time, and informed plaintiff that he had referred plaintiff's inability to access Kronos for resolution.  See Email, "Re: Kronos Access Denied:  Time for this week, Sick Day Tomorrow:  2/13/ double docked,"  dated February 25, 2019; email, "RE URGENT CORRECTION NEEDED":  FMLA TIME ERROR pay week 2/25-3/1," dated February 25-26, 2019, annexed as Exhibit "JJJJ."

**RESPONSE:**  Dispute.  The stated fact is misleading and Plaintiff disputes Defendants' representation that her continued problematic and inconsistent access to KRONOS by Defendants was anything other than deliberate and retaliatory.  Dr. Kaye was denied consistent access to KRONOS between July 2018 and January 2020.  Dr. Kaye made repeated requests to Defendants, which were clearly ignored, because during this 18-month

time period they continued to mis-enter her time and in effect demote her in salary.

Defendants gave inconsistent explanations for the inconsistent and problematic KRONOS access.  Initially the emails revealed a failure to create KRONOS profiles for Bronx and Manhattan FPECC staff. However, in July 2018, at the same time those emails were distributed amongst IT staff, Dr. Kaye was told that there was a connectivity issue.  Dr. Kaye referenced this same connectivity issue in October 2019, over a full year later.

On May 29, 2019, Dr. Kaye asked Donna Fong about her FMLA leave balances and usage.  Dr. Kaye pointed out that there was a 10-day discrepancy between their calculations and hers: Dr. Kaye recorded that she had used 27 days while Defendants/Ms. Fong had recorded that Dt. Kaye had used 37 days.  Ms. Fong shared Dr. Kaye's email with Defendant Wangel.

To date, Defendants have done nothing to address these discrepancies and how it affected Dr. Kaye's compensation.   Further, between October 15, 2018 and April 27, 2019, Dr. Kaye counted that on 14 separate occasions, that H + H/CHS had entered her FMLA usage incorrectly.

- **Exhibit 89:  Email from Kaye dated August 13, 2018 with the Subject Pay Error (NYC000429);**

- **Exhibit 91:  Email from Swenson dated July 2, 2018 with the Subject KRONOS Accounts for FPECC Staff at Manhattan and Bronx (NYC00305-NYC000306);**

- **Exhibit 92: Email from Kaye dated July 3, 2018 with the Subject KRONOS was not up and Running in the Bronx (NYC00317-NYC000319);**

- **Exhibit 126: Email from Kaye dated February 25, 2019 with the Subject: Urgent KRONOS Issue Cannot Enter Time (NYC001312);**

- **Exhibit 127: Email from Kaye dated April 8, 2019 with the Subject: KRONOS Sunday 3/31 (NYC003947);**

- **Exhibit 128: Email from Kaye dated May 29, 2019 with the Subject: FMLA annual Schedule and Balance (NYC002880-NYC002882);**

- **Exhibit 129: Email from Kaye dated October 17, 2019 with the Subject: Annual Leave Request (NYC001745-NYC001746); and**

- **Exhibit 174: Email from Kaye to LaBoy and Wangel dated April 30, 2018 with the Subject: Melissa Kaye BHC to CHS Line Change" (NYC000513)**

### G. FPECC Policies

132. In early January 2019, Drs. Ford and Jain learned that a draft of FPECC's Psychological Testing Policy, which had been shared with the clinic directors on November 7, 2018, had been either distributed or discussed "among the Legal Aid attorneys citywide." Dr. Jain was concerned that [i]f the draft of the policy was sent or discussed among the attorneys before our final approval, it undermines our internal discussions." Email, "Re:  CHS draft policies circulated?" dated January 11, 2019, and email, "FW: Draft -Psychological Testing Policy," dated January 11, 2019, both annexed as Exhibit "KKKK."

**RESPONSE:** Disputed.  On August 27, 2018, Defendant Jain circulated a Psychological Testing Survey.  On November 7, 2018, Defendant Jain circulated a draft of the Psychological Testing Policy. On November 7th, Drs. Mundy and Winkler commented on the policy.  Both of them raised similar concerns about clinicians' autonomy and judgment being undermined by the Court.  Dr. Kaye raised similar concerns about the policy on November 8th, however, unlike Drs. Mundy and Winkler, Defendant Jain complained about Dr. Kaye's comments to Defendant Ford. Dr. Kaye specifically was concerned that the policy would override the clinical discretion of the examiners, and that it would undermine the Court Ordered evaluation process.

On January 11, 2019, Dr. Kaye raised concerns about the draft Psychological Testing and other policies that were being developed. Defendant Jain then sent an email that he learned that "someone" had been circulating the policies outside of CHS. In the wake of that email, Defendant Wangel conducted another search of Dr. Kaye's email box.  Despite the absence of

an Acceptable Use IT Policy beforehand, Defendants' witch-hunt proved futile, since they were

unable to prove that Dr. Kaye had externally circulated the policy.  Unlike Dr. Kaye's male

colleagues, Drs. Winkler and Mundy, who made comments on the policy, Defendants Jain, Ford

and Wangel singled her out and monitored her email box for a second time.  Additionally,

unlike her male colleagues, Dr. Kaye was rated at the baseline in several aspects of her

performance evaluation by Defendant Jain.

- **Exhibit 49: Email from Wangel dated January 11, 2019 with the Subject Email Access to Active Employee (NYC2192-NYC2194);**

- **Exhibit 50: Email from Joseph Moore dated January 11, 2019 with the Subject Email Access to Active Employee (NYC02193-NYC02195);**

- **Exhibit 77: August 27, 2018: Email from Jain dated August 27, 2018 with the Subject: FPECC Psychological Testing Survey (NYC003306-NYC003308);**

- **Exhibit 83: Email from Wangel dated January 11, 2019 with the Subject: CHS Draft Policies Circulated (NYC001134-NYC001135);**

- **Exhibit 130:  Email from Jain dated November 7, 2018 with the Subject: Re: Draft Psychological Testing Policy (NYC000818-NYC000821);**

- **Exhibit 131: Email from Mundy dated November 7, 2018 with the Subject: Draft Psychological Testing Policy (NYC000837-NYC000838);**

- **Exhibit 132:  Email from Jain dated November 8, 2018 with the Subject: Draft Psychological Testing Policy NYC000843-NYC000844); and**

- **Exhibit 174: Email from Kaye to LaBoy and Wangel dated April 30, 2018 with the Subject: Melissa Kaye BHC to CHS Line Change" (NYC000513)**

133.  Based on suspicions that plaintiff had shared the policy externally without consent, Mr. Wangel sought access to all outgoing email from the mailbox of plaintiff from the time period of July 1, 2018, until January 11, 2019, with a focus on "legal aid society and personal email addresses (gmail, Yahoo, etc.)"  and "[a]ll of part of the phrase: FPECC policy Psychological Testing."  An initial review of the collection indicated that plaintiff" sent a total of 87 documents (121 items) to her personal gmail address in violation of the

[] (sic) Acceptable Use Policy."  See Email, "RE:  Email Access to Active Employee,"  dated January 11, 2019 annexed as Exhibit "LLLL."

**RESPONSE:**  Disputed.  For an unknown reason, Defendants had engaged in ongoing monitoring of Dr. Kaye's emails at least one other time since the fall of 2018.  The first alleged investigation took place well before the alleged distribution of Defendants' policy.  **Exhibit 50: Email from Joseph Moore dated January 11, 2019 with the Subject Email Access to Active Employee NYC2193-2195**

On January 11, 2019, Defendants commenced another witch hunt of Dr. Kaye's email box. Spearheaded by Defendant Wangel, on manufactured suspicions, Defendants wrongly accused Dr. Kaye of circulating the FPECC Psychological Testing Policy externally. Amongst Defendant Wangel and his staff, in the midst of their efforts, they made the statement:  "you know the drill."  Defendants engaged in this witch hunt even though they have never circulated an IT "Acceptable" Use Policy to Dr. Kaye and or CHS staff beforehand.  Ultimately, Defendants could not attribute the distribution of the Psychological Testing Policy to Dr. Kaye.  Additionally, Dr. Kaye was never warned or disciplined for circulating any internal CHS policies to external entities or organizations.

- **Exhibit 4: Kaye Decl.; ¶ 169;**

- **Exhibit 49: Email from Wangel dated January 11, 2019 with the Subject Email Access to Active Employee (NYC2192-NYC2194);**

- **Exhibit 50: Email from Joseph Moore dated January 11, 2019 with the Subject Email Access to Active Employee (NYC2193-2195)**

**H.  FMLA Leave**

134.  On July 6, 2018, plaintiff requested Family Medical Leave Act ("FMLA") leave forms. That same day, a Personnel Labor Relations Associate, Donna Fong, provided plaintiff with the requested forms.  See Email thread, "FMLA," dated July 6, 2018, annexed as Exhibit

"MMMM."

**RESPONSE:** Disputed.  Dr. Kaye could not open the forms as they were sent on July 6, 2018.

- **Exhibit 133: Email from Fong dated October 5, 2018 with the Subject: FMLA (NYC003369)**

135.  On October 5, 2018, plaintiff again requested FMLA\leave forms in order to take FMLA leave for her son, as the "forms you previously sent me are not opening."  See Email thread, "RE: FMLA,(sic)" dated October 5, 2018, annexed as Exhibit "NNNN."

**RESPONSE:** Admit an add.  Plaintiff completed her FMLA form on Friday October 12, 2018.

**Exhibit 134:  Kaye FMLA Form dated October 12, 2018 (NYC002534-NYC002537)**

136.  On October 15, 2018, plaintiff submitted her completed FMLA paperwork to take care of her son from "10/15 thru 10/26."  Email, "RE: FMLA paperwork Confidential Information," dated October 15, 2018, annexed as Exhibit "OOOO."  Plaintiff was informed that the FMLA paperwork was emailed to "Central office for approval."  Id.

**RESPONSE:** Disputed.  Defendants contacted Dr. Kaye to request a copy of her son's birth certificate on Monday, October 15, 2018.  She responded with the requested document on the same day.  Although Defendants sent her FMLA paperwork to Central Office, there was a question as to whether Dr. Kaye had sufficient time to qualify.

Defendants used two systems to calculate Dr. Kaye's time and leave and employment status.  Although it was customary to use the Central Office system, especially since Dr. Kaye had transitioned from Bellevue, Defendants chose to use the less accurate Timekeeping system that they could manipulate instead.  Therefore, there was a conflict between two employees' findings:  Ms. Mullett determined that Dr. Kaye had worked 1184 hours, which would have made her ineligible for FMLA; while Ms. Barrow had determined that Dr. Kaye had worked 1704 hours, which would have placed Dr. Kaye over the 1,250 hour thresh hold.  Ms. Mullett's supervisor, April Alexander along with Ms. Barrow stated that Defendants should use the

Central Payroll system to calculate Dr. Kaye's leave usage and employment status.

Defendants instead chose to use the Timekeeping system, an application that they could easily manipulate and obscure from Dr. Kaye's review.  According to Dr. Kaye's estimates, on at least 14 different occasions, Defendants entered her FMLA usage incorrectly.  There were times that she was docked leave 18 hours a day. There were other times where she was docked on weekends, despite the fact she never worked on weekends throughout her 20 year career.

In the review of her claims, Dr. Kaye generated a spreadsheet that listed the inaccuracies of Defendants' implementation of the FMLA between October 15, 2018 and April 25, 2019. The result of Defendants' interference ended up being that Dr. Kaye received a 31K demotion in salary in 2018, and a 36K demotion in salary in 28K. Additionally, Dr. Kaye's retention bonus was also unfairly reduced by a third, again this was attributable to Defendants' insistence on using their timekeeping rather than their central payroll system. The triable issue of fact is whether this deliberate insistence on using an inaccurate system was rooted in retaliatory and or discriminatory animus.

- **Exhibit 88: Email from Barrow dated July 24, 2018 with the Subject 30 Minute Lunch (NYC000402-NYC000403);**

- **Exhibit 111: Email from Alexander dated September 26, 2018 with the Subject Can You Help Us Help Ourselves (NYC000581-NYC000582);**

- **Exhibit 112: Email from Mullett to Campese dated September 28, 2018 NYC003419-NYC003422 (look at NYC03421); and**

- **Exhibit 135:  Dr. Kaye's FMLA Usage Tabulation between October 2018 and April 2019**

137.  Plaintiff , Dr. Jain, CHS Payroll, and Doctors Council was (sic) notified that "[h]er leave code in the Kronos system should be 02 until we receive the approval notification. "See Email thread, "Re: KayeMFMLA8Oct18," dated October 17, 2018, annexed as Exhibit "PPPP."

**RESPONSE:** Disputed.  The exhibit does not support the stated fact and the stated fact is not an accurate depiction of the email sent by H+ H employee Donna Fong.  On October 17, 2018, Ms. Fong sent an email to Defendant Jain and Dr. Kaye that her leave would start on October 15th through October 26th.  In the same email thread, Defendant Wangel forwarded, Ms. Fong's email to Nate Santamaria from Dr. Kaye's union.

It was not clear when Dr. Kaye learned about the various codes used to record her time during that period.  However, on October 29, 2018, she emailed Ms. Fong and Defendants that her timesheets had not been processed for the pay periods of 10/15 and 10/22.  Defendant Jain was out during that time, and Defendant Ford was supposed to process Dr. Kaye's timesheets.  Since this did not happen, Defendant Wangel instructed Dr. Kaye to enter the 02 Code until Central Office had officially processed her request.

On October 30, 2018, Dr. Kaye would receive a letter from Maria Mendez, that would notify her that her leave had been retroactively approved.  The letter listed that the first three days of the leave would be coded into the system as FMLA using sick leave (10/15-10/17/18).  Her leave from 10/18 through 10/26/18 was to be coded in the system as FMLA using annual leave.  Dr. Kaye contended that because she had accrued a significant amount of annual leave, that Defendants would only use the 02 annual leave code until she had exhausted that balance.  Accordingly, there was no distinction necessary between the 02 and 55 codes.  However, despite these realities, Dr. Kaye's hours worked were inaccurately reflected in the system nonetheless.  As a result, this led to her employment status being inaccurate, a demotion in her cumulative pay and an unwarranted reduction in her retention bonus.

There is a triable issue of fact as to whether Defendants accurately calculated Dr. Kaye's leave

balances.  The record suggests that from the repeated mistakes, that Defendants intentionally

used the ATLS Time Keeping System that was flawed, inaccurate and subject to their

manipulation.  Further, it was the same ATLS system that worked in tandem with KRONOS, that

Dr. Kaye lacked consistent access to between the months of July 2018 and January 2020.

Accordingly, during that period, Dr. Kaye was surreptitiously demoted in salary and title.

- **Exhibit 135: Dr. Kaye's FMLA Usage Tabulation between October 2018 and April 2019;**

- **Exhibit 136:  Email from Fong dated October 17, 2018 with the Subject: ReKayeMFMLA08Oct18   (NYC000739-NYC000740);**

- **Exhibit 137:  Email from Kaye dated October 29, 2018 with the Subject: Re: Timesheet not Processed (NYC002487-NYC002488); and**

- **Exhibit 138: Correspondence from Mendez dated October 30, 2018 (NYC003394)**

138.  On October 30, 2018, plaintiff received notice from Maria Mendez, Assistant Director, HRSS Leaves Administration at H + H, that her FMLA leave request was retroactively approved.  See Email, "Melissa Kaye FMLA\To care for family member leave approval - retro," dated October 30, 2018, annexed as Exhibit "QQQQ."

**RESPONSE:** Disputed.  The email attempts to obscure the fact that Defendants interfered

with Dr. Kaye's ability to take leave under the FMLA. Ms. Mendez's letter was generated

after Dr. Kaye contacted Defendants on October 29th to notify them that her timesheets

had not been processed for the previous two pay periods.  This was despite the fact that the

letter reiterated Ms. Fong's language, which was sent to Dr. Kaye on October 17th.

- **Exhibit 136:  Email from Fong dated October 17, 2018 with the Subject:ReKayeMFMLA08Oct18   (NYC000739-NYC000740);**

- **Exhibit 137:  Email from Kaye dated October 29, 2018 with the Subject: Re: Timesheet not Processed (NYC002487-NYC002488); and**

- **Exhibit 138:  Correspondence from Mendez dated October 30, 2018 (NYC3394)**

139.  On November 8, 2018, plaintiff notified Ms. Mendez that she planned to be out on FMLA leave on "11/13 and 11/14." In response, Ms. Mendez requested clarification from plaintiff's doctor regarding the frequency and duration of plaintiff's requests for FMLA intermittent leave.  See Email thread, "Melissa Kaye FMLA\To care for ill family member leave approval -retro," dated November 8, 14, 2018, annexed as Exhibit "BBBB."

**RESPONSE:**  Disputed.  The stated fact is misleading and does not fully depict what transpired.

On November 23, 2018, Dr. Kaye received notification that her FMLA leave had been denied.

Without substantive justification, Defendants stated that they denied her request, because her

son's doctor did not list the dates when he would have flares.  However, Defendants'

application for FMLA did not require this information.  Instead, it asked if the condition was

episodic and it asked the applicant to estimate the frequency of the occurrences during the

requested time period. Dr. Kaye completed this portion of the form on October 12, 2018, and at

that time Defendants did not raise the issue.  Instead they only sought the birth certificate of

Dr. Kaye's son, which she gave to them on the same day.  From the shifting requests, a

reasonable fact finder could determine that Defendants interfered with Dr. Kaye's use of FMLA

to care for her son.

- **Exhibit 139:  Dr. Kaye's FMLA Application dated October 12, 2018 (NYC000725-NYC000728); and**

- **Exhibit 140:  Dr. Kaye's Request for FMLA, Child Care and Military Leave dated 10/8/18 (NYC000729-NYC000730)**

140.  On January 18, 2019, plaintiff submitted the updated FMLA paperwork, and on February 16, 2019, Plaintiff received notice from Ms. Mendez that her request for an intermittent leave of absence to care for her ill family member had been approved.  See Email thread, "RE: Updated FMLA," dated January 18 -February 15, 2019, and Email, "Melissa Kaye FMLA\To care for ill family member leave approval," dated February 15, 2019, annexed as Exhibit "SSSS."

**RESPONSE:** Disputed.  Plaintiff contends that she did not need to update her paperwork,

since she had already complied with Defendants' application on October 12, 2018. On

January 29, 2019, Dr. Kaye contacted Ms. Mendez to inquire about her application.  Dr.

Kaye reminded Ms. Mendez that she had submitted the additional documentation on

January 18, 2019, and that she had not heard anything else.   Defendants arbitrarily asked

for additional documentation as a means to further dock her time, salary and employment

status.  Therefore during the period of November 23, 2018 to February 2019, Defendants

continued to interfere with Dr. Kaye's FMLA usage.

- **Exhibit 139:  Dr. Kaye's FMLA Application dated October 12, 2018 (NYC000725-NYC000728);**

- **Exhibit 140:  Dr. Kaye's Request for FMLA, Child Care and Military Leave dated 10/8/18 (NYC000729-NYC000730);**

- **Exhibit 141: Email from Kaye dated January 29, 2019 with the Subject: FW: Updated FMLA (NYC003893); and**

- **Exhibit 142:  Letter from Mendez dated February 15, 2019 with the Subject: Intermittent FMLA (NYC001276-NYC001277)**

141.  On May 7, 2019, plaintiff requested clarification on the HHC FMLA leave policy, as well as her current FMLA leave balance.  After providing plaintiff with (sic) documentation used to calculate her FMLA leave, plaintiff determined that she had used 27 FMLA leave days; CHS Payroll corrected her leave balance.  See Email thread, "RE:  FMLA annual schedule and balance," between May 2018 (sic) and July 2019, annexed as Exhibit "TTTT."

**RESPONSE:**  Disputed.  The exhibit does not support the statement of fact.  Additionally, the

statement of fact does not accurately depict what transpired between October 15, 2018

and April 27, 2019; on May 7, 2019; and on July 2, 2019.

Dr. Kaye wrote to inquire about how Defendants calculate FMLA, she specifically asked

how they defined the year for purposes of determining FMLA eligibility and usage.  She also

asked about her leave balances.  Defendants acknowledged the latter inquiry, but said that

they were unable to answer her query about her leave balances at that time.  Dr. Kaye

continued to experience illegal deductions from her pay check and salary.  Instead of using

the central payroll system to calculate Dr. Kaye's time and leave usage, Defendants based

their calculations on their timekeeping system, which contained the timesheets Defendant

Jain incorrectly entered into the system, and to which Dr. Kaye did not have consistent

access.

- **Exhibit 143:Email from Fong dated May 21, 2019 with the Subject: FMLA Annual Schedule and Balance, baring the bates stamp series: NYC002816-NYC002818; and**

- **Exhibit 176:  Email from Kaye dated May 7, 2019 with Subject FMLA annual schedule and balance (NYC2785-NYC2789)**

On May 21, 2019, Ms. Fong inaccurately responded to Dr. Kaye regarding her FMLA

usage.  On May 29, 2019, Dr. Kaye disputed H + H's calculation of her usage. The discrepancy

was the equivalent of a paycheck deduction of approximately $7K.

- **Exhibit  128: Email from Kaye dated May 29, 2019 with the Subject: FMLA annual Schedule a Balance (NYC002880-NYC002882); and**

- **Exhibit 143: Email from Fong dated May 21, 2019 with the Subject: FMLA annual Schedule and Balance (NYC002816-NYC002818)**

On June 21, 2019, Dr. Kaye asked Defendants again to correct her timesheets, leave balances,

and FMLA deductions that took place between December 21, 2018 and January 7, 2019.  Dr.

Kaye noted that she only used 27 days while Defendants had her usage at 37 days.  It was later

determined that Diana Wong had incorrectly coded the time leave usage for the period of

12/21/18 to 1/7/19

- **Exhibit 144: Email from Kaye dated June 21, 2019 with the Subject: FMLA Annual Schedule and Balance (NYC02954-NYC02957)**

On November 26, 2019, Dr. Kaye sought to file a grievance with her union regarding

Defendants' illegal demotion of her salary and their incorrect records of her leave balances.

Between October 15, 2018 and April 27, 2019, Defendants incorrectly inputted her FMLA leave

and deductions on at least 14 separate occasions.

- **Exhibit 4: Kaye Decl. ¶¶ 78-84;**

- **Exhibit 135: Dr. Kaye's FMLA Usage Tabulation between October 2018 and April 2019;**

- **Exhibit 145:  Email from Wong dated July 2, 2019 with the Subject: Re: FMLA Annual Schedule and Balance (NYC002979-NYC002982); and**

- **Exhibit 146:  Email from Kaye dated November 26, 2019 with the Subject: Pay Deductions Grievance Sought (NYC003169-NYC003172)**

   **I.   Reasonable Accommodation**

142.  In or about late October 2018, plaintiff sought a reasonable accommodation "to return to my prior shift, a split shift, and the ability to work remotely,' to accommodate for her son's disability.  Plaintiff's request for an accommodation to CHS EEO Officer, Kevin Marazzo. See Email, "Fw:  Reasonable Accommodations Request,"  dated October 25, 2018, annexed as Exhibit "UUUU."

**RESPONSE:** Admit and add.  Dr. Kaye sought to work her previous shift from 9AM to 5:30PM

with a 30 minute unpaid lunch.  She also asked to work remotely when she was not

conducting 730 examinations.  Dr. Kaye sought this accommodation because by May 2018,

her son's condition had worsened to the point that she personally needed to administer his

medications.  Since the Courts didn't open until 10AM and Defendants weren't produced

until that time, the requested hours would not impact the operations of the clinic.

- **Exhibit 4: Kaye Decl.¶¶ 161-164**

143.  Plaintiff's son suffers from an allergic contact dermatitis, where common chemicals in the environment cause a "blistering, excoriating rash."  Beginning in May 2018, plaintiff treated her son's condition with alternative, Chinese medicine "potions" that she "had to

put all over his skin…. in the morning.  Kaye Ex. B at 273:4-275:11.

**RESPONSE:**  Admit and add.  Dr. Kaye elaborated on her son's conditions at her deposition.

She testified that he had developed emotional problems from the use of high potency

steroids; that he experienced some bouts of life threatening anaphylactic reactions to

allergens; that he had developmental delays that required him to be on an "Individualized

Education Program" (IEP); and that due to the excoriating rashes on his skin, he suffered

from sleep deprivation.

- **Exhibit 9: Kaye Dep. 11/15/21 p. 273-277:1-7**

144.  On October 30, 2018, plaintiff was notified that "HHC policy does not allow third party accommodations, i.e. for children, spouses etc." and that as an alternative, "you may qualify for FMLA (Family Medical Leave).  See Email thread, "FW:  CONFIDENTIAL – REASONABLE ACCOMMODATION REQUEST FORM," dated October 30, 2018, annexed as Exhibit "VVVV."  Plaintiff forwarded this email to her union representative Nate Santa Maria. Id.

**RESPONSE:  Admit.**

145.  In or about early January 2019, plaintiff wrote to Drs. Jain and Ford, copying EEO personnel, her union, Dr. Yang, Mr. Wangel, and Mr. Campese, requesting that she be restored to her former shift, as a result of needing additional time to readjust due to her brother's untimely death, and that her current shift is even more difficult for her family, since her "children were extremely close to their uncle."  Mr. Wangel responded only to Drs. Ford and Jain, telling them "[p]lease do not respond. This will be treated as a request for intermittent FMLA."  See Email, "RE: Shift Restoration, " dated January 10, 2019, annexed as Exhibit "WWWW."

**RESPONSE:**  Disputed.  Dr. Kaye was never notified that her request would be treated as

intermittent FMLA.  Dr. Kaye did apply for FMLA on October 12, 2018, however, Defendants

interfered with her FMLA usage, by way of an illegal demotion of her salary, corporate job title

and job functions. Defendants also rescinded Dr. Kaye's ability to take intermittent FMLA on

November 23, 2019 only to restore it in February 2019 under the alleged premise that she

needed to submit additional information about her son's condition.   This statement of fact

presents an issue that should be resolved at trial.  The record is unclear whether the request for

additional information pertained to Dr. Kaye's first request for FMLA in October 2018 or

Defendants' subsequent designation of Dr. Kaye's request for an accommodation in January

2019.

- **Exhibit 4: Kaye Decl. ¶¶ 64-84; and**

- **Exhibit 134: Dr. Kaye's FMLA Application dated October 12, 2018 (NYC2534-NYC2537)**

146.   On or about June 27, 2019, EEO Officer Mr. Marrazzo sent plaintiff a reasonable
       accommodation request form in response to her request. On July 12, 2019, plaintiff
       submitted her request for a reasonable accommodation.  See Email, "Fw:  Request for a
       Reasonable Accommodation," dated July 12, 2019, annexed as Exhibit "XXXX."

**RESPONSE:**  Admit and add.  Dr. Kaye made a second request for a reasonable accommodation

on July 11, 2019.  In this instance, she sought an accommodation to address her medical

conditions: IBS, atypical chest pain, and anxiety, each of which were exacerbated due to

Defendants' hostile and retaliatory work environment.

147.   Between July 17, 2019, and October 8, 2019, discussion among FPECC leadership, the
       EEO Office, and plaintiff occurred concerning plaintiff's reasonable accommodation
       request to determine the reasonableness of plaintiff's request in combination with
       plaintiff's job duties and the needs of the Bronx Court Clinic.  See Email thread, "RE: Kay
       (sic) description of job duties, reasonable accommodation," dated July 17, 2019, Email
       thread, "RE: Request for a Reasonable Accommodation"  dated August 20, 2019, and
       Email thread, "RE: Request for a Reasonable Accommodation,"  dated October 8, 2019,
       annexed as Exhibit "YYYY."

**RESPONSE:**  Disputed. The statement of fact is misleading to the extent that it suggests that

Defendants complied with the ADA's requirement to engage in an interactive process with Dr.

Kaye, or that they didn't engage in retaliation.  On August 16, 2019, Dr. Kaye contacted EEO

Officer Kevin Marrazzo to complain that Defendants had further retaliated against her because

she had filed a lawsuit against them.  She cited the agency's protracted delay of their decision in response to her request as yet another attempt to force her to resign.  Dr. Kaye discussed the interactive process and instead of remote work, she asked that she be allowed to work a 9AM to 5PM schedule like the other Court Clinic Directors.  Dr. Kaye noted that her request could not possibly pose an undue hardship on H + H, because the other three Court Clinic Directors worked her requested shift.  The accommodation Dr. Kaye sought in this instance, was simply to be treated in the same fashion as her comparators, who performed identical job functions. Again none of the other Directors were required to work 9 hour days, and each of them had less longevity/seniority than Dr. Kaye.  Further according to Defendants, the other Directors each had busier Court Clinics than Plaintiff.  Therefore, the requirement that Dr. Kaye work longer hours with the alleged less busy center defied logic and business necessity even more.

148.  On October 28, 2019, plaintiff was notified that her reasonable accommodation request was approved to the extent that her "request for an accommodation for a later start time is granted as follows: that your shift will be changed from 8:00 am to 5:00 pm, to 9:00 am to 6:00 pm; this shift change is on an as needed basis up to 5 days a week."  Plaintiff was also notified that it (sic) was "unable to approve your request to work remotely as a form of reasonable accommodation as your request is not reasonable and/or poses an undue hardship."  Email, "Grant of Reasonable Accommodation," dated October 23, 2019, annexed as Exhibit "ZZZZ."

**RESPONSE:** Admit and add.  Dr. Kaye was still being required to work a nine-hour day, despite the fact that the other Court Clinic directors were not required to do the same.  Defendants have not provided any explanation as to why or how Dr. Kaye's requested hours would pose an undue hardship to H + H.  The absence of an explanation, in light of Dr. Kaye working her requested schedule for the vast majority of her employment presents a factual dispute that should be resolved at trial.  *Further, requiring the alleged least busy Center Director to work the longest hours also presents issues for resolution at trial.*

Additionally, a reasonable trier of fact could make the determination that Defendants' actions were motivated by animus.  The following factors when viewed in totality could lead a reasonable juror to determine that Defendants failed to accommodate Dr. Kaye's stated disability:  Defendant Ford's comments about managing Dr. Kaye out; Defendant Ford's previous writings about her own difficulties getting her children to school and the two times she resigned from positions thereafter; and Defendants' failure to explain why Dr. Kaye's previous shift would pose an undue hardship to CHS/H+H.  Contrary to Defendant Jain's assertions, Dr. Kaye did not supervise Dr. Brayton.  Additionally, the Courts did not open until 10AM.

- **Exhibit 4: Kaye Decl. ¶¶ 161-164; and**

- **Exhibit 9: Kaye Dep. 11/15/21 p.262:15-25-265:1-70**

### J.   Deductions in Pay

149.  On October 28, 2019, plaintiff was notified that she had 6 hours and 56 minutes absence without pay during the pay period of 10/06/19 – 10/12/19.  On November 8, 2019, plaintiff was notified that she had 8 hours absence without pay during the pay period of 10/13/19-10/19/19.  In both instances, plaintiff did not have any available leave time.  See Email thread, "RE: DEDUCTION OF PAY NOTICE," dated October 25-30, 2019 and Email thread, "RE: DEDUCTION OF PAY NOTICE,"  dated November 8-12, 2019, annexed as Exhibit "AAAAA."

**RESPONSE:** Disputed.  Defendants have used two methodologies to track Dr. Kaye's time and pay. The first and correct one was the Payroll Management system.  The second and problematic system was the  ATLS Timesheet System.  Both Ms. Barrow and Ms. Alexander confirmed that Defendants should have used the Payroll System, accordingly Defendants' representations that Dr. Kaye had exhausted her leave balances were false.  Instead of heeding the advice of these experienced staff members, Defendants insisted on using the system they

could manipulate to meet their nefarious ends.

Plaintiff alleges that Defendant surreptitiously docked her pay upon the transition of the Bronx Court Clinic from Bellevue to CHS.  For the first month, Plaintiff lacked access to KRONOS altogether.  Dr. Kaye's inconsistent access to KRONOS provided Defendants with the opportunity to surreptitiously alter her timesheets so that her pay would be docked. Dr. Kaye alleged that Defendant Jain altered her timesheets on numerous occasions.  She also alleged that despite numerous complaints about her pay being docked, Defendants failed to correct the errors and failed to reimburse her.  Based on Dr. Kaye's records,  in 2018 Defendants demoted her in salary by $31K; and in 2019, Defendants demoted her in salary by $36K

- **Exhibit 4: Kaye Decl.  ¶¶ 85-103**

- **Exhibit 88: Email from  Rosalind Barrow dated July 24, 2018 with the Subject 30 Minute Lunch (NYC000402-NYC000403);**

- **Exhibit 111: Email from Alexander dated September 26, 2018 with the Subject Can You Help Us Help Ourselves (NYC000581-NYC000582); and**

- **Exhibit 112: Email from Mullett to Campese dated September 28, 2018 (NYC003419-NYC003422)(look at NYC03421)**

### K.  Recording Forensic Evaluations

150.  On March 20, 2019, Mr. Wangel referred an incident involving plaintiff to H + H's Corporate Compliance for review.  Specifically, it was learned that plaintiff had "electronically recorded on multiple occasions, evaluations of patients," apparently "without the consent of the patient or counsel."  It was also learned that plaintiff made the recordings using her personal iPhone.  See Email, "Referral," dated March 20, 2019, annexed as Exhibit "BBBBB."

**RESPONSE:**  Disputed.  The statement of fact is misleading and attempts to mischaracterize

what transpired.  Firstly, as a forensic evaluator, Dr. Kaye did not have a doctor-patient

relationship with the inmates she examined.  The distinction that forensic psychiatrists do not have a doctor patient relationship with those they evaluate is also a core tenet of the practice of forensic psychiatry. It is also a required disclosure that the forensic examiner must make at the beginning of every competence exam pursuant to U.S. v. Dusky.

Dr. Kaye's complaints that Defendants and City Hall interfered with and rigged exams was confirmed when she was brought up on manufactured disciplinary charges for recording Mr. Gonzalez's examinations.  On March 7, 2019, Ms. Swenson wrote an email to her colleagues that stated: "they want him (Jose Gonzalez) found fit."  Jose Gonzalez was examined on three separate occasions: twice by Drs. Kaye and Winkler; and a third time by Drs. Brayton and Mullan.  Mr. Gonzalez was found unfit on both occasions by Drs. Kaye and Winkler. On the third occasion, he was found fit by Drs. Mullan and Brayton.

- **Exhibit 147 :  Email from Swenson dated March 7, 2019 with the Subject: I am making mistakes so you don't have to (NYC002606-NYC002607)**

The record contains a conflict about how it was brought to Corporate Compliance's attention that Dr. Kaye recorded the exams she conducted with Jose Gonzalez.  Defendant Wangel testified that first Defendant Ford and then Defendant Yang approached him about reporting the recordings to Corporate Compliance.  The statement of fact contained in Paragraph 150 would suggest however that Defendant Wangel made the decision on his own. Defendant Yang's email to Defendant Wangel would tend to support Defendant Wangel's testimony not Defendants' proffered Exhibit BBBBB.

- **Exhibit 36:  Wangel Dep. p. 201:5-202:1-12**

On April 4, 2019, after Defendant  Yang received an update from Defendant Wangel that he had emailed Ms. Patsos about the investigation, Defendant Yang replied with the thumbs up

emoji.  A reasonable fact finder therefore could determine that Defendant Yang, as Defendant Wangel's supervisor had instructed him not only to report the Dr. Kaye's recording to Corporate Compliance, but that she also instructed Defendant Wangel to follow up with Ms. Patsos on April 4, 2019 to check on the status of the investigation.

- **Exhibit 148:  Email from Yang dated April 4, 2019 with the Subject Re: Referral (NYC002690)**

The Court on the record disclosed that Dr. Kaye sent audio files that contained recordings of the exams that she conducted of Jose Gonzalez on March 12, 2018 and September 28, 2018, the Thursday prior to her testimony.    Dr. Kaye testified that she disclosed to Dr. Winkler that she was recording the examinations.  She also testified that of the 3,000 exams she had conducted over the course of her career, that it was "variable" whether she recorded them or not.  Dr. Kaye further explained that she decided to record Mr. Gonzalez's exam, because she had spoken to Defense Counsel beforehand and had gained some insight about Mr. Gonzalez.  Dr. Kaye suspected that he might be thought disordered, and that it might be difficult for her to take notes and to simultaneously interview him.  To insure that she "got everything complete," she decided to record the exams.

Defendant Wangel made the decision to refer the matter to Corporate Compliance even though CHS was not formally managing the Bronx Court Clinic in March 2018.  Consistent with this fact was that Defendant Jain was not involved in the disciplinary process; Defendant Jain did not start at CHS until April 2018.  Additionally, the Bronx Court Clinic did not allegedly officially transition to CHS until July 2018.

- **Exhibit 149:  Jose Gonzalez Controversion Hearing February 7, 2019 (D1147-D1277) (See p. D1150 and D1222-D1223)**

151.  On May 9, 2019, the H + H's Office of Corporate Compliance ("OCC") completed its investigation and issued a memorandum summarizing their findings. See Confidential Investigatory Information, dated May 9, 2019, annexed as Exhibit "CCCCC."  The OCC determined that (sic)

> "[A]lthough Dr. Kaye did not technically violate any existing law or policy regarding the audio-recording of 730 competency evaluations her decision to record the defendant in the Proceeding during his 730 competency evaluation was inappropriate, and such recording was inconsistent with the custom and practice of performing 730 competency evaluations.
>
> *   *   *   *   *
>
> Based on the findings in this investigation, the OCC Recommends that Dr. Kaye be disciplined in the form of counseling, and retrained on the custom and practice of conducting 730 competency evaluations. The OCC also recommends that CHS develop general policies and procedures for conducting 730 competency evaluations, if such policies and procedures do not currently in (sic) exist, and more specifically to develop policies regarding any form of recording such evaluations." Id.

**RESPONSE:**  Disputed.  The statement of fact is misleading to the extent that it suggests that Dr. Kaye deserved to be brought up on disciplinary charges for violating an alleged CHS custom.  As was noted in response to Paragraph 151, the Court Clinics were not under CHS management in March 2018, which was when Dr. Kaye recorded the first exam.  A reasonable fact finder could be skeptical about the existence of an alleged "custom": 1) when the Court Clinics did not have any already existing written rules to that effect; 2) when Dr. Kaye, the longest serving Court Clinic staff person (which included management), that worked for the Court Clinics was not privy to such a "custom;" and 3) when the American Academy of Psychiatry and the Law (AAPL), stated that recording exams was permissible for the very same reasons Dr. Kaye gave when she

was on the stand on February 7, 2019.

- **Exhibit 150: American Academy of Psychiatry and the Law: Video Recording of Forensic Psychiatric Evaluations**

At no time did Ms. Patsos  or Defendant Ford mention that it was inappropriate for Dr. Kaye to

record Mr. Gonzalez without his consent.  It was not until Dr. Kaye referenced AAPL's policy

which permitted Video-recording that Defendants shifted their justification for disciplining Dr.

Kaye.

- **Exhibit 151:  Memo from Ford Signed July 1, 2019 with the Subject: Audio Recording of 730 Competency Evaluations (NYC001521); and**

- **Exhibit 152: Corporate Compliance's Final Confidential Investigatory Information Memorandum from Patsos to Yang dated May 9, 2019 (NYC002797-NYC002800)**

152.   On May 31, 2019, Policy # INT 50, entitled, "Unauthorized Recordings, was distributed to the court clinic directors.  See Email, "FW:  New Interdisciplinary and Revised Nursing Policies, dated May 31, 2019, annexed as Exhibit "DDDDD."

**RESPONSE:** Admit.

153.   On or about July 1, 2019, Dr. Ford and Clarence Muirjr (sic) met with plaintiff to issue her a counseling memo that she had "inappropriately recorded a 730 Competency Evaluation without authorization."  See Memorandum, (sic) "Re: Audio recording of 730 Competency Evaluations, dated May 29, 2019, from Dr. Ford to plaintiff, and Email thread, "re: Follow-up,"  between June 18, 2019 to June 21, 2019, annexed as Exhibit "EEEEE."

**RESPONSE:**  Disputed.  Dr. Kaye was told by her union rep, that she was having a pre-

termination and disciplinary meeting with Defendant Ford and Mr. Muir Jr.  The parties

executed the backdated memo (dated May 29, 2019) on July 1, 2019, the same day as the

meeting.  Dr. Kaye signed under protest: she contested the findings in the memo and she

disputed the referenced date.  Dr. Kaye had not seen the memo prior to July 1, 2019.

**Exhibit 153:  Kaye Dep. Re-Direct 2/3/22 pgs.  412:14-25-p.415:1-9**

### L.   Warning Letter -Workplace Conduct

154.  On March 7, 2019, plaintiff received an email from Teleakie Parker seeking information regarding her professional credentialing, which plaintiff found suspicious and thereafter expressed concern that CHS "may be mishandling my private and confidential information."  On May 7, 2019, Plaintiff forwarded the email to Catherine Patsos of H + H's Office of Corporate Compliance for investigation.  See Email thread, "CHS Phishing email physician credentialing failure to advise,"  between March and May 2019, annexed as Exhibit "FFFFF."

**RESPONSE:** Admit with qualifications.  Dr. Kaye reported what she believed to be a phishing email from the Assistant Coordinating Manager for Operations, Ms. Parker.  Dr. Kaye reached out to her supervisors and H + H management, to no avail.  Defendants refused to provide an explanation about the nature of the requests, and they chose to ignore Dr. Kaye's complaints.  Based on a previous incident of identity theft that she experienced at the hands of another H + H employee, Dr. Kaye was particularly concerned and alarmed. Besides a repeat occurrence, Dr. Kaye was also concerned about her ability to practice, since it seemed as if her credentialing and licensing information were missing.  Dr. Kaye contacted Ms. Swenson at least twice during the month of March, when she did not hear back from her, on May 7th she reported her issues to Corporate Compliance.

- **Exhibit 154:  Email from Kaye dated March 8, 2019 with the Subject:  FW Audit: Kaye, Melissa (NYC002608-NYC002609); and**

- **Exhibit 155:  Email from Kaye dated May 7, 2019 with the Subject: CHS Pfishing Email Physician Credentialing Failure to Advise (NYC002780-NYC002781).**

155.  On May 31, 2019, Andrea Swenson, the Senior Administrator for the Court Clinics, reported to Dr. Jain, Mr. Muirjr (sic), and Samantha Kent that plaintiff had "screamed at [her] for a good 40 minutes," telling her that "physicians are the reason [Swenson and the other administrator] have a job," and wanted to know if Drs. Mundy, Owen and Winkler were being treated like secretaries."  According to Ms. Swenson, Plaintiff also reportedly told Ms. Swenson she was "lying" when Ms. Swenson said that she had talked about the Teleakie email, and that Ms. Swenson had "done nothing."  See Email thread, "FW:

Assistance with the Bronx," dated May 31., 2019, annexed as Exhibit "GGGGG."

**RESPONSE:** Disputed.  The email and statement of fact mischaracterize what transpired between Dr. Kaye and Ms. Swenson on May 31, 2019.  On March 7, 2019, Dr. Kaye received an email from Teleakie Parker that sought her date of birth, social security number and an assortment of credentialing and licensing documents.  Dr. Kaye expressed concern about the request and wondered why they were not already in her personnel file.

- **Exhibit 154:  Email from Kaye dated March 8, 2019 with the Subject:  FW Audit: Kaye, Melissa (NYC002608-NYC002609)**

Dr. Kaye's concern was reasonable, since like Defendant Wangel, she believed that the requested documentation should have been in her personnel file.   In fact,  Defendant Wangel specifically asked Ms. Soto why certain documents were being sought, and questioned how they would know what to ask for if they did not have Dr. Kaye's personnel file.

- **Exhibit 156: Email from Wangel dated March 8, 2019 with the  Subject: Audit -Kaye, Melissa (NYC002626-NYC002628)**

Dr. Kaye also conveyed to her union that the amount of information sought with a one-day turnaround was unreasonable. She specifically stated that Ms. Parker and the unit had to know before that time, that they needed the information, especially since Dr. Kaye had been working under CHS since July 2018.  Dr. Kaye elaborated on the bases of her concern, primarily: a previous incident that involved her identity being stolen at H + H; and her ability to practice/do her job, if her credentials were not in her personnel file. **Exhibit 154:  Email from Kaye dated March 8, 2019 with the Subject:  FW Audit: Kaye, Melissa NYC002608-NYC002609.**

Similar to Dr. Kaye's perspective, Ms. Swenson also stated in her email on May 31st, 2019, that Ms. Parker's email came out of nowhere, especially since Dr. Kaye had been working for H

+ H for over 20 years and this information should have been in her personnel file.  **Exhibit 157: Email from Swenson dated May 31, 2019 with the Subject:  Assistance w. Bronx (NYC002833-NYC002834)**  Ms. Swenson had made a similar remark that her supervisor also thought that the audit had come out of nowhere; she had spoken to her supervisor Clarence Muir Jr., who also was unaware of any audit being conducted.  **Exhibit 158: Email from Swenson dated March 14, 2019 with the Subject: Audit -Kaye, Melissa (NYC002642-NYC002645)**

However, the email audit "did not come out of nowhere," it was an exercise that apparently examined a number of employees who had transferred from Bellevue and other places.  In an email from Donna Fong, Dr. Kaye was listed amongst a number of employees being audited.  Although Defendants could have provided Dr. Kaye with an explanation to this effect, they chose not to, the question as to why they refrained should be left for a jury to determine.  **Exhibit 159:  Email from Fong dated July 3, 2018 with the Subject:  HR/PR Audit Report 7/2 (NYC002015)**

Dr. Kaye reached out to Ms. Swenson on March 14, 2019 for assistance.  **Exhibit 158:  Email from Swenson dated March 14, 2019 with the Subject: Audit -Kaye, Melissa (NYC002642-NYC002645)**  On May 7, 2019, when Dr. Kaye did not hear anything back from Ms. Swenson; Dr. Kaye then reported the incident to Ms. Patsos in Corporate Compliance.  Ms. Patsos acknowledged receipt of the email.  **Exhibit 155:  Email from Kaye with the Subject CHS Pfishing Email Physician Credentialing Failure to Advise Date May 7, 2019 (NYC002780-NYC002781)**

There is a disputed issue of fact as to what transpired next.  Dr. Kaye claimed that she heard nothing further from Ms. Patsos until she was summoned to her office for recording Jose

Gonzalez's 730 Examination.  However, Ms. Patsos stated that she emailed either Christian Neighbors in IT and or Joseph Reyes in Credentialing. In either instance, Ms. Patsos's alleged email was never produced during discovery.  Further, Dr. Kaye denies ever being contacted by either individual during the course of her employment at H +H.

- **Exhibit 4: Kaye Decl. ¶¶ 168 ; and**

- **Exhibit 160: Patsos Dep. p. 183:20-25-192:1-9 (see pages 188-190)**

Between May 7th and May 31st, Dr. Kaye did not hear anything else from Ms. Swenson. When she saw Ms. Swenson at the Bronx Court Clinic that day, the two had a discussion about the time reporting cards and Dr. Kaye's concerns about the phishing email.  Dr. Kaye denied that she ever yelled at Ms. Swenson.  Ms. Swenson was unprofessional and mocked Dr. Kaye during the course of the meeting.  According to Dr. Kaye, Ms. Swenson responded who cares, when she explained: that she had previously experienced identity theft at H + H; and that she could be taken off of the payroll if her credentials were not up to date.

- **Exhibit 153:  Kaye Dep. Re-Direct p. 412:14-25-p.415:1-9**

Consistent with the retaliatory stance that Defendants and management had taken towards Dr. Kaye, Ms. Swenson continued to mock and antagonize Plaintiff.    Despite being 5'7, Ms. Swenson claimed to  be intimidated by Dr. Kaye whose listed height is 5'1.  Further,  contrary to Ms. Swenson's contentions, the meeting took place in Dr. Kaye's office not in a public area and it was not in front of Ms. Persaud.

- **Exhibit 58:  Swenson Dep. p. 143:19-23; and**

- **Exhibit 161:  Dr. Kaye's Driver's License  (D00014)**

156.  After discussing the interaction between Ms. Swenson and plaintiff with Dr. Jain, Drs. MacDonald and Ford agreed that the plaintiff's conduct was unprofessional.  Mr. Wangel

suggested, and Dr. Ford agreed, to draft a warning memo to present to plaintiff.  See Email thread, "Re: Assistance with Bronx," dated June 3-4, 2019, annexed as Exhibit "HHHHH."

**RESPONSE:**  Disputed.  The statement of fact mischaracterizes the text of the emails.

Defendant Wangel never stated that the memo was a warning.  Whether the two memos

Dr. Kaye received on July 1, 2019 were warnings or disciplinary, and the effect that they

have had on Dr. Kaye's career present issues of disputed facts.  Defendants have insisted

that the memos were warnings and therefore should have no impact on Dr. Kaye's career.

However, their position was contradicted by Dr. MacDonald's email as sent on June 18,

2019, a full two weeks after the exhibit referenced in the statement of fact.  In that email,

Dr. MacDonald asks: "Did we complete the discipline?" To which, Dr. Ford responded in the

negative, "because Dr. Kaye was out on FMLA.**" Exhibit 162: Email from MacDonald dated

June 18, 2019 with the Subject: Re: Did we Complete the Discipline (NYC002946).**   Prior to

this email, on June 7th, Defendants circulated a draft memo with the Subject: Warning

Memo.  **Exhibit 163: Email from Ford dated June 7, 2019 with the Subject:  Re: Dr. Kaye**

**Warning Memo (NYC004002)**  Clearly, Defendants believed that the meeting on July 1,

2019 and the accompanying memos were disciplinary.

  In either instance, Dr. Kaye would have to report the memos to disciplinary and licensing

boards.  She testified that the presence of the memos despite Defendants' characterizations

needed to be disclosed.  The description of the memos as being warnings or disciplinary was

an exercise of nuanced semantics, that have nevertheless had repercussions that continue

to impact Dr. Kaye's ability to earn a living to this day.  **Exhibit 153: Kaye Dep. Re-Direct**

**2/3/22 p.412:14-25-p.415:1-9**

Dr. Kaye testified that the misleading characterization of what transpired on May 31st with

Ms. Swenson was tantamount to a disruptive physician charge.  Dr. Kaye could face further

discipline or revocation of her license, if she failed to disclose the alleged warning memo.

Defendants' false manufactured allegations of what transpired at the May 31st meeting was

indicative of the retaliatory hostile work environment Plaintiff endured during their tenure.

**Exhibit 153: Kaye Dep. Re-Direct 2/3/22 p.412:14-25-p.415:1-9**

157.  On June 6, 2019, a warning memo for plaintiff, drafted by Samantha Kent, Associate
     Director of Employment & Labor Relations at CHS, regarding the incident with Ms.
     Swenson on May 31, 2018, was sent to Drs. Ford and MacDonald, as well as Mr. Wangel
     and Ms. Laboy, with instructions to present to plaintiff .  See Email, "Workplace Conduct
     Memo,"  dated June 6, 2019, and Email thread, "RE: Workplace Conduct Memo," dated
     June 6, 2019, annexed as Exhibit "IIIII."

**RESPONSE:** Disputed.  Whether the memo was a warning or constituted disciplinary action is an

issue of disputed fact.  Please see Plaintiff's response to Paragraph 157 and the

referenced/attached exhibits.

158.  On or about July 1, 2019, Dr. Ford and Clarence Muirjr (sic) met with plaintiff to issue
     her a warning memo that she had "engaged in inappropriate and unprofessional conduct
     when you spoke with Ms. Andrea Swenson, Administrative Director of FPECC, on or about
     May 31, 2019."   See Memorandum Re: Unprofessional Conduct and Communication,
     dated June 6, 2019,  from Dr. Ford to plaintiff , annexed as Exhibit "JJJJJ,"  see also Email
     thread, "Re:  Follow-up," between June 18, 2019 to June 21, 2019, annexed as Exhibit
     "KKKKK."

**RESPONSE:** Disputed.  Plaintiff disputes the statement of fact to the extent that it seeks to

establish the truth of the claims asserted.  Firstly, Dr. Kaye denies that she engaged in any

"inappropriate conduct," including allegedly yelling at Ms. Swenson.  Secondly, the stated fact

mischaracterizes what transpired on July 1, 2019.  Prior to the meeting, Dr. Kaye's union rep

told her that it was a pre-termination meeting.

In the wake of the meeting, were questions of whether she was supposed to report the memos she received on July 1st, on job applications and or to licensing boards should she apply for licenses to practice in other states.   Based on legal advice, Dr. Kaye  was told that she had to disclose the incident with Ms. Swenson, because the way the memo was worded, it was the equivalent of a "disruptive physician" charge.

The repercussions of the charge have been two-fold: if Dr. Kaye failed to disclose, she could lose her license; and or if the allegations were substantiated, Dr. Kaye's license could be revoked. Therefore, it has been Dr. Kaye's position that Defendants intentionally mischaracterized the nature of the memo so that she would not disclose it on documents, and so that she would lose her medical license.   Her belief stems from Defendants intentional misnomer of the charge to her, and the characterization of the memos as discipline amongst themselves.   **Exhibit 153:  Kaye Dep. Re-Direct p. 412:14-25-p.415:1-9**

### M. Notes

159.  In October 2018, plaintiff emailed Dr. Jain, requesting his original notes for a file, so that the file could be closed.  Dr. Jain indicated in response that the files were in his office. Email, "Fw:  Notes," dated October 2-3, 2018, annexed as Exhibit "LLLLL."

**RESPONSE:** Disputed.  The statement of fact is misleading and does not accurately depict what transpired.  Dr. Kaye asked Defendant Jain to give Ms. Persaud his original notes. On May 17, 2018, Dr. Kaye complained to Dr. Winkler and Legal Aid that Defendant Jain threw out his notes.  Prior to this complaint, Defendant Jain disclosed  to Drs. Kaye and Winkler that he threw out his notes, and Drs. Kaye and Winkler told Defendant Jain that this was improper.  Dr. Kaye told Defendant Jain that throwing out his notes was a Class E Felony.

- **Exhibit 4:  Kaye Decl. ¶¶156-160;**

- **Exhibit 23:  Kaye Dep.  Cross Exam. Dep.  1/25/22 p. 52:5-20-53:1-16; and**

- **Exhibit 24:  Winkler Dep. p. 293:23-24-295:1-8**

On October 2, 2018 Dr. Kaye sent an email where Ms. Persaud sought the original copies of

Dr. Jain's notes, so she could "close out the files that he had seen."    Unbeknownst to Dr. Kaye,

in a conversation with Defendant Ford, Defendant Jain accused Dr. Kaye of stealing his notes.

**Exhibit 164: Email from Kaye dated October 2, 2018 with the Subject: Notes (NYC000655).**

In light of her professional obligations to report malfeasance, on November 30, 2018, Dr. Kaye

reported Defendant Jain to Defendant Ford.  Instead of looking into the matter or conducting

an investigation, Defendant Ford made the excuse that Defendant Jain was from out of town.

When asked if she had reported the matter to Corporate Compliance based on the gravity of

the allegations, Defendant Ford said she did not and that she had conducted her own

investigation.

- **Exhibit 4: Kaye Decl.¶¶135;**

- **Exhibit 14:  Ford Dep. p. 212:10-24-213:1-7; p. 330:9-24-p.341:1-2; and**

- **Exhibit 23:  Kaye Dep. Cross Exam. 1/25/22 p.52:5-20-53:1-6**

Between December 4th and 11, 2018, Defendant Jain's notes were "found."  Dr. Kaye

believed that Defendant Jain re-created his notes, because they were in pristine condition,

and because of his previous insistence that he destroyed them.

- **Exhibit 4: Kaye Decl.¶¶135 and 156-160**

160.  On or about December 20, 2018, Dr. Jain notified Dr. Ford that he had learned that
plaintiff had taken his handwritten notes out of the charts and "has them in her
possession."  Specifically, Dr. Jain stated that his "notes for at least 10 cases, which I gave
to Lucrecia to file, are not in their respective charts."  Dr. Jain reported that [w]hen he
asked for notes on a particular case, Lucrecia said [plaintiff] asked for my notes,  (sic) took

them" and Lucrecia could not find them." Dr. Jain added that "[t]here is no legitimate
reason for these notes to be missing or taken by [plaintiff] without my knowledge.  This is
unusual and concerning."  Email,  "Fw: Bronx -my handwritten notes,"  dated December
20, 2018, annexed as Exhibit "MMMMM."

**RESPONSE:** Disputed.  Plaintiff disputes this statement of fact to the extent that it seeks to

establish the truth of the claims asserted.  Defendant Jain made this false representation

two days after Dr. Kaye alleged that he had perjured himself in open Court that he had

forgotten his notes at his office.  Dr. Kaye denied that she ever took Defendant Jain's notes.

The referenced email was sent less than a month after Dr. Kaye had complained to

Defendant Ford. *Additionally, Dr. Winkler corroborated Dr. Kaye's account, when he testified*

*that Defendant Jain told him that he in fact did throw out his notes.*

**Exhibit 4:  Kaye Decl.  ¶¶ 135 and 156-160;**

**Exhibit 23:  Kaye Dep.  Cross Exam. 1/25/22 p. 52:5-20-53:1-16; and**

**Exhibit 24:  Winkler Dep. p. 293:23-24-295:1-8**

### N.  Staffing for the Bronx Clinic

161.  On April 3, 2018, Dr. Ford recommended two candidates for interview, Drs. Jonathan
      Kent and Raina Lamade, to full (sic) open position at the Bronx Court Clinic, previously
      held by Dr. Winkler prior to his promotion to Director of the Brooklyn Court Clinic. See
      Email correspondence, between Susannah Lewis and Drs. Jain and Kaye, dated April 3-5,
      2018, annexed as Exhibit "NNNNN."

**RESPONSE:** Admit and add.  Drs. Kaye, Winkler and Jain interviewed both Drs. Lamade and

Kent.  Collectively, Dr. Kaye and her colleagues determined that Drs. Lamade and Kent were not

good choices for the Bronx Court Clinic.

- **Exhibit 4: Kaye Decl.¶ 181**

162.  Plaintiff interviewed Dr. Kent on or about April 23, 2018.  See Email, dated April 24,
      2018, from Dr. Kent to plaintiff, annexed as Exhibit "OOOOO."  Plaintiff did not believe Dr.
      Kent was "a good fit for the Bronx."  See Email, date(sic) April 24, 2018, from plaintiff to

Drs. Jain and Winkler, annexed as Exhibit "PPPPP."

RESPONSE:  Disputed.  The statement of fact attempts to distort what transpired.  Drs. Kaye,

Jain and Winkler interviewed Dr. Kent together. Again, collectively they determined that Dr.

Kent was not a good fit and that he lacked the knowledge to perform independently, which was

needed at the Bronx Court Clinic due to its size.  Dr. Kaye raised the issue that Dr. Kent needed

supervision because of his lack of experience, and because of the ethical tenets against

supervision of a co-evaluator, Dr. Kaye stated that he would not be a good fit.

- **Exhibit 4: Kaye Decl ¶ 181; and**

- **See Defendants' Exhibit PPPPP**

163.  On or about May 18, 2018, Plaintiff learned that Dr. Louise Mullan would be starting at
the Bronx Court Clinic.   See Email., dated May 18, 2018, from Dr. Jain to Dr. Mullan and
plaintiff, annexed as Exhibit "QQQQQ."  Dr. Mullan worked as a per diem or part-time
psychiatrist at the Bronx Court Clinic until on or about June 14, 2019.  See Email, dated
May 31, 2019, from Lucrecia Persaud to Andrea Swenson, annexed as Exhibit "RRRRR,"
Jain, Ex. C. at 118:4-7.

RESPONSE: Admit and add. Dr. Mullan's schedule and her status as a psychiatrist did not

permit the Clinic to take on the same workload that it had when Dr. Winkler worked full

time as a co-evaluator.  Specifically, since Dr. Winkler is a psychologist, psychological testing

could be conducted if required.  Typically, psychiatrists don't administer psychological

testing.

- **Exhibit 4:  Kaye Decl. ¶¶ 179**

164.  On June 11, 2018, Dr. Jain sent plaintiff information concerning a psychologist who was
interested in a full-time position, and wanted to know her "thoughts on him for a full-time
Bronx psychologist position."  See Email, "Bronx Psychologist Candidate,"  dated June 11,
2018, annexed as Exhibit "SSSSS."

RESPONSE: Disputed.  Plaintiff disputes the email and the statement of fact because it does

not accurately convey what transpired.  Between June and July of 2018, Dr. Kaye along with

Defendant Jain and Dr. Winkler interviewed Dr. Jackson. Although Dr. Winkler no longer

worked at the Bronx Court Clinic, Defendant Jain insisted on having him participate in the

interviewing process of Dr. Kaye's staff.  As further insult to injury, although Defendant Jain

included Dr. Winkler in all of the interviews for candidates to work in the Bronx, he did not

feel compelled to do the same for Dr. Kaye, even though the selection would eventually

become her staff person.

Plaintiff maintained that she, Dr. Winkler and Defendant Jain collectively determined

that Dr. Jackson would not be a good fit for the Bronx. Defendant Jain and Dr. Winkler

believed that he was arrogant and that he was not receptive to learning.  It was clear

throughout the interview process that Defendant Jain deferred to Dr. Winkler over Dr. Kaye,

again this was despite the fact that the hire would work with her in the Bronx.

- **Exhibit 4:  Kaye Decl. ¶¶ 181-182**

165.  Following Dr. Mullan's departure, efforts were made to hire another psychiatrist at the
Bronx Court Clinic.  See Email, dated September 19, 2019, from Dr. Yang to Jessica Laboy,
et. al., annexed as Exhibit "TTTTT."

**RESPONSE:** Disputed.  Dr. Kaye was not included on the referenced email.

- **Exhibit 4: Kaye Decl. ¶¶ 179 and 181-183.**

166.  On or about October 1, 2018,  Dr. Anansa Brayton was hired as an evaluator at the
Bronx Court Clinic.  See Email, dated October 1, 2018, from Dr. Jain to plaintiff, annexed as
Exhibit "UUUUU."  Dr. Brayton worked full time as a psychologist at the Bronx Court Clinic
until or about November 11, 2019.  See Email, dated November 1, 2019, from Dr. Brayton
to plaintiff, Dr. Jain and Lucrecia Persaud, annexed as Exhibit "YYYYY."

**RESPONSE:** Disputed.  Dr. Brayton did not start working at the Bronx Court Clinic until

December 11, 2018. Dr. Winkler testified that he trained Dr. Brayton for three months.  Mr.

Bloom testified that between April 2018 and December 2018, Dr. Kaye was the only full-time evaluator at the Bronx Court Clinic.  Dr. Kaye, Dr. Winkler and Mr. Bloom all testified that Dr. Brayton's reports were overly detailed and difficult to read.   They each stated that sometimes the content of the reports would be inconsistent with Dr. Brayton's findings.  Dr. Kaye and Mr. Bloom described instances where judges took issue with the quality of Dr. Brayton's work.   Dr. Kaye, Dr. Winkler and Mr. Bloom each stated that at some point Dr. Brayton had remediation training.  Mr. Bloom believed that she was upset when she received this additional training and not too long afterwards she resigned to pursue another opportunity at Family Court.

- **Exhibit 23:  Kaye Dep. Cross Exam. 1/25/22 p.58:8-24-p.60:1-3;**

- **Exhibit 24: Winkler Dep. p. 73:4-24-78:1-11; p.287:23-24-289:1-5; and**

- **Exhibit 33: Bloom Dep. p. 166:11-25; p. 182:18-25-192:1-16**

167.  In anticipation of, and following Dr. Brayton's departure, leadership sought to backfill her position at the Bronx Court Clinic.  See Email thread, dated September 20, 2019, October 31, 2019, November 1-2, 4, 2019, entitled "What is plan for psychologist staffing in the Bronx?"  between Drs. Ford, Jain and Garcia-Mansilla, among others, email, dated October 31, 2019 -November 12, 2019, from Dr. Jain to Wilma Soto and Kiesha Bailey, annexed as Exhibit "WWWWW."

**RESPONSE:**  Disputed.  Dr. Kaye was not privy to any efforts to replace Dr. Brayton.  From November 2019 until she was constructively discharged in January 2020, Defendants declared a work stoppage.  Cases were only being seen when the Court ordered them; this was after there were protracted delays with inmates being detained without court appearances.   Further, Dr. Kaye maintained that Defendants would not allow evaluators from other clinics to see cases to address the backlog.  Mr. Bloom had an email exchange with Dr. Jain about this very issue during the period of the work stoppage.

- **Exhibit  4:  Kaye Decl. ¶¶ 184-190;**

- **Exhibit 23: Kaye Cross Exam.  1/25/22  p.20:16-25-p.22:1-17; and p. 55:17-22;**

- **Exhibit 32: Email from Bloom dated December 9, 2019 with the Subject: 730 List (Kaye6thProd00557-Kaye6thProd00559);**

- **Exhibit 33: Bloom 243:11-24;**

- **Exhibit 165: Email from Bloom dated December 18, 2019 with the Subject: Butler (Kaye6thProd00564-Kaye6thProd00566);**

- **Exhibit 166: Email from Jain dated December 18, 2019 with the Subject: Butler (Kaye6thProd00567-Kaye6thProd00570);**

- **Exhibit 167: Email from Jain dated December 18, 2019 with the Subject: Butler (Kaye6thProd00571-Kaye6thProd00575); and**

- **Exhibit 168:  Email from Bloom dated January 16, 2019 with the Subject: Travel on Fridays (Kaye6thProd00602-Kaye6thProd00609)**

168.  Efforts were also made to rotate in or transfer examiners from another borough to assist with cases in the Bronx Court Clinic. Id.

**RESPONSE:** Disputed.  Dr. Kaye and Mr. Bloom both testified that no efforts were made to bring evaluators from other clinics.  Dr. Kaye testified that she was in effect rubber-roomed between the months of November 2019 and her constructive discharge in January 2020.  Unless a Judge became exasperated by the delays caused by the work stoppage, there weren't any 730s being seen at the Bronx Court Clinic during that time period.

Mr. Bloom specifically implored Defendant Jain to allow evaluators to come from other boroughs so that his clients would not experience any further delays.  Mr. Bloom became exasperated with Defendant Jain's denials of the stoppage and the deception surrounding the production of inmates for exams.   Mr. Bloom's sentiments and his impressions about Defendants' work stoppage are captured in the referenced emails.  The record therefore

contains conflicting accounts about the work stoppage which appropriately should be resolved at trial.

- **Exhibit 23: Kaye Cross Exam. Dep.  1/25/22 p.20:16-25-p.22:1-17; and p. 55:17-22;**

- **Exhibit 32: Email from Bloom dated December 9, 2019 with the Subject 730 List (Kaye6thProd00557-Kaye6thProd00559);**

- **Exhibit 33: Bloom 243:11-24;**

- **Exhibit 165: Email from Bloom dated December 18, 2019 with the Subject Butler (Kaye6thProd00564-Kaye6thProd00566);**

- **Exhibit 166: Email from Jain dated December 18, 2019 with the Subject Butler (Kaye6thProd00567-Kaye6thProd00570);**

- **Exhibit 167: Email from Jain dated December 18, 2019 with the Subject Butler (Kaye6thProd00571-Kaye6thProd00575); and**

- **Exhibit 168:  Email from Bloom dated January 16, 2019 with the Subject Travel on Fridays (Kaye6thProd00602-Kaye6thProd00609)**

169.  There were challenges in retaining and recruiting staff for the Bronx Court Clinic.  Dr. Jain received concerns from Drs. Brayton and Mullan regarding the "tense" work environment, directors from the other boroughs expressed concerns about sending their examiners to the Bronx to do examinations because of the work environment, and plaintiff was resistant to work with certain examiners.  See Jain, Ex. C at 116:18-118:1, 120:16-121:2. 121:24-122:9, 124:2-19, 125:9-12. 144:7-145:20, 182:11-21, 208:1-210:16, 270:4-272:12, 318:8-321:8, Yang, Ex. M at 85:18-87:9.

**RESPONSE:** Disputed.  Dr. Kaye, Dr. Winkler and Mr. Bloom refuted the contention that Dr. Kaye presided over a "tense" work environment in the Bronx. Dr. Mullan because she had child care issues that CHS would not accommodate.  Dr. Brayton resigned because she had found another opportunity in Family Court. Dr. Winkler testified that he did not find the work environment in the Bronx to be difficult.  Mr. Bloom also disagreed with that position.

- **Exhibit 23: Kaye Cross Exam. Dep. 1/25/22 p.20:16-25-p.22:1-17; and p. 55:17-22; 59:3-9;**

- **Exhibit 24: Winkler Dep. 46:5-7; p.234:14-25-236:1-4**

- **Exhibit 32: Email from Bloom dated December 9, 2019 with the Subject 730 List (Kaye6thProd00557-Kaye6thProd00559);**

- **Exhibit 33: Bloom Dep. 67:21-24-69:1-9;**

- **Exhibit 165: Email from Bloom dated December 18, 2019 with the Subject Butler (Kaye6thProd00564-Kaye6thProd00566);**

- **Exhibit 166: Email from Jain dated December 18, 2019 with the Subject Butler (Kaye6thProd00567-Kaye6thProd00570);**

- **Exhibit 167: Email from Jain dated December 18, 2019 with the Subject Butler (Kaye6thProd571-Kaye6thProd00575); and**

- **Exhibit 168: Email from Bloom dated January 16, 2019 with the Subject Travel on Fridays (Kaye6thProd00602-Kaye6thProd00609)**

    **O.  Complaints to BOC**

170.  On January 7, 2020, plaintiff submitted a letter to the Board of Correction and Inspector General for the Department of Correction, complaining of what she believed to be a "matter of public concern to oversight agencies consistent with my duty as a physician to do so, and I request that action be taken to protect due process rights of criminal defendants and the integrity of the legal system.  See January 7, 2020, letter, annexed as Exhibit "XXXXX."

**RESPONSE:** Disputed. Dr. Kaye filed a Complaint with the Board of Correction and the Inspector General on January 7, 2020.  The quoted language is misleading and is taken out of context.

Plaintiff also objects to the stated fact to the extent that it seeks to assert a legal conclusion: that her advocacy was not protected under the First Amendment and § 1983.  Dr. Kaye's complaint listed the very areas of malfeasance, fraud, waste and constitutional violations she raised during the course of her employment at CHS/H+H.

- **Exhibit 169: January 7, 2020 Board of Correction Complaint.**

When Dr. Kaye filed this complaint, she had been practically banned from seeing any Defendants.  Between the months of November 2019 and January 2020, a backlog of over 42 inmates with court ordered examinations accumulated.  These inmates' liberty interests were compromised, to the extent that their court dates were indefinitely delayed until they were examined.  In order to avoid any further deprivations of their rights, Dr. Kaye felt compelled to resign.  She believed that if she did not, that Defendants would continue the work stoppage at the Bronx Court Clinic indefinitely: a*nd Dr. Kaye was right, on the next business day after she was constructively discharged, Defendants resumed exams in the Bronx.*

Therefore, the primary motivations behind Dr. Kaye's BOC/Inspector General Complaint: was to bring attention to the Constitutional violations being implemented by CHS and City Hall; to end the indefinite stoppage of examinations and prolonged incarceration of inmates that had orders for competency examinations assigned to staff at the Bronx Court Clinic; and to bring attention to Defendants' policies that were endangering public safety to the extent that they were rigging exams to free potentially dangerous people in an effort to close Rikers Island by any means.

Dr. Kaye's letter, her advocacy to the legal community and external bodies did not invoke any of her obligations as a physician.  As a forensic psychiatrist, Dr. Kaye was a neutral arbiter of competence.  She did not treat the Defendants she examined during the course of her employment.  As a physician she did not owe them a duty of care or a duty to protect them from Defendants' policies and malfeasance.   As a psychiatrist, she did not have a duty to the Court to preserve the integrity of the process or the administration of justice.  Nevertheless, during the course of her employment Dr. Kaye complained that Defendants' policies violated:

the due process clause; Defendants' rights against self-incrimination; and the Sixth and Eight

Amendments of the U.S. Constitution.  She also had concerns about the public's safety in those

instances where Defendants recklessly released potentially dangerous criminals back onto the

City's streets.

Dr. Kaye complained that Defendants' HIPAA release policy, violated inmates' rights against

self-incrimination and the due process clause.  In essence, Defendants' releases required

inmates who may be found mentally unfit, to release their medical records for examination by

the forensic evaluator and to all parties of the litigation.  Although the inmate would be

informed of the implications of such a waiver, the question of whether they had the capacity to

fully understand the waiver and knowingly release their records persisted. Dr. Kaye advocated

against this clear violation of the Constitution, as *a concerned member of the public*, not as a

part of her job.  Again, unlike Dr. Winkler, Dr. Kaye has never been an officer of the Court.

When Dr. Kaye complained about the use of redacted records,  although she mentioned

medical malpractice, on a macro level she also sought to protect inmates' rights under the due

process clause and Sixth Amendment.  Inmates standing trial are entitled to knowingly and

intelligently participate in their defense.  However, if an assessment of their competence is not

based on sufficient or adequate data, then they are deprived of this right.  Dr. Kaye raised these

issues with the named Defendants, CHS management, several judges, the bar, the Department

of Investigation, the Attorney General's Office, the Inspector General's Office and the Board of

Correction.  In response, Dr. Kaye experienced a retaliatory hostile work environment.

Evidence that she acted outside of the scope of her employment was the admonishment from

Deirdre Newton about Third Party Communications.  **Exhibit 170:  Email from Newton dated**

March 23, 2018  with the Subject: Third Party Communications"  (NYC001950).

Although Defendants had policies that required employees to report waste, fraud and abuse, this was only one facet of Dr. Kaye's numerous complaints.   Her letter cited instances where Defendants' policies encouraged double-dipping, quid quo pro work arrangements and blatant conflicts of interests.  Defendants' policies may have required her to report these things, but under the law Dr. Kaye also invoked her protections as a Whistleblower.  Again, the letter was Dr. Kaye's last-ditched effort during the course of her employment to protect the rights of inmates and the general public from the former administration's reckless policies and practices.  Dr. Kaye advocated and fought Defendants for over five years to protect inmates in the system and the people of the City of New York, and she and her family paid the price dearly due to Defendants' retaliatory harassment and violations of the law.

### Resignation/Retirement

171.  On January 13, 2020, plaintiff submitted her resignation.  See "Receipt for Retirement Application, annexed as Exhibit "YYYYY."  Plaintiff alleges that she was forced out, or constructively discharged.

**RESPONSE:**  Disputed. Dr. Kaye submitted her resignation on January 9, 2020.  The

Defendants' referenced exhibit is Dr. Kaye's Board of Correction/Inspector General

Complaint.  **Exhibit 171:  Email from Kaye dated January 9, 2020 with the Subject:**

**Resignation**

### P.  Complaints to New York State Inspector General and Department of Justice

172.  Plaintiff testified that she filed complaints online with the New York State Inspector General and the Department of Justice.  She cannot confirm when she filed these complaints with either agency, nor whether either agency contacted H + H or any of its employees.  See Deposition of Melisa Kaye, dated February 3, 2022, annexed as Exhibit "ZZZZZ"  at 381:4-386:11.

**RESPONSE:** Admit with qualifications. Since the number of complaints Dr. Kaye made were so numerous, she could not remember them all at her deposition.  However, below is a complete list of the complaints she filed along with the dates she made them:

- July 8, 2016:  Dr. Kaye filed complaints to H + H's  BHC and the Department of Investigation;

- June 27, 2017:  Dr. Kaye complained to the Legal Aid Society about H + H's defiance of Court Orders for redacted medical records.  She complained that H + H's refusal to comply with the orders was causing adjournments in six separate cases and for violating inmates' constitutional rights;

- January 2018 through 2021: Dr. Kaye submitted Medicaid fraud reports;

- February 5, 2018: Dr. Kaye complained to Judge Lieb's law secretary Ms. Laird about unredacted medical records about CHS defying the Court's order for unredacted medical records;

- February  22, 2018:  Dr. Kaye complained to the Legal Aid Society about Dr. MacDonald's attempt to improperly access medical records obtained in the matter of People v. Kim Jenkins, when she conducted her 730 evaluation.  Dr. Kaye disclosed to Dr. MacDonald that she could not release the records to him without a Court Order.  In response to her statement, Dr. MacDonald angrily said, "we own them anyway, they're CHS records;

- March 12. 2018:  Dr. Kaye complained to the Bronx DA's Office about delays in cases due to H + H refusing to provide unredacted records in defiance of Court Orders. She complains to Judges Fabrizio, Moore and Torres and Lieb. **Exhibit 172:  Kaye**

**Email dated March 12, 2018 with the Subject:  Redacted (NYC001937-NYC001938);**

- June 28, 2018:  Dr. Kaye complained about CHS's private practice policy and the violation of Chapter 68 of the City's Conflict of Interest Board's Rules and Regulations.  Dr. Kaye voices her complaints at the FPECC Director Division Meeting.  At the close of the meeting, she had a one-on-one conversation with Defendant Jain, where she also raised these issues;

- September 4, 2018:  Dr. Kaye complained to the Department of Investigation regarding the private practice policy and the rigging of CPL 730 competency examinations and results;

- September 2018; April 2019; and September 2019: Dr. Kaye complained to the Office of Court Administration and H +H's Inspector General's Office;

- October through November 2018: Dr. Kaye complained to Pete Homberg a political candidate;

- October 9, 2018 and November 28, 2018:  Dr. Kaye complained to Emma Noftz, a lawyer from the Bronx Defenders.  **Exhibit 173: Email from Kaye dated November 28, 2018 with the Subject: Redacted.  (NYC003830);**

- November 2018 and October 2020: Dr. Kaye complained to the Conflict of Interest Board regarding the Private Practice Policy;

- November 20, 2018: Dr. Kaye complained to the Assistant District Attorney Kelly Van Develde delaying cases due to CHS's refusal to comply with Court Orders for unredacted medical records;

- December 2018 through July 2019: Dr. Kaye made multiple phone calls and

complaints to the National Labor Relations Board and Office of Labor Management

Services;

- January 2019:  Dr. Kaye complained to Doctors Council regarding Defendant Yang's

  policies and their effects on the public and inmates at Rikers;

- January 2019: Dr. Kaye complained about CHS/Defendant Yang's policies to the

  Legal Aid Society;

- February 2019 and January 2021:  Dr. Kaye complained to the New York State

  Comptroller and Inspector General;

- March 2019:  Dr. Kaye complained to the New York State Attorney General's Public

  Integrity Bureau;

- April through May 2019: Dr. Kaye complained to H + H's Corporate Compliance

  Office, specifically to Ms. Patsos about the retaliation, discrimination and

  malfeasance she had experienced after she engaged in whistleblowing;

- May 2019; September 2019 and October 2019: Dr. Kaye complained to the New York

  State Public Corruption Bureau about DeBlasio and H + H's use of Gotham FQHC as a

  straw organization, politically funded by dark money and operating as a political

  slush fund.  She cited the tax fraud, judicial fraud, regulatory and medicolegal

  violations;

- September 20, 2019: Dr. Kaye complained to Ms. Patsos, H + H's Corporate

  Compliance Officer about: the falsification of employment records;  kickbacks

  between forensic examiners and lawyers to rig CPL 730 competency exams and CPL

  390 pre-pleading exams in exchange for private business deals and bribes.  Ms.

Patsos acknowledged receipt of the complaint and did not initiate an investigation;

- September 2019 and July 2020: Dr. Kaye complained to CMS/Medicaid about CHS's fraud fueled policy of altering medical records, by the 730 team, and CHS bundling clinical and forensic services and  thereby committing healthcare fraud;

- October 2019:  Dr. Kaye complained to the New York Post about the corruption and rigging of court ordered competency and pre-pleading exams.  She cited constitutional violations and public safety concerns;

- In 2019 and 2020: Dr. Kaye complained to the Office of Court Administration's Audit Bureau regarding the concerted efforts of CHS FPECC to commit fraud on the Court in an effort to influence and alter the trajectory of criminal proceedings in the New York State Courts throughout the five boroughs;

- 2019: Dr. Kaye complained to the  Citizens Budget Committee about CHS FPECC doctors outsourcing to themselves 390 exams to be done as private mitigation cases.  They injected bias and their political agendas into private mitigation cases when the exams should have been conducted as neutral court ordered 390 exams. In the process, they were defrauding taxpayers by double dipping and being paid privately for their city-salaried job duties;

- 2019: Dr. Kaye complained to politicians Nicole Malliotakis  and Lee Zeldin about the corruption  and fraud taking place within  amongst CHS/DeBlasio/MOCJ;

- November 28, 2020: Dr. Kaye filed complaints with the offices of the Comptroller and Inspector General;

- January 2021:  Dr. Kaye filed another complaint with the Department of

Investigation;

- January 2021: Dr. Kaye filed a second complaint with the Conflict of Interest Board;

- January 2021: Dr. Kaye filed a complaint to the New York State Attorney General's Office; this complaint was forwarded to the Inspector General's Office;

- January 2021: Dr. Kaye filed a complaint with the Office of Court Administration, Inspector General's office citing fraud;

- February 1, 2021:  Dr. Kaye filed a complaint with the Public Corruption Bureau

- **Exhibit 4: Kaye Decl. ¶  191**

    **Q.  Medical License in New Mexico**

173.  Plaintiff has not submitted her work verification to CHS as part of the licensing process for a medical license in New Mexico, believing that "[b]ecause CHS engaged in ongoing retaliation against me including the manufactured disciplinary actions, they're not going to fill out a form in good faith if they fill it out at al."  Id., 387:23-392:22.

**RESPONSE:** Disputed.  Dr. Kaye did not initially submit her work verification due to the

ongoing harassment Defendants have engaged in  against her since they began

management of the Court Clinics.  However, Dr. Kaye did apply for an exemption to this

requirement; the board had an extenuating circumstances exception.  On or about February

16, 2022, Dr. Kaye obtained her Medical License to practice in New Mexico.

- **Exhibit 4:  Kaye Decl.¶¶192-196**

174.  Plaintiff has not contacted CHS or H + H to determine  how they would complete her work verification for her medical license in New Mexico.  Id., 403:23-404:23.

**RESPONSE:** Disputed.  At the time of Dr. Kaye's deposition, she sought the extenuating

circumstance exception to get around the work verification requirement.  Dr. Kaye

explained on her application that she was suing her former employer, and thereby believed

that they would not provide her with a reference in good faith.  Within two weeks of Dr.

Kaye's Re-Direct Deposition on February 3, 2022, the New Mexico medical board granted

Dr. Kaye her license on February 16, 2022. However, due to Defendants' actions, Dr. Kaye

was forced to quit her job in January 2020 and has remained unemployed in New Mexico.

- **Exhibit 4: Kaye Decl. ¶¶ 192-196**


Dated: Queens, New York
     May 27, 2022                       LAW OFFICES OF SPECIAL HAGAN

                                          88-08 Justice Avenue, Apt. 16i

                                          Elmhurst, New York 11373

                                        (917) 337-2439

                                                  /s/

                                        By: _____

                                        Special Hagan, Esq.

                                        Attorney for Melissa Kaye, M.D. Plaintiff

                                        special@haganlawoffices.net