UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
.................................................................................. X
MELISSA KAYE,

PLAINTIFF,


-against-


NEW YORK CITY HEALTH AND HOSPITALS CORPORATION;
ABHISHEK JAIN; ELIZABETH FORD; JONATHAN WANGEL and
PATRICIA YANG, (in their official and individual capacities and as
aiders and abettors)

**PLAINTIFF'S STATEMENT OF
ADDITIONAL MATERIAL
FACTS**


18-12137(JPC)(JLC)


DEFENDANTS.

.................................................................................. X


Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Plaintiff Melissa Kaye, M.D. ("Plaintiff

or "Dr. Kaye"), submits the following Statement of Additional Material Facts, to which it is

contended there exist material issues to be tried:

I.      **Background**

A.  **Procedural History and Plaintiff's Claims**

1.  On May 2, 2019, Plaintiff submitted and served the proposed Summons and First Amended
    Complaint on Defendants.  (ECF Dkt. 25-1)
    - **Exhibit 1:  Plaintiff's Summons First Amended Complaint as filed on May 2, 2019
      (ECF Dkt. 25-1)**

2.   On May 3, 2019, due to a docketing error, with the leave of the Court, Plaintiff served the
    First Amended Complaint on Defendants.  (ECF Dkt. 29)
    - **Exhibit 2: Plaintiff's First Amended Complaint as filed on May 3, 2019 (ECF. Dkt.
      29)**

3.  Plaintiff raised the following causes of action in the Amended Complaints she served on
    May 2, 2019 and May 3, 2019:  violations of Dr. Kaye's rights under the  1st and 14th
    Amendments of the United States Constitution; pay parity claims under the Equal Pay Act;
    interference and retaliation under the Family Medical Leave Act ("FMLA"); discrimination
    and retaliation/retaliatory hostile work environment under Title VII of the Civil Rights Act

1

of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title VII"); 42 U.S.C. §§ 1983 and 1988; discrimination and retaliation under the New York Human Rights Law as contained in New York Executive Law §296 et. seq. ("NYHRL"); discrimination and retaliation under New York City Human Rights Law as contained in the Administrative Code of the City of New York, §8-107 et. seq. ("NYCHRL"); and retaliation under New York's Whistleblowing Law.

- **Exhibit 2:  Plaintiff's First Amended Complaint was filed on May 3, 2019 (ECF Dkt. 29) p. 5 ¶7; and**

- **Exhibit 1:  Plaintiff's First Amended Complaint as filed on May 2, 2019 (ECF Dkt. 25-1)**

4.  Defendants violated Dr. Kaye's rights: 1) when they paid her at least $38K less and employed her in the lesser Attending Physician corporate title than her male comparator, Dr. Steven Ciric, who was in the Physician Specialist title, with lesser responsibilities and less seniority; 2) when they retaliated against her for raising concerns about the violation of criminal defendants' rights: against self-incrimination; to due process under the law; and the 8th Amendment; 3) when they retaliated against her for filing complaints of retaliation and gender discrimination on May 3, 2018, May 22, 2018 and September 7, 2018; 4) when they violated the FMLA by engaging in theft of wages, interference and retaliation); 5) when they failed to accommodate and or engage in an interactive process when she sought an alternative work schedule under the FMLA; 6) when they retaliated against her for whistleblowing under the New York Labor Law; and 6) when they created a retaliatory hostile work environment and work stoppage that led to  her constructive discharge.

- **Exhibit 2:  Plaintiff's First Amended Complaint as filed on May 3, 2019 (ECF Dkt. 29) p. 5 ¶7; and**

- **Exhibit 1:  Plaintiff's First Amended Complaint as filed on May 2, 2019 (ECF Dkt. 25-1)**

5.   Defendants filed an Answer to an unspecified complaint on July 19, 2019.

- **Exhibit 3: Defendants' Answer to the First Amended Complaint.  (ECF. Dkt. 34)**

**B.  Dr. Kaye's Protected Status and Professional Background**

6.  Plaintiff, Melissa Kaye, M.D., is a woman.

- **Exhibit 4:  Dr. Kaye's Redacted Driver's License (D00014)**

7.  Dr. Kaye obtained her medical degree from the Medical College of Pennsylvania, and she obtained a Bachelor of Arts from the University of Colorado.

- **Exhibit 5:  Dr. Kaye's Decl. ¶¶ 1-5;**

- **Exhibit 6:  Kaye Dep. Direct  [1]11/15/21 p. 200:17-24; and**
- **Exhibit 7: Curriculum Vitae of Melissa Kaye, M.D. (NYC002541-NYC002544)**

8.  Dr. Kaye is triple-board certified in the following subspecialties: General Psychiatry; Forensic Psychiatry; and Child & Adolescent Psychiatry.
    - **Exhibit 5:  Dr. Kaye's Decl. ¶¶ 1-5;**

    - **Exhibit 7: Curriculum Vitae of Melissa Kaye, M.D. (NYC2541-NYC2544); and**

    - **Exhibit 8:  Defendants' Responses and Objections to Plaintiff's First Set of Requests for Admission (RFA) ¶¶ 70 and 71 p. 39-40**

9.  Dr. Kaye began to work for H + H  part-time in August 1999.  She became a full-time employee in May 2000 in the Attending Physician III corporate title.
    - **Exhibit 6:  Kaye Direct Dep.. as taken on  11/15/21 Dep. Direct p. 202:9-15; and**

    - **Exhibit 8:  RFA ¶ 3 p. 4[2]  and ¶ 29 p. 18**

10. Dr. Kaye was promoted to Medical Director of the Bronx Court Clinic in 2004.
    - **Exhibit 6:  Kaye 11/15/21 Dep. Direct p. 202:9-15; and**

    - **Exhibit 8:  RFA ¶ 3 p. 4[3]  and ¶ 29 p. 18**

11. From 2008 to 2020, Dr. Kaye had the earliest start date of all the Court Clinic Directors and the most seniority.  She started working at H + H in August 1999 part-time, and became a full-time employee in May 2000.
    - **Exhibit 5:  Dr. Kaye's Decl. ¶¶ 1-5; and**

    - **Exhibit 7: Curriculum Vitae of Melissa Kaye, M.D. (NYC002541-NYC002544)**

12. Dr. Kaye was qualified for the positions she held during her tenure:  Attending Physician III; Attending Physician II; Medical Director of the Bronx Court Clinic; and Director of the Bronx Court Clinic.
    - **Exhibit 8:  RFA ¶¶ 72-74 pgs. 40-41**

---

[1] Depositions will be cited in the following format:  Deponent's Last Name Dep. and p. number (e.g. Ford Dep. p. 10:15-25.)  Since Dr. Kaye was deposed three times in this matter, a brief description of whether it was her Direct, Cross Exam or Re-Direct will also be included (e.g. Kaye Cross Exam. 1/25/22 p. 15:10-25)

[2] References to Defendants' Responses to Plaintiff's Requests for Admission, will be cited as: RFA; Paragraph Number, and the page number. (e.g. RFA  ¶5 p. 3)

[3] References to Defendants' Responses to Plaintiff's Requests for Admission, will be cited as: RFA; Paragraph Number, and the page number. (e.g. RFA  ¶5 p. 3)

**C. Supervisory Authority and Hierarchical Structure of the Forensic Psychiatric Evaluation Court Clinics (FPECC)**

13. Correctional Health Services is a part of H + H.
    - **Exhibit 5:  Kaye Decl. ¶ 17; and**

    - **Exhibit 8:  RFA ¶ 36 p. 21**

14. The four court clinics operated under two Hospitals up until they were merged under Health and Hospitals Corporation (H + H)/Correctional Health Services (CHS) in 2018.  The Bronx and Manhattan Court Clinics were under Bellevue Hospital, and the Brooklyn and Queens Court Clinics operated under Kings County Hospital.
    - **Exhibit 5:  Kaye Decl ¶ 5; and**

    - **Exhibit 9:  Yang Dep. as taken on 2/28/20 p. 44:2-21;[4]**

15. Defendant Yang was appointed Senior Vice President of Correctional Health Services on June 18, 2015.
    - **Exhibit 8: RFA ¶ 40 p. 24;**

    - **Exhibit 9:  Yang Dep. as taken on 2/28/20 p.44:1-6; and**

    - **Exhibit 10:  June 18, 2015 Health and Hospitals' Press Release**

16. During the time relevant Dr. Kaye reported to the following managers:
    ◊ from 2004 to 2008: Manuel Trujilo M.D.;  and Steven Kenneth Hoge, M.D.;

    ◊ from 2008 to 2009: Mary Anne Badaracco M.D.; and Steven Kenneth Hoge, M.D.;

    ◊ from 2009 to 2014: Mary Anne Badaracco, M.D.; and Elizabeth Ford, M.D.;

    ◊ from 2014 to 2018: Mary Anne Badaracco, M.D.; and Jeremy Colley, M.D.; and

    ◊ from 2018 to 2020: Patricia Yang, D.Ph.; Ross MacDonald, M.D.; Elizabeth Ford, M.D.; and Abhishek Jain, M.D.
    - **Exhibit 5: Kaye Decl.¶¶ 6**

17. For all times relevant, Defendant Yang supervised Defendants Ford, Jain and Wangel.
    - **Exhibit 8:  RFA ¶¶ 40-43 p.23-25**

---

[4] Defendant Patricia (Patsy) Yang was deposed at Veritext's Offices on February 28, 2020.  The transcript erroneously stated that she was deposed on February 28, 2018.

18. Defendant Ford for all times relevant was Chief of Service of Psychiatry for CHS/H + H.
   - **Exhibit 8:  RFA ¶ 56 p. 32**

19. Defendant Ford testified that she was Dr. Kaye's supervisor: from 2009 until 2014; and again from 2018 until 2020.
   - **Exhibit 8: RFA ¶ 53 p. 30; and ¶58 p. 33; and**

   - **Exhibit 11: Ford Dep. p. 28:16-19 and p. 261:23-25-262-4-7**

20.  Defendant Ford testified that she had the ability to hire, fire, demote, promote and or discipline Dr. Kaye.
   - **Exhibit 11: Ford Dep. p. 114-121**

21.  Defendants have denied that Defendant Ford had the ability to hire, fire, demote, promote and or discipline Dr. Kaye.
   - **Exhibit 8:  RFA ¶ 55 p. 32**

22. For all times relevant, Defendant Jain reported to Defendant Ford.  For all times relevant, Defendant Jain was employed by H + H.
   - **Exhibit 5:  RFA ¶¶ 57 and 59 p. 32-34**

23. Mary Anne Badaracco was  appointed Director of Psychiatry and Chief of Psychiatry at Bellevue Hospital and Vice Chair of the Department of Psychiatry at NYU School of Medicine in October 2008.
   - **Exhibit 12: Email From Weissman dated August 21, 2008 with the Subject: FW: [Psych Faculty] Leadership Change**

24. For all times relevant, Defendant Jain was the Director of Forensic Psychiatry Evaluation Court Clinics (FPECC) for CHS/H +H.  He was hired to work at CHS between March and April 2018.
   - **Exhibit 8: RFA ¶ 60 p. 34; and**

   - **Exhibit 13:  Jain Dep. p. 30:3-11**

25.  Defendant Jain was Dr. Kaye's direct supervisor from March 2018 until she was constructively discharged and forced to retire in January 2020.
   - **Exhibit 5: Kaye Decl. ¶ ¶ 23 and 131; and**

   - **Exhibit 8:  RFA ¶ 61 p. 34**

26.  During all times relevant Defendant Jonathan Wangel worked at CHS/H +H as either: Senior Director of Labor Relations; or Assistant Vice President Deputy Counsel. He testified that he did not have any other titles in between the two positions.

- **Exhibit 8:  RFA ¶ 63 p. 35; and**

- **Exhibit 14:  Wangel Dep. p. 18**

27. Defendant Wangel testified that he was Senior Director of Labor Relations from December 2015 until June/July 2019, which was when he became Assistant Vice President Deputy Counsel.
   - **Exhibit 14: Wangel Dep. p. 14:12-25-p.18**

28. Defendant Wangel testified that Defendant Yang had been his supervisor for the entire duration of his employment.
   - **Exhibit 14:  Wangel Dep. p.17:17-25-p.18:1-4**

29. Defendants have claimed that Defendant Yang was Defendant Wangel's supervisor from December 12, 2015 to September 5, 2017 and again from December 24, 2018 to June 16, 2019.
   - **Exhibit 8:  RFA ¶ 66 p. 37**

**II.     Dr. Kaye Pursues Pay Parity under the Equal Pay Act**

   *A.  Dr. Kaye Sought Pay Parity in 2004*

30. Defendants denied that they employed any Physician Specialists between 2000 and 2019. They also denied that all of the Physician Specialists they employed were males.
   - **Exhibit 8: RFA ¶¶ 75-76 p. 42-43**

31. Between 2000 and 2019, Drs. Ciric and Weiss worked as Physician Specialists. Doctors Steven Ciric and Jonathan Weiss are males.
   - **Exhibit 5: Kaye Decl. ¶¶ 32-44;**

   - **Exhibit 15: Ciric Appointment Letter (D00450); and**

   - **Exhibit 16: HR Payroll Audit Report for Jonathan Weiss (NYC002028)**

32. Dr. Kaye was promoted to Medical Director of the Bronx Forensic Psychiatric Court Clinic (Bronx Court Clinic) in 2004. At the time, she had been Medical Director of the Bronx Forensic Psychiatric Evaluation Court Clinic in the Attending Physician Title, and sought a promotion to the Physician Specialist title along with an increase in salary.  When she sought the promotions in 2004,  her supervisors were Drs. Manuel Trujilo, Gary Belkin and Steven Kenneth Hoge.
   - **Exhibit 5: Kaye Decl. ¶ 4; and**

   - **Exhibit 17:  Correspondence from Dr. Kaye to Dr. Belkin dated June 23, 2004**

*B.   2013/2014: Dr. Kaye's First Pay Parity Complaint Made to Defendant Ford*

33. Since Dr. Kaye was not able to obtain pay and title parity in 2004, she tried again in 2013/2014.  She was prompted to pursue parity at that time, after she read an email that had been inadvertently circulated.   The email disclosed the corporate titles and salaries of Court Clinic staff. From the email, Dr. Kaye discovered: she was paid approximately $38,000 less than her male comparators and that they had worked in the Physician Specialist corporate title.
   - **Exhibit 5:  Kaye Decl. ¶¶ 35-36; and**

   - **Exhibit 6: Kaye Direct Dep. 11/15/21 p. 46:3-25-48:1-6**

34. When Dr. Kaye initially approached Defendant Ford about pay parity and promotion to the higher unionized Physician Specialist title in 2013/2014, Defendant Ford made the following statement: "getting things done around here was like moving elephants."
   - **Exhibit 5:  Kaye Decl. ¶¶ 6, 37 and 38;**

   - **Exhibit 6: Kaye Direct Dep. 11/15/21 p. 46-48;**

   - **Exhibit 9:  Yang Dep. as taken on 2/28/20 p. 84:23-25-85:1-3;**

   - **Exhibit 11:  Ford Dep. p.296:10-25-297:1-4; and**

   - **Exhibit 18:  Email forwarded by Yang dated May 3, 2018 with the Subject: Pay Equity for Court Clinic Medical Directors (NYC000208-NYC000211)**

35. Defendants denied that Defendant Ford made the statement to Dr. Kaye: "that getting anything done around here is like moving elephants."
   - **Exhibit 5:  Kaye Decl. ¶¶ 37-38; and**

   - **Exhibit 8:  RFA ¶101 p. 58**

36. However, during the course of her deposition, Defendant Ford conceded that she may have said something to the effect that: "getting things done around here is like moving elephants."  Defendant Ford's testimony was consistent with the email sent by Defendant Yang, who suggested that an email be drafted to Dr. Kaye that removed: "editorials and elephantine quotes."
   - **Exhibit 11:  Ford Dep. p.296:10-25-297:1-4; and**

   - **Exhibit 18:  Email forwarded by Yang dated May 3, 2018 with the Subject: Pay Equity for Court Clinic Medical Directors (NYC000208-NYC000211)**

37.  Defendant Ford testified that she left Bellevue in 2014, before it could be determined whether her alleged efforts to address Dr. Kaye's pay parity issues were fruitful.  Defendant Ford left Bellevue on July 2, 2014.  Subsequent to her departure, she served as Executive Director of Mental Health Services at CHS from September 2014 until 2018.

- **Exhibit 5: Kaye Decl. ¶¶ 6 and 38; and**

- **Exhibit 11: Ford Dep. P.38:20-23; p.114:18-25-116:1-12**

*C.  Parity: Comparison between Dr. Kaye and Male Comparator Dr. Ciric*

38. Defendants have admitted and denied that the Physician Specialist title has a larger salary range than the Attending Physician title

- **Exhibit 8:  RFA ¶ 78 p. 43;**

- **Exhibit 19: See Paragraph 14 of Defendants' Statement of Undisputed Facts; and**

- **Exhibit 20: Doctors Council Collective Bargaining Agreement (See pg. D610)**

39.  Defendant Ford testified that the reasons for the disparities in the titles and compensation between Drs. Kaye and Ciric were because of the hiring dates, and the increased cost of living.  In short, according to Dr. Ford, Dr. Ciric was paid more was because he had been hired later.

- **Exhibit 11: Ford Dep. p.118:7-25-120**

40.  Dr. Kaye was hired part-time in 1999 and full-time in 2000.

- **Exhibit 21:  Kaye's Personnel Action form dated August 16, 1999 (D00029); and**

- **Exhibit 22: Kaye's Personnel Action form dated  May 2, 2000 (D00028)**

41. Dr. Ciric was hired to work part-time in 1999 and  to work full-time in July 2001.

- **Exhibit 15:  Ciric's Appointment Letter dated June 21, 2001 (D000450);**

- **Exhibit 23:  Ciric's Personnel Action Form dated July 1, 2001 (D000449);**

- **Exhibit 227:  Ciric's  Personnel Action Form dated July 20, 1999 (D000448)**

42. When Dr. Kaye was hired, her personnel codes were as follows:  her job number was 5737; her budget line was 4306; and her budget code or group number was 11.

- **Exhibit 21:  Kaye's Personnel Action Form dated August 16, 1999 (D00029); and**

- **Exhibit 22: Kaye's Personnel Action Form dated  May 2, 2000 (D00028)**

43. Upon his hire into the Attending Physician III at the Manhattan Court Clinic in July 2001, Dr. Ciric's personnel codes were as follows: his job number was 05328; his budget line was 4306; and his budget code or group number was 11.
   - **Exhibit 23:  Ciric's Personnel Action Form dated July 1, 2001 (D00049)**

44.  Health and Hospitals Corporation (H +H) is one of the agencies that must submit budgets to the New York City Office of Management and Budget (OMB).    Accordingly, they use the same terminology and reporting structure as promulgated by OMB.
   - **Exhibit 24: The City of New York Adopted Budget Fiscal Year 2022: Expense Revenue Contract https://www1.nyc.gov/assets/omb/downloads/pdf/erc6-21.pdf  See p. 11**

45.  According to OMB, a budget code:

> *Is a 4 character code assigned to a schedule within an agency which identifies the allocation made in such schedule in terms of its accounting fund class, unit of appropriation, responsibility center, control category, local service district and program.*

   - **Exhibit 24: The City of New York Adopted Budget Fiscal Year 2022: Expense Revenue Contract https://www1.nyc.gov/assets/omb/downloads/pdf/erc6-21.pdf  See p. 7**

46. According to OMB, a budget line:
> *Is an identified amount allocated for a specific purpose in the expense budget supporting schedules for each budget code within a unit of appropriation. Budget lines are used to provide detailed information on the number of positions, titles, salaries and other expenses in a budget code.*

   - **Exhibit 24: The City of New York Adopted Budget Fiscal Year 2022: Expense Revenue Contract https://www1.nyc.gov/assets/omb/downloads/pdf/erc6-21.pdf  See p. 7**

47. Throughout the time that both Drs. Kaye and Ciric worked at their respective Court Clinics, they both shared the same budget code/group number 11.  Both were group 11 employees under the Doctors Council collective bargaining agreement and therefore both their corporate titles were covered under the collective bargaining agreement. (i.e. both the Physician Specialist and Attending Physician corporate titles were covered under the cba)
   - **Exhibit 20:  Doctors Council Collective Bargaining Agreement (D000603-D000604);**

   - **Exhibit 22: Kaye's Personnel Action form dated  May 2, 2000 (D00028); and**

   - **Exhibit 23:  Ciric's Personnel Action Form dated July 1, 2001 (D00049)**

9

48. However, when Dr. Ciric was promoted to Physician Specialist on August 12, 2008,  his budget line changed from 4306 to 4310. As can be seen from Dr. Ciric's promotion at that time, the budget code not the budget line dictated whether an incumbent employee could be promoted from one corporate title covered by the union to another.  Dr. Ciric did not have to die in the Attending Physician corporate title as Dr. Kaye was subsequently told. Accordingly, Dr. Kaye could have been promoted from Attending Physician III to Physician Specialist III within Forensic Psychiatry/Court Clinic Program if Defendants so chose.

   • **Exhibit 25: Ciric Personnel Action Form Dated August 12, 2008 (D000442-D000444)**

49. In 2004, Dr. Kaye was double-board certified, while Dr. Ciric was only certified in one subspecialty.

   • **Exhibit 7: Curriculum Vitae of Melissa Kaye, M.D. (NYC002541-NYC002544); and**

   • **Exhibit 26:  Curriculum Vitae of Steven Ciric, M.D. (D000397-D000400)**

50. Although Dr. Ciric had not been the Director of a Court Clinic in 2008, he was a non-managerial staff person without increased responsibilities at the time his corporate title was changed from Attending Physician III to Physician Specialist III.  He nevertheless had a superior corporate title within the same budget code as Dr. Kaye.  Therefore, despite less clinical and managerial responsibilities, Dr. Ciric enjoyed a higher rate of pay and a superior corporate title than Dr. Kaye even in 2008.

   • **Exhibit 5:  Kaye Decl ¶ 2; and**

   • **Exhibit 25: Ciric Personnel Action Forms August 2008 and Email Correspondence from Rodriguez dated August 7, 2008 (D000442-D000444)**

51. On April 18, 2011, Dr. Mary Anne Badaracco hired Dr. Ciric to work at the Manhattan Forensic Psychiatric Evaluation Court Clinic.  At that time, Dr. Ciric went from a Physician Specialist III to a Physician Specialist IV; and he went from a 1.0 FTE (full-time equivalent at 100%) to a .80 FTE ( an FTE working 80% of a 40 hour work week or 32 hours per week). Dr. Ciric worked less hours than Dr. Kaye and was paid more.  In fact, he was promoted into a higher title although he worked fewer hours less than he did prior to his promotion.

   • **Exhibit 22: Kaye's Personnel Action form dated  May 2, 2000 (D00028); and**

   • **Exhibit 27:  Bellevue Requisition Form dated April 18, 2011 (D000434**

52. When Dr. Kaye approached Dr. Mary Anne Badaracco about changing her title from Attending Physician to Physician Specialist, Dr. Badaracco lied to Dr. Kaye and told her that she must "die in her line."  Again, the budget code and not the budget line dictated whether a promotion from Attending Physician III to Physician Specialist III could take

place.  Despite Dr. Kaye's requests in 2004, 2013 and 2018, Defendants refused to explore the option and failed to provide a valid explanation as to why Dr. Kaye could not have been promoted into the Physician Specialist line at any of those times.

- **Exhibit 6: Kaye Dep. 11/15/21 pgs. 58-64**

53. Defendants had a position in the Physician Specialist line in 2013, when they hired Jonathan Weiss, M.D.  Dr. Weiss had less experience and less work history at H + H at the time of his hire than Dr. Kaye, additionally the Physician Specialist corporate title had been an option around the time Dr. Kaye complained to Defendant Ford.

- **Exhibit 28:  Email from Wangel dated September 27, 2018 with the Subject:  Total Work Hours (NYC000603-NYC000605); and**

- **Exhibit 29:  Weiss Physician Profile**

54. Dr. Kaye also approached her Dr. Jeremy Colley about being promoted within the union from one unionized title corporate title, the Attending Physician title to the unionized Physician Specialist title.  Dr. Colley also lied to Dr. Kaye and said that she would have to die in her title.

- **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 pgs. 58-64**

55. Defendant Ford admitted that it was unfair that Dr. Kaye was paid less than Dr. Ciric.

- **Exhibit 11:  Ford Dep. p. 119:16-25-120:2**

56. Although Ford claimed that she advocated for parity for Dr. Kaye when she was in a lesser title and pay grade than Dr. Ciric, Defendant Ford also testified that she did not know the difference between the Attending Physician and Physician Specialist corporate titles.

- **Exhibit 11:  Ford Dep. p. 116-120**

*D.  Discrepancies in Dr. Kaye's Salary and Defendants' Figures:  Defendants Violated the Memorandum of Agreement when they included her Retention and Longevity Bonuses in Her Annualized Salary*

57. There were discrepancies surrounding Dr. Kaye's salary in 2018.  Defendant Ford represented to Defendant Yang that Dr. Kaye's salary in 2018 was 203K only 2K less than Dr. Mundy.  CHS management contended that without the differential, Dr. Kaye's annualized salary was $191,571 and $203,912 with the differential.  Dr. Kaye's W2 for 2018 was 196,860.44 with the differential and her salary in 2017 was $180,132.68.

- **Exhibit 30: Email from Ford to Laboy dated April 25, 2018 with the Subject: Time Sensitive Melissa Kaye Question (NYC00170);**

- **Exhibit 31: Email from Ford to Yang dated April 25, 2018 with the Subject:  She's Making More than Anyone Except Old Ciric and Mundy (NYC00176);**

- **Exhibit 32:  Email from LaBoy dated May 3, 2018 with the Subject: Pay Equity for Court Clinic Medical Directors.  (NYC000204-NYC000208); and**

- **Exhibit 33: Melissa Kaye's W2s (Kaye3rdProd0081-Kaye3rdProd0082)**

58. Further, unlike Dr. Kaye, Dr. Mundy's annualized salary in 2018, was $203K without the differential.
    - **Exhibit 34:  Mundy Action Request Form (D000343)**

59. Dr. Kaye had a lower corporate title and was compensated at a lower rate than Dr. Mundy. In May 2018, Dr. Kaye had been surreptitiously demoted in corporate title to Attending Physician II, and was paid $196,860.44 with a 20K differential, which meant her actual  full-time annualized salary at that time was approximately $176K. However, Dr. Mundy was a part-time employee in the Attending Physician III, title and had an annualized compensation rate of $176,828.
    - **Exhibit 5:  Kaye Decl. ¶¶ 94-100; and**

    - **Exhibit 32:  Email from LaBoy dated May 3, 2018 with the Subject: Pay Equity for Court Clinic Medical Directors (NYC000204-NYC000208)**

60.  According to the Memorandum of Agreement entered into with Doctors Council, the City of New York and Health and Hospitals Corporation, on July 14, 2017, effective July 1, 2017, the minimum annual base salary for all Doctors Council employees represented at H + H who worked in NYC H + H facilities in psychiatry was supposed to be increased to 180K per year for Board eligible psychiatrists and 190K per year for those with Board Certification(s). Doctors' retention and longevity bonuses were not supposed to be counted towards their salaries. Defendants violated this part of the MOA in 2018 and 2019 with Dr. Kaye.
    - **Exhibit 35:  Memorandum of Agreement between: Doctors Council; Health and Hospitals Corporation; and the City of New York (NYC00008-NYC000015) (See Paragraph 4)**

61. Male Doctors were hired at a higher rate of compensation and in higher corporate titles than Dr. Kaye.  Dr. Jonathan Weiss was hired to work part-time at the Manhattan Court Clinic in September 2013 in the Physician Specialist title, and was compensated at a full-time equivalent annualized salary rate of $202,826.   He was actually paid $101,413 that year as a part-time employee.  Dr. Weiss was not a Center Director, but was compensated at a higher rate than Dr. Kaye, he also did not have as much experience or as many board certifications as Dr. Kaye.
    - **Exhibit 5:  Dr. Kaye's Decl. ¶¶ 1-5; and**

    - **Exhibit 36: HR Payroll Audit Report for Jonathan Weiss (NYC002028)**

62. Dr. Kaye was not a Group 12 employee.  The Attending Physician corporate title was not listed in that group in her former union's Collective Bargaining agreement.
- **Exhibit 20: Doctors Council Collective Bargaining Agreement (D000600-D000706)**

63.  However, instead of addressing Dr. Kaye's questions and issues surrounding negative vested annual leave, Defendants lied to Dr. Kaye and told her that she was not a Group 11 employee, that she was a Group 12 employee.
- **Exhibit 37:  Email from Kaye dated April 8, 2019 with the Subject: FW: Negative Vested Annual Leave… (NYC002699-NYC002700)**

III. **Dr. Kaye's Advocates For Criminal Defendants' Rights Against Self-Incrimination; Due Process; and Cruel and Unusual Punishment; Defendants Retaliate Against Her and Violate Her Rights Under the 1st and 14th Amendments of the U.S. Constitution**

A. *Weaponization of the Force Order for City Hall's Agenda:  Defendant Yang's Interference with the Bronx Forensic Psychiatric Evaluation Court Clinic in 2015*

64. Despite Defendant Yang's insistence that she did not have any part in the operations of the Court Clinics until 2018, Dr. Kaye and her colleagues began to experience pressure from Defendant Yang and City Hall In December 2015.  At that time, Defendant Yang and City Hall sought to pressure Dr. Kaye and her colleagues to expedite the production of Miguel Figueroa by way of a force order.  Dr. Kaye objected to this interference due to widely-held belief that the use of force orders is a potentially inhumane way of obtaining a Defendants' appearance in court against their will.
- **Exhibit 5: Kaye Decl. ¶¶ 111-116;**

- **Exhibit 9:  Yang Dep. as taken on 2/28/20 p. 44:2-6 and p.47:22-14;**

- **Exhibit 38: Bloom Dep. p. 13:9-25-23:1-5;**

- **Exhibit 39: Email from Bloom dated December 16, 2015 with the Subject: Call from Melissa Kaye (Kaye6thProd0003-Kaye6thProd0004)**

- **Exhibit 40: Email from Kaye dated December 17, 2015 with the Subject: MF (Kaye6thProd0005-Kaye6thProd0006)**

- **Exhibit 41: Email from Kaye dated December 18, 2015 with the Subject: MF (Kaye6thProd0014-Kaye6thProd0018)**

65.  A force order typically is issued once an inmate has refused to go to Court on three separate occasions.  Judges are often reluctant to issue them because of the potential physical harm that may take place with either the officers or the inmates.  Execution of a

force order entails officers in SWAT gear entering the cell of an inmate, ordering them to appear and using whatever force necessary to gain their compliance if they refuse.

- **Exhibit 38: Bloom Dep. p. 22:2-25-23:1-5; and**

- **Exhibit 42:  Kaye Cross Exam. Dep. 1/25/22 p. 10:16-25-p.14:1-20**

66. During the time Dr. Kaye worked at Bronx Court Clinic, the Clinic had a custom that was recognized by the Courts of allowing the inmate to refuse production on three separate occasions before they sought a force order from the Court.
    - **Exhibit 39: Email from Bloom dated December 16, 2015 with the Subject: call from Melissa Kaye (Kaye6thProd0003-Kaye6thProd0004); and**

    - **Exhibit 41: Email from Kaye dated December 18, 2015 with the Subject: MF (Kaye6thProd00014-Kaye6thProd00018)**

67. When Dr. Kaye learned that Defendant Yang and City Hall sought to force Mr. Figueroa to appear without the three refusal, without his attorney present and that they were being pressured to find  him unfit, s she communicated her concerns.  Dr. Kaye testified that, Mr. Figueroa posed a management problem for Defendant Yang and City Hall and they sought to remove him from Rikers by cutting corners.
    - **Exhibit 39: Email from Bloom dated December 16, 2015 with the Subject: call from Melissa Kaye (Kaye6thProd0003-Kaye6thProd0004);**

    - **Exhibit 41: Email from Kaye dated December 18, 2015 with the Subject: MF (Kaye6thProd00014-Kaye6thProd00018); and**

    - **Exhibit 42:  Kaye Cross Exam. Dep. 1/25/22 p. 10:16-25-p.14:1-20;**


 B. *April 2017-December 2017: Dr. Kaye's Protracted Advocacy Against the Use of Redacted Medical Records to Complete Forensic Evaluations*

68. H + H and CHS sought to develop a template order for the Court, which would allow them to produce redacted medical records.  Defendants sought to redact the following information from Defendants' medical records: (1) HIV data; (2) genetic predisposition test records; and (3) substance and alcohol use data.
    - **Exhibit 43: Proposed Order to Disclose and Provide Records (Kaye6thProd00298)**

69. HIV Status and substance abuse can cause cognitive difficulties that could affect a Defendant's mental capacity.  Therefore the redaction of that information would be an inappropriate infringement on a Defendant's constitutional rights, since a forensic evaluator would not be able to make a fair assessment of their competency.  Dr. Kaye raised these issues at the January 29, 2018 meeting with Defendants Yang and Ford.

- **Exhibit 6: Kaye Dep. 11/25/21 p.333;17-25-334:1-22; and**

- **Exhibit 11: Ford Dep. p. 55:13-25-56:1-4**

70. Between the months of April 2017 and October 2017, Dr. Kaye made numerous complaints about Defendant Yang and City Hall's interference with the administration of 730 Examinations, and their violation of Defendants' Constitutional rights to due process and a fair trial.
    - **Exhibit 8:  RFA ¶ 18 p. 12;**

    - **Exhibit 44:  Email from Kaye dated April 17, 2017 with the Subject: Meeting Notes (Kaye6thProd0199-Kaye6thProd0200);**

    - **Exhibit 45: Email from Kaye dated June 14, 2017 with the Subject: Information Sharing CHS Ball (Kaye6thProd00216-Kaye6thProd00218);**

    - **Exhibit 46: Email from Kaye dated August 28, 2017 with the Subject: 730 Subpoenas (Kaye7thProd00284-Kaye7thProd00294);**

    - **Exhibit 47: Email from Kaye dated September 7, 2017 with the Subject: Fleming, Soto, Capellan requests for medical records (Kaye6thProd0296-Kaye6thProd00297);**

    - **Exhibit 48:  Email from Judge Moore dated September 20, 2017 with the Subject: William Rivera (Kaye6thProd00303);**

    - **Exhibit 49: Email from Bloom dated September 20, 2017 with the Subject: William Rivera (Kaye6thProd0304-Kaye6thProd0305);**

    - **Exhibit 50: Email from McEvilley dated September 20, 2017 with the Subject William Rivera (Kayee6thProd0306-Kaye6thProd00307); and**

    - **Exhibit 51: Email from Kaye dated September 21, 2017 with the Subject: William Rivera (Kaye6thProd0308-Kaye6thProd00310)**

71. Dr. Kaye's protestations against redacted medical records pertained to Defendant William Rivera.  Between the months of June 2017 and October 2017, Judge Moore rendered several orders for the production of unredacted medical records.  Dr. Kaye insisted that she could not conduct the 730 Exam without the unredacted records.  Dr. Kaye was protecting both Mr. Rivera's constitutional rights and her medical license.
    - **Exhibit 52: Transcript from the Hearing in Front of Honorable Judge Moore dated June 28, 2017;**

- **Exhibit 53:  Transcript from the Hearing in Front of the Honorable Judge Moore dated September 18, 2017; and**

- **Exhibit 54: Transcript from the Hearing in Front of the Honorable Judge Moore dated October 3, 2017**

72. After Dr. Kaye experienced months of internal resistance and pressure from H+H/CHS, Judge Moore contacted Deirdre Newton from H + H/CHS and insisted that she produce the unredacted medical records to Dr. Kaye.
    - **Exhibit 48: Email from the Honorable Judge Moore dated September 20, 2017 (Kaye6thProd00303)**

73. As an officer of the Court/attorney, Jeffrey Bloom raised the issue of defendants knowingly and intelligently waiving their rights as it pertained to both redacted medical records and Defendants' anticipated HIPAA releases.  He further testified that Dr. Kaye's advocacy protecting the Constitutional rights of Defendants was outside of the purview of her job description. Mr. Bloom testified that from his years as a MICA attorney, that forensic evaluators were solely responsible for the neutral administration of 390/730 evaluations. Dr. Kaye corroborated this sentiment in the email that she sent on September 21, 2017.
    - **Exhibit 38: Bloom Dep. p. 133-134;**

    - **Exhibit 55: Email from Bloom dated June 28, 2017 with Subject Redacted Rikers Island Records Received (Kaye6thprod00269-Kaye6thProd00273); and**

    - **Exhibit 56:  Email from Kaye dated September 21, 2017 with the Subject: Premature Jubilation (Kaye5thProd0010-Kaye5thProd0011)**

74. During this time period, Dr. Kaye repeatedly opposed the use of redacted medical records, a view shared by her male colleagues Drs. Colley, Ciric, and Winkler. However, Dr. Kaye was the only person who was blamed by Defendant Yang when Judge Moore threatened to hold H + H in contempt for failure to comply with his order to produce unredacted medical records for Defendant William Rivera.
    - **Exhibit 6: Kaye Direct Dep. 11/25/21 p.44:20-25-45:1-11; p.95:13-25-100:1-6; p.278:5-25-280:1-17; p.333:7-25-336:1-13; and**

    - **Exhibit 42: Kaye Cross Exam Dep. p.39:14-25-42:1-24; and**

    - **Exhibit 57:  Email from Bloom dated June 27, 2017 with the Subject: Redacted Records (Kaye6thProd0263-Kaye6thProd0265)**

75. Despite the exchange with Judge Moore, H + H/CHS continued to resist production of unredacted records.  On February 15, 2018, Dr. Kaye complained to Ms. Laird who worked

in Judge Torres's office. Dr. Kaye complained about the production of unredacted records for Defendant Peter Hall. The failure to produce the unredacted records resulted in the delay of his examination. Judge Villegas originally issued the order on December 28, 2017.

- **Exhibit 58: Email from Kaye dated February 15, 2018 with the Subject: Peter Hall Records (for six months) (Kaye6thProd0396-Kaye6thProd0399)**

76. Defendants Yang and Ford would wrongly attribute the events involving Judge Moore to Judge Torres. They would also accuse Dr. Kaye of being responsible for having H+H/CHS being held in contempt. In addition to Dr. Kaye's protestations against the HIPAA releases at the January 29, 2018 meeting, Defendant Ford made the statement that Dr. Kaye had been a problem for a long time and that she needed to be managed out.

- **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 333:17-25-336:1-13; and**

- **Exhibit 59: Email from Yang dated February 1, 2019 with Subject: Judge Torres wants to Hold us in Contempt (NYC00075-NYC00076)**

*C. Dr. Kaye Cites the Unconstitutionality of Defendants' HIPAA Releases and Private Practice Policy; Defendant Yang Threatens Dr. Kaye With Termination on the Spot: "If You Don't Like the Way we Do Things Around Here, There's the Door!*

77. On January 29, 2018, Defendant Yang visited the Bronx Court Clinic to intimidate Dr. Kaye. She brought along with her former H + H CEO, Bill Hicks, Dr. MacDonald, Beth Ward, Sara Gillen and other senior H +H/CHS management. During the course At the meeting Dr. Kaye reiterated her complaints about the use of redacted medical records and HIPAA releases. Dr. Kaye specifically raised the Constitutional violations that Defendants' policies and actions would have on inmates with mental health issues.

- **Exhibit 6: Kaye Dep. 11/15/21 p.99-102:1-9**

78. When Dr. Kaye raised the Constitutional and ethical issues surrounding the HIPAA releases, Defendant Yang threatened to fire her. Defendant Yang responded to Dr. Kaye directly: "You don't like the way we do things around here, there's the door [Yang gestured to the door]; we've got all the money, we can hire whoever we want.

- **Exhibit 6:  Kaye Dep. 11/15/21 p. 99-102:1-9**

79. Defendant Yang denied  ever threatening Dr. Kaye: that if she didn't like the way things were being done there's the door. Defendant Yang denied that she ever made this statement to Dr. Kaye.

- **Exhibit 8:  RFA ¶ 181 p. 105; and**

- **Exhibit 9:  Yang Dep. as taken on 2/28/20 p. 338:7-19**

80. On February 1, 2018, within two days of the 29th Meeting, Dr. Ford sent an email to Yang, MacDonald which claimed that Dr. Kaye had been a problem for a long time and that they would manage her out.
   - **Exhibit 59: Email from Yang dated February 1, 2019 with Subject: Judge Torres wants to Hold us in Contempt (NYC00075-NYC00076)**

81. Earlier in Defendant Ford's career, she resigned on two separate occasions due to child care issues. She complained in her book that getting her children to school and spending time with them after work had proven to be impossible with her work schedule.
   - **Exhibit 11: Ford Dep. p. 18:7-18; and**

   - **Exhibit 60:  Excerpts from Ford's Book : Sometimes Amazing things Happen pgs. 49, 100, 104 and 123**

   *D. Dr. Kaye Complains to Judge Torres's Staff About H + H's Continued Production of Redacted Records and the Ensuing Delays; Dr. Ross MacDonald, Defendant Ford's Supervisor Retaliates*

82. On February 5, 2018 Dr. Kaye complained to Judge Torres's staff person that H + H continued to send redacted medical records, and that it was holding up her cases.  Criminal Defendants who had evaluations at the Bronx Court Clinic at this time, experienced prolonged incarceration because CHS/H+H refused to comply with the Court's orders for the production of unredacted medical records.
   - **Exhibit 61:  Email from Kaye dated February 5, 2018 with the Subject: Medical Record (NYC001914-NYC001915)**

83. Dr. Kaye was the only female evaluator who refused to write reports with redacted records, the other evaluators who refused to do so were males  (i.e. Drs. Winkler and Ciric). For example, Dr. Winkler refused to complete an evaluation with redacted records.
   - **Exhibit 62: Email from Winkler dated November 16, 2017 with the Subject: Redacted Records (Kaye5thProd0001-Kaye5thProd0002)**

84. Unlike the other male evaluators who also engaged in protected activity, Dr. Kaye was the only one who was targeted by Dr. Ross MacDonald.  Dr. MacDonald was Defendant Ford's supervisor and thereby Dr. Kaye's indirect supervisor.  On February 23, 2018, Dr. MacDonald, Dr. Kaye's indirect supervisor, illegally attempted to force Dr. Kaye to release Kim Jenkins's medical records.   Dr. Kaye response to Dr. MacDonald's  query was that she could not release the records without an order from the Court.
   - **Exhibit 5: Kaye Decl. ¶ 191(E);**

   - **Exhibit 63: Email from Ross MacDonald, M.D. dated February 22, 2018 with Subject: Records (NYC001924-NYC001925); and**

- **Exhibit 64: Email from Moreira dated February 23, 2018 with the Subject: Records (NYC001926-NYC001927)**

85.  Dr. Kaye experienced further discrimination in terms of promotional opportunities and staffing.  In the wake of her complaints throughout the months of January and February, Defendants removed and promoted her staff person Dr. Winkler.  This had the effect of impeding Dr. Kaye and the Court Clinic from completing 730 Examinations in a timely fashion.  From April 2018 to December 2018, Dr. Kaye would be the only full-time evaluator at the Bronx Court Clinic.  She would also be the only Clinic Director that did not have a staff person.

- **Exhibit 5:  Kaye Decl. ¶ 178; and**

- **Exhibit 42: Kaye Dep. Cross Exam. 1/25/22 p. 57:19-25-58:1-23**

86.  Defendants have denied that Dr. Kaye did not have administrative staff.  They also denied that Dr. Kaye used to supervise Lucrecia Persaud.

- **Exhibit 8:  RFA ¶¶ 89-91 p. 50-52**

87. Dr. Winkler was promoted from Deputy Director of the Bronx Court Clinic to Director of the Brooklyn Court Clinic after he raised the same issues surrounding the use of redacted medical records.

- **Exhibit 6: Kaye Dep. as taken on 11/15/21 p.99-102:1-9**

88.  Although H+ H/CHS's counsel was not representing any parties with standing in the email, Deirdre Newton retaliated against Dr. Kaye for communicating with the Court.  Newton falsely claimed that the emails sent were privileged and that Dr. Kaye was putting the privilege at risk by telling the Court why its orders had not been honored by CHS H + H.

- **Exhibit 65:  Email from Newton dated March 23, 2018 with the Subject Third Party Communication (NYC001949)**

89. Judge Grasso reached out to Bronx Court Clinic staff person Lucrecia Persaud to speak with Dr. Winkler about the ongoing issue surrounding redacted records.  Dr. Winkler did not receive a warning about Third Party Communications.  Additionally, Dr. Winkler did not experience retaliation or threats from H +H staff.

- **Exhibit 66: Email from Persaud dated April 11, 2018 with the Subject: Medical Records (NYC001989)**

E.  *January 29, 2018:  Dr. Kaye Voices Concerns about Defendants' HIPAA Releases and Private Practice Policy; Yang Responds: If You Don't Like the Way We Do Things Around Here, There's the Door!*

    i.    New York Criminal Procedure Law §§ 390 and 730  and Forensic Examiner's Role as a Neutral Arbiter of Competence

90. "Forensic Psychiatrists at H + H Court Clinics conduct examinations pursuant to sections 390 and 730 of New York State's Criminal Procedure Law (CPL). CPL 390 exams are pre-sentencing evaluations; and CPL 730 Exams are evaluations that determine a criminal defendant's competence to stand trial. Both CPL 390 and 730 Exams are ordered by the Court; in these evaluations, forensic examiners are required to adhere to the medicolegal standards of the profession."

   - **Exhibit 5: Kaye Decl. ¶ 10**

91. As a forensic psychiatrist and licensed physician, Dr. Kaye did not have any obligations to protect and or to advocate for the constitutional rights of the criminal defendants she examined. Dr. Kaye was and is not an officer of the Court.

   - **Exhibit 5: Kaye Decl. ¶ 13**

92. New York Criminal Procedure Law § 730 requires two qualified examiners to make independent determinations of competence to stand trial.

   - **Exhibit 5: Kaye Decl. ¶ 175**

   ii.    Dr. Kaye Speaks Up about Defendants' HIPAA Releases and Private Practice Activities; Defendant Yang Threatens to Fire Her on the Spot

93. On January 29, 2018, after months of Dr. Kaye advocating against the use of redacted records to write forensic evaluations, Defendant Yang, Defendant Ford, Bellevue CEO Bill Hicks, Sara Gillen, and Dr. Ross MacDonald came to the Bronx Court Clinic to intimidate Dr. Kaye.

   - **Exhibit 5: Kaye Decl. ¶¶ 125-128;**

   - **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p. 99-102:1-9; and**

   - **Exhibit 9: Yang Dep. as taken 2/28/20 p. 338:7-19**

94. During the course of the January 29, 2018 meeting, Dr. Kaye raised concerns Defendants' proposed use of HIPAA releases and their private practice activities.

   - **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p. 95-101; and**

   - **Exhibit 9: Yang Dep. as taken on p. 338:7-19**

95. At the January 29, 2018, Dr. Kaye was concerned that criminal defendants with mental illness would not have the mental capacity to understand that the releases could also waive their protection against self-incrimination and due process under the U.S. Constitution.

   - **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p. 95-101**

96. During the course of the January 29, 2018 meeting, Dr. Kaye also raised her concern about Defendants and FPECC employees' private practice activities.  Specifically, the rigging of exams in furtherance of quid quo pro arrangements between evaluators and attorneys.

   - **Exhibit 6: Kaye Direct Dep. as taken on  11/15/21 Dep. p. 95-101; and**

   - **Exhibit 67:  Board of Correction Complaint dated January 7, 2020**

97. In response to Dr. Kaye, at the January 29, 2018 meeting, in front of a room full of people, Defendant Yang made the statement:  you don't like the way we do things around here; there's the door; we've got all of the money!

   - **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 Dep. p. 95-101**

98. Defendant Yang denied that she ever said: "you don't like the way we do things around here; there's the door; we've got all of the money!"

   - **Exhibit 9:  Yang Dep. as taken on 2/28/20 p. 338:14-19**

99. On January 31, 2018, two days after Yang threatened to fire Kaye at the January 29, 2018 meeting, Yang discussed Kaye working elsewhere with Bill Hicks.

   - **Exhibit 68:  Email from Yang to B. Hicks dated January 31, 2018 with the Subject: 730 Clinic Management Consolidation (NYC0064-NYC0065)**

   iii.      *Defendant Ford Supports Yang's Efforts; Says Dr. Kaye has been a Problem for a Long time;  "We Will Manage her Out!"*

100.    On February 1, 2018,  Defendant Ford responded to Defendant Yang that Dr. Kaye had been a problem for a long time and that we will manage her out.

   - **Exhibit 59: Email from Yang dated February 1, 2019 with Subject: Judge Torres wants to Hold us in Contempt (NYC00075-NYC00076)**

101.    Defendants Ford and Yang erroneously stated that Judge Torres had threatened to hold them  in contempt. However, several judges at the time had expressed growing exasperation with H + H/CHS's ongoing refusal to comply with court orders and produce unredacted medical records.  Dr. Kaye raised concerns about the constitutional implications of Defendants' resistance, and the impact it would have on her ability to practice within the medicolegal parameters of the profession.

   - **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 44:20-25-26:1-6; and 95:13-25-99:1-25;**

102.   In or around that time, it was Judge Moore who had reached out to Deirdre Newton from H + H after they had resisted production of unredacted medical records and delayed the incarceration of Peter Hall for over six months.

   - **Exhibit 58:  Email from Kaye dated February 15, 2018 with the Subject: Peter Hall Records (six months)  (Kaye6thProd0396-Kaye6thProd0399)**

103.  In or around March 27, 2018 Dr. Winkler was promoted to work as Director of the Brooklyn Court Clinic.  Defendant Ford promised Dr. Kaye, that before he officially transferred, that she would replace Dr. Winkler.   This was because Dr. Winkler was the only other qualified examiner besides Dr. Kaye at the Bronx Court Clinic.

- **Exhibit 5: Kaye Decl. ¶¶ 51; 176-178; and 184-190; and**

- **Exhibit 69: Email from Ford dated March 27, 2018 with the Subject:  Welcome! (and CVs to review) (NYC001958-NYC001959)**

104.  In an effort to render the Bronx Court Clinic and Dr. Kaye non-functional, Dr. Kaye would not have a full-time staff person between the months of April 2018 and December 2018.

- **Exhibit 5: Kaye Decl. ¶¶ 51; 176-178; and 184-190**

105.  Upon the transition of the clinic to CHS, Defendants would engage in further measures to sabotage Dr. Kaye's performance.  For example, they would under-report the number of reports seen by Dr. Kaye and the Clinic as a whole.  Defendants would also distort the numbers of the Bronx Court Clinic; they would fail to enter data into ISight, their tracking system.  Therefore, Dr.  Kaye contends that there are disparities between the number of exams she remembered seeing and the numbers Defendants have reported.

- **Exhibit 5: Kaye Decl ¶¶ 19-31;**

- **Exhibit 70:  Kaye Work Output Comparison for Calendar Years 2018 and 2019; and**

- **Exhibit 71:  Defendants' Work Product Spreadsheet (D001532)**

*iv.    Defendant Ford Excludes Dr. Kaye from Internal CHS Taskforce: Invites Dr. Kaye's then Subordinate Dr. Winkler Instead*

106.  In February 2018, right after the January 2018  meeting, Defendant Ford excluded Dr. Kaye from her FPECC internal working group.  Instead, Defendant Ford invited Dr. Kaye's then staff person Dr. Winkler.  Dr. Kaye was by far the more senior staff person.   Dr. Winkler further testified that she should have been selected to go instead of him, and at some point Defendant Ford decided to only have him attend the meetings.

- **Exhibit 5: Kaye Decl. ¶¶ 129-140; and**

- **Exhibit 24:  Winkler Dep. p. 54:22-25-56:1**

*v.    Defendants Seek to Sabotage Dr. Kaye and the Bronx Court Clinic:  by Removing Dr. Winkler and Denying her Adequate Staff; by Underreporting and Failing to Input the  Output of the Bronx Court Clinic; and by Denying Dr. Kaye Access to Medical Charts*

107.   On November 5, 2018, Lucrecia Persaud sent an email that documents that at least 42 cases had not been inputted into the ISight.  ISight was supposed to be introduced to the Bronx Court Clinic on September 17, 2018. The failure to input the cases prevented Dr. Kaye and Center staff from having access to those medical records, it also artificially deflated the work output of the Bronx Court Clinic.

- **Exhibit 73:  Email from Persaud dated November 5, 2018 with the Subject: Requested Medical Records for Bronx Court Clinic. (NYC002434)**

108.   Between March 2018 and December 2018, the Bronx Court Clinic only had one full-time staff person, Dr. Kaye.   Dr. Kaye complained about the use of HIPAA releases with potentially mentally incompetent criminal defendants, to Defendants Yang and Ford on January 29, 2018.  In March 2018, Dr. Winkler left the Bronx Court Clinic to serve as Director of the Brooklyn Court Clinic.  In order to complete 730 Exams in compliance with CPL 730, there must be two qualified evaluators.  For nine months, Dr. Kaye was the only qualified examiner at the Bronx Court Clinic.

- **Exhibit 5: Kaye Decl. ¶¶ 176-186;**

- **Exhibit 42: Kaye Cross Exam Dep. as taken on 1/25/22 p. 57:19-25-58:1-24; and**

- **Exhibit 74: CPL § 730 Statute**

109.   Dr. Kaye did not supervise any staff after Dr. Winkler was promoted to Director of the Brooklyn Court Clinic in March/April 2018.

- **Exhibit 2: Kaye Decl.  ¶¶ 176-186**

110.   Defendant Ford recognized the importance of keeping the co-examiner supervisor roles separate, therefore when Dr. Brayton was hired, Dr. Kaye was not her supervisor. However, Defendants also denied that the supervision would pose a conflict of interest in terms of neutrality.

- **Exhibit 8:  RFA ¶ 84-85 p.47- 48;**

- **Exhibit 75:  Email thread from Kaye with the date range December 5, to December 7, 2018 with the Subject:  Bringing Dr. Brayton to the Bronx. (NYC003470-NYC003475 see p. NYC003474)**

111.   Nevertheless, despite the ethical problems posed with Dr. Kaye's supervision of Dr. Brayton, Defendant Jain still delegated the sign-off of Dr. Brayton's timesheets to Dr. Kaye.

- **Exhibit 8:  RFA ¶ 87 p. 49**

112.   Dr. Kaye notified Emma Noftz that since they did not have a second full time staff person at the Bronx Court Clinic, there have been delays in exams.

- **Exhibit 76: Email from Kaye to Emma Noftz dated November 28, 2018 with the Subject: Redacted (NYC002545)**

113.   On December 4, 2018, Dr. Kaye complained that all of the Bronx Court Clinic's records had been removed from the Center.  This has the effect of rendering Dr. Kaye from tracking her work and the productivity of the Court Clinic at that time.

- **Exhibit 77: Email from Kaye dated December 4, 2018 with the Subject:  Bronx Court Clinic Needs to be Checked on a file (Name Redacted) (NYC002242)**

114.   Dr. Kaye's access to the ISight system remained inconsistent going into April 2019.  On April 11, 2019, Dr. Kaye was unable to access the system. Due to a lack of access to the system, she was unable to track her workload and the status of the defendants' assigned to the clinic.

- **Exhibit 78: Email from Kaye dated April 11, 2019 with the Subject: Locked Out of ISight (NYC002721)**

115.   Defendants took over the Bronx Court Clinic in July 2018.  For the period of June 2018 to December 2018, they recorded the Bronx Court Clinic as having seen a total of 21 730s.  However, based on Dr. Kaye's records, for that same time period, she has herself having completed 64 730 Examinations.  For the same time period of June 2018 to December 2018, Defendants have the Clinic for only seeing 21 730 Examinations.  Defendants' numbers include exams that were not seen by Dr. Kaye.  According to Defendants' data, Dr. Kaye only completed 8 730 Exams versus the 64 she said she completed during the same time period.

- **Exhibit 70: Kaye's 730 Work Output Comparison for Calendar Years 2018 and 2019; and**

- **Exhibit 79: ISight Report Comparing Completed 730 Examinations for  2018 and 2019  (XLS3933)**

116.   In calendar year 2019, ISight only had data on the number of exams Dr. Kaye conducted from January to March 2019.  Defendants have not provided any explanation for the absence of additional data  during this time period. Even with this limited data, there are discrepancies between the number of exams Dr.  Kaye says were conducted at the clinic for that time period and those that CHS says were conducted.   For example, in 2019 Defendants' data has the Bronx Court Clinic at 80 Exams for the year.  In comparison, Dr. Kaye claimed that there were 69 exams altogether and that she participated in 69 of them.

- **Exhibit 5:  Kaye Decl ¶¶ 29-31;**

- **Exhibit 70: Kaye's Work Output Comparison for Calendar Years 2018 and 2019; and**

- **Exhibit 79: ISight Report Comparing Completed 730 Examinations for  2018 and 2019  XLS3933**

**IV.     May 2018-December 2018: Dr. Kaye Experiences Discrimination and Retaliation Under Title VII, NYSHRL and NYCHRL**

*A.   Dr. Kaye's  May 3rd Email to Defendant Yang Requesting Pay Parity*

117.    On May 3, 2018 Dr. Kaye sent an email to Defendant Yang where she raised the issue of pay parity.  In the email, Dr. Kaye explained to Defendant Yang, that despite her board certifications and years of experience, she had been working in the lesser Attending Physician corporate title and that she had been paid less than her male comparators.
- **Exhibit 80: Email forwarded by Yang to S. Gillen and J. LaBoy dated May 3, 2018 with the Subject:  Pay Equity for Court Clinic Medical Directors (NYC00210-NYC00211)**

*B.   Defendants Yang and Jain Demote Dr. Kaye in Office Title 8 Days After Her Protected Activity*

118.    Dr. Kaye had the title of Medical Director of the Bronx Forensic Psychiatric Court Clinic from 2004 to 2018
- **Exhibit 5: Kaye Decl. ¶¶ 52-54; and**

- **Exhibit 8: RFA ¶¶ 33 and 34 p. 20-21**

119.    On May 11, 2018 Defendant Jain circulated an email that listed the corporate titles of himself and the other FPECC Center Directors.  At that time, Dr. Kaye's title  was changed from Medical Director to Director.
- **Exhibit 81: Email from Jain dated May 11, 2018 with the Subject: Titles (NYC00216)**

120.    On May 22, 2018, Dr. Kaye filed a complaint with the Equal Employment Opportunity Commission (EEOC).  Since by that time, she had not heard anything back from Defendant Yang, Bellevue CEO Bill Hicks, CHS Management, H +H management or Defendants' EEO Offices.
- **Exhibit 82: Dr. Kaye's EEOC Charge of Discrimination  520-2018-01534 and the EEOC's File (D000752-D000762)**

121.    On May 25, 2018, Dr. Kaye received notification that her title would be changed from Medical Director to Director.  She expressed concern and discussed the professional significance of the change via an email to Andrea Swenson.  At which time, Ms. Swenson told Dr. Kaye that it was Defendant Jain's decision to change the titles.

- **Exhibit 83: Email from Kaye dated May 25, 2018 with the  Subject: Business Cards (NYC00235)**

122.   Defendants' email with the Court Clinic Directors' business cards only contained draft cards for three of the four Center Directors; Dr. Mundy's Business Card was not included. Dr. Mundy was hired to work full-time as Senior Director of the Manhattan Court Clinic on March 8, 2018.  Unlike Dr. Kaye, his title was not changed on May 11, 2018.
- **Exhibit 81: Email from Jain dated May 11, 2018 with the Subject: Titles (NYC00216);**

- **Exhibit 84:  Human Resources Action Request Form for Dr. Mundy dated March 8, 2018 (D000342); and**

- **Exhibit 85: Dr. Mundy's  Action Request Form dated April 16, 2018 (D000343)**

123.   Dr. Kaye never received an official written offer from Defendants and or  Dr. Mary Anne Badaracco to be promoted to a Managerial Corporate Title
- **Exhibit 5:  Kaye Decl. ¶ 51**

124.   At her deposition, Andrea Swenson testified that Defendant Yang told her to change the titles of Court Clinic Directors to just Directors, not Defendant Jain.
- **Exhibit 86: Swenson Dep. p.53:20-25-57:1-5**

125.   Defendants denied that Defendant Yang [could]: hire, fire, promote and or discipline Kaye.
- **Exhibit 8:  RFA ¶ 46 p. 26-27**

126.   According to Health and Hospitals Corporation's Personnel Rules , the Senior Vice President/Defendant Yang is the corporate officer delegated by the President to be responsible for Personnel and Labor Function.  They are also responsible for the terms and conditions of promotions.
- **Exhibit 87:  Health and Hospitals Personnel Rules and Regulations. p. 4 and Section 5.2.3(b)(ii) p.25-26**

127.    According to H  + H 's Operating Procedure, the Senior Vice President/Defendant Yang is also responsible for the approval of acting appointments to "a higher Group 11 position." Despite the fact that Dr. Kaye did not have a change in her responsibilities when Defendant Yang was hired, the fact remained that at earliest since 2004 and at latest in 2011, she was not paid for doing the same work as her comparators in the Manhattan Forensic Psychiatric Court Clinic.
- **Exhibit 88:  Operating Procedure 20-41 Health & Hospitals Corporation Salary Policy dated December 20, 2004 p. 4**

128.   In fact, in 2011, when Dr. Ciric was promoted he had performed less work than before his promotion:  he went from being a 1.0 FTE employee to a .80 FTE employee; from a full-time employee to a part-time employee.

- **Exhibit 89:  Ciric's Joint Oversight Committee Personnel Request Form dated 4/11; (D00437-D00439)**

*C.  Defendants Demote Dr. Kaye in Corporate Title 11 Days After She Sought Pay Parity*

129.   On May 14, 2018, Defendants started to list Dr. Kaye as an Attending Physician II.  This was a demotion from the Attending Physician III corporate and functional title that she had from 2000 until 2018.

- **Exhibit 90: Email from S. Gillen dated May 14, 2018 with the Subject: 730 Retention Bonus (NYC00220-NYC00221)**

130.   Defendants have also admitted that Dr. Kaye was employed in the Attending Physician Level III corporate title since 2000.

- **Exhibit 8:  RFA ¶ 28 p. 17**

*D.  June 21-22, 2018:  Dr. Kaye Complains about Defendants' Private Practice Policy and Tells Defendant Jain About Her  EEOC Charge*

131.   Dr. Kaye complained about Defendants' private practice policy and reported her EEOC Charge to Defendant Jain on or about June 21st and 22nd, 2018.

- **Exhibit 6:  Kaye Dep.  as taken on 11/15/21 p. 247:12-25-248:1-14**

132.   Defendant Jain testified that Dr. Kaye's concerns about double-dipping (i.e. forensic staff employed by the city, engaging in private practice either on city time or using city resources).  He also conceded that as Dr. Kaye expressed, that there needed to be a separation between private practice and the evaluators' work at the court clinics.  However, he also testified that private practice was supported when appropriate.

- **Exhibit 13:  Jain Dep. p. 111:5-24; p.115:8-24-p.116:1-17; p.151:1-24-154:1-10**

133.   Once Dr. Kaye complained about the EEOC charge and private practice policy to Defendant Jain.  In response, Defendant Jain threatened Dr. Kaye, and reported her to Defendant Wangel.

- **Exhibit 5:  Kaye Decl. ¶ 58; and**

- **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 247:12-25-248:1-3**

134.   Defendant Jain emailed Defendant Wangel that Dr. Kaye had filed a charge of discrimination at the Equal Employment Opportunity Commission (EEOC).

- **Exhibit 91: Email from Jain dated June 21, 2018 with the Subject: Re: Jonathan (NYC000288)**

135.    Defendants denied that Defendant Jain reported Dr. Kaye's EEOC charge to Defendant Wangel.
- **Exhibit 8:  RFA ¶ 111 p. 63-64**

136.    Defendant Jain conducted a  meeting in or around June 22, 2018.  One of the topics of discussion at the meeting included the private practice policy.
- **Exhibit 92:  Email from Jain dated June 21, 2018 with the Subject:  Meeting this Friday 6/22 (NYC00285-NYC00286);**

137.    Dr. Kaye expressed concern about the private practice policy.  She testified that neither she nor any of the other directors had an opportunity to contribute to or comment on the policy prior to Defendant Jain's issuance of it at their directors' meeting.    She also testified that Dr. Owen was upset with and felt infantilized by the policy.
- **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 247:12-25-248:1-14**

138.    Defendant Jain testified that Dr. Kaye and the other directors had commented on and made suggestions about the policy prior to the Directors' meeting. He also testified that their comments were incorporated into the substance of the policy.
- **Exhibit 13:  Jain Dep. p. 11:5-24-112:1-13**

139.    Consistent with Dr. Kaye's account that the FPECC Directors did not have any input into the policy, was Defendant Jain's email to Defendant Ford.  In that email he stated that most of the directors would be on board, and that he anticipated that some would "raise a stink,"  specifically Dr. Owen.
- **Exhibit 13:  Jain Dep. p. 150:11-25-154:1-10; and**

- **Exhibit 93:  Email from Jain dated June 18, 2018 with the Subject:  Non-urgent list of items to discuss.  (NYC002014)**

140.    In or around July 13, 2018, Dr. Kaye, Defendant Jain and the other FPECC directors discussed the private practice policy again.  At that time Dr. Kaye also complained about the policy.
- **Exhibit 94:  Email from Kaye dated June 28, 2018 with the Subject:  Re: New FPECC Policy (NYC000297-NYC000298); and**

- **Exhibit 95:  Email from Jain dated June 28, 2018 with the Subject: New FPECC Policy (NYC000291-NYC000295)**

i.     *Dr. Kaye's Issues with the Private Practice Policy were Three-Fold: Perpetuation of Fraud-on-the-Court; Farming-Out City-Salaried Mitigation Report Work for Private Referrals; and the Ineffective/Artificial Isolation of the Defendant Pool by Borough to Facilitate Private Practice*

141.   Dr. Kaye testified about the concerns she raised about the private practice policy on June 22nd and July 13th, 2018 to Defendants Ford and Jain.  She complained that the policy set up a situation where there would be *fraud-on-the-court*.  Where the involved stakeholders who hired FPECC evaluators for private work, would also have cases that involved the FPECC evaluators when they functioned as salaried city employees.  Dr. Kaye believed that this type of dynamic had the potential to compromise the legitimacy of the evaluation process, and to interfere with the administration of justice.
- **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p. 247:12-25-261:1-21**

142.   Dr. Kaye also testified that some of the evaluators had developed overly-friendly relationships with the lawyers, and that they had been influenced in how they issued findings when they conducted 730 exams.  She testified that she told Defendants Jain and Ford about this misconduct, and that she experienced retaliation and acrimony from Defendants and FPECC staff.  Dr. Kaye described instances where Dr. Owen and other evaluators had engaged in abuses such as partying and socializing with defense attorneys.  Dr. Kaye also testified, that she had learned that some of the findings these evaluators rendered were done in a way to engender private referrals.
- **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p. 247:12-25-261:1-21**

143.   Plaintiff also testified that she complained about the *farming-out of mitigation reports*.  Dr. Kaye believed that the private practice policy would lead to further abuse by some evaluators, who had already begun to bill work to their private practices that they would normally perform as city-salaried employees.
- **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 247:12-25-261:1-21**

144.   Dr. Kaye also expressed her skepticism about the policy's prohibition against performing evaluations in their private practices in the same borough in which they worked.  She complained that this restriction was ineffective and impractical, in that Defendants sometimes had cases in multiple boroughs.  She also noted that this restriction did not prevent against doctors conflicting themselves out of city salaried job duties because of the private practice work they performed.
- **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 247:12-25-261:1-21**

145.   Dr. Kaye complained that the private practice policy, as worded would violate the constitutional rights of criminal defendants.   She complained that the policy had the potential to encourage FPECC staff to engage in deceptive practice, that would corrupt the 390/730 exam process, and that would affect the Court's ability to rule neutrally on Defendants' capacity to participate in their cases.
- **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 247:12-25-261:1-21**

146.   Dr. Kaye clarified at her deposition that she was not against private practice or moonlighting as a whole, but that she opposed the abuses that had become prevalent amongst some FPECC evaluators.  Dr. Kaye cited instances where they were either engaged

in private practice directly or indirectly with the City of New York. Dr. Kaye opposed these abuses, because of the impact it would have on the constitutional rights of criminal defendants and the overall administration of justice.

- **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p. 247:12-25-261:1-21**

147.   Consistent with H + H Operating Procedure 50-1, Dr. Kaye also reported her concerns about FPECC employees and Defendants' private practice policy to the New York State Inspector General and to the Department of Justice's Public Integrity Bureau on the following dates:  September 4, 2018; March 2019; and January 8, 2021.

- **Exhibit 5:  Kaye Decl ¶ 191; and**

- **Exhibit 6:  Kaye Dep. as taken on 11/15/21 p. 249:261:1-15**

*E.   Defendant Jain Excludes Dr. Kaye from Meetings; and Avoids Meeting with Her One-on-One*

148.   Unless Dr. Kaye insisted, after she filed charges at the EEOC, between September 2018 and January 2020, Defendant  Jain repeatedly refused to meet with her.  This was despite the fact that he was her direct supervisor, and even though he regularly met with the other Court Clinic Directors in Manhattan, Brooklyn and Queens.

- **Exhibit 5: Kaye Decl. ¶ 129**

149.   Defendant Jain insisted on believing the false rumor that Dr. Kaye would not meet alone with him.  In order to protect her reputation from being further damaged, Dr. Kaye was placed  in the untenable position of defending herself. The truth was that Defendant Jain refused to meet with Dr. Kaye alone after her EEOC complaint. When they did meet in October 2018, it was because she cornered him in her office.  As a result, Dr. Kaye was excluded from meetings that would impact her ability to perform.

- **Exhibit 6:  Kaye Dep. as taken on 11/15/21 p. 305:24-25-306:1-23;**

- **Exhibit 42: Kaye Dep. Cross Exam as taken on 1/25/22 p. 14-19; and**

- **Exhibit 96 : Email from  MuirJr dated October 5, 2018 with the Subject: Conversation with Dr. Kaye (NYC00671-NYC00672)**

150.   Defendant Jain claimed the reason he didn't meet with Dr. Kaye was because she had taken an adversarial posture towards him.  When asked if she ever told him that she would not meet with him, he could not answer in the affirmative.

- **Exhibit 13: Jain Dep. p. 81:3-24-83:1-18**

151.   Defendants denied that Defendant Jain would avoid meeting Dr. Kaye "face-to-face."

- **Exhibit 8: RFA ¶ 7 p. 6-7**

152.   To accommodate Defendant Jain's issues with meeting with her one-on-one, Dr. Kaye asked for a meeting with Defendant Jain and Dr. Winkler to discuss Dr. Brayton's supervision, the operations of the clinic and to determine his expectations of her moving forward in Brooklyn with Dr. Winkler.  Defendant Jain initially agreed to the meeting, but at the last minute canceled.  Defendant Jain never discussed his expectations for Dr. Kaye on this date or up until she was constructively discharged.

- **Exhibit 5: Kaye Decl ¶¶ 129-140; and**

- **Exhibit 97: Email from Kaye dated August 30, 2019 with the Subject: Brayton's Supervision (Kaye4thProd00086-Kaye4thProd00089);**

153.    Dr. Kaye made another attempt to address Defendant Jain's hostility towards her, in this instance she again attempted to work with him and Dr. Brayton. This was despite the fact that doing so raised potential issues with dual agency.  Nevertheless, Dr. Kaye offered herself as a resource for Dr. Brayton's professional development.  The meeting never materialized, because at this time, rumors had begun to circulate that Dr. Brayton had obtained another job opportunity.

- **Exhibit 98: Email from Kaye dated October 30, 2019 with the Subject: Dr. Brayton's Supervision (NYC001811-NYC001812)**

154.   Defendant  Jain excluded Dr. Kaye from a meeting with Bronx Chief Criminal Court judge George Grasso.  This meeting pertained to the operations of the Bronx Court Clinic, which at the time was an integral part of Dr. Kaye's position as Medical Director of the Bronx Court Clinic.

- **Exhibit 5: Kaye Decl. ¶ 130**

155.   On September 7, 2018, Defendant Jain and Ms. Swenson intentionally scheduled a meeting in the Bronx with Chief Court Clerk Nat Hart, when they knew that Dr. Kaye would be at a meeting in downtown Manhattan.

- **Exhibit 5: Kaye Decl ¶ 131**

156.   In or around November 29, 2018, Dr. Jain and Ms. Swenson excluded Dr. Kaye from a meeting with Chief Court Clerk William Kalish.

- **Exhibit 5:  Kaye Decl.  ¶ 132**

*F.  Defendants Demote Dr. Kaye When they Assign Dr. Mundy to be Her Supervisor in PeopleSoft*

157.   On December 3, 2018 Dr. Kaye's retention bonus was docked and Dr. Mundy was incorrectly listed as Dr. Kaye's supervisor in People Soft/KRONOS. Defendant Wangel emailed Dr. Kaye that the problems had both been addressed.

- **Exhibit 99: Email from Wangel dated December 3, 2018 with the Subject Expiring License Certification (NYC002262-NYC002263)**

158.   On February 15, 2019 Dr. Mundy continued to be included on emails as if he were Dr. Kaye's supervisor.  The demotion in function and reporting continued in PeopleSoft unabated.  Despite Defendant Yang's email that feigned concern about rectification of the issue, and despite the unnecessary disclosure of Dr. Kaye's FMLA/health information.

- **Exhibit 100: Email from Yang dated February 15, 2019 with the Subject: Simmering About to Boil Over (NYC003911-NYC003913);**

- **Exhibit 101: Email from Kaye dated April 12, 2019 with the Subject: ATLS 2018 Time Keeping Year End Close (NYC003955-NYC003956); and**

- **Exhibit 102:  Email from Jain dated April 16, 2019 with the Subject: ATLS 2018 Timekeeping Year End Close (NYC002727-NYC002731)**

159.   After months of complaining, Defendants represent that Dr. Mundy was removed as Dr. Kaye's supervisor on June 10, 2019.  Dr. Jain made this statement despite the relatively little effort it took to alternate his supervision of Dr. Brayton with Dr. Kaye in People soft between the months of December 2018 and November 2019.

- **Exhibit 101: Email from Kaye dated April 12, 2019 with Subject ATLS 2018 Time Keeping Year End Close (NYC003955-NYC003956);**

- **Exhibit 102:  Email from Jain dated April 16, 2019 with the subject ATLS 2018 Timekeeping Year End Close (NY00C2727-NYC002731); and**

- **Exhibit 103: Email from Jain dated June 10, 2019 with the Subject PeopleSoft Dr. Kaye Assignment.  (NYC002933-NYC002935)**

160.   On July 16, 2019 Dr. Mundy received  yet another email where he was listed as Dr. Kaye's supervisor. In this instance he was prompted to complete Dr. Kaye's performance evaluation.

- **Exhibit 104: Email from Mundy dated July 16, 2019 with the Subject Group 12 Performance Evaluation (NYC003033)**

**V.   Defendants Attack Dr. Kaye's Status as a Caregiver to Force her Constructive Discharge**

*A.   Dr. Kaye's' Caregiver Status as a Mother of Fraternal Twins*

161.   Dr. Kaye is the mother of 12-year old fraternal twins: she has a daughter and a son.  At the time of the filing of this lawsuit, they were 9 years old.

- **Exhibit 5: Kaye Dec ¶ 59; and**

- **Exhibit 8: RFA ¶ 14 p. 10**

162.   Dr. Kaye's son has had medical and developmental conditions since he was three years old.  His conditions got worse in May 2018, and at that time, Dr. Kaye physically needed to administer his medication herself.  Prior to Defendants' retaliatory shift-change, she was able to comply with her son's treatment regimen.

- **Exhibit 5: Kaye Decl. ¶¶ 60-62**

*B.   Defendant Ford has Known about Dr. Kaye's Caregiver Status Since 2012; She Weaponized Dr. Kaye's Children to "Manage Her Out"*

163.   There is conflicting record evidence as to when Defendant Ford became aware of Dr. Kaye's caregiver status.   Dr. Kaye testified that she  told Defendant Ford about her son's condition in 2012.  Dr. Kaye also declared that she began to discuss her son's condition more with Defendant Ford in May 2018, when her son's condition worsened.  However Defendant Ford testified that Dr. Kaye had not discussed her son's condition with her until the Fall of 2018, which conveniently would have been after Dr. Kaye had engaged in protected activity.

- **Exhibit 5: Kaye Decl. ¶ 61-62; and**

- **Exhibit 11: Ford. Dep. p. 148: 10-149:1-9**

164.   In her book: "Sometimes Amazing Things Happen," Defendant Ford spoke of at least two instances where she had to resign from positions, because she couldn't honor her caregiving responsibilities. She specifically described the effect that her work-hours had on getting  her kids ready for school, and how hectic that would be for she and her husband. Defendant Ford also took a leave of absence from June to November 2018; she testified that she took the leave to care for herself and her family.

- **Exhibit 11: Ford Dep. 84:25-86:1-5 and 86:23-25-87:1-2; and**

- **Exhibit 60:  Excerpts from Dr. Ford's Book: "Sometimes Amazing Things Happen." Pgs.  49, 100, 104, 134 and 135**

165.   In February 2018, before CHS officially managed the Bronx Court Clinic, Defendant Ford emailed Defendant Yang that Dr. Kaye had been a problem for a long time and that she needed to be managed out.

- **Exhibit 59: Email from Yang dated February 1, 2019 with Subject: Judge Torres wants to Hold us in Contempt (NYC00075-NYC00076)**

166.   During the course of her deposition Defendant Ford admitted that she hadn't managed Dr. Kaye between 2014 and 2018.

- **Exhibit 11: Ford Dep. p. 97-100**

167.   Defendant Ford managed Kaye from 2009 to 2014.  During the years 2009, July 2012-December 2012, she did not have any problems with her performance.  In 2009, Ford said that "Kaye was easy to work with, highly skilled and dedicated to her service."

- **Exhibit 11: Ford Dep. p. 94; and**

- **Exhibit 105: Kaye Performance Evaluations for 2009 and July 2012 through December 2012**

### C.   Defendant Jain tells Dr. Kaye:  Child Care Issues are not A CHS Concern!

168.   Once Dr. Kaye told Defendant Jain about her EEOC charge, which was in June 2018, he began to avoid meeting with her, or speaking to her face-to face.  Between September 7th and 11th, 2018, Dr. Kaye supplemented her EEOC Charge to include allegations of retaliation. On October 18, 2018, Dr. Kaye had an impassioned conversation with Defendant Jain about the shift change.  When Dr. Kaye told Defendant Jain about the effect of the shift change on her children, he remarked that *childcare issues were not a concern for CHS*.   When Dr. Kaye said that if she was forced to continue to work the 9-hour day, that she would have to resign, she testified that Defendant Jain became excited and asked: what was her resignation date? She stated that he wanted to know when he could start posting her position.

- **Exhibit 6: Kaye Dep. as taken on 11/15/21 p. 305:10-25-306:1-23**

169.   Defendant Jain denied that he made the statement that CHS could not accommodate or was not concerned with child care issues.

- **Exhibit 13: Jain Dep. p. 124-125**

### D.   Defendants Impose Retaliatory Shift Change After Dr. Kaye's EEOC Charge; They Engage in Theft of Wages and Demote her in Salary

170.   On February 2, 2018, Bob Peck from the Brooklyn Office of the Legal Aid Society, would circulate a fax pinned by CHS that discussed the upcoming transition.

- **Exhibit 106:  Peck Fax dated February 2, 2018**

171.   Dr. Kaye met with Defendant Wangel on April  19, 2018 before CHS assumed formal management of the Bronx Court Clinic.  Consistent with the fax from CHS, Defendant Wangel assured Dr. Kaye that nothing would change, including her work hours, title and bonuses. However these were the very things Defendants methodically targeted to destroy Dr. Kaye's career.

- **Exhibit 107:  Email from Kaye dated April 30, 2018 with the Subject Melissa Kaye BHC to CHS line Change (NYC00513)**

172.   In June 2018 Dr. Kaye had a meeting with Defendant Jain and told him that she had filed a charge of discrimination at the EEOC.  Defendant Jain threatened to report her to Defendant Wangel.

- **Exhibit 5:  Kaye Decl. ¶ 58**

173.   Defendant Jain testified, that he told Dr. Kaye that he would report her EEOC charge to Defendant Wangel.  He also admitted that he in fact told Defendant Wangel about Dr. Kaye's EEOC charge, because he thought he was the person who addressed those issues. At the time, Defendant Wangel was the Senior Director of Employment & Labor Relations.

- **Exhibit: 5: Kaye Decl. ¶ 58; and**

- **Exhibit 13:  Jain Dep. p. 103:10-25-104:1-4**

174.   The Bronx Court Clinic officially transitioned to CHS Management on July 1, 2018.

- **Exhibit 5:  Kaye Decl.  ¶ 64; and**

- **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p. 247:12-22**

175.   Prior to the transition from Bellevue to CHS, Dr. Kaye worked a 40-hour work week and took a 30-minute half-hour lunch.

- **Exhibit 6:  Kaye Direct Dep.  as taken on 11/15/21 p.281:13-16.**

176.   In July 2018, Defendant Jain notified Dr. Kaye that her shift had been changed from 9AM to 5:30PM with an unpaid ½ lunch, to 8AM to 6PM with an hour unpaid lunch.

- **Exhibit 5: Kaye Decl. ¶ ¶ 68-69**

177.   In or around July 11, 2018, Defendant Wangel began to circulate emails that inquired about the rationale of having staff work 8 hours with a 30 minute standing lunch.  At the time, Dr. Kaye was the only staff person that scheduled her day this way.

- **Exhibit 108:  Email from Wangel dated July 11, 2018 with the Subject: FPECC Question (NYC000369-NYC000370)**

178.   H +H staff member Rosalind Barrow shared with staff that Dr. Kaye was right, and that Doctors Council had previously entered into an agreement with H + H that would permit them to take ½ lunches.

- **Exhibit 108:  Email from Wangel dated July 11, 2018 with the Subject:  FPEC Question (NYC00369-NYC000370); and**

- **Exhibit 109:  Email from Kaye dated July 13, 2018 with the Subject: 30-Minute Lunch (NYC000385)**

179.    Between July 2018 and August 2018, Dr. Kaye did not  have access to KRONOS and or her timesheets.  During that time Defendant Jain had entered her time in the system for her.

- **Exhibit 5: Kaye Decl. ¶ 65;  and**

- **Exhibit 6: Kaye Dep. as taken on 11/15/21 p. 281:16-19**

180.    Between July 2018 and August 2018, Defendant Jain worked in concert with H + H/CHS staff to change Dr. Kaye's time entries from 9AM to 5:30PM to 8AM to 5PM.  This caused Dr. Kaye to be docked pay.

- **Exhibit 5: Kaye Decl. ¶ 67- 68**

181.    Defendants have denied that Defendant Jain changed Dr. Kaye's timesheets. Defendants also deny that Defendant Jain's alteration of Dr. Kaye's timesheets caused her pay to be docked.

- **Exhibit 8:  RFA ¶¶ 196-197 p. 113-114**

182.    Dr. Kaye shared with Defendant Jain, that prior to the Court Clinic's transition, when she was at Bellevue that she used paper timesheets.  Dr. Kaye then proceeded to retrieve the 10 years of timesheets that she kept, and attempted to show them to Defendant Jain.  She recalled that Defendant Jain had ignored her.

- **Exhibit 5: Kaye Decl. ¶ 66; and**

- **Exhibit 6:  Kaye Dep. as taken on 11/15/21 p. 282: 3-15**

183.    Between July and August 2018, Dr. Kaye complained that she did not have access to KRONOS to input her time.  During this time Defendant Jain inaccurately entered Dr. Kaye's time into KRONOS, which resulted in a reduction in her salary.  Dr. Kaye continued to have problems entering her time in KRONOS in October 2018.

- **Exhibit 5: Kaye Decl. ¶ 74;**

- **Exhibit 110:  Email: from Kaye dated July 10, 2018 with the Subject: Direct Deposit (NYC00366-NYC00367); and**

- **Exhibit 111:  Email from Kaye dated August 13, 2018 with the Subject: Pay Error (NYC000429)**

184.    Dr. Kaye did not obtain access to KRONOS until the middle of August, she had also been out of the office for a variety of reasons between July 1, 2018 and August 13, 2018.  It was at that time, that she started to complain about her pay being docked and about her time being entered into KRONOS incorrectly.

- **Exhibit 5:  Kaye Decl. ¶ 73; and**

- **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 282:9-12;**

185.   On August 16, 2018, Dr. Kaye told Defendant Jain that the 9-hour work day would interfere with her family responsibilities, her child care.  At which time, Defendant Jain failed to respond.
   - **Exhibit 112: Email from Kaye dated August 16, 2018 with Subject: 1-Hour Lunch (NYC00514)**

186.   Defendant Jain had been putting her time into the system as if she had worked a seven-hour day with an hour of unpaid lunch.
   - **Exhibit 5: Kaye Decl. ¶¶ 68, 130, and 135; and**

   - **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p. 282:12-14**

187.   When Dr. Kaye told Defendant Jain that she had worked an 8-hour day with a 30-minute unpaid lunch, Defendant Jain lurched at her and said: "No you don't that's not true!"
   - **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 281:19-25**

188.   Initially, when Dr. Kaye complained about the shift change, Defendant Jain told her: "the system couldn't handle a 30-minute lunch.
   - **Exhibit 5: Kaye Decl. ¶ 71**

189.   On another occasion that Dr. Kaye complained to Defendant Jain about the shift change, he told her that her shift had been changed, because everyone had to be the same and that everyone had to work the same hours.
   - **Exhibit 5: Kaye Decl.  ¶¶ 66 and 71; and**

   - **Exhibit 6:  Kaye Direct Dep. as taken on 11/15/21 p. 262:8-20 and p. 282:3-15**

190.   However, all of the Court Clinic Directors did not have the same hours.  Defendant Jain told Dr. Kaye that she had a 9-hour work day and that she had to work from 8AM to 6PM.
   - **Exhibit 5: Kaye Decl. ¶¶ 68-69**

191.    The record contained conflicting evidence about Dr. Winkler's required work hours. According to his Action Request Form he was required to work 35 hours.  However, his offer letter from PAGNY stated that he was hired to work 40 hours.
   - **Exhibit 113: Dr. Winkler's Action Request Form and Offer Letter from PAGNY (D000174-D000176)**

37

192.   Dr. Winkler resolved this conflict at his deposition, when he testified that he worked a 9AM to 5PM shift, with an hour unpaid lunch; for a 35-hour work week.  As Dr. Kaye's former staff person, who she trained, Dr. Winkler had less longevity and was junior to her, yet he enjoyed substantively superior status and working conditions in Defendants' work environment.

- **Exhibit 24:  Winkler Dep.  p. 19:15-24-20:1-7; and p. 60:5-12**

193.   Dr. Winkler also testified that none of the other Court Clinic Directors were made to change their hours when the Clinics transitioned to CHS.

- **Exhibit 24:  Winkler Dep. p. 60-63**

194.   There was no business need for Dr. Kaye to work the hours of 8AM to 6PM.  Defendants have repeatedly claimed that the Bronx Court Clinic was the least busy and had the smallest workload of all of the Centers. However, unlike the other Court Clinics, Dr. Kaye was required to work more and longer hours than the other Clinic Directors.

- **Exhibit 5:  Kaye Decl. ¶¶ 19-31;**

- **Exhibit 6:  Kaye  Direct Dep. as taken on  11/15/21 p. 209:16-18;**

- **Exhibit 70:  Kaye's 730 Statistics for Calendar Years 2018 and 2019;**

- **Exhibit 79:  Defendants' ISight Chart (XLS3933); and**

- **Exhibit 116:  Email from Swenson dated March 22, 2019 with the Subject:  FPECC Directors Count 3/14/19 (NYC002661-NYC002666)**

195.   The Criminal Defendants that Dr. Kaye would interview, would not be produced until after 10AM, there wasn't an operational need to have Dr. Kaye report to work at 8AM.

- **Exhibit 5:  Kaye Decl. ¶ 75**

196.   On November 5, ,2018 Dr. Kaye emailed Defendant Jain that she was not able to enter her time into KRONOS to complete her timesheet.

- **Exhibit 114: Email from Kaye with the Subject KRONOS Not Accepting Time Input for Monday 10/29 dated November 5, 2018 (NYC002438)**

197.   On November 30, 2018, Dr. Kaye met with Defendant Ford about the impact that the shift change was having on she and her children.  Their meeting took place after the FPECC Directors' Meeting Dr. Kaye attended that was convened with Defendant Ford.   She pleaded with Defendant Ford to restore her shift, Defendant Ford ran out of the meeting and called out for Defendant Wangel.

- **Exhibit 115: Email from Jain dated November 29, 2018 with the Subject: FPECC Meeting (Agenda attached) (NYC003403-NYC003404); and**

- **Exhibit 42: Kaye Cross Exam. Dep. as taken on  1/25/22 p. 52:5-25-53:1-19**

198.   Dr. Kaye was the only Court Clinic Director that was required to work a 40-hour work week. Drs. Ciric, Owen and Mundy were permitted to work 35 hours a week.  Dr. Ciric was a .8 FTE employee and therefore was not required to work a full -time schedule.  Dr. Mundy's required work hours were omitted from his form.  Dr. Winkler's form and offer letter conflicted: one document stated he worked 35 hours and the other stated he worked 40.  Dr. Kaye was the only Director forced to work 9 hours a day.

- **Exhibit 113: Winkler Action Request Form and Offer Letter dated 3/22/18 (D000174-D000176);**

- **Exhibit  89:  Ciric's Joint Oversight Committee Personnel Request Form dated 4/11; (D000437-D000439); and**

- **Exhibit: Owen Action Request Form dated 4/16/18 (D000219-D000220)**

199.   Defendant Yang erroneously interpreted Dr. Kaye's collective bargaining agreement to require that she work a 45-hour work week.   This was despite the fact that Rosalind Barrow  had confirmed with Defendant Wangel, that Dr. Kaye's union had entered into an agreement where members could work a 30-minute lunch and a 40-hour work week.

- **Exhibit 9:  Yang Dep. as taken on 2/28/20  p. 257:7-12;**

- **Exhibit 108: Email from Wangel dated July 11, 2018 with the Subject: FPECC Question (NYC00369-NYC00370);**

- **Exhibit 109:  Email from Kaye dated July 13, 2018 with the Subject: 30-Minute Lunch (NYC000385); and**

- **Exhibit 117: Email from Rosalind Barrow dated July 24, 2018 with the Subject: 30-Minute Lunch (NYC000402-NYC000403)**

200.    Defendants Yang, Wangel, Ford  and Jain worked together to impose the 45-hour work week on Dr. Kaye, with the intention of forcing Dr. Kaye to resign and or retire.   Defendant Wangel could point to any language in the Doctors Council Collective Bargaining Agreement, that required any of its members to work a 45- hour work week with an unpaid hour lunch; or that required any of their members to take an hour of unpaid lunch.

- **Exhibit 9:  Yang Dep. 2/28/20 p. 257:7-12; and**

- **Exhibit 14:  Wangel Dep. p. 160:20-24; p.134:15-25-160:20-24**

201.   Dr. Kaye continued to have problems either entering time and or accessing KRONOS well into 2019, this was despite Defendants' insistence that the problem had been solved.

Due to an inability to consistently access KRONOS and to monitor her leave balances, Defendants continued to illegally dock Dr. Kaye's salary.

- **Exhibit 118: Email from Kaye dated April 8, 2019 with the Subject: Unable to put in Annual Leave 4/3/19  (NYC002697)**

202.   On January 18, 2019 Dr. Jain continued to dock Dr. Kaye's pay by ignoring her requests for sick leave.  Dr. Kaye provided a screenshot of the request to Dr. Jain; in response, Dr. Jain said that he did not see the request.

- **Exhibit 119:  Email thread from Kaye dated January 18, 2019 with the Subject MK Out Sick (NYC003883-NYC003888)**

203.   In March 2019, despite Defendants' insistence that Dr. Kaye's salary was not being docked and that the problems with KRONOS had been resolved, Dr. Kaye continued to have problems entering her time.

- **Exhibit 120:  Email from Kaye dated March 6, 2019 with the Subject I cannot get into KRONOS (NYC002601); and**

- **Exhibit 121: Email from Kaye dated March 6, 2019 with the Subject KRONOS Input Problem for FMLA Leave Request for Week of 3/18 of 3/25 and 4/1 and 4/2 (NYC002602-NYC002603)**

204.   Dr. Kaye's problems entering time into KRONOS continued into April 2019.  The problems became so severe that she had to make the choice between her compensation or writing a report for an important case.  She opted to write the report and further risk being docked pay.

- **Exhibit 122: Email from Kaye dated April 18, 2019 with the Subject: Reports due Next Week Prioritized (NYC002750)**

205.   From July 2018 until she was constructively discharged and forced to retire in January 2020, Dr. Kaye did not have consistent access to KRONOS.

- **Exhibit 5: Kaye Decl. ¶ 74**

206.   Defendants have denied that between January 2018 and June 2018  that they docked Dr. Kaye's pay.

- **Exhibit 8: RFA ¶ 194 p. 112**

207.   As a result of  the efforts of Defendant Jain and CHS staff to alter Dr. Kaye's time sheets, she experienced two years of wage theft: in 2018, she was demoted in salary and unfairly docked $31K in wages; and in 2019, she was demoted in salary $36K in wages were stolen by Defendants.

- **Exhibit 5: Kaye Decl. ¶¶ 93-100; and**

- **Exhibit 33: Melissa Kaye's W2s (Kaye3rdProd0081-Kaye3rdProd0082)**

**E.  *Dr. Kaye's Experiences Retaliation After She Files a Supplemental EEOC Charge in September 2018***

**i.  *Retention Bonus Withheld for 3 Months in Retaliation of Her Supplemental Charge of Discrimination at the EEOC***

208.    On September 7, 2018 Dr. Kaye filed a Supplemental Charge of Discrimination with the EEOC.  In the supplemental charge, she added claims that she had experienced retaliation in the wake of her EEOC charge in May 2018 when she was subjected to a shift change.  Dr. Kaye complained that Defendants intentionally changed her shift from 9AM to 5:30PM with a ½ hour unpaid lunch, to an 8AM to 5PM work day.  As a result, Dr. Kaye was the only Court Clinic Director who was required to work a 9-hour work day, despite the fact that she performed the same job functions as the other Directors.

- **Exhibit 82: Dr. Kaye's EEOC Charge of Discrimination  520-2018-01534 and the EEOC's File (D000752-D000762)**

209.    On September 18, 2018, H + H Senior Counsel, Blanche Greenfield emailed Defendant Wangel, a copy of Dr. Kaye's EEOC and Supplemental Charge.

- **Exhibit 123:  Email from Greenfield dated September 18, 2018 with the Subject: Melissa Kaye (NYC000536-NYC000539)**

210.    On September 19, 2018, Defendants began to email about the disbursement of Retention Bonuses.  According to this email, the bonuses were supposed to be sent out by October 5, 2018.

- **Exhibit 124:  Email from Kolodziejski to Alexander dated September 19, 2018 with the Subject:  Doc Council List Additions.  (NYC003341-NYC003343)**

211.    On September 26, 2018, Defendant Yang emailed Bellevue CEO, Bill Hicks about Dr. Kaye's Retention Bonus.  She points out in the email, that Dr. Kaye has filed an: "EEO complaint against us."

- **Exhibit 125: Email from Yang dated September 26, 2018 with the Subject: Can You Help Us Help Ourselves.  (NYC000581-NYC000583)**

212.    To be eligible for the entire $20,000 retention payment, Dr. Kaye would have needed to be a full-time 40-hour a week employee between August 1, 2017 and June 30, 2018**.**

- **Exhibit 228:  Email from Kaye dated October 31, 2018 with the Subject: FTE Error Causing Bonus Retention Error (NYC002451-NYC002452)**

213.    On September 26, 2018 April Alexander (Alexander), Director of Human Resources at H + H's Central Offices, emailed that she could no longer access Dr. Kaye's detailed work

information since Plaintiff now worked  for CHS.   Alexander instructed CHS's payroll staff to access Dr. Kaye's details through a Central Office query with the desired date range.

- **Exhibit 125:  Email from Alexander dated September 26, 2018 with the Subject: Re: Can You Help Us Help Ourselves?  (NYC000581-NYC000583)**

214.   On September 26, 2018, Assistant Vice President of H +H's Office of Labor Relations, Matthew Campese, designated the "requisite time period" to determine eligibility for the retention bonus:  August 1, 2017 to June 30, 2018.

- **Exhibit 14: Wangel Dep. p. 49:6-22; and**

- **Exhibit 125: Email from Campese dated September 26, 2018 with the Subject: Re: Can You Help us Help Ourselves?  (NYC000581-NYC000583)**

215.   On September 26, 2018, H and H Employee, Angela Mullett represented that April Alexander told  her to forward the number of hours worked.  According to Mullett, Dr. Kaye only "actually worked" 1,184 hours for the "requisite time period."

- **Exhibit 126:  Email from Mullett dated September 26, 2018 with the Subject: Re: Total Work Hours (NYC003419-NYC003420)**

216.   H + H Assistant Vice President of Labor Relations, Matthew Campese then determined that Dr. Kaye was eligible for a retention payment of $13,400 based on an (full-time equivalent) FTE .67 status.

- **Exhibit 126:  Email from Mullett dated September 26, 2018 with the Subject: Re: Total Work Hours (NYC003419-NYC003420)**

217.   As early as September 26, 2018  Defendant Wangel knew that an error had taken place with the calculations and emailed Defendant Yang, that the retention bonus payment error was attributable to Bellevue and H + H.   However, despite this knowledge, Dr. Kaye did not receive the correct lump sum amount even after the December 28, 2018 payroll period.

- **Exhibit 5: Kaye Decl ¶¶ 94-99;**

- **Exhibit 125:  Email from Wangel dated September 26, 2018 with the Subject: Re: Can You Help Us Help Ourselves?   (NYC00587-NYC000593); and**

- **Exhibit 127:  Email from Campese dated 12/19/18 with the Subject:  Dr. Kaye (NYC001058)**

218.   On October 4, 2018, Dr. Mary Ann Badaracco, Dr.Kaye's indirect supervisor when she worked under Bellevue/H +H, confirmed that she was entitled to the full retention bonus. Dr. Badaracco confirmed with Doctors Council union representative, Nate Santamaria, that Dr. Kaye had "continuous H + H employment from July 2017 thru June 30, 2018."

- **Exhibit 128:  Email from Badaracco dated October 4, 2018 with the Subject: Re: Retention Bonus (NYC000707-NYC000708)**

219.   On October 31, 2018, Dr. Kaye emailed Wayne Myrie, Bellevue's Payroll Director to notify him of the partial retention bonus payment she received and to have him confirm that she was entitled to the full payment.  Myrie confirmed Dr. Kaye's status as a 1.0 FTE employee, he also confirmed that she was entitled to the full $20,000 retention bonus payment.

- **Exhibit 129:  Email from Kaye dated October 31, 2018 with the Subject: FW: FTE Error Causing Bonus Retention Error (NYC000807-NYC00808)**

220.   On October 31, 2018, Dr. Kaye emailed Doctors Council Union representative Nate Santamaria, that CHS/Defendants committed an error with her retention bonus payment.

- **Exhibit 129:  Email from Kaye dated October 31, 2018 with the Subject: FW:  Error Causing Bonus Retention Error (NYC000807-NYC000808)**

221.   On November 15, 2018 Assistant Director of Payroll for CHS, Colleen Barrow emailed Angela Mullett and Wangel.  At that time, she pointed out that Dr. Kaye should receive the full $20,000 retention bonus. Barrow reached the correct determination, because she ran the timesheet query for the correct time period:  7/30/17 to 6/30/18

- **Exhibit 130:  Email from Barrow, Colleen dated 11/15/18 with the Subject:  Dr. Kaye Retention Bonus Payment 000047801(NYC000866)**

222.   However,  on November 16, 2018, on the very next day after Ms. Barrow pointed out the error, a Timesheet Profile Request was ordered for Dr. Kaye.  The requested time period spanned:  July 30, 2017 to April 28, 2018.  This was despite Ms. Barrow's email on the previous day.

- **Exhibit 131:  Timesheet Profile Request dated November 16, 2018 (NYC003421)**

223.   Defendants Yang and Wangel retaliated against Dr. Kaye due to her filing of a Supplemental EEOC Charge on September 7-11[th], 2018, and because they would have to pay Dr. Kaye out of their budget.  CHS's obligation to pay Dr. Kaye the outstanding $6,600 was confirmed by Bellevue's Payroll Director Wayne Myrie.

- **Exhibit 132:  Email from Myrie dated December 18, 2018 with the Subject: Total Hours (NYC001028-NYC001030)**

224.   Accordingly, Defendants deliberately delayed the payment of Dr. Kaye's full retention bonus until December 28, 2018, which was after the holiday season.

- **Exhibit 127:  Email from Campese dated 12/19/18 with the Subject: Dr. Kaye (NYC001058)**

225.   On July 14, 2017, Doctors Council entered into a Memorandum of Agreement (MOA) with the City of New York and H +H.

- **Exhibit 35:   Memorandum of Agreement between: Doctors Council; Health and Hospitals Corporation; and the City of New York (NYC00008-NYC000015)**

226.   The purpose of the 7/14/17 MOA was to address an ongoing recruitment and retention crisis in the following clinical practice areas:  Emergency Medicine; Psychiatry; and Primary Care.
- **Exhibit 35:   Memorandum of Agreement between: Doctors Council; Health and Hospitals Corporation; and the City of New York (NYC00008-NYC000015)**

227.   On July 14, 2017, to effectuate the objectives of the parties, despite H + H's then financial crisis, Doctors Council, Health and Hospitals Corporation and the City of New York, agreed to a "very targeted adjustment in the compensation in the listed clinical practice areas."
- **Exhibit 35:   Memorandum of Agreement between: Doctors Council; Health and Hospitals Corporation; and the City of New York (NYC00008-NYC000015)**

228.   Part of the 7/14/17 MOA involved the creation of a "Temporary Retention Payment Program" that was supposed to go into effect on July 1, 2017.
- **Exhibit 35:   Memorandum of Agreement between: Doctors Council; Health and Hospitals Corporation; and the City of New York (NYC00008-NYC000015)**

229.   Eligible Employees under the 7/14/17 MOA, who were compensated on an annual basis,  were entitled to a maximum "Retention Payment" in a fiscal year of $20,000.
- **Exhibit 35:   Memorandum of Agreement between: Doctors Council; Health and Hospitals Corporation; and the City of New York ((NYC00008-NYC000015)**

230.   The 7/14/17 MOA defined eligible employees as those having been in active payroll status ( or on protected leave status) for the entire period from August 1st to June 30th prior to the year of payment.
- **Exhibit 35:   Memorandum of Agreement between: Doctors Council; Health and Hospitals Corporation; and the City of New York (NYC00008-NYC000015)**

231.   Payments made under the Temporary Retention Payment Program: were supposed to be paid as a one-time lump sum; were not supposed to be considered part of the employee's annual base compensation; and was not supposed to be pensionable.
- **Exhibit 35:   Memorandum of Agreement between: Doctors Council; Health and Hospitals Corporation; and the City of New York (NYC00008-NYC000015)**

232.   Defendants disbursed Dr. Kaye's retention bonus in two payments: the first payment took place on or about October 5, 2018; and the second allegedly took place during the December 28, 2018 pay period.  In violation of the MOA, Defendants also added Dr. Kaye's lump sum into her annualized salary in 2018.
- **Exhibit 5:  Kaye Decl. ¶¶ 96 and 97;**

- **Exhibit 124:  Email from Kolodziejski to Alexander dated September 19, 2018 with the Subject:  Doc Council List Additions.  (NYC003341-NYC003343); and**

- **Exhibit 129:   Email from Kaye dated October 31, 2018 with the Subject: FW:  Error Causing Bonus Retention Error (NYC000807-NYC000808)**

ii.  *Defendants Dock Dr. Kaye for Taking Boards in Child and Adolescent Psychiatry*

233.   H + H and or Bellevue had a standard practice of granting educational leave for the full day, for doctors who sat for their board exams.
- **Exhibit 133: Email from Kaye to Badaracco dated October 19, 2018 with the Subject: Educational Leave for Board Exams (NYC002526); and**

- **Exhibit 134: Email from Kaye to Colley dated October 19, 2018 with the Subject: Educational Leave for Board Exams (NYC002527)**

234.   In February 2018, while she was still at Bellevue, Dr. Kaye notified her then supervisors, Drs. Colley and Badaracco that she would be sitting for the Child and Adolescent Psychiatry Board Examinations. At that time, she was told that it was Bellevue/H+H's policy to grant clinicians who sat for their board exams, educational leave for the full-day.
- **Exhibit 135:  Email Thread dated October 5, 2018 through November 30, 2018 with the Subject: Educational Leave 9/24/18 (NYC003570-NYC003573)**

235.   Dr. Kaye notified H + H staff person Sharon Rivera, that she was scheduled to take the Child and Adolescent Board Examination on September 24, 2018.  Dr. Kaye passed the exam, upon completion.
- **Exhibit 136:  Email from Kaye dated August 28, 2018 with the Subject:  Educational Leave 9/24/18 (NYC003296-NYC003297); and**

- **Exhibit 137: Email from Kaye dated October 5, 2018 with the Subject: 9/24 Time Sheet Error dated 10/5/18 (NYC00360)**

236.   On October 5, 2018, Dr.Kaye's entry for educational leave was overridden.  Despite standard practice of granting educational leave (i.e. full day compensation) to doctors who sat for their board exams, Defendants docked Dr. Kaye 18 hours (i.e. 2 full days of work) when she sat for and passed her board certification.
- **Exhibit 138: Email from Kaye dated October 5, 2018 with the Subject 9/24 Time Sheet Error dated 10/5/18 (NYC003360-NYC003362)**

237.   Between October 5, 2018 and November 30, 2018, Dr. Kaye sent numerous emails, where she advocated to get credit for the full-day when she took and passed her board examination in Child and Adolescent Psychiatry.

- **Exhibit 135:  Thread From Kaye covering dates October 5, 2018 through November 30, 2018 with the Subject: Educational Leave 9/24/18 (NYC003570-NYC003573)**

238.   Initially Dr. Kaye was told that the Child and Adolescent Psychiatry Boards were not related to her job, and that she would not receive credit for the day.  Then, Ciara Smith, Director of CHS Payroll, partially granted Dr. Kaye's request, but only for the hours she actually sat for the exam.  Despite email correspondence to the contrary, at that time, CHS did not have an already existing policy for granting leave to take board certification examinations.

- **Exhibit 135: Email  Thread from Kaye spanning October 5, 2018 to November 30, 2018 (NYC003570-NYC003573)**

239.   On October 31, 2018, Dr. Kaye emailed Bellevue Director of Payroll, Wayne Myrie to obtain confirmation that she should receive a full-day (i.e. 9 hours of leave) for taking her Board examination.

- **Exhibit 139:  Email thread between Kaye and Myrie dated October 31, 2018 with the Subject:  Re: Educational Leave for Board Certification Exam (NYC003794-NYC003765)**

240.   Wayne Myrie, Bellevue's Payroll Director, responded on October 31, 2018, that Dr. Kaye should receive credit for the full-day when she sat for and passed the Child and Adolescent Psychiatry Boards.

- **Exhibit 140:  Email thread between Kaye and Myrie dated October 31, 2018 with the Subject: Re:  Educational Leave for Board Certification Exam (NYC003784-NYC003795)**

241.   On November 30, 2018, although Dr. MacDonald had approved the full-day off for Dr. Kaye, Defendant Ford instructed Defendant Jain to wait for Defendant Wangel's approval before they "communicated with Dr. Kaye."

- **Exhibit 141: Email from Ford dated November 30, 2018 with the Subject: FW: Docked Educational Leave (NYC00924)**

242.   On November 30, 2018, Dr. MacDonald wrote Defendant Wangel in support of Dr. Kaye's receipt of a full-day for educational leave.  Dr. MacDonald cited CHS's best interest in the provision of support for clinicians who sat for their Board Examinations.

- **Exhibit 142:  Email from MacDonald dated November 30, 2018 with the Subject: board exams.  (NYC00960-NYC00961)**

243.   On December 14, 2018, Ciara Smith sought Defendant Wangel's guidance on how to draft an email to Dr. Kaye about the decision to grant her educational leave when she took the Child and Adolescent Psychiatry Board exams on September 24, 2018.

- **Exhibit 143: Email from Smith dated December 14, 2018 with the Subject: Re: Docked Educational Leave (NYC001022-NYC001023)**

244.   However, when Smith actually did send the email to Dr. Kaye, she told Dr. Kaye that she reported directly to Jessica Laboy and that she did not report to anyone directly at Central Office.

- **Exhibit 144:  Email from Smith dated December 14, 2018 with the Subject:  Re: Docked Educational Leave (NYC001024)**

245.   Jessica Laboy was hired to work for Correctional Health Services in 2016.  During the time relevant, Ms. Laboy was CHS's Administrative Officer and Assistant Vice President.

- **Exhibit 5: Exhibit Kaye Decl. ¶ 9;**

- **Exhibit 145:  Correctional Health Services Division Organizational Chart Updated November 2018 (NYC001085); and**

- **Exhibit 146: Correctional Health Services Division Organizational Chart Updated January 2019 (NYC00824)**

246.   Between November 2018 and January 2019, as Chief Administrative Office/Assistant Vice President, Ms. Laboy reported directly to Defendant Yang.

- **Exhibit 145:  Correctional Health Services Division Organizational Chart Updated November 2018 (NYC001085); and**

- **Exhibit 146: Correctional Health Services Division Organizational Chart Updated January 2019 (NYC00824)**

247.   Dr. Kaye  testified that her union rep told her about his conversation with Defendant Wangel about the shift change.  According to Nate Santamaria, both Defendant Wangel and Defendant Yang were "miffed" about the EEOC charge.  He also conveyed to Dr. Kaye that Defendant Yang had insisted on docking Dr. Kaye's pay, and that she insisted on the imposition of the shift change.

- **Exhibit 5: Kaye Decl ¶ 76.; and**

- **Exhibit 6: Kaye Direct Dep. as taken on 11/15/21 p.304-305; [5]**

248.   When asked if the conversation ever took place,  Defendant Wangel denied using the word mif with Dr. Kaye.  Mr. Santamaria raised this discussion both in October 2018 and again in December 2018.

- **Exhibit 8:  RFA ¶ 119 pgs. 68-69; and**

---

[5] Plaintiff recorded her deposition and the word "miffed" was omitted from the transcript on p. 305 at line 3 where "—" was indicated.

- **Exhibit 14: Wangel Dep. p. 217:18-25-218:1-7[6]**

249.   Defendants denied that Defendant Yang denied Dr.Kaye's request to return to her prior shift.
- **Exhibit 8:  RFA ¶ 51 p. 29-30**

250.   On January 15, 2019, Dr. Kaye received notification that the 18 hours deducted from her when she sat for the exam, had been corrected in KRONOS to reflect a full-day credit for Educational Leave.  It took from September 24, 2018 until January 15, 2019, for Dr. Kaye to have her leave balances and payroll records adjusted**.**
- **Exhibit 147:  Email from Kaye dated January 15, 2019 with the Subject:  Re: Docked Educational Leave (NYC001161-NYC001162)**

251.   On November 26, 2019, Dr. Kaye wrote her union to file a grievance.  In the email correspondence, she cited an ongoing pattern by Defendants where they docked her pay in retaliation for her protected activities.  The email noted that Defendants started docking her pay in July 2018, after she had filed discrimination complaints internally and at the EEOC on May 3rd and May 22, 2018 respectively.
- **Exhibit 8:  RFA¶ 12 p. 9; and**

- **Exhibit 148:  Email from Kaye dated November 26, 2019 with the Subject: Pay Deductions Grievance Sought (NYC003169-NYC003172)**

252.   Dr. Kaye justified her request to file a grievance by listing an extensive list of occasions, that Defendants capitalized on to dock her pay.  Amongst the most egregious included the docking of her pay on two consecutive payroll periods for observing two Jewish High Holidays.
- **Exhibit 148:  Email from Kaye dated November 26, 2019 with the Subject; Pay Deductions Grievance Sought (NYC003169-NYC003172)**

***VI.     Dr. Kaye Files a Supplemental EEOC Charge; Defendants Further Retaliate and Interfere with Her Rights Under the FMLA***

*A.   Dr. Kaye Worked Sufficient Hours to Qualify for FMLA*

253.   Dr. Kaye worked at least 1,250 hours in 2016, 2017 and 2018.
- **Exhibit 8:  RFA ¶ 35 p. 21**

254.   Between September 7th and 22nd, 2018,  Dr. Kaye submitted a supplemental/amended EEOC charge, which included allegations of retaliation.

---

[6] The referenced testimony was taken down incorrectly.  The word "miffed" and not "miff" was said by both Plaintiff's Counsel and Defendant Wangel.

- **Exhibit 82: Dr. Kaye's EEOC Charge of Discrimination  520-2018-01534 and the EEOC's File (D000752-D000761)**

B.   *Dr. Kaye's October 2018 FMLA Application: Defendants Grant and Revoke Dr. Kaye's Request*

255.   Dr. Kaye submitted an application for intermittent FMLA on October 12, 2018 to care for her son.  She requested to be restored back to a half-hour unpaid lunch rather than an hour unpaid lunch.
- **Exhibit 152: Dr. Kaye's FMLA Application dated October 12, 2018 (NYC002534-NYC002537)**

256.   In retaliation of her request for FMLA and supplemental EEOC Charge,  on October 29, 2018, Dr. Kaye's time sheets were not processed for the two weeks she was out.
- **Exhibit 149: Email From Wangel dated October 29, 2018 with the Subject: Time sheet not Processed (NYC002487-NYC002488)**

257.   On October 30, 2018, Dr. Kaye's FMLA was approved retroactively.  However, she did not receive any documentation to confirm that the monies  and leave balances that were illegally deducted were restored.
- **Exhibit 150: Email from Mendez dated October 30, 2018 with the Subject: Melissa Kaye FMLA/To Care for Ill Family Member Leave Approval Retro.  (NYC003393-NYC003394)**

C.   *Defendants Retroactively Deny Dr. Kaye's Request on the False Premise that she didn't Specify the Frequency of the Reoccurrence of her Son's Condition*

258.   On November 14, 2018, H + H retroactively denied Dr. Kaye FMLA request.
- **Exhibit 151: Email from Mendez with the Subject: Melissa Kaye FMLA/To Care for Ill Family Member; Leave Approval Retro (Kaye4thProd0177)**

259.   Defendants denied that they rescinded or revoked Dr. Kaye's FMLA .
- **Exhibit 8:  RFA ¶ 17 p. 12**

260.   Dr. Kaye was made to re-apply for FMLA based on the alleged premise, that she had not disclosed how frequently her son's medical condition re-occurred.  However, Dr. Kaye answered this question on her original application in October 2018. Defendants' application specifically asked applicants to specify whether the medical condition was reoccurring and they asked them to estimate the frequency of episodes.
- **Exhibit 5: Kaye Decl. ¶¶ 64-84; and**

- **Exhibit 152: Dr. Kaye's FMLA Application dated October 12, 2018 (NYC002534-NYC002537)**

261.   On February 15, 2019, Dr. Kaye continued to inquire about the status of her FMLA requests, leave balances and deductions to her salary.  Defendants did not respond to her inquiries during that time.

- **Exhibit 153: Email from Kaye dated February 15, 2019 with the Subject: Updated FMLA (Kaye4thProd0010-Kaye4thProd0011)**

   *D.   Dr. Kaye Inquires about Defendants FMLA Policy and Leave Balances;  Between October 2018 and June 2019, Defendants Improperly Deduct Time and Leave from Dr. Kaye on at least 14 Separate Occasions Leading to Further Wage Theft and Deductions from Dr. Kaye's Salary*

262.   Dr. Kaye wrote to ask how Defendants calculated the  FMLA calendar year.  She specifically asked how Defendants defined the year for purposes of determining eligibility and usage.  She also asked about her leave balances.  Defendants acknowledge the latter inquiry, but say they were unable to answer the question at that time.  Dr. Kaye continued to experience illegal deductions from her pay check and salary.

- **Exhibit 154:  Email from Kaye dated May 7, 2019 with the Subject: FMLA annual schedule and balance (NYC002785-NYC002789)**

263.   On May 21, 2019, Ms. Fong responded to Dr. Kaye regarding her FMLA usage.  On May 29, 2019, Dr. Kaye disputed H + H's calculation of her usage. The discrepancy is the equivalent of a paycheck deduction of approximately $7K.

- **Exhibit 155: Email from Fong dated May 21, 2019 with the Subject: FMLA annual Schedule and Balance (NYC002816-NYC002818); and**

- **Exhibit 156: Email from Kaye dated May 29, 2019 with the Subject FMLA annual Schedule a Balance (NYC002880-NYC002882)**

264.   On June 21, 2019, Dr. Kaye again asked Defendants to correct her timesheets, leave balances, and FMLA deductions that took place between December 21, 2018 and January 7, 2019.

- **Exhibit 157: Email from Kaye dated June 21, 2019 with the Subject: FMLA annual schedule and balance (NYC002954-NYC002957)**

265.   On November 26, 2019, Dr. Kaye sought to file a grievance with her union regarding Defendants' illegal demotion of her salary and leave balances.  Between October 15, 2018 and April 27, 2019, Defendants incorrectly inputted her FMLA leave and deductions on 14 separate occasions.

- **Exhibit 5: Kaye Decl. ¶ 79; and**

- **Exhibit 148:  Email from Kaye dated November 26, 2019 with the Subject Pay Deductions Grievance Sought (NYC003169-NYC003172)**

**VII.     Dr. Kaye's Requests for Reasonable Accommodations Are Denied: Defendants Fail to Accommodate and Fail to Engage in Interactive Process**

  *A.  October 2018:  Dr. Kaye's First Request for Reasonable Accommodation*

266.    Dr. Kaye initially requested an accommodation in October 2018 to care for her son.  In retaliation of her supplemental charge with the EEOC in September 2018, Defendants denied that request based on the premise that H + H's policy did not afford accommodations to care for family members.

- **Exhibit 5: Kaye Decl.¶¶ 161-164 ; and**

- **Exhibit 158: See Email thread from Granderson dated October 30, 2018 with the Subject:  "FW:  CONFIDENTIAL – REASONABLE ACCOMMODATION REQUEST FORM," (NYC003387-NYC003389)**

  *B.   June -July 2019:  Dr. Kaye's Second Request for Reasonable Accommodation; Defendants Fail to Engage in Interactive Process and Fail to Accommodate*

267.    Dr.  Kaye sought an accommodation a second time around between June 27, 2019 and July 12, 2019.  At that time, Dr. Kaye sought a modified work-schedule for herself since her medical conditions had been exacerbated by Defendants' retaliatory hostile work environment.

- **Exhibit 159:  Email from Kaye dated July 12, 2019 with the Subject: Re: Request for a Reasonable Accommodation (NYC004126-NYC004130)**

268.    Defendants granted Dr. Kaye's second request for a reasonable accommodation, but still required her to work 9 hours a day. Dr. Kaye requested the ability to write her reports remotely and in the alternative to return to her prior shift.  Defendants did not provide any legitimate business reason to require Dr. Kaye to work a 9 hour shift.  They have not cited any provision of the collective bargaining agreement.  Additionally, as allegedly the least busy court clinic, it was illogical to insist that Dr. Kaye work the longest hours of all of the Court Clinic directors.  Defendants failed to engage in an interactive process, when they permitted Dr. Kaye to work the same 9 hour shift.

- **Exhibit 5: Kaye Decl. ¶¶ 161-164; and**

- **Exhibit 6: Kaye Dep. 11/15/21 p.262:15-25-265:1-7**

**VIII.    *Defendants Retaliate Against Dr. Kaye for Whistleblowing***

  **A.  Dr. Kaye Reports Defendant Jain's Destruction of his Handwritten Notes**

269.    On May 17, 2018, Dr. Kaye complained to Dr. Winkler and Legal Aid that Defendant Jain threw out his notes.  Prior to this complaint, Defendant Jain disclosed  to Drs. Kaye and

Winkler that he threw out his notes, and Drs. Kaye and Winkler told Defendant Jain that this was improper.  Dr. Kaye told Defendant Jain that throwing out his notes was a Class E Felony.

- **Exhibit 5:  Kaye Decl. ¶¶156-160;**

- **Exhibit 42:  Kaye Dep.  Cross Exam. Dep.  1/25/22 p. 52:5-20-53:1-16; and**

- **Exhibit 24:  Winkler Dep. p. 293:23-24-295:1-8**

270.   On October 2, 2018 Dr. Kaye sent an email to Ms. Persaud that sought the original copies of Dr. Jain's notes, so she could "close out the files that he had seen."
- **Exhibit 160: Email from Kaye dated October 2, 2018 with the Subject: Notes (NYC000655).**

271.   After the November 30, 2018 FPECC Directors' Meeting, Dr. Kaye also raised the issue of Defendant Jain destroying his handwritten notes to Defendant Ford.  According to Dr. Kaye, Attorneys had complained about Defendant Jain's conduct, and she felt compelled to disclose since it was a Class E Felony.  In response to her disclosure, Dr. Kaye recalled that Defendant Ford commented: Defendant Jain was not from New York.
- **Exhibit 5: Kaye Decl.¶¶ 156-160; and**

- **Exhibit 42 : Kaye Cross Exam. Dep. 1/25/22 p. 51:25-52:1-19 and 53:3-19;**

272.   In light of her professional obligations to report malfeasance, on November 30, 2018, Dr. Kaye reported Defendant Jain to Defendant Ford.  However, instead of looking into the matter or conducting an investigation, Defendant Ford made the excuse that Defendant Jain was from out of town.
- **Exhibit 5: Kaye Decl.¶¶135;**

- **Exhibit 11:  Ford Dep. p. 212:10-24-213:1-7; p. 330:9-24-p.341:1-2; and**

- **Exhibit 42:  Kaye Dep. Cross Exam. 1/25/22 p.52:5-20-53:1-6**

273.    In retaliation for Dr. Kaye's complaints about Defendant Jain's destruction of his notes, on December 3, 2018, Dr. Mundy was copied on emails as Dr. Kaye's Supervisor.
- **Exhibit 161:  Email from Kaye dated December 3, 2018 with the Subject: Expiring License/Certification (NYC002262-NYC002264)**

274.   On December 4, 2018 Dr. Kaye emailed Ms. Swenson about the destruction and unavailability of all of her paper files in the old cases she had previously seen.
- **Exhibit 162:  Email from Kaye dated December 4, 2018 with the Subject:  Bronx Files Need to be Check (sic) for Chart (Redacted)(NYC00242)**

275.   Between December 4th and 11, 2018, Defendant Jain's notes were "found."  Dr. Kaye believed that Defendant Jain re-created his notes, because they: were in pristine condition, were on a different color paper than she had previously observed; and because of his previous insistence that he had the practice of throwing them out. Ultimately, Defendant Ford did not find any wrongdoing on the part of Dr. Kaye.

- **Exhibit 5: Kaye Decl.¶¶135 and 156-160**

276.   Defendant Ford testified that she had conducted an investigation into Dr. Kaye's allegations that Defendant Jain had destroyed his handwritten notes.  However, Defendants denied that Defendant Ford conducted an investigation.

- **Exhibit 8: RFA ¶ 189 p. 109; and**

- **Exhibit 11:  Ford Dep. p. 338:4-21**

277.   Despite being put on notice about Defendant Jain's destruction of his handwritten notes, Defendant Ford failed to report him to Corporate Compliance.

- **Exhibit 8: RFA ¶ 188 p. 108-109; and**

- **Exhibit 11: Ford Dep. 338:4-21**

**B.   Dr. Kaye's Whistleblowing Complaints Between 2016 and 2021**

278.   Dr. Kaye engaged in Whistleblowing on the following occasions between 2016 and 2021:

**A.**      She filed a complaint with H + H and the Department of Investigation on July 8, 2016;

**B.**      Between January 2018 and 2021, Dr. Kaye submitted CMS/Medicaid fraud reports about CHS altering Rikers Island medical records and unlawfully bundling clinical and forensic services to fraudulently obtain reimbursement.  This included altering medical records for an accused sex offender in the matter of <u>People of the State of New York v. Ezekiel Stephen</u>.  Defendants altered the accused's medical records in that case: so that his charges could be dropped; and so that he could be released from custody;

**C.**      Between June 2018 thru October 2020, Dr. Kaye complained about CHS's private practice policy and the violation of Chapter 68 of the City's Conflict of Interest Board's Rules and Regulations.  She voiced her concerns at the FPECC Director Division Meeting. At the close of the meeting, she also had a one-on-one conversation with Dr. Jain, where she also raised these issues;

**D.**      Between September and October 2018,  Dr. Kaye complained to the NYC fraud hotline about FPECC evaluators outsourcing court-ordered 390 exams to themselves as private "mitigation" cases.  This resulted in evaluators getting paid privately to perform

their city-salaried job duties. Simultaneously, the CHS FPECC evaluators injected their political bias and their agendas into these private "mitigation" reports, which were supposed to have been done as neutral objective court-ordered CPL 390 pre-sentence evaluations.

**E.**     On September 4, 2018**,**  Dr. Kaye complained to the Department of Investigation (DOI) regarding the private practice policy and the rigging of CPL 730 competency examinations and results;

**F.**     On September 2018; April 2019; and September 2019, Dr. Kaye complained to the Office of Court Administration and H +H Inspector General's Office**;**

**G.**     On October through November 2018, Dr. Kaye complained to Pete Homberg a political candidate;

**H.**     On October 9, 2018 and November 28, 2018, Dr. Kaye  complained to Emma Noftz, a lawyer from the Bronx Defenders;

**I.**     On November 2018 and October 2020, Dr. Kaye complained to the Conflict-of-Interest Board regarding the Private Practice Policy**;**

**J.**     Between December 2018 through July 2019, Dr. Kaye made multiple phone calls and complaints to the National Labor Relations Board (NLRB) and Office of Labor Management Services;

**K.**     Between February 2019 and January 2021,  Dr. Kaye complained to the New York State Comptroller and Inspector General;

**L.**     In March 2019, Dr. Kaye complained to the New York State Attorney General's Public Integrity Bureau;

**M.**     From April through May 2019, Dr. Kaye  complained to H + H's Corporate Compliance Office, specifically to Chief Compliance Officer,  Ms.  Catherine Patsos, about discrimination and malfeasance at H + H/CHS.  Dr. Kaye also complained about the retaliation that  she had experienced after she had engaged in whistleblowing, and after she had complained to the EEOC;

**N.**     In May 2019, September 2019, and October 2019, Dr. Kaye complained to the New York State Public Corruption Bureau about DeBlasio and H + H's use of Gotham FQHC and CHS as  straw organizations. She  stated that these entities were funded by dark money, and that they operated as a political slush fund siloed from proper regulatory and administrative oversight by H + H.  She also accused the administration and CHS of tax fraud, judicial fraud, regulatory and medicolegal violations and a reckless

disregard for public safety;

**O.**     On May 7, 2019, Dr. Kaye complained to Ms. Patsos at H + H Corporate Compliance about malfeasance at CHS; the falsification of medical records. She also complained about kickback arrangements between forensic examiners and lawyers to rig CPL 730 competency exams and CPL 390 pre-pleading exams, in exchange for private business deals and quid quo pro hiring. The objectives of these deals: were to advance the political agenda of MOCJ and CHS; and to empty Rikers Island.  Ms. Patsos acknowledged receipt of the complaint and did not initiate an investigation.

**P.**     In September 2019 and July 2020, Dr. Kaye  complained to CMS/Medicaid about the CHS policy of having the Rikers Island "730 Team" fraudulently alter medical records by omission to conceal the scope of practice violations.  She also complained about their practice of bundling clinical and forensic services to commit healthcare fraud;

**Q.**     In October 2019, Dr. Kaye complained to the New York Post about the corruption and rigging of court ordered competency and pre-pleading exams and she cited constitutional violations and public safety concerns;

**R.**     In 2019 and 2020, Dr.  Kaye complained to the Office of Court Administration's Audit Bureau regarding the concerted efforts of CHS FPECC to commit fraud on the Court by exerting undue influence on the CPL 730 competency examinations, in an effort to influence and to alter the trajectory of criminal proceedings in the New York State Courts throughout the five boroughs;

**S.**     In 2019 and 2020, Dr. Kaye complained to the Department of Justice about H + H/CHS malfeasance;

**T.**      In 2019. Dr. Kaye complained to the  Citizens Budget Committee about CHS FPECC doctors outsourcing to themselves CPL 390 exams to be done instead as private mitigation cases.  In those instances, FPECC doctors then injected bias and their political agendas into these private mitigation cases when the exams should have been conducted as neutral court ordered 390 exams. In the process, they defrauded taxpayers by double-dipping: they received private payments when they performed their city-salaried job duties;

**U.**     In 2019, Dr. Kaye complained to politicians Nicole Malliotakis  and Lee Zeldin about the corruption  and fraud taking place within and amongst CHS, the DeBlasio Administration and MOCJ;

**V.**     On November 28, 2020, Dr. Kaye filed complaints with the offices of the Comptroller and Inspector General;

**W.**      In or around January 8, 2021, Dr. Kaye filed another complaint with the Department of Investigation;

**X.**      In or around January 8, 2021, Dr. Kaye filed a second complaint with the Conflict-of-Interest Board;

**Y.**      In or around January 8, 2021, Dr. Kaye filed a complaint with the Department of Justice, this complaint was forwarded to the New York State Inspector General's Office;

**Z.**      In or around January 8, 2021, Dr. Kaye filed complaints with the Office of Court Administration and Inspector General's office citing Fraud on the Court; and

**AA.**      In or around February 1, 2021, Dr. Kaye filed a complaint with the New York State Public Corruption Bureau.
- **Exhibit 5: Kaye Decl. ¶ 191**

**IX.      Dr. Kaye Experiences a Retaliatory Hostile Work Environment Under Defendants Yang, Ford and Jain After She Engages in Protected Activities Under the First Amendment**

### A. Dr. Kaye and Jeffrey Bloom, Esq. Raise Concern About Dual Agency and Experience Retaliation

279.   On March 27, 2018, an email was circulated by Defendant Ford that Dr. Alex Garcia Mansilla would be starting as the Director of Psychological Assessment for CHS.  In that capacity, Garcia Mansilla would provide oversight of psychological testing procedures and issues related to all four clinics.
- **Exhibit 163:  Email from Ford dated March 27, 2018 with the Subject: Welcome (and CVs to review)  (NYC001958)**

280.   On December 12, 2018, Jeff Bloom sent an email where he expressed concern that Dr. Garcia Mansilla would be sitting in on a 730 Examination.  Since she was both the Director of Psychological Assessment for CHS and a clinician that provided treatment to inmates on Rikers, Mr. Bloom objected to her presence at his client's 730 Examination.
- **Exhibit 38: Bloom Dep. p. 192:18-25-204:3-11; and**

- **Exhibit 164: Email from Bloom dated December 12, 2018 with the Subject: Bronx Clinic (Kaye6thProd000456-Kaye6thProd000458)**

281.   Defendant Jain testified that Mr. Bloom's email and conduct at the 730 Examination on December 12, 2018 was inappropriate.  This was despite the fact that functioning as a clinician and as a forensic examiner has generally been deemed as dual agency, and thereby a violation of medical ethics.
- **Exhibit 38: Bloom Dep. p. 192:18-25-204:3-11;**

- **Exhibit 13: Jain Dep. p. 247:21-25-249:1-6; and**

- **Exhibit 164: Email from Bloom dated December 12, 2018 with the Subject Bronx Clinic (Kaye6thProd456-Kaye6thProd458)**

282.   On January 22, 2019 Defendant Ford circulated FPECC Policy entitled "Managing Dual Roles." It was back dated to December 21, 2018 and addressed CHS's alleged efforts to avoid any appearance or occurrence of dual agency.
   - **Exhibit 164: Email from Ford dated January 22, 2019 with the Subject: FPECC Policy -Managing Dual Roles with the attached policy (NYC001188-NYC001190)**

283.   Mr. Bloom testified that his supervisor Peter Jones had a phone call with Defendant Ford about the examination he attended with Dr. Garcia Mansilla.  Mr. Jones would convey to Mr. Bloom that Defendant Ford had it "out" for him.
   - **Exhibit 38: Bloom Dep. p.201:7-25-203:1-7**

284.   When Defendant Ford was asked whether she had ever spoken to Peter Jones from the Legal Aid society, Defendant Ford said she didn't remember his name.
   - **Exhibit 11: Ford Dep. p. 214:19-25-215:1-5**

285.   On February 19, 2019, Dr. Jain attempted to have Dr. Kaye function as Dr. Brayton's supervisor, despite the fact that it violated the practice norms of separating supervisors from co-evaluators.  Defendants made this designation despite circulation of a policy against Dual agency in December 2018.
   - **Exhibit  164: Email from Ford dated January 22, 2019 with the Subject: FPECC Policy - Managing Dual Roles with the attached policy (NYC001188-NYC001190);**

   - **Exhibit 165:  Email from Swenson dated February 19, 2019 with the Subject: Sup Change and attached Personnel Action Request (NYC003915-NYC003916); and**

   - **Exhibit 166:  Email from Ford dated December 4, 2018 with the Subject: draft edits; welcome won't go out until Beesh tells me Barry on board." (NYC00944)**

286.   The issue of dual agency and Dr. Kaye's supervision of Dr. Brayton reared its head again with the Jose Gonzalez case.  Dr. Kaye previously conducted a 730 Examination of Mr. Gonzalez and was controverted.  Dr. Brayton was assigned the matter by CHS after the Judge ordered another exam to be separately administered by two evaluators.  Dr. Kaye notified Defendant Jain that extensive collateral data had been delivered to the Clinic for review by Drs. Brayton and Mullan.   Despite the importance of the case, Dr. Brayton had not begun to review the materials.  Dr. Kaye was put in the precarious position of serving as a resource to Dr. Brayton and attempting to maintain a proper firewall between her on

an evaluation she previously administered.  Dr. Kaye notified Defendant Jain that he should follow-up with Dr. Brayton to ensure that she reviewed the collateral data and completed the evaluation in a timely manner. She assured Defendant Jain that she would be available to Dr. Brayton as a resource on forensic psychiatry in general, but not on the Jose Gonzalez case.

- **Exhibit 167: Email from Kaye dated February 21, 2019, with the Subject: JG and the Supervision of Brayton (NYC001308-NYC001309)**

287.  Dr. Kaye sought to protect herself from claims of dual agency and interference, after Defendants tried to have her sign-off on Dr. Brayton's timesheets.  Dr. Kaye and Defendant Ford noted that this dynamic would be problematic, since at times they would have to conduct exams together (i.e. Drs. Kaye and Brayton).  Nonetheless, Defendants made repeated efforts to insist that Dr. Kaye sign-off on Dr. Brayton's timesheets.

- **Exhibit 101: Email from Kaye dated April 12, 2019 with Subject: ATLS 2018 Time Keeping Year End Close (NYC003955-NYC003956); and**

- **Exhibit 102:  Email from Jain dated April 16, 2019 with the Subject: ATLS 2018 Timekeeping Year End Close (NYC002727-NYC002731)**

288.  On July 16, 2019 Lorraine McEvilley requested a third-evaluator due to a split finding between Drs. Brayton and Mullan.  In her request, she pointed out the conflict of interest/dual agency problems that having Defendant sit in on the exam with Dr. Brayton would present, since he was her supervisor at the time.  Although, Defendant Jain noted that Dr. Winkler had also been Dr. Brayton's supervisor, Dr. Winkler unlike Defendant Jain had already ended his role in her supervision at the time of McEvilley's request.

- **Exhibit 168 : Email from Kaye dated July 16, 2019 with the Subject: Split Finding Parole Case 3rd Evaluator Needed (NYC003038-NYC003039); and**

- **Exhibit 169: Email from Jain dated July 23, 2019 with the Subject Third Evaluator Needed (NYC003052-NYC003056)**

289.  Clearly cognizant of the problems surrounding Dr. Kaye supervising Dr. Brayton even though it was very likely that they would be co-examiners, Dr. Jain reached out to Dr. Winkler for guidance on how to broach the subject with Dr. Kaye.  Dr. Kaye was the only full-time forensic evaluator at the Court Clinic, and for 730 Examinations to be done in accordance with the CPL, two examiners were needed.

- **Exhibit 170: Email from Jain dated August 27, 2019 with the Subject: Anansa Supervision (NYC001647)**

290.  Defendant Ford recognized the importance of keeping the co-examiner supervisor roles separate, therefore when Dr. Brayton was hired, Dr. Kaye was not her supervisor. However, Defendants also denied that the supervision would pose a conflict of interest in terms of neutrality.

- **Exhibit 8:  RFA ¶ 84-85 p.47- 48; and**

- **Exhibit 75:  Email thread Kaye with the date range December 5, to December 7, 2018 with the Subject:  Bringing Dr. Brayton to the Bronx. (NYC003470-NYC003475 see p. NYC003474)**

291.   Nevertheless, despite the ethical problems posed with Dr. Kaye's supervision of Dr. Brayton, Defendant Jain still delegated the sign-off of Dr. Brayton's timesheets to Dr. Kaye.
- **Exhibit 8:  RFA ¶ 87 p. 49**

292.   After her complaint on January 29, 2018 and after Dr. Winkler's departure from the Bronx Court Clinic, Dr. Kaye did not supervise any other evaluators. This was in contrast to the other male Center Directors who were either male and or who did not complain of discrimination.
- **Exhibit 5: Kaye Decl. ¶¶ 51; 176-178; and 184-190; and**

- **Exhibit 171: Email from Gillen dated April 25, 2018 with the Subject: Time Sensitive Melissa Kaye Question (NYC0177-NYC0178)**

293.   Despite the confusion surrounding Dr. Kaye's role in supervising Dr. Brayton, Defendants Jain and Ford blamed Dr. Kaye for Dr. Brayton's decision to take another job in the Family Court.  They ignored the complaints from Legal Aid and judges, and denied that Dr. Brayton was being remediated because she struggled with her performance.
- **Exhibit 38: Bloom Dep. p. 182:21-25-190; and**

- **Exhibit 42: Kaye Dep. Cross Exam. 1/25/22 p.58:8-25-60:1-3;**

- **Exhibit 172: Email from Jain dated September 11, 2019  with the Subject: Important Update (NYC003138)**

   i.   *Defendants Sabotage Dr. Kaye: by  Underreporting and Failing to Input Case Data into ISight; and by Understaffing the Bronx Court Clinic*

294.   On November 5, 2018, Lucrecia Persaud sent an email that documents that at least 42 cases had not been inputted into the ISight.  ISight was supposed to be introduced to the Bronx Court Clinic on September 17, 2018. The failure to input the cases prevented Dr. Kaye and Center staff from having access to those medical records, it also artificially deflated the work output of the Bronx Court Clinic.
- **Exhibit 73:  Email from Persaud dated November 5, 2018 with the Subject: Requested Medical Records for Bronx Court Clinic. (NYC002434)**

295.   Between March 2018 and December 2018, the Bronx Court Clinic only had one full-time staff person, Dr. Kaye.   Dr. Kaye complained about HIPAA releases to Defendants Yang and

Ford on January 29, 2018.  In March 2018, Dr. Winkler left the Bronx Court Clinic to serve as Director of the Brooklyn Court Clinic.  In order to complete 730 Exams in compliance with CPL 730, there must be two qualified evaluators.  For nine months, Dr. Kaye was the only qualified examiner at the Bronx Court Clinic.

- **Exhibit 42: Kaye Dep. (Cross Exam) 1/25/22 p. 57:19-25-58:1-24; and**

- **Exhibit 74: CPL 730 Statute**

296.   Dr. Kaye did not supervise any staff after Dr. Winkler was promoted to Director of the Brooklyn Court Clinic in March/April 2018.

- **Exhibit 5: Kaye Decl.  ¶¶ 176-186**

297.   Dr. Kaye notified Emma Noftz that since they did not have a second full-time staff person at the Bronx Court Clinic, there have been delays in exams.

- **Exhibit 76: Email from Kaye to Emma Noftz dated November 28, 2018 with the Subject: Redacted (NYC002545)**

298.   On December 4, 2018, Dr. Kaye complained that all of the Bronx Court Clinic's records had been removed from the Center.  By removing the records, Defendants sought to prevent Dr. Kaye from tracking or quantifying her productivity and that of the Court Clinic.

- **Exhibit 77: Email from Kaye dated December 4, 2018 with the Subject:  Bronx Court Clinic Needs to be Checked on a file (Name Redacted) (NYC002242)**

299.   Dr. Kaye's access to the ISight system remained inconsistent going into April 2019.  On April 11, 2019, Dr. Kaye was unable to access the system. Due to a lack of access to the system, she was unable to track her workload and the status of the defendants' assigned to the clinic.

- **Exhibit 78: Email from Kaye dated April 11, 2019 with the Subject Locked Out of ISight (NYC002721)**

300.   Defendants took over the Bronx Court Clinic in July 2018.  For the period of June 2018 to December 2018, they recorded the Bronx Court Clinic as having seen a total of 21 730s. However, based on Dr. Kaye's records, for that same time period, she has herself having completed 64 730 Examinations.  For the same time period of June 2018 to December 2018, Defendants have the Clinic for only seeing 21 730 Examinations.  Defendants' numbers include exams that were not seen by Dr. Kaye.  According to Defendants' data, Dr. Kaye only completed 8 730 Exams versus the 64 she said she completed during the same time period.

- **Exhibit 70: Kaye's 730 Worksheet; and**

- **Exhibit 79: ISight Report Comparing Completed 730 Examinations for  2018 and 2019  XLS3933**

301.   In calendar year 2019, ISight only had data on the number of exams Dr. Kaye conducted from January to March 2019.  Defendants have not provided any explanation for the absence of additional data  during this time period. Even with this limited data, there are discrepancies between the number of exams Dr.  Kaye says were conducted at the clinic for that time period and those that CHS says were conducted.   For example, in 2019 Defendants' data has the Bronx Court Clinic at 80 Exams for the year.  In comparison, Dr. Kaye claimed that there were 69 exams altogether and that she participated in 69 of them.

- **Exhibit 5:  Kaye Decl ¶¶ 29-31;**

- **Exhibit 70: Kaye's 2019 730 Exam work sheet with ISight Data Comparison; and**

- **Exhibit 79: ISight Report Comparing Completed 730 Examinations for  2018 and 2019  XLS3933**

***B.*** **Dr. Kaye Complains about Defendants' Psychological Testing Policy; Defendants Engage in Baseless Witch Hunt of Her Emails**

302.   On August 27, 2018, Defendant Jain sent out a Psychological Testing Survey, the objective was presumably to develop a Psychological Testing Policy.

- **Exhibit 173:  Email from Jain dated August 27, 2018 with the Subject:  Psych Testing Survey 8.27.18 (NYC0003306-NYC003308)**

303.   Between November 6 and November 8, 2018, Dr. Kaye raised concerns about the policy.  She expressed to Defendant Jain, that the policy as worded could potentially undermine the court-ordered evaluation process by overriding the clinical discretion of examiners to determine when testing was appropriate.

- **Exhibit 42:  Kaye Cross Exam. Dep. as taken on 1/25/22 p.49:6-50:1-22;**

- **Exhibit 174:  Email from Kaye dated November 6, 2018 with the Subject:  RE: Draft:  Psychological Testing Survey (NYC002414-NYC002418);**

- **Exhibit 175:  Email from Jain dated November 7, 2018 with the Subject:  Draft Psychological Testing Policy (NYC003339-NYC003402); and**

- **Exhibit 176:  Emails from Kaye dated November 8, 2018 with the Subject:  Draft Psychological Testing Policy (NYC003842-NYC003847)**

304.   On November 7, 2018 Drs. Mundy and Winker expressed similar concerns to Dr. Kaye, as they pertained to the ability of the independence of the  examiner to determine whether psychological testing was needed.

- **Exhibit 175:  Email from Jain dated November 7, 2018 with the Subject; Draft Psychological Testing Policy (NYC003399-NYC003402)**

305.  On November 19, 2018, Dr. Kaye notified Andrea Swenson about a security breach that involved an at liberty defendant.  The Defendant was high  on PCP and refused to leave the examination area.  At the time of the incident there had been several other similar occurrences, yet since CHS took over the Clinic, they had not put any protocol in place. As such, the lives of Dr. Kaye and others in attendance were put at risk.  Further, subsequent to Dr. Kaye putting Ms. Swenson on notice, CHS failed to put any policies in place to protect against any similar occurrences from taking place going forward.

- **Exhibit 177: Email from Dr. Kaye dated November 19**, **2018** (**NYC003836-NYC003837**)

306.  On November 30, 2018 the Psychological Testing Policy was again brought up at one of the Unit's meetings.  Dr. Kaye reiterated her concerns at that time with Defendants and raised a number of other ongoing issues she was having with Defendants, including the shift change and Defendant Jain's destruction of his handwritten notes.

- **Exhibit 178:  Email Agenda for November 30, 2018 Meeting (NYC002301)**

307.  In retaliation for her complaints throughout the month of November 2018, Defendants removed  Dr. Kaye's administrative job functions.   Up until then, Dr. Kaye performed administrative functions similar to the other Court Clinic directors.  However, on December 17, 2018, her administrative functions were removed and this role was taken over by Andrea Swenson.  Ms. Swenson was hired by CHS in March 2018. CHS officially took over the management of the Bronx Court Clinic on July 1, 2018.

- **Exhibit 86: Swenson Dep. p. 16:22-25; 17:17-23 and 19:5-8; and**

- **Exhibit 179: Email from Ford dated December 17, 2018 with the Subject: Administrative Functions (NYC002184-NYC002187)**

308.  Further unlike Drs. Mundy and Winkler, men, who also raised similar issues about the Psychological Testing Policy, Dr. Kaye was subjected to a witch hunt, where Defendant Wangel and IT staff resumed their monitoring of her emails.  Defendants have suggested it was because of an email that Dr. Kaye wrote about the larger legal community having problems with the policy.  However, the result of their efforts would prove that Defendant Jain and or Defendant Ford's accusation that Dr. Kaye had circulated the draft policy externally had proven false.  Further, this explanation would not address the previous time Defendants monitored Dr. Kaye's email box.

- **Exhibit 180:  Email from Wangel dated January 11, 2019 with the Subject:  CHS draft policies circulated? (NYC001134-NYC001135); and**

- **Exhibit 181:  Email Joseph Moore dated January 11, 2019 with the Subject Email Access to Active Employee (NYC002193-NYC002195)**

309.   On December 11, 2018, in an attempt to leave her hostile work environment, Dr. Kaye emailed Drs. Badaracco and Colley for positions at Bellevue. Ultimately, they were unable to reach a written agreement on salary and/or corporate title.

- **Exhibit 5: Kaye Decl.¶ 165-166;**

- **Exhibit 6: Kaye Direct Dep. p. 184:11-25-192:1-10; and**

- **Exhibit 182: Email from Kaye dated December 11, 2018 with the Subject: Employment Sought (NYC002539)**

310.   On January 11, 2019 Dr. Kaye raised her concerns about the Psychological Testing Policy again.  She also complained about Dr. Alex Garcia Mansilla engaging in dual agency. Specifically, that Dr. Garcia Mansilla acted as a treating clinician and would have a role in the forensic evaluation process.  Dr. Kaye pointed out that Dr. Garcia Mansilla acting in this capacity violated one of the main tenets of forensic psychiatry: dual agency.

- **Exhibit 183: Email from Kaye dated January 11, 2019 with the Subject Psychological Testing Policy (NYC003439-NYC003440)**

311.   In retaliation of Dr. Kaye's complaints about the policies and Defendant Jain's notes, on January 11, 2019, Defendants engaged in a witch hunt of Dr. Kaye's email box. At that time they falsely suspect Dr. Kaye of circulating FPECC Psychological Testing Policy externally. Defendants order a search of Dr. Kaye's emails with the search terms: "Legal Aid Society;" "FPECC Psych Testing Policy;" and Dr. Kaye's personal email address.  The search is headed by Defendant Wangel who ultimately was not able to prove that Dr. Kaye distributed the policy outside of CHS.  Dr. Kaye was never warned or disciplined for circulating any internal CHS policies to external entities or organizations.

- **Exhibit 5: Kaye Decl¶ 169;**

- **Exhibit 181: Email from Joseph Moore dated January 11, 2019 with the Subject Email Access to Active Employee (NYC002193-NYC002195); and**

- **Exhibit 184: Email from Wangel dated January 11, 2019 with the Subject Email Access to Active Employee (NYC002192-NYC002194)**

312.   When engaging in the search, HHC employee told Defendants said, "you know the drill;" this was not the first time that Defendants engaged in a witch hunt of Dr. Kaye's emails. Dr. Kaye was the only Court Clinic Director to have her email box searched.

- **Exhibit 181: Email from Joseph Moore dated January 11, 2019 with the Subject Email Access to Active Employee (NYC002193-NYC002195); and**

- **Exhibit 184: Email from Wangel dated January 11, 2019 with the Subject Email Access to Active Employee (NYC002192-NYC002194)**

313.   During the course of Defendant Wangel's witch hunt of Dr.Kaye's email box, he shared with Defendant Yang that Dr. Kaye was attempting to return to Bellevue.  Defendant Yang responded: "Excellent!"

- **Exhibit 185: Email from Yang dated January 12, 2019 with the Subject: Email Access to Active Employee (NYC002230-NYC002232)**

314.   Further support that Defendant Wangel's email search was indeed a witch hunt was his statement:  "Will turn over all stones and see what comes creeping out."

- **Exhibit 186: Email from Wangel dated January 12, 2019 with the Subject:  Email Access to Active Employee (NYC002233-NYC002235)**

315.   Although it was the second time Defendant Wangel and the IT unit had monitored Dr. Kaye's emails, yet again, Defendant Wangel did not have any grounds to file disciplinary charges against Dr. Kaye for anything that involved her email usage.

- **Exhibit 14:  Wangel Dep. p. 256-272:1-6**

316.   Furthermore, despite Defendants' investigations of Dr. Kaye's email usage, Dr. Kaye never received or signed HHC's Acceptable Use IT Policy.

- **Exhibit 5: Kaye Decl.¶169; and**

- **Exhibit 187:  Acceptable Use Policy (NYC002201-NYC002208)**

317.   When Defendants efforts to push Dr. Kaye out were unsuccessful after monitoring her emails, taking away her staff, depriving her of adequate security, failing to find her guilty of distributing internal policies externally, demoting her in salary and title, Defendant Yang then continued her efforts to get her placed back at Bellevue.  Defendant Yang did not specify who said they would not work with Kaye during her deposition.  She also did not specify any specific positions she or H +H sought for Kaye elsewhere.

- **Exhibit 9: Yang Dep.88:3-25-90:1-4; and**

- **Exhibit 188: Email from Yang dated January 29, 2019 with the Subject: People (NYC002580)**

**C.  Dr. Kaye Refused to Succumb to the Pressure to Find Jose Gonzalez  Fit; Defendants Manufacture Disciplinary Charges Against Dr. Kaye in Further Retaliation Against their Policies and Political Agendas**

318.   On February 7, 2019, Dr. Kaye testified at a hearing that controverted the examination findings she conducted with Dr. Winkler for criminal defendant Jose Gonzalez, otherwise known as the EMT Killer.

- **Exhibit 189:  Gonzalez Hearing Transcript dated February 7, 2019**

319.   Dr. Kaye and Dr. Winkler conducted two 730 Examinations of Jose Gonzalez: the first took place on March 12, 2018; and the second on September 28, 2018.  On both occasions, Mr. Gonzalez was found unfit by both Drs. Kaye and Winkler.

- **Exhibit 189: Gonzalez Hearing Transcript dated February 7, 2019 p. 344**

320.   The first 730 Examination of Mr. Gonzalez took place on March 12, 2018, which was before Defendant Jain started at CHS. At the time of the exam, Dr. Winkler still officially served as Deputy Director of the Bronx Court Clinic, and it was also before CHS assumed management of the Bronx Court Clinic.

- **Exhibit 9: Kaye Dep. 11/15/21 p.50:1-14;**

- **Exhibit 10: Yang Dep. as taken on 2/28/20 p. 44:1-6;**

- **Exhibit 13: Jain Deposition p.81:3-8; and**

- **Exhibit 189: Gonzalez Hearing Transcript dated February 7, 2019 p. 344;**

321.   Dr. Kaye complied with the standards of the American Academy of Psychiatry and the Law (AAPL) when she recorded Mr. Gonzalez's examination.  Dr. Kaye had some prior knowledge of Mr. Gonzalez's affect, and determined that his interview would be difficult since he may have been thought-disordered.  Therefore, consistent with the standards of the profession, Dr. Kaye recorded the examinations, so she could focus on Mr. Gonzalez and reference an accurate record when she needed to write her reports.

- **Exhibit 6:  Kaye Dep. 11/15/21 p; and**

- **Exhibit 190:  AAPL Taskforce on Videoconferencing and Recording**

322.    Consistent with an ongoing pattern of Defendant Yang and City Hall "jerry rigging" exams, Andrea Swenson, CHS Administrator, joked: "they want him found fit."

- **Exhibit 86:  Swenson Dep. p  174-215:1-7; and**

- **Exhibit 191:  Email from Swenson dated March 7, 2019 with the Subject: I am making mistakes so you don't have to (NYC002606-NYC002607)**

323.   However, during the course of her deposition when asked who was "they," Ms. Swenson testified that she did not remember. When Ms. Swenson was asked if she had spoken to anyone who had examined Mr. Gonzalez before she had sent her email, she also testified that she did not remember.   Further, Ms. Swenson testified that she had not read any of the reports and did not have any first-hand professional knowledge or experience as to why the prior 730 examinations were controverted.

- **Exhibit 86:  Swenson Dep. p  174-215:1-7; and**

- **Exhibit 191:  Email from Swenson dated March 7, 2019 with the Subject: I am making mistakes so you don't have to (NYC002606-NYC002607)**

324.   New York State is a one-party consent recording state.  H + H and CHS did not have a recording policy at the time Dr. Kaye recorded the exams.  The March 12, 2018 exam took place before July, 1, 2018, which was when CHS/H+H officially took over management of the Bronx Court Clinic.  Mr. Gonzalez's second examination took place a little over two months afterwards in September 2018.
- **Exhibit 14: Wangel Dep. p. 190-208**

325.   H +H's Compliance Officer, Ms. Patsos was contacted by Defendant Wangel, she testified that she conducted an investigation into Dr. Kaye's recording of Mr. Gonzalez's examinations, even though Dr. Kaye had not broken any laws, and even though she had not violated any already existing CHS/H+ H policies.
- **Exhibit 192: Patsos Dep. p. 28-29:1-9**

326.    There is conflicting record evidence as to who was responsible for initiating and approving the effort to investigate Dr. Kaye's recordings of Jose Gonzalez's 730 examinations.  In one context, Defendant Wangel testified that it was Defendant Ford who told  him to investigate, however the record contained email exchanges between he and Defendant Yang regarding the investigation.
- **Exhibit 14:  Wangel Dep. p. 201:5-202:1-12; and**

- **Exhibit 193:  Email from Yang dated April 4, 2019 with the Subject Re: Referral (NYC002690)**

   *i.*   ***Defendant Jain Rates Dr. Kaye at the Baseline: Fully Competent in her Performance Evaluation***

*327.*   In retaliation for her critique of the psychological testing policy and her testimony at the controversion hearing, where she did not previously succumb to the pressure to find Mr. Gonzalez fit, Defendant Jain rated Dr. Kaye "Fully Competent."  A rating that he admitted was baseline or marginal.
- **Exhibit 194: Dr. Kaye's Original Performance Evaluation dated February 25, 2019 (NYC001352-NYC001358)**

328.   Presumably in light of Dr. Kaye's protected activities, Defendant Ford cautioned Defendant Jain about the "Fully Competent" rating, especially in light of Dr. Kaye's experience and performance in comparison to the other Clinic Directors.  Although Defendant Jain changed the overall rating, Dr. Kaye was still rated fully competent in several of the performance measures.

- **Exhibit 195: Email from Jain dated February 27, 2019 with the Subject:  Re: Overdue Performance Evaluation list (NYC001368-NYC001369); and**

- **Exhibit 196: Email from Jain dated February 28, 2019 with the Subject:  Overdue Performance Evaluation (NYC001397-NYC001406)**

329.   Dr. Kaye did not acknowledge receipt of the  Defendant Jain's evaluation, nor did she sign it.  She wanted to meet with Defendant Jain to rebut his ratings.  However, by that time Defendant Jain had made a deliberate effort to avoid meeting with her one-on-one.
- **Exhibit 5: Kaye Decl.  ¶¶ 141-148**

  *ii.    Defendants Further Retaliate Against Dr. Kaye for Filing a Lawsuit and Her Amended Complaint in April 2019*

330.   Plaintiff's Counsel was ordered to contact the Court by April 12, 2019 to explain why she hadn't served hardcopies of  her complaint in the lawsuit herein, Kaye v. Health and Hospitals Corporation et. al. 18-12137.  Counsel complied with the Court's deadline and wrote the Court on April 11th and 12th.  Counsel was granted an extension until April 30, 2019 to serve her summons and complaint by way of a process server.
- **Exhibit 8: RFA ¶ 19 p.13; and**

- **Exhibit 197:  ECF Docket Report at Docket Entries 4 and 5.**

331.   On April 9, 2019, Defendants' Corporate Compliance Office arranged to meet with Dr. Kaye on April 12, 2019.
- **Exhibit 198:  Calendar Request from Khalid, Sofia dated April 9, 2019 for a meeting scheduled to take place on April 12, 2019 at 3PM.  (NYC001468)**

332.   Defendants denied that a meeting was arranged for Plaintiff to meet with Corporate Compliance.
- **Exhibit 8: RFA ¶ 20 p. 14**

333.   Although Defendants did not have a policy that prohibited the recording of examinations beforehand, they nevertheless scheduled a meeting with Dr. Kaye.
- **Exhibit 199: Corporate Compliance's Final Confidential Investigatory Information Memorandum from Patsos to Yang dated May 9, 2019 (NYC002797-NYC002800)**

334.   Dr. Kaye was told by her union, that the meeting on April 12, 2019, was a pre-termination meeting.
- **Exhibit 200:  Kaye Re-Direct Dep. as taken on  2/3/22 p.412:14-25-415:1-9**

335.   Dr. Kaye's recording of Jose Gonzalez's exams was consistent with the American Academy of Psychiatry and the Law's Taskforce on Video Recording of Examinations.

- **Exhibit 190: American Academy of Psychiatry and the Law: Video-recording of Forensic Psychiatric Evaluations**

336.   Catherine Patsos,  H + H's Compliance Office, wrote in her investigatory report, that Defendants did not have an already-existing policy that prohibited the recording of forensic examinations.  It did not mention anything about recording with or without consent.
- **Exhibit 199: Corporate Compliance's Final Confidential Investigatory Information Memorandum from Patsos to Yang dated May 9, 2019 (NYC002797-NYC002800)**

337.   Defendants claimed they had an already-existing policy against recording in place before Dr. Kaye recorded the Jose Gonzalez 730 Evaluations, and before Dr. Kaye was scheduled to meet with Corporate Compliance on April 12, 2019.
- **Exhibit 8: RFA 21 ¶ p. 14**

338.   Despite an absence of any violations, Ms. Patsos recommended that Dr. Kaye be disciplined and that she receive training. Although Dr. Winkler was also controverted for the Jose Gonzalez 730 Evaluation, Ms. Patsos did not recommend that he receive training.
- **Exhibit 199: Corporate Compliance's Final Confidential Investigatory Information Memorandum from Patsos to Yang dated May 9, 2019 (NYC002797-NYC002800); and**

- **Exhibit 201:  Memo from Ford Signed July 1, 2019 with the Subject: Audio Recording of 730 Competency Evaluations (NYC001521); and**

339.   The Defendants have stated that the meeting with Ms. Patsos and the subsequent memoranda that Dr. Kaye received on July 1, 2019 were warnings.
- **Exhibit 202: Email from Ford dated June 7, 2019 with the Subject: Re: Dr. Kaye Warning Memo (NYC004002);**

- **Exhibit 203:   Memorandum from Ford signed under protest on July 1, 2019 with the Subject: Audio Recording of 730 Competency Evaluations (NYC004079); and**

- **Exhibit 204: Memorandum from Ford signed under protest on July 1, 2019 with the Subject:  Unprofessional Conduct and Communication (NYC002978)**

340.   However, Defendants denied that Dr. Kaye was warned about recording forensic examinations on April 12, 2019.
- **Exhibit 8: RFA ¶ 22 p. 14**

**D. May 29, 2019 Meeting with Andrea Swenson:  Defendants Manufacture Disruptive Physician Charges against Dr. Kaye to End her Employment and Career**

341.   Dr. Kaye wrote Andrea Swenson after she received an email from Teleakie Parker that asked her for a number identifying documents, some of which included copies of her licenses, her date of birth, social security number and Board Certifications.

- **Exhibit 205: Email from Kaye to Andrea Swenson dated March 14, 2019 (NYC002642-NYC002648)**

342.   Previously a victim of identity theft due to the mishandling of her file at H + H, Dr. Kaye became concerned about phishing when she received an email from Teleakie Parker about Pfishing and Recredentialing.  Dr. Kaye's Recredentialing, licensure and other employment information was previously in her personnel file.  Defendants lack any explanation as to what happened to the file and they did not tell Dr. Kaye that her file was missing.

- **Exhibit 206: Email from Wangel dated March 8, 2019 with the Subject: Audit, Kaye, Melissa (NYC002626-NYC002628); and**

- **Exhibit 207: Email from Dr. Kaye dated March 8, 2019 with the Subject: Audit, Kaye, Melissa (NYC002629-NYC002630)**

343.   H + H employee Clarence Muir, Andrea Swenson's supervisor said that he was unaware of any audit being conducted.

- **Exhibit 208: Email from Swenson dated March 14, 2019 with the Subject: Audit Kaye, Melissa (NYC002642-NYC002643)**

344.   On March 7, 2019 Teleakie Parker (Parker),  CHS's Assistant Coordinating Manager of Operations sent an email to Dr. Kaye that asked for her credentialing as well as her date of birth and social security number.  The email gave Dr. Kaye one-business day to produce the requested list of documents and information.

- **Exhibit 207:  Email from Parker dated March 7, 2019 with the Subject:  Audit -Kaye, Melissa (NYC002629-NYC002630)**

345.   Dr. Kaye emailed her union the same day about Parker's email.  She requested their assistance, especially since she had been told by Defendant Wangel and Jessica Laboy that her credentialing would transfer from Bellevue to CHS.  Dr.  Kaye was also concerned about the one-business day turnaround that she was given to comply.

- **Exhibit 209: Email from Kaye dated March 7, 2019 with the Subject:  Audit -Kaye, Melissa (NYC002608-NYC002609)**

346.   Dr. Kaye also sent an email response to Parker on March 8, 2019.  Dr. Kaye where she reiterated her concerns that and her conversation with Defendant Wangel and Laboy.  Dr. Kaye ended the email by telling Parker, that she would need more than one-day to produce the extensive list of documentation and information sought.

- **Exhibit 207:  Email from Kaye dated March 8, 2019 with the Subject: Re: Audit -Kaye, Melissa (NYC002629-NYC002630)**

347.   Dr. Kaye then followed up with Ms. Swenson, who at that time was acting in an administrative capacity for CHS.   Dr. Kaye conveyed her concerns to Ms. Swenson and believed that she would follow-up.  Plaintiff told her that she was particularly troubled about the email, because she had previously experienced identity-theft at H +H.  Ms. Swenson responded that she would look into things and would get back to Dr. Kaye.

- **Exhibit 229:  Email from Kaye dated March 14, 2019 with the Subject:  FW:  Audit: - Kaye, Melissa (NYC002642-NYC002645)**

348.   On May 31, 2019, Dr. Kaye saw Ms. Swenson at the Bronx Court Clinic.  It has been approximately three months after she initially raised her concerns with Ms. Swenson about Ms. Parker's email.  During that time, she had heard nothing from Ms. Swenson, despite her representations that she would follow-up.  During the course of their conversation in her office, Dr. Kaye reiterated her concerns about Ms. Parker's email.  She did not yell at Ms. Swenson, but expressed concern again about being taken off of payroll and identity theft.  To which, Ms. Swenson responded: who cares, who cares.

- **Exhibit 42:  Kaye Cross Exam. Dep. as taken on 1/25/22 p. 28:19-25-30**

349.   On May 31, 2019, Ms. Swenson sent two separate emails, right after her meeting with Dr. Kaye.  In neither email does she state that Dr. Kaye yelled at her during their meeting.

- **Exhibit 210:  Email from Swenson dated May 31, 2019 with the Subject: FW: Assistance with Bronx: (NYC002833-NYC002834)**

350.   In her emails on May 31, 2019, Ms. Swenson also shared with Ms. Kent that Defendant Jain was supposed to address Dr. Kaye's concerns with Jessica Laboy.  Ms. Swenson shared that from her conversation with Dr. Kaye, it was clear that Defendant Jain had not followed-up; she added that she wasn't going to throw Defendant Jain "under the bus."

- **Exhibit 210:  Email from Swenson dated May 31, 2019 with the Subject: FW: Assistance with Bronx (NYC02833-NYC002834)**

351.   Instead of addressing Dr. Kaye's concerns about being taken off of the payroll, her ability to practice and identity theft, Defendant Ford called Dr. Kaye to meet with her on July 1, 2019. The meeting culminated with Dr. Kaye's receipt of two memos that were disciplinary in nature.

- **Exhibit 42:  Kaye Cross Examination Dep. taken on January 25, 2022 p. 33-34:1-16; and**

- **Exhibit 211: Email between Ford and MacDonald dated June  18, 2019 with the Subject: Did we Complete the Discipline. (NYC002945-NYC02946);**

352.   On August 2, 2019, Defendants continued to harass Dr. Kaye about her credentialing and licensure documents, however, Dr. Kaye had already provided the requested documents to her supervisor Defendant Jain in July 2019.  Defendant Jain had failed to

disclose that he did not provide Dr. Kaye's information, which ultimately subjected Dr. Kaye to further harassment from agency management.

- **Exhibit 212: Email from Kent dated August 2, 2019 with the Subject Expiring License Certification (NYC003080-NYC003081)**

353.   Dr. Kaye was the only Forensic Court Clinic Director subjected to a Payroll Audit.
- **Exhibit 213: Email from Fong dated July 3, 2018 with the Subject: HR/PR Audit Report 7/2 (NYC002015)**

354.   The repercussions of being written up regarding her conversation with Ms. Swenson continue to impact Dr. Kaye's ability to earn a living and to pursue licensure in other states. However amongst the Defendants and H + H staff there are inconsistencies in how the memoranda were treated:  Dr. MacDonald specifically asked if they had completed the discipline against Dr. Kaye.  While Ms. Kent stated that the memos were warnings.  In either scenario, the memos have impacted Dr. Kaye's ability to practice medicine.
- **Exhibit 42:  Kaye Cross Examination Deposition taken on January 25, 2022 p. 33-34:1-16;**

- **Exhibit 211: Email between Ford and MacDonald dated June  18, 2019 with the Subject Did we Complete the Discipline. (NYC002945-NYC002946);**

- **Exhibit 214: Email from Ford dated May 9, 2019 with the Subject: Investigative Memorandum (NYC002804); and**

- **Exhibit 215: Email from Kent dated June 6, 2019 with the Subject Workplace Conduct Memo (NYC002901)**

355.   Emboldened by the disciplinary charges Swenson propagated against Dr. Kaye for raising concerns about her personal information being sought, Andrea Swenson and Defendants continue to mock Dr. Kaye and Mr. Bloom.  Swenson remarked about Dr. Kaye using a heater in her office. On another occasion Swenson flippantly commented about covering the Bronx Court Clinic while Mr. Bloom was there.  Swenson's attitude was consistent with Defendant Jain, who accused both Dr. Kaye and Jeffrey Bloom of being adversarial.
- **Exhibit 13: Jain Deposition p. 320:18-24-321:1-16**

- **Exhibit 216:  Email from Swenson dated August 8, 2019 with the Subject Bronx today (NYC003084-NYC003085); and**

- **Exhibit 217: Email from Swenson dated August 12, 2019 with the Subject MK Out 8/13 (NYC03089)**

356.   Dr. Kaye discussed the professional impact of the memos on her career.  She testified that the Memo she received that involved the false allegations from Ms. Swenson, were the equivalent of a disruptive physician charge, which could lead to her license being revoked.  Dr. Kaye also testified that if she failed to disclose the memos when she applied for licenses or jobs, that her license could also be revoked.

- **Exhibit 42:  Kaye Cross Examination Deposition taken on January 25, 2022 p. 28-34:1-16**

357.   Swenson further mocked and contributed to the campaign to pay Dr. Kaye less than the other Center Directors when she failed to input Dr. Kaye's work and the evaluations seen at the Bronx Court Clinic into ISight. Despite these efforts, Swenson had to begrudgingly admit that Dr. Kaye saw more cases proportionally than the other Directors.  In fact, Dr. Kaye was the only Director who saw all of the cases in her clinic and despite having an absence of staff, she saw more exams than all of the Directors despite being paid less and having inferior corporate and office titles of Attending Physician/Center Director.

- **Exhibit 218:  Email from Swenson dated March 22, 2019 with the Subject:  Re: FPECC Directors Count 3.14.19(002).xlsx (NYC002661-NYC002662)**

358.   The write up about her conversation with Ms. Swenson remains a blemish to Dr. Kaye's record well after she was constructively discharged and forced into retirement by Defendants.  To date, these charges that involved her legitimate concerns about an audit only some H + H staff were privy to has impacted her ability to obtain gainful employment, since she must disclose to employers and licensing boards in other states any form of discipline, warnings or other complaints in her personnel file.

- **Exhibit 42: Kaye Cross Exam. Dep. as taken on 1/25/22 p. 33-36:1-15;**

- **Exhibit 203: Memorandum from Ford signed under protest on July 1, 2019 with the Subject: Audio Recording of 730 Competency Evaluations (NYC004079); and**

- **Exhibit 204: Memorandum from Ford signed under protest on July 1, 2019 with the Subject:  Unprofessional Conduct and Communication (NYC002978)**

- i.     **July 1, 2019 Disciplinary Meeting with Defendant Ford, Clarence Muir Jr., and Doctors' Council Union Representative Nate Santamaria:  Defendants Seek to Tarnish Dr. Kaye's Professional Record and End her Career**

359.   On or around June 18, 2019, Dr. Ross MacDonald sent an email that asked Defendant Ford: Did we complete the discipline?  The email pertained to the two memos that Defendant Ford eventually presented to Dr. Kaye on July 1, 2019.  One of the memos, involved the recording of Jose Gonzalez's 730 Exam.

- **Exhibit 203:  Memorandum from Ford signed under protest on July 1, 2019 with the Subject: Audio Recording of 730 Competency Evaluations (NYC004079);**

- **Exhibit 204: Memorandum from Ford signed under protest on July 1, 2019 with the Subject:  Unprofessional Conduct and Communication (NYC002978); and**

- **Exhibit 211:  Email from MacDonald dated June 18, 2019 with the Subject: Did we Complete the Discipline? (NYC002946)**

360.   On July 1, 2019 Dr. Kaye met with Defendant Ford and Clarence Muir.
- **Exhibit 203:  Memorandum from Ford signed under protest on July 1, 2019 with the Subject:  Audio Recording of 730 Competency Evaluations. (NYC004079); and**

- **Exhibit 204:  Memorandum from Ford signed under protest on July 1, 2019 with the Subject:  Unprofessional Conduct and Communication(NYC002978)**

361.   Defendants denied that Defendant Ford and Clarence Muir met on July 1, 2019 about Dr. Kaye's recording of a 730 Examination.
- **Exhibit 5: RFA ¶ 142 p. 83-84**

362.   On July 1, 2019, Dr. Kaye received a disciplinary memo that suggested that she violated the rights of a patient and that she violated his rights under HIPAA.
- **Exhibit 6: Kaye Dep. p. 340:14-20;**

- **Exhibit 42: Kaye Cross Exam. Dep. p. 23:10-15;**

- **Exhibit 200:  Kaye Re-Direct Dep. p.32:22-25-33:1-7; and**

- **Exhibit 203:  Memorandum from Ford signed under protest on July 1, 2019 with the Subject: Audio Recording of 730 Competency Evaluations (NYC004079)**

363.   The Forensic Psychiatric Court Clinics are HIPAA exempt, and Dr. Kaye did not have a doctor patient relationship with the inmates that she evaluated.
- **Exhibit 5:  RFA ¶ 125 p. 73;**

- **Exhibit 42:  Kaye Cross Exam Dep as taken on 1/25/22. 23:10-15; and**

- **Exhibit 219:  Memorandum from MacKechenle dated December 12, 2003 with the Subject: NYC Health and Hospitals Corporation:  Organizational Structure Under HIPAA (NYC004117-NYC004120)**

   E.   **Defendants Further Sabotage Dr. Kaye and the Bronx Court Clinic by Under-reporting the Workload, Withholding Staff and Declaring a Work Stoppage:  Ultimately Dr. Kaye was Forced Retire Prematurely and was Constructively Discharged**

364.   The work output of Dr. Kaye and the Bronx Court Clinic were intentionally distorted by Defendants and Ms. Swenson.  On several occasions, Dr. Kaye contacted Ms. Swenson about her failure to input at least 40 cases into ISight.

- **Exhibit 5:  Kaye Decl. ¶ 51; 176-178 and 184-190;**

- **Exhibit 70:  Kaye Work Output Comparison of Cases Seen in 2018 and 2019; and**

- **Exhibit 220: Email from Gillen dated April 25, 2018 with the Subject: Time Sensitive Melissa Kaye Question (NYC00177-NYC000178)**

365.    Dr. Brayton resigned to work for a position with the Family Court in November 2019. From November 2019 until January 2020, Defendants declared a work stoppage in the Bronx.  Absent an order from the Court, cases were not being seen in the Bronx.

- **Exhibit 5: Kaye Decl. ¶¶ 51; 176-178; and 184-190**

366.    Due to the number of cases that were not being seen, Dr. Kaye felt compelled to resign. She believed the longer she remained "rubber roomed" at the clinic, the longer criminal defendants would languish in detention without examinations.  Dr. Kaye's suspicions proved correct, for the next business day after she retired, Defendants brought evaluators from the other boroughs to see cases.

- **Exhibit 5: Kaye's Decl ¶¶ 184-190;**

- **Exhibit 38: Bloom Dep. p. 243:11-24;**

- **Exhibit 42:  Kaye Cross Exam. Dep. as taken on  1/25/22 p.20:16-25-22:1-17; and p. 55:17-22;**

- **Exhibit 221: Email from Bloom dated December 9, 2019 with the Subject: 730 List (Kaye6thProd00557-Kaye6thProd00559);**

- **Exhibit 222:  Email from Bloom dated December 18, 2019 with the Subject:  Butler (Kaye6thProd00564-Kaye6thProd00566);**

- **Exhibit 223 :  Email from Jain dated December 18, 2019 with the Subject;  Butler (Kaye6thProd00571-Kaye6thProd00575); and**

- **Exhibit 224:  Email from Bloom dated January 16, 2019 with the Subject: Travel on Fridays (Kaye6thProd00602-Kaye6thProd00609)**

367.   Defendant Jain and Mr. Bloom had conflicting accounts of what transpired between the months of November 2019 and January 2020.  Mr. Bloom confronted Defendant Jain about

the work stoppage and Defendant Jain was evasive.  They also disagreed about the number of criminal defendants that had not been seen due to their work stoppage.

- **Exhibit 38: Bloom Dep. p. 243:11-24;**

- **Exhibit 221: Email from Bloom dated December 9, 2019 with the Subject: 730 List (Kaye6thProd00557-Kaye6thProd00559);**

- **Exhibit 222:  Email from Bloom dated December 18, 2019 with the Subject:  Butler (Kaye6thProd00564-Kaye6thProd00566);**

- **Exhibit 223:  Email from Jain dated December 18, 2019 with the Subject:  Butler (Kaye6thProd00571-Kaye6thProd00575); and**

- **Exhibit 224:  Email from Bloom dated January 16, 2019 with the Subject: Travel on Fridays (Kaye6thProd00602-Kaye6thProd00609)**

368.   On January 7, 2020, Dr. Kaye filed a complaint with the Board of Correction.  The complaint provided a summary of all of the complaints that Dr. Kaye made between 2015 and January 2020.
- **Exhibit 225 :  January 7, 2020 Board of Correction Complaint.**

369.   On January 9, 2020, Dr. Kaye submitted her letter of resignation with 2 weeks-notice to H + H CEO, Dr. Mitchell Katz and the named Defendants.  Within 30 minutes of her email Dr. Kaye was told that she would need to take all of her belongings and not return to the premises.  After 20 years, Dr. Kaye was made to pack up all of her belongings on the spot, it took her until 3AM to pack everything up and leave.
- **Exhibit 5:  Kaye Decl. ¶¶ 184-187; and**

- **Exhibit 226:  Email from Kaye dated January 9, 2020 with the Subject: Resignation**

370.   Between July 2016 and February 2021, Dr. Kaye filed at least 34 different complaints with various entities.  At least 29 were made while she was still employed at H + H.  Dr. Kaye's complaints touched and concerned matters of public concern that included but were not limited to any and all of the following allegations: Medicaid fraud; fraud on the courts; rigging of examinations by City Hall staff members and the named Defendants; violations of criminal defendants' rights under the 5th, 6th and 8th amendments of the U.S. Constitution; and the quid quo pro arrangements between forensic examiners and the bar. Dr. Kaye paid the ultimate price for her advocacy, she lost the job she loved and she and her family continue to suffer the repercussions of Defendants' retaliatory and discriminatory animus.
- **Exhibit 5:  Kaye Decl. ¶ 191**

Date:  June 7, 2022

/s/

_____

**LAW OFFICES OF SPECIAL HAGAN**
**88-08 Justice Avenue Apt. 16i**
**Elmhurst, New York 11373**
**SPECIAL HAGAN, ESQ.**
**Attorney for Plaintiff,**
**Melissa Kaye, M.D.**
**(917) 337-2439**