UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MELISSA KAYE,

PLAINTIFF,

-against-

NEW YORK CITY HEALTH AND HOSPITALS CORPORATION;
ELIZABETH FORD;
ABHISHEK JAIN;
JONATHAN WANGEL; and
PATRICIA YANG (as aiders and abettors)

DEFENDANTS.

## MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
### (Request for Oral Argument)

*Duly Submitted by:*

Special Hagan, Esq.
**LAW OFFICES OF SPECIAL HAGAN, ESQ.**
**88-08 Justice Avenue Apt. 16i**
**Elmhurst, New York 11373**

# TABLE OF CONTENTS

|  | Pages |
|---|---|
| TABLE OF AUTHORITIES | |
| I) PRELIMINARY STATEMENT | |
| II) MATERIAL ISSUES IN DISPUTE | |
| III) STATEMENT OF FACTS | |
| IV) ARGUMENT | |
| POINT I:<br>LEGAL STANDARD FOR SUMMARY JUDGMENT | |
| POINT II: PLAINTIFF'S CLAIMS UNDER THE EQUAL PAY ACT SHOULD NOT BE DISMISSED | |
| POINT III:   PLAINTIFF'S RETALIATION CLAIMS UNDER THE FIRST AMENDMENT AND 1983 SHOULD NOT BE DISMISSED | |
| POINT IV:     PLAINTIFF'S CLAIMS UNDER THE FMLA SHOULD NOT BE DISMISSED | |
| POINT V:    PLAINTIFF'S RETALIATION CLAIMS UNDER<br>§ 1983, ADEA, NYSHRL AND NYCHRL PRESENT TRIABLE ISSUES OF FACT | |
| POINT VI:    THE CRONYISM IN DOC'S HIRING PRACTICES HAD A DISPARATE IMPACT ON PLAINTIFF AND OTHER LONG TENURED DOC EMPLOYEES;<br>DEFENDANTS' APPLICATION FOR SUMMARY JUDGMENT<br>UNDER THE ADEA, NYSHRL AND NYCHRL MUST BE DENIED | |

| | |
|---|---|
| **POINT VII:  PLAINTIFF'S AIDING AND ABETTING CLAIMS PRESENT TRIABLE ISSUES OF FACT** | |
| **V. CONCLUSION** | |

**PRELIMINARY STATEMENT**

Plaintiff, Melissa Kaye, M.D.  ("Dr.Kaye"), submits this Memorandum of Law in opposition to the motion for summary judgment filed by Defendants:  New York City Health and Hospitals Corporation/Correctional Health Services (H+H/CHS); Elizabeth Ford (Ford); Patricia Yang (Yang); Abhishek Jain (Jain); and Jonathan Wangel (Wangel) (collectively "individual defendants").  Plaintiff brought this action to remedy defendants' unlawful employment practices under:  the 1st and 14th Amendments of the United States Constitution; the Equal Pay Act; Family Medical Leave Act ("FMLA"); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et. seq. ("Title VII"); 42 U.S.C. §§ 1983 and 1988; the New York Human Rights Law as contained in New York Executive Law §296 et. seq. ("NYHRL"); and New York City Human Rights Law as contained in the Administrative Code of the City of New York, §8-107 et. seq. ("NYCHRL"); and New York Whistleblowing Law.

Defendants' motion must be denied in its entirety.  Defendants' application fails to explain their repeated departures from the advice of staff members and their policies, when they: illegally engaged in wage theft; demoted Dr. Kaye in corporate title to Attending Physician II; when they removed her full-time staff person and refused to provide a consistent full-time replacement; revoked and interfered with her FMLA leave by refusing to calculate her time correctly; breached the Memorandum of Agreement in the payment of her retention bonus by making partial payments and counting it towards her salary; and when they imposed an arbitrary shift change to interfere with her childcare responsibilities and to force her constructive discharge.  Defendants have yet to justify why the Medical Director of the alleged least busy Court Clinic had to work the longest hours.  Defendant Wangel admitted that he had

not read any materials that stated that an hour unpaid lunch and or a 9-hour work day were in fact mandatory in Plaintiff corporate title and or group code.

Further, Defendants' arguments fail to address that on at least 34 separate occasions, that Dr. Kaye engaged in protected activities.  Between 2015 and 2021, Dr. Kaye's protected activities fell into one or more of three categories:  activities and complaints protected under the First Amendment; complaints  of parity, discrimination, and retaliatory hostile work environment  under Title VII, the City and State Human Rights Laws; and  her ongoing Whistleblowing under New York Local Law 740 to the Inspector General's Office, the Department of Justice and any number of other agencies.  Instead of addressing each of Dr. Kaye's activities in context, Defendants attempt to conflate them, and they wrongly attribute her protected activities to her alleged ethical obligations as a physician and as a City employee.

Between 2015 and 2021, Dr. Kaye cited the unconstitutionality of Defendants' policies in a number of contexts. In 2015,  Defendants' use of an unwarranted force order as it violated the rights of criminal Defendant Miguel Figueroa under the 8th Amendment's protection against cruel and unusual punishment. Defendants' insistence on the production of redacted medical records between April 2017 until Dr. Kaye's departure  in 2020.  Dr. Kaye believed that failure to use unredacted medical records with the inmates substance use history and HIV status invoked the rights of criminal defendants under the due process clause.  An inmate's HIV status and treatment along with their substance usage could cause cognitive difficulties that could affect a their mental capacity.   Dr. Kaye therefore felt complete unredacted medical records were integral.  Dr. Kaye also advocated against Defendants' insistence on HIPAA waivers. She cited the 6th Amendment's protection against self-incrimination, since the inmate may lack the

6

capacity to understand the repercussions of their waiver along with the disclosure of potentially incriminating information during litigation.

Defendants instead make the flawed and erroneous argument that Dr. Kaye acted consistent with her ethical obligations as a physician and as a City employee.  However, this argument ignores the law and the tenets of forensic psychiatry.  Forensic psychiatrists do not owe a duty of care to the inmates they examine.  As practitioners, their only obligation is to administer neutral forensic examinations that comply with the medicolegal standards of the profession.  Additionally since forensic psychiatrists are not officers of the Court or legal practitioners, they do not have any obligation to report when the administration of justice is compromised.

Based on the foregoing, Plaintiff's counterstatement to Defendants' issues of disputed fact, her referenced Rule 56.1 Statement, and the discussion herein, Dr. Kaye respectfully submits that Defendants' application for summary judgment must be denied in its entirety.

**STATEMENT OF FACTS**

**IV. ARGUMENT**

**POINT I**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**MUST BE DENIED IN ITS ENTIRETY**

**1.  Defendants Fail to Meet the Evidentiary Burden for Summary Judgment**

Summary judgment is appropriate where the movant shows that there is no genuine dispute as to any material fact. Fed. R. Civ. P. 56(a)-(c)  Green v. Town of E. Haven, 952 F.3d 394, 405 (2d Cir. March 10, 2020); see Davis-Garrett v. Urban Outfitters, Inc., 921 F.3d  30, 41 (2d Cir. April 8, 2019); see also Girand v. LiveTiles Corp., 17 Civ. 9005(ER), 2020 U.S. Dist. LEXIS

60213, at *11 (S.D.N.Y. March 31, 2020) Defendants have failed to meet their burden.  The record is rife with contradictory testimony and record evidence. Additionally, Defendants' intent is at the core of the issues presented herein.

Discrimination cases often present questions about the employers' intent, therefore extra caution should be accorded when applications for summary judgment have been filed.  Mandell v. Cty of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003); Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) see also United States v. N.Y.C. Dep't of Educ., 407 F. Supp. 3d 365, 391 (S.D.N.Y. Sept. 18, 2019) (Kaplan J., adopting Report and Recommendation)("Courts should be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question because direct evidence of an employer's discriminatory intent will rarely be found).  As can be seen, Defendants' intent is at issue in practically all of Dr. Kaye's claims.

**POINT II**
**DR. KAYE'S CLAIMS UNDER THE EQUAL PAY ACT SHOULD NOT BE DISMISSED**

The Equal Pay Act (EPA) prohibits the payment of unequal wages to employees on the basis of sex.  29 USC § 206(d)(1)  To make out a prima facie claim under the EPA, a Plaintiff must establish the following things: (1) that the employer paid different wages to employees of the opposite sex; (2) that employees performed equal work in positions that required equal skill, effort and responsibility; and (3) that the jobs were performed under similar working conditions.  Jamilik v. Yale Univ., 362 Fed. Appx. 148, 150 (2d Cir. 2009)  Although the burden is heavy for defendants, but they may raise the affirmative defense of a non-discriminatory

explanation for the pay differential.  Id. see also **Ryduchowski v. Port Auth. of N.Y. and N.J.,** 203 F.3d 135, 143 (2d Cir. 2000)

As a general and threshold matter however, Courts in this Circuit have typically determined that summary judgment is unavailable on Equal Pay Act claims.  Crawford v. ExlService.com, 16 Civ 9137(LAP), 2019 Dist. LEXIS 196195 (SDNY Nov. 12, 2019)  This determination has generally been reached based on the premise that questions that pertain to Plaintiff's identified comparators and the employer's proffered justifications for their disparate treatment were questions of fact best suited for juries to resolve.  Id.  Plaintiff respectfully submits that Defendants' affirmative defenses present triable issues that must be resolved at trial.

The record herein shows that Dr. Kaye applied for pay parity in 2004, 2013/2014 and again in 2018.  Melissa Kaye, M.D. is a triple board certified forensic psychiatrist.  She started her career at Health and Hospitals Corporation (H +H)/Bellevue at first as a part-time employee in 1999 and then as a full-time employee in 2000.  From the inception until the forced end of her tenure, Dr. Kaye worked as an Attending Physician in the Group 11 budget code and was in the 4306 budget line.  Her male comparator, Steven Ciric, M.D. also started part-time in 1999 and began full-time employment in 2001.  He was also hired into the Group 11/budget code and 4306 budget line.

Dr. Kaye,  initially sought pay  and title parity based on gender in 2004.  At that time, she was promoted to Medical Director of the Bronx Forensic Psychiatric Court Clinic (FPECC). Consistent with H + H's Personnel Rules and Regulations and the Doctors Council (Group 11) collective bargaining agreement, Dr. Kaye was eligible to be promoted in both corporate title

and compensation. At the time Dr. Kaye was double board certified and as Medical Director, she would assume  additional administrative and operational responsibilities. Therefore, she was eligible for a promotion into the Physician Specialist corporate title, which was still within the Group 11 budget code in 2004.  Accordingly, she wrote Dr. Belkin and was only promoted in compensation but not corporate title.

In 2008, Dr. Ciric was promoted to the Physician Specialist title and received an accompanying increase in salary. Also in 2008, after a timekeeping fraud and abuse scandal, Dr. Badaracco was appointed to Director of Psychiatry and  Chief of Psychiatry at Bellevue Hospital and Vice Chair of the Department of Psychiatry at NYU School of Medicine. At that time Dr. Ciric was not a Court Clinic Director, but was just a staff forensic evaluator at the Manhattan Forensic Psychiatric Evaluation Court Clinic.  Additionally, unlike Dr. Kaye, Dr. Ciric only had one board certification.

In 2011, Dr. Badaracco promoted  Dr. Ciric again  from Physician Specialist III to Physician Specialist IV.  At that time, he became Director of the Manhattan Court Clinic, but his full time equivalent (FTE) status was reduced from 1.0 to .80.  Although his gross salary was close to Dr. Kaye, his rate of pay or annualized salary was higher and he worked at least 8 less hours than Plaintiff. Therefore Dr. Ciric's promotion raises an issue of disputed fact to the extent of whether his promotions were consistent with the collective bargaining agreement and H + H's Personnel Rules and Regulations.

In 2013/2014, Dr. Kaye would inadvertently receive an email that listed the salaries and corporate titles of  FPECC staff members.  At that time, she officially learned that she was in the lesser Attending Physician III corporate title. She would also learn, that she was being paid at

least $38,000 less than her comparator Steven Ciric. In 2013/2014, Dr. Ciric was also now a Court Clinic Director in Manhattan.  Dr. Kaye testified that when she first learned of the disparity, she approached Laurie Davidson from her union.  From Davidson, she would then approach Defendant Ford.  The parties dispute however,  whether Defendant Ford actually approached Dr. Badaracco:  Dr. Kaye testified that she would learn that she had not, while Defendant Ford testified to the contrary.

Upon Dr. Ford's departure, Dr. Kaye approached Drs. Colley and Badaracco.  Dr. Kaye initially approached Dr. Colley, who told her that he would follow-up with Dr. Badaracco. Therefore, after she spoke to Dr. Colley, Dr. Kaye met with Dr. Badaracco: who expressed concern; said it was an EEOC issue; but nonetheless told the lie that Dr. Kaye would have to *die in her line*.  Dr. Badaracco represented that all she could do was insure that Dr. Kaye would get the maximum pay in the Attending Physician III corporate title, which was the equivalent of a $2,000 raise.  With this effort, Dr. Kaye's salary was still at least $36,000 less than Dr. Ciric. However since she believed Dr. Badaracco's representations, that she could do no more, she did not pursue the matter any further at that time.

Similar to the facts in Jamilik, Defendants claim that the differential between Drs. Ciric and Kaye are attributable to the workloads of the Bronx and Manhattan Court Clinics. However, as the Court in Jamilik determined, this explanation does not justify the difference initial difference that took place in 2008, when Dr. Ciric was promoted from Attending Physician III to Physician Specialist III. The record is clear that both Drs. Kaye and Ciric were qualified but that even at that time he was promoted while in an inferior office title than Dr. Kaye. Additionally, there are triable issues of fact as to whether Dr. Kaye was a Group 11 or a Group

12 employee.  Both Dr. Kaye and Dr. Ciric were initially hired as Group 11 employees in the

Budget Code 11. Additionally as per the Collective bargaining agreement, both employees were

in Doctors Council.  Defendants have not referenced any admissible record evidence to

establish that Dr. Kaye was not a Group 11 employee and or that she was instead a Group 12

employee.  In contrast, Dr. Kaye cites the Doctors Council collective bargaining agreement and

her action request forms.  Accordingly, Defendants have failed to meet their burden of

establishing a legitimate explanation for the disparities in salaries.

**POINT III**
**PLAINTIFF'S CLAIMS UNDER THE FMLA SHOULD NOT BE DISMISSED**

Section 2615 of the FMLA prohibits employers from interfering and retaliating against

employees who choose to exercise their rights under the law.  Dr. Kaye's claims fall under both

sections of the statute.  Plaintiff respectfully submits that the record contains sufficient

evidence that Defendants both interfered with and retaliated against Dr. Kaye when she

attempted to take FMLA.

To establish a prima facie case of FMLA retaliation, a Plaintiff must show that she: 1)

exercised rights protected under the FMLA; 2) was qualified for the position; 3)  suffered an

adverse employment action; and 4) the adverse employment action gave rise to an inference of

retaliatory intent.  Fasanello v. U.N. Int'l Sch., 19 CV 5281 (GHW), 2022 U.S. Dist. LEXIS 5281 at

33 (S.D.N.Y. March 23, 2022)   Once the Plaintiff has satisfied her prima facie burden, then she

must demonstrate that the legitimate non-discriminatory reason proffered by the employer

was pretextual.  Id.

Defendants' brief ignores Dr. Kaye's claims of interference altogether.  However, the record is replete with evidence of instances where they either denied, revoked and or improperly docked Dr. Kaye's leave and pay balances in response to her FMLA requests.   The record evidence clearly establishes that Dr. Kaye sought to take FMLA on October 12, 2018 and then again in January 2019.  **Dr. Kaye's FMLA Application dated October 12, 2018 (NYC002534-NYC002537)** Defendants initially approved Dr. Kaye's application for intermittent leave under the FMLA.  However, on October 29, 2018, in retaliation of her request, Defendants failed to process Dr. Kaye's timesheets two weeks in a row.  **Email From Wangel dated October 29, 2018 with the Subject: Time sheet not Processed (NYC002487-NYC002488)**

Although Dr. Kaye's FMLA request was temporarily retroactively approved on October 30, 2018, it was rescinded a month later.  **Email From Wangel dated October 29, 2018 with the Subject: Timesheet not Processed (NYC002487-NYC002488)**  On November 14, 2018 Defendants rescinded Dr. Kaye's FMLA leave based on the specious premise that she had not provided them with medical documentation about the frequency of her son's condition.  **Exhibit 151: Email from Mendez with the Subject: Melissa Kaye FMLA/To Care for Ill Family Member; Leave Approval Retro (Kaye4thProd0168-Kaye4thProd0169)**  However a review of Dr.Kaye's October 12, application will reveal that she in fact complied, and provided the requested information.  **Exhibit 5: Kaye Decl. ¶¶ 64-84; and Exhibit 152: Dr. Kaye's FMLA Application dated October 12, 2018 (NYC002534-NYC002537)**

What is also clear from the record is that Defendants repeatedly made errors in the entry of Dr. Kaye's leave usage.  On June 21, 2019, Dr. Kaye again asked Defendants to correct her timesheets, leave balances, and FMLA deductions that took place between December 21,

2018 and January 7, 2019.  **Exhibit 157: Email from Kaye dated June 21, 2019 with the Subject:**

**FMLA annual schedule and balance (NYC002954-NYC002957)**Between October 15, 2018 and

April 27, 2019, Defendants incorrectly inputted her FMLA on at least 14 separate occasions.

**Exhibit 5: Kaye Decl. ¶ 79; Exhibit 148:  Email from Kaye dated November 26, 2019 with the**

**Subject Pay Deductions Grievance Sought (NYC003169-NYC003172)**

Consistent with precedent in this Circuit, Plaintiff has met her burden for establishing

pretext.  Precedent holds that pretext can be established by contradictions in the employer's

proffered legitimate non-retaliatory reasons, discrepancies and errors.   Fasanello v. U.N. Int'l

Sch., 19 CV 5281(GHW), 2022 U.S. Dist. LEXIS 52536 at 37-38 (S.D.N.Y. March 23, 2022); citing

Zann Kwan v. Andalex Grp. LLC, 737 F3d 834, 836 (2d Cir. 2013)   Defendants' denial that they

ever rescinded Dr. Kaye's FMLA in their responses to Plaintiff's requests for admissions, coupled

with the inconsistencies in their paperwork and explanations present additional issues of

disputed fact that must be resolved at trial.  **Responses to Plaintiff's Requests for Admission.**

**Exhibit 8:  RFA ¶ 17 p. 12**

## POINT IV
## PLAINTIFF'S CLAIMS UNDER THE FIRST AMENDMENT SHOULD NOT BE DISMISSED

Defendants arguments under this claim are primarily premised on Dr. Kaye's speech not

being protected or matters of public concern.  Plaintiff respectfully argues that Defendants'

position misinterprets the law, it ignores the gravity of Dr. Kaye's complaints and deprives her

of First Amendment protection as a matter of right because she was a public servant.  F

The record establishes that Dr. Kaye engaged in protected speech on at least 34

separate occasions between 2016 and 2021. **Exhibit: Dr. Kaye's Declaration ¶ 191**.  Her

complaints included but were not limited to:  1) violations of criminal defendants right against

self-incrimination with Defendants' HIPAA waivers; 2) protestation against the politically

expedient use of a force order to procure the production of Miguel Figueroa in violation of the

8th Amendment; 3) due process violations of the due process clause based on the rigging of the

CPL 390 and 730 processes and 4) her discrimination complaints internally, the EEOC and the

lawsuit herein.

It is well-settled law that filing grievances is Constitutionally protected activity. Williams

v. N.Y.C. Dept. of Corr. 19-cv-3347(LJL), 2022 U.S. Dist. LEXIS 69682 at * 4, 2022 WL 1125285 at

* 4 (S.D.N.Y. April 14, 2022)  citing Vidal v. Valentin, 2019 U.S. Dist. LEXIS 119109, 2019 WL

3219442 at * 7 (S.D.N.Y. July 7, 2019)  Therefore  Dr. Kaye's complaints of discrimination, fraud

and malfeasance fall under protected speech.

Courts have further held that public employees do not relinquish their First Amendment

rights to comment on matters of public interest by virtue of their government employment.

Kiernan v. Town of Southampton, 734 Fed. Appx 37, 42  (2d Cir. 2018) citing Connick v. Myers,

461 U.S. 138, 140, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983)  In the context of public employees,

their speech is protected if it was made as a private citizen and was not designed to redress

personal grievances.  Kiernan, 734 Fed. Appx. 40-42 (2d Cir. 2018)

Again as a forensic evaluator, it was not part of Dr. Kaye's job to preserve the

administration of justice.  As a forensic evaluator, she was solely tasked with providing neutral

evaluations that adhered to the medicolegal standards of her subspecialty. Therefore, Dr.Kaye's

persistent outreach to Judges, members of the legal community and agencies went far beyond

the scope of her job.  Also the numerosity of her efforts belied protected activities again that

were beyond the scope of her employment.

Dr. Kaye holds that similar to the Plaintiff in Kiernan, she acted on her views concerning H +H/CHS's operations and policies, including but not limited to those governing the administration of mental competency exams, corruption and double-dipping amongst FPECC staff and the legal community, political interference/pressure to rig the outcome of examinations and Medicaid fraud.  Therefore, arguably issues that invoke the Constitutional rights of  criminal defendants under the due process clause, 6th and 8th Amendments of the U.S. Constitution rise to the level of public  concern.  Morris v. Lindau, 196 F. 3d 102, 111 (2d Cir.1999)

Dr. Kaye cites the January 29, 2018 meeting where Defendant Yang threatened to termination on the spot when she raised concern about the constitutionality of HIPAA releases and employees' private practice activities.  In front of a room of people, Defendant Yang unequivocally stated:  if you don't like the way we do things around here, there's the door, we've got all of the money! **Exhibit 6:  Kaye Dep. 11/15/21 p. 99-102:1-9**  At her deposition, Defendant Yang denied  ever threatening Dr. Kaye: that if she didn't like the way things were being done there's the door.

Whether Defendant Yang ever threatened Dr. Kaye presents a triable issue of fact.  At both her deposition and in response to Plaintiff's Requests for Admission, Defendants denied that she ever made this statement to Dr. Kaye.  Exhibit 8:  RFA ¶ 181 p. 105; and Exhibit 9:  Yang Dep. as taken on 2/28/20 p. 338:7-19

However the record contained evidence that on February 1, 2018, within two days of the 29th Meeting, Dr. Ford sent an email to Yang, MacDonald which claimed that Dr. Kaye had been a problem for a long time and that they would manage her out.  **Exhibit 59: Email from**

**Yang dated February 1, 2019 with Subject: Judge Torres wants to Hold us in Contempt**

**(NYC00075-NYC00076)**  Subsequent to this email, Defendant Yang had numerous exchanges

with Bellevue CEO, Bill Hicks, and H + H staff on efforts to place Dr. Kaye elsewhere. It was clear,

that after the meeting that Defendant Yang clearly sought to rid herself of Dr. Kaye because she

had raised concerns about their policies and practices.

Further there is a question of whether Dr. Winkler's  promotion and effective removal

from the Bronx Court Clinic was retaliatory.  Defendants cite the removal as a promotion.

However, between April 2018 and December 2018, Defendants did not replace Dr. Winkler.

Thereby crippling the operations of the Bronx Court Clinic.  When Defendants sought to finalize

their efforts to force Dr. Kaye into retirement, not only did they not replace Dr. Brayton upon

her departure, they declared a work stoppage at the Court clinic altogether between the

months of November 2019 and January 2020.

**POINT V**
**DEFENDANTS AFFIRMATIVE DEFENSE OF QUALIFIED IMMUNITY MUST FAIL**

It has been determined that qualified immunity is only an appropriate affirmative

defense when illegal intent is not an element of Plaintiff's claims.  Frierson v. Rienisch, 806 Fed.

Appx 54, 59-60 (2d Cir. 2020) citing Locurto v. Saffir, 264 F.3d 154, 169 (2d Cir 2020)  citing

Locurto v. Saffir, 264 F3d 154, 169 (2d Cir. 2001) However, here, Dr. Kaye clearly alleges that

Defendants' intent to discriminate was illegal. Therefore, when claims involve questions of

whether Defendants intentionally retaliated against Plaintiff because of her First Amendment

activities, it has been well established that they would not be protected by qualified immunity.

Macera v. Vill. Bd. of Ilion, 16 CV 668 (LEK)(TWD), 2019 U.S. Dist. LEXIS 169632, at 3 (N.D.N.Y.

Sept. 30, 2019); citing Mandell v. County of Suffolk, 316 F.3d 368 at 385 (2d Cir. 2003)(holding

17

that where there were disputed issues of fact on the issues of intent that precluded summary

judgment on a First Amendment retaliation claim, qualified immunity was unwarranted.)

POINT VI
PLAINTIFF'S RETALIATION CLAIMS UNDER TITLE VII, NYSHRL AND NYCHRL MUST NOT BE
DISMISSED

Defendants have also failed to establish no triable issue of fact as to Plaintiff's retaliation

claims. To establish a prima facie case of retaliation under Title VII and the NYSHRL, a plaintiff

must show that: (1) she engaged in a protected activity by opposing a practice made unlawful

by Title VII; (2) her employer was aware of that activity; (3) she suffered a materially adverse

employment action; and (4) there was a causal connection between the protected activity and

the adverse employment action. Cretella v. Liriano, 633 F. Supp. 2d 54, 74 (S.D.N.Y. 2009), aff'd,

370 Fed. App'x 157 (2d Cir. 2010). The NYCHRL defines the activities protected against

retaliation more broadly and "protects plaintiffs who oppose any practice forbidden under" the

NYCHRL. N.Y.C. Admin. Code. § 8-107(7). Grimes-Jenkins v. Consol. Edison of N.Y., 16 Civ.

4897(AT), 2021 U.S. Dist. LEXIS 62975, (S.D.N.Y. March 31, 2021)

Further, "[r]ather than requiring a plaintiff to show an adverse employment action, [the

NYCHRL] only requires [her] to show that something happened that was reasonably likely to

deter a person from engaging in protected activity." Xiang v. Eagle Enters., LLC, No. 19 Civ.

1752, 2020 U.S. Dist. LEXIS 7909, 2020 WL 248941, at *9 (S.D.N.Y. Jan. 16, 2020) (alterations in

original) (quoting Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y.

2012)). "Otherwise, a prima facie case of retaliation faces the same requirements under the

NYCHRL as under the NYSHRL." Malena, 886 F. Supp. 2d at 362.

POINT VII

18

PLAINTIFF'S RETALIATORY HOSTILE WORK ENVIRONMENT CLAIMS MUST NOT BE DISMISSED

To survive summary judgment on a claim of retaliatory hostile work environment asserted under Title VII, a plaintiff must satisfy the same standard that governs hostile work place claims. They must produce evidence demonstrative that the incidents of retaliation following protected activity were sufficiently severe or pervasive to have altered the conditions of her employment. Wallace v. Wormuth, No. 18-Cv-6525 (RA), 2022 U.S. Dist. Lexis 61329 (S.D.N.Y. March 31, 2022) citing Rueda v. City of New York, No. 11-CV-55248(VSB), 2017 U.S. Dist. LEXIS 154450, * 11(S.D.N.Y. Sept. 21, 2017)  To satisfy their burden, a Plaintiff must also establish that the adverse employment actions that they experienced took place due to their protected activities. Id.  Protected activity under the statute is defined as opposition to statutorily prohibited discrimination. Id.

Plaintiff respectfully asserts that she has satisfied this burden.  Defendants had a pattern of retaliating immediately after Dr. Kaye engaged in protected activities. At the January 29, 2018 meeting, they threatened to terminate her on the spot. Within weeks of that meeting they removed Dr. Winkler from the Bronx Court Clinic and did not replace him thereafter.

When Dr. Kaye complained of pay parity on May 3, 2018, between May 11th and 14th, Defendants demoted her in corporate title from Attending Physician III to Attending Physician II.  Defendants then demoted Dr. Kaye again on May 25th, 2018 in office title when they changed her title from Medical Director to Director.  The record contains triable issues of fact as to whether Defendant Yang or Jain was responsible for the change.  Ms. Swenson testified that

19

it was Defendant Yang, which contradicted the produced emails that made it seem like it was Defendant Jain.

When Defendants and CHS officially took over the Bronx Court Clinic, they then demoted Dr. Kaye in salary and engaged in wage theft.  Again Dr. Kaye complained of discrimination in May 2018 and Defendants acted at their first opportunity in July 2018.  They denied Dr. Kaye consistent access to her timesheets from July 2018 until she was constructively discharged in January 2020.  During that time, Defendants were able to dock Dr. Kaye's pay by $31K in 2018 and by 36K in 2019.

When Dr. Kaye filed her supplemental charge of discrimination between September 7 and September 22, 2018, she experienced an onslaught of adverse employment actions immediately thereafter.  Within the pay period of her complaint, Defendants docked her pay for two Jewish holidays two pay periods in a row and in the same month of her complaint.  On September 24, 2018, Defendants docked her for taking and passing her board certification in child and adolescent psychiatry.  This was despite the fact that Defendants did not have a policy that required the deduction.  Dr. Kaye had to engage in an extensive email campaign that involved her former supervisors, her union and the payroll offices at Bellevue and H + H before she got Defendants to admit that her time and pay should not be docked.  Further, all of the people Dr. Kaye contacted each admitted that physicians should be fully compensated for the day for sitting for their board examinations.

Defendants retaliatory efforts culminated between November 2019 and January 2020.  Along with the other adverse employment actions, it can be argued that the work stoppage that in effect placed Dr. Kaye in a rubber room would have led a reasonable person to resign.

The indefinite detention of criminal defendants because of Defendants' retaliatory animus led

Dr. Kaye to determine that she should end her employment rather than let them languish

indefinitely.  As was corroborated by Mr. Bloom during his deposition, on the very next

business day after Dr. Kaye resigned, Defendants resumed operations and examinations at the

Bronx Court Clinic.  Dr. Kaye respectfully argues that she has satisified her burden of

establishing that a reasonable person in her position would have been dissuaded from engaging

in protected activities and that they would have also felt compelled to resign.

POINT VIII
PLAINTIFF'S CLAIMS UNDER THE CAREGIVER ACT MUST NOT BE DISMISSED

The New York City Human Rights Law protects employees from discrimination on the basis

of their caregiver status. N.Y.C. Admin Code § 8-107(a)  The law defines a caregiver as someone

who provides direct and ongoing care for a minor child or care recipient.  § 8-102(30)(a)

Pursuant to the statute, as a mother of fraternal twins to whom she provides treatment for

developmental and medical disabilities, Dr. Kaye certainly meets the definition of a caregiver

under the statute.

Further, the record establishes that her caregiving activities were known to Defendants.  Dr.

Kaye declared that Defendant Ford knew about her son and her caregiving responsibilities in

2012.  Dr. Kaye told Defendant Jain about her responsibilities first in June 2018 and then again

in October 2018.  Clearly, Defendant Jain also knew about Dr. Kaye's caregiving responsibilities

before the shift change he along with the other Defendants imposed on her in August 2018.

Further, Defendant Ford's book where she stated that her caregiving responsibilities led
her to resign from two positions also poses additional issues of fact coupled with her statement
that Dr. Kaye should be managed out also poses triable issues of fact that pertain to intent.
Consequently,

POINT X

PLAINTIFF'S WHISTLEBLOWER CLAIMS UNDER NEW YORK LABOR LAW 740 MUST NOT BE DISMISSED

Retaliation

Defendant has also failed to establish no triable issue of [*27] fact as to Plaintiff's retaliation claims. Def. Mem. at 19-21. To establish a prima facie

22

case of retaliation under Title VII and the NYSHRL, a plaintiff must show that: (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII; (2) her employer was aware of that activity; (3) she suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Cretella v. Liriano, 633 F. Supp. 2d 54, 74 (S.D.N.Y. 2009)*, *aff'd*, 370 Fed. App'x 157 (2d Cir. 2010). The NYCHRL defines the activities protected against retaliation more broadly and "protects plaintiffs who oppose any practice forbidden under" the NYCHRL. N.Y.C. Admin. Code § 8-107(7). Further, "[r]ather than requiring a plaintiff to show an adverse employment action, [the NYCHRL] only requires [her] to show that something happened that was reasonably likely to deter a person from engaging in protected activity." *Xiang v. Eagle Enters., LLC, No. 19 Civ. 1752, 2020 U.S. Dist. LEXIS 7909, 2020 WL 248941, at \*9 (S.D.N.Y. Jan. 16, 2020)* (alterations in original) (quoting *Malena v. Victoria's Secret Direct, LLC, 886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012)*). "Otherwise, a prima facie case of retaliation faces the same requirements under the NYCHRL as under the NYSHRL." *Malena, 886 F. Supp. 2d at 362*.

Caregiver Claims Under NYCHRL Survive

Employees under the NYCHRL are proteted from discrimination on the basis of their caregiver status.  N.Y.C. Admin Code 8-107(a)

Under the City Human Rights Law, a caregiver is defined as someone hwo provides direct and ongoing care for a minor child § 8-102(30)(a)

Gender Discrimination Under Title VII and SHRL

## A. Title VII and NYSHRL

Espinosa contends that she was fired because of her gender. Pl. Mem. at 23-25, ECF No. 58. The framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) guides the Court's analysis of an intentional discrimination claim under Title VII and the NYSHRL. *Brennan v. Metro. Opera Ass'n. Inc.*, 192 F.3d 310, 316 n.2 (2d Cir. 1999) ("Employment discrimination claims brought under the NYSHRL are analyzed identically to claims under . . . Title VII."). A plaintiff must first make out a *prima facie* case of discrimination by showing (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination on the basis of the plaintiff's membership in the protected class. *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). If a [*13] *prima facie* case is established, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for the adverse decision. *Id.* If the defendant sets forth a legitimate non-discriminatory reason, it "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding" that the reason merely serves as pretext for discrimination. *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The Court must "be careful not to second-guess an employer's business judgment that it makes in good faith"; indeed, in order to show pretext, a plaintiff must show that the defendant's nondiscriminatory reason is not credible *and* that "it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1225-26 (2d Cir. 1994).

**Espinosa v. Weill Cornell Med. Coll., 18 Civ. 11665(AT), 2021 U.S. Dist. LEXIS 52334 (S.D.N.Y. March 19, 2021**


Gender discrimination under NYCHRL

The NYCHRL must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Albunio v. City of New York*, 16 N.Y.3d 472, 947 N.E.2d 135, 137, 922 N.Y.S.2d 244 (N.Y. 2011). To survive summary judgment, [t]he plaintiff need only show that her employer treated her less well, at least in part for discriminatory reasons. The employer may present evidence of its legitimate, non-discriminatory motives to show the conduct was not caused by discrimination, but it is entitled to summary judgment on this basis only if the record establishes as a matter of law that discrimination played no role in its actions.

Grimes-Jenkins v. Consol. Edison of N.Y., 16 Civ. 4897(AT), 2021 U.S. Dist. LEXIS 62975,


(S.D.N.Y. March 31, 2021)


Dr. Kaye meets the definition of a caregiver under the law.

NY Labor Law 740 and 741

## 2. New York State Whistleblower Retaliation Claim

### a. Applicable Law

Section 740 of the New York Labor Law provides that "[a]n employer shall not take [*354] any retaliatory personnel action against an employee because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that is in violation of law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety." N.Y. Lab. Law § 740(2)(a). Section 741 of the Labor Law offers additional protections to individuals "perform[ing] health care services for and under the control or direction of [**59] any public or private employer which provides health care services." N.Y. Lab. Law § 741(1)(a). Section 741(2) provides that

no employer shall take retaliatory action against any employee because the employee does any of the following:

(a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or

(b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care.

N.Y. Lab. Law § 741(2).

The "[w]histleblower cause of action incorporates policies, elements and remedies distinct from those of Title VII," Swanston v. Pataki, No. 97 Civ. 9406 (MJL) (KTD), 1999 U.S. Dist. LEXIS 10756, 1999 WL 504905, at *5 (S.D.N.Y. July 15, 1999), and such claims are not analyzed under the McDonnell Douglas burden-shifting framework. "[T]o fall afoul of the [whistleblower] statute, [however,] the adverse action must be taken 'because' the employee engaged in protected activity. In other words, the whistleblower statute, like the anti-discrimination laws, requires some causal connection between an adverse personnel action and a report of dangerous activity." Varughese v. Mount Sinai Med. Ctr., No. 12 Civ. 8812 (CM) (JCF), 2015 U.S. Dist. LEXIS 43758, 2015 WL 1499618, at *68 (S.D.N.Y. Mar. 27, 2015), aff'd, No. 15-1328, 693 Fed. Appx. 41, 2017 U.S. App. LEXIS 12123, 2017 WL 2889483 (2d Cir. July 7, 2017).

### b. Analysis

Defendant contends that Plaintiff's [**60] Section 740 and 741 claims "must be dismissed because there is no evidence that [Plaintiff] engaged in any protected activity, nor any evidence of a causal connection to any retaliatory acts." (Def. Moving Br. (Dkt. No. 50) at 18)

As to protected activity, there is evidence that Plaintiff objected to, and complained about, the Hospital's alleged policy of scheduling patients for individual therapy sessions — and not for other types of therapy — in an effort to increase Medicaid reimbursement. According to Plaintiff, after the New York State Office of Mental Health amended Part 599 in 2012 to provide for higher reimbursement for individual therapy sessions, Plaintiff's supervisors instructed her and other clinicians "not to do any more group sessions [or] . . . family sessions," and to instead schedule "as many individual sessions as possible, even if the patient would not . . . benefit[] from an individual session or an individual session was not part of the patient's treatment plan." (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 75-76; Pltf. Aff. (Dkt. No. 56-7) ¶ 10)

Plaintiff asserts that she became concerned about "performing the wrong sessions for patients just to allow the Hospital [**61] to [be] reimbursed more." (Pltf. Aff. (Dkt. No. 56-7) ¶ 14) Plaintiff testified that she objected to the new practice at "[a]lmost all of the [weekly] supervision[]" sessions [*355] with Arce-Tomale after 2012. Plaintiff also complained to Quinones, her union delegate, and her union representative about the Hospital's new practice. (Def. R. 56.1 Appx., Ex. 1 (Pltf. Dep.) (Dkt. No. 49-2) at 88-89, 97; Pltf. Aff. (Dkt. No. 56-7) ¶ 14) Acknowledging that Defendant denies that Plaintiff ever complained about its treatment and reimbursement practices (see Def. R. 56.1 Appx., Ex. 2 (Quinones Decl.) (Dkt. No. 49-3) at 111; id., Ex. 3 (Arce-Tomale Decl.) (Dkt. No. 49-4) at 89-90), Plaintiff's evidence is sufficient to raise a material issue of fact as to whether she made such complaints.

As to whether the Hospital's alleged practices present a "substantial and specific danger to the public health and safety," "[c]ourts have consistently held that the statute addresses only traditional 'public health and safety' concerns." Villarin v. Rabbi Haskel Lookstein Sch., 96 A.D.3d 1, 5, 942 N.Y.S.2d 67 (1st Dept. 2012). Accordingly, complaints about "financial wrongdoing" or "fraudulent billing" generally fall outside the ambit of the Whistleblower Law, see Chin v. Chinatown Manpower Project, No. 11 Civ. 5270 (CM), 2014 U.S. Dist. LEXIS 72573, 2014 WL 2199424, at *14 (S.D.N.Y. May 23, 2014) (citing Remba v. Fed'n Employment & Guidance Serv., 76 N.Y.2d 801, 559 N.E.2d 655, 559 N.Y.S.2d 961 (N.Y. 1990)), unless a plaintiff demonstrates "that the [**62] illegal activity concomitantly creates 'substantial and specific danger to the public health and safety.'" Villarin, 96 A.D.3d at 5.

Here, there is evidence that Plaintiff complained to her supervisors about fraudulent billing and timekeeping practices, and about mental health treatment and therapy decisions being made on the basis of reimbursement rates. Plaintiff's alleged complaints concerning the latter issue are sufficient to implicate a "danger to public health and safety" within the meaning of Section 740, and to implicate "improper quality of patient care" within the meaning of Section 741, and thus qualify as protected activity under the Whistleblower Law. See Varughese, 2017 U.S. App. LEXIS 12123, 2015 WL 1499618, at *67 (at **summary**

**judgment**, finding protected activity element satisfied for <u>Section 740</u> and <u>741</u> claims where plaintiff complained about medical practitioners "drinking on the job").

**MATERIAL ISSUES IN DISPUTE**