UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                               :
MELISSA KAYE,                                                  :
                                                               :
                              Plaintiff,                        :
                                                               :        18 Civ. 12137 (JPC) (JLC)
            -v-                                                 :
                                                               :        OPINION AND ORDER
NEW YORK CITY HEALTH AND HOSPITALS                             :
CORPORATION *et al.*,                                          :
                                                               :
                              Defendants.                       :
                                                               :
---------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

Plaintiff Melissa Kaye brings this action against Defendants New York City Health and

Hospitals Corporation ("H+H"), her former employer, as well as against Patricia Yang, Elizabeth

Ford, and Abhishek Jain, her former supervisors, and Jonathan Wangel, an H+H labor relations

administrator (collectively, the "Individual Defendants"). Her Amended Complaint, which is the

operative pleading, *see* Dkt. 244 at 3, brings ten causes of action, which arise under multiple

different laws and involve a variety of different allegations. *See* Dkt. 25-1 ("Am. Compl.") ¶¶ 102-

61. Plaintiff's first cause of action alleges that Defendants discriminated against her on the basis

of her sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e

*et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*

("NYSHRL"), the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*

("NYCHRL"), and the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution, as enforced under 42 U.S.C. § 1983. Am. Compl. ¶¶ 102-08. Her second cause of

action alleges that Defendants interfered with her use of leave to provide medical care for a

member of her family, in violation of the Family Medical Leave Act of 1993, 29 U.S.C. § 2601

("FMLA"), and further retaliated against her for her use of leave under the FMLA. Am. Compl.

¶¶ 109-17.  Plaintiff's third, fourth, and fifth causes of action also allege retaliation.  These causes of action allege that Defendants retaliated against her for her complaints about sex discrimination, which she claims are protected by Title VII, the NYSHRL, and the NYCHRL, *id.* ¶¶ 125-32, and for her complaints that H+H's policies for conducting forensic evaluations of criminal defendants violated ethical and legal principles, complaints that she claims are protected by the First Amendment and by New York's employee whistleblowing law, *id.* ¶¶ 118-24, 133-35; *see* N.Y. Lab. Law ("NYLL") § 740.  Plaintiff's sixth cause of action alleges that Defendants paid her less than male employees who performed equal work, in violation of the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA").  Am. Compl. ¶¶ 136-39.  Her seventh cause of action alleges that Defendants discriminated against her on the basis of her caregiver status, in violation of the NYCHRL.  *Id.* ¶¶ 140-47.  Her eighth cause of action alleges that Defendants are liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for the discrimination and retaliation that she allegedly suffered.  Am. Compl. ¶¶ 148-54.  Her ninth cause of action alleges that the Individual Defendants are liable under section 1983 for the alleged violations of her constitutional rights.  *Id.* ¶¶ 155-58.  And lastly, her tenth cause of action alleges that Defendants aided and abetted the alleged primary violations of her rights under the NYSHRL and the NYCHRL.  *Id.* ¶¶ 159-61.[1]

For reasons that follow, Defendants' motion for summary judgment is granted in full.

---

[1] In her opposition, Plaintiff argues that her "claims under the Americans with Disability Act should survive summary judgment."  *See* Dkt. 271 ("Opposition") at 28.  (Because Plaintiff did not include page numbers on the Opposition itself, pincites refer instead to the ECF-generated page numbers on the filed document.)  However, Plaintiff's Amended Complaint brings no cause of action under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), so the Court does not consider whether such claims would survive summary judgment.

## I. Background

### A. Facts[2]

#### 1. The Forensic Psychiatric Evaluation Court Clinics

In approximately August 1999, Plaintiff was hired by Bellevue Hospital to work as a forensic evaluator in the Bronx Court Clinic. Defts. 56.1 Stmt. ¶ 3. When she was hired, her civil service line or title, which influences the compensation H+H doctors are paid, *id.* ¶ 14, was Attending Physician, *id.* ¶ 3, which remained her civil service title throughout the duration of her employment, *see, e.g.*, Pl. Counter 56.1 Stmt. ¶ 5. Different tiers exist within civil service titles, and at least by 2014, Plaintiff was an Attending Physician III. Defts. 56.1 Stmt. ¶ 18; Pl. Counter 56.1 Stmt. ¶ 3. As a forensic evaluator, she was responsible for conducting court-ordered forensic

---

[2] These facts are drawn from Defendants' statement of undisputed material facts under Local Civil Rule 56.1(a), Dkt. 228 ("Defts. 56.1 Stmt."), Plaintiff's counter-statement under Rule 56.1(b), Dkt. 258 ("Pl. Counter 56.1 Stmt."), Defendants' supplemental statement of undisputed material facts, Dkt. 306 ("Defts. Supp. 56.1 Stmt."), and the exhibits filed by the parties. Pursuant to the Court's Order dated June 8, 2022, Dkt. 270, Plaintiff's statement of additional material facts pursuant to Local Civil Rule 56.1(b), submitted on June 7, 2022, has been stricken from the docket. And, as explained *infra* at 25-26, although Plaintiff then included a version of that stricken statement as an exhibit to her filing at Docket Number 273, *see* Dkt. 273-2, a filing that the Court accepted despite its late submission, *see* Dkt. 285, and that otherwise contained only exhibits cited in Plaintiff's untimely opposition brief, the Court did not grant leave for Plaintiff to resubmit the stricken statement or otherwise reconsider or abrogate its earlier Order striking the statement. The Court therefore does not consider the stricken Rule 56.1 statement of additional material facts in this Opinion and Order.

Unless otherwise noted, the Court cites only to Defendants' statement of undisputed material facts when Plaintiff does not dispute the fact, has not offered admissible evidence to refute it, or—as is frequently the case in Plaintiff's Rule 56.1 counter-statement—simply seeks to add her own "spin" on the fact or otherwise dispute the inferences drawn from it. Furthermore, in deciding Defendants' motion for summary judgment the Court has considered only the factual claims contained in the parties' Rule 56.1 statements and the admissible evidence cited in support of those claims; the Court has not independently reviewed the entirety of the record to determine whether any evidence not cited by the parties might alter its conclusions. *See Morisseau v. DLA Piper*, 532 F. Supp. 2d 595, 618 (S.D.N.Y. 2008) ("Rule 56.1 necessarily means that the court need not search the entire file in resolving a summary judgment motion. It may confine its review to the evidence cited by the parties. . . . As Judge Easterbrook has observed, 'judges are not like pigs, hunting for truffles buried in the record.'" (quoting *Albrechtsen v. Bd. of Regents of Univ. of Wis. Sys.*, 309 F.3d 433, 436 (7th Cir. 2002)) (brackets and internal quotation marks omitted)).

examinations of criminal defendants prior to trial or sentencing. Defts. 56.1 Stmt. ¶ 4. In 2004, she became the Medical Director of the Bronx Court Clinic. *Id.* ¶ 5. In May 2018, her title was changed from Medical Director to Director. *Id.* ¶¶ 78-80. The record does not indicate that her position or its title changed at any subsequent point. H+H also operates a Manhattan Court Clinic, Brooklyn Court Clinic, and Queens Court Clinic (together with the Bronx Court Clinic, the "Forensic Psychiatric Evaluation Court Clinics" or "FPECCs"). *Id.* ¶ 6. Ford was Director of Forensic Psychiatry at Bellevue from May 2009 through 2014. *Id.* ¶ 8. During that time, she supervised the Bronx and Manhattan Court Clinics, and Plaintiff reported to her. *Id.*

During 2017 and 2018, formal supervision of the Bronx Court Clinic and the remaining FPECCs was transferred to Correctional Health Services ("CHS"), a division of H+H. *Id.* ¶¶ 24-25. Ford, who had previously been Director of Forensic Psychiatry at Bellevue, became Chief of Psychiatry for CHS in 2015. *Id.* ¶ 28. That same year, Yang became Senior Vice President of CHS, *id.* ¶ 27; Pl. 56.1 Counter Stmt. ¶ 27; Dkt. 225-13 ("Yang Dep.") at 37:8-13, and Wangel became Senior Director of Labor Relations at H+H, a position he held through mid-2019, when he became Assistant Vice President and Deputy Counsel, Defts. 56.1. Stmt. ¶ 31, Dkt. 225-16 at 18:10-12, 23-25 (Wangel deposition). In the spring of 2018, Jain was hired as Director of the FPECCs, Defts. 56.1 Stmt. ¶ 54, and Andrea Swenson, who is not a party to this lawsuit, was hired as Senior Administrator for the Court Clinics, *id.* ¶ 56; Dkt. 260-23 at 19:7 (Swenson deposition).

As part of the transfer of the FPECCs to CHS, Ford convened a workgroup in early 2018 to develop a standardized approach to forensic exams across all the FPECCs. Deft. 56.1 Stmt. ¶ 33. The initial e-mail soliciting participants for the workgroup was circulated to a number of employees across the clinics, including Plaintiff. *Id.* ¶ 34; Dkt. 225-18.[3] By February 12,

_____

[3] Although Plaintiff denies remembering that she received the e-mail, Pl. Counter 56.1 Stmt. ¶¶ 33-34, the record contains the actual e-mail correspondence itself, which reflects that Plaintiff both received the solicitation e-mail and replied to it, Dkt. 225-18.

however, Plaintiff learned that Dr. Barry Winkler, a forensic evaluator who worked in the Bronx Court Clinic, Pl. Counter 56.1 Stmt. ¶ 16, had been chosen to participate in the workgroup instead of her, Defts. 56.1 Stmt. ¶ 35.

The Bronx and Manhattan Court Clinics differed considerably in their staffing; as of February 7, 2018, *see* Dkt. 225 ¶ 3(K), the Bronx Court Clinic employed, in addition to Plaintiff, only a single full-time psychologist, while the Manhattan Court Clinic, which at the time had a vacant director position, employed four part-time psychiatrists, two part-time psychologists, one full-time social worker, and a forensic fellow.  Dkt. 225-11.[4]  The two further differed in their workload, though the parties disagree about the extent of the difference, and Plaintiff has produced records of the number of exams she performed that differ from the records that Defendants have produced.  *Compare* Defts. 56.1 Stmt. ¶ 15; Dkt. 225-9; Dkt. 259-22 *with* Pl. 56.1 Counter Stmt. ¶ 15; Dkt. 259-21.  But regardless of the exact figures, multiple H+H employees, including Plaintiff herself, all agreed that the Manhattan Court Clinic conducted more exams than the Bronx Court Clinic did.  *See* Dkt. 225-2 ("Kaye Dep.") at 209:13-14 ("[T]he Manhattan Court Clinic had a higher volume."); Dkt. 225-4 ("Ford Dep.") at 172:5-8, 12-14 ("[T]he Manhattan clinic had the most 730 orders ordered, which [led] to [a] higher volume of cases. . . .  And then the Bronx had many fewer orders and also many fewer staff."); Dkt. 225-8 ("Winkler Dep.") at 284:16-21; Dkt. 225-10 (discussing, in an October 16, 2018 email conversation between Ford, Jain, and Swenson, why the Bronx Court Clinic had fewer 730 orders for forensic examinations than clinics in the other boroughs).

---

[4] Defendants' Rule 56.1 statement asserts that the Manhattan Court Clinic employed one full-time psychiatrist and two part-time psychiatrists, Defts. 56.1 Stmt. ¶ 16, but the organizational chart cited as evidence in support of that claim instead lists no full-time psychiatrists and four part-time psychiatrists, *see* Dkt. 225-11.  Because only the exhibit itself constitutes evidence, the Court relies on it rather than on the inconsistent Rule 56.1 statement.

**2.      Plaintiff's Compensation**

In approximately July 2001, Dr. Stephen Ciric began working at Bellevue as a forensic psychiatrist; his curriculum vitae from the mid-2000s indicates that his title was Attending Physician. Dkt. 225-5. In either 2004 or 2008, his title was changed from Attending Physician III to Physician Specialist III. Pl. Counter 56.1 Stmt. ¶ 10; Dkt. 259-18; Defts. Supp. 56.1 Stmt. ¶ 2; Dkt. 305-2.[5] During that period, his compensation was comparable to or lower than Plaintiff's. In 2007, Plaintiff's salary was $159,299 while Ciric's was $144,240, *compare* Dkt. 305-1 *with* Dkt. 305-2, and while Ciric's salary was increased to $160,413, effective July 1, 2008, Plaintiff's was increased further, to $172,573, effective March 15, 2009, Dkts. 305-02, 305-03. Around 2011, Ciric was appointed Medical Director of the Manhattan Court Clinic, and his civil service title was raised from Physician Specialist III to Physician Specialist IV. Defts. 56.1 Stmt. ¶ 11; Dkt. 225-6. Compensation for those positions—and thus for Ciric—was determined by the collective bargaining agreement between H+H and the Doctors Council, the union representing doctors employed by H+H. Defts. 56.1 Stmt. ¶ 12. From at least 2013 onwards, Ciric received a higher

---

[5] The parties have made competing and, at times, inconsistent claims about when Ciric's civil service title was changed from Attending Physician to Physician Specialist. Defendants initially claimed that Ciric was employed as a Physician Specialist starting in 2001. Defts. 56.1 Stmt. ¶ 10. That claim, however, was flatly contradicted by his curriculum vitae as of February 1, 2004, the only evidence Defendants cited in support. Dkt. 225-5. Plaintiff's Rule 56.1 counter-statement claims that his civil service line was changed in 2004, Pl. Counter 56.1 Stmt. ¶ 10; yet her briefing in opposition instead claims that 2008 was "when Dr. Ciric was promoted from Attending Physician III to Physician Specialist III," Opposition at 11. Plaintiff cites an exhibit, Dkt. 259-18, containing three personnel action forms for Ciric. (Puzzlingly, it also contains a form appearing to record Ciric's resignation in 2007, *id.* at 2, although neither party claims that he resigned in 2007.) The first personnel action form, which was filled out by hand, bears various dates from 2004 and gives a title for Ciric of "PHYSICIAN SPECIAL." *Id.* at 1. The second, also filled out by hand, is dated from 2008 and gives a title for Ciric of "sessions psych." *Id.* at 3. The third is dated from 2009 and gives a typed title for Ciric of "PHYSICIAN SPECIALIST HRLY." *Id.* at 4. Accompanying their reply brief, Defendants submitted a supplemental Rule 56.1 statement, which claimed that his promotion occurred in 2008, Defts. Supp. 56.1 Stmt. ¶ 2, and cited a personnel action form promoting him from "Att. Phys. III" to "Phys. Specialist," effective "07/01/08," with the remark "Level 3 Physician Specialist," Dkt. 305-2.

salary than Plaintiff did.  *Id.* ¶¶ 17-18.  In 2017, he resigned from his position.  *Id.* ¶ 23.
Subsequently, Dr. Daniel Mundy took over management of the Manhattan Court Clinic.  Pl.
Counter 56.1 Stmt. ¶ 23; Dkt. 259-25.  Prior to his promotion, Mundy was a part-time psychiatrist
evaluator with the Attending Physician civil service title.  Defts. 56.1 Stmt. ¶ 57.  Once he was
appointed to manage the Manhattan Court Clinic, however, Mundy was transferred to a non-
unionized managerial title.  *Id.* ¶ 58.  Because Mundy no longer had a civil service title governed
by the collective bargaining agreement, his compensation did not depend on his civil service title
but was rather set based on surveys of salaries paid by other employers to employees working in
comparable positions.  *Id.* ¶ 69.  Mundy's managerial salary exceeded the salary paid to Plaintiff,
just as Ciric's salary did when he had managed the Manhattan Court Clinic.  *Id.* ¶ 68.

Around 2013 or 2014, Plaintiff first became aware of the discrepancy in pay between
herself and Ciric.  *Id.* ¶ 17.  In early 2014, she raised that discrepancy with Ford, her then-
supervisor, and requested that her civil service title be changed from Attending Physician to
Physician Specialist, the title held by Ciric.  *Id.* ¶ 18.  Ford told Plaintiff that she would raise the
concern with her supervisor, *id.*, Dr. Mary Anne Badaracco,[6] who was Chief of Psychiatry at
Bellevue, *id.* ¶ 7.  However, it is unclear whether Ford ever did, in fact, discuss the complaint with
Badaracco.  *Compare id.* ¶ 19 *with* Pl. Counter 56.1 Stmt. ¶ 19.[7]  In 2014, Ford was replaced as
Plaintiff's supervisor by Dr. Jeremy Colley, Defts. 56.1 Stmt. ¶ 9, and in late 2014 or early 2015
Plaintiff repeated her complaints about her compensation to him, *id.* ¶ 20.  He then raised Plaintiff's

---

[6] The parties disagree about whether Badaracco's first name is "Marianne" or "Maryanne."
*Compare* Defts. 56.1 Stmt. ¶ 7 *with* Pl. Counter 56.1 Stmt. ¶ 7.  Both appear to be incorrect.  *See*
NYC Health + Hospitals, *Mary Anne Badaracco, M.D.*,
https://www.nychealthandhospitals.org/doctors/badaracco-mary-anne/ (last visited Mar. 25,
2023).

[7] Ford testified that she had raised the issue with Badaracco, Ford Dep. at 115:7-9, 19-20,
but Plaintiff testified that when she first spoke with Badaracco about it, Badaracco appeared not
to have had any prior conversations about the subject, Kaye Dep. at 61:14-16.

concerns with Badaracco, who contacted Plaintiff directly to discuss them. *Id.* ¶ 21. Badaracco and Colley then told Plaintiff that while her civil service title could not be changed from Attending Physician to Physician Specialist, she would receive the maximum raise permitted by the collective bargaining agreement for an employee in the Attending Physician III line. *Id.* ¶ 22.

Around December 2017, Plaintiff learned that management of the FPECCs would be transferred from various city hospitals, including Bellevue, and would instead be consolidated under CHS. *Id.* ¶ 45. Following discussions, CHS and the Doctors Council agreed that once management of the FPECCs was transferred to CHS, unionized clinic employees would retain union positions whose terms and conditions would continue to be governed by the collective bargaining agreement. *Id.* ¶ 53. Furthermore, the date of the transfer was set for July 1, 2018, in part to ensure that unionized clinic employees, including Plaintiff, would receive a retention bonus for which they would be eligible only if they remained employed by Bellevue through the full fiscal year ending in June 2018. *Id.* ¶ 47.[8] Both before and after the transfer occurred, Plaintiff searched for job opportunities that would enable her to remain an employee of Bellevue rather than becoming an employee of CHS, but those attempts were unsuccessful. *Id.* ¶¶ 49-52.

Before the transfer occurred, Plaintiff raised her complaints about pay with Ford. Ford Dep. at 116:25-117:7. On April 24, 2018, Plaintiff e-mailed Ford asking to speak directly with Yang about pay parity. Defts. 56.1 Stmt. ¶ 62; Dkt. 226-12. Ford responded, "Of course." Defts. 56.1 Stmt. ¶ 63; Dkt. 226-12. She added, "Likely that much more flexibility for your salary if you are willing to move into [a] managerial role, but I know that also means losing union/other benefits." Defts. 56.1 Stmt. ¶ 63; Dkt. 226-12. As mentioned, when Mundy was appointed to

---

[8] Plaintiff disputes this fact in her Rule 56.1 counter-statement, arguing that the timing of the transition was set by a memorandum of understanding between the Doctors Council and the City, Pl. Counter 56.1 Stmt. ¶ 47, but although she has produced and cited such a memorandum she does not indicate which provision supposedly governed the transition of the FPECCs to CHS management, and after its own review, the Court was unable to identify one, *see* Dkt. 260-19.

manage the Manhattan Court Clinic, he left his unionized position to take a non-unionized managerial role.  Defts. 56.1 Stmt. ¶¶ 57-58.  As a result, he was not eligible for the retention bonus that was paid to unionized employees, including Plaintiff, who remained employed by Bellevue through June 30, 2018.  *Id.* ¶ 58.  Similarly, Dr. Elizabeth Owen, who had previously managed the Brooklyn Court Clinic, left her unionized position to take a non-unionized managerial role when she was appointed to manage the Queens Court Clinic following the transfer of the FPECCs to CHS supervision.  *Id.* ¶ 60.

On May 3, 2018, following her exchange with Ford, Plaintiff e-mailed Yang, setting forth her employment history, complaining that she was paid less than male colleagues because of her sex, and requesting that her civil service title be changed from Attending Physician to Physician Specialist.  *Id.* ¶ 65.  Yang then forwarded the email to other CHS managers and began to discuss Plaintiff's compensation.  *Id.* ¶ 66; Dkt. 226-15.  In response, Sara Gillen, the Chief Operating Officer for CHS, Defts. 56.1 Stmt. ¶ 30, shared her belief that the two non-unionized managerial employees were paid higher salaries than Plaintiff due to their managerial roles.  Dkt. 226-15.  Yang replied, "[W]e will need to be able to offer a position that suits the needs of FPECC and is fair and equitable to the scope and responsibility.  We can offer her the management position comparable to Winkler[, the new director of the Brooklyn court clinic,] and Mundy, to run Bx under us."  *Id*.  Yang then replied to Plaintiff and forwarded her e-mail to the CEO of Bellevue, where Plaintiff was then employed.  Defts. 56.1 Stmt. ¶¶ 71-72.  Nonetheless, Plaintiff preferred to remain in her unionized position rather than taking a non-unionized managerial position, even if the latter would carry a higher salary, due to the job protections that union membership provided.  *Id.* ¶¶ 73-74.[9]  Indeed, on April 30, 2018, following a conversation with Wangel and Jessica Laboy,

---

[9] In her Rule 56.1 counter-statement, Plaintiff denies Defendants' claim, advanced in their own Rule 56.1 statement, that she was offered a non-unionized managerial position but declined it.  *Compare* Defts. 56.1 Stmt. ¶ 73, *with* Pl. Counter 56.1 Stmt. ¶ 73.  Nonetheless, Plaintiff's

the Chief Administrative Officer for CHS, *id.* ¶ 32, Plaintiff e-mailed the two to memorialize that the terms and conditions of her employment—including her membership in the union—would not be affected by the transfer of the FPECCs to CHS.  *Id.* ¶ 64; Dkt. 226-13.  Shortly thereafter, on May 22, 2018, Plaintiff filed a Charge of Discrimination against Bellevue with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that she had been discriminated against in terms of pay based on her sex.  Defts. 56.1 Stmt. ¶ 124; Dkt. 227-3.

### 3.     Plaintiff's Policy Complaints

Plaintiff disagreed with many of the policies Defendants instituted to govern how forensic evaluations would be conducted at the FPECCs.  *E.g.*, Pl. Counter 56.1 Stmt. ¶ 2, at 4.  In particular, she "believed that CHS had infiltrated the Court Clinics with the objective of politicizing the examination process."  *Id.* ¶ 83.  Due to those disagreements, she lodged a number of complaints about those policies, both internally and externally, beginning in 2015.  *See Id.* ¶ 2, at 4.  In her first such complaint, made to Colley in December 2015, Plaintiff expressed her concern that Yang and other CHS employees had inappropriately interfered in the examination process when they sought a finding that a particular prisoner was unfit for trial.  Defts. 56.1 Stmt. ¶ 82.  In particular, Plaintiff objected to CHS's attempts to expedite the issuance of a force order, which authorizes correctional officers to remove a prisoner from his cell by force, in order to expedite a forensic examination, Pl. Counter 56.1 Stmt. ¶ 82, even though her own exhibit indicates that she herself first raised the possibility of seeking a force order for that particular defendant, Dkt. 261-6 at 3.  Concerns about the use of force orders do not appear to have recurred after the incident in 2015.

---

denial does not assert that she would, in fact, have taken a non-unionized managerial position; rather, she denies only that Defendants ever *formally* offered her a specific non-unionized managerial position in writing.  *See* Pl. Counter 56.1 Stmt. ¶ 73.  Furthermore, she admits "that she felt that the offer of a managerial position was a ploy to fire her."  *Id.* ¶ 74.  Thus, the Court does not interpret her as denying that Defendants were willing to employ her in a non-unionized managerial role, or that she would not have accepted it, only that no offer of such a role was ever formally made in writing.

Next, a protracted conflict took place between Plaintiff and CHS staff concerning the information that would be available to forensic evaluators in conducting forensic evaluations of criminal defendants.  CHS was concerned that state law prohibited the release of information about individuals' past substance abuse, Dkt. 225-21, and thus believed that such information could not be released to the forensic evaluators responsible for conducting forensic examinations of criminal defendants.  Defts. 56.1 Stmt. ¶ 38.  Furthermore, CHS was unwilling to seek authorization for the release of that information directly from defendants, and CHS believed defendants' attorneys would be unwilling to seek its release, as well.  *Id.* ¶ 39.  By contrast, Plaintiff believed "that redacted records of any sort are completely unacceptable, and that HIV and substance abuse information play integral parts in psychiatric examinations."  Pl. Counter 56.1 Stmt. ¶ 38, at 37.  According to Plaintiff, she began to advocate for the use of unredacted medical records in 2017, and these disagreements led to a confrontation at a meeting on January 29, 2018 at which Plaintiff, Ford, and Yang were all present.  *Id.* ¶ 37, at 35.  At that meeting, Plaintiff claims, she argued that it was inappropriate to conduct forensic examinations based on redacted medical records, *e.g.*, *id.* ¶ 43, and she further argued that requesting HIPAA waivers from criminal defendants would be inappropriate because the defendants might be incapable of a knowing and intelligent waiver, *id.* ¶ 39.  In response, she claims, Yang said, "[I]f you don't like the way we do things around here, there's the door!"  *Id.* (emphasis omitted); *see* Kaye Dep. at 99:21-22.  Yang denies making that statement.  Pl. Counter 56.1 Stmt. ¶ 84.  On February 1, 2018, in an e-mail exchange about the disagreement, Ford wrote that "[Plaintiff] has been a problem for a long time and we will manage her out."  Defts. 56.1 Stmt. ¶ 37 (alteration in original).  Plaintiff then repeated her concerns about the use of redacted medical records in e-mails that were sent to Colley on March 12 and 13, 2018.  *Id.* ¶¶ 42-43.  She continued to repeat such complaints over the next two years of her employment.  Pl. Counter 56.1 Stmt. ¶ 172.

11

Plaintiff also objected to the CHS private practice policy, which permitted forensic evaluators employed by CHS also to perform forensic evaluations privately for additional compensation. Kaye Dep. at 255:4-256:16. In her view, that policy could give rise to conflicts of interest, since evaluators might alter the findings of the examinations they conducted for the city in order to improve their chances of being hired to perform additional private work. Defts. 56.1 Stmt. ¶ 87. She raised her concerns about the private practice policy during the January 29, 2018 meeting with Ford and Yang. Pl. Counter 56.1 Stmt. ¶ 84. She raised those concerns again during either a single meeting or two meetings with Ford and Jain that occurred in the spring or summer of 2018. *Id.* ¶ 87.[10] In addition to these complaints lodged within CHS, Plaintiff claims that she lodged numerous complaints with external organizations and individuals between 2017 and 2020. *Id.* ¶ 172.[11]

---

[10] Plaintiff's Rule 56.1 counter-statement identifies one meeting in April 2018 where the policy was discussed, *see* Pl. Counter 56.1 Stmt. ¶ 87, and another on June 28, 2018, *id.* ¶ 172, at 151. However, the portion of her deposition transcript cited to support the claim that a meeting occurred in April 2018 in fact describes the meeting as having occurred in June or July, Kaye Dep. at 248:2-3, leaving it unclear whether the reference to a separate April meeting was simply an erroneous attempt to mention the single June 28, 2018 meeting.

[11] These consisted of a complaint to the Legal Aid Society in June 2017 about redacted medical records; reports of fraud submitted to Medicaid from 2018 to 2021; a complaint to a state judge's law secretary in February 2018 about redacted medical records; a complaint to the Legal Aid Society in February 2018 about an allegedly improper attempt to access medical records; a complaint to the Bronx District Attorney's office and to state court judges in March 2018 about redacted medical records; a complaint to the New York City Department of Investigation in September 2018 about the private practice policy and alleged rigging of forensic examinations; complaints to the Office of Court Administration and to H+H's Inspector General in September 2018, April 2019, and September 2019; complaints to political candidate Pete Homberg from October through November 2018; complaints to a Bronx Defenders attorney in October and November 2018; complaints to the New York City Conflicts of Interest Board in November 2018 and October 2020 regarding the private practice policy; complaints to an Assistant District Attorney in November 2018 regarding unredacted medical records; complaints to the National Labor Relations Board and the U.S. Department of Labor's Office of Labor Management Statistics from December 2018 to July 2019; a complaint to her union in January 2019; a complaint to the Legal Aid Society in January 2019; complaints to the New York State Comptroller and Inspector General in February 2019 and January 2021; a complaint to the New York State Attorney General's Public Integrity Bureau in March 2019; complaints to the New York State Public Corruption Bureau in May 2019, September 2019, and October 2019 about "tax fraud, judicial

### 4.      Episodes of Alleged Retaliation

As mentioned, Plaintiff complained both about CHS policies and about her allegedly inequitable compensation at various points in 2017 and 2018, culminating in her filing a charge of discrimination with the EEOC on May 22, 2018.  Defts. 56.1 Stmt. ¶ 124.  Thereafter, Plaintiff claims that she began to experience various forms of adverse treatment at work as retaliation for her complaints.[12]  *E.g.*, Pl. Counter 56.1 Stmt. ¶ 2, at 5.  As a result, she filed a Supplemental Charge of Discrimination with the EEOC on September 11, 2018, which added allegations of

---

fraud, [and] regulatory and medicolegal violations"; a complaint to the H+H Corporate Compliance Officer in September 2019 about alleged fraud; complaints to the Centers for Medicare and Medicaid Services in September 2019 and July 2020 about alleged fraud at CHS; a complaint to the *New York Post* in October 2019 about alleged corruption; complaints in 2019 and 2020 to the Office of Court Administration's Audit Bureau about alleged fraud at CHS; a complaint to the "Citizens Budget Committee" at some point in 2019 about alleged fraud resulting from FPECC doctors' private practices; complaints to politicians Nicole Malliotakis and Lee Zeldin at some point in 2019 about alleged corruption and fraud "taking place within amongst [sic] CHS/DeBlasio/MOCJ"; complaints to "the offices of the Comptroller and Inspector General" in November 2020; and complaints to the Department of Investigation, the Conflict of Interest Board, the New York State Attorney General's Office, the Office of Court Administration, and the Public Corruption Bureau in January or February 2021.  Pl. Counter 56.1 Stmt. ¶ 172.  Below, the Court discusses whether Plaintiff's evidence raises a triable issue of fact as to whether these complaints were made.  *See infra* III.D.1.b.

[12] In addition to the episodes of alleged retaliation discussed below, Plaintiff claims that she was underpaid by $31,000 in 2018 and by either $28,000 or $36,000 in 2019.  Pl. Counter 56.1 Stmt. ¶¶ 2, 103, 130, 149.  However, while the documentary evidence cited in the Rule 56.1 statement does document various employment-related disputes in 2018, it does not support the claim that her underpayment in 2018 amounted to $31,000 or that she was underpaid at all in 2019.  *See* Dkts. 261-17 (disputing whether her unpaid lunch would last thirty minutes or an hour), 261-25 (disputing whether the time spent taking credentialing exams would be covered by educational leave or annual leave), 261-26 (allocating a portion of the time missed for those exams to educational leave and a portion to annual leave), 261-27 (allocating, after further disputation, all time missed for those exams to educational leave), 262-6 (revealing efforts by CHS staff to compute the retention bonus due to Plaintiff), 262-7 (revealing efforts to correct the initial, erroneous underpayment of the retention bonus).  And while Plaintiff does cite to her own sworn declaration, which repeats the claim made in her Rule 56.1 counter-statement, Dkt. 259-4 ("Kaye Decl.") ¶¶ 94-97, 99, "self-serving, conclusory affidavits, standing alone, are insufficient to create a triable issue of fact," *Kobrand Corp. v. Abadia Retuerta S.A.*, No. 12 Civ. 154 (KBF), 2012 WL 5851139, at *4 (S.D.N.Y. Nov. 19, 2012).  For that reason, while the Court will discuss *infra* the various specific disputes Plaintiff documents from 2018, it will disregard the conclusory and unsupported claims that she was underpaid $31,000 in 2018 and either $28,000 or $36,000 in 2019.

retaliation to her earlier allegations of discrimination.  Defts. 56.1 Stmt. ¶ 125; Dkt. 227-4.
Plaintiff alleges that the adverse treatment she suffered constituted retaliation for her filing of this
supplemental charge as well as for her earlier complaints.  Pl. Counter 56.1 Stmt. ¶¶ 125-26.  On
December 21, 2018, she filed the Complaint that initiated this action.  Dkt. 1.  The docket does not
indicate, however, that that Complaint was ever served on any Defendant, and on April 11, 2019,
Plaintiff filed a letter with the Court explaining why service had not been effected by that point.
Dkt. 4.  Instead, the only proof of service to be found on the docket reflects that an Amended
Complaint was served on Defendants in April and May 2019.  Dkts. 24, 30.

As mentioned, starting in 2004, Plaintiff's job title at the Bronx Court Clinic was Medical
Director.  Defts. 56.1 Stmt. ¶ 5.  In March 2018, CHS personnel decided that the title Director
should instead be used both for the managers of each FPECC and for Jain, who supervised the
managers of the individual clinics and who managed the FPECCs collectively.  Defts. 56.1 Stmt.
¶¶ 78-80.[13]  Plaintiff claims that her title was changed from Medical Director to Director as
retaliation for her complaints.  *Id.* ¶ 81.  In addition, two spreadsheets contained in e-mails sent in
early May listed Plaintiff as an Attending Physician II.  Dkts. 259-5 (listing "Title" as "Attending
Physician II"), 259-8 (listing "Corp Title" as "Attending Physician L-II").  Based on these e-mails,
Plaintiff claims that "[o]n May 14, 2018, 11 days after [she] complained of pay parity,
Defendants . . . demoted her in corporate title from Attending Physician III to Attending Physician

---

[13] Plaintiff claims that "Defendants did not produce any evidence or business cards to show
that [Mundy's] title had also been changed," Pl. Counter 56.1 Stmt. ¶ 78, and therefore concludes
that "Defendants have not produced evidence to support their position that ***all*** of the Directors had
their titles changed," *id.* ¶ 81.  Defendants, however, have produced an e-mail from Jain, dated
May 11, 2018, listing Mundy's title as "Director, Manhattan Forensic Psychiatry Court Clinic,"
Dkt. 226-21, as well as an e-mail exchange in which Jain and Ford decided to employ the title
Director for all the FPECC managers collectively, which obviously includes Mundy, Dkt. 226-23.
Thus, Defendants have produced evidence both that all FPECC managers were given the title
Director and that Mundy individually was given that title.  By contrast, Plaintiff has produced no
evidence that Mundy was ever given the title of Medical Director.

II." Pl. Counter 56.1 Stmt. ¶ 4. Those e-mails, however, were sent by a CHS administrator before Plaintiff's employment was officially transferred from Bellevue to CHS, and the spreadsheets they contained did not appear to have been produced by human resources software but rather appeared to be otherwise unmarked screenshots taken from Excel. Dkts. 259-5, 259-8. Furthermore, besides these two internal e-mails listing her as an Attending Physician II, she has produced no evidence of any change in any of the terms or conditions of employment that would ordinarily be tied an employee's rank, such as pay, and she has produced no formal documentation, such as a personnel action form, memorializing her purported change in position from Attending Physician III to Attending Physician II. Indeed, she herself has disputed the reliability of at least one of the e-mails, inasmuch as she has elsewhere denied that she received a salary equal to the amount it lists as her salary. *E.g.*, Pl. Counter 56.1 Stmt. ¶ 68.

Shortly after CHS assumed management of the FPECCs on July 1, 2018, a dispute arose concerning Plaintiff's shift. She sought to work an eight-and-a-half-hour shift with an unpaid half-hour lunch break, which she believed she was entitled to work pursuant to an agreement between Bellevue and the doctors' union, and which was her shift when the Bronx Court Clinic fell under Bellevue's jurisdiction. Kaye Dep. at 281:15-16; Dkt. 261-17. By contrast, her supervisors wanted her to work a nine-hour shift with an unpaid one-hour lunch, Defts. 56.1 Stmt. ¶¶ 90-91, which they claimed was the shift all doctors were required to work, *id.* ¶ 96. Eventually, Plaintiff was required, over her protests, to work a nine-hour day, from 8:00 a.m. to 5:00 p.m., with a one-hour lunch break. *Id.* ¶ 101.

When the FPECCs were transferred to CHS management, the timekeeping software used by CHS initially did not work properly for employees at the Bronx Court Clinic. *Id.* ¶ 130. Furthermore, from that point through at least October 2019, Plaintiff was on occasion unable to access the timekeeping software in order to enter the hours that she had worked. *Id.* ¶ 131; Pl.

15

Counter 56.1 Stmt. ¶ 131.[14]  On those occasions, she notified Jain, her supervisor, that she was

unable to access the software, and he entered the hours she worked.  Defts. 56.1 Stmt. ¶ 130.

Plaintiff took credentialing exams on September 24, 2018.  In advance, she submitted a

request for educational leave, with appropriate documentation.  *Id.* ¶ 102.  However, her request

was initially rejected, and she was told that the time during which she sat for the exam would be

taken out of her annual leave instead.  *Id.* ¶ 103.  Jain then instructed the payroll department that

Plaintiff should be credited with educational leave, not annual leave, because the exams were

required for her professional credentials.  *Id.* ¶ 104.  Initially, the payroll department changed

Plaintiff's timesheet to credit her with five hours, fifteen minutes of educational leave, deducting

the remainder of the time missed from annual leave.  Pl. Counter 56.1 Stmt. ¶ 105.  They explained

that employees were permitted to take educational leave only for periods supported by the

documentation they submitted, and Plaintiff's documentation did not support her claims that the

exam required her to miss the entire day.  Dkts. 226-40, Dkt. 261-26 at 1.  Nonetheless, CHS later

informed Plaintiff that it was revising its policy to allow employees to take a full day of educational

leave during credentialing exams.  Defts. 56.1 Stmt. ¶ 108; Dkt. 226-41 at 2.  Furthermore, it

informed her that she would be credited with a full day of educational leave, a decision documented

by a screenshot of CHS's timekeeping software reflecting that credit.  Defts. 56.1 Stmt. ¶ 108; Dkt.

226-41 at 1.  Nonetheless, Plaintiff maintains that "it remains unclear if the error was corrected a

full 4 months after she was wrongly docked pay and time."  Pl. Counter 56.1 Stmt. ¶ 108.

As mentioned, Plaintiff was eligible for a retention bonus because she remained a

unionized Bellevue employee through June 30, 2018.  The size of the bonus owed was reduced

---

[14] Plaintiff's Rule 56.1 counter-statement alleges that she "was denied consistent access to KRONOS [the time-keeping system] between July 2018 and January 2020."  Pl. Counter 56.1 Stmt. ¶ 131.  However, the evidence she cites does not identify any occasion after October 2019 when she was unable to access it.  *Id.*

proportionally if an employee worked only part-time.  Dkt. 226-47 at 4.  When first paying her bonus, CHS computed Plaintiff not as a full-time employee but rather as a part-time employee who worked only sixty-seven percent of a full-time workload.  *See* Dkt. 226-49.  Consequently, she was not paid the full retention bonus; instead, she was paid sixty-seven percent of the full amount.  Defts. 56.1 Stmt. ¶¶ 119, 121.  An additional staff member, Federico Zuniga, was also paid his retention bonus incorrectly, Dkt. 227-1, although he was neither an FPECC employee nor a manager, Pl Counter 56.1 Stmt. ¶ 122.  On October 31, 2018, Plaintiff complained that she had been incorrectly listed as a part-time employee and therefore had incorrectly been paid less than the full retention bonus.  Defts. 56.1 Stmt. ¶ 121.  Subsequently, following complaints from the Doctors Council, CHS staff confirmed that Plaintiff was a full-time employee, and informed her that the full retention bonus would be paid.  *Id.* ¶ 123.  Nonetheless, Plaintiff maintains that CHS intentionally miscalculated her hours in order pay her less than the full bonus to which she was entitled.  Pl. Counter 56.1 Stmt. ¶ 123.

Next, Plaintiff claims that Jain, her supervisor, repeatedly refused to meet with her and excluded her from meetings between September 2018 and January 2020, including from meetings that involved the Bronx Court Clinic.  *Id.* ¶ 128.  In support of that claim, she cites e-mails relating to a particular meeting scheduled for December 4, 2018, when Jain met with William Kalish, the Chief Court Clerk.  *Id.*  In mid-November, the meeting had been scheduled for that date because Plaintiff had said, "as far as I know, I'm available" on that date.  Dkt. 262-16 at 1.  On November 28, 2018, however, she e-mailed Jain to let him know that she had psychiatric evaluations scheduled for that day and might be unable to attend the meeting.  Dkt. 262-17.  In reply, Jain asked Plaintiff whether the meeting could go forward as scheduled, so long as those who attended filled her in afterwards.  Dkt. 262-16 at 2.  When Plaintiff said that she was "fine" with whatever Jain decided, *id.*, he decided to hold the meeting as scheduled, *id.* at 1.  She then expressed her

concerns that she was being excluded from meetings and proposed that the meeting be rescheduled to a day when she would not be conducting evaluations. Dkt. 262-18. In reply, Jain said that "[w]e have not been excluding you and have actually been trying to schedule these meetings so you can be present and provide input." Dkt. 262-19. Because of her conflict, the meeting was rescheduled for the following day, when Plaintiff was available. Dkt. 262-20. In Plaintiff's view, during this episode "Defendant Jain and Ms. Swenson excluded Dr. Kaye from a meeting with Chief Court Clerk William Kalish." Pl. Counter 56.1 Stmt. ¶ 128.

Plaintiff's next set of allegations concern leave that she requested for medical reasons. Her son suffers from a severe allergy to common environmental chemicals. Defts. 56.1 Stmt. ¶ 143. To better enable her to provide necessary care, she requested both intermittent leave pursuant to the FMLA and a reasonable accommodation under the ADA. *See id.* ¶ 142; Dkt. 227-21. On October 15, 2018, she first submitted her FMLA leave request, which covered the following two weeks. Defts. 56.1 Stmt. ¶ 136. On October 30, 2018, when she returned from FMLA leave, that request was approved. *Id.* ¶ 138. However, her timesheets had not yet been processed for the two weeks when she was on leave. Pl. Counter 56.1 Stmt. ¶ 137. That same month, she also sought a reasonable accommodation that would allow her to work a shorter shift, to work a split shift, and to work remotely to care for her son. Defts. 56.1 Stmt. ¶ 142. The request was denied on the grounds that H+H policy permitted ADA accommodations to be granted only for an employee's own disability, not for the disability of a family member, while an employee's need to provide care for a family member would instead be accommodated through leave under the FMLA. *Id.* ¶ 144. On November 8, 2018, Plaintiff notified a human resources employee via e-mail that she would be taking FMLA leave for November 13 and 14, 2018. *Id.* ¶ 139. Those dates were included on a list of planned absences in Plaintiff's initial FMLA documentation. Dkt. 227-18 at 1. However, because Plaintiff's documentation listed the "frequency/duration of the absences needed to care

for your family member as 1-4 times per 5-180 weeks for 1-2 months," H+H human resources sought further clarification about the frequency and duration of Plaintiff's planned absences. *Id.* at 3.   On January 18, 2019, she submitted further documentation clarifying their frequency and duration, and on February 15, 2019, her FMLA leave was retroactively approved.   Defts. 56.1 Stmt. ¶ 140; Dkt. 227-19.   On May 7, 2019, she e-mailed a human resources employee to inquire about her FMLA leave balance.   Defts. 56.1 Stmt. ¶ 141.   While she was told that she had used 37 days of FMLA leave, her own calculations reflected that only 27 days had been used.   Dkt. 227-20 at 2-3.   Once she explained that ten of the days coded as FMLA leave days were in fact taken as annual leave, human resources confirmed that her leave balance would be corrected.   *Id.* at 1.[15]

In addition, on July 12, 2019, Plaintiff submitted a request for a reasonable accommodation for her own medical conditions.[16]   Defts. 56.1 Stmt. ¶ 146; Dkt. 227-24.   In particular, because of symptoms that "often occur in the early a.m.," Dkt. 227-24 at 3, she sought a later start time, a flexible schedule, and the ability to work remotely, *id.* at 6.   Following discussion among CHS staff, on October 23, 2019, Plaintiff was granted an accommodation permitting her to begin her shift an hour later than normal, at 9:00 a.m. rather than 8:00 a.m.   Defts. 56.1 Stmt. ¶ 148.   She was not permitted to work remotely.   *Id.*

---

[15] In her Rule 56.1 counter-statement, Plaintiff claims that she "continued to experience illegal deductions from her pay check and salary.   Instead of using the central payroll system to calculate [her] time and leave usage, Defendants based their calculations on their timekeeping system, which contained the timesheets Defendant Jain incorrectly entered into the system, and to which Dr. Kaye did not have consistent access."   Pl. Counter 56.1 Stmt. ¶ 141.   Nonetheless, these claims are not supported by the two exhibits cited as evidence.   *See* Dkts. 263-3, 263-36.

[16] As mentioned, *see supra* note 1, Plaintiff's briefing argues that the evidence in the record creates a genuine dispute of material fact as to whether Defendants violated the ADA by denying her a reasonable accommodation.   *See* Opposition at 28-29.   However, because the Amended Complaint does not bring any claims for an ADA violation, the Court will consider only whether the partial denial of Plaintiff's requested accommodation constituted retaliation for her conduct protected by other laws, not whether that denial violated the ADA itself.

On November 7, 2018, Jain circulated a draft of the FPECC Psychological Testing Policy to the Clinic managers to solicit their feedback. *Id.* ¶ 132; Dkt. 227-11 at 3. On January 10, 2019, he circulated the revised policy. Dkt. 227-11 at 2. Plaintiff opposed the new policy. *Id.* at 1-2. At the same time, Defendants learned that news of the new policy had leaked to Legal Aid attorneys. Defts. 56.1 Stmt. ¶ 132. Because Defendants suspected that Plaintiff was responsible for the leak, they conducted a search of her work e-mail. *Id.* ¶ 133. That search did not produce evidence that she had leaked the policy. Pl. Counter 56.1 Stmt. ¶ 133.

In the spring and summer of 2019, two separate incidents led Defendants to serve disciplinary memoranda on Plaintiff. First, on March 20, 2019, following discussions with Yang and Ford, Wangel e-mailed H+H's corporate compliance department to notify them that Plaintiff had electronically recorded psychiatric evaluations without the consent of either the defendants being evaluated or their counsel. Defts. 56.1 Stmt. ¶ 150; Pl. Counter 56.1 Stmt. ¶ 150. In the investigation that ensued, compliance interviewed Mundy, the director of the Manhattan Court Clinic, who reported that he never recorded evaluations and that he had not heard of anyone making such recordings, and Owen, the director of the Queens Court Clinic, who reported her understanding that the Department of Corrections prohibited such recordings. Dkt. 227-29 at 3. Compliance did not, however, find any written H+H or CHS policy prohibiting the making of such recordings. *Id.* at 2. It concluded that Plaintiff's recording of the exam did not violate any existing law or policy but was inappropriate and inconsistent with CHS custom and practice. *Id.* at 3. As a result, it recommended that she be counseled and trained on appropriate evaluation practices, and that CHS develop a formal policy governing the recording of such exams. *Id.* On May 31, 2019, Jain sent the directors of the four FPECCs a new CHS policy governing unauthorized recordings. Defts. 56.1 Stmt. ¶ 152. Then, on July 1, 2019, Ford met with Plaintiff to issue her a counseling memorandum based on the results of the investigation. *Id.* ¶ 153.

The second episode of workplace discipline originated with an e-mail that Plaintiff received on March 7, 2019 from Teleakie Parker, an operations employee at CHS, asking for information related to Plaintiff's credentials, including her date of birth, Social Security number, and professional certifications, diplomas, and other documentation substantiating her qualifications.  *Id.* ¶ 154; Dkt. 227-32 at 4-5.  Plaintiff suspected the e-mail of being a phishing scam, in part because she had previously been the victim of identity theft, and she reported the e-mail to her supervisors, including Jain, Ford, and Wangel, on March 8, 2019, then followed up with Swenson on March 14, 2019.  Dkt. 227-32.  On May 7, 2019, she then escalated the issue to H+H's corporate compliance department.  Pl. Counter 56.1 Stmt. ¶ 154; Dkt. 227-32.  On May 31, 2019, Plaintiff and Swenson had a discussion about multiple issues, including Plaintiff's concerns that she had been sent a phishing e-mail and her complaints about timekeeping.  Pl. Counter 56.1 Stmt. ¶ 155, at 135.

Afterwards, Swenson sent an e-mail to Jain (as well as to another employee) documenting Plaintiff's complaints that she was being "treated like a secretary."  Dkt. 227-33.  Swenson forwarded that e-mail to Samantha Kent, Associate Director of Employment and Labor Relations at CHS, Defts. 56.1 Stmt. ¶ 157, explaining that Plaintiff "screamed at [Swenson] for a good 40 minutes," Dkt. 227-33; *see also* Defts. 56.1 Stmt. ¶ 155.  After Swenson spoke with Jain, he forwarded her e-mail to Ford, who then forwarded it to Wangel and another CHS executive, opining that Plaintiff's conduct was "absolutely unprofessional."  Dkt. 227-34 at 1; Defts. 56.1 Stmt. ¶ 156.  Wangel then suggested drafting "a separate write-up" to address Plaintiff's conduct (in addition to the counseling memo addressing her recordings of forensic evaluations).  Dkt. 227-34 at 1; Defts. 56.1 Stmt. ¶ 156.  That warning memo was circulated on June 6, 2019, Defts. 56.1 Stmt. ¶ 157, and it was issued to Plaintiff on July 1, 2019, along with the counseling memo regarding recordings, *id.* ¶¶ 153, 158.  Plaintiff's Rule 56.1 counter-statement denies that she yelled

at Swenson.  Pl. Counter 56.1 Stmt. ¶ 158.  In the cited portion of her deposition, however, Plaintiff merely described the warning memo as a gross miscategorization of her interactions with Swenson. Dkt. 227-51 ("Kay Cont'd Dep.") at 415:3-7.  The warning memo, in turn, reflects that Plaintiff "disrupted the work space for approximately 40 minutes by speaking unprofessionally to Ms. Swenson" solely by describing the content of Plaintiff's speech—namely, her claim that Swenson "ha[s] a job only because of physicians like me"—and not by describing the tone of her voice. Dkt. 248-6.  And because the memo does not discuss the tone of Plaintiff's voice, the claim that it miscategorized the interaction does not amount to a denial that her voice was raised.

Next, on two occasions in the fall of 2019, Plaintiff's pay was reduced because of time that she took off of work.  Defts. 56.1 Stmt. ¶ 149.  On October 28, 2019, she was notified that she had missed six hours and fifty-six minutes during the pay period between October 6, 2019 and October 12, 2019, and on November 8, 2019 she was notified that she had missed eight hours during the pay period between October 13, 2019 and October 19, 2019.  *Id.*  Defendants claim that she was not paid for the hours she had missed during either period because she had no leave time remaining, *id.*; Plaintiff denies that no leave remained, Pl. Counter 56.1 Stmt. ¶ 149.  However, the documentary evidence cited in support of her denial consists solely of e-mails from July and September 2018, well over a year before the instances of reduced pay.  *Id.*; *see* Dkts. 261-18, 262-6, 262-7.[17]

Lastly, Plaintiff alleges that Defendants retaliated against her by deliberately understaffing the Bronx Court Clinic.  As mentioned, in 2018, the FPECCs were all consolidated under the management of CHS.  As part of that transition, Owen, the previous manager of the Brooklyn Court Clinic, accepted a position managing the Queens Court Clinic.  Defts. 56.1 Stmt. ¶ 60.

---

[17] Plaintiff additionally cites to her own uncorroborated declaration, where she claims that "the [timekeeping] system said I had time" and that she "also verbally confirmed with CHS payroll that I had the time to take beforehand."  Kaye Decl. ¶ 102.

Winkler, who had previously worked under Plaintiff at the Bronx Court Clinic, Pl. Counter 56.1 Stmt. ¶ 59, accepted the now-open position managing the Brooklyn Court Clinic, Defts. 56.1 Stmt. ¶ 55, leaving open his previous position at the Bronx Court Clinic.  In the spring of 2018, CHS staff, including Plaintiff, Jain, and Winkler, considered number of candidates for Dr. Winkler's former position at the Bronx Court Clinic, without finding one they wished to hire. *Id.* ¶¶ 161-62. From approximately May 18, 2018 to June 14, 2019, Dr. Louise Mullan worked part-time at the Bronx Court Clinic, but she was unable on her own to carry the workload assigned to Winkler when he was employed full-time as an evaluator. *Id.* ¶ 163; Pl. Counter 56.1 Stmt. ¶ 163.  Dr. Anansa Brayton began working full-time at the Bronx Court Clinic in approximately December 2018 and continued there through November 2019, although Plaintiff and other CHS staff were concerned about the quality of her work.  Pl. Counter 56.1 Stmt. ¶ 166.

Defendants claim that they attempted to compensate for the reduced staffing at the Bronx Court Clinic following Brayton's departure in November 2019 by rotating evaluators from other boroughs to the Bronx, by scheduling Bronx defendants to be evaluated at clinics in other boroughs, and by seeking to hire a replacement for Brayton; in support, they cite e-mails exchanged among CHS staff discussing these solutions. *Id.* ¶¶ 167-69; Dkts. 227-46, 227-49. Plaintiff claims instead that beginning in November 2019, "Defendants declared a work stoppage" at the Bronx Court Clinic; that "Defendants would not allow evaluators from other clinics to see cases to address the backlog"; and that she was "in effect rubber-roomed," or not permitted to work.  Pl. Counter 56.1 Stmt. ¶¶ 167-68.  Because of this work stoppage, she claims, as well as Defendants' other allegedly retaliatory conduct, she was forced to resign on January 9, 2020. *Id.* ¶ 167; Dkt. 263-31.

**B.     Procedural History**

On December 21, 2018, Plaintiff filed the Complaint that initiated this action, Dkt. 1, which was then assigned to the Honorable J. Paul Oetken, *see* Case Opening Initial Assignment Notice dated Dec. 26, 2018.  As mentioned, however, the docket does not reflect that that Complaint was ever served on Defendants.  After the Court extended her time to complete service until April 30, 2019, Dkt. 6, Plaintiff filed an Amended Complaint on that day, which was rejected by the Clerk of Court as erroneously filed, Dkt. 22; *see* Notice to Attorney Regarding Deficient Pleading dated May 1, 2019.  She then sought leave to re-file the Amended Complaint on May 2, 2019, Dkt. 25, attaching as an exhibit the document that was filed on ECF on April 30, 2019 and rejected by the Clerk of Court, Dkt. 25-1.  Leave was granted the next day.  Dkt. 28.  Rather than re-filing the document that she had attached as an exhibit to her request for leave to amend the Complaint, however, Plaintiff filed a different document that was also labeled "First Amended Complaint." Dkt. 29.  The differences between the document Plaintiff was granted leave to file and the document she actually filed were not brought to the Court's attention until after Defendants had moved for summary judgment.  *See* Dkts. 234-43.  On May 2, 2022, following this case's transfer to the undersigned, the Court ordered that the document actually filed at Docket Number 29 be stricken from the docket, because it was not the document Plaintiff was granted leave to file.  Dkt. 244.  The operative Amended Complaint is therefore the document that Plaintiff was granted leave to file.  *See* Dkt. 25-1.  Defendants' Answer, which responded to the allegations contained in the operative Amended Complaint, not the allegations contained in the document that was improperly filed and subsequently stricken, was filed on July 19, 2019.  Dkt. 34.

The Court entered a case management plan and scheduling order on September 18, 2019. Dkt. 49.  Discovery, which occupied nearly two and a half years, concluded in early 2022.  Dkt. 220.  Defendants then moved for summary judgment on March 4, 2022.  Dkt. 229 ("Defts. Br.").

Following multiple extensions, *see* Dkts. 233, 244, Plaintiff filed opposing papers on May 6, 2022, Dkts. 250-52.  Those papers, however, were incomplete:  her memorandum of law consisted of a single page containing nothing but the case caption, *see* Dkt. 250, and her statement of disputed material facts pursuant to Local Civil Rule 56.1(b), which was filed twice, *see* Dkts. 251, 252, consisted of a single page containing a single fact.  Because of the incomplete nature of those filings, on May 18, 2022, the Court extended Plaintiff's time to oppose summary judgment until May 27, 2022.  Dkt. 257.  On May 27, 2022, Plaintiff submitted a counter-statement to Defendants' Rule 56.1 statement of undisputed material facts, Dkt. 258, and supporting exhibits, *see* Dkts. 259-63.  She did not, however, file a memorandum of law in opposition.

Nearly two weeks later, on June 7, 2022, Plaintiff submitted a statement of additional material facts pursuant to Local Civil Rule 56.1(b), without having previously secured leave for her untimely filing.  Approximately one hour after that, she requested that the Court accept her late filing and further requested leave to submit a memorandum of law in opposition by June 9, 2022.  Dkt. 265.  The next day, before the Court had ruled on her request, she filed the exhibits supporting her statement of additional material facts.  Dkts. 266-69.  The Court then denied her motion to submit a late statement of disputed material facts under Rule 56.1 and therefore ordered the statement and its supporting exhibits to be stricken from the docket, while granting her request to submit a late memorandum of law in opposition.[18]  Dkt. 270.  On June 9, 2022, Plaintiff then filed an incomplete memorandum of law in opposition.  Dkt. 271.  On June 11, she filed two copies of a declaration listing exhibits supporting her opposition to Defendants' motion; one copy of the declaration was incorrectly labeled on ECF as a memorandum of law, *see* Dkt. 272, while the exhibits were attached only to the other, *see* Dkt. 273.  Although the Court had clearly ordered that

---

[18] As mentioned, *see supra* note 2, the Court does not consider Plaintiff's statement of additional material facts when deciding this motion, and similarly does not consider the stricken supporting exhibits.

Plaintiff's statement of additional disputed material facts be stricken, Dkt. 270, Plaintiff included a copy of that Rule 56.1 statement as an exhibit to the declaration filed in support of her motion for summary judgment.  Dkt. 273-2.

At this stage, the Court received an *ex parte* e-mail from Plaintiff herself conveying her wish to replace Special Hagan, her attorney at the time, with new counsel.  *See* Dkt. 275.  At a conference subsequently held on June 29, 2022, the Court granted Ms. Hagan leave to withdraw as Plaintiff's counsel.  Dkt. 285.  In addition, Ms. Hagan informed the Court that on June 11, 2022 she had not intended to re-file the incomplete memorandum of law at Docket Number 272 but rather to file a completed version of that memorandum.  *See* Dkt. 274.  The Court therefore permitted Plaintiff to file the completed memorandum, Dkt. 285*,* and accepted the late-filed Declaration at Docket Number 273, which was represented as containing exhibits in support of the memorandum of law, Dkt. 274.  As mentioned, one exhibit to that Declaration was in fact the Rule 56.1 statement of additional disputed facts, which the Court had already stricken.  Plaintiff never sought leave for the Court to reconsider or vacate its prior Order striking that additional and untimely Rule 56.1 statement, Dkt. 270, and Plaintiff did not advise the Court that she was re-submitting the stricken statement.  Nor did the Court intend to revisit or vacate that prior Order striking it.  For purposes of clarity, then, the Clerk of Court is respectfully directed to strike the document at Docket Number 273-2 from the docket.  During the June 29, 2022 conference, Plaintiff filed her completed memorandum of law in opposition.  Dkt. 284 ("Opposition"). Defendants then replied on September 9, 2022.  Dkt. 307 ("Defts. Reply").

## II.  Legal Standards

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a

verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

On a motion for summary judgment, the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. "If the moving party meets its initial burden, the nonmoving party must then 'set forth specific facts showing that there is a genuine issue for trial' using affidavits or other evidence in the record, and cannot rely on the 'mere allegations or denials' contained in the pleadings." *Taylor v. City of New York*, No. 19 Civ. 6754 (KPF), 2022 WL 744037, at *6 (S.D.N.Y. Mar. 11, 2022) (quoting *Anderson*, 477 U.S. at 248); *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) ("[A] nonmoving part[y] . . . may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). At the same time, however, "in considering what may reasonably be inferred from witness testimony, the court should not accord the nonmoving party the benefit of unreasonable inferences, or inferences at war with undisputed facts." *Taylor*, 2022 WL 744037, at *7 (internal quotation marks omitted). "Where no rational finder of fact could find in favor of the nonmoving party

because the evidence to support its case is so slight, summary judgment must be granted." *Brown*

*v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

### III.  Discussion

Because some legal issues and factual allegations are common to more than one of

Plaintiff's causes of action, the Court will not address them in the order that they are pled in the

Amended Complaint but will rather group them thematically.   First, the Court will address

Plaintiff's sixth cause of action, which claims that Defendants violated the Equal Pay Act.  *See*

*infra* III.A.  Second, the Court will address her first and seventh causes of action, which claim that

Defendants discriminated against her based, respectively, on her sex and on her caregiver status.

*See infra* III.B.  Third, the Court will address the part of her second cause of action that claims that

Defendants interfered with her exercise of rights under the FMLA.  *See infra* III.C.  Fourth, the

Court will address her third, fourth, and fifth causes of action, as well as the rest of her second

cause of action, all of which claim that Defendants retaliated against her for engaging in protected

activity.  *See infra* III.D.  Lastly, the Court will address her eighth, ninth, and tenth causes of action,

all of which involve forms of derivative liability.  *See infra* III.E.

### A.  Equal Pay Act

The EPA prohibits an employer from "paying wages to employees . . . at a rate less than

the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the

performance of which requires equal skill, effort, and responsibility, and which are performed

under similar working conditions."  29 U.S.C. § 206(d)(1).  Such pay differentials are nonetheless

permitted, however, where they are "made pursuant to (i) a seniority system; (ii) a merit system;

(iii) a system which measures earnings by quantity or quality of production; or (iv) a differential

based on any factor other than sex."  *Id.*  Consequently, EPA claims are governed by a burden-

shifting framework.  "[A] plaintiff must first establish a *prima facie* case of discrimination by

showing: i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999) (internal quotation marks omitted).  Once a plaintiff has shown that her employer pays different wages to employees of the opposite sex for the same work, the burden shifts to the employer, who must show "that the wage disparity is justified by one of the affirmative defenses provided under the Act." *Id.* at 136.  Should the employer satisfy that burden, "the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Id.*

Plaintiff's briefing in opposition to summary judgment and her Rule 56.1 counter-statement rest her EPA claim on a comparison between herself and the male employees who managed the Manhattan Court Clinic, Ciric and Mundy.  Opposition at 10-12; Pl. Counter 56.1 Stmt. ¶ 55.  Although Defendants also deny that Plaintiff can establish she was paid less than Ciric, Defts. Br. at 4, they argue that Plaintiff's EPA claim should be denied primarily because "the evidence in the record establishes that plaintiff and Drs. Ciric and Mundy did not perform 'equal work,'" Defts. Reply at 5, as required by the second element of a *prima facie* EPA case, *see Belfi*, 191 F.3d at 135.  "While the equal work inquiry does not demand evidence that a plaintiff's job is 'identical' to a higher-paid position, the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014).  In particular, "a plaintiff must establish that the jobs compared entail common duties or content, and do not simply overlap in titles or classifications." *Id.*  Thus, "a successful EPA claim depends on the comparison of actual job content; broad generalizations drawn from job titles, classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice." *Id.* at 256.  Furthermore, because the showing of equal work is an element of the

plaintiff's *prima facie* case, the plaintiff, not the defendant, bears the burden of producing evidence to establish the substantial equality of the work performed by the plaintiff and by the alleged comparators. *E.g.*, *id.* at 254-55 ("[T]o prove a violation of the EPA, *a plaintiff must demonstrate that . . . the employees perform equal work . . . .*" (emphasis added)).

As Plaintiff emphasizes, Opposition at 10, the question of "[w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes is a question for the jury." *Lavin-McEleney v. Marist College*, 239 F.3d 476, 480 (2d Cir. 2001). As with all questions of fact ordinarily resolved by a jury at trial, however, the question of whether a plaintiff and an opposite-sex comparator performed substantially equal work may be resolved by the Court on summary judgment unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Thus, Defendants are entitled to summary judgment on Plaintiff's EPA claim if she has "fail[ed] to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial"—namely, the question of whether the work performed by Plaintiff and by Ciric and Mundy was substantially equal. *Celotex*, 477 U.S. at 323.

Based on the evidence in the record that Plaintiff cites in her Rule 56.1 counter-statement, the Court concludes that she has failed to make that showing. To be sure, Plaintiff and Ciric and Mundy each held the title of Director of one of the four FPECCs. But "broad generalizations drawn from job titles" do not suffice for "a successful EPA claim," which instead "depends on the comparison of actual job content." *Port Auth. of N.Y. & N.J.*, 768 F.3d at 256. Thus, Plaintiff cannot simply rely on the fact that she shared a job title with Ciric and Mundy but must instead present evidence showing that the work that she and they actually performed involved "common duties or content." *Id.* at 255. This she fails to do. The section of her brief addressing her EPA claim does not cite a single piece of evidence specifically identifying the actual job tasks performed

by the manager of the Manhattan Court Clinic.  *See* Opposition at 10-13.  Similarly, her Rule 56.1

counter-statement neither advances factual claims about the actual job content of or duties

performed by the manager of the Manhattan Court Clinic nor cites to evidence in the record

establishing such facts.[19]  And if Plaintiff has not produced evidence identifying the job content of

the manager of the Manhattan Court Clinic, she cannot show that that job content was substantially

equal to her own.  For that reason, the Second Circuit has held that summary judgment should be

granted to EPA defendants when a plaintiff fails to set forth specific facts showing that

substantially equal work was performed by the plaintiff and the identified comparators.  *Tomka v.*

*Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1995) (rejecting EPA claims with respect to purported

comparators employed as district managers because the plaintiff "has set forth no specific facts to

indicate that she performed substantially equal work to either of the two named district managers"),

*abrogated on other grounds by Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998).

   Furthermore, while Plaintiff has failed to produce evidence establishing the actual content

of the jobs performed by her purported comparators, Defendants have produced evidence showing

that substantial differences existed between the actual job content of the managers of the Bronx

and Manhattan Court Clinics—in particular, that the manager of the Manhattan Court Clinic had

a primarily administrative role while the manager of the Bronx Court Clinic had a primarily clinical

role.  First, Defendants have produced evidence that the manager of the Manhattan Court Clinic

supervised considerably more employees than the manager of the Bronx Court Clinic, who

supervised only a single employee.  Defts. 56.1 Stmt. ¶ 16.  Furthermore, Defendants have

produced evidence that the Manhattan Court Clinic was considerably busier than the Bronx Court

Clinic, conducting considerably more evaluations of criminal defendants.  *Id.* ¶ 15.  And while

---

[19] Plaintiff does discuss the hours Ciric worked, *e.g.*, Pl. Counter 56.1 Stmt. ¶ 10, but that
fact obviously shows nothing about what tasks he performed during those hours.

Plaintiff disputes Defendants' quantitative data concerning the workload of the Bronx Court Clinic, Pl. Counter 56.1 Stmt. ¶ 15, she has not produced any evidence herself to show that the two clinics saw a similar number of cases, and indeed conceded at her own deposition that the Manhattan Court Clinic had a higher volume of cases, Kaye Dep. at 209:13-18.  Indeed, to the extent that she advances any factual claims about comparisons between the Bronx Court Clinic and other FPECCs, they only reinforce Defendants' arguments that the job content of the manager of the Bronx Court Clinic was not substantially equal to the job content of the other clinic managers.  In her Rule 56.1 counter-statement, *id.* ¶ 66, she paraphrases and cites an e-mail from Ford explaining, "Admin burden much lower in Bronx for director, but clinical burden much higher (she has to see every case that comes thru)," Dkt. 261-1, which thus identifies Plaintiff's job as involving primarily clinical work while her male comparators' jobs involved primarily administrative work.[20]  *See also* Pl. Counter 56.1 Stmt. ¶ 70 ("[A]lthough Dr. Kaye may have had a lighter administrative burden than the other Directors, she eclipsed them on the clinical side, since she examined almost all of the Defendants at the Bronx Court Clinic herself.").  Similarly, "unlike her male colleagues . . . [who] each had interns, social workers and fellows to draft reports for them that they would sign off on," Plaintiff claims that "she wrote all of her own reports."  *Id.*  Again, then, Plaintiff herself highlights differences in job function between herself and her male comparators:  they managed others who performed clinical tasks while she performed those tasks herself.

To prevail on her EPA claim, Plaintiff must produce evidence to prove that the male employees who received a higher salary than she did performed work that was substantially equal

---

[20] Of course, while Plaintiff may believe that a clinical role deserved a higher salary than an administrative one, Pl. Counter 56.1 Stmt. ¶ 70 ("[T]he stated fact poses a question about the pay scale.  There is a question of whether Dr. Kaye's pay should have been dictated by her workload or job function."), the EPA does not authorize courts to second-guess differences in pay among employees performing different work but rather only mandates equal pay for equal work.

to the work she performed.  On this record, no reasonable factfinder could conclude that she has carried that burden.  To determine that Plaintiff performed the same work as Ciric and Mundy, a factfinder would require evidence about the work those doctors actually did perform.  Plaintiff, however, has produced no such evidence.  Furthermore, while some evidence does address how Plaintiff's job content compared to the job content of the other FPECC directors, it identifies considerable differences between Plaintiff's work and the work of her male comparators, not substantial equality.  Directors of busier FPECCs with more employees performed considerably more administrative work, given the larger staff and workload they supervised; because Plaintiff managed a smaller clinic with less staff, she had fewer administrative responsibilities but was responsible for performing clinical work not performed by the directors of other FPECCs.[21] Because no evidence exists from which a jury could conclude that Plaintiff shared job duties and content with Ciric and Mundy, and because considerable evidence exists that managing the Bronx and Manhattan Court Clinics involved jobs with very different duties and content, Plaintiff cannot shown that the work she performed was substantially equal to the work they performed.  *See, e.g.*, *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 570-71 (S.D.N.Y. 2012) (holding that the plaintiff failed to show that her male comparators performed equal work for the purposes of a *prima facie* EPA case, even though they shared her job title and, like her, directed programs within the same university division, because of the absence of record evidence establishing the actual work the comparators performed and because of considerable differences between the programs directed by the plaintiff and by the comparators).  And because she has identified no other male employees

---

[21] Although in her opposition brief Plaintiff argues that Defendants violated the EPA by paying her less than Ciric before he was appointed to manage the Manhattan Court Clinic, Opposition at 12, her claims for that period must fail too because she has produced no evidence whatsoever about the actual content of his job during that period.  Nor has she produced any evidence that Ciric was paid more than she during that period; indeed, the only evidence in the record suggests that Plaintiff was paid more.  *See* Defts. Supp. 56.1 Stmt. ¶¶ 1-3.

paid more than she who might serve as comparators, she cannot make out her *prima facie* case. Defendants are therefore granted summary judgment on Plaintiff's EPA claim.

**B.      Discrimination**

As mentioned, Plaintiff alleges that Defendants discriminated against her based both on her sex, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Title VII, the NYSHRL, and the NYCHRL, Am. Compl. ¶¶ 102-08, and on her caregiver status, in violation of the NYCHRL, *id.* ¶¶ 140-47.

**1.      Sex Discrimination**

Although section 1983, Title VII, the NYSHRL, and the NYCHRL all target discrimination on the basis of sex, some impose different substantive standards than others regarding employer liability.  Once it is established that an employer has acted "under color of state law," equal protection claims brought under section 1983 and Title VII claims "must stand or fall together." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004).  Under Title VII claims and equal protection claims brought under section 1983, courts must "apply the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green* to determine whether summary judgment is appropriate." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  That framework requires a plaintiff first to "establish a *prima facie* case of discrimination by showing that: (1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Id.*  If the plaintiff meets that burden, "the defendant may rebut that showing by articulating a legitimate, non-discriminatory reason for the employment action."  *Id.*  At that stage, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture."  *Id.* Consequently, "[f]or the case to continue, the plaintiff must then come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination."

*Id.* That burden cannot be satisfied by producing "simply some evidence" but instead requires "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Id.* (quoting *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996)) (internal quotation marks and brackets omitted). "To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." *Id.* (internal quotation marks, brackets, and ellipsis omitted).

By contrast, "courts must analyze NYCHRL claims separately and independently from any federal . . . claims," *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013), because that statute must "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed," N.Y.C. Admin. Code § 8-130(a). To show discrimination under the NYCHRL, a plaintiff need only show that she was "treated . . . less well, at least in part for a discriminatory reason.'" *Khwaja v. Jobs to Move America*, No. 19 Civ. 7070 (JPC), 2021 WL 3911290, at *3 (S.D.N.Y. Sept. 1, 2021) (quoting *Mihalik*, 715 F.3d at 110 n.8). "[T]he challenged conduct need not even be 'tangible (like hiring or firing).'" *Mihalik*, 715 F.3d at 110 (citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 40 (App. Div. 2009)). It is sufficient to show "differential treatment of any degree based on a discriminatory motive." *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014). Additionally, while truly trivial conduct may not be actionable under the NYCHRL, the "employer has the burden of proving the conduct's triviality under the NYCHRL," as an affirmative defense. *Mihalik*, 715 F.3d at 111. Furthermore, a court need not limit its inquiry to the *McDonnell Douglas* test when deciding a motion for summary judgment on NYCHRL discrimination claims. *Bennett v. Health Mgmt. Sys., Inc.*, 936

N.Y.S.2d 112, 120 (App. Div. 2011) ("[T]he *McDonnell Douglas* evidentiary framework is not the only evidentiary framework applicable to discrimination cases."). Instead, "defendant bears the burden of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes: under the *McDonnell Douglas* test, or as one of a number of mixed motives, by direct or circumstantial evidence." *Id.* at 121.

The NYSHRL was amended in 2019. *See* 2019 N.Y. Sess. Laws chap. 160. Before that point, "discrimination claims under the NYSHRL and Title VII were generally treated as analytically identical, and addressed together." *Edelman v. NYU Langone Health Sys.*, No. 21 Civ. 502 (LGS), 2022 WL 4537972, at *14 (S.D.N.Y. Sept. 28, 2022) (internal quotation marks omitted). As amended, however, the NYSHRL must "be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed." N.Y. Exec. Law § 300 (2023). While New York courts have not yet produced any substantive analysis of how this amendment changes standards of liability under the NYSHRL, courts in this District have interpreted the amendment as "render[ing] the standard for claims closer to the standard of the NYCHRL," *Livingston v. City of New York*, 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021). Nonetheless, because for reasons that follow, the Court concludes that Plaintiff's claims do not succeed under either Title VII or the NYCHRL. It is therefore unnecessary to determine exactly where the standard imposed by the NYSHRL falls between the standards imposed by federal or city law, or to separately consider or analyze Plaintiff's NYSHRL claim.

In her briefing, Plaintiff identifies three respects in which, she alleges, she was treated less well or suffered an adverse employment action because of her sex.[22]   First, she claims that Defendants failed to promote her either to Physician Specialist or to Senior Director because of her sex.  Opposition at 14.  Second, she claims Defendants paid her less than her male comparators because of her sex.  *Id.*  Third, she claims that "males were given preferential treatment in day-to-day activities that were vital to the operations of the Court Clinics," in support of which she cites only purported "disputed issues of fact surrounding whether [Plaintiff] was excluded from Defendant Ford's work group."   *Id.*   Defendants deny Plaintiff's claims that any of these employment actions were undertaken because of her sex.  Whether those claims are evaluated under the *McDonnell Douglas* test, as required under Title VII or section 1983, or under the less regimented approach required by the NYCHRL, the result is the same:  Plaintiff has not produced adequate evidence from which a reasonable factfinder could conclude that her sex was the reason why Defendants undertook any of the forms of adverse treatment she has identified.

### a.    Promotion

To prevail under any of the applicable antidiscrimination laws, a plaintiff must prove that she suffered some adverse treatment from her employer, although different statutes employ different rules to determine how severe that treatment must be in order to be actionable.  Plaintiff argues that she was discriminated against by not receiving a promotion either to Physician Specialist or to Senior Director.  But while Physician Specialist is plausibly a more senior civil service title than Attending Physician, since Physician Specialists had a higher salary range than

---

[22] The Amended Complaint also alleges that Defendants treated Plaintiff less well based on her sex because they "provided PLAINTIFF's male comparators with staff," Am. Compl. ¶ 104, but because Plaintiff does not raise this argument in her briefing in opposition to summary judgment, the Court deems it waived.  *See Ohr Somayach/Joseph Tanenbaum Educ. Ctr. v. Farleigh Int'l Ltd.*, 483 F. Supp. 3d 195, 206 n.6 (S.D.N.Y. 2020) (2d Cir. 2006) ("Arguments not raised in a party's brief are deemed waived.").

Attending Physicians under the collective bargaining agreement that governed doctors employed by H+H, Defts. 56.1 Stmt. ¶ 14, the record contains no evidence showing that Senior Director is a superior title to Physician Specialist.  Plaintiff's Rule 56.1 counter-statement includes no allegations whatsoever as to the benefits associated with being a Senior Director.  Furthermore, while Plaintiff's 2018 salary was at least $176,000, Pl. Counter 56.1 Stmt. ¶ 68, when Winkler was promoted to Senior Director upon his appointment to manage the Brooklyn Court Clinic, he was given a full-time salary of only $118,000, Dkt. 260-28, and when Owen was promoted to Senior Director at the same time, her full-time salary of $114,195 remained unchanged, Dkt. 260-31 at 1. Because Plaintiff has adduced no evidence showing that Senior Director constituted a higher title than Attending Physician, she has not shown that Defendants discriminated against her by failing to make her a Senior Director.[23]

To show that the failure to promote her to Physician Specialist violated antidiscrimination law, in turn, Plaintiff must produce evidence to show that she was denied that promotion because of her sex.  The only such evidence cited in her brief is the purported fact "that Defendants repeatedly hired males with less credentials to work in the superior unionized Physician Specialist budget code/Group 11 job group . . . .  These males typically worked in either the superior Physician Specialist corporate title or in the superior Senior Director functional title."  Opposition at 14.  In particular, she claims that "[s]pecifically Drs. Ciric, Mundy and Winkler were each hired

---

[23] The fact that Mundy, Winkler, and Owen were all promoted to Senior Director suggests that Senior Director was the corporate title assigned to non-unionized managerial employees, since those three doctors—the managers, respectively, of the Manhattan, Brooklyn, and Queens Court Clinics—all accepted managerial corporate titles when the FPECCs were transferred to CHS supervision.  As discussed, *see supra* note 9; *infra* note 26, Plaintiff wished to remain in the Doctors Council, her union, rather than transferring to a managerial role—she admitted in her Rule 56.1 counter-statement, for example, that she testified in her deposition "that the union offered protections that she would not otherwise have if she were a non-unionized employee." Pl. Counter 56.1 Stmt. ¶ 74.  And Plaintiff's desire not to be promoted to a managerial position and instead to remain in her union would have constituted an indisputably nondiscriminatory motive for Defendants' failure to promote her to Senior Director.

as Court Clinic Directors in one or both of the listed titles." *Id.*  And from the fact that these males were purportedly promoted to superior positions, she infers that she was not promoted based on her sex.[24]  Of the three males cited, however, only Ciric was promoted to Physician Specialist, *see* Defts. Supp. 56.1 Stmt. ¶ 2; Mundy and Winkler were instead promoted to Senior Director, *see* Pl. Counter 56.1 Stmt. ¶¶ 58-59.  Because, as noted, Plaintiff has produced no evidence showing that Senior Director was a higher title than Physician Specialist—and, indeed, because Winkler, at least, was paid considerably less than Plaintiff as a Senior Director—it is unclear how their promotions bear on the Defendants' motivations in not promoting Plaintiff to Physician Specialist. Furthermore, since at least one other female employee—namely, Owen—was also appointed Senior Director, and since Plaintiff has provided no information about the sex of the other applicants for the position, it is further unclear how promoting Mundy and Winkler show Defendants to have been motivated by sex.  Thus, only Ciric's promotion to Physician Specialist, which occurred in either 2004 or 2008, *see supra* note 5, could constitute evidence that Defendants failed to promote Plaintiff to that position based on her sex.

Under either the *McDonnell Douglas* approach or the NYCHRL approach, however, that evidence is insufficient to raise a disputed issue of fact as to whether Plaintiff was denied a promotion to Physician Specialist because of her sex.  To be sure, in certain contexts an employee

---

[24] Plaintiff's briefing also cites the hiring of Dr. Jonathan Weiss as a Physician Specialist in 2013 as further evidence of Defendants' discriminatory motivations.  Opposition at 14.  Her Rule 56.1 counter-statement does claim that Weiss was hired as a Physician Specialist.  Pl. Counter 56.1 Stmt. ¶¶ 13, 20, 60.  But none of the evidence cited in support of that claim mentions Weiss. Furthermore, while some evidence on the docket does reflect that Weiss worked as a Physician Specialist, *e.g.*, Dkt. 226-15, a plaintiff "must show that she was similarly situated in all material respects to the individuals with whom she seeks to compare herself," *Lioi v. N.Y.C. Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 584 (S.D.N.Y. 2012) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)), and Plaintiff's Rule 56.1 counter-statement does not identify—nor has the Court been able to uncover—any (non-stricken) evidence on the docket pertaining to Weiss from which to conclude that Plaintiff and he were similarly situated in all material respects.

39

with a protected characteristic can make out a *prima facie* case of discrimination if he or she was repeatedly denied a promotion in favor of individuals lacking that characteristic. *See, e.g.*, *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (inferring discrimination for the *prima facie* case when a Jewish police officer was not promoted during a six-year period when at least five Catholic officers were, given further evidence that the commissioner had spoken of the importance of "Christian values" and that the department tolerated routine antisemitic behavior from officers); *Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 250 (S.D.N.Y. 1999) (inferring discrimination when a female plaintiff "was consistently recommended and consistently rejected at a firm where men who received this type of support from a supervisor were routinely granted the title").[25]   In those cases, however, plaintiffs produced specific evidence suggesting that the protected characteristic itself was responsible for their not being promoted.   In particular, if a plaintiff shows she was denied promotions at the very same time that individuals lacking the protected characteristic were routinely promoted, the disparity in whether individuals promoted possessed that characteristic suggests that the characteristic itself formed the basis for the promotions.

By contrast, Plaintiff has shown only that Ciric was promoted to Physician Specialist, then five to ten years later she was not; she has produced no evidence that males were routinely promoted to that title during a period when she was not.   Differing treatment between only two individuals, who necessarily differ in numerous respects, does not on its own justify an inference

---

[25] A different standard may apply when an employer faces a direct choice between two employees applying simultaneously for the same position and chooses the employee who lacks the protected characteristic. *E.g.*, *Jackson v. N.Y.C. Dept. of Homeless Servs.*, 501 F. Supp. 2d 496, 503 (S.D.N.Y. 2007) (holding that an employee had made out a *prima facie* case when a less qualified male was chosen over her for a position).   But because Plaintiff and Ciric were never directly competing for a promotion to Physician Specialist, such standards do not apply. Furthermore, even had Plaintiff adequately proven that Weiss was promoted to Physician Specialist in 2013 (and had she further established that the two were legitimate comparators), she claims that he was hired in 2013, Pl. Counter 56.1 Stmt. ¶ 20, months before she asked Ford to be promoted to Physician Specialist, Defts. 56.1 Stmt. ¶ 18.

that any one particular difference between the two, such as a difference in sex, was responsible for the differing treatment.  Furthermore, because different time periods differ in countless respects, the fact that an employer acted differently at different times cannot justify the inference that a difference between the *employees*, rather than some difference in the characteristics of the employer at those times, such as its employment needs or available jobs, was responsible for the differing treatment.  In effect, Plaintiff asks the Court to infer that if an employer has once promoted a man to a position, then sex is the explanation for any single woman's not being promoted to that position at any point in the future.  A presumptive inference of this scope is simply not plausible.  Without more, a single instance of an employer's promotion of a qualified employee of one sex cannot sustain the inference that all future decisions not to promote a qualified employee of the other sex will be made because of the latter employee's sex.

Allowing the prior promotion of a single man, on its own, to justify the inference that sex was a motivating factor in every subsequent failure to promote a woman would be particularly unreasonable in this case, where the record reflects that H+H was in general quite willing to promote women into senior roles during the period when it employed Plaintiff.  When Plaintiff first sought a promotion to Physician Specialist, her supervisor was Ford, a woman.  Defts. 56.1 Stmt. ¶ 8.  In turn, Ford's supervisor, the Chief of Psychiatry at Bellevue, was Badaracco, herself a woman.  *Id.* ¶ 7, 19.  Following the transfer of the FPECCs to CHS, Plaintiff was directly supervised by Jain, a man, *id.* ¶ 54, but his supervisor was Ford, *id.*  Furthermore, while Ford's supervisor was male, his supervisor was Yang, a woman.  Dkt. 225-11.  And of the FPECC directors, at least half were women.  After the transition to CHS, Plaintiff and Owen directed the Bronx and Queens Court Clinics, respectively, while Mundy and Winkler directed the Manhattan and Brooklyn Court Clinics, respectively, *id.* ¶ 55, before the transition Plaintiff and Owen directed the Bronx and Brooklyn Court Clinics, respectively, *id.* ¶ 60, Ciric directed the Manhattan Court

Clinic, *id.* ¶¶ 11, 23, and the identity of the Queens Court Clinic director is unclear from the record. When an employer routinely promotes other women to senior roles, it would hardly be plausible to infer that one particular woman was denied a promotion because of her sex—which would equally well have constituted a reason not to promote those women who were promoted—rather than because of some other, non-discriminatory reason.

Lastly, Defendants were willing to promote *Plaintiff herself* to a more senior, higher-paying position—namely, a non-unionized managerial role—which she did not want because she preferred to remain within the Doctors Council. *Id.* ¶¶ 73-74.[26] If Plaintiff's sex was the reason why Defendants were unwilling to promote her to Physician Specialist, it would be puzzling for them to be willing to promote her to a managerial title, since presumably her sex would equally well constitute a reason against the latter promotion. Thus, Defendants' willingness to promote her to a managerial title but not to Physician Specialist suggests that their motivation lay in some difference between the two positions, not in her sex.

In sum, the evidence in the record shows that H+H routinely promoted women to senior positions and that it was willing to promote Plaintiff to a more senior position. In this context, no reasonable factfinder could conclude, simply from the fact that H+H had once promoted a man to Physician Specialist but was not willing to promote Plaintiff to that position five to ten years later,

---

[26] While Plaintiff does not admit Defendants' claim that she was offered a managerial position, her denial focuses only on whether Defendants ever made a formal offer in writing for a specific position, Pl. Counter 56.1 Stmt. ¶ 73, and she does not deny that she wished to remain within the union, *id.* ¶ 74. Furthermore, while Defendants cite to testimony from multiple depositions establishing that they were willing to offer Plaintiff a managerial role but did not because she was uninterested, Defts. 56.1 Stmt. ¶¶ 73-74, Plaintiff fails to cite any evidence controverting those claims. Instead, immediately before the portion of her deposition that she cites, she testified that "my goal was to stay in my union line" and that, therefore, had she been offered a different non-union position funded through NYU, "I don't think I would have taken it." Kaye Dep. at 185:22-186:3. Similarly, later in the deposition she explained that "I never asked or made any indication that I wanted to change to a managerial line. And it was actually the opposite for all the reasons that I've previously discussed." *Id.* at 230:17-20. Thus, Plaintiff has produced no evidence to controvert Defendants' claim that they were willing to promote her.

that she was denied that promotion because of her sex.  Such circumstances, taken as a whole, are insufficient to "give rise to an inference of discrimination." *Weinstock*, 224 at 42.  For that reason, Plaintiff has not made out a *prima facie* case under *McDonnell Douglas*, and she cannot survive summary judgment under the NYCHRL.  Her sex discrimination claims are therefore dismissed with respect to Defendants' failure to promote her.

### b. Compensation

Plaintiff next argues that she suffered discriminatory adverse treatment in that she was not paid a higher salary when she complained about pay equity to Ford and to Colley and Badaracco in 2014 and to Ford, Yang, and others in 2018.  As with Defendants' failure to promote her to Physician Specialist, to prevail Plaintiff must produce evidence that her sex played some role in motivating Defendants' decision not to give her a raise.  And here too, her argument rests on comparisons between herself and Ciric and Mundy, who were paid more than she.  Opposition at 14.  Even assuming that Plaintiff had made out a *prima facie* case, though, this argument cannot succeed, because Defendants have presented a clear nondiscriminatory reason why she was not paid more—namely, that her compensation could not exceed the maximum compensation set by the collective bargaining agreement.

In 2014, when she met with Colley and Badaracco following her complaints about pay equity, they raised her salary to the maximum permitted under the agreement, but they explained that it could not be raised further.  Defts. 56.1 Stmt. ¶ 22; Kaye Dep. at 64:6-16.  And once the FPECCs transitioned to CHS supervision, Defendants responded to Plaintiff's renewed complaints about pay equity by proposing that she be promoted to a managerial title so that her compensation would not be limited by the collective bargaining agreement, but Plaintiff preferred to remain within the union and did not wish to change to a managerial line.  Defts. 56.1 Stmt. ¶ 73-75; Kaye Dep. at 230:17-20.  Thus, Defendants did not raise Plaintiff's pay because doing so would have

exceeded the limits set by the collective bargaining agreement.  That explanation for Plaintiff's failure to be paid a higher salary is clearly nondiscriminatory, and she has produced no evidence that it is pretextual.  No reasonable factfinder could conclude that she was denied a promotion to Physician Specialist based on her sex, as the Court has just held, and because her compensation was limited by her civil service title, the fact that sex was not a motivating factor in denying her a promotion means that it also was not a factor in her not being paid more.  Whether under the *McDonnell Douglas* test or under the more flexible NYCHRL approach, Plaintiff therefore cannot show that she was not paid a higher salary because of her sex.  As a result, her sex discrimination claims are dismissed with respect to her level of compensation.

### c.     Workgroup

Lastly, in her briefing Plaintiff argues that she was excluded on the basis of her sex from the workgroup Ford convened to set FPECC-wide standards for forensic exams.  To prove that Defendants excluded her because of her sex, in turn, she cites only the fact that Ford instead choose Winkler, her male subordinate, to represent the Bronx Court Clinic.  Even assuming that exclusion from the workgroup is not so trivial that it is nonactionable, Plaintiff cannot sustain an inference of discrimination merely based on Winkler's participation in the workgroup.  Perhaps it might be plausible to infer that individuals were selected for the workgroup based on sex if the group were composed primarily of men rather than women as a whole.  But Plaintiff has produced evidence of the sex of only two workgroup members—Winkler, a man, and Ford, a woman.  And given that the only evidence in the record indicates that the workgroup was composed of an equal number of men and women, no reasonable factfinder could infer that members were chosen based on their sex, or in particular that Plaintiff was excluded because of her sex.  This is particularly the case where Plaintiff has failed to come forward with any evidence of discriminatory intent or animus based on her sex, and fails even to argue in her brief that evidence of such intent or animus exists.

*See* Opposition at 13-15.  Because the Bronx Court Clinic employed only two individuals, Plaintiff and Winkler, some job responsibilities would inevitably be assigned to the latter rather than the former, and therefore the fact that one particular task was assigned to him hardly suggests that her sex motivated the assignment.  Furthermore, to sustain an inference of discrimination based on disparate treatment between herself and Winkler, Plaintiff "must show that she was similarly situated in all material respects" to him, *Lioi*, 914 F. Supp. at 584 (quoting *Graham*, 230 F.3d at 39), and she has established neither which aspects of the comparison between the two were material nor that they were similar in all such respects.  Because Plaintiff has not produced evidence to show that her sex motivated her exclusion from Ford's workgroup, her sex discrimination claims are likewise dismissed with respect to her exclusion from the workgroup.[27]

* * *

Accordingly, because Plaintiff cannot prove that because of her sex she suffered any form of adverse treatment she has identified, Defendants are granted summary judgment on her sex discrimination claims.

### 2.    Caregiver Discrimination

In addition to alleging that Defendants discriminated against her based on her sex, Plaintiff claims that Defendants discriminated against her based on her caregiver status, Am. Compl. ¶¶ 140-47, that is, the fact that she "provides direct and ongoing care for a minor child," N.Y.C. Admin. Code ¶ 8-102, which is a protected characteristic under the NYCHRL, *id.* ¶ 8-107(1)(a). As mentioned, to prevail on an NYCHRL discrimination claim Plaintiff must prove that she was "treated . . . less well, at least in part for a discriminatory reason.'"  *Khwaja*, 2021 WL 3911290,

---

[27] In her briefing, Plaintiff's argument focuses on the fact that, at his deposition, Winkler testified that Plaintiff "should have been" at the workgroup.  Winkler Dep. at 55:15.  But the fact that Winkler disagreed with Ford's decision to invite him rather than Plaintiff shows merely that his judgment as to who should have been included differed from Ford's; it does not further support the inference—as would be required—that Ford's judgment was based on Plaintiff's sex.

at *3 (quoting *Mihalik*, 715 F.3d at 110 n.8).  However, Plaintiff has presented no evidence that shows that her caregiver status played any role whatsoever in Defendants' decisions about her employment.  Citing excerpts from Ford's autobiography, Plaintiff argues in her briefing only that "Defendant Ford's book where she stated that her caregiving responsibilities led her to resign from two positions, coupled with her email that told Defendant Yang that she should be managed out could lead a reasonable fact finder to determine Defendants' intent behind the arbitrary shift change was rooted in animus."  Opposition at 26.  But the Court does not understand how those passages—which do not concern Plaintiff whatsoever and instead make the important but widely acknowledged and commonsensical point that balancing a full-time job with the demands of motherhood is challenging, Dkt. 260-8—bear in any way on Defendants' reasons for their treatment of Plaintiff.  Thus, because Plaintiff has produced no evidence that her caregiver status motivated Defendants' treatment of Plaintiff, Defendants are granted summary judgment on Plaintiff's caregiver discrimination claim.

## C.    FMLA Interference

Plaintiff alleges that Defendants both interfered with her ability to take leave under the FMLA and retaliated against her for activity protected by the FMLA.  Am. Compl. ¶¶ 109-17.  The Court will address Plaintiff's FMLA retaliation claims along with her other retaliation claims.  *See infra* III.D.2.g.  First, however, it addresses her FMLA interference claims.  To succeed on a claim for FMLA interference, a plaintiff must establish "1) that she is an eligible employee under the FMLA; 2) that defendant is an employer as defined in FMLA; 3) that she was entitled to leave under FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under FMLA."  *Ziccarelli v. NYU Hosps. Ctr.*, 247 F. Supp. 3d 438, 447 (S.D.N.Y. 2017) (internal quotation marks omitted).  With respect to the fifth element of an FMLA interference claim, the actual denial of benefits, Plaintiff claims first

that her request for FMLA leave "on October 12, 2018 and then again in January 2019," though initially approved "on October 30, 2018, . . . was rescinded a month later," and second that "on June 21, 2019, [she] again asked Defendants to correct her timesheets, leave balances, and FMLA deduction that took place between December 21, 2019 and January 7, 2019." Opposition at 16.[28]

Interference with FMLA leave is actionable, however, "only if the employer's actions ultimately result in denial of a benefit under the FMLA." *Stuart v. T-Mobile USA, Inc.*, No. 14

---

[28] Plaintiff also claims that "[b]etween October 15, 2018 and April 27, 2019, Defendants incorrectly inputted her FMLA on at least 14 separate occasions." Opposition at 16-17. The evidence cited in support of this claim, however, is wholly inadequate. First, Plaintiff cites an e-mail, dated November 26, 2019, in which she sought to file a union grievance alleging that she was not allowed to take paid time off during the Jewish High Holidays in October 2019 even though H+H's timekeeping software recorded her as having paid time off available. Dkt. 263-6. But this e-mail, which claims that she was incorrectly denied time off in October 2019 for a religious holiday, does not prove interference with her FMLA leave, which cannot be taken for religious reasons, between October 15, 2018 and April 27, 2019, a period that does not encompass October 2019. (Perhaps Plaintiff's theory is that her October 2019 annual leave balances had been depleted because her FMLA leave was incorrectly coded as annual leave between October 15, 2018 and April 27, 2019, but at the summary judgment stage she must produce not theories but evidence, which the e-mail does not contain.) Second, Plaintiff cites to her own declaration, in which she swore:

> Between October 15, 2018 and April 27, 2019, H +H/CHS made at least 14 errors in the entry of my FMLA usage. One of the errors during this time included them charging me 18 hours of leave a day rather than 9 hours, as a result my annual leave was depleted. When I pointed out the error, I never received confirmation that it had been addressed or that my leave balances and pay were corrected.

Kaye Decl. ¶ 79. To defeat summary judgment, however, a plaintiff must produce "specific facts" rather than relying on "conclusory allegations," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), and the conclusory allegation that on fourteen occasions Defendants erroneously deprived Plaintiff of FMLA leave certainly does not suffice, particularly when Plaintiff's declaration fails even to specifically identify when these supposed errors occurred. Furthermore, courts in this District have routinely held that a plaintiff's unsubstantiated and self-serving testimony, on its own, is insufficient to create a genuine issue of fact. *See, e.g.*, *Beauvoir v. Falco*, 345 F. Supp. 3d 350, 367 n.5 (S.D.N.Y. 2018) ("Plaintiff's deposition testimony is simply self-serving testimony that cannot be used to defeat summary judgment." (citing *Fincher v. Depository Tr. & Clearing Corp.*, No. 06 Civ. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008))), *aff'd*, 604 F.3d 712 (2d Cir. 2010)); *Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 258 n.15 (S.D.N.Y. 2008) ("Plaintiffs' self-serving and unsubstantiated deposition testimony is insufficient to create a triable issue of fact . . . ."), *aff'd*, 360 F. App'x 255 (2d Cir. 2010). Plaintiff's testimony—presented not even via deposition, under examination, but simply via declaration—is likewise insufficient.

Civ. 4252 (JMF), 2015 WL 4760184, at *3 (S.D.N.Y. Aug. 12, 2015). And Plaintiff has produced no evidence showing that on either of the two occasions cited she was ever denied a benefit to which she was entitled under the FMLA. First, while Plaintiff claims that her "FMLA request was temporarily retroactively approved on October 30, 2018, it was rescinded a month later," Opposition at 16, the exhibit cited, an e-mail sent to Plaintiff on that date from HRSS Leaves Administration Assistant Director Maria Mendez, contains no reference to the retroactive approval of her October 2018 FMLA leave having been rescinded, and instead merely requested that she ensure that her FMLA documentation was consistent with the frequency of her requested leave going forward, *see* Dkt. 227-18. Furthermore, as Plaintiff's own exhibits show, once she provided the updated paperwork, Dkt. 263-1, the leave she had taken in the interim was subsequently approved, Dkt. 263-2. And while Plaintiff argues that she should not have been required to update her paperwork because she had already provided the required information, Pl. Counter 56.1 Stmt. ¶ 140, that argument is irrelevant to her FMLA interference claim, which requires the *ultimate denial of a benefit to which she was entitled*, *see Stuart*, 2015 WL 4760184, at *3, since Plaintiff has produced no evidence that on any occasion she was unable to take paid FMLA leave because of the delay in approval.[29] Next, while Plaintiff did dispute how Defendants calculated the FMLA leave she had used between October 15, 2018 and April 2, 2019, Dkt. 263-5 at 2-3, the very same exhibit shows that the confusion arose because Plaintiff herself had designated certain dates as FMLA leave that were ultimately taken instead as annual leave, *id.* at 1-2, and that Defendants agreed to re-code those days as annual leave once Plaintiff alerted them to the change, *id.* at 1.

---

[29] Plaintiff's argument that "a review of [her] October 12th[] application will reveal that she in fact complied, and provided the requested information," Opposition at 16, is also flawed on the merits. Her FMLA leave application specified that she would require leave of between "5-180 day(s)" over a frequency of "1-4 times per 5-180 week(s) 1-2 month(s)." Dkt. 262-34. From the Court's perspective, however, it would appear impossible to take leave of up to 180 days—a period of six months—four times in one to two months. Defendants' request for clarification thus appears eminently reasonable.

Because Defendants agreed to correct the error once it was brought to their attention, and because Plaintiff has not shown that before it was corrected the error prevented her from taking FMLA leave on any occasion, she has once again failed to show that she was ultimately denied FMLA benefits to which she was entitled, as required for a claim of FMLA interference. *See Stuart*, 2015 WL 4760184, at *3. Because the evidence in the record does not show that Plaintiff was ultimately denied FMLA benefits on any occasion when she claims she was denied such benefits, Defendants are granted summary judgment with respect to Plaintiff's FMLA interference claim.

## D.     Retaliation

Plaintiff next claims that Defendants retaliated against her for her use of leave under the FMLA, for her complaints about discrimination, and for her complaints and whistleblowing concerning how CHS performed psychiatric evaluations of criminal defendants, conduct protected, respectively, by the FMLA; by Title VII, the NYSHRL,[30] and the NYCHRL; and by the First Amendment to the United States Constitution and section 740 of the NYLL. In her briefing, Plaintiff identifies the following allegedly retaliatory conduct: the May 2018 change in her job title from Medical Director to Director, Opposition at 24; the alleged May 2018 change in her civil service title from Attending Physician III to Attending Physician II, *id.*; the change in her shift starting in July 2018, when the FPECCs were transferred to CHS management, from an eight-and-a-half hour shift with a half-hour lunch to a nine-hour shift with an hour-long lunch, *id.* at 21-22; the denial of access to CHS timekeeping software between July 2018 and January 2020, *id.* at 24, and the failure to process timesheets for two weeks in October 2018, *id.* at 16; the denial of educational leave for the full day when she took her credentialing exams on September 24, 2018,

---

[30] As mentioned, *see supra* at 36, the NYSHRL was amended in 2019. *See* 2019 N.Y. Sess. Laws chap. 160. Because the Court concludes that Plaintiff has failed to make out a claim for retaliation under either Title VII or the NYCHRL, however, it need not precisely locate the standard imposed by the NYSHRL relative to the standards imposed by federal and city law.

*id.* at 25; the initial underpayment of her retention bonus, *id.* at 21-22; the reduction of her pay during two consecutive pay periods in September 2018, *id.* at 21; the request for further documentation for her FMLA claim in November 2018 and the miscalculation of her FMLA balances at various points, *id.* at 16-17; the refusal to permit her to work remotely following her request for a reasonable accommodation in July 2019, *id.* at 28-29; the search of her e-mail inbox in January 2019, *id.* at 32; the counseling memo issued to Plaintiff in July 2019 for recording forensic evaluations without patients' consent and the warning memo issued to her at the same time for screaming at Swenson, *id.* at 31-32; and finally understaffing at the Bronx Court Clinic between the transition to CHS management and Plaintiff's resignation in January 2020, *id.* at 19.[31]

Details differ between the various statutes under which Plaintiff brings her claims, and corresponding differences exist in the details of what a plaintiff must prove to prevail under each. But certain elements exist in common among each. First, a plaintiff must prove that she engaged in conduct that is protected by the relevant law. *See Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843-44 (2d Cir. 2013) (explaining that to prevail on a retaliation claim under federal, and state antidiscrimination laws, a plaintiff must show "participation in a protected activity" (internal quotation marks omitted)); *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (App. Div. 2021) ("To make out an unlawful retaliation claim under the NYCHRL, a plaintiff must show that (1) he or she engaged in a protected activity . . . ." (internal quotation marks and brackets

---

[31] Plaintiff's lengthy Rule 56.1 counter-statement does identify other episodes of adverse treatment that allegedly occurred in 2018 or 2019 following her allegedly protected activity. Nonetheless, Local Civil Rule 56.1(b) requires parties to file a "short and concise statement" of material facts; it does not authorize parties opposing summary judgment to supplement their primary brief in opposition with one hundred and fifty pages of additional supplemental briefing, and Defendants could hardly be expected to expect to address nearly two hundred collective pages of opposition briefing in their ten-page reply. For that reason, in its analysis of Plaintiff's retaliation claims the Court considers only the actions identified as retaliatory in her brief; the Court has not independently considered whether a retaliation claim might be made out concerning other episodes of adverse treatment identified in the Rule 56.1 counter-statement.

omitted)); *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) ("In order to make out a prima facie case, [a plaintiff] must establish that: 1) he exercised rights protected under the FMLA . . . ."); *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) ("A plaintiff asserting a First Amendment retaliation claim must establish that: (1) his speech or conduct was protected by the First Amendment . . . ." (internal quotation marks omitted)); N.Y. Lab. Law § 740(2) (prohibiting employers from retaliating "because [an] employee does any of the following" enumerated actions).

Second, a plaintiff must prove that her engaging in protected conduct caused her employer to subject her to an adverse employment action.[32]   Under Title VII, the NYSHRL, and the NYCHRL, proof of causation is governed by the *McDonnell Douglas* burden-shifting framework. *Kwan*, 737 F.3d at 843; *Bilitch*, 148 N.Y.S.3d at 246.  To make out a *prima facie* case, a plaintiff must first show "a causal connection between the protected activity and the adverse employment action."  *Kwan*, 737 F.3d at 844; *see also Bilitch*, 148 N.Y.S.3d at 246 (requiring under the NYCHRL that "there is a causal connection between the protected activity and the alleged retaliatory conduct").  Ordinarily, a plaintiff may carry that burden by pointing to the temporal proximity between the protected activity and the adverse employment action.  *Id.* at 845.  Next, "the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action."  *Id.*; *see also Bilitch*, 148 N.Y.S.3d at 246 (NYCHRL).  And "after the

---

[32] The laws under which Plaintiff brings her retaliation claims arguably employ different standards to determine whether adverse treatment is sufficiently severe to be actionable.  *Compare Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (holding actions to be "materially adverse" under Title VII if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination" (internal quotation marks omitted)), *with Mihalik*, 715 F.3d at 112 (holding that to prevail under the NYCHRL a plaintiff must prove that "the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action").  However, because the Court does not grant summary judgment in favor of Defendants with respect to any part of Plaintiff's retaliation claims on the grounds that the adverse treatment she suffered was insufficiently severe to be actionable, distinguishing between those different standards here is unnecessary.

defendant has articulated a non-retaliatory reason for the employment action, . . . [t]he plaintiff must then come forward with [evidence that the] non-retaliatory reason is a mere pretext for retaliation." *Kwan*, 737 F.3d at 845; *see also Bilitch*, 148 N.Y.S.3d at 246 ("Where a defendant produces evidence that justifies his or her allegedly retaliatory conduct on permissible grounds the plaintiff must either counter the defendant's evidence by producing evidence that the reasons put forth by the defendant were merely a pretext, or show that, regardless of any legitimate motivations the defendant may have had, the defendant was motivated at least in part by an impermissible motive" (internal quotation marks and brackets omitted)).[33]

While the Second Circuit has never squarely held that the *McDonnell Douglas* approach applies to FMLA retaliation cases, it has employed the approach, *see Fasanello v. United Nations Int'l Sch.*, No. 19 Civ. 5281 (GHW), 2022 WL 861555, at *10 (S.D.N.Y. Mar. 23, 2022) (citing *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 n.7 (2d Cir. 2016)), and Plaintiff argues that it should apply here, Opposition at 15. The Court will therefore apply it. In her *prima facie* case, Plaintiff must first show that "the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Graziadio*, 817 F.3d at 429. As under other statutes, temporal proximity also suffices for this showing under the FMLA. *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir. 2012). If Plaintiff can make that showing, Defendants "must demonstrate a legitimate, non-[retaliatory] reason for [their] actions." *Graziadio*, 817 F.3d at 429. If they can do so, Plaintiff "must then show that [Defendants'] proffered explanation is

---

[33] Title VII and the NYCHRL differ in the sort of causal connection they require a plaintiff to show to prevail on her *prima facie* case: while under the former, a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer," *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013), under the latter a plaintiff need only show that the action "was caused at least in part by retaliatory motives," *Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015) (internal quotation marks and ellipsis omitted). Nonetheless, because the Court ultimately concludes that Defendants are entitled to summary judgment on all Plaintiff's retaliation claims, the Court will apply only the more plaintiff-friendly NYCHRL standard in its analysis.

pretextual." Under the First Amendment and section 740 of the NYLL, the causal inquiry is not regimented by the *McDonnell Douglas* framework. Instead, a plaintiff need only show that "there was a causal connection between this adverse action and the protected speech," *Matthews*, 779 F.3d at 172 (First Amendment), or "some causal connection between an adverse personnel action and a report of dangerous activity," *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 354 (S.D.N.Y. 2017) (NYLL).

To prevail on any of her retaliation claims, then, Plaintiff must show that her performance of an action protected under some law caused her to suffer adverse treatment. To resolve those claims, then, the Court will first determine on which occasions she did, in fact, engage in protected conduct. Then, the Court will examine each episode of adverse treatment she suffered to determine whether a genuine issue of fact exists as to whether it was caused by her protected conduct. Because that examination shows that her protected conduct did not cause Defendants to engage in any adverse treatment she suffered, Defendants' motion for summary judgment is granted with respect to all of Plaintiff's retaliation claims.

### 1. Protected Activity

Plaintiff's allegedly protected conduct broadly falls into two categories: conduct related to her own rights as an employee under various civil rights laws, namely Title VII, the NYSHRL, the NYCHRL, the Equal Protection Clause, and the FMLA, Opposition at 15-17, 21-25, and complaints about the policies and practices of H+H and her co-employees, *id.* at 17-20, 26-28. Defendants do not dispute that Plaintiff engaged in conduct protected by Title VII, the NYSHRL, the NYCHRL, the Equal Protection Clause, and the FMLA. Defts. Br. at 12. In particular, she engaged in protected conduct when she complained about pay equity in May 2018, including by filing an EEOC charge, *id.* at 21, when she amended that charge in September 2018, *id.*, when she

filed this lawsuit, in connection with which she first served Defendants in April or May 2019, *id.* at 28, and when she applied to take leave under the FMLA in October 2018, *id.* at 16.

The parties do dispute, however, whether Plaintiff engaged in conduct that is protected under the First Amendment or section 740. During the period in question, Plaintiff complained that Defendants sought a force order against a criminal defendant in 2015, Opposition at 8, 17, that Defendants used redacted medical records, *id.* at 8, that Defendants insisted that criminal defendants waive their rights under HIPAA, *id.* at 8, 17-18, 26-27, and that Defendants permitted staff evaluators to practice privately, *id.* at 18. Plaintiff raised these complaints internally at a meeting that occurred on January 29, 2018, activity that she claims is protected by the First Amendment.[34] Opposition at 18-19. And she claims she raised them externally on "at least 34 separate occasions between 2016 and 2021," *id.* at 17, 27, activity that she claims is protected both by the First Amendment and by section 740, *id.* Those external complaints, she claims, also alleged that Defendants had engaged in a broader range of malfeasance, including "jerry rigging of exams and circumvention of the CPL in the administration of mental competency exams [that] inevitably violated the rights of criminal defendants and potentially the public's safety," namely "exert[ing] pressure on staff to make fitness determinations to suit their political and or administrative agendas." *Id.* at 26-27.

### a.   Internal Complaints

The Court first considers Plaintiff's internal complaints, which Defendants deny are protected by the First Amendment. "Speech by a public employee is protected by the First Amendment only when the employee is speaking as a citizen on a matter of public concern." *Ross v. Breslin*, 693 F.3d 300, 305 (2d Cir. 2012) (internal quotation marks and ellipsis omitted). A

---

[34] Because the section of Plaintiff's brief addressing her section 740 claims does not cite any internal complaints, instead citing only her alleged external complaints, Opposition at 26-28, the Court does not evaluate whether her internal complaints were protected by section 740.

public employee must therefore show that "the employee spoke as a private citizen and the speech at issue addressed a matter of public concern." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020) (internal quotation marks and ellipsis omitted). Although Defendants' arguments could have been more precisely set forth, the Court understands them to deny that Plaintiff "spoke as a private citizen" when she complained internally about H+H policies. Defts. Br. at 16-19. A court must "ask two questions to determine whether a public employee speaks as a citizen: (A) did the speech fall outside of the employee's official responsibilities, and (B) does a civilian analogue exist?" *Matthews*, 779 F.3d at 173 (internal quotation marks omitted) (citing *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203-04 (2d Cir. 2010)). Because Plaintiff's internal complaints did not fall outside of her official responsibilities, and because a civilian analogue to those complaints did not exist, the Court concludes that they were not protected by the First Amendment.

Employee speech does not fall outside of the employee's official responsibilities, and is not protected by the First Amendment, when "it is part-and-parcel of the employee's concerns about his ability to properly execute his duties." *Id.* (internal quotation marks and brackets omitted) (quoting *Weintraub*, 593 F.3d at 203). Many of Plaintiff's internal complaints indisputably meet this standard. She complained that CHS provided only redacted medical records to forensic examiners, including herself, because "HIV and substance abuse information play integral parts in [the] psychiatric examinations" that she herself was responsible for performing. Pl. Counter 56.1 Stmt. ¶ 38. Indeed, she believed she could be sued for malpractice were she to perform examinations based on redacted records. Defts. 56.1 Stmt. ¶ 43. And although she may have also believed that an evaluation performed using redacted records would prejudice the defendant examined, Pl. Counter 56.1 Stmt. ¶ 43, such complaints expressed concerns that she herself would be unable to properly conduct those examinations absent unredacted records, *id.* ¶ 38 ("Plaintiff maintains that redacted records of any sort are completely unacceptable, and that

HIV and substance abuse information play integral parts in psychiatric examinations."). Because she believed that she could not properly perform forensic evaluations using redacted medical records, her complaints about the redactions plan "concern[ed] . . . [her] ability to properly execute [her] duties." *Matthews*, 779 F.3d at 173 (internal quotation marks omitted).

Similarly, since Defendants proposed employing HIPAA waivers to obtain the information that Plaintiff believed was required for forensic examinations, her complaints about that approach were likewise "part-and-parcel," *id.* (internal quotation marks omitted), of her concerns about her own duties. Furthermore, the sole complaint identified in Plaintiff's Rule 56.1 counter-statement concerning the use of force orders, which occurred in December 2015, Pl. Counter 56.1 Stmt. ¶¶ 24, 82, involved difficulties producing a criminal defendant who was scheduled to be evaluated by Plaintiff herself. Dkt. 259-29. Thus, her complaints about methods used to produce him likewise were "part-and-parcel," *Matthews*, 779 F.3d at 173 (internal quotation marks omitted), of her concerns about performing her assigned examination; indeed, in the e-mail chain Plaintiff cites *she herself* first mentions that a force order might be necessary to ensure that the defendant would be produced for her to examine him, Dkt. 259-29 at 3, and then only disagreed about whether to wait for him to refuse production further before seeking that order, Dkt. 259-13.

By contrast, the subject of Plaintiff's final internal complaint, about H+H's policy allowing staff evaluators to practice privately, appears to concern not policies and procedures relevant to her own forensic examinations but rather policies that permitted other psychiatrists to engage in practices to which she objected. In some cases, the Second Circuit has held, a public employee does speak as a citizen, not an employee, when objecting to general policies of the agency that employs him or her. *Matthews*, 779 F.3d at 174. But such employees speak as a citizen only when their "duties do not involve formulating, implementing, or providing feedback" on the policy. *Id.* For example, the patrol officer who sued in *Matthews* spoke as a citizen because policy-oriented

speech "was neither part of his job description nor part of the practical reality of his everyday work."  *Id.*  But policy-oriented speech did form part of Plaintiff's job.  Unlike the patrol officer in *Matthews*, whom the Second Circuit explicitly found "had no duty to monitor the conduct of his supervisors," *id.*, Plaintiff was a supervisory employee who, as director of one of the four FPECCs, necessarily monitored the conduct of those she supervised.  In that capacity, she was responsible for "implementing," *id.*, the private practice policy—and other H+H policies—by ensuring that the employees she supervised complied with it.  Furthermore, evidence in the record reveals that "providing feedback," *id.*, on FPECC policies was among Plaintiff's job responsibilities.  *See, e.g.*, Dkt. 226-25 at 2.  She even provided feedback on the private practice policy itself:  some of her complaints were voiced during a formal work meeting in the summer of 2018 with her supervisor, Jain, held for the purpose of discussing the policy, during which all the FPECC directors were able to comment on it.  Kaye Dep. at 247:24-249:11.[35]  Because implementing and providing feedback on FPECC policies was part of Plaintiff's job as the director of the Bronx Court Clinic, her complaints about the private practice policy did not fall outside her official job duties.

Furthermore, Plaintiff's complaints plainly lack a "civilian analogue."  *Matthews*, 779 F.3d at 175.  "Speech has a relevant civilian analogue if it is made through channels available to citizens generally."  *Id.* (internal quotation marks omitted).  For example, "an indicium that speech by a public employee has a civilian analogue is that the employee's speech was to an independent state agency responsible for entertaining complaints by any citizen in a democratic society regardless of his status as a public employee."  *Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011) (internal quotation marks omitted).  A public employee's speech to such an agency has a relevant civilian

---

[35] To be sure, on this particular occasion Jain did not accept the feedback that was provided. Kaye Dep. at 248:11-13.  But the mere fact that Plaintiff and the other FPECC Directors were given an opportunity to comment on the policy distinguishes them from employees like the patrol officer in *Matthews*, whose job "did not encompass commenting on precinct-wide policy" and who was not "expected to speak on policy."  779 F.3d at 174.

analogue when the employee speaks through "a path that was available to ordinary citizens who are regularly provided the opportunity to raise issues" with the agency. *Matthews*, 779 F.3d at 176. In *Matthews*, for example, the plaintiff brought his complaints "directly to the Precinct commanders, with whom he did not have regular interactions and who had an open door to community comments and complaints." *Id.* By contrast, Plaintiff complained to her work supervisor, Jain, and his supervisors, Ford and Yang, during professional work meetings to which ordinary civilians assuredly would not have been invited. *E.g.*, Kaye Dep. at 247:24 (describing the "meeting with the FPECC directors" at which she voiced her complaints). Furthermore, there is no evidence in the record suggesting that Jain, Ford, or Yang "had an open door to community comments and complaints." *Matthews*, 779 F.3d at 176. The contrast with *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41 (2d Cir. 1983), a case upon which Plaintiff relies extensively, Opposition at 18, 20, is instructive: while in *Rookard* the plaintiff complained to the H+H Inspector General, 710 F.2d at 46, which is "responsible for entertaining complaints by any citizen," *Jackler*, 658 F.3d at 241 (internal quotation marks omitted), Plaintiff complained to her supervisor and to his supervisors, none of whom was assigned that responsibility. Thus, because Plaintiff's internal complaints did not fall outside her official responsibilities and lacked any civilian analogue, they are not protected by the First Amendment.

### b.   External Complaints

By contrast, Defendants do not appear to argue that Plaintiff's thirty-four or more alleged external complaints, Opposition at 17, would be unprotected by the First Amendment or by section 740. Defts. Reply at 9-10, 14. Nonetheless, for two reasons Plaintiff has not produced sufficient evidence to raise a genuine issue of fact as to whether Defendants retaliated against her for any of those thirty-four or more complaints.

First, Plaintiff has not produced evidence sufficient to create a genuine issue of fact as to whether the substantial majority of those complaints were even made at all.  As Defendants note, Defts. Reply at 2-3, with the exception of her complaints to a Bronx judge in March 2018 and to the New York City Conflicts of Interest Board, Plaintiff's unsupported, self-serving eleventh-hour declaration is the only evidence cited to establish that any of the thirty-four or more complaints were actually made.[36]  *See* Opposition at 17; Pl. Counter 56.1 Stmt. ¶ 172.  And as the Court has explained, *see supra* notes 12, 28, that declaration alone is inadequate to raise a genuine issue of fact for trial.  Indeed, while courts in this District routinely refuse to allow parties to rely solely on self-serving testimony to create genuine issues of fact for trial, considering Plaintiff's declaration on this question would be particularly inappropriate given the "sham affidavit rule," under which "a plaintiff cannot submit a declaration to defeat summary judgment that contradicts the declarant's prior deposition testimony."  *In re Fosamax Prods. Liability Litig.*, 647 F. Supp. 2d 265, 281 (S.D.N.Y. 2009).  During her deposition, Plaintiff was repeatedly asked to name the occasions when she had made the complaints for which she suffered retaliatory treatment, besides her pay equity complaints and her internal complaints about H+H policies, *see* Kaye Dep. at 278:5-10, 307:14-23, 310:6-9, and she was able to name only a phone call to an uncertain agency in September 2018, *id.* at 308:24-309:4, and a complaint to the New York City Conflicts of Interest Board at an unspecified date, *id.* at 310:16-21.  Furthermore, while the sham affidavit rule does not apply "where the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition," *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000), Plaintiff was asked repeatedly when she had complained about Defendants and yet failed

---

[36] Plaintiff does purport to cite evidence to support the claim that she complained to a Bronx Defenders attorney in November 2018, *see* Pl. Counter 56.1 Stmt. ¶ 172, at 151, but the e-mail cited addresses scheduling and does not contain a whistleblowing complaint about any of the allegedly unlawful policies she opposed, *see* Dkt. 263-33.

to identify the litany of at least thirty-four complaints to various external agencies that are listed in her declaration.  Thus, while Plaintiff has submitted evidence to substantiate her claims that she complained to a Bronx judge in March 2018, Dkt. 263-32, and while in her deposition she did testify that she complained to an unknown agency in September 2018, Kaye Dep. at 307:24-310:5, and that she twice complained to the Conflicts of Interest Board, *id.* at 310:10-16, she has not presented sufficient evidence to create an issue of fact as to whether she made the remaining complaints, and the Court will not consider them in its analysis of retaliation.[37]

Second, even were the Court willing to consider the unsubstantiated statements in Plaintiff's declaration, she has presented no evidence whatsoever that any of these complaints caused any of the purportedly retaliatory treatment she suffered.  If an employer does not even know that an employee has engaged in certain conduct, then that conduct cannot be the cause of the employer's conduct towards the employee.  The *McDonnell Douglas* framework acknowledges this fact by requiring a plaintiff to prove, as part of his *prima facie* case, that the employer knew of the protected activity.  *Kwan*, 737 F.3d at 844.  Since First Amendment retaliation claims and section 740 claims do not employ the burden-shifting framework, the employer's knowledge is not broken out as a separate element and is instead subsumed into the causation inquiry.  "It is axiomatic that a First Amendment retaliation claim does not exist where the defendants had no knowledge of the allegedly protected speech."  *Skates v. Inc. Vill. of Freeport*, 265 F. Supp. 3d, 222, 236 (E.D.N.Y. 2017) (internal quotation marks omitted).  Thus, where a plaintiff "fails to identify any admissible evidence suggesting that [any individual] who allegedly took adverse

---

[37] Plaintiff does submit a complaint she allegedly filed with the Board of Correction on January 7, 2020, although the Court notes that nothing about the exhibit—a six-page pdf containing only the text of the purported complaint—indicates that it was actually submitted to the Board.  Dkt. 263-29.  However, all of Defendants' alleged retaliatory acts occurred before January 7, 2020, which is only days before she resigned from her position with CHS.  Pl. Counter 56.1 Stmt. ¶ 171.  That complaint could not have caused retaliation to occur before it was filed.

employment actions against her had knowledge of her protected activity . . . she fails to raise a genuine issue of triable fact with respect to whether an adverse employment action was causally related to her [protected] activity." *Id.* at 238; *accord Marchioni v. Bd. of Educ. of Chicago*, 341 F. Supp. 2d 1036, 1053 (N.D. Ill. 2004) ("A causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity."). And Plaintiff has produced no evidence whatsoever to show that any Defendant had any knowledge of any of her at least thirty-four external complaints.[38] Thus, she has not raised a genuine issue of fact for trial as to whether any of those complaints caused Defendants to retaliate against her.

In conclusion, Plaintiff cannot succeed on her claims that Defendants retaliated against her for complaining internally, in violation of the First Amendment, because those internal complaints were not protected by the First Amendment, and she cannot succeed on her claims that they retaliated against her for complaining externally, in violation of the First Amendment and section 740, both because she has produced inadequate evidence to prove that most of those external complaints were even made, and because no reasonable factfinder could conclude that any were the cause of Defendants' allegedly retaliatory conduct. For those reasons, Defendants are granted summary judgment on Plaintiff's First Amendment and NYLL section 740 retaliation claims.

---

[38] In the *McDonnell Douglas* burden-shifting context, the Second Circuit has held that "for purposes of a prima facie case, a plaintiff may rely on general corporate knowledge of her protected activity to establish the knowledge prong." *Kwan*, 737 F.3d at 844 (internal quotation marks omitted). Plaintiff claims that some of her complaints were directed to the Inspector General of H+H, and the inspector general's knowledge might suffice as "general corporate knowledge." But First Amendment retaliation and section 740 do not employ the *McDonnell Douglas* framework; instead, the plaintiff bears the burden of proving causation throughout. And on the facts of this case, where Plaintiff's only evidence consists of her own testimony that complaints were made, where they were made to a separate corporate office—the inspector general—far removed from the individuals who allegedly retaliated against her, and where she has produced no evidence whatsoever to indicate that any information about those complaints reached those individuals, no reasonable factfinder could conclude that she has carried that burden.

**2.      Retaliatory Acts**

As noted, Defendants do not appear to contest that Plaintiff engaged in activity protected by the FMLA, Title VII, the NYSHRL, and the NYCHRL.  The Court will therefore examine the alleged retaliatory acts she has identified in her brief.  In a few instances, Plaintiff has produced no evidence that Defendants actually performed those acts, and because the occurrence of an adverse employment action is an element of the *prima facie* case, *Kwan*, 737 F.3d at 844, the failure to produce such evidence defeats her retaliation claims with respect to those allegations.  For the most part, however, the parties do not dispute that the actions Plaintiff claims were retaliatory did in fact occur.  Thus, the Court must determine if a genuine issue of fact exists as to whether that conduct was caused by any of Plaintiff's protected activities.  Plaintiffs can typically satisfy the causation element of a *prima facie* case based on the temporal proximity between the protected activity and the alleged retaliation, *id.* at 845, and some of the alleged retaliation Plaintiff has identified did occur in close temporal proximity to her protected conduct.  But even assuming that she could make out a *prima facie* case with respect to each episode of alleged retaliation, Defendants have produced non-retaliatory explanations for each.  Plaintiff therefore must, "in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation" motivated Defendants' conduct.[39]  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 553 (2d Cir. 2010).  And Plaintiff has produced no evidence that Defendants' proffered explanations are pretextual and that

---

[39] As mentioned, Title VII and the NYCHRL differ as to whether Plaintiff must show that she would not have been treated adversely but for her protected activity or whether she need show only that retaliation motivated the adverse treatment at least in part.  *See supra* note 33.  Because this difference does not affect the Court's analysis, however, the Court will not address it further.

retaliation instead motivated their conduct.[40]  The Court therefore concludes that Defendants are entitled to summary judgment on Plaintiff's remaining retaliation claims.

   a.   **Change in Job Title**

On May 3, 2018, Plaintiff complained to Yang about Defendants' alleged sex discrimination and equal pay violations.  Defts. 56.1 Stmt. ¶ 65.  And on May 11, 2018, Jain decided that Plaintiff's job title would be changed from Medical Director to Director, *id.* ¶ 78, a change of which Plaintiff learned by May 25, 2018, *id.* ¶ 79.  Assuming, because Defendants do not dispute the point, that this change qualifies as an adverse employment action—which would not otherwise be clear to the Court—the complaint and the title change occurred close enough in time to sustain the causation element of Plaintiff's *prima facie* case.  *See Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 111 (2d Cir. 2010) (holding a four-month gap between protected activity and adverse employment action sufficiently short to sustain an inference of causation for the purposes of a *prima facie* case).  Defendants, however, have produced a non-retaliatory explanation for the change:  as part of the reorganization of the FPECCs, CHS management had decided that the manager of each clinic would be given the title of Director of that clinic, and that Jain would be given the title of Director of all the FPECCs.  Defts. Br. at 12.  And Defendants have supported this explanation with compelling evidence in the record, namely e-mails among

---

[40] To be sure, Plaintiff has produced some direct evidence that Defendants retaliated against her based on some of her conduct.  At her deposition, she testified that following her complaints about H+H policies at a meeting on January 29, 2018, Yang told her that "if you don't like the way we do things, there's the door."  Kaye Dep. at 99:2-100:1.  Furthermore, she has produced an e-mail in which, after discussing Plaintiff's refusal to perform examinations based on redacted medical records, Ford stated that "Kaye has been a problem for a long time and we will manage her out."  Dkt. 225-20.  But while this evidence may show that Defendants sought to retaliate against Plaintiff for her concerns related to H+H policies, the Court has already held that Plaintiff's complaints at the January 29, 2018 meeting were not protected under the First Amendment, and Plaintiff has advanced no argument that her refusal to perform examinations using redacted records was protected under any law.  Instead, Plaintiff must show that Defendants retaliated against her for activity protected under Title VII, the NYSHRL, the NYCHRL, or the FMLA, and evidence related to her disagreements with H+H policies does not bear on that question.

CHS management confirming that Mundy, Owen, and Winkler were all given the title of Director along with Plaintiff.[41]   Dkts. 226-21, 226-22, 226-23.   Plaintiff has presented no evidence that it is pretextual, or that Defendants' true motivation was retaliatory.   Consequently, Plaintiff has not carried her burden of showing that her protected activity motivated this change in her title.

Plaintiff further claims that that same month she was demoted in civil service title from Attending Physician III to Attending Physician II.   Opposition at 24.   However, the only evidence she has presented in support of that claim consists of two spreadsheets contained in e-mails sent in early May.   Dkts. 259-5 at 1, 259-8.   Each e-mail was sent by Laboy, the Chief Administrative Officer for CHS, Defts. 56.1 Stmt. ¶ 32; Yang Dep. at 36:3-4, which was not yet Plaintiff's employer.   They were sent in response to two inquiries unrelated to civil service titles about compensation among doctors at CHS, one pertaining to salaries, Dkt. 259-5 at 1, and the other to start dates, Dkt. 259-8.   Thus, neither spreadsheet appears to be an official employment record of Plaintiff's employment status at H+H but instead appears to be a spreadsheet generated by Laboy to analyze compensation questions unrelated to civil service titles.   Furthermore, Plaintiff has presented no further evidence beyond these two spreadsheets that her civil service title in fact changed, such as official employment documents recording the change, nor has she presented any evidence that her benefits or compensation were reduced in May 2018, as would be expected had she been demoted to a lower civil service grade.   And her own evidence shows that Defendants listed her as having the civil service title of Attending Physician III well after she was allegedly

---

[41] As the Court has discussed, *see supra* note 13, one piece of evidence Defendants produced—an e-mail containing business card mock-ups for the FPECC Directors, Dkt. 226-22 at 3—does show only that Plaintiff, Owen, and Winkler were given the title of Director.   However, that e-mail contains no evidence that Mundy retained the title of Medical Director.   Rather, it simply contains no evidence about Mundy's title:   as it notes, a request for his new business cards had not yet been received because his phone number had not yet been assigned.   *Id.* at 4.   Thus, while Defendants have produced other evidence that the heads of each Court Clinic, including Mundy, were given the title of Director, *see* Dkts. 225-21, 225-23, Plaintiff has presented no evidence that creates a dispute of fact as to whether Mundy retained the title of Medical Director.

demoted in May 2018.  *E.g.*, Dkt. 260-30 at 1 (Feb. 21, 2019 email from Ford to Jain).  In short,

while Plaintiff may have shown that in May 2018, before she was officially employed by CHS,

Laboy apparently thought she was an Attending Physician II, she has presented no evidence that

her civil service title actually changed.  In her *prima facie* case, it is Plaintiff's burden to show that

she actually suffered an adverse employment action, *see Kwan*, 737 F.3d at 844, and thus her

failure to produce evidence that she was actually demoted to Attending Physician II entitles

Defendants to summary judgment on the claim that such a demotion was retaliatory.

> **b.    Shift Change**

Following the transfer of the FPECCs to CHS management in July 2018, Plaintiff's shift

was changed from an eight-and-a-half hour shift, with a half-hour unpaid lunch, to a nine-hour

shift with an hour-long unpaid lunch.  Defts. 56.1 Stmt. ¶¶ 90, 99-101; Dkt. 226-36; Kaye Dep. at

281:15-16.  This change, too, occurred close enough in time to her pay equity complaints,

including her filing of an EEOC charge in May 2018, to satisfy the causation prong of her *prima*

*facie* case.  The burden having shifted, Defendants have articulated an explanation for the shift

change:  under CHS policy, all doctors were required to take an hour-long lunch.  Defts. Br. at 13.

Defendants have produced contemporaneous evidence that CHS management insisted on a

uniform hour-long lunch, Dkt. 226-27, and that multiple Bellevue doctors transferring to CHS

were subject to the same schedule change, Dkt. 226-35.  Obviously, requiring Plaintiff to comply

with a standard policy requiring an hour-long lunch is a non-retaliatory motivation.  And Plaintiff

has produced no evidence showing that it was pretextual.  While she argues that there existed no

written policy mandating an hour-long lunch, Opposition at 7, 26, employers need not reduce every

policy to writing, and the fact that multiple doctors were required to change to an hour-long lunch

is evidence that hour-long lunches were standard, even if no written policy existed.  Furthermore,

while Plaintiff claims that the collective bargaining agreement guaranteed doctors a half-hour

lunch, citing an e-mail sent by a deputy director of labor relations on July 24, 2018, Opposition at 26, 31; Pl. Counter 56.1 Stmt. ¶ 89, the material attached to that e-mail addressed only the hours doctors were required to work, not the lunch breaks they were allowed, *see* Dkt. 226-32 at 3-6. Lastly, while Plaintiff claims that the other FPECC directors were treated differently, Opposition at 22, Winkler testified that he took a one-hour lunch, Winkler Dep. at 60:11-12.  Thus, Plaintiff has provided no evidence to defeat Defendants' non-retaliatory explanation that her shift was changed because CHS required all doctors to take an hour-long lunch.  Consequently, Defendants are entitled to summary judgment on the claim that they retaliated by changing her shift.

### c.    Timesheets

Plaintiff claims that after she "complained of discrimination in May 2018 . . . Defendants acted at the first opportunity to retaliate in July 2018" in that they "denied [her] consistent access to her timesheets from July 2018 until . . . January 2020."  Opposition at 24.  Furthermore, she claims that "on October 29, 2018, in retaliation of her request [for FMLA leave], Defendants failed to process [her] timesheets two weeks in a row."  *Id.* at 16.  The parties agree that Plaintiff was denied access to CHS timekeeping software immediately after the FPECCs transitioned to CHS management, Defts. 56.1 Stmt. ¶ 130; Pl. Counter 56.1 Stmt. ¶ 130, and the evidence in the record shows that two timesheets had not been processed in late October 2018 when she returned from FMLA leave, Dkt. 262-32.  But while Plaintiff additionally claims that Defendants "denied [her] access" to the timekeeping program, Opposition at 24, her evidence reflects only her inability to access the software, *see* Pl. Counter 56.1 Stmt. ¶¶ 130-31, and she has produced no evidence whatsoever to show that Defendants ever took any action to deny her access.  Thus, outside the two specific instances mentioned above, she has produced no evidence to show that any Defendant took an adverse employment action against her with respect to timesheet access.  And such an adverse employment action must be proven in the *prima facie* case of a retaliation claim.  *See Self*

66

*v. Dep't of Educ.*, 844 F. Supp. 2d 428, 435 (S.D.N.Y. 2012) (explaining that the *McDonnell Douglas* framework requires that a plaintiff "must suffer an adverse employment action *at the hands of her employer*" (emphasis added)). Thus, because Plaintiff has not shown that Defendants took any action against her with respect to the timesheets, save for their failure to ensure that the timekeeping software worked for Bronx Court Clinic employees immediately after the July 2018 transition to CHS management and their failure to process two timesheets in October 2018, she can make out a *prima facie* case only with respect to those actions.

The temporal proximity between the transition in July 2018 and Plaintiff's filing of an EEOC Charge of Discrimination in May 2018, and between the failure to process timesheets in October 2018 and her filing of EEOC Supplemental Charge of Discrimination on September 11, 2018, Dkt. 227-4 at 7, would plausibly suffice to sustain an inference of retaliation as required by the causation element of the *prima facie* case. Nonetheless, in each case Defendants have produced a non-retaliatory explanation for their action. First, they explain that the timekeeping software did not work immediately after the transition because they were still in the process of completing the administrative transfer of FPECC employees to CHS systems, including the timekeeping system. Defts. Br. at 12. The evidence in the record supports this explanation, since it shows that all employees of the Bronx Court Clinic could not access the timekeeping software, and that other CHS employees had struggled to access it when their employment began. Dkt. 227-8. Plaintiff has produced no evidence to show this explanation is pretextual. Second, as reflected by the evidence Plaintiff herself cites in support of the claim that her timesheets were not processed for two weeks in October 2018 when she was on leave, they were not processed because Jain, who ordinarily would have been responsible, was also on leave himself during that period. Dkt. 262-32. And Plaintiff has presented no evidence to show that that explanation for why they were not processed is pretextual. Thus, Defendants are entitled to summary judgment on the claim that they

retaliated against Plaintiff with respect to the processing of her timesheets and her ability to access the CHS timekeeping software.

### d.   Educational Leave

When Plaintiff took time off work to sit for her credentialing exams in September 2018, she was initially required to cover that time using annual leave rather than educational leave.  Defts. 56.1 Stmt. ¶ 103.  Then, when she complained, she was allowed to use educational leave for five hours and fifteen minutes of the time she missed, but was required to use annual leave for the rest. *Id.* ¶ 104.  Eventually, following a change in CHS policy, she was credited with educational leave for the full day.  *Id.* ¶ 108; Dkt. 226-41.  Given that Plaintiff was not, in fact, denied any leave to which she claims to have been entitled, she has not shown an adverse employment action, as required to make out a retaliation claim.  Furthermore, she has not produced sufficient evidence to show that her protected activity was the cause of any of Defendants' conduct.  Because the exams closely followed her filing of the EEOC Supplemental Charge on September 11, 2018, she could make out a *prima facie* case based on temporal proximity.  Defendants, however, have provided non-retaliatory explanations for their conduct—namely, they were following their own policies concerning educational leave.  First, Plaintiff was initially denied leave because a payroll staffer believed that educational leave covered only course attendance, not credentialing exams.  *See* Dkt. 226-38 at 2.  Then, she was given only five hours and fifteen minutes of educational leave because the documentation she initially submitted indicated that her exam would last only five hours and fifteen minutes, and she provided no documentation to justify an additional two hours and forty-five minutes of educational leave that day.  *Id.* at 1; *see also* Dkt. 248-4 at 2 (listing the appointment length for the exam as "315 minutes").  And when Plaintiff pointed out that she was required to arrive thirty minutes early, payroll corrected the error and credited her with an additional half-hour of educational leave, while noting that because Plaintiff had provided no documentation to show

that she arrived two hours early, she could not be given an additional two hours of educational leave. Dkt. 261-26. Plaintiff has produced no evidence to show that this non-retaliatory explanation for Defendants' conduct is pretextual, or that payroll's actions were really motivated by retaliation. Thus, Defendants are entitled to summary judgment on the claim that they retaliated against Plaintiff by denying her educational leave when she took her credentialing exams.

### e.    Retention Bonus

Because the Bronx Court Clinic was not transferred to CHS management until July 1, 2018, Plaintiff was entitled to be paid a retention bonus of $20,000 under the collective bargaining agreement. Defts. 56.1 Stmt. ¶ 47. However, she was initially paid only two-thirds of the amount due. *Id.* ¶ 119. Following her complaints, H+H recalculated the bonus she was owed and corrected their error. *Id.* ¶ 123. The EEOC Supplemental Charge of Discrimination, filed on September 11, 2018, and the underpaid retention bonus were sufficiently close in time to raise an inference of causation, as required to make out a *prima facie* case. But once again, Defendants have produced a non-retaliatory explanation for the underpayment: the amount due depended on whether Plaintiff was a full-time or part-time employee, and Defendants simply made an error and incorrectly computed the hours she had worked between July 1, 2017 and June 30, 2018. Defts. Br. at 13. And Defendants have produced evidence documenting that error: in e-mails they have produced a CHS staffer, citing "print outs provided by Payroll," computed the full-time employee percentages of the various employees owed retention bonuses and incorrectly identified Plaintiff as having worked only part-time. Dkt. 226-49. Furthermore, Plaintiff herself has produced a version of the same e-mail with those printouts attached, and they did indeed incorrectly reflect that Plaintiff's "actual hours worked" was less than full-time. Dkt. 262-7 at 3-4. Defendants' explanation for why the bonus was miscalculated is made further plausible by the fact that the amount due depended on Plaintiff's hours worked at Bellevue during the previous year, but

because she no longer worked at Bellevue, payroll staff there no longer had access to her payroll data.  Dkt. 226-48 at 2.  And the inference that Defendants underpaid Plaintiff's bonus out of retaliation is further undercut by the additional e-mails they have also produced, in which CHS management, including Yang and Wangel, frantically pushed payroll and operations staff to compute the amounts due so that the bonuses could be paid on time.  *See* Dkts. 226-47, 226-48.

Plaintiff, in turn, has produced no evidence showing that this explanation is pretextual.  In the e-mail exchanges concerning the bonus, a Bellevue human resources employee explained that Bellevue no longer had access to Plaintiff's payroll information, and thus that Plaintiff's full-time status could be confirmed only through a Central Office payroll query.  Dkt. 226-48 at 2.  Plaintiff argues that retaliation may be inferred because Defendants instead computed Plaintiff's hours "based on the timesheets Defendant Jain erroneously completed."  Pl. Counter 56.1 Stmt. ¶ 116.  But Plaintiff has produced no evidence that the hours were in fact computed based on those timesheets; indeed, the e-mail computing Plaintiff's hours explicitly states that it "is based on the printouts provided by Payroll."  Dkt. 226-49 at 4.  Furthermore, the error made in computing Plaintiff's full-time employee status was hardly surprising given the extreme time pressure under which CHS human resources staff were operating:  they had been told that retention bonuses would not be paid on time unless the amounts were confirmed by September 26, 2018, Dkt. 226-47 at 3-5, and they were not advised to employ a Central Office payroll query to compute the status of all four full-time employees until 4:00 p.m. on September 26, 2018, Dkt. 226-48 at 2-3.  And the record discloses no reason why the junior H+H staffer who computed Plaintiff's hours might have been motivated to retaliate against her—indeed, the record discloses almost no information about that staffer at all—nor has Plaintiff produced any evidence showing that any more senior H+H staff who plausibly might have been motivated to retaliate directed the staffer in computing Plaintiff's hours.  Thus, because Plaintiff has not carried her burden of showing that Defendants'

explanation for the underpayment is pretextual, they are entitled to summary judgment on the claim that the underpayment was retaliatory.

### f.    Pay Reduction

In her briefing, Plaintiff claims that in "September 2018 . . . Defendants docked her pay and leave balances for two pay periods in a row on two Jewish High holidays in a row." Opposition at 21. Yet, while her Rule 56.1 counter-statement does reference her being docked during the High Holidays, Pl. Counter 56.1 Stmt. ¶ 126, the exhibits cited pertain only to her EEOC Supplemental Charge, not to any purported loss of pay. Her pay was, however, reduced during two consecutive pay periods in 2019, Defts. 56.1 Stmt. ¶ 149, and one of those reductions was due to time taken off for Yom Kippur, Dkt. 227-27 at 2-3. Thus, perhaps Plaintiff intended to refer to this period in her briefing. Nonetheless, even had she made out a *prima facie* case, Defendants have provided a non-retaliatory explanation for why her pay was reduced—namely, that she took time off work but had no paid leave remaining. Defts. Br. at 14. And to support that explanation, Defendants have submitted e-mails from the timekeeping system recording that her pay was reduced because she had absences from work and no remaining paid leave. Dkt. 227-27 at 3, 7. Plaintiff has produced no argument or evidence for why this explanation is pretextual.[42] Thus, Defendants are granted

---

[42] In her declaration, Plaintiff does claim that when she was docked pay in "September and October 2019 . . . the KRONOS system said [she] had time" and that she "verbally confirmed with CHS payroll that [she] had the time to take beforehand." Kaye Decl. ¶ 102. As the Court has discussed, however, Plaintiff's self-serving, unsubstantiated testimony is insufficient, on its own, to create a dispute of fact sufficient to survive summary judgment. *See supra* notes 12, 28. Indeed, this statement is not merely unsubstantiated by documentary evidence but further actively contradicted by it. Following the pay deductions, Plaintiff e-mailed various individuals in H+H management to complain, but pointedly did not assert that prior to taking time off she had confirmed, either by consulting KRONOS or by communicating verbally with CHS payroll, that she had paid leave available. Dkt. 227-27 at 6. Instead, she repeatedly argued that her pay was unfair not because she had been told that she had leave available but rather because she had been *unable* to determine whether she had leave available, *id.* (describing "problems with Kronos and the ability to obtain accurate, real time leave balances"); *id.* ("I still don't have confirmation of my usage; again I have respectfully requested an accounting of time and leave balances for last year but to no avail."); *id.* at 8 (asking "if there is a way for me to check my time

71

summary judgment on the claim that they retaliated against Plaintiff by reducing her pay for taking time off during the Jewish High Holidays.

### g.    FMLA Leave

As discussed, *see supra* III.C, in November 2018, Defendants asked Plaintiff to submit additional documentation in support of her request for FMLA leave, Defts. 56.1 Stmt. ¶ 139, and in December 2018 and January 2019, Defendants incorrectly recorded Plaintiff's annual leave time as FMLA leave, which Plaintiff only realized in May and June 2019, *id.* ¶ 141; Dkt. 227-20. Plausibly, each of these incidents occurred close enough in time to Plaintiff's September 2018 EEOC Supplemental Charge to sustain an inference of causation based on temporal proximity. Defendants, however, have produced non-retaliatory explanations for each.  First, Defendants explain that they asked Plaintiff to supplement her FMLA leave request because the initial documentation Plaintiff submitted required further clarification.  Defts. Br. at 24.  In particular, Defendants' human resources employee requested clarification as to the "frequency/duration of the absences needed to care for your family member," which were listed "as 1-4 times per 5-180 weeks for 1-2 months."  Dkt. 227-18 at 3.  To show that this explanation is pretextual, Plaintiff argues that "a review of Dr. Kaye's October 12th, application will reveal that she in fact complied, and provided the requested information."  Opposition at 16.  But a review reveals that Defendants' human resources employee correctly characterized the application:  it stated that the "frequency of flare-ups" was "1-4 times per 5-180 week(s) 1-2 month(s)" and the "duration of related incapacity" was "5-180 day(s) per episode."  Dkt. 262-34 at 4.  And because this description of how frequently Plaintiff would require FMLA leave, and how long each episode of leave would last, is indeed

---

and leave balances in real time"); *id.* (complaining that "I am not privy to my time and leave balances" before taking time off).  And the claim that she had been unable to identify her available leave in real time before taking time off directly contradicts her claim, in the declaration, that she had confirmed on KRONOS and verbally with CHS payroll that she had paid leave remaining.

quite unclear, Defendants' request for clarification was an entirely understandable, non-retaliatory response.  Second, the e-mail chain which Plaintiff identified the error in Defendants' tabulation of her FMLA usage reveals the reason why it was incorrectly tabulated:  Plaintiff had initially told Defendants that she would be using FMLA leave during the final week of December 2018 and the first week of January 2019, and never informed them that she instead had used annual leave for those weeks.  Dkt. 227-20 at 1.  Plaintiff has presented no evidence or argument that either explanation is pretextual.  Thus, Defendants are granted summary judgment with respect to the argument that they retaliated against Plaintiff by seeking additional FMLA documentation or incorrectly tabulating her FMLA leave.

### h.    Remote Work

On July 12, 2019, Plaintiff submitted a request for a reasonable accommodation.  Defts. 56.1 Stmt. ¶ 146.  That request sought "an accommodation for a later start time, a flexible schedule and to work remotely" because of gastrointestinal issues she was experiencing most mornings.  Dkts. 227-24 at 6.  On October 23, 2019, she was granted an accommodation permitting her to begin her shift an hour later than normal, at 9:00 a.m. rather than 8:00 a.m., but not permitting her to work remotely.  Defts. 56.1 Stmt. ¶ 148.  Plaintiff claims that Defendants "Denied Her Request for An Accommodation because She Filed the Lawsuit Herein," Opposition at 28, referring presumably to the denial of the remote work accommodation.  Even assuming that the October 2019 partial denial of the request is close enough in time to Plaintiff's protected activity to make out a *prima facie* case, however, Defendants have produced a non-retaliatory explanation for the partial denial.  According to the contemporaneous e-mails they have produced, they responded to her request by considering "the accommodations being requested and what is doable at the Departmental level without causing a hardship."  Dkt. 227-25 at 4.  In their view, a "later start time could work as long as defendants are not having to wait to be seen, and court is open with court

officers still around when her shift ends.  For things like her supervision of Dr. Brayton and meetings, we can do our best to accommodate around her schedule." *Id.* at 3.  However, "remote work [was] out of the question." *Id.*  As they explain, Defts. Reply at 13, "employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee," as long as the chosen accommodation is effective. *Noll v. IBM Corp.*, 787 F.3d 89, 95 (2d Cir. 2015).  Thus, Defendants claim that they denied Plaintiff's request for remote work because they preferred, and were permitted to provide, a less-disruptive, equally effective accommodation when one was available.

Plaintiff has presented no evidence or argument that this explanation is pretextual.  Indeed, it appears quite reasonable:  Given that Plaintiff's medical issues occurred predominately in the mornings, allowing her to begin work later would plausibly accommodate them, and obviously a shift change is less disruptive than permitting remote work, particularly for a job involving in-person examinations that Plaintiff herself was required to perform.  Because Plaintiff has not carried her burden to show that Defendants' explanation is pretextual, they are entitled to summary judgment with respect to the claim that they retaliated against her by partially denying her request for an accommodation.

### i.       E-mail Search

In January 2019, Defendants searched Plaintiff's work e-mail outbox.  Defts. 56.1 Stmt. ¶ 133.  In particular, they sought "email to external recipients, focus[ing] on legal aid society and personal email addresses (gmail, yahoo, etc.)" containing "[a]ll or part of the phrase: FPECC policy Psychological Testing." Dkt. 227-12 at 2.  Plaintiff argues that "Defendant Wangel ordered [this] baseless witch hunt of [her] emails" because "he and Yang were miffed with [her] because she had filed a charge with the EEOC."  Opposition at 32.  Even assuming that the temporal proximity between the September 2018 EEOC Supplemental Charge and the inbox search permits

an inference of causation sufficient for Plaintiff's *prima facie* case, Defendants have produced a non-retaliatory explanation for the search. In November 2018, a draft psychological testing policy was circulated among the FPECC directors, and in January 2019 a revised version was circulated. Dkt. 227-11 at 2-3. Plaintiff repeatedly expressed her disagreement with the draft policy. *Id.* at 1-2. Furthermore, information about the policy had somehow leaked to Legal Aid attorneys. Defts. 56.1 Stmt. ¶ 132. Given her opposition to the policy, Defendants suspected that she might have leaked it, and sought to investigate her based on that suspicion. *Id.* ¶ 133; Dkt. 227-12.

Plaintiff argues that this explanation is pretextual because Winkler and Mundy "raised similar concerns about clinicians' autonomy and judgment being undermined by the Court" but although all three "made comments on the policy, Defendants Jain, Ford and Wangel singled her out." Pl. Counter 56.1 Stmt. ¶ 132. A comparison of the comments made by Winkler and Mundy with those made by Plaintiff, however, makes clear why Defendants' suspicions focused on Plaintiff. Winkler suggested rewording a single subsection of the draft policy, Dkt. 262-26 at 1, and Mundy suggested clarifying how the policy would relate to court orders requiring testing, a change he saw as "[n]o biggie," *id.* By contrast, Plaintiff expressed strong opposition to the policy, explained that she was "not comfortable performing court orders [sic] exams in which a third party decides if and when psychological testing is necessary," argued that the policy "undermines the efficiency, integrity and validity of the court ordered evaluation process and compromises the independence of the examinations for which psychological testing is requested," and asked that Jain "reconsider [the] implications and repercussions of this policy." Dkt. 261-10. Similarly, once the revised policy was circulated she expressed concerns that it would "raise[] questions about the legitimacy of the examination, open[] the door to controversion by defense attorneys and prosecutors, and undermine[] the credibility of the examination results." Dkt. 227-11 at 2. Given the distinctive vehemence of Plaintiff's opposition, it is hardly surprising that Defendants

suspected her, rather than Mundy and Winkler, of leaking the draft.  Furthermore, while Plaintiff notes that ultimately "Defendants could not attribute the distribution of the Psychological Testing Policy to Dr. Kaye," Pl. Counter 56.1 Stmt. ¶ 133, to defeat a retaliation claim Defendants need only show that they acted for non-retaliatory reasons, not that those non-retaliatory reasons were ultimately vindicated.  *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (explaining that when determining whether an employer's proffered reasons are pretextual "we are decidedly not interested in the truth of the allegations against plaintiff.  We are interested in what motivated the employer; the factual validity of the underlying imputation against the employee is not at issue." (internal quotation marks and citation omitted)).  Thus, Plaintiff has not shown that Defendants' explanation for searching her e-mail inbox is pretextual, and Defendants are therefore entitled to summary judgment with respect to the claim that the search was retaliatory.

### j.    Disciplinary Memoranda

On July 1, 2019, Defendants served Plaintiff with two disciplinary memoranda, one addressing her recording of a criminal defendant's forensic examination without his consent, and one addressing an episode in which she allegedly screamed at Swenson. Defts. 56.1 Stmt. ¶¶ 153, 158.  As to the first, it is unclear whether Plaintiff can even make out a *prima facie* case, given that the investigation was initiated on March 20, 2019, before Plaintiff's spring 2019 service of the Amended Complaint on Defendants, Dkts. 24, 30, but over six months after she filed the EEOC Supplemental Charge on September 11, 2018, Defts. 56.1 Stmt. ¶ 125.  *See Hollander v. Am. Cyanamid Co.,* 895 F.2d 80, 85-86 (2d Cir. 1990) (finding a lack of evidence that an adverse action, taken three months after the plaintiff's EEOC complaint, was in response to the plaintiff's protected activity); *but see Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 45-46 (2d Cir. 1980) (finding that the lapse of eight months between an EEOC complaint and a retaliatory act indicated a causal connection).  In any event, Defendants have produced a non-retaliatory explanation for

the memo:  it was a "well-founded admonition[] for her improper conduct."  Defts. Br. at 14.  That is, Plaintiff was disciplined for violating CHS "custom and practice," Dkt. 227-29 at 3, for recording forensic evaluations because she did, in fact, violate CHS custom and practice.

Plaintiff argues that this explanation is pretextual because custom and practice did not forbid recording evaluations.  In support, she cites the lack of a formal written policy, her own asserted ignorance of any such custom and practice, and the American Academy of Psychiatry and the Law's position that "[t]here is some disagreement regarding the necessity of obtaining consent before video recording interviews."  Dkt. 263-10 at 13; Pl. Counter 56.1 Stmt. ¶ 151.  As noted, however, in evaluating pretext a court must investigate "what motivated the employer," not "the factual validity of the underlying imputation against the employee."  *McPherson*, 457 F.3d at 216 (internal quotation marks omitted).  And the evidence Plaintiff cites does not bear on whether Defendants believed that custom and practice prohibited recording evaluations, nor does it show that that belief was not their basis for issuing the counseling memorandum.  Indeed, the memorandum itself lays out its basis for concluding that the recordings violated custom and practice, including Kaye's own acknowledgment when interviewed that the recording was "atypical," Owen's and Mundy's statements that the practice was prohibited and that the prohibition was well-known, and the American Psychiatric Association's opinion that a psychiatrist should inform patients prior to recording.  Dkt. 227-29 at 2-3.

Because the episode precipitating the second memorandum, concerning the incident when Plaintiff supposedly screamed at Swenson, occurred after Plaintiff served her Amended Complaint in April and May 2019, she can make out a *prima facie* case based on temporal proximity. Nonetheless, Defendants offer the same non-retaliatory explanation for that memorandum:  it was a "well-founded admonition[] for her improper conduct."  Defts. Br. at 14.  Here too, Plaintiff argues that this explanation is pretextual because she "denied that she ever yelled at Ms. Swenson."

Pl. Counter 56.1 Stmt. ¶ 155.  But, as discussed, in the cited portion of her deposition transcript, Plaintiff did not, in fact, deny that she ever yelled at Swenson; instead, she claimed that the memorandum itself—which did not mention her tone of voice—grossly mischaracterized her conduct, without specifying in what respect it had been mischaracterized.  *See* Kay Cont'd Dep. at 412:14-25, 415:1-9.  Furthermore, even had Plaintiff denied that she yelled, that denial would bear only on what actually happened, not on Defendants' motivations:  Swenson told H+H management that Plaintiff had yelled at her, and Plaintiff has presented no evidence that H+H management disbelieved that account.  Thus, Plaintiff has not carried her burden of introducing evidence to show that Defendants' asserted reason for disciplining her for this incident is pretextual.

Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's claim that the two disciplinary memoranda were retaliatory.

### k.      Staffing at the Bronx Court Clinic

Lastly, at various points throughout the final two years of Plaintiff's employment as director of the Bronx Court Clinic, that clinic had less than its full complement of staff examiners. First, the Bronx Court Clinic had no second full-time examiner between Winkler's promotion to direct the Brooklyn Court Clinic in March 2018, Defts. 56.1 Stmt. ¶¶ 54-55, and Brayton's start at the Bronx Court Clinic in approximately December 2018, Pl. Counter 56.1 Stmt. ¶ 166, although from May 2018 through June 14, 2019, Mullan worked part-time at the Bronx Court Clinic *id.* ¶ 163.  Second, during the one-and-a-half months between Brayton's departure on November 22, 2019, Dkt. 227-48, and Plaintiff's resignation on January 9, 2020, the Bronx Court Clinic again had no second full-time examiner.  Plaintiff alleges that Defendants retaliated against her when they "removed her full-time staff person and refused to provide a consistent full-time replacement." Opposition at 7.  Furthermore, she alleges that in the brief period between Brayton's

departure and her own resignation, Defendants "declared a work stoppage at the Court clinic altogether." *Id.* at 19.

Plaintiff, however, has provided no evidence whatsoever that Defendants "refused to provide a consistent full-time replacement" for Winkler at the Bronx Court Clinic or "declared a work stoppage" once Brayton left the Bronx Court Clinic. Indeed, all the evidence in the record pertaining to staffing reflects Defendants' consistent attempts to hire staff for the FPECCs, including the Bronx Court Clinic. *See* Dkt. 227-40 to -49. And they successfully provided a full-time replacement for Winkler, Brayton, from December 2018 to November 2019, as well as providing a part-time replacement, Mullan, from May 2018 to June 2019. Plaintiff no doubt would have preferred for Winkler to be replaced more quickly, but to prevail on her retaliation claim she must show that Defendants took some adverse employment action against her. *See Self*, 844 F. Supp. 2d at 435 (explaining that the *McDonnell Douglas* framework requires that a plaintiff "must suffer an adverse employment action *at the hands of her employer*" (emphasis added)). And she has produced no evidence to identify which adverse actions Defendants took to avoid replacing Winkler, or even any evidence to show that the failure to replace him resulted from Defendants' conduct at all, rather than from the unwillingness of potential employees to accept the job. Defendants can hardly be asked to present a non-retaliatory reason for taking a particular action when Plaintiff has not even identified the action that she alleges was retaliatory. Similarly, while Plaintiff has presented evidence that the Bronx Court Clinic was understaffed following Brayton's departure, and thus that it was frequently difficult for forensic evaluations to be scheduled, Pl. Counter 56.1 Stmt. ¶¶ 167-68; Dkts. 259-33 at 243:11-24:19 (deposition of Legal Aid Society attorney, Jeffrey Bloom), 263-25 to -28, she has produced no evidence in support of her speculation that these difficulties arose from Defendants' decision to declare a work stoppage at the Clinic rather than for the obvious alternative reason that the Clinic's second examiner had recently

departed.  *See Jeffreys*, 426 F.3d at 554 ("[A] nonmoving part[y] . . . may not rely on conclusory allegations or unsubstantiated speculation . . . [and] must offer some hard evidence showing that its version of the events is not wholly fanciful." (internal quotation marks omitted)).

Thus, the only action of Defendants' related to Bronx Court Clinic staffing that Plaintiff has identified as a potential adverse employment action is the promotion of Winkler to direct the Brooklyn Court Clinic.  In her briefing, however, Plaintiff argues only that the promotion of Winkler constituted retaliation for her policy-related complaints at the meeting held on January 29, 2018.  Opposition at 24 ("At the January 29, 2018 meeting, [Defendants] threatened to terminate [Plaintiff] on the spot.  Within weeks of that meeting they removed Dr. Winkler from the Bronx Court Clinic.").  As the Court has held, those complaints were not protected, and therefore Plaintiff cannot sustain a retaliation claim on the theory that those complaints caused Defendants to take adverse action against her.  The earliest conduct identified in her briefing as protected under antidiscrimination law, in turn, was her complaints about pay on May 3, 2018. Opposition at 21, 24.  Since those complaints occurred after Dr. Winkler was promoted, which occurred in late March 2018, Dkt. 263-35, they could not have caused the promotion.  And in any event Plaintiff has identified no evidence to suggest that Defendants promoted him for any reason aside from the obvious non-retaliatory reason that they viewed him best qualified for the job.  Thus, Defendants are entitled to summary judgment with respect to the claim that they retaliated against Plaintiff by understaffing the Bronx Court Clinic or by declaring a "work stoppage" there.

## E.   Derivative Liability

Lastly, Plaintiff brings three claims under doctrines that allow for derivative liability once a plaintiff has established a violation of her rights—namely, *Monell* liability, liability under 42 U.S.C. § 1983, and aiding and abetting liability under the NYSHRL and the NYCHRL.  Because

the Court has found that Defendants did not violate Plaintiff's rights, those three claims must be dismissed as well.

First, *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).   But because the Court has found that no independent constitutional violation has occurred, there is no liability to extend to any municipal organization. *Id.* ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct.").   Thus, Defendants are entitled to summary judgment on Plaintiff's *Monell* claim.[43]

Second, while the Court has already addressed Plaintiff's section 1983 claims in analyzing the various constitutional provisions that she claims Defendants violated, Plaintiff's ninth cause of action brings a stand-alone claim under section 1983, which the Court will therefore briefly address separately.   Section 1983 provides a remedy for "any citizen of the United States or other person within the jurisdiction thereof" who suffers the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.   The Court has concluded that Plaintiff did not suffer the deprivation of any right, privilege, or immunity secured by the Constitution or laws.   Thus, Plaintiff has no remedy under section 1983, and Defendants are entitled to summary judgment on Plaintiff's section 1983 claim.

---

[43] The Court notes, in passing, that Plaintiff's arguments in support of her *Monell* claim would fail in any event because she appears to labor under the misconception that *Monell* is a theory of individual liability, not municipal liability.   *E.g.*, Opposition at 30 ("[T]he record is sufficient to establish <u>Monell</u> Liability for Defendant Yang.").

Third, under the NYSHRL and the NYCHRL, "accessory liability may only be found where a primary violation has been established." *White v. Pacifica Found.*, 973 F. Supp. 2d 363, 377 (S.D.N.Y. 2013); *see also Adams v. Equinox Holdings, Inc.*, No. 19 Civ. 8461 (JPC), 2023 WL 2561508, at *10 (S.D.N.Y. Mar. 17, 2023).  The Court has found that no violation of the NYSHRL or the NYCHRL occurred.  Consequently, Defendants are entitled to summary judgment on Plaintiff's aiding and abetting claim under the NYSHRL and the NYCHRL in her tenth cause of action.

## IV.  Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in full. The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 224, to strike the document at Docket Number 273-2, to enter judgment in favor of Defendants, and to close this case.

SO ORDERED.

Dated: March 31, 2023
     New York, New York

_____
JOHN P. CRONAN
United States District Judge

82